# EXHIBIT 10



IDEM JOB 05-07-064
*BILL OF COMPLAINT – TOKYO HIGH COURT*
*TRANSLATION FROM JAPANESE*

## CERTIFICATION OF ACCURACY

I CERTIFY, UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT WE ARE COMPETENT IN ENGLISH AND **JAPANESE** AND THAT THE FOLLOWING IS, TO THE BEST OF OUR KNOWLEDGE AND BELIEF, A TRUE, CORRECT, COMPLETE AND ACCURATE TRANSLATION OF THE ORIGINAL DOCUMENT.

NOVEMBER 15, 2005

HAMID NAYINI
PROJECT MANAGER
IDEM TRANSLATIONS, INC.

COPY

# Bill of Complaint

June 30, 2005

To: The Tokyo High Court

{Pages 1 and 2 omitted as requested.}

Case of claiming damages

| | |
|---|---|
| Amount of claims: | 5,496,000,000 yen |
| Amount of stamps affixed: | 11,520,000 yen |

3

1. Prayer

Plaintiff hereby claims that the following judgment and provisional execution be declared:

1. Defendant shall pay Plaintiff the sum of 50 million U.S. dollars and additional amount of payments at 5% per annum from the next day of delivery of this bill of complaint until all payments are made.

2. All expenses incurred by this action shall be borne by Defendant.

2. Causes of Action

I. Parties

1. Plaintiff AMD Japan Ltd. (hereinafter called "AMD Japan"), a wholly owned Japanese corporation of a U.S. corporation Advanced Micro Devices, Inc. (hereinafter called "AMD USA"), has its head office on the fifth floor of Shinjuku NS Building at 2-4-1 Nishishinjuku, Shinjuku-ku, Tokyo, and is doing business, as sales agent of AMD USA in Japan, in the sales of x86 family central processing units (hereinafter called "CPU") to be installed in personal computers (hereinafter called "PC") manufactured by AMD USA (CPU manufactured and sold by AMD USA is hereinafter called "AMD-made CPU" and the AMD group centered around AMD USA is called "AMD").

2. Defendant, a Japanese corporation wholly owned by Intel International which is in turn wholly owned by Intel Corporation (hereinafter called "Intel USA") located in Santa Clara, California, U.S.A. has its head office at 5-6 Tokodai, Tsukuba-shi, Ibaragi Prefecture, and is doing business in Japan in import and sales of CPUs manufactured and sold by Intel USA (CPU manufactured and sold by Intel USA is hereinafter called "Intel-made CPU" and the Intel group centered around Intel USA is called "Intel").

4

II. Background of this Antitrust Case

1. Investigation on this antitrust case and the Fair Trade Commission's advice

On April 8, 2004, the Fair Trade Commission of Japan conducted an on-site investigation of Defendant's offices and others in accordance with the Law Relating to Prohibition of Private Monopoly and Methods of Preserving Fair Trade (hereinafter called "Antitrust Law") to look into Defendant's violation of Antitrust Law. As a result, the Commission recognized that Defendant committed conducts that violate Article 3 of Antitrust Law, and issued a notice of advice to Defendant on March 8, 2005 based on Article 48, Section 1 of said law as provided below (Advice No. 1, 2005) (A1). The part of the text in bold letters below indicates quotations from either the notice of advice or advisory decision.

## Text of Judgment

1. **In importing CPUs manufactured and sold by Intel Corporation (i.e. x86 family central processing units to be installed in personal computers, same below) from said corporation, and in distributing these products to PC manufacturers in Japan (i.e. manufacturers/distributors of PCs having head offices in Japan, same below), Intel KK shall cease preventing domestic PC manufacturers from adopting CPUs manufactured by the competitors that are to be installed in all or most of the PCs, as it has been doing since around May of 2002 regarding CPUs manufactured and sold by domestic PC manufacturers, by means of promising to pay rebates or funds relevant to Intel-made CPUs under either of the following conditions:**

   (1) **Keep MSS (i.e. market share of CPUs to be installed in PCs manufactured and sold by Intel Corporation relative to those manufactured and sold by domestic PC manufacturers, same below) at 100% and not adopt the competitors' CPUs (i.e. CPUs manufactured and sold by businesses other than Intel Corporation); or**

   (2) **Keep MSS 90% and restrict the share of the competitors' CPUs at 10% or lower.**

2. Intel KK shall notify all domestic PC manufacturers having an account with it of the matters listed below and acquaint all of its employees with them. Regarding the specific method of said notification and information distribution, Intel KK shall obtain prior consent from the Fair Trade Commission of Japan.

