# EXHIBIT 11



**idem**
Translations, Inc.

IDEM JOB 05-07-191
*BILL OF COMPLAINT:*
*The Tokyo District Court, Civil Affairs Division*
*TRANSLATION FROM JAPANESE*

# CERTIFICATION OF ACCURACY

I CERTIFY, UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT WE ARE COMPETENT IN ENGLISH AND **JAPANESE** AND THAT THE FOLLOWING IS, TO THE BEST OF OUR KNOWLEDGE AND BELIEF, A TRUE, CORRECT, COMPLETE AND ACCURATE TRANSLATION OF THE ORIGINAL DOCUMENT.

NOVEMBER 15, 2005

HAMID NAYINI
PROJECT MANAGER
IDEM TRANSLATIONS, INC.

**IDEM JOB 05-07-191 PAGE 1**

COPY

# Bill of Complaint

June 30, 2005

To: The Tokyo District Court, Civil Affairs Division

|                          |                          |
|--------------------------|--------------------------|
| Counsel to Plaintiff and agent ad litem: | Hideo Chigusa (seal) |
| ditto (chief)            | Motokazu Kikuchi (seal)  |
| ditto                    | Yukio Yanagida (seal)    |
| ditto                    | Naoki Yanagida (seal)    |
| ditto                    | Keiko Kouno (seal)       |
| ditto                    | Kazuya Yoneyama (seal)   |

1

IDEM JOB 05-07-191 PAGE 2

| | |
|---|---|
| Plaintiff: | AMD Japan Ltd. |
| Represented by<br>Representative Director: | David Michael Use<br>Shinjuku NS Bldg. 5th floor, 2-4-1 Nishishinjuku, Shinjuku-ku,<br>Tokyo  〒163-0839 |
| Counsel to Plaintiff<br>represented by: | Hideo Chigusa<br>3-4-23 Higashinakano, Nakano-ku, Tokyo     〒164-0003<br>TEL. 03-3361-5797<br>FAX. 03-3361-5797 |
| Counsel to Plaintiff: | Motokazu Kikuchi, Chief |
| ditto | Yukio Yanagida |
| ditto | Naoki Yanagida |
| ditto | Keiko Kouno |
| ditto | Kazuya Yoneyama |
| | Yanagida & Nomura Law Firm |
| | (Mailing address)<br>1310 North Tower, Yurakucho Denki Building,<br>7-1 Yurakucho 1-chome, Chiyoda-ku, Tokyo  〒100-0006<br>TEL. 03-3213-0034<br>FAX. 03-3214-5234 |
| Defendant: | Intel Japan Ltd. |
| Represented by<br>Representative Director: | Kazumasa Yoshida<br>5-6 Toukodai, Tsukuba-shi, Ibaragi Prefecture  〒300-2635 |

2

A Case of Damage Claims

| | |
|---|---|
| Amount of claims: | 6,045,600,000 yen |
| Amount of stamps affixed: | 12,070,000 yen |

## Prayer for Relief

Plaintiff hereby claims that the following judgment and provisional execution be declared:

1. Defendant shall pay Plaintiff the sum of 55,000,000 (fifty-five million) U.S. dollars and additional amount of payments at 5 (five) per cent per annum from the next day of delivery of this Bill of Complaint until all payments are made.

2. All expenses incurred by this action shall be borne by Defendant.

## Causes of Action

### I. Parties

1. Plaintiff AMD Japan Ltd. (hereinafter called "AMD Japan"), a wholly owned Japanese corporation of a U.S. corporation Advanced Micro Devices, Inc. (hereinafter called "AMD USA"), has its head office on the fifth floor of Shinjuku NS Building at 2-4-1 Nishishinjuku, Shinjuku-ku, Tokyo, and is doing business, as sales agent of AMD USA in Japan, in the sales of x86 family central processing units (hereinafter called "CPU") to be installed in personal computers (hereinafter called "PC") manufactured by AMD USA (CPU manufactured and sold by AMD USA is hereinafter called "AMD-made CPU" and the AMD group centered around AMD USA is called "AMD").

2. Defendant, a Japanese corporation wholly owned by Intel International which is in turn wholly owned by Intel Corporation (hereinafter called "Intel USA") located in Santa Clara, California, U.S.A. has its head office at 5-6 Toukodai, Tsukuba-shi, Ibaragi Prefecture, and is doing business in Japan in import and sales of CPUs manufactured and sold by Intel USA (CPU manufactured and sold by Intel USA is hereinafter called "Intel-made CPU" and the Intel group centered around Intel USA is called "Intel").

### II. Unlawful Acts of Defendants

1. Overview of Unlawful Acts

IDEM JOB 05-07-191 PAGE 5

Defendant, being a dominant business in the market of CPUs for PCs in Japan, abused its dominant position in the market and was engaged in the following unlawful acts (hereinafter called "Unlawful Acts of this Case") for the purpose of excluding AMD-made CPUs imported and sold by Plaintiff, who is one of the competitors, from the Japanese market of CPUs for PCs:

(1) Exclusionary conducts against AMD

Defendant committed exclusionary conducts by pressuring 5 of Japanese PC manufacturers (i.e. manufacturers/distributors of PCs having head offices in Japan), which are Nippon Electric Co. Ltd.(hereinafter called "NEC"), Fujitsu Ltd. (hereinafter called "Fujitsu"), Sony Corporation (hereinafter called "Sony"), Toshiba Corporation (hereinafter called "Toshiba") and Hitachi Ltd. (hereinafter called "Hitachi") not to adopt the competitors' CPUs regarding CPUs to be installed in all or most PCs or those belonging to particular product lines that are called "xx series" by means of promising to offer rebates or fund called "market development fund" (hereinafter called "MDF") relevant to Intel-made CPUs under either of the following conditions a) to c):

a) Keep MSS (i.e. market share of CPUs to be installed in PCs manufactured and sold by Intel Corporation relative to those manufactured and sold by domestic PC manufacturers) at 100% and not adopt CPUs manufactured and sold by businesses other than Intel Corporation (hereinafter called "Competitors' CPUs);

b) Keep MSS 90% and restrict the share of Competitors' CPUs at 10% or lower; or

c) Not to adopt Competitors' CPUs regarding CPUs to be installed in all PCs belonging to multiple product lines that are produced in higher volume than others among PC product lines called "xx series."

(2) Interference with AMD's business activities

① Interference with posting information on products loaded with AMD-made CPUs on catalogs and Web sites.

5

IDEM JOB 05-07-191 PAGE 6

Defendant asked domestic PC manufacturers to remove their products loaded with AMD-made CPUs from their catalogs and Internet Web sites posting PC products manufactured and sold by them, and forced them to modify related information so that general consumers have a hard time viewing it.

② Interference with proposed deals highly effective in advertising AMD-made CPUs

Defendant interfered with proposed deals expected to be highly effective in advertising AMD-made CPUs by means of intimating special funding for its business customers or unfavorable treatments in the business deals.

③ Interference with launch events

Defendant interfered with presentation events for new products called "launch event" for AMD-made CPUs by means of pressuring business customers including domestic PC manufactures who had been planning to participate in such launch events to decline participation.

④ Instruction to delete/modify articles on AMD-made CPUs in PC magazines

Defendant prevented the fair evaluation of AMD-made CPUs from being published forcing editors of PC magazines to delete their articles on AMD-made CPUs to be published in the magazines edited and issued by said editors and to modify the contents of their articles highly evaluating the performance of said CPUs by means of intimating unfavorable treatments in the business deals in the event they do not follow Defendant's intent, for example, by saying "We won't run the ad again or rent out our products."

2. Specific Unlawful Acts against Each Business Customer and the Circumstances

(1) Related to NEC

① Interference with the release of ValueStar U-series

Defendant pressured a subsidiary of NEC, NEC Custom Technica, Ltd. (currently NEC Personal Products Ltd., hereinafter called "Custom Technica") who had been in

6

the business of development and production of PCs for mass consumption, to cancel or postpone production and sales of desktop PCs loaded with Athron (brand name of the newly released AMD-made CPU), which is called ValuStar U-series and planned to be released by the company in October of 1999 by stating that "If NEC would like to succeed in this project, it should not become the first manufacturer to adopt Athron in Japan regarding the joint venture project as provider with Intel USA planned by NEC at that time, which ended up delaying the release to January of 2000.

As a result, the first domestic PC model loaded with Athron, which was AMD's new flagship product, was commercially produced not by NEC, the largest domestic PC manufacturer at that time, but by another manufacturer.

② Exclusion from ValueStar L-series

Since around April of 2002, Defendant has been making a proposal to Custom Technica that AMD-made CPUs for all PC models belonging to ValueStar L-series of desktop PCs that had been continuously adopting AMD-made PCs be switched to Intel-made CPUs from the model introduced in the fall of 2002, telling them that it would offer rebates if they accept said proposal, but if they don't, it would stop disclosing information on its development plan for new Intel products called "roadmap," and forced them to exclude AMD-made CPUs from the ValueStar L-series from the model introduced in the fall of 2004, although it was not the time for renewal of the platform (i.e. design standard regulating all PC specifications, also termed "basic environment").

③ Funding contingent upon the share restriction at 10%

In and around the first half of 2002, Defendant agreed with NEC Solutions Co. Ltd., who was then controlling the overall PC business of NEC, to offer a financial assistance in the amount of approximately 300 million yen under the conditions that Intel-made CPUs be installed in no less than 90% of NEC-made PCs and Competitors' CPUs including those by AMD be restricted to less than 10%.

Defendant continued to bring down the share of AMD-made CPUs installed in NEC-made PCs by making similar agreements and has been maintaining the level of below 10% since around 2004 to the present.

(2) Related to Fujitsu

① Request for removal of models loaded with AMD-made CPUs from Web sites

In the approximate period from June to August of 2002, Defendant pressured Fujitsu to remove models loaded with AMD-made CPUs from the Internet Web sites posting a lineup of desktop PC products manufactured and sold by them for businesses. As a result, images and information of the models loaded with AMD-made CPUs were removed from the Web sites posting a lineup of Fujitsu-made PCs so that they can be viewed only after clicking once on a model loaded with an Intel-made CPU.

② Request to remove models loaded with AMD-made CPUs from the product catalog

In and around January of 2003, Defendant requested that Fujitsu remove its PC models for businesses loaded with AMD-made CPUs from Fujitsu's product catalog in exchange for offering discounts on the price of Intel-made CPU Celeron as much as pleasing.

③ Preventing productization of FMV LIFE BOOK MG series

In and around February of 2003, Defendant asked Fujitsu not to adopt AMD-made CPUs for their thin-type notebook series PC FMW LIFE BOOK MG that were to be released in March of the same year for domestic businesses and forced them to call off their productization plan in exchange for offering discounts on Intel products.

④ Exclusion from FM-BIBLO NB series

In and around March of 2003, Defendant pressured Fujitsu to switch CPUs for all of their notebook PC products to be released from the summer of 2003 for mass consumption, which were their flagship products FM-BIBLO NB series that had been continuously adopting AMD-made CPUs, to Intel-made CPUs in exchange for offering discounts in the total amount of 2 million US dollars on Intel products. As a result,

AMD-made CPUs were excluded from FM-BIBLO NB series since the model released in the summer of 2003.

(3) Related to Toshiba

① Funding on exclusionary conditions

In and around March of 2001, Defendant entered into an agreement with Toshiba Digital Media Network Company, a subsidiary of Toshiba doing business in production and sales of Toshiba-made PCs (hereinafter called "DM Company") that all of the CPUs to be installed in Toshiba-made PCs since around the second quarter of 2001 be Intel-made and none of AMD-made CPUs be adopted in exchange for offering a great amount of fund totaling over 100 million US dollars.

As a result, the production plan of DM Company's notebook PC Satellite series loaded with AMD-made CPUs to be released in June of 2001 was called off, and all AMD-made CPUs were excluded from Toshiba-made PCs.

Since then, Defendant has been maintaining such an exclusionary situation by making similar agreements to the above.

(4) Related to Sony

① Funding on exclusionary conditions

In and around the first half of 2003, Defendant entered into an agreement with Sony or its subsidiary engaged in development and production of Sony's PCs to install Intel-made CPUs in all Sony-made PCs and not to adopt AMD-made CPUs after the summer and fall model releases in 2003 in exchange for offering a great amount of fund totaling about 10 million US dollars.

As a first result, regarding the 2003 summer model, AMD-made CPUs were excluded from Vaio Note FR series, notebook PCs for domestic markets, that had been continuously adopting AMD-made CPUs, and from the 2003 fall model, AMD-made CPUs were excluded from said series for European markets and their desktop PCs (SFF model of Vaio-V series) that had barely kept the share of AMD-made CPUs, which led to total exclusion of AMD-made CPUs from Sony's PCs. Since then, Defendant has

been maintaining such an exclusionary situation by making similar agreements to the above.

(5) Related to Hitachi

  ① Funding on exclusionary conditions

    In and around May of 2002, Defendant entered into an agreement with Hitachi that all CPUs installed in all PCs manufactured by them be Intel-made and that AMD-made CPUs not adopted.

    As a result, AMD-made CPUs were excluded from all Hitachi's PCs since the first quarter of 2004 at the latest, and Defendant has been maintaining such an exclusionary situation by making similar agreements to the above.

(6) Related to Sharp

  ① Request for exclusion by offering discounts on license fees

    Before around June of 2002, Defendant presented a proposal to Sharp Corporation (hereinafter called "Sharp") that all AMD-made CPUs to be installed in PCs manufactured by said company be switched to Intel-made CPUs under the condition that the license fee offered by Defendant to Sharp in and prior to 1997 for general-purpose flash memories be discounted.

  ② Request for increased share by intimating that the benefit could be deprived

    Before around June of 2003, Defendant told Sharp that it would change the business channel from direct deals to via-agent ones and apply unfavorable treatments such as deprivation of benefits such as offering of MDF if the share of Intel-made CPUs within Sharp remains as is (approximately 50%), and made a proposal that the share of Intel-made CPUs within Sharp be kept at 80% or more. Due to Sharp's rejection, this proposal was not implemented.

  ③ Complaint against the Athron XP-M launch event held on March 12, 2003

On March 12, 2003, Sharp participated as "launch partner" (i.e. affiliated company) in the presentation event in Tokyo held by AMD Japan for launching its new product Athron XP-M, and presented the first notebook PC in Japan from Sharp called "Muramasa" loaded with Athron XP-M.

Since this launch event was held on the same day as that of Intel-made CPU Centrino, Defendant made a complaint against Sharp in a strong tone of voice saying "How dare you do it?" after the event.

(7) Related to JCS

① Interference with participation in the Opteron launch event held on April 23, 2003

Japan Computing Systems Corporation (hereinafter called "JCS") was planning to participate in the launch event of Opteron, a new CPU product for servers, held by AMD Japan in Tokyo on April 23, 2003, whereas Defendant pressured JCS not to participate in the event and let it suddenly decline to participate one day before said event.

(8) Related to Thirdwave

① Interference with participation in the Athron 64 launch event held on Sept. 24, 2003

Defendant pressured Thirdwave Corporation (hereinafter called "Thirdwave") and Tsukumo Co. Ltd. who were planning to participate as launch partners in the launch event of the new product Athron 64 held in Tokyo by AMD Japan on September 24, 2003 and let Thirdwave decline to participate in said event.

(9) Related to MOE

① Purchase of PCs loaded with AMD-made CPUs delivered to "Real Vana'Diel"

At the opening of the internet café "Real Vana'Diel" operated by Melco Online Entertainment Corporation (hereinafter called "MOE"), Defendant purchased all PCs loaded with AMD-made Athron 64 CPUs that had been delivered for installation in said establishment, and forced MOE to replace them with PCs loaded with Intel-made CPUs. In that occasion, Defendant offered a great amount of fund to MOE totaling

about 24 million yen only in the fiscal year 2004 by means of providing all the replacement PCs loaded with Intel-made CPUs without compensation, guaranteeing free upgrades for said PCs, and supplying funds to pay for the advertisement cost.

