# EXHIBIT A

LEXSEE 2005 US DIST LEXIS 19788

**LATINO QUIMICA-AMTEX S.A. (f/k/a Latino Quimica S.A.), QUIMICA AMTEX S.A. (f/k/a Quimica Amtex, LTDA), and QUIMICA AMTEX S.A. de C.V., individually and on behalf of all others similarly situated, Plaintiffs, -against- AKZO NOBEL CHEMICALS B.V., AKZO NOBEL FUNCTIONAL CHEMICALS, LLC, ATOFINA (f/k/a Elf Atochem S.A.), ATOFINA CHEMICALS, INC. (f/k/a Atochem North America, Inc. and Elf Atochem North America, Inc.), DAICEL CHEMICALS INDUSTRIES, LTD., DAICEL (U.S.A), INC., DENKI KAGAKU KOGYO KABUSHIKI KAISHA, DENKA CORPORATION, and DENAK CO., LTD., Defendants.**

**03 Civ. 10312 (HB)(DF)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2005 U.S. Dist. LEXIS 19788; 2005-2 Trade Cas. (CCH) P74,974*

September 7, 2005, Decided
September 8, 2005, Filed

**SUBSEQUENT HISTORY:** As Amended September 19, 2005.

**DISPOSITION:** [*1] Defendants' motion to dismiss Amended Complaint granted, and Plaintiffs' motion for leave to file Second Amended Complaint denied.

**COUNSEL:**

[*2] Linda P. Nussbaum, Esq., Cohen, Milstein, Hausfeld & Toll, PLLC, New York, NY.

Paul T. Gallagher, Esq., Cohen, Milstein, Hausfeld & Toll, PLLC, Washington, DC.

Mark S. Goldman, Esq., Weinstein, Kitchenoff, Scarlato, Karon & Goldman Ltd., Philadelphia, PA.

Daniel R. Karon, Esq., Weinstein Kitchenoff Scarlato Karon & Goldman Ltd., Cleveland, OH.

Felipe Echecopar, Echocopar Asesores, S.C., Naucalpan, Edo. de Mex.

D. Jarrett Arp, Esq., Gibson, Dunn & Crutcher LLP, Washington, DC.

Stephen C. McKenna, Esq., Gibson, Dunn & Crutcher LLP, Denver, CO.

Daniel G. Swanson, Esq., Gibson, Dunn & Crutcher LLP, Los Angeles, CA.

William A. Wargo, Esq., Gibson, Dunn & Crutcher LLP, New York, NY.

James D. Miller, Esq., Clifford Chance US, LLP, New York, NY.

Bruce Alan Colbath, Esq., James F. Lerner, Esq., Weil, Gotshal & Manges LLP, New York, NY.

Allan Paul Victor, Esq., Weil, Gotshal & Manges LLP, New York, NY.

Steven E. Bizar, Esq., Buchanan Ingersoll, PC, Philadelphia, PA.

Margaret M. Zwisler, Esq., Howrey, Simon, Arnold & White, LLP, Washington, DC.

Andrew R. Leder, Esq., Belair & Evans, New York, NY.

**JUDGES:** DEBRA FREEMAN, United States Magistrate Judge.

**OPINIONBY:** DEBRA FREEMAN

**OPINION:**

### AMENDED MEMORANDUM AND ORDER

Case 1:05-cv-00485-JJF    Document 19-2    Filed 05/02/2006    Page 3 of 43

Page 2
2005 U.S. Dist. LEXIS 19788, *; 2005-2 Trade Cas. (CCH) P74,974

**DEBRA FREEMAN, United States Magistrate Judge:**

In this antitrust action, referred to me for general pretrial supervision, the parties have consented, pursuant to *28 U.S.C. § 636(c)*, to have this Court decide Defendants' motion to dismiss the Amended Complaint for lack of subject matter jurisdiction, as well as Plaintiffs' motion for leave to file a Second Amended Complaint. (*See* Dkt. 28.) For the reasons set forth below, Defendants' motion to dismiss is granted, and Plaintiff's motion for leave to file a Second Amended Complaint is denied, on the ground that the amendment would be futile.

### BACKGROUND

#### A. Factual Background

Plaintiffs Latino Quimica-Amtex S.A., Quimica Amtex S.A., and Quimica Amtex S.A. de C.V. (collectively, "Plaintiffs") are Mexican, Argentinian, and Colombian purchasers of sodium monochloroacetate and monochloroacetic acid (collectively "MCAA"), which are chemicals used in food, pharmaceutical, herbicide and plastic additive applications. (First Amended Complaint, [*3] filed May 27, 2004 ("Am. Compl.") (Dkt. 23), PP 1, 7-9, 28.) Plaintiffs purchased MCAA in foreign markets at prices allegedly fixed by defendants Akzo Nobel Chemicals B.V., Akzo Nobel Functional Chemicals, LLC, Atofina, Atofina Chemicals, Inc., Daicel Chemicals Industries, Ltd., Daicel (U.S.A.), Inc., Denki Kagaku Kogyo Kabushiki Kaisha, Denka Corporation, and Denak Co., Ltd. (collectively, "Defendants"), who are manufacturers of MCAA. (*Id.* P 10-18, 29, 43.) According to Plaintiffs, Defendants entered into agreements among themselves and with other MCAA manufacturers, from approximately September 1, 1995 through August 31, 1999, to fix the price of MCAA on a global basis and to allocate MCAA markets throughout the world. (*Id.* P 29.) n1 Claiming that they were injured by Defendants' anticompetitive conduct, Plaintiffs commenced this class action suit n2 against Defendants.

> n1 Defendants Akzo and Elf Atochem have pleaded guilty to criminal antitrust charges for these actions. (*Id.* PP 34-37.)

> n2 Because no class has yet been certified in this putative class action, the Court must treat the action as an individual action by the named plaintiffs. *See Sniado v. Bank Austria AG, 174 F. Supp. 2d 159, 162-163 (S.D.N.Y. 2001)* (citations omitted), *vacated on other grounds, 352 F.3d 73 (2d Cir. 2003), remanded, 542 U.S. 917, 124 S. Ct. 2870, 159 L. Ed. 2d 774 (2004), dismissing appeal, 378 F.3d 210 (2d Cir. 2004).*

[*4]

Despite the fact that Plaintiffs allege that they suffered injury in purchases that were made entirely in foreign markets for delivery in foreign countries (*see id.* PP 20, 26(c), 29), Plaintiffs nonetheless seek to invoke the jurisdiction of this Court and to hold Defendants liable under *Section 1* of the Sherman Act, *15 U.S.C. § 1*, and *Sections 4* and *16* of the Clayton Act, *15 U.S.C. §§ 15, 26*. n3 Although the Sherman Act generally does not apply to proscribe conduct in foreign markets, Plaintiffs seek the benefit of an exception found in the Foreign Trade Antitrust Improvements Act of 1982, *15 U.S.C. § 6a* ("FTAIA"), which provides, *inter alia*, that an action challenging foreign conduct may be maintained where that conduct had a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce, and "such effect" gave rise to the plaintiff's claim. *15 U.S.C. § 6a(1), (2)*. Defendants dispute that this FTAIA exception applies in this case.

> n3 The Clayton Act enables private rights of action to be maintained under the Sherman Act. (*See infra* at 9.)

[*5]

#### B. Procedural History

Plaintiffs initiated this lawsuit on December 31, 2003, seeking treble damages and injunctive relief, as well as attorneys' fees and costs. (*See* Complaint, filed Dec. 31, 2003 (Dkt. 2).) In May 2004, the case was referred to me by the Honorable Harold Baer for general pretrial supervision (Dkt. 20).

When this Court held its first conference with counsel, on May 17, 2004, counsel informed the Court that a then-pending case before the United States Supreme Court, *F. Hoffmann-LaRoche Ltd. v. Empagran S.A.*, involved similar legal issues, and that the Supreme Court's resolution of those issues would likely be dispositive on the question of subject matter jurisdiction in this case. In *Empagran*, plaintiffs, who had allegedly suffered injury in foreign purchases of vitamins, contended that they were entitled to invoke the protections of the U.S. antitrust laws where the defendants, vitamin manufacturers and distributors, had engaged in a price-fixing conspiracy that adversely affected customers in both the United States and foreign countries. In June 2004, the Supreme Court issued a decision, based on principles of international comity, as well [*6] as statutory language and history, in which the Court dismissed the plaintiffs' claim to the extent it arose from an adverse effect of the defendants' conduct on foreign commerce that was inde-

2005 U.S. Dist. LEXIS 19788, *; 2005-2 Trade Cas. (CCH) P74,974

pendent of any adverse effect of their conduct on U.S. commerce. *See Empagran, 542 U.S. 155, 159 L. Ed. 2d 226, 124 S. Ct. 2359, 2365-72 (2004).* The Court, however, remanded to the D.C. Circuit the question of whether the plaintiffs should be permitted to proceed on an alternative theory of liability arguably included in their complaint -- that "because vitamins are fungible and readily transportable, without an adverse domestic effect (*i.e.*, higher prices in the United States), the sellers could not have maintained their international price-fixing arrangement and respondents would not have suffered their foreign injury." *Id. at 2372.*

When the *Empagran* decision was issued, the parties to this case disagreed as to its import. Defendants asserted that it was, indeed, case dispositive, and that this action should therefore be dismissed, but Plaintiffs (represented by the same counsel as the plaintiffs in *Empagran*) argued that, as in *Empagran*, Plaintiffs had alleged two theories [*7] of liability, and that they should be permitted to proceed with the alternative theory that the Supreme Court had not addressed.

The parties did agree that the question of subject matter jurisdiction should be placed before this Court for resolution before they incurred the cost of further proceedings, and they consented to have this Court decide that question. n4 On August 27, 2004, all Defendants, except Denak Co., Ltd., which appears not to have been served in the action, moved to dismiss the Amended Complaint n5 under *Rule 12(b)(1) of the Federal Rules of Civil Procedure*, for lack of subject matter jurisdiction. (*See* Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed Aug. 27, 2004 (Dkt. 30); Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction, filed Aug. 27, 2004 ("8/27/04 Def. Mem.") (Dkt. 31).) The principal argument advanced in Defendants' motion was that the Amended Complaint failed to allege adequately that the domestic effect of Defendants' conduct "gave rise" to Plaintiffs' foreign claim, as required by the FTAIA. (*See id.*)

n4 With the Court's approval, the parties agreed to brief the issue of subject matter jurisdiction first, without prejudice to Defendants' right to file additional preliminary motions pursuant to *Federal Rules of Civil Procedure 8, 9, and/or 12*, in the event this Court determines that it has subject matter jurisdiction over this action.

[*8]

n5 Plaintiffs amended their Complaint on May 27, 2004, for the sole purpose of adding de-

fendants Denki Kagaku Kogyo Kabushiki Kaisha, Denka Corporation, and Denak Co., Ltd. The Amended Complaint (Dkt. 23) is substantially identical to Plaintiff's original Complaint.

Plaintiffs opposed Defendants' motion to dismiss (*see* Plaintiffs' Response to Defendants' Motion to Dismiss for Lack of Jurisdiction, filed Oct. 1, 2004 ("10/1/04 Pl. Mem.") (Dkt. 35)), but, one week after filing their opposition papers, Plaintiffs also moved for leave to file a Second Amended Complaint, so as to add further factual allegations supporting their current theory of liability (*see* Plaintiffs' Notice of Motion and Motion for Leave to File a Second Amended Class Action Complaint, filed Oct. 12, 2004 (Dkt. 36); Memorandum of Law in Support of Motion for Leave to File Second Amended Class Action Complaint, filed Oct. 7, 2004 ("10/7/04 Pl. Mem.") (Dkt. 37)). Although Plaintiffs maintained that their alternative causation theory was adequately pleaded in their Amended Complaint, they purportedly offered the proposed [*9] Second Amended Complaint to enhance and clarify the factual basis for that theory. The additional causation allegations contained in Plaintiffs' proposed Second Amended Complaint were derived from the declaration of an economist, John C. Beyer, Ph.D (*see* 10/1/04 Pl. Mem. at 8; Declaration of John C. Beyer, Ph.D. ("Beyer Decl."), attached to 10/1/04 Pl. Mem. as Ex. 4), which Plaintiffs had submitted to the Court with their papers opposing the motion to dismiss.

Defendants filed a reply in further support of their motion to dismiss, asserting that Plaintiffs, even with their attempt to support their allegations with Dr. Beyer's declaration, failed to allege the necessary causal connection between an anticompetitive effect on U.S. commerce and Plaintiffs' antitrust claim. (*See* Reply Memorandum in Support of Motion to Dismiss for Lack of Jurisdiction, filed Oct. 15, 2004 ("10/15/04 Def. Mem.") (Dkt. 38).) Defendants also opposed Plaintiffs' motion for leave to amend, arguing that Plaintiffs had engaged in unfair "procedural gamesmanship" by waiting for Defendants' motion to dismiss before seeking to amend their pleading, and that the proposed amendment, in any event, would be [*10] futile. (*See* Certain Defendants' Opposition to Plaintiffs' Motion for Leave to Amend, filed Oct. 25, 2004 ("10/25/04 Def. Mem.") (Dkt. 39).) On November 11, 2004, Plaintiffs filed a reply in support of their motion for leave to amend. (*See* Plaintiffs' Reply Memorandum In Support of Their Motion for Leave to File a Second Amended Class Action Complaint, filed Nov. 4, 2004 ("11/4/04 Pl. Mem.") (Dkt. 40).)

Subsequent to the parties' submissions of their briefs, the parties supplemented their submissions by providing the Court with copies of briefs and decisions in

2005 U.S. Dist. LEXIS 19788, *; 2005-2 Trade Cas. (CCH) P74,974

other cases that, in the parties' view, had bearing on the pending motion. In particular, the parties kept this Court apprised of the status of the *Empagran* case, as it was briefed on remand and finally decided by the D.C. Circuit in June 2005. *See Empagran, No 01-7115, 417 F 3d 1267, 2005 U.S. App. LEXIS 12743 (D.C. Cir June 28, 2005)*. On July 15, 2005, this Court heard oral argument from the parties regarding the adequacy of both the Amended Complaint and the proposed Second Amended Complaint, in light of all relevant authority.

## DISCUSSION

### I. APPLICABLE LEGAL STANDARDS

#### A. [*11] Rule 12(b)(1)

Under *Federal Rule of Civil Procedure 12(b)(1)*, a defendant may move to dismiss a claim on the ground that the court lacks jurisdiction over the subject matter. *Fed. R. Civ. P. 12(b)(1)*. Such a motion may be based on a facial or factual attack on the complaint. *See Poodry v. Tonawanda Band of Seneca Indians, 85 F.3d 874, 887 n.15 (2d Cir. 1996)*. Regardless of whether the challenge is "facial" or "factual," the plaintiff bears the burden of establishing a court's subject matter jurisdiction. *See Makarova v. United States, 201 F 3d 110, 113 (2d Cir. 2000)*.

Where a defendant makes a facial attack, which only questions the sufficiency of the pleading, a court "must accept as true all material factual allegations in the complaint." *Alonso v. Saudi Arabian Airlines Corp., 1999 U.S. Dist. LEXIS 5826, No. 98 Civ. 7781 (SAS), 1999 WL 244102, at *1 (S.D.N.Y. Apr. 23, 1999)* (citations omitted). Where, on the other hand, a defendant challenges the factual basis for subject matter jurisdiction, a court is "not obligated to accord presumptive truthfulness to the allegations of the complaint. Rather, it may weigh the evidence on the record accompanying the [*12] *Rule 12(b)(1)* motion, or hold an evidentiary hearing, and decide for itself the merits of the jurisdictional dispute." *Dow Jones & Co. v. Harrods, Ltd., 237 F. Supp. 2d 394, 404 (S.D.N.Y. 2002); see A.I.G. Asian Infrastructure Fund, L.P. v. Chase Manhattan Asia Ltd., No. 02 Civ. 10034 (KMW), 2004 U.S. Dist. LEXIS 27334, at *4 (S.D.N.Y. Mar. 25, 2004)* (factual attack "requires the Court to determine whether the plaintiff has established facts sufficient to support subject matter jurisdiction").

In this case, Plaintiffs submitted a declaration of fact (from Dr. Beyer) in opposition to Defendants' motion to dismiss, and Defendants made at least some effort to challenge the content of that declaration in reply. (*See* 10/25/04 Def. Mem. at 12 (Plaintiffs "do not appear to have a factual basis to support their causation theory"); *id.* at 12-14 (attacking data discussed in Beyer declaration).) Nonetheless, Defendants clarified at oral argu-

ment that they intended to mount only a facial challenge to the Amended Complaint. (*See* Transcript of Civil Cause for Conference, dated July 15, 2005 ("7/15/05 Tr."), at 6.) Further, Defendants explained that, to [*13] the extent they argued that Plaintiff's proposed further amendment would be futile, their challenge to the proposed Second Amended Complaint was also intended to be a facial attack. (*Id.* at 6-7.) Thus, this Court must accept as true the allegations of the Amended Complaint and evaluate its sufficiency on that basis. Similarly, to the extent the Court considers the adequacy of the proposed Second Amended Complaint, the Court must also consider that pleading on its face.

#### B. Rule 15(a)

*Rule 15(a)* provides that leave to amend a pleading "shall be freely given when justice so requires." *Fed. R. Civ. P. 15(a)*. A "motion to amend should be denied if there is an 'apparent or declared reason -- such as undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of an amendment, [or] futility of amendment.'" *Dluhos v. Floating and Abandoned Vessel Known as "New York," 162 F.3d 63, 69 (2d Cir. 1998)* (quoting *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)*. Where a court would lack subject matter jurisdiction over the case as [*14] pleaded in the proposed amendment, the court may deny leave to amend on the ground of futility. *See Chan v. Reno, 916 F. Supp. 1289, 1302 (S.D.N.Y. 1996)*.

#### C. Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA")

*Section 1* of the Sherman Antitrust Act provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." *15 U.S.C. § 1*. Private parties injured "by reason of anything forbidden in the antitrust laws" have the right to bring suit for treble damages, costs (including reasonable attorneys' fees), and injunctive relief, through Sections 4 and 16 of the Clayton Act. *15 U.S.C. §§ 15, 26*.

