## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE INTEL CORP. MICROPROCESSOR ANTITRUST LITIGATION | MDL No. 05-1717-JJF |
| PHIL PAUL, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION,<br><br>Defendant. | C.A. No. 05-485-JJF<br><br>CONSOLIDATED ACTION |

## APPENDIX IN SUPPORT OF INTEL CORPORATION'S
## MOTION TO DISMISS PLAINTIFFS' FOREIGN CONDUCT CLAIMS

OF COUNSEL:
David M. Balabanian
James L. Hunt
Christopher B. Hockett
Nora C. Cregan
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, CA 94111-4067
(415) 393-2000

Richard A. Ripley
BINGHAM McCUTCHEN LLP
2020 K Street, N.W.
Washington, D.C. 20006
(202) 373-6000

Dated: November 3, 2006

Richard L. Horwitz (#2246)
W. Harding Drane, Jr. (#1023)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
wdrane@potteranderson.com

*Attorneys for Defendant*
*Intel Corporation*

## TABLE OF CONTENTS TO APPENDIX

Topic ........................................................................................................     Page

Exhibit A .................................................................................................     A1

Exhibit B .................................................................................................     A17

TABLE OF AUTHORITIES FOR APPENDIX

**CASES**

*AG Acceptance Corp. v. Glinz*, 684 N.W.2d 632 (N.D. 2004) .............................. A19

*Anheuser-Busch, Inc. v. Abrams*, 520 N.E.2d 535 (N.Y. 1998) .................................................................................................. A18

*Assoc. General Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) .................................................... A19

*Beckler v. Visa U.S.A., Inc.*, No. 09-04-C-00030, 2004 WL 2115144 (N.D. Dist. Ct. Aug. 23, 2004) ........................................ A19

*Bergstrom v. Noah*, 974 P.2d 520 (Kan. 1999) ................................. A17

*Brooks Fiber Commc'n of Tucson, Inc. v. GST Tucson Lightwave, Inc.*, 992 F. Supp. 1124 (D. Ariz. 1997) .......................... A17

*Byre v. City of Chamberlain*, 362 N.W.2d 69 (S.D. 1985) .................... A19

*Davies v. Genesis Medical Ctr.*, 994 F. Supp. 1078 (S.D. Iowa 1998) ...................................................................................... A17

*Davric Maine Corp. v. Rancourt*, 216 F.3d 143 (1st Cir. 2000) .............................................................................................. A17

*Ford Motor Co. v. Lyons*, 405 N.W.2d 354 (Wis. Ct. App. 1987) .............................................................................................. A19

*Fucile v. Visa U.S.A., Inc.*, No. S1560-03 CNC, 2004 WL 3030037 (Vt. Super. Dec. 27, 2004) ............................................... A19

*Gray v. Marshall Cty. Bd. of Edu.*, 367 S.E.2d 751 (W. Va. 1988) .............................................................................................. A19

*Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) ............................................................................................ A19

*Keating v. Philip Morris, Inc.*, 417 N.W.2d 132 (Minn. Ct. App. 1987) ...................................................................................... A18

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213 (C.D. Cal. 2003) ................................................... A17

*Midwest Commc'n, Inc. v. Minnesota Twins, Inc.*, 779 F.2d 444 (8th Cir. 1985) ......................................................................... A18

*Orr v. Beamon*, 77 F. Supp. 2d 1208 (D. Kan. 1999) ......................... A17

*Rose v. Vulcan Materials Co.*, 194 S.E.2d 521 (N.C. 1973) ................ A18

*State v. Duluth Bd. of Trade*, 121 N.W. 395 (Minn. 1909) .................. A18

*Tennessee ex rel. Leech v. Levi Strauss & Co.*, No. 79-722-III, 1980 WL 4696 (Tenn. Ch. Ct. Sept. 25, 1980) ....................... A19

*Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811 (Ct. App. 1995) .............................................................................................. A17

*Walker v. U-Haul Co. of Miss.*, 734 F. 2d 1068 (5th Cir. 1984) .............................................................................................. A18

TABLE OF AUTHORITIES FOR APPENDIX
(Continued)

