# EXHIBIT A

Westlaw.

--- S.W.3d ----, 2006 WL 1118892 (Ark.)
**(Publication page references are not available for this document.)**

▷

Only the Westlaw citation is currently available.


Supreme Court of Arkansas.
Jerry ANDERSON, Mike Stout, John Dunn, and
Check Mart of Hot Springs, LLC,
Appellants,
v.
Charles STEWART, Appellee.
**No. 05-886.**


April 27, 2006.


An Appeal from the Circuit Court of Garland County, Arkansas, No. CV2001- 8071, John Homer Wright, Circuit Judge.


TOM GLAZE.


This appeal, certified to us by the court of appeals, poses the issue as to whether the trial court erred in applying the doctrine of "piercing the corporate veil" and holding shareholders in a limited liability company individually liable. [FN1] We find no error, and affirm.

> FN1. The court of appeals certified the case to this court, suggesting that we should "decide the extent of the protection that Ark.Code Ann. § 4-32-304 affords investors who chose [to operate as a LLC]." However, the appellants do not raise this broad argument in their brief; accordingly, we do not address the issue suggested by the court of appeals.

Appellants Jerry Anderson and Mike Stout are the owners of Check Mart of Hot Springs, LLC; appellant John Dunn is the former owner of Check Mart. Check Mart is a "payday lender," or company that offers cash loans to customers in exchange for personal checks, drawn on the customer's bank account, that are presented to and held by Check Mart. Appellee Charles Stewart filed a class action complaint against Check Mart in November of 2001, alleging that, by charging interest disguised as "fees," Check Mart engaged in conduct amounting to usury, in violation of Ark. Const. art. 19, § 13. Stewart filed a motion seeking class certification on February 4, 2002, and the trial court granted Stewart's motion on

January 29, 2003. It defined the class as "any and all persons who have entered into deferred presentment agreements with [Check Mart] ... within five years of the date that [the] complaint was filed and continuing up through and until judgment may be rendered in this matter."

Also on January 29, 2003, the trial court entered an order granting Stewart's motion for summary judgment on liability, finding that there was no genuine issue of material fact, and that the fees charged by Check Mart "constitute interest and as such would render usurious the contracts between [Check Mart] and the members of this class." The trial court thus determined that the plaintiffs were entitled to judgment on the issue of liability as a matter of law.

On November 14, 2003, Stewart filed his second amended class action complaint, naming as defendants Stout and Anderson, the "sole owners of Check Mart of Hot Springs, LLC," and Dunn, who formerly owned Check Mart and who sold the business to Stout and Anderson. Stewart's complaint alleged that Check Mart, LLC was the alter ego of Stout, Anderson, and Dunn, who all received financial gain from their operation of the business. Stewart asserted that the trial court had already determined that the plaintiffs were entitled to judgment as a matter of law on the usury claim. In addition, Stewart raised a further cause of action under the Arkansas Deceptive Trade Practices Act (DTPA), Ark.Code Ann. § 4-88-101 et seq. (Repl.2001), alleging that Stout, Anderson, and Dunn were, as controlling and supervising persons, individually liable for the damages caused by Check Mart. Stewart also asked the trial court to pierce the corporate veil, asserting that the defendants operated Check Mart "for the sole purpose of engaging in activities [that] violated the Arkansas usury protections in the Arkansas Constitution," and that Check Mart lacked sufficient assets to satisfy any judgment against it and was inadequately capitalized.

The case was presented at a bench trial on November 9, 2004, and following the trial, the parties agreed to submit briefs on the issue of the liability of the individual defendants. On April 19, 2005, the trial court entered an order finding that the plaintiff class was entitled to damages of $122,027.50, attorneys' fees of $36,878.25, and costs of litigation of $908.42,

--- S.W.3d ----, 2006 WL 1118892 (Ark.)
**(Publication page references are not available for this document.)**

for a total judgment in favor of the class in the amount of $159,814.17. The court further found that the individual defendants were liable under the Deceptive Trade Practices Act, and apportioned the damages among the individual defendants based on the amount of time they had owned stock in the company. Anderson, Stout, and Dunn filed timely notices of appeal, and now argue that the trial court erred in piercing the corporate veil and holding them each individually liable under § 4-88-101, the DTPA.

 In bench trials, the standard of review on appeal is whether the trial court's findings were clearly erroneous or clearly against the preponderance of the evidence. *Weiss v. McFadden,* 356 Ark. 123, 148 S.W.3d 248 (2004); *Carwell Elevator Co., Inc. v. Leathers,* 352 Ark. 381, 101 S.W.3d 211 (2003). This court gives due deference to the superior position of the trial judge to determine the credibility of the witnesses and the weight to be accorded their testimony. *City of Rockport v. City of Malvern,* 356 Ark. 393, 155 S.W.3d 9 (2003); *Pyle v. Sayers,* 344 Ark. 354, 39 S.W.3d 774 (2001). Further, it is within the province of the trier of fact to resolve conflicting testimony. *Myrick v. Myrick,* 339 Ark. 1, 2 S .W.3d 60 (1999).

 As noted above, the appellants assert in their brief that the trial court erred in piercing the corporate veil to hold them individually liable. In making this argument, they raise two subpoints: 1) the Arkansas Deceptive Trade Practices Act only provides for proceedings by the Attorney General; and 2) there was insufficient evidence to support the piercing of the corporate veil.

 In the first of their two arguments, the appellants contend that Ark.Code Ann. § 4-88-113 of the Deceptive Trade Practices Act, "is applicable to proceedings brought by the Attorney General and does not extend by statute or case law to cases brought outside the scope of the Deceptive Trade Practices Act by the Attorney General." This claim is easily dismissed, as § 4-88- 113(f) clearly provides that "[a]ny person who suffers actual damage or injury as a result of an offense or violation as defined in this [Act] has a cause of action to recover actual damages, if appropriate and reasonable attorney's fees." Because the statute provides a cause of action to "any person who suffers actual damages," there is no merit to the appellants' argument that only the Attorney General can bring a DTPA complaint. *See Wallis v. Ford Motor Company,* ___ Ark. ___, ___ S.W.3d ___ (May 12, 2005) (pointing out that § 4-

88-113(f) gives a private cause of action to any person who suffers actual damage or injury, but where the only alleged injury is the diminution in value of the product, a private cause of action is not cognizable under the statute).

 The second part of the appellants' argument is that there was insufficient evidence to support the trial court's decision to pierce the corporate veil. It is a nearly universal rule that a corporation and its stockholders are separate and distinct entities, even though a stockholder may own the majority of the stock. *First Commercial Bank v. Walker,* 333 Ark. 100, 969 S.W.2d 146 (1998); *Quinn-Matchet Partners, Inc. v. Parker Corp.,* 85 Ark.App. 143, 147 S.W.3d 703 (2004). In special circumstances, the court will disregard the corporate facade when the corporate form has been illegally abused to the injury of a third party. *EnviroClean, Inc. v. Arkansas Pollution Control & Ecology Comm'n,* 314 Ark. 98, 858 S .W.2d 116 (1993); *Don G. Parker, Inc. v. Point Ferry, Inc.,* 249 Ark. 764, 461 S.W.2d 587 (1971). The conditions under which the corporate entity may be disregarded or looked upon as the alter ego of the principal stockholder vary according to the circumstances of each case. *Winchel v. Craig,* 55 Ark.App. 373, 934 S.W.2d 946 (1996). The doctrine of piercing the corporate veil is founded in equity and is applied when the facts warrant its application to prevent an injustice. *Humphries v. Bray,* 271 Ark. 962, 611 S.W.2d 791 (Ark.App.1981). Piercing the fiction of a corporate entity should be applied with great caution. *Banks v. Jones,* 239 Ark. 396, 390 S.W.2d 108 (1965); *Thomsen Family Trust v. Peterson Family Enters.,* 66 Ark.App. 294, 989 S.W.2d 934 (1999). The issue of whether the corporate entity has been fraudulently abused is a question for the trier of fact, and the one seeking to pierce the corporate veil and disregard the corporate entity has the burden of proving that the corporate form was abused to his injury. *See National Bank of Commerce v. HCA Health Servs. of Midwest, Inc.,* 304 Ark. 55, 800 S.W.2d 694 (1990).

 Legal treatises have noted that common instances in which the separate corporate identity has been disregarded are when the corporation attempted to 1) evade the payment of income taxes, 2) hinder, delay, and defraud creditors, 3) evade a contract or tort obligation, 4) evade the obligations of a federal or state statute, and 5) perpetrate fraud and injustice generally. *See* H. Murray Claycomb, *Arkansas Corporations* § 3-15 (1991); *see also* 18 C.J.S. *Corporations,* § 9 (1990) (courts will apply substantive law in disregard of corporate license

2006 WL 1118892                                                                    Page 3
--- S.W.3d ----, 2006 WL 1118892 (Ark.)
**(Publication page references are not available for this document.)**

when to interpose it would defeat public convenience, justify wrongs, protect fraud or defend crime, and in situations in which it would otherwise pose an obstacle to the protection or enforcement of private or public rights).

Arkansas cases in which the corporate veil has been pierced have generally involved some fraud or deception. See *EnviroClean, Inc. v. Arkansas Pollution Control & Ecol. Comm'n,* 314 Ark. at 104, 858 S.W.2d at 120 (two companies intended to deceive Pollution Control & Ecology Commission and abused the corporate form by misrepresenting a change in ownership and by attempting to circumvent PC & E's permitting process); *Humphries v. Bray,* 271 Ark. at 966, 611 S.W .2d at 793 (for purposes of determining whether, under workers' compensation statutes, separate companies under a single ownership constituted an employer with five employees, the court noted evidence, including tax records and payroll slips, showing that the owner's three companies were not operated separately); *Winchel v. Craig,* 55 Ark.App. at 381-82, 934 S.W.2d at 950-51.

In *Winchel v. Craig, supra,* the plaintiff-appellee, Craig, was injured by a fertilizer-spreading machine manufactured by appellants Jesse and Verda Winchels' company, Winchel Enterprises. Shortly after Craig filed his complaint, the Winchels resigned as officers of Winchel Enterprises and dissolved the corporation. *Winchel,* 55 Ark.App. at 375, 934 S.W.2d at 947. At trial, a jury found that the affairs of the corporation had been conducted in such a manner that the corporate entity should be disregarded, and the Winchels held personally liable. *Id.* On appeal, the court of appeals affirmed, writing as follows:

In the instant case, there is evidence that the appellee [Craig] was injured by a spreader manufactured by the corporation Winchel Enterprises; that appellants [Jesse and Verda Winchel] were its sole incorporators, stockholders, and officers; that the corporation had no liability insurance in case someone was hurt by its equipment; that the appellants dissolved Winchel Enterprises and sold or transferred its assets subsequent to appellee filing suit against the corporation; that about a month before the appellants resigned as officers of Winchel Enterprises, they formed a new corporation whose Articles of Incorporation stated that the purpose of the new corporation was to manufacture spreader beds--and this is the same kind of equipment that was manufactured by the first corporation; and that appellants made no provision upon dissolution of the old corporation to provide for payment of any

liability it might have to appellee as a result of this suit which was pending at that time. *Id.* at 381-82, 934 S.W.2d at 950-51.

On the other hand, in cases where the courts refused to pierce the corporate veil, the evidence failed to make a showing of illegality or fraudulent behavior. See *Don G. Parker, Inc. v. Point Ferry, Inc.,* 249 Ark. at 766, 461 S.W.2d at 589 (incorporators took all necessary legal steps to establish a corporation, the shareholders attended corporate meetings, and tax returns were properly filed in the name of the corporation; the only evidence of illegality was the fact that the corporation's ferry was not properly licensed, but the ferry was operated by a lessee, not by the corporation itself); *Banks v. Jones,* 239 Ark. at 399, 390 S.W.2d at 110 (no evidence that there was any interchange of employees, facilities, funds, or management between two companies owned by the same individual; the evidence showed that the two companies were on separate properties and had separate books, and that the corporation filed proper tax returns and carried liability insurance); *Quinn-Matchett Partners v. Parker Corp.,* 85 Ark.App. at 149-50, 147 S.W.3d at 707 (evidence showed that the corporation adhered to corporate formalities by keeping its own financial records and bank accounts, by filing separate tax returns, and by recording the loans made between it and its owner).

In the instant case, appellant Stout testified that he became a stockholder of Check Mart in early 2001 when he and appellant Jerry Anderson bought out appellant Dunn's interest; prior to becoming a stockholder, when Dunn owned the company, Stout had been the registered agent for the business. Dunn had been running the business for over a year at several different locations in Hot Springs when Stout and Anderson bought it. Stout testified that Check Mart closed in December of 2001; he could not recall whether the company continued to collect fees after that time. After Check Mart closed, Stout formed D & L Service Company, which Stout described as a "service company for a loan company out of South Dakota" that serviced loans and collected a fee from the South Dakota loan company. When asked whether a number of Check Mart's customers became customers of D & L Service Company, Stout said that he "would assume so, yes," although he stated that he did not work in the day-to-day operations, so he couldn't testify that he "knew it for a fact."

Stout denied knowing about any of Check Mart's business or customer records, acknowledging that his attorney handled the records and had furnished any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- S.W.3d ----, 2006 WL 1118892 (Ark.)
**(Publication page references are not available for this document.)**

and all documents relating to fees paid to Check Mart. Stout further acknowledged that Check Mart did not maintain any customer records or any other documents that would reflect the amount of fees that Check Mart received from its customers. He also agreed that, to his knowledge, D & L did not have any of Check Mart's customer records. Stout stated that the only person who would have knowledge of the company's day-to-day business records would be the manager, Bonnie Berg, who was not present at the trial to testify.

Stout agreed that, in order to have a check cashing business in Arkansas, one has to post a surety bond. In addition, he agreed that a party wishing to obtain a license to operate a check cashing operation must have proof of liquid assets in a certain amount. [FN2] Stout sought a letter of credit from First State Bank to satisfy the statutory cash-on-hand requirements, but cancelled the letter of credit on February 5, 2002, some three months after Stewart's lawsuit was filed. Stewart introduced the surety bond, naming Dunn as principal, that was posted by Check Mart when the company was started in March of 2000, and Stout agreed that the bond was the only bond ever posted for Check Mart. However, he did not recognize any other related documents, and he could not state positively whether the bond was ever canceled. Stout could also not be "absolutely positive" about whether Check Mart had surrendered its check cashing license to the State, although Check Mart's bond was canceled on February 6, 2002.

> FN2. Ark.Code Ann. § 23-52-107(1) (Repl.2000) requires an applicant for a check-cashing permit to "have a minimum of cash or other liquid assets of at least ... $20,000 for the operation of each location at which the applicant will engage in the check-cashing business and shall be required to post with the Department of Finance and Administration a fifty-thousand-dollar bond payable to the State of Arkansas[.]"

Stout testified that, other than Bonnie Berg, Check Mart had no other full-time employees, and that no one else besides himself, Dunn, or Anderson had ever been owners of the company. He also stated that he and his wife operated Check Mart of Conway, Inc., another "servicer" for the South Dakota loan company. He said that the way the Conway Check Mart operated was that a customer would come in and make a loan application, which was transmitted to South Dakota; if the loan was approved, a check was printed from the South Dakota office, and the customer could cash the check in the Conway office or take it to the customer's bank. The customer would leave a check at the Conway office as collateral for that loan. If the customer did not come back when the loan was due, Check Mart of Conway would deposit the customer's check "as a servicer for the loan company."

Stout said that he believed the State revoked the license for Check Mart of Hot Springs, and he agreed that after the instant lawsuit was filed, Check Mart had no assets. However, tax records introduced at trial showed that Stout reported $33,397 in gross receipts from Check Mart on his personal tax return in 2001.

Stewart also introduced copies of "dun letters" sent by Check Mart to customers who failed to make payments on their transactions with Check Mart and whose checks were dishonored by their banks. Stout "assumed" that Check Mart would maintain copies of any such letters sent to customers, but did not know for a fact. Stout denied having any knowledge of the amounts of fees paid to Check Mart by customers, and denied knowing whether Check Mart ever sued any of its customers, despite the introduction into evidence of a small claims complaint filed in the name of Check Mart and signed by Bonnie Berg, the store's manager. Further, Stout denied knowing anything about whether Check Mart maintained copies of checks written to the company. Stout professed that it was his intent for Check Mart to comply with the Arkansas Check Casher's Act, but did not know whether, or for how long, the Act required him to retain any records.

When asked whether Check Mart ever had an accountant, Stout stated that the company did not have an accountant, although he personally had one. Stout was unsure whether Berg kept the books for Check Mart "or if the accountant posted [them]," and did not know who prepared the company's profit-and-loss statement. That profit-and-loss statement for the period from January through November of 2001 reflected a loss of $7,078; Stout could not explain why the entire amount of that same loss was reported on his personal tax returns for 2001.

Stewart also called Sharon Harper to testify at the trial of this matter. Harper testified that she had begun doing business with Check Mart in 2000 and continued doing business with Check Mart until 2002. After 2002, Harper said that she did business with D & L Service Company, and the "same lady" who had worked for Check Mart was working for D

2006 WL 1118892                                                                                    Page 5
--- S.W.3d ----, 2006 WL 1118892 (Ark.)
**(Publication page references are not available for this document.)**

& L.

 On these facts, the trial court's decision to pierce the
corporate veil and hold the individual defendants
liable was not clearly erroneous. The evidence
demonstrated that Check Mart and its owners failed
to properly maintain business records, thereby failing
to comply with the Check Casher's Act.  [FN3] In
addition, Stout withdrew Check Mart's letters of
credit and canceled the bond Check Mart had posted
shortly after this lawsuit was filed, an act which
Stewart contends was designed to ensure that Check
Mart would not have the appropriate assets to satisfy
any judgment that might be entered against the
company. Further, Sharon Harper's testimony
revealed that, even after Check Mart closed, the same
individuals were operating the same kind of business
in the form of D & L Service Company.

>    FN3.  Ark.Code Ann. §   23-52-112(a)
>    (Repl.2000) requires check cashers to "keep
>    and use in its business any books, accounts,
>    and records that the State Board of
>    Collection Agencies may require to carry
>    into effect the provisions of this chapter and
>    the administrative regulations issued
>    hereunder"; §  23-52-112(b) requires check
>    cashers to "preserve all relevant records for
>    a period of at least two (2) years after
>    making the last entry on any transaction."

 These facts are strikingly similar to those in *Winchel
v. Craig, supra,* where the court of appeals noted that
after the defendant company was dissolved, a new
one was formed with the identical purpose, and that
no provision had been made upon dissolution of the old
company for the payment of any liabilities the old
company might have incurred. Given the evidence
before it, we hold that the trial court did not err in
piercing the corporate veil and holding the individual
defendants personally liable.

 --- S.W.3d ----, 2006 WL 1118892 (Ark.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Not Reported in N.W.2d                                                                 Page 1
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases  P 74,556
(Cite as: 2004 WL 2115144 (N.D.Dist.))

NORTH DAKOTA DISTRICT COURT.
Ralph & Diane BECKLER, on behalf of themselves
and all others similarly
situated, Plaintiffs,
v.
VISA U.S.A. INC. and Mastercard International,
Inc., Defendants.
SIOLEN KELLY HO, Barbara Hall and Virginia
Torres, on behalf of themselves and
all other consumers similarly affected, Plaintiffs,
v.
VISA U.S.A. INC. and Mastercard International,
Inc., Defendants.
Robert STARK, on behalf of himself and all others
similarly situated,
Plaintiff,
v.
VISA U.S.A. INC. and Mastercard International
Incorporated, Defendants.
No. 09-04-C-00030.

Aug. 23, 2004.

Steven W. Plambeck of Nilles, Hansen & Davies,
Ltd., Fargo, ND; Stephen V. Bomse, David M.
Goldstein of Heller Ehrman White & McAuliffe
LLP, San Francisco, CA; Robert C. Mason and
Miranda L. Berge of Arnold & Porter LLP, New
York, NY, for Defendant Visa U.S.A. Inc.

Patrick J. Ward of Zuger Kirmis & Smith, Bismarck,
ND; Kenneth A. Gallo of Paul, Weiss, Rifkind,
Wharton & Garrison LLP, Washington, DC; Gary R.
Carney of Paul, Weiss, Rifkind, Wharton & Garrison
LLP, New York, NY, for Defendant MasterCard
International Incorporated.

Michael J. Williams, Fargo, ND; David Markun,
Edward S. Zusman and Kevin Eng of Markun
Zusman Compton & David, LLP, San Francisco, CA,
for Plaintiffs.

MEMORANDUM OPINION

HERMAN, J.

NATURE OF PROCEEDINGS
*1 This is an antitrust action "on behalf of all
consumers in the State of North Dakota who have
been forced to pay artificially inflated prices as a
result of defendants' anti-competitive actions" (see,

Paragraph 1, Class Action Complaint).

The alleged anti-competitive actions include an
illegal "tying" arrangement requiring merchants to
follow the "Honor All Cards" rules of the ubiquitous
Visa and MasterCard associations.

OTHER LITIGATION
In October 1996, a series of class action lawsuits
were filed in the United States District Court for the
Eastern District of New York, styled In re Visa
Check/Master Money Antitrust Litig. (a/k/a Wal-Mart
Stores, Inc. et al. v. Visa U.S.A. Inc. and MasterCard
Int'l, Inc.), (the "Wal-Mart" action) No. 96-CV-5238,
by certain retailers and retail trade associations
against the defendants. The retailers alleged, among
other things, that Visa and MasterCard violated
federal antitrust laws by forcing merchants who
accept their cards to accept Visa and MasterCard-
branded debit cards. Plaintiffs claimed defendants'
actions caused merchants to pay excessive fees on
Visa and MasterCard off-line debit transactions,
which injured competition, merchants and
consumers. The retailers sought: (1) an injunction
prohibiting defendants from engaging in the alleged
violations of the federal antitrust laws (including the
elimination of the alleged forced acceptance of the
Vista and MasterCard-branded debit cards by
merchants who accept Visa and MasterCard-branded
credit cards), and (2) damages for the alleged excess
portion of fees paid.

During the course of the Wal-Mart litigation, the
Second Circuit Court of Appeals upheld the District
Court's decision to certify a class of four million
merchants (280 F.3d 124 (2d Cir.2001)) and the
district Court later granted the retailers' cross-motion
for summary judgment on a host of key issues (2003
U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003)).

Finally, on June 4, 2003, the retailers entered into
proposed settlements with Visa and MasterCard,
which would, among other things, allow merchants to
accept the Visa or MasterCard-branded credit cards
without accepting their debit cards (and vice versa),
reduce the prices charged to merchants for off-line
signature debit transactions for a period of time, and
pay over $3 billion into a settlement fund. On
January 23, 2004, the District Court entered an order
and final judgment granting final approval to the
settlements.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                              Page 2
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556
**(Cite as: 2004 WL 2115144 (N.D.Dist.))**

Separate from the *Wal-Mart* case, the Department of Justice ("DOJ") commenced an action against Visa and MasterCard alleging federal antitrust violations. On October 7, 1998, the DOJ sued Visa U.S.A. Inc., Visa International Corp. (collectively "Visa"), and MasterCard International, Inc., alleging two violations of section 1 of the Sherman Act, 15 U.S.C. § 1.

The DOJ alleged that defendants' rules permitted member banks to issue credit and charge cards on both the Visa and MasterCard networks, but improperly prohibited them from issuing cards on the two major general purpose credit and charge card networks not controlled by banks: American Express and Discover. *United State v.. Visa U.S.A., Inc.,* 163 F.Supp.2d 322, 329 (S.D.N.Y.2001). The government contended that these exclusionary practices restrained competition among credit card networks and credit card issuers, harming consumers in both the credit card and charge card markets.

**\*2** The district court, analyzing the government's claims under the "rule of reason," began by defining two relevant product markets: (1) a general purpose card market, and (2) a general purpose card network services. *Id.* at 335. Significantly, for purposes of this litigation, the court also rejected a broader market definition urged by Visa and MasterCard, holding that other forms of payment, such as debit cards, constitute a market separate from charge and credit cards. *Id.* at 331, 336-39. The court found that the defendants have market power in the network services market--the market in which the associations operate. *Id.* at 340. The court held that the challenged exclusionary rules "weaken[ed] competition and harm[ed] consumers." *Id.* at 329-30, 399-400.

Visa and MasterCard appealed, but the Second Circuit affirmed the district court's conclusion that their respective exclusionary rules violated the Sherman Act. *United States v. Visa U.S.A., Inc.,* 344 F.3d 229 (2d Cir.2003).

More importantly, consumer based litigation similar to this case has been brought in the Supreme Court of the District of Columbia, *Peterson et al. v. Visa USA, Inc. and Master Card International, Inc.* Civil Action No. 03-008080 ("The Multi-State Action.") The Multi-State action was brought by plaintiffs (including the Becklers) from each of seventeen states (including North Dakota) plus the District of Columbia and is essentially identical to this claim, i.e. that the debit card overcharge was passed on to consumers. Defendants have moved to dismiss the Multi-State action on grounds of *forum non conveniens.* Becaue the statutes of limitations are not necessarily tolled while this issue is being addressed, in the Multi-State action, the plaintiffs have filed their own class actions in their home states thus, this North Dakota filing by the Becklers.

Plaintiffs' motion to stay this proceeding has been withdrawn. There being no deadlines on the Multi-State decision nor any way to know if that decision will moot the individual State actions, this Court determines that it should proceed and address defendants' motion to dismiss.

### DISCUSSION

At the outset, the Court assumes that a "tying" arrangement illegal under the Clayton and Sherman Acts is also illegal under State law, North Dakota Century Code chapter 51-08.1. Moreover, at the motion to dismiss stage, the Court considers the allegations of the Complaint in the light most favorable to the plaintiffs. *See, Saefke v. Stenehjem,* 673 N.W.2d 41, 44-45 (N.D.2003). Defendants argue the plaintiffs do not have "standing" to bring these claims and that regardless of the merits of the retailers' litigation, this state claim should be dismissed.

