**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ADVANCED MICRO DEVICES, INC. and AMD INTERNATIONAL SALES & SERVICE, LTD., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| INTEL CORPORATION and INTEL KABUSHIKI KAISHA, | ) ) ) | C.A. No. 05-441-JJF (Re: D.I. 236) |
| Defendants. | ) ) ) | |
| IN RE: | ) ) | |
| INTEL CORP. MICROPROCESSOR ANTITRUST LITIGATION | ) ) ) | MDL Docket No. 05-1717-JJF (Re: D.I. 300) |
| PHIL PAUL, on behalf of himself and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 05-485-JJF (Re: D.I. 213) |
| INTEL CORPORATION, | ) ) | |
| Defendant. | ) ) | |

**SPECIAL MASTER'S REPORT AND RECOMMENDATIONS**
**ON PLAINTIFFS' MOTIONS TO COMPEL;**

**GRANT OF MOTIONS RECOMMENDED.**

## INTRODUCTION

The captioned cases are antitrust actions brought against Intel Corporation[1] ("Intel") as the manufacturer of microprocessors that run the Microsoft Windows and Linux families of operating systems (the "x86 Microprocessor Market"), a market in which Intel is alleged to hold worldwide market share measured as 80% of the market in units and 90% of the market in revenues. The 05-441 action is brought by Advanced Micro Devices, Inc. and AMD International Sales & Service, Ltd. (collectively, "AMD"), an American-based manufacturer and the only domestic competitor of Intel in the x86 Microprocessor Market.

The 05-485 action is brought on behalf of a class of consumers who allege economic injury resulting from Intel's alleged anticompetitive and monopolistic practices. The 05-485 action has been consolidated with over 70 other consumer-related actions by the Judicial Panel on Multidistrict Litigation and assigned to this Court, where it is docketed as MDL Docket No. 05-1717 (collectively, the "Class Litigation"). As used herein, the term "Class Plaintiffs" refers to the plaintiffs in the Class Litigation and the term "Plaintiffs" means AMD and the Class Plaintiffs, collectively.

There are also several antitrust actions pending in foreign tribunals and other jurisdictions. The first is litigation in Japan between AMD and Intel (the "Japan Litigation").[2] Another group of litigation involves antitrust class actions pending before the California state

---

[1] Intel Kabushiki Kaisha is also a named defendant in the AMD case, Case No. 05-441, and AMD refers to both Intel entities, collectively, as "Intel."

[2] The Japan Litigation includes litigations captioned *AMD Japan K.K. v. Intel K.K.*, Case No. Heisei 17 (Wa) No. 13151 (Tokyo Dist. Ct., 6/30/05) and *AMD Japan K.K. v. Intel K.K.*, Case No. Heisei 17 (Wa) No. 4 (Tokyo High Court, 6/30/05) and all proceedings related thereto.

2

courts (collectively, the "California Class Litigation").[3]

The matter *sub judice* comes before me, as Special Master,[4] on the motions of AMD (D.I. 236 in Case No. 05-441) and the Class Plaintiffs (D.I. 300 in Case No. 05-1717)[5] to compel Intel to produce certain categories of discovery materials that relate to Intel's business dealings and sales transactions with its customers in foreign countries, for the asserted purpose of ascertaining whether those dealings and transactions create barriers to competition that unlawfully exclude AMD from competing in the global market for x86 microprocessors.

For the reasons discussed further herein, the Special Master concludes that Plaintiffs' motions to compel should be GRANTED.

## BACKGROUND

On October 30, 2006, AMD and the Class Plaintiffs filed their respective motions to compel Intel to produce certain categories of discovery materials related to Intel's dealings and sales transactions with its customers in foreign countries. Intel opposes the production of these discovery materials based, in part, upon this Court's Memorandum Opinion and Order dated September 26, 2006 dismissing certain "foreign commerce claims" (the "September 26, 2006

---

[3] The California Class Litigation includes actions filed by or on behalf of a putative California class of indirect purchasers of Intel microprocessors, including certain actions which have been or will be transferred to the Honorable Jack Komar of the Santa Clara County Superior Court by the Judicial Council for the State of California under JCCP 4443, together with actions originally filed in that Court including *Melkonians v. Intel Corp.*, Santa Clara County Superior Court Case No. 1-05-CV-045077; *Macias v. Intel Corp.*, formerly in the Los Angeles County Superior Court Case No. BC336897; *Toronto v. Intel Corp.*, formerly in the San Diego County Superior Court Case No. GIC850053; *Groves v. Intel Corp.*, Santa Clara County Superior Court Case No. 1-05-CV-053490; *Wangler v. Intel Corp.*, formerly in the Los Angeles County Superior Court Case No. BC340460; *Pishvaee v. Intel Corp.*, Santa Clara Superior Court Case No. 1-05-CV-053300; and other actions made part of JCCP 4443.

