# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE<br>INTEL CORP.<br>MICROPROCESSOR ANTITRUST<br>LITIGATION | MDL No. 05-1717-JJF |
| PHIL PAUL, *on behalf of himself*<br>*and all others similarly situated,*<br><br>                    Plaintiffs,<br><br>          v.<br><br>INTEL CORPORATION,<br><br>                    Defendant. | Civil Action No. 05-485-JJF<br><br>CONSOLIDATED ACTION |

## CLASS PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO INTEL'S MOTION TO DISMISS CLASS PLAINTIFFS' FOREIGN CONDUCT CLAIMS

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Allyson B. Baker
COHEN, MILSTEIN, HAUSFELD
  & TOLL P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Telephone:   (202) 408-4600
Facsimile:   (202) 408-4699

PRICKETT JONES & ELLIOTT, P.A.
James L. Holzman (#663)
J. Clayton Athey (#4378)
Laina M. Herbert (#4717)
1310 King Street
P.O. Box 1328
Wilmington, DE 19899
jlholzman@prickett.com
jcathey@prickett.com
lmherbert@prickett.com
Telephone: (302) 888-6500
Facsimile: (302) 658-8111

*Interim Liaison Counsel for the Class Plaintiffs*

Michael P. Lehmann
Thomas P. Dove
Alex C. Turan
FURTH LEHMANN & GRANT LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Telephone:   (415) 433-2070
Facsimile:    (415) 982-2076

Steve W. Berman
Anthony D. Shapiro
HAGENS BERMAN SOBOL
   SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone:   (206) 623-7292
Facsimile:    (206) 623-0594

Guido Saveri
R. Alexander Saveri
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111
Telephone:   (415) 217-6810
Facsimile:    (415) 217-6813

*Interim Co-Lead Counsel*

Dated: December 22, 2006

## TABLE OF CONTENTS

INTRODUCTION ............................................................................... 1

BACKGROUND ................................................................................ 3

    The Allegations of the Class Action Complaint ......................................... 3

    Intel's Motion to Dismiss in the AMD Case ............................................. 4

    Motions to Compel Intel to Produce Foreign
    Conduct Documents ......................................................................... 5

ARGUMENT ................................................................................... 7

I.     On This Motion, The Court Must Accept all Allegations In
      The Class Action Complaint As True ...................................................... 7

II.    Class Plaintiffs May Rely On Intel's Foreign
      Anticompetitive Conduct To Prove A Domestic
      Violation .................................................................................... 7

III.   Intel's Foreign Exclusionary Conduct Satisfies The
      FTAIA's Domestic Commerce Exception ................................................ 9

      A.    Intel's Foreign Exclusionary Conduct Had A
          Direct, Substantial, and Reasonably Foreseeable
          Effect on United States Commerce ............................................... 10

            1.    The FTAIA Looks to the Effect of Foreign
                 Conduct on U.S. Commerce, Not on a
                 Particular Plaintiff ...................................................... 11

            2.    Antitrust Cases Applying the FTAIA Show
                 That Directness Should Not Be Determined
                 By Parsing Causation ................................................... 12

          a.    *Caribbean Broadcasting* ............................................... 13

          b.    *Den Norske* .............................................................. 15

          c.    *MM Global Services* ................................................... 16

          d.    *Information Resources* ................................................. 17

i

3.    The FTAIA's Legislative History Confirms
that Domestic Effects Can Be Direct Though
Causation Involves Multiple Steps ................................... 19

B.    The Domestic Effects of Intel's Foreign Conduct
Give Rise to Class Plaintiffs' Antitrust Claims ........................... 20

C.    International Comity Concerns Do Not Warrant a
Narrow Application of the FTAIA's Domestic
Commerce Exception in Cases for Monopolization
of World Markets, Because the Anticompetitive
Effects are Equally Direct in All Countries ................................ 21

CONCLUSION ................................................................................................ 23

# TABLE OF AUTHORITIES

CASES

*Adkins v. Rumsfeld,*
   No. 04-1453, 2006 WL 2458630 ...........................................................................7

*Caribbean Broadcasting System, Ltd. v. Cable & Wireless P.L.C.,*
   148 F.3d 1080 (D.C. Cir. 1998) ........................................................... 10, 13-14, 18

*Den Norske Stats Oljeselskap As v. HeereMac Vof,*
   241 F.3d 420 (5th Cir. 2001) ...................................................................... Passim

*F. Hoffman-La Roche Ltd. v. Empagran S.A.,*
   542 U.S. 155 (2004) ................................................................................... Passim

*In re Kaiser Group Int'l., Inc.,*
   399 F.3d 558 (3d Cir. 2005) ..................................................................................7

*Information Resources, Inc. v. Dun & Bradstreet Corp.,*
   127 F.Supp.2d 411 (S.D.N.Y. 2000) ....................................................................17

*Information Resources, Inc. v. Dun & Bradstreet Corp.,*
   260 F.Supp.2d 659 (S.D.N.Y. 2003) ............................................................ Passim

*LePage's Inc. v. 3M,*
   324 F.3d 141 (3d Cir.) .......................................................................................12

*McConnell v. Federal Election Commission,*
   540 U.S. 93 (2003) .........................................................................................2-3

*MM Global Services, Inc. v. Dow Chemical Co.,*
   No. 02-1107, 2004 WL 556577 (D. Conn. 2004) ........................................... Passim

*Mortensen v. First Federal Sav. and Loan Assoc.,*
   549 F.2d 884 (3d Cir. 1977) .................................................................................7

*Nokia Corp. v. Interdigital Communications,*
   No. 05-16, 2005 WL 3525696 (D. Del. 2005) .........................................................7

*Tampa Elec. Co. v. Nashville Coal Co.,*
   365 U.S. 320 (1961) ..........................................................................................22

*United Phosphorus, Ltd. v. Angus Chemical Co.,*
   131 F.Supp.2d 1003 (N.D. Ill. 2001), *aff'd*, 322 F.3d 942 (7th Cir. 2003) .............11

**STATUTES**

15 U.S.C. § 6a ......................................................................................................8

15 U.S.C. § 6a(1) .............................................................................................9, 11

15 U.S.C. § 6a(1)(A) ..........................................................................................10

15 U.S.C. § 6a(2) .............................................................................................9, 20

**OTHER AUTHORITIES**

H.R Rep. No. 97-686 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2487 ..................................... 19-20

"Special Master's Report and Recommendations" MDL D.I. 365 .............................................. 5-6

Rule 12(b)(1) ......................................................................................................6

"September 26 Decision," MDL D.I. 280 ...................................................................................5

## INTRODUCTION

Some of the issues raised by Intel's Motion to Dismiss pursuant to 12(b)(1) of the Federal Rules of Judicial Procedure, first arose in connection with the motions of Class Plaintiffs and AMD to compel Intel to produce its foreign conduct documents. In support of their motion to compel, Class Plaintiffs showed that the extraterritorial reach of the state laws on which their claims are based is not limited by the Foreign Trade Antitrust Improvements Act ("FTAIA"), a statute that defines only the reach of the Sherman Act. *See* Class Pls.' Opening Brief in Support of Mot. to Compel at 8-10 (Oct. 30, 2006), D.I. 302.[1] Class Plaintiffs further demonstrated that these state laws are not otherwise limited by any statutory provisions comparable to the FTAIA. *See id.* at 9. While Class Plaintiffs dispute Intel's assertion on this motion to dismiss that application of these state laws to Intel's foreign conduct would be unconstitutional, they need not address that argument here because Intel's motion should be denied even if the state laws were subject to the FTAIA.[2]

The motion must be denied for two primary reasons. First, the Special Master's analysis in recommending that Intel be compelled to produce its foreign conduct documents compels the denial of this motion. As the Special Master recognized, Class Plaintiffs have alleged claims challenging the lawfulness of Intel's *domestic* conduct. The Special Master held that Intel's foreign misconduct is relevant to these domestic conduct claims. Such claims plainly are outside

---

[1]     References to "D.I. ___" are to docket items in C.A. No. 05-MD-1717 unless otherwise noted.

[2]     Moreover, the Court should refrain from reaching any ostensible constitutional issues because this motion can be resolved on other grounds. *See, e.g., McConnell v. Federal Election Commission*, 540 U.S. 93, 280 n.12 (2003) ("[a]fter all, the constitutional avoidance doctrine counsels us to adopt constructions of statutes to 'avoid decision of constitutional questions,' not to deliberately create constitutional questions.").

the scope of the FTAIA, and as the Special Master's ruling implies, that is no less so if Class Plaintiffs rely on Intel's foreign conduct as part of their proof of the domestic violation.

