IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE<br>INTEL CORP.<br>MICROPROCESSOR ANTITRUST<br>LITIGATION | ) ) ) ) ) | MDL No. 05-1717-JJF |
| PHIL PAUL, *on behalf of himself*<br>*and all others similarly situated,* | ) ) ) | Civil Action No. 05-485-JJF |
| Plaintiffs, | ) ) | CONSOLIDATED ACTION |
| v. | ) ) | |
| INTEL CORPORATION, | ) ) | |
| Defendant. | ) ) | |

**CLASS PLAINTIFFS' ANSWERING MEMORANDUM
IN OPPOSITION TO INTEL'S MOTION TO DISMISS**

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Allyson B. Baker
COHEN, MILSTEIN, HAUSFELD
  & TOLL P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Telephone:   (202) 408-4600
Facsimile:    (202) 408-4699

Michael P. Lehmann
Thomas P. Dove
Alex C. Turan
FURTH LEHMANN & GRANT LLP
225 Bush Street, 15th Floor

PRICKETT JONES & ELLIOTT, P.A.
James L. Holzman (#663)
J. Clayton Athey (#4378)
Laina M. Herbert (#4717)
1310 King Street
P.O. Box 1328
Wilmington, DE  19899
jlholzman@prickett.com
jcathey@prickett.com
lmherbert@prickett.com
Telephone: (302) 888-6500
Facsimile: (302) 658-8111

*Interim Liaison Counsel for the Class Plaintiffs*

San Francisco, CA 94104
Telephone:  (415) 433-2070

Steve W. Berman
Anthony D. Shapiro
HAGENS BERMAN SOBOL
    SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone:  (206) 623-7292

Guido Saveri
R. Alexander Saveri
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111
Telephone:  (415) 217-6810

*Interim Co-Lead Counsel*

Dated:  January 5, 2007

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................iii

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 2

ARGUMENT ............................................................................................................. 5

I.    INTEL CANNOT SATISFY THE RIGOROUS STANDARD FOR DISMISSAL ............. 5

II.   PLAINTIFFS HAVE PROPERLY ALLEGED ANTITRUST INJURY ............................ 6

      A. Intel's Argument Is Premature on a Motion to Dismiss ................................. 12

      B. Plaintiffs Are Injured by Intel's Anticompetitive Pricing Practices ............... 14

          1.  Intel's Average Prices Were Not "Low," and, Indeed, Were Higher Than AMD's
              Average Prices ...................................................................................... 15

          2.  The Key Point on This Motion is That the Complaint Alleges That Intel's Prices
              Would Have Been Lower in the Absence of Intel's Misconduct ........................ 18

      C. Plaintiffs Also Allege Injury from Intel's Other Anticompetitive Practices .................. 23

III.  PLAINTIFFS HAVE STANDING TO BRING THEIR CLAIMS ................................... 26

      A. Intel Applies the Wrong Standard................................................................. 27

      B. Plaintiffs Nevertheless Satisfy the *Associated General Contractors* Factors................ 34

          1.  There Is a Causal Connection Between the Antitrust Violation and Plaintiffs' Harm
              .................................................................................................... 35

          2.  Plaintiffs Are Direct Victims of the Antitrust Injury ................................... 39

          3.  Plaintiffs' Injuries Are Not Remote or Speculative .................................... 48

IV.   NON-CALIFORNIA PLAINTIFFS CAN INVOKE CALIFORNIA LAW ....................... 51

      A. Introduction and Factual Background............................................................ 51

      B. Under Applicable Choice Of Law Rules, California Law Should Apply Nationwide ... 52

          1.  Analysis Under the Laws of States Other Than California...................................... 52

          2.  Analysis Under California's "Governmental Interest" Standard............................. 54

i

3.   Application of California Law to Claims by Citizens of Other States Meets the "Minimal" Due Process Threshold of Fairness..........................................................58

V.   OTHER ALLEGED LEGAL DEFECTS DO NOT BAR PLAINTIFFS' ANTITRUST CLAIMS ................................................................................................................64

A.  Alleged Intrastate Limitations of Certain State Antitrust Laws......................................64

B.  Donnelly Act Class Claims ..............................................................................................67

VI.  PLAINTIFFS  HAVE STATED CLAIMS ADEQUATELY UNDER STATE CONSUMER PROTECTION STATUTES ....................................................................68

A.  Plaintiffs Have Alleged Injury in Fact and Causation ....................................................68

B.  Rule 23 Trumps the Procedural Provisions of the Alaska, Georgia, Louisiana and Montana Consumer Protection Statutes..........................................................................69

C.  Plaintiffs Have Alleged Deceptive or Unconscionable Conduct Sufficiently ...............70

D.  Plaintiffs Can Also Proceed Under the California UCL .................................................77

VII. PLAINTIFFS' COMMON LAW CLAIMS SHOULD NOT BE DISMISSED...................80

A.  California Recognizes the Common Law Tort of Monopolization ................................80

B.  Plaintiffs' Unjust Enrichment Claims Are Cognizable...................................................81

CONCLUSION..................................................................................................................87

# TABLE OF AUTHORITIES

CASES

*2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*,
   369 F.3d 732 (3d Cir. 2004)...................................................................13, 35, 47

*Adarand Constructors, Inc. v. Slater*,
   228 F.3d 1147 (10th Cir. 2000) ...............................................................15

*Advanced Micro Devices, Inc. v. Intel Corp.*,
   9 Cal. 4th 362 (1994) .............................................................................5, 51

*Adventure Communications, Inc. v. Kentucky Registry of Election Finance*,
   191 F.3d 429 (4th Cir. 1999) ..................................................................59

*AG Acceptance Corp. v. Glinz*,
   684 N.W.2d 632 (N.D. 2004) ..................................................................32

*Alberta Gas Chems. Ltd. v. E.I. Du Pont De Nemours & Co.*,
   826 F.2d 1235 (3d Cir. 1987)..................................................................14

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*,
   228 F.3d 429 (3d Cir. 2000).....................................................14, 36, 50, 87

*Allstate Ins. Co. v. Hague*,
   449 U.S. 302 (1981).................................................................................59-60

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*,
   190 F.3d 1051 (9th Cir. 1999) ................................................................13, 21

*Anderson Contracting, Inc. v. Bayer AG*,
   Case No. CL 95959 (Iowa Dist. Ct. May 31, 2005) ...............................42

*Anheuser-Busch, Inc. v. Abrams*,
   520 N.E.2d 535 (N.Y. 1998)...................................................................32

*Applied Med. Res. Corp. v. Ethicon Inc.*,
   Case No. SACV 03-1329-JVS(MLGx), 2006 U.S. Dist. LEXIS 12845 (C.D. Cal. Feb.
   2, 2006) ...................................................................................................18

*Armstrong v. Bayer AG*,
   No. 66-05 CnC, slip op. (Vt. Cir. Ct., Oct. 10, 2006)............................34

*Aron v. U-Haul Co.*,
   143 Cal. App. 4th 796 (2006) .................................................................79

*Arroyo-Melecio v. Puerto Rican Am. Ins. Co.*,
   398 F.3d 56 (1st Cir. 2005).....................................................................38-39

iii

*Arthur v. Microsoft Corp.*,
  267 Neb. 586 (2004) ...................................................................................................31

*Arthur v. Microsoft Corp.*,
  676 N.W.2d 29 (Neb. 2004)..........................................................................................40

*Associated General Contractors of California, Inc. v. California State Council of
  Carpenters*,
  459 U.S. 519 (1983) ("*AGC*")..............................................................................Passim

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ("*ARCO*") ...............................................................13, 15, 19, 21

*B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*,
  258 F.3d 578 (7th Cir. 2001) .......................................................................................19

*Bailey v. Morgan Drive-Away, Inc.*,
  647 F. Supp. 648 (D. Kan. 1986)..................................................................................74

*Bank of the West v. Superior Court*,
  2 Cal. 4th 1254 (1992) ...........................................................................................62, 80

*Barton & Pittinos, Inc. v. Smithkline Beecham Corp.*,
  118 F.3d 178 (3d Cir. 1997)..........................................................................................43

*Bauer v. Club Med Sales, Inc.*,
  No. C-95-1637 MHP, 1996 WL 310076 (N.D. Cal. May 22, 1996) .......................54

*Beckler v. Visa U.S.A., Inc.*,
  No. 09-04-C-00030, 2004 WL 2115144 (N.D. Dist. Ct. Aug. 23, 2004) ................32

*Bell v. Blue Cross*,
  131 Cal. App. 4th 211 (2005) .......................................................................................80

*Bellevue Drug Co. v. Advance PCS*,
  Civ. A. No. 03-4731, 2004 U.S. Dist. LEXIS 3627 (E.D. Pa. Mar. 2, 2004)...................15, 19

*Bergstrom v. Noah*,
  266 Kan. 829 (Kan. 1999)............................................................................................33

*Bernardo v. Planned Parenthood Fed. of Am.*,
  115 Cal. App. 4th 322 (2004) .......................................................................................80

*Bethlehem Steel Corp. v. Fischbach & Moore, Inc.*,
  641 F. Supp. 271 (E.D. Pa. 1986) .............................................................................71-72

*Blakemore v. Superior Court*,
  129 Cal. App. 4th 36 (2005) .........................................................................................80

*Blue Shield of Va. v. McCready*,
    457 U.S. 465 (1982)............................................................................................46

*Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo, Inc.*,
    96 F.3d 10 (1st Cir. 1996)................................................................................23

*Bowen v. N.Y. News, Inc.*,
    522 F.2d 1242 (2d Cir. 1975)...................................................................13, 21

*Box Butte County Sch. Dist. No.6 v. Bayer AG*,
    Case No. CI 04-270 (Neb. Dist. Ct. Jan. 9, 2006) .........................................42

*Bradburn Parent/Teacher Store, Inc. v. 3M*,
    Civ. A. No. 02-7676, 2003 U.S. Dist. LEXIS 13273 (E.D. Pa. July 24, 2003)...............Passim

*Brader v. Allegheny Gen. Hosp.*,
    64 F.3d 869 (3d Cir. 1995)....................................................................12, 36, 50

*Browne v. McDonnell Douglas Corp.*,
    504 F. Supp. 514 (N.D. Cal. 1980) ................................................................54

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977).....................................................................................Passim

*Bunker's Glass Co. v. Pilkington PLC*,
    75 P.3d 99 (Ariz. 2003)....................................................................................31

*Burlington No. R.R. Co. v. Woods*,
    480 U.S. 1 (1987)..............................................................................................70

*Buscher v. Abbott Labs.*,
    No. 94-C-755 at 2 (W.Va. Cir. Ct., Jan. 24, 1994) ......................................67

*California v. ARC Am. Corp.*,
    490 U.S. 93 (1989)......................................................................................28, 56

*Californians for Disability Rights v. Mervyn's, LLC*,
    39 Cal. 4th 223 (2006) ....................................................................................62

*Capp v. Microsoft*,
    Case No. 00 CV 0637 (Wis. Cir. Ct. July 25, 2001)......................................41

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
    479 U.S. 104 (1986)........................................................................................27

*Carlie v. Morgan*,
    922 P.2d 1 (Utah 1996)....................................................................................77

*Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*,
  227 F.3d 62 (3d Cir. 2000)..................................................................................43

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
  20 Cal. 4th 163 (1999) ........................................................................ 63, 78-80

*Cellular Plus, Inc. v. Superior Court*,
  14 Cal. App. 4th 1224 (Cal. Ct. App. 1993) .....................................................6, 30

*Church v. Consolidated Freightways, Inc.*,
  No. C-90-2290 DLJ, 1992 U.S. Dist. LEXIS 18234 (N.D. Cal. Sept. 14, 1992) ...................55

*Cianci v. Superior Court*,
  40 Cal. 3d 903 (1985) .....................................................................................30

*City of Pittsburgh v. West Penn Power Co.*,
  147 F.3d 256 (3d Cir. 1998)...........................................................13, 18, 36, 66

*Clothesrigger, Inc. v. GTE Corp.*,
  191 Cal. App. 3d 605 (1987) .......................................................... 57-58, 61

*Comes v. Microsoft Corp.*,
  646 N.W.2d 440 (Iowa 2002) .....................................................................31, 41

*Competition Collision Ctr., LLC v. Crompton Corp.*,
  Case No. 431278, Hr'g Tr. at 15 (Cal. Super. Ct. Apr. 27, 2005) .............................21, 42, 63

*Cox v. Microsoft Corp.*,
  778 N.Y.S.2d 147 (N.Y. App.Div. 2004) ...........................................68, 76, 83, 86

*Cox v. Microsoft Corp.*,
  No. 105193/2000 2005 WL 3288130 (July 29, 2005).....................................41, 76, 83, 84, 86

*David B. Lilly Co. v. Fisher*,
  18 F.3d 1112 (3d Cir. 1994)............................................................................52

*Davric Maine Corp. v. Rancourt*,
  216 F.3d 143 (1st Cir. 2000)...........................................................................32

*DBSI Signature Place, LLC v. BL Greensboro, L.P.*,
  Case No. CV 05-051-S-LMB, 2006 U.S. Dist. LEXIS 30387 (D. Idaho May 9, 2006) .........74

*Diamond Multimedia Systems, Inc. v. Superior Court*,
  19 Cal.4th 1036 (1999) .......................................................................57-58, 61-62

*Dingle v. Bioport Corp.*,
  388 F.3d 209 (6th Cir. 2004) ..........................................................................15

*D. R. Ward Construction Co. v. Rohm & Haas Co.*,
   2006 U.S. Dist. LEXIS 61828 (E.D. Pa. May 31, 2006) ................................................. Passim

*Eagle v. Star-Kist Foods, Inc.*,
   812 F.2d 538 (9th Cir. 1987) ...................................................................................49

*Eddins v. Redstone*,
   134 Cal. App. 4th 290 (2005) ...................................................................................78

*Elkins v. Microsoft Corp.*,
   817 A.2d 9 (2002) ...................................................................................31, 34, 41

*Erie R. Co. v. Tompkins*,
   304 U.S. 64 (1938).......................................................................................70

*Excellus Health Plan, Inc. v. Tran*,
   287 F. Supp.2d 167 (W.D.N.Y. 2003) ...................................................................76

*Farrell v. General Motors Corp.*,
   815 P.2d 538 (Kan. 1991) .......................................................................................75

*Fed. Trade Comm'n v. Mylan Labs., Inc.*,
   62 F. Supp. 2d 25 .......................................................................................82

*Fenn v. Noah*,
   142 Idaho 775, 133 P.2d 1240 (2006).......................................................................73

*First Nationwide Savings v. Perry*,
   11 Cal.App.4th 1657 (1992) .......................................................................................81

*Fla. Seed Co., Inc. v. Monsanto Co.*,
   105 F.3d 1372 (11th Cir. 1997) .......................................................................44

*Ford Motor Co. v. Lyons*,
   405 N.W.2d 354 (Wis. Ct. App. 1987) .......................................................................32

*Freeman Industries L.L.C. v. Eastman Chemical Co.*,
   172 S.W 3d 512 (Tenn. 2005).......................................................................................86

*Freeman v. San Diego Ass'n of Realtors*,
   77 Cal. App. 4th 171 (1999) .......................................................................................30

*Friedman v. Microsoft*,
   CV2000-000722 (Ariz. Super. Ct. Nov. 14, 2000).......................................................41

*Fucile v. Visa U.S.A., Inc.*,
   No. S1560-03 CNC, 2004 WL 3030037 (Vt. Super. Dec. 27, 2004) ................................ 33-34

*Genesco Entm't v. Koch*,
  593 F. Supp. 743 (S.D.N.Y. 1984)............................................................76

*Gerlinger v. Amazon.Com, Inc.*,
  311 F. Supp.2d 838 (N.D. Cal. 2004) ......................................................81

*Ghirardo v. Antonioli*,
  14 Cal. 4th 39 (1996) ..............................................................................81

*Glaberson v. Comcast Corp.*,
  Civ. A. No. 03-6604, 2006 U.S. Dist. LEXIS 62672 (E.D. Pa. Aug. 31, 2006).............. Passim

*Goldwasser v. Ameritech Corp.*,
  222 F.3d 390 (7th Cir. 2000) .............................................................14, 46

*Gordon v. Microsoft*,
  2001 WL 366432 (Minn. Dist. Ct. Mar. 30, 2001), *review denied* (Minn. Ct. App.
  May 8, 2001), *aff'd*, 645 N.W. 393 (Minn. 2002) .....................................41, 44, 49

*Goshen v. Mutual Life Ins. Co. of N.Y.*,
  774 N.E.2d 1190 (N.Y. 2002)....................................................................76

*Graduate Cardiology Consultants, P.C. v. Vivra, Inc.*,
  2000 WL 33711050 (Pa. Com. Pl. Oct. 20, 2000)..................................87

*Gray v. Marshall County Board of Education*,
  367 S.E.2d 751 (W. Va. 1988)..................................................................31

*Green Leaf Nursery v. E.I. du Pont de Nemours & Co.*,
  341 F.3d 1292 (11th Cir. 2003) ................................................................52

*Gregory Marketing Corp. v. Wakefern Food Corp.*,
  787 F.2d 92 (3d Cir. 1986)..................................................................22, 78

*Gregory v. Albertson's, Inc.*,
  104 Cal. App. 4th 845 (2002) .............................................................77-78

*Gross v. New Balance Athletic Shoe, Inc.*,
  955 F. Supp. 242 (S.D.N.Y. 1997)............................................................48

*Gruber v. Owens-Illinois, Inc.*,
  899 F.2d 1366 (3d Cir. 1990)....................................................................68

*Gruber v. Price Waterhouse*,
  117 F.R.D. 75 (E.D. Pa. 1987)..................................................................54

*GTE New Media Servs., Inc. v. Ameritech Corp.*,
  21 F. Supp.2d 27 (D.D.C. 1998) ..............................................................64

*Hanna v. Plumer*,
   380 U.S. 460 (1965)........................................................................................70

*Harmsen v. Smith*,
   693 F.2d 932 (9th Cir. 1982) .........................................................................55

*Hataway v. McKinley*,
   830 S.W.2d 53 (Tenn. 1992).........................................................................53

*Hirsch v. Bank of America*,
   107 Cal. App. 4th 708 (2003) ........................................................................81

*Holder v. Archer Daniels Midland Co.*,
   No. 96-2975, 1998 WL 1469620 (D.C. Super. Ct. Nov. 4, 1998).........................32

*Hosp. Bldg. Co. v. Trs. of Rex Hosp.*,
   425 U.S. 738 (1976)..........................................................................................6

*Howe v. Microsoft Corp.*,
   656 N.W.2d 285 (N.D. 2003) ........................................................................41

*Hurtado v. Superior Court*,
   11 Cal.3d 574 (1974) .....................................................................................57

*Hydrogen Peroxide Antitrust Litig.*,
   MDL No. 1682, 2006 U.S. Dist. LEXIS 18790 (E.D. PA. Apr. 11, 2006) ...........42

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977)...............................................................................Passim

*In re Activision Sec. Litig.*,
   621 F. Supp. 415 (N.D. Cal. 1985) ................................................................55

*In re Air Passenger Computer Reservation Sys. Antitrust Litig.*,
   694 F. Supp. 1443 (C.D. Cal. 1988) ..............................................................36

*In re Air Passenger Computer Reservation Systems Antitrust Litigation*,
   727 F. Supp. 564 (C.D. Cal. 1989) ................................................................36

*In re Bridgestone/Firestone Inc. Tires Prods. Liability Litig.*,
   205 F.R.D. 503 (S.D. Ind. 2001), *rev'd in part on other grounds*, 288 F.3d 1012 (7th
   Cir. 2002) ...............................................................................................67, 70

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997).........................................................................6

*In re Canon Cameras*,
   No. 05 Civ. 7233(JSR), 2006 WL 1751245 (S.D.N.Y. June 23, 2006)..................85

*In re Cardizem CD Antitrust Litig.*,
105 F. Supp. 2d 618 (E.D. Mich. 2000) *cert denied*, 543 U.S. 939 *(*U.S. Oct. 12, 2004) ................................................................................................................ 82-85

*In re Cipro Cases I and II*,
121 Cal. App. 4th 402 (2004) ......................................................................................81

*In re Computer Memories Sec. Litig.*,
111 F.R.D. 675 (N.D. Cal. 1986) ................................................................................55

*In re Elec. Carbon Prods. Antitrust Litig.*,
333 F. Supp. 2d 303 (D.N.J. 2004) .............................................................................71

*In re First Alliance Mortg. Co.*,
269 B.R. 428 (C.D. Cal. 2001) ....................................................................................54

*In re Healthsouth Corp. Sec. Litig.*,
Master File No. CV-98-J-2634-S, 2000 U.S. Dist. LEXIS 20443 (N.D. Ala. Dec. 20, 2000) ............................................................................................................................15

*In re Heritage Bond Litig.*,
No. MDL 02-ML-1475 DT, 2004 WL 1638201 (C.D. Cal. July 12, 2004) ...........................55

*In re K-Dur Antitrust Litig.*,
338 F. Supp. 2d 517 (D.N.J. 2004) .......................................................... 82, 84-85

*In re Linerboard Antitrust Litig.*,
305 F.3d 145 (3d Cir. 2002) .......................................................................................40

*In re Lorazepam & Clorazepate Antitrust Litig.*,
295 F. Supp. 2d 30 (D.D.C. 2003) ......................................................................82, 85

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
998 F.2d 1144 (3d Cir. 1993) ..........................................................................18, 46, 50

*In re MDC Holdings Sec. Litig.*,
754 F.Supp. 785 (S.D. Cal. 1990) ..............................................................................55

*In re Mercedes-Benz Antitrust Litig.*,
157 F. Supp. 2d 355 (D.N.J. 2001) .............................................................................71

*In re Merck & Co., Inc. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005) .................................................................................. 15-16

*In re NAHC, Inc. Sec. Litig.*,
306 F.3d 1314 (3d Cir. 2002) .......................................................................................5

*In re Napster Copyright Litig.,*
354 F. Supp. 2d 1113 (N.D. Cal. 2005) ............................................................40, 44

*In re New Motor Vehicles Canadian Export Antitrust Litig.,*
350 F. Supp.2d 160 (D. Me. 2004) ...................................................................... Passim

*In re Oot,*
112 B.R. 497 (Bankr. N.D.N.Y. 1989) ...................................................................67

*In re ORFA Securities Litigation.,*
654 F. Supp. 1449 (D.N.J. 1987) .........................................................................54

*In re OSB Antitrust Litig.,*
No. 06-826, slip op. (E.D. Pa. Sept. 27, 2006) ......................................65, 69, 86

*In re Peters,*
90 B.R. 588 (Bankr. N.D.N.Y. 1988) ...................................................................67

*In re Pizza Time Theatre Sec. Litig.,*
112 F.R.D. 15 (N.D. Cal. 1986)...........................................................55-56, 59-60

*In re Relafen Antitrust Litig.,*
221 F.R.D. 260 (D. Mass. 2004)..................................................................80, 86

*In re Rezulin Products Liability Litigation,*
392 F.Supp.2d 597 (S.D.N.Y. 2005).......................................................................86

*In re Seagate Tech. Sec. Litig.,*
115 F.R.D. 264 (N.D. Cal. 1987).............................................................55-56, 59

*In re South Dakota Microsoft Antitrust Litig.,*
657 N.W. 2d 668 (S.D. 2003) ...............................................................................41

*In re Sugar Indus. Antitrust Litig.,*
579 F.2d 13 (3d Cir. 1978).............................................................................39, 49

*In re Terazosin Hydrochloride Antitrust Litig.,*
160 F. Supp.2d 1365 (S.D. Fla. 2001) ....................................................69, 80, 84

*In re Tri-State Crematory Litig.,*
215 F.R.D. 660 (N.D. Ga. 2003)...........................................................................60

*In re Vitamin Cases,*
107 Cal. App. 4th 820 (Cal. Ct. App. 2003) .........................................................42

*In re Warfarin Sodium Antitrust Litig.,*
212 F.R.D. 231 (D. Del. 2002), *aff'd,* 391 F.3d 516 (3d Cir. 2004)............................53-54, 84

*In re Warfarin Sodium Antitrust Litig.*,
214 F.3d 395 (3d Cir. 2000)................................................................6, 13, 27, 50

*In re Western Acceptance Corp., Inc.*,
788 P.2d 214 (Idaho 1990)...............................................................................73

*In re Worlds of Wonder Sec. Litig.*,
No. C 87 5491 SC, 1990 WL 61951 (N.D. Cal. Mar. 23, 1990) ......................55, 59

*Int'l Bhd. Of Teamsters, Loc. 734 Health & Welfare Trust Fund v. Philip Morris, Inc.*,
196 F.3d 818 (7th Cir. 1999) ............................................................................68

*Joint Stock Soc'y v. UDV,*
*No. America, Inc.*, 266 F.3d 164 (3d Cir. 2001) ..................................................28

*Kearney v. Salomon Smith Barney, Inc.*,
39 Cal. 4th 95 (2006) ..............................................................................60-61, 63

*Keating v. Philip Morris, Inc.*,
417 N.W.2d 132 (Minn. Ct. App. 1987).............................................................34

*Kloth v. Microsoft Corp.*,
444 F.3d 312 (4th Cir. 2006) ............................................................................25

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) ...........................................................19, 30, 40, 49

*Kristiansen v. John Mullins & Sons, Inc.*,
59 F.R.D. 99 (E.D.N.Y. 1973) ..........................................................................70

*Krumme v. Mercury Ins. Co.*,
123 Cal. App. 4th 924 (2004) ...........................................................................79

*LePage's Inc. v. 3M,*
324 F.3d 141 (3d Cir. 2003) *(en banc)* .......................................................10-11, 23

*Lerch v. Citizens First Bancorp, Inc.*,
144 F.R.D. 247 (D.N.J. 1992).................................................................1, 51, 54

*Levis Strauss & Co. v. Fed. Pants Co.*,
No. CV 75-3642-JWC, 1979 U.S. Dist. LEXIS 11611 (C.D. Cal. June 19, 1979) ..........22-23

*Lorix v. Crompton Corp.*,
720 N.W.2d 15 (Minn. Ct. App. 2006), *review granted*, No. A05-2148, 2006 Minn.
LEXIS 794 (Minn. Nov. 14, 2006) ................................................................44-45

*Lum v. Bank of Am.*,
361 F.3d 217 (3d Cir. 2004)...............................................................................6

*McCarthy v. Recordex Serv., Inc.*,
　80 F.3d 842 (3d Cir. 1996)...............................................................................35, 48

*McGhee v. Arabian American Oil Co.*,
　871 F.2d 1412 (9th Cir. 1989) ........................................................................21, 54

*McKell v. Wash. Mutual, Inc.*,
　142 Cal. App. 4th 1457 (2006) ..................................................................... 77, 79-80

*Meijer, Inc. v. 3M Co.*,
　Civ. A. No. 04-5871, 2005 U.S. Dist. LEXIS 13995 (E.D. Pa. July 13, 2005).....................12

*Mendoza v. Zirkle Fruit Co.*,
　301 F.3d 1163 (9th Cir. 2002) ...............................................................................38

*Metabolife Int'l., Inc. v. Wornick*,
　264 F.3d 832 (9th Cir. 2001) ................................................................................70

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
　269 F. Supp. 2d 1213 (C.D. Cal. 2003), *aff'd*, 380 F.3d 1154 (9th Cir. 2004), *rev'd on
　other grounds*, 125 S. Ct. 2764 (2005) ................................................................29, 43

*Microsoft I-V Cases*,
　2000-2 Trade Cases (CCH) ¶ 73,013 .....................................................................41, 49

*Mid-West Paper Prods. Co. v. Continental Group, Inc.*,
　596 F.2d 573 (3d Cir. 1979).................................................................................43

*Midwest Communication, Inc. v. Minnesota Twins, Inc.*,
　779 F.2d 444 (8th Cir. 1985) ...............................................................................34

*N.Y. Citizens Comm.. on Cable TV v. Manhattan Cable TV, Inc.*,
　651 F. Supp. 802 (S.D.N.Y. 1986)...................................................................... Passim

*Natural Gas Anti-Trust Cases I, II, III and IV*,
　2003-1 Trade Cas. (CCH) ¶ 73,959 (Cal. Super. Ct., San Diego Cty., Oct. 16, 2002) ..... 80-81

*New York Jets LLC v. Cablevision Sys. Corp.*,
　No. 05 Civ. 2875(HB), 2005 WL 2649330 (S.D.N.Y. Oct. 17, 2005) ...................................76

*New York v. Feldman*,
　210 F. Supp.2d 294 (S.D.N.Y. 2002).........................................................................76

*New York v. Microsoft Corp.*,
　224 F. Supp. 2d 76 (D.D.C. 2002) .......................................................................24, 75

*Nordberg v. Trilegiant Corp.*,
　445 F. Supp. 2d 1082 (N.D. Cal. 2006) .....................................................................82

*Norwest Mortgage, Inc. v. Superior Court*,
   72 Cal. App. 4th 214 (1999) .......................................................................... 61-62

*O'Keefe v. Mercedes-Benz USA, LLC*,
   214 F.R.D. 266 (E.D. Pa. 2003) ..................................................................... 70-71

*O'Neill v. Coca-Cola Co.*,
   669 F. Supp. 217 (N.D. Ill. 1987) ........................................................................ 38

*Orr v. Beamon*,
   77 F. Supp. 2d 1208 (D. Kan. 1999) .................................................................. 32-33

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*,
   647 N.E.2d 741 (N.Y. 1995) .................................................................................. 76

*Paracor Finance, Inc. v. General Elec. Capital Corp.*,
   96 F.3d 1151 (9th Cir. 1996) ................................................................................. 81

*People ex rel. Dept. of Motor Vehicles v. Cars 4 Causes*,
   139 Cal. App. 4th 1006 (2006) ............................................................................. 80

*Peterson v. Visa U.S.A., Inc.*,
   No. Civ. A. 03-8080, 2005 WL 1403761 (D.C. Super. Ct. Apr. 22, 2005) ................ 32, 47-48

