

LEXSEE 2006 US DIST LEXIS 12845

Analysis
As of: Jan 05, 2007

**Applied Medical Resources Corp. v. Ethicon Inc. et al.**

**Case No. SACV 03-1329-JVS(MLGx)**

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

*2006 U.S. Dist. LEXIS 12845; 2006-1 Trade Cas. (CCH) P75,202*

**February 2, 2006, Decided**
**February 2, 2006, Filed**

**PRIOR HISTORY:** *Applied Med. Res. Corp. v. Ethicon, Inc., 2005 U.S. Dist. LEXIS 41199 (C.D. Cal., May 23, 2005)*

**COUNSEL:** [*1] For Applied Medical Resources Corp, a California corporation, Plaintiff: David C Marcus, David H Orozco, Jason P Fulton, Joseph S Grinstein, Stephen D Susman, Susman Godfrey, Los Angeles, CA.

For -- Johnson & Johnson Inc, a New Jersey Corporation, Defendant: Michelle Beth Goodman, Thomas P Hanrahan, Sidley Austin, Los Angeles, CA.

For Ethicon Inc, a New Jersey Corporation, Ethicon Endo-Surgery Inc, an Ohio Corporation, Johnson & Johnson Health Care Systems Inc, a New Jersey Corporation, Defendants: David C Giardina, John W Treece, Sidley Austin, Chicago, IL; James Quinn, Scott Martin, Weil Gotshal and Manges, New York, NY; Michelle Beth Goodman, Thomas P Hanrahan, Sidley Austin, Los Angeles, CA.

For Novation L L C, a Delaware Corporation, Defendant: Bruce A Blefeld, Vinson and Elkins, Houston, TX; Gerald E Hawxhurst, Quinn Emanuel Urquhart Oliver and Hedges, Los Angeles, CA; Robert C Walters, William D Sims, Jr, Vinson and Elkins, Dallas, TX.

**JUDGES:** Honorable James V. Selna, Judge.

**OPINION BY:** James V. Selna

**OPINION:**

CIVIL MINUTES -- GENERAL

**Proceedings:** (In Chambers) Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment (Fld 7-1-05) [*2]

This is an antitrust action brought by Applied Medical Resources Corp. ("Applied") challenging marketing practices employed by Ethicon, Inc., Ethicon Endo-Surgery, Inc., and Johnson & Johnson Health Care Systems, Inc. (collectively "J & J") in the sale of trocars, other endo products, and sutures. Applied alleges violations of *Section 1 of the Sherman Act*, the monopolization and attempted monopolization provisions of *Section 2* of the Sherman Act, and the exclusive dealing provisions of *Section 3 of the Clayton Act*. *15 U.S.C. § § 1, 2, 14*. At the core of the dispute is whether J & J may lawfully sell its products in multi-product offerings, or "bundles."

J & J moves for summary judgment on the complaint as a whole and on each of the individual claims. First, J & J asserts that each of the claims must fail because there has been no harm to competition. Second, J & J asserts that its bundling practices do not fall within any of the well-recognized exclusionary or predatory practices under *Section 2 of the Sherman Act*, and that the Court should be wary of creating new and allegedly amorphous categories of proscribed conduct. Third, J & J asserts that the *Section 1* [*3] claim must fail if its practices are not exclusionary under *Section 2*. Finally, J & J asserts that the exclusive dealing claim under *Section 3 of the Clayton Act* must fail because its bundled offerings

Case 1:05-cv-00485-JJF    Document 272-3    Filed 01/05/2007    Page 3 of 44

Page 2

2006 U.S. Dist. LEXIS 12845, *; 2006-1 Trade Cas. (CCH) P75,202

are predicated on percentage purchase requirements, and are not exclusive. n1

> n1 To the extent that Applied's claims focus on sole source contracts with group purchasing organizations ("GPOs"), J & J contends that the claims must fail because the contracts are for services, rather than goods, which are outside the scope of *Section 3*.

I. Background.

A. The Parties.

Applied manufactures a line trocars, medical devices placed in the abdomen of a surgery patient to facilitate the entry of medical instruments into the body cavity during minimally invasive surgery. J & J also manufactures trocars, but has a much broader product line. J & J offers other devices, endo devices, used in minimally invasive surgery as well as sutures. For purposes of this Motion, J & J invites the Court to assume that trocars [*4] constitute a relevant market, and that it has monopoly power in the trocar market. (J & J Memorandum, p. 21.) There is also evidence that J & J has a strong position in the market for sutures.

B. The Purchasers.

The principal buyers for endo products and sutures are hospitals. Although any given hospital could purchase its needs directly from Applied, J & J or another supplier, hospital purchases are typically made through buying organizations which aggregate the purchases of member hospitals to secure better prices. These organizations include group purchasing organizations ("GPOs") and integrated delivery networks ("IDNs"). n2 In theory, a hospital could be a member of more than one GPO, and in any event could switch from one organization to another on a relatively frequent basis. However, certain practices of the GPOs tend to build allegiance. Hospitals are offered discounts based on the percentage of its requirements purchased through the organization.

> n2 For simplicity, the Court will refer to both types of organizations as GPOs

[*5]

One aspect of the marketplace for hospital supplies is the use of bundles. GPOs may be offered or solicit suppliers such as J & J and other multi-product companies to provide packages of various products at prices which reflect a discount over the cost of making separate, single-product purchases. The combination of group purchasing power and bundling has the potential to offer member hospitals significant cost savings. Typically, the GPOs enter into yearly or multi-year contracts with suppliers.

C. Historical Market Practices.

At least since the 1990s, J & J and Tyco have been the main competitors in the market place for endo products and sutures. Beginning in the 1990s, J & J and Tyco offered bundled discounts for the combined purchase of endo products and sutures. The structure of the bundles varied in a number of respects. Under the J & J bundled contracts, the discount levels were linked to the percentage of requirements purchased from J & J, with a higher percentage of purchases yielding a higher discount. Typically, the contracts contained a minimum share requirement which had to be met to qualify for any discount at all. n3 Some of the bundled contracts evolved into [*6] "sole source" contracts for some or all of the products in the bundle, in exchange for even deeper discounts. As discussed below, there is conflicting evidence whether the practice of bundling was buyer-driven or imposed by the principal multi-product competitors.

> n3 For example, some contracts required that 80% of a hospital's needs for a product line be purchased from J & J before it would receive any discount

Bundling had an effect on single-product manufacturers who had but one product line to offer. Depending on the nature of a GPO's bundling contract, a single-product manufacturer might simply not be competitive. Where bundling contracts imposed percentage purchase requirements, a single-product manufacturer might be wholly excluded, in the case of a sole-source contract, or be viewed as disfavored because purchases diverted to single-product manufacturer could result in a reduced discount or no discount at all on bundled purchases.

Beginning in the fall of 2003, J & J took steps to mitigate the effects [*7] of its bundled contracts on single-product competitors. In determining threshold percentage discount requirements, J & J carved out purchases from competitors who did not offer a full line of products. For example, a GPO could purchase Applied trocars without jeopardizing it ability to qualify for discounts or achieve the maximum discount level.

II. Legal Standard.

The standards on this motion are familiar ones. Summary judgment is appropriate only where the record,

Case 1:05-cv-00485-JJF    Document 272-3    Filed 01/05/2007    Page 4 of 44

Page 3

2006 U.S. Dist. LEXIS 12845, *; 2006-1 Trade Cas. (CCH) P75,202

read in the light most favorable to the non-moving party, indicates that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; see also *Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. Material facts are those necessary to the proof or defense of a claim, and are determined by referring to substantive law. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. In deciding a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id. at 255.* [*8] The basic analysis governs antitrust claims. *Matsushita Elec. Indus. Co, Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*.

III. Discussion.

   A. Bundling as Lawful, Pro-Competitive Conduct.

   As an overarching proposition, J & J argues that bundling is lawful, pro-competitive conduct. (J & J Memorandum, pp. 9-12.) There is ample evidence in the record that bundled competition in the medical supplies field has produced cost savings. As Judge Easterbrook notes generally, "[C]ompetition for the contract is a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress." *Menasha Corp. v. News America Marketing In-Store Services, Inc. 354 F.3d 661, 663 (7th Cir. 2004)*. The Court agrees, but finds that J & J paints with too broad a brush in pushing for the conclusion that its bundle is lawful as a matter of law.

   The cases which have found bundles lawful turn on particularized facts. For example, in *Ticketmaster Corp. v. Tickets.com, Inc., 2003 U.S. Dist. LEXIS 6484, 2003 WL 21397701 at *6 (C.D. Cal.)*, Ticketmaster secured exclusive contracts with various venues which bundled ticketing services [*9] for all outlets: retail, telephone, and internet. The court found the practice valid because splitting the services would have required Ticketmaster to divulge its trade secrets, and more importantly it would have lost inventory control, "which it believes is essential for it to do business." (Id.) Moreover, its challenger had an opportunity to compete for the bundle, and the purchasers of Ticketmaster services had the economic power to fend for themselves.

   J & J argues in all the cases where bundling has been found unlawful there was no competitive option, n4 and that no case has found bundling unlawful where a competitor offered a similar bundle. Both points are correct. But there is conflicting evidence here as to how the bundling practice came about and continued: There is evidence to support the proposition that it was encouraged by the GPOs; there is evidence that J & J pursued bundling for its own protective purposes. Moreover, there is a question of fact as to the extent to which Tyco acted as a constraining force, particular in its suture offerings. There is at least grist for the factual contention that in view of J & J's admitted market power in the trocar market and [*10] likely market power in the suture market, Tyco is something of a toothless tiger.

      n4 E.q., *LePage's, Inc. v. 3M, 324 F.3d 141, 156-57 (3d. Cir. 2003)*; *SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1065 (3d Cir. 1978)*.

   A more detailed, conventional assessment of Applied's claims should control the result here rather than a sweeping endorsement of head-to-head bundling. That is particularly so where one of the competitors has monopoly power.

   B. Absence of Harm to Competition.

   Virtually no citation is required for the proposition that the antitrust laws are designed to protect competition and not competitors. Here, J & J argues that there is no harm to competition two reasons. First, whatever harm Applied sustains as a result of being foreclosed from potential customers who have entered into bundled contracts with J & J, that level of foreclosure does not affect competition. Second, there is no evidence that any significant competitor has been or is likely to be excluded [*11] from the market as a result of the bundled contracts.

   1. Foreclosure.

   Assuming that a 30% to 40% foreclosure represents a minimum threshold for harm to competition, n5 J & J's position rests on an invitation to accept its expert's analysis of foreclosure rather than Applied's. (J & J Memorandum, p. 13-14.) Unless the Applied's expert analysis is so flawed that it must be disregarded–which the Court does not find to be the case–Applied is entitled to summary judgment to the favorable inferences which can be drawn from its report.

      n5 As an across-the-board assumption, this is dubious given that J & J's authorities are exclusive dealing cases. *Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2, 45-46, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984)*; *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island, 373 F.3d 57, 68 (1st Cir. 2004)*. Moreover, Stop & Shop does not find a bright line, but merely observes that foreclosure of less than 30%-40% is "unlikely to be of concern." (Id.)

Case 1:05-cv-00485-JJF    Document 272-3    Filed 01/05/2007    Page 5 of 44

Page 4

2006 U.S. Dist. LEXIS 12845, *; 2006-1 Trade Cas. (CCH) P75,202

[*12]

The foreclosure argument has much more force if one focuses on the period after J & J initiated its carve outs. After late 2003, GPOs could purchase Applied trocars without penalty. From that point, the bundle no longer had an exclusionary effect. To be sure, there may still be obstacles in terms of customer desire to centralize purchases or other logistical factors which might have hindered access, but those factors cannot be attributed to any unlawful conduct on the part of J & J. The antitrust laws are designed to promote competition on the basis of price and quality, and the after late 2003, Applied had the ability to compete on those key factors where there were contractual carve outs.

In response to J & J's Uncontroverted Facts concerning the carve out, Applied asserts that "J & J's contractual carveout is imprecise, and can threaten hospitals with penalties if they purchase certain levels of Applied products." (Applied's Evidentiary Support, J & J's Uncontroverted Fact No. 154.) The evidence marshaled by Applied does not support the position. The carve outs are straight forward, and literally take purchases from single-product suppliers out of the equation. The provision in [*13] the Novation agreement is typical:

> All market share compliancy . . . will be measured by taking the net dollars of Ethicon products over the net dollar purchases of similar product from full line suppliers. . . . Purchases from other companies that do not manufacture full lines of products will not be counted in the compliancy measurements.

(Orozco Decl., Tab 304, p. NO34669; see also id., Tab 98, JJCA0088968; Tab 105, p. JJCA0110196; Tab 125, p. JJCA0311226.) Through deposition testimony, Applied presents a hypothetical which it contends shows that exercise of the carve out could still penalize a buyer. (Id. Tab 256, Edeburn Depo., pp. 429-32; Tab 293, Taylor Depo., pp. 246-47.) Assume 80% compliance is required, and the customer has split its purchases of $ 100 as follows: $ 80 to J & J and $ 20 to Tyco. The customer is in compliance. Assume that the customer shifted $ 20 from J & J to Applied, and maintained its $ 20 purchase from Tyco. With Applied out of the equation, the base for compliance measurement would be $ 80, and the customer would be slightly out of compliance (80% compliance -- .80 x $ 80 = $ 64). One cannot fault the math, but the potential [*14] loss of discount stems from the customer's choice among full line suppliers, not from a decision to place business with a single-product firm such as Applied. In any event, the foreclosure is purely theoretical and insufficient to create a material issue of fact.

J & J is entitled to summary judgment on these contracts on the ground that there was harm to competition. n6 At oral argument, Applied acquiesced in this ruling, and cited the introduction of carve outs as proof that less restrictive had always been available to J & J.

> n6 Applied notes that not all contracts have carve outs. (Applied's Evidentiary Support, J & J's Uncontroverted Fact No. 155.) Potential liability for those contracts would obviously not be affected.

2. Exclusion of Significant Competitor.

J & J contends that where there is no exclusion of a significant competitor, there can be no harm to competition. (J & J Memorandum, p. 15, citing *Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 394 (7th Cir. 1984).*) [*15] However, Roland and other cases cited by J & J are exclusive dealing cases. n7 J & J cannot support the proposition that all antitrust claims fail where the conduct does not produce the exit of a significant competitor.

> n7 E.g., *Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 329, 81 S. Ct. 623, 5 L. Ed. 2d 580 (1961); Omega Environmental, Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1162 (9th Cir. 1997).*

C. Monopolization and Attempted Monopolization.

The Court agrees in part and disagrees in part with the construct which J & J advances for analyzing Applied's *Section 2* claims. J & J concedes for the purpose of this motion that it has monopoly power in the trocar market. (J & J Memorandum, p. 21.) The Court agrees that conduct which is lawful for a monopolist will always fall short of satisfying a claim for attempted monopolization. *California Computer Products, Inc. v. International Business Machines Corp., 613 F.2d 727, 738 (9th Cir. 1979); Greyhound Computer v. International Business Machines Corp., 559 F.2d 488, 499 (9th Cir. 1977).* [*16] Thus, the Court agrees that on this motion one can collapse the claims for monopolization and attempted monopolization.

The Court disagrees that a claim under *Section 2* can only be established by the specific predatory or exclusionary acts which J & J then proceeds to catalogue.

