



IN THE DISTRICT COURT OF BOX BUTTE COUNTY, NEBRASKA

BOX BUTTE COUNTY SCHOOL DISTRICT )
NO. 6, a/k/a ALLIANCE PUBLIC SCHOOLS, )
on behalf of itself and all others similarly )
situated, )          Case No. CI 04 - 270
                Plaintiff, )
                                              )          ORDER
        v.                                    )
                                              )
BAYER AG; *et. al.*,                          )
                Defendants.                   )

This matter came before the Court on July 7, 2005, for hearing on two motions on

the merits brought by Defendants, pursuant to Neb. R. Pleading Civ. Actions Rule

12(b)(6):

1) Motion to Dismiss by Bayer MaterialScience LLC (f/k/a Bayer Polymers

LLC), Bayer Corp., Crompton Corp., Uniroyal Chemical Co., Inc., DSM Copolymers,

Inc., and ExxonMobil Chemical Co., based upon the argument that Plaintiff lacks

antitrust standing as damages alleged by Plaintiff are too attenuated and cannot be

supported by Nebraska law because Plaintiff was the purchaser of a derivative end-use

product in which Defendants' product was one component; and

2) Motion to Dismiss by Defendant ExxonMobil Chemical Co., based upon the

argument that Plaintiff failed to sufficiently plead its Complaint in that it failed to put

Defendants on fair notice of the claims against them.

Briefs were submitted and oral arguments were heard on these issues, and the

Court took the matter under advisement.

After consideration of the oral arguments presented by the parties and a review of the briefs submitted by the parties,

IT IS HEREBY ORDERED that these motions are OVERRULED.

Dated this _____ day of January 2006.

BY THE COURT:

Brian C. Silverman
District Judge

2



LEXSEE 2003 US DISTRICT LEXIS 13273

Questioned
As of: Jan 05, 2007

**BRADBURN PARENT/TEACHER STORE, INC. v. 3M (MINNESOTA MINING
AND MANUFACTURING COMPANY) Padova, J.**

**CIVIL ACTION, NO. 02-7676**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA**

*2003 U.S. Dist. LEXIS 13273; 2003-2 Trade Cas. (CCH) P74,105*

**July 24, 2003, Decided
July 25, 2003, Filed**

**SUBSEQUENT HISTORY:** Class certification denied by *Bradburn Parent/Teacher Store, Inc. v. 3M, 2004 U.S. Dist. LEXIS 3347 (E.D. Pa., Mar. 1, 2004)*

**DISPOSITION:** Portion of Plaintiff's complaint seeking money damages dismissed by agreement of parties. Defendant's motion to dismiss Plaintiff's complaint denied in all other respects.

**COUNSEL:** [*1] For Bradburn Parent/Teacher Store, Inc, on Behalf of Itself and Others Similarly Situated, PLAINTIFF: Charles M Jones, Jones and Osteen Jones & Arnold, Hinesville, GA USA. Gregory Baruch, J Daniel Leftwich, Robert Stephen Berry, Berry & Leftwich, Washington, DC USA.

For 3M (Minnesota, Mining and Manufacturing Company), DEFENDANT: Brent N Rushforth, Kit G Harkins, Jr, Paul Alexander, Heller Ehrman White & McAuliffe, LLP, Washington, DC USA. David W Engstrom, Eleanor Illoway, John G Harkins, Jr, Harkins Cunningham, Philadelphia, PA USA.

**JUDGES:** John R. Padova, J.

**OPINION BY:** John R. Padova

**OPINION:**

MEMORANDUM

John R. Padova

Defendant 3M (Minnesota Mining and Manufacturing Company) (hereinafter "3M") has filed a motion to dismiss Plaintiff's Complaint in its entirety pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. For the reasons that follow, the Court grants Defendant's Motion in part and denies Defendant's Motion in part.

I. PRIOR HISTORY

The conduct of Defendant which forms the basis of this lawsuit was the subject of a prior lawsuit in this Court, *LePage's v. 3M, Civ. A. No. 97-3983, 2000 U.S. Dist. LEXIS 3087 (E.D. Pa. Mar. 14, 2000)*(the "Lepage's litigation"). [*2] In that suit, a competing retailer of transparent tape, LePage's, Inc., sued Defendant alleging, *inter alia*, unlawful maintenance of monopoly power in violation of Section 2 of the Sherman Act, *15 U.S.C. § 2*. After a nine-week trial, the jury found in favor of LePage's on its unlawful maintenance of monopoly power claim, and awarded damages of $ 22,828,899.00, which were subsequently trebled to $ 68,486,697.00. See id. This Court subsequently denied Defendant's Motion for Judgment as a Matter of Law with respect to this claim. See id. A panel of the United States Court of Appeals for the Third Circuit ("Third Circuit") initially reversed this Court's Order upholding the jury's verdict and directed this Court to enter judgment for Defendant on LePage's's unlawful maintenance of monopoly power claim. *LePage's, Inc. v. 3M, 277 F.3d 365 (3d Cir. 2002)* ("LePage's I"). Upon rehearing *en banc*, the Third Circuit vacated the panel decision and reinstated the jury verdict against Defendant on LePage's's unlawful maintenance of monopoly power

2003 U.S. Dist. LEXIS 13273, *; 2003-2 Trade Cas. (CCH) P74,105

claim. *LePage's, Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003)* ("LePage's II"). [*3]

## II. THE COMPLAINT

The Complaint alleges one count of monopolization in violation of the Sherman Act, *15 U.S.C. § 2*. The Complaint alleges that Defendant unlawfully maintained its monopoly in the transparent tape market through its bundled rebate programs n1 and through exclusive dealing arrangements with various retailers. The Complaint asserts that, as a result of Defendant's conduct, Plaintiff and other members of the proposed Class have "suffered antitrust injury." (Compl. P 27). The damages period in this case runs from October 2, 1998 until the present. (Compl. P 2).

> n1 As discussed at length in the LePage's litigation, Defendant's bundled rebate programs provided purchasers with significant discounts on Defendant's products. However, the availability and size of the rebates were dependant upon purchasers buying products from Defendant from multiple product lines. See *LePage's II, 324 F.3d at 154-55*.

Plaintiff seeks declatory relief, permanent injunctive relief, [*4] treble compensatory damages, attorney's fees, costs and interest. (See Compl. PP A-F).

Plaintiff seeks to join other direct purchasers of Defendant's transparent tape from October 2, 1998, and the present as a class under *Rule 23 of the Federal Rules of Civil Procedure*.

Plaintiff seeks offensive collateral estoppel as to four issues decided in the LePage's litigation. First, Plaintiff seeks offensive collateral estoppel as to the definition of the relevant market for transparent tape. n2 (Compl. P 17). Second, Plaintiff seeks offensive collateral estoppel as to Defendant's monopoly power in this market. n3 (Id.) Third, Plaintiff seeks offensive collateral estoppel as to the "exclusionary and unlawful nature" of Defendant's bundled rebate programs. (Id.) Fourth, Plaintiff seeks offensive collateral estoppel as to the harm to competition caused by and resulting from Defendant's violation of *Section 2 of the Sherman Act*. (Id.)

> n2 On appeal in the Lepage's litigation, "the parties agreed that the relevant product market is transparent tape and the relevant geographic market is the United States." *LePage's II, 324 F.3d at 146*.

[*5]

> n3 Defendant conceded in the LePage's litigation that it possessed monopoly power in this market, with a 90% market share. *LePage's II, 324 F.3d at 146*.

## III. LEGAL STANDARD

A claim may be dismissed under *Federal Rule of Civil Procedure 12(b)(6)* only if the plaintiff can prove no set of facts in support of the claim that would entitle her to relief. *ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir.1994)*. The reviewing court must consider only those facts alleged in the complaint and accept all of the allegations as true. Id.

## IV. MOTION TO DISMISS

A. Failure to Allege Injury Causally Linked to A Violation of The Antitrust Laws

Defendant argues that Plaintiff has failed to allege facts which could establish a causal link between the anti-competitive conduct that Defendant was found responsible for in the LePage's litigation and the supracompetitive prices that Plaintiff and other class members have allegedly paid for transparent tape during the damages period in this case. The Third Circuit has held that the following five factors must [*6] be considered in determining whether a plaintiff has standing to challenge an alleged antitrust violation:

> 1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

2003 U.S. Dist. LEXIS 13273, *; 2003-2 Trade Cas. (CCH) P74,105

*Angelico v. Lehigh Valley Hospital, 184 F.3d 268, 274 (3d Cir. 1999).* Thus, a causal link between the antitrust violation and the harm that Plaintiff suffers is a necessary (though not sufficient) component to establishing standing.

There are no special pleading requirements for an antitrust claim. Rather, "Notice pleading is all that is required for a valid antitrust complaint." *Municipal Utilities Bd. of Albertville v. Alabama Power Co., 934 F.2d 1493, 1501 (11th Cir. 1991).* [*7] Furthermore, "the existence of an 'antitrust injury' is not typically resolved through motions to dismiss." *Brader v. Allegheny Gen. Hosp., 64 F.3d 869, 876 (3d Cir. 1995).* (citations omitted). On the other hand, to survive a Motion to Dismiss, Plaintiff's Complaint must contain more than conclusory allegations of "harm to competition." *Microsoft Corp. v. Computer Support Services of Carolina, 123 F. Supp. 2d 945, 951 (W.D.N.C. 2000).* Rather, Plaintiff must allege that it has suffered an actual injury "causally linked to a violation of the antitrust laws." *Pace Electronics, Inc. v. Cannon Computer Systems, Inc., 213 F.3d 118, 120 (3d Cir. 2000).* Thus, "reasonable particularity in pleading" is required under the antitrust laws. *Garshman v. Universal Res. Holding, Inc., 625 F. Supp. 737, 741 (D. N.J. 1986).* Furthermore, "The pleader will not be allowed to evade this requirement by attaching a bare legal conclusion to the facts that he narrates: if he claims an antitrust violation, but the facts he narrates do not at least outline or adumbrate such a violation, he will get nowhere merely by dressing them up in the language [*8] of antitrust." *Id. at 742.*

Plaintiff's allegations concerning injury and causation are found in Paragraph 27 of the Complaint, in which Plaintiff alleges as follows:

> As found in LePage's or otherwise, 3M's unlawful maintenance of its tape monopoly has suppressed competition and *has maintained prices paid by direct purchasers to 3M well above competitive levels after any 3M rebates (if any) attributable to tape purchases. By 1997, and before the damage period in this action commenced,* 3M began implementing one or more increases in its monopoly pricing. These increases were facilitated and maintained by virtue of its exclusionary practices. As a consequence, members of the alleged class purchasing at these prices have all suffered antitrust injury.

(Compl. P 27)(emphasis added). According to Defendant, the Complaint is defective because it

> fails to allege that any price increase for transparent or invisible tape by 3M after October 1998 was anything other than a response to the standard market phenomena of cost increases and inflationary pressure. If [Plaintiff] is saying that, because of LePage's, years later 3M cannot [*9] respond to cost increases by adjusting its prices, then the theory is invalid as a matter of law.

(Def. Mot. Dismiss at 6). According to Defendant, in order to survive a Motion to Dismiss, the allegations in Plaintiff's Complaint must support some theory which could explain how price increases, if any, implemented during the damages period were caused by the anticompetitive conduct of Defendant that was at issue in the LePage's Litigation. Defendant asserts that "there is in fact no causal link between any price adjustment that [Defendant] might make in transparent tape today in response to, for example, cost increases and any of the events at issue in LePage's." (Def's Mot. Dismiss at 2). Defendant points out that the conduct of Defendant which the jury in the LePage's Litigation found to be in violation of the *Sherman Act* (bundled rebates and exclusive dealing contracts with certain high volume retailers) resulted in *decreased prices* for the products Defendant sold (Def's Reply Mem. at 5). Thus, while this conduct undoubtedly harmed LePage's, see *LePage's II, 324 F.3d at 160-62,* Defendant argues that retailers, who bore the benefit of these [*10] lower prices, cannot claim antitrust injury because of this conduct. See *Atlantic Richfield Co. v. U.S.A. Petroleum Co., 495 U.S. 328, 109 L. Ed. 2d 333, 110 S. Ct. 1884 (1990)* (noting that a plaintiff does not suffer antitrust injury if he is benefitted, and not harmed, by anti-competitive conduct.)

Defendant further notes the failure of Plaintiff's Complaint to assert a "recoupment" theory under *Brooke Group, Ltd. v. Brown and Williamson Tobacco Corp., 509 U.S. 209, 125 L. Ed. 2d 168, 113 S. Ct. 2578 (1993).* In Brooke Group, the United States Supreme Court held that the practice of pricing goods below cost in order to remove competitors from the relevant market, and then subsequently raising prices in order to recoup the losses sustained because of the below-cost pricing, was illegal under the antitrust laws. See *id. at 226.* Plaintiff's Complaint, however, contains no allegations which would support a "recoupment" theory. This is not surprising, considering that there was no evidence in the LePage's Litigation that Defendant priced its transparent tape be-

2003 U.S. Dist. LEXIS 13273, *; 2003-2 Trade Cas. (CCH) P74,105

low its cost. Indeed, Plaintiff appears to specifically disclaim any reliance [*11] upon a theory of "recoupment" under Brooke Group. (Pl's Opp. Mot. Dismiss at 11-12).

However, the allegations in Plaintiff's Complaint do support at least one theory of causation which could entitle Plaintiff to relief. Plaintiff alleges in the Complaint that Defendant "has maintained prices paid by direct purchasers to 3M well above competitive levels after any 3M rebates (if any) attributable to tape purchases." (Compl. P 27.) Plaintiff's response to the Motion to Dismiss elaborates that "3M, from the start maintained its prices at monopoly levels prevailing before it began its illicit and exclusionary scheme in 1992, which was intended to protect and maintain those anti-competitive prices." (Pl's Opp. Mot. Dismiss at 12). Plaintiff further asserts that "whatever the size of rebates given to the largest class members, they were still rebates off a monopoly price." (Pl's Opp. Mot. Dismiss at 13). Thus, the allegations in the Complaint appear to assert that the bundled rebates and exclusive dealing that Defendant engaged in allowed Defendant to maintain its monopoly in the transparent tape market and stifled competition from Lepage's (and possibly other competitors), which in [*12] turn allowed Defendant to maintain supra- competitive prices for transparent tape.

According to Defendant, Plaintiff's claims cannot be reconciled with the fact that, at least while the bundled rebate program was being instituted, retailers that received the bundled rebates paid *less* for the total amount of goods they received from Defendant than they would have paid had they bought these products from other suppliers. (Def's Reply Mem. at 5). However, Plaintiff does allege in the Complaint that Defendant "has maintained prices paid by direct purchasers to 3M well above competitive levels *after any 3M rebates (if any) attributable to tape purchases*." (Compl. P 27.)(emphasis added). Thus, Plaintiff's allegations, if proven, could establish that, were it not for Defendant's anticompetitive conduct, Plaintiff would have paid less for transparent tape than it actually paid during the damages period, even when any bundled rebates or other discounts are taken into account. Under this theory of damages, it is not necessary for Plaintiff to allege the existence of price increases during the damages period for it to survive a Motion to Dismiss.

This theory of the case is supported [*13] by the Third Circuit's *en banc* decision in *LePage's II*. The opinion in LePage's II exhaustively details the plummeting demand for LePage's's tape following the introduction of Defendant's bundled rebate programs, which in turn drastically decreased LePage's's market share during the period from 1992 to 1997. See *Lepage's II, 324 F.3d at 161-62*. The court noted that, "Had 3M continued with its program it could have eventually forced LePage's out

of the market." *Id. at 162*. The court also noted that "3M's exclusionary conduct not only impeded LePage's ability to compete, but it also harmed competition itself. . . ." *LePage's II, 314 F.3d at 162*. Plaintiff's allegations, in turn, could establish that, had Defendant's conduct not drastically reduced the market power of LePage's, the prices that plaintiff paid for transparent tape would have decreased to the point where they were less than the price Plaintiff actually paid for transparent tape during the damages period, even after any rebates or discounts provided by Defendant are taken into account.

The cases Defendant cites do not alter the Court's conclusion. Defendant cites [*14] to *Schuylkill Energy Resources v. Pennsylvania Power and Light Co., 113 F.3d 405 (3d Cir. 1997)*, for the proposition that dismissal under *Rule 12(b)(6)* is proper where the claim of antitrust injury rests upon "unsupported conclusions" or "unwarranted inferences". However, the court in Schuylkill was faced with a plaintiff who was at the current time legally barred from competing with the defendant in the relevant market. The court held that the plaintiff's potential entry into the market at a later point in time (based upon planned de-regulation of the electricity market) was too speculative to allow it to recover for antitrust injury. *Id. at 418*. Here, there is no dispute that Plaintiff was a direct purchaser in the market for transparent tape from October 2, 1998 until December, 2000. Furthermore, as discussed, *supra,* the allegations in Plaintiff's Complaint, if proven, do support at least one theory of causation which could entitle Plaintiff to relief.

