17

Westlaw.

Not Reported in N.W.2d                                                      Page 1

Not Reported in N.W.2d, 2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
**(Cite as: Not Reported in N.W.2d)**

▷
Briefs and Other Related Documents
Gordon v. Microsoft Corp.Minn.Dist.Ct.,2001.
District Court of Minnesota.
Daniel GORDON, Brandon Welter, David
Ellingson, Kari A. Wallace, on behalf of themselves
and all others similarly situated, Plaintiffs,
v.
MICROSOFT CORPORATION, Defendant.
**No. 00-5994.**

March 30, 2001.

ORDER GRANTING CLASS CERTIFICATION
AND MEMORANDUM
PETERSON, J.
**\*1** The above entitled matter came on for hearing
before the Honorable Bruce A. Peterson on
February 5, 2001, on Plaintiffs' Motion for Class
Certification.

Richard M. Hagstrom and Thomas M. Sobol
appeared on behalf of Plaintiffs.

David B. Tulchin appeared on behalf of Defendant.

Based on all the files, records, pleadings,
submissions and arguments of counsel, it is hereby
ORDERED:

1. Plaintiffs' Motion for Class Certification is
GRANTED.

2. The class period is May 18, 1994 to the present.
The class will consist of:
All persons or entities who acquired for their own
use, and not for further selling, leasing or licensing,
a license in Minnesota from Microsoft, an agent of
Microsoft, or an entity under Microsoft's control,
for an Intel-compatible PC version of MS-DOS,
Windows 95, upgrades to higher MS-DOS versions,
upgrades to or of Windows 95, Windows 98,
upgrades to or of Windows 98, or other software

products in which MS-DOS or Windows has been
incorporated in full or part ("Microsoft Operating
System Software") at any time during the Class
Period ("Windows Operating Software Class").

3. The attached memorandum is hereby
incorporated into this Order.

MEMORANDUM

Defendant contends the pricing and distribution
system for Microsoft Operating System software is
too complex to determine antitrust damages for a
class of Minnesota consumers. Because the
Minnesota Legislature intended such consumers to
have a remedy for antitrust violations, because there
is no realistic alternative to a class action, and
because Plaintiffs have proposed a methodology
that, while hotly disputed, at least appears at this
preliminary stage adequate for use at trial, the court
certifies the class.

*Facts and Procedural History*

Plaintiffs [FN1] seek certification of a class
composed of Minnesota indirect purchasers of
Microsoft Windows or MS-DOS operating software
("Microsoft OS"). Defendant in this matter
manufactures Microsoft OS, which is the software
that runs personal computers ("PCs").

> FN1. The Complaint dated April 28, 2000
> named Daniel Gordon as Plaintiff and
> others similarly situated as the "Windows
> Operating Software Class." An Amended
> Complaint was filed on January 23, 2001,
> naming Daniel Gordon, Brandon Welter,
> David Ellingson and Kari Wallace as
> Plaintiffs. The Amended Complaint
> contains additional facts, as well as an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
**(Cite as: Not Reported in N.W.2d)**

additional class, the "Windows Application Software Class." The motion now before the court concerns only certification of the first class, the " Windows Operating Software Class." The court will consider the facts described in the Amended Complaint as applied to the Plaintiffs listed therein.

Defendant's products may reach the consumer in a variety of ways. In some instances, the consumer buys the "full packaged product," a shrink wrapped package containing Microsoft OS. The product may have been sold by Defendant directly to a vendor (a store such as Best Buy or CompUSA), or the product may have moved through an intermediate distributor before reaching the store shelf. A different chain of distribution provides educational institutions, students and faculty members with academic editions of the product. Defendant also licenses copies of Microsoft OS programs to manufactures of PCs ("original equipment manufacturers" or "OEMs") who install the software and then sell the PCs to consumers for a single price. Plaintiffs assert that a monopoly overcharge to each of the direct purchasers has been passed on to consumers, including members of the proposed class.

Plaintiffs allege that Defendant established a monopoly in the market for operating software through various anticompetitive acts and has maintained that monopoly since the late 1980s. According to Plaintiffs, Defendant has used its monopoly power to stifle innovation in the market and overcharge consumers. Plaintiffs claim the Defendant's actions have eliminated competition in the market for similar operating system software, deprived purchasers of the benefits of a free market, and injured consumers by forcing them to purchase Microsoft OS at artificially high and non-competitive prices in violation of the Minnesota Antitrust Law.

**\*2** Although indirect purchasers such as Plaintiffs are barred from making claims under federal antitrust laws, see *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977), Minnesota antitrust law expressly provides damages for indirect purchasers injured by

antitrust violations. Minn. State. § 325D.57. No special provision regulates such suits brought as class actions, however, suits filed under the antitrust law as class actions must meet all requirements for class certification specified by the Minnesota Rules of Civil Procedure and relevant case law. To date, apparently no Minnesota court has certified a class of indirect purchasers.

*Analysis*

In order to proceed as a class action, Plaintiffs must meet all four prerequisites of Rule 23.01 and one of the three requirements of Rule 23.02 of the Minnesota Rules of Civil Procedure.

### I. Rule 23.01 Requirements

Minnesota Rule of Civil Procedure 23.01 requires a finding that:
(a) the class is so numerous that joinder of all members is impracticable;
(b) there are questions of law or fact common to the class;
(c) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(d) the representative parties will fairly and adequately protect the interest of the class.

Plaintiffs contend that the four factors enumerated above (numerosity, commonality, typicality and adequacy) are easily met in this case because:1) the class of persons or entities that purchased Microsoft OS from various sources is a class too numerous to make joinder practicable;
2) the questions of whether Defendant is a monopolist in the market for operating system software, whether Defendant engaged in anticompetitive conduct in order to unlawfully maintain its monopoly, whether the alleged conduct violated the Minnesota Antitrust Law, the impact of Defendant's activity in the relevant market, and whether Defendant's conduct caused harm to the class are common to every member of class;
3) Plaintiffs' claims are typical of the claims of the class, even if the amount of damages is variable; and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
**(Cite as: Not Reported in N.W.2d)**

4) the representative parties' interests are not in conflict with the class and Plaintiffs' lawyers are adequate to defend the interests of the class.

Defendant offers no argument on these issues and this court finds that Plaintiffs have met their burden under Rule 23.01.

### II. Rule 23.02(c) Requirements

Minnesota Rule of Civil Procedure 23.02 requires that Plaintiffs also meet one of three additional requirements. Plaintiffs argue that they have met the requirement of Rule 23.02(c) that "questions of law or fact common to the members of the class predominate over questions affecting only individual members of the class, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The rule instructs the court to consider:
1) the interest of members of the class in individually controlling the prosecution or defense of separate actions;
**\*3** 2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
3) the desirability or undesirability of appropriateness of concentrating the litigation of the claims in the particular forum; and
4) the difficulties likely to be encountered in the management of a class action.

Id. See also *Streich v. American Family Mut. Auto. Ins. Co.,* 399 N.W.2d 210, 218 (Minn.App.1987) (" in determining whether a class action is appropriate, factors to consider include manageability, fairness, efficiency and available alternatives").

### A. Predominance

Private antitrust liability requires a showing of (1) a violation of the antitrust laws, (2) the fact of damage, and (3) some indication of the amount of damage. See *Keating v. Phillip Morris, Inc.,* 417 N.W.2d. 132, 137 (Minn.App.1987). Plaintiffs assert that the following questions of fact or law common to all member of the proposed class

predominate:
1) whether Defendant is a monopolist in the market for operating system software,
2) whether Defendant engaged in anticompetitive conduct in order to unlawfully maintain its monopoly,
3) whether the alleged conduct violated the Minnesota Antitrust Law,
4) the impact of Defendant's activity in the relevant market, and
5) whether Defendant's conduct caused harm.

Defendant argues that common questions do not predominate because Plaintiffs will not be able to prove class-wide injury and because damages will have to be determined on a case by case basis, necessitating many mini-trials.

An issue will meet the predominance standard " when there exists generalized evidence that proves or disproves [an] element on a simultaneous, class-wide basis. Such proof obviates the need to examine each class member's individual position." *In Re Industrial Gas,* 100 F.R.D. 280, 288 (N.D.Ill.1983). The mere existence of individual damage questions does not automatically preclude satisfaction of the predominance requirement; the total amount of time spent on a common issue compared to time spent on individual issues is immaterial, so long as some common proof is used to demonstrate adequately some damages to each plaintiff. See *In Re Alcoholic Beverages,* 95 F.R.D. 321, 327 (E.D.N.Y.1982); *In Re South Central Bakery Products,* 86 F.R.D. 407, 419 (M.D.La.1980). In this case it is readily apparent that Plaintiffs will present common proof on the class-wide issues of whether Defendant created a monopoly, whether it did so through illegal means, whether its conduct violated state law, and the impact of its conduct on the market.

The court recognizes the inherent complexities in determining fact of class-wide injury and amount of individual damages in an indirect purchaser class action, but agrees with the federal court that " complexity does not mean the issue of conspiracy does not predominate." *In Re Workers Compensation,* 130 F.R.D. 99, 108 (D.Minn.1990). In enforcing various trade regulation statutes,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
**(Cite as: Not Reported in N.W.2d)**

Minnesota courts have construed remedial statutes broadly and rejected arguments based on complexity alone. See *Group Health Plan, Inc. v. Phillip Morris, Inc.,* WL 25889 (Minn.2001); *Gilchrist v. Perl,* 387 N.W.2d 412 (Minn.1986); *Streich v. American Family Mut. Ins. Co.,* 399 N.W.2d 210 (Minn.Ct.App.1987). In *Group Health,* for example, the Minnesota Supreme Court rejected holdings in *Thompson v. American Tobacco Co.,* 189 F.R.D. 544 (D.Minn.1999) and *Parkhill v. Minnesota Mut. Life Ins. Co.,* 188 F.R.D. 332 (D.Minn.1999), both of which initially denied class certification on the basis that individualized proof of reliance predominated over common questions of law or fact. WL 25889 at *2. While this court must address problems of proving class-wide injury and amount of individual damages in considering the superiority requirement, this court concludes that questions of law or fact common to all class members here predominate over questions affecting individuals.

### B. Superiority

*4 In order to certify a class, the second prong of Rule 23.02(c) requires that the court find that class action "is superior to other available methods for the fair and efficient adjudication of the controversy."

### 1. Prior Cases

Defendant asserts that a class action is not a superior method of adjudication, relying heavily on the fact that since the Minnesota legislature amended Minn.Stat. § 325D.57 in 1984 to permit indirect purchasers to sue for antitrust damages, Minnesota courts have denied class certification motions because of manageability in five indirect purchaser cases.

Despite the consistency of prior decisions, certainly no established rule exists in Minnesota against certification of indirect purchaser classes. Along with California, Wisconsin, New Mexico, Michigan, Kansas, South Dakota, the District of Columbia, North Dakota and Maine, Minnesota has

enacted legislation allowing indirect purchasers to recover damages in antitrust suits. According to the court in *State of Minnesota v. Phillip Morris, Inc.,* 551 N .W.2d 490, 493 (1996), the state legislature intended to broadly confer standing for indirect purchasers when it enacted the statute. The court opined that the broad statutory grant of standing was a direct response to the United States Supreme Court's ruling in *Illinois Brick Co. v. Illinois* that indirect purchaser plaintiffs could not use the pass-through theory to establish injury. See 431 U.S. 720; see also *Keating v. Phillip Morris, Inc., supra* 417 N.W.2d at 163 (stating that the Minnesota Antitrust Act was amended "to allow a cause of action to indirect purchasers ... The legislative history of this amendment indicates that it was a direct response to the *Illinois Brick* decision. ").

Inferring a rule in Minnesota against indirect purchaser classes in the face of the 1984 amendment would be contrary to legislative intent. As a practical matter, denying class certification usually constitutes the functional dismissal of a consumer antitrust lawsuit. Denying class c ertification based merely on economic complexity would effectively abrogate the indirect purchaser provision altogether, since economic complexity is inherent in indirect purchaser actions. In order to effectuate the Minnesota Legislature's intent, standards for class certification should be interpreted if at all possible in a fashion that indirect purchasers can meet.

Closer analysis reveals that each of the five prior cases differed materially from the case now before the court, and that each denial was on narrow grounds rather than pursuant to any general rule. In *Keating v. Philip Morris, Inc.,* the owner of several gas stations sued six of the largest cigarette manufacturers in the country. *See* 417 N.W.2d. at 134. The cigarette companies sell to a vast number of distributors, who in turn sell to retailers, such as the gas stations, or to "subjobbers." The "subjobbers " also sell to the retailers. The gas station owner moved to certify a class of "[a]ll persons, corporations or other entities in Minnesota ... who purchased cigarettes manufactured by the Defendants ... for resale to consumers" at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
**(Cite as: Not Reported in N.W.2d)**

monopolistic prices. Id. at 134.

*5 Cigarette retailers must frequently restock their inventory. The plaintiff claimed damages from many separate purchases at different prices of different amounts of product from several defendants. See id. Thus, the court found that in order to establish both fact of injury and amount of individual damages, "[t]he class action would quickly degenerate into thousands and thousands of individual trials ." Id. at 137. The plaintiff failed to meet the burden of predominance and manageability because "the differences involved in each transaction preclude a uniform method for calculating damages," and the plaintiff failed to produce any "mathematical calculations or formulae " to be used in determining damages. Id. The instant case, by contrast, involves only one Defendant, and presumably most Plaintiffs purchased a small number of products on one or a small number of occasions.

*City of St. Paul v. FMC Corp.,* WL 259683 (D.Minn.1990), involved an alleged conspiracy to fix the prices of chlorine products used as disinfectants. The City of St. Paul moved for certification of a class of "all municipal corporations, school boards, cities and towns, school boards, and commissions located within the State ... that purchased chlorine and caustic soda indirectly," from eleven chemical companies. Id. at [*]1. The product was sold in cylinders of various sizes. See id. For cylinders of the smaller sizes, distributors had to repackage chlorine purchased from the defendants. See id. Because of the toxic nature of the product, substantial costs were added to the product throughout the chain of distribution at various stages, including inspection, testing, delivery and maintenance. See id. Maintenance services often formed a substantial portion of a package price, but some of the purchasers of the largest cylinders provided their own services and did not purchase total packages. See id. The court found that common questions did not predominate over individual questions because "substantial value is added to the chlorine at various points in the chain of distribution," and the court "would have to examine the circumstances of each class member individually to determine whether that member

[had] suffered an overcharge." Id at [*]2.

