29

Case 1:05-cv-00485-JJF    Document 272-9    Filed 01/05/2007    Page 1 of 16

contention lacks merit and the reporting agencies could avail themselves of the justification defense with respect to the letters.

We next address appellants' argument that the justification defense does not apply because the credit reporting agencies' conduct constituted a per se illegal group boycott. Appellants correctly argue that a party may recover for tortious interference and antitrust claims by showing an illegal boycott. See *U.S. v. Realty Multi-List, Inc.* [1980-81 TRADE CASES ¶ 63,624], 629 F.2d 1351, 1362-63 (5th Cir. 1980) (the per se rule is the trump card of antitrust law, and when an antitrust plaintiff successfully plays it, he need only tally his score); See Footnote [11] *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001) (tortious interference). However, as the credit reporting agencies point out, to be subject to per se analysis, the complained-of conduct must be without "redeeming virtue." *Realty Multi-List*, 629 F.2d at 1363. Where conduct is expressly authorized by statute, it cannot be said to be without redeeming virtue. *Hatley v. Am. Quarter Horse Ass'n* [1977-1 TRADE CASES ¶ 61,441], 552 F.2d 646, 653 (5th Cir. 1977).

In this case, the credit reporting agencies presented evidence showing their actions were in accordance with section 1681e, because appellants' use of credit reports to attempt to delete negative but accurate information is not specifically authorized by section 1681b and reporting agencies must ensure "maximum possible accuracy of the information" in the report. Additionally, section 1681b is a permissive statute, specifically stating reporting agencies "may" furnish reports to third parties but only under the listed circumstances. See 15 U.S.C. § 1681b. The credit reporting agencies were under no statutory obligation to provide appellants with any reports. We conclude the reporting agencies' conduct was authorized by statute, and accordingly is not subject to a per se analysis.

Having concluded the credit reporting agencies could avail themselves of the justification defense, we also conclude the agencies conclusively established the elements of justification because they established their conduct was in accordance with a federal statute. When a defendant conclusively establishes each element of an affirmative defense, he is entitled to summary judgment, unless the plaintiff presents evidence creating a fact issue on one of the elements. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997); *Provencio*, 44 S.W.3d at 681. Accordingly, the burden shifted to appellants to present evidence creating a fact issue.

As the credit reporting agencies point out, however, appellants failed to do so. To the extent appellants complain summary judgment on their antitrust and tortious interference claims on the basis of justification was improper, we overrule their second and third points of error.

Because we have concluded summary judgment was proper on the basis of justification, we need not address appellants' remaining points of error. See *Rogers*, 772 S.W.2d at 79. We also need not reach the credit reporting agencies' conditional cross-points. See Tex. R. App. P. 47.1.

We affirm the trial court's judgment.

---

[¶ 73,959]  Natural Gas Anti-Trust Cases, Cases I, II, III, and IV. Coordination Proceeding Special Title (Rule 1550(b)). This Document Relates to: All Actions.

California Superior Court, San Diego County. Judicial Council Coordination Proceedings Nos. 4221, 4224, 4226, and 4228. Dated October 16, 2002.

### California Cartwright Act

**Conflicts Between Laws—Federal and State Laws—Preemption—Regulated Industries—Natural Gas Utilities.**—State antitrust claims that were brought against an energy company and its natural gas subsidiaries, which involved alleged monopolization and tying in the natural gas markets in southern California, were not preempted by the U.S. Constitution or any federal law. Application of state antitrust laws was neither expressly repealed nor implicitly preempted by federal law. Congress has not shown an intent to preempt the field and state antitrust causes of action did not conflict with federal law.

See ¶ 970.63.

**Special Industry Laws—Primary Jurisdiction—Filed Rate Doctrine—Natural Gas Utilities—Preemption, Stay of Action.**—State antitrust claims brought against an energy company and its subsidiaries were not barred by the filed rate doctrine. The filed rate doctrine was inapplicable to the case, which involved allegations of monopolization and tying in the natural gas markets in southern California, because there were no tariffs concerning the spot-market. Moreover, the doctrine did not apply where there were no available alternative sellers. It was unnecessary to

---

[11] Because the Texas Antitrust Act is modeled after the Sherman Antitrust Act and the Clayton Act, see 15 U.S.C. §§ 1-37a (1997 & Supp. 2002), we construe it in harmony with federal judicial interpretations of comparable federal antitrust statutes. Tex. Bus. & Com. Code Ann. § 15.04 (Vernon 1987); *Caller-Times Publ'g Co. v. Triad Communications, Inc.* [1992-1 TRADE CASES ¶ 69,746], 826 S.W.2d 576, 580 (Tex. 1992).

stay the action pending Federal Energy Regulatory Commission (FERC) proceedings. FERC did not have jurisdiction over state antitrust claims and could not adjudicate the instant case.
 See ¶ 1379.

**Jurisdiction and Venue—State Laws—Personal Jurisdiction—Natural Gas Utilities.**—A Texas-based natural gas utility company was within the jurisdiction of a California court, for purposes of a suit brought against the company under the California Cartwright Act. The company had been directly and continuously involved in the operation of electricity generation facilities in California for several years and admitted that it had done business in the state for over 50 years. Moreover, a corporate entity that managed natural gas interests in the forum state was alleged to be a division of the defendant company, rather than a separate company; thus, its alleged actions in furtherance of an illegal conspiracy could be attributed to the defendant company. A motion by the company to quash the service of process upon it was, therefore, denied.
 See ¶ 9408.05.

**Conflicts Between Laws—Federal and State Laws—Preemption—Regulated Industries—Natural Gas Utilities.**—State antitrust claims that were brought against an energy company and its natural gas subsidiaries, which involved alleged monopolization and tying in the natural gas markets in northern California, were not preempted by the U.S. Constitution or any federal law. Application of state antitrust laws was neither expressly repealed nor implicitly preempted by federal law. Congress has not shown an intent to preempt the field and state antitrust causes of action did not conflict with federal law.
 See ¶ 970.63.

**Special Industry Laws—Primary Jurisdiction—Filed Rate Doctrine—Natural Gas Utilities—Preemption, Stay of Action.**—State antitrust claims brought against an energy company and its subsidiaries were not barred by the filed rate doctrine. The filed rate doctrine did not pertain to the case The plaintiffs did not challenge a filed rate approved by the Federal Energy Regulatory Commission; rather, they alleged a conspiracy which violated state antitrust laws and caused damages through exorbitant rates charged to consumers.
 See ¶ 1379.

**Exemptions and Immunities—State Laws—Intra-Enterprise Conspiracy Doctrine—Parent, Subsidiaries—Natural Gas Utilities.**—California state antitrust claims brought against an energy company and its subsidiaries were not barred by *Copperweld v. Independence Tube Corp.* (1984-2 TRADE CASES ¶ 66,065), which held that parent corporations and their wholly-owned subsidiaries were incapable of forming illegal conspiracies under the antitrust laws. Whether or not a complete unity of interests existed between the energy company and its subsidiaries was a factual question that could not be resolved at the demurrer stage of the litigation. Moreover, the conspiracy was not necessarily contained within the energy company's corporate family, as the complaint included allegations that other innocent parties coerced into the conspiracy could be part of the combination. Finally, because two of the defendant companies—the parent and a subsidiary—were required by law to vigorously compete, any combination between them to restrain trade would not be immunized by *Copperweld*.
 See ¶ 885.05.

