# TAB 6



--- F.Supp.2d ----, 2006 WL 3921865 (E.D.Pa.), 2006-2 Trade Cases P 75,514
**(Cite as: 2006 WL 3921865 (E.D.Pa.))**

<u>Motions, Pleadings and Filings</u>

United States District Court,
E.D. Pennsylvania.
D.R. WARD CONSTRUCTION CO., et al.,
Plaintiffs
v.
ROHM AND HAAS CO., et al., Defendants.
**No. MDL NO. 1684, 2:05-CV-4157-LDD.**

May 30, 2006.

**Background:** Indirect purchasers of products containing plastic additives filed suit under state antitrust laws and common law theory of unjust enrichment on behalf of alleged class, against various manufacturers and distributors, alleging they conspired to fix, maintain or stabilize the price of plastics additives and to allocate markets for the sale thereof in states of Arizona, Tennessee, and Vermont. Defendants moved to dismiss.

**Holdings:** The District Court, <u>Legrome D. Davis</u>, J., held that:

<u>(1)</u> allegations in complaint met standard for constitutional standing;

<u>(2)</u> to determine whether purchasers possessed federal prudential standing, court would look to treatment of standing under relevant state antitrust statutes;

<u>(3)</u> purchasers had standing under Arizona Antitrust Act (AAA);

<u>(4)</u> principles of federal prudential standing did not bar court from hearing claim under Tennessee Trade Practices Act (TTPA);

<u>(5)</u> because purchasers met general standing requirements under Vermont law to bring claim under Vermont Consumer Fraud Act (VCFA), they satisfied prudential federal standing considerations for VCFA claim in diversity action;

<u>(6)</u> assuming arguendo that *Associated Gen. Contractors, Inc.(AGC)* principles applied to determine federal prudential standing for state antitrust claims, defendants failed to demonstrate those factors did not confer standing as a matter of law;

<u>(7)</u> as for TTPA claim, purchasers sufficiently al-

leged that defendants' anticompetitive conduct produced a substantial effect on Tennessee commerce;

<u>(8)</u> indirect purchasers could bring independent unjust enrichment claims under Arizona, Tennessee, and Vermont law, and viability of those claims did not hinge upon success of state statutory antitrust claims; and

<u>(9)</u> allegations were factually sufficient to state cause of action for unjust enrichment under each state's law..

Motion granted in part and denied in part.

**[1] Federal Civil Procedure** 0

170Ak0 k.
Under motion to dismiss for failure to state a claim, defendants bear burden of showing that no claim has been stated. <u>Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.</u>

**[2] Federal Civil Procedure** 0
170Ak0 k.
Motion to dismiss for failure to state a claim may be granted only when it is clear, after allocating burden of proof, that plaintiff can prove no set of facts in support of claim which would entitle her to relief. <u>Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.</u>

**[3] Federal Civil Procedure** 0
170Ak0 k.
On motion to dismiss for failure to state a claim, district court must take all well pleaded allegations as true, construe complaint in light most favorable to plaintiff, and determine whether, under any reasonable reading of the pleadings, plaintiff may be entitled to relief; however, court need not credit bald assertions or legal conclusions in deciding motion to dismiss. <u>Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.</u>

**[4] Federal Courts** 0
170Bk0 k.
Question of whether plaintiff has standing to bring a cause of action in federal court is a jurisdictional issue, a threshold question in every federal case.

**[5] Federal Courts** 0

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

170Bk0 k.

Standing to sue in federal court is a federal question, the resolution of which presents a different analysis than the question of whether a party has standing to sue in state court.

**[6] Federal Courts** 🔑0
170Bk0 k.

Even when federal court sits in diversity jurisdiction, plaintiff must meet federal standing requirement.

**[7] Federal Civil Procedure** 🔑0
170Ak0 k.

To achieve standing, plaintiff must satisfy both the case and controversy requirements of Article III of United States Constitution and certain prudential requirements. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[8] Federal Civil Procedure** 🔑0
170Ak0 k.

To satisfy constitutional requirements for standing, plaintiff must allege (1) injury in fact, (2) causal nexus between injury and challenged conduct, and (3) likelihood that a favorable judicial decision will redress the injury. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[9] Antitrust and Trade Regulation** 🔑0
29Tk0 k.

Indirect purchasers' allegations in complaint against manufacturers and distributors of plastic additives, that they conspired to fix, maintain or stabilize price of plastics additives and to allocate markets for sale thereof in three states, met standard for constitutional standing; purchasers alleged that they paid inflated prices for products with plastics additives due to overcharge on plastics additives which was passed on to them from intervening links within distribution chain, that their overpayment for products containing plastics additives was caused by conspiracy among defendants to charge inflated prices for plastics additives, and that judicial relief would compensate purchasers for those injuries, restoring them to position they were in prior to price-fixing scheme. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[10] Federal Civil Procedure** 🔑0
170Ak0 k.

Doctrine of "prudential standing," which augments

constitutional dimensions of standing in federal court, consists of a set of judge-made rules forming an integral part of judicial self-government; rules are intended to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to federal courts to those litigants best suited to assert particular claim.

**[11] Federal Civil Procedure** 🔑0
170Ak0 k.

Prudential standing considerations, which serve to limit court's role in resolving public disputes, determine whether particular plaintiff can sue under particular statutory or constitutional provision, based in part upon language of provision.

**[12] Antitrust and Trade Regulation** 🔑0
29Tk0 k.

Under United States Supreme Court's *Associated Gen. Contractors, Inc.(AGC)* decision, array of factors that courts must consider in determining whether party has suffered injury too remote to bring cause of action for damages under Sherman Act and Clayton Act are (1) causal connection between antitrust violation and harm to plaintiff, and defendant's intent to cause the harm, (2) whether nature of plaintiff's alleged injury is of type that antitrust statutes were intended to remedy, (3) directness or indirectness of alleged injury, (4) existence of more direct victims of alleged antitrust violations, (5) potential for duplicative recovery, and (6) danger of complex and/or speculative apportionment of damages. Sherman Act, § 1 et seq., 15 U.S.C.A. § 1 et seq.; Clayton Act, § 1 et seq., 15 U.S.C.A. § 12 et seq.

**[13] Federal Courts** 🔑0
170Bk0 k.

Court sitting in diversity jurisdiction need not apply federal case law concerning prudential antitrust standing to determine whether party has standing to assert cause of action under state antitrust statute; instead, to determine whether diversity plaintiff possesses federal prudential standing to bring claim under state antitrust statute, Court looks to treatment of standing under relevant state antitrust statutes.

**[14] Antitrust and Trade Regulation** 🔑0
29Tk0 k.

--- F.Supp.2d ----, 2006 WL 3921865 (E.D.Pa.), 2006-2 Trade Cases P 75,514
**(Cite as: 2006 WL 3921865 (E.D.Pa.))**

As predicted by federal district court in Pennsylvania, Arizona Supreme Court would apply its traditional standing approach, rather than *Associated Gen. Contractors, Inc. (AGC)* analysis of United States Supreme Court, to determine whether an indirect purchaser of goods and services has standing to sue under the Arizona Antitrust Act (AAA). A.R.S. § 44-1408(b).

**[15] Action** ⚖️0
13k0 k.
Under Arizona law, question of standing involves only principles of judicial restraint, as there is no counterpart to case or controversy requirement of the federal constitution.. U.S.C.A. Const. Art. 3, § 2, cl. 1.

**[16] Action** ⚖️0
13k0 k.
Under Arizona law, litigant suing under state statute possesses standing when plaintiff sustains an injury in fact that is distinct and palpable, thereby giving the plaintiff a personal interest in the outcome of the controversy.

**[17] Antitrust and Trade Regulation** ⚖️0
29Tk0 k.
Indirect purchasers of products containing plastics additives had standing to pursue action in federal court under Arizona Antitrust Act (AAA) alleging that manufacturers and distributors conspired to fix, maintain or stabilize price of plastics additives and to allocate markets for sale thereof; purchasers possessed an interest in outcome of litigation and had alleged injury that was distinct and palpable, the amount of overcharge that was passed on to them due to alleged price-fixing conspiracy. A.R.S. § 44-1401 et seq.

**[18] Antitrust and Trade Regulation** ⚖️0
29Tk0 k.
As predicted by federal district court in Pennsylvania, Supreme Court of Tennessee would apply traditional standing requirements rather than United States Supreme Court's *Associated Gen.Contractors, Inc. (AGC)* analysis to determine whether injuries suffered by indirect purchasers of products containing plastics additives were too remote to confer

standing under Tennessee Trade Practices Act (TTPA). West's T.C.A. §§ 47-25-101 et seq., 47-25-106.

**[19] Action** ⚖️0
13k0 k.
Party has standing to sue under Tennessee law when she meets the minimum constitutional requirements of standing under federal law; i.e., party suing under Tennessee statute must demonstrate that she has sustained a distinct and palpable injury, that the injury was caused by the challenged conduct, and that the injury is capable of being redressed by a judicial remedy.

**[20] Antitrust and Trade Regulation** ⚖️0
29Tk0 k.
Principles of federal prudential standing did not bar federal district court in Pennsylvania from hearing claim under Tennessee Trade Practices Act (TTPA) by indirect purchasers of products containing plastics additives, alleging that manufacturers and distributors conspired to fix, maintain or stabilize price of plastics additives and to allocate markets for sale thereof. West's T.C.A. § 47-25-101 et seq.

**[21] Antitrust and Trade Regulation** ⚖️0
29Tk0 k.
Purpose of amendment to Vermont Consumer Fraud Act (VCFA) clarifying the right of any "person" to recover for damages or injury sustained as a result of any violation of state antitrust laws including VCFA section prohibiting unfair and deceptive methods of competition in commerce, regardless of whether the person dealt directly with the defendants, is to clarify the right of an indirect purchaser to obtain recovery for a violation of the state antitrust law. 9 V.S.A. §§ 2453(a), 2465(b).

**[22] Federal Civil Procedure** ⚖️0
170Ak0 k.
Vermont Supreme Court has adopted, in general, constitutional and prudential components of federal standing doctrine; first prong of test is identical to case-or-controversy analysis under federal Constitution, and second prong of test, prudential element of standing, evaluates whether plaintiff is raising another person's legal rights, whether plaintiff asserts a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

general grievance, and whether plaintiff's claims fall within the zone of interest protected by the invoked law.

**[23] Antitrust and Trade Regulation ☞0**
29Tk0 k.
Because indirect purchasers of products containing plastics additives met general standing requirements under Vermont law to bring claim under Vermont Consumer Fraud Act (VCFA), they satisfied federal standing considerations for VCFA claim in diversity action. 9 V.S.A. § 2451 et seq.

**[24] Antitrust and Trade Regulation ☞0**
29Tk0 k.
Even if principles of United States Supreme Court's *Associated Gen. Contractors, Inc (AGC)* decision applied to determine federal prudential standing for claims under Arizona, Tennessee and Vermont statutes that manufacturers and distributors of plastic additives conspired to fix, maintain or stabilize the price of those additives and to allocate markets for the sale thereof in those three states, defendants failed to meet their burden of

demonstrating, at motion to dismiss phase, that *(AGC)* factors did not confer standing as matter of law; sufficient causal nexus existed between injury and defendants' alleged anticompetitive behavior, there was no indication that state statutes were enacted to provide remedies to certain types of indirect purchasers such as those who participated in the immediate market subject to price-fixing conspiracy but not to other categories of indirect purchasers who functioned lower in the distribution chain such as end consumers who purchased products containing ingredient subject to the conspiracy, when read in light most favorable to them complaint suggested that plaintiffs had suffered the greatest, if not the most direct, injury of the alleged conspiracy, damages were not per se too speculative or tenuously connected to the alleged wrongdoing to confer antitrust standing nor could court say that determination of existence and amount of overcharge suffered by plaintiffs require inappropriate guesswork or unmanageable complex analysis, and potential for duplicative recovery factor was inapposite. A.R.S. § 44-1401 et seq.; West's T.C.A. § 47-25-101 et seq.; 9 V.S.A. § 2451 et seq.

**[25] Antitrust and Trade Regulation ☞0**
29Tk0 k.
To state a claim under the Tennessee Trade Practices Act (TTPA), plaintiff must allege, *inter alia*, that the alleged anti-competitive conduct affects Tennessee trade or commerce to a substantial degree. West's T.C.A. § 47-25-101 et seq.

**[26] Antitrust and Trade Regulation ☞0**
29Tk0 k.
Indirect purchasers of products containing plastics additives who were bringing claim under Tennessee Trade Practices Act (TTPA) sufficiently alleged that defendants' anticompetitive conduct produced a substantial effect on Tennessee commerce; one named plaintiff was alleged to be Tennessee resident who indirectly purchased plastics additives, each defendant was alleged to have manufactured, marketed, and sold plastics additives in Tennessee during proposed class period, it was further alleged that defendants conspired to fix price of plastics additives sold in Tennessee, that named plaintiff who was Tennessee resident and other Tennesseans paid higher prices in Tennessee for products containing plastics additives as result of the price-fixing conspiracy, and that the alleged price-fixing conspiracy injured the businesses and property of the named plaintiff who resided in Tennessee and other Tennesseans. West's T.C.A. § 47-25-101 et seq.

**[27] Implied and Constructive Contracts ☞0**
205Hk0 k.
Indirect purchasers in Arizona, Tennessee, and Vermont of products containing plastics additives could bring independent unjust enrichment claims against additives' manufacturers and distributors, and viability of those claims did not hinge upon success of state statutory antitrust claims; even if indirect purchaser could only state claim for unjust enrichment if jurisdiction in question recognized statutory antitrust claim on behalf of indirect purchasers, those states all did, so permitting independent unjust enrichment claims would not circumvent procedural and substantive limitations of their antitrust statutes. A.R.S. § 44-1401 et seq.; West's T.C.A. § 47-25-101 et seq.; 9 V.S.A. § 2451 et seq.

**[28] Implied and Constructive Contracts ☞0**

--- F.Supp.2d ----, 2006 WL 3921865 (E.D.Pa.), 2006-2 Trade Cases P 75,514
**(Cite as: 2006 WL 3921865 (E.D.Pa.))**

205Hk0 k.
To succeed on a claim for unjust enrichment under
Arizona law, plaintiff must establish (1) an enrich-
ment, (2) an impoverishment, (3) a connection
between the enrichment and the impoverishment, (4)
the absence of justification for the enrichment and the
impoverishment, and (5) the absence of a remedy
provided by law; Arizona law does not require either
a direct causal connection between the enrichment
and the impoverishment, or the transference of a dir-
ect enrichment from the plaintiff to the defendant.

**[29] Implied and Constructive Contracts ⬅️0**
205Hk0 k.
Under Vermont law, a claim for unjust enrichment
lies when a party confers a benefit upon another party
and retention of the benefit would be inequitable.

**[30] Implied and Constructive Contracts ⬅️0**
205Hk0 k.
Elements of an unjust enrichment claim under Ten-
nessee law include (1) any benefit, whether direct or
indirect, conferred upon the defendant by the
plaintiff, (2) appreciation by the defendant of such
benefit, (3) acceptance of the benefit under circum-
stances that render inequitable or unjust the receipt of
the benefit without corresponding payment of its
value, and (4) exhaustion of all remedies against the
person with whom plaintiff enjoyed privity of con-
tract, unless exhaustion would be futile.

Stephen W. Armstrong, Montgomery Mccracken
Walker & Rhoads LLP, Philadelphia, for Rohm &
Haas Company, Defendant.

Steven E. Bizar, Buchanan Ingersoll, P.C., Phil-
adelphia, for Atofina Chemicals, Inc., Defendant.

Peter Breslauer, Montgomery Mccracken Walker &
Rhoads LLP, Philadelphia, for Rohm & Haas Com-
pany, Defendant.

Jeremy J. Calsyn, Cleary Gottlieb Steen & Hamilton,
LLP, Washington, DC, for Kreha Corporation of
America, Defendant.

Andre L. Dennis, Stradley, Ronon, Stevens & Young
LLP, Philadelphia, for Barelocher USA, L.L.C., De-
fendant.

Nancy J. Gellman, Conrad O'Brien Gellman & Rohn
PC, Phila, for Akcros Chemicals America, Akzo No-
bel, Inc., Defendants.

John G. Harkins, Jr., Harkins Cunningham, Phil-
adelphia, for Rohm & Haas Company, Defendant.

Alan Kanzer, Alston & Bird LLP (N.Y.), New York,
NY, for Barelocher USA, L.L.C., Defendant.

Torsten M. Kracht, Alston & Bird LLP, New York,
NY, for Barelocher USA, L.L.C., Defendant.

Wayne A. Mack, Duane Morris LLP, Philadelphia,
for Kreha Corporation of America, Defendant.

Thomas J. McGarrigle, Philadelphia, for Crompton
Corporation, Defendant.

Krishna B. Narine, Law Office of Krishna B. Narine,
Elkins Park, for D.R. Ward Construction Co., Anna
C. Furney, David Pearman, Grant Goodman, James
Leventhal, Melinda Friedman, Plaintiffs Pro se.

Lathrop B. Nelson, III, Montgomery McCracken
Walker and Rhoads, L .L.P., Philadelphia, for Rohm
& Haas Company, Defendant.

Valerie Brand Pipano, Reed Smith LLP, Phil-
adelphia, for Crompton Corporation, Defendant.

Steven A. Reed, Harkins Cunningham, Philadelphia,
for Rohm & Haas Company, Defendant.

Brian E. Roof, Frantz Ward LLP, Cleveland, OH, for
Ferro Corporation, Defendant.

Richard L. Scheff, Montgomery Mccracken Walker
& Rhoads LLP, Philadelphia, for Rohm & Haas
Company, Defendant.

Howard D. Scher, Buchanan Ingersoll, PC, Phil-
adelphia, for Atofina Chemicals, Inc., Defendant.

Colleen Healy Simpson, Harkins Cunningham LLP,
Philadelphia, for Rohm & Haas Company, Defend-
ant.

Francis X. Taney, Jr., Buchanan Ingersoll PC, Phil-
adelphia, for Atofina Chemicals, Inc., Defendant.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Catherine N. Walto, Rawle & Henderson LLP, Phil-adelphia, for Mitsubishi Rayon America, Inc., De-fendant.

MEMORANDUM OPINION

DAVIS, J.

*1 Presently before the Court are defendants' joint motion to dismiss the second amended indirect pur-chaser complaint (Doc. No. 16), plaintiffs' brief in opposition (Doc. No. 28), and defendants' response thereto (Doc. No. 33). For the following reasons, this Court grants defendants' motion in part and denies defendants' motion in part.

I. Factual and Procedural History

This action was commenced by complaint on August 4, 2005. (Doc. No. 1). On March 1, 2006, plaintiffs D.R. Ward Construction, Anna C. Furney, and David Pearman ("plaintiffs"), indirect purchasers of products containing plastics additives, filed a second amended complaint on behalf of an alleged class of Arizona, Tennessee, and Vermont entities that indir-ectly purchased plastics additives from defendants, various manufacturers and distributors of plastics ad-ditives, between January 1990 and January 2003. (See Second Am. Compl., Doc. No. 24, at ¶¶ 1, 34). Plaintiffs allege that defendants conspired to fix, maintain, or stabilize the price of plastics additives and to allocate markets in Arizona, Tennessee, and Vermont for the sale of plastics additives. (See Second Am. Compl., at ¶¶ 2, 25-27, 48, 55, 67). Plaintiffs assert causes of action under the antitrust statutes of Arizona, [FN1] Tennessee, [FN2] and Vermont ("state antitrust claims"), [FN3] and under the common law theory of unjust enrichment. (Id., at ¶¶ 47-75).

II. Discussion

Defendants' motion to dismiss consists of three primary arguments. First, defendants argue that plaintiffs lack standing to bring their state antitrust claims; defendants reason that the Supreme Court's standing analysis in *Associated Gen. Contractors, Inc. v. California State Council of Carpenters, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)* (hereafter "*AGC* "), applies to plaintiffs' state antitrust

claims, and that the injury suffered by plaintiffs, as indirect purchasers, is to remote to satisfy this stand-ing analysis. (See Def. Br., at 4-15). Second, defend-ants argue that plaintiffs' antitrust claim under Ten-nessee law fails as a matter of law because plaintiffs' second amended complaint lacks factual allegations to indicate that Tennessee commerce was substan-tially impacted by defendants' conduct. (Id., at 15-17). Third, defendants argue that plaintiffs fail to state a claim for unjust enrichment under Arizona, Tennessee, and Vermont law for a variety of reasons, including the failure to allege a direct benefit, the failure to allege a causal relationship between the conferral of the benefit and the detriment to plaintiffs, and the derivative (if not parasitic) relationship between an unjust enrichment claim based upon anti-trust conduct and a state antitrust claim. (Id., at 18-22).

A. Characterization of Motion

[1][2][3] Defendants' motion to dismiss is properly styled a Rule 12(b)(6) motion to dismiss. See, e.g., *Maio v. Aetna, Inc., 221 F.3d 472, n. 7 (3d Cir.2000)* (treating motion to dismiss for lack of antitrust stand-ing as Rule 12(b)(6) motion); *In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 397-399 (3d Cir.2000)* (evaluating antitrust standing under Rule 12(b)(6) rubric). Under Rule 12(b)(6), defendants bear the burden of showing that no claim has been stated. See *Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir.1991)*. Thus, a Rule 12(b)(6) motion may be granted only when it is clear, after allocating the burden of proof, that plaintiff can prove no set of facts in support of the claim which would entitle her to relief. See *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); Robb v. City of Philadelphia, 733 F.2d 286, 290 (3d Cir.1984)*. In ap-plying this standard, this Court "must take all the well pleaded allegations as true, construe the complaint in the light most favorable to the plaintiff, and determ-ine whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief." *Col-burn v. Upper Darby Township, 838 F.2d 663, 665-66 (3d Cir.1988)*. However, this Court need not credit bald assertions or legal conclusions in deciding a motion to dismiss. See, e.g., *Morse v. Lower Merion School Dist., 132 F.3d 902, 907 (3d*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**B. State Antitrust Claims**

**\*2** Defendants contend that plaintiffs' claims under the AAA, the TTPA, and the VCFA fail as a matter of law for lack of prudential antitrust standing, based upon the Supreme Court's analysis in *AGC, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)*. (*See* Def. Br., at 4-15). Defendants also argue that plaintiffs' claim under the TTPA must be dismissed for the additional reason of failing to allege a substantial effect on Tennessee trade or commerce. (*Id.*, at 15-18).

**1. Standing**

[4][5][6] The question of whether a plaintiff has standing to bring a cause of action in federal court is a jurisdictional issue, a "threshold question in every federal case." *Warth v. Seldin, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)*. Standing to sue in federal court is a "federal question ." *Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 804, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985)*. The resolution of this federal question presents a different analysis than the question of whether a party has standing to sue in state court. *Id.* Thus, even when a federal court sits in diversity jurisdiction, a plaintiff must meet the federal standing requirement. *See, e.g., Wheeler v. Travelers Ins. Co., 22 F.3d 534, 537 (3d Cir.1994)*; *Federal Kemper Ins. Co. v. Rauscher, 807 F.2d 345, 352 (3d Cir.1987)* (noting that "question of justiciability" of claim under state law "is a federal issue to be determined only by federal law").

[7] The concept of standing is composed of constitutional and prudential considerations. To achieve standing, a plaintiff "must satisfy both the case and controversy requirements of Article III of the [United States] Constitution and certain prudential requirements ." *See, e.g., Wheeler, 22 F.3d at 537*.

**a. Constitutional Standing**

[8] The constitutional dimension of the standing doctrine ensures that a party has an actual "case or controversy" to meet the justiciability demands of Article III. To satisfy the constitutional requirements for standing, a plaintiff must allege: (1) injury in fact; (2)

a causal nexus between the injury and the challenged conduct; and (3) the likelihood that a favorable judicial decision will redress the injury. *See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)*; *Joint Stock Society v. UDV North America, Inc., 266 F.3d 164, 175 (3d Cir.2001)*. These requirements ensure that a plaintiff has a "personal stake" in the outcome of the proceedings. *See, e.g., Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 380-40, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)*.

[9] This Court finds that, when read in a light most favorable to plaintiffs, the allegations in plaintiffs' amended complaint meet the standard for constitutional standing, the " 'irreducible constitutional minimum' of standing." *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 484 (3d Cir.1998)*. Plaintiffs allege that they paid inflated prices for products with plastics additives due to an overcharge on plastics additives which was passed on to them from the intervening links within the distribution chain, that plaintiffs' overpayment for products containing plastics additives was caused by the conspiracy among defendants to charge inflated prices for plastics additives, and that judicial relief will compensate plaintiffs for these injuries, restoring plaintiffs to the position they were in prior to the price-fixing scheme. (*See* Second Am. Compl., at ¶¶ 1-2, 25-28, 47-72); *see, e.g., AGC, 459 U.S. at 535 n. 31* (distinguishing between prudential and constitutional standing requirements and noting that any harm to the antitrust plaintiff "is sufficient to satisfy the constitutional standing requirement of injury in fact"). Tellingly, defendants do not assert that plaintiffs lack constitutional standing, but, instead, limit their argument in favor of dismissal to plaintiffs' failure to meet prudential standing considerations.

**b. Prudential Standing**

**\*3** [10] The doctrine of prudential standing augments the constitutional dimensions of standing in federal court. Prudential standing consists of " 'a set of judge-made rules forming an integral part of judicial self-government." ' *See, e.g., Joint Stock Soc'y v. UDV North America, Inc., 266 F.3d 164, 179 (3d Cir.2001)*. These rules are indented to "avoid decid-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ing questions of broad social import where no indi- vidual rights would be vindicated and to limit access to the federal courts to those litigants best suited to assert a particular claim." *Shutts,* 472 U.S. at 804.

