# TAB 15

IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE OSB ANTITRUST LITIGATION | Master File No. 06-CV-00826 (PD) |
| THIS DOCUMENT RELATES TO: All Indirect Purchaser Actions. | Honorable Paul S. Diamond |

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs, S.M. Roberts Construction, David Perryman, Allen Mazerolle, Lawrence Lang, d/b/a Lang Development, Glenn Padlicki d/b/a Douglas Custom Homes, William Reinig d/b/a William Reinig Installation Company, Scott Kinne, William Thompson, Jonathan Weidlinger, Phillip Koontz, individually and d/b/a A&K Discount Siding, Benny M. Parr, David Clemente Construction, Inc., Scott Kelley, Silverthorn Construction Company, Thomas Harrison Construction, Inc., Maria Flangos, Tony Madureira d/b/a AV Builders, Jan Brussell d/b/a Brussell Consulting and Construction Management Inc. and O. Wesley Box hereby bring this action to obtain injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26 for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, to recover damages under state antitrust and consumer protection laws and state common law principles of restitution, disgorgement, unjust enrichment, and to recover the costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly situated sustained as a result of Defendants' violations of those laws. Plaintiffs' allegations as to themselves and their own actions are based upon their own knowledge. All other allegations are based upon information and belief pursuant to the investigation of counsel. The Defendants have exclusive possession, custody or control of information and documents relating to their conspiracy to fix, raise, maintain and/or stabilize the prices of OSB.

## NATURE OF THIS ACTION

1.     This case arises out of a massive conspiracy beginning in or around June 1, 2002 and continuing through to the present ("Class Period") among all Defendants and their co-conspirators with the purpose and effect of fixing prices, limiting or altering production, and committing other unlawful, unfair and deceptive practices designed to fix, raise, maintain and/or stabilize the prices of Oriented Strand Board ("OSB") sold to or distributed to the Plaintiffs and the putative Classes of indirect purchasers.

2.     Defendants are the leading manufacturers of OSB and control the OSB industry. Throughout the Class Period, Defendants have sold OSB in the United States and elsewhere. Plaintiffs allege that during the Class Period, Defendants willfully and knowingly conspired, combined and contracted to fix, raise, maintain and stabilize the prices at which OSB was sold in the United States. In furtherance of their unlawful, unfair and deceptive practices, Defendants agreed to reduce the supply of OSB through sequenced downtime at their production mills.

3.     As a result of Defendants' illegal conduct, Plaintiffs and the other members of the Classes suffered economic loss because they paid artificially inflated prices for OSB during the Class Period. Such prices wrongfully exceeded the amount they would have paid if the prices for OSB had been determined by a competitive market. Each member of the Classes has suffered related economic harm as a result of Defendants' illegal conduct.

4.     Defendants' conspiracy has involved anticompetitive conduct by a cartel that has economically harmed indirect purchasers throughout the United States. The conspiracy has affected billions of dollars of commerce throughout the United States and caused related economic loss to each member of the Classes.

5.    The conspiracy has included covert communications during which Defendants expressly agreed to reduce the production and supply of OSB and to fix prices of OSB sold in and/or distributed throughout the United States and elsewhere.

6.    This action is brought as a class action on behalf of all persons that indirectly purchased OSB from any of the Defendants between June 1, 2002 and the present.

7.    In Count One of this Complaint, Plaintiffs, on behalf of themselves and all others in the United States who are indirect purchasers of OSB, seek injunctive relief against Defendants based upon allegations of a conspiracy to restrain trade for OSB, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

8.    Counts Two through Twenty Seven are brought by Plaintiffs seeking damages and other relief on behalf of themselves and those Class members who indirectly purchased OSB in Arizona, California, the District of Columbia, Florida, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nevada, New Mexico, New York, North Carolina, North Dakota, Pennsylvania, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin (the "Indirect Purchaser States").

9.    Count Twenty Eight is brought by Plaintiffs on their own behalf and on behalf of the Class members from the Indirect Purchaser States, seeking a constructive trust and disgorgement of profits from the unjust enrichment of Defendants.

## JURISDICTION AND VENUE

10.    The Court has jurisdiction over the federal claim under 28 U.S.C. §1331 and §1337, and by §16 of the Clayton Act, 15 U.S.C. § 26. The Court has jurisdiction over the state law claims under 28 U.S.C. §1367 because those claims are so related to the federal claim that they form part of the same case or controversy. The Court also has

jurisdiction over the claims under 28 U.S.C. §1332(d) because the amount in controversy

for the Class exceeds $5,000,000, and there are members of the Class who are citizens of

a state different from the Defendants.

      11.    Without limiting the generality of the foregoing, Defendants (directly or

through agents who at the time were acting with actual and/or apparent authority and

within the scope of such authority) have:

        a.    Transacted business in the Indirect Purchaser States;

        b.    Contracted to supply and/or obtain services and/or goods in the Indirect

              Purchaser States;

        c.    Intentionally availed themselves of the benefits of doing business in the

              Indirect Purchaser States;

        d.    Produced, promoted, sold, marketed and/or distributed their products

              and/or services in the Indirect Purchaser States and thereby, have

              purposefully profited from their access to markets in the Indirect

              Purchaser States;

        e.    Caused tortious damage by acts or omissions in the Indirect Purchaser

              States;

        f.    Caused tortious damage in the Indirect Purchaser States by acts or

              omissions committed outside such jurisdictions while: (i) regularly doing

              or soliciting business in such jurisdictions; and/or, (ii) engaging in other

              persistent courses of conduct within such jurisdictions; and/or, (iii)

              deriving substantial revenue from goods used or consumed or services

              rendered in such jurisdictions;

g.   Committed acts and omissions which Defendants knew would cause injury (and, in fact, did cause injury) in the Indirect Purchaser States, to Plaintiffs and members of the Indirect Purchaser States while: (i) regularly doing or soliciting business in such jurisdictions; and/or, (ii) engaging in other persistent courses of conduct within such jurisdictions; and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdictions;

h.   Conspired with others who did have the requisite minimum contacts with the Indirect Purchaser States; and/or,

i.   Otherwise had the requisite minimum contacts with the Indirect Purchaser States, such that under the circumstances it is fair and reasonable to require Defendants to come to this Court to defend this action.

12.   Venue is proper in this District pursuant to 15 U.S.C. §22 and 28 U.S.C. §1391 because one or more of the Defendants reside, is licensed to do business, or is found or transacts business, in this District, and a substantial part of the events giving rise to the claims arose in this District.

13.   The activities of the Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

5

## PARTIES

### A. Plaintiffs

14.   Plaintiff Maria Flangos is a resident of Arizona. During the time period covered in this Complaint, Plaintiff indirectly purchased OSB from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-competitive and artificially inflated prices for OSB and has been injured by reason of the illegal conduct alleged herein.

15.   Plaintiff Tony Madureira d/b/a AV Builders is a resident of Arizona. During the time period covered in this Complaint, Plaintiff indirectly purchased OSB from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-competitive and artificially inflated prices for OSB and has been injured by reason of the illegal conduct alleged herein.

16.   Plaintiff Lawrence Lang, d/b/a Lang Development is a resident of California. During the time period covered in this Complaint, Plaintiff indirectly purchased OSB from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-competitive and artificially inflated prices for OSB and has been injured by reason of the illegal conduct alleged herein.

17.   Plaintiff Glenn Padlicki d/b/a Douglas Custom Homes is a resident of California. During the time period covered in this Complaint, Plaintiff indirectly purchased OSB from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-competitive and artificially inflated prices for OSB and has been injured by reason of the illegal conduct alleged herein.

6

18.    Plaintiff Thomas Harrison Construction, Inc. is a Florida Corporation with a place of business in Naples, Florida. During the time period covered in this Complaint, Plaintiff indirectly purchased OSB from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-competitive and artificially inflated prices for OSB and has been injured by reason of the illegal conduct alleged herein.

19.    Plaintiff David Clemente Construction, Inc. is a Corporation with a place of business in the State of Kansas. During the time period covered in this Complaint, Plaintiff indirectly purchased OSB from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-competitive and artificially inflated prices for OSB and has been injured by reason of the illegal conduct alleged herein.

20.    Plaintiff Allen Mazerolle is a resident of Maine. During the time period covered in this Complaint, Plaintiff indirectly purchased OSB from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-competitive and artificially inflated prices for OSB and has been injured by reason of the illegal conduct alleged herein.

21.    Plaintiff Scott Kinne is a resident of Massachusetts. During the time period covered in this Complaint, Plaintiff indirectly purchased OSB from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-competitive and artificially inflated prices for OSB and has been injured by reason of the illegal conduct alleged herein.

22.    Plaintiff William Thompson is a resident of Massachusetts. During the time period covered in this Complaint, Plaintiff indirectly purchased OSB from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-

7

competitive and artificially inflated prices for OSB and has been injured by reason of the illegal conduct alleged herein.

23.    Plaintiff Jan Brussell d/b/a Brussell Consulting and Construction Management Inc. is a resident of Nevada. During the time period covered in this Complaint, Plaintiff indirectly purchased OSB from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-competitive and artificially inflated prices for OSB and has been injured by reason of the illegal conduct alleged herein.

24.    Plaintiff O. Wesley Box is a resident of New Mexico. During the time period covered in this Complaint, Plaintiff indirectly purchased OSB from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-competitive and artificially inflated prices for OSB and has been injured by reason of the illegal conduct alleged herein.

25.    Plaintiff William Reining d/b/a William Reining Installation Company is a resident of New York. During the time period covered in this Complaint, Plaintiff indirectly purchased OSB from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-competitive and artificially inflated prices for OSB and has been injured by reason of the illegal conduct alleged herein.

26.    Plaintiff Jonathan Weidlinger is a resident of New York. During the time period covered in this Complaint, Plaintiff indirectly purchased OSB from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-competitive and artificially inflated prices for OSB and has been injured by reason of the illegal conduct alleged herein.

27.    Plaintiff Phillip Koontz, individually and d/b/a A& K Discount Siding is a resident of South Dakota. During the time period covered in this Complaint, Plaintiff indirectly purchased OSB from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-competitive and artificially inflated prices for OSB and has been injured by reason of the illegal conduct alleged herein.

28.    Plaintiff David Perryman is a resident of Tennessee. During the time period covered in this Complaint, Plaintiff indirectly purchased OSB from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-competitive and artificially inflated prices for OSB and has been injured by reason of the illegal conduct alleged herein.

29.    Plaintiff Scott Kelley is a resident of Tennessee. During the time period covered in this Complaint, Plaintiff indirectly purchased OSB from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-competitive and artificially inflated prices for OSB and has been injured by reason of the illegal conduct alleged herein.

30.    Plaintiff S. M. Roberts Construction is a resident of Vermont. During the time period covered in this Complaint, Plaintiff indirectly purchased OSB from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-competitive and artificially inflated prices for OSB and has been injured by reason of the illegal conduct alleged herein.

31.    Plaintiff Benny M. Parr is a resident of West Virginia. During the time period covered in this Complaint, Plaintiff indirectly purchased OSB from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-

competitive and artificially inflated prices for OSB and has been injured by reason of the illegal conduct alleged herein.

32.     Plaintiff Silverthorn Construction Company is a resident of Wisconsin. During the time period covered in this Complaint, Plaintiff indirectly purchased OSB from one or more of the Defendants, their subsidiaries, divisions, units or affiliates. As a result, Plaintiff paid supra-competitive and artificially inflated prices for OSB and has been injured by reason of the illegal conduct alleged herein.

33.     Plaintiffs bring this action in their individual and representative capacity on behalf of the Plaintiff Classes alleged herein.

## B.     **Defendants**

34.     Defendant Ainsworth Lumber Co. Ltd. ("Ainsworth") is a corporation organized, existing, and doing business under the laws of Canada with its principal place of business located in Vancouver, British Columbia. Effective September 22, 2004, Ainsworth finalized its acquisition of three OSB manufacturing facilities located in Minnesota from defendant Potlatch Corporation. Ainsworth produces OSB from a number of locations, including facilities in: Bemidji, Grand Rapids and Cook, Minnesota; 100 Mile House, British Columbia; High Level and Grand Prairie, Alberta; and Barwick, Ontario. During the Class Period, Ainsworth, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed OSB in the United States.

35.     During the Class Period, Ainsworth directly or indirectly and through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of OSB sold in and/or distributed to the United States and elsewhere.

10

These horizontal-pricing practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for OSB sold to Plaintiffs and the Classes.

36.    During the Class Period, and as a direct and intended consequence of its involvement in the horizontal price-fixing conspiracy alleged herein, Ainsworth controlled, directly or indirectly, the price, cost or volume of OSB sold in and/or distributed in the United States.

37.    Defendant Georgia-Pacific Corporation ("Georgia-Pacific") is a corporation organized, existing, and doing business under the laws of the State of Georgia with its principal place of business located in Atlanta, Georgia. Georgia-Pacific produces OSB from a number of locations, including facilities in Fordyce, Arkansas; Grenada, Mississippi; Dudley, North Carolina; Brookneal and Skippers, Virginia; and Mount Hope, West Virginia. During the Class Period, Georgia-Pacific, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed OSB in the United States.

38.    During the Class Period, Georgia-Pacific directly or indirectly and through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of OSB sold in and/or distributed to the United States and elsewhere. These horizontal-pricing practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for OSB sold to Plaintiffs and the Classes.

39.    During the Class Period, and as a direct and intended consequence of its involvement in the horizontal price-fixing conspiracy alleged herein, Georgia-Pacific controlled,

11

directly or indirectly, the price, cost or volume of OSB sold in and/or distributed in the United States.

40.     Defendant J.M. Huber Corporation ("Huber") is a corporation organized, existing, and doing business under the laws of the State of New Jersey with its principal place of business located in Edison, New Jersey. Huber produces OSB from a number of locations, including facilities in Easton, Maine; Commerce, Georgia; Crystal Hill, Virginia; Spring City, Tennessee; and Broken Bow, Oklahoma. During the Class Period, Huber, directly or through its wholly-owned subsidiary Huber Engineered Woods, LLC, and other subsidiaries and/or affiliates, manufactured, marketed, sold or distributed OSB in the United States.

41.     During the Class Period, Huber directly or indirectly and through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of OSB sold in and/or distributed to the United States and elsewhere. These horizontal-pricing practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for OSB sold to Plaintiffs and the Classes.

42.     During the Class Period, and as a direct and intended consequence of its involvement in the horizontal price-fixing conspiracy alleged herein, Huber controlled, directly or indirectly, the price, cost or volume of OSB sold in and/or distributed in the United States.

43.     Defendant Louisiana-Pacific Corporation ("Louisiana-Pacific") is a corporation organized, existing, and doing business under the laws of the State of Delaware, with its offices and principal place of business now located in Nashville, Tennessee. Before relocating its principal place of business to Nashville in September 2004, Louisiana-Pacific maintained its

principal place of business in Portland, Oregon during a portion of the Class Period. Louisiana-Pacific produces OSB from a number of locations, including facilities in Athens, Georgia; Carthage and Jasper, Texas; Hanceville, Alabama; Houlton and Woodland, Maine; Sagola, Michigan; Roxboro, North Carolina; Hayward, Wisconsin; Chambord, Mainiwaki and St. Michel, Quebec; Dawson Creek, British Columbia; and Swan Valley, Manitoba. During the Class Period, Louisiana-Pacific, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed OSB in the United States.

44.    During the Class Period, Louisiana-Pacific directly or indirectly and through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of OSB sold in and/or distributed to the United States and elsewhere. These horizontal-pricing practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for OSB sold to Plaintiffs and the Classes.

45.    During the Class Period, and as a direct and intended consequence of its involvement in the horizontal price-fixing conspiracy alleged herein, Louisiana-Pacific controlled, directly or indirectly, the price, cost or volume of OSB sold in and/or distributed in the United States.

46.    Defendant Norbord Industries, Inc. ("Norbord") is a corporation organized, existing, and doing business under the laws of Canada with its principal place of business located in Toronto, Ontario. In 2004, defendant Norbord emerged as a purely focused new panelboard company from what had been a business segment within the more diversified Nexfor, Inc. ("Nexfor"). On June 30, 2004, Nexfor divested its paper business and renamed

13

itself Norbord.  Norbord produces OSB from a number of locations, including facilities located

in Cordele, Georgia; Guntown, Mississippi; Huguley, Alabama; Jefferson and Nacogdoches,

Texas; Joanna, South Carolina; and La Sarre and Val-d'Or, Quebec.  During the Class Period,

defendant Norbord (which included Nexfor prior to June 30, 2004), directly or through its

subsidiaries and/or affiliates, manufactured, marketed, sold or distributed OSB in the United

States.

        47.    During the Class Period, Norbord directly or indirectly and through subsidiaries

and/or affiliates that it dominated and controlled, conspired with others named as Defendants

herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise,

maintain or stabilize prices of OSB sold in and/or distributed to the United States and elsewhere.

These horizontal-pricing practices restrained trade or commerce in the United States and were

willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact

on prices for OSB sold to Plaintiffs and the Classes.

        48.    During the Class Period, and as a direct and intended consequence of its

involvement in the horizontal price-fixing conspiracy alleged herein, Norbord controlled, directly

or indirectly, the price, cost or volume of OSB sold in and/or distributed in the United States.

        49.    Defendant Potlatch Corporation ("Potlatch") is a corporation organized, existing,

and doing business under the laws of the State of Delaware with its principal place of business

located in Spokane, Washington.  On September 22, 2004, Potlatch sold its OSB manufacturing

facilities and related assets to defendant Ainsworth.  Potlatch produced OSB from a number of

locations, including facilities in Bemidji, Grand Rapids and Cook, Minnesota.  During the Class

Period, Potlatch directly or through its subsidiaries and/or affiliates, manufactured, marketed,

sold or distributed OSB in the United States.

50.    During the Class Period, Potlatch directly or indirectly and through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of OSB sold in and/or distributed to the United States and elsewhere. These horizontal-pricing practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for OSB sold to Plaintiffs and the Classes.

51.    During the Class Period, and as a direct and intended consequence of its involvement in the horizontal price-fixing conspiracy alleged herein, Potlatch controlled, directly or indirectly, the price, cost or volume of OSB sold in and/or distributed in the United States.

52.    Defendant Weyerhaeuser Company ("Weyerhaeuser") is a corporation organized, existing, and doing business under the laws of the State of Washington with its offices and principal place of business located in Federal Way, Washington. Weyerhaeuser produces OSB from a number of locations, including facilities in Sutton, West Virginia; Arcadia, Louisiana; Grayling, Michigan; Elkin, North Carolina; Drayton Valley and Edson, Alberta; Miramachi and Wawa, Ontario; and Hudson Bay, Saskatchewan. During the Class Period, Weyerhaeuser, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed OSB in the United States.

53.    During the Class Period, Weyerhaeuser directly or indirectly and through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of OSB sold in and/or distributed to the United States and elsewhere. These horizontal-pricing practices restrained trade or commerce in the United

15

States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for OSB sold to Plaintiff and the Class.

54.    During the Class Period, and as a direct and intended consequence of its involvement in the horizontal price-fixing conspiracy alleged herein, Weyerhaeuser controlled, directly or indirectly, the price, cost or volume of OSB sold in and/or distributed in the United States.

55.    Defendant Tolko Industries, Inc. ("Tolko") is a corporation organized, existing, and doing business under the laws of Canada with its offices and principal place of business located in Vernon, British Columbia. Tolko produces OSB from a number of locations, including facilities in High Prairie and Slave Lake, Alberta; and Meadow Lake, Saskatchewan. During the Class Period, Tolko, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed OSB in the United States.

56.    During the Class Period, Tolko directly or indirectly and through subsidiaries and/or affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of OSB sold in and/or distributed to the United States and elsewhere. These horizontal-pricing practices restrained trade or commerce in the United States and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for OSB sold to Plaintiffs and the Classes.

57.    During the Class Period, and as a direct and intended consequence of its involvement in the horizontal price-fixing conspiracy alleged herein, Tolko controlled, directly or indirectly, the price, cost or volume of OSB sold in and/or distributed in the United States.

16

58.     Whenever reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the corporation's management, direction, control, or business affairs.  Moreover, Defendants acted as each other's agents or joint venturers with respect to their conspiracy, and any Defendant that is a subsidiary of a foreign parent acted as its parent company's agent for its parent's U.S. OSB sales.

59.     The acts charged in this Complaint have been done by the aforesaid Defendants and were ordered and performed by the aforesaid Defendants' officers, directors, agents, employees or representatives while actively engaged in the management, direction, control or transaction of said Defendants' business or affairs.

## C.    Co-Conspirators

60.     Various individuals, partnerships, corporations and associations not named as defendants in this Complaint have participated as co-conspirators in the violations of law alleged herein and have performed acts and made statements in furtherance thereof.  The identity of all co-conspirators is unknown at this time and will require discovery.

## CLASS ACTION ALLEGATIONS

61.     Plaintiffs bring this action on their own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of the following Class ("the Nationwide Class"):

> All persons and entities residing in the United States, who indirectly purchased OSB from any of the Defendants between June 1, 2002 and the present (the "Class Period").  Excluded from the Class are all federal, state, or local governmental entities, Defendants, and subsidiaries and affiliates of Defendants.

62.    Plaintiffs also bring this action on their own behalf and as a class action pursuant

to Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of

all members of the following Classes (collectively, the "Indirect Purchaser Classes"):

ARIZONA: All persons and entities residing in Arizona who indirectly purchased OSB
from any of the Defendants between June 1, 2002 and the present. Excluded from the
Class are all federal, state, or local governmental entities, Defendants, and subsidiaries
and affiliates of Defendants (the "Arizona Indirect Purchaser Class").

CALIFORNIA: All persons and entities residing in California who indirectly purchased
OSB from any of the Defendants between June 1, 2002 and the present. Excluded from
the Class are all federal, state, or local governmental entities, Defendants, and
subsidiaries and affiliates of Defendants (the "California Indirect Purchaser Class").

DISTRICT OF COLUMBIA: All persons and entities residing in the District of
Columbia who indirectly purchased OSB from any of the Defendants between June 1,
2002 and the present. Excluded from the Class are all federal, state, or local
governmental entities, Defendants, and subsidiaries and affiliates of Defendants (the
"District of Columbia Indirect Purchaser Class").

FLORIDA: All persons and entities residing in Florida who indirectly purchased OSB
from any of the Defendants between June 1, 2002 and the present. Excluded from the
Class are all federal, state, or local governmental entities, Defendants, and subsidiaries
and affiliates of Defendants (the "Florida Indirect Purchaser Class").

IOWA: All persons and entities residing in Iowa who indirectly purchased OSB from any
of the Defendants between June 1, 2002 and the present. Excluded from the Class are all
federal, state, or local governmental entities, Defendants, and subsidiaries and affiliates
of Defendants (the "Iowa Indirect Purchaser Class").

KANSAS: All persons and entities residing in Kansas who indirectly purchased OSB
from any of the Defendants between June 1, 2002 and the present. Excluded from the
Class are all federal, state, or local governmental entities, Defendants, and subsidiaries
and affiliates of Defendants (the "Kansas Indirect Purchaser Class").

MAINE: All persons and entities residing in Maine who indirectly purchased OSB from
any of the Defendants between June 1, 2002 and the present. Excluded from the Class
are all federal, state, or local governmental entities, Defendants, and subsidiaries and
affiliates of Defendants (the "Maine Indirect Purchaser Class").

MASSACHUSETTS: All persons residing in Massachusetts who indirectly purchased
OSB from any of the Defendants between June 1, 2002 and the present. Excluded from

the Class are all federal, state, or local governmental entities, Defendants, and subsidiaries and affiliates of Defendants (the "Massachusetts Indirect Purchaser Class").

MICHIGAN: All persons and entities residing in Michigan who indirectly purchased OSB from any of the Defendants between June 1, 2002 and the present. Excluded from the Class are all federal, state, or local governmental entities, Defendants, and subsidiaries and affiliates of Defendants (the "Michigan Indirect Purchaser Class").

MINNESOTA: All persons and entities residing in Minnesota who indirectly purchased OSB from any of the Defendants between June 1, 2002 and the present. Excluded from the Class are all federal, state, or local governmental entities, Defendants, and subsidiaries and affiliates of Defendants (the "Minnesota Indirect Purchaser Class").

MISSISSIPPI: All persons and entities residing in Mississippi who indirectly purchased OSB from any of the Defendants between June 1, 2002 and the present. Excluded from the Class are all federal, state, or local governmental entities, Defendants, and subsidiaries and affiliates of Defendants (the "Mississippi Indirect Purchaser Class").

NEVADA: All persons and entities residing in Nevada who indirectly purchased OSB from any of the Defendants between June 1, 2002 and the present. Excluded from the Class are all federal, state, or local governmental entities, Defendants, and subsidiaries and affiliates of Defendants (the "Nevada Indirect Purchaser Class").

NEW MEXICO: All persons and entities residing in New Mexico who indirectly purchased OSB from any of the Defendants between June 1, 2002 and the present. Excluded from the Class are all federal, state, or local governmental entities, Defendants, and subsidiaries and affiliates of Defendants (the "New Mexico Indirect Purchaser Class").

NEW YORK: All persons and entities residing in New York who indirectly purchased OSB from any of the Defendants between June 1, 2002 and the present. Excluded from the Class are all federal, state, or local governmental entities, Defendants, and subsidiaries and affiliates of Defendants (the "New York Indirect Purchaser Class").

NORTH CAROLINA: All persons and entities residing in North Carolina who indirectly purchased OSB from any of the Defendants between June 1, 2002 and the present. Excluded from the Class are all federal, state, or local governmental entities, Defendants, and subsidiaries and affiliates of Defendants (the "North Carolina Indirect Purchaser Class").

NORTH DAKOTA: All persons and entities residing in North Dakota who indirectly purchased OSB from any of the Defendants between June 1, 2002 and the present. Excluded from the Class are all federal, state, or local governmental entities, Defendants, and subsidiaries and affiliates of Defendants (the "North Dakota Indirect Purchaser Class").

19

PENNSYLVANIA: All persons and entities residing in Pennsylvania who indirectly purchased OSB from any of the Defendants between June 1, 2002 and the present. Excluded from the Class are all federal, state, or local governmental entities, Defendants, and subsidiaries and affiliates of Defendants (the "Pennsylvania Indirect Purchaser Class").

SOUTH DAKOTA: All persons and entities residing in South Dakota who indirectly purchased OSB from any of the Defendants between June 1, 2002 and the present. Excluded from the Class are all federal, state, or local governmental entities, Defendants, and subsidiaries and affiliates of Defendants (the "South Dakota Indirect Purchaser Class").

TENNESSEE: All persons and entities residing in Tennessee who indirectly purchased OSB from any of the Defendants between June 1, 2002 and the present. Excluded from the Class are all federal, state, or local governmental entities, Defendants, and subsidiaries and affiliates of Defendants (the "Tennessee Indirect Purchaser Class").

VERMONT: All persons and entities residing in Vermont who indirectly purchased OSB from any of the Defendants between June 1, 2002 and the present. Excluded from the Class are all federal, state, or local governmental entities, Defendants, and subsidiaries and affiliates of Defendants (the "Vermont Indirect Purchaser Class").

WEST VIRGINIA: All persons and entities residing in West Virginia who indirectly purchased OSB from any of the Defendants between June 1, 2002 and the present. Excluded from the Class are all federal, state, or local governmental entities, Defendants, and subsidiaries and affiliates of Defendants (the "West Virginia Indirect Purchaser Class").

WISCONSIN: All persons and entities residing in Wisconsin who indirectly purchased OSB from any of the Defendants between June 1, 2002 and the present. Excluded from the Class are all federal, state, or local governmental entities, Defendants, and subsidiaries and affiliates of Defendants (the "Wisconsin Indirect Purchaser Class").

63.    Plaintiffs do not know the exact size of the Classes at the present time. However, Plaintiffs believe that due to the nature of the trade and commerce involved, there are thousands of class members, geographically dispersed throughout the United States such that joinder is impracticable.

64.    Plaintiffs' claims are typical of those of the Classes in that they are indirect purchasers of OSB and their claims arise from the same common course of conduct giving rise to the claims of the members of the Classes and the relief sought is common to the Classes.

65.    Plaintiffs, as representatives of the Classes, will fairly and adequately protect the interests of the Class members. They have engaged counsel who are highly experienced and competent in class action litigation and complex antitrust and consumer protection litigation. The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class members. An effective and practicable manner of notice to such Class members can be fashioned by the Court.

66.    There are questions of law and fact common to the Classes, including, but not limited to:

        a.    Whether the Defendants and their co-conspirators engaged in a contract, combination or conspiracy among themselves to fix, raise, maintain or stabilize the prices of, or allocate the market for, OSB sold in the United States;

        b.    The duration and extent of the contract, combination or conspiracy;

        c.    Whether the Defendants and their co-conspirators were participants in the contracts, combinations or conspiracies alleged herein;

        d.    Whether the Defendants and their co-conspirators engaged in conduct that violated Section 1 of the Sherman Act;

        e.    Whether the Defendants and their co-conspirators engaged in unlawful, unfair or deceptive contracts, combinations or conspiracies among themselves, express or implied, to fix, raise, maintain, or stabilize prices of OSB sold in and/or distributed in the United States;

21

f.     Whether the Defendants and their co-conspirators engaged in conduct that violated state antitrust, unfair competition, and/or consumer protection laws of the Indirect Purchaser States as alleged herein;

g.     Whether the anticompetitive conduct of the Defendants and their co-conspirators caused prices of OSB to be artificially inflated to non-competitive levels;

h.     Whether the Defendants and their co-conspirators unjustly enriched themselves as a result of their inequitable conduct at the expense of the members of the Classes;

i.     Whether the Defendants and their co-conspirators fraudulently concealed the existence of their unlawful conduct;

j.     Whether Plaintiffs and the Classes are entitled to injunctive relief; and

k.     Whether Plaintiffs and other members of the Classes were injured by the conduct of Defendants and, if so, the appropriate class-wide measure of damages.

67.    These and other questions of law and fact are common to the Classes and predominate over any question affecting only individual members of the Classes, including legal and factual issues relating to liability, damages, and restitution.

68.    Prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for Defendants.

69.    This Class action is superior to any alternatives for the fair and efficient adjudication of this controversy because:

a.   It will avoid a multiplicity of suits and consequent burden on the courts and Defendants;

b.   It would be virtually impossible for all Class members to intervene as parties-plaintiff in this action;

c.   It will allow numerous individuals with claims too small to adjudicate on an individual basis because of the prohibitive cost of this litigation, to obtain redress for their economic injuries;

d.   As a class action it is appropriate for treatment on a fluid recovery basis, which will obviate any manageability problems; and

e.   It will provide court oversight of the claims process, once Defendants' liability is adjudicated.

70.   Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to each Class as a whole.

## TRADE AND COMMERCE

71.   During the Class Period, Defendants engaged in continuous contracts, combinations or conspiracies in restraint of trade in violation of the Sherman Act.

72.   During the Class Period, Defendants sold and shipped substantial quantities of OSB in a continuous and uninterrupted flow of interstate commerce to customers located in states other than the states and countries in which Defendants produced OSB. Defendants and their co-conspirators received millions of dollars from such interstate trade and commerce.

73.    The Defendants' business activities that are the subject of this Complaint were within the flow of and substantially affected interstate trade and commerce.

74.    During the Class Period, the Defendants' conduct and their co-conspirators' conduct occurred in, affected, and foreseeably restrained the interstate commerce in the United States.

### FACTUAL ALLEGATIONS

A.    **Background of the OSB Industry**

75.    OSB is a widely used form of structural panel that evolved from waferboard in the late 1970s. It is similar to other structural panels, such as plywood, in its strength and rigidity, panel size and thickness, fastener performance and paintability.

76.    The construction industry relied on OSB extensively, particularly in new residential construction, because of its versatility. Principal end uses for OSB include, but are not limited to: siding, roof and wall sheathing, underlayment, flooring, decking and I-Joists.

77.    Because OSB manufacture takes the tree apart by slicing the log in the long grain direction, it can use trees of varying size and shape which are not suitable for plywood. Additionally, it can be custom manufactured to meet specific requirements in thickness, density, panel size, surface texture, strength and rigidity.

78.    OSB is an engineered, mat-formed structural panel product made of strands, flakes or wafers sliced from small diameter, round wood logs and bonded with an exterior-type binder under heat and pressure. It is manufactured from sustainable fast-growing trees such as aspen poplar, southern yellow pine, mixed hardwoods, and other suitable species. The logs are cut to length, debarked, and processed into precise, uniform strands ranging from three and one-half inches to six inches long and approximately one inch wide. The strands are dried, sorted, and mixed with

wax and waterproof exterior-type binder and formed into large continuous mats. These mats are oriented in cross directional layers for increased strength, then pressed at a high temperature and pressure to form panels.

79.    The manufacturing process for OSB is far less costly than other structural panels such as plywood. The OSB manufacturing process uses only trees from sustainable, fast-growing forests or wood lots that are naturally regenerating, so there is always an abundant supply of convenient, high-quality raw materials.

80.    The mills that produce OSB are relatively modern, and are, therefore, almost fully automated. Accordingly, shutting down OSB mills is a fairly simple process.

81.    In 1992, OSB was recognized by all major U.S. model building code agencies as a performance-based structural use panel through the adoption of DOC PS2-92 Wood-Based Structural Use Panels.

82.    Today, all model building codes in the U.S. recognize OSB panels for the same uses as plywood on a thickness-by-thickness basis. In fact, OSB has now virtually replaced any other type of panel in new residential construction in North America.

83.    OSB also serves as the principal component in numerous engineered building products manufactured by Defendants. These OSB-engineered products include, but are not limited to the following: I-Joists, OSB flooring and wall systems, and siding products. OSB-engineered products are similarly impacted by the allegations set forth in this Complaint.

84.    OSB is used primarily in new residential construction. Its engineering properties impart qualities, such as stiffness and weather resiliency, that make it appropriate for use in wall sheathing, roof sheathing, subflooring applications, and other engineered building products during

new home construction. As such, demand for OSB is driven primarily by the U.S. housing market, which is measured in terms of housing starts.

85.    In 2003, in the construction market, OSB demand for roofing applications accounted for approximately 46% of the market; OSB demand for wall sheathing accounted for approximately 28% of the market; OSB demand for flooring applications accounted for over 22% of the market; and OSB demand for other applications accounted for less than 4% of the market.

86.    The underlying demand for OSB has been strong since 1991 based primarily upon a strong new housing construction market in the United States. During the Class Period, annual sales of OSB in the United States exceeded $5 billion.

**B.    Distribution of OSB**

87.    Defendants distribute OSB through direct sales to large contractors, home building companies and original equipment manufacturers. However, a majority of OSB is sold through a process whereby OSB is distributed through an intermediate party.

88.    A majority of the Defendants maintain an internal distribution channel that sells OSB to home improvement warehouses, lumber yards, dealers and other retailers. In turn, the lumber yards, home improvement warehouses, dealers and retailers sell OSB directly to the end-users of the product.

89.    Lumber yards usually purchase OSB from company distribution centers. The lumber yards then sell OSB to construction customers such as contractors who work on small to mid-sized housing projects.

90.    Home improvement chains such as Lowe's and Home Depot typically purchase OSB from an internal distribution network. Their customer base ranges from contractors to home and building owners.

**C.**    **The Market Structure of OSB is Conducive to Collusion**

91.    The market for OSB is characterized by a high degree of concentration, and this concentration has increased in recent years. During the 1990s, production of OSB in the United States grew very rapidly, and there was substantial excess capacity in OSB production as leading suppliers added plants in anticipation of further demand. Thus, especially as of 2002, the OSB market was conducive to collusion in at least the following two ways: (i) the rapid growth of production capacity during the 1990's left the OSB market oversupplied from 2000-2002; and (ii) OSB producers consolidated their OSB operations from 1999-2002. These events, combined with a failed price increase by Defendants during the first quarter of 2002, left prices frustratingly low, particularly during a time of rising demand.

**(i)    Imbalanced Supply of OSB Led to Declining Prices Prior to Class Period**

92.    Because OSB offered advantages over plywood such as lower prices, higher material efficiency and flexibility, demand and production increased in the 1990s and early 2000s.

93.    From 1995 to 2000, the APA-Engineered Wood Association, whose members include Defendants Louisiana-Pacific, Georgia-Pacific, Ainsworth, Potlatch, Tolko, and Norbord, was involved in a strategic marketing program aimed at increasing demand for OSB. The program consisted of over ten separate initiatives targeting residential, nonresidential, and industrial markets.

94.    In 1980, North American OSB panel production was 751 million square feet (3/8" basis) (0.7 million cubic meters). A decade later, in 1990, this figure had grown to 7.6 billion square feet (7.0 million cubic meters). Between 1996 and 2000, OSB capacity grew rapidly by over 38% (25% in 1996, 5% in 1997, 5% in 1998, and 3% in 1999). By 2001, OSB production had grown to 22 billion square feet (19.4 million cubic meters) in North America.

95.    This rapid increase in OSB production during the 1990s resulted in substantial excess capacity, as leading suppliers added plants in anticipation of further demand.  As a result of the increased capacity, despite tremendous demand for the product, Defendants' OSB inventories swelled, keeping prices suppressed to near 5 year lows by the end of 2001.

96.    Due to the oversupplied OSB market, OSB prices dropped 45% between 1994 and 1997, and 39% between 1999 and 2001, despite a robust housing market.

97.    The U.S. Department of Agriculture noted that "[d]espite the growth in capacity and high demand, [OSB] prices have continued to moderate." James L. Howard, *U.S. Forest Products Annual Market Review and Prospects, 2000-2003,* at 4 (U.S. Dept. of Agric., Forest Service, Forest Products Laboratory, December 2002).  Mr. Howard also stated that, "[t]he pricing trends for OSB continued through 2001 as prices ended the year lower than a year earlier.  After increasing through the first quarter 2002, OSB prices are sliding toward a new low for the year." *Id.*

98.    For example, reported prices by Random Lengths of 7/16" OSB in dollars per thousand square feet (MSF) for the North Central Region went from the low $200s in May and June 2001 to the $140s in October 2001 to $134 in late December 2001.

99.    Louisiana-Pacific recognized the impact that supply and demand had on OSB prices, stating:

> Product pricing is significantly affected by the relationship between supply and demand in the building products industry.  Product supply is influenced primarily by fluctuations in available manufacturing capacity.  Demand is affected by the state of the economy in general and a variety of other factors.  The demand for our building products is primarily affected by the level of new residential construction activity and home repair and remodeling activity.  Demand is also subject to fluctuations due to changes in economic conditions, interest rates, population growth, weather conditions and other factors.

Louisiana-Pacific's Form 10-K for the period ending December 31, 2002 ("2002 Louisiana Pacific

Form 10-K") at 33.

     100.   On April 2, 2001, Defendant Ainsworth's CEO Brian Ainsworth recognized the

imbalance of supply over demand and the impact that the oversupplied market had on pricing,

stating:

> The deterioration in North American pricing for commodity products experienced
> during the third quarter of this year has continued into the fourth quarter [of 2000],...
> U.S. Housing starts, on an annualized basis, remain however strong, and what we are
> observing is the impact of an unbalanced supply/demand equation.

Ainsworth News Release, dated April 2, 2001.

     101.   The following year, when reporting Ainsworth's financial results for the fourth

quarter of 2001 and the full year 2001, CEO Brian Ainsworth again recognized the OSB

oversupply problem, stating:

> Our poor financial results directly reflect an accelerated deterioration in North
> American pricing in the fourth quarter from that experienced in the third quarter....
> Despite the relatively robust North American residential construction market, excess
> structural panel capacity resulted in some of the lowest prices we've seen since 1997
> for our company's oriented strand board (OSB) products.
>
> During the 2001 fourth quarter, the company's average OSB price declined by
> 20.6%, as compared to the 2001 third quarter, and by 16.5% when compared to the
> same period of 2000. For the full year of 2001 the company's average OSB price
> was down 21.8% from that realized in 2000.
>
> In response to the poor market conditions, a number of North American OSB and
> Plywood producers curtailed production in the fourth quarter.
>
>                             * * *
>
> OSB sales revenue in the 2001 fourth quarter was 10.0% greater than the same period
> of 2000, as a 35.8% increase in unit volume was partially offset by the 19.0% drop in
> average sales price.

Ainsworth News Release, dated February 18, 2002.

     102.   In addition to an already oversupplied market in 2001, additional capacity was

planned, with major projects anticipated in the Northeast and Southern U.S as well as in Canada.

103.    Combined with the effect of closing older, less efficient OSB plants and opening

larger plants with higher productivity and lower costs, concerns grew over the imbalance of

supply over demand:

> The next OSB wave has just started and already the reality of too much capacity
> relative to demand has taken place.... Aside from economic drivers, the major factor
> that will influence structural panel prices will be the rate of construction of new OSB
> plants in North America (and, to a lesser degree, off shore plants).... For the period
> 2001 to 2004, another four billion square feet of new capacity is planned at 10 sites in
> North America - over and above the 500 million square feet per year of "capacity
> creep" at existing plants. Of the additional 10 plants proposed, half of them are in
> formal stages of planning, indicating that at least nine new plants and two capacity
> additions will likely be built over the entire period between 2000 to 2004.

Russell Taylor, *Tough Markets*, Logging & Sawmilling Journal, March, 2001.

104.    With an existing imbalance of supply over demand in 2001 and additional planned

capacity for 2003 and beyond, the next three-year period (between 2001 and 2003) looked

extremely challenging for OSB producers:

> The net result is a simple supply and demand imbalance, [ ] where too much planned
> capacity is chasing a demand scenario that is expected to show little growth over the next
> few years. However, our forecast assumes that fewer OSB mills will be built than are
> currently planned and/or there will be some additional OSB curtailments. This will still
> result in low operating rates [which] should hover between 85% and 90% between 2001 and
> 2005 - well below the 90-95+% levels achieved in the 1997-2000 period.

Russell Taylor, *OSB and Plywood Outlook for 2001-2002: Bleak In The Short-Term, But It Can

Only Get Better!*, February 22, 2001.

105.    By the end of 2002, OSB prices had dropped nearly below what they were at the

end of 2001 due to the excess supply in the market. For example, Louisiana-Pacific reported a

27% drop in OSB's average net selling price in 2001 over 2000, and an additional 2% in 2002 over

2001. 2002 Louisiana-Pacific Form 10-K at 23. Overall, OSB prices in the United States had

dropped an estimated 40% from 1999-2002.

106.    As reported by Louisiana-Pacific in its 2002 10-K, "For OSB, with an annual

capacity volume of 5.8 billion square feet (3/8" basis) or 5.0 billion square feet (7/16" basis), a $1

change in the annual average price on 7/16" basis would change annual pre-tax profits by

approximately $5 million." 2002 Louisiana-Pacific Form 10-K at 37. Thus, a 40% decline in

average price over three years had a tremendous negative financial impact upon defendants.

107.    As a result, the problem of low OSB prices, and the reason behind the problem, was

well known in the industry:

> The erosion of lumber prices to 10 year lows in early 2001 has started to cause
> panic among lumber producers. OSB producers are facing a similar scenario as
> prices plunged at the start of 2001 to five year lows. While a diagnosis of the
> problem is very simple - too much supply chasing a slowing demand - a
> prescription is much more complicated and it's likely to take most of this year to
> create some solutions. As a result, the outlook for lumber and panel products calls
> for continuing weak prices in the short term until further and substantial supply
> curtailments occur in both lumber and structural panels to allow prices to move
> higher.

Russell Taylor, *Tough Markets,* Logging & Sawmilling Journal, March 2001.

108.    The solution to the problem was also well known throughout the industry.  As early

as February 2001, an industry analyst noted:

> With the two largest OSB companies (Louisiana-Pacific and Weyerhaeuser)
> commanding half of North American production and the top four (including Georgia-
> Pacific and Nexfor) representing two-thirds of the industry, the potential exists of
> having market leadership from the dominant producers. Like in the pulp and paper
> industry, [ ] planned or scheduled curtailments on an industry-wide basis may limit
> the downside on prices - this is a strategy sorely needed in the structural panel sector.
> 					***
> Unlike the last six years, the next four years will need some careful strategic
> thinking to avoid an all out bloodbath in OSB as well as plywood prices.

Russell Taylor, *OSB and Plywood Outlook for 2001-2002: Bleak In The Short-Term, But It Can*

*Only Get Better!,* February 22, 2001.  This call for "market leadership from the dominant

producers" regarding "planned or scheduled curtailments on an industry-wide basis" would be

answered by Defendants in mid-2002.

      **(ii)**    **The OSB Market is Controlled by the Defendants**

      109.    The underlying structure of the OSB market is conducive to the existence of a price-fixing conspiracy, due to the high degree of market concentration, which rapidly developed beginning in 1999 through the consolidation of OSB producers.

      110.    In 1999, the top five OSB producers controlled only 56% of production capacity. In 2000, the top five producers controlled 67% of production capacity. Currently, the top five producers control 79% of the OSB capacity while the top eight producers control 95% of the OSB production capacity in North America.

      111.    Over the next four years, Defendants accomplished significant consolidation by increasing their production capacity through the acquisition of existing OSB operations rather than building additional OSB mills. Four significant acquisitions occurred during this time period: (i) Weyerhaeuser acquired the OSB operations of MacMillan Bloedel ("MacBlo") (1999); (ii) Louisiana-Pacific acquired the OSB operations of Le Groupe Forex ("Forex") (1999); (iii) Weyerhaeuser acquired the OSB operations of Willamette Industries, Inc. ("Willamette") (2002); and Nexfor acquired the OSB operations of International Paper Company ("International Paper") (2002).

      112.    As of 2004, Defendants' cumulative share of the U.S. OSB market was nearly 88%, with the leading producer, Louisiana-Pacific, controlling over 26% of the market, and the second leading producer, Weyerhauser controlling approximately 17%. This further consolidation of an already consolidated market facilitated the conspiracy, i.e., "[i]ndustry consolidation should result in better demand-capacity management." Catherine Ainsworth, Robert Allen, Michael Ainsworth and Bruce Rose, Presentation at Ainsworth Lumber Co. Ltd. Investor Breakfast (June 8,

2005), available at http://www.ainsworth.ca/html/invest_news.html.

113.    During the same time period, the other Defendants also controlled a significant share of the market with Norbord controlling approximately 14%; Ainsworth controlling approximately 13%; Georgia-Pacific controlling approximately 9%; Huber controlling approximately 5% ; and Tolko controlling approximately 4%.

**D.    The Failed OSB Price Increase in 2002**

114.    In June and September of 2001, Louisiana-Pacific announced that it would be taking "market-related downtime" at all its OSB mills for a period of one or two weeks "depending on market conditions." Louisiana-Pacific News Releases, dated June 28, 2001 and September 20, 2001.

115.    Ainsworth, Potlatch, Norbord, Georgia-Pacific and Weyerhaeuser followed shortly thereafter, all announcing periods of downtime from three days to two weeks.  Like Louisiana-Pacific, many of the other Defendants attributed the reason to market conditions: (i) Weyerhaeuser announced that its Slave Lake OSB mill was being curtailed "to balance production and inventory with customer demand."  Random Lengths Publications, Inc., *Wood Wire: Curtailment Watch: Panel Mills,* dated November 9, 2001; (ii) International Paper, prior to being acquired by Nexfor (Norbord), announced a 25% decrease in capacity at its OSB mills for the month of November 2001 due to "[p]oor market conditions." *Id.,* dated November 2, 2001; and (iii) Georgia-Pacific curtailed its OSB mill in Woodland, Maine from December 21, 2001 until spring, again citing "[m]arket conditions." *Id.,* dated December 17, 2001.

116.    These curtailments in late 2001 caused OSB prices to increase through the first quarter of 2002.  For example, reported prices by Random Lengths of 7/16" OSB MSF for the North Central Region went from $131 in early January to $168 in February to $196 in March.

117.    However, as the U.S. Department of Agriculture noted:

Despite a growth in capacity and high demand, [OSB] prices have continued to moderate. The pricing trends for OSB continued through 2001 as prices ended the year lower than a year earlier. After increasing through the first quarter 2002, OSB prices are sliding toward a new low for the year.

James L. Howard, *U.S. Forest Products Annual Market Review and Prospects, 2000-2003,* at 4

(U.S. Dept. of Agric., Forest Service, Forest Products Laboratory, December 2002).

118.    After reaching a high of $196 in mid-March, 2002, prices of 7/16" OSB MSF in

the North Central Region (as reported by Random Lengths) dropped significantly and then

leveled off:

| | |
|---|---|
| May 3, 2002 | $167 |
| June 7, 2002 | $153 |
| July 3, 2002 | $149 |
| August 2, 2002 | $155 |
| September 6, 2002 | $159 |
| October 4, 2002 | $166 |
| November 1, 2002 | $162 |
| December 6, 2002 | $147 |

## E.    Defendants' Successful Attempt to Control Prices in 2003

119.    After the failed increase of early 2002, Defendants conspired to do better next

time. In mid to late 2002, the industry cut production because the OSB market had been "mired

with overcapacity" prior to 2003,

[t]he industry developed its own version of "managed trade," with some self-imposed curtailments to allow production to better balance with supply in the early part of the year. The result through the first five months of 2003 has seen U.S. OSB output at 3% below last year's levels and plywood 6.5% lower. Even Canadian OSB is just 1.6% higher than in 2002, with plywood off by 7%. The net result has been constrained OSB and plywood production, while housing starts have remained very strong. This has allowed 7/16" OSB prices to soar from the US $160s to the US $360/Msf-levels that have eclipsed the previous all-time OSB peak price achieved in the summer of 1999.

"Real Market Dynamics-Prices for Lumber & Panels Become Market Driven," Wood Markets

Monthly (August 2003).

120.    "The industry," as opposed to individual producers, had to develop "its own version of managed trade" because, in this commodity market, independent curtailments will not sufficiently cut production to allow for an increase in prices; a concerted effort by all producers is required.  Otherwise, competitors will be competing in the market by increasing their own production to make up for other manufacturers' cutbacks, as illustrated by the failed price increase in second quarter of 2002.

121.    The Defendants' first series of mill curtailments in 2001 had the intended effect of reducing the available supply of OSB and temporarily increasing prices.  However, after the first quarter of 2002, inventories again began to rise as Defendants ramped up production, causing prices to remain stagnant or decline.  Thereafter, the Defendants continued to successfully implement their conspiracy to fix, raise, maintain and stabilize the prices of OSB.

122.    Starting in mid-2002, Defendants removed significant capacity from production, and dramatically reduced the inventories of OSB available for sale.  The idling of plant capacity and accompanying decline in inventories was followed by a sharp increase in the price of OSB. The price increase was a result of the Defendants conspiring to reduce available supply at a time when demand for OSB was increasing in order to illegally raise prices.

123.    The OSB price increase during early 2002 failed, as OSB prices ended 2002 nearly below the year end prices of 2001 despite "OSB consumption [in 2002 being] a record 19.4 million cubic meters." James L. Howard, *U.S. Forest Products Annual Market Review and Prospects, 2000-2003,* at 6 (U.S. Dept. of Agric., Forest Service, Forest Products Laboratory, December 2002).  In contrast, the price increase that occurred in 2003 was a great success.

**F.    Despite High Demand, OSB Production is Reduced to Eliminate Supply**

124.    In 2002, forecasters predicted and Defendants knew that North American structural

panel consumption looked positive and that consumption would be unabated over the next three to

five years.

125.    In the face of this strong and increasing demand, Defendants agreed, combined and

conspired to limit and reduce OSB manufacturing capacity and restrict the supply of OSB in the

United States, with the knowledge, intent and purpose to fix, raise, maintain and stabilize the

prices of OSB.

126.    Defendants communicated among themselves and conspired to collectively reduce

the supply of OSB available for sale in the United States, during a time of increased demand for

the product, in at least the following four ways: (i) by removing production capacity from the

market through mill shutdowns; (ii) by delaying or canceling the construction of new OSB mills;

(iii) buying needed OSB from competitors instead of manufacturing it themselves, which they

could do at a lower cost; and (iv) lowering operating rates at mills.

127.    To take advantage of the continued rise in OSB consumption, Defendants first

needed to minimize additional OSB capacity:

> For the last two years, OSB prices were lower than previous cycle averages due to an
> imbalance between the supply and demand of OSB products. During 2001 and 2000,
> [Louisiana-Pacific] and several of [its] competitors had announced plans to construct new
> OSB plants or expand existing facilities, which would have added significantly to industry
> capacity in the next few years. Several of these planned facilities, including two of
> [Louisiana-Pacific's] planned facilities, have been delayed or cancelled.

2002 Louisiana-Pacific Form 10-K at 22. Louisiana-Pacific canceled its planned OSB facilities in

the second half of 2002, including its project in Quebec which required Louisiana-Pacific to

record impairment losses of $14.5 million. *Id.* at 51.

128.    In April 2002 Norbord announced that it suspended its previously announced plan

36

to build a new OSB mill in Arkansas. Thus, the decisions by Louisiana-Pacific and Norbord to cancel their planned OSB mills further reduced the supply of OSB to enter the market in 2003 and beyond.

129.    The impact from canceling these plants was immediate, prompting an improved forecast in 2003 on supply and demand:

> The supply/demand outlook for structural panels in 2003 points to small but steady improvements in demand, with limited increases in OSB capacity.... With only two new OSB plants scheduled for 2003 and no firm commitments yet for 2005, OSB operating rates and prices should improve modestly in 2003 and more rapidly in 2004. As we saw in 2002, an excess of supply can quickly push operating rates and prices lower, regardless of the market's strength (as the softwood lumber sector knows only too well). As in the second half of 2002, effective supply management by the larger producers during periods of slow demand will have a direct impact on price levels in 2003.

Russell Taylor, *Markets - Price Improvements on the Way,* Logging & Sawmilling Journal, March, 2003.

### G.    Defendants Further Reduce Supply Through OSB Production Curtailments

130.    In the second half of 2002, numerous mill closings by OSB manufacturers resulted in a large amount of production capacity being taken out of the market. About 63% of the capacity shutdown occurred in the last four months of 2002. As a result, there was a noticeable decline in inventories in late 2002 and early 2003, at a time when demand for OSB from new housing construction was rising to record levels. This slowdown in production and inventory decline at a time when demand was rising is at odds with economic fundamentals, which would have predicted an increase in production and inventories.

131.    While OSB was being consumed at record levels in the United States (during the quarter ending June 30, 2002, "OSB consumption was a record 5.2 million cubic meters ...." James L. Howard, *U.S. Forest Products Annual Market Review and Prospects, 2000-2003,* at 4 (U.S.

Dept. of Agric., Forest Service, Forest Products Laboratory, December 2002)), Defendants communicated among themselves for the purpose of coordinating a series of plant closures which resulted in a significant share of total OSB production capacity being taken out of the market beginning in mid-2002.

132.    Louisiana-Pacific eliminated production from virtually all its North American OSB mills on two separate occasions during the second half of 2002. After permanently closing its OSB mill in Olathe, Colorado in May 2002, Louisiana-Pacific issued a press release on June 18, 2002 stating that on July 1, 2002 it "will be taking market-related downtime at 13 of its 14 North American oriented strand board (OSB) facilities to adjust production to customer demand."

133.    Less than four months later, on October 15, 2002, Louisiana-Pacific issued another press release announcing downtime at these mills, stating "that the company will be taking 65-70 days of downtime among 12 of its 15 North American oriented strand board (OSB) facilities for scheduled maintenance and other projects." The remaining three OSB mills included Olathe, CO (which had been closed in May 2002), and Woodland, ME (which remained idle since being acquired from Georgia-Pacific in September 2002).

134.    Louisiana-Pacific, the industry leader with over 28% of the North American production capacity, through communications and in coordination with the other Defendants, reduced capacity in OSB production by eliminating approximately one-quarter of its production capacity during the second half of 2002, and another 8% in 2003.

135.    The other Defendants joined Louisiana-Pacific in the curtailment of OSB production by coordinating downtime at their OSB mills during the second half of 2002:

     a. on October 10, 2002 Norbord announced periods of downtime at six of its nine OSB mills for the end of October through December 2002;

b.    on October 25, 2002 Weyerhaeuser announced periods of downtime at six of its ten OSB mills for November 18 through December 2002;

c.    on August 20 and October 2, 2002, Potlatch announced periods of downtime at two of its three OSB mills for September and October 2002; and

d.    on August 16, and October 15, 2002 Ainsworth announced periods of downtime at two of its three OSB mills for September and October 2002.

136.    After March 2002, Georgia-Pacific no longer publicly reported any downtime for its OSB mills in North America; however its OSB sales volume declined in 2003 by approximately 13% from 2002.

137.    In addition, Tolko shut down its High Prairie OSB mill for two weeks beginning on August 15, 2002.

138.    A sharp increase in OSB prices beginning in 2003 was the result of Defendants intentional reduction of the available supply at a time when demand for OSB was increasing. Defendants' reduction of production and existing inventories created the impression that supply was limited and inadequate to satisfy the demand for OSB, and allowed them to charge artificially inflated prices for OSB.

139.    As reported by Random Lengths, the prices of 7/16" OSB MSF in the North Central Region dramatically increased:

| | |
|---|---|
| January 3, 2003 | $148 |
| March 7, 2003 | $175 |
| May 2, 2003 | $200 |
| July 3, 2003 | $315 |
| September 5, 2003 | $425 |
| November 7, 2003 | $465 |

140.    Due to Defendants' 2002 and subsequent coordinated supply curtailments, OSB

39

prices remain at artificially inflated levels today.

141.    The production slowdown by Defendants in late 2002 and early 2003, while demand continued to rise, is not representative of a competitive marketplace. Defendants successfully implemented their fraudulent scheme to fix, raise and maintain prices for OSB sold throughout the United States.

142.    Defendants' coordinated reduction of OSB supply and inventories was very effective, as an industry analyst noted:

> After a shaky year in 2002, when scheduled OSB curtailments became a fact of business, and despite record-high demand for both plywood and OSB, the market outlook for 2003 and 2004 is starting to look good again. However, a number of supply based factors, particularly rising domestic capacity and offshore imports, could impact structural panel markets negatively and cause prices to sputter once again in 2003.

Russell Taylor, *Markets - Price Improvements on the Way,* Logging & Sawmilling Journal, March, 2003.

143.    The impact of Defendants' efforts to reduce supply during the second half of 2002 had an immediate effect on OSB production in early 2003. In 2003, for the first time in a decade, OSB production decreased from the preceding year.

144.    "According to the APA - The Engineered Wood Association, OSB production for the first two quarters of 2003 was below (by 3.2%) production in this period in 2002." James L. Howard, *U.S. Forest Products Annual Market Review and Prospects, 2001-2004,* at 5 (U.S. Dept. of Agric., Forest Service, Forest Products Laboratory, April 2004). This curtailment in OSB production resulted in the beginning of an unprecedented upward pricing trend for OSB, *i.e.,* "[h]aving increased through the first two quarters of 2003, OSB prices are rising toward a new high for the year." *Id.*

145.    The rising OSB prices had their intended effect on Defendants. One of the most

notable recoveries was posted at Louisiana-Pacific, which struggled with debt and low product prices in 2002. The firm had been going through an extensive restructuring, which culminated in a concentration on OSB manufacturing about the same time that the OSB market embarked on the record price run. Louisiana-Pacific reported 2003 net income of $285 million, or $2.58 per share, on net sales of $2.3 billion. That compares to 2002's loss of $62 million, or 59 cents per share, on sales of $1.6 billion. The surging profits expanded Louisiana-Pacific's cash position to $926 million at the end of 2003, compared to $148 million the previous year. OSB accounts for the majority of sales for Louisiana-Pacific: "OSB accounted for about 61% of our sales in 2004, 59% in 2003 and 47% in 2002, and we expect OSB sales to continue to account for a substantial portion of our revenues and profits in the future." Louisiana-Pacific's Form 10-K for the period ending December 31, 2004 ("2004 Louisiana-Pacific Form 10-K") at 34.

146.    In 2003, Georgia-Pacific reported an increase of average selling prices for OSB of 74% "due to strong growth in residential housing starts in the second half of 2003, combined with low inventories in the distribution channels." Georgia-Pacific's Form 10-K for the period ending December 31, 2003 ("2003 Georgia-Pacific Form 10-K") at 18. In the very same document, describing this same period, Georgia-Pacific - which no longer publicly announced its mill curtailments - explained how those "low inventories in the distribution channels" came to be: "Due to excess production capacity in the building products manufacturing industry, [Georgia-Pacific] closed or indefinitely curtailed production at certain facilities in our structural panels ... businesses during 2003." *Id.*

147.    Evidence suggests that Louisiana-Pacific took a leading role in reducing capacity in OSB production. Louisiana-Pacific undertook the reduction of capacity with assurances from other Defendants that they would not raise output and undercut its efforts to get prices in the

industry higher.

148.    By engaging in collusive conduct which artificially manipulated the supply and price of OSB, Defendants were able to manipulate and artificially fix, raise, maintain and stabilize the prices for OSB that they manufacture and sell.

**H.    Defendants' Anticompetitive Acts Resulted in Significant OSB Price Increases**

149.    "Over the past eighteen months, Oriented Strand Board (OSB) has become the darling of the wood products industry, as prices cracked the US $200 per thousand square feet mark on the 7/16" back in April 2003 - and have stayed above this level ever since.  Prices peaked at U.S. $520 per thousand square feet, a staggering $400 over the break even costs of many mills." Russell Taylor, *Engineered Wood - Sizzling returns on OSB,* Logging & Sawmilling Journal, November, 2004.



Monthly Average of 7/16" OSB Prices MSF (North Central), 2001-2006

Sources:  Random Lengths, Bureau of Labor Statistics

42

150.    The market circumstances that led to the price increases were described by Jim

McGovern, Louisiana-Pacific's OSB Marketing Director: "It was almost like a perfect storm.

Channel inventories were really light, there was a pent-up demand for housing, and supply was

really lean." Sharon O'Malley, *Through the Roof as OSB and plywood prices soar, builders are*

*seeking lower-cost alternatives with proven performance,* Building Products, Jan-Feb 2004.

Louisiana-Pacific and the other Defendants communicated, conspired and agreed to create the

"perfect-storm" of inventory and supply conditions.

151.    OSB prices continued to rise through 2003 as Defendants' supply restrictions caused

panic among OSB purchasers:

> Demand for OSB-and upward price momentum-showed no let-up.  To the amazement of
> almost everyone, few could see an end to the run on the near horizon.  Panicked buyers, some
> with September needs yet to cover, were more concerned about availability than price.  Some
> builders could be forced to scale back projects or even shut down job sites due to a lack of
> wood.

*Panel Market Report,* Random Lengths, August 29, 2003.

152.    Louisiana-Pacific reported to its investors that OSB prices reached record levels in

2003, driven by product demand outstripping the industry's ability to supply the product during the

peak building season. Louisiana-Pacific attributed the imbalance to increased housing starts, which

created more demand, coupled with limited new capacity coming on line.  Louisiana-Pacific's Form

10-K for the period ending December 31, 2003 ("2003 LouisianaPacific Form 10-K") at 15.

153.    In 2003, Louisiana-Pacific reported a staggering 723% increase in operating profits

for its OSB segment over 2002. 2003 Louisiana-Pacific Form 10-K at 22.  Its OSB segment reported

$502.9 million in operating profits for 2003 versus a mere $61 million in 2002. *Id.*  An increase

in average net selling price of 70% provided the basis for this gargantuan increase in Louisiana-

Pacific's OSB operating profits. *Id.*

43

154.    Louisiana-Pacific falsely attributed the huge increase in profits to "unusually poor weather conditions."

155.    To maintain their supra-competitive OSB prices, Defendants continued to curtail OSB production:

> OSB's historic price run reached stratospheric levels as producers aggressively raised quotes, often several times per day. Rumors swirled that the government had purchased a large volume of OSB, but these were unconfirmed. However, Norbord's announcement of maintenance curtailments at five plants in October and November raised the prospect of tightening supplies.

*Government Orders Tighten Plywood, Lumber Markets,* Random Lengths, August 22, 2003. See also *Openings & Closings,* Timber Mart-South Market Newsletter, 2nd Quarter 2004 ("In one of the strongest panel markets in years, companies still scheduled maintenance downtime this quarter.").

156.    On November 19, 2003, Norbord announced 30 days of downtime at three of its mills located at Jefferson, Texas; Joanna, South Carolina; and Huguley, Alabama. The downtime was estimated to reduce production by approximately 36 million square feet (3/8").

157.    In December 2003, Louisiana-Pacific announced a downtime period of 41 days at five of its North American OSB mills. Downtime at the Louisiana-Pacific mills, which included Sagola, Michigan; Swan Valley, Manitoba; Chambord, Quebec; St. Michel Quebec; and Carthage, Texas was estimated to reduce normal production by more than 50 million square feet.

158.    In 2004, Louisiana-Pacific reported another huge increase of 65% in operating profits for its OSB segment, which reflected a total increase in Louisiana-Pacific's OSB operating profits of nearly 800% over the course of the first two years of the conspiracy. 2004 Louisiana-Pacific Form 10-K at 20. Similarly, Louisiana-Pacific's average net selling price again jumped another 27% resulting in a total average price increase of approximately 97% over

that same two year period. *Id.*

159.    During the first six months of 2004, as compared to the first six months of 2003, Louisiana-Pacific reported a price increase for its "Commodity OSB" of 154% despite a 94% decrease in "Commodity OSB" sales volume.  Louisiana-Pacific Corp., "Louisiana-Pacific Corporation Q2 2004 Results July 28, 2004" Slideshow Presentation at 9, *available at* http://media.corporate-ir.net/media_files/NYS/LPX/presentations/Q204earningspresentation.pdf. A comparison of this same time period by Louisiana-Pacific reveals an incredible increase in profit from OSB sales of 1004%. Id. at 7.

160.    As Louisiana-Pacific concedes, this significant price increase is attributable to "increased demand within a shortened time span when inventories were low and industry capacity was limited." 2003 Louisiana-Pacific Form 10-K at 22.

161.    Again, between June and August 2004, Louisiana-Pacific scheduled downtimes of varying durations at its OSB facilities in Athens, Georgia; Houlton and Woodland, Maine; Hayward, Wisconsin; Sagola, Michigan; Roxboro, North Carolina; and Swan Valley Manitoba. Additionally, in November 2004, Louisiana-Pacific announced curtailments of production at its Woodland, Maine plant.

162.    Georgia-Pacific nearly tripled its operating profits from 2002 to 2003 "primarily due to increases in selling prices for plywood and oriented strand board of 15% and 74%, respectively, when compared with the prior year [2002]. Prices increased due to a strong pick up in residential housing starts in the second half of 2003, combined with low inventories in the distribution channels." Georgia-Pacific's Form 10-K for the period ending December 31, 2003 ("2003 G-P Form 10-K") at 18.

163.    This tremendous increase in OSB selling prices occurred in 2003 despite a 13%

decline in sales volume from 2002.  Georgia-Pacific's Form 10-K for the period ending December

31, 2004 ("2004 G-P Form 10-K") at 26.

        164.    Similarly in 2003, Ainsworth also reported huge single year price increases:

> Driven by historically low interest rates and pent-up demand, the housing
> construction market in North America was exceptionally robust throughout 2003.
> The year saw the highest number of U.S. housing starts recorded in 25 years. As a
> result, Ainsworth's average OSB price was 45.8% higher than 2002. North American
> OSB benchmark prices peaked at a record high in October, and after a brief price
> drop in December new records were again reached early in 2004.

Ainsworth 2003 Annual Report at 4.

        165.    Similarly, Weyerhaeuser reported:

> Contribution to earnings in 2003 was favorably impacted by price increases in
> structural panels due to strong demand and restricted supply. Low dealer
> inventories early in the year, coupled with no major new capacity added by the
> industry in 2003, served to create significant upward pressure on OSB and
> plywood prices in the second half of 2003.

Weyerhaeuser Form 10-K, December 31, 2003 ("2003 WH Form 10-K") at 32.

**I.**      <u>**Defendants Use the Random Lengths "Print" Price to Fix and Monitor OSB Prices**</u>

        166.    In order to monitor their competitors' OSB prices, Defendants received OSB

pricing updates on Wednesdays and Fridays of every week as reported by the industry

publication "Random Lengths."  Every Wednesday at 10 a.m. Pacific time, "Random Lengths"

issues its Midweek Market Report, which includes Structural Panel composite prices for OSB.

Every Friday, the Random Lengths Weekly Report is published, and within that newsletter is a

full Lumber and Panel Market Report, which again includes OSB prices by size and region.  This

Random Lengths Weekly Report has served the lumber industry for over 60 years.

        167.    Random Lengths describes its reported prices:

> Reported prices reflect sales from mills to their customers. Sales at the secondary level are
> not considered, although they may be discussed in the market summaries. With few
> exceptions, reported prices are representative of actual sales prices, not what mills have

quoted, or what buyers think they can pay.

\*\*\*

... the determination of reported prices is not clouded by expectations or predictions. A
price reported in Random Lengths is a benchmark of the price at which a product traded at
the time of publication. In a fast-moving market, prices will lag to a degree based on how
quickly prices are changing. Reported prices are intended to provide a snapshot, telling
readers a lot, but not everything, about the market."

Random Lengths Publications, Inc., *How reported prices are determined,* p. 1-2 (2004).

168.    The Random Lengths reported prices assisted the Defendants in their scheme to

artificially raise the prices of OSB.  Those twice-weekly reported prices, which allow for very little

lag time, allowed Defendants to monitor their competitors' prices and detect potential cheating on

the conspiracy.  They also served as a single price list upon which Defendants based their OSB

prices, both for sales at their mills and through their contracts with purchasers.  Defendants

combined, conspired or otherwise agreed to fix, raise, maintain and stabilize the prices at which

OSB was sold by aligning their OSB prices with the Random Lengths "print" price.

169.    Remarkably, the alleged scheme is very similar to that in *In re Linerboard Antitrust*

*Litigation,* 203 F.R.D. 197 (E.D. Pa. 2001), *affirmed,* 305 F.3d 145 (3d Cir. *2002), cert. denied,*

538 U.S. 977 (2003).  In that case, which was settled on a class-wide basis for $202 million, it was

alleged that defendants, including Weyerhaeuser and Georgia-Pacific, conspired to reduce the

supply of linerboard at a time of rising demand by coordinating downtime at their linerboard mills.

Defendants did other things, including buying linerboard from their co-conspirators instead of

producing it themselves, to remove inventory from the oversupplied market, in order to jump-start

price increases on linerboard.

170.    In this case, the same defendants took similar actions for the same purpose of

raising prices, and which injured purchasers of the price-fixed product in the same way.

47

J.    **Associations Facilitate the Conspiracy**

171.    Defendants and their co-conspirators were able to further the conspiracy through their common sponsorship and participation in trade associations and other industry groups, such as the National Council of the Housing Industry – the Supplier 100, APA – The Engineered Wood Association, and the American Forest & Paper Association.

172.    National Council of the Housing Industry – the Supplier 100 (NCHI) is a special standing committee of the National Association of Homebuilders (NAHB), a trade association consisting of building suppliers and service providers. According to NAHB's website, NCHI consists of more than 100 distinguished building suppliers, as well as related building industry trade associations. Defendants Louisiana-Pacific, Georgia-Pacific, Weyerhauser and Norbord are all members of NCHI. NCHI gives leading building suppliers the opportunity to participate in NAHB activities, including regular meetings, seminars and tradeshows around the country. The meetings and other business of NCHI allowed Defendants and their co-conspirators to continue to implement the conspiracy alleged herein, while simultaneously allowing them to promote their products.

173.    APA – The Engineered Wood Association (APA) is a nonprofit trade association with members comprised of well-known leaders whose mills produce the majority of the structural wood panel products manufactured in North America. Defendants Louisiana-Pacific, Georgia-Pacific, Ainsworth, Potlatch, Tolko, and Norbord are members of the APA. Each year, APA participates in trade shows and offers seminars to its members around the country. The shows, seminars and other business of APA allowed Defendants and their co-conspirators to continue to implement the conspiracy alleged herein, while simultaneously allowing them to promote their products.

48

174.    American Forest & Paper Association (AF&PA) is a national trade association of the forest, pulp, paper, paperboard, and wood products industry. According to its website, the AF&PA's inclusive "big tent" philosophy has successfully united various sectors of the forest products industry. Defendants Georgia-Pacific, Huber, Louisiana-Pacific, Norbord, Potlatch and Weyerhauser are members of AF&PA. The AF&PA offers its members a number of opportunities to meet every year ranging from committee meetings to association-wide conferences and seminars. The conferences, meetings, seminars and other business of AF&PA allowed Defendants and their co-conspirators to continue to implement the conspiracy alleged herein, while simultaneously allowing them to promote their products.

175.    There is a high degree of overlap among the membership of the associations. For example, Louisiana-Pacific, Georgia-Pacific and Norbord are members of the NCHI, APA, and AF&PA. Weyerhaeuser is a member of both CCHI and AF&PA. Potlatch is a member of both APA and AF&PA.

**K.    Neither Costs nor Demand Explain Increases in OSB Prices**

176.    The pricing behavior observed in the market suggests that price increases during the Class Period cannot be explained by increases in input costs or increased demand for OSB. Market data suggests that while input prices increased beginning in 2002, and demand for OSB continued to be quite strong during the Class Period, the dramatic increase in OSB prices that began in 2003 is not fully explained by either the increase in demand associated with strong residential construction or the increase in input prices. The price of OSB increased much faster than increases in either input costs or demand, and thus cannot be explained by these circumstances.

177.    OSB prices fluctuated throughout the 1990s, but the general trend was relatively flat. Prior to 2003, the OSB Price Index, the Demand Index and the Input Cost Index moved

closely together, as one would expect in a competitive market. Prices dipped from 2000 to 2002

from a relative peak in 1999 due to flat demand and overcapacity in the market. However, in early

2003, prices skyrocketed to roughly twice the 2002 level, and while prices fluctuated after the

dramatic increase, they never returned to the previous level. The OSB price index increased much

faster than the increases in either the input cost or demand index.

178.    Louisiana-Pacific was a key beneficiary of the conspiracy. "After three years of

seemingly intractable losses, the company made $280.5 million in 2003, marking the most profitable

year since 1994's $346.9 million." *Price Jumps Leave LP's Balance in the Black,* Oregonian, Feb.

6, 2004. The "sudden fortune resulting from OSB's price runup has befuddled analysts." *Id.* But

Louisiana-Pacific's Chairman and CEO, Mark Suwyn, explained in simple terms how the OSB

industry was able to pull off this feat. As he explained in Louisiana-Pacific's 2003 10-K,

"Competitive advantages don't come just from hard work."

179.    In 2003, Louisiana-Pacific reported a 723% increase in profits from OSB, while its

costs rose less than 15%. 2003 Louisiana-Pacific 10-K at 22.

180.    Additionally, Louisiana-Pacific's Chairman and CEO Mark Suwyn stated in March

of 2002 that "[i]n OSB, our costs today are almost 10% below what they were five years ago."

Louisiana-Pacific's Form 10-K for the period ending December 31, 2001 ("2001 Louisiana-Pacific

Form 10-K"). Mr. Suwyn further stated that Louisiana-Pacific lowered these costs even further in

2002. 2002 Louisiana-Pacific Form 10-K. Mr. Suwyn, however, did confirm that demand was not

an issue depressing the price of OSB, stating: "[t]he low pricing for commodity building products

[like OSB] last year was primarily the result of industry over-capacity - not lack of demand." *Id.*

181.    Likewise, in 2003, Norbord's production costs rose only 8%, but profits rose 400%.

Norbord 2003 Annual Report at p. 22-23.

182.    Ainsworth discarded input cost as a basis for the skyrocketing price of OSB.  After announcing a 45.8% increase in average OSB price, Ainsworth acknowledged that the "OSB cost of products sold in fiscal 2003 was $187.5 million compared to $184.1 million in fiscal 2002, representing an increase of $3.4 million or 1.8%." Ainsworth 2003 Annual Report at 8.

183.    While Defendants were reporting unprecedented profits, the rising costs of OSB were increasing construction costs and home prices and injuring Plaintiffs and members of the Classes.  As reported by Michael Carliner, staff vice president for economics with National Association of Home Builders, a 2,000 square foot home will require about 300 4-by-8 foot sheets of OSB.  An increase of the square prices by $10 adds roughly $3,000 to the costs of the home.

## FRAUDULENT CONCEALMENT

184.    Throughout the Class Period, Defendants effectively, affirmatively and fraudulently concealed their unfair and deceptive contracts, combinations or conspiracies from Plaintiffs and the Class.

185.    Defendants engaged in a successful, illegal price-fixing conspiracy that by its nature was inherently self-concealing.

186.    Defendants' wrongful conduct as alleged in this Complaint was carried out through means and methods which were willfully and knowingly designed and intended to avoid detection, and which in fact successfully precluded detection for a substantial period of time.

187.    Because the unfair and deceptive contracts, combinations or conspiracies were intentionally kept secret by Defendants and their co-conspirators, Plaintiffs were unaware of the fact that supply of OSB was intentionally curtailed and that prices of OSB were secretly agreed upon as alleged herein.

188.    Although Plaintiffs exercised due diligence during the Class Period by promptly investigating the facts giving rise to the claims asserted herein, Plaintiffs did not and could not have discovered the self-concealing, unfair and deceptive contracts, combinations or conspiracies at an earlier date by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contracts, combinations, or conspiracies.  These techniques of secrecy included, but were not limited to, secret and surreptitious communications by use of the telephone or in-person meetings, covert signals, intentional avoidance of written records and misrepresentations to customers falsely attributing price increases to competitive factors.

189.    In order to further conceal their conspiracy, Defendants falsely led Plaintiffs and other members of the Class to believe that the prices for Defendants' price-fixed OSB were competitive, when in fact, pursuant to their illegal conspiracy, Defendants' prices were higher than they would have been in a competitive market.  In purchasing OSB products at issue in this action, Plaintiffs and the Class therefore relied on the presumption that they were paying prices set by an efficient market, when in fact they were paying prices artificially inflated by Defendants' fraudulent and deceptive conduct.

190.    The OSB industry is not exempt from antitrust regulation, and thus, Plaintiff reasonably considered it to be a well regulated "competitive" industry.  Therefore, each of Defendants' price increase announcements during the Class Period were implicit statements that the price increases were legitimate and the result of legitimate competitive market forces.

191.    In the context of the above-described circumstances surrounding Defendants' pricing practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that Defendants' pricing was conspiratorial.  Accordingly, a

reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' prices.

192.    As a result of the fraudulent concealment of the conspiracy, Plaintiffs assert the tolling of the applicable statutes of limitations with respect to any claims and rights of action that Plaintiffs and other Class members have as a result of the contracts, combinations and conspiracies alleged in this Complaint.

## VIOLATIONS ALLEGED

### COUNT ONE
### (For Injunctive Relief Under Section 16 of the Clayton Act for Defendants' Violation of Section 1 of the Sherman Act)

193.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants:

194.    This claim is asserted on behalf of the Nationwide Class.

195.    In response to market conditions, and in an effort to stem declining prices and artificially inflate the prices of OSB, beginning at least as early as June of 2002, the exact date being unknown to Plaintiffs, and continuing thereafter through the present, the Defendants and their co-conspirators engaged in continuing contracts, combinations and conspiracies in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act, which had the purpose and effect of fixing, raising, maintaining and stabilizing the prices of OSB at artificially high, non-competitive levels in the United States.

196.    The aforesaid contracts, combinations and conspiracies between and among the Defendants and their co-conspirators were furthered and effectuated, among other ways, in the following manner:

a.   In the first quarter of 2002, an OSB price increase could not be maintained due to an existing imbalance of supply over demand.

b.   Against this backdrop, executives of Louisiana-Pacific, acting in concert with executives from their major competitors, conspired and combined to effectuate a substantial reduction of the production and supply of OSB, which allowed for a series of substantial increases in OSB prices.

c.   Defendants devised a strategy to increase the price of OSB.  As part of that strategy, Louisiana-Pacific, the dominant producer of OSB, and other defendants, coordinated plans to take downtime at their plants to reduce their OSB production substantially, eliminate or delay the introduction of added OSB capacity through the construction of new plants, reduce operating rates at producing OSB plants, and purchase existing OSB inventory rather than produce it themselves.  These actions were extraordinary, and contrary to economic fundamentals.

d.   On June 18, 2002, Louisiana-Pacific communicated to its competitors its intention to take mill downtime resulting in a shutdown of all but one of its North American OSB mills in July of 2002. Louisiana-Pacific would repeat this communication less than four months later, on October 15, 2002.  The result would be a substantial reduction of Louisiana-Pacific's production of OSB in the second half of 2002.

e.   Between June and October of 2002, in response to the communications from Louisiana-Pacific, Defendants began to take production downtime.

54

Significantly, this downtime was taken at a time when demand in the industry was increasing.

f.    This downtime contributed significantly to a 3.2% reduction in total OSB production during the first two quarters of 2003. By October of 2003, OSB prices reached record highs after steadily decreasing from 1999-2002.

g.    Having eliminated the OSB supply from the market, Defendants contracted, combined, conspired or otherwise agreed to fix, raise, maintain and stabilize the prices at which OSB was sold by aligning their OSB prices with each other, through the "print" prices reported in Random Lengths;

h.    To maintain the supra-competitive price of OSB, Defendants again took significant downtime at their OSB mills in 2003, which resulted in a new high price for OSB in April 2004.

197.    For the purpose of forming and effectuating the alleged agreements, understandings, and conspiracies, the Defendants and their co-conspirators did those things that they contracted, combined and conspired to do, including the following:

a.    agreeing among themselves to fix, raise, maintain and stabilize the price of OSB in the United States;

b.    agreeing among themselves to restrict the supply of OSB by implementing and coordinating production curtailments at their OSB mills;

c.    agreeing among themselves to implement and coordinate increases in the prices of OSB in the United States; and

d.    agreeing to conceal and keep secret their illegal agreements reached.

55

198.    The contracts, combinations and conspiracies alleged herein had the following effects, among others:

      a.    price competition among the Defendants and their co-conspirators in the sale of OSB has been restrained, suppressed and/or eliminated;

      b.    prices for OSB manufactured and sold by Defendants and their co-conspirators in the United States have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels; and

      c.    those who purchased OSB directly or indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

199.    As a direct and proximate result of the illegal contracts, combinations and conspiracies alleged herein, Plaintiffs and the members of the Nationwide Class were, and continue to be, damaged in their business or property by paying more for OSB purchased indirectly from Defendants and their co-conspirators than they would have paid and will pay in the absence of the illegal contracts, combinations and conspiracies.

200.    These violations are continuing and will continue unless enjoined by this Court.

201.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the Nationwide Class seek the issuance of an injunction against Defendants, preventing and restraining the violations alleged herein.

## COUNT TWO
### (Violation of Arizona Revised Statute §44-1402)

202.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants:

203. This claim is asserted on behalf of the Arizona Indirect Purchaser Class.

204. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which OSB was sold, distributed, or obtained in Arizona.

205. By reason of the foregoing, Defendants have entered into combinations or conspiracies in restraint of trade in violation of Ariz. Rev. Stat. § 44-1402.

206. Defendants' combinations or conspiracies had the following effects:

    a.    OSB price competition was restrained, suppressed, and eliminated throughout Arizona;

    b.    OSB prices were raised, fixed, maintained and stabilized at artificially high levels throughout Arizona;

    c.    Plaintiffs and members of the Arizona Indirect Purchaser Class were deprived of free and open competition; and

    d.    Plaintiffs and members of the Arizona Indirect Purchaser Class paid supra-competitive, artificially inflated prices for OSB.

207. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

208. As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Arizona Indirect Purchaser Class have been injured in their business and property and are threatened with further injury.

**COUNT THREE**
**(Violation of California Cartwright Act: §16720, *et seq.*,**
**California Business & Professions Code)**

209.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants:

210.    This claim is asserted on behalf of the California Indirect Purchaser Class.

211.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by unfairly and deceptively affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which OSB was sold, distributed, or obtained in California.

212.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of the Cartwright Act, California Business and Professions Code §16720, *et seq.*

213.    Defendants' unlawful conduct had the following effects:

    a.    OSB price competition was restrained, suppressed, and eliminated throughout California;

    b.    OSB prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California;

    c.    Plaintiffs and members of the California Indirect Purchaser Class were deprived of free and open competition; and

    d.    Plaintiffs and members of the California Indirect Purchaser Class paid supra-competitive, artificially inflated prices for OSB.

214.    During the Class Period, Defendants' illegal conduct substantially affected California commerce.

215.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the California Indirect Purchaser Class have been injured in their business and property.

## COUNT FOUR
### (Violation of California Unfair Competition Law: § 17200 *et seq.*
### California Business & Professions Code)

216.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege as follows against all defendants:

217.    This claim is asserted on behalf of the California Indirect Purchaser Class.

218.    Defendants agreed to, and did in fact, affect, fix, control and/or maintain, at artificial and non-competitive levels, the prices at which OSB was sold, distributed or obtained in California.

219.    By reason of the foregoing, Defendants engaged in unfair competition and have committed unlawful, unfair or deceptive acts or practices in violation of the California Business and Professions Code §17200, *et seq.*

220.    Defendants' unlawful conduct had the following effects:

    a.    OSB price competition was restrained, suppressed, and eliminated throughout California;

    b.    OSB prices were raised, fixed, maintained, and stabilized at artificially high levels throughout California;

    c.    Plaintiffs and members of the California Indirect Purchaser Class were deprived of free and open competition; and

      d.      Plaintiffs and members of the California Indirect Purchaser Class paid

                supra-competitive, artificially inflated prices for OSB.

    221.    During the Class Period, Defendants' illegal conduct substantially affected

California commerce.

    222.    As a direct and proximate result of Defendants' unlawful conduct, plaintiffs and

members of the California Indirect Purchaser Class have been injured and are entitled to

restitution of all sums wrongfully paid to Defendants, as well as appropriate injunctive relief.

## COUNT FIVE
### (Violation of D.C. Code § 28-4502)

    223.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows,

against all Defendants:

    224.    This claim is asserted on behalf of the District of Columbia Indirect Purchaser

Class.

    225.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by

affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the

prices at which OSB was sold, distributed or obtained in the District of Columbia.

    226.    By reason of the foregoing, Defendants have entered into contacts, combinations

or conspiracies in restraint of trade, in violation of D.C. Code § 28-4502.

    227.    Defendants' contracts, combinations or conspiracies had the following effects:

      a.      OSB price competition was restrained, suppressed, and eliminated

                throughout the District of Columbia;

      b.      OSB prices were raised, fixed, maintained, and stabilized at artificially

                high levels throughout the District of Columbia;

      c.      Plaintiffs and members of the District of Columbia Indirect Purchaser

             Class were deprived of free and open competition; and

      d.      Plaintiffs and members of the District of Columbia Indirect Purchaser

             Class paid supra-competitive, artificially inflated prices for OSB.

228.    During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia.

229.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the District of Columbia Indirect Purchaser Class have been injured and are threatened with further injury

## COUNT SIX
### (Violation of D.C. Code § 28-3904)

230.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege as follows against all Defendants:

231.    This claim is asserted on behalf of the District of Columbia Indirect Purchaser Class.

232.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which OSB was sold, distributed or obtained in the District of Columbia.

233.    The foregoing conduct constitutes "unlawful trade practices," within the meaning of D.C. Code § 28-3904.

234.    Defendants' unlawful conduct had the following effects:

      a.      OSB price competition was restrained, suppressed, and eliminated

             throughout the District of Columbia;

b.    OSB prices were raised, fixed, maintained, and stabilized at artificially

high levels throughout the District of Columbia;

c.    Plaintiffs and members of the District of Columbia Indirect Purchaser

Class were deprived of free and open competition; and

d.    Plaintiffs and members of the District of Columbia Indirect Purchaser

Class paid supra-competitive, artificially inflated prices for OSB.

235.    As a direct and proximate result of the Defendants' conduct, Plaintiffs and

members of the District of Columbia Indirect Purchaser Class have been injured.

## COUNT SEVEN
### (Violation of Florida Statute § 501.211(2))

236.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows,

against all Defendants:

237.    This claim is asserted on behalf of the Florida Indirect Purchaser Class.

238.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by

affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the

prices at which OSB was sold, distributed, or obtained in Florida.

239.    By reason of the foregoing, Defendants engaged in unfair methods of

competition, unconscionable acts or practices and unfair or deceptive acts and practices in

violation of Fla. Stat. § 501.204.

240.    Defendants' unlawful conduct had the following effects:

a.    OSB price competition was restrained, suppressed, and eliminated

throughout Florida;

b.   OSB prices were raised, fixed, maintained, and stabilized at artificially
high levels throughout Florida;

c.   Plaintiffs and members of the Florida Indirect Purchaser Class were
deprived of free and open competition; and

d.   Plaintiffs and members of the Florida Indirect Purchaser Class paid supra-
competitive, artificially inflated prices for OSB.

241.    During the Class Period, Defendants' illegal conduct substantially affected
Florida commerce.

242.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and
members of the Florida Indirect Purchaser Class have been injured and are threatened with
further injury.

**COUNT EIGHT**
**(Violation of Iowa Code § 553.4)**

243.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every
allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows,
against all Defendants:

244.    This claim is brought on behalf of the Iowa Indirect Purchaser Class.

245.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by
affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels the prices
at which OSB was sold, distributed or obtained in Iowa.

246.    By reason of the foregoing, Defendants have entered into contracts, combinations
or conspiracies in restraint of trade or commerce, in violation of Iowa Code § 553.4.

247.    Defendants' contracts, combinations or conspiracies had the following effects:

      a.    OSB price competition was restrained, suppressed, and eliminated throughout Iowa;

      b.    OSB prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Iowa;

      c.    Plaintiffs and members of the Iowa Indirect Purchaser Class were deprived of free and open competition; and

      d.    Plaintiffs and members of the Iowa Indirect Purchaser Class paid supra-competitive, artificially inflated prices for OSB.

248.    During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

249.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Iowa Indirect Purchaser Class have been injured and have been threatened with further injury.

## COUNT NINE
### (Violation of Kansas Statute Annotated § 50-112)

250.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants:

251.    This claim is asserted on behalf of the Kansas Indirect Purchaser Class.

252.    Defendants agreed to, and did in fact, act in restraint of trade by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels the prices at which OSB was sold, distributed or obtained in Kansas.

253.    By reason of the foregoing, Defendants have entered into arrangements, contracts, agreements, trusts or combinations that prevented full and free competition in the markets for OSB, in violation of K.S.A. § 50-112.

254.    Defendants' arrangements, contracts, agreements, trusts or combinations had the following effects:

  a.    OSB price competition was restrained, suppressed, and eliminated throughout Kansas;

  b.    OSB prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas;

  c.    Plaintiffs and members of the Kansas Indirect Purchaser Class were deprived of free and open competition; and

  d.    Plaintiffs and members of the Kansas Indirect Purchaser Class paid supra-competitive, artificially inflated prices for OSB.

255.    During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

256.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Kansas Indirect Purchaser Class have been injured.

## COUNT TEN
### (Violation of Maine Revised Statute § 1104(1))

257.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants:

258.    This claim is asserted on behalf of the Maine Indirect Purchaser Class.

259.    Defendants agreed to, and did in fact act in restraint of trade or commerce in the State of Maine by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which OSB was sold, distributed or obtained in Maine.

260.    By reason of the foregoing, Defendants entered into contracts, combinations or conspiracies in restraint of trade or commerce in the State of Maine in violation of 5 M.R.S.A. § 1101.

261.    Defendants' contracts, combinations or conspiracies had the following effects:

    a.    OSB price competition was restrained, suppressed, and eliminated throughout Maine;

    b.    OSB prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine;

    c.    Plaintiffs and members of the Maine Indirect Purchaser Class were deprived of free and open competition; and

    d.    Plaintiffs and members of the Maine Indirect Purchaser Class paid supra-competitive, artificially inflated prices for OSB.

262.    During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

263.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Maine Indirect Purchaser Class have been injured in their business and property.

**COUNT ELEVEN**
**(Violation of Maine Unfair Trade Practices Act - 5 M.R.S.A. §§ 207)**

264.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants:

265.    This claim is alleged on behalf of the Maine Indirect Purchaser Class.

266.    Plaintiffs and members of the Maine Indirect Purchaser Class purchased in the State of Maine and paid out-of-pocket for OSB, primarily for personal use.

267.    Defendants agreed to, and did in fact, act in restraint of trade by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which OSB was sold, distributed or obtained in Maine.

268.    By reason of the foregoing, Defendants engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of Defendants' businesses in violation of 5 M.R.S.A. § 207.

269.    Defendants' unlawful conduct had the following effects:

    a.    OSB price competition was restrained, suppressed, and eliminated throughout Maine;

    b.    OSB prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine;

    c.    Plaintiffs and members of the Maine Indirect Purchaser Class were deprived of free and open competition; and

    d.    Plaintiffs and members of the Maine Indirect Purchaser Class paid supra-competitive, artificially inflated prices for OSB.

270.    During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

271.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Maine Indirect Purchaser Class have been injured.

## COUNT TWELVE
### (Violation of Massachusetts Consumer Protection Act – G.L. C. 93A, §2)

272.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants:

273.    This claim is asserted on behalf of the Massachusetts Indirect Purchaser Class.

274.    Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

275.    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels, the prices at which OSB was sold, distributed, or obtained in Massachusetts.

276.    By reason of the foregoing, Defendants engaged in unfair competition and unfair or deceptive acts or practices, in violation of G.L. c. 93A, §2.

277.    Defendants' unlawful conduct had the following effects:

    a.    OSB price competition was restrained, suppressed, and eliminated throughout Massachusetts;

    b.    OSB prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Massachusetts;

    c.    Plaintiffs and members of the Massachusetts Indirect Purchaser Class were deprived of free and open competition; and

    d.    Plaintiffs and members of the Massachusetts Indirect Purchaser Class paid supra-competitive, artificially inflated prices for OSB.

278.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Massachusetts Indirect Purchaser Class were injured.

279.    Each of the Defendants has been served with a demand letter in accordance with G.L. c. 93A, § 9, or such service of a demand letter was unnecessary due to the Defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth.

280.    More than thirty days has passed since such demand letters were served, and each Defendant served has failed to make a reasonable settlement offer.

281.    Defendants' and their co-conspirators' violations of Chapter 93A were knowing or willful, entitling the Plaintiffs and members of the Massachusetts Indirect Purchaser Class to multiple damages.

**COUNT THIRTEEN**
**(Violation of Michigan Comp. Laws § 445.772)**

282.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants:

283.    This claim is asserted on behalf of the Michigan Indirect Purchaser Class.

284.    Defendants agreed to, and did in fact, act in restraint of trade or commerce, by affecting, fixing, controlling, and/or maintaining at artificial and non-competitive levels the prices at which OSB was sold, distributed or obtained in Michigan.

285.    By reason of the foregoing, Defendants formed contracts, combinations or conspiracies in restraint of trade, in violation of Mich. Comp. Laws § 445.772.

286.    Defendants' contracts, combinations or conspiracies had the following effects:

69

    a.    OSB price competition was restrained, suppressed, and eliminated throughout Michigan;

    b.    OSB prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan;

    c.    Plaintiffs and members of the Michigan Indirect Purchaser Class were deprived of free and open competition; and

    d.    Plaintiffs and members of the Michigan Indirect Purchaser Class paid supra-competitive, artificially inflated prices for OSB.

287.    During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

288.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Michigan Indirect Purchaser Class have been injured in their business or property and are threatened with further injury.

### COUNT FOURTEEN
### (Violation of Minnesota Statute § 325D.51 and § 325D. 53)

289.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants:

290.    This claim is asserted on behalf of the Minnesota Indirect Purchaser Class.

291.    Defendants agreed to, and did in fact, act in unreasonable restraint of trade or commerce by, among other things:

    a.    affecting, fixing, controlling, and/or maintaining at artificial and non-competitive levels the prices at which OSB was sold, distributed or obtained in Minnesota; and

     b.      affecting, fixing, controlling, maintaining or discontinuing the production,

manufacture or supply of OSB for the purpose or with the effect of

affecting, fixing, controlling and/or maintaining the price of OSB.

229.     By reason of the foregoing, Defendants formed contracts, combinations or

conspiracies in unreasonable restraint of trade, in violation of Minn. Stat. §§ 325D.51 and

3255D.53.

230.    Defendants' contracts, combinations or conspiracies had the following effects:

     a.      OSB price competition was restrained, suppressed, and eliminated

throughout Minnesota;

     b.      OSB prices were raised, fixed, maintained, and stabilized at artificially high

levels throughout Minnesota;

     c.      Plaintiffs and members of the Minnesota Indirect Purchaser Class were

deprived of free and open competition; and

     d.      Plaintiffs and members of the Minnesota Indirect Purchaser Class paid

supra-competitive, artificially inflated prices for OSB.

231.     During the Class Period, Defendants' illegal conduct substantially affected

Minnesota commerce.

232.     As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs

and members of the Minnesota Indirect Purchaser Class have been injured and are threatened

with further injury.

## COUNT FIFTEEN
### (Violation of Mississippi Code § 75-21-3)

233.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows,

against all Defendants:

234.    This claim is asserted on behalf of the Mississippi Indirect Purchaser Class.

235.    Defendants agreed to, and did in fact, act in restraint of trade by affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels the prices at which OSB was sold, distributed or obtained in Mississippi, and, in so doing, attempted to, and did, restrain the freedom of trade or production.

236.    By reason of the foregoing, Defendants formed contracts, trusts or combinations in restraint of trade, in violation of Miss. Code. Ann. § 75-21-3.

237.    Defendants' contracts, trusts or combinations had the following effects:

   a.    OSB price competition was restrained, suppressed, and eliminated throughout Mississippi;

   b.    OSB prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi;

   c.    Plaintiffs and members of the Mississippi Indirect Purchaser Class were deprived of free and open competition; and

   d.    Plaintiffs and members of the Mississippi Indirect Purchaser Class paid supra-competitive, artificially inflated prices for OSB.

238.    During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

239.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Mississippi Indirect Purchaser Class have been injured.

## COUNT SIXTEEN
### (Violation of Nevada Revised Statute § 598A.060)

240.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

72

allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants:

241.   This claim is brought on behalf of the Nevada Indirect Purchaser Class.

242.   Defendants agreed to, and did act in restraint of trade or commerce by fixing, raising and/or stabilizing, at artificial and non-competitive levels, the prices at which OSB was sold, distributed or obtained in Nevada.

243.   By reason of the foregoing, Defendants formed contracts, combinations or conspiracies in restrain of trade in violation of Nev. Rev. Stat. § 598A.060.

244.   Defendants' contracts, combinations or conspiracies had the following effects:

   a.   OSB price competition was restrained, suppressed, and eliminated throughout Nevada;

   b.   OSB prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada;

   c.   Plaintiffs and members of the Nevada Indirect Purchaser Class were deprived of free and open competition; and

   d.   Plaintiffs and members of the Nevada Indirect Purchaser Class paid supra-competitive, artificially inflated prices for OSB.

245.   During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

246.   As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the Nevada Indirect Purchaser Class have been injured in their business or property and are threatened with further injury.

## COUNT SEVENTEEN
### (Violation of New Mexico Annotated Statute § 57-1-1)

247.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants:

248.    This claim is asserted on behalf of the New Mexico Indirect Purchaser Class.

249.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at artificially inflated and non-competitive levels, the prices at which OSB was sold, distributed or obtained in New Mexico.

250.    By reason of the foregoing, Defendants formed conspiracies in restraint of trade or commerce in violation of N.M.S.A. § 57-1-1.

251.    Defendants' conspiracies had the following effects:

    a.    OSB price competition was restrained, suppressed, and eliminated throughout New Mexico;

    b.    OSB prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico;

    c.    Plaintiffs and members of the New Mexico Indirect Purchaser Class were deprived of free and open competition; and

    d.    Plaintiffs and members of the New Mexico Indirect Purchaser Class paid supra-competitive, artificially inflated prices for OSB.

252.    During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

253.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff

74

and members of the New Mexico Indirect Purchaser Class have been injured in their business or property and threatened with further injury.

**COUNT EIGHTEEN**
**(Violation of New Mexico Annotated Statute § 57-12-3)**

254.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants:

255.    This claim is asserted on behalf of the New Mexico Indirect Purchaser Class.

256.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which OSB was sold, distributed or obtained in New Mexico.

257.    The aforementioned conduct on the part of the Defendants constituted "unconscionable trade practices," in violation of N.M.S.A. Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by Plaintiffs and the members of the New Mexico Indirect Purchaser Class and the prices paid by them for OSB as set forth in N.M.S.A., § 57-12-2E.

258.    Defendants' unlawful conduct had the following effects:

    a.    OSB price competition was restrained, suppressed, and eliminated throughout New Mexico;

    b.    OSB prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New Mexico;

    c.    Plaintiffs and members of the New Mexico Indirect Purchaser Class were deprived of free and open competition; and

75

      d.     Plaintiffs and members of the New Mexico Indirect Purchaser Class paid

               supra-competitive, artificially inflated prices for OSB.

259.    During the Class Period, Defendants' illegal conduct substantially affected New

Mexico commerce.

260.    As a direct and proximate result of the unlawful conduct of the Defendants,

Plaintiffs and members of the New Mexico Indirect Purchaser Class have been injured.

**COUNT NINETEEN**
**(Violation of New York CLS General Business § 349)**

261.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows,

against all Defendants:

262.    This claim is asserted on behalf of the New York Indirect Purchaser Class.

263.    Defendants agree to, and did in fact, act in restraint of trade or commerce by

affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the

prices at which OSB was sold, distributed or obtained in New York.

264.    The conduct of the Defendants described herein constitutes consumer-oriented

deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in

consumer injury and broad adverse impact on the public at large, and harmed the public interest

of New York State in an honest marketplace in which economic activity is conducted in a

competitive manner.

265. Defendants' unlawful conduct had the following effects:

      a.     OSB price competition was restrained, suppressed, and eliminated

               throughout New York;

76

b.    OSB prices were raised, fixed, maintained, and stabilized at artificially
high levels throughout New York;

c.    Plaintiffs and members of the New York Indirect Purchaser Class were
deprived of free and open competition; and

d.    Plaintiffs and members of the New York Indirect Purchaser Class paid
supra-competitive, artificially inflated prices for OSB.

266.    During the Class Period, Defendants' illegal conduct substantially affected New
York commerce.

267.    During the Class Period, each of the Defendants named herein, directly, or
indirectly and through affiliates they dominated and controlled, manufactured, sold and/or
distributed OSB in New York.

268.    Plaintiffs and members of the New York Indirect Purchaser Class seek actual
damages for their injuries caused by these violations in an amount to be determined at trial.
Without prejudice to their contention that Defendants' unlawful conduct was willful and
knowing, Plaintiffs and members of the New York Indirect Purchaser Class do not seek in this
action to have those damages trebled pursuant to N.Y. Gen. Bus. Law § 349 (h).

### COUNT TWENTY
### (Violation of North Carolina General Statute § 75-1)

269.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every
allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows,
against all Defendants:

270.    This claim is asserted on behalf of the North Carolina Indirect Purchaser Class.

271.    The Defendants agreed to, and did in fact, act in restraint of trade or commerce by
affecting, fixing, controlling and/or maintaining at artificial and non-competitive levels the prices

at which OSB was sold, distributed or obtained in North Carolina.

272.    By reason of the foregoing, Defendants formed contracts, combinations or conspiracies in restraint of trade or commerce, in violation of N.C. Gen. Stat. § 75-1.

273.    Defendants' contracts, combinations or conspiracies had the following effects:

a.    OSB price competition was restrained, suppressed, and eliminated throughout North Carolina;

b.    OSB prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Carolina;

c.    Plaintiffs and members of the North Carolina Indirect Purchaser Class were deprived of free and open competition; and

d.    Plaintiffs and members of the North Carolina Indirect Purchaser Class paid supra-competitive, artificially inflated prices for OSB.

274.    During the Class Period, Defendants' illegal conduct substantially affected North Carolina commerce.

275.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the North Carolina Indirect Purchaser Class have been injured.

**COUNT TWENTY ONE**
**(Violation of North Dakota Cent. Code § 51-08.1-02)**

276.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants:

277.    This claim is asserted on behalf of the North Dakota Indirect Purchaser Class.

278.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at artificially inflated and non-competitive

78

levels, the prices at which OSB was sold, distributed or obtained in North Dakota.

279.    By reason of the foregoing, Defendants formed contracts, combinations or conspiracies in restraint of trade or commerce, in violation of N.D. Cent. Code § 51-08.1-02.

280.    Defendants' contracts, combinations or conspiracies had the following effects:

    a.    OSB price competition was restrained, suppressed, and eliminated throughout North Dakota;

    b.    OSB prices were raised, fixed, maintained, and stabilized at artificially high levels throughout North Dakota;

    c.    Plaintiffs and members of the North Dakota Indirect Purchaser Class were deprived of free and open competition; and

    d.    Plaintiffs and members of the North Dakota Indirect Purchaser Class paid supra-competitive, artificially inflated prices for OSB.

281.    During the Class Period, Defendants' illegal conduct substantially affected North Dakota commerce.

282.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the North Dakota Indirect Purchaser Class have been injured in their business or property and are threatened with further injury.

## COUNT TWENTY TWO
### (Violation of Pennsylvania Unfair Trade Practices & Consumer Protection Law – UTPCPL, 73 P.S. § 201-1, *et seq.*)

283.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants:

284.    This claim is asserted on behalf of the Pennsylvania Indirect Purchaser Class.

285.   Defendants were engaged in trade and commerce as defined by the UTPCPL, 73 P.S. § 201-1, *et seq*.

286.   Plaintiffs and members of the Pennsylvania Indirect Purchaser Class purchased OSB for personal, family, or household purposes.

287.   Defendants violated the UTPCPL under its "catch-all provision," 73 P.S. § 201-2(4)(xxi), by engaging in deceptive conduct which created a likelihood of confusion or misunderstanding as alleged herein.

288.   The acts and practices of Defendants, as set forth herein, constitute unfair methods of competition and unfair or deceptive acts or practices in the conduct of Defendants' business in violation of the UTPCPL, as aforesaid.

289.   Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Pennsylvania, by affecting, fixing, controlling, and/or maintaining, at artificial and non-competitive levels, the prices at which OSB was sold, distributed, or obtained in Pennsylvania.

290.   Defendants deliberately failed to disclose material facts to Plaintiff and the Members of the Pennsylvania Indirect Purchaser Class concerning Defendants' unlawful activities and artificially inflated prices for OSB. Defendants owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business consumer, Defendants breached that duty by their silence. Defendants misrepresented to all consumers during the Class Period that Defendants' OSB prices were competitive and fair.

291. Defendants' unlawful conduct had the following effects:

    a.    OSB price competition was restrained, suppressed, and eliminated throughout Pennsylvania;

        b.      OSB prices were raised, fixed, maintained, and stabilized at artificially

high levels throughout Pennsylvania;

        c.      Plaintiffs and members of the Pennsylvania Indirect Purchaser Class were

deprived of free and open competition; and

        d.      Plaintiffs and members of the Pennsylvania Indirect Purchaser Class paid

supra-competitive, artificially inflated prices for OSB.

292.    As a direct and proximate result of the Defendants' violations of law, Plaintiffs and Members of the Pennsylvania Indirect Purchaser Class have been injured in their business and property, as aforesaid.

293.    Plaintiffs and members of the Pennsylvania Indirect Purchaser Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Defendants' willful and deceptive conduct, as described herein.

294.    Defendants' deception, including its affirmative misrepresentations and omissions concerning the price of OSB, likely misled all consumers acting reasonably under the circumstances to believe that they were purchasing OSB at prices born by a free and fair market. Defendants' affirmative misrepresentations and omissions constitute information important to Plaintiffs and the Members of the Pennsylvania Indirect Purchaser Class as they related to the cost of OSB they purchased.

## COUNT TWENTY THREE
### (Violation of South Dakota Codified Laws § 37-1-3.1)

295.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants:

296.    This claim is asserted on behalf of the South Dakota Indirect Purchaser Class.

297.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels, the prices at which OSB was sold, distributed or obtained in South Dakota.

298.    By reason of the foregoing, Defendants formed contracts, combinations or conspiracies in restraint of trade or commerce, in violation of S.D.C.L. § 37-1-3.1.

299.    Defendants' contracts, combinations or conspiracies had the following effects:

      a.    OSB price competition was restrained, suppressed, and eliminated throughout South Dakota;

      b.    OSB prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota;

      c.    Plaintiffs and members of the South Dakota Indirect Purchaser Class were deprived of free and open competition; and

      d.    Plaintiffs and members of the South Dakota Indirect Purchaser Class paid supra-competitive, artificially inflated prices for OSB.

300.    During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce.

301.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the South Dakota Indirect Purchaser Class have been injured in their business or property and are threatened with further injury.

## COUNT TWENTY FOUR
### (Violation of Tenn. Code Ann. § 47-25-101)

302.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows,

against all Defendants:

303.    This claim is asserted on behalf of the Tennessee Indirect Purchaser Class.

304.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which OSB was sold, distributed or obtained in Tennessee.

305.    By reason of the foregoing, Defendants entered into arrangements, contracts, and agreements in restraint of trade, in violation of Tenn. Code Ann. § 47-25-101 *et seq.* ("TTPA").

306.    Defendants' arrangements, contracts and agreements had the following effects:

    a.    OSB price competition was restrained, suppressed and eliminated throughout Tennessee;

    b.    OSB prices were raised, fixed, maintained and stabilized at artificially high levels throughout Tennessee;

    c.    Plaintiffs and members of the Tennessee Indirect Purchaser Class were deprived of free and open competition; and

    d.    Plaintiffs and members of the Tennessee Indirect Purchaser Class paid supra-competitive, artificially inflated prices for OSB.

307.    During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce and caused injury to consumers in Tennessee.

308.    As a direct and proximate result of Defendants' unlawful conduct, members of the Tennessee Indirect Purchaser Class have been injured.

## COUNT TWENTY FIVE
### (Violation of 9 Vt. Stat. Ann. §§ 2451, 2453)

309.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows,

83

against all Defendants:

310.    This claim is asserted on behalf of the Vermont Indirect Purchaser Class.

311.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling or maintaining, at artificial and non-competitive levels, the prices at which OSB was sold, distributed or obtained in Vermont.

312.    By reason of the foregoing, Defendants engaged in unfair methods of competition in Vermont commerce and in unfair or deceptive acts or practices in Vermont commerce in violation of 9 Vt. Stat. Ann. §§ 2451, 2453.

313.    Defendants' unlawful conduct had the following effects:

    a.    OSB price competition was restrained, suppressed, and eliminated throughout Vermont;

    b.    OSB prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Vermont;

    c.    Plaintiffs and members of the Vermont Indirect Purchaser Class were deprived of free and open competition; and

    d.    Plaintiffs and members of the Vermont Indirect Purchaser Class paid supra-competitive, artificially inflated prices for OSB.

314.    During the Class Period, Defendants' illegal conduct substantially affected Vermont commerce.

315.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Vermont Indirect Purchaser Class were injured.

## COUNT TWENTY SIX
### (Violation of West Virginia Code § 47-18-3)

316.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

84

allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants:

317.    This claim is asserted on behalf of the West Virginia Indirect Purchaser Class.

318.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by, among other things, a) fixing, controlling or maintaining at non-competitive and artificially inflated prices the market price of OSB; and b) fixing, controlling, maintaining, limiting or discontinuing the production, manufacture, sale or supply of OSB in West Virginia.

319.    By reason of the foregoing, Defendants formed contracts, combinations or conspiracies in restraint of trade in violation of W. Va. Code § 47-18-3.

320.    Defendants' contracts, combinations or conspiracies had the following effects:

    a.    OSB price competition was restrained, suppressed, and eliminated throughout West Virginia;

    b.    OSB prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia;

    c.    Plaintiffs and members of the West Virginia Indirect Purchaser Class were deprived of free and open competition; and

    d.    Plaintiffs and members of the West Virginia Indirect Purchaser Class paid supra-competitive, artificially inflated prices for OSB.

321.    During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce.

322.    As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs and members of the West Virginia Indirect Purchaser Class have been injured in their business or property.

## COUNT TWENTY SEVEN
### (Violation of Wisconsin Statute § 133.03)

323.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants:

324.    This claim is asserted on behalf of the Wisconsin Indirect Purchaser Class.

325.    Defendants agreed to and did in fact, act in restraint of trade by affecting, fixing, controlling and/or maintaining at non-competitive and artificially inflated levels the prices at which OSB was sold, distributed and obtained in Wisconsin.

326.    By reason of the foregoing, Defendants formed contracts, combinations or conspiracies, in violation of W.S.A., § 133.03.

327.    Defendants' contracts, combinations or conspiracies had the following effects:

 a.    OSB price competition was restrained, suppressed, and eliminated throughout Wisconsin;

 b.    OSB prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin;

 c.    Plaintiffs and members of the Wisconsin Indirect Purchaser Class were deprived of free and open competition; and

 d.    Plaintiffs and members of the Wisconsin Indirect Purchaser Class paid supra-competitive, artificially inflated prices for OSB.

328.    During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce.

329.    As a direct and proximate result of the Defendants' unlawful conduct, plaintiffs and members of the Wisconsin Indirect Purchaser Class have been injured.

## COUNT TWENTY EIGHT
### (Unjust Enrichment and Disgorgement of Profits)

330.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege, as follows, against all Defendants:

331.    This claim is asserted on behalf of the Indirect Purchaser Classes.

332.    Defendants have been unjustly enriched and will continue to be unjustly enriched through overpayments by Plaintiffs and the members of the Indirect Purchaser Classes and the resulting profits.

333.    The financial benefits derived by Defendants by reason of their unlawful conduct rightfully belong to Plaintiffs and the Indirect Purchaser Classes, as they paid supra-competitive prices during the Class Period, inuring to the benefit of Defendants.

334.    It would be inequitable for Defendants to be permitted to retain the benefit of these overpayments, which was conferred by Plaintiffs and members of the Indirect Purchaser Classes and retained by Defendants.

335.    Plaintiffs seek disgorgement of all ill-gotten profits resulting from Defendants' unlawful, unjust and inequitable conduct.  Plaintiffs and the members of the Indirect Purchaser Classes are entitled to the establishment of a constructive trust from which Plaintiffs and Indirect Purchaser Class members may seek restitution by making claims on a pro-rata basis.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1.    Declare that this action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the Classes as defined herein and further order notice of such action to all members of the Classes in the most effective practicable manner;

2.    Find that the Defendants, by participating in the contract, combination and conspiracy alleged herein,

     (i)    acted in violation of Section 1 of the Sherman Act identified in Count One;

     (ii)   acted in violation of the state antitrust laws and state consumer protection and unfair competition laws identified in Counts Two through Twenty Eight;

     (iii)  were unjustly enriched as set forth in Count Twenty Eight.

3.    Enjoin Defendants from continuing the illegal activities alleged herein;

4.    Award Plaintiffs and members of the Classes damages as provided by law, including actual damages, multiple damages where provided by law and/or statutory minimum damages where provided by law, and joint and several judgments in favor of Plaintiffs and the Classes as provided by law;

5.    Award Plaintiffs and members of the Classes restitution on a pro-rata basis, including disgorgement of profits obtained by Defendants as a result of their acts of unfair competition and acts of unjust enrichment;

6.    Award Plaintiffs and the members of the Classes pre-judgment and post-judgment interest on the above sums at the highest rate provided by law;

7.    Allow Plaintiffs and members of the Classes to recover their reasonable attorneys' fees and costs as provided by law; and

8.    Grant such other and further relief as this Court deems to be necessary, proper just and/or equitable.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial

by jury of all issues triable of right by a jury.

Dated: June 15, 2006

**GILMAN AND PASTOR, LLP**

By:    s/ Daniel D'Angelo_____
        Kenneth G. Gilman
        David Pastor
        Douglas M. Brooks
        Daniel D'Angelo
        60 State Street, 37th Floor
        Boston, MA 02109
        Tel: (617) 742-9700
        Fax: (617) 742-9701

        **Plaintiffs' Lead Counsel**

Robert Schubert
Willem F. Jonckheer
**SCHUBERT & REED LLP**
Three Embarcadero Center, Suite 1650
San Francisco, CA 94111
Tel: (415) 788-4229
Fax (415) 788-0161

Mario N. Alioto
Lauren C. Russell
**TRUMP, ALIOTO, TRUMP & PRESCOTT**
2280 Union Street
San Francisco, CA  94123
Tel: (415) 563-7200
Fax: (415) 346-0679

**Plaintiffs' Co-Lead Counsel**

**Plaintiffs' Co-Lead Counsel**

Timothy D. Battin
Mark Schirmer
**STRAUS & BOIES LLP**
4041 University Drive
Fairfax, VA  22030
Tel: (703) 764-8700
Fax: (703) 764-8704

Krishna B. Narine
**LAW OFFICE OF KRISNA B. NARINE**
7839 Montgomery Avenue
Elkins Park, PA  19027
Tel: (215) 771-4988
Fax: (215) 782-3241

**Plaintiffs' Co-Lead Counsel**

Alan M. Sandals
Joseph M. Gordon
**SANDALS & ASSOCIATES, P.C.**
One South Broad Street, Suite 1850
Philadelphia, PA  19107-3418
(215) 825-4000
(215) 825-4001

Gordon Ball
**BALL & SCOTT**
Suite 601, 550 Main Avenue
Knoxville, TN  37902
Tel: (865) 525-7028
Fax: (865) 525-4679

Mary G. Kirkpatrick
**LISMAN WEBSTER KIRKATRICK AND LECKERLING, P.C.**
84 Pine Street
P.O. Box 728
Burlington, VT  05402-0728
Tel: (802) 864-5756
Fax: (812) 864-3629

Joseph M. Patane
**LAW OFFICES OF JOSEPH M. PATANE**
2280 Union Street
San Francisco, CA  94123
Tel: (415) 563-7200
Fax: (415) 346-0679

Wyatt Durrette
Christine Williams
Halliday Moncure
**DURRETTE BRADSHAW PLC**
Main Street Center 20th Floor
600 East Main Street
Richmond, VA  23219
Tel: (804) 775-6900
Fax: (804) 775-6911

Jordan Lewis
**SIEGEL, BRILL, GREUPNER, DUFFY & FOSTER, P.A.**
1845 Walnut Street, 24th Floor
Philadelphia, PA  19103

Issac L. Diel
**LAW OFFICE OF ISAAC L. DIEL**
135 Oak Street
Bonner Springs, KS  66012
Tel: (913) 383-8711
Fax: (913) 422-0307

Lawrence G. Papale
**LAW OFFICES OF LAWRENCE G. PAPALE**
1308 Main Street #117
St. Helena, CA  94574
Tel: (707) 963-1704
Fax: (707) 963-0706

Van Bunch
**BONNETT, FAIRBOURN & BALINT, PC**
57 Carriage Hill
Signal Mountain, TN  37377
Tel:  (423) 886-9736
Fax: (423) 886-9739

Gregory Erlandson
**BANGS, MCCULLEN LAW FIRM**
P.O. Box 2670
Rapid City, SD  57709
Tel: (605) 343-1040
Fax: (605) 343-1503

Michael Simon
Kevin Pearl
M. Eric Frankovitch
**FRANKOVITCH, ANETAKIS,**
**COLANTONIO & SIMON**
337 Penco Road
Weirton, WV  26062
Tel: (304) 723-4400
Fax: (304) 723-5892

James Wyatt
**WYATT & BLAKE, LLP**
435 E. Morehead Street
Charlotte, NC  28202-2609
Tel: (704) 331-0767
Fax: (704) 331-0773

Angela Drake
**LOWTHER JOHNSON, LLC**
901 St. Louis Street
20th Floor
Springfield, MO  65806
Tel: (417) 866-7777
Fax: (417) 866-1752

Gregory Lewen
**MILLER, SCHWARTZ & MILLER, PA**
2435 Hollywood Blvd.
Hollywood, FL  33020
Tel: (954) 962-2000
Fax: (954) 924-0311

Michael J. Watton
**WATTON LAW GROUP**
225 East Michigan Street
Suite 550
Milwaukee, WI 53202
Tel: (414) 273-6858
Fax: (414) 273-6894

**Plaintiffs' Counsel**

Susan LaCava
**SUSAN LACAVA, SC**
23 N. Pinckney
Suite 300
Madison, WI  53703
Tel: (608) 258-1335
Fax: (608) 258-1669

Daniel Hume
**KIRBY, MCINERNEY & SQUIRE, LLP**
830 Third Avenue
10th Floor
New York, NY  10022
Tel: (212) 317-2300
Fax: (212) 751-2540

Andrew Nickelhoff
**SACH WALDMAN, PC**
1000 Farmer Street
Detroit, MI  48226
Tel: (313) 496-9429
Fax: (313) 965-4602

Andrew Friedman
**BONNETT, FAIRBOURN & BALINT, PC**
2901 N. Central Avenue
Suite 1000
Phoenix, AZ  85012
Tel: (602) 274-1100
Fax: (602) 274-1199

John A. Elardo
**THE ELARDO LAW FIRM, P.C.**
3001 E. Camelback Road
Suite 130
Phoenix, AZ 85016
Te: (602) 604-7511
Fax: (612) 294-0909

91

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing *Consolidated Amended Class Action*

*Complaint* was filed through the Clerk of the United States District Court for the Eastern District

of Pennsylvania.  In addition, I caused copies of the same to be sent via first class mail postage

prepaid to all counsel set forth on the attached service list.


Date: June 15, 2006                          _____/s/  Daniel D'Angelo_____
                                             Daniel D'Angelo
                                             Gilman and Pastor, LLP
                                             60 State Street, 37th Floor
                                             Boston, MA 02109
                                             Tel: 617.742.9700
                                             Fax: 617.742.9701
                                             Email: ddangelo@gilmanpastor.com


                                             ***Counsel for Plaintiff***

{00008710.DOC ; 1}

**<u>Counsel for Direct Purchaser Plaintiffs</u>**

Eugene A. Spector
Jeffrey L. Kodroff
Jeffrey J. Corrigan
Jay S. Cohen
Simon B. Paris
**SPECTOR, ROSEMAN & KODROFF, P.C.**
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Tel:    (215) 496-0300
espector@srk-law.com
jkodroff@srk-law.com
jcorrigan@srk-law.com
jcohen@srk-law.com
sparis@srk-law.com
*Lead Counsel for Direct Plaintiffs*

Michael D. Hausfeld
William P. Butterfield
George Farah
**COHEN, MILSTEIN, HAUSFELD & TOLL, P.L.L.C.**
1100 New York Avenue. N.W.
West Tower, Suite 500
Washington, DC 20005-4699
Tel:    (202) 408-4600
mhausfeld@cmht.com
wbutterfield@cmht.com
gfarah@cmht.com
*Co-Lead Counsel for Direct Plaintiffs*

{00008710.DOC ; 1}

**Counsel for Defendants**

Joseph A. Tate
Carolyn H. Feeney
Will W. Sachse
Donald C. Le Gower
David J. Stanoch
**DECHERT LLP**
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Tel:    (215) 994-2350 (Tate direct)
        (215) 994-2247 (Feeney direct)
Fax:    (215) 994-2222
joseph.tate@dechert.com
carolyn.feeney@dechert.com
will.sachse@dechert.com
donald.legower@dechert.com
david.stanoch@dechert.com
*Lead Counsel for Defendants and Counsel for*
*Louisiana-Pacific Corp.*

Thomas G. Slater, Jr.
Douglas M. Garrou
Benjamin Hatch
**HUNTON & WILLIAMS LLP**
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Tel:    (804) 788-8475
Fax:    (804) 788-8218
tslater@hunton.com
dgarrou@hunton.com
bhatch@hunton.com
*Counsel for Georgia-Pacific Corp.*

Paul H. Saint-Antoine
Amy Miner
**DRINKER BIDDLE & REATH LLP**
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103-6996
Tel:    (215) 988-2700
Fax:    (215) 988-2757
paul.saint-antoine@dbr.com
amy.miner@dbr.com
*Counsel for Georgia-Pacific Corp.*

Paul H. Friedman
Laura E. Robbins
**DECHERT LLP**
1775 I Street, N.W.
Washington, DC 20006
Tel:    (202) 261-3300
Fax:    (202) 261-3333
paul.friedman@dechert.com
laura.robbins@dechert.com
*Lead Counsel for Defendants and Counsel for*
*Louisiana-Pacific Corp.*

R. Hewitt Pate
Ryan Shores
**HUNTON & WILLIAMS LLP**
1900 K Street, N.W.
12th Floor
Washington, DC 20006
Tel:    (202) 955-1500
Fax:    (202) 778-2201
hpate@hunton.com
rshores@hunton.com
*Counsel for Georgia-Pacific Corp.*

James H. Mutchnik
James H. Schink
Barock S. Echols
**KIRKLAND & ELLIS LLP**
200 East Randolph Drive
Chicago, IL 60601
Tel:    (312) 861-2350 (direct)
Fax:    (312) 861-2200
jmutchnik@kirkland.com
jschink@dechert.com
bechols@dechert.com
*Counsel for Weyerhaeuser Company*

{00008710.DOC ; 1}

Sherry A. Swirsky
Thomas W. Hazlett
**SCHNADER HARRISON SEGAL &**
**LEWIS, LLP**
1600 Market Street, Suite 3600
Philadelphia, PA 19103-7286
Tel:    (215) 751-2182 (Swirsky direct)
Tel:    (215) 751-2345 (Hazlett direct)
Fax:    (215) 972-7475
sswirsky@schnader.com
thazlett@schnader.com
*Counsel for Weyerhaeuser Company*

Reginald D. Steer
**AKIN GUMP STRAUSS HAUER**
**  & FELD LLP**
580 California Street, 15th Floor
San Francisco, CA 94104-1036
Tel:    (415) 765-9520
Fax:    (415) 765-9501
rsteer@akingump.com
*Counsel for Potlatch Corp.*

William T. Hangley
Robert L. Ebby
Daniel Segal
Sozi Tulante
**HANGLEY ARONCHICK SEGAL &**
**PUDLIN**
One Logan Square
18th & Cherry Streets
27th Floor
Philadelphia, PA 19103
Tel:    (215) 496-7001 (direct)
Fax:    (215) 568-0300
wth@hangley.com
rebby@hangley.com
das@hangley.com
spt@hangley.com
*Counsel for Norbord, Inc.*

Edward F. Mannino
Mary Kay Christodoulou
David Comerford
**AKIN GUMP STRAUSS HAUER**
**  & FELD LLP**
One Commerce Square
2005 Market St., Suite 2200
Philadelphia, PA 19103
Tel:    (215) 965-1200
Fax:    (215) 965-1210
emannino@akingump.com
mchristodoulou@akingump.com
dcomerford@akingump.com
*Counsel for Potlatch Corp.*

Trey Nicoud
**GIBSON, DUNN & CRUTCHER**
One Montgomery Street
Suite 3100
San Francisco, CA 94104
Tel:    (415) 393-8200
Fax:    (415) 986-5309
tnicoud@gibsondunn.com
*Counsel for Norbord, Inc.*

Michael L. Denger
**GIBSON, DUNN & CRUTCHER**
One Montgomery Street
Suite 3100
1050 Connecticut Avenue, NW
Washington, DC 20036-5306
*Counsel for Norbord, Inc.*

{00008710.DOC ; 1}

Harry T. Robins
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Tel:    (212) 309-6000
Fax:    (212) 309-6001
hrobins@morganlewis.com
*Counsel for Tolko Industries*

J. Gordon Cooney, Jr.
Mark P. Edwards
Robert A. Particelli
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103
Tel:    (215) 963-5876
Fax:    (215) 963-5001
jgcooney@morganlewis.com
medwards@morganlewis.com
rparticelli@morganlewis.com
*Counsel for Tolko Industries*

John H. Shenefield
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Ave., N.W.
Washington, DC 20004
Tel:    (202) 739-3000
Fax:    (202) 739-3001
jshenefield@morganlewis.com
*Counsel for Tolko Industries*

David Eggert
William Baer
Michael B. Bernstein
**ARNOLD & PORTER LLP**
555 Twelfth Street N.W.
Washington, DC 20004
Tel:    (202) 942-5133 (Eggert direct)
        (202) 942-5936 (Baer direct)
Fax:    (202) 942-5999
David.Eggert@aporter.com
William.Baer@aporter.com
Michael.B.Bernstein@aporter.com
*Counsel for J.M. Huber Corp.*

{00008710.DOC ; 1}

Steven H. Lupin
**HAMBURG, RUBIN, MULLIN, MAXWELL & LUPIN**
ACTS Center-Blue Bell
375 Morris Road
P.O. Box 1479
Lansdale, PA 19446
Tel:      (215) 661-0400
Fax:      (215) 661-0315
slupin@hrmml.com
*Counsel for J.M. Huber Corp.*

James A. Keyte
Shepard Goldfein
Karen Hoffman
**SKADDEN, ARPS, SLATE, MEAGHER    & FLOM LLP**
Four Times Square
New York, NY 10036
Tel:      (212) 735-2583 (Keyte direct)
Fax:      (917) 777-2583
jkeyte@skadden.com
sgoldfei@skadden.com
khoffman@skadden.com
*Counsel for Ainsworth Lumber Co. Ltd.*

{00008710.DOC ; 1}

John G. Harkins, Jr.
Eleanor Morris Illoway
**HARKINS CUNNINGHAM LLP**
2800 One Commerce Squre
2005 Market Street
Philadelphia, PA 19103
jharkins@harkinscunningham.com
emi@harkinscunningham.com
*Counsel for Ainsworth Lumber Co., Ltd.*