# TAB 21

LEXSEE 2003 U.S. DIST. LEXIS 26812



Warning
As of: Feb 25, 2007

**HOWARD KOENIG and EMPLOYEELIFE.COM, Plaintiffs, v. AUTOMATIC DATA PROCESSING, Defendant.**

**Civil Action No. 99-5816**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2003 U.S. Dist. LEXIS 26812*

**June 30, 2003, Decided**
**June 30, 2003, Filed; June 30, 2003, Entered**

**NOTICE:** [*1]  NOT FOR PUBLICATION

**SUBSEQUENT HISTORY:** Motion denied by, Costs and fees proceeding at, Judgment entered by, Application granted by, in part *Koenig v. Automatic Data Processing, 2004 U.S. Dist. LEXIS 28782 (D.N.J., Feb. 25, 2004)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former vice president filed alleged hat defendant company wrongfully terminated monthly severance payments, stock options and other benefits due him under a severance agreement. The company moved for judgment on the pleadings on its alleged Sherman Act, specifically *15 U.S.C.S. §§ 1,2*, violations and the vice president moved to amend his complaint and for summary judgment on the company's remaining counterclaims.

**OVERVIEW:** The vice president left the company pursuant to a negotiated agreement that included severance benefits subject to certain conditions, and later, he became chief executive of a different company. The vice president claimed that non-compete clauses in the severance agreement, violated the Sherman Act, *15 U.S.C.S. §§ 1* and 2. The company claimed that the vice president had not alleged an antitrust injury arising out of the non-compete agreements that he signed, and the court agreed. Rather than setting out how the non-compete obligations affected competition in the relevant market of online benefits administration, the vice president only alleged facts about how they adversely had an effect on his interests. This did not strike the court as an antitrust injury, but was merely theorizing that such restraints may eventually have an effect on the market of interactive internet services. Because the vice president failed to allege the dangerous probability of the company monopolizing a common market, his *15 U.S.C.S. § 2* claim failed. Furthermore, there was nothing new in the vice president's proposed amended complaint that would cure the defects in his theories.

**OUTCOME:** The company's motion for judgment on the pleadings respecting was granted; the vice president's motion to amend his complaint was denied; and the vice president's motion for summary judgment on the remaining counts of the counterclaim was granted.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pretrial Judgments > Judgment on the Pleadings*
[HN1] Fed. R. Civ. P. 12(c) motions are granted where the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law. Under a Rule 12(c) motion, a court can examine all the pleadings that have been filed, but must still view the facts in the complaint and any reasonable inferences that can be drawn from them in favor of the non-moving party.

2003 U.S. Dist. LEXIS 26812, *

*Antitrust & Trade Law > Sherman Act > Coverage > General Overview*
[HN2] See *15 U.S.C.S. § 1.*

*Antitrust & Trade Law > Sherman Act > Claims*
[HN3] The Third Circuit has determined that a *15 U.S.C.S. § 1* claim requires a plaintiff to establish these four elements: (1) that the defendants undertake concerted action; (2) that the behavior in question has produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action is illegal, and (4) that the plaintiff is injured as a proximate result of the concerted action.

*Antitrust & Trade Law > Sherman Act > Claims*
[HN4] Before establishing the four factors for a claim under *15 U.S.C.S. § 1,* a plaintiff must first allege an "antitrust injury," i.e., one that is causally related to the defendants' allegedly illegal anti-competitive activity. The injury must be one that the antitrust laws are intended to prevent. Because antitrust law aims to protect competition, not competitors, a court must analyze the antitrust injury question from the viewpoint of the consumer. An antitrust plaintiff must prove that challenged conduct have affected the prices, quantity or quality of goods or services, not just his own welfare. An individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market. If the allegations only establish that the defendants' actions harmed only the plaintiff, and not consumers, then the complaint fails to meet the required anti-trust injury threshold.

*Antitrust & Trade Law > Sherman Act > Claims*
[HN5] Antitrust accusations can be dismissed for failure to state a claim when a plaintiff fails to allege a valid relevant market. The plaintiff must establish that the challenged acts are unreasonably restrictive of competitive conditions' in the relevant market. And, of significance here, where non-compete agreements are challenged as imposing anti-trust injuries, they are analyzed under the rule of reason, which asks whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect. The law is definitively set forth that an individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market. Thus the rele-

vant analysis is first to determine whether the anti-competition clause produces anti-competitive effects, and then to decide whether it produces unreasonable restraints on trade.

*Antitrust & Trade Law > Sherman Act > Claims*
[HN6] The first, third and fourth factors in the Queen City Pizza analysis used for *15 U.S.C.S. § 1* claims require that a plaintiff allege that a defendant has engaged in concerted, illegal action that has proximately caused him harm. Concerted action within the meaning of § 1 is "the existence of an agreement" or a unity of purpose or a common design and understanding or a meeting of the minds in an unlawful arrangement.

*Antitrust & Trade Law > Sherman Act > Coverage > General Overview*
[HN7] It is well-established that anti-competition clauses ("non-compete" clauses or "no-hire agreements"), fall outside the ambit of the Sherman Act. In most circumstances, non-compete clauses are considered ancillary restraints on trade pursuant to which temporary, circumscribed anti-competitive behavior is tolerated. Numerous courts have recognized the general rule that agreements not to compete, entered into in conjunction with the termination of employment or sale of a business, do not offend the federal antitrust provisions if they are reasonable in duration and geographical limitation.

*Antitrust & Trade Law > Sherman Act > Coverage > General Overview*
[HN8] In contrast to anti-competition clauses, price fixing, where separate companies in the same market agree to set prices of products or services in order to drive non-compliant, competing companies out of business, is held to be a *15 U.S.C.S. § 1* violation. This anti-competitive behavior contrasts with the activity of a single company that demands a non-compete agreement from its employees. Officers or employees of the same firm do not provide the plurality of actors for a § 1 conspiracy.

*Antitrust & Trade Law > Sherman Act > Claims*
[HN9] The second Queen City Pizza factor used for *15 U.S.C.S. § 1* claims is identifying anti-competitive effects in the relevant market. A plaintiff has the burden of making out the relevant market, or the area of effective competition. The relevant market has two components: product and geographic. The relevant product market is all the goods or services a consumer might use to accomplish the same thing, while the relevant geographic market is the area in which the consumer may "rationally

2003 U.S. Dist. LEXIS 26812, *

look" for the those goods and services. While determinations of relevant markets often require factual inquiries into the "commercial realities faced by consumers," those lines of inquiry are not necessary for the court when confronted with a motion to dismiss.

*Antitrust & Trade Law > Sherman Act > Claims*
[HN10] A plaintiff suing under *15 U.S.C.S. § 1* must show that the defendant is creating anti-competitive effects in the relevant market. A market compromised by anti-competitive behavior is one where prices, quantity or quality of goods or services are affected.

*Antitrust & Trade Law > Sherman Act > Coverage > Monopolization Offenses*
[HN11] See *15 U.S.C.S. § 2*.

*Antitrust & Trade Law > Sherman Act > Coverage > Monopolization Offenses*
[HN12] While attempted monopolization is not directly defined in *15 U.S.C.S. § 2*, three elements are necessary to make out a Sherman Act violation: (1) that the defendant has engaged in predatory or anti-competitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. Not every act done with intent to produce an unlawful result constitutes an attempt" at monopolization.

*Antitrust & Trade Law > Sherman Act > Coverage > Monopolization Offenses*
[HN13] In trying to prove that a defendant has reached a dangerous probability of actual monopolization in violation of *15 U.S.C.S. § 2*, a plaintiff must include a definition of the relevant market and examination of market power, because a defendant will only be liable for attempted monopolization if it has "sufficient market power." That market power must reflect an actual share in the relevant market, and not predictions of future entry. In other words, no attempted monopoly claim will lie if a defendant is not engaged in operating in the relevant market identified as threatened by monopolization.

*Antitrust & Trade Law > Sherman Act > Coverage > Monopolization Offenses*
[HN14] Regarding claims under *15 U.S.C.S. § 2*, without any share in the relevant market as described by plaintiffs, there can be no inference that defendants hold sufficient economic power in that market to create a dangerous probability of monopoly.

*Antitrust & Trade Law > Sherman Act > Claims*
*Antitrust & Trade Law > Sherman Act > Coverage > Monopolization Offenses*
[HN15] The notion that proof of unfair or predatory conduct alone is sufficient to make out the offense of attempted monopolization is contrary to the purpose and policy of the Sherman Act, *15 U.S.C.S. § 1 et seq.*

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN16] According to Fed. R. Civ. P. 15(a), a plaintiff may have leave to amend "as a matter of course" before a responsive pleading is filed. After that, leave to amend is granted if justice so requires. Fed. R. Civ. P. 15(a). Motions to amend complaint are denied on a showing of undue delay, bad faith, dilatory motive, prejudice and futility. In assessing "futility," the District Court applies the same standard of legal sufficiency as applies under Fed. R. Civ. P. 12(b)(6). Accordingly, if a claim is vulnerable to dismissal under Fed. R. Civ. P. 12(b)(6), but the plaintiff moves to amend, leave to amend generally must be granted unless the amendment would not cure the deficiency.

*Antitrust & Trade Law > Private Actions*
*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN17] In order to be granted leave to amend a complaint in an antitrust case, a plaintiff must be able to show an antitrust injury, as well as anti-competitive conduct.

*Civil Procedure > Summary Judgment > Standards > General Overview*
[HN18] Summary judgment is granted when there are no genuine issues of material fact for the court to decide and the moving party is entitled to judgment as a matter of law Fed. R. Civ. P. 56(c). At the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. Non-movants are entitled to every favorable inference that can be drawn from the record.

*Antitrust & Trade Law > Consumer Protection > False Advertising > Lanham Act*
[HN19] See *15 U.S.C.S. § 1125*(a).

2003 U.S. Dist. LEXIS 26812, *

*Antitrust & Trade Law > Consumer Protection > Likelihood of Confusion*

[HN20] Beyond the initial requirement of proving likelihood of damage, to prove federal unfair competition under the Lanham Act, *15 U.S.C.S. § 1125*(a)(1)(A), a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion. The inquiry is not whether the confusion is possible, but whether it is likely. Confusion is likely to exist when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.

*Antitrust & Trade Law > Consumer Protection > False Advertising > Lanham Act*

[HN21] A "preliminary requirement" on a Lanham Act plaintiff is the showing of the likelihood of damages. And there must be more than a mere subjective belief that the plaintiff is likely to be harmed.

**COUNSEL:** For HOWARD KOENIG, EMPLOYEELIFE.COM, Plaintiffs: NOEL C. CROWLEY, CROWLEY & CROWLEY, ESQS., MORRISTOWN, NJ.

For AUTOMATIC DATA PROCESSING, Defendant: ANTHONY J. LAURA, REED SMITH LLP, NEWARK, NJ; JOHN O'FARRELL, FRANCIS & O'FARRELL, MORRISTOWN, NJ.

For AUTOMATIC DATA PROCESSING, Counter Claimant: ANTHONY J. LAURA, REED SMITH LLP, NEWARK, NJ; JOHN O'FARRELL, FRANCIS & O'FARRELL, MORRISTOWN, NJ.

**JUDGES:** Katharine S. Hayden, U.S.D.J.

**OPINION BY:** Katharine S. Hayden

**OPINION: KATHARINE S. HAYDEN, U.S.D.J.**

In December 1999, plaintiff Howard D. Koenig ("Koenig") filed this lawsuit based on his allegations that defendant Automatic Data Processing ("ADP") wrongfully terminated the monthly severance payments, stock options and other benefits due him under his Severance Agreement. On April 4, 2002, the Court issued an Opinion resolving cross-motions for summary judgment by denying ADP's motion for summary judgment on Koenig's ERISA and breach of contract claims and granting Koenig summary judgment on some of ADP's counterclaims. n1 These motions were decided pursuant to a

case management order of the Magistrate Judge that denied discovery on Koenig's antitrust [*2] claims until the ERISA and related contract claims and counterclaims were decided. In this second round of motions, ADP moves under *Fed. R. Civ. P. 12(c)* for judgment on the pleadings on its alleged Sherman Act violations. Koenig moves to amend his complaint and for summary judgment on ADP's remaining counterclaims.

> n1 The Court dealt with ADP's claims that Koenig breached the Stock Option Agreements between the parties, that he breached the agreement that governed his severance, and that he benefitted from unjust enrichment, fraud, unfair dealing and disloyalty. The counts remaining are Koenig's antitrust claims, his motion to amend his complaint, and ADP's six remaining counterclaims, which include violations of the Lanham Act, unfair competition, two counts of tortious interference and 2 counts of unjust enrichment.

BACKGROUND

ADP began its business by administering other companies' payrolls, (Answer P16.) It has since expanded by offering tax filing services, human resources management, securities transaction [*3] processing, investor communications, computerized claims services for insurance companies, and other information services to companies home and abroad. (Id.) In May 1996, Koenig was hired by ADP to serve as Corporate Vice President of Operations and Client Services. In February 1999, he left pursuant to a negotiated agreement that included severance benefits subject to certain conditions, and in August 1999, he became CEO of EEL.

As indicated, this Court decided fully briefed and argued motions regarding the legal relationship between Koenig and ADP and how it affected his right to receive certain executive benefits. The relevant facts are set forth in its written decision of April 4, 2002 and are incorporated herein. As a result of the decision, the Court granted Koenig summary judgment on his claim that ADP breached the terms of their severance agreement and on ADP's counterclaims that Koenig had committed material breach of his obligations that disentitled him to executive benefits. The Court also found that Koenig was not liable on various common law tort claims and granted him outstanding monthly severance payments and the value of the stock options that had yet to [*4] vest when Koenig left ADP.

Koenig sought another type of relief in counts I and II that focused on non-compete clauses in the severance agreement, characterized as violating the Sherman Act, *15 U.S.C. §§ 1* and *2*. ADP moves to dismiss these

claims under *Fed. R. Civ. P. 12(c)*. The specific relief sought under these counts includes treble damages; declaratory relief that ADP's restraints on Koenig's future employment are violative of public policy; and an injunction against ADP's use of similar restraints on employment in the future.

## DISCUSSION

### I. Antitrust Claims

#### A. Standard of Review

ADP moves for judgment on the pleadings on Koenig's antitrust claims pursuant to *Federal Rule of Civil Procedure 12(c)*. [HN1] These motions are granted where "the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Jablonski v. Pan American World Airways, Inc., 863 F.2d 289, 290 (3d Cir. 1988)*. Under a 12(c) motion, the Court can examine all the pleadings that have been filed, but must still "view the facts in the complaint and any reasonable inferences that [*5] can be drawn from them in favor of the non-moving party." *Wolf v. Ashcroft, 297 F.3d 305 (3d Cir. 2000)*.

#### B. Section 1 of the Sherman Act

Under *15 U.S.C. § 1.*, [HN2] "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." [HN3] The Third Circuit has determined that a *§ 1* claim requires the plaintiff to establish these four elements: (1) that the defendants undertook concerted action; (2) that the behavior in question produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action is illegal, and (4) that the plaintiff was injured as a proximate result of the concerted action. *Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997)*.

*1. Antitrust Injury Threshold Requirement*

[HN4] Before establishing these four factors, the plaintiff must first allege an "antitrust injury," i.e., one that is "causally related to the defendants' allegedly illegal anti-competitive activity." *Eichorn v. AT&T Corp., 248 F.3d 131, 138 [*6]* (citing *Brunswick Corp. v. Pueblo Bowl-o-Mat, Inc., 429 U.S. 477, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977))*. The injury must be one that "the antitrust laws [was] intended to prevent." *Brunswick Corp., 429 U.S. at 489*. Because "antitrust law aims to protect competition, not competitors, [a court] must analyze the antitrust injury question from the viewpoint of the consumer. An antitrust plaintiff must prove that chal-

lenged conduct affected the prices, quantity or quality of goods or services," not just his own welfare. *Mathews v. Lancaster General Hosp., 87 F.3d 624, 641 (3d Cir. 1996)*(citing *Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 728 (3d Cir. 1991))*. "An individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market." *Eichorn, 248 F.3d at 140*. If the allegations only establish that the defendants' actions harmed only the plaintiff, and not consumers, then the complaint fails to meet the required anti-trust injury threshold.

[HN5] Antitrust accusations can be dismissed for failure to state a claim [*7] when a plaintiff fails to allege a valid relevant market. *Queen City Pizza, 124 F.3d at 433*. The plaintiff must establish that "'the challenged acts are unreasonably restrictive of competitive conditions' in the relevant market." *Eichorn, 248 F.3d at 138* (quoting *Standard Oil Co. of N.J. v. United States, 221 U.S. 1, 28, 31 S. Ct. 502, 55 L. Ed. 619 (1911))*. And, of significance here, where non-compete agreements are challenged as imposing anti-trust injuries, they are analyzed under the rule of reason, which asks whether the questioned practice "imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *State Oil Co. v. Khan, 522 U.S. 3, 10, 118 S. Ct. 275, 139 L. Ed. 2d 199 (1997)*. The law is definitively set forth that "an individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market." *Eichorn, 248 F.3d at 140*. Thus the relevant analysis is [*8] first to determine whether the anti-competition clause produces anti-competitive effects, and then to decide whether it produces unreasonable restraints on trade. Id.

ADP contends that Koenig has not alleged an antitrust injury arising out of the non-compete agreements that he signed, and the Court agrees. Rather than setting out how the non-compete obligations affect competition in the relevant market of online benefits administration, Koenig only alleges facts about how they adversely had an effect on his interests. It does not strike the Court that an antitrust injury is alleged in the conclusory statement that the imposed "forfeiture of severance pay, stock options and other benefits...unreasonably restrain[s] trade." (Compl. P40.) The closest Koenig's allegations come to articulating antitrust injury affecting the competitive marketplace is where he claims that keeping him out of the workplace will erode his "professional and managerial skills" -- a detriment particularly severe in the faced-paced environment of internet technology. (Id. P42.)

2003 U.S. Dist. LEXIS 26812, *

But it is merely theorizing that such restraints *may eventually* have an effect on the market of interactive internet services. **[*9]** n2 Koenig makes no showing that the non-competition language he complains of has had any effect on the quality, availability or price of internet-based benefits administration. He does not allege that online benefit selection has suffered as a result of the restrictions on his employment. Antitrust laws were enacted to protect competition, not competitors. *Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962)*, and as a practical matter, Koenig flat out did what he wanted after he left ADP and started EEL. He cannot make a showing that what happened after he left the company translates into an adverse effect on the relevant market and as such, does not allege antitrust injury. See *Queen City Pizza, 124 F.3d at 433*, supra.

> n2 How much harm could Koenig really have suffered, ADP argues, if Koenig was able to take the job as CEO of EEL and remain in that position? ADP claims that no agreement, in reality, prevented Koenig from competing with ADP as the head of EEL. (Def.'s Mot. at 8.)

**[*10]**

Moreover, Koenig has pleaded that ADP and EEL are not direct, nor even potential competitors in the relevant market. (Compl. P23.) "As Supreme Court and our precedent make clear, only anti-competitive actions between competitors give rise to Sherman Act liability," said the Third Circuit in *Eichorn, 248 F.3d at 139*. In arguing for the considerable financial benefits he sued for, and to justify his new employment as permissible under his agreements with ADP, Koenig denied competition between ADP and EEL. It appears he is abandoning that position in favor of administering the crowning blow of Sherman Act violations.

*2. Showing a § 1 Violation: the Queen City Pizza factors*

Even had he sufficiently pleaded an antitrust injury, on the pleadings Koenig fails to establish the elements required under *Queen City Pizza*.

**a. Factors One, Three and Four**

**[HN6]** The first, third and fourth factors in the *Queen City Pizza* analysis require that Koenig allege that ADP engaged in concerted, illegal action that proximately caused him harm. Concerted action within the meaning of *§ 1* is "the existence of an agreement" or a "unity of purpose or a common design **[*11]** and understanding or a meeting of the minds in an unlawful ar-

rangement." *Mathews v. Lancaster General Hosp., 87 F.3d at 638* (internal citations omitted).

Koenig pleads that the non-competition clause of his severance agreement with ADP amounts to illegal concerted action because it was designed to chill competition by keeping him out of the relevant marketplace. But **[HN7]** it is well-established that anti-competition clauses ("non-compete" clauses or "no-hire agreements"), fall *outside* the ambit of the Sherman Act. *Eichorn, 248 F.3d at 145* (citing *United States v. Addyston Pipe & Steel Co., 85 F. 271 (6th Cir. 1898)*). In most circumstances, non-compete clauses are considered ancillary restraints on trade pursuant to which temporary, circumscribed anti-competitive behavior is tolerated. "Numerous courts have recognized the general rule that agreements not to compete, entered into in conjunction with the termination of employment or sale of a business, do not offend the federal antitrust provisions if they are reasonable in duration and geographical limitation." *Id. at 145* (internal citations omitted).

**[HN8]** In contrast, price fixing, **[*12]** where separate companies in the same market agree to set prices of products or services in order to drive noncompliant, competing companies out of business, is held to be a *§ 1* violation. See generally *United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S. Ct. 811, 84 L. Ed. 1129 (1940)*(identifying price-fixing as anti-competitive conduct worthy of scrutiny as a per se violation of the antitrust laws). This anti-competitive behavior contrasts with the activity of a single company that demands a non-compete agreement from its employees. "Officers or employees of the same firm do not provide the plurality of actors for a *§ 1* conspiracy." *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984)*("It is perfectly plain that an internal 'agreement' to implement a single, unitary firm's policies does not raise the antitrust dangers that *§ 1* was designed to police.").

Koenig accuses ADP of violating federal antitrust law by its "policy and practice" of forcing him to sign non-competition agreements which far exceed any "legitimate business purpose" of preventing outgoing employees from misappropriating trade secrets or clients. (Compl. P39.) But it is evident that **[*13]** an attack on the existence of the non-compete language in the severance agreement falls short of establishing that ADP engaged in illegal, concerted action.

**b. Factor Two**

**[HN9]** The remaining Queen City Pizza factor is identifying anti-competitive effects in the relevant market. *Queen City Pizza, 124 F.3d at 442*. Plaintiff has the burden of making out the relevant market, or the area of

effective competition. *Id. at 436; Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 328, 81 S. Ct. 623, 5 L. Ed. 2d 580 (1961).* The relevant market has two components: product and geographic. *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 513 (3d Cir. 1998).* The relevant product market is all the goods or services a consumer might use to accomplish the same thing, while the relevant geographic market is the area in which the consumer may "rationally look" for the those goods and services. *Eichorn, 248 F.3d at 147.* While determinations of relevant markets often require factual inquiries into the "commercial realities faced by consumers," those lines of inquiry are not necessary for the court when confronted with a motion [*14] to dismiss. *Queen City Pizza, 124 F.3d at 436* (citing *Eastman Kodak Company v. Image Technical Services, Inc., 504 U.S. 451, 482, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992)).*

[HN10] The plaintiff must also show that the defendant is creating anti-competitive effects in the relevant market. A market compromised by anti-competitive behavior is one where prices, quantity or quality of goods or services are affected. *Mathews, 87 F.3d at 641.*

In his complaint Koenig describes the relevant market as follows:

> EEL and ADP are potential competitors in a line of commerce. The relevant product market for this line of commerce is the business of selling employee health and welfare benefit insurance and related products using methods, programs and systems that position the vendor as the administrator and manager of employee health and welfare benefit plans and relieve employers of plan administration responsibility.

(Compl. P30). Koenig also identifies relevant submarkets, describing them as "utilizing an interactive, internet based system which facilitates direct contact with individual employees and shifts purchasing decisions from employers to their individual employees. [*15] " (Compl. P31.)

The Court agrees with ADP that this description of the relevant market is inadequate. The complaint does not establish that an internet-based method of selecting benefits is a special market, or why the selection of benefits through in-house human resources personnel or outside providers is other than an interchangeable product to internet benefit selection services. Assuming an impact on competitors, the pleadings do not establish that consumers' accessibility to all the possible products would

be curtailed if alternative products to the internet program are still in the marketplace.

The *§ 1* claims fail both as to the threshold antitrust injury requirement and the substantive showing under *Queen City Pizza,* and they are dismissed.

**B. *Section 2* of the Sherman Act**

*Section 2* of the Sherman Act makes it illegal to [HN11] "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade of commerce among the several states...." *15 U.S.C. § 2.* [HN12] While attempted monopolization is not directly defined in *§ 2,* three elements are necessary to make out a Sherman Act violation: (1) [*16] that the defendant has engaged in predatory or anti-competitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 113 S. Ct. 884, 122 L. Ed. 2d 247 (1993).* Spectrum Sports also held that "not every act done with intent to produce an unlawful result constitutes an attempt" at monopolization. *Id. at 455.*

[HN13] In trying to prove that the defendant reached a dangerous probability of actual monopolization, a plaintiff must include a definition of the relevant market and examination of market power, *Spectrum Sports, 506 U.S. at 455,* because a defendant will only be liable for attempted monopolization if it has "sufficient market power." That market power must reflect an actual share in the relevant market, and not predictions of future entry. *Pastore v. Bell Telephone Co. of Pennsylvania, 24 F.3d 508, 513 (3d Cir. 1994).* In other words, no attempted monopoly claim will lie if a defendant is not engaged in operating in the relevant market identified as threatened by monopolization.

In *Pastore,* plaintiffs accused defendants of attempted monopolization [*17] in the market of installing a custom-designed access control communications security network ("CDACCSN"). In dismissing this claim, the court stated that plaintiffs had not alleged that defendants actually *participated* in the CDACCSN market; the allegations were that the defendants might *enter* the CDACCSN market. [HN14] "Without any share in the relevant market as described by plaintiffs, there can be no inference that defendants hold sufficient economic power in that market to create a dangerous probability of monopoly." *Pastore, 24 F.3d at 513.*

Like the Pastore plaintiffs, Koenig has taken the position that no actual ongoing competition exists now or in the past between ADP and EEL. (Compl. P35.) Instead he emphasizes ADP's market dominance in the payroll services industry, and characterizes ADP as an "entrenched and dominant provider" with approximately

65% of the national market. (Compl. P33.) He also accuses ADP of managing personnel records and health and welfare benefit programs at below-cost levels. (Compl. P34.) Nowhere, however, does Koenig contend that ADP has *any* market share in existing internet-based programs providing health and welfare benefit [*18] selection, and as noted above, he states that ADP and EEL aren't competitors at all. Under the *Pastore* analysis, Koenig fails to allege the dangerous probability of ADP monopolizing a common market.

Even if he did establish in his complaint that ADP had engaged "for years" in providing non-internet based benefit selection programs at "predatory and below-cost pricing," Koenig has not set forth facts to demonstrate that ADP's actions caused anti-competitive effects in the relevant market. [HN15] "The notion that proof of unfair or predatory conduct alone is sufficient to make out the offense of attempted monopolization is contrary to the purpose and policy of the Sherman Act." *Spectrum Sports, 506 U.S. at 457.*

Koenig's § 2 claim that ADP attempted to monopolize the relevant market is dismissed.

## II. Motion for Leave to Amend

[HN16] According to *Federal Rule of Civil Procedure 15(a)*, a plaintiff may have leave to amend "as a matter of course" before a responsive pleading is filed. *Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000).* After that, leave to amend is granted if justice so requires. *Fed. R. Civ. P. 15(a).* Motions to amend complaint are [*19] denied on a showing of undue delay, bad faith, dilatory motive, prejudice and futility. *In re NAHC, Inc. Sec. Litig., 306 F.3d 1314, 2002 WL 31194316, 13 (3d Cir. 2002).* "In assessing 'futility,' the District Court applies the same standard of legal sufficiency as applies under *Rule 12(b)(6)*. Accordingly, if a claim is vulnerable to dismissal under *Rule 12(b)(6)*, but the plaintiff moves to amend, leave to amend generally must be granted unless the amendment would not cure the deficiency." *Jurimex Kommerz Transit G.M.B.H. v. Case Corp., 65 Fed. Appx. 803, 2003 WL 1919361 (3d Cir. 2003).*

[HN17] In order to be granted leave to amend a complaint in an antitrust case, the plaintiff must be able to show an antitrust injury, as well as anti-competitive conduct. *Handicomp, Inc. v. United States Golf Ass'n, 2000 U.S. App. LEXIS 6861, 2000 WL 426245 (3d Cir. 2000)*(finding on motion for summary judgment that because plaintiff had neglected to prove an antitrust injury or "imminent monopoly power or anti-competitive conduct." on the part of the defendant, no leave to amend was granted).

The Court concludes that Koenig's proposed amended complaint has not met the legal burden of suffi-

ciently pleading [*20] antitrust injury. In it, Koenig adds Benefit America (BTI) as a plaintiff. BTI, according to the amendment, operates a "new and different" business, offering "a web-based enrollment/benefit selection service which gives the individual employees of its subscribing employers ongoing control in the choice of employer-sponsored health and welfare benefit plans...by means of an interactive self-help program." (Prop. Am. Compl. P21.)

But this begs the question of antitrust injury because ADP and BTI have only competed on "isolated and infrequent occasions...in the business of providing health and welfare benefit administration." (Prop. Am. Compl. P35.) In PP39-40, Koenig describes the two companies as only potential competitors. Koenig repeats that ADP's practice of enforcing non-compete agreements, by forcing employees to forfeit severance pay, stock options and other benefits, violates *§ 1* of the Sherman Act, without curing the legal insufficiency of such bare-boned allegations. (Prop. Am. Compl. P43.) He also realleges that such restrictions have an especially deleterious effect in the internet business where "sweeping" changes are made with lightning speed. (Id. P45.) He concentrates [*21] on the personal harm that has been inflicted on him by ADP, that it has refused to remit severance payments or honor stock options. (Prop. Am. Compl. P48-9.)

Koenig inflates his original accusation that ADP attempted to monopolize the interactive, internet-based market of providing employee benefits by using the influence of its dominance in the payroll service business with charges of bundling, predatory pricing and disparagement of competitors' products. But as the above analysis makes clear, there must be a dangerous probability of ADP achieving monopoly power in the alleged relevant market of online employee benefits. Stuck with his facts that ADP and his company are only potential competitors, Koenig not only fails to show ADP has imminent monopoly power in the relevant market, he fails to show ADP even has an actual share in it.

There is nothing new in Koenig's proposed amended complaint that would cure the defects in his §§ 1 and 2 theories, and the Court concludes that under futility, the motion for leave to amend must be denied.

## IV. Summary Judgment on Counterclaims

### A. Standard of Review

[HN18] Summary judgment is granted when there are no genuine issues [*22] of material fact for the court to decide and the moving party is entitled to judgment as a matter of law *Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* "At the summary judgment stage the judge's

2003 U.S. Dist. LEXIS 26812, *

function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* Non-movants are entitled to every favorable inference that can be drawn from the record. *Carrasca v. Pomeroy, 313 F.3d 828, 833 (3d Cir. 2002).*

**B. Counterclaims**

ADP's six remaining counterclaims are: Count IX (violation of the Lanham Act, *15 U.S.C. § 1125(a)*); Count XI (unfair competition); Count VII (tortious interference against EEL); Count X (tortious interference against both EEL and Koenig); and Counts VI and VIII (unjust enrichment against EEL and Koenig).

*1. Counts IX and XI (Lanham Act and Unfair Competition Claims)*

Count IX of ADP's Answer and Counterclaim charges Koenig and EEL with a violation of misusing three of ADP's legally protectable service marks and designs: **[*23]** "Total Tax," "Total Pay," and the "EE life-cycle." TotalTax and TotalPay are service marks programs that ADP developed (ADP never explains exactly what they are). The EE life-cycle is a diagram that aids employees in human resource decisions. (Decl. of Noel Crowley, Ex. C.)

ADP contends that EEL placed these protected designs on its website without authorization, giving one cause to draw "the obvious inference...that Koenig stole ADP's proprietary information and used it in an effort to obtain credibility with his new venture," i.e., EEL. (Def.'s Opp. at 18.) EEL does not deny the posting, but blames it on actions of an unauthorized consultant and argues that no consumer would mistake what were clearly ADP materials as EEL's even though they were on EEL's website. EEL argues too that these service marks have not been associated with ADP long enough to warrant protecting ADP as the sole provider of the services depicted. Finally, the argument is made that ADP never suffered any injury or harm from EEL's erroneous posting anyway.

*Section 1125(a)* of chapter 15 of the United States Code says:

**[HN19]** (1) Any person who, on or in connection with any goods or services, or any container **[*24]** for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or

misleading description of fact, or false or misleading representation of fact, which --

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities,

shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

*15 U.S.C. § 1125(a).*

**[HN20]** Beyond the initial requirement of proving likelihood of damage, "to prove federal unfair competition under the Lanham Act, *15 U.S.C. § 1125(a)(1)(A)*, a plaintiff must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to **[*25]** identify goods or services causes a likelihood of confusion." *Marshak v. Treadwell, 240 F.3d 184, 198 (3d Cir. 2001).* The inquiry is not whether the confusion is possible, but whether it is likely. *Checkpoint Systems, Inc., v. Check Point Software Technologies, Inc., 269 F.3d 270, 280 n. 7 (3d Cir. 2001).* Confusion is likely to exist when "consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Id. at 280.*

No genuine issue of material fact exists as to whether or not ADP's service marks appeared on EEL's website since ADP claims that they were, and EEL concedes to that fact. (Gevertz Aff. Ex. A-E.) These exhibits show that ADP became aware of EEL's unauthorized posting of ADP's service marks Total Tax, TotalPay on EEL's website and notified EEL to that effect in an August 27, 1999 letter, just two weeks after Koenig became the CEO of EEL. (Gevertz Aff. Ex. A.) While initially

2003 U.S. Dist. LEXIS 26812, *

denying that any trademarks were used in violation of the need to protect proprietary information, EEL eventually admitted [*26] that ADP's trademarks were placed on the website in error and removed them within a month of getting notice. (Gevertz Aff. Ex. E.)

[HN21] A "preliminary requirement" on a Lanham Act plaintiff is the showing of the likelihood of damages. And "there must be 'more than a mere subjective belief that the plaintiff is likely to be harmed.'" *US Golf Ass'n v. St. Andrews Systems, Data-Max, Inc., 749 F.2d 1028, 1033 (3d Cir. 1984)*(internal citations omitted). ADP has not shown evidence it suffered any damages as a result of EEL's posting registered marks on its website for a few weeks in the fall of 1999. As such, its counterclaims based on the Lanham Act and unfair competition are dismissed.

### 2. Counts VI and VIII (Unjust Enrichment against Koenig and EEL)

The bases for both unjust enrichment claims, Counts VI and VIII, is ADP's assertion that Koenig unfairly reaped the benefits he received from his Stock Option and Letter Agreements, thereby secondarily benefitting EEL with those same benefits. In addition, ADP claims that EEL profited from wrongfully using ADP's service marks, as well as confidential and proprietary information. (Def.'s Answer and Countercl. P89.)

The [*27] Court agrees with Koenig that its previous findings in its April 2002 Opinion form the basis for granting him summary judgment on the unjust enrichment claims, and the ruling above on the Lanham Act challenge is a basis for dismissing the theory of unjust enrichment based upon unlawful use of ADP's marks. Counts VI and VIII of the counterclaim are dismissed.

### 3. Counts VII and X (Tortious Interference against Koenig and EEL)

Koenig moves for summary judgment on the tortious interference claim against EEL based on the Court's findings in April 2002 that ADP and Koenig were not true competitors and that Koenig did not breach his non-

compete agreement with ADP. He also moves for summary judgment on the tortious interference claim against Koenig for his involvement of EEL's hiring of two ADP employees -- Richard Macy and Helen Roberts. The Court found Koenig had nothing to do with their hirings and had not breached the non-hire/non-solicitation clause in the severance agreement. The Court agrees and dismisses Counts VII and X of the counterclaim.

CONCLUSION

For the foregoing reasons, ADP's motion for judgment on the pleadings respecting counts I and II alleging violations of [*28] the Sherman Act §§ 1 and 2 is **granted;** Koenig's motion to amend his complaint is **denied;** and Koenig's motion for summary judgment on the remaining counts of the counterclaim is **granted.** An appropriate Order will be entered.

Dated: June 30, 2003

Katharine S. Hayden, U.S.D.J.

**ORDER**

**KATHARINE S. HAYDEN, U.S.D.J.**

**THIS MATTER** having come before the Court upon defendant Automatic Data Processing's motion to dismiss pursuant to *Fed. R. Civ. P. 12(c)*; and upon plaintiff Howard Koenig's cross-motion for summary judgment and his motion to amend the complaint; the Court having considered the written submissions by the parties, and for good cause shown;

**IT IS,** therefore, on this 30th day of June, hereby

**ORDERED** that defendant's motion to dismiss plaintiff's complaint is **granted;** and it is further

**ORDERED** that plaintiff's cross-motion for summary judgment is **granted;** and it is further

**ORDERED** that plaintiff's motion to amend his complaint is **denied.**

Katharine S. Hayden, U.S.D.J.

# TAB 22



156 Fed.Appx. 461, 2005 WL 2891740 (C.A.3 (N.J.)), 37 Employee Benefits Cas. 1254
**(Cite as: 156 Fed.Appx. 461)**

---

Briefs and Other Related Documents
**Koenig v. Automatic Data Processing**C.A.3 (N.J.),2005.This case was not selected for publication in the Federal Reporter.NOT PRECEDENTIAL Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,Third Circuit.
Howard **KOENIG**; Employeelife.com,
Appellees/Cross-Appellants in Nos. 03-3231 and 04-1827
v.
**AUTOMATIC DATA PROCESSING**
Appellant/Cross-Appellee in Nos. 03-3112 and 04-1826.
**Nos. 03-3112, 04-1827, 03-3231, 04-1826.**

Argued June 28, 2005.
Filed Nov. 3, 2005.

**Background:** Former employee and his new employer sued his former employer, alleging a claim under the Employee Retirement Income Security Act (ERISA) for wrongful denial of severance benefits allegedly due under a letter agreement and release, and asserting federal antitrust claims. The United States District Court for the District of New Jersey, Katharine S. Hayden, J., granted summary judgment against the former employer on the benefits claim, but entered judgment on the pleadings in favor of the former employer on the antitrust claims. Both parties appealed.

**Holdings:** The Court of Appeals, Rendell, Circuit Judge, held that:

(1) district court should have applied federal common law in its discussion of whether the employee breached the agreement;

(2) district court properly construed the agreement de novo;

(3) refusal to award prejudgment interest on the value of stock options awarded to the employee was not an abuse of discretion; and

(4) failure to comply with a local rule could not alone be grounds for denial of an ERISA fee award.

Reversed and remanded.
West Headnotes
**[1] Federal Courts 170B ⬅⟿421**

170B Federal Courts
    170BVI State Laws as Rules of Decision
        170BVI(C) Application to Particular Matters
            170Bk421 k. Labor and Employment; Workers' Compensation. Most Cited Cases
District court should have applied federal common law in its discussion of whether a former employee breached a letter agreement and release with an employer, and whether any such breaches were "material," where the employer's severance pay policy qualified as a severance pay plan governed by ERISA and the agreement, arising from the plan, was contractual in form; without explanation, the court applied state law, and adhered, specifically, to state law principles of "forfeiture" in denying the employer the right to withhold benefits as the agreement provided by its terms. Labor-Management Relations Act, 1947 § 302(c), 29 U.S.C.A. § 186(c); Employee Retirement Income Security Act of 1974, § 3(1)(B), 29 U.S.C.A. § 1002(1)(B).

**[2] Labor and Employment 231H ⬅⟿576**

231H Labor and Employment
    231HVII Pension and Benefit Plans
        231HVII(H) Coverage and Benefits of Particular Types of Plans
            231Hk576 k. Severance Plans. Most Cited Cases
District court properly construed a letter agreement and release de novo without deferring to an employer's interpretation as the administrator of an ERISA plan from which the agreement arose, where the employer's challenged action did not involve a decision regarding whether to award benefits, but rather, compliance with the agreement detailing the provision of benefits. Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.

**[3] Interest 219 ⬅⟿56**

219 Interest
   219III Time and Computation
      219k56 k. Mode of Computation in General.
Most Cited Cases
Refusal to award prejudgment interest on the value of
stock options to which a former employee was found
to be entitled in an action challenging a denial of
severance benefits was not an abuse of discretion; the
court fashioned an award without prejudgment
interest after accounting for this variable and
considering the policies underlying such a decision,
and it could not be known when employee would
have liquidated the stock.

[4] Labor and Employment 231H ☞711

231H Labor and Employment
   231HVII Pension and Benefit Plans
      231HVII(K) Actions
         231HVII(K)7 Costs and Attorney Fees
            231Hk711 k. Factors Considered in
General. Most Cited Cases
Failure to comply with a local rule requiring
complete disclosure of all fee agreements in
applications for the allowance of counsel fees could
not be grounds for denial of an ERISA fee award,
exclusive of other considerations.    Employee
Retirement Income Security Act of 1974, § 2 et seq.,
29 U.S.C.A. § 1001 et seq.

*462 Appeal from the United States District Court
for the District of New Jersey. (D.C. Civil No. 99-
cv-05816).   District Judge: Honorable Katharine S.
Hayden.

Herbert J. Stern [Argued], Stern & Kilcullen,
Roseland, NJ, Anthony J. Laura, Reed Smith,
Newark, NJ, for Appellant/Cross-Appellee,
Automatic Data Processing.
Noel C. Crowley [Argued], Crowley & Crowley,
Morristown, NJ, for Appellees/Cross-Appellants,
Howard Koenig; Employeelife.com.

Before ROTH, RENDELL, and BARRY, Circuit
Judges.

OPINION OF THE COURT
RENDELL, Circuit Judge.
**1 Appellees Howard Koenig and
Employeelife.com ("EEL") FN1 brought this suit
against Appellant Automatic Data Processing
("ADP") alleging that ADP wrongfully denied
Koenig severance benefits due under a Letter
Agreement and Release ("Agreement") after Koenig

allegedly breached the Agreement. Appellees also
brought federal antitrust claims against ADP. After
determining that the Employee Retirement Income
Security Act ("ERISA") applied to the claims under
the Agreement, the District Court granted Appellees'
motion for summary judgment on these claims,
concluding that the breach of the Agreement by
Koenig was not material and did not justify the
forfeiture of all benefits. In subsequent opinions, the
District Court also (1) denied ADP's motion for
reargument on the ERISA claims; (2) granted ADP's
motion for judgment on the pleadings regarding the
antitrust claims and denied Appellees' motion to
amend the complaint; and (3) denied Koenig's
motions for attorneys' fees on the ERISA claims and
prejudgment interest on a stock option award, and
granted Koenig's motion for prejudgment interest on
a severance pay award. Both parties appealed.

        FN1. Since commencing this action, EEL
        has changed its name to "Benefit America."

**1 The District Court had subject matter jurisdiction
under 28 U.S.C. § 1331 and under 29 U.S.C. §
1132(e), and we have jurisdiction under 28 U.S.C. §
1291.   We will reverse the judgment entered by the
District Court and remand for further proceedings.

I.

**1 ADP hired Koenig in May 1996 as a Senior Vice
President of Operations Support for the Employer
Services Group, the largest of ADP's four major
groups.   In *463 April 1997, Koenig was promoted
to Corporate Vice President and became one of
ADP's top thirty officers in a work force of
approximately 37,000.   As an executive, Koenig had
access to the company's confidential and proprietary
information regarding, inter alia, current operations
and performance, new products and technology, and
strategic planning.

**1 In January, 1999, ADP decided to eliminate
Koenig's position.   Pursuant to ADP's published
Severance Pay Plan ("Plan"), the parties negotiated
and entered into the Agreement, which detailed the
terms and conditions upon which Koenig would
receive severance benefits.   The benefits provided in
the Agreement included, inter alia:   (1) monthly
severance payments from March 1, 1999 until
February 4, 2000, provided that if Koenig obtained
other employment during that time, he would receive
75% of the remaining payments in a lump sum,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 Fed.Appx. 461
156 Fed.Appx. 461, 2005 WL 2891740 (C.A.3 (N.J.)), 37 Employee Benefits Cas. 1254
**(Cite as: 156 Fed.Appx. 461)**

minus a continuing $1,000 monthly payment until February 4, 2000; (2) the right to exercise, within 15 days of the last monthly severance payment, stock options previously granted under two separate agreements dated August 11, 1995 and November 11, 1997 ("Stock Option Agreements"), with the shares offered in the former plan vesting on August 11, 1999 and the shares offered in the latter plan vesting on February 4, 2000; (3) the right to keep a number of shares obtained under two previous restricted stock agreements, with the vesting of restrictions on the first plan on June 26, 1999 and on the second plan on July 1, 1999; and (4) continued participation in ADP's pension plan, retirement and savings plan, and savings-stock purchase plan until February 4, 2000.

**\*\*2** In consideration for these benefits, **Koenig** undertook certain obligations under the Agreement, including: (1) a promise to maintain monthly contact with ADP regarding the status of his employment search and to contact ADP immediately upon obtaining other employment; (2) a renewed commitment to abide by non-disclosure, non-competition, non-solicitation, and non-hire provisions **Koenig** agreed to in the Stock Option Agreements; [FN2] (3) a promise not to disclose the terms of the **\*464** Agreement or any underlying agreements to anyone other than his attorney, accountant, or tax advisor; and (4) a promise not make any disparaging statements about ADP, its employees, or its products or services. The Agreement further provided that if **Koenig** breached any of its terms, "all monies to be paid by ADP under this Letter Agreement shall immediately cease, and ADP shall have, in addition to all other rights or remedies provided in law or in equity by reason of [the] breach, the right to the return of all monies paid pursuant to this Letter Agreement." Lastly, the Agreement provided that **Koenig** released all claims against ADP existing as of the date of the Agreement arising out of or related to his employment and termination thereof.

> FN2. The August 11, 1995 and November 11, 1997 Stock Option Agreements contained very similar provisions. In the November 1997 agreement, the "non-competition" clause provided, in relevant part, that for at least twelve months after his employment with ADP, **Koenig** would not "directly or indirectly, become or be interested in, employed by, or associated with in any capacity, any person, corporation, partnership or other entity whatsoever engaged in any aspect of ADP's

businesses or businesses ADP has formal plans to enter on the date [he] cease[s] to be an ADP employee, in a capacity which is the same or similar to any capacity in which [he] was involved during the last two years of ... employment by ADP." The "non-disclosure" clause provided, in relevant part, that during and after his employment, **Koenig** would not "use, or disclose to any Person any confidential information, trade secrets and proprietary information of ADP, its vendors, licensors, marketing partners or clients, learned by [him] during [his] employment and/or any of the names and addresses of clients of ADP." The "non-solicitation" clause provided, in relevant part, that during the non-competition period, **Koenig** would not, on his behalf or on behalf of another, "directly or indirectly, solicit, contact, call upon, communicate with or attempt to communicate with any Person which was a client or a bona fide prospective client of ADP before the Termination Date...." The "non-hire" clause provided in relevant part that during the non-competition period, **Koenig** would not "directly or indirectly, hire, contract with, solicit or encourage to leave ADP's employ any ADP employee, or hire or contract with any former ADP employee within one year after the date such person ceases to be an ADP employee." Both Stock Option Agreements also contained a choice of law clause providing that each was to be "governed by, and construed in accordance with, the laws of the State of New Jersey."

**\*\*2** Less than a month after he was terminated from ADP, **Koenig** accepted an offer of employment from SRA International, Inc. Although **Koenig** was on SRA's payroll from April 5, 1999 until August 15, 1999, he did not contact ADP regarding this employment. While employed at SRA, **Koenig** also accepted employment as the Chief Executive Officer of Pointment, Inc., starting on June 21, 1999. **Koenig** also did not contact ADP regarding this employment. In August 1999, Pointment announced in a press release that it was changing its name to EmployeeLife.com, Inc. ("EEL") and that **Koenig**, its CEO, had been previously employed by ADP. ADP did not learn of **Koenig's** employment with EEL until September 1999, when it discovered EEL's website and alleged that a number of the materials contained on the site had been developed by ADP. Shortly thereafter, ADP cut off **Koenig's** financial and stock

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

option entitlements under the Agreement in light of **Koenig's** alleged breach.

**\*\*2** On December 13, 1999, **Koenig** and EEL brought this action against ADP alleging: (1) Sherman Act violations under 15 U.S.C. §§ 1 and 2; (2) ERISA violations under 29 U.S.C. § 1132 for failure to pay severance benefits; and (3) breach of contract claims to the extent that the Agreement was not governed by ERISA. ADP counterclaimed against **Koenig**, alleging that he had breached his obligations under various agreements with ADP.

**\*\*2** Subsequent to the filing of this lawsuit, in a press release issued in January 2000, EEL disclosed certain terms of the Agreement and accused ADP of violating the law. Also several months after ADP had discontinued making severance payments to **Koenig**, two ADP employees contacted **Koenig** regarding possible employment with EEL. **Koenig** claims that he did not hire them, but instead referred them to EEL's President. Both employees were eventually hired by EEL, though one ultimately returned to ADP after he was offered a higher position and increased salary.

II.

**\*\*3** The District Court granted **Koenig's** motion for summary judgment on the ERISA claims. The Court determined that ERISA governed **Koenig's** claims because they arose out of the Agreement and the Agreement was entered into pursuant to the Plan, which was a welfare benefit plan under ERISA, 29 U.S.C. § 1002(3). *Koenig v. Automatic Data Processing*, No. 99-5816, slip op. at 23 (D.N.J. Apr. 3, 2002) ("April 3, 2002 Opinion"). The Court rejected ADP's argument that its action regarding **Koenig's** severance benefits was reviewable under an "arbitrary and capricious" standard, because ADP's action did not involve the discretionary award of benefits, but, rather, compliance with an agreement setting forth the terms of the severance benefits.

**\*\*3** Then, the Court applied New Jersey law in assessing the validity of ADP's and **Koenig's**\*465 claims under the Agreement and the Stock Option Agreements. The Court proceeded to analyze specific ways in which ADP claimed **Koenig** breached the agreements, and determined that, based upon standard principles of law or facts of record, **Koenig** had not breached either the non-compete or the non-hire provisions of the Stock Option Agreements, nor had he violated the confidentiality provision of the Agreement.^FN3

> FN3. Although in the Background section of its opinion the District Court labels ¶ 4 of the Stock Option Agreements the "Non-Hire Clause," *Koenig v. Automatic Data Processing*, No. 99-5816, slip op. at 5 (D.N.J. Apr. 3, 2002), in its Discussion, the Court refers to this provision as the "non-solicitation clause." *Id.* at 31. We adopt the District Court's original labels and refer to ¶ 4 of the Stock Option Agreements as the "non-hire provision" and ¶ 3 of the agreements as the "non-solicitation provision."

**\*\*3** The District Court then turned its attention to ADP's claim that **Koenig** failed to keep ADP apprised of his employment status or to provide written notice to ADP upon obtaining employment with SRA and Pointment, a breach of ¶ 6 of the Agreement. *Id.* at A35. The Court applied New Jersey contract law to "fill in gaps in ERISA," *id.* at 38, and concluded that ADP's "sweeping and absolute denial of all of **Koenig's** benefits in the stipulated damages clause [¶ 8(d) of the Agreement] d[id] not reasonably exact damages in relation to the breadth of **Koenig's** breach." *Id.* at 39. Because the Court found that the stipulated damages clause enabled ADP to cease all of its obligations and seek reimbursement for any benefits provided after any breach, regardless of its severity, the Court concluded that it was an invalid penalty clause. *Id.* at 40. Determining that **Koenig's** breach did not go to the essence of the contract and was not a material breach, the Court held ADP's total repudiation of its responsibilities and demand for reimbursement to be unreasonable. *Id.* at 40-41. The Court thus denied ADP's motion for summary judgment and granted summary judgment to **Koenig**, restoring to him the benefits already received, the remaining unpaid monthly severance benefits, and the value of remaining stock options. *Id.* at 41-42.

**\*\*3** Thereafter, in an Opinion and Order dated June 27, 2002, the District Court denied ADP's motion for reargument, reinforcing its previous ruling that a *de novo* standard of review was applicable in interpreting the Agreement, but also refusing to reconsider its application of New Jersey law to evaluate the non-competition provision. *Koenig v. Automatic Data Processing*, No. 99-5816, slip op. at 2 (D.N.J. Jun. 27, 2002) ("June 27, 2002 Opinion").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 Fed.Appx. 461
156 Fed.Appx. 461, 2005 WL 2891740 (C.A.3 (N.J.)), 37 Employee Benefits Cas. 1254
(Cite as: 156 Fed.Appx. 461)

**\*\*4** In a later Opinion and Order dated June 30, 2003, the District Court granted judgment on the pleadings to ADP on **Koenig's** antitrust claims, concluding that **Koenig** had not demonstrated: (1) antitrust injury (*i.e.,* injury to competition rather than competitors); (2) that ADP had engaged in illegal, concerted action; (3) an adequate description of the relevant market; or (4) that ADP attempted to monopolize a relevant market. *Koenig v. Automatic Data Processing,* No. 99-5816, slip op. at 4-11 (D.N.J. Jun. 30, 2003) ("June 30, 2003 Opinion"). The Court also denied **Koenig's** motion to amend the complaint.

**\*\*4** As a final matter, in an Order and Opinion dated February 25, 2004, the District Court denied **Koenig's** motion for an award of attorneys' fees under ERISA. The Court concluded that **Koenig** had failed to comply with <u>Local Civil Rule 54.2(b)</u>, which requires that "[a]pplications for the allowance of counsel fees shall include an affidavit describing all fee agreements and setting forth the amount billed to the client for fees and disbursements and the amount paid." **Koenig** did not \*466 adequately describe the fee agreement he had with EEL stating only that EEL "provisionally paid" all his attorneys' fees. *Koenig v. Automatic Data Processing,* No. 99-5816, slip op. at 2 (D.N.J. Feb. 25, 2004) ("February 25, 2004 Opinion").

**\*\*4** The parties press errors as to certain of the District Court's rulings. ADP urges that: (1) the District Court improperly applied New Jersey law and, as a result, improperly restored benefits to **Koenig** notwithstanding his clear breach of the Agreement, and (2) the District Court erred in applying a *de novo* standard rather than limiting its review of ADP's conduct to an "arbitrary and capricious" standard under ERISA. **Koenig** argues, on cross-appeal, that: (1) the District Court improperly dismissed ADP's antitrust complaint and denied leave to amend, (2) the District Court erred in denying prejudgment interest, and (3) the District Court erred in denying plaintiffs' application for counsel fees based on the violation of a local rule.

### III.

**\*\*4** "We exercise plenary review over summary judgment and we apply the same standard that the lower court should have applied." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir.2000). To affirm the grant of summary judgment, we must be convinced that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law when the facts are viewed in the light most favorable to the nonmoving party. <u>Fed.R.Civ.P. 56(c)</u>. We exercise plenary review over the District Court's grant of a motion for judgment on the pleadings under <u>Fed.R.Civ.P. 12(c)</u>. *Jablonski v. Pan Am. World Airways, Inc.,* 863 F.2d 289, 290 (3d Cir.1988). We review the District Court's denial of leave to amend a complaint for abuse of discretion. *Lorenz v. CSX Corp.,* 1 F.3d 1406, 1413 (3d Cir.1993).

### IV.

#### A. Appeal

*1. Application of State Law to ERISA Claims Regarding Breach of the Agreement*

**\*\*5** **[1]** In order to determine whether the District Court applied the correct legal principles, we must work our way through the nature of the ERISA claim at issue here. "ERISA recognizes two types of employee benefit plans: 'employee pension benefit plans,' and 'employee welfare benefit plans.' <u>29 U.S.C. § 1002(3) (1988)</u>. Severance pay plans are classified under the statute as welfare benefit plans. <u>29 U.S.C. §§ 186(c), 1002(1)(B)</u>." *Deibler v. Local Union 23,* 973 F.2d 206, 209 (3d Cir.1992). As we indicated in *Taylor v. Continental Group,* "[s]everance plans are often similar to employment contracts, whose interpretation requires determining the intent of both contracting parties." 933 F.2d 1227, 1232 (3d Cir.1991) (citing *Bruch v. Firestone Tire & Rubber Co.,* 828 F.2d 134, 145 (3d Cir.1987), *rev'd on other grounds,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). The severance plan before us has the trappings of a "top hat" plan, which is defined under ERISA as "a 'plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly trained employees.' <u>29 U.S.C. §§ 1051(2), 1081(a)(3), and 1101(a)(1)</u>." *Miller v. Eichleav Eng'rs, Inc.,* 886 F.2d 30, 34 (3d Cir.1989); *see also* <u>Goldstein v. Johnson & Johnson,</u> 251 F.3d 433, 442 (3d Cir.2001) ("[Top hat] plans are intended to compensate only highly-paid executives, and the Department of Labor has expressed the view that such employees are in a strong bargaining position relative to their employers and thus do not require the same substantive protections that are necessary for other employees.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

156 Fed.Appx. 461
156 Fed.Appx. 461, 2005 WL 2891740 (C.A.3 (N.J.)), 37 Employee Benefits Cas. 1254
**(Cite as: 156 Fed.Appx. 461)**

Page 6

We have held that \*467 such plans are more akin to unilateral contracts than to the trust-like structure normally found in ERISA plans.") (citations omitted). At least one federal appellate court has construed this definition broadly to cover a severance plan that included a contractual agreement that was individually negotiated between the employer and an employee in a relatively strong bargaining position and conferred benefits upon both parties. *See Duggan v. Hobbs, 99 F.3d 307 (9th Cir.1996)* (concluding that where a non-executive employee exerted influence over the design and operation of his severance agreement, through negotiations involving attorneys, to become the only employee ever to receive severance benefits, there was no reason not to broadly construe the agreement as a top hat plan, which is exempt from the trust-like provisions of ERISA and generally construed as a contract). Whether or not the plan at issue qualifies as a top hat plan, courts have determined that plans and agreements exhibiting these features are governed by ERISA and should be construed under the federal common law of contract. *See, e.g., Bock v. Computer Assocs. Int'l, Inc., 257 F.3d 700, 704 (7th Cir.2001)* (explaining that with respect to individual severance agreements that are contractual in form, confer benefits on both employer and employee, and are distinguishable from vested benefits under a pension plan, "[i]t has been uniformly held that general principles of contract law-under the federal common law that guides interpretation of ERISA plans-are to be applied to the interpretation of the language of such severance agreements") (citing *Anstett v. Eagle-Picher Indus., Inc., 203 F.3d 501, 503 (7th Cir.2000)* ("the claim for separation benefits [under this ERISA plan] is really a claim to enforce a contract") (citation omitted); *Grun v. Pneumo Abex Corp., 163 F.3d 411, 419 (7th Cir.1998)* ("we construe [the severance compensation agreement] in accordance with the federal common law under ERISA and general rules of contract interpretation"); *Collins v. Ralston Purina Co., 147 F.3d 592 (7th Cir.1998); Murphy v. Keystone Steel & Wire Co., 61 F.3d 560 (7th Cir.1995); Hickey v. A.E. Staley Mfg., 995 F.2d 1385 (7th Cir.1993); Taylor, 933 F.2d at 1232-33));* see also *In re New Valley Corp., 89 F.3d 143, 149 (3d Cir.1996)* ("Top hat plans are ... governed by general principles of federal common law. Here, that law is the federal common law of contract.") (citation omitted).

**\*\*6** Here, there is no doubt that ADP's Severance Pay Policy qualifies as a severance pay plan governed by ERISA. *29 U.S.C. § § 186(c), 1002(1)(B).* Further, the Agreement arising from the Plan was contractual

in form. It was negotiated by the parties, presumably at arm's length given **Koenig's** executive status, and it included an exchange of obligations and benefits between the parties. Consequently, it is clear from the above-cited cases that, regardless of whether or not the Agreement constitutes a top hat plan, it is to be construed under the federal common law of contract.

**\*\*6** Accordingly, ADP's argument that the District Court applied the wrong law in construing the Agreement is well taken. Although the District Court recognized that the Agreement was governed by "general contract principles," April 3, 2002 Opinion, at 24, the Court did not cite or apply federal common law in its discussion of whether **Koenig's** alleged breaches of the Agreement and whether any such breaches were "material." Instead, without explanation, the Court applied New Jersey law, citing opinions by the Supreme Court of New Jersey and federal courts construing New Jersey law in diversity cases, and adhered, specifically, to New Jersey law principles of "forfeiture" in denying\*468 ADP the right to withhold benefits as the Agreement provides by its terms. Moreover, the District Court failed to consider whether the issue of materiality is a fact issue under federal law and, therefore, not appropriate for summary judgment.

**\*\*6** It is true that if there is no established federal common law on a given issue, the Court may consult state law, including the law of the forum state, as a guide to fashioning a rule that is consistent with the policies underlying the federal statute in question. *See, e.g., Healsey v. Belden & Blake Corp., 2 F.3d 1249, 1257 n. 8 (3d Cir.1993)* ("*Firestone* authorizes the federal courts to develop federal common law to fill gaps left by ERISA. *489 U.S. at 110, 109 S.Ct. 948....* In developing federal common law, we can, of course, look to analogous state law rules, 'as long as [the] state law is consistent with the policies underlying the federal statute at issue.' ") (citing *Fox Valley & Vicinity Constr. Workers Pension Fund v. Brown, 897 F.2d 275 (7th Cir.)* (en banc), *cert. denied, 498 U.S. 820, 111 S.Ct. 67, 112 L.Ed.2d 41 (1990)*). However, the District Court's opinion does not set forth its reasoning, nor do we have assurance that New Jersey law should necessarily serve as a guide. Because we cannot be sure that the District Court would have arrived at the same conclusion if it had applied federal common law, or established an appropriate rule of federal law to govern in the absence of one, we will reverse the judgment and remand for the Court to interpret the Agreement under the federal common law in the first instance.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### 2. Standard of Review

**\*\*6** [2] ADP's argument that the District Court erred in construing the Agreement *de novo* without deferring to ADP's interpretation as the administrator of the plan is unavailing, as ADP's action did not involve a decision regarding whether to award benefits, but rather compliance with the Agreement detailing the provision of benefits. We find the District Court's conclusions on this point in its June 27, 2002 Opinion and Order denying ADP's motion for reargument to be sound. *See Taylor, supra;* June 27, 2002 Opinion, at 6.

### B. Cross-Appeal

#### 1. Antitrust Claims and Denial of Amendment to the Complaint

**\*\*7** **Koenig** cross-appeals from the District Court's grant of judgment on the pleadings to ADP on the antitrust claims and the denial of **Koenig's** motion to amend the complaint. However, we find the District Court's opinion of June 30, 2003 to adequately explain and fully support its order and we believe it unnecessary to offer additional explanations and reasons, as the District Court opinion was thorough and comprehensive. Therefore, essentially for the reasons set forth in the District Court's opinion, we will affirm the grant of judgment on the pleadings to ADP and the denial of **Koenig's** motion to amend the complaint.

#### 2. Prejudgment Interest

**\*\*7** [3] **Koenig** urges that the District Court should have awarded prejudgment interest on the value of his stock options. The District Court awarded **Koenig** a money judgment based on the value of the stock on the date he would have exercised the options, but declined to award prejudgment interest, reasoning that a determination of whether **Koenig** would have liquidated his stock on that date would be speculative and, further, ADP was not unjustly enriched by retaining shares of its own stock. **Koenig** urges that interest is necessary to make him whole. If on remand the District Court again awards **Koenig** relief, we will not disturb its decision, in its discretion, to deny prejudgment interest. *See* **\*469** *Taxman v. Board of Educ.,* 91 F.3d 1547, 1566 (3d Cir.1996) ("The matter of prejudgment interest is left to the discretion of the district court.") We understand the District Court's view that a remedy that would restore the stock option value as of the date of exercise necessarily involves some speculation as it cannot be known when **Koenig** would have liquidated the stock. Given this variable, calculating an award with "mathematical precision" is impossible, *Eazor Express, Inc. v. Int'l Bhd. of Teamsters,* 520 F.2d 951, 973 (3d Cir.1975), and we cannot say that the District Court abused its discretion in its decision to fashion an award without prejudgment interest after accounting for this variable and considering the policies underlying such a decision. *See Fotta v. Trs. of the UMW Health & Ret. Fund of 1974,* 165 F.3d 209, 212 (3d Cir.1998) (explaining that award of prejudgment interest is based on consideration of making the claimant whole and preventing unjust enrichment). Accordingly, we will not require that on remand the District Court modify this aspect of its ruling if **Koenig** is again successful.

### 3. Attorneys' Fees

**\*\*7** [4] **Koenig** also objects to the District Court's denial of attorneys' fees under ERISA based upon the New Jersey local rule requiring complete disclosure of all fee agreements in applications for the allowance of counsel fees. While the normal standard of review of fee determinations is abuse of discretion, we have announced a more exacting review of ERISA fee awards, given the need of the Court to analyze the factors we set forth in *Ursic v. Bethlehem Mines,* 719 F.2d 670, 673 (3d Cir.1983). *See, e.g., Anthuis v. Colt Indus. Operating Corp.,* 971 F.2d 999, 1012 (3d Cir.1992) (explaining that in reviewing a District Court's decision regarding the award of counsel fees in an ERISA case "we must require that, in each instance in which the district court exercises its fee-setting discretion, it must articulate its considerations, its analysis, its reasons and its conclusions touching on each of the five factors delineated in *Ursic"* ). Here, the District Court super-imposed a local rule onto the otherwise federally mandated analysis, and did not engage in the latter inquiry. While we recognize the right of local courts to monitor fee arrangements as between attorneys and clients, we do not find this policy to be sufficient to overcome the policy for awarding fees as a matter of federal law under a statutory scheme such as ERISA. While the Court should no doubt enforce compliance with such local rules, we conclude that failure to comply should not be grounds for denial,

156 Fed.Appx. 461                                                                                                    Page 8
156 Fed.Appx. 461, 2005 WL 2891740 (C.A.3 (N.J.)), 37 Employee Benefits Cas. 1254
**(Cite as: 156 Fed.Appx. 461)**

exclusive of other considerations.

**\*\*8** On remand, should the Court again grant underlying relief to **Koenig**, the issue of the award of fees under ERISA according to the standards laid out in *Ursic* should be reconsidered, with the Court free to mandate compliance with the disclosures required by the local rule as a further condition to that award. Accordingly, we will vacate that aspect of the Court's order and remand for further consideration.


## V.

**\*\*8** For the reasons stated above, we will AFFIRM the grant of judgment on the pleadings to ADP on the antitrust claims and the denial of **Koenig's** motion to amend the complaint, we will REVERSE the grant of summary judgment to **Koenig** on the ERISA claims, the denial of **Koenig's** motion for prejudgment interest on the stock options award, and the denial of **Koenig's** motion for attorneys' fees, and we will REMAND for further proceedings consistent with this opinion.

C.A.3 (N.J.),2005.
Koenig v. Automatic Data Processing
156 Fed.Appx. 461, 2005 WL 2891740 (C.A.3 (N.J.)), 37 Employee Benefits Cas. 1254

Briefs and Other Related Documents (Back to top)

• 2005 WL 4814517 (Appellate Brief) Fourth Step Reply Brief of Plaintiffs Howard Koenig and Employeelife.com, Appellees in Nos. 03-3112 and 04-1826, Cross-Appellants in Nos. 03-3231 and 04-1827, in Support of Their Cross-Appeal (May 31, 2005)
• 2005 WL 4814516 (Appellate Brief) Principal Brief of Plaintiffs Howard Koenig and Employeelife.com, Appellees in Nos. 03-3112 and 04-1826, Cross-Appellants in Nos. 03-3231 and 04-1827 (Mar. 7, 2005)
• 2004 WL 4996745 (Appellate Brief) Principal Brief and Appendix Volume I of III (Pages A1-A89) on Behalf of Automatic Data Processing, Appellant in Nos. 03-3112 and 04-1826 and Cross-Appellee in Nos. 03-3231 and 04-1827 (Dec. 27, 2004)
• 04-1826 (Docket) (Mar. 30, 2004)
• 04-1827 (Docket) (Mar. 30, 2004)
• 03-3231 (Docket) (Jul. 31, 2003)
• 03-3112 (Docket) (Jul. 23, 2003)


END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 23



2006 WL 2838374 (Minn.App.)                                    Page 1
**(Cite as: 2006 WL 2838374)**

For Opinion See 720 N.W.2d 15

Briefs and Other Related Documents

Court of Appeals of Minnesota.
Diane LORIX, individually and on behalf of all others similarly situated, Appellant,
v.
CROMPTON CORPORATION, Uniroyal Chemical Company, Inc. Uniroyal Chemical Company
Limited, and Bayer Corporation, Respondents.
No. A05-2148.
January 30, 2006.

Appellant's Reply Brief and Supplemental Appendix
Garrett D. Blanchfield, Jr. (#209855), Reinhardt Wendorf & Blanchfield, E-1250 First
National Bank Bldg., 332 Minnesota Street, St. Paul, Minnesota 55101, Tel: (651)
287-2100, Fax: (651) 287-2103.Bonny E. Sweeney, Alreen Haeggquist, Lerach,
Couglinstoia, Geller, Rudman & Robbins, LLP, 655 West Broadway, Suite 1900, San
Diego, CA 92101, Tel: (619) 231-1058, Fax: (612) 231-7423, Attorneys for Appellant
Diane Lorix.Michael J. Flannery, James J. Rosemergy, Carey & Danis, LLC, 8235
Forsyth Boulevard, Suite 1100, St. Louis, MO 63105, Tel: (314) 725-7700, Fax: (314)
725-0905.Brian J. Robbins, Jeffrey P. Fink, Robbins Umeda & Fink, LLP, 1010 Second
Avenue, Suite 2360, San Diego, CA 92101, Tel: (619) 525-3990, Fax: (619) 525-3991,
Additional Counsel for Appellant.Michael A. Lindsay, Dorsey & Whitney, LLP, Suite
1500, 50 South Sixth Street, Minneapolis, MN 55402-1498, Tel: (612) 340-7819, Fax:
(612) 340-2868.Ian Simmons, Benjamin G. Bradshaw, O'Melveny & Myers LLP, 1625 Eye
St., N.W., Washington, D.C. 20006, Tel: (202) 383-5300, Fax: (202) 383-5414,
Attorneys for Respondents Crompton, Corporation, Uniroyal Chemical Company, Inc. and
Uniroyal Chemical Company Limited.James S. Simonson, Gray Plant Mooty, Mooty &
Bennett PA, 500 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402-3796, Tel:
(612) 632-3300, Fax: (612) 333-0066.William V. O'Reilly, J. Andrew Read, Jones Day,
51 Louisiana Avenue, NW, Washington, D.C. 20001-2113, Tel: (202) 879-3939, Fax:
(202) 626-1700, Counsel for Respondent Bayer Corporation.

*i *TABLE OF CONTENTS*

TABLE OF AUTHORITIES ... ii

I. Numerous Courts Have Rejected Respondents' Cases and Found That Purchasers of
Incorporated Products Have Standing to Sue For Damages Suffered As A Result Of
Respondents' Conspiracy to Fix Prices ... 1

 A. Many States Have Granted Standing to Purchasers of Products with Price-Fixed
Components ... 1

 B. Respondents' North Carolina and *EPDM* Cases Are Inapposite ... 6

 C. Respondents' *Visa* Cases are Inapposite ... 9

II. *Associated General Contractors* Is Inapposite To This Indirect Purchaser Action
... 11

 A. Neither the Trial Court, Nor Respondents, Explain How *A. G. C.,* Which Was
Created by Federal Courts to Determine Standing Under Federal Law, Can Be Harmonized
with Minnesota Law ... 11

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2838374 (Minn.App.)                                    Page 2
(Cite as: 2006 WL 2838374)

  B. *A.G.C.* Should Not Be Applied to Indirect Purchaser Cases ... 13

III. Even *if Associated General Contractors* Is Applicable, Ms. Lorix's Injuries, Suffered as a Direct Result of Respondents' Conspiracy, Are Sufficient To Grant Standing ... 15

  A. Respondents Acknowledge that a Purchaser Need Not be a Consumer or Competitor in the Restrained Market ... 15

  B. Ms. Lorix's Damages Claims are Not Speculative, Duplicative Nor Complex ... 19

IV. Legislative History Establishes that <u>Minn. Stat. § 325D.57</u> Provides Standing To Plaintiff ... 22

V. *Philip Morris and Gordon v. Microsoft* Demonstrate That Ms. Lorix Has Standing ... 24

VI. Conclusion ... 26

                     *ii TABLE OF AUTHORITIES


FEDERAL CASES

<u>Associated General Contractors of Cal., Inc. v. Cal. State Council of Carpenters,</u>
<u>459 U.S. 519 (1983)</u> ... passim

<u>Blue Shield of Virginia v. McCready, 457 U.S. 465 (1982)</u> ... 25

<u>Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977)</u> ... 17

<u>General Ind's. v. Hartz Mountain Corp., 810 F.2d 795 (8th Cir. 1987)</u> ... 15

<u>Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977)</u> ... 6, 24

<u>Lovett v. General Motors, 975 F.2d 518 (8th Cir. 1992)</u> ... 21

<u>McDonald v. Johnson & Johnson, 722 F.2d 1370 (8th Cir. 1983)</u> ... 15, 21

<u>S.D. Collectibles, Inc. v. Plough, 952 F.2d 211 (8th Cir. 1991)</u> ... 21

*South Dakota v. Kansas City S. Ind., 880 F.3d 40 (8th Cir. 1989)* ... 21

STATE CASES

<u>Arthur v. Microsoft, 676 N.W.2d 29 (Minn. 2004)</u> ... 13

<u>B.W.I. Custom Kitchen v. Owens-Illinois, 191 Cal. App. 3d 1341 (1987)</u> ... 19

*iii <u>Bunker's Glass Co. v. Pilkington PLC, 75 P.3d 99 (Ariz. 2003)</u> ... 12

<u>Fucile v. Visa U.S.A. Inc., No. S1560-03 CNC, 2004 WL 3030037 (Vt. Super. Ct. Dec.</u>
<u>27, 2004)</u> ... 9, 11, 16, 19

<u>Comes v. Microsoft, 696 N.W.2d 318 (Iowa 2005)</u> ... 3, 5, 12

<u>Crouch v. Crompton Corp., No. 02-cv5-4375,2004 WL. 2414027 (N.C. Super. Ct. Oct. 28,</u>
<u>2004)</u> ... 6, 7, 8, 10,14,20

<u>Forcier v. State Farm Mutual Automobile Insurance Co., 310 N.W.2d 124 (Minn. 1981)</u>
... 19

<u>Freeman Industries v. Eastman Chemical, 172 S.W.2d 512 (2005)</u> ... 2, 19

               ©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Gordon v. Microsoft, No. MC 00-5994, 2003 WL. 23105552 (Minn. Dist. Ct. March 14, 2003)* ... 4, 5, 25

*Gutzwiller v. Visa U.S.A. Inc., No. C4-04058,2004 WL. 2114991 (Minn. Dist. Ct. Sept. 15, 2004)* ... 9, 10, 13, 19

*Ho v. Visa U.S.A. Inc., No. 112316/00,2004 WL. 1118534 (N.Y. Sup. Ct. Apr. 21, 2004)* ... 9, 17

*Holder v. Archer Daniels Midland Co., No. 96-2975, 1998 WL. 1469620 (D.C. Super. Nov. 4, 1998)* ... 2, 3, 24

*Humphrey v. Philip Morris, No. C1-94-8565 1995 WL. 1937124 (Minn. Dist. Ct. May 19,1995)* ... 12, 22

*Hyde v. Abbott Laboratories, Inc., 473 S.E.2d 680 (N.C. Ct. App. 1996)* ... 7

*Knowles v. Visa U.S.A. Inc., Civ. A. Cv-03-707, 2004 WL. 2475284 (Me. Super. Ct. Oct. 20,2004)* ... 9, 10, *iv 13, 16, 17,19

*Luscher v. Bayer A.G., No. CV 2004-014835 (Arizona Super. Court, September 14,2005)* ... 8, 9, 17, 19

*Smith v. Visa U.S.A. Inc., No. C0-04-2096, 2005 WL. 1936336 (Minn. Dist. Ct. July 12, 2005)* ... 9

*Southard v. Visa U.S.A. Inc., LACV 031729, 2004 WL. 3030028 (Iowa Dist. Ct. Nov. 17, 2004)* ... 9, 11, 14, 17, 18

*State by Humphrey v. Philip Morris, Inc., 551 N.W.2d 490 (Minn. 1996)* ... 1, 22, 24, 25

*Tremco Inc. v. Holman, No. C8-96-2139, 1997 WL. 423575 (Minn. Ct. App. July 29, 1997)* ... 12, 17

*Weaver v. Cabot Corp., No. 03 CV5 04760,2004 WL 3406119 (N.C. Super. Ct. March 26,2004)* ... 6

DOCKETED CASES

*Bellinder v. Microsoft Corp., No. 00-C-0855,2001 1397995 (Kan. Dist. Ct. Sept. 7, 2001)* ... 25

*Investors Corp. of Vermont v. Bayer A.G., Case No. 51011-04* ... 2, 6, 11, 17, 19, 21

*Muzzey Corp. v. Avery Dennison., Case No. C1 05-126 (Bluff County Neb. Dist. Ct. Jan. 17, 2006)* ... 4

STATE STATUTES

Minn. Stat. ¶ 325D.57 ... 1, 5, 21

Minn. Stat. § 325D.57 ... 7, 22, 23

*1 Respondents' Brief presents an inaccurate view of jurisprudence concerning standing in indirect purchaser litigation. In Respondents' theorized world, Minnesota consumers who purchase a product whose price has been artificially increased because it contains a price-fixed product cannot sue for their injuries, even though Minn. Stat. ¶ 325D.57 specifically grants standing to "any person ... injured directly or indirectly." Despite Respondents' draconian view, courts in many jurisdictions have conferred standing in cases strikingly similar to the this one. These courts have rejected the application of *Associated General Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 59 U.S. 519 (1983) ("*A.G.C.*") or applied *A.G.C.* and found that a purchaser who paid more because an ingredient was

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

price-fixed has standing.

These results are consistent with the goals of Minnesota's antitrust laws: to provide a broad, expansive remedy to those injured by "sharp commercial practices." *State by Humphrey v. Philip Morris, Inc.,* 551 N.W.2d 490,497 (Minn. 1996). Defendant's cases are inconsistent with these goals and should be rejected.

I. NUMEROUS COURTS HAVE REJECTED RESPONDENTS' CASES AND FOUND THAT PURCHASERS OF INCORPORATED PRODUCTS HAVE STANDING TO SUE FOR DAMAGES SUFFERED AS A RESULT OF RESPONDENTS' CONSPIRACY TO FIX PRICES

A. Many States Have Granted Standing to Purchasers of Products with Price-Fixed Components

The issue before this Court is not unique. In the last few years, numerous state courts have analyzed the standing of a purchaser who pays too much for a product because it contains a price-fixed product. These courts have recognized that consumers *2 are the ultimate victim, and deserve the opportunity to prove their case and be made whole. *See, e.g., Freeman Industries v. Eastman Chem., 172 S.W.2d 512, 520 (2005); Investors Corp. of Vermont v. Bayer A.G.,* Case No. 51011-04 CnC (Chittenden Cnty, Vt. Super. Ct., June 1, 2005); *Holder v. Archer Daniels Midland Co., No. 96-2975, 1998 WL 1469620 (D.C. Super. Nov. 4, 1998); Anderson Contracting Inc. v. Bayer,* Case No. CL 95959 (Ia. Dist. Ct. May 31, 2005).

In *Investors Corp.* the court held that plaintiff had standing where he was an indirect purchaser of a synthetic rubber known as EPDM, which was incorporated into a variety of products purchased by the plaintiff. The *Investors Corp.* court applied the same *A.G.C.* analysis as the trial court in this matter, but reached a different conclusion. Unlike the trial court, the *Investors Corp.* court held there was a "causal connection" between the conspiracy and the harm. *Id.* Order at 3, and refused to draw inferences in favor of Defendants.[FN1] The rationale of *Investors Corp.* is more consistent with the principles of *A.G.C.,* and the plaintiff in that matter stands in the same shoes as Ms. Lorix. Thus, even if *A.G.C.* is determined to be applicable to this matter, Ms. Lorix should be granted standing.

FN1. Thus, the court held that even if other inputs could affect price, and even if the price-fixed product is a small fraction of the finished product, these issues are "far afield" in a 12(b)6 analysis. *Id.* (Order at 4.)

In *Anderson Contracting,* an Iowa district court analyzed standing for a plaintiff who bought various products that contained EPDM, whose price was artificially *3 increased. (App. 98.) Rejecting the defendants' arguments, many of which are duplicated in the present action, the *Anderson Contracting* court held:
The amount of EPDM in the products purchased by plaintiff is not at issue. Nor is the fact that plaintiff did not purchase EPDM itself at issue....if defendants conspired to fix the prices of EPDM, such price fixing would undoubtedly have an effect on the price of the products purchased by plaintiff. Accordingly, this court rejects defendants' 'remoteness' argument because the occurrence of any price fixing by defendants would likely impact plaintiffs purchase of products containing EPDM. The cost of the whole bears some relation to the cost of the ingredients or parts. The fact that EPDM was merely one of several ingredients in the products plaintiff purchased does not lead to the conclusion that plaintiff is not an indirect purchaser of EPDM.

(Resp. App., 15.) Respondents also raise the spectre of damages being unmanageable. The *Anderson Contracting* court quickly disposed of this argument. "Antitrust cases are commonly complex, but the potential for complex litigation is not a sufficient reason to find that indirect purchasers are barred from bringing suit under the Iowa competition law." (Resp. App., 16.)

Respondents attempt to distinguish *Anderson Contracting* by quarreling with its basis

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for rejecting *A.G.C.* (Resp. Brief, 26 n. 8.) However, as discussed above, *Anderson Contracting* contains a broad analysis that is analogous to the instant matter. Furthermore, *A.G.C.* had already been distinguished in Iowa by *Comes, 696 N.W.2d 318 (Iowa 2005)* so Respondents' passage has minimal relevance.

Many other courts have likewise rejected these same arguments against standing for indirect purchasers. *See, Holder, 1998 WL 1469620* (alleging that a conspiracy to fix the price of sorbates, raised prices of many grocery items), *Box Butte Cty. Sch. Dist. No. *4 6, v. Bayer A.G.,* Case No. CI04-270 (Butte County, Neb. Dist. Ct. Jan. 9, 2006) (alleging that a conspiracy to fix the price of EPDM, raised the prices of all products containing EPDM); *Muzzey Corp. v. Avery Dennison.,* Case No. Cl 05-126 (Bluff County Neb. Dist. Ct. Jan. 17, 2006) (App. 127) (alleging that an increase in the price of labelstock - which is used to make labels that appear on other products, or are sold to consumers to use in printers - raised the price all products containing labelstock), *Poole v. Rohm & Haas Co.,* Case No. CI 05-21 (Morrill County, Neb. Dist. Ct. Jan. 9,2006) (App. 135)(alleging a conspiracy in the "plastic additives" market which are used in plastics much as rubber chemicals are used in the manufacture of tires), and *Poole v. Bayer A.G.,* Case No. CI 05-20 (Morrill County, Neb. Dist. Ct. Jan. 9, 2006) (App. 132) (alleging a conspiracy in the NBR market (nitrobutadiene rubber), used in the manufacture of rubber products). Collectively, these cases demonstrate that many states actively protect indirect consumers who are the real injured parties in a price fixing conspiracy.

Minnesota courts have also certified classes involving incorporated products. *See, Gordon v. Microsoft, No. MC 00-5994, 2003 WL 23105552, at * 1 (Minn. Dist. Ct. March 14, 2003)* (certifying class of persons who "indirectly acquired... any version of the following software ... or *any other software product in which MS-DOS or Windows has been incorporated in whole or in part...*") (emphasis added).

Respondents contend that a party like the plaintiff, who purchases a product whose price was increased because it contained price-fixed components is not an indirect purchaser. However, the Iowa Supreme Court, in a recent decision concerning *5 certification of an indirect purchaser class, stated that indirect purchasers are "parties to whom [defendant] did not directly sell its products, but who ultimately obtained the products through the stream of commerce." *Comes, 696 N.W.2d at 320.* This definition is consistent with the language of *Minn. Stat. § 325D.57,* the remedial policies and legislative history underlying the statute, and opinions such as *Gordon, 2003 WL 23105552,* construing the Minnesota statute.

Finally, Respondents allege Ms. Lorix has no standing because rubber processing chemicals are not identifiable components of tires, have no independent economic value, and cannot be bought separately by consumers. The significance of Respondents' contentions is unclear. First, Respondents fail to offer support for these factual allegations.[FN2] Second, these arguments have been rejected by other courts. *See, e.g., Anderson Contracting,* CL 95959 at 15 (App. 111.) ("Defendants also maintain that Plaintiff did not purchase EPDM, but rather purchased products containing EPDM, as one of several ingredients; therefore, the products did not arrive in Plaintiff's possession unchanged from when it left Defendants' control..... This Court disagrees with Defendants' argument. The amount of EPDM in the products purchased by Plaintiff is *6 not at issue, nor is the fact that Plaintiff did not purchase EPDM itself at issue.").[FN3] *See also, Investors Corp.,* Case No. 51011-04 CnC at 3-4.

   FN2. These allegations are certainly not supported by the Complaint.

   FN3. Justice Brennan, in his dissent to *Illinois Brick,* stated that the amount of increase in price due to an ingredient being price-fixed "is a factual matter to be determined based on the strength of plaintiffs evidence." *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 759 (1977).

Even if Respondents' contention was true, Respondents fail to explain its relevance. Regardless of whether rubber processing chemicals are incorporated into the final product, or can somehow be teased out of it, the ultimate fact is that Respondents'

                © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2838374 (Minn.App.)                                    Page 6
(Cite as: 2006 WL 2838374)

conspiracy to fix the price of chemicals directly resulted in Ms. Lorix paying more
for her tires. *See, e.g., Anderson Contracting,* CL 95959 at 15 (App. 111).

                B. Respondents' North Carolina and *EPDM* Cases Are Inapposite

Respondents argue that numerous state courts have dismissed indirect purchaser
cases, and therefore, this Court should simply follow in lock step. (Resp. Brief, at
24-28.) Of course, this issue should not be decided by totaling up cases "for" and
"against" as if this were a scorecard. Rather, the cases proffered by Respondents
must each be examined to determine what, if any, value they can add to the analysis.

In support of its position that a plaintiff cannot be a purchaser of an incorporated
product, Respondents cite to two North Carolina cases, *Crouch v. Crompton Corp.,* No.
02-cv5-4375, 2004 WL 2414027 (N.C. Super. Ct. Oct. 28, 2004), and *Weaver v. Cabot
Corp.,* No. 03 CV5 04760,2004 WL 3406119 (N.C. Super. Ct. March 26,2004). (Resp.
Brief at 16.) These cases are distinguishable. North Carolina does not have a
statute *7 analogous to Minn. Stat. § 325D.57. In fact, North Carolina courts were
required to make their state antitrust law consistent with the federal laws,
including standing. *Crouch,* 2004 WL 2414027 at * 12. Furthermore, the *Crouch* court
held that state antitrust statutes "should be narrowly construed," *Id.* at *28,
whereas Minnesota's antitrust statute is remedial and must be broadly interpreted.
Thus, the *Crouch* court began its analysis from a much narrower standpoint.

In North Carolina, indirect purchaser standing is a judicial doctrine. The case that
created that standing - *Hyde v. Abbott Laboratories, Inc.,* 473 S.E.2d 680 (N.C. Ct.
App. 1996) - was relied upon by the *Crouch* court. However, the *Crouch* court took an
unduly restrictive view of *Hyde.* In *Hyde,* the court found that indirect purchasers
of baby food had standing to sue the manufacturers. It appears that the *Crouch* court
interpreted *Hyde* to *require* plaintiff to be a consumer or competitor in the
allegedly restrained market, *Crouch,* 2004 WL 2414027 at *11-12, although *Hyde* itself
does not say that. Thus, *Crouch* and *Weaver* can be distinguished on two bases: First,
the relevant law in North Carolina is based upon an extremely narrow basis; and
secondly, *Crouch* (and *Weaver*[FN4], *8 which is primarily a copy of *Crouch*) is based
upon a single court's interpretation of a single opinion. As such, it should be
given no weight here in Minnesota.[FN5]

          FN4. The *Weaver* opinion is largely devoid of analysis, citing only one case
          and obviously parroting *Crouch.* More importantly, the *Weaver* court believed
          that any plaintiff who bought a product into which a price-fixed product was
          incorporated, could not have standing because it would put the court "in an
          impossible position" of attempting to determine the amount of the price
          increase in the finished product. As discussed above and in Appellant's
          initial brief at 26-29, this narrow view of standing has been squarely
          repudiated by courts, and leading economic commentators.

          FN5. Furthermore, the *Crouch* court's concerns regarding its ability to
          determine damages has been squarely rejected by other state courts who have
          considered this same issue.

The final case cited by Respondents is *Luscher v. Bayer A.G.,* No. CV 2004-014835
(Arizona Super. Court, September 14,2005). In *Luscher,* a plaintiff brought suit
against the manufacturers of EPDM. Unlike the present case, *Luscher* did not limit
its action to a particular end product. (Respondents App., 99), whereas Ms. Lorix
seeks damages based on purchases of a single product. Without analysis, the *Luscher*
court adopted the *AGC* test - but made findings that actually support Ms. Lorix.
*Luscher* held that there was a connection between the alleged conspiracy and
plaintiff's injury; specifically, that plaintiff paid more than he would have in the
absence of the conspiracy. *Luscher,* CV 2004-014835 at 2 (Resp. App., 100.). The
*Luscher* court also found that the increased price for goods paid by the plaintiff is
the type of damage sought to be redressed by the antitrust laws. *Id.* at 3 (Resp.
App., 101.) Strangely, however, *Luscher* then concludes that the "ultimate consumer
continues to enjoy the benefits of the competitive market for his various
purchases." *Id.* (Resp. App., 101.) This statement is inconsistent with the court's

                © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2838374 (Minn.App.)                                    Page 7
(Cite as: 2006 WL 2838374)

previous statement that the plaintiff paid more for products than he would have in
the absence of the conspiracy.

Finally, other courts, confronting the *same conspiracy* as alleged in *Luscher,* have
found that plaintiffs have standing as a result of defendants' price-fixing of EPDM.
*9 *Anderson Contracting,* No. CL 95959 and *Box Butte County School District No. 6 v.
Bayer A.G,* No. CI 04-270. Therefore, *Luscher* provides no persuasive value here.

                    C. Respondents' *Visa* Cases are Inapposite

Respondents and the trial court rely on the *Visa* cases[FN6] to support many of their
contentions. In the *Visa* cases, plaintiffs sued Visa in a number of states, alleging
that Visa forced an illegal arrangement upon merchants by "tying" acceptance of its
debit card to acceptance of its credit cards. As a result, plaintiffs alleged that
prices were artificially inflated for every good sold in the state.

> FN6. *Gutzwiller v. Visa U.S.A. Inc.,* No. C4-04058, 2004 WL 2114991 (Minn.
> Dist. Ct. Spet. 15, 2004); *Ho v. Visa U.S.A. Inc.,* No. 112316/00,2004 WL
> 1118534 (N.Y. Sup. Ct. Apr. 21, 2004); *Fucile v. Visa U.S.A. Inc.,* No. S1560-
> 03 CNC, 2004 WL 3030037 (Vt. Super. Ct. Dec. 27,2004); *Knowles v. Visa U.S.A.
> Inc.,* Civ. A. Cv-03-707,2004 WL 2475284 (Me. Super. Ct. Oct. 20,2004); *Smith
> v. Visa U.S.A. Inc.,* No. C0-04-2096,2005 WL 1936336 (Minn. Dist. Ct. July
> 12,2005); *Southard v. Visa U.S.A. Inc.,* LACV 031729, 2004 WL 3030028 (Iowa
> Dist. Ct. Nov. 17, 2004).

The *Visa* cases are factually distinct from the instant matter. The tying arrangement
alleged in those cases allegedly increased the price of *every good* sold in that
state, regardless of whether it was purchased with cash or credit. Thus, as *Visa*
courts noted, the plaintiffs *never purchased* the alleged affected products. *See,
e.g., Southard v. Visa U.S.A. Inc.,* No. LACV 031729,2004 WL 3030028 at *3 (Iowa
Dist. Ct. Nov. 17, 2004) (plaintiffs are not "indirect purchasers," they are
"derivative," because they did not "end up" with a product that defendant
supplied.)[FN7]

> FN7. Ms. Lorix, on the other hand, did "end up" with a product supplied by
> Respondents.

*10 Furthermore, the nature of this "derivative" tying arrangement means that
damages are far more complex than in the instant case. Ms. Lorix alleges that the
price of one product - tires - was increased as a result of the conspiracy; the *Visa*
plaintiffs alleged the price of *every product* was increased. Damages in tying cases
"present unique damages issues" and "it is difficult to imagine a more complex
damage case. Plaintiffs [Visa] case would require an analysis of pricing of
virtually every product sold at retail in North Carolina." *Crouch,* 2004 WL 2414027,
at ** 26-27. Furthermore, tying damages would "depend upon the specific elasticity
of demand for... essentially every product of any kind sold to anyone in the State."
*Knowles,* WL 2475284, at *6. As a result, the *Knowles* court found that damages would
be too complex. *Id.* However, the court recognized that "this might be a manageable
inquiry if only one product were involved." *Id.*[FN8]

> FN8. Respondents may argue that because there are different types of tires,
> there will similarly be different elasticities of demand. Plaintiff
> respectfully suggests that such assumptions are unsupported and irrelevant to
> the resolution of a Rule 12 motion.

In the *Visa* cases, the plaintiffs were unable to demonstrate that the restrained
market "contributes in any way to the research, manufacture, production,
distribution or advertising of the consumer goods for which Plaintiff contends he
paid inflated prices." *Gutzwiller v. Visa US.A., Inc.,* No. C4-04058, 2004 WL
2114991, at *7 (Minn. Dist. Ct. Sept. 15, 2004). Ms. Lorix, by contrast, has alleged
that the rubber chemicals were used in the manufacture and production of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

consumer goods for which she paid an inflated price. (App. 2, ¶ 3, App. 9, ¶ 35.)

**\*11** This distinction has been noted by other courts. For example, in *Investors Corp.*, the court specifically analyzed <u>Fucile, 2004 WL 030237,</u> and concluded that indirect purchasers, who, like Ms. Lorix, purchased a product that was incorporated into consumer goods, "stand[] in a different posture than *Fucile.* "Financial Services [which were the basis of the *Visa* antitrust conspiracy] by contrast, are not components of common consumer goods, except, perhaps, in an extraordinary abstract sense." *Investors Corp.,* at 3. Similarly, the *Southard* court noted that plaintiffs were not indirect purchasers because they did not end up with a product supplied by the defendants. <u>Southard, 2004 WL 3030028,</u> at*3. Therefore, the *Visa* cases are not relevant to this appeal.

    II. *ASSOCIATED GENERAL CONTRACTORS* IS INAPPOSITE TO THIS INDIRECT PURCHASER ACTION

It is clear that *A.G.C.* is inapposite to this matter. Courts have declined to apply *A.G.C.* for two reasons: first, because it cannot be harmonized with state antitrust laws, and second, because it is easily distinguished. Both of these rationales are applicable in this matter.

A. Neither the Trial Court, Nor Respondents, Explain How *A. G. C.,* Which Was Created
   by Federal Courts to Determine Standing under Federal Law, Can Be Harmonized with
                                    Minnesota Law

The parties do not dispute that federal and state law can only be "harmonized" where the state and federal laws do not differ. But on the issue of indirect purchaser standing, as Respondents' own cases recognize, federal and state law are entirely **\*12** different. *See,* <u>Tremco Inc. v. Holman,</u> No. C8-96-2139, 1997 WL 423575, at \*2 <u>(Minn. Ct. App. July 29, 1997).</u> Thus, harmonization is inapplicable here.

Nor do Respondents explain why the concept of harmonization, which attempts to harmonize *substantive* areas of law, should have any applicability to *a procedural* issue such as standing. The Associate Attorney General of Minnesota, in response to questions from a Senate subcommittee regarding amendments to Minnesota statutes to allow indirect purchasers to sue, stressed that "with respect to violations there [sic] should be uniformity because it's very important that businesses persons in the marketplace understand what violations are and what aren't violations. *But here we're talking about a procedural problem.*"[FN9] (Resp. App., 131) (emphasis added). This distinction has been recognized by Minnesota courts. *See, e.g.,* <u>Humphrey v. Philip Morris,</u> No. C 1-94-8565 1995 WL 1937124, at \*3 (Minn. Dist. Ct. May 19, 1995) ("Although federal precedent is relevant in determining application of antitrust remedies, the Minnesota statute has broadened the scope of those who may seek recovery.") *See also, Comes,* 696 N.W.2d at 446.

> FN9. Appellant elsewhere argues that Respondents' submission of the
> Subcommittee transcript is outside the pleadings. *See, supra at* Sec. V.
> Appellant does not waive this argument, but instead, submits it subject to the
> Court's determination of whether to consider the transcript.

Significantly, no case that has thoroughly considered whether *A.G.C* can be harmonized with state indirect purchaser statutes has subsequently applied *A.G.C. See, Comes,* 696 N.W.2d at 446-47; **\*13**<u>Bunker's Glass Co. v. Pilkington PLC,</u> 75 P.3d 99 (Ariz. 2003); <u>Arthur v. Microsoft, 676 N.W.2d 29, 35 (Minn. 2004);</u> *Anderson Contracting,* No. CL 95959, at 14 (Polk County, Iowa Dist. Ct. may 31, 2005) ("Defendants' reliance on *Associated General Contractors* is misplaced, and the facts are distinguishable from the facts of the present [indirect purchaser] case.") There is no substantive basis for Minnesota to supplant its own law for that of a federal direct purchaser case.

                B. *A.G.C.* Should Not be Applied to Indirect Purchaser Cases

The test set forth in *A.G.C.* is complex and subject to confusion. Courts have interpreted *A.G.C.* to have anywhere from three to seven factors. *See, e.g.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2838374 (Minn.App.)                                          Page 9
(Cite as: 2006 WL 2838374)

_Gutzwiller, 2004 WL 2114991 (applying three factors)_ and _Knowles, 2004 WL 2475284 (applying seven factors)._ Courts have applied _A.G.C._ to every variety of antitrust violation. However, the policies underlying the _A.G.C._ test, and the relevant case law, demonstrates that _A. G. C._ should not be applied to indirect purchaser cases.

The facts underlying _A.G.C._ are relevant to determine the type of case to which _A.G.C._ should be applied.[FN10] In _A.G.C._, the plaintiff was not a consumer or competitor. Plaintiff Union alleged it was damaged by an association that coerced third parties to enter into business deals with non-union firms. The Supreme Court was concerned with whether plaintiff would benefit from increased competition. _A.G.C., 459 U.S. at 539._ Thus, the issue was not whether a price-fixing agreement - which is a _per se_ violation of the antitrust laws - injured a downstream plaintiff by raising the price of something she *14 purchased. In fact, the concerns raised in _A.G.C._ are never present in a _per se_ violation, because increased competition always leads to lower prices, which by definition, would benefit purchasers.

        FN10. The _A.G.C._ test was created after _Illinois Brick_ precluded indirect
        purchasers from suing under federal antitrust law. Thus, the Supreme Court did
        not intend, or design, _A.G.C._ test be applied to indirect purchaser cases.

_The per se_ violations in the instant litigation should be contrasted not only with _A.G.C._ but also with _Visa. Visa's_ application of _A.G.C._ was appropriate because the _Visa_ plaintiffs were not indirect purchasers of a price-fixed product; instead, they were non-purchasers -- the _Visa_ plaintiffs never purchased anything containing the price-fixed product. The claims of the _Visa_ plaintiffs were not even indirectly related the alleged wrong. Thus, as the court in _Visa v. Southard_ noted, "plaintiffs in [this] case are not really 'indirect purchasers.' Their claim against defendant could more accurately be termed 'derivative.' These plaintiffs never ended up with a product the defendant supplied." _Southard, 2004 WL 3030028, at *3._ By contrast, Ms. Lorix did end up "with a product the defendant supplied." _See also, Crouch, 2004 WL 2414027 at *27_ (stating that the _Visa_ case was "not a price fixing case.")

State courts have recognized that _A.G.C._ is not applicable to _per se_ price fixing cases. In _Anderson Contracting,_ the Iowa District Court rejected application of _A.G.C._ because it did not involve the price-fixing of a product and harm to a downstream purchaser. _Anderson Contracting,_ (App. 140). The _Anderson Contracting_ court understood that cases concerning the potential injury to horizontal competitors who do not allege _per se_ violation is completely different than the direct injury suffered by a consumer as a result of a conspiracy to raise prices.

*15 Ms. Lorix purchased a downstream product that incorporates the price-fixed product; was clearly injured by Respondents' conspiracy, and should have a chance to prove this. This is consistent with Minnesota and Eighth Circuit analysis of antitrust standing, which "focuses instead on whether the injury was of the type that Congress sought to redress through the antitrust laws and whether a link was demonstrated between the injury and the market restraint." _McDonald v. Johnson & Johnson, 722 F.2d 1370, 1373-74 (8th Cir. 1983)._ "[M]ere causal connection between an antitrust violation and harm to a plaintiff cannot be the basis for antitrust compensation unless the injury is directly related to the harm the antitrust laws were designed to protect." _Id._ at 1374. _General Ind's. v. Hartz Mountain Corp., 810 F.2d 795, 809 (8th Cir. 1987)._ Ms. Lorix's injury is the result of Respondents' price fixing, a fundamental evil that antitrust laws were designed to combat. Therefore, _A.G.C._ is not necessary to this analysis and Ms. Lorix has standing.[FN11]

        FN11. In addition, Appellant is required to establish some _A.G.C._ factors -
        complexity and speculativeness - at class certification pursuant to Minn. R.
        Civ. P. 23. Certainly, it makes more sense to analyze these complicated issues
        with the benefit of a developed record.
III. EVEN IF _A.G.C._ IS APPLICABLE, MS. LORIX'S INJURIES, SUFFERED AS A DIRECT RESULT
        OF RESPONDENTS' CONSPIRACY, ARE SUFFICIENT TO GRANT STANDING.

A. Respondents Acknowledge that a Purchaser Need Not be a Consumer or Competitor in

2006 WL 2838374 (Minn.App.)                                    Page 10
(Cite as: 2006 WL 2838374)

                              the Restrained Market.


Respondents acknowledge that a plaintiff need not be a consumer or competitor in the
alleged market. (Resp. Brief at 15.) This is consistent with the majority of courts
that *16 have applied A.G.C., and consistent with the antitrust principles that
underlie that case.

In A.G.C., the plaintiff Union failed to allege that the restraint of trade covered
the entire market, so it was unclear whether the entire marketplace was affected.
A.G.C. 459 U.S. at 540, n.41. In this case, Ms. Lorix has alleged that the restraint
of trade encompassed the entire market. (App. 9, ¶ 34).

Furthermore, the Supreme Court noted that it was unclear whether enhanced
competition would benefit the Union. A.G.C. at 539. In this case, Ms. Lorix has
alleged a price-fixing conspiracy, which is a per se violation of the antitrust laws
precisely because it can have no pro-competitive effects. In the absence of the
conspiracy, prices would drop to a competitive level, which benefits Ms. Lorix and
the class. Thus, the fact that a purchaser is not a consumer or competitor should be
viewed in light of the policies set forth in A.G.C: Ms. Lorix satisfies that factor
under this analysis.

Assuming, arguendo, that the Court applies A.G.C. to this matter, Appellant suggests
that the "consumer or competitor" factor be replaced with the "causal connection"
factor utilized by many courts. Even Respondents' cases support the proposition that
"consumer or competitor" is not an appropriate factor. See, e.g., Fucile, 2004 WL
3030037, at *2; Knowles, 2004 WL 2475284, at *5; [FN12] Luscher, No. CV 2004-12 *17
014835, at 2; and Tremco, 1997 WL 423575, at *2. Instead, cases focus on the "causal
connection" between the antitrust violation and the alleged harm. See, e.g., Tremco,
1997 WL 423575, at *2; Knowles, 2004 WL 2475284; Ho, No. 112316100, 2004 WL 118534
(N.Y.Sup.Ct. April 21,2004), Investors Corp., Case No. S1011-04 CnC (Chittenden
County, Vt. Super. Ct., June 1,2005) (in Resp. Appendix).


        FN12. Knowles separately considers whether plaintiff was a "consumer or
        competitor." Knowles, 2004 WL 2475284, at *5. The court concluded that
        plaintiff was not a consumer or competitor, but nonetheless, because plaintiff
        alleged an injury of the type that Congress sought to redress, and Maine adopt
        ed an Illinois Brick repealer statute (just as Minnesota did), "suggests that
        the court should not deny standing just because plaintiffs are not
        participants in the actual market where trade was restrained." Id.

This analysis is more appropriate than the "consumer or competitor," because "causal
connection" is more akin to the definition of "antitrust injury" set forth in
Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477,489 (1977) ("Plaintiffs
must prove antitrust injury, which is to say injury of the type the antitrust laws
were intended to prevent and that flows from that which makes Respondents' acts
unlawful. The injury should reflect the anticompetitive effect either of the
violation or of anticompetitive acts made possible by the violation. It should, in
short, be 'the type of loss that the claimed violations ... would be likely to
cause.' " (citation omitted)). See also, Tremco, 1997 WL 423575, at *2 (applying
Pueblo Bowl-A-Mat to determine antitrust standing).

Knowles v. Visa, 2004 WL 2975284, is particularly relevant on this issue. In
Knowles, the court applied the "causal connection" analysis, and held "it is evident
that plaintiffs have adequately pleaded a causal connection...." Id.[FN13] This is
significant: if *18 a "causal connection" is "evident" in a case alleging a tying
arrangement of financial services increased the price of every product sold by every
merchant, it is more "evident" that a "causal connection" exists where plaintiff
alleges a per se antitrust violation that raised the price on a single product.


        FN13. In Southard, the trial court considered "the nature of the action,"
        rather than the "consumer or competitor" or "causal connection" analysis. The


        © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2838374 (Minn.App.)                                    Page 11
(Cite as: 2006 WL 2838374)

> *Southard* court held that those plaintiff were not "indirect purchasers" but
> were "derivative purchasers" because they "have not ended up with a product
> the defendant supplied." <u>Southard, 2004 WL 3030028, at *3</u>. By contrast, Ms.
> Lorix did have products that Respondents supplied. (App. 1, ¶ 1, App. 2, ¶ ¶
> 2-3.)

Furthermore, courts applying *A.G.C.* hold that the "causal connection" was satisfied
when a price-fixed component raised the price of a finished product. For example, in
*Investors Corp.*[FN14], No. 51011-04 CnC, the court held that there was a causal
connection between the conspiracy and the injury, because an increase in the price
of a component part can increase the price of the finished product. *Id.* at 3. The
defendants in *Investors Corp.* - some of whom are defendants in this case - made the
same argument as the defendants in this case: that there are other inputs into
pricing, different forms of distribution, and different types of manufacturing,
leading to speculative damages, and precluding a "causal chain." The *Investors Corp.*
court found that such facts were not relevant to a Rule 12 analysis. *Investors
Corp.*, No. 51011-04 CnC at 4. Similarly, in *Luscher*, No. Cv. 2004-014835, the court
held that the higher price for goods satisfied the "causal connection." Order at 4.

> FN14. In fact, not only is *Investors Corp.* factually similar to the instant
> matter, but *Investors Corp.* also has a striking procedural similarity: it was
> preceded by a *Visa* case (*Fucile v. Visa*), just as *Lorix* was preceded by
> *Gutzwiller*. And, although *Fucile* denied standing, *Investors Corp.* was decided
> in favor of plaintiff.

Thus, Plaintiffs believe that if the *A.G.C.* test is to be applied, the first factor
should focus on the relationship between the conspiracy and injury. Here, as in
*Knowles*, *19 *Investors Corp.*, and *Luscher*, there is a causal connection between the
conspiracy and injury, and Plaintiff has satisfied the first factor of the *A.G.C.*
test.

    B. Ms. Lorix's Damages Claims are Not Speculative, Duplicative nor Complex

Respondents allege that the damages in this case are speculative. Ironically, they
offer no proof of this: only their own speculation. Respondents seem to argue that
because their conspiracy resulted in an allegedly small price increase, damages will
be hard to calculate, and they should be granted a free pass. Clearly, antitrust law
does not make exceptions for conspiracies that result in small increases to a large
number of consumers. <u>Freeman, 172 S.W.2d at 515</u> (finding cause of action for
indirect purchasers even though price-fixed product was used in "small quantities"
to slow growth of mold in food.). In fact, this is precisely the type of fact
pattern for which class actions were designed. *See, e.g.*, <u>Forcier v. State Farm Mut.
Auto. Ins. Co., 310 N.W.2d 124, 130 (Minn. 1981)</u>.

Defendant cites to <u>B.W.I. Custom Kitchen v. Owens-Illinois, 191 Cal. App. 3d 1341
(1987)</u> as support for its claim that damages in this case are too speculative.
However, *B.W.I.* analyzed "speculative" in a class certification analysis of
"impact," with the benefit of a developed record. Significantly, *B.W.I.* recognized
that "courts should avoid interpreting procedural requirements in such a way as
'would thwart the legislative intent... to retain the availability of indirect-
purchaser suits as a viable and effective means of enforcing California's antitrust
laws.' " *Id.* at 1355 (citation omitted). If these *20 issues should not be used to
deny certification, then it makes no sense to use them to deny standing.

Respondents' next argument is based upon a boilerplate recitation of factors that
can impact pricing. These factors are present in every price-fixing case, whether
direct or indirect, and are appropriate addressed at class certification, with the
assistance of experts. "Complex antitrust cases... invariably involve complicated
questions of causation and damages. This case will likely prove no exception, but
that is not reason enough to dismiss for lack of standing." *Investors Corp.*, No.
51011-04 CnC, Order at 5. (Internal quotation marks and citation omitted).

Viewed in their entirety, Respondents' arguments are based largely on *Visa* court's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2838374 (Minn.App.)                                    Page 12
**(Cite as: 2006 WL 2838374)**

determinations of speculation and complexity.[FN15] The concerns raised by Respondents
are simply insufficient to deny standing to Ms. Lorix. Of course, those cases are
undisputably more complex and speculative than the instant matter. For example, one
*Visa* court noted that "this [Visa] case presents a far easier analysis [than a
price-fixing case]. It is not a price-fixing case.... Tying cases present unique
damages issues." *Crouch, 2004 WL 2414027 at \*26.* If Respondents' contention that the
existence of these *21 factors, which are typical in antitrust cases is sufficient
to deny standing in a price-fixing case, then no antitrust plaintiff could have
standing.[FN16]

> FN15. Respondents also cite to *Crouch,* which is distinguished elsewhere in
> this Brief. See § I.B. The concerns voiced in *Crouch,* like those in the *Visa*
> cases have been debunked by various courts and commentators (*see* App. Brief,
> p. 7, n. 4).

> FN16. Similarly, the cases cited by Respondents in footnote 4 of their brief
> are all far more complex than the issues in this matter. *See, Lovett v.*
> *General Motors, 975 F.2d 518, 520,* (8th Cir. 1992) (individual who owned a car
> dealership sued individually to recover damages resulting from defendants'
> alleged conspiracy with rival dealers to restrict distribution of vehicles);
> *S.D. Collectibles, Inc. v. Plough 952 F.2d 211 (8th Cir. 1991)* (plaintiff who
> was a representative of manufacturer sued manufacturer because manufacturer
> terminated agreement; court held that because plaintiff did not buy the
> product in question, it had no standing); *McDonald v. Johnson & Johnson, 722*
> *F.2d 1370, 1373 (8th Cir. 1983)* (stockholders had no standing to sue for
> damages resulting from alleged fraud, because their loss was not caused by
> antitrust violations, and plaintiff had other remedies), *South Dakota v.*
> *Kansas City S. Ind.,* 880 F.3d 40,47-48 (8th Cir. 1989) (injuries resulting
> from state's assignment of certain rights did not result from anticompetitive
> nature of practices, but instead, were an incidental result of anticompetitive
> activity in another segment of the economy.).

Finally, Respondents contend that damages in this case would be duplicative. But the
Minnesota legislature expressly delegated the power to the district court to take
"any steps necessary to avoid duplicative recovery." Minn. Stat. 325D.57. Frankly,
given this judicial power, it is hard to fathom why a case should, nonetheless, be
dismissed as duplicative. Nonetheless, Respondents suggest that, in furtherance of
this statutory language, that trial courts should simply dismiss the case because
there is a federal, direct purchaser case against the same defendants.

Respondents' reinterpretation of this statute would effectively negate the "broad
grant of standing" established by Minn. Stat. § 325D.57. Furthermore, it is
premature to dismiss this as duplicative of the federal action, when the federal
action has not been adjudicated.

**\*22 IV. LEGISLATIVE HISTORY ESTABLISHES THAT MINN. STAT. § 325D.57 PROVIDES STANDING**
**TO PLAINTIFF**

Because the language of the statute is clear, this Court need not resort to
extraneous sources of information, such as legislative history. *Humphrey, 1995 WL*
*1937124, at \*4.* To the extent that this statute has any ambiguity, it should be
construed broadly to effectuate the remedial nature of this statute. *See Humphrey,*
*551 N.W.2d at 496* (citation omitted). This transcript was never referenced in the
complaint, and indeed, the trial court declined "to evaluate any evidence outside
the pleadings." (App. 91). Furthermore, there is no reason to believe that the
comments of an AAG to a subcommittee are evidence of legislative intent.

Respondents contend that legislative history demonstrates that standing is not
limitless.[FN17] Respondents purport to establish the legislative history of the
statute by referring to a few cherry-picked comments made by an associate attorney
general ("AAG") before a Subcommittee of the State Senate Judiciary Committee.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> FN17. Of course, Plaintiffs are not saying that standing should be
> "limitless," rather, Plaintiffs have consistently contended that standing
> should be determined according to longstanding principles of Minnesota law.

Nonetheless, a closer analysis of the AAG's comments shows that Respondents'
quotations of the AAG do not fully explain his comments. The AAG states "the new
statute is designed to give [plaintiff] the right to be in court, to prove *who
actually suffered the overcharge* and to recover the damages." Hearing on S.F. 1807
Before the Sen. Judiciary Comm. Civil Law Subcomm., 1984 Leg., 73d Sess. 9 (Minn.
Mar. 19, *23 1984) (Resp. App. 127). It is clear that Ms. Lorix, as the end user, is
the person who actually *suffered* the burden of the overcharge. This conclusion is
buttressed by the AAG's later statement that this statute is designed to protect
"the ultimate consumer." (Resp. App., 32.) It is important to note that the AAG, who
was in charge of the antitrust division, made his comments after *A.G.C.* was issued,
but failed to reference it as a limitation on standing. This commentary supports an
interpretation that the statute grants standing to the consumer.

The language quoted by the Respondents in support of their contention that the AAG's
comments indicate a certain interpretation of the statute must be placed in context.
Respondents quote the AAG discussing the "chain of purchase" (Resp. Brief., 23-24.).
The two examples that the AAG suggests as perhaps being outside the "purchase" are a
taxpayer and a garage sale purchaser. (Resp. App., 133.) Neither of these
"purchasers" is analogous to Ms. Lorix who is the end user and who purchased tires
from a retailer and who claims injuries as a result. Finally, from the context of
the comments, it is clear that the subcommittee is discussing a specific version of
the bill. However, whether this bill became <u>Minn. Stat. § 325D.57</u> is unknown and
thus the AAG's comments on a chain of purchase have very limited value[FN18]

> FN18. Respondents also point to the AAG's comments on the "chain of purchase"
> as proof that an indirect purchaser must be a "consumer or competitor." (Resp.
> Brief, 23.) This comment must also be considered in the larger context of his
> remarks. As the AAG noted in the language immediately preceding the
> Respondents' quote, "If you are outside the target area you cannot recover."
> The concept of "target area" comes from Justice Brennan's dissent in the
> *Illinois Brick* case. Specifically, Brennan suggested that the test for
> standing not focus on the "directness of the injury," but rather on whether
> plaintiff is within the "target area of the defendants' conspiracy." <u>Illinois
> Brick, 431 U.S. at 760</u>. Put another way, the test is "whether the injury to
> the plaintiff is a reasonably foreseeable consequence of the defendants'
> illegal conduct." *Id.* at 760 n. 18 (citation omitted).
> Certainly, Respondents, who conspired to keep the prices of rubber processing
> chemicals at an artificially inflated level, could foresee that the consumers
> will pay more for the product down the line regardless of whether it is in its
> original form or combined with other ingredients. *See also,* <u>Holder, 1998 WL
> 1469620 (DC Super. Nov. 4, 1998)</u> (same). Thus, the DC Superior Court has
> interpreted the same language set forth by the Associate Attorney General, and
> found that it does not preclude a grant of standing to consumers who purchased
> grocery items containing a price-fixed ingredient. Again, the language
> selected by Respondents in support of their interpretation is, at best,
> subject to contradictory interpretations.

> *24 V. *PHILIP MORRIS AND GORDON V. MICROSOFT* DEMONSTRATE THAT MS. LORIX HAS
> STANDING.

Respondents try to distinguish *Phillip Morris* and *Gordon* cases, both of which
support Plaintiff. In *Philip Morris,* the Minnesota Supreme Court found standing
without resorting to the *A. G.C.* test, noting that standing can only be acquired
through a statute or by showing "injury-in-fact." <u>Humphrey, 551 N.W.2d 490, 493
(1996).</u> [FN19] Respondents contend that because the plaintiff was a consumer in the
allegedly-restrained market, analysis under *A.G.C.* was unnecessary. However, if
plaintiff was a consumer, then it satisfied the first factor of *A.G.C.* Yet, the
Supreme Court did not *apply A.G.C.* because it was *unnecessary* to do so. Rather, the
Supreme Court, relying on long-standing Minnesota jurisprudence, found that the
plaintiff had suffered injury-in-fact, and *25 therefore, had standing. <u>Humphrey,</u>

©  2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2006 WL 2838374 (Minn.App.)                                    Page 14
(Cite as: 2006 WL 2838374)

551 N.W.2d at 498. Similarly, in this case, Ms. Lorix has alleged and suffered
injury-in-fact, and has standing.[FN20] (App. Brief, 33-34.)

    FN19. Even though *Humphrey* is an antitrust case, Respondents ignore this
    clear, relevant statement of the law. Similarly, the *Humphrey* court noted that
    the legislature may, "by statute, expand the connection between conduct and
    injury necessary to permit suit." *Humphrey, 551 N.W.2d at 495*. Clearly, the
    Minnesota Supreme Court believed that the Legislature had expanded the scope
    of Minnesota's antitrust act to include any injured party.

    FN20. Respondents fail to explain how the analysis of Ms. Lorix's claim
    differs from the claim of plaintiffs in *Blue Shield of Virginia v. McCready,
    457 U.S. 465 (1982),* discussed at Appellant's Brief, 33-34.

Respondents' attempt to distinguish *Gordon* is based upon unsupported factual
assertions. Respondents argue that the operating system "is an identifiable product
that can be removed and replaced with a different operating system." (Resp. Brief,
31.) There is no support for that proposition, either in the record or the *Gordon*
opinion. Furthermore, the statement is inconsistent with the *Gordon's* class
definition, which was quite broad, certifying persons who "indirectly acquired...
any version of the following software... or any other software product in which MS-
DOS or Windows has been incorporated in whole or in part...". *Gordon, 2003 WL
23105552, at *1*.[FN21]

    FN21. As discussed *supra,* it doesn't matter if a component has been
    incorporated entirely to a finished product. (See Section I.A.)

Respondents further attempt to distinguish *Gordon* by relying on a *Kansas* court's
class definition, *Bellinder v. Microsoft Corp.,* No. 00-C-0855, 2001 1397995 (Kan.
Dist. Ct. Sept. 7, 2001), and then drawing certain factual assumptions from that
definition. D. Br. at 31. However, that class definition is materially different
from - and narrower than - the class certified in *Gordon*. It serves no purpose, and
should be disregarded.

*26 VI. CONCLUSION

For the reasons stated in this reply Brief and Appellant's Brief, Ms. Lorix
respectfully requests that this Court reverse the Order from which the appeal is
taken, and remand this matter to the District Court for further proceedings
consistent with the relief sought in this appeal.

Appendix not available.

Diane LORIX, individually and on behalf of all others similarly situated, Appellant,
v. CROMPTON CORPORATION, Uniroyal Chemical Company, Inc. Uniroyal Chemical Company
Limited, and Bayer Corporation, Respondents.
2006 WL 2838374 (Minn.App.)

Briefs and Other Related Documents (Back to top)

* 2006 WL 2838373 (Appellate Brief) Respondents' Brief (Jan. 17, 2006)
* 2005 WL 4797641 (Appellate Brief) Appellant's Brief (Dec. 5, 2005)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 24



137 Fed.Appx. 491                                                                    Page 1
137 Fed.Appx. 491, 2005 WL 1488382 (C.A.3 (Pa.)), 2005-1 Trade Cases P 74,842, Util. L. Rep. P 14,560
**(Cite as: 137 Fed.Appx. 491)**

Briefs and Other Related Documents
Martorano v. PP&L Energy Plus, L.L.C.C.A.3 (Pa.),2005.This case was not selected for publication in the Federal Reporter.NOT PRECEDENTIAL Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,Third Circuit.
Joseph MARTORANO, III, d/b/a Enerco, Appellant
v.
PP&L ENERGY PLUS, L.L.C.; PP&L, Inc.
No. 04-3751.

Argued June 8, 2005.
Decided June 23, 2005.

**Background:** Consultant and broker for electricity end users sued wholesaler, alleging that wholesaler's refusal to sell excess capacity to regional transmission organization resulted in artificially high prices required to be paid by its customers. The United States District Court for the Eastern District of Pennsylvania, Anita B. Brody, J., dismissed action, and plaintiffs appealed.

**Holding:** The Court of Appeals, Becker, Circuit Judge, held that plaintiffs lacked antitrust standing.

Affirmed.
West Headnotes
**Antitrust and Trade Regulation 29T ⬤➔963(3)**

29T Antitrust and Trade Regulation
   29TXVII Antitrust Actions, Proceedings, and Enforcement
      29TXVII(B) Actions
         29Tk959 Right of Action; Persons Entitled to Sue; Standing; Parties
            29Tk963 Injury to Business or Property
               29Tk963(3) k. Particular Cases. Most Cited Cases
         (Formerly 265k28(1.6))
Consultant and broker for electricity end users did not have antitrust standing to bring action against wholesale electricity supplier based on alleged restraint in market for wholesale electricity.

*491 On Appeal from the United States District Court For the Eastern District of Pennsylvania. (D.C. No. 03-cv-05963). District Judge: Honorable Anita B. Brody.

Frank N. DiMeo, Jr. (Argued), Rosenn, Schafer & DiMeo, P.C., Philadelphia, PA, for Appellant.
David L. Meyer, James Atwood, (Argued), Derek Ludwin, Covington & Burling, Washington, DC, John G. Harkins, Jr., Steven A. Reed, Harkins Cunningham, LLP, Philadelphia, PA, for Appellees.

Before FUENTES, VAN ANTWERPEN and BECKER, Circuit Judges.

BENCH OPINION
BECKER, Circuit Judge.
**\*\*1 Judge Becker:** The panel has conferred, and I will deliver a bench opinion which will constitute the opinion and judgment of the Court.

**\*\*1** The order of the District Court will be affirmed. We agree with the District Court that Martorano and Enerco lack antitrust standing. Enerco is not a competitor or customer of PP&L. We held in Barton & Pittinos, Inc. v. SmithKline Beecham Corp., 118 F.3d 178, 184 (3d Cir.1997), that advertisers and brokers of a good or service are not competitors of companies that actually supplied the good or service. That is the case here. PP&L actually supplied the electricity. Enerco is merely a broker.

**\*\*1** If this appeal were not controlled by Barton & Pittinos, it would be controlled by our recent opinion in *492Utilimax.com, Inc. v. PPL Energy Plus, LLC, 378 F.3d 303 (3d Cir.2004), which dealt with the very same "window" as Mr.DiMeo described it, that we are dealing with here in terms of the history of the electric power sale market in Pennsylvania. We treated wholesale and retail markets in Utilimax, wholesale and retail markets for electricity capacity in Pennsylvania and New Jersey, as distinct markets, and held that the plaintiff in LSE was not a competitor of PP&L's wholesale business.

**\*\*1** Mr. Martorano and Enerco are not even LESs. They are two more steps removed from PP&L's wholesale electricity business, since Enerco is hired by retail customers such as the University of Pennsylvania and others to find an LSE. So Enerco is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

surely not a competitor either.   And even if PP & L does have a brokerage and consulting arm and we accept Mr. DiMeo's representation that it does compete with Enerco, the relevant inquiry is whether they are competitors in the market which was restrained, here the market for whole electricity.   We find the *Carpet Group* case which Mr. DiMeo relies upon clearly distinguishable because there everybody involved was trying to sell carpet.   *See Carpet Group Intern. v. Oriental Rug Importers Ass'c., 227 F.3d 62 (3d Cir.2000).*   They were direct sellers.   Martorano and Enerco are not.   Were we to go further, we would note our agreement with Judge Brody that Martorano's injury is too indirect for antitrust standing.     And *Utilimax,* if we went beyond standing, would likewise require us to hold that the Filed Rate Doctrine would bar the suit.

**\*1** At all events, for the reasons stated, the order of the District Court granting the motion to dismiss will be affirmed.       This constitutes the opinion and judgment of the Court.   I ask Judge Fuentes or Judge Van Antwerpen as to whether you have any additions or corrections?

**\*1 Judge Fuentes:**  I have no additions, correction, and I concur in the decision.

**\*1** Judge Van Antwerpen:  I would cite *LePage's v. 3M,* 324 F.3d 141 (3d Cir.2003).     There are not necessary allegation of a relevant antitrust market, sustainable market power and exclusionary predatory conduct, and the Sherman Act Section 2 claim.   With that minor addition, I join wholeheartedly.

**\*2 Judge Becker:**  Well, it is not a minor addition. It would be an additional substantive ground.

**\*2 Judge Van Antwerpen:**  Yeah, Yeah.

**\*2 Judge Becker:**  but I would agree with that as well.

**\*2** In due course the Clerk will arrange to have this bench opinion transcribed as a not precedential opinion of this Court and posted on our website in accordance with our Court's practice and indeed as required by Congress by the E-Government Act.

**\*2 Judge Fuentes:**    I join in Judge Van Antwerpen's addition to the decision.

**\*2 Judge Van Antwerpen:**  So we're unanimous.

**\*2 Judge Becker:**   Okay, thank you very much.

That concludes this proceeding.

C.A.3 (Pa.),2005.
Martorano v. PP&L Energy Plus, L.L.C.
137 Fed.Appx. 491, 2005 WL 1488382 (C.A.3 (Pa.)), 2005-1 Trade Cases P 74,842, Util. L. Rep. P 14,560

Briefs and Other Related Documents (Back to top)

• 2005 WL 4962369 (Appellate Brief) Reply Brief of Appellant Joseph Martorano, III, d/b/a Enerco (Jun. 10, 2005)
• 2004 WL 5131442 (Appellate Brief) Brief of Defendants-Appellees PP&L Energy Plus, LLC and PP&L, Inc. (Dec. 22, 2004)
• 2004 WL 5131441 (Appellate Brief) Brief of Appellant Joseph Martorano, III, d/b/a Enerco (Nov. 25, 2004)
• 04-3751 (Docket) (Sep. 27, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 25



Slip Copy                                                                                          Page 1
Slip Copy, 2006 WL 2865492 (D.N.J.), 2006-2 Trade Cases P 75,498
**(Cite as: Slip Copy)**

Briefs and Other Related Documents
Only v. Ascent Media Group, LLCD.N.J.,2006.
United States District Court,D. New Jersey.
Warren ONLY, Plaintiff,
v.
ASCENT MEDIA GROUP, LLC, Defendant.
**Civil No. 06-2123 (FSH).**

Oct. 5, 2006.

Warren Only, Vineland, NJ, pro se.
Andrew E. Anselmi, McCusker, Anselmi, Rosen &
Carvelli, PC, Chatham, NJ, for Plaintiff.

*OPINION*
HOCHBERG, District Judge.

### I. INTRODUCTION

**\*1** This matter is before the Court on Cross-Motions
to Dismiss filed by Defendant Ascent Media Group,
LLC ("Ascent Media") and Plaintiff Warren Only
pursuant to Fed.R.Civ.P. 12(b)(6).[FN1] Plaintiff Only's
Request/Motion to Strike Ascent Media's Motion to
Dismiss Pursuant to Rule 56(f), and Plaintiff Only's
Motion for Leave to File a Supplemental Complaint
pursuant to Fed.R.Civ.P. 15(d). The Court has made
its determination after considering the written
submissions of the parties and without oral argument
pursuant to Fed.R.Civ.P. 78.

> FN1. This court terminated an associated
> case, *Ascent Media Group, LLC v. Warren
> Only* (No. 06-2374) on June 13, 2006 and
> consolidated it with this case, No. 06-2123.
> Since the cases have been consolidated and
> Ascent Media is the Defendant and Warren
> Only is the Plaintiff in the consolidated case,
> this Court will refer to the parties as such in
> this Order.

### II. FACTUAL BACKGROUND

**\*1** Plaintiff Only is a broadcasting and
telecommunications consultant with offices in New
Jersey who provides satellite communication services
to the broadcast and telecommunications industry,
including providing uplink, downlink, payout, and

internet and syndication support services. Defendant
Ascent Media is a global provider of satellite
transmission and reception services for the broadcast,
cable, entertainment, satellite, and
telecommunications industries. Among other
services, Ascent Media coordinates the transmission
and receiving of audio, video, and data signals via
satellites around the world.

**\*1** Mr. Only applied to Ascent Media in December
2004 for full time local loop connectivity to Ascent
Media's network and Earth Station uplink facilities.
[FN2] Lisa Roberts, Vice President of Sales at Ascent
Media, took Mr. Only's application, which contained
a detailed technical floor plan and configuration of
his operation, and offered to lease Mr. Only available
antennas on the property at Ascent Media's Stamford
"Glenn Brook" Earth Station facility. Mr. Only
submitted a credit application to Roberts in
December 2004, and he was not notified of any credit
problems at the time. On December 14, 2004,
Roberts sent Mr. Only a letter containing a quote for
a full time port and local loop connectivity. The letter
states that "[t]his proposal is subject to availability of
facilities at the time a service agreement is signed,
upon the execution of a formal agreement acceptable
to both parties, and receipt of required corporate
approvals."

> FN2. For purposes of this Factual
> Background section, all facts are taken as
> true from Plaintiff's Amended Complaint
> because this Court is granting Defendant's
> Motion to Dismiss. *See Mortensen v. First
> Fed. Sav. and Loan Ass'n,* 549 F.2d 884, 891
> (3d Cir.1977) (holding that for motions to
> dismiss under F.R.C.P. 12(b)(6) for failure
> to state a cause of action, "plaintiff is
> afforded the safeguard of having all its
> allegations taken as true and all inferences
> favorable to plaintiff will be drawn.")

**\*1** After their initial meeting, Roberts arranged a
meeting between herself, a transmissions engineer,
and Mr. Only in order for Mr. Only to connect to
Ascent Media's Earth Station Transport System.
Roberts gave Mr. Only a connectivity chart, antenna
profile, and list of teleport rates, and she arranged for
Mr. Only to meet with Paula Horn, another Ascent
Media employee, to discuss syndication services. In

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                    Page 2
Slip Copy, 2006 WL 2865492 (D.N.J.), 2006-2 Trade Cases P 75,498
(Cite as: Slip Copy)

February 2006, Mr. Only demanded service and offered to pay Ascent Media up front. In May 2006, Ascent Media decided not to provide common carrier services and/or communications satellite service to Mr. Only based on Mr. Only's credit application and an employee's recommendation that Ascent Media should not enter into a deal based on his previous work experience with Mr. Only.

### III. PROCEDURAL BACKGROUND

*1 Mr. Only filed this suit on May 10, 2006 and filed an Amended Complaint on May 12, 2006.[FN2] On May 24, 2006, Ascent Media filed a complaint against Mr. Only (Docket No. 06-2374). Plaintiff Only moved to dismiss Ascent Media's complaint in a motion to dismiss on June 8, 2006. On June 13, 2006, Magistrate Judge Shwartz denied Mr. Only's motion to dismiss, consolidated the two cases, and terminated Docket No. 06-2374. Magistrate Judge Shwartz issued a Report and Recommendation granting Ascent Media's request for a preliminary injunction on June 15, 2006, and this Court adopted the Report and Recommendation on September 11, 2006. This Order held that Mr. Only and any affiliates must cease and desist from (a) using, reproducing, distributing, or offering to reproduce or distribute Ascent Media's Antenna Profiles and/or any portions thereof; (b) posting on Plaintiff's website the Antenna Profiles and/or any portion thereof; (c) preparing any derivative works based on the Antenna Profiles; (d) representing to the consuming public that Mr. Only is affiliated with Ascent Media and its clients; (e) instructing any other individual to engage in any of the above-described acts in subparagraphs a) through d); and (f) aiding and abetting or otherwise assisting in any of the above-described acts in subparagraphs a) through d). The Court further ordered Mr. Only to modify the portions of his website to ensure that they do not violate any of the above restrictions.

> FN3. Plaintiff filed a Second Amended Complaint on May 31, 2006 and a Third Amended Complaint on June 2, 2006. On June 13, 2006, Magistrate Judge Shwartz struck the Second and Third Amended Complaint and ruled that the May 12, 2006 Amended Complaint is the operative complaint in this case.

*2 Defendant filed a Motion to Dismiss Plaintiff's Amended Complaint and Counterclaim on July 21,

2006. Plaintiff filed a Motion/Request to Strike Ascent Media's Motion to Dismiss Pursuant to Rule 56(f) on July 26, 2006. [FN4] Plaintiff filed an Objection to Defendant's Motion to Dismiss and a Further Request to Strike Ascent Media's Motion to Dismiss Pursuant to F.R.C.P. 56(f) on August 9, 2006.[FN5] Defendant filed its Consolidated Opposition and Response to Plaintiff's Recent Filings on August 14, 2006. Plaintiff filed a Motion to Dismiss Defendant Ascent Media's Verified Complaint on August 31, 2006.[FN6] Plaintiff also filed a "Motion for Leave to File Supplemental Complaints Pursuant to F.R.C.P. 15(d)" on August 31, 2006. Defendant filed a Consolidated Opposition to Plaintiff Only's Motion to Dismiss Ascent Media's Verified Complaint and Motion for Leave to File Supplemental Complaints on September 25, 2006. Plaintiff filed his Reply to Ascent Media's Consolidated Opposition on October 3, 2006.

> FN4. Mr. Only also submitted additional filings related to his Motion/Request to Strike Ascent Media's Motion to Dismiss Pursuant to Rule 56(f) on July 27, 206 and August 1, 2006.

> FN5. Plaintiff did not specifically address Defendant's arguments in this objection or in any of the Plaintiff's other filings.

> FN6. A s discussed above, Ascent Media's May 24, 2006 complaint against Mr. Only (Docket No. 06-2374) was terminated and consolidated with this Case on June 13, 2006.

### VI. PLAINTIFF'S REQUEST/MOTION TO STRIKE ASCENT MEDIA'S MOTION TO DISMISS PURSUANT TO RULE 56(F)

*2 Mr. Only's July 26, 2006 filing requests that this Court strike Ascent Media's Motion to Dismiss Pursuant to F.R.C.P. Rule 56(f). Rule 56(f) states that: "Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just." Mr. Only does not meet this threshold because he has not presented facts essential for his opposition to Defendant's Motion to Dismiss. Further, Plaintiff's allegation that Defendant has

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

already taken discovery is without merit. In his Motion to Strike, Mr. Only appears to be claiming that Defendant has conducted discovery because of the citations in its motion to federal and state court cases with Mr. Only as a plaintiff. However, in evaluating a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), courts may consider matters of public record, such as case law. *See Pension Guaranty Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir.1992).* Furthermore, Defendant specifically disavowed relying on any document referenced in its Preliminary Statement of its Motion to Dismiss, where the cases are referenced. The Court therefore denies Plaintiff's Motion to Strike.

### V. DEFENDANT'S MOTIONS TO DISMISS PLAINTIFF ONLY'S AMENDED COMPLAINT AND COUNTERCLAIMS

#### A. Standard of a Motion to Dismiss

**\*2** A motion to dismiss under Rule 12(b)(6) should be granted "if it appears to a certainty that no relief could be granted under any set of facts which could be proved." *Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir.1997).* Although a court does not need to credit a complaint's "bald assertions" or "legal conclusions," it is required to accept as true all of the allegations in the complaint as well as all reasonable inferences that can be drawn therefrom and view them in the light most favorable to the plaintiff. *Id., citing Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir.1989). See also In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1429-30 (3d Cir.1997).* In evaluating a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court may consider only the Complaint, exhibits attached to the Complaint, matters of public record, and undisputedly authentic documents if the Plaintiff's claims are based on those documents. *Pension, 998 F.2d at 1196.*

**\*3** The Supreme Court has expressly stated that motions to dismiss under Rule 12(b)(6) should be granted "very sparingly" in antitrust cases. *See Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 746 (1976).* However, there is no heightened pleading standard in antitrust cases, and the general principles governing Rule 12(b)(6) motions apply. *See, e.g., In re Mercedes-Benz Anti-Trust Litigation, 157 F.Supp.2d 355, 359 (D.N.J.2001).* Further, an antitrust complaint containing only "conclusory recitations of law" is insufficient to survive a motion to dismiss. *See In re K-Dur Antitrust Litigation, 338 F.Supp.2d 517, 529 (D.N.J.2004) (citing McPherson's. Ltd. v. Never Dull. Inc., 1990 WL 238812, \*3 (D.N.J. Dec. 26, 1990)).*

#### B. Claims for Relief in Plaintiff's Amended Complaint and Counterclaim

##### 1. The Amended Complaint

**\*3** The Amended Complaint alleges that Ascent Media "maintains and operates a **Monopoly** of satellite Earth Station teleport Uplinks and Downlink facilities through out the United States" and that there "are no arguable competitive Earth Station facilities in the 'New York Metro Area' at present time." (emphasis in original). Mr. Only also alleges that Ascent Media conspired with its employees and subsidiaries to deny Mr. Only the use of Ascent Media's facilities and common carrier service on the basis of Mr. Only's race and a "personal vendetta." Based on these allegations, Mr. Only raises three claims for relief under Sections One and Two of the Sherman Act: 1) combining and conspiring to illegally block Mr. Only from obtaining "Common Carrier/Satellite Communications services" in violation of Section One of the Sherman Act, 15 U.S.C. § 1; 2) unreasonably restraining trade by combining and conspiring to illegally block Mr. Only from obtaining "Common Carrier/Satellite Communications services" in violation of Section One of the Sherman Act, 15 U.S.C. § 1; and 3) unreasonably monopolizing the market by entering into a "contract, combination or conspiracy" to unlawfully prevent plaintiff from obtaining "Common Carrier/Satellite Communications services" in violation of Section Two of the Sherman Act, 15 U.S.C. § 2.

##### 2. The Counterclaim

**\*3** In his counterclaim to Ascent Media's complaint, Mr. Only includes eight separate claims for relief. The first three claims are identical to the three claims in the Amended Complaint. Count IV, entitled "Genocide pursuant 18 U.S.C.1901," alleges that "Ascent Media, and each of them, knowingly and willfully conspired and agreed among themselves to tortuously or unlawfully injure Mr. Only with the specific intent to destroy, in whole or in substantial part, Mr. Only's, ethnic 'Black' racial, group." Count V alleges that Ascent Media violated 47 U.S.C. §

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4
Slip Copy, 2006 WL 2865492 (D.N.J.), 2006-2 Trade Cases P 75,498
(Cite as: Slip Copy)

202(a) by unlawfully discriminating against Mr. Only by blocking him from acquiring common carrier service based on his race. Count VI, entitled "False Light Invasion of Privacy," alleges that Ascent Media "invaded Mr. Only's right to privacy by publishing in court documents depicting Mr. Only as committing a Copyright Infringement" and by "falsely bringing Mr. Only ... up on erroneous charges that were untrue and defamatory." Count VII, entitled "Intentional Infliction of Emotional Distress," claims that Ascent Media intentionally and maliciously published false information causing Mr. Only to suffer humiliation and mental anguish. Last, Count VIII, entitled "Common-Law Invasion of Privacy," alleges that Defendants invaded Mr. Only's right to privacy by "knowingly appropriating and using Mr. Only's business names and photographs from his websites to falsely associate his name and business with a false Copyright Infringement claim."

### C. Analysis

*1. Plaintiff Fails to State a Claim under the Federal Antitrust Laws*

*4 Plaintiff Only has failed to state a claim under either Section One or Section Two of the Sherman Act, 15 U.S.C. § 1 and 2. As a threshold matter, in order to maintain a cause of action under the Sherman Act, plaintiffs must prove "injury of the type the antitrust laws were intended to prevent." *See Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477, 489 (1997).* Federal antitrust laws are designed to remedy injuries to the competitive process itself, adhering to the longstanding principle that "[a]bove all, the United States antitrust laws strive to maintain competition in our domestic markets." *Turicentro, S.A. v. American Airlines Inc ., 303 F.3d 293, 305 (3d Cir.2002).* The antitrust laws "exist to protect competition, not competitors." *Queen City Pizza, Inc. v. Domino's Pizza, Inc., 922 F.Supp. 1055, 1063 (E.D.Pa.1996), aff'd 124 F.3d 430 (3d Cir.1997).* In this case, Plaintiff has not alleged that competition has been harmed by Ascent Media's alleged conduct and instead alleges harm to himself individually. Indeed, he has pled that he is not a competitor of Ascent Media. *See* Am. Compl. ¶ 27 (noting that Plaintiff "presented no competition whatsoever to 'Ascent' "). Plaintiff has also stated before this Court that he could have purchased equivalent service from Ascent Media's competitors. *See* Transcript of Hearing before Magistrate Judge Shwartz on June 12, 2006 ("Transcript") at 44-45 ("[T]here are other

people's switches I can use, but in this case, the deal was with Ascent.") Therefore, Plaintiff has not alleged claims actionable under the Sherman Act.

*4 Plaintiff fails to state a claim under Section Two of the Sherman Act for further reasons. First, Section Two prohibits individuals from monopolizing, attempting to monopolize, or combining or conspiring with any other person or persons to monopolize any part of the trade or interstate commerce. 15 U.S.C. § 2. The offense of monopoly under Section 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as opposed to growth or development from a superior product, business acumen, or historic accident. *See SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1062 (3d Cir.1978) (citing United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966)).* Mr. Only has not identified a relevant market or alleged that Ascent Media may successfully monopolize the market based on its share.

*4 Second, Mr. Only also fails to state a claim under Section Two of the Sherman Act because Ascent Media had no duty to deal with him. There is no general duty to deal, and a company's refusal to do business with a potential business partner ordinarily does not give rise to a claim for relief under Section Two of the Sherman Act. *See Verizon Comms. Inc., v. Law Offices of Curtis Trinko, LLP, 540 U.S. 398, 408 (2004).* The Court has identified three exceptional circumstances where a duty may be recognized, but Mr. Only's allegations do not fall under these exceptions.[FN7]

> FN7. The *Trinko* Court recognized that a "concerted" refusal to deal may violate the Sherman Act under its prior decisions, a sudden refusal to deal on fair terms following a longstanding and mutually profitable business relationship may approach the boundary of Section Two liability, and the "unavailability of access to ... 'essential facilities' " operated by a Sherman Act Defendant may create a limited third exception. *See Trinko, 540 U.S. at 409-411.*

*5 Third, Mr. Only fails to state a claim under Section Two of the Sherman Act because he fails to identify the relevant market. An antitrust plaintiff has the burden of defining the relevant market, and a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                      Page 5
Slip Copy, 2006 WL 2865492 (D.N.J.), 2006-2 Trade Cases P 75,498
(Cite as: Slip Copy)

court may dismiss a claim for failure to do so. *See, e.g.,. Queen City Pizza, Inc., 922 F.Supp. at 1064.* Plaintiff Only has failed to define any relevant product or geographic market and instead only makes vague references to Ascent Media's alleged "monopoly of Earth Station facilities" in the "New York Metro" area. Am Compl. ¶ 26.

\*5 Fourth, Plaintiff fails to allege that Ascent Media has monopoly power or is attempting monopoly power in the relevant market beyond general statements that "there are no arguable competitive Earth Station facilities in the 'New York Metro' at present" and " 'Ascent' maintains a 'Monopoly' of Earth Station facilities in the area." *Id.* Courts generally do not find that a defendant company has monopoly power if it controls less than 50 percent of the given market. *See, e.g., Ideal Dairy Farms v. John Labatt, Ltd., 90 F.3d 737, 749 (3d Cir.1996).* Mr. Only has not alleged this fact, and indeed has acknowledged that Ascent Media has many competitors from which Mr. Only could have purchased services equivalent to those he sought from Ascent Media. *See* Transcript at 44-45, 49, 51, 58, 71-72. Plaintiff Only also fails to state a claim for attempted monopolization because this must allege, among other requirements, "a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993).* Mr. Only does not allege any facts regarding Ascent Media's market share, much less whether that share is significant enough to create a dangerous probability that Ascent Media will achieve monopoly power.

\*5 Mr. Only also fails to state a claim under Section One of the Sherman Act. Section One prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. To establish a civil cause of action under Section One, a plaintiff must prove four elements: (1) that the defendants contracted, combined, or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy. *See Arnold Pontiac-GMC, Inc. v. General Motors Corp., 786 F.2d 564, 572 (3d 1986).* Although Mr. Only claims that several Ascent Media entities and employees conspired among themselves to prevent his efforts to start a business, a corporate parent cannot conspire with its own subsidiaries or individual employees under Section One of the Sherman Act. *See*

*Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769 and 777 (1984).* Mr. Only has therefore failed to allege an agreement constituting a conspiracy under the Sherman Act. Mr. Only's claim that Ascent Media conspired with "some anonymous person outside of Ascent" to interfere with Mr. Only's business plan also fails to state an actionable conspiracy under Section One because the Third Circuit has held that "a general allegation of conspiracy without a statement of the facts is an allegation of a legal conclusion and insufficient of itself to constitute a cause of action." *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 182 (3d Cir.1988). See, e.g., Garshman v. Universal Res. Holding Inc., 824 F.2d 223, 230 (3d Cir.1987)* (holding that the "allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act.") Mr. Only has failed to meet the minimum standard here.

### 2. Plaintiff Fails to State a Claim under the Communications Act

\*6 Count V of Plaintiff's Counterclaim alleges that Ascent Media refused to provide him common carrier services on the basis of Mr. Only's race in violation of Section 202 of the Communications Act. 47 U.S.C. § 202(a) makes it unlawful for "any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device." Plaintiff Only fails to state a claim upon which relief can be granted because he has not alleged that he sought common carrier services from Ascent Media.

\*6 47 U.S.C. § 202(b) clarifies that protected charges or services must be for "*the use of common carrier lines of communication,* whether derived from wire or radio facilities, in chain broadcasting or incidental to radio communication of any kind." (emphasis added). Plaintiff has not alleged that he sought common carrier services from Ascent Media, and instead he alleges that he "applied to defendant 'Ascent' for full time local loop connectivity to 'Ascents' network ... for the distribution of content from a technical operations center controlled by Mr. Only in New York to 'Ascents' satellite teleport network via a fiber circuit controlled by "Ascent" ..." Am. Compl. ¶ 9. Furthermore, the price quote that Ascent Media provided Plaintiff in a December 14,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2004 letter confirms that Mr. Only sought a single terrestrial local loop .[FN8] The fiber local loop connection that Mr. Only requested is not for the "use of common carrier lines of communication" and thus does not meet the requirements of 47 U.S.C. § 202(b).[FN9] The Court therefore dismisses Mr. Only's Communications Act claim.

> FN8. The December 14, 2004 letter provides service and pricing for "One (1) simplex TV 1 local loop (2 audio channels) from 350 Fifth Avenue to Ascent Media 545. Ascent Media will provide management and troubleshooting of this service" and "One (1) port (2 audio channels) on the Ascent Media Network Services Router."

> FN9. Notably, it does not even appear that Ascent Media is a common carrier, a threshold question to fall under the Communications Act. In determining whether the court should regulate a line of communications as a common carrier, the court must "inquire, first, whether there [exists] any legal compulsion ... to serve [the public] indifferently, and if not, second, whether there are reasons implicit in the nature of [the] operations to expect an indifferent holding out to the eligible user public." _Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC_, 525 F.2d 630, 642 (D.C.Cir.1976) ("NARUC I"). See also _Sw. Bell Tel. v. FCC_, 19 F.3d 1475, 1481 (D.C.Cir.1994) ("If the carrier chooses its clients on an individual basis and determines in each particular case 'whether and on what terms to serve' and there is no specific regulatory compulsion to serve all indifferently, the entity is a private carrier for that particular service and the Commission is not at liberty to subject the entity to regulation as a common carrier" (citing _Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC_, 533 F.2d 601, 608-09 (1976) ("NARUC II")). Ascent Media does not satisfy the first prong of this analysis because there is no law or regulation compelling it to provide fiber local loops connections indifferently or on a common carrier basis. It does not appear that Ascent Media meets the second prong of the analysis because "a carrier will not be a common carrier where its practice is to make individualized decisions, in particular

cases, whether and on what terms to deal." _NARUC I_, 525 F.2d at 641. See also _V.I. Tel. Corp. v. FCC_, 198 F.3d 921, 925 (D.C.Cir.1999) (endorsing the FCC's conclusion that an entity that "engage[s] in negotiations with each of its customers on the price and other terms which would vary depending on the customers' capacity needs, duration of the contract, and technical specifications" rather than "sell [ing] capacity ... indifferently to the public" is not a common carrier).

### 3. Plaintiff Fails to State a Claim for Genocide

\*6 Count IV of Plaintiff's Counterclaim, entitled "Genocide pursuant 18 U.S.C. § 1091," alleges that "Ascent Media, and each of them, knowingly and willfully conspired and agreed among themselves to tortuously or unlawfully injure Mr. Only with the specific intent to destroy, in whole or in substantial part, Mr. Only's, ethnic 'Black' racial, group." Mr. Only clearly does not meet the necessary elements to satisfy this claim. 18 U.S.C. § 1091(a) defines genocide as an event when an individual has the specific intent to destroy, in whole or in substantial part, a national, ethnic, racial, or religious group and "(1) kills members of that group; (2) causes serious bodily injury to members of that group; (3) causes the permanent impairment of the mental faculties of members of the group through drugs, torture, or similar techniques; (4) subjects the group to conditions of life that are intended to cause the physical destruction of the group in whole or in part; (5) imposes measures intended to prevent births within the group; or (6) transfers by force children of the group to another group." Further, Plaintiff's genocide claim is defective as a matter of law because 18 U.S.C. § 1091 creates a criminal offense, not a civil cause of action. 18 U.S.C. § 1092 states that nothing in § 1091 shall "be construed as creating any substantive or procedural right enforceable by law by any party in any proceeding." The Court therefore dismisses Count IV of Plaintiff's Counterclaim.

### 4. Plaintiff Fails to State a Claim for False Light, Intentional Infliction of Emotional Distress, and Invasion of Privacy

\*7 Plaintiff brings three intentional torts in his Counterclaim alleging that Ascent Media committed "False Light Invasion of Privacy," "Intentional Infliction of Emotional Distress," and "Common-

Slip Copy                                                                              Page 7
Slip Copy, 2006 WL 2865492 (D.N.J.), 2006-2 Trade Cases P 75,498
(Cite as: Slip Copy)

Law Invasion of Privacy" when it sued Mr. Only for copyright violation and accused him of using Ascent Media's proprietary information without permission.[FN10] All three claims are without merit because "[a] statement made in the course of a judicial proceeding is absolutely privileged and wholly immune from liability." *Williams v. Kenney,* 877 A.2d 277, 286 (N.J.Super.Ct .App.Div.205) (*citing Hawkins v. Harris,* 661 A.2d 284, 287-288 (N .J.1995)). Civil liability cannot attach under any legal theory for statements made during the course of litigation. *Loigman v. Twp. Comm'n,* 889 A.2d 426, 436 (N.J.2006) (litigation privilege provides immunity "not only from defamation actions, but also from a host of other tort-related claims"). The Court therefore dismisses Plaintiff's claims for False Light, Intentional Infliction of Emotional Distress, and Invasion of Privacy.

> FN10. *See* Countercl. ¶ 87 ("Ascent Media ... without Mr. Only's consent, invaded Mr. Only's right to privacy by publishing in court documents depicting Mr. Only as committing a Copyright Infringement act ..."), ¶ 97 ("Ascent Media clearly exposed Mr. Only to hatred, contempt, ridicule, obloquy, because it falsely depicted Mr. Only and his group as 'persons' that either unlawfully takes or copies other peoples information in an unlawful, heinous and criminal manner, who intentionally uses other peoples information, in this case riding on Ascent Media's purported prominence in an attempt to get a 'free ride' as it relates to information given by 'Ascent Media' to Mr. Only then reneged ...."), and ¶ 105 ("Defendants, jointly or separately, with out Mr. Only's consent, invaded Mr. Only's right to privacy by knowingly appropriating and using Mr. Only's business names and photographs from his websites to falsely associate his name and business with a false Copyright Infringement claim.")

**V. PLAINTIFF'S MOTION TO DISMISS**

**\*7** Plaintiff Only's second Motion to Dismiss, filed on August 31, 2006, is both procedurally improper and also raises similar arguments that this Court has already dismissed in denying Plaintiff's June 2, 2006 Motion to Dismiss. Specifically, Plaintiff again argues that "Ascent Media had no valid copyright registration on file as it relates to this case." *Compare* Plaintiff Only's June 2, 2006 Motion to Dismiss in

Docket No. 06-2374 at ¶ 24 *with* Plaintiff Only's August 31, 2006 Motion to Dismiss in Docket No. 06-2123 at ¶ 11. Ascent Media's copyright infringement claim is proper under Section 411 of the Copyright Act. Section 411 states that "no action for infringement of the copyright in any United States work shall be instituted until registration of the copyright claim has been made in accordance with this title." 17 U .S.C. § 411(a). The requirements of section 411 are satisfied when an entity proves "payment of the required fee, deposit of the work in question, and receipt by the Copyright Office of a registration application." *Wilson v. Mr. Tee's,* 855 F.Supp. 679, 682 (D.N.J.1994). As the Court has previously found, Ascent Media has satisfied the requirements of section 411. *See* Ascent Media's Complaint at ¶ 10 and Exhibit B.

**\*7** Further, a party may not move to dismiss a complaint that the party has already answered. *See Vassardakis v. Parish,* 36 F.Supp. 1002, 1003 (S.D.N.Y.1941) ("Defendants' motion to dismiss is made under Rule 12(b)(6) of the Rules of Civil Procedure, which requires that such a motion shall be made before pleading if a further pleading is permitted. The defendants have filed answers to this amended complaint so this motion to dismiss must be denied.") Because Plaintiff Only answered Defendant Ascent Media's Complaint in Docket No. 06-2374 on June 5, 2006, he has improperly filed a Motion to Dismiss.

**VI. PLAINTIFF'S MOTION FOR LEAVE TO FILE A SUPPLEMENTAL COMPLAINT**

**\*8** Although motions for leave to amend should be granted as justice requires, a district court may deny leave to amend if the "amendment is futile or inequitable." *Concepcion v. Resnik,* No. 05-1840, 2005 WL 1791699 (3d Cir. July 27, 2005). A proposed amendment is futile if the complaint, as amended, would fail to state a claim upon which relief could be granted. *See, e.g., In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1434. In addition to the claims already discussed above, Plaintiff Only's proposed amended complaint contains three different elements from his earlier pleadings: 1) allegations describing the markets relevant to the Defendants' antitrust claims; 2) a New Jersey Antitrust Act claim; and 3) a tortious interference claim. For the reasons discussed above, Mr. Only's supplemental complaint again fails to state a claim under federal antitrust laws. Further, because Section 56:9-18 of the New Jersey

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Annotated Statutes provides that the New Jersey Anitrust Act "shall be construed in harmony with ruling judicial interpretations of comparable Federal antitrust statutes," N.J. Stat. Ann § 46:9-18, Plaintiff Only's attempt to state a claim under the New Jersey Antitrust act fails for the same reasons that his attempt to state a claim under the Sherman Act fails.

**\*8** Plaintiff Only also fails to state a claim for tortious interference under New Jersey law. The four essential elements of a claim for tortious interference with contract or prospective business advantage include 1) a protectable right, such as a prospective or contractual relationship, and a showing that a plaintiff was in "pursuit" of business; 2) intentional interference done "with malice"; 3) a loss of the prospective gain; and 4) damage caused by the injury. *Printing Mart-Morristown v. Sharp Electronics Corp., 563 A.2d 31, 37* (N.J.1989). A complaint must include allegations giving rise to some "reasonable expectation of economic advantage." *Id.* at 31. Although Plaintiff Only generally alleges that he "had valid contractual relationships or legitimate expectations of legally enforceable contractual or economic relationships with others," the proposed amended pleadings do not identify existing contracts of a prospective business relationship with the required specificity. *See, e.g., Patel v. Soriano, 848 A.2d 803, 831 (N.J.Super.Ct.App.Div.2004)* and *Coast City Truck Sales, Inc. v. Navistar Int'l Trasnp. Co., 912 F.Supp. 747, 773-75 (D.N.J.1995).*[FN11]

> FN11. In addition to the fact that granting Plaintiff Only's Supplemental Complaint would be futile because the proposed amendments fail to state a claim upon which relief can be granted, Magistrate Judge Shwartz's June 13, 2006 Order struck Plaintiff Only's Second Amended Complaint filed May 31, 2006 and Third Amended Complaint filed June 2, 2006 and ordered that the operative complaint in this case was Plaintiff Only's Amended Complaint filed May 12, 2006.

### VII. CONCLUSION

**\*8** For the reasons stated herein, Plaintiff Only's Request/Motion to Strike Ascent Media's Motion to Dismiss Pursuant to Rule 56(f) is **DENIED**, Defendant's Motion to Dismiss Plaintiff's Amended Complaint and Counterclaim is **GRANTED**, Plaintiff's Motion to Dismiss is **DENIED**, and Plaintiff's Motion for Leave to File a Supplemental Complaint is **DENIED**. An appropriate order will issue, and Defendant Ascent Media shall submit a letter to this Court within ten days of the order advising the Court on the status of its complaint.

D.N.J.,2006.
Only v. Ascent Media Group, LLC
Slip Copy, 2006 WL 2865492 (D.N.J.), 2006-2 Trade Cases P 75,498

Briefs and Other Related Documents (Back to top)

• 2:06cv02123 (Docket) (May 10, 2006)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 26

Westlaw.

Not Reported in P.3d
Not Reported in P.3d, 2001 WL 403167 (Nev.Dist.Ct.), 2001-1 Trade Cases P 73,232
(Cite as: Not Reported in P.3d)

C

Pooler v. R.J. Reynolds Tobacco Co.Nev.Dist.Ct.,
2001.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
District Court of Nevada.
Lucille POOLER, et al, Plaintiff,
v.
R.J. REYNOLDS TOBACCO COMPANY, et al,
Defendant.
No. CV00-02674.

April 4, 2001.

Jerry H. Mowbray, Esq., Reno, for Plaintiff.
Ben Furth, Esq., the Furth Firm, San Francisco, CA,
for Plaintiff.
Thomas R.C. Wilson, Esq., McDonald, Carano,
Wilson, McCune, Bergin, Frankovich & Hicks, Reno,
for Defendant Philip Morris Inc.
David Boies, Esq., Jonathan D. Schiller, Esq., Sherab
Posel, Esq., Boies Schiller & Flexner, Armouk, NY,
for Defendant Philip Morris Inc.
Darryl Snider, Esq., Michael T. Williams, Esq.,
Kenneth L. Cherrof, Esq., Heller, Ehrman, White &
McAuliffe, LLP, Washington, DC, for Defendant
Philip Morris Inc.
Dan C. Bowen, Esq., Lionel, Sawyer & Collins,
Reno, for Defendants Brown & Williamson Tobacco
Corporation and R.J. Reynolds Tobacco Company.
Thomas F. Cullen, Esq., Edward L. Fourntain, Esq.,
William V. O'Reilly, Esq., Jones, Day, Reavis &
Pogue, Washington, DC, for Defendant R.J.
Reynolds Tobacco Company.
Irving Scher, Esq., Weil, Gotshal & Manges LLP,
New York, N.Y., for Defendant Lorillard Tobacco
Company.
Peter D. Isakoff, Esq., Holly E. Loiseau, Esq., Weil,
Gotshal & Manges LLP, Washington, D.C., for
Defendant Lorillard Tobacco Company.
Colin R. Kaas, Esq., Andrew R. McGaan, Esq.,
Barack S. Echois, Esq., Stephen R. Patton, Esq.,
Kirkland & Ellis, Washington, D.C., for Defendant
Brown & Williamson Tobacco Corporation.

ORDER DENYING MOTION TO DISMISS

**\*1** The court has carefully considered the legal
memoranda and exhibits submitted in support of and
in opposition to defendants' motion to dismiss filed

November 3, 2000 and the argument of counsel
presented on March 30, 2001.

**\*1** Three arguments are asserted in support of the
motion to dismiss: (1) NRS 598A.210(2) does not
permit suit by indirect purchasers for conduct that
allegedly took place prior to amendment of the
statute, effective October 1, 1999.(2) The Second
Amended Complaint fails to allege acts committed in
this state which are part of the alleged illegal
conspiracy, as required by NRS 598A.060. (3) This
action is barred by the applicable statute of
limitations, NRS 598A.220, because the plaintiff
does not allege with particularity affirmative acts of
fraudulent concealment on the part of the defendants.

**\*1** The Nevada Unfair Trade Practice Act (UTPA), as
enacted in 1975, provided that "*any person* injured in
his business or property," by reason of an alleged
violation of the act may sue for treble damages,
attorney fees and costs. The Nevada legislature
declared that the provisions of the UTPA shall be
"construed in harmony with prevailing interpretations
of the federal antitrust statutes." NRS 598A.050. In
*Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct.
2061, 52 L.Ed.2d 707 (1977), the United States
Supreme Court decided that indirect purchasers had
standing to bring antitrust claims under federal law
but only for injunctive relief, not money damages.
Applying the *Illinois Brick* decision under the
authority of NRS 598A.050, Judge Mark
Handelsman entered a decision on April 3, 1995 in
*DeVincenzi vs. Abbott Laboratories, et al,* Case No.
CV94-02528, concluding that indirect purchasers had
no standing under NRS 598A.210 to bring an action
for recovery under UTPA.

**\*1** The 1999 amendment of NRS 598A.210(2)
provides that an action for damages may be instituted
by "any person injured or damaged *directly or
indirectly* in his business or property" by reason of a
violation of UTPA. Does this amendment "change"
prior law, thus precluding indirect purchaser actions
for conduct occurring prior to October 1, 1999. or is
it a "clarification" of the unaltered legislative intent
to permit such actions by any injured party (whether
damaged directly or indirectly) before and after the
effective date of the amendment?

**\*1** Although the word "change" appears in the
legislative history of the amendment, it is apparent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in P.3d                                                                Page 2
Not Reported in P.3d, 2001 WL 403167 (Nev.Dist.Ct.), 2001-1 Trade Cases P 73,232
**(Cite as: Not Reported in P.3d)**

that the legislative action in 1999 was a response to the application of *Illinois Brick* to the Nevada act by Judge Handelsman in the *DeVincenzi* decision. The language of NRS 598A.210(2) prior to amendment is unambiguous: Any injured person may sue. There is no legislative history to suggest that when the UTPA was originally adopted the legislature distinguished between whether the injury was direct or indirect, or intended to preclude indirectly injured persons from bringing suit. The 1999 amendment, expressly including indirectly injured parties, does no more than to respond to the results in *Illinois Brick* and *DeVincenzi* by reaffirming the original legislative intent: any person injured by an alleged violation of the act may sue. Therefore, plaintiff's UTPA claims may be pursued in this action whether the alleged conduct of defendants occurred before or after the 1999 amendment of NRS 598A.210(2).

**\*2** Defendants next argue that the marketing and retail sale in Nevada of cigarettes at prices allegedly established by an illegal conspiracy is insufficient to confer jurisdiction under UTPA because such sales alone do not constitute a conspiracy in restraint of trade or any part of activity prohibited under NRS 598A.060. The UTPA should be construed consistently with the legislative policy declared in NRS 598A.030, including preserving and protecting the free, open and competitive nature of our market system and penalizing "to the full extent allowed by law" of all persons engaged in anticompetitive practices. NRS 598A.030(2)(b), (c).

**\*2** The Second Amended Complaint alleges that for decades the defendants have conspired to set the price of cigarettes significantly above competitive levels and that distributors and wholesalers routinely receive notification of impending price increases within hours and often minutes of defendants' price increase notification. It is alleged that through various incentive programs to distributors and/or retailers, defendants were able to monitor their conspiratorial actions and ensure that the mutually-agreed price levels were honored and thus that the conspiracy was enforced. Allegedly this course of conduct was implemented in both domestic and foreign markets. By obtaining the benefit of Nevada laws enabling the sale of cigarettes to indirect purchasers in this state, it is claimed that defendants "reaped at least tens of millions of dollars of profits." Second Amended Complaint, page 2, lines 24-27. The allegations of the Second Amended Complaint, taken as a whole, describe an illegal scheme whereby the price-fixing agreement, wholesale and retail marketing, incentive programs and retail sales to the

ultimate consumer are integral to the nature, implementation, enforcement and success of the conspiracy. Therefore, the marketing and sales of tobacco products in Nevada during the time alleged and in the context of the other allegations of the Second Amended Complaint is sufficient to confer jurisdiction under NRS 598A.060.

**\*2** Finally, defendants argue that the failure of plaintiff to allege the elements of fraudulent concealment requires dismissal of the UTPA claim under NRS 598A.220, the applicable statute of limitations. However, NRS 598A.220(1) does not require proof of fraudulent concealment, but only that the action be brought within four years "after the plaintiff discovered, or by the exercise of reasonable diligence, should have discovered the facts relied upon for proof of the conspiracy." The allegations of the Second Amended Complaint, if true, are sufficient to demonstrate that the plaintiff could not have discovered, by the exercise of due diligence, the alleged facts relied upon for proof of the conspiracy.

**\*2** Accordingly, the motion to dismiss is denied.

Nev.Dist.Ct., 2001.
Pooler v. R.J. Reynolds Tobacco Co.
Not Reported in P.3d, 2001 WL 403167 (Nev.Dist.Ct.), 2001-1 Trade Cases P 73,232

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 27



Not Reported in F.Supp.2d                                                                         Page 1
Not Reported in F.Supp.2d, 2004 WL 315267 (S.D.N.Y.)
**(Cite as: 2004 WL 315267 (S.D.N.Y.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Hernán REY-WILLIS, Plaintiff,
v.
CITIBANK, N.A., Defendant.
No. 03 Civ.2006(SAS).

Feb. 18, 2004.

**Background:** Depositor, who maintained accounts in both New York and Argentine branches of international bank that was headquartered in New York, brought suit for damages in connection with conversion of dollars in his Argentine account into pesos. The court dismissed depositor's complaint for failure to plead his claims with particularity, but granted leave to amend, 2003 WL 21714947.

**Holdings:** On bank's motion to dismiss after amendment, the District Court, Scheindlin, J., held that:
(1) depositor failed to state that act of deception took place in New York, and
(2) depositor did not plead fraud with sufficient particularity to state claim for deceptive business practices under New York law.
Motion granted.

West Headnotes

**[1] Antitrust and Trade Regulation** 🔑131
29Tk131 Most Cited Cases
   (Formerly 92Hk38 Consumer Protection)

**[1] Antitrust and Trade Regulation** 🔑358
29Tk358 Most Cited Cases
   (Formerly 92Hk38 Consumer Protection)
Depositor failed to state deceptive acts and practices claim against bank under New York law, for failure to state that act of deception took place in New York, on allegations that "as of yet unidentified" bank account representatives, who "were reachable by customers through [particular] phone number . . . and were based in Tampa, Florida," made series of phone

calls to him and allowed him to transfer funds from his New York account to his Argentine account without telling him that Argentine government was about to enact so-called "El Corralito" orders which imposed restraints on bank customer's ability to withdraw funds from Argentine banks and converted all U.S. dollar accounts to Argentine pesos, with resultant loss of value and stability. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.; McKinney's General
Business Law § 349.

**[2] Federal Civil Procedure** 🔑636
170Ak636 Most Cited Cases
By failing to identify bank personnel who engaged in allegedly fraudulent activity, depositor did not plead fraud with sufficient particularity to state claim for deceptive business practices under New York law against international bank; depositor merely alleged that bank allowed his dollars to be transferred from New York branch to Argentine branch and allowed purchase of Argentine certificate of deposit (CD) in dollars, knowing that Argentine government was going to freeze deposits and require their conversion to pesos and knowing that dollar depositors would lose money as result. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.; McKinney's General Business Law § 349.

Scott A. Kamber, Wechsler Harwood LLP, New York, New York, for Plaintiff.

Francis P. Barron, Michael T. Reynolds, Matthew G. Coogan, Cravath, Swaine & Moore LLP, New York, New York, Henry Weisburg, Perry S. Bechky, Shearman & Sterling LLP, New York, New York, for Defendant.

*OPINION AND ORDER*

SCHEINDLIN, J.

*1 By Opinion and Order dated July 23, 2003, this Court dismissed Rey-Willis's complaint for failure to plead his claims with particularity under Federal Rule of Civil Procedure 9(b). [FN1] On November 5, 2003, Rey-Willis filed an amended complaint alleging one claim of deceptive business practices under the New York Consumer Protection Act. [FN2] Rey-Willis chose not to replead his claim of commercial bad faith. Once again, Citibank has moved to dismiss. [FN3] For the reasons that follow,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 315267 (S.D.N.Y.)
**(Cite as: 2004 WL 315267 (S.D.N.Y.))**

Page 2

that motion is granted; the amended complaint must be dismissed. [FN4]

> FN1. *See Rey-Willis v. Citibank, N.A.,* No. 03 Civ.2006, 2003 WL 21714947 (S.D.N.Y. July 23, 2003).

> FN2. N.Y. GEN. BUS. LAW § 349 (2003).

> FN3. The legal standard applicable to a motion to dismiss is set forth in the Court's earlier opinion and thus is not restated here. *See Rey-Willis,* 2003 WL 21714947, at *3- *4.

> FN4. Citibank moves to dismiss on a number of alternative grounds, including: (1) failure to state a claim, including failure to plead fraud with particularity, (2) that the agreements governing Rey-Willis's accounts bar this action, (3) that Rey-Willis has already obtained relief in Argentina, and (4) *forum non conveniens.* Because I dismiss for failure to plead fraud with particularity, I need not reach the other proffered grounds for dismissal.
> In addition to moving to dismiss, Citibank moves to strike Rey-Willis' request for punitive damages. Rey-Willis, however, has consented to strike the punitive damage request. *See* Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss With Prejudice the Amended Complaint and Motion to Strike Plaintiff's Demand for Punitive Damages ("Pl.Mem.") at 14.

[1] The facts of this case are fully set forth in the prior Opinion and need not be repeated at any great length. In essence, Rey-Willis alleges that Citibank engaged in deceptive business practices when it allowed him to transfer funds from his New York account to his Argentine account without telling him that the Argentine government was about to enact the so-called "El Corralito" orders. [FN5] The El Corralito orders imposed restraints on a bank customer's ability to withdraw funds from Argentine banks and converted all U.S. dollar accounts to Argentine pesos, with a resultant loss of value and stability. [FN6]

> FN5. *See* Amended Complaint ("Compl.") ¶ 3.

> FN6. *See id.* ¶¶ 30, 31.

The elements of a claim for deceptive business practices under section 349 of the General Business Law are: (1) a practice that was misleading in a material respect, and (2) a resulting injury to the claimant. [FN7] Because section 349 requires that the plaintiff be misled - in essence, defrauded - a section 349 claim must be pled in accordance with Rule 9(b). [FN8] In addition, because section 349 is designed to address "broad consumer-protection concerns," [FN9] a plaintiff bringing a section 349 claim must, "at the threshold, charge conduct that is consumer oriented.... [D]efendant's acts or practices must have a broad impact on consumers at large." [FN10]

> FN7. *See P. Kaufmann, Inc. v. Americraft Fabrics, Inc.,* 232 F.Supp.2d 220, 225 (S.D.N.Y.2002).

> FN8. *See, e.g., Pelman v. McDonald's Corp.,* 237 F.Supp.2d 512, 526 (S.D.N.Y.2003) ("A plaintiff must plead with specificity the allegedly deceptive acts or practices that form the basis of a claim under the Consumer Protection Act," including section 349).

> FN9. *Gaidon v. Mutual Life Ins. Co. of Am.,* 94 N.Y.2d 330, 343, 704 N.Y.S.2d 177, 725 N.E.2d 598 (1999).

> FN10. *New York Univ. v. Cont'l Ins. Co.,* 87 N.Y.2d 308, 318, 639 N.Y.S.2d 283, 662 N.E.2d 763 (1995).

Rey-Willis's initial complaint was dismissed because he failed to allege the first element - a misleading practice - with sufficient particularity. "Although the Complaint indicate[d] the approximate date, place, and content of Citibank's fraudulent omissions, it fail[ed] to identify the persons who made the alleged misrepresentation.... Because he does not specifically identify, by name or otherwise, the identity of the persons who engaged in fraudulent activity, Rey-Willis fails to meet the heightened pleading standard of Rule 9(b)." [FN11] In an attempt to cure this defect, the amended complaint now alleges that Rey-Willis was defrauded in a series of phone calls with "as of yet unidentified" [FN12] Citibank account representatives that "were reachable by customers through the phone number 813-604-3000 and were based in Tampa, Florida." [FN13]

> FN11. *Rey-Willis,* 2003 WL 21714947, at *8.

Not Reported in F.Supp.2d                                                              Page 3
Not Reported in F.Supp.2d, 2004 WL 315267 (S.D.N.Y.)
**(Cite as: 2004 WL 315267 (S.D.N.Y.))**

FN12. Compl. ¶ 51.

FN13. *Id.* ¶ 55.

If this is true, as I must assume, then Rey-Willis's amended complaint does not, as a matter or law, state a claim under section 349, which requires that the act of deception take place in New York. [FN14] The alleged misleading conversations took place between Citibank account representatives in Florida and Rey-Willis, who resided in Argentina at the time. [FN15] Thus, if the Florida-based account representatives are responsible for the fraud, then Rey-Willis has no claim under section 349.

FN14. *See Goshen v. Mutual Life Ins. Co. of N.Y.,* 98 N.Y.2d 314, 325, 746 N.Y.S.2d 858, 774 N.E.2d 1190 (2002) ("to qualify as a prohibited act under [section 349], the deception of a consumer must occur in New York.").

FN15. *See* Compl. ¶ 12.

*2 [2] Nonetheless, Rey-Willis argues that his allegations are sufficient. "Plaintiff's account was still a New York account. The decisions were still made in New York, even if they were communicated to Rey-Willis through employees in Tampa who were able to speak Spanish." [FN16] But if it is true that the Florida-based account representatives were merely messengers - and the decision-makers in New York are the ones truly responsible for the fraud - then the amended complaint suffers from the same infirmity as the initial complaint: Rey-Willis fails to identify, by name or otherwise, the identity of the persons who engaged in fraudulent activity. [FN17]

FN16. Pl. Mem. at 8.

FN17. *See generally Ouaknine v. MacFarlane,* 897 F.2d 75, 79 (2d Cir.1990) (construing Rule 9(b) to require a complaint alleging fraud to "allege the time, place, speaker and sometimes even the content of the alleged misrepresentation."); *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) (Easterbrook, J.) (particularity "means the who, what, when, where, and how: the first paragraph of any newspaper story.").

Rey-Willis's allegations with respect to the New York-based decision-makers are exceedingly vague.

He alleges, for example, that "*Citibank* knew about the government's plans to enact" El Corralito, [FN18] that "*Citibank* had inside information," [FN19] that "*Defendant* engaged in deceptive acts or practices," [FN20] and that "*Defendant's* unlawful deceptive acts or practices were willful and knowing and committed to increase Citibank's profits." [FN21] The most specific (and only) allegation regarding the decision-makers is an oblique reference to "New York executives and employees." [FN22] None of these allegations are sufficient to put Citibank on notice of who precisely is being accused of misleading Rey-Willis. This deficiency remains even after Citibank provided Rey-Willis with "targeted discovery ... specifically intended to aid him in drafting his amended complaint." [FN23] Accordingly, Rey-Willis's allegations fail to meet the heightened pleading standard of Rule 9(b) and his claim for deceptive business practices, and this case, must be dismissed.

FN18. Compl. ¶ 32 (emphasis added).

FN19. *Id.* ¶ 41 (emphasis added).

FN20. *Id.* ¶ 49 (emphasis added).

FN21. *Id.* ¶ 59 (emphasis added).

FN22. *Id.* ¶ 57.

FN23. Memorandum in Support of Defendant's Motion to Dismiss With Prejudice the Amended Complaint and Motion to Strike Plaintiff's Demand for Punitive Damages at 2.

SO ORDERED:

Not Reported in F.Supp.2d, 2004 WL 315267 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:03cv02006 (Docket) (Mar. 21, 2003)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 28

**F I L E D**

San Francisco County Superior Court

JUN 2 0 2003

GORDON PARK-LI, Clerk

BY: _Andrea Carney_

Deputy Clerk

SUPERIOR COURT OF CALIFORNIA

CITY AND COUNTY OF SAN FRANCISCO

| | |
|---|---|
| Coordination Proceeding Special Title [rule 1550(b)]<br><br>**SMOKELESS TOBACCO CASES I - IV**<br><br>This Document Relates To:<br><br>    ALL ACTIONS. | J.C.C.P. Nos. 4250, 4258, 4259, and 4262<br><br>[~~PROPOSED~~] ORDER RE: DEMURRER AND MOTION TO STRIKE<br><br><br><br>Dept.:   304<br>Judge:  Hon. Richard A. Kramer |

On June 11, 2003, the demurrer to plaintiffs' Master Consolidated Coordinated Class Action Complaint ("Master Complaint") and motion to strike portions of the Master Complaint, pursuant to Cal. Code of Civil Procedure sections 430.10; 435 and 436, filed by defendants U.S. Smokeless Tobacco Company (f/k/a United States Tobacco Company), U.S. Smokeless Tobacco Brands, Inc. (f/k/a U.S. Smokeless Tobacco Sales and Marketing Company, Inc.), U.S. Smokeless Tobacco Manufacturing Limited Partnership (f/k/a U.S. Smokeless Tobacco Manufacturing Company Inc.) and UST Inc. (collectively "USSTC Defendants") came on for hearing before this Court as duly noticed. Counsel appeared for all parties.

///

///

///

1  After consideration of the Master Complaint, all pleadings filed in support and

2  opposition to the demurrer and motion to strike and the arguments of counsel the Court

3  ruled as follows:

4      1.    The demurrer to the Third Cause of Action alleging violations of the

5  Cartwright Act (Cal. Bus. & Prof. Code §§ 16700, et seq.) is OVERRULED.  Plaintiffs

6  have alleged facts sufficient to state a cause of action because plaintiffs have

7  sufficiently alleged facts regarding the existence of a trust, combination, agreement or

8  conspiracy under the Cartwright Act.

9      2.    The demurrer to the First Cause of Action for Common Law Monopoly is

10  OVERRULED.  The cause of action is cognizable in California law,  plaintiffs have

11  alleged facts sufficient to state a cause of action and are not required to allege that the

12  USSTC Defendants are entities "affected with a public interest."

13      3.    The motion to strike plaintiffs' claims for actual and punitive damages

14  alleged in the First Cause of Action for Common Law Monopoly is DENIED as the

15  remedies alleged are proper under this cause of action and are not limited to injunctive

16  relief.

17  IT IS SO ORDERED:

18  DATED: 6/19/03

19                              RICHARD A. KRAMER
                            Judge of the Superior Court

20

21  Approved as to form:

22                            6/17/03

23  CHARLES SAMEL
    HOWREY SIMON ARNOLD & WHITE

24  Attorneys for USSTC Defendants

25

26  Submitted by:

27

28  DANIEL J. MOGIN    6/17/03
    Attorneys for Coordinated Plaintiffs

[PROPOSED] ORDER RE: DEMURRER AND MOTION TO STRIKE              PAGE 2