IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE:<br>INTEL CORP. MICROPROCESSSOR<br>ANTITRUST LITIGATION | ) ) ) ) ) | MDL Docket No. 05-1717 (JJF) |
| PHIL PAUL, on behalf of himself and all<br>others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>INTEL CORPORATION,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 05-485 (JJF)<br><br>CONSOLIDATED |

**APPENDIX TO**
**LETTER TO SPECIAL MASTER VINCENT J. POPPITI**
**FROM MARY B. GRAHAM**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
302.658.9200

*Attorneys for Third Party Fry's Electronics, Inc.*

*OF COUNSEL:*

Robert W. Stone
Michael D. Powell
Quinn Emanuel Urquhart Oliver
& Hedges, LLP
555 Twin Dolphin Drive, Suite 560
Redwood Shores, CA  94065
650.801.5000

April 17, 2007

LEXSEE 2006 U.S. DIST. LEXIS 81000

**BANCORP SERVICES, L.L.C., Plaintiff, vs. SUN LIFE ASSURANCE COMPANY OF CANADA, Defendant.**

**No. 4:00-CV-1073 (CEJ)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MIS-SOURI, EASTERN DIVISION**

*2006 U.S. Dist. LEXIS 81000*

**September 11, 2006, Decided**
**September 11, 2006, Filed**

**SUBSEQUENT HISTORY:** Motion denied by *Bancorp Servs., L.L.C. v. Sun Life Assur. Co., 2007 U.S. Dist. LEXIS 17479 (E.D. Mo., Feb. 27, 2007)*

**PRIOR HISTORY:** *Bancorp Servs. v. Sun Life Assur. Co. of Can., 2006 U.S. Dist. LEXIS 20737 (E.D. Mo., Apr. 14, 2006)*

**COUNSEL:** [*1] For Bancorp Services, L.L.C., Plaintiff: Charles K. Verhoeven, David A. Perlson, William A Morehead, QUINN AND EMANUEL, San Francisco, CA; Charles A. Weiss, Douglas W. King, Michelle L. Gravel, Rhiana A. Sharp, BRYAN CAVE LLP, St. Louis, MO; Patrick M. Shields, QUINN AND EMANUEL, Los Angeles, CA; James F. Bennett, DOWD BENNETT, LLP, Clayton, MO US.

For Sun Life Assurance Company of Canada, (U.S.), Defendant: Aaron W. Moore, Emily A. Berger, Matthew B. Lowrie, LOWRIE LANDO & ANASTASI, LLP, Cambridge, MA; Alan C. Kohn, Thomas A. Durphy, KOHN AND SHANDS, St. Louis, MO.

For Analect LLC, Intervenor: Patrick M. Shields, Thomas S Biemer, DILWORTH PAXSON LLP, Philadelphia, PA US; Susan E. Bindler, Maggie B. Peters, HAAR AND WOODS, LLP, St. Louis, MO.

For Sun Life Assurance Company of Canada, Counter Claimant: Aaron W. Moore, Emily A. Berger, Matthew B. Lowrie, LOWRIE LANDO & ANASTASI, LLP, Cambridge, MA; Alan C. Kohn, KOHN AND SHANDS, St. Louis, MO.

For Bancorp Services, L.L.C., Counter Defendant: Charles K. Verhoeven, David A. Perlson, William A Morehead, QUINN AND EMANUEL, San Francisco, CA; Charles A. Weiss, Douglas W. King, Rhiana A. Sharp, BRYAN CAVE LLP, St. Louis, [*2] MO; Patrick M. Shields, QUINN AND EMANUEL, Los Angeles, CA.

**JUDGES:** CAROL E. JACKSON, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** CAROL E. JACKSON

**OPINION:**

**MEMORANDUM AND ORDER**

Before the Court are the motions of Analect, LLC, (Analect) to intervene and for a protective order to protect its confidential and proprietary information from disclosure. Plaintiff Bancorp Services, LLC (Bancorp) and defendant Sun Life Assurance Company of Canada (Sun Life) have filed responses and the issues are fully briefed.

**I. Background**

Analect is a benefit finance company that, in conjunction with defendant Sun Life, provides stable value separate account Bank Owned Life Insurance (SVSA BOLI) products to financial institution policy holders. Under the terms of a confidentiality agreement dated September 8, 1999, Sun Life is required to keep confidential all information about Analect and its SVSA BOLI products. Sun Life also agreed to notify Analect in the event that it received a request to disclose such information.

Plaintiff Bancorp alleges in its complaint that defendant Sun Life's SVSA BOLI products infringe Bancorp's patent. In the course of discovery, Bancorp served Sun Life with a request [*3] for production of documents. Among the documents that Sun Life identified as potentially responsive are several containing Analect's confi-

dential information. Sun Life accordingly notified Analect of Bancorp's request for production and withheld those documents for Analect's review. Negotiations among Analect, Bancorp, and Sun Life have failed to resolve the dispute. n1

> n1 Bancorp has filed a motion to compel production of the documents directly from Sun Life. In addition, Bancorp issued a subpoena directly to Analect. Analect offered to produce, and Bancorp agreed to accept, some documents subject to an "Attorney's Eyes Only" designation; other documents were produced in template form. Bancorp nonetheless continues to seek production of the documents from Sun Life, under the terms of the existing protective order.

## II. Discussion

### A. Analect's Motion to Intervene

Bancorp opposes Analect's motion to intervene, asserting that Analect has failed to show that its interests will be impaired by [*4] the disclosure of its confidential information. Bancorp also asserts that Sun Life adequately represents Analect's interests.

The Federal Rules of Civil Procedure permit intervention as of right when:

> the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

*Rule 24(a)(2), Fed.R.Civ.P.*

The Eighth Circuit has articulated the following test that an applicant for intervention must satisfy: (1) the party must have a recognized interest in the subject matter of the litigation; (2) that interest must be one that might be impaired by the disposition of the litigation; and (3) the interest must not be adequately protected by the existing parties. *Mille Lacs Band of Chippewa Indians v. Minnesota, 989 F.2d 994, 997 (8th Cir. 1993).* Courts construe *Rule 24* liberally, and all doubts are to be resolved in favor of intervention. *United States v. Union Elec. Co., 64 F.3d 1152, 1158 (8th Cir. 1995).* [*5]

In order to establish a "recognized interest," the applicant must have an interest in the subject matter of the litigation that is "direct, substantial, and legally protectible." Id. (quoting *Alameda Water & Sanitation Dist. v. Browner, 9 F.3d 88, 90 (10th Cir. 1993)).* An applicant's interest in protecting trade secrets or confidential proprietary information is sufficient to satisfy this requirement for intervention. *Armour of America v. United States, 70 Fed. Cl. 240, 243-44 (Fed. Cl. 2006).*

The second element "mandates a showing that the interest holder be injured in a practical sense." *Id. at 244* (quoting 6 James Wm. Moore et al., *Moore's Federal Practice § 24.03[3] [a]* (3d ed. 2005)). The loss of trade secrets or proprietary information "undoubtedly constitutes a practical injury." Id. Here, Bancorp is a direct competitor of Analect and Analect would be harmed by allowing the officers and employees of Bancorp to have access to its proprietary information.

Persons seeking intervention carry a "minimal" burden of showing that their interests are inadequately represented by the existing [*6] parties. *Trbovich v. United Mine Workers of America, 404 U.S. 528, 538 n.10, 92 S. Ct. 630, 30 L. Ed. 2d 686 (1972).* The burden is on those opposing intervention to show that representation for the absentee is inadequate. *Armour, 70 Fed. Cl. at 245.* Sun Life and Analect have overlapping, but less than identical, interests in protecting Analect's confidential information and the Court concludes that Analect has met its burden on this factor. Accordingly, the Court will grant Analect's motion to intervene.

### B. Analect's Motion for Protective Order

Analect reviewed the documents that Sun Life identified as potentially responsive to Bancorp's document request and separated them into three categories: (1) documents that Analect does not object to Sun Life producing; (2) documents that Analect does not object to Sun Life producing subject to an "Attorney's Eyes Only" designation or in a "template" form; and (3) seven documents n2 that Analect objects to Sun Life producing under any circumstances.

> N2 Analect initially identified eighteen documents in this category. During the briefing of this motion, Analect continued to review the documents and reduced to seven the number of items it seeks to withhold altogether.

[*7]

The Federal Rules of Civil Procedure contemplate liberal discovery, in the interest of just and complete resolution of disputes. *Katz v. Batavia Marine & Sporting Supplies, Inc., 984 F.2d 422, 424 (Fed. Cir. 1993).*

See also *Seattle Times Co. v. Rhinehart, 467 U.S. 20, 34, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984)* (the "sole" purpose of liberal pretrial discovery is to assist "in the preparation and trial, or the settlement, of litigated disputes"). However, "[i]t is clear from experience that pretrial discovery . . . has a significant potential for abuse." Id. In addition to matters of delay and expense, liberal discovery "may seriously implicate privacy interests of litigants and third parties." *Id. at 34-35.* Accordingly, *Rule 26* provides a mechanism by which litigants and non-parties may seek a protective order. *Id. at 35* ("The Rules do not . . . apply only to the parties to the litigation, as relevant information in the hands of third parties may be subject to discovery.") As relevant to this dispute, a court may, "for good cause shown," enter an order "that a trade secret or other confidential research, development or commercial information [*8] not be revealed or be revealed only in a designated way." *Rule 26(c)(7).*

The Court first addresses Bancorp's argument that Analect's motion for protective order should be denied because Analect did not comply with the "meet and confer" requirements of Local Rule 3.04. As Bancorp acknowledges, Bancorp and Analect held two telephone conferences and conducted extensive and detailed correspondence. Bancorp's assertion thus is flatly refuted by the record.

The existing protective order in this case does not provide an "Attorney's Eyes Only" designation, and Sun Life has repeatedly objected to this omission. Bancorp argues that Analect's request for the designation on its own behalf "merely recycles Sun Life's failed arguments" and therefore should be denied. As noted above, Sun Life and Analect do not have identical interests. Furthermore, in weighing the burdens imposed by discovery, the Court affords additional consideration to non-parties. *Cytodyne Technologies, Inc. v. Biogenic Technologies, Inc., 216 F.R.D. 533, 535 (M.D. Fla. 2003)* (non-party status is considered in weighing the burdens imposed in providing discovery). "[T]he status of a person as a non-party [*9] is a factor that weighs against disclosure." *American Elec. Power Co., Inc. v. United States, 191 F.R.D. 132, 136 (S.D. Ohio, 1999).* Thus, Analect is entitled to seek additional protection for its confidential information, without regard to Sun Life's success or failure in seeking the same.

Restrictions on information supplied to competitors are not unusual. See *Federal Open Market Committee of Federal Reserve System v. Merrill, 443 U.S. 340, 362 n.25, 99 S. Ct. 2800, 61 L. Ed. 2d 587 (1979)* ("[O]rders forbidding any disclosure of trade secrets or confidential commercial information are rare. More commonly, the trial court will enter a protective order restricting disclosure to counsel"). Bancorp objects that the proposed pro-tective order permits Analect to make its own designations regarding what material is confidential. This is a standard provision of most protective orders. Analect's proposed order provides a mechanism for challenging such designations and thus the interests of all concerned parties are adequately balanced. The Court finds that the proposed "Attorney's Eyes Only" designation is appropriate to those Analect documents in Sun Life's possession that are responsive [*10] to Bancorp's document request.

Analect has identified three categories of documents which it proposes to release solely in "template" or "illustrative" form. These are: (1) administrative reports generated in connection with SVSA BOLI policies; (2) service fee schedules showing Analect's fee terms with particular customers; and (3) policy illustrations showing the terms under which proposed policies could be offered. Analect asserts that Sun Life has identified in each category numerous potentially responsive documents that contain the same information with respect to different clients. As Bancorp notes, however, in this instance, Analect's customers are also Sun Life's customers. Bancorp contends that information contained in the SVSA reports, service fee schedules and policy illustrations is relevant to its liability case and the calculation damages. The Court agrees that templates and illustrations will not suffice and will direct Analect to produce the documents, subject to an "Attorney's Eyes Only" designation.

Finally, Analect has identified seven documents it seeks to withhold altogether, as highly confidential and irrelevant to the parties' dispute. Six of the documents involve [*11] Analect's capitalization and one is a privileged document prepared by its counsel. The Court will not require production of these documents.

Accordingly,

**IT IS HEREBY ORDERED** that the motion of non-party Analect, LLC, for leave to intervene [# 146] is **granted.**

**IT IS FURTHER ORDERED** that the motion of non-party Analect, LLC, for protective order [# 148] is **granted in part and denied in part.**

**IT IS FURTHER ORDERED** that Analect, LLC, shall submit, no later than **September 22, 2006,** a draft protective order consistent with this Memorandum and Order.

**IT IS FURTHER ORDERED** that Bancorp shall, no later than **September 18, 2006,** show cause in writing why the seal should not be lifted on its memorandum in opposition to Analect's motion to compel [# 161].

CAROL E. JACKSON

UNITED STATES DISTRICT JUDGE

2006 U.S. Dist. LEXIS 81000, *

Dated this 11th day of September 2006.

LEXSEE 137 NM 229

**BEATRICE C. ROMERO and MICHAEL FERREE, on behalf of themselves and all others similarly situated, Plaintiffs-Appellees, v. PHILIP MORRIS INCORPO- RATED, R.J. REYNOLDS TOBACCO CO., BROWN & WILLIAMSON TO- BACCO CORP., LORILLARD TOBACCO CO., LIGGETT GROUP, INC., and BROOKE GROUP, LTD., Defendants-Appellants.**

**Docket No. 24,034**

**COURT OF APPEALS OF NEW MEXICO**

*137 N.M. 229; 2005 NMCA 35; 109 P.3d 768; 2005 N.M. App. LEXIS 14; 2005-1 Trade Cas. (CCH) P74,754*

**February 8, 2005, Filed**

**PRIOR HISTORY:**    APPEAL FROM THE DIS- TRICT COURT OF RIO ARRIBA COUNTY. James A. Hall, District Judge.

**COUNSEL:** Gabrielle M. Valdez, Eaton, Martinez, Hart & Valdez, P.C., Albuquerque, NM. Shane Charles Youtz. Youngdahl, Youtz & Youngdahl, P.C.. Albu- querque, NM. Pilar Vaile, N.M. Ctr. on Law & Poverty, Albuquerque, NM. Jonathan W. Cuneo, Daniel Cohen, The Cuneo Law Group, P.C., Washington, DC. Gordon Ball, Law Offices of Gordon Ball, Knoxville, TN, for Appellees.

Eric R. Burris, Brownstein, Hyatt & Farber, P.C., Albu- querque, NM. Michael T. Williams, Heller, Ehrman, White & McAuliffe LLP, Los Angeles, CA, for Appel- lant Philip Morris USA Inc.

Andrew G. Schultz, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, NM, for Appellants R.J. Rey- nolds Tobacco Co., Brown & Williamson Tobacco Corp., and Lorillard Tobacco Co.

Thomas F Cullen, Jr., William V. O'Reilly, Edwin L. Fountain, Jones, Day, Reavis & Pogue Washington, DC, for Appellant R.J. Reynolds Tobacco Co.

Stephen R. Patton, Andrew R. McGaan, Barack S. Echols, Kirkland & Ellis Chicago, IL, for Appellant Brown & Williamson Tobacco Corp.

Peter D. Isakoff, Weil, Gotshal & Manges, LLP, Wash- ington, DC. Irving Scher, Weil, Gotshal & Manges,

LLP, New York, NY, for Appellant Lorillard Tobacco Co.

Patricia G. Williams, Wiggins, Williams & Wiggins, P.C., Albuquerque, NM, for Appellants Liggett Group, Inc. and Brooke Group Holding, Inc.

**JUDGES:** JONATHAN B. SUTIN, Judge. WE CON- CUR: MICHAEL D. BUSTAMANTE, Chief Judge, A. JOSEPH ALARID, Judge.

**OPINION BY:** JONATHAN B. SUTIN

**OPINION**

    [*231]  [***770]

    **SUTIN, Judge.**

    [**1]    We have here first impression issues for New Mexico relating to certification of an indirect (con- sumer) purchaser antitrust (price-fixing) class action. Defendant cigarette manufacturers appeal from an order certifying a statewide class of all consumers who bought Defendants' cigarettes during an approximate seven-year period.

    [**2]    Plaintiffs allege Defendants violated the New Mexico Antitrust Act, *NMSA 1978, §§ 57-1-1 to - 17* (1979, as amended through 1987), by entering into a conspiracy to inflate their cigarette list price increases to wholesalers and distributors. Plaintiffs claim injury and damages from the pass-on of overcharges down the chain of distribution. We affirm, holding that under the re- quirements for class certification in Rule 1-023(B)(3) NMRA, the methodologies Plaintiffs presented to prove antitrust injury and damages are sufficient for class certi-

137 N.M. 229, *; 2005 NMCA 35, **;
109 P.3d 768, ***; 2005 N.M. App. LEXIS 14

fication. Questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

[**3] As Background (PP 4-34 infra), we generally discuss: (1) the Antitrust Act; (2) New Mexico's class certification rule, Rule 1-023; followed by (3) and (4) Plaintiffs' and Defendants' proofs and positions; and (5) the district court's determinations and Defendants' points on appeal. In our Discussion, we: (1) set out our general approach to Rule 1-023 (PP35-39); (2) identify the standard of review (PP40); then, (3) we discuss Rule 1-023(B)(3)'s predominance standards for injury and damages; and (4) the superiority (manageability) standard (PP51-55); following which, (5) we analyze the cases supporting certification using classwide injury and damages through generalized proof (PP56-67); (6) we analyze the cases supporting denial of certification because of the need to prove individual injury and individualized damages (PP68-77); and (7) we analyze the Antitrust Act's "damages actually sustained" language (PP78-83). We close the opinion with a summary and the result (PP84-98).

**BACKGROUND**

**1. The Antitrust Act: Indirect-Purchaser**

**Standing and Elements of Claim**

[**4] In *Illinois Brick Co. v. Illinois, 431 U.S. 720, 728-29, 52 L. Ed. 2d 707, 97 S. Ct. 2061 (1977)*, the United States Supreme Court held that indirect purchasers of a product from a manufacturer did not have standing to sue under the federal antitrust law for overcharges that were "passed on" to the indirect purchasers. The Court's decision built on its previous ruling in *Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 489, 20 L. Ed. 2d 1231, 88 S. Ct. 2224 (1968)*, that antitrust defendants could not use the defense that overcharges were not absorbed by direct purchasers but were "passed on" to indirect purchasers, adopting the reasoning that to allow indirect purchaser lawsuits would unnecessarily complicate matters given "the economic uncertainties and complexities involved in proving passon." *Illinois Brick, 431 U.S. at 725 & n.3*. In his dissenting opinion in Illinois Brick, Justice Brennan preferred to limit the Hanover Shoe rule to prohibiting the use of a pass-on defense, thus permitting indirect purchasers to prove overcharges. *Illinois Brick, 431 U.S. at 753* (Brennan, J., dissenting).

[**5] In response to Illinois Brick, many states enacted provisions allowing indirect purchaser lawsuits under their antitrust law. The viability of these state provisions was confirmed when the United States Supreme

Court limited Illinois Brick to construing federal antitrust policy and not "defining the interrelationship between the federal and state antitrust laws." *California v. ARC Am. Corp., 490 U.S. 93, 103, 105, 104 L. Ed. 2d 86, 109 S. Ct. 1661 (1989)*. New Mexico's [***771] [*232] indirect purchaser provision is contained in *Section 57-1-3(A)* of the Antitrust Act.

[**6] *Section 57-1-3(A)* reads:

All contracts and agreements in violation of *Section 57-1-1* or *57-1-2 NMSA 1978* shall be void, and any person threatened with injury or injured in his business or property, directly or indirectly, by a violation of *Section 57-1-1* or *57-1-2 NMSA 1978* may bring an action for appropriate injunctive relief, up to threefold the damages sustained and costs and reasonable attorneys' fees. If the trier of fact finds that the facts so justify, damages may be awarded in an amount less than that requested, but not less than the damages actually sustained.

Commensurate with the grant of standing to indirect purchasers, the Antitrust Act allows defendants to assert as a defense that the plaintiffs "passed on all or any part of [an] overcharge . . . to another purchaser or seller in [the distribution] chain." *§ 57-1-3(C)*.

[**7] To recover antitrust damages under federal law, a plaintiff must prove: (1) an antitrust violation; (2) that the violation caused damage to the plaintiff's business or property, characterized in antitrust cases as "injury," or "fact of damage," or "impact," hereinafter referred to as "injury"; and (3) the amount of damages sustained. See *Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114, 23 L. Ed. 2d 129, 89 S. Ct. 1562 & n.9 (1969)* (distinguishing the injury element establishing causation, which requires proof of "some" damage from a conspiracy, from the damages element that measures the extent of damage); *Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294, 302 & n.12 (5th Cir. 2003)*; *Windham v. Am. Brands, Inc., 565 F.2d 59, 67 (4th Cir. 1977)* (involving allegations by tobacco growers of tobacco company price-fixing). "Antitrust injury, causation, and damages all are necessary parts of the proof because 'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" *Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1055 (8th Cir. 2000)* (quoting *Hawaii v. Standard Oil Co., 405 U.S. 251, 262-63 n.14, 31 L. Ed. 2d 184, 92 S. Ct. 885 (1972)*). We interpret the Antitrust Act in harmony with

137 N.M. 229, *; 2005 NMCA 35, **;
109 P.3d 768, ***; 2005 N.M. App. LEXIS 14

federal antitrust laws when, as here, we have no New Mexico authority on point to guide us. *Griffin v. Guadalupe Med. Ctr., Inc., 1997 NMCA 12, P9, 123 N.M. 60, 933 P.2d 859.* We determine, and the parties do not disagree, that the same three elements, i.e., a violation, causing injury, resulting in damages, must be proven under the Antitrust Act. See *Ren v. Philip Morris Inc.,* No. 00-004035-CZ, 2002 WL 1839983, slip op. at *2 (Mich. Cir. Ct. June 11, 2002) (involving state antitrust allegations by consumers against manufacturers); *Keating v. Philip Morris, Inc., 417 N.W.2d 132, 137 (Minn. Ct. App. 1987)* (involving state antitrust allegations by retailers against tobacco manufacturers).

## 2. Class Certification Rule

[**8]    Under Rule 1-023(A), to be certified as a class, New Mexico plaintiffs must satisfy the prerequisites commonly referred to as numerality, commonality, typicality, and adequacy. These prerequisites are not at issue in this appeal. The district court may only certify a class action for the recovery of damages if plaintiffs establish and the court finds these further prerequisites exist:

> The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:
>
> (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions;
>
> (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;
>
> (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;
>
> (d) the difficulties likely to be encountered in the management of a class action.

[***772]    [*233]    Rule 1-023(B)(3); *Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614-16, 138 L. Ed. 2d 689, 117 S. Ct. 2231 (1997).*

[**9]    These Rule 1-023(B)(3) prerequisites are commonly referred to as the predominance and superiority requirements, see *Amchem Prods., 521 U.S. at 615,* and they are directly at issue in this appeal. As we shall discuss, the predominance requirement brings into primary focus the plaintiffs' proposed methods of proof at trial of the elements of an antitrust claim. And the primary focus of the superiority requirement is the suitability of the class action for management of the litigation. In the present case, the parties' evidence focused on whether common factual issues predominated over individual ones and on difficulties likely to be encountered in the management of the litigation. Predominance of legal issues is not at issue.

## 3. Plaintiffs' Proof and Positions

[**10]    Plaintiffs allege a seven-year, Antitrust Act price-fixing conspiracy among Defendants who controlled over ninety percent of the United States market for cigarettes. [1] The primary evidence for class certification consisted of affidavits of an economist, Robert E. McCormick, Ph.D., Professor and Scholar, Department of Economics, Clemson University, together with materials and data he relied on. Dr. McCormick estimated that approximately 292,500 New Mexicans were damaged by approximately $ 132.3 to $ 216.3 million for purchasing the products during the time involved in this action. Relying on publicly available sales and market data, information as to pricing practices within the cigarette industry, and certain economic theories and statistical models, Dr. McCormick's view was that a conspiracy to raise prices would necessarily produce a common, classwide injury in the form of an embedded overcharge passed on through wholesalers, distributors, retailers, and jobbers to indirect purchasers.

> 1    Price-fixing conspiracy claims were the subject of several federal nationwide antitrust class actions filed by direct purchasers of cigarettes. These actions were consolidated and transferred to the United States District Court for the Northern District of Georgia. The district court granted summary judgment for the defendants on the issue of conspiracy to fix prices, and the Court of Appeals for the Eleventh Circuit affirmed. See *Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1291 (11th Cir. 2003).*

[**11]    Dr. McCormick's methodologies for determining classwide injury and damages included (1) a "benchmark price" analysis to determine the amount of overcharge, (2) a "tax incidence theory" to determine the amount of pass-on of overcharge to indirect purchasers, and (3) a "correlation analysis" to determine the fact of antitrust injury, that is, the facts of embedded overcharging and the pass-on of those overcharges to consumers. Dr. McCormick's correlation analysis consisted of a statistical measurement of the average tendency of two sets

of prices, the list price and the retail price, to move together over time.

[**12]    More particularly, Dr. McCormick analyzed the overall markets for cigarettes in the United States and in New Mexico, the market structure and distribution mechanism for cigarettes nationally and in New Mexico, manufacturer list prices nationally and in New Mexico, and retail scanner pricing data in New Mexico. As well, Dr. McCormick inquired into relevant supply and demand factors regarding cigarettes, and analyzed pricing policies of cigarette manufacturers nationally and analyzed certain economic literature. He further analyzed the rate of pass-on of manufacturer list prices to retail consumers and empirical retail data submitted by Defendants.

[**13]    In regard to classwide injury, Dr. McCormick concluded through his correlation analysis that Defendants' list prices and corresponding retail prices moved together consistently. He further concluded that "no amount of shopping by any smoker in New Mexico could escape a conspiratorial overcharge." According to Dr. McCormick's analysis, ninety-eight percent of the retail prices of the brands sampled moved with the manufacturers' prices, with a level of only five or less percent for error in the statistical conclusion. Thus, Plaintiffs assert, a conspiracy to raise prices will be felt by the consumer even if the retailer sells below its cost [***773] [*234] since, if the conspiratorial list price increase had not occurred, the retailer would have been selling below a lower list price.

[**14]    Based on Dr. McCormick's analyses and opinions, Plaintiffs further argued below that once a price-fixing conspiracy is proven to have existed during the period alleged, every indirect purchaser of Defendants' products during that period in New Mexico was injured because every one of them was deprived of access to a competitive market. According to Plaintiffs, deprivation of a competitive market is the real common issue, and the fact that some purchasers might have at one time paid less was not material. Purchasers do not make a one-time purchase, because, Plaintiffs argued, sooner or later, when enough packs are purchased, if this conspiracy is out there, the purchaser is going to be injured. Plaintiffs point out that Dr. McCormick had the benefit of extensive pricing data and economic analysis tools not available as late as the late 1980s. They contend that Dr. McCormick's analyses satisfied their burden to show that common issues regarding antitrust injury predominated over individual issues regarding injury.

[**15]    Plaintiffs further contend that once they show wide-spread injury to the class on a classwide basis through common evidence, an estimate of aggregate damages is sufficient to carry Plaintiffs to certification

even if they fail to transform their theories to real numbers. Plaintiffs argue that the concerns of complexity do not outweigh the importance of providing Plaintiffs an opportunity to try and prove damages resulting from the alleged conduct.

[**16]    More particularly, although nowhere specifically recited in Plaintiffs' answer brief, in estimating aggregate damages, Dr. McCormick considered information that measured retail sales of cigarettes in New Mexico and overcharges at the manufacturer level adjusted by a rate of pass-on through the claim of distribution that takes into consideration the behavior of entities along that chain. Dr. McCormick used a "general formula" pursuant to which damages would be apportioned by multiplying the manufacturer's sales by the overcharge percentage for direct purchasers, and then multiplying that product by the rate of pass-on of overcharge by retailers. Plaintiffs acknowledge that Dr. McCormick is estimating the amount of overcharge that was passed on to indirect purchasers. He arrived at a range of damages for indirect purchasers based on minimum overcharge and maximum overcharge amounts.

[**17]    After setting out his range of estimated damages, Dr. McCormick set out alternatives as to how he would apportion damages to individual class members. Again, not specifically discussed in Plaintiffs' answer brief, one of Dr. McCormick's alternatives was to award each class member with the damages to the average member of the class by dividing aggregate classwide damages by the number of class members. Another alternative was to collect smoking histories and behavior of individual class members during a claims process and, using the information in conjunction with per-pack overcharges already calculated, provide an estimate of actual damages to each individual class member. While acknowledging that individualized damages to indirect purchasers are concededly difficult to show, Plaintiffs assert that Defendants should not be free to violate antitrust laws by raising difficulty and uncertainty of proof.

### 4. Defendants' Proof and Positions

[**18]    In opposition to class certification, Defendants presented an affidavit of their economic expert, Dr. Edward A. Snyder, an economist and Dean of the University of Chicago Graduate School of Business, along with various retailers' affidavits, one Plaintiff's deposition, and other documentary evidence. Defendants' evidence essentially consisted of details relating to the actual process of the distribution of cigarettes from Defendants to consumers, actual variations in retail pricing, and market and consumer behavior.

[**19]    During the alleged class period, Defendants sold about eighty different brands of cigarettes to about

eight to twelve distributors and wholesalers in New Mexico who, in turn, sold to retailers. Retailers included convenience stores, cigarette outlets, mass merchandisers, supermarkets, grocery [***774] [*235] stores, drug stores, liquor stores, gas stations, and bars.

[**20]  Defendants did not set retail prices. Retailers independently determined their prices. Different retailers, and different types of retailers, pursued differing strategies with respect to cigarette pricing. For example, cigarette outlets generally offered lower prices than other retailers. Native American stores charged the lowest prices. Grocery stores typically charged higher prices than other retailers. In regard to strategies, some retailers used standardized pricing, while others varied their prices depending on location or local competition. Some retailers set their prices so that the prices ended in either "0" or "5," and some ran cigarette promotions to build customer traffic.

[**21]  Consumers paid different prices for cigarettes depending upon, among other things, the brand, the retail outlet, and whether the purchaser availed himself or herself of any discounts or promotions. At some time during the class period, many members quit smoking, started smoking, or changed which, how often, and where they bought cigarettes. As an example, Defendants show that during the class period one Plaintiff, Beatrice Romero, bought Marlboros, a Philip Morris premium brand, at a grocery store where she shopped, five years later she switched to Misty, a Brown & Williamson discount brand, which she purchased at a discount cigarette store, and later she started smoking mostly "Native" brand cigarettes, a very low-priced brand that she purchased at a Native American store. Mrs. Romero had no records showing her purchases or the prices she paid during the class period.

[**22]  According to Defendants, retail price data collected from a sample of twenty-five stores between 1996 and 2000 showed that retail cigarette prices for the same brand varied as much as seventy-five percent from one New Mexico retail outlet to another. Variations in pricing resulted from discounts and promotions effective at both the wholesale level and the retail level. Different wholesalers paid different prices due to manufacturers' promotional and incentive programs and discounts for prompt payment and assistance in promoting a particular brand. These wholesalers then charged different prices to retailers. Retailers sometimes switched wholesalers in order to obtain better prices.

[**23]  Defendants argued below that there were a variety of discounts and promotions offered by particular manufacturers directly to retailers, which changed from time to time and lowered retail prices. These included: (1) "buy downs," where a manufacturer paid a retailer

directly to reduce the retail price for a particular brand or for particular brands; (2) display agreements in which a manufacturer paid retailers for product placement and display space, payments the retailers could use to lower prices; and (3) "buy some get some" promotions, such as buy one get one free, which lowered the per-pack price paid by the consumer. The multitude of retail discounts and promotions in effect at any given time resulted in price variations from one geographic area to another, from one store to another, and even within a single store among competing brands.

[**24]  Pursuant to Defendants' expert, cigarette prices in some stores did not increase in the weeks following manufacturer list price increases, indicating that some retailers absorbed those increases, and that others passed on some or all of the increase to consumers. For example, during the class period for which data was available, the data showed that six weeks after each of ten list price increases over forty percent of retailers had not raised prices on one or more major brands, and further showed instances in which nearly all retailers did not pass on list price increases for at least one major cigarette brand for two months. Some retailers did not increase prices in order to keep prices under certain pre-set levels. Others raised or lowered prices for reasons unrelated to manufacturer list price increases. Some retailers did not always increase their prices when list prices went up, or, alternatively, did not increase their prices at the same time or in the same amounts.

[**25]  Defendants assert on appeal that this "empirical data" shows that retail prices "did [*236] [***775] not increase in the wake of increases in list prices in any common or predictable fashion," stating that Dr. Snyder studied the "actual cigarette prices charged by New Mexico retailers to determine whether those prices uniformly increased following increases in list prices" and that "the data incontrovertibly showed that they did not." (Emphasis omitted.) Defendants further find it significant that Dr. Snyder's analysis "showed that over 40% of New Mexico cigarette retailers had not raised prices on one or more major brands fully six weeks after each list price increase had taken effect."

[**26]  Defendants attack Dr. McCormick's conclusion of classwide injury as insufficient, arguing that only methodologies that would prove specific injury to individual class members were appropriate. They specifically attack Dr. McCormick's correlation analysis on the ground that it said nothing about the specific amounts of the movements of list price and retail price, and, further, that because correlation analysis is only capable of measuring the average tendency of list and retail prices to move together over time and does not measure the amount by which retail prices changed, the correlation analysis could not detect the numerous instances where

retailers did not pass on all or portions of list price increases. Thus, according to Defendants, the correlation analysis failed to demonstrate that any particular consumer was injured from a higher retail price at any specific point in time, thereby failing to prove injury to individual class members.

[**27]  Defendants attack Dr. McCormick's damages methodology and calculations on the ground they are merely an estimate or average that would result in class members receiving damages awards different from the damages they actually sustained. Defendants argue that Dr. McCormick failed to show how the aggregate classwide damages calculations could be reduced to an amount of damage actually suffered by any one consumer. Thus, Defendants argue, distribution of damages will result in class members recovering amounts different from the loss actually sustained.

[**28]  Defendants go on to assert that most class members do not have records that would show their purchases or the prices paid. In support of this assertion, Defendants cite Dr. McCormick's deposition testimony in which he acknowledged that "it's not likely that [in a claims process] there are going to be substantial records associated with who bought from whom[,] what[,] when." He further acknowledged that cigarettes are "a consumable product usually purchased in small quantities on a repetitive basis where records are not usually kept by consumers." In addition, in acknowledging a distinction between stock and airline ticket purchaser cases as opposed to cigarette purchaser cases, Dr. McCormick stated that "cigarettes are different from--it's not a product where detailed records pairing buyer and seller are recorded in a systematic fashion." Defendants note cases, which we discuss later in this opinion, that have rejected class certification for class members who generally do not have or keep documented proof of their purchases. Plaintiffs are silent in regard to the documented-proof concern, apparently considering it immaterial at the class certification stage.

### 5. The District Court's Determinations

### and Defendants' Points on Appeal

[**29]  During argument on the issue of class certification, the district court indicated that it was difficult not to think that wholesale prices did not affect retail prices: "It's always been my view that in general terms, at least, wholesale prices affect resale prices." Further, the court's questions showed concerns about requiring individuals to bring individual lawsuits because such suits did not constitute a practical avenue for individuals to obtain relief, and because of the likelihood of inconsistent results. The court also indicated during argument that there was little reason not to certify the class to at

least determine whether a price-fixing conspiracy existed.

[**30]  The district court certified the class, determining first that Plaintiffs met their burden under Rule 1-023(A) of establishing the core requirements of commonality, numerosity, typicality, and adequacy. The court then moved to the issues of predominance and superiority under subpart (B)(3), [***776]  [*237] first determining that common issues predominated as to the issue of whether a price-fixing conspiracy existed, and then determining that Plaintiffs satisfied the other requirements of subpart (B)(3) -- those that are at issue in this appeal, namely, that common issues regarding classwide antitrust injury and damages predominate over issues regarding individual injury and the calculation of individual damages.

[**31]  The court delivered its opinion orally from the bench following argument, and that opinion was placed verbatim in a written order. The court began its discussion with the forecast that it would "look at Rule 1-023 quite broadly to effectuate . . . legislative intent." As to predominance on the issue of antitrust injury, virtually all the court stated was its conclusion that "the methodology that's been proposed here meets what I view as the fairly low standard of plausibility." The court also concluded that a plausible method had been presented for determination of aggregate damages, even though "that's well below what must be proved at trial." The court stated that, "once [injury] is shown, . . . New Mexico law will not require the amount of damages to be proven at this stage[,]" and, therefore, "the issue of the amount of damages need not be addressed here at this stage." However, the court added that, "alternatively, I would conclude . . . that if it is required that some reasonable method be addressed for purposes of the amount of damages, that has been established, and I base that on a fairly broad view of what our Courts will look for in terms of class certification. "

[**32]  The court then moved to superiority, concluding: "there is no other method of adjudication that can reasonably be brought to address the issue of whether a conspiracy existed. It is simply impractical to believe that any individual smoker could raise this as a lawsuit and pursue it [through] to verdict." In the court's view, this was "consistent with the legislative intent in adopting a statutory scheme which permits indirect purchasers to pursue actions for violation of the Antitrust Act," an Act through which, the court felt, the Legislature "expressed a strong desire to discourage behavior which violates the Act" and intended "to provide for recovery, a remedy, to persons who have been affected, either directly or indirectly." The court believed that the appellate courts would interpret the Antitrust Act broadly to implement that legislative intent through Rule 1-023.

137 N.M. 229, *; 2005 NMCA 35, **;
109 P.3d 768, ***; 2005 N.M. App. LEXIS 14

[**33]    The court closed its order by offering its views that "the class action mechanism really is the perfect mechanism to determine the existence of a conspiracy in this type of a situation," and that it is a "terrific mechanism . . . for the Defendants . . . to rebut . . . the Plaintif[s'] contention that there was a conspiracy and to have a final resolution that's binding not just on one consumer, but on all members of the class." When the district court decided the certification motion in this case, we had not yet let it be known that we consider findings and conclusions to be very beneficial for review of class action cases. See *Brooks v. Norwest Corp., 2004 NMCA 134, P36, 136 N.M. 599, 103 P.3d 39 (2004)*, cert. denied, No. 28,870 (Dec. 7, 2004); *Berry v. Fed. Kemper Life Assur. Co., 2004 NMCA 116, P19 n.1, 136 N.M. 454, 99 P.3d 1166 (2004)*, cert. denied, No. 28,850 (Sept. 17, 2004). We reiterate for future class certification cases that district courts should provide findings of fact and conclusions of law.

[**34]    Defendants raise three points of error on appeal, each of which focuses on the district court's interpretation of the standards to use in application of the Rule 1-023(B)(3) requirements. First, Defendants contend that the certification standards the district court used in scrutinizing Plaintiffs' methodologies were too lenient, and also that the court by-passed its duty to vigorously analyze Plaintiffs' methodologies and failed to require any showing by Plaintiffs of how, through common proof, they would show individual injury and individualized damages at trial. Second, Defendants contend that the district court erred in not addressing damages or, alternatively, in accepting Plaintiffs' theory of aggregating damages to the class as a whole despite the inability to determine actual damages for individual class members, thereby relieving class members of having to prove any actual damages. As part of this contention, [***777] [*238] Defendants assert that the court failed to require a damages methodology by which Plaintiffs would adhere to the Antitrust Act's proof requirement of "damages actually sustained." Third, Defendants contend that the district court erred in its interpretation and application of the superiority requirement by entirely ignoring manageability and approving the class solely because the court believed that individual lawsuits would be impractical.

**DISCUSSION**

**1. General Approach to Rule 1-023** [**35]    Rule 1-023(B)(3) is essentially identical to its federal counterpart, *Rule 23(b) of the Federal Rules of Civil Procedure*. We may look to federal law for guidance in determining the appropriate legal standards to apply under these rules. See *Benavidez v. Benavidez, 99 N.M. 535, 539, 660 P.2d 1017, 1021 (1983)* (stating that it was appropriate for the district court to look to federal law construing Rule 1-

060(B) NMRA); *Eastham v. Pub. Employees' Ret. Ass'n Bd., 89 N.M. 399, 402-03, 553 P.2d 679, 682-83 (1976)* (relying on federal interpretations of *Fed. R. Civ. P. 23*); *Ridley v. First Nat'l Bank in Albuquerque, 87 N.M. 184, 185-86, 531 P.2d 607, 608-09 (Ct. App. 1974)* (same). Nonetheless, we must be analytically careful when looking at federal antitrust class action cases because they do not involve actions by indirect (consumer) purchasers. See *Execu-Tech Bus. Sys., Inc. v. Appleton Papers Inc., 743 So. 2d 19, 22 (Fla. Dist. Ct. App. 1999)* (stating that the presumption of injury in an anti-competitive market "should not arise in indirect purchaser cases due to the evidentiary complexities and uncertainties noted in *Illinois Brick*"); Ren, 2002 WL 1839983, at *5 (stating that "the presumption engaged in by some courts regarding injury to direct purchasers is not available in an indirect purchaser case").

[**36]    We enter into our analysis of the issues before us recognizing that class actions play a significant role in obtaining remedies for small claim holders against defendants who violate antitrust laws. See *Amchem Prods., 521 U.S. at 617* (indicating that the class action process solves the problem of lack of incentive to seek redress for an antitrust violation by aggregating small potential recoveries into a matter worth pursuing, including an attorney's labor). Rule 1-023 is a device to save court and party resources and promote litigation economy by litigating common questions of law and fact at one time. *Gen. Tel. Co. v. Falcon, 457 U.S. 147, 155, 161, 72 L. Ed. 2d 740, 102 S. Ct. 2364 (1982)* (majority opinion and Burger, C.J., concurring and dissenting). The predominance and superiority requirements seek to assure avenues exist through which treatment as a class action can achieve economy and promote uniformity of decision. *Amchem Prods., 521 U.S. at 615*; see *Fed. R. Civ. P. 23(b)(3)* advisory comm. notes (concluding that the additional requirements sought to cover cases "in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results"). Rule 1-023 is a remedial procedural device, and we will interpret it liberally. See *In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 504 (S.D.N.Y. 1996)* [hereinafter In re NASDAQ]; *In re Sugar Indus. Antitrust Litig., 73 F.R.D. 322, 357-58 (E.D. Pa. 1976)* [hereinafter In re Sugar]. We also recognize that a dominant policy behind the class action procedure is the "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods., 521 U.S. at 617* (internal quotation marks and citation omitted). Through class actions, injured persons with small claims are given an avenue to "overcome the problem that small recoveries do not provide the incentive for any individual

137 N.M. 229, *; 2005 NMCA 35, **;
109 P.3d 768, ***; 2005 N.M. App. LEXIS 14

to bring a solo action prosecuting his or her rights." Id. (internal quotation marks and citation omitted).

[**37] Yet we are aware that Rule 1-023 was not "intended to permit a redress for all wrongs committed under the antitrust laws." *City of Philadelphia v. Am. Oil Co., 53 F.R.D. 45, 73 (D.N.J. 1971)* (acknowledging the plaintiffs' argument of class action superiority on the ground the defendants should [***778] [*239] not be permitted to profit by their conspiracy, and the unfortunate consequences of not certifying the class, but determining nevertheless that the basic requirement of manageability was not met). Furthermore, although *Section 57-1-3(A)* confers standing to New Mexico indirect purchasers to bring a civil action for damages, we see no indication that the Legislature intended the Antitrust Act to single out indirect purchasers for any different or more favorable class action treatment than was intended for other persons seeking relief from a violation of the Act. See *Peridot, Inc. v. Kimberly-Clark Corp.*, No. MC 98-012686, 2000 WL 673933, at *2 (Minn. Dist. Ct. Feb. 7, 2000) (holding that state indirect purchaser provision makes "no special allowance for such suits to be brought as class actions--suits filed under the antitrust chapter as class actions still must meet all requirements for class certification"); *Melnick v. Microsoft Corp.*, Nos. CV-99-709, CV-99-752, 2001 WL 1012261, at *6 n.7 (Me. Super. Ct. Aug. 24, 2001) ("The enactment of [Maine's indirect purchaser statute] does not change the plaintiffs' burden of proof on a motion for class certification."); *Derzon v. Appleton Papers, Inc.*, No. 96-CV-3678, 1998 WL 1031504, at *4 (Wis. Cir. Ct. July 7, 1998) ("Simply because Wisconsin sought to provide a remedy to indirect purchasers . . . does not signify that such a remedy is necessarily appropriate for a class action[.]").

[**38] While recognizing the useful purpose of Rule 1-023, we are mindful that courts must nevertheless conduct a rigorous analysis into whether the prerequisites of the rule are met before certifying a class. *Gen. Tel. Co., 457 U.S. at 161*; *Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294, 301 (5th Cir. 2003)*; *In re Cardizem CD Antitrust Litig., 200 F.R.D. 297, 303 (E.D. Mich. 2001)* [hereinafter In re Cardizem]. The party seeking certification has the burden of showing that each prerequisite of Rule 1-023 is met. *Amchem Prods., 521 U.S. at 614*; *Bell Atl. Corp., 339 F.3d at 301*; *Windham v. Am. Brands, Inc., 565 F.2d 59, 64 n.6 (4th Cir. 1977)*. The district court's rigorous analysis often "involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Coopers & Lybrand v. Livesay, 437 U.S. 463, 469, 57 L. Ed. 2d 351, 98 S. Ct. 2454 (1978)* (internal quotation marks, citation, and emphasis omitted). Thus, the court may "probe behind the pleadings before coming to rest on the certification question." *Gen. Tel. Co., 457 U.S. at 160*. In fact, we have

held that "it is essential for the court to understand the substantive law, proof elements of, and defenses to the asserted cause of action to properly assess whether the certification criteria are met." *Brooks, 2004 NMCA 134, P31, 103 P.3d 39*.

[**39] A class may not be certified unless the district court is satisfied that the Rule 1-023(B)(3) requirements are actually satisfied; and the court may not simply presume conformance with Rule 1-023. See *Gen. Tel. Co., 457 U.S. at 160*; *Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 677 (7th Cir. 2001)* (rejecting "the 'across-the-board' rule jettisoned by *Gen. Tel. Co.*" and holding that district courts were required to find actual, not presumed, conformance with *Rule 23(b)*); *Sample v. Monsanto Co., 218 F.R.D. 644, 650 (E.D. Mo. 2003)* (rejecting the plaintiffs' assertion of predominance of common issues as to injury based on expert testimony where the plaintiffs presumed classwide injury without any consideration whether a price-fixing conspiracy or markets "actually operated in . . . a manner so as to justify that presumption"); *Execu-Tech Bus. Sys., 743 So. 2d at 22* (refusing in indirect purchaser cases to apply a presumption of anti-competitive market injury). We have noted that the abundant literature regarding class action litigation "indicates that the courts have grown more cautious over the years about the class action vehicle." *Berry, 2004 NMCA 116, P34, 99 P.3d 1166*. Although the wisdom or form of class certification can be reconsidered after a class has been certified, see Rule 1-023(C)(1), courts should be careful not to postpone rigorous analysis into satisfaction of the prerequisites until after certification. See *Berry, 2004 NMCA 116, PP33-37, 99 P.3d 1166*.

[***779] [*240] **2. Standard of Review**

[**40] We review the grant of class certification for abuse of discretion as set out in *Berry, 2004 NMCA 116, PP25-26, 99 P.3d 1166*.

**3. The Predominance Standards for Injury and Damages**

[**41] "The *Rule 23(b)(3)* predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., 521 U.S. at 623*. "Stated broadly, Plaintiffs' burden under *[Rule] 23(b)(3)* is to establish that common or 'generalized proof' will predominate at trial with respect to the essential elements of their antitrust claim." *In re Polypropylene Carpet Antitrust Litig., 996 F. Supp. 18, 22 (N.D. Ga. 1997)* (order) [hereinafter In re Polypropylene Carpet]. The validity of the methodologies that pass certification scrutiny will be determined when they are tested at trial. See *In re NASDAQ, 169 F.R.D. at 521*.

[**42] In the present case, no predominance issue exists as to whether Defendants violated the Antitrust Act. Defendants concede that, in price-fixing cases brought by indirect purchasers, the question whether there was a conspiracy is typically a common one. As to antitrust injury, "to proceed as a class, Plaintiffs must show they plan to use common evidence that reveals impact as to each member of the proposed class without resorting to lengthy individualized examinations." *In re Polypropylene Carpet, 996 F. Supp. at 22.* As to antitrust damages, Plaintiffs "must show they will compute damages through the use of common proof." *Id. at 29* (internal quotation marks and citation omitted).

[**43] It is not difficult to stage the debate on the overriding predominance issue in the present case. On one side is whether the methodologies advanced by Plaintiffs at the certification stage to prove injury and damages at trial must, as Defendants assert, be sufficient to establish at trial specific individual injury and individualized damages with respect to each class member. The other side is whether those methodologies need only, as Plaintiffs assert, constitute a "threshold showing" from which injury and damages can reasonably be inferred on a classwide basis, leaving for trial the sufficiency of those generalized methodologies to satisfy Plaintiffs' burden of proof. Plaintiffs contend the burden does not include having to show a specific individual injury and a specific amount of individualized damages with respect to each individual class member.

[**44] In Plaintiffs' view, their methodologies are "plausible," "viable," and "sound" methods for demonstrating classwide injury and damages. The substantive quality of the injury methodology that meets the threshold necessary for certification has been characterized in various ways, including "'logically probative of a loss attributable' to the alleged conspiracy." *In re Domestic Air Transp. Antitrust Litig., 137 F.R.D. 677, 692 (N.D. Ga. 1991)* [hereinafter In re Domestic Air] (quoting *Bogosian v. Gulf Oil Corp., 561 F.2d 434, 454 (3d Cir. 1977)*). Plaintiffs must "have demonstrated at least a 'colorable method' of proving [common injury] at trial." *Wal-Mart Stores, Inc. v. Visa USA Inc. (In re Visa Check), 280 F.3d 124, 135 (2001)* (internal quotation marks and citation omitted) (alteration in original). Damages methodologies have been held sufficient to meet the required threshold and permit class certification if they are "not so insubstantial and illusory as to amount to no method at all." *In re Potash Antitrust Litig., 159 F.R.D. 682, 697 (D. Minn. 1995)* [hereinafter In re Potash]; *In re Catfish Antitrust Litig., 826 F. Supp. 1019, 1042 (N.D. Miss. 1993)* [hereinafter In re Catfish] (stating that "the court's role at the class certification stage in assessing the proposed methods of proving damages is quite limited," namely, inquiring "whether or not the proposed methods

are so insubstantial that they amount to no method at all").

[**45] In Defendants' view, the court applied too low a standard, i.e., a mere plausibility standard that falls below what courts require for certification of a class action and what amounts to no method at all. As we discuss more fully later in this opinion, courts disagree on whether a class can be certified based on a generalized methodology from [***780] [*241] which classwide injury may be inferred, as opposed to requiring the plaintiffs to show a common method to prove specific individual injury. Furthermore, differences exist in case law as to the predominance standard on the question of antitrust damages.

[**46] The difficult task of determining whether to certify a class stems not only from the different legal approaches taken in various courts as to how relaxed the predominance standards may be, but also in no small part from the use of economic experts. Drs. McCormick and Snyder submitted extensive affidavits with their analyses and supporting materials and data. These experts appear to be qualified and competent, and each, at least in part, based their opinions on some empirical data.

[**47] Dr. McCormick's analyses and opinions lend themselves to the approach advanced by Plaintiffs that individualized proof of injury and damages is not required beyond the use of general methodologies from which common injury can reasonably be inferred and only aggregate damages need be proven at trial. Dr. Snyder's analyses and opinions lend themselves to the approach advanced by Defendants that the real world facts regarding the cigarette industry, as opposed to economic theory based on no or insufficient real world facts, show that when injury and damages are seen on an individualized basis the results are varied and Dr. McCormick's theories and methodologies cannot reasonably predict injury or an individual purchaser's damages. Each expert attacks the other's analyses and conclusions.

[**48] The complexity of the issues when economic theorists take over the subject matter has caused courts to avoid attempting to resolve the "familiar 'battle of the experts'" at the class certification stage, particularly as to the issue of predominance as it relates to injury. *In re Potash, 159 F.R.D. at 694, 697; Wal-Mart Stores, Inc., 280 F.3d at 135* (holding a district court at the class certification stage "may not weigh conflicting expert evidence or engage in statistical dueling of experts" (internal quotation marks and citation omitted)). Rather, these cases hold that it is for the jury to determine whether Plaintiffs' expert is correct in his assessment of injury, and all that Plaintiffs must present at the certification stage is a threshold showing that the proof at trial will be sufficiently generalized to make the class

action approach worth the effort. *In re Potash, 159 F.R.D. at 697;* see also *In re Catfish, 826 F. Supp. at 1042* ("Whether or not [the expert] is correct in his assessment of common impact/injury is for the trier of fact to decide at the proper time."); *In re Domestic Air, 137 F.R.D. at 692* (stating the "the weight to be given [the expert's] testimony and its effect is for the fact finder in assessing the merits of plaintiffs' claims at a later date").

[**49]   Despite the need in many cases to postpone critical analysis of an expert's methodologies, in assessing whether the certification requirements are met and in fulfilling its rigorous-analysis duty, the district court "must undertake an analysis of the issues and the nature of required proof at trial to determine whether the matters in dispute and the nature of plaintiffs' proofs are principally individual in nature or are susceptible of common proof equally applicable to all class members." *In re Cardizem, 200 F.R.D. at 303; In re Potash, 159 F.R.D. at 693* (stating the court must evaluate the substantive allegations of the complaint); *In re Catfish, 826 F. Supp. at 1039* (concluding that the suitability for certification of an antitrust class action is a fact-sensitive process); *Execu-Tech Bus. Sys., 743 So. 2d at 20-21* (stating the focus of the evidentiary hearing on predominance and manageability is "whether [plaintiffs] had developed or could develop a methodology to show through generalized, class-wide proof that the price fixing impacted each individual class member"); *Nissan Motor Co. v. Fry, 27 S.W.3d 573, 592 (Tex. App. 2000)* (understanding of the claims, defenses, relevant facts, and applicable substantive law is essential to the predominance inquiry).

[**50]   There exist no bright lines to determine whether common questions predominate. *In re Potash, 159 F.R.D. at 693.* "There is no precise test governing the determination of whether common questions predominate over individual claims. Rather, a pragmatic assessment of the entire action and all of the issues is involved in making the [***781] [*242] determination." *Howe v. Microsoft Corp., 2003 ND 12, 656 N.W.2d 285, 289 (N.D. 2003).* Nevertheless, while rigorous factual analysis is necessary and can be critical to the predominance determination, there is more than a kernel of truth in the view that in some complex cases "decisions as to whether class action status should be allowed seem to rest, more than many other judicial determinations, on judicial philosophy, rather than on precedent or statutory language." *Id. at 288.* It has been said that "when there is a question as to whether certification is appropriate, the Court should give the benefit of the doubt to approving the class." *In re Workers' Comp., 130 F.R.D. 99, 103 (D. Minn. 1990).*

**4. The Superiority (Manageability) Standard**

[**51]   Rule 1-023(B)(3) requires class members to demonstrate that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." The rule sets out in four subparagraphs "the matters pertinent to the findings," the fourth and only relevant one for this case being "the difficulties likely to be encountered in the management of a class action." Rule 1-023(B)(3)(d). Predominance and superiority are often peas in the same pod when management of a class action is at issue. See *Elliott v. ITT Corp., 150 F.R.D. 569, 577 (N.D. Ill. 1992)* ("Resolution of the predominance question tends to focus on the form trial on the issues would take, with consideration of whether the action would be manageable."). That is, the management issue is relevant to both predominance and superiority. *Brooks, 2004 NMCA 134, P33, 103 P.3d 39; Berry, 2004 NMCA 116, P96, 99 P.3d 1166* (stating the manageability issue is "intertwined with the issue of predominance"). Still, Plaintiffs must distinctly prove both of the elements, predominance and superiority. *Brooks, 2004 NMCA 134, P30, 103 P.3d 39.* The *Rule 23(b)(3)(D)* factor, "commonly referred to as 'manageability,' . . . encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 164, 40 L. Ed. 2d 732, 94 S. Ct. 2140 (1974).*

[**52]   There appears to be little question and few cases appear to disagree as a general proposition that, from a manageability perspective, a class action is a superior procedure to handle thousands of class members' small claims when common issues of fact and law predominate and common methods of proving those claims exist. See, e.g., *In re NASDAQ, 169 F.R.D. at 527-29* (discussing reasons why the class action is superior to other methods of adjudication because it can be the most efficient, convenient, and fair method to resolve a controversy); *In re Sugar, 73 F.R.D. at 358* ("It is manifest that the maintenance of class actions is superior to the institution of a multitude of individual lawsuits."). But that general statement begs questions that are at the heart of the present case, namely, the extent, if any, to which the ultimate proof at trial must consist of evidence showing specific, individual injury and specific, individualized damages; whether factual development requires individual evidentiary adjudications for each of the class members due to significant, material factual differences; and whether management of the factual adjudications would be so extensive or difficult as to be intolerable or cause insurmountable problems in the management of the action. See *In re NASDAQ, 169 F.R.D. at 528* (stating, in regard to manageability, that the court "foresees no insurmountable problems in the management of this lawsuit"). As we discuss later in this opinion, there exist cases, including price-fixing cases, in which such manageability concerns have been thought to overshadow the

beneficial use of a class action to adjudicate small claims.

[**53] In addition to management concerns arising from injury and damages determinations, management of the action can pose significant problems if members of the class are not identifiable. See *In re Phenylpropanolamine (PPA) Prods. Liab. Litig., 214 F.R.D. 614, 617 (W.D. Wash. 2003)* (order) [hereinafter In re Phenylpropanolamine] ("If the members of the class are not identifiable, [management] of the action may pose insurmountable problems." (internal quotation [***782] [*243] marks and citation omitted)). Cases involving indirect consumer purchasers have been concerned about the absence of written proof of purchase and vagaries of memory. See *id. at 617-18* & n.5 (discussing various cases addressing lack of documentary or physical proof of purchase).

Because the vast majority of putative class members are unlikely to possess proof of purchase, and given the purportedly immense size of this class, the individualized inquiries surrounding class identification would be prodigious and would defy the court's ability to effectively and efficiently manage the litigation.

*Id. at 619-20; City of Philadelphia, 53 F.R.D. at 71-72* (determining potential class of consumers who "by and large . . . made cash purchases [of gasoline] at many different stations, at many different times, at many different prices," where few, if any records would exist on which to base an award, to be unmanageable, in part, because "it would be almost impossible . . . to compile a list of the members of this class"); see also *Sias v. Edge Communs., Inc., 2000 OK CIV APP 72, 8 P.3d 182, 185 (Okla. Civ. App. 2000)* (upholding finding that identification of class of prepaid calling card purchasers would be very difficult and class adjudication unduly burdensome where class size would be very substantial, defendant produced several different designs of calling cards, and purchasers generally discarded cards after use). The use of sworn affidavits is not necessarily an appropriate substitute for an individualized hearing. See *In re Phenylpropanolamine, 214 F.R.D. at 618-19;* see also *Sias, 8 P.3d at 186* (stating that the record failed to indicate that any class members could be identified through reasonable efforts since potential class members "likely do not possess any proof of their qualification as class members because the [calling] cards are intended to be discarded").

[**54] All said, the most important focus and most salient question to ask in terms of manageability should remain that based on the language of Rule 1-023(B)(3), namely, even with significant management concerns, is the class action superior to whatever other methods are available for the fair and efficient administration of the

controversy? "'Manageability problems are significant only if they create a situation that is less fair and efficient than other available techniques.'" *In re NASDAQ, 169 F.R.D. at 528* (quoting *In re Sugar, 73 F.R.D. at 358*). There appears to be no want of cases holding, as did the court in In re Catfish, that "individual questions of damages are often encountered in antitrust actions, and they are rarely a barrier to certification." *826 F. Supp. at 1043.* In antitrust price-fixing cases, the general mindset, at least in the federal courts, appears to be that refusal to certify on the sole ground that the action is not manageable is disfavored and should be the exception rather than the rule. See, e.g., *Wal-Mart Stores, Inc., 280 F.3d at 140; In re Workers' Comp., 130 F.R.D. at 110* (stating that "dismissal for management reasons is never favored"). But see *In re Hotel Tel. Charges, 500 F.2d 86, 90, 92 (9th Cir. 1974)* ("The desirability of allowing small claimants a forum to recover for largescale antitrust violations does not eclipse the problem of unmanageability."); *Barreras Ruiz v. Am. Tobacco Co., 180 F.R.D. 194, 199 (D.P.R. 1998)* (stating that although it is difficult to ignore the reality that a class action is the only viable remedy for the plaintiffs given the enormous burden of pursuing independent litigation, it is not a sufficient reason to "headlong plunge into an unmanageable and interminable litigation process").

[**55] The foregoing general discussion in Parts 3 (PP41-50) and 4 (PP51-54) of this opinion of predominance and superiority standards leads us into a more detailed discussion of the cases relied on by the parties to support their respective positions. The cases do not by any means provide a definitive path for resolution of the issues in the present case. We first discuss federal and state antitrust cases supporting certification based on proof of classwide injury and damages through generalized methodologies in Part 5 (PP56-67). We next discuss federal and state cases that do not support certification based on such proof and methodologies in Part 6 (PP68-77). Following these discussions, we address Defendants' position that the Antitrust Act itself requires proof of each [***783] [*244] class member's actual damages in Part 7 (PP78-83).

### 5. Cases Supporting Classwide Injury and Damages Through Generalized Proof

[**56] For their methodologies to pass certification scrutiny, Plaintiffs rely for the most part on several often-cited federal direct purchaser cases favoring classwide proof under the *Rule 23(b)(3)* proof requirements. See, e.g., *In re Cardizem, 200 F.R.D. at 321; In re NASDAQ, 169 F.R.D. at 520-24; In re Potash, 159 F.R.D. at 697.* We discuss these three not insignificant, mainstay cases in order to see the rationales for Plaintiffs' approach.

[**57]   In re Cardizem was an antitrust action by direct purchasers of the drug Cardizem CD from the drug manufacturers to recover higher, artificially inflated prices for the drug purchases. *200 F.R.D. at 300-01.* The court's analysis centered on the relationship between manufacturers and direct purchasers (wholesalers, chain pharmacies, food and drug stores, hospitals, clinics, long-term care facilities, mail order pharmacies, and governmental agencies) who could likely prove documented purchases. *Id. at 300 n.1, 323, 326.*

[**58]   The court in In re Cardizem determined that the formal, standardized, structured, established, and predictable criteria and framework involved in pricing, discounts, rebates, and individual negotiations supplied sufficient common evidence "to prove that all class members suffered at least some injury." *Id. at 318-20.* As to quantum of damages, the court determined that the plaintiffs "proffered several reasonable damage methodologies for measuring class-wide damages on an aggregate basis and for calculating damages for individual class members." *Id. at 322.* After a detailed analysis of the methodologies, the court appears to have been convinced that the plaintiffs' experts could devise for use at trial a likely method to determine damages using actual market data as well as forecasts and models, and based on a "market [that] is in fact highly structured with prices set according to pre-set criteria enumerated in company pricing manuals." *Id. at 324-25.*

[**59]   However, the court in In re Cardizem did not view the measure of damages in direct purchaser-antitrust overcharge cases to be actual harm, but, rather, "a surrogate--the full overcharge." *Id. at 316* (internal quotation marks and citation omitted). Further, the court did not require "an exactness on a direct purchaser's overcharge damage award," in terms of requiring direct purchasers to net out their damages by proving that part of the overcharge was passed on to consumers. Id. In re Cardizem also rejected the concern that an overcharge-damage theory might result in a windfall to the plaintiffs. *Id. at 317.* The court agreed with the view that in assigning a full right to recover to direct purchasers, Illinois Brick established a policy that "'the standard of individual net harm yields to a standard of net social harm in order to accommodate the limitations of the legal system.'" *In re Cardizem, 200 F.R.D. at 316* (quoting Roger D. Blair & William H. Page, "Speculative" Antitrust Damages, *70 Wash. L. Rev. 423, 434 (1995)).* Finally, the court in In re Cardizem had no difficulty rejecting the defendants' arguments that the class action was not a superior method to adjudicate the controversy. *Id. at 325.*

[**60]   In re NASDAQ was an action by individual buyers of securities and the State of Louisiana in its *parens patriae* capacity against market-makers, alleging an unlawful price-fixing scheme by the market-makers.

*169 F.R.D. at 498-99.* The court certified the class under *Rule 23(b)(3)* based on (1) the plaintiffs' intention "to prove the effectiveness of Defendants' conspiracy by using economic theory, academic studies, data sources, and statistical techniques--all designed to demonstrate that Nasdaq spreads were actually widened as a result of the conspiracy--that are common to the entire class"; and (2) methodologies by which the plaintiffs proposed "to prove the existence and measure of damages," including comparing several different "spreads (and resulting revenues)" as to actual securities traded, and comparing profits from spreads, methodologies "widely accepted [as] means of measuring [***784]  [*245] damages in antitrust cases." *In re NASDAQ, 169 F.R.D. at 520-21.* Further, the court cited In re Potash in noting that it had judicial methods available to resolve individual damages issues, and further noted that "courts have allowed the plaintiffs to establish the measure of damages at trial, and this measure is then applied to the individual transactions (typically in a second[,] bifurcated proceeding following trial on the common issues)." *In re NASDAQ, 169 F.R.D. at 522.* Aggregate damages of the class as a whole was thought to be "susceptible to determination in a single trial along with the issue of liability," *id. at 524,* and the court determined that damages could be determined on a classwide, or aggregate basis, "where the computerized records of the particular industry, supplemented by claims forms, provide a means to distribute damages to injured class members in the amount of their respective damages." *Id. at 526.* On the issue of superiority, the court foresaw "no insurmountable problems in the management of the lawsuit." *Id. at 528.*

[**61]   In re Potash involved an action by wholesaler direct purchasers for conspiracy to fix the wholesale price of potash. *159 F.R.D. at 687-88.* In regard to injury, the court employed a presumption that price fixing impacts "all purchasers of a price-fixed product in a conspiratorially affected market" and ultimately determined that the clash of expert analyses and opinions on such impact was to be resolved at trial. *Id. at 695-97.* The plaintiffs, the court held, need only make "a threshold showing that what proof they will offer will be sufficiently generalized in nature that . . . the class action will provide a tremendous savings of time and effort." *Id. at 697* (internal quotation marks and citation omitted) (alteration in original).

[**62]   As to amount of damages, the court in In re Potash adopted what it called a "relaxed standard," which was that "the Court's inquiry [into predominance as to damages] is limited to whether or not the proposed methods are so insubstantial as to amount to no method at all." Id. The court frankly stated that this "relaxed standard flowed from the equitable notion that the wrongdoer should not be able to profit by insistence on

an unattainable standard of proof." Id. Although recognizing that, typically, the amount of damages in antitrust actions largely involves individualized questions, the court in In re Potash nevertheless determined that this did not preclude certification. Id. The plaintiffs' expert's opinion was based on three methods of computing overcharge that, according to the expert, permitted damages suffered by class members to be determined "with a substantial degree of precision, by means of a formula." Id. In the court's view, these methods were not "so insubstantial as to amount to no method at all." Id. The court set out the "various judicial methods . . . available [to the court] to resolve individual damage issues without precluding class certification," including among others, "appointing special masters or magistrates to preside over individual damage proceedings," and "using the defendants' transactional records to compute individual damages." Id. at 698. In regard to manageability, the court held that the class action was "the most efficient and convenient method to resolve the controversy." Id. at 699.

[**63]    Plaintiffs also cite cases supporting the view that variations in damages amounts in antitrust actions will not defeat certification on predominance or superiority grounds once they show conspiracy and injury. This position is exemplified by the following language in In re Workers' Compensation:

> Individual questions of damages are often a problem encountered in an antitrust action and are rarely a barrier to certification.
>
> Separate mini-trials, a special master, later stratification of the class, or a magistrate may be available to resolve such issues. In this action[,] plaintiffs must demonstrate a conspiracy and its impact, not necessarily on an individual basis; those questions predominate over any secondary and individual questions of damages.
>
> . . . .
>
> . . . If the plaintiffs' claims are substantiated, a question as to which the Court presently has no opinion, the class action mechanism is clearly the most efficient means of resolving the many claims which [***785] [*246] may be asserted. The Court is confident that stated classes or subclasses will make the case comfortably--if not easily--manageable. If the case were not handled as a class, thousands of small claims would be either brought or unjustly abandoned. The first

possibility would be a flood of cases, the second would involve individual claims abandoned because of cost.

The Court is mindful that dismissal for management reasons is never favored. The vehicle of class action is meant to permit plaintiffs with small claims and little money to pursue a claim otherwise unavailable. A contrary rule would essentially preclude class treatment whenever separate issues had to be tried.

130 F.R.D. at 110 (internal quotation marks and citations omitted); see also In re Catfish, 826 F. Supp. at 1042-43 (stating relaxed standard of whether "the proposed methods are so insubstantial that they amount to no method at all," and "it is generally recognized that some relaxation of the plaintiff's burden of proving damages is tolerated once an antitrust violation and resulting damages have been established" and stating further that the determination of damages amounts, although individualized, are rarely a barrier to certification); In re Polypropylene Carpet, 996 F. Supp. at 29-30 (holding sufficient for class certification the plaintiffs' intention to use such techniques as (1) multiplying "the amount of any price increase estimated by [a] regression analysis by the number of products purchased by the class members," or (2) multiplying "the estimated price increase by the total dollar purchases made by the class members").

[**64]    We also note several federal decisions Plaintiffs cite specifically in support of their position that class damages may be proven in the aggregate. See Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 90 L. Ed. 652, 66 S. Ct. 574 (1946); Brown v. Pro Football, Inc., 146 F.R.D. 1 (D.D.C. 1992); In re Brand Name Prescription Drugs Antitrust Litig., Nos. 94 C897, MDL 997, 1994 WL 663590 (N.D. Ill. Nov. 18, 1994) (mem.); In re Alcoholic Beverages Litig., 95 F.R.D. 321 (E.D.N.Y. 1982). Plaintiffs also draw on Newberg on Class Actions, which contains an entire section devoted to "Proof and Distribution of Aggregate Class Damages," see 3 Alba Conte & Herbert B. Newberg, Newberg on Class Actions, ch. 10 (4th ed. 2002), and whose overall disposition (based solely on federal case law) tends to be supportive of not precluding certification or trial if only aggregate damages is proven with a per-capita or average formula for distribution of the damages award. See, e.g., Newberg, supra, §§ 10:2 to 10:7, 10:12.

[**65]    Plaintiffs further rely on several state court Microsoft antitrust cases permitting class certification based on a showing of classwide injury and a lenient standard in regard to damages. See Coordination Proceedings Special Title Rule 1550(b) Microsoft I-V

137 N.M. 229, *; 2005 NMCA 35, **;
109 P.3d 768, ***; 2005 N.M. App. LEXIS 14

Cases, No. 4106, slip op. (Cal. Super Ct. Aug. 29, 2000); Gordon v. Microsoft Corp., No. 00-5994, 2001 WL 366432, at *13 (D. Minn. Mar. 30, 2001); In re N.M. Indirect Purchasers Microsoft Corp. Antitrust Litig., No. D-0101-CV-2000-1697, slip op. at 5 (N.M. Dist. Ct. Oct. 2, 2002); Howe, 656 N.W.2d at 298; In re S.D. Microsoft Antitrust Litig., 2003 SD 19, 657 N.W.2d 668, 677-79 (S.D. 2003). But see Melnick v. Microsoft Corp., Nos. CV-99-709, CV-99-752, 2001 WL 1012261, at *16 (Me. Super. Ct. Aug. 24, 2001) (holding plaintiffs' methodologies to be too general to constitute a means to prove damages on a classwide basis); A&M Supply Co. v. Microsoft Corp., 252 Mich. App. 580, 654 N.W.2d 572, 598, 600 (Mich. Ct. App. 2002) (reading state law to require proof of actual damages and rejecting figures that were "general in nature" to prove the actual damages the class members sustained).

[**66] Plaintiffs also see two Tennessee cases as particularly important. They are Meighan v. U.S. Sprint Communs. Co., 924 S.W.2d 632 (Tenn. 1996), and Sherwood v. Microsoft Corp., No. 99C-3562 (Cir. Ct. Tenn. Dec. 20, 2002) (mem. and order). Meighan is a trespass and taking action for damages for cables installed over land, in which the court states that trial courts may determine an aggregate amount for the class as a whole, and then to either divide the award among class members, or allow each class member to individually prove his or her claim against the entire [***786] [*247] judgment. 924 S.W.2d at 635, 638. In certifying an antitrust class action, the court in Sherwood turned primarily to Tennessee law and Meighan and rejected A&M Supply Co. and Melnick which required individualized damages determinations. Sherwood, at 5-6, 18, 21.

[**67] Plaintiffs assert, based on the foregoing cases, among others, that they needed only to come forward with their generalized threshold showings by which they intend to prove classwide injury and damages. It is Dr. McCormick's theoretical analyses and aggregation of damages from which, according to Plaintiffs, it can be reasonably anticipated that common, classwide injury to most, if not all class members, and classwide damages, can be proven. Plaintiffs assert that the superiority requirement has been satisfied based not only on the fact that it would be impractical for the individual consumers to pursue these claims, but that this class action is superior to individual actions within the meaning of Rule 1-023 in regard to the fair and efficient adjudication of claims.

**6. Cases Supporting the Need to Prove Individual Injury**

**and Individualized Damages Through Common Proof**

[**68] The generalized, and as the district court in the present case characterized it, "plausible," methodology approach of Plaintiffs has not been adopted in several cases, some of which are quite similar to the present case. Several indirect tobacco purchaser, price-fixing cases fall in this group of cases. For example, in a cigarette retailer action in Minnesota and in cases parallel to the present case brought by consumer purchasers in Minnesota and Michigan in which the plaintiffs presented the same experts' theories as those in the present case, the courts denied certification. See Ren v. Philip Morris Inc., No. 00-004035-CZ, 2002 WL 1839983, slip op. at *18 (Mich. Cir. Ct. June 11, 2002) (indirect purchaser); Ludke v. Philip Morris Cos., No. MC 00-1954, 2001 WL 1673791, at *4 (Minn. Dist. Ct. Nov. 21, 2001) (mem.) (indirect purchaser); Keating v. Philip Morris, Inc., 417 N.W.2d 132, 138 (Minn. Ct. App. 1987) (retailer). But see Smith v. Phillip Morris Cos., No. 00-CV-26 (Kan. Dist. Ct. Nov. 15, 2001) (journal entry of decision) (certifying class of indirect purchasers of cigarettes, stating that a single price-fixing conspiracy "affects all of the proposed class members equally," and that the plaintiffs were bound only to show that "damage was inflicted upon the class by the price fixing conspiracy" and to "present a logical, reasonable method for determining the damages of the entire class"). We discuss these cases at the outset.

[**69] Ren was a price-fixing antitrust case brought by indirect consumer purchasers of cigarettes. In regard to antitrust injury, Ren determined that the indirect purchasers could not establish injury "through the use of the presumptions or inferences that might otherwise prevail in direct purchaser federal antitrust cases." 2002 WL 1839983, at *5. Ren quoted with approval the following analysis in Melnick, in which the court determined that:

> the presumption engaged in by some courts regarding injury to direct purchasers is not available in an indirect purchaser case:
>
> Because indirect purchasers must demonstrate that any overcharges resulting from the illegal action of the defendants have been passed on to them, an entirely separate level of evidence and proof is injected into litigation of indirect purchaser claims. Proof of antitrust conspiracy may logically lead to a conclusion that the subject of the conspiracy, the retailers, have each been harmed. No such conclusion logically follows without specific proof tracing that overcharge on to consumers.

Melnick, 2001 WL 1012261, at *7 (internal quotation marks and citation omitted). The court in Ren nevertheless concluded that Dr. McCormick's correlation analysis was "a method based on common proofs from which it could be concluded that there was class wide injury or impact" and that the plaintiffs thereby met their predominance burden as to injury. Ren, 2002 WL 1839983, at *11-12.

[**70]    On the other hand, in regard to damages, the court in Ren determined that Dr. McCormick's mere aggregation of damages showing classwide damages, with no indication of "the quantum of damages to any one [***787] [*248] individual," id. at *14, was insufficient to meet the plaintiffs' predominance burden as to damages. Id. at *16. The court expressly rejected Dr. McCormick's proposed aggregate class damages approach, finding it inadequate as a matter of law. Id. at *17.

[**71]    More particularly, the court in Ren held that Dr. McCormick's proposal to simply divide estimated aggregate classwide damages among class members "amounted to 'no method' at all since it necessarily permits an award of something other than actual damages." Id. Without a method for proving each individual class member's actual damages through a formula or other common proof, the plaintiffs failed to show that common issues would predominate. Id. at *16-17. The court found it unlikely that "any sort of ascertainment of individual damages can be made under some systematic or formulaic basis that avoids the necessity of individualized proofs regarding the brands of cigarettes purchased, and the particular retail prices paid," id. at *16, and determined that, upon resolution of any common issues, the court would still "be faced with potentially an indefinite number of mini-trials to ascertain a class member's actual damages," and further determined that these considerations made a class action unmanageable. Id. at *17-18.

[**72]    In Ludke, the court determined that "it would be nearly impossible to determine what amount any particular consumer was damaged by the conspiracy or whether the particular consumer was damaged at all." 2001 WL 1673791, at *3 (emphasis omitted). In particular, the court in Ludke noted that because class members "do not generally keep receipts or any other proof of purchase . . . [and] may well not know how many cigarettes they consume," certifying the class "would be an invitation for fraud." Id. at *3. Further, Ludke quoted with approval the following from Windham v. Am. Brands, Inc., 565 F.2d 59, 68 (4th Cir. 1977):

Thus in cases where the fact of injury and damage breaks down in what may be

characterized as "virtually a mechanical task," "capable of mathematical or formula calculation," the existence of individualized claims for damages seems to offer no barrier to class certification on grounds of manageability. On the other hand, where the issue of damages and impact does not lend itself to such a mechanical calculation, but "requires separate mini-trials," of an overwhelming large number of individual claims, courts have found that the "staggering problems of logistics" thus created "make the damage aspect of case predominate," and render the case unmanageable as a class action.

Ludke, 2001 WL 1673791, at *2 (alteration in original). Ludke also turned to the denial of class certification to cigarette retailers in Keating stating: "Clearly, if the [Keating] Court found that an individualized claims process for a class composed of cigarette retailers would be daunting, an individualized claims process would be a nightmare to administer for the hundreds of thousands of claims likely to be generated by a class action composed of end-users of cigarettes." Ludke, 2001 WL 1673791, at *4. The court in Ludke was troubled "not so much . . . by the calculation of aggregate damages, as . . . by the impossible task of dispersing these aggregate damages to individual claimants." Id. at *3.

[**73]    Keating was a price-fixing antitrust case brought by cigarette retailers. 417 N.W.2d at 133-34. The court affirmed the denial of certification of a statewide class of cigarette retailers. Id. at 137-38. The court held that evidence of the distribution and pricing of cigarettes required proof of injury and damages on an individualized basis. Id. at 134, 137. More particularly, in discussing the wholesale cigarette market, the court was concerned that each retailer would have to establish the price paid on each purchase under circumstances of widespread wholesaler use of nonuniform, as well as noncash discounts. Id. at 137. The court noted the trial court's determination that "any determination of fact or amount of individual damage will require thousands of factual examinations done on a retailer by retailer basis, and a transaction by transaction basis. The class action would quickly degenerate into thousands and thousands of individual trials." Id. (internal quotation marks omitted). The court determined that the trial court did not [*249] [***788] abuse its discretion in denying certification on both predominance and superiority (specifically, manageability) grounds. Id. at 136-38; see also Windham, 565 F.2d at 66 (involving tobacco growers' claims of a price-fixing conspiracy by cigarette manufac-

137 N.M. 229, *; 2005 NMCA 35, **;
109 P.3d 768, ***; 2005 N.M. App. LEXIS 14

turers, in which the court stated, "while [an antitrust] case may present a common question of violation, the issues of injury and damage remain the critical issues in such a case and are always strictly individualized").

[**74]  State courts in pharmaceutical cases have arrived at similar results. In Wood v. Abbot Laboratories, No. 96-512561-CZ, 1997 WL 824019 (Mich. Cir. Ct. Sept. 11, 1997) (unpublished opinion and order), a pharmaceutical price-fixing case, the court denied certification to indirect consumer purchasers of drugs. Citing Michigan's statute permitting an indirect purchaser to recover only actual damages, the court held that the plaintiffs failed to "provide a method for calculating each class member's actual damages and thus calculation of injury and actual damages would require examination of the drugs each class member purchased . . . rendering the class unmanageable." Id. at *2. As to the plaintiffs' expert's methodologies and opinion, and rejecting those theories that provided "at best . . . a method for calculating the existence of injury and damage on a class-wide basis," the court continued:

[the expert's] theories do not provide a method for calculating each class member's actual damages and thus calculation of injury and actual damages would require examination of the drugs each class member purchased from which retailer, the discounts applicable to each retailer for each drug at the time of purchase, and other relevant factors, resulting in thousands of mini-trials and rendering the class unmanageable. For this reason, other jurisdictions to consider this issue have denied certification to the class of indirect purchasers of brand name prescription drugs.

Id. The court found "that individual questions of fact as to both injury and damages predominate over the one theory common to the class, that being the existence of the alleged conspiracy, and that these individual questions render the case unmanageable as a class action." Id. at *3. Several other Abbot Laboratories state court cases have denied class certification. See McCarter v. Abbott Labs., Inc., No. CV 91-050, at 7 (Ala. Cir. Ct. Apr. 9, 1993) (order) (determining individual questions in regard to each purchase of infant formula were varied fact questions that had to be answered separately to determine injury and damages); Karofsky v. Abbott Labs., No. CV-95-1009, at 31 (Me. Super. Ct. Oct. 16, 1997) (decision and order) (denying class certification and concluding "that there are so many individual issues [of] retail pricing strategies, market forces, profit margins, geography,

individual drugs, and circumstances of purchase, that the presentation of plaintiffs' claims as a class action would simply be unmanageable"); Kerr v. Abbott Labs., No. 96-002837, 1997 WL 314419, at *2, 4 (Minn. Dist. Ct. Feb. 19, 1997) (mem.) ("Tracing individualized transactions through the complex distribution network of the brand-name prescription drug industry would clearly cause individual questions of fact to predominate over questions common to the proposed class."); Fischenich v. Abbott Labs., Inc., MC 94-6868, at 8-9 (Minn. Dist. Ct. May 26, 1995) (order) ("It is also unlikely that proposed class members will have any records indicating where the formula was purchased, when it was purchased, and how much was purchased. This leads to the question of how damages will be verified unless defendants are given an opportunity to cross-examine the individual purchasers."); see also In re Methionine Antitrust Litig., 204 F.R.D. 161, 163 (N.D. Cal. 2001) (holding, in action involving state antitrust law, that "the amount of damage suffered by each class member will not be determined on a class-wide basis[,]" but that "courts have uniformly held . . . that the existence of such an individual question is not a sufficient reason for denying certification").

[**75]  In the federal realm, In re Phenylpropanolamine involved a proposed class of consumers seeking refunds for purchases of over-the-counter medications. 214 F.R.D. at 618. The court concluded that the likely lack of class member proof of purchases, as evidenced by the testimony of several named plaintiffs, made the case unmanageable. Id.  [***789]  at 619-20  [*250]  & n.8. The court's major concern was verification of purchase, stating:

Unlike cases involving substantial purchases for which proof of purchase would be readily available or prescription medication verifiable by medical and pharmacy records, the process of simply identifying who rightfully belongs within the proposed class would entail a host of mini-trials. . . . Because the vast majority of putative class members are unlikely to possess proof of purchase, and given the purportedly immense size of this class, the individualized inquiries surrounding class identification would be prodigious and would defy the court's ability to effectively and efficiently manage the litigation.

Id. at 619-20. The court further noted that adopting an aggregate approach to damages "would not serve to lesson [sic] the manageability problems plaguing the proposed class" because the court still would face "the

daunting task of determining who could claim those damages in the first place." *Id. at 620.*

[**76]    Turning away from cigarette and drug-related cases, other significant federal decisions have similarly denied certification. In Bell Atlantic Corp. v. AT&T Corp., the plaintiffs sought to certify a class alleging antitrust (monopoly) violations and proposed to prove damages using a formula to calculate damages based on averages developed from national labor cost data. *339 F.3d 294, 304 (5th Cir. 2003).* As to injury, the court stated that "where [injury] cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats *Rule 23(b)(3)* predominance." *Id. at 302.* Further, in noting that the federal courts have "rejected claims where the plaintiff's proposed method of calculating damages failed to reasonably approximate actual economic losses," the court upheld the district court's denial of certification, holding the plaintiffs' averaging technique was not an "adequate approximation of any single class member's damages, let alone a just and reasonable estimate of the damages of every class member. " *Id. at 303, 304, 308.*

[**77]    The court in Bell Atlantic Corp. was critical of the plaintiffs' methodology, in that "numerous factors that would have affected the amount of damages, *if any,* suffered by any given class member . . . [were] not accounted for in the proposed formula." *Id. at 304.* The court indicated that "class treatment . . . may not be suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties propose to calculate individual damages is clearly inadequate." *Id. at 307;* see also *Sample v. Monsanto Co., 218 F.R.D. 644, 650-51 (E.D. Mo. 2003)* (refusing to presume classwide impact without any consideration of whether the markets or the alleged conspiracy at issue actually operated in a manner to justify that presumption, and determining that accepting a generalized theory would be an improper dereliction of its duty to rigorously analyze the proposed class certification proofs against the record facts); *Ralston v. Volkswagenwerk, A.G., 61 F.R.D. 427, 432-33 (W.D. Mo. 1973)* ("[Damages] should not be based on speculation or a system of averaging. Rather, the compensation due each individual member of the class must necessarily reflect the damages actually suffered by that party."); *City of Philadelphia v. Am. Oil Co., 53 F.R.D. 45, 48-49, 72 (D.N.J. 1971)* (stating, in connection with its concern about cash purchases of gasoline at many different stations, at many different times, and at many different prices, that, "no matter how easy it is to establish damages on a class level, if it is extremely difficult or almost impossible to distribute these sums to their rightful recipients, the class is unmanageable"); and see *A&M Sup-ply, 654 N.W.2d at 603* (a state court decision stating "a plaintiff's burden [is] to articulate a method or formula by which a court could determine that the defendant's conduct caused each member of the proposed class actual damages").

## 7. The Antitrust Act's "Damages Actually Sustained" Language

[**78]    Defendants assert that the Antitrust Act's express use of the words "damages actually sustained" in *Section 57-1-3(A)* helps answer the dispute as to what must be shown at the class certification stage. After [***790] [*251] permitting indirect purchasers who are injured to sue for up to threefold "the damages sustained," *Section 57-1-3(A)* permits the finder of fact, where the facts justify it, to award damages "in an amount less than that requested, but not less than the damages actually sustained." *§ 57-1-3(A).* Thus, the finder of fact can award damages above those "actually sustained," but cannot drop below "damages actually sustained." Id.

[**79]    Based on this language, Defendants argue that permitting an aggregate damages award at trial, with no proof of the individualized damages of class members, would be contrary to the clear wording of the statute. Defendants point to Ren, in which actual damages language in the state antitrust statute caused the court to reject a distribution of an aggregate award unless each class member received a damages award representing only his or her actual loss. See Ren, 2002 WL 1839983, at *2, 17 (construing a Michigan statute stating that a person injured directly or indirectly may bring an action for actual damages sustained in relation to whether the court could use a fluid recovery fund to avoid problems with ascertaining individual assessment of damages and denying resorting to a fluid recovery fund theory, and holding that "it necessarily follows . . . that a defendant is only liable to a plaintiff for the 'actual damages' sustained by that plaintiff as the result of a violation of the [Michigan statute]").

[**80]    Plaintiffs, by brief footnote only, argue that the wording in *Section 57-1-3(A)* should be read only in the context that, while "exemplary" damages can be reduced if there exists evidence of lack of willfulness, such justification cannot also be used to reduce any damages actually sustained. Plaintiffs also argue that the Antitrust Act is meant to be a "'full consideration' statute, entitling the injured person to recovery of the full amount paid, which obviates the need to individually calculate the amount of overcharge in each transaction. "

[**81]    We doubt *Section 57-1-3(A),* enacted in substantially its present form in 1891, was worded with class certification predominance and superiority re-

quirements in mind, or, more particularly, with any focus on whether an aggregate recovery would suffice instead of requiring each class member to prove his or her actual, individualized damages, in order to recover under the Antitrust Act. The phrase "damages actually sustained" appears to us to have been inserted in order to set a floor for damages below which the trier of fact cannot go in awarding damages. For these reasons, although the wording of the statute does reflect a legislative requirement that the trier of fact assess actual damages sustained, we are unpersuaded that these words in the statute were specifically intended to set a particular standard under Rule 1-023(B)(3) for class certification or for determining whether aggregate damages would be a proper award, and whether distribution of a lump sum award on a per-capita or average basis would be proper, in a class action. We therefore determine that Defendants' view of the Antitrust Act does not control the question whether, if a class is certified under Rule 1-023(B)(3), individualized damages need not be proven at trial.

[**82]  Defendants mingle with their Antitrust Act actual damages argument, namely, that an aggregate damages recovery would violate New Mexico's enabling act, *NMSA 1978, § 38-1-1(A) (1966)*. This section provides that rules of procedure promulgated by the New Mexico Supreme Court "shall not abridge, enlarge or modify the substantive rights of any litigant." Id. Defendants argue that this act forbids what the district court did, namely, permit Plaintiffs to pursue an aggregate damages remedy when the Antitrust Act does not permit it. See *Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 592, 138 L. Ed. 2d 689, 117 S. Ct. 2231 (1997)* (stating that the court must be "mindful that *Rule 23*'s requirements must be interpreted in keeping with . . . the [federal] Rules Enabling Act[]"); *Windham, 565 F.2d at 66* (stating that generalized classwide proof of damages would contravene the mandate of the Rules Enabling Act, *28 U.S.C. § 2072(b)*, that Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right" (internal quotation marks omitted)); see also *Bell Atl. Corp., 339 F.3d at 302* (stating antitrust proof requirements cannot be "lessened by reason of being raised in the [*252]  [***791] context of a class action"); *Alabama v. Blue Bird Body Co., 573 F.2d 309, 327 (5th Cir. 1978)* (recognizing that a class action procedure cannot "in any way alter the substantive proof required to prove up a claim for relief"). Plaintiffs' response is that Rule 1-023 is a procedural rule and "procedural provisions do not 'abridge, enlarge or modify the substantive rights of any litigant,'" relying on *In re Daniel H., 2003 NMCA 63, P18, 133 N.M. 630, 68 P.3d 176*.

[**83]  Rule 1-023 does not, as written, abridge a defendant's substantive rights under the Antitrust Act. Defendants' concern is the district court's interpretation of Rule 1-023, not the mere existence of the rule. Defendants argue that by interpreting the rule to allow an award of aggregate and not individualized damages the court lessens and alters the substantive proof of actual damages sustained required under the Antitrust Act. We are unpersuaded. To the extent *Section 57-1-3(A)* requires the assessment of actual damages sustained by reason of a violation of the Antitrust Act, it does not necessarily follow that an aggregate award cannot consist of actual damages, or that the distribution made to each individual class member from a lump sum award consisting of actual damages must correspond to each class member's actual loss.

## SUMMARY AND RESULT

### 1. Summary of Positions

[**84]  That common issues predominate over individual issues as to antitrust conspiracy is not in question in this appeal. It is clear that the means for proving a conspiracy will be common to the class. See, e.g., Ren, 2002 WL 1839983, at *3 (determining that proof of whether manufacturers conspired to fix prices "will not differ between class members").

[**85]  As to antitrust injury and amount of damages, the ends of the spectrum are plainly presented. Plaintiffs present generalized methodologies to prove classwide injury and damages. They present no common proof by which, at trial, they expect to prove the individual injury to and the individualized damages of each class member. The question is whether to open the class certification door under these circumstances. To do so, assuming Plaintiffs prove a price-fixing conspiracy, would allow each class member who purportedly is able to show a purchase of cigarettes during the class period to recover damages without Plaintiffs having to specifically prove the class member's actual payment of an overcharge and without having to specifically prove the amount of each class member's individual loss for which the member is entitled to damages.

[**86]  Plaintiffs' injury-related evidence consists of methodologies from which, according to Plaintiffs, it can reasonably be inferred that a very high percentage of those purchasing cigarettes were necessarily injured by the overcharges. Plaintiffs' damages-related evidence builds on their injury-related evidence but goes no further than estimating the aggregate damages, dividing that number by the number of class members, and distributing the lump sum under an averaging formula. There exists no indication in Plaintiffs' brief that they intend any individual adjudications as to what overcharge any individual class member actually paid, or as to the particular amount any individual class member was actually

damaged, even if that amount need only be reasonably estimated.

[**87]    The bottom line rationale for Plaintiffs is that the intent of the Legislature in enacting the indirect purchaser provision in the Antitrust Act together with the underlying remedial purpose of Rule 1-023 is that indirect consumer purchasers with small claims be able, through the class action procedure, to recover damages through classwide proof of injury and damages, without Plaintiffs having to prove each class member's individual injury or individualized damages. To deny certification on either predominance or superiority grounds would effectively deny the class members, consisting of indirect consumer purchasers, access to the court for recovery of damages, leaving class members to fare for themselves in separate, independent, and uneconomical actions to establish small claims. Equally important, Plaintiffs contend that manufacturers who violate the Antitrust Act should not be permitted to escape liability through a rigid reading of Rule 1-023(B)(3). Thus, according to Plaintiffs, Defendants should be [***792] [*253] subject to a lump sum [2] restitution award, to be divided under an averaging formula.

> 2    An antitrust treatise makes this sweeping comment in regard to lump sum judgments: "Interestingly, there has never been an antitrust class action in which a lump-sum judgment was entered following a trial of common issues holding a defendant liable for an aggregate amount to the entire class." 2 Antitrust Adviser § 10.46, at 10-103 (Irving Scher, 4th ed. 1995).

[**88]    Defendants contend Plaintiffs' approach denudes Rule 1-023(B)(3) to the point that the predominance and superiority requirements of the rule are meaningless. They point out that the vast majority of prospective class members likely have no record of when or where they purchased cigarettes, what brands they purchased, or how much they paid for the cigarettes. They feel due caution requires a court to have a deep concern that the process can be fraught with poor memory or, worse, with fraud. They also argue that any overcharge must be ascertained and can only be ascertained by factual development of actual pricing from an individual manufacturer through an individual retailer on any given day or week. Defendants assert that neither the Antitrust Act, nor Rule 1-023(B)(3), requires or even contemplates class recovery without common proof predominating to establish each class member's individual injury and individualized damages. Defendants also assert that the manageability problems necessarily arising because individual injury and individualized damages must be proven should make it clear a class action is not a superior process for adjudication of the claims.

[**89]    The tensions between these views are not insignificant. A class action is permissible if, among other prerequisites, joinder is impracticable due to numerosity. See Rule 1-023(A)(1). A beneficial and primary purpose of the Rule 1-023 procedure is to address class members' claims in one proceeding where joinder outside of the class action setting is impracticable. If a class action were unavailable, the many small claimants will not file an action, not have the funds to prosecute the action, or not benefit financially when costs are set against recovery. Yet a tension is created by the circumstance of the impracticability of individualized proof as to each of the thousands of class members' injuries and losses. There no doubt also exist instances in which the class action process may not be superior because of severe manageability problems in regard to the adjudication of such claims. This case magnifies the tension between competing views about class recovery when proof of individualized damages is impracticable and, if required, can present substantial manageability problems. The tug between proof requirements is heightened by the many and varied decisions condoning, as well as condemning, aggregate or generalized proofs. Cases vary in context, facts, and philosophy. To a large extent, differences seem to reflect different attitudes as well as degrees of the fears of courts as to "the unmanageability and untested limits of class actions under the amended *Rule 23*." Newberg, supra, § 10:5, at 484.

## 2. Result: Antitrust Injury

[**90]    In regard to antitrust injury, we hold that Plaintiffs have satisfied the predominance standard under Rule 1-023(B)(3). Plaintiffs have presented common, generalized, logically probative methodologies to prove antitrust injury to class members, methodologies that are at the very least superficially acceptable to meet the predominance threshold. We are in line with the thinking, for example, in Ren, where the court agreed that Dr. McCormick's analyses relating to injury were sufficient for class certification purposes. See Ren, 2002 WL 1839983, at *2, 4-9. In Ren, the plaintiffs attempted to use common proof, specifically including economic theory and correlation analysis, to show injury. Id. at *6. The court determined that the correlation analysis which showed that the overcharge was passed on to the consumer ninety-six percent of the time was sufficient to show injury. Id. at *11-12. The court noted that at the class certification stage, the plaintiffs were not required to show that every single member of the class was injured where the plaintiffs could show widespread injury to the class. Id.

[*254] [**91]    [***793] In the present case, where Plaintiffs' expert has shown through methodologies, including correlation analysis, that the overcharge,

or at least some portion of it, was passed on to the consumer ninety-eight percent of the time, we conclude that the district court did not abuse its discretion in determining that Plaintiffs met their burden. This conclusion is in accord with the well-analyzed price-fixing cases and makes good sense when addressing injury in an anti-competitive market in which it is likely that a large number of consumers, such as people who purchase cigarettes on an ongoing basis, over time will be affected by price fixing. "As a rule of thumb, a price fixing antitrust conspiracy model is generally regarded as well suited for class treatment." *In re Catfish Antitrust Litig., 826 F. Supp. 1019, 1039 (N.D. Miss. 1993).* Although the foregoing adage comes from a direct purchaser/price-fixing case, we think it adaptable as well, to indirect purchaser/price-fixing cases.

[**92]     Although a tie-leasing and not a price-fixing case, what the court in *Bogosian v. Gulf Oil Corp., 561 F.2d 434 (3d Cir. 1977)*, stated in regard to injury is apropos:

> There is absolutely no requirement that the loss be personal or unique to plaintiff, so long as the plaintiff has suffered loss in his business or property, for as we have noted, this second aspect of fact of damage is not concerned with any policy of limiting liability. Thus, when an antitrust violation impacts upon a class of persons who do have standing, there is no reason in doctrine why proof of the impact cannot be made on a common basis so long as the common proof adequately demonstrates some damage to each individual.

*Id. at 454.* In regard to a conspiracy resulting in "increased prices to a class of plaintiffs beyond the prices which would obtain in a competitive regime," the court in Bogosian further stated that "an individual plaintiff could prove fact of damage simply by proving that the free market prices would be lower than the prices paid and that he made some purchases at the higher price." *Id. at 455.*

[**93]     We caution, however, that it is one thing at the class certification stage to allow certification based on what appear to be logically probative general methodologies, and another thing to prove at trial that a high percentage of indirect purchasers were injured by their purchases of products in an anti-competitive market. Once past certification, Defendants will still be permitted to attack Plaintiffs' methodologies at trial as to scientific reliability and as to sufficiency of proof of antitrust injury. Cf. *Concord Boat Corp. v. Brunswick Corp., 207*

*F.3d 1039, 1056-57 (8th Cir. 2000)* (determining expert's "model to construct a hypothetical market which was not grounded in the economic reality of the . . . market," which "ignored inconvenient evidence," and which failed to account for market events that were unrelated to any anti-competitive conduct, to lack sufficient foundation to prove damages, resulting in conclusions that were mere speculation, and to require reversal because admission of the opinion affected the defendants' substantial rights). The following cautionary guideline highlights the point:

> The fact that a case is proceeding as a class action does not in any way alter the substantive proof required to prove up a claim for relief. The holding is also a recognition that "impact" is a question unique to each particular plaintiff and one that must be proved with certainty. That does not mean of course that cases do not exist wherein this requirement of certainty cannot be established by some sort of classwide proof. But it does mean that cases do exist wherein generalized proof of impact would be improper.

*Blue Bird Body Co., 573 F.2d at 327* (footnote omitted). Blue Bird Body Co. also noted the "great importance" the Fifth Circuit Court of Appeals placed "on the 'impact' element of an antitrust cause of action." Id.

### 3. Result: Antitrust Damages and Manageability

[**94]     While issues relating to proof of purchase are ever-present in this case, we agree with what appears to have been the district court's view, namely, that certification in this case hinges on the sufficiency for certification of Plaintiffs' classwide injury methodologies and not on Plaintiffs' damages methodologies. If there exists classwide injury, it follows [*255] [***794] that class members who were injured suffered some damages. In our view, this logical step provides the common proof necessary to overcome Defendants' predominance objections as to damages. See *In re NASDAQ Market-Makers Antitrust Litig., 169 F.R.D. 493, 523, 524 (S.D.N.Y. 1996)* (indicating agreement with the view that "the predominance requirement of *Rule 23(b)(3)* is satisfied with respect to proof of injury, even though individualized inquiry may be necessary on the quantum of damages," and further that individual damages questions are not a barrier to certification but are to be reserved "to be litigated in a subsequent set of proceedings"); *In re Domestic Air Transp. Antitrust Litig., 137 F.R.D. 677, 691-92 (N.D. Ga. 1991)* (noting that once price fixing and injury have been established, a plaintiff "need only introduce evidence sufficient for a jury to estimate the amount of

137 N.M. 229, *; 2005 NMCA 35, **;
109 P.3d 768, ***; 2005 N.M. App. LEXIS 14

damages" through a "formulaic approach[] to calculation of damages [that] permits the calculation of a minimum overcharge applicable to all members of the class, " and determining that the plaintiffs' methodologies that evidenced common injury also permitted formulaic calculation of damages). [3]

3   One antitrust treatise observes that "the overwhelming majority of antitrust class actions fall under [*Rule 23(b)(3)*]'s predominance requirements]," and that "in antitrust cases, courts are more likely to consider the critical issue to be whether common liability issues predominate and to disregard individual damages (although not impact) questions." 8 Julian von Kalinowski et al., *Antitrust Laws and Trade Regulation §§ 166.03[3]*, at 166-44; 166.03[3][a][i], at 166-46 (2d ed. 2003).

[**95]     Although fairly formidable, Defendants' case law does not persuade us that in price-fixing cases we must ignore the methodological classwide injury umbrella that paves the way for a logically probative general methodology to prove damages. Nor do Defendants' cases and arguments persuade us that, as a matter of law, an aggregate damages methodology with a certain amount of individualized proof cannot produce a fair result if, in fact, a price-fixing conspiracy has been proven. [4] The following language from *Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 90 L. Ed. 652, 66 S. Ct. 574 (1946)*, has not yet gone out of style:

The jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances juries are allowed to act on probable and inferential as well as (upon) direct and positive proof. Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain.

Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery.

The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.

4   In Newberg's view, it is settled law that class-wide proof of the measure of damages in price-fixing cases is proper, followed by a second stage of litigation to determine amounts of damages for each class member based on an aggregate damages verdict. See Newberg, supra, §§ 10:5, at 486-87; 10:6, at 488; 10:7 n.1, at 489.

*Id.* at 264-65 (internal quotation marks and citations omitted). Even the dissent in Bigelow established the "difficulty in ascertaining the exact amount of damage [as] a risk properly cast upon the wrong-doing defendant" in federal antitrust law. *Id.* at 267-68 (Frankfurter, J., dissenting). "Antitrust plaintiffs have a limited burden with respect to showing that individual damages issues do not predominate." *In re Potash Antitrust Litig., 159 F.R.D. 682, 697 (D. Minn. 1995).* "It is generally recognized that some relaxation of the plaintiff's burden of proving damages is tolerated once an antitrust violation and resulting damages have been established." *In re Catfish, 826 F. Supp. at 1042.* There is a willingness to accept some measure of uncertainty, not only because of the difficulty in ascertaining the damages, but also because of the "simple, equitable notion that the wrongdoer should not be allowed to profit by an insistence upon [***795] [*256] an unattainable standard of proof." *Id.* at 1042-43.

[**96]     It seems obvious, though, that proof of damages will necessitate at the very least some acceptable proof of purchase of the product in question during the time in question, and may well necessitate more proof than that. Certainly, some minimum amount of individualized proof will be at the very least required for class members to receive any amount of damages. However, while manageability issues will likely arise under any proof of damages, we do not see problems of such an intolerable or insurmountable character to cause us to pause at this stage and prevent certification on manageability grounds. As several price-fixing cases have indicated, it must be the rare case where certification should be precluded where the predominance requirements have been satisfied.

[**97]     It is not without significance that the district court in the present case obviously feels comfortable proceeding to the merits, leaving it with the court and the jury to wrestle with issues of claims and proof. Determination of manageability is usually left to the discretion of the district court. See *Windham, 565 F.2d at 65; Link v. Mercedes-Benz of N. Am., Inc., 550 F.2d 860, 864 (3d Cir. 1977).* As long as neither we nor the district court sees virtually insurmountable obstacles lying in wait as to such proof, we see no reason to hold that the district court abused its discretion in certifying the class over

137 N.M. 229, *; 2005 NMCA 35, **;
109 P.3d 768, ***; 2005 N.M. App. LEXIS 14

Defendants' superiority objections and cases. See *In re NASDAQ, 169 F.R.D. at 528-29* (stating that the court did not foresee any insurmountable problem in the management of the lawsuit; that "courts are generally loath to deny class certification based on speculative problems with case management"; and determining that class action treatment was superior to any other available method for the "fair" and "efficient" adjudication of the case); see also *In re Catfish, 826 F. Supp. at 1043* ("The difficulties or challenges which may face the court in the damages phase of this litigation, should it proceed that far, are frail obstacles to certification when measured against the substantial benefits of judicial economy achieved by class treatment of the predominating, common issues.").

[**98] We do not determine, nor do we intend to pre-determine, how the district court should procedurally handle the class or any divisions of the class, the management and processing and or adjudication of the claims of individual class members, and the proofs of the elements of their antitrust claims. The court has numerous management tools at hand. See *Wal-Mart Stores, Inc., 280 F.3d 124, 141 (2d Cir. 2001)*. If the court has second thoughts on any issue, it can reconsider and either decertify or modify certification if the manageability of damages adjudication or distribution proves to be an intolerable burden on the judicial system or otherwise proves to create a situation that is less fair and efficient than other available techniques. See *Link, 550 F.2d at 864; In re Sugar Indus. Antitrust Litig., 73 F.R.D. 322, 355, 358 (E.D. Pa. 1976); Hayna v. Arby's, Inc., 99 Ill. App. 3d*

700, 425 N.E.2d 1174, 1184, 55 Ill. Dec. 1 (Ill. App. Ct. 1981) (stating that courts will allow certification anticipating that "as the case proceeds to trial on the merits, . . . evidence will be adduced to alleviate the difficulties perceived in the identification of class members, the computation of damages as well as the administration of those damages"); cf. *In re Cardizem CD Antitrust Litig., 200 F.R.D. 297, 326 (E.D. Mich. 2001)* (noting that the plaintiffs contended that purchase data was readily available to ascertain individual damage amounts, and that if complications in calculating damages become evident, the court could "alter or amend its class certification order before a decision [was] rendered on the merits").

## CONCLUSION

[**99] The Antitrust Act allowance of indirect purchaser access to the court for recovery of damages and the remedial purposes underlying Rule 1-023 are advanced, not diminished, by allowing the price-fixing claims to proceed as a class action.

[**100] We affirm the district court's Rule 1-023 certification of a class.

[**101] **IT IS SO ORDERED.**

**JONATHAN B. SUTIN, Judge**

[***796] [*257] **WE CONCUR:**

**MICHAEL D. BUSTAMANTE, Chief Judge**

**A. JOSEPH ALARID, Judge**

LEXSEE 222 CAL.APP.3D 1278

**COURTESY TEMPORARY SERVICE, INC., Plaintiff and Appellant, v. LEONEL CAMACHO et al., Defendants and Appellants**

**No. B027238**

**Court of Appeal of California, Second Appellate District, Division Seven**

*222 Cal. App. 3d 1278; 272 Cal. Rptr. 352; 1990 Cal. App. LEXIS 854*

**August 15, 1990**

**PRIOR HISTORY:** [***1]
Superior Court of Los Angeles County, No. C628981, Jerry K. Fields, Judge.

**DISPOSITION:**

That portion of the order of the court denying Courtesy's petition for preliminary injunction against Employees from using Courtesy's confidential customer list and related information is reversed with directions to enter a new and different preliminary injunction in accordance with this opinion. In all other respects the judgment below is affirmed and the cross-appeal is dismissed. Costs on appeal are awarded to appellant Courtesy.

**SUMMARY: CALIFORNIA OFFICIAL REPORTS SUMMARY**

A temporary employment agency brought an unfair trade practices action against former employees who set up a competing agency and simultaneously applied for a preliminary injunction to prohibit the employees from soliciting any of the agency's customers that they serviced while employed at the agency; from soliciting or employing the agency's temporary labor force; and from using or disclosing any of the agency's confidential customer information. The trial court issued a preliminary injunction restraining the employees from soliciting or utilizing the agency's employees, but found that the agency's confidential customer list and related information was an unprotectable work product. (Superior Court of Los Angeles County, No. C628981, Jerry K. Fields, Judge.)

The Court of Appeal reversed that portion of the trial court's order denying the agency's petition for a preliminary injunction enjoining the employees from using the agency's customer list and related information with

directions to enter an appropriate preliminary injunction, and otherwise affirmed. It held that the trial court erred in denying the petition for an injunction, since the agency's customer list was a protectable trade secret under the Uniform Trade Secrets Act (*Civ. Code, § 3426* et seq.), and in failing to enjoin the employees' unfair business practices under *Bus. & Prof. Code, § 17200* et seq. (enforcement of unfair competition statutes). (Opinion by Woods (Fred), J., with Lillie, P. J., and Johnson, J., concurring.)

**HEADNOTES: CALIFORNIA OFFICIAL REPORTS HEADNOTES**

Classified to California Digest of Official Reports, 3d Series

**(1) Appellate Review § 12--Decisions Appealable-- Order Granting or Refusing Temporary Restraining Order or Preliminary Injunction.** --In a temporary employment agency's action against former employees who set up a competing agency, the trial court's order partially denying the agency's request for a preliminary injunction and refusing to enjoin the employees from using the agency's confidential customer list and related information to solicit the agency's customers was directly appealable. All orders granting or refusing either a temporary restraining order or a preliminary injunction are directly appealable.

**(2) Unfair Competition § 7--Acts Constituting Unfair Competition--Use of Trade Secrets--Confidential Customer List--Uniform Trade Secrets Act.** --In a temporary employment agency's action against former employees who set up a competing agency, the trial court erred in finding that the agency's customer list and related information stolen by the former employees did not constitute protectable trade secrets. The list fell within the definition of a trade secret under the Uniform Trade Secrets Act (*Civ. Code, § 3426.1*, subd. (d)) as informa-

tion that derives an independent economic value from not being generally known to the public or other persons who could obtain economic value from its disclosure or use, and that is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. The customer list was the product of a substantial amount of time, expense, and effort on the agency's part. Also, from a negative viewpoint, the list indicated those entities that have not patronized the business and for that reason as well was a protectable trade secret under the act. Moreover, the nature and character of the customer information, such as billing rates, key contacts, specialized requirements and markup rates were sophisticated information, irrefutably of commercial value, and not readily ascertainable to other competitors. The employees acquired commercially valuable information by appropriating the agency's customers, thereby saving themselves comparable efforts in screening businesses that declined the agency's services. Also, the information was not divulged to any persons outside the business, was given to employees only on a "need to know" basis, and was limited only to customers of the branch office in which an employee worked, and the employees were told of the confidential and proprietary nature of such information.

**(3) Unfair Competition § 7--Acts Constituting Unfair Competition--Use of Trade Secrets-- Misappropriation of Confidential Customer List.** --In a temporary employment agency's action against former employees who set up a competing agency, the trial court erred in finding that an appellate court decision prohibited it from finding that the agency's customer list and related information stolen by the former employees was a protectable trade secret. Unlike the decision mistakenly relied on by the trial court, in which there was disputed evidence as to whether the former employees being sued were given or had used confidential information, and in which there was no evidence as to the efforts expended in compiling its customer list or in maintaining its secrecy, the record in the agency's action supported a finding that the agency's former employees did not acquire the agency's customers by "the fruit of their own labor," but rather that they expended scant efforts on their own, and unfairly relied on the agency's efforts in compiling the customer list and related commercially valuable and not easily discoverable information. Using the agency's customer list, payroll records, and billing rates, they intentionally solicited the agency's customers, while still employed by the agency, in a successful attempt to injure the agency by diverting its customers to their competing business Such conduct was enjoinable as a patently unfair trade practice under the Uniform Trade Secrets Act ( *Civ. Code, § 3426* et seq.).

**(4) Unfair Competition § 7--Acts Constituting Unfair Competition--Use of Trade Secrets-- Misappropriation of Confidential Customer List.** --In a temporary employment agency's action against former employees who set up a competing agency, the trial court erred in failing to enjoin the employees' unfair business practices under *Bus. & Prof. Code, § 17200* et seq. Since the Uniform Trade Secrets Act ( *Civ. Code, § 3426* et seq.) does not supersede any statute relating to misappropriation of a trade secret, even if the agency's customer list would not have qualified as a protectable trade secret under the act, the employees' unfair and deceptive practice in using the list to steal the agency's customers should have been enjoined under *Bus. & Prof. Code, § 17200* et seq. (enforcement of unfair trade practices statutes). A former employee's use of confidential information obtained from his former employer to compete with him and to solicit the business of his former employer's customers is unfair competition.

**COUNSEL:**

Thomas M. Regele for Plaintiff and Appellant.

Arthur H. Lampel for Defendants and Appellants.

**JUDGES:**

Opinion by Woods (Fred), J., with Lillie, P. J., and Johnson, J., concurring.

**OPINION BY:**

WOODS

**OPINION:**

[*1281] [**353] I.

Introduction

This is an appeal by Courtesy Temporary Service, Inc., hereinafter "Courtesy," from an order of the Los Angeles Superior Court partially denying Courtesy's motion for a preliminary injunction to restrain Leonel Camacho, Maria Camacho, and Bianca Alvarez, former employees of Courtesy, hereafter "Employees," from soliciting Courtesy's customers and/or utilizing or disclosing certain confidential proprietary information concerning such customers.

II.

Contentions

Courtesy contends [***2] that while in Courtesy's employ, Employees misappropriated Courtesy's confidential customer list, including such information as the volume of the customer's business, specific customer requirements, key managerial customer contacts and

222 Cal. App. 3d 1278, *; 272 Cal. Rptr. 352, **;
1990 Cal. App. LEXIS 854, ***

billing rates for use in Employees' competing business. Courtesy contends that Employees used such information to solicit, pirate and deceive Courtesy's customers, subjecting Courtesy to a substantial loss of business, all in violation of the law of the State of California against unfair competition, entitling Courtesy to injunctions and damages.

Employees contend that customer lists of temporary help agencies are not protected trade secrets, the court correctly determined that Employees could not be enjoined from contacting or dealing with Courtesy's customers, and that substantial evidence supports the finding that Courtesy's customers were developed from public sources.

As hereafter discussed we resolve all contentions against Employees, as being unmeritorious, and in favor of Courtesy.

[*1282] [**354] III.

Factual and Procedural Synopsis

A. *Facts*

Courtesy is a California corporation with four branch offices, one of which is located in Hacienda [***3] Heights, California. Courtesy is in the temporary employment business, providing temporary workers to various companies, primarily factories, warehouses and light industrial concerns, according to their specific needs. Courtesy actively recruits, interviews and hires people as its own employees and then assigns these employees to its customer companies requesting assistance. Courtesy maintains the employer-employee relationship and is therefore responsible for paying these employees.

Since its inception in 1969, Courtesy has expended a great deal of time, money and effort developing and servicing its clientele and recruiting its labor force. Courtesy employs a permanent sales force to seek out and secure new business and service Courtesy's established business. Courtesy supports its sales staff with print advertising, entertainment expense accounts and promotional gifts and items. As a result, Courtesy has been successful in developing and maintaining an advantageous, stable and continuous customer base.

In the course of its dealings with its customers, Courtesy became knowledgeable and experienced in its customers' operations and developed sophisticated customer information [***4] such as the key contacts within the customer's business, special needs and customer characteristics, workers' compensation information, billing rates, profit margins and other financial information. All of this information was the product of substantial time and expense, not generally known to the public nor readily ascertainable in the temporary em-

ployment industry. A list of Courtesy's customers, who have demonstrated their willingness to use temporary employees, is not available in a trade or public directory or any other source. In short, there is no source to determine which particular businesses might be seeking or utilizing temporary employees. Rather, Courtesy's customer names, specialized requirements and patronage were secured by screening a large number of such prospects, at considerable time, effort and expense to Courtesy.

Courtesy employs branch managers and personnel supervisors for each of its branch offices. A branch manager's duties include servicing customer accounts and soliciting new business. A personnel supervisor's duties consist of interviewing and screening employee applicants, filling customer job orders and distributing payroll checks to the employees. [***5]

[*1283] Defendant Leonel Camacho had been employed by Courtesy as its Hacienda Heights branch manager and sales representative for a total period of nine years until he quit on December 1, 1986, to open a competing business, Transworld Temporaries. Defendant Maria Camacho and Bianca Alvarez had been employed by Courtesy as personnel supervisors in the Hacienda Heights office for approximately six years and two years, respectively, until they quit to join Leonel Camacho at Transworld Temporaries. While in Courtesy's employ, Employees were paid a monthly commission based upon a percentage of the branch office's net monthly sales, in addition to their base salaries.

As part of their duties as branch manager and sales representative and personnel supervisors, respectively, Employees developed familiarity and friendly contacts with Courtesy's customers and employees. In order that Employees might effectively carry out their employment duties, Courtesy necessarily revealed to Employees confidential and proprietary information regarding Courtesy's customers, including their sales volume, profit margins, special employment needs, particular likes and dislikes and pay rates and markups. [***6] Similarly, in the course of their employment at Courtesy, Employees necessarily acquired confidential knowledge regarding Courtesy's employees/labor force, including their names, addresses, job skills, past employment history and employment record with [**355] Courtesy's customers. At all times, Employees were aware of the confidential nature of this information and of Courtesy's reasonable efforts to ensure its secrecy.

By November 1986, and while still in Courtesy's employ, Employees admittedly planned the formation of a competing temporary employment business, Transworld Temporaries, and the transfer of all of Courtesy's preferred customers serviced by Employees to such

222 Cal. App. 3d 1278, *; 272 Cal. Rptr. 352, **;
1990 Cal. App. LEXIS 854, ***

competing business. Employees were keenly aware that Courtesy's long-standing, preferred customers would want to keep Courtesy's present temporary employees in their businesses because of their training and experience over the course of extended job assignments. Thus, Employees knew that the quickest and most effective way to appropriate Courtesy's more lucrative accounts and simultaneously establish their own labor force, was to pirate Courtesy's employees.

In furtherance of this scheme, in November 1986, while still [***7] employed at Courtesy, Employees began soliciting Courtesy's employees to join them in their soon-to-be-open competing business. Employees admittedly wrote and published a letter to Courtesy's customers and employees thanking them for their patronage, stating that their "*continual* support and cooperation" obliged Employees to "*further* improve," and asking them to "accept the best [Employees] have to offer from [their] *new location*." The "new [*1284] location" was the address of Employees' competing business, Transworld Temporaries. Employees' statements were intended, and were in fact understood by those who read them, to refer to Courtesy, implying that Courtesy had either relocated or was being taken over by Transworld Temporaries. When Courtesy's employees came into the Hacienda Heights office during the last week of November 1986 to pick up their weekly payroll checks, Employees handed this letter to such employees and directed them to pick up their paychecks at the new address in the future.

Employees were equally intent upon diverting all of Courtesy's preferred and valuable customers' business to Transworld Temporaries. During the course of his deposition, [***8] Camacho produced a document which he testified was a customer list which he prepared and used to solicit business for his new company. The first two pages of this list contain the names of all of Courtesy's major customers. In each instance, for a Courtesy customer, the list contains a person to contact in such company for temporary personnel needs. Employees admitted that this list was prepared while still in Courtesy's employ and that the names and information concerning Courtesy's customers on such list were obtained through Employees' employment at Courtesy. Employees' list also includes billing rates and/or markup percentages for Courtesy's customers and only Courtesy's customers. With one exception, Camacho admitted that he solicited the business of all of Courtesy's customers on behalf of Transworld Temporaries prior to Employees' leaving Courtesy's employ. In each such instance of solicitation, Employees admittedly utilized the confidential customer information acquired by Employees while in Courtesy's employ.

Immediately after resigning from Courtesy's employ, Employees obtained payroll information concerning Courtesy's employees for the week ended November 30, 1986, [***9] from Courtesy's preferred customers. Employees fully intended to use such payroll information to remunerate Courtesy's employees through their competing business, Transworld Temporaries, and thereafter bill Courtesy's customers for such temporary services.

Finally, utilizing Courtesy's confidential and proprietary information regarding the amount of business transacted by and between said customers and Courtesy, and Courtesy's mark up of these various accounts, Employees have solicited all of Courtesy's more valuable and preferred customers.

Courtesy's advantageous business relations with its customers are threatened to be, and have been, disrupted in that certain preferred customers have begun to use the services of Employees. Combined, Courtesy's [**356] subject customers account for nearly $ 1.5 million in annual sales. Courtesy's sales were immediately decreased by approximately 60 percent by Employees' [*1285] tactics. Although Employees claim to have solicited business from approximately 150 firms, at the end of their first month of business, Employees' new agency claimed only one customer which had not been a customer of Courtesy.

B. *Procedural History*

On December 16, [***10] 1986, Courtesy filed its complaint for injunctive relief and money damages for: (1) unfair competition and misappropriation of trade secrets -- violation of California Civil Code n1 section 3426 et seq.; (2) violation of *California Business and Professions Code section 17200* et seq.; (3) tortious interference with prospective economic advantage; (4) breach of confidential relationship; (5) breach of implied covenant of good faith and fair dealing; and (6) libel/business disparagement. Courtesy simultaneously applied for a temporary restraining order and order to show cause re preliminary injunction, enjoining defendants from (1) soliciting any customers of Courtesy serviced by Employees when employed at Courtesy; (2) soliciting or employing Courtesy's specified temporary labor force employees; and (3) utilizing or disclosing any confidential Courtesy customer information. The Honorable Robert Weil issued the temporary restraining order as requested.

n1 Unless otherwise noted, all references are to the Civil Code.

The [***11] preliminary injunction hearing took place on March 2, 1987, the Honorable Jerry Fields,

judge presiding. At the hearing, the court found, based upon the evidence, that Employees had acted deceitfully, that they had stolen Courtesy's customers and employees and had even attempted to steal Courtesy's money. The court issued a preliminary injunction restraining Employees from soliciting or utilizing Courtesy's employees. However, despite having found Employees' acts to be "abhorrent" and "detestable" the trial court felt itself precluded by *American Paper & Packaging Products, Inc. v. Kirgan (1986) 183 Cal.App.3d 1318 [228 Cal.Rptr. 713]* from enjoining Employees' stealing of Courtesy's confidential customer list and related information and held such list to be unprotectable work product. This appeal and cross-appeal followed.

## IV.

### Discussion

The trial court correctly found that Courtesy's customer list and related information are trade secrets in light of all of the circumstances before it. The trial court erred, however, in failing to correctly interpret and apply the [*1286] law. First, the court erred in relying upon *American Paper* in [***12] concluding that Courtesy's customer list and information do not constitute protectable trade secrets under section 3426 et seq. Second, *American Paper* is distinguishable from the facts in this case. Third, *American Paper* misconstrued California's trade secret statute and its legislative intent, and we decline to rely on the decision in this case. Finally, the court erred in not granting the requested injunctive relief under *Business and Professions Code section 17200* et seq., a separate ground espoused by Courtesy.

A. *The trial court's order, partially refusing Courtesy's requested preliminary injunction, is directly appealable.*

**(1)** All orders granting or refusing either a temporary restraining order or a preliminary injunction are directly appealable. ( *Code Civ. Proc., § 904.1,* subd. (f).)

B. *The trial court erred in finding that Courtesy's customer list and related information stolen by Employees did not constitute protectable trade secrets under the authority of "American Paper" and the Uniform Trade Secrets Act.*

At the preliminary injunction hearing, the trial court sarcastically found that Camacho represented the "American way" [**357] by being a "small person who [***13] saved his money and went into business on his own in an attempt to make a life for himself and his wife by *stealing, lying and cheating.*" (Italics added.) The court labelled this the "worst case" wherein employees have been shown to be "deceitful," specifically finding that Employees stole Courtesy's customers. Despite these findings, the lower court felt itself precluded by *Ameri-*

*can Paper & Packaging Products, Inc. v. Kirgan, supra, 183 Cal.App.3d 1318,* from enjoining Employees' misappropriation of Courtesy's customer list and related proprietary information. However, neither *American Paper* nor the Uniform Trade Secrets Act (UTSA), section 3426 et seq., compels this result. This case involves a clear factual scenario of a customer list and related information constituting protectable trade secrets.

1. *Courtesy's customer list and related information satisfy the definition of trade secret contained in the Uniform Trade Secrets Act.*

**(2)** Effective January 1, 1985, California adopted the Uniform Trade Secrets Act (§§ 3426-3426.10) for misappropriation of trade secrets. It defines a trade secret as "information, including a formula, pattern, [***14] compilation, program, device, method, technique, or process, that: [para.] (1) Derives independent economic value, actual or potential, from not being generally [*1287] known to the public or to other persons who can obtain economic value from its disclosure or use; and [para.] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (§ 3426.1, subd. (d).)

Measured by this two-prong test, the facts in the instant case conclusively establish that Courtesy's customer list and related information are protectable trade secrets. The legislative intent and better reasoned cases, which the Uniform Trade Secrets Act is meant to codify, establish that a customer list procured by substantial time, effort, and expense is a protectable trade secret.

The UTSA's definition of a "'trade secret' contains a reasonable departure from the Restatement of Torts (First) definition which required that a trade secret be 'continuously used in one's business.' *The broader definition* in the proposed Act . . . includes information that has commercial value from a negative viewpoint, for example the results of lengthy and expensive research which proves that [***15] a certain process will *not* work could be of great value to a competitor." (Italics added and original italics.) (See legis. committee com., 12 West's Ann. *Civ. Code, § 3426.1* (1990 pocket supp.) p. 108.)

The compilation by Courtesy of its list of customers was the result of lengthy and expensive efforts, including advertising, promotional campaigns, canvassing, and client entertainment. The court below, however, ruled that such "work effort" of Courtesy in compiling its customer list was "not any secret" entitled to protection and, on such erroneous basis, denied the injunction as to Courtesy's customer list. Contrary to the court's ruling, it is this very "work effort," or process of acquiring and retaining clientele, that constitutes a protectable trade secret.

A list of customers or subscribers "built up by ingenuity, time, labor and expense of the owner over a period of many years is property of the employer," and "'[k]nowledge of such a list, acquired by an employee by reason of his employment, may not be used by the employee as his own property or to his employer's prejudice.'" ( *Greenly v. Cooper (1978) 77 Cal.App.3d 382, 392 [143 Cal.Rptr. 514].*) [***16] Employees, by appropriating only those customers who, after Courtesy's efforts, chose to patronize Courtesy and saving themselves comparable efforts in screening those entities who declined Courtesy's patronage, have acquired commercially invaluable information.

This concept of "negative" research was emphasized in the case of *Hollingsworth Solderless Terminal Co. v. Turley (9th Cir. 1980) 622 F.2d 1324.* If a customer list is acquired by lengthy and expensive efforts which, from a [*1288] negative viewpoint, indicate those entities that have *not* subscribed to plaintiff's services, it deserves [**358] protection as a "trade secret" under the act. According to *Hollingsworth*, even if the customers' names could be found in telephone or trade directories, such public sources "'would not disclose the persons who ultimately made up the list of plaintiff's customers.'" ( *Id. at p. 1333.*) It is the list of persons who actually purchase Courtesy's services that constitute confidential information.

Here, the evidence established that Courtesy's customer list and related information was the product of a substantial amount of time, expense and effort [***17] on the part of Courtesy. Moreover, the nature and character of the subject customer information, i.e., billing rates, key contacts, specialized requirements and markup rates, is sophisticated information and irrefutably of commercial value and not readily ascertainable to other competitors. Thus, Courtesy's customer list and related proprietary information satisfy the first prong of the definition of "trade secret" under section 3426.1.

2. *Courtesy's efforts to maintain the confidentiality of its customer list satisfy UTSA's definition of trade secret.*

Courtesy's customer list also satisfies the second prong of the UTSA definition of "trade secret" in that it has been "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (§ 3426.1, subd. (d)(2).) "[R]easonable efforts to maintain secrecy have been held to include advising employees of the existence of a trade secret, limiting access to a trade secret on 'need to know basis,' and controlling plant access." (See legis. committee com., 12 West's Ann. Civ. Code (1990 pocket supp.) p. 108.)

The unrefuted evidence in this case is that information regarding Courtesy's customers is not divulged [***18] to any persons outside the business. It is Courtesy's policy to divulge such confidential and proprietary information to its branch office employees, such as Employees, only as is necessary for them to effectively carry out their specific duties. The sales, customer and employee information for one branch office is not generally revealed to any other branch employees. As to any information revealed to such employees, the employees are told of the confidential and proprietary nature of such information. Access to such customer information was divulged to Employees only on an "as needed basis" to perform their duties and was limited to the branch office wherein Employees exclusively worked. Furthermore, Employees were advised of its confidentiality. These efforts satisfy the secrecy requirement of section 3426.1, subdivision (d)(2), and thus the customer list constitutes a "trade secret."

[*1289]  3. *The trial court erred in holding that American Paper precluded it from finding that Courtesy's customer list and related information are protectable trade secrets.*

(3) In denying Courtesy's requested injunction of Employees' use of Courtesy's customer list and related information, [***19] the lower court reasoned that the case of *American Paper & Packaging Products, Inc. v. Kirgan, supra, 183 Cal.App.3d 1318,* mandated the conclusion that Courtesy's customer information was not a protectable trade secret. A careful reading and analysis of *American Paper* reveals that it is factually inapposite to the instant case. *American Paper* held that customer lists can be protectable trade secrets under the UTSA, but that information generally known in the trade and already used by good faith competitors "is not a protectable trade secret and injunction should not issue." ( *Id. at p. 1326.*) The *American Paper* court concluded that the plaintiff, a packing concern, had not presented sufficient evidence providing that its customer list was a trade secret and that names of manufacturer customers who require shipping supplies, while they may not be generally known to the public, would be readily ascertainable to other persons in the shipping business. (*Ibid.*) The compilation process that plaintiff had used was found to be "neither sophisticated nor [**359] difficult nor particularly time consuming." (*Ibid* [***20] .)

In *American Paper*, defendants, shortly after leaving plaintiff's employ, began working as salespersons for a competitor of plaintiff. Although plaintiff had alleged that its customer information was obtained by defendants from its records and files which had been provided to them prior to their termination, defendants denied that they were given information on any actual or potential customers by plaintiff. They alleged that any such customer lists were developed as "fruit of their own labor" by visiting industrial-zoned communities in their sales

222 Cal. App. 3d 1278, *; 272 Cal. Rptr. 352, **;
1990 Cal. App. LEXIS 854, ***

area, locating and compiling lists of manufacturing companies, making cold calls on such companies, and consulting phone directories. *(183 Cal.App.3d at p. 1321.)*

Contrary to the disputed testimony that defendants were given confidential information in *American Paper*, the record herein overwhelmingly supports a finding that Employees, using Courtesy's customer lists, payroll records, and billing rates, intentionally solicited Courtesy's customers while still in Courtesy's employ. Employees terminated their employment with Courtesy on December 1, 1986, and were operating their own competing business [***21] on the same day. Within two weeks of operation without any visits to industrial-zoned communities, canvassing, or "cold calls," Employees had misappropriated 60 percent of Courtesy's customers.

Whereas plaintiff in *American Paper* had proffered no evidence as to the efforts it expended in compiling its customer list or in maintaining its [*1290] secrecy, Courtesy, in the instant case, has detailed the substantial efforts it expended in acquiring its customers, including years of promotional and advertising campaigns. Whereas defendants in *American Paper* denied having been given any confidential customer information, Employees admitted having used Courtesy's customer lists and financial information to deliberately solicit Courtesy's customers while employed by Courtesy.

In his declaration in opposition to Courtesy's motion for preliminary injunction, Camacho admitted that he "jumped the gun" in soliciting Courtesy's customers while still employed by Courtesy. Camacho admitted having a list of potential clients, which included Courtesy's clients, and that he prepared the list from Courtesy's personnel roster a couple of weeks prior to leaving Courtesy. He further testified [***22] that while employed by Courtesy, he had sent "proposal" packages to Courtesy's customers whose names he obtained from Courtesy's "payroll printout." Rather than merely announcing the opening of his own business, almost two weeks prior to the opening of his business, Camacho asked Courtesy's preferred customer, Plastron, about getting temporary employment business from them. Camacho admitted that he had submitted a proposal to Plastron. While still employed by Courtesy, Camacho submitted similar proposals to Courtesy's better customers, including Nutro Products, Lights of America, County Sanitation District, and Industry Deburring, among others.

Another "improper" method used by Employees to divert Courtesy's customers was to convert payroll records of various customers to Employees' own use. Camacho admitted to having requested and obtained from Courtesy's customers, after terminating his employment, weekly payroll reports of Courtesy's tempo- rary employees for the week ending November 30, 1986, with the intent to "run a payroll" through his new agency, Transworld Temporaries, and to "pay [Courtesy's] employees for that work week through Transworld Temporaries."

Employees' solicitation [***23] has nourished their new enterprise. As of the end of December 1986, Transworld Temporaries had only invoiced one client that had not been a preferred customer of Courtesy. Such evidence supports the conclusion that Employees, unlike defendants in *American Paper*, did not acquire Courtesy's customers by "the fruit of their own labor" or through public sources, but rather they expended scant efforts of their own, and unfairly relied upon the efforts expended by Courtesy in compiling its customer list and related commercially valuable and not [**360] easily discovered information. The evidence further supports the conclusion that Employees, while still employed by Courtesy, used confidential customer information to not merely announce formation of their new business, but to actively solicit Courtesy's customers in a successful attempt to injure Courtesy by diverting [*1291] those customers to Employees' competing business. Such conduct, which was not shown in *American Paper*, is enjoinable as a patently unfair trade practice under the UTSA.

In summary, considering the admitted misappropriation of sophisticated, detailed customer information and active solicitation by Employees in [***24] the instant case, as contrasted with the independent efforts of the former employees and innocuous and readily ascertainable information at issue in *American Paper*, the trial court's refusal to grant injunctive relief was an abuse of discretion.

C. *The trial court erred in not enjoining Employees' unfair business practices under Business and Professions Code section 17200 et seq.*

(4) Finally, the court below erred in relying exclusively on section 3426 et seq. and *American Paper's* construction of that statute to deny Courtesy's claim under *Business and Professions Code section 17200* et seq. The UTSA, specifically section 3426.7, subdivision (a), expressly provides that the Act "does not supersede any statute relating to misappropriation of a trade secret, or any statute otherwise regulating trade secrets." Thus, even if Courtesy's customer list would not qualify as a "trade secret" under section 3426.1, the unfair and deceptive practices of employees in stealing Courtesy's customers should have been enjoined under *Business and Professions Code section 17200* et seq.

In its complaint, Courtesy stated a cause of action under *Business and Professions Code section 17200* for

222 Cal. App. 3d 1278, *; 272 Cal. Rptr. 352, **;
1990 Cal. App. LEXIS 854, ***

[***25] unfair competition, requesting injunctive relief and alleging, among other things, that by Employees' solicitation, piracy and deceit of Courtesy's customers, Courtesy was irreparably injured in its identity, reputation and goodwill, causing the loss of valuable customers, employees, and profits and threatening the complete destruction of its business.

*Business and Professions Code section 17200* provides: "As used in this chapter, unfair competition shall mean and include unlawful, unfair or fraudulent business practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with *Section 17500) of Part 3 of Division 7 of the Business and Professions Code.*" *Business and Professions Code section 17203* provides for injunctive relief against "[a]ny person performing or proposing to perform an act of unfair competition within this state."

In *Klamath-Orleans Lumber, Inc. v. Miller (1978) 87 Cal.App.3d 458 [151 Cal.Rptr. 118],* the court upheld a permanent injunction restraining [*1292] two former employees from soliciting their former employer's customers. Plaintiff, a manufacturer of load binders, had [***26] compiled a confidential customer list that contained such information as the creditworthiness and purchasing habits of each customer, and the defendants, the plaintiff's shop and office managers, had left plaintiff's employ to organize their own competing business and had written up plaintiff's customer lists from memory.

The defendants then mailed advertising brochures to plaintiff's customers.

The court held that the defendants' actions constituted a breach of trust and misappropriation of confidential information. There was "substantial evidence to support the trial court's determination that plaintiff's knowledge was confidential and deserving of protection, and that defendants' ability to solicit both more selectively and more effectively was due to their extensive use of plaintiff's customer list -- a patent act of unfair competition." *(87 Cal.App.3d at p. 466.)* Indeed, the cases are legion holding that a former employee's use of confidential information obtained from his former employer to compete with him and to solicit the business of his former employer's customers, is regarded as unfair competition. (See, e.g., *Greenly v.* [**361] *Cooper, supra, 77 Cal.App.3d 382, 391-392.)* [***27]

V.

That portion of the order of the court denying Courtesy's petition for preliminary injunction against Employees from using Courtesy's confidential customer list and related information is reversed with directions to enter a new and different preliminary injunction in accordance with this opinion. In all other respects the judgment below is affirmed and the cross-appeal is dismissed. Costs on appeal are awarded to appellant Courtesy.

LEXSEE 216 F.R.D. 533

**CYTODYNE TECHNOLOGIES, INC., Plaintiff, vs. BIOGENIC TECHNOLO-
GIES, INC., et al, Defendants.**

**CASE NO. 3:03-mc-4-J-TEM**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLOR-
IDA, JACKSONVILLE DIVISION**

*216 F.R.D. 533; 2003 U.S. Dist. LEXIS 14694; 16 Fla. L. Weekly Fed. D 652*

**June 3, 2003, Decided
June 4, 2003, Filed**

**DISPOSITION:** [**1] Defendant Supernatural Distributors' motion to compel denied without prejudice. Tree of Life's motion to quash granted. Defendant Supernatural Distributors motion to expedite granted.

**COUNSEL:** For Cytodyne Technologies, Inc, PLAINTIFF: Molloy J Brian, Wilentz, Goldman & Spitzer, Woodbridge, NJ USA.

For Super Natural Distributors, Inc, DEFENDANT: Heatherann Marie Solanka, Foley & Lardner, Jacksonville, FL USA.

For Super Natural Distributors, Inc, DEFENDANT: Michael A Bowen, Foley & Lardner, Milwaukee, WI USA.

For Super Natural Distributors, Inc, DEFENDANT: Michael A Lampert, Saul Ewing LLP, Princeton, NJ USA.

For Tree of Life, Inc, MOVANT: Michael Robert Cavendish, McGuirewoods LLP, Jacksonville, FL USA.

**JUDGES:** THOMAS E. MORRIS, United States Magistrate Judge.

**OPINION BY:** THOMAS E. MORRIS

**OPINION:**

[*534] **ORDER**

This case came before the Court on April 30, 2003 for a hearing on Defendant Super Natural Distributors, Inc.'s Motion for Order Compelling Compliance with Subpoena (Doc. # 1, Motion to Compel), Non-party Tree of [**2] Life's Response to Motion for Order Compelling Compliance with Subpoena and Cross-Motion to Quash with Incorporated Memorandum of Law (Doc. #

5, Motion to Quash) and Super Natural Distributors, Inc.'s Motion to Expedite Ruling on Motion for Order Compelling Compliance with Subpoena (Doc # 6, Motion to Expedite). All counsel of record known to this Court were notified of the motion hearing. Only counsel for Defendant Super Natural Distributors Inc. and non-party Tree of Life attended the hearing. Oral argument was heard from counsel present at the hearing.

Super Natural Distributors, Inc. ("Super Natural") is a named defendant in the lawsuit currently pending in the United States District Court for the District of New Jersey that underlies this miscellaneous case. Cytodyne Technologies, Inc. is the plaintiff in the New Jersey action. On September 5, 2002, Super Natural issued a subpoena to non-party Tree of Life for a "designated witness" deposition and production of records wherein numerous records concerning Tree of Life's business in general and business dealings with Cytodyne Technologies, Inc. in particular were requested. (*See* Doc. # 5, Ex. D for copy of subpoena. n1) This [**3] request for third party discovery arose out of Super Natural's counterclaim for price discrimination against Plaintiff Cytodyne Technologies (Doc. # 1 at 1). Tree of Life objects to the subpoena on the grounds it seeks trade secret and proprietary information that if disclosed would give Defendant Super Natural n2 a competitive advantage and that Defendant has failed to meet its burden establishing that the information sought is relevant and necessary to its lawsuit (Doc. # 5, pp. 6-17). Both parties acknowledge that Tree of Life, Inc. and Super Natural Distributors, Inc. are competitors in the marketplace (Doc. # 2 at 3; Doc. # 5 at 3).

---

n1 The Court notes that Defendant failed to attach any supporting documents with its Motion to

216 F.R.D. 533, *; 2003 U.S. Dist. LEXIS 14694, **;
16 Fla. L. Weekly Fed. D 652

Compel. However, the Court finds a copy of the subpoena attached to Tree of Life's Motion to Quash (Doc. # 5, Ex. D).

n2 All references to "defendant" in this Order shall pertain solely to Defendant Super Natural Distributors, Inc.

The subpoena at issue called for the production [**4] of documents in Milwaukee, Wisconsin n3 on September 12, 2002 and the appearance of a corporate representative in Jacksonville, Florida for a deposition on September 16, 2002 (Doc. # 2, p. 3). The subpoena seeks deposition testimony on the following subjects:

1. The relationship between Tree of Life, Inc. d/b/a Forcite/The Source ("Forcite") and Cytodyne Technologies, Inc. ("Cytodyne") including, without limitation, the prices Cytodyne charge Forcite for products manufactured by or on behalf of Cytodyne ("Cytodyne Products"), the quantity of Cytodyne Products Forcite purchased from Cytodyne, and other terms of sale.
2. Any departure from the standard prices or terms of sale offered to Forcite by Cytodyne in connection with transactions involving or relating to Forcite's purchase of Cytodyne Products from Cytodyne.
3. Arrangements and agreements between Forcite and Cytodyne concerning prices and terms of sale.
[*535]  4. Rebates, credits, premiums, free product, or any other type of price reduction or discount that Cytodyne offered and/or provided to Forcite in connection with transactions involving or relating to Forcite's purchase of Cytodyne Products from Cytodyne.
5. The terms [**5] of sale, including the price and quantity of product, for Cytodyne Products sold by Forcite to its customers during the time period October 1998 to March 2001.
6. Forcite's policies and practices concerning resale pricing on Cytodyne Products and any variations in such pricing.
7. The geographic areas in which, and the classes of trade to which, Forcite resold Cytodyne Products.
8. Oral and written communications between Forcite and Cytodyne concerning pricing and resale pricing during the pe-

riod from January 1998 through December 2000.

(Doc. # 1, p. 2; Doc. # 5, Ex. D, Subpoena, Schedule A.)

Super Natural seeks documents for inspection and copying concerning:

1. Invoices, credit memos, and corresponding payment records, including, but not limited to checks, wire transfers and/or rebates vouchers, reflecting or relating to the sale of Cytodyne Products by Forcite to its customers for the time period October 1998 to March 2001.
2. Invoices, credit memos, and corresponding payment records, including, but not limited to checks, wire transfers and/or rebates vouchers, from Cytodyne to Forcite reflecting or relating to the purchase of Cytodyne Products by Forcite [**6] for the time period October 1998 to March 2001.

(Doc. # 1, p.3; Doc. # 5, Ex. D, Subpoena Schedule B.)

n3 It is the Court's understanding that prior to the motion hearing, the parties agreed with each other to await the Court's ruling before attempting enforcement of the subpoena. The parties informed the Court during the April 30, 2003 hearing that they had earlier agreed to produce documents, if so ordered, at mutually convenient location. Thus, the location of any required production of documents is no longer an issue for the Court's consideration.

The record of the April 30, 2003 hearing is hereby incorporated by reference. The non-transcribed recording of said hearing may be obtained by contacting the Courtroom Deputy of the undersigned.

**Discussion**

Motions to compel disclosures and other discovery are committed to the sound discretion of the trial court. *Commercial Union Insurance Co. v. Westrope, 730 F.2d 729, 731 (11th Cir. 1984)*. The scope of discovery under the [**7] Federal Rules is broad. "Parties may obtain

discovery of any matter, not privileged, which is relevant to the subject matter involved in the pending action ...." *FED. R. CIV. P. 26(b)*. The Supreme Court has held that discovery is designed to help define and clarify the issues. *Hickman v. Taylor, 329 U.S. 495, 501, 91 L. Ed. 451, 67 S. Ct. 385 (1947)*.

Although *Rule 26(b)* applies to discovery of non-parties as well as parties in a suit, non-party status is considered by the court in weighing the burdens imposed in providing the requested discovery. *See American Standard Inc. v. Pfizer Inc., 828 F.2d 734 (Fed. Cir. 1987)* (affirming district court's restriction of discovery where non-party status "weighted against disclosure"); *American Electric Power Company, Inc. v. United States, 191 F.R.D. 132, 136 (S.D. Oh. 1999)* (status as a non-party is a factor that weighs against disclosure); *Solarex Corp. v. Arco Solar, Inc., 121 F.R.D. 163, 179 (E.D.N.Y. 1988)* (non-party status is a significant factor in determining whether discovery is unduly burdensome). The limited case law in this area reveals a case-specific balancing [**8] test wherein the court must weigh factors such as relevance, the need of the party for the documents, the breadth of the document request, and the time period covered by the request against the burden imposed on the person ordered to produce the desired information. *Farnsworth v. Procter & Gamble Co., 758 F.2d 1545 (11th Cir. 1985)*; *American Electric Power Company, Inc. v. United States, 191 F.R.D. 132 (S.D. Oh. 1999)*. Further, the courts have acknowledged that disclosure of confidential information to a competitor is presumed to be harmful to the disclosing entity. *See American Standard, Inc., 828 F.2d at 741* and cases cited therein.

In the instant case, Tree of Life avers that the information requested by Super Natural contains trade secrets, and is otherwise confidential and proprietary. Florida law controls what is a "trade secret" in this case. Trade secrets are defined by Florida statute as:

> Information, including a formula, pattern, compilation, program, device, method, technique, or process that:
> [*536]    (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily [**9] ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*FLA. STAT. § 688.002(4)* (2002). Florida courts have held that the term "trade secrets" includes active customer lists. *Sethscot Collection v. Drbul, 669 So. 2d 1076 (Fla. 3d DCA 1996)*. Tree of Life professes that its "stock-in-trade is its customer list and the relationships maintained with those customers" (Doc # 5, p. 6). Accordingly, the Court finds that the information requested in Schedule A, numbers 5-7 and Schedule B, number 1 of the contested subpoena are protected from disclosure as "trade secrets" under *Fla. Stat. § 688.002(4)*.

Once Tree of Life has shown the requested discovery to be trade secrets, Tree of Life must then demonstrate that disclosure might be harmful. *R&D Business Sys. v. Xerox Corp., 152 F.R.D. 195 (D. Colo. 1993)*. As noted above, courts have presumed that disclosure to a competitor is more harmful than disclosure to a noncompetitor. *See, e.g., Coca-Cola Bottling Co. v. Coca-Cola Co., 107 F.R.D. 288 (D. Del. 1985)*; [**10] *United States v. United Fruit Co., 410 F.2d 553, 557 (5th Cir. La. 1969)* (holding that a company would be harmed by disclosure of financial and marketing data to competitors). This Court finds that since Tree of Life and the Defendant are competitors, Tree of Life has made the required showing that the discovery requested in Subpoena Schedule A, numbers 5-7 and Subpoena Schedule B, number 1 are confidential and that their disclosure is potentially harmful.

The burden then shifts to the Defendant to show that this information is relevant and necessary in proving its counter-claim against the Plaintiff. *Duracell, Inc. v. SW Consultants, Inc., 126 F.R.D. 576 (N.D. Ga. 1989)*. Defendant avers that "the subpoena is intended to conduct discovery with respect to whether price reductions given to Tree of Life by Cytodyne were used to gain a competitive advantage over Super Natural, causing it economic loss and injury to competition generally." The Subpoena Schedule A, numbers 5-7 and Subpoena Schedule B, number 1 are more focused on the internal financial affairs and marketing strategies of Tree of Life than on the alleged price discrimination. The other information [**11] requested seems to be only that which could verify or negate discovery received from Plaintiff. Thus, the Court finds Defendant has failed to show a substantial need for the requested information and it would be unduly burdensome to require a non-party to produce the documents requested and/or to gather those documents which would be needed in preparation of deposition testimony covering the broad range of topics on which Defendant seeks information.

Determination of whether the need outweighs the harm falls within the sound discretion of the trial court. *See generally, Farnsworth, 758 F.2d 1545; Duracell, 126 F.R.D. 576*. The Court, in balancing the need of De-

fendant for the requested information against Tree of Life's interest in keeping the information from a competitor, finds that the harm to Tree of Life in disclosure outweighs, at this time, Defendant's need for the production of documents identified in Schedule B and the deposition testimony as outlined in Schedule A of the contested subpoena.

Defendant asserts that the instant case is "nearly identical" to the Tenth Circuit case of *Covey Oil Co. v. Continental Oil Co.* (Doc. # 2 at 8). [**12] *Covey Oil Co. v. Continental Oil Co., 340 F.2d 993 (10th Circuit 1965).* In *Covey Oil Co.,* the Tenth Circuit concluded that the interests of justice required the enforcement of a subpoena in which the subpoenaed non-party claimed trade secrets relating to price, cost, and volume of sales of gasoline rather than processes, formulas, or methods. *Id.* To protect the subpoenaed party, the court imposed conditions designed to protect the subpoenaed party. These conditions included, among others, forbidding the use of the material for business or competitive purposes, limiting the disclosure of documents to counsel and only for purposes of the litigation, limiting the right to presence at the depositions, and ordering that documents [*537] and depositions to be held by the clerk under seal. *Id. at 999.*

The instant case is distinguishable from *Covey* on several key points. For example, the defendant in *Covey* submitted proof that it was losing its market position. *Id. at 997.* In the instant case, Defendant made an allegation of lost of market share in its counterclaim against Plaintiff, but has not submitted any proof of that loss, or [**13] even alleged that market share was lost to Tree of Life (*see* Doc. # 5, Ex. C, pp. 18-19). In *Covey,* the defendant issuing the non-party subpoenas was seeking to defend allegations of price fixing and price discrimination under the *Sherman Act* and the *Robinson-Patman Act. Covey, 340 F.2d at 993.* In the instant action, Defendant Super Natural raised a counter-claim against Plaintiff alleging Plaintiff violated of the Robinson-

Patman Act; Super Natural now seeks to substantiate the allegations raised in the counter-claim. The defendant in *Covey* demonstrated a great need for the discovery request and the court found the information sought was "vital to the defenses asserted." *Id. at 998.* In this case, Defendant is seeking to "confirm the nature and volume of price discounts," but has not demonstrated any great need for the information requested directly from Tree of Life. In fact, during the April 30 hearing, Defendant's counsel was unable to support a need for *any* of the requested information, other than to perhaps verify discovery received from Plaintiff.

Accordingly, it is hereby

**ORDERED:**

1. Defendant's Motion to Compel (Doc. [**14] # 1) is **DENIED** without prejudice to an amended subpoena that is limited to requesting deposition testimony from a Tree of Life representative who can verify or deny the validity of discovery received from Plaintiff. n4

n4 The Court notes the counsel present at the April 30 hearing were amenable to such a deposition.

2. Tree of Life's Motion to Quash (Doc. # 5) is **GRANTED.**

3. Defendant's Motion to Expedite (Doc. # 6) is **GRANTED.**

**DONE AND ORDERED** at Jacksonville, Florida this 3rd day of June, 2003.

THOMAS E. MORRIS

United States Magistrate Judge