   (1) Measures taken based on Section 1 above.

   (2) Notice to domestic PC manufacturers, regarding CPUs to be installed in PCs manufactured and sold by said manufacturers to the effect that the offering of rebates or funds relevant to Intel-made CPUs is not contingent upon non-adoption of any competitor's CPUs.

   (3) Notice to domestic PC manufacturers that Intel KK has ceased preventing them from adopting the competitors' CPUs regarding CPUs to be installed in all PCs belonging to multiple product lines that are produced in higher volume than others among PC product lines called "xx series" by means of promising to offer rebates relevant to Intel-made CPUs under the conditions that the CPUs adopted for installation in PCs belonging to said multiple product lines be switched to Intel-made CPUs so that Intel-made CPUs are installed in all PCs belonging to said multiple product lines and that such a situation be maintained.

3. Intel KK shall not exclude business activities of its competitors related to sales of CPUs to domestic PC manufacturers through the following conducts:

   (1) To pressure domestic PC manufacturers to keep the ratio of any competitor's CPUs at 0% or no more than 10%, regarding CPUs to be installed in PCs manufactured and sold by them, by means of promising to pay rebates or funds relevant to Intel-made CPUs under the conditions that the MSS be kept at 100% or no less than 90% and that such a situation be maintained.

   (2) To pressure domestic PC manufacturers, without valid reasons, not to adopt any competitor's CPUs, regarding CPUs to be installed in all PCs belonging to the multiple product lines that are produced in higher volume than others among PC product lines called "xx series", by means of promising to pay rebates or

funds relevant to Intel-made CPUs under the conditions that the CPUs to be installed in all PCs belonging to said multiple product lines be switched to Intel-made CPUs so that Intel-made CPUs are installed in all PCs belonging to said multiple product lines and that such a situation be maintained.

4. Intel KK shall take necessary measures to provide education related to Antitrust Law for its business executives and employees engaged in sales of CPUs and to conduct periodic audits by the company's legal counsel in order not to repeat the conducts described in Section 3 above in the future. The Commission shall approve these measures prior to implementation.

5. Intel KK shall inform the Commission of the measures it has taken based on Sections 1, 2 and 4 above without delay.

2. Defendant's acceptance of the advice and the advisory decision
   On April 1, 2005, Defendant accepted the above advice.
   On April 13, 2005, the Fair Trade Commission of Japan made an advisory decision in the same purport as said advice (A2).
   After the procedures taken on May 16, 2005, said decision was finalized.

III. Exclusionary conducts of Defendant recognized by the advisory decision
   1. Overview
      Defendant's exclusionary conducts recognized by the advisory decision (hereinafter called "Exclusionary Conducts in this Case") are as follows:
      In its effort to sell Intel-made CPUs to domestic PC manufacturers (i.e. manufacturers/distributors of PCs having head offices in Japan), Defendant, being a dominant business in the market of CPUs for PCs in Japan, abused its dominant position in the market and excluded Plaintiff's business activities from the competition by means of pressuring domestic PC manufacturers to switch CPUs to be installed in PCs manufactured

or sold by them from Intel-made to AMD-made in exchange for the promise of payment for rebates or funds under the conditions that 1) all the CPUs to be installed in PCs manufactured and sold by said manufacturers be Intel-made; 2) 90% of CPUs to be installed in PCs manufactured and sold by said manufacturers be Intel-made; or 3) all CPUs to be installed in PCs belonging to the multiple product lines called "xx series" that are produced in higher volumes than others manufactured and sold by said PC manufacturers be switched to Intel-made, for the purpose of excluding AMD-made CPUs imported and sold by Plaintiff, who is one of the competitors, from the CPU market for PCs in Japan.

2. Motif of Exclusionary Conducts in this Case

The advisory decision concluded that the motif of Exclusionary Conducts in this Case stems from the following: "**Since around the year 2000, as AMD Japan started to sell CPUs at lower prices than those of their competitor Intel and domestic PC manufacturers began installing AMD-made CPUs in their PCs in the middle-to-low end product lines from the viewpoint of price and function, the share of AMD-made CPUs in the total sales of all CPUs in Japan has risen from about 17% to 22% during the period from 2000 to 2002. Therefore, Intel Japan feared that the sales volume of AMD-made CPUs would continue to increase.**" (A2, page 5)

The background of Defendant's fear that the sales volume of AMD-made CPUs might continue to increase is the increasing difficulties for Intel to control AMD's CPU business due to AMD's strategy change to design and manufacture CPUs based on its own platform (i.e. design standard regulating all PC specifications, also termed "basic environment") since the introduction of seventh-generation of AMD-made CPUs represented by Athron and Duron. In other words, since AMD had been manufacturing its CPUs on a platform provided by Intel until the seventh-generation CPUs, Intel was able to control the volume of AMD's CPU business even indirectly by adjusting the timing of licensing for AMD and the production of CPU infrastructure such as mother boards. However, upon introduction of seventh-generation CPUs whereby AMD started

8

development and production of CPUs based on its own platform, Intel lost its means of control over AMD's CPU business.

In addition, the sales of AMD-made CPUs soared drastically especially those for PCs in low-to-middle end tiers from the viewpoint of price and function thanks to the success of AMD's sixth generation CPUs represented by K6 series.

Under these circumstances, Defendant has come to fear that the sales volume of AMD-made CPUs might continue to grow and committed Exclusionary Conducts in this Case aiming at maximizing its MSS for each PC manufacturer in Japan in order to maintain and enhance its dominant position in the market.

III. Specifics of Defendant's Exclusionary Conducts in this Case

(1) Exclusionary Conducts in this Case

Exclusionary Conducts in this Case are as follows (A2, page 6):

**Since around May of 2002, in an attempt to maximize MSS for each PC manufacturer, Defendant pressured five domestic PC manufacturers (during a period from 2000 to 2003, the share of CPU sales by Intel Japan, AMD Japan and Transmeta USA combined to these five companies relative to the total domestic sales of CPUs was about 77%) who directly distribute Intel-made CPUs not to adopt any competitor's CPUs for all or most of the PCs they manufacture or PCs belonging to specific product lines in exchange for the promise to pay rebates or MDF[1] under either of the following conditions regarding CPUs to be installed in PCs manufactured and sold by each of the five companies:**

**a) Keep MSS at 100% and not to adopt any CPUs other than Intel-made CPUs (hereinafter called "Competitor's CPUs").**

**b) Keep MSS at 90% and restrict Competitor's CPUs at 10% or lower.**

**c) Not to adopt Competitor's CPUs to be installed in all PCs belonging to multiple product lines that are produced in higher volume than others.**

---

[1] Market Development Fund

(2) Examples of Exclusionary Conducts in this Case

The advisory decision refers to the following facts as examples of Exclusionary Conducts in this Case (A2, page 6):

a) Intel Japan promised multiple domestic PC manufacturers to offer them rebates relevant to particular Intel-made PCs under the conditions that Competitor's CPUs to be installed in particular PCs manufactured and sold by them be switched to Intel-made CPUs, or adoption of Competitor's CPUs to be newly installed in particular PCs be stopped so that their MSS be at 100%, and that such a situation be maintained. Accordingly, said domestic PC manufacturers have boosted their MSS to nearly 100% and have maintained such a situation.

b) Intel Japan promised domestic PC manufacturers to offer them rebates or MDF relevant to particular Intel-made PCs under the conditions that their MSS be kept at 90% and the share of Competitor's CPUs restricted at 10% or lower and that such a situation be maintained. Accordingly, said domestic PC manufacturers have boosted their MSS to nearly 90% and keep the share of Competitor's CPUs relative to the purchase volume of all CPUs at about 10%, and such a situation has been maintained.

c) Intel Japan promised domestic PC manufactures to offer them rebates relevant to particular Intel-made PCs under the conditions that Competitor's CPUs adopted for particular PCs belonging to two product lines that have relatively high production volume among all PCs manufactured and sold by them be switched to Intel-made CPUs and Competitor's CPUs be not adopted for any PC belonging to said product lines, and that such a situation be maintained. Accordingly, said PC manufacturers installed Intel-made CPUs in all of their PCs belonging to said two product lines, and such a situation has been maintained.

(3) Five domestic PC manufacturers named in the advisory decision

"**Five of domestic PC manufacturers that directly sell Intel-made CPUs**" (A2, page 6) named in the advisory decision are Nippon Electric Co. Ltd.(hereinafter called "NEC"), Fujitsu Ltd. (hereinafter called "Fujitsu"), Sony Corporation (hereinafter called "Sony"), Toshiba Corporation (hereinafter called "Toshiba") and Hitachi Ltd. (hereinafter called "Hitachi").

An investigator in the Investigation Bureau of the Fair Trade Commission of Japan made it clear at a press conference on the day of issuing the advice that "five of domestic PC manufactures" named in the advisory decision refer to each of the above companies, which is reported by each major newspaper (A3-1 to A3-3).

(4) Specifics of Exclusionary Conducts related to NEC

① Exclusion from ValueStar L-series

Since around April of 2002, Defendant has been making a proposal to a subsidiary of NEC, NEC Custom Technica, Ltd. (currently NEC Personal Products Ltd., hereinafter called "Custom Technica") who has been in the business of development and production of PCs for mass consumption that AMD-made CPUs for all PC models belonging to ValueStar L-series of desktop PCs that had been continuously adopting AMD-made PCs be switched to Intel-made CPUs from the model introduced in the fall of 2002, and has told them that it would offer rebates if they accept said proposal, but if they don't, it would stop disclosing information on its development plan for new Intel products called "roadmap" and force them to exclude AMD-made CPUs from the ValueStar L-series from the model introduced in the fall of 2004, although it was not the time for platform renewal.

② Funding contingent upon the share restriction at 10%

In and around the first half of 2002, Defendant agreed with NEC Solutions Co. Ltd. who was then controlling the overall PC business of NEC to offer a financial assistance in the amount of approximately 300 million yen under the conditions that Intel-made CPUs be installed in no less than 90% of NEC-made PCs and Competitor's CPUs including those by AMD be restricted to less than 10%.

Defendant continued to bring down the share of AMD-made CPUs loaded in NEC-made PCs by making similar agreements and has been maintaining the level of below 10% since 2004 at the latest to the present.

The conduct described in Section 4-① is deemed to be one of Exclusionary Conducts in this Case c) above, and the conduct described in Section 4-② is deemed to be one of Exclusionary Conducts in this Case a) and its example a) above.

(5) Specifics of Exclusionary Conducts related to Fujitsu

① Preventing productization of FMV LIFE BOOK MG series

In and around February of 2003, Defendant asked Fujitsu not to adopt AMD-made CPUs for their thin-type notebook series PC FMW LIFE BOOK MG that were to be released in March of the same year for domestic businesses and forced them to call off their productization plan in exchange for offering discounts on Intel products.

② Exclusion from FM-BIBLO NB series

In and around March of 2003, Defendant pressured Fujitsu to switch CPUs for all of their notebook PC products to be released from the summer of 2003 for mass consumption, which were their flagship products FM-BIBLO NB series that had been continuously adopting AMD-made CPUs, to Intel-made CPUs in exchange for offering discounts in the total amount of 2 million US dollars on Intel products. As a result, AMD-made CPUs were excluded from FM-BIBLO NB series since the model released in the summer of 2003.

The conducts described in Item (5)-① and (5)-② are deemed to be one of Exclusionary Conducts in this Case c) and its example c) above.

(6) Specifics of Exclusionary Conducts related to Toshiba

   ① Funding on exclusionary conditions

In and around March of 2001, Defendant entered into an agreement with Toshiba Digital Media Network Company, a subsidiary of Toshiba doing business in production and sales of Toshiba-made PCs (hereinafter called "DM Company") that all of the CPUs to be installed in Toshiba-made PCs since around the second quarter of 2001 be Intel-made and none of AMD-made CPUs be adopted in exchange for offering a great amount of fund totaling over 100 million US dollars.

As a result, the production plan of DM Company's notebook PC Satellite series loaded with AMD-made CPUs to be released in June of 2001 was called off, and all AMD-made CPUs were excluded from Toshiba-made PCs.

Since then, Defendant has been maintaining such an exclusionary situation by making similar agreements to the above.

The conduct described in Item (6)-① is deemed to be one of Exclusionary Conducts in this Case a) and its example a) above.

(7) Specifics of Exclusionary Conducts related to Sony

   ① Funding on exclusionary conditions

In and around the first half of 2003, Defendant entered into an agreement with Sony or its subsidiary engaged in development and production of Sony's PCs to install Intel-made CPUs in all Sony-made PCs and not to adopt AMD-made CPUs after the summer and fall model releases in 2003 in exchange for offering a great amount of fund totaling about 10 million US dollars.

As a result, first as to the 2003 summer model, AMD-made CPUs were excluded from Vaio Note FR series, notebook PCs for domestic markets, that had been continuously adopting AMD-made CPUs, and from the 2003 fall model, AMD-made CPUs were excluded from said series for European markets that had barely kept the share of AMD-made CPUs as well as desktop PC Vaio-V series (SFF model), which

led to total exclusion of AMD-made CPUs from Sony's PCs. Since then, Defendant has been maintaining such an exclusionary situation by making similar agreements to the above.

The conduct described in Item (7)-① is deemed to be one of Exclusionary Conducts in this Case a) and its example a) above.

(8) Specifics of Exclusionary Conducts related to Hitachi

① Funding on exclusionary conditions

In and around May of 2002, Defendant entered into an agreement with Hitachi that all CPUs installed in all PCs manufactured by them be Intel-made and that AMD-made CPUs not adopted.

As a result, AMD-made CPUs were excluded from all Hitachi's PCs since the first quarter of 2004 at the latest, and Defendant has been maintaining such an exclusionary situation by making similar agreements to the above.

The conduct described in Item (8)-① is deemed to be one of Exclusionary Conducts in this Case a) and its example a) above.

## IV. Interference with Business other than Exclusionary Conducts in this Case

In addition to Exclusionary Conducts in this Case recognized in the advisory decision, Defendant committed interference with business in the following ways for the purpose of excluding AMD-made CPUs:

1. Related to NEC

Regarding the joint provider project with Intel USA, Defendant stated "If NEC would like to succeed in this project, it should not become the first manufacturer to adopt Athron (brand name of the newly released AMD-made CPU) in Japan, and pressured NEC to cancel or delay the production and sales of desktop PCs called ValueStar U-series loaded with Athron, the newly launched AMD-made CPU, that had been planned to be released in October of 1999, which ended up delaying the release to January of 2000.

15

As a result, the first domestic PC model loaded with Athron, which was AMD's new flagship product, was commercially produced not by NEC, the largest domestic PC manufacturer at that time, but by another manufacturer.

2. Related to Fujitsu

(1) Request for removal of models loaded with AMD-made CPUs from the Web sites

In the approximate period from June to August of 2002, Defendant pressured Fujitsu to remove models loaded with AMD-made CPUs from the Internet Web sites posting a lineup of desktop PC products manufactured and sold by them for businesses. As a result, images and information of the models loaded with AMD-made CPUs were removed from the Web sites posting a lineup of Fujitsu-made PCs so that they can be viewed only after clicking once on a model loaded with an Intel-made CPU.

(2) Request to remove models loaded with AMD-made CPUs from the product catalog

In and around January of 2003, Defendant attempted to force Fujitsu to remove Fujitsu-made PC models for businesses loaded with AMD-made CPUs from Fujitsu's product catalog in exchange for offering discounts on the price of Intel-made CPU Celeron as much as pleasing.

3. Related to Sharp

(1) Request for exclusion by offering discounts on license fees

Before around June of 2002, Defendant presented a proposal to Sharp Corporation (hereinafter called "Sharp") that all AMD-made CPUs to be installed in PCs manufactured by said company be switched to Intel-made CPUs under the condition that the license fee for general-purpose flash memories be discounted as offered by Defendant to Sharp in and prior to 1997.

(2) Request for increased share by intimating that the benefit could be deprived

Before around June of 2003, Defendant told Sharp that it would change the business channel from direct deals to via-agent ones and apply unfavorable treatments such as

deprivation of benefits if the share of Intel-made CPUs within Sharp remains as is (approximately 50%), and made a proposal that the share of Intel-made CPUs within Sharp be kept at 80% or more. Due to Sharp's rejection, this proposal was not implemented.

(3) Complaint against the Athron XP-M launch event held on March 12, 2003

On March 12, 2003, Sharp participated as "launch partner" (i.e. affiliated company) in the presentation event in Tokyo held by AMD Japan for launching its new product Athron XP-M, and presented the first note PC in Japan from Sharp called "Muramasa" loaded with Athron XP-M.

Since this launch event was held on the same day as that of Intel-made CPU Centrino, Defendant made a complaint against Sharp in a strong tone of voice saying "How dare you do it?" after the event.

4. Related to JCS

(1) Interference with participation in the Opteron launch event held on April 23, 2003

Japan Computing Systems Corporation (hereinafter called "JCS") was planning to participate in the launch event of Opteron, a new CPU product for servers, held by AMD Japan in Tokyo on April 23, 2003, whereas Defendant pressured JCS not to participate in the event and let it suddenly decline to participate one day before said event.

5. Related to Thirdwave

(1) Interference with participation in the Athron 64 launch event held on September 24, 2003

Defendant pressured Thirdwave Corporation (hereinafter called "Thirdwave") and Tsukumo Co. Ltd. who were planning to participate as launch partners in the launch event of the new eighth generation product Athron 64 held in Tokyo by AMD Japan on September 24, 2003 and let Thirdwave decline to participate in said event.

6. Related to MOE

(1) Purchase of PCs loaded with AMD-made CPUs delivered to "Real Vana'Diel"

At the opening of the internet café "Real Vana'Diel" operated by Melco Online Entertainment Corporation (hereinafter called "MOE"), Defendant purchased all PCs loaded with AMD-made Athron 64 CPUs that had been delivered for installation in said establishment, and forced MOE to replace them with PCs loaded with Intel-made CPUs. In that occasion, Defendant offered a great amount of fund to MOE totaling about 24 million yen only in the fiscal year 2004 by means of providing all the replacement PCs loaded with Intel-made CPUs without compensation, guaranteeing free upgrades for said PCs, and supplying funds to pay for the advertisement cost.

As to the PC peripherals to be installed in "Real Vana'Diel", MOE made it one of the main features to install a special assembly composed of parts with the best performance available at that time to provide "the best hardware network environment" and announced that it would introduce AMD-made Athron 64 CPUs in its own Internet home page as of November of 2003.

However, despite the high evaluation by the pubic for its best performance, AMD-made CPUs were deprived of their opportunities to make the fair evaluation known to the public due to Defendant's conducts described above.

7. Related to editors of PC magazines

(1) Instruction to delete/modify articles on AMD-made CPUs in PC magazines

Defendant prevented the fair evaluation of AMD-made CPUs from being published forcing editors of PC magazines to delete their articles on AMD-made CPUs to be published in PC magazines edited and issued by said editors and to modify the contents of their articles highly evaluating the performance of said CPUs by saying "We won't run the ad again or rent out our products," as well as by means of intimating unfavorable treatments in the business deals in the event they do not follow Defendant's intent.

V. Exclusionary Conducts in this Case as Defendant's Abuse of Dominant Position in the Market

1. Defendant's dominant position in the market

According to the data (A4-1 to A4-3) from Dataquest of the US market research firm Gartner Group, Inc., the share of Intel-made CPUs in the domestic CPU market for PCs was about 82.2% (about 14.5% for AMD-made CPUs) in 2003, and about 87.0% (about 10.4%, ditto) in 2004, indicating that Intel-made CPUs are enjoying dominantly large share in the CPU market. Also, Intel-made CPUs, together with AMD-made CPUs, are leading the innovation of CPU technology, and its domestic sales volume accounts for the great majority of the total sales volume of CPUs in Japan. Also, Defendant is working on establishment and enhancement of brand power of Intel-made CPUs by means of promoting business activities relevant to PCs loaded with Intel-made CPUs for domestic PC manufacturers through the support system of advertisement and promotion activities for domestic PC manufacturers.

Backed by its tremendous funding capability, market share of Intel-made CPUs and brand power, Defendant has been consistently providing domestic PC manufacturers with a wide range of CPU products from CPUs for high-performance PCs (called 'high-end products") to those for lower performance PCs (called 'low-end products") from the viewpoint of price and function, and has come to take the dominant position in the CPU market for PCs in Japan.

2. Exclusionary Conducts in this Case as abuse of dominant position in the market

As described above, the core of Exclusionary Conducts in this Case lies in such conducts as preventing domestic PC manufacturers from purchasing Competitor's CPUs or restricting their purchase volume to a certain level by means of offering a great amount of funds to domestic PC manufacturers and notifying them of unfavorable treatments in the business deals. Such conducts are necessarily contingent upon Defendant's dominant position in the market.

In other words, first of all, the very reason that Defendant could resort to the means of offering a great amount of fund was that it was in a dominant position in the market, and therefore, possessed tremendous financial power. Defendant has financed domestic PC manufacturers in the total amount of as much as 100 million US dollars, which could not have been possible unless Defendant was in the dominant position in the market.

Also, as evident from the fact that the timing of Exclusionary Conducts coincides with the period when the business performances of domestic PC manufacturers were in a slump, the great amount of funding from Defendant was extremely appealing for domestic PC manufacturers suffering from the business slump, and there was a situation where they had no choice but to be under the thumb of Intel.

In addition, Defendant was successful in excluding AMD-made CPUs by notifying domestic PC manufacturers of the unfavorable treatments in its business deals such as cancellation of disclosure of technical information on Intel-made CPUs, just because Defendant was in the dominant position in the market. In other words, domestic PC manufacturers would face much hardship in developing and producing their new products loaded with Intel-made CPUs if the technical information thereof is not disclosed to them, which necessarily gives a fatal blow to their business that would let them lag behind other companies in the highly competitive industry of production and development of PCs. In fear of such retaliatory treatments, domestic PC manufacturers had no choice but to take actions in line with Defendant's intentions.

As mentioned above, it is evident that domestic PC manufacturers were forced to take actions in line with Defendant's intentions judging from that Defendant was micro-managing the matters that should have been determined by PC manufacturers themselves, such as contents of their product catalogs and Web sites, or whether or not to participate in the launch events for AMD products as described in Section IV "Interference with Business other than Exclusionary Conducts in this Case" as well as the fact that Defendant was successful in letting them ultimately follow its instructions in most cases.

Exclusionary Conducts of Defendant were committed, backed by its dominant position in the market, in a way that gives virtually no choice for domestic PC

manufacturers other than to purchase Intel-made CPUs in their procurement in order to exclude AMD products from the market of CPUs for PCs, and therefore, it is nothing but abuse of the dominant position in the market on the part of Defendant.

3. Effect of exclusion in the market

As a result of Exclusionary Conducts in this Case, the share of AMD-made CPUs relative to the total sales of CPUs in Japan dropped from about 22.2% in 2002 to about 14.5% in 2003, and further to 10.4% in 2004 (A4-1 to A4-3).

VI. Damages and Causal Relationship

The damages sustained by Plaintiff due to Exclusive Conducts in this Case is worth the lost profit from commission income which is equal to 8% of lost earnings incurred by AMD caused by said conducts, which amounts to no less than 50 million US dollars as far as we know at this moment. Details of damages and their amount will be claimed later in a brief we are planning to submit.

VII.    Accordingly, Plaintiff hereby claims that Defendant make a payment in the amount of 50 million US dollars and the amount of late charge at 5% per annum, as provided by the civil law, from the next day of delivery of this bill of complaint until all payments are made.

## Instrument of Evidence

| | | |
|---|---|---|
| 1. Evidence A1 | | Notice of advice |
| 2. Evidence A2 | | Advisory decision |
| 3. Evidence A3-1 | | Newspaper article (morning edition of Asahi Shinbun dated March 9, 2005) |
| 4. Evidence A3-2 | | Newspaper article (morning edition of Nikkei Shinbun dated March 9, 2005) |
| 5. Evidence A3-3 | | Newspaper article (morning edition of Mainichi Shinbun dated March 9, 2005) |
| 6. Evidence A4-1 | | Table titled "Japan PC Shipment – Total Unit –" |
| 7. Evidence A4-2 | | Table titled "Japan PC Shipment – Total Share –" |
| 8. Evidence A4-3 | | Graph titled "Transition of Total Share" |

## Attachments

| | |
|---|---|
| 1. Copy of Bill of Complaint | 1 |
| 2. Copies of Evidences A | 2 each |
| 3. Power of attorney (instruction) | 1 |
| 4. Entire certificate of registered and current matters | 2- {illegible} (Seal) |