As to the PC peripherals to be installed in "Real Vana'Diel", MOE made it one of the main features to install a special assembly composed of parts with the best performance available at that time to provide "the best hardware network environment" and announced in its own Internet home page in November of 2003 that it would introduce AMD-made Athron 64 CPUs.

However, despite the high evaluation by the customer MOE for its best performance, AMD-made CPUs were deprived of their opportunities to make the fair evaluation known to the public due to Defendant's conducts described above.

(10) Related to editors of PC magazines

Defendant prevented the fair evaluation of AMD-made CPUs from being published forcing editors of PC magazines to delete their articles on AMD-made CPUs to be published in the magazines edited and issued by said editors and to modify the contents of their articles highly evaluating the performance of said CPUs by means of intimating unfavorable treatments in the business deals in the event they do not follow Defendant's intent, for example, by saying "We won't run the ad again or rent out our products."

3. Defendant's Unlawful Acts Constitute Abuse of Dominant Position in the Market

(1) Defendant's dominant position in the market

According to the data (A4-1 to A4-3) from Dataquest of the US market research firm  Gartner Group, Inc., the share of Intel-made CPUs in the domestic CPU market for PCs was about 82.2% (about 14.5% for AMD-made CPUs) in 2003, and about 87.0% (about 10.4%, ditto) in 2004, indicating that Intel-made CPUs are enjoying dominantly large share in the CPU market in Japan. Also, Intel-made CPUs, together with AMD-made CPUs, are leading the innovation of CPU technology, and its

domestic sales volume accounts for the great majority of the total sales volume of CPUs in Japan. Also, Defendant is working on establishment and enhancement of brand power of Intel-made CPUs by means of promoting business activities relevant to PCs loaded with Intel-made CPUs for domestic PC manufacturers through the support system of advertisement and promotion activities for domestic PC manufacturers.

Backed by its tremendous funding capability, market share of Intel-made CPUs and their brand power, Defendant has been consistently providing domestic PC manufacturers with a wide range of CPU products from CPUs for high-performance PCs (called 'high-end products") to those for lower performance PCs (called 'low-end products") from the viewpoint of price and function, and has come to take the dominant position in the CPU market for PCs in Japan.

(2) Defendant's abuse of its dominant position in the market

As described above, the core of Unlawful Acts of this Case lies in such conducts as preventing domestic PC manufacturers from purchasing Competitors' CPUs or restricting their purchase volume to a certain level by means of offering a great amount of funds to domestic PC manufacturers and notifying them of unfavorable treatments in the business deals. Such conducts are necessarily contingent upon Defendant's dominant position in the market.

In other words, first of all, the very reason that Defendant could resort to the means of offering a great amount of fund was that it was in a dominant position in the market, and therefore, possessed tremendous financial power. Defendant has financed domestic PC manufacturers in the total amount of as much as 100 million US dollars, which could not have been possible unless Defendant was in the dominant position in the market.

Also, as evident from the fact that the timing of the exclusionary conducts coincides with the period when the business performances of domestic PC manufacturers were in a slump, the great amount of funding from Defendant was extremely appealing for

domestic PC manufacturers suffering from the business slump, and there was a situation where they had no choice but to be under the thumb of Intel.

In addition, Defendant was successful in excluding AMD-made CPUs by notifying domestic PC manufacturers of the unfavorable treatments in its business deals such as cancellation of disclosure of technical information on Intel-made CPUs, just because Defendant was in the dominant position in the market. In other words, domestic PC manufacturers would face much hardship in developing and producing their new products loaded with Intel-made CPUs if the technical information thereof is not disclosed to them, which necessarily gives a fatal blow to their business that would let them lag behind other companies in the highly competitive industry of production and development of PCs. In fear of such retaliatory treatments, domestic PC manufacturers had no choice but to take actions in line with Defendant's intentions.

As mentioned above, it is evident that domestic PC manufacturers were forced to take actions in line with Defendant's intentions judging from that Defendant was micro-managing the matters that should have been determined by PC manufacturers themselves, such as contents of their product catalogs and Web sites, or whether or not to participate in the launch events for AMD products as well as the fact that Defendant was successful in letting them ultimately follow its instructions in most cases.

Unlawful Acts of this Case were committed, backed by its dominant position in the market, in a way that gives virtually no choice for domestic PC manufacturers other than to purchase Intel-made CPUs in their procurement in order to exclude AMD products from the market of CPUs for PCs, and therefore, it is nothing but abuse of a dominant position in the market on the part of Defendant.

(3) Defendant's motif in abusing its dominant position in the market

In the background of Defendant's abuse of its dominant position in the market lie more difficulties for Intel to control AMD's CPU business than ever before due to AMD's strategy change to design and manufacture CPUs based on its own platform since the introduction of seventh-generation of AMD-made CPUs represented by those

14

IDEM JOB 05-07-191 PAGE 15

brand names as Athron and Duron. In other words, since AMD had been manufacturing its CPUs on a platform provided by Intel until the sixth-generation CPUs, Intel was able to control the volume of AMD's CPU business even indirectly by adjusting the timing of licensing for AMD and the production of CPU infrastructure such as mother boards. . However, upon introduction of seventh-generation CPUs whereby AMD started development and production of CPUs based on its own platform, Intel lost its means of control over AMD's CPU business.

In addition, the sales of AMD-made CPUs soared drastically especially those for PCs in low-to-middle end tiers from the viewpoint of price and function thanks to the success of AMD's sixth generation CPUs represented by K6 series.

Under these circumstances, Defendant has come to fear that the sales volume of AMD-made CPUs might continue to grow and committed abuse of its dominant position in the market.

(4) Effect of exclusion in the market

As a result of Unlawful Acts of this Case, the share of AMD-made CPUs relative to the total sales of CPUs in Japan dropped from about 22.2% in 2002 to about 14.5% in 2003, and further to 10.4% in 2004 (A4-1 to A4-3).

15

### III. Fair Trade Commission's advice to Defendant

1. Fair Trade Commission's advice

On April 8, 2004, the Fair Trade Commission of Japan conducted an on-site investigation of Defendant's offices and others in accordance with the Law Relating to Prohibition of Private Monopoly and Methods of Preserving Fair Trade (hereinafter called "Antitrust Law") to look into Defendant's violation of Antitrust Law. As a result, the Commission recognized that Defendant committed conducts that constitute private monopoly in violation of Article 3 of Antitrust Law, and issued a notice of advice to Defendant on March 8, 2005 based on Article 48, Section 1 of said law as provided below (Advice No. 1, 2005) (A1). In the advisory report, "five of domestic PC manufactures directly distributing Intel-made CPUs" refer to NEC, Fujitsu, Sony, Toshiba and Hitachi. This event was reported by each major newspaper (A3-1 to A3-3).

2. Summary of acts recognized as violating the Law

In its effort to sell Intel-made CPUs to domestic PC manufacturers, Defendant, being a dominant business in the market of CPUs for PCs in Japan, abused its dominant position in the market and excluded Plaintiff's business activities from the competition by means of pressuring five domestic PC manufacturers, NEC, Fujitsu, Toshiba, Sony and Hitachi, to switch CPUs to be installed in the PCs manufactured and sold by them from Intel-made to AMD-made in exchange for the promise of payment for rebates or funds under the conditions that 1) all the CPUs to be installed in PCs manufactured and sold by said manufacturers be Intel-made; 2) 90% of CPUs to be installed in PCs manufactured and sold by said manufacturers be Intel-made; or 3) all CPUs to be installed in PCs belonging to the multiple product lines called "xx series" that are produced in higher volumes than others manufactured and sold by said PC manufacturers be switched to Intel-made, for the purpose of excluding CPUs imported and sold by AMD Japan, who is one of the competitors, from the CPU market for PCs in Japan.

3. Defendant's acceptance of the advice and the advisory decision

On April 1, 2005, Defendant accepted the above advice.

On April 13, 2005, the Fair Trade Commission of Japan made an advisory decision in the same purport as said advice (A2).

After the procedures taken on May 16, 2005, said decision became final.

## IV. Damages and Causal Relationship

1.    The amount of damages inflicted by Defendant's Unlawful Acts of this Case is a sum of the damage caused by the exclusionary conducts against AMD (lost profits from the commission income equal to 8% of AMD's unrealized income due to the exclusionary conducts) and the damage arising from interference with AMD's business activities. As far as known to date, the above total sum is no less than fifty-five million US dollars. More on the specifics and amount of damages will be claimed in the brief.

2.    On June 30, 2005, Plaintiff filed a suit with the Tokyo High Court against Defendant to claim damages in accordance with Article 25 of Antitrust Law.

In said lawsuit, Plaintiff claimed damages caused by the violation of law recognized in the advisory decision on the basis of said finalized decision by the Fair Trade Commission, while in this Case, Plaintiff claims damages caused by Unlawful Acts of this Case as a whole including said violation of law recognized in the advisory decision as well as interference with business activities by Defendant.

V.    From all of the above, Plaintiff hereby claims that Defendant pay the sum of 55,000,000 (fifty-five million) U.S. dollars and additional amount of payments at the statutory rate of interest of 5% per annum from the next day of delivery of this Bill of Complaint until all payments are made as reparation for damages based on Article 709 of the Civil Law.

17

Instrument of Evidence

1. Evidence A1          Notice of advice

2. Evidence A2          Advisory decision

3. Evidence A3-1        Newspaper article
                        (morning edition of Asahi Shinbun dated March 9, 2005)

4. Evidence A3-2        Newspaper article
                        (morning edition of Nikkei Shinbun dated March 9, 2005)

5. Evidence A3-3        Newspaper article
                        (morning edition of Mainichi Shinbun dated March 9, 2005)

6. Evidence A4-1        Table titled "Japan PC Shipment – Total Unit –"

7. Evidence A4-2        Table titled "Japan PC Shipment – Total Share –"

8. Evidence A4-3        Graph titled "Transition of Total Share"


Attachments


1. Copy of Bill of Complaint                              1

2. Copies of Evidences A                                 2 each

3. Power of attorney (instruction)                       1

4. Entire certificate of registered and current matters   2- {illegible} (seal)


18

# EXHIBIT 12

15 USCS § 6a

LEXSTAT 15 USC SEC. 6A

UNITED STATES CODE SERVICE
Copyright © 2005 Matthew Bender & Company, Inc.,
one of the LEXIS Publishing (TM) companies
All rights reserved

*** CURRENT THROUGH P.L. 109-94, APPROVED 10/26/05 ***

TITLE 15. COMMERCE AND TRADE
CHAPTER 1. MONOPOLIES AND COMBINATIONS IN RESTRAINT OF TRADE

GO TO CODE ARCHIVE DIRECTORY FOR THIS JURISDICTION

15 USCS § 6a (2005)

§ 6a. Conduct involving trade or commerce with foreign nations

This Act [15 USCS § § 1 et seq.] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless--
  (1) such conduct has a direct, substantial, and reasonably foreseeable effect--
    (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
    (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
  (2) such effect gives rise to a claim under the provisions of this Act [15 USCS § § 1 et seq.], other than this section.

If this Act [15 USCS § § 1 et seq.] applies to such conduct only because of the operation of paragraph (1)(B), then this Act [15 USCS § § 1 et seq.] shall apply to such conduct only for injury to export business in the United States.

HISTORY:
  (July 2, 1890, ch 647, § 7, as added Oct. 8, 1982, P.L. 97-290, Title IV, § 402, 96 Stat. 1246.)

HISTORY; ANCILLARY LAWS AND DIRECTIVES

Explanatory notes:
  A prior § 7 of Act July 2, 1890, ch 647, 26 Stat. 210, formerly appeared as 15 USCS § 15 and was repealed by Act July 5, 1955, ch 283, § 3, 69 Stat. 283, effective six months after date of enactment on July 5, 1955.

# EXHIBIT 13

EXPORT TRADING COMPANIES
P.L. 97-290

## EXPORT TRADING COMPANY ACT OF 1982

*P.L. 97-290, see page 96 Stat. 1233*

Senate Report (Banking, Housing, and Urban Affairs Committee)
No. 97-27, Mar. 18, 1981 [To accompany S. 734]

House Report (Foreign Affairs Committee) No. 97-637(I),
July 15, 1982 [To accompany H.R. 1799]

House Report (Judiciary Committee) No. 97-637(II),
July 26, 1982 [To accompany H.R. 1799]

House Report (Banking, Finance and Urban Affairs Committee)
No. 97-629, July 1, 1982 [To accompany H.R. 6016]

Senate Conference Report No. 97-644, Oct. 1, 1982
[To accompany S. 734]

House Conference Report No. 97-924, Oct. 1, 1982
[To accompany S. 734]

Cong. Record Vol. 127 (1981)

Cong. Record Vol. 128 (1982)

### DATES OF CONSIDERATION AND PASSAGE

Senate April 8, 1981; October 1, 1982

House July 27, October 1, 1982

The Senate bill was passed in lieu of the House bills after amending
its language to contain much of the text of the House bills. The
House Reports (97-637(I) this page, 97-637(II) page 2444, and 97-629
page 2467), the Related Report (page 2487) and a House
Conference Report (page 2501) are set out.

### HOUSE REPORT NO. 97-637, PART I

[page 1]

The Committee on Foreign Affairs, to whom was referred the bill
(H.R. 1799) entitled "The Export Trading Company Act of 1981",
having considered the same, report favorably thereon with amend-
ments and recommend that the bill as amended do pass.

\*          \*          \*          \*          \*

[page 9]

#### PURPOSE AND SUMMARY

The purpose of H.R. 1799 is to increase exports of U.S. goods and
services by encouraging and facilitating the provision of export trade
services to U.S. companies through greater use of export trading com-

2431

EXPORT TRADING COMPANIES
P L. 97-290

I would be happier with this bill if it were less restrictive. I would be most pleased if we had decided to remove all restrictions on bank holding companies, banks, and business enterprises that wish to offer banking services. Banks and other financial intermediaries need not be limited to only a few lines of business and no others. I hope at some future time we will be bold enough to move banking into a fully competitive environment without the suffocating restrictions and protections now in law. The Bank Export Services Act may be a small part of a larger deregulation and it is on that hope that I support it.

RON PAUL.

## HOUSE REPORT NO. 97-686

*Much of Title IV of this Public Law was derived from*
*H.R. 5235 (House Report No. 97-686, Aug. 2, 1982).*
*House Report No. 97-686 is set out:*

[page 1]

The Committee on the Judiciary, to whom was referred the bill (H.R. 5235) to amend the Sherman Act, the Clayton Act, and the Federal Trade Commission Act to exclude from the application of such Acts certain conduct involving exports, having considered the same, reports favorably thereon with amendments and recommends that the bill as amended do pass.

&ast;  &ast;  &ast;  &ast;  &ast;

[page 2]

### I. PURPOSE

H.R. 5235 is one of several bills introduced in the 97th Congress that seek to promote American exports. A number of considerations provide the basis for this legislation. First is the apparent perception among businessmen that American antitrust laws are a barrier to joint export activities that promote efficiencies in the export of American goods and services. Second, courts differ in their expression of the proper test for determining whether United States antitrust jurisdiction over international transactions exists. H.R. 5235 addresses these problems of perception and definition by clarifying the Sherman Act and the antitrust proscriptions of the Federal Trade Commission Act to make explicit their application only to conduct having a "direct, substantial, and reasonably foreseeable effect" on domestic commerce or domestic exports. The bill will also clarify Section 7 of the Clayton Act to make explicit its inapplicability to the promotion and operation of export and foreign joint ventures.

Passage of H.R. 5235 will not be a panacea for the many problems that may be afflicting American export trade. Assertions that the antitrust laws have had any significant negative impact on exports are at best speculative. Nonetheless, H.R. 5235 will achieve several objectives. First, H.R. 5235 will encourage the business community to engage in efficiency producing joint conduct in the export of American goods and services. Second, enactment of a single, objective test—the "direct, substantial, and reasonably foreseeable effect" test—will serve

2487

as a simple and straightforward clarification of existing American law and the Department of Justice enforcement standards. A clear

[page 3]

benchmark will exist for businessmen, attorneys and judges as well as our trading partners.

## II. SUMMARY OF THE REPORTED BILL

H.R. 5235, as reported, contains four sections. Section 1 sets forth the short title: the "Foreign Trade Antitrust Improvements Act of 1982." Section 2 amends the Sherman Act, 15 U.S.C. §§ 1, *et seq.*, by adding a new Section 7 that makes the Sherman Act inapplicable to conduct involving trade or commerce with foreign nations, other than import transactions, unless there is a "direct, substantial, and reasonably foreseeable effect" on domestic or import commerce, or the export opportunities of a domestic person. Section 3 amends Section 7 of the Clayton Act, 15 U.S.C. § 18, to make it inapplicable to the formation or operation of joint ventures limited to commerce with foreign nations, other than import commerce. Section 4 amends the antitrust (*i.e.*, unfair methods of competition) aspect of Section 5(a) of the Federal Trade Act, 15 U.S.C. § 45(a), to conform to Section 5 of the FTC Act to the Sherman Act amendment contained in Section 2 of H.R. 5235.

## III. BACKGROUND

### A. PROCEDURAL HISTORY OF H.R. 5235

On March 4, 1981, Chairman Rodino and Congressman McClory introduced H.R. 2326, the Foreign Trade Antitrust Improvements Act of 1981, the forerunner of H.R. 5235. The bill was referred to the Committee on the Judiciary, and, in turn, to the Subcommittee on Monopolies and Commercial Law.

The Subcommittee held three days of hearings on the international application of the United States' antitrust laws, H.R. 2326, and related bills. Testifying on March 26, 1981, were Malcolm Baldridge, Secretary of Commerce; Professor Eleanor M. Fox of the New York University School of Law; Mr. A. Paul Victor of the law firm of Weil, Gotshal & Manges; Mr. David N. Goldsweig, an attorney experienced in international antitrust issues, practicing with the General Motors Corp.; and Professor James A. Rahl, Owen L. Coon, Professor of Law at Northwestern University. Testifying on April 8, 1981, were Mr. John H. Shenefield of the law firm of Milbank, Tweed, Hadley & McCloy and a former Assistant Attorney General in charge of the Antitrust Division of the United States Department of Justice; Mr. James R. Atwood of the law firm of Covington & Burling and former Deputy Assistant Secretary and Deputy Legal Adviser in the United States Department of State; and Mr. Martin F. Connor, Washington Corporate Counsel of the General Electric Co., who testified on behalf of the Business Roundtable. Finally, testifying on June 24, 1981, were Gordon O. F. Johnson, Chairman, LogEtronics, Inc.; Mr. Thomas M. Rees, a former Member of Congress and an attorney familiar with export issues; and Mr. Fred Emery, a former Director of the Federal Register.

On December 10, 1981, the Subcommittee unanimously approved an amendment to H.R. 2326 in the nature of a substitute, which was introduced as H.R. 5235, cosponsored by all twelve Members of the Sub-

EXPORT TRADING COMPANIES
P. L. 97-290
[page 4]

committee. On May 18, 1982, by unanimous voice vote, the full Committee reported H.R. 5235 with an amendment in the nature of a substitute.

B. NEED FOR LEGISLATION

### 1. Business perception that antitrust laws prohibit legitimate joint activity

Some testimony in the hearing record suggests that the United States is doing well as an exporter and that whatever problems that might exist are not caused by our antitrust laws. *See, e.g.,* Prepared statement of Professor James A. Rahl, dated March 26, 1981 ("Rahl Statement"), at 3–4.

This view is borne out by a July 1980 report to the Congress prepared by the Office of the United States Trade Representative and the Department of Commerce. The report found that the three government policies that most discourage United States exports are taxation of Americans employed abroad, uncertainties about enforcement of the Foreign Corrupt Practices Act, and export control regulations. The Report specifically stated that while antitrust laws were of concern of businessmen. "No specific instances were shown of these laws unduly restricting exports." Professor Rahl testified that, far from hindering our export efforts, American antitrust laws have been a major factor in ridding the world of many international cartels and enhancing domestic competition, both factors in improving our overall export performance. Rahl Statement at 7–9.

There is, however, evidence that a perception exists among businessmen, especially small businessmen, that antitrust law prohibits efficiency-enhancing joint export activities. For example, Secretary Baldridge testified that antitrust assurances were necessary to encourage small- and middle-sized exporters to increase their exports. Prepared Statement of Honorable Malcolm Baldrige, dated March 26, 1981, ("Baldrige Statement"), at 5–7; Hearing Transcript of March 26, 1981, at 44–45. Professor Fox, Mr. Victor, Mr. Goldsweig and Mr. Shenefield also acknowledged a perception of the antitrust laws as a hindrance in joint export activities. Hearing Transcript of March 26, 1981, at 51, 57; Prepared Statement of Professor Eleanor M. Fox, dated March 26, 1981 ("Fox Statement"), at 2–3; Prepared Statement of Mr. A. Paul Victor, dated March 26, 1981 ("Victor Statement"), at 3–4; Prepared Statement of Mr. David N. Goldsweig, dated March 26, 1981 ("Goldsweig Statement"), at 2; Prepared Statement of Mr. John H. Shenefield, dated April 8, 1981 ("Shenefield Statement"), at 1–2. As Mr. Shenefield stated, "[i]t is an article of orthodoxy in the business community that the antitrust laws stand as an impediment to the international competitive performance of the United States. Specifically, it is believed that the antitrust laws hinder our export performance. . . ." Shenefield Statement at 1–2. And the Section of Antitrust Law of the American Bar Association mentions the *"perception* of some American businessmen that the United States antitrust laws prohibit certain exporting activities. . . ." American Bar Association, Section of Antitrust Law, *Report to Accompany Resolutions Concerning Legislative Proposals to Promote Export Trading,* dated October 26, 1981 ("Antitrust Section Report") at 22 (emphasis in original).

2489

LEGISLATIVE HISTORY
P.L. 97-290
[page 5]

*2. Uncertainty in the Verbal Formulation of the Nature and Quantum of Effects That Are Necessary To Create Jurisdiction Under the Antitrust Laws*

The hearing record suggests a second, related problem—possible ambiguity in the precise legal standard to be employed in determining whether American antitrust law is to be applied to a particular transaction. Since Judge Learned Hand's opinion in *United States v. Aluminum Co. of America*, 148 F.2d 416, 443-44 (2d Cir. 1945), it has been relatively clear that it is the situs of the effects as opposed to the conduct, that determines whether United States antitrust law applies.[1] There remains, however, some disparity among judicial interpretations and between those interpretations and executive enforcement policy regarding the quantum and nature of the effects required to create jurisdiction.

*Alcoa* itself contemplated a test based upon whether the international transaction was intended to affect domestic commerce and whether it actually did so. 148 F.2d at 443-44. Following the lead of *Alcoa* and its subsequent judicial interpretations, the Department of Justice announced its view in 1977 that the United States antitrust laws should be applicable to an international transaction "when there is a substantial and foreseeable effect on the United States commerce," and that it would be a miscarriage of Congressional intent to apply the Sherman Act to "foreign activities which have no direct or intended effect on United States consumers or export opportunities...." United States Department of Justice, Antitrust Division, *Antitrust Guide to International Operations* 6-7 (1977).

Recently, however, in private actions under the antitrust laws, the courts have arrived at different formulations of the nature and quantum of "effects" needed. For example, in *Todhunter-Mitchell & Co. v. Anheuser-Busch, Inc.*, 383 F. Supp. 586, 587 (E.D. Pa. 1074), the court looked to whether the conduct "directly affect[s] the flow of foreign commerce into or out of this country". In *Waldbaum v. Worldvision Enterprises, Inc.*, 1978-2 Trade Case (CCH) Para. 62,378, at 76,257 (S.D.N.Y. 1978), the court asked whether there were "anticompetitive effects in the United States. . . ." In *Industria Siciliana Asfalti, Bitumi, S.P.A. v. Exxon Research & Engineering Co., et al.*, 1977-1 Trade Cas. (CCH) Para. 61,256, at 70,784 (S.D.N.Y. 1977), the court required a showing of an "impact upon United States commerce." And, in *Dominicus Americana Bohio v. Gulf & Western Industries, Inc.*, 473 F. Supp. 680, 687 (S.D.N.Y. 1979), the court stated that "it is probably not necessary for the effect on foreign commerce to be both substantial and direct as long as it is not *de minimus*." See also *Timberlane Lumber Co.* 1. *Bank of America, N.T. & S. A.*, 549 F.2d 613 (9th Cir. 1976); *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1291-92 (3rd Cir. 1979); *National Bank of Canada v. Interbank Card Ass'n.*, 666 F.2d 6, 8 (2d. Cir. 1981).

The precise effect of these varying formulations is disputed. Some commentators believe there are few, if any, differences in the results. An ABA Antitrust Section analysis has concluded that, despite the variations in wording, "there is, with rare exception, no *significant*

---

[1] *See Continental Ore Co. v. Union Carbide & Carbon Corp.* 370 U.S. 690, 704-05 (1962); *Steele v. Bulova Watch Co.* 344 U.S. 280 (1952).

EXPORT TRADING COMPANIES
P L. 97-290
[page 6]

inconsistency between judicial precedents and the Justice Department's view of the effects test." Antitrust Section Report at 10 (emphasis in original).

Other commentators view the matter differently. For example, the Business Roundtable believes that "[j]udicial decisions are rife with inconsistencies regarding the types of effects on the domestic economy that must be demonstrated in order to establish U.S. antitrust jurisdiction over an international transaction." Prepared Statement of Mr. Martin F. Connor, dated April 8, 1981 ("Roundtable Statement"), at 6-7; *see* Goldsweig Statement at 2-6. The Roundtable goes on to note that "[t]he commentators are also divided on the correct test to apply . . . ." *Id.* at 7.

The Committee need not choose between these competing views to conclude that legislative clarification is appropriate. First, as a practical matter, businessmen and antitrust practitioners often consider American antitrust law an unnecessarily complicating factor in a fluid environment in which prompt decisionmaking may be critical. As the Business Roundtable has stated, "antitrust considerations typically enter the picture long before a business transaction is explored in depth. If these considerations indicate problems, the possible transaction may die on the drawing board well before negotiations are commenced." Roundtable Statement at 6; *see* Baldrige Statement at 6. A single, clear standard can reduce the amount of legal research and analysis that will be necessary to make an accurate prediction to whether United States antitrust laws "indicate problems."

Second, even if different formulations have not led to divergent results, the possibility of divergence in results certainly exists. Presumably a *de minimus* standard creates a lower threshold than a "substantial effects" test. Indeed, in some cases a different result might not only be possible but compelled. Businessmen and antitrust counsel cannot safely ignore the current differences in formulation. *See* Goldsweig Statement at 4. H.R. 5235 will provide assurances against private plaintiff's successfully proposing different standards than those employed by the Department of Justice.

Finally, at a time when international trade plays an immense and increasingly important role in the economy, it is appropriate for Congress to formulate a standard to be applied uniformly throughout the federal judicial sytem. A single standard will allow consistent precedent to develop by providing more definite touchstones to guide the parties and the courts. As the Business Roundtable has concluded, "no legitimate purpose is served by perpetuating uncertainty on this fundamental question."

## CONGRESSIONAL RESPONSE

Over the past few years, public debate has focused on two approaches for removing uncertainty that may now exist concerning the jurisdiction of the United States antitrust laws. The first, embodied in various export trading company bills such as S. 734, H.R. 1648 and H.R. 1799 as introduced, contemplates an amendment to the Webb Pomerene Act. 15 U.S.C. §§ 61. *et seq.*, to provide a procedure whereby persons seeking to engage in joint export activity would apply to the Department of Commerce for antitrust certification. The Department, after inter-

2491

LEGISLATIVE HISTORY
P L 97-290

[page 7]

agency consultation with the Department of Justice and the Federal Trade Commission, would issue applicants a certificate that purports to exempt designated joint activities from the antitrust laws. During the Subcommittee hearing process, many of the witnesses criticized these "certification" proposals as excessively bureaucratic, ineffective, and even counterproductive. On July 27, 1982, the House passed H.R. 1799 with Committee amendments so that the bill does not amend the Pomerene Act and creates a certificate procedure in the Department of Justice. See. H.R. Rep. 97-637, pt. 2.

The second approach, a straightforward clarification of the antitrust laws, was originally embodied in H.R. 2326. H.R. 2326 contained only two substantive sections. The first provided that the Sherman Act "shall not apply to conduct involving trade or commerce with any foreign nation unless such conduct has a direct and substantial effect on trade or commerce within the United States or has the effect of excluding a domestic person from trade or commerce with such foreign nation." The second section provided that Section 7 of the Clayton Act "shall not apply to joint ventures limited solely to export trading, in goods or services, from the United States to a foreign nation."

As Chairman Rodino stated in introducing the bill, H.R. 2326 would allow "American firms greater freedom when dealing internationally while reinforcing the fundamental commitment of the United States to a competitive domestic marketplace. . . . [T]he uncertainty of antitrust constraints has remained a strong concern of potential exporters; that concern is remedied by this bill." 127 Cong. Rec. H. 779 (daily ed. March 4, 1981). Mr. McClory, a co-author of this legislation, explained that H.R. 2326

> squarely addresses the complaint voiced by American exporters and potential exporters that their actions are inhibited by uncertainty regarding the scope and effect of our antitrust laws, and it does so without a bureaucratic apparatus which would confer antitrust immunity at an uncertain cost in Government redtape and possible anticompetitive domestic effects. By clarifying the law, it will especially help those small- and medium-size businesses which many are convinced have the greatest potential for making a significant contribution to the volume of our export trade.

> *        *        *        *        *        *        *

> This legislation will send to the export business community the clear signal that it appears to need in order for it to compete with greater confidence and freedom of action in the international marketplace, and it should also help to deter unjustified private and government actions against exporters. (*Id.*)

The specific purpose of the Sherman Act modification is:

> to more clearly establish when antitrust liability attaches to international business activities. The Sherman Act prohibits restraints of trade or commerce with foreign nations. [*See, e g.*, Sections 1 & 2, 15 U.S.C. §§ 1 & 2, which apply to "trade or commerce among the several States or with foreign nations."] This bill will establish that restraints on export trade

EXPORT TRADING COMPANIES
P L. 97-290

[page 8]

only violate the Sherman Act if they have a direct and sub-
stantial effect on commerce within the United States or a
domestic firm competing for foreign trade. ((*Id.*) (Remarks
of Chairman Rodino).)

The modifications to Section 7 of the Clayton Act are necessary
because:

> The Supreme Court has held that Section 7 of the Clayton
> Act applies to joint ventures when the participants form a
> separate corporation and purchase the new venture's stock.
> Section 7 prohibits acquisitions that may substantially lessen
> competition and attacks potentially anticompetitive market
> concentration in its incipiency. Businessmen must, therefore,
> exercise caution when forming such ventures. This bill would
> exempt joint ventures that are limited to export trading.
> This does not mean that export-related joint ventures are
> free of all antitrust restrictions. They remain subject to the
> Sherman Act, but the stringent "incipiency" standard of sec-
> tion 7 would not apply. (*Id.*)

D. EVOLUTION OF H.R. 2326 TO H.R. 5235

During and after the hearings on H.R. 2326, a number of experts,
after expressing strong support for its basic concepts, suggested im-
provements. As a result, the Subcommittee and the Committee made
changes in the bill, the most important of which are discussed below.

1. *Inclusion of the Federal Trade Commission*

Several witnesses pointed out that, although H.R. 2326 would pro-
vide assurances against Sherman Act suits by the Department of
Justice and private parties, it supplied no similar protection against
actions brought by the Federal Trade Commission. Fox Statement
at 6; Goldsweig Statement at 9–10; Shenefield Statement at 9; Round-
table Statement at 10–11. The amendment in the nature of a substitute
that the Subcommittee approved in December, 1981, included a new
section that made a change in Section 5(a) of the Federal Trade
Commission Act parallel to that made in the Sherman Act. The
Subcommittee amendment alters only the antitrust coverage of Section
5(a) of the FTC Act; the consumer protection jurisdiction of Section
5(a) is left untouched.

2. *Addition of the requirement that effects "reasonably foreseeable"*

Some witnesses and commentators also suggested the need to alter
H.R. 2326 to make clear that the effects upon domestic commerce
or a domestic export opportunity must be foreseeable:

> A significant source of business uncertainty when engaging
> in foreign commerce is the possibility that an unpredictable,
> remote or indirect impact on U.S. commerce, determined after
> the fact, could result in a firm being subjected to U.S. anti-
> trust jurisdiction. The Justice Department in its *Antitrust
> Guide* takes the position that only "foreseeable" effects on
> U.S. commerce should result in U.S. antitrust jurisdiction.
> *Accord, United States v. Aluminum Company of America,*
> 148 F. 2d 416. 444 (2d. Cir. 1945) (Goldsweig Statement at

2493

LEGISLATIVE HISTORY
P.L. 97-290

[page 9]

11; *see* Shenefield Statement at 10; Roundtable Statement at 12–13).

Because the ultimate purpose of this legislation is to promote certainty in assessing the applicability of American antitrust law to international business transactions and proposed transactions, the Subcommittee amendment makes explicit that the effect on domestic commerce or export opportunities must be "reasonably foreseeable." The Subcommittee chose a formulation based on *foreseeability* rather than *intent* to make the standard an objective one and to avoid—at least at the jurisdictional stage—inquiries into the actual, subjective motives of defendants. An intent test might encourage ignorance of the consequences of one's actions, which in this context, would be an undesirable result.

The objective nature of the jurisdictional test is also evident from use of the term "reasonably," which was added through an amendment of Mr. Butler. "Reasonably" connotes not only objectivity, but practicality as well. The test is whether the effects would have been evident to a reasonable person making practical business judgments, not whether actual knowledge or intent can be shown.

This provision should free businessmen and their advisors from having to worry unduly about effects that are highly unlikely, but it does not permit them effectively to turn from the reasonably foreseeable consequences of their actions.

Once the effects of a course of conduct are felt, the test remains an objective one, but a defendant confronted with evidence that his past conduct has had direct and substantial effects within this country could not argue that continued effects of this type flowing from similar future conduct were not "reasonably foreseeable."

*3. Imports and Purely Foreign Transactions*

Some observers raised questions about the status of import transactions under H.R. 2326 and urged the Subcommittee to make clear that the legislation had no effect on the application of antitrust laws to imports. As Mr. Atwood stated, "it is important that there be no misunderstanding that import restraints, which can be damaging to American consumers, remain covered by the law." Prepared Statement of Mr. James R. Atwood, dated April 8, 1981, ("Atwood Statement"), at 14; *see* Rahl Statement at 10; Antitrust Section Report at 31. To remove any possible doubt, the Subcommittee amendment (H.R. 5235, as introduced) modified the legislation to make clear that it applied only to "export" trade.

The desirability of another change soon became apparent. The Subcommittee's "export" commerce limitation appeared to make the amendments inapplicable to transactions that were neither import nor export, *i.e.*, transactions within, between, or among other nations. *See, e.g., Pacific Seafarers, Inc.* v. *Pacific Far East Line, Inc.*, 404 F. 2d 804 (D.C. Cir. 1968), *cert. denied*, 393 U.S. 1093 (1969).

A transaction between two foreign firms, even if American-owned, should not, merely by virtue of the American ownership, come within the reach of our antitrust laws. Such foreign transactions should, for the purposes of this legislation, be treated in the same manner as export transactions—that is, there should be no American antitrust jurisdiction absent a direct, substantial and reasonably foreseeable effect

2494

EXPORT TRADING COMPANIES
P L 97-290

[page 10]

on domestic commerce or a domestic competitor. The Committee amendment therefore deletes references to "export" trade, and substitutes phrases such as "other than import" trade. It is thus clear that wholly foreign transactions as well as export transactions are covered by the amendment, but that import transactions are not.

With these changes, H.R. 5235 achieves an important objective of freeing American-owned firms that operate entirely abroad or in United States export trade from the possibility of dual and conflicting -antitrust regulation. When their activities lack the requisite domestic effects, they can operate on the same terms, and subject to the same antitrust laws that govern their foreign-owned competitors. To be sure, if the foreign state in question has an antitrust regimen, American-owned firms must still comply. But no longer is there any possibility that, because of uncertainty growing out of American ownership, such firms will be subject to a different and perhaps stricter regimen of antitrust than their competitors of foreign ownership.

### 4. *Conduct Having a Foreign Impact*

The intent of the Sherman and FTC Act amendments in H.R. 5235 is to exempt from the antitrust laws *conduct* that does not have the requisite domestic effects. This test, however, does not exclude all persons injured abroad from recovering under the antitrust laws of the United States. A course of conduct in the United States—*e.g.*, price fixing not limited to the export market—would affect all purchasers of the target products or services, whether the purchaser is foreign or domestic. The *conduct* has the requisite effects within the United States, even if some purchasers take title abroad or suffer economic injury abroad. *Cf.*, *e.g.*, *Pfizer Inc.*, *et al* v. *Government of India*, *et al*, 434 U.S. 308 (1978). Foreign purchasers should enjoy the protection of our antitrust laws in the domestic marketplace, just as our citizens do. Indeed, to deny them this protection could violate the Friendship, Commerce and Navigation treaties this country has entered into with a number of foreign nations.

There are other reasons for preserving the rights of foreign persons to sue under our laws when the conduct in question has a substantial nexus to this country. As the Supreme Court pointed out in *Pfizer*, *supra*, 434 U.S. at 314–315, to deny foreigners a recovery could under some circumstances so limit the deterrent effect of United States antitrust law that defendants would continue to violate our laws, willingly risking the smaller amount of damages payable only to injured domestic persons.

While H.R. 5235 preserves antitrust protections in the domestic marketplace for all purchasers, regardless of nationality or the situs of the business, a different result will obtain when the conduct is solely export-oriented. Thus, a price-fixing conspiracy directed solely to exported products or services, absent a spillover effect on the domestic marketplace (see pt. E(2), *infra*), would normally not have the requisite effects on domestic or import commerce. Foreign buyers injured by such export conduct would have to seek recourse in their home courts.

If such solely export-oriented conduct affects export commerce of another person doing business in the United States, both the Sherman and FTC Act amendments preserve jurisdiction insofar as there is injury to that person. Thus, a domestic exporter is assured a remedy

2495

LEGISLATIVE HISTORY
P L. 97-290
[page 11]

under our antitrust laws for injury caused by unlawful conduct of a competing United States exporter. But a foreign firm whose non-domestic operations were injured by the very same export oriented conduct would have no remedy under our antitrust laws. This result is assured by the Committee's inclusion of the final sentence in the Sherman and FTC Act amendments. It limits recovery for conduct that has no requisite domestic effects, other than the effects on the export commerce of another person doing business in the United States, to such person.

5. *Type of Domestic Impact*

As explained more fully (see pt. E(1), *infra*), in providing that the federal courts may assert the jurisdiction of the United States antitrust laws if conduct affects the export trade or export commerce "of a person engaged in such trade or commerce in the United States," the Committee does not intend to alter existing concepts of antitrust injury or antitrust standing. This bill only establishes the standards necessary for assertion of United States antitrust jurisdiction. The substantive antitrust issues on the merits of the plaintiffs' claim would remain unchanged.

For example, the mere fact that an exporter may be adversely affected in a financial sense by the activities of another would not necessarily mean that he has sustained an injury for which he may recover under Section 4 of the Clayton Act. *See,* e.g., *Illinois Brick Co.* v. *State of Illinois,* 431 U.S. 720[1] (1977) ; *Brunswick Corp.* v. *Pueblo Bowl-O-Mat,* 429 U.S. 477[2] (1977).

For similar reasons, the domestic "effect" that may serve as the predicate for antitrust jurisdiction under the bill must be of the type that the antitrust laws prohibit. *See,* e.g., *National Bank of Canada* v. *Interbank Card Ass'n,* 666 F.2d 6, 8 (2d Cir. 1981). For example, a plaintiff would not be able to establish United States antitrust jurisdiction merely by proving a *beneficial* effect within the United States, such as increased profitability of some other company or increased domestic employment, when the plaintiff's damage claim is based on an extraterritorial effect on him of a different kind.

According to the International Law Section of the American Bar Association, the legislation as reported by the Subcommittee, before amendment by the Committee, could have been read as ignoring

whether conduct has an adverse effect on competition. This result not only departs from the weight of scholarly opinion, but would produce perverse results. Under such an interpretation, conduct which has an anticompetitive effect which impinges only on defendants located in foreign nations and which has a neutral or procompetitive domestic effect would be subject to the antitrust laws. (American Bar Association, Section of International Law, *Report on Purposes and Provisions of H.R. 5235,* at 9.)

The Committee did not believe that the bill reported by the Subcommittee was intended to confer jurisdiction on injured foreign persons when that injury arose from conduct with no anticompetitive effects in the domestic marketplace. Consistent with this conclusion, the full Committee added language to the Sherman and FTC Act amend-

1.  97 S Ct. 2061, 52 L.Ed.2d 707
2.  97 S Ct. 690, 50 L Ed 2d 701.

EXPORT TRADING COMPANIES
P L. 97-290
[page 12]

ments to require that the "effect" providing the jurisdictional nexus must also be the basis for the injury alleged under the antitrust laws. This does not, however, mean that the impact of the illegal conduct must be experienced by the injured party within the United States. As previously set forth, it is sufficient that the conduct providing the basis of the claim has had the requisite impact on the domestic or import commerce of the United States, or, in the case of conduct lacking such an impact, on an export opportunity of a person doing business in the United States.

### G. Clayton Act Amendments

Some comments in the record suggest that the original amendment to Section 7 of the Clayton Act, as expressed in H.R. 2026, was susceptible to misinterpretation. As originally drafted, the amendment applied to "joint ventures limited solely to export trading. . . ." The concerns raised about this language centered on, first, whether the parents of the joint ventures would be included in the exemption; second, whether incidental activities necessary to engage in joint export activities would be covered by the exemption; and finally, whether export joint ventures that themselves entered into mergers or acquisitions might not be unintentionally exempted from the proscriptions of Section 7. See Antitrust Section Report at 32-33; Roundtable Statement at 17-18; Atwood Statement at 18.

The Committee amendment, which states that Section 7 of the Clayton Act "shall not apply to the formation or operation of any joint venture . . .", is intended to address all these concerns. First, by making clear that it is the *conduct* of *forming* and *operating* the joint venture and not the joint venture itself that is protected, the amendment removes any disparity between the joint venture and its parents and makes plain that joint ventures that engage in merger activity that joint ventures that engage in merger activity are not exempted are not exempted by the amendment. Second, by making clear that the operation of the joint venture falls within the amendment, and not merely the exporting or foreign activity itself, the amendment affords protection to the incidental activities of the joint venture. In order to be exempted from Section 7 of the Clayton Act, however, the incidental activities must have a strong and direct relationship to the primary export or foreign activity.

The full Committee corrected another potential problem with the Subcommittee version of the Section 7 amendment, which was limited to joint ventures involved solely in export commerce. As reported by the full Committee, the amendment applies to commerce with foreign nations, other than import commerce. Thus, joint ventures involved solely with export commerce, or other forms of foreign commerce with no import nexus to the United States, will be outside the coverage of Section 7 of the Clayton Act. For example, a joint venture could not only export goods from the United States, but also produce or market goods in foreign nations, and still enjoy the exemption from the incipiency standard of the Clayton Act.

### E. OTHER ISSUES

During the proceedings on H.R. 5235, two other significant issues were raised, which the Committee did not feel necessitated changes in the legislation.

LEGISLATIVE HISTORY
P L. 97-290
[page 13]

1. *Effect of Legislation and Current Law*

A very important question is the effect of the legislation on current antitrust law. It is the intent of the sponsors of the legislation and the Committee to address only the subject matter jurisdiction of United States antitrust law in this legislation. H.R. 5235 does not affect the legal standards for determining whether conduct violates the antitrust laws, and thus the substantial antitrust issues on the merits of a claim would remain unchanged.

Moreover, the bill is intended neither to prevent nor to encourage additional judicial recognition of the special international characteristics of transactions. If a court determines that the requirements for subject matter jurisdiction are met, this bill would have no effect on the courts' ability to employ notions of comity, *see, e.g., Timberlane Lumber Co. v. Bank of America,* 549 F.2d 1287 (3rd Cir. 1979), or otherwise to take account of the international character of the transaction. Similarly, the bill is not intended to restrict the application of American laws to extraterritorial conduct where the requisite effects exist or to the extraterritorial pursuit of evidence in appropriate cases. *See* Atwood Statement at 7 n. 7.

2. *International Cartels*

Probably the most important criticism of the legislative concept of H.R. 5235 came from Professor Rahl, who feared the legislation could be misinterpreted as a legislative approval for American firms to engage in the type of international cartel activity prevalent before World War II:

> [P]erhaps most unfortunate of all is the risk that this provision would encourage American firms not only to form cartels among themselves but to participate in foreign and international cartels. . . . Past experience indicates that a serious risk would then arise of a secret agreement to include the United States in the market allocation to round things out. (Rahl Statement at 11.)

The Committee, after weighing this and similar arguments carefully, does not believe the legislation will result in a rejuvenation of international cartels. Any major activities of an international cartel would likely have the requisite impact on United States commerce to trigger United States subject matter jurisdiction. For example, if a domestic export cartel were so strong as to have a "spillover" effect on commerce within this country—by creating a world-wide shortage or artificially inflated world-wide price that had the effect of raising domestic prices—the cartel's conduct would fall within the reach of our antitrust laws. Such an impact would, at least over time, meet the test of a direct, substantial and reasonably foreseeable effect on domestic commerce. The Committee would expect the Department of Justice and the Federal Trade Commission to continue their vigilance concerning cartel activity and to use their enforcement powers appropriately.

In addition, the Committee recognized the increased sensitivity of other nations to antitrust considerations and cartel activity. By more precisely defining the subject matter jurisdiction of U.S. antitrust law, H.R. 5235 in no way limits the ability of a foreign sovereign to

EXPORT TRADING COMPANIES
P.L. 97-290
[page 14]

act under its own laws against an American-based export cartel having unlawful effects in its territory. Indeed, the clarified reach of our own laws could encourage our trading partners to take more effective steps to protect competition in their markets. *See* Atwood Statement at 6-8.

## IV. THE PROVISIONS OF H.R. 5235

H.R. 5235, the Foreign Trade Antitrust Improvements Act of 1982, contains three substantive provisions that amend the Sherman Act, Section 7 of the Clayton Act and the antitrust aspects of Section 5(a) of the Federal Trade Commission Act to clarify the limits of these provisions in reaching certain export and foreign activities.

Section 1 of H.R. 5235 states the short title. Section 2 amends the Sherman Act, 15 U.S.C. § 1, *et seq.*, by adding a new Section 7 to the Sherman Act. The intent of the new Section 7 is to establish that the proscriptions of the Sherman Act do not apply to export or purely foreign commerce unless the conduct has a direct, substantial and reasonably foreseeable anticompetitive effect on domestic or import commerce, or a domestic export opportunity.

Section 3 of H.R. 5235 amends Section 7 of the Clayton Act, 15 U.S.C. § 18, to exempt the formation and operation of joint ventures limited to export or purely foreign trade. This Section is intended only to remove the "incipiency" standard of Section 7 of the Clayton Act.

Section 4 amends the Federal Trade Commission Act to make it clear that the antitrust proscriptions of Section 5(a), 15 U.S.C. 45 (a), apply only to methods of competition that have a direct, substantial and reasonably foreseeable effect on domestic or import commerce, or a domestic export opportunity. This amendment is intended to parallel the Sherman Act amendment. As noted above, this amendment does not affect the FTC's consumer protection jurisdiction.

## V. INFORMATION SUBMITTED PURSUANT TO RULES

### 1. *Budget Statement*

Clause 2(1)(3)(B) of House Rules XI is inapplicable because this legislation does not provide new budgetary authority or increased expenditures.

### 2. *Cost Estimate*

The Committee concurs with the estimate provided by the Congressional Budget Office and adopts that estimate as the cost estimate of the Committee for the purpose of clause 7(a) of House Rule XIII. Pursuant to clause 2(1)(3)(C) of House Rule XI, set out is the estimate of the Director of the Congressional Budget Office:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, D.C., May 27, 1982.*

Hon. PETER W. RODINO, Jr.,
*Chairman, Committee on the Judiciary, U.S. House of Representatives, Rayburn House Office Building, Washington, D.C.*

DEAR MR. CHAIRMAN: Pursuant to Section 403 of the Congressional Budget Act of 1974, the Congressional Budget Office has reviewed H.R. 5235, the Foreign Trade Antitrust Improvements Act of 1982,

LEGISLATIVE HISTORY
P L 97-290
[page 15]

as ordered reported by the House Committee on the Judiciary, May 18, 1982.

The bill amends the Sherman, Clayton, and Federal Trade Commission Acts in restating or limiting the extraterritorial reach of the U.S. antitrust laws. It is expected that no significant additional cost to the government will be incurred as a result of enactment of this legislation.

Sincerely,

ALICE M. RIVLIN, *Director.*

3. *Inflationary Impact Statement*

Pursuant to clause 2(1)(4) of House Rule XI, the Committee estimates that this bill will not have an inflationary impact on prices and costs in the operation of the national economy.

4. *Oversight Findings*

The Subcommittee on Monopolies and Commercial Law of this Committee exercises oversight responsibilities with respect to the antitrust laws. The favorable consideration of this bill was recommended by the Subcommittee. The Subcommittee will monitor developments under this legislation.

No findings or recommendations of the Committee on Government Operations were received as referred to in House Rule XI, clause 2(1)(3)(D).

\*            \*            \*            \*            \*

[page 18]

## ADDITIONAL VIEWS OF CHAIRMAN RODINO

I intend to offer H.R. 5235 under suspension of the House Rules with one minor clarification in Sections 2 and 4, which amend the Sherman and FTC Acts. The reported version requires that the effect upon domestic commerce or a domestic export opportunity be "the basis of the violation alleged. . . ." As explained more fully in the Committee's Report, the Committee added this language to make it absolutely clear that the basis of American antitrust jurisdiction has to be a domestic *anticompetitive* effect.

I believe that it is possible to improve the language of the Committee's version by substituting the phrase "such effect gives rise to a claim" under the provisions of the Sherman or FTC Act. The substituted language accomplishes the same result as the Committee version and is better, in my view, because the Committee language may suggest that an effect, rather than conduct, is the basis for a violation.

PETER W. RODINO.

# EXHIBIT 14

No. 03-724

# In the Supreme Court of the United States

F. HOFFMANN-LA ROCHE LTD., ET AL., PETITIONERS

*v.*

EMPAGRAN, S.A., ET AL.

*ON WRIT OF CERTIORARI TO THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT*

**BRIEF FOR THE UNITED STATES
AS AMICUS CURIAE SUPPORTING PETITIONERS**

<div style="margin-left:50%">

EDWIN S. KNEEDLER
  *Acting Solicitor General
  Counsel of Record*

R. HEWITT PATE
  *Assistant Attorney General*

MAKAN DELRAHIM
  *Deputy Assistant Attorney
  General*

LISA S. BLATT
  *Assistant to the Solicitor
  General*

ROBERT B. NICHOLSON
STEVEN J. MINTZ
  *Attorneys*

  *Department of Justice
  Washington, D.C. 20530-0001
  (202) 514-2217*

</div>

WILLIAM H. TAFT, IV
  *Legal Adviser
  United States Department
  of State
  Washington, D.C. 20520*

JOHN D. GRAUBERT
  *Acting General Counsel
  Federal Trade Commission
  Washington, D.C. 20580*

## QUESTIONS PRESENTED

1. Whether under the Foreign Trade Antitrust Improvements Act of 1982 (FTAIA), 15 U.S.C. 6a, the Sherman Act applies to claims of foreign plaintiffs whose injuries do not arise from the effects of antitrust violations on United States commerce.

2. Whether such foreign plaintiffs lack antitrust standing under Section 4 of the Clayton Act, 15 U.S.C. 15(a).

TABLE OF CONTENTS

|  | Page |
|---|---|
| Interest of the United States | 1 |
| Statement | 1 |
| Summary of argument | 5 |
| Argument: | |
| Respondents have no claim under the antitrust laws | 7 |
| A. The FTAIA requires a plaintiff's claim to arise out of a conspiracy's anticompetitive effect in the United States | 8 |
| 1. The text of the statute requires a plaintiff to allege that his claim arises from the domestic anticompetitive effect of a Sherman Act violation | 8 |
| 2. The FTAIA's legislative history does not reveal an intent to open United States courts to claims seeking redress for foreign injuries sustained as a result of foreign conduct | 16 |
| 3. Important policy considerations grounded in the antitrust laws significantly undermine the court of appeals' interpretation | 19 |
| B. Plaintiffs whose injuries are not tied to a conspiracy's anticompetitive effect on United States commerce lack antitrust standing | 25 |
| Conclusion | 30 |

TABLE OF AUTHORITIES

Cases:

*Association Gen. Contractors of California, Inc.* v. *California State Council of Carpenters,* 459 U.S. 519 (1983) ............ 6, 26, 29, 30

*Bennett* v. *Spear,* 520 U.S. 154 (1997) ............ 27

(III)

IV

Cases—Continued:                                                    Page

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429
   U.S. 477 (1977) ........................................... 26, 27, 28, 29
*Caribbean Broad. Sys., Ltd.* v. *Cable & Wireless,*
   *PLC*, 148 F.3d 1080 (D.C. Cir. 1998) ........................ 11
*Den Norske Stats Oljeselskap As* v. *HeereMac Vof,*
   241 F.3d 420 (2001), cert. denied, 534 U.S. 1127
   (5th Cir. 2002) ............................................. 4, 7,
                                        9, 11, 13, 16
*EEOC* v. *Arabian Am. Oil Co.*, 499 U.S. 244
   (1991) ...................................................... 7, 16
*Foley* v. *Filardo*, 336 U.S. 281 (1949) ....................... 15
*Hartford Fire Ins. Co.* v. *California*, 509 U.S. 764
   (1993) ...................................................... 7, 13
*Hawaii* v. *Standard Oil Co.*, 405 U.S. 251 (1972) ............. 26
*Heckler* v. *Edwards*, 465 U.S. 870 (1984) .................... 10
*Illinois Brick* v. *Illinois*, 431 U.S. 720 (1977) ............ 26
*Kruman* v. *Christies Int'l, PLC*, 284 F.3d 384 (2d Cir.
   2002), cert. dismissed, 124 S. Ct. 27 (2003) ............... 4, 9, 11
*Malamud* v. *Sinclair Oil Corp.*, 521 F.2d 1142 (6th
   Cir. 1975) .................................................. 27
*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*,
   475 U.S. 574 (1986) ..................................... 7, 28, 29
*McCulloch* v. *Sociedad Nacional de Marineros de*
   *Honduras*, 372 U.S. 10 (1963) ............................. 15
*Microsoft Corp. Antitrust Litig., In re*, 127 F. Supp.
   2d 702 (D. Md. 2001) ....................................... 16
*National Credit Union Admin.* v. *First Nat'l Bank*
   *& Trust Co.*, 522 U.S. 479 (1998) ......................... 27
*Pfizer, Inc.* v. *Government of India*, 434 U.S. 308
   (1978) .................................................. 7, 16, 17, 28
*San Diego Bldg. Trades Council* v. *Garmon*,
   359 U.S. 236 (1959) ........................................ 15
*Textron Lycoming Reciprocating Engine Div. AVCO*
   *Corp.* v. *UAW*, 523 U.S. 653 (1998) ...................... 9
*Turicento, S.A.* v. *American Airlines Inc.*, 303
   F.3d 293 (3d Cir. 2002) .................................... 28

V

Cases—Continued:                                                   Page

United Phosphorus, Ltd. v. Angus Chem. Co.,
  322 F.3d 942 (7th Cir.), cert. denied, 124 S. Ct.
  533 (2003) ..................................................................   8
U.S. Dep't. of Labor v. Triplett, 494 U.S. 715
  (1990) ........................................................................   12
United States v. Aluminum of America, 148 F.2d
  416 (2d Cir. 1945) ....................................................   17
United States v. Borden Co., 347 U.S. 514 (1954) ............   21
United States v. Nippon Paper Indus. Co., 109
  F.3d 1 (1st Cir. 1997), cert. denied, 522 U.S. 1044
  (1998) ........................................................................   7
Valley Forge Christian Coll. v. Americans United for
  Separation of Church & State, Inc., 454 U.S. 464
  (1982) ........................................................................   12
Verizon Communications Inc. v. Law Offices of
  Curtis V. Trinko, 124 S. Ct. 872 (2004) ..................   26
Vitamins Antitrust Litig., In re, No. 99-197 TFH,
  2000 WL 1737867 (D.D.C. Mar. 31, 2000) ..............   2
Warth v. Seldin, 422 U.S. 490 (1975) ...........................   12

Constitution and statutes:

Panama Const. art. 290 .................................................   25
15 U.S.C. 1 ....................................................................   2, 7, 11
15 U.S.C. 6a ..................................................................   3, 14
15 U.S.C. 6a(1) ..............................................................   3, 8, 23
15 U.S.C. 6a(2) ..............................................................   passim
15 U.S.C. 15 ..................................................................   5, 11, 20
15 U.S.C. 26 ..................................................................   2
15 U.S.C. 4 ....................................................................   11, 27
18 U.S.C. 3571 ..............................................................   24
18 U.S.C. 3663 ..............................................................   24
Ecuador Civ. Code:
  Art. 2211 ....................................................................   25
  Art. 2241 ....................................................................   25
  Art. 2256 ....................................................................   25

VI

Statutes—Continued:                                          Page

Ecuador Crim. Code:
  Art. 67 ..................................................................... 25
  Art. 363 ................................................................... 25
Ecuador Organic Law for Consumer Protection:
  Art. 2 ...................................................................... 25
  Art. 51 ..................................................................... 25
  Art. 70 ..................................................................... 25
  Art. 87 ..................................................................... 25
Law of Ukraine On Protecting the Economic Com-
  petition (2001), art. 55 ........................................... 25
Law of Ukraine On Restriction of Monopolism and
  Prevention of Unfair Competition in Business
  Activities (1992) ..................................................... 25

Miscellaneous:

1A Phillip E. Areeda & Herbert & Hovenkamp,
  *Antitrust Law* (2d ed. 2000) ................................. 28
Phillip E. Areeda & H. Hovenkamp, *Antitrust Law*
  (Supp. 2003) ........................................................... 28
*Black's Law Dictionary* (6th ed. 1990) ...................... 10
Chemical Business NewsBase:  Press Release, *Rhone-
  Poulence Issues Statement Regarding Vitamin
  Business*, 1999 WL 17728220 (May 26, 1999) .......... 2
B. Evans & C. Evans, *A Dictionary of Contemporary
  American Usage* (1957) .......................................... 10
H.R. Rep. No. 686, 97th Cong., 2d Sess. (1982) ......... 13, 16,
                                                        17, 18, 19, 27
H.R. 5235, 97th Cong., 2d Sess. (1982) ...................... 18
<http://www.usdoj.gov/atr/public/guidelines/0091.
  html> ........................................................................ 1
4 Trade Reg. Rep. (CCH) ¶ 13,113 (Aug. 10, 1993) ...... 1, 10
U.S. Dep't of Justice Press Release, *F. Hoffman-
  LaRoche and BASF Agree To Pay Record Criminal
  Fines For Participating In International Vitamin
  Cartel* (May 20, 1999) ........................................... 2

VII

Miscellaneous—Continued:                          Page

U.S. Dep't of Justice, Scott D. Hammond, Director
   of Criminal Enforcement, Antitrust Division, *Detect-
   ing and Deterring Cartel Activity Through an
   Effective Leniency Program* Brighton, England
   Nov. 21-22, 2000) <http://www.sudoj.gov/atr/public
   speeches/9928.htm ................................................. 23, 24
U.S. Dep't of Justice & Federal Trade Comm'n,
   *Antitrust Enforcement Guidelines For International
   Operations* (1995), *reprinted in* 4 Trade Reg. Rep.
   (CCH) ¶ 13,107 (Apr. 5, 1995) ................................ 11, 17, 18

# In the Supreme Court of the United States

No. 03-724

F. HOFFMANN-LA ROCHE LTD., ET AL., PETITIONERS

*v.*

EMPAGRAN, S.A., ET AL.

*ON WRIT OF CERTIORARI TO THE
UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT*

## BRIEF FOR THE UNITED STATES
## AS AMICUS CURIAE SUPPORTING PETITIONERS

### INTEREST OF THE UNITED STATES

The Department of Justice and the Federal Trade Commission have primary responsibility for enforcing the federal antitrust laws, and thus they have a strong interest in the correct application of those laws and in the effect of judicial interpretations on antitrust enforcement programs. The United States is concerned that the court of appeals' holding will substantially harm its ability to uncover and break up international cartels and undermine law enforcement relationships between the United States and its trading partners.

### STATEMENT

1. The Antitrust Division of the United States Department of Justice has a Corporate Leniency Policy that provides amnesty from criminal prosecution in certain circumstances. 4 Trade Reg. Rep. (CCH) ¶ 13,113 (Aug. 10, 1993); <*http://www.usdoj.gov/atr/public/guidelines/0091.htm*>. In 1999, one of the petitioners, Rhone-Poulenc SA, applied for admission to the government's amnesty program for Rhone-Poulenc's role in global price-fixing and market-allocation conspiracies among domestic and foreign manufacturers and

2

distributors of bulk vitamins. In exchange for amnesty, the company exposed the cartel, which had sold billions of dollars of vitamins in the United States and other countries around the world. The company cooperated with the United States' subsequent investigations into violations by the vitamin companies of Section 1 of the Sherman Act, 15 U.S.C. 1. Chemical Business NewsBase: Press Release, *Rhone-Poulenc issues statement regarding vitamin business*, available in 1999 WL 17728220 (May 26, 1999); U.S. Dep't Of Justice Press Release, *F. Hoffman-LaRoche and BASF Agree To Pay Record Criminal Fines For Participating In International Vitamin Cartel* (May 20, 1999) (Press Release).

To date, the investigation triggered by Rhone-Poulenc's application for amnesty has resulted in plea agreements with twelve corporate defendants and thirteen individual defendants and the imposition of fines exceeding $900 million—including the largest criminal fine ($500 million) ever obtained by the Department of Justice under any statute. Press Release, at 1-2. Eleven of the thirteen individuals have received sentences resulting in imprisonment, and an additional individual awaits a criminal trial. European Union, Canadian, Australian, and Korean authorities similarly have obtained record civil penalties exceeding €855 million against the vitamin companies. Pet. 5; Pet. App. 68a.

In the wake of the government's investigations, domestic private parties sued the vitamin companies seeking treble damages and attorney's fees, see 15 U.S.C. 1, 15, 26, for overcharges that the domestic companies paid in United States commerce as a result of the price-fixing conspiracy. In settlement of suits by some United States purchasers, the vitamin companies paid amounts "exceeding $2 billion." Pet. 5; *In re Vitamins Antitrust Litig.*, No. 99-197 TFH, 2000 WL 1737867 (D.D.C. Mar. 31, 2000).

2. Respondents are foreign corporations domiciled in Ecuador, Panama, Australia, and Ukraine. Pet. App. 6a; Pet. ii, 5; Br. in Opp. ii. They brought this class action on behalf

3

of purchasers of "vitamins abroad from the vitamin companies or their alleged co-conspirators * * * for delivery outside the United States." Pet. App. 6a. The district court held (*id.* at 47a-53a) that it lacked subject matter jurisdiction over respondents' claims against petitioners under the Foreign Trade Antitrust Improvements Act of 1982 (FTAIA), 15 U.S.C. 6a, which provides that the Sherman Act shall not apply to non-import foreign conduct unless it has "a direct, substantial, and reasonably foreseeable effect" on United States commerce, 15 U.S.C. 6a(1), and that "such effect gives rise to a claim" under the Sherman Act, 15 U.S.C. 6a(2).[1] The district court explained that, although respondents had alleged that "the conduct causing their injuries resulted in a 'direct, substantial, and reasonably foreseeable effect on U.S. commerce,'" they had not alleged that the conduct's effect on United States commerce gave rise to respondents' claims. Pet. App. 48a-49a. Because the district court found subject

---

[1] The FTAIA, which was enacted in 1982 (Pub. L. No. 97-290, § 402, 96 Stat. 1248) and became Section 7 of the Sherman Act, 15 U.S.C. 6a, provides:

Sections 1 to 7 of this title shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1) such conduct has a direct, substantial, and reasonably foreseeable effect—

(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.

4

matter jurisdiction lacking, the court did not reach petitioners' alternative contention that respondents lacked antitrust standing because they "fall outside the class of persons whom the Sherman Act is designed to protect." *Id.* at 53a, 54a.

3. A divided panel of the court of appeals reversed and remanded. Pet. App. 1a-42a. The court observed that the "Second and Fifth Circuits have split" on "the question whether FTAIA requires that the plaintiff's claim arise from the U.S. effect of the anticompetitive conduct." *Id.* at 14a-15a. The court explained (*ibid.*) that the Fifth Circuit in *Den Norske Stats Oljeselskap As* v. *HeereMac Vof*, 241 F.3d 420, 427 (2001) (*Statoil*), cert. denied, 534 U.S. 1127 (2002), held that the plain text of the FTAIA bars claims that do not stem from the conspiracy's anticompetitive domestic effects. By contrast, the court explained (Pet. App. 16a-17a), the Second Circuit in *Kruman* v. *Christie's International PLC*, 284 F.3d 384, 400 (2002), cert. dismissed, 124 S. Ct. 27 (2003), held that the FTAIA permits suit, even when the plaintiff's injury does not arise from the domestic effect of the conspiracy, as long as the "domestic effect violate[s] the substantive provisions of the Sherman Act."

The majority adopted a "view of the statute [that] falls somewhere between the views of the Fifth and Second Circuits, albeit somewhat closer to the latter than the former." Pet. App. 20a. The majority rejected respondents' argument —based on *Kruman*, 284 F.3d at 397-400—that the "FTAIA only speaks to the question what conduct is prohibited, not which plaintiffs can sue." Pet. App. 20a. The majority nonetheless interpreted the phrase "gives rise to a claim" in 15 U.S.C. 6a(2) as requiring only that "the conduct's harmful effect on United States commerce must give rise to 'a claim' by someone, even if not the foreign plaintiff who is before the court." Pet. App. 4a. The majority also found its interpretation supported by the FTAIA's legislative history, *id.* at 24a-30a, and by its view that asserting jurisdiction over

5

respondents' claims would maximize deterrence of international cartels by "forc[ing] the conspirator to internalize the full cost of his anticompetitive conduct," *id.* at 32a.

The majority further held that respondents have antitrust standing under Section 4 of the Clayton Act, 15 U.S.C. 15(a). Pet. App. 33a-37a. The court reasoned that "the arguments that have already persuaded [the court] that, where anticompetitive conduct harms domestic commerce, FTAIA allows foreign plaintiffs injured by anticompetitive conduct to sue to enforce the antitrust laws similarly persuade us that the antitrust laws intended to prevent the harm that the foreign plaintiffs suffered here." *Id.* at 36a.

Judge Henderson dissented. Pet. App. 40a-42a. She disagreed with the majority's interpretation of the FTAIA, reasoning that the Fifth Circuit's reading was "unambiguously" supported by the Act's text and history. *Id.* at 40a.

## SUMMARY OF ARGUMENT

A. The Foreign Trade Antitrust Improvements Act provides that the Sherman Act shall not apply to foreign conduct unless it has a requisite effect on United States commerce and "such effect gives rise to a claim" under the Sherman Act. 15 U.S.C. 6a(2). The most natural reading of that statutory language is that the required effect on United States commerce must give rise to a claim by the particular plaintiff before the court. In rejecting that interpretation, the court of appeals reached the implausible conclusion that Congress intended to permit suits in the United States that seek redress for injuries that were sustained entirely overseas and that arise out of purely foreign commerce. That conclusion finds no support in the Act's legislative history.

Such an expansive interpretation of the FTAIA would greatly expand the potential liability for treble damages in United States courts and would thereby deter members of international cartels from seeking amnesty from criminal prosecution by the United States Government. The inter-

6

pretation adopted by the court of appeals thus would weaken the Department of Justice's criminal amnesty program, which has served as an effective means of cracking international cartels. That interpretation also likely would damage the cooperative law enforcement relationships that the United States has nurtured with foreign governments and would burden the federal courts with a wave of new international antitrust cases raising potentially complex satellite disputes that turn on hypothetical claims of persons not before the courts.

B. Antitrust standing principles independently support the conclusion that foreign plaintiffs whose claims arise solely from a conspiracy's effects on foreign commerce cannot bring antitrust lawsuits in United States courts. Section 4 of the Clayton Act, which defines the class of persons who may maintain a private damages action under the antitrust laws, does not provide a treble damages remedy for all injuries that result from an antitrust violation. *Associated General Contractors* v. *California State Council of Carpenters*, 459 U.S. 519 (1983). This Court accordingly has limited the types of plaintiffs who are proper parties to bring a private antitrust action based on substantive antitrust and other policy considerations.

Foreign plaintiffs whose claims arise from a conspiracy's effects outside the United States are not proper plaintiffs to invoke our antitrust laws. The focus of the FTAIA, and the fundamental purpose of the Sherman Act, are the protection of American consumers and commerce. To provide antitrust relief to respondents, even though their injuries have no connection to a conspiracy's effects on United States commerce, would divorce antitrust recovery from the central purposes of the antitrust laws.

7

## ARGUMENT

### RESPONDENTS HAVE NO CLAIM UNDER THE ANTI-TRUST LAWS

Section 1 of the Sherman Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. 1. Although this Court has articulated a general presumption in other contexts that Congress intends its laws to apply only within the territorial jurisdiction of the United States, *EEOC* v. *Arabian American Oil Co.*, 499 U.S. 244, 248 (1991), "it is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." *Hartford Fire Ins. Co.* v. *California*, 509 U.S. 764, 796 (1993); *Matsushita Elec. Industrial Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 582-583 n.6 (1986); see *United States* v. *Nippon Paper Indus. Co.*, 109 F.3d 1, 4-6 (1st Cir. 1997) (holding that Sherman Act's criminal provisions apply to wholly foreign conduct with intended and substantial domestic effects), cert. denied, 522 U.S. 1044 (1998).

Consistent with that judicial construction of the Sherman Act, Congress provided in the FTAIA that the Sherman Act applies to foreign conduct when "(1) such [foreign] conduct has a direct, substantial, and reasonably foreseeable effect * * * on [United States domestic commerce] * * * and (2) such effect gives rise to a claim" under the Sherman Act. 15 U.S.C. 6a. It is not disputed in this case that, under Section 6a, the Sherman Act applies to a plaintiff's claim that arises from an illegal conspiracy's anticompetitive effects on domestic commerce, whether the plaintiff is located here or abroad, or is a citizen of the United States or of another country. *Pfizer, Inc.* v. *Government of India*, 434 U.S. 308 (1978) (holding that a foreign government may sue under the Sherman Act); see *Statoil*, 241 F.3d at 427 n.22, 428 n.25.

8

The question presented in this case is whether the Sherman Act permits respondents to recover treble damages and attorney's fees under the United States' antitrust laws for injuries that they sustained entirely overseas and that arose out of purely foreign sales transactions that had no substantial effect on United States commerce. The court of appeals held that respondents were entitled to seek such relief on the theory that the foreign conduct by petitioners that injured respondents was part of a global price-fixing conspiracy that had anticompetitive effects in the United States, and that those effects give rise to a claim by some *other* person.

Such an expansive reach of the antitrust laws is not justified by either the text or history of the FTAIA. The result reached by the court of appeals is also highly likely to have the perverse effect of undermining the government's efforts to detect and deter international cartel activity.

## A. THE FTAIA REQUIRES A PLAINTIFF'S CLAIM TO ARISE OUT OF A CONSPIRACY'S ANTICOMPETITIVE EFFECT IN THE UNITED STATES

### 1. *The Text Of The Statute Requires A Plaintiff To Allege That His Claim Arises From The Domestic Anticompetitive Effect Of A Sherman Act Violation*

a. The FTAIA governs whether a federal court may hear a plaintiff's complaint alleging violations of the Sherman Act involving foreign conduct. Section 6a(1) provides that the Sherman Act extends to foreign conduct only when it has a requisite effect on United States commerce. 15 U.S.C. 6a(1). That such effect was caused by the vitamin cartel has not been disputed. Pet. App. 9a. A requisite effect is not enough to establish that the Sherman Act applies to foreign conduct, however, for Section 6a(2) imposes the further condition that

9

"such effect gives rise to a claim" under the Sherman Act. 15 U.S.C. 6a(2).[2]

It is a "fundamental principle of statutory construction" that the meaning of statutory language "cannot be determined in isolation, but must be drawn from the context in which it is used." *Textron Lycoming Reciprocating Engine Div., AVCO Corp.* v. *UAW*, 523 U.S. 653, 657 (1998) (internal quotation marks omitted). The FTAIA's focus is explicitly and only on the *domestic* effect of anticompetitive conduct. Its text contains no hint of a statutory purpose to permit recovery where the situs of the plaintiff's injury is entirely foreign and that injury arises exclusively from a price-fixing or market-allocation conspiracy's effect on foreign commerce. Accordingly, read in context, by far the most natural reading of Section 6a(2)'s requirement that "such effect gives rise to a claim" under the Sherman Act is that the requisite anticompetitive effect on domestic commerce must give rise to a Sherman Act claim brought by the *particular plaintiff* before the court.

The requirement that a plaintiff tie his own claim to a conspiracy's domestic anticompetitive effect does not conflict with a supposedly literal or "plain" meaning of Section 6a(2), based on its use of the indefinite article "a," as has been suggested. See *Kruman*, 284 F.3d at 400; *Statoil*, 241 F.3d at 432 (Higginbotham, J., dissenting). "The word 'a' has varying meanings and uses," and "the meaning depends on context." *Black's Law Dictionary* 1 (6th ed. 1990). And in particular, although "[a] (or *an*) is called the indefinite article,"

---

[2] The court of appeals treated the FTAIA as setting forth a threshold requirement for subject matter jurisdiction rather than a substantive element of a Sherman Act claim. Pet. App. 8a; see generally *United Phosphorus, Ltd.* v. *Angus Chem. Co.*, 322 F.3d 942, 949-951 (7th Cir.) (en banc), cert. denied, 124 S. Ct. 533 (2003). That issue has no bearing on the question of statutory interpretation before the Court, *i.e.*, whether the Sherman Act applies to foreign conduct when a claim by the plaintiff does not arise from a conspiracy's effect on United States commerce.

10

"[a]ctually, it is used to indicate a definite but unspecified individual, as in *a man in our town*. * * * When we wish to refer indefinitely to a single person or thing we say *any*, as in *any man in our town, any library book*." Bergen Evans & Cornelia Evans, *A Dictionary of Contemporary American Usage* 3 (1957). Thus, the article "a" is far too slender a reed on which to rest the conclusion that Congress intended to give Section 6a(2) an unprecedented world-wide scope whenever *any* person in the domestic commerce of the United States would have *any* claim under the Sherman Act based on the same conduct.

Moreover, the article "a" in Section 6a(2) is immediately followed by the specific term "claim." 15 U.S.C. 6a(2). Congress surely intended a federal court to examine not *any* hypothetical "claim," but a claim that is being asserted by the party seeking to invoke the jurisdiction of the court in the case actually pending before it. In other words, the reference to "a claim" *presupposes*, but leaves unstated, that the "claim" to which the conduct in question "gives rise" is one advanced by the plaintiff. In this respect, Section 6a(2) is just like Rule 12(b)(6) of the Federal Rules of Civil Procedure, which provides for dismissal of a complaint for "failure to state a claim on which relief can be granted." Surely Rule 12(b)(6) refers to "a claim" asserted by the plaintiff in the case, not by some other hypothetical person not before the court. Accordingly, to recognize jurisdiction in a federal district court under the United States' antitrust laws over a private action lacking the requisite "effect" on United States commerce—on the premise that the requirement of such "a claim" might be satisfied by some third party—"would not be consistent with the 'sense of the thing,' and would confer upon [the court] jurisdiction beyond what 'naturally and properly belongs to it.'" *Heckler* v. *Edwards*, 465 U.S. 870, 879 (1984) (citation omitted). Instead, the critical inquiry under Section 6a(2) "is, regardless of the situs of the plaintiff's injury, did that injury arise from the anticom-

11

petitive effects on United States commerce?" *Statoil*, 241
F.3d at 427 n.22.[3]

For similar reasons, the Second Circuit in *Kruman*, 284
F.3d at 397-400, erred in concluding that the only relevant
inquiry is whether the conduct that caused the anticompeti-
tive domestic effect violated the substantive provisions of
the antitrust laws, such that the *government* would have a
valid claim for injunctive relief under Section 4 of the Sher-
man Act, 15 U.S.C. 4. Under that view, the phrase "gives
rise to a claim" adds nothing, because the United States
always has a claim under Section 4 of the Sherman Act
whenever that Act is violated. Nor is there any suggestion
in the FTAIA's text that Congress intended the availability
of relief under the Sherman Act to turn on whether the
government would have a claim—particularly since the
FTAIA equally governs whether a private party may seek
relief, and a price-fixing conspiracy that violates Section 1 of
the Sherman Act, 15 U.S.C. 1, does not "give[] rise" to a
private "claim" under the Sherman Act in the absence of in-
jury to the particular plaintiff. See 15 U.S.C. 15(a) (provid-
ing for private right of action to "any person injured in his
business or property"). In short, as the court of appeals in
this case pointed out, "[t]he view that FTAIA must be taken
to refer only to defendant's conduct tends to ignore the fact

---

[3] Contrary to respondents' contention, the government's reading of
the statute does not mean that only injury that occurs *in the United States*
comes within the terms of the FTAIA. Br. in Opp. 20-21. Rather, the text
of the FTAIA requires that any anticompetitive injury, whether here or
abroad, arise from the conspiracy's requisite effect on domestic commerce.
See, *e.g.*, *Caribbean Broad. Sys., Ltd.* v. *Cable & Wireless PLC*, 148 F.3d
1080, 1086-1087 (D.C. Cir. 1998) (while the situs of injury was overseas,
plaintiff's claim arose from a conspiracy's effect on the United States ad-
vertising market). Moreover, the federal agencies charged with the re-
sponsibility of enforcing the antitrust laws "do not discriminate in the
enforcement of the antitrust laws on the basis of the nationality of the
parties." U.S. Dep't of Justice & Federal Trade Comm'n, *Antitrust En-
forcement Guidelines For International Operations* § 2 (1995), *reprinted
in* 4 Trade Reg. Rep. (CCH) ¶ 13,107, at 20,589-20,592 (Apr. 5, 1995).

12

that FTAIA does refer on its face to the conduct's effect giving rise to a claim"—which even the court acknowledged "arguably refers to a plaintiff's injury." Pet. App. 21a.

Thus, when the court of appeals recognized that "the usual meaning of 'a claim' is a private action," Pet. App. 22a, it should have further recognized that, in the context of a statute governing a private civil action, the words "a claim" are most naturally understood to refer to a claim that is actually being asserted in the civil action arising under that statute. Indeed, we are not aware of any statutory scheme that makes the determination of statutory coverage turn on whether a person not before the court, *i.e.*, a hypothetical plaintiff in some other civil action, has a claim. Ordinarily, a litigant "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Valley Forge Christian Coll.* v. *Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982) (quoting *Warth* v. *Seldin*, 422 U.S. 490, 499 (1975)). "This is generally so even when the very same allegedly illegal act that affects the litigant also affects a third party." *United States Dep't of Labor* v. *Triplett*, 494 U.S. 715, 720 (1990).

b. The implausibility of the panel's expansive interpretation of Section 6a(2) is confirmed by the fact that it would produce results that Congress could not have intended. The panel's holding would open United States courts to suits that are strikingly localized to foreign countries. For example, under the panel's holding, a buyer in Nigeria could file suit in the United States against its own Nigerian supplier if that supplier was a member of an international cartel, simply by alleging (and being able to prove if contested, see, p. 22, *infra*) that some unnamed third person who was injured by the same cartel in United States commerce would have a claim under the Sherman Act.

In other words, under the panel's reading of Section 6a(2), once *any* person is determined to have a claim arising from

13

an injury resulting from the domestic anticompetitive effects of a conspiracy, any foreign purchaser can piggyback on that claim and sue for treble damages in United States courts, even when that purchaser is "injured solely by that [conspiracy's] effect on foreign commerce." Pet. App. 4a. Consider, for example, an international price-fixing cartel with wholly foreign members that had annual foreign sales of $2 billion to 50 foreign customers, and annual sales in the United States of $1 million to one customer. Because the domestic customer could sue based on the conspiracy's domestic effects, all 50 foreign customers also could bring a claim under the Sherman Act, "even if those plaintiffs had no commercial relationship with any United States market and their injuries were unrelated to the injuries suffered in the United States." *Statoil*, 241 F.3d at 427-428.

No decision pre-dating the FTAIA has been cited that permitted such a suit. *Statoil*, 241 F.3d at 429 ("[W]e have found no case in which jurisdiction was found in a case like this—where a foreign plaintiff is injured in a foreign market with no injuries arising from the anticompetitive effect on a United States market."). Congress passed the FTAIA to "exempt from the Sherman Act export transactions that did not injure the United States economy," *Hartford Fire Ins. Co.*, 509 U.S. at 796 n.23, and to create a "single, objective test—the 'direct, substantial, and reasonably foreseeable effect' test"—to "serve as a simple and straightforward clarification of *existing* American law," H.R. Rep. No. 686, 97th Cong., 2d Sess. 2 (1982) (House Report) (emphasis added). It is highly doubtful that the same Congress that intended to codify *limits* on the extraterritorial reach of the antitrust laws intended at the same time to bring about the sweeping expansion that the court of appeals' decision would accomplish.

c. The statutory text should also be read in light of background principles concerning the extraterritorial reach of United States law. As noted above (see p. 7, *supra*),

14

although this Court has adopted a general presumption that Congress intends for its laws to apply only within the territorial jurisdiction of the United States, it is well established—quite apart from the FTAIA—that the Sherman Act applies to foreign conduct that was meant to and did produce some substantial effect in the United States. And the FTAIA ratifies that fundamental proposition by providing that the Sherman Act applies to foreign conduct that has a "direct, substantial, and reasonably foreseeable effect" on the domestic commerce of the United States, if that effect in turn "gives rise to a claim" under the Sherman Act. 15 U.S.C. 6a. The Sherman Act and the FTAIA have thus supplanted any general background presumption against extraterritoriality within those fields involving effects on domestic commerce. It does not follow, however, that general background principles are entirely irrelevant in considering the further question presented in this case.

Here, respondents' alleged injuries do not flow from any effect of petitioners' conduct on the domestic commerce of the United States (e.g., from sales to customers in the United States), which would fall within the rubric of *Hartford Fire Insurance Co.* and the terms of the FTAIA. They instead flow from sales transactions that occurred outside the United States, either entirely within one foreign country or between a seller in one foreign country and a purchaser in another. To apply the Sherman Act to those transactions would extend the Act one significant step further than this Court's Sherman Act decisions culminating in *Hartford Fire Insurance Co.* and anything required by the terms of the FTAIA. Such an application would regulate not merely the defendants' conduct (their conspiracy to fix prices and allocate markets) and the remedies for persons injured by that conduct in United States commerce (persons who bought vitamins from those defendants at supracompetitive prices in domestic sales transactions). It also would subject wholly foreign sales transactions having no significant effect

15

on United States commerce to regulation under our antitrust laws, by affording a Sherman Act claim to injured purchasers of vitamins in foreign countries against the defendants who charged them supracompetitive prices in those foreign transactions. See *San Diego Bldg. Trades Council* v. *Garmon*, 359 U.S. 236, 247 (1959) ("[R]egulation can be as effectively exerted through an award of damages as through some form of preventive relief.").

In *Foley Brothers* v. *Filardo*, 336 U.S. 281 (1949), this Court held that a federal law requiring employers to pay overtime for work in excess of an eight-hour day did not apply in a foreign country. Because the statute and associated cause of action were motivated by "concern with domestic labor conditions," the Court saw no reason to apply them to conditions in foreign countries. *Id.* at 286. The Court concluded that "[a]n intention so to regulate labor conditions which are the primary concern of a foreign country should not be attributed to Congress in the absence of a clearly expressed purpose." *Ibid.* Similarly, in *EEOC* v. *Arabian American Oil Co.*, the Court declined to apply Title VII to employment in a foreign country in the absence of "clearer evidence of congressional intent." 499 U.S. at 255. In both cases, the Court's conclusion was reinforced by its determination that to subject such transactions or relationships in foreign countries to United States law would risk friction with the foreign governments concerned. So too here, in the absence of a clearer expression of congressional intent, the Court should not interpret Section 6a(2) to afford a private claim under the Sherman Act to foreign purchasers in wholly foreign sales transactions, which "are the primary concern of a foreign country" when such sales have no significant effect on our commerce. *Foley Bros.*, 336 U.S. at 286; see, *e.g.*, *McCulloch* v. *Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 19, 21 (1963); *Romero* v. *International Terminal Operating Co.*, 358 U.S. 354, 382-383 (1959).

16

2. *The FTAIA's Legislative History Does Not Reveal An
   Intent To Open United States Courts To Claims
   Seeking Redress For Foreign Injuries Sustained As
   A Result Of Foreign Conduct*

The court of appeals' majority acknowledged that portions
of the FTAIA's legislative history could be read to support
the government's interpretation of the Act, Pet. App. 24a,
29a, but concluded that, on the whole, the legislative history
favors an expansive interpretation because nothing in the
history affirmatively "denigrate[s] or exclude[s]" an expan-
sive interpretation, *ibid.* The majority thus assumed that, in
the absence of express legislative history to the contrary,
Congress must have intended the more expansive interpre-
tation—a dubious analytical approach to begin with for a
statute that was prompted in significant part by a perceived
need to clarify the *limitations* of the Sherman Act's reach
over international transactions. House Report 2.

More fundamentally, however, the majority looked for an
answer to the wrong question in its review of the legislative
history. Because application of the Sherman Act to wholly
foreign sales transactions having no substantial effect on
United States commerce would be contrary to the most
natural reading of the text of the FTAIA and to the back-
ground presumption against application of United States
laws to transactions in foreign countries, the proper question
is whether the legislative history contains a clearly ex-
pressed intent to extend the reach of the Sherman Act in
that manner. There is no suggestion, much less a clear ex-
pression, of such an intent. See *Statoil*, 241 F.3d at 429 n.28
("Nothing is said about protecting foreign purchasers in
foreign markets.") (quoting *In re Microsoft Corp. Antitrust
Litig.*, 127 F. Supp. 2d 702, 715 (D. Md. 2001)).

The only explicit mention of suits by foreign purchasers,
and the deterrent effect such suits might have, is a discus-
sion in the House Report of this Court's decision in *Pfizer,
supra.* House Report 10. *Pfizer*, however, addressed

17

neither the extraterritorial reach of the antitrust laws nor
the extent to which a plaintiff's claim must have some con-
nection to United States commerce. Rather, *Pfizer* held that
a foreign government that purchased goods from United
States companies is a "person" "entitled to sue for treble
damages under the antitrust laws to the same extent as any
other plaintiff." 434 U.S. at 320. Although the Court in
*Pfizer* observed that "suits by foreigners who have been
victimized by antitrust violations clearly may contribute to
the protection of American consumers," *id.* at 314, the
Court's decision in *Pfizer* involved foreign purchasers
injured by anticompetitive *domestic* conduct and effects. *Id.*
at 318 (observing that foreign governments "enter[ed] our
commercial markets as a purchaser of goods or services").
The Court nowhere intimated that the purposes of the anti-
trust laws would support the availability of a private treble
damages action when foreign injury is sustained exclusively
as a result of *foreign* conduct, and the House Report's dis-
cussion of *Pfizer* therefore carries no such intimation either.

The remainder of the legislative history, in fact, cuts
strongly against such an interpretation. For example, the
House Report states that the Act "preserves antitrust pro-
tections in the *domestic* marketplace for all purchasers,
regardless of nationality or the situs of the business." House
Report 10 (emphasis added).[4] Such purchasers, however, are
markedly different from foreign purchasers who "bought
[goods] exclusively outside the United States" and whose in-
juries arise exclusively from a conspiracy's foreign anticom-
petitive effects. Pet. App. 8a. Other passages in the House
Report uniformly tie the application of United States anti-

---

[4] There was no Senate Report on the bill, and the brief discussion in
the conference report, H.R. Conf. Rep. No. 924, 97th Cong., 2d Sess. 29-30
(1982), sheds no light on the issue.

18

trust laws to foreign transactions to a domestic anticompetitive effect.[5]

Finally, the explanation in the legislative history for the language of Section 6a(2) as ultimately enacted strongly undermines the court of appeals' interpretation. The House Judiciary Committee amended the relevant bill, as proposed by the Subcommittee, to add Section 6a(2) with language that provided that "(2) such effect is the basis of the violation alleged." House Report, 16; H.R. 5235, 97th Cong., 2d Sess. § 2 (Aug. 2, 1982). Absent that subsection, the House Report explained, a plaintiff might have been able to bring suit in federal court "merely by proving a *beneficial* effect within the United States, such as increased profitability of some other company or increased domestic employment." House Report 11. The Report explained that the language the Committee added would "require that the 'effect' providing the jurisdictional nexus *must also be the basis for the injury alleged under the antitrust laws.*" *Id.* at 11-12 (emphasis added). That passage unambiguously contemplates that the plaintiff's claim must be based on injury resulting from the

---

[5] See, *e.g.*, House Report 5 ("Since Judge Learned Hand's opinion in *United States* v. *Aluminum Co. of America*, 148 F.2d 416, 443-444 (2d Cir. 1945), it has been relatively clear that it is the situs of the effects as opposed to the conduct, that determines whether United States antitrust law applies."); *ibid.* (quoting Antitrust Div., DOJ, *Antitrust Guide to International Operations* 6-7 (1977) ("[I]t would be a miscarriage of Congressional intent to apply the Sherman Act to 'foreign activities which have no direct or intended effect on United States consumers or export opportunities."); *id.* at 7 (bill would "reinforc[e] the fundamental commitment of the United States to a competitive domestic marketplace"); *id.* at 9-10 ("A transaction between two foreign firms, even if American-owned, should not, merely by virtue of the American ownership, come within the reach of our antitrust laws. Such foreign transactions should, for purposes of this legislation, be treated in the same manner as export transactions—that is, there should be no American antitrust jurisdiction absent a direct, substantial and reasonably foreseeable effect on a domestic consumer or a domestic competitor.").

19

domestic effect of the defendant's conduct in violation of the Sherman Act.

As contemplated in the separate statement by Chairman Rodino (see House Report 18), Section 6a(2), as added by the Committee, was subsequently amended to require that "such effect gives rise to a claim." The Chairman stated that "[t]he substituted language accomplishes the same result as the Committee version" but was preferable "because the Committee language may suggest that an effect, rather than conduct, is the basis for a violation." *Ibid.* Thus, Section 6a(2) as finally enacted was intended to accomplish the same result as the language the House Report described as requiring that the "effect" of the defendant's conduct on United States commerce "must also be the basis for the injury alleged"—*i.e.*, by the plaintiff—"under the antitrust laws." *Id.* at 2. The decision of the court of appeals cannot be reconciled with that expression of congressional intent.

### 3. *Important Policy Considerations Grounded In The Antitrust Laws Significantly Undermine The Court Of Appeals' Interpretation*

a. The court of appeals' interpretation of the FTAIA would substantially interfere with the primary enforcement of the antitrust laws by the United States Government. Price-fixing conspiracies, including those operating globally, are inherently difficult to detect and prosecute. Cooperation by one of the conspirators, through provision of documents or testimony, is often vital to law enforcement.

In light of those practical realities, the Antitrust Division of the Department of Justice maintains a robust amnesty program that offers strong incentives to conspirators who voluntarily disclose their criminal conduct and cooperate with prosecutors. Cf. Germany Am. Br. Pet. Stage 14-16 (discussing EU and German amnesty policies). Since 1993, the program has offered: (1) automatic (*i.e.*, not discretionary) amnesty to corporations that come forward prior to an

20

investigation and meet the program's requirements; (2) the possibility of amnesty even if cooperation begins after an investigation is underway; and (3) if a corporation qualifies for automatic amnesty, all directors, officers, and employees who come forward and agree to cooperate also receive automatic amnesty. 4 Trade Reg. Rep. (CCH) ¶ 13,113 (Aug. 10, 1993). Critically, amnesty is available only to the first conspirator to break ranks with the cartel and come forward. The incentives, transparency, and certainty of treatment established by the program set up a "winner take all" dynamic that sows tension and mistrust among cartel members and encourages defection from the cartel.

The amnesty program has been extremely valuable to enforcement of the antitrust laws. The majority of the Antitrust Division's major international investigations, including the investigation of the vitamin cartel, have been advanced through cooperation of an amnesty applicant. The program has been responsible for cracking more international cartels than all of the Division's search warrants, secret audio or videotapes, and FBI interrogations *combined*. Since 1997, cooperation from amnesty applications has resulted in scores of criminal convictions and more than $1.5 billion in criminal fines.

The court of appeals' interpretation of Section 6a would undermine the effectiveness of the government's amnesty program. Even those conspirators who come forward and receive amnesty from *criminal* prosecution still face exposure to private treble damage actions under 15 U.S.C. 15(a). Potential amnesty applicants therefore weigh their civil liability exposure when deciding whether to avail themselves of the government's amnesty program. The court of appeals' interpretation would tilt the scale for conspirators against seeking amnesty by expanding the scope of their potential civil liability. Faced with joint and several liability for co-conspirators' illegal acts all over the world, a conspirator could not readily quantify its potential liability. The pros-

21

pect of civil liability to all global victims would provide a significant disincentive to seek amnesty from the government.

From a practical standpoint, moreover, the court of appeals' analysis of deterrence is unsound because its focus is on private lawsuits that often follow the exposure of a cartel by the government. Such lawsuits are possible, of course, only if the cartel is discovered in the first place. A private action "supplements government enforcement of the antitrust laws; but it is the Attorney General and the United States district attorneys who are primarily charged by Congress with the duty of protecting the public interest under these laws." *United States* v. *Borden Co.*, 347 U.S. 514, 518 (1954).

In the government's judgment, the amnesty program, by creating a high risk of defection and exposure, deters cartel behavior more effectively than an increase in private litigation after the cartel has been exposed. It follows that deterrence is best maximized, and United States consumers are best protected, not by maximizing the potential number of private lawsuits, but by encouraging conspirators to seek amnesty and thus expose cartels in the first place.

b.  The court of appeals' holding would also present a risk of undermining the foreign relations of the United States. Germany, a major trading partner of the United States, expressed the view in its amicus brief at the petition stage (at 9) that, "[b]y applying the United States' antitrust laws in cases where neither the plaintiff nor the alleged harm has direct effects on United States commerce, the court of appeals' decision fails to respect the fundamental right of foreign sovereigns to regulate their own markets and industries." We understand that other countries share that view. A scheme in which United States courts would adjudicate treble damages actions arising out of transactions that occur wholly in foreign countries and that have no meaningful connection to the United States would be likely to result in tension with our trading partners and attempts by foreign

22

countries to enact statutory counter-reactions to any judgments entered in such suits. See *id.* at 11-14 (describing foreign "blocking" and "claw back" statutes and refusals to enforce certain United States judgments). It is for reasons such as these that the Court declined to apply United States law to transactions in foreign countries in *Arabian American Oil Co.* and *Foley Brothers.* See p. 15, *supra.*

Extension of the Sherman Act to foreign transactions having no substantial relation to the United States might also undermine the cooperative relationships that this Nation's antitrust agencies have forged with their foreign counterparts in recent years. In the cartel area, conspiratorial meetings frequently take place in more than one country, witnesses may be scattered around the world, and documentary evidence may be located in multiple jurisdictions. Effective prosecution of an international cartel requires the ability to gather evidence in different countries and, frequently, coordination of investigative strategies among multi-national enforcement agencies. Because the United States and many of its foreign counterparts now have similar views on the seriousness of cartel behavior (see *infra*, p. 24), and effective mechanisms for coordinating investigations, the United States has become more effective in attacking conspiracies that straddle borders. But those cooperative relationships depend on mutual good will and reciprocity. If our foreign counterparts fear that the fruits of their cooperation ultimately will be used to support follow-on treble damage actions in the United States that they perceive as inappropriate, cooperation may be strained, to the overall detriment of international cartel enforcement.

c. The court of appeals' decision also would be likely to burden the federal courts with a wave of antitrust cases raising potentially complex satellite disputes. For cases in which defendants contest whether the Sherman Act applies to foreign conduct covered by the FTAIA, plaintiffs must prove both that the challenged foreign conduct had the

23

requisite effects on United States commerce and that those
effects give rise to a claim. 15 U.S.C. 6a(1) and (2).

For plaintiffs whose injuries are sustained in United
States commerce, proof of the FTAIA's prerequisites will
overlap substantially with the merits of the plaintiff's claim.
But for plaintiffs entitled to sue under the court of appeals'
holding, *i.e.*, plaintiffs whose injuries are sustained entirely
abroad and arise from purely foreign transactions, the statu-
tory inquiry would turn on claims and persons not before the
court. Courts faced with such suits nonetheless would be
forced to adjudicate whether the challenged foreign conduct
was part of some global conspiracy, whether that global con-
spiracy had the requisite effects on domestic commerce, and
whether some third person was injured in United States
commerce in such a way that gave rise to a claim. Pet. App.
4a, 20a. Those questions might be intensely factual, hotly
disputed, and difficult to resolve, particularly when the criti-
cal person and claim are not before the court. The court of
appeals' decision thus would thrust upon federal courts the
potential for burdensome and protracted satellite litigation
that is far removed from the claim before the court.

d. The court of appeals failed to take into account any of
the foregoing considerations. It rather believed that "forc-
[ing] the conspirator to internalize the full costs of his anti-
competitive conduct" would provide maximum deterrence to
cartels that injure American consumers. Pet. App. 32a. The
theoretical possibility of additional deterrence contemplated
by the court, however, would come only at the expense of
weakening the ability of the United States government to
discover the wrongdoing in the first place. The court of
appeals similarly overlooked that the primary deterrent to
cartel activity is the threat of imprisonment and other
criminal penalties (especially when heightened through the
fear of exposure created by the amnesty program). Scott D.
Hammond, Director of Criminal Enforcement, Antitrust
Div., *Detecting and Deterring Cartel Activity Through an*

24

*Effective Leniency Program* (Brighton, England, Nov. 21-22, 2000) ("Based on our experience, there is no greater deterrent to the commission of cartel activity than the risk of imprisonment for corporate officials.") (available at *<http://www. usdoj.gov/atr/public/speeches/9928.htm>*). Criminal fines also can be substantial, as the penalties imposed on the participants in the vitamin cartel demonstrate. P. 2, *supra*.[6]

The court of appeals likewise failed to consider the large number of antitrust statutes around the world that deter and punish cartel activity. It is our understanding that approximately 100 countries now have comprehensive antitrust laws, and at least one-third of those, including most of the major industrialized countries, allow private lawsuits to recover damages for antitrust violations or provide for damages in conjunction with administrative proceedings.[7] Private civil suits have been filed against the vitamin cartel in Canada, the United Kingdom, Germany, Belgium, and the Netherlands, and class actions have been filed in Canada, Australia, and New Zealand. Pet. 5. At least three of the four home countries of respondents have antitrust laws that

---

[6] Persons who violate the Sherman Act are subject to a maximum statutory term of imprisonment of three years, a statutory maximum corporate fine of $10 million, and a statutory maximum individual fine of $350,000. 15 U.S.C. 1. Fines may exceed those amounts however, as defendants may be fined up to twice the gross gain from the offense or twice the gross loss to victims of the offense if those amounts exceed the Sherman Act's maximum fine. 18 U.S.C. 3571. Defendants may also be ordered to pay restitution in the full amount of the victim's loss. 18 U.S.C. 3663, 3663A; U.S.S.G. § 8B1.1.

[7] *E.g.*, ABA Section of Antitrust Law, *Competition Laws Outside the United States* 1:13, 2:13-14, 3:16-17, 9:11, 10:10 (2001); Global Competition Review, *Cartel Regulation, Getting the Fine Down in 25 Jurisdictions Worldwide* (2002); Global Competition Review, *Private Antitrust Litigation in 16 Jurisdictions Worldwide* (2004); World Trade Organization, Working Group on the Interaction Between Trade and Competition Policy, *Overview of Members' National Competition Legislation, Note by the Secretariat*, WT/WGTCP/W/128/Rev. 2 (July 4, 2000), available at *<http://www.wto.org/english/tratop_e/comp_e/comp_e.htm>*

25

prohibit price-fixing and laws that authorize private civil actions by persons who suffer damages from antitrust violations.[8] These countries have enacted the remedies that their governments consider appropriate, and United States law should not promote forum shopping that undermines those sovereign judgments.

## B. PLAINTIFFS WHOSE INJURIES ARE NOT TIED TO A CONSPIRACY'S ANTICOMPETITIVE EFFECT ON UNITED STATES COMMERCE LACK ANTITRUST STANDING

Even if the Court were to conclude, contrary to our submission in Point A, that the FTAIA does not limit the application of the Sherman Act itself in a manner that excludes claims arising from wholly foreign sales transactions with no significant effect on United States commerce, respondents' suit must fail because the Clayton Act does not in any event offer a cause of action in these circumstances.

1. Section 4 of the Clayton Act, 15 U.S.C. 15(a), provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may sue for treble damages and attorney's fees. Despite that broad language, Section 4 never was intended

---

[8] Australia Trade Practices Act § 45A (agreement is unlawful if it has purpose or effect of "fixing, controlling or maintaining * * * the price for * * * goods or services") and Federal Court of Australia Act § 33C, *et seq.*; Panama Const. art. 290 and Law No. 29 of 1996 arts. 5, 11(1) (per se violations include any agreement that involves "to fix, manipulate, arrange or impose the sale or purchase price of goods or services or to exchange information with the same purpose or effect"), 142 (allowing suit by "any affected party"); Law of Ukraine On Restriction of Monopolism and Prevention of Unfair Competition in Business Activities (1992) and Law of Ukraine On Protecting the Economic Competition art. 55 (2001). The situation in Ecuador is less clear, but it does appear that damages caused by cartel behavior (which appears to be illegal in Ecuador, Crim. Code arts. 67, 363) may be available under Ecuador's general consumer protection and contract laws. Ecuador Organic Law for Consumer Protection arts. 2, 51, 70, 87; Civ. Code arts. 2211, 2241, 2256.

26

"to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation." *Associated General Contractors*, 459 U.S. at 529; accord *Verizon Communications, Inc* v. *Law Offices of Curtis V. Trinko*, 124 S. Ct. 872, 877 (2004) (concurring opinion of Stevens, J). Thus, even if an antitrust plaintiff has suffered harm sufficient to satisfy the constitutional standing requirement of "injury in fact," the court must make a further determination whether the plaintiff has "antitrust standing," *i.e.,* "whether the plaintiff is a proper party to bring a private antitrust action." *Associated General Contractors*, 459 U.S. at 535 n.31.

This Court accordingly has established several limitations on antitrust standing based on substantive antitrust and policy considerations. For instance, in *Hawaii* v. *Standard Oil Co.*, 405 U.S. 251 (1972), the Court held that States could not sue in their *parens patriae* capacity for damages to their general economy. Similarly, in *Illinois Brick Co.* v. *Illinois*, 431 U.S. 720 (1977), the Court held that the antitrust laws do not provide relief to indirect purchasers who paid an enhanced price because their suppliers had been victimized by a price-fixing conspiracy. In *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977), the Court held that a plaintiff must show "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." And in *Associated General Contractors*, 459 U.S. at 545, the Court found that a union lacked antitrust standing to sue a multi-employer association for alleged antitrust violations, after considering "the nature of the Union's injury, the tenuous and speculative character of the relationship between the alleged antitrust violation and the Union's alleged injury, the potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of the alleged conspiracy."

27

Those decisions establish that antitrust standing should be denied to a plaintiff whose suit would "divorce[] antitrust recovery from the purposes of the antitrust laws without a clear statutory command to do so." *Brunswick*, 429 U.S. at 487; accord *Associated General Contractors*, 459 U.S. at 538 (observing that the plaintiff should be seeking to redress injuries that are tied to the central purposes of the antitrust laws). In analogous circumstances, this Court has interpreted the Administrative Procedure Act, 5 U.S.C. 701 *et seq.*, and other statutes to deny standing when the plaintiff's interests do not fall within the "zone of interests" protected by the statute. *E.g., National Credit Union Admin.* v. *First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998); *Bennett* v. *Spear*, 520 U.S. 154, 163 (1997); see *Malamud* v. *Sinclair Oil Corp.*, 521 F.2d 1142, 1152 (6th Cir. 1975) (applying zone of interests analysis to the antitrust laws).

2. Foreign purchasers in transactions having no substantial connection to United States commerce are not proper plaintiffs under Section 4 of the Clayton Act. As explained above, there is a background presumption that Congress did not intend to regulate such transactions in foreign countries under United States law, and nothing in the Clayton Act itself suggests a congressional intent to afford a treble damages remedy. The FTAIA did not amend the Clayton Act, and nothing in the text or history of the FTAIA's amendment of the Sherman Act suggests a congressional intent, much less a "clear statutory command" (*Brunswick*, 429 U.S. at 487), to displace the background presumption and create a treble damages remedy under the Clayton Act for a wide class of global plaintiffs whose injuries have no connection to United States commerce. To the contrary, the House Report makes clear (at 11) that the FTAIA was "not intend[ed] to alter existing concepts of antitrust injury or antitrust standing." And to conclude, as did the court of appeals, that such a class of plaintiffs may sue based on the rights of third

parties who were injured in the United States conflicts with basic principles of standing generally. See p., 12, supra.

The court of appeals reasoned that "[t]he foreign plaintiffs' paying of inflated prices in foreign commerce" was a loss that the antitrust laws were designed to prevent. Pet. App. 35a. The fact that respondents were direct purchasers victimized by a price-fixing conspiracy, however, does not mean that respondents suffered the kind of injury contemplated by Section 4 of the Clayton Act when their particular injuries did not arise from anticompetitive effects on United States commerce. Under the FTAIA, the conduct of petitioners at issue in this case was unlawful under the Sherman Act only because of its anticompetitive effect on domestic United States commerce. Respondents' injury, which is not based on any such an effect, does not "flow[] from that which makes the defendants' acts unlawful," *Brunswick Corp.*, 429 U.S. at 489, and therefore is outside the zone of interests protected by the antitrust laws.

"American antitrust laws do not regulate the competitive conditions of other nations' economies." *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 582 (1986). Rather, the central purpose of the antitrust laws is to protect consumers, competition, and commerce *in the United States.* "Congress' foremost concern in passing the antitrust laws was the protection of Americans." *Pfizer*, 434 U.S. at 314; see 1A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 272h, at 358 (2d ed. 2000) ("[The FTAIA] makes clear that the concern of the antitrust laws is protection of *American* consumers and *American* exporters, not foreign consumers or producers."); *Turicentro, S.A.* v. *American Airlines Inc.*, 303 F.3d 293, 307 (3d Cir. 2002) ("Plaintiffs' injuries occurred exclusively in foreign markets. They are not of the type Congress intended to prevent through the [FTAIA] or the Sherman Act."). Accordingly, to award treble damages and attorney's fees to a class of foreign plaintiffs whose injuries arise exclusively from a conspiracy's

29

foreign anticompetitive effects would "divorce antitrust recovery from the purposes of the antitrust laws without a clear statutory command to do so." *Brunswick Corp.*, 429 U.S. at 487; *Matsushita*, 475 U.S. at 582-284 & nn. 6 & 7 (antitrust damages unavailable except where foreign conduct caused plaintiffs' injury in American market).[9]

The conclusion that the Clayton Act does not afford respondents a cause of action is reinforced by the fact that private suits such as this would undermine enforcement of the Sherman Act by the United States Government, which is primarily responsible for protecting American consumers and markets. All of the lower court decisions interpreting Section 6a(2), *i.e.*, this case, *Kruman* and *Statoil*, have involved private actions by foreign plaintiffs that followed directly on the heels of criminal or civil enforcement actions initiated by United States and foreign antitrust authorities. As explained previously, the United States' experience is that the most effective method of enforcement features an amnesty program that offers strong incentives to conspirators to break ranks with and expose their cartels by seeking amnesty from criminal prosecution. Greatly expanding the scope of private follow-on litigation would weaken the incentives to seek amnesty, and ultimately weaken the protection of United States consumers by making international cartels difficult to detect. See pp. 19-21, *supra*. Opening our courts to suits with no connection to United States commerce also would risk undermining the relationships with foreign governments that are important to the

---

[9] The court of appeals viewed respondents as proper plaintiffs because respondents' claimed injuries, in the court's view, suffered none of the defects mentioned in *Associated General Contractors, supra.* Pet. App. 36a-37a. The factors mentioned in that decision, however, simply persuaded the Court that the plaintiffs in that particular case lacked standing. The Court did not intimate that those factors were exclusive, and explicitly stated that "[a] number of other factors may be controlling" in determining whether a plaintiff has antitrust standing. 469 U.S. at 538.

30

United States' enforcement efforts and would impose on federal courts potentially burdensome and complex antitrust suits brought by plaintiffs around the globe based on transactions that took place overseas. See pp. 21-23, *supra*; cf. *Associated General Contractors*, 459 U.S. at 545 ("massive and complex damages litigation not only burdens the courts, but also undermines the effectiveness of treble-damages suits"). Those considerations, and the fact that such suits are far removed from the core policy of the antitrust laws to protect commerce in the United States, establish that respondents lack standing to invoke the treble damages remedy of Section 4 of the Clayton Act.

## CONCLUSION

The judgment of the court of appeals should be reversed.

Respectfully submitted.

EDWIN S. KNEEDLER[*]
*Acting Solicitor General*

R. HEWITT PATE
*Assistant Attorney General*

MAKAN DELRAHIM
*Deputy Assistant Attorney General*

WILLIAM H. TAFT, IV
*Legal Adviser*
*United States Department of State*

JOHN D. GRAUBERT[**]
*Acting General Counsel*
*Federal Trade Commission*

LISA S. BLATT
*Assistant to the Solicitor General*

ROBERT B. NICHOLSON
STEVEN J. MINTZ
*Attorneys*

FEBRUARY 2004

---

[*] The Solicitor General is recused in this case.
[**] The General Counsel is recused in this case.