In 1982, Congress enacted the FTAIA as an amendment to the Sherman Act, to clarify the extraterritorial reach of United States antitrust laws. *See O.N.E. Shipping, Ltd. v. Flota Mercante Grancolombiana, S.A., 830 F.2d 449, 451 (2d Cir. 1987)*. The FTAIA provides that

> [The Sherman Act] shall not apply to conduct involving trade or commerce

Case 1:05-cv-00485-JJF    Document 19-2    Filed 05/02/2006    Page 6 of 43

Page 5

2005 U.S. Dist. LEXIS 19788, *; 2005-2 Trade Cas. (CCH) P74,974

(other than [*15] import trade or import commerce) with foreign nations unless --

> (1) such conduct has a direct, substantial, and reasonably foreseeable effect -
>
> (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
>
> (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
>
> (2) such effect gives rise to a claim under the provisions of [the Sherman Act], other than this section.

*15 U.S.C. § 6a.* For the Court to have subject matter jurisdiction over a Sherman Act claim for "conduct involving trade or commerce ... with foreign nations," the requirements of both *Sections 6a(1)* and *(2)* of the FTAIA must be satisfied. *See Empagran, 124 S Ct at 2365; Sniado, 352 F.3d at 77; Den Norske Stats Oljeselskap AS v. Heeremac Vof, 241 F.3d 420, 421-22 (5th Cir. 2001).*

## II. DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

In this case, the parties dispute whether the Amended Complaint sufficiently alleges subject matter jurisdiction [*16] based on the FTAIA. Because Defendants are only raising a facial attack to the Amended Complaint (*see supra* at 8), the Court will accept the material factual allegations of the Amended Complaint as true. As Plaintiffs bear the burden of subject matter jurisdiction, Plaintiffs must demonstrate that they have set forth allegations sufficient to plead the elements of both *Sections 6a(1)* and *(2)* of the FTAIA.

### A. Allegations of the Amended Complaint

In their Amended Complaint, Plaintiffs allege that Defendants conspired to fix MCAA prices and allocate MCAA markets in the United States and worldwide

(Am. Compl. PP 2, 29), and that this "unlawful price fixing and market allocation conduct had adverse effects in the U.S. and in other nations that caused injury to Plaintiffs in connection with their foreign MCAA purchases" (*id. P 29).* With respect to the nature of the domestic injury caused by Defendants' conduct, Plaintiffs plead that "Defendants' anticompetitive conduct directed at foreign markets caused injury to U.S. commerce by reducing the U.S. MCAA market's competitiveness and by directing anticompetitive conduct at U.S. commerce." (*Id.* P 31.) "As a [*17] result," Plaintiffs allege, "Defendants' anticompetitive conduct directed at the foreign MCAA market had the requisite direct, substantial and reasonably foreseeable effect on U.S. commerce needed to invoke the Sherman Act." (*Id.*)

With respect to Plaintiffs' foreign injury, Plaintiffs further plead that, in their purchases of MCAA, they "paid more for MCAA than they would have paid absent Defendants['] . . . conspiracy to harm U.S. and worldwide commerce," and that "Plaintiffs suffered injuries-in-fact when they paid inflated MCAA prices." (*Id.* P 43.) Thus, Plaintiffs plead that "Defendants' conspiracy to fix MCAA prices and allocate MCAA markets around the world caused Plaintiffs injuries-in-fact" (*id.,*) and that "Defendants' . . . conspiracy to harm U.S. and world commerce directly injured Plaintiffs" (*id.* P 44).

### B. FTAIA Requirements

#### 1. *Section 6a(1)*

As this case involves neither import nor export trade, Plaintiffs argue that the above-quoted allegations of the Amended Complaint satisfy *Section 6a(1)* because those allegations adequately describe "conduct" that had a "direct, substantial, and reasonably foreseeable effect . . . on trade or [*18] commerce which is not trade or commerce with foreign nations," *i.e.,* conduct that had a direct, substantial, and reasonably foreseeable effect on *domestic* commerce.

The Second Circuit has adopted a broad interpretation of the "conduct" proscribed by the Sherman Act. In *Sniado,* the Second Circuit directed the district court to interpret "conduct" as the entire worldwide conspiracy alleged by the plaintiffs, rather than the more narrowly-described activity of "charging . . . supra-competitive fees in Europe." *352 F.3d at 78.* Similarly, this Court finds that Plaintiffs have alleged "conduct" consisting of Defendants' participation in "an over-arching worldwide conspiracy to raise, stabilize and maintain MCAA prices," and Defendants' establishment of price-fixing agreements for MCAA both inside and outside of the United States. (Am. Compl. P 29.)

With respect to whether this conduct had a "direct, substantial, and reasonably foreseeable effect" on domes-

2005 U.S. Dist. LEXIS 19788, *; 2005-2 Trade Cas. (CCH) P74,974

tic commerce, the Amended Complaint alleges, as quoted above, that Defendants' conduct, which included fixing MCAA prices in the United States (*id.*,) resulted in "supra-competitive MCAA prices in the U.S." [*19] (*id.* P 1), as well as "injury to U.S. commerce by reducing the U.S. MCAA market's competitiveness and by directing anticompetitive conduct at U.S. commerce" (*id* P 31). Assuming the truth of these allegations, the Amended Complaint adequately pleads that Defendants' conduct had the necessary effect on domestic commerce within the meaning of *Section 6a(1)*. *See Den Norske, 241 F.3d at 426-27* (allegations that international conspiracy "compelled Americans to pay supra-competitive prices" were sufficient to satisfy the first requirement of the FTAIA); *see also M.M. Global Services, Inc. v. The Dow Chemical Co., No. 3:02 cv 1107 (AVC), 2004 U.S. Dist. LEXIS 4139, at *15-18 (D. Conn. Mar. 18, 2004)* (finding, on reconsideration, that allegations that price-fixing conspiracy was intended to prevent erosion of U.S. prices were sufficient to allege conduct having direct, substantial, and reasonably foreseeable effect on domestic commerce); *cf. Eurim-Pharm GmbH v. Pfizer Inc., 593 F. Supp. 1102, 1106-07 (S.D.N.Y. 1984)* (allegations that defendants' worldwide conspiracy created artificially inflated prices, without specifying where prices [*20] were inflated, were insufficient to allege requisite effect on U.S. commerce).

### 2. Section 6a(2)

Defendants' challenge to the adequacy of the Amended Complaint focuses primarily on the type of causation allegation that would be necessary to satisfy *Section 6a(2) of the FTAIA*. Under that subsection, the domestic effect of a defendant's alleged anticompetitive conduct, as pleaded under *Section 6a(1)*, must "give rise to a [Sherman Act] claim."

In *Empagran,* the Supreme Court rejected an argument that, as long as an alleged global conspiracy caused both domestic and foreign adverse effects, this provision of the FTAIA could be satisfied. As part of its analysis, the Court considered whether allowing citizens of foreign countries to take advantage of U.S. antitrust laws, when their claims had little connection to the United States, would upset "a balance of competing considerations that [other nations'] own domestic antitrust laws embody." *124 S. Ct. at 2368.* The Court reasoned that principles of prescriptive comity counseled against construing *Section 6a* so as to permit U.S. actions for claims arising from the independent foreign effects of foreign conduct: [*21]

Where foreign anticompetitive conduct plays a significant role and where foreign injury is independent of domestic effects, Congress might have hoped that America's antitrust laws, so fundamental a component of our own economic system, would commend themselves to other nations as well. But, if America's antitrust policies could not win their own way in the international marketplace for such ideas, Congress, we must assume, would not have tried to impose them, in an act of legal imperialism, through legislative fiat.

*Id. at 2369.*

The Supreme Court therefore concluded that, where subsection *6a(2)* refers to a domestic effect giving rise to "a claim," the "claim" must not be a hypothetical domestic claim that could have been raised by others, but rather must be the *plaintiff's* claim, *i.e.,* "the claim at issue" in the case. *Id. at 2371-72; accord Sniado v. Bank Austria AG, 378 F.3d 210, 212 (2d Cir. 2004)* (under *Empagran,* plaintiff "must allege that the European conspiracy's effect on domestic commerce gave rise to *his* claims") (emphasis added).

Here, Plaintiffs allege that they suffered injuries solely [*22] in foreign transactions, and their claims seek compensation for those foreign injuries. Plaintiffs, therefore, must not only allege, as they have, that Defendants' global price-fixing conspiracy resulted in a reduction in the competitiveness of the U.S. market for MCAA, but they must also allege that this adverse domestic effect of the conspiracy "gave rise to" their claim for injuries in foreign markets. Defendants further argue that the statutory language requiring that the domestic effect of a defendant's conduct "give[] rise to" the plaintiff's claim suggests that Plaintiffs must plead more than an indirect, "but for" connection between the alleged domestic effect and their claim. Rather, Defendants argue that the Plaintiffs must plead that the domestic effect of Defendants' conduct directly, or "proximately" caused the foreign injury that is the subject of Plaintiffs' claim, and that Plaintiffs have not done so in the Amended Complaint.

On remand in *Empagran,* the D.C. Circuit squarely addressed the question of whether allegations of "but for" causation can be sufficient to satisfy the causation requirement of *Section 6a(2)*. With the plaintiffs in that case conceding the [*23] point, the court determined that "the statutory language -- 'gives rise to' -- indicates a direct causal connection, that is, proximate causation, and is not satisfied by the mere but-for 'nexus' the [plaintiffs] advanced in their brief." *Empagran, 417 F.3d 1267, 2005 U.S. App. LEXIS 12743, at *9.* In reaching this conclusion, the court considered the types of comity is-

Page 7

2005 U.S. Dist. LEXIS 19788, *; 2005-2 Trade Cas. (CCH) P74,974

sues that had concerned the Supreme Court in its remand decision:

> This interpretation of the statutory language accords with principles of prescriptive comity' -- 'the respect sovereign nations afford each other by limiting the reach of their laws' ... -- which required that we 'ordinarily construe[] ambiguous statutes to avoid unreasonable interference with the sovereign authority of other nations.' ... To read the FTAIA broadly to permit a more flexible, less direct standard than proximate cause would open the door to just such interference with other nations' prerogative to safeguard their own citizens from anti-competitive activity within their own borders.

*Id. 417 F.3d 1267, 2005 U.S. App. LEXIS 12743, at 9-10* (citing, *inter alia, Empagran, 124 S. Ct. at 2366, 2367*).

In this case, as well, plaintiffs' counsel [*24] conceded at oral argument that "but for" causation is insufficient, and that the causation standard contemplated by the "gives rise to" language of *Section 6a(2) of the FTAIA* is "proximate" causation. (*See* 7/15/05 Tr. at 21-22 ("Proximate cause is the standard. The U.S. [effect], in fact, has to have proximately caused the foreign injury."); *see also id.* at 55-56.) Thus, the Court is not presented with any dispute between the parties as to the correct standard to apply. In any event, this Court is persuaded by the reasoning of the D.C. Circuit that "proximate" causation is a standard more consistent with principles of prescriptive comity than a looser, "but for" standard.

Further, the proximate causation standard advanced by both parties is consistent with antitrust principles requiring that an antitrust injury-in-fact be caused directly by a defendant's conduct. In considering whether a plaintiff's injury was "too remote" to establish standing under *Section 4* of the Clayton Act, the Supreme Court noted that, while "an antitrust violation may be expected to cause ripples of harm," "it is reasonable to assume that Congress did not intend to allow every person tangentially [*25] affected by an antitrust violation to maintain an action." *Blue Shield of Virginia v. McCready, 457 U.S. 465, 477, 73 L. Ed. 2d 149, 102 S. Ct. 2540 (1982).* Moreover, because Congress enacted *Section 4* of the Clayton Act with language from *Section 7* of the Sherman Act -- which had been read to incorporate the common law principle of proximate cause -- the Supreme Court concluded that Congress presumably in-

tended this same "judicial gloss" to apply to the Clayton Act. *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 532-34, 74 L. Ed. 2d 723, 103 S. Ct. 897 (1983); see also Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 267-68, 272, 117 L. Ed. 2d 532, 112 S. Ct. 1311 (1992)* (holding that right to sue for treble damages under Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C. § 1964(c)*, which was modeled after *Section 4* of the Clayton Act, requires showing that defendant's violation was proximate cause of the plaintiff's injury).

Having conceded that the adequacy of their pleading should be measured under a proximate causation standard, Plaintiffs assert that the Amended Complaint sufficiently alleges, even if in a cursory manner, that [*26] the domestic effect of Defendants' global conspiracy *did* proximately cause Plaintiffs' foreign injury. In asserting this argument, Plaintiffs point, in particular, to their allegation that Defendants' "unlawful price fixing and market allocation conduct had adverse effects in the United States and in other nations that caused injury to Plaintiffs in connection with their foreign MCAA purchases." (Am. Compl. P 29; 7/15/05 Tr. at 30, 32.) This, however, is insufficient. Read carefully, the allegation highlighted by Plaintiffs only vaguely pleads that "adverse effects in the U.S. *and in other nations* ... caused injury to Plaintiffs in connection with their foreign MCAA purchases." (*Id.* P 29) (emphasis added); *see also id.* P 26(c) (alleging that one of the questions common to the putative class is "whether Defendants and their con-conspirators' unlawful price fixing conduct had adverse effects in the U.S. *and in other nations* that caused injury to Plaintiffs in connection with their foreign MCAA purchases") (emphasis added).) As the allegation does not even plead that it was the effect on U.S. commerce, rather than an effect on foreign commerce, that gave rise to Plaintiffs' [*27] claim, it is patently inadequate to plead the necessary direct causal link.

Plaintiffs' further allegations that "Defendants' conspiracy to fix MCAA prices and allocate MCAA markets around the world caused Plaintiffs' injuries-in-fact" (*id.* P 43), and that "Defendants and their co-conspirators' illegal contract, combination and conspiracy to harm U.S. and world commerce directly injured Plaintiffs" (*id.* P 44), fare no better. While these allegations plead, in general terms, a causal relationship between Defendants' conspiracy and Plaintiffs' injuries abroad, they support only a theory that Plaintiffs were injured by Defendants' global anticompetitive conduct. Nothing in these allegations even suggests that Plaintiffs' injuries were directly, or proximately, caused by the domestic effect of Defendants' alleged conspiracy. Thus, these allegations are also insufficient to satisfy *Section 6a(2) of the FTAIA.*

2005 U.S. Dist. LEXIS 19788, *; 2005-2 Trade Cas. (CCH) P74,974

Because the Amended Complaint fails to plead that a domestic effect of Defendants' conduct gave rise to Plaintiffs' claims, the Amended Complaint fails, on its face, to allege subject matter jurisdiction, and the motion to dismiss is granted.

## III. PLAINTIFFS' MOTION [*28] TO AMEND

Turning to Plaintiffs' motion for leave to file a Second Amended Complaint, the Court must determine whether that motion should be rejected as an unfair litigation tactic, and, if not, whether the proposed new pleading cures the deficiencies of the Amended Complaint.

### A. "Procedural Gamesmanship"

Defendants first argue that Plaintiffs' motion to amend should be rejected as too late. Defendants point out that Plaintiffs' counsel were well aware of the "alternative theory" argued to the Supreme Court in *Empagran*, as they also represented the plaintiffs in that case. (*See* 8/27/04 Def. Mem. at 24; 10/25/04 Def. Mem. at 3.) Defendants further note that the Supreme Court's decision in *Empagran* was issued on June 14, 2004, prior to this Court's setting of a briefing schedule for a motion challenging the adequacy of Plaintiffs' alternative theory in light of that decision. (*See* 10/15/04 Def. Mem. at 1.) Further, the Court notes that the Second Circuit's decision in *Sniado*, which had been remanded by the Supreme Court for further consideration in view of *Empagran*, was issued on August 5, 2004, prior to Defendants' deadline for submitting their [*29] motion to dismiss in this case. Although Plaintiffs assert that it was the decisions in *Empagran and Sniado* that led them to seek leave to amend their pleading (*see* 11/4/04 Pl. Mem. at 5-6), they waited until after Defendants filed their motion on August 27, 2004, to try to present the Court with their additional proposed allegations.

Defendants' frustration over Plaintiffs' timing is understandable. Defendants spent time and money preparing a substantial motion to dismiss a pleading based on one legal issue, and Plaintiffs were well aware that this issue would be the sole focus of the motion. Defendants assert that Plaintiffs' failure to include their new allegations in their first Amended Complaint, or to seek leave to amend further prior to Defendants' deadline for its motion to dismiss, is evidence of Plaintiffs' effort to engage in impermissible "piecemeal pleading," with the advantage of being able to respond directly to Defendants arguments for dismissal. (*Id.* at 3-4 (citing *Zito v. Leasecomm Corp., 2004 U.S. Dist. LEXIS 19778, No. 02 Civ. 8074 (GEL), 2004 WL 2211650, at *26 (S.D.N.Y. Sept 30, 2004)*.)

In response to Defendants' assertions of unfair "gamesmanship," Plaintiffs' [*30] counsel explained to the Court in oral argument that the idea of submitting an expert declaration did not occur to them until they received Defendants' motion to dismiss, and that, only after they had submitted the declaration to "beef up" their opposition to the dismissal motion did they realize that the Beyer declaration was "only so good[,] as an attachment to [the opposition] brief," and that "it would really be great to have a complaint with all this good stuff in it related to proximate cause . . . ." (7/15/05 Tr. at 25-26.) Plaintiffs argue that this case differs from *Zito*, on which Defendants rely in support of their position that the Court should disregard the motion to amend, because, in *Zito*, the plaintiffs sought leave to amend only after they had already amended their complaint once to cure deficiencies, and after the defendants had moved for dismissal a second time. (11/4/04 Pl. Mem. at 6-7.)

Although the Court is sympathetic to Defendants' view that, if Plaintiffs were going to seek leave to amend their allegations related to subject matter jurisdiction, they should have done so before Defendants briefed their motion to dismiss, the Court also notes that [*31] this is Plaintiffs' first attempt to amend these allegations, and that Defendants have been able to respond to the new allegations without undue additional briefing. The Court also notes that this case is still at an early stage, and that no judicial decisions have yet been issued regarding the adequacy of Plaintiffs' pleading. *Cf. Sniado, 378 F.3d at 213* (declining to grant plaintiff leave to re-amend his pleading after rejection of his amended complaint on appeal). Under the circumstances, the Court will consider the merits of Plaintiffs' motion to amend. n6

N6 In considering the motion to amend, the Court will also consider all arguments made by Defendants in opposition. Plaintiffs' request to strike 10 pages of Defendants' opposition brief (*see* 11/4/04 Pl. Mem. at 2-3 n.1), is denied, as that request, which is directed to a brief rather than a pleading, does not constitute a proper motion to strike under *Fed. R. Civ. P. 12(f)*. See 2 James Wm. Moore et al., *Moore's Federal Practice § 12.37[2]* (3d ed. 2004) ("Only material included in a 'pleading' may be the subject of a motion to strike, and courts have been unwilling to construe the term broadly."). Further, *Fed. R. Civ. P 12(g)* does not authorize the Court to "strike" any portion of Defendants' opposition brief, as the arguments raised do not, despite Plaintiffs' suggestion, constitute a "defense or objection" within the meaning of that Rule.

[*32]

### B. Futility

Case 1:05-cv-00485-JJF    Document 19-2    Filed 05/02/2006    Page 10 of 43

Page 9

2005 U.S. Dist. LEXIS 19788, *; 2005-2 Trade Cas. (CCH) P74,974

Defendants argue that Plaintiffs' motion to amend should, in any event, be denied because Plaintiffs' proposed new pleading would still be inadequate on its face to withstand a motion to dismiss, and the amendment would thus be futile. (See 10/25/04 Def. Mem. at 2, 5-14; 7/15/05 Tr. at 6.) Having found Plaintiffs' Amended Complaint to be deficient, the question for the Court is whether the proposed Second Amended Complaint suffers from the same infirmity or, instead, sufficiently pleads the direct causal connection that is missing from the Amended Complaint.

In their proposed new pleading, Plaintiffs do spell out their causation allegations in greater detail, although Plaintiffs maintain that they have not changed their theory of causation, but only expanded upon their allegations in order to "clarify" them. (10/7/04 Pl. Mem. at 3; see 11/4/04 Pl. Mem. at 6.) For example, Plaintiffs now clarify that "MCAA is an interchangeable commodity" that is sold in a "worldwide geographic market where price movements in one geographic sub-market would have a ripple-effect on prices in other geographic sub-markets." (Second Amended Class Action Complaint, dated [*33] Oct. 7, 2004 ("2d Am. Compl."), attached to Mot. to Amend as Ex. A, P 23.) Plaintiffs further clarify their previous "worldwide" market allegations by alleging that, "given MCAA's commodity nature and worldwide flow, Defendants' and their co-conspirators' MCAA prices charged in countries other than the U.S. closely resemble and are highly correlated with U.S. MCAA prices." (Id. P 24.)

Plaintiffs go on to plead that, had it not been for the alleged price-fixing conspiracy, foreign MCAA purchasers "would have been able to purchase MCAA in the U.S. at competitive prices" (id. P 25), and that the global conspiracy thus "could not have succeeded" without Defendants' agreement to fix MCAA prices in the United States (id. P 26). Essentially, Plaintiffs plead that Defendants' alleged global price-fixing conspiracy resulted in artificially high MCAA prices in the United States, without which it would not have been possible for the conspiracy to sustain artificially high MCAA prices in Plaintiffs' home countries. (See id.) If the prices had been legitimately competitive in the United States, then, Plaintiffs maintain, foreign purchasers would have been able to purchase MCAA here [*34] instead, destroying the Defendants' ability to continue selling at inflated prices in Mexico, Argentina, and Colombia. (See id.) In their own words, Plaintiffs allege:

> Without an agreement affecting U.S. commerce, foreign-based MCAA purchases would have arbitraged, purchasing MCAA at competitive U.S. prices and ex-

porting it into their home countries. Arbitrage from the U.S. would have defeated Defendants' and their co-conspirators' attempts to fix prices and allocate market shares in other countries worldwide. Hence, Defendants and their co-conspirators' worldwide MCAA price fixing conspiracy necessarily had to include the U.S. and, thus, any anticompetitive effects that occurred in the U.S. necessarily would also have been felt by foreign MCAA purchasers.

(Id.)

Simply stated, the theory embodied in these allegations is that, because of the fungible nature of the product at issue and the worldwide nature of the product market, the adverse effect of Defendants' conduct on U.S. commerce was "necessary" for the success of their global conspiracy, with its resulting impact in foreign countries. n7 This theory, however, was explicitly rejected by the Second Circuit [*35] in Sniado. In Sniado, the plaintiff had sued European banks, alleging that he paid supra-competitive service fees for exchanging currency, exclusively in European countries, as a result of a price-fixing conspiracy among the defendants. See Sniado, 378 F.3d at 212. On remand from the Supreme Court for reconsideration in light of Empagran, the plaintiff argued, for the first time, that the Sherman Act reaches foreign injury that is "not independent" of the foreign conspiracy's effect on United States commerce. See id. In exercising its discretion to consider the viability of the plaintiffs new, "alternative theory" of liability, the Second Circuit held that, even if it were reasonable to infer from the plaintiffs pleading that "'the domestic component' of the alleged 'worldwide conspiracy' was 'necessary . . . for the conspiracy's overall success,'" such allegations would be "too conclusory to avert dismissal." Id. at 213 (emphasis added).

---

n7 The Court notes that Plaintiffs do not actually allege that they, themselves, would have purchased MCAA in the United States, had prices been lower in the U.S. market. Rather, Plaintiffs plead that they did not purchase MCAA in the U.S. market "in part" because the U.S. prices were not significantly lower than prices in Plaintiffs' home countries (2d Am. Compl. PP 12-14), suggesting that there may have been any number of reasons why they chose not to make their purchases here. It is thus apparent that Plaintiffs are not relying on their own experiences with attempted arbitrage in contending that their claims

2005 U.S. Dist. LEXIS 19788, *; 2005-2 Trade Cas. (CCH) P74,974

arise from a domestic effect of the alleged conspiracy. Rather, Plaintiffs are apparently relying on broader market forces, by which markets are inter-dependent and an impact on any one geographic sub-market will necessarily affect the others.

[*36]

Here, Plaintiffs allege that any domestic anticompetitive effects of Defendants' conspiracy "necessarily would also have been felt" by purchasers of MCAA in foreign countries. (2d Am. Compl. P 26.) Yet, as noted above, this concept of having been injured by an inevitable "ripple effect," as Plaintiffs themselves phrase it (id. P 23), would not be sufficient to afford Plaintiffs standing to maintain their antitrust claims (see supra at 15-16). Similarly, under the FTAIA, the mere interdependence of markets cannot be sufficient to satisfy the requirement that a domestic effect "gives rise to" the plaintiff's claim. See Den Norske, 241 F.3d at 427 (under the FTAIA, alleging an "interrelatedness" between prices paid in geographic sub-markets is insufficient; "the FTAIA requires more than a 'close relationship' between the domestic injury and the plaintiffs claim; it demands that the domestic effect 'gives rise' to the claim").

At bottom, Plaintiffs' allegations merely describe, albeit with greater specificity than their initial allegations, a "but for" theory of causation -- that, but for the conspiracy's anticompetitive effect in the United States, the global [*37] conspiracy "could not have succeeded." (2d Am. Compl. P 26.) Indeed, addressing the identical theory in Empagran, n8 the D.C. Circuit held: "While maintaining super-competitive prices in the United States may have facilitated the [defendants'] scheme to charge comparable prices abroad, this fact demonstrates at most but-for causation." 2005 U.S. App. LEXIS 12743, at *11.

n8 As summarized by the D.C. Circuit in Empagran: "The appellants' theory in a nutshell is as follows:

Because the appellees' product (vitamins) was fungible and globally marketed, they were able to sustain super-competitive prices abroad only by maintaining super-competitive prices in the United States as well. Otherwise, overseas purchases would have purchased bulk vitamins at lower prices either directly from U.S. sellers or from arbitrageurs selling vitamins

imported from the United States, thereby preventing the appellees from selling abroad at the inflated prices. Thus, the super-competitive pricing in the United States 'gives rise to' the foreign super-competitive prices from which the appellants claim injury.

2005 U.S. App. LEXIS 12743, at *8-9 (footnote omitted).

[*38]

Despite acknowledging that the causation theory they articulated before the D.C. Circuit in Empagran is precisely the same theory at issue here, Plaintiffs' counsel urge the Court to disregard the D.C. Circuit's decision, and, instead, to accept the reasoning of the district courts in M.M. Global Services, Inc. v. The Dow Chemical Company, 329 F. Supp. 2d 337 (D. Conn. Aug. 11, 2004), and In re Monosodium Glutamate Antitrust Litigation, No. 00-MDL-1328 (PAM), 2005 U.S. Dist. LEXIS 8424 (D. Minn. May 2, 2005), which upheld subject matter jurisdiction under the FTAIA on the basis of somewhat different allegations.

In M.M. Global Services, the plaintiffs purchased, in the United States, products manufactured by U.S. defendant Union Carbide, and resold those products in India. 329 F. Supp. 2d at 339. Claiming that the defendants had compelled them to agree to a price fixing conspiracy for the resale of those products, the plaintiffs alleged that this anticompetitive conduct directly resulted in diminished competition "'in the sale and resale of [Union Carbide] products in and from the United States.'" Id. at 342. [*39] Further, the plaintiffs alleged that, "'as a result of such effect on competition, [the] plaintiffs were injured by being precluded from effectively and fully competing and maximizing their sales of products.'" Id. These allegations suggest a considerably more direct nexus to U.S. commerce than the allegations made here.

The facts alleged in In re Monosodium Glutamate Antitrust Litigation, which involved an alleged global conspiracy to fix the price of monosodium glutamate ("MSG"), are more similar to those alleged here, as the plaintiffs did not plead any personal contact with the United States, but nonetheless contended that their foreign injuries resulted from the conspiracy's adverse domestic effects. 2005 U.S. Dist. LEXIS 8424, at *3-4. In that case, however, the plaintiffs alleged that the defendants fixed U.S. prices and controlled U.S. markets "not merely to capture cartel profits in the United States, but also to allow the cartel to be effective anywhere in the world." Id. 2005 U.S. Dist. LEXIS 8424, at *4. In other

2005 U.S. Dist. LEXIS 19788, *; 2005-2 Trade Cas. (CCH) P74,974

words, the plaintiffs alleged that the defendants "included the United States in the cartel precisely to extract cartel profits from purchasers around the world [*40] without risk of arbitrage." *Id.* These allegations ascribe to the defendants deliberate conduct aimed at the United States for the specific, intended purpose of furthering their anticompetitive conduct elsewhere. This, too, is a more direct causation allegation than Plaintiffs make in this case, where Plaintiffs allege a global price-fixing conspiracy, but do not allege that Defendants acted to control the U.S. MCAA market for the purpose of furthering their scheme in the foreign markets in which Plaintiffs operated. Rather, as noted above, Plaintiffs merely rely on general market principles to allege that, in a global market, an effect of anticompetitive conduct in one location (*i.e.,* the United States) will cause a ripple effect that will necessarily "be felt" in others. The causal link described by this theory is simply too indirect to support this Court's subject matter jurisdiction.

Finally, the Court notes that Plaintiffs' proposed new pleading does contain a few boilerplate allegations of direct causation. In one paragraph of the Second Amended Complaint, for example, Plaintiffs make the conclusory allegation that the U.S. effect of Defendants' conspiracy "directly injured" [*41] Plaintiffs. (2d Am. Compl. P 43.) And in other paragraphs, Plaintiffs use the "gives rise to" language of the FTAIA, pleading that "the effect on U.S. commerce gave rise to Plaintiffs' antitrust injuries." (*Id.* PP 27, 38.) Without the factual predicate to

support these allegations, however, they cannot be read to plead the requisite causal link between the conspiracy's domestic effect and Plaintiffs' foreign claim. *See Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1088, 1092 (2d Cir. 1995)* (holding that the court need not credit legal conclusions that are unsupported by the factual allegations pleaded) (citations omitted).

As the Court finds that Plaintiffs' proposed Second Amended Complaint would not withstand a motion to dismiss for lack of subject matter jurisdiction, Plaintiffs' motion for leave to file a Second Amended Complaint is denied as futile.

**CONCLUSION** For all of the foregoing reasons, Defendants' motion to dismiss the Amended Complaint is granted, and Plaintiffs' motion for leave to file a Second Amended Complaint is denied. The Clerk is respectfully requested to enter judgment dismissing the Amended Complaint and to close this case on [*42] the Court's docket.

Dated: New York, New York

September 19, 2005

    SO ORDERED

    DEBRA FREEMAN

    United States Magistrate Judge

# EXHIBIT B

LEXSEE 2000 US DIST LEXIS 19905

**LANTEC, INC., a Utah corp.; LANCOMPANY INFORMATICA LTDA., a Brazil corporation; LANTEC INFORMATICA LTDA., a Brazil Corp.; LANTRAINING INFORMATICA LTDA., a Brazil Corp.; Plaintiffs, vs. NOVELL, INC., a Delaware corporation, Defendant,**

**Case No. 2:95-CV-97-ST**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

*2000 U.S. Dist. LEXIS 19905; 2001-2 Trade Cas. (CCH) P73,448*

**September 14, 2000, Decided**
**September 15, 2000, Filed**

**DISPOSITION:** [*1] GRANTED NOVELL'S MOTION TO DISMISS ANTITRUST CLAIMS OF LANCOMPANY AND LANTRAINING; DENIED AS MOOT NOVELL'S ALTERNATIVE MOTION IN LIMINE TO EXCLUDE EVIDENCE OF LANCOMPANY'S AND LANTRAINING'S ANTITRUST DAMAGES; AND DENIED PLAINTIFFS' MOTION TO STRIKE SAID MOTIONS OF NOVELL; AND DENIED NOVELL'S MOTION TO STRIKE PLAINTIFFS' RESPONSE.

**COUNSEL:** For LANTEC, INC., plaintiff: Stanford B. Owen, P. Bruce Badger, Mr., FABIAN & CLENDENIN, SALT LAKE CITY, UT. Evan A Schmutz, Mr., HILL JOHNSON & SCHMUTZ LC, PROVO, UT. James G McLaren, HILL AIR FORCE BASE, HILL AFB, UT.

For LANCOMPANY INFORMATICA LTDA., LANTEX INFORMATICA LTDA, LANTRAINING INFORMATICA LTDA, plaintiffs: Stanford B. Owen, P. Bruce Badger, Mr., FABIAN & CLENDENIN, SALT LAKE CITY, UT. Evan A Schmutz, Mr., HILL JOHNSON & SCHMUTZ LC, PROVO, UT.

For NOVELL, INC., defendant: R. Brent Stephens, Stanley J. Preston, Rodney R Parker, Mr., Ryan E. Tibbitts, Mr., Max D Wheeler, Mr., Maralyn M. Reger, SNOW CHRISTENSEN & MARTINEAU, SALT LAKE CITY, UT.

For NOVELL, INC., counter-claimant: Stanley J. Preston, Rodney R Parker, Mr., Max D Wheeler, Mr., Maralyn M. Reger, SNOW CHRISTENSEN & MARTINEAU, SALT LAKE CITY, UT.

For LANTEC, INC., [*2] LANCOMPANY INFORMATICA LTDA., LANTEX INFORMATICA LTDA, LANTRAINING INFORMATICA LTDA, counter-defendants: Stanford B. Owen, P. Bruce Badger, Mr., FABIAN & CLENDENIN, SALT LAKE CITY, UT. Evan A Schmutz, Mr., HILL JOHNSON & SCHMUTZ LC, PROVO, UT.

For NOVELL, INC., counter-claimant: Stanley J. Preston, Rodney R Parker, Mr., Max D Wheeler, Mr., Maralyn M. Reger, SNOW CHRISTENSEN & MARTINEAU, SALT LAKE CITY, UT. Stephen J. Hill, LINUX NETWORK, SANDY, UT.

For LANTEC, INC., counter-cefendant: Stanford B. Owen, P. Bruce Badger, Mr., FABIAN & CLENDENIN, SALT LAKE CITY, UT. Evan A Schmutz, Mr., HILL JOHNSON & SCHMUTZ LC, PROVO, UT. James G McLaren, HILL AIR FORCE BASE, HILL AFB, UT.

**JUDGES:** TED STEWART, United States District Judge.

**OPINIONBY:** TED STEWART

**OPINION:**

DECISION GRANTING NOVELL'S MOTION TO DISMISS THE ANTITRUST CLAIMS OF LANCOMPANY AND LANTRAINING; DENYING AS MOOT NOVELL'S ALTERNATIVE MOTION IN LIMINE TO EXCLUDE EVIDENCE OF LANCOMPANY'S AND LANTRAINING'S ANTITRUST DAMAGES; AND DENYING PLAINTIFF'S MOTION TO STRIKE SAID MOTIONS

2000 U.S. Dist. LEXIS 19905, *; 2001-2 Trade Cas. (CCH) P73,448

OF NOVELL; AND DENYING NOVELL'S MOTION TO STRIKE PLAINTIFF'S RESPONSE

This matter is before the court on the following Motions: Novell's Motion to Dismiss the [*3] Antitrust Claims of plaintiffs Lancompany Informatica, Ltda., (Lancompany) and LanTraining Informatica Ltda., (LanTraining) for lack of subject matter jurisdiction and in the alternative Motion *In Limine* to Exclude Evidence of LanCompany's and LanTraining's Antitrust Damages; and, Plaintiffs' Motion to Strike said Motions of Novell; and Novell's Motion to Strike Plaintiffs' Response to Novell's Reply Memorandum in Support of its Rule 12(b)(1) Motion to Dismiss.

The court will first address Novell's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Lantec's Motion to Strike Novell's Motion to Dismiss for Lack of Subject Matter Jurisdiction.

Pursuant to *Fed. R. Civ. P. 12(b)(1)*, Novell moves to dismiss LanCompany's and LanTraining's antitrust claims for lack of subject matter jurisdiction. Novell contends (1) because LanCompany and LanTraining are Brazilian companies who participate wholly in foreign markets, this court lacks subject matter jurisdiction over their antitrust claims; and, (2) these companies have no standing to pursue or assert these claims.

As an initial matter, Plaintiffs contend that Novell admitted subject matter jurisdiction in its Answer and therefore [*4] is foreclosed from raising the issue at this late date. However, subject matter jurisdiction is an issue that may be raised at any time.

> Federal courts are courts of limited jurisdiction. The character of the controversies over which federal judicial authority may extend are delineated in Art. III, § 2, cl. 1. Jurisdiction of the lower federal courts is further limited to those subjects encompassed within a statutory grant of jurisdiction. Again, this reflects the constitutional source of federal judicial power: . . . , that power only exists "in such inferior Courts as the Congress may from time to time ordain and establish." Art, III, § 1.
>
> Subject-matter jurisdiction, then, is an Art. III as well as a statutory requirement; it functions as a restriction on federal power, and contributes to the characterization of the federal sovereign. Certain legal consequences directly follow from this. For example, no action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant, *California v. LaRue, 409 U.S. 109, 34 L. Ed. 2d 342, 93 S. Ct. 390 (1972)*, principles of estoppel do not apply, *American Fire & Casualty Co. v. Finn, 341 U.S. 6, 17-18, 95 L. Ed. 702, 71 S. Ct. 534 (1951)*, [*5] and a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings. Similarly, a court, including an appellate court, will raise lack of subject-matter jurisdiction on its own motion.

*Insurance Corp. of Ireland, Ltd., v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702, 72 L. Ed. 2d 492, 102 S. Ct. 2099 (1982)* (underlined emphasis added).

Thus, it is irrelevant if Novell admitted jurisdiction in its Answer to the Amended Verified Complaint because "subject matter jurisdiction cannot be conferred or waived by consent, estoppel, or failure to challenge jurisdiction early in the proceedings." *Laughlin v. Kmart Corp., 50 F.3d 871, 873 (10th Cir. 1995)*. A challenge to subject matter jurisdiction may be raised at any time in the proceedings. *U.S. v. Burch, 169 F.3d 666, 668 (10th Cir. 1999)* (challenge to subject matter jurisdiction may be raised at any time in proceedings including in collateral attack under § 2255).

Plaintiffs move to strike Novell's Rule 12(b)(1) motion asserting lack of subject matter jurisdiction because they contend the motion can properly be brought only as a [*6] motion to dismiss for the failure to state a claim under Rule 12(b)(6) or a motion for summary judgment under Rule 56. Lantec contends that because the deadline for filing such motions under Rules 56 and 12(b)(6) expired on October 1, 1998, Novell's motion is untimely and should be stricken. Further, Plaintiffs contend that because Novell's Motion must be considered under Rule 12(b)(6), the issue is whether or not LanTraining and LanCompany have stated a claim under the Sherman Act, an issue Plaintiffs contend is not jurisdictional. Plaintiffs also contend that Novell's failure to raise this issue earlier is the result of its counsel's having taking a contrary position on behalf of Novell in an entirely different case in this district.

The last contention may be quickly resolved. The court has reviewed the submissions from that case, *Caldera v. Microsoft, 72 F. Supp. 2d 1295*, Case No. 96-CV-645-B, which the parties attached as exhibits to their memoranda in this matter. The court does not find the facts of that case to be similar to those alleged in this case and therefore does not find *Caldera* to be controlling.

Page 3

2000 U.S. Dist. LEXIS 19905, *; 2001-2 Trade Cas. (CCH) P73,448

The parties argue extensively regarding the correct procedural posture of Novell's [*7] Motion regarding subject matter jurisdiction. In this circuit, the following rules are applicable:

> Generally, Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction take two forms. First, a facial attack on the complaint's allegations as to subject matter jurisdiction questions the sufficiency of the complaint. *Ohio Nat'l Life Ins. Co. v. United States 922 F.2d 320, 325 (6th Cir. 1990).* In reviewing a facial attack on the complaint, a district court must accept the allegations as true.
>
> Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends. When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). *Wheeler v. Hurdman, 825 F.2d 257, 259 n.5 (10th Cir.), cert. denied, 484 U.S. 986, 98 L. Ed. 2d 501, 108 S. Ct. 503 (1987).* In such instances a court's references to evidence [*8] outside the pleadings does not convert the motion to a Rule 56 motion. *Wheeler, 825 F.2d at 259 n.5.*
>
> However, a court is required to convert a Rule 12(b)(1) motion to dismiss into a Rule 12(b)(6) motion or a Rule 56 summary judgment motion when resolution of the jurisdictional question is intertwined with the merits of the case. *Id. at 259.* The jurisdictional question is intertwined with the merits of the case if subject matter jurisdiction is dependent on the same statue which provides the substantive claim in the case. *Wheeler, 825 F.2d at 259.*

*Holt v. U.S., 46 F.3d 1000, 1002-03 (10th Cir. 1995)* (considering jurisdictional issue under wholly separate statute (the Flood Control Act) from the underlying FTCA claim).

Thus, a Rule 12(b)(1) motion can properly be a "speaking motion" and include references to evidence extraneous to the complaint without converting it to a Rule 56 motion. *Wheeler, 825 F.2d at 259 n.5.*

Based upon the foregoing, the court will deny Plaintiffs' Motion to Strike Novell's Motion to Dismiss for Lack of Jurisdiction. A Motion challenging subject matter jurisdiction can be brought [*9] at any time in the proceedings and is properly brought under Rule 12(b)(1), although it may, if appropriate, be subsequently converted to a motion under Rule 12(b)(6) or Rule 56.

Although the *Holt* test could be read as meaning that any time the jurisdictional challenge arises out of a section of the same statute that creates the cause of action in another section, the jurisdictional question is automatically considered to be intertwined with the merits, a recent Tenth Circuit case clarifies that the test is not so simplistic. "Under *Wheeler,* however, the focus of the inquiry is not merely on whether the merits and the jurisdictional issue arise under the same statute. Rather the underlying issue is whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim." *Pringle v. U.S., 208 F.3d 1220, 1223 (10th Cir. 2000).*

LanCompany and LanTraining, as the parties invoking jurisdiction have the burden of showing subject matter jurisdiction.

> Since federal courts are courts of limited jurisdiction, we presume no jurisdiction exists absent an adequate showing by the party invoking federal jurisdiction. If jurisdiction [*10] is challenged, the burden is on the party claiming jurisdiction to show it by a preponderance of the evidence. Thus, [plaintiffs] bear the burden of alleging the facts essential to show jurisdiction and supporting those facts with competent proof. Mere conclusory allegations of jurisdiction are not enough.

*U.S. v. Spectrum Emergency Care, Inc., 190 F.3d 1156, 1160 (10th Cir. 1999)* (quoting *U.S. ex rel. Precision Co. v. Koch Indus., Inc., 971 F.2d 548,* (10th Cir. 1992), cert. denied 507 U.S. 951, 122 L. Ed. 2d 742, 113 S. Ct. 1364 (1993)).

Whether the motion challenging subject matter jurisdiction is brought under Rule 12(b)(1) or under Rule 56, the burden of the party seeking to establish jurisdiction "remains essentially the same--they must present affidavits or other evidence sufficient to establish the court's subject matter jurisdiction by a preponderance of

Case 1:05-cv-00485-JJF    Document 19-2    Filed 05/02/2006    Page 17 of 43

Page 4
2000 U.S. Dist. LEXIS 19905, *; 2001-2 Trade Cas. (CCH) P73,448

the evidence." *Spectrum Emergency, supra*, 190 F.3d at 1160 n 5.

Novell contends that LanCompany's and LanTraining's claims should be dismissed because this court lacks subject matter jurisdiction over the antitrust claims of these two foreign corporations. [*11]

In 1982, Congress amended the Sherman Act by adding the Foreign Trade AntiTrust Improvement Act (FTAIA), *15 U.S.C. § 6a*, to exempt from United States antitrust law conduct that lacked sufficient domestic effect. *See Eurim-Pharm GmbH v. Pfizer Inc.*, 593 F. Supp. 1102, 1105 (S.D. N.Y. 1984) (citing Congressional purposes).

By the addition of the FTAIA Congress imposed a single and objective standard for determining when foreign antitrust conduct is, and is not, subject to the United States' antitrust law. *Liamuiga Tours v. Travel Impressions, Ltd.*, 617 F. Supp. 920 (E.D. N.Y. 1985)

> Although the Sherman Act prohibits monopolization and attempted monopolization of any line of interstate or foreign commerce, section 1 of the FTAIA makes the Sherman Act inapplicable to
>
> > conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—
> > (1) such conduct has a direct, substantial, and reasonably foreseeable effect-
> > (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
> > (B) on export trade [*12] or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States.

*Caribbean Broadcasting System, Ltd. v. Cable & Wireless PLC*, 331 U.S. App. D.C. 226, 148 F.3d 1080, 1085 (D.C. Cir. 1998) (quoting *15 U.S.C. § 6a*) (underlined emphasis added).

Under the Tenth Circuit case law cited above, the court must determine whether resolution of the jurisdictional question requires resolution of an aspect of the substantive claim and therefore requires conversion of Novell's motion to a motion under Rule 12(b)(6) or Rule 56. *Pringle*, 208 F.3d at 1223.

In this case, although the merits of the antitrust claims and the jurisdictional issue arise under sections of the same statute, the resolution of the jurisdictional question does not require resolution of an aspect of the substantive claim. The requirement that there be a "direct, substantial and reasonably foreseeable" effect on domestic commerce is not an aspect of the substantive antitrust claims. Accordingly, the court need not convert the motion to one under Rule 12(b)(6) or Rule 56 and may consider affidavits, and other evidence [*13] on the issue of the jurisdictional elements under Section 6a.

There are several reasons why, as a practical matter, the analysis of the motion under Rule 12(b)(1) in no way prejudices Plaintiffs. First, many of the key facts are undisputed. For example, it is undisputed that LanCompany and LanTraining are Brazilian companies; are headquartered in Brazil; and conduct their business solely in Brazil and Latin America. Second, because Novell makes a facial challenge to subject matter jurisdiction over LanCompany's and LanTraining's antitrust claims, the factual allegations of the Complaint are presumed true for purposes of the Motion. Third, the court may look to the materials submitted by Plaintiffs in support of their jurisdictional allegations to determine if Plaintiffs have met their burden of establishing the court's subject matter jurisdiction over LanCompany's and LanTraining's antitrust claims. In support of subject matter jurisdiction, Plaintiffs have submitted Dr. Beyer's expert report, a portion of his deposition and a transcript of a hearing transcript from the *Caldera* case.

Novell contends that even assuming as true the allegations that Novell terminated its dealings [*14] with LanCompany and LanTraining for the purpose of bringing pressure on Lantec and Lantec Brazil, and to eliminate Lantec's source of capital by "assassinating" or putting out of business the foreign companies upon which Lantec depended for funds, there is no showing of a "direct, substantial and reasonably foreseeable" effect on domestic commerce.

Plaintiffs oppose the 12(b)(1) motion because they contend their Amended Verified Complaint alleges Novell injured the two foreign corporations by conduct that had the requisite direct, substantial and reasonably foreseeable anti-competitive effect on domestic commerce. Plaintiffs contend that by using LanCompany and LanTraining as a fulcrum or conduit to crush Lantec by eliminating its foreign source of capital, Novell elimi-

Page 5

2000 U.S. Dist. LEXIS 19905, *; 2001-2 Trade Cas. (CCH) P73,448

nated competition in relevant market and thereby had a direct, substantial and reasonably foreseeable effect on trade or domestic commerce in the United States.

However, a close reading of the Amended Verified Complaint reveals that it does not allege such an effect on domestic commerce, or facts from which such an effect on domestic commerce are shown.

The Amended Verified Complaint alleges generally that Novell's [*15] conduct toward all plaintiffs had the effect of "unreasonably restraining interstate trade and commerce in the relevant market" P 218(f) and "affecting a substantial amount of interstate commerce in the relevant market" P 218(s).

The specific allegations regarding LanCompany and LanTraining are:

> 212. Novell developed a scheme to breach its contracts with the Lantec Companies [defined earlier as all four plaintiffs] and to refuse to deal with any of the Lantec companies so that it could enter into a relationship with WordPerfect for the development and sale of NetWare messaging applications to the exclusion of the Lantec Companies. Novell manipulated and utilized LanCompany and LanTraining in order to curtail Lantec's and Lantec Brazil's sales and distribution channels and to cut off their sources of investment capitol. Novell refused to deal with LanCompany and LanTraining as a fulcrum, conduit or market force to injure Novell's competitors and competition in the NetWare Messaging Applications market, including Lantec and Lantec Brazil and LanCompany and LanTraining injury is inextricably intertwined with the injury to competition in the relevant market.

Amended [*16] Verified Complaint at P 212 (underlined emphasis added).

The Complaint defines the "relevant geographic market as "the world." P 149. Plaintiffs submitted the deposition testimony of their expert, Dr. Beyer, that the principal products in this case are designed and specified by suppliers who are residents of the United States. However, neither his deposition nor his expert report opine that Novell's actions in terminating its agreements with and refusing to deal with the two Brazilian companies which do no business in the United States' domestic market, had a direct, substantial and reasonably foreseeable effect on domestic commerce.

The court agrees with Novell that Plaintiffs have failed to allege a direct effect, a substantial effect, or a reasonably foreseeable effect on domestic commerce. "An effect is direct if it follows as an immediate consequence of the defendant's activity." *Filetech S.A. v. France Telecom S.A*, 157 F.3d 922, 931 (2nd Cir. 1998) (citations and quotation marks omitted). However, "an allegation that income flows between corporations is insufficient to establish the requisite domestic effect." *Optimum v. Legent Corp.*, 926 F. Supp. 530 (W.D. Pa. 1996). [*17] An allegation of a loss of competition resulting from the loss of the participation of a company that was expecting funds from a company that was injured by a refusal to deal is far from following as an immediate consequence of the alleged wrongful refusal to deal.

Plaintiffs have also failed to allege or show facts from which it could be shown that Novell's actions toward the Brazilian companies had a "substantial" effect on the domestic market. The effect required for jurisdictional nexus must be the anti-competitive effect in the domestic market. *Liamuiga Tours*, 617 F. Supp. at 923-24 (citing FTAIA's legislative history).

This case is distinguishable from the case relied upon by Plaintiffs, *Caribbean Broadcasting System, Ltd. v. Cable & Wireless PLC* 331 U.S. App. D.C. 226, 148 F.3d 1080, 1085 (D.C. Cir. 1998). In *Caribbean Broadcasting*, the complaint alleged that the foreign company was competing in the market in which many companies based in the United States were customers. *148 F.3d at 1086*. In *Caribbean Broadcasting*, the D.C. Circuit distinguished an earlier case, *The "In" Porters, S.A. v. Hanes Printables*, 663 F. Supp. 494 (M.D. N.C. 1987), [*18] because the "foreign firm in that case did not sell to American consumers." *148 F.3d at 1086*.

The test of "reasonably foreseeability" is whether the alleged domestic effect "would have been evident to a reasonable person making practical business judgments." *Eurim-Pharm*, 593 F. Supp. at 1106 n.4. In this case, the alleged domestic effects are too far removed from Novell's alleged actions toward LanCompany and LanTraining for the effects to have been "evident" to a reasonable person making practical business judgments.

In support of its contention that the Amended Verified Complaint establishes Novell's actions toward LanCompany and LanTraining adequately allege a direct, substantial and reasonably foreseeable effect on the domestic market, Plaintiffs contend that where the injury to the two foreign plaintiffs is "inextricably intertwined" with the injury inflicted on the domestic market they may sue even though they are not consumers or competitors in the relevant market. Plaintiffs' Memorandum in Opposition at 10. In support of this theory Plaintiffs cite *Blue*

2000 U.S. Dist. LEXIS 19905, *; 2001-2 Trade Cas. (CCH) P73,448

*Shield of Virginia v. McCready, 457 U.S. 465, 73 L. Ed. 2d 149, 102 S. Ct. 2540 (1982).* [*19] *McCready,* involved the issue of a plaintiffs standing to allege an antitrust injury. *McCready* did not involve the FTAIA or a foreign corporation's claim of violations of the United States' antitrust laws and is therefore not helpful on the issue of subject matter jurisdiction under the FTAIA.

The standing analysis applied in *McCready* cannot be substituted for the clear objective standard set forth by Congress in the FTAIA. Further, any expansion of the FTAIA's plain language regarding jurisdiction would re-write the statute-an impermissible role for the courts. Such a broadening of the jurisdictional standard based upon case law would open the door to uncertainty over the scope of the U.S. anti-trust laws in international commerce, uncertainty that Congress attempted to eliminate by enacting the FTAIA. *See Liamuiga Tours, 617 F. Supp. at 923,*

Further, the alleged injury at issue in *McCready* was held to be "inextricably intertwined" with the alleged antitrust conspiracy because the plaintiff therein was in essence the direct purchaser who paid the higher costs alleged to have been caused by the anti-competitive actions, a situation not present in [*20] this case. *Compare Serpa Corp. v. McWane, Inc., 199 F.3d 6 (1st Cir. 1999)* (declining to apply "inextricably intertwined" language of *McCready* to afford antitrust standing to distributor allegedly injured by anti-competitive effect of manufacturer's purchase of competitor).

Plaintiffs also attempt to rely on a theory developed to afford former employees standing to bring claims under antitrust statutes. Plaintiffs cite *Reverend Royal Brown v. Archer Daniels Midland Co., 1996 U.S. Dist. LEXIS 11481, 1996 WL 442274 *3 (E.D. La 1996),* which in turn followed the *Province v. Cleveland Press Pub. Co. 787 F.2d 1047, 1054 (6th Cir. 1986)* line of cases involving the standing of former employees to bring actions when they lose their jobs as a result of anti-trust violations. In this line of cases the *McCready* "inextricably intertwined" theory of standing is expanded to allow employees or companies who are injured by anti-trust violations standing to sue when their injuries are

"inextricably intertwined" to the injury to the relevant market because the plaintiff was used by the antitrust violator as "a fulcrum, conduit or market force to injure competitor or participants [*21] in the relevant product and geographical market." *Id.*

Once again, such case law regarding theories of standing is not a substitute for the single objective standard set forth the FTAIA. Further this area of law in which there is a split of authority over whether such an extension of the law of standing is warranted even for domestic plaintiffs. *See Sullivan v. Tagliabue, 25 F.3d 43 (5th Cir. 1994)* (collecting cases showing split of authority) and *Thomason v. Mitsubishi Electronic Sales America, Inc., 701 F. Supp. 1563 (N.D. Ga. 1988)* (same).

The court notes that Plaintiffs also rely on these same lines of cases in connection with their contentions regarding standing. However, the court's determination that it lacks subject matter jurisdiction over the antitrust claims of the two foreign corporations which operate solely in Brazil, because there is not the requisite effect on the domestic market of the United States, renders moot Novell's contention that the claims should be dismissed for lack of standing.

The court will also deny as moot Novell's Alternative Motion *In Limine* to Exclude Evidence of LanCompany's and LanTraining's Antitrust [*22] Damages for lack of standing.

Finally, the court will deny Novell's Motion to Strike Plaintiffs' Response to Novell's Reply Memorandum in Support of its Rule 12(b)(1) Motion to Dismiss the LanCompany and LanTraining Antitrust Claim.

The court will enter an appropriate order in accordance with the foregoing.

DATED this 14th day of September, 2000.

BY THE COURT:

TED STEWART

United States District Judge

# EXHIBIT C

LEXSEE 2005 U.S. DIST. LEXIS 39641

**In re Monosodium Glutamate Antitrust Litigation, This document relates to: Inquivosa, S.A., et al. v. Ajinomoto Co., Inc., et al.**

**Civil File No. 00–MDL–1328 (PAM), Civ. No. 03–2997**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

*2005 U.S. Dist. LEXIS 39641*

**October 26, 2005, Decided**

**PRIOR HISTORY:** *In re Monosodium Glutamate Antitrust Litig.*, 2005 U.S. Dist. LEXIS 8424 (D. Minn., May 2, 2005)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Antitrust plaintiffs, foreign purchasers of Monosodium Glutamate or nucleotides, brought claims against defendants, alleged coconspirators in a world–wide scheme to maintain artificially high prices for those substances. The alleged coconspirators moved for reconsideration of their motion to dismiss the amended complaint under the Foreign Trade Antitrust Improvements Act (FTAIA), *15 U.S.C.S. § 6a*, and the Sherman Act, *15 U.S.C.S. § 1* et seq.

**OVERVIEW:** The complaint alleged that the coconspirators included the United States in their cartel to extract cartel profits from purchasers around the world without risk of arbitrage of the substances sale prices. The conspiracy's effect on United States commerce gave rise to the foreign purchasers' antitrust claims and injuries. The alleged coconspirators argued that the court lacked subject matter jurisdiction over the action, and the Sherman Act could not apply to the case, given the international character of the claims. The court, adopting the reasoning of the recent opinion in F. Hoffman–LaRoche Ltd. v. Empagran, S.A., held that the global price–fixing cartel theory established only an indirect relationship between United States prices and the prices paid in foreign markets. As such, the purchasers could only show that the foreign effect of price–fixing gave rise to their injuries. Because they were unable to show that the domestic effect proximately caused their injuries, the purchasers could not state a claim under the Sherman Act.

**OUTCOME:** The motion to dismiss the amended complaint was granted on reconsideration.

**LexisNexis(R) Headnotes**

*Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend*
[HN1] Where claims against a party remain unresolved, a motion for reconsideration falls under the rubric of *Fed. R. Civ. P. 54(b)*. Although issues decided should not be subject to continued argument, a court may revisit its earlier decision in extraordinary circumstances. A motion for reconsideration may be justified on the basis of an intervening change in law.

*Antitrust & Trade Law > International Application of U.S. Law > Foreign Trade Antitrust Improvements Act*
[HN2] Congress enacted the Foreign Trade Antitrust Improvements Act (FTAIA) to clarify the application of United States antitrust laws to international business transactions. *15 U.S.C.S. § 6a*. Specifically, the FTAIA provides that the Sherman Act applies to foreign conduct only if (1) the conduct has a direct, substantial, and reasonably foreseeable effect on United States commerce, and (2) such effect gives rise to a claim under the Sherman Act. *15 U.S.C.S. § 6a(1)–(2)*.

*Antitrust & Trade Law > International Application of U.S. Law > Foreign Trade Antitrust Improvements Act*
[HN3] The "gives rise to" language in the Foreign Trade Antitrust Improvements Act (FTAIA) requires a plaintiff to demonstrate a direct causal relationship between the domestic effects and the foreign injury. Thus, a mere but–for nexus is insufficient. To read the FTAIA broadly to permit a more flexible, less direct standard than proximate cause would open the door to unreasonable interference with the sovereign authority of other nations to safeguard their own citizens from

2005 U.S. Dist. LEXIS 39641, *

anticompetitive activity within their own orders.

**COUNSEL:** [*1] For Plaintiffs' Lead Counsel, Plaintiff: Daniel E Gustafson, Gustafson Gluck PLLC, Mpls, MN; Daniel R Karon, Goldman Scarlato & Karon, PC, Cleveland, OH; Heidi M Silton, Lockridge Grindal Nauen PLLP, Minneapolis, MN; Karla M Gluek, Gustafson Gluek PLLC, Mpls, MN; Richard A Lockridge, Lockridge Grindal Nauen PLLP, Minneapolis, MN; Samuel D Heins, Heins Mills & Olson, PLC, Mpls, MN; Susan E MacMenamin, Heins Mills & Olson, PLC, Mpls, MN; W Joseph Bruckner, Lockridge Grindal Nauen PLLP, Minneapolis, MN

For Plaintiffs' Executive Committee, Plaintiff: Bruce L Simon, Cotchett Pitre & Simon, Burlingame, CA; Guido Saveri, Saveri & Saveri Inc, San Francisco, CA; Howard J Sedran, Levin Fishbein Sedran & Berman, Philadelphia, PA; Jared B Stamell, Stamell & Schager, New York, NY; Steven A Asher, Barrack Rodos & Bacine, Philadelphia, PA; Steven A Kanner, Much Shelist Freed Denenberg Ament & Rubenstein, Chicago, IL; Steven O Sidener, Gold Bennett Cera & Sidener, San Francisco, CA

For Heller Seasonings & Ingredients, Inc , Plaintiff: Ann D White, Mager White & Goldstein, Jenkintown, PA; Daniel E Gustafson, Gustafson Gluek PLLC, Mpls, MN; Pamela I Perry, Kenny Nachwalter Seymour Arnold, Critchlow [*2] & Spector, Miami, FL; Richard Alan Arnold, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Richard A Lockridge, Lockridge Grindal Nauen PLLP, Minneapolis, MN; Roberta D Liebenberg, Fine Kaplan & Black, Philadelphia, PA; Samuel D Heins, Heins Mills & Olson, PLC, Mpls, MN; Vincent J Esades, Heins Mills & Olson, PLC, Mpls, MN; W Joseph Bruckner, Lockridge Grindal Nauen PLLP, Minneapolis, MN; William J Blechman, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL

For Inquivosa S A , Plaintiff: Pamela I Perry, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Richard Alan Arnold, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Richard A Lockridge, Lockridge Grindal Nauen PLLP, Minneapolis, MN; William J Blechman, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Heidi M Silton, Lockridge Grindal Nauen PLLP, Minneapolis, MN

For MCC Menssing Chemiehandel & Consultants GmbH, Plaintiff: Pamela I Perry, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Richard Alan Arnold, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Richard A Lockridge, Lockridge Grindal Nauen PLLP, Minneapolis, [*3] MN; William J Blechman, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Heidi M Silton, Lockridge Grindal Nauen PLLP, Minneapolis, MN

For Newco Trading Co , Plaintiff: Pamela I Perry, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Richard Alan Arnold, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Richard A Lockridge, Lockridge Grindal Nauen PLLP, Minneapolis, MN; William J Blechman, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Heidi M Silton, Lockridge Grindal Nauen PLLP, Minneapolis, MN

For Petbowe Chemtrade Corp , Plaintiff: Pamela I Perry, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Richard Alan Arnold, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Richard A Lockridge, Lockridge Grindal Nauen PLLP, Minneapolis, MN; William J Blechman, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Heidi M Silton, Lockridge Grindal Nauen PLLP, Minneapolis, MN

For Plus Sun Co , Ltd , Plaintiff: Pamela I Perry, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Richard Alan Arnold, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, [*4] FL; Richard A Lockridge, Lockridge Grindal Nauen PLLP, Minneapolis, MN; William J Blechman, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Heidi M Silton, Lockridge Grindal Nauen PLLP, Minneapolis, MN

For Defendants' Co-Liaison Counsel, Defendant: Joseph T Dixon, Jr, Henson & Efron, PA, Mpls, MN; Michael A Lindsay, Dorsey & Whitney LLP, Minneapolis, MN; Scott A Neilson, Henson & Efron, PA, Mpls, MN

For Daesang America, Inc, formerly known as Miwon America, Inc, Defendant: Alan H Maclin, Briggs & Morgan, PA, Minneapolis, MN; Paul J Vincenti, Not Admitted; Richard B Pacella, Law Offices of Richard B Pacella, New York, NY; W Patrick Judge, Briggs & Morgan, PA, Minneapolis, MN

2005 U S Dist LEXIS 39641, *4

For CJ America, Inc, Defendant: Barry F McNeil, Haynes & Boone, Dallas, TX; David B Reece, Haynes & Boone, Dallas, TX; Michael A Lindsay, Dorsey & Whitney LLP, Minneapolis, MN; Ronald W Breaux, Haynes & Boone, Dallas, TX; Eric A Ruzicka, Dorsey & Whitney LLP, Minneapolis, MN

For Ajinomoto Co , Inc , Defendant: Michael R Lazerwitz, Cleary Gottlieb Steen & Hamilton LLP – DC, Washington, DC; Michael A Lindsay, Dorsey & Whitney LLP, Minneapolis, MN; Steven J Kaiser, Cleary Gottlieb [*5] Steen & Hamilton LLP – DC, Washington, DC

For Ajinomoto USA, Inc , Defendant: Michael R Lazerwitz, Cleary Gottlieb Steen & Hamilton LLP – DC, Washington, DC; Michael A Lindsay, Dorsey & Whitney LLP, Minneapolis, MN; Steven J Kaiser, Cleary Gottlieb Steen & Hamilton LLP – DC, Washington, DC

For Archer Daniels Midland Co , Defendant: Craig S Coleman, Faegre & Benson LLP, Minneapolis, MN; John L Cuddihy, Williams & Connolly, Washington, DC; John E Schmidtlein, Williams & Connolly, Washington, DC; Richard A Duncan, Faegre & Benson LLP, Minneapolis, MN

For C J America, Inc , Defendant: Eric A Ruzicka, Dorsey & Whitney LLP, Minneapolis, MN; Vernle C Durocher, Jr, Dorsey & Whitney LLP, Minneapolis, MN

For Cheil Jedang Corp , Defendant: Eric A Ruzicka, Dorsey & Whitney LLP, Minneapolis, MN; Vernle C Durocher, Jr, Dorsey & Whitney LLP, Minneapolis, MN

For Kyowa Hakko Kogyo Co , Ltd , Defendant: Christopher V Roberts, Weil Gotshal & Manges – NY, New York, NY

For Deko International, Co , Ltd , Respondent: Dionne M Benson, Law Firm Unknown, INACTIVE; Jon S Swierzewski, Larkin Hoffman Daly & Lindgren Ltd, Bloomington, MN

For Gold Bennett Gerra & Sidener LLP, [*6] Movant: Joseph M Barton, Not Admitted; Paul F Bennett, Gold Bennett Cera & Sidener, San Francisco, CA; Steven O Sidener, Gold Bennett Cera & Sidener, San Francisco, CA

For Conopco, Inc , Movant: Lauren C Ravkind, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Richard Alan Arnold, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; William J Blechman, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL

For Daesang Corporation, Movant: Alan H Maclin, Briggs & Morgan, PA, Minneapolis, MN; Richard B Pacella, Law Offices of Richard B Pacella, New York, NY; W Patrick Judge, Briggs & Morgan, PA, Minneapolis, MN; Brent R Lindahl, Briggs & Morgan, PA, Minneapolis, MN

For Daesang Japan, Inc , Movant: Alan H Maclin, Briggs & Morgan, PA, Minneapolis, MN; Richard B Pacella, Law Offices of Richard B Pacella, New York, NY; W Patrick Judge, Briggs & Morgan, PA, Minneapolis, MN; Brent R Lindahl, Briggs & Morgan, PA, Minneapolis, MN

For Daesang America, Inc, Movant: Alan H Maclin, Briggs & Morgan, PA, Minneapolis, MN; Richard B Pacella, Law Offices of Richard B Pacella, New York, NY; W Patrick Judge, Briggs & Morgan, PA, Minneapolis, MN; [*7] Brent R Lindahl, Briggs & Morgan, PA, Minneapolis, MN

For Diversified Foods and Seasonings, Inc, on behalf of itself and all others similary situated, Plaintiff: Pamela I Perry, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Richard Alan Arnold, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; William J Blechman, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL

For Archer Daniels Midland, sued as Archer Daniels Co , Inc , Defendant: Nicholas J Boyle, Williams & Connolly, Washington, DC

For Ajinomoto USA, Inc, Defendant: David S Snyder, Cleary Gottlieb Steen & Hamilton, Washington, DC; Marcilynn A Burke, Not Admitted; Michael R Lazerwitz, Cleary Gottlieb Steen & Hamilton LLP – DC, Washington, DC; Michael A Lindsay, Dorsey & Whitney LLP, Minneapolis, MN; Mitchell W Granberg, Dorsey & Whitney LLP, Minneapolis, MN

For Ajinomoto Co , Inc, Defendant: Michael R Lazerwitz, Cleary Gottlieb Steen & Hamilton LLP – DC, Washington, DC; Michael A Lindsay, Dorsey & Whitney LLP, Minneapolis, MN; Mitchell W Granberg, Dorsey & Whitney LLP, Minneapolis, MN

For Cheil Foods and Chemicals, Inc, Defendant: Vernle C Durocher, Jr, Dorsey [*8] & Whitney LLP, Minneapolis, MN

For Takeda Chemical Industries, Ltd , Defendant: Joseph T Dixon, Jr, Henson & Efron, PA, Mpls, MN; Lawrence Byrne, White & Case LLP, New York, NY; Paul D Sarkozi, Hogan & Hartson, New York, NY; Philip Schaeffer, White & Case, New York, NY

For Takeda USA, Inc, Defendant: Lance Croffoot–Suede, White & Case LLP, New York, NY; Lawrence Byrne, White & Case LLP, New York, NY; Ruth E Harlow, White & Case LLP, New York, NY; Scott A Neilson, Henson & Efron, PA, Mpls, MN

For Thorp, Inc , Plaintiff: Pamela I Perry, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Richard Alan Arnold, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; William J Blechman, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL

For Takeda Chemical Industries, Ltd , Defendant: Philip Schaeffer, White & Case, New York, NY

For Felbro Food Products, Inc , Plaintiff: Pamela I Perry, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Richard Alan Arnold, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; William J Blechman, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL

For Cheiljedang [*9] Corporation, Defendant: Barry F McNeil, Haynes & Boone, Dallas, TX; David B Reece, Haynes & Boone, Dallas, TX; Ronald W Breaux, Haynes & Boone, Dallas, TX; Eric A Ruzicka, Dorsey & Whitney LLP, Minneapolis, MN; Vernle C Durocher, Jr, Dorsey & Whitney LLP, Minneapolis, MN

For Kyowa Hakko Kogyo Co , Ltd , Defendant: A Paul Victor, Weil Gotshal & Manges, New York, NY; Christopher V Roberts, Weil Gotshal & Manges – NY, New York, NY; David R Crosby, Leonard Street and Deinard, PA, Minneapolis, MN; William L Greene, Leonard Street and Deinard, PA, Minneapolis, MN

For Archer Daniels Midland, sued as Arthcer Daniels Midland Co , Inc , Defendant: Michael A Lindsay, Dorsey & Whitney LLP, Minneapolis, MN

For First Spice Mixing Co , Inc , Plaintiff: Pamela I Perry, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Richard Alan Arnold, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; William J Blechman, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL

For Kyowa Hakko Kogyo Co , Ltd , Defendant: A Paul Victor, Weil Gotshal & Manges, New York, NY; Christopher V Roberts, Weil Gotshal & Manges – NY, New York, NY; Douglas R Boettge, Leonard [*10] Street and Deinard, PA, Minneapolis, MN; William L Greene, Leonard Street and Deinard, PA, Minneapolis, MN; David R Crosby, Leonard Street and Deinard, PA, Minneapolis, MN

For Cheiljedang Corporation, a Korean company formerly known as Cheil Foods and Chemicals, Inc, also known as CJ America, Inc, Defendant: Eric A Ruzicka, Dorsey & Whitney LLP, Minneapolis, MN; Vernle C Durocher, Jr, Dorsey & Whitney LLP, Minneapolis, MN

For M Phil Yen, Inc , Plaintiff: Pamela I Perry, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL;

Richard Alan Arnold, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; William J Blechman, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL.

For Takeda Chemical Industries, Ltd., Defendant: Philip Schaeffer, White & Case, New York, NY

For Takeda U S A , Inc , Defendant: Joseph T Dixon, Jr, Henson & Efron, PA, Mpls, MN; Lance Croffoot-Suede, White & Case LLP, New York, NY; Lawrence Byrne, White & Case LLP, New York, NY; Ruth E Harlow, White & Case LLP, New York, NY; Scott A Neilson, Henson & Efron, PA, Mpls, MN

For Chicago Ingredients Inc, on behalf of itself and all others similarly situated, Plaintiff: [*11] Pamela I Perry, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Richard Alan Arnold, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; William J Blechman, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL.

For Takeda Chemical Industries, Ltd., Defendant: Philip Schaeffer, White & Case, New York, NY

For Takeda Vitamin & Food U S A , Inc , Defendant: Christina A Sessa, Squadron Ellenoff Plesent & Sheinfeld, New York, NY; Joseph T Dixon, Jr, Henson & Efron, PA, Mpls, MN; Lawrence Byrne, White & Case LLP, New York, NY; Paul D Sarkozi, Hogan & Hartson, New York, NY; Philip Schaeffer, White & Case, New York, NY

For Y Hata Company Ltd, on behalf of itself and all others similarly situated, Plaintiff: Pamela I Perry, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Richard Alan Arnold, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; William J Blechman, Kenny Nachwalter Seymour Arnold, Critchlow & Spector, Miami, FL; Richard A Lockridge, Lockridge Grindal Nauen PLLP, Minneapolis, MN; Samuel D Heins, Heins Mills & Olson, PLC, Mpls, MN

For Archer Daniels Midland, sued as "Archer Daniels Midland Co. [*12] ", Defendant: John Dwyer French, Law Firm Unknown; John E Schmidtlein, Williams & Connolly, Washington, DC

For Takeda Chemical Industries, Ltd., Defendant: Philip Schaeffer, White & Case, New York, NY

For Takeda Vitamin & Food U S A , Inc , formerly known as Takeda USA, Inc, Defendant: Joseph T Dixon, Jr, Henson & Efron, PA, Mpls, MN

John W Borg, Special Master, Pro se, Edina, MN

**JUDGES:** Paul A. Magnuson, United States District Court Judge

**OPINIONBY:** Paul A. Magnuson

**OPINION:**

### MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion for Reconsideration of the May 2, 2005, Order, which denied Defendants' Motion to Dismiss. For the reasons that follow, the Court grants the Motion and dismisses the Amended Complaint.

### BACKGROUND

#### A. The Parties

Plaintiffs are foreign corporations who purchased monosodium glutamate ("MSG") and/or nucleotides directly from one or more Defendants in transactions that occurred outside of the United States. n1 Plaintiffs allege that Defendants and an undetermined number of unnamed co-conspirators participated in a global price-fixing and market allocation scheme

2005 U.S. Dist. LEXIS 39641, *12

to increase the world-wide price of MSG and nucleotides. **[*13]** Plaintiffs also claim that Defendants' conduct in forming and implementing the global conspiracy exerted direct and substantial effects on United States trade and commerce by inflating the prices paid by purchasers in the United States. (Am. Compl. PP 13-28.) In addition, Plaintiffs allege that price movements in one geographic sub-market were inextricably linked to all other markets so that the prices charged by Defendants and their co-conspirators in other countries were highly correlated with United States prices. (Id. PP 39-42.)

n1 Plaintiffs are attempting to sue on behalf of themselves and all foreign purchasers of MSG or nucleotides from any of the named Defendants or Defendants' co-conspirators from January 1, 1984, through November 1, 1999. (Am. Compl. P 45.)

According to Plaintiffs, Defendants fixed United States prices and controlled United States markets not merely to capture cartel profits in the United States, but also to allow the cartel to be effective anywhere in the world. Because MSG and **[*14]** nucleotides are fungible commodities, Defendants and their co-conspirators allegedly "knew that their conspiracy would not succeed unless they coordinated their prices and market shares in markets across the world." (Id. P 43.) Thus, Defendants allegedly included the United States in the cartel precisely to extract cartel profits from purchasers around the world without risk of arbitrage. (Id.)

Plaintiffs' alleged injury is that they purchased overpriced MSG and nucleotides abroad because Defendants' unlawful conspiracy prevented them from buying competitively priced MSG and nucleotides from the United States. (Id. PP 54-56.)

### B. Procedural History

This action commenced in May 2003. Thereafter, the parties agreed to stay proceedings pending a decision by the United States Supreme Court in *F. Hoffman-La Roche Ltd. v. Empagran, S.A.*, an antitrust class action brought on behalf of foreign and domestic purchasers of vitamins alleging an international price-fixing conspiracy by manufacturers and distributors. That case involved price-fixing conduct that significantly and adversely affected customers both within and outside the United States. However, the adverse **[*15]** foreign effect was independent of any adverse domestic effect.

In June 2004, the Supreme Court decided Empagran and held that a plaintiff must show that the defendant's conduct affected United States commerce and that the domestic effect gave rise to the plaintiffs injury to invoke the protections of the Sherman Act. *542 U.S. 155, 124 S. Ct. 2359, 2366-72, 159 L. Ed. 2d 226 (2004)*. However, the Supreme Court expressly declined to address the issue presented in this case: whether subject matter jurisdiction exists when a plaintiffs foreign injury is allegedly linked to the domestic effects of the allegedly anti-competitive conduct. *Id. at 2372*. Instead, it remanded the issue to the District of Columbia Circuit Court of Appeals.

In response to the Empagran decision, Plaintiffs filed an Amended Complaint in November 2004, and soon thereafter moved to stay proceedings in this action until the District of Columbia Circuit Court of Appeals had ruled on the remanded issue. However, this Court refused to stay the proceedings and entertained Defendants' Motion to Dismiss in early 2005. In its May 2, 2005, Order, the Court held that Plaintiffs alleged a sufficient link between the **[*16]** domestic effect caused by Defendants' anti-competitive conduct and Plaintiffs' injury.

### DISCUSSION

### A. Standard of Review

**[HN1]** When claims against a party remain unresolved, a motion for reconsideration falls under the rubric of *Federal Rule of Civil Procedure 54(b)*. See *Interstate Power Co. v. Kansas City Power & Light Co., 992 F.2d 804, 807 (8th Cir. 1993)*. Although issues decided should not be subject to continued argument, the Court may revisit its earlier decision in extraordinary circumstances. *Conrod v. Davis, 120 F.3d 92, 95 (8th Cir. 1997)*. For example, a motion for reconsideration may be justified on the basis of an intervening change in law. *Grozdanich v. Leisure Hills Health Ctr., 48 F. Supp. 2d 885, 888 (D. Minn. 1999)* (Erickson, Mag. J.).

### B. The Foreign Trade Antitrust Improvements Act

In its Motion to Dismiss, Defendants contend that the Court lacks subject matter jurisdiction over this action because

the Sherman Act does not apply to Plaintiffs' antitrust claim  Plaintiffs counter that the Court has subject matter jurisdiction because the effect of Defendants'  [*17]  conspiracy on United States commerce gave rise to Plaintiffs' antitrust claims and injuries

[HN2] Congress enacted the Foreign Trade Antitrust Improvements Act ("FTAIA") in 1982 to clarify the application of United States antitrust laws to international business transactions. See *15 U S C  § 6a*. Specifically, the FTAIA provides that the Sherman Act applies to foreign conduct only if: (1) the conduct has a "direct, substantial, and reasonably foreseeable effect" on United States commerce, and (2) "such effect gives rise to a claim" under the Sherman Act  Id  at *§ 6a(1)-(2)*; see also H R  Rep  No  97-686 (1982) (the purpose of the FTAIA is to "establish that restraints on export trade only violate the Sherman Act if they have a direct and substantial effect on commerce within the United States or a domestic firm competing for foreign trade"); id  (the FTAIA is not intended "to confer jurisdiction on injured foreign persons when that injury arose from conduct with no anti-competitive effects in the domestic marketplace").

## C. Empagran

On June 28, 2005, a unanimous panel of the District of Columbia Court of Appeals held that [HN3] the "gives rise [*18]  to" language in the FTAIA requires a plaintiff to demonstrate a direct causal relationship between the domestic effects and the foreign injury  *Empagran S A  v  F  Hoffmann-Laroche, 417 F 3d 1267, 2005 WL 1512951. at *3 (D C  Cir. 2005)*  Thus, a mere but-for nexus is insufficient  The Court of Appeals reasoned:

> To read the FTAIA broadly to permit a more flexible, less direct standard than proximate cause would open the door to [unreasonable interference with the sovereign authority of other nations] to safeguard their own citizens from anti-competitive activity within their own orders

*Id*.

The Court of Appeals recognized that maintaining super-competitive prices in the United States may have facilitated the scheme to charge comparable prices abroad  Nevertheless, it found that "this fact demonstrates at most but-for causation" and does not establish that the domestic effects of the price-fixing scheme — i e , increased prices in the United States — proximately caused the foreign purchasers' injuries

The Court of Appeals also rejected the plaintiffs' global conspiracy theory, reasoning that the theory established only an indirect [*19]  connection between the United States prices and the prices paid in foreign markets  It explained: "Under the appellants' theory, it was the foreign effect of price-fixing outside of the United States that directly caused, or gave rise to, their losses when they purchased vitamins abroad at super-competitive prices "  Id  Thus, even a showing that the defendants knew or could foresee the effect of their allegedly anti-competitive conduct in the United States on the plaintiffs' injuries abroad, or a showing that the defendants intended to manipulate United States trade, was insufficient  Instead, the plaintiffs had to show that the domestic effect proximately caused the plaintiffs' injury  Because the global conspiracy theory did not show that the foreign injury was inextricably linked to domestic restraints of trade, the Court of Appeals held that the domestic effect cited by the plaintiffs did not give rise to their claimed injuries so as to bring their Sherman Act claim within the FTAIA exception

## D. This Action

The theory Plaintiffs advance in this case is identical to that advanced in Empagran  In particular, Plaintiffs contend that MSG and nucleotides are fungible [*20]  and globally marketed, which allowed Defendants to sustain super-competitive prices abroad only by maintaining super-competitive prices in the United States  Plaintiffs further allege that they would have purchased MSG and/or nucleotides at lower prices either directly from United States sellers or from arbitrageurs selling MSG and/or nucleotides imported from the United States, thereby preventing Defendants from selling abroad at inflated prices  Finally, Plaintiffs contend that Defendants accomplished their global price-fixing cartel by creating barriers to international commerce in the form of market division agreements

This Court is persuaded by the decision and reasoning of the District of Columbia Circuit Court of Appeals in *Empagran*  The global price-fixing cartel theory establishes only an indirect relationship between United States prices and the prices paid in foreign markets. As such, Plaintiffs can only show that the foreign effect of price-fixing gave rise to their injuries  Because Plaintiffs are unable to show that the domestic effect proximately caused their injuries, Plaintiffs cannot state a claim under the Sherman Act

2005 U.S. Dist. LEXIS 39641, *20

**CONCLUSION**

Accordingly, **[*21] IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Reconsideration (Clerk Doc. No. 557) is **GRANTED;** and

2. The Amended Complaint is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: October 26, 2005

Paul A. Magnuson

United States District Court Judge

**JUDGMENT IN A CIVIL CASE**

**Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

**Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED THAT**

1. Defendants' Motion for Reconsideration (Clerk Doc. No. 557) is **GRANTED;** and

2. The Amended Complaint is **DISMISSED WITH PREJUDICE.**

DATE: October 26, 2005

# EXHIBIT D

LEXSEE 2006 US DIST LEXIS 8977

**In re DYNAMIC RANDOM ACCESS MEMORY (DRAM) ANTITRUST
LITIGATION; This document Relates to: Centerprise Int'l, Ltd. v. Micron
et al. (C 05-3026 PJH)**

**No. C 02-1486 PJH**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT
OF CALIFORNIA**

*2006 U.S. Dist. LEXIS 8977*

**March 1, 2006, Decided
March 1, 2006, Filed**

**PRIOR HISTORY:** *In re Dynamic Random Ac-
cess Memory (DRAM) Antitrust Litig., 2005 U.S.
Dist. LEXIS 30299 (N.D. Cal., Nov. 7, 2005)*

**COUNSEL:** **[*1]** For Internet Integration Inc., on
its own behalf and on behalf of all others similarly
situated, Plaintiff: Cadio Zirpoli, Guido Saveri,
Richard Alexander Saveri, Saveri & Saveri Inc.,
San Francisco, CA; Fred Taylor Isquith, Wolf
Haldenstein Adler Freeman&Herz LLP, New York,
NY; Joseph J. Tabacco, Jr., Berman DeValerio
Pease Tabacco Burt & Pu, San Francisco, CA;
Merrick Scott Rayle, Lovell Stewart Halebian LLP,
Pacific Grove, CA; Allan Steyer, Steyer Lowenthal
Boodrookas Alvarez & Smith LLP, San Francisco,
CA; Anthony D. Shapiro, Hagens Berman Sobol
Shapiro LLP, Seattle, WA; Christopher Lovell,
Lovell Stewart Halebian LLP, New York, NY; D.
Scott Macrae, Steyer Lowenthal Boodrookas Alva-
rez & Smith LLP, San Francisco, CA; Eugene A.
Spector, Jeffrey J. Corrigan, John A. Macoretta,
Spector Roseman & Kodroff PC, Philadelphia, PA;
Francis A. Bottini, Jr., Francis M. Gregorek, Wolf
Haldenstein Adler Freeman & Herz, San Diego,
CA; Garrett D. Blanchfield, Jr., Reinhardt Wendorf
& Blanchfield, St. Paul, MN; Geoffrey C. Rushing,
Saveri & Saveri Inc., San Francisco, CA; Joel Cary
Meredith, Steven J. Greenfogel, Meredith Cohen
Greenfogel & Skirnick PC, Philadelphia, PA; Mark
Reinhardt, Reinhardt **[*2]** Wendorf & Blanchfield,
St. Paul, MN; Steve W. Berman, Hagens Berman
Sobol Shapiro LLP, Seattle, WA; Steven A. Kan-

ner, Much Shelist Freed Denenberg & Ament PC,
Chicago, IL; Susan G. Kupfer, Glancy & Binkow
LLP, San Francisco, CA.

For William Breck Seiniger, Jr., Plaintiff: Joseph J.
Tabacco, Jr., Berman DeValerio Pease Tabacco
Burt & Pu, San Francisco, CA; Steve W. Berman,
Hagens Berman Sobol Shapiro LLP, Seattle, WA;
Anthony D. Shapiro, Hagens Berman Sobol Shapiro
LLP, Seattle, WA.

For Micron Technology Inc., Micron Semiconduc-
tor Products Inc., Defendant: G. Michael Barnhill,
Jim D. Cooley, Womble Carlyle Sandridge & Rice
PLLC, Charlotte, NC; Joel S. Sanders, Christine
Hart Clay, Gibson, Dunn & Crutcher LLP, San
Francisco, CA; Debra L. Bouffard, Sheehey Fur-
long & Behm PC, Burlington, VT; R. Jeffrey Behm,
Sheehey Furlong & Behm PC, Burlington, VT;
Ronald C. Redcay, Arnold & Porter LLP, Los An-
geles, CA.

For Centerprise International, Ltd., Plaintiff: Natalie
Finkelman Bennett, Media, PA; Scott R. Shepherd,
Shepherd Finkelman Miller & Shah LLC, Media,
PA.

**JUDGES:** PHYLLIS J. HAMILTON, United
States District Judge.

**OPINIONBY:** PHYLLIS J. HAMILTON

Case 1:05-cv-00485-JJF    Document 19-2    Filed 05/02/2006    Page 31 of 43

Page 2
2006 U.S. Dist. LEXIS 8977, *

OPINION:

## ORDER GRANTING MOTION TO DISMISS [*3]

Before this court are several defendants' joint motion to dismiss for lack of subject matter jurisdiction. The moving defendants include the following: Micron Technology, Inc.; Micron Semiconductor Products, Inc.; Crucial Technology, Inc.; Samsung Electronics Col., Ltd.; Samsung Semiconductor, Inc.; Mosel-Vitelic Corporation; Mosel-Vitelic Corporation (USA); Infineon Technologies AG; Infineon Technologies North America, Corp.; Hynix Semiconductor Inc.; Hynix Semiconductor America, Inc.; Elpida Memory, Inc.; Elpida Memory (USA) Inc.; NEC Electronics America, Inc.; Nanya Technology Corporation; Nanya Technology Corporation USA; Winbond Electronics Corporation; and Winbond Electronics Corporation America (collectively "defendants").

Defendants' motion came on for hearing before this court on January 25, 2006. Defendants appeared through their respective counsel, Michael D. Blechman, Julian Brew, William Farmer, Raphael M. Goldman, Gary L. Halling, Lisa Kimmel, Steven Morrissette, Joel S. Sanders, Ian Simmons, and Howard Ullman. Plaintiff appeared through its counsel, James C. Shah. Having read the papers filed in conjunction with the motion and carefully considered the arguments and [*4] the relevant legal authority, and good cause appearing, the court hereby GRANTS defendants' motion, for the reasons stated below and for the reasons stated at the hearing.

## BACKGROUND

On May 6, 2005, plaintiff filed the instant action against defendants, on behalf of itself and all others similarly situated, alleging violations of the Sherman Antitrust Act, *15 U.S.C. § 1.* See Class Action Complaint for Violation of the Sherman Act ("Complaint").

Specifically, plaintiff-a British corporation -- alleges that defendants engaged in a global conspiracy to fix prices for DRAM, an electronic microchip frequently used in computers. See, e.g., id. at PP 2, 32-57. According to plaintiff, the international conspiracy operated to deliberately fix DRAM prices in the United States, in order to extract cartel prices from plaintiff and other DRAM purchasers located outside the United States. Id. at PP 75, 80-81. As a result of the conspiracy, plaintiff alleges that it and others similarly situated were injured because they were forced to pay more for DRAM than they otherwise would have, and were further precluded from buying or selling DRAM products at [*5] competitive prices, both in the United States and abroad. Id. at PP 77, 85-86.

Defendants assert that plaintiff's complaint fails to set forth allegations supporting subject matter jurisdiction, or in the alternative, standing, and they collectively seek dismissal of the complaint pursuant to *Federal Rule of Civil Procedure 12(b)(1).*

## DISCUSSION

### A. Legal Standards

The plaintiff bears the burden of demonstrating that subject matter jurisdiction exists over the complaint when challenged under *Fed. R. Civ. P. 12(b)(1).* See, e.g., *Tosco Corp. v. Communities for a Better Env't, 236 F.3d 495, 499 (9th Cir. 2001).* The defendant may either challenge jurisdiction on the face of the complaint or provide extrinsic evidence demonstrating lack of jurisdiction on the facts of the case. *White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000).* Here, since the defendants challenge jurisdiction on the face of the complaint, all allegations of the complaint are taken as true and all disputed issues of fact are resolved in favor of the non-moving party. See *Love v. United States, 915 F.2d 1242, 1245 (9th Cir. 1990).* [*6]

Plaintiff also bears the burden of demonstrating that it has standing to pursue the claims alleged in the complaint. See *United States v. Hays, 515 U.S. 737, 743, 115 S. Ct. 2431, 132 L. Ed. 2d 635 (1995)* (burden on plaintiff "clearly to allege facts demonstrating that [plaintiff] is a proper party to invoke judicial resolution of the dispute"). In antitrust actions such as this one, plaintiff must allege antitrust injury in order to have standing -- i.e., "injury of the type the antitrust laws were intended to prevent." See, e.g., *Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334, 110 S. Ct. 1884, 109 L. Ed. 2d 333 (1990).*

### B. Subject Matter Jurisdiction

Section 1 of the Sherman Act prohibits all unlawful restraints of trade, including price-fixing

agreements. See *15 U.S.C. § 1.* Since the language of *section 1* is broad, and could conceivably limit all restraints of trade, Congress and the courts have limited the reach of *section 1.* In 1982, Congress enacted the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), which amended the Sherman Act to preclude its application to conduct involving trade or commerce with foreign nations unless two jurisdictional prerequisites [*7] are met. First, the conduct must have a "direct, substantial, and reasonably foreseeable" effect on US domestic commerce. See *15 U.S.C. § 6a.* Second, the "direct, substantial, and reasonably foreseeable" effect must "give rise to" a Sherman Act claim. Id.

In construing the FTAIA, it is well-settled that antitrust jurisdiction under the Sherman Act may be asserted over wholly foreign conduct on the basis of the economic effects of that conduct within the United States. See., e.g., *Hartford Fire Ins. Co. v. California, 509 U.S. 764, 796, 113 S. Ct. 2891, 125 L. Ed. 2d 612 (1993)* ("the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States."); *United States v. Aluminum Co. of Am. (Alcoa), 148 F.2d 416 (2d Cir. 1945).* What is less settled, however, are the standards by which courts must determine the magnitude and type of domestic effect necessary for jurisdiction to be exercised over foreign conduct.

Here, plaintiff is a foreign national who does not directly participate in the US market, and who suffered a wholly foreign injury (i.e., paying inflated prices for DRAM in the UK) [*8] as a result of a global price-fixing conspiracy allegedly put in place by defendants, which conspiracy purportedly affected US prices for DRAM and in turn, worldwide prices. See Complaint, PP 5, 74-77, 80-86. Accordingly, the issue for the court is whether plaintiff has sufficiently alleged US domestic effects giving rise to its foreign injury -- i.e., that the two-prong jurisdictional prerequisites set forth under the FTAIA have been met. For the reasons below, the court finds that plaintiff ultimately has not, and cannot, meet them.

1. Direct, substantial, and reasonably foreseeable.

First, plaintiff must sufficiently allege that defendants' conduct had a "direct, substantial, and rea-

sonably foreseeable" effect on US domestic commerce. See U.S.C. § 6a. A domestic effect is "direct" if it "follows as an immediate consequence of the defendant's activity," and it will be considered "substantial" if it involves a sufficient volume of US commerce and is not a mere "spillover effect." See *United States v. LSL Biotechnologies, 379 F.3d 672, 680 (9th Cir. 2004)* (expressly declaring "direct" within meaning of FTAIA to mean "immediate consequence"); *United Phosphorous Ltd. v. Angus Chem. Co., 131 F. Supp. 2d 1003, 1011-12 (N.D. Ill. 2001).* [*9]

Here, plaintiff has alleged that defendants' conduct resulted in higher prices in the United States. Specifically, plaintiff alleges that defendants' conspiracy resulted in "the deliberate fixing of prices in the United States," and further alleges that at least two defendants have already pled guilty to charges in the United States that they participated in an international conspiracy to fix prices. See Complaint, PP 72-74, 76. Plaintiff also makes allegations as to the large volume of DRAM commerce that defendants were engaged in. Id. at P 30. These allegations sufficiently describe, if taken as true, that as a result of defendants' conspiracy, the prices for DRAM in the United States went up. As such, plaintiff has sufficiently alleged a "direct, substantial, and reasonably foreseeable" effect on domestic commerce.

2. Whether conduct "gives rise to" a Sherman Act claim.

The second element -- which requires plaintiff to allege that the domestic "effect" in question also "gives rise to" a Sherman Act claim -- is harder for plaintiff to establish.

Courts that have had occasion to consider this element of the FTAIA have generally concluded that jurisdiction under the [*10] FTAIA exists only when the injury for which the plaintiff seeks redress arises from the direct, substantial, and reasonably foreseeable US effect. See, e.g., *Den Norske Stats Oljeselskap As v. HeereMac Vof, 241 F.3d 420, 429 n. 13 (5th Cir. 2001)* (affirming decision that no subject matter jurisdiction existed under FTAIA because foreign plaintiffs' injury (paying higher prices in the North Sea) did not arise from domestic effect (higher prices in the domestic market)). The controlling precedent on this issue, as acknowl-

edged by the parties, is the Supreme Court's opinion in *F. Hoffmann-La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 124 S. Ct. 2359, 159 L. Ed. 2d 226 (2004) (Empagran I)*.

*Empagran I* dealt with facts very similar to the case at bar here. There, plaintiffs alleged that defendants, a group of vitamin sellers, engaged in a global conspiracy to fix the prices for vitamins, leading to higher vitamin prices in the United States and independently leading to higher vitamin prices in other countries, like Ecuador. In passing on whether subject matter jurisdiction existed under the FTAIA as to certain foreign purchaser plaintiffs, the Supreme Court held that "a purchaser in **[\*11]** the United States could bring a Sherman Act claim under the FTAIA based on domestic injury, but a purchaser in Ecuador could not bring a Sherman Act claim based on foreign harm." See *542 U.S. at 159*. The *Empagran I* court held that where the foreign harm suffered by plaintiff is independent of any adverse domestic effect (e.g., higher prices in the US), no jurisdiction can lie. *Id. at 165*. The *Empagran I* court, however, expressly left open the question whether the Sherman Act may apply to claims "linked to" domestic effects (i.e., claims in which the foreign injury is *not* independent of the domestic effect). *Id. at 175*.

The Supreme Court remanded the case for further proceedings, and the case was eventually decided by the D.C. Circuit in *Empagran S.A. v. F. Hoffmann-Laroche Ltd., 417 F.3d 1267 (D.C. Cir. 2005), cert. denied (Empagran II)*. The *Empagran II* court, in considering whether a sufficient link existed between the allegedly anticompetitive conduct and the harm to the foreign plaintiffs, held that in order to prove the requisite nexus between domestic effect and foreign injury, plaintiffs needed **[\*12]** to allege more than a mere link between domestic effect and foreign injury. Rather, proximate causation is the standard. See *417 F.3d at 1271*. The *Empagran II* court then employed the proximate causation standard and found that plaintiffs had failed to sufficiently allege that the domestic effects cited by plaintiffs -- i.e., increased prices in the US -- gave rise to their foreign injury. Specifically, the court found that "while maintaining super-competitive prices in the United States may have facilitated the appellees' scheme to charge comparable prices abroad, this fact demonstrates at most

but-for causation . . . that establishes only an indirect connection between the US prices and the prices [plaintiffs] paid when they purchased vitamins abroad." Id.

Plaintiff here alleges no more than the plaintiffs in *Empagran I* and *II*. In sum, plaintiff alleges: that plaintiff was "required to track the DRAM prices in dollars, which was the only available measure due to Defendants' sales and distribution practices, then work on dollar exchange rates in order to buy the DRAM at the best available price worldwide"; that "the United States prices were the **[\*13]** source of, and substantially affected the worldwide DRAM prices;" that "defendants used th[e] supra-competitive prices of DRAM in the United States to raise prices worldwide . . . and without these supra-competitive prices for DRAM in the United States, Plaintiff and class members located outside of the United States would not have paid artificially inflated prices;" and finally, that plaintiff and the proposed class members were injured "in that they paid more for DRAM than they otherwise would have paid in the absence of the unlawful conduct of defendants and were precluded from buying products from or selling products in the United States and in the worldwide market at competitive prices." See Complaint, PP 75-77.

Without more, these allegations constitute no more than the but for causation that the *Empagran* cases find objectionable. Plaintiff attempts to distinguish the *Empagran* litigation by pointing out that *Empagran I* expressly left unanswered the question whether subject matter jurisdiction exists where, as here, plaintiffs foreign injury is purportedly intertwined with the domestic effects, and that the holding in *Empagran II* does not determine resolution **[\*14]** of the issue on the facts before this court. These arguments, however, are unpersuasive. First, as defendants urge and at least one subsequent court has found, the "proximate causation" standard enunciated in *Empagran II* is more consistent with (1) principles of prescriptive comity and (2) general antitrust principles than a "but for" standard, factors which argue in favor of adoption of that standard. See *Latino Quimica-Amtex S.A. v. Akzo Nobel Chem. B.V., 2005 U.S. Dist. LEXIS 19788, 2005 WL 2207017 (S.D. N.Y. 2005)*. Second, the cases applying the *Empagran* holdings since issuance of *Empagran II* have not only similarly adopted that stan-

dard, but also expressly considered -- and rejected -- the very same factual scenarios and arguments that plaintiff raises here. See id.; see also *In re Monosodium Glutamate, 2005 U.S. Dist. LEXIS 39641, 2005 WL 2810682 (D. Minn. 2005)* (granting defendants' motion for reconsideration and reversing earlier decision to deny defendants' motion to dismiss on subject matter jurisdiction grounds).

Indeed, *In re Monosodium Glutamate* involved allegations which are essentially identical to those made by plaintiff here: that defendants "fixed United States prices **[*15]** and controlled United States markets not merely to capture cartel profits in the United States, but also to allow the cartel to be effective anywhere in the world;" and that defendants knowingly did so with the understanding that their conspiracy would not succeed unless they "coordinated their prices and market shares in markets across the world." See *2005 U.S. Dist. LEXIS 39641, 2005 WL 2810682 at * 1.* There, the court found that a "global price-fixing cartel theory establishes only an indirect relationship between United States prices and the prices paid in foreign markets." See id., *2005 U.S. Dist. LEXIS 39641, 2005 WL 2810682 at * 3.*

So here. There is simply no persuasive authority that plaintiff can muster to support an argument that plaintiffs global price-fixing conspiracy sufficiently alleges causation -- and a claim under the FTAIA -- post *Empagran I* and *II.*

Accordingly, since plaintiff cannot sufficiently allege that its foreign injury was dependent upon, or somehow directly linked to, the domestic effect at issue (i.e., higher US prices), the court GRANTS defendants' motion to dismiss for lack of subject matter jurisdiction.

### C. Standing

Defendants also argue that plaintiff lacks **[*16]** standing to assert antitrust claims. Antitrust standing is an issue separate from the jurisdictional question discussed above. In *Assoc. Gen'l Contractors v. Cal. State Council of Carpenters, 459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*, the Supreme Court set forth the factors a court must consider in determining whether a plaintiff has standing to bring a claim for violation of the antitrust laws. These are (1) whether there is a causal connection between the alleged antitrust violation and the harm

plaintiff allegedly suffered, and whether defendants intended to cause that harm; (2) whether the nature of plaintiff's injury is the type the antitrust laws were intended to forestall; (3) the directness of the injury; (4) the existence of more direct victims; (5) the risk of duplicative recovery; and (6) the complexity of apportioning damages. *Id. at 538-47*; see also *American Ad Mgmt v. Gen. Tel. Col. of Cal., 190 F.3d 1051, 1054 (9th Cir. 1999).*

Defendants focus on the majority of these factors, arguing that the allegations in plaintiffs complaint fail to establish that plaintiff has suffered "antitrust injury" -- i.e., the type of injury that "the antitrust **[*17]** laws were intended to prevent"; that there is no direct link between the domestic effects of defendants' alleged anticompetitive conduct and plaintiffs' injury; plaintiffs' claim rests on a "speculative" and "abstract conception" of harm, since there is no direct proximate causation; and that the domestic direct purchasers are more "appropriate plaintiffs" here. See, e.g., *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977).* Plaintiff responds by arguing that, contrary to defendants' arguments, each factor is satisfied.

The same considerations that mandate a finding of no subject matter jurisdiction weigh against a finding of antitrust standing. However, in view of the disposition of the Sherman Act claim, above, there is no need for consideration of defendants' alternative claim that plaintiff lacks standing. See *Verizon Communications, Inc. v. Law Offices of Curtis v. Trinko LLP, 540 U.S. 398, 416 n.5, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004).*

Accordingly, and in conclusion, defendants' motion to dismiss is GRANTED.

### D. Leave to Amend

*Federal Rule of Civil Procedure 15(a)* provides that leave to amend a pleading "shall **[*18]** be freely given when justice so requires." *Fed. R. Civ. Proc. 15(a).* Leave to amend will be denied, however, where the amendment would be futile, or where the amended complaint would be subject to dismissal. See *Saul v. U.S., 928 F.2d 829, 843 (9th Cir. 1991); Reddy v. Litton Indus., Inc., 912 F.2d 291, 296 (9th Cir. 1990).*

If granted leave to amend here, plaintiff proposes adding additional allegations regarding the correlation between "U.S. prices during the conspiracy and those in Europe and Asia-Pacific." Opp. Br. at 20:14-15. Such allegations, however, while providing more detail, do not substantively change plaintiff's theory of recovery -- i.e., that plaintiff's injury was caused by a global price-fixing conspiracy with the purpose and effect of raising U.S. prices and in turn, worldwide prices. Without a different theory of recovery altogether, plaintiff cannot escape a finding that no subject matter jurisdiction exists. See *Latino Quimica-Amtex, 2005 U.S. Dist. LEXIS 39641, 2005 WL 2207017 at ** 12-13* ("[U]nder the FTAIA, the mere inter-dependence of markets cannot be sufficient to satisfy the requirement that **[*19]** a domestic effect "gives rise" to the plaintiff's claim) (denying leave to amend as futile).

Accordingly, since the court would lack subject matter jurisdiction over the case as pleaded in a proposed amended complaint, the court finds that amendment would be futile, and DENIES plaintiff leave to amend.

### E. Conclusion

For the above reasons, the court hereby GRANTS defendants' motion to dismiss for lack of subject matter jurisdiction, and DENIES plaintiff leave to amend. Plaintiff's complaint is accordingly dismissed with prejudice.

**IT IS SO ORDERED.**

Dated: March 1, 2006

PHYLLIS J. HAMILTON

United States District Judge

# EXHIBIT E



Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 1603093 (W.D.Ky.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

Only the Westlaw citation is currently available.
United States District Court, W.D. Kentucky,
Louisville Division.
GENERAL ELECTRIC COMPANY, et al.,
Plaintiffs,
v.
LATIN AMERICAN IMPORTS, S.A., d/b/a
Latam, et al., Defendants.
**Civil Action No. 99-92.**

July 16, 2002

Distributor of American manufacturer's household appliances in Peru filed counterclaims against manufacturer, alleging antitrust violations. Manufacturer moved for summary judgment. The District Court, Jennifer B. Coffman, J., held that distributor failed to establish antitrust injury, a necessary prerequisite to its antitrust claims.

Motion granted.

West Headnotes

**Monopolies 265 ⊙⇒28(1.4)**

265 Monopolies
    265II Trusts and Other Combinations in Restraint of Trade
        265k28 Actions for Damages by Combinations or Monopolies
            265k28(1.1) Right of Action
                265k28(1.4) k. Injury to Business or Property. Most Cited Cases
Allegations by distributor of American manufacturer's household appliances in Peru, that manufacturer embarked on a scheme whereby it induced distributor to develop a market for its appliances, that it refused to renew distributor's contract and set about to destroy distributor, with the effect that distributor, an important trade " bridge," could not ally itself with competing U.S. appliance manufacturers, which suffered a reduced

ability to sell their products in Peru, and that manufacturer thereby was able to stifle competition and monopolize the market, failed to establish an antitrust injury, as required for distributor to prevail on its antitrust claims; distributor failed to demonstrate how its injury resulted from a decrease in competition rather than from some other consequence of manufacturer's actions.

*MEMORANDUM OPINION AND ORDER*
JENNIFER B. COFFMAN, Judge.
*1 This matter is before the court upon GE's motion (Record No. 139) for summary judgment on LATAM's antitrust claims and the parties' *Daubert* motions regarding LATAM's antitrust expert (Record No. 118), Lawrence G. Goldberg, and GE's antitrust expert (Record No. 135), Barry Harris. The court, having reviewed the record and being otherwise sufficiently advised, will grant GE's motion as to LATAM's antitrust claims (Counts 6 and 7 of the Second Amended Counterclaim), deny the parties' respective *Daubert* motions as moot, and cancel the *Daubert* hearings with regard to the experts Goldberg and Harris.

Fed.R.Civ.P. 56(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The plain language of this rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Betkerur, M.D. v. Aultman Hospital Assoc.*, 78 F.3d 1079, 1087 (6th Cir 1996).

LATAM's antitrust claims stem from its theory of this case: that GE embarked on a scheme whereby it induced LATAM to serve as its distributor in Peru

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 2

Not Reported in F.Supp.2d, 2002 WL 1603093 (W.D.Ky.)
(Cite as: Not Reported in F.Supp.2d)

and develop a market for GE appliances, then refused to renew LATAM's distributorship contract and set about to destroy LATAM, with the effect that LATAM, an important trade "bridge" by virtue of its success in developing the Peruvian market for sale of U.S. appliances, could not ally itself with competing U.S. manufacturers of appliances, allowing GE to stifle competition and monopolize the market. In Count 6 of its counterclaims, LATAM charges GE with an attempt to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Specifically, LATAM alleges that it was involved in "export trade" to Peru in the geographic market of the United States, in the relevant product market of U.S.-branded household appliances. LATAM further alleges that GE had a market share in excess of 70% in these relevant markets, which gave it a dangerous probability of success in achieving an outright monopoly. Count 7 of the counterclaims charges GE with conspiracy to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

Seeking summary judgment on these antitrust counterclaims, GE makes three major arguments: (1) that this court lacks jurisdiction over the counterclaims by virtue of the Foreign Trade Antitrust Improvement Act of 1982 ("FTAIA"), 15 U.S.C. § 6; (2) that LATAM has not demonstrated any antitrust injury; and (3) that LATAM has not sufficiently shown the substantive elements of Sections 1 and 2 of the Sherman Act, due to deficiencies in its definition and establishment of the relevant market. As the second of these arguments is dispositive, we will address it first and then discuss only tangentially the remaining arguments.

### Antitrust Injury

*2 Simply put, this is not an antitrust case. The enactment of the antitrust laws was a response to " congressional concern with the protection of competition, not competitors." *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). Accordingly, "[i]t is not enough to assert' simply that [a plaintiff] has been harmed as an individual competitor;' rather, [a plaintiff] must suggest how [defendants'] 'activities have had [some] adverse impact on price, quality, or output of ... services offered to consumers in the relevant market.' " *Betkerur v. Aultman Hospital Association,* 78 F.3d 1079, 1092 (6th Cir.1996) (quoting *Capital Imaging Assocs. V. Mohawk Valley Medical Assocs.,* 996 F.2d 537, 547 (2d Cir.), *cert. denied,* 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993)). To allege sufficiently the elements of a federal antitrust violation, "[p]laintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Valley Products Co. v. Landmark,* 128 F.3d 398, 402 (6th Cir.1997) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) ) (emphasis in original). GE contends that one failure of LATAM in regard to showing antitrust injury is that it "allege[s] nothing more than restriction on the movement of articles in commerce, not injury to consumers." Additionally, however, the concept of antitrust injury requires a plaintiff to demonstrate that his alleged injuries are the result of anticompetitive behavior. Claims of injury arising from antitrust violations are compensable only when "the injury flows directly from the unlawful act." *Axis, S.p.A v. Micafil, Inc.,* 870 F.2d 1105, 1107 (6th Cir.), *cert. denied,* 493 U.S. 823, 110 S.Ct. 83, 107 L.Ed.2d 49 (1989). If a plaintiff "would have suffered the same injury without regard to the allegedly anticompetitive acts of Defendants, Plaintiff has not suffered an antitrust injury." *Hodges v. WSM, Inc.,* 26 F.3d 36, 38 (6th Cir.1994). "The Sixth Circuit ... has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of the antitrust laws, flows directly from conduct that is not itself an antitrust violation." *Valley Products,* 128 F.3d at 403.

In *Valley Products, supra,* a manufacturer of soap and hotel amenities brought an antitrust suit against hotel franchisors who denied the manufacturer permission to use the franchisors' trademarks after two other soap manufacturers were granted a " preferred supplier" status. The plaintiff alleged the existence of an illegal tying arrangement in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d

Not Reported in F. Supp 2d, 2002 WL 1603093 (W.D.Ky.)
(Cite as: Not Reported in F.Supp.2d)

violation of the antitrust laws, but the court upheld the district court's observation that the "plaintiffs' exclusion from access to defendants' license, and their resulting inability to produce logoed amenities, is what has caused them harm, not their exclusion based on the illegal tie. The plaintiffs would have suffered the identical loss if their contracts with [the franchisors] had simply been terminated, even if no preferred vendor agreement ... existed." *Id.* at 403 (quoting *Valley Products v. Landmark,* 877 F.Supp. 1087, 1093-94 (W.D Tenn.1994)). Bolstered by the reasoning of *Valley Products* and similar cases, GE argues:

*3 [W]hether GE engaged in the alleged anticompetitive activity or not, the effect on the market that [LATAM] complains of-a reduced ability of other American appliance makers to sell their products in Peru-would have been exactly the same. Latam would have been unavailable to these other manufacturers whether Latam stayed with GE and thrived, or whether its contract expired and it was destroyed. Thus, the injury Latam alleges does not depend in any way on GE's alleged anticompetitive actions. It is not, therefore, antitrust injury. And this is not an antitrust case.

GE also characterizes the deposition testimony of LATAM's antitrust expert, Lawrence Goldberg, as having admitted this point.

> FN1. "Q: So in either case, from the perspective of another U.S. manufacturer of appliances, Latam was not available to serve as its distributor in Peru, is that correct?
> A: That may have been the case but there was no choice." (Goldberg deposition at 154).

In response, LATAM addresses GE's argument regarding its failure to allege injury to consumers:
In this case, the injury implicated by Latam's claim is felt by participants in the market for export to Peru of U.S.-made appliances. While these firms have no economic interaction whatsoever with U.S consumers or the U.S. domestic marketplace ..., Congress has, nevertheless, made it abundantly clear that the U.S export market falls within the protection of U.S. antitrust laws ... In sum, antitrust injury can, indeed, exist in cases where export commerce is restrained, even though no effect is felt on domestic prices or quality.

Latam cites cases in support of this proposition, concluding that "[g]iven Congress' subsequent enactment of the FTAIA, thereby expressly granting of [sic] jurisdiction over matters affecting 'export commerce'-matters that, necessarily, will have no ' spillover' effect on consumer prices and quality-it must follow that cases seeking to remedy harm to this 'export commerce' necessarily involve 'injury of the type the antitrust laws were intended to prevent.' [quoting *Brunswick, supra* ]."

Although this reasoning indeed speaks to one facet of GE's argument regarding antitrust injury-LATAM's alleged failure to assert injury to consumers-it does not confront GE's observation that the injury to LATAM was not suffered by virtue of the harm LATAM alleges to American appliance manufacturers. Nor does it answer GE's contention that, had GE not allegedly destroyed LATAM, but rather LATAM remained with GE and thrived, LATAM-the "trade bridge" which could have enabled other U.S. appliance manufacturers to compete with GE in the export market to Peru-would have been similarly unavailable to these other American manufacturers. LATAM does confront this argument in another section of the response (purportedly devoted to GE's jurisdictional arguments regarding the FTAIA):
GE ignores Latam's repeated clarifications .... that its claim does not arise out of anything that GE did, or did not do, in connection with the appliance distributorship. Thus, GE could have renewed the appliance distributorship or terminated it, allowing Latam to freely associate with other appliance manufacturers, and it would have faced no antitrust liability. Latam's case, on the other hand, is based upon GE's elimination of Latam as a participant in the U.S. export market.... GE's manipulation of its relationship with Latam so as to adversely affect Latam's ability to pursue an association with another U.S. appliance manufacturer who desires to export his product to Peru is actionable under the Sherman Act. *E g Sky View* [sic] *Dist., Inc v. Miller Brewing Co.,* 620 F 2d 750, 752 (10th Cir.1980) ("

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 4

Not Reported in F.Supp.2d, 2002 WL 1603093 (W.D.Ky.)
(Cite as: Not Reported in F.Supp.2d)

the complaint sets forth more than *"mere "* substitution of a distributorship and asserts that the substitution of Sky View [sic] was designed to adversely affect Miller's competitors and that in fact it did stop Miller's competition.") (Emphasis in original.)

> FN2. *Skyview, supra,* apparently did involve a theory similar to that which LATAM advances; in *Skyview,* an independent distributor alleged that the brewing company had encouraged it to overexpand, then terminated the distributorship and granted an exclusive distributorship to another distributor it had just formed, a substitution designed to impede the brewing company's competitors, and that did in fact harm competition. The district court had dismissed the complaint because it thought the allegations regarding any conspiracy between the brewing company and the distributor it formed to replace the plaintiff were insufficient; the Tenth Circuit, noting the standard on a motion to dismiss, held this to be error. *See Skyview,* 620 F.2d at 752.

*4 First of all, the court notes the extremely speculative nature of LATAM's argument; as GE has noted, nowhere does LATAM offer evidence that other appliance manufacturers actually *sought* to utilize LATAM and were denied, or that, during LATAM's distributorship with GE, LATAM did " freely associate" with other manufacturers. On the whole, LATAM's proof as to the anticompetitive effect it alleges is deficient. This deficiency became apparent in the court's analysis of GE's jurisdictional arguments, discussed below, in which GE challenged the opinion of LATAM's antitrust expert (Goldberg) that GE's alleged conduct produced "direct, substantial and reasonably foreseeable" effects on the U.S. appliances export market to Peru.

Two principles enunciated by the Sixth Circuit in regard to granting summary judgment are that (1) "

the respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment' " and (2) "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Betkerur, M.D. v. Aultman Hospital Association,* 78 F.3d 1079, 1087 (6th Cir.1996). While the court is aware that it is not required to comb the record in order to make LATAM's arguments for it, the court did examine the content of the *Daubert* motions in an effort to lend substance to the cited conclusions of LATAM's expert regarding the effect of GE's alleged destruction of LATAM on the U.S. market for export of appliances to Peru. After an examination of these more specifically alleged effects, the court's opinion as to the deficiency of LATAM's pleadings on this subject remains unaltered.

> FN3. LATAM's response to GE's motion to exclude the testimony of its proferred antitrust expert summarizes these effects as follows:
> Thus, Prof. Goldberg learned that:
> • Latam's imports for GE during 1996, its last "non-impaired" year, was 8,860 units, 64% of the U.S. exports in that year (Goldberg Table 1-2.)
> • nine U.S. manufacturers that were represented in Peru in the 1990's were no longer represented in 2000.
> • The total U.S. exports to Peru decreased during the 1996-2000 period, from 13,869 units in 1996 to 2,808 in 2000. (Goldberg Table 13-1)
> • The total Non-GE U.S. exports to Peru decreased 50% during the 1996-2000 period, from 5,009 units in 1996 to 2,618 in 2000. (Goldberg Table 13-1)
> • three of the four distributors who had been exporting product into Peru in 1992 and were still doing so in 2000 had suffered some type of financial distress and reorganization during the 1996-2000 period (Goldberg Depo. at 63-64)
> • the U.S. exports from the three

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d

Not Reported in F Supp 2d, 2002 WL 1603093 (W D Ky )
(Cite as: Not Reported in F.Supp.2d)

Page 5

manufacturers served by these three distributors decreased a full 70% during the 1996 2000 period, from 4,472 in 1996 to 1,345 in 2000. (Goldberg Table 13-1)

• During the same four years the sales of the fourth manufacturer (Frigidaire), whose distributor had *not* failed, grew from 537 to 1,273 (Goldberg Table 13-1), indicating that a market still existed for such U.S. luxury niche goods if only they can reach Peru, ruling out the likelihood that the decline in the U.S. export trade was due to some the [sic] other overarching economic factors.

Initially, it should be noted that some of these factors appear to support GE's contention that the U.S. export market for appliances to Peru remained competitive, rather than bolstering LATAM's assertion that the market suffered. For example, the third and fourth bullet points, regarding an alleged decrease in U.S. exports to Peru, when taken together, appear to reflect that GE exports to Peru decreased at a more substantial rate than non-GE exports. Further, the last bullet point, which reveals that Frigidaire's sales more than doubled during the relevant period, severely undercuts LATAM's theory of antitrust injury. LATAM's explanation that Frigidaire's distributor did not fail (thus facilitating the sales increase) explicitly contradicts its assertion of antitrust injury by virtue of other manufacturers' being deprived of LATAM's services.

The weaknesses in LATAM's pleading of antitrust injury, moreover, are driven home in GE's reply, which focuses first on this element with citation to *Tennessean Truckstop, Inc v NTS, Inc,* 875 F.2d 86 (6th Cir.1989). In this case, the Sixth Circuit enunciated that, pursuant to Supreme Court case law, "the antitrust plaintiff 'must show (1) that the alleged violation tends to reduce competition in some market and (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the defendant's actions.' " *Tennessean Truckstop,* 875 F.2d at 88 (quoting P. Areeda & H. Hovenkamp,

*Antitrust Law* ¶ 334.1b at 299 (1988 Supp.)) Using this case, GE correctly and succinctly points out that "the harm Latam identifies in the market is not harm to Latam but harm to other American appliance manufacturers. Yet Latam has not even suggested how its damages are the result of the hypothetical harm to Whirlpool, Maytag, Frigidaire, and the other manufacturers whose case Latam seems to want to pursue, as if it were some sort of *parens patriae*" LATAM has not adequately answered this argument regarding antitrust injury, and the court fails to see how "the plaintiff's injury would result from a decrease in ... competition rather than from some other consequence of [GE's] actions." *Id.* at 88. Accordingly, we find that this necessary prerequisite of its antitrust claims is not met, requiring the dismissal of Counts 6 and 7 of the counterclaims.

*Jurisdiction and Substantive Elements*

*5 Due to our holding that antitrust injury is lacking and is therefore dispositive of LATAM's antitrust counterclaims, we will assume, for purposes of this motion for summary judgment, that LATAM meets all the other arguments raised by GE. The court notes, however, that GE's argument that this court lacks jurisdiction over LATAM's counterclaims because the Sherman Act does not apply to conduct which affects only foreign markets is persuasive. The FTAIA requires a "direct, substantial and reasonably foreseeable effect on the domestic marketplace *and* that this anticompetitive effect on the domestic marketplace gave rise to their injuries." *Ferromin International Trade Corp v UCAR International, Inc,* 153 F.Supp.2d 700, 705 (E.D.Pa.2001) (emphasis in original). GE's contention that neither of these prongs is met has merit.

FN4 LATAM simply cites its expert's *conclusions* that the effect on U.S. export trade caused by GE's alleged destruction of LATAM is "direct, substantial, and reasonably foreseeable," without ample factual foundation. LATAM has not come close to alleging the type of substantial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                    Page 6

Not Reported in F.Supp.2d, 2002 WL 1603093 (W.D.Ky.)
(Cite as: Not Reported in F.Supp.2d)

effect on a U.S. market that existed in *Access Telecom, Inc v. MCI Telecommunications Corp.,* 197 F.3d 694 (5th Cir.1999). Even were this court to have found that LATAM had met the antitrust injury requirement, the failure to cite or argue anything concrete in response to a motion for summary judgment on this requirement of the FTAIA would be fatal to LATAM's antitrust counterclaims. Without regard to these alleged effects, argued by LATAM, *see supra,* LATAM has done nothing to show their directness, substantiality, or reasonable foreseeability with regard to the FTAIA.

As to the second prong of the FTAIA, the parties disagree as to whether LATAM's alleged injuries must "arise from" anticompetitive effects on U.S. commerce. *Compare Den Norske Stats Oljeselskap As v. Heeremac Vof,* 241 F.3d 420 (5th Cir.2001) (imposing such a requirement) with *Kruman v. Christie's International PLC,* 284 F.3d 384 (2nd Cir.2002) (apparently declining to impose such a requirement). This court declines to resolve this question unnecessarily. The court notes, however, that LATAM mistakenly approaches this issue. First, it erroneously relies upon the tautological assertion of its expert, Goldberg, who says (without factual foundation), that "the antitrust damage to the other U.S. manufacturers is related to the destruction of Latam and in that sense it is very closely related ... Latam's destruction prevented it from dealing with these other manufacturers, leading to the damage to the market. Now, Latam was damaged personally by this and it's all intertwined together with the antitrust and anticompetitive effects." (Goldberg deposition, at 121 22).

Secondly, LATAM is not claiming that the anticompetitive effects felt by U.S. appliance manufacturers gave rise to its injuries; rather, it is claiming that its destruction led to the anticompetitive

effects-the reduced ability of U.S. manufacturers to export their product to Peru. Thus, the case law cited by LATAM in an effort to show that it meets the *Den Norske* test is inapposite.

Finally, GE argues that LATAM has not sufficiently shown the substantive elements of Sections 1 and 2 of the Sherman Act, due to deficiencies in its definition and establishment of the relevant market. If this court had not already decided that LATAM's antitrust claims fail as a matter of law, we would be required to take up the question of which approach is most appropriate to LATAM's theory of the case at this time. As we have shown from the foregoing, however, we need not address the arguments contained in the *Daubert* motions regarding the experts Goldberg and Harris, and we need not conduct the hearings requested by the parties with regard to them. Accordingly,

> FN5. GE challenges LATAM's definition of the relevant market in this case as the market for the export of U.S.-manufactured appliances for distribution in Peru, contending that LATAM has made no effort to determine which commodities are reasonably interchangeable by consumers, and, indeed, that LATAM ignores the fact that antitrust law condemns only that conduct which is harmful to consumers. GE cites case law in support of these arguments, and excerpts from the deposition of LATAM's expert in arguing that he ignores consumers in his definition of the relevant market. GE also contends that the market is competitive, which undercuts any assertion that GE possessed market power sufficient to control prices and exclude competition.
>
> In response to these arguments, LATAM states that its market definition is appropriate to this case, that GE's arguments are merely *Daubert* complaints about the methodology employed by LATAM's expert (Goldberg), and that these issues are more fully briefed in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 1603093 (W.D.Ky.)
**(Cite as: Not Reported in F.Supp.2d)**

> *Daubert* pleadings. The court strongly condemns this tactic, whereby LATAM deflects its response to a motion for summary judgment to other pleadings (and thereby effectively increases the page limits therefor, despite this court's admonition in the past that no extensions of either page limits or deadlines would be granted). In an effort to give LATAM the benefit of the doubt, however, the court has reviewed the arguments contained in the *Daubert* motions regarding both GE and LATAM's antitrust experts

IT IS ORDERED that GE's motion for summary judgment with regard to Counts 6 and 7 of LATAM's Second Amended Counterclaim is GRANTED.

IT IS FURTHER ORDERED that GE's motion to exclude the testimony of Lawrence Goldberg and LATAM's motion to exclude the testimony of Barry Harris are DENIED AS MOOT.

IT IS FURTHER ORDERED that, as the *Daubert* motions regarding Messrs. Goldberg and Harris have been denied as moot, there is no need to conduct the parties' requested hearings as to them, currently set for July 1, 2002. All other proceedings remain scheduled for July 1, 2002, unless the parties are otherwise notified by order of the court.

W.D.Ky.,2002.
General Elec. Co. v. Latin American Imports, S.A., d/b/a LATAM
Not Reported in F.Supp.2d, 2002 WL 1603093 (W.D.Ky.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.