## STATUTES

ARIZONA ANTITRUST ACT, §§ 44-1401, ET.SEQ...................................... A17

ARIZ. REV. STAT. ANN. § 44-1412 (2006) ............................................ A17

D.C. CODE § 28-4515 (2006) ............................................................. A17

IOWA CODE § 553.2 (2006) ............................................................... A17

MICH. COMP. LAWS § 445.784 (2006) ................................................. A18

N.M. STAT. § 57-1-15 (2006)............................................................. A18

NEB. REV. STAT. § 59-829 (2005)....................................................... A18

NEV. REV. STAT. § 598A.050 (2006) ................................................... A18

W. VA. CODE § 47-18-16 (2006) ........................................................ A19

**EXHIBIT A**

| AMD Complaint | First Amended Consolidated Complaint |
|---|---|
| 40. **Sony**. With the introduction of its Athlon microprocessor in 1999, AMD began to make notable inroads into Intel's sales to major Japanese OEMs, which export PCs internationally including into the U.S. By the end of 2002, AMD had achieved an overall Japanese unit market share of approximately 22%. To reverse the erosion of its business, in 2003 Intel paid Sony multimillion dollar sums, disguised as discounts and promotional support, in exchange for absolute microprocessor exclusivity. Sony abruptly cancelled an AMD Mobile Athlon notebook model. Soon thereafter, it cancelled plans to release AMD Athlon desktop and notebook computers. As a result, AMD's share of Sony's business dropped from 23% in 2002 to 8% in 2003, and then to 0%, where it remains today. In proceedings brought by the JFTC, Intel has | 145. **Sony**. With the introduction of its Athlon microprocessor in 1999, AMD began to make notable inroads into Intel's sales to major Japanese OEMs, which export PCs internationally, including into the U.S. By the end of 2002, AMD had achieved an overall Japanese unit market share of approximately 22%. To reverse the erosion of its business, in 2003 Intel paid Sony multimillion dollar sums, disguised as discounts and promotional support, in exchange for absolute microprocessor exclusivity. Sony abruptly cancelled an AMD Mobile Athlon notebook model. Soon thereafter, it cancelled plans to release AMD Athlon desktop and ~~notebook computers~~mobile PCs. As a result, AMD's share of Sony's business dropped from 23% in 2002 to 8% in 2003, and then to 0%, where it remains today. In |

| AMD Complaint | First Amended Consolidated Complaint |
|---|---|
| accepted the JFTC charges of misconduct with respect to Sony. | proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Sony. |
| 41. **Toshiba.** Like Sony, Toshiba was once a significant AMD customer, but also like Sony, Toshiba received a very substantial payment from Intel in 2001 not to use AMD processors. Toshiba thereupon dropped AMD. Its executives agreed that Intel's financial inducements amounted to "cocaine," but said they were hooked because reengaging with AMD would jeopardize Intel market development funds estimated to be worth $25-30 million per quarter. Toshiba made clear to AMD that the tens of millions of dollars of additional marketing support was provided on the explicit condition that Toshiba could not use AMD microprocessors. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Toshiba. | 146. **Toshiba.** Like Sony, Toshiba was once a significant AMD customer, but also like Sony, Toshiba received a very substantial payment from Intel in 2001 not to use AMD processors. Toshiba thereupon dropped AMD. Its executives agreed that Intel's financial inducements amounted to "cocaine," but said they were hooked because reengaging with AMD would jeopardize Intel market development funds estimated to be worth $25-30 million per quarter. Toshiba made clear to AMD that the tens of millions of dollars of additional marketing support was provided by Intel on the explicit condition that Toshiba could not use AMD microprocessors. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to |

| AMD Complaint | First Amended Consolidated Complaint |
|---|---|
|  | Toshiba. |
| 42. **NEC.** AMD also enjoyed early success with NEC, capturing nearly 40% of its microprocessor purchases for notebooks and desktops in the first quarter of 2002. In May 2002, Intel agreed to pay NEC more than 300 million yen per quarter in exchange for caps on NEC's purchases from AMD. The caps assured Intel at least 90% of NEC's business in Japan, and they established an overall worldwide quota on NEC's AMD dealings. The impact was immediate. While AMD had maintained an 84% share of NEC's Japanese consumer desktop business in the third quarter of 2002, after the payments, AMD's share quickly plummeted to virtually zero in the first quarter of 2003. NEC has made clear to AMD that its Japanese share must stay in the single digits pursuant to NEC's agreement with Intel. Worldwide, AMD's share | 147. **NEC.** AMD also enjoyed early success with NEC, capturing nearly 40% of its microprocessor purchases for ~~notebooks~~desktop and ~~desktops~~mobile PCs in the first quarter of 2002. In May 2002, Intel agreed to pay NEC more than 300 million yen per quarter in exchange for caps on NEC's purchases from AMD. The caps assured Intel at least 90% of NEC's business in Japan, and they established an overall worldwide quota on NEC's AMD dealings. The impact was immediate. While AMD had maintained an 84% share of NEC's Japanese consumer desktop business in the third quarter of 2002, ~~after the payments,~~ AMD's share quickly plummeted after the payments to virtually zero in the first quarter of 2003. NEC has made clear to AMD that ~~its~~AMD's Japanese share must stay in the single digits pursuant to |

| AMD Complaint | First Amended Consolidated Complaint |
|---|---|
| dipped from nearly 40% to around 15%, where it stands today. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to NEC. | NEC's agreement with Intel. Worldwide, AMD's share dipped from nearly 40% to around 15%, where it stands today. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to NEC. |
| 43. **Fujitsu.** In the summer of 2002, Fujitsu informed AMD that Intel had pressured Fujitsu to remove Fujitsu's AMD-powered desktop models from Fujitsu's website. Fuj itsu complied by making any potential AMD-buyer click past Intel products to get to the AMD offerings. Then, in early 2003, Intel moved to lock up an even greater share of Fujitsu's business. Intel offered an undisclosed package of financial incentives in return for Fujitsu's agreement to restrict its dealings with AMD. Fujitsu's catalog currently limits AMD to a single notebook product In proceedings brought by the JFTC, Intel has accepted the JFTC charges | 148. **Fujitsu.** In the summer of 2002, Fujitsu informed AMD that Intel had pressured Fujitsu to remove Fujitsu's AMD-powered desktop models from Fujitsu's website. Fuj-itsuFujitsu complied by making any potential AMD-buyer click past Intel products to get to the AMD offerings. Then, in early 2003, Intel moved to lock up an even greater share of Fujitsu's business. Intel offered an undisclosed package of financial incentives in return for Fujitsu's agreement to restrict its dealings with AMD. Fujitsu's catalog currently limits AMD to a single notebook product .\_In proceedings brought by the JFTC, Intel has |

| AMD Complaint | First Amended Consolidated Complaint |
|---|---|
| of misconduct with respect to Fujitsu. | accepted the JFTC charges of misconduct with respect to Fujitsu. |
| 44. **Hitachi.** According to the JFTC, Intel has also purchased an exclusive-dealing arrangement with Hitachi, which had been a substantial AMD customer. The agreement caused AMD's Hitachi business to fall precipitously. For example, during the first part of 2002, AMD was shipping 50,000 Athlon microprocessors to Hitachi per quarter. But by the middle of the year, AMD sold no microprocessors to Hitachi at all. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Hitachi. | 149. **Hitachi.** According to the JFTC, Intel has also purchased an exclusive-dealing arrangement with Hitachi, which had been a substantial AMD customer. The agreement caused AMD's Hitachi business to fall precipitously. For example, during the first part of 2002, AMD was shipping 50,000 Athlon microprocessors to Hitachi per quarter. But by the middle of the year, AMD sold no microprocessors to Hitachi at all. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Hitachi. |
| 54. **Fujitsu.** In 2002, Fujitsu and AMD formed an alliance to develop a low power commercial notebook (FMV Lifebook MG Series) scheduled to go to market in the first quarter of 2003, which AMD spent over 20 million yen designing. Shortly before the | 159. **Fujitsu.** In 2002, Fujitsu and AMD formed an alliance to develop a low-power commercial notebook (FMV Lifebook MG Series) scheduled to go to market in the first quarter of 2003, on which AMD spent over 20 million yen designing. Shortly |

| AMD Complaint | First Amended Consolidated Complaint |
|---|---|
| launch, Fujitsu told AMD that Intel would not allow it to launch an AMD-powered commercial notebook, and the project died. To this day, AMD remains locked out of Fujitsu's commercial notebook lines. Intel's exclusionary conduct with Fujitsu extends beyond commercial notebooks. In the consumer space, for example, Intel purchased total exclusivity for Fujitsu's FM-Biblo NB consumer notebook line. When AMD tried to break Intel's lock on Fujitsu notebooks by offering to match any Intel discount, Fujitsu made clear that there was no price AMD could pay because Intel simply would not allow it. To this day, AMD remains locked out of Fujitsu's Biblo line. | before the launch, Fujitsu told AMD that Intel would not allow it to launch an AMD-powered commercial notebook, and the project died. To this day, AMD remains locked out of Fujitsu's commercial notebook lines. Intel's exclusionary conduct with Fujitsu extends beyond commercial notebooks. ~~In the consumer space, for~~For example, Intel purchased total exclusivity for Fujitsu's FM-Biblo NB consumer notebook line. When AMD tried to break Intel's lock on Fujitsu notebooks by offering to match any Intel discount, Fujitsu made clear that there was no price AMD could pay, because Intel simply would not allow it. To this day, AMD remains locked out of Fujitsu's Biblo line. |
| 55. **Fujitsu-Siemens.** Fujitsu-Siemens, a European joint-venture, was once a mainstay for AMD's desktop business, with AMD chips powering | 160. **Fujitsu-Siemens.** Fujitsu-Siemens, a European joint-venture, was once a mainstay for AMD's desktop business, with AMD chips powering |

| AMD Complaint | First Amended Consolidated Complaint |
|---|---|
| over 30% of Fujitsu Siemens' offerings in the consumer sector. In early 2003, Intel offered Fujitsu-Siemens a "special discount" on Celeron processors which Fujitsu-Siemens accepted in exchange for hiding its AMD computers on its website and removing all references to commercial AMD-powered products in the company's retail catalog. | over 30% of Fujitsu ~~-~~Siemens' offerings in the consumer sector. In early 2003, Intel offered Fujitsu-Siemens a "special discount" on Celeron processors which Fujitsu-Siemens accepted in exchange for hiding its AMD computers on its website and removing all references to commercial AMD-powered products in ~~the company's~~its retail catalog. |
| 56. Intel has also succeeded in convincing Fujitsu-Siemens to impose market restrictions on its AMD-powered PCs. Its parent, Fujitsu, currently sells an AMD-equipped Lifebook S2010, a commercial notebook, but only in the U.S. and Japan. Fujitsu-Siemens has declined AMD's plea to offer the machine in the European market as well. Similarly, Fujitsu Siemens designed for the European market the FMC Lifebook MG Series notebook. But it refused to offer that computer | 161. Intel ~~has~~ also ~~succeeded in convincing~~convinced Fujitsu-Siemens to impose market restrictions on its AMD-powered PCs. Its parent, Fujitsu, ~~currently~~ sells an AMD-equipped Lifebook S2010, a commercial notebook, but only in the U.S. and Japan. Fujitsu-Siemens has declined AMD's plea to offer the machine in the European market ~~as well~~. Similarly, Fujitsu ~~-~~ Siemens designed ~~for the European market~~the FMC Lifebook MG Series notebook. ~~But for the~~ |

| AMD Complaint | First Amended Consolidated Complaint |
|---|---|
| in Asia or North America.  Finally, although Fujitsu-Siemens produces an AMD commercial desktop, the Scenico, it refuses to advertise it on its website, offering it instead only as a build-to-order product.  Having invested significantly to bring these computers to market, Fujitsu-Siemens has been able to offer no explanation for its refusal to exploit them worldwide.  AMD's unit share of Fujitsu-Siemens' business recently fell below 30% for the first time in four years. | European market, but it refused to offer that computer in Asia or North America.  Finally, although Fujitsu-Siemens produces an AMD-equipped commercial desktop, the Scenico, it refuses to advertise it on its website, offering it instead only as a build-to-order product.  Having invested significantly to bring these computers to market, Fujitsu-Siemens has been able to offeroffered no explanation for its refusal to exploit them worldwide.  AMD's unit share of Fujitsu-Siemens' business recently fell below 30% for the first time in four years. |
| 57.  **NEC.**  Intel was forced to relax its hold on NEC's business when long-time NEC customer, Honda Motor Company, demanded that NEC supply it with servers powered by AMD's Opteron microprocessors.  After underwriting the considerable expense of designing and | 162.  **NEC.**  Intel was forced to relax its hold on NEC's business when a long-time NEC customer, Honda Motor Company, demanded that NEC supply it with servers powered by AMD's Opteron microprocessors.  After underwriting the considerable expense of designing and |

A8

| **AMD Complaint** | **First Amended Consolidated Complaint** |
|---|---|
| manufacturing an Opteron server for Honda, NEC then inexplicably refused to market the product to any of its other customers. | manufacturing an Opteron server for Honda, NEC then inexplicably refused to market the product to any of its other customers. |
| 65. Intel has deployed a variety of variants of this basic rebate scheme. In the case of one European OEM, for example, Intel imposes the additional condition that the customer purchase target volumes of specific processors, generally microprocessors against which AMD's products compete particularly well. In the case of another, Intel offers as an inducement discounted microprocessors rather than rebates. In the case of the European division of one U.S. OEM, Intel has imposed a target of between 70-90% of the customer's requirements. Rather than qualifying the customer for a cash rebate, however, meeting the target entitles the OEM to purchase designated processors at up to 20% below "normal" cost, thereby enabling the | 169. Intel has deployed a variety of variants of this basic rebate scheme. In the case of one European OEM, for example, Intel imposes\d the additional condition that the customer purchase target volumes of specific processors, generally microprocessors against which AMD's products compete particularly well. In the case of another, Intel ~~offers~~offered as an inducement discounted microprocessors rather than rebates. In the case of the European division of one ~~U.S.~~United States OEM, Intel has imposed a target of between 70-90% of the customer's requirements. Rather than qualifying the customer for a cash rebate, however, meeting the target entitles the OEM to purchase designated processors at up |

| AMD Complaint | First Amended Consolidated Complaint |
|---|---|
| customer to obtain favorable pricing on bundled products (e.g., a Centrino-series processor and chipset) and/or to receive product offerings not available to competitors. | to 20% below "normal" cost, thereby enabling the customer to obtain favorable pricing on bundled products (e.g., a Centrino-series processor and chipset) and/or to receive product offerings not available to competitors. |
| 74. In 2002, Intel pointed its gun at NEC. Intel threatened to discontinue providing NEC with the technological roadmap of future Intel products if NEC did not convert its entire line of Value Star L computers to Intel microprocessors. Without that roadmap, NEC would be at a distinct competitive disadvantage. Predictably, NEC succumbed and eliminated AMD from the Value Star L series in 2002 and 2003. | 178. In 2002, Intel pointed its gun at NEC. Intel threatened to discontinue providing NEC with the technological roadmap of future Intel products if NEC did not convert its entire line of Value Star L computers to Intel microprocessors. Without that roadmap, NEC would be~~have~~ have been at a distinct competitive disadvantage. Predictably, NEC succumbed and eliminated AMD from the Value Star L series in 2002 and 2003. |
| 75. NEC's European subsidiary, NEC-CI, which operates NEC's European and nonJapanese Asian divisions, reported that Intel executives said they would "destroy" NEC-CI for | 179. NEC's European subsidiary, NEC-CI, which operates NEC's European and ~~nonJapanese~~non-Japanese Asian divisions, reported that Intel executives said they would "destroy" |

| AMD Complaint | First Amended Consolidated Complaint |
|---|---|
| engaging with AMD in the commercial desktop segment. Intel told NEC-CI's retailers that NEC-CI's AMD dealings could impair its ability to supply products to its customers, and when NEC-CI resisted the pressure, Intel imposed a discriminatory price increase. | NEC-CI for engaging with AMD in the commercial desktop segment. Intel told NEC-CI's retailers that NEC-CI's AMD dealings could impair its ability to supply products to its customers, and when NEC-CI resisted the pressure, Intel imposed a discriminatory price increase. |
| 81. Other AMD customers and channel partners reporting Intel coercion to withdraw from the Athlon64 launch were Lenovo, NEC-CI and Best Buy. | 185. Other AMD customers and channel partners reporting Intel coercion to withdraw from the Athlon64 launch were Lenovo, NEC-CI and Best Buy. |
| 83. Other companies that reported being intimidated from participating in the Opteron launch were MSI, Atipa, Solectron and Fujitsu-Siemens. Indeed, Intel representatives told Fujitsu-Siemens' executives in the weeks preceding the Opteron launch that if they attended, they would be the only Tier One OEM showing its support as all of the others would back out. With the exception of IBM, Intel was right. | 187. Other companies that reported being intimidated from participating in the Opteron launch were MSI, Atipa, Solectron and Fujitsu-Siemens. Indeed, Intel representatives told Fujitsu-Siemens' executives in the weeks preceding the Opteron launch that if they attended, they would be the only Tier One OEM showing its support as all of the others would back out. With the exception of IBM, Intel was right. |
| 86. As retaliation for dealing with AMD, | 190. As retaliation for dealing with AMD, |

| **AMD Complaint** | **First Amended Consolidated Complaint** |
|---|---|
| Intel has also used chipset pricing as a bludgeon. For example, in 2003, Acer had committed to launch the AMD Athlon XP. Acer executives worldwide had been working with AMD to bring the product to market post launch. But, on the eve of the launch the Acer management in Taiwan pulled the plug. AMD learned from Acer executives that Intel had threatened to raise chipset prices by $10 on all Intel based Acer systems if any processor business was awarded to AMD outside of Europe. | Intel has also used chipset pricing as a bludgeon. For example, ~~in 2003,~~ Acer ~~had~~ committed to launch the AMD Athlon XP~~.~~ in 2003. Acer executives worldwide had ~~been working~~worked with AMD to bring the product to market post ~~,~~launch. But~~,~~ on the eve of the launch ~~the~~, Acer management in Taiwan pulled the plug. AMD learned from Acer executives that Intel had threatened to raise chipset prices by $10 on all Intel ~~,~~based Acer systems if <u>Acer awarded</u> any <u>of its</u> processor business ~~was awarded~~ to AMD outside of Europe. |
| 89. As with OEMs, Intel offers discounts and rebates to distributors on the condition that they not do business with AMD, either worldwide or in strategic sub-markets. For example, in December 2004, Ingram Micro, Intel's biggest distributor in China, suddenly cut off discussions to distribute AMD chips as well. A | 193. As with OEMs, Intel offers discounts and rebates to distributors on the condition that they not do business with ~~AMD~~<u>Intel's competitors</u>, either worldwide or in strategic sub-markets. For example, in December 2004, Ingram Micro, Intel's biggest distributor in China, suddenly cut off ~~discussions~~<u>talks</u> to distribute AMD |

| AMD Complaint | First Amended Consolidated Complaint |
|---|---|
| high-ranking Ingram Micro official later reported to AMD that Ingram Micro had no choice because Intel proffered loyalty rebates that were too lucrative to pass up. | chips ~~as well~~. A high-ranking Ingram Micro official later reported to AMD that Ingram Micro had no choice because Intel proffered loyalty rebates that were too lucrative to pass up. |
| 93. Avnet Inc., one of the world's largest computer equipment distributors and an avid AMD supporter, has also received its share of Intel intimidation. Thus, Avnet cited Intel as the reason it could not distribute AMD parts to the industrial sector. And when AMD launched its Opteron server chip, Intel made clear it would make it "painful" for Avnet were it to begin distributing that chip. When Avnet did so anyway, Intel threatened to cut if off. Another distributor got even worse treatment. In retaliation for Supercom's AMD dealings in Canada, Intel pressured Supercom's customers to switch to another distributor. | 197. Avnet, Inc., one of the world's largest computer equipment distributors and an avid AMD supporter, has also received its share of Intel intimidation. Thus, Avnet cited Intel as the reason it could not distribute AMD parts to the industrial sector. And when AMD launched its Opteron server chip, Intel made clear it would make it "painful" for Avnet were it to begin distributing that chip. When Avnet did so anyway, Intel threatened to cut if off. Another distributor got even worse treatment. In retaliation for Supercom's AMD dealings in Canada, Intel pressured Supercom's customers to switch to another distributor. |

| AMD Complaint | First Amended Consolidated Complaint |
|---|---|
| 94. These are not the only distributors that Intel has attempted to coerce from doing business with AMD. Others include R.I.C. in Germany, Paradigit in the Netherlands, and Quote Components, also in the Netherlands. | 198. These are not the only distributors that Intel has attempted to coerce from doing business with AMD. Others include R.I.C. in Germany, Paradigit in the Netherlands, and Quote Components, also in the Netherlands. |
| 100. The story is even worse in Europe. AMD has been entirely shut out from Media Markt, Europe's largest computer retailer, which accounts for 35% of Germany's retail sales. Intel provides Media Markt between $15-20 million of MDF annually, and since 1997 Media Markt has carried Intel computers exclusively. Intel subsidies also foreclose AMD from Aldi, a leading German food retail chain, whose PC sales account for an additional 15-20% of the German market. | 204. The story is even worse in Europe. AMD has been entirely shut out from Media Markt, Europe's largest computer retailer, which accounts for 35% of Germany's retail sales. Intel provides Media Markt between $15-20 million of MDF annually, and since 1997 Media Markt has carried Intel computers exclusively. Intel subsidies also foreclose AMD from Aldi, a leading German food retail chain, whose PC sales account for an additional 15-20% of the German market. |
| 101. In the United Kingdom, Intel has locked up substantially all of the business of DSG (Dixon Services Group), operator of three major | 205. In the United Kingdom, Intel has locked up substantially all of the business of DSG (Dixon Services Group), operator of three major |

| AMD Complaint | First Amended Consolidated Complaint |
|---|---|
| chains including Dixon and PC World that collectively account for two thirds of the U.K. PC market In exchange for Intel payments, DSG has agreed to keep AMD's share of its business below 10%. Like Media Markt, DSG reports that Intel penalizes it with reduced MDF just on account of the small amount of business it does with AMD. Toys'R'Us in the U.K. is also exclusive to Intel. Time, another U.K. retailer (which builds computers as well), took a substantial MDF payment from Intel in exchange for near-exclusivity on notebooks during the first half of 2004, and it reports that Intel has withheld discounts because Time has introduced too many AMD Athlon64 desktop models. In France, Intel has brought pressure on the largest retailers, including Conforama, Boulanger, causing them to cease dealing with AMD or drastically reduce their | chains (including Dixon and World) that collectively account for two thirds of the U.K. PC market , In exchange for Intel payments, DSG has agreed to keep AMD's share of its business below 10%. Like Media Markt, DSG reports that Intel penalizes it with reduced MDF just ~~on account~~because of the small amount of business it does with AMD. Toys '12'R' Us in the U.K. is also exclusive to Intel. Time, another U.K. retailer (which builds computers as well), took a substantial MDF payment from Intel in exchange for near-exclusivity on notebooks during the first half of 2004, and it reports that Intel has withheld discounts because Time has introduced too many AMD Athlon64 desktop models. In France, Intel has brought pressure on the largest retailers~~,~~ (including Conforama, Boulanger), causing them to cease dealing with AMD or drastically |

| AMD Complaint | First Amended Consolidated Complaint |
|---|---|
| AMD business. | reduce their AMD business. |
| 106. Nor is Intel above threatening retailers to gain preferred treatment. For example, at the recent CeBit computer show in Hanover, Germany (the largest computer show in the world), a German chain, Vobis, hung an AMD Turion64 banner from its booth as part of a co-marketing agreement with AMD and its OEM partner (Yakamo) to announce AMD's new mobile microprocessor. Intel's German general manager and its vice president for mobile products demanded that the Turion64 banner be removed. When Vobis' CEO declined, the Intel representatives threatened immediately to stop microprocessor shipments to Vobis' supplier. The banner was removed before the CeBit show opened. | 210. Nor is Intel above threatening retailers to gain preferred treatment. For example, at the recent CeBit computer show in Hanover, Germany (the largest computer show in the world), a German chain, Vobis, hung an AMD Turion64 banner from its booth as part of a co-marketing agreement with AMD and its OEM partner (Yakamo) to announce AMD's new mobile microprocessor. Intel's German general manager and its vice president for mobile products demanded that the Turion64 banner be removed. When Vobis' CEO declined, the Intel representatives threatened immediately to stop microprocessor shipments to Vobis' supplier. The banner was removed before the CeBit show opened. |

**EXHIBIT B**

| | |
|---|---|
| Arizona | "The Arizona Antitrust Act, A.R.S. §§ 44-1401 *et seq*, mirrors federal antitrust law." *Brooks Fiber Comm'n of Tucson, Inc. v GST Tucson Lightwave, Inc.*, 992 F. Supp. 1124, 1130 (D. Ariz. 1997). "It is the intent of the legislature that in construing this article, the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes." ARIZ. REV. STAT. ANN. § 44-1412 (2006). |
| California | The requirements for antitrust injury under state law are informed by federal law. *See Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811, 1814 n.1 (1995) ("Because the Cartwright Act has objectives identical to the federal antitrust acts," California courts "look to cases construing the federal antitrust laws for guidance in interpreting the Cartwright Act."); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213, 1224 (C.D. Cal. 2003) ("while the scope of actionable injury is slightly different under the Cartwright Act, the standing analysis is nonetheless informed by many of the same factors considered" under federal law). |
| District of Columbia | A "court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes." D.C. CODE § 28-4515 (2006). |
| Iowa | *See* IOWA CODE § 553.2 (2006) ("This chapter *shall* be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter. This construction *shall* not be made in such a way as to constitute a delegation of state authority to the federal government, but shall be made to achieve uniform application of the state and federal laws prohibiting restraints of economic activity and monopolistic practices.") (emphasis added); *see also Davies v. Genesis Med. Ctr.*, 994 F. Supp. 1078, 1103 (S.D. Iowa 1998) ("When interpreting Iowa antitrust statutes, Iowa courts are required by section 553.2 to give considerable weight to federal cases construing similar sections of the Sherman Act."). |
| Kansas | *See Orr v. Beamon*, 77 F. Supp. 2d 1208, 1211-1212 (D. Kan. 1999) ("While recognizing that federal antitrust cases are not binding on the court in interpreting Kansas antitrust statutes, the court finds such cases sufficiently persuasive to guide its decision with regard to standing under Kansas law.") (citing *Bergstrom v. Noah*, 974 P.2d 520, 531 (Kan. 1999)). |
| Maine | "'Maine antitrust statutes parallel the Sherman Act,' and thus [we] have analyzed claims thereunder according to the doctrines developed in relation to federal law." *Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 149 (1st Cir. 2000). |

| | |
|---|---|
| Michigan | *See* MICH. COMP. LAWS § 445.784 (2006) ("(1) To the extent that this act incorporates provisions of or provisions similar to the uniform state antitrust act, this act *shall* be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this act among those states that enact similar provisions. <br><br> (2) It is the intent of the legislature that in construing all sections of this act, the courts *shall* give due deference to interpretations given by the federal courts to comparable antitrust statutes, including, without limitation, the doctrine of per se violations and the rule of reason.") (emphasis added). |
| Minnesota | Minnesota treats "the state and federal statutory schemes as equivalent for standing analysis purposes." *Midwest Commc'n, Inc. v. Minnesota Twins, Inc.*, 779 F.2d 444, 454 (8th Cir. 1985); *see also Keating v. Philip Morris, Inc.*, 417 N.W.2d 132, 136 (Minn. Ct. App. 1987) ("The Minnesota Supreme Court has consistently held that the Minnesota Antitrust Law should be construed consistently with the federal courts' construction of the federal antitrust laws."); *State v. Duluth Bd. of Trade*, 121 N.W. 395, 399 (Minn. 1909) ("[T]he general purpose of all statutes of this kind is the same, and we may therefore properly look to the decisions made under federal and state statutes of a similar character for the principle by which to construe our own statute."). |
| Mississippi | Mississippi's antitrust law is "analytically identical" to federal law. *Walker v. U-Haul Co. of Miss.*, 734 F. 2d 1068, 1070 n.5 (5th Cir. 1984). |
| Nebraska | "When any provision . . . is the same as or similar to the language of a federal antitrust law, the courts of this state in construing such sections or chapter *shall* follow the construction given to the federal law by the federal courts." NEB. REV. STAT. §59-829 (2005) (emphasis added). |
| Nevada | Nevada's antitrust statute "*shall* be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes." NEV. REV. STAT. § 598A.050 (2006) (emphasis added). |
| New Mexico | "[T]he Antitrust Act *shall* be construed in harmony with judicial interpretations of the federal antitrust laws." N.M. STAT. § 57-1-15 (2006) (emphasis added). |
| New York | State antitrust law "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, difference in the statutory language or the legislative history justify such a result." *Anheuser-Busch, Inc. v. Abrams*, 520 N.E.2d 535, 543 (N.Y. 1998). |
| North Carolina | Because North Carolina's antitrust laws mirror the Sherman Act, federal interpretation of the Sherman Act is "instructive." *Rose v. Vulcan Materials Co.*, 194 S.E.2d 521, 530 (N.C. 1973). |

| North Dakota | While there is no express harmonization provision under North Dakota's Uniform State Antitrust Act, North Dakota courts have routinely turned to federal law in interpreting the scope of that act. *See, e.g., AG Acceptance Corp. v. Glinz*, 684 N.W.2d 632, 638-40 (N.D. 2004) (affirming summary judgment on tying claims under Sherman Act and North Dakota's Uniform State Antitrust Act for failure to establish defendant had market power in tying market under *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984)); *Beckler v. Visa U.S.A., Inc.*, No. 09-04-C-00030, 2004 WL 2115144, *3 (N.D. Dist. Ct. Aug. 23, 2004) (applying *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) and finding plaintiffs lacked standing to bring claim under North Dakota's antitrust laws). |
|---|---|
| South Dakota | "[B]ecause of the similarity of language between the federal and state antitrust statutes and because of the legislative suggestion for interpretation found in SDCL 37-1-22, great weight should be given to the federal cases interpreting the federal statute." *Byre v. City of Chamberlain*, 362 N.W.2d 69, 74 (S.D. 1985). |
| Tennessee | Federal law is persuasive authority in construing the Tennessee Trade Practices Act. *Tennessee ex rel. Leech v. Levi Strauss & Co.*, No. 79-722-III, 1980 WL 4696, *2 (Tenn. Ch. Ct. Sept. 25, 1980). |
| Vermont | *Fucile v. Visa U.S.A., Inc.*, No. S1560-03 CNC, 2004 WL 3030037 *3 (Vt. Super. Dec. 27, 2004) (finding that even though Vermont does not follow *Illinois Brick*, the Vermont Supreme Court would nonetheless follow the *Associated General Contractors* factors analysis of antitrust standing; dismissing action because plaintiff lacked standing under the four factors). |
| West Virginia | *See* W.Va. Code § 47-18-16 (2006) ("This article *shall* be construed liberally and in harmony with ruling judicial interpretations of comparable federal antitrust statutes.") (emphasis added); *see also Gray v. Marshall County Bd. of Edu.*, 367 S.E.2d 751, 755 (W.Va. 1988) ("[W]e are directed by the legislature to apply the federal decisional law interpreting the Sherman Act to our own parallel anti-trust statute."). |
| Wisconsin | Interpretation of state antitrust laws is "controlled by federal court decisions under the Sherman Act." *Ford Motor Co. v. Lyons*, 405 N.W.2d 354, 367 (Wis. Ct. App. 1987). |

Respectfully submitted,

OF COUNSEL:                                  POTTER ANDERSON & CORROON LLP
David M. Balabanian
James L. Hunt
Christopher B. Hockett                       By: */s/ Richard L. Horwitz*
Nora C. Cregan                                    Richard L. Horwitz (#2246)
BINGHAM McCUTCHEN LLP                             W. Harding Drane, Jr. (#1023)
Three Embarcadero Center                          Hercules Plaza, 6th Floor
San Francisco, CA 94111-4067                      1313 North Market Street
(415) 393-2000                                    P.O. Box 951
                                                  Wilmington, DE 19899-0951
Richard A. Ripley                                 (302) 984-6000
BINGHAM McCUTCHEN LLP                             rhorwitz@potteranderson.com
2020 K Street, N.W.                               wdrane@potteranderson.com
Washington, D.C. 20006
(202) 373-6000                               *Attorneys for Defendant*
                                             *Intel Corporation*

Dated: November 3, 2006

760048 / 29282

20

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

## CERTIFICATE OF SERVICE

I, Richard L. Horwitz, hereby certify that on November 3, 2006, the attached

document was hand delivered to the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

James L. Holzman
J. Clayton Athey
Eric M. Andersen
Prickett, Jones & Elliott, P.A.
1310 King Street
Post Office Box 1328
Wilmington, DE 19899

I hereby certify that on November 3, 2006 I have sent the documents by

Electronic Mail to the following non-registered participants:

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Allyson B. Baker
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
mhausfeld@cmht.com
dsmall@cmht.com
blandau@cmht.com
abaker@cmht.com

Michael P. Lehman
Thomas P. Dove
Alex C. Turan
The Furth Firm LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
mplehmann@furth.com
tdove@furth.com
aturan@furth.com

Steve W. Berman
Anthony D. Shapiro
Hagens Berman Sobol Shapiro, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
steve@hbsslaw.com
tony@hbsslaw.com

Guido Saveri
R. Alexander Saveri
Saveri & Saveri, Inc.
111 Pine Street, Suite 1700
San Francisco, CA 94111
guido@saveri.com
rick@saveri.com

By:     */s/ Richard L. Horwitz*_____
        Richard L. Horwitz (#2246)
        W. Harding Drane, Jr. (#1023)
        POTTER ANDERSON & CORROON LLP
        Hercules Plaza, 6th Floor
        1313 N. Market Street
        Post Office Box 951
        Wilmington, DE  19899-0951
        (302) 984-6000
        rhorwitz@potteranderson.com
        wdrane@potteranderson.com