Plaintiffs acknowledge that under federal law they could *not* maintain this class action. In essence, *Illinois Brick v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707(1977) sounded the death-knell for "indirect purchaser" claims under the federal anti-trust laws. Many states, including North Dakota, later took legislative action to repeal the *Illinois Brick* bar to indirect purchaser claims. See, NDCC § 51-08.1-08(3) and its legislative history. The Court finds that this legislative endeavor was, in fact, an effective repeal of *Illinois Brick.*

**\*3** Defendants accepts that repeal, but argue the plaintiffs are not really "indirect purchasers" and that despite the narrow rule of *Illinois Brick,* an anti-trust plaintiff must always have some legal "standing" to bring, their claim. See, *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

### CONCLUSION

Clearly defendants here are not indirect purchasers in the ordinary sense. They do not allege to have been forced to purchase off line debit cards offered by defendants in addition to--or to the exclusion of--on-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

line debit cards offered by small competitors. Indeed, the class of plaintiffs whom the Becklers seek to represent includes all North Dakota consumers, whether they purchased goods and services for cash, with checks, with credit cards, or with either form of debit cards. In essence, plaintiffs claim to have been overcharged ("injured" in anti-trust parlance) as a result of their ordinary, day-to-day purchases of an enormous variety of goods that these defendants neither manufactured nor sold.

 As "non-purchasers" of defendants' debit card services to merchants, the Court believes that plaintiffs lack standing to sue for the alleged restraint of trade in such services. Their alleged injury is simply too remote.

 Even though the consumer litigation is relatively new (both the Multi-State action and the follow-up individual state actions), several trial courts have reached this result. *Ho v. Visa U.S.A., Inc* No. 112316/00, slip op at 6 (N.Y. Cty April 26, 2004) attached as Exhibit 1; *Stark v. Visa U.S.A. Inc. and MasterCard International, LLC,* Case No. 03-055030-CZ Oakland County, Michigan, opinion and order attached as Exhibit 2.

 Counsel for defendants will prepare appropriate Findings of Fact, Conclusions of Law and Order for Judgment consistent with this Memorandum Opinion.

EXHIBIT 1
SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF NEW YORK: IAS PART 60

SIOLEN KELLY HO, BARBARA HALL and VIRGINIA TORRES, on behalf of themselves and all other consumers similarly affected,

Plaintiffs,
-against-
VISA U.S.A. INC. and MASTERCARD INTERNATIONAL, INC.,

Defendants.

FRIED, J.

 Defendants Visa U.S.A. Inc. (Visa) and MasterCard International, Inc. (Master Card) move, pursuant to 3211(a)(7) and 3211(a)(1), to dismiss the amended complaint.

 Plaintiffs Siolen Kelly Ho, Barbara Hall, and Virginia Torres seek to sue on their own behalf and on behalf of all similarly situated consumers. Plaintiffs allege that they are consumers at stores such as The Express, Victoria's Secret, Sears Roebuck Co., Macy's, and Bloomingdale's, all of which are part of the International Mass Retail Association (IMRA) and the National Retail Federation (NRF). Plaintiffs allege that those stores, along with more than three million retail establishments, accept Visa and MasterCard credit cards as a form of payment. Plaintiffs further allege that, although the acceptance of Visa and MasterCard credit cards is voluntary, the retailers are forced to accept Visa and MasterCard debit cards as a condition of being able to accept the more all-encompassing credit cards. According to plaintiffs, Visa and MasterCard charge the retailers more, per transaction, when a debit card is used by a customer, than when a credit card is used. According to plaintiffs, the retail stores pass on the increased charge to consumers, such as themselves, by raising the price of the products that they sell.

 **\*4** In 1996, several groups of retailers filed anti-trust actions in federal court challenging these practices of Visa and MasterCard. In 2003, that litigation resulted in a settlement involving the payment of damages of over $3 billion, and injunctive relief worth an additional $25 to $87 billion. (*In re Visa Check/Mastermoney Antitrust Litigation,* 297 F Supp 2d 503 [RDNY 2003] ).

 Plaintiffs' amended complaint asserts two causes of action. In their first cause of action, plaintiffs allege violations-of the Donnelly Act (General Business Law § 340), New York State's version of the federal Sherman Anti-Trust Act. 5 USC §  1 *et seq.* In their second cause of action, plaintiffs allege violations of General Business Law § 349, which makes unlawful deceptive acts and practices in the conduct of business.

 Citing *Cox v. Microsoft Corp.* (290 A.D.2d 206 [1st Dept 2002] ), defendants contend that plaintiffs' Donnelly Act cause of action must be dismissed, because the Act's treble damages remedy precludes private persons from bringing a class action under the act. See CPLR 901(b) (unless a statute which imposes a penalty specifically provides that an action to recover the penalty may be brought as a class action, such a class action is precluded).

 In response, plaintiffs offer to abandon their class action claims for Donnelly Act violations, and agree to further amend their complaint, if so required.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                    Page 4
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases  P 74,556
**(Cite as: 2004 WL 2115144 (N.D.Dist.))**

However, defendants argue that, even if plaintiffs abandon their class action claims, the first cause of action must be dismissed. Defendants contend that plaintiffs lack standing because their alleged injuries are too remote.

In the case of *Illinois Brick Co. v. Illinois,* (431 U.S. 720 [1977] ), the United States Supreme Court held that purchasers of concrete blocks, who had paid enhanced prices for their purchases because their suppliers had been victimized by a price fixing conspiracy, could not bring a federal anti-trust action because they were indirect purchasers. In 1999, the New York State Legislature amended the Donnelly Act to provide that persons who had been damaged as a result of a violation of the Donnelly Act would not be deprived of standing to sue, merely because they did not deal directly with the defendant. (Gen. Bus. L. § 340 ( [6] ). Defendants contend that plaintiffs' injuries are too remote to qualify them as "indirect purchasers" under the Donnelly Act amendment.

Defendants argue that the proximate cause analysis utilized by the United States Supreme Court in *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* (459 U.S. 519 [1983] ), to determine whether antitrust standing is proper under state laws similar to New York's, should be used here. That analysis, which was recently summarized by the United States District Court for the District of Columbia in *In re Lorazepam & Clorazepate Antitrust Litigation,* (295 F Supp 2d 30, 37 [DDC 2003] ). considered the following five factors in determining whether a plaintiff is a proper party to bring an antitrust case:
   **\*5** 1. The nature of plaintiff's claimed injury;
   2. The directness of the injury;
   3. The specific intent of the alleged defendants;
   4. The character of the alleged damages, including the risk of duplicative recovery, the complexity of apportionment and their speculative nature; and
   5. The existence of other, more appropriate plaintiffs.

Here, the plaintiffs' claims, as general consumers at stores which accept Visa and MasterCard, are clearly derivative of the stores' claims against those companies, and their alleged injuries are indirect. They have had no direct dealings with either of the defendants; they do not claim to use defendants' credit or debit card services in any way. Rather, they claim that stores where they shop raise their prices on all products in order to absorb the extra fees charged by Visa and MasterCard, and that they pay higher prices as a result. Thus, plaintiffs' claims are far more

indirect than those in cases challenging the tobacco industry, on which plaintiffs rely, where the plaintiffs are cigarette smokers who actually purchased the defendants' product, though not directly from defendants. (See e.g. *Lennon v. Philip Morris Companies, Inc.,* 189 Misc.2d 577, 734 N.Y.S.2d 374 [Sup Ct. N.Y. County [Ramos, J.] 2001] ).

With respect to intent, in the *Lorazepam* case, on which plaintiffs here rely, those plaintiffs claimed that they were injured because they had to pay excessive prices for certain drugs. As the *Lorazepam* court noted, the aim of the manufacturers' preclusive conduct was to charge the elevated prices of which the plaintiffs complained. Here, in contrast, though Visa and MasterCard presumably intended to obtain higher rates from the stores that accepted their cards, there is no indication that they intended that the prices of all consumer goods in those stores would be increased.

With respect to the character and calculation of damages, and the complexity of calculating those damages, plaintiffs allege that the stores where they shop, such as The Express, Victoria's Secret, Sears Roebuck Co., Macy's, and Bloomingdale's, have absorbed the debit card fees by raising their prices. In their amended complaint, plaintiffs note that those stores are part of the IMRA and NRF, which, along with more than three million retail establishments, accept Visa and MasterCard credit and debit cards. Even assuming that plaintiffs' class action claims have been abandoned with respect to their Donnelly Act cause of action, their amended complaint appears to cover all of the purchases that they made as individual consumers at *any* retail store that accepts Visa and MasterCard, not merely at the handful of named stores-- purchases which potentially range from a few cents to hundreds, or even thousands, of dollars. The complexity and speculative nature of plaintiffs' claims are overwhelming.

Moreover, any recovery obtained by plaintiffs here is likely to be duplicative, in light of the fact that the retailers have already brought and resolved their claims with respect to the debit cards, and have obtained a multi-billion dollar settlement. Therefore, this is obviously not a situation where the antitrust violators will go unpunished, because the parties who are directly injured will not sue.

**\*6** For these reasons, I conclude that plaintiffs' alleged injury is far too remote to provide antitrust standing under the Donnelly Act, and the first cause of action must be dismissed.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                 Page 5
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556
(Cite as: 2004 WL 2115144 (N.D.Dist.))

Plaintiffs' second cause of action alleges that defendants violated General Business Law (GBL) § 349 by engaging "in a wide and far-reaching advertising campaign" to induce consumers to acquire debit cards without disclosing that the merchants are being charged high fixed prices for accepting the cards, which costs the retailers are compelled to pass on to all of their consumers.

Defendants argue that the second cause of action should be dismissed, because, like the Donnelly Act, Section 349 provides for treble damages, and therefore, a class action is impermissible. Under the Donnelly Act, any person who sustains damages by reason of a violation of the act "shall recover three-fold the actual damages." (Gen.Bus.L. § 340[5] ). In contrast, pursuant to section 349, plaintiffs may seek merely their actual damages or $50, whichever is greater, the imposition of treble damages being discretionary with the court. Gen. Bus. L. § 349[h] ). Plaintiffs indicate that they are willing to waive the possibility of treble damages, but seek to maintain their class action claims under section 349. As plaintiffs contend, class actions have been sustained under section 349, where plaintiffs have agreed to waive treble damages relief (*see Super Glue Corp. v. Avis Rent A Car System, Inc.,* 132 A.D.2d 604, 517 N.Y.S.2d 764 [2nd Dept 1987] ), and where class members were permitted to opt-out, if they wished to seek treble damages. *(See Ridge Meadows Homeowners' Assn., Inc. v. Tara Development Co., Inc.,* 242 A.D.2d 947 [4th Dept 1997] ). Thus the availability of treble damages does not preclude plaintiffs' second cause of action.

Defendants contend that, nonetheless, plaintiffs fail to satisfy the three elements of a section 349 claim: "that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." (*Stutman v. Chemical Bank,* 95 N.Y.2d 24, 29 [2000] ). Defendants contend that no misleading practice has been alleged by plaintiffs--that nothing in defendants' advertising even discussed fees paid by merchants for credit and debit cards, and that, in any case, the information regarding those cards, with their differing fees, was public knowledge. And again, defendants argue that the alleged injuries suffered by plaintiffs are far too remote and speculative to state a claim under GBL § 349.

As defendants contend, New York courts have held that mere failure to disclose that lower rates for certain services were available, does not necessarily constitute a deceptive practice under Section 349. (*See e.g. Gershon v. Hertz Corp.,* 215 A.D.2d 202 [1st Dept 1995] ) [alternative car rental arrangements at lower rates]; *see also Super Glue Corp. v. Avis Rent A Car System, Inc.,* 159 A.D.2d 68, 557 N.Y.S.2d 959 [2nd Dept 1990] [excessive prices charged for insurance or refueling, without more, are not actionable as deceptive practice] ).

**\*7** Citing *State of New York v. Feldman,* (210 F Supp 2d 294 [SDNY 2002] ), plaintiffs contend that there can be a violation of Section 349 without an affirmative misrepresentation. However, *Feldman* did not involve claims of deceptive advertising. Rather, in *Feldman,* several States brought an antitrust enforcement action against a group of people allegedly involved in an unlawful scheme to rig bids at stamp auctions. Plaintiffs' second cause of action specifically alleges that it is based on a widespread campaign of advertising by defendants, although no specific advertisements are cited, and plaintiffs fail to demonstrate anything specific in defendants' advertisements which was misleading. To the extent that plaintiffs' allegations regarding deceptive practices are based on defendants' alleged massive advertising campaign, *Feldman* is of little assistance to them, and their second cause of action fails to state a claim. Therefore, it is not necessary to reach defendants' contention that information about their pricing structure was publicly known.

In their brief and in oral argument, plaintiffs appear to have reformulated their second cause of action as a general antitrust claim, like the claims of the New York State Attorney General in *Feldman* and not unlike their Donnelly Act claim in the first cause of action. In *Feldman* the court noted that New York courts have interpreted Section 349 as encompassing deceptive practices prohibited by the Federal Trade Commission Act, and that the government may use the FTC Act to enforce antitrust laws. Plaintiffs argue that Section 349 can be used to enforce general claims of deceptive practices where antitrust laws have been violated, and that defendants' debit card practices have already been held to violate antitrust laws.

Although plaintiffs' amended complaint does not assert such a general antitrust claim pursuant to Section 349, on a motion to dismiss, it is appropriate for the court to consider not merely whether the complaint has stated a particular cause of action, but whether, on the facts alleged, a cause of action exists. Therefore, I will consider whether plaintiffs can state

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                 Page 6
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556
**(Cite as: 2004 WL 2115144 (N.D.Dist.))**

a claim under Section 349 that is not limited to a claim for deceptive advertising.

 Defendants contend that if plaintiffs seek to utilize section 349 as a general antitrust statute, the analysis used to determine standing for Donnelly Act claims should be used to determine standing under section 349, as well.

 Plaintiffs cite *Securitron Magnalock Corp. v. Schnabolk,* (65 F.3d 256, 264 [2nd Cir1995] [citations omitted] ) for the proposition that " 'any person who has been injured by reason of any violation of this section' " can maintain a cause of action under section 349, and argue that, because they have been injured by defendants' actions, they have standing. However, the court in *Securition* merely held that suits under section 349 were not limited to consumers, and that corporate competitors have standing to sue as well, so long as the underlying conduct results in some harm to consumers, or to the public at large. That case did not consider the question of the remoteness of the injury--which is at issue here.

 **\*8** Recently, in a case in which health insurers sought to recover, from tobacco companies, the increased costs of medical services due to smoking, the United States Court of Appeals for the Second Circuit considered whether there may be a remoteness bar to standing under Section 349. (*Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris USA Inc., 344 F.3d 211* [2nd Cir2003] ). Noting that a New York court has permitted a suit for indirect injuries under Section 349, the U.S. Court certified the following question to the New York Court of Appeals: "Are claims by a third party payer of health care costs seeking to recover costs of services provided to subscribers as a result of those subscribers being harmed by a defendant's or defendants' violation of N.Y. Gen. Bus. Law § 349 too remote to permit suit under that statute?" *Id.* at 221. The Court of Appeals has accepted the certified question. (*Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris USA Inc., 100 N.Y.2d 636 [2003] ).*

 At least until the Court of Appeals determines that a different type of analysis should be utilized to determine standing under Section 349, I conclude that an analysis akin to that utilized for Donnelly Act standing is appropriate. Utilizing that analysis, I further conclude that, even if the Count of Appeals determines that third-party payers of health care costs have standing to sue tobacco companies under

section 349, for the reasons discussed above, plaintiffs' alleged claims are too remote to support a general antitrust claim under Section 349. Furthermore, if plaintiffs were permitted to bring their section 349 claims as a class action, as they seek to, the complexity and speculative nature of calculating damages would increase geometrically, for those claims could involve nearly all the purchases of all of the consumers in the state of New York.

 Accordingly, it is hereby

 ORDERED that defendants' motion to dismiss is granted, and the complaint is dismissed with costs and disbursements to defendants as taxed by the Clerk of the Court on submission of an appropriate bill of costs; and it is further

 ORDERED that the Clerk is directed to enter judgment accordingly.

EXHIBIT 2

 ROBERT STARK, on behalf of himself and all others similarly situated,

Plaintiff,

v

 VISA U.S.A. INC. and MASTERCARD INTERNATIONAL INCORPORATED,

Defendants.

Case No. 03-055030-CZ
Hon. Colleen A. O'Brien
*OPINION AND ORDER*
INTRODUCTION

 This matter is before the Court on Defendants' motion for summary disposition under MCR 2.116(C)(8). The Court heard oral argument and took the motion under advisement. After considering Defendants' motion and brief in support, Plaintiff's response and Defendants' reply in light of applicable law, and for the reasons discussed below, the Court grants. Defendants' motion for summary disposition.

 This is an antitrust action. Defendants claim that Plaintiff lacks standing to sue for purported violation of the Michigan Antitrust Reform Act ("MARA") because he alleges only remote injuries and did not purchase--directly or indirectly--the services that Defendants allegedly restrained in violation of MARA.

BACKGROUND

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                    Page 7
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556
(Cite as: 2004 WL 2115144 (N.D.Dist.))

**\*9** Plaintiff claims that Defendants engaged in tying arrangements in violation of the Michigan Antitrust Reform Act. ("MARA") MCL 445.772. Plaintiff claims that he and the Michigan class he represents have been damaged "indirectly" under the Act because they were forced to pay the overcharge that resulted from Visa and MasterCard's unlawful tying arrangement. For these alleged violations, Plaintiff seeks damages and attorneys' fees.

Plaintiff's Complaint in this matter is based on the same conduct of Defendants that was at issue in previous federal litigation. In October 1996, several groups of merchants commenced a class action against Visa and MasterCard in federal court. *In re Visa Check/MasterMoney Antitrust Litigation,* 192 F.R.D. 68 (E.D.N.Y., 2000), *aff'd* 280 F.3d 124 (C.A.2, 2001), *cert den* 536 U.S. 917, 122 S.Ct. 2382, 153 L.Ed.2d 201 (2002). The merchants alleged that under the "Honor All Cards" rules, as a condition of being permitted to accept Visa and/or MasterCard credit cards, they were also required to accept Visa and MasterCard debit cards. The merchants claimed that this constituted a tying arrangement and an attempt to monopolize a debit market in violation of federal antitrust laws. The merchants alleged that as result of those purported antitrust violations, they paid inflated fees for Visa and MasterCard debit transactions--fees that were higher than those they paid for debit transactions processed over other debit networks.

In February 2000, the federal court certified a nationwide class of more than four million merchants who had accepted Visa or MasterCard within the statute of limitations period. That class action was settled in April 2003 on the eve of trial. The federal court issued an order granting final approval of the settlements. See *In re Visa Check/MasterMoney Antitrust Litig.,* 297 F Supp 2d 503 (E.D.N.Y., 2003). Pursuant to the settlements, Visa and MasterCard each eliminated the asserted tying of credit and debit card services to merchants, thereby allowing merchants to reject consumers' Visa or MasterCard-branded debit cards but still accept consumers' Visa or MasterCard-branded credit cards. Visa and MasterCard also collectively paid more than three billion dollars into a settlement fund.

In the federal litigation, the merchants alleged that Visa and MasterCard imposed an overcharge on merchants by forcing them to accept Visa and MasterCard debit cards as a condition of accepting Visa and MasterCard credit cards. In the instant matter, Plaintiff contends that the merchants passed

that overcharge on to both him and Michigan consumers by increasing the price of goods.

Plaintiff claims to have paid higher prices on every purchase he made from merchants who accept Visa or MasterCard, regardless of whether he used a debit card to make the purchase. Plaintiff alleges that all consumers, including those who used cash, were affected by Defendants' actions. Therefore, the proposed class would include not only consumers who purchased goods using debit cards but also any consumers who purchased goods from any Michigan retailer that accepted Visa and/or MasterCard credit cards.

ANALYSIS
**\*10** Defendants' motion is brought pursuant to MCR 2.116(C)(8). Defendant argues that Plaintiff's claims should be dismissed because he lacks standing to sue under the Michigan Antitrust Reform Act for the injuries he alleged.

A motion under MCR 2.116(C)(8) tests the "legal sufficiency of the complaint on the basis of the pleadings alone." *Mack v. Detroit,* 467 Mich. 186, 193, 649 N.W.2d 47 (2002). "All factual allegations are accepted as true, along with any inferences or conclusions which may be fairly drawn therefrom." *Ambro v. American Nat'l Bank & Trust Co.,* 152 Mich.App. 613, 616-617, 394 N.W.2d 46 (1986).

Defendant's first argument is that Plaintiff cannot meet the five-factor test set forth in *Associated General Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). This Court agrees.

In *Associated General Contractors,* the United States Supreme court Supreme Court identified five factors for determining whether the relationship between the plaintiff's harm and the defendants' conduct is sufficiently close to confer standing to sue: (1) whether the plaintiff is a consumer or competitor in the allegedly restrained market; (2) whether the alleged injury alleged is a direct, first-hand impact of the restraint alleged; (3) whether there are more directly injured plaintiffs with motivation to sue; (4) whether the damages claims are speculative; and (5) whether the plaintiff's claims risk duplicative recoveries and would require a complex apportionment of damages. *Id.* at 538- 45.

First of all, Plaintiff is not a consumer or competitor in the allegedly restrained market. Here, in the alleged market, the merchants are the consumers of

Not Reported in N.W.2d                                                      Page 8
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556
**(Cite as: 2004 WL 2115144 (N.D.Dist.))**

Visa and MasterCard debit card services; and other debit networks are the competitors of Visa and MasterCard. Thus, there is no connection between Plaintiff's purchases of consumer goods and the Defendants' alleged tying of debit services.

Second, the injury that Plaintiff alleges here is not a direct, first-hand impact of the restraint alleged. Here, the direct impact allegedly fell on the merchants. Plaintiff alleges only derivative and second-hand injuries from those that merchants purportedly incurred.

Third, there are more directly injured persons with motivation to sue to vindicate any interest in antitrust enforcement. Here, the alleged direct victims of Defendants' conduct, the merchants, litigated for seven years in a massive nationwide class action challenging the very same Visa and MasterCard conduct alleged in plaintiff's Complaint. The merchants directly affected have vindicated any interest in antitrust enforcement by suing the Defendants for the same alleged conduct. Thus, denying Plaintiff an antitrust remedy clearly will not leave any alleged antitrust violation "undetected or unremedied." *Id.* at 542.

Fourth, the Court agrees with Defendants that Plaintiff's damage claims are speculative. Here, Plaintiff asserts he paid overcharges on every single purchase that he made for several years from merchants who accepted Visa or MasterCard cards, However, there is nothing about the debit network systems of Visa or MasterCard that contributes in any way to the production of the consumer goods for which Plaintiff contends he paid inflated prices.

**\*11** Moreover, Plaintiff's claims risks duplicative recoveries and would require a complex apportionment of damages. Here, Plaintiff's claims are based on the very same conduct of Visa and MasterCard that was at issue in the federal merchant class action. Thus, Plaintiff is seeking recovery duplicative of the sums to be paid under the settlements to the Michigan merchants at which Plaintiff shopped. Moreover, Plaintiff's claims would require apportionment of damages using virtually every single purchase that Plaintiff made during the years for which he seeks damages. The Court agrees with Defendants that certainly any effort to make such an apportionment would be incredibly complex, if not impossible.

Plaintiff argues that Defendants' reliance on *Associated General Contractors* is misplaced for the reason that the test in *Associated General Contractors* is inconsistent with MARA's grant of standing to persons injured "indirectly." MCL 445.778(2). Plaintiff argues that MARA's plain language, rather than federal standing rules, governs the question of who has standing to bring a claim under MARA. Thus, under Plaintiff's analysis, the Act in itself grants standing per se.

Federal antitrust law does not recognize actions by indirect purchasers. The death knell of actions by indirect purchasers was embodied in the case of *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). In *Illinois Brick,* the plaintiffs sought to recover an overcharge on concrete acquired from users and direct purchasers of the concrete, who allegedly had overpaid for the concrete due to a manufacturers' price-fixing conspiracy and had passed on that overcharge to the plaintiffs. *Id.* at 726- 27. The United States Supreme Court concluded that such plaintiffs should not be deemed to have suffered an injury cognizable under the federal antitrust laws, given the potential for multiple liability and the complexity that would be introduced into antitrust damages suits if such pass-on theories were permitted. *Id* at 727-29, 736-47.

After *Illinois Brick,* Michigan and several other states amended their antitrust statutes to reject the Illinois Brick rule. Such legislation became known as *Illinois Brick* repealer laws. See *A & M Supply Co. v. Microsoft Corp.,* 252 Mich.App. 580, 583, 654 N.W.2d 572 (2002)

Specifically, in 1985, the Michigan Legislature adopted a damages statute modeled on the federal Clayton Act, but which also provided a potential damages remedy to persons injured "directly or indirectly" by a violation of Michigan's antitrust law. MCL 445.778(2). Thus, the mere fact that a plaintiff is an "indirect purchaser" would not automatically bar an antitrust damages claim.

However, this Court agrees with Defendants that it does not necessarily follow that Michigan's repeal of the *Illinois Brick* rule also eliminated the *Associated General Contractors* standing requirements. The Supreme Court in *Illinois Brick* made clear that its decision addressed only whether there should be a bar on "indirect purchaser" suits. It expressly "d[id] not address the standing issue," explaining that the "indirect purchaser" question is "analytically distinct from the question of which persons have sustained injuries to remote to give them standing to sue." *Illinois Brick, supra* at 728 n. 7.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                    Page 9
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556
**(Cite as: 2004 WL 2115144 (N.D.Dist.))**

**\*12** Plaintiff argues that restrictive federal standing rules such as in *Associated General Contractors* do not apply to MARA indirect purchaser claims. Plaintiff points out that no Michigan trial or appellate court has ever applied the *Association General Contractors* factors in a case under MARA's indirect purchaser provisions. However, while Michigan appellate courts have not developed a test for determining when a plaintiff's injury is too remote to permit suit under MARA, the Act requires courts to give "due deference to interpretations given by the federal courts to comparable antitrust statutes. MCL 445.784. Moreover, the Court notes that courts in other states that have repealed the Illinois Brick rule have continued to apply antitrust standing requirements to dismiss the claims of plaintiffs who assert only derivative or remote injuries. See *Ho v. Visa USA, Inc.* Index No. 112316/00, N.Y. Sup. Crt. April 26, 2004; *International Brotherhood of Teamsters, Local 734 Health and Welfare Trust Fund v. Philip Morris, Inc.* 196 F.3d 818 (C.A.7, 1999).

Furthermore, even if this Court did not apply the five-factor test in *Associated General Contractors*, Plaintiff's claim would still fail under MARA. The Court agrees with Defendants' second argument that because Plaintiff is not an indirect purchaser, he cannot sue under MARA.

MCL 445.788(2) provides in pertinent part:

> Any ... person ... injured directly or indirectly in his or her business or property by a violation of this act may bring an action ... for actual damages sustained by reason of a violation of this act ... (emphasis added).

The repealer language in 445.788(2) addresses "indirect purchasers" such as "an end user or licensee" of the product that the defendant had manufactured. *A & M Supply, supra* at 583, 654 N.W.2d 572. Plaintiff claims that he and the Michigan class he represents have been damaged "indirectly" under MARA's plain text because they were forced to pay the "overcharge" that resulted from Visa and MasterCard's unlawful tying arrangement. Plaintiff claims that he is an indirect purchaser of the debit car services because the monopoly overcharge on Defendants' debit card services is reflected in the artificially inflated prices of the consumer goods he purchases.

Thus, Plaintiff's alleged injuries admittedly do not stem from his purchase of the purportedly restrained debit card services that Defendants provided to merchants. Plaintiff does not claim that he repurchased from merchants or other middlemen the allegedly restrained debit card services that defendants provided to merchants. Instead, as correctly pointed out by Defendants, Plaintiff claims only derivative and remote injuries on his purchases from merchants of an endless variety of merchandise not even manufactured or sold by defendants. Therefore, Plaintiff is actually a "non-purchaser" of the debit card services that Defendants provide to merchants. Thus, MARA would not be applicable.

**\*13** THEREFORE, IT IS HEREBY ORDERED that Defendants' motion for summary disposition is GRANTED.

IT IS FURTHER ORDERED that this Opinion and Order resolves the last pending claim and closes the case.

IT IS SO ORDERED.

Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556

END OF DOCUMENT

# **<u>EXHIBIT C</u>**

Westlaw.

Not Reported in A.2d                                                                                                       Page 1
Not Reported in A.2d, 2004 WL 3030037 (Vt.Super.)
**(Cite as: 2004 WL 3030037 (Vt.Super.))**

C

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Vermont, Chittenden County.
Anthony J. FUCILE
v.
VISA U.S.A. INC. and Mastercard International, Inc.
No. S1560-03 CNC.

Dec. 27, 2004.

John T. Sartore of Paul Frank & Collins, P.C., Burlington, VT; Stephen V. Bomse and David M. Goldstein of Heller Ehrman White & McAuliffe LLP, San Francisco, CA; Robert C. Mason of Arnold & Porter LLP, New York, NY, for Defendant Visa U.S.A. Inc.

Samuel Hoar, Jr. of Dinse, Knapp & McAndrew, Burlington, VT; Kenneth A. Gallo and Patricia C. Crowley of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC; Gary R. Carney and Randi D. Adelstein of Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for Defendant MasterCard International Incorporated.

Robert A. Mello of Mello & Klesch, LLP, South Burlington, VT; David Markun, Edward S. Zusman and Kevin Eng of Markun Zusman Compton & David, LLP, San Francisco, CA, for Plaintiffs.

ENTRY

NORTON, J.

*1 The plaintiff, Anthony J. Fucile, sues Visa and Mastercard on behalf of himself and all similarly situated individuals for damages incurred by purchasing products sold by merchants who used the defendants' debit card services. Mr. Fucile claims that because of the defendants' antitrust violations, merchants were forced to pay higher costs for the use of debit cards. The merchants, in turn, passed these costs along to consumers through the price of the goods they sold. Mr. Fucile brings this action under the Vermont Consumer Fraud Act. The defendants move to dismiss for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6)

of the Vermont Rules of Civil Procedure. Because Mr. Fucile lacks standing under the Consumer Fraud Act, the court dismisses his complaint.

This action stems from a class action in the U.S. District Court for the Eastern District of New York. In that action, a class of retailers sued Visa and Mastercard for antitrust violations, claiming that the two defendants illegally required retailers to accept debit card services along with credit card services. The parties settled before trial, resulting in more than $3 billion in damages and injunctive relief worth between $25 billion to $87 billion. See generally *In re Visa Check/Mastermoney Antitrust Litig.,* 297 F.Supp.2d 503 (E.D.N.Y.2003).

Mr. Fucile now seeks damages as a consumer from merchants affected by the antitrust violations at issue in the prior class action litigation, claiming that these violations constituted an unfair method of competition within the meaning of 9 V.S.A. § 2453(a). Mr. Fucile claims standing to bring this claim not as a purchaser, because he did not actually purchase the financial services from the defendants, but as an "indirect purchaser."

The defendants, however, argue that Mr. Fucile is neither a direct purchaser nor an indirect purchaser. Rather, he is a "non-purchaser," because he did not actually receive the financial services that were affected by the defendants' antitrust violation. Mr. Fucile merely complains about prices of goods that may or may not have been affected by the price of the defendants' financial services. Therefore, the defendants argue, he lacks standing.

A motion to dismiss for failure to state a claim upon which relief can be granted will issue only if it is beyond doubt that there exists no facts or circumstances that entitle a plaintiff to relief. *Powers v. Office of Child Support,* 173 Vt. 390, 395 (2002). In a motion to dismiss, the court assumes all facts that a plaintiff pleads are true and disregards all of a defendant's contrary assertions. *Id.* Here, the dispositive issue is whether a person in Mr. Fucile's position, having not actually acquired the product or service that is alleged to be tainted by unlawful trade, can seek damages under the Consumer Fraud Act. Because this standing issue is one of law, it is appropriate for disposition on a motion to dismiss for failure to state a claim upon which relief can be

Not Reported in A.2d                                                                     Page 2
Not Reported in A.2d, 2004 WL 3030037 (Vt.Super.)
(Cite as: 2004 WL 3030037 (Vt.Super.))

granted. See, e.g., *Parker v. Town of Milton,* 169 Vt. 74, 76- 79 (1998).

 **\*2** The Consumer Fraud Act, literally read, provides limitless standing to any consumer. See 9 V.S.A. § 2451a(a) (defining consumer as "any person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services"). Courts will not, however, interpret statutes in a manner that leads to "absurd results manifestly unintended by the Legislature." *In re G.T.,* 170 Vt. 507, 517 (2000). Although courts should interpret the Consumer Fraud Act liberally in order to serve its remedial purpose, courts should not "so freely stretch its meaning as to evade the Legislature's intent." *Wilder v. Aetna Life & Cas. Ins. Co.,* 140 Vt. 16, 19 (1981). Thus, the court must define some limits to who may have standing to sue under the Consumer Fraud Act.

 Although federal courts have limited antitrust actions to "direct purchasers" of goods or services, see *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 746 (1977), Vermont has expressly disagreed with this limitation and allowed indirect purchaser suits under state law. See 9 V.S.A. § 2465(b); *Elkins v. Microsoft Corp.,* 174 Vt. 328, 337-38. (2002). But the standing issue in the instant case is a separate matter from the indirect purchaser issue. Indeed, the *Illinois Brick* did not address standing, stating that the indirect purchaser issue "is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages." *Illinois Brick,* 431 U.S. at 728 n. 7. Despite his claim that he qualifies as an "indirect purchaser," Mr. Fucile is far more remote than the plaintiff in *Elkins.* In *Elkins,* the plaintiff had actually acquired the product that was allegedly tainted by unfair methods of competition. See *Elkins,* 174 Vt. at 333. Here, Mr. Fucile never actually purchased the tainted financial services, but merely claims damages through the purchase of other products, the price of which may or may not have been affected by the financial services. Therefore, despite Vermont's indirect purchaser rule, the court must still determine if Mr. Fucile has standing given his remote relationship to the alleged wrongdoing.

 Federal courts have generally split into two camps with respect to antitrust standing. Some courts have opted for the "direct injury" test, which focuses on the relationship between the parties. Under this test, if the plaintiff is separated by intermediate victims, courts usually deny standing. See Annotation, *"Target Area" Doctrine as Basis For Determining Standing to Sue Under § 4 of Clayton Act (15*

*U.S.C.A. § 15) Allowing Treble Damages For Violation of Antitrust Laws,* 70 A.L.R. Fed. 637, § 2[a]. Other courts have used the "target area" test, which focuses on the general area of the economy injured by the antitrust violator. See *id.*

 The Supreme Court has not endorsed either test, but it has provided factors that lower courts should consider in determining standing. *Associated Gen. Contractors v. Calif. State Council of Carpenters,* 459 U.S. 519, 537 n. 33 (1983). These factors include (1) whether there is a causal connection between the antitrust violation and the alleged harm, *id. at 537;* (2) the directness of the injury, considering the "chain of causation," *id. at 540;* (3) whether the violator had an improper motive, *id. at 537 and n. 35;* (4) whether the plaintiff's injury was of a type that Congress sought to redress by providing a private remedy, *id. at 538;* (5) whether the alleged damages are speculative, *id. at 542;* and (6) whether the nature of the action will keep "the scope of complex antitrust trials within judicially manageable limits," *id. at 543.*

 **\*3** Simply by glancing at these factors, one can see that the Court did not pull them from thin air. Rather, they reflect the Court's standing factors to determine whether a case or controversy exists, pursuant to Article III of the Constitution. [FN1] The three primary factors in this context are (1) injury, (2) causation, and (3) redressibility. See *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992). The Vermont Supreme Court has expressly adopted these factors in other contexts. See, e.g., *Agency of Natural Resources v. U.S. Fire Ins. Co.,* 173 Vt. 302, 306 (2001). Although the Vermont Consumer Fraud Act has broader remedial purposes than federal statutes, the court nevertheless believes that the Vermont Supreme Court would also draw upon the standing factors in *Associated General Contractors* for guidance, at least to the extent that these factors are consistent with allowing "indirect purchaser" standing.

> FN1. The Court has noted that antitrust standing is somewhat different from constitutional standing because it requires additional considerations, but both share the same basic requirements. See *Associated Gen. Contractors,* 459 U.S. at 535 n .31.

 Therefore, in applying the general factors of *Associated General Contractors,* the court holds that Mr. Fucile does not have standing in this case. First, the causal chain here is simply too long. Mr. Fucile's damages are through an alleged inflated cost of goods

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sold by merchants who were injured by the defendants' inflated cost of financial services. He would have to demonstrate that the merchants actually passed their costs along to consumers through the price of their goods, rather than absorbing them by other means. The court would need to consider all other potential causes of inflated costs, such as any number of supply problems that affected the price of each different product the plaintiff class bought in Vermont during the relevant time period. This exercise in speculation extends far beyond a court's abilities. Although causation may be indirect, given the indirect purchaser rule in Vermont, it cannot extend beyond a reasonable length, as it does here. Thus, factors (1) and (2) weigh against standing.

 Second, the defendants' intent in this case weighs in favor of standing. Although the complaint is unclear as to the defendants' intent to violate antitrust law, the extent of money that the defendants allegedly made because of their tying arrangement demonstrates that their actions were intentional. Moreover, the defendants are associations providing financial services to thousands of banks. One cannot imagine that they lack familiarity with antitrust laws in conducting their business, so inferring intent here is appropriate. Therefore, factor (3) weighs in favor of standing for Mr. Fucile.

 Third, the injury here does not appear to be a type that the Legislature intended to redress through the Consumer Fraud Act. Although, as the Vermont Supreme Court has stated many times, courts should construe the Act liberally to effectuate its remedial purpose, the court cannot imagine that the Legislature intended the Act to redress injuries to all consumers, even those whose contact to the goods or services tainted by unfair competition is remote and tangential. One could divine any number of hypothetical scenarios analogous to this case that highlight the absurdity of allowing standing under these circumstances.

 **\*4** For instance, assume the plaintiff in *Elkins* was not a computer purchaser, but a client whose attorney provided legal services using Microsoft software. The client could claim that her bill was slightly higher because the attorney was forced to pay a higher price for the software because of Microsoft's antitrust violations. Whether or not the client's alleged injury is accurate, the court cannot reasonably assume that the Legislature intended the Consumer Fraud Act to extend limitlessly. As Justice Brennan acknowledged in his *Illinois Brick* dissent, "[t]here is, of course, a

point beyond which antitrust defendants should not be held responsible for the remote consequences of their actions." 431 U.S. at 749 n. 2. The plaintiff here extends far beyond this point. Thus, factor (4) weighs against standing.

 Finally, the alleged damages are highly speculative. Assuming that the merchants actually passed along added expenses in the price of goods sold, the court would need to determine the degree to which these expenses were passed along. This degree may vary from one good to another. For instance, merchants may pass on greater costs in product markets that are relatively inelastic and fewer costs in product markets that are relatively elastic. See *Illinois Brick*, 431 U.S. at 750 n. 3 (Brennan, J., dissenting). The court would then have to determine actual sales of goods to the plaintiff class during the relevant time period. Consumer fraud cases typically venture into the field of approximation, see *id.* at 758--59 (Brennan, J., dissenting), but these alleged damages venture into uncharted territories of sheer guesswork. Factors (5) and (6) therefore weigh against standing.

 Tallying the above analysis, the court grants the defendants' motion to dismiss. The court also notes that even should the Vermont Supreme Court ultimately adopt a different standard than that in *Associated General Contractors,* such as the "target area" test as it existed prior to *Associated General Contractors,* this court would still dismiss. In its most liberal manifestation, the target area test considered not only whether an antitrust violator's actions were aimed at a particular sector of the market, but whether the violator could have foreseen that its actions would affect the sector. See, e.g., *Mulvey v. Samuel Goldwyn Prod.,* 433 F.2d 1073, 1076 (9th Cir.1970); see also *Illinois Brick,* 431 U.S. at 760 and n. 18 (Brennan, J., dissenting) (discussing "more liberal" target area test). Even under this test, Mr. Fucile lacks standing. The defendants could not be expected to foresee an antitrust violation affecting merchants to result in increased cost of goods throughout the entire consumer base and to so injure that consumer base as to result in liability to every consumer in the country. General consumers were not the target area of the defendants' actions; merchants were. Therefore, the court would grant the defendants' motion using this test, as well.

 **\*5** Finally, the court briefly addresses Mr. Fucile's request that the court permit an amended answer to allow a narrower class, defined as those consumers who used debit cards in their transactions. The court denies this request, as it would not result in a

Not Reported in A.2d
Not Reported in A.2d, 2004 WL 3030037 (Vt.Super.)
**(Cite as: 2004 WL 3030037 (Vt.Super.))**

Page 4

different ruling. Mr. Fucile lacks standing because his injury--as a general consumer of products that are not directly related to the defendants' financial services-- is too remote. Whether he used a debit card, a credit card, a check, or cash is irrelevant. His injury would still be that of a general consumer, and he would lack standing.

### ORDER

For the foregoing reasons, the defendant's motion to dismiss is GRANTED.

### JUDGMENT FOR DEFENDANTS

The court having

granted the defense motion for
  dismissal
judgment is entered for defendants, this action is dismissed.

Not Reported in A.2d, 2004 WL 3030037 (Vt.Super.)

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **<u>EXHIBIT D</u>**



⌐

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. California.
GERLING GLOBAL REINSURANCE CORP. OF
AMERICA, et al., Plaintiffs,
v.
Chuck QUACKENBUSH in his capacity as
Commissioner of Insurance of the State of
California, Defendant.
AMERICAN INSURANCE ASSOCIATION and
American Re-Insurance Co., Plaintiffs,
v.
Chuck QUACKENBUSH in his capacity as
Commissioner of Insurance of the State of
California, Defendant.
WINTERTHUR INTERNATIONAL AMERICA
INSURANCE CO., et al., Plaintiffs,
v.
Chuck QUACKENBUSH in his capacity as
Commissioner of Insurance of the State of
California, Defendant.
Assicurazioni GENERALI S.p.A., Plaintiff,
v.
Chuck QUACKENBUSH in his capacity as
Commissioner of Insurance of the State of
California, Defendant.
**Nos. Civ. S-00-0506WBSJFM, Civ. S-00-
0613WBSJFM, CIV S-00-0779WBSJFM, Civ.S-
00-
0875WBSJFM.**

June 9, 2000.
Louis H Castoria, Debra S Sturmer, Wilson Elser
Moskowitz Edelman, and Dicker, San Francisco, CA,
Frederick W Reif, Pro Hac Vice, James P Donovan,
Pro Hac Vice, Wilson Elser Moskowitz Edelman and
Dicker, New York, NY, for Gerling Global
Reinsurance Corp of America U.S. Branch, plaintiff.

Louis H Castoria, Debra S Sturmer, Frederick W
Reif, James P Donovan, (See above), for Gerling
Global Life Reinsurance Company, plaintiff.

Louis H Castoria, Frederick W Reif, James P
Donovan, (See above), for Gerling Global Life
Insurance Company, plaintiff.

Louis H Castoria, Debra S Sturmer, Frederick W
Reif, James P Donovan, (See above), for Gerling
America Insurance Company, plaintiff.

Louis H Castoria, Debra S Sturmer, Frederick W
Reif, James P Donovan, (See above), for Constitution
Insurance Corp., plaintiff.

Frank Kaplan, Alschuler Grossman and Pines, Los
Angeles, CA, Andrew W Stroud, Mennemeier
Glassman and Stroud, Sacramento, CA, for Chuck
Quackenbush, in his capacity as the Commissioner of
Insurance of the State of California, defendant.

Pro Hac Vice, Stephen M Shapiro, Pro Hac Vice,
Mayer Brown and Platt, Chicago, IL, Neil M
Soltman, Mayer Brown and Platt, Los Angeles, CA,
Kenneth S Geller, Pro Hac Vice, Mayer Brown and
Platt, Washington, DC, for Association, plaintiff.

Martin S Checov, O'Melveny and Myers, San
Francisco, CA, Stephen M Shapiro, Neil M Soltman,
(See above), for American Re-Insurance Company,
plaintiff.

Frank Kaplan, Alschuler Grossman and Pines, Los
Angeles, CA, Andrew W Stroud, Mennemeier
Glassman and Stroud, Sacramento, CA, for Chuck
Quackenbush, in his capacity as Insurance
Commissioner for the State of CA, defendant.

Chandra L Gooding, Milbank Tweed Handley and
McCloy, Los Angeles, CA, for Winterthur
International America Insurance Company, plaintiff.

Chandra L Gooding, (See above), for Winterthur
International America Underwriters Insurance
Company, plaintiff.

Chandra L Gooding, (See above), for General
Casualty Company of Wisconsin, plaintiff.

Chandra L Gooding, (See above), for Regent
Insurance Company, plaintiff.

Chandra L Gooding, (See above), for Republic
Insurance Company, plaintiff.

Chandra L Gooding, (See above), for Southern
Insurance Company, plaintiff.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                               Page 2
Not Reported in F.Supp.2d, 2000 WL 777978 (E.D.Cal.)
**(Cite as: 2000 WL 777978 (E.D.Cal.))**

Chandra L Gooding, (See above), for Unigard Indemnity Company, plaintiff.

Chandra L Gooding, (See above), for Unigard Insurance Company, plaintiff.

Chandra L Gooding, (See above), for Blue Ridge Insurance Company, plaintiff.

Andrew W Stroud, Mennemeier Glassman and Stroud, Sacramento, CA, for Chuck Quackenbush, in his capacity as Insurance Commissioner, for the State of California, defendant.

Peter Simshauser, Skadden Arps Slate Meagher and Flom, Los Angeles, CA, for Assicurazione Generali, plaintiff.

Frank Kaplan, Alschuler Grossman and Pines, Los Angeles, CA, for Chuck Quackenbush, defendant.

*MEMORANDUM AND ORDER; PRELIMINARY INJUNCTION*

SHUBB, J.

*1 In October 1999, California enacted the Holocaust Victim Insurance Relief Act ("HVIRA"). *See* Cal. Ins.Code § § 13800-13807 and accompanying regulations, Cal.Code Regs. Tit. 10 § § 2278-2278.5. [FN1] The stated purpose of the HVIRA is for insurance companies doing business in the State of California to ensure that "any involvement they or their related companies may have had with insurance policies of Holocaust victims are disclosed to the state and to ensure the rapid resolution of these questions, eliminating further victimization of these policyholders and their families." Cal. Ins.Code § 13801(e). Each set of plaintiffs has moved against defendant Chuck Quackenbush, the California Commissioner of Insurance, for a preliminary injunction against enforcement of the HVIRA and accompanying regulations on the grounds that they are unconstitutional and that such enforcement will cause plaintiffs irreparable harm. *See* Fed.R.Civ.P. 65. [FN2]

    FN1. Some of the plaintiffs use the term "HVIRA" to refer to all statutes related to California Insurance Code sections 13800-13807, including California Insurance Code section 790.15 and California Code of Civil Procedure section 354.5. In fact, the latter

two sections were enacted before Insurance Code sections 13800-13807 and are not part of the HVIRA. When the court uses the term "HVIRA," it refers only to California Insurance Code sections 13800-13807 and the accompanying regulations.

    FN2. Gerling additionally moves for a preliminary injunction against enforcement of California Civil Procedure Code section 354.5 and California Insurance Code section 790.15. The court dismisses Gerling's motion as to these two claims. (*See* Order re: Motion to Dismiss, filed concurrently.) Hence, the court only considers the parties' motions for preliminary injunction against enforcement of the HVIRA. Gerling also moves for summary judgment on the same claims discussed in its motion for preliminary injunction. Because discovery is incomplete, and defendant has not responded to that motion, the court does not consider it at this time. See Fed.R.Civ.P. 56(f).

II. *Facts*

A. *The Statutes*

  The disputed statutes and regulations relate to claims asserted by Holocaust victims or their heirs or beneficiaries for coverage under insurance policies issued in Europe between 1920-1945. After the National Socialist (NAZI) party came to power, it enacted a series of statutes authorizing governmental confiscation of Jewish property and other assets, including insurance proceeds. Under these NAZI statutes, German insurers were required to pay the proceeds of insurance policies of Jewish residents to "blocked accounts" controlled by the NAZI government. A 1943 statute ordered confiscation of the estates of deceased Jews. Further, although many Holocaust victims had insurance policies, many lost the papers during their imprisonment. In many cases, the persons most knowledgeable about the policy were killed, leaving heirs without a paper trail. As a result, many Holocaust victims and their descendants and heirs have never collected on insurance policies.

  The HVIRA requires insurance companies doing business in California to file reports disclosing policies issued in Europe during the period 1920-1945. *See* Cal. Ins.Code § § 13800-13807. Other statutes extend the statute of limitations for filing such claims (Cal.Civ.Proc.Code § 354.5), and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2000 WL 777978 (E.D.Cal.)
(Cite as: 2000 WL 777978 (E.D.Cal.))

suspend the license of insurance companies who have not paid valid claims (Cal. Ins.Code § 790.15).

 1. *California Insurance Code §§ 13800-13807 ("HVIRA")*

 The HVIRA obligates insurers doing business in California to file reports identifying insurance policies (life, property, liability, health, annuities, dowry, educational, or casualty) sold to persons in Europe between 1920 and 1945 directly or through a "related company." Cal. Ins.Code § 13804(a). A "related company" is "any parent, subsidiary, reinsurer, successor in interest, managing general agent, or affiliate company of the insurer." Cal. Ins.Code § 13802(b). Specifically, the statute requires the insurer or related company to file with the registry: (1) the number of those insurance policies; (2) the holder, beneficiary, and current status of those policies; and (3) the city of origin, domicile, or address for each policy holder. *See* Cal. Ins.Code § 13804(a). Further, with regard to each policy, the insurer must certify one of the following: (1) that the proceeds of the policies have been paid to the designated beneficiaries or their heirs where that person or persons, after diligent search, could be located and identified; (2) that the proceeds where the beneficiaries or heirs could not, after diligent search, be located or identified, have been distributed to Holocaust survivors or to qualified charitable nonprofit organizations for the purpose of assisting Holocaust survivors; (3) that a court of law has certified in a legal proceeding resolving the rights of unpaid policyholders, their heirs, and beneficiaries, a plan for the distribution of the proceeds; or (4) that the proceeds have not been distributed and the amount of those proceeds. *See* Cal. Ins.Code § 13804(b).

 **2** Under the regulations, these reports were to be filed on or before April 7, 2000. *See* Cal.Code Regs. § 2278.4. Under the statute, if the reports were not filed by the 210 th day after the HVIRA became effective (May 7, 2000), the Commissioner "shall suspend the certificate of authority to conduct insurance business in the state...." Cal. Ins.Code § 13806. [FN3]

> FN3. Defendant has represented that he will not attempt to enforce the statute against plaintiffs until 20 days after the motions for preliminary injunction have been heard.

 2. *California Civil Procedure Code § 354.5*

 Under this statute, any Holocaust victim or heir or beneficiary who resides in the state may bring a legal action to recover on any claim arising out of an insurance policy or policies purchased or in effect in Europe before 1945 from an insurer (defined term), "notwithstanding any other provision of law." Cal.Civ.Proc.Code § 354.5(b). Further, it forbids dismissal of any claim whether brought by a resident or nonresident on statute of limitations grounds as long as the action is commenced on or before December 31, 2010. *See* Cal.Civ.Proc.Code § 354.5(c)

 3. *California Insurance Code § 790.15*

 This statute modifies the Insurance Code to empower the Insurance Department of the State of California to suspend the license of an insurer admitted to do business in California if the Department concludes that an "affiliate" of the insurer has failed to pay any valid claim from Holocaust survivors.

 B. *International Negotiations*

 The federal government, along with foreign governments and insurance companies, is also grappling with the same goal of giving Holocaust victims some compensation for lost monies from insurance policies.

 The United States and German governments have recently negotiated the formation of the Foundation for Remembrance, Responsibility, and the Future ("Foundation") funded by the German government and German corporations to resolve the claims of Holocaust victims. The Foundation is capitalized with approximately $5 billion dollars toward payments of victims of slave and forced labor, as well as payments on asserted claims related to insurance, banking, taking of property, and medical experiments. In a December 13, 1999 letter to Chancellor Schroeder, President Clinton stated that the executive agreement between the two countries shall state that the "Foundation should be regarded as the exclusive remedy for all claims against German companies arising out of the Nazi era." (American: Sullivan Decl. Ex. 6, 12/13/99 Clinton letter to Schroeder). [FN4] Deputy Secretary of the Treasury Stuart Eizenstat is the principal representative of the United States on these issues.

> FN4. Many of the exhibits appear in some or all of the various plaintiffs' papers. The court will only cite to one location of each

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 4
Not Reported in F.Supp.2d, 2000 WL 777978 (E.D.Cal.)
**(Cite as: 2000 WL 777978 (E.D.Cal.))**

exhibit.

A second organization, the International Commission on Holocaust Era Insurance Claims ("ICHEIC"), chaired by former Secretary of State Lawrence Eagleburger, was established as a voluntary organization between European regulators, major European insurance companies, representatives of Jewish and Holocaust survivor organizations, Israel, and the National Association of Insurance Commissioners in the United States. Generali and the Winterthur plaintiffs are members.

**\*3** The framework for the ICHEIC is set out in a Memorandum of Understanding ("MOU"). Among other things, the MOU provides that the ICHEIC shall conduct an investigatory process to determine the current status of insurance policies issued to Holocaust victims for which claims are filed with the ICHEIC and shall establish a claims process to settle and pay individual claims. (American: Sullivan Decl. Ex. 13, MOU). Eizenstat told the House Banking Committee that "[t]he U.S. Government has supported the International Commission on Holocaust Era Insurance Claims since it began, and we believe it should be considered the exclusive remedy for resolving insurance claims from the World War II era." (Winterthur: Grimm Decl. Ex. I, Eizenstat 2/9/00 at House Banking Committee hearing). [FN5] It is expected that the German Foundation will recognize the ICHEIC as the exclusive mechanism for resolving insurance claims. (Winterthur: Grimm Decl. Ex. I, Eizenstat 2/9/00 at House Banking Committee hearing). [FN6]

> FN5. Defendant objects that Eizenstat's statement lacks foundation and is inadmissible hearsay. At the preliminary injunction stage, however, the court may consider hearsay. "The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co., Inc. v. Harvey,* 734 F.2d 1389, 1394 (9th Cir.1984). Consequently, the court does not discuss each of defendant's evidentiary objections.

> FN6. The plaintiffs also discuss a 1995 agreement between the United States and Germany to "settle compensation claims by

certain United States nationals who suffered loss of liberty or damage to body or health as a result of National Socialist measures of persecution directly against them." This agreement provided for two separate payments by Germany in settlement of the claims. In return for the payments by the German government, the United States "declare[d] all compensation claims against the Federal Republic of Germany by United States nationals for damage within the meaning of [the Agreement] to be finally settled." This Agreement, although related in topic, is not directly applicable because it deals with claims against Germany, not against insurance companies, and does not appear to involve insurance claims.

C. *The Parties*

Plaintiffs in all four cases are insurance companies licensed to do business in California. Each set of plaintiffs alleges that the statutes are unconstitutional. In all four cases, defendant is Chuck Quackenbush in his capacity as the Commissioner of Insurance of the State of California.

1. *Gerling Global Reinsurance Corporation of America ("Gerling")*

Plaintiffs are five insurance companies licensed to do business in California. They are "related to" or "affiliated" with two German companies (Gerling-Konzern Allgemenine Versicherungs-AG ("GKA") and Gerling-Konzern Lebensversicherungs-AG ("GKL") that issued policies in Europe during the proscribed time period. Hence, they have to file reports. Gerling alleges that the HVIRA is unconstitutional under: (1) the constitutional grant of authority to the federal government over foreign affairs; (2) the Commerce Clause; (3) the Due Process Clause; (4) Bill of Attainder; (5) the Fourth Amendment; and (6) the Contracts Clause.

2. *American Insurance Association and American Re-Insurance Co. (together, "American")*

Plaintiffs are American Insurance Association ("AIA") and American Reinsurance Company ("AmRe"). AIA principally represents American insurance companies that did not issue insurance policies in Europe during the relevant period and do not own or control any companies that did. [FN7] Five members of AIA are related to European companies that issued the applicable policies. AmRe

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 5
Not Reported in F.Supp.2d, 2000 WL 777978 (E.D.Cal.)
**(Cite as: 2000 WL 777978 (E.D.Cal.))**

is a large insurance company licensed to do business in California. AmRe claims that neither it, nor any subsidiary or affiliate over which it has control, issued insurance policies that were in effect in Europe during 1920-1945.

> FN7. Assicurazioni Generali, a European Company, is also represented by American Insurance, but files its own motion for preliminary injunction.

American claims that the statutes are unconstitutional for three reasons: (1) the HVIRA treads on the federal government's exclusive power to conduct foreign relations; (2) the HVIRA violates the Foreign Commerce Clause; and (3) the HVIRA violates the Due Process clause.

### 3. *Winterthur International American Insurance Co., et al. (together, "Winterthur")*

**\*4** Plaintiffs are nine insurance companies licensed to do business in California. None of the companies ever issued insurance policies in Europe during the applicable time period, though each is "related" to such a company. Each plaintiff claims, however, that it is not in possession, custody, or control of any records pertaining to insurance companies sold by "related companies."

Winterthur argues that the HVIRA is unconstitutional because: (1) it is an unconstitutional invasion of the federal government's foreign affairs power; (2) it violates the Dormant Commerce Clause; (3) it violates the Due Process Clause; (4) it deprives plaintiffs of rights secured by the Equal Protection Clause; (5) it is an unconstitutional bill of attainder; and (6) implementation constitutes an unreasonable search and seizure.

### 4. *Assicurazioni Generali, S.p.A ("Generali")*

Generali is an Italian insurance company that issued insurance policies in Europe during the applicable time period. Generali is represented by the AIA, but has filed separately because it claims that the Insurance Commissioner has singled it out for attack, even though it has been paying insurance claims from Holocaust victims for the last several years.

Generali claims the HVIRA unconstitutionally violates the Due Process and Commerce Clauses and invades the foreign affairs power of the federal government.

### D. *Threatened Enforcement*

The Commissioner has actively threatened enforcement against all plaintiffs. He subpoenaed many insurance companies, including plaintiffs and those represented by plaintiffs, to appear at a hearing on December 1, 1999. At the hearing, Quackenbush informed the insurance companies, "[t]his issue will be resolved in California. I promised that for the last two years. And on April 6, th you're going to see just how serious California is if you have not complied with this law." (Generali: Tiberini Decl., Ex. 10, Transcript of 12/1/99 Investigatory Hearing, 14:16-20). He told Generali specifically, "I want you to take back to your officers in Italy and everywhere else, that you might want to consider seriously leaving the State, because it's obvious to me right now that you have no intention of complying with the law." (Generali: Tiberini Decl., Ex. 10, Transcript of 12/1/99 Investigatory Hearing, 49:12-16). At the end of questioning Generali, Quackenbush stated generally, "[i]t is your choice now whether you're going to work with this Department of Insurance to bring your company in full compliance, whether you're going to leave the state voluntarily, or whether I'm going to kick you out. That's your three choices." (Generali: Tiberini Decl., Ex. 10, Transcript of 12/1/99 Investigatory Hearing, 51:19-23).

## II. *Standard*

"To obtain a preliminary injunction, a party must establish either: (1) probable success on the merits and irreparable injury, or (2) sufficiently serious questions going to the merits to make the case a fair ground for litigation with the balance of hardships tipping decidedly in the movant's favor." *See Baby Tam & Co. v. City of Las Vegas,* 154 F.3d 1097, 1100 (9th Cir.1998). These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. *See id.* The movant has the burden of proving each element of either test. *See Prescott v. County of El Dorado,* 915 F.Supp. 1080, 1084 (E.D.Cal.1996).

**\*5** Under the doctrine of *Ex Parte Young,* 209 U.S. 123 (1908), it is appropriate for a party to move for a preliminary injunction in federal court against state officers "who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution...." *Id.* at 156. A preliminary injunction is particularly appropriate when the moving party is faced with a "Hobson's

Not Reported in F.Supp2d                                                                                      Page 6
Not Reported in F.Supp.2d, 2000 WL 777978 (E.D.Cal.)
**(Cite as: 2000 WL 777978 (E.D.Cal.))**

choice" of continuing to violate the law, thus exposing itself to huge liability, or to "violate the law once as a test case and suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381 (1992).

III. *Probability of Success on the Merits*

 Among them, the various plaintiffs make seven claims regarding the constitutionality of the statutes. They claim that the statutes violate: (1) the constitutional grant of authority to the federal government over foreign affairs (all parties); (2) Commerce Clause (all parties); (3) the Due Process Clause (all parties); (4) Bill of Attainder (Gerling and Winterthur); (5) the Fourth Amendment (Gerling and Winterthur); (6) the Contracts Clause (Gerling); and (7) Equal Protection (Winterthur). The court finds that plaintiffs have established a probability of success under the foreign affairs doctrine and the Commerce Clause. Accordingly, the court limits its analysis to these claims, and it is unnecessary to address the other claims.

 A. *Foreign Affairs*

 The framers of the Constitution made clear that the federal government was to have supreme power in the general field of foreign affairs. *See Hines v. Davidowitz,* 312 U.S. 52, 62 (1941). James Madison, in addressing the people of the State of New York, explained that the proposed Constitution contained a "class of powers, lodged in the general government, consist[ing] of those which regulate the intercourse with foreign nations.... This class of powers forms an obvious and essential branch of the federal administration. If we are to be one nation in any respect, it clearly ought to be in respect to other nations." Madison, *The Federalist Papers,* No. 42. Alexander Hamilton wrote, regarding the power of the federal judiciary over laws which involve the peace of the confederacy: "the peace of the WHOLE ought not be left at the disposal of a PART. The Union will undoubtably be answerable to foreign powers for the conduct of its members. And the responsibility for an injury ought ever be accompanied with the faculty of preventing it." Hamilton, *The Federalist Papers,* No. 80. [FN8]

> FN8. *See also The Federalist Papers* Nos. 3, 4. Here, John Jay discusses the importance of the national government in relation to keeping the peace with foreign powers.

 The Supreme Court has clarified the federal government's control over foreign affairs. "The Constitution entrusts [the nation's foreign affairs and international relations] solely to the Federal Government." *Zschernig v. Miller,* 389 U.S. 429, 436 (1968). "Power over external affairs is not shared by the States; it is vested in the national government exclusively." *United States v. Pink,* 315 U.S. 203, 233 (1942). "Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." *Hines,* 312 U.S. at 63.

 **\*6** *Zschernig* is the most recent case addressing the issue of foreign affairs. This case involved an Oregon probate law that conditioned inheritance rights of a nonresident alien upon the alien's ability to demonstrate that his country of origin would grant reciprocal rights to a U.S. citizen and would not confiscate any of the inherited property. *See Zschernig,* 389 U.S. at 430- 431. The Court held that the statute "affect[ed] international relations in a persistent and subtle way," *id. at 440,* had "great potential for disruption or embarrassment," *id. at 435,* and had "more than some incidental or indirect effect in foreign countries," *id. at 434.* Thus, the statute intruded into "matters which the Constitution entrusts solely to the Federal Government." *Id. at 436. [FN9]*

> FN9. The First Circuit applied and interpreted *Zschernig* in *National Foreign Trade Council v. Natsios,* 181 F.3d 38 (1st Cir.1999), *cert. granted,* 120 S.Ct. 525 (1999). There, the First Circuit declared unconstitutional a Massachusetts law which restricted the ability of Massachusetts and its agencies to purchase goods or services from companies that do business with Burma. *See id.* The First Circuit held that the law had "more than an incidental or indirect effect in foreign countries," *Natsios,* 181 F.3d at 52 (quoting *Zschernig,* 389 U.S. at 434), and a "great potential for disruption or embarrassment" as evidenced by the protests of America's trading partners, *id.* at 54 (quoting *Zschernig,* 389 U.S. at 435).

 1. *The HVIRA's Goal is International in Nature*

 The stated goal of the HVIRA is to exercise a power exclusively entrusted to the national government. The statute states that "[t]his chapter is necessary to ... encourage the development of a resolution to these

Not Reported in F.Supp.2d                                                                 Page 7
Not Reported in F.Supp.2d, 2000 WL 777978 (E.D.Cal.)
**(Cite as: 2000 WL 777978 (E.D.Cal.))**

[insurance claim] issues through the international process or through direct action by the State of California, as necessary." Cal. Ins.Code § 13801(f). Encouraging resolution through an international process clearly implicates matters of foreign affairs, and, as such, is a function vested in the national government.

2. *Effects on International Relations and Potential for Disruption and Embarrassment*

 Plaintiffs have demonstrated a probability that the HVIRA affects international relations. The United States federal government has been actively involved in compensating Holocaust victims since the end of World War II. In 1952, the United States was a party to a treaty among France, England, the United States, and Germany transferring to the Federal Republic of Germany the responsibility for implementing reparations. "The Federal Republic [of Germany] acknowledges the obligation to assure ... adequate compensation to persons persecuted for their political convictions, race, faith or ideology, who thereby have suffered damage to life, limb, health, liberty, property, their possessions or economic prospects (excluding identifiable property subject to restitution)." (Gerling: Appendix of Authorities, Ex. A, Transition Agreement, Ch. 4 ¶ 1). Since that treaty, the United States has been actively involved in Holocaust victims compensation efforts. The HVIRA has a strong potential of interfering with these efforts.

 First, the HVIRA has the real potential of frustrating the United States' efforts in negotiating the German Foundation. This Foundation, capitalized at close to $5 billion, will provide payments to victims of slave and forced labor as payments on asserted claims related to insurance, banking, taking of property, and medical experiments. On December 17, 1999, Secretary of the Treasury Stuart Eizenstat, the Special Representative of the Secretary of State and the President on Holocaust-Related Issues Senate Foreign Relations Committee, stated that "[i]n the context of a comprehensive German Foundation, in all cases, consensual and non consensual, brought against German companies for claims arising out of the Nazi-era, we are prepared to say that the German Foundation should be regarded as the exclusive remedy and that dismissal of such cases would be in our foreign policy interests." (American: Sullivan Decl. Ex. 11, 12/17/99 Press Release). [FN10] The German Foundation cannot be the exclusive remedy if California's HVIRA is also applicable.

   FN10. Defendant argues that the German

Foundation is not in place, and thus is not a federal policy. However, the very negotiation for a German Foundation dedicated toward compensation implicates foreign policy.

 *7 Second, the HVIRA has a potentially negative effect on the ICHEIC, which is a voluntary organization of European regulators, major European insurance companies, representatives of Jewish and Holocaust survivor organizations, Israel, and the National Association of Insurance Commissioners in the United States insurance companies. The ICHEIC investigates Holocaust era insurance policies and helps settle claims. Eizenstat wrote Quackenbush in November 1999 that the HVIRA "has the unfortunate effect of damaging the one effective means now at hand to process quickly and completely unpaid insurance claims from the Holocaust period, the International Commission on Holocaust Era Insurance Claims...." (American: Sullivan Decl. Ex. 24, 11/30/99 Eizenstat letter to Quackenbush). Further, Eizenstat informed Quackenbush, "you should know that actions by California, pursuant to this law, have already threatened to damage the cooperative spirit which the International Commission requires to resolve the important issue for Holocaust survivors." (American: Sullivan Decl. Ex. 24, 11/30/99 Eizenstat letter to Quackenbush). Eizenstat wrote Governor Davis on the same day, stating, "actions by California, pursuant to this law, have already potentially damaged and could derail both a settlement of forced and slave labor negotiations and the progress already achieved by the International Commission on Holocaust Era Insurance Claims...." (American: Sullivan Decl. Ex. 23, 11/30/99 Eizenstat letter to Governor Davis).

 Former Secretary of State Lawrence Eagleburger, the chair of the ICHEIC, testified that he believes that under the terms of the MOU under which the ICHEIC was organized, each insurance company that signed the MOU and is fully cooperating in the ICHEIC process "is entitled to receive, and should receive," an exemption from the enforcement of legislation such as the HVIRA. (Winterthur: Eagleburger Decl. ¶ 12). Section 10 of the MOU requires signatories to "work to achieve exemptions from related pending and future legislation ... for those insurers that become signatories to this MOU and which fully cooperate with the processes and funding of the IC." (Winterthur: Eagleburger Decl. Ex. A.). ICHEIC members include plaintiffs Winterthur and Generali.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 777978 (E.D.Cal.)
(Cite as: 2000 WL 777978 (E.D.Cal.))

Third, the HVIRA potentially conflicts with the January 29, 2000 Joint Statement issued by the United States and Swiss governments at the inaugural meeting establishing the Swiss-US Joint Economic Commission ("Joint Statement"). Specifically, in the Action Plan attached to the Joint Statement, the United States government promised to "call on the U.S. State insurance Commissioners and State legislative bodies to refrain from taking unwarranted investigative initiatives or from threatening or actually using sanctions against Swiss insurers." (Winterthur: Thalmann Supp. Decl. Ex. A, Joint Statement Action Plan at 3).

Finally, the HVIRA potentially conflicts with the national goal of creating "enduring legal peace." Eizenstat referred to this goal in his November 30, 1999 letter to Governor Davis. With regard to the German Foundation, Eizenstat stated, "[c]learly, for this deal to work ... German industry and German government need to be assured that they will get 'legal peace', not just from class-action lawsuits, but from the kind of legislation represented by the California Victim Insurance Relief Act." (American: Sullivan Decl. Ex. 23, 11/30/99 Eizenstat letter to Governor Davis). President Clinton and Secretary of State Madeline Albright each echoed this sentiment several weeks later as the negotiations for the German Foundation began to close. President Clinton, in a December 13, 1999 letter to Chancellor Schroeder, wrote that "the Foundation should be regarded as the exclusive remedy for all claims against German companies arising out of the Nazi era. [The executive agreement] will state further that both our countries desire all embracing and enduring legal peace to advance our foreign policy interests." (American: Sullivan Decl. Ex. 6, 12/13/99 Clinton letter to Schroeder). Albright, when addressing the Slave Labor Meeting in Berlin on December 17, 1999 stated in relation to the German Foundation that "[t]he United States is agreeing to assist in providing legal peace to German companies, both in our courts and from state and local action. To succeed in achieving legal peace, it is essential that the Foundation be comprehensive." (American: Sullivan Decl. Ex. 9, 12/17/99 Albright remarks).

**8** By conflicting so directly with the national government's policies and promises, the HVIRA not only affects international relations, but also has "great potential for disruption or embarrassment." *See Zschernig, 389 U.S. at 435.* The HVIRA is inconsistent with Eizenstat's statements regarding the German Foundation as the exclusive remedy for claims from the Nazi era. It conflicts with the

cooperative spirit of the ICHEIC, which the United States supports. The HVIRA makes the United States' promises in the U.S.-Swiss Joint Economic Statement appear to be unfulfilled. Finally, "legal peace" cannot be achieved if California and each of the other states are free to enact their own legislation forcing companies to report insurance policies or lose their license. *See* Cal.Code Ins. §§ 13800-13807.

Defendant argues that plaintiffs "have not demonstrated that the Holocaust Statutes have an actual direct impact on foreign relations. Indeed, plaintiffs cannot point to any federal policy enactments that the Holocaust Statutes must give way to." (Opp'n. at 84). Defendant then cites to the declarations of Robert Brown, the representative of the Minister of Israeli Society in the World Jewish Community, Linda Gerstel, a shareholder in a law firm representing Holocaust victims in class action insurance cases, and Leslie Tick, staff counsel to the Department of Insurance, and an attorney for defendant. [FN11] Brown states that he took part in the negotiations of the German Foundation settlement and claims that he does "not believe that the [HVIRA] interfered with the negotiations of the Germany Foundation settlement." (Opp'n.: Brown Decl. ¶ 6). Gerstel testified that she participated in the German Foundation negotiations and states that "[n]othing in the negotiations ... was intended to effect or nullify the powers of the State Insurance Commissioners or any related regulatory scheme including, but not limited to, legislation enacted in California." (Opp'n.: Gerstel Decl. ¶ 7). Tick described the formation of the ICHEIC and its work. Defendant has not made clear which portion of her lengthy declaration and exhibit supports defendant's claim.

FN11. Plaintiffs object on numerous grounds to parts of all three declarations. Because the court does not rely on the declarations, the court does not address the objections.

Defendant's argument is wholly unpersuasive. First of all, as discussed above, several policy makers in the Executive Branch have clearly stated the United States' position with regard to the compensation of Holocaust victims. The fact that several participants in the German Foundation negotiations stated that they do not think that negotiations were compromised by the California statutes is irrelevant. The German Foundation negotiations are simply an illustration of potential foreign affairs that could be affected by the HVIRA. In any case, even if the HVIRA did not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9
Not Reported in F.Supp.2d, 2000 WL 777978 (E.D.Cal.)
(Cite as: 2000 WL 777978 (E.D.Cal.))

actually affect the negotiations, it certainly has the potential to affect foreign affairs *and* it is embarrassing to the United States to have individual states enacting legislation inconsistent with Executive promises and negotiations. *See* Zschernig, 389 U.S. at 435. Thus, the HVIRA interferes with the national government's exclusive power over external affairs. *See* Pink, 315 U.S. at 233.

 *9 Second, there does not have to be a formally stated national policy in order for a state to impermissibly interfere with foreign affairs. Under *Zschernig,* a state statute that affected international relations in "a persistent and subtle way" was held unconstitutional for impacting the federal government's foreign affairs powers. Zschernig, 389 U.S. at 440.

 Finally, defendant's argument confuses the preemption doctrine with the foreign affairs power. A state cannot pass statutes that interfere with foreign affairs whether or not the national government has a stated policy. *See* Pink, 315 U.S. at 233 ("Power over external affairs is not shared by the States; it is vested in the national government exclusively.").

 Defendant cites to Clark v. Allen, 331 U.S. 503 (1947), in support of his argument that plaintiffs must articulate a specific national policy violated by the HVIRA. *Clark,* however, does not stand for such a proposition. In *Clark,* the Supreme Court held that, generally, rights to succession are determined by local law. However, those rights may be affected by an overriding federal policy. *See id.* at 517. In *Clark,* the Court did not find an overriding federal policy, nor did the Court find that the statute had anything more than an "incidental and indirect effect in foreign countries." *See id.* Therefore, the statute did not impermissibly intrude on foreign affairs powers. *Clark* did not require that there be an overriding federal policy. The Supreme Court simply found that there was none.

 Defendant further argues that the German Foundation and the ICHEIC are not as comprehensive as the HVIRA with regard to reporting. Defendant points out that the German Foundation does not have a reporting requirement and that the ICHEIC, as a voluntary organization, does not encompass all the insurance companies addressed by the HVIRA. These assertions may be true. However, foreign affairs remains the province of the national government; the states do not have authority to fill in perceived gaps in international measures as they see fit. The United States must be able to speak with one voice on matters of international concern.

 3. *More than an Incidental Effect on Foreign Countries*

 Defendant argues that the effect is on foreign companies, not foreign governments, and thus the HVIRA does not violate the foreign affairs policy. The language of *Zschernig* requires that the statute have "more than some incidental or indirect effect in foreign *countries,"* not foreign governments. Zschernig, 389 U.S. at 434. "Experience has shown that international controversies of the gravest moment, sometimes even leading to war, may arise from real or imagined wrongs to another's subjects inflicted, or permitted by a government." Zschernig 389 U.S. at 441 (quoting Hines 312 U.S. at 64).

 Plaintiffs have demonstrated a probability of success in showing that the HVIRA has more than some incidental effect in foreign countries. In addition to the interference with foreign commerce and the interference with foreign relations, the immediate effect of the statute is to require foreign companies to do an extensive search of warehouses and then compile a massive report, even if the company's only connection with California is through a subsidiary.

 *10 Plaintiffs have also raised a serious issue that the statutes are in conflict with some European Privacy laws. For example, in its Amicus brief, the Federal Republic of Germany argues that the disclosure of information and documentation by German insurers to the California Insurance Department without the express authorization of policyholders or their beneficiaries could place the German insurers in violation of the Bundesdatenschutzgesetz (German Federal Data Protection Act, "BDSG"). Federal Republic of Germany Amicus Brief at 6). Violation of the BDSG "may result in criminal as well as civil penalties." (Federal Republic of Germany Amicus Brief at 6). Gerling submits the Declaration of Dr. Spiros Simitis, a professor at Yale Law School and a former Data Protection Commissioner of the German State of Hesse. After an extensive analysis of the BDSG, Simitis states that "under present conditions, [Gerling's] German affiliates are not allowed to transfer the data requested." (Gerling: Reif Decl. Ex. 10, Simitis Decl. ¶ 28). [FN12]

      FN12. Simitis also notes that European Union has a Data Protection Directive which "explicitly affirms the individual's right to determine the use of her or his data."

(Gerling Reif Decl. Ex. 10, Simitis Decl. ¶ 11).

Defendant argues that in fact, the HVIRA and related statutes do not conflict with the BDSG. Defendant submits the declaration of Paul Schwartz, a professor at Brooklyn Law School. Schwartz states that he has been recognized as an expert on data protection law. He disagrees with Simitis' final conclusion and gives his own lengthy interpretation of the BDSG. (Opp'n.: Schwartz Decl. ¶ 6). [FN13]

> FN13. Defendant also argues that the ICHEIC has already published the names of some German companies policyholders on its website. Defendant argues that it "defies logic" that the ICHEIC would violate German laws. The question is not before the court as to whether the ICHEIC's actions violated German laws.

There is an obvious dispute as to whether the HVIRA conflicts with the German BDSG and other European laws. The very fact that a state law requires a foreign company to do something that arguably violates the laws of the countries in which it is incorporated or does business shows that the law has an effect on international relations which is more than "incidental."

Plaintiffs have made a persuasive showing that the HVIRA interferes with foreign relations, has great potential for disruption or embarrassment, and has more than an incidental effect in foreign countries. Accordingly, plaintiffs have shown a probability of success on their claim that the HVIRA interferes with the federal government's control over foreign affairs. [FN14]

> FN14. Defendant cites *Trojan Technologies v. Commonwealth of Pennsylvania,* 916 F.2d 903 (3rd Cir.1990) in an attempt to distinguish *Zschernig.* In *Trojan,* the Third Circuit examined a Pennsylvania "buy American" statute. This statute required agencies of the Commonwealth when constructing public works to include a provision in all contracts that steel used in the projects must be produced in the United States. *See id.* at 904. The Third Circuit found this statute did not interfere with the federal government's exercise of the Foreign Affairs power because "[t]he Pennsylvania statute exhibits none of the dangers attendant on the statute reviewed in

*Zschernig." Id.* at 913. The Third Circuit noted that the statute was evenhanded in its application, applying to steel from any foreign source "without respect to whether the source country might be considered friend of foe." *Id* . Here, while the HVIRA is arguably evenhanded, it does exhibit other "dangers" not at issue in *Trojan,* and thus violates the Foreign Affairs power. Among other things, the HVIRA is inconsistent with several of the national government's statements, policies, and promises, and it potentially violates foreign laws. Thus, it affects foreign relations, is potentially disruptive and embarrassing, and has more than incidental effects in foreign countries.

## B. *Commerce Clause*

The Commerce Clause reserves to Congress the right "to regulate commerce with foreign Nations, and among the several States...." U.S. Const. art. 1, § 8, cl. 3. "[E]ven in the absence of specific action taken by the Federal Government," the Commerce Clause limits the powers of states to enact laws regulating interstate or foreign commerce. *Wardair Canada, Inc. v. Florida Dep't. of Revenue,* 477 U.S. 1, 7-8 (1986).

### 1. *McCarran-Ferguson Act*

State regulation and taxation of insurance is often excepted from Commerce Clause restrictions through the McCarran-Ferguson Act. This Act was passed in the wake of *United States v. South-Eastern Underwriters Association,* 322 U.S. 533 (1944), which held that insurance is "commerce" within the meaning of the Commerce Clause. *See Western and Southern Life v. State Board of Equalization of Cal.,* 451 U.S. 648, 653-654 (1981). Congress, believing "that the business of insurance is 'a local matter, to be subject to and regulated by the laws of the several States," ' enacted the McCarran-Ferguson Act, which Congress intended to restore state taxing and regulatory powers over the insurance business to their pre *South-Eastern Underwriters* scope. *See id.* at 654 (quoting H.R.Rep. No. 143, 79 th Cong., 1 st Sess., 2). Specifically, the Act states, "[t]he business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business." 15 U.S.C. § 1012(a).

**\*11** Defendant thus argues that the HVIRA is exempted from Commerce Clause restrictions by the

McCarran-Ferguson Act. The HVIRA, however, does not appear to fall within the scope of regulations intended to be exempted by the Act.

In *Federal Trade Commission v. Travelers Health Association,* 362 U.S. 293 (1960), the Supreme Court held that the Federal Trade Commission could issue a cease and desist order against certain insurance practices by a Nebraska insurance company. The company's activities, selling insurance through an interstate mail order insurance business, were extraterritorial, and thus were not regulated by state law within the meaning of the McCarran-Ferguson Act. *See id. at 298.* Thus, the insurance practices were not immune from federal control. The court stated that it is clear from the debate surrounding the implementation of the McCarran-Ferguson Act "that Congress viewed state regulation of insurance solely in terms of regulation by the law of the State where occurred the activity sought to be regulated. There was no indication of any thought that a State could regulate activities carried on beyond its own borders." *Id.* at 300.

The Ninth Circuit discussed the holding in *Travelers* in its opinion in *In re Insurance Antitrust Litigation v. Ace Check Cashing Inc.,* 938 F.2d 919 (1991), *aff'd in part, rev'd in part* by *Hartford Fire Ins. Co. v. California,* 509 U.S. 764 (1993). "[E]stablished law blocks regulation by one state of the United States of the insurance business outside the borders of that state." *Id.* at 928. "[A] state does not have power to regulate in any way contracts of insurance or reinsurance entered into outside its jurisdiction even though the risks covered were risks within the state." *Id.*

Here, the HVIRA attempts to regulate the decision making authority of European insurance companies to pay or not to pay claims on European policies. *See* Cal. Ins.Code § 13801(f) ("This chapter is necessary to ... encourage the development of a resolution to these [Holocaust era insurance claim] issues through the international process or through direct action by the State of California."). The HVIRA specifically asks for information about insurance policies sold "directly or through a related company, to persons in Europe, which were in effect between 1920 and 1945." Cal. Ins.Code § 13804(a). Clearly the "State where occurred the activity sought to be regulated" was not California. *Travelers,* 362 U.S. at 300.

Further, in discussing the passage of the McCarran-Ferguson Act, the Supreme Court stated, "[o]ne of the major arguments advanced by proponents of

leaving regulation to the States was that the States were in close proximity to the people affected by the insurance business and, therefore, were in a better position to regulate that business than the Federal Government." *Id. at 302.* Although some of the people affected by the HVIRA may now be California residents, the HVIRA makes no distinction between reporting insurance policies related to California residents and insurance policies related to residents of any other state or foreign county. There is no legitimate reason why California should regulate the reporting of these policies.

**\*12** Under *SEC v. National Secur. Inc.,* 393 U.S. 453, 460 (1969), licensing companies is considered the "business of insurance" within the meaning of the McCarran-Ferguson Act. However, the gist of the HVIRA is not about licensing insurance companies, but rather about forcing companies to report on insurance policies issued in Europe and using the threat of license suspension as an enforcement mechanism.

The McCarran-Ferguson Act does not insulate the HVIRA from analysis under the Commerce Clause.

2. *Violations of the Commerce Clause*

Plaintiffs have shown a probability that the HVIRA violates the Commerce Clause. Although there is only one Commerce Clause, "state restrictions burdening foreign commerce are subjected to a more rigorous and searching scrutiny" than are regulations on interstate commerce. *South-Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 100 (1984). The section of the commerce clause dealing with foreign commerce is often referred to as "the Foreign Commerce Clause."

a. *One Voice*

The Foreign Commerce Clause is a subset of the broader foreign affairs powers discussed above. "Foreign commerce is pre-eminently a matter of national concern." *Japan Line, LTD. v. County of Los Angeles,* 441 U.S. 434, 448 (1979). "In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power." *Id.* "The Federal Government must speak with one voice when regulating commercial relations with foreign governments." *Id.*

The HVIRA potentially prevents the federal government from speaking with one voice in its

Not Reported in F.Supp.2d                                                                                    Page 12
Not Reported in F.Supp.2d, 2000 WL 777978 (E.D.Cal.)
**(Cite as: 2000 WL 777978 (E.D.Cal.))**

expectations of foreign insurance companies. Under the HVIRA, foreign insurance companies must conduct an extensive and thorough search for records. *See* Cal. Ins.Code § § 13804(a) and 13804(b). Further, the companies must certify whether or not claims of Holocaust victims have been paid, and must certify whether or not they have searched for the victims. *See* Cal. Ins.Code § 13804(b). These demands emanate not from the national government, but from an individual state, and would be in conflict with the national government's promises to Germany that the German Foundation would be the exclusive relief for claims from Holocaust victims. [FN15]

> FN15. Defendant points out that commerce is controlled by Congress, not the Executive Branch. *See Barclays Bank v. Franchise Tax Bd.,* 512 U.S. 298, 329 (1994). However, Congress "may delegate very large grants of its power over foreign commerce to the President, who also possesses in his own right certain powers conferred by the Constitution on him as Commander-in-Chief and as the Nation's organ in foreign affairs." *Id.* (internal quotations omitted).

3. *Commerce Outside State Borders*

 The Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy v. Beer Ins.,* 491 U.S. 324 (1989). Defendant argues that the commerce does not take place wholly outside of California's borders. "The critical question is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Id.* (citing *Brown Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 579 (1986).

 **\*13** The practical effect of the HVIRA is that insurance companies that sold policies during the applicable time period must make an extensive search of their warehouses to come up with a list of individuals that might include Holocaust victims. It is common sense that most, if not all, of the companies that sold policies in Europe from 1920-1945 were European. They are being asked to gather voluminous European records of policies sold to Europeans and to report these records to California. The required records are not in any way tailored toward California citizens. The only connection to California is that the statute is enforced by taking away the company's or its affiliate's California

license and the reporting is done to California. Clearly, California is meddling in foreign commerce entirely outside its borders.

 Plaintiffs have shown a probability of success on the merits that the HVIRA violates the Commerce Clause.

C. *Other Constitutional Claims*

 Because the court finds that plaintiffs have demonstrated a probability of success on the merits that the HVIRA is unconstitutional based on a violation of the federal foreign affairs power and a violation of the Commerce Clause, the court does not address the remaining constitutional issues.

IV. *Irreparable Injury*

 It is the plaintiff's burden to demonstrate that the balance of irreparable harm favors the plaintiff. *See Carribean Marine Servs. Co. v. Baldridge,* 844 F.2d 668, 674 (9th Cir.1988). "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction .... a plaintiff must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief." Plaintiffs have met this burden.

 The required reports under California Insurance Code section 13804 were due April 7, 2000. *See* Cal.Code Regs. § 2278. Under section 13806, if the parties did not file the reports by May 7, 2000, the Commissioner "shall suspend the certificate of authority to conduct insurance business in the state." Cal. Ins.Code § 13806.

 Plaintiffs have demonstrated that suspension of their licenses to practice insurance in the state of California would cause them irreparable harm. Such suspension could undermine the goodwill of the company because the market may infer that the company is unstable. Further, a suspension would prevent plaintiffs from being able to renew contracts for their existing policy holders causing further loss of goodwill. *See Rent-a-Center, Inc. v. Canyon Television and Appliance,* 944 F.2d 597, 603 (9th Cir.1991) (affirming preliminary injunction and holding that damage to the goodwill of a business supports a finding of irreparable injury).

 In addition, suspension is likely to cause reputational injury resulting in a loss of market share. *See United Services Automobile Ass'n v. Muir,* 792 F.2d 356, 362 (3rd Cir.1986). Suspension might suggest

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 13
Not Reported in F.Supp.2d, 2000 WL 777978 (E.D.Cal.)
**(Cite as: 2000 WL 777978 (E.D.Cal.))**

marketplace fraudulent or illegal activity or financial instability. *See id.* Plaintiffs point out that suspending their licenses will imply publicly that the companies are implicated with the wrongdoings of the Holocaust, has acted illegally, or is not financially sound. Indeed, the Commissioner has already made such implications. For example, the California Department of Insurance has a website. One page is dedicated to Winterthur. Next to Winterthur is a picture of a concentration camp. The caption reads, "This company is an affiliate of one of what could be many companies that have outstanding, unpaid claims owed to Holocaust survivors, their heirs and beneficiaries, for life and property loss resulting from the atrocities committed during the Holocaust. It is time for justice." (Winterthur: Smith Decl. Ex 1; *http://www.insurance.ca.gov/docs/FS-Holocau st.htm.* Suspending Winterthur's license would further implicate the company, causing irreparable harm. *See Ross-Simons, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 20 (1st Cir.1996)* ("By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable.").

**\*14** The public interest is also an important factor to be considered in a suit for injunctive relief affecting the public interest. *See Miller v. California Pac. Med. Ctr.,* 991 F.2d 536, 540 (9th Cir.1993).* If plaintiffs' licenses are suspended, the companies would not be able to write any new business in California. Although they would be obligated to service claims on existing policies until those policies expired by their natural terms, the companies would not be able to modify or renew the existing policies. For example, if a policyholder wanted to increase her policy limits, she would not be able to do so.

In many cases, the existing policy will expire within the year. At the end of the year, policyholders will be scrambling to find new insurers. This task could become more difficult due to the decreased number of insurance companies in the state as a result of the suspension provisions of the HVIRA.

Finally, license suspension would undoubtably affect the insurance companies' employees. Companies that could no longer write policies in California would likely have to lay off or fire their employees engaged in underwriting and sales. Plaintiffs have demonstrated that irreparable harm will likely occur if the HVIRA is enforced.

V. *Conclusion*

None of the plaintiffs deny that the Holocaust was a terrible atrocity. And none of the plaintiffs deny that the victims and their heirs and beneficiaries should be compensated to the extent possible. However, even though the end goal of such compensation is laudable, this goal may not be achieved through unconstitutional means. Plaintiffs have shown a probability of success on the merits of their claim and have shown that irreparable harm will occur if the court does not enjoin enforcement of the HVIRA.

IT IS THEREFORE ORDERED that plaintiffs motions for preliminary injunction be, and the same hereby are, GRANTED.

Pending final judgment in these actions, defendant is enjoined from enforcing the provisions of the Holocaust Victim Insurance Relief Act and the accompanying regulations. Cal. Ins.Code § § 13800-13807 and Cal.Code Regs. § § 2278-2278.5.

Not Reported in F.Supp.2d, 2000 WL 777978 (E.D.Cal.)

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 2657449 (Trial Motion, Memorandum and Affidavit) Defendant's Opposition to the Winterthur Plaintiffs' Motion to Entertain Rule 60(b)(5) Motion Before Issuance of Mandate (Aug. 18, 2005)Original Image of this Document with Appendix (PDF)

• 2000 WL 35305869 (Expert Report and Affidavit) Declaration of Professor Dr. Hans Peter Bull (May 3, 2000)Original Image of this Document (PDF)

• 2000 WL 35303166 (Expert Report and Affidavit) Declaration of Paul M. Schwartz (May 2, 2000)Original Image of this Document (PDF)

• 2000 WL 35303165 (Expert Report and Affidavit) Declaration of Lawrence S. Eagleburger (Apr. 24, 2000)Original Image of this Document (PDF)

• 2:00CV00875 (Docket) (Apr. 20, 2000)

• 2:00CV00779 (Docket) (Apr. 10, 2000)

• 2:00CV00613 (Docket) (Mar. 22, 2000)

• 2:00CV00506 (Docket) (Mar. 09, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **EXHIBIT E**



**Motions, Pleadings and Filings**

United States District Court,
S.D. New York.
H-QUOTIENT, INC., Plaintiff,
v.
KNIGHT TRADING GROUP, INC. and Knight
Securities, L.P., Defendants.
**No. 03 Civ. 5889(DAB).**

Feb. 9, 2005.

*MEMORANDUM AND ORDER*

BATTS, J.

**\*1** Before the Court is a Motion to Remand to the Supreme Court of the State of New York, County of New York by Plaintiff H-Quotient, Inc. ("H-Quotient"). Plaintiff also seeks to recover the costs incurred as a result of the removal.

For the reasons stated herein, Plaintiff's Motion to Remand is DENIED and Plaintiff's Request for the Recovery of Costs is DENIED.

## I. BACKGROUND

Plaintiff H-Quotient, a Virginia corporation, is a developer and publisher of software producers for the hospital and health care industry. (Compl.¶ ¶ 1- 2.) Plaintiff's common stock is publicly traded and quoted on the Over the Counter Bulletin Board ("OTCBB"), an electronic trading service used by many small companies, that transmits real-time information of over-the-counter securities. OTCBB is operated and regulated by the National Association of Securities Dealers ("NASD"), a not-for-profit, self-regulatory organization of the securities industry authorized to do business in New York. (Id.¶ ¶ 9-10.)

Defendants Knight Trading Group, Inc. and Knight Securities, L.P. (collectively "Defendants"), Delaware organizations authorized to do business in New York and with their principal places of business in New Jersey and New York, acted as a broker and dealer for securities of companies quoted on the OTCBB. (Id.¶ 3, 4, 11.) Defendants served as market makers for the stock of Plaintiff, [FN1] which

involved "act[ing] on behalf of other brokerage houses by contracting with other stock brokerages to buy and sell Plaintiff's stock on behalf of such other stock brokerage's clients." (Id.¶ 15.) Simply put, Defendants held a certain number of shares of Plaintiff's stock in order to facilitate trading of the stock.

> FN1. T.D. Waterhouse Investor Services, Inc. and T.D. Waterhouse Capital Markets, Inc. also acted as a market maker for Plaintiff's stock. Claims against them were dismissed by Order of Dismissal, dated Dec. 3, 2003.

Plaintiff commenced this action in New York State Supreme Court, County of New York on July 29, 2003. [FN2] The Complaint alleges that Defendants took part in "the improper and illegal 'naked short' sale of Plaintiff's stock and the 'front-running' of Plaintiff's stock, *i.e.,* executing orders for their own account before filling orders received by customers, all to the detriment of Plaintiff, Plaintiff's stockholders and to the market for Plaintiff's stock in general." (Id.¶ 18.)

> FN2. On or about that same day, Plaintiff made an application by Order To Show Cause to Justice Karla Moskowitz, seeking a preliminary injunction to refrain Defendants from engaging in certain securities practices. Justice Moskowtiz signed the Order on July 31, 2003.

The Complaint raises three causes of action that sound in New York common law of torts, namely breach of duty to deal honestly with Plaintiff, attempt to damage the business of Plaintiff, and attempt to injure the character and business reputation of Plaintiff. Plaintiff also alleges a violation of New York General Business Law § 340, a New York antitrust statute known as the Donnelly Act.

On August 6, 2003, Defendants timely filed a Notice of Removal to the United States District Court for the Southern District of New York. Defendants assert that there is federal jurisdiction over this matter because the above-mentioned claims actually arise under federal securities and antitrust laws. Plaintiff filed the present Motion to Remand on September 16, 2003, pursuant to 28 U.S.C. § 1447. Plaintiff also

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 323750 (S.D.N.Y.), 2005-1 Trade Cases  P 74,722
**(Cite as: 2005 WL 323750 (S.D.N.Y.))**

seeks to recover the costs incurred as a result of the removal. Defendants filed their Memorandum in Opposition to the Motion to Remand on January 27, 2004.

## II. DISCUSSION

### A. Legal Standards

**\*2** "[A]ny civil action brought in a State court of which the districts courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the ... district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). "Absent diversity of citizenship, federal-question jurisdiction is required." *Caterpillar Inc. v. Williams,* 482 U.S. 386, 392 (1987); *see also* 28 U.S.C. § 1441(b); *Beneficial Nat'l Bank v. Anderson,* 539 U.S. 1, 6 (2003). Any doubts as to whether federal jurisdiction exists are to be resolved against removability. *Lupo v. Human Affairs Int'l,* 28 F .3d 269, 274 (2d Cir.1994) (quoting *Solmlyo v. J. Lu-Rob Enters., Inc.,* 932 F.2d 1043, 1045-46 (2d Cir.1991)). Furthermore, the party seeking removal bears the burden of establishing federal jurisdiction. *See United Food & Commercial Workers Union v. CenterMark Properties Meriden Square, Inc.,* 30 F.3d 298, 301 (2d Cir.1994).

Federal jurisdiction exists when a "case falls within the original 'federal question' jurisdiction of the United States district courts." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 8 (1983); *Perpetual Sec., Inc. v. Tang,* 290 F.3d 132, 136 (2d Cir.2002). Federal district courts "have jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331; *see also Beneficial Nat'l Bank,* 539 U.S. at 6.

The presence of federal question jurisdiction is governed by the well-pleaded complaint rule. *See Metro. Life Ins. Co. v. Taylor,* 481 U.S. at 58, 63 (1987). "[W]hether a case is one arising under the Constitution or a law or treaty of the United States, ... must be determined from what necessarily appears in the plaintiff's statement of his own claim ... unaided by anything alleged in anticipation or avoidance of defenses which it is thought the defendant may interpose." *Taylor v. Anderson,* 234 U.S. 74, 75-76 (1914); *see also Caterpillar Inc.,* 482 U.S. at 392 (1987). If a complaint only "alleges ... state law based causes of action, it cannot be removed from state court to federal court even if there is a federal defense." *Hernandez v. Conriv Realty Associates,* 116 F.3d 35, 38 (2d Cir.1997) (citing *Caterpillar Inc.,*

482 U.S. at 392-93); *see Franchise Tax Bd.,* 463 U.S. at 14 ("since 1887 it has been settled law that a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties admit that the defense is the only question truly at issue in the case."). The well-pleaded complaint rule "makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." *Caterpillar,* 482 U.S. at 392.

Two exceptions exist to the well-pleaded complaint rule: the complete preemption [FN3] and artful pleading doctrines. [FN4]

> FN3. Courts often comment that the complete preemption doctrine is not really an exception to the well-pleaded complaint rule, but rather a corollary, because whenever the doctrine applies, the well-pleaded complaint rule is satisfied. *Caterpillar,* 482 U.S. at 393; *Marcus v. AT & T Corp.,* 138 F.3d 46, 53 (2d Cir.1998).

> FN4. The artful pleading doctrine is also more properly styled a "corollary" rather than an exception.

**\*3** In certain instances, courts have found that Congress "so completely preempt[ed] a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Metro. Life,* 481 U.S. at 63-64. Therefore, in such cases, removal is proper under 28 U.S.C. § 1441(b), which authorizes any claim that "arises under" federal law to be removed to federal court. *See Beneficial Nat'l Bank,* 539 U.S. at 8; *Caterpillar,* 482 U.S. at 392-93. The Supreme Court has found complete preemption in only three categories of cases: (1) certain claims under the Labor Management Relations Act, *see Beneficial Nat'l Bank,* 539 U.S. at 8; (2) suits brought by a beneficiary under Employment Retirement Income Security Act of 1974, *see id.;* and (3) Indian land grant rights, *see Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 666-67 (1974). Recently, the Second Circuit also found complete preemption for cases arising under the Securities Litigation Uniform Standards Act. *See Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 332 F.3d 116, 124 n. 5 (2d Cir.2003). The Court of Appeals noted, however, that "the complete preemption doctrine must be applied sparingly and with great restraint." *Id.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Another "exception" to the well-pleaded complaint rule is the artful pleading doctrine. Under this doctrine, a plaintiff may not avoid removal "by framing in terms of state law a complaint the real nature of [which] is federal, ... or by omitting to plead necessary federal questions in a complaint." *Fax Telecommunicaciones Inc. v. AT & T,* 138 F.3d 479, 486-87 (2d Cir.1998) (quoting *Derrico v. Sheehan Emergency Hosp.,* 844 F.2d 22, 27 (2d Cir.1988)); *see also Marcus,* 138 F.3d at 55-56. Thus, removal is proper if "the elements of the [state law] claim [a]re virtually identical to those of a claim expressly grounded on federal law." *Travelers Indem. Co. v. Sarkisian,* 794 F.2d 754, 760 (2d Cir.1986); *see also In re NASDAO Market Makers Antitrust Litigation,* 929 F.Supp. 174, 178 (S.D.N.Y.1996) (interpreting *Sarkisian* ).

Where there is a proper basis for removal, a federal district court has jurisdiction over the civil action as well as supplemental jurisdiction over "all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). The district court, however, may decline to exercise supplemental jurisdiction over a claim if (1) the claim raises novel or complex issues of state law, (2) the state law claim "substantially dominates" over the federal claim, (3) the district court has dismissed all federal claims, or (4) there are other compelling reasons to decline jurisdiction. 28 U.S.C. § 1367(c)(1)-(4).

**B. Analysis**

In the present case, Plaintiff argues that this Court lacks subject matter jurisdiction and therefore must remand the action back to state court. Defendants bear the burden of demonstrating that this case is properly in federal court.

**\*4** Although the Parties in this case are diverse, removal is not proper based on diversity jurisdiction because Defendant Knight Trading Group, Inc. is a citizen of New York. *See* 28 U.S.C. § 1441(b) ("Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."). Therefore, Defendants must show that this Court has federal question jurisdiction over the subject matter of this action.

Defendants argue that federal question jurisdiction exists for the following reasons: (1) Plaintiff's claims based on naked short-selling arise under federal

securities law, (2) Congress has completely preempted Plaintiff's claims with federal securities laws, and (3) Plaintiff has artfully pleaded an alleged federal antitrust violation as a claim under New York's Donnelly Act.

**1. The Donnelly Act and Federal Antitrust Violation**

Defendants argue that Plaintiff artfully pleaded its state antitrust claim under the Donnelly Act to prevent a federal claim under the Sherman Act, 15 U.S.C. § 7 *et seq.* According to Defendants, interstate commerce dominates the allegations in Plaintiff's complaint and Plaintiff makes no contentions that intrastate conduct, namely New York's local interests, were at all affected by Defendants' conduct. In Defendants' views, the resolution of this claim will turn upon a determination of whether it violated federal law by conducting an interstate conspiracy to restrain trade in an over-the-counter securities exchange market.

According to the Donnelly Act, contracts, or agreements for monopoly or in restraint of trade are illegal and void for those monopolies "in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. General Business Law § 340(1).

The New York Court of Appeals has not clearly laid out in what circumstances the Donnelly Act is preempted by the federal antitrust trust, the Sherman Act. However, New York courts have determined that "Where the conduct complained of principally affects interstate commerce, with little or no impact on local or intrastate commerce, it is clear that federal antitrust laws operate to preempt the field and oust state courts of jurisdiction." *Two Queens, Inc. v. Scoza,* 745 N.Y.S.2d 517, 519 (1st Dep't.2002); *see also In re Wiring Device Antitrust Litigation,* 498 F.Supp. 79, 82 (E.D.N.Y.1980) (stating that where interstate commerce is involved, federal antitrust laws preempt the Donnelly Act) (citing *Beltone Electronics Corp. v. Selbst,* 1977-2 Trade Cases CCH PP 61,586, 72,387 (Sup.Ct.N.Y.Co.1977), *aff'd mem.,* 403 N.Y.S.2d 1019 (1st Dep't.1978)); *Flood v. Kuhn,* 443 F.2d 264, 268 (2d Cir.1971), *aff'd,* 407 U.S. 258 (1972) (court held that because burden on interstate commerce outweighs states' interests in regulating baseball's reserve system, Commerce Clause precludes application of state antitrust law).

**\*5** In this case, the participants of any alleged Donnelly Act violation are Defendants, Delaware organizations and a New Jersey market maker with

Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 2005 WL 323750 (S.D.N.Y.), 2005-1 Trade Cases  P 74,722
**(Cite as: 2005 WL 323750 (S.D.N.Y.))**

their principal places of business in New York and New Jersey, and another New York based company. [FN5] Further, the conspiracy is directed at an electronic, over-the-counter securities exchange, operated by the NASD, a foreign corporation authorized to do business in New York. The stock at issue is that of Plaintiff's, a Virginia corporation with its principal place of business in Virginia. Plaintiff has not put forth any specific allegations in its pleadings of impact on intrastate commerce.

> FN5. As stated above, Plaintiff voluntarily dismissed its claims against the alleged co-conspirators, T.D. Waterhouse.

It appears to the Court that any of the activities alleged to have been committed by Defendants primarily affected interstate commerce. Defendants were dealing with the sale of stocks in a Virginia company, and did not limit its business to any particular state. Defendants are "unquestionably engaged in interstate commerce, [so] those who are damaged from an alleged restraint of trade find a remedy in the federal, not the state antitrust laws." *In re Wiring Device*, 498 F.Supp. at 82.

The Court finds that Plaintiff's fourth cause of action, alleging a Donnelly Act violation, actually arises under the federal antitrust statute, the Sherman Act.

Because federal question jurisdiction exists based on the Sherman Act, the Court will not address the remaining arguments against remand set forth by Defendants.

Plaintiff's remaining claims arise out of the Defendants' alleged "scheme" to drive down the price of its securities through naked short-selling. Hence, they all "derive from a common nucleus of operative fact ... such that [a plaintiff] would ordinarily be expected to try them all in one proceeding." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). Because there is federal jurisdiction under the Sherman Act, this Court may retain supplemental jurisdiction over the state law claims. These claims are standard common law claims. None are novel or complex in any way, nor do the state law claims predominate over the federal claims.

### III. CONCLUSION

Based on the foregoing reasons, this Court hereby DENIES Plaintiff's Motion to Remand to state court and DENIES Plaintiff's Request for the Recovery of Costs.

Defendants shall answer the Complaint within 30 days of the date of this Order.

SO ORDERED.

Not Reported in F.Supp.2d, 2005 WL 323750 (S.D.N.Y.), 2005-1 Trade Cases  P 74,722

**Motions, Pleadings and Filings (Back to top)**

• 1:03cv05889 (Docket) (Aug. 06, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**<u>EXHIBIT F</u>**

Westlaw.

Not Reported in F.Supp.2d, 2003 WL 22070561 (D.Md.), 2003-2 Trade Cases P 74,138
**(Cite as: 2003 WL 22070561 (D.Md.))**

H

**Motions, Pleadings and Filings**


United States District Court,
D. Maryland.
In re MICROSOFT CORP. ANTITRUST
LITIGATION
John ROBY
v.
MICROSOFT CORPORATION
Michael LEWIS
v.
MICROSOFT CORPORATION
Henry MASCAGNI
v.
MICROSOFT CORPORATION
Hayley J. GARDNER
v.
MICROSOFT CORPORATION
Steve GRUBB
v.
MICROSOFT CORPORATION
Linda STEWART
v.
MICROSOFT CORPORATION
Murline ADDINGTON
v.
MICROSOFT CORPORATION
Travis D. MCHANN
v.
MICROSOFT CORPORATION
Billy LEWIS
v.
MICROSOFT CORPORATION
Booker T. BAILEY
v.
MICROSOFT CORPORATION
James PIGG
v.
MICROSOFT CORPORATION
Angela BRINKLEY
v.
MICROSOFT CORPORATION
Delanious HARRIED
v.
MICROSOFT CORPORATION
Gertrude GREEN
v.
MICROSOFT CORPORATION

Camelia CALVERT
v.
MICROSOFT CORPORATION
Mary WYATT
v.
MICROSOFT CORPORATION
**Nos. MDL 1332, Civ. JFM-03-741, Civ. JFM-03-742, Civ. JFM 03-743, Civ. JFM 03-744, Civ. JFM-03-745, Civ. JFM-03-746, Civ. JFM-03-747, Civ. JFM-03-748.**

Aug. 22, 2003.

Steven J. Aeschbacher, Thomas W. Burt, Richard J. Wallis, Microsoft Corporation, Redmond, WA, Joseph E. Neuhaus, Sullivan and Cromwell, David B. Tulchin, Sullivan and Sullivan, New York, NY, for Microsoft Corporation.

Brent H. Hazzard, Hazzard Law, Christopher W. Cofer, Cofer and Associates PA, Jackson, MS, for John Does, Michael NMI Lewis, Henry Mascagni, Hayley J. Gardner, Steve Grubb, Linda Stewart, Murline Addington, Travis D. McHann, Jr.


MEMORANDUM

MOTZ, J.

**\*1** Plaintiffs John Roby, Michael Lewis, Henry Mascagni, Hayley J. Gardner, Steve Grubb, Linda Stewart, Murline Addington, Travis D. McHann, Billy Lewis, Booker T. Bailey, Jr., James Pigg, Angela Brinkley, Delanious Harried, Gertrude Green, Camelia Calvert, and Mary Wyatt have filed suit against Microsoft Corporation, alleging that they were overcharged for Microsoft software. Now pending before me are Microsoft's motions to dismiss plaintiffs' complaints. [FN1] For the reasons stated below, the motions will be granted.

> FN1. The motions in the cases of Grubb, Bailey, Brinkley, and Calvert are technically motions for judgment on the pleadings.

I.

These actions arise out of plaintiffs' purchases of computers containing Microsoft operating systems. Plaintiffs allege, based largely on the findings of fact in *United States v. Microsoft,* 84 F.Supp.2d 9 (D.D.C.1999), that Microsoft engaged in unfair, deceptive, and anticompetitive conduct designed to

achieve and maintain alleged monopolies in the markets for personal computer operating software, word processing software, and spreadsheet software. According to plaintiffs, as a result of these alleged monopolies, Microsoft charged monopoly prices for its software and denied plaintiffs free choice in the competitive market as well as the benefits of software innovation. Based on these allegations, each plaintiff asserts a claim under the Mississippi Antitrust Act, Miss.Code Ann. § 75-21-3 ("MAA"). Each plaintiff also asserts a claim for civil conspiracy. [FN2]

> FN2. Plaintiffs initially asserted claims under the Mississippi Consumer Protection Act, Miss.Code Ann. § § 75-24-1 et seq. They now concede, however, that the Consumer Protection Act does not create a private right of action for claims based on anticompetitive conduct.

## II.

The MAA provides that any corporation that "monopolize[s] or attempt[s] to monopolize the production, control or sale of any commodity, or the prosecution, management or control of any kind, class or description of business" shall be deemed to be a prohibited "trust or combine" subject to liability as provided in the MAA. Miss.Code Ann. § 75-21-3. [FN3] Microsoft argues that the scope of this provision is limited to wholly intrastate conduct and that no wholly intrastate conduct is alleged by plaintiffs.

> FN3. The MAA was initially enacted in 1900. The language of the MAA remains almost entirely unchanged. (See Def.'s Tab 1.)

In Standard Oil Co. of Kentucky v. State ex rel. Attorney Gen., 107 Miss. 377, 65 So. 468 (Miss.1914), the Supreme Court of Mississippi addressed an alleged conspiracy between various oil companies to monopolize trade in petroleum throughout the United States. The defendant, who was allegedly allocated exclusive rights to sell petroleum products in Mississippi, moved to dismiss the complaint on the basis that the complaint alleged only conduct in interstate commerce that was beyond the reach of the Mississippi antitrust statute. In addressing the scope of the Mississippi antitrust statute, the Supreme Court of Mississippi explained:

> In the case at bar, if, with the intent to monopolize commerce in petroleum products throughout the United States, appellants had agreed to and had actually done only such things as relate to that

portion of the commerce therein which is interstate, they would have been punishable only under the laws of the general government, even though they intended to, and in fact did thereby, monopolize also that portion of the commerce therein that is wholly intrastate. In other words, a conspiracy to monopolize trade in any commodity to be punishable under state laws must have as one of its objects a monopoly in the intrastate trade therein *to be accomplished in part at least by transactions which are also wholly intrastate.*

**\*2** *Id.* at 470-71 (emphasis added).

*Standard Oil* was based upon the "dual sovereignty" view of the Commerce Clause prevalent at the time the decision was rendered. That view was well articulated by the Supreme Court of the United States in *Addyston Pipe & Steel Co. v. United States,* a case relied upon the by the Mississippi Supreme Court in *Standard Oil:*

> Although the jurisdiction of Congress over commerce among the states is full and complete, it is not questioned that it has none over that which is wholly within a state, and therefore none over combinations or agreements so far as they relate to a restraint of such trade or commerce. It does not acquire any jurisdiction over that part of a combination or agreement which relates to commerce wholly within a state, by reason of the fact that the combination also covers and regulates commerce which is interstate.

175 U.S. 211, 248, 20 S.Ct. 96, 44 L.Ed. 136 (1899).

In later years the Supreme Court's conceptual approach to the Commerce Clause changed, and the dual sovereignty doctrine became obsolete. *See N.L.R.B. v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 49, 57 S.Ct. 615, 81 L.Ed. 893 (1937); *see also Cantor v. Detroit Edison Co.,* 428 U.S. 579, 632-37, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (Stewart, J., dissenting) (discussing evolution of federal Commerce Clause jurisprudence with respect to the Sherman Act). However, the issue presented in this case is not whether today the State of Mississippi could constitutionally enact legislation that prohibits interstate anticompetitive conduct affecting intrastate commerce within Mississippi, regardless of how and where the means of effecting the illegal conduct are carried out. The issue is whether the legislature intended to do so when it enacted the MAA.

I am persuaded that it did not. The MAA was enacted one year after *Addyston Pipe* was decided and against the same conceptual background

Not Reported in F.Supp.2d                                                                                         Page 3
Not Reported in F.Supp.2d, 2003 WL 22070561 (D.Md.), 2003-2 Trade Cases P 74,138
**(Cite as: 2003 WL 22070561 (D.Md.))**

embodied in that decision. Of course, I recognize that it can be argued that the Mississippi legislature's true intent when enacting the MAA was to regulate commerce to the fullest extent permitted by the Constitution. However, plaintiffs have cited no legislative history to support that view, and the fact that the legislature has not amended the MAA since 1914 when *Standard Oil* was decided argues against such an interpretation of the legislative intent. [FN4]

FN4. Plaintiffs cite *Moore ex rel. State of Mississippi v. Abbott Labs.,* 900 F.Supp. 26 (S.D.Miss.1995), for the proposition that the highest court in Mississippi has not determined whether "Mississippi antitrust law is limited to intrastate conspiracies." *Id.* at 32. That is true to the extent that *Standard Oil* found the MAA to be applicable to an illegal agreement that was both interstate and intrastate in nature and was accomplished at least in part by transactions that were wholly intrastate. In any event, *Moore* was a removal case which did not directly determine the scope of the MAA's coverage.

I also note that limiting state antitrust statutes to intrastate is consistent with the jurisprudence of other states. For example, in *Arnold v. Microsoft Corp.,* No. 00-CI-00123, 2001 WL 193765 (Ky.Cir.Ct. July 21, 2000), *aff'd,* No.2000-CA-002144-MR, 2001 WL 1835377 (Ky. T.App.2001), *motion for review denied,* No.2002-SC-0116-D (Ky.2002), the court held that Kentucky's antitrust statute was limited to intrastate commerce. *Id.* at *9. The court noted:

When a national company commits an anticompetitive act, it is certain to have at least some impact on at least one Kentucky resident. To use that as a means to bring a company's national or global operations under Kentucky law smacks of overreaching. This Court declines to do so. *Id.*

The question thus becomes whether plaintiffs have alleged at least *some* conduct by Microsoft which was performed wholly intrastate. In *Standard Oil,* the Mississippi Supreme Court found that there were sufficient allegations of such conduct because one of the objects of the alleged illegal conduct was "a monopoly of that portion of trade in petroleum products which lies wholly within the state of Mississippi, to be accomplished in part at least by

transactions lying wholly within the state." 65 So. At 471. In the present case it can be inferred that plaintiffs allege that one of the objects of Microsoft's allegedly illegal conduct was to establish an unlawful monopoly in the relevant product markets within Mississippi. Plaintiffs have failed to allege, however, that this monopoly was to be accomplished by any transactions "lying wholly within the state." To the contrary, even after having been alerted to the criticality of the issue by Microsoft's motion to dismiss, plaintiffs make only the entirely conclusory averment that "Defendant Microsoft obviously created a monopoly in both interstate and intrastate commerce." (Pls.' Opp'n at 7.) This falls far short of the type of allegation that the Mississippi Supreme Court contemplated in *Standard Oil.* [FN5]

FN5. Because I am dismissing Plaintiffs' MAA claims, it is unnecessary for me to determine whether punitive damages are available under the MAA.

III.

**\*3** Microsoft also moves to dismiss plaintiffs' civil conspiracy claims. Under Mississippi law, a civil conspiracy claim cannot stand alone. It must reference an underlying tort. *Wells v. Shelter Gen'l Ins. Co.,* 217 F.Supp.2d 744, 755 (S.D.Miss.2002) (citing cases from numerous jurisdictions standing for the same proposition, *i.e.,* "absent the underlying tort, there can be no liability for civil conspiracy"). The only tort arising under Mississippi law referenced by plaintiffs is the asserted violation of the MAA which, for the reasons I have stated, is not viable. [FN6]

FN6. Plaintiffs seem to suggest that they may assert a civil conspiracy claim under Mississippi law based upon alleged violations of federal law and the laws of other states. They have not, however, cited any authority to support this far-reaching proposition and, absent such authority, I am not prepared to accept it.

A separate order is being entered herewith.

Not Reported in F.Supp.2d, 2003 WL 22070561 (D.Md.), 2003-2 Trade Cases P 74,138

**Motions, Pleadings and Filings (Back to top)**

• 2006 WL 1372578 (Trial Motion, Memorandum and Affidavit) Microsoft's Sur-Reply in Response to Plaintiffs' Supplemental Memorandum (Apr. 28,

2006)Original Image of this Document (PDF)

• 2006 WL 1372577 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of Supplemental Memorandum (Apr. 21, 2006)Original Image of this Document (PDF)

• 2006 WL 690391 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of its Motion to Stay Proceedings Pending State-Court Litigation (Feb. 27, 2006)Original Image of this Document (PDF)

• 2006 WL 371982 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Memorandum in Support of Its Motion to Stay Proceedings Pending State-Court Litigation or, in the Alternative, for an Order Coordinating Discovery with Plaintiffs' State Court Action (Jan. 27, 2006)Original Image of this Document (PDF)

• 2006 WL 371983 (Trial Motion, Memorandum and Affidavit) Microsoft's Reply Memorandum in Support of Its Motion to Dismiss and Motion for Summary Judgment (Jan. 27, 2006)Original Image of this Document (PDF)

• 2005 WL 3778397 (Trial Motion, Memorandum and Affidavit) Defendant Microsoft Corporation's Reply Memorandum in Support of Motion to Stay All Proceedings Pending Transfer by the Judicial Panel on Multidistrict Litigation (Nov. 3, 2005)Original Image of this Document (PDF)

• 2005 WL 3778396 (Trial Motion, Memorandum and Affidavit) Defendant Microsoft Corporation's Notice of Motion and Motion to Stay All Proceedings Pending Transfer by the Judicial Panel on Multidistrict Litigation; Memorandum of Points and Authorities (Oct. 11, 2005)Original Image of this Document (PDF)

• 2005 WL 3778398 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Motion for Remand (Sep. 1, 2005)Original Image of this Document (PDF)

• 2004 WL 3737251 (Trial Pleading) First Amended and Supplemental Complaint and Jury Demand (Nov. 19, 2004)Original Image of this Document (PDF)

• 2003 WL 24210774 (Partial Expert Testimony) (Partial Testimony) (Dec. 18, 2003)Original Image of this Document (PDF)

• 2003 WL 23843454 (Trial Motion, Memorandum

and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843489 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843527 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843554 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843568 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843583 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843609 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843632 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843661 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843695 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843707 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843734 (Trial Motion, Memorandum

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2003 WL 22070561 (D.Md.), 2003-2 Trade Cases  P 74,138
**(Cite as: 2003 WL 22070561 (D.Md.))**

and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843750 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843757 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843775 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843782 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843792 (Trial Motion, Memorandum and Affidavit) Microsoft's Memorandum in Opposition to Plaintiffs' Motion to Reconsider (Oct. 6, 2003)Original Image of this Document (PDF)

• 2003 WL 23843508 (Trial Motion, Memorandum and Affidavit) Memorandum (Aug. 22, 2003)Original Image of this Document (PDF)

• 2003 WL 23843543 (Trial Motion, Memorandum and Affidavit) Memorandum (Aug. 22, 2003)Original Image of this Document (PDF)

• 2003 WL 23843597 (Trial Motion, Memorandum and Affidavit) Memorandum (Aug. 22, 2003)Original Image of this Document (PDF)

• 2003 WL 23843621 (Trial Motion, Memorandum and Affidavit) Memorandum (Aug. 22, 2003)Original Image of this Document (PDF)

• 2003 WL 23843648 (Trial Motion, Memorandum and Affidavit) Memorandum (Aug. 22, 2003)Original Image of this Document (PDF)

• 2003 WL 23843669 (Trial Motion, Memorandum and Affidavit) Memorandum (Aug. 22, 2003)Original Image of this Document (PDF)

• 2003 WL 23843724 (Trial Motion, Memorandum and Affidavit) Memorandum (Aug. 22, 2003)Original

Image of this Document (PDF)

• 2003 WL 23843737 (Trial Motion, Memorandum and Affidavit) Memorandum (Aug. 22, 2003)Original Image of this Document (PDF)

• 2003 WL 24210773 (Partial Expert Testimony) (Partial Testimony) (Jul. 23, 2003)Original Image of this Document (PDF)

• 2003 WL 23843500 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Microsoft's Motion to Dismiss (Apr. 14, 2003)Original Image of this Document (PDF)

• 2003 WL 23843535 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Microsoft's Motion to Dismiss (Apr. 14, 2003)Original Image of this Document (PDF)

• 2003 WL 23843562 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Microsoft's Motion for Judgment on the Pleadings (Apr. 14, 2003)Original Image of this Document (PDF)

• 2003 WL 23843574 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Microsoft's Motion to Dismiss (Apr. 14, 2003)Original Image of this Document (PDF)

• 2003 WL 23843590 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Microsoft's Motion to Dismiss (Apr. 14, 2003)Original Image of this Document (PDF)

• 2003 WL 23843614 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Microsoft's Motion to Dismiss (Apr. 14, 2003)Original Image of this Document (PDF)

• 2003 WL 23843643 (Trial Motion, Memorandum and Affidavit) Reply Memorandum in Support of Microsoft's Motion to Dismiss (Apr. 14, 2003)Original Image of this Document (PDF)

• 1:03cv00750 (Docket) (Apr. 07, 2003)

• 1:03cv00746 (Docket) (Mar. 27, 2003)

• 1:03cv00744 (Docket) (Mar. 27, 2003)

• 1:03cv00747 (Docket) (Mar. 27, 2003)

• 1:03cv00745 (Docket) (Mar. 27, 2003)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 6
Not Reported in F.Supp.2d, 2003 WL 22070561 (D.Md.), 2003-2 Trade Cases  P 74,138
**(Cite as: 2003 WL 22070561 (D.Md.))**


• 1:03cv00742 (Docket) (Mar. 27, 2003)

• 1:03cv00748 (Docket) (Mar. 27, 2003)

• 1:03cv00749 (Docket) (Mar. 27, 2003)

• 1:03cv00741 (Docket) (Mar. 27, 2003)

• 1:03cv00743 (Docket) (Mar. 27, 2003)

• 2002 WL 32951685 (Trial Pleading) First Amended Complaint for: 1. Illegal Maintenance of Intel-Compatible PC Operating System Monopoly (Sherman Act §  2) 2. Illegal Monopolization of Web Browser Market (Sherman Act §  2) 3. Unlawful Tying of Internet Explorer to Windows PC Operating Sy stem (Sherman Act §  1) 4. Attempted Monopolization of the Workgroup Server Operating System Market (Sherman Act §  2) 5. Unlawful Tying of Windows Workgroup Server Operating System to Windows PC Operating System (Sherman Act §  1) 6. Unlawful Tying of (Aug. 26, 2002)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **<u>EXHIBIT G</u>**



Not Reported in S.W.2d                                                                              Page 1
Not Reported in S.W.2d, 1980 WL 4696 (Tenn.Ch.), 1980-2 Trade Cases  P 63,558
**(Cite as: 1980 WL 4696 (Tenn.Ch.))**

Chancery Court of Tennessee, Davidson County.
State of Tennessee ex rel. William M. Leech, Jr.,
Attorney General & Reporter
v.
Levi Strauss & Co.
**No. 79-722-III**

Filed September 25, 1980

BRANDT, Chanc.

**Memorandum**
**\*1** This is an action by the Tennessee Attorney
General charging that Levi Strauss violated
Tennessee's anti-trust statutes. [FN1]

    FN1. T. C. A. § 69-101 provides:
    'Trusts and combinations lessening
    competition or controlling prices unlawful
    and void.--All arrangements, contracts,
    agreements, trusts, or combinations between
    persons or corporations made with a view to
    lessen, or which tend to lessen full and free
    competition in the importation or sale of
    articles imported into this state, or in the
    manufacture or sale of articles of domestic
    growth or of domestic raw material, and all
    arrangements, contracts, agreements, trusts,
    or combinations between persons or
    corporations designed, or which tend, to
    advance, reduce, or control the price or the
    cost to the producer or the consumer of any
    such product or article, are declared to be
    against public policy, unlawful, and void.'

The suit is before the Court upon the State's motion
to strike certain defenses and Levi Strauss's motion
for a judgment on the pleadings or in the alternative
for partial summary judgment. The three issues
raised by the motions are (1) the statute of limitation
to be applied to the actions under Tennessee's anti-
trust laws, (2) the authority of the State to maintain a
damage suit on behalf of its citizens under the
common law theory of *parens patriae*, and (3) the
effect of the now-repealed Tennessee Fair Trade Law
upon the fixing of retail prices by a manufacturer.
These are all questions of first impression in
Tennessee.

The complaint alleges that beginning in 1969 and

thereafter for several years, Levi Strauss conspired
and combined with others to arbitrarily and illegally
fix and control the prices at which Levi Strauss
wearing apparel was retailed in Tennessee. The State
has sued for damages in two capacities, first as a
purchaser itself of Levi Strauss products and second
as *parens patriae* on behalf of all Tennessee citizens
who were damaged by the alleged price-fixing. Class
certification is sought, the proposed class being
everyone in Tennessee who purchased Levi Strauss
goods at prices fixed by the alleged unlawful
conduct.

*Statute of Limitation*
Tennessee's anti-trust laws do not contain a statute of
limitation so the Court must look to other statutes to
determine which is applicable. The alternatives are
(1) the one year limitation for actions for statutory
penalties, T. C. A. § 28-304, (2) the three year period
for property tort actions, T. C. A. § 28-305, or (3) the
ten year limitation for 'all other cases not expressly
provided for', T. C. A. § 28-310. The Court
concludes that this civil damage suit brought by the
State is subject to the three year statute of limitation
in T. C. A. § 28-305.

A threshold issue is whether the suit is subject to any
statute of limitation at all. Section 28-115 of the
Code provides that the various statutes of limitation
'do not apply to actions brought by the State of
Tennessee, unless otherwise expressly provided.' In
*State v. Standard Oil Company*, 120 Tenn. 86 (1907),
a suit to enjoin conduct prohibited by the anti-trust
statute, the Supreme Court stated that 'there is no
statute of limitation applicable to the State in civil
actions.' *Id.* at 144.

**\*2** That sweeping pronouncement is not absolute. It
may be correct in many contexts, but not in the
context of the damage claim in the instant suit. In its
claim for damages the State is suing as a purchaser of
Levi Strauss products. In that respect the State is not
acting as a sovereign but rather as an ordinary
consumer. The State exemption from statutes of
limitation does not apply to the damage claim.

In deciding which statute of limitation to apply, it is
necessary to determine the character of the State's
price-fixing claim. Tennessee's anti-trust statutes
prohibit combinations which control the price to the
consumer of any product. T. C. A. § 69-101. A

Not Reported in S.W.2d                                                                                Page 2
Not Reported in S.W.2d, 1980 WL 4696 (Tenn.Ch.), 1980-2 Trade Cases  P 63,558
**(Cite as: 1980 WL 4696 (Tenn.Ch.))**

private cause of action for damages is given to 'any person who may be injured or damaged by any such . . . combination.' T. C. A. § 69-106. Although anti-trust actions are based upon statutes, it has been universally held that private anti-trust suits are actions sounding in tort.  See *Wilson P. Abraham Construction Corp. v. Texas Industries, Inc.* [1979-2 TRADE CASES ¶ 62,929], 604 F. 2d 897 (5th Cir. 1979) and the authorities cited in footnote 7, page 901. [FN2]

> FN2. The State anti-trust statute passed in 1891 is quite similar to the Sherman Anti-Trust Act passed by Congress in 1890.  15 U. S. C. § 1.  Authorities which define the character of private damage suits under the federal anti-trust statutes, particularly the Sherman Act, are most persuasive.

The tortious injury to property statute of limitation obviously applies to cases of physical property damage.  Tennessee courts are also applying the three year property damage limitation to suits for monetary loss which do not involve physical damage.  The most significant case is *Vance v. Schulder*, 547 S. W. 2d 927 (Tn. 1977).  There, the Supreme Court was faced with deciding which statute of limitation applied to a suit charging that fraudulent representations induced the sale of stock for less than its value. After a reasoned analysis of the nature of the cause of action, the Court concluded that a loss sustained from fraud and deceit is included in the phrase 'injuries to personal property' contained in T. C. A. § 28-305, the three year limitation.  *Id.* at 932. The Court rejected the notion that the injury must be physical injury to property.

Relying upon *Vance* in a diversity suit, the Sixth Circuit Court of Appeals concluded that the three year limitation in § 28-305 is applicable to a suit charging fraud, misrepresentation and deceit. *Edwards v. Travelers Insurance of Hartford, Conn.*, 563 F. 2d 105 (6th Cir. 1977).

In urging that the Court apply the ten year 'all other cases' limitation of  § 28-310, the State relies upon the United States Supreme Court's 1906 decision in *Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U. S. 390 (1906).  That was a private civil anti-trust action in which damages were awarded to the City of Atlanta because of collusive price-fixing.  The cause of action arose in Tennessee and the case was tried in the United States District Court in Tennessee.  The Sherman Anti-Trust Act did not provide a statute of limitation and the applicable

limitation was a matter of state law.  [FN3] The Supreme Court was given the same three alternatives presented in the instant suit--the one year statutory penalty limitation (§ 28-304), the three year tortious injury to property limitation (§ 28-305) or the ten year 'all other cases' limitation (§ 28-310).  The Supreme Court upheld the Sixth Circuit's decision that the ten year limitation applied.

> FN3. In 1955 Congress enacted a four year statute of limitation for civil suits filed under the Clayton Act, 15 U. S. C. § 15b.

**\*3** The Sixth Circuit was faced with the task of deciding whether an injury to one's 'business or property' in the Sherman Act was an injury to personal property in the Tennessee statute of limitation.  In reaching its decision the Court noted that:
> While the precise question has not been decided by the Supreme Court of Tennessee, we do find an indisposition to give to the section [28-305] any such broad and indeterminate meaning as would include a suit which does not involve any actual injury to property.
> 127 F. at 31.

That statement concerning the absence of Tennessee authority is crucial to an understanding of the Supreme Court's decision.  What the Sixth Circuit essentially did was attempt to decide the issue based upon what it perceived the Tennessee Supreme Court would have held on the same issue.  The federal appeals court was saying that Tennessee had not extended the concept of injury to property beyond cases involving actual physical injury.  [FN4]

> FN4. The Supreme Court's decision to uphold the Sixth Circuit was influenced by the fact that the author of the Sixth Circuit opinion, Judge Lurton, had been a justice on the Tennessee Supreme Court. Judge Lurton went on to become an associate justice on the United States Supreme Court.

If the Sixth Circuit and United States Supreme Court were called upon to decide the same issue today--that is, whether a tortious injury to property not involving physical damage falls within the injury to property limitation in § 28-305--the result would no doubt be different.  The Tennessee Supreme Court decision in *Vance v. Schulder* and the cases which preceded it could not be disregarded by the federal courts.

Indeed, they have not been disregarded.  As noted,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.2d                                                                                          Page 3
Not Reported in S.W.2d, 1980 WL 4696 (Tenn.Ch.), 1980-2 Trade Cases P 63,558
**(Cite as: 1980 WL 4696 (Tenn.Ch.))**

the Sixth Circuit, relying upon *Vance,* held the three year statute to apply to suits for fraud and misrepresentation. *Edwards v. Travelers Insurance of Hartford, Conn., supra.* In another Sixth Circuit case decided slightly before *Edwards,* the Court, again relying upon *Vance,* held that the ten year 'all other cases' limitation did not apply to suits arising under the Securities Exchange Act of 1934 [FN5] and Securities Exchange Commission Rule 10b-5. [FN6] *Clarke v. Wilson,* (Unreported Order, March 28, 1977).

FN5. 15 U. S. C. § 78a, et seq.

FN6. 17 C. F. R. § 240.10b-5.

This Court can perceive of no reason why the principles stated by the Tennessee Supreme Court in *Vance v. Schulder* are not applicable to this suit. This private anti-trust suit for injury or damage sounds in tort. It is an action for injuries to personal property and is subject to the three year statute of limitation in T. C. A. § 28-305.

**\*4** The decision on the statute of limitation does not at this stage of the litigation result in any action by the Court other than a declaration that the three year limitation applies. Under T. C. A. § 28-305 suits are barred unless commenced within three years 'from the accruing of the cause of action.' The question of when the cause of action accrued in this case has not been addressed by the parties.

*Parens Patriae*

The State's posture as a plaintiff in this case is somewhat unusual. It has sued as a direct purchaser of Levi Strauss products as would any other consumer and has also sued to recover on behalf of Tennessee citizens under the *parens patriae* theory. [FN7] Levi Strauss challenges the State's authority to sue *parens patriae.*

FN7. Private damage suits are authorized by T. C. A. § 69-106 which provides that:
'Any person who may be injured or damaged by any such arrangement, contract, agreement, trust, or combination, described in this chapter may sue for and recover, in any court of competent jurisdiction, of any person operating such trust or combination, the full consideration or sum paid by him for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust.'

The concept of *parens patriae* has its origin in English common law where the King was the guardian of 'infants, idiots and lunatics'--this is, persons suffering under a disability. In the United States that responsibility has passed to the states and is manifested in various laws and practices which protect persons under disabilities.

Relying on *parens patriae,* states can maintain anti-trust actions to protect the interests of their citizens, such as suits to enjoin unlawful activities which injure the state's economy. [FN8] Such injury is perceived as injury to the quasi-sovereign interest of the State itself. Utilization of *parens patriae* is dependent upon a showing that the state is asserting an interest separate from the claims of its citizens.

FN8. *Georgia v. Pennsylvania R. R. Co.* [1944-45 TRADE CASES ¶ 57, 344], 324 U. S. 439 (1945).

In the case at bar the State seeks to extend the concept to include an action by the State for injury to individual citizens. As has been noted in the leading case on the issue, 'Judicial recognition of such authority would be a substantial departure from the scope of *parens patriae* authority as it has been recognized in this country to date. * * * *Parens patriae* has received no judicial recognition in this country as a basis for recovery of money damages for injuries suffered by individuals.' *California v. Frito-Lay, Inc.* [1973- 1 TRADE CASES ¶ 74,364], 474 F. 2d 774 (9th Cir. 1973), cert. denied 412 U. S. 908 (1973).

The question of a state's authority to suit *parens patriae* for damages to individual citizens was squarely faced by the Ninth Circuit in *Frito-Lay.* There the State of California filed a federal anti-trust suit *parens patriae* as representative of its citizens who were the victims of alleged resale price-fixing by the snack food industry. The State urged that it was impossible or impractical for the consumers to bring individual suits. After examining the historical origins and legal authorities on *parens patriae,* the Court concluded that California could not maintain the suit. The holding in *Frito-Lay* is compelling.

**\*5** The response of Congress to the *Frito-Lay* decision is instructive. In 1976 it passed the Hart-Scott-Rodino Anti-Trust Improvements Act, 15 U. S. C. § 15c. The act specifically authorizes states to maintain federal anti-trust suits such as the instant suit. The act establishes precise procedures which are to be followed in *parens patriae* damage suits.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.2d                                                          Page 4
Not Reported in S.W.2d, 1980 WL 4696 (Tenn.Ch.), 1980-2 Trade Cases P 63,558
**(Cite as: 1980 WL 4696 (Tenn.Ch.))**

It is also significant that the Tennessee Legislature has granted the Attorney General authority to sue on behalf of injured citizens in the Consumer Protection Act. T. C. A. § 47-18-108(a)(b). The Legislature can pass similar legislation in the anti-trust field.

The State is asking this Court to do what every other court, with one exception [FN9] has declined to do--extend the concept of *parens patriae* to permit suits by the State to collect damages for individual citizens. The object of the attempted broadening of *parens patriae*--the recovery of damages to injured consumers--is certainly worthwhile. And, considering the small amount of loss to each consumer, such an action by the State may be the only practical way the individual purchaser will recover. Nevertheless, this Court concludes that such a drastic departure from accepted practice must result from acts of the Legislature where the underlying public policy issues can be resolved and where essential procedural safeguards can be established. The portion of the complaint seeking damages as *parens patriae* should be dismissed.

> FN9. The State's power to sue for damages *parens patriae* was upheld by a trial court in *State of Michigan v. Detroit Lumbermans Association* [1979-2 TRADE CASES ¶ 62,990], (Circuit Court for Wayne County, October 26, 1979). The damage claim was coupled with a claim for injunctive relief to prohibit further violations. The Court noted that the case was not one 'in which the State is seeking to prosecute the purely personal claims of its citizens, but rather it is seeking to protect the public interest in preserving a fair and open lumber market.' p. 10. In the 1978 Federal Trade Commission consent decree, Levi Strauss agreed not to engage in any prohibited practices in the future. Although the instant suit contains a prayer for injunctive relief, the F. T. C. consent decree leads to the conclusion that this is in all respects a damage suit.

*Fair Trade Law Impact*

Levi Strauss argues that, even if it did conspire or combine with others to fix retail prices, such conduct was legal under Tennessee's Fair Trade Law. [FN10] That law was repealed in 1975, [FN11] but was in effect during most of the period during which the State alleges Levi Strauss unlawfully maintained retail prices.

> FN10. The Fair Trade Law was codified at T. C. A. § 69-201-69-205.

> FN11. Chapter 25, Public Acts of 1975.

The Fair Trade Law was in essence an exemption from the anti-trust laws. It legalized price-fixing by permitting a manufacturer and its vendee to enter into a contract which required the vendee to sell a commodity at the price dictated by the manufacturer. [FN12] Whether Levi Strauss had a price-fixing contract with its retailers is an issue of fact which cannot be resolved on motion for summary judgment. Resolution of the question must await trial.

> FN12. The law provided in pertinent part that:
> 'No contract relating to the sale or resale of a commodify which bears, or the label or content of which bears, the trade-mark, brand, or name of the producer or owner of such commodity and which is in fair and open competition with commodities of the same general class produced by others shall be deemed in violation of any law of this state by reason of any of the following provisions which may be contained in such contract: 1. That the vendee will not resell such commodity except at the price stipulated by the vendor. 2. That a producer making sale, or a vendee making resale, of any commodity required that his vendee will not resell except at the price stipulated by such producer or reselling vendee as the case may be.'

*Conclusion*

*6 An order will be entered (1) declaring that this suit is subject to the three year statute of limitation of T. C. A. § 28-305, (2) dismissing the damage claim brought *parens patriae*, an (3) overruling the defendant's motion based upon the Fair Trade Law defense.

The Court's decision on the defendant's motion resolves the issues raised by the State's motion to strike certain defenses. The order will accordingly deny the State's motion to strike.

Counsel for both parties will agree upon an order for submission to the Court. If unable to agree the defendant should submit a proposed order to which the plaintiff can respond in accordance with the local rules.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.2d                                                                                          Page 5
Not Reported in S.W.2d, 1980 WL 4696 (Tenn.Ch.), 1980-2 Trade Cases  P 63,558
**(Cite as: 1980 WL 4696 (Tenn.Ch.))**


 Not Reported in S.W.2d, 1980 WL 4696 (Tenn.Ch.),
1980-2 Trade Cases  P 63,558

END OF DOCUMENT

©  2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H

Not Reported in F.Supp.    Page 1
Not Reported in F.Supp., 1994 WL 577246 (N.D.Ill.)
**(Cite as: 1994 WL 577246 (N.D.Ill.))**

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.
UNITED PHOSPHORUS, LTD, an Indian corporation; Shroff's United Chemicals, Ltd., an Indian corporation; and J.C. Miller & Associates, Inc., an Illinois corporation, Plaintiffs
v.
ANGUS CHEMICAL COMPANY, a Delaware corporation; Angus Chemie GmbH, a German corporation; Freeman Hughes; Ollie W. Chandler; Lowell Pals; Gary W. Granzow; D.B. Gupta; and Lupin Laboratories, Ltd., an Indian corporation, Defendants.
**No. 94 C 2078.**

Oct. 18, 1994.

MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

**\*1** Plaintiffs United Phosphorus, Ltd. ("UPL"), Shroff's United Chemicals, Ltd. ("SUCL"), and J.C. Miller & Associates ("JCM") brought this antitrust action against Defendants Angus Chemical Company and its corporate officers, Freeman Hughes, Ollie Chandler, Lowell Pals, Gary W. Granzow (collectively "Angus"), Angus Chemie GmbH ("Chemie"), and Lupin Laboratories, Ltd. and its officer and owner D. B. Gupta (collectively "Lupin"). In a two-count complaint for federal antitrust violations and for intentional interference with prospective business advantage, Plaintiffs allege that Defendants engaged in various anti-competitive acts to prevent Plaintiffs from entering the interstate and foreign market for 1-Nitro-Propane ("1-NP") and 2-Amino-1 Butanol ("AB").

Defendants move to dismiss the Complaint for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6), alleging that (1) Count I of Plaintiff's Complaint fails to allege

specific facts to support subject matter jurisdiction as required by the Foreign Trade Antitrust Improvements Act; (2) Count I also fails to state a claim under § 2 of the Sherman Antitrust Act; and (3) If Count I is dismissed, then the court should also dismiss Count II, the state law claim for interference with prospective business, for lack of supplemental jurisdiction. For the following reasons, Defendants' Motion to Dismiss is denied.

*BACKGROUND* [FN1]

India currently has the greatest incidence of tuberculosis in the world. The primary pharmaceutical drug used in India to cure this potentially fatal illness is Ethambutol. Two chemicals, AB, the key ingredient of Ethambutol, and 1-NP, the raw material used to make AB, are the subjects of this litigation.

To make Ethambutol, Indian chemical laboratories, including Defendant Lupin, use AB, which they buy from Defendant Chemie, currently the world's only manufacturer of AB. Chemie, a German subsidiary wholly owned by Defendant Angus, uses 1-NP as raw material to manufacture AB at its plant in Germany. Angus, a Delaware Corporation in the business of manufacturing and selling chemical products, makes 1-NP at a plant in Sterlington, Louisiana, and is presently the world's only manufacturer of 1-NP.

"Henry's reaction," the original process for manufacturing AB from 1-NP, was first developed in 1890. In 1940, Purdue University doctors Haas and Vanderbilt designed an accelerated process, and a patent was issued for this and other related processes. However, the Haas patents expired long ago, and the information about the 1-NP/AB process has since passed into the public domain, enabling others, like Plaintiffs, to build a commercial plant for 1-NP and AB.

In late 1990 and early 1991, Plaintiffs UPL and SUCL made an application to the government of India in April of 1991 for permission to build a plant in Vapi, India, to manufacture AB. On the application, UPL and SUCL stated that the sources of their AB technology was New Jersey chemist Dr. Philip Adams and plaintiff JCM, whose principal chemist, John C. Miller, is a former Angus employee. Plaintiffs announced their intention to begin

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1994 WL 577246 (N.D.Ill.)
(Cite as: 1994 WL 577246 (N.D.Ill.))

manufacturing AB in the summer of 1991.

 *2 During this time, Defendants Angus and Chemie instituted a law suit against Plaintiffs and Dr. Adams in the Circuit Court of Cook County, Illinois, alleging a conspiracy to steal Angus' trade secrets for manufacturing AB and 1- NP. However, Defendants' lawsuit was not exempt under the *Noerr-Pennington* doctrine because Defendants Angus and Chemie did not have a protectable trade secret since the technology for making 1-NP and AB was and is in the public domain.

 Plaintiffs claim that after Defendants Angus and Chemie learned of UPL's and SUCL's intention to manufacture AB, Defendants performed the following acts in furtherance of its combination and conspiracy to constrain competition and prevent Plaintiffs from manufacturing AB and selling AB in India:  1) Defendants contacted Dr. Adams and attempted to buy his AB technology;  2) Defendants illegally obtained a copy of Plaintiffs' application to the Indian government;  3) Defendants instituted the trade secret lawsuit against Plaintiffs in order to foist huge legal expenses on Plaintiffs and "spend them into submission";  4) Defendants called, harassed, and attempted to scare off potential and current clients of JCM and Indian clients of Plaintiffs;  and 5) Defendant Angus refused to sell 1-NP to Plaintiffs.

 When Plaintiffs discovered that Defendant ANGUS would not sell them 1-NP, the most important ingredient for the manufacture of AB, Plaintiffs then attempted to buy 1-NP from another corporation, W.R. Grace & Company ("Grace"). However, Grace could not comply with Plaintiffs' request for 1-NP because Grace was planning to close its 1-NP plant in Deer Park, Texas.

 Having no alternative to buy 1-NP, Plaintiffs next investigated buying the Grace plant in Texas to make 1-NP themselves.  Plaintiff JCM and chemical engineer Eric Burkholder formed a joint venture called "Miller-Deltachem" to develop a process for manufacturing 1-NP and AB.  In October of 1991, UPL and SUCL finalized agreements for the purchase of Miller-Deltachem's processes for manufacturing 1-NP and AB.

 Plaintiffs allege that Defendants committed the following acts after UPL and SUCL decided to manufacture 1-NP:  1) Defendants attempted to buy Grace's 1-NP technology to prevent plaintiffs from acquiring a rival process and manufacturing facility;  2) Defendants harassed and threatened Plaintiffs'

potential clients;  3) Defendants, by amending their previous trade secret lawsuit to include 1-NP and other chemicals and Eric Burkholder as a defendant, succeeded in causing Burkholder to withdraw from his agreement with JCM before any process for manufacturing 1-NP and AB was ever developed;  4) Defendants caused Burkholder and Eugene Klim, a chemical broker, to agree to an order in the Cook County lawsuit enjoining Burkholder and Klim from associating with Plaintiffs for the manufacture of 1-NP or AB.

 Plaintiffs further maintain that Defendants committed similar anti-competitive acts against Grace, Grace's "toll manufacturer" Cedar Chemicals, a German company BASF, a small American company Humphrey Chemical and other persons or businesses who might plan to manufacture nitro-paraffins, the chemical group of which 1-NP is a member.

 *3 Finally, Plaintiffs allege the following antitrust and economic injuries:  1) A lost profit of $8,750,000 had UPL been able to sell AB in interstate and foreign commerce;  2) Lost profits which Plaintiffs would have earned if they had been able to sell 1-NP in interstate and foreign markets;  3) Expenses of $440,000 paid by Plaintiffs for the Cook County lawsuit;  4) UPL and SUCL's loss of government incentives worth $1 million;  5) JCM's loss of the Miller-Deltachem contract expectancy worth $500,000;  6) JCM's loss of business profits worth in excess of $2 million.  For their federal antitrust claim under the Clayton and Sherman acts and their state claim for intentional interference with prospective business expectancy, Plaintiffs seek treble compensatory damages, permanent injunctive relief, attorney's fees and other costs, and other such relief.

*DISCUSSION*

 Defendants move to dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction.  Defendants primarily contend that Plaintiffs' federal antitrust claim is a foreign dispute not subject to American adjudication under the Foreign Trade Antitrust Improvements Act ("FTAIA").  Furthermore, they argue that even if this Court does have jurisdiction, Plaintiffs have still failed to plead the requisite elements of a Sherman Act violation.

 Defendants also challenge the standing of the Plaintiffs to bring suit, arguing that any injury the Indian plaintiffs may have incurred was in India, that the complaint fails to allege any antitrust injury to JCM, and that Plaintiffs cannot rely on antitrust

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1994 WL 577246 (N.D.Ill.)
**(Cite as: 1994 WL 577246 (N.D.Ill.))**

injuries to non-parties.  Finally, Defendants contend that if the federal claim is dismissed, Plaintiffs' state law claims should likewise be dismissed for lack of supplemental jurisdiction.

I. The Foreign Trade Antitrust Improvements Act ("FTAIA") and Clayton Act Claims

We initially address a statutory issue disputed by the parties, namely whether the Foreign Trade Antitrust Improvements Act ("FTAIA"), codified at 15 U.S.C. § 6(a), applies to the instant case.  In support of their Motion to Dismiss, Defendants argue that the Plaintiffs have failed to plead a "direct, substantial, and reasonably foreseeable effect" on domestic commerce, as required by the FTAIA.    Plaintiffs respond that the FTAIA does not apply to their cause of action because their antitrust claim was brought under the Clayton, not Sherman, Act.

The FTAIA, codified at 15 U.S.C. § 6(a), states:
Sections 1 to 7 of this title (Sherman Act) shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless--
(1) such conduct has a direct, substantial, and reasonably foreseeable effect--
(A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
(B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
**\*4** (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.
If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.  15. U.S.C. § 6(a) (1982).

Simply put, the Sherman Act does not apply to foreign commercial conduct  "unless such conduct has a direct, substantial and reasonably foreseeable effect" on domestic, or U.S., commerce.

In 1982, Congress enacted the FTAIA as an amendment to the Sherman Act to clarify the appropriate extraterritorial reach of the federal antitrust laws.  [FN2] O.N.E. Shipping, Ltd. v. Flota Mercante Grancolombiana, S.A., 830 F.2d 449, 451 (2d Cir.1987);  Roger P. Alford, "The Extraterritorial Application of Antitrust Laws:  A Postscript on Hartford Fire Insurance Co. v. California," 34 Va.J.Int'l L. 213, 216 (1993).    The purposes of the

FTAIA, as set forth in its legislative history, are to "encourage the business community to engage in efficiency producing joint conduct in the export of American goods an services" and to amend the Sherman Act and the Federal Trade Commission Act to create a unitary statutory test to determine whether American antitrust jurisdiction exists over certain international transactions. H.R.Rep. No. 686, 97th Cong., 2d Sess., reprinted in 1982 U.S.Code Cong. & Ad.News 2487;  128 Cong.Rec. H4981 (daily ed. Aug. 3, 1982).

Although, as Plaintiffs point out, the FTAIA specifically refers to amendment of the Sherman Act, federal courts have recognized that the FTAIA applies to actions under the Clayton Act which allege Sherman Act violations.   McElderry v. Cathay Pacific Airways, Ltd., 678 F.Supp. 1071 (S.D.N.Y.1988); The In Porters, S.A. v. Hanes Printables, Inc., 663 F.Supp. 494 (M.D.N.C.1987).

In McElderry, an American passenger brought a class action suit against an international airline, claiming that the airline's excess baggage charge system violated the Sherman and Clayton acts, Federal Aviation Act, and the Robinson-Patman Price Discrimination Act.     However, after assessing plaintiffs' antitrust claims, which alleged violations of § §  1 and 2 of the Sherman Act and §  4 of the Clayton Act, the court dismissed the complaint for failure to comply with FTAIA requirements. McElderry v. Cathay Pacific Airways, Ltd., 678 F.Supp. 1071 (S.D.N.Y.1988).

Similarly, in The 'In' Porters, the court dismissed the complaint of a French distributor of foreign outerwear against an American manufacturer and its corporate owner for conspiring to restrict plaintiff's distribution territory, fixing the prices, and tying the purchase of certain of defendants' products to purchase of other defendants' products.      Like McElderry, the court found that the plaintiff's antitrust claims, which were based on both the Sherman and Clayton Acts, failed to allege an "actual injury to plaintiff within the United States," a FTAIA requirement.     The 'In' Porters, S.A. v. Hanes Printables, Inc., 663 F.Supp. 494, 500 (M.D.N.C.1987).

**\*5** In deciding whether the FTAIA applied to antitrust claims brought under both the Sherman and Clayton acts, The 'In' Porters court stated:
... the court determines whether these claims fall within the extraterritorial reach of antitrust laws by reference to only the Sherman Act, as this is the

Not Reported in F.Supp.                                                                                Page 4
Not Reported in F.Supp., 1994 WL 577246 (N.D.Ill.)
**(Cite as: 1994 WL 577246 (N.D.Ill.))**

typical manner in which "extraterritorial reach" is analyzed.  The *'In' Porters,* 663 F.Supp. at 497, n. 2 (emphasis added).
  As support, the court cited *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.,* 494 F.Supp. 1161, 1164 (E.D.Pa.1980), for the proposition that "issues with respect to the extraterritorial application of American economic regulation are the same regardless of the particular statute being applied."

  While *The 'In' Porters* court acknowledged that the FTAIA  [FN3]  amended only the Sherman and Federal Trade Commission Acts and not the Clayton Act, the court nonetheless decided that the FTAIA's extraterritorial reach guidelines applied to plaintiff's Clayton Act claim.  The court, apparently believing that the purposes of the Clayton and Sherman Acts are too similar to differentiate on jurisdictional grounds, noted:
    'Given the evident purpose of the new statute [FTAIA] ... a court would find it difficult to take jurisdiction under Clayton Act § 7 over a venture that the new statute immunizes from the Sherman Act.' *The 'In' Porters, S.A.,* 663 F.Supp. at 498, n. 4 (citing P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 235' a, p. 305 (Supp.1993)).
  Therefore, based on *McElderry* and *The 'In' Porters,* bringing suit under the Clayton Act does not *per se* preclude application of the FTAIA when Sherman Act violations are alleged.

  In the instant case, Plaintiffs contend that their antitrust claims were brought under the Clayton Act [FN4], and not the Sherman Act  [FN5], and, therefore, are immune to attachment of the FTAIA requirements.  We disagree.

  In order to have a private cause of action for injuries based on Sherman Act violations, every private plaintiff must sue under the Clayton Act.  In *Indiana Grocery,* a Seventh Circuit court affirmed summary judgment against a plaintiff whose cause of action was based on alleged Sherman Act violations.  The court found that the mere presence of substantive Sherman Act violations "does not by itself bestow on any plaintiff a private right of action for damages. That is the gift of section 4 of the Clayton Act." *Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1419 (7th Cir.1989).  Therefore, a claim by a private party alleging Sherman Act violations must necessarily be based on *both* the Sherman Act and the Clayton Act, not one or the other.

  It is misleading for Plaintiffs to characterize their antitrust claims as arising under the Clayton Act, but

not the Sherman Act.  While Plaintiffs' first paragraph of the antitrust count of their Complaint states: "Plaintiffs bring suit under the Clayton Act, 15 U.S.C. § 15" [FN6], the remaining paragraphs allege 14 violations of § 2 of the *Sherman Act,* 15 U.S.C. § 2:
  **6 "The jurisdiction of this Court over Count I is based on 28 U.S.C. § 1337 and the Sherman Antitrust Act" (Complt. ¶ 1);
  "ANGUS and ANGUS CHEMIE have violated § 2 of the Sherman Antitrust Act" (*Id.* ¶ 31);
  ANGUS and ANGUS CHEMIE have also violated § 2 of the Sherman Antitrust Act" (*Id.* ¶ 34);
  "HUGHES has violated § 2 of the Sherman Antitrust Act" (*Id.* ¶ 35);
  "HUGHES has also violated § 2 of the Sherman Antitrust Act" (*Id.*);"
  CHANDLER has likewise violated § 2 of the Sherman Antitrust Act" (*Id.* ¶ 36);
  "CHANDLER has also violate § 2 of the Sherman Antitrust Act" (*Id.*);
  "PALS has likewise violated § 2 of the Sherman Antitrust Act" (*Id.* ¶ 37);
  "PALS has also violated § 2 of the Sherman Antitrust Act" (*Id.*);
  "GRANZOW has violated § 2 of the Sherman Antitrust Act" (*Id.* ¶ 38);
  "GRANZOW has also violated § 2 of the Sherman Antitrust Act" (*Id.*);
  "LUPIN LABS has violated § 2 of the Sherman Antitrust Act" (*Id.* ¶ 39);
  "GUPTA has violated § 2 of the Sherman Antitrust Act" (*Id.* ¶ 40);
  "GUPTA has also violated § 2 of the Sherman Antitrust Act" (*Id.*).
  The Clayton Act is not mentioned again in the entire complaint.

  It is quite obvious to this Court that Plaintiffs' cause of action, while technically "brought under" the Clayton Act, relies heavily on the Sherman Act. Since the FTAIA applies to the Sherman Act and Plaintiffs' claims allege numerous Sherman Act violations, we hold that the FTAIA applies to Plaintiffs' claim.  Therefore, Plaintiffs must meet FTAIA requirements to prove Sherman Act violations, and, ultimately, to sustain their Clayton Act cause of action.

  II. Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1)
  Plaintiffs also argue that Defendants have moved to dismiss under the wrong rule of civil procedure.  In their reply brief, Plaintiffs contend that Defendants should have moved to dismiss under Fed.R.Civ.P.

Not Reported in F.Supp.                                                                                   Page 5
Not Reported in F.Supp., 1994 WL 577246 (N.D.Ill.)
**(Cite as: 1994 WL 577246 (N.D.Ill.))**

12(b)(6) instead of 12(b)(1).  Rule 12(b)(1) dismisses
a complaint for lack of subject matter jurisdiction,
and Rule 12(b)(6) dismisses a complaint for failure to
state a claim upon which relief can be granted.

 Plaintiffs claim that although it is a procedural
question of jurisdiction, a lack of a "direct,
substantial and reasonably foreseeable effect" on
domestic commerce is also a fact question so closely
intertwined with the merits of the case that it must be
brought under 12(b)(6), not 12(b)(1).    What
Plaintiffs have failed to realize, however, is that
Defendants actually brought their motion to dismiss
pursuant to *both* Fed.R.Civ.P. 12(b)(1) and 12(b)(6).
Defendants, therefore, have properly moved to
dismiss for both lack of subject matter jurisdiction
and failure to state a claim upon which relief can be
granted based on Plaintiffs' alleged omission of facts
which have jurisdictional and substantive
implications.  Therefore, we do not reach the issue of
whether Rule 12(b)(1) is sufficient by itself to make a
motion to dismiss based on a failure to allege facts
relating to jurisdiction which are closely intertwined
with the merits of the case.

III. Direct, Substantial, and Reasonably Foreseeable
Effect on Domestic
Commerce
 **\*7** We now examine whether Plaintiffs' Complaint
sufficiently alleges facts to survive a Motion to
Dismiss.   In assessing a motion to dismiss, a court
assumes as true all factual allegations contained in
the complaint and makes all possible inferences in
favor of the plaintiff.  *Gorski v. Troy,* 929 F.2d 1183,
1186 (7th Cir.1991).    A complaint should not be
dismissed "unless it appears beyond doubt that the
plaintiff can prove no set of facts in support of his
claim which would entitle him to relief." *Id.*

 Defendants first contend that this Court lacks subject
matter jurisdiction because Plaintiffs have not pled
the FTAIA requirement of a "direct, substantial, and
reasonably   foreseeable   effect"   on   domestic
commerce.    In contrast, Plaintiffs argue that their
Complaint meets this FTAIA requirement.

 In enacting the FTAIA, Congress felt that American
jurisdiction over international commerce should be
limited to transactions which affect American
economy.   *Hartford Fire Ins. Co. v. California,* 113
S.Ct. 2891 (1993) (citing H.R.Rep. No. 97-686, pp.
2-3, 9-10 (1982);   P. Areeda & H. Hovenkamp,
*Antitrusts Law,* ¶ 236'a, pp. 296-297 (Supp.1992)).
Congress believed that "the concern of the antitrust
laws is protection of American consumers and

American exporters, not foreign consumers or
producers."   P. Areeda & H. Hovenkamp, *Antitrust
Law,* ¶ 236'a, p. 305 (Supp.1993)).

 With these policies in mind, Congress thus passed
the FTAIA to amend the Sherman Act so that
jurisdiction over foreign commercial conduct would
not be exercised unless such conduct had a "direct,
substantial, and reasonably foreseeable effect" on
United States commerce.    Courts have routinely
dismissed international antitrust claims based on the
failure to plead this FTAIA requirement.  *Hartford
Fire Ins. Co. v. California,* 113 S.Ct. 2891 (1993);
*McGlinchy v. Shell Chemical Co.,* 856 F.2d 802 (9th
Cir.1988);  *The 'In' Porters, S.A. v. Hanes Printables,*
663 F.Supp. 494 (M.D.N.C.1987);  *Eurim-Pharm
GmbH v. Pfizer Inc.,* 593 F.Supp. 1102
(S.D.N.Y.1984).  Accordingly, Plaintiffs' international
antitrust claim must meet this FTAIA requirement to
withstand Defendants' Motion to Dismiss.

 Plaintiffs argue that they have shown the requisite
domestic effect, and cite, as support, numerous
interstate commerce cases which require a
demonstration that the alleged anti-competitive
conduct occurred in the interstate commerce or by
showing that the conduct, though wholly intrastate,
had a "substantial effect" on interstate commerce.
Plaintiffs' Reply Brief, p. 5-16, (citing *Summit
Health, Ltd. v. Pinhas,* 111 S.Ct. 1842 (1991);
*McLain v. Real Estate Board, Inc.,* 444 U.S. 232
(1980);   *Burke v. Ford,* 389 U.S. 320 (1967), etc.)
Although persuasive, we find these interstate cases
cited by Plaintiffs to be less applicable to the instant
case because this action involves international, not
interstate, commerce and the FTAIA requirement
specifically applies to international commercial
activity.    Furthermore, because the FTAIA spells out
the type of effect required, we decline to look to
analogous interstate case law to interpret the effect
required.

 **\*8** Plaintiffs attempt to demonstrate the requisite
antitrust injury in the United States by describing
alleged acts of Defendants in interfering with
American companies, including Plaintiff JCM and
non-parties, and, especially, Defendants' alleged anti-
competitive acts to prevent plaintiffs from acquiring
the Grace plant in Texas.

 The Court is aware, however, that conduct on
American soil is not always sufficient to prove effect
on domestic commerce because it is the situs of the
*effect,* not the conduct, which is crucial.  *Liamuiga
Tours, Div. of Caribbean Tourism Consultants, Ltd.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 6
Not Reported in F.Supp., 1994 WL 577246 (N.D.Ill.)
**(Cite as: 1994 WL 577246 (N.D.Ill.))**

*v. Travel Impressions, Ltd.,* 617 F.Supp. 920, 924 (E.D.N.Y.1985); *Eurim-Pharm GmbH v. Pfizer Inc.,* 593 F.Supp. 1102 (S.D.N.Y.1984) (emphasis added). The language of the FTAIA itself refers only to the "direct, substantial, and reasonably foreseeable *effects* " on domestic commerce. 15. U.S.C. § 6(a) (emphasis added).

 The Complaint also variously alleges that Defendants' acts were "intended" to affect domestic commerce. The Court is also aware, however, that allegations of what the Defendants intended to do may not be sufficient to demonstrate the requisite effects on domestic commerce. *Eurim-Pharm GmbH v. Pfizer Inc.,* 593 F.Supp. 1102, 1107 (S.D.N.Y.1984). The test is whether the effect would have been evident to a reasonable person making practical business judgments, not whether actual knowledge or intent can be shown. *Eurim-Pharm GmbH,* 593 F.Supp. at 1106, n. 4 (citing H.R.Rep. No. 97-686, 97th Cong., 2d Sess. 2, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2431 at 2487). Hence, what Defendants intended to do is irrelevant to our determination of the effects on domestic commerce.

 Defendants assert that the only impact alleged by Plaintiffs occurred in India, not in the United States. As Defendants point out, the Complaint does state that Plaintiffs UPL and SUCL are Indian corporations with no offices in the United States, that Defendants intended to keep Plaintiffs from manufacturing and selling AB and 1-NP in India, that Defendants threatened potential customers of Plaintiffs in India, that Defendants also refused to sell 1-NP to Plaintiffs in India, and that the effect of Defendants' acts were "to raise the price of AB in India from $6 a kilo to $12 a kilo." If these were the only effects alleged by Plaintiffs, then we would be inclined to agree with Defendants that these are clearly not the domestic effects which confer jurisdiction under the FTAIA upon this Court.

 Upon a closer examination, the Complaint does contain broad, conclusory allegations, some of which are attached to the allegations of effects in India, of antitrust injury in the United States:
    "These anti-competitive activities also destroyed competition for AB and 1-NP in India and in the United States, caused the output of AB and 1-NP to be artificially constrained ..." (*Complt.* P. 56)
    "Had defendants not engaged in these above-described anti-competitive activities, plaintiffs would have been competitors of ANGUS and ANGUS CHEMIE in the U.S. and Indian markets

for the sale of AB and 1-NP." (*Id.* 68)
**\*9** "Defendants' anticompetitive acts have prevented plaintiffs from manufacturing 1-NP and AB which would have been sold in interstate and foreign commerce." (*Id.* 70)
"Defendants' anticompetitive acts have had a substantial effect on interstate and foreign commerce ..." (*Id.* 72)

 In addition, Plaintiffs' Complaint describes the alleged injury suffered by their own corporations: loss of expected profits, government incentives, contract expectancy, actual business profits.

 Defendants maintain that these bare, legal conclusions are insufficient allege the requisite effect on domestic commerce. In support of their contention, Defendants cite to the Seventh Circuit's decision in *Car Carriers, Inc. v. Ford Motor Co.* as an example of that court's restrictive view of pleading requirements. In *Car Carriers, Inc. v. Ford Motor Co.,* the court affirmed dismissal of the antitrust complaint because it contained "bare legal conclusions" which the court found was insufficient to survive a motion to dismiss. *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101 (7th Cir.1984), *cert. denied,* 470 U.S. 1054 (1985).

 The Seventh Circuit similarly dismissed an antitrust count in *Sutliff, Inc. v. Donovan Cos.,* holding that a plaintiff cannot fulfill a pleading requirement "by attaching a bare legal conclusion to the facts that he narrates." *Sutliff, Inc. v. Donovan Cos.,* 727 F.2d 648, 653-54 (7th Cir.1984).

 However, in response to what the court believed to be a resurgence of dismissals of claims which were not required to be plead with specificity, the Seventh Circuit recently announced its unfavorable view of district judges who require stricter pleading in the antitrust context. In *Hammes v. Aamco Transmissions, Inc.,* the plaintiffs appealed a judgment which dismissed their antitrust suit on the ground that the complaint had failed to adequately allege that the defendants' antitrust violations had affected interstate commerce [FN7] . The Court of Appeals reversed, finding that it was "quite enough, probably more than enough, if the complaint alleges that the plaintiff was engaged in interstate commerce and was injured by the alleged antitrust violation." *Hammes v. Aamco Transmissions, Inc.,* 33 F.3d 774, 782 (1994).

 The complaint in *Hammes* contained broad allegations of Defendants' unlawful conduct, no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 7
Not Reported in F.Supp., 1994 WL 577246 (N.D.Ill.)
**(Cite as: 1994 WL 577246 (N.D.Ill.))**

numbers to substantiate those claims, and no express allegation that defendants' violations of the Sherman Act affected interstate commerce. *Id.* at 778. Chief Judge Posner, who wrote the opinion, held that the federal rules do not require the plaintiffs to plead the particulars of his claims, and, thus, bare allegations, when taken together with the other substantive allegations of the complaint, may be sufficient to confer jurisdiction upon a court. *Id.* at 778-80. The *Hammes* court also noted:

> "when the jurisdictional prerequisite is effect on interstate commerce, the pleading of a conclusion should be good enough, since the number of cases that fail at the threshold has become minuscule; 'there are astonishingly few offenses to antitrust principles that do not affect commerce.' " *Id.* at 778-79 (citing P. Areeda & H. Hovenkamp, *Antitrust Law,* ¶ 232.1f, p. 286 (Supp.1992)).

**\*10** In the instant case, the alleged acts of Defendants, such as the attempts to prevent Plaintiffs from buying the Grace plant, the refusal by Defendants, the sole worldwide manufacturers of 1-NP and AB, to sell to Plaintiffs, and the scaring off of potential customers, coupled with the statements in the Complaint connecting Plaintiffs to the United States and their intention to enter the domestic market for 1- NP and AB, all substantiate Plaintiffs' general allegation that the acts of Defendants have substantially affected the domestic market. Therefore, although Plaintiffs have made bare, conclusory allegations that Defendants' anti-competitive conduct had a substantial effect on U.S. commerce, we find that, under *Hammes,* these allegations, taken together with the other substantive paragraphs in the Complaint, sufficiently plead the FTAIA's requisite "direct, substantial and reasonably foreseeable effect" on domestic commerce. [FN8] Thus, the antitrust count of Plaintiffs' Complaint is subject to jurisdiction by this Court under the FTAIA.

Because this Court finds jurisdiction over Count I of Plaintiffs' Complaint, it also finds supplemental jurisdiction over the pendent state law claim for intentional interference with prospective business expectancy.

## IV. CONSPIRACY TO MONOPOLIZE

Defendants maintain that even if Plaintiffs have pleaded facts sufficient to support subject matter jurisdiction, Plaintiffs have still failed to state a claim, particularly that Defendants engaged in a conspiracy to monopolize. To sustain a cause of action under Section 4 of the Clayton Act, the complainant must allege violations of the antitrust

laws, in this case, the Sherman Antitrust Act. *See* 15 U.S.C. § 15. Plaintiffs, in this case, have alleged violations of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, which outlaws a monopoly, an attempt to monopolize, and a combination or conspiracy to monopolize.

Plaintiffs have made numerous boilerplate allegations that Defendants conspired to monopolize the 1-NP and AB markets. Defendants argue that a conspiracy cannot exist between Angus, a parent corporation, and Chemie, Angus' wholly-owned subsidiary.

Defendants are correct in asserting that a parent corporation and its wholly-owned corporation are incapable of conspiring with each other for purposes of the Sherman Act. *Copperweld Corp. v. Independence Tube Corp.,* 104 S.Ct. 2731 (1984). Therefore, Angus, which is a parent corporation and Chemie, the wholly-owed subsidiary of Angus, cannot possibly conspire together.

However, Defendants Angus and Chemie are not the only parties to the instant action; Defendant Lupin, an Indian corporation independent of and separate from Defendants Angus and Chemie, is also a party and, thus, a conspiracy could exist between Angus with its subsidiary Chemie and Lupin.

**\*11** Defendants' contention that Plaintiffs have nonetheless failed to plead facts which establish a conspiracy among the Defendants also fails. The elements of a conspiracy to monopolize under § 2 of the Sherman Act are proof of concerted action, overt acts in furtherance of conspiracy, and specific intent to monopolize. *Black and Decker, Inc. v. Hoover Service Center,* 765 F.Supp. 1129 (D.Conn.1991).

In the Complaint, Plaintiffs have indicated in boilerplate language that each of the Defendants have "... violated § 2 of the Sherman Antitrust Act (15 U.S.C. § 2): (a) by combining and conspiring with the other defendants to monopolize and (b) by combining and conspiring to attempt to monopolize the markets for nitro-paraffins and their derivatives." (*Plaintiff's Cmplt,* ¶ 31-40. Furthermore, Plaintiffs also allege that:

> "... in furtherance of their combination and conspiracy, defendants conducted meetings, exchanged correspondence through the United States mail and over telephone lines in the United States, and otherwise joined together to decide upon and commit the anti-competitive acts ..." (*Id.,* ¶ 41).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 8
Not Reported in F.Supp., 1994 WL 577246 (N.D.Ill.)
**(Cite as: 1994 WL 577246 (N.D.Ill.))**

Plaintiffs do not further allege any other fact nor make any other statement regarding a conspiracy among Defendants in their complaint. Thus, it appears that we reach the same question we answered in determining the FTAIA's requirement of domestic effect: whether general, broad allegations of a conspiracy are sufficient to withstand dismissal.

Although the Complaint does not aver any other facts than the broad statements of conspiracy mentioned above, we believe that the allegations set forth in the Complaint are sufficient to claim a conspiracy to monopolize. Although Plaintiffs did not plead with specificity, the Complaint does contain allegations, although somewhat broad and vague, which illustrate that Defendant Lupin bought AB from Chemie to create Ethambutol. And because Chemie and Angus are the only manufacturers of AB, we can infer that Lupin exclusively bought from Chemie and Angus. Accompanied by the other allegations that the Defendants held meetings, exchanged correspondence and joined together in furtherance of the conspiracy, we find that, under *Hammes*, Plaintiffs' conclusory allegations, once again, are sufficient to survive Defendants' Motion to Dismiss at this particular stage of litigation, despite the paucity of allegations establishing a conspiracy by Defendants.

Likewise, the remainder of Defendants' contentions can be eliminated. Defendants argue that Plaintiffs UPL and SUCL have no antitrust standing because their injury was suffered only in India. However, Plaintiffs have stated in their complaint that UPL and SUCL intended to enter the U.S. market as well as the Indian market, and, therefore, the lost profits which they allegedly would have earned was an injury which occurred in both the U.S. and India.

Defendants also argue that Plaintiff JCM cannot state an antitrust claim because JCM did not suffer an antitrust injury within the U.S. In order to sue under the antitrust laws, a plaintiff must establish that it suffered "antitrust injury." *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.,* 998 F.2d 391, 399 (7th Cir.1991) A plaintiff must show that the injury incurred directly "flows from that which makes [the defendants'] acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489 (1977). In other words, the plaintiff must establish that it suffered an injury as a result of a defendant's unlawful, anti-competitive activities.

**\*12** In the case at bar, the Complaint establishes that JCM suffered an injury in the United States as a result of the alleged anti-competitive conduct of Defendants. It is alleged that Defendants engaged in acts, specifically a "spurious lawsuit" in Cook County which intimidated engineer Eric Burkholder to withdraw from JCM's joint venture, Miller Deltachem, and, thus, prevented performance of the contract with UPL and SUCL. JCM lost the contract expectancy.

Furthermore, the Complaint alleges that JCM lost business in excess of $2 million due to the acts of Defendants. Even though JCM was not a potential manufacturer or seller of 1-NP and AB, JCM certainly would have played a crucial part in the manufacture of 1-NP and AB by developing the processes to manufacture 1-NP and AB which would have been sold in domestic and foreign markets. Most significantly, the Complaint alleges that JCM suffered financial losses as a result of Defendants' alleged anti-competitive acts, which suffices for Plaintiff JCM to demonstrate antitrust injury.

And, finally, Defendants assert that Plaintiffs cannot rely on injuries to non-parties to satisfy pleading requirements. Defendants argue that Plaintiffs have pleaded antitrust injuries to companies not involved in the instant action in attempt to disguise the absence of their own. Because we have already determined that Plaintiffs have established the requisite antitrust injury within the United States, we need not address this contention as Plaintiffs obviously need not rely on the injuries of the other companies.

We hold that Plaintiffs have sufficiently alleged a direct, substantial and reasonably foreseeable effect on domestic commerce, that Plaintiffs have sufficiently alleged a conspiracy to monopolize under the Sherman Act, and that all the Plaintiffs have standing to sue for antitrust injures in the United States. Therefore, this court does have subject matter and supplemental jurisdiction over this entire action, and Plaintiffs have stated a claim under the Clayton Antitrust Act.

As the foregoing analysis certainly indicates, this Court recognizes that Plaintiffs have sufficiently pled their claims to avoid a motion to dismiss. Recognizing the duty to allow these claims to proceed to a later stage of the litigation, however, does not necessarily require us to remain silent as to the possible insufficiency of those claims. This Complaint has managed to squeeze into the federal courthouse door on allegations of domestic antitrust injury. As the case proceeds, however, the parties are

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                       Page 9
Not Reported in F.Supp., 1994 WL 577246 (N.D.Ill.)
**(Cite as: 1994 WL 577246 (N.D.Ill.))**

put on notice that the allegations will need to be much more than merely economic theories to survive later dispositive motions.

*CONCLUSION*
 For the foregoing reasons, Defendants' Motion to Dismiss Count I and Count II of Plaintiffs' Complaint is denied.

>FN1. These background facts are taken from Plaintiffs' complaint, which the Court assumes as true when considering a Motion to Dismiss.

>FN2. Prior to enactment of the FTAIA, courts followed a tripartite test: 1) the effect or intended effect on the foreign commerce of the United States; (2) the type and magnitude of the alleged illegal behavior; and (3) the appropriateness of exercising extraterritorial jurisdiction in light of considerations of international comity and fairness. *Timberlane Lumber Co. v. Bank of America, 549 F.2d 597, 613- 15 (9th Cir.1976)* (Timberlane I); *Timberlane Lumber Co. v. Bank of America, 574 F.Supp. 1453, 1463-67 (N.D.Cal.1983),* aff'd, *749 F.2d 1378 (9th Cir.1984), cert. denied, 472 U.S. 1032, (1985)* (Timberlane II); *see also Liamuiga Tours, Div. of Caribbean Tourism Consultants, Ltd. v. Travel Impressions, Ltd., 617 F.Supp. 920, 923 (E.D.N.Y.1985).*

>FN3. While the *In Porters* court referred to 15 U.S.C. § 6(a) as the "Export Act", it is synonymous in the instant case with "FTAIA."

>FN4. The Clayton Act, 15 U.S.C. § 15, gives the right to bring suit in federal court to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws."

>FN5. In their Complaint, Plaintiffs allege various violations of § 2 of the Sherman Act, 15 U.S.C. § 2, which states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine

not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court."

>FN6. Plaintiffs' Complaint, ¶ 1.

>FN7. Although the *Hammes* case involves an interstate commerce antitrust case and we declined earlier to look to interstate commerce cases to determine the domestic effect required, we find this particular interstate commerce case to be controlling on how detailed federal pleadings must be. The substantive law on the elements of a particular claim is different for international antitrust cases than interstate cases, as is demonstrated by the FTAIA, which imposes a special standard for pleading for foreign antitrust cases. On the other hand, the law on procedural issues remains relatively the same, regardless of the type of dispute involved.

>FN8. Although § 6a has become the "test" for jurisdiction over international antitrust matters, considerations of comity are still considered. *McGlinchy v. Shell Chemical Co., 845 F.2d 802, 814 (9th Cir.1988).* However, we need not address that issue in the instant case as we do not reach the question.

 Not Reported in F.Supp., 1994 WL 577246 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

• 1:94CV02078 (Docket) (Apr. 04, 1994)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.