[4] The Order appointing Special Master is docketed at D.I. 106 in Case No. 05-441, at D.I. 60 in the 05-1717 MDL docket, and at D.I. 21 in Case No. 05-485.

[5] Unless otherwise specified, the docket items cited hereinafter refer only to the docket in Case No. 05-441.

3

Order"). D.I. 217-18. In Intel's view, the September 26, 2006 Order – and the Court's analysis of the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a (the "FTAIA") on which that Order is based – strips all claims based on Intel's foreign conduct out of these cases and, therefore, renders irrelevant any discovery about Intel's foreign conduct.

As background for the analysis of whether the subject discovery is properly within the scope of discovery with respect to the remaining claims in these litigations, the Special Master briefly reviews the September 26, 2006 Order and the parties' differing views on the impact of that Order.

## September 26, 2006 Order Dismissing Foreign Claims

Shortly after discovery commenced, Intel filed a motion to dismiss certain of the claims asserted by AMD's Complaint on the bases that the Court lacked subject matter jurisdiction over – and AMD lacked standing to assert – those claims.[6] D.I. 111-112. As framed by Intel's moving papers,[7] Intel sought the dismissal of:

> [AMD's claims for] damages and injunctive relief under the U.S. antitrust laws for those claims based on alleged Intel business practices affecting the sale of AMD's German-made microprocessors in foreign countries, claims the FTAIA places outside the reach of federal jurisdiction.

D.I. 112 at p. 1; and *id.* at p. 30 (same).

On September 26, 2006, the Court granted Intel's motion to dismiss, reasoning that:

> [I]t lacks jurisdiction over AMD's claims that are based on lost sales of AMD's German-made microprocessors to foreign customers, as alleged in (1) paragraphs 40-44, 54, 57, and 74 relating to Japanese OEMs; (2) paragraphs 55, 56, 65, 75, 75 and

---

[6] On November 3, 2006, Intel filed a motion to dismiss similar foreign conduct claims asserted by the Class Plaintiffs' Complaint. D.I. 311-12 in the 05-1717 MDL docket. That motion is currently pending decision by the Court.

[7] The issues that Intel framed for the Court – and the limitations of those issues – are discussed in greater detail *infra* at pp. 12-14.

81 related to European OEMs; (3) paragraphs 81, 83 and 86 relating to alleged interference with the launch of an AMD-based system by foreign OEMs or sales to these foreign OEMs; (4) paragraphs 89, 93, 94 relating to interference with foreign distributors' sales in foreign countries; (5) paragraphs 100 and 101 relating to interference with sales to retailers in Europe; and (6) paragraph 106, which alleges interference with the German retail chain Vobis.

D.I. 217 at p. 7. The Court concluded that "it lack[ed] subject matter jurisdiction under the FTAIA over AMD's claims, to the extent those claims are based on foreign conduct *and* foreign harm." D.I. 217 at p. 15 (emphasis added).

With respect to AMD's standing, the Court concluded:

> For the reasons discussed in the context of the FTAIA, the Court concludes that the alleged injuries suffered by AMD as a result of Intel's foreign conduct are foreign injuries that occurred in foreign markets. Because such foreign injuries are "not the type of injury Congress intended to prevent through the [FTAIA] or the Sherman Act," the Court concludes that AMD lacks standing to pursue its claims based on foreign injury. Accordingly, for this additional reason, the Court will dismiss AMD's claims for foreign injuries arising as a result of Intel's alleged foreign conduct.

D.I. 217 at p. 17. Thus, like the dismissal based on lack of subject matter jurisdiction, the allegations dismissed by the Court because of AMD's lack of standing were based upon both foreign conduct *and* foreign harm, specifically addressed to lost and excluded sales of AMD's German-made microprocessors to foreign customers.

Accordingly, in its final holding, the Court dismisses "AMD's claims for foreign injuries arising as a result of Intel's alleged foreign conduct." D.I. 217 at p. 17.

**Plaintiffs' Motions to Compel**

Following the issuance of the Court's September 26, 2006 Order, Intel revised its objections to the Plaintiffs' discovery requests. As a result of that Order, Intel takes the position

5

that it will not produce certain categories of information responsive to the Plaintiffs' discovery requests because, in Intel's view, those categories of information are relevant only to claims that have been stricken from these cases. In response, the Plaintiffs filed the motions to compel that are *sub judice*.

In seeking to compel the requested discovery from Intel, AMD disputes that its ability to take discovery of Intel's foreign conduct is precluded by the September 26, 2006 Order. AMD characterizes the issue as follows:

> This motion presents the single, overriding issue of whether Judge Farnan's September 26, 2006 decision is the discovery show-stopper Intel suggests. It is not. Granted, the decision precludes AMD from pursuing damage claims based on "lost sales of AMD's German-made microprocessors to foreign customers" but it recognizes AMD's right to pursue claims for lost sales to *domestic* customers of microprocessors regardless of the product's origin (domestic commerce claims) and for lost sales of American-made microprocessors to *foreign* customers (export commerce claims). And, on its face, it leaves open, as it necessarily must, all discovery relevant to either remaining claim.

D.I. 236 at p. 3 (*quoting* D.I. 217 at p. 3) (emphasis in original).

Additionally, AMD argues that the subject discovery is relevant to its proof of the key elements of its Sherman Act claims, and that it is necessary to show that Intel (1) has market power in the relevant market; (2) has acquired or maintained its monopoly through anticompetitive means; and (3) has engaged in exclusionary conduct in relation to the overall relevant market, so as to violate U.S. antitrust laws. D.I. 236 at pp. 12-17.

**Intel's Opposition to Motions to Compel**

Intel raises four main arguments in opposition to AMD's motion to compel. The first argument in opposition is that AMD's export commerce claims are essentially the same claims that the Court dismissed on jurisdictional and standing grounds by its September 26, 2006

6

Order.[8]   D.I. 243 at pp. 1-3, 9-17.  Intel's argument continues that, because these claims have been stricken from these cases, the discovery has sought no relevancy to those issues remaining in the cases.  *Id.* at pp. 3-4.

Intel's second main argument is that, even if some export commerce claims arguably remain, AMD is barred from relief by the statute of limitations because it ceased domestic manufacture of microprocessors in 2002.[9]   D.I. 243 at pp. 17-19.

The third main argument raised by Intel is that the FTAIA bars AMD from discovery of Intel's foreign conduct after AMD ceased its domestic manufacture of microprocessors in 2002. D.I. 243 at pp. 19-21.

Finally, Intel raises several arguments that are intended to refute AMD's position as to the relevancy of the subject discovery to the remaining claims in these cases.  D.I. 243 at pp. 21-29.

## November 29, 2006 Oral Argument

On November 29, 2006, the Special Master conducted a hearing on the motions to compel.  D.I. 274.  As a threshold matter, the Special Master discussed the Order Appointing Special Master – and the constitutional underpinnings of Fed. R. Civ. P. 53 – that limit the Special Master's role to assisting the Court with discovery matters.  *Id.* at 4:1-5:6.  *See also* D.I. 236 at ¶ 3.  ("[The Special Master] shall hear, resolve and make rulings on all **disputes regarding discovery** and, when appropriate, enter orders setting forth his rulings.") (Emphasis added).

---

[8]  As discussed *infra* at pp. 11-14, the Special Master treats this argument as a threshold matter.

[9]  As discussed *infra* at p. 8, the Special Master has advised the parties that such substantive law claims are not properly before the Special Master.

7

In this regard the Special Master made clear that the Special Master does not have the authority to address the substantive law matters raised by the parties, as those matters are within the exclusive province of the Court. Specifically, the Special Master declined to address the Class Plaintiffs' suggestion that the Special Master opine to the Court – or speculate on what the Court might conclude – regarding to the substantive law issues raised by Intel's pending motion to dismiss certain claims in the Class Litigation. D.I. 274 at 5:6-16. The Special Master also expressly declined Intel's suggestion that the Special Master make substantive law determinations with respect to the foreign commerce/export claims, with respect to both the viability of the claims and the statute-of-limitations argument raised by Intel's opposition papers. *Id.* at 5:17-7:2.

The ensuing hearing focused on a discussion of the parties' respective positions on the scope of discovery dispute framed by the motions to compel. At the hearing, the Special Master asked for clarification of whether the parties were in agreement that the discovery materials that are the subject of the parties' dispute can, as AMD suggests, be generally as described documents – including contracts and correspondence exchanged during sales negotiations – that fall into one of the following categories that evidence:

> (a)    limitations on a customer's freedom to purchase microprocessors from AMD;
>
> (b)    requirements that a customer purchase specified amounts or percentages from Intel;
>
> (c)    other coercion, including threats of retaliation or retribution, for doing business with AMD (or not doing sufficient business with Intel);
>
> (d)    any other quantity-forcing behavior;
>
> (e)    other "foreign conduct" intended to handicap AMD in the marketplace, make its products less desirable to customers and

8

consumers, or raise its costs of doing business; and

(f)    Intel's internal communications bearing on any of the forgoing.

D.I. 274 at 7:11-8:20 (*quoting* D.I. 236 at pp. 2-3).   Although Intel takes exception with the argumentative language used to describe the categories, it agreed that "in general what was presented broadly summarized [the] categories" in dispute.  D.I. 274 at 42:18-21.

These general categories of discovery that the parties agree are the subject of the instant motions to compel are hereinafter referred to, collectively, as the "Foreign Conduct Discovery Materials".  The parties further agree that it would not be productive at this point for the Special Master to review each individual document request that relates to the disputed categories, and that judicial economy would be best served by a decision concerning the disputed categories of documents.  D.I. 274 at 42:24-44:7 and 99:10-101:7.

The Special Master now turns to his analysis of why Plaintiffs' motions to compel Intel to produce the Foreign Conduct Discovery Materials should be granted.

## DISCUSSION

### A.    Governing Law – Scope of Discovery

Discovery in these cases is governed by the Federal Rules of Civil Procedure.  With respect to the scope of discovery, Rule 26 provides, in pertinent part, that a party may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party:

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  **Relevant**

9

> **information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.**

Fed. R. Civ. P. 26(b)(1) (emphasis added).

The party seeking discovery has the burden of demonstrating its merits. *See, e.g., McLaughlin v. Copeland*, 455 F.Supp. 749, 753 (D. Del. 1978). However, "discovery should ordinarily be allowed under the concept of relevancy unless it is clear that the information sought can have no possible bearing upon the subject matter of the action." *La Chemise Lacoste v. Alligator Co., Inc.*, 60 F.R.D. 164, 171 (D. Del. 1973).

The broad scope of discovery permitted by Rule 26 has been held to be particularly appropriate in antitrust cases. *U.S. v. Dentsply Int'l, Inc.*, No. Civ. A-99-5 MMS, 2000 WL 654286, *5 (D. Del. May 10, 2000) ("The fact that the United States is the relevant market in this case does not necessarily limit discovery to the United States . . . A 'general policy of allowing liberal discovery in antitrust cases' has been observed by this Court because 'broad discovery may be needed to uncover evidence of invidious design, pattern, or intent.'") *See also, In re Plastics Additives Antitrust Litigation*, No. Civ. A. 03-2038 2004 WL 2743591, at *14 (E.D. Pa. Nov. 29, 2004) ("It is well-settled that courts presiding over antitrust cases generally take a liberal view of relevance in determining scope of discovery.")

In determining whether the discovery sought by the motions to compel is within the scope permitted by Fed. R. Civ. P. 26, the Special Master turns first to a brief examination of the claims that remain in the Complaint following the September 26, 2006 Order. In this regard, the Special Master – like the parties in their arguments – focuses on the claims asserted by AMD for several reasons. First, a recently filed motion to dismiss certain of the foreign conduct claims in the Class Litigation is currently pending before the Court. D.I. 311-12 in the 05-1717 MDL

10

docket and D.I. 217-18 in Case No. 05-485.  Additionally, although the damages differ, the Sherman Act claims asserted by the Class Plaintiffs are either identical to, or derivative of, those asserted by AMD.  Finally, Intel has agreed that it will produce the Foreign Conduct Discovery Materials to the Class Plaintiffs if it is compelled to produce them to AMD.  D.I. 274 at 76:23-77:2.

## B.    The Sherman Act Claims

According to the Plaintiffs, the discovery sought relates to claims asserted under Section 2 of the Sherman Act.  The Sherman Act provides, in relevant part, that:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding ten years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 2 (2004).

AMD asserts two distinct categories of claims under Section 2 that are alleged to arise from Intel's monopolistic behavior and result in foreclosure of AMD from sales of x86 microprocessors in the global market.  The first category is AMD's "domestic commerce claims" for lost and foreclosed sales to U.S. customers, irrespective of where the microprocessors were manufactured.  The second category is AMD's "export commerce claims" for lost and foreclosed sales of American-made microprocessors to foreign customers.  D.I. 236 at p. 3.  AMD contends that the Foreign Conduct Discovery Materials are relevant to both categories of claims.

Before discussing the relevancy of the Foreign Conduct Discovery Materials to the remaining claims, the Special Master believes it important – as a threshold issue – to discuss Intel's argument with respect to the continued viability of the export commerce claims.

11

Intel disputes that the export commerce claims are still part of these cases in light of the September 26, 2006 Order. Even if they are, Intel argues that they should not be considered given the perceived deficiencies in the form of pleading:

> I want to emphasize [that the foreign export claim] has never been the gravamen of AMD's claim. Indeed it is literally one paragraph, 129, export business, that's all we have. That is plainly insufficient for the court to base a determination that jurisdiction exists for those claims.

> * * *

> I can easily understand why a court may say that [conclusory] allegation is insufficient to establish jurisdiction, which in turn might explain why [Judge Farnan] then chose to just simply strike all of the foreign conduct allegations.

D.I. 274 at 68:21-69:4 and 71:10-15. Intel also raises statute-of-limitations issues based on AMD's 2002 discontinuance of the manufacture of microprocessors at its FAB 25 plant in Austin, Texas. D.I. 243 at pp. 17-20.

Having previously advised the parties that substantive law issues are not properly before the Special Master, *supra* at p. 8, the Special Master turns to Intel's argument that the export commerce claims are effectively disposed of by virtue of the September 26, 2006 Order.

In framing its motion to dismiss the foreign conduct claims for the Court, Intel specifically defined the subject claims to be those based upon the *foreign* sale of AMD's *foreign-manufactured* microprocessors:

- Intel filed this "motion to dismiss the foreign commerce claims of [AMD] for . . . relief under the U.S. antitrust laws for claims based on . . . the sale of AMD's German-made microprocessors in foreign countries." D.I. 112 at p. 1.

- "Intel [sought] an order dismissing or striking all claims that are based on alleged lost sales of AMD's German-made microprocessors to foreign

12

customers."  D.I. 112 at p. 30.

- The proposed form of order accompanying Intel's motion to dismiss provided: "in particular, the Court dismisses all claims that are based on alleged lost sales of AMD's German-made microprocessors to foreign customers."  D.I. 111, Proposed Order at p. 2.

The Special Master concludes that not only did Intel limit the issue before the Court to claims based on foreign harm caused by foreign conduct, but Intel expressly excluded certain of AMD's foreign commerce claims from its motion to dismiss:

- "The present motion is **not** addressed to AMD's federal or state allegations of lost sales of its German-made microprocessors to U.S. customers."  D.I. 112 at p. 5 n. 2 (emphasis added).

- "While AMD **may seek relief** in this action **for alleged domestic injury due its U.S. export and import commerce** under the  FTAIA, AMD may not pursue claims of injury arising out of conduct causing only direct harm to foreign commerce."  D.I. 112 at p. 29.

The Special Master concludes that Intel's argument that the export commerce claims were not adequately pleaded could have been raised by its motion to dismiss, but clearly were not. The Special Master reads the September 26, 2006 Order to provide only the specific relief that was actually requested by Intel.  In this regard, the Special Master concludes that the Court's final holding – dismissing "AMD's claims for foreign injuries arising as a result of Intel's alleged foreign conduct" (D.I. 217 at p. 17) – is tailored to the specific relief that Intel sought.  That relief was not requested to encompass or strike – and did not encompass or strike – paragraph 129 of AMD's Complaint.

Accordingly, the Special Master concludes that AMD's export commerce claims remain viable claims in these cases.

**C.    Relevancy of Foreign Conduct Discovery Materials**

Facts germane to any claim or defense in the pleadings are properly the subject of discovery. *See In re PE Corp. Securities Litigation*, 221 F.R.D. 20, 24 (D. Conn. 2003); *see also Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351-52 (1978) ("it is proper to deny discovery of [information] that is *relevant only to claims or defenses that have been stricken* or to events that occurred before applicable limitations period, *unless the information sought is otherwise relevant to issues in the case*") (emphasis added).    Accordingly, if the Foreign Conduct Discovery Materials are relevant to export commerce claims and/or domestic commerce claims, they are discoverable.

It is axiomatic that exclusionary conduct abroad would be relevant to a Sherman Act claim premised upon lost and foreclosed sales of American-made products to foreign customers. As succinctly argued by AMD:

> As I think you can observe, in terms of establishing a viable export claim, it would be silliness to argue that foreign misconduct is not relevant.  It is the only conduct that is relevant since by definition export customers [can only] be foreign concerns.

D.I. 274 at 18:10-16.

To prove its export commerce claims, AMD must introduce evidence of exclusionary conduct on the part of Intel that foreclosed opportunities for AMD to sell its American-made microprocessors to foreign customers.[10]    Accordingly, the Special Master concludes that the

---

[10]    AMD's Complaint alleges exclusionary conduct on the part of Intel throughout the Complaint, including at paragraphs 2 and 129.  Further, AMD's Complaint at paragraphs 63 and 67 references the "market-foreclosing" effects of Intel's alleged discount program and rebate schemes, respectively.  The categories of Foreign Conduct Discovery Materials essentially mirror the categories of alleged exclusionary conduct set forth in paragraph 2 of AMD's Complaint.

14

Foreign Conduct Discovery Materials are reasonably calculated to lead to the discovery of exclusionary conduct that would support a foreclosure claim in connection with the sale of American-made x86 microprocessors abroad. Thus, while it would be proper to deny discovery of the foreign conduct at issue in this litigation if it were only relevant to claims or defenses that have been stricken by the September 26, 2006 Order, it is not proper to deny the discovery of the Foreign Conduct Discovery Materials because they are relevant to the export commerce claims. *See Oppenheimer Fund*, 437 U.S. at 351-52.

Monopolization

Pursuant to Section 2 of the Sherman Act, it is unlawful for a firm to "monopolize". *See United States v. Microsoft Corp.*, 253 F.3d 34, 50 (D.C. Cir. 2001); 15 U.S.C. § 2. "The offense of monopolization has two elements: '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Microsoft*, 253 F.3d at 50 (*citing United States v. Grinnell Corp.*, 384 U.S. 563, 570-71); *see also Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 595-96 (1985); *United States v. Dentsply International, Inc.*, 399 F.3d 181, 186 (3d Cir. 2005) (citation omitted). AMD acknowledges that to prove its claim under Section 2 of the Sherman Act. "AMD must show (1) that Intel has market power in the relevant market, and (2) that Intel acquired or maintained its monopoly through anticompetitive means, rather than by means of a superior product, business acumen, or historic accident." D.I. 236 at p. 12.

Relevant Market

Identifying the relevant market is the "first step" in any antitrust action brought under Section 2 of the Sherman Act. *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 782 (6th

Cir. 2002), cert. denied, 537 U.S. 1148 (2003). The geographic market is defined as the area within which parties compete for business. *See Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 331 (1961). The parties do not dispute that the relevant geographic market is a worldwide market. In fact, Intel admits by its answer to paragraph 24 of the Complaint, D.I. 54 at ¶ 24, that "The relevant geographic market for x86 microprocessors is worldwide. Intel and AMD compete globally . . . ." It is unclear whether there is a real dispute as to the relevant product market. *See id.* For purposes of this report and recommendation, the Special Master assumes that that relevant product market is that of the x86 Microprocessor Market – microprocessors that run the Microsoft Windows and Linux families of operating systems.[11] *See* D.I. 1 at ¶ 1.

Monopoly Power

"Monopoly power is the power to control prices or exclude competition." *Los Angeles Land v. Brunswick Corp.*, 6 F.3d 1422, 1425 (9th Cir. 1993); *see also Grinnell*, 384 U.S. at 571. Whether an entity has monopoly or market power "may be proven directly by evidence of control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market." *Conwood Co., L.P.*, 290 F.3d at 783, fn2 (*citing Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 97-98 (2d Cir. 1998)); *see also Dentsply*, 399 F.3d at 187 (existence of monopoly power can be inferred from predominant share of market).[12] However, looking to current market share can be misleading and may not by itself indicate monopoly power. *Microsoft*, 253 F.3d at 54 (citations omitted).

Here, Intel has agreed to provide plaintiffs with information relevant to showing Intel's

---

[11]  Nowhere in its opposition to AMD's motion to compel does Intel challenge AMD's assertion that Intel concedes the relevant market "is a single, worldwide market for x86 microprocessors." *See* D.I. 236 at p. 2; D.I. 243 generally.

[12]  "Courts have increasingly leaned toward using circumstantial evidence as a short cut to determine whether monopoly power exists." *Conwood Co., L.P.*, 290 F.3d at 783, fn2 (citation omitted).

16

market share throughout the x86 Microprocessor Market, including sales to foreign countries. Intel, however, is unwilling to provide plaintiffs with the additional discovery sought through the Foreign Conduct Discovery Materials.[13] Thus, Intel's position places the Plaintiffs at risk of being incapable of proving one of the necessary elements of their *prima facie* case – monopoly power – a burden that AMD acknowledges it must satisfy to prevail in the litigation.

To prove monopoly power, AMD must show that Intel has the power to control prices or exclude competition. *See Grinnell*, 384 U.S. at 571; *Dentsply*, 399 F.3d at 186; *Los Angeles Land*, 6 F.3d at 1425. As Intel is unwilling to stipulate to having monopoly power, AMD is entitled to discover information relevant to Intel's ability to control prices and/or exclude competition. Accordingly, the Special Master concludes that the Foreign Conduct Discovery Materials are reasonably calculated to lead to the discovery of exclusionary conduct that would be indicative of monopoly power in the global marketplace.

Anticompetitive Conduct

> *Aggressive, competitive conduct by a monopolist is highly beneficial to consumers. Courts should prize and encourage it under the antitrust laws. Aggressive, exclusionary conduct by a monopolist is deleterious to consumers. Courts should condemn it under the antitrust laws. There is only one problem. Competitive and exclusionary conduct look alike.*

Frank H. Easterbrook, Symposium: *Developments in Section Two of the Sherman Act on Identifying Exclusionary Conduct*, 61 Notre Dame L. Rev. 972 (1986).

Having a monopoly does not by itself violate Section 2 of the Sherman Act. *Microsoft*, 253 F.3d at 58. A firm violates Section 2 of the Sherman Act "only when it acquires or

---

[13] As an alternative to Intel producing the Foreign Conduct Discovery Materials, AMD proposed that Intel stipulate or admit to certain of the elements of proof regarding the claims. D.I. 236 at pp. 14 (monopoly power), 15 (anticompetitive means), and 17 (exclusionary conduct). Not surprisingly, Intel has not agreed to do so.

maintains, or attempts to acquire or maintain, a monopoly by engaging in exclusionary conduct as 'distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Microsoft*, 253 F.3d at 58 (*citing Grinnell*, 384 U.S. at 570-71). "A monopolist willfully acquires or maintains monopoly power when it competes on some basis other than the merits." *LePage's, Inc. v. 3M*, 324 F.3d 141, 147 (3d Cir. 2003) (en banc), *cert. denied*, 542 U.S. 953 (2004).

"An *attempted* monopolization [under § 2] occurs when a competitor, with a dangerous probability of success, engages in anti-competitive practices the specific design of which are, to build a monopoly or exclude or destroy competition." *Conwood Co., L.P.*, 290 F.3d at 782 (emphasis added) (citation omitted); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993) (proof of dangerous probability of success of monopolizing and specific intent to monopolize required to establish liability for attempted monopolization under Section 2 of the Sherman Act). In order for a "completed" monopolization claim to succeed, "the plaintiff must prove a general intent on the part of the monopolist to exclude; while by contrast, to prevail on a 'mere' attempt claim, the plaintiff must prove specific intent to 'destroy competition or build monopoly power.'" *Conwood Co., L.P.*, 290 F.3d at 782 (*citing Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 101 (2d Cir. 1998)). "However, 'no monopolist monopolizes unconscious of what he is doing.'" *Conwood Co., L.P.*, 290 F.3d at 782 (*citing Aspen*, 472 U.S. at 602). "Thus, '[i]mproper exclusion (exclusion not the result of superior efficiency) is always deliberately intended." *Conwood Co., L.P.*, 290 F.3d at 782 (*citing Aspen*, 472 U.S. at 603).

"If a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory [or exclusionary.]" *Conwood Co., L.P.*, 290 F.3d at 783 (*citing Aspen*, 472 U.S. at 605). However, just because an entity has monopoly or market

18

power, does not bar it from taking advantage of its scale of economies because of its size. *Conwood Co., L.P.*, 290 F.3d at 783 (*citing Aspen*, 472 U.S. at 597).

To be condemned as exclusionary, a monopolist's conduct must have an anticompetitive effect - it must harm the competitive process and thereby harm consumers. *Microsoft*, 253 F.3d at 58. Typically, harm to one or more competitors will not suffice. *Microsoft*, 253 F.3d at 58. However, if the there is only one other competitor, harm to such competitor may suffice. *See, e.g., Aspen*, 472 U.S. 585 (defendant that controlled three-fourths of relevant ski-facility market held liable for monopolization when it engaged in exclusionary conducted directed at its only competitor); *Power Replacements Corp. v. Air Preheater Company, Inc.*, 356 F. Supp. 872, 896-897 (E.D. Pa. 1973) (defendant liable for monopolization where defendant had power to exclude competition and was successful in excluding competition of its only rival through discriminatory price discounts and disparagement of plaintiffs' products). "The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Microsoft*, 253 F.3d at 58 (*citing Spectrum Sports*, 506 U.S. at 458).

In this case, AMD alleges that Intel monopolized through exclusionary conduct. Accordingly, AMD must show that: (i) Intel engaged in exclusionary conduct, and (ii) any such exclusionary conduct was sufficiently material to the overall relevant market so as to violate U.S. antitrust laws.[14] As the undisputed geographic market is global, and approximately 68% of the total worldwide production of computers powered by x86 microprocessors are sold to non-U.S.

---

[14] AMD acknowledges this burden of proof. *See* D.I. 236 at p. 12; D.I. 274 26:22-27:5 ("[I]t is not every exclusion that establishes violation of Section 2, it is only when the exclusion aggregated throughout the available market to the participants and rivals in the market has some material outcome, some material preclusion that maintains the monopoly for the monopolist and excludes competition ....")

customers,[15] evidence of foreign exclusionary conduct is essential for AMD to demonstrate that Intel's alleged exclusionary conduct was sufficiently material to the overall relevant market so as to violate U.S. antitrust laws. *See, e.g., Microsoft*, 253 F.3d at 68-71.

Accordingly, the Special Master concludes that the Foreign Conduct Discovery Materials are reasonably calculated to lead to the discovery of facts that would support a showing that any exclusionary conduct was sufficiently material to the overall relevant market so as to violate U.S. antitrust laws.

## FTAIA Does Not Prohibit Discovery of Foreign Conduct Relevant to Surviving Claims

Having concluded that the Foreign Conduct Discovery Materials are discoverable on various grounds, including: (i) their relevance to exclusionary conduct that would support a foreclosure claim in connection with the sale of U.S.-made microprocessors abroad, (ii) their relevance to exclusionary conduct that would be indicative of monopoly power in the global marketplace, and (iii) their relevance to facts that would support a showing that any exclusionary conduct was sufficiently material to the overall global market so as to violate U.S. antitrust laws, the Special Master will now address whether the FTAIA somehow prohibits the discovery of otherwise discoverable information.

Intel's argument that the FTAIA prohibits the discovery of the Foreign Conduct Discovery Materials would prevail if the foreign conduct were only relevant to the claims stricken by the September 26, 2006 Opinion. *See Oppenheimer Fund, Inc.*, 437 U.S. at 351-52 ("it is proper to deny discovery of [information] that is *relevant only to claims or defenses that have been stricken . . .* , unless the information sought is otherwise relevant to issues in the case") (emphasis added). However, as discussed above, the foreign conduct at issue is relevant to both

---

[15] *See* D.I. 1 at ¶ 28.

062038.00616/40165857v.3

the domestic commerce claims and the export commerce claims, which claims remain at issue in the litigation. Accordingly, under *Oppenheimer*, discovery of the Foreign Conduct Discovery Materials should not be denied. *Id.*

While the FTAIA does limit certain foreign conduct from being actionable under the Sherman Act, the FTAIA does not prohibit the discovery of information that is otherwise discoverable. Indeed, nothing in the FTAIA suggests it was designed to prohibit the discovery of information that is otherwise discoverable and Intel is unable to cite to any case in support of such proposition. In fact, the language in the legislative history surrounding the enactment of the FTAIA that is related to discovery states as follows:

> 1. **Effect of Legislation and Current Law**
>
> A very important question is the effect of the legislation on current antitrust law. It is the **intent** of the sponsors of the legislation and the Committee to address only the subject matter jurisdiction of United States antitrust law in this legislation . . . . **[T]he bill is not intended to restrict the application of American laws to extraterritorial conduct where the requisite effects exist or to the extraterritorial pursuit of evidence in appropriate cases.**

H.R. Rep. No. 97-686, at 13 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2487, 2498 (emphasis added).[16]

Intel offers no answer for what cases would be "appropriate" if these pending cases are not. Rather, Intel focuses on the word "evidence," drawing a distinction between that word and the word "discovery." Intel then argues that substantive law, rather than discovery rules, would

---

[16] While the Special Master acknowledges that the use of legislative history is reserved for instances where the language of the statute is unclear, the Special Master views the legislative history as instructive, especially as the FTAIA itself is silent with respect to discovery. The Special Master notes that the legislative history cited herein is consistent with the statutory construction rule of *in pari materia* – *i.e.*, a new statute should be read as part of the existing legislature and should expressly indicate any intended divergence.

not permit "evidence" to be considered unless it was relevant to claims having "the direct requisite effect on U.S. commerce." D.I. 274 at 46:13-51:17. The Special Master concludes that this argument is non-availing, given that AMD has claimed domestic injury for its export commerce claims. D.I. 1 at ¶¶ 2, 36, 63, 67 and 129.

Additionally, Intel offers no authority in support of its theory that – under similar circumstances – the FTAIA precludes discovery of the foreign conduct related to both AMD's domestic commerce claims and its export commerce claims. In contrast, AMD offers authority in the form of several court decisions authored after the enactment of the FTAIA that clearly permitted such discovery. D.I. 236 at p. 4. In reviewing these authorities, the Special Master notes two authorities, including one from this Court, that are particularly instructive.

In *Dentsply*, this Court addressed the relevancy of foreign market data to alleged violations of the Sherman Act, with respect to:

> facts relevant to the United States' claim that Dentsply has violated antitrust laws by imposing a condition on its United States dealers that has foreclosed competitors from entering the artificial tooth market in the United States, and whether and to what extent competitive artificial teeth entered the United States market and what effect, if any, Dentsply's United States distribution policy has had on the ability of competitive artificial teeth to enter the United States market.

*Dentsply*, 2000 WL 654286 at *5. The Court concluded that "The fact that the United States is the relevant market in this case does not necessarily limit discovery to the United States." *Id.* The Court permitted each category of discovery sought, based upon its findings that they were probative of such issues as "intent" and "effect on competition." *Id.* at *5-6.

Similarly, the United States District Court for the Eastern District of Pennsylvania permitted the discovery of foreign documents that were produced to a foreign investigative body upon a finding they were relevant to antitrust claims affecting American commerce:

22

> Regardless of whether plaintiffs have alleged a global conspiracy, materials produced to international government authorities may cover transactions involving the sale or marketing of plastic additives in the United States. They may also cover transactions and decision-making outside the United States that influence the sale or marketing of plastic additives in the United States. Accordingly, these documents may lead to evidence that illuminates defendants' motive and opportunity for the alleged conspiracy within the United States, the breadth of the conspiracy, and the manner by which the defendants fraudulently concealed the conspiracy from plaintiffs.

*Plastic Additives*, 2004 WL 2743591 at *14.

Based upon the plain language of the FTAIA, and consistent with the legislative history of the FTAIA and the rationale underlying the decisions of courts that have permitted discovery of foreign conduct in antitrust cases, the Special Master concludes that the FTAIA does not preclude AMD from obtaining the discovery sought by Plaintiffs' motions.

## CONCLUSION

In conclusion, and for the reasons set forth above, the Special Master recommends that Plaintiffs' motions to compel Intel to produce the Foreign Conduct Discovery Materials be GRANTED. In this regard, the Special Master does not opine on the ultimate admissibility of any Foreign Conduct Discoverability Material for purposes of trial.

**The Special Master's Report and Recommendation will become a final order of the Court unless objection is timely taken by December 27, 2006, in accordance with the Court's Order dated December 8, 2006.**

ENTERED this
15th day of December, 2006

_____
Vincent J. Poppiti  (DSBA No. 100614)
Special Master

23