Second, the motion must be denied because Intel's foreign exclusionary conduct in fact is actionable under state and federal antitrust law. The FTAIA does not place Intel's foreign conduct beyond the reach of the Sherman Act or the state laws on which Class Plaintiffs sue. Such conduct falls within the FTAIA's exception for foreign conduct that has a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce. Authority that was not brought to the Court's attention on Intel's motion to dismiss AMD's foreign commerce claims -- including decisions applying the FTAIA in cases like this one and a portion of the statute's legislative history -- demonstrates that Intel's foreign misconduct had a direct effect on U.S. commerce.

## BACKGROUND

<u>The Allegations of the Class Action Complaint</u>

As alleged in their complaint, Class Plaintiffs and the members of the class they seek to represent are United States consumers – individuals and companies – that purchased computers that contain Intel x86 microprocessors. *See, e.g.*, First Amended Consolidated Complaint ("Complaint"), ¶ 106, D.I. 108. These purchases were made in the United States. *Id.* And the Class's injuries were suffered in the United States when they purchased the Intel computers at inflated prices. *Id.* ¶ 234.

The complaint also alleges that the market which Intel has unlawfully monopolized is the world-wide x86 microprocessor market.[3] *See id.* ¶ 231. Intel monopolized the world market through anticompetitive conduct in this country, *e.g.*, *id.* ¶¶143-44, 150, 153-58, 177, 180, 184, 192, 203, 208, and abroad, *e.g.*, *id.* ¶¶145-49, 159-62, 178-79, 183, 190, 204-05, 210. The domestic effect of Intel's domestic and foreign conduct was reduced competition, higher prices, less innovation and less freedom of choice in the United States portion of the x86 microprocessor market. *Id* ¶¶ 233-235. In particular, Intel's foreign and domestic misconduct has resulted in higher prices in the United States for Intel's x86 microprocessors, even after accounting for applicable discounts and rebates attributable to microprocessor purchases. *Id.* ¶ 234. Intel's overcharges were passed on to the Class in the form of higher prices for computers containing Intel's x86 microprocessors. *Id.*

As alleged in the complaint, Plaintiffs' monopolization claims arise under state law, including the antitrust and consumer protection statutes of thirty-two states. *Id.* ¶¶ 268-315. Plaintiffs also assert a claim under Section 2 of the Sherman Antitrust Act for injunctive relief. *Id.* ¶¶ 236-246.

---

[3]    Intel does not dispute that the relevant market is the worldwide market for x86 microprocessors. *See* Answer to AMD's Complaint ¶ 24, D.I. 51 in 05-cv-441.

<u>Intel's Motion to Dismiss in the AMD Case[4]</u>

On May 2, 2006, Intel moved under the FTAIA to dismiss AMD's claims, but only to the extent they sought redress for foreign harm. Specifically, Intel's motion sought "an order dismissing or striking all claims that are based on alleged lost sales of AMD's German-made microprocessors to foreign customers." Memorandum in Support of Intel's Motion to Dismiss AMD's Foreign Commerce Claims ("Mot. to Dismiss AMD Foreign Commerce Claims") at 30, D.I. 64-65. ("[t]he allegations in the Complaint of foreign conduct that allegedly interfered with the sale of foreign-manufactured microprocessors to foreign customers should be dismissed or, alternatively, stricken."); *See id.* at 31 (seeking dismissal to the extent "AMD seeks recovery under U.S. antitrust law for lost sales of its foreign-made microprocessors to foreign companies in foreign locations."); *id at 2.* ("AMD cannot invoke the U.S. antitrust laws to attempt to address these alleged harms that occurred (if at all) outside the United States."); *id.* ("AMD does not – and cannot – meet either prong of [the FTAIA exception] for claims based on the alleged lost sales of its German-manufactured microprocessors to foreign customers."); *id.* at 3 ("AMD's claims of foreign harm should be dismissed"); *id* at 5. Significantly, Intel did not seek to dismiss AMD's claim based on lost sales to customers in the United States.[5]

---

[4]    Class Plaintiffs did not participate in the briefing of Intel's Motion to Dismiss AMD's foreign commerce claims. This is their first opportunity to weigh in on the extraterritorial reach of state and federal antitrust law in this case.

[5]    Thus, Intel has switched course here. In its motion to dismiss in the AMD case, it apparently recognized that it could not defeat AMD's claim for domestic injury. Now Intel seeks to dismiss Class Plaintiffs' claims for U.S. injury – the only claims they have asserted in this litigation -- to the extent such claims are based on foreign conduct. Intel's assertion that the Court dismissed "all of AMD's claims for injuries arising from Intel's alleged foreign conduct," Intel Mem. at 3, is incorrect. As the Special Master recognized, and as discussed herein, the September 26 Decision left AMD's domestic commerce claims and export claims intact even though they are based in part on Intel's foreign conduct.

On September 26, 2006, the Court issued a Memorandum Decision ("September 26 Decision," D.I. 280) dismissing AMD's claims, but *only* to the extent they were based on AMD's lost *foreign* sales caused by Intel's foreign conduct. Consistent with the limited relief requested in Intel's motion, the Court did not dismiss AMD's claims for lost sales to U.S. customers. *In re Intel Microprocessor Antitrust Litig.*, Nos. MDL 05-1717, Civ. A. 05-441, 2006 WL 2742297 at *4 (D. Del. Sept. 26, 2006) (holding that the Court "lacks jurisdiction over AMD's claims that are based on lost sales of AMD's German-made microprocessors to foreign customers as alleged in [specified paragraphs of the AMD complaint]."). *See id.* at *15 (holding that "any alleged harm suffered by AMD has been directly caused by the foreign effects of Intel's alleged conduct, namely lost foreign sales."); *id.* at *7 (concluding that Court "lacks subject matter jurisdiction under the FTAIA over AMD's claims, to the extent those claims are based on foreign conduct and foreign harm.").

<u>Motions to Compel Intel to Produce Foreign Conduct Documents</u>

After the September 26 Decision, Intel amended its responses to Class Plaintiffs' document requests to lodge a relevance objection based on the Court's ruling. *See* Intel's Amended Responses to Class Plaintiffs' Second Request for Production at 3, Exhibit B to D.I. 302. Specifically, Intel stated that it would not produce documents that "evidence or constitute Intel's conduct in foreign commerce...." *Id.* at 5. Plaintiffs, as well as AMD, then moved to compel production of Intel's foreign conduct documents.

On December 15, 2006, the Special Master issued a report and recommendation ("Report," D.I. 365) recommending that the motions be granted. The Special Master described Intel's argument to be that the September 26 Decision "strips all claims based on Intel's foreign conduct out of these cases and, therefore, renders irrelevant any discovery about Intel's foreign

conduct." Report at 4. The Report also observed that the September 26 Decision only dismissed AMD's claims for foreign injuries. *Id.* at 5. The Special Master further noted that after the September 26 Decision, AMD had two claims remaining in the litigation: (1) domestic commerce claims for lost sales to U.S. customers, and (2) export commerce claims for lost sales of American-made microprocessors to foreign customers. *Id.* at 11.

As to the domestic commerce claim, the Special Master held that AMD and the Class Plaintiffs are entitled to foreign conduct discovery to prove two elements of their claims: monopoly power and anticompetitive conduct. On the ground that Intel's market power could be proved through evidence that "Intel has the power to control prices or exclude competition" (*id* at 17), the Special Master ruled that foreign conduct discovery was "reasonably calculated to lead to the discovery of exclusionary conduct that would be indicative of monopoly power in the global marketplace" (*id.*). The Special Master also held that Intel's foreign conduct was material to AMD's domestic commerce claim because AMD (and Class Plaintiffs) must prove that Intel's exclusionary conduct in the United States "was sufficiently material to the overall relevant market so as to violate U.S. antitrust laws." *Id.* at 19. Given that the relevant market was worldwide and that approximately 68% of x86 computers are sold to non-U.S. customers, the Special Master concluded that "evidence of foreign exclusionary conduct is essential for AMD to demonstrate that Intel's alleged exclusionary conduct was sufficiently material to the overall relevant market so as to violate U.S. antitrust laws." *Id.* at 19-20.

## ARGUMENT

I.    **On This Motion, The Court Must Accept All Allegations In The Class Action Complaint As True.**

In assessing Intel's Rule 12(b)(1) motion to dismiss Class Plaintiffs' complaint, the "Court must accept all factual allegations in the Complaint as true, and the Court may only consider the complaint and any other documents referenced in or attached to that complaint." *Adkins v. Rumsfeld*, No. 04-1453, 2006 WL 2458630 at * 2 (D. Del. Aug. 24, 2006) (Exhibit A hereto). *See Mortensen v. First Federal Sav. and Loan Assoc.*, 549 F.2d 884, 891 (3d Cir. 1977) (discussing the Rule 12(b)(1) standard of review)*; In re Kaiser Group Int'l., Inc.*, 399 F.3d 558 (3d Cir. 2005) (recognizing that on a facial 12(b)(1) challenge, the court will treat "all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff"). This rule applies here because Intel's motion is a facial challenge to the complaint; Intel does not "dispute the existence of the jurisdictional facts alleged in the Complaint." *Nokia Corp. v. Interdigital Communications*, No. 05-16, 2005 WL 3525696 at *2 (D. Del. Dec. 21, 2005) (Exhibit B hereto). Accordingly, Intel must show that, accepting the truth of all allegations in the complaint, Class Plaintiffs' claims must be dismissed to the extent they are based on Intel's foreign conduct. For the reasons set forth herein, Intel has not carried its burden.

II.   **Class Plaintiffs May Rely On Intel's Foreign Anticompetitive Conduct To Prove A Domestic Violation.**

Intel asks the Court to dismiss Class Plaintiffs' claims to the extent they are "based on" foreign conduct allegations. *See, e.g.*, Mem. in Support of Intel Corp.'s Mot. to Dismiss Pls.' Foreign Conduct Claims (Nov. 3, 2006) ("Intel Mem.") at 21, D.I. 312. By using the vague term "based on" Intel does not address the key question: can Class Plaintiffs' claims rely in any way on Intel's foreign conduct? Specifically, Intel fails to confront the critical distinction between (a)

holding Intel liable for its foreign conduct under state or federal antitrust law, and (b) relying on the foreign conduct as part of Class Plaintiffs' proof of the unlawfulness of Intel's U.S. conduct.

Class Plaintiffs' claims can be based on Intel's foreign misdeeds even if it were true (which it is not, *see infra* at 9) that Intel cannot be held liable for them under U.S. or state antitrust law. Intel's foreign conduct is relevant to proving the unlawfulness of Intel's *domestic* misconduct. To the extent they challenge Intel's actions in the United States, Class Plaintiffs' claims are outside the ambit of the FTAIA. The conduct placed beyond the Sherman Act's reach by the FTAIA (subject to exceptions) is "conduct involving trade or commerce (other than import trade or import commerce) with *foreign* nations...." 15 USC § 6a (emphasis added). The FTAIA does not affect claims arising from conduct involving domestic commerce. That is no less true here if Class Plaintiffs rely on Intel's foreign conduct as part of their proof of the unlawfulness of Intel's conduct in the United States. *See* Report at 20-21 ("the foreign conduct at issue is relevant to both the domestic commerce claims [asserted by both Class Plaintiffs and AMD] and the export claims [asserted only by AMD], which claims remain at issue in the litigation."); *id.* at 21 ("the FTAIA does not prohibit the discovery of information that is otherwise discoverable."). Use of foreign conduct to prove a domestic violation is not tantamount to making Intel liable for its foreign conduct. *See id.*

The Special Master's Report compels that conclusion. The Special Master permitted discovery of Intel's foreign conduct though the Court had ruled that the FTAIA placed Intel's foreign exclusionary conduct beyond the reach of the Sherman Act. The Special Master held that proof of the foreign conduct was relevant to proving a claim that was not barred by the FTAIA. Report at 14-21. Specifically, the foreign conduct, he held, is relevant to two elements of a claim for injury resulting from Intel's domestic conduct: (a) Intel's monopoly power and (b)

8

the materiality of Intel's exclusionary conduct in the United States. *Id.* at 19-20. Foreign

conduct would not be relevant to a domestic claim – and discovery of such conduct would not be

permitted – if the FTAIA deprived the Court of jurisdiction to consider such conduct as evidence

of a domestic violation. The upshot of the Special Master's Report, therefore, is that in the

language of the FTAIA, the Sherman Act is not being "appl[ied]" to foreign conduct simply

because such conduct is a part of the plaintiff's proof of a domestic violation. 15 U.S.C. § 6a.

For this reason, even if the FTAIA prohibited imposing liability on Intel under U.S. or

state antitrust law for its foreign anticompetitive behavior, the FTAIA would not make such

behavior irrelevant to this case. Class Plaintiffs' claims could still be "based on" foreign conduct

in that such conduct can be a part of the proof of Intel's domestic violation. Therefore, Intel is

not entitled to the relief it seeks.

III.    **Intel's Foreign Exclusionary Conduct Satisfies The FTAIA's Domestic Commerce Exception.**

Class Plaintiffs have shown that they may rely on Intel's foreign conduct to prove that

Intel's conduct in the United States is unlawful, even if such foreign conduct were not

independently actionable under the FTAIA. Plaintiffs now demonstrate that Intel, in fact, may

be held accountable under U.S. and state antitrust laws for its foreign exclusionary behavior

because such behavior had a direct, substantial and reasonably foreseeable effect on U.S.

commerce.

The FTAIA places all (non-import) conduct involving foreign commerce outside the

Sherman Act's reach unless the conduct satisfies an exception to this rule. *See F. Hoffman-La

Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004). In this case, Class Plaintiffs' claims

satisfy the domestic commerce exception, which has two prongs. First, foreign conduct must

have a "direct, substantial, and reasonably foreseeable effect" on domestic commerce, 15 USC §

9

6a(1), and second, the direct domestic effect of that foreign conduct must "give[] rise to a

[Sherman Act] claim," 15 U.S.C. § 6a(2).  The following discussion of case law applying the

FTAIA, the statute's legislative history, and the international comity considerations that underlie

Congress's passage of the FTAIA demonstrates that both prongs are met here.

> **A.     Intel's Foreign Exclusionary Conduct Had a Direct, Substantial, and
> Reasonably Foreseeable Effect on United States Commerce.**

Intel's anticompetitive conduct overseas had a direct, substantial and reasonably

foreseeable effect on commerce in this country.[6]  Intel's contrary argument is flawed in several

important ways.  First, Intel incorrectly assumes that its foreign conduct must have a direct effect

on *Class Plaintiffs* even though the statute expressly states that the requisite effect must be on

domestic *commerce. See* 15 U.S.C. § 6a(1)(A); *Empagran*, 542 U.S. at 161.  Second, Intel's

arguments ignore the lessons of four cases applying the FTAIA to foreign conduct that, like

Intel's foreign conduct in this case, does not specifically target the United States.  These cases

reveal that:  (1) the directness of the foreign conduct's effect on U.S. commerce should not be

assessed based on how finely the causal chain can be parsed; and (2) the domestic effect from

Intel's foreign conduct in this case is no less direct than the domestic effect, held to be direct

under the FTAIA, from the defendants' foreign conduct in these other cases.  *See Caribbean*

*Broadcasting System, Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1087 (D.C. Cir. 1998);

*Den Norske Stats Oljeselskap As v. HeereMac Vof*, 241 F.3d 420, 426-27 (5th Cir. 2001);

*Information Resources, Inc. v. Dun & Bradstreet Corp.*, 260 F.Supp.2d 659, 669-70 (S.D.N.Y.

2003); *MM Global Services, Inc. v. Dow Chemical Co.*, No. 02-1107, 2004 WL 556577 (D.

---

[6]     In evaluating the domestic effect of foreign conduct, courts, including this Court
in its September 26 Decision, have focused on whether the effect was direct.  Intel does the same
in its motion.  This focus on directness may be because foreseeability follows from directness
and because substantiality usually is not subject to debate.  Class Plaintiffs likewise focus on the
directness component.

Conn. Mar. 18, 2004) (Exhibit C hereto).  Third, Intel's argument is undermined by the

legislative history of the FTAIA.

### 1.    The FTAIA Looks to the Effect of Foreign Conduct on U.S. Commerce, Not on a Particular Plaintiff.

Intel argues that Class Plaintiffs' purchaser *claims* are more indirect than AMD's

competitor claims.  *See* Intel Mem. at 5-6.  Intel's argument is misdirected.  The FTAIA does not

ask the Court to evaluate the foreign conduct's effect on a particular *plaintiff*.  Indeed, the impact

of the illegal foreign conduct need not even be felt by the plaintiff within the United States.  *Den*

*Norske,* 241 F. 3d at 425 n.15 (*quoting* H.R. Rep. No. 97-686 at 12).  Rather, the statute asks a

different question:  whether the foreign conduct "has a 'direct, substantial and reasonably

foreseeable effect' on American domestic, import, or (certain) export *commerce*." *Empagran*,

542 U.S. at 162 (emphasis added).   Whether the foreign conduct's effect on a particular plaintiff

is direct is irrelevant; only the effect on U.S. commerce must be direct.

In this case, Intel's foreign conduct impacted U.S. commerce in multiple ways, including

by reducing competition in the U.S. portion of the x86 microprocessor market, raising prices for

Intel's x86 microprocessors in the United States, and reducing the quality and variety of x86

microprocessor products in the United States.  Compl. ¶¶ 231, 234.  That these domestic effects

were first felt by Intel's competitors and direct customers in the United States, and only

indirectly by the Class, does not matter here.  They still constitute effects on U.S. commerce, and

as such, they satisfy the domestic effect prong of the FTAIA's domestic commerce exception.[7]

---

[7]     Because the effect of Intel's foreign conduct on domestic commerce includes effects occurring *before* Intel's microprocessors are incorporated into computers, such as Intel charging OEMs higher prices for its microprocessors, it is irrelevant that the microprocessors are later resold as part of a computer.  In any event, under the plain language of the FTAIA, the impact of the foreign conduct can be on *any* part of United States commerce.  15 U.S.C. § 6a(1) (creating an exception for foreign conduct having the requisite effect "on trade or commerce

**2.    Antitrust Cases Applying the FTAIA Show That Directness Should Not Be Determined by Parsing Causation.**

In cases where there is no allegation of foreign anticompetitive conduct specifically targeting the United States,[8] the chain of causation from foreign anticompetitive conduct to domestic effect can always be looked at link by link.  If such parsing were enough to conclude that the domestic effect was indirect, then this effect would always be indirect in such cases.  For example, monopolization cases as a class can be viewed as involving multiple causation steps between anticompetitive activity and anticompetitive effect – even within the country where the challenged conduct occurred.  Specifically, one can argue that the steps start with the defendant's anticompetitive conduct, which then injures competitors, which then limits competition, which then creates or maintains the defendant's monopoly power, which then is used to raise prices. *See, e.g., LePage's Inc. v. 3M,* 324 F.3d 141 at 153-54 (3d Cir. 2003).  Parsing causation in cases like this one thus sheds little light on whether the domestic effect should be considered direct.

A review of four antitrust cases that, like this case, do not involve allegations of anticompetitive behavior specifically targeting the United States reveals that the domestic effect in those cases, which was held to be direct, was no more direct than the domestic effect in this

---

which is not trade or commerce with foreign nations").  Nowhere does the statute require that the impact be on a certain part of domestic commerce, such as the market in which the monopolized product is sold.  For similar reasons, Intel's reliance on *United Phophorus, Ltd. v. Angus Chemical Co.*, 131 F.Supp.2d 1003 (N.D. Ill. 2001), *aff'd*, 322 F.3d 942 (7th Cir. 2003) is misplaced.  In that case, the plaintiffs argued that their exclusion from the ingredient market in India affected sales of the finished product in the United States. *Id.* at 1013.  In contrast, in this case, Class Plaintiffs allege a domestic effect in the U.S. portion of the "ingredient" market for x86 microprocessors, not just in the U.S. finished product market for computers.

[8]    Cases involving exclusionary activity in foreign countries directed at the United States provide little guidance here.  That such conduct has a direct effect on U.S. commerce normally is obvious.  Hence, Class Plaintiffs examine cases, like this one, involving foreign anticompetitive conduct that did not specifically target the United States.

case.[9]  These cases therefore compel the conclusion that Intel's foreign conduct in this case

satisfies the FTAIA's directness requirement.

### a. *Caribbean Broadcasting*

In *Caribbean Broadcasting*, the plaintiff, Caribbean Broadcasting System ("CBS"), and

one of the defendants, Caribbean Communications Co. ("CCC"), owned competing FM radio

stations in the Eastern Caribbean. *Caribbean Broadcasting*, 148 F.3d at 1082.  For years, CBS

tried unsuccessfully to sell advertising on its radio station based in the British Virgin Islands. *Id.*

at 1082-1083.  Eventually it sued CCC and CCC's joint venturer, Cable & Wireless ("C&W")

for monopolizing the market for English-language radio broadcast advertising in the Eastern

Caribbean.  *Id.* at 1085-1087.  It alleged that CCC misrepresented to advertisers that they could

reach the entire Caribbean over CCC's station, and that they therefore did not need to advertise

with CBS.  *Id.* at 1082.  CBS further alleged that C&W, in conspiracy with CCC, had made sham

technical objections to CBS's application for a broadcast license, delaying CBS's entry into

broadcasting for more than two years.  *Id.*  According to the complaint, many of the companies

that advertised in the relevant market were based in the United States, and they paid excessive

prices for advertising because of the defendants' unlawful monopolization.  *Id.* at 1087.

The district court had dismissed the complaint for, among other reasons, lack of subject

matter jurisdiction under the FTAIA.  The District of Columbia Circuit reversed.  It construed

the complaint to allege that "CCC and C&W intentionally and successfully, by means of fraud

---

[9]        On the motion to dismiss in the AMD case, the parties did not address *MM Global Services* at all.  Intel only addressed *Den Norske,* and only for its analysis of the second prong of the FTAIA's domestic commerce exception, and not for its directness analysis discussed herein. The parties in *AMD* discussed an earlier decision by the *Information Resources* court, but not the decision discussed by Class Plaintiffs here, which clarified the earlier one.  The Court relied on the earlier decision in its September 26 Decision.  Thus, in rendering its September 26 Decision, the Court did not have the benefit of the analysis provided herein of *Den Norske*, *Information Resources,* and *MM Global Services*.

and deceit, secured monopoly power in the relevant market, used this power to raise prices, and thereby hurt U.S. advertisers." *Id.* The court observed that "antitrust injury to CBS is ultimately a harm to U.S. purchasers of radio advertising." *Id.* It held that this harm to U.S. consumers was "direct," and sufficient to establish subject matter jurisdiction. *Id.*

The parallels between this case and *Caribbean Broadcasting* are substantial. Both involve a relevant market that includes both U.S. and foreign customers. Both involve foreign anticompetitive conduct by the defendant. And both involve allegations that the conduct harmed a competitor and permitted the defendant to monopolize the relevant market, charge higher prices in that market and harm U.S. purchasers who paid the inflated prices. The D.C. Circuit, however, found that harm to be a direct effect on U.S. commerce. Because the harm to U.S. commerce in this case is no less direct, this Court should reach the same conclusion.

The D.C. Circuit could have parsed the causal chain connecting the defendants' foreign conduct and the higher prices paid by U.S. advertisers, but it did not. It could have described a series of steps from the false representations of the defendants, to the decision of advertisers to advertise only on CCC's station, to CBS's inability – for financial or other reasons – to disseminate the truth about the reach of CCC's broadcast signal, to the inability of advertisers to discover the truth themselves, to CBS's inability – for financial or other reasons -- to convince advertisers in any event to use its radio station, to the lessening of competition for the sale of radio advertising in the Eastern Caribbean, to CCC's ability to raise its prices, to U.S. advertisers' payment of inflated prices. Importantly, however, the D.C. Circuit did not parse the causal chain in this manner.[10]

---

[10]    In granting Intel's motion to dismiss in the *AMD* case, this Court distinguished *Caribbean Broadcasting* on the ground that the foreign conduct there "had simultaneous, direct foreign and domestic effects, with the plaintiffs' antitrust claim arising from those direct

### b. *Den Norske*

*Den Norske* is another case in which the defendants' foreign anticompetitive conduct did

not specifically target the United States, but in which the court found the domestic effect to be

direct. The plaintiff in that case was a Norwegian oil company that owned and operated oil and

gas drilling platforms in the North Sea. *Den Norske,* 241 F.3d at 421. The defendants controlled

the world's only heavy-lift barges, which were used by offshore oil drilling companies to

transport oil drilling platforms. *Id.* at 422. The defendants were headquartered in the

Netherlands, Great Britain and the United States. *Id.* at 422 n.2. The plaintiff alleged that they

conspired, among other things, to give two defendants exclusive access to heavy-lift projects in

the Gulf of Mexico, while the third received a higher allocation of the North Sea projects in

return for staying out of the Gulf. *Id.* at 422. In addition to alleging that the conspiracy caused it

to pay inflated prices for heavy-lift services in the North Sea, the plaintiff alleged that these

overpayments compelled it to charge higher prices for crude oil it exported to the U.S., and that

the conspiracy also caused purchasers of heavy-lift services in the Gulf of Mexico to pay inflated

prices. *Id.* The Fifth Circuit found these allegations sufficient to satisfy the domestic effect

prong of the FTAIA:

> We accept the contention that [plaintiff] Statoil has
> sufficiently alleged that the defendants' conduct-that is, the
> agreement among heavy-lift service providers to divide territory,
> rig bids, and fix prices-had a direct, substantial, and reasonably
> foreseeable effect on the United States market. Statoil alleges that
> the conspiracy not only forced purchasers of heavy-lift services in
> the Gulf of Mexico to pay inflated prices, but also that the
> agreement compelled Americans to pay supra-competitive prices

domestic effects," whereas for Intel's foreign conduct "there is no simultaneous direct domestic
effect." Sept. 26 Decision, D.I. 280 at 14. But the question remains: how can it be said that the
foreign conduct of the *Caribbean Broadcasting* defendants had a direct domestic effect but
Intel's did not? Both diminished competition in the relevant market, thereby causing higher
prices in that market that were paid by U.S. customers.

for oil.  These allegations are sufficient to satisfy the first
requirement of the FTAIA.

*Id.* at 426-27.

In *Den Norske*, the chain of causation between foreign conduct and domestic effect could

be parsed easily.  The allocation of territories caused diminished competition in the provision of

heavy-lift services in the North Sea, which caused higher prices for such services, which caused

oil-drilling companies like Statoil to incur higher costs, which caused them to charge higher

prices for crude oil, which caused their U.S. customers to pay higher oil prices.  Yet, the Fifth

Circuit found the domestic effect to be direct.

Here, the effect of Intel's foreign conduct on U.S. commerce is more direct.  In *Den

Norske*, the effect on U.S. commerce was in an entirely different market (crude oil) from the

market (heavy-lift services) in which the foreign anticompetitive conduct occurred.  In this case,

Intel's exclusionary foreign conduct in the worldwide x86 microprocessor market caused U.S.

companies such as Dell and Hewlett-Packard to pay Intel inflated prices for microprocessors sold

in that same market.

### c. *MM Global Services*

In *MM Global Services*, the plaintiffs had distributed chemicals in India for Union Carbide

Corp. and then for its successor, a Dow Chemical Co. affiliate.  When they were terminated as

Dow's distributor, they brought suit, alleging that various Union Carbide and Dow companies had

coerced them into agreeing to fix the resale price of Union Carbide products in India.  They

further alleged that the defendants had engaged in such price-fixing to "'ensure that prices

charged by the plaintiffs to end-users in India for products would not cause erosion to prices for

the products charged by Union Carbide and Dow to end-users . . . in the United States . . . .'"

*MM Global Services*, 2004 WL 556577 at * 5 (quoting amended complaint) (supplied brackets omitted).  The court denied the defendants' motion to dismiss the plaintiffs' antitrust claim under the FTAIA, as well as the defendants' motion for reconsideration.  The court found that "it is not a stretch in logic, and quite foreseeable, to conclude that a conspiracy to fix prices in the Indian market might reasonably cause direct and substantial effects on the prices charged for the same products in the United States."  *Id.* at *6.

In *MM Global Services*, the first effect of the defendants' alleged price fixing was felt in India, the market in which the alleged price-fixing occurred.  Only a secondary effect was visited upon the U.S. market.  The alleged conspiracy helped to keep prices up in the United States by avoiding lower prices in India that would have put downward pressure on U.S. prices.  Thus, the causation chain in *MM Global Services* could be parsed too, as one moves from the price-fixing's primary effects in India to its secondary effects in the United States.  Nonetheless, the court in that case found the price-fixing's domestic effect to be direct.  The same conclusion should be reached in this case because Intel's foreign anticompetitive conduct had a more direct effect on U.S. commerce.  Intel's foreign conduct suppressed competition and inflated prices for Intel's x86 microprocessors throughout the world market, thereby affecting U.S. commerce in the same manner, at the same time, and as directly as it affected Indian commerce or the commerce of any other nation.

### d.  *Information Resources*

In *Information Resources,*[11] the plaintiff, IRI, alleged that Nielsen engaged in anticompetitive conduct in the United States and foreign countries in an effort to destroy IRI as a

---

[11]    In its Motion to Dismiss AMD's complaint at 19, AMD D.I. 51, Intel relied on an earlier *Information Resources* decision, *Information Resources, Inc. v. Dun & Bradstreet Corp.*, 127 F.Supp.2d 411 (S.D.N.Y. 2000), that was subsequently clarified on a motion for

competitor in the retail tracking services industry. *Information Resources*, 260 F.Supp.2d 659 at 661. The alleged foreign conduct had directly injured IRI's foreign subsidiaries, and the district court had ruled earlier that the alleged harm to IRI was derivative and indirect, as it arose only in IRI's capacity as an owner and supplier of its subsidiaries. *Id.* at 661-62. The prior ruling also held that IRI could not recover for the "weakening of its competitive position in the United States because of reduced revenue from its foreign subsidiaries." *Id.* at 662.

On a motion for reconsideration, IRI reformulated its damages claims, which the district court described as follows: "its present claims focus on disbursements it had to make in the United States to repair injuries inflicted on its foreign subsidiaries; it then seeks recovery not of the sums it was required to expend, but of the injuries IRI sustained in the domestic United States market because of the lack of those funds," *id.*, which "would have [been] used to compete against Defendants in the domestic market," *id.* IRI argued that "Defendants fully appreciated that IRI could not afford to fend off an anticompetitive attack on its domestic business, while covering large, unanticipated losses in other geographic markets." *Id.* at 663. The court accepted IRI's argument, holding that "[t]he necessity, intentionally imposed on IRI by defendants' foreign and domestic activities, to devote the use of millions of dollars of its domestic funds to purposes other than its chosen ways of competing, was a 'direct, substantial and reasonably foreseeable effect' on domestic trade or commerce and gave rise to a claim of attempted monopolization." *Id.* at 669.

As in *Caribbean Broadcasting* and *Den Norske*, the causal chain in *Information Resources* readily could be parsed. Defendants' foreign conduct reduced the sales and

---

reconsideration in the *Information Resources* decision discussed herein. *See Information Resources, Inc.*, 260 F.Supp.2d at 669-70. As noted above, the Court relied on the earlier decision in its September 26 Decision.

profitability of IRI's foreign subsidiaries, which required IRI to cover its subsidiaries' losses, which deprived IRI of funds to compete effectively in the United States, which diminished competition in the retail tracking services market in the United States. Despite this multi-step causation, the court in *Information Resources* concluded that the defendants' foreign conduct had a direct effect on domestic commerce.

This chain of causation, moreover, is quite similar to the causation path in this case. Intel's exclusionary foreign conduct limited AMD's foreign sales, which weakened AMD's ability to compete in the United States, which restricted competition in the United States portion of the global x86 microprocessor market. As in *Information Resources*, therefore, the Court should conclude that the foreign conduct in this case had a direct effect on U.S. commerce.

### 3. The FTAIA's Legislative History Confirms that Domestic Effects Can Be Direct Though Causation Involves Multiple Steps.

The legislative history of the FTAIA confirms that foreign conduct's impact on U.S. commerce can have multiple causation steps and still be direct.[12] The House Judiciary Committee report on the bill that became the FTAIA ("House Rep."), H.R Rep. No. 97-686, at *13-*14 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2487, considered whether the bill would result in a revival of international cartels. The report gave short shrift to that concern, asserting that "[a]ny major activities of an international cartel would likely have the requisite impact on United States commerce to trigger United States subject matter jurisdiction." *Id.* at *13. The report then provided an example of how that domestic impact would occur:

> For example, if a domestic export cartel were so
> strong as to have a 'spillover' effect on commerce within
> this country -- by creating a world-wide shortage or
> artificially inflated world-wide price that had the effect of

---

[12]    The parties in *AMD* did not address this portion of the legislative history in their briefs on the motion to dismiss.

> raising domestic prices -- the cartel's conduct would fall
> within the reach of our antitrust laws.  Such an impact
> would, at least over time, meet the test of a direct,
> substantial and reasonably foreseeable effect on domestic
> commerce.

*Id.*

Thus, the committee with jurisdiction over the bill that became the FTAIA specifically devised a hypothetical with more twists and turns than exist in this case.  In the Judiciary Committee's example, the conspiracy targeted foreign markets – the markets importing the products or services from the United States -- which in turn caused a shortage or higher prices (or both) in those foreign markets, which in turn caused a world-wide shortage or price inflation world-wide, including in the United States.  There is no doubt that in the Committee's example, like in *MM Global Services*, the primary effect of the cartel was felt in the foreign countries importing the U.S. goods or services, and only a secondary effect reverberated into the U.S. market.  But the Committee nonetheless thought that the secondary effect was a direct effect under the bill that became the FTAIA.

The conclusion from a review of these cases and this legislative history is clear:  (1) the mere ability to parse the causation chain does not mean that the foreign conduct's effect on U.S. commerce is indirect; and (2) Intel's foreign conduct in this case had a direct effect on U.S. commerce.

**B.    The Domestic Effects Of Intel's Foreign Conduct Give Rise To Class Plaintiffs' Antitrust Claims.**

The second prong of the FTAIA's domestic-commerce exception requires that the effects on domestic commerce "give rise to" the plaintiff's antitrust claim.  *See* 15 U.S.C. § 6a(2); *Empagran*, 542 U.S. at 162, 173-74.  Here, there can be no doubt that the domestic effect of Intel's foreign anticompetitive conduct gives rise to Class Plaintiffs' antitrust claims.  Class

20

Plaintiffs allege that the domestic effect of Intel's foreign anticompetitive conduct included reduced competition and increased prices for Intel's x86 microprocessors sold in the United States. Compl. ¶ 234. Their claims arise from those higher prices, which they allege were passed on to them. *Id.*

In sum, U.S. and state antitrust law may be applied to Intel's foreign conduct because the FTAIA's domestic commerce exception is satisfied. Intel certainly has not shown otherwise. As Class Plaintiffs discuss next, this result is particularly appropriate where, as here, the plaintiff's claim is for monopolization of a global market.

C. **International Comity Concerns Do Not Warrant a Narrow Application of the FTAIA's Domestic Commerce Exception in Cases for Monopolization of World Markets, Because the Anticompetitive Effects are Equally Direct in All Countries.[13]**

The Supreme Court has made clear that whether the FTAIA should be applied broadly or narrowly to a particular factual situation depends in part on comity considerations. *Empagran*, 542 U.S. at 164 ("[T]his Court ordinarily construes ambiguous statutes to avoid unreasonable interference with other nations' sovereign authority."). The Court explained that:

> This rule of statutory construction cautions courts to assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws. It thereby helps the potentially conflicting laws of different nations work together in harmony—a harmony particularly needed in today's highly interdependent commercial world.

*Id.* at 164-65. The Court then explained that comity does not prohibit application of our antitrust laws to foreign conduct in all events—there are times when interference with a country's regulation of its own commerce is justified:

---

[13]    This comity issue was not discussed in the briefing on the motion to dismiss in the AMD case.

> No one denies that America's antitrust laws, when applied to
> foreign conduct can interfere with a foreign nation's ability
> independently to regulate its own commercial affairs. But our
> courts have long held that application of our antitrust laws to
> foreign anticompetitive conduct is nonetheless reasonable, and
> hence consistent with principles of prescriptive comity, insofar as
> they reflect a legislative effort to redress *domestic* antitrust injury
> that foreign anticompetitive conduct has caused.

*Id.* at 165 (emphasis in original).

But in a case alleging monopolization of a world market, no country can claim that comity favors it. In a world market, anticompetitive conduct, wherever it occurs, restrains competition throughout the relevant market, diminishing competition in all countries and making application of U.S. antitrust laws (as well as other countries' competition laws) reasonable and consistent with principles of comity. In this case, therefore, comity does not counsel a restrictive application of the FTAIA's domestic-commerce exception. Intel's foreign anticompetitive conduct affected United States commerce no less, and no less directly, than it impacted the commerce of any other country.

The very concept of a relevant geographic market makes it abundantly clear that anticompetitive conduct in a world market, no matter where it occurs, suppresses competition throughout the market, generating simultaneous and equally direct anticompetitive effects in all countries within the market. The geographic scope of a relevant market is the area in which sellers of the product effectively compete. *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 331-32 (1961). If competition among sellers is reduced, it necessarily is reduced throughout the area in which they compete. When, as in this case, that area is worldwide, the reduction in competition is worldwide, and certainly includes the United States no less than any other country. For that reason, comity does not counsel a restrictive application of the FTAIA's domestic commerce exception in this case.

22

## CONCLUSION

For the foregoing reasons, Class Plaintiffs respectfully request that the Court deny Intel's

motion to dismiss Class Plaintiffs' foreign conduct claims.

Dated: December 22, 2006

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Allyson B. Baker
COHEN, MILSTEIN, HAUSFELD
  &amp; TOLL P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC 20005
Telephone: (202) 408-4600

Michael P. Lehmann
Thomas P. Dove
Alex C. Turan
FURTH LEHMANN & GRANT LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Telephone: (415) 433-2070

Steve W. Berman
Anthony D. Shapiro
HAGENS BERMAN SOBOL
  SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292

Guido Saveri
R. Alexander Saveri
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111
Telephone: (415) 217-6810

*Interim Co-Lead Counsel*

PRICKETT JONES & ELLIOTT, P.A.

By: _____
   James L. Holzman (#663)
   J. Clayton Athey (#4378)
   Laina M. Herbert (#4717)
   1310 King Street
   P.O. Box 1328
   Wilmington, DE 19899
   jlholzman@prickett.com
   jcathey@prickett.com
   lmherbert@prickett.com
   Telephone: (302) 888-6500

*Interim Liaison Counsel for the Class
Plaintiffs*

## CERTIFICATE OF SERVICE

I, J. Clayton Athey, hereby certify that on this 22nd day of December, 2006, I caused the foregoing Class Plaintiffs' Memorandum of Law in Opposition to Intel's Motion to Dismiss Class Plaintiffs' Foreign Conduct Claims to be served on the following counsel via electronic filing:

Frederick L. Cottrell, III, Esquire
Chad Michael Shandler, Esquire
Steven J. Fineman, Esquire
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
cottrell@rlf.com
shandler@rlf.com
fineman@rlf.com
*Counsel for AMD International Sales & Service LTD and Advanced Micro Devices, Inc.*

Charles P. Diamond, Esquire
Mark A. Samuels, Esquire
Linda J. Smith, Esquire
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
CDiamond@omm.com
MSamuels@omm.com
lsmith@omm.com
*Counsel for AMD International Sales & Service LTD and Advanced Micro Devices, Inc.*

Adam L. Balick, Esquire
Bifferato Gentilotti Biden & Balick
711 North King Street
Wilmington, DE 19801-3503
abalick@bgbblaw.com
*Counsel for AMD International Sales & Service LTD and Advanced Micro Devices, Inc.*

Laurin Grollman, Esquire
Salem M. Katsh, Esquire
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
lgrollman@kasowitz.com
skatsh@kasowitz.com
*Counsel for AMD International Sales & Service LTD and Advanced Micro Devices, Inc.*

Richard L. Horwitz, Esquire
W. Harding Drane, Jr., Esquire
Potter Anderson & Corroon, LLP
1313 N. Market St., Hercules Plaza, 6th Flr.
P.O. Box 951
Wilmington, DE 19899-0951
rhorwitz@potteranderson.com
wdrane@potteranderson.com
*Counsel for Intel Corporation and Intel Kabushiki Kaisha*

David Mark Balabanian, Esquire
Joy K. Fuyuno, Esquire
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA 94111-4067
david.balabanian@bingham.com
joy.fuyuno@bingham.com
*Counsel for Intel Corporation*

Christopher B. Hockett, Esquire
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA 94111
chris.hockett@bingham.com
*Counsel for Intel Corporation*

Daniel S. Floyd, Esquire
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California
90071-3197
dfloyd@gibsondunn.com
*Counsel for Intel Corporation*

Robert E. Cooper, Esquire
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California
90071-3197
rcooper@gibsondunn.com
*Counsel for Intel Corporation*

Donald F. Drummond, Esquire
Drummond & Associates
One California Street, Suite 300
San Francisco, CA 94111
ballen@drummondlaw.net
*Counsel for Dressed to Kill Custom Draperies LLC, Jose Juan, Tracy Kinder and Edward Rush*

Darren B. Bernhard, Esquire
Peter E. Moll, Esquire
Howrey LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004
Bernhardd@howrey.com
*Counsel for Intel Corporation and Intel Kabushiki Kaisha*

B.J. Wade, Esquire
Glassman Edwards Wade & Wyatt, P.C.
26 N. Second Street
Memphis, TN  38103
bwade@gewwlaw.com
*Counsel for Cory Wiles*

Nancy L. Fineman, Esquire
Cotchett, Pitre, Simon & McCarthy
840 Malcolm Road, Suite 200
Burlingame, CA  94010
nfineman@cpsmlaw.com
*Counsel for Trotter-Vogel Realty Inc.*

Robert D. Goldberg, Esquire
Biggs and Battaglia
921 North Orange Street, P.O. Box 1489
Wilmington, DE  19899
goldberg@batlaw.com
*Counsel for Charles Dupraz, Vanessa Z. DeGeorge, Melissa Goeke, Nancy Bjork, James R. Conley, Jeff Vaught, Jim Kidwell Richard Caplan, Virginia Deering, Ficor Acquisition Co. LLC, Tom Hobbs, David Kurzman, Leslie March, Andrew Marcus, Paula Nardella, Bill Richards, Maria Pilar Salgado, Ron Terranova, Nancy Wolft Ryan James Volden and Carl Yamaguchi*

Donald Chidi Amamgbo, Esquire
Amamgbo & Associates, APC
1940 Embarcadero Cove
Oakland, CA  94606
donaldamamgbo@citycom.com
*Counsel for Athan Uwakwe*

Jeffrey F. Keller, Esquire
Jade Butman, Esquire
Law Offices of Jeffrey F. Keller
425 Second Street, Suite 500
San Francisco, CA  94107
jkeller@jfkellerlaw.com
jbutman@kellergrover.com
*Counsel for David E. Lipton, Maria I. Prohias, Patricia M. Niehaus, Peter Jon Naigow, Ronld Konieczka, Steve J. Hamilton, Susan Baxley and Kevin Stoltz*

Gordon Ball, Esquire
Ball & Scott
550 W. Main Ave., Suite 750
Knoxville, TN  37902
gball@ballandscott.com
*Counsel for Andrew Armbrister and Melissa Armbrister*

Joseph M. Patane, Esquire
Law Offices of Joseph M. Patane
2280 Union Street
San Francisco, CA  94123
jpatane@tatp.com
*Counsel for Karol Juskiewicz and Lawrence Lang*

James Gordon McMillan, III, Esquire
Bouchard Margules & Friedlander
222 Delaware Avenue,
Suite 1400
Wilmington, DE 19801
jmcmillan@bmf-law.com
*Counsel for Raphael Allison and Matthew Kravitz*

Michele C. Jackson, Esquire
Lieff Cabraser Heimann & Bernstein, LLP
Embarcadero Center West, 275 Battery Street, 30th Floor
San Francisco, CA  94111
mjackson@lchb.com
*Counsel for Huston Frazier, Jeanne Cook Frazier and Brian Weiner*

A. Zachary Naylor, Esquire
Robert Kriner, Jr., Esquire
Robert R. Davis, Esquire
James R. Malone, Jr., Esquire
Chimicles & Tikellis, LLP
One Rodney Square, P.O. Box 1035
Wilmington, DE 19899
zacharynaylor@chimicles.com
robertkriner@chimicles.com
robertdavis@chimicles.com
jamesmalone@chimicles.com
*Counsel for Gideon Elliott, Angel Genese, Nir Goldman, Paul C. Czysz, Elizabeth Bruderle Baran, Carrol Cowan, Russell Dennis, Damon DiMarco, Kathy Ann Chapman, Caresse Harms, JWRE Inc., Leonard Lorenzo, Michael E. Ludt, John Maita, Chrystal Moeller, Robert J. Rainwater, Mary Reeder, Stuart Schupler and Sonia Yaco*

Ali Oromchian, Esquire
Finkelstein, Thompson & Loughran
601 Montgomery Street, Suite 665
San Francisco, CA 94111
ao@ftllaw.com
*Counsel for Ian Walker, Damon DiMarco, Carrol Cowan, Leonard Lorenzo and Russell Dennis*

Vincent J. Esades, Esquire
Muria J. Kruger, Esquire
Marguerite E. O'Brien, Esquire
Heins Mills & Olson, P.L.C.
3550 I.D.S. Center
80 S. Eight Street
Minneapolis, MN 55402
vesades@heinsmills.com
mkruger@heinsmills.com
mobrien@heinsmills.com
*Counsel for Bergerson & Associates Inc.*

Harry Shulman, Esquire
Robert Mills, Esquire
The Mills Law Firm
145 Marina Boulevard
San Rafeal, CA 94901
harry@millslawfirm.com
deepbluesky341@hotmail.com
*Counsel for Stuart Munson*

Douglas A. Millen, Esquire
Steven A. Kanner, Esquire
Much Shelist Freed Denenberg Ament & Rubenstein, P.C.
191 North Wacker Drive, Suite 1800
Chicago, IL 60606
dmillen@muchshelist.com
skanner@muchshelist.com
*Counsel for HP Consulting Services Inc. and Phillip Boeding*

Garrett D. Blanchfield, Jr., Esquire
Mark Reinhardt, Esquire
Reinhardt Wendorf & Blanchfield
332 Minnesota Street, Suite E-1250
St. Paul, MN 55101
g.blanchfield@rwblawfirm.com
mreinhardt@comcast.net
*Counsel for Susan Baxley*

Hollis L. Salzman, Esquire
Kellie Safar, Esquire
Goodking Labaton Rudoff & Sucharow, LLP
100 Park Avenue
New York, NY 10017
hsalzman@labaton.com
ksafar@labaton.com
*Counsel for Angel Genese, Gideon Elliott and Nir Goldman*

Jason S. Kilene, Esquire
Daniel E. Gustafson, Esquire
Gustafson Gluek PLLC
650 Northstar East, 608 Second Avenue South
Minneapolis, MN 55402
jkilene@gustafsongluek.com
dgustafson@gustafsongluek.com
*Counsel for Fiarmont Orthopedics & Sports Medicine PA*

Lance A. Harke, Esquire
Harke & Clasby
155 S. Miami Avenue
Miami, FL 33130
lharke@harkeclasby.com
*Counsel for Nathaniel Schwartz and Maria I. Prohias*

Bruce J. Wecker, Esquire
Hosie McArthur LLP
One Market Street
Spear Street Tower #2200
San Francisco, CA 94105
bwecker@hosielaw.com
*Counsel for Dwight E. Dickerson*

Francis O. Scarpulla, Esquire
Law Offices of Francis O. Scarpulla
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
foslaw@pacbell.net
*Counsel for Lazio Family Products, Law Offices of Laurel Stanley, William F. Cronin, Michael Brauch and Andrew Meimes*

R. Bruce McNew, Esquire
Taylor & McNew, LLP
3711 Kennett Pike, Suite 210
Greenville, DE 19807
mcnew@taylormcnew.com
*Counsel for Robert Marshall*

Ian Otto, Esquire
Nathan Cihlar, Esquire
Straus & Boies, LLP
4041 University Drive, 5th Floor
Fairfax, VA 22030
dboies@straus-boies.com
*Counsel for Dressed to Kill Custom Draperies LLC, Jose Juan, Edward Rush and Tracy Kinder*

Allan Steyer, Esquire
Steyer Lowenthal Boodrookas Alvarez & Smith LLP
One California Street, Third Floor
San Francisco, CA 94111
asteyer@steyerlaw.com
*Counsel for Cheryl Glick-Salpeter, Jay Salpeter, Jodi Salpeter and Michael H. Roach*

Mario Nunzio Alioto, Esquire
Trump Alioto Trump & Prescott LLP
2280 Union Street
San Francisco, CA 94123
malioto@tatp.com
*Counsel for Karol Juskiewicz and Lawrence Lang*

Steven A. Asher, Esquire
Robert S. Kitchenoff, Esquire
Weinstein Kitchenoff & Asher, LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
asher@wka-law.com kithenoff@wka-law.com
*Counsel for Joseph Samuel Cone*

Francis A. Bottini, Jr., Esquire
Wolf Haldenstein Adler Freeman & Herz
750 B Street, Suite2770
San Diego, CA  92101
bottini@whafh.com
*Counsel for Ryan James Volden, Ficor Acquisition Co LLC, Giacobbe-Fritz Fine Art LLC, Andrew Marcus, Bill Richards, Carl Yamaguchi, Charles Dupraz, David Kurzman, James R. Conley, Jeff Vaught, John Matia, Kathy Ann Chapman, Caresse Harms, JWRE Inc., Jim Kidwell, John Maita, Leslie March, Maria Pilar Salgado, Melissa Goeke, Nancy Bjork, Nancy Wolfe, Paula Nardella, Richard Caplan, Ron Terranova, Tom Hobbs, Vanessa Z. DeGeorge, Virginia Deering, Chrystal Moeller, Robert J. Rainwater, Mary Reeder and Sonia Yaco*

Fred Taylor Isquith, Esquire
Adam J. Levitt, Esquire
Wolf Haldenstein Adler Freeman & Herz
270 Madison Ave., 11th Floor
New York, NY  10016
isquith@whafh.com
levitt@whafh.com
*Counsel for Ryan James Volden, Ficor Acquisition Co LLC, Giacobbe-Fritz Fine Art LLC, Andrew Marcus, Bill Richards, Carl Yamaguchi, Charles Dupraz, David Kurzman, James R. Conley, Jeff Vaught, John Matia, Kathy Ann Chapman, Caresse Harms, JWRE Inc., Jim Kidwell, John Maita, Leslie March, Maria Pilar Salgado, Melissa Goeke, Nancy Bjork, Nancy Wolfe, Paula Nardella, Richard Caplan, Ron Terranova, Tom Hobbs, Vanessa Z. DeGeorge, Virginia Deering, Chrystal Moeller, Robert J. Rainwater, Mary Reeder and Sonia Yaco*

Edward A. Wallace, Esquire
The Wexler Firm LLP
One N. LaSalle Street, Suite 2000
Chicago, IL  60602
eawallace@wexlerfirm.com
*Counsel for Peter Jon Naigow*

Jeffrey S. Goddess, Esquire
Rosenthal, Monhait, Gross & Goddess
Mellon Bank Center, Suite 1401
P.O. Box 1070
Wilmington, DE 19899
jgoddess@rmgglaw.com
*Counsel for Ludy A. Chacon, Joseph Samuel Cone, Darice Russ and Michael K. Simon*

Jason S. Hartley, Esquire
Ross, Dixon & Bell LLP
550 West B Street, Suite 400
San Diego, CA  92101
jhartley@rdblaw.com
*Counsel for Gabriella Herroeder-Perras*

Craig C. Corbitt, Esquire
Zelle, Hofmann, Voelbel, Mason & Gette LLP
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
ccorbitt@zelle.com
*Counsel for William F. Cronin, Law Offices of Laurel Stanley and Lazio Family Products*

Eugene A. Spector, Esquire
William G. Caldes, Esquire
Spector Roseman & Kodroff, P.C.
Suite 2500
1818 Market Street
Philadelphia, PA 19103
espector@srk-law.com
bcaldes@srk-law.com
*Counsel for David Arnold, Andrew S. Cohn,
Jason Craig, Maria Griffin, Lena K. Manyin,
Paul Ramos and Michael Ruccolo*

Scott E. Chambers, Esquire
Schmittinger & Rodriguez, P.A.
414 S. State Street
P.O. Box 497
Dover, DE 19903
*Counsel for David Arnold, Andrew S. Cohn,
Jason Craig, Maria Griffin, Lena K. Manyin,
Paul Ramos and Michael Ruccolo*

Juden Justice Reed, Esquire
Schubert & Reed LLP
Two Embarcadero Center, Suite 1600
San Francisco, CA 94111
jreed@schubert-reed.com
*Counsel for Patrick J. Hewson*

Natalie Finkelman Bennett, Esquire
Shepherd, Finkelman, Miller & Shah
65 Main Street
Chester, CT 06412-1311
nfinkelman@classactioncounsel.com
*Counsel for Ludy A. Chacon*

Russell M. Aoki, Esquire
Aoki Sakamoto Grant LLP
One Convention Place
701 Pike Street, Suite 1525
Seattle, WA 98101
russ@aoki-sakamoto.com
*Counsel for Kevin Stoltz*

Michael L. Kirby, Esquire
Kirby Noonan Lance & Hoge LLP
One America Plaza
600 West Broadway, Suite 1100
San Diego, CA 92101
mkirby@knlh.com
*Counsel for Justin Suarez*

Richard A. Ripley, Esquire
Bingham McCutchen
1120 20th Street, NW, Suite 800
Washington, DC 20036
richard.ripley@bingham.com
*Counsel for Intel Corporation*

Jeffrey A. Bartos, Esquire
Guerrieri, Edmond, Clayman & Bartos, PC
1625 Massachusetts Avenue, NW
Washington, DC 20036
jbartos@geclaw.com
*Counsel for Jose Juan, Dressed to Kill Custom
Draperies, LLC, Tracy Kinder and Edward
Rush*

Donald L. Perelman, Esquire
Fine Kaplan & Black, RPC
1835 Market Street, 28th Flr
Philadelphia, PA 19103
dperelman@finekaplan.com
*Counsel for Kevin Stoltz*

Randy R. Renick, Esquire
Law Offices of Randy Renick
128 North Fair Oaks Avenue, Suite 204
Pasadena, CA 91103
rrr@renicklaw.com
*Counsel for Shanghai 1930 Restaurant
Partners L.P. and Major League Softball Inc.*

Daniel Hume, Esquire
Kirby McInerney & Squire LLP
830 Third Avenue, 10th Floor
New York, NY 10022
dhume@kmslaw.com
*Counsel for Raphael Allison and Matthew Kravitz*

Daniel B. Allanoff, Esquire
Steven Greenfogel, Esquire
Meredith Cohen Greenfogel & Skirnick, P.C.
22nd Floor, Architects Building
117 S. 17th Street
Philadelphia, PA 19103
dallanoff@mcgslaw.com
sgreenfogel@mcgslaw.com
*Counsel for Benjamin Allanoff*

Scott Ames, Esquire
Serratore & Ames
9595 Wilshire Blvd., Suite 201
Los Angeles, CA 90212
scott@serratoreames.com
*Counsel for Major League Softball, Inc.*

Harvey W. Gurland, Jr., Esquire
Duane Morris
200 S. Biscayne Blvd., Suite 3400
Miami, FL 33131
HWGurland@duanemorris.com
*Counsel for Intel Corporation*

Douglas G. Thompson, Jr., Esquire
Finkelstein, Thompson & Loughran
1050 30th Street N.W.
Washington, DC 20007
dgt@ftllaw.com
*Counsel for Ian Walker, Damon DiMarco, Carrol Cowan, Leonard Lorenzo and Russell Dennis*

Barbara C. Frankland, Esquire
Rex A. Sharp, Esquire
Gunderson Sharp & Walke, L.L.P.
4121 W. 83rd St., Ste. 256
Prairie Village, KS 66208
bfrankland@midwest-law.com
rsharp@midwest-law.com
*Counsel for Marvin D. Chance, Jr.*

Reginald Von Terrell, Esquire
The Terrell Law Group
223 25th Street
Richmond, CA 94804
REGGIET2@aol.com
*Counsel for Athan Uwakwe*

VIA U.S. MAIL
Clerk Michael J. Beck
Clerk, MDL Judicial Panel
One Columbus Circle, N.E.
Room G-255, Federal Judiciary Bldg.
Washington, DC 20002-8004
*Pro Se*

_____
J. Clayton Athey (Bar ID #4378)