*Pfizer, Inc. v. Superior Court*,
   141 Cal. App. 4th 290 (Cal. Ct. App. 2006), *review granted*, No. S145775, 2006 Cal.
   LEXIS 13327 (Cal. Nov. 1, 2006) .......................................................................... 62

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ......................................................................................... 58-61

*Pinker v. Roche Holdings, Ltd.*,
   292 F.3d 361 (3d Cir. 2002) .................................................................................... 5

*Planned Parenthood Fed'n of Am. v. Ashcroft*,
   320 F. Supp. 2d 957 (N.D. Cal. 2004) .................................................................... 15

*Pooler v. R.J. Reynolds Tobacco Co.*,
   2001 WL 403167 (Nev. Dist. Ct. Apr. 4, 2001) ....................................................... 65

*Progressive W. Ins. Co. v. Superior Court*,
   135 Cal. App. 4th 263 (2005) ............................................................................... 80

*Reazin v. Blue Cross & Blue Shield of Kan., Inc.*,
   635 F. Supp. 1287 (D. Kan. 1986) ........................................................................ 33

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979) ............................................................................................ 68

*Roberts v. Heim,*
  670 F. Supp. 1466 (N.D. Cal. 1987), *aff'd in part, rev'd in part on other grounds sub nom.*, *Roberts v. Peat, Marwick, Mitchell & Co.*, 857 F.2d 646 (9th Cir. 1988)....................59

*Rosack v. Volvo of Am. Corp.*,
  131 Cal. App. 3d 741 (Cal. Ct. App. 1982) .........................................................................19

*Rose v. Vulcan Materials Co.*,
  194 S.E.2d 521 (N.C. 1973).................................................................................................32

*S.D. Collectibles v. Plough, Inc.*,
  952 F.2d 211 (8th Cir. 1991) ...............................................................................................44

*Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.*,
  113 F.3d 405 (3d Cir. 1997)..................................................................................................13

*Semba v. Lonza AG*,
  Docket No. CV-99-50, 1999 Me. Super. LEXIS 358 (Me. Super. Ct. 1999)........................42

*Sherwood v. Microsoft Corp.*,
  No. M2000-01850-COA-R9-CV, 2003 Tenn. App. LEXIS 539 (Tenn. App. July 31, 2003) ....................................................................................................................................41

*Soo Line R. Co. v. Overton*,
  992 F.2d 640 (7th Cir. 1993) ...............................................................................................59

*Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*,
  181 F.3d 410 (3d Cir. 1999)..................................................................................................5

*Sperry v. Crompton Corp.*,
  810 N.Y.S.2d 498 (N.Y. App. Div. 2006) ............................................................................68

*State by Humphrey v. Philip Morris Inc.*,
  551 N.W.2d 490 (Minn. 1996)..............................................................................................45

*State ex rel. Lance v. Hobby Horse Ranch Tractor & Equip. Co.*,
  129 Idaho 565, 929 P.2d 741 (1996).....................................................................................73

*State ex rel. Lefkowitz v. Colorado State Christian College of the Church of the Inner Power, Inc.*,
  346 N.Y.S.2d 482 (N.Y. Sup. Ct. 1973) ..............................................................................76

*State ex rel. McGraw v. Visa U.S.A., Inc.*,
  Civ. A. No. 03-C-551, (W. Va. Cir. Ct. Oct. 14, 2005)........................................................31

*State ex rel. Van de Kamp v. Texaco, Inc.*,
  46 Cal. 3d 1147 (1988) ........................................................................................................30

*State ex. rel. Wasden v. Daicel Chem. Indus., Ltd.*,
   106 P.3d 428 (Idaho 2005)................................................................................74

*State of Tennessee ex rel. Leech v. Levi Strauss & Co.*,
   No. 79-722-III, 1980 WL 4696 (Tenn. Ch. Ct. Sept. 25, 1980) .............................32

*State v. Collins*,
   580 N.W.2d 36 (Minn. Ct. App. 1998)..................................................................44

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
   171 F.3d 912 (3d Cir. 1999)..........................................................................14, 50

*Theme Promotions, Inc. v. News America FSI*,
   35 Fed. Appx. 463 (9th Cir. 2002)......................................................................30

*Tungate v. MacLean-Stevens Studios, Inc.*,
   714 A.2d 792 (Me. 1998)....................................................................................75

*Two Queens, Inc. v. Scoza*,
   745 N.Y.S.2d 517 (N.Y. App. Div. 2002) .............................................................66

*Union Carbide Corp. v. Superior Court*,
   679 P.2d 14 (Cal. 1984) ...............................................................................45, 47

*United States v. Crescent Amusement Co.*,
   323 U.S. 173 (1944)............................................................................................24

*United States v. Dentsply Int'l, Inc.*,
   Civ. A. No. 99-005-SLR, 2001 WL 624807 (D. Del. Mar. 30, 2001), *aff'd sub nom.*
   *Howard Hess Dental Labs Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363 (3rd Cir. 2005).............67

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966)............................................................................................24

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ..............................................................................24

*Van Dusen v. Barrack*,
   376 U.S. 612 (1964)............................................................................................52

*Verizon Delaware, Inc. v. Covad Communications Co.*,
   377 F.3d 1081 (9th Cir. 2004) ............................................................................70

*Villager Franchise Sys., Inc. v. Dhami, Dhami & Virk*,
   2006 WL 224425 (E.D. Cal. Jan. 26, 2006) ........................................................81

*Vinci v. Waste Management, Inc.*,
   36 Cal. App. 4th 1811 (Cal. Ct. App. 1995) ..................................................29, 44

*Vinci v. Waste Management, Inc.,*
    80 F.3d 1372 (9th Cir. 1996) ........................................................44

*VRG Corp. v. GKN Realty Corp.,*
    641 A.2d 519 (N.J. 1994) ...........................................................86

*Wade v. Jobe,*
    818 P.2d 1006 (Utah 1991) .........................................................77

*Waggener v. Seever Sys., Inc.,*
    233 Kan. 517, 664 P.2d 813 (1983) ............................................75

*Walker v. U-Haul Co. of Miss.,*
    734 F.2d 1068 (5th Cir. 1984) .....................................................32

*Wanaque Borough Sewerage Auth. v. Township of West Milford,*
    677 A.2d 747 (N.J. 1996) ...........................................................86

*Washington Mutual Bank, FA v. Superior Court,*
    24 Cal.4th 906 (2001) .................................................................55

*Wayne v. Staples, Inc.,*
    135 Cal. App. 4th 466 (2006) .....................................................80

*Weinberger v. Jackson,*
    102 F.R.D. 839 (N.D. Cal. 1984) ...............................................55

*Wershba v. Apple Computer, Inc.,*
    91 Cal. App. 4th 224 (2001) ............................................56, 58, 61

*Western Pac. R. Corp. v. Western Pac. R. Co.,*
    206 F.2d 495 (9th Cir.1953), *cert. denied,* 346 U.S. 910 (1953).................81

*Wheeler v. Travelers Ins. Co.,*
    22 F.3d 534 (3d Cir. 1994) .........................................................26

*Zinberg v. Washington Bancorp, Inc.,*138
    F.R.D. 397 (D.N.J. 1990) ..........................................................54

## STATUTES

5 M.R.S.A. § 207 ...................................................................................75

15 U.S.C. § 2 ..................................................................................5, 37

15 U.S.C. § 15 ..............................................................................6, 26-28

15 U.S.C. § 26 ...................................................................................................................6, 27

15 U.S.C. § 45 ........................................................................................................................73

Ariz. Rev. Stat. § 44-1412 .....................................................................................................30

Ark. Code Ann. § 4-88-107(a) ...............................................................................................72

Bus. & Prof. Code § 16750 ....................................................................................................63

Bus. & Prof. Code § 17200 ....................................................................................................77

Bus. & Prof. Code § 17203 ....................................................................................................63

Cal. Bus. & Prof. Code § 17200 et seq. .............................................................................5, 77

California Cartwright Act, Cal. Bus. & Prof. Code § 16720 ...................................................5

California Penal Code .............................................................................................................60

D.C. Code § 28-4502 .............................................................................................................64

D.C. Code § 28-4515 .............................................................................................................30

Idaho Code § 48-102(1) .........................................................................................................73

Idaho Code § 48-603 ..........................................................................................................73,74

Idaho Code § 48-604(1) .........................................................................................................73

Iowa Code § 553.2 .................................................................................................................31

Kan. Stat. Ann. § 50-626 .......................................................................................................75

Kan. Stat. Ann. § 50-627 .......................................................................................................74

Mich. Comp. Laws § 445.784 ...............................................................................................30

Miss. Code Ann. § 75-21-1 ....................................................................................................65

N.M. Stat. § 57-1-15 ..............................................................................................................31

N.M. Stat. Ann. § 57-12-3 .....................................................................................................75

N.M. Stat. Ann § 47-12-2(E) .................................................................................................76

N.Y. Gen. Bus. Law § 340(1) ................................................................................................66

N.Y. Gen. Bus. Law § 349 ..............................................................................................68, 76-77

Neb. Rev. Stat. § 598A.050 ................................................................................31

Nev. Rev. Stat. § 598A.60 ..................................................................................65

S.D. Codified Laws § 37-1-22 ............................................................................30

Vt. Stat. § 2453(b).............................................................................................31

Utah Code Ann. §§ 3-11-4, 3-11-5 ....................................................................77

W.Va. Code § 37-18-3 .......................................................................................66

W. Va. Code § 47-18-4 ......................................................................................67

W. Va. Code § 47-18-16 ....................................................................................31

**RULES**

Cal. Rule of Court 976(d)(2)...............................................................................63

Federal Rule of Civil Procedure 23 .......................................................... 67, 69-71

Federal Rule of Civil Procedure 12(b) (6) ..................................................7, 13, 38, 49

**OTHER AUTHORITIES**

XIV H. Hovenkamp, *Antitrust Law* ¶2412 (2d ed. 2005)............................................46

II Philip E. Areeda et al., *Antitrust Law* ¶ 345 n.3 (2d ed. 2002) ..................................38

*Black's Law Dictionary* 1561 (8th ed. 2004)..............................................................75

C. Wright & A. Miller, *Federal Practice and Procedure* § 3531.14 (2d ed. 1984) ....................28

Daniel Karon, "Undoing the Otherwise Perfect Crime—Applying Unjust Enrichment to Consumer Price-Fixing Claims," 108 W.Va. L. Rev. 395, 421-28 (2005)............................86

*Federal Practice & Procedure* § 1758 (3d ed. 2005) ..................................................70

Kevin K. Green, "The Unfair Competition Law After Proposition 64: The Supreme Court Speaks," 15 ................................................................................63

Restatement (Second) Conflict of Laws § 145 (1971)..................................................53

## **INTRODUCTION**

Plaintiffs are consumers who, as a result of anticompetitive conduct by Defendant Intel Corporation ("Intel"), were overcharged for Intel's x86 microprocessors. As detailed in Plaintiffs' First Amended Consolidated Complaint ("FACC"), Intel committed a variety of exclusionary acts, which created barriers to entry and raised the costs of competitors and potential competitors in the market for x86 microprocessors. By preventing effective competition, Intel was able to charge inflated prices for its microprocessors, which prices were passed on to consumers.

While Intel's conduct harmed competitors such as Advanced Micro Devices, Inc. ("AMD"), the same conduct also harmed Plaintiffs. Therefore, Plaintiffs have sued for damages under the antitrust and consumer protection laws and the common law of California and other states, and for injunctive relief under federal antitrust laws. Because Plaintiffs state well-pleaded claims for each of these causes of action, Intel's motion to dismiss the complaint is without merit. Intel cannot surmount the rigorous standard for dismissal of antitrust claims because its legal arguments are seriously flawed.

*First*, Intel wrongly contends that Plaintiffs have not alleged antitrust injury. As consumers forced to pay supracompetitive prices, they have suffered "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [Intel's] acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). Intel's arguments to the contrary are both premature and unfounded. In particular, Intel's argument that anticompetitive conduct that includes discounting cannot amount to antitrust injury to purchasers is contrary to law and asks this Court to disregard the facts in Plaintiffs' well-pleaded complaint.

*Second*, Intel's argument that Plaintiffs lack standing to sue for antitrust violations is simply wrong. The heightened standing requirements that Intel seeks to impose – from

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*") – govern federal claims for damages, but have no relevance to Plaintiffs' claims under state antitrust laws that specifically permit indirect purchaser claims. Nevertheless, even if this Court were to apply the *AGC* factors, they would strongly weigh in favor of standing here. Intel's arguments to the contrary misconstrue Plaintiffs' allegations, ignore the relevant case law and are inconsistent with the purposes behind the state laws relied upon by Plaintiffs.

*Third*, Intel incorrectly asserts that non-residents of California cannot invoke California law. Application of the relevant choice of law rules demonstrates that given the circumstances of this case, California law should apply nationwide.

*Fourth*, Intel's remaining attacks on Plaintiffs' state law claims are without merit. The statutes asserted by Plaintiffs apply to the challenged conduct, and Plaintiffs have standing to pursue those claims on behalf of a putative class of consumers. Plaintiffs' common law claims are similarly valid.

Accordingly, the Court should deny Intel's motion to dismiss in its entirety.

## **STATEMENT OF FACTS**

This lawsuit seeks to redress monopolization of the market for x86 microprocessors. In order to understand the case and the issues raised by Intel's motion, some background information on the product market is necessary.

A microprocessor is a distinct physical component, typically encased in some sort of housing. It fits onto a computer motherboard, usually by insertion into a socket, and is typically removable, replaceable and upgradeable. Once it is manufactured and inserted into a computer by an Original Equipment Manufacturer ("OEM"), it is physically unaltered as the computer is sold down the chain of distribution. Indeed, an OEM like Dell Computer Corporation ("Dell")

typically allows online customers to customize a computer purchase by selecting from multiple Intel microprocessor options at different price points.  When such a customer makes a selection, he, she or it is directed to an online "checkout" page where the microprocessor chosen is a separate line item with its own SKU number. The same is true when an end user buys a microprocessor as a stand-alone item (typically for upgrading or similar purposes) from a retailer like a Circuit City or Fry's Electronics.  Thus, the microprocessor installed in a computer is completely traceable down the chain of distribution.

Intel holds a monopoly in the market for x86 microprocessors.  *See* FACC ¶ 1.  As set forth in Plaintiffs' complaint, Intel has maintained this monopoly through anticompetitive means, including the following conduct that created barriers to entry and raised the costs of competitors and potential competitors in the relevant market:

- Intel has forced major customers into exclusive or near-exclusive deals.

- Intel has conditioned rebates, allowances, and market development funding on customers' agreement to severely limit or forego purchases from AMD or other competitors.

- Intel has established a system of discriminatory, retroactive, first-dollar rebates triggered by purchases at such high levels as to have the practical and intended effect of denying customers the freedom to purchase any significant volume of processors from AMD and others.

- Intel has threatened retaliation against customers introducing AMD-powered computer platforms, particularly in strategic market segments.

- Intel has established and enforced quotas with key retailers, effectively requiring them to stock overwhelmingly, if not exclusively, Intel-powered computers, thereby artificially limiting consumer choice.

- Intel has forced PC makers and technology partners to boycott AMD product launches and promotions.

- Intel has abused its market power by forcing on the industry technical standards that have as their central purpose the handicapping of AMD and others in the marketplace.

*Id.* ¶ 2.  This conduct "has unfairly and artificially capped AMD's and other's market shares, and it has constrained AMD and others from expanding to reach the minimum efficient levels of scale necessary to compete with Intel . . . ."  *Id.* ¶ 5.

Plaintiffs seek to represent a class of "[a]ll persons and entities residing in the United States who from June 28, 2001 through the present, purchased an x86 microprocessor in the United States, other than for resale, indirectly from the Defendant or any controlled subsidiary of Defendant."  *Id.* ¶ 106.[1]  These consumers are injured by Intel's unlawful monopolization, as specifically alleged in the FACC:

> Intel's exclusionary and restrictive practices described herein have suppressed competition in the x86 Microprocessor Market, resulting in higher prices for Intel x86 microprocessors, even accounting for discounts or rebates attributable to microprocessor purchases.  The overcharges imposed by Intel have been passed on to Plaintiffs and the Class members in the form of higher prices for personal computers, workstations, and servers containing x86 microprocessors.
>
> Intel's supra-competitive prices are not the result of superior products or business acumen or competition on the merits.  Instead, Intel has been able, at the financial expense of Plaintiffs and Class members, to artificially inflate prices for its products by engaging in a series of exclusionary acts and restrictive practices with the purpose and effect of restraining and preventing competition and unlawfully acquiring and maintaining its monopoly in the worldwide x86 Microprocessor Market.

*Id.* ¶¶ 234-35.  But for Intel's anticompetitive conduct, AMD and others could have grown to be stronger competitors of Intel, resulting in lower prices across the entire market.  Thus, not only

---

[1]    In the event California law is not applied to the claims of all class members for damages, Plaintiffs will seek certification of a subclass of indirect purchasers in Alaska, Arizona, Arkansas, California, the District of Columbia, Florida, Georgia, Idaho, Iowa, Kansas, Louisiana, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.  *See* FACC ¶¶ 107-08.

did Intel's conduct harm competitors and potential competitors such as AMD, it also injured consumers.

Plaintiffs assert several claims for the damages caused by Intel's conduct: for violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16720; for tortuous monopolization under California law; for violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*; for violation of twenty state antitrust and restraint of trade laws; violation of twenty-three state consumer protection and unfair competition laws; and for unjust enrichment. *See* FACC ¶¶ 247-320. Plaintiffs also seek injunctive relief for Intel's violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

## ARGUMENT

## I.    INTEL CANNOT SATISFY THE RIGOROUS STANDARD FOR DISMISSAL

In deciding a motion to dismiss for failure to state a claim, a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 (3d Cir. 2002).[2] "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to

---

[2]    This Court may "take judicial notice of facts that are 'not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'" *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (quoting Fed. R. Evid. 201(d)). Indeed, "a district court *must* take judicial notice 'if requested by a party and supplied with the necessary information.'" *Id.* (quoting Fed. R. Evid. 201(d)) (emphasis added). Thus, when resolving motions to dismiss, courts can take notice of documents integral to or relied on in the complaint, documents filed with governmental entities, and pricing data. *See id.* In addition, the Court may take judicial notice of the unpublished opinions and transcripts of court rulings cited by Plaintiffs, copies of which are submitted herewith. *See Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.*, 181 F.3d 410, 426-27 (3d Cir. 1999).

support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir.

1997) (quoting *Scheuer v. Rhode*s, 416 U.S. 232, 236 (1974)).

Importantly, "[t]here are no special pleading requirements for an antitrust claim."

*Bradburn Parent/Teacher Store, Inc. v. 3M*, Civ. A. No. 02-7676, 2003 U.S. Dist. LEXIS 13273,

at *6 (E.D. Pa. July 24, 2003).  Indeed, "[t]he dismissal standard is *higher* in antitrust cases than

generally."  *Glaberson v. Comcast Corp.*, Civ. A. No. 03-6604, 2006 U.S. Dist. LEXIS 62672, at

*11 (E.D. Pa. Aug. 31, 2006) (emphasis added); *see also Lum v. Bank of Am.*, 361 F.3d 217, 228

(3d Cir. 2004) ("[W]e should be extremely liberal in construing antitrust complaints.") (quoting

*Knuth v. Erie-Crawford Dairy Coop Ass'n*, 395 F.2d 420, 423 (3d Cir. 1968)).  Thus, the

Supreme Court has held that in antitrust cases, "dismissals prior to giving the plaintiff ample

opportunity for discovery should be granted very sparingly."  *Hosp. Bldg. Co. v. Trs. of Rex

Hosp.*, 425 U.S. 738, 746 (U.S. 1976).

Because Intel cannot satisfy this "rigorous standard" for dismissal of antitrust claims, *id.*,

the Court should deny its motion.

## II.        PLAINTIFFS HAVE PROPERLY ALLEGED ANTITRUST INJURY

Plaintiffs allege that as a result of Intel's anticompetitive practices, they paid more for

x86 microprocessors than they would have paid if those practices had not prevented more

effective competition from AMD and others.  *See* FACC ¶ 245.  Excessive payment is "injury of

the type the antitrust laws were intended to prevent and that flows from that which makes

[Intel's] acts unlawful."  *Brunswick*, 429 U.S. at 489.  As such, Plaintiffs sufficiently allege

antitrust injury.[3]

---

      [3]        Intel's brief discusses the antitrust injury requirement under Section 4 of the
Clayton Act, even though Plaintiffs' claims arise not under that provision but rather under
various state laws and Section 16 of the Clayton Act.  The cases cited by Intel "merely define the
term 'antitrust injury' for purposes of *federal* antitrust laws, such as the Clayton Act."  *Cellular*

Intel asks this Court to disregard Plaintiffs' well-pleaded allegations and to hold instead, as a matter of law and prior to discovery, that alleged anticompetitive practices that include discounting or other payments to customers simply *cannot* give rise to antitrust injury to consumers.  As a threshold matter, Intel's argument is premature on a motion to dismiss. Plaintiffs should be permitted an opportunity to engage in discovery and proffer opinions from experts that describe the manner in which Intel's anticompetitive practices have resulted in higher prices for consumers.  Intel's attempt to use Rule 12(b)(6) to resolve what should be an issue for trial on a fully-developed record is irregular and inappropriate.

More fundamentally, Intel's central premise is wrong, and Plaintiffs' allegations are more than sufficient at the pleading state.  Intel's simplistic argument that because some of its anticompetitive behavior involved payments, discounts, and rebates, its prices *could not* have been lower absent its exclusionary conduct – ignores critical aspects of Plaintiffs' allegations and, moreover, rests on a wholly unsupported assumption.

Intel simply assumes that had it not provided the unlawful discounts, it would have either offered the same amount of discounts in a lawful form or provided no discounts at all.  Intel's Mem. at 15.  Intel furnishes *no* support for its bald factual assertion, leaving one to ask:  Where is the analysis that establishes that Intel's prices, net of any discounts, could not have been lower in a more competitive environment?  How can Intel – or the Court – rule out before discovery and expert analysis that Intel, if faced with more effective competition, would not have offered

---

*Plus, Inc. v. Superior Court*, 14 Cal. App. 4th 1224, 1234 (Cal. Ct. App. 1993) (emphasis added). While state laws also require antitrust injury, "the scope of that term is broader."  *Id.*  ("Thus, the more restrictive definition of 'antitrust injury' under federal law does not apply to [California's Cartwright Act].").  With respect to Plaintiffs' claim for injunctive relief under Section 16 of the Clayton Act, that provision is "not as demanding" as Section 4 where antitrust injury is concerned, requiring only "a showing that there is a 'significant threat of injury . . . .'"  *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 399 (3d Cir. 2000) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969)).

larger discounts in a lawful form?  More importantly for purposes of this motion to dismiss, Plaintiffs certainly have not alleged that the amount of Intel's discounts would have been the same or smaller absent its wrongful conduct.

In addition to being based on mere speculation, Intel's antitrust injury argument assumes erroneously that Plaintiffs are alleging that Intel's overall prices to any given customer were low *on average*.  Indeed, as alleged and as supported by judicially noticeable facts, Intel's prices on average (including discounts) were higher than AMD's prices.  Plaintiffs' complaint, rather, is about the *structure* of Intel's prices and discounts.  Intel structured its microprocessor prices to make it very expensive for a customer to shift, for example, 5 or 10 percent of its purchases from Intel to AMD, even though the customer could actually *save money* if it shifted most or all of its purchases to AMD's lower-priced chips.  The complaint is devoid of any allegation that Intel's customers paid "low" prices on average.[4]

Ultimately, however, the question is not whether Intel's prices were "low" in some absolute sense, or even whether those prices were lower than AMD's.  Rather, the relevant inquiry is whether Intel microprocessors would have been less expensive overall *in a world*

---

[4]    Intel makes much of Plaintiffs' allegations about some of Intel's prices being so low that competitors could not match them.  *See* Intel Mem. at 14.  However, Intel takes these allegations out of context.  Each refers solely and specifically to certain prices offered as part of Intel's first-dollar rebate system.  *See* FACC ¶¶ 163-175.  Under this system, Intel unilaterally sets a customer's quarterly target at a level that Intel knows to be the large majority of the customer's microprocessor needs, while above the amount the customer would purchase from Intel absent the rebate.  *Id.* ¶¶ 163-64.  If the customer reaches the target, it gets a substantial rebate (usually about 8-10% of the price paid) on *all* of its Intel microprocessor purchases that quarter, not just on the purchases exceeding the target.  As explained in the complaint, *id.* ¶¶ 165-66, this first-dollar rebate system makes each unit purchased up to the target amount relatively expensive unless the target it achieved.  This "payment" for reaching the target (what economists call cliff pricing), is what makes it very difficult for competitors to *incrementally* shift sales away from Intel, *see id.* ¶ 166, and it is this particular aspect of Intel's pricing system that the complaint refers.  Nonetheless, across all of the customer's purchases *i.e.*, on average Intel's prices have not been "low," and not lower than AMD's.

*without Intel's anticompetitive conduct.*  Intel ignores key portions of the complaint that demonstrate that Plaintiffs will be able to show through discovery and expert analysis that consumers would have been better off had Intel not unlawfully monopolized the x86 microprocessor market.

Plaintiffs further have alleged that Intel has maintained its very large market share through various anticompetitive activities.  *See, e.g.,* FACC ¶¶ 1, 5.  Such allegations make clear that had Intel not engaged in that conduct, it would have been forced to cut its prices to avoid share losses to AMD and others.  To conclude otherwise would be to assume that Intel acted anticompetitively for no reason.

Plaintiffs further have alleged that Intel engaged in anticompetitive conduct designed "to keep[] competitors small and keep[] Intel's customers dependent on Intel for very substantial amounts of product [so that] OEMs remain vulnerable to continual threats of Intel retaliation, Intel's competitors remain capacity-constrained, the OEMs remain Intel-dependent, and Intel thereby perpetuates its economic hold over them, allowing it to continue to demand that customers curtail their dealings with Intel's competitors."  FACC ¶ 141.  In short, Intel's anticompetitive scheme was not designed to drive Intel's rivals from the market, but to keep them small and ineffective.  The benefits of this strategy to Intel, which it has pursued for over a decade see *id.* ¶ 2, are greater revenues through higher market share and higher prices.  *See, e.g.*, *id.* ¶ 1 ("These anticompetitive acts have … allowed Intel to charge inflated prices for its products."), *id.* ¶ 5 ("With AMD's and others' opportunity to compete thus constrained … Intel's monopoly profits continue to flow.").

These allegations are significant in two ways.  First, had Intel allowed AMD and others to compete fairly, and thereby expand their businesses, Intel would have faced more efficient

competitors that could price even lower than they did.  This increased price competition predictably would have forced Intel to lower its prices.

Second, these allegations reveal the poverty of Intel's "low price" argument.  That argument requires the Court to accept that *for over ten years*, Intel has pursued an unlawful pricing strategy when it could have charged higher prices in a lawful form. This argument might be tenable if it were made in a case where the monopolist had driven its competition from the market by charging "low" prices for a year or so, and then had raised its prices substantially to recoup its foregone profits.  Here, however, Plaintiffs have alleged a very different kind of case. Plaintiffs are alleging a long-term scheme by Intel – not to *forego* current profits to drive its competitors from the market and then raise its prices – but to *increase* current and future profits by keeping its rivals small.  Plaintiffs' allegations, therefore, support their claim that Intel was profiting from its scheme through higher prices and greater market share.

Moreover, although Plaintiffs' allegations regarding Intel's anticompetitive pricing practices are sufficient to establish antitrust injury, Plaintiffs' complaint includes other allegations that similarly contribute to the overcharge imposed on consumers.  Intel's effort to minimize or distort these allegations is unpersuasive.

The transparent tape litigation is instructive.  In *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) *(en banc)*, a competitor successfully sued 3M, alleging that 3M's discounting and other practices allowed it to monopolize the market for transparent tape.  *See id.* at 145.  The Third Circuit observed that 3M's conduct prevented LePage's from being an efficient competitor, thus allowing 3M to set high prices – notwithstanding its purported "discounts" – that its customers had no choice but to accept:

> As a result, LePage's manufacturing process became less efficient
> and its profit margins declined.  In transparent tape manufacturing,

large volume customers are essential to achieving efficiencies of scale. As 3M concedes, "'large customers were extremely important to [LePage's], to everyone.' . . . Large volumes . . . permitted 'long runs,' making the manufacturing process more economical and predictable." . . . .

3M's interest in raising prices is well-documented in the record. In internal memoranda introduced into evidence by LePage's, 3M executives boasted that the large retailers like Office Max and Staples had no choice but to adhere to 3M's demands. LePage's expert testified that the price of Scotch-brand tape increased since 1994, after 3M instituted its rebate program. In its opinion, the District Court cited the deposition testimony of a 3M employee acknowledging that the payment of the rebates after the end of the year discouraged passing the rebate on to the ultimate customers. The District Court thus observed, "the record amply reflects that 3M's rebate programs did not benefit the ultimate consumer."

*Id.* at 161-63 (citations omitted).[5]

3M's customers later brought their own suits, and 3M moved to dismiss, arguing – as Intel does here – that the plaintiffs did not suffer antitrust injury because they were beneficiaries of the challenged rebates. *See Bradburn*, 2003 U.S. Dist. LEXIS 13273, at *9-*10. The court denied 3M's motion:

[T]he allegations in the Complaint appear to assert that the bundled rebates and exclusive dealing that Defendant engaged in allowed Defendant to maintain its monopoly in the transparent tape market and stifled competition from LePage's (and possibly other competitors), which in turn allowed Defendant to maintain supra-competitive prices for transparent tape.

According to Defendant, Plaintiff's claims cannot be reconciled with the fact that, at least while the bundled rebate program was being instituted, retailers that received the bundled rebates paid less for the total amount of goods they received from Defendant than they would have paid had they bought these products from other suppliers. However, Plaintiff does allege in the Complaint that Defendant "has maintained prices paid by direct purchasers to 3M well above competitive levels after any 3M rebates (if any) attributable to tape purchases." Thus, Plaintiff's allegations, if

---

[5] Similarly, Intel provides its rebates in cash at the close of each quarter. *See* FACC ¶ 163.

> proven, could establish that, were it not for Defendant's anti-competitive conduct, Plaintiff would have paid less for transparent tape than it actually paid during the damages period, even when any bundled rebates or other discounts are taken into account. . . .
>
> Plaintiff's allegations, in turn, could establish that, had Defendant's conduct not drastically reduced the market power of LePage's, the prices that plaintiff paid for transparent tape would have decreased to the point where they were less than the price Plaintiff actually paid for transparent tape during the damages period, even after any rebates or discounts provided by Defendant are taken into account.

*Id.* at *11-*13 (citations omitted); *accord Meijer, Inc. v. 3M Co.*, Civ. A. No. 04-5871, 2005 U.S. Dist. LEXIS 13995, at *21 (E.D. Pa. July 13, 2005). This Court should similarly reject the identical argument now advanced by Intel.

## A.      Intel's Argument Is Premature on a Motion to Dismiss

The Third Circuit has held that "the existence of an 'antitrust injury' is not typically resolved through motions to dismiss." *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995) ("We are not in a position to predict whether Brader will ultimately be able to sustain his burden of proof on this issue since Brader has not yet had an opportunity to obtain evidence."); *see also Meijer*, 2005 U.S. Dist. LEXIS 13995, at *21 n.3 ("[T]he sufficiency of Meijer's contentions regarding the effect of 3M's conduct on prices will be resolved 'after discovery, either on summary judgment or after trial.'") (quoting *Brader*, 64 F.3d at 876); *N.Y. Citizens Comm.. on Cable TV v. Manhattan Cable TV, Inc.*, 651 F. Supp. 802, 811 (S.D.N.Y. 1986) ("The Committee should be given the opportunity to show that its members have suffered injury from higher prices.").

Thus, dismissal on antitrust injury grounds is the exception, not the rule.[6]  For example, when it upheld a Rule 12(b)(6) dismissal in *Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405 (3d Cir. 1997), the Third Circuit explained that it was "not . . . a typical case" because the antitrust injury issue could be resolved through interpretation of a contract and a state statute.  *Id.* at 417-18.[7]  In contrast, Intel's arguments regarding antitrust injury implicate a complex set of facts and require discovery and expert economic analysis before they can be resolved.  The complaint simply furnishes no basis to rule out before discovery and expert analysis the possibility that in a more competitive environment absent Intel's unlawful conduct, Intel's prices would have been lower.

In particular, analyzing antitrust injury in a case such as this requires an understanding of what would have happened but for Intel's unlawful conduct.  *See West Penn*, 147 F.3d at 269 n.20 ("The proper measure of damages . . . is the difference between the prices actually paid and those that would have been paid absent the [antitrust violation].").  Constructing a "but-for" world can be complicated and must be premised on expert economic assessment, as well as data and other evidence on which such analysis can be based.  At this stage of the proceedings, when

---

[6]    Indeed, several of the cases on which Intel relies reached the summary judgment or trial stage.  *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 333 (1990) ("*ARCO*"); *Brunswick*, 429 U.S. at 481; *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 736 (3d Cir. 2004); *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1053 (9th Cir. 1999); *Bowen v. N.Y. News, Inc.*, 522 F.2d 1242, 1246 (2d Cir. 1975).

[7]    In *Schuylkill*, the plaintiff was legally and contractually barred from competing with the defendant in the electric utility market.  *See Schuylkill,* 113 F.3d at 419; *see also Bradburn*, 2003 U.S. Dist. LEXIS 13273, at *14 (distinguishing *Schuylkill* on this basis).  Similarly, in *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256 (3d Cir. 1998), another case involving the electric utility industry cited by Intel, the regulatory scheme barred the parties from competing with one another.  *See id.* at 265; *see also id.* at 263 ("The present case arises in a factual context which is substantially different from that of most antitrust cases."); *Warfarin Sodium*, 214 F.3d at 401 (distinguishing *West Penn* on the basis of "this regulatory quirk").

discovery is just beginning and expert reports are not yet due to be submitted, a determination of antitrust injury is premature.

    **B.**    **Plaintiffs Are Injured by Intel's Anticompetitive Pricing Practices**

    Plaintiffs are consumers forced to pay higher prices for x86 microprocessors as a result of Intel's anticompetitive conduct.  This injury – higher prices to consumers – is exactly the type of injury the antitrust laws were intended to prevent.  *See Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 439 (3d Cir. 2000) ("The intent of the antitrust laws covers injuries to 'consumers forced to pay higher prices . . . .'") (quoting *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 927 (3d Cir. 1999)); *Alberta Gas Chems. Ltd. v. E.I. Du Pont De Nemours & Co.*, 826 F.2d 1235, 1241 (3d Cir. 1987) ("We must analyze the antitrust injury question from the viewpoint of the consumer."); *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 398 (7th Cir. 2000) ("As people forced to pay an alleged monopolistic overcharge, they have described the kind of injury the antitrust laws are designed to redress, which is to say they have satisfied the 'antitrust injury' requirement of *Brunswick* . . . ."); *Glaberson*, 2006 U.S. Dist. LEXIS 62672, at *24-*25 ("Counts Two and Three further allege that Comcast's success in reducing competition from RCN enabled it to charge the inflated prices that injured Plaintiffs. . . . [S]uch prices are the type of injury for which the antitrust laws were intended to provide redress."); *N.Y. Citizens Cmte.*, 651 F. Supp. at 811 (finding antitrust injury when "MCTV's actions are alleged to have precluded competition between programmers, the immediate result of which was higher prices to consumers").

    Intel argues that there can be no injury to consumers because the alleged anticompetitive conduct includes discounting and other payments to customers, which – according to Intel – result in "[l]ow prices" that benefit Plaintiffs rather than harm them.  Intel's Mem. at 14-15. Intel's "low prices" argument fails because Plaintiffs have alleged that on average Intel

microprocessors are more expensive than AMD microprocessors, notwithstanding any discounts offered by Intel, and because Plaintiffs have alleged that Intel's prices would have been even lower in the absence of its anticompetitive conduct.

1.  Intel's Average Prices Were Not "Low," and, Indeed, Were Higher Than AMD's Average Prices

While, as alleged in the complaint, Intel's first-dollar rebates were a form of cliff pricing, that does not support Intel's argument that its prices overall were "low." To the contrary, the complaint makes clear that Intel's prices overall were not "low," but rather, were unlawfully inflated and higher than AMD's prices.[8]

Plaintiffs have alleged that, in addition to being "superior," AMD's microprocessors were "lower-cost" than those offered by Intel. FACC ¶ 4. Facts of which this Court may take judicial notice support this allegation. A recent study by R. Preston McAfee, the J. Stanley Johnson Professor of Business, Economics and Management at the California Institute of Technology, demonstrated that federal procurement solicitations for computer hardware that use brand name specifications (i.e., Intel-only) cost the government hundreds of millions of dollars because they prevent the purchase of AMD's lower-priced chips. *See* R. Preston McAfee, Improving Federal Procurement: The Benefits of Vendor-Neutral Contract Specification, at 13 (Feb. 2006) (attached as Exhibit A).[9]

---

[8]    Unlike in *ARCO,* see 495 U.S. at 340, in this case Intel's prices overall are not "low." Thus, "[t]he 'low prices' favorably referred to in ARCO are not the same 'low prices' at issue in the instant case." *Bellevue Drug Co. v. Advance PCS,* Civ. A. No. 03-4731, 2004 U.S. Dist. LEXIS 3627, at *14 (E.D. Pa. Mar. 2, 2004).

[9]    This report was referenced in Congressional testimony. *See* Sharpening Our Edge – Staying Competitive in the 21st Century Marketplace: Hearing Before the Committee on Government Reform, 109th Cong. 58 (2006) (testimony of Hector Ruiz) (attached as Exhibit B) ("AMD recently commissioned a study, the results of which were released yesterday, showing that the Federal Government, and U.S. taxpayers, would have saved between $281 million and $563 million by adopting performance-based procurement standards for microprocessors."). Accordingly, the Court can take judicial notice of its findings. *See, e.g., Dingle v. Bioport Corp.,*

Using commercially available data from a reporting service called Mercury Research, Professor McAfee demonstrated that average sales prices ("ASPs") for AMD microprocessors are substantially lower than ASPs for Intel microprocessors:

| Type | Intel ASP | AMD ASP |
|------|-----------|---------|
| Desktop | $115 | $74 |
| Laptop | $182 | $68 |
| Server | $519 | $481 |

*Id.* at 16 (citing "Mercury 4Q04 Aggregation").

Thus, the complaint does not allege that Intel's prices were low on average, only that Intel's pricing scheme was tailored to prevent an incremental shift in share from Intel to its competitors. This distinction between high overall Intel prices and the impact of the pricing scheme on purchasers' decisions readily can be seen from an example of how one of Intel's chief discounting schemes has coerced customers to buy additional Intel microprocessors despite their higher prices. Assume, as suggested by the available data, that Intel desktop microprocessors are sold for $115 each, after accounting for any applicable discounts and rebates, and that comparable AMD desktop microprocessors are sold for $74 each. Next assume that according to Intel, this $115 price represents a 20 percent "discount," and that to obtain this price on any microprocessors, a customer must purchase 80 percent of its microprocessors from Intel. To put it another way, if a customer fails to meet the 80 percent target, Intel will *raise* that customer's

---

388 F.3d 209, 211 (6th Cir. 2004); *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1168 n.12 (10th Cir. 2000); *Planned Parenthood Fed'n of Am. v. Ashcroft*, 320 F. Supp. 2d 957, 964 (N.D. Cal. 2004); *In re Healthsouth Corp. Sec. Litig.*, Master File No. CV-98-J-2634-S, 2000 U.S. Dist. LEXIS 20443, at *5 (N.D. Ala. Dec. 20, 2000). Judicial notice of these prices would be appropriate even had they not been referenced in Congressional testimony. *Cf. In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 264 n.3 (3d Cir. 2005) (holding that it was proper to take judicial notice of stock prices on a motion to dismiss).

price – on all microprocessor purchases – to $143.75 ($143.75 less a 20 percent discount results in a $115 price). Thus, the arrangement is not so much a discount as a threatened penalty in the form of a price increase for failure to comply with Intel's targets.

Here is how this coercive scheme would work for a customer seeking to buy a total of 100 microprocessors. If the customer purchases 80 chips from Intel and 20 chips from AMD, it pays a total of $10,680 (80 Intel chips at the "discounted" price of $115 each, for $9200, and 20 AMD chips at $74 each, for $1,480). If that customer contemplates buying just one additional microprocessor from AMD instead of from Intel, it faces an Intel price *increase* to $143.75 – on *all* of the chips it purchases from Intel. The total cost for a customer that buys 79 Intel chips and 21 AMD chips therefore jumps to $12,910.25 (79 Intel chips at the "undiscounted" price of $143.75 each, for $11,356.25, and 21 AMD chips at $74 each, for $1554). Even though the AMD microprocessor is $41 cheaper than the Intel microprocessor, the penalty imposed by Intel increases the customer's total cost by $2230.25 – a difference that AMD cannot make up even if gives the customer the 21 AMD microprocessors for free.[10]

In the foregoing example, Intel's "discounts" are not resulting in lower prices at all. Rather, the *structure* of the discounts is such that a customer is compelled to buy more Intel microprocessors, at a higher average price, even when it would otherwise prefer to purchase

---

[10]     The reason the customer does not simply buy all 100 of its microprocessors from AMD instead of Intel, which would cost it only $7400, is because it "must engage significantly with Intel: (1) because Intel's competitors are too small to service all [major] OEMs' needs while satisfying other customer demand; (2) because to meet customer expectations, OEMs must assure commercial computer buyers that specifications, including the microprocessor, will remain unchanged during the product's lifecycle; and (3) because Intel has encouraged end-users to specify that processors be of the same family among similar computers in one installation, as that is perceived to increase reliability (although technically this is not the case)." FACC ¶ 167. Indeed, it is the customer's need to buy a significant amount of microprocessors from Intel that creates the leverage that Intel has unlawfully exploited to coerce customers to buy a large percentage of their remaining needs from Intel.

more lower-cost AMD microprocessors.[11]  In the absence of this anticompetitive pricing scheme, to avoid losing very substantial sales to AMD, Intel would need to *lower* its prices, not – as is currently the case – merely threaten to *raise* them.  Such lower prices would result in lower prices to consumers such as Plaintiffs.  *See* FACC ¶ 234.  This theory of harm to consumers is articulated in the allegations of the complaint.  Intel's contrary argument conflicts with those allegations, and certainly does not establish that Plaintiffs *cannot* show consumer injury.[12]

2. <u>The Key Point on This Motion is That the Complaint Alleges That Intel's Prices Would Have Been Lower in the Absence of Intel's Misconduct</u>

As discussed above, Intel wrongly infers from Plaintiffs' allegations that select Intel prices are "low" that Intel's prices *on average* are "low."  More importantly, simply asserting that Intel's prices are "low" misses the point: the question is whether the complaint requires the conclusion that Intel's prices are *lower* than they would have been absent its anticompetitive conduct.  *See West Penn*, 147 F.3d at 269 n.20 ("The proper measure of damages . . . is the difference between the prices actually paid and those that would have been paid absent the [antitrust violation]."); *Applied Med. Res. Corp. v. Ethicon Inc.*, Case No. SACV 03-1329-JVS(MLGx), 2006 U.S. Dist. LEXIS 12845, at *21 n.13 (C.D. Cal. Feb. 2, 2006) ("J&J's contention that bundling produced lower prices begs the issue if the so-called lower prices were

---

[11]     In the example given above, AMD could not overcome Intel's penalty even by offering its product for free, but this is not because Intel's average prices are "low" or even lower than AMD's prices.  FACC ¶ 172 (illustrating "why a customer's *incremental cost* of purchasing from Intel those units that both Intel and a rival could supply can be zero or even negative, a price the rival cannot match") (emphasis added).

[12]     As explained above, *see supra* § II.A., predicting what would have happened in the but-for world can be complex and requires both discovery and expert investigation and evaluation.  At this stage of proceedings, it is sufficient that Plaintiffs have alleged that prices would have been lower but for Intel's anticompetitive conduct, and have not alleged facts establishing the opposite conclusion.  Plaintiffs' allegations must be accepted as true for purposes of the motion to dismiss, and the issue can be revisited later, if necessary, on a full record.

18

higher than would obtain in the absence of bundling."). *Rosack v. Volvo of Am. Corp.,* 131 Cal. App. 3d 741, 759-60 (Cal. Ct. App. 1982) ("The effectiveness of any negotiation by the purchaser must be seen as relative, depending on whether the negotiation commences from a price which is set by a competitive market or from an artificially inflated fixed price. The good negotiator in the fixed market would presumably have gotten an even better 'deal' in a competitive market.") A seller's claim that it "discounts" a product means little out of context. *Cf. B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 258 F.3d 578, 579 (7th Cir. 2001) ("Finlay Fine Jewelry . . . regularly offers its products at 50% off.  Half off what?, one may ask.").  The focus must be on how Intel would have priced its microprocessors in a more competitive environment.[13]

Here, Plaintiffs allege that "Intel's exclusionary and restrictive practices . . . have suppressed competition in the x86 Microprocessor Market, resulting in higher prices for Intel x86 microprocessors, *even accounting for discounts or rebates attributable to microprocessor purchases*."  FACC ¶ 234 (emphasis added).  This is far from the "leap of illogic" that Intel suggests.  Intel Mem. at 1.  Rather, this allegation is well grounded in several other specific factual allegations in the complaint.

Plaintiffs have alleged that Intel's misconduct has allowed it to maintain an overwhelming market share of 80 percent by unit volume and 90 percent by revenue.  *See, e.g.,*

---

[13]    Thus, unlike in *ARCO*, in this case there are no "[l]ow prices" at all, *see* 495 U.S. at 340, only illusory discounts off an inflated price.  Thus, "[t]he 'low prices' favorably referred to in *ARCO* are not the same 'low prices' at issue in the instant case."  *Bellevue Drug Co. v. Advance PCS*, Civ. A. No. 03-4731, 2004 U.S. Dist. LEXIS 3627, at *14 (E.D. Pa. Mar. 2, 2004); *see also Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) (rejecting a defendant's argument "that a conspiracy to depress prices would not harm consumers but benefit them, because reduced milk acquisition costs would mean lower cheese manufacturing costs and, therefore, lower prices for cheese products," because "the central purpose of the antitrust laws, state and federal, is to preserve competition").

FACC ¶¶ 1, 5 ("Intel's conduct has unfairly and artificially capped AMD's and others' market shares …."). It follows that, absent such conduct, to avoid a significant shift in sales to its competitors, Intel would have been forced to utilize lawful methods of competition, certainly including lower prices. Lower prices, far from being illogical, are the most likely competitive weapon Intel would have employed to avoid losing very substantial market share in a world free of its exclusionary conduct.

Moreover, by stopping AMD – or any other potential entrant – from becoming a more effective competitor, Intel keeps its rivals' costs higher and their quality lower, preventing them from offering a lower-priced or higher-quality product that would in turn force Intel to lower its own prices. *See, e.g.*, FACC ¶ 126 ("Intel has . . . prevent[ed] AMD from achieving the minimum scale necessary to become a full-fledged, competitive alternative to Intel . . . ."); *id.* ¶ 231 ("Were it not for Intel's acts, AMD and others would be able to compete for microprocessor business on competitive merit . . . bringing customers and end-product consumers lower prices, enhanced innovation, and greater freedom of choice."); *id.* ¶ 242 (alleging that Intel's conduct is "designed to keep AMD and other competitors and potential competitors weak, undersized, and unable to achieve a minimum efficient scale of operation needed to offer a viable substitute for Intel's x86 microprocessors").[14]

Furthermore, as alleged, the objective of Intel's anticompetitive conduct was to keep its rivals small and weak, not necessarily to drive them from the market. Intel's anticompetitive

---

[14]     The Court may take judicial notice of the fact that the record already contains evidence supporting these allegations. In the course of briefing the issue of foreign discovery, AMD has proffered declarations and documents (of which the Court can take judicial notice) indicating that Intel's exclusionary conduct forced it to reduce production of microprocessors at its Fab 25 production facility in Austin, Texas. *See* Decl. of William Siegle ¶¶ 11-26 (Oct. 27, 2006); Decl. of Dewey Overholser ¶¶ 2-5 (Oct. 26, 2006). Had Intel not engaged in such conduct, AMD could have readily met the additional market demand for its microprocessors.

scheme, which it has employed for over ten years, allowed it to keep its prices and sales up, *i.e.*, to be more profitable. *See* FACC ¶¶ 1, 2, 5, 141. Nowhere does the complaint allege that Intel sacrificed profits through lower prices, hoping one day to eliminate its competition and then raise its prices to recoup its lost profits. The entire premise of this case is that Intel's monopoly is durable and profitable, which directly supports Plaintiffs' allegation that in a more competitive world, Intel's prices would have been lower. The complaint forecloses Intel's unsupported and counter-intuitive assertion that its prices would have been the same or higher had it faced stronger competitors. Thus, it is Intel that defies logic when it asks the Court to believe that it could have charged higher, lawful prices for the last ten-plus years, but chose not to for no apparent reason.

Intel fails to cite a single case holding that consumers did not suffer antitrust injury from allegedly higher prices. The cases it does cite are inapposite. In *Brunswick*, the plaintiff argued that it was deprived of the "benefits of increased concentration" when a merger kept a rival business in operation. 429 U.S. at 488.[15] Here, Plaintiffs seek the benefits of increased *competition* in the form of the lower prices that would result if AMD and others had been permitted to compete effectively with Intel.[16]

---

[15]    In *American Ad Management*, a case cited by Intel, *see* Intel Mem. at 15-16, the court distinguished *Brunswick* and held that the plaintiff there did suffer antitrust injury, because whereas the challenged conduct in *Brunswick* – the rescue of the bowling centers – "was not in itself unlawful" but was "potentially unlawful only because of Brunswick's size," *American* involved conduct that "is itself potentially unlawful." 190 F.3d at 1056. Because Plaintiffs allege that Intel's conduct is itself unlawful and has resulted in higher prices to consumers, Plaintiffs properly have alleged antitrust injury.

[16]    Thus, this action is unlike the other cases cited by Intel in which the plaintiffs are better off without competition than with it. *See ARCO*, 495 U.S. at 336-37 (holding that if the defendant restricted its sales to a few dealers or prevented those dealers from offering particular services, the plaintiff would benefit because it would face less competition in selling goods or offering those services); *AGC*, 459 U.S. at 539 (holding that a union could be harmed by the cost-cutting that would accompany competition among its members' employers); *Bowen*, 522

Another case cited by Intel, *Gregory Marketing Corp. v. Wakefern Food Corp.*, 787 F.2d 92 (3d Cir. 1986), considered whether a terminated broker suffered antitrust injury from a discriminatory pricing scheme that violated the Robinson-Patman Act ("RPA").  *See id.* at 93. Explaining that standing principles applied to the RPA "in light of the particular law creating the substantive antitrust violation," *id.* at 95 n.5, and that the relevant provision of the RPA was intended to protect independent retailers disadvantaged by discriminatory discounts, *see id.* at 96 n.6, the Third Circuit held that the plaintiff's injuries resulted from its termination, not the RPA violation, *see id.* at 96 ("The lost future income clearly does not flow from decreased competition in the apple juice market.").  In contrast, Plaintiffs here have suffered an injury – increased prices – that flow from Intel's exclusion of AMD as an effective competitor.

There can be no serious assertion that Plaintiffs benefit from the higher prices they allege result from Intel's anticompetitive conduct.  Only by disregarding Plaintiffs' well-pleaded allegations and making a factual finding as to what prices would have been absent Intel's unlawful monopolization could this Court rule that Plaintiffs are better off with Intel's so-called "discounts" than without them.  *See Levis Strauss & Co. v. Fed. Pants Co.*, No. CV 75-3642-JWC, 1979 U.S. Dist. LEXIS 11611, at *5 (C.D. Cal. June 19, 1979) ("Levi argues that the counter-claimants actually benefited from the price maintenance program.  On its face, this argument goes to the absence of provable damages, an issue not here resolvable in light of the material facts in dispute.").

---

F.2d at 1255 (holding that an exclusive dealing clause "could only benefit plaintiffs" because their competition would be reduced).  Intel's argument is that Plaintiffs are better off with their so-called "discounts" then without them.  The proper question, however, is whether Plaintiffs are better off with or without *competition*.  Clearly, because more competition would result in lower prices, Plaintiffs are better off with it, and therefore can allege an antitrust injury.

C.    **Plaintiffs Also Allege Injury from Intel's Other Anticompetitive Practices**

As alleged in Plaintiffs' complaint, Intel's anticompetitive practices involved more than discounting and other payments to customers.  For example, Plaintiffs allege that "Intel has resorted to old-fashioned threats, intimidation and 'knee-capping' to deter OEMs from dealing with Intel's rivals."  FACC ¶ 176.  Plaintiffs further allege that Intel has interfered with AMD product launches, *see id.* ¶¶ 181-188, and has engaged in standard setting and other technical abuses, *see id.* ¶¶ 212-30.  In a case such as this one, "[t]he relevant inquiry is the anticompetitive effect of [Intel's] exclusionary practices considered together."  *LePage's*, 324 F.3d at 162.

As to Plaintiffs' allegations of threats and intimidation, Intel argues that "purported unperformed threats cannot support plaintiffs' claimed injury."  Intel Mem. at 18 n. 21 (citing *Borschow Hosp. & Med. Supplies, Inc. v. Cesar Castillo, Inc.*, 96 F.3d 10, 17 (1st Cir. 1996)).[17] Yet this is not what *Borschow* held.  Rather, that case stands for the proposition that "a threat alone is insufficient to constitute an illegal *tying* arrangement."  *Id.* at 17 (emphasis added). Because the defendant in *Borschow* never actually withheld the tying product, the plaintiff was not injured.  *See id.* at 17-18 ("Where a tying product has not been withheld, there is no tie.").

This is not a tying case.  Here, Plaintiffs allege that Intel's threats had the effect of deterring OEMs from dealing with Intel's competitors, thereby maintaining Intel's monopoly. *See* FACC ¶¶ 176-180.  It is well established that threats and intimidation can work to restrain

---

[17]    Plaintiffs allege that Intel did follow through on certain of its threats.  *See* FACC ¶ 177 ("For example, Compaq's CEO, Michael Capellas, disclosed in late 2000 that because of the business he had given to AMD, Intel withheld delivery of server chips that Compaq desperately needed.  Reporting that he 'had a gun' to his head, Capellas informed an AMD executive that he had to stop buying AMD processors."); *id.* ¶ 179 ("Intel told NEC-CI's retailers that NEC-CI's AMD dealings could impair its ability to supply products to its customers, and when NEC-CI resisted the pressure, Intel imposed a discriminatory price increase.").

competition, even if the threats are never carried out.  *See, e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 570 (1966) ("ADT threatened retaliation against firms that contemplated inaugurating central station service.  And the record indicates that, in contemplating opening a new central station, ADT officials frequently stressed that such action would deter their competitors from opening a new station in that area."); *United States v. Crescent Amusement Co.*, 323 U.S. 173, 181 (1944) ("The mere threat would at times be sufficient and cause the competitor to sell out to the combination 'because his mule was scared.'"); *New York v. Microsoft Corp.*, 224 F. Supp. 2d 76, 163 (D.D.C. 2002) ("Microsoft has argued that where the retaliation itself is banned, there is little practical need to protect against threats of retaliation because to carry out the threat would violate the decree.  While technically true, this analysis ignores the power wielded by a monopolist such as Microsoft and the resulting damage which can flow from a mere threat.").

Intel's argument that threats alone can have no anticompetitive effect is particularly disingenuous in light of its own experience with another monopolist, Microsoft:

> Microsoft threatened Intel that if it did not stop aiding Sun on the multimedia front, then Microsoft would refuse to distribute Intel technologies bundled with Windows. . . . Microsoft's internal documents and deposition testimony confirm both the anticompetitive effect and intent of its actions.  Microsoft does not deny the facts found by the District Court, nor does it offer any procompetitive justification for pressuring Intel not to support cross-platform Java.  Microsoft lamely characterizes its threat to Intel as "advice."  The District Court, however, found that Microsoft's "advice" to Intel to stop aiding cross-platform Java was backed by the threat of retaliation, and this conclusion is supported by the evidence cited above.  Therefore we affirm the conclusion that Microsoft's threats to Intel were exclusionary, in violation of § 2 of the Sherman Act.

*United States v. Microsoft Corp.*, 253 F.3d 34, 77-78 (D.C. Cir. 2001) (citations omitted).

With respect to Intel's standard setting and other technical abuses, Intel wrongly claims that Plaintiffs allege "injury to themselves other than to [sic] higher prices."  Intel Mem. at 27. The injury claimed by Plaintiffs *is* higher prices – higher prices that resulted from Intel's anticompetitive conduct, including its technology-related conduct.  *See* FACC ¶¶ 234, 235, 245.

Thus, Intel's reliance on *Kloth v. Microsoft Corp.*, 444 F.3d 312 (4th Cir. 2006), is misplaced.  The plaintiffs in *Kloth* were held by the court to be indirect purchasers who could not recover damages under federal antitrust law based on higher prices, and who therefore separately claimed other types of injury.  *See id.* at 323 ("In addition to claiming injury based on the allegation that Microsoft charged supra-competitive prices – i.e., overcharges which are barred by *Illinois Brick* – plaintiffs claim, as we have just noted, *other types of injury*.") (emphasis added).[18]

Unlike the plaintiffs in *Kloth*, Plaintiffs here do not allege that they are injured by Intel's technological misconduct in and of itself, but rather that this misconduct allowed Intel to maintain its monopoly and charge supra-competitive prices, which injured Plaintiffs.  Because Plaintiffs are suing under state statutes that permit indirect purchasers to recover damages, there is no barrier – as there was in *Kloth* – to their doing so.  *See also N.Y. Citizens Comm.*, 651 F. Supp. at 810 ("It is not necessary to decide, however, whether these allegations alone would be sufficient allegations of antitrust injury, since the Committee's allegation that subscribers pay higher prices is the kind of injury contemplated by the antitrust laws.").

---

[18]    *Kloth* was premised on the plaintiffs' lack of standing under the *AGC* factors, not the absence of antitrust injury.  *See* 444 F.3d at 325.  Here, Plaintiffs have standing to seek damages for the overcharge that was passed on to them as a result of Intel's anticompetitive conduct, which included discounting and other practices.  *See infra* § III.B.

**III.**         **PLAINTIFFS HAVE STANDING TO BRING THEIR CLAIMS**

The Third Circuit has explained that "[t]o achieve standing, a plaintiff must satisfy both the case and controversy requirements of Article III of the Constitution and certain prudential requirements." *Wheeler v. Travelers Ins. Co.*, 22 F.3d 534, 537 (3d Cir. 1994). "Tellingly, [Intel] do[es] not assert that plaintiffs lack constitutional standing, but, instead, limit[s] [its] argument in favor of dismissal to plaintiffs' failure to meet prudential standing considerations." *D.R. Ward Constr. Co. v. Rohm & Haas Co.*, MDL Docket No. 1684, 2006 U.S. Dist. LEXIS 61828, at *9 (E.D. Pa. May 31, 2006); *see also* Intel's Mem. at 11.[19]  Indeed, Plaintiffs clearly have constitutional standing: they allege that they paid inflated prices as a result of Intel's anticompetitive conduct and that judicial relief will compensate them for these injuries. *See D.R. Ward*, 2006 U.S. Dist. LEXIS 61828, at *8-*9.

Intel seeks to import the heightened prudential standing requirements of *AGC*, even though that case arose in the context of federal damage claims under Section 4 of the Clayton Act, 15 U.S.C. § 15. *See AGC,* 459 U.S. at 521. A proper analysis, however, must look to state – not federal – law, because state law, which permits suits by indirect purchasers, provides the basis for Plaintiffs' claims for damages. *AGC* therefore has little or no relevance to Plaintiffs' standing. Even if the *AGC* factors do apply here, they strongly weigh in favor of Plaintiffs' standing. As will become clear, however, the standing inquiry is a fact-intensive one, and is better resolved on a fully-developed record. *See D.R. Ward*, 2006 U.S. Dist. LEXIS 61828, at *47 ("An antithetical ruling [on standing] would require the Court to impermissibly rely on facts

---

[19]         Intel does raise a constitutional standing argument with respect to Plaintiffs' claims under state consumer protection statutes. This argument is addressed below. *See infra* § VI.A.

external to the pleadings, but also would deprive plaintiffs of the opportunity to discover and confirm such facts through the discovery process.").

### A.    Intel Applies the Wrong Standard

Plaintiffs do not raise any claim for damages under federal antitrust law.  Their only federal claim is one for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, and their remaining claims are for damages under state statutory and common law.  As such, the *AGC* standard discussed in Intel's brief does not apply here.

The Supreme Court has made it clear that standing under Section 16 differs from standing under Section 4.  *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 111 n.6 (1986) ("[B]ecause standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries, some of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are not relevant under § 16.").  Thus, "Section 16 is not as demanding" as Section 4, under which "plaintiff's standing is tested by an application of a number of factors" from *AGC*: a Section 16 plaintiff need only establish a threat of antitrust injury.  *Warfarin Sodium*, 214 F.3d at 399.  As demonstrated above, Plaintiffs have done more than allege a *threat* of antitrust injury; they have alleged that they already have suffered – and continue to suffer – such an injury.

With respect to Plaintiffs' state antitrust claims, Intel is wrong to assume that the federal *AGC* standard "applies equally to plaintiffs' state law claims, including their Cartwright Act claim."  Intel Mem. at 12 n.11.  In analyzing Plaintiffs' prudential standing, this Court must look to state law principles, not the *AGC* factors.  *See D.R. Ward*, 2006 U.S. Dist. LEXIS 61828, at *14-*19 ("[T]o determine whether a diversity plaintiff possesses federal prudential standing to bring a claim under a state antitrust statute, this Court looks to the treatment of standing under the relevant state antitrust statutes. . . . Phrased differently, the state rules of antitrust standing

determine whether a plaintiff suing under a state antitrust statute enjoys federal prudential standing in a diversity action.").[20]

It is especially important to focus on state substantive law when – as in this case – the antitrust claims are brought under the laws of states that permit suits for damages by indirect purchasers. In *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court held that indirect purchasers could not sue for damages under Section 4 of the Clayton Act. *See id.* at 736. A number of states have adopted a contrary approach, and the Supreme Court has held that "[s]tate laws to this effect are consistent with the broad purposes of the federal antitrust laws: deterring anticompetitive conduct and ensuring the compensation of victims of that conduct." *California v. ARC Am. Corp.*, 490 U.S. 93, 102 (1989) ("Congress intended the federal antitrust laws to supplement, not displace, state antitrust remedies."). Importantly for purposes of Intel's motion, the *ARC America* Court held that *Illinois Brick* and *AGC* "were cases construing § 4 of the Clayton Act; in [neither] of those cases did the Court identify a federal policy against States imposing liability in addition to that imposed by federal law." *Id.* at 105. Thus, *AGC* is not controlling in cases based on state – rather than federal – law:

> [B]ecause the concept of prudential standing in the antitrust context is intertwined with the substantive content of and intent behind the particular statute authorizing the cause of action, the standing requirements of [these state] antitrust statutes, which recognize indirect purchaser claims, should be the guide for determining whether prudential considerations permit a plaintiff to

---

[20]    *See also In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp.2d 160, 169 (D. Me. 2004) (following state court rulings in determining state antitrust and consumer protection claims); 13A C. Wright & A. Miller, *Federal Practice and Procedure* § 3531.14, at 90-91 (2d ed. 1984) ("[F]ederal courts have stated that state law of standing should be applied as to state rights . . . whether the state question arises in an original diversity action, on removal from state court, or as a matter of ancillary jurisdiction") (footnotes omitted). *Cf. Joint Stock Soc'y v. UDV No. America, Inc.*, 266 F.3d 164, 186 (3d Cir. 2001) (applying Delaware law in determining standing under the Delaware Uniform Deceptive Trade Practices Act).

> sue under these statutes, as opposed to those requirements
> engrafted by federal case law onto federal antitrust statutes, which
> do not recognize indirect purchaser claims.  Indeed, the opposite
> approach carries the potential to disrupt the governmental power
> equilibrium upon which the federal system operates; the federal
> judiciary would be entitled to disregard the intent of the state
> legislature, as reflected in the literal language of the state antitrust
> statute, by applying federal, judicially-fashioned principles of
> practicality, now detached from their federal statutory moorings, to
> determine whether a particular plaintiff is a "worthy" or "proper"
> candidate to sue under state law in a diversity action.

*D.R. Ward*, 2006 U.S. Dist. LEXIS 61628, at *15.

In an appendix to its brief, Intel purports to identify the authorities supporting its dubious claim that the *AGC* factors apply to Plaintiffs' claims.  *See* Intel Mem. at 12 & Appendix A.  Yet these citations do not support Intel's argument.

An example of the cursory nature of Intel's legal analysis is its treatment of California's Cartwright Act.  Intel relies on *Vinci v. Waste Management, Inc.*, 36 Cal. App. 4th 1811 (Cal. Ct. App. 1995), a case addressing whether a shareholder of a corporation had standing to sue for an injury to the corporation.  *See id.* at 1815.  Although the *Vinci* court did list the *AGC* factors, it noted that the defendant "relies almost exclusively" on the antitrust injury factor, and the court did not analyze each factor in determining that the shareholder lacked standing.  *See id.* at 1815 & n.2.[21]  Another case cited by Intel, however, *see* Intel Mem. at 20 n.23, makes clear that standing under the Cartwright Act is governed by substantive California law, and that federal

---

[21]     As Intel observes, the federal district court in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213 (C.D. Cal. 2003), *aff'd*, 380 F.3d 1154 (9th Cir. 2004), *rev'd on other grounds*, 125 S. Ct. 2764 (2005), stated that "while the scope of actionable injury is slightly different under the Cartwright Act, the standing analysis is nonetheless informed by many of the same factors considered" under federal law.  *Id.* at 1224-25.  Yet the only authority cited for this proposition was *Vinci*, and the *Grokster* court did not actually apply the *AGC* factors to the Cartwright Act claim, but rather based its conclusion on California law.  *See id.* at 1223-24.  In addition, the court explained that the Cartwright Act "is broader than its Clayton Act analog."  *Id.* at 1223.

antitrust precedent has "limited" value and is "not necessarily decisive" in construing that statute. *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 985 (9th Cir. 2000);[22] *see also State ex rel. Van de Kamp v. Texaco, Inc.*, 46 Cal. 3d 1147, 1164 (1988) (holding that judicial interpretation of the Sherman Act "is not directly probative of the Cartwright drafters' intent"); *Cianci v. Superior Court*, 40 Cal. 3d 903, 920 (1985) (holding that "the Cartwright Act is broader in range and deeper in reach than the Sherman Act"); *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 183 n.9 (1999) ("Federal precedents must be used with caution because the [antitrust] acts, although similar, are not coextensive."); *cf. Theme Promotions, Inc. v. News America FSI*, 35 Fed. Appx. 463, 466-67 (9th Cir. 2002) (unpublished) (reversing grant of summary judgment on Cartwright Act claim, noting that "California law grants antitrust standing more liberally than does federal law," because there are "broader, more liberal state antitrust claims"). Thus, Intel "overstates the weight of authority that federal decisions regarding the Sherman Act have upon decisions California courts make regarding the Cartwright Act." *Cellular Plus*, 14 Cal. App. 4th at 1240.

Intel's argument fares no better with respect to other states. Several states have statutes regarding the harmonization of state and federal antitrust law. Three of these, however, are "permissive" harmonization statutes, in that they merely allow courts to use federal cases "as a guide" in interpreting state antitrust laws. *See* Ariz. Rev. Stat. § 44-1412; D.C. Code § 28-4515; S.D. Codified Laws § 37-1-22. Another state statute only requires that courts "give due deference" to federal interpretations. Mich. Comp. Laws § 445.784. Yet these permissive statutes are not a basis for the application of federal prudential standing principles to state law

---

[22]    Although it made no express finding that the *AGC* factors applied to Cartwright Act claims, the court in *Knevelbaard* did address each factor in ruling that the plaintiffs had standing, while noting that "California law affords standing more liberally than does federal law." *Knevelbaard,* 232 F.3d at 987.

claims.  *See D.R. Ward*, 2006 U.S .Dist. LEXIS 61828, at *21-*26 (finding that *AGC* did not

apply to the Arizona Antitrust Act despite the existence of a permissive harmonization statute);

*see also Bunker's  Glass Co. v. Pilkington PLC*, 75 P.3d 99, 112 (Ariz. 2003) ("[W]e do not read

the federal guidance clause as manifesting a legislative intent to rigidly follow federal precedent

on every issue of antitrust law regardless of whether differing concerns and interests exist in the

state and federal systems, and irrespective of whether uniformity among the states or between the

states and the federal system could be achieved by doing so.").[23]

Four other states have "mandatory" harmonization statutes requiring courts to construe

state antitrust laws in harmony with federal interpretations.  *See* Iowa Code § 553.2; Neb. Rev.

Stat. § 598A.050; N.M. Stat. § 57-1-15; W. Va. Code § 47-18-16.  Yet these statutes do not

support Intel's argument either.  For example, the Iowa Supreme Court has held that "this

provision is not aimed at defining who can sue under our state antitrust law.  Rather, our

legislature clearly announced the purpose of the harmonization statute by stating it is designed to

achieve uniform application of the state and federal laws prohibiting monopolistic practices."

*Comes v. Microsoft Corp.*, 646 N.W.2d 440, 446 (Iowa 2002); *see also id.* ("[W]e are not

required to define who may sue in our state courts in the same way federal courts have defined

who may maintain an action in federal court."); *accord Arthur v. Microsoft Corp.*, 267 Neb. 586,

598 (2004) ("We interpret the provisions of § 59-829 in a manner similar to the reasoning of the

court in *Comes* . . . .").[24]

---

[23]     Vermont's harmonization statute, *see* 9 Vt. Stat. § 2453(b), requires only that
terms used have the same meaning as terms in the Federal Trade Commission Act.  *See Elkins v.
Microsoft Corp.*, 817 A.2d 9 (2002).

[24]     *Gray v. Marshall County Board of Education*, 367 S.E.2d 751 (W. Va. 1988),
cited by Intel, is not to the contrary.  That decision applied federal law to the issue of whether a
corporation could conspire with one of its employees, not whether a particular plaintiff had
standing to sue.  *See id.* at 775.  Indeed, a West Virginia court recently held that the *AGC*

The other states listed in Intel's appendix have no harmonization statute at all. *See D.R. Ward*, 2006 U.S. Dist. LEXIS 61828, at *27-*30 (noting the absence of a harmonization clause in the Tennessee Trade Practices Act and finding that *AGC* did not apply).[25] Intel cites several cases to show that courts can use federal law in interpreting state antitrust statutes, but these cases do not mandate that courts follow federal law, and in any event concern substantive antitrust law, not standing.[26]

Intel's appendix includes only two cases actually applying the *AGC* factors to state law antitrust claims.[27] One of these cases, *Orr v. Beamon*, 77 F. Supp. 2d 1208 (D. Kan. 1999), is a

_____

analysis is inapplicable to a claim by indirect purchasers under that state's law. *See State ex rel. McGraw v. Visa U.S.A., Inc.*, Civ. A. No. 03-C-551, slip op. at 4 (W. Va. Cir. Ct. Oct. 14, 2005)

[25]     Intel cites *State of Tennessee ex rel. Leech v. Levi Strauss & Co.*, No. 79-722-III, 1980 WL 4696 (Tenn. Ch. Ct. Sept. 25, 1980), but that case holds only that federal authorities can be "persuasive." *Id.* at *2 n.2.

[26]     *See Davric Maine Corp. v. Rancourt*, 216 F.3d 143, 149 (1st Cir. 2000) (applying federal standard for attempted monopolization claim); *Walker v. U-Haul Co. of Miss.*, 734 F.2d 1068, 1071 (5th Cir. 1984) ("The parties and the district court have treated the state and federal antitrust claims as analytically identical. We follow suit."); *Anheuser-Busch, Inc. v. Abrams*, 520 N.E.2d 535, 539 (N.Y. 1998) (rejecting an argument of per se legality, in part because such a holding would be inconsistent with federal precedent, while noting that "we do not move in lockstep with the Federal courts in our interpretation of antitrust law"); *Rose v. Vulcan Materials Co.*, 194 S.E.2d 521, 530 (N.C. 1973) (considering federal cases as "instructive" in determining what contracts constituted illegal restraints of trade); *Ford Motor Co. v. Lyons*, 405 N.W.2d 354, 367 (Wis. Ct. App. 1987) (stating that interpretation of North Dakota's equivalent to Section 1 of the Sherman Act "is controlled by federal court decisions under the Sherman Act" and holding that a parent corporation and its subsidiary cannot conspire with one another) (citing *Grams v. Boss*, 294 N.W.2d 473, 480 (Wis. 1980) ("[T]he question of what acts constitute a combination or conspiracy in restraint of trade is controlled by federal court decisions under the Sherman Act.")).

[27]     Although the court in *Beckler v. Visa U.S.A., Inc.*, No. 09-04-C-00030, 2004 WL 2115144 (N.D. Dist. Ct. Aug. 23, 2004), did cite *AGC* when summarizing the defendants' arguments, it did not explain why *AGC* should apply to antitrust claims under North Dakota law, and it in fact did not apply the *AGC* factors in finding that the plaintiffs lacked standing. *See id.* at *3. The other North Dakota case cited by Intel, *AG Acceptance Corp. v. Glinz*, 684 N.W.2d 632 (N.D. 2004), concerned whether there was sufficient evidence of a tying violation, not whether the plaintiff had standing. *See id.* at 639.

Elsewhere in its brief, Intel cites *Peterson v. Visa U.S.A., Inc.*, No. Civ. A. 03-8080, 2005

federal district court case that applied *AGC* to Kansas antitrust claims because it could find "no Kansas cases to the contrary." *Id.* at 1211. Another federal district court, however, while not specifically addressing standing under the Kansas antitrust statute, allowed a plaintiff to pursue his state antitrust claims even though he lacked standing on his Sherman Act claims. *See Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 635 F. Supp. 1287, 1333-35 (D. Kan. 1986). Especially in the absence of a harmonization provision, *see D.R. Ward*, 2006 U.S. Dist. LEXIS 61828, at *27*30, there is no reason to believe that the Kansas Supreme Court would apply *AGC* to state antitrust claims. *See also Bergstrom v. Noah*, 266 Kan. 829, 844-845 (Kan. 1999) ("Kansas law is similar in some respects to the Sherman Act, but it is not identical. . . . While [federal] cases may be persuasive authority for any state court interpreting its antitrust laws, such authority is not binding upon any court in Kansas interpreting Kansas antitrust laws.").

The other case cited by Intel, *Fucile v. Visa U.S.A., Inc.*, No. S1560-03 CNC, 2004 WL 3030037 (Vt. Super. Dec. 27, 2004), is similarly unpersuasive. In *Fucile*, a Vermont trial court applied the *AGC* factors because of its belief that "they reflect the [United States Supreme] Court's standing factors to determine whether a case or controversy exists, pursuant to Article III of the Constitution." *Id.* at *3. This analysis is flawed. *See D.R. Ward*, 2006 U.S. Dist. LEXIS 61828, at *35 ("Finally, the Court rejects as flawed the rationale provided by the *Fucile* Court for applying the *AGC* antitrust standing analysis: the *AGC* analysis, a gauge for determining prudential standing under federal antitrust statutes, is distinct from the inquiry into standing

---

WL 1403761 (D.C. Super. Ct. Apr. 22, 2005), in which the court applied the *AGC* factors because the District of Columbia harmonization statute *permitted* it to use federal law as a guide. *See id.* at *4. However, this ruling conflicted with *Holder v. Archer Daniels Midland Co.*, No. 96-2975, 1998 WL 1469620 (D.C. Super. Ct. Nov. 4, 1998), which held that the "target area" test was the appropriate standard under District of Columbia law. *See id.* at *4. The *Peterson* court did note that the plaintiff lacked standing under the *Holder* standard as well. *See Peterson* 2005 WL 1403761, at *4 n.2.

under Article III of the Constitution; and, although the Vermont Supreme Court applies the test

for constitutional standing in other contexts, it has yet to apply the *AGC* factors to determine

prudential standing under any state statute."); *see also Elkins,* 817 A.2d at 17  ("Nowhere in the

Act is there any requirement that the definition of who may sue under the Act must be consistent

with the definition of who may sue under federal antitrust law, including under the FTCA."):

*Armstrong v. Bayer AG*, No. 66-05 CnC, slip op. at 6 (Vt. Cir. Ct., Oct. 10, 2006) (denying

motion to dismiss and distinguishing *Fucile* in case involving antitrust claims by indirect

purchasers of a product made with allegedly price-fixed chemicals).[28]

Because Plaintiffs have constitutional standing, and because the *AGC* federal prudential

standing requirements do not apply to their claims, the Court should reject Intel's standing

argument.

### B.    Plaintiffs Nevertheless Satisfy the *Associated General Contractors* Factors

Even if *AGC*, rather than state law standing principles, applied to Plaintiffs' claims, the

*AGC* factors weigh strongly in favor of finding standing here.  Courts consider five factors in

determining whether a particular plaintiff has prudential standing to bring a federal antitrust

damages claim: (1) whether the plaintiff suffered antitrust injury; (2) the causal connection

---

[28]        In *Midwest Communication, Inc. v. Minnesota Twins, Inc.*, 779 F.2d 444 (8th Cir. 1985), the Eighth Circuit "treat[ed] the state and federal statutory schemes as equivalent for standing analysis purposes." *Id.* at 454.  It did so, however, only after noting that "the court and the parties treated the state claims as the equivalent of the federal claims, both substantively and for purposes of standing analysis," that "the record presented to this Court does not show that the parties contested this treatment of state law," and that the parties "have not raised any issue on appeal regarding possible distinctions between the state and the federal antitrust laws." *Id.* Thus, the issue was not properly before the court, which in any event did not hold – as Intel states – that "Minnesota treats" the statutory schemes as equivalent.  Intel Mem. App. A at A2. Another Minnesota case cited by Intel holds that, *prior to 1984*, "the Minnesota Antitrust Law should be construed consistently with the federal courts' construction of the federal antitrust laws," but explains that the statute was amended in 1984.  *See Keating v. Philip Morris, Inc.*, 417 N.W.2d 132, 136 (Minn. Ct. App. 1987) (citing *State v. Duluth Bd. of Trade*, 121 N.W. 395, 399 (1909)).

between the antitrust violation and the plaintiff's harm; (3) the existence of more direct victims

of the antitrust injury; (4) the directness or indirectness of the injury; and (5) the risk of

duplicative recovery or the complexity in apportioning damages.  *See 2660 Woodley*, 369 F.3d at

740-41.

As demonstrated above, Plaintiffs have alleged antitrust injury properly, so the first factor

weighs in favor of standing.  "Moreover, factors four and five in the *AGC* framework echo

*Illinois Brick*'s concerns."  *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 850 (3d Cir. 1996).

Because the state antitrust statutes asserted by Plaintiffs allow indirect purchasers to sue for

damages, these factors weigh in favor of standing as well.  *See D.R. Ward*, 2006 U.S. Dist.

LEXIS 61828, at *47 (holding that the fifth factor weighs in favor of standing for an indirect

purchaser suing under state antitrust law).[29]

As to factors two, three and four, contrary to Intel's arguments, (a) there is a causal

connection between the antitrust violation and plaintiffs' harm, (b) Plaintiffs are direct victims of

the antitrust injury, and (c) their injuries are not remote or speculative.  Accordingly, the *AGC*

factors – if they apply at all – support Plaintiffs' standing to bring their claims.  *See id.* at *37

("Assuming *arguendo* that the *AGC* factors applied to determine federal prudential standing for

plaintiffs' state antitrust claims, this Court finds that defendants have failed to meet their burden

of demonstrating at the motion to dismiss phase that these factors do not confer standing as a

matter of law.").

     1.      <u>There Is a Causal Connection Between the Antitrust Violation and Plaintiffs' Harm</u>

The causal connection factor weighs in favor of standing for many of the same reasons

that Plaintiffs' antitrust injury allegations are sufficient.  *See supra* § II.B.  Indeed, "the questions

---

[29]     Intel concedes that the fifth factor is "neutral."  Intel Mem. at 16 n.19.

of antitrust injury and antitrust standing are difficult to disentangle." *West Penn*, 147 F.3d at 265 n.15; *see also Glaberson*, 2006 U.S. Dist. LEXIS 62672, at *15-*16 ("The concept of antitrust injury overlaps with the [causation] factor in the balancing test because the injury must be causally related to the defendant's allegedly anticompetitive activity."). *Allegheny,* 228 F.3d at 439, which Intel cites because the court found the injury "too remotely connected" to the wrongdoing, Intel Mem. at 20, actually demonstrates that the causal connection factor is easily satisfied. *See id.* at 439 ("There is a causal connection between the Tobacco Companies' alleged conspiracy and the Hospitals' injuries – i.e., but-for that alleged [antitrust violation], the injuries would not have arisen.").[30]

As detailed above, Intel's anticompetitive conduct caused Plaintiffs' injuries. But for Intel's conduct, its customers would have been free to buy more of AMD's lower-cost microprocessors, which would have compelled Intel to lower its prices in response. *See supra*

---

[30]     The *Allegheny* court held that the plaintiffs lacked standing because the fourth and fifth *AGC* factors – which are of minimal relevance in this indirect purchaser case, *see supra* § III.B. – "overwhelm[ed]" the others. *Allegheny,* 228 F.3d at 440; *see also infra* note 46 (discussing *Allegheny* in the context of the fourth *AGC* factor).

Another case cited by Intel, *In re Air Passenger Computer Reservation Systems Antitrust Litigation*, 727 F. Supp. 564 (C.D. Cal. 1989) ("*CRS II*"), similarly undermines its argument. In the *CRS* litigation, the court ruled that the plaintiffs *did* have standing to pursue their monopolization claim, in which they alleged – as Plaintiffs do here – that they were overcharged in their capacity as consumers of defendants. *See id.* at 565; *see also In re Air Passenger Computer Reservation Sys. Antitrust Litig.*, 694 F. Supp. 1443, 1466 (C.D. Cal. 1988) ("*CRS I*") ("Injury caused by supracompetitive pricing is the type of injury which the antitrust laws were intended to prohibit. In this case, the participating airlines are injured as consumers of CRS services by paying supracompetitive rates. A reasonable jury may conclude that defendants' willful acquisition of monopoly power has permitted them to extract monopoly prices from airlines. Thus, plaintiffs are injured by the anticompetitive consequences of the antitrust violation."). It was only as to the plaintiffs' *attempted* monopolization claim – a claim not asserted by Plaintiffs here – that they were held to lack standing, because "[a]s a matter of economic theory, supracompetitive rates are the result of monopoly, not attempted monopoly. . . . [S]upracompetitive pricing does not result from an attempt to monopolize when the monopolization is not achieved." *CRS II*, 727 F. Supp. at 569-70. In this case, where Plaintiffs allege that Intel has a monopoly and charges supracompetitive rates, the requisite causal connection clearly exists.

§ II..1.  In addition, because Intel's conduct limited the ability of AMD and others to be efficient competitors, prices of microprocessors made by AMD and others would have been even lower absent that conduct, placing more competitive pressure on Intel to lower its prices.  *See* FACC ¶ 234; *see also supra* § II.B.2.

Intel observes that Plaintiffs do not allege a period of recoupment during which Intel discontinued its rebates and increased its prices.  *See* Intel Mem. at 18.  This is correct: Plaintiffs allege that Intel's prices, even after accounting for discounts and rebates, are *currently* supracompetitive.  *See* FACC ¶ 234.  Plaintiffs need not allege recoupment to have standing.  *See Bradburn*, 2003 U.S. Dist. LEXIS 13273, at *10-*11 (holding that the plaintiff had standing to seek overcharges resulting from the defendant's anticompetitive discounting scheme even though the plaintiff "specifically disclaim[ed]" a recoupment theory).

This Court's opinion regarding the Foreign Trade Antitrust Improvements Act ("FTAIA"), *see In re Intel Microprocessor Antitrust Litig.*, MDL Docket No. 05-1717-JJF, 2006 U.S. Dist. LEXIS 70554 (D. Del. Sept. 26, 2006), involved a separate issue, and Intel quotes it out of context.  *See* Intel Mem. at 19.  The FTAIA requires that Intel's foreign conduct have a "direct" effect on U.S. commerce, while *AGC*'s analysis merely requires that Intel's conduct (all of it, not just its foreign conduct) have "a causal connection" to Plaintiffs' injuries.  There is no requirement under *AGC* that the connection be direct.  The causal relationship between Intel's anticompetitive conduct and the harm to Plaintiffs is clear: that conduct interfered with the ability of AMD and others to compete and kept them smaller and weaker, all of which limited

37

competition and permitted Intel to overcharge for its microprocessors.  Those overcharges were passed on to Plaintiffs.  *See* FACC ¶ 234.[31]

At this stage of the proceedings, Plaintiffs' allegations are more than sufficient to establish standing.  *See Arroyo-Melecio v. Puerto Rican Am. Ins. Co.*, 398 F.3d 56, 73 (1st Cir. 2005) ("At the Rule 12(b)(6) stage, we cannot conclude that the alleged antitrust activities could not be proven to be a but-for cause of the harm the consumers allegedly suffered.  Such causation issues are often decided at summary judgment, not on the pleadings, precisely because they depend on some factual development.  Dismissal at the pleadings stage is more often associated with disfavored plaintiffs, *not consumers*, such as distributors or suppliers injured by anti-competitive threats directed towards others.") (emphasis added and citations omitted); *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1171 (9th Cir. 2002) (refusing to find damages too speculative at motion to dismiss stage because antitrust plaintiffs must be afforded opportunity to evidence to support allegation at later stage in proceedings).[32]

---

[31]    Intel suggests that, according to the complaint, its conduct affected only "the *next generation* of AMD's state of the art microprocessors."  Intel Mem. at 19 (emphasis added and quoting FACC ¶ 126).  Intel misreads the quoted paragraph of the complaint: although *one* effect of Intel's conduct was to impede the next generation of AMD's products, that was not the *only* effect.  *See* FACC ¶ 126 ("Intel has unlawfully maintained the monopoly IBM bestowed on it and systematically excluded AMD from any meaningful opportunity to compete for market share by: preventing the companies that buy chips and build computers from freely deploying AMD processors; relegating AMD to the low-end of the market; preventing AMD from achieving the minimum scale necessary to become a full-fledged, competitive alternative to Intel; and erecting impediments to AMD's ability to increase its productive capacity for the next generation of AMD's state of the art microprocessors.").  More fundamentally, any suggestion that Intel's conduct did not affect prices throughout the class period contradicts allegations to the contrary, *see, e.g.*, FACC ¶¶ 2, 10, 112, 234, 235, 245, and is inconsistent with further allegations that (a) this is a monopoly maintenance case, *see, e.g., id.* ¶ 2, and (b) Intel's anticompetitive conduct began more than ten years ago, *see id*.  Well before the start of the class period in June 2001, absent Intel's misconduct, its monopoly power would have eroded, leading to lower prices throughout the class period.

[32]    *O'Neill v. Coca-Cola Co.*, 669 F. Supp. 217, 224 (N.D. Ill. 1987), cited by Intel, represents "an erroneous denial of standing."  II Philip E. Areeda et al., *Antitrust Law* ¶ 345 n.3

2.      Plaintiffs Are Direct Victims of the Antitrust Injury

Consumers, such as Plaintiffs, are "presumptively favored as appropriate plaintiffs to assert antitrust injury." *Arroyo-Melecio*, 398 F.3d at 72; *see also N.Y. Citizens Comm.*, 651 F. Supp. at 811 ("Consumers have standing when they are injured as a result of a defendant's improper exclusion of competitors from the market.").  Although Plaintiffs were the ultimate consumers of Intel's x86 microprocessors, Intel nevertheless argues that they "are not participants in the x86 microprocessor market" because microprocessors often are purchased as components of computers.  Intel Mem. at 21.[33]

Intel is flatly wrong.  A purchaser of a product is a participant in the relevant market even if that product has been incorporated into another product.  In this case, the unlawful overcharge does not disappear when Intel's microprocessor is put in a computer.  Intel's argument to the contrary was rejected by the Third Circuit nearly thirty years ago.  *See In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13, 18 (3d Cir. 1978) (holding that plaintiffs that purchased candy from

---

(2d ed. 2002) ("Areeda") ("Standing to enjoin a vertical merger was denied because of an insufficient threat to competition.  Perhaps the court meant that the likely effects did not suffice for illegality.  But finding a violation would mean that consumers are threatened with injury and thus are entitled to standing."); *see also Glaberson*, 2006 U.S. Dist. LEXIS 62672, at *19 ("To test standing in a private suit, therefore, the court should assume the existence of a violation and then ask whether the [standing elements] are shown.") (quoting II Areeda, *Antitrust Law* ¶ 335f).

[33]      Intel misreads Plaintiffs' complaint when it states that "plaintiffs' injuries reflect overcharges *only* 'in the form of higher prices for personal computers, workstations, and servers containing Intel x86 microprocessors.'"  Intel Mem. at 21 (emphasis added and quoting FACC ¶ 234).  The word "only" does not appear in the quoted paragraph of Plaintiffs' complaint, which alleges that "[t]he overcharges imposed by Intel have been passed on to Plaintiffs and the Class members in the form of higher prices for personal computers, workstations, and servers . . . ." FACC ¶ 234.  Yet the proposed class includes "[a]ll persons and entities residing in the United States who from June 28, 2001 through the present, purchased an x86 microprocessor in the United States, other than for resale, indirectly from the Defendant . . . ."  FACC ¶ 106.  In other words, the proposed class includes not only those who purchased computers containing Intel's x86 microprocessors, but also those who indirectly purchased stand-alone microprocessors or microprocessors incorporated into other products.  To the extent these microprocessors were incorporated into computers, Plaintiffs allege that the overcharge on the microprocessors resulted in an overcharge on the computers as well.  *See, e.g.*, FACC ¶ 245.

defendants that fixed sugar prices had standing, even though the sugar had been combined with other ingredients, because "just as the sugar sweetened the candy, the price-fixing enhanced the profits of the candy manufacturers"); *accord In re Linerboard Antitrust Litig.*, 305 F.3d 145, 159 (3d Cir. 2002) (holding that plaintiffs that purchased corrugated sheets or boxes from defendants that fixed linerboard prices had standing, even though "linerboard was a mere ingredient").[34]

It makes no difference that Plaintiffs purchased x86 microprocessors indirectly, because the state statutes under which Plaintiffs bring their claims permit indirect purchasers to recover damages for antitrust violations. *See, e.g.*, *In re Napster Copyright Litig.*, 354 F. Supp. 2d 1113, 1125 (N.D. Cal. 2005) ("[U]nder California law, an indirect purchaser of goods or services is deemed to participate as a customer in the relevant market and thus may suffer a cognizable antitrust injury."); *D.R. Ward*, 2006 U.S. Dist. LEXIS 61828, at *40 ("There is no indication that the AAA, the TTPA, and the VCFA were enacted to provide remedies to certain types of indirect purchasers, such as those who participate in the immediate market subject to the price-fixing conspiracy, but not to other categories of indirect purchasers, which function at a lower level in the distribution chain, such as consumers who purchase products containing an ingredient subject to the price-fixing conspiracy.").

Thus, many courts have held that indirect purchasers of a component product have standing. A prime example is the consumer antitrust litigation against Microsoft, which concerned software that, for the most part, was loaded onto computers that were sold to consumers. *See, e.g.*, *Arthur v. Microsoft Corp.*, 676 N.W.2d 29 (Neb. 2004) (noting that "more

---

[34]     Intel cites a case that it states "appl[ied] [the] market participant rule to Cartwright Act standing," Intel Mem. at 20 n.23 (citing *Knevelbaard*, 232 F.3d at 989), but it ignores the next sentence of that opinion, in which the court rejected an argument similar to the one now advanced by Intel. *See Knevelbaard*, 232 F.3d at 989 ("The defendants here contend that they are in one market (cheese) while the plaintiffs are in another (fluid milk). But the complaint's allegations unmistakably place all parties in the milk market . . . .").

than 90 percent of new Intel-based personal computers had been shipped with a version of

Windows preinstalled in the computer" and holding that indirect purchasers of the software had

standing under Nebraska law); *Comes*, 646 N.W.2d at 451 (holding that indirect purchasers of

Microsoft software had standing to sue under the Iowa Competition Law); *Sherwood v.*

*Microsoft Corp.*, No. M2000-01850-COA-R9-CV, 2003 Tenn. App. LEXIS 539, at *13 & n.2

(Tenn. App. July 31, 2003) (holding that indirect purchasers of Microsoft software, including

those who purchased "computers with Windows operating system software already installed,"

had standing under the Tennessee Trade Practice Act); *Elkins*, 817 A.2d at 11 (holding that

plaintiffs who purchased Microsoft software "pre-installed in a personal computer from a

computer manufacturer" had standing); *Friedman v. Microsoft*, CV2000-000722 (Ariz. Super.

Ct. Nov. 14, 2000) (denying motion to dismiss claim by indirect purchasers of Microsoft

software for lack of standing).[35]

---

[35]    Other courts, by certifying classes of indirect purchasers of Microsoft software, implicitly held that such purchasers had standing.  *See, e.g.*, *Microsoft I-V Cases*, J.C.C.P. No. 4106, 2000-2 Trade Cases (CCH) ¶ 73,013, at 88,555 (Cal. Super. Ct. Aug. 29, 2000) (certifying class of indirect purchasers of Microsoft software, specifically recognizing that the "software was frequently incorporated into personal computers and represented only a small fraction of the consumers' purchase price"); *Cox v. Microsoft Corp.*, No. 105193/2000, 2005 WL 3288130, at *1 (July 29, 2005) (certifying class of indirect purchasers of Microsoft software despite "evidence that some original equipment manufacturers may not have raised their prices on computer packages when the price of the Microsoft products went up"); *Howe v. Microsoft Corp.*, 656 N.W.2d 285 (N.D. 2003) (affirming certification of indirect purchaser class); *In re South Dakota Microsoft Antitrust Litig.*, 657 N.W. 2d 668 (S.D. 2003) (affirming certification of indirect purchaser class despite "a multitude of complexities and variances in the marketplace and distribution chain"); *Gordon v. Microsoft*, 2001 WL 366432, at *12 (Minn. Dist. Ct. Mar. 30, 2001), *review denied* (Minn. Ct. App. May 8, 2001), *aff'd*, 645 N.W. 393 (Minn. 2002) (certifying a class of indirect purchasers of Microsoft operating system software under Minnesota antitrust law, despite the "complicated distribution system" for such software and the fact that most direct purchasers "incorporate the OS products as about 4% of the value of a PC sold for a single price."); *Capp v. Microsoft*, Case No. 00 CV 0637 (Wis. Cir. Ct. July 25, 2001) (certifying class of indirect purchasers of Microsoft software under Wisconsin antitrust law).

Other examples abound.  *See, e.g.*, *D.R. Ward*, 2006 U.S. Dist. LEXIS 61828, at *2 (denying motion to dismiss complaint by "indirect purchasers of products containing plastics additives" for lack of standing); *Competition Collision Ctr., LLC v. Crompton Corp.*, Case No. 431278, Hr'g Tr. at 15 (Cal. Super. Ct. Apr. 27, 2005) (transcript excerpts attached as Exhibit C) (same, noting that "[t]here's nothing in [the complaint] that says the plastic additives disappear . . . . It is equally plausible to read paragraph 27, for example, to indicate that this stuff forms a protective shield around the resins and enhances it in the way described and remains in the product throughout its life . . . ."); *Anderson Contracting, Inc. v. Bayer AG*, Case No. CL 95959, slip op. at 13-15 (Iowa Dist. Ct. May 31, 2005) (denying motion to dismiss complaint by indirect purchasers of the chemical EPDM for lack of standing, even though the defendants sold the product to "manufacturers who incorporate EPDM, as one of many ingredients, into numerous different end-use products," holding that "[t]he fact that EPDM was merely one of several ingredients in the products Plaintiff purchased dos not lead to the conclusion that Plaintiff is not an indirect purchaser of EPDM"); *Box Butte County Sch. Dist. No.6 v. Bayer AG*, Case No. CI 04-270 (Neb. Dist. Ct. Jan. 9, 2006) (denying motion to dismiss claim by an indirect purchaser "of a derivative end-use product in which Defendants' product was one component" on standing grounds); *In re Hydrogen Peroxide Antitrust Litig.*, MDL No. 1682, 2006 U.S. Dist. LEXIS 18790, at *16-*18 (E.D. Pa. Apr. 11, 2006) (denying motion for a more definite statement about "the specific products plaintiffs bought" when they alleged that they "indirectly purchased hydrogen peroxide and its downstream products, sodium perborate or sodium percarbonate"); *Semba v. Lonza AG*, Docket No. CV-99-50, 1999 Me. Super. LEXIS 358 (Me. Super. Ct. 1999) (certifying class of indirect purchasers of vitamins).[36]

---

[36]    As a California court explained in approving a settlement reached by a class of

Neither *Barton & Pittinos, Inc. v. Smithkline Beecham Corp.*, 118 F.3d 178 (3d Cir.

1997), nor *Grokster*, *see* Intel Mem. at 21-23, involved purchasers at all, and for this reason both

are inapposite. *See Mid-West Paper Prods. Co. v. Continental Group, Inc.*, 596 F.2d 573, 593

(3d Cir. 1979) ("For unlike other potential plaintiffs, who may be only remotely affected by the

ripples caused by the conspirators' tampering with the supply and demand curve, indirect

purchasers can state unequivocally that under all circumstances prevalent in the real economic

world, money is passing from their hands into the pockets of the price fixers as a result of the

conspiracy, and that no rational pricing decisions by any intermediary will erase this fact.").

Thus, in *Barton & Pittinos*, the plaintiff did not "contend that it was a consumer in the

relevant market," 118 F.3d at 182 n.5, and the court rejected its argument that it was a competitor

of the defendant, *see id.* at 184 (holding that "advertisers and brokers of a good or service are not

competitors of companies that actually supply the good or service").[37]  Similarly, in *Grokster*,

the party asserting the antitrust claim was "neither a competitor nor customer," 269 F. Supp. 2d

at 1221, and the court specifically distinguished cases – such as this one – in which indirect

purchasers sue under state antitrust law.  *See id.* at 1224 (holding that "[u]nder California law, an

---

California indirect purchasers of vitamins from the same defendants, "[t]he vitamins that settling
defendants manufactured and sold were used not only in vitamin supplements, but also in beef,
pork, chicken, some types of fish and dairy products as well as cereals, margarine, flour, bread,
baby food, juice, hair products, weight-loss products and pet food. It was possible that nearly
every consumer in California during the applicable 10-year period was a class member."  *In re
Vitamin Cases*, 107 Cal. App. 4th 820, 823 (Cal. Ct. App. 2003).

[37]     Also, as the Third Circuit subsequently explained, "*Barton & Pittinos* arguably
rests on an overstated premise.  The Court's conclusion in *Barton* that in order to suffer antitrust
injury, one must be either in competition with the defendant or a consumer of its goods or
services, if construed as an absolute (which arguably it need not be), may in some circumstances
lead to results that conflict with Supreme Court and other precedent."  *Carpet Group Int'l v.
Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 76 (3d Cir. 2000); *see also id.* at 77
(distinguishing *Barton & Pittinos* and finding that the plaintiffs competed with the defendant rug
importers and wholesalers by organizing trade shows and buying trips for retailers to purchase
rugs directly).

indirect purchaser participates (indirectly) as a customer in the relevant market, and thus may suffer a cognizable antitrust injury," but stating that "Sharman does not participate, directly or indirectly, in the relevant market").[38]

The only indirect purchaser case Intel cites in support of its argument regarding component products is *Lorix v. Crompton Corp.*, 720 N.W.2d 15 (Minn. Ct. App. 2006), *review granted*, No. A05-2148, 2006 Minn. LEXIS 794 (Minn. Nov. 14, 2006), which is wholly distinguishable.[39]  Unlike the x86 microprocessors in this case, which were incorporated as essentially unmodified components in computers, the products at issue in *Lorix* – rubber chemicals used in the tire manufacturing process – would have been consumed or altered in the chain of distribution.  *See id.* at *16.  The plaintiff in *Lorix* argued that there should be no limits at all to indirect purchaser standing, and "went so far as to declare that every Minnesota citizen could bring an antitrust suit against rubber-processing chemical manufacturers because price-fixing resulted in the increased price of tires, which in turn increases the cost of transportation and, therefore, the cost of goods transported by truck."  *Id.* at *7.  Here the Plaintiffs' injury is much more direct.  They are not consumers of goods or services created with computers containing x86 microprocessors – they are purchasers of the microprocessors and computers themselves.[40]

---

[38]    Other cases cited by Intel are inapplicable for the same reason: the disfavored plaintiff was not a purchaser.  *See Vinci v. Waste Management, Inc.*, 80 F.3d 1372, 1376 (9th Cir. 1996) (shareholder); *Vinci*, 36 Cal. App. 4th at 1816 (same); *Napster*, 354 F. Supp. 2d at 1125-26 (same); *Fla. Seed Co., Inc. v. Monsanto Co.*, 105 F.3d 1372, 1374 (11th Cir. 1997) (terminated distributor); *S.D. Collectibles v. Plough, Inc.*, 952 F.2d 211, 213 (8th Cir. 1991) (same).

[39]    Moreover, because the Minnesota Supreme Court has granted a petition for further review of the *Lorix* case, the opinion has no precedential value.  *See State v. Collins*, 580 N.W.2d 36, 43 (Minn. Ct. App. 1998).

[40]    The *Gordon* case, *see supra* note 35 in which the court certified a class of indirect purchasers of Microsoft software that was incorporated into computers, is a far more analogous case applying Minnesota antitrust law.

Assuming *Lorix* survives further review, it should be limited to its facts, and in any event cannot support Intel's broad application of it to all cases involving component products. *See* Intel Mem. at 24 ("Similarly, plaintiffs here who indirectly purchased products containing Intel x86 microprocessors are not participants in the allegedly restrained market and thus lack antitrust standing."). The Minnesota Supreme Court has held that "the legislative history of this enactment [the 1984 amendment allowing indirect purchaser suits under the Minnesota antitrust statute] indicated that it was a direct response to the *Illinois Brick* decision." *State by Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490, 497 (Minn. 1996). Yet *Illinois Brick* itself involved indirect purchasers of concrete block that had been incorporated into buildings purchased by the plaintiff, *see Illinois Brick*, 431 U.S. at 726, and the Minnesota legislature surely intended to confer standing on such a plaintiff. *Cf. Union Carbide Corp. v. Superior Court*, 679 P.2d 14, 16-17 (Cal. 1984) ("California's 1978 amendment to section 16750 in effect incorporates into the Cartwright Act the view of the dissenting opinion in *Illinois Brick* that indirect purchasers are persons 'injured' by illegal overcharges passed on to them in the chain of distribution."); *Illinois Brick*, 431 U.S. at 759 (Brennan, J., dissenting) ("Nor should the fact that the price-fixed product in this case (the concrete block) was combined with another product (the buildings) before resale operate as an absolute bar to recovery.").

Microprocessors are not an ephemeral or insignificant component consumed in the computer manufacturing process. Rather, "[t]he *brain* of every computer is a general-purpose microprocessor, an integrated circuit capable of executing a menu of instructions and performing requested mathematical computations at very high speed." FACC ¶ 116 (emphasis added). Indeed, "the OEMs have largely become undifferentiated distributors of the Intel platform, offering *'Intel Inside'* and *'Centrino'* computers largely indistinguishable from those of their

45

rivals." *Id.* ¶ 19.  Thus, the fact that microprocessors were incorporated as components in computers purchased by Plaintiffs should have no impact on the standing analysis.

Intel's related argument that "there are other entities more directly affected by the alleged conduct" – pointing to AMD, among others – is similarly misguided.  Intel Mem. at 24.  The Third Circuit has held that the existence of other direct victims "does not diminish the directness of [Plaintiffs'] injury."  *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1168-69 (3d Cir. 1993).  It is perfectly appropriate for overcharged customers to bring suit, even when a defendant also has been or could be sued by a competitor.[41]  *See Blue Shield of Va. v. McCready*, 457 U.S. 465, 479 (1982) ("Here the remedy cannot reasonably be restricted to those competitors whom the conspirators hoped to eliminate from the market."); *Goldwasser*, 222 F.3d at 399 ("One assumes that those other competitors are grateful for the help from the consumer litigation, but that is incidental.  The Goldwasser plaintiffs do not care in principle which competitors enter their markets; they just want a competitively structured local telephone market that will prevent Ameritech from inflicting antitrust injury on them.  We are satisfied that they are asserting their own rights, and thus that they have standing."); *Glaberson*, 2006 U.S. Dist. LEXIS 62672, at *29 n.6 ("The fact that Comcast's conduct harmed RCN and potentially RCN's customers, as well as Plaintiffs, does not deprive Plaintiffs of their antitrust standing. . . . .

---

[41]     As one commentator has stated: "Indeed, even if the two actions are joined under the federal court's pendent or diversity jurisdiction, the outcome is the same.  Under the Supremacy Clause, the presence of the state suit can in no way deprive the federal direct purchasers of their statutory right to full treble damages for the overcharge, with no discount for that which was passed on.  Under state law as approved in the Supreme Court's *California* decision, the indirect purchasers are entitled to provable passed-on damages." XIV H. Hovenkamp, *Antitrust Law* ¶2412, at 344 (2d ed. 2005).

Plaintiffs' injuries, which consist of overcharges, are distinct from RCN's injuries, which likely consist of lost profits.").[42]

Indeed, Intel's argument that "direct purchasers of microprocessors," or other entities further up in the distribution chain than Plaintiffs, are more direct victims, Intel Mem. at 24, is nothing more than an end-run around the state laws that permit indirect purchaser suits. *See D.R. Ward*, 2006 U.S. Dist. LEXIS 61828, at *43 ("[T]his factor loses relevance when applied to antitrust statutes that permit indirect purchaser claims, which, by definition, necessarily presuppose the existence of more direct purchasers. Put differently, the strict application of this factor, in the context of indirect purchasers, would always caution against standing, an outcome incompatible with the purpose of *Illinois Brick* repealer statutes . . . .").[43]

*Peterson*, on which Intel relies, is inapposite. In that case, the plaintiffs alleged that merchants were overcharged on debit card services and, as a result, overcharged the plaintiffs "on all consumer goods" they purchased. *See* 2005 WL 1403761, at *1. Thus, unlike Plaintiffs here, the plaintiff in *Peterson* "was neither a direct purchaser *nor an indirect purchaser*" of the

---

[42]    Intel cites *2660 Woodley*, but that case arose in the specific context of a commercial bribery claim under § 2(c) of the Robinson-Patman Act. *See 2660 Woodley, 369 F.3d.* at 736-37. The court "noted the difficulty of precisely defining standing under § 2(c)," and held that only "a direct competitor of a company that obtains a contract through commercial bribery has standing to press a 2(c) claim against the briber." *Id.* at 742 (quoting *Environmental Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052, 1067 (3d Cir. 1988)).

[43]    Some of the entities that Intel argues are "more directly affected" than Plaintiffs, such as computer resellers, are themselves indirect purchasers. Intel Mem. at 24. Intel's implicit concession that these "intermediate" indirect purchasers would have standing undermines its entire standing argument. Moreover, the existence of such entities does nothing to detract from Plaintiffs' standing under state antitrust laws, especially when none of the intermediate purchasers have brought suit themselves. *See, e.g.*, *Union Carbide*, 679 P.2d at 19 ("Moreover, the fact of purchasers intermediate between plaintiffs and direct purchasers in the chain of distribution, even if assumed, would not establish a substantial risk of multiple liability. There is no showing of any actual assertion of a Cartwright Act claim on behalf of any such intermediate purchaser."); *see also N.Y. Citizens Comm.*, 651 F. Supp. at 812 ("The advantages of competition are ultimately to the benefit of the consumer, who should be able to bring such a suit to vindicate the purposes of the antitrust laws.").

relevant product, and the merchants were more appropriate plaintiffs. *Id.* at \*5 (emphasis

added). The court specifically distinguished cases in which plaintiffs "fit within the chain of

manufacture" of a product, such as in the instant case and *Illinois Brick* itself:

> D.C. plaintiff's claim does not fit into the indirect purchaser
> category. This is evident when comparing the facts of the instant
> case to *Illinois Brick*. Plaintiffs in *Illinois Brick* fit within the
> chain of manufacture, as they purchased buildings that contained
> the overpriced concrete block. In contrast, D.C. plaintiff did not
> purchase the debit card services from the merchants.

*Id.* at \*3. Because Plaintiffs here do "fit within the chain of manufacture, as they purchased

[computers] that contained the overpriced [microprocessors]," *id.*, they clearly have standing.

### 3. Plaintiffs' Injuries Are Not Remote or Speculative

Plaintiffs' injuries are no more remote than in any indirect purchaser case, which by

definition involves proof that an overcharge has been passed on through the chain of distribution.

Intel's argument – that "Plaintiffs were, therefore, at least two, if not more, levels removed from

Intel's sale of the microprocessor," Intel Mem. at 25 – is really one that indirect purchasers

should be denied recovery, an argument that is foreclosed by the state antitrust statutes invoked

by Plaintiffs, which allow such recovery. Because this *AGC* factor "echo[es] *Illinois Brick*'s

concerns," it is inapplicable to this indirect purchaser case. *McCarthy*, 80 F.3d at 850.[44]

---

[44]     Intel's reliance on *Gross v. New Balance Athletic Shoe, Inc.*, 955 F. Supp. 242
(S.D.N.Y. 1997), *see* Intel Mem. at 26, is misplaced. In *Gross*, the plaintiffs alleged a resale
price maintenance conspiracy among the defendant and certain of its retailers. *See id.* at 245.
The court held that purchasers from non-conspiring retailers could not recover on the theory that
"the conspiracy, if successful, stifled price competition for, and raised the price of, all New
Balance shoes," because the claimed damages were "incapable of being quantified with any
degree of economic certainty." *Id.* at 245-46; *see id.* at 246-47 ("Plaintiffs' alleged injury was
suffered, if at all, only indirectly as a result of a general price increase which in turn resulted
from the direct effects of the conspiracy."). *Gross* did not involve an overcharge that was passed
on to consumers – an injury for which the state laws asserted by Plaintiffs clearly provide relief –
but rather an "indirect" injury of a different sort: a general effect on the market not traceable to
any prices charged by the defendant.

Proof of damages here will not be "unacceptably speculative." Intel Mem. at 25. Expert witnesses in indirect purchaser cases routinely calculate the percentage of an overcharge that is passed on to consumers. *See, e.g.*, *Microsoft I-V Cases*, 2000-2 Trade Cases (CCH) ¶ 73,013, at 88,561 ("The same economic models and analyses that have been accepted for purposes of tracing a supracompetitive price that results from a price fixing conspiracy are relevant and applicable to trace the pass-through resulting from monopoly abuse."); *Gordon*, 2001 WL 366432, at *9 ("This economic theory – that as a general matter a non-negligible cost increase to all distributors at the beginning of a distribution system would, in a highly competitive market, eventually work its way through to a price increase to the consumers at the end of the system – appears well developed enough to entitle Plaintiffs to an opportunity to prove it at trial.").

That calculation of damages in this case will involve third-party discovery, *see* Intel's Mem. at 25, and analysis of various pricing inputs, *see id.* at 26, is no reason to dismiss the complaint on standing grounds. *See Sugar Indus.*, 579 F.2d at 18 (holding that "isolating the excessive cost of one ingredient which goes into the product purchased by the plaintiff" could "[c]onceivably" be difficult "in some cases," but "is most likely ascertainable" through discovery); *Knevelbaard*, 232 F.3d at 991 ("The cheese makers argue that because other factors influence milk prices, the harm to plaintiffs is speculative. . . . Whether experts will be able to measure the difference between the allegedly restrained price for milk and the price that would have prevailed but for the antitrust violation remains to be seen; in deciding a Rule 12(b)(6) motion we are dealing only with the complaint's allegations, which in this instance do not make the claim speculative.").[45]

---

[45]    Intel provides no support for its statement that "[a]n injury is unacceptably speculative and remote if it 'may have been produced by independent factors.'" Intel Mem. at 25 (quoting *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 542 (9th Cir. 1987)). In *Eagle*, the court

As the Third Circuit observed in *Steamfitters*, relied upon by Intel, *see* Intel's Mem. at 25, "there is a meaningful distinction between damages that are completely incapable of determination and those that are difficult to determine but are nonetheless measurable."  171 F.3d at 929;[46] *see also Lower Lake Erie*, 998 F.2d at 1169 ("[W]e do not hold that litigation must be avoided solely because it might be difficult to ascertain damages.  Injured parties cannot be penalized and left without recourse because measurement of their damages is difficult. . . . Reliability is instead an evidentiary question properly decided under evidentiary standards . . . . At the standing stage we look to the initial allegation of damages . . . ."); *D.R. Ward*, 2006 U.S. Dist. LEXIS 61828, at *44 ("Nor is this Court able to conclude as a matter of law at the motion to dismiss stage that a determination of the existence and amount of any overcharge suffered by the instant plaintiffs requires inappropriate guesswork or unmanageably complex analyses, particularly without the benefit of any discovery or expert testimony.").[47]

---

merely identified the existence of "several independent factors that may add to the speculativeness of the injury."  812 F.2d at 542.  The court did not hold that whenever a defendant can identify a possible independent factor, an injury thereby becomes "unacceptably speculative and remote."  Intel Mem. at 25.  Significantly, the plaintiffs in *Eagle* were neither buyers nor sellers of raw tuna, but rather were the employees of the vessel owners that set tuna prices.  *Eagle,* 812 F.2d at 540-41.  The "independent factors" in that case had to with the wages paid to the employees, not the prices for tuna.  *See id.* at 542.

[46]     *Steamfitters* and *Allegheny* do not support Intel's argument.  *See* Intel Mem. at 25. In *Steamfitters*, the Third Circuit explained that the plaintiff health and welfare funds "are not consumers forced to pay higher prices for tobacco products . . . ."  *Steamfitters*, 171 F.3d at 927; *see also id.* at 929 n.10 (stating that "consumers who paid these higher prices would possibly be able to bring an antitrust or RICO claim"); *Warfarin Sodium*, 214 F.3d at 402 ("In this case, the purchasers of Coumadin are akin to the smokers in *Steamfitters*.").  *Allegheny* was similar: smokers – not hospitals that paid for their care – were the proper plaintiffs.  *See Allegheny*, 228 F.3d at 441 ("The Hospitals' injuries are still derivative of the nonpaying patients' injuries."). Here, Plaintiffs are the consumers who were injured by Intel's anticompetitive conduct.

[47]     The "vaguely defined link" from *AGC*, quoted out of context in Intel's brief, Intel Mem. at 26 (quoting 459 U.S. at 540), had nothing to do with calculation of damages, but instead concerned the ambiguous allegations of injury in that case.  *See AGC,* 459 U.S. at 540-41 ("According to the complaint, defendants applied coercion against certain landowners and other

Accordingly, even if the *AGC* factors apply to this case – which, as discussed above, they

do not – they strongly weigh in favor of Plaintiffs' standing.  As such, Intel's motion to dismiss

on standing grounds should be denied.

## IV.    NON-CALIFORNIA PLAINTIFFS CAN INVOKE CALIFORNIA LAW

### A.    Introduction and Factual Background

Intel next argues that non-California class members cannot invoke California law.  Intel

Mem. at 28-39.  In order to assess this argument, certain undisputed facts need to kept in mind:

- *First*, Intel and AMD are both headquartered in California.  Intel has its headquarters in Santa Clara.  AMD has its headquarters in Sunnyvale.

- *Second*, it is reasonable to infer from the FACC that Intel's challenged practices and policies emanated from its California quarters.  Certainly, the decision of how to price its x86 microprocessors may be inferred to have occurred in California.

- *Third*, the litigation between AMD and Intel that led to the entry of the former into the x86 microprocessor business took place in California.  *See* FACC ¶¶ 116-21; *see also Advanced Micro Devices, Inc. v. Intel Corp.*, 9 Cal. 4th 362 (1994).

- *Fourth*, a disproportionate number of the third-party subpoenas issued by AMD or the putative class in this litigation went to entities based in California.  The list includes:  Acer America, Asus Computer, Apple Computer, Appro International, ASI Computer, Averatec, Costco Wholesale, Chartered Semiconductor, Epox Computer, Foxconn Electronics, Fujitsu America, Fujitsu-Siemens Computer, Gateway Computers, Hitachi America, Hitachi, Ltd., Hewlett-Packard (now including Compaq), MSI Computer, Mitac, MPC Computer, NEC Corporation, Pathscale, Staples, Sun Microsystems, SuperMicro, Toshiba America, Trigem Computer, Tyan Computer, and UMC Group.

- *Fifth*, even third parties that are not headquartered in California have major operating facilities in that state.  Sony, for example, has major R&D and

---

contracting parties in order to cause them to divert business from certain union contractors to
nonunion contractors.  As a result, the Union's complaint alleges, the Union suffered unspecified
injuries in its 'business activities.'") (footnotes omitted).  Here, Plaintiffs' injury is
straightforward and well-pleaded, and damages will be calculated using well-established
methodologies.  Similarly out of context is Intel's reference to this Court's FTAIA ruling, *see*
Intel Mem. at 26, which – as noted above, *see supra* § III.B.1. – addressed a separate issue
entirely.

engineering facilities in California. *See* <http://www.sony.com/SCA/corporate.shtml>.

- *Sixth*, according to October 2003 census data, Californians have more households with computers (12.84 million) than any other state. *See* <http://www.census.gov/population/socdemo/computer/2003/tab01B.xls>.

Under the choice of law rules of any of the transferor states, California law should be controlling here.

### B.    <u>Under Applicable Choice Of Law Rules, California Law Should Apply Nationwide</u>

1.    <u>Analysis Under the Laws of States Other Than California</u>

Intel contends that a choice of law analysis here is necessary.  Intel Mem. at 30. Plaintiffs do not disagree, although they believe it would be more appropriate and judicially efficient to conduct that analysis in conjunction with a motion to certify a nationwide class under California law, if and when one is filed.

Intel next contends that this Court should look to the choice of law rules of Delaware, Tennessee, and Florida.  Intel Mem. at 33-35.  Nonetheless, if one were to apply a choice of law analysis now, California's choice of law principles should control.  This district is the transferee district; as Intel notes, in a multidistrict litigation such as this, the law of the transferor district is normally applied.  *See Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964).  However, nearly thirty cases were transferred to this district from federal courts in California, whereas only two cases were transferred from federal courts in Tennessee and one case from a federal court in Florida. This fact alone favors California choice of law principles as controlling.

Even if the choice of law principles of Delaware, Tennessee, or Florida were deemed relevant, all three jurisdictions apply the "most significant relationship" test of the Second Restatement on Conflict of Laws.  *See David B. Lilly Co. v. Fisher*, 18 F.3d 1112, 1118-19 (3d Cir. 1994); *Green Leaf Nursery v. E.I. du Pont de Nemours & Co.*, 341 F.3d 1292, 1301 (11th

Cir. 2003); *Hataway v. McKinley*, 830 S.W.2d 53, 54 (Tenn. 1992). Under that restatement provision, "[t]he rights and liability of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties." Restatement (Second) Conflict of Laws § 145 (1971) ("Restatement"). The factors to be taken into account include "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Id.* Those factors are to be evaluated in accordance with their "relative importance with respect to the particular issue." Restatement § 145.

Here, the conduct causing the injury occurred where Intel set the supracompetitive prices for its x86 microprocessors that were then put into the stream of commerce: California. Intel has its primary place of business in California. A similar analysis was made by this court in this district in the multidistrict proceedings in *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231 (D. Del. 2002), *aff'd*, 391 F.3d 516 (3d Cir. 2004):

> The court is also unpersuaded by one class member's objection to applying Delaware state law to class members from other states. … Where the defendant's headquarters are located in Delaware and the alleged deceptive acts originated in Delaware, it is proper to apply the Delaware consumer fraud statute to a nationwide class. *See In re Cordis Corp. Pacemaker Product Liability Litigation*, No. C-3-86-543, 1992 WL 754061, at *13, 1992 U.S. Dist. LEXIS 22612, at *49 (S.D. Ohio Dec. 23, 1992) (noting that it is proper under Supreme Court precedent to apply a particular state's laws in a nationwide class action if the defendant's headquarters are in that state and many of the acts upon which liability is predicated took place there).

*Id.* at 251.[48]

The fact that the injury to the consumer the payment of a supracompetitive price for an Intel x86 microprocessor contained in a computer may have occurred in a state other than California does not undercut this analysis. As the comments to Restatement Section 145 indicate:

> Choice of the applicable law becomes more difficult in situations where the defendant's conduct and the resulting injury occurred in different states. When the injury occurred in two or more states, or when the place of injury cannot be ascertained or is fortuitous and, with respect to the particular issue, bears little relation to the occurrence and the parties, the place where the defendant's conduct occurred will usually be given particular weight in determining the state of the applicable law.

2.    Analysis Under California's "Governmental Interest" Standard

As Intel notes, *see* Intel Mem. at 36-39, California applies a "governmental interest" or "comparative impairment" choice of law standard.

Under California's "governmental interest" approach, "a party seeking to invoke the law of another jurisdiction bears the burden of establishing that the foreign law does apply." *In re First Alliance Mortg. Co.*, 269 B.R. 428, 448 (C.D. Cal. 2001).[49]  This burden applies in the

---

[48]    For other examples within Third Circuit where a single state's laws have been applied to the claims of citizens residing in states across the country, *see e.g. In re ORFA Securities Litigation.,* 654 F. Supp. 1449, 1455 (D.N.J. 1987) (New Jersey law applied to claims of citizens who resided in multiple states); *Lerch v. Citizens First Bancorp, Inc.,* 144 F.R.D. 247, 256-57 (D.N.J. 1992) (same) ; *Zinberg v. Washington Bancorp, Inc.,* 138 F.R.D. 397, 411-12 (D.N.J. 1990) (same); *Gruber v. Price Waterhouse,* 117 F.R.D. 75, 81-82 (E.D. Pa. 1987) (same, with respect to Pennsylvania law).

[49]    *See also McGhee v. Arabian American Oil Co.*, 871 F.2d 1412, 1422 (9th Cir. 1989); *Browne v. McDonnell Douglas Corp.*, 504 F. Supp. 514, 517 (N.D. Cal. 1980); *Bauer v. Club Med Sales, Inc.*, No. C-95-1637 MHP, 1996 WL 310076, at *2 (N.D. Cal. May 22, 1996).

context of multi-state class actions.[50]    It is "substantial," especially where, as here, Intel is

headquartered in California.  *In re Activision Sec. Litig.*, 621 F. Supp. 415, 430 (N.D. Cal. 1985).

In California, "the burden is on the defendant to show:  (1) that a true conflict exists;

(2) that each state has an interest in applying its own law; and (3) if each state has an interest,

which state's interest would be more impaired if its law were not applied."  *In re Worlds of*

*Wonder Sec. Litig.*, No. C 87 5491 SC, 1990 WL 61951, at *4 (N.D. Cal. Mar. 23, 1990).  First,

"the foreign law proponent must identify the applicable rule of law in each potentially concerned

state and must show it materially differs from the law of California."  *Washington Mutual*,

24 Cal. 4th at 919.  Second, the defendant must "establish the other state's interest in having its

own law applied."  *Id.* at 920.  Third, the defendant must establish that the foreign state's

interests would be more impaired if California's were adopted.  *Id.*  "California will decline to

apply its own law to a case ... only if it is shown that another state has a greater interest in having

its law applied."  *Pizza Time*, 112 F.R.D. at 19.

Here, Intel cannot satisfy the second or third requirements.  With respect to the states that

have not enacted indirect purchaser statutes, there is no interest that conflicts with their citizens

invoking the Cartwright Act against Intel.  There is no contention by Intel that those states do not

proscribe improper monopolistic conduct or that they have a policy of precluding compensation

---

[50]    *See Washington Mutual Bank, FA v. Superior Court*, 24 Cal.4th 906, 920-21
(2001); *Harmsen v. Smith*, 693 F.2d 932, 946-47 (9th Cir. 1982); *In re MDC Holdings Sec.
Litig.*, 754 F.Supp. 785, 803-04 (S.D. Cal. 1990) (certifying class including non-residents of
California where defendants failed to meet their burden of showing non-California law applied);
*In re Seagate Tech. Sec. Litig.*, 115 F.R.D. 264, 269-70 (N.D. Cal. 1987) (same); *In re Pizza
Time Theatre Sec. Litig.*, 112 F.R.D. 15, 20-21 (N.D. Cal. 1986) (same); *In re Computer
Memories Sec. Litig.*, 111 F.R.D. 675, 685 (N.D. Cal. 1986) (same); *Weinberger v. Jackson*,
102 F.R.D. 839, 847 (N.D. Cal. 1984) (same); *In re Heritage Bond Litig.*, No. MDL 02-ML-
1475 DT, 2004 WL 1638201, at *6-10 (C.D. Cal. July 12, 2004) (same); *Church v. Consolidated
Freightways, Inc.*, No. C-90-2290 DLJ, 1992 U.S. Dist. LEXIS 18234, at *11-13 (N.D. Cal.
Sept. 14, 1992) (same); *Worlds of Wonder*, 1990 WL 61951, at *4-*5 (same).

for victims of such conduct under another state's law and in another court system.  Simply

because such states do not provide their citizens recovery under their own antitrust laws does not

mean that they have an interest in denying their citizens recovery under other states' laws in

other courts for injuries caused by out-of-state defendants committing intentional torts out-of-

state.  In the context of class actions, courts have repeatedly recognized that other states' interest

in having their own laws applied is outweighed by their interest in allowing their citizens

protection against illegal activities that have harmed them.[51]

As the Supreme Court recognized in *ARC America*, simply because federal law seeks to

avoid the burdens of indirect purchaser litigation, there is no conflict with state laws that allow

indirect purchaser claims.  *See* 490 U.S. at 103 ("It is one thing to consider the congressional

policies identified in *Illinois Brick* and *Hanover Shoe* in defining what sort of recovery federal

antitrust law authorizes; it is something altogether different, and in our view inappropriate, to

consider them as defining what federal law allows States to do under their own antitrust law.").

Similarly, there is no conflict between state laws that allow indirect purchaser claims and those

that do not.  Here, the burdens of indirect purchaser litigation would not be borne under the laws

of the non-repealer states or by the courts of those states.

Intel also cannot satisfy the third requirement.  Even if it *could* identify a conflicting

interest with respect to other states, California's interests would be more impaired if its law did

---

[51]    *See Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 241-44 (2001)
("California's more favorable laws may properly apply to benefit nonresident plaintiffs when
their home states have no identifiable interest in denying such persons full recovery"); *Seagate*,
115 F.R.D. at 269-70 (under California choice-of-law test, holding California's law applied
because "foreign state's interest in having the action proceed as a class action in California is
greater than the foreign state's interest in not allowing the suit to proceed at all"); *Pizza Time*,
112 F.R.D. at 20-21 (under California choice-of-law test, holding states' interest in application of
own laws outweighed by interest of California and states' shared goals of deterring fraudulent
conduct and providing remedy for its residents).

not apply.  California has an interest in enforcing its laws against wrongful conduct which occurs

in-state, one which allows for recovery by nonresidents for harms from such activities.  *See*, *e.g.*,

*Hurtado v. Superior Court*, 11 Cal.3d 574, 583 (1974) (allowing nonresidents to sue under

California wrongful death statute because statute sought to deter wrongful conduct that took

place in-state regardless of whom the conduct harmed).  "California also has a legitimate and

compelling interest in preserving a business climate free of fraud and deceptive practices."

*Diamond Multimedia Systems, Inc. v. Superior Court*, 19 Cal.4th 1036, 1064 (1999).

Courts have repeatedly recognized these interests in the context of class actions.  For

example, in *Diamond*, the California Supreme Court held that California's securities fraud

statutes could be applied to a nationwide class of securities purchasers including nonresident

class members who purchased the stock outside California because the conduct that caused the

price of the stock to be artificially inflated occurred in California.  California had an interest in

allowing nonresidents to recover due to its "clear and substantial interest in preventing fraudulent

practices in this state which may have an effect both in California and throughout the country."

*Id.* at 1063.  The court again recognized that "California does have a legitimate interest in

discouraging unlawful conduct that has a potential to harm California investors as well as

persons in other states."  *Id.*

Similarly, in *Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605 (1987), the court

reversed an order denying a nationwide class asserting California claims stemming from  a

telecommunications company's long-distance charges, recognizing "California's fraud

deterrence and consumer protection interests in applying its law to the claims of nonresident

plaintiffs."  *Id.* at 615.  It concluded:  "the [trial] court simply erred in stating California has no

interest in providing nonresident plaintiffs greater protection than their home states provide." *Id.* at 616.

In *Wershba*, the court held that computer purchasers nationwide could assert California consumer claims against Apple Computer for its termination of free technical support for its computers. The court held that nonresidents could recover because "even though transactions may have occurred outside California, the representations upon which the causes of action rested . . . necessarily emanated from California" since Apple had a substantial presence within the state. 91 Cal. App. 4th at 243.

Here, Intel has its headquarters within California, and its policies in furtherance of its illegal monopoly were directed from within that state's borders. The fact that some of the acts in furtherance of the illegal monopoly took place in other places does not nullify California's interest in providing compensation that will fully deter the policies devised within its borders that led to such conduct. As in *Wershba*, the fact that some ultimate sales of Intel x86 microprocessors took place in different states does not bar application of the Cartwright Act. Both California's "clear and substantial interest in preventing fraudulent practices in this state" and its "legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices" would be seriously impinged if individuals harmed by such conduct were not allowed to recover. *See Diamond*, 19 Cal. 4th at 1064.

        3.      <u>Application of California Law to Claims by Citizens of Other States Meets the "Minimal" Due Process Threshold of Fairness</u>

Application of California's laws to claims by citizens of other states also satisfies constitutional requirements. The Due Process and Full Faith and Credit clauses of the Constitution "provide[] modest restrictions on the application of forum law." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 818 (1985). Assuming a "material" conflict with another law, *see id.*

58

at 819, sufficient contacts with a state must exist such that application of its substantive law is "neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981). Such contacts need not be extensive—in fact, they can be "minimal."[52] "[T]he existence of personal jurisdiction [over the defendant] is a significant factor." *Adventure Communications*, 191 F.3d at 437 (citing *Allstate*, 449 U.S. at 317 n.23). A related factor is the expectations of the parties. Defendants doing business relating to the claims in-state satisfy this "modest" requirement. *See Pizza Time*, 112 F.R.D. at 18.

Here, assuming *arguendo* that the kind of "conflict" referenced in *Shutts* is at issue here, the constitutional minimum set forth there is well-exceeded by Defendants here. There, only 3 percent of the plaintiffs and roughly one-quarter of 1 percent of the leases at issue had any connection with the state of Kansas. *Shutts*, 472 U.S. at 815-23. Here, Intel's significant presence within California and its extensive illegal practices therein bar any argument that application of California's law would be "arbitrary or unfair." *Id.* Numerous courts have held that less contact and less activity meets the due process threshold.[53] Moreover, Intel can hardly

---

[52]     *See, e.g.*, *Adventure Communications, Inc. v. Kentucky Registry of Election Finance,* 191 F.3d 429, 436 (4th Cir. 1999) (quoting *Hellenic Lines Ltd. v. Rhoditis,* 398 U.S. 306, 314 n.2 (1970)); *Soo Line R. Co. v. Overton*, 992 F.2d 640, 645 (7th Cir. 1993).

[53]     *See Roberts v. Heim,* 670 F. Supp. 1466, 1493-94 (N.D. Cal. 1987), *aff'd in part, rev'd in part on other grounds sub nom.*, *Roberts v. Peat, Marwick, Mitchell & Co.*, 857 F.2d 646 (9th Cir. 1988) (holding *Shutts* contacts test satisfied in action against over 100 defendants including 40 partnerships, general partners, and employees, where eight of the partnerships were headquartered in California, approximately 25% of the limited partners were residents of California, the individual general partner of a portion of the partnerships resided in California, and the corporate general partner maintained an office in California); *Seagate,* 115 F.R.D. at 272 (holding *Shutts* contacts test satisfied where defendant "headquarted" in California and fraud "perpetrated primarily in California"); *Pizza Time,* 112 F.R.D. at 18 (holding *Shutts* contacts test satisfied where defendant corporation "incorporated and headquarted in California, "the alleged misrepresentations emanated from California, and many of the plaintiffs were California residents"); *Worlds of Wonder*, 1990 WL 61951 at *4-*5 (holding *Shutts* contacts test satisfied where defendant had "its principal place of business" in California, corporate officers were residents, and wrongdoing "emanated from California.").

claim either unfamiliarity with California's laws or surprise that their illegal acts would be subject to liability under them. *See Pizza Time*, 112 F.R.D. at 18 (where defendants "were selling . . . stock . . . in California as well as throughout the nation," California's interest was "self-evident at the time and sufficient to give notice to the parties that California law might apply in any subsequent litigation.").[54]  The fact that some acts giving rise to the claims at issue took place in another state does not render Intel's contacts insufficient.[55]  California is the state in which an important and substantial part of the illegal conduct took place, which more than meets the "minimal" contacts required under *Shutts*.

Intel's reliance on *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95 (2006), is misplaced.  In *Kearney*, the plaintiff's UCL "unlawful" prong claim[56] was predicated on the defendant's alleged violation of a California Penal Code provision prohibiting tape-recording of telephone calls without both parties' consent. *See id.* at 102, 115-23.  The Supreme Court examined choice-of-law principles at length, and concluded that *California law would apply* over the less-protective Georgia law (which requires the consent of only one party to the call).  See *id.* at 123-28.  Thus, *Kearney* fully supports the conclusion that California law should apply here as well.

---

54        *See also Allstate,* 449 U.S. at 317-18 ("By virtue of its presence, Allstate can hardly claim unfamiliarity with the laws of the host jurisdiction and surprise that the state courts might apply forum law to litigation in which the company is involved. . . . Particularly since the company was licensed to do business in the forum, it must have known it might be sued there and that the forum courts would feel bound by forum law . . . .").

55        *See In re Tri-State Crematory Litig.,* 215 F.R.D. 660, 678 (N.D. Ga. 2003) (contacts sufficient because "each contract for cremation entered into by a respective [defendant], regardless of the location or primary place of business of the respective [defendants], has one common element: at least a portion of the contract was to be performed in Georgia").

56        The UCL's three prongs "unlawful," "unfair," and "fraudulent" are discussed in more detail below.

What Intel overlooks, moreover, is that *Kearney* had nothing to do with the claims of non-California residents. Rather, *Kearney* involved claims of California residents against a non-California defendant. *Id.* at 102. The Supreme Court did not address what law would apply if the same action had been brought by non-Californians. That question is answered in *Diamond*, *Wershba*, and *Clothesrigger*, discussed above. *Kearney* provides no support for Intel's position.

Next, Intel focuses on California's UCL, arguing that because the UCL's reach is supposedly constricted, non-Californians should not be able to assert *any* of the four California-law claims pleaded in the complaint. Intel Mem. at 38. Intel is wrong on both points.

California law is clear that the UCL protects *all* consumers, not just California consumers, from unfair business practices emanating from California—particularly from California residents like Intel. *See Norwest Mortgage, Inc. v. Superior Court*, 72 Cal. App. 4th 214 (1999). In *Norwest Mortgage*, the leading case on the UCL's extraterritorial reach, the California Court of Appeal concluded that not only California residents, but also *non-California residents* whose injuries emanated from California, may pursue UCL claims. *See id.* at 222. "[S]tate statutory remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California." *Id.* at 224-25 (citing *Diamond*, 19 Cal.4th at 1059, 1063-64). This was true in *Norwest Mortgage* even though the defendant's principal place of business was Iowa, not California. *See id.* at 217.[57]

As discussed above, Intel directs its entire business from California, and the harm caused by its California conduct was worldwide in scope. Under *Norwest Mortgage*, *Diamond*, and the

---

[57] The defendant in *Norwest Mortgage* was merely incorporated in California. 72 Cal. App. 4th at 217. The court in *Norwest Mortgage* indicated that on remand, the trial court would still need to consider the choice-of-law question when analyzing the claims of non-Californians. *Id.* at 229. That analysis would hinge on case law such as *Diamond*, *Wershba*, *Clothesrigger*, and *Shutts*, already discussed above.

other authorities discussed above, non-California plaintiffs may seek relief against Intel under

the UCL (as well as other California laws).

Contrary to Intel's position, *see* Intel Mem. at 38, the California voters have *not*

"restrict[ed] the scope of California's UCL."  Rather, as the California Supreme Court explained

in July, Proposition 64 "*left entirely unchanged* the substantive rules governing business and

competitive conduct."  *Californians for Disability Rights v. Mervyn's, LLC*, 39 Cal. 4th 223, 232

(2006) (emphasis added).  More particularly, it held that "[n]othing a business might lawfully do

before Proposition 64 is unlawful now, and nothing earlier forbidden is now permitted.  Nor does

the measure eliminate any right to recover."  *Id.* (citing *Korea Supply Co. v. Lockheed Martin*

*Corp.*, 29 Cal. 4th 1134, 1144-50 (2003); *Bank of the West v. Superior Court*, 2 Cal. 4th 1254,

1266 (1992)).  Instead of restricting anyone's rights, Proposition 64 was actually intended to

"*protect*[] the right of individuals to retain an attorney and file for relief under [the UCL]."

Prop. 64 § 1(d) (emphasis added).[58]

The California Supreme Court implicitly reaffirmed this on November 1, 2006, when it

granted review in *Pfizer, Inc. v. Superior Court*, 141 Cal. App. 4th 290 (Cal. Ct. App. 2006),

*review granted*, No. S145775, 2006 Cal. LEXIS 13327 (Cal. Nov. 1, 2006). The California

Supreme Court's decision to grant review strongly suggests that it disagrees with *Pfizer's*

conclusion already contradicted once in Mervyn's, a case Intel did *not* cite that Proposition 64

substantively "restricted" the UCL in any respect whatsoever; see also Cal. Rule of Court

976(d)(2) ("an opinion is no longer considered published if the Supreme Court grants review").[59]

---

[58]     The full text of Proposition 64 is available here:
<http://www.ss.ca.gov/elections/bp_nov04/prop_64_text_of_proposed_law.pdf> [as of January
4, 2007].

[59]     *See generally* Kevin K. Green, "The Unfair Competition Law After
Proposition 64:  The Supreme Court Speaks," 15 *Competition* 37 (2006).

The Supreme Court also more overtly recognized the UCL's continuing vitality in *Kearney*, when it explicitly rejected the notion, advanced in an *amicus* brief, that "the reach of the statute should be restrained in the application of California's choice-of-law principles." *Kearney*, 39 Cal. 4th at 131.[60]

In sum, nothing in Proposition 64 or in the UCL as a whole suggests that California does not have a strong interest in preventing California companies, like Intel, from harming consumers both inside and outside California. On the contrary, the UCL's "coverage is sweeping, embracing anything that can properly be called a business practice and that at the same time is forbidden by law. It governs 'anti-competitive business practices as well as injuries to consumers, and has as a major purpose the preservation of fair business competition." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (citations and internal quotation marks omitted). Restricting the UCL's scope, as Intel proposes, would contravene the UCL's original legislative purpose, as recently reaffirmed by the voters and the California Supreme Court.

Finally, neither the UCL nor Proposition 64 has any bearing on the scope or purposes of California's Cartwright Act, California common-law monopolization, or California common-law

---

[60]    It so held in part because the UCL claim in *Kearney* was predicated upon "conduct that is 'unlawful' and already subject to an express statutory private right of action"; because "both the named plaintiffs and the members of the proposed class allegedly are direct victims of the unlawful conduct, rather than simply unharmed persons suing on behalf of the general public"; and because remedies sought were "authorized not only by the terms of the UCL, but by the terms of [the underlying statute] itself." *Kearney*, 39 Cal. 4th at 131. The same factors are present in this case. Plaintiffs' UCL claim is predicated (in part) on conduct that is already made unlawful by the Cartwright Act. This is not a "general public" action; rather, the class members suffered unique harm. And the UCL remedies sought (injunctive relief and restitution (Bus. & Prof. Code § 17203)) are also available under the Cartwright Act (Bus. & Prof. Code § 16750).

unjust enrichment.  As discussed above, California's interest in enforcing these laws against California businesses (like Intel) for the benefit of all injured consumers is paramount.

## V.    OTHER ALLEGED LEGAL DEFECTS DO NOT BAR PLAINTIFFS' ANTITRUST CLAIMS

Intel further argues that:  (1) Plaintiffs' claims under the antitrust laws of the District of Columbia, Mississippi, Nevada, New York, South Dakota, and West Virginia are barred because those statutes apply only to intrastate conduct; and (2) New York's antitrust statute (the Donnelly Act) does not permit class claims.  *See* Intel Mem. at 41-42.

### A.    Alleged Intrastate Limitations of Certain State Antitrust Laws

District of Columbia.  The District of Columbia antitrust statute prohibits every contract, trust, or conspiracy in restraint of "trade of commerce all or any part of which is within the District of Columbia …"  D.C. Code § 28-4502;  *see also id.* § 25-4503 (similar language with respect to monopolization claims).  In *GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp.2d 27 (D.D.C. 1998), *remanded on other grounds*, 199 F.3d 1343 (D.C. Cir. 2000), this statute was held to apply in a case involving a plaintiff who operated a nationwide internet Yellow Pages service and claimed that, as a result of a conspiracy, internet users seeking such Yellow Pages were directed by a popular web browser to a nationwide service provided by certain regional companies.  The conduct in question clearly had interstate and intrastate components.  The district court ruled that there was a sufficient connection with the jurisdiction under the statute because the plaintiff alleged that "the defendants' anti-competitive activity impacts upon Internet users and businesses purchasing Internet Yellow Pages advertisements in the District of Columbia."  21 F. Supp. 2d at 45.  Plaintiffs have made a similar claim here, asserting injury to putative class members throughout the United States, including in the District of Columbia.  *See* FACC ¶¶ 248, 251-53.

Mississippi.  The Mississippi antitrust statute prohibits agreements to "restrain trade," "increase … the price of a commodity," or "hinder competition in the production, importation … sale or purchase of a commodity."  Miss. Code Ann. § 75-21-1.  In *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp.2d 160, 171 (D. Me. 2004) ("*NMV*"), the court held that where car manufacturers wanted Mississippi dealers, like those of every other state, to charge Mississippi consumers higher prices as a result of the lack of competition from imported Canadian vehicles, this would hinder competition in the importation of a commodity within the meaning of Section 75-21-1.  The court further reasoned that some of these sales would have occurred wholly within Mississippi.  350 F. Supp.2d at 171; s*ee* also *In re OSB Antitrust Litig.*, No. 06-826, slip op. at 2 (E.D. Pa. Sept. 27, 2006) ("*OSB* Order") (refusing to dismiss Mississippi antitrust claims on intrastate issue).  The same is true here.

Nevada.  The Nevada Unfair Trade Practices Act ("NUTPA") enumerates various types of anticompetitive conduct and declares it "unlawful to conduct any part of such activity in this state."  Nev. Rev. Stat. § 598A.60.  In *NMV*, the court refused to dismiss a claim based on this statute, saying the complaint alleged a conspiracy among manufacturers and dealers operating in Nevada that contemplated sales of vehicles in Nevada at higher prices.  350 F. Supp. 2d at 171-72; *see also Pooler v. R.J. Reynolds Tobacco Co.*, 2001 WL 403167 at *2 (Nev. Dist. Ct. Apr. 4, 2001) (alleged conspiracy to maintain high cigarette prices in domestic and foreign markets encompassed marketing and sales of tobacco products in Nevada).  Based on these authorities, the allegations relating to plaintiffs' NUTPA claim are sufficient.

New York.  The Donnelly Act prohibits every contract, agreement or arrangement to create or maintain a monopoly in the state, or interfering with the free conduct of business in the state for the purpose of creating or maintaining a monopoly.  N.Y. Gen. Bus. Law § 340(1).  In

*Two Queens, Inc. v. Scoza*, 745 N.Y.S.2d 517 (N.Y. App. Div. 2002), the court held that the statute was not preempted by federal law where the claim in question had a "significant intrastate or local anticompetitive impact in violation of State antitrust law with minimal interstate consequences."  745 N.Y.S.2d at 519.  The question is whether the burden on interstate commerce outweighs state interests.  *Id.*  Here, the intrastate impacts are enormous; it may reasonably be inferred that New York consumers buy numerous computers containing Intel x86 microprocessors.  Moreover, the burden on interstate commerce is minimal given that federal and other state antitrust laws also prohibit Intel's anticompetitive behavior, and Intel has not shown that any burden on interstate commerce outweighs New York's interests.

South Dakota.  The current version of S.D. Rev. Code § 37-1-31 says that "[a] contract, combination or conspiracy between two or more persons in restraint of trade or commerce *any part of which is within this state* is unlawful."  (emphasis added).  Thus, the statute clearly applies to interstate conduct that has any intrastate component.  In *NMV*, the district court assumed the state legislature "intended its antitrust coverage to be as broad as possible" and concluded that "plaintiffs need only allege that part of the trade or commerce occurred within South Dakota."  350 F. Supp. 2d at 172.  The court found that the sales of motor vehicles in the state satisfied that requirement.  Likewise, here, sales of computers containing Intel x86 microprocessors in South Dakota also satisfy that requirement.

West Virginia.  The West Virginia antitrust statute (W.Va. Code § 37-18-3) was also construed in *NMV* to apply to claims involving a nationwide conspiracy for the same reasons expressed in the portions of its opinion dealing with the South Dakota antitrust statute.  350 F. Supp.2d at 175.  Moreover, an unpublished state court decision indicates that the West Virginia statute "prohibits a conspiracy that restrains West Virginia trade or commerce, regardless of the

66

locus of the conspiracy." *Buscher v. Abbott Labs.*, No. 94-C-755 at 2 (W.Va. Cir. Ct., Jan. 24, 1994), *cited in* 350 F. Supp.2d at 175. Finally, the monopoly portion of the West Virginia statute covers a monopoly "any part of which is in this state." W. Va. Code § 47-18-4. Based on all of these factors, the FACC passes muster with respect to claims based on West Virginia antitrust law.

### B.    Donnelly Act Class Claims

Intel argues Plaintiffs' Donnelly Act claims may not be certified as a class action because the New York class action statute, CPLR § 901(b), prohibits class actions for penalties. The Court need not reach this question, however, because CPLR § 901(b) is a procedural rule and therefore does not apply in federal court, where class action procedures are governed by Federal Rule of Civil Procedure 23. *See In re Oot*, 112 B.R. 497, 502 (Bankr. N.D.N.Y. 1989) (ruling that because Section 901(b) is a procedural rule, the court was bound to apply Rule 23); *In re Peters*, 90 B.R. 588, 594 (Bankr. N.D.N.Y. 1988); *see also In re Bridgestone/Firestone Inc. Tires Prods. Liability Litig.*, 205 F.R.D. 503, 515 (S.D. Ind. 2001), *rev'd in part on other grounds*, 288 F.3d 1012 (7th Cir. 2002) (Michigan statute limiting consumer actions to Michigan residents and those injured in that state was trumped by Rule 23); *see also supra* § IV.B. *But see United States v. Dentsply Int'l, Inc.*, Civ. A. No. 99-005-SLR, 2001 WL 624807, at *15-*16 (D. Del. Mar. 30, 2001), *aff'd sub nom. Howard Hess Dental Labs Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363 (3rd Cir. 2005). There is no prohibition in Rule 23 against certification of treble damages claims, and Intel does not argue otherwise. Plaintiffs' Donnelly Act claim, therefore, may be certified as a class action under Rule 23.

Even if the procedural strictures of CPLR § 901(b) apply in federal court, the Court should defer construing that statute because the same issue is presently before the New York Court of Appeals in *Sperry v. Crompton Corp.*, 810 N.Y.S.2d 498 (N.Y. App. Div. 2006), *leave*

*to appeal granted*, 853 N.E.2d 244 (N.Y. 2006).  Oral argument is scheduled for January 10,

2007.  Given the likely short time before New York's highest court rules on this issue, Plaintiffs

submit that, if this Court decides that it must apply CPLR. § 901(b), it should wait for the

decision of the Court of Appeals, which will be binding on this Court as an interpretation of New

York law.  *See Gruber v. Owens-Illinois, Inc.*, 899 F.2d 1366, 1369 (3d Cir. 1990).[61]

## VI.    PLAINTIFFS  HAVE STATED CLAIMS ADEQUATELY UNDER STATE CONSUMER PROTECTION STATUTES

### A.    Plaintiffs Have Alleged Injury in Fact and Causation

Intel initially takes the view that plaintiffs lack constitutional standing to raise consumer

protection/unfair competition claims under state law because they have suffered no injury in fact.

Intel's Mem. at 42-44.  This argument is nonsense.

Throughout the FACC, plaintiffs allege that they paid higher or supra-competitive prices

for Intel x86 microprocessors as a result of Intel's exclusionary practices.  *See, e.g.*, FACC ¶¶

234-35, 245, 251-53, 266, 290, 315.  In short, they were overcharged and paid more money as a

result of Intel's conduct.  Under any definition of standing, be it constitutional or prudential,

paying more money as a result of a defendant's alleged unlawful practices is injury in fact.  "A

person whose property is diminished by a payment of money wrongfully induced is injured in his

property."  *Reiter v. Sonotone Corp.*, 442 U.S. 330, 340 (1979); *see also Int'l Bhd. Of Teamsters,*

*Loc. 734 Health & Welfare Trust Fund v. Philip Morris, Inc.*, 196 F.3d 818, 823 (7th Cir. 1999)

("Paying too much, or getting an inferior product for the same money . . . causes a loss of one's

money, which is 'property'.")

---

[61]    In any event, plaintiffs who are New York residents are free to pursue individual
claims under the Donnelly Act (including claims for injunctive relief).  Plaintiffs have separately
sued for actual damages under N.Y. Gen. Bus. Law § 349, the state's consumer protection
statute.  A class action is permissible to pursue such a claim.  *Cox v. Microsoft Corp.*,
778 N.Y.S.2d 147, 148-49 (N.Y. App.Div. 2004).

In other suits brought by indirect purchasers alleging overcharges, courts have routinely found constitutional standing. Thus, for example, in *D.R. Ward*, it was held that allegations that plaintiffs paid inflated prices due to an overcharge for plastics additives that was caused by defendant manufacturers' conspiracy and was passed down the distribution chain were sufficient to establish constitutional standing. 2006 U.S. Dist. LEXIS 61828, at *7. Similarly, in *OSB*, where indirect purchasers sued for overcharges claimed to have been caused by a conspiracy to fix prices for oriented strand board, the district court found that plaintiffs had adequately alleged "a concrete economic injury, traceable to Defendants' alleged conspiracy." *OSB* Order at 3. Finally in *In re Terazosin Hydrochloride Antitrust Litig.*, 160 F. Supp.2d 1365, 1370 (S.D. Fla. 2001), the court said that the allegation that class plaintiffs paid more for terazosin in several states "presents a 'controversy' with adverse parties satisfying the constitutional prerequisites for standing," a point defendants conceded. Thus, Intel's objections based on constitutional standing are meritless.

## B.     Rule 23 Trumps the Procedural Provisions of the Alaska, Georgia, Louisiana and Montana Consumer Protection Statutes

Intel's next point is that the consumer protection laws of Alaska, Georgia, Louisiana and Montana do not permit consumers to sue in a representative capacity. Intel Mem. at 44-45.

The short response to this argument is that Federal Rule of Civil Procedure 23 trumps these state procedural rules.[62] "Procedural state laws are not used in federal court if to do so would result in a 'direct collision' with a Federal Rule of Civil Procedure." *Metabolife Int'l.,*

---

[62]     *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Hanna v. Plumer*, 380 U.S. 460 (1965); C. Wright, D. Miller & M. Kane, 7A *Federal Practice & Procedure* § 1758 (3d ed. 2005) ("[t]he *Hanna* decision resolves any doubt as to the availability of a class action in a federal court under Rule 23 in a diversity action, even in a state that does not recognize the procedure. Federal and not local standards also will determine the various procedural elements of the class.").

*Inc. v. Wornick*, 264 F.3d 832, 845 (9th Cir. 2001).  *See Burlington No. R.R. Co. v. Woods*,

480 U.S. 1, 4-5 (1987).  Where such a "direct collision" exists, the Federal Rule of Civil

Procedure applies.  *See Verizon Delaware, Inc. v. Covad Communications Co.*, 377 F.3d 1081,

1091 (9th Cir. 2004).

　　　　Courts repeatedly have held that state law across-the-board limits on class adjudication

are procedural limits that create a "direct collision" with Rule 23.  *See O'Keefe v. Mercedes-Benz*

*USA, LLC*, 214 F.R.D. 266, 285-86 (E.D. Pa. 2003) (holding that limits on class actions in

Alabama's consumer protection act were "procedural" and conflicted with the class adjudication

provided by Rule 23); *Bridgestone/Firestone*, 205 F.R.D. at 514-15 (concluding that similar

limits under the Michigan Consumer Protection Act created a direct conflict by attempting to

place limits on "*how* these Plaintiffs can proceed in pursuing relief," an issue governed by

Rule 23); *Kristiansen v. John Mullins & Sons, Inc.*, 59 F.R.D. 99, 109-10, n.13 (E.D.N.Y. 1973)

(holding that a similar class action bar created a direct conflict, because Rule 23 governed the

"method of enforcing rights" in court).

　　　　Louisiana, Alaska, Georgia, and Montana each have across-the-board class action bars

nearly identical to the limits at issue in the above cases:  they provide a substantive right of

recovery, but seek to place limitations on "the court's equitable power to allow joinder in an

attempt to conserve judicial economy."  *O'Keefe*, 214 F.R.D. at 285.  Such across-the-board

rules "directly conflict" with Rule 23 and do not apply in federal court.

### C.　　Plaintiffs Have Alleged Deceptive or Unconscionable Conduct Sufficiently

　　　　The FACC alleges that Intel monopolized the market through, *inter alia*, discriminatory

rebates and discounts intended to foreclose competition, see FACC  ¶¶ 2, 144-59, 170-71, below-

cost pricing, see *id*. ¶171, and threats and intimidation (often oral) directed to customers who

were considering making deals with AMD and retaliation against those who did, *see id*. ¶¶ 2,

176-90.  By these various descriptions, it is clear that none of these practices could have been known to consumers who indirectly bought Intel x86 microprocessors until AMD filed its complaint because they were inherently deceptive and self-concealing.  *See*, *e.g.*, *In re Elec. Carbon Prods. Antitrust Litig.*, 333 F. Supp. 2d 303, 316 (D.N.J. 2004); *In re Mercedes-Benz Antitrust Litig.*, 157 F. Supp. 2d 355, 371 (D.N.J. 2001); *Bethlehem Steel Corp. v. Fischbach & Moore, Inc.*, 641 F. Supp. 271, 275 (E.D. Pa. 1986).  The FACC also contains allegations of Intel's use of compiler programs that will secretly degrade computer performance when a program is run on an AMD platform.  *See* FACC ¶¶ 226-30. Moreover, Plaintiffs have alleged that Intel acted fraudulently here.  *See id*. ¶¶ 258, 261, 263.

This same conduct is also unconscionable.  The FACC asserts that Intel organized group boycotts in an attempt to exclude AMD from the market.  *See id.* ¶ 2.  Its retaliatory and intimidating actions were egregious, such as: pressuring Hewlett-Packard to consider firing people who dealt on a limited basis with AMD  *see id*. ¶ 159; threatening to "destroy" NEC's European subsidiary for engaging with AMD in the commercial desktop segment, *see id*. ¶ 178; withholding server chips to Compaq and making its CEO feel that he "had a gun" to his head because he had dealt with AMD, *see id*. ¶ 177; threatening Acer with "severe consequences" if it supported the launch of AMD's Athlon 64 chipset, *see id*. ¶ 183; threatening Acer with a $10 chipset price increase on all Intel-based Acer systems if Acer awarded any non-European processor business to AMD, *see id*. ¶ 190; promising to make it "painful" to Avnet, a computer distributor, if it began distributing AMD's Opteron chip, *see  id*. ¶ 197; and threatening to cut off supplies to Vobis if it exhibited support for the launch of AMD's Turion 64 chip, *see id*. ¶ 210.

Intel argues that Plaintiffs have failed to allege deceptive or fraudulent conduct under the consumer protection laws of Arkansas, Idaho, Kansas, Maine, New Mexico, New York, and

Utah. *See* Intel Mem. at 45-46. Intel also contends that Plaintiffs have not alleged

unconscionable conduct under the laws of Arkansas, Utah, and New Mexico. *Id*. at 47-48. Its

principal authority is *NMV*. In fact, that case largely supports Plaintiffs' position as to the

consumer protection/unfair competition laws in question, as do other authorities. Plaintiffs will

address each state in turn.

Arkansas. The Arkansas Deceptive Trade Practices Act ("ADTPA") forbids enumerated

"deceptive and unconscionable trade practices," as well as "any other unconscionable, false, or

deceptive act or practice in business, commerce, or trade." Ark. Code Ann. § 4-88-107(a). It

also prohibits use of any deception, fraud or false pretense and the concealment, suppression, or

omission of material facts on which others rely. *Id*. § 44-88-108. Thus, either deception or

unconscionability will satisfy ADTPA's requirements. Here, as noted above, Plaintiffs have

alleged inherently self-concealing practices. Even if they had not, in *NMV*, the court held that a

conspiracy to keep Canadian cars out of the United States was unconscionable under the statute.

350 F. Supp. 2d at 178 (defining unconscionability as "showing no regard for conscience;

affronting the sense of justice, decency, or reasonableness"). As a pleading matter, Intel's

conduct alleged here certainly meets this liberal standard.

Idaho. The Idaho Consumer Protection Act ("ICPA") prohibits "unfair methods of

competition and unfair or deceptive acts or practices," as well as "unconscionable method[s],

act[s] or practice[s]." Idaho Code § 48-603. Intel's orchestration of boycotts, below cost

pricing, discriminatory kickbacks to customers with the intent of excluding AMD, use of

compiler language designed to secretly degrade computers running on the AMD platform and

coercive tactics certainly constitute unfair practices. As noted above, some of these are also

inherently deceptive.

As for unconscionability, Idaho considers, *inter alia*, whether the defendant took advantage of consumers, exacted supracompetitive prices, and engaged in conduct that "would outrage or offend the public conscience." *Id*. § 40-603(c)(2). The Idaho statute further instructs courts to give due weight to the judicial interpretations of the Federal Trade Commission ("FTC") Act (15 U.S.C. § 45) in interpreting Idaho law. Idaho Code § 48-604(1); *see also In re Western Acceptance Corp., Inc.*, 788 P.2d 214, 216 (Idaho 1990). Of course, the FTC Act prohibits antitrust violations, including group boycotts. *NMV*, 350 F. Supp.2d at 184 (citing *FTC v. Cement Institute*, 333 U.S. 683, 694 (1948)). Reading the statute in this manner also is consistent with the Idaho legislature's declaration that "fair competition is fundamental to the free market system" and that the "unrestrained interaction of competitive forces" will yield the best allocation of the state's economic resources, the lowest prices and the highest quality. Idaho Code § 48-102(1). Moreover, the Supreme Court of Idaho has directed that the ICPA is to be construed liberally in light of the legislative intent "to deter deceptive or unfair trade practices and to provide relief for consumers exposed to proscribed practices." *State ex rel. Lance v. Hobby Horse Ranch Tractor & Equip. Co.*, 129 Idaho 565, 929 P.2d 741, 743 (1996). *Accord, Fenn v. Noah*, 142 Idaho 775, 133 P.2d 1240, 1245 (2006). In light of the foregoing, the court in *NMV* found the nationwide antitrust conspiracy therein to be unconscionable, as a pleading matter, under ICPA. 350 F. Supp. 2d at 184-85. The same should be true of the anticompetitive practices at issue here.

Intel's reliance on *State ex rel. Wasden v. Daicel Chem. Indus., Ltd.*, 106 P.3d 428, 434-35 (Idaho 2005), cited in Exhibit D of its appendix, is misplaced. In *Wasden*, the complaint did not properly allege unconscionable sales conduct that was directed at consumers because plaintiffs did not allege that they purchased products containing the goods sold by defendants

and paid more for these products than they would have absent Defendants' conduct.  More

importantly, in *Wasden*, the plaintiffs relied only on unconscionable sales conduct in violation of

§ 48-603(18) and did not assert any "practice which is otherwise misleading, false, or deceptive

to the consumer" under § 48-603(17).  The district court in *DBSI Signature Place, LLC v. BL*

*Greensboro, L.P.*, Case No. CV 05-051-S-LMB, 2006 U.S. Dist. LEXIS 30387 (D. Idaho May 9,

2006), distinguished *Wasden* and ruled that summary judgment could not be granted on an ICPA

claim where the claim could come within § 48-603(17):

> There is at least one provision on the list that could apply to the
> circumstances presented here.  Idaho Code § 48-603(17) states that
> it is unlawful to engage "in any act or practice which is otherwise
> misleading, false, or deceptive to the consumer."

*Id.* at *53.  Thus, the allegations of conduct that is misleading, false, or deceptive to the

consumer under § 48-603(17) requires that the motion on the ICPA claim be denied regardless of

whether the claim also constitutes unconscionable sales conduct under § 48-603(18).

    <u>Kansas.</u>  The Kansas Consumer Protection Act ("KCPA") proscribes both "deceptive acts

and practices" and "unconscionable acts or practices" done in connection with a consumer

transaction. Kan. Stat. Ann. §§ 50-626, 50-627.  Courts applying Kansas law have said that the

issue of whether an act or practice is deceptive is one for a jury, not a judge, to decide.  *Bailey v.*

*Morgan Drive-Away, Inc.*, 647 F. Supp. 648, 656 (D. Kan. 1986); *Farrell v. General Motors*

*Corp.*, 815 P.2d 538, 547 (Kan. 1991).  Certainly, a trier of fact could deem the conduct of Intel

alleged here to be deceptive.

    Unconscionability is a legal question for the judge to decide under Kansas law.

*Waggener v. Seever Sys., Inc.*, 233 Kan. 517, 664 P.2d 813, 818 (1983).  The KCPA defines

unconscionability in the context of sales transactions, *see* Kan. Stat. Ann. § 50-627(b) which, as

the court in *NMV* noted in connection with ADTPA, is not helpful in the antitrust context, so

74

resort to a general definition is permissible.  350 F. Supp.2d at 178.  The general definition of

unconscionability refers to lack of regard for conscience and an affront to the sense of "justice,

decency, or reasonableness."  *Black's Law Dictionary* 1561 (8th ed. 2004).  The conduct alleged

here satisfies that test as well.

Maine.  Maine's Unfair Trade Practices Act ("MUTPA") proscribes "[u]nfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

5 M.R.S.A. § 207.  MUTPA contains a provision requiring it to be interpreted in harmony with

the FTC Act.  5 M.R.S.A. § 207(1); *Tungate v. MacLean-Stevens Studios, Inc.*, 714 A.2d 792,

797 (Me. 1998).  In *NMV*, the court found that the antitrust conspiracy alleged there could

constitute an unfair trade practice under MUTPA.  350 F. Supp. 2d at 186-87.  The same is true

here.

New Mexico.  The New Mexico Unfair Practices Act ("NMUPA") prohibits unfair,

deceptive and unconscionable trade practices in the conduct of any trade of commerce.  N.M.

Stat. Ann. § 57-12-3.  Here, the alleged practices of Intel are both unfair and deceptive.  The

NMUPA defines unconscionability to be practices that take grossly unfair advantage of a

person's lack of knowledge, ability, experience or capacity or result in a gross disparity between

the value received by a person and the price paid.  N.M. Rev. Stat. § 47-12-2(E).  Here, as noted

above, Plaintiffs have alleged highly inflated prices for Intel x86 microprocessors because of

Intel's conduct.  Similar allegations in *NMV* resulted in the denial of a motion to dismiss.  350 F.

Supp.2d at 195-96.  The same result should be reached here.

New York.  New York's General Business Law § 349 requires that the defendant engage

"in an act or practice that is deceptive or misleading in a material way. …"  *Goshen v. Mutual*

*Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195 (N.Y. 2002).  An act or practice is deceptive if it is

"likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995). Courts have looked to the FTC Act's broad definitions of deceptive practices in construing Section 349. *See, e.g., Genesco Entm't v. Koch*, 593 F. Supp. 743, 751-52 (S.D.N.Y. 1984); *State ex rel. Lefkowitz v. Colorado State Christian College of the Church of the Inner Power, Inc*., 346 N.Y.S.2d 482, 487 (N.Y. Sup. Ct. 1973).

Antitrust claims have been held to be cognizable under Section 349. *See Excellus Health Plan, Inc. v. Tran*, 287 F. Supp.2d 167, 179-80 (W.D.N.Y. 2003) (group boycott); *New York v. Feldman*, 210 F. Supp.2d 294, 302 (S.D.N.Y. 2002) (bid-rigging); *New York Jets LLC v. Cablevision Sys. Corp*., No. 05 Civ. 2875(HB), 2005 WL 2649330 at *11 (S.D.N.Y. Oct. 17, 2005) (monopolistic practices); *Cox v. Microsoft Corp.*, 778 N.Y.S.2d 147, 148 (N.Y. App. Div. 2004) (monopolistic business practices). In *Cox*, the requisite deceptiveness was found through "secret agreements with computer manufacturers and distributors to inhibit competition" and creation of an "applications barrier" in Windows software that rejected competing Intel-compatible operating systems. *Id.* Here, as well, secret agreements with computer manufacturers, distributors and retailers are alleged, as well as Intel's use of compiler programs that secretly degrade computer performance when a program is run on an AMD platform. The FACC therefore states a cause of action under Section 349.

Utah. The Utah Consumer Sales Practices Act ("UCSPA") prohibits deceptive and unconscionable acts or practices by a supplier. Utah Code Ann. §§ 3-11-4, 3-11-5. Here, as noted above, the FACC alleges deceptive practices by Intel. Unconscionability under UCSPA is defined with reference to various circumstances, as well as others "which the supplier knew or had reason to know." *Id.* § 13-11-5(3). In *NMV*, it was noted that Utah courts have looked at

contract principles of substantive and procedural unconscionability in interpreting the UCSPA. 350 F. Supp. 2d at 204-05. *See Wade v. Jobe*, 818 P.2d 1006, 1017-18 (Utah 1991), *overruled on other grounds*, *Carlie v. Morgan*, 922 P.2d 1 (Utah 1996). The *NMV* court therein reasoned that application of these principles could not be made on a motion to dismiss and allowed the UCSPA claims to go forward. *See* 350 F. Supp. 2d at 205. The same reasoning applies here.

### D.     Plaintiffs Can Also Proceed Under the California UCL

Next, Intel attacks Plaintiffs' claim under California's Unfair Competition Law ("UCL"). Cal. Bus. & Prof. Code §§ 17200 *et seq*. Wrongly contending that Plaintiffs suffered no "antitrust injury," Intel asserts that plaintiffs' UCL claims are likewise barred. Intel Mem. at 48. (citing *Cel-Tech*, 20 Cal.4th at 184-87; *Gregory v. Albertson's, Inc.*, 104 Cal. App. 4th 845, 856-57 (2002)). This argument highlights Intel's fundamental misunderstanding of the UCL and the California case law interpreting it.

The UCL broadly prohibits conduct that is *either* "unlawful, unfair, *or* fraudulent." Bus. & Prof. Code § 17200 (emphasis added). Because this language "is framed in the disjunctive, a business practice need only meet one of the three criteria to be considered unfair competition." *McKell v. Wash. Mutual, Inc.*, 142 Cal. App. 4th 1457, 1471 (2006). "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." *Cel-Tech*, 20 Cal. 4th at 180. In this case, plaintiffs have invoked separately each of the UCL's three prongs by alleging that Intel's conduct is "unfair, unlawful *and/or* fraudulent." FACC ¶ 263 (emphasis added). Each of the three prongs must be separately evaluated in accordance with the "separate lines of authority construing each of [them]." *Gregory*, 104 Cal. App. 4th at 851.

The first of the three prongs, the "unlawful" prong, "'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently

actionable." *Cel-Tech*, 20 Cal. 4th at 180 (quoting *State Farm Fire & Casualty Co. v. Superior Court*, 45 Cal. App. 4th 1093, 1103 (1996)).  This is the only prong potentially affected by Intel's argument that plaintiffs have suffered no "antitrust injury," because this is the only prong that hinges on Intel's alleged violations of the Sherman Act, the Cartwright Act, or other "borrowed" laws.  For reasons already discussed in detail above, the complaint adequately alleges a violation of all of these laws.  *See supra* § II.B.  Accordingly, Plaintiffs' UCL "unlawful" prong claim should stand.[63]  For this reason alone, Intel's motion to dismiss Plaintiffs' UCL claim must be denied.

Second, the "unfair" prong, is distinct from the "unlawful" prong.  In the California Supreme Court's words, "the law does more than just borrow.  The statutory language referring to 'any unlawful, unfair *or* fraudulent' practice (italics added) makes clear that *a practice may be deemed unfair even if not specifically proscribed by some other law*." *Cel-Tech*, 20 Cal. 4th at 180 (second emphasis added).   The only exception is when "*specific legislation* provides a 'safe harbor.'"  *Id.* at 182 (emphasis added).  This is known as the "*Cel-Tech* safe harbor."  It applies *only* when another statute "actually 'bar[s]' the action or clearly permit[s] the conduct."  *Id.* at 183.

---

[63]    Intel's reliance on *Gregory* is misplaced for several reasons.  First of all, *Gregory* was not an antitrust case, but instead involved alleged violations of the California Health & Safety Code.  *Gregory*, 104 Cal. App. 4th at 857.  Second, the plaintiff in *Gregory* "was given an opportunity to state an alternative theory under the antitrust laws, which might indeed present a fact-intensive issue, but made no legally cognizable effort to do so."  *Id.*  In this case, by contrast, the complaint is replete with antitrust allegations, which present "fact-intensive issue[s]," as the *Gregory* court acknowledged.   Finally, to the extent Intel is attempting to suggest that California's UCL is merely coextensive with California antitrust law, Intel is simply wrong.  *See Eddins v. Redstone*, 134 Cal. App. 4th 290, 344 (2005) (affirming summary judgment on the plaintiff's antitrust claim, but *reversing* the summary judgment on the plaintiffs' UCL claim, recognizing that the claims are legally distinct and must be separately analyzed).

In other words, to bar a UCL "unfair" conduct, a law must affirmatively *permit* the challenged conduct. It is not enough that no law prohibits it. *See id.* at 182-83 (safe harbor protects "practices which the Legislature has *expressly declared to be lawful* in other legislation" (emphasis added)); *Aron v. U-Haul Co.*, 143 Cal. App. 4th 796, 804 (2006) ("[t]he power to create and define an exception to the UCL is committed to the Legislature. . . . Courts thus may not create 'implied safe harbors.'"); *Krumme v. Mercury Ins. Co.*, 123 Cal. App. 4th 924, 940 n.5 (2004) ("a safe harbor statute must *explicitly prohibit* liability for the defendant's acts or omissions") (emphasis added).

Intel does not argue anywhere in its memorandum that any law *affirmatively authorizes* its alleged misconduct or *explicitly prohibits* UCL liability. All Intel argues is that its conduct is not unlawful because the "antitrust injury" element of the Sherman and Cartwright Acts has not been alleged. In *Cel-Tech*, however, the California Supreme Court expressly rejected the notion that conduct cannot be "unfair" simply because some other law does not prohibit it. It will be up to the trier of fact to determine whether Intel's alleged misconduct is "unfair" as the UCL defines that term. *See McKell*, 142 Cal. App. 4th at 1473 ("[a] business practice is unfair within the meaning of the UCL if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits."). As the California Court of Appeal has observed, the evaluation of an "unfair" prong claim "is fact intensive and is not conducive to resolution at the [pleading] stage.'" *Progressive W. Ins. Co. v. Superior Court*, 135 Cal. App. 4th 263, 287 (2005).

Finally, under the UCL's third prong, the barring of "fraudulent" conduct, the standard is whether the defendant's misconduct is "likely to deceive" consumers. *See, e.g.*, *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992) ("[T]o state a claim under the act one need

not plead and prove the elements of a tort.  Instead, one need only show that 'members of the

public are likely to be deceived.'"); *McKell*, 142 Cal. App. 4th at 1471.[64]   Regardless of whether

Plaintiffs suffered "antitrust injury" (which they did) or whether Intel violated any other specific

law, the complaint adequately alleges conduct that is "likely to deceive" purchasers of Intel's

chips within the meaning of the UCL.

Accordingly, Intel's motion to dismiss plaintiffs' UCL claim should be denied.[65]

## VII.    PLAINTIFFS' COMMON LAW CLAIMS SHOULD NOT BE DISMISSED

### A.    California Recognizes the Common Law Tort of Monopolization

Intel contends that California does not recognize the common law tort of monopolization.

It cites no case law directly on point.  Intel Mem. at 49.  There is, however, contrary case law.

One example is provided by *Natural Gas Anti-Trust Cases I, II, III and IV*, 2003-1 Trade

Cas. (CCH) ¶ 73,959 (Cal. Super. Ct., San Diego Cty., Oct. 16, 2002), where the court refused to

strike a claim alleging the common law tort of monopolization. It reasoned:

> Additionally, the monopolization cause of action is not stricken
> because California courts have recognized that monopolization and
> attempted monopolization are against public policy and prohibited
> at common law.  *Burdell v. Grandi*, 152 Cal. 376 (1907).
> California also recognizes the existence of the common law
> "business tort" of monopolization, separate and apart from
> statutory claims arising under the Cartwright Act.  *Exxon Corp. v.
> Superior Court*, … 51 Cal. App. 4th 1672 (1997).

*Id.* ¶ 95,753.

---

[64]     *Accord People ex rel. Dept. of Motor Vehicles v. Cars 4 Causes*, 139 Cal. App. 4th 1006, 1016 (2006); *Wayne v. Staples, Inc.*, 135 Cal. App. 4th 466, 484 (2006); *Progressive W. Ins. Co. v. Superior Court*, 135 Cal. App. 4th 263, 284 (2005); *Bell v. Blue Cross*, 131 Cal. App. 4th 211, 221 (2005); *Blakemore v. Superior Court*, 129 Cal. App. 4th 36, 41 (2005); *Bernardo v. Planned Parenthood Fed. of Am.*, 115 Cal. App. 4th 322, 355 (2004).

[65]     This result is in accordance with other indirect purchaser federal court decisions rendered after *Cel-Tech* that have permitted UCL claims to go forward.  *See, e.g., Terazosin*, 160 F. Supp.2d at 1379; *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 283 (D. Mass. 2004).

Another example is provided in *Smokeless Tobacco Cases I-IV*, J.C.C.P. Nos. 4250, 4258, 4259 & 4262 (Cal. Super. Ct., San Francisco Cty.), where the trial court also rejected an attempt to dismiss a common law monopolization claim. Further support for such a claim is also found in *In re Cipro Cases I and II*, 121 Cal. App. 4th 402 (2004), where the appellate court upheld a class certification order in a case where common law monopolization was pled. *Id*. at 407, 410.[66]

**B.    Plaintiffs' Unjust Enrichment Claims Are Cognizable**

Plaintiffs' seventh cause of action in the FACC is for unjust enrichment, brought primarily under California law and alternatively under the laws of the various states. Intel attacks this claim on multiple grounds, none of which have merit.

California law.  Intel's first point is that California does not recognize a cause of action for unjust enrichment, citing two decisions by intermediate courts of appeal. Intel's Mem. at 49. However, other decisions by California courts (including one by the California Supreme Court) or by federal courts applying California law have held or implied that a cause of action for unjust enrichment does exist.[67] One recent California federal court decision notes that the cases holding that there is no separate cause of action for unjust enrichment are engaging in "essentially

---

[66]    Intel also asserts that proximate causation is inadequately pled as to this claim. Intel Mem. at 54. The face of the complaint indicates otherwise.  *See* FACC ¶ 257.

[67]    See *Ghirardo v. Antonioli*, 14 Cal. 4th 39, 51-52 (1996) (discussing principles of unjust enrichment and how to plead a cause of action for same); *Hirsch v. Bank of America*, 107 Cal. App. 4th 708, 722 (2003) (finding that plaintiff stated a valid cause of action for unjust enrichment); *First Nationwide Savings v. Perry*, 11 Cal.App.4th 1657, 1660 (1992) (same); *Paracor Finance, Inc. v. General Elec. Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996) ("*Paracor*") (finding that unjust enrichment is an action in quasi-contract under California law); *Western Pac. R. Corp. v. Western Pac. R. Co.*, 206 F.2d 495, 498 (9th Cir.1953), *cert. denied*, 346 U.S. 910 (1953) ("California courts, in common with authorities generally, recognize a cause of action based on unjust enrichment"); *Gerlinger v. Amazon.Com, Inc.*, 311 F. Supp.2d 838, 856 (N.D. Cal. 2004) (same as *Paracor*); *Villager Franchise Sys., Inc. v. Dhami, Dhami & Virk*, 2006 WL 224425, at *7 (E.D. Cal. Jan. 26, 2006) ("California law recognizes a cause of action for unjust enrichment").

semantic arguments" because the cause of action could be understood as one for restitution. *Nordberg v. Trilegiant Corp.*, 445 F. Supp. 2d 1082, 1100 (N.D. Cal. 2006).

      <u>Unjust enrichment and antitrust claims.</u>  Intel's next argument is that Plaintiffs cannot evade limits imposed on antitrust claims by recasting those claims under an unjust enrichment theory.  This argument is faulty.  Courts in numerous antitrust cases have permitted unjust enrichment claims to go forward in addition to, or in lieu of, antitrust claims, recognizing that the former depend on a legal basis that differs from the one underpinning the latter.  *See*, *e.g.*, *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 543-46 (D.N.J. 2004) (court refused to dismiss unjust enrichment claims for 50 states, the District of Columbia, and Puerto Rico); *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 50-51 (D.D.C. 2003) (court refused to dismiss unjust enrichment claims under Minnesota, Massachusetts and Illinois law); *In re Cardizem CD Antitrust Litig.*, 105 F.Supp.2d 618, 668-71 (E.D. Mich. 2000) *cert denied*, 543 U.S. 939 *(*U.S. Oct. 12, 2004) (No. 03-779) (court refused to dismiss unjust enrichment claims brought under the laws of ten states, in addition to antitrust claims); *Fed. Trade Comm'n v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25, 46, 49, 56 & App. (D.D.C. 1999), *on recons.*, 99 F. Supp. 2d 1, 11 (D.D.C. 1999) (court permitted restitution claims based on unjust enrichment to go forward even with respect to states where antitrust claims were dismissed); *D.R. Ward,* 2006 U.S. Dist. LEXIS 61828, at *48 ("plaintiffs may bring independent unjust enrichment claims under Arizona, Tennessee and Vermont law and…the viability of these claims does not hinge upon the success of the state statutory antitrust claims"); *Cox,* 778 N.Y.S. 2d at 149 (unjust

enrichment claim under New York law could go forward in addition to statutory claim for deceptive acts and practices).[68]

Permitting an unjust enrichment claim to be pursued as an alternative to an antitrust claim is entirely permissible. In *Cardizem*, for example, defendants argued that the unjust enrichment claims depended on the allegations supporting the state antitrust claims and suffered from the same flaws that precluded plaintiffs from stating an antitrust claim. The district court responded as follows:

> The first of Defendants' arguments fails to read Plaintiffs' complaint in the light most favorable to Plaintiffs and confuses Plaintiffs' right to recover an equitable remedy under a common law claim based upon principles of unjust enrichment with its right to recover a remedy at law for an alleged violation of a state's antitrust laws. The authority Defendants rely upon fails to support their position that the success of Plaintiffs' common law unjust enrichment claims necessarily depends upon the success of their statutory claims. To the contrary, the courts often award equitable remedies under common law claims for unjust enrichment in circumstances where claims based upon contract or other state law violations prove unsuccessful. *See e.g.*, *Watts v. Watts*, 137 Wis.2d 506, 530, 405 N.W.2d 303, 313 (1987) ("[A] claim of unjust enrichment does not arise out of an agreement entered into by the parties. Rather, an action for recovery based upon unjust enrichment is grounded on the moral principle that one who has received a benefit has a duty to make restitution where retaining such a benefit would be unjust"). *Accord Acton Constr. Co. v. State*, 383 N.W.2d 416, 417 (Minn. App. 1986); *Paschall's Inc. v. Dozier*, 219 Tenn. 45, 57-58, 407 S.W.2d 150, 155-56 (1966).
>
> Rather than allegations and proof of the elements necessary for its antitrust claims, Plaintiffs' common law claims for unjust enrichment depend upon allegations and proof that "'the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.'"

---

[68]    Subsequent to the appellate court opinion, a trial court certified both statutory and unjust enrichment claims. Cox v. Microsoft Corp., No. 105193/2000 2005 WL 3288130, at *6 (N.Y. Misc. July 29, 2005).

105 F. Supp. 2d at 669.[69]

    <u>Effect of completed sales transactions with third parties.</u>  Intel next argues that unjust enrichment cannot apply where, as here, Plaintiffs bought computers from third parties and do not seek to rescind those sales.  Intel Mem. at 51-52.  A similar argument was advanced in *K-Dur*, where it was argued that plaintiffs' receipt of valuable medicine in return for their payments precluded a claim for unjust enrichment.  338 F. Supp. 2d at 545.  The district court responded that "[d]eterminations that depend on evaluating whether a benefit received approximates the value paid are primarily questions of fact, and as such, are not appropriately addressed on a motion to dismiss."  *Id.* at 546.[70]  The opinion by the New York court in *Cox* also supports Plaintiffs' position.  There, consumers bought valuable computers from third parties equipped with the Microsoft operating system, but were nonetheless allowed to raise unjust enrichment claims against Microsoft.

    <u>The "direct benefit" issue.</u>  Intel next argues that there must be a "direct benefit" conferred upon it by the indirect purchaser class members in order to establish a claim for unjust enrichment and that no putative class members can satisfy this requirement.  Intel Mem. at 52-53.

    The first response to this argument is that it should not be resolved on a motion to dismiss. As noted in *In re Canon Cameras*, No. 05 Civ. 7233(JSR), 2006 WL 1751245, at *2

---

[69]    This is not to say that the courts are in complete agreement on this point.  Intel relies primarily on *Terazosin* for a contrary proposition.  Intel Mem. at 50-51.  There, the district court disagreed with the court in *Cardizem*.  *See Terazosin*, 160 F. Supp. 2d at 1380 & n.12.  However, the best authority in this Circuit is *K-Dur*, where the court allowed unjust enrichment claims to proceed under the laws of all 50 states, even though a number of those states obviously do not have statutory provisions allowing indirect purchasers to sue for antitrust violations.  *See also Warfarin Sodium*, 212 F.R.D. at 241, 248 (court certified settlement class with respect to, *inter alia*, claims for unjust enrichment under the laws of 50 states and the District of Columbia).

[70]    Even though the district court in *NMV* reached a different result, it recognized that its opinion was at odds with the decision in *K-Dur*.  *See NMV*, 350 F. Supp. 2d at 210 n.88.

(S.D.N.Y. June 23, 2006), "whether defendant received any benefit from plaintiffs' camera

purchases is a question of fact not properly resolved on a motion to dismiss." The same is true

here.

The argument on direct benefits also is a red herring, as explained by the district court in

*Cardizem*:

> Contrary to Defendants' argument, there is no additional
> requirement that a benefit flow solely from Plaintiffs to
> Defendants. The courts do not define "benefit" as narrowly as
> Defendants urge. As the Alabama Supreme Court observed,
> "[w]henever one person adds to the other's advantage in any form,
> whether by increasing his holdings or saving him from expense or
> loss, he has conferred a benefit upon the other." *Opelika
> Production Credit Ass'n, Inc. v. Lamb*, 361 So.2d 95, 99 (1978)
> (citing Restatement, Restitution, § 1(b); Sullivan, "The Concept of
> Benefit in the Law of Quasi-Contract," 64 Geo. L.J. 1 (1975)).
> Whether or not the benefit is directly conferred on the defendant is
> not the critical inquiry; rather, the plaintiff must show that his
> detriment and the defendant's benefit are related and flow from the
> challenged conduct. *Id*. Defendants' arguments, that the
> connection between Plaintiffs alleged overpayments for Cardizem
> CD and the benefits Defendants obtained as a result of those
> overpayments is too tenuous, raise factual questions and refute
> Defendants' claim that Plaintiffs can prove no set of facts allowing
> it to state a common law claim for unjust enrichment.

105 F. Supp. 2d at 671 (footnote omitted). *Accord*, *e.g.*, *KDur*, 338 F. Supp. 2d at 544-45 (where

the plaintiffs seek to recover improperly inflated costs for drug, directness is not an issue);

*Lorazepam*, 295 F. Supp. 2d at 51 ("[a] plaintiff alleging an unjust enrichment may be seeking to

recover a benefit which he gave directly to the Defendant, *or* one which was transferred to the

Defendant by a third party") (emphasis added); *D.R. Ward*, 2006 U.S. Dist. LEXIS 61828, at *48

(no requirement of passing of direct benefit from plaintiffs to defendant for unjust enrichment

claims under Tennessee, Vermont and Arizona law); *Cox*, 778 N.Y.S.2d at 149 (reversing

dismissal of unjust enrichment claim on the theory that plaintiffs only indirectly bestowed a

benefit on Microsoft; "[c]ontrary to such reasoning, plaintiffs' allegations that Microsoft's

deceptive practices caused them to pay artificially inflated prices for its products state[d] a cause

of action for unjust enrichment"); *see generally* Daniel Karon, "Undoing the Otherwise Perfect

Crime—Applying Unjust Enrichment to Consumer Price-Fixing Claims," 108 W.Va. L. Rev.

395, 421-28 (2005).[71]

    <u>Pleading of proximate cause.</u>  Intel's final point is that Plaintiffs failed to plead proximate

causation of injury, as required by tort law.  Intel Mem. at 53.  However, proximate causation is

not an element of an unjust enrichment claim.  *Allegheny Gen. Hosp. v. Philip Morris, Inc.*,

116 F.Supp.2d 610, 619 (W.D. Pa. 1999), *aff'd*, 228 F.3d 429 (3d Cir. 2000); *Graduate*

*Cardiology Consultants, P.C. v. Vivra, Inc.*, 2000 WL 33711050 at *6 (Pa. Com. Pl. Oct. 20,

2000).  Thus, this objection is misplaced as well.

---

[71]    Intel's contrary authorities are unpersuasive.  As Intel notes, the court in *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 286-87 (D. Mass 2004), did indicate that North Carolina appeared to follow a direct benefit rule.  However, Intel fails to note that this same court also suggested that an unpublished Fourth Circuit decision provided support for a contrary result.  *Id.* at 287 n. 21 (citing *Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 72 Fed. Appx. 916, 920 (4th Cir. 2003)) ; *see also OSB* Order at 5 (permitting unjust enrichment claim by indirect purchasers under North Carolina law to go forward).

    The court in *In re Vitamins Antitrust Litig.*, MDL No. 1285, 2001 WL 849928, at *9 (D.D.C. Apr. 11, 2001), another case cited by Intel, also applied a "direct benefit" test under its view of Tennessee law.  That view is no longer valid, however, after *Freeman Industries L.L.C. v. Eastman Chemical Co.*, 172 S.W 3d 512, 525 (Tenn. 2005), in which the court held that "a plaintiff need not establish that the defendant received a direct benefit from the plaintiff," noting that other jurisdictions adopt a similar view.  *Id.* (citing *Hirsch v. Bank of America*, 107 Cal. App. 4th 708 (2003); *HPI Heath Care Servs., Inc. v. Mount Vernon Hosp., Inc.*, 131 Ill.2d 145, 545 N.E.2d 672 (1989); *State ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142 (Iowa 2001)).

    And the decision of the court in *In re Rezulin Products Liability Litigation*, 392 F.Supp.2d 597, 620 (S.D.N.Y. 2005), also cited by Intel, is flawed.  To the extent it was characterizing New York law, it failed to take into account the ruling in *Cox*.  *See OSB* Order at. 4 (permitting unjust enrichment claim by indirect purchasers under New York law to go forward).  To the extent it was characterizing New Jersey law, it failed to deal with precedents that make no mention of a "direct benefit" in analyzing an unjust enrichment claim.  *See, e.g., Wanaque Borough Sewerage Auth. v. Township of West Milford*, 677 A.2d 747, 753 (N.J. 1996); *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994).

## CONCLUSION

For the foregoing reasons, the Court should deny Intel's motion to dismiss.

Dated:  January 5, 2007

PRICKETT JONES & ELLIOTT, P.A.

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Allyson B. Baker
COHEN, MILSTEIN, HAUSFELD
   & TOLL P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Telephone:  (202) 408-4600

By: *James L. Holzman / Laina M. Herbert*
                             #4717
James L. Holzman (#663)
J. Clayton Athey (#4378)
Laina M. Herbert (#4717)
1310 King Street
P.O. Box 1328
Wilmington, DE  19899
jlholzman@prickett.com
jcathey@prickett.com
lmherbert@prickett.com
Telephone:  (302) 888-6500

*Interim Liaison Counsel for the Class
Plaintiffs*

Michael P. Lehmann
Thomas P. Dove
Alex C. Turan
FURTH LEHMANN & GRANT LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
Telephone:  (415) 433-2070

Steve W. Berman
Anthony D. Shapiro
HAGENS BERMAN SOBOL
   SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone:  (206) 623-7292

Guido Saveri
R. Alexander Saveri
SAVERI & SAVERI, INC.
111 Pine Street, Suite 1700
San Francisco, CA 94111
Telephone:  (415) 217-6810

*Interim Co-Lead Counsel*

## CERTIFICATE OF SERVICE

I, J. Clayton Athey, hereby certify that on this 5th day of January, 2007, I caused the foregoing **Class Plaintiffs' Answering Memorandum in Opposition to Intel's Motion to Dismiss** to be served on the following counsel via electronic filing:

Frederick L. Cottrell, III, Esquire
Chad Michael Shandler, Esquire
Steven J. Fineman, Esquire
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
cottrell@rlf.com
shandler@rlf.com
fineman@rlf.com
*Counsel for AMD International Sales &*
*Service LTD and Advanced Micro Devices,*
*Inc.*

Charles P. Diamond, Esquire
Mark A. Samuels, Esquire
Linda J. Smith, Esquire
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
CDiamond@omm.com
MSamuels@omm.com
lsmith@omm.com
*Counsel for AMD International Sales &*
*Service LTD and Advanced Micro Devices,*
*Inc.*

Adam L. Balick, Esquire
Bifferato Gentilotti Biden & Balick
711 North King Street
Wilmington, DE 19801-3503
abalick@bgbblaw.com
*Counsel for AMD International Sales &*
*Service LTD and Advanced Micro Devices,*
*Inc.*

Laurin Grollman, Esquire
Salem M. Katsh, Esquire
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019
lgrollman@kasowitz.com
skatsh@kasowitz.com
*Counsel for AMD International Sales &*
*Service LTD and Advanced Micro Devices,*
*Inc.*

Richard L. Horwitz, Esquire
W. Harding Drane, Jr., Esquire
Potter Anderson & Corroon, LLP
1313 N. Market St., Hercules Plaza, 6th Flr.
P.O. Box 951
Wilmington, DE 19899-0951
rhorwitz@potteranderson.com
wdrane@potteranderson.com
*Counsel for Intel Corporation and Intel*
*Kabushiki Kaisha*

David Mark Balabanian, Esquire
Joy K. Fuyuno, Esquire
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA 94111-4067
david.balabanian@bingham.com
joy.fuyuno@bingham.com
*Counsel for Intel Corporation*

Christopher B. Hockett, Esquire
Bingham McCutchen LLP
Three Embarcadero Center
San Francisco, CA 94111
chris.hockett@bingham.com
*Counsel for Intel Corporation*

Darren B. Bernhard, Esquire
Peter E. Moll, Esquire
Howrey LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004
Bernhardd@howrey.com
*Counsel for Intel Corporation and Intel
Kabushiki Kaisha*

Daniel S. Floyd, Esquire
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California
90071-3197
dfloyd@gibsondunn.com
*Counsel for Intel Corporation*

B.J. Wade, Esquire
Glassman Edwards Wade & Wyatt, P.C.
26 N. Second Street
Memphis, TN 38103
bwade@gewwlaw.com
*Counsel for Cory Wiles*

Robert E. Cooper, Esquire
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California
90071-3197
rcooper@gibsondunn.com
*Counsel for Intel Corporation*

Nancy L. Fineman, Esquire
Cotchett, Pitre, Simon & McCarthy
840 Malcolm Road, Suite 200
Burlingame, CA 94010
nfineman@cpsmlaw.com
*Counsel for Trotter-Vogel Realty Inc.*

Donald F. Drummond, Esquire
Drummond & Associates
One California Street, Suite 300
San Francisco, CA 94111
ballen@drummondlaw.net
*Counsel for Dressed to Kill Custom Draperies
LLC, Jose Juan, Tracy Kinder and Edward
Rush*

Robert D. Goldberg, Esquire
Biggs and Battaglia
921 North Orange Street, P.O. Box 1489
Wilmington, DE 19899
goldberg@batlaw.com
*Counsel for Charles Dupraz, Vanessa Z.
DeGeorge, Melissa Goeke, Nancy Bjork,
James R. Conley, Jeff Vaught, Jim Kidwell
Richard Caplan, Virginia Deering, Ficor
Acquisition Co. LLC, Tom Hobbs, David
Kurzman, Leslie March, Andrew Marcus,
Paula Nardella, Bill Richards, Maria Pilar
Salgado, Ron Terranova, Nancy Wolft Ryan
James Volden and Carl Yamaguchi*

Donald Chidi Amamgbo, Esquire
Amamgbo & Associates, APC
1940 Embarcadero Cove
Oakland, CA  94606
donaldamamgbo@citycom.com
*Counsel for Athan Uwakwe*

Jeffrey F. Keller, Esquire
Jade Butman, Esquire
Law Offices of Jeffrey F. Keller
425 Second Street, Suite 500
San Francisco, CA  94107
jkeller@jfkellerlaw.com
jbutman@kellergrover.com
*Counsel for David E. Lipton, Maria I. Prohias, Patricia M. Niehaus, Peter Jon Naigow, Ronld Konieczka, Steve J. Hamilton, Susan Baxley and Kevin Stoltz*

Gordon Ball, Esquire
Ball & Scott
550 W. Main Ave., Suite 750
Knoxville, TN  37902
gball@ballandscott.com
*Counsel for Andrew Armbrister and Melissa Armbrister*

Joseph M. Patane, Esquire
Law Offices of Joseph M. Patane
2280 Union Street
San Francisco, CA  94123
jpatane@tatp.com
*Counsel for Karol Juskiewicz and Lawrence Lang*

James Gordon McMillan, III, Esquire
Bouchard Margules & Friedlander
222 Delaware Avenue,
Suite 1400
Wilmington, DE 19801
jmcmillan@bmf-law.com
*Counsel for Raphael Allison and Matthew Kravitz*

Michele C. Jackson, Esquire
Lieff Cabraser Heimann & Bernstein, LLP
Embarcadero Center West, 275 Battery Street, 30th Floor
San Francisco, CA  94111
mjackson@lchb.com
*Counsel for Huston Frazier, Jeanne Cook Frazier and Brian Weiner*

A. Zachary Naylor, Esquire
Robert Kriner, Jr., Esquire
Robert R. Davis, Esquire
James R. Malone, Jr., Esquire
Chimicles & Tikellis, LLP
One Rodney Square, P.O. Box 1035
Wilmington, DE 19899
zacharynaylor@chimicles.com
robertkriner@chimicles.com
robertdavis@chimicles.com
jamesmalone@chimicles.com
*Counsel for Gideon Elliott, Angel Genese, Nir
Goldman, Paul C. Czysz, Elizabeth Bruderle
Baran, Carrol Cowan, Russell Dennis, Damon
DiMarco, Kathy Ann Chapman, Caresse
Harms, JWRE Inc., Leonard Lorenzo, Michael
E. Ludt, John Maita, Chrystal Moeller, Robert
J. Rainwater, Mary Reeder, Stuart Schupler
and Sonia Yaco*

Harry Shulman, Esquire
Robert Mills, Esquire
The Mills Law Firm
145 Marina Boulevard
San Rafeal, CA 94901
harry@millslawfirm.com
deepbluesky341@hotmail.com
*Counsel for Stuart Munson*

Ali Oromchian, Esquire
Finkelstein, Thompson & Loughran
601 Montgomery Street, Suite 665
San Francisco, CA 94111
ao@ftllaw.com
*Counsel for Ian Walker, Damon DiMarco,
Carrol Cowan, Leonard Lorenzo and Russell
Dennis*

Douglas A. Millen, Esquire
Steven A. Kanner, Esquire
Much Shelist Freed Denenberg Ament &
Rubenstein, P.C.
191 North Wacker Drive, Suite 1800
Chicago, IL 60606
dmillen@muchshelist.com
skanner@muchshelist.com
*Counsel for HP Consulting Services Inc. and
Phillip Boeding*

Vincent J. Esades, Esquire
Muria J. Kruger, Esquire
Marguerite E. O'Brien, Esquire
Heins Mills & Olson, P.L.C.
3550 I.D.S. Center
80 S. Eight Street
Minneapolis, MN 55402
vesades@heinsmills.com
mkruger@heinsmills.com
mobrien@heinsmills.com
*Counsel for Bergerson & Associates Inc.*

Garrett D. Blanchfield, Jr., Esquire
Mark Reinhardt, Esquire
Reinhardt Wendorf & Blanchfield
332 Minnesota Street, Suite E-1250
St. Paul, MN 55101
g.blanchfield@rwblawfirm.com
mreinhardt@comcast.net
*Counsel for Susan Baxley*

Hollis L. Salzman, Esquire
Kellie Safar, Esquire
Goodking Labaton Rudoff & Sucharow, LLP
100 Park Avenue
New York, NY 10017
hsalzman@labaton.com
ksafar@labaton.com
*Counsel for Angel Genese, Gideon Elliott and Nir Goldman*

R. Bruce McNew, Esquire
Taylor & McNew, LLP
3711 Kennett Pike, Suite 210
Greenville, DE 19807
mcnew@taylormcnew.com
*Counsel for Robert Marshall*

Jason S. Kilene, Esquire
Daniel E. Gustafson, Esquire
Gustafson Gluek PLLC
650 Northstar East, 608 Second Avenue South
Minneapolis, MN 55402
jkilene@gustafsongluek.com
dgustafson@gustafsongluek.com
*Counsel for Fiarmont Orthopedics & Sports Medicine PA*

Ian Otto, Esquire
Nathan Cihlar, Esquire
Straus & Boies, LLP
4041 University Drive, 5th Floor
Fairfax, VA 22030
dboies@straus-boies.com
*Counsel for Dressed to Kill Custom Draperies LLC, Jose Juan, Edward Rush and Tracy Kinder*

Lance A. Harke, Esquire
Harke & Clasby
155 S. Miami Avenue
Miami, FL 33130
lharke@harkeclasby.com
*Counsel for Nathaniel Schwartz and Maria I. Prohias*

Allan Steyer, Esquire
Steyer Lowenthal Boodrookas Alvarez & Smith LLP
One California Street, Third Floor
San Francisco, CA 94111
asteyer@steyerlaw.com
*Counsel for Cheryl Glick-Salpeter, Jay Salpeter, Jodi Salpeter and Michael H. Roach*

Bruce J. Wecker, Esquire
Hosie McArthur LLP
One Market Street
Spear Street Tower #2200
San Francisco, CA 94105
bwecker@hosielaw.com
*Counsel for Dwight E. Dickerson*

Mario Nunzio Alioto, Esquire
Trump Alioto Trump & Prescott LLP
2280 Union Street
San Francisco, CA 94123
malioto@tatp.com
*Counsel for Karol Juskiewicz and Lawrence Lang*

Francis O. Scarpulla, Esquire
Law Offices of Francis O. Scarpulla
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
foslaw@pacbell.net
*Counsel for Lazio Family Products, Law Offices of Laurel Stanley, William F. Cronin, Michael Brauch and Andrew Meimes*

Steven A. Asher, Esquire
Robert S. Kitchenoff, Esquire
Weinstein Kitchenoff & Asher, LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
asher@wka-law.com kithenoff@wka-law.com
*Counsel for Joseph Samuel Cone*

Francis A. Bottini, Jr., Esquire
Wolf Haldenstein Adler Freeman & Herz
750 B Street, Suite2770
San Diego, CA  92101
bottini@whafh.com
*Counsel for Ryan James Volden, Ficor Acquisition Co LLC, Giacobbe-Fritz Fine Art LLC, Andrew Marcus, Bill Richards, Carl Yamaguchi, Charles Dupraz, David Kurzman, James R. Conley, Jeff Vaught, John Matia, Kathy Ann Chapman, Caresse Harms, JWRE Inc., Jim Kidwell, John Maita, Leslie March, Maria Pilar Salgado, Melissa Goeke, Nancy Bjork, Nancy Wolfe, Paula Nardella, Richard Caplan, Ron Terranova, Tom Hobbs, Vanessa Z. DeGeorge, Virginia Deering, Chrystal Moeller, Robert J. Rainwater, Mary Reeder and Sonia Yaco*

Fred Taylor Isquith, Esquire
Adam J. Levitt, Esquire
Wolf Haldenstein Adler Freeman & Herz
270 Madison Ave., 11th Floor
New York, NY  10016
isquith@whafh.com
levitt@whafh.com
*Counsel for Ryan James Volden, Ficor Acquisition Co LLC, Giacobbe-Fritz Fine Art LLC, Andrew Marcus, Bill Richards, Carl Yamaguchi, Charles Dupraz, David Kurzman, James R. Conley, Jeff Vaught, John Matia, Kathy Ann Chapman, Caresse Harms, JWRE Inc., Jim Kidwell, John Maita, Leslie March, Maria Pilar Salgado, Melissa Goeke, Nancy Bjork, Nancy Wolfe, Paula Nardella, Richard Caplan, Ron Terranova, Tom Hobbs, Vanessa Z. DeGeorge, Virginia Deering, Chrystal Moeller, Robert J. Rainwater, Mary Reeder and Sonia Yaco*

Edward A. Wallace, Esquire
The Wexler Firm LLP
One N. LaSalle Street, Suite 2000
Chicago, IL  60602
eawallace@wexlerfirm.com
*Counsel for Peter Jon Naigow*

Jeffrey S. Goddess, Esquire
Rosenthal, Monhait, Gross & Goddess
Mellon Bank Center, Suite 1401
P.O. Box 1070
Wilmington, DE 19899
jgoddess@rmgglaw.com
*Counsel for Ludy A. Chacon, Joseph Samuel Cone, Darice Russ and Michael K. Simon*

Jason S. Hartley, Esquire
Ross, Dixon & Bell LLP
550 West B Street, Suite 400
San Diego, CA  92101
jhartley@rdblaw.com
*Counsel for Gabriella Herroeder-Perras*

Craig C. Corbitt, Esquire
Zelle, Hofmann, Voelbel, Mason & Gette LLP
44 Montgomery Street, Suite 3400
San Francisco, CA  94104
ccorbitt@zelle.com
*Counsel for William F. Cronin, Law Offices of Laurel Stanley and Lazio Family Products*

Eugene A. Spector, Esquire
William G. Caldes, Esquire
Spector Roseman & Kodroff, P.C.
Suite 2500
1818 Market Street
Philadelphia, PA 19103
espector@srk-law.com
bcaldes@srk-law.com
*Counsel for David Arnold, Andrew S. Cohn, Jason Craig, Maria Griffin, Lena K. Manyin, Paul Ramos and Michael Ruccolo*

Scott E. Chambers, Esquire
Schmittinger & Rodriguez, P.A.
414 S. State Street
P.O. Box 497
Dover, DE 19903
*Counsel for David Arnold, Andrew S. Cohn, Jason Craig, Maria Griffin, Lena K. Manyin, Paul Ramos and Michael Ruccolo*

Juden Justice Reed, Esquire
Schubert & Reed LLP
Two Embarcadero Center, Suite 1600
San Francisco, CA 94111
jreed@schubert-reed.com
*Counsel for Patrick J. Hewson*

Natalie Finkelman Bennett, Esquire
Shepherd, Finkelman, Miller & Shah
65 Main Street
Chester, CT 06412-1311
nfinkelman@classactioncounsel.com
*Counsel for Ludy A. Chacon*

Russell M. Aoki, Esquire
Aoki Sakamoto Grant LLP
One Convention Place
701 Pike Street, Suite 1525
Seattle, WA 98101
russ@aoki-sakamoto.com
*Counsel for Kevin Stoltz*

Michael L. Kirby, Esquire
Kirby Noonan Lance & Hoge LLP
One America Plaza
600 West Broadway, Suite 1100
San Diego, CA 92101
mkirby@knlh.com
*Counsel for Justin Suarez*

Richard A. Ripley, Esquire
Bingham McCutchen
1120 20th Street, NW, Suite 800
Washington, DC 20036
richard.ripley@bingham.com
*Counsel for Intel Corporation*

Jeffrey A. Bartos, Esquire
Guerrieri, Edmond, Clayman & Bartos, PC
1625 Massachusetts Avenue, NW
Washington, DC 20036
jbartos@geclaw.com
*Counsel for Jose Juan, Dressed to Kill Custom Draperies, LLC, Tracy Kinder and Edward Rush*

Donald L. Perelman, Esquire
Fine Kaplan & Black, RPC
1835 Market Street, 28th Flr
Philadelphia, PA 19103
dperelman@finekaplan.com
*Counsel for Kevin Stoltz*

Randy R. Renick, Esquire
Law Offices of Randy Renick
128 North Fair Oaks Avenue, Suite 204
Pasadena, CA 91103
rrr@renicklaw.com
*Counsel for Shanghai 1930 Restaurant Partners L.P. and Major League Softball Inc.*

Daniel Hume, Esquire
Kirby McInerney & Squire LLP
830 Third Avenue, 10th Floor
New York, NY 10022
dhume@kmslaw.com
*Counsel for Raphael Allison and Matthew Kravitz*

Scott Ames, Esquire
Serratore & Ames
9595 Wilshire Blvd., Suite 201
Los Angeles, CA 90212
scott@serratoreames.com
*Counsel for Major League Softball, Inc.*

Douglas G. Thompson, Jr., Esquire
Finkelstein, Thompson & Loughran
1050 30th Street N.W.
Washington, DC 20007
dgt@ftllaw.com
*Counsel for Ian Walker, Damon DiMarco, Carrol Cowan, Leonard Lorenzo and Russell Dennis*

Reginald Von Terrell, Esquire
The Terrell Law Group
223 25th Street
Richmond, CA 94804
REGGIET2@aol.com
*Counsel for Athan Uwakwe*

Daniel B. Allanoff, Esquire
Steven Greenfogel, Esquire
Meredith Cohen Greenfogel & Skirnick, P.C.
22nd Floor, Architects Building
117 S. 17th Street
Philadelphia, PA 19103
dallanoff@mcgslaw.com
sgreenfogel@mcgslaw.com
*Counsel for Benjamin Allanoff*

Harvey W. Gurland, Jr., Esquire
Duane Morris
200 S. Biscayne Blvd., Suite 3400
Miami, FL 33131
HWGurland@duanemorris.com
*Counsel for Intel Corporation*

Barbara C. Frankland, Esquire
Rex A. Sharp, Esquire
Gunderson Sharp & Walke, L.L.P.
4121 W. 83rd St., Ste. 256
Prairie Village, KS 66208
bfrankland@midwest-law.com
rsharp@midwest-law.com
*Counsel for Marvin D. Chance, Jr.*

VIA U.S. MAIL
Clerk Michael J. Beck
Clerk, MDL Judicial Panel
One Columbus Circle, N.E.
Room G-255, Federal Judiciary Bldg.
Washington, DC 20002-8004
*Pro Se*

J. Clayton Athey (Bar ID #4378)