Case 1:05-cv-00485-JJF   Document 272-3   Filed 01/05/2007   Page 6 of 44

Page 5

2006 U.S. Dist. LEXIS 12845, *; 2006-1 Trade Cas. (CCH) P75,202

Unlawful maintenance of monopoly power may be shown where a firm's conduct "impaired competition in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605, 105 S. Ct. 2847, 86 L. Ed. 2d 467 (1985).* n8 As noted above, otherwise lawful conduct may violate *Section 2* where there are anticompetitive effects. *Image Technical Services. Inc. v, Eastman Kodak Co., 125 F.3d 1195, 1207 (9th Cir. 1997).* For several reasons, the absence of a showing that J & J bundling practices fall within one of the traditional categories of predatory or exclusionary acts is not dispositive. First, anticompetitive conduct can come in many forms, generally driven by the facts of a particular case. *LePage's Inc. v. 3M, 324 F.3d 141, 152 (3d Cir. 2003).* Indeed, if one turned to one of the historically most instructive cases on monopolization, *United States v. Aluminum Co. of America, 148 F.2d 416, 430-31 (2d Cir. 1945),* [*17] the construction of excess aluminum production capacity to deter entry into the market would not fall within any of the categories advanced by J & J, yet Alcoa was found to have monopolized on the basis of just such conduct. (Id.)

n8 Aspen's citation of Areeda & Turner bears directly on what follows in the text:

"Thus, exclusionary' comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." 3 P. Areeda & D. Turner, Antitrust Law 78 (1978).

*Aspen, 472 U.S. at 605 n.32.*

Second, what is dispositive is the overall effect of the conduct. As the Ninth Circuit observed in *City of Anaheim v. Southern California Edison Co., 955 F.2d 1373, 1376 (9th Cir.1992):*

[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect. [*18] At the same time, if all we are shown is a number of perfectly legal acts, it becomes much more difficult to find overall

wrongdoing. Similarly, a finding of some slight wrongdoing in certain areas need not by itself add up to a violation. We are not dealing with a mathematical equation. We are dealing with what has been called the "synergistic effect" of the mixture of the elements.

(Emphasis supplied.) Put another way, an antitrust plaintiff is entitled to full consideration of each element of its proof in light of all the elements.

Even if one assumes that J & J is correct that Applied cannot make out a claim for predatory pricing, n9 tying, or exclusive dealing, the Court finds that Applied has created a material issue of fact as to whether J & J has maintained its monopoly power through unduly restrictive means.

n9 In any event, monopolization does not require predatory pricing. *LePage's, 324 F.3d at 152.*

Applied has advanced evidence which could support findings that the [*19] totality of J& J's conduct was exclusionary. Advanced points to the adverse effects of sole-source contracts and Applied's rapid penetration when J & J initiated carve outs which permitted GPOs to purchase its products. Applied points to the bundling of trocars and sutures. While J & J does not concede market power in sutures, it has a very high market share, and one could find that bundling had the actual and intended effect of leveraging its strong position in sutures to protect its positions in trocars. n10 There is at least some evidence that J & J feared a substantial erosion in its trocar position absent the insulating effect of its suture-trocar bundle. n11 Applied also points to the share-based structure of J & J's discount. n12

n10 Contrary to J & J's assertion, the courts have not dismissed the theory of monopoly leveraging where the leveraging produces actual or potential monopoly power in the leveraged market. *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 415 n.4, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004)* ("To the extent the Court of Appeals dispensed with a requirement that there be a "dangerous probability of success' in monopolizing a second market, it erred"; emphasis supplied; citation omitted); *Alaska Airlines, Inc. v. United Airlines, Inc., 948 F.2d 536, 547 (9th Cir. 1991)* ("a plaintiff cannot

2006 U.S. Dist. LEXIS 12845, *; 2006-1 Trade Cas. (CCH) P75,202

establish a violation of *Section 2* without proving that the defendant used its monopoly power in one market to obtain, or attempt to attain, a monopoly in the downstream, or leveraged, market"; emphasis supplied). J & J arguably has actual or potential market power in both the trocar and suture markets.

[*20]

n11 It is worth noting that trocars and sutures are not complementary products, and there is no inherent reason for offering them together.

n12 There are several reasons for including share-based discount in the analysis. First, as noted in text, Applied is entitled to consideration of all J & J's conduct. Second, J & J has admitted market power. The cases cited for the proposition that a monopolist offering a multi-product bundle may engage in such pricing with impunity are factually wide of the mark. In *Western Parcel Express v. United Parcel Service of America, Inc., 190 F.3d 974, 975 (9th Cir. 1999)*, the district court found that Western had failed to establish market power, and the Ninth Circuit affirmed. The validity of UPS's discount scheme is irrelevant. In *Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1044, (8th Cir. 2000)*, Brunswick had 75% of the stern drive engine market, and offered a share-discount program which the Eighth Circuit found lawful. However, Concord Boat dealt with a single product, and the Eight Circuit found unpersuasive the bundling cases which J & J discusses, such as *LePage's* and *SmithKline*. (*Id. at 1062*.) See note 3, supra.

[*21]

There is also evidence that bundling had an adverse effect on prices n13 and limited market penetration of what Applied asserts were technologically superior trocars. Price and quality are touch stones of the competitive process, and there is evidence that bundling had adverse effects on both. This evidence would satisfy the Ninth Circuit standard for predatory conduct. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014, 1030-31 (9th Cir.)*, cert. denied, *459 U.S. 825, 103 S. Ct. 57, 103 S. Ct. 58, 74 L. Ed. 2d 61 (1982)*.

n13 J & J's contention that bundling produced lower prices begs the issue if the so-called lower prices were higher than would obtain in the absence of bundling.

J & J strongly urges the Court to avoid the creation of new and amorphous categories of monopolization liability. (J & J Memorandum, pp. 32-37; J & J Reply, pp. 11-12.) The argument fails given the broad, fact-intensive nature of a monopolization claims. In any event, J & J's authorities for such a cautious approach arise [*22] in a specific context where caution is warranted. In *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 414, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004)*, the Supreme Court was confronted with the intersection of the antitrust and telecommunications regulations:

> Allegations of violations of [telecommunications statutory] duties are difficult for antitrust courts to evaluate, not only because they are highly technical, but also because they are likely to be extremely numerous, given the incessant, complex, and constantly changing interaction of competitive and incumbent LECs [local exchange carriers] implementing the sharing and interconnection obligations. . . . Judicial oversight under the Sherman Act would seem destined to distort investment and lead to a new layer of interminable litigation, atop the variety of litigation routes already available to and actively pursued by competitive LECs.

(Emphasis supplied.) The same concerns for false positives in a technologically complex, evolving industry and for the difficulty of fashioning and enforcing remedies are not present here. See *id at 414-15*. While the parties have undoubtedly [*23] advanced the technology for endo products and sutures, these industries are far more conventional than telecommunications. Nor is this a case where the conduct is so obviously pro-competitive-straight, single-product price cutting-that the Court should be concerned about the chilling effect of antitrust liability. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp. 509 U.S. 209, 223, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993)*.

Finally, the Court is not creating liability for a monopolist who offers a bundle (J & J Memorandum, p.), but rather simply finds that the monopolist is subject to conventional monopolization analysis on a disputed factual record. The ultimate trier of fact may well side with J & J and its economic experts, but given that there is an alternative economic assessment of J & J's practices, the resolution is for the trier of fact.

Case 1:05-cv-00485-JJF     Document 272-3     Filed 01/05/2007     Page 8 of 44

Page 7

2006 U.S. Dist. LEXIS 12845, *; 2006-1 Trade Cas. (CCH) P75,202

Summary judgment on the *Section 2* claims is denied.

D. Section 1 Claim.

As Applied points out, it does not necessarily follow that conduct which is lawful under *Section 2* is also lawful under *Section 1*. n14 But here the evidence which would establish the use of exclusionary or predatory contractual practices to maintain a monopoly would also raise [*24] an issue of fact as to whether those contracts constituted an unlawful restraint of trade under *Section 1*. See *Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 239 (1st Cir. 1983)*.

N14 If practices challenged under *Section 2* were initiated in the absence of actual or incipient market power, those practices would not necessarily enjoy immunity from a claim that they nevertheless unreasonably restrained trade.

Summary judgment is denied on the *Section 1* claim.

E. Exclusive Dealing.

J & J makes two arguments in urging summary judgment on the *Section 3 Clayton Act* claim for exclusive dealing. First, where bundling contracts do not require purchase of all requirements, they cannot, by definition, involve exclusive dealing. Applied responds that J & J ignores the fact that the cases have recognized the concept of *de facto* exclusivity where the practical effect of the contract is to prevent use of a competing product. *Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 329-30, 81 S. Ct. 623, 5 L. Ed. 2d 580 (1961)*: [*25] *Minnesota Mining & Mfg. Co v. Appleton Papers, Inc., 35 F.Supp.2d 1138, 1144 (D. Minn. 1999); Masimo Corp. v. Tyco Health Care Group. L.P., 2004 U.S. Dist. LEXIS 26916 at *46-47 (C.D. Cal.)*. Here, the fact that J & J made substantial sales outside the bundle and the fact that Applied has admittedly made sales to hospitals with J & J contracts undermines the *de facto* theory. (J & J Facts, PP 172-74.) The admitted facts here distinguish the present case from Masimo. *Masimo Corp., 2004 U.S. Dist. LEXIS 26916 at *47-48*. J & J's is entitled to summary judgment on the contracts with tiered purchasing requirements which allowed purchases outside the contract.

Second, J & J argues where the contracts are exclusive in fact, the GPOs merely provide services not controlled by *Section 3*. Assuming the GPOs only provide services, J & J is correct that an exclusive dealing arrangement with a distributor will not run afoul of *Section 3*. *CDC Technologies, Inc. v. IDEXX Laboratories, Inc., 186 F.3d 74,79 (2d Cir. 1999)*. However, if one accepts Applied's position, there is a viable legal theory: The GPOs do not represent [*26] J & J or any other manufacturer, but rather are conduits for the constructive buyers, their members. The constructive buyer concept is within *Section 3*. *Advanced Health-Care Services, Inc. v. Radford Community Hospital. 910 F.2d 139, 152-53 (4th Cir. 1990)*. However, Applied's theory is factually flawed. While the GPOs right to contract elsewhere may be eliminated, the right of the member to purchase elsewhere is not. If Applied is correct that one should look through the arrangement to the constructive buyer, there is no exclusivity.

J & J is entitled to summary judgment on the Clayton Act claim. At oral argument, Applied acquiesced in the ruling and invited the Court to dismiss the claim with prejudice and a waiver of its right of appeal. The waiver is a matter of record.

IV. Conclusion.

With the exception of the grant of summary judgment with respect to contracts with carve outs and on the Clayton Act claim, the Motion is denied.

Initials of Preparer



**STATE OF VERMONT**
**CHITTENDEN COUNTY**

**SUPERIOR COURT**
**No. 66–05 CnC**





**CHRISTINE F. ARMSTRONG,**
      **Plaintiff**

      **v.**

**BAYER AG, et al,**
        **Defendants**

## OPINION AND ORDER
## DEFENDANTS' MOTION TO
## DISMISS FOR LACK OF STANDING

### Introduction

    The Defendants, Chemtura Corporation (formerly known as Crompton Corporation), Uniroyal Chemical Company, Inc., Zeon Chemicals Inc., Zeon Chemicals L.P. and DSM Copolymer, Inc. (the "Defendants"), have moved to dismiss Christine Armstrong's (the "Plaintiff's") class action complaint under V.R.C.P. 12(b)(6) for lack of standing.

### Summary of issues and decisions

1.    **Standing under the Vermont Consumer Fraud Act.**  The Plaintiff alleges that the Defendants violated the Vermont Consumer Fraud Act (the "VCFA") by fixing the prices of a certain industrial chemical.  Does the Plaintiff, as a purchaser of consumer products which were manufactured using the allegedly price-fixed chemical, have standing to sue the manufacturer of the chemical under the VCFA?

        **Decision:** The Plaintiff has standing to sue under the VCFA as an indirect purchaser of a price-fixed product.

2.    **Plaintiff's Cause of Action for Unjust Enrichment.**  The Plaintiff also claims that the Defendants have been unjustly enriched by the Plaintiff under Vermont common law.  Does the Plaintiff have a cause of action for unjust enrichment?

> **Decision:** The Plaintiff has not stated a cause of action for unjust enrichment because the benefit allegedly conferred on the Defendants by the Plaintiff is not sufficiently direct.

### Facts

The relevant allegations contained in the Plaintiff's complaint follow:

From at least January 1, 1995 through June 30, 2003 (the "Class Period"), the Defendants and their co-conspirators fixed prices for acrylonitrile-butadiene rubber ("NBR").  The Defendants placed NBR into the stream of commerce with the knowledge that it would be used to manufacture consumer products that would be marketed, sold and/or distributed in Vermont.  NBR is used in the manufacture of many commercial and industrial products such as automotive parts, sponges, and footware.  The Plaintiff is a Vermont resident who purchased consumer products that were manufactured using NBR during the Class Period and paid higher prices for them because of NBR price fixing by the Defendants.

### Standard for Rule 12(b)(B) Motions

A motion to dismiss under a Rule 12(b)(6) motion should not be granted "unless it is beyond doubt 'that there exist no facts or circumstances that would entitle the plaintiff to relief.'" Richards v. Town of Norwich, 169 Vt. 44, 48 (1999) (quoting Amiot v. Ames, 166 Vt. 288, 291 (1997)).  The court assumes that all factual allegations pleaded in the complaint are true, accepting as true all reasonable inferences that may be derived from plaintiff's pleadings.  Id. at 49.  A plaintiff must allege facts sufficient to confer standing on the face of the complaint.  Parker v. Town of Milton, 169 Vt. 74, 76 (1998).

2

**A.    The Plaintiff has standing to sue under The Vermont Consumer Fraud Act.**

The VCFA "expressly states that *any* consumer, reinforced by the definition of consumer as 'any person,' who suffers injury may bring an action under the statute against a 'seller, solicitor or *other violator*." Elkins v. Microsoft Corp., 174 Vt. 328, 331 (2002) (quoting 9 V.S.A. § 2461(b)).  The statute is "supported by the express legislative intent…to 'protect the public' against 'unfair or deceptive acts or practices' and to 'encourage fair and honest competition.'" Id. at 331 (quoting 9 V.S.A § 2451).  "In light of this purpose, this Court has repeatedly held that the VCFA is remedial in nature and therefore must be construed liberally so as to furnish all the remedy and all the purposes intended." Id. at 331.  "Of course, liberal construction does not allow [the court] to stretch the language beyond legislative intent." Id. at 331.

1.    Elkins v. Microsoft Corp.: Indirect purchasers have standing under the VCFA.

In Elkins, the Vermont Supreme Court held that indirect purchasers are not barred from suing under the VCFA. Id. at 331.  The VCFA does not require privity between parties and contains no distinction between direct and indirect purchasers. Elkins, 174 Vt. at 331.  Furthermore, the VCFA is properly applied to defendants who are "other violators", a "broad term" which goes beyond sellers or solicitors. Id. at 331.  Therefore, a plaintiff who had purchased a computer which contained price-fixed software had standing to sue the software manufacturer. Elkins involved allegations that Microsoft Corporation had overcharged computer manufacturers for Windows 98.  As a result, the computer manufacturers were forced to raise the prices of the computers on which Windows 98 was pre-installed, which injured the plaintiff when he bought a computer. The Court held that even though the Plaintiff was only an indirect purchaser of the software he was not barred from bringing a VCFA claim against Microsoft.

2.    Fucile v. Visa U.S.A. Inc.: Standing for indirect purchasers is determined by the six-factor test.

Two years later, the Chittenden Superior Court addressed the narrower issue of which indirect purchasers have sustained injuries that are too remote to give them

3

standing to sue under the VCFA. <u>Fucile v. Visa U.S.A. Inc.</u>, 2004 WL 3030037, 2 (Vt. Superior Ct.). In answering this question, the Vermont trial court adopted the six-factor test employed by the U.S. Supreme Court in its consideration of price-fixing complaints under federal law. <u>Id</u>. at 2 (citing <u>Associated Gen. Contractors v. Calif. State Council of Carpenters</u>, 459 U.S. 519 (1983)). Those factors include, (1) whether there is a causal connection between the antitrust violation and the alleged harm; (2) the directness of the injury, considering the chain of causation; (3) whether the violator had an improper motive; (4) whether the plaintiff's injury was of a type that the legislature sought to redress by providing a remedy; (5) whether the alleged damages are too speculative; and (6) whether the nature of the action will keep the scope of complex antitrust trials within judicially manageable limits. <u>Id</u>. at 2.

<u>Fucile</u> involved allegations that Visa and MasterCard conspired to fix prices for financial services offered to merchants, specifically the use of debit cards. As a result of overpaying for these services, the merchants were allegedly forced to raise the prices of the goods they sold, harming Mr. Fucile and similarly situated individuals when they purchased those goods. <u>Id</u>. at 1.

Applying the six-factor test, the court found that Mr. Fucile did not have standing under the VCFA. <u>Id</u>. at 3. Under factors (1) and (2), the causal chain between the wrongdoing and the injury was unreasonably long and indirect. It required a demonstration that the merchants actually passed their costs to the purchasers rather than absorbing them by other means, and that other potential causes of inflated costs, such as supply problems, were not present. Applying factor (3), the court found that the defendant's intent to violate the antitrust laws could be inferred from the allegations. <u>Id</u>. at 3. Under factor (4), the court found that Mr. Fucile's was not an injury that the legislature intended to redress through the VCFA. <u>Id</u>. at 3. Whether or not the plaintiff was injured, "the court cannot reasonably assume that the Legislature intended the Consumer Fraud Act to extend limitlessly...There is, of course, a point beyond which antitrust defendants should not be held responsible for the remote consequences of their actions." <u>Id</u>. at 4 (quoting from Justice Prennan's dissent in <u>Illinois Brick</u>, 431 U.S. at 749 fn. 2 ). Finally, applying factors (5) and (6), the court found that the alleged

damages were highly speculative and would not be manageable by the court. The court would have to determine the degree to which the merchants passed along the costs for each good sold, which would cause the court to venture into the "uncharted territories of sheer guesswork." Id. at 4.

3.    Under Elkins and the six-factor Fucile test, the Plaintiff has standing to sue under the VCFA.

      a.    *There is a sufficiently direct causal chain between the alleged price fixing and the harm to the Plaintiff.*

Under factors (1) and (2) there is a sufficient causal chain between the Defendant's alleged price-fixing and the harm incurred by the Plaintiff. Unlike Fucile, there is no significant gap in the causal chain between the alleged price-fixing and the alleged injury to the Plaintiff. Here, the Defendant's price fixing of NBR allegedly caused their direct customers, industrial rubber manufacturers, to raise the prices of their rubber, which in turn caused subsequent manufacturers and distributors to raise their prices, eventually causing the Plaintiff harm in the form of overly priced consumer goods containing NBR. Although the alleged chain is long, it is much more direct than the chain in Fucile. Specifically, there is no causal jump like the one present in Fucile, where the overcharge for financial services allegedly caused the retailers to raise the prices of their goods. Here, the overpriced NBR flows through the causal chain from the Defendant to the Plaintiff. Like the software in Elkins, the NBR here ends up as an incorporated component of the consumer goods purchased by the Plaintiff. Although the software in Elkins was a distinct and separable product that was incorporated into the computer and the NBR is more of an inseparable ingredient, this distinction does not affect the directness of the causal chain between the overpriced NBR and the overpriced NBR-containing consumer good. The Plaintiff here purchased NBR as an ingredient in consumer goods in the same way that the plaintiff in Elkins purchased Windows 98 as a component of a computer. The Plaintiff here bought NBR in a more direct way than the plaintiff in Fucile. Those plaintiffs did not buy any financial services at all.

b.    *Improper motives of the Defendants can be inferred from the allegations.*

The Plaintiff alleges that the Defendants conspired to fix the price of NBR and actively concealed this conspiracy from the Plaintiff. The Plaintiff also alleges that one of the Defendants has admitted to its guilt in conspiring to violate the anti-trust laws. Complaint ¶ 36. This is sufficient to infer an improper motive from the allegations under factor (3).

c.    *The Plaintiff's alleged injury is of the type that the Vermont Legislature intended to redress under the VCFA.*

Under factor (4), the Plaintiff's injury is the kind that the Vermont Legislature intended to redress with the VCFA. The Vermont Supreme court found that the plaintiff in Elkins was an indirect purchaser of the type that the VCFA was meant to cover. The Plaintiff here (NBR in a manufactured consumer product) is sufficiently similar to the Elkins plaintiff (software in a PC) for the same analysis to apply.

d.    *The Plaintiff's alleged damages are not too speculative and they are not so difficult to determine that they could not be managed by the court.*

Finally, under factors (5) and (6), the alleged damages are not sufficiently speculative to defeat standing. The damages are somewhat speculative. At each stage in the causal chain, it is not certain that the relevant manufacturer or distributor did not absorb some of the costs themselves. Calculating the amount of the NBR overcharge that was actually passed on at each step of the manufacturing process will present some difficulty. However, this problem was presumably present in Elkins, and the damages at issue are not as speculative as those in Fucile. Unlike the merchants in Fucile, it is more probable that the intermediary manufacturers and distributors at issue would incorporate the overcharge into the prices of their goods. And calculating the damages here is not as nebulous an endeavor as in Fucile. At each step of the causal chain, the Plaintiff could simply calculate the percentage of the intermediary's price that was based on the initial overcharge. This calculation was not available to the court in Fucile because the alleged overcharge for the financial services was not as clearly incorporated into the cost of the merchant's retail goods.

6

**B.    The Plaintiff has not stated a cause of action for Unjust Enrichment.**

"The equitable doctrine of unjust enrichment rests upon the principle 'that a man shall not be allowed to enrich himself unjustly at the expense of another.'" Legault v. Legault, 142 Vt. 525, 531 (1983) (quoting Morse v. Kenney, 87 Vt. 445, 449 (1914)). Under the quasi-contract theory of unjust enrichment, the law implies a promise to pay when a party receives a benefit and the retention of that benefit would be inequitable. Brookside Memorials, Inc. v. Barre City, 167 Vt. 558, 559 (1997). With respect to unjust enrichment, the inquiry is whether equity and good conscience demand that the defendant return that which the plaintiff seeks to recover. Id. at 560; Legault, 142 Vt. at 531. Whether there is unjust enrichment may not be determined from a limited inquiry confined to an isolated transaction, but must be a realistic determination based on a broad view of the human setting involved. Legault, 142 Vt. at 531. The elements for a claim of unjust enrichment are: (1) a benefit was conferred on the defendant, (2) the defendant accepted the benefit, and (3) the defendant retained the benefit under such circumstances that it would be inequitable for the defendant not to compensate the plaintiff for its value. See Center v. Mad River Corporation, 151 Vt. 408, 412 (1989); DJ Painting, Inc. v. Baraw Enterprises, Inc., 172 Vt. 239, 242 (2001). Privity between the parties is not required. Beauregard v. Orleans Trust Co., 108 Vt. 42 (1936).

The case at issue raises the following question: How direct of a relationship between the plaintiff and the defendant must be alleged in order to sustain a cause of action for unjust enrichment in Vermont? The Plaintiff argues that it is unnecessary to plead any relationship between the parties because the black letter definition of unjust enrichment lacks a relationship element. Pl.'s Resp. to Def.'s Mot. to Dismiss at 37. The Defendant argues that a relationship between the parties is implicit in the elements of unjust enrichment and is necessary to sustain a claim. Def.'s Reply to Pl.'s Resp. to Def.'s Mot. to Dismiss at 9; Def.'s Mot. to Dismiss at 25. Due to the lack of case law on this subject in Vermont, both parties have cited many court decisions from other jurisdictions. An analysis of Vermont case law shows that the relationship between the parties in this case is too remote to support a claim for unjust enrichment in Vermont.

7

1.    <u>Vermont case law indicates that there needs to be a more direct relationship between the parties than alleged here to support a claim for unjust enrichment.</u>

    a.    *The Vermont Supreme Court has indicated that a direct relationship is required to sustain unjust enrichment.*

In the few instances where the Vermont Supreme Court has come close to addressing this issue, it has indicated that some sort of direct relationship is required between the parties in order to sustain an unjust enrichment claim. For example, in <u>Morrisville Lumber Co., Inc. v. Okcuoglu</u>, the Court dismissed an unjust enrichment claim because there was no direct relationship between the parties. 148 Vt. 180, 183 (1987). In <u>Morrisville Lumber,</u> the defendant-homeowners hired a contractor to build a house. The contractor hired the plaintiff-lumber company to supply lumber for the construction. Subsequently, the contractor was fired. The plaintiff-lumber company found that it could not recover its unpaid balance from the contractor, so it sued the defendants for unjust enrichment. The court found that the defendants were not unjustly enriched because they had already paid the contractor for all of the benefits that they received and should not have to pay twice. In the course of its discussion, the court offered the following:

> "The plaintiff relies on <u>Circus Studios, Ltd. V. Tufo,</u> 145 Vt. 219, 485 A.2d 1261 (1984), to support its unjust enrichment claim. In <u>Circus Studios</u>, this court held the defendants liable on an implied contract theory. <u>Id.</u> at 222, 485 A.2d at 1263. The defendants had accepted and used plaintiff's work product and dealt directly with the party to whom they were liable. In the present case, the defendants neither accepted any materials from, nor dealt directly with, the subcontractor. Testimony indicated that the defendants did not even know with whom their general contractor would be dealing." <u>Morrisville Lumber Co.,</u> 148 Vt. at 183-184.

Although the Court's final decision turned on another issue, the opinion indicates that parties one step away from each other are outside the proper scope of an unjust enrichment claim.

In <u>DJ Painting, Inc. v. Baraw Enterprises, Inc.,</u> 172 Vt. 239 (2001), the Vermont Supreme Court indicated that an unjust enrichment claim cannot be maintained if it would undermine the separate contractual relationships created by the parties. In that case, the defendant-property owner hired a general contractor to make improvements at

the defendant's resort hotel. The general contractor hired the plaintiff-painter. After contributing some painting services, the plaintiff-painter was fired by the general contractor and subsequently brought suit against the defendant for unjust enrichment. Like the court in Morrisville Lumber, the court held that because the owner had already paid the general contractor for its services, it had not retained a benefit and the subcontractor could not sue the owner for unjust enrichment. Id. at 244.

In its discussion, the court indicated that the "ordinary quasi-contract case" is one in which, "one party has performed work for another party without the formality of a contract, the party benefited has accepted the services, and therefore ought to be required to pay for them." Id. at 243. The court makes it clear that unjust enrichment is not to be used to undermine the separate contractual relationships created by the parties which are intended to keep the parties from ever having to deal directly with one another.

> "It can hardly be equitable to impose a contract on the parties that completely undermines the contractual relationships that the parties themselves have created. The point of hiring a general contractor for a construction job is for the general to manage the job and hire the subcontractors. The owner does not deal directly with the subcontractors and is often unaware of the identity of the subcontractors...The owner pays the general contractor, but if the general does not pay the subcontractors, the subcontractors have the statutory lien mechanism to attach money as yet unpaid to the general contractor. That was not the case here, as the general's failure to pay the subcontractor arose out of a dispute over the work, which was fully resolved under the contract between the general and the subcontractor. The contract between the general...and the...plaintiff sufficiently protected the rights of the parties." Id. at 245.

This language indicates that it is inappropriate to use an unjust enrichment theory to impose an obligation on an unrelated party in a contractual scheme designed to prevent the parties from ever having to deal directly with each other.

b.    *There is no reported Vermont Supreme Court case in which an unjust enrichment claim was permitted where the relationship between the parties was as distant the one in this case.*[1]

The cases cited by the Plaintiff do not address the issue of directness and involve disputes between parties who are at most only one step removed from each other.  For example, the Plaintiff cites Brookside Memorials, Inc. v. Barre City, 167 Vt. 558 (1997), for the proposition that there is no relationship element in unjust enrichment.  Pl.'s Resp. to Def.'s Mot. to Dismiss at 37.  That case involved a granite manufacturer suing a municipality for unjust enrichment where the municipality had been overcharging the manufacturer for sewer bills.  The parties clearly had a direct business relationship and the directness of their relationship was not an issue before the court.

Similarly, the plaintiff cites Ray Reilly's Tire Mart, Inc. v. F.P. Elnicki, Inc., 149 Vt. 37 (1987), also for the principle that a direct relationship is not a necessary element of an unjust enrichment claim.  Pl.'s Resp. to Def.'s Mot. to Dismiss at 38.  In that case, the defendant bought a car from a third party.  The third party hired the plaintiff to fix the car's tires and then failed to pay the plaintiff.  The court held that the plaintiff could not recover against the defendant for unjust enrichment because the defendant had already paid for the benefit, namely functioning tires, when he bought the car.  This decision supports the conclusion that a direct relationship is a necessary element of an unjust enrichment claim.

---

[1] It should be noted that another judge in this court reached a different conclusion in the related case of Investors Corp. of Vt. v. Bayer AG, No. S1011-040CnC, slip op. (Vt. Sup. Ct. 2005).  In that case, the court held that a claim for unjust enrichment was properly pled where plaintiff alleged that defendants unfairly restricted trade of ethylene propylene diene monomer ("EPDM"), causing economic harm to plaintiff indirect purchasers.  The court stated that, "The fact that [Plaintiff] did not deal directly with the defendants is not relevant, as long as the elements for unjust enrichment are pleaded." Id. at 6 (Citing In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517, 544-45 (D.N.J. 2004); In re Cardizem CD Antitrust Litig., 105 F. Supp. 2d 618, 670-71 (E.D. Mich. 2000)).  The only Vermont authority cited for this holding was Brookside Memorials, Inc. v. Barre City, 167 Vt. 558 (1997), which for reasons discussed below, is off-point.  The court also did not consider other Vermont authority indicating that unjust enrichment is not appropriate in this type of case.  In addition, as the Defendants point out, that case involved allegations that the EPDM constituted 80% of the end-products purchased by the plaintiff, whereas the allegations in this case do not specify how much NBR was in the end products.  Def.'s Mot. To Dismiss at 24.

10

In this case, the Defendants received a benefit from the makers of consumer goods who overpaid for the NBR, but the Defendants did not receive any benefits from the Plaintiff and any other purchasers of the finished consumer goods. Under the traditional approach to unjust enrichment claims, the makers of the consumer goods could bring unjust enrichment claims against the price-fixing NBR manufacturers, but the buyers of the consumer goods (like the plaintiff here) could not recover from the manufacturers because they had no direct dealings with them.

Every act of price fixing, and indeed every bad economic act, has a ripple effect on the economy. The defendants' immediate purchasers are most obviously affected, but presumably the direct purchasers pass part of the damage on to their customers, who do the same with theirs, and so on. At some point in this causal chain, the link between the initial wrongdoer and the damaged party becomes so tenuous that it would be absurd and inequitable to recognize a cause of action for a recovery. See Fucile, 2004 WL 3030037 at 3 and 4 (discussing the absurd results of an overly inclusive standard for standing under the VCFA). For an example, we can look at the facts of Fucile in which credit card companies fixed the prices of their financial services to merchants, who then allegedly passed the costs on to their retail consumers through the prices of the goods they sold. Without an implicit relationship requirement, the consumers here would have a cause of action for unjust enrichment: they allegedly conferred a benefit on the credit card companies which were unjustly retained. But why stop there? If any of those consumers sold services or goods, their customers would have an equally valid cause of action for unjust enrichment. And creative lawyers may even go farther: if end-users have less disposable income because they were forced to pay more for certain consumer goods, and as a result do not purchase other goods, doesn't that take away an anticipated benefit from other sellers? To avoid a limitless and absurd application, some degree of directness between the parties should be required under unjust enrichment.

Protecting consumers from price fixing is an important policy goal, and if Vermont consumers did not have any other recourse under the law, there would be a good argument that unjust enrichment should be used to protect them. Daniel R. Karon, *Undoing the Otherwise Perfect Crime – Applying Unjust Enrichment to Consumer Price-*

11

*Fixing Claims,* West Virginia L.R., Vol. 108, no. 2 (2005).  However, Vermont does protect consumers from price fixing under the Vermont Consumer Fraud Act. See 9 V.S.A. § 2451 et. seq., and Elkins, 174 Vt. 328 (2002).  Therefore it is not necessary for the courts to effectively legislate a new cause of action for price fixing under the rubric of unjust enrichment.

### Conclusion

The Plaintiff has standing to sue under the VCFA as an indirect purchaser of a price-fixed product.  Under Elkins and the six-part Fucile test, the Plaintiff has sufficiently pleaded injury under the VCFA to survive the motion to dismiss.  The Plaintiff has not stated a cause of action for unjust enrichment because the benefit allegedly conferred on the Defendants by the Plaintiff is not sufficiently direct.  Under the relevant case-law in Vermont, and considering certain policy objectives, the Plaintiff's cannot maintain a cause of action for unjust enrichment in Vermont.

### **ORDER**

For the reasons stated above, the Defendants' Motion to Dismiss the Vermont Consumer Fraud Act claim is DENIED. The Defendants' Motion to Dismiss the Unjust Enrichment claim is GRANTED.

Ben W. Joseph, Presiding Judge
Chittenden Superior Court

**10** October 2006

12



Not Reported in F.Supp.                                                                                          Page 1
Not Reported in F.Supp., 1996 WL 310076 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

Bauer v. Club Med Sales, Inc.N.D.Cal.,1996.Only the Westlaw citation is currently available.
United States District Court, N.D. California.
Margaret E. BAUER, William R. Bauer, Mary Kathleen Bauer, Plaintiffs,
v.
CLUB MED SALES, INC., a Delaware Corporation; Doe Sales Agent; Doe Architect and Does 1 Through 400, Inclusive, Defendants.
**No. C-95-1637 MHP.**

May 22, 1996.

*MEMORANDUM AND ORDER*
PATEL, District Judge.
**\*1** Plaintiffs Margaret E. Bauer, William R. Bauer and Mary Kathleen Bauer brought this action against defendant Club Med Sales, Inc., a Delaware corporation, alleging negligence, dangerous condition and breach of warranty. Currently before the court is the question of whether the laws of Mexico or California govern the determination of liability for defective premises and wrongful death damages.

Having considered the parties' submissions, and for the reasons set forth below, the court finds that under applicable choice of law principles Mexico law governs the issue of liability for defective premises and California law governs the issue of wrongful death damages.

*BACKGROUND*[FN1]

Plaintiffs' decedent Rudolph James Bauer, a California resident, purchased a vacation package for the Club Med del Hotel Club Med Playa Blanca,[FN2] located in La Huerta, Jalisco, Mexico. Mr. Bauer arrived at the Club Med resort late in the afternoon of April 12, 1994. According to defendant, Mr. Bauer was observed consuming alcoholic beverages between at least 8:00 p.m. on April 12, 1994, and the very early morning hours of April 13, 1994 immediately preceding his death. Defendant alleges that Mr. Bauer was seen visibly intoxicated in the discotheque at the Playa Blanca facility and was observed carrying a "liquor bladder" on the discotheque premises.

On April 13, 1994 Mr. Bauer began ascending a staircase leading from the patio outside the discotheque to an elevated area where his lodgings were located. According to plaintiffs, as Mr. Bauer ascended the staircase, he stumbled and tried to recover his balance by grabbing onto a light post. Plaintiffs allege that because the staircase had no handrail or other protection and because the light post was not firmly secured to the wall, Mr. Bauer fell from the top of the staircase approximately six feet to the ground below. Mr. Bauer sustained injuries which resulted in his death on April 13, 1994.

According to defendant, Mr. Bauer was intoxicated and lost his balance near the top of the staircase. Defendant alleges that Mr. Bauer reeled to his right and attempted to grab a lamp post on the edge of the stairwell in order to steady himself; however, due to his intoxication Mr. Bauer was unable to regain his balance and fell over the edge of the stairwell.

Decedent's mother Margaret E. Bauer, a citizen of Florida, his brother William R. Bauer, a citizen of South Carolina, and his sister Mary Kathleen Bauer, a citizen of Virginia, brought this action in Superior Court of the State of California for the County of San Francisco against defendant Club Med Sales alleging negligence, dangerous condition and breach of warranty. Defendant timely removed to this court pursuant to 28 U.S.C. § 1441(b) on the basis of this court's diversity jurisdiction under 28 U.S.C. § 1332.

Plaintiffs' complaint alleges that the staircase was in a dangerous and defective condition and additionally, that the staircase was negligently designed and maintained. The alleged deficiencies include the failure to provide a means of prevention and assistance on the staircase to prevent a fall to the ground below, and the failure to provide adequate lighting to prevent guests from falling over the side.

**\*2** Plaintiffs pray for over $7,000,000 in compensatory damages, and punitive damages.

*LEGAL STANDARD*

In a diversity action, a federal court sitting in California must apply California's choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496 (1941); *Strassberg v. New England Mutual Life Ins. Co.,* 575 F.2d 1262, 1263 (9th Cir. 1978). In *Reich v. Purcell,* 67 Cal. 2d 551 (1967), California abandoned the rule that the controlling law

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 310076 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.)

was the law of the place where the tort occurred. Instead, California adopted the more flexible "governmental interests" analysis. *Id.* at 555-56; *Hurtado v. Superior Court,* 11 Cal. 3d 574, 579-80 (1974).

This choice of law analysis embodies the presumption that California law applies unless the proponent of foreign law can show otherwise. *See Browne v. McDonnell Douglas Corp.,* 504 F. Supp. 514, 517 (N.D. Cal. 1980) ("Under the government interest analysis, California will apply its own law unless it is shown that there is a compelling reason to displace forum law."); *Kasel v. Remington Arms Co.,* 24 Cal. App. 3d 711, 731 (1972).

When a litigant invokes a foreign law, he or she must "demonstrate that the [[[foreign] rule of decision will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it." *Hurtado,* 11 Cal.3d at 581; *Beach Aircraft Corp. v. Superior Court,* 61 Cal. App. 3d 501, 522 (1976). The burden of proving that a foreign jurisdiction's law applies is therefore on the party invoking the foreign rule of decision. *See McGhee v. Arabian American Oil Co.,* 871 F.2d 1412, 1422 (9th Cir. 1989).

California's choice of law analysis involves a three step process. *See Liew v. Official Receiver and Liquidator,* 685 F.2d 1192, 1196 (9th Cir. 1982). This analysis applies separately to each issue within a case in which government interests are implicated because all issues need not be decided by application of the same law. *Browne,* 504 F. Supp. at 517 (citing *Beach Aircraft Corp. v. Superior Court,* 61 Cal. App. 3d 501 (1976)).

In the first step of the analysis, the court must determine whether the substantive laws of California and the foreign jurisdiction differ on the issue before it. *Id.*

Second, if the laws do differ, then the court must determine what interests, if any, the competing jurisdictions have in the application of their respective laws. *Id.; Hurtado,* 11 Cal. 3d at 581 (the forum court determines "whether either or both states have an interest in applying their policy to the case") (quoting Herma Hill Kay, *Comments on Reich v. Purcell,* 15 U.C.L.A. L. Rev. 584, 585 (1968)). To determine what interest a jurisdiction has in the application of its law, the forum court examines the particular law and asks whether those policies will be served by applying that law in the action before the

forum. *Hurtado,* 11 Cal. 3d at 581.

**\*3** When only *one* of the jurisdictions has an interest in the application of its law, then there is only a "false conflict" and the law of that jurisdiction applies. *Liew,* 685 F.2d at 1196; *Hurtado,* 11 Cal. 3d at 580; *Hernandez v. Burger,* 102 Cal. App. 3d 795, 799 (1980). Because of California's presumption in favor of applying forum law, when *neither* jurisdiction has an interest in the application of its rule of law, California applies its own law. *See Hurtado,* 11 Cal. 3d at 581 ("even in cases involving foreign elements, the court should be expected, as a matter of course, to apply the rule of decision found in the law of the forum") (citations omitted). In such cases, known as "unprovided" cases, "neither law would serve the purposes behind that law [and the forum applies] its own law for the sake of convenience." Gregory E. Smith, *Choice of Law in the United States,* 38 Hastings L.J. 1041, 1047 (1987); *see also* Herma Hill Kay, *The Use of Comparative Impairment to Resolve True Conflicts: An Evaluation of the California Experience,* 68 Cal. L. Rev. 577, 611-12 (1980).

It is only when *both* jurisdictions have a policy interest in the application of their laws that a "true conflict" exists. *See Liew,* 685 F.2d at 1196. California courts then proceed to the third step in California's governmental interest analysis known as the "comparative impairment" test. *Id.* At this stage a court must determine which jurisdiction's interest would be most impaired if its policies were subordinated to those of the other jurisdiction. *Id.; see also Offshore Rental Co. v. Continental Oil Co.,* 22 Cal. 3d 157, 161 (1978); *Bernhard v. Harrah's Club,* 16 Cal. 3d 313, 320 (1976), *cert. denied,* 429 U.S. 859 (1976).

*DISCUSSION*[FN3]

I. *Liability for Defective Premises*

A. *Different Rules for Liability for Defective Premises*

The first step in California's conflict of laws analysis is to determine whether the substantive laws of California (the place of the decedent's residence and domicile, and the forum) and Mexico (the place where the wrong occurred) actually differ. The fact that two states or governments are involved does not

Not Reported in F.Supp.                                                                    Page 3
Not Reported in F.Supp., 1996 WL 310076 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

necessarily lead to the conclusion that there is a conflict giving rise to a choice of law problem. If the laws of the two states or governments are identical and no actual conflict of laws exists, then the analysis ends there. See *Hurtado,* 11 Cal. 3d at 580.

With regard to plaintiffs' cause of action alleging dangerous condition, defendant contends that Mexico and California have differing laws governing construction practices. Defendant asserts that the stairwell at the Playa Blanca resort met applicable building codes for Mexico and in particular, for the state of Jalisco where the resort is located. Defendant contends that under Mexico law no restraining handrail was required at the point were Mr. Bauer fell over the stairwell. In comparison, defendant submits that California law may require the construction of a handrail which, arguably, may have prevented Mr. Bauer from falling.

**\*4** Neither party submits any evidence from which this court can take judicial notice or otherwise determine what the law of Mexico is with respect to liability for defective premises. Plaintiff does not quarrel with defendant's articulation of Mexico's law. For the purpose of this motion the court assumes that California and Mexico law differ on this issue and addresses the rest of the analysis.

### B. *Governmental Interests*

Assuming that an actual conflict of laws exists, the next question under California's choice of law analysis is whether Mexico has any policy interest that may justify applying its law governing defective premises liability rather than California law. See *Hurtado,* 11 Cal. 3d at 581. Defendant submits that Mexico clearly has such an interest.

Defendant argues that the government of Mexico has set its own policy by virtue of its building code standards and safety allowances with regard to stairwells, and that this is a sovereign decision which "should not and cannot be" interfered with by the State of California, even in light of the fact that many California residents travel to Mexico for leisure.

At the same time, however, defendant recognizes the interests of the State of California in applying its own building code standards in order to protect California citizens travelling abroad.

### C. *Mexico Law Applies Under Comparative*

### *Impairment Test*

Because both California and Mexico have a policy interest in the application of their laws governing defective premises, a true conflict exists. See *Liew,* 685 F.2d at 1196. Accordingly, the court proceeds to the third step in the analysis--the comparative impairment test. *Id.* Under the comparative impairment test, the court must determine which jurisdiction's interest would be most impaired if its policies were subordinated to those of the other jurisdiction. *Id.* This analysis, however, is very different from a "weighing process." *Bernhard,* 16 Cal. 3d at 320 (citations omitted). The court does not weigh the conflicting interests, but instead, attempts to determine the "appropriate scope of conflicting state policies." *Id.* at 320-21.

Defendant submits that because Mexico is sufficiently able to enforce its own building codes and construction practice regulations within its borders, Mexico's sovereignty interest would be severely impaired if its standards were subordinated to the interests of the State of California. Defendant further argues that applying California laws to construction practices and building codes in this instance is unduly harsh and is "tantamount to a court ordered adoption of a universal building code with no variance from state to state or country to country."

Although California has a cognizable interest in the application of its own stringent building and construction standards in order to protect its citizens travelling abroad, this court agrees with defendant that California's interests are subordinate to Mexico's sovereignty interest in enforcing its own construction standards within its borders. Because Mexico's interest would be most impaired if its building and construction regulations were subordinated, this court finds that Mexico law should govern the issue of defective premises liability.

### II. *WRONGFUL DEATH DAMAGES*

#### A. *Different Rules for Wrongful Death Damages*

**\*5** The parties agree that a significant difference exists between the laws of California and Mexico governing the recovery of damages for wrongful death. California law allows recovery without limitation for all damages proximately caused by a tort, Cal. Civ. Code § 3333, as well as for punitive damages. Cal. Civ. Code § 3294. The law of Mexico

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 310076 (N.D.Cal.)
(Cite as: Not Reported in F.Supp.)

Page 4

prescribes a maximum recovery limit for wrongful death. *See Hernandez,* 102 Cal. App. 3d at 797-99 ("The law of Mexico limits recovery to the amount of the injured party's medical and rehabilitative expenses and lost wages at the minimum wage rate.") (citing Civ. Code of the State of Baja California (Norte), art. 1793; Ley Federal del Trabajo, arts. 487, 491 and 495); *see also Hurtado,* 11 Cal. 3d at 578-79 (calculating the maximum amount recoverable under Mexican law).

### B. *Governmental Interests*

Because the substantive laws of Mexico and California differ on the amount of recovery allowed for wrongful death, the next question is what interests, if any, Mexico and California have in the application of their respective laws. *See Hurtado,* 11 Cal. 3d at 580-81.

Plaintiffs contend that Mexico has no interest in applying its wrongful death statute restricting damages and therefore a "false conflict" exists. Accordingly, plaintiffs assert that California law should control. In response, defendant submits that Mexico has a legitimate interest in the application of its statute because the accident giving rise to plaintiffs' wrongful death action occurred in Mexico and because Mexico has an interest in promoting tourism within its borders.

California courts employing governmental interests analysis to determine whether a foreign jurisdiction's stricter recovery rules should apply over California's more liberal rule have held (with one exception) that a jurisdiction's only interest in having its damages limitation rules applied is to protect its *resident* defendants from excessive financial burdens or from exaggerated claims. *See e.g., Hurtado,* 11 Cal. 3d at 580-81 ("The interest of a state in a tort rule limiting damages for wrongful death is to protect defendants from excessive financial burdens or exaggerated claims."); *Reich v. Purcell,* 67 Cal. 2d 551, 556 (1967) ("Defendant's liability should not be limited when no party to the action is from a state limiting liability and when defendant, therefore, would have secured insurance, if any, without any such limit in mind."). The interest in protecting defendants from excessive damages has been described by the California Supreme Court as "primarily local." *Id.* at 556.

The exception to this trend is the Fourth District Court of Appeal's decision in *Hernandez v. Burger,* 102 Cal. App. 3d 795 (1980), upon which defendants rely in support of their argument. In *Hernandez,* the court considered California resident defendants' argument that a Mexican limitation of damages rule should apply in a personal injury action brought against them by a Mexican plaintiff for an injury sustained when defendants' vehicle struck the plaintiff in Mexico. The court held that Mexico had an interest in applying its damages limitation to non-residents; that California had absolutely no interest in applying its more liberal recovery rules to an accident that occurred outside of California; and that, accordingly, the Mexican rule should apply. *Id.* at 804.

*6 Although defendant urges this court to ignore the weight of authority and extend the holding of *Hernandez* to the case at bar, the facts of *Hernandez* are distinguishable from the facts in the present case. Moreover, it has been noted that the holding of *Hernandez* is of "dubious authority." *Marsh v. Burrell,* 805 F. Supp. 1493, 1499 (N.D. Cal. 1992).

The plaintiff in *Hernandez* was a foreign national allegedly injured by California residents in a foreign country; in this case, neither plaintiffs nor defendant are foreign nationals. Plaintiffs are residents of Florida, South Carolina and Virginia. Plaintiffs' decedent, Mr. Bauer, was a California resident. Defendant Club Med Sales is incorporated in Delaware and has its principal place of business in New York. The only factual similarity between *Hernandez* and the instant case is the fact that the acts giving rise to the action occurred in a foreign country.

The cases are additionally distinguishable because in *Hernandez* the Court of Appeal specifically took judicial notice of the fact that tourism from the United States is the major industry in the Mexican province of Baja California. *Hernandez,* 102 Cal. App. 3d at 802. The court then concluded that "[f]ostering tourism in Baja California is ... a legitimate interest of Mexico and the application of Mexico's limited damages law to nonresident motorists might well advance that interest." *Id.* The *Hernandez* court identified no other rationale for its departure from previous California Supreme Court decisions holding that a jurisdiction's only policy interest in limiting damages is to protect its residents from excessive financial burden.

In the spirit of *Hernandez,* Club Med Sales contends that Mexico's interest in fostering tourism justifies the application of Mexico's statute limiting recovery for

Not Reported in F.Supp.                                                    Page 5
Not Reported in F.Supp., 1996 WL 310076 (N.D.Cal.)
**(Cite as: Not Reported in F.Supp.)**

wrongful death damages. Defendant further argues that Mexico law should apply in order to prevent residents of the United States from collecting significantly larger judgments than what a Mexican national would receive for a similar injury. These self-serving arguments have a hollow ring. Defendant is a United States corporation doing business in Mexico. While Mexico's tourism interest may be served by Club Med Sales' presence there, Club Med Sales, as a United States corporation, benefits from that presence. Neither Mexico's nor California's interest is served by limitations on damages for California citizens when a United States corporation is found negligent. Furthermore, a Mexican national could sue defendant in an appropriate United States forum and, depending upon the conflict-of-law analysis in that forum, might benefit from the application of United States law.

Finally, this court chooses not to depart from the weight of California authority holding that a jurisdiction's only interest in having its damages limitation rules applied is to protect its *resident* defendants from excessive financial burdens. Since plaintiffs and the decedent are United States citizens and Club Med Sales is not a Mexico corporation but an American corporation, Mexico has no interest in having its damages rules apply.

*CONCLUSION*

**\*7** For the foregoing reasons, this court concludes that Mexico law governs the issue of defective premises liability and California law governs the issue of wrongful death damages.

IT IS SO ORDERED.

> FN1.   Unless otherwise indicated, the following facts are taken from undisputed portions of the record.

> FN2.   Club Med is a registered trademark only. The phrase "Club Med" does not necessarily include Club Mediteranee, SA, Club Med, Inc. or Club Med Sales, Inc.

> FN3.   In their brief on choice of law, plaintiffs focus only on the issue of wrongful death damages. Defendant's brief, however, focused on both liability for defective premises and wrongful death damages because according to defendant,

"in order for liability for wrongful death damages to arise, it must be found that the area of the subject premises where plaintiff's decedent died was defective or dangerous. Once this fundamental issue is resolved, then wrongful death damage issues can be addressed." Accordingly, this court will undertake a choice of law analysis on both issues.

N.D.Cal.,1996.
Bauer v. Club Med Sales, Inc.
Not Reported in F.Supp., 1996 WL 310076 (N.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in N.W.2d                                                                                       Page 1
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556
(Cite as: Not Reported in N.W.2d)

Beckler v. Visa U.S.A., Inc.N.D.Dist.,2004.Ralph & Diane BECKLER, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

VISA U.S.A. INC. and Mastercard International, Inc., Defendants.
SIOLEN KELLY HO, Barbara Hall and Virginia Torres, on behalf of themselves and all other consumers similarly affected, Plaintiffs,

v.

VISA U.S.A. INC. and Mastercard International, Inc., Defendants.
Robert STARK, on behalf of himself and all others similarly situated, Plaintiff,

v.

VISA U.S.A. INC. and Mastercard International Incorporated, Defendants.
**No. 09-04-C-00030.**

Aug. 23, 2004.

Steven W. Plambeck of Nilles, Hansen & Davies, Ltd., Fargo, ND; Stephen V. Bomse, David M. Goldstein of Heller Ehrman White & McAuliffe LLP, San Francisco, CA; Robert C. Mason and Miranda L. Berge of Arnold & Porter LLP, New York, NY, for Defendant Visa U.S.A. Inc.
Patrick J. Ward of Zuger Kirmis & Smith, Bismarck, ND; Kenneth A. Gallo of Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC; Gary R. Carney of Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, for Defendant MasterCard International Incorporated.
Michael J. Williams, Fargo, ND; David Markun, Edward S. Zusman and Kevin Eng of Markun Zusman Compton & David, LLP, San Francisco, CA, for Plaintiffs.

MEMORANDUM OPINION
HERMAN, J.

*NATURE OF PROCEEDINGS*

*1 This is an antitrust action "on behalf of all consumers in the State of North Dakota who have been forced to pay artificially inflated prices as a result of defendants' anti-competitive actions" (see, Paragraph 1, Class Action Complaint).

The alleged anti-competitive actions include an illegal "tying" arrangement requiring merchants to follow the "Honor All Cards" rules of the ubiquitous Visa and MasterCard associations.

*OTHER LITIGATION*

In October 1996, a series of class action lawsuits were filed in the United States District Court for the Eastern District of New York, styled *In re Visa Check/Master Money Antitrust Litig.* (a/k/a Wal-Mart Stores, Inc. et al. v. Visa U.S.A. Inc. and MasterCard Int'l, Inc.), (the "Wal-Mart" action) No. 96-CV-5238, by certain retailers and retail trade associations against the defendants. The retailers alleged, among other things, that Visa and MasterCard violated federal antitrust laws by forcing merchants who accept their cards to accept Visa and MasterCard-branded debit cards. Plaintiffs claimed defendants' actions caused merchants to pay excessive fees on Visa and MasterCard off-line debit transactions, which injured competition, merchants and consumers. The retailers sought: (1) an injunction prohibiting defendants from engaging in the alleged violations of the federal antitrust laws (including the elimination of the alleged forced acceptance of the Vista and MasterCard-branded debit cards by merchants who accept Visa and MasterCard-branded credit cards), and (2) damages for the alleged excess portion of fees paid.

During the course of the *Wal-Mart* litigation, the Second Circuit Court of Appeals upheld the District Court's decision to certify a class of four million merchants (280 F.3d 124 (2d Cir.2001)) and the district court later granted the retailers' cross-motion for summary judgment on a host of key issues (2003 U.S. Dist. LEXIS 4965 (E.D.N.Y. Apr. 1, 2003)).

Finally, on June 4, 2003, the retailers entered into proposed settlements with Visa and MasterCard, which would, among other things, allow merchants to accept the Visa or MasterCard-branded credit cards without accepting their debit cards (and vice versa), reduce the prices charged to merchants for off-line signature debit transactions for a period of time, and pay over $3 billion into a settlement fund. On January 23, 2004, the District Court entered an order and final judgment granting final approval to the settlements.

Separate from the *Wal-Mart* case, the Department of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                                  Page 2
Not Reported in N.W.2d, 2004 WL 2115114 (N.D.Dist.), 2004-2 Trade Cases P 74,556
**(Cite as: Not Reported in N.W.2d)**

Justice ("DOJ") commenced an action against Visa and MasterCard alleging federal antitrust violations. On October 7, 1998, the DOJ sued Visa U.S.A. Inc., Visa International Corp. (collectively "Visa"), and MasterCard International, Inc., alleging two violations of section 1 of the Sherman Act, <u>15 U.S.C. § 1</u>.

The DOJ alleged that defendants' rules permitted member banks to issue credit and charge cards on both the Visa and MasterCard networks, but improperly prohibited them from issuing cards on the two major general purpose credit and charge card networks not controlled by banks: American Express and Discover. <u>United State v. Visa U.S.A., Inc., 163 F.Supp.2d 322, 329 (S.D.N.Y.2001)</u>. The government contended that these exclusionary practices restrained competition among credit card networks and credit card issuers, harming consumers in both the credit card and charge card markets.

**\*2** The district court, analyzing the government's claims under the "rule of reason," began by defining two relevant product markets: (1) a general purpose card market, and (2) a general purpose card network services. <u>Id. at 335.</u> Significantly, for purposes of this litigation, the court also rejected a broader market definition urged by Visa and MasterCard, holding that other forms of payment, such as debit cards, constitute a market separate from charge and credit cards. <u>Id. at 331, 336-39.</u> The court found that the defendants have market power in the network services market-the market in which the associations operate. <u>Id. at 340.</u> The court held that the challenged exclusionary rules "weaken[ed] competition and harm[ed] consumers." <u>Id. at 329-30, 399-400.</u>

Visa and MasterCard appealed, but the Second Circuit affirmed the district court's conclusion that their respective exclusionary rules violated the Sherman Act. <u>United States v. Visa U.S.A., Inc., 344 F.3d 229 (2d Cir.2003).</u>

More importantly, consumer based litigation similar to this case has been brought in the Supreme Court of the District of Columbia, *Peterson et al. v. Visa USA, Inc. and Master Card International, Inc.* Civil Action No. 03-008080 ("The Multi-State Action.") The Multi-State action was brought by plaintiffs (including the Becklers) from each of seventeen states (including North Dakota) plus the District of Columbia and is essentially identical to this claim, i.e. that the debit card overcharge was passed on to consumers. Defendants have moved to dismiss the Multi-State action on grounds of *forum non*

*conveniens.* Becaue the statutes of limitations are not necessarily tolled while this issue is being addressed, in the Multi-State action, the plaintiffs have filed their own class actions in their home states thus, this North Dakota filing by the Becklers.

Plaintiffs' motion to stay this proceeding has been withdrawn. There being no deadlines on the Multi-State decision nor any way to know if that decision will moot the individual State actions, this Court determines that it should proceed and address defendants' motion to dismiss.

### DISCUSSION

At the outset, the Court assumes that a "tying" arrangement illegal under the Clayton and Sherman Acts is also illegal under State law, North Dakota Century Code chapter 51-08.1. Moreover, at the motion to dismiss stage, the Court considers the allegations of the Complaint in the light most favorable to the plaintiffs. *See, <u>Saefke v. Stenehjem, 673 N.W.2d 41, 44-45 (N.D.2003)</u>*. Defendants argue the plaintiffs do not have "standing" to bring these claims and that regardless of the merits of the retailers' litigation, this state claim should be dismissed.

Plaintiffs acknowledge that under federal law they could *not* maintain this class action. In essence, <u>*Illinois Brick v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707(1977)</u> sounded the death-knell for "indirect purchaser" claims under the federal anti-trust laws. Many states, including North Dakota, later took legislative action to repeal the *Illinois Brick* bar to indirect purchaser claims. See, <u>NDCC § 51-08.1-08(3)</u> and its legislative history. The Court finds that this legislative endeavor was, in fact, an effective repeal of *Illinois Brick.*

**\*3** Defendants accepts that repeal, but argue the plaintiffs are not really "indirect purchasers" and that despite the narrow rule of *Illinois Brick,* an anti-trust plaintiff must always have some legal "standing" to bring, their claim. See, <u>*Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).</u>

### CONCLUSION

Clearly defendants here are not indirect purchasers in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                    Page 3
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556
(Cite as: Not Reported in N.W.2d)

the ordinary sense. They do not allege to have been forced to purchase off line debit cards offered by defendants in addition to-or to the exclusion of-on-line debit cards offered by small competitors. Indeed, the class of plaintiffs whom the Becklers seek to represent includes all North Dakota consumers, whether they purchased goods and services for cash, with checks, with credit cards, or with either form of debit cards. In essence, plaintiffs claim to have been overcharged ("injured" in anti-trust parlance) as a result of their ordinary, day-to-day purchases of an enormous variety of goods that these defendants neither manufactured nor sold.

As "non-purchasers" of defendants' debit card services to merchants, the Court believes that plaintiffs lack standing to sue for the alleged restraint of trade in such services. Their alleged injury is simply too remote.

Even though the consumer litigation is relatively new (both the Multi-State action and the follow-up individual state actions), several trial courts have reached this result. *Ho v. Visa U.S.A., Inc* No. 112316/00, slip op at 6 (N.Y. Cty April 26, 2004) attached as Exhibit 1; *Stark v. Visa U.S.A. Inc. and MasterCard International, LLC,* Case No. 03-055030-CZ Oakland County, Michigan, opinion and order attached as Exhibit 2.

Counsel for defendants will prepare appropriate Findings of Fact, Conclusions of Law and Order for Judgment consistent with this Memorandum Opinion.


EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF NEW YORK: IAS PART 60

SIOLEN KELLY HO, BARBARA HALL and VIRGINIA TORRES, on behalf of themselves and all other consumers similarly affected,


                    Plaintiffs,

                    -against-


VISA    U.S.A.    INC.    and    MASTERCARD INTERNATIONAL, INC.,

                    Defendants.

FRIED, J.

Defendants Visa U.S.A. Inc. (Visa) and MasterCard International, Inc. (Master Card) move, pursuant to 3211(a)(7) and 3211(a)(1), to dismiss the amended complaint.

Plaintiffs Siolen Kelly Ho, Barbara Hall, and Virginia Torres seek to sue on their own behalf and on behalf of all similarly situated consumers. Plaintiffs allege that they are consumers at stores such as The Express, Victoria's Secret, Sears Roebuck Co., Macy's, and Bloomingdale's, all of which are part of the International Mass Retail Association (IMRA) and the National Retail Federation (NRF). Plaintiffs allege that those stores, along with more than three million retail establishments, accept Visa and MasterCard credit cards as a form of payment. Plaintiffs further allege that, although the acceptance of Visa and MasterCard credit cards is voluntary, the retailers are forced to accept Visa and MasterCard debit cards as a condition of being able to accept the more all-encompassing credit cards. According to plaintiffs, Visa and MasterCard charge the retailers more, per transaction, when a debit card is used by a customer, than when a credit card is used. According to plaintiffs, the retail stores pass on the increased charge to consumers, such as themselves, by raising the price of the products that they sell.

*4 In 1996, several groups of retailers filed anti-trust actions in federal court challenging these practices of Visa and MasterCard. In 2003, that litigation resulted in a settlement involving the payment of damages of over $3 billion, and injunctive relief worth an additional $25 to $87 billion. (*In re Visa Check/Mastermoney Antitrust Litigation,* 297 F Supp 2d 503 [RDNY 2003] ).

Plaintiffs' amended complaint asserts two causes of action. In their first cause of action, plaintiffs allege violations-of the Donnelly Act (General Business Law § 340), New York State's version of the federal Sherman Anti-Trust Act. 5 USC § 1 *et seq.* In their second cause of action, plaintiffs allege violations of General Business Law § 349, which makes unlawful deceptive acts and practices in the conduct of business.

Citing *Cox v. Microsoft Corp.* (290 A.D.2d 206 [1st Dept 2002] ), defendants contend that plaintiffs' Donnelly Act cause of action must be dismissed, because the Act's treble damages remedy precludes private persons from bringing a class action under the act. See CPLR 901(b) (unless a statute which

Not Reported in N.W.2d                                                    Page 4
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556
**(Cite as: Not Reported in N.W.2d)**

imposes a penalty specifically provides that an action to recover the penalty may be brought as a class action, such a class action is precluded).

In response, plaintiffs offer to abandon their class action claims for Donnelly Act violations, and agree to further amend their complaint, if so required.

However, defendants argue that, even if plaintiffs abandon their class action claims, the first cause of action must be dismissed. Defendants contend that plaintiffs lack standing because their alleged injuries are too remote.

In the case of _Illinois Brick Co. v. Illinois_, (431 U.S. 720 [1977] ), the United States Supreme Court held that purchasers of concrete blocks, who had paid enhanced prices for their purchases because their suppliers had been victimized by a price fixing conspiracy, could not bring a federal anti-trust action because they were indirect purchasers. In 1999, the New York State Legislature amended the Donnelly Act to provide that persons who had been damaged as a result of a violation of the Donnelly Act would not be deprived of standing to sue, merely because they did not deal directly with the defendant. (Gen. Bus. L. § 340 ( [6] ). Defendants contend that plaintiffs' injuries are too remote to qualify them as "indirect purchasers" under the Donnelly Act amendment.

Defendants argue that the proximate cause analysis utilized by the United States Supreme Court in _Associated General Contractors of California, Inc. v. California State Council of Carpenters, (459 U.S. 519 [1983] )_, to determine whether antitrust standing is proper under state laws similar to New York's, should be used here. That analysis, which was recently summarized by the United States District Court for the District of Columbia in _In re Lorazepam & Clorazepate Antitrust Litigation, (295 F Supp 2d 30, 37_ [DDC 2003] ). considered the following five factors in determining whether a plaintiff is a proper party to bring an antitrust case:
*5 1. The nature of plaintiff's claimed injury;
2. The directness of the injury;
3. The specific intent of the alleged defendants;
4. The character of the alleged damages, including the risk of duplicative recovery, the complexity of apportionment and their speculative nature; and
5. The existence of other, more appropriate plaintiffs.

Here, the plaintiffs' claims, as general consumers at stores which accept Visa and MasterCard, are clearly derivative of the stores' claims against those companies, and their alleged injuries are indirect. They have had no direct dealings with either of the defendants; they do not claim to use defendants' credit or debit card services in any way. Rather, they claim that stores where they shop raise their prices on all products in order to absorb the extra fees charged by Visa and MasterCard, and that they pay higher prices as a result. Thus, plaintiffs' claims are far more indirect than those in cases challenging the tobacco industry, on which plaintiffs rely, where the plaintiffs are cigarette smokers who actually purchased the defendants' product, though not directly from defendants. (See e.g. _Lennon v. Philip Morris Companies, Inc._, 189 Misc.2d 577, 734 N.Y.S.2d 374 [Sup Ct. N.Y. County [Ramos, J.] 2001] ).

With respect to intent, in the _Lorazepam_ case, on which plaintiffs here rely, those plaintiffs claimed that they were injured because they had to pay excessive prices for certain drugs. As the _Lorazepam_ court noted, the aim of the manufacturers' preclusive conduct was to charge the elevated prices of which the plaintiffs complained. Here, in contrast, though Visa and MasterCard presumably intended to obtain higher rates from the stores that accepted their cards, there is no indication that they intended that the prices of all consumer goods in those stores would be increased.

With respect to the character and calculation of damages, and the complexity of calculating those damages, plaintiffs allege that the stores where they shop, such as The Express, Victoria's Secret, Sears Roebuck Co., Macy's, and Bloomingdale's, have absorbed the debit card fees by raising their prices. In their amended complaint, plaintiffs note that those stores are part of the IMRA and NRF, which, along with more than three million retail establishments, accept Visa and MasterCard credit and debit cards. Even assuming that plaintiffs' class action claims have been abandoned with respect to their Donnelly Act cause of action, their amended complaint appears to cover all of the purchases that they made as individual consumers at _any_ retail store that accepts Visa and MasterCard, not merely at the handful of named stores-purchases which potentially range from a few cents to hundreds, or even thousands, of dollars. The complexity and speculative nature of plaintiffs' claims are overwhelming.

Moreover, any recovery obtained by plaintiffs here is likely to be duplicative, in light of the fact that the retailers have already brought and resolved their claims with respect to the debit cards, and have obtained a multi-billion dollar settlement. Therefore,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                Page 5
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556
(Cite as: Not Reported in N.W.2d)

this is obviously not a situation where the antitrust violators will go unpunished, because the parties who are directly injured will not sue.

**\*6** For these reasons, I conclude that plaintiffs' alleged injury is far too remote to provide antitrust standing under the Donnelly Act, and the first cause of action must be dismissed.

Plaintiffs' second cause of action alleges that defendants violated General Business Law (GBL) § 349 by engaging "in a wide and far-reaching advertising campaign" to induce consumers to acquire debit cards without disclosing that the merchants are being charged high fixed prices for accepting the cards, which costs the retailers are compelled to pass on to all of their consumers.

Defendants argue that the second cause of action should be dismissed, because, like the Donnelly Act, Section 349 provides for treble damages, and therefore, a class action is impermissible. Under the Donnelly Act, any person who sustains damages by reason of a violation of the act "shall recover three-fold the actual damages." (Gen.Bus.L. § 340[5] ). In contrast, pursuant to section 349, plaintiffs may seek merely their actual damages or $50, whichever is greater, the imposition of treble damages being discretionary with the court. Gen. Bus. L. § 349[h] ). Plaintiffs indicate that they are willing to waive the possibility of treble damages, but seek to maintain their class action claims under section 349. As plaintiffs contend, class actions have been sustained under section 349, where plaintiffs have agreed to waive treble damages relief (*see Super Glue Corp. v. Avis Rent A Car System, Inc., 132 A.D.2d 604, 517 N.Y.S.2d 764* [2nd Dept 1987] ), and where class members were permitted to opt-out, if they wished to seek treble damages. (*See Ridge Meadows Homeowners' Assn., Inc. v. Tara Development Co., Inc., 242 A.D.2d 947* [4th Dept 1997] ). Thus the availability of treble damages does not preclude plaintiffs' second cause of action.

Defendants contend that, nonetheless, plaintiffs fail to satisfy the three elements of a section 349 claim: "that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." (*Stutman v. Chemical Bank,* 95 N.Y.2d 24, 29 [2000] ). Defendants contend that no misleading practice has been alleged by plaintiffs-that nothing in defendants' advertising even discussed fees paid by merchants for credit and debit cards, and that, in any case, the information regarding

those cards, with their differing fees, was public knowledge. And again, defendants argue that the alleged injuries suffered by plaintiffs are far too remote and speculative to state a claim under GBL § 349.

As defendants contend, New York courts have held that mere failure to disclose that lower rates for certain services wereavailable, does not necessarily constitute a deceptive practice under Section 349. (*See e.g. Gershon v. Hertz Corp.,* 215 A.D.2d 202 [1st Dept 1995] ) [alternative car rental arrangements at lower rates]; *see also Super Glue Corp. v. Avis Rent A Car System, Inc.,* 159 A.D.2d 68, 557 N.Y.S.2d 959 [2nd Dept 1990] [excessive prices charged for insurance or refueling, without more, are not actionable as deceptive practice] ).

**\*7** Citing *State of New York v. Feldman,* (210 F Supp 2d 294 [SDNY 2002] ), plaintiffs contend that there can be a violation of Section 349 without an affirmative misrepresentation. However, *Feldman* did not involve claims of deceptive advertising. Rather, in *Feldman,* several States brought an antitrust enforcement action against a group of people allegedly involved in an unlawful scheme to rig bids at stamp auctions. Plaintiffs' second cause of action specifically alleges that it is based on a widespread campaign of advertising by defendants, although no specific advertisements are cited, and plaintiffs fail to demonstrate anything specific in defendants' advertisements which was misleading. To the extent that plaintiffs' allegations regarding deceptive practices are based on defendants' alleged massive advertising campaign, *Feldman* is of little assistance to them, and their second cause of action fails to state a claim. Therefore, it is not necessary to reach defendants' contention that information about their pricing structure was publicly known.

In their brief and in oral argument, plaintiffs appear to have reformulated their second cause of action as a general antitrust claim, like the claims of the New York State Attorney General in *Feldman* and not unlike their Donnelly Act claim in the first cause of action. In *Feldman* the court noted that New York courts have interpreted Section 349 as encompassing deceptive practices prohibited by the Federal Trade Commission Act, and that the government may use the FTC Act to enforce antitrust laws. Plaintiffs argue that Section 349 can be used to enforce general claims of deceptive practices where antitrust laws have been violated, and that defendants' debit card practices have already been held to violate antitrust laws.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                    Page 6
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556
(Cite as: Not Reported in N.W.2d)

Although plaintiffs' amended complaint does not assert such a general antitrust claim pursuant to Section 349, on a motion to dismiss, it is appropriate for the court to consider not merely whether the complaint has stated a particular cause of action, but whether, on the facts alleged, a cause of action exists. Therefore, I will consider whether plaintiffs can state a claim under Section 349 that is not limited to a claim for deceptive advertising.

Defendants contend that if plaintiffs seek to utilize section 349 as a general antitrust statute, the analysis used to determine standing for Donnelly Act claims should be used to determine standing under section 349, as well.

Plaintiffs cite *Securitron Magnalock Corp. v. Schnabolk, (65 F.3d 256, 264* [2nd Cir1995] [citations omitted] ) for the proposition that " 'any person who has been injured by reason of any violation of this section' " can maintain a cause of action under section 349, and argue that, because they have been injured by defendants' actions, they have standing. However, the court in *Securition* merely held that suits under section 349 were not limited to consumers, and that corporate competitors have standing to sue as well, so long as the underlying conduct results in some harm to consumers, or to the public at large. That case did not consider the question of the remoteness of the injury- which is at issue here.

*8 Recently, in a case in which health insurers sought to recover, from tobacco companies, the increased costs of medical services due to smoking, the United States Court of Appeals for the Second Circuit considered whether there may be a remoteness bar to standing under Section 349. (*Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris USA Inc., 344 F.3d 211* [2nd Cir2003] ). Noting that a New York court has permitted a suit for indirect injuries under Section 349, the U.S. Court certified the following question to the Now York Court of Appeals: "Are claims by a third party payer of health care costs seeking to recover costs of services provided to subscribers as a result of those subscribers being harmed by a defendant's or defendants' violation of N.Y. Gen. Bus. Law § 349 too remote to permit suit under that statute?" *Id.* at 221. The Court of Appeals has accepted the certified question. (*Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris USA Inc., 100 N.Y.2d 636* [2003] ).

At least until the Court of Appeals determines that a different type of analysis should be utilized to determine standing under Section 349, I conclude that an analysis akin to that utilized for Donnelly Act standing is appropriate. Utilizing that analysis, I further conclude that, even if the Count of Appeals determines that third-party payers of health care costs have standing to sue tobacco companies under section 349, for the reasons discussed above, plaintiffs' alleged claims are too remote to support a general antitrust claim under Section 349. Furthermore, if plaintiffs were permitted to bring their section 349 claims as a class action, as they seek to, the complexity and speculative nature of calculating damages would increase geometrically, for those claims could involve nearly all the purchases of all of the consumers in the state of New York.

Accordingly, it is hereby

ORDERED that defendants' motion to dismiss is granted, and the complaint is dismissed with costs and disbursements to defendants as taxed by the Clerk of the Court on submission of an appropriate bill of costs; and it is further

ORDERED that the Clerk is directed to enter judgment accordingly.

EXHIBIT 2

ROBERT STARK, on behalf of himself and all others similarly situated,

Plaintiff,

v

VISA U.S.A. INC. and MASTERCARD INTERNATIONAL INCORPORATED,

Defendants.

Case No. 03-055030-CZ

Hon. Colleen A. O'Brien

*OPINION AND ORDER*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases  P 74,556
**(Cite as: Not Reported in N.W.2d)**

Page 7

INTRODUCTION

This matter is before the Court on Defendants' motion for summary disposition under MCR 2.116(C)(8). The Court heard oral argument and took the motion under advisement. After considering Defendants' motion and brief in support, Plaintiff's response and Defendants' reply in light of applicable law, and for the reasons discussed below, the Court grants. Defendants' motion for summary disposition.

This is an antitrust action. Defendants claim that Plaintiff lacks standing to sue for purported violation of the Michigan Antitrust Reform Act ("MARA") because he alleges only remote injuries and did not purchase-directly or indirectly-the services that Defendants allegedly restrained in violation of MARA.

BACKGROUND

*9 Plaintiff claims that Defendants engaged in tying arrangements in violation of the Michigan Antitrust Reform Act. ("MARA") MCL 445.772. Plaintiff claims that he and the Michigan class he represents have been damaged "indirectly" under the Act because they were forced to pay the overcharge that resulted from Visa and MasterCard's unlawful tying arrangement. For these alleged violations, Plaintiff seeks damages and attorneys' fees.

Plaintiff's Complaint in this matter is based on the same conduct of Defendants that was at issue in previous federal litigation. In October 1996, several groups of merchants commenced a class action against Visa and MasterCard in federal court. In re Visa Check/MasterMoney Antitrust Litigation, 192 F.R.D. 68 (E.D.N.Y., 2000), aff'd 280 F.3d 124 (C.A.2, 2001), cert den 536 U.S. 917, 122 S.Ct. 2382, 153 L.Ed.2d 201 (2002). The merchants alleged that under the "Honor All Cards" rules, as a condition of being permitted to accept Visa and/or MasterCard credit cards, they were also required to accept Visa and MasterCard debit cards. The merchants claimed that this constituted a tying arrangement and an attempt to monopolize a debit market in violation of federal antitrust laws. The merchants alleged that as result of those purported antitrust violations, they paid inflated fees for Visa and MasterCard debit transactions-fees that were higher than those they paid for debit transactions processed over other debit networks.

In February 2000, the federal court certified a nationwide class of more than four million merchants who had accepted Visa or MasterCard within the statute of limitations period. That class action was settled in April 2003 on the eve of trial. The federal court issued an order granting final approval of the settlements. See In re Visa Check/MasterMoney Antitrust Litig., 297 F Supp 2d 503 (E.D.N.Y., 2003). Pursuant to the settlements, Visa and MasterCard each eliminated the asserted tying of credit and debit card services to merchants, thereby allowing merchants to reject consumers' Visa or MasterCard-branded debit cards but still accept consumers' Visa or MasterCard-branded credit cards. Visa and MasterCard also collectively paid more than three billion dollars into a settlement fund.

In the federal litigation, the merchants alleged that Visa and MasterCard imposed an overcharge on merchants by forcing them to accept Visa and MasterCard debit cards as a condition of accepting Visa and MasterCard credit cards. In the instant matter, Plaintiff contends that the merchants passed that overcharge on to both him and Michigan consumers by increasing the price of goods.

Plaintiff claims to have paid higher prices on every purchase he made from merchants who accept Visa or MasterCard, regardless of whether he used a debit card to make the purchase. Plaintiff alleges that all consumers, including those who used cash, were affected by Defendants' actions. Therefore, the proposed class would include not only consumers who purchased goods using debit cards but also any consumers who purchased goods from any Michigan retailer that accepted Visa and/or MasterCard credit cards.

ANALYSIS

*10 Defendants' motion is brought pursuant to MCR 2.116(C)(8). Defendant argues that Plaintiff's claims should be dismissed because he lacks standing to sue under the Michigan Antitrust Reform Act for the injuries he alleged.

A motion under MCR 2.116(C)(8) tests the "legal sufficiency of the complaint on the basis of the pleadings alone." Mack v. Detroit, 467 Mich. 186, 193, 649 N.W.2d 47 (2002). "All factual allegations are accepted as true, along with any inferences or conclusions which may be fairly drawn therefrom." Ambro v. American Nat'l Bank & Trust Co., 152

Not Reported in N.W.2d                                    Page 8
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556
(Cite as: Not Reported in N.W.2d)

Mich.App. 613, 616-617, 394 N.W.2d 46 (1986).

Defendant's first argument is that Plaintiff cannot meet the five-factor test set forth in *Associated General Contractors of Cal., Inc. v. Cal. State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). This Court agrees.

In *Associated General Contractors,* the United States Supreme court Supreme Court identified five factors for determining whether the relationship between the plaintiff's harm and the defendants' conduct is sufficiently close to confer standing to sue: (1) whether the plaintiff is a consumer or competitor in the allegedly restrained market; (2) whether the alleged injury alleged is a direct, first-hand impact of the restraint alleged; (3) whether there are more directly injured plaintiffs with motivation to sue; (4) whether the damages claims are speculative; and (5) whether the plaintiff's claims risk duplicative recoveries and would require a complex apportionment of damages. *Id.* at 538-45.

First of all, Plaintiff is not a consumer or competitor in the allegedly restrained market. Here, in the alleged market, the merchants are the consumers of Visa and MasterCard debit card services; and other debit networks are the competitors of Visa and MasterCard. Thus, there is no connection between Plaintiff's purchases of consumer goods and the Defendants' alleged tying of debit services.

Second, the injury that Plaintiff alleges here is not a direct, first-hand impact of the restraint alleged. Here, the direct impact allegedly fell on the merchants. Plaintiff alleges only derivative and second-hand injuries from those that merchants purportedly incurred.

Third, there are more directly injured persons with motivation to sue to vindicate any interest in antitrust enforcement. Here, the alleged direct victims of Defendants' conduct, the merchants, litigated for seven years in a massive nationwide class action challenging the very same Visa and MasterCard conduct alleged in plaintiff's Complaint. The merchants directly affected have vindicated any interest in antitrust enforcement by suing the Defendants for the same alleged conduct. Thus, denying Plaintiff an antitrust remedy clearly will not leave any alleged antitrust violation "undetected or unremedied." *Id.* at 542.

Fourth, the Court agrees with Defendants that Plaintiff's damage claims are speculative. Here,

Plaintiff asserts he paid overcharges on every single purchase that he made for several years from merchants who accepted Visa or MasterCard cards, However, there is nothing about the debit network systems of Visa or MasterCard that contributes in any way to the production of the consumer goods for which Plaintiff contends he paid inflated prices.

*11 Moreover, Plaintiff's claims risks duplicative recoveries and would require a complex apportionment of damages. Here, Plaintiff's claims are based on the very same conduct of Visa and MasterCard that was at issue in the federal merchant class action. Thus, Plaintiff is seeking recovery duplicative of the sums to be paid under the settlements to the Michigan merchants at which Plaintiff shopped. Moreover, Plaintiff's claims would require apportionment of damages using virtually every single purchase that Plaintiff made during the years for which he seeks damages. The Court agrees with Defendants that certainly any effort to make such an apportionment would be incredibly complex, if not impossible.

Plaintiff argues that Defendants' reliance on *Associated General Contractors* is misplaced for the reason that the test in *Associated General Contractors* is inconsistent with MARA's grant of standing to persons injured "indirectly." MCL 445.778(2). Plaintiff argues that MARA's plain language, rather than federal standing rules, governs the question of who has standing to bring a claim under MARA. Thus, under Plaintiff's analysis, the Act in itself grants standing per se.

Federal antitrust law does not recognize actions by indirect purchasers. The death knell of actions by indirect purchasers was embodied in the case of *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). In *Illinois Brick,* the plaintiffs sought to recover an overcharge on concrete acquired from users and direct purchasers of the concrete, who allegedly had overpaid for the concrete due to a manufacturers' price-fixing conspiracy and had passed on that overcharge to the plaintiffs. *Id.* at 726-27. The United States Supreme Court concluded that such plaintiffs should not be deemed to have suffered an injury cognizable under the federal antitrust laws, given the potential for multiple liability and the complexity that would be introduced into antitrust damages suits if such pass-on theories were permitted. *Id* at 727-29, 736-47.

After *Illinois Brick,* Michigan and several other states amended their antitrust statutes to reject the Illinois

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                                    Page 9
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556
(Cite as: Not Reported in N.W.2d)

Brick rule. Such legislation became known as *Illinois Brick* repealer laws. See *A & M Supply Co. v. Microsoft Corp.*, 252 Mich.App. 580, 583, 654 N.W.2d 572 (2002)

Specifically, in 1985, the Michigan Legislature adopted a damages statute modeled on the federal Clayton Act, but which also provided a potential damages remedy to persons injured "directly or indirectly" by a violation of Michigan's antitrust law. MCL 445.778(2). Thus, the mere fact that a plaintiff is an "indirect purchaser" would not automatically bar an antitrust damages claim.

However, this Court agrees with Defendants that it does not necessarily follow that Michigan's repeal of the *Illinois Brick* rule also eliminated the *Associated General Contractors* standing requirements. The Supreme Court in *Illinois Brick* made clear that its decision addressed only whether there should be a bar on "indirect purchaser" suits. It expressly "d[id] not address the standing issue," explaining that the "indirect purchaser" question is "analytically distinct from the question of which persons have sustained injuries to remote to give them standing to sue." *Illinois Brick, supra* at 728 n. 7.

*12 Plaintiff argues that restrictive federal standing rules such as in *Associated General Contractors* do not apply to MARA indirect purchaser claims. Plaintiff points out that no Michigan trial or appellate court has ever applied the *Association General Contractors* factors in a case under MARA's indirect purchaser provisions. However, while Michigan appellate courts have not developed a test for determining when a plaintiff's injury is too remote to permit suit under MARA, the Act requires courts to give "due deference to interpretations given by the federal courts to comparable antitrust statutes. MCL 445.784. Moreover, the Court notes that courts in other states that have repealed the Illinois Brick rule have continued to apply antitrust standing requirements to dismiss the claims of plaintiffs who assert only derivative or remote injuries. See *Ho v. Visa USA, Inc.* Index No. 112316/00, N.Y. Sup. Crt. April 26, 2004; *International Brotherhood of Teamsters, Local 734 Health and Welfare Trust Fund v. Philip Morris, Inc.* 196 F.3d 818 (C.A.7, 1999).

Furthermore, even if this Court did not apply the five-factor test in *Associated General Contractors,* Plaintiff's claim would still fail under MARA. The Court agrees with Defendants' second argument that because Plaintiff is not an indirect purchaser, he cannot sue under MARA.

MCL 445.788(2) provides in pertinent part:
Any ... person ... injured directly or indirectly in his or her business or property by a violation of this act may bring an action ... for actual damages sustained by reason of a violation of this act ... (emphasis added).

The repealer language in 445.788(2) addresses "indirect purchasers" such as "an end user or licensee" of the product that the defendant had manufactured. *A & M Supply, supra* at 583, 654 N.W.2d 572. Plaintiff claims that he and the Michigan class he represents have been damaged "indirectly" under MARA's plain text because they were forced to pay the "overcharge" that resulted from Visa and MasterCard's unlawful tying arrangement. Plaintiff claims that he is an indirect purchaser of the debit car services because the monopoly overcharge on Defendants' debit card services is reflected in the artificially inflated prices of the consumer goods he purchases.

Thus, Plaintiff's alleged injuries admittedly do not stem from his purchase of the purportedly restrained debit card services that Defendants provided to merchants. Plaintiff does not claim that he repurchased from merchants or other middlemen the allegedly restrained debit card services that defendants provided to merchants. Instead, as correctly pointed out by Defendants, Plaintiff claims only derivative and remote injuries on his purchases from merchants of an endless variety of merchandise not even manufactured or sold by defendants. Therefore, Plaintiff is actually a "non-purchaser" of the debit card services that Defendants provide to merchants. Thus, MARA would not be applicable.

*13 THEREFORE, IT IS HEREBY ORDERED that Defendants' motion for summary disposition is GRANTED.

IT IS FURTHER ORDERED that this Opinion and Order resolves the last pending claim and closes the case.

IT IS SO ORDERED.

N.D.Dist.,2004.
Beckler v. Visa U.S.A., Inc.
Not Reported in N.W.2d, 2004 WL 2115144 (N.D.Dist.), 2004-2 Trade Cases P 74,556

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



LEXSEE 2004 US DIST LEXIS 3627

Warning
As of: Jan 05, 2007

**BELLEVUE DRUG CO., ROBERT SCHREIBER, INC., d/b/a BURNS PHAR-
MACY, and REHN-HUERBINGER DRUG CO., d/b/a PARKWAY DRUGS # 4, on
behalf of themselves and all others similarly situated, and the PHARMACY FREE-
DOM FUND and the NAT'L COMMUNITY PHARMACISTS ASS'N, Plaintiffs, v.
ADVANCE PCS, Defendant.**

CIVIL ACTION NO. 03-4731

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

*2004 U.S. Dist. LEXIS 3627; 2004-1 Trade Cas. (CCH) P74,329*

**March 2, 2004, Decided
March 2, 2004, Filed; March 3, 2004, Entered**

**SUBSEQUENT HISTORY:** Motion granted by, Stay granted by *Bellevue Drug Co. v. Advance PCS, 2004 U.S. Dist. LEXIS 17172 (E.D. Pa., Aug. 20, 2004)*

**DISPOSITION:** [*1] Defendant's motion to dismiss denied.

**COUNSEL:** For BELLEVUE DRUG CO., ROBERT SCHREIBER, INC. dba BURNS PHARMACY, REHN-HUERBINGER DRUG CO. dba PARKWAY DRUGS # 4, ON BEHALF OF THEMSELVES AND ALL OTH-ERS SIMILARLY SITUATED, PHARMACY FREE-DOM FUND, NATIONAL COMMUNITY PHARMA-CISTS ASSOCIATION, Plaintiffs: H. LADDIE MON-TAGUE, JR., LEAD ATTORNEY, BERGER & MON-TAGUE PC, PHILA, PA.

For BELLEVUE DRUG CO., ROBERT SCHREIBER, INC. dba BURNS PHARMACY, REHN-HUERBINGER DRUG CO. dba PARKWAY DRUGS # 4, ON BEHALF OF THEMSELVES AND ALL OTH-ERS SIMILARLY SITUATED, PHARMACY FREE-DOM FUND, NATIONAL COMMUNITY PHARMA-CISTS ASSOCIATION, Plaintiffs: JEROME M. MAR-CUS, LEAD ATTORNEY, BERGER & MONTAGUE PC, PHILADELPHIA, PA.

For ADVANCE PCS, Defendant: E. MARCELLUS WILLIAMSON, STEPHEN J. SPIEGELHALTER, LEAD ATTORNEYS, WASHINGTON, DC.

For ADVANCE PCS, Defendant: J. THOMAS ROSCH, LEAD ATTORNEY, LATHAM & WATKINS LLP, SAN FRANCISCO, CA.

For ADVANCE PCS, Defendant: STEVEN E. BIZAR, LEAD ATTORNEY, ELIOT G. LONG, BUCHANAN INGERSOLL, P.C., PHILADELPHIA, PA.

**JUDGES:** EDUARDO C. ROBRENO, J.

**OPINION BY:** EDUARDO C. ROBRENO

**OPINION:** [*2]

MEMORANDUM

EDUARDO C. ROBRENO, J

March 2, 2004

Bellevue Drug Co., Robert Schreiber, Inc., d/b/a Burns Pharmacy, and Rehn-Huerbinger Drug Co., d/b/a Parkway Drugs # 4, on behalf of themselves and others similarly situated (collectively "plaintiffs"), n1 along with the Pharmacy Freedom Fund and the National

Case 1:05-cv-00485-JJF    Document 272-3    Filed 01/05/2007    Page 40 of 44

Page 2

2004 U.S. Dist. LEXIS 3627, *; 2004-1 Trade Cas. (CCH) P74,329

Pharmacists Associations bring this action against Advance PCS under section 1 of the Sherman Act, *15 U.S.C. § 1*, based on allegations of a horizontal agreement among competitors having the effect of restraining trade in the drug dispensing industry. Based on the defendant's allegedly illegal activities, plaintiffs seek treble damages and injunctive relief under sections 4 and 16 of the Clayton Act, *15 U.S.C. § § 15* and*26*.

> n1 Bellevue Drug Co. owns and operates a pharmacy located in Hammonton, New Jersey. Robert Schreiber, Inc., d/b/a Burns Pharmacy, owns and operates a pharmacy located in Morrisville, Pennsylvania. Rehn-Huerbinger Drug Co., d/b/a Parkway Drugs # 4, owns and operates a pharmacy located in Glencoe, Illinois. Pharmacy Freedom Fund ("PFF") is a not-for-profit organization of several thousand independent community pharmacy owners headquartered in Fort Worth, Texas. National Community Pharmacists Association ("NCPA") is a not-for-profit organization representing approximately 24,000 pharmacies nationwide and is headquartered in Alexandria, Virginia. Both PFF and NCPA seek injunctive relief on behalf of its members and do not seek status as a representative plaintiff or class member under *Fed. R. Civ. P. 23*.

[*3]

Presently before the Court is defendant's motion to dismiss the complaint for failure to state a claim upon which relief can be granted. For the reasons that follow, the motion shall be denied.

I. BACKGROUND n2

> n2 The following facts are taken from the complaint and are cast in a light most favorable to the non-moving party.

As a prescription benefit manager ("PBM"), Advance PCS contracts individually with various plan sponsors to provide a variety of services related to the prescription drug industry, including purchasing brand name and generic prescription drugs and dispensing services from retail pharmacies; managing networks of retail pharmacies; and processing and adjudicating claims made by retail pharmacies for prescriptions they fill for members of prescription plans ("plan members") that Advance PCS administers. n3

> N3 Advance PCS maintains principal executive offices in Irving, Texas. According to plaintiffs, Advance PCS is the largest PBM in the United States. It administers prescription drug benefits for over 75 million people or one in every four Americans. It handles some 540 million prescriptions a year amounting to over $ 28 million billion in prescription drug spending.

[*4]

In its role as a plan administrator, Advance PCS is not itself the real purchaser of dispensing services or prescription drugs from network retail pharmacies. Instead, it acts as a purchasing agent on behalf of the plan sponsors that individually contract with Advance PCS. Specifically, the complaint alleges that "by jointly conferring their pharmacy purchase decisions upon Advance PCS" the plan sponsors accomplish a horizontal agreement. Further, the complaint alleges that the arrangement that the individual plan sponsors have with Advance PCS eliminates competition because they no longer actively compete with one another for the dispensing services and prescription drugs sold by the retail pharmacies. The arrangement -- alleged by plaintiffs to have the effect of a "horizontal price fixing" agreement -- enables the participants to agree not to bid up the price or bid against each other, thereby reducing the apparent demand for filling prescriptions, and concomitantly reducing the market price for prescription drugs and dispensing services provided by retail pharmacies. n4

> n4 According to the complaint, the plan sponsors delegate price-setting authority to Advance PCS. For example, plaintiffs allege that the plan sponsors have given Advance PCS the authority to set reimbursement rates for generic drugs, i.e., the "Maximum Allowable Cost" or "MAC," for the plans that Advance PCS administers.

[*5]

As alleged by plaintiffs, the "aggregated economic power" that Advance PCS yields enables it to set reimbursement rates for retail pharmacies' brand name and prescription drugs and dispensing services below that which would prevail in a competitive marketplace. n5 Although plaintiffs do not allege that the plan sponsors conspire with each other directly to effect this arrangement, the complaint does allege that each plan sponsor is aware of and understands the involvement of other plan sponsors and the role of Advance PCS as a common agent for these plan sponsors.

Case 1:05-cv-00485-JJF    Document 272-3    Filed 01/05/2007    Page 41 of 44

Page 3

2004 U.S. Dist. LEXIS 3627, *; 2004-1 Trade Cas. (CCH) P74,329

n5 The complaints asserts that the relevant market consists of the dispensing and sale of brand name and generic prescription drugs in the United States.

As alleged in the complaint, Advance PCS and its affiliates have a contract with virtually all of the approximately 60,000 pharmacies in the United States. The complaint alleges that every year or so, Advance PCS modifies the contractual terms unilaterally by sending plaintiffs and members of the class amendments or revised pages to the agreement. These terms, among other things, set the amount Advance PCS will pay as reimbursement for the cost of drugs and the amount the contracting pharmacies are permitted to charge plan members for co-payments.

[*6]

Advance PCS, in addition to administering prescription drug benefit plans, operates its own mail-order pharmacy business. On top of the horizontal price-fixing agreement discussed above, plaintiffs allege that Advance PCS engages in anti-competitive conduct by using its aggregated market power derived from the combination of plan sponsors to create artificial vertical advantages for its own dispensing activities. More specifically, plaintiffs allege that Advance PCS contractually prohibits its retail pharmacies from dispensing more than a 30-day supply of drugs. Meanwhile, mail-order pharmacies operated by Advance PCS are permitted to dispense a 90-day supply. Using information provided by the retail pharmacies it deals with, Advance PCS contacts plan members and advertises that the plan member can purchase a 90-day supply of a drug from Advance PCS's mail-order operation for one co-payment. This co-payment is advertised to be less than the total of three co-payments which would be paid for three, 30-day supplies of the same drug from a competing retail pharmacy subject to Advance PCS's co-payment and drug distribution restrictions. This activity diverts the refill and follow-on prescription [*7] business, alleged to be the most profitable part of the prescription drug dispensing business, from the retail pharmacies to Advance PCS's mail-order operation.

Finally, plaintiffs allege that Advance PCS uses its aggregated power to unilaterally impose "onerous" contract terms on retail pharmacies that choose to participate in the Advance PCS network. These terms include co-payment restrictions and limitations on the fees plaintiffs are permitted to charge for the submission of claims, checks on patient eligibility, drug checks, and plan-member use of a particular pharmacy.

II. DISCUSSION

A. Standard for Motion to Dismiss.

A motion to dismiss for failure to state a claim serves to test the sufficiency of a complaint. See *Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993)*. A plaintiff's allegations are considered true and are construed in the light most favorable to him, see *Rocks v. Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989)*, and his complaint should not be dismissed "unless it appears beyond doubt that [he] can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)*. [*8]

Under *Fed. R. Civ. P. 8(a)(2)*, the complaint "shall contain a short and plain statement of the claim showing that the pleader is entitled to relief." *Fed. R. Civ. P. 8(a)(2)*. The main purpose behind *Rule 8(a)(2)* is to give the defendant adequate notice of the claim asserted against him in order for him to adequately respond. *Loftus v. SEPTA, 843 F. Supp. 981, 986 (E.D. Pa. 1994)* (citing *Conley, 355 U.S. at 47*). A plaintiff need not anticipate probable defenses and respond to them in his complaint. *Campbell v. D'Agostino, No. 03-5328, 2003 U.S. Dist. LEXIS 24520, at *9 (E.D. Pa. Dec. 11, 2003)*. There is no heightened pleading standard in antitrust cases, and the general principles governing *Rule 12(b)(6)* motions apply. See *In re Mercedes-Benz Antitrust Litig., 157 F. Supp. 2d 355, 359 (D. N.J. 2001)* (citing *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc., 62 F.3d 967, 976 (7th Cir. 1995)*).

It has long been the rule in this Circuit that a complaint alleging a conspiracy "must contain sufficient information for the Court to determine [*9] whether or not a valid claim for relief has been stated and to enable the opposing side to prepare an adequate pleading." *Rose v. Bartle, 871 F.2d 331, 366 n.60 (3d Cir. 1989)*. What this means is that

the plaintiffs must plead with particularity the "circumstances" of the alleged wrongdoing in order to place the defendants on notice of the precise misconduct with which they are charged. Only allegations of conspiracy which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and certain actions of the alleged conspirators taken to achieve that purpose, will be deemed sufficient ... An inference [of conspiracy] ... from the Complaint ... [is] no substitute for the requirement that the circumstances of the conspiracy be pleaded with specificity.

2004 U.S. Dist. LEXIS 3627, *; 2004-1 Trade Cas. (CCH) P74,329

*Rose, 871 F.2d at 366* (quoting *Kalmanovitz v. G. Heileman Brewing Co.., 595 F. Supp. 1385, 1401 (D. Del. 1984)).*

B. Standing to Sue: "Antitrust Injury".

*Section 4 of the Clayton Act* provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may maintain [*10] a private action for treble damages. *15 U.S.C. § 15(b).* "A showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4, because a party may have suffered antitrust injury but may not be a proper plaintiff under § 4 for other reasons." *Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 110, 93 L. Ed. 2d 427, 107 S. Ct. 484 (1986)*; see also *Barton & Pittinos v. Smithkline Beecham Corp., 118 F.3d 178, 181 (3d Cir. 1997).* "Injury, although casually related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny, 'since it is inimical to [the antitrust] laws to award damages' for losses stemming from continued competition." *Atlantic Richfield Co., v. USA Petroleum Co., 495 U.S. 328, 334, 109 L. Ed. 2d 333, 110 S. Ct. 1884 (1990)* (quoting *Cargill, 479 U.S. at 109-110*). If the injury is not of the recognized type, even though the would-be plaintiff may have suffered an injury as a result of conduct that violated the antitrust laws, he or she has no standing to bring a private [*11] action under the antitrust laws to recover for it. *Smithkline Beecham Corp., 118 F.3d at 181.*

Advance PCS argues that the complaint should be dismissed because plaintiffs have not alleged an "antitrust injury ... that is of the type the antitrust laws were intended to protect." n6 Although defendant argues that this injury is necessary to state a cause of action under the Sherman Act, as discussed above, antitrust injury is more accurately analyzed as an issue of standing for private plaintiffs bringing suit under the Clayton Act and is separate and distinct from the factual allegations necessary to state a cause of action under the antitrust laws.

n6 The "antitrust injury" argument asserted by defendant is directed at the alleged price suppression practices. Defendant does not raise this argument with respect to the other alleged restraints of trade, i.e., the 30-day drug dispensing limitation or the fee charge and co-payment restrictions.

In attacking plaintiffs' complaint for failure to plead [*12] an "antitrust injury," Advance PCS argues that price-suppression generally benefits consumers. n7 Advance PCS relies primarily on the Supreme Court's decision in *Atlantic Richfield Co., v. USA Petroleum Co., 495 U.S. 328, 109 L. Ed. 2d 333, 110 S. Ct. 1884 (1990),* where the Court discussed at length what constitutes "antitrust injury" for the purposes of the Sherman Act.

n7 Defendant also advances the argument that price-suppression on the buy side cannot constitute antitrust injury unless there is supra-competitive pricing on the sell side. In support of this proposition, the defendant cites *Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 240-243, 92 L. Ed. 1328, 68 S. Ct. 996 (1948)*; *American Tobacco Co., 328 U.S. 781, 803-806, 90 L. Ed. 1575, 66 S. Ct. 1125*; *United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 219-20, 84 L. Ed. 1129, 60 S. Ct. 811 (1940).* The Court does not read any of these cases to require, as a condition precedent to a finding of "antitrust injury," the coupling of supra-competitive pricing on the sell side and price-suppression on the buy side, as suggested by defendant.

[*13]

In *ARCO,* defendant ARCO was an integrated oil company that sold gasoline to consumers through its own stations and through independent retailers, such as the plaintiff in that case, *USA Petroleum. 495 U.S. at 331.* At some point, ARCO enacted a marketing strategy enabling its own dealers to lower prices. *Id. at 331-32.* USA Petroleum's complaint alleged that the marketing strategy was a conspiracy to fix prices below market levels and reduce competition among gas retailers. *Id. at 332.* The Supreme Court held that USA Petroleum failed to meet the antitrust injury requirement because its losses did "not flow from the aspects of a vertical, maximum price-fixing that render it illegal." *Id. at 337.* In dictum, which Advance PCS now relies on, the Supreme Court stated that "low prices benefit consumers regardless of how those prices are set, and as long as they are above predatory levels, they do not threaten competition." *Id. at 339.*

The Court finds *ARCO* distinguishable from the present case. In contrast to the vertical price-fixing agreement alleged in ARCO (where the distributor was charging lower [*14] prices to the consumer), the situation alleged here is horizontal price-fixing agreement, where distributors are alleged to be colluding with one another to artificially suppress, not the prices charged to consumers, but the prices paid to their suppliers. Clearly, the

Case 1:05-cv-00485-JJF     Document 272-3     Filed 01/05/2007     Page 43 of 44

Page 5

2004 U.S. Dist. LEXIS 3627, *; 2004-1 Trade Cas. (CCH) P74,329

potential anti-competitive effects of the latter are more pernicious than the former. While the vertical price-fixing agreement discussed by the Supreme Court may give rise to price competition between distributors, see *ARCO, 495 U.S. at 341,* the same cannot be said with the horizontal agreement alleged here because the distributors, instead of competitively bidding with the seller, act in concert with one another. The "low prices" favorably referred to in ARCO are not the same "low prices" at issue in the instant case. Indeed, when all reasonable inferences are drawn in favor of the plaintiffs, competition as between the distributors, is decreased and not increased in the case at bar. Thus, an antitrust injury of the type stemming from the reduction of competition has been alleged. *Id. at 334.*

Despite defendant's arguments to the contrary, injury to sellers inflicted through [*15] a horizontal price-fixing conspiracy of buyers constitutes an antitrust injury which is actionable by the seller. See *Mandeville Island Farms, 334 U.S. at 235.* As framed by the Supreme Court in considering a dismissal of a plaintiff's complaint by the district court, the issue presented in Mandeville was "whether, in the circumstances pleaded, California sugar refiners who sell sugar in interstate commerce [the purchasers] may agree among themselves to pay a uniform price for sugar beets grown in California without incurring liability to the local beet growers [the sellers] under the Act." *Id. at 221.* The Court concluded that sugar refiners could not escape liability under the Sherman Act and found it "clear that the agreement is the sort of combination condemned by the Act, even though the price-fixing was by purchasers, and the persons specially injured under the treble damage claim are sellers, not customers or consumers." Id.

In view of the above, the Court finds that plaintiffs have sufficiently pled a restraint in trade resulting in "antitrust injury" that is actionable by plaintiff under the antitrust laws. The "existence of an [*16] 'antitrust injury' is not typically resolved through motions to dismiss," *Brader v. Allegheny Gen. Hosp., 64 F.3d 869, 876 (3d Cir. 1995),* and defendant has provided an insufficient basis for the Court to find the instant case to be an exception.

Having found that an injury of the type protected by the antitrust laws has been pled, the Court turns to the elements necessary to establish a cause of action under the Sherman Act.

C. Section 1 Violations.

*Section 1 of Sherman Act* states that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations is hereby declared illegal." *15 U.S.C. § 1.* In this Circuit, three elements must be alleged to sustain a cause of action under *section 1 of the Sherman Act:* a contract, combination or conspiracy; a restraint of trade; and an effect on interstate commerce. See *Fuentes v. South Hills Cardiology, 946 F.2d 196, 199 (3d Cir. 1990)* (citing *Weiss v. York Hospital, 745 F.2d 786, 812 (3d Cir. 1984),* cert. denied, *470 U.S. 1060, 84 L. Ed. 2d 836, 105 S. Ct. 1777 (1985)).* [*17] Because the effects of defendant's alleged activities on interstate commerce are not disputed by the parties, the Court will determine if the first two elements have been sufficiently pled to state a cause of action.

1. Contract, Combination or Conspiracy. n8

n8 Although Advance PCS argues that the complaint does not state a claim flowing from a vertical price-fixing agreement, plaintiffs have made clear in their memorandum in opposition to the motion to dismiss that the antitrust claim is grounded on a horizontal agreement. See Plaint. Mem. Opp., at 2, 4, 5-6.

Advance PCS argues that the dismissal of the complaint is warranted because the plaintiffs have failed to plead the existence of a horizontal conspiracy. In its view, "[a] horizontal price-fixing agreement is an agreement among competitors fixing their prices ... [but] the Complaint does not allege the existence of any agreement here." The Court disagrees.

According to the Supreme Court, the "fixing of prices by one member of a group pursuant [*18] to express delegation, acquiescence, or understanding is just as illegal as the fixing of prices by direct, joint action." *United States v. Masonite Corp. 316 U.S. 265, 276, 86 L. Ed. 1461, 62 S. Ct. 1070, 1942 Dec. Comm'r Pat. 777 (1942).* Here, plaintiffs' complaint alleges that Advance PCS markets the number and size of the plan sponsors it represents and that each plan sponsor is fully aware that Advance PCS negotiates with network retail pharmacies on behalf of many other plan sponsors. Further, plaintiffs allege in their complaint that the aggregate market power possessed by Advance PCS through its representation of numerous plan sponsors allows it to set prices for prescription drugs and drug dispensing services below that which would have existed in a freely competitive market and allows it to unilaterally impose unreasonable and anti-competitive contract terms on plaintiffs. These lower prices, of course, provide an economic benefit to the plan sponsors as do the 30-day drug supply limitation when coupled with a co-payment limitation. These allegations, if accepted as true, may give rise to the inference that Advance PCS acted with the acquiescence and understanding of the plan sponsors it represented [*19] and

Case 1:05-cv-00485-JJF    Document 272-3    Filed 01/05/2007    Page 44 of 44

Page 6

2004 U.S. Dist. LEXIS 3627, *; 2004-1 Trade Cas. (CCH) P74,329

that each plan sponsor "had an awareness of the general scope and purpose of the undertaking." *Id. at 275.*

"No formal agreement is necessary to constitute an unlawful conspiracy ... The essential combination or conspiracy may be found in course of dealings or other circumstances as well as in any exchange of words." *American Tobacco Co. v. United States, 328 U.S. 781, 809-810, 90 L. Ed. 1575, 66 S. Ct. 1125 (1946).* n9 Based on the allegations made in the complaint, the Court finds that plaintiff has sets forth facts which establish the existence of a contract, combination, or conspiracy. Moreover, the Court finds that the facts pled -- including, but not limited to, the object of the alleged agreements between defendant and the PBMs and actions taken to effect the object of the alleged agreements--are particularized enough to place defendants "on notice of the precise misconduct with which they are charged." *Rose, 871 F.2d at 366.* Thus, the Court will not dismiss the complaint for failure to sufficiently plead a horizontal agreement.

n9 The Third Circuit teaches that consciously parallel action provides circumstantial evidence of a conspiracy in antitrust cases where the (1) defendants' behavior is parallel; (2) the defendants were conscious of each other's conduct and this awareness was an element of their decision-making process; and (3) there is a motivation to enter into such an agreement. *Petruzzi's IGA Supermarkets v. Darling-Delaware Co., 998 F.2d 1224, 1242-43 (3d Cir. 1993).* All of these factors have been pled by the plaintiff in the complaint.

[*20]

2. Restraint of Trade.

In view of *Mandeville, 334 U.S. at 222, 234-35,* discussed above, the Court finds that a price-suppression scheme effected by a group of buyers, who would otherwise compete with one another for goods sold by a seller, constitutes a restraint on trade.

As for the contract provisions relating to fee charges, co-payment prices, and drug dispensing practices, which the plaintiffs claim curtail their ability to distribute their products and limit their ability to set prices, the Court finds that plaintiffs have sufficiently pled a restraint of trade cognizable under *section 1 of the Sherman Act.*

III. CONCLUSION

In view of the above, defendant's motion to dismiss shall be denied.

An appropriate order follows.

ORDER

**AND NOW,** this 2nd day of **March 2004,** for the reasons set forth in the accompanying memorandum, it is hereby **ORDERED** that defendant's motion to dismiss (doc. no. 3) shall be **DENIED.**

**AND IT IS SO ORDERED.**

**EDUARDO C. ROBRENO, J.**