B. Dismissal of Indirect Purchaser Damages Claims Based Upon Illinois Brick

Defendant seeks to dismiss any claims for damages based upon conduct that occurred after December, 2000. [*15] Plaintiff concedes that at this time it ceased to be a direct purchaser of transparent tape from Defendant, and, therefore, that it has no standing to obtain money damages on its own behalf for alleged overcharges which occurred after this date. (Pl's Opp. Mot. Dismiss at 10); see also *Illinois Brick v. Illinois, 431 U.S. 720, 52 L. Ed. 2d 707, 97 S. Ct. 2061 (1977)*. Thus, to the extent that Plaintiff's Complaint can be read to seek money damages on its own behalf based upon damages incurred after December, 2000, this portion of Plaintiff's Complaint will be dismissed by agreement of the parties. n4

    n4 The parties dispute whether Plaintiff can represent a class of purchasers who directly purchased transparent tape after December, 2000. This issue is properly decided on a motion for class certification, and the Court expresses no opinion on this question at this time.

2003 U.S. Dist. LEXIS 13273, *; 2003-2 Trade Cas. (CCH) P74,105

## V. CONCLUSION

For the reasons discussed above, to the extent that Plaintiff's Complaint can be read to seek money damages [*16] on its own behalf for damages incurred after December, 2000, this portion of Plaintiff's Complaint will be dismissed by agreement of the parties. Defendant's Motion to Dismiss is denied in all other respects. An appropriate order follows.

## ORDER

**AND NOW**, this 22nd day of July, 2003, upon consideration of Defendant's Motion to Dismiss Plaintiff's Complaint (Document # 41), Plaintiff's Response (Document # 43), and all related submissions, **IT IS HEREBY ORDERED** as follows:

A) By agreement of the parties, to the extent that Plaintiff's Complaint can be read to seek money damages on its own behalf for the period after December, 2000, this portion of Plaintiff's Complaint is **DISMISSED**; and B) Defendant's Motion to Dismiss Plaintiff's Complaint is **DENIED** in all other respects.

BY THE COURT:

John R. Padova, J.



STATE OF WISCONSIN          CIRCUIT COURT          DANE COUNTY
                              BRANCH 9

TOM CAPP,

      Plaintiff,

   v.
                                              Case No. 00 CV 0637

MICROSOFT CORPORATION,
a Washington corporation,

      Defendant.

FILED
JUL 2 5 2001
CIRCUIT COURT DANE COUNTY, W.

## ORDER CERTIFYING CLASS ACTION

The Plaintiff's Motion to Certify Action as Class Action (the "Class Certification

Motion") filed on March 7, 2000, came on for hearing before this Court on June 29, 2001, at

9:00 a.m.; Plaintiff Tom Capp having appeared by his counsel, Turner & Massch, by Mark A.

Maasch, of San Diego, California; Defendant Microsoft Corporation ("Microsoft") having

appeared by its counsel, Quarles & Brady, by Stuart Parsons, of Milwaukee, Wisconsin, Sullivan

& Cromwell, by Justin Daniels, of New York, New York, and Montgomery, McCracken, Walker

& Rhoads, by Peter Breslauer, of Philadelphia, Pennsylvania; and the Court having thoroughly

reviewed and considered the memoranda and materials submitted by the parties together with the

statements and arguments of counsel and all of the records on file, and after doing so, finding

and concluding, for the reasons more fully stated in my bench decision which has been

transcribed, that the requirements of Wis. Stats. § 803.08 have been satisfied and that the class

proposed in Plaintiffs' First Amended Complaint dated March 15, 2000, should be certified.

QBMKE\5089005.1

108-1

NOW, THEREFORE, IT IS HEREBY ORDERED, as follows:

1.     That Microsoft's Motion to Compel and Motion for Evidentiary Hearing are denied;

2.     That Plaintiffs' Motion to Certify Action as Class Action shall be and is GRANTED;

3.     That the class certified shall be and is as follows:  All end user licensees of Windows 98 residing in the State of Wisconsin as to whom Microsoft has an electronic mail address that is computer-accessible by Microsoft;

4.     That Tom Capp be certified as the class representative;

5.     That John L. Cates and Mark A. Maasch be appointed as lead counsel for the class; and

6.     That an appropriate notice be sent to the members of the class as soon as practicable after the class certification issue is decided in Milwaukee, and this Court has had an opportunity to consider consolidating actions within this state.

Dated this 25 day of July, 2001.

Hon. Gerald Nichol
Dane County Circuit Court Judge

10

LEXSEE 1992 US DIST LEXIS 18234



Analysis
As of: Jan 05, 2007

**JOHN H. CHURCH JR., et al., on behalf of himself and others similarly situated, Plaintiffs, v. CONSOLIDATED FREIGHTWAYS, INC., et al., Defendants.**

**No. C-90-2290 DLJ**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*1992 U.S. Dist. LEXIS 18234; Fed. Sec. L. Rep. (CCH) P97,047*

**September 14, 1992, Decided
September 15, 1992, Filed; September 17, 1992, Entered**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff employees sought subclass certification leave to amend the complaint in a class action against defendants, employer and its successors, alleging violations of the Securities Exchange Act of 1934, *15 U.S.C.S. § 78*(a) et seq.; the Employment Retirement Income Security Act (ERISA), *29 U.S.C.S. § 1001* et seq.; the Age Discrimination in Employment Act (ADEA), *29 U.S.C.S. § 626* et seq.; and certain pendent state common law claims.

**OVERVIEW:** The employees' class action arose from their employer's successful acquisition by tender offer and the subsequent consolidation of the employer and its subsidiary. The employees filed a motion for subclass certification, proposing a subclass of discharged employees. The employees also filed a motion for leave to amend their complaint to add two new causes of action under ERISA to allege breach of fiduciary duties regarding investigation of the tender offer terms and regarding managing assets. The court granted both motions. The court reasoned that by limiting the number of pendent common law claims to claims for fraud and negligent misrepresentation under California law, the employees minimized the choice of law determinations that previously warranted against certification. The court

found that common issues of law predominated. The court reasoned that the liberal amendment policy under Fed. R. Civ. P. 15 favored leave to amend where it was at least arguable that the proposed allegations stated a claim.

**OUTCOME:** The court granted the employees' motions for subclass certification and for leave to file a first amended class action complaint.

**LexisNexis(R) Headnotes**

*Civil Procedure > Class Actions > Certification*
*Civil Procedure > Class Actions > Judicial Discretion*
[HN1] A district court should not consider the merits of the action when determining whether class certification is appropriate. Rather, a district court should rule only on those issues which need to be resolved to reach a determination regarding class certification. Significantly, class certification under Fed. R. Civ. P. 23 is a preliminary ruling and is subject to modification. A district court, however, should determine that the proposed class representatives are part of the class and suffered the same injury as the putative class members.

1992 U.S. Dist. LEXIS 18234, *; Fed. Sec. L. Rep. (CCH) P97,047

*Civil Procedure > Parties > Joinder > General Overview*
*Civil Procedure > Class Actions > Certification*
*Civil Procedure > Class Actions > Prerequisites > Numerosity*

[HN2] Fed. R. Civ. P. 23(a) sets forth four prerequisites for determining whether or not a class should be certified. The rule provides as follows: (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. These prerequisites are commonly called (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*

[HN3] Under Fed. R. Civ. P. 15(a), amendments will be freely granted unless the amendment will cause undue delay, will prejudice the opposing party, is made in bad faith, or is futile.

COUNSEL: [*1] For plaintiffs: Elizabeth Joan Cabraser and James M. Finberg of Lieff, Cabraser & Heimann. Alan M. Sandals of Berger & Montague.

For defendants: Michael L. Zigler and Alan Cope Johnston of Morrison & Foerster.

JUDGES: Jensen

OPINION BY: D. LOWELL JENSEN

OPINION:

ORDER

On December 4, 1991, the Court heard plaintiffs' motion for subclass certification, and plaintiffs' motion for leave to file a first amended class action complaint. Elizabeth Joan Cabraser and James M. Finberg of Lieff, Cabraser & Heimann appeared for plaintiffs. Alan M. Sandals of Berger & Montague also appeared on behalf of plaintiffs. Michael L. Zigler and Alan Cope Johnston of Morrison & Foerster appeared for defendants. Having considered the papers submitted, the arguments of counsel, the applicable law, and the entire record herein,

the Court GRANTS plaintiffs' motion for subclass certification, and GRANTS plaintiffs' motion for leave to file a first amended class action complaint, for the following reasons.

I. BACKGROUND

This is a class action alleging violations of the Securities Exchange Act of 1934, *15 U.S.C. § 78*(a) et seq.; the Employment Retirement Income Security Act ("ERISA"), *29 U.S.C. § 1001,* [*2] et seq., the Age Discrimination in Employment Act ("ADEA"), *29 U.S.C. § 626* et seq., and certain pendent state common law claims.

The factual and procedural background of this action is set forth more fully in this Court's prior Orders, and will not be repeated here. Church, et al. v. Consolidated Freightways, Inc., et al., Civ. No. 90-2290-DLJ (N.D. Cal. Apr. 15, 1991 and Jun. 14, 1991). The following is a brief summary of the background.

A. The tender offer.

This case arises from Consolidated Freightways, Inc.'s ("CF") successful acquisition by tender offer of Emery Air Freight Corporation ("Emery"), and the subsequent consolidation of Emery and CF's subsidiary, CF Air Freight, Inc, into Emery Worldwide ("EWW").

The success of the tender offer depended upon the tender of at least 51% of Emery common and preferred stock. All shares of preferred stock and 20% of outstanding common stock were held in trust for Emery employee participants of the employee stock ownership plan ("ESOP"). Many of these participants comprise the proposed plaintiff subclass. Participating employees could either tender or withhold their shares.

Emery employees [*3] allegedly received several communications from various defendants regarding the tender offer. Defendants essentially recommended that the tender offer was in the best interests of the ESOP participants and recommended that participants tender their shares. Moreover, in a solicitation statement, Emery stated that the post merger company would continue to employ all Emery employees under terms substantially comparable to those existing immediately prior to the merger. Among the then existing terms and conditions of employment for Emery employees, were that severance benefits were determined by years of service, and that the

1992 U.S. Dist. LEXIS 18234, *3; Fed. Sec. L. Rep. (CCH) P97,047

maximum amount of severance benefits then available was twenty-six weeks. These same conditions were not retained following the merger of the companies. Thus plaintiffs contend that the above representations were materially false and were made with the knowledge of CF and Emery.

Plaintiffs allege that, shortly after the tender offer was completed, Emery announced that it was unilaterally reducing by 50% the maximum severance benefits available to employees. Soon thereafter, Emery allegedly began to terminate or constructively discharge its employees on a mass scale, [*4] including the named plaintiffs.

B. Prior attempt at certification of subclass.

Plaintiffs previously sought certification of an umbrella class and two subclasses. The Court certified a class on plaintiffs' ERISA claims and a subclass on the federal securities law claims. See Church, et al. v. Consolidated Freightways, Inc., et al., Civ. No. 90-2290-DLJ, 36, (N.D. Cal. Jun. 14, 1991) ("Order").

The Court denied plaintiffs' motion to certify a subclass based on various pendent state common law claims. Id. Plaintiffs had alleged eleven pendent claims. The Court concluded that plaintiffs had not established that common issues of law and fact predominated, as required for class certification under *Federal Rule of Civil Procedure ("Rule") 23(b)(3)*. Plaintiffs did not identify what common body of law allegedly governed the claims. The Court noted that choice of law issues would necessitate numerous "mini-trials" to determine the applicable law. Moreover, the Court also found that the lack of a presumption of reliance in actions for fraud under California law would require individualized findings of reliance with respect to each class member.

C. Renewed attempt to certify [*5] subclass.

By the present motion, plaintiffs seek to overcome the shortcomings of their previously proposed subclass of common law claimants. Plaintiffs now seek to certify a subclass only on claims for fraud and negligent misrepresentation under California law. Plaintiffs propose the following subclass:

Subclass B: Discharged Employees.
Subclass B is composed of all persons who were exempt (or managerial) employees of Emery and who were

released, discharged, constructively discharged, laid off, forced to resign, or otherwise separated from employment with Emery Worldwide for other than completely voluntary, self-initiated reasons during the period from April 3, 1989 through the present time.

Proposed First Amended Class Action Complaint ("Proposed Amended Complaint"), P 24(b).

As a basis for the fraud and negligent misrepresentation claims, plaintiffs allege that they relied on defendants' misrepresentations by tendering their shares and/or continuing their employment with Emery rather than seeking or accepting alternative employment after the announcement of the tender offer. Id., PP 118, 124. Approximately 75% of the over 1000 proposed subclass members tendered [*6] their shares in response to the tender offer. [cite record].

D. Amended complaint.

Plaintiffs also seek leave to file a First Amended Class Action Complaint. The proposed amended complaint represents, in part, an attempt to conform to the revised pleading of the deceit claims, discussed above. Plaintiffs also seek leave to add two new causes of action under ERISA. The ERISA claims, asserted against Emery ESOP fiduciaries, allege breach of fiduciary duties regarding investigation of the tender offer terms and regarding managing assets of the Emery ESOP.

II. MOTION TO CERTIFY SUBCLASS

A. Legal standard.

The issues in a class certification motion may be generally described as procedural in nature. [HN1] A district court should not consider the merits of the action when determining whether class certification is appropriate. *Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974); Blackie v. Barrack, 524 F.2d 891, 901 (9th Cir. 1975)*, cert. denied, *97 S. Ct. 57 (1976)*. Rather, a district court should rule only on those issues which need to be resolved to reach a determination regarding [*7] class certification. Significantly, class certification under Rule 23 is a preliminary ruling and is subject to modification. *Weinberger v. Jackson, 102 F.R.D. 839, 843 (N.D. Cal. 1984)*. A district court, however, should determine that the proposed class representatives are part of the class and suffered the same injury as the putative class members. *General Tel. Co. of Southwest v. Falcon,*

1992 U.S. Dist. LEXIS 18234, *7; Fed. Sec. L. Rep. (CCH) P97,047

*457 U.S. 147, 156 (1982).*

[HN2] Rule 23(a) sets forth four prerequisites for determining whether or not a class should be certified. The rule provides as follows:

(a) **Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

See Rule 23(a). These prerequisites are commonly called (1) numerosity, (2) commonality, (3) [*8] typicality, and (4) adequacy. *In re Activision Securities Litigation, 621 F. Supp. 415, 428 (N.D. Cal. 1985).*

If the Court finds that Rule 23(a)'s prerequisites are satisfied, it then must consider if the conditions for the proposed form of class action under Rule 23(b) are satisfied. Plaintiffs in this action seek class certification on the California state law claims under Rule 23(b)(3), which requires the Court to make two findings:

[1] that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and [2] that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

See Rule 23(b)(3).

B. Compliance with Rule 23(a).

The Court previously determined that plaintiffs satisfied the requirements of Rule 23(a) with respect to certain common law claims, including the fraud and negligent misrepresentation claims, which do not seek reinstatement of employment as a remedy. Order at 17. Defendants again challenge compliance with Rule 23(a), arguing that the named plaintiffs' claims are not typical of the class. Defendants [*9] contend that the named plaintiffs received and relied upon additional misleading communications, that class members did not receive. However, where misleading communications are consistent and uniform, the class members are similarly situated with respect to all of the communications. See

*Blackie, 524 F.2d at 903.* Accordingly, defendants offer no basis to disturb the Court's previous determination of compliance with Rule 23(a).

C. Compliance with Rule 23(b).

Rule 23(b)(3) requires that (1) the common issues of law or fact predominate over individual issues, and that (2) a class action be the superior means to resolve the litigation. See Rule 23(b)(3).

1. Common issues of law.

In denying plaintiffs' previous attempt to certify the common law claims, the Court noted that plaintiffs failed to identify what common body of law would govern the claims. Order at 27. The Court found this shortcoming itself sufficient to preclude class certification. Id. Plaintiffs now base the claims they wish to certify entirely on California law. Defendants argue that California choice of law rules and due process considerations preclude application of [*10] California law.

The Court's previous denial of subclass certification was based, in part, on problems in choice of law determination:

Given the number of causes of actions, the jurisdictions involved, and the presumed interest of each forum in regulating the employment relationships within its jurisdiction, the number of resolutions this Court must make even before approaching the merits of the action as to which law to apply is overwhelming. On this issue alone, then, a class action is not the superior method of adjudicating the interests implicated as determination of the choice of law issue would require numerous "mini-trials" in and of itself.

Order at 29-30. Plaintiffs seek to alleviate the problems in choice of law determinations by limiting proposed certification to only two common law claims. Defendants contend that this is nothing more than a disguised motion for reconsideration, without the requisite showing of why reconsideration is warranted. Given that determinations regarding class certification may be conditional and altered by the Court before a decision on the merits, see Rule 23(c)(1), it appears to the Court that plaintiffs' motion is a good faith attempt [*11] to cure the problems regarding certification of the common law claims, previously articulated by the Court.

1992 U.S. Dist. LEXIS 18234, *11; Fed. Sec. L. Rep. (CCH) P97,047

(a) Choice of law.

Plaintiffs argue that application of California law is appropriate under California's choice of law rules. This Court is required to apply California choice of law principles in determining which law to apply to plaintiffs' pendent claims. *Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941); SEC v. Elmas Trading Corp., 683 F. Supp. 743 (D. Nev. 1987),* aff'd without opinion, *865 F.2d 265 (9th Cir. 1988).* Under California law, this Court must determine: (1) whether a true conflict of law exists; (2) whether both states have an interest in applying their respective law; and (3) which state's interest would be more impaired should its law not be applied. *Ledesma v. Jack Stewart Produce, Inc., 816 F.2d 482, 484 (9th Cir. 1987); In re MDC Holdings Securities Litigation, 754 F. Supp. 785, 803 (S.D. Cal. 1990).* In class certification motions, this Court generally presumes that California law will apply [*12] unless defendants demonstrate conclusively that the laws of other states will apply. *In re Worlds of Wonder Securities Litigation, Fed. Sec. L. Rep (CCH) P 95,004, 95,629 (N.D. Cal. 1990).* Defendants bear a "substantial burden" in making such a showing. Id.

Defendants contend that there are true conflicts between California law and the law of other states regarding the asserted claims. Defendants provide a lengthy appendix setting forth the alleged conflicts among the different states' laws on the common law claims. See Defendants' Opposition to Plaintiff's [sic] Motion to Certify a Subclass ("Memo in Opposition to Subclass"), Appendix A. Defendants claim that the laws differ in numerous areas including (1) burden of proof; (2) proof of intent; (3) proof of justifiable reliance; (4) the availability of defenses to fraud claims, including the defense that a defendant did not profit as a result of the alleged fraud; and (5) standards governing damage awards, including the availability of punitive damages and prejudgment interest.

Plaintiffs also provide a lengthy account of the claimed similarities among the different states' laws, and attempt [*13] to show that any differences are not of such importance as to undermine certification. See Plaintiff's Memorandum In Support Of Motion To Certify A Subclass ("Memo in Support of Subclass"), 14-19.

Having reviewed the exhaustive briefing on the laws of various jurisdictions, the Court is not entirely convinced that defendants have met their substantial

burden of establishing a true conflict of law regarding the deceit claims. Nevertheless, the Court need not actually decide this issue because, as shown below, even assuming a true conflict, defendants have not established that the interests of other states in having their laws followed in this case is greater than California's same interest.

First, California has a strong interest in preventing fraud by corporations residing and conducting business in California. *In re Activision, 621 F. Supp. at 430.* CF and Emery Worldwide maintain headquarters in California. Moreover, all defendants conducted business in California. Thus California has an interest in applying its law given the defendants' contact in the state.

Second, it is very probable that the deceit claims would not be addressed comprehensively [*14] if California law is not applied. Thus, even if other states have an interest in applying their own law, this interest does not outweigh California's interest in facilitating a class action. *In re Pizza Time Theatre Securities Litigation, 112 F.R.D. 15, 18-21 (N.D. Cal. 1986).* All jurisdictions share the goal of deterring fraudulent conduct and providing a remedy for the victims of fraud. Id.

Each jurisdiction would rather have the injuries of its citizens litigated and compensated under another state's law than not litigated or compensated at all . . . It appears that the maximum attainment of the underlying purposes of all the states will be achieved best by certifying the class.

Id. Thus to the extent that application of California law will facilitate a class action to remedy a fraud, the interests of other states in applying their own law diminishes.

Defendants contend that plaintiffs' deceit claims are nothing more than employment claims, and that other states have a strong interest in regulating employment relationships within their borders. While plaintiffs' claims arise, in part, from an employment context, they are not claims [*15] regarding employee safety, employee contracts, or wrongful termination; they are, in fact, claims for fraud and negligent misrepresentation. Thus while states do have a strong interest in applying their own law to claims regarding employment relationships within their borders, the employment component of the

1992 U.S. Dist. LEXIS 18234, *15; Fed. Sec. L. Rep. (CCH) P97,047

instant claims does not raise the interests of these other states above that of California's.

Accordingly, defendants have not met their substantial burden of demonstrating that the laws of other states, rather than California law, should apply to the proposed class action deceit claims.

(b) Due process.

Defendants contend that application of California law to the proposed class deceit claims would violate the Due Process Clause. In order to apply California law in a constitutionally permissible manner, California "'must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.'" *Phillips Petroleum Co. v. Shutts, 105 S. Ct. 2965, 2978 (1985)* (quoting *Allstate Ins. Co. v. Hague, 101 S. Ct. 633, 639-40 (1981))*. [*16]

While defendants correctly note that a large percentage of potential class members do not reside in California, Shutts requires an examination of the contacts between plaintiffs' "claims" and the forum state. *Shutts, 105 S. Ct. at 2980; In re Seagate Technologies Securities Litigation, 115 F.R.D. 264, 272 (N.D. Cal. 1987).* In this case numerous defendants either resided or conducted business in California. Certain of the alleged misrepresentations emanated from California. Moreover, as stated above, California has an interest in addressing the alleged fraudulent conduct of its residents. Such contacts and interests are sufficient to meet the Shutts standard. See *Seagate, 115 F.R.D. at 272.* Accordingly the application of California law to the proposed class action deceit claims would not violate the Due Process Clause.

2. Common issues of fact.

In denying plaintiffs' previous attempt to certify the common law claims, the Court noted that the need for individualized findings of reliance would weigh against a finding that common questions of fact predominate. The Court relied upon [*17] *Mirkin v. Wasserman, 227 Cal. App. 3d 1537,* review granted, *282 Cal. Rptr. 840 (1991),* holding that there is no presumption of reliance in actions for fraud under California law. Order at 28. Subsequent to the Court's Order, the California Supreme Court granted review of Mirkin, see *282 Cal. Rptr. 840 (1991),* negating its value as precedent. Plaintiffs now reiterate

their argument that reliance would be presumed for the class, negating the need for individualized findings.

California law presumes reliance under certain circumstances. *Vasquez v. Superior Court, 4 Cal. 3d 800, 814 (1971)* (if trial court finds that material misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class); *National Solar Equipment Owners' Ass'n v. Grumman Corp., 235 Cal. App. 3d 1273, 1283-84 (1991),* review den, *1992 Cal. LEXIS 312 (1992)* (given somewhat relaxed rules concerning reliance in a class action setting, where defendant allegedly makes material omissions, [*18] there is no need to show reliance by class members); In re Worlds of Wonder, supra, at P 95,629 (reliance presumed, citing Vasquez).

Defendants argue that the Vasquez reliance presumption is inapplicable here because plaintiffs did not take objective action from which reliance can be presumed. It is true that presumption of reliance depends, in part, upon objective action consistent with reliance. *National Solar, 235 Cal. App. 3d at 1283* (citing *Occidental Land, Inc. v. Superior Court, 18 Cal.3d 355 (1976)).* For example, in Vasquez, plaintiffs affirmatively signed agreements indicating objective action consistent with reliance. *Vasquez, 4 Cal. 3d at 805.* Defendants contend that the proposed plaintiff class members took no action; they simply continued their employment and did not seek new jobs. However, defendants ignore the fact that approximately 75% of the proposed class members took action consistent with reliance--they tendered their shares of preferred stock. Such action supports application of presumed reliance to those proposed class members that tendered their stock. [*19]

Plaintiffs also contend that inaction on the part of those proposed class members who did not tender their stock is also consistent with reliance, and thus presumed reliance under Vasquez should apply. While inaction can be the product of reliance on a misrepresentation or omission, plaintiffs provide no authority for applying the Vasquez presumption of reliance where "inaction" is consistent with both reliance and non reliance. Here, the inaction of those proposed class members who did not tender stock is consistent with both reliance and non reliance. These proposed class members would not be entitled to the Vasquez presumption of reliance, and thus the need for individualized findings of reliance as to these proposed class members militates against a finding that

1992 U.S. Dist. LEXIS 18234, *19; Fed. Sec. L. Rep. (CCH) P97,047

common issues of fact predominate as to their claims. Plaintiffs anticipated this conclusion and request in their reply brief that, at the very minimum, this Court certify the deceit claims of those individuals who tendered shares.

The Court has also reviewed the extensive post-hearing "letter-briefing" on the issue of presumed reliance. Defendants cite In re Xoma Corporation Securities Litigation, Civ. [*20] No. 91-2252, Order (N.D. Cal. December 30, 1991), and argue that California law does not permit presumed reliance for "fraud on the market" claims. However, this case is not a "fraud on the market" case, to the extent that plaintiffs allege reliance on misleading communications, rather than reliance on the integrity of the price of a publicly traded stock. Xoma has no bearing on the application of presumed reliance to the deceit claims in this action. Moreover, after Xoma, another Court in the District applied presumed reliance pursuant to National Solar, under circumstances more akin to the instant action. Levine v. Diamanthuset, Inc., Civ. No. 87-5663-MHP, Order (N.D. Cal. July 14, 1992).

Finally, defendants claim that the need for individualized determinations regarding causation and damages precludes a finding that common issues of fact predominate. The Court previously rejected these same arguments regarding certification of a class for the securities claims. For the same reasons, the possible need for somewhat individualized determinations of causation and damages does not preclude a finding that common issues of fact predominate over the deceit claims.

3. [*21] Conclusion regarding Rule 23(b).

By limiting the number of pendent common law claims to claims for fraud and negligent misrepresentation under California law, plaintiffs minimized the choice of law determinations that previously warranted against certification. Application of California law to the deceit claims is both constitutional and in accordance with California's choice of law rules. Accordingly, the Court finds that common issues of law predominate.

The Court's previous determination that plaintiffs were not entitled to presumed reliance was grounded largely on Mirkin. The California Supreme Court's subsequent grant of review of Mirkin warranted renewed examination of the issue by this Court. Presumption of reliance, however, is limited to those proposed class members who took action consistent with reliance, ie., those members who tendered their stock. Accordingly, the Court finds that common issues of fact predominate as to the proposed class members who tendered their stock. Given the potential number of claimants and the findings of commonality, the Court also finds that a class action is superior to other available methods for the fair and efficient adjudication [*22] of the alleged deceit claims. The Court will grant plaintiffs' motion to certify a subclass for the fraud and negligent misrepresentation claims, limited however, to class members who tendered their stock.

III. MOTION TO AMEND COMPLAINT

Plaintiffs seek leave to file an amended complaint. The proposed amended class action complaint represents, in part, an attempt to conform to the revised pleading of the deceit claims, discussed above. Plaintiffs also seek leave to add two new causes of action under ERISA. The ERISA claims, asserted against Emery ESOP fiduciaries, allege breach of fiduciary duties regarding investigation of the tender offer terms and regarding managing assets of the Emery ESOP.

[HN3] Under Rule 15(a), amendments will be freely granted unless the amendment will cause undue delay, will prejudice the opposing party, is made in bad faith, or is futile. *International Association of Machinists & Aerospace Workers v. Republic Airlines, 761 F.2d 1386, 1390 (9th Cir. 1985).*

Defendants generally oppose amendment, claiming that the amendment will result in delay and prejudice. However, the liberal amendment policy overcomes any such objections. Defendants [*23] vigorously oppose addition of plaintiffs' proposed ERISA claims. This issue has also been the subject of post-hearing "letter briefing." Without delving into the detail of the nature of the claims, it does not appear to the Court that addition of the proposed ERISA claims would be "futile" in the strictest sense. Again, the liberal amendment policy favors leave to amend where it is at least arguable that the proposed allegations state a claim. Accordingly the Court will grant the motion for leave to file an amended complaint. This determination does not preclude defendants from challenging the sufficiency of the new ERISA claims under Rule 12(b)(6), or otherwise.

IV. CONCLUSION

1992 U.S. Dist. LEXIS 18234, *23; Fed. Sec. L. Rep. (CCH) P97,047

For the foregoing reasons, the Court ORDERS as follows:

1. Plaintiffs' motion for subclass certification of its fraud and negligent misrepresentation claims is GRANTED, only as to those proposed class members who also tendered their stock. The Court hereby certifies the following class on plaintiffs' fraud and negligent misrepresentation claims:

Subclass B: Discharged Employees.
Subclass B is composed of all persons who were exempt (or managerial) employees of Emery; and who tendered, or instructed [*24] the tender of, common or preferred stock of Emery to Consolidated Freightways during the period from February 17, 1989 to April 6, 1989, inclusive; and who were released, discharged, constructively discharged, laid off, forced to resign, or otherwise separated from employment with Emery Worldwide for other than completely voluntary, self-initiated reasons during the period from April 3, 1989 through the present time.

2. Plaintiffs' motion for leave to file a First Amended Class Action Complaint is GRANTED. Plaintiffs shall file an amended complaint, in conformance with this Order, on or before October 5, 1992;

3. A status conference is hereby scheduled for Wednesday October 28, 1992 at 8:30 a.m.

IT IS SO ORDERED.

DATED: September 14, 1992.

D. Lowell Jensen

United States District Judge



Westlaw.

10 Misc.3d 1055(A), 809 N.Y.S.2d 480, 2005 WL 3288130 (N.Y.Sup.), 2005 N.Y. Slip Op. 51968(U)
**(Cite as: 10 Misc.3d 1055(A))**

**H**
Briefs and Other Related Documents
Cox v. Microsoft Corp.N.Y.Sup.,2005.(The decision of the Court is referenced in a table in the New York Supplement.)
Supreme Court, New York County, New York.
Charles COX and Old Factories, Inc., Individually and on behalf of all those similarly situated, Plaintiffs,
v.
MICROSOFT CORPORATION and Does 1 through 100, inclusive, Defendants.
**No. 105193/2000.**

July 29, 2005.

KARLA MOSKOWITZ, J.
**\*1** Plaintiffs move, pursuant to CPLR 901, for class certification.

Plaintiffs Charles Cox and Old Factories, Inc., bring this action under New York State law to recover damages consumers sustained as a result of defendant Microsoft Corporation's anti-competitive conduct. Plaintiffs assert a claim under General Business Law (GBL) § 349 and a common-law claim for unjust enrichment.

Plaintiffs seek to represent two classes:
All persons and entities who indirectly purchased for their own use and not for purposes of further selling, leasing or licensing, a license in New York for Microsoft Operating System Software (including MS-DOS, Windows 3.11, Windows for Workgroups, Windows NT Workstation, Windows 95, Windows 98, and any upgrades to new versions), on or after May 18, 1994; and
All persons and entities who indirectly purchased for their own use and not for purposes of further selling, leasing or licensing, a license in New York for Microsoft Application Software (including Microsoft Word, Excel, Office Suite, Office and any upgrades to newer versions), on or after May

18, 1994.

Plaintiffs set forth numerous instances of anti-competitive conduct that two federal decisions have found Microsoft perpetrated, *United States v. Microsoft Corp.* (56 F 3d 1448 [DC Cir1995] (Microsoft I), and *United States v. Microsoft Corp.* (84 F Supp 2d 9 [D DC 1999] [Findings of Fact], and 87 F Supp 2d 30 [D DC 2000] [Conclusions of Law], *aff'd in part, rev'd in part, and remanded* 253 F 3d 34 [DC Cir2001] ) (Microsoft II).

Specifically, plaintiffs allege that Microsoft has a monopoly in the operating system software market and in the applications systems software market. In an effort to maintain its monopoly, Microsoft has required manufacturers of personal computers to enter into per-processor license agreements with Microsoft. These agreements have required the manufacturer to pay a royalty to Microsoft on every computer the manufacturer ships out, regardless of whether the computer contains a Microsoft system, another operating system or no operating system at all. Thus, a manufacturer could use a competing operating system only if it was willing to pay twice once to Microsoft and once to Microsoft's competitor. Plaintiffs allege that this practice has had the effect of destroying competition and denying consumers a choice in the operating systems and applications software markets and that it has raised prices for the licensing of Intel-compatible personal computer operating system software and applications software.

In addition, because of Microsoft's monopoly in the operating system market, Microsoft has been able to dictate the terms and conditions under which manufacturers use Microsoft products. Microsoft has required manufacturers to pre-install Microsoft operating systems on their PCs and to act as Microsoft's agents in offering end-user licenses for customers to accept or reject under terms Microsoft strictly and exclusively dictates.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10 Misc.3d 1055(A), 809 N.Y.S.2d 480, 2005 WL 3288130 (N.Y.Sup.), 2005 N.Y. Slip Op. 51968(U)
**(Cite as: 10 Misc.3d 1055(A))**

**\*2** The federal court decisions found an "applications barrier to entry," by which consumers' interest in an operating system derives primarily from the ability of that system to run software applications (*see* Microsoft II, 253 F 3d at 55-56). Windows 95 and Windows 98 are operating systems. Plaintiffs allege that from 1988 to 1998, several products, known as middleware products, threatened to weaken or circumvent the applications barrier to entry, that had insulated Microsoft from competition. Included in this category of products was Netscape Navigator, a web browser that was a complement to, not a substitute for, Windows. Plaintiffs allege that when Netscape Navigator became popular, shortly after its introduction in December 1994, Microsoft attempted to mislead Netscape and the public by conditioning the timing of availability of essential technical information that Netscape needed on Netscape's willingness to agree to certain secret proposed limitations on Netscape's development of platform-level browsing technologies for Windows 95.

Plaintiffs further allege that, in an attempt to steer consumers away from the use of Navigator, Microsoft deliberately engineered a malfunction into Windows 95 by commingling the computer code for Microsoft's Internet Explorer (IE) with that for Windows 95, that would result in a malfunction when using any other browser, such as Navigator. The purpose of this engineered defect was to deceive consumers into believing that any dysfunction with other browsers, such as Netscape, were attributable to defects in that browser software. Plaintiffs allege that Microsoft continued this strategy with Windows 98. In the federal action, the District Court also found that Microsoft designed Windows 98 so "that using Navigator on Windows 98 would have unpleasant consequences for users" by, in some circumstances, overriding the user's choice of a browser other than IE as his or her default browser (Microsoft II, Findings of Fact, ¶ 172).

In October 2002, plaintiffs filed a First Amended Complaint alleging causes of action for violation of GBL § 349, unjust enrichment and breach of implied warranty. I denied Microsoft's motion to dismiss the GBL § 349 claim and granted the

motion to dismiss the unjust enrichment and breach of implied warranty claims. Both parties appealed.

By Order dated June 8, 2004, the Appellate Division reinstated plaintiffs' claim for unjust enrichment and otherwise affirmed the ruling. The Appellate Division found that it did not matter that, as indirect purchasers of Microsoft's software products, plaintiffs only indirectly bestowed a benefit upon Microsoft and stated that "plaintiffs' allegations that Microsoft's deceptive practices caused them to pay artificially inflated prices for its products state a cause of action for unjust enrichment" (*Cox v. Microsoft Corp.,* 8 AD3d 39, 40 [1st Dept 2004] ).

A class action must satisfy the prerequisites of numerosity, commonality, typicality, adequacy of representation and superiority (CPLR 901[a] ). Courts must liberally construe New York's class action statute and read it to "favor the maintenance of class actions" (*Englade v. HarperCollins Publs., Inc.,* 289 A.D.2d 159, 159 [1st Dept 2001]; *Brandon v. Chefetz,* 106 A.D.2d 162, 168 [1st Dept 1985] ).

**\*3** Further, at the class certification stage, inquiry into the merits is limited "to whether on the surface there appears to be a cause of action which is not a sham" (*Brandon v. Chefetz, supra* ).

CPLR 901(a)(1) requires that "the class [be] so numerous that joinder of all members, whether otherwise required or permitted, is impracticable." Here, plaintiffs allege that the class consists of at least thousands of purchasers of Microsoft software. Because each class member's potential recovery is small and they are not likely to bring individual actions for nominal economic injuries, joinder would be impracticable. Therefore, plaintiffs have met the requirement of numerosity.

CPLR 901(a)(3) requires that: "the claims or defenses of the representative parties are typical of the claims or defense of the class." Where, as here, a plaintiff's claims derive from the same practice or course of conduct that gives rise to the claims of the other class members and is based upon the same legal theory, the requirement of typicality is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10 Misc.3d 1055(A), 809 N.Y.S.2d 480, 2005 WL 3288130 (N.Y.Sup.), 2005 N.Y. Slip Op. 51968(U)
**(Cite as: 10 Misc.3d 1055(A))**

satisfied (see *Friar v. Vanguard Holding Corp.,* 78 A.D.2d 83, 98 [2d Dept 1980] ). Microsoft contends that plaintiffs cannot satisfy the typicality requirement of 901(a)(3) because neither of the two named plaintiffs can assert that they were exposed to, or in any way deceived by, all of the conduct alleged in the amended complaint. This is essentially the same argument that Microsoft makes with regard to CPLR 901(a)(2); the requirement of common questions of law and fact. As set forth below, plaintiffs need not demonstrate that Microsoft's conduct in fact deceived each plaintiff.

Plaintiffs have also met the requirements of CPLR 901(a)(4), requiring plaintiffs to demonstrate that they will fairly and adequately protect the interests of the class. Plaintiffs allege, and it is not disputed, that plaintiffs' counsel have extensive experience in litigating complex class actions. In addition, plaintiffs' interests are aligned with the interests of other class members because the same alleged conduct has injured the plaintiffs and all class members. There are no allegations that plaintiffs or their counsel have any interests antagonistic to those of the other class members.

The Claim Under General Business Law § 349

In its ruling, the Appellate Division determined that the allegations of the First Amended Complaint adequately set forth a claim for relief under GBL § 349:
A cause of action under General Business Law § 349 is stated by plaintiffs' allegations that Microsoft engaged in purposeful, deceptive, monopolistic business practices, including entering into secret agreements with computer manufacturers and distributors to inhibit competition and technological development, and creating an "applications barrier" in its Windows software that, unbeknownst to consumers, rejected competitors' Intel-compatible PC operating systems, and that such practices resulted in artificially inflated prices for defendants' products and denial of consumer access to competitors' innovations, services and products.

**\*4** (*Cox v. Microsoft Corp.,* 8 AD3d at 40).

Microsoft argues that plaintiffs' GBL § 349 claim will involve predominantly individual issues and is therefore inappropriate for class certification under CPLR 901(a)(2). Microsoft contends that, in a consumer fraud class action pursuant to GBL § 349, the proof must show that the defendant's misrepresentations or omissions deceived and injured plaintiff. Microsoft argues that first, plaintiffs cannot show that Microsoft reasonably deceived each member of the class, and second, that not every consumer suffered damages. Microsoft presents evidence in the form of pricing information of computers to demonstrate that the cost of the software is a small price of the computer package and that it did not pass all increases on to consumers.

Microsoft relies on *Solomon v. Bell Atlantic Corp.* (9 AD3d 49 [1st Dept 2004] ). In *Solomon,* the First Department decertified a class in an action against Verizon Communications, where the action was based upon Verizon's false advertisements regarding the speed of its DSL service. The Appellate Division found that "[i]n a class action alleging deceptive acts and practices and false advertising, the proof must show that each plaintiff was reasonably deceived by the defendant's misrepresentations or omissions and was injured by reason thereof" (9 AD3d at 52).

However, while reliance may be necessary in a false advertising claim, it is well settled that reliance is not an element of a GBL § 349 claim (*Stutman v. Chemical Bank,* 95 N.Y.2d 24, 29 [2000] citing *Small v. Lorillard Tobacco Co.,* 94 N.Y.2d 43, 55-56 [1999]; *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 26 [1995] ). To prevail in a cause of action under GBL § 349, the plaintiff must prove three elements: that the challenged act or practice was consumer-oriented; that it was misleading in a material way; and that the plaintiff suffered injury as a result of the deceptive act (*Stutman v. Chemical Bank, supra* at 29). In short, the plaintiff must prove causation, not reliance. In *Solomon,* reliance was the only form of causation that was asserted. In this case, plaintiffs sufficiently allege that Microsoft's acts were consumer-oriented, deceptive, and that the plaintiffs suffered injury as a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10 Misc.3d 1055(A), 809 N.Y.S.2d 480, 2005 WL 3288130 (N.Y.Sup.), 2005 N.Y. Slip Op. 51968(U)
**(Cite as: 10 Misc.3d 1055(A))**

result of the deceptive act.

As to Microsoft's second objection, regarding damages, Microsoft's argument is essentially that each class member will need to show that he or she suffered harm, by showing that the alleged overcharge of Microsoft software passed through the chain of distribution.

Microsoft relies on *Small v. Lorillard Tobacco Co.* (94 N.Y.2d 43 [1999] ) in which the Court of Appeals upheld the First Department's decertification of a class action. In *Small,* the plaintiffs sought to bring a GBL § 349 claim as well as common-law claims resulting from the defendant tobacco companies'deceptive practices in selling cigarettes. Plaintiffs alleged that the defendants, inter alia, suppressed evidence that nicotine was addictive and controlled the level of nicotine in cigarettes to cause or maintain nicotine addiction. The Appellate Division concluded that the class actions would be unmanageable because of the individual issues of damages with respect to each of the five million plaintiffs. On appeal, the plaintiffs argued that the Appellate Division incorrectly held that they must prove that they were addicted to nicotine in order to allege a cognizable injury and harm. According to the plaintiffs, addiction was not the injury, rather, they asserted that defendants' deception prevented them from making free and informed choices as consumers. Plaintiffs alleged that, had they known that nicotine was addictive, they never would have purchased cigarettes. The Court of Appeals found that the plaintiffs' definition of injury was legally flawed because their theory contained no manifestation of either pecuniary or " actual" harm. Plaintiffs did not allege the alleged misrepresentation affected the cost of cigarettes, nor did they seek recovery for injury to their health as a result of their ensuing addiction. Thus, the Court of Appeals held that deception does not, in and of itself, constitute an injury.

*\*5 This case is not similar to *Small,* where the plaintiffs could not prove actual harm. Here, plaintiffs allege that Microsoft was able to charge inflated prices for its products as a result of its deceptive actions and that these inflated prices passed to consumers. In addition, as the Appellate

Division noted, plaintiffs also allege that class members had been denied a choice of products as a result of Microsoft's deceptive conduct. Although a plaintiff must prove "actual" injury to recover under a GBL § 349 claim, he or she need not prove pecuniary harm (*Oswego Laborers' Local 214 Pension fund v. Marine Midland Bank,* 85 N.Y.2d at 26).

In addition, although Microsoft has presented evidence that some original equipment manufacturers or retailers may not have raised their prices on computer packages when the price of the Microsoft products went up, this argument goes to the amount of dollar damages individual class members suffered and is not determinative of the question of class certification (*see Makastchian v. Oxford Health Plans, Inc.,* 270 A.D.2d 25 [1st Dept 2000]; *Ackerman v. Price Waterhouse,* 252 A.D.2d 179 [1st Dept 1998] ). Where there are differences in the amount of damages the individual class members suffered, the court may try the class aspects first and create subclasses or appoint a special master to hear the individual damage claims (*see e.g. Godwin Realty Assoc. v. CATV Enterprises, Inc.,* 275 A.D.2d 269 [1st Dept 2000] ).

The Unjust Enrichment Claim

A claim for unjust enrichment must show that the defendant (1) was enriched; (2) at plaintiff's expense; and (3) that "it is against equity and good conscience to permit defendant to retain what is sought to be recovered" (*Matter of Coordinated Title Ins.Cases v. Commonwealth Land Title Ins. Co.,* 2 Misc.3d 1007[A] * * *9 [Sup Ct Nassau County 2004], quoting *Albrechta v. Broome County Indus. Dev. Agency,* 274 A.D.2d 651, 652 [3d Dept 2003] ). As to this cause of action, the Appellate Division has held that "plaintiffs' allegations that Microsoft's deceptive practices caused them to pay artificially inflated prices for its products state a cause of action for unjust enrichment" *(Cox v. Microsoft Corp.,* 8 AD3d at 40).

As to this claim, Microsoft again argues that the only way an indirect purchaser can prove that Microsoft was unjustly enriched is to show that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

10 Misc.3d 1055(A)                                                                                    Page 5

10 Misc.3d 1055(A), 809 N.Y.S.2d 480, 2005 WL 3288130 (N.Y.Sup.), 2005 N.Y. Slip Op. 51968(U)
**(Cite as: 10 Misc.3d 1055(A))**

alleged overcharge passed through the chain of distribution. Microsoft argues that, as a result, plaintiff cannot establish injury and damages on plaintiffs' claims under GBL § 349. As already noted, individual issues regarding the amount of damages will not prevent class action certification ( *see Friar v. Vanguard Holding Corp.,* 78 A.D.2d 83 *supra* ).

CPLR 901(a)(5) requires that the court find that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Clearly, the difficulty and expense of proving the dollar amount of damages an individual consumer suffered, versus the comparatively small amount that any one consumer would expect to recover, indicates that the class action is a superior method to adjudicate this controversy. Moreover, although Microsoft has already defended federal antitrust litigation involving its actions, this class action redresses injuries to individual consumers.

**\*6** Accordingly, for the foregoing reasons, plaintiffs' motion for class certification is granted.

Settle Order.

N.Y.Sup.,2005.
Cox v. Microsoft Corp.
10 Misc.3d 1055(A), 809 N.Y.S.2d 480, 2005 WL 3288130 (N.Y.Sup.), 2005 N.Y. Slip Op. 51968(U)

Briefs and Other Related Documents (Back to top)

• 0105193/2000 (Docket) (Apr. 27, 2000)
• 2000 WL 34566184 (Trial Pleading) Class Action Complaint Demand for Jury Trial (Mar. 10, 2000) Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

12

LEXSEE 2006 US DIST LEXIS 30387

Caution
As of: Jan 05, 2007

**DBSI SIGNATURE PLACE, LLC, an Idaho limited liability company, Plaintiff/Counterdefendant, v. BL GREENSBORO, L.P., a Texas limited partnership, LS NORTHLINE, LLC, a Texas limited liability company, and MARK J. SULLIVAN, Defendants/Counterclaimants.**

**Case No. CV 05-051-S-LMB**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO**

*2006 U.S. Dist. LEXIS 30387*

**May 9, 2006, Decided**

**SUBSEQUENT HISTORY:** Reaffirmed, On reconsideration by, Partial summary judgment denied by, Partial summary judgment granted by, in part, Sanctions disallowed by *DBSI Signature Place, LLC v. BL Greensboro, L.P., 2006 U.S. Dist. LEXIS 86367 (D. Idaho, Nov. 28, 2006)*

**PRIOR HISTORY:** *DBSI Signature Place, LLC v. BL Greensboro, L.P., 2006 U.S. Dist. LEXIS 11495 (D. Idaho, Mar. 1, 2006)*

**COUNSEL:** [*1] For DBSI Signature Place, LLC, an Idaho limited liability company, Plaintiff: Robert B Burns, MOFFATT THOMAS BARRETT ROCK & FIELDS, Boise, ID.

For BL Greensboro, L.P., a Texas limited partnership, LS Northline, LLC, a Texas limited liability company, Mark J Sullivan, Defendants: Andrew C Brassey, BRASSEY WETHERELL CRAWFORD & MCCURDY, Boise, ID.; John W Greene, Arlington, TX.; Christopher P Graham, Brassey Wetherell Crawford & Garrett, Boise, ID.; Frank Hill, Hill Gilstrap, Arlington, TX, US.

For Alliance Commercial Properties, Intervenor: Brian F McColl, WILSON & MCCOLL, Boise, ID.

For Alliance Commercial Properties, ThirdParty Plaintiff: Brian F McColl, WILSON & MCCOLL, Boise, ID.

For DBSI Signature Place, LLC, an Idaho limited liability company, ThirdParty Defendant: Robert B Burns, MOFFATT THOMAS BARRETT ROCK & FIELDS, Boise, ID.

For BL Greensboro, L.P., a Texas limited partnership, ThirdParty Defendant: Andrew C Brassey, BRASSEY WETHERELL CRAWFORD & MCCURDY, Boise, ID.; John W Greene, Arlington, TX.; Christopher P Graham, Brassey Wetherell Crawford & Garrett, Boise, ID.

For BL Greensboro, L.P., a Texas limited partnership, LS Northline, LLC, a Texas [*2] limited liability company, Mark J Sullivan, Counter Claimants: Christopher P Graham, Brassey Wetherell Crawford & Garrett, Boise, ID.

For DBSI Signature Place, LLC, an Idaho limited liability company, Counter Defendant: Robert B Burns, MOFFATT THOMAS BARRETT ROCK & FIELDS, Boise, ID.

For BL Greensboro, L.P., a Texas limited partnership, LS Northline, LLC, a Texas limited liability company, Mark J Sullivan, Cross Claimants: Andrew C Brassey, BRASSEY WETHERELL CRAWFORD & MCCURDY, Boise, ID.; Christopher P Graham, Brassey Wetherell Crawford & Garrett, Boise, ID.

**JUDGES:** Larry M. Boyle, Chief U. S. Magistrate Judge.

**OPINION BY:** Larry M. Boyle

**OPINION:**

ORDER

Currently pending before the Court are Plaintiff's Motion for Leave to File Third Amended Complaint Requesting Punitive Damages (Docket No. 56), Plaintiff's Motion to Compel Responses to Punitive Damages Discovery (Docket No. 66), Defendants' Motion for Summary Judgment (Docket No. 80), Plaintiff's Motion for Summary Judgment (Docket No. 79), and Plaintiff's Motion to Strike Fifteenth Affirmative Defense and Count Two of Defendants' Counterclaim (Docket No. 95). Having carefully reviewed the record, considered oral arguments, and otherwise [*3] being fully advised, the Court enters the following Order.

## I.

## BACKGROUND

In May of 2004, DBSI Housing, Inc. ("DBSI Housing"), the affiliated predecessor in interest to Plaintiff/Counterdefendant DBSI Signature Place LLC ("Plaintiff") began negotiating with Defendant/Counterclaimant BL Greensboro, L.P. ("Greensboro") for the purchase of a commercial office complex ("Signature Place") in Greensboro, North Carolina. *Plaintiff's Statement of Undisputed Material Facts,* PP 1, 3 (Docket No. 79, Att. 2); *Second Amended Complaint and Demand for Jury Trial,* P 9 (Docket No. 55). Defendant/Counterclaimant LS Northline, LLC ("Northline") is the sole general partner of Greensboro and Defendant/Counterclaimant Mark J. Sullivan ("Sullivan") is the vice-president of Northline. *Second Amended Complaint and Demand for Jury Trial,* PP 3-4 (Docket No. 55). In this capacity, Sullivan communicated with various individuals at DBSI Housing to facilitate negotiations for, and the eventual purchase of, Signature Place.

On July 8th and 9th of 2004, the parties consummated negotiations and executed an Earnest Money Contract ("Contract") for the purchase of Signature Place. *Plaintiff's* [*4] *Statement of Undisputed Material Facts,* P 3 (Docket No. 79, Att. 2); *Graham Affidavit,* Exhibit E (Docket No. 65, Att. 3). A proposed assumption of leases ("Assumption") was attached to the Contract. *Graham Affidavit,* Exhibit E (Docket No. 65, Att. 3). At the closing on September 30, 2004 ("Closing"), Douglas L. Swenson, President of DBSI, executed the Assumption, which provided:

> Assignee [DBSI Housing] hereby assumes, and agrees to perform all of the obligations of Assignor [Greensboro] under the Leases after the date of this Assignment, and assumes and agrees to pay any leasing commissions that become

payable after the date of this Assignment with respect to any of the Leases . . . .

*Id.* at Exhibit F (Docket No. 65, Att. 4); *Plaintiff's Statement of Undisputed Material Facts,* P 5 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts,* P 5 (Docket No. 94).

The leases assumed by DBSI at the Closing include one with TRC Staffing Services, Inc. ("TRC"), entered on January 16, 2004. *McMurray Affidavit,* P 2 (Docket No. 56. Att. 5). The TRC lease specifies that the Lessor--Greensboro at the time the lease was executed--"is [*5] providing . . . up to $ 9.00 per rentable square foot for Tenant Improvements ('Tenant Upfit Allowance')." *Plaintiff's Statement of Undisputed Material Facts,* P 26 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts,* P 26 (Docket No. 94). The lease further provides that "[t]he Tenant Upfit Allowance will be paid to Lessee [TRC] upon completion of the Tenant Improvements, issuance of a Certificate of Occupancy for the Premises, and Contractor's Waiver of Lien." *Graham Affidavit,* Exhibit A at Art. XX of Ex. C (Docket No. 65, Att. 1).

The City of Greensboro issued a Certificate of Occupancy for the TRC premises in April of 2004--almost four months before DBSI executed the Assumption. *McMurray Affidavit,* P 3 (Docket No. 56. Att. 5). However, although the construction work was "substantially completed" in April, 2004, the contractor did not execute a lien waiver until January 21, 2005, and TRC did not request payment for the Tenant Upfit Allowance until February 25, 2005. *Graham Summary Judgment Affidavit,* Exs. F, G (Docket No. 80, Att. 7); *Plaintiff's Statement of Undisputed Material Facts,* PP 27, 30 (Docket No. 79, Att. 2); [*6] *Response to DBSI's Statement of Undisputed Material Facts,* PP 27, 30 (Docket No. 94).

Another lease assumed by DBSI on September 30, 2004, was executed by Greensboro and Greensboro Orthopedic Clinic, P.A. ("GOC") on June 2, 2004. *Graham Affidavit,* Exhibit D at Art. XXI of Ex. C (Docket No. 65, Att. 2). This lease provided that the Lessor--Greensboro at the time--"shall provide $ 40.00 per rentable square foot for Tenant Improvements ('Tenant Upfit Allowance')," and that the Tenant Upfit Allowance would be paid "upon completion of the Tenant Improvements and issuance of a Certificate of Occupancy for the Premises." *Plaintiff's Statement of Undisputed Material Facts,* P 28 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts,* P 28 (Docket No. 94). The total allowance for this tenant upfit came to $ 1,220,712. *Id.* The lease specified that the "Lessor shall pay the Tenant Upfit Allowance upon completion of the Tenant Improvements as evidenced by a certificate of occupancy

and delivery of a lien waiver signed by any person or entity who performed work or supplied materials for upfit of the Premises." *Graham Affidavit,* Exhibit D at Art. [*7] XXI of Ex. C (Docket No. 65, Att. 2).

GOC commenced construction of its tenant improvements in July 2004 and had substantially completed the improvements by the end of November of 2004. *Plaintiff's Statement of Undisputed Material Facts,* P 29 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts,* P 29 (Docket No. 94). The City of Greensboro issued a certificate of occupancy in November--*after* the September Closing on the purchase of Greensboro Place and Plaintiff's Assumption of the leases. *McMurray Affidavit,* P 5 (Docket No. 56, Att. 5). GOC began to occupy the premises in December of 2004. *Answer to Second Amended Complaint,* p. 12 at P IX (Docket No. 90).

The parties' Contract required Defendants to provide tenant estoppel certificates as a condition of Closing. *Third Burns Affidavit,* Exhibit 4, p. 11 (Docket No. 79, Att. 3). Defendant Sullivan delivered these certificates to Plaintiff, as required by the Contract. Despite the fact that GOC was undergoing tenant upfits and TRC had substantially completed its improvements, their estoppel certificates state that "Tenant asserts no claim against Landlord in regard to any obligation [*8] of Landlord relating to the Premises." *Graham Affidavit,* Exhibits N, O (Docket No. 65, Att. 6). The TRC certificate additionally states that TRC had paid no amount to Defendants for prepaid rent. *Id.* at Exhibit O.

Greensboro obtained GOC as a tenant, in part, through the efforts of Alliance Commercial Properties ("Alliance Commercial"). Prior to entering a lease with GOC, Greensboro entered into a Broker Agency and Commission Agreement Lease Transaction ("Commission Agreement") with Alliance Commercial on February 17, 2004. *Graham Affidavit,* Exhibit B (Docket No. 65, Att. 1). The Commission Agreement provides that the Listing Agency (Greensboro) "agrees to pay" Alliance Commercial four percent "of the total commission received by Listing Agency for the transaction, *payable when Listing Agency receives the commission.*" *Id.* (emphasis added); *Plaintiff's Statement of Undisputed Material Facts,* P 10 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts,* P 10 (Docket No. 94). The Commission Agreement later explains that the "Listing Agency's Listing Agreement specifies the commission is payable as follows": "One-half commission to [*9] be paid upon Lease Execution; one-half commission to be paid upon occupancy by Tenant." *Graham Affidavit,* Exhibit B (Docket No. 65, Att. 1). Although Greensboro never received a commission for the GOC lease as the "listing agent," it paid the first half of the lease commission to Alliance after execution

of the lease with GOC. *Plaintiff's Statement of Undisputed Material Facts,* PP 11, 12 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts,* PP 11, 12 (Docket No. 94).

Plaintiff has now paid the Tenant Upfit Allowances to GOC and TRC, but filed the present action on January 31, 2005, alleging that Defendants breached their contractual obligations and that Defendant Greensboro is the party responsible for paying the upfit allowances. Plaintiff also seeks recovery for TRC's prepaid rent. *Second Amended Complaint,* P 16 (Docket No. 55). Defendant has counterclaimed for breach of contract, alleging that (1) Plaintiff breached the Assumption agreement by failing to pay the second half of Alliance Commercial's leasing commission, and (2) Defendants are entitled to a set-off based on Plaintiff's alleged failure to reimburse Defendants for a rents [*10] or charges collected after Closing, pursuant to section 8.4 of the Contract.

Plaintiff has alleged both contract and tort claims against Defendants Greensboro and Northline, but only tort claims--including fraud--against Defendant Sullivan. *Second Amended Complaint,* (Docket No. 55). The primary conduct forming the basis for Plaintiff's tort claims are representations that Defendant Sullivan allegedly made to Eric Gordon of DBSI Housing sometime between July 28, 2004, and August 2, 2004. *Gordon Affidavit,* P 4 (Docket No. 56, Att. 5). Mr. Gordon avers that he "confirmed by telephone call with Mark Sullivan . . . that Greensboro was paying all costs associated with the TRC Lease and GOC Lease, as well as the other leases reflected on the rent roll, which costs include the tenant improvement allowances owed to TRC and GOC." *Id.* Based on this alleged representation, tenant estoppel certificates from TRC and GOC, and an email from Sullivan stating that GOC was going to spend an additional $ 15.00 per square foot for tenant improvements "over our allowance," Plaintiff has requested that the Court grant leave to amend its Complaint to add a claim for punitive damages. *See Gordon* [*11] *Affidavit,* P 4-5 & Exhibits A-B (Docket No. 56, Att. 5); *Memorandum in Support of Motion for Leave to File Third Amended Complaint* (Docket No. 56, Att. 1).

Both parties also have moved for summary judgment (Docket Nos. 79 & 80), and Plaintiff has filed a Motion to Strike the Fifteenth Affirmative Defense and Count Two of Defendants' Counterclaim (Docket No. 95).

Plaintiff has consented to the dismissal of its claim for unfair and deceptive acts/practices based on North Carolina law, its claim for negligent representation, and its claim for unjust enrichment. *Plaintiff's Response to Defendants' Motion for Summary Judgment,* p. 6 (Docket No. 93). As a result, Plaintiff's only remaining claims are

for (1) breach of contract, (2) fraud, and (3) unfair and deceptive acts/practices under the Idaho Consumer Protection Act. Defendants have moved for summary judgment on all three claims, and Plaintiff has moved for summary judgment on all of its breach of contract claims except the claim based on the duty of good faith and fair dealing. Also at issue are Defendants' counterclaims for breach of contract. Both parties have moved for summary judgment on the counterclaim related to payment [*12] for the second half of Alliance Commercial's leasing commission, and Plaintiff has moved to strike the second counterclaim seeking a setoff for amounts collected by Plaintiff after the Closing. n1 The final matter addressed in this Order is whether a claim for punitive damages should be allowed in this action. n2

n1 This counterclaim is not the subject of the pending motions for summary judgment, other than as an asserted defense to Plaintiff's claims for breach of contract. By Order dated April 27, 2006, however, the Court allowed supplemental discovery on this counterclaim and the parties may seek summary judgment on this counterclaim on or before August 1, 2006. *Order* (Docket No. 107).

n2 The Court has held two hearings on the issues raised in this action and the matters have been fully briefed.

II.

PRELIMINARY MATTERS

A. Motion to Strike

1. Standards of Law

*Federal Rule of Civil Procedure 12(f)* provides that "the [*13] court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Rule 12(f)* motions are generally viewed with disfavor, *see, e.g., Bassiri v. Xerox Corp., 292 F. Supp. 2d 1212, 1220 (C.D. Cal. 2003); Rosales v. Citibank, 133 F. Supp. 2d 1177, 1180 (N.D. Cal. 2001)*, and "should be denied unless it can be shown that no evidence in support of the allegation would be admissible, or those issues could have no possible bearing on the issues in the litigation." *Gay-Straight Alliance Network v. Visalia Unified School Dist., 262 F. Supp. 2d 1088, 1099 (E.D. Cal. 2001)*. The Court must "view the pleading under attack in the light most favorable to the pleader." *Bassiri, 292 F. Supp. 2d at 1220*.

2. Discussion

Plaintiff has moved to strike Defendants' Fifteenth Affirmative Defense and Count Two of their Counterclaim because the defense and counterclaim were included in an Answer filed by Defendants after the October 17, 2005 deadline for amending pleadings. *See Order* (Docket No. 51). On October 14, 2005, Plaintiff filed a Motion for Leave to Amend [*14] to File Second Amended Complaint. (Docket No. 54). That same day, although the Court had not yet granted Plaintiff's Motion, Plaintiff also filed the Second Amended Complaint. (Docket No. 55). Plaintiff's Second Amended Complaint alleged for the first time that Defendants owe Plaintiff $ 14,175 for the TRC Staffing Tenant Upfit Allowance. (Docket No. 55).

Defendants did not object to Plaintiff's Motion to Amend or otherwise respond to the Second Amended Complaint. It appears that Defendants' failure to respond was due, in part, to Plaintiff's filing, on October 17, 2005, of a Motion for Leave to File Third Amended Complaint Requesting Punitive Damages. (Docket No. 56). Defendants objected to Plaintiff's Motion requesting leave to file a Third Amended Complaint, and the Court held a hearing on January 26, 2006. At the hearing, the Court deferred ruling on the Motion for Leave to File Third Amended Complaint, but granted the Motion for Leave to File Second Amended Complaint and ordered Defendants to file an answer within twenty days. Defendants complied with the Court's order and, on February 14, 2006, filed their Answer to Plaintiff's Second Amended Complaint. (Docket No. 90). It is [*15] this Answer that includes the challenged affirmative defense and counterclaim.

The new affirmative defense and counterclaim are both based on Defendants' assertion that they have a right to a setoff against all of Plaintiff's claims (not just Plaintiff's new claim for the TRC upfit allowance asserted for the first time in the Second Amended Complaint). *Answer to Second Amended Complaint* (Docket No. 90). Specifically, Defendants claim that Plaintiff failed to account for or reimburse Defendant Greensboro for amounts owing to Greensboro for the period prior to the Closing Date, as required by Section 8.4(a) of the parties' Contract. n3 *Answer to Second Amended Complaint,* PP VI, VIII (Docket No. 90). Defendants seek recoupment and/or setoff "in an amount to be proven at trial" against the amount requested by Plaintiff for the breach of contract claims. *Id.* at P XIII.

n3 Section 8.4(a) of the Contract states that "[a]ny rents or other charges subsequently col-

lected by Purchaser [DBSI Housing, Inc.] which are owing to Seller [Greensboro] by tenants or occupants of the Real Property for periods prior to the Closing Date shall forthwith be paid by Purchaser to Seller, including without limitation base escalation or pass-through collection of operating expense amounts." *Third Burns Affidavit,* Exhibit 4, p. 10 (Docket No. 79, Att. 3).

[*16]

This challenge to Plaintiff's recovery on its contract claims was not included in Defendants' earlier Answers and Plaintiff asserts that Defendants have not disclosed any documents or facts supporting their claim to a setoff. n4 *Memorandum in Support of Motion to Strike,* p. 3. (Docket No. 95, Att. 1). Plaintiff also claims that it has been prejudiced by the late-disclosure of the setoff claim because both the discovery and dispositive motion deadlines have passed and, thus, Plaintiff can no longer conduct discovery of the facts underlying Defendants' new claims, nor request summary judgment with regard to them. *Id.* Plaintiff requests that the Court grant its Motion to Strike as the only way to avoid manifest prejudice. *Id.* at p. 4.

n4 The sole document in the record before the Court evincing the setoff is an April 2005 demand letter from Greensboro requesting that Plaintiff pay all post-closing prorations as required by the Earnest Money Contract.

The Court notes, however, that Plaintiff opened [*17] the door to the new affirmative defense and counterclaim by amending its Complaint. When Plaintiff amended its Complaint a second time, it added a new claim for breach of contract and a request to recover additional amounts. "[W]hen a plaintiff files an amended complaint which changes the theory or scope of the case, the defendant is allowed to plead anew as though it were the original complaint filed by the Plaintiff." *Brown v. E.F. Hutton & Co.,* 610 F. Supp. 76, 78 (S.D.Fla. 1985). Because "the amending pleader chooses to redo his original work, and receives the benefit of this *nunc pro tunc* treatment, he can hardly be heard to complain that claims filed against him are improper because they should have been asserted in response to his original pleading." *Joseph Bancroft & Sons Co. v. M. Lowenstein & Sons, Inc.,* 50 F.R.D. 415, 419 (D.Del. 1970).

Several courts have applied this rationale to allow a defendant to amend its pleading after a plaintiff files an amended complaint. *See, e.g., Massey v. Helman,* 196 F.3d 727, 735 (7th Cir. 2000)* (explaining that "[b]ecause a plaintiff's new complaint wipes away prior pleadings, the [*18] amended complaint opens the door for defendants to raise new and previously unmentioned affirmative defenses"); *Tralon Corp. v. Cedarapids, Inc.,* 966 F. Supp. 812, 832-33 (N.D.Iowa 1997)* (providing defendant a "fresh start" in answering plaintiffs' Second Amended Complaint because the Second Amended Complaint "greatly expanded" both the factual allegations made by plaintiffs against defendant as well as the scope of those claims); *Refuse Fuels, Inc. v. Nat'l Union Fire Ins. Co.,* 139 F.R.D. 576, 578 (D.Mass. 1991)* (explaining that "defendants did not need leave to serve new counterclaims and assert new defenses" after plaintiffs amended their complaint pursuant to *Fed. R. Civ. P. 15(a)*).

In conformity with this authority, the Court finds it appropriate to allow Defendants to amend their answer to include the new affirmative defense and counterclaim. Although the Court recognizes that Plaintiff did not significantly expand the scope of its claims, it did add a new claim for breach of contract and a new fact supporting its fraud claim. Even though Defendants' counterclaim and affirmative answer respond to more [*19] than just the specific amendments made in Plaintiff's Second Amended Complaint, they also are responsive to Plaintiff's new basis for breach of contract. For all of these reasons, Plaintiff's Motion to Strike will be denied. However, to avoid potential prejudice to Plaintiff because of the expiration of the discovery and pretrial motion deadlines, the Court has granted an extended period of discovery solely related to Defendants' counterclaim and affirmative defense, *Order* (Docket No. 107), and will also allow the parties to file dispositive motions on the setoff claim.

**B. Choice of Law**

The parties agree that North Carolina law applies to the parties' breach of contract claims and that Idaho law applies to Plaintiff's fraud and unfair and deceptive acts/practices claims. *Defendants' Memorandum in Support of Motion for Summary Judgment,* pp. 4-6 (Docket No. 80, Att. 1); *Plaintiff's Response to Defendants' Motion for Summary Judgment,* p. 2 (Docket No. 93). Because there is no dispute, the Court will only briefly discuss the choice of law issues.

First, because the parties' contract contains a choice of law provision selecting North Carolina law to govern and [*20] interpret the contract, and because Idaho recognizes choice of law clauses, North Carolina law governs the contract issues in this action. *See Sword v. Sweet,* 140 Idaho 242, 246, 92 P.3d 492, 496 (2004)* (applying the Restatement (Second) of Conflict of Laws and allowing enforcement of choice of law clauses). Addi-

2006 U.S. Dist. LEXIS 30387, *

tionally, Idaho applies the most significant relationship test--involving application of a variety of factors--to determine the law applicable to tort claims. *Grover v. Isom, 137 Idaho 770, 772-73, 53 P.3d 821, 823-24 (2002)*. Both parties have acknowledged that these factors weigh in favor of applying Idaho law. *Defendants' Memorandum in Support of Motion for Summary Judgment, pp. 5-6* (Docket No. 80, Att. 1); *Plaintiff's Response to Defendants' Motion for Summary Judgment*, p. 2 (Docket No. 93). Accordingly, the Court will apply North Carolina law to the parties' breach of contract claims, and will apply Idaho law to Plaintiff's fraud and unfair and deceptive acts/practices claims.

## III.

## MOTIONS FOR SUMMARY JUDGMENT

### A. Standards of Law

Motions for summary judgment are governed by *Federal Rule of Civil Procedure 56* [*21] , which provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*.

Under *Rule 56*, summary judgment is required if the nonmoving party fails to make a showing sufficient to establish the existence of an element that is essential to the party's case and upon which the party will bear the burden of proof at trial. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. If the nonmoving party fails to make such a showing on any essential element of the party's case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id. at 323. See also Fed. R. Civ. P. 56(e)*. n5

n5 *Rule 56(e)* states that, in responding to a motion for summary judgment,

> an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, sum-

> mary judgment, if appropriate, shall be entered against the adverse party.

> *Fed. R. Civ. P. 56(e)*.

[*22]

According to *Rule 56*, an issue must be both "material" and "genuine" to preclude entry of summary judgment. An issue is "material" if it affects the outcome of the litigation. An issue is "genuine" when there is "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial," *Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975)* (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968)*), or when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The Ninth Circuit Court of Appeals cases are in accord. *See, e.g., British Motor Car Distribs., Ltd. v. S.F. Auto. Indus. Welfare Fund, 882 F.2d 371 (9th Cir. 1989)*.

In ruling on summary judgment motions, the court does not resolve conflicting evidence with respect to disputed material facts, nor does it make credibility determinations. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987)*. Moreover, all inferences [*23] must be drawn in the light most favorable to the nonmoving party. *Id. at 631*. That is, "if a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *Id.*

In order to withstand a motion for summary judgment, a nonmoving party

> (1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come forward with more persuasive evidence than would otherwise be necessary when the factual context makes the nonmoving party's claim implausible.

*British Motor Car Distribs., 882 F.2d at 374* (citation omitted). Moreover, where the moving party meets its initial burden of demonstrating the absence of any genuine issue of material fact, the nonmoving party must

"produce 'specific facts showing that there remains a genuine issue for trial' and evidence 'significantly probative' as to any [material] fact claimed to be disputed." *Steckl v. Motorola, Inc., 703 F.2d 392, 393 (9th Cir. 1983)* (citing [*24] *Ruffin v. County of L.A., 607 F.2d 1276, 1280 (9th Cir. 1979))*.

In recent years the Supreme Court, "by clarifying what the non-moving party must do to withstand a motion for summary judgment, has increased the utility of summary judgment." *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987)*. Therefore, "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id.* A material fact is

> one that is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. The materiality of a fact is thus determined by the *substantive law* governing the claim or defense. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

*T.W. Elec. Serv., Inc., 809 F.2d at 630* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))* (emphasis added).

## B. Plaintiff's Breach of Contract Claim Based on Section 9.4(e) of the Contract

Plaintiff first claims that Defendants breached section 9.4(e) of the parties' [*25] Contract by reporting that no work had been performed for which they had not paid. *Plaintiff's Reply in Support of Motion for Summary Judgment,* p. 6 (Docket No. 98); *see also Second Amended Complaint and Demand for Jury Trial,* PP 32, 33 (Docket No. 55). Section 9.4(e) of the Contract provides: "Liens. No labor has been performed, nor materials supplied to Seller for the Property which the Seller has not fully paid." *Plaintiff's Statement of Undisputed Material Facts,* P 25 (Docket No. 79, Att. 2). Plaintiff's Second Amended Complaint specifies that its claim for breach of section 9.4(e) is based on its assertion that both GOC and TRC had equitable liens in Signature Place and, therefore, Defendants were required to report that labor had been performed for the Property for which Defendants had not yet paid. Plaintiff argues that equitable liens existed because, at the time the parties entered the Contract, TRC had substantially completed its improvements and GOC had commenced its improvements.

*Second Amended Complaint and Demand for Jury Trial,* PP 31-33 (Docket No. 55).

Defendants respond that neither GOC nor TRC had equitable liens in Signature Place and Defendants [*26] did not breach their obligation under section 9.4(e). *Response to DBSI's Motion for Summary Judgment,* p. 10 (Docket No. 91, Att. 1).

An equitable lien arises "[w]here property of one person can by a proceeding in equity be reached by another as security for a claim on the ground that otherwise the former would be unjustly enriched." *Embree Constr. Group, Inc. v. Rafcor, Inc., 330 N.C. 487, 411 S.E.2d 916, 923 (N.C. 1992)* (quoting *Restatement of Restitution § 161* (1937)). Defendants agree that there is evidence in the record demonstrating that GOC and TRC made payments to their general contractors for tenant improvements prior to the September 30, 2004 Closing. *Response to DBSI's Motion for Summary Judgment,* p. 10 (Docket No. 91, Att. 1). However, they note that under North Carolina law, "equity will not lend its aid in any case where the party seeking it has a full and complete remedy at law." *Id.* at p. 11 (quoting *Jefferson Standard Life Ins. Co. v. Guilford Cty., 225 N.C. 293, 34 S.E.2d 430, 434 (N.C. 1945))*.

Defendants point out that both GOC and TRC could have sued Greensboro for breach of their lease agreements to recover [*27] the tenant upfit allowances and could have setoff against rent any amounts owing on the upfit allowances. n6 Plaintiff counters that these provisions in the leases created an equitable lien against the property in favor of TRC and GOC because it indicates an intention to make the property a security for Greensboro's obligation to pay the upfit allowances. *Plaintiff's Reply in Support of Motion for Summary Judgment,* p. 7 (Docket No. 98) (citing *Winborne v. Guy, 222 N.C. 128, 22 S.E.2d 220 (N. C. 1945))*. However, as explained in another case cited by Plaintiff, the Court's "equitable intervention is obviated when an adequate remedy at law is available to the plaintiff." *Embree, 411 S.E.2d at 920*. Thus, an equitable lien is not enforceable unless and until there is no adequate remedy at law available. *See Potter v. Homestead Pres. Ass'n, 330 N.C. 569, 412 S.E.2d 1, 7 (N.C. 1992)* (explaining that "[a] plaintiff must pursue her legal remedies first").

> n6 Section 3.2 of GOC's office lease provides that GOC's "covenants to pay the Base Rent and the Additional Rent are not independent of, and may be offset against, the Lessor's covenants to pay the Tenant Upfit Allowance." *Graham Affidavit,*

Exhibit D (Docket No. 80, Att. 3). TRC's lease does not contain a similar provision.

[*28]

Here, both TRC and GOC had remedies at law available to recover against Greensboro. They could sue for breach of contract based on the lease agreements providing for payment of the agreed tenant upfit allowances. Any claim for unjust enrichment, which is necessary for an equitable lien to arise, would arise only if Greensboro failed to pay for the tenant improvements. *See Restatement of Restitution § 161* (1937) (explaining that an equitable lien arises if the property owner would be unjustly enriched). Such a failure had not occurred by September 30, 2004 because the conditions stated in the leasing agreements for payment of the upfit allowances (i.e., the certificates of occupancy and waiver of liens) had not yet occurred.

Moreover, some courts have considered completion of the work giving rise to the claimed equitable lien to be a critical factor in creating the lien. *See Embree, 411 S.E.2d at 922* (collecting cases). The Court is of the opinion that it is a critical aspect of the creation of an equitable lien in favor of GOC here. n7 Accordingly, because the work on the GOC space had not been completed and the conditions for [*29] payment on the TRC and GOC allowances not met as per the terms of the leasing agreements, Plaintiff's claim for summary judgment based on its argument that Defendants created equitable liens in favor of TRC and GOC is denied.

n7 DBSI implicitly acknowledges that its claim for an equitable lien in favor of GOC is tenuous. *See, e.g., Plaintiff's Memorandum in Support of Motion for Summary Judgment,* pp. 8-9 (stating that the decision in *Embree* "establishes that at least TRC, *and possibly GOC as well,* had an equitable lien in Signature Place as of the closing") (emphasis added); *Plaintiff's Response to Defendants' Motion for Summary Judgment,* p. 13 (Docket No. 93) (stating "GOC *may have had* an equitable lien against Signature Place") (emphasis added).

However, Plaintiff argues that, even if no equitable liens were created, Defendant Greensboro breached section 9.4(e) because it had not paid for work on the Property that it was obligated to pay for pursuant to the TRC and GOC leases. *Plaintiff's* [*30] *Memorandum in Support of Motion for Summary Judgment,* p. 10 (Docket No. 79, Att. 10). In other words, because TRC and GOC

were responsible for paying their materialmen and contractors for the work on the Property, and because Defendant Greensboro was responsible for reimbursing TRC and GOC for a portion of the work, Greensboro had not fully paid for all work performed and materials supplied for the Property. Defendants argue that their representation in section 9.4(e) is accurate because no labor was performed or materials supplied to it as "Seller for the Property." *Response to DBSI's Motion for Summary Judgment,* p. 10 (Docket No. 91, Att. 1).

First, the Contract provides that the descriptive headings of the sections, in this case the "Liens" heading, "are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions." *Third Burns Affidavit,* Exhibit 4, p. 18, § 12.10 (Docket No. 79, Att. 2). Accordingly, even if no liens existed, if Defendant Greensboro had not fully paid for labor or materials that had been supplied for the property, then it may have breached the warranty made in section 9.4(e).

Second, section 9.4(e) [*31] is subject to more than one interpretation. It could be read as stating that no labor has been performed for which the Seller has not fully paid and that no materials have been supplied to Seller for the Property which the Seller has not fully paid. This interpretation of section 9.4(e) would conform to the doctrine of the last antecedent, applied by North Carolina courts in contract interpretation cases. "By what is known as the doctrine of the last antecedent, relative and qualifying words, phrases, and clauses ordinarily are to be applied to the word or phrase immediately preceding and, unless the context indicates a contrary intent, are not to be construed as extending to or including others more remote." *HCA Crossroads Residential Ctrs. v. North Carolina Dep't of Human Resources, etc., 327 N.C. 573, 398 S.E.2d 466, 469 (N.C. 1990)* (applying grammar rules as an aid to interpreting a written instrument). Applying this principle, the phrase "to Seller for the Property" is applied to the phrase immediately preceding it, i.e., "nor materials supplied to," and nothing in the clause would require the labor to be performed by the Seller or to be contracted for by the Seller. It would appear that the clause [*32] would require only that labor has been performed and the Seller has not fully paid for the labor.

Conversely, using the term "Seller for the Property," as Defendants suggest, would require that the provision be read to provide that no labor has been performed "to Seller for the Property" for which the Seller has not fully paid. Because the language in 9.4(e) is ambiguous and both interpretations are reasonable, a genuine issue of material fact exists as to what Defendant Greensboro warranted in section 9.4(e) and, therefore, interpretation of the contract is for the trier of fact. *See Holshouser v. Shaner Hotel Group Props. One Ltd. P 'ship, 134 N.C.*

*App. 391, 518 S.E.2d 17, 23 (N.C. Ct. App. 1999)* (explaining that "[a]n ambiguity exists where the language of the contract is fairly and reasonably susceptible to either of the constructions asserted by the parties") (citation and internal quotation marks omitted); *Int'l Paper Co. v. Corporex Constructors, Inc., 96 N.C. App. 312, 385 S.E.2d 553, 556 (N.C. Ct. App. 1989)* (stating that a contract is ambiguous when the "writing leaves it uncertain as to what the agreement was"). Therefore, a genuine issue of material fact exists regarding [*33] whether Defendant Greensboro breached the Contract by making the section 9.4(e) warranty when work had commenced on the tenant upfit improvements (work to which Greensboro ultimately would contribute payment, albeit indirectly). The labor performed for the tenant improvements had already commenced on the property at the time the Contract was executed, and Greensboro had not yet reimbursed (or paid) TRC or GOC for this labor. Accordingly, regardless of whether equitable liens had been created, Defendants still may have breached section 9.4(e). Thus, summary judgment on this claim is not appropriate.

Defendant Greensboro also defends against Plaintiff's breach of contract claim by arguing that, because the tenant upfit allowances did not become due and payable until after the September 30, 2004 Closing, and Plaintiff assumed all of the obligations of Greensboro under the leases after that date, Plaintiff is the party responsible for paying the allowances. It is noteworthy that each of the leasing agreements provided for conditions to payment of the tenant upfit allowances, and those conditions had not been met as of September 30, 2004. The TRC lease provided that "[t]he Tenant Upfit [*34] Allowance will be paid to Lessee [TRC] upon completion of the Tenant Improvements, issuance of a Certificate of Occupancy for the Premises, and Contractor's Waiver of Lien." *Graham Affidavit,* Exhibit A at Art. XX of Ex. C (Docket No. 65, Att. 1). The City of Greensboro issued a Certificate of Occupancy for the premises in April of 2004--almost four months before DBSI executed the Assumption. *McMurray Affidavit,* P 3 (Docket No. 56. Att. 5). However, although the construction work was "substantially completed" in April, 2004, the contractor did not execute a lien waiver until January 21, 2005, and TRC did not request payment for the Tenant Upfit Allowance until February 25, 2005. *Graham Summary Judgment Affidavit,* Exs. F, G (Docket No. 80, Att. 7); *Plaintiff's Statement of Undisputed Material Facts,* PP 27, 30 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts,* PP 27, 30 (Docket No. 94). Thus, it would appear that the obligation to pay TRC for the improvements did not arise until January 21, 2005.

Similarly, the GOC lease provided that the Tenant Upfit Allowance would be paid "upon completion of the Tenant Improvements and issuance [*35] of a Certificate of Occupancy for the Premises." *Plaintiff's Statement of Undisputed Material Facts,* P 28 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts,* P 28 (Docket No. 94). The lease specified that the "Lessor shall pay the Tenant Upfit Allowance upon completion of the Tenant Improvements as evidenced by a certificate of occupancy and delivery of a lien waiver signed by any person or entity who performed work or supplied materials for upfit of the Premises." *Graham Affidavit,* Exhibit D at Art. XXI of Ex. C (Docket No. 65, Att. 2). The City of Greensboro did not issue a certificate of occupancy until November 2004, after the September Closing on the purchase of Greensboro Place and DBSI Housing's Assumption of the leases. *McMurray Affidavit,* P 5 (Docket No. 56, Att. 5).

For these reasons, Plaintiff assumed the obligation to pay for the tenant upfit allowances under the Assumption agreement. Plaintiff has made these payments, but argues that, because Defendants breached 9.4(e) of the contract and their duty of good faith and fair dealing, Plaintiff has suffered damages in the amount of the upfit allowances. In other words, even [*36] if Plaintiff assumed the obligation to pay the upfit allowances, it may still be able to recover the amounts paid if it can establish that Defendants breached the Contract and this breach caused damages in the amount of the upfit allowances and associated costs. For this reason, the fact that Plaintiff assumed the obligation to pay the upfit allowances does not operate to excuse any breach of section 9.4(e) or the duty of good faith and fair dealing.

## C. Plaintiff's Claim for Breach of the Covenant of Good Faith and Fair Dealing

Plaintiff's second claim for breach of contract is based on the covenant of good faith and fair dealing. "[A] party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement." *Maglione v. Aegis Family Health Ctrs., 168 N.C. App. 49, 607 S.E.2d 286, 291 (N.C. Ct. App. 2005)* (quoting *Weyerhaeuser Co. v. Bldg. Supply Co., 40 N.C. App. 743, 253 S.E.2d 625, 627 (1979)).* Plaintiff claims that Defendants breached the covenant of good faith and fair dealing by refusing to pay for TRC's and GOC's tenant improvements and by providing Plaintiff with tenant estoppel [*37] certificates for both TRC and GOC containing allegedly false representations that "Tenant asserts no claim against Landlord in regard to any obligation of Landlord relating to the Premises." *Plaintiff's Memorandum in Support of Motion for Summary Judgment,* pp. 10-11 (Docket No. 79, Att. 1).

Plaintiff argues that the tenant estoppel certificates were false because TRC and GOC had completed work on the tenant upfits prior to the time Greensboro submitted the tenant estoppel certificates to Plaintiff. Plaintiff notes that North Carolina law defines "claim" to include "a right to payment, whether . . . fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *N.C. Gen. Stat. § 39-23.1(3)* (defining "claim" for purposes of the Uniform Fraudulent Transfer Act); *see also* BLACK'S LAW DICTIONARY 240-41 (7th ed. 1999) (providing a similar definition for "claim"). Based on this definition, TRC and GOC may have had "claims" against Greensboro when they commenced the tenant upfits because a right to payment had accrued, even though it was "contingent" on certain conditions, such as completion of the improvements and [*38] securing a certificate of occupancy and waiver of liens.

Defendants respond that, even if the certificates contain false representations, *Greensboro* did not represent anything in the Tenant Estoppel certificates. *Response to DBSI's Motion for Summary Judgment,* p. 12 (Docket No. 91, Att. 1). Rather, the certificates were signed by TRC and GOC representatives and contained clauses stating that the "undersigned acknowledges that Purchaser [DBSI Housing] and Landlord [Greensboro] are relying on (and will rely) on the truth and accuracy of the representations made herein." *Graham Affidavit,* Exhibits N, O (Docket No. 65, Att. 6). Although Defendants' position is technically correct, it also may be true that Defendants prepared the forms for the tenants' review and then delivered the certificates to Plaintiff, knowing that Plaintiff might consider the information contained in the certificates when conducting its due diligence.

At the hearing on March 15, 2006, the parties disagreed about whether Defendant Sullivan or some other employee of Defendant Greensboro had prepared the certificates. The evidence in the record does not conclusively establish who prepared the certificates. [*39] n8 *See, e.g., Third Burns Affidavit,* Exhibit C, p. 93 (Docket No. 79, Att. 3). Defendants argue that, even if someone at Greensboro prepared the certificates, they were reviewed by GOC and TRC and the substantive information in the certificates was provided by GOC and TRC. *Response to DBSI's Statement of Undisputed Material Facts,* P 31 (Docket No. 94). Moreover, the responsible parties at GOC and TRC testified at depositions that they believed their representations in the certificates were accurate. *See, e.g., Graham Affidavit,* Exhibit S at pp. 24-25 (Docket No. 80, Att. 3). However, even if Defendants did not prepare the certificates or provide any of the substantive information in the certificates, a jury could find that Defendants' delivery of the certificates as required by the Contract, n9 especially if coupled with a knowl-

edge that the information contained in the certificates was misleading or false, could rise to the level of a breach of the duty of good faith and fair dealing.

n8 Counsel for Plaintiff represented at the hearing that Tom McMurray may have information on who prepared the certificates, but this information is not in the record and cannot be considered by the Court for summary judgment purposes.

[*40]

n9 Section 8.7 of the Contract states: "As a condition of Closing, [DBSI Housing] shall have received, on or before the Closing Date, an Estoppel Certificate . . . substantially in the form as attached." *Graham Affidavit,* Exhibit E, p. 11 (Docket No. 65, Att. 3). The attached form included a line stating that "Tenant asserts no claim against Landlord in regard to any obligation of Landlord relating to the Premises." *Id.* This exact language is used in the Tenant Estoppel Certificates executed by TRC and GOC.

For these reasons, the Court cannot determine as a matter of law that Defendants' conduct in initially preparing and/or delivering the tenant estoppel certificates (to satisfy a condition in the parties' Contract) amounts to a breach of the covenant of good faith and fair dealing. Nor can it conclude the opposite. Accordingly, because genuine issues of material facts remain regarding whether Defendants can be responsible for the representations made in the estoppel certificates and whether such representations would violate the duty of good faith and fair dealing, Defendants' [*41] motion for summary judgment on this claim is denied.

**D. Plaintiff's Claim for Recovery of TRC's Prepaid Rent Deposit**

It is undisputed that TRC made a Prepaid Rent Deposit to Greensboro in the amount of $ 2,428.13, by check dated January 7, 2004, for application to the rental period of October 19 to November 19, 2004. *Plaintiff's Statement of Undisputed Material Facts,* P 16 (Docket No. 79, Att. 2); *Burns Affidavit,* Exhibit B (Docket No. 56, Att. 2). Section 8.4(a) of the parties' Contract provides that Plaintiff "shall receive a credit for the amount of any prepaid rents." *Graham Affidavit,* Exhibit E (Docket No. 65, Att. 3). At Closing, Greensboro did not credit DBSI for the TRC prepaid rent. *Plaintiff's Statement of Undisputed Material Facts,* P 17 (Docket No. 79, Att. 2). Plaintiff requests summary judgment on its

claim for breach of contract for Defendants' failure at Closing to credit Plaintiff for TRC's prepaid rent.

Defendants' only defense to this claim is that they are entitled to a setoff or recoupment for Plaintiff's own failure to account for or reimburse Defendant Greensboro for amounts owing to Greensboro for "[a]ny rents or other charges [*42] subsequently collected by Purchaser [DBSI Housing, Inc.] which are owing to Seller [Greensboro] by tenant or occupants of the Real Property for periods prior to the Closing Date," as required by the Section 8.4 of the parties' Contract. *Answer to Second Amended Complaint,* PP VI, VIII (Docket No. 90). Greensboro has presented no evidence establishing the amount of any such setoff. The only information submitted by Defendants that indicates DBSI may owe Greensboro something under this section is an April 2005 letter sent by Greensboro's counsel requesting that DBSI pay any post-closing prorations to Greensboro. *See Graham Affidavit in Opposition to Motion for Summary Judgment,* Exhibit D (Docket No. 91, Att. 1). However, this letter does not specify how much may be owed pursuant to section 8.4.

Thus, there is no evidence in the record at this point in the proceedings to demonstrate that Plaintiff actually did collect any rent or other charges that are for the period prior to the September 30, 2004 Closing date and owing to Defendants. *See Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998)* (explaining that "to defeat a summary judgment motion, the non-moving [*43] party must demonstrate that the evidence is such that a reasonable jury could return a verdict in his or her favor"). Accordingly, Defendants have not established the setoff as a defense to Plaintiff's prepaid rent claim. Although Greensboro may be able to recover any amounts owed to it under section 8.4 of the Contract by way of its counterclaim, it does not change the fact that Greensboro owes Plaintiff $ 2,428.13 for TRC's prepaid rent. Accordingly, summary judgment in favor of Plaintiff on this claim is warranted.

**E. Defendants' Counterclaim to Recover the Commission Paid to Alliance Commercial**

Defendants have asserted a breach of contract counterclaim, claiming that DBSI breached the terms of the Assumption by failing to pay the second half of a leasing commission to Alliance Commercial. *Answer to Second Amended Complaint,* PP IV, VII, X (Docket No. 90). Defendants claim that "DBSI expressly assumed that obligation" under the Assumption Agreement. *Defendants' Memorandum in Support of Motion for Summary Judgment,* p. 11 (Docket No. 80, Att. 1). Both parties request that summary judgment be entered in their favor on this claim.

Although Plaintiff "assume[d] [*44] and agree[d] to pay any leasing commissions that become payable after [September 30, 2004]," *Plaintiff's Statement of Undisputed Material Facts,* P 5 (Docket No. 79-2); *Response to DBSI's Statement of Undisputed Material Facts,* P 5 (Docket No. 94), it argues that the conditions for the commission to become payable have not been satisfied and, therefore, it is not liable for Alliance Commercial's commission, *Plaintiff's Memorandum in Support of Motion for Summary Judgment,* p. 4 (Docket No. 79, Att. 1).

Prior to entering into a lease with GOC, Greensboro entered into a Broker Agency and Commission Agreement Lease Transaction ("Commission Agreement") with Alliance Commercial on February 17, 2004. *Graham Affidavit,* Exhibit B (Docket No. 65, Att. 1). The Commission Agreement provides that the Listing Agency (Greensboro) "agrees to pay" Alliance Commercial four percent "of the total commission received by Listing Agency for the transaction, *payable when Listing Agency receives the commission.*" *Id.* (emphasis added); *Plaintiff's Statement of Undisputed Material Facts,* P 10 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts,* [*45] P 10 (Docket No. 94). The Commission Agreement later explains that the "Listing Agency's Listing Agreement specifies the commission is payable as follows": "One-half commission to be paid upon Lease Execution; one-half commission to be paid upon occupancy by Tenant." *Graham Affidavit,* Exhibit B (Docket No. 65, Att. 1). Although Greensboro never received a commission for the GOC lease as the "listing agent," it paid the first half of the lease commission to Alliance when it executed the lease with GOC. *Plaintiff's Statement of Undisputed Material Facts,* PP 11, 12 (Docket No. 79, Att. 2); *Response to DBSI's Statement of Undisputed Material Facts,* PP 11, 12 (Docket No. 94).

Greensboro acknowledges that it has never received a commission as the listing agency for the GOC lease. However, Greensboro argues that the specific language of the agreement provides that "regardless of whether Greensboro received a commission," Alliance Commercial was to receive a leasing commission. *Response to DBSI's Motion for Summary Judgment,* p. 5 (Docket No. 91).

The Agreement's terms are clear and unambiguous on its face, allowing for the Court to interpret the agreement as a matter of [*46] law. *Dep't of Transp. v. Idol, 114 N.C. App. 98, 440 S.E.2d 863, 864 (N.C. Ct. App. 1994).* Greensboro agreed to pay Alliance Commercial four percent of the total commission *received by Greensboro* for the transaction, payable when Greensboro received the commission. The Agreement further explains that Greensboro was to receive one-half of its commis-

sion upon lease execution and the other half upon occupancy by the tenant. Any evidence that the parties to the Agreement--Greensboro and Alliance Commercial--intended a different payment arrangement is barred by the parol evidence rule. "The parol evidence rule prohibits the admission of parol evidence to vary, add to, or contradict a written instrument intended to be the final integration of the transaction." *Mayo v. North Carolina State Univ., 168 N.C. App. 503, 608 S.E.2d 116, 121 (N.C. Ct. App. 2005)*, affirmed by *619 S.E.2d 502, 360 N.C. 52 (N.C. 2005)* (citation and internal quotation marks omitted). Thus, the fact that Greensboro paid the first half of the leasing commission to Alliance Commercial, and other information about the parties' course of performance under the Agreement, are irrelevant to the Court's interpretation of the [*47] Agreement. *See Response to DBSI's Motion for Summary Judgment,* pp. 3, 6 (Docket No. 91). Accordingly, because as a matter of law the leasing commission has not become "payable after" September 30, 2004, as required for DBSI Housing to assume its payment under the Assumption Agreement, summary judgment in favor of Plaintiff on Defendants' counterclaim for breach of contract (count one) is granted. Concomitantly, the Court will deny Defendants' request for summary judgment on this claim.

### F. Plaintiff's Claim for Fraud

Defendants request summary judgment on Plaintiff's fraud claim. Defendants argue that (1) Plaintiff's own negligence estops it from asserting fraud in the inducement, and (2) DBSI's fraud claim fails as a matter of law. *Defendants' Memorandum in Support of Motion for Summary Judgment,* pp. 15-18 (Docket No. 80, Att. 1). To make a claim for fraud there must be evidence of: (1) a representation; (2) its falsity; (3) its materiality; 4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's [*48] reliance on the truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury. *Aspiazu v. Mortimer, 139 Idaho 548, 550, 82 P.3d 830, 832 (2003).*

In the summary judgment briefing, Plaintiff explains that its fraud claim "is grounded on the fact that Defendants made numerous representations to DBSI that there were no amounts payable to either TRC or GOC under their respective leases." *Plaintiff's Response to Defendants' Motion for Summary Judgment,* p. 6 (Docket No. 93). Plaintiff argues that, because of these "fraudulent representations, DBSI did not *cancel* the Contract prior to the running of the due diligence review period." *Id.* Plaintiff asserts that its fraud claim thus has nothing to do with inducement. *Id.* at pp. 6-7.

The Court agrees with Defendants that Plaintiff's fraud claim, however worded, is a claim for fraud in the inducement. Essentially, Plaintiff claims that Defendants' representations led to its decision to not cancel the contract and instead to proceed with the purchase of Signature Place. However, the Court disagrees with Defendants' assertion that Plaintiff's own negligence estops it from asserting [*49] fraud.

While the terms of a written contract normally will control, *see, e.g., West v. Prater, 57 Idaho 583, 587-88, 67 P.2d 273, 277-78 (1937)*, "Idaho law firmly allows that '[f]raud in the inducement is always admissible to show that representations by one party were a material part of the bargain.'" *Aspiazu, 139 Idaho at 551, 82 P.3d at 833* (quoting *Thomas v. Campbell, 107 Idaho 398, 402, 690 P.2d 333, 337 (1984)).* Here, although the written contract between the parties provides that DBSI would assume all obligations under the GOC and TRC leases, there is evidence indicating that Defendants may have represented to DBSI Housing that these obligations did not include the GOC and TRC tenant upfit allowances or that Defendants may have allowed DBSI Housing to be misled about the obligations it was assuming. Because the parties' Contract does not specifically address who is responsible for these allowances and information provided pursuant to the Contact (i.e., the estoppel certificates) makes it appear there were no outstanding obligations regarding the TRC and GOC leases, the rule that Plaintiff may be estopped by its own negligence [*50] in failing to read the Contract does not apply. *Compare Irwin Rogers Ins. Agency v. Murphy, 122 Idaho 270, 273, 833 P.2d 128, 131 (1992)* (defendant signed a promissory note including all the terms to which he was bound that he thought was just an insurance paper and was not excused from the contract because of his own negligence of failing to read the note).

Even if Douglas Swenson, the President of DBSI Housing, had read the entire agreement before he signed it, nothing in it would have specifically informed him that Plaintiff was assuming the GOC and TRC allowances. While the TRC and GOC leases contained information indicating that the obligation to pay for the tenant upfits did not accrue until certain conditions were met, the tenant estoppel certificates indicated that TRC and GOC had no claims against the Landlord, (Defendant Greensboro). Thus, the appropriate rule here is that "agreements and communications prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . fraud." *Tusch Enterprises v. Coffin, 113 Idaho 37, 45 n. 5, 740 P.2d 1022, 1030 n. 5 (1987)* (citation and internal quotation marks omitted). [*51] In other words, fraud can "provide a basis for demonstrating that the parties agreed to something apart

2006 U.S. Dist. LEXIS 30387, *

from or in addition to the written documents." *Aspiazu,* 139 *Idaho* at 551, 82 *P.3d* at 833.

In the present case, there are issues of fact sufficient to prevent summary judgment on Plaintiff's fraud claim. Plaintiff alleges that Mr. Sullivan made representations by telephone to Eric Gordon upon which Plaintiff relied when entering into the contract, n10 and alleges that the tenant estoppel certificates also misrepresent the liabilities Plaintiff would assume under the Contract. As explained above, because Defendants may have prepared and delivered the estoppel certificates, and may have been aware that the certifications were not entirely accurate, it is possible that a jury could attribute any misrepresentation in the certificates to Defendants. *See, e.g., Watts v. Krebs,* 131 *Idaho* 616, 619-20, 962 *P.2d* 387, 390-91 (1998) (determining that a seller of real property with superior knowledge may, by failing to disclose material facts, commit fraud, even if seller makes no false statements). Additionally, because the Contract required delivery of the [*52] tenant estoppels, any reliance on them may be justified. Accordingly, genuine issues of material fact exist and Defendants' request for summary judgment on Plaintiff's fraud claim is denied.

> n10 Defendants argue that Douglas Swenson could not have relied on these representations; however, there is information in the record indicating that Swenson relied on the information provided by Eric Gordon and that Eric Gordon may have relied on Sullivan's alleged representations.

## G. Plaintiff's Claim Based on Deceptive or Unfair Practices

Plaintiff also seeks to recover damages against Defendants under the Idaho Consumer Protection Act ("ICPA"), *I.C. § § 48-601 et seq.,* on the ground that Defendant Sullivan's representations to Plaintiff "constitute unfair or deceptive acts or practices made in the conduct of and affecting commerce." *Second Amended Complaint,* P 24 (Docket No. 55). The ICPA specifically defines what constitutes a deceptive act or practice. *Idaho Code § 48-603* [*53] begins: "The following unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared to be unlawful, where a person knows or in the exercise of due care should know, that he has in the past, or is . . . ." The statute then lists nineteen types of conduct that constitute either an unfair method of competition or an unfair or deceptive act or practice. *Id.* "There is nothing in the wording of Idaho Code § 48-603 indicating that the list of conduct is merely illustrative." *State ex rel. Wasden v. Daicel Chemical Indus., Ltd.,* 141 *Idaho* 102, 107-8, 106 *P.3d* 428, 433-34 (2005). Thus, the conduct at issue must be contained in the list for Plaintiff to make a claim for a violation of the ICPA.

There is at least one provision on the list that could apply to the circumstances presented here. *Idaho Code § 48-603(17)* states that it is unlawful to engage "in any act or practice which is otherwise misleading, false, or deceptive to the consumer." The word "consumer" is not defined by the ICPA and nothing in the Act indicates that the legislature intended [*54] this provision to apply only to personal consumers and not to business consumers such as Plaintiff. In fact, the legislature stated that the purpose of the ICPA is "to protect both consumers and businesses against unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce, and to provide efficient and economical procedures to secure such protection." *Idaho Code § 48-601.* Additionally, the legislature specified its intent that this chapter "be remedial and so construed." *Id.* In other words, "[t]he ICPA should be construed liberally." *Fenn v. Noah,* 133 *P.3d* 1240, 2006 *Ida. LEXIS* 46, P.3d , 2006 WL 910033, *3 (Idaho Apr. 11, 2006).

For these reasons, the Court concludes as a matter of law that the ICPA could apply to Plaintiff's allegations and, thus, summary judgment in favor of Defendants is not warranted. *See White v. Mock,* 140 *Idaho* 882, 891, 104 *P.3d* 356, 365 (2004) (explaining that whether a statute applies is a matter of law to be determined by the Court).

## IV.

## MOTION TO FILE THIRD AMENDED COMPLAINT

### A. Standards of Law

"The question of whether to permit [*55] a claim for punitive damages is substantive in nature and accordingly is controlled by relevant Idaho case law." *Strong v. Unumprovident Corp.,* 393 *F. Supp. 2d* 1012, 1025 (D. Idaho 2005). Under Idaho law, a party may seek punitive damages only with leave of the Court. *Idaho Code § 6-1604(2).* After a hearing on the matter, the Court "shall allow the motion to amend the pleadings if, after weighing the evidence presented, the court concludes that, the moving party has established at such hearing a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." *Id.* The standard at trial is proof, "by clear and convincing evidence,[of] op-

pressive, fraudulent, malicious or outrageous conduct by the party against whom the claim for punitive damages is asserted." *Idaho Code § 6-1604(1)*.

Punitive damages may be recovered against a corporation if "an officer or director participated in, or ratified, the conduct underlying the punitive damage award." *Vendelin v. Costco Wholesale Corp., 140 Idaho 416, 430-31, 95 P.3d 34, 48-49 (2004)* (citations omitted). However, "while [*56] punitive damages may be recovered in a contract action, they are not favored in the law and therefore should be awarded only in the most compelling circumstances; they should be awarded cautiously and within narrow limits." *Gen'l Auto Parts Co., Inc. v. Genuine Parts Co., 132 Idaho 849, 852, 979 P.2d 1207, 1210 (1999)* (quoting *Cuddy Mountain Concrete, Inc. v. Citadel Constr., Inc., 121 Idaho 220, 227, 824 P.2d 151, 158 (Ct.App. 1992)*) (internal citation marks omitted). "The plaintiff must show that the defendant acted in a manner that was an extreme deviation from reasonable standards of conduct, and that the act was performed by the defendant with an understanding of or disregard for its likely consequences." *Id. at 852-53, 979 P.2d at 1210-11* (citations omitted). Moreover, the "justification for punitive damages must be that the defendant acted with an extremely harmful state of mind, whether that be termed 'malice, oppression, fraud or gross negligence;' 'malice, oppression, wantonness;' or simply 'deliberate and willful.'" *Id.; see also Jones v. Panhandle Distribs., 117 Idaho 750, 755, 792 P.2d 315, 320 (1990)*.

Therefore, [*57] when the moving party's claims are reasonably disputed and there is substantial evidence that supports the non-moving party's claims, a motion to amend to assert punitive damages will not be allowed. *See Strong, 393 F. Supp. 2d at 1026* (finding the plaintiff had not established a reasonable likelihood of proving by a preponderance of the evidence "the requisite 'extremely harmful state of mind' and 'extreme deviation from reasonable standards'" because the cause of the plaintiff's disability, which was in issue, was "reasonably disputed and there [wa]s substantial medical evidence that support[ed] a conclusion that [the plaintiff] suffers from a sickness") (citing *Kuntz v. Lamar Corp., 385 F.3d 1177, 1187 (9th Cir. 2004)*). n11

n11 *Strong* involved the "preponderance of the evidence" standard required in *Idaho Code § 6-1604* before its amendment in 2003. *Section 6-1604* now places a higher burden on the moving party, i.e., a requirement for "clear and convincing evidence." *See also* BLACK'S LAW DICTIONARY 596 (8th ed. 2004) ("**clear and convincing evidence**. . . . This is a greater burden

than preponderance of the evidence . . . ."). Therefore, the *Strong* standard remains applicable. That is, if the moving party's claims are reasonably disputed and there is substantial evidence that supports the non-moving parties' claims, the moving party has not met the "preponderance of the evidence" standard; therefore, the moving party has also not met the more stringent "clear and convincing evidence" standard.

[*58]

The Idaho state courts have also made clear, with respect to punitive damages claims, that the decision whether to submit the punitive damages question to a jury rests within the sound discretion of the trial court. *Manning v. Twin Falls Clinic & Hosp., 122 Idaho 47, 830 P.2d 1185, 1190* (citing *Hoglan v. First Sec. Bank, 120 Idaho 682, 819 P.2d 100 (1991); Eddins Constr., Inc. v. Bernard, 119 Idaho 340, 806 P.2d 433 (1991); Soria, 111 Idaho 594, 726 P.2d 706)*. In this respect, the federal courts are in accord with Idaho state substantive and procedural law. *Foman v. Davis, 371 U.S. 178, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)*.

Accordingly, though *Federal Rule of Civil Procedure 15(a)* encourages the liberal granting of motions to amend pleadings, due to the strict conditions precedent to and the disfavor of punitive damages, a plaintiff will be allowed to amend the pleadings to assert a claim for punitive damages only if, after weighing the evidence presented, the Court concludes that Plaintiff has established a reasonable likelihood of proving, by clear and convincing, evidence, that Defendants' conduct was oppressive, fraudulent, malicious, [*59] or outrageous. *See Vendelin, 140 Idaho at 423, 95 P.3d at 41*.

**B. Discussion**

Plaintiff points to the following circumstances to support its claim that punitive damages are appropriate in this case. First, Plaintiff claims that Defendant Sullivan, a representative of Defendants, falsely represented that Defendants would be responsible for the GOC and TRC Tenant Upfit Allowances. Second, Plaintiff contends that it relied on an email from Defendant Sullivan referring to the GOC Tenant Upfit Allowance as "our allowance" to conclude that Greensboro would pay the GOC tenant upfit allowance. *Gordon Affidavit*, P 3 & Exhibit A (Docket No. 56, Att. 5). Finally, Plaintiff points to tenant estoppel certificates executed by TRC and GOC, but allegedly initially prepared by Defendants, as misrepresentations of the financial liabilities Plaintiff would assume under the TRC and GOC leases.

These circumstances also serve as the basis for Plaintiff's fraud claim, and fraud is "one type of mental

state, which *might* support an award of punitive damages." *Myers v. Workmen's Auto Ins. Co., 140 Idaho 495, 503, 95 P.3d 977, 985 (2004)* (emphasis added). [*60] Merely because fraud is *alleged,* however, does not necessarily warrant an award of punitive damages. *See Trees v. Kersey, 138 Idaho 3, 11, 56 P.3d 765, 773 (Idaho 2002)* (plaintiff demonstrated fraud at trial, but the Supreme Court of Idaho vacated the punitive damages award). n12 The issue presented here then, is whether Plaintiff's allegations of fraudulent or misrepresentative behavior by Defendants establish "a reasonable likelihood" that it will be able to prove facts sufficient to support an award of punitive damages at trial under the "clear and convincing evidence" standard.

> n12 While the facts in *Trees* are different from the facts presented in the instant action, *Trees* is an example of a case in which a fraud claim may be proven, but a punitive damages award is nonetheless not warranted. As the court in *Trees* noted, "[p]unitive damages are not favored in law and should be awarded in only the most unusual and compelling circumstances." *138 Idaho at 11, 56 P.3d at 773.*

[*61]

Defendants argue that the one alleged telephone conference between DBSI Housing employee Eric Gordon and Defendant Sullivan is not by itself, or in combination with the other allegations, sufficient to support a claim for punitive damages. Plaintiff relies primarily on statements in Eric Gordon's affidavit and deposition testimony to support its allegation that Sullivan made a false representation. Gordon averred that Sullivan told him "Greensboro was paying all costs associated with the TRC Lease and GOC Lease, as well as the other leases reflected on the rent roll, which costs include the tenant improvement allowances owed to TRC and GOC." *Gordon Affidavit,* P 4 (Docket No. 56, Att. 5). During his deposition testimony, Gordon testified that he asked Mr. Sullivan if he had the right information, the correct leases, and the correct valuations for the leases, and Sullivan stated "Yes, that is correct." *Graham Supplemental Affidavit,* Exhibit A, p. 22 (Docket No. 83).

Defendants argue that these generalized comments are insufficient to support a particularized fraud claim, and are also insufficient to support an allegation of fraudulent conduct to support a punitive damages claim. [*62] The Court agrees that these comments alone do not establish a reasonable likelihood that Plaintiff could prove *by clear and convincing evidence* at trial facts sufficient to support an award of punitive damages. To jus-

tify punitive damages, the Plaintiff must demonstrate that Defendants acted with an extremely harmful state of mind and in an "extreme deviation from reasonable standards of conduct." *Gen'l Auto Parts Co., 132 Idaho at 852-53, 979 P.2d at 1210-11.* Nothing in the record indicates that Defendant Sullivan acted with the requisite extremely harmful state of mind.

Plaintiff also points to a June 11, 2004 email, which was forwarded by Sullivan to Eric Gordon on July 27, 2004, near the time the conversation between Sullivan and Gordon allegedly occurred. The email from Sullivan states: "Also, we've been told that the new tenant ([GOC]) is going to spend at least an additional $ 15 sf ($ 450,000) for TI over our allowance." *See Gordon Affidavit,* Exhibit A (Docket No. 56, Att. 5). Plaintiff argues that Sullivan's use of the word "our," instead of the word "your," represented to Gordon that Greensboro would be paying the GOC upfit allowance. *Plaintiff's* [*63] *Memorandum in Support of Motion for Leave to File Third Amended Complaint,* p. 7 (Docket No. 56, Att. 1).

Defendants point out that at the time the email was originally sent, on June 11, 2004, the parties had not yet entered into the Contract for the purchase of Signature Place and it was still Defendants' responsibility to pay for the upfit allowance. Thus, from Sullivan's perspective it was still "our" allowance. Also, the email was forwarded on July 27, 2004, two months before DBSI Housing assumed any responsibilities under the GOC lease. Thus, if the conditions for payment of the upfit allowance had been met before September 30, 2004, when DBSI Housing assumed the lease, Defendant Greensboro would have been responsible for the upfit allowance. Considering the timing of the email and the inference required to find that Sullivan's use of the word "our" misrepresented anything to Gordon or DBSI Housing, the Court finds that this email, either alone or in combination with any other evidence, does not establish a reasonable likelihood that Plaintiff could prove facts at trial sufficient to support an award of punitive damages at trial with "clear and convincing evidence."

The final [*64] evidence relied on by Plaintiff to support a punitive damages claim are the tenant estoppel certificates executed by TRC and GOC. Both certificates state that "Tenant asserts no claim against Landlord in regard to any obligation of Landlord relating to the Premises." *Graham Affidavit,* Exhibits N, O (Docket No. 65, Att. 6). The TRC certificate additionally states that there is no prepaid rent. *Id.* at Exhibit O.

Defendants argue that the tenant estoppel certificates do not constitute a representation *by Greensboro* that TRC and GOC had no unpaid claims against Greensboro, because the certificates were signed by TRC and GOC

representatives and contain clauses stating that the "undersigned acknowledges that Purchaser [DBSI Housing] and Landlord [Greensboro] are relying on (and will rely) on the truth and accuracy of the representations made herein." *Graham Affidavit,* Exhibits N, O (Docket No. 65, Att. 6). Plaintiff responds that Defendants prepared and delivered the estoppel certificates, knowing that the information was misleading and that the TRC representation regarding unpaid rent was false. *Reply,* p. 4 (Docket No. 67).

The Court notes that at least the TRC [*65] certificate contains a false statement because TRC had prepaid rent to Greensboro in the amount of $ 2,428.13 on January 7, 2004. *Reply,* p. 4 (Docket No. 67). TRC's controller, Craig Kumpf, however, took responsibility for this oversight, *Graham Affidavit,* Exhibit Q, p. 24 (Docket No. 65, Att. 6), and, even if Greensboro initially prepared the certificate, this one oversight is not sufficient to establish a fraudulent state of mind for purposes of punitive damages. Additionally, there exists a dispute of fact as to who prepared the certificates.

Moreover, Defendants contend there are no additional misrepresentations in the certificates because no "claims" existed to assert for either GOC or TRC. *Memorandum in Opposition,* p. 16 (Docket No. 64). The GOC tenant upfit was not completed at the time the certificates were filled out or by the September 30, 2004 Closing. As provided in the GOC lease, the "Lessor shall pay the Tenant Upfit Allowance upon completion of the Tenant Improvements as evidenced by a certificate of occupancy and delivery of a lien waiver signed by any person or entity who performed work or supplied materials for upfit of the Premises." *Id.,* Exhibit [*66] D at Art. XXI of Ex. C. Defendants point out that these conditions for payment of the allowance were not met by the September 30, 2004 Closing and, therefore, GOC had no claim until after the September 30, 2004 Closing.

Similarly, the TRC lease provides that "[t]he Tenant Upfit Allowance will be paid to Lessee [TRC] upon completion of the Tenant Improvements, issuance of a Certificate of Occupancy for the Premises, and Contractor's Waiver of Lien." *Graham Affidavit,* Exhibit A at Art. XX of Ex. C (Docket No. 65, Att. 1). Although the City of Greensboro issued a Certificate of Occupancy for the premises in April of 2004--almost four months before DBSI executed the Assumption--the contractor did not execute a lien waiver until January 21, 2005, and TRC did not request payment for the Tenant Upfit Allowance until February 25, 2005. *McMurray Affidavit,* P 3 (Docket No. 56. Att. 5); *Graham Summary Judgment Affidavit,* Exs. F, G (Docket No. 80, Att. 7).

Plaintiff responds that, even though the right to payment may not have not arisen under the express terms

of the tenant upfit provisions, TRC and GOC may have had equitable claims against Greensboro based on the improvements [*67] that had been completed at the time of the September 30, 2004 Closing. The Court has determined that TRC and GOC did not have equitable liens at the time of the Closing. Although TRC and GOC had claims contingent on certain events, the Court concludes that any misrepresentation in the certificates is not sufficient to create a reasonable likelihood that Plaintiff could prove at trial by clear and convincing evidence that it is entitled to an award of punitive damages. The certificates were reviewed and signed by TRC and GOC employees and they accepted responsibility for the certificates' accuracy. These circumstances make it unlikely that Plaintiff will be able to support a punitive damages claim by clear and convincing evidence at trial.

In summary, after carefully weighing the entire record, including the evidence and argument of counsel presented at the hearing on March 15, 2006, the Court concludes that although there is some evidence indicating that Defendants may have allowed Plaintiff to be misled, Plaintiff has not established a reasonable likelihood of proving at trial by clear and convincing evidence that Defendants "acted with an extremely harmful state of mind," *see* [*68] *Gen'l Auto Parts, 132 Idaho at 853, 979 P.2d at 1211,* or any other facts sufficient to support an award of punitive damages. n13 Accordingly, Plaintiff's Motion for Leave to File Third Amended Complaint Requesting Punitive Damages (Docket No. 56) is denied.

n13 The Court notes that it has allowed the fraud claim to go forward but denied the punitive damages claim based on the fraud allegations. The summary judgment decision rested on whether genuine issues of material facts existed with regard to the elements of Plaintiff's fraud claim, but the punitive damages decision was made in light of the clear and convincing trial evidence standard. Although the ruling may appear inconsistent, it is based two different standards of law. Moreover, even when a fraud claim has been proved, punitive damages are not always allowed. *See Trees, 138 Idaho at 11, 56 P.3d at 773.*

Because Plaintiff cannot assert a claim for punitive damages, the information sought by interrogatories numbered 17 [*69] through 24 is not relevant, Plaintiff's Motion to Compel Responses to Punitive Damages Discovery is denied as irrelevant to the issues in this action. *See Fed. R. Civ. P. 26* (providing that the Court may

order discovery of any matter *relevant* to the subject matter involved in the action).

**V.**

**ORDER**

Accordingly, IT IS HEREBY ORDERED:

1. Plaintiff's claims for (i) unfair and deceptive acts/practices based on North Carolina law, (ii) negligent representation, and (iii) unjust enrichment, contained in its Second Amended Complaint, are DISMISSED pursuant to Plaintiff's consent.

2. Defendants' Motion for Summary Judgment (Docket No. 79) is DENIED.

3. Plaintiff's Motion for Summary Judgment (Docket No. 80) is GRANTED, in part, and DENIED, in part, as provided in Section III, Parts B, C, D, E, F and G, at pages 15 through 21.

4. Plaintiff's Motion for Leave to File Third Amended Complaint Requesting Punitive Damages (Docket No. 56) is DENIED.

5. Plaintiff's Motion to Compel Responses to Punitive Damages Discovery (Docket No. 66) is DENIED.

6. Plaintiff's Motion to Strike Fifteenth Affirmative Defense and Count Two of Defendants' [*70] Counterclaim (Docket No. 95) is DENIED.

DATED: **May 9, 2006.**

Honorable Larry M. Boyle

Chief U. S. Magistrate Judge