The *City of St. Paul* court found that individual factual issues predominated over common issues because the plaintiff presented no method for proving fact of injury on a class-wide basis. *See* Id. at [*]2. Here, Plaintiffs have offered a method of proving fact of class-wide injury that does not require examining each class member's individual circumstances. Because the plaintiff did not meet its burden of proving predominance in *City of St. Paul,* the court did not even address the superiority determination at issue here.

The court in *Fischenich v. Abbott Laboratories, Inc., et al,* No. MC 94-6868 (Minn.Dist.Ct. May 26, 1995), denied a motion for class certification on the grounds that upwards of 1,000,000 mini-trials would be required to determine individual damages due to lack of data. See id. at 5. The defendants manufactured infant formula sold in a variety of retail markets, including grocery stores, drug stores, mass merchandisers and convenience stores. See id. at 6. The parties agreed that the members of the proposed class lacked basic information about amount paid for the product, quantity of the product purchased, and dates of purchase. See id. at 5. Furthermore, the plaintiff's proposed method of calculation was based on unsubstantiated assumptions regarding pass-through and lowest retail prices, records of which did not exist during eight years of the proposed class period. See id. at 8.

*6 Consumers are much more likely to remember, and perhaps even to have a record of, when they purchased a computer than when they purchased baby food. For example, in his deposition Plaintiff Gordon stated when and where he bought his computer and for exactly how much. Although class members may recall fewer details about purchasing a shrink-wrapped product than a PC, there will still be far fewer purchases to reconstruct than the weekly or even daily purchases of infant formula.

In *Peridot, Inc. v. Kimberly-Clark Corporation, et al,* No. MC 94-6868 (Minn.Dist.Ct. May 26, 1995), ten manufacturers of commercial tissue products were sued by two commercial entities as indirect purchasers. The plaintiffs moved to certify the class

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
**(Cite as: Not Reported in N.W.2d)**

of "business entities that purchased commercial tissue products from forty Minnesota distributors that purchased directly from defendant manufacturers." Id. at 4. The court held that "where evidence shows that defendants' alleged price-fixing action was not always 'passed on' to all putative class members ... proof of impact and damages as to each plaintiff becomes too individualized a task to make a class action feasible-the class is unmanageable." Id. at 7, quoting *In re Alcoholic Beverages Litigation,* 1982-1 Trade Cas (CCH) ¶ 63, 783 (E.D.N.Y. Mar 11, 1982). The plaintiff's own expert admitted that he had "never before devised" the method for calculation he proposed and was "unaware of anyone else devising a model for calculating the amount of a price increase passed through to others in a distribution chain using his proposed economic methods.". Id. at 9. Unlike in *Peridot,* Plaintiffs' economic expert in this case has proposed a viable method for determining the amount of pass through that occurred to indirect purchasers during the proposed class period, as have a host of others.

Lastly, in *Kerr v. Abbott Laboratories,* WL 314419 (D.Minn.1997), the plaintiffs proposed to certify a class of "all person who purchased brand-name prescription drugs from retail pharmacies in the State of Minnesota" sold by twenty-five manufacturers. Id. at *1. Although the plaintiffs offered several methods for class-wide computation of damages in the aggregate, no valid mathematical formula or calculation could be developed to determine individual damages. The court determined that a class action would be unmanageable because it involved "various brand-name drugs, from various retailers, at various times, under varying terms" necessitating " thousands of trials [to] examine thousands of transactions between thousands of retailers, wholesalers, distributors and manufacturers." Id.

In each of the prior cases, the court denied class certification because the plaintiff failed to propose a viable method for proving class-wide fact of injury ( *City of St. Paul* ), amount of individual damages ( *Fischenich, Kerr* ), or both (*Keating, Peridot* ). This case is different. One software manufacturer has been sued, rather than three infant formula

manufacturers, six cigarette manufacturers, ten commercial tissue manufacturers, eleven chemical manufactures, or twenty-five prescription drug manufacturers. The lawsuit concerns only two basic products, Microsoft Windows and MS-DOS, rather than multiple brands of cigarettes, various forms of chlorine products, or all brand-name prescription drugs. In addition, Microsoft OS was usually purchased on only one or a small number of occasions, as opposed to the frequent and recurrent purchases of cigarettes, infant formula, drugs or chlorine products. Determination of amount of individual damages is more readily subject to calculation here than in these earlier cases, and, unlike in any of the other cases, Plaintiffs have actually produced a time-consuming but apparently workable method for calculating damages.

*7 Although Minnesota courts may have previously declined to certify a class of indirect purchasers, a number of other states that have implemented *Illinois Brick* repealer statutes like ours have certified classes of indirect purchasers in antitrust cases. See *Carlson v. Abbot Labs.,* No. 94-CV-002608 (Cir.Ct. Milwaukee Co., Wis. Mar. 23, 1995); see e.g. *K-S Pharmacies, Inc. v. Abbott Labs.,* No. 94 CV 2384 (slip op.)(Cir.Ct. Dane Co., Wis., May 17, 1996); *Lethbridge v. Johnson & Johnson,* Super Ct.No. BC 113271 (slip op.)(Cal.2d App.Dist. Nov.10, 1997); *Feitelberg v. Abbott Labs.,* No. 953865 (Cal.Super. Ct. San Francisco Co., June 23, 1995); *Preciado v. Abbott Labs.,* No. 962294 (Cal.Super. Ct. San Francisco Co., Aug. 16, 1995); *Robinson v. EMI Music Dist.,* WL 495551 (Cir.Ct.Tenn.1996); *Donelan v. Abbott Labs.,* No. 94 C 709 (Kan. Dist. Ct. Sedgwick Co., May 3, 1995); and *Hagemann v. Abbott Labs.,* Civ. No. 94-221 (S. Dakota Cir. Ct. Hughes Co., Nov. 21, 1995).

### 2. Manageability

An indirect purchaser class is legally plausible, but do the facts here establish superiority? Minnesota Rule of Civil Procedure 23.02(c) lists four factors " pertinent to [a] finding" of superiority. First the court must consider whether class members would pursue separate, individual actions. It is unlikely

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                                 Page 7

Not Reported in N.W.2d, 2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
**(Cite as: Not Reported in N.W.2d)**

that proposed class members here would personally bring suit, considering the high cost and time commitment required and that individual recovery would be minimal. For the same reason, the second consideration for the court is moot: no individual litigation has been commenced at this point. The third factor is the suitability of the particular forum. The proposed class consists only of Minnesota residents, making this forum appropriate.

Defendant's argument against certification is based on the final factor, manageability, because proving fact of class-wide injury and the amount of damage to each indirect purchaser would require individual determinations. To maintain an antitrust suit as a class action, Plaintiffs must be able to establish a violation of antitrust law, the fact that injury occurred on a class-wide level as a result of the violation, and "some indication of the amount of damage." *Keating v. Philip Morris, Inc., supra* 417 N.W.2d at 137. However, common proof of fact of injury "is possible without common damage amounts." *In Re Potash Antitrust Litigation,* 159 F.R.D. 682, 694 (D.Minn.1995). Fact of injury to each class member is an element of liability and must be shown with some certainty. See *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 563 (1931) and *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 379 (1927). The amount of individual damages, however, may be established by "just and reasonable inference," *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264-66 (1946). Neither of these standards, of course, requires Plaintiffs to *prove* class-wide fact of injury or individual damages at the class certification stage. On the other hand, at this stage, Plaintiffs "cannot demonstrate common impact by simply *alleging* a price-fixing conspiracy." *Potash,* 159 F.R.D. at 695 (quoting *In Re Catfish Antitrust Litig.,* 826 F.Supp. 1019, 1039 (N.D.Miss.1993)). Instead, the court must determine whether Plaintiffs offer a viable method for determining class-wide impact and whether "a mechanical calculation is available," *In Re Antibiotic Antitrust Actions,* 333 F.Supp. 278, 281 (S.D.N.Y.1971), for determining individual damage amounts.

**\*8** Defendant, citing *Washington Mutual Bank v.*

*Superior Court of Orange County,* 24 Cal. 4 th 906, 103 Ca. Rptr.2d 320, 15 P.3d 1071 (2001), contends that Plaintiffs must show that common issues predominate "at the time of certification," Id. at 923, and certification cannot be granted based on "counsel's assurances of manageability." Id. at 924. In *Washington Mutual Bank,* a home mortgagor sued on behalf of a nationwide class, claiming that the bank had "charged excessive amounts for replacement hazard insurance when a mortgagor defaulted on the loan." Id. at 906. Because the deed securing the mortgage contained a choice of law clause mandating that both federal law and law of the state where the property was located governed, the California Supreme Court held that class certification should not have been granted before determining the effect of choice of law agreements. *See* Id. Not only are choice of law questions not a problem here, but the following discussion demonstrates that Plaintiffs have presented more than assurances of manageability.

### a. Fact of Class-wide Injury

To prove harm to each class member, Plaintiffs must show that the price each member paid for Microsoft OS was higher than it would have been absent Defendant's illegal conduct. Plaintiffs must do this by establishing that Defendant's conduct increased prices paid by direct purchasers, and that some amount of this overcharge was passed on to the consumers.

Plaintiffs have offered testimony of Dr. Keith Leffler, an authority in the field of antitrust economics, that it is possible to establish fact of injury on a class-wide basis. Dr. Leffler describes "three yardstick methodologies that could be used to estimate Microsoft's overcharge to its buyers." [FN2] Leff. Supp. Aff. ¶ 23. One yardstick is a "comparison price from a comparable market that was not affected by the anticompetitive activity." Leff. Aff ¶ 10. The prices for Microsoft OS would be compared to those of "software sellers [that] encountered significant competition such as, for example, anti-virus software, money management software or fax software." Id. at ¶ 13. Prices in such competitive markets indicate what Microsoft

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
**(Cite as: Not Reported in N.W.2d)**

OS prices would be with competition. See id. The second yardstick is "based on margins earned by sellers in a comparable market free from antitrust violations." Id at ¶ 10. An estimation of the price Microsoft likely could have charged but for its monopoly can "be derived from assuming Microsoft would earn a competitive return, properly adjusted for risk, for its investments in product improvements undertaken to provide various versions and upgrades of the Microsoft operating systems." Id. at ¶ 17. Risk can be estimated from profit margins from an "average" software company facing competition. Leff. Supp. Aff. ¶ 28. The third yardstick requires measuring the "price in the market at issue during a period free from anticompetitive conduct." Leff. Aff. ¶ 10. Dr. Leffler proposes to evaluate prices for Microsoft OS in the late 1980s and early 1990s when DR DOS, a compatible alternative to MS-DOS, "had caused a 30-40% reduction in the price of MS-DOS. " Id. at ¶ 18. After a "benchmark" price has been determined using one of these yardsticks, Dr. Leffler proposes to deduct the "benchmark" price from the actual price paid to determine the amount of overcharge to the direct purchasers. The strength and accuracy of Dr. Leffler's model cannot be determined here, but will be established upon application of the facts at trial. See *Zenith Radio Corp. v. Hazeltine Research Inc.,* 395 U.S. 100, 123-124 (1969).

> FN2. Defendant criticizes the yardsticks, citing their "principal deficiency" to be " that none of them even attempts to deal with the enormous difficulties of showing how much (if any) of an initial claimed overcharge was passed on to the ultimate end users." Defendant's Memorandum at 35. There is some ambiguity as to whether Dr. Leffler proposes to use the yardsticks to measure overcharge to the direct purchasers or to establish the amount of overcharge passed through the chain of distribution to the consumer. When describing the Comparable Market Yardstick in his original Affidavit, Dr. Leffler mentions both "the price to end users," Leff. Aff. ¶ 14, and "Microsoft's

operating system prices," id. at ¶ 15. Then he refers to "the overcharge by Microsoft," id. at ¶ 17, and "Microsoft overcharge," id. at ¶ 19, when discussing the other two yardsticks. However, Lefler's Supplemental Affidavit contains the language quoted in the text, indicating that the yardsticks are intended to measure overcharge to direct purchasers. Relying on Dr. Leffler's language describing the yardsticks as a measure of the overcharge to direct purchasers, the court addresses pass through as a separate issue discussed below.

**\*9** Consistent with Dr. Leffler's position, in *United States v. Microsoft,* 84 F.Supp.2d 9 (D.D.C.1999), Judge Jackson not only described an overcharge to direct purchasers but specified an amount. He called Microsoft's actions "indicative of monopoly power .. . A Microsoft study from November of 1997 reveals that the company could have charged $49 for an upgrade to Windows 98-there is no reason to believe that the $49 price would have been unprofitable-but the study identifies $89 as the revenue-maximizing price. Microsoft thus opted for the higher price." Id. at 27.

If Plaintiffs indeed establish an overcharge to the direct purchasers at trial, in order to prove fact of injury Plaintiffs must be able to show that some of the overcharge was passed through to all class members. Defendant contends there would be no universal pass through because of time delays between Defendant's price increases and any retail price increase, and because of a number of variables that determine consumer prices. Defendant claims that because of "focal point pricing" (fixing retail prices at amounts that end in 49 or 99, *See* Nichols Aff. ¶ 34), and "menu costs" (the cost of changing retail prices), an increase in the cost of one component is not "immediately" passed on to consumers. See Hausman Aff. ¶ 41. Defendant then points out that PCs with preinstalled Microsoft OS sell for a wide range of prices, with the differential far exceeding the amount of any possible overcharge and even the cost of the entire Microsoft OS component. See Nichols Aff. ¶¶ 18, 26. Defendant also asserts that rebates, either as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
**(Cite as: Not Reported in N.W.2d)**

discounts at the cash register or as mail-in vouchers, affected how much consumers paid at any given time during the class period. See id. at ¶ 31. Any pass through of software overcharge is also questionable because some PCs are apparently sold below cost and some PCs are sold for the same price even if the operating software differs in cost. Finally, Defendant claims that inclusion of valuable Web browsing capabilities in the Microsoft OS off-set any harm caused by an overcharge. See Hausman Aff. ¶ 98.

Dr. Leffler relies heavily on economic literature to establish that a cost increase to distributors will cause a price increase to consumers in all cases in which, as here, the product has no close substitutes. See Leff. Aff. ¶ 8. All or nearly all of the overcharge to the direct purchasers will be passed through to end users, "when distribution markets are highly competitive." Id. at fn. 6. The distribution markets for Microsoft OS are highly competitive, so it is likely that "competitors at the retail and distribution stages will be motivated and forced by competition to reduce their prices when they face lower costs because of the elimination of an overcharge." Id. at ¶ 9. This economic theory-that as a general matter a non-negligible cost increase to all distributors at the beginning of a distribution system would, in a highly competitive market, eventually work its way through to a price increase to the consumers at the end of the system-appears well developed enough to entitle Plaintiffs to an opportunity to prove it at trial.

*10 Dr. Leffler addresses the issue of "price lag," the time required for a cost change to work its way to the consumers in a complex chain of distribution. He contends that the overcharges at issue "would have been embedded in the prices at all levels of distribution at the beginning of the class period" because Defendant's monopolistic conduct began a substantial time before the class period. Leff. Aff. ¶ 5b. Since the overcharge would have had time to work its way to consumers before the class period began, whatever the price paid for a PC after 1994, it would have been lower but-for the overcharge. Thus, if prices were further increased during the class period at certain intervals, it does not follow that class members who made purchases just before

a price increase were not injured. Likewise, if a consumer received a rebate or paid less than cost, it does not follow that that individual was not damaged by an overcharge that kept the price from being even lower.

Dr. Leffler also explains that focal point pricing and menu costs would not have eliminated pass through to class members. He asserts that "the extremely competitive nature of computer retailing and the lower cost of an operating system in the but-for world" negates the proposition of Defendant's expert that "a small change in the cost of the operating system may not cause a seller to move from its chosen focal point." Leff. Supp. Aff. ¶ 13. Because the Microsoft OS is "unchanged as it passes through distribution ... every dollar reduction in the overcharge by Microsoft causes exactly a dollar cost reduction at the distribution level for each and every participant distributor." Id. at ¶ 14. If price decreases in Microsoft OS occurred across the board at the distribution and retail stages, competition would demand price reductions to the consumers. *See* Id. If the overcharge was eliminated, resellers could avoid varying competitive focal prices by upgrading other PC components such as the hardware, applications software, and technical support and services. *See* Id. at ¶ 15.

Lefler contends inclusion of a Web browser in the Microsoft OS has no bearing on whether or not Defendant's alleged overcharge injured purchasers. If Defendant's monopolistic pricing of Microsoft OS harmed consumers, other conduct by the Defendant plays no role in an analysis of fact of injury. While "[t]he predatory browser action may benefit consumers in the browser market ... this has no implications as to the injury and the amount of injury suffered by consumers in the separate operating system market." Leff. Supp. Aff. ¶ 22. Whether Defendant committed an antitrust violation causing higher consumer prices independent of providing its Web browser would appear to be an issue that must be resolved at trial.

Plaintiffs offer affirmations by independent economic and antitrust experts that their own calculations have determined that Defendant's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
**(Cite as: Not Reported in N.W.2d)**

increased prices have been passed through to consumers. See Robert E. Hall, "Toward a Quantification of the Effects of Microsoft's Conduct, " *American Economic* Review 90 at 188-196 (2000) (quantifying harm Microsoft causeed consumers at about 56 billion in five years); Franklin M. Fisher and Daniel L. Rubinfeld, *Did Microsoft Harm Consumers?: An Economic Analysis,* Chapters 1 and 3 (2000) (concluding Microsoft has inflicted harm on all consumers); Consumer Federation of America, Media Access Project, U.S. Public Interest Research Group, *The Consumer Cost of the Microsoft Monopoly: $10 Billion in Overcharges and Counting* (Jan.1999) (confirming that Microsoft's monopoly caused consumer harm on a nationwide basis); Herbert Hovenkamp, *Federal Antitrust Policy, the Law of Competition and Its Practice,* Chapter 16, "Private Enforcement," at 564 (1994) (explaining that an "overcharge at the top of a distribution chain generally results at higher prices at every level."); Robert G. Harris and Lawrence A. Sullivan, "Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis," 2 U. Penn. L.Rev., 128 at 276 (1979) (asserting that " in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule.") Moreover, one of Defendant's experts, Dr. Richard Schmalensee, testified that "OEMs pass the price of the operating system through to consumers as part of the overall price of the computer." *United States v. Microsoft,* ¶ 2. Goodnow Aff.

**\*11** Judge Jackson's Findings of Fact in *United States v. Microsoft,* 84 F.Supp.2d 9 (D.D.C.1999), support Plaintiffs' position that consumers have been directly harmed by Defendant: "Many of Microsoft's actions have harmed consumers in ways that are immediate and easily discernible. They have also caused less direct, but nevertheless serious and far-reaching, consumer harm by distorting competition." Id. at 102-103.

It is apparent that Defendant hotly disputes Plaintiffs' pass through theory, and both positions have merit. Now is not the time to resolve that dispute. The court concludes that Plaintiffs have proposed a viable methodology and theory for proving the fact of class-wide injury to a jury. Defendant's many counter-arguments can be better

considered in that forum. See *In Re Potash Antitrust Litigation,* 159 F.R.D. 682, 697 (D.Minn.1995) (" Whether or not plaintiffs' expert is correct in his assessment of common impact/injuries is for the trier of fact to decide at the appropriate time." (quoting *In Re Catfish Litig.,* 826 F.Supp. 1019,1042 (N.D.Miss.1993)).

#### 2b. Individual Damages

To warrant class certification, Plaintiffs must also show that a viable method exists for calculating individual damages. In antitrust cases, damage issues "are rarely susceptible of the kind of detailed proof of injury which is available in other contexts .. . [I]n the absence of more precise proof, the factfinder may conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure ... that defendants' wrongful acts had caused damage to the plaintiffs." *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 123-24 (1969). Allowing a defendant to escape liability simply because it has implemented its monopoly in such a complex manner as to render calculations difficult " would mean that the more grievous the wrong done, the less likelihood there would be of a recovery." *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 264-65 (1946).

While Plaintiffs do not need to present a precise damage formula at the class certification stage, they must propose the existence of such a method. "In assessing whether to certify a class, a Court's inquiry is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all, ..[T]he fact that the damages calculation may involve individualized analysis is not by itself sufficient to preclude certification when liability can be determined on a classwide basis." *In Re Potash Antitrust Litigation,* 159 F.R.D. 682, 697 (D.Minn.1995); see also *In Re Worker's Compensation Antitrust Litigation,* 130 F.R.D. 99, 108 (D.Minn 1990) ("Mere existence of individual damage questions will not preclude certification as long as there is some 'common proof' to adequately demonstrate some damage to each plaintiff.")

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d, 2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
**(Cite as: Not Reported in N.W.2d)**

Dr. Leffler asserts that a method exists for establishing the amount of overcharge to direct purchasers passed through to consumers.[FN3] A key concept in Dr. Leffler's analysis is the logical proposition that an increase in the cost of Microsoft OS affects each purchaser in the same manner as an increase in any other cost: "the impact of a change in Microsoft's charge to the distribution channel would have the same impact as a comparable change in other costs faced by the distribution channel." Leff. Aff. ¶ 21. This concept permits the effect on consumer prices of a Microsoft OS overcharge to distributors to be determined by actual analysis of the effects of other cost increases. As Dr. Leffler explains, considering cost increases for various computer components and evaluating " how the actual prices charged end users were impacted by actual cost changes to Microsoft's customers will show how the overcharge impacted end users." Leff. Supp. Aff. ¶ 33-34. An overcharge for Microsoft OS would have affected class members in the same manner as a cost increase in any other computer component, such as a disk drive, a hard drive, or a system upgrade. Using data from public sources and third party discovery, Plaintiffs will review actual cost changes for actual products, examine actual market behavior at each distribution stage, and determine the actual impact on consumers in a variety of distribution channels.

> FN3. Dr. Leffler is not totally clear whether his proposed methodology will determine amount of individual damages or aggregate damages to the class. Dr. Leffler considers the issue of individual damages "premature" at this stage, but indicates nonetheless that his methodology will yield a "specific individual's damages," Leff. Supp. Aff. ¶ 32 fn. 60. The damage calculations here, like those in *Gilchrist v. Pearl,* 387 N.W.2d 412 (Minn.1986), involve determining the percentage of Defendant's alleged overcharge that has been passed through to consumers. All purchasers in specific distribution channels presumably experienced a similar percentage pass through, and the court

proceeds with the understanding that the percentage of pass through, as determined by Dr. Leffler's proposed methodology, will be applicable to class members on an individual basis.

**\*12** Dr. Leffler asserts that the amount of pass through in each of the chains of distribution will be near 100%. If he is right and the pass though amounts all converge at a similar percentage, even if it is less than 100%, the damage to individual consumers can be readily calculated. If Plaintiffs establish an overcharge and a 75% pass through, damages to a class member would be 75% of the overcharge to the applicable direct purchaser. Of course, the percentage of pass through could vary for each chain of distribution. This would require a more complicated damage calculation.

Defendant has presented a complicated distribution system: several variations of OS products; distributed by Defendant at different prices; to at least six categories of direct purchasers (royalty and other OEM distributors, full packaged product and volume licensing distributors, direct retail and large account software resellers); many of whom resell to a third level distributor (PC aggregators, full line and other PC resellers, system builders and value added PC resellers, authorized educational software resellers, direct marketing and value added software resellers, and volume licensing resellers); and most of whom incorporate the OS products as about 4% of the value of a PC sold for a single price; before the products reach the consumers. This class probably contains tens or even hundreds of thousands of people. Multiple distribution channels like these have "no significant conceptual difficulties," but they do require separate analyses. See Leff. Aff. ¶ 23, Plaintiffs' counsel, in taking on the responsibility of representing this class and declaring to the court that they intend to conduct the empirical research on these multiple distribution channels needed to make meaningful estimates of the pass through percentages applicable to each class member, may well be undertaking as extensive and sophisticated an antitrust analysis as has ever been conducted in Minnesota. Nonetheless, they said they would do it and, if done properly, such a methodology apparently would constitute a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.W.2d                                                        Page 12

Not Reported in N.W.2d, 2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254
**(Cite as: Not Reported in N.W.2d)**

mechanical method for calculating damages. While not guaranteed to produce a simple result, Plaintiffs' method is far more substantial than "no method at all." *Potash,* 159 F.R.D. at 697. Moreover, should it be necessary, individual damage issues could also be resolved though use of methods such as " bifurcating liability and damage trials, appointing special masters or magistrates to preside over individual damage proceedings, decertifying the class after the liability trial, if liability and damages are separated ... and creating subclasses." Id. at 698.

In sum, then, based on Plaintiffs' proposed methods of determining an overcharge to direct purchasers and a percentage pass through to individual consumers, the court does not find manageability problems sufficient to deny certification of the class. "Dismissal for management reasons is never favored" since "the vehicle of a class action is meant to permit plaintiffs with small claims and little money to pursue a claim otherwise unavailable. " *In Re Workers Compensation,* 130 F.R.D. 99, 110 (D.Minn.1990). Superiority is to be determined based on a consideration of all four factors, and class certification must be found to be superior to other *available* methods of adjudication. Such a disparity exists between the parties' abilities to litigate that most proposed class members, absent certification, have no other legal recourse at all. Even if a few businesses included in the proposed class may be in a position to litigate a separate claim, the fact that thousands of individuals would have no method by which to receive fair adjudication of their claims makes class certification far superior to the alternative.

### Conclusion

**\*13** Plaintiffs have met their burden of presenting viable methods of establishing fact of class-wide injury and calculating individual damages, rendering adjudication as a class action superior to the alternative, no action at all. Therefore, Plaintiffs' motion to certify this matter as a class action is GRANTED.

8 NO. 11 Andrews Antitrust Litig. Rep. 4

Minn.Dist.Ct.,2001.

Gordon v. Microsoft Corp.

Not Reported in N.W.2d, 2001 WL 366432 (Minn.Dist.Ct.), 2001-1 Trade Cases P 73,254

Briefs and Other Related Documents (Back to top)

• 2002 WL 32881083 () Affidavit of Jeffrey K. Mackie-Mason in Support of Plaintiffs' Motion to Amend the Class Definition (Nov. 13, 2002) Original Image of this Document (PDF)
• 2000 WL 34539574 () Affidavit of Keith B. Leffler, Ph.D. (Sep. 15, 2000)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

18

Westlaw.

Not Reported in A.2d                                                    Page 1

Not Reported in A.2d, 2000 WL 33711050 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

C
Graduate Cardiology Consultants, P.C. v. Vivra,
Inc.Pa.Com.Pl.,2000.Only the Westlaw citation is
currently available.GRADUATE CARDIOLOGY
CONSULTANTS, P.C., Plaintiff
v.
VIVRA, INC., et al., Defendants
**No. 2827 FEB.TERM 2000, CONTROL 080518.**

Oct. 20, 2000.

MEMORANDUM OPINION
HERRON, J.
**\*1** Defendants Vivra, Inc. ("Vivra"), Vivra Heart
Services, Inc. ("VHS"), Vivra Holdings, Inc. ("
Vivra Holdings"), VSP Holdings, Inc. ("VSP
Holdings"), Vivra Specialty Partners, Inc. ("Vivra
Specialty Partners") [FN1] and Charles W. Ott ("Ott"
) have filed Preliminary Objections ("Objections")
to the amended complaint ("Complaint") of
Plaintiff Graduate Cardiology Consultants, P.C. For
the reasons set forth in this Opinion, the Court is
issuing a contemporaneous Order overruling the
Objections in part and sustaining the Objections in
part.

> FN1. In 1996, VHS was a subsidiary of
> Vivra Partners. Vivra Partners, in turn, was
> a subsidiary of Vivra, Incorporated, a
> publicly held Delaware corporation. In
> June 1997, Vivra, Incorporated was sold to
> a third party. At the same time, Vivra
> Specialty Partners changed its name to or
> was merged into "Vivra, Inc." and was
> sold to a privately held new company
> called "VSP Holdings, Inc." VSP
> Holdings subsequently either changed its
> name to or was merged into another
> corporation known as "Vivra Holdings, Inc.
> " Throughout this time, VHS continued as
> a subsidiary of Vivra, Inc. For the sake of
> simplicity, Vivra Specialty Partners,

Inc./Vivra, Inc. will be referred to as "
Vivra," while VSP Holdings, Inc./Vivra
Holdings, Inc. will be referred to as "Vivra
Holdings." Vivra, VHS, Vivra Holdings,
VSP Holdings and Vivra Specialty
Partners are referred to collectively as the "
Vivra Defendants."

BACKGROUND

On December 30, 1996, Graduate and VHS entered
into two agreements ("1996 Agreements"). The first
agreement was an Agreement for Purchase and Sale
of Assets ("1996 Sale Agreement"), under whose
terms Graduate sold certain of its assets ("Graduate
Assets") to VHS. Under the 1996 Sale Agreement,
VHS also agreed to assume post-closing obligations
under Graduate's office leases ("Lease Obligations"
).[FN2]

> FN2. Among the Lease Obligations were
> payments due under leases for One
> Graduate Plaza, Philadelphia,
> Pennsylvania ("One Graduate Plaza") and
> 1740 South Street, Philadelphia,
> Pennsylvania ("1740 South Street")
> (collectively, "Office Spaces"). The leases
> for the Office Spaces are referred to
> collectively as the "Leases."

At the same time, Graduate and VHS also entered
into a Management Services Agreement ("
Management Agreement").[FN3] Under the
Management Agreement, VHS provided
administrative and management services to
Graduate and collected fees due to Graduate from
health care organizations ("Fees"). In exchange,
VHS retained 37.5% of the Fees, subject to certain
adjustments, and paid the remaining 62.5% to
Graduate.

> FN3. The 1996 Sale Agreement and the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 2

Not Reported in A.2d, 2000 WL 33711050 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

Management Agreement are referred to collectively as the "1996 Agreements."

On August 5, 1998, Graduate and VHS entered into a second Agreement for Sale and Purchase of Assets ("1998 Sale Agreement"). Under this Agreement, the Management Agreement was terminated and Graduate purchased the Graduate Assets back from VHS. In the 1998 Sale Agreement, VHS warranted that, aside from certain accrued employee benefits, no VHS liabilities or obligations related to the Graduate Assets were outstanding. VHS also represented that it was not in violation of or in default under any material contract, including the Leases. The 1998 Sale Agreement closed on August 14, 1998.[FN4]

> FN4. The representations and warranties of both VHS and Graduate were made as of both the date of execution and the date of closing of the 1998 Sale Agreement.

The Complaint alleges that VHS was in breach of the 1998 Sale Agreement when the Agreement both was executed and closed. VHS had paid the Lease Obligations for the Office Spaces for all of 1997 and January 1998, as required by the 1998 Sale Agreement. However, according to the Complaint, VHS did not pay Lease Obligations totaling $118,275.02 that accrued between February 1 through August 14, 1998 ("Rent Delinquency").

At some point between August 14, 1998 and January 5, 1999, Graduate became aware of the Rent Delinquency and alerted VHS. On January 5, 1999, Vivra, VHS's parent, allegedly agreed, on behalf of itself and VHS, to pay the Rent Delinquency. In response, Graduate agreed not to pursue its rights under the Agreements.

Soon after, Vivra sent Graduate checks ("Checks") payable to the Office Space landlord ("Landlord") for the amounts due. However, due to uncertainty generated by the insolvency of the Landlord, Graduate held the Checks pending clarification of the correct identity of the payee under the Leases. The Complaint alleges that this was done with the consent of VHS.

**\*2** By December 1999, the Checks still had not been cashed. Because of the significant length of time since the Checks were signed, Graduate believed that they were no longer valid, and again requested that the Vivra Defendants correct the Rent Delinquency. According to the Complaint, the Vivra Defendants have refused to do so.

In a separate matter, in October 1999, Graduate became aware of an alleged overpayment of Fees by QualMed Plans for Health ("QualMed") to VHS. Because VHS retained 37.5% of all Fees collected, Graduate asserts that VHS must pay it 37.5% of any amount owed by Graduate to QualMed. To keep VHS's assets out of Graduate's reach, however, the Complaint alleges that the Vivra Defendants have engaged in fraudulent and conspiratorial behavior.

Graduate asserts eight Counts against the Defendants in the Complaint: breach of contract, promissory estoppel, fraudulent misrepresentation, negligent misrepresentation, fraudulent conveyance, conspiracy, unjust enrichment and contractual compensation adjustments.

The Objections are based on two grounds. First, the Defendants have filed a demurrer that asserts that the Plaintiff's failure to allege actual, compensable damage resulting from the Defendants' supposed malfeasance is fatal. Second, the Defendants claim that the fraudulent conveyance and conspiracy Counts are insufficiently specific and must be dismissed.

As discussed below in greater detail *infra,* the demurrer to the Complaint as a whole must be overruled. However, the fraudulent conveyance and conspiracy Counts do not meet the requisite level of specificity, and the Objections to them are sustained.

DISCUSSION

I. Demurrer

For the purposes of reviewing preliminary objections in the form of a demurrer, "all well-pleaded material, factual averments and all

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 3

Not Reported in A.2d, 2000 WL 33711050 (Pa.Com.Pl.)
(Cite as: Not Reported in A.2d)

inferences fairly deducible therefrom" are presumed to be true. *Tucker v. Philadelphia Daily News,* 757 A.2d 938, 941-42 (Pa.Super.Ct.2000). When presented with preliminary objections whose end result would be the dismissal of a cause of action, a court should sustain the objections where "it is clear and free from doubt from all the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish [its] right to relief." *Bourke v. Kazaras,* 746 A.2d 642, 643 (Pa.Super.Ct.2000) (citation omitted). Furthermore,

[I]t is essential that the face of the complaint indicate that its claims may not be sustained and that the law will not permit recovery. If there is any doubt, it should be resolved by the overruling of the demurrer. Put simply, the question presented by demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible.

*Bailey v. Storlazzi,* 729 A.2d 1206, 1211 (Pa.Super.Ct.1999).

According to the Defendants, the Complaint does not allege a demand for payment of the Rent Delinquencies. Consequently, they assert, the Plaintiff cannot establish the causation or damages necessary for each of the Counts, and the Complaint should be dismissed.

**\*3** The Plaintiff counters that the Defendants' alleged actions resulted in harm to the Plaintiff in two ways:

First, [VHS] misappropriated to itself funds it was contractually obligated to pay as rent. Second, it obtained an inflated price when it sold the practice assets back to plaintiff by falsely claiming that it had, in fact, paid the rents it knew it was obligated to pay but had not paid.

Plaintiff's Memorandum at 2-3.

Most of the offenses alleged in the Complaint against the Defendants require proof of causation. However, for each offense, the misconduct that must cause the damage is different. In addition, one of the Counts alleged does not require causation or damages at all. This precludes addressing the demurrer wholesale and requires that the element of causation, or lack thereof, be addressed separately

for each Count.

In summary, the Complaint alleges causation and damages for each of the Counts, albeit in a cursory manner that leaves the Court skeptical as to Graduate's ability to prove causation and resulting damages at trial. However, because a court must regard all factual allegations in a Complaint as true, the demurrer must be overruled.

### A. Breach of Contract

To establish a claim for breach of contract, a claimant must show "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *CoreStates Bank, N.A. v. Cutillo,* 723 A.2d 1053, 1058 (Pa.Super.Ct.1999) (citation omitted). *See also Logan v. Mirror Printing Co. of Altoona, Pa.,* 410 Pa.Super. 446, 448-49, 600 A.2d 225, 226 (1991) ("[i]n order to recover for damages pursuant to a breach of contract, the plaintiff must show a causal connection between the breach and the loss").[FN5]

> FN5. At least one Pennsylvania case holds that a breach of contract action does not require proof of damages or, consequently, causation. *See Grabowski v. Quigley,* 454 Pa.Super. 27, 41, 684 A.2d 610, 617 (1996) ( "[a] cause of action [for breach of contract] exists even if no compensable loss can be shown because any breach gives rise to at least nominal damages"). However, this case appears to be an isolated example, with the general standard requiring proof damages resulting from the breach of the contract.

Here, VHS was required to pay the Lease Obligations under the 1996 Agreements. Moreover, in the 1998 Sale Agreement, VHS warranted that it was in compliance with the Leases and that there was no Rent Delinquency.[FN6] Thus, a failure to pay the Lease Obligations, as alleged in the Complaint, qualifies as a breach of the Agreements.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 4

Not Reported in A.2d, 2000 WL 33711050 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

FN6. In Paragraph 3.10 of the 1998 Sale Agreement, VHS represents that its only liabilities are those related to holiday, sick leave and vacation time. In Paragraph 3.11, VHS represents that it is not in violation of or in default under any of the "Material Contracts" set forth in Schedule 2.1(b). The Complaint states that the Leases are among the Material Contracts. Complaint at ¶ 25.

That said, the Complaint does not allege that any demand for payment has been made on Graduate by the Landlords. In addition, Graduate's assertion of misappropriation in its Memorandum is immaterial, as any benefit to the Defendants without harm to Graduate is not relevant for the breach of contract claim.

Furthermore, VHS's failure to pay the Lease Obligations cannot have affected the price paid under the 1998 Sale Agreement. Section 3.10 of that Agreement insulates Graduate from obligations incurred prior to the Agreement's closing, including the Rent Delinquency.[FN7] Because this Agreement protects Graduate from VHS's prior obligations, to the extent that they exist, the existence of such obligations has no effect on the purchase price.

FN7. According to Section 3.10 of the 1998 Sale Agreement, with the exception of liabilities related to holiday, sick leave and vacation time,

[Graduate] will not be obligated for, nor will the Assets secure or be subject to, any liabilities or obligations of the Business of any kind or nature, whether absolute, accrued, contingent, known, unknown or otherwise, and whether normally set forth or reflected in a financial statement arising from the operation of the Business prior to Closing, including but not limited to claims of third parties which may arise from government investigations or proceedings, in each case which relate to the operation of the Business prior to Closing.

In spite of this, the Complaint alleges that Graduate incurred the damages set forth therein "[b]y reason of the foregoing" facts. Complaint at ¶ 44. Because a court must accept the allegations in a complaint as true for the purposes of preliminary objections, the Court is bound to accept the Complaint's allegations of causation as correct. As a result, the Complaint presents a complete claim for breach of contract, and the demurrer to Count I-Breach of Contract is overruled.

B. Promissory Estoppel

**\*4** Simply put, "promissory estoppel makes promises enforceable." *GMH Assocs., Inc. v. Prudential Realty Group,* 752 A.2d 889, 904 (Pa.Super.Ct.2000). A successful claim for promissory estoppel requires evidence that:
(1) the promisor made a promise that [it] should have reasonably expected would induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise.

*Crouse v. Cyclops Indus.,* 560 Pa. 394, 403, 745 A.2d 606, 610 (2000) (citation omitted).

Promissory estoppel also requires proof that the claimant "justifiably relied on the inducement. Promissory estoppel does not apply if the complaining party acted on his own will and not as a result of the defendant's representations." *Ravin, Inc. v. First City Co.,* 692 A.2d 577, 581 (Pa.Super.Ct.1997). [FN8] Moreover, a plaintiff may request money damages as relief in a promissory estoppel claim. *See DelConte v. Stefonick,* 268 Pa.Super. 572, 577, 408 A.2d 1151, 1153 n. 1 (1979) (where a complaint requests "any relief the court deems proper" based on a promissory estoppel claim, the request is satisfactory, even if additional relief is requested). *See also Herzfeld v. City of Phila.,* No. Civ. A. 84-5014, 1985 WL 2700, at \*3 (E.D.Pa. Sept. 13, 1985) ("monetary damages are recoverable under the doctrine of promissory estoppel").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                          Page 5

**Not Reported in A.2d, 2000 WL 33711050 (Pa.Com.Pl.)**
**(Cite as: Not Reported in A.2d)**

FN8. Because the Objections challenge only causation, the Court presumes the existence of the first and third elements of promissory estoppel in considering the Objections.

In addition to the promises made in the Agreements, outlined *supra,* the Complaint alleges that Vivra promised, on behalf of itself and VHS, to pay the Rent Delinquency. Complaint at ¶ 28. The Complaint further alleges that Graduate relied on these promises when it "refrained from enforcing its rights under the various agreements with [VHS] and otherwise." *Id.* at ¶ 29. These allegations support a claim based on promissory estoppel and require enforcement of the promise to pay the Rent Delinquency. As a result, the demurrer to this Count is overruled.

### C. Fraudulent and Negligent Misrepresentation

The elements of intentional fraudulent misrepresentation are:
(1) A representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance.

*Bortz v. Noon,* 556 Pa. 489, 499, 729 A.2d 555, 560 (1999). Similarly, negligent misrepresentation requires "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and; (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Id., 556* Pa. at 501, 729 A.2d at 561.

**\*5** Here, the alleged misrepresentation is the representation and warranty by VHS and Ott in the 1998 Purchase Agreement that there was no Rent Delinquency. Complaint at ¶ 40. The Complaint alleges that the damages Graduate incurred were a result of this misrepresentation. *Id.* at ¶¶ 44, 46.

Consequently, the demurrer to the fraudulent misrepresentation and negligent misrepresentation Counts are overruled.

### D. Fraudulent Conveyance

Under Pennsylvania's fraudulent conveyance statute,
A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
(1) with actual intent to hinder, delay or defraud any creditor of the debtor; or
(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

12 Pa.C.S. § 5104(a). As relief, a plaintiff alleging a fraudulent conveyance may request money damages. *See, e.g., Amadon v. Amadon,* 59 A.2d 135, 359 Pa. 434 (1948) (awarding wife $3,500 based on fraudulent conveyances made by husband).

In the Complaint, Graduate alleges that VHS and Vivra transferred assets to other Vivra Defendants " with the intent of hindering, delaying and/or defrauding Graduate as a creditor, and to put assets beyond Graduate's reach." [FN9] Complaint at ¶ 48. [FN10] This supports a claim for fraudulent conveyance. In addition, request for monetary relief is appropriate. Consequently, the demurrer to Count V-Fraudulent Conveyance is overruled.

FN9. Graduate's general averment of intent is proper. *See* Pa. R. Civ. P. 1019(b) (" [m]alice, intent, knowledge, and other conditions of mind may be averred generally").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 6

Not Reported in A.2d, 2000 WL 33711050 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

FN10. In the alternative, Graduate asserts that:
(1) the transferor was engaged or was about to engage in a business or a transaction for which the remaining assets of the transferor were unreasonably small in relation to the business or transaction, and/or (2) the transferor was insolvent at that time or became insolvent as a result of the transfer.
Complaint at ¶ 49. This tracks the language in 12 Pa.C.S. § 5104(b), which sets forth factors to be considered when determining if a transfer was made with the requisite "actual intent."

### E. Conspiracy

To state a cause of action for civil conspiracy, a claimant must show "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *Strickland v.. University of Scranton,* 700 A.2d 979, 987 (Pa.Super.Ct.1997) (citation omitted). *See also GMH Assocs. v. Prudential Realty Group,* 752 A.2d 889, 905 (Pa.Super.Ct.2000) ("a conspiracy is not actionable until some overt act is done in pursuance of the common purpose or design ... and actual legal damage results"). However, "it is not necessary that [a plaintiff] plead specific amounts of out of pocket losses in order to survive a demurrer." *Smith v. Wagner,* 403 Pa.Super. 316, 324, 588 A.2d 1308, 1312 (1991).

According to the Complaint, the Vivra Defendants have conspired against Graduate by "secreting and/or transferring assets in order to hinder, delay and/or defraud Graduate as a creditor, and/or to put assets beyond Graduate's reach." Complaint at ¶ 51. As mentioned *supra,* this constitutes a violation of Pennsylvania's fraudulent conveyance statute. In addition, if Graduate is unable to obtain assets to which it is entitled, it has suffered legal damage. As a result, these allegations, if true, support a cause of action for conspiracy, and the demurrer to Count VI is overruled accordingly.

### F. Unjust Enrichment

**\*6** The elements of a claim for unjust enrichment are "benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Wiernik v. PHH U.S. Mortgage Corp.,* 736 A.2d 616, 622 (Pa.Super.Ct.1999), *app. denied,* 561 Pa. 700, 751 A.2d 193 (2000). No Pennsylvania case specifically requires loss by the plaintiff or causation. [FN11] *Cf. Allegheny Gen. Hosp. v. Phillip Morris, Inc.,* No. Civ. A. 99-5, 1999 WL 33135090, at \*8 (W.D.Pa. Nov. 4, 1999), *aff'd,* No. 99-4024, 2000 WL 1478534 (3rd Cir. Oct. 6, 2000) (proximate causation is not an element of an unjust enrichment claim under Pennsylvania law).

FN11. In contrast, other jurisdictions require a loss to the plaintiff corresponding to a gain by the defendant for a viable unjust enrichment claim. *See, e.g., Clay v. American Tobacco Co.,* 188 F.R.D. 483, 500 (S.D.Ill.1999) ("the plaintiff must show that the defendant was unjustly enriched at the plaintiff's expense"); *Kalamazoo River Study Group v. Rockwell Int'l,* 3 F.Supp.2d 815, 818 (W.D.Mich.1997), *aff'd,* 171 F.3d 1065 (6th Cir.1999) (a claim for unjust enrichment requires proof of causation); *Bieber-Guillory v. Aswell,* 723 So.2d 1145, 1150 (La.Ct.App.1998) (action for unjust enrichment requires "causation between the enrichment and the impoverishment"); *Maines Paper & Food Serv., Inc. v. Eanes,* No. 77301, 2000 WL 1429418, at \*4 (Ohio Ct.App. Sept. 28, 2000) ("[t]he concept of unjust enrichment includes not only loss by the plaintiff but gain by the defendant, with a tie of causation between them").

Even if causation and damages were required, Graduate alleges that it compensated VHS under the Management agreement by granting VHS the right

Not Reported in A.2d                                                                    Page 7

Not Reported in A.2d, 2000 WL 33711050 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

to 37.5% of all Fees. Moreover, the Complaint asserts that, "by reason of their conduct as averred above, the Vivra defendants have been unjustly enriched." Complaint at ¶ 13. Consequently, there is no merit to the Defendants' claim that Count VII-Unjust Enrichment is incomplete, and the demurrer to the Count is overruled.

### G. Contractual Compensation Adjustments

Last, Graduate has brought a claim for contractual compensation adjustments based on the 1996 Agreements. This claim is wholly separate from the previous seven Counts and has no connection to either the Lease Obligations or the Rent Delinquency.

Under the 1996 Agreements, all Fees due to Graduate were paid to VHS. This included Fees due from QualMed. VHS, in turn, retained 37.5% of the Fees as compensation for its services and forwarded the balance to Graduate. According to the Complaint, Graduate has received notice that QualMed overpaid its Fees during the term of the Management Agreement. Because VHS retained 37.5% of the QualMed Fees, Graduate requests that VHS be required to compensate Graduate for 37.5% of the amount Graduate is required to repay to QualMed.

The Defendants' Objections to causation and damages are without merit here as well. If Graduate is forced to repay QualMed, the amount of those repayments will exceed the amount that Graduate received from QualMed via VHS. This would clearly result in damage to Graduate, and the demurrer to this final Count is overruled as well. [FN12]

FN12. To the extent that the Complaint does not allege the specific amount of the overpayments, it is important to note that the Plaintiff requests the repayment of " 37% [sic] of all sums Graduate is compelled to refund to QualMed." Complaint at ¶ 57(a). If no amounts are due QualMed, then the Defendants

presumably will owe Graduate no compensation.

### II. Insufficient Specificity

Pennsylvania Rule of Civil Procedure 1028(a)(3) permits preliminary objections based on insufficient specificity in a pleading. To determine if a pleading meets Pennsylvania's specificity requirements, a court must ascertain whether the facts alleged are " sufficiently specific so as to enable [a] defendant to prepare [its] defense." *Smith v. Wagner,* 403 Pa.Super. 316, 319, 588 A.2d 1308, 1310 (1991) (citation omitted). *See also In re The Barnes Foundation,* 443 Pa.Super. 369, 381, 661 A.2d 889, 895 (1995) ("a pleading should formulate the issues by fully summarizing the material facts, and as a minimum, a pleader must set forth concisely the facts upon which [the] cause of action is based"). [FN13]

FN13. Allegations of fraud, including fraudulent conveyance, are held to an even higher standard. Pa. R. Civ. P. 1019(b). *See also Martin v. Lancaster Battery Co.,* 530 Pa. 11, 18, 606 A.2d 444, 448 (1992) (an allegation of fraud must "explain the nature of the claim to the opposing party so as to permit the preparation of a defense " and be "sufficient to convince the court that the averments are not merely subterfuge").

*7 In the Objections, the Defendants claim that the Counts for fraudulent conveyance and conspiracy are impermissibly vague. The Court must agree. As stated *supra,* the allegations of fraudulent conveyance do little more than repeat the language of the fraudulent conveyance statute. Similarly, the Count for conspiracy asserts only that the Vivra Defendants have conspired "by secreting and/or transferring assets in order to hinder, delay and/or defraud Graduate as a creditor, and/or to put assets beyond Graduate's reach ." Complaint at ¶ 51. These statements are insufficient to allow the Defendants to prepare a defense to these Counts.

The Plaintiff maintains in its Memorandum that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2000 WL 33711050 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

facts underlying the fraudulent conveyance and conspiracy claims are "more within [the Defendants'] knowledge than plaintiff's," permitting them to defend against the two Counts. [FN14] Plaintiff's Memorandum at 5. Pennsylvania law grants the plaintiff considerable latitude "where the crucial facts are in the exclusive knowledge of the defendant, and the plaintiff so pleads." *Line Lexington Lumber & Millwork Co. v. Pennsylvania Publishing Corp.,* 451 Pa. 154, 162, 301 A.2d 684, 689 (1973). However, the Complaint does not allege that the facts upon which these two Counts are based are in the exclusive knowledge of the Defendants. [FN15] *Cf. Baker v. Rangos,* 229 Pa.Super. 333, 350 n. 4, 324 A.2d 498, 506 n. 4 (1974) (plaintiffs are "not entitled to have their complaints reviewed with special leniency" where they do not plead "the defendants' superior knowledge"). Consequently, Count V-Fraudulent Conveyance and Count VI-Conspiracy are insufficiently specific [FN16] and the Objections to them are sustained.

> FN14. Significantly, this assertion is not included in the Complaint.

> FN15. Even if the Plaintiff pled that the relevant facts were in the exclusive knowledge of the Defendants, it is far from certain that the Complaint would meet the specificity requirements.

> FN16. This conclusion finds support in Pennsylvania case law as to both Counts. *See Landau v. Western Pa. Nat'l Bank,* 445 Pa. 217, 225, 282 A.2d 335, 340 (1971) (a "single, vague and conclusory allegation that the [defendants] have ' conspired' ... falls far short of the requisite pleading of 'the material facts' "); *Newman v. Newman,* 328 Pa. 552, 196 A. 30 (1938) (general allegations of an effort to cheat and defraud defendants' creditors in violation of statute was insufficiently specific to support a count for fraudulent conveyance); *Shaffer v. Proctor & Gamble,* 412 Pa.Super. 630, 638, 604 A.2d 289, 293 (1992) (allegations of conspiracy are

insufficient where they are "merely conclusory"); *Leopold v. Tuttle,* 378 Pa.Super. 466, 471, 549 A.2d 151, 154 (1988) (claim for fraudulent conveyance cannot be based on "vague conclusions of fact or unjustified inferences of the grantor's indebtedness"); *Burnside v. Abbott Laboratories,* 351 Pa.Super. 264, 280, 505 A.2d 973, 982 (1985) (allegations of "no more than a contemporaneous and negligent failure to act" are insufficient to support a cause of action for conspiracy).

In Pennsylvania, "parties are liberally granted leave to amend their pleadings." *Frey v. Pennsylvania Elec. Co.,* 414 Pa.Super. 535, 538, 607 A.2d 796, 797 (1992). As a result, Graduate is granted twenty days in which to file a second amended complaint whose fraudulent conveyance and conspiracy counts are sufficiently specific.

## CONCLUSION

Each of the Counts in the Complaint is complete and the demurrer is overruled. However, the causes of action for fraudulent conveyance and conspiracy are not sufficiently specific. As a result, the Objections to them are sustained, the Counts are stricken and the Plaintiff is directed to file a second amended complaint within twenty days of this Opinion.

## ORDER

AND NOW, this 20th day of October, 2000, upon consideration of the Preliminary Objections of Vivra, Inc., Vivra Heart Services, Inc ., Vivra Holdings, Inc., VSP Holdings, Inc., Vivra Specialty Partners, Inc. and Charles W. Ott to the Amended Complaint of Plaintiff Graduate Cardiology Consultants, P.C., and Plaintiff's response thereto and in accordance with the Memorandum Opinion being filed contemporaneously with this Order, it is hereby ORDERED and DECREED that:

1. The Preliminary Objections in the form of a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                  Page 9

Not Reported in A.2d, 2000 WL 33711050 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

demurrer to the Amended Complaint are OVERRULED;

**\*8** 2. The Preliminary Objections asserting insufficient specificity in Count V-Fraudulent Conveyance and Count VI-Conspiracy are SUSTAINED and those Counts are STRICKEN; and

3. The Plaintiff is granted leave to file an amended complaint within twenty days of this Order.

Pa.Com.Pl.,2000.
Graduate Cardiology Consultants, P.C. v. Vivra, Inc.
Not Reported in A.2d, 2000 WL 33711050 (Pa.Com.Pl.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

19

LEXSEE 2006 US DIST LEXIS 18790

Analysis
As of: Jan 05, 2007

**IN RE: HYDROGEN PEROXIDE ANTITRUST LITIGATION; This Document Relates To: INDIRECT PURCHASER ACTION**

**CIVIL ACTION NO. 05-666, MDL DOCKET NO. 1682**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2006 U.S. Dist. LEXIS 18790*

**April 11, 2006, Decided**

**PRIOR HISTORY:** *In re Hydrogen Peroxide Antitrust Litig., 401 F. Supp. 2d 451, 2005 U.S. Dist. LEXIS 31590 (E.D. Pa., 2005)*

**JUDGES:** [*1] Stewart Dalzell, J.

**OPINION BY:** Stewart Dalzell

**OPINION:**

MEMORANDUM

Dalzell, J.

On January 31, 2005, European Union antitrust regulators charged eighteen global hydrogen peroxide manufacturers with price-fixing. On the heels of the European claims, the United States Department of Justice began a criminal investigation. About a month ago, this U.S. investigation led two manufacturers, both defendants in this litigation before us, to agree to plead guilty and pay over $ 72 million in criminal fines. See United States Department of Justice, Belgian and Dutch Companies Agree To Plead Guilty to Participating in Chemical Industry Price-Fixing Conspiracies (March 14, 2006), at http://www.usdoj.gov/atr/public/press_releases/2006/215056.htm.

Shortly after the Government investigations began, a buyer filed in this Court the first of thirty-three federal putative class actions. In the wake of that initial filing, the Judicial Panel on Multidistrict Litigation transferred every cognate federal action to us. See *In re: Hydrogen Peroxide Antitrust Litig., 374 F. Supp. 2d 1345 (J.P.M.L.*

*2005)*. We consolidated these cases and then divided them into two actions, [*2] one for direct purchasers, n1 the other for indirect purchasers. See *Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S. Ct. 2061, 52 L. Ed. 2d 707 (1977)*.

n1 Last November, we denied defendants' motion to dismiss the direct purchaser action. See *In re: Hydrogen Peroxide Antitrust Litig., 401 F. Supp. 2d 451 (E.D. Pa. 2005)*.

In the indirect purchaser action, plaintiffs assert antitrust claims under the laws of Arizona, California, Nebraska, Tennessee, and Vermont. See Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005). Before us are ten defendants' motions for a more definite statement and partially to dismiss the second consolidated amended class action complaint. These defendants urge us to: (1) dismiss or stay the California claims because they duplicate pre-existing claims in California Superior Court, see *Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1979)*; (2) require plaintiffs to [*3] file a new pleading that identifies the specific hydrogen peroxide products plaintiffs bought and the seller of them, see *Fed. R. Civ. P. 12(e)*; and (3) dismiss plaintiffs' treble damages claims under Nebraska and Tennessee law. Aside from the third request, which is unopposed, we shall deny defendants' motions.

**A. Factual and Procedural Background**

On May 20, 2005, plaintiffs filed the first indirect purchaser action n2 in this Court. See Jimmy F. Hux v. Atofina Chemicals et al., C.A. No. 05-2392 (2005). More of these actions soon followed, and plaintiffs' counsel ultimately merged their claims into one consolidated amended class action complaint. Anticipating a motion to dismiss, on August 29, 2005 we ordered defendants first to serve a "Reservation of Grounds for Dismissal Memorandum" (the "Memorandum") on plaintiffs. This Memorandum would, in theory, apprise plaintiffs about any perceived deficiencies in the first complaint and enable them, if they concurred, to file a second, supplemented one. n3

n2 Indirect purchasers are individuals who allege that they have overpaid for a particular product as a result of a defendant's anticompetitive actions, but who did not purchase the allegedly affected product from the defendant. This happens most often when "a consumer (or other down-the-line purchaser) buys from an innocent intermediary who was overcharged due to its supplier's antitrust violation." 2 Phillip E. Areeda, Roger D. Blair, & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application § 346a, at 359 (2d ed. 2000). In that situation, the intermediary may sue the offender for damages, but the consumer, under Illinois Brick, may (except in extremely limited circumstances) sue only for injunctive relief. Id. Illinois Brick prompted as many as thirty-seven states to enact "Illinois Brick Repealer" statutes, which permit indirect purchasers to sue for treble damages under state law. See, e.g., Donald I. Baker, Federalism and Futility: Hitting Potholes on the Illinois Brick Road, Antitrust, Fall 2002, at 14; Jonathan T. Tomlin & Dale J. Giali, Federalism and the Indirect Purchaser Mess, 11 Geo. Mason L. Rev. 157, 161 (2002).

Under CAFA, plaintiffs attorneys must now bring most indirect purchaser class actions under state antitrust law in federal court. See, e.g., Bruce V. Spiva & Jonathan K. Tycko, Indirect Purchaser Litigation on Behalf of Consumers After CAFA, Antitrust, Fall 2005, at 12. As one commentator has remarked, this means that, "as a practical matter, state courts will rarely get to interpret their own state antitrust laws, particularly in indirect purchaser suits, because they are so often brought as class actions." Id.

[*4]

n3 Under our Order, defendants' failure to identify a deficiency in the first complaint would have waived their right to attack that deficiency in a subsequent motion to dismiss.

In their December 1, 2005 Memorandum, defendants, inter alia, asserted that: (1) plaintiffs' claims on behalf of purchasers in Minnesota and New York could not survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss, and (2) "Plaintiffs fail to allege whether they actually purchased Hydrogen Peroxide as manufactured and sold by Defendants, or whether they purchased a different, diluted form of H[2]O[2], or H[2]O[2] (diluted or not) that had been repackaged or bundled with other non-H[2]O[2] products for sale as a single product unit." Mem., at 9.

On January 9, 2006, plaintiffs filed a second consolidated amended class action complaint. This second complaint dropped claims on behalf of Minnesota and New York purchasers. Plaintiffs also clarified that they were suing only on behalf of those who "indirectly purchased hydrogen peroxide and its downstream products, sodium [*5] perborate or sodium percarbonate, as manufactured and sold by the Defendants . . . ." Second Consolidated Amended Class Action Compl. ("Compl."), Preamble (emphasis added).

In their second amended complaint, nine named plaintiffs n4 sued fifteen defendants n5 on behalf of themselves and others similarly situated in Arizona, Nebraska, Tennessee, Vermont, and California. n6 Plaintiffs claim that from January 1, 1994 to the present, these defendants and others conspired to fix the price and restrict the output of hydrogen peroxide sold in the United States. Compl. PP37-58. Plaintiffs claim that they indirectly purchased hydrogen peroxide during this period and, because of defendants' conspiracy, paid too much for it. Compl. PP49-51.

n4 The named plaintiffs are: (1) Joelle Prochera (Arizona); (2) Colorfast Dye and Printhouse, Inc. (California); (3) Frank Gerenscer (California); (4) Bernard Lawrence Winery (California); (5) Terry Muzzey (Nebraska); (6) Melinda Owens (Tennessee); (7) Elizabeth Armstrong (Vermont); (8) the City of Stockton (California); and (9) Orange County Sanitation District (California). See Compl. PP3-11.

[*6]

n5 Defendants fall into six groups:

(1) Atofina Chemicals, Inc., Arkema, Inc., TotalFinaElf S.A., and Total S.A. (the "Atofina Defendants");

(2) Solvay Interox, Inc., Solvay America, Inc., Solvay Chemicals, Inc., and Solvay S.A. (the "Solvay Defendants");

(3) Degussa Corporation and Degussa A.G. (the "Degussa Defendants");

(4) EKA Chemicals, Inc., Akzo Nobel, Inc., and Akzo Nobel Chemical International B.V. (the "Akzo Defendants");

(5) Kemira Chemicals, Inc. and Kemira Oyj (the "Kemira Defendants"); and

(6) FMC Corporation.

See Compl. PP12-33; see also February 2, 2006 Order P2.

n6 Unlike the Arizona, Nebraska, Tennessee, and Vermont sub-classes, the California sub-class may be more further divided into private and public indirect purchasers. Compare Compl. PP108-117 with Compl. PP77-86.

**1. The California Litigation**

In February of 2005, about three months before Hux was filed, certain plaintiffs filed four putative indirect purchaser class actions in California Superior Court. Those plaintiffs have also sued here. At plaintiffs' request, [*7] the California Judicial Council consolidated these actions before Superior Court Judge Richard A. Kramer in San Francisco. n7

n7 As defendants note, Judge Kramer has extensive experience adjudicating complex cases. See Def.s' Mem., at 20 n.20.

The legal claims in Judge Kramer's proceeding duplicate the California claims asserted before us. In a February 1, 2006 case management conference, Judge Kramer had the parties address this overlap. William Parish, Esq. responded for plaintiffs. After conceding that "the federal indirect action includes identical claims

to the California indirect action," Def.s' Mem., Ex. A, at 5, Parish advised Judge Kramer that plaintiffs wished to litigate all California claims here: "We would ask the Court in this proceeding simply stay this proceeding and allow the matters to proceed in conjunction with the direct actions now pending in Pennsylvania." Id.; see also Pl.s' Mem., at 11 ("If the Court declines to abstain, plaintiffs will pursue their claims in the MDL proceeding [*8] and request that the state case, which remains in a preliminary posture, be stayed."). At the end of that conference, Judge Kramer decided to "allow [the parties] to get to the federal court, allow you to talk some more, decide what we're going to do." Def.s' Mem., Ex. A, at 8. No material later events have occurred before Judge Kramer.

**2. The Instant Motions**

On February 9, 2006, ten of this action's defendants filed a motion for a more definite statement and a partial motion to dismiss. These defendants ask us to: (1) compel plaintiffs to file a third complaint that would specify what products they bought and the seller of them; (2) dismiss, or, in the alternative, stay the California claims; n8 and (3) dismiss plaintiffs' claims under Nebraska and Tennessee law for treble damages. Aside from the third request, which is unopposed, see Pl.s' Resp., at 17, we shall deny the motions.

n8 While the California public indirect purchasers ask us to abstain, the private ones take no position on this issue. See Pl.s' Resp., at 9, 17.

[*9]

**B. Legal Analysis**

These motions require us to resolve two issues. First, we must decide under *Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1979)*, whether to dismiss or stay our California claims out of deference to Judge Kramer's proceeding. Second, under *Fed. R. Civ. P. 12(e)*, we must decide whether to require plaintiffs to file a third amended complaint that could provide information that might allow defendants to file a motion to dismiss for lack of standing.

**1. Colorado River Abstention**

It is well-settled that federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Colorado River, 424 U.S. at 817.* Despite the inefficiencies that may result, this principle is no less true in cases where there is parallel litigation in state court: "The pendency of an action in the state court is no bar to proceedings concerning the same matter in the

Federal court having jurisdiction. . . ." Id. (quoting *McClellan v. Carland, 217 U.S. 268, 282, 30 S. Ct. 501, 54 L. Ed. 762 (1910)).* While the Supreme [*10] Court in Colorado River nonetheless held that a district court may in certain circumstances defer to parallel state proceedings, it held that those circumstances must be "exceptional," and "only the clearest of justifications will warrant dismissal." *Id. at 813, 819.*

*Colorado River* requires us to take two steps. We must first determine whether the federal and state actions are indeed parallel. *IFC Interconsult, AG v. Safeguard Int'l Partners, LLC, 438 F.3d 298, 306 (3d Cir. 2006).* If they are, in the second step we must balance six factors set forth in *Colorado River* and *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 103 S. Ct. 927, 74 L. Ed. 2d 765 (1983). IFC, 438 F.3d at 307 n.4.*

### a. Parallelism

For matters to be parallel, "there must be identities of parties, claims, and time." *Id. at 306;* see also *Yang v. Tsui, 416 F.3d 199, 205 n.5 (3d Cir. 2005)* ("Parallel cases involve the same parties and 'substantially identical' claims, raising 'nearly identical allegations and issues.'" (quoting [*11] *Timoney v. Upper Merion Twp., 66 Fed. Appx. 403, 405 (3d Cir. 2003)).*

Here, both proceedings are parallel. The legal claims are, by plaintiffs' admission, "identical." Def.s' Mem., Ex. A, at 5. Because both proceedings are pending simultaneously, they share the identity of time. Last, the proceedings share many of the same parties, which is all the jurisprudence requires. See *IFC, 438 F.3d at 306* ("We have never required complete identity of parties for abstention.").

### b. Balancing

Once a court finds that the state and federal proceedings are parallel, it must consider:

> [1] which court first assumed jurisdiction over a relevant res, if any; [2] whether the federal court is inconvenient; [3] whether abstention would aid in avoiding piecemeal litigation; [4] which court first obtained jurisdiction; [5] whether federal or state law applies; and [6] whether the state action is sufficient to protect the federal plaintiff's rights.

*IFC, 438 F.3d at 307 n.4* (citing *Rycoline Prods., Inc. v. C & W Unlimited, 109 F.3d 883, 890 (3d Cir. 1997)).* The balance is "heavily weighted in favor of the exercise of jurisdiction." *Moses Cone, 460 U.S. at 16.* [*12]

Because none of these factors compels abstention, let alone favors it, dismissing or staying this case would amount to an abuse of discretion. See *Ryan v. Johnson, 115 F.3d 193, 200 (3d Cir. 1997)* (citing "the heavy presumption the Supreme Court has enunciated in favor of exercising federal jurisdiction" and reversing district court's Colorado River abstention); *Spring City Corp. v. Am. Bldgs. Comp., 193 F.3d 165, 173 (3d Cir. 1999)* (seeing no "exceptional circumstances" and reversing district court's Colorado River abstention); see also *IFC, 438 F.3d at 307* (describing "the disfavor in which we hold [Colorado River] abstention" and affirming district court's refusal to stay case).

Three factors are neutral. Because neither court has asserted jurisdiction over any property, the first factor is neutral, as is the second, inconvenience. Regardless of where the California action proceeds, the defense would still have to litigate the Vermont, Tennessee, Nebraska, and Arizona claims here. The adequacy of the state action -- the sixth factor -- is also neutral. Only when the state forum would be inadequate does this factor [*13] come to play. See *Ryan, 115 F.3d at 200.*

Defendants claim that the third factor, avoiding piecemeal litigation, strongly supports abstention. They predicate this argument on a faulty assumption. Defendants assume that, if we exercise jurisdiction, plaintiffs will ask Judge Kramer to exercise it concurrently. But on page eleven of their Memorandum, plaintiffs advise, "If the Court declines to abstain, plaintiffs will pursue their claims in the MDL proceeding and request that the state case, which remains in a preliminary posture, be stayed." Moreover, plaintiffs advised Judge Kramer that, if we retain jurisdiction, they would ask him to suspend it: "So we would ask the Court in this proceeding simply stay this proceeding and allow the matters to proceed in conjunction with the direct actions now pending in Pennsylvania." Def.s' Mem., Ex. A, at 5.

Turning to the fourth factor -- which court first obtained jurisdiction -- it would appear, at first glance, that defendants have a stronger argument. Plaintiffs filed their action in California Superior Court, only later filing here. The Supreme Court, however, has cautioned not to apply this factor too mechanistically: [*14] "Priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Moses Cone, 460 U.S. at 22.* Under this lens, our MDL proceeding is more advanced. In Judge Kramer's proceeding, unlike here, plaintiffs have not yet filed a consolidated amended class action complaint. Nor have plaintiffs there, unlike here, appointed interim counsel or begun discovery.

The remaining factor is whether state or federal law applies. This is nuanced, at least before CAFA. "As Cone

made clear, while the presence of federal issues militates against abstention, the converse cannot be said; abstention cannot be justified merely because a case arises entirely under state law." *Ryan, 115 F.3d at 199* (interpreting *Moses Cone, 460 U.S. at 26*). The indirect purchaser action involves no federal issues. Further, as *Ryan* emphasizes, that California law will ultimately govern our substantive inquiry has little, if any, bearing. This is particularly so now that Congress has put its thumb heavily on the federal side of the scales in class actions like these. n9 Hence, this [*15] last factor, like all of the others, does not weigh in favor of abstention. CAFA itself weighs against it.

n9 The Senate Judiciary Committee Report on CAFA begins with its authors' conclusions about the shortcomings of state court class action litigation:

By now, there should be little debate about the numerous problems with our current class action system. A mounting stack of evidence reviewed by the Committee demonstrates that abuses are undermining the rights of both plaintiffs and defendants. One key reason for these problems is that most class actions are currently adjudicated in state courts, where the governing rules are applied inconsistently (frequently in a manner that contravenes basic fairness and due process considerations) and where there is often inadequate supervision over litigation procedures and proposed settlements.

* * *

To make matters worse, current law enables lawyers to "game" the procedural rules and keep nationwide or multi-state class actions in state courts whose judges have reputations for readily certifying classes and approving settlements without regard to class member interests. In this environment, consumers are the big losers: In too many cases, state court judges are readily approving class action settlements that offer little -- if any -- meaningful recovery to the class

members and simply transfer money from corporations to class counsel.

S. Rep. 109-14, at 4 (2005), as reprinted in 2005 U.S.C.C.A.N. 3, 5-6.

[*16]

**2. More Definite Statement**

Defendants next argue that, under *Fed. R. Civ. P. 12(e)*, we should require plaintiffs to file yet a third amended complaint that would identify the specific products plaintiffs bought and the seller of them. Defendants seek this information for two reasons. First, under Nebraska, Vermont, Tennessee, Arizona, and California law, one may not sue for an antitrust violation if the buyer "did not purchase the product actually sold by defendants, or where plaintiffs were too remote in the chain of distribution." Def.s' Mem., at 9. Defendants surmise that this purchasing information may allow them to file a motion to dismiss for lack of standing. The second reason defendants seek this purchasing information is that they are allegedly unable to admit or deny that plaintiffs bought hydrogen peroxide "as manufactured and sold by the Defendants . . . ." See Compl. Preamble & PP3-11.

*Fed. R. Civ. P. 12(e)* allows one to move for a more definite statement "if a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required [*17] to frame a responsive pleading, . . ." Motions for more definite statements arise in "the rare case where because of the vagueness or ambiguity of the pleading the answering party will not be able to frame a responsive pleading." *Schaedler v. Reading Eagle Publ'ns Inc., 370 F.2d 795, 798 (3d Cir. 1967).* "Motions for a more definite statement are generally disfavored, and should [be granted only] if a pleading is unintelligible, making it virtually impossible for the opposing party to craft a responsive pleading." *Synagro-WWT v. Rush Twp., 204 F. Supp. 2d 827, 849-50 (M.D. Pa. 2002)* (quoting *Sabugo-Reyes v. Travelers Indem. Co., 2000 U.S. Dist. LEXIS 504, C.A. No. 99-5755, 2000 WL 62627, at *3 (E.D. Pa. January 14, 2000)).* This is because

the theoretical overall scheme of the federal rules calls for relatively skeletal pleadings and places the burden of unearthing the underlying factual details on the discovery process, . . . [and] the permissive allowance of *Rule 12(e)* motions seeking detailed factual averments will

shift the burden of fact elicitation from the discovery phase back to the pleadings, with a resulting delay in joinder [*18] of issue and resolution of the merits.

Charles Alan Wright & Arthur R. Miller, 5C Federal Practice and Procedure § 1376, at 322 (3d ed. 2004).

In the second amended complaint, plaintiffs allege that they "indirectly purchased hydrogen peroxide and its downstream products, sodium perborate or sodium percarbonate, as manufactured and sold by the Defendants . . . ." Compl., Preamble. Each plaintiff also alleges that it "indirectly purchased Hydrogen Peroxide . . . ." Compl. PP3-11.

Defendants contend that these allegations are so ambiguous that it is impossible for them to "admit or deny that each Plaintiff indirectly purchased from Defendants a hydrogen peroxide product, let alone hydrogen peroxide 'as manufactured and sold by the Defendants.'" Def.s' Mem., at 11. Yet defendants overlook a third possibility. Under *Rule 8(b)*, if a party "is without knowledge or information sufficient to form a belief as to the truth of an averment, the party shall so state and this has the effect of a denial." Defendants point to no reason why they cannot simply do that.

Defendants also claim that the information they seek may enable them to file a motion to dismiss for lack of standing. [*19] It would be inappropriate now to require plaintiffs to file yet a third amended complaint with great particularity simply on the off chance that defendants might be able to unearth a dispositive threshold defense. This action already trails the direct purchaser action by months. It would be imprudent to delay it even longer just so defendants can sniff for *Rule 12(b)(1)* fodder. If there is a standing issue, defendants must find it in discovery. If they do, *Rule 56* is at their service.

## C. Conclusion

For these reasons, we shall deny defendants' motions as they pertain to *Colorado River* abstention and *Rule 12(e)*. We shall grant the unopposed part of their partial motion to dismiss, however, and dismiss plaintiffs' treble-damage claims under Nebraska and Tennessee law.

BY THE COURT:

/s/ Stewart Dalzell, J.

20

Not Reported in A.2d                                                                 Page 1
Not Reported in A.2d, 1998 WL 1469620 (D.C.Super.), 1999-1 Trade Cases P 72,442
**(Cite as: Not Reported in A.2d)**

Holder v. Archer Daniels Midland Co.D.C.
Super.,1998.
Superior Court of the District of Columbia.
David W. HOLDER
v.
ARCHER DANIELS MIDLAND CO., et al.
**No. 96-2975.**

Nov. 4, 1998.

William C. Buckhold of Fort & Schlefer, L.L.P.,
Washington, D.C., for plaintiff.
Terry M. Grimm of Winston & Strawn, Chicago, Ill.,
for A.E. Staley Manufacturing Co.; John E.
Schmidtlein of Williams & Connolly, Washington,
D.C., for Archer Daniels Midland Co.; Nathan P.
Eimer of Sidley & Austin, Chicago, Ill., for CPC
International, Inc .; Robert E. Bloch and Mark W.
Ryan of Mayer, Brown & Platt, Washington, D.C.,
for Cargill, Inc., for defendants.

ORDER

KRAMER, J.

District of Columbia Antitrust Act

*1 Standing and Capacity to Sue-State Laws-Indirect
Purchasers-Class Actions-Food Products.-Consumers
who purchased grocery items, which contained
ingredients (high fructose corn syrup and citric acid)
that were the objects of an alleged price fixing
conspiracy, had standing to bring suit under the
District of Columbia Antitrust Act. The plain
language of the statute, buttressed by its legislative
history, suggested that these indirect purchasers were
entitled to standing. The Act offered standing to "any
indirect purchaser in the chain of manufacture,
production, or distribution of goods," without
distinguishing among indirect purchasers based on
the number of hands through which the product had
passed. Moreover, the terms "manufacture" and
"production" implied a process that involved
fundamentally changing the form of the product as it
traveled along the chain. Standing was not denied
based on arguments raised by defending corn syrup
and citric acid producers that permitting the
consumers to sue would create unmanageable factual
and evidentiary problems and that other jurisdictions
and federal cases predating *Illinois Brick v. Illinois*
had not extended standing to similarly situated

indirect purchasers.

See ¶ 9404.

This matter is before the court on Defendants' Joint
Motion for Summary Judgment. Upon consideration
of the motion, opposition, and reply memoranda, the
court finds that the motion should be denied.[FN1]

> FN1. Defendants' Memorandum of Points
> and Authorities in support of Defendants'
> Joint Motion for Summary Judgment is cited
> as "Deft's Memo"; plaintiff's opposition as
> "Pltf's Oppos.," and defendant's reply
> thereto as "Deft's Reply."

In this case, plaintiff has brought suit under the
District of Columbia Antitrust Act of 1980 (the Act).
*See* D.C.Code § § 28-4501 to 4518. Plaintiff alleges
that in violation of the Act, defendants conspired to
fix the prices of high fructose corn syrup (HFCS) and
citric acid. Neither plaintiff nor members of the
putative class purchased the HFCS and citric acid
directly. Rather, they purchased consumer products,
primarily grocery items, which contained HFCS and
citric acid as ingredients. Plaintiff alleges that he and
other putative class members were injured within the
meaning of the Act because the conspiracy resulted
in higher prices for the consumer products containing
these ingredients.

The defendants move for summary judgment on the
ground that the Act does not confer standing to bring
suit on indirect purchasers such as plaintiff (1) who
have purchased consumer products containing only
an ingredient which was the object of a price-fixing
conspiracy, and (2) where that ingredient had passed
through several intermediate levels of distribution
before being sold to plaintiffs. Defendants argue that
the problems of proof confronting such purchasers
are so complex that any damages would be utterly
speculative and ultimately unfair to defendants.
Accordingly, defendants argue, summary judgment
must be granted in their favor.

To prevail on a motion for summary judgment, a
movant must establish that there is no genuine issue
as to any material fact, and that the movant is entitled
to judgment as a matter of law. D.C.Super. Ct. Civ.
R. 56(c); *Colbert v. Georgetown University,* 641
A.2d 469, 472 (D.C.1994) (en banc). In reviewing a
motion for summary judgment, the court must view

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 2
Not Reported in A.2d, 1998 WL 1469620 (D.C.Super.), 1999-1 Trade Cases P 72,442
(Cite as: Not Reported in A.2d)

the evidence in the light most favorable to the non-movant. *Id.* In the context of the narrow standing issue raised by this motion, there are no factual issues between the parties that would preclude summary judgment. Thus, the issue before the court is solely one of law.

**\*2** In asserting that plaintiff lacks standing to bring suit, defendants rely on four basic arguments: (1) despite the plain language of the D.C. Antitrust Act, its legislative history supports a restrictive interpretation which would preclude standing for plaintiff; (2) permitting plaintiff to sue would create unmanageable factual and evidentiary problems; (3) federal cases pre-dating *Illinois Brick v. Illinois* [1977-1 Trade Cases ¶ 61,4601, 431 U.S. 720 (1977)], support their position; and (4) other courts interpreting similar statutes have not extended them to include indirect purchasers of a product containing only an ingredient allegedly affected by a price-fixing conspiracy. The court finds none of these arguments persuasive, concludes that plaintiff and the putative class have standing to seek damages under the Act, and denies summary judgment.

*The Plain Language of the Statute.*

The D.C. Antitrust Act prohibits all contracts, combinations or conspiracies in restraint of trade where all or any part thereof is within the District of Columbia. D.C.Code § 28-4502. Any person injured by such a contract, combination or conspiracy may bring a civil action under the Act for damages and injunctive relief. D.C.Code § 28-4508(a).

Section 4509(a) of the Act, provides:
Any indirect purchaser in the chain of manufacture, production, or distribution of goods or services, upon proof of payment of all or any part of any overcharge for such goods or services, shall be deemed to be injured within the meaning of this chapter.

D.C.Code § 28-4509(a). It is the interpretation of this subsection which is at the core of the standing issue presented here.

The language of this provision, referring to "any" indirect purchaser, does not distinguish among indirect purchasers based on the number of hands through which the product has passed. Rather, its plain language would bring plaintiff squarely within its terms. Nor does the statute distinguish between an indirect purchaser of a product that has changed form and an indirect purchaser of a product that remains

substantially unaltered.

Moreover, the statute refers to any indirect purchaser in "the chain of manufacture, production, or distribution" of goods or services. The three different components of the chain (manufacture, production, and distribution) suggest a chain that may be of considerable length. In addition, the specific terms "manufacture" and "production" imply a process that involves fundamentally changing the form of the product as it travels along the chain. <sup>FN2</sup> This provides further evidence that the legislative drafters had no intention of limiting its scope as defendants would suggest.

> FN2. *See* Black's Law Dictionary 965 (6th ed.1990) (defining "manufacture" to include the "production of articles for use from raw or prepared materials by giving such materials new forms, qualities, properties or combinations").

Thus, the plain language of Section 4509(a) would appear to permit indirect purchasers to bring an action to recover overcharges resulting from a price-fixing conspiracy, whether they had purchased the ingredient targeted by the price-fixing or a product containing the price-fixed ingredient and regardless of whether the ingredient had passed through several intermediate levels of distribution. The proper starting point for interpreting a statutory provision is the plain language of that provision, *Stuart v. District of Columbia*, 694 A.2d 49, 50 (D.C.1997) and the court must find good cause for ignoring it.

*The Legislative History of the Statute.*

**\*3** The legislative history of the D.C. Antitrust Act makes clear that it was passed in reaction to the Supreme Court's decision three years earlier in *Illinois Brick v. Illinois*, 431 U.S. 720 (1977). *See* Report of the Committee on the Judiciary, District of Columbia Council, Bill No. 3-107, Law No. 3-169 at 1 (Committee Report). In *Illinois Brick,* the Court ruled that indirect purchasers, that is, those who did not purchase the allegedly price-fixed product directly from the antitrust defendant, had no standing to sue under § 4 of the Clayton Act (15 U.S.C. § 15). 431 U .S. at 728-29. By enacting the D.C. Antitrust Act three years later, including the indirect purchaser provision found in Section 4509, the D.C. Council deliberately chose to reject the gloss put on the Clayton Act by *Illinois Brick* and to provide a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                      Page 3
Not Reported in A.2d, 1998 WL 1469620 (D.C.Super.), 1999-1 Trade Cases P 72,442
(Cite as: Not Reported in A.2d)

contrasting antitrust scheme for the District of Columbia.[FN3] *See also Goda v. Abbott Labs.* [1997-1 Trade Cases ¶ 71,730], C.A. No. 96-1445, 1997-1 Trade Cas. ¶ 71,730 at 79,141 (D.C.Super.1997).[FN4]

> FN3. There is no question that the D.C. Council had the authority to do so. In *California v. ARC America Corp.* [1989-1 Trade Cases ¶ 68,537], 490 U.S. 93, 98 n. 3, 101-102 (1989), the Supreme Court held that state indirect purchaser statutes, such as Section 4509, are not preempted by federal law and, in so doing, made specific reference to the D.C. provision. *See also Shepard Park Citizens Ass'n v. General Cinema Beverages,* 584 A.2d 20, 23-25 (D.C.1990).

> FN4. Defendants' reliance on Section 4515 of the D.C. Antitrust Act is misplaced. That section provides:
> "It is the intent of the Council of the District of Columbia that in construing this [Act], a court of competent jurisdiction may use as a guide interpretations given by federal courts to *comparable antitrust statutes.*" (Emphasis supplied).
> Since the D.C. Act was passed to distinguish D.C. antitrust law from federal law with respect to standing for indirect purchasers, there is no "comparable" federal antitrust statute in this respect.

The Report of the D.C. Council's Judiciary Committee reviewed the ruling in *Illinois Brick,* which, the Report explained, had held that "indirect purchasers [of price-fixed products] were entitled to no recovery even though they ultimately had paid the overcharges resulting from the antitrust violation." Committee Report at 1. The Report further explained that in contrast: "Section 28-4509(a) makes clear that indirect purchases can indeed seek damages for overcharges resulting from antitrust violations which are proven to have been passed on to them." *Id.*

Defendants concede that "the D.C. Council's decision to confer standing on indirect purchasers was in direct response to the Supreme Court's decision in *Illinois Brick,*" but argue that it was "more particularly [in response to] Justice Brennan's dissent in that case." Def't Memo at 7. The basis for this argument would appear to be found in the Committee Report, which pointed out that "*Illinois Brick* has engendered substantial criticism, commencing with

the dissenting opinion of Mr. Justice Brennan joined by Justices Marshall and Blackmun." Committee Report at 1.

There does appear to be one point on which plaintiff, defendants and the court all agree: Justice Brennan's dissent provides a useful backdrop for analyzing the Council's intent in passing Section 4509(a). As explained below, however, the language of that dissent is not helpful to defendants. Indeed, point by point examination of the defendants' arguments which rely on Justice Brennan's dissent uncovers the weakness of their position.

Defendants assert that "Justice Brennan agreed with the majority [in *Illinois Brick* ] that purchasers who are remote from the defendant and/or have purchased a transformed product that was not itself the subject of an alleged price-fixing agreement should not have standing under the antitrust laws." Def't's Memo at 8. It is true that Justice Brennan wrote: "There is, of course, a point beyond which antitrust defendants should not be held responsible for the remote consequences of their actions." 431 U.S. at 748 n. 2. As he later made clear, however, in his view that "point" is well beyond the circumstances here.

*4 Indeed, Justice Brennan directly addressed the issue of indirect purchasers of priced-fixed ingredients. *Illinois Brick* had involved a suit by governmental purchasers of buildings which contained concrete blocks, the allegedly price-fixed "ingredient" sold by the concrete block manufacturers to masonry contractors, who sold to general contractors, from whom the governmental entities purchased the blocks as one "ingredient" in the entire building. Justice Brennan wrote: "Nor should the fact that the price-fixed product in this case (the concrete block) was combined with another product (the buildings) before resale operate as an absolute bar to recovery." *Id.* at 759. Thus, in a closely analogous factual context, he addressed precisely the issue which the court confronts here. Far from concluding that a plaintiff should be barred from recovery, he concluded a plaintiff should not be.

Justice Brennan explored various standing rules that he would deem acceptable. One to which he made reference with apparent approval is the more "widely accepted" test for standing which does not focus on the "directness of the injury," but rather on whether a plaintiff is within the "target area" of the defendant's violation. *Id.* at 760. Put another way, the test is "whether the injury to the plaintiff is a reasonably foreseeable consequence of the defendant's illegal

Not Reported in A.2d                                                    Page 4
Not Reported in A.2d, 1998 WL 1469620 (D.C.Super.), 1999-1 Trade Cases  P 72,442
**(Cite as: Not Reported in A.2d)**

conduct." [FN5] *Id.* at 760 n. 18 (citations omitted).[FN6]

FN5. Defendants also allege that Justice Brennan suggested that standing take account of two factors: "the number of intervening hands the product has passed through and the extent of its change in the process." ' Deft's Memo at 8. This is a misinterpretation of Justice Brennan's dissent. Having pointed out that the proof problems of indirect purchasers are "factual matter[s] to be determined based on the strength of the plaintiff's evidence," *Id* . at 759, Justice Brennan then followed that statement with a footnote, stating:
One commentator has suggested that, in deciding whether to permit recovery by indirect purchasers in a particular case, courts should consider the number of intervening hands the product has passed through and the extent of its change in the process. P. Areeda, Antitrust Analysis: Problems, Texts, Cases 75 (2d ed.1974).
*Id.* at 759 n. 15. Justice Brennan's dissent, read as a whole, shows that this was not a formula he adopted for determining standing.

FN6. This test, suggested by Justice Brennan, satisfies defendants' position that the court should apply common law concepts "to limit the universe of persons who may recover under the antitrust laws" even where, as here, the statutory language "broadly provides a remedy to 'any person' injured by an antitrust violation." Deft's Reply at 3-4.

Certainly, manufacturers who conspire to keep prices of a product at an artificially inflated level can foresee that consumers will pay more for the product down the line, whether it remains in its original form or is combined with other ingredients. Thus, the test suggested by Justice Brennan ensures standing for the plaintiff in this case and satisfies Justice Brennan's position that "the defendant [should be held] liable to those within the defendant's chain of distribution." *Id.* at 761.[FN7] Consequently, defendants' reliance on the legislative history of Section 4509 and on Justice Brennan's dissent does not, in the end, support their position.

FN7. Quoting Professor Areeda, Justice

Brennan pointed out that "[i]t would indeed be 'paradoxical to deny recover[y] to the ultimate consumer while permitting the middlemen a windfall recovery .'" ' *Id.,* quoting P. Areeda, *Antitrust Analysis; Problems, Text, Cases* 75 (2d ed.1974).

*Evidentiary Complexities.*

Defendants also contend that interpreting the D.C. indirect purchaser statute to include suits such as the present one would present "insurmountable problems of proof" that argue against standing. Deft's Memo at 13. Quoting <u>Illinois Brick, 431 U.S. at 737,</u> defendants assert that "[i]ndirect purchaser actions inevitably plunge the courts into 'massive efforts to apportion the recovery among all potential plaintiffs that could have absorbed any part of the overcharge- from direct purchasers to middlemen to ultimate consumers." ' *Id.* at 13. All indications are, however, that the D.C. Council was fully aware of the potential for such proof problems and concluded that those problems were not sufficient to deny standing to indirect purchasers such as plaintiff.

Justice Brennan's dissent, which guided the Council in the passage of the Act, specifically considered and rejected such a position. Referring to language from an earlier Supreme Court decision, <u>Hanover Shoe, Inc. v. United Shoe Machinery Corp. [1968 Trade Cases ¶ 72,490], 392 U.S. 481 (1968),</u> Justice Brennan wrote that it "correctly observed that the necessity of tracing a cost increase through several levels of a chain of distribution 'would often require additional long and complicated proceedings involving massive evidence and complicated theories." ' <u>431 U.S. at 758,</u> quoting <u>Hanover Shoe, 392 U.S. at 493.</u> "[T]his," Justice Brennan pointed out, "may be said of almost all antitrust cases." *Id.* "In essence," Justice Brennan noted, "estimating the amount of damages passed on to an indirect purchaser is no different from and no more complicated than estimating what the middleman's selling price would have been, absent the violation." *Id.* at 758-759.

*5 Addressing the added complexities resulting when the price-fixed product is merely an "ingredient" of the product ultimately sold to the consumer, Justice Brennan concluded that "this is a factual matter to be determined based on the strength of the plaintiff's evidence." *Id.* at 759. Justice Brennan pointed out that "it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 5
Not Reported in A.2d, 1998 WL 1469620 (D.C.Super.), 1999-1 Trade Cases P 72,442
**(Cite as: Not Reported in A.2d)**

approximate." *Id.* (citations omitted). Thus, he concluded, "[l]ack of precision in apportioning damages between direct and indirect purchasers is ... plainly not a reason for denying indirect purchasers an opportunity to prove other injuries and damages." *Id.* at 759-60.

Not only does the court presume that the Council's view of proof problems corresponded with Justice Brennan's, but in addition, the Council specifically addressed these potential proof problems in Section 4508(c). That Section permits "the fact of injury and the amount of damages sustained by members of a class [to be] proven on a classwide basis, without requiring proof of such matters by each individual member of the class." It further allows an individual member of a class to prove his or her damages according to "the ratio of such member's purchases or sales to the purchases or sales of the class as a whole." Though there is no discussion of this provision in the Committee Report, it is apparent that the Council included it to provide a formula for damages which would address the proof problems underlying the majority holding in *Illinois Brick.* Had the Council intended the courts to accept such proof problems as a basis for denying standing to consumers in plaintiff's position, it is highly unlikely that Section 4508(c) would have been passed.

Sections 28-4509(b) & (c) provide further safeguards for defendants by permitting them to avoid duplication of recovery of damages, thereby "greatly reducing if not entirely eliminating" one of the concerns that motivated the *Illinois Brick* decision.[FN8] *Goda v. Abbott Labs.,* [1997-1 Trade Cases ¶ 79,141]. Such safeguards, if they had been in existence at the time, might have served to overcome the hesitancy of earlier courts in applying antitrust statues broadly.

> [FN8.] Subsections 28-4509(b) and (c) provide:
> (b) In actions where both direct and indirect purchasers are involved, a defendant shall be entitled to prove as a partial or complete defense to a claim for damages that the illegal overcharge has been passed on to others who are themselves entitled to recover so as to avoid duplication of recovery of damages.
> (c) In any case in which claims are asserted by both direct purchasers and indirect purchasers, the court may transfer and consolidate cases, apportion damages and

delay disbursement of damages to avoid multiplicity of suits and duplication of recovery of damages, and to obtain substantial fairness.

In the present case, a broad application of the District of Columbia's antitrust statute seems particularly important to effectuate the purpose of the statute. As Justice Brennan recognized, "in many instances, consumers, although indirect purchasers, bear the brunt of antitrust violations." *Illinois Brick,* 431 U.S. at 764.[FN9] In the end, it would seem "improper, and somewhat illogical, to decide on a pretrial motion for summary judgment that the plaintiffs could not prove their damages." *In re Master Key Antitrust Litig.* [1973-2 Trade Cases ¶ 74,680] (D.Conn.1973).[FN10]

> [FN9.] *See also* Committee Report at 2 (revealing an intent when apportioning damages to give consideration "to a party who has taken the lead or has been most effective in pursuit of the interest of the consumers").

> [FN10.] *In re Master Key Antitrust Litigation* was a case where plaintiffs, who had purchased buildings containing price-fixed hardware components of doors that were installed in the buildings, claimed that increased hardware prices had been passed onto them in the prices they had ultimately paid for the buildings.

*Pre-Illinois Brick Authority.*

Construing the purpose of the District of Columbia's antitrust statute as an attempt to return to the pre-*Illinois Brick* era, defendants also argue that federal cases prior to *Illinois Brick* offer helpful guidance in interpreting our statute. Defendants assert that it was "generally accepted by federal courts" before *Illinois Brick* that indirect purchasers of an allegedly price-fixed ingredient incorporated into a different product lacked standing to sue. Deft's Memo at 10. Even if this were true, the legislative history of the District of Columbia provision, pointing with approval to Justice Brennan's dissent, demonstrates that these pre-*Illinois Brick* decisions do not reflect the Council's intent in drafting this statute. In any event, although a number of federal cases did deny standing in such a situation,[FN11] many cases also reached the opposite conclusion and granted standing.[FN12] Thus, defendants' argument on this point is without merit.

Not Reported in A.2d                                                                                  Page 6
Not Reported in A.2d, 1998 WL 1469620 (D.C.Super.), 1999-1 Trade Cases P 72,442
**(Cite as: Not Reported in A.2d)**

FN11. *See, e.g.,* *Philadelphia Housing Auth. v. American Radiator & Standard Sanitary Corp.* [1970 Trade Cases ¶ 73,168], 50 F.R.D. 13 (E.D.Pa.1970), *aff'd sub nom.* *Magano v. American Radiator & Standard Sanitary Corp.* [1971 Trade Cases ¶ 73,477], 438 F.2d 1187 (3d Cir.1971) (per curiam); *In re Sugar Antitrust Litigation* [1976-2 Trade Cases ¶ 61,215], 73 F.R.D. 322 (E.D.Pa.1976); *Bill Minielli Cement Contracting, Inc. v. Richter Concrete Corp.* [1973-1 Trade Cases ¶ 74,591], 62 F.R .D. 381, 389 (S.D.Ohio 1973); *In re Antibiotic Antitrust Actions* [1972 Trade Cases ¶ 74,165], 333 F.Supp. 310 (S.D.N.Y.1971).

FN12. *See, e.g.,* *State of Illinois v. Ampress Brick Co.* [1976-1 Trade Cases ¶ 60,939], 536 F.2d 1163 (7th Cir.1976), *rev. sub nom.* *Illinois Brick v. Illinois,* 431 U.S. 720 (1977); *Western Liquid Asphalt Cases* [1974-1 Trade Cases ¶ 75,081], 487 F.2d 191 (9th Cir.1973) (asphalt incorporated in road construction projects); *Armco Steel Corp. v. State of North Dakota* [1967 Trade Cases ¶ 72,058], 376 F.2d 206 (8th Cir.1967) (corrugated culverts, structural plate pipes, and metal end sections incorporated in highway construction projects); *Carnivale Bag v. Slide-Rite Mfg. Corp.* [1975-1 Trade Cases ¶ 60,370], 395 F.Supp. 287 (S.D.N.Y.1975) (zipper component).

*Authority from Other Jurisdictions.*

**\*6** Finally, defendants argue that courts in other jurisdictions have refused to extend similar statutes to include indirect purchasers of a product containing an allegedly price-fixed component. While a few states also allow indirect purchaser suits in price-fixing cases,[FN13] seeking guidance from these other states is unavailing due to the paucity of case law interpreting their antitrust statutes .[FN14]

FN13. Like the District of Columbia, a few states enacted indirect purchaser provisions in response to *Illinois Brick. See, e.g.,* Cal. Bus. & Prof.Code § 16750(a); Hawaii Rev. Stat. § 480-14(c); Wis. Stat. Ann. § 133.18(1). At least one state court has interpreted its antitrust statute to reach the opposite conclusion of *Illinois Brick. See*

*Hyde v. Abbott Labs.* [1996-2 Trade Cases ¶ 71,532], 473 S.E.2d 680 (N.C.App.1996).

FN14. Defendants cite the case of *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* [1988-1 Trade Cases ¶ 68,053], 235 Cal.Rptr. 228 (Ct.App.1987), in which a California court granted standing to an indirect purchaser of allegedly price-fixed glass bottles. The court noted that where a product "is ultimately sold to the consumer, and is largely unchanged in form from the price-fixing manufacturer to the indirect purchaser, assessing whether the manufacturer's overcharges were passed on is less difficult." *Id.* at 235. This court finds unpersuasive this very inconclusive dicta from a court in another jurisdiction interpreting an indirect purchaser provision with different statutory language.

In sum, the plain language of the statute, buttressed by its legislative history, convinces the court that the D.C. Council intended to grant indirect purchasers such as plaintiff the right to sue under the District of Columbia's Antitrust Act. Thus, defendants cannot prevail on their motion for summary judgment.

Accordingly, it is ORDERED, that Defendants' Joint Motion for Summary Judgment is DENIED.

D.C. Super.,1998.
Holder v. Archer Daniels Midland Co.
Not Reported in A.2d, 1998 WL 1469620 (D.C.Super.), 1999-1 Trade Cases P 72,442

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.