For plaintiffs: James T. Kelly, Houston, Tex., Steven N. Williams and Joseph W. Cotchett of Cotchett, Pitre, Simon & McCarthy, Burlingame, Cal., Bruce L. Simon and Peter E. Borkon of Cotchett, Pitre, Simon & McCarthy, Beverly Hills, Cal., Peter N. Larson, Mark Fogelman, Eric L. Dupre, Harvey L. Leiderman, and Elizabeth A. Frohlich of Steefel, Levitt & Weiss, and Francis O. Scarpulla, San Francisco, Cal., William Bernstein, Barry R. Himmelstein, Daniel E. Barenbaum, and Eric B. Fastiff of Lieff, Cabraser, Heimann & Bernstein, San Francisco, Cal., Lance Astrella of Astrella & Rice, Denver, Colo., Thomas V. Girardi and David N. Bigelow of Girardi & Keese, Los Angeles, Cal., Albro L. Lundy and Brad N. Baker of Baker, Burton & Lundy, Hermosa Beach, Cal., Carole E. Handler, Randy R. Merritt, and Shaaron D. Wright of ODonnell & Shaeffer, Los Angeles, Cal., Walter J. Lack and Paul A. Traina of Engstrom, Lipscomb & Lack, Maxwell M. Blecher of Blecher & Collins, Brian McMahon, Los Angeles, Cal. For defendants: David G. Palamer, Craig V. Richardson, and Brian Duffy of Greenberg Traurig, Denver, Colo., James J. Broanahan, Mark R. McDonald, and Stephen P. Freccera of Morrison & Foerster, San Francisco, Cal., Louie E. Shoch, Mark E. Weber, Richard P. Levy, Robert E. Cooper, and Robert J. Borthwick of Gibson, Dunn & Crutcher, Los Angeles, Cal., Jeffrey Fillerup and John Vaughn of Luce, Forward, Hamilton & Scripps, San Diego, Cal., and Michael J. Ponce, Westminster, Cal.

### OCTOBER 16, 2002 RULING ON MOTIONS

HADEN, J.: The Court takes judicial notice of each item requested to be so noticed by each party, pursuant to Ev. Code sections 451 and/or 452.

### Southern California Case

**I. Sempra Defendants' Demurrer**

The Sempra Defendants' demurrer to the Southern California Master Complaint is overruled. The allegations of a conspiracy involving the El Paso Defendants, which violated the state antitrust laws and unfair competition laws are adequately pled. These actions are neither barred by the Supremacy Clause nor the Filed

Rate Doctrine. These causes of action are neither completely preempted by the U.S. Constitution nor any federal law. Congress has not shown an intent to preempt the field and state antitrust and unfair competition causes of action do not conflict with federal law. Application of state ant-trust laws has been neither expressly repealed nor implicitly preempted. *California v. Federal Power Commission* [1962 TRADE CASES ¶ 70,302], 369 U.S. 482, 485 (1962); *Otter Tail Power Co. v. United States* [1973-1 TRADE CASES ¶ 74,373], 410 U.S. 366, 373-74. Additionally, the Filed-Rate Doctrine, which is essentially another form of pre-emption, is not applicable here because there are no tariffs concerning the spot-market. Even if such rates could be considered tariffed, the Filed Rate Doctrine is inapplicable where there are no available alternative sellers. *Columbia Steel Casting Co. v. Portland General Electric Co.* [1996-2 TRADE CASES ¶ 71,660], 111 F.3d 1427 (9th Cir. 1997), *cert. Denied*, 523 U.S. 1112 (1998); *In re Lower Lake Erie Iron Ore Antitrust Litigation* [1993-1 TRADE CASES ¶ 70,249], 998 F.2d 1144, 1159 (3rd Cir.), *cert. Dismissed*, 510 U.S. 1021 (1993). County of *Stanislaus v. Pacific Gas & Electric Co.* [1997-1 TRADE CASES ¶ 71,823], 114 F.3d 1042, 1045 (9th Cir.1997), is not applicable because it truly was an attack on an approved tariff. Further, it is unnecessary for the Court to stay the action under the Doctrine of Primary Jurisdiction. The FERC does not have jurisdiction over state antitrust and unfair competition claims. Simply put, FERC cannot adjudicate this claim. This Court will hear this matter pending FERC's proceedings.

## II. Sempra Defendants' Motion to Strike

The Sempra Defendants' motion to strike references to damages is denied. Disgorgement may be appropriate should classes be certified. To the extent Plaintiffs can prove their allegations, they may be entitled to treble damages under the state antitrust causes of action. Moreover, it is premature to eliminate any possible restitution.

## III. Sempra Defendants' Motion to Stay

The Sempra Defendants' Motion to stay this state court action under the Doctrine of Primary Jurisdiction while certain FERC proceedings occur is overruled. FERC has no jurisdiction over state anti-trust or unfair competition causes of action.

## IV. Defendant El Paso Corporation's Motion to Quash Service

El Paso Corporation's (EPC) Motion to Quash Service is denied. Plaintiffs have alleged sufficient facts and produced adequate evidence to demonstrate both special and general jurisdiction is proper over El Paso Corporation.

The Court can exercise personal jurisdiction over El Paso Corporation, fka as El Paso Energy Corporation (EPEC), under the doctrine of "specific personal jurisdiction", even if EPEC had no physical presence in California. See *Pedus Building Services, Inc. v. Allen* 96 Cal.App.4th 152, 163; *Gordy v. The Daily News, L.P.* 95 F.3d 829, 832. EPC is the successor to El Paso Natural Gas, which allegedly participated in forming the conspiracy in Phoenix.

The Court can also exercise personal jurisdiction over EPC under the doctrine of "general" jurisdiction because EPC has been directly and continuously involved in the operation of electricity generation facilities in California since approximately 1998 and has admitted doing business in California for over fifty (50) years. (Handler declaration, Ex. E at 1). Further, Plaintiffs argue the sworn testimony of Ralph Eads and William Wise (Ex. C and D to declaration of Carol Handler) before the FERC reveals El Paso Merchant, which manages El Paso Merchant-Gas, is a division of EPC, not a separate company. Therefore, any actions of El Paso Merchant are direct actions of EPC. As an act in furtherance of the 1996 conspiracy, EPC caused El Paso Merchant-Gas to enter into an intra-corporate transaction with EPNG to acquire 35-40% of the capacity on the EPNG pipeline, the principal transporter of natural gas to Southern California (Complaint at para 159-166). *Vons Companies v. Seabest Foods*, 14 Cal.4th 434 (1996).

Additionally, jurisdiction over a non-resident parent corporation is properly asserted here due to personal availment and agency. *Sonora Diamond Corp. v. Superior Court* 83 Cal.App.4th 523 (2000)

### Northern California Case

The Court takes judicial notice of each item requested to be so noticed by each party, pursuant to Ev. Code sections 451 and/or 452.

## V. The El Paso Defendants' Demurrer

El Paso's demurrer to each cause of action of the Northern California Complaint is overruled. The causes of action are properly alleged and none of them is barred by either the Supremacy Clause, the Filed Rate Doctrine, or the *Copperweld* Doctrine. Nor should the Court abstain at this time under the Primary Jurisdiction Doctrine.

These causes of action are neither completely preempted by the U.S. Constitution nor any federal law. Congress has not shown an intent to preempt the field and the state antitrust and unfair competition causes of action do not conflict with federal law.

The Filed Rate Doctrine does not pertain. Plaintiffs do not challenge a Filed Rate ap-

proved by the FERC but rather allege a conspiracy by Defendants which violated state antitrust and unfair competition laws, thereby causing damages to Plaintiffs through exorbitant rates charged California consumers.

The *Copperweld* doctrine (*Copperweld v. Independence Tube Corp.* [1984-2 TRADE CASES ¶ 66,065], (1984) 467 U.S. 752) is not applicable at the demurrer stage. Whether or not there exists a complete unity of interest among the alleged conspirators is a factual question. Additionally, Plaintiffs have not alleged the conspiracy occurred solely within the El Paso corporate family. The complaint contains allegations certain Plaintiffs are coerced innocent parties who may be considered part of the combination. *McManus v. A.E. Realty Partners* 119 Cal.App.3d 1106 (4th App.Dist. 1987). Finally, because El Paso Pipeline and El Paso Merchant are required by law to vigorously compete, any combination to restrain trade would not be immunized by *Copperweld*.

### VI. El Paso Defendants' Motion to Strike

The El Paso Defendants' Motion to Strike is denied for the same reasons their motion in the Southern California case was denied. To the extent Plaintiffs can prove their allegations they may be entitled to damages, restitution or disgorgement. Additionally, the monopolization cause of action is not stricken because California courts have recognized that monopolization and attempted monopolization are against public policy and prohibited at common law. *Burdell v. Grandi* 152 Cal. 376 (1907). California also recognizes the existence of the common law "business tort" of monopolization, separate and apart from statutory claims arising under the Cartwright Act. *Exxon Corp. v. Superior Court* [1997-1 TRADE CASES ¶ 71,677], 51 Cal.App.4th 1672 (1997). Finally, the tying allegation is not stricken because such a claim may be based on allegations of bundling a commodity and a service. *Marin County Bd. of Realtors v. Palsson* [1976-1 TRADE CASES ¶ 60,898], 16 Cal.3d 920 (1976).

### VII. El Paso Defendants' Motion to Quash Service

El Paso Corporation's Motion to Quash Service is denied. Plaintiffs have alleged sufficient facts and produced adequate evidence to demonstrate both special and general jurisdiction is proper over El Paso Corporation.

### VIII. Defendant Coral Energy Resources, L.P.'s demurrer

Defendant Coral Energy's demurrer to the Complaint is sustained with fifteen (15) days leave to amend, if able, to allege a viable cause of action. CCP 430.10(e). At present, Dry Creek has no standing and is not the real party in interest to assert either a breach of contract cause of action, or breach of the implied covenant of good faith and fair dealing, concerning the Agreement, Ex. A to the Complaint, between Gallo Glass and Coral Energy Resources L.P.. Additionally, no predicate acts are alleged by Coral Energy in the 7th c/a, violation of section 17200.

### IX. DEFENDANT CORAL ENERGY RESOURCES, L.P.'S MOTION TO STRIKE

The ruling sustaining Defendant Coral Energy's demurrer to the complaint with leave to amend moots the motion to strike.

### X. Defendant Coral Energy Resources, L.P.'s Motion to Transfer/Bifurcate

Coral's unopposed motion to bifurcate is granted. Both Plaintiffs and Coral have agreed bifurcation is appropriate. Provided a new complaint is filed alleging viable causes of action, the Court retains jurisdiction over them to determine issues regarding transfer and timing of any trial. CRC 1541(b)(1), (2), and/or (3); 1543(a) and (b).

---

[¶ 73,960] **Federal Trade Commission, Plaintiff v. Cyberspace.com, LLC, et al., Defendants.**

U.S. District Court, Western District of Washington, at Seattle. No. C00-1806L. Dated July 10, 2002.

#### Federal Trade Commission Act

**FTC Enforcement—Summary Judgment—Misrepresentation—Internet Services—Solicitation Checks.**—Two related companies engaged in misrepresentation in violation of the FTC Act by sending consumers invoices paired with "rebate" checks that, when cashed, acted as accepted offers for the sale of Internet services. Although the back side of the checks and invoices contained fairly detailed disclosures regarding the services offered and the consequences of endorsing the check, the placement and small print of the disclosures made them inconspicuous. In the absence of a clear and conspicuous disclosures regarding the nature of the check and invoice, the solicitation on the whole created a false impression that the check was a rebate or refund for goods or services rendered, stemming from some debt or obligation that was part of a pre-existing relation-

30

Not Reported in F.Supp.2d                                                                                                   Page 1
Not Reported in F.Supp.2d, 2005 WL 2649330 (S.D.N.Y.), 2005-2 Trade Cases P 74,970
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
New York Jets LLC v. Cablevision Systems Corp.S.D.N.Y.,2005.
United States District Court,S.D. New York.
NEW YORK JETS LLC and Jets Development LLC, Plaintiffs,
v.
CABLEVISION SYSTEMS CORPORATION, CSC Holdings, Inc., and Madison Square Garden LP, Defendants.
No. 05 Civ. 2875(HB).

Oct. 17, 2005.

*OPINION & ORDER*
BAER, J.[FN*]

FN* Margaret Johnson, a summer 2005 intern in my Chambers, and currently a second year law student at New York University School of Law, provided assistance in the research of this Opinion.

*1 On March 16, 2005, Plaintiffs, New York Jets LLC and Jets Development LLC (collectively, the "Jets"), filed the instant action against Defendants Cablevision Systems Corporation, CSC Holdings, Inc., and Madison Square Garden, LP, (collectively, "Cablevision"). The Jets allege that Cablevision, the owner of Madison Square Garden and Radio City Music Hall, violated Section 2 of the Sherman Act, committed tortious interference and engaged in deceptive acts and practices. On April 5, 2005, Cablevision moved to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Oral argument was held on June 15, 2005. Subsequent to the initial argument on the motion, this Court ordered the parties to proceed with limited discovery with respect to the application of the *Noerr-Pennington* doctrine to Cablevision's alleged conduct. The parties submitted simultaneous supplemental briefs on September 20, 2005 and a second oral argument directed to this facet of the motion was held on September 27, 2005. For the foregoing reasons, Defendants' motion is GRANTED in part and DENIED in part.

*BACKGROUND*

*A. The Parties*

The Jets own and operate the New York Jets professional football franchise. (Compl.¶ 10). Since the franchise was founded in 1959, the Jets (and its predecessor, the Titans) have never owned a stadium of its own and currently play home games at Giants Stadium, in East Rutherford, New Jersey. (Compl.¶ 37).

Cablevision owns Madison Square Garden Arena ("Madison Square Garden" or "The Garden") (seating capacity: 19,500), as well as the Theatre at Madison Square Garden (seating capacity: 5600) and Radio City Music Hall (seating capacity: 6000). (Compl.¶ 20). The Garden is the home of, amongst others, the New York Knicks basketball team and the New York Rangers ice hockey team. Other events, such as concerts, circuses and political conventions are also held at The Garden. (Compl.¶ 20). Included amongst the 19,500 seats are 89 luxury suites used for business entertainment. (Compl.¶ ¶ 23, 24). Cablevision's Radio City property is a popular music and performance venue. (Compl.¶ 20). Cablevision both produces and promotes events and rents its venues to others for the same purposes. (Compl.¶ 18). These spaces are unique in that they provide the only enclosed facilities in Manhattan that have a seating capacity in excess of 5,000. (Compl.¶¶ 20).

In addition to owning these three sports and entertainment venues, Cablevision is one of the nation's largest cable operators in terms of number of subscribers, serving over 3 million people in the New York City area. (Compl.¶ 13).

*B. The Sports and Convention Center*

For several years, plaintiffs were at work to develop a proposal for a Sports and Convention Center to be constructed on the "West Side Rail Yard," a 30 acre site on the far west side of midtown Manhattan, owned by the Metropolitan Transportation Authority ("MTA"). (Compl.¶¶ 2, 34, 35). The proposal called for construction of a 75,000-seat stadium where the Jets would play ten home games per year, and that would also serve as a "multi-purpose, entertainment, and convention facility." (Compl.¶¶ 2, 3). Once built, the Sports and Convention center would, according to the Jets, "create thousands of jobs, hundreds of millions of dollars of tax revenues, and hundreds of millions of dollars of economic activity

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00485-JJF    Document 272-9    Filed 01/05/2007    Page 8 of 16

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2649330 (S.D.N.Y.), 2005-2 Trade Cases P 74,970
**(Cite as: Not Reported in F.Supp.2d)**

Page 2

and development." (Compl.¶ 2). It was to serve as an "essential cornerstone" of New York City's bid to host the 2012 Olympics, as well as the new home of the Jets. (Compl.¶ 3).

### 1. Pre-2004 Negotiations

*2 When Robert Wood Johnson IV became the owner of the New York Jets football franchise in 2000, the team began to search for a way to build a stadium in Manhattan. (Compl.¶ 4). To date, at a cost of over $50 million, the Jets have engaged in "extensive and expensive efforts" in pursuit of a stadium. (Compl.¶ ¶ 4, 38). Those efforts have included "intensive negotiations" with the MTA and the Empire State Development Corporation, New York State's economic development agency, as well as "the development of a plan, encompassing, among other things, architectural and environmental considerations." (Compl.¶ 38).

The Jets and Cablevision have not always been at odds. In 2002, the Jets and Cablevision contemplated constructing the "Trisport" facility which would have housed the Jets, Knicks, and Rangers, and also provided entertainment and convention space. (Compl.¶ 35). However, according to the Jets, Cablevision "abandoned" that project in early 2003. (*Id.*)

### 2. Jets' Proposal

On March 25, 2004, the Jets entered into a Memorandum of Understanding ("MOU") with the MTA and the Empire State Development Corporation. The MOU required "the parties to work cooperatively and to use their 'best efforts' to obtain written agreements and the approvals necessary to develop the Sports and Convention Center and to begin construction" by July 2005. (Compl.¶ ¶ 4, 53). The MOU contained "nine milestones" to be achieved before construction could begin and, as of February 2005, four of the nine milestones had been completed and three more were nearly complete. (Compl.¶ 54, 55).

Pursuant to the terms of the MOU, the Jets agreed to finance all of the MTA's costs associated with the project, including "fees for consultants and outside counsel, costs for surveys, assessments, environmental review, and other things." (Compl.¶ 53). By early 2005, the Jets had spent more than $2.6 million on such expenses. (*Id.*) The Jets and the MTA also agreed to participate in an arbitration to determine the fair market value of the site that was set to commence on February 23, 2005. (Compl.¶ ¶ 4, 55). Following the arbitration, a comprehensive agreement to develop the Sports and Convention Center would have been entered into. (Compl.¶ 55).

### 3. Cablevision's Bid

Thus, things were moving along swimmingly until February 4, 2005, when Cablevision filed an unsolicited bid to purchase the West Side Rail Yard for $600 million in order to build a "mixed-use residential real estate development." (Compl.¶ 56). The bid consisted of a two-page letter which the Jets characterize as having "contradicted all the relevant zoning provisions governing the site, had no provisions for financing, was not associated with a professional real estate developer, and lacked specificity for the development itself." (Compl.¶ 57).

Cablevision's bid was not well received by the market. On March 9, 2005 Standard & Poor's ("S & P"), a credit rating agency, lowered Cablevision's credit rating and stated that "real estate development [was] clearly outside Cablevision's purview as a cable TV, media, and entertainment operator" and that therefore the bid "could represent a substantial change in the company's risk profile ." (Compl.¶ 59).

### C. Stadium Delay

### 1. Advertising & Lobbying Efforts

*3 Cablevision lobbied state officials to reject the proposed Sports and Convention Center. (*See* Pl.'s Letter dated September 15, 2005, Ex. H, D'Amato Dep., 7-10). In addition to its lobbying efforts, Cablevision is alleged to have funded a multi-million dollar advertising blitz "designed to malign and denigrate" the Jets and the proposed Sports and Convention Center. (Compl.¶ ¶ 6, 41). Some of the advertisements were disseminated by the New York Association for Better Choices, a "front group" funded by Cablevision. (Compl.¶ 7). According to the Jets, these advertisements falsely represented the economic benefits, financing, and environmental impact of the Sports and Convention Center. (Compl.¶ 41, 42) (quoting news reports criticizing Cablevision's media campaign).

Cablevision refused to allow the Jets to purchase

Case 1:05-cv-00485-JJF    Document 272-9    Filed 01/05/2007    Page 9 of 16

Not Reported in F.Supp.2d                                                                                                         Page 3
Not Reported in F.Supp.2d, 2005 WL 2649330 (S.D.N.Y.), 2005-2 Trade Cases P 74,970
**(Cite as: Not Reported in F.Supp.2d)**

airtime for local commercials on any of the non-broadcast networks carried on its cable system, and also allegedly coerced other television stations into refusing to air the Jets' ads. (Compl.¶ ¶ 7, 45). As a result, the Jets allege that public support for the proposed Sports and Convention Center was reduced. (Compl.¶ 47).

2. *Litigation*

Cablevision filed two actions in New York State Supreme Court to halt the Jets' proposal. First, in September 2004, Cablevision filed suit "to prevent the MTA and New York Planning Commission from ... holding scheduled public hearings ... based on supposed flaws in a draft environmental impact statement" for the site. (Compl.¶ 51). The case was dismissed on September 21, 2004. (*Id.*). Then, in December 2004, Cablevision filed a second lawsuit, alleging that the Jets had "improperly manipulated data" submitted in connection with the environmental impact review for the Jets' proposed development. (Compl.¶ 52). This action was consolidated with other related cases and ultimately dismissed. *See Madison Square Garden, L.P. v. N.Y. Metro. Transp. Auth.,* 2005 WL 1310274 (N.Y.Sup. Jun. 2, 2005), *aff'd,* 19 A.D.3d 284, 799 N.Y.S.2d 186 (N.Y.App. Div. 1st Dep't 2005). In addition, the Jets contend that Cablevision funded other litigations brought by third parties to defeat the Jets' proposal, some of which are still pending. (Pl.'s Supp. Brief at 12).

D. *The Public Authorities Control Board*

On June 6, 2005 the Public Authorities Control Board ("PACB"), a governmental body consisting of representatives of Governor George Pataki, State Senate Majority Leader Joseph Bruno, and Assembly Speaker Sheldon Silver, declined to approve funding and zoning for the Sports and Convention Center, effectively killing the Jets' proposal. (*See* Def.'s Supp. Brief at 2).

I. *STANDARD OF REVIEW*

When ruling on a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must construe all factual allegations in the complaint in favor of the non-moving party. *See Krimstock v. Kelly,* 306 F.3d 40, 47-48 (2d Cir.2002). The Court's consideration is normally limited to facts alleged in the complaint, documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken. *See Allen v. WestPoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). A motion to dismiss should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Shakur v. Selsky,* 391 F.3d 106, 112 (2d Cir.2004) (*quoting Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)).

*4 Where, as here, "matters outside the pleadings are presented" with a motion to dismiss, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.P. 12(b). "When matters outside of the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment ..." *Freidl v. City of New York,* 210 F.3d 79, 83 (2d Cir.2000). However, "[a] district court may not convert a motion under [Rule 12(b)(6) ] into a Rule 56 motion ... without sufficient notice to an opposing party and an opportunity for that party to respond." *Groden v. Random House, Inc.,* 61 F.3d 1045, 1052 (2d Cir.1995). Here, both parties have submitted extrinsic materials relevant to the application of the *Noerr-Pennington* defense. Thus, this Court will convert this motion to one for summary judgment with regard only to the application of *Noerr-Pennington.*

A court will not grant a motion for summary judgment unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 250 (1986). In determining whether there is a genuine issue of material fact, the Court must resolve all ambiguities, and draw all inferences, against the moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962) (*per curiam* ); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir.1987). This is especially so here since only limited discovery has been permitted and additional discovery might further substantiate plaintiffs' allegations.

II. *DISCUSSION*

Cablevision argues in its motion to dismiss that the Jets' antitrust claim is deficient because the Jets fail to allege that Cablevision engaged in anticompetitive

Case 1:05-cv-00485-JJF    Document 272-9    Filed 01/05/2007    Page 10 of 16

Not Reported in F.Supp.2d                                                                     Page 4
Not Reported in F.Supp.2d, 2005 WL 2649330 (S.D.N.Y.), 2005-2 Trade Cases P 74,970
(Cite as: Not Reported in F.Supp.2d)

conduct or that Cablevision enjoys a monopoly in a relevant market. Cablevision also asserts that the doctrines of justiciability and comity require the dismissal of the action. Further, Cablevision contends that the Jets fail to allege the elements necessary to sustain either of the Jets' state law claims.

### A. Section 2 of the Sherman Act

To state a claim for monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2 (2004) ("Section 2"), a plaintiff must demonstrate "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP. ("Trinko"), 540 U.S. 398, 407 (2004) (internal citation omitted). Possession of monopoly power is not a *per se* violation of Section 2; instead, an entity must monopolize a "relevant market" through "anticompetitive conduct," rather than by "a superior product, business acumen, or historic accident." Creative Copier Serv. v. Xerox Corp., 344 F.Supp.2d 858, 865 (D.Conn.2004) (citing United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)). "The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458 (1993).

*5 The Jets allege that Cablevision violated Section 2 by monopolizing the market for large indoor entertainment venues in Manhattan. Conversely, Cablevision contends that the Jets fail to allege that Cablevision posesses monopoly power in a properly defined market, and that the conduct complained of does not constitute anticompetitive behavior. In particular, Cablevision contends that its actions were directed at securing government action and are therefore immune from antitrust liability. Cablevision also asserts that the Jets failed to allege any injury stemming from defendants' purportedly anticompetitive conduct.

#### 1. Relevant Market

The threshold issue to be considered in an antitrust claim is the determination of a relevant market, and in this motion to dismiss plaintiff has adequately plead that requirement. See Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 268 (2d Cir.1979) ("[T]he first step in a court's analysis must be a definition of the relevant market.") (citation omitted). As defined by the Second Circuit, a "relevant market" consists of "all products reasonably interchangeable by consumers for the same purposes." Geneva Pharm. Tech. Corp. v. Barr Lab. Inc., 386 F.3d 485, 496 (2d Cir.2004) (citation omitted). Such a determination involves a "deeply fact-intensive" inquiry and "courts are hesitant to grant motions to dismiss for failure to plead the relevant product market." Creative Copier, 344 F.Supp.2d at 863 (citing Todd v. Exxon Corp., 275 F.3d 191, 199-200 (2d Cir.2001). Therefore, to survive a motion to dismiss, a plaintiff need only allege a "plausible" market. Hack v. President and Fellows of Yale Coll., 237 F.3d 81, 86 (2d Cir.2000) (quoting Brown Shoe Co. v. United States, 370 U.S. 294 (1962)).

Here, the Jets maintain that Cablevision is in control of all enclosed spectator facilities with capacities of greater than 5,000 that are appropriate for large-scale sports and entertainment events. (Compl.¶ 18(a)). According to the Jets, the control over these venues has enabled Cablevision to monopolize three relevant markets: (1) the facilities market, (2) the ticket market, and (3) the suites market. The Jets define the facilities market as "the market for the rental of enclosed facilities with seating capacity greater than 5,000 for enclosed large scale spectator events in Manhattan." (Compl.¶ 18(a)). The "ticket market" is "the market for sales of tickets for enclosed large-scale spectator events held in enclosed facilities with seating capacity of greater than 5,000 in Manhattan." (Compl.¶ 18(b)). The "suites market" is "the market for the rental of suites ... in enclosed facilities with seating capacity of greater than 5,000 in Manhattan." (Compl.¶ 18(c)).

Cablevision argues that the Jets' definition of the relevant market is too geographically narrow and arbitrarily disregards venues that hold fewer than 5,000 spectators. For purposes of the Sherman Act, "[t]he relevant geographic market is defined simply as the geographic area where competition occurs." N.Y. Citizens Comm. on Cable TV v. Manhattan Cable TV, 651 F.Supp. 802, 807 (S.D.N.Y.1986). Geographic constraints are reasonable when they reflect actual barriers on the flow of goods or services into or out of the market. Id. Similarly, a relevant product market consists of goods that are "reasonably

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2649330 (S.D.N.Y.), 2005-2 Trade Cases P 74,970
**(Cite as: Not Reported in F.Supp.2d)**

Page 5

interchangeable." *Id.* at 808. *See also Tic-X-Press, Inc. v. Omni Promotions Co.,* 815 F.2d 1407, 1420 (11th Cir.1987) (finding that relevant market consists of venues in Atlanta with capacities greater than 4,000). Here, the Jets plausibly allege that large venues within Manhattan are not interchangeable with larger venues outside of Manhattan, or with smaller venues within Manhattan. The interchangeability of alternative venues is too fact-intensive an inquiry to appropriately resolve at this stage of the proceedings. Further discovery is necessary before this Court can determine whether Cablevision possesses monopoly power in a relevant market.

*2. Anticompetitive Behavior*

*6 The Jets allege that Cablevision engaged in four types of anticompetitive behavior: (1) "public misrepresentations;" (2) "attempts to silence plaintiffs;" (3) "misuse of the litigation process;" and (4) a "sham bid for the West Side Rail Yard." (Compl.¶ ¶ 41-60). Cablevision argues, *inter alia,* that its conduct was aimed at securing government action and is therefore immune from antitrust liability.

In evaluating allegedly anticompetitive conduct, a court must determine whether "the challenged conduct is 'exclusionary' or 'predatory." ' *Creative Copier,* 344 F.Supp.2d 858, 865 (D.Conn.2004) (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 602 (1985)). However, certain conduct, albeit anticompetitive, is nonetheless exempt from antitrust liability. *See City of Colum. v. Omni Outdoor Adver., Inc.,* 499 U.S. 365, 379-380 (1991). Beginning with *E. R.R. Pres. Conf. v. Noerr Motor Freight, Inc.,* 365 U.S. 127 (1961) and *Mine Workers v. Pennington,* 381 U.S. 657 (1965), the Supreme Court determined that attempts by private entities to "influence legislative, executive, administrative or judicial action are immune from federal antitrust liability." *Twin City Bakery Workers & Welfare Fund v. Astra Aktiebolag,* 207 F.Supp.2d 221, 223 (S.D.N.Y.2002) (*citing to Noerr,* 365 U.S. at 136; *Pennington,* 381 U.S. at 670). Put another way, if Cablevision's conduct was anticompetitive, but aimed at securing government action, Cablevision is immune from antitrust liability. *See U.S. Football League v. Nat'l Football League,* 634 F.Supp. 1155, 1178 (S.D.N.Y.1986) ("mere solicitation of governmental action through legislative [administrative, or judicial] processes, even though the sole purpose of the defendants is to restrain competition, is an activity which is fully protected by the First Amendment") (internal quotation omitted).

The Supreme Court has limited *Noerr-Pennington* immunity to those circumstances where a monopolist truly seeks to secure government action. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 499-500 (1988). "The validity of such efforts, and thus the applicability of Noerr immunity, varies with the context and nature of the activity." *Id.* at 499. The Court explained that, "[j]ust as the antitrust laws should not regulate political activities simply because those activities have a commercial impact, so the antitrust laws should not necessarily immunize what are in essence commercial activities simply because they have a political impact. *Id.* at 507 (internal quotation omitted).

The Supreme Court has articulated an exception to *Noerr-Pennington* when a defendant's attempt at " 'influencing governmental action[ ] is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." ' *Omni Outdoor,* 499 U.S. at 380 (quoting *Noerr,* 365 U.S. at 144). "The 'sham' exception to *Noerr* encompasses situations in which persons use the governmental *process*-as opposed to the *outcome* of that process-as an anticompetitive weapon." *Id.* (emphasis in original). "A 'sham' situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all," but rather seek to harass a competitor by "impos[ing] expense and delay." *Id.* (internal quotation omitted). To come within this exception, a competitor must demonstrate that the conduct in question was both "objectively baseless," and was initiated "without regard for the merits [but rather] for the purpose of injuring a market rival." *Primetime 24 Joint Venture v. National Broadcasting Co.,* 219 F.3d 92, 100-101 (2d Cir.2000) (internal quotations omitted). However, "[t]hat a private party's political motives are selfish is irrelevant .... an intent to restrain trade as a *result* of the government action sought does not foreclose protection." *Omni Outdoor,* 499 U.S. 380-81 (internal quotation omitted). Thus, a valid attempt to procure government action, even when initiated to attain a competitive advantage, is protected by *Noerr-Pennington.* However, a meritless petition, submitted to impose undue delay and expense on a rival, will subject a defendant to antitrust liability.

a. *"Public Misrepresentations"*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00485-JJF    Document 272-9    Filed 01/05/2007    Page 12 of 16

Not Reported in F.Supp.2d                                                                Page 6
Not Reported in F.Supp.2d, 2005 WL 2649330 (S.D.N.Y.), 2005-2 Trade Cases P 74,970
(Cite as: Not Reported in F.Supp.2d)

*7 According to the Jets, Cablevision has engaged in a massive media campaign "through their cable monopoly and other outlets designed to malign and denigrate the Sports and Convention Center project and [the Jets]." (Compl.¶ 41). The Jets also allege that Cablevision's advertisements and public statements contained numerous misrepresentations. (*Id.* ¶¶ 5-7, 36, 41-42). Cablevision argues that the advertisements were directed at influencing public opinion and toward securing governmental action (in the form of a rejection of the Jets' stadium proposal), and are therefore protected under *Noerr-Pennington.*

In *Allied Tube,* the Supreme Court stated that "[a] publicity campaign directed at the general public, seeking legislative or executive action, enjoys antitrust immunity even when the campaign employs unethical and deceptive methods." 486 U.S. at 499-500. *See also Noerr,* 365 U.S. at 140-41 ("a publicity campaign to influence governmental action falls clearly into the category of political activity"). Here, the Jets allege that Cablevision employed a "multi-million dollar ... campaign designed to delay and derail the Sports and Convention Center." (Compl.¶ 5). In the course of this campaign, the Jets allege that Cablevision misrepresented the "economic benefits," "financing," and "environmental impact" of the proposed stadium, as well as the Jets' "truthfulness and integrity ... in preparing and submitting regulatory filings" for the project. (Compl.¶ 41).

These alleged misrepresentations fall squarely within the confines of *Noerr-Pennington.* Cablevision's advertisements and public statements were aimed at influencing public opinion as well as the government decisionmakers who possessed the power to block the Jets' proposal. Cablevision did not undertake this advertising campaign to detract from the Jets' appeal as a sports franchise. Indeed, Cablevision's only interest in discrediting the Jets was in conjunction with the Jets' efforts to construct a stadium next door to Madison Square Garden. While "[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor," *Noerr,* 365 U.S. at 144, the facts alleged here fail to pass that test. The complaint alleges that Cablevision disseminated misleading information regarding the merits of the Jets' stadium proposal. To constitute a "sham," Cablevision's public statements must have been directed at harming the Jets' interests in some manner distinct from securing defeat of the Sports and Convention Center. The Jets fail to allege any purpose for the advertisements separate from achieving defeat of the stadium. Since this outcome necessarily depended on government intervention, Cablevision's alleged public misrepresentations are immune from antitrust liability.

b. *"Attempts to Silence Plaintiffs"*

*8 The Jets allege that Cablevision refused to air the Jets' advertisements in support of the Sports and Convention Center, and that Cablevision coerced other television stations into refusing to air the Jets' ads. (Compl.¶ 43). Cablevision contends that it has no legal duty to run advertisements distributed by a competitor and that the Jets were able to adequately disseminate their message without Cablevision's cooperation.[FN1]

> FN1. In addition, at oral argument Cablevision asserted that its refusal to air the Jets' ads was protected by *Noerr-Pennington.* This argument is far fetched. A refusal to engage in business with a competitor, i.e., a refusal to sell a competitor advertising time, is too attenuated to constitute an attempt to secure governmental action, even when those advertisements involve an issue of public concern.

In general, a business "has a right to deal, or refuse to deal, with whomever it likes ..." *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 761 (1984).[FN2] However, the right to "refuse to deal" is not unrestrained. *See Eastman Kodak Co. v. Image Tech. Serv.,* 504 U.S. 451, 483 n. 12 (1992) ("as a general matter a firm can refuse to deal with its competitors ... [however] such a right is not absolute; it exists only if there are legitimate competitive reasons for the refusal"). The Supreme Court articulated the scope of a business's right to "refuse to deal" with competitors in *Aspen Skiing,* 472 U.S. at 601. There, the Court found that a firm that "attempt[s] to exclude rivals on some basis other than efficiency" is engaged in an anticompetitive practice. *Aspen Skiing,* 472 U.S. at 605. Thus, monopolists are permitted to choose with whom they conduct business so long as the purpose of their refusal to deal is not to create or maintain a monopoly. *Id.* at 602. In *Aspen Skiing,* the Court affirmed a finding of antitrust liability where the defendant had failed to articulate any normal business purpose or efficiency justification for its decision not to deal with its competitor. *Id.* at 610-11.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00485-JJF    Document 272-9    Filed 01/05/2007    Page 13 of 16

Not Reported in F.Supp.2d                                                                                  Page 7
Not Reported in F.Supp.2d, 2005 WL 2649330 (S.D.N.Y.), 2005-2 Trade Cases P 74,970
(Cite as: Not Reported in F.Supp.2d)

FN2. *See also* Trinko, 540 U.S. at 408 ("As a general matter, the Sherman Act does not restrict the long recognized right of a [firm] engaged in an entirely private business ... to exercise his own independent discretion as to parties with whom he will deal.") (internal citation omitted).

The Supreme Court revisited the right to "refuse to deal" in *Trinko*. There, the Court cautioned that the *Aspen Skiing* exception is to be narrowly construed. Trinko, 540 U.S. at 408-09. In *Trinko,* the Court found that defendant Verizon was not liable under the Sherman Act for allegedly failing to process rival communications companies' service orders in a timely fashion. *Id.* at 416. The Court distinguished the allegations in *Trinko* from instances in which a firm that was "in the business of providing a service to certain customers ... refused to provide the same service to certain other customers." *Id.* at 410.

Here, the Jets allege that "[t]here is no rational business justification for [Cablevision's] refusal to accept profitable advertising" from the Jets. (Compl.¶ 44). Cablevision responds that they are not obligated to do business with any competitor, including the Jets. However, plaintiffs contend that Cablevision refused to sell airtime, a commodity which it made available to other consumers, to the Jets, in order to prevent the Jets from encroaching on Cablevision's stadium monopoly. While Cablevision is generally free to engage in business or refuse to engage in business with whomever it chooses, it may not do so when the purpose of such refusal is to maintain a monopoly. As alleged, defendants' "refusal to deal" was predicated on an impermissible purpose, and thus if proven would subject Cablevision to antitrust liability. FN3

FN3. Cablevision also contends that it cannot be liable for refusing to air Cablevision's advertisements because it does not enjoy a monopoly with respect to its cable television network. Nevertheless, it is sufficient that Cablevision's refusal to air the Jets' ads constituted anticompetitive conduct intended to maintain Cablevision's stadium monopoly. Whether Cablevision's refusal to air the Jets' ads actually inhibited the Jets in disseminating their message is an issue of fact upon which further discovery is necessary.

c. *"Misuse of the Litigation Process"*

\*9 The Jets allege that Cablevision "funded, supported, and promoted baseless litigation designed solely to delay, increase the cost of, and prevent the development of the Sports and Convention Center project." (Compl.¶ 50). The complaint references two lawsuits brought by Cablevision to prevent approval of the Sports and Convention Center. (Compl.¶ 51-52).FN4 Relying again on *Noerr-Pennington,* Cablevision argues its attempts to block the Jets' stadium through litigation are protected.

FN4. In addition, the Jets claim that Cablevision funded litigation brought by outside groups. (*See* Pl.'s Supp. Br. at 12).

As set forth above, *Noerr-Pennington* immunity is not absolute, for instance, it does not protect the filing of "sham litigation." Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 516 (1972). In *Prof'l* Real Estate Inv., Inc v. Colum. Pictures Indus., Inc., 508 U.S. 49 (1993), the Supreme Court established a two-part test for determining whether litigation could be characterized as a "sham:"
First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.... [Second,] a court should focus on whether the baseless suit conceals an attempt to interfere directly with a competitor's business relationships through the use of the governmental process-as opposed to the outcome of that process-as an anticompetitive weapon.... [Thus, to disprove *Noerr* immunity, a plaintiff must] demonstrat[e] both the objective and the subjective components of a sham ...

*Id.* at 60-61 (internal citations and emphasis omitted). As the Second Circuit explained in *PrimeTime 24:*In cases in which the defendant is accused of bringing a whole series of legal proceedings, the test is not retrospective but prospective: Were the legal filings made, not out of a genuine interest in redressing grievances, but as part of a pattern or practice of successive filings undertaken essentially for purposes of harassment? ... [I]t is immaterial that some of the claims might, as a matter of chance, have merit. The relevant issue is whether the legal challenges are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.

219 F.3d at 101 (internal quotations omitted).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00485-JJF    Document 272-9    Filed 01/05/2007    Page 14 of 16

Not Reported in F.Supp.2d                                                                                          Page 8
Not Reported in F.Supp.2d, 2005 WL 2649330 (S.D.N.Y.), 2005-2 Trade Cases P 74,970
(Cite as: Not Reported in F.Supp.2d)

The Jets allege that Cablevision brought and financed frivolous litigation in an attempt to delay the construction of the Sports and Convention Center. (Compl.¶ 36(c)). The Jets contend that defendants had "no reasonable basis to believe that they could prevail on the merits" of the litigation. (Compl.¶ 51). Cablevision responds that the Jets have not demonstrated that these litigations were objectively baseless, nor that the litigations were brought without regard to the merits. Indeed, Cablevision contends that certain actions are still pending in state court, and that various entities joined in Cablevision's effort to halt the Jets' proposal. *Noerr-Pennington* and its progeny establish a high bar for litigants seeking to recover for antitrust violations based on the filing of sham litigation. For now, plaintiffs have adequately alleged that Cablevision's efforts to block the Jets in state court constituted a sham. Further, on the record developed thus far I am unable to evaluate the merit, if any, of the state court actions, as well as the defendant's motivation in initiating those actions. If Cablevision did indeed file successive suits without regard for their merit, but rather to impose additional expense and delay on the Jets, this conduct is not protected by *Noerr-Pennington.* Drawing all inferences in favor of the Jets, it cannot be established that Cablevision is entitled to *Noerr-Pennington* immunity.

d. *"Sham Bid for the West Side Rail Yard"*

*10 The Jets claim that Cablevision engaged in anticompetitive conduct by submitting a sham bid to develop the West Side Rail Yard. In its motion to dismiss, Cablevision contends that its bid is protected by *Noerr-Pennington.*

Assuming that *Noerr-Pennington* applies when government decisionmakers act in a proprietary capacity,[FN5] the Jets have adequately alleged that Cablevision's bid constituted a sham. The Jets allege that Cablevision "submitted a sham bid to acquire the planned Sports and Convention Center site for the sole purpose of impeding Plaintiffs' plans to construct the Sports and Convention Center" and absent any "legitimate business rationale." (Compl.¶ ¶ 36, 36(d)). The Jets assert that Cablevision "had no intention" of building on the West Side Rail Yard, but rather submitted the bid "solely for the purpose of delaying and derailing the Sports and Convention Center." (Compl.¶ 57). Cablevision responds that its bid constituted a valid effort to acquire the West Side Rail Yard. Cablevision contends that its bid, which was higher than the Jets' offer, was actively considered by the MTA. The limited discovery produced thus far demonstrates that there are triable issues of fact concerning the viability of Cablevision's bid. (*Cf.* Pl.'s Supp. Br. at 5; Def.'s Supp. Br. at 13). Additional discovery may further illuminate the circumstances surrounding Cablevision's competing proposal. If it becomes apparent that Cablevision indeed sought to acquire the West Side Rail Yard for its own development project, defendants will likely be entitled to protection under *Noerr-Pennington.* However, if the Jets can establish that Cablevision never intended to acquire the property, but submitted a bid only to impede the Jets' progress, immunity will be unavailable. Upon the record developed thus far, the Jets' claim is entitled to proceed.

FN5. *See U.S. Football League,* 634 F.Supp. at 1179 (*"Noerr-Pennington* may indeed be applied to immunize petitioning conduct directed at government agencies acting in a proprietary capacity").

3. *Anticompetitive Injury*

Cablevision also asserts that the Jets fail to allege any cognizable antitrust injury stemming from defendants' alleged anticompetitive conduct. The Supreme Court has defined "antitrust injury" as:
[I]njury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violations or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations ... would likely cause.

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc. ("Pueblo"),* 429 U.S. 477, 489 (1977); *see also Kasada, Inc. v. Access Capital, Inc.,* No. 01 Civ. 8893, 2004 WL 2903776, *11 (S.D.N.Y. Dec. 14, 2004) (same).

Here, the Jets maintain that Cablevision's anticompetitive conduct has, *inter alia,* "limited, reduced, restrained, suppressed, and effectively foreclosed" competition, forced "consumers and businesses who attend events, rent facilities or rent suites in these markets in Manhattan [to pay] ... artificially inflated prices," and has created a situation where "potential competitors of Cablevision [including the Jets] ... have been foreclosed from competing on the merits with Cablevision and [thus, have been] injured in their business and property."

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2649330 (S.D.N.Y.), 2005-2 Trade Cases P 74,970
(Cite as: Not Reported in F.Supp.2d)

Page 9

(Compl.¶ 63-64). These allegations are sufficient to survive a motion to dismiss. *See, e.g., Brader v. Allegheny Gen. Hosp.,* 64 F.3d 869, 876 (3d Cir.1995) ("[T]he existence of an 'antitrust injury' is not typically resolved through [a] motion[ ] to dismiss.").

B. Tortious Interference & Deceptive Business Practices

*11 Plaintiffs' claims for tortious interference with prospective business relations and deceptive business practices are substantively identical to their antitrust claim. (Compl.¶ ¶ 67-79).[FN6] To prove tortious interference, a plaintiff must show "(1) business relations with a third party; (2) defendants' interference with those business relations; (3) [that] defendants acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the relationship." *Purgess v. Sharrock,* 33 F.3d 134, 141 (2d Cir.1994). Plaintiffs' allegations of anticompetitive conduct suffice to state a claim for tortious interference. *See Innomed Labs, L.L .C. v. Alza Corp.,* 01 Civ. 8095, 2002 WL 31521084, *7 (S.D.N.Y. Nov. 13, 2002) (Baer, J.) (anticompetitive behavior may constitute "wrongful act" for purposes of tortious intereference claim).

> FN6. The Jets allege that Cablevision tortiously interfered both with plaintiffs' relations with the MTA and with the Jets' attempts to place ads on non-Cablevision television stations.

Plaintiffs also allege that Cablevision's conduct constituted deceptive business practices in violation of New York General Business Law Section 349. To state a claim for deceptive business practices, a plaintiff must allege "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chemical Bank,* 95 N.Y.2d 24, 29 (2000). Plaintiffs here have alleged that Cablevision engaged in anticompetitive conduct including the submission of a sham bid and the initiation of frivolous litigation. This behavior is sufficient to state a claim for deceptive business practices. *See Leider v. Ralfe,* 01 Civ. 3137, 2005 WL 152025, *9-10 (S.D.N.Y. Jan. 25, 2005) (Baer, J.) (anticompetitive conduct involving consumer deception may constitute deceptive business practices); *New York v. Feldman,* 210 F.Supp.2d 294, 301 (S.D.N.Y.2002) (consumer oriented activity consists of any action causing "consumer injury or harm to the public interest") (internal quotation omitted).

C. Justiciability and Comity

Cablevision argues that this Court is not the appropriate forum to resolve these issues. In particular, Cablevision argues that the *Younger* doctrine and the Anti Injunction Act prohibit this Court from interfering with ongoing state court proceedings.

Pursuant to the Supreme Court's decision in *Younger v. Harris,* 401 U.S. 37 (1971), federal courts must abstain from enjoining pending civil proceedings in state court. *Wash. v. County of Rockland,* 373 F.3d 310, 318 (2d Cir.2004). The Anti-Injunction, 28 U.S.C. § 2283 (2005) also prohibits federal courts from enjoining state court proceedings in most circumstances.

Here, plaintiffs do not seek an injunction staying any pending state court litigation. Nor would a judgment in this action necessitate such an injunction. While it is true that plaintiffs' allegations relate, in part, to the merit of certain state court actions, the gravamen of plaintiffs' complaint is distinct from the subject matter of any action currently pending in state court.

*12 Finally, Cablevision argues that this controversy is not ripe for adjudication. However, after Cablevision filed its moving brief, the Jets' stadium proposal was defeated by the PACB. Therefore, it does not appear that any subsequent events in the political arena will alter the relations of the parties to this action.

III. *CONCLUSION*

In accordance with the conclusions set forth above, Cablevision's motion to dismiss is GRANTED with respect to Cablevision's alleged "public misrepresentations" and DENIED in all other respects. The Pretrial Scheduling Order is hereby modified as follows: All discovery shall be completed by March 31, 2006; no dispositive motion shall be made returnable after May 15, 2006; the Joint Pretrial Order is due July 17, 2006; and this matter is added to the August, 2006 trailing trial calendar.

The Clerk of the Court is instructed to close this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00485-JJF    Document 272-9    Filed 01/05/2007    Page 16 of 16

Not Reported in F.Supp.2d                                                                           Page 10
Not Reported in F.Supp.2d, 2005 WL 2649330 (S.D.N.Y.), 2005-2 Trade Cases P 74,970
**(Cite as: Not Reported in F.Supp.2d)**

motion and remove it from my docket.

IT IS SO ORDERED

S.D.N.Y.,2005.
New York Jets LLC v. Cablevision Systems Corp.
Not Reported in F.Supp.2d, 2005 WL 2649330 (S.D.N.Y.), 2005-2 Trade Cases P 74,970

Briefs and Other Related Documents (Back to top)

• 2006 WL 548644 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Dismiss Defendants' Counterclaims (Jan. 24, 2006)
• 2006 WL 548642 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Opposition to Plaintiffs' Motion to Dismiss Defendants' Amended Counterclaims (Jan. 17, 2006)
• 2005 WL 3655316 (Trial Pleading) Answer and Counterclaims (Nov. 15, 2005) Original Image of this Document (PDF)
• 2005 WL 3654063 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Memorandum in Further Support of Motion to Amend Order on Motion to Dismiss to Include Certification Under | 1292(b) and to Stay Proceedings Pending Appeal (Nov. 14, 2005)
• 2005 WL 3281017 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Support of their Motion to Amend Order on Motion to Dismiss, to Include Certification Under |1292(B) and to Stay Proceedings Pending Appeal (Oct. 27, 2005)
• 2005 WL 643364 (Trial Pleading) Complaint (Mar. 16, 2005)
• 2005 WL 923048 (Trial Pleading) Complaint (Mar. 16, 2005) Original Image of this Document (PDF)
• 1:05cv02875 (Docket) (Mar. 16, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.