[11] Of paramount importance in performing a prudential standing analysis is the source of create the plaintiff's claim to relief, as the "standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's posi- tion a right to judicial relief." *Warth v. Seldin,* 422 U.S. 490, 500- 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Indicative of this interconnectedness between the source of plaintiff's cause of action and principles of prudential standing, the Supreme Court has ac- knowledged that a particular statutory enactment may abrogate these principles by prescribing an express right of action for certain persons. *Id.* at 501. In other words, prudential standing considerations, which serve to limit a court's role in resolving public dis- putes, determine whether a particular plaintiff can sue under a particular statutory or constitutional provi- sion, based in part upon the language of this provi- sion. *Id.* at 500-501.

i. Background

In order to determine the appropriate standard to ap- ply to determine whether federal prudential standing considerations permit plaintiffs to sue in federal court under the state antitrust statutes, the Court must briefly discuss the test for prudential antitrust stand- ing under the federal antitrust statutes, the Sherman Act, 15 U.S.C. §§ 1-7, and the Clayton Act, 15 U.S.C. §§ 12-27.

In *Illinois Brick v. Illinois,* the Supreme Court con- cluded that, as a matter of law, indirect purchasers of price-fixed products do not suffer "injury" within the meaning of § 4 of the Clayton Act, which gives dis- trict courts jurisdiction to "prevent and restrain viola- tions of [the Sherman Act]," including agreements among competitors to restrain trade. 431 U.S. 720, 728- 729, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). The Supreme Court decision was based primarily upon policy considerations. *Id.; see AGC,* 459 U.S. at 529 (noting that literal reading of § 4 of Clayton Act "is

broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation"). The *Illinois Brick* Court reasoned that permitting indirect purchasers to assert a cause of action under federal antitrust statutes based upon the passing-on of the overcharge to each link in the chain of manufacture or distribution would create an array of administrative, procedural, and substant- ive burdens, including, *inter alia,* a risk of multiple liability for defendants, hopelessly complex damages calculations requiring the apportionment of the over- charge among all potential plaintiffs--from whole- salers to middlemen to retailers to the ultimate pur- chaser--within the various distribution chains, and an increase in the costs of antitrust litigation with a con- comitant reduction in the amount of recovery to each plaintiff. *Id.* at 730-732, 737-744. These con- sequences, according to the Supreme Court, would deter the effective enforcement of federal antitrust laws. *Id.* at 741.

**\*4** [12] Following *Illinois Brick,* the Supreme Court further limited the class of persons who can sue under federal antitrust law by crafting a test to determine prudential standing for those plaintiffs, now limited (with respect to monetary damages) to direct pur- chasers, [FN4] whose allegations fall within the liter- al scope of the federal antitrust statutes. In *AGC,* the Supreme Court identified an array of factors that courts must consider in determining whether a party has suffered an injury *too remote* to bring a cause of action for damages under the Sherman Act and the Clayton Act: (1) the causal connection between the antitrust violation and the harm to the plaintiff, and the defendant's intent to cause the harm; (2) whether the nature of plaintiff's alleged injury is of the type that the antitrust statutes were intended to remedy; (3) the directness or indirectness of the alleged in- jury; (4) the existence of more direct victims of the alleged antitrust violations; (5) the potential for du- plicative recovery; and (6) the danger of complex and/or speculative apportionment of damages. *AGC,* 459 U.S. at 537-45; *City of Pittsburgh v. West Penn Power Comp.,* 147 F.3d 256, 264 (3d Cir.1998) (applying ACG factors and characterizing ACG test as "prudential" standing analysis). The *AGC* test has been "regularly and consistently applied as the pas-

sageway through which [federal] antitrust plaintiffs must advance ." *West Penn Power Comp., 147 F.3d at 264.*

ii. Relevance of *AGC* Factors to Existence of Prudential Standing for State Antitrust Claims

[13] This Court finds that a court sitting in diversity jurisdiction need not apply federal case law concerning prudential antitrust standing to determine whether a party has standing to assert a cause of action under a state antitrust statute. Instead, to determine whether a diversity plaintiff possesses federal prudential standing to bring a claim under a state antitrust statute, this Court looks to the treatment of standing under the relevant state antitrust statutes.

Several reasons support this approach. First, because the concept of prudential standing in the antitrust context is intertwined with the substantive content of and intent behind the particular statute authorizing the cause of action, the standing requirements of the Vermont, Tennessee, and Arizona antitrust statutes, which recognize indirect purchaser claims, should be the guide for determining whether prudential considerations permit a plaintiff to sue under these statutes, as opposed to those requirements engrafted by federal case law onto federal antitrust statutes, which do not recognize indirect purchaser claims. *See, e.g., Warth, 422 U.S. at 500* (prudential standing "often turns on the nature and source of claim asserted"). Indeed, the opposite approach carries the potential to disrupt the governmental power equilibrium upon which the federal system operates; the federal judiciary would be entitled to disregard the intent of the state legislature, as reflected in the literal language of the state antitrust statute, by applying federal, judicially-fashioned principles of practicality, now detached from their federal statutory moorings, to determine whether a particular plaintiff is a "worthy" or "proper" candidate to sue under state law in a diversity action. [FN5] *See, e.g., California v. ARC America Corp., 490 U.S. 93, 103, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989)* (noting that it is inappropriate to consider congressional policies that defined remedies available under federal antitrust law in determining "what federal law allows States to do under their own antitrust law," including who may recover under state antitrust stat-

utes). This approach of deferring to state standing principles as the basis for federal prudential standing under a state antitrust statute appears consistent with the methodology of the majority of courts addressing this issue. *See, e.g., Joint Stock Society, 266 F.3d at 179* (looking to Delaware case law to determine whether standing exists under the Delaware Uniform Trade Practices Act, rather than automatically applying *AGC* factors); *Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 987 (9th Cir.2000)* (applying state law principles of antitrust standing, which is broader than antitrust standing under federal law, to determine whether plaintiff milk producers could bring claim under California antitrust statute against cheese makers for depressing prices for milk); *Metropolitan Express Serv., Inc. v. City of Kansas City, Missouri, 23 F.3d 1367, 1369 (8th Cir.1994)* (holding that in a diversity case, court will not address plaintiff's claims unless plaintiff has standing to sue under state law and meets Article III case or controversy requirement); *In re Napster, Inc. Copyright Litig., 354 F.Supp.2d 1113, 1125 (N.D.Cal.2005)* (looking to California case law to determine whether standing exists for indirect purchaser under California's Cartwright Act, which prohibits agreements in restraint of trade). It also comports with critical commentary. *See, e.g.,* 13A Charles Wright & Arthur Miller, Federal Practice and Procedure § 3531.14, at 90-91 (2d ed.1984) ("federal courts have stated that state law of standing should be applied as to state rights ..., whether the state question arises in an original diversity action, on removal from state court, or as a matter of ancillary jurisdiction"). [FN6] Finally, the Court notes that defendants do not argue that the Court is required, through the doctrine of *stare decisis,* to apply the *AGC* factors as the standard for federal prudential standing in all antitrust cases, whether brought under a state or federal statute; instead, defendants argue that the *AGC* analysis applies to "state law standing" in part because the three alleged class jurisdictions have adopted this analysis for their state antitrust statutes. (*See* Def. Br., at 6).

*5 In summary, the Court finds that it need not use the *AGC* factors as the framework for analyzing whether federal prudential considerations permit standing under the Vermont, Tennessee, and Arizona

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

antitrust statutes, unless relevant state law adopts these factors. Phrased differently, the state rules of antitrust standing determine whether a plaintiff suing under a state antitrust statute enjoys federal prudential standing in a diversity action.

iii. Standing Under Tennessee, Arizona, and Vermont Antitrust Statutes

Defendants present the following syllogistic logic to justify dismissal. First, although defendants properly acknowledge that the Supreme Courts of Tennessee, Arizona, and Vermont have interpreted their respective antitrust statutes as permitting antitrust claims by indirect purchasers of goods or services, defendants nonetheless argue that the question of whether an indirect purchaser may bring a claim under the text of a relevant antitrust statute, which examines whether indirect purchasers can ever suffer a statutorily cognizable injury, is distinct from the question of whether the alleged injury is too remote to confer prudential antitrust standing, which examines the relationship between the injury and the cause of action. (*See* Def. Br., at 2- 6). [FN7] Defendants then contend that Tennessee, Arizona, and Vermont law require application of the *AGC* test to determine whether an indirect purchaser plaintiff has standing to pursue an antitrust claim under state law. (*Id.,* at 6, 11, 14-15). Finally, applying the *AGC* analysis, defendants contend that each *AGC* factor militates in favor of denying standing to the instant plaintiffs. (*Id.,* at 8-11).

To determine the validity of defendants' logic, the Court must evaluate the standing limitations associated with each state antitrust statute. This requires an inquiry into the text of the relevant state antitrust statute, the judicial decisions determining who may sue under these statutes, including the treatment of federal precedent regarding standing for violations of the Sherman Act and the Clayton Act, and the reasoning behind these decisions.

(a) Arizona Antitrust Act

(i) Standard

The Arizona Antitrust Act ("AAA") permits any "person threatened with injury or injured in his business or property" to sue for redress of a violation of the statute. A.R.S. § 44-1408(b). The statute defines "person" as an "individual, corporation, business trust, partnership, association or any other legal entity." *Id.* § 44-1401. The statute contains a federal guidance clause, which states that it is "the intent of the legislature that in construing this article, the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes." *Id.* § 44-1412.

The Arizona Supreme Court recently analyzed the issue of standing to sue under the AAA. In *Bunker's Glass Co. v. Pilkington, PLC,* the Arizona Supreme Court rejected the logic of *Illinois Brick* and concluded that an indirect purchaser of goods and services has standing to sue under the AAA. 206 Ariz. 9, 75 P.3d 99, 102 (Ariz.2003). The Court reasoned that the broad language of the statute permits an indirect purchaser suit, and noted that the Court must defer to the legislature, not the federal courts, to create limitations on the scope of a statutory right of action. *Id.* at 103, 107. The Court also reasoned that § 44-1412 renders the use of federal precedent permissive, rather than mandatory, and that, to the extent uniformity is desired, this uniformity extends only to the standard of conduct required, rather than "procedural matters such as who may bring an action for injuries caused by violations of the standard of conduct." *Id.* at 103, 106. Furthermore, the Court rejected as unsubstantiated the fears that motivated the Supreme Court's decision in *Illinois Brick* to limit antitrust actions under federal law to direct purchasers, including the complexity of proving damages, the risk of multiple liability, and the evisceration of the incentive for direct purchasers and victims in general to bring antitrust suits. *Id.* at 107, 109. Finally, while noting that a plaintiff must be able to prove actual or threatened injury that is not too remote to generate prudential standing to proceed on a federal antitrust claim in federal court, [FN8] the *Pilkington* Court never expressed an intention to adopt this federal standing analysis for the AAA, and, in fact, appeared to distance Arizona law from federal considerations of standing in the antitrust context, expressly deciding to "follow the command of our constitution and afford greater protection to Arizona citizens by allowing them to attempt to prove" their antitrust claims

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 3921865                                                                        Page 11
---- F.Supp.2d ----, 2006 WL 3921865 (E.D.Pa.), 2006-2 Trade Cases P 75,514
**(Cite as: 2006 WL 3921865 (E.D.Pa.))**

through litigation rather than being "barred at the courthouse door." *Id.* at 110.

**\*6** Despite the Arizona Supreme Court's liberalization of standing principles for plaintiffs suing under the AAA, an unpublished Arizona Superior Court decision recently applied a virtually unmodified version of the *AGC* test to determine whether an antitrust plaintiff's injuries were too remote to confer standing under the AAA. *See Luscher v. Bayer AG,* No. CV-2004-014835 (Ariz.Super. Ct. Maricopa Cty. Sept. 14, 2005). The *Luscher* Court cited the federal guidance clause in the AAA as its lone justification for relying upon the *AGC* analysis. *Id.*

[14] Notwithstanding the *Luscher* decision, this Court predicts that the Arizona Supreme Court would apply its traditional standing approach, rather than an *AGC* analysis, to determine whether an indirect purchaser has standing to pursue a claim under the AAA. Several reasons support this conclusion. First, *Pilkington* clearly represents the Arizona Supreme Court's hostile view not only towards the judicial erection of insurmountable standing barriers to claims under the AAA, in derogation of the legislative intent of the statute, but also towards the adoption of federal precedent to craft such barriers. *See Pilkington,* 75 P.3d at 107. Second, the AAA does not possess a mandatory harmonization clause requiring uniformity between federal and state antitrust precedent, and, furthermore, the permissive harmonization clause in the AAA has been interpreted as applying to substantive issues, rather than to procedural questions of standing. *See* A.R.S. § 44-1412; *Pilkington,* 75 P.3d at 106. Third, defendants fail to provide this Court with any decision from an intermediate appellate court in Arizona suggesting that the Arizona Supreme Court would apply an *AGC* analysis to determine standing under the AAA. *See, e.g., Paolella v. Browning-Ferris,* 158 F.3d 193, 189 (3d Cir.1998) (federal court sitting in diversity must predict how state's highest court would resolve issue and, in absence of definitive statement from highest court, district court may consider decisions from state appellate courts). Fourth, many of the considerations which motivated the Supreme Court to adopt the *AGC* analysis, including, *inter alia,* the avoidance of speculative and complex damages calculations, the

prevention of duplicative recoveries, and the remediation of antitrust violations by those persons with the strongest motivation to pursue such claims, were rejected by the *Pilkington* Court as exaggerated, or at the very least, as subordinate to the more important objective of courthouse access for indirect purchasers of price-fixed products.

[15][16] Under Arizona law, the question of standing involves only principles of "judicial restraint," as there is no counterpart to the "case or controversy" requirement of the federal constitution. *See, e.g., State v. B Bar Enter.,* 133 Ariz. 99, 649 P.2d 978, 980 n. 2 (Ariz.1982). A litigant suing under a state statute possesses standing when the plaintiff sustains an injury in fact that is distinct and palpable, thereby giving the plaintiff a personal interest in the outcome of the controversy. *See, e.g., Armory Park Neighborhood Assoc. v. Episcopal Community Serv. In Arizona,* 148 Ariz. 1, 712 P.2d 914, 919 (Ariz.1985); *Aegis of Arizona v. Town of Marana,* 206 Ariz. 557, 81 P.3d 1016, 1021-1022 (Ariz.Ct.App.2004). This requirement is not rigorous; it is only meant to guarantee that courts "do not issue mere advisory opinions, that the case is not moot and that the issues will be fully developed by true adversaries." *Armory Park Neighborhood Assoc.,* 712 P.2d at 919.

(ii) Application

**\*7** [17] This Court finds that, accepting the allegations in the amended complaint as true, plaintiffs satisfy federal prudential considerations of standing because they would have standing to pursue their claim under the AAA in state court. For instance, as purchasers of products containing plastics additives, plaintiffs clearly possess an interest in the outcome of the litigation. (*See* Second Am. Compl., at ¶¶ 1, 34). Furthermore, plaintiffs have alleged an injury that is distinct and palpable, the amount of the overcharge that was passed-on to plaintiffs due to defendants' alleged price-fixing conspiracy. (*Id.,* at ¶¶ 49, 61, 68). These allegations comport with the standing requirements of Arizona law, and, in accordance with the teachings of *Pilkington,* plaintiffs satisfy federal prudential requirements of standing to bring a claim in federal court under the AAA.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2006 WL 3921865 (E.D.Pa.), 2006-2 Trade Cases P 75,514
**(Cite as: 2006 WL 3921865 (E.D.Pa.))**

(b) Tennessee Trade Practices Act

(i) Standard

The Tennessee Trade Practices Act ("TTPA") prohibits anti-competitive arrangements which tend to lessen "full and free competition in the importation or sale of articles imported into this state ... or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product ...." Tenn.Code Ann. § 47-25-101. The TTPA provides a civil remedy to "any person who is injured or damaged by any such arrangement." *Id.* § 47-25-106. The TTPA does not contain a clause requiring or permitting courts to interpret the TTPA consistent with federal law.

The Supreme Court of Tennessee recently declared that indirect purchasers of articles may bring a private action under the TTPA. *See, e.g., Freeman Indus. v. Eastman Chemical Co., 172 S.W.3d 512, 520 (Tenn.2005).* The *Freeman* Court first reasoned that the plain language of the statute provides a private right of action to indirect purchasers. *Id.* at 517-518. The Court then reasoned that, unlike other state antitrust statutes, the TTPA lacks a mandatory harmonization clause requiring consistency between interpretations of the TTPA and interpretations of federal antitrust statutes. *Id.* at 519. Finally, the Court rejected the concerns that motivated the United States Supreme Court to interpret the Clayton Act and Sherman Act as precluding all indirect purchaser claims, explaining that indirect purchasers are frequently the "real victims of the antitrust violations," that courts are competent to handle the risk of multiple liability and recovery under the TTPA, and that justice should not be defeated by the speculative risk of complex damages assessments. *Id.* at 520.

[18] This Court predicts that the Supreme Court of Tennessee, based upon the *Freeman* decision, would apply traditional standing requirements rather than the *AGC* analysis to determine whether the injuries suffered by an indirect purchaser are too remote to confer standing under the TTPA. Several reasons support this conclusion. First, the TTPA does not contain a harmonization clause requiring cohesion between interpretations of federal and state law. *See Freeman,* 172

S.W.3d at 519. Second, imposing a strict standing requirement would undermine many of the goals that the TTPA sought to achieve, including affording a remedy to indirect purchasers, that class of persons the Tennessee Supreme Court has deemed the "real victims" of antitrust conduct. *Id.* at 520. Third, the *Freeman* Court rejected as unfounded many of the fears that motivated the Supreme Court in *AGC* and *Illinois Brick* to craft judicial standing limitations on who may sue under federal antitrust law. *Id.* Fourth, defendants present no Tennessee decision suggesting that the standing analysis of *AGC* would be superimposed upon the TTPA to determine whether an indirect purchaser can proceed with litigation.

**\*8** [19] A party has standing to sue under Tennessee law when she meets the minimum constitutional requirements of standing under federal law. *See, e.g., In re Petition of Youngblood, 895 S.W.2d 322, 326 (Tenn.1995)* (adopting federal constitutional standard); *Cox v. Shell Oil Co., 196 S.W.3d 747, 2005 WL 2860249, at \*9 (Tenn.Ct.App. Oct.31, 2005)* (state law standing "parallels the constitutional restriction on federal court jurisdiction to 'cases and controversies' "). In other words, a party suing under a Tennessee statute must demonstrate that she has sustained a distinct and palpable injury, that the injury was caused by the challenged conduct, and that the injury is capable of being redressed by a judicial remedy. *See, e.g., Metro. Air Research Testing Auth., Inc. v. Metro. Gov't, 842 S.W.2d 611, 615 (Tenn.Ct.App.1992).*

(ii) Application

[20] Because this Court has already determined that plaintiffs satisfy principles of constitutional standing, plaintiffs also satisfy principles of standing under Tennessee law, including, absent direction from a Tennessee appellate court otherwise, under the TTPA. Principles of federal prudential standing therefore do not bar this Court from hearing plaintiffs' claim under the TTPA.

(c) Vermont Consumer Fraud Act

(i) Standard

[21] The Vermont Consumer Fraud Act ("VCFA")

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

prohibits unfair and deceptive methods of competition in commerce. 9 V.S.A. § 2453(a). The VCFA provides a private remedy for "any consumer who ... sustains damages or injury as a result of any false or fraudulent representations or practices prohibited by section 2453 of this title." Id. § 2461(b). In 2000, the Vermont legislature passed an amendment to the VCFA clarifying the right of any "person" to recover for damages or injury sustained as a result of any violation of state antitrust laws, including § 2453(a), regardless of whether the person dealt directly with the defendants. Id. § 2465(b). The purpose behind § 2465(b) is to clarify the right of an indirect purchaser to obtain recovery for a violation of the state antitrust law. See, e.g., Elkins v. Microsoft Corp., 174 Vt. 328, 817 A.2d 9, 17 (Vt.2001). Construction of § 2453(a) must be guided by the "construction of similar terms contained in section 5(a)(1) of the Federal Trade Commission Act as from time to time amended by the Federal Trade Commission and the courts of the United States." Id. § 2453(b).

Although the 2000 amendment to the VCFA expressly authorized indirect purchaser antitrust actions, the Vermont Supreme Court has interpreted the VCFA as providing a cause of action for indirect purchasers of products subject to unfair competition prior to the 2000 amendment. See Elkins v. Microsoft Corp., 817 A.2d at 20. In reaching this conclusion, the Elkins Court privileged the clear language of the statute, which allows suits by "any consumer" against any "violator" without an interpolative privity requirement. Id. at 13. The Elkins Court then found that the legislative intent behind the VCFA, which confers "as broad as reach as possible in order to best protect consumers against unfair trade practices," elides any distinction between direct and indirect purchasers. Id. Moreover, the Elkins Court interpreted the 2000 amendment not as prescribing a new cause of action, but as clarifying the preexisting right of indirect purchasers to recover for a violation of the VCFA. Id. at 17. Finally, the Elkins Court provided a detailed analysis of why the harmony clause in § 2453(b) renders inapplicable federal court decisions interpreting federal antitrust statutes, including the Clayton Act and Sherman Act, to the construction of the VCFA. Id. at 16-17.

*9 Two decisions by the Superior Court of Chittenden County, Vermont recently applied the AGC factors to determine whether an antitrust defendant possesses standing to bring a claim under the VCFA, at least to the extent that these factors are consistent with allowing indirect purchaser standing. See, e.g., Fucile v. VISA U.S.A. Inc., 2004 WL 3030037, at *2 (Vt.Super.Ct. Dec. 27, 2004); Investors Corp. of Vermont v. Bayer AG, Doc. No. S1011-04-CnC (June 1, 2005). The Fucile Court reasoned that because the AGC factors help determine whether a case or controversy exists under Article III of the Constitution, and that because the Vermont Supreme Court has adopted constitutional principles of standing in other contexts, the Vermont Supreme Court would apply the AGC factors to determine a party's standing under the VCFA. Fucile, 2004 WL 3030037, at *3. The Bayer Court relied without scrutiny upon the methodology in Fucile. See Bayer, Doc. No. S1011-04- CnC, at *3 (applying AGC analysis based upon Fucile precedent).

This Court cannot conclude as a matter of law that the Vermont Supreme Court would adopt the AGC factors for determining standing under the VCFA. Several reasons support this analysis. First, the harmonization clause in the VCFA does not require consistency between construction of the VCFA and construction of the Clayton Act and Sherman Act. See Elkins, 817 A.2d at 17. In fact, the Vermont Supreme Court expressly rejected the argument "that the definition of who may sue under the Act [VCFA] must be consistent with the definition of who may sue under federal antitrust law." Id. Second, imposing an AGC analysis on the VCFA would severely limit the number of indirect purchasers who can bring suit under the statutory scheme, thereby rewriting the language of the 2000 amendment to the VCFA and undermining the VCFA's overarching remedial goal of reaching as broadly as possible to best protect consumers against antitrust violations. Id. at 13. Third, defendants present no appellate court decision applying the AGC test to determine antitrust standing under the VCFA. Finally, the Court rejects as flawed the rationale provided by the Fucile Court for applying the AGC antitrust standing analysis: the AGC analysis, a gauge for determining prudential standing under fed-

eral antitrust statutes, is distinct from the inquiry into standing under Article III of the Constitution; and, although the Vermont Supreme Court applies the test for constitutional standing in other contexts, it has yet to apply the *AGC* factors to determine prudential standing under any state statute.

[22] Because this Court cannot determine as a matter of law that the Vermont Supreme Court would conduct an *AGC* analysis to determine standing under the VCFA, the Court applies traditional Vermont standing principles. The Vermont Supreme Court has adopted, in general, the constitutional and prudential components of the federal standing doctrine. *See Schievella v. Dep't of Taxes*, 171 Vt. 591, 765 A.2d 479, 481 (Vt.2000). The first prong of this test is identical to the case-or-controversy analysis under the federal Constitution. *See, e.g., Bringham v. State*, 889 A.2d 715, 719, 721 (Vt.2005) ("Vermont has adopted the case-or-controversy requirement"); *Agency of Natural Resources v. United States Fire Ins. Co.*, 173 Vt. 302, 796 A.2d 476, 479 (2001) (noting that Vermont has adopted case-or-controversy requirement in which plaintiffs, to have standing, must have suffered particular injury that is attributable to defendant and court must be capable of redressing injury). The second prong of this test–the prudential element of standing–evaluates whether plaintiff is raising another person's legal rights, whether plaintiff asserts a general grievance, and whether plaintiff's claims fall within the "zone of interest" protected by the invoked law. *See Hinesburg Sand & Gravel Co., Inc. v. State*, 166 Vt. 337, 693 A.2d 1045, 1048 (Vt.1997).

(ii) Application

**\*10** [23] Plaintiffs satisfy the constitutional elements of standing. Furthermore, it is clear that plaintiffs' indirect purchaser claim falls within the "zone of interest" protected by the VCFA, which was amended in 2000 to permit such causes of action, and that plaintiffs' desire for damages based upon passed-on overcharges is not a general grievance. Accordingly, this Court finds that plaintiffs meet general standing requirements under Vermont law to bring a claim under the VCFA, and, therefore, that plaintiffs satisfy prudential federal standing considerations for the

VCFA claim in this diversity action.

iii. *AGC* Analysis

[24] Assuming *arguendo* that the *AGC* factors applied to determine federal prudential standing for plaintiffs' state antitrust claims, this Court finds that defendants have failed to meet their burden of demonstrating at the motion to dismiss phase that these factors do not confer standing as a matter of law.

(a) Causal Connection and Improper Motive

Plaintiffs allege that they purchased and paid significantly more for products containing plastic additives as a result of defendants' price-fixing conspiracy. (*See* Second Am. Compl., at ¶¶ 1, 25, 40, 49, 53, 61, 70, 72). Plaintiffs further allege an improper motive on the part of defendants in engaging in price-fixing activities and in concealing these activities. (*Id.*, at ¶¶ 25-27, 32-33). Furthermore, although facts external to the complaint, such as the percentage of plastic additives in the products plaintiffs purchased, carry the potential to impact the causation analysis, these facts are irrelevant to the resolution of defendants' motion to dismiss, which relies entirely upon what the complaint states. *See In re Warfarin Sodium Antitrust Litig.*, 214 F.3d at 399 (reversing district court's finding of no antitrust standing for indirect purchaser at motion to dismiss stage because district court improperly relied upon facts outside allegations); *Bayer AG*, Doc. No. S1011-04 CnC, at \*4 (causation factor of standing analysis for claim under VCFA satisfied at motion to dismiss phase because external facts render court better suited to assess causation at class certification and summary judgment stages); *Crouch v. Crompton Corp.*, 2004 WL 2414027, at \*24 (N.C Super. Ct. Oct. 28, 2004) (identifying facts relevant to resolution of *AGC* causation analysis for indirect purchasers under state antitrust statute). Accordingly, the Court finds at this juncture that a sufficient causal nexus exists between the injury and defendants' allegedly anti-competitive behavior. *See, e.g., Kraft Foods, Inc.*, 232 F.3d at 989 (finding sufficient causation and direct injury to confer antitrust standing under state antitrust statute in part because "disputed claims of causation and injury cannot be decided on a

Case 1:05-cv-00485-JJF     Document 294-3     Filed 02/28/2007     Page 16 of 61

2006 WL 3921865                                                                          Page 15
--- F.Supp.2d ----, 2006 WL 3921865 (E.D.Pa.), 2006-2 Trade Cases P 75,514
**(Cite as: 2006 WL 3921865 (E.D.Pa.))**

Rule 12(b)(6) motion").

(b) Nature of Injury in Relation to Purpose of Anti-trust Statutes

Although plaintiffs allege that they purchased products containing plastics additives, and, by implication, that they are members of a secondary market of products indirectly influenced by the artificial pricing of the plastics additives market, the Supreme Courts of Arizona, Vermont, and Tennessee have declared respectively that the intent of the AAA, the TTPA, and the VCFA was to provide redress to indirect purchasers who purchase from retailers a product subject to a price-fixing conspiracy. *See, e.g., Pilkington,* 75 P.3d at 102, 105 n. 3 (noting Arizona legislature's intent to allow indirect purchasers to sue and refusing to distinguish between forms of indirect purchaser suits allowed); *Freeman,* 172 S.W.3d at 518 (reading TTPA as permitting an indirect purchaser to "recover from the antitrust violator the amount of the overcharge that the direct purchaser passed on to the indirect purchaser"); *Elkins,* 817 A.2d at 13 ("The Legislature clearly intended the VCFA to have as broad a reach as possible in order to best protect consumers against unfair trade practices."). There is no indication that the AAA, the TTPA, and the VCFA were enacted to provide remedies to certain types of indirect purchasers, such as those who participate in the immediate market subject to the price-fixing conspiracy, but not to other categories of indirect purchasers which function at a lower level in the distribution chain, such as end consumers who purchase products containing an ingredient subject to the price-fixing conspiracy. In other words, if plaintiffs can show that the unlawful increase in the price of plastics additives affected the cost of the products they purchased, regardless of whether plaintiffs participated in the immediate market for plastics additives or the secondary market for products with plastics additives, the AAA, the TTPA, and the VCFA would appear to contemplate recovery. *See, e.g., Bayer AG, Doc. No. S1011-04 CnC,* at *5. This factor therefore weighs in favor of standing.

(c) Directness of Injury

**\*11** Although plaintiffs are purchasers of products

containing plastic additives, which is the subject of the antitrust restraint, plaintiffs' amended complaint, when read in a light most favorable to plaintiffs, suggests that plaintiffs have suffered the greatest, if not the most direct, injury of the alleged antitrust conspiracy. (*See* Second Am. Compl., at ¶¶ 49, 51, 53, 60, 70). For instance, plaintiffs allege that they paid an inflated price for plastics additives due to defendants' price-fixing agreement, thereby implying that the direct harm of the price-fixing conspiracy was passed through the stream of commerce to them, purchasers of products containing plastics additives. *See Pilkington,* 75 P.3d at 109 n. 9 (indirect purchasers are often "the truly injured party" due to passage of overcharges along chain of distribution); *Freeman,* 172 S.W.3d at 520 (indirect purchaser who ultimately paid overcharge is "real" victim of antitrust violation). Indeed, defendants concede that plaintiffs allege that they were harmed when direct purchasers of plastic additives "passed on, in the form of increased prices for unspecified goods manufactured with or containing 'Plastic Additives,' some or *all* of the increase in their costs of doing business." (*See* Def. Br., at 9) (emphasis added). To the extent that defendants challenge the veracity of these allegations, the discovery process is necessary to develop an array of factual issues that bear upon the directness of the plaintiffs' injury, such as plaintiffs' positioning within the chain of distribution of plastics additives, the structure of the distribution chain, the degree to which the artificially increased portion of the price of plastics additives was passed along the distribution chain or absorbed by more direct purchasers, and the impact of intra- and extra-market factors on the price of products containing plastics additives. *See Crouch,* 2004 WL 2414027, at *19, 24; *see also In re Warfarin in Sodium Antitrust Litig.,* 214 F.3d at 398 (reversing dismissal of federal antitrust claims for lack of antitrust standing because district court impermissibly relied upon facts beyond allegations in complaints). Accordingly, accepting the allegations in the complaint as true, the Court finds that the directness of the injury prong weighs in favor of standing.

(d) More Direct Purchasers

There are clearly more direct victims of the alleged price-fixing conspiracy. However, this factor loses

2006 WL 3921865                                                                Page 16
--- F.Supp.2d ----, 2006 WL 3921865 (E.D.Pa.), 2006-2 Trade Cases P 75,514
(Cite as: 2006 WL 3921865 (E.D.Pa.))

relevance when applied to antitrust statutes that permit indirect purchaser claims, which, by definition, necessarily presuppose the existence of more direct purchasers. Put differently, the strict application of this factor, in the context of indirect purchasers, would always caution against standing, an outcome incompatible with the purpose of *Illinois Brick* repealer statutes, like the AAA, TTPA, and the VCFA. Furthermore, to the extent that this factor should be modified to evaluate the existence of other indirect purchasers with a more direct link to the price-fixing conspiracy, this Court lacks the necessary facts to perform this evaluation, such as information regarding the various chains of distribution of plastics additives, the links that comprise these chains, plaintiffs' positioning within this network, the absorption and passing-on pattern for each entity in this network, and the range of other possible influences on the price of plastics additives. *See Couch, 2004 WL 2414027, at *19.* This factor therefore does not mandate dismissal at this procedural stage in this litigation.

(e) Speculative Nature and Complexity of Damages

*12 This Court, following the respective analytical underpinnings of the *Pilkington, Freeman,* and *Elkins* decisions, refuses to find as a matter of law that damages to indirect purchasers under the AAA, the TTPA, and the VCFA are *per se* too speculative or too tenuously connected to the alleged wrongdoing to confer antitrust standing. Nor is this Court able to conclude as a matter of law at the motion to dismiss stage that a determination of the existence and amount of any overcharge suffered by the instant plaintiffs requires inappropriate guesswork or unmanageably complex analyses, particularly without the benefit of any discovery or expert testimony. *See, e.g., Mendoza v. Zirkle Fruit Co., 301 F.3d 1163, 1171 (9th Cir.2002)* (refusing to find damages too speculative at motion to dismiss stage because antitrust plaintiffs must be afforded opportunity to evidence to support allegation at later stage in proceedings); *Crouch, 2004 WL 2414027, at *25* (noting that there "may well be occasions on which the Court should defer a standing determination until there has been far ranging discovery and expert evidence produced on pass through and allocation"). The Court

also notes that defendants have failed to articulate, with specificity, why the measurement of plaintiffs' damages would be unascertainable and why this Court would lack the capacity to scrutinize the evidence and resolve complex issues of damages apportionment. Accordingly, this factor does not weigh in favor of dismissal for lack of antitrust standing at this point in the proceedings.

(f) Duplicate Recovery

Defendants argue that any damages awarded to indirect purchasers of plastics additives would duplicate the recovery by direct purchasers of plastics additives, which are currently pursuing class action litigation against defendants under the Sherman Act. (*See* Def. Br., at 10). Again, this factor proves inapposite when used to determine standing under state antitrust statutes that permit indirect purchaser claims, which necessarily presuppose the possibility of recovery, and the apportionment of damages for injuries actually incurred, among direct purchasers and a range of indirect purchasers based upon proof of the passage of the artificially inflated cost of plastics additives. Nor have defendants presented any argument as to why the existence of a direct purchaser claim against defendants under the Sherman Act should influence whether indirect purchasers have antitrust standing under state antitrust claims. *See, e.g., ARC America Corp., 490 U.S. at 105* (finding that states may adopt state antitrust statutes with broader scope than federal counterparts in part because absence of federal policy against states imposing liability through state antitrust statutes in addition to that imposed by federal law through federal antitrust statutes and because state statutes cannot affect remedies available under federal law); *Crouch, 2004 WL 2414027, at *19, 24* (suggesting relevant inquiry with respect to this factor should be existence of double recovery on state claim). Moreover, it would be presumptive for this Court to find at this early stage in the proceedings, prior to discovery, that plaintiffs will be unable to present a reliable method of identifying the effects of the price fixing, including the degree of absorption of the price increase, among those participants in the distribution chain or chains. Accordingly, at this juncture, this factor weighs in favor of standing.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(g) Conclusion

**\*13** In summary, assuming *arguendo* the applicabil-
ity of the *AGC* factors to claims under the AAA, the
TTPA, and the VCFA, the Court finds that the allega-
tions in the complaint satisfy each of the *AGC* factors
at the motion to dismiss stage. An antithetical ruling
not only would require the Court to impermissibly
rely on facts external to the pleadings, but also would
deprive plaintiffs of the opportunity to discover and
to confirm such facts through the discovery process.

2. Allegations of TTPA Violation

Defendants also argue that plaintiffs' claim under the
TTPA should be dismissed for failing to allege that
defendants' anti-competitive behavior produced a
substantial effect on Tennessee commerce. (*See* Def.
Br., at 15-18).

[25] To state a claim under the TTPA, a plaintiff
must allege, *inter alia,* that the "alleged anti-
competitive conduct affects Tennessee trade or com-
merce to a substantial degree." *See Freeman, 172
S.W.3d at 523.* In *Freeman,* the Tennessee Supreme
Court held that an out-of-state plaintiff which pur-
chased food products containing sorbates, the subject
of the price-fixing conspiracy, failed to allege facts to
suggest a substantial effect on Tennessee commerce.
*Id.* at 524. Although plaintiff alleged that a co-
defendant, from its principal place of business in
Tennessee, conspired to fix the price of sorbates and
to take orders and implement sales of sorbates to dir-
ect customers at supra-competitive prices, plaintiff
never alleged that it purchased sorbates from this co-
defendant, the lone defendant with ties to Tennessee.
*Id.* The *Freeman* Court therefore affirmed the trial
court's dismissal of plaintiff's TTPA claim. *Id.*

[26] In contrast to the situation in *Freeman,* the alleg-
ations in plaintiffs' second amended complaint clearly
meet the "substantial effects" standard. Plaintiff Dav-
id Pearlman, unlike the out-of-state plaintiff in *Free-
man,* is a Tennessee resident who indirectly pur-
chased plastics additives. (*Id.,* at ¶ 5). Each defendant
is alleged to have manufactured, marketed, and sold
plastics additives in Tennessee during the proposed
class period. (*Id.,* at ¶¶ 6-14). Plaintiffs further allege

that defendants conspired to fix the price of plastics
additives sold in Tennessee, that plaintiff Pearlman
and other Tennesseans paid higher prices in Tennes-
see for products containing plastics additives as a res-
ult of the price-fixing conspiracy, and that the alleged
price-fixing conspiracy injured the businesses and
property of plaintiff Pearlman and other Tennesseans.
(*Id.,* at ¶¶ 60- 65); *see In re New Motor Vehicle Ca-
nadian Export Antitrust. Litig.,* 350 F.Supp. 160, 173
(D.Me.2004) (denying motion to dismiss indirect
purchaser claim under TTPA for failure to allege sub-
stantial effects on Tennessee commerce because fac-
tual allegations generated inference that defendant-
manufacturers wholesaled their vehicles to dealers in
Tennessee and made significant profits from Ten-
nessee transactions); *Freeman, 172 S.W.3d at 523*
(suggesting by negative implication that allegation of
influence of anti-competitive conduct on market
prices within Tennessee substantially affects in-
trastate commerce). Simply put, if these allegations
do not satisfy the "substantial effects" test, the Court
is unable to envision allegations which would.

C. Unjust Enrichment Claims

**\*14** Defendants argue that plaintiffs' unjust enrich-
ment claims fails for two independent reasons. First,
defendants argue that plaintiffs' unjust enrichment
theory of liability is an inappropriate attempt to cir-
cumvent the limitations of plaintiffs' statutory anti-
trust claims. (*See* Def. Br., at 19- 21). Second, de-
fendants argue that plaintiffs' allegations are factually
insufficient to state a cause of action for unjust en-
richment under Tennessee, Vermont, or Arizona state
law. (*Id.*).

1. Availability

Defendants argue that, in jurisdictions which possess
antitrust statutes conferring standing on indirect pur-
chasers, an indirect purchaser may only bring a stat-
utory claim for alleged anti-competitive behavior.
(*See* Def. Br., at 18-19). Defendants further contend
that, if plaintiffs' state antitrust claims are defective,
plaintiffs may not recover restitution through an un-
just enrichment claim based upon the predicate
wrong of the antitrust violation; indeed, according to
defendants' logic, plaintiffs should not be permitted

to make an "end run" around the standing limitations of antitrust laws. (*Id.,* at 19).

[27] This Court rejects defendants' arguments, finding instead that plaintiffs may bring independent unjust enrichment claims under Arizona, Tennessee, and Vermont law and that the viability of these claims does not hinge upon the success of the state statutory antitrust claims. The following reasons buttress this conclusion. First, the Tennessee Supreme Court expressly permits independent unjust enrichment claims by indirect purchasers, and defendants cite no cases under Arizona or Vermont law that preclude indirect purchasers from bringing unjust enrichment claims against the manufacturers of products subject to an alleged price-fixing conspiracy. *See Freeman, 172 S.W.3d at 524-526.* Second, the success of plaintiffs' common law unjust enrichment claims should not necessarily depend upon the success of their state antitrust claims, particularly because the Federal Rules of Civil Procedure permit parties to plead claims in the alternative and because, in practice, equitable remedies for unjust enrichment claims are often awarded when state statutory claims prove unsuccessful. *See, e.g., In re Cardizem Antitrust Litig.,* 105 F.Supp.2d 618, 669 (E.D.Mich.2000) (denying motion to dismiss unjust enrichment claims for amount of overpayment by indirect purchasers allegedly subject to overcharge in part because unjust enrichment claims are not contingent upon success of statutory antitrust violation). Third, even if an antitrust plaintiff's unjust enrichment claim under state law is tied to the remedies available under the state antitrust claim, defendants fail to analyze the statutory language of the AAA, the TTPA, and the VCFA to determine whether these antitrust statutes permit equitable remedies, such as the recovery of restitution. *See In re New Motor Vehicle Canadian Export Antitrust. Litig.,* 350 F.Supp. 160, 209-212 (D.Me.2004) (denying defendants' motion to dismiss indirect purchasers' restitution claim under state law for each of fifty states, which is based upon wrongful conduct in violating state antitrust laws, because defendants failed to argue that state statues permitting indirect purchaser claims fail to authorize restitutionary relief). [FN9] Finally, and perhaps most importantly, assuming *arguendo* the validity of the logic un-

derlying defendants' argument, that an "indirect purchaser can only state a claim for unjust enrichment if the jurisdiction in question recognizes a statutory antitrust claim on behalf of indirect purchasers," defendants' argument actually supports the viability of plaintiffs' unjust enrichment claims: Tennessee, Arizona, and Vermont all permit indirect purchasers to pursue antitrust claims; thus, an unjust enrichment claim would not circumvent the procedural and substantive limitations of these antitrust statutes. (*See* Def. Br., at 19); *see In re Terzosin Hydrochloride Antitrust Litig.,* 160 F.Supp.2d 1365, 1380 (S.D.Fl.2001) (permitting unjust enrichment claims by indirect purchasers to be pled under the common law of jurisdiction that allows indirect purchasers to recover "passed on" overcharges).

2. Adequacy of Allegations

a. Arizona law

*15 Defendants argue that plaintiffs' second amended complaint fails to state a claim for unjust enrichment under Arizona law because it fails to allege that plaintiffs conferred a direct benefit on defendants. (*See* Def. Br., at 20-21).

[28] To succeed on a claim for unjust enrichment under Arizona law, a plaintiff must establish the following five elements: (1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) the absence of justification for the enrichment and the impoverishment; and (5) the absence of a remedy provided by law. *See, e.g., Community Guardian Bank v. Hamlin,* 182 Ariz. 627, 898 P.2d 1005, 1008 (Az.Ct.App.1995). Despite defendants' contentions otherwise, Arizona law does not require either a direct causal connection between the enrichment and the impoverishment, or the transference of a direct enrichment from the plaintiff to the defendant. *See, c.f., In re Cardizem CD Antitrust Litig.,* 105 F.Supp.2d at 671 (finding that common law unjust enrichment theory of liability does not require passing of direct benefit from plaintiff to defendant and permitting indirect purchasers of heart medication subject to antitrade conspiracy to sue manufacturers of heart medication for unjust enrichment); *see also* Daniel R. Karon, *Undoing The Other-*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*wise Perfect Crime-Applying Unjust Enrichment To Consumer Price-Fixing Claims,* 108 W. Va. L.Rev. 395, 421 (2005) (no state's unjust enrichment law requires conferral of direct benefit from plaintiff to defendant). Nor do the cases cited by defendants stand for this proposition. [FN10]

Plaintiffs' amended complaint states a claim under Arizona law. Plaintiffs allege facts to suggest that defendants were enriched by inflating in collusive fashion the price of plastics additives, a practice driven by recognition of the demand of end-use consumers for products with plastics additives; [FN11] that plaintiffs were impoverished by paying the inflated price; that plaintiffs' overpayment flowed up the distribution chain to inure to defendants' financial benefit; and that principles of equity demand disgorgement of this benefit. (*See* Second Am. Compl., at ¶¶ 25, 53, 61, 72, 74- 75). Although this Court makes no determination as to whether plaintiffs will ultimately prevail on their unjust enrichment claim under Arizona law, they have alleged facts that survive a motion to dismiss. *See* Karon, 108 W. Va. L.Rev. at 428.

b. Vermont law

Defendants argue that plaintiffs' second amended complaint fails to state a claim for unjust enrichment under Vermont law because it fails to allege that plaintiffs conferred a direct benefit on defendants. (*See* Def. Br., at 20-21).

[29] Under Vermont law, a claim for unjust enrichment lies when a party confers a benefit upon another party and retention of the benefit would be inequitable. *See, e.g., Brookside Memorials, Inc. v. Barre City,* 167 Vt. 558, 702 A.2d 47, 49 (Vt.1997). Again, in contrast to defendants' assertions, none of the cases cited by defendants stands for the proposition that a plaintiff must confer a "direct benefit" upon a defendant to succeed on an unjust enrichment claim under Vermont law. [FN12] In fact, a least one Vermont court has permitted an indirect purchaser to proceed on an unjust enrichment claim against the manufacturers of a product subject to a price-fixing conspiracy, holding that "Vermont law does not require that the enrichment be directly conferred from one party to another in order for the latter party to have a color-

able claim for unjust enrichment" *See, e.g., Bayer AG,* Doc. No. 51011-04 CnC, at *6 (denying motion to dismiss unjust enrichment claim by indirect purchaser of products with chemical ingredient subject to price-fixing conspiracy against manufacturers of chemical ingredient); Karon, 108 W. Va. L.Rev. at 421.

**\*16** Plaintiffs' amended complaint, when read in a light most favorable to plaintiffs, states a cause of action for unjust enrichment under Vermont law. Plaintiffs' factual allegations suggest that they conferred a benefit on defendants in the form of overpayments for the plastics additives component of the products plaintiffs purchased, an overpayment that defendants should have anticipated at the time of the consummation of the alleged price-fixing conspiracy. (*See* Second Am. Compl., at ¶¶ 25, 32, 53, 61, 72, 74-75). Plaintiffs further allege that, by virtue of defendants anti-competitive conduct, the retention of such overpayments would be inequitable. (*Id.*). Accordingly, plaintiffs have adequately pled a cause of action for unjust enrichment.

c. Tennessee law

Defendants argue that plaintiffs' second amended complaint fails to state a claim for unjust enrichment under Tennessee law because it fails to allege that plaintiffs pursued remedies against the parties from whom plaintiffs purchased products or that this pursuit would be futile. (*See* Def. Br., at 21).

[30] The elements of an unjust enrichment claim under Tennessee law include: (1) any benefit, whether direct or indirect, conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of such benefit; (3) acceptance of the benefit under circumstances that render inequitable or unjust the receipt of the benefit without corresponding payment of its value; and (4) exhaustion of all remedies against the person with whom plaintiff enjoyed privity of contract, unless exhaustion would be futile. *See, e.g., Freeman,* 172 S.W.3d at 525.

Plaintiffs do not allege that, prior to filing suit against defendants, plaintiffs pursued remedies against the parties from which plaintiffs purchased products con-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00485-JJF     Document 294-3     Filed 02/28/2007     Page 21 of 61

2006 WL 3921865                                                               Page 20
--- F.Supp.2d ----, 2006 WL 3921865 (E.D.Pa.), 2006-2 Trade Cases P 75,514
**(Cite as: 2006 WL 3921865 (E.D.Pa.))**

taining plastics additives (i .e., more direct purchasers of plastics additives). [FN13] Nor do plaintiffs allege that the pursuit of claims against these entities would be futile. *See, e.g., Freeman,* 172 S.W.3d at 526 (finding error in denial of defendants' motion for summary judgment on unjust enrichment claim when indirect purchaser fails to provide facts in support of bare allegation that attempt to pursue remedies against downstream seller of product would be futile). Moreover, plaintiffs fail to address defendants' exhaustion of remedies argument in their brief, let alone to provide affidavits identifying either the measures plaintiffs took to seek relief from intervening links in the chain of distribution of plastics additives and/or the futility of such measures. Accordingly, without such allegations, plaintiffs' unjust enrichment claim is premature and the Court grants without prejudice defendants' motion to dismiss plaintiffs' unjust enrichment claim under Tennessee law.

D. Conclusion

For the preceding reasons, this Court grants without prejudice defendants' motion to dismiss plaintiffs' claim for unjust enrichment under Tennessee law and denies defendants' motion to dismiss in all other respects. An appropriate Order follows.

ORDER

*17 AND NOW, this 30th day of May 2006, upon consideration of defendants' joint motion to dismiss the second amended indirect purchaser complaint (Doc. No. 26), plaintiffs' brief in opposition (Doc. No. 28), and defendants' response thereto (Doc. No. 33), it is hereby ORDERED as follows:

1. Defendants' motion (Doc. No. 26) is GRANTED in part and DENIED in part.

2. Plaintiffs' unjust enrichment claim under Tennessee law is DISMISSED without prejudice.

3. Plaintiffs may proceed on all remaining claims in the second amended indirect purchaser complaint.

FN1. Plaintiffs' Arizona antitrust claim arises under the Arizona Antitrust Act ("AAA"), Ariz.Rev.Stat. §§ 44-1401, *et seq.*.

FN2. Plaintiffs' Tennessee antitrust claim arises under the Tennessee Trade Practices Act ("TTPA"), Tenn.Code Ann. §§ 47-25-101, *et seq.*.

FN3. Plaintiffs' Vermont antitrust claim arises under the Vermont Consumer Fraud Act ("VCFA"), 9 Vt. Stat. Ann. §§ 2451 *et seq.*.

FN4. Indirect purchasers may sue for injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26. *See In re Warfarin Sodium Antitrust Litig.,* 214 F.3d 395, 399-400 (3d Cir.2000); *Mid-West Paper Products Co. v. Cont'l Group, Inc.,* 596 F.2d 573, 594 (3d Cir.1979).

FN5. Although a plaintiff could still bring a claim in state court under the state antitrust statute, the possible foreclosure of access to federal courts for plaintiffs bringing state antitrust claims defeats the goals of diversity jurisdiction in the antitrust context.

FN6. Charles Wright and Arthur Miller emphasize the possible tension between prudential considerations of standing under federal law and the conceptualization of standing to enforce a state right under state law:

If a clear case should appear in which standing would be recognized by state rules but denied by prudential federal rules, the federal court would have to choose between the general obligation to exercise diversity jurisdiction and its doubts as to the wisdom of enforcing this state claim of this particular plaintiff. It does not seem likely that the same choice should be made for all cases. It might be appropriate to deny standing on the basis of strong prudential objections, particularly if the interests pursued by the plaintiff seem remote and the substantive issues are sensitive. On the other hand, state standing might well be honored if there is a reasonable ground for seeking decision and the prudential objections are relatively weak.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 3921865                                                                          Page 21
--- F.Supp.2d ----, 2006 WL 3921865 (E.D.Pa.), 2006-2 Trade Cases P 75,514
**(Cite as: 2006 WL 3921865 (E.D.Pa.))**

*Id.* at 90-91.

FN7. This distinction is explicit under federal law. See *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 476, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982); *Illinois Brick,* 431 U.S. at 728 n. 7. There is nonetheless considerable overlap between these two issues, as both help define the question of who may sue under federal antitrust law and as similar considerations guide their resolution.

FN8. The *Pilkington* Court acknowledged that although federal law treats the question of whether a particular class of plaintiffs can be deemed, at the outset of litigation, not to suffer an antitrust injury as analytically distinct from the question of the remoteness of a particular injury, both questions implicate principles of standing. See *Pilkington,* 75 P.3d at 106 n. 8, 110.

FN9. For instance, the AAA expressly permits a person "injured in his business or property" to "bring an action for appropriate injunctive or other equitable relief ..." Ariz.Rev.Stat. § 44-1408(B).

FN10. The analyses in these cases hinge on the absence of any impoverishment, as compared to the lack of a direct enrichment. See, e.g., *Stapley v. American Bathtub Liners,* 162 Ariz. 564, 785 P.2d 84, 88 (Ariz.App.Ct.1989) (reversing jury verdict for vendor of property on unjust enrichment claim against purchaser who possessed property prior to closing with legal consent of vendors, but who never paid rent, because no showing of impoverishment and because whatever benefit attached to purchaser was presumably included in purchaser price of property); *Sierra Vista v. Cochise Enter., Inc.,* 144 Ariz. 375, 697 P.2d 1125, 1131 (Ariz.App.Ct.1984) (finding *quantum meruit* claim waived because appellants' never raised theory of liability prior to or during trial and noting in dicta that *quantum meruit* claim would fail because no impoverish-

ment).

FN11. The Third Circuit has noted that a price-fixing conspiracy among manufacturers of a product would not exist if there was no ultimate consumer of the product, regardless of the various links of middlemen. See *In re Warfarin Sodium Antitrust Litig.,* 214 F.3d at 401.

FN12. These cases simply do not address this issue. See *In re Estate of Elliott,* 149 Vt. 248, 542 A.2d 282, 285 (Vt.1988) (affirming denial of unjust enrichment claim due to creditors' failure to introduce evidence of estate's receipt of "any benefit" of creditors' services); *Land Inv., Inc. v. Battleground Assoc.,* 138 Vt. 316, 415 A.2d 753, 759 (Vt.1980) (denying unjust enrichment claim without analysis because claim premised on impermissible legal contention that "one who borrows money to purchase real estate and defaults in the loan obligation unjustly enriches the seller at the expense of the lender").

FN13. The Court finds that the "exhaustion of remedies" requirement to an unjust enrichment claim under Tennessee law makes little sense in this context unless a party is required to take such remedial steps prior to filing suit against the parties with whom the prospective plaintiff lacks a direct relationship. See, e.g., *AmSouth Erectors, LLC v. Skaggs Iron Works, Inc.,* 376 Md. 140, 829 A.2d 530, 2003 WL 21878640, at *6 (Tenn.Super.Ct. Aug. 5, 2003) (purpose of exhaustion of remedies requirement is to "winnow out claims that are not ripe for adjudication"); *Window Gallery of Knoxville v. Davis,* 1999 WL 1068730, at *4 (Tenn.Super.Ct. Nov. 24, 1999) (retail seller of windows must exhaust remedies against defendant contractor, to whom seller furnished windows, before "proceed[ing]" against homeowner under theory of unjust enrichment).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 3921865
--- F.Supp.2d ----, 2006 WL 3921865 (E.D.Pa.), 2006-2 Trade Cases P 75,514
**(Cite as: 2006 WL 3921865 (E.D.Pa.))**


--- F.Supp.2d ----, 2006 WL 3921865 (E.D.Pa.),
2006-2 Trade Cases P 75,514

 **Motions, Pleadings and Filings (Back to top)**

• 2:05cv04157 (Docket) (Aug. 4, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 7



Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2001 WL 1003207 (E.D.Pa.), 2001-2 Trade Cases P 73,472
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
**Dexterity     Surgical,     Inc.     v.     Tyco**
**Intern.E.D.Pa.,2001.**
United States District Court, E.D. Pennsylvania.
**DEXTERITY SURGICAL, INC.,**
v.
**TYCO INTERNATIONAL, et al.**
**No. CIV.A. 00-5789.**

Aug. 22, 2001.

*ORDER-MEMORANDUM*
LUDWIG, J.
**\*1** AND NOW, this 17th day of August, 2001, the
dismissal motion of defendants Tyco International,
Ltd. and United States Surgical Corp. is granted, and
this anti-trust action is dismissed. Fed.R.Civ.P.
12(b)(6). [FN1] Jurisdiction is federal question. 28
U.S.C. § 1331.

> FN1. Under Fed.R.Civ.P. 12(b)(6), the
> factual allegations in the complaint are
> accepted as true, all reasonable inferences
> are drawn in the light most favorable to the
> plaintiff, and dismissal is appropriate only if
> it appears plaintiff could prove no facts that
> would entitle granting relief. Doe v. Delie,
> No. 97-3019, 2001 WL 817680 (3d Cir. July
> 19, 2001).

**\*1** This action charges defendants with
monopolization of the distribution market for hernia
repair surgery repair products. Cmplt. ¶¶ 28-41.
Plaintiff **Dexterity Surgical**, Inc. is a distributor of
surgical products, including balloon dissectors,
tackers, and ancillary products used in performing
preperitoneal laparoscopic hernia repair surgery. Id.
¶¶ 3, 14. Defendant U.S. Surgical is a manufacturer of
sophisticated surgical products, and defendant Tyco
is a manufacturing and service company and is the
parent corporation of U.S. Surgical. Id. ¶¶ 7, 8.

**\*1** The facts of this case are substantially similar to
those in Precision Surgical v. Tyco, 111 F.Supp.2d
586 (E.D.Pa.2000) (Ludwig, J.). In that action,
Precision Surgical sued Tyco and U.S. Surgical under
the Sherman Act, 15 U.S.C. § 2, for the same
conduct as is alleged here-the acquisition by U.S.

Surgical of the two primary manufacturers of balloon
dissectors and its subsequent termination of a
distribution contract with plaintiff in order to
distribute the product itself.[FN2] The action was
dismissed for lack of antitrust standing inasmuch as
an antitrust injury was not alleged to have been
sustained by plaintiff Precision Surgical, Inc. See
summary of complaint, Precision Surgical, 111
F.Supp.2d at 590. Here, Dexterity, like Precision, was
a distributor for one of the two manufacturers of
balloon dissectors acquired by U.S. Surgical. The
question now is whether there is a material standing
to sue distinction as between these two cases.

> FN2. For a more detailed description of the
> statement of alleged facts, see Precision
> Surgical, 111 F.Supp.2d at 587-88.

**\*1** An alleged factual difference is that Precision had
a distribution contract with Origin Medsystems, Inc.,
which was purchased by defendants in July 1999,
four months before their acquisition of General
Surgical Innovations, Inc., in November, 1999. On
the ground that Dexterity had a contract with General
Surgical, it maintains that U.S. Surgical's direct sales
through Origin placed U.S. Surgical in competition
with Dexterity during that four-month period; and
consequently it has articulated standing. Pltf. mem. at
5. There may be a question whether Origin became
immediately engaged in distribution, see Precision
Surgical, 111 F.Supp.2d at 587 (U.S. Surgical did not
establish its own direct sales force until December
1999). However, on this motion to dismiss, the
factual allegations of the complaint will be viewed in
the light most favorable to the pleader. Fed.R.Civ.P.
12(b)(6).

**\*1** This difference, however, does not amount to a
viable distinction. From July, 1999 through
November, 1999, Precision was also competing with
U.S. Surgical as a distributor. Moreover, regardless
of how the facts are viewed in the present case, the
rationale of Precision leads to the same anti-trust law
result.

**\*1** "Vertical integration by the monopolist may
deprive a former supplier or customer of a trading
partner and thus cause injury-in-fact.... But this injury
is no more an injury to competition when a
monopolist integrates than when a competitor

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2001 WL 1003207 (E.D.Pa.), 2001-2 Trade Cases  P 73,472
**(Cite as: Not Reported in F.Supp.2d)**

integrates." *Id.* at 589 (quoting 3 Areeda & Hovenkamp, Antitrust Law § 756b); *see also GKA Beverage Corp. v. Honickman* 55 F.3d 762, 767 (2d Cir.1995). The gravamen of Dexterity's injury, like Precision's, was the termination of its distribution contract upon defendants' vertical integration. This does not constitute an antitrust injury. *Id.* at 590.

**\*2** Dexterity also perceives [FN3] that "further development of the proper application of antitrust standing in Third Circuit caselaw ... [supports its contention] that it is generally improper to dispose of an antitrust claim for lack of standing when the injury alleged is 'inextricably intertwined' with the injury to competition." Pltf. mem. at 4. It refers to *Carpet Group International v. Oriental Rug Importers, Inc.,* 227 F.3d 62 (3d Cir.2000) (a rug trade show operator was held to be enough of a competitor with a rug importer/exporter to have antitrust standing). Nevertheless, antitrust standing is essentially a fact-based analysis. *See Pace Electronics, Inc., v. Canon Computer Systems, Inc.,* 213 F.3d 118, 120 (3d Cir.2000). *Carpet Group* does not announce a shift in the law but represents an application of the law of standing to its particular facts.[FN4]

> FN3. Dexterity would also distinguish itself from Precision in that it has uncovered evidence of antitrust violations to which Precision did not have access. Pltf. mem. at 5-7. But this puts the evidentiary cart before the standing to sue horse.

> FN4. According to Dexterity's memorandum, undesirable price changes have followed defendants' monopolization. If true, the consumers of these products, the doctors, hospitals, insurance companies, and patients would be the direct victims with claims of standing to sue. Potential for duplicative recovery and the existence of direct victims are factors in antitrust standing analysis. *Carpet Group,* 227 F.3d at 76.

E.D.Pa.,2001.
Dexterity Surgical, Inc. v. Tyco Intern.
Not Reported in F.Supp.2d, 2001 WL 1003207 (E.D.Pa.), 2001-2 Trade Cases  P 73,472

Briefs and Other Related Documents (Back to top)

• 2:00CV05789 (Docket) (Nov. 14, 2000)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 8

LEXSEE 2004 U.S. DIST. LEXIS 1943


Caution
As of: Feb 25, 2007

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff, v. DAN LEPORE & SONS COMPANY and L.F. DRISCOLL COMPANY, Defendants.**

**CIVIL ACTION NO. 03-CV-5462**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2004 U.S. Dist. LEXIS 1943*

**February 9, 2004, Filed**

**SUBSEQUENT HISTORY:** Reconsideration denied by *EEOC v. Dan Lepore & Sons Co., 2004 U.S. Dist. LEXIS 4842 (E.D. Pa., Mar. 16, 2004)*

**DISPOSITION:** Amended Motion to Intervene as Party Plaintiff was granted in part and denied in part.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Intervenor plaintiff worker moved the court pursuant to Fed. R. Civ. P. 24(a) to intervene in plaintiff Equal Employment Opportunity Commission's (EEOC) actions against defendants, a general contractor and a construction company. The EEOC's action was brought under Title VII of the Civil Rights Act of 1964, as amended, and Title I of the Civil Rights Act of 1991 alleging unlawful gender biased employment practices and retaliation.

**OVERVIEW:** The worker filed charges of discrimination with the EEOC based on alleged sexual harassment by defendants on separate construction sites and retaliation, in the form of not hiring for future projects, for reporting sexual harassment. The EEOC instituted suit and the worker moved to intervene. The court rejected the worker's attempt to add antitrust claims under the Sherman Act, *15 U.S.C.S. § 1* et seq., and the Clayton Act, *15 U.S.C.S. § 15* et seq., because the worker alleged specific acts of sexual discrimination that resulted in the type of injury redressed by Title VII, not the type of injury cognizable under antitrust laws. The worker's claims under the Pennsylvania Human Relations Act (PHRA) were allowed to be brought into the EEOC action because the claims under the PHRA and the EEOC's Title VII claims derived from a common nucleus of operative facts and principles of fairness and judicial economy weighed in favor of granting the worker's motion to intervene to assert PHRA violations. The worker's claim under the Pennsylvania Equal Rights Amendment (PERA), Pa. Const. art. I, § 28, could not be added because there was no private cause of action for damages under the PERA.

**OUTCOME:** The court denied the worker's motion to intervene to raise the antitrust claims and the PERA violations. The court granted the worker's motion to intervene to raise the PHRA claims. The worker's motion to intervene as party plaintiff was denied as moot. Finally, the worker was directed to file an amended complaint in conformity with the order on or before a date specified by the court.

**LexisNexis(R) Headnotes**

*Civil Procedure > Parties > Intervention > Right to Intervene*
[HN1] See Fed. R. Civ. P. 24(a)(1).

*Civil Procedure > Parties > Intervention > Right to Intervene*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*

2004 U.S. Dist. LEXIS 1943, *

*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Enforcement > Intervention*
[HN2] Title VII of the Civil Rights Act of 1964, as amended, provides that the person or persons aggrieved shall have the right to intervene in a civil action brought by the Equal Employment Opportunity Commission. *42 U.S.C.S. § 2000e-5*(f)(1). The statute, however, does not grant an unconditional right to assert additional claims. *42 U.S.C.S. § 2000e-5*(f)(1).

*Civil Procedure > Justiciability > Standing > General Overview*
*Civil Procedure > Parties > Intervention > Motions to Intervene*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Enforcement > Intervention*
[HN3] The right to intervene presupposes the presentation of a cognizable claim that the intervenor would have standing to pursue. Thus, a motion to intervene should be denied when standing is lacking or the complaint fails to present cognizable claims.

*Antitrust & Trade Law > Clayton Act > Remedies > General Overview*
*Antitrust & Trade Law > Sherman Act > Remedies > General Overview*
*Civil Procedure > Justiciability > Standing > General Overview*
[HN4] Neither the Sherman Act, *15 U.S.C.S. § 1* et seq., nor the Clayton Act, *15 U.S.C.S. § 1* et seq., provide a remedy for what are in actuality Title VII of the Civil Rights Act of 1964 claims. Stated differently, the type of injury redressed by Title VII is not related to the type of injury cognizable under antitrust laws, for they provide remedy for sex discrimination. In determining whether a plaintiff has standing to pursue antitrust claims courts must analyze the question of antitrust injury from the viewpoint of the consumer of the product or services at issue as antitrust laws were promulgated to protect competition, not competitors.

*Civil Procedure > Parties > Intervention > Right to Intervene*
*Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview*
*Labor & Employment Law > U.S. Equal Employment Opportunity Commission > Enforcement > Intervention*
[HN5] An employee has an unconditional right to intervene in a Title VII of the Civil Rights Act of 1964 action brought by the Equal Employment Opportunity Commission; an employee does not, however, have an unconditional right to bring state law claims in the same action.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims*
*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Parties*
[HN6] The exercise of pendent jurisdiction requires an examination of both constitutional and discretionary considerations. In assessing whether to exercise pendent jurisdiction, the court must consider the following three factors: (1) whether the pendent state claims and the federal claim on which jurisdiction is based derive from a common nucleus of operative facts; (2) whether the exercise of federal jurisdiction over the state law claims or the pendent party would violate a specific federal policy which seeks to limit the scope of federal jurisdiction; and (3) fairness to the litigants, judicial economy, and the interests of federalism.

*Civil Procedure > Parties > Intervention > Right to Intervene*
*Constitutional Law > State Constitutional Operation*
[HN7] While the Supreme Court of Pennsylvania has not ruled on the issue of whether a private cause of action for damages exists under the Pennsylvania Equal Rights Amendment, Pa. Const. art. I, § 28, courts in the Third Circuit have concluded that the Pennsylvania Constitution does not create such a right.

COUNSEL: [*1] For BETH ANNE BURROUGHS, Intervenor Plaintiff: ANITA F. ALBERTS, ANITA ALBERTS ASSOC, DOYLESTOWN, PA.

For BETH ANNE BURROUGHS, Movant: ANITA F. ALBERTS, ANITA ALBERTS ASSOC, DOYLESTOWN, PA.

For DAN LEPORT & SONDS COMPANY, Defendant: JOHN P. MEYERS, DAVID F. WHITE, KELLY MCLAUGHLIN FOSTER, PLYMOUTH MEETING, PA. ROBERT P. STYLE, ASTOR WEISS KAPLAN & MANDEL, PHILADELPHIA. ANTHONY B. HALLER, BLANK ROME LLP, PHILADELPHIA, PA.

For EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff: CYNTHIA A. LOCKE, JACQUELINE H. MCNAIR, JUDITH A. O'BOYLE, EQUAL EMPLOYMENT, OPPORTUNITY COMMISSION, PHILADELPHIA, PA.

For L.F. DRISCOLL COMPANY, Defendant: ANTHONY B. HALLER, BLANK ROME LLP, PHILADELPHIA, PA.

**JUDGES:** Legrome D. Davis

**OPINION BY:** Legrome D. Davis

**OPINION:**

MEMORANDUM ORDER

Presently before the Court is the Amended Motion to Intervene as Party Plaintiff Filed by Beth Anne Burroughs Pursuant to *F.R.C.P. 24(a)* (Dkt. No. 19). For the reasons that follow, Plaintiff's motion is GRANTED in part, and DENIED in part.

I. Factual Background and Procedural History

In 2003, Beth Anne Burroughs ("Burroughs") filed charges of discrimination with the Equal [*2] Employment Opportunity Commission (the "EEOC" or the "Commission"). (Compl. P 6). On September 30, 2003September 30, 2003, more than thirty days after Burroughs filed her charges of discrimination, the EEOC filed the instant action pursuant to *Title VII of the Civil Rights Act of 1964*, as amended, and *Title I of the Civil Rights Act of 1991* alleging unlawful gender biased employment practices and retaliation. (See generally Compl.). The Commission alleges that the charging party, Beth Anne Burroughs ("Burroughs") was sexually harrassed by Defendant Dan Lepore & Sons Company's ("Lepore") foreman and male co-workers on two separate construction sites. The Commission also alleges that Burroughs was also subjected to disparate treatment as a consequence of her gender when she was evicted by the general contractor, Defendant L.F. Driscoll Company ("Driscoll," Lepore and Driscoll collectively identified as "Defendants"), from the job site because she was not wearing safety glasses. Male employees who also failed to wear safety glasses and hard hats were not similarly evicted. (Id.) The Commission further alleges that, in retaliation for reporting the sexual harassment to Driscoll, [*3] Burroughs was not hired for future projects.

On October 10, 2003, pursuant to *Federal Rule of Civil Procedure 24(a)*, Burroughs's filed a Motion to Intervene As Party Plaintiff. (Dkt. No. 2). On November 6, 2003, Burroughs filed an Amended Motion to Intervene As Party Plaintiff, adding an antitrust claim under the Clayton Act. (Dkt. No. 6). In her amended motion, Burroughs seeks to assert the following claims: (1) federal antitrust violations under the Sherman Act and the Clayton Act; (2) a state law claim for gender discrimination in violation of the *Pennsylvania Human Relations Act* ("PHRA"); and (3) violations of *Article I § 28 of the Pennsylvania Constitution*, which is commonly identi-

fied as the Pennsylvania Equal Rights Amendment ("PERA").

Burroughs asserts that her claims arise from the same operative facts as the claims asserted by the EEOC, and that to grant the motion to intervene would further the important interest of judicial economy. While the EEOC is amenable to intervention, Defendants oppose intervention on numerous grounds.

II. Legal Standards

*Rule 24(a)(1) of the Federal Rules of Civil Procedure* [*4] provides [HN1] "Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene." See *Fed.R.Civ.Pro. 24(a)(1)*. Title VII [HN2] provides that "the person or persons aggrieved shall have the right to intervene in a civil action brought by the [EEOC]." See *42 U.S.C. § 2000e-5(f)(1)*; see also *EEOC v. DPCE, Inc., 1990 U.S. Dist. LEXIS 5022, 1990 WL 54995, at * 1 (E.D. Pa. April 25, 1990)*. The statue, however, does not grant an unconditional right to assert additional claims. See *42 U.S.C. § 2000e-5(f)(1)*; see also *EEOC v. The West Co., 1986 U.S. Dist. LEXIS 30036, 1986 WL 1239, at *3 (E.D. Pa. Jan. 27, 1986)* ("The fact that [plaintiff] has an unconditional right to intervene in the EEOC's Title VII action, however, does not provide her with an unconditional right to bring state law claims in the same action."). Additionally, [HN3] the right to intervene "presupposes the presentation of a cognizable claim that the intervenor would have standing to pursue." *EEOC v. Victoria's Secret Stores, Inc., 2003 U.S. Dist. LEXIS 1290, 2003 WL 21282193,* [*5] *at * 1 (Jan. 13, 2003)* (citations omitted). Thus, a motion to intervene should be denied when standing is lacking or the complaint fails to present cognizable claims. *Id.*

*42 U.S.C. § 2000e-5(f)(1)* clearly grants to Burroughs the right to intervene this action. The right to intervene, however, is not coextensive with the assertion of additional claims. Thus, the narrow issues before the court concern the appropriate scope of Burroughs's intervention and whether the complaint asserts cognizable claims for which she has standing.

A. Antitrust Claims

In Count I of her proposed complaint-in-intervention, Burroughs asserts antitrust claims against Lepore and Driscoll pursuant to the Sherman and Clayton Acts, *15 U.S.C. § 1 et. seq.* and *15 U.S.C. § 15 et. seq.*, respectively. Lepore and Driscoll argue that Burroughs's claims under the Sherman Act and the Clayton Act cannot be added because: (1) she impermissibly expand the scope of the Title VII litigation; (2) she lacks standing to assert claims under either Act; and (3) she

fails to state a claim under either Act. (Defendant L.F. Driscoll's Motion in Opposition [*6] to Plaintiff's Amended Motion Intervene at 3-6; Defendant Dan Lepore & Sons Company Motion in Opposition to the Amended Motion to Intervene of Beth Anne Burroughs at 1-3). Burroughs urges the Court to grant the Motion to Intervene and decide the issue of pendent jurisdiction only should Defendants file a *Rule 12(b)* motion. (Burroughs' Reply to Defendant Lepore's Motion Opposing the Intervention of Beth A. Burroughs at 1).

[HN4] Neither the Sherman nor the Clayton Act "provide a remedy for what are in actuality Title VII claims." *Daley v. St. Agnes Hospital, Inc., 490 F. Supp. 1309, 1317 (E.D.Pa. 1980)* (citing *Marchwinski v. Oliver Tyrone Corp., 83 F.R.D. 606 (W.D. Pa. 1979))*; see also *Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 107 S. Ct. 484, 93 L. Ed. 2d 427 (1986)*. Stated differently, "the type of injury redressed by Title VII is not related to the type of injury cognizable under antitrust laws, for [they provide] remedy for sex discrimination." *Daley, 490 F. Supp. at 1318*. Policy considerations also disfavor allowing plaintiffs to recast Title VII claims as antitrust claims: "By simply phrasing their [*7] claim in terms of the malleable term 'competition' and bringing in a civil action sounding in antitrust, plaintiffs could easily circumvent the vital administrative procedure of Title VII and virtually eliminate the EEOC's role as conciliator, thereby frustrating a major policy behind the statute." *Id.*, (quoting *Monk v. Island Creek Coal Co., 1979 U.S. Dist. LEXIS 10838, 1979 WL 266, at * 8 (W.D. Va. July 24, 1979))*. In determining whether a plaintiff has standing to pursue antitrust claims "courts must analyze the question of antitrust injury from the viewpoint of the consumer of the product or services at issue" as antitrust laws were promulgated to protect competition, not competitors. See *Hughes v. Halbach & Braun Indus., Ltd., 10 F. Supp. 2d 491, 494 (W.D. Pa. 1998)* (citing *Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983))*.

Burroughs specifically alleges that Lepore and Driscoll acted in concert to "remove Burroughs from both the RPAC site and the Wharton School site on the false pretext of a minor safety infraction, after she tried to stop ongoing sexual [*8] harassment," (Burroughs's proposed complaint-in-intervention P 38), and that this action is "ongoing and continuous and directed specifically at Burroughs in illegal retaliation for attempts to stop constant sexual harassment altering the terms and conditions of her employment." (Id. P 45). Burroughs also alleges that as a direct and proximate result of Defendants' illegal action, she has suffered antitrust injury, loss of income and earning capacity, and continues to be excluded from relevant job markets. She seeks treble damages,

among other relief, for Defendants' "illegal concerted action in restraint of trade and boycotting her, based on her gender." (Id. P 43).

On its face, Burroughs's proposed complaint-in-intervention fails to allege the type of injury antitrust laws were designed to remedy. See *Daley, supra*; *Hughes, supra*. Although Burroughs alleges that she suffered "antitrust injury," it is clear from a reading of the proposed complaint-in-intervention that in actuality she seeks a remedy for injury to competitors, not to competition. Indeed, Count I of Burroughs's proposed complaint-in-intervention attempts to recast Title VII claims into purported [*9] violations of the Sherman and Clayton Acts. Simply stated, Burroughs alleges specific acts of sexual discrimination which result in the type of injury redressed by Title VII, not the type of injury cognizable under antitrust laws. Accordingly, Burroughs's proposed complaint-in-intervention fails on its face to allege antitrust injury.

Even if Burroughs's proposed complaint-in-intervention alleged antitrust injury, inclusion of antitrust claims in the instant action would unduly complicate the proceedings and shift the focus the litigation from the EEOC's Title VII claims. See *Equal Opportunity Employment Commission v. Rekrem, Inc., 199 F.R.D. 526, 529 (S.D.N.Y. 2001)* (citing *EEOC v. National Cleaning Contractors, Inc., 1991 U.S. Dist. LEXIS 11383, 1991 WL 161364, at *2 (S.D.N.Y. 1991))*. Accordingly, Burroughs's motion to intervene to litigate the antitrust claims presented in Count I is denied.

B. Pennsylvania Human Relations Act Claim

In Count II of her proposed complaint-in-intervention, Burroughs asserts claims against Driscoll for violations of the PHRA. Burroughs alleges that Driscoll violated the PHRA by aiding and abetting Lepore in its illegal retaliatory and discriminatory [*10] treatment. (Burroughs Motion at P 49). Driscoll argues that Burroughs's claim under the PHRA cannot be properly added because it fails to meet the requirements for exercising pendent jurisdiction. Specifically, Driscoll argues that Plaintiff's "aiding and abetting" theory contradicts the EEOC's theory that Driscoll violated Title VII by treating Burroughs differently because of her sex. (Defendant L.F. Driscoll's Motion in Opposition to Plaintiff's Amended Motion to Intervene at 6). Burroughs contends that the Court should grant her motion to intervene and reserve judgment on the issue of pendent jurisdiction until receipt of a *Rule 12(b)* motion. (Burroughs' Reply to Defendant Lepore's Motion Opposing the Intervention of Beth A. Burroughs at 1).

[HN5] Burroughs has an unconditional right to intervene in the EEOC's Title VII action; she does not, however, have an unconditional right to bring state law

2004 U.S. Dist. LEXIS 1943, *

claims in the same action. See *EEOC v. The West Co.,* *1986 U.S. Dist. LEXIS 30036, 1986 WL 1239, at *3.* [HN6] The "exercise of pendent jurisdiction requires an examination of both constitutional and discretionary considerations." *Id.,* (citing *United Mine Workers of America v. Gibbs, 383 U.S. 715, 725-26, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966)).* [*11] In assessing whether to exercise pendent jurisdiction, the Court must consider the following three factors: (1) whether the pendent state claims and the federal claim on which jurisdiction is based derive from a common nucleus of operative facts; (2) whether the exercise of federal jurisdiction over the state law claims or the pendent party would violate a specific federal policy which seeks to limit the scope of federal jurisdiction; and (3) fairness to the litigants, judicial economy, and the interests of federalism. See *Ambromovage v. United Mine Workers of America, 726 F.2d 972, 989-90 (3d Cir. 1984).*

A review of the Complaint filed by the EEOC and the proposed complaint-in-intervention reveals that Burroughs's claims under the PHRA and the EEOC's Title VII claims derive from a common nucleus of operative facts. Indeed, Driscoll does not dispute this. (Burroughs' Reply to Defendant Lepore's Motion Opposing the Intervention of Beth A. Burroughs at 1). Instead, Driscoll argues that Burroughs's claim is inconsistent with the EEOC's theory of liability, and that it would contravene federal policy to permit an intervenor to determine the scope and the focus of litigation. [*12] (Defendant L.F. Driscoll's Motion in Opposition to Plaintiff's Amended Motion to Intervene at 6). This Court does not view Burroughs's aiding and abetting claim as inconsistent with the EEOC's theory of liability. In relevant part, the EEOC alleges that Driscoll's disparate treatment of Burroughs in evicting her from the Kimmel Center construction site "assisted" Lepore in its retaliatory failure to hire her for future employment. (Compl. P 8). Under the circumstances of this case, the exercise of federal jurisdiction over the PHRA count would not conflict with a specific federal policy which seeks to limit the scope of federal jurisdiction. Further, given the overlapping factual and legal issues presented by the EEOC's Complaint and Count II of Burroughs's proposed complaint-in-intervention, principles of fairness and judicial economy weigh in favor granting Burroughs's motion to intervene to assert PHRA violations.

C. Pennsylvania Equal Rights Amendment Claim

Count III of Burroughs's proposed complaint-in-intervention seeks to raise violations of the PERA. (Id. P 52). Defendants contend that the PERA does not authorize claims brought by private actors. (Driscoll's Supplemental [*13] Memorandum of Law in Support of its Motion in Opposition to Plaintiff's Amended Motion to Intervene at 1). Burroughs implores the Court to grant

the motion to intervene and decide the issue of standing only upon presentation of a *Rule 12(b)* motion. (Burroughs' Reply to Defendant Lepore's Motion Opposing the Intervention of Beth A. Burroughs at 1).

As discussed previously, the right to intervene "presupposes the presentation of a cognizable claim that the intervenor would have standing to pursue." *Victoria's Secret Stores, 2003 U.S. Dist. LEXIS 1290, 2003 WL 21282193, at * 1.* [HN7] While Supreme Court of Pennsylvania has not ruled on the issue of whether a private cause of action for damages exists under the PERA, courts in this circuit have concluded that the Pennsylvania Constitution does not create such a right. See *Ryan v. General Machine Products, 277 F. Supp. 2d 585. 595 (E.D. Pa. 2003)* (holding that plaintiff's claims fail as a matter of law because the PERA does not create a private right of action); see also *Douris v. Schweiker, 229 F. Supp. 2d 391, 405 (E.D. Pa. 2002)* (citing *Kelleher v. City of Reading, 2001 U.S. Dist. LEXIS 14958, No. 01-3386, 2001 WL 1132401, at *2-3 (E.* [*14] *D. Pa. Sept. 24, 2001)).* As Burroughs lacks standing to assert claims under the PERA, her Motion to Intervene to assert the PERA violations alleged in Count III is denied.

III. Conclusion

For the foregoing reasons, Burroughs's motion to intervene is GRANTED in part, and DENIED in part.

ORDER

AND NOW this    day of January 2004, upon consideration of the Amended Motion to Intervene as Party Plaintiff Filed by Beth Anne Burroughs Pursuant to *F.R.C.P. 24(a)* (Dkt. No. 6), and the responses thereto, it is hereby ORDERED that Burroughs' motion is GRANTED in part and DENIED in part. More specifically:

1. Burroughs's Amended Motion to Intervene to raise the antitrust claims alleged in Count I is DENIED.

2. Burroughs's Amended Motion to Intervene to raise the PHRA claims asserted in Count II is GRANTED.

3. Burroughs's Amended Motion to Intervene to raise the PERA violations alleged in Count III is DENIED.

4. Burroughs's Motion to Intervene as Party Plaintiff Filed by Beth Anne Burroughs Pursuant to *F.R.C.P. 24(a)* (Dkt. No. 2) is DENIED as moot.

5. Burroughs is directed to file an amended complaint [*15] in conformity with this order on or before February 16, 2004.

By the Court:

2004 U.S. Dist. LEXIS 1943, *

Legrome D. Davis

# TAB 9



Slip Copy

Slip Copy, 2006 WL 2559479 (E.D.Pa.), 2006-2 Trade Cases P 75,531

(Cite as: Slip Copy)

Page 1

▷

Briefs and Other Related Documents

Glaberson v. Comcast Corp.E.D.Pa.,2006.
United States District Court,E.D. Pennsylvania.
GLABERSON et al.
v.
COMCAST CORPORATION et al.
**Civil Action No. 03-6604.**

Aug. 31, 2006.

Jason P. Fulton, Susman Godfrey, L.L.P., Dallas, TX, Jessica N. Servais, David R. Woodward, Heins Mills & Olson PLC, Minneapolis, MN, Carol A. Mager, Mager & Goldstein LLP, Philadelphia, PA, Gary L. Specks, Kaplan Fox & Kilsheimer LLP, Highland Park, IL, for Plaintiffs.
Darryl J. May, Jason A. Leckerman, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, PA, James T. Cain, Melonie S. Jurgens, Michael S. Shuster, Sheron Korpus, Kasowitz Benson Torres & Friedman LLP, New York, NY, for Defendants.

***MEMORANDUM***

PADOVA, J.
**\*1** Plaintiffs, cable television services customers of Defendants in the Philadelphia and Chicago regions, have brought this antitrust action against Defendants for damages arising out of Defendants' alleged imposition of horizontal restraints in the relevant cable television markets and unlawful monopolization and attempted monopolization of those markets. Presently before the Court is Defendants' Motion to Dismiss the Third Amended Class Action Complaint (Docket No. 138), pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, Defendants' Motion to Dismiss is denied.

I. BACKGROUND

**\*1** Plaintiffs, six non-basic cable television programming services customers of Defendants in the Philadelphia, Pennsylvania and Chicago, Illinois regions, have brought this antitrust suit on behalf of themselves and all those similarly situated, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. § § 15, 26, for violations of Sections 1 (Count One) and 2 (Counts Two and Three) of the Sherman Act,

15 U.S.C. § § 1, 2. The Third Amended Complaint alleges that Defendants Comcast Corporation, Comcast Holdings Corporation, Comcast Cable Communications, Inc., Comcast Cable Communications Holdings, Inc., and Comcast Cable Holdings, LLC (collectively "Comcast") acquired cable systems and cable subscribers from their competitors in the Philadelphia and Chicago cable markets until the number of competing cable providers in those markets was substantially reduced. (3d Am.Compl.¶ ¶ 3, 49, 51-53.) The remaining competitors were primarily very large businesses who owned pockets of cable systems and cable subscribers throughout the country. (*Id.* ¶ 3.) Comcast then entered into agreements with those companies to avoid competition by allocating the nation's regional cable markets amongst themselves through swaps of their respective cable assets, including subscribers. (*Id.* ¶ 4.) Comcast received competitors' cable systems and cable subscribers in the Philadelphia and Chicago cable markets in exchange for Comcast's cable systems and cable subscribers in other parts of the country. (*Id.* ¶ ¶ 4, 10, 50, 54-56.) One swap agreement allocated markets and customers between Comcast and AT & T Broadband ("AT & T"); Comcast swapped its Chicago-area subscribers for AT & T's Philadelphia-area subscribers. (*Id.* ¶ ¶ 4, 56.) Then, as part of the November 18, 2002, merger between Comcast and AT & T, Comcast acquired AT & T's cable monopoly and cable subscribers in the Chicago area. (*Id.* ¶ ¶ 5, 57.) The result of all the swap agreements was that Comcast willfully obtained and maintained monopoly power in the relevant geographic markets, defined as Comcast's cable franchises located in Philadelphia and Chicago and geographically contiguous areas and areas in close geographic proximity to Philadelphia and Chicago in designated counties (hereinafter the Philadelphia and Chicago "clusters"). (*Id.* ¶ ¶ 6, 31.) The Third Amended Complaint alleges that Comcast currently controls ninety-four percent and ninety-two percent of the cable market in the Philadelphia and Chicago clusters, respectively, and that Comcast has used its monopoly power to raise cable prices in the Philadelphia and Chicago clusters to artificially high, supra-competitive levels. (*Id.* ¶ ¶ 7, 80-81, 99.)

**\*2** Count One of the Third Amended Complaint maintains that Comcast has conspired with its competitors and engaged with them in a strategy of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2559479 (E.D.Pa.), 2006-2 Trade Cases P 75,531
(Cite as: Slip Copy)

Page 2

allocating markets through swap agreements that exchanged their respective cable assets, including subscribers, and that such horizontal market restraints constitute per se violations of § 1 of the Sherman Act.[FN1] (Id. ¶ 73.) Plaintiffs also maintain that Comcast's acquisitions of competing cable companies in the Philadelphia and Chicago clusters through asset purchases and mergers amount to contracts and conduct in restraint of trade in further violation of § 1. (Id. ¶ 74.) Count Two alleges that Comcast has monopolized, and Count Three alleges that Comcast has attempted to monopolize, the product market for multichannel video programming services ("MVPS") within the Philadelphia and Chicago clusters in violation of § 2 of the Sherman Act. (Id. ¶ ¶ 102, 107.) Comcast's anticompetitive conduct purportedly entails not only its swap agreements and acquisitions of competing cable companies, but also Comcast's refusal to provide Philadelphia-area competitor RCN Telecomm Services, Inc. ("RCN") with long-term, nondiscriminatory access to local sports programming controlled by Comcast ("Sportsnet"), which Plaintiffs contend RCN requires in order to compete effectively against Comcast. (Id. ¶ ¶ 11-12, 97.) In addition, Comcast has substantially interfered with RCN's access to the contractors needed to build competing cable systems in Comcast's Philadelphia franchise areas, and Comcast has engaged in pricing campaigns designed to prevent or destroy competition from RCN. (Id.) Plaintiffs contend that they have been injured by Comcast's activities because they have been forced to pay higher cable prices than they would have paid absent Comcast's unlawful conduct, and they seek treble damages, injunctive relief, and their costs of suit, including attorneys' fees. (Id. ¶ ¶ 11, 28, 67, 103, 108.) Comcast has moved to dismiss Plaintiffs' Third Amended Complaint in its entirety.

FN1. A horizontal restraint is defined as "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition." _United States v. Topco Assocs., Inc.,_ 405 U.S. 596, 608 (1972).

II. LEGAL STANDARD

*2 When deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court may look only to the facts alleged in the complaint and its attachments. _Jordan v. Fox, Rothschild, O'Brien & Frankel,_ 20 F.3d 1250, 1261 (3d Cir.1994). The court must accept as true all well-pleaded allegations in the

complaint and view them in the light most favorable to the plaintiff. _Angelastro v. Prudential-Bache Sec., Inc.,_ 764 F.2d 939, 944 (3d Cir.1985). The court, however, "need not credit a complaint's 'bald assertions' or 'legal conclusions.' " _Cal. Pub. Employees' Ret. Sys. v. The Chubb Corp.,_ 394 F.3d 126,143 (3d Cir.2004) (citing _Morse v. Lower Merion Sch. Dist.,_ 132 F.3d 902, 906 (3d Cir.1997)). A Rule 12(b)(6) motion will be granted when a plaintiff cannot prove any set of facts, consistent with the complaint, which would entitle him or her to relief. _Ransom v. Marrazzo,_ 848 F.2d 398, 401 (3d Cir.1988). The dismissal standard is higher in antitrust cases than generally. _Brotech Corp. v. White Eagle Int'l Tech. Grp., Inc.,_ Civ. A. No. 03-232, 2004 WL 1427136, at *3 (E.D. Pa. June 21, 2004) (citation omitted); see also _Lum v. Bank of Am.,_ 361 F.3d 217, 228 (3d Cir.2004) ("[I]n antitrust cases, ... dismissal prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." (quoting _Hosp. Bldg. Co. v. Trustees of the Rex Hosp.,_ 425 U.S. 738,746 (1976))). Nonetheless, the facts underlying the elements of an antitrust claim must be pled with specificity. _Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,_ 459 U.S. 519, 528 n. 17 (1983); _Brotech Corp.,_ 2004 WL 1427136, at *3 (citation omitted).

III. DISCUSSION

*3 Comcast argues that Plaintiffs' Third Amended Complaint should be dismissed because it does not allege facts indicating that Plaintiffs have antitrust standing to challenge Comcast's transactions with other cable companies or Comcast's conduct towards RCN.[FN2] Comcast further asserts that Count One should be dismissed for failure to state a claim under § 1 of the Sherman Act, and that Counts Two and Three should be dismissed for failure to state a claim under § 2 of the Sherman Act. Comcast also contends that Plaintiffs' claims are time-barred to the extent that they depend on three acquisitions that occurred outside the Clayton Act's four-year statute of limitations for bringing private antitrust actions.

FN2. While motions to dismiss that implicate constitutional standing principles are generally predicated on Federal Rule of Civil Procedure 12(b)(1), the United States Court of Appeals for the Third Circuit has considered motions to dismiss that raise issues of antitrust standing under Rule 12(b)(6). _Maio v. Aetna, Inc.,_ 221 F.3d 472,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

481 n. 7 (3d Cir.2000).

A. *Plaintiffs' Antitrust Standing*

**\*3** Whether a plaintiff has standing to raise antitrust claims is a threshold inquiry. *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256,264 (3d Cir.1998); *Baglio v. Baska*, 940 F.Supp. 819, 828 (W.D.Pa.1996) (citing *Associated Gen. Contractors*, 459 U.S. at 519), aff'd, 116 F.3d 467 (3d Cir.1997). The burden on a plaintiff in a private antitrust action to demonstrate that he has antitrust standing arises from § 4 of the Clayton Act, which provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may bring suit under the antitrust laws in the district courts for treble damages. See 15 U.S.C. § 15. "[T]he focus of the doctrine of 'antitrust standing' is somewhat different from that of standing as a constitutional doctrine." *Associated Gen. Contractors*, 459 U.S. at 535 n. 31. While " '[h]arm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact ... [the doctrine of antitrust standing requires] the court [to] make a further determination [as to] whether the plaintiff is a proper party to bring a private antitrust action." *Alberta Gas Chems. Ltd. v. E.I. Du Pont De Nemours & Co.*, 826 F .2d 1235, 1239 (3d Cir.1987) (quoting *Associated Gen. Contractors*, 459 U.S. at 535 n. 31); *see also West Penn Power*, 147 F.3d at 264.

**\*3** The United States Court of Appeals for the Third Circuit uses the following five-factor balancing test to evaluate antitrust standing:
**\*3** (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

**\*3** *2660 Woodley Road Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 740-41 (3d Cir.2004) (quoting *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 181 (3d Cir.1997)). The first step in determining whether a plaintiff has antitrust standing begins with the second factor in the balancing test,

commonly known as the antitrust injury requirement. *West Penn Power*, 147 F.3d at 264 n. 14, 265. If there is no antitrust injury, that is the end of the inquiry, and the claim should be dismissed. *Id.* at 265 (citing *Barton & Pittinos, Inc.*, 118 F.3d at 182). An antitrust injury is an "injury of 'the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anti-competitive effect either of the violation or of anti-competitive acts made possible by the violation." *Eichorn v. AT & T Corp.*, 248 F.3d 131,140 (3d Cir.2001) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). The concept of antitrust injury overlaps with the first factor in the balancing test because the injury must be causally related to the defendant's allegedly anticompetitive activity. *See West Penn Power*, 147 F.3d at 265.

**\*4** Comcast argues that Count One of the Third Amended Complaint should be dismissed because Plaintiffs lack antitrust standing to challenge the swaps and acquisitions of cable systems in the Philadelphia and Chicago clusters that form the basis for Count One. Comcast also argues that Counts Two and Three should be dismissed to the extent that they depend upon those transactions. Comcast then contends that Counts Two and Three should be dismissed in their entirety because Plaintiffs do not have antitrust standing to challenge the remaining conduct underlying those claims, namely Comcast's treatment of RCN.

1. *The cable system transactions*

**\*4** Comcast asserts that Plaintiffs lack antitrust standing to challenge its swap agreements and acquisitions because Plaintiffs are unable to demonstrate a direct causal connection between those transactions and Plaintiffs' alleged injury of higher cable prices. According to Comcast, Plaintiffs have failed to allege any facts suggesting that there was actual or likely future competition between Comcast and the transacting cable companies in the relevant markets. Comcast contends that the Third Amended Complaint acknowledges that price competition for cable programming services only arises when an overbuilder operates in a given franchise area alongside the incumbent cable provider. Comcast argues that the Third Amended Complaint must, therefore, plead facts showing that the challenged transactions specifically removed overbuilders from Comcast's franchise areas or prohibited overbuilders from entering Comcast's franchise areas.[FN3] Comcast

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4
Slip Copy, 2006 WL 2559479 (E.D.Pa.), 2006-2 Trade Cases P 75,531
(Cite as: Slip Copy)

maintains that the Third Amended Complaint instead makes clear that all that the challenged transactions accomplished was the substitution of Comcast as the exclusive provider of cable services in a given franchise area for another exclusive provider. Comcast asserts that the challenged transactions were, therefore, "competition-neutral," and that Plaintiffs cannot show that Comcast's actions had anticompetitive effects that could give rise to an antitrust injury.

> FN3. Overbuilders are wireline cable providers that install cable systems along the same rights-of-way as the incumbent cable franchisee.

**\*4** We need not consider whether Comcast's actions should be considered "competition-neutral" absent allegations specifically concerning the elimination of overbuilders since, for the purposes of assessing antitrust standing, we assume as true the statements in the Third Amended Complaint that Comcast's conduct threatened competition in the relevant markets. *See Angelico, M.D. v. Lehigh Valley Hosp., Inc.,* 184 F.3d 268, 275 n. 2 (3d Cir.1999) (noting that the district court "erred by incorporating the issue of anticompetitive market effect into its standing analysis, confusing antitrust injury with an element of a claim under section one of the Sherman Act, 15 U.S.C. § 1, which prohibits 'contracts, combinations or conspiracies in restraint of trade' " (quoting 15 U.S.C. § 1)). As a leading treatise explains:
**\*4** "[T]he antitrust injury element of standing demands that the plaintiff's alleged injury result from the threat to competition that underlies the alleged violation. A court seeing no threat to competition ... may then deny that the plaintiff has suffered antitrust injury and dismiss the suit for lack of standing. Such a ruling would be erroneous, for the absence of any threat to competition means that no violation has occurred and that even suit by the government-which enjoys automatic standing-must be dismissed.... To test standing in a private suit, therefore, the court should assume the existence of a violation and then ask whether the [standing elements] are shown."

**\*5** 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 335f (2d ed.2002). It would thus be improper for us, as part of our standing analysis, to conclude that the challenged swap agreements and acquisitions cannot constitute antitrust violations because the Third Amended Complaint does not specifically allege that the cable companies

transacting with Comcast were overbuilders. *See Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,* 171 F.3d 912, 925 n. 7 (3d Cir.1999) ("While we do not decide whether an agreement among competitors to withhold a new product from a market would constitute an antitrust violation, we assume for the sake of assessing plaintiffs' antitrust standing that the conduct in which defendants allegedly engaged would constitute such a violation.").

**\*5** We find that the Third Amended Complaint pleads a reduction of actual and prospective competition in the Philadelphia and Chicago clusters that was the intended result of the challenged swap agreements and acquisitions. (3d Am.Com pl.¶ ¶ 3-4, 10-12, 25, 61, 99(b).) The Third Amended Complaint provides examples of how the transactions were structured to achieve the removal of competitors from the relevant markets. (*Id.* ¶ ¶ 50-57.) It alleges, for instance, that in a swap agreement between Comcast and Adelphia Communications Corp. ("Adelphia"), which closed on or about January 1, 2001, Comcast obtained Adelphia's cable systems and cable subscribers located in Philadelphia and adjacent New Jersey areas in exchange for Comcast's cable systems and cable subscribers in and around Palm Beach, Florida and Los Angeles, California and that this agreement eliminated competition from Adelphia in the Philadelphia market. (*Id.* ¶ 55(b).) We also find that Plaintiffs' alleged injury, "an increase in price resulting from the dampening of competitive market forces [,] is assuredly one type of injury for which § 4 [of the Clayton Act] potentially offers redress." *Blue Shield of Va. v. McCready,* 457 U.S. 465, 482-83 (1982). The injury is one that flows from the challenged swap agreements and acquisitions, in that Comcast's ability to raise its cable prices stemmed from the purported deliberate lessening of competition achieved through those transactions. Accordingly, with respect to the challenged swap agreements and acquisitions, the Third Amended Complaint sufficiently pleads the antitrust injury and causal connection/defendant intent elements required to satisfy factors one and two of the five-factor balancing test governing antitrust standing.[FN4]

> FN4. The authority upon which Comcast relies is inapposite. Comcast, for example, cites *West Penn Power,* 147 F.3d at 265, for the proposition that where a private plaintiff alleges it has suffered injury due to the suppression or elimination of competition via horizontal transactions but fails to plead

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

facts establishing the existence of actual or likely future competition between the transacting parties in the relevant market, the plaintiff's claims should be dismissed for lack of antitrust standing. In *West Penn Power,* the plaintiff, the City of Pittsburgh, brought suit against two electric companies seeking damages and an injunction precluding the merger of the companies, claiming that the merger would void the possibility of lower-priced electric service charged to city residents. The Third Circuit held that the plaintiff's claim did not meet standing requirements because of the absence of antitrust injury and a lack of causal connection between the plaintiff's injuries and the alleged harm. *Id.* The Third Circuit agreed with the district court's conclusion that there was no antitrust injury, as the proposed merger had not "brought about the lessening of competition in a 'marketplace' where there was no competition." *Id.* at 266-67. *West Penn Power* is distinguishable from the instant case. As the Third Circuit has explained, it arrived at the conclusion in *West Penn Power* because

an intervening regulatory scheme precluded the companies from competing, i.e., the merger was not the cause of the injury. No significant antitrust injury inquiry was required to reach this conclusion and none was undertaken. We can reasonably posit, however, that if not for this regulatory quirk, the City would have been entitled to ... relief because the proposed merger would have eradicated competition, a result prohibited under the Clayton Act, and detrimental to the City's electrical customers.

*In re Warfarin Sodium Antitrust Litig.,* 214 F.3d 395,401 (3d Cir.2000). Unlike *West Penn Power,* the instant case does not involve a regulatory scheme that authorizes territorial monopolies and hence, the "quirk" that justified the denial of antitrust standing in *West Penn Power* is not present here. Comcast also relies upon *Mathews v. Lancaster Gen. Hosp., 883 F.Supp. 1016 (E.D.Pa.1995), aff'd, 87 F.3d 624 (3d Cir.1996),* a case in which the court held that defendants were entitled to summary judgment based on the plaintiff's lack of antitrust standing where "[f]rom the standpoint of the consumer, there has been no meaningful change in the market" as a

result of the defendants' conduct. *Id. at 1045. Mathews* is distinguishable because the plaintiff in that case only alleged harm to himself, as a provider of orthopedic services whose privileges had been restricted at hospitals, and not harm to competition. *Id.* In *Mathews,* the "undisputed evidence show[ed] that orthopedic services are still readily available from a large and ever-increasing number of providers." *Id.*

**\*5** In addition, we hold that the Third Amended Complaint adequately pleads antitrust standing requirements three through five. Plaintiffs' injury of higher cable prices is allegedly directly traceable to Comcast's success in dampening competitive market forces for the provision of cable services. Plaintiffs are direct victims because they purchased cable services straight from Comcast at the inflated prices generated through Comcast's purported antitrust violations. There is little likelihood of duplicative recovery because Plaintiffs are not seeking to recover damages passed onto them by other entities and complex apportionment of damages is not an issue because each Plaintiff suffered overcharges that are separate and distinct. We conclude that, regarding the challenged swap agreements and acquisitions that form the basis for Count One and parts of Counts Two and Three, the Third Amended Complaint satisfactorily alleges the elements of antitrust standing.

### 2. *Conduct affecting RCN*

**\*6** Comcast argues that Plaintiffs lack antitrust standing to challenge Comcast's conduct towards RCN, and that the portions of Counts Two and Three that depend on such conduct should be dismissed. As discussed above, Counts Two and Three allege that Comcast deprived RCN of a longterm contract for Sportsnet, denied RCN access to the key contractors in the Philadelphia area, and made RCN the target of pricing schemes. (3d Am.Compl.¶ ¶ 85-90, 105.) Comcast asserts that Plaintiffs' theory of injury-that Comcast was able to charge supra-competitive cable prices as a result of its suppression of competition from RCN-founders on paragraphs ninety and ninety-three of the Third Amended Complaint, which, Comcast contends, serve as an acknowledgment that RCN was able to enter and compete with Comcast in the Philadelphia cluster. Paragraph ninety states that RCN obtained short-term access to Sportsnet programming in Philadelphia, and paragraph ninety-three states that, in the summer of 2000, RCN began

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

offering cable service in Delaware County, Pennsylvania communities served by Comcast. Comcast maintains that its alleged ability to charge Plaintiffs inflated cable prices cannot be attributed to the purported exclusion of RCN from the Philadelphia cluster, and that Counts Two and Three fail to plead facts showing a direct causal connection between Comcast's treatment of RCN and Plaintiffs' claimed injury. Comcast also argues that Plaintiffs lack antitrust standing because RCN is a more direct victim of the alleged antitrust violations. *See Associated Gen. Contractors, 459 U.S. at 542* (stating that "[t]he existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party ... to perform the office of a private attorney general").

**\*6** We find that Counts Two and Three adequately plead the first and second factors, i.e., the causal connection/defendant intent element and the antitrust injury element, of the antitrust standing analysis with respect to Comcast's treatment of RCN. Counts Two and Three allege that Comcast deliberately acted with anticompetitive intent towards RCN by suppressing competition from RCN in the portion of the Philadelphia cluster in which RCN offered services and by preventing competition from RCN in the portions of the cluster it might have entered. (3d Am.Compl.¶ ¶ 82, 86.) Counts Two and Three further allege that Comcast's success in reducing competition from RCN enabled it to charge the inflated prices that injured Plaintiffs. (*Id.* ¶ ¶ 92, 94.) As discussed, *supra* Part III.A.1, such prices are the type of injury for which the antitrust laws were intended to provide redress. *McCready, 457 U.S. at 482-83.* Counts Two and Three need not contend that Comcast completely eliminated all competition from RCN in order to demonstrate a link between Comcast's treatment of RCN and Plaintiffs' injury. Under § 2 of the Sherman Act, "it is not necessary that all competition be removed from the market. The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit ." *United States v. Dentsply Int'l, Inc., 399 F.3d 181, 191 (3d Cir.2005)* (citation omitted).

**\*7** We additionally find that Counts Two and Three sufficiently plead the three remaining elements of antitrust standing with respect to Comcast's conduct towards RCN. Plaintiffs' own cable bills were higher because Comcast acted to restrain RCN, and Plaintiffs' injury is thus directly traceable to

Comcast's anticompetitive behavior.[FN5] The fact that Comcast's conduct harmed RCN and potentially RCN's customers, as well as Plaintiffs, does not deprive Plaintiffs of their antitrust standing. "[O]ther direct victims exist, but their presence does not diminish the directness of the [Plaintiffs'] injury." *In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1168-70 (3d Cir.1993)* (finding that plaintiff steel companies had antitrust standing to recover inflated dock handling charges resulting from defendant railroads' conspiracy preventing plaintiffs from using private docks and that the presence of dock companies as another direct victim did not dilute the causal connection between the inflated charges paid by plaintiffs and defendants' conspiracy); *see also U.S. Horticultural Supply, Inc. v. Scotts Co., Civ. A. No. 03-733, 2004 WL 1529185, at \*6 (E.D.Pa. Feb. 18, 2004)* (noting that there may be more than one proper plaintiff of an alleged antitrust violation). Permitting Plaintiffs to proceed in this case does not pose the risk of duplicative damages even if RCN litigates its rights; Plaintiffs' injuries, which consist of overcharges, are distinct from RCN's injuries, which likely consist of lost profits. See *McCready, 457 U.S. at 469 n. 4, 474-75* (allowing a purchaser of health insurance to challenge a boycott by the insurer and psychiatrists directed at psychologists even though the psychologists had maintained their own successful suit, where the psychologists suffered one kind of injury-lost profits in selling their services-and plaintiff suffered another kind of injury-reduced coverage on her health insurance policy). Nor is there a risk of complex apportionment of damages since Comcast overcharged each Plaintiff through separate monthly bills and Comcast's billing records are easily recoverable.

> FN5. Defendants argue in the alternative that Plaintiffs do not have antitrust standing with respect to Comcast's RCN-related conduct because they do not live in the counties where RCN operates, and they do not specifically allege that RCN ever competed in their counties or applied or intended to apply for franchise licenses covering their counties. Comcast relies upon *Brotech Corp. 2004 WL 1427136,* a case in which this Court noted that a competitor who seeks entry to a market can state an antitrust injury stemming from the defendant's violation of antitrust laws only if that prospective competitor can demonstrate " 'both its intention to enter the market and

its preparedness to do so.' " *Id.* at *5 (quoting *Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 806 (D.C.Cir.2001)). Plaintiffs are not competitors of Comcast and the standards that courts impose on competitors to ensure that their injury is not speculative are not applicable to the determination of Plaintiffs' antitrust standing.

*7 RCN is not the more direct or "superior" plaintiff to vindicate the public interest. In general, "[t]he antitrust laws ... were enacted for the protection of competition, not competitors" and "basic economic theory teaches us that the chief benefit of competition is lower prices to consumers." *Brunswick Corp.*, 429 U.S. at 488 (quotation omitted); *Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 109 (3d Cir.1992). Comcast allegedly acted to restrain competition from RCN in order to gain the ability to charge consumers inflated prices. Plaintiffs were, therefore, the ultimate target of Comcast's anticompetitive conduct towards RCN. As the Supreme Court found in *McCready,* where the injury to the consumer is "inextricably intertwined" with the injury the defendant sought to inflict on the relevant market, standing under § 4 of the Clayton Act is present. *McCready,* 457 U.S. at 479, 483-84 (holding that plaintiff's injury was not rendered remote merely because the alleged goal of the defendant was to halt encroachment by competitors and noting that the § 4 "remedy cannot reasonably be restricted to those competitors whom [defendants] hoped to eliminate from the market"); *see also Goldwasser v. Ameritech Corp.*, 222 F.3d 390 (7th Cir.2000) (finding that consumers had antitrust standing to claim defendant had engaged in practices leading to anticompetitively high prices where those practices were aimed at preventing competitors from entering local markets; [FN6] *N.Y. Citizens Comm. on Cable TV v. Manhattan Cable TV, Inc.*, 651 F.Supp. 802, 811 (S.D.N.Y.1986) ( "Consumers have standing when they are injured as a result of a defendant's improper exclusion of competitors from the market." (citing *McCready,* 457 U.S. at 465)). We hold that Counts Two and Three of the Third Amended Complaint sufficiently allege the elements of antitrust standing with respect to Plaintiffs' injuries stemming from Comcast's conduct towards RCN. We deny the instant Motion to Dismiss to the extent the Motion disputes Plaintiffs' antitrust standing.

FN6. The United States Court of Appeals for the Seventh Circuit in *Goldwasser*

explained:

[W]e think [the defendant] is wrong to claim that the plaintiffs lack standing because they are attempting to raise third-party rights-the rights of the competitors. It is true that the reason the plaintiffs have been injured (allegedly, of course) implicates the rights of the competitors not to be excluded from the local markets through anticompetitive actions of [the defendant], but that does not make this a *jus tertii* case. These plaintiffs want lower prices and more choice, and they claim that [the defendant] (a monopolist) is doing things to prevent that from happening. Their theory is a classic exclusionary acts theory, and in all such cases, the monopolist's alleged sin is the exclusion of other competitors from the market. One assumes that those other competitors are grateful for the help from the consumer litigation, but that is incidental. The [plaintiffs] do not care in principle which competitors enter their markets; they just want a competitively structured local telephone market that will prevent [the defendant] from inflicting antitrust injury on them. We are satisfied that they are asserting their own rights, and thus that they have standing.

*Goldwasser,* 222 F.3d at 398-99.

B. *Plaintiffs' Claim Under Section One of the Sherman Act*

*8 In Count One of the Third Amended Complaint, Plaintiffs assert that Comcast has violated § 1 of the Sherman Act. Section 1 provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. Courts have long recognized that § 1 only prohibits unreasonable restraints of trade. *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988). Certain restraints of trade are per se unreasonable, while others require more rigorous analysis under the "rule of reason." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 356 (3d Cir.2004) (citing *InterVest Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 158-59 (3d Cir.2003)).

*8 Generally, to establish a § 1 violation, a plaintiff must prove: "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2559479 (E.D.Pa.), 2006-2 Trade Cases P 75,531
**(Cite as: Slip Copy)**

Page 8

was injured as a proximate result of the concerted action." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F .3d 430, 442 (3d Cir.1997) (citations omitted); *Tunis Bros. Co., Inc. v. Ford Motor Co.,* 952 F.2d 715, 722 (3d Cir.1991). However, when a per se violation of § 1 is alleged, a plaintiff need only prove concerted action that was the proximate cause of the plaintiff's injuries. *See Flat Glass,* 385 F.3d at 356. Per se treatment is reserved for a small category of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 289 (1985) (quotation omitted); *see also Texaco Inc. v. Dagher, --U.S. ----,* 126 S.Ct. 1276, 1279 (2006) ("Per se liability is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." (quotation omitted)). Accordingly, courts "have expressed reluctance to adopt per se rules ... 'where the economic impact of certain practices is not immediately obvious.' " *Texaco,* 126 S.Ct. at 1279 (quoting *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997)). "For those activities not within the per se invalidity category, courts employ the rule of reason test." *Eichorn,* 248 F.3d at 138. "Under this test, plaintiffs have the burden of establishing that, under all the circumstances, 'the challenged acts are unreasonably restrictive of competitive conditions' in the relevant market." *Id.* (quoting *Standard Oil Co. of N.J. v. United States,* 221 U.S. 1, 28 (1911)). Comcast argues that Count One of the Third Amended Complaint does not allege a per se violation of § 1 of the Sherman Act, and that Plaintiffs must proceed under the rule of reason and plead additional facts, which, if true, could demonstrate an anticompetitive effect within the relevant markets.

\*9 Count One alleges that Comcast engaged in the horizontal division of cable markets by entering into swap agreements with its competitors and that those agreements prevented competitors from entering or reentering the Philadelphia and Chicago clusters to challenge Comcast. (3d Am.Compl.¶ ¶ 63-65, 70-74.) Comcast acknowledges that the agreed upon division of markets between competitors in order to suppress competition is the type of conduct courts have traditionally afforded per se treatment. *See Palmer v.. BRG of Georgia, Inc.,* 498 U.S. 46,49 (1990) (" 'One of the classic examples of a per se

violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition.... This Court has reiterated time and time again that [h]orizontal territorial limitations ... are naked restraints of trade with no purpose except stifling competition.' " (quoting *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 608 (1972))).

\*9 Comcast contends, however, that we should not accept Count One's characterization of the swap agreements as horizontal market allocations. [FN7] Comcast invokes *Jetro Cash & Carry Enters., Inc. v. Food Distrib. Ctr.,* 569 F. Supp 1404 (E.D.Pa.1983), for the proposition that the "talismanic invocation of the word 'horizontal' does not automatically mandate application of the fatal per se rule." *Id.* at 1414. In *Jetro,* the court did not have to accept as true all well-pleaded allegations in the complaint because the court was not considering a motion to dismiss; rather, the court had conducted a bench trial and was making findings of fact and law. *Id.* at 1406. While courts should not credit "bald allegations" even at the motion to dismiss stage, *Cal. Pub. Employees' Ret. Sys,* 394 F.3d at 143, we find that Count One's allegations that the swap agreements constitute horizontal market allocations are buttressed by descriptions in the Third Amended Complaint of the parties to the swap agreements, when the agreements were completed, and how the terms of the agreements served to eliminate competitors from the Philadelphia and Chicago clusters and effectively preclude opportunities for entry and reentry.[FN8] (3d Am.Compl.¶ ¶ 10, 54-56, 63-64.)

> FN7. Comcast emphasizes that the conduct Plaintiffs challenge under § 1 of the Sherman Act includes Comcast's acquisitions. Count One only alleges that Comcast's swap agreements with horizontal competitors constitute per se violations of § 1. (3d Am.Compl.¶ 73 .) Count One separately alleges that Comcast's acquisitions of competing cable companies and their cable subscribers in the Philadelphia and Chicago clusters constitute contracts and conduct in restraint of trade in violation of § 1 under the applicable rule of reason analysis. (*Id.* ¶ 74.) Thus, Comcast's assertions that acquisitions hold the promise of increasing a firm's efficiency, *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768 (1984), and, thus, are not manifestly anticompetitive business

Slip Copy                                                                                                Page 9
Slip Copy, 2006 WL 2559479 (E.D.Pa.), 2006-2 Trade Cases P 75,531
(Cite as: Slip Copy)

practices are irrelevant to the assessment of whether Count One has alleged per se violations of § 1.

FN8. Comcast has submitted excerpts from its swap agreements with AT & T and Adelphia to argue that, irrespective of the specificity of Count One's allegations, we should find as a matter of law that none of the swap agreements amount to horizontal market allocations. (James T. Cain Decl. Ex. A(7), A(8).) According to Comcast, the excerpts demonstrate that the swap agreements did not impose restrictions on the ability of any counterparty to reenter or compete directly in the affected markets. We decline to consider these excerpts on a motion to dismiss, as they go beyond the facts alleged in the Third Amended Complaint and do not warrant the exceptions made for documents that are "integral to or explicitly relied upon in the complaint" or "undisputedly authentic" and the basis for plaintiffs' claims. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997) (quotation omitted); *Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993). Moreover, the excerpts are not sufficient for us to draw conclusions as a matter of law, even with respect to Comcast's arrangements with AT & T and Adelphia, because Count One does not necessarily depend upon the presence, or absence, of express covenants-not-to-compete.

**\*9** Comcast further argues that Plaintiffs cannot show that Comcast engaged in conduct that was per se unlawful because the transactions challenged in Count One were approved by government authorities at the federal, state, and local levels. Comcast relies upon *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U .S. 398 (2004), in which the Supreme Court, considering the dismissal of antitrust claims, noted that "[o]ne factor of particular importance is the existence of a regulatory structure designed to deter and remedy anticompetitive harm. Where such a structure exists, the additional benefit to competition provided by antitrust enforcement will tend to be small, and it will be less plausible that the antitrust laws contemplate such additional scrutiny." *Id .* at 412.

**\*10** The mere fact that regulatory and law enforcement agencies may have reviewed and approved the challenged transactions is not ground for dismissal of Plaintiffs' claims. *See Otter Tail Power Co. v. United States,* 410 U.S. 366, 372 (1973) (explaining that "[a]ctivities which come under the jurisdiction of a regulatory agency nevertheless maybe subject to scrutiny under the antitrust laws"); *Cableamerica Corp. v. Fed. Trade Comm'n,* 795 F.Supp. 1082,1092 (N.D.Ala.1992) (stating that " '[a]ntitrust immunity is not conferred by the bare fact that defendants' activities might be controlled by an agency having broad powers over their conduct' " and that " '[t]here is no general presumption that Congress intends the antitrust laws to be displaced whenever it gives an agency regulatory authority over an industry' " (quoting *Phonetele, Inc. v. Am. Tel. & Tel. Co.,* 664 F.2d 716,729 (9th Cir.1981))). "Only where there is a 'plain repugnancy between the antitrust and regulatory provisions' will repeal [of the antitrust provisions] be implied." *Gordon v. New York Stock Exch., Inc.,* 422 U.S. 659, 682 (1975) (citing *United States v. Phila. Nat'l Bank,* 374 U.S. 321, 350-351 (1963)). Comcast does not contend that the antitrust laws and the regulatory provisions under which the challenged transactions were approved are repugnant to each other, but simply argues that we should refrain from "substitut[ing][our] judgment for that of the countless federal, state, and local authorities who approved the Cable System Transactions as being in the public interest." (Def. Rep. Mem. at 22.)

**\*10** *Trinko,* 540 U.S. 398, the case upon which Comcast primarily relies, does not support the proposition that Comcast's conduct should be shielded from antitrust scrutiny. In *Trinko,* the Supreme Court analyzed the 1996 Telecommunications Act and found that it expressly preserves claims that satisfy existing antitrust standards. *Id.* at 407. The Court's focus on the telephone industry's regulatory regime was in the context of deciding whether to recognize an expansion of the contours of § 2 of the Sherman Act to create additional exceptions to the established proposition that there is no duty to aid competitors. *Id.* at 412. *Trinko* does not provide a basis for insulating claims based on well-established examples of anticompetitive conduct, such as horizontal market allocations, from judicial review.

**\*10** We conclude that Count One of the Third Amended Complaint sufficiently alleges that the swap agreements are horizontal market allocations subject to the per se rule. Count One further alleges that the swap agreements were the result of concerted action and a proximate cause of Plaintiffs' injuries.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 10
Slip Copy, 2006 WL 2559479 (E.D.Pa.), 2006-2 Trade Cases P 75,531
**(Cite as: Slip Copy)**

(3d Am.Compl.¶ ¶ 10, 75.) Accordingly, we find that Count One states a claim under § 1 of the Sherman Act. Comcast's Motion to Dismiss is denied to the extent that it asserts otherwise. We need not consider Comcast's arguments that Count One fails to plead an anticompetitive effect in a relevant product or geographic market under the rule of reason. See Flat Glass, 385 F.3d at 356; see also CSR Ltd. v. Fed. Ins. Co., 40 F.Supp.2d 559, 564 (D.N.J.1998) ("At this early [motion to dismiss] stage of the proceeding, the court does not find it necessary to determine which mode of analysis [per se or rule of reason] it will ultimately employ in evaluating the plaintiffs' activities."); Swarthmore Radiation Oncology, Inc. v. Lapes, 812 F.Supp. 517, 520 (E.D.Pa.1992) ("[The court] need not decide, at this stage of the proceedings, whether a per se rule or a 'rule of reason' applies.").

### C. Plaintiffs' Claim Under Section Two of the Sherman Act

**\*11** In Counts Two and Three of the Third Amended Complaint, Plaintiffs assert that Comcast has violated § 2 of the Sherman Act by monopolizing and attempting to monopolize the market for MVPS in the Philadelphia and Chicago clusters. Section 2 of the Sherman Act states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations" is guilty of an offense and subject to penalties. 15 U.S.C. § 2. In order to state a claim for monopolization under § 2 of the Sherman Act, a plaintiff must plead facts indicating " '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.' " Schuylkill Energy Res., Inc. v. Pa. Power & Light Co ., 113 F.3d 405,412-13 (3d Cir.1997) (quoting Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 197 (3d Cir.1992)). The possession of monopoly power "will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." Trinko, 540 U.S. at 407 (emphasis deleted). In order to state a claim for attempted monopolization, a plaintiff must allege that the defendant has "(1) engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and with (3) a dangerous probability of achieving monopoly power.' " Queen City Pizza. 124 F.3d at 442 (quotations omitted). To determine

whether there exists a viable claim of monopolization or attempted monopolization, "a court must inquire 'into the relevant product and geographic market.' " Id. (quoting Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447,459 (1993)); Syncsort Inc. v. Sequential Software, Inc., 50 F.Supp.2d 318, 327 (D.N.J.1999) (citation omitted).

**\*11** Counts Two and Three propose that the relevant geographic market is Comcast's Philadelphia and Chicago clusters, i.e., "those areas covered by Comcast's cable franchises or any of its subsidiaries or affiliates, located in Philadelphia, Pennsylvania [and Chicago, Illinois] and geographically contiguous areas, or areas in close geographic proximity to Philadelphia, Pennsylvania [and Chicago, Illinois]" in designated counties. (3d Am.Compl.¶ ¶ 31, 78, 107.) Comcast argues that Counts Two and Three must be dismissed because they do not adequately plead a relevant geographic market. Comcast contends that Plaintiffs' geographic market definition is carefully but artificially gerrymandered to include Comcast's franchise areas and leave out neighboring areas covered by rival cable providers. Comcast asserts that Plaintiffs' attempt to delineate the relevant geographic market solely by reference to the places where Comcast has subscribers is improper as a matter of law. See Eichorn, 248 F.3d at 147 ("By defining the market so narrowly that it only includes the defendants, plaintiffs' proffered geographic and product markets are unrealistic.").

**\*12** The viability of claims of monopolization and attempted monopolization under § 2 of the Sherman Act is dependent upon "demonstration by a plaintiff of why a proposed market is the relevant market." Syncsort, 50 F.Supp.2d at 330 (citing Schuylkill Energy Res., 113 F.3d at 415). " 'The relevant geographic market is the area in which a potential buyer may rationally look for the goods or services he or she seeks[.]' " Tunis Bros., 952 F.2d at 726 (alteration in original) (quoting Pa. Dental Ass'n v. Medical Serv. Ass'n of Pa., 745 F.2d 248,260 (3d Cir.1984)). "Consequently, the geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product." Id. "The definition of the relevant geographic market, therefore, is a question of fact to be determined in the context of each case in acknowledgment of the commercial realities of the industry under consideration." Borough of Lansdale v. Phila. Elec. Co., 692 F.2d 307, 311 (3d Cir.1982); see also Brown Shoe Co. v. United States, 370 U.S. 294, 336-37 (1962); but cf. Queen City Pizza, 124

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 11
Slip Copy, 2006 WL 2559479 (E.D.Pa.), 2006-2 Trade Cases P 75,531
(Cite as: Slip Copy)

F.3d at 436 (noting that there is no per se prohibition against dismissal of antitrust claims for failure to plead a relevant market.) The relevant geographic market may be local, regional, national, or international in origin. *See Brown Shoe, 370 U.S. at 337.* However, "[t]he mere delineation of a geographical area, without reference to a market as perceived by consumers and suppliers, fails to meet the legal standard necessary for the relevant geographic market." *Tunis Bros., 952 F.2d at 727; see also Gordon v. Lewistown Hosp., 272 F.Supp.2d 393, 432 (M.D.Pa.2003)* ("There is voluminous case law holding that a firm's service area, alone, does not equate to a market's geographic scope.").[FN9]

> FN9. Comcast asserts that "Plaintiffs' proposed geographic market (a miscellany of 30 counties spread across five states) is an arbitrary construct which cannot be explained or justified by reference to (i) the areas in which Plaintiffs allege that Comcast faces actual competition from RCN (i.e., Delaware County, Pennsylvania), or (ii) the areas in which Comcast faces actual competition for the relevant product (i.e., everywhere in the United States that Comcast offers MVPS)." (Def. Rep. Mem. at 31.) While numerous cases say that for the purposes of § 2 of the Sherman Act, the relevant geographic market is the "area of effective competition," *see e.g., Jetro, 569 F. Supp at 1412,* what is meant is the area where the buyer can practicably and feasibly turn to make its purchases. *Id.; Tunis Bros., 952 F.2d at 726.* Plaintiffs need not define the relevant market based upon where Comcast competes. *See Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd., 924 F.2d 1484, 1490 (9th Cir.1991)* ("[A] company may compete in many markets or in only part of a market. Where it competes does not define the market.").

**\*12** "To survive a Rule 12(b)(6) motion to dismiss," Plaintiffs' alleged market must be "plausible." *Todd v. Exxon Corp., 275 F .3d 191, 200 (2d Cir.2001)* (discussing product markets) (quotation omitted); *cf. Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 479 n. 12 (3rd Cir.1992).* Counts Two and Three of the Third Amended Complaint not only identify the geographic areas that constitute the proposed relevant geographic market but also allege that subscribers living within the Philadelphia and Chicago clusters cannot look

beyond Comcast for their cable services. (3d Am.Compl.¶ ¶ 31, 41-42, 78, 107.) As Defense Counsel acknowledged at Oral Argument, the commercial realities of the cable market mean that it is particularly local in nature and that consumers chose their cable providers based on the options available to them at their residences. (08/07/06 Tr. at 64.) We find that deciding whether Plaintiffs' proposed relevant geographic market appropriately tracks Comcast's franchise territories requires a fact-intensive inquiry not appropriately conducted on a motion to dismiss, and that the geographic market pled in Counts Two and Three of the Third Amended Complaint is sufficient to set forth valid claims under § 2 of the Sherman Act. Accordingly, we conclude that Comcast's Motion to Dismiss is denied to the extent that it asserts that Counts Two and Three fail to state a claim under § 2 of the Sherman Act.[FN10]

> FN10. Comcast also argues that Plaintiffs cannot show that its conduct produced anticompetitive effects in the relevant markets as required to maintain a § 2 claim. We have found, *supra* Part III .B, that Count One states a claim under § 1 of the Sherman Act with respect to Comcast's alleged horizontal market allocations. That same manifestly anticompetitive conduct also underlies Plaintiffs' § 2 claims in Counts Two and Three. Comcast maintains that we should nonetheless dismiss Counts Two and Three to the extent that they rely on Comcast's other conduct, namely Comcast's acquisitions of competing cable companies and Comcast's treatment of RCN. We will not, at this stage, take such a piecemeal approach to Counts Two and Three. *See LePage's Inc. v. 3M, 324 F.3d 141, 162 (3d Cir.2003)* ("The relevant inquiry is the anticompetitive effect of [defendant's] exclusionary practices considered together."). Moreover, Comcast's contention that its acquisitions cannot be considered anticompetitive unless they involved overbuilders clearly implicates questions of fact regarding, for example, the sources of competition in the relevant product market.

### D. Statute of Limitations

**\*13** Comcast argues that Counts One through Three are time-barred under the applicable statute of limitations to the extent that they depend on transactions which were consummated more than

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                           Page 12
Slip Copy, 2006 WL 2559479 (E.D.Pa.), 2006-2 Trade Cases P 75,531
(Cite as: Slip Copy)

four years before Plaintiffs filed their original Complaint in this action on December 8, 2003. The Third Amended Complaint alleges three such transactions: an acquisition of Marcus Cable Communication's ("MCC") cable systems and approximately 27,000 cable subscribers in Harrington, Delaware that closed on April 1, 1998 (3d Am.Compl.¶ 52(a)); an acquisition of Greater Philadelphia Cablevision, Inc's ("GPC") cable systems and approximately 79,000 cable subscribers in Philadelphia, Pennsylvania that closed in June 1999 (*Id.* ¶ 52(b)); and an acquisition of Tele-Communications, Inc.'s ("TCI") 1.6 million cable subscribers in and around Chicago, Illinois that closed on March 9, 1999 (*Id.* ¶ 53(a)).[FN11]

> FN11. The TCI acquisition was made by AT & T. The Third Amended Complaint alleges that, as part of the merger between AT & T and Comcast, Comcast assumed liability for AT & T's violations of antitrust law. (3d Am.Compl.¶ 5.)

**\*13** The statute of limitations is an affirmative defense, and the burden of establishing its applicability to a particular claim rests with the defendant. *Van Buskirk v. Carey Canadian Mines, Ltd.,* 760 F.2d 481, 487 (3d Cir.1985) (citation omitted). When considering a motion to dismiss pursuant to Rule 12(b)(6) on statute of limitations grounds, courts " 'must determine whether the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations.' " *Davis v. Grusemeyer,* 996 F.2d 617, 623 (3d Cir.1993) (quoting *Cito v. Bridgewater Twp. Police Dept.,* 892 F.2d 23, 25 (3d Cir.1989)). The defendant bears a heavy burden in seeking to establish that the challenged claims are barred as a matter of law. *Davis,* 996 F.2d at 623 n. 10 (citing *Van Buskirk,* 760 F.2d at 498). The Clayton Act provides that "[a]ny action to enforce any cause of action under section 15,15a, or 15c of this title shall be forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b. Generally, a cause of action accrues, and the statute begins to run, when the defendant commits an act that injures the plaintiff. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338 (1971). Plaintiffs, who limit their claims for damages to the four years preceding the filing of their original complaint, do not dispute the applicability of the Clayton Act's four-year statute of limitations. Plaintiffs argue, however, that their claims may be based on conduct occurring prior to

the four-year period under the continuing violation exception to the accrual rule.

**\*13** "The Supreme Court has considered and rejected the argument that, in the context of a defendant's continuing violation of the Sherman Act, the statute of limitations runs from the violation's earliest impact on a plaintiff." *Lower Lake Erie Iron Ore,* 998 F.2d at 1171 (citing *Hanover Shoe, Inc. v. United Shoe Mach. Corp.,* 392 U.S. 481, 502 n. 15 (1968)). The four-year statute of limitations does not bar later recovery for private antitrust actions if the defendant's conduct "constituted a continuing violation of the Sherman Act and ... inflicted continuing and accumulating harm." *Hanover Shoe,* 392 U.S. at 502 n. 15. Antitrust law provides that, in the case of a continuing antitrust violation, "each overt act that is part of the violation and that injures the plaintiff ... starts the statutory period running again." *Klehr v. A.O. Smith Corp.,* 521 U.S. 179,189 (1997) (quotation omitted). Plaintiffs contend that the continuing violation exception should be applied to the MCC, GPC, and TCI acquisitions because the Third Amended Complaint alleges that those transactions are part of an ongoing program of acquisitions, which furthered Comcast's unlawful restraints on trade and monopolization and which extended into the limitations period. (3 d Am. Compl. ¶ 68.) *See Areeda, supra,* ¶ 320c4 ("When the monopolist creates its monopoly by a series of repeated or re-asserted acts designed to maintain its monopoly, the statute of limitation is restarted, provided that the subsequent acts fall within the definition of independent predicate acts...."). Plaintiffs further contend that, since the Third Amended Complaint alleges that the MCC, GPC, and TCI acquisitions resulted in continuing and accumulating harm to them within the limitations period in the form of overcharges, they are not barred by the statute of limitations from making claims based on those acquisitions. (3d Am.Compl.¶ ¶ 51-53, 62.) *See In re Buspirone Patent Litig.,* 185 F.Supp.2d 363, 378 (S.D.N.Y.2002) ("[I]f a party commits an initial unlawful act that allows it to maintain market control and overcharge customers for a period longer than four years, purchasers maintain a right of action for any overcharges paid within the four years prior to their filings."); *Meijer, Inc. v. 3M,* Civ. A. No. 04-5871, 2005 WL 1660188, at \*4 (E.D.Pa. July 13, 2005).

**\*14** Comcast argues that Plaintiffs' injuries accrued from the MCC, GPC, and TCI acquisitions on the dates that the acquisitions closed and beyond the applicable statute of limitations. Comcast maintains

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that acquisitions are single, discrete acts and that they cannot be appraised collectively as part of a continuing acquisitions program. *Cf. Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1050 (8th Cir.2000) (stating that the statute of limitations on a merger or acquisition of another company's assets being challenged under § 7 of the Clayton Act, 15 U.S.C. § 7, presumptively begins to run at the time the merger or acquisition occurs). Comcast further maintains that making post-acquisition charges the basis for a continuing violation exception would effectively abolish the statute of limitation for acquisitions because combined corporations would necessarily be exposed to damages each time they made a sale. *See* Areeda, *supra*, ¶ 320c5 ("[A]ny 'continuing violation' rule to the effect that each sale by the post-merger firm restarts the statute of limitations would leave mergers open to perpetual challenge. Clearly, Congress did not intend to exempt mergers from the antitrust statute of limitation.... Limiting merger challenges to four years following acquisition would thus seem to be a foregone conclusion....").

**\*14** We find that the conceptualization of the MCC, GPC, and TCI acquisitions for statute of limitations purposes implicates questions of fact-such as whether the acquisitions were part of a continuing course of conduct or whether they were discrete transactions-which are not properly considered on this Motion to Dismiss. Moreover, we note that Counts One through Three of the Third Amended Complaint are based primarily upon conduct occurring within the statute of limitations period. For example, all of the challenged swap agreements, four of the challenged acquisitions, and the merger between AT & T and Comcast occurred within the four-year period preceding the filing of the initial Complaint, as did the pricing campaign allegedly designed to prevent competition from RCN. (Compl.¶ ¶ 52-53, 55-57, 93.) The MCC, GPC, and TCI acquisitions are merely alleged to have contributed to the damages associated with limitations period acts. Comcast is thus asking us to dismiss portions of Plaintiffs' § 1 and § 2 claims. "Such a piecemeal approach to an antitrust claim is improper." *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 654 F.Supp. 1195, 1204 (N.D.N.Y.1987) (refusing to dismiss portions of defendant's antitrust claim on statute of limitations grounds) (citation omitted); *see also LePage's Inc. v. 3M*, 324 F.3d 141,162 (3d Cir.2003) ("As the Supreme Court recognized in *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962), the courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation."). Accordingly, we hold that Comcast's Motion to Dismiss is denied to the extent that it is based on the statute of limitations.

### IV. CONCLUSION

**\*15** We conclude that Comcast has not demonstrated that Plaintiffs cannot prove any set of facts, consistent with the Third Amended Complaint, which would entitle them to relief. The Third Amended Complaint alleges the elements of antitrust standing and Comcast's arguments that Count One has not timely stated a claim under § 1 of the Sherman Act and that Counts Two and Three have not timely stated claims under § 2 of the Sherman Act are unavailing. Accordingly, Comcast's Motion to Dismiss is denied. An appropriate order follows.

### *ORDER*

**\*15 AND NOW,** this 31st day of August, 2006, upon consideration of Defendants' Motion to Dismiss Plaintiffs' Third Amended Class Action Complaint (Docket No. 138), and all submissions filed in connection therewith, **IT IS HEREBY ORDERED** that said Motion is **DENIED.**

E.D.Pa.,2006.
Glaberson v. Comcast Corp.
Slip Copy, 2006 WL 2559479 (E.D.Pa.), 2006-2 Trade Cases P 75,531

Briefs and Other Related Documents (Back to top)

• 2007 WL 444834 (Trial Pleading) Answer and Affirmative Defenses (Jan. 4, 2007)
• 2006 WL 3761452 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply in Support of Plaintiffs' Motion for Class Certification (Dec. 4, 2006)
• 2006 WL 3761218 () Declaration of John C. Beyer, Ph.D., in Response to Expert Report of Dr. Stanley M. Besen Regarding Class Certification (Dec. 1, 2006)
• 2006 WL 3761213 () (Deposition of Stanley M. Besen) (Nov. 16, 2006)
• 2006 WL 3761451 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (Nov. 9, 2006)
• 2006 WL 2882291 (Trial Motion, Memorandum and Affidavit) Class Plaintiffs' Memorandum in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2559479 (E.D.Pa.), 2006-2 Trade Cases P 75,531
**(Cite as: Slip Copy)**

Opposition to Comcast's Motion for Partial Reconsideration, or, in the Alternative, for Certification for Immediate Interlocutory Appeal (Sep. 22, 2006) Original Image of this Document (PDF)
• 2006 WL 2304770 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants' Motion to Dismiss the Third Amended Class Action Complaint (Jun. 12, 2006) Original Image of this Document (PDF)
• 2004 WL 4961970 () Declaration Of John C. Beyer, PH.D., Regarding Class Certification (Nov. 29, 2004)
• 2004 WL 4961960 (Trial Motion, Memorandum and Affidavit) Defendants' Brief in Support of Their Motion to Dismiss the Second Amended Complaint (Aug. 6, 2004) Original Image of this Document (PDF)
• 2004 WL 4961959 (Trial Motion, Memorandum and Affidavit) Class Plaintiffs' Opposition to Defendants' Motion to Strike Affidavits (Jul. 27, 2004) Original Image of this Document (PDF)
• 2004 WL 4961969 () Declaration of Howard J. Sedran (Jul. 22, 2004)
• 2004 WL 4961968 () Declaration of J. Owen Todd in Support of Plaintiffs' Opposition to Defendants' Motion to Compel Arbitration (Jul. 21, 2004)
• 2004 WL 4961958 (Trial Motion, Memorandum and Affidavit) Defendants' Motion to Strike Plaintiffs' Affidavits Containing Legal Conclusions (Jul. 13, 2004) Original Image of this Document (PDF)
• 2004 WL 4961957 (Trial Motion, Memorandum and Affidavit) Defendants' Motion for Protective Order (May 12, 2004) Original Image of this Document (PDF)
• 2004 WL 2718814 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Support of Amended Motion to Compel Arbitration (May 5, 2004) Original Image of this Document (PDF)
• 2004 WL 4961956 (Trial Motion, Memorandum and Affidavit) Defendants' Opposition to Plaintiffs' Motion for Entry of Practice & Procedure Order No. 1 (Apr. 28, 2004) Original Image of this Document (PDF)
• 2004 WL 2718811 (Trial Motion, Memorandum and Affidavit) Scheduling Order (Apr. 26, 2004) Original Image of this Document (PDF)
• 2004 WL 2718806 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Support of Motion to Compel Arbitration (Mar. 12, 2004) Original Image of this Document (PDF)
• 2004 WL 1432047 (Trial Pleading) Amended Class Action Complaint for Violations of the Sherman Antitrust Act (Feb. 20, 2004)

• 2003 WL 23194567 (Trial Pleading) Class Action Complaint for Violations of the Sherman Antitrust Act (Dec. 8, 2003)
• 2003 WL 23906553 (Trial Pleading) Class Action Complaint for Violations of the Sherman Antitrust Act (Dec. 8, 2003) Original Image of this Document (PDF)
• 2:03cv06604 (Docket) (Dec. 8, 2003)
• 2003 WL 23906579 (Trial Pleading) Second Amended Class Action Complaint for Violations of the Sherman antitrust Act (2003) Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 10



Not Reported in A.2d
Not Reported in A.2d, 2000 WL 33711050 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

Graduate Cardiology Consultants, P.C. v. Vivra, Inc.Pa.Com.Pl.,2000.Only the Westlaw citation is currently available.GRADUATE CARDIOLOGY CONSULTANTS, P.C., Plaintiff
v.
VIVRA, INC., et al., Defendants
**No. 2827 FEB.TERM 2000, CONTROL 080518.**

Oct. 20, 2000.

MEMORANDUM OPINION
HERRON, J.
**\*1** Defendants Vivra, Inc. ("Vivra"), Vivra Heart Services, Inc. ("VHS"), Vivra Holdings, Inc. ("Vivra Holdings"), VSP Holdings, Inc. ("VSP Holdings"), Vivra Specialty Partners, Inc. ("Vivra Specialty Partners") [FN1] and Charles W. Ott ("Ott") have filed Preliminary Objections ("Objections") to the amended complaint ("Complaint") of Plaintiff Graduate Cardiology Consultants, P.C. For the reasons set forth in this Opinion, the Court is issuing a contemporaneous Order overruling the Objections in part and sustaining the Objections in part.

> FN1. In 1996, VHS was a subsidiary of Vivra Partners. Vivra Partners, in turn, was a subsidiary of Vivra, Incorporated, a publicly held Delaware corporation. In June 1997, Vivra, Incorporated was sold to a third party. At the same time, Vivra Specialty Partners changed its name to or was merged into "Vivra, Inc." and was sold to a privately held new company called "VSP Holdings, Inc." VSP Holdings subsequently either changed its name to or was merged into another corporation known as "Vivra Holdings, Inc." Throughout this time, VHS continued as a subsidiary of Vivra, Inc. For the sake of simplicity, Vivra Specialty Partners, Inc./Vivra, Inc. will be referred to as "Vivra," while VSP Holdings, Inc./Vivra Holdings, Inc. will be referred to as "Vivra Holdings." Vivra, VHS, Vivra Holdings, VSP Holdings and Vivra Specialty Partners are referred to collectively as the "Vivra Defendants."

BACKGROUND

**\*1** On December 30, 1996, Graduate and VHS entered into two agreements ("1996 Agreements"). The first agreement was an Agreement for Purchase and Sale of Assets ("1996 Sale Agreement"), under whose terms Graduate sold certain of its assets ("Graduate Assets") to VHS. Under the 1996 Sale Agreement, VHS also agreed to assume post-closing obligations under Graduate's office leases ("Lease Obligations").[FN2]

> FN2. Among the Lease Obligations were payments due under leases for One Graduate Plaza, Philadelphia, Pennsylvania ("One Graduate Plaza") and 1740 South Street, Philadelphia, Pennsylvania ("1740 South Street") (collectively, "Office Spaces"). The leases for the Office Spaces are referred to collectively as the "Leases."

**\*1** At the same time, Graduate and VHS also entered into a Management Services Agreement ("Management Agreement").[FN3] Under the Management Agreement, VHS provided administrative and management services to Graduate and collected fees due to Graduate from health care organizations ("Fees"). In exchange, VHS retained 37.5% of the Fees, subject to certain adjustments, and paid the remaining 62.5% to Graduate.

> FN3. The 1996 Sale Agreement and the Management Agreement are referred to collectively as the "1996 Agreements."

**\*1** On August 5, 1998, Graduate and VHS entered into a second Agreement for Sale and Purchase of Assets ("1998 Sale Agreement"). Under this Agreement, the Management Agreement was terminated and Graduate purchased the Graduate Assets back from VHS. In the 1998 Sale Agreement, VHS warranted that, aside from certain accrued employee benefits, no VHS liabilities or obligations related to the Graduate Assets were outstanding. VHS also represented that it was not in violation of or in default under any material contract, including the Leases. The 1998 Sale Agreement closed on August 14, 1998.[FN4]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 33711050 (Pa.Com.Pl.)
(Cite as: Not Reported in A.2d)

FN4. The representations and warranties of both VHS and Graduate were made as of both the date of execution and the date of closing of the 1998 Sale Agreement.

**\*1** The Complaint alleges that VHS was in breach of the 1998 Sale Agreement when the Agreement both was executed and closed. VHS had paid the Lease Obligations for the Office Spaces for all of 1997 and January 1998, as required by the 1998 Sale Agreement. However, according to the Complaint, VHS did not pay Lease Obligations totaling $118,275.02 that accrued between February 1 through August 14, 1998 ("Rent Delinquency").

**\*1** At some point between August 14, 1998 and January 5, 1999, Graduate became aware of the Rent Delinquency and alerted VHS. On January 5, 1999, Vivra, VHS's parent, allegedly agreed, on behalf of itself and VHS, to pay the Rent Delinquency. In response, Graduate agreed not to pursue its rights under the Agreements.

**\*1** Soon after, Vivra sent Graduate checks ("Checks") payable to the Office Space landlord ("Landlord") for the amounts due. However, due to uncertainty generated by the insolvency of the Landlord, Graduate held the Checks pending clarification of the correct identity of the payee under the Leases. The Complaint alleges that this was done with the consent of VHS.

**\*2** By December 1999, the Checks still had not been cashed. Because of the significant length of time since the Checks were signed, Graduate believed that they were no longer valid, and again requested that the Vivra Defendants correct the Rent Delinquency. According to the Complaint, the Vivra Defendants have refused to do so.

**\*2** In a separate matter, in October 1999, Graduate became aware of an alleged overpayment of Fees by QualMed Plans for Health ("QualMed") to VHS. Because VHS retained 37.5% of all Fees collected, Graduate asserts that VHS must pay it 37.5% of any amount owed by Graduate to QualMed. To keep VHS's assets out of Graduate's reach, however, the Complaint alleges that the Vivra Defendants have engaged in fraudulent and conspiratorial behavior.

**\*2** Graduate asserts eight Counts against the Defendants in the Complaint: breach of contract, promissory estoppel, fraudulent misrepresentation, negligent misrepresentation, fraudulent conveyance, conspiracy, unjust enrichment and contractual compensation adjustments.

**\*2** The Objections are based on two grounds. First, the Defendants have filed a demurrer that asserts that the Plaintiff's failure to allege actual, compensable damage resulting from the Defendants' supposed malfeasance is fatal. Second, the Defendants claim that the fraudulent conveyance and conspiracy Counts are insufficiently specific and must be dismissed.

**\*2** As discussed below in greater detail *infra,* the demurrer to the Complaint as a whole must be overruled. However, the fraudulent conveyance and conspiracy Counts do not meet the requisite level of specificity, and the Objections to them are sustained.

DISCUSSION

I. Demurrer

**\*2** For the purposes of reviewing preliminary objections in the form of a demurrer, "all well-pleaded material, factual averments and all inferences fairly deducible therefrom" are presumed to be true. *Tucker v. Philadelphia Daily News,* 757 A.2d 938, 941-42 (Pa.Super.Ct.2000). When presented with preliminary objections whose end result would be the dismissal of a cause of action, a court should sustain the objections where "it is clear and free from doubt from all the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish [its] right to relief." *Bourke v. Kazaras,* 746 A.2d 642, 643 (Pa.Super.Ct.2000) (citation omitted). Furthermore,
**\*2** [I]t is essential that the face of the complaint indicate that its claims may not be sustained and that the law will not permit recovery. If there is any doubt, it should be resolved by the overruling of the demurrer. Put simply, the question presented by demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible.

**\*2** *Bailey v. Storlazzi,* 729 A.2d 1206, 1211 (Pa.Super.Ct.1999).

**\*2** According to the Defendants, the Complaint does not allege a demand for payment of the Rent Delinquencies. Consequently, they assert, the Plaintiff cannot establish the causation or damages necessary for each of the Counts, and the Complaint should be dismissed.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 33711050 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

Page 3

**\*3** The Plaintiff counters that the Defendants' alleged actions resulted in harm to the Plaintiff in two ways: **\*3** First, [VHS] misappropriated to itself funds it was contractually obligated to pay as rent. Second, it obtained an inflated price when it sold the practice assets back to plaintiff by falsely claiming that it had, in fact, paid the rents it knew it was obligated to pay but had not paid.

**\*3** Plaintiff's Memorandum at 2-3.

**\*3** Most of the offenses alleged in the Complaint against the Defendants require proof of causation. However, for each offense, the misconduct that must cause the damage is different. In addition, one of the Counts alleged does not require causation or damages at all. This precludes addressing the demurrer wholesale and requires that the element of causation, or lack thereof, be addressed separately for each Count.

**\*3** In summary, the Complaint alleges causation and damages for each of the Counts, albeit in a cursory manner that leaves the Court skeptical as to Graduate's ability to prove causation and resulting damages at trial. However, because a court must regard all factual allegations in a Complaint as true, the demurrer must be overruled.

A. Breach of Contract

**\*3** To establish a claim for breach of contract, a claimant must show "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa.Super.Ct.1999) (citation omitted). *See also Logan v. Mirror Printing Co. of Altoona, Pa.*, 410 Pa.Super. 446, 448-49, 600 A.2d 225, 226 (1991) ("[i]n order to recover for damages pursuant to a breach of contract, the plaintiff must show a causal connection between the breach and the loss").[FN5]

> FN5. At least one Pennsylvania case holds that a breach of contract action does not require proof of damages or, consequently, causation. *See Grabowski v. Quigley*, 454 Pa.Super. 27, 41, 684 A.2d 610, 617 (1996) ( "[a] cause of action [for breach of contract] exists even if no compensable loss can be shown because any breach gives rise to at least nominal damages"). However, this case appears to be an isolated example, with the

general standard requiring proof damages resulting from the breach of the contract.

**\*3** Here, VHS was required to pay the Lease Obligations under the 1996 Agreements. Moreover, in the 1998 Sale Agreement, VHS warranted that it was in compliance with the Leases and that there was no Rent Delinquency.[FN6] Thus, a failure to pay the Lease Obligations, as alleged in the Complaint, qualifies as a breach of the Agreements.

> FN6. In Paragraph 3.10 of the 1998 Sale Agreement, VHS represents that its only liabilities are those related to holiday, sick leave and vacation time. In Paragraph 3.11, VHS represents that it is not in violation of or in default under any of the "Material Contracts" set forth in Schedule 2.1(b). The Complaint states that the Leases are among the Material Contracts. Complaint at ¶ 25.

**\*3** That said, the Complaint does not allege that any demand for payment has been made on Graduate by the Landlords. In addition, Graduate's assertion of misappropriation in its Memorandum is immaterial, as any benefit to the Defendants without harm to Graduate is not relevant for the breach of contract claim.

**\*3** Furthermore, VHS's failure to pay the Lease Obligations cannot have affected the price paid under the 1998 Sale Agreement. Section 3.10 of that Agreement insulates Graduate from obligations incurred prior to the Agreement's closing, including the Rent Delinquency.[FN7] Because this Agreement protects Graduate from VHS's prior obligations, to the extent they exist, the existence of such obligations has no effect on the purchase price.

> FN7. According to Section 3.10 of the 1998 Sale Agreement, with the exception of liabilities related to holiday, sick leave and vacation time,
> [Graduate] will not be obligated for, nor will the Assets secure or be subject to, any liabilities or obligations of the Business of any kind or nature, whether absolute, accrued, contingent, known, unknown or otherwise, and whether normally set forth or reflected in a financial statement arising from the operation of the Business prior to Closing, including but not limited to claims of third parties which may arise from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 33711050 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

government investigations or proceedings, in each case which relate to the operation of the Business prior to Closing.

**\*3** In spite of this, the Complaint alleges that Graduate incurred the damages set forth therein "[b]y reason of the foregoing" facts. Complaint at ¶ 44. Because a court must accept the allegations in a complaint as true for the purposes of preliminary objections, the Court is bound to accept the Complaint's allegations of causation as correct. As a result, the Complaint presents a complete claim for breach of contract, and the demurrer to Count I-Breach of Contract is overruled.

B. Promissory Estoppel

**\*4** Simply put, "promissory estoppel makes promises enforceable." _GMH Assocs., Inc. v. Prudential Realty Group,_ 752 A.2d 889, 904 (Pa.Super.Ct.2000). A successful claim for promissory estoppel requires evidence that:
**\*4** (1) the promisor made a promise that [it] should have reasonably expected would induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise.

**\*4** _Crouse v. Cyclops Indus.,_ 560 Pa. 394, 403, 745 A.2d 606, 610 (2000) (citation omitted).

**\*4** Promissory estoppel also requires proof that the claimant "justifiably relied on the inducement. Promissory estoppel does not apply if the complaining party acted on his own will and not as a result of the defendant's representations." _Ravin, Inc. v. First City Co.,_ 692 A.2d 577, 581 (Pa.Super.Ct.1997). [FN8] Moreover, a plaintiff may request money damages as relief in a promissory estoppel claim. _See DelConte v. Stefonick,_ 268 Pa.Super. 572, 577, 408 A.2d 1151, 1153 n. 1 (1979) (where a complaint requests "any relief the court deems proper" based on a promissory estoppel claim, the request is satisfactory, even if additional relief is requested). _See also Herzfeld v. City of Phila.,_ No. Civ. A. 84-5014, 1985 WL 2700, at \*3 (E.D.Pa. Sept. 13, 1985) ("monetary damages are recoverable under the doctrine of promissory estoppel").

FN8. Because the Objections challenge only causation, the Court presumes the existence

of the first and third elements of promissory estoppel in considering the Objections.

**\*4** In addition to the promises made in the Agreements, outlined _supra,_ the Complaint alleges that Vivra promised, on behalf of itself and VHS, to pay the Rent Delinquency. Complaint at ¶ 28. The Complaint further alleges that Graduate relied on these promises when it "refrained from enforcing its rights under the various agreements with [VHS] and otherwise." _Id._ at ¶ 29. These allegations support a claim based on promissory estoppel and require enforcement of the promise to pay the Rent Delinquency. As a result, the demurrer to this Count is overruled.

C. Fraudulent and Negligent Misrepresentation

**\*4** The elements of intentional fraudulent misrepresentation are:
**\*4** (1) A representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and, (6) the resulting injury was proximately caused by the reliance.

**\*4** _Bortz v. Noon,_ 556 Pa. 489, 499, 729 A.2d 555, 560 (1999). Similarly, negligent misrepresentation requires "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and, (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." _Id.,_ 556 Pa. at 501, 729 A.2d at 561.

**\*5** Here, the alleged misrepresentation is the representation and warranty by VHS and Ott in the 1998 Purchase Agreement that there was no Rent Delinquency. Complaint at ¶ 40. The Complaint alleges that the damages Graduate incurred were a result of this misrepresentation. _Id._ at ¶¶ 44, 46. Consequently, the demurrer to the fraudulent misrepresentation and negligent misrepresentation Counts are overruled.

D. Fraudulent Conveyance

**\*5** Under Pennsylvania's fraudulent conveyance statute,
**\*5** A transfer made or obligation incurred by a debtor

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 33711050 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

Page 5

is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

**\*5** (1) with actual intent to hinder, delay or defraud any creditor of the debtor; or

**\*5** (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

**\*5** (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

**\*5** (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

**\*5** 12 Pa.C.S. § 5104(a). As relief, a plaintiff alleging a fraudulent conveyance may request money damages. *See, e.g., Amadon v. Amadon,* 59 A.2d 135, 359 Pa. 434 (1948) (awarding wife $3,500 based on fraudulent conveyances made by husband).

**\*5** In the Complaint, Graduate alleges that VHS and Vivra transferred assets to other Vivra Defendants "with the intent of hindering, delaying and/or defrauding Graduate as a creditor, and to put assets beyond Graduate's reach." [FN9] Complaint at ¶ 48.[FN10] This supports a claim for fraudulent conveyance. In addition, request for monetary relief is appropriate. Consequently, the demurrer to Count V-Fraudulent Conveyance is overruled.

FN9. Graduate's general averment of intent is proper. *See* Pa. R. Civ. P. 1019(b) ("[m]alice, intent, knowledge, and other conditions of mind may be averred generally").

FN10. In the alternative, Graduate asserts that:
(1) the transferor was engaged or was about to engage in a business or a transaction for which the remaining assets of the transferor were unreasonably small in relation to the business or transaction, and/or (2) the transferor was insolvent at that time or became insolvent as a result of the transfer. Complaint at ¶ 49. This tracks the language in 12 Pa.C.S. § 5104(b), which sets forth factors to be considered when determining if a transfer was made with the requisite "actual intent."

**E. Conspiracy**

**\*5** To state a cause of action for civil conspiracy, a claimant must show "(1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose; and (3) actual legal damage." *Strickland v.. University of Scranton,* 700 A.2d 979, 987 (Pa.Super.Ct.1997) (citation omitted). *See also GMH Assocs. v. Prudential Realty Group,* 752 A.2d 889, 905 (Pa.Super.Ct.2000) ("a conspiracy is not actionable until some overt act is done in pursuance of the common purpose or design ... and actual legal damage results"). However, "it is not necessary that [a plaintiff] plead specific amounts of out of pocket losses in order to survive a demurrer." *Smith v. Wagner,* 403 Pa.Super. 316, 324, 588 A.2d 1308, 1312 (1991).

**\*5** According to the Complaint, the Vivra Defendants have conspired against Graduate by "secreting and/or transferring assets in order to hinder, delay and/or defraud Graduate as a creditor, and/or to put assets beyond Graduate's reach." Complaint at ¶ 51. As mentioned *supra,* this constitutes a violation of Pennsylvania's fraudulent conveyance statute. In addition, if Graduate is unable to obtain assets to which it is entitled, it has suffered legal damage. As a result, these allegations, if true, support a cause of action for conspiracy, and the demurrer to Count VI is overruled accordingly.

**F. Unjust Enrichment**

**\*6** The elements of a claim for unjust enrichment are "benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Wiernik v. PHH U.S. Mortgage Corp.,* 736 A.2d 616, 622 (Pa.Super.Ct.1999), *app. denied,* 561 Pa. 700, 751 A.2d 193 (2000). No Pennsylvania case specifically requires loss by the plaintiff or causation. [FN11] *Cf. Allegheny Gen. Hosp. v. Phillip Morris, Inc.,* No. Civ. A. 99-9, 1999 WL 33135090, at \*8 (W.D.Pa. Nov. 4, 1999), *aff'd,* No. 99-4024, 2000 WL 1478534 (3rd Cir. Oct. 6, 2000) (proximate causation is not an element of an unjust enrichment claim under Pennsylvania law).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 33711050 (Pa.Com.Pl.)
(Cite as: Not Reported in A.2d)

Page 6

FN11. In contrast, other jurisdictions require a loss to the plaintiff corresponding to a gain by the defendant for a viable unjust enrichment claim. *See, e.g., Clay v. American Tobacco Co.,* 188 F.R.D. 483, 500 (S.D.Ill.1999) ("the plaintiff must show that the defendant was unjustly enriched at the plaintiff's expense"); *Kalamazoo River Study Group v. Rockwell Int'l,* 3 F.Supp.2d 815, 818 (W.D.Mich.1997), *aff'd,* 171 F.3d 1065 (6th Cir.1999) (a claim for unjust enrichment requires proof of causation); *Bieber-Guillory v. Aswell,* 723 So.2d 1145, 1150 (La.Ct.App.1998) (action for unjust enrichment requires "causation between the enrichment and the impoverishment"); *Maines Paper & Food Serv., Inc. v. Eanes,* No. 77301, 2000 WL 1429418, at *4 (Ohio Ct.App. Sept. 28, 2000) ("[t]he concept of unjust enrichment includes not only loss by the plaintiff but gain by the defendant, with a tie of causation between them").

**\*6** Even if causation and damages were required, Graduate alleges that it compensated VHS under the Management agreement by granting VHS the right to 37.5% of all Fees. Moreover, the Complaint asserts that, "by reason of their conduct as averred above, the Vivra defendants have been unjustly enriched." Complaint at ¶ 13. Consequently, there is no merit to the Defendants' claim that Count VII-Unjust Enrichment is incomplete, and the demurrer to the Count is overruled.

### G. Contractual Compensation Adjustments

**\*6** Last, Graduate has brought a claim for contractual compensation adjustments based on the 1996 Agreements. This claim is wholly separate from the previous seven Counts and has no connection to either the Lease Obligations or the Rent Delinquency.

**\*6** Under the 1996 Agreements, all Fees due to Graduate were paid to VHS. This included Fees due from QualMed. VHS, in turn, retained 37.5% of the Fees as compensation for its services and forwarded the balance to Graduate. According to the Complaint, Graduate has received notice that QualMed overpaid its Fees during the term of the Management Agreement. Because VHS retained 37.5% of the QualMed Fees, Graduate requests that VHS be required to compensate Graduate for 37.5% of the amount Graduate is required to repay to QualMed.

**\*6** The Defendants' Objections to causation and damages are without merit here as well. If Graduate is forced to repay QualMed, the amount of those repayments will exceed the amount that Graduate received from QualMed via VHS. This would clearly result in damage to Graduate, and the demurrer to this final Count is overruled as well.[FN12]

FN12. To the extent that the Complaint does not allege the specific amount of the overpayments, it is important to note that the Plaintiff requests the repayment of "37% [sic] of all sums Graduate is compelled to refund to QualMed." Complaint at ¶ 57(a). If no amounts are due QualMed, then the Defendants presumably will owe Graduate no compensation.

### II. Insufficient Specificity

**\*6** Pennsylvania Rule of Civil Procedure 1028(a)(3) permits preliminary objections based on insufficient specificity in a pleading. To determine if a pleading meets Pennsylvania's specificity requirements, a court must ascertain whether the facts alleged are "sufficiently specific so as to enable [a] defendant to prepare [its] defense." *Smith v. Wagner,* 403 Pa.Super. 316, 319, 588 A.2d 1308, 1310 (1991) (citation omitted). *See also In re The Barnes Foundation,* 443 Pa.Super. 369, 381, 661 A.2d 889, 895 (1995) ("a pleading should formulate the issues by fully summarizing the material facts, and as a minimum, a pleader must set forth concisely the facts upon which [the] cause of action is based").[FN13]

FN13. Allegations of fraud, including fraudulent conveyance, are held to an even higher standard. Pa. R. Civ. P. 1019(b). *See also Martin v. Lancaster Battery Co.,* 530 Pa. 11, 18, 606 A.2d 444, 448 (1992) (an allegation of fraud must "explain the nature of the claim to the opposing party so as to permit the preparation of a defense" and be "sufficient to convince the court that the averments are not merely subterfuge").

**\*7** In the Objections, the Defendants claim that the Counts for fraudulent conveyance and conspiracy are impermissibly vague. The Court must agree. As stated *supra,* the allegations of fraudulent conveyance do little more than repeat the language of the fraudulent conveyance statute. Similarly, the Count for conspiracy asserts only that the Vivra Defendants

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2000 WL 33711050 (Pa.Com.Pl.)
(Cite as: Not Reported in A.2d)

have conspired "by secreting and/or transferring assets in order to hinder, delay and/or defraud Graduate as a creditor, and/or to put assets beyond Graduate's reach ." Complaint at ¶ 51. These statements are insufficient to allow the Defendants to prepare a defense to these Counts.

\*7 The Plaintiff maintains in its Memorandum that the facts underlying the fraudulent conveyance and conspiracy claims are "more within [the Defendants'] knowledge than plaintiff's," permitting them to defend against the two Counts. [FN14] Plaintiff's Memorandum at 5. Pennsylvania law grants the plaintiff considerable latitude "where the crucial facts are in the exclusive knowledge of the defendant, and the plaintiff so pleads." *Line Lexington Lumber & Millwork Co. v. Pennsylvania Publishing Corp.,* 451 Pa. 154, 162, 301 A.2d 684, 689 (1973). However, the Complaint does not allege that the facts upon which these two Counts are based are in the exclusive knowledge of the Defendants. [FN15] *Cf. Baker v. Rangos,* 229 Pa.Super. 333, 350 n. 4, 324 A.2d 498, 506 n. 4 (1974) (plaintiffs are "not entitled to have their complaints reviewed with special leniency" where they do not plead "the defendants' superior knowledge"). Consequently, Count V-Fraudulent Conveyance and Count VI-Conspiracy are insufficiently specific [FN16] and the Objections to them are sustained.

> FN14. Significantly, this assertion is not included in the Complaint.

> FN15. Even if the Plaintiff pled that the relevant facts were in the exclusive knowledge of the Defendants, it is far from certain that the Complaint would meet the specificity requirements.

> FN16. This conclusion finds support in Pennsylvania case law as to both Counts. *See Landau v. Western Pa. Nat'l Bank,* 445 Pa. 217, 225, 282 A.2d 335, 340 (1971) (a "single, vague and conclusory allegation that the [defendants] have 'conspired' ... falls far short of the requisite pleading of 'the material facts' "); *Newman v. Newman,* 328 Pa. 552, 196 A. 30 (1938) (general allegations of an effort to cheat and defraud defendants' creditors in violation of statute was insufficiently specific to support a count for fraudulent conveyance); *Shaffer v. Proctor & Gamble,* 412 Pa.Super. 630, 638, 604 A.2d 289, 293 (1992) (allegations of

conspiracy are insufficient where they are "merely conclusory"); *Leopold v. Tuttle,* 378 Pa.Super. 466, 471, 549 A.2d 151, 154 (1988) (claim for fraudulent conveyance cannot be based on "vague conclusions of fact or unjustified inferences of the grantor's indebtedness"); *Burnside v. Abbott Laboratories,* 351 Pa.Super. 264, 280, 505 A.2d 973, 982 (1985) (allegations of "no more than a contemporaneous and negligent failure to act" are insufficient to support a cause of action for conspiracy).

\*7 In Pennsylvania, "parties are liberally granted leave to amend their pleadings." *Frey v. Pennsylvania Elec. Co.,* 414 Pa.Super. 535, 538, 607 A.2d 796, 797 (1992). As a result, Graduate is granted twenty days in which to file a second amended complaint whose fraudulent conveyance and conspiracy counts are sufficiently specific.

## CONCLUSION

\*7 Each of the Counts in the Complaint is complete and the demurrer is overruled. However, the causes of action for fraudulent conveyance and conspiracy are not sufficiently specific. As a result, the Objections to them are sustained, the Counts are stricken and the Plaintiff is directed to file a second amended complaint within twenty days of this Opinion.

## ORDER

\*7 AND NOW, this 20th day of October, 2000, upon consideration of the Preliminary Objections of Vivra, Inc., Vivra Heart Services, Inc ., Vivra Holdings, Inc., VSP Holdings, Inc., Vivra Specialty Partners, Inc. and Charles W. Ott to the Amended Complaint of Plaintiff Graduate Cardiology Consultants, P.C., and Plaintiff's response thereto and in accordance with the Memorandum Opinion being filed contemporaneously with this Order, it is hereby ORDERED and DECREED that:

\*7 1. The Preliminary Objections in the form of a demurrer to the Amended Complaint are OVERRULED;

\*8 2. The Preliminary Objections asserting insufficient specificity in Count V-Fraudulent Conveyance and Count VI-Conspiracy are SUSTAINED and those Counts are STRICKEN; and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 8
Not Reported in A.2d, 2000 WL 33711050 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**


*8 3. The Plaintiff is granted leave to file an amended
complaint within twenty days of this Order.

Pa.Com.Pl.,2000.
Graduate Cardiology Consultants, P.C. v. Vivra, Inc.
Not Reported in A.2d, 2000 WL 33711050
(Pa.Com.Pl.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 11



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21339279 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

℃

Briefs and Other Related Documents
Gyarmathy & Assoc., Inc. v. TIG Ins. Co.N.D.Tex.,2003.Only the Westlaw citation is currently available.

United States District Court,N.D. Texas, Dallas Division.
GYARMATHY & ASSOCS., INC., et al., Plaintiff,
v.
TIG INSURANCE CO., et al., Defendants.
No. Civ.A. 3:02-CV-1245-.

June 3, 2003.

*ORDER*

GODBEY, J.
**\*1** Before the Court is Plaintiff's motion for class certification. Because questions of fact and law common to the class do not predominate over questions affecting individual members, that motion is DENIED.

**\*1** Defendant TIG Insurance Co. ("TIG") sold a worker's compensation insurance policy to Plaintiff Gyarmathy & Associates, Inc. ("Gyarmathy"), effective December 18, 1999. Gyarmathy acquired the policy through its insurance broker Arthur Gallagher & Co. Gyarmathy claims that the printed materials it received showed that TIG would be obligated to pay Gyarmathy a flat rate dividend fifteen months after the inception date of the policy, in an amount equal to a fixed percentage of the premium. Based on its understanding of the dividend provisions, Gyarmathy elected to acquire the flat rate dividend policy instead of other dividend options from TIG or, presumably, insurance from other carriers. TIG later told Gyarmathy that payment of a dividend was contingent upon approval by the TIG Board of Directors, which had not approved a dividend.

**\*1** Gyarmathy has sued TIG under various legal theories, including civil RICO, Texas Deceptive Trade Practices Act, Texas Insurance Code, fraud, negligent misrepresentation, breach of contract, and breach of duty of good faith and fair dealing. Gyarmathy has sued both on behalf of itself and a putative class consisting of:
**\*1** All persons (and entities) other than officers, directors, employees or controlling persons of TIG who purchased Defendants' Workers Compensation Policies with a loss valuation date on or after February 1, 2001, and who elected the Flat Dividend Proposal but who were not paid the flat dividend because the Board of Directors declared that a dividend would not be paid on policies with a loss valuation date after February 1, 2001.

**\*1** Although Gyarmathy sues under various legal theories, its motion for class certification does not address the different theories, and instead addresses all the theories under a factual scenario of misrepresentations and omissions in the placing of the insurance policies. *E.g.,* Memorandum in Support of Class Certification at 14 ("Therefore, the core of this litigation will overwhelmingly focus on common factual issues concerning the omissions and uniform misrepresentations on the face of the Flat Dividend Policies and the consistent activities of Defendants relating to selling these Flat Dividend Policies."); *id.* at 10 n. 7. At the class certification hearing, however, Gyarmathy did distinguish somewhat among its different legal theories.

**\*1** Gyarmathy moves for class certification under Federal Rule of Civil Procedure 23(b)(3), which provides, in part, that class certification is appropriate when "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members...." In considering the predominance question, the Court will first consider which state's law would apply to the claims of the class members. Gyarmathy argues, with support from some courts, that a different choice of law standard applies in class certification. *See* Reply Brief at 7 n. 7. Under this approach, the most significant relationship test is applied class-wide. Unsurprisingly, the state of the defendant's residence in the aggregate has a greater relationship to the putative class action than the state of any individual class member. *E.g., In re Great Southern Life Ins. Co. Sales Practices Litigation,* 192 F.R.D. 212 (N.D.Tex.2000); *National Western Life Ins. Co. v. Rowe,* 86 S.W.3d 285 (Tex.App.-Austin 2002, no pet.).

**\*2** The Texas Supreme Court and the Fifth Circuit appear to have rejected this approach, however. In *Spence v. Glock, Ges.m.b.H,* 227 F.3d 308 (5th Cir.2000), the Fifth Circuit, applying Texas choice of law principles, held that plaintiffs failed to carry their

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21339279 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

burden of examining "the policies of each state with contacts." *Id.* at 313. Likewise, in *Henry Schein, Inc. v. Stromboe,* 2002 WL 31426407 (Tex. Oct. 31, 2002) (Part IV.C) (page references not presently available), the Texas Supreme Court also found that plaintiffs failed to demonstrate that Texas law should apply to so many of the claims in the case that a common issue of law would predominate; again, the Court rejected a wholesale "defendant lives here" approach to the choice of law analysis.

**\*2** With *Spence v. Glock* and *Henry Schein, Inc.* in mind, the Court must decline Gyarmathy's invitation to apply Texas law simply because TIG lives here.[FN1] Applying Texas choice of law rules vis a vis a hypothetical class member [FN2] suggests that a Texas court would apply the substantive law of the class member's domicile to the claims at issue here. Texas follows the Restatement (Second) of Conflict of Laws generally. *See Spence,* 227 F.3d at 311-12. Under section 193 of the Restatement, the validity of and rights under a workers compensation insurance contract are generally determined by the local law of the state that is the principal location of the risk.[FN3] Section 193 suggests that the local law of the class member's domicile would apply.

> FN1. As in those cases, the Court could perhaps conclude its analysis at this point on the basis that plaintiff failed to carry its burden. The Court will, however, proceed with the choice of law analysis.

> FN2. For purposes of this hypothetical, the Court will assume that the employees protected by the workers compensation insurance are in the same state as the hypothetical class member.

> FN3. Although no Texas case has directly applied section 193, *National Western* did apply the analogous section for life insurance policies. 86 S.W.3d at 301. This Court questions whether the result in *National Western* is valid after *Henry Shein, Inc.,* but the case nonetheless reinforces the view that a Texas court would apply section 193 of the Restatement to a workers compensation insurance question.

**\*2** Application of the class member's state's law is also consistent with the more general analysis of sections 6, 145, and 188 of the Restatement. Texas may be the situs of the defendant, the place where the

"last act" giving rise to contract occurred, and a state with an interest in regulating the conduct of insurers domiciled here. The class member's state, however, is the situs of most of the representations in the sales process, it has an interest in regulating the conduct of foreign insurers doing business in that state, it is where premiums are paid, and it is where the loss is incurred. Moreover, in the context of workers compensation insurance, that state has a strong interest in regulating insurance that will provide benefits to injured workers in the state. All in all, it appears that the state of the class member has the most significant relationship to the contract of workers compensation insurance and that a Texas court would apply that state's law.[FN4]

> FN4. This result seems unsurprising. There are relatively few Texas choice of law cases in ordinary insurance disputes, perhaps because it never occurs to most litigants to argue for the law of the state of the insurance company, instead of the law of the state of the insured, and perhaps because that result is statutorily required in most circumstances involving Texas insureds. *See* Tex. Ins.Code art. 21.42 (apply Texas law to certain insurance policies of Texas insureds). As a consequence, many of the reported cases involve unusual facts, but nonetheless apply the law of the state where the risk is located. *See, e.g., TV-3, Inc. v. Royal Ins. Co.,* 28 F.Supp.2d 407, 415-16 (E.D.Tex.1998); *SnyderGeneral Corp. v. Great American Ins. Co.,* 928 F.Supp. 674, 677-78 (N.D.Tex.1996); *Mayo v. Hartford Life Ins. Co.,* 193 F.Supp.2d 927, 937-60 (S.D.Tex.2002) (applying Texas law to life insurance policies on Texas employees purchased by their employers). *See also Society of Mount Carmel v. National Ben Franklin Ins. Co.,* 643 N.E.2d 1280, 1287 (Ill.App.1994) (applying section 193 of the Restatement to workers compensation insurance).

**\*2** Accordingly, it appears that a Texas court would apply the law of each insureds' states of residence to the claims before the Court. Gyarmathy has thus failed to show that common issues of law predominate.[FN5]

> FN5. The Court could probably conclude its analysis at this point. "In a multi-state class

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21339279 (N.D.Tex.)
(Cite as: Not Reported in F.Supp.2d)

action, variations in state law may swamp any common issues and defeat predominance." *Castano v. American Tobacco Co., 84 F.3d 734, 741 (5th Cir.1996).*

**\*2** The Court will now consider briefly Gyarmathy's claim that common issues of fact predominate. Gyarmathy's argument is that all putative class members were given an essentially identical flat dividend proposal, all of which omitted the same material information. In support of its arguments, Gyarmathy relied heavily on the district court opinion in *Sandwich Chef of Texas, Inc. v. Reliance National Indem. Ins. Co.,* 202 F.R.D. 484 (S.D.Tex.2001), which was recently reversed by the Fifth Circuit, 319 F.3d 205 (5th Cir.2003) (holding individual reliance issues preclude class action certification in RICO fraud case). *See also Henry Schein, Inc., supra,* (Part IV.A, holding individual issues of reliance or cause in fact preclude class certification of fraud, breach of express warranty, negligent misrepresentation, promissory estoppel and DTPA claims); *Richard v. Hoechst Celanese Chemical Group, Inc.,* 208 F.R.D. 575, 584 (E.D.Tex.2002) ("it may not be possible to certify a class in a RICO action within the Fifth Circuit"). It appears that the case law precludes certification of Gyarmathy's RICO, DTPA, fraud and negligent misrepresentation claims.

**\*3** In addition to the case law counseling against class certification, the factual record before the Court shows that individual fact issues likely will predominate here. Gyarmathy argues that it will prove its case with the text of the flat dividend proposal, and that nothing else is necessary as they were all substantially identical. While the text of the flat dividend proposals may have been identical, the record before the Court shows that those documents were not delivered to the putative class members in identical contexts. Many of the potential class members placed their coverage through brokers. The record reflects that at least some potential class members received varying representations from their brokers above and beyond what is contained in the flat dividend proposal. While Gyarmathy may be content to limit its proof to the content of the flat dividend proposal, there is no reason TIG should be so limited in its defense. TIG may legitimately argue that in the context of a specific class member, the flat dividend proposals were not misleading and did not omit material information or that the class member did not rely on the proposal in making its decision. *Cf. Cimino v. Raymark Indus., Inc.,* 151 F.3d 297, 315-19 (5th Cir.1998) (holding in asbestos case that

class-based finding of causation of injury improperly denied defendant right to trial by jury of causation on individual basis). Accordingly, the Court finds that common issues of fact do not predominate.[FN6]

FN6. Gyarmathy suggests that the Court can infer class-wide reliance, and avoid the problems in individualized proof, citing *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972). The Fifth Circuit has rejected extending an *Affiliated Ute* presumption beyond fraud on the market securities theories to this sort of class action context. *See McManus v. Fleetwood Enterprises, Inc.,* 320 F.3d 545, 549 (5th Cir.2003) (applying Texas law); *Summit Properties Inc. v. Hoechst Celanese Corp.,* 214 F.3d 556, 561 (5th Cir.2000) ("No court has accepted the use of this theory outside the context of securities fraud...."). This Court declines to rush in where the Fifth Circuit fears to tread.

**\*3** Plaintiff Gyarmathy has thus failed to carry its burden of showing that common issues of fact and law would predominate as required by Rule 23(b)(3). Accordingly, Gyarmathy's motion for class certification is DENIED.

N.D.Tex.,2003.
Gyarmathy & Assoc., Inc. v. TIG Ins. Co.
Not Reported in F.Supp.2d, 2003 WL 21339279 (N.D.Tex.)

Briefs and Other Related Documents (Back to top)

• 3:02cv01245 (Docket) (Jun. 14, 2002)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.