Westlaw.

649 F.2d 646
649 F.2d 646
**(Cite as: 649 F.2d 646)**

Page 1

▷
Dart Industries Co., Inc. v. Westwood Chemical Co., Inc.
C.A.Cal., 1980.

United States Court of Appeals,Ninth Circuit.
DART INDUSTRIES COMPANY, INC., Movant-Appellee,
v.
WESTWOOD CHEMICAL COMPANY, INC., Respondent-Appellee.
**Nos. 77-3880, 78-1525.**

April 2, 1980.

Corporate plaintiff appealed from an order of the United States District Court for the Central District of California, Manuel L. Real, J., which quashed a subpoena duces tecum and denied any further discovery against appellee. The Court of Appeals, Palmieri, District Judge, sitting by designation, held that: (1) by an unambiguous release agreement, the corporate plaintiff released any right to engage in discovery against appellee, and (2) the district court did not abuse discretion when it quashed the subpoena duces tecum which had been issued to one of appellee's officers directing him to appear for deposition and to produce documents, nor did it abuse discretion when it denied further discovery against appellee.

Order affirmed.

J. Blaine Anderson, Circuit Judge, dissented and filed opinion.
West Headnotes
**[1] Federal Courts 170B ⭆820**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(K) Scope, Standards, and Extent
      170BVIII(K)4 Discretion of Lower Court
        170Bk820 k. Depositions and Discovery.
Most Cited Cases
District court order barring discovery is to be reviewed under an abuse of discretion standard.

**[2] Federal Civil Procedure 170A ⭆1272.1**

170A Federal Civil Procedure
  170AX Depositions and Discovery

    170AX(A) In General
      170Ak1272 Scope
        170Ak1272.1 k. In General. Most Cited Cases
        (Formerly 170Ak1272)

**Witnesses 410 ⭆16**

410 Witnesses
  410I In General
    410k16 k. Subpoena Duces Tecum. Most Cited Cases
    (Formerly 170Ak1239)
In proceeding that was an outgrowth of a suit in New York by chemical company against former employees who allegedly conspired with two other companies to terminate a sales agency agreement, the district court did not abuse discretion when it quashed a subpoena duces tecum that had been issued to an officer of an alleged conspirator company or when it denied any further discovery against the company whose officer had been subpoenaed; the company whose officer had been subpoenaed was not a party to the New York suit and had entered into a release agreement under which the plaintiff chemical company received $700,000 in settlement of all claims, including claims arising from the alleged conspiracy.

**[3] Release 331 ⭆30**

331 Release
  331II Construction and Operation
    331k30 k. Scope and Extent in General. Most Cited Cases
Where general release agreement provided that first corporation released and discharged second corporation and its division "of any rights it has or may hereafter have by reason of a conspiracy" alleged by first corporation and, under the agreement, first corporation received $700,000 in settlement of all claims and where the agreement, which did not contain ambiguous language, was entered into by sophisticated business organizations represented by experienced counsel, agreement was a release of any right to engage in discovery against second corporation and did not merely release the second corporation from any possible claims as a defendant.

**[4] Release 331 ⭆25**

649 F.2d 646
649 F.2d 646
(Cite as: 649 F.2d 646)

331 Release
    331II Construction and Operation
        331k25 k. General Rules of Construction. Most Cited Cases
There was no reason to denigrate the use of "boiler plate" or "stereotype" language in a release agreement where the language was used appropriately; "boiler plate" language has the value of frequent usage and general understanding and may enhance clarity.

[5] Federal Civil Procedure 170A ⌐1269.1

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1269 Grounds and Objections
                170Ak1269.1 k. In General. Most Cited Cases
        (Formerly 170Ak1269)
Though discovery is a valuable right and should not be unnecessarily restricted, necessary restrictions may be broader when a nonparty is the target of discovery.

[6] Federal Civil Procedure 170A ⌐1268

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1267 Discretion of Court
                170Ak1268 k. Liberality in Allowance of Remedy. Most Cited Cases
District judge did not abuse discretion when he failed to invoke strong policy in favor of liberal discovery to defeat an unambiguous agreement for which substantial consideration had been paid.

Arthur I. Winard, New York City, Lon M. Mickelson, Los Angeles, Cal., on briefs, for movant-appellee.
John G. Wigmore, Lawler, Felix & Hall, Los Angeles, Cal., on briefs, for respondent-appellee.

Appeal from the United States District Court for the Central District of California.

Before WALLACE and ANDERSON, Circuit Judges, and PALMIERI,[FN*] District Judge.

    FN* The Honorable Edmund L. Palmieri, Senior United States District Judge for the Southern District of New York, sitting by designation.

*648 PALMIERI, District Judge:
This is an appeal from the entry of an order quashing a subpoena duces tecum and denying any further discovery against appellee. The basic question presented on appeal is whether the district court abused its discretion by denying discovery.

The present proceeding is an outgrowth of a lawsuit filed by Westwood Chemical Company, Inc. (Westwood) against two of its former employees in the Southern District of New York. These employees allegedly conspired with Synthetic Products Company (Synthetic), a division of Dart Industries Company, Inc. (Dart), as well as Dart, to terminate a sales agency agreement that had been in force for some years between Westwood and Synthetic. In an effort to pursue discovery ancillary to the New York lawsuit, Westwood had a subpoena duces tecum issued from the Central District of California to one of Dart's officers directing him to appear for deposition upon written questions and to produce documents. Upon Dart's motion, the district court signed an order quashing the subpoena and denying any further discovery against Dart.

(1)(2) The district court's order barring discovery is to be reviewed under an "abuse of discretion" standard. In Premium Service Corp. v. Sperry & Hutchinson Co., 511 F.2d 225, 229 (9th Cir. 1975), this court affirmed an order quashing a subpoena duces tecum and explained:
We will reverse such an order to quash only for abuse of discretion Such abuses must be unusual and exceptional; we will not merely substitute our judgment for that of the trial judge A judge abuses his discretion only when his decision is based on an erroneous conclusion of law or where the record contains no evidence on which he rationally could have based that decision.

We conclude that the district court did not abuse its discretion in barring discovery.

Dart was not a party to the New York lawsuit that arose from the termination of the sales agreement with Westwood because Dart and Westwood had entered into an agreement of general release on September 1, 1976. Under the release, Westwood received $700,000 from Dart in settlement of all claims under the parties' sales agency agreement, and as satisfaction for all claims Westwood may have had resulting from the termination of the sales agreement and the alleged conspiracy causing the termination.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(3) The crucial issue in the controversy before us turns on the interpretation of the release agreement. The release agreement provided "that WESTWOOD releases and discharges DART INDUSTRIES INC. and its Synthetic Products Division of any rights it has or may hereafter have by reason of a conspiracy alleged by WESTWOOD " (emphasis added). Dart argues, and the district court agreed, that Westwood released any right to engage in discovery against Dart. Westwood contends that the agreement was designed only to release Dart from any possible claims against Dart as a defendant, not to bar discovery in an action against third parties. Although each side has sought to support its interpretation of the agreement's meaning by affidavits of attorneys who participated in its formulation, we have concluded that the meaning of the agreement is clear, requiring no amplification.

(4) Our dissenting brother disagrees with our construction of the general release by saying "it contains much of the standard boiler plate to live up to this advance billing" (as a general release), adding that there is nothing in the agreement referring to Westwood's releasing its right of discovery from Dart. The answer to this is that Westwood gave up far more than its right of discovery against Dart. It gave up everything. It released Dart from "any rights (Westwood) has or may hereafter have by reason of a conspiracy alleged by Westwood." (emphasis added). Additionally, we can see no reason to denigrate the use of boiler plate or stereotype language where, as here, it was used appropriately. Such language has the value of frequent usage and general understanding. Far from derogating from its meaning, we believe**649** it enhances its clarity beyond peradventure of doubt.

What our brother seems to be saying is that because the word "discovery" should have been used, and was not used, the agreement is ambiguous and operates only as a partial release. This conclusion is nothing short of rewriting the agreement and emasculating it. Equally unfounded is his statement that the major portion of the $700,000 payment to Westwood "merely represents money due under their sales agreement." This flies in the face of the agreement which states at the very outset:
WESTWOOD CHEMICAL COMPANY, INC., having an address at 801 Second Avenue, New York, New York 10017, for and in consideration of the sum of SEVEN HUNDRED THOUSAND U. S. DOLLARS ($700,000.00) in hand paid by DART INDUSTRIES, INC., 8480 Beverly Boulevard, Los Angeles, California 90048, the receipt and sufficiency whereof is hereby acknowledged,

The dissent in this particular apparently relies on a choice between conflicting partisan affidavits submitted after the agreement was executed and the consideration paid, and when this controversy reached the district court. We believe that court reached a correct conclusion on "evidence which he rationally could have based that decision." Premium Service Corp. v. Sperry & Hutchinson Co., supra at 229.

(5) The dissent states that important policy considerations militate against interpreting the agreement as a general release. While discovery is a valuable right and should not be unnecessarily restricted, Kyle Engineering Co. v. Kleppe, 600 F.2d 226, 232 (9th Cir. 1979), the "necessary" restriction may be broader when a nonparty is the target of discovery. As one district court has noted, "(t)here appear to be quite strong considerations indicating that discovery would be more limited to protect third parties from harassment, inconvenience, or disclosure of confidential documents." Collins and Aikman Corp. v. J. P. Stevens & Co., Inc., 51 F.R.D. 219, 221 (D.S.C.1971). One author has stated that the more appropriate nomenclature is "nonparty" discovery, not "third-party" discovery, as "the word nonparty serves as a constant reminder of the reasons for the limitations that characterize 'third-party' discovery." Getman, R., "Federal 'Third-Party' Discovery in the Small Antitrust Case," 45 Brooklyn L.Rev. 311 (1979).

(6) Although the strong policy in favor of liberal discovery is clear, Hickman v. Taylor, 329 U.S. 495, 507, 67 S.Ct. 385, 391, 91 L.Ed. 451 (1957), commentators have recognized that there is a potential for abuse in such a policy. One commentator has written:
(T)he draftsmen of the federal rules held utopian notions of what might be gained from discovery. Designed with the hope of eliminating the so-called sporting theory of justice, discovery practice in many cases simply transfers the battlefield from the courtroom to the pretrial stage.
A central justification for our exceedingly liberal discovery practice has been that the right to discover facts and information is kept entirely distinct from the right to use that information at trial.
This theory gives insufficient weight to the rights of privacy of the person from whom discovery is sought and to the expense, delay, and potential for harassment and abuse that go with unrestricted

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

649 F.2d 646
649 F.2d 646
**(Cite as: 649 F.2d 646)**

Page 4

discovery.

We need an increased consciousness of the excesses and an increased willingness either assumed voluntarily or imposed through wider use of the discretionary powers of the court to check them.

Stanley, J., "President's Page" (Message from the President of the American Bar Association), 62 American Bar Association Journal 1375 (November 1976). See Also, Pollack, M., "Discovery Its Abuses and **\*650** Correction," 80 F.R.D. 219 (Remarks made at the Fifth Circuit Conference on April 26, 1978). The district judge did not abuse his discretion in not invoking the policy favoring liberal discovery to defeat an unambiguous agreement for which Dart paid substantial consideration.

While an exception was expressly set forth in the agreement with respect to the two former employees, none was stated with respect to Dart. We cannot accept Westwood's suggestion that it necessarily agreed only to refrain from suing Dart. Its agreement is far broader and it cannot be equated with a covenant not to sue [FN1], an undertaking that could readily have been expressed. If indeed the cooperation of Dart for the production of documents and the providing of testimonial evidence was a matter of importance to Westwood in the contemplated litigation against its ex-employees, such obligations could easily have been spelled out and defined.[FN2] Having bought its peace for $700,000, a very substantial consideration, Dart should be permitted, as the district court ruled, to be left alone totally free of any obligations to Westwood.

FN1. For a discussion of the difference between a covenant not to sue and a general release, see Dale Hilton, Inc. v. Triangle Publications, Inc., 198 F.Supp. 638, 639-40 (S.D.N.Y.1961). The dissent cites the Restatement (Second) of Contracts s 354, Comment c (Tent. Draft No. 13, March 1, 1978) in support of the conclusion that the release was in reality a covenant not to sue. The section states: "If a literal interpretation of a writing that purports to be a release would frustrate that purpose, the writing may be interpreted as a contract not to sue." The illustration given for the occasion when such a narrow interpretation is appropriate, explains that if a release of one of two joint debtors would release the other (who has paid no consideration), the release will be

interpreted as a contract not to sue. In the case before us, no such drastic consequence will occur. Westwood explicitly reserved its rights against the two former employees, and only these employees. A literal interpretation of the general release will not release them.

FN2. See our discussion of Vuitton et Fils, S. A. v. J. Young Enterprises, 609 F.2d 1335 (9th Cir. 1979), infra, at 650.

In Van Bronkhorst v. Safeco Corp., 529 F.2d 943, 950 (9th Cir. 1976), this court stated that agreements that avoid litigation and lessen the burden on courts are to be encouraged: "It hardly seems necessary to point out that there is an overriding public interest in settling and quieting litigation." (footnote omitted). Accord, United States v. McInnes, 556 F.2d 436 (9th Cir. 1977).[FN3] The dissent correctly points out that the policy in favor of settlement is not an absolute. In Vuitton et Fils, S. A. v. J. Young Enterprises, 609 F.2d 1335 (9th Cir. 1979), to which he analogizes the case before us, this court reversed the district court's entry of a final judgment based upon the parties' stipulated consent to an injunctive order. The parties to that stipulation expressly reserved defenses, provided for continued discovery, and did not address the other remedies prayed for in the complaint. This court, in an opinion by the author of the dissent here, concluded that the continuation of Vuitton's action was clearly contemplated by the parties. The broad language of the Dart/Westwood general release plainly terminates any further involvement by Dart.

FN3. See, Lynch, E. "Settlement of Civil Cases: A View from the Bench," 5 Litigation 8 (1978) (in which the author notes: "Our pluralistic, complex and crowded society seems to breed lawsuits faster than pollution. Every lawyer and judge, and virtually everyone for that matter, is aware that our courts are backed up with all types of litigation.")

While it is true that traditional rules of contract interpretation dictate that an ambiguous agreement be construed against its author [FN4] in this case, Dart the agreement before us does not contain ambiguous language. The agreement was entered into by two sophisticated business organizations represented by experienced counsel. Dart is correct in its assertion that Westwood could have negotiated the type of

649 F.2d 646                                                                                   Page 5
649 F.2d 646
**(Cite as: 649 F.2d 646)**

release it now asserts it did negotiate a narrow release limited solely to the release of Dart from being named as a defendant in a conspiracy lawsuit. Nevertheless, Westwood did not do so.

>  FN4. 4 S. Williston, Contracts s 621 (1961 & Supp.1979).

**\*651** The trial judge did not abuse his discretion when he quashed the subpoena duces tecum.

Westwood's motion under F.R.C.P. 60(b)(1), filed subsequent to the district court's order which we have discussed, and seeking to be relieved of that order, is treated by us as a motion for remand of the case for its consideration, and we decline to remand. Smith v. Lujan, 588 F.2d 1304, 1307 (9th Cir. 1979); Crateo, Inc. v. Intermark, Inc., 536 F.2d 862, 869 (9th Cir.), cert. denied, 429 U.S. 896, 97 S.Ct. 259, 50 L.Ed.2d 180 (1976).

The order of the district court is affirmed.

J. BLAINE ANDERSON, Circuit Judge (dissenting): I am now thoroughly convinced that my concurrence in the opinion filed in this appeal on the 17th day of January, 1980, was ill-advised and mistaken. I withdraw my concurrence and dissent from that opinion and from the vote of my colleagues to deny the petition for rehearing. My reasons, which I should have expressed earlier, are now set forth.

The general rule is that discovery orders, such as the one denying further discovery in the present case, are reviewed under an "abuse of discretion" standard. However, this limited standard of review cannot afford any protection to a discovery order which is erroneous as a matter of law. People of State of California ex rel. Younger v. Tahoe Regional Planning Agency, 516 F.2d 215, 217 (9th Cir. 1975), cert. denied, 423 U.S. 868, 96 S.Ct. 131, 46 L.Ed.2d 97. Since the district court's order in the present case was based solely on its legal conclusions on the meaning of the agreement, its action is freely reviewable on appeal. Id. Not only does a fair reading of the agreement [FN1] reveal that it could not have been intended as Westwood's release of its discovery rights against Dart, but also important policy considerations militate against such a result.

>  FN1. Contrary to the majority assertion, this writer is not convinced that the agreement involved in the present case cannot be

equated to a covenant not to sue. Where a purported release of one joint debtor (i. e., Dart) states that all rights against another joint debtor are reserved (i. e., the two former employees), then the writing may be interpreted as a contract not to sue, rather than as a release. Restatement (Second) of Contracts s 354, Comment c (Tent. Draft No. 13, March 1, 1978). And, as the case cited by the majority says, "where the court can possibly interpret the document as a covenant not to sue, it will do so." Dale Hilton, Inc. v. Triangle Publications, Inc., 198 F.Supp. 638, 639 (S.D.N.Y.1961).

Accepting for the moment the characterization of the agreement as not containing any ambiguous language, the agreement is still not susceptible of the interpretation given to it by the majority. The agreement is entitled "General Release" and it contains much of the standard boiler plate to live up to this advance billing. There can be no doubt but that it releases Westwood's rights against Dart which arose from the alleged conspiracy between Dart and Westwood's former employees. The agreement also clearly states that: "It is understood that this release applies solely to DART INDUSTRIES, INC. and Synthetic Products and to no other party whatsoever." Nowhere in the agreement is there any reference made to Westwood giving up or releasing its right of discovery from Dart. Yet, this is how the majority reads the agreement.

Since the agreement contains absolutely no discussion of discovery, and the parties obviously attach totally different meanings to it, the only possible way to read the release of discovery rights into it is by considering it ambiguous so that other evidence may be considered in determining the intent of the parties. See United States v. Haas & Haynie Corp., 577 F.2d 568, 572 (9th Cir. 1978).

At the time the agreement was entered into, it was made absolutely clear to Dart that Westwood intended to sue its former employees. The majority opinion points out: "an exception was expressly set forth in the agreement with respect to the two former employees " As the alleged co-conspirator with these former employees, Dart was on notice that Westwood would seek discovery. Yet, Dart did not include a **\*652** provision preventing discovery in the agreement. Since Dart either knew or had reason to know of Westwood's interpretation of the agreement, it should be given the meaning attributed to it by Westwood (that is, no release of discovery rights).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

649 F.2d 646                                                                                    Page 6
649 F.2d 646
**(Cite as: 649 F.2d 646)**

Haas & Haynie, supra, 577 F.2d at 573.

Moreover, Dart was the principal author of the agreement, and as such it should be construed in favor of Westwood. See 4 Williston on Contracts, s 621 (3d ed. 1961). This is particularly true where Dart admits knowledge of the pending lawsuit against the former employees, yet does not include any language about discovery in the agreement.

Upon further study and reflection, I am satisfied that we cannot apply the abuse of discretion standard on review of this issue. The district court, by denying all discovery from Dart, has done violence to all previous interpretation and experience under the discovery rules. As the Supreme Court has noted, the discovery rules "are to be accorded a broad and liberal treatment." Hickman v. Taylor, 329 U.S. 495, 507, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947). The basic philosophy underlying discovery is that "prior to trial every party to a civil action is entitled to the disclosure of all relevant information in the possession of any person, unless the information is privileged." Wright, Law of Federal Courts 354 (2d ed. 1970). Moreover, district courts "should guard against unnecessarily restricting the parties' access to discovery." Kyle Engineering Co. v. Kleppe, 600 F.2d 226, 232 (9th Cir. 1979). These considerations alone are a sufficient basis for reversing the district court's order. See e. g., In re Westinghouse Elec. Corp., etc., 570 F.2d 899, 902 (10th Cir. 1978).

Furthermore, the majority opinion represents an unwarranted extension of the rule favoring the settlement of litigation.[FN2] It is undisputed that the agreement settled all claims which Westwood had against Dart. (It should be noted that the major portion of the $700,000 payment to Westwood merely represented money due under their sales agreement.) Had Westwood sought to pursue claims against Dart, then the rule favoring settlement should bar those claims. But here an entirely different situation arises. Westwood is attempting to sue its two former employees and seeks discovery from Dart in relation to that litigation. In reaching its settlement agreement with Westwood, Dart was not acting as a representative of any other party. At no time did Westwood or Dart contemplate the settlement of any claims which Westwood might have against any other party. Moreover, as to Westwood's two former employees, it was specifically recognized by the parties that Westwood would pursue its claim against them. Given these facts, the policy favoring settlement and the cases cited by the majority are irrelevant to this case, and should not be applied to

terminate Westwood's discovery rights.

    FN2. This policy in favor of settlement is far from absolute. In a recent decision this court stated that: "as a general rule a stipulation should not be construed as a stipulation that disposes of the entire case unless there is an unequivocal statement by the parties that it was so intended." Vuitton Et Fils, S. A. v. J. Young Enterprises, Inc., 609 F.2d 1335, 1337 (9th Cir. 1979). By analogy this same reasoning should apply here. This writer does not believe that the agreement not to sue should be construed as a release of discovery rights in the absence of an unequivocal statement by the parties that it was so intended.

What the district court and the majority opinion have done is to stretch the settlement agreement so as to destroy or at least seriously affect Westwood's cause of action against nonparties (the two former employees) to the settlement agreement. It must be remembered that Westwood expressly reserved its right to sue these two former employees in the settlement agreement. Despite this express reservation and the fact that any policy in favor of settlement is irrelevant, the majority chooses to affirm the district court's order which was clearly erroneous as a matter of law.

Because I am convinced that the district court's order denying all further discovery by Westwood from Dart was contrary to the terms of the agreement, contrary to all general rules of contract interpretation, and *653 contrary to the general policy in favor of discovery, I believe that the petition for rehearing should be granted and the order of the district court reversed.

C.A.Cal., 1980.
Dart Industries Co., Inc. v. Westwood Chemical Co., Inc.
649 F.2d 646

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 417 US 156

**EISEN v. CARLISLE & JACQUELIN ET AL.**

**No. 73-203**

**SUPREME COURT OF THE UNITED STATES**

*417 U.S. 156; 94 S. Ct. 2140; 40 L. Ed. 2d 732; 1974 U.S. LEXIS 60; 9 Fair Empl.
Prac. Cas. (BNA) 1302; 7 Empl. Prac. Dec. (CCH) P9374A; 1974-1 Trade Cas. (CCH)
P75,082; Fed. Sec. L. Rep. (CCH) P94,570; 18 Fed. R. Serv. 2d (Callaghan) 877; 4
ELR 20513*

**February 25, 1974, Argued
May 28, 1974, Decided**

**PRIOR HISTORY:**

CERTIORARI TO THE UNITED STATES
COURT OF APPEALS FOR THE SECOND CIRCUIT.

**DISPOSITION:**

*479 F.2d 1005,* vacated and remanded.

**SUMMARY:**

In May 1966 the plaintiff brought, in the United
States District Court for the Southern District of New
York, a class action on behalf of himself and all other
odd-lot traders on the New York Stock Exchange, charg-
ing defendant brokerage firms and defendant Stock Ex-
change in his complaint with violations of the antitrust
and securities laws. The litigation, protracted for 8 years
and involving a series of decisions by the District Court
and the Court of Appeals, dealt with the complex ques-
tions surrounding plaintiff's attempt to maintain his suit
as a class action under *Federal Civil Procedure Rule 23*.
Insofar as pertinent, the District Court ultimately decided
that (1) individual notice should be mailed to approxi-
mately 2000 or more class members who had two or
more transactions during the relevant period, and to 5000
members selected at random from the 200 million mem-
bers who were identifiable, but that notice by publication
should be given to the remainder of this class, and (2)
before considering the apportionment of the cost of no-
tice, the court should hold a preliminary hearing as to the
merits of the plaintiff's case, in which he must make a
strong showing of likelihood of success *(52 FRD 253);*
after that hearing was held, the District Court imposed 90
percent of the cost of giving notice on defendants *(54
FRD 565)*. Disapproving these rulings of the District
Court, the Court of Appeals for the Second Circuit re-

versed and ordered the suit dismissed as a class action,
one of the judges concurring in the result solely on the
ground that the District Court's holding in *54 FRD 565,*
as stated above, was erroneous *(479 F2d 1005,* reh and
reh en banc den *479 F2d 1020).*

On certiorari, the United States Supreme Court va-
cated the judgment of the Court of Appeals with instruc-
tions to dismiss the class action as defined in plaintiff's
original complaint, however, without prejudice to any
efforts plaintiff may make to redefine his class. In an
opinion by Powell, J., expressing the view of six mem-
bers of the court, it was held that (1) the District Court's
orders permitting the suit to proceed as a class action and
allocating the cost of notice constituted "final" decisions
within the meaning of *28 USCS 1291* and were therefore
appealable to the Court of Appeals as of right; (2) the
District Court's resolution of the notice problem was er-
roneous in (a) failing to comply with the requirements of
*Federal Civil Procedure Rule 23(c)(2)*, which requires
individual notice to all class members whose names and
addresses may be ascertained through reasonable effort
and (b) imposing part of the cost of notice on the defen-
dants; (3) because the plaintiff has consistently main-
tained that he will not bear the cost of notice to members
of the class as defined in his original complaint, the class
action as so defined should be dismissed, however with-
out prejudice to any efforts plaintiff may make to rede-
fine his class as a subclass within *Federal Civil Proce-
dure Rule 23(c)(4)* or *Federal Civil Procedure Rule 15*,
dealing with amendments of pleadings.

Douglas, J., joined by Brennan and Marshall, JJ.,
dissented in part, expressing the view that while the
plaintiff may proceed by amending his complaint to de-
fine a subclass, nevertheless he need not do so.

417 U.S. 156, *; 94 S. Ct. 2140, **;
40 L. Ed. 2d 732, ***; 1974 U.S. LEXIS 60

## LAWYERS' EDITION HEADNOTES:

[***LEdHN1]
ERROR §32.5
 finality of order allocating cost of notice of class action -
-
Headnote:[1A][1B]

A District Court's order permitting a suit to proceed as a class action and allocating the cost of notice by imposing 90 percent thereof on defendants is a "final" decision within the meaning of *28 USCS 1291,* conferring upon the courts of appeal jurisdiction of appeals from all final decisions of the United States District Courts, and is therefore appealable as of right under that section; the order falls within that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated; the order is a final disposition of a claim of right which is not an ingredient of the cause of action and does not require consideration with it and is but one aspect of the District Court's effort to construe the requirements of *Federal Civil Procedure Rule 23(c)(2)* in a way that would permit plaintiff's suit to proceed as a class action.

[***LEdHN2]
ERROR §22
 finality of decision below --
Headnote:[2]

Restricting appellate review to "final decisions" within the meaning of *28 USCS 1291* prevents the debilitating effect on judicial administration caused by piecemeal appellate disposition of what is, in practical consequence, but a single controversy; no verbal formula yet devised can explain prior finality decisions with unerring accuracy or provide an utterly reliable guide for the future.

[***LEdHN3]
ERROR §23
 final judgment -- terminating action --
Headnote:[3]

Under *28 USCS 1291,* which confers upon the courts of appeal jurisdiction of appeals from all final decisions of the Federal District Courts, appellate review is not limited to those final judgments which terminate an action.

[***LEdHN4]
ERROR §22
 finality of decision below -- construction of *28 USCS 1291* --

Headnote:[4]

The requirement of finality as a prerequisite of jurisdiction of a Court of Appeals to entertain appeals from all final decisions of a federal court is to be given a practical rather than a technical construction; the inquiry requires some evaluation of the competing considerations underlying all questions of finality, that is, the inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other.

[***LEdHN5]
PARTIES §24
 class suits -- notice requirements -- allocation of costs of notice --
Headnote:[5]

In a class action filed in a federal court by plaintiff on behalf of himself and all other odd-lot traders on the New York Stock Exchange, in which the complaint charged defendants with violations of the antitrust and securities laws, the District Court's order authorizing notice by publication to be given to a substantial number of members of the class is erroneous because it fails to comply with the notice requirements of *Federal Civil Procedure Rule 23(c)(2),* requiring the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable efforts; and the District Court's order allocating the costs of the notice is erroneous because it imposes part of the cost of notice on the defendants.

[***LEdHN6]
PARTIES §24
 class suits -- individual notice to identifiable members --
Headnote:[6]

The import of the language in *Federal Civil Procedure Rule 23(c) (2),* under which the court is required to direct to class members "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," is that individual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort.

[***LEdHN7]
PARTIES §24
 class suits -- individual notice --
Headnote:[7]

In a federal class suit in which the names and addresses of 2,250,000 class members are easily ascertainable, and there is nothing to show that individual notice cannot be mailed to each, such notice is clearly the "best notice

417 U.S. 156, *; 94 S. Ct. 2140, **;
40 L. Ed. 2d 732, ***; 1974 U.S. LEXIS 60

practicable" within the meaning of *Federal Civil Procedure Rule 23(c)(2)*.

**[\*\*\*LEdHN8]**
PARTIES §24
 class suits -- notice to members -- prohibitive costs -- necessity of individual notice --
Headnote:[8]

In a federal class action instituted by plaintiff on behalf of himself and all other odd-lot traders on the New York Stock Exchange, in which the complaint charged defendants with violations of the antitrust and securities laws, the requirements of *Federal Civil Procedure Rule 23(c)(2)* of individual notice to all members whose names and addresses may be ascertained through reasonable effort is not dispensed with because (1) the prohibitively high cost of providing individual notice to 2,250,000 class members would end the suit as a class action and effectively frustrate the plaintiff's attempt to vindicate the policies underlying the antitrust and securities laws, or (2) because no prospective class member has a large enough stake in the matter to justify separate litigation of his individual claim.

**[\*\*\*LEdHN9]**
PARTIES §24
 class suits -- individual notice to members as mandatory --
Headnote:[9]

In a class suit individual notice to identifiable class members, an unambiguous requirement of *Federal Civil Procedure Rule 23*, is not a discretionary consideration to be waived in a particular case or to be tailored to fit the pocketbooks of particular plaintiffs.

**[\*\*\*LEdHN10]**
ACTIONS §224
 commencement of action --
Headnote:[10A][10B]

Commencement of a class action tolls the applicable statute of limitations as to all members of the class.

**[\*\*\*LEdHN11]**
LAW §803.5
PARTIES §24
 class suits -- due process -- requirement of notice --
Headnote:[11]

Adequate representation, rather than notice, is not the touchstone of due process in a class action and does not, of itself, satisfy *Federal Civil Procedure Rule 23*, which speaks to notice as well as to adequacy of representation and requires that both be provided; otherwise no notice at all, published or otherwise, would be required in a class action.

**[\*\*\*LEdHN12]**
PARTIES §24
 class suits -- allocation of cost of notice --
Headnote:[12A][12B]

In a class action the plaintiff must initially bear the cost of notice to the members of his class as part of the ordinary burden of financing his own suit, where the relationship between the parties is truly adversarial.

**[\*\*\*LEdHN13]**
PARTIES §24
 class suits -- cost of notice -- preliminary hearing on merits of case --
Headnote:[13A][13B]

*Federal Civil Procedure Rule 23* does not authorize, as part of the determination whether a suit may be maintained as a class action, a preliminary hearing on the merits of the case with a view to determining whether the named plaintiff is more than likely to prevail on his claims; such a procedure contravenes Rule 23 by allowing a representative plaintiff to secure the benefits of a class action without first satisfying the requirements for it, and is directly contrary to the command of subd (c)(1) of the Rule that the court determine whether a suit so denominated a class action may be maintained as such as soon as practicable after the commencement of the action; moreover, a preliminary determination of the merits may result in substantial prejudice to a defendant, since of necessity it is not accompanied by the traditional rules and procedures applicable to civil trials and the court's tentative findings, made in the absence of established safeguards, may color the subsequent proceedings and place an unfair burden on the defendant.

**[\*\*\*LEdHN14]**
PARTIES §24
 class suits -- propriety -- determinative question --
Headnote:[14]

In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of *Federal Civil Procedure Rule 23* are met.

**[\*\*\*LEdHN15]**
ERROR §1704
 class suit -- remand for dismissal -- plaintiff's refusal to bear cost of notice --

417 U.S. 156, *; 94 S. Ct. 2140, **;
40 L. Ed. 2d 732, ***; 1974 U.S. LEXIS 60

Headnote:[15A][15B]

A case involving a class action in which the named plaintiff has consistently maintained that he will not bear the cost of notice under *Federal Civil Procedure Rule 23(c)(2)* to members of the class as defined in his original complaint, will be remanded by the United States Supreme Court to the Court of Appeals with instructions to dismiss the class action as so defined, however, without prejudice to any efforts the plaintiff may make to redefine his class either under *Federal Civil Procedure Rule 23(c)(4)*, providing that a class may be divided into subclasses, or under *Federal Civil Procedure Rule 15*, dealing with amended pleadings.

**SYLLABUS:**

Petitioner brought a class action under *Fed. Rule Civ. Proc. 23* on behalf of himself and all odd-lot traders on the New York Stock Exchange for a certain four-year period, charging respondent brokerage firms, which handled 99% of the Exchange's odd-lot business, and respondent Exchange with violating the antitrust and securities laws. There followed a series of decisions by the District Court and the Court of Appeals. The District Court ultimately decided that the suit could be maintained as a class action, and, after finding that some two and a quarter million members of the prospective class could be identified by name and address with reasonable effort and that it would cost $ 225,000 to send individual notice to all of them, proposed a notification scheme providing for individual notice to only a limited number of prospective class members and notice by publication to the remainder. The District Court then held a preliminary hearing on the merits, and after finding that petitioner was "more than likely" to prevail at trial, ruled that respondents should bear 90% of the costs of the notification scheme. The Court of Appeals reversed and ordered the suit dismissed as a class action, disapproving the District Court's partial reliance on publication notice. The Court of Appeals held that Rule 23 (c)(2) required individual notice to all identifiable class members; that the District Court had no authority to hold a preliminary hearing on the merits for the purpose of allocating notice costs; that the entire notice expense should fall on petitioner; and that the proposed class action was unmanageable under Rule 23 (b)(3)(D). Petitioner contends that the Court of Appeals had no jurisdiction to review the District Court's orders, and further, that the Court of Appeals decided the above issues incorrectly. *Held*:

1. The District Court's resolution of the notice problems constituted a "final" decision within the meaning of *28 U. S. C. § 1291* and was therefore appealable as of right under that section. Pp. 169-172.

(a) Section 1291 does not limit appellate review to "those final judgments which terminate an action . . . ," but rather the requirement of finality is to be given a "practical rather than a technical construction." *Cohen v. Beneficial Loan Corp., 337 U.S. 541, 545-546.* Pp. 170-172.

(b) The District Court's decision that respondents could lawfully be required to bear the costs of notice involved a collateral matter unrelated to the merits of petitioner's claims and was "a final disposition of a claimed right which is not an ingredient of the cause of action and does not require consideration with it," *Cohen, supra, at 546-547.* P. 172.

2. The District Court's resolution of the notice problems failed to comply with the notice requirement of Rule 23 (c)(2). Pp. 173-177.

(a) The express language and intent of Rule 23 (c)(2) leave no doubt that individual notice must be sent to all class members who can be identified through reasonable effort. Here there was nothing to show that individual notice could not be mailed to each of the two and a quarter million class members whose names and addresses were easily ascertainable, and for these class members individual notice was clearly the "best notice practicable" within the meaning of Rule 23 (c)(2). Pp. 173-175.

(b) The facts that the cost of sending individual notices would be prohibitively high to petitioner, who has only a $ 70 stake in the matter, or that individual notice might be unnecessary because no prospective class member has a large enough stake to justify separate litigation of his individual claim, do not dispense with the individual-notice requirement, since individual notice to identifiable class members is not a discretionary consideration to be waived in a particular case but an unambiguous requirement of Rule 23. Pp. 175-176.

(c) Adequate representation in itself does not satisfy Rule 23 (c)(2), since the Rule speaks to notice as well as to adequacy of representation and requires that both be provided. Otherwise no notice at all, published or otherwise, would be required in this case. Pp. 176-177.

3. Petitioner must bear the cost of notice to the members of his class, and it was improper for the District Court to impose part of the cost on respondents. Pp. 177-179.

(a) There is nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action, and, indeed, such a procedure contravenes the Rule by allowing a representative plaintiff to secure the bene-

417 U.S. 156, *; 94 S. Ct. 2140, **;
40 L. Ed. 2d 732, ***; 1974 U.S. LEXIS 60

fits of a class action without first satisfying the requirements of the Rule.  Pp. 177-178.

(b) A preliminary determination of the merits may substantially prejudice a defendant, since it is unaccompanied by the traditional rules and procedures applicable to civil trials.  P. 178.

(c) Where, as here, the relationship between the parties is truly adversary, the plaintiff must pay for the cost of notice as part of the ordinary burden of financing his own suit.  Pp. 178-179.

**COUNSEL:**

Aaron M. Fine argued the cause for petitioner.  With him on the briefs were Mordecai Rosenfeld and Harold E. Kohn.

Devereux Milburn and William Eldred Jackson argued the cause for respondents.  With them on the briefs were Louis L. Stanton, Jr., and Russell E. Brooks. *

* Briefs of amici curiae urging reversal were filed by Louis J. Lefkowitz, Attorney General, pro se, Samuel A. Hirshowitz, First Assistant Attorney General, and George D. Zuckerman and Arnold D. Fleischer, Assistant Attorneys General, for the Attorney General of New York; by Israel Packel, Attorney General, Lawrence Silver and Gerry J. Elman, Deputy Attorneys General, and David Berger for the Commonwealth of Pennsylvania; by Evelle J. Younger, Attorney General, Anthony C. Joseph, Assistant Attorney General, and Michael I. Spiegel, Deputy Attorney General, for the State of California; by William J. Baxley, Attorney General of Alabama, Norman C. Gorsuch, Attorney General of Alaska, Gary K. Nelson, Attorney General of Arizona, Arthur K. Bolton, Attorney General of Georgia, Ed W. Hancock, Attorney General of Kentucky, Robert H. Quinn, Attorney General, and Leo Schwartz, Special Assistant Attorney General of Massachusetts, John C. Danforth, Attorney General of Missouri, Allen I. Olson, Attorney General of North Dakota, Richard J. Israel, Attorney General of Rhode Island, Kimberly B. Cheney, Attorney General of Vermont, Robert I. Shevin, Attorney General of Florida, Richard C. Turner, Attorney General of Iowa, William J. Guste, Attorney General of Louisiana, A. F. Summer, Attorney General of Mississippi, Louis J. Lefkowitz, Attorney General of New York, Larry Derryberry, Attorney General of Oklahoma, Kermit A. Sande, Attorney General of South Dakota, Andrew P. Miller, Attorney General of Virginia, and David I. Shapiro and James vanR. Springer for the State of Alabama et al.; by Sheldon V. Burman for the New York State Trial Lawyers Assn.; by Edward I. Pollock, Leonard Sacks, and Stephen I. Zetterberg for the California Trial Lawyers Assn.; by Melvin L. Wulf and Burt Neuborne for the American Civil Liberties Union; by Jack Greenberg, James M. Nabrit III, Charles Stephen Ralston, and Eric Schnapper for the NAACP Legal Defense and Educational Fund, Inc.; and by Alan B. Morrison for the Public Citizen and Consumers Union of United States, Inc.

Briefs of amici curiae urging affirmance were filed by William C. Falkenhainer and Rollin E. Woodbury for Southern California Edison Co., and by Samuel E. Gates, Dwight B. Buss, Ralph L. McAfee, Carl J. Schuck, Marvin Schwartz, William Simon, George A. Spiegelberg, and Philip H. Strubing for the American College of Trial Lawyers.

**JUDGES:**

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and Stewart, White, Blackmun, and Rehnquist, JJ., joined.  Douglas, J., filed an opinion dissenting in part, in which Brennan and Marshall, JJ., joined, post, p. 179.

**OPINION BY:**

POWELL

**OPINION:**

[*159]    [***738]    [**2144]    MR. JUSTICE POWELL delivered the opinion of the Court.

On May 2, 1966, petitioner filed a class action on behalf of himself and all other odd-lot n1 traders on the New York Stock Exchange (the Exchange).  The complaint charged respondents with violations of the antitrust and securities laws and demanded damages for petitioner and his class.  Eight years have elapsed, but there has been no trial on the merits of these claims.  Both the parties and the courts are still wrestling with the complex questions surrounding petitioner's attempt to maintain his suit as a class action under *Fed. Rule Civ. Proc. 23*.  We granted certiorari to resolve some of these difficulties. *414 U.S. 908 (1973).*

n1 Odd lots are shares traded in lots of fewer than a hundred.  Shares traded in units of a hundred or multiples thereof are round-lots.

[*160]    I

417 U.S. 156, *; 94 S. Ct. 2140, **;
40 L. Ed. 2d 732, ***; 1974 U.S. LEXIS 60

Petitioner brought this class action in the United States District Court for the Southern District of New York. Originally, he sued on behalf of all buyers and sellers of odd lots on the Exchange, but subsequently the class was limited to those who traded in odd lots during the period from May 1, 1962, through June 30, 1966. *52 F.R.D. 253, 261 (1971)*. Throughout this period odd-lot trading was not part of the Exchange's regular auction market but was handled exclusively by special odd-lot dealers, who bought and sold for their own accounts as principals. Respondent brokerage firms Carlisle & Jacquelin and DeCoppet & Doremus together handled 99% of the Exchange's odd-lot business. S. E. C., Report of [***739] Special Study of Securities Markets, H. R. Doc. No. 95, pt. 2, 88th Cong., 1st Sess., 172 (1963). They were compensated by the odd-lot differential, a surcharge imposed on the odd-lot investor in addition to the standard brokerage commission applicable to round-lot transactions. For the period in question the differential was 1/8 of a point (12 1/2cent) per share on stocks trading below $ 40 per share and 1/4 of a point (25cent) per share on stocks trading at or above $ 40 per share. n2

n2 On July 1, 1966, the $ 40 "breakpoint" was raised to $ 55.

Petitioner charged that respondent brokerage firms had monopolized odd-lot trading and set the differential at an excessive level in violation of §§ 1 and 2 of the Sherman Act, *15 U. S. C. §§ 1* and 2, and he demanded treble damages for the amount of the overcharge. Petitioner also demanded unspecified money damages from the Exchange for its alleged failure to regulate the differential for the protection of investors in violation of §§ 6 and 19 of the Securities Exchange Act of 1934, *15 U. S. C. §§ 78f* and 78s. Finally, he requested attorneys' [*161] fees and injunctive prohibition of future excessive charges.

A critical fact in this litigation is that petitioner's individual stake in the damages award he seeks is only $ 70. No competent attorney would undertake this complex antitrust action to recover so inconsequential an amount. Economic reality dictates that petitioner's suit proceed as a class action or not at all. Opposing counsel have therefore engaged in prolonged combat over the various requirements of Rule 23. The result has been an exceedingly complicated series of decisions by both the District Court and the Court of Appeals for the Second Circuit. To understand the labyrinthian history of this litigation, a preliminary overview of the decisions may prove useful.

In the beginning, the District Court determined that petitioner's suit was not maintainable as a class action.

On appeal, the Court of Appeals issued two decisions known popularly as *Eisen I* and *Eisen II*. The first held that the District Court's decision was a final order [**2145] and thus appealable. In the second the Court of Appeals intimated that petitioner's suit could satisfy the requirements of Rule 23, but it remanded the case to permit the District Court to consider the matter further. After conducting several evidentiary hearings on remand, the District Court decided that the suit could be maintained as a class action and entered orders intended to fulfill the notice requirements of Rule 23. Once again, the case was appealed. The Court of Appeals then issued its decision in *Eisen III* and ended the trilogy by denying class action status to petitioner's suit. We now review these developments in more detail.

*Eisen I*

As we have seen, petitioner began this action in May 1966. In September of that year the District Court [*162] dismissed the suit as a class action. *41 F.R.D. 147*. Following denial of his motion for interlocutory review under *28 U. S. C. § 1292* (b), petitioner took an appeal as of right under § 1291. Respondents then moved to dismiss on the ground that the order appealed from was not final. In *Eisen I*, the Court of Appeals held that the denial of class [***740] action status in this case was appealable as a final order under § 1291. *370 F.2d 119 (1966)*, cert. denied, *386 U.S. 1035 (1967)*. This was so because, as a practical matter, the dismissal of the class action aspect of petitioner's suit was a "death knell" for the entire action. The court thought this consequence rendered the order dismissing the class action appealable under *Cohen v. Beneficial Loan Corp.*, *337 U.S. 541, 546 (1949)*.

*Eisen II*

Nearly 18 months later the Court of Appeals reversed the dismissal of the class action in a decision known as *Eisen II*. *391 F.2d 555 (1968)*. In reaching this result the court undertook an exhaustive but ultimately inconclusive analysis of Rule 23. Subdivision (a) of the Rule sets forth four prerequisites to the maintenance of any suit as a class action: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." The District Court had experienced little difficulty in finding that petitioner satisfied the first three prerequisites but had concluded that petitioner might not "fairly and adequately protect the interests of the class" as required by Rule 23 (a)(4). The Court of Appeals indicated its disagreement with the

417 U.S. 156, *; 94 S. Ct. 2140, **;
40 L. Ed. 2d 732, ***; 1974 U.S. LEXIS 60

[*163] reasoning behind the latter conclusion and directed the District Court to reconsider the point.

In addition to meeting the four conjunctive requirements of 23 (a), a class action must also qualify under one of the three subdivisions of 23 (b). n3 Petitioner argued that the suit was maintainable [**2146] as a class action under all three subdivisions. The Court of Appeals held the first two subdivisions inapplicable to this suit n4 and [*164] therefore turned its attention [***741] to the third subdivision, (b)(3). That subdivision requires a court to determine whether "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." More specifically, it identifies four factors relevant to these inquiries. After a detailed review of these provisions, the Court of Appeals concluded that the only potential barrier to maintenance of this suit as a class action was the Rule 23 (b)(3)(D) directive that a court evaluate "the difficulties likely to be encountered in the management of a class action." Commonly referred to as "manageability, " this consideration encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit. With reference to this litigation, the Court of Appeals noted that the difficulties of distributing any ultimate recovery to the class members would be formidable, though not necessarily insuperable, and commented that it was "reluctant to permit actions to proceed where they are not likely to benefit anyone but the lawyers who bring them." *391 F.2d, at 567.* The Court therefore directed the District Court to conduct "a further inquiry . . . in order to consider the mechanics involved in the administration of the present action." *Ibid.*

n3 "(b) Class Actions Maintainable.

"An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

"(1) the prosecution of separate actions by or against individual members of the class would create a risk of

"(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

"(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

"(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

"(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

n4 Before the Court of Appeals, petitioner dropped the contention that the suit qualified under subdivision (b)(1)(B). The court held subdivision (b)(1)(A) inapplicable on the ground that the prospective class consisted entirely of small claimants, none of whom could afford to litigate this action in order to recover his individual claim and that consequently there was little chance of "inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class . . . ." Subdivision (b)(2) was held to apply only to actions exclusively or predominantly for injunctive or declaratory relief. Advisory Committee's Note, Proposed Rules of Civil Procedure, *28 U. S. C. App., p. 7766.*

[*165] Finally, the Court of Appeals turned to the most imposing obstacle to this class action -- the notice requirement of Rule 23 (c)(2). The District Court had held that both the Rule and the Due Process Clause of the Fifth Amendment required individual notice to all class members who could be identified. *41 F.R.D., at 151.* Petitioner objected that mailed notice to the entire class would be prohibitively expensive and argued that some form of publication notice would suffice. The Court of Appeals declined to settle this issue, noting that "on the

record before us we cannot arrive at any rational and satisfactory conclusion on the propriety of resorting to some form of publication as a means of giving the necessary notice to all members of the class on behalf of whom the action is stated to be commenced and maintained." *391 F.2d, at 569.*

The outcome of *Eisen II* was a remand for an evidentiary hearing on the questions of notice, manageability, adequacy of representation, and "any other matters which the District Court may consider pertinent and proper." *Id., at 570.* And in a ruling that aroused later controversy, the Court of Appeals expressly purported to retain appellate jurisdiction while the case was heard on remand.

[**2147]  *Eisen III*

After it held the evidentiary hearing on remand, which together with [***742] affidavits and stipulations provided the basis for extensive findings of fact, the District Court issued an opinion and order holding the suit maintainable as a class action. *52 F.R.D. 253 (1971).* The court first noted that petitioner satisfied the criteria identified by the Court of Appeals for determining adequacy of representation under Rule 23 (a)(4). Then it turned to the more difficult question of manageability. Under this general rubric the court dealt with problems of the computation [*166] of damages, the mechanics of administering this suit as a class action, and the distribution of any eventual recovery. The last-named problem had most troubled the Court of Appeals, prompting its remark that if "class members are not likely ever to share in an eventual judgment, we would probably not permit the class action to continue." *391 F.2d, at 567.* The District Court attempted to resolve this difficulty by embracing the idea of a "fluid class" recovery whereby damages would be distributed to future odd-lot traders rather than to the specific class members who were actually injured. The court suggested that "a fund equivalent to the amount of unclaimed damages might be established and the odd-lot differential reduced in an amount determined reasonable by the court until such time as the fund is depleted." *52 F.R.D., at 265.* The need to resort to this expedient of recovery arose from the "next best class" from the prohibitively high cost of computing and awarding multitudinous small damages claims on an individual basis.

Finally, the District Court took up the problem of notice. The court found that the prospective class included some six million individuals, institutions, and intermediaries of various sorts; that with reasonable effort some two million of these odd-lot investors could be identified by name and address; and that the names and addresses of an additional 250,000 persons who had participated in special investment programs involving

[*167] odd-lot trading n6 could also be identified with reasonable effort. Using the then current first-class postage rate of six cents, the court determined that stuffing and mailing each individual notice form would cost 10 cents. Thus individual notice to all identifiable class members would cost $ 225,000, n7 and additional expense would be incurred for suitable publication notice designed to reach the other four million class members.

n5 These two million traders dealt with brokerage firms who transmitted their odd-lot transactions to respondents Carlisle & Jacquelin and DeCoppet & Doremus via teletype. By comparing the odd-lot firms' computerized records of these teletype transactions and the general-services brokerage firms' computerized records of all customer names and addresses, the names and addresses of these two million odd-lot traders can be obtained.

n6 In the period from May 1962 through June 1968, 100,000 individuals had odd-lot transactions through participation in the Monthly Investment Plan operated by the Exchange and 150,000 persons traded in odd lots through participation in a number of payroll deduction plans operated by Merrill Lynch, Pierce, Fenner & Smith,

n7 Adjusting this figure to reflect the subsequent 4 cent increase in first-class postage would yield a figure of $ 315,000.

The District Court concluded, however, that neither Rule 23 (c)(2) nor the Due Process Clause required so substantial an expenditure at the outset of this litigation. Instead, it proposed a notification scheme consisting of four elements: (1) individual notice to all member [***743] firms of the Exchange and to commercial banks with large trust departments; (2) individual notice to the approximately 2,000 identifiable class members with 10 or more odd-lot transactions during the relevant period; (3) individual notice to an additional 5,000 class members selected at random; and (4) prominent publication notice in the Wall Street Journal and in other newspapers [**2148] in New York and California. The court calculated that this package would cost approximately $ 21,720.

The only issue not resolved by the District Court in its first opinion on remand from *Eisen II* was who should bear the cost of notice. Because petitioner understandably declined to pay $ 21,720 in order to litigate an action

[*168]  involving an individual stake of only $ 70, this question presented something of a dilemma:

"If the expense of notice is placed upon [petitioner], it would be the end of a possibly meritorious suit, frustrating both the policy behind private antitrust actions and the admonition that the new Rule 23 is to be given a liberal rather than a restrictive interpretation, Eisen II at 563.  On the other hand, if costs were arbitrarily placed upon [respondents] at this point, the result might be the imposition of an unfair burden founded upon a groundless claim.  In addition to the probability of encouraging frivolous class actions, such a step might also result in [respondents'] passing on to their customers, including many of the class members in this case, the expenses of defending these actions." 52 F.R.D., at 269.

Analogizing to the laws of preliminary injunctions, the court decided to impose the notice cost on respondents if petitioner could show a strong likelihood of success on the merits, and it scheduled a preliminary hearing on the merits to facilitate this determination.  After this hearing the District Court issued an opinion and order ruling that petitioner was "more than likely" to prevail at trial and that respondents should bear 90% of the cost of notice, or $ 19,548. 54 F.R.D. 565, 567 (1972).

Relying on the purported retention of jurisdiction by the Court of Appeals after Eisen II, respondents on May 1, 1972, obtained an order directing the clerk of the District Court to certify and transmit the record for appellate review.  Subsequently, respondents also filed a notice of appeal under 28 U. S. C. § 1291. Petitioner's motion to dismiss on the ground that the appeal had not been taken from a final order was denied by the Court of Appeals on June 29, 1972.

[*169]  On May 1, 1973, the Court of Appeals issued Eisen III. 479 F.2d 1005. The majority disapproved the District Court's partial reliance on publication notice, holding that Rule 23 (c)(2) required individual notice to all identifiable class members.  The majority further ruled that the District Court had no authority to conduct a preliminary hearing on the merits for the purpose of allocating costs and that the entire expense of notice necessarily fell on petitioner as representative plaintiff.  Finally, the Court of Appeals rejected the expedient of a fluid-class recovery and concluded that the proposed class action was unmanageable under Rule 23 (b)(3)(D).  For [***744]  all of these reasons the Court of Appeals ordered the suit dismissed as a class action. One judge concurred in the result solely on the ground that the District Court had erred in imposing 90% of the notice costs on respondents.  Petitioner's requests for rehearing and rehearing en banc were denied. 479 F.2d, at 1020.

Thus, after six and one-half years and three published decisions, the Court of Appeals endorsed the conclusion reached by the District Court in its original order in 1966 -- that petitioner's suit could not proceed as a class action. In its procedural history, at least, this litigation has lived up to Judge Lumbard's characterization of it as a "Frankenstein monster posing as a class action." Eisen II, 391 F.2d, at 572.

II

[***LEdHR1A]  [1A]At the outset we must decide whether the Court of Appeals in Eisen III had jurisdiction to review the District Court's orders permitting the suit to proceed as a class action and allocating the cost of notice.  Petitioner contends that it did not.  Respondents counter by asserting two independent bases [**2149] for appellate jurisdiction: first, that the orders in question constituted a "final" [*170]  decision within the meaning of 28 U. S. C. § 1291 n8 and were therefore appealable as of right under that section; and, second, that the Court of Appeals in Eisen II expressly retained jurisdiction pending further development of a factual record on remand and that consequently no new jurisdictional basis was required for the decision in Eisen III.  Because we agree with the first ground asserted by respondents, we have no occasion to consider the second.

n8 Section 1291 provides:

"The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court."

[***LEdHR2]     [2]  [***LEdHR3]     [3] [***LEdHR4]  [4]Restricting appellate review to "final decisions" prevents the debilitating effect on judicial administration caused by piecemeal appellate disposition of what is, in practical consequence, but a single controversy.  While the application of § 1291 in most cases is plain enough, determining the finality of a particular judicial order may pose a close question.  No verbal formula yet devised can explain prior finality decisions with unerring accuracy or provide an utterly reliable guide for the future. n9 We know, of course, that § 1291 does not [*171]  limit appellate review to "those final judgments which terminate an action . . . ," Cohen v. Beneficial Loan Corp., 337 U.S., at 545, but rather that the requirement [***745]  of finality is to be given a "practical rather than a technical construction." Id., at 546. The inquiry requires some evaluation of the competing considerations underlying all questions of finality -- "the

inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other." *Dickinson v. Petroleum Conversion Corp., 338 U.S. 507, 511 (1950)* (footnote omitted).

n9 As long ago as 1892 the Court complained: "Probably no question of equity practice has been the subject of more frequent discussion in this court than that the finality of decrees. . . . The cases, it must be conceded, are not altogether harmonious." *McGourkey v. Toledo & Ohio R. Co., 146 U.S. 536, 544-545.* In the intervening years the difficulty of resolving such questions has not abated. As Mr. Justice Black commented in *Gillespie v. U.S. Steel Corp., 379 U.S. 148, 152 (1964),* "whether a ruling is 'final' within the meaning of § 1291 is frequently so close a question that decision of that issue either way can be supported with equally forceful arguments, and . . . it is impossible to devise a formula to resolve all marginal cases coming within what might well be called the 'twilight zone' of finality."

We find the instant case controlled by our decision in *Cohen v. Beneficial Loan Corp., supra.* There the Court considered the applicability in a federal diversity action of a forum state statute making the plaintiff in a stockholder's derivative action liable for litigation expenses, if ultimately unsuccessful, and entitling the corporation to demand security in advance for their payment. The trial court ruled the statute inapplicable, and the corporation sought immediate appellate review over the stockholder's objection that the order appealed from was not final. This Court held the order appealable on two grounds. First, the District Court's finding was not "tentative, informal or incomplete," *337 U.S., at 546,* but settled conclusively the corporation's claim that it was entitled by state law to require the shareholder to post security for costs. Second, the decision did not constitute merely a "step toward final disposition of the merits of the case. . . . ." *Ibid.* Rather, it concerned a collateral matter that could not be reviewed effectively on appeal from the final judgment. The Court summarized its conclusion in this way:

"This decision appears to fall in that small class which finally determine [**2150]** claims of right separable from, and collateral to, rights asserted in the action, [*172]** too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Ibid.*

[***LEdHR1B]** [1B]Analysis of the instant case reveals that the District Court's order imposing 90% of the notice costs on respondents likewise falls within "that small class." It conclusively rejected respondents' contention that they could not lawfully be required to bear the expense of notice to the members of petitioner's proposed class. Moreover, it involved a collateral matter unrelated to the merits of petitioner's claims. Like the order in *Cohen,* the District Court's judgment on the allocation of notice costs was "a final disposition of a claimed right which is not an ingredient of the cause of action and does not require consideration with it," *id., at 546-547,* and it was similarly appealable as a "final decision" under § 1291. In our view the Court of Appeals therefore had jurisdiction to review fully the District Court's resolution of the class action notice problems in this case, for that court's allocation of 90% of the notice costs to respondents was but one aspect of its effort to construe the requirements of Rule 23 (c)(2) in a way that would permit petitioner's suit to proceed as a class action. n10

n10 As explained in Part III of this opinion, we find the notice requirements of Rule 23 to be dispositive of petitioner's attempt to maintain the class action as presently defined. We therefore have no occasion to consider whether the Court of Appeals correctly resolved the issues of manageability and fluid-class recovery, or indeed, whether those issues were properly before the Court of Appeals under the theory of retained jurisdiction.

III

[***746]** [***LEdHR5]** [5]Turning to the merits of the case, we find that the District Court's resolution of the notice problems was [*173]** erroneous in two respects. First, it failed to comply with the notice requirements of Rule 23 (c)(2), and second, it imposed part of the cost of notice on respondents.

A

[***LEdHR6]** [6]Rule 23 (c)(2) provides that, in any class action maintained under subdivision (b)(3), each class member shall be advised that he has the right to exclude himself from the action on request or to enter an appearance through counsel, and further that the judgment, whether favorable or not, will bind all class members not requesting exclusion. To this end, the court is required to direct to class members "the best notice practicable under the circumstances, *including individual notice to all members who can be identified through reasonable effort.*" n11 We think the import of this language is unmistakable. Individual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort.

417 U.S. 156, *; 94 S. Ct. 2140, **;
40 L. Ed. 2d 732, ***; 1974 U.S. LEXIS 60

n11 Emphasis added. Subdivision (c)(2) provides in full:

"(2) In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel."

The Advisory Committee's Note to Rule 23 reinforces this conclusion. See *28 U. S. C. App., p. 7765.* The Advisory Committee described subdivision (c)(2) as "not merely discretionary" and added that the "mandatory notice pursuant to subdivision (c)(2) . . . is designed to fulfill requirements of due process to which the class action procedure is of course subject." *Id.,* at 7768. The **[\*174]** Committee explicated its incorporation of due process standards by citation to *Mullane v. Central Hanover Bank &* **[\*\*2151]** *Trust Co., 339 U.S. 306 (1950),* and like cases.

In *Mullane* the Court addressed the constitutional sufficiency of publication notice rather than mailed individual notice to known beneficiaries of a common trust fund as part of a judicial settlement of accounts. The Court observed that notice and an opportunity to be heard were fundamental requisites of the constitutional guarantee of procedural due process. It further stated that notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. " *Id., at 314.* The Court continued:

"But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen **[\*\*\*747]** method may be defended on the ground that it is in itself reasonably certain to inform those affected." *Id., at 315.*

The Court then held that publication notice could not satisfy due process where the names and addresses of the beneficiaries were known. n12 In such cases, "the reasons **[\*175]** disappear for resort to means less likely than the mails to apprise them of [an action's] pendency." *Id., at 318.*

n12 The Court's discussion of the inadequacies of published notice bears attention:

"It would be idle to pretend that publication alone, as prescribed here, is a reliable means of acquainting interested parties of the fact that their rights are before the courts. . . . Chance alone brings to the attention of even a local resident an advertisement in small type inserted in the back pages of a newspaper, and if he makes his home outside the area of the newspaper's normal circulation the odds that the information will never reach him are large indeed. The chance of actual notice is further reduced when, as here, the notice required does not even name those whose attention it is supposed to attract, and does not inform acquaintances who might call it to attention." *339 U.S., at 315.*

In *Schroeder v. City of New York, 371 U.S. 208 (1962),* decided prior to the promulgation of amended Rule 23, the Court explained that *Mullane* required rejection of notice by publication where the name and address of the affected person were available. The Court stated that the "general rule" is that "notice by publication is not enough with respect to a person whose name and address are known or very easily ascertainable . . . ." *Id., at 212-213.* The Court also noted that notice by publication had long been recognized as a poor substitute for actual notice and that its justification was "'difficult at best.'" *Id., at 213.*

**[\*\*\*LEdHR7]** [7]Viewed in this context, the express language and intent of Rule 23 (c)(2) leave no doubt that individual notice must be provided to those class members who are identifiable through reasonable effort. In the present case, the names and addresses of 2,250,000 class members are easily ascertainable, and there is nothing to show that individual notice cannot be mailed to each. For these class members, individual notice is clearly the "best notice practicable" within the meaning of Rule 23 (c)(2) and our prior decisions.

**[\*\*\*LEdHR8]** [8]Petitioner contends, however, that we should dispense with the requirement of individual notice in this case, and he advances two reasons for our doing so. First, the prohibitively high cost of providing individual notice to 2,250,000 class members would end this suit as a class action and effectively frustrate petitioner's attempt to vindicate the policies underlying the antitrust and securities **[\*176]** laws. Second, petitioner contends that individual notice is unnecessary in this case, because no prospective class member has a

417 U.S. 156, *; 94 S. Ct. 2140, **;
40 L. Ed. 2d 732, ***; 1974 U.S. LEXIS 60

large enough stake in the matter to justify separate litiga-tion of [**2152] his individual claim. Hence, class members lack any incentive to opt out of the class action even if notified.

[***LEdHR9] [9] [***LEdHR10A] [10A]The short answer to these arguments is that individual notice to identifiable class members is not a discretionary con-sideration to be waived in a particular case. It is, [***748] rather, an unambiguous requirement of Rule 23. As the Advisory Committee's Note explained, the Rule was intended to insure that the judgment, whether favorable or not, would bind all class members who did not request exclusion from the suit. *28 U. S. C. App., pp. 7765, 7768.* Accordingly, each class member who can be identified through reasonable effort must be notified that he may request exclusion from the action and thereby preserve his opportunity to press his claim separately or that he may remain in the class and perhaps participate in the management of the action. There is nothing in Rule 23 to suggest that the notice requirements can be tailored to fit the pocketbooks of particular plaintiffs. n13

### [***LEdHR10B] [10B]

n13 Petitioner also argues that class members will not opt out because the statute of limitations has long since run out on the claims of all class members other than petitioner. This contention is disposed of by our recent decision in *American Pipe & Construction Co.* v. *Utah, 414 U.S. 538 (1974),* which established that commencement of a class action tolls the applicable statute of limita-tions as to all members of the class.

[***LEdHR11] [11]Petitioner further contends that adequate representation, rather than notice, is the touchstone of due process in a class action and therefore satisfies Rule 23. We think this view has little to com-mend it. To begin with, Rule 23 speaks to notice as well as to adequacy of representation and requires that both be provided. Moreover, petitioner's argument proves too much, for it [*177] quickly leads to the conclusion that no notice at all, published or otherwise, would be re-quired in the present case. This cannot be so, for quite apart from what due process may require, the command of Rule 23 is clearly to the contrary. We therefore con-clude that Rule 23 (c)(2) requires that individual notice be sent to all class members who can be identified with reasonable effort. n14

n14 We are concerned here only with the no-tice requirements of subdivision (c)(2), which are applicable to class actions maintained under sub-division (b)(3). By its terms subdivision (c)(2) is

inapplicable to class actions for injunctive or de-claratory relief maintained under subdivision (b)(2). Petitioner's effort to qualify his suit as a class action under subdivisions (b)(1) and (b)(2) was rejected by the Court of Appeals. See n. 4, *supra.*

B

[***LEdHR12A] [12A] [***LEdHR13A] [13A]We also agree with the Court of Appeals that peti-tioner must bear the cost of notice to the members of his class. The District Court reached the contrary conclusion and imposed 90% of the notice cost on respondents. This decision was predicated on the court's finding, made after a preliminary hearing on the merits of the case, that petitioner was "more than likely" to prevail on his claims. Apparently, that court interpreted Rule 23 to authorize such a hearing as part of the determination whether a suit may be maintained as a class action. We disagree.

[***LEdHR13B] [13B] [***LEdHR14] [14]We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action. Indeed, such a procedure contravenes the Rule by allowing a representative plaintiff to secure the benefits of a class action without first satisfying the requirements for it. He is thereby allowed to obtain a determination [***749] on the merits of the claims advanced on [*178] behalf of the class without any assurance that a class action may be maintained. This procedure is directly contrary to the command of subdivision (c)(1) that the court determine whether a suit denominated a class action may be main-tained as such "as soon as practicable after the com-mencement of [the] action . . . ." [**2153] In short, we agree with Judge Wisdom's conclusion in *Miller v. Mackey International, 452 F.2d 424 (CA5 1971),* where the court rejected a preliminary inquiry into the merits of a proposed class action:

"In determining the propriety of a class action, the ques-tion is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Id., at 427.*

Additionally, we might note that a preliminary determi-nation of the merits may result in substantial prejudice to a defendant, since of necessity it is not accompanied by the traditional rules and procedures applicable to civil trials. The court's tentative findings, made in the absence

417 U.S. 156, *; 94 S. Ct. 2140, **;
40 L. Ed. 2d 732, ***; 1974 U.S. LEXIS 60

of established safeguards, may color the subsequent proceedings and place an unfair burden on the defendant.

[***LEdHR12B] [12B]In the absence of any support under Rule 23, petitioner's effort to impose the cost of notice on respondents must fail. The usual rule is that a plaintiff must initially bear the cost of notice to the class. The exceptions cited by the District Court related to situations where a fiduciary duty pre-existed between the plaintiff and defendant, as in a shareholder derivative suit. n15 Where, as here, the relationship between the parties is truly adversary, [*179] the plaintiff must pay for the cost of notice as part of the ordinary burden of financing his own suit.

n15 See, e. g., Dolgow v. Anderson, 43 F.R.D. 472, 498-500 (EDNY 1968). We, of course, express no opinion on the proper allocation of the cost of notice in such cases.

[***LEdHR15A] [15A]Petitioner has consistently maintained, however, that he will not bear the cost of notice under subdivision (c)(2) to members of the class as defined in his original complaint. See 479 F.2d, at 1008; 52 F.R.D., at 269. We therefore remand the cause with instructions to dismiss the class action as so defined. n16

[***LEdHR15B] [15B]

n16 The record does not reveal whether a smaller class of odd-lot traders could be defined, and if so, whether petitioner would be willing to pay the cost of notice to members of such a class. We intimate no view on whether any such subclass would satisfy the requirements of Rule 23. We do note, however, that our dismissal of the class action as originally defined is without prejudice to any efforts petitioner may make to redefine his class either under Rule 23 (c)(4) or Fed. Rule Civ. Proc. 15.

The judgment of the Court of Appeals is vacated and the cause remanded for proceedings consistent with this opinion.

It is so ordered.

**DISSENT BY:**

DOUGLAS (In Part)

**DISSENT:**

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL concur, dissenting in part.

While I am in general agreement with the phases of this case touched on by the Court, I add a few words [***750] because its opinion does not fully explore the issues which will be dispositive of this case on remand to the District Court.

Federal Rule Civ. Proc. 23 (c)(4) provides: "When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly."

[*180] As Judge Oakes, speaking for himself and Judge Timbers, said below:

"The plaintiff class might, for example, be divided into much smaller subclasses . . . of odd lot buyers for particular periods, and one subclass treated as a test case, with the other subclasses held in abeyance. Individual notice at what would probably be a reasonable cost could then be given to all members of the particular small subclass who can be easily identified. " 479 F.2d 1005, 1023 (dissenting from denial of rehearing en banc).

Or a subclass might include those on monthly investment plans, or payroll deduction [**2154] plans run by brokerage houses. n1 The possibilities, though not infinite, are numerous.

n1 The parties and courts below concentrated on whether a class action could be sustained on behalf of all six million odd-lot investors, so that the record is limited in information bearing on what manageable subclasses could be created.

There is, nonetheless, indication that certain subclasses might be economically manageable. Counsel for respondent Carlisle & Jacquelin stated in oral argument before the Court of Appeals that 100,000 shareholders participate in his client's Monthly Investment Plan, and that Carlisle & Jacquelin corresponds with those investors. Merrill Lynch corresponds with 150,000 people participating in a payroll deduction investment plan. Whether Eisen or any other plaintiff who may come forward to intervene fits in such a subclass, we do not know. But if brokerage houses correspond regularly in the course of business with such odd-lot investors, the marginal cost of providing the individual notice required by Rule 23 (c)(2) might be nothing more than printing and stuffing an additional sheet of paper in correspondence already being sent to the inves-

417 U.S. 156, *; 94 S. Ct. 2140, **;
40 L. Ed. 2d 732, ***; 1974 U.S. LEXIS 60

tor, or perhaps only programing a computer to type an additional paragraph at the bottom of monthly or quarterly statements regularly mailed by the brokers.

A subclass of those who had engaged in numerous transactions might also be defined, so that the recovery per class member might be large enough to justify the cost of notice and management of the action. A survey of only four of 14 wire firms revealed 2,000 customers with 10 or more transactions between 1962 and 1966. *52 F.R.D. 253, 259, 267, and n. 10.*

By defining more definite subclasses such as those discussed, moreover, the problems inherent in distributing an eventual judgment would be reduced. Class members would be more readily identifiable, with more readily accessible transaction records and individually provable damages.

[*181] The power to create a subclass is clear and unambiguous. Who should be included and how large it should be are questions that only the District Court should resolve. Notice to each member of the subclass would be essential under Rule 23 (c)(2); and under Rule 23 (c)(2)(A) any notified member may opt out. There would remain the question whether the subclass suit is manageable. But since the subclass could be chosen in light of the nonmanageability of the size of the class whose claims are presently before us, there is no apparent difficulty in that sense.

The statute of limitations, it is argued, has run or is about to run on many of these classes. We held in *American Pipe & Construction Co. v. Utah, 414 U.S. 538,* [***751] that the start of a class action prior to the running of the statute protects all members of the class. Whether that rule should obtain for the benefit of other members who could have been included in the subclass bringing suit, but for the manageability issue, is a question we have not decided. n2 Moreover, if the subclass sues and wins or [*182] sues and loses, questions covering the rights of members of the larger class who are not parties would be raised. These are questions we have not answered. n3 But the fact that unresolved [**2155] questions of law would remain is not an insurmountable obstacle, and Rule 23 (c)(4)(B) expressly authorizes subclasses to sue in lieu of a full class. Rule 23 (c)(4)(B) may have had, as a forerunner, the proposal stated by Judge Weinstein in 1960:

"When there is a question of law or fact common to persons of a numerous class whose joinder is impracticable, one or more of them whose claims or defenses are repre-

sentative of the claims or defenses of all and who will fairly and adequately protect the interests of all may sue or be sued on behalf of all." n4

n2 In this case, the entire class was defined in the original complaint, and the defendants were put on notice within the period of limitation of their potential liability, serving the purpose of the statute of limitations even if the substantive merits were eventually to be prosecuted in the form of a subclass action with the class action held in abeyance. "Within the period set by the statute of limitations, the defendants have the essential information necessary to determine both the subject matter and size of the prospective litigation, whether the actual trial is conducted in the form of a class action, as a joint suit, or as a principal suit with additional intervenors." *American Pipe & Construction Co. v. Utah, 414 U.S. 538, 555.* And see Wheaton, Representative Suits Involving Numerous Litigants, *19 Cornell L. Q. 399, 423 (1934).*

n3 If the subclass lost, it is argued that other investors not members of that subclass could not be precluded from prosecuting successful suits of their own, since they had never had their day in court or necessarily even been apprised of the subclass' action. See *Hansberry v. Lee, 311 U.S. 32;* F. James, Civil Procedure § 11.26 (1965); 1B J. Moore, Federal Practice para. 0.411 [1] (1974). If the subclass won, strict application of the doctrine of mutuality of estoppel would limit the usefulness of that subclass victory in suits brought by investors not members of that subclass. See generally F. James, *supra,* § 11.31; 1B J. Moore, *supra,* para. 0.412 [1] (and Supp. 1973), and cases cited therein. And see Vestal, Preclusion/Res Judicata Variables: Parties, *50 Iowa L. Rev. 27, 55-59 (1964);* Note, *35 Geo. Wash. L. Rev. 1010 (1967);* Currie, Mutuality of Collateral Estoppel: Limits of the *Bernhard* Doctrine, *9 Stan. L. Rev. 281 (1957).*

n4 Weinstein, Revision of Procedure: Some Problems in Class Actions, *9 Buffalo L. Rev. 433, 458.*

In explanation he added:

"Such a rule would provide six requirements for a class action: (1) a class, (2) numerous members, [*183] (3) common question of law or fact, (4) impracticability

417 U.S. 156, *; 94 S. Ct. 2140, **;
40 L. Ed. 2d 732, ***; 1974 U.S. LEXIS 60

of joinder, (5) representative claim or defense, (6) fair and adequate protection of absentees.

"Almost any 'bond of association' in an event or status out of which a legal dispute arose is sufficient to constitute a class. The class must be numerous but need not be so large that, in itself, this factor makes it impracticable to bring them all before the court. A number of members sufficient to satisfy present Section 195 [of the New York Civil Practice Act] would satisfy the proposed rule. Size, modesty of monetary interest, inability to locate members and difficulty of obtaining jurisdiction [***752] should all be considered in determining impracticability of joinder." n5

n5 Id., at 458-459 (footnotes omitted).

The Court permits Eisen to redefine his class either by amending his complaint pursuant to *Fed. Rule Civ. Proc. 15*, or by proceeding under Rule 23 (c)(4). While Eisen may of course proceed by amending his complaint to define a subclass, it is clear that he need not do so. n6 Definition of the subclass would properly be accomplished by order of the District Court, as permitted by Rules 23 (c)(4) and 23 (c)(1), without amendment of the complaint as filed. While the complaint alleges that [*184] Eisen sues on his behalf and on behalf of all purchasers and sellers of odd lots, it adds, "Plaintiff will fairly insure the adequate representation of all such persons." Problems of manageability covered by Rule 23 (b)(3)(D) arise only after issues are joined and the District Court is engaged in shaping up the litigation for a trial on the merits. If it finds that a subclass would be more appropriate, no new action need be started nor any amended complaint filed.

n6 Were Eisen to be remitted to an individual action, as he would be if he refused to pay the cost of notice even to a subclass, amendment of the complaint might be called for by the District Court. Under Rule 23 (d)(4), the District Court may in some instances require that pleadings be amended to eliminate class allegations. The Advisory Committee Notes indicate that this provision is to be applied only when a suit must proceed as a nonclass, individual action, not when, as here, an appropriate class exists and the action must be prosecuted in the first instance by a subclass only because of problems of manageability. See *28 U. S. C. App., p. 7767.*

Rule 23 (c)(1) provides: "As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to

be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits."

It is as plain as words can make it that the court which decides that a full [**2156] class action can be maintained can alter or amend its order "before the decision on the merits." One permissible way in which the court's order may be changed is to have it "altered" as provided in Rule 23 (c)(1) by reducing the larger class to a subclass as provided in the same subsection -- Rule 23 (c)(4)(B). The prerequisites of a class cause of action are described in Rule 23 (a). In the instant case that hurdle has been passed and we are at the stage of notice requirements and manageability. Not an iota of change is made in the cause of action by restricting it to a subclass.

The purpose of Rule 23 is to provide flexibility in the management of class actions, with the trial court taking an active role in the conduct of the litigation. See *Dolgow v. Anderson, 43 F.R.D. 472, 481-482* (EDNY); *Green v. Wolf Corp., 406 F.2d 291, 298* (CA2), cert. denied, *395 U.S. 977.* Lower federal courts have recognized their discretion to define those subclasses proper to prosecute an action without being bound by the plaintiff's [*185] complaint. See, *e. g., Dolgow v. Anderson, supra, at 491-493; Philadelphia Elec. Co. v. Anaconda American Brass Co., 43 F.R.D. 452, 462-463* (ED Pa.). See generally 7A C. Wright & A. Miller, Federal Practice and Procedure § 1790, p. 187; 3B J. Moore, Federal Practice para. 23.65. And, as Rule 23 (c)(1) clearly indicates, the courts retain both the power and the duty to realign classes during the conduct of an action when [***753] appropriate. See, *e. g., Carr v. Conoco Plastics, Inc., 423 F.2d 57, 58* (CA5), cert. denied, *400 U.S. 951; Johnson v. ITT-Thompson Industries, Inc., 323 F.Supp. 1258, 1262* (ND Miss.); *Ostapowicz v. Johnson Bronze Co., 54 F.R.D. 465, 466* (WD Pa.); *Baxter v. Savannah Sugar Refining Corp., 46 F.R.D. 56, 60* (SD Ga.). That discretion can be fully retained only if the full-class complaint is preserved when a subclass is defined to prosecute the action. The bounds of the subclass can then be narrowed or widened by order of the District Court as provided in Rule 23 (c)(1), without need to amend the complaint and without the constraints which might exist if the complaint had earlier been amended pursuant to Rule 15 to include only the subclass.

I agree with Professor Chafee that a class action serves not only the convenience of the parties but also prompt, efficient judicial administration. n7 I think in our society that is growing in complexity there are bound to be innumerable people in common disasters, calamities, or ventures who would go begging for justice without the class action but who could with all regard to due process be protected by it. Some of these are consumers whose claims may seem *de minimis* but who alone have no

417 U.S. 156, *; 94 S. Ct. 2140, **;
40 L. Ed. 2d 732, ***; 1974 U.S. LEXIS 60

practical recourse for either remuneration or injunctive relief. Some may be environmentalists who have no photographic development plant about to be ruined because of [*186] air pollution by radiation but who suffer perceptibly by smoke, noxious gases, or radiation. Or the unnamed individual may be only a ratepayer being excessively charged by a utility, or a homeowner whose assessment is slowly rising beyond his ability to pay.

n7 Z. Chafee, Some Problems of Equity 149 (1950).

The class action is one of the few legal remedies the small claimant has against those who command the status quo. n8 I would strengthen his hand with [**2157] the view of creating a system of law that dispenses justice to the lowly as well as to those liberally endowed with power and wealth.

n8 Judge Weinstein writing in the N. Y. Law Journal, May 2, 1972, p. 4, col. 3, said:

"Where, however, public authorities are remiss in performance of this responsibility for reason of inadequate legal authority, excessive workloads or simple indifference, class actions may provide a necessary temporary measure until desirable corrections have occurred. The existence of class action litigation may also play a substantial role in bringing about more efficient administrative enforcement and in inducing legislative action.

"The matter touches on the issue of the credibility of our judicial system. Either we are committed to make reasonable efforts to provide a forum for adjudication of disputes involving all our citizens -- including those deprived of human rights, consumers who overpay for products because of antitrust violations and investors who are victimized by insider trading or misleading information -- or we are not. There are those who will not ignore the irony of courts ready to imprison a man who steals some goods in interstate commerce while unwilling to grant a civil remedy against the corporation which has benefited, to the extent of many millions of dollars, from collusive, illegal pricing of its goods to the public.

"When the organization of a modern society, such as ours, affords the possibility of illegal behavior accompanied by widespread, diffuse consequences, some procedural means must exist to remedy -- or at least to deter -- that conduct."

**REFERENCES:** Return To Full Text Opinion

*4 Am Jur 2d, Appeal and Error 51; 32 Am Jur 2d, Federal Practice and Procedure 357, 358, 420; 59 Am Jur 2d, Parties 80, 81*

11 Am Jur Pl & Pr Forms (Rev ed), Federal Practice and Procedure, Forms 1881-1892

3 Am Jur Trials 681, Tactics and Strategy of Pleading 11, 69

US L Ed Digest, Appeal and Error 22, 23, 32.5, 1704; Parties 24; Rules of Court 5

ALR Digests, Appeal and Error 11, 973; Parties 72

L Ed Index to Annos, Appeal and Error; Class Actions

ALR Quick Index, Appeal and Error; Class suits

Federal Quick Index, Appeal and Error; Class Suits; Federal Rules of Civil Procedure

Annotation References:

Propriety, under *Rules 23(a) and 23(b) of Federal Rules of Civil Procedure*, as amended in 1966, of class actions for violation of federal antitrust laws. 6 ALR Fed 19.

Appealability of determination adverse to confirmation of action as class action under *Rule 23 of Federal Rules of Civil Procedure.* 17 ALR Fed 933.

Propriety, under *Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure*, as amended in 1966, of class action for violation of federal securities laws. 9 ALR Fed 1118.

LEXSEE 162 F.R.D. 355

**IN RE: INDEPENDENT SERVICE ORGANIZATIONS ANTITRUST LITIGA-
TION; This Document Applies To: CSU Holdings, Inc., et al. v. Xerox**

**CIVIL ACTION No. MDL-1021 (94-2102)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS**

*162 F.R.D. 355; 1995 U.S. Dist. LEXIS 9806*

**June 30, 1995, Decided
June 30, 1995, FILED, ENTERED**

**COUNSEL:** [**1]

For CSU HOLDINGS INC, Case Number: 94-2102-
EEO - USDC for the District of Kansas, COPIER SER-
VICES UNLIMITED, INC., Case Number: 94-2102-
EEO - USDC for the District of Kansas, COPIER SER-
VICE UNLIMITED OF ST. LOUIS, INC., Case Num-
ber: 94-2102-EEO - USDC for the District of Kansas,
plaintiffs: Eric D. Braverman, Employers Reinsurance
Corporation, Overland Park, KS. P. John Owen, Lori R.
Schultz, Morrison & Hecker, Kansas City, MO. Michael
C. Manning, Morrison & Hecker, Phoenix, AZ. For AC-
QUISITION SPECIALISTS, INC, Case Number: 94-
1285 - USDC for the Northern District of California -
USDC for the District of Kansas 94-2502, TECSPEC,
INC, a Texas Corporation, Case Number: 94-1285 -
USDC for the Northern District of California. 94-2502
USDC for the District of Kansas dba Atek, CONSOLI-
DATED PHOTO COPY, INC., a Virginia corporation.
Case Number: 94-1285 - UDDC for the Northern District
of California. 94-2502 USDC for the District of Kansas,
COPIER REBUILD CENTER, INC., a Maryland corpo-
ration. Case Number: 94-1285 - USDC for the Northern
District of California. 94-2502 USDC for the District of
Kansas, CPO LTD, a California corporation. Case Num-
ber 94-1285 - USDC for the District Court of Kansas,
GRADWELL COMPANY, INC., an Alabama corpora-
tion. Case Number 94-1285 - USDC for the Northern
District of California. 94-2502 USDC for the District
Court of Kansas, GRAPHIC CORPORATION OF
ALABAMA, an Alabama corporation. Case Number 94-
1285 - USDC for the Northern District of California. 94-
2502 USDC for the District of Kansas, INTERNA-
TIONAL BUSINESS EQUIPMENT, INC, a California
corporation. Case Number 94-1285 - USDC for the
Northern District of California. 94-2502 USDC for the
District Court of Kansas, LASER RESOURCES INC, an
Iowa corporation, Case Number 94-1285 - USDC for the
Northern District of California. 94-2502 USDC for the
District Court of Kansas, LASER RESOURCES OF
MINNESOTA, INC., a Minnesota corporation. Case
Number 94-1285 - USDC for the Northern District of
California. 94-2502 USDC for the District of Kansas,
LASER SOLUTIONS, INC, a California corporation.
Case Number: 94-1285 - USDC for the Northern District
of California. 94-2502 USDC for the District of Kansas,
LASER SUPPORT AND ENGINEERING, INC., a Cali-
fornia corporation. Case Number: 94-1285 - USDC for
the Northern District of California. 94-2502 USDC for
the District of Kansas, MARATHON COPIER SER-
VICE, INC., a California corporation. Case Number: 94-
1285 - USDC for the Northern District of California. 94-
2502 USDC for the District of Kansas, NATIONWIDE
TECHNOLOGIES, INC., a Illinois corporation. Case
Number: 94-1285 - USDC for the Northern District of
California. 94-2502 USDC for the District of Kansas,
REPROGRAPHICS RESOURCES SYSTEMS, INC, an
Iowa corporation. Case Number: 94-1285 - USDC for
the Northern District of California. 94-2502 USDC for
the District of Kansas, RESOURCES SYSTEMS, INC,
an Iowa corporation. Case Number 94-1285 - USDC for
the Northern District of California. 94-2502 USDC for
the District of Kansas, SUNTONE INDUSTRIES, INC,
a Florida corporation. Case Number: 94-1285 - USDC
for the Northern District of California. 94-2502 USDC
for the District of Kansas, TECHNICAL DUPLICA-
TION SERVICES, INC, a California corporation. Case
Number: 94-1285 - USDC for the Northern District of
California. 94-2502 USDC for the District of Kansas, X-
TECH SYSTEMS INC, a California corporation. Case
Number 94-1285 - USDC for the Northern District of
California. 94-2502 USDC for the District of Kansas,
XER-DOX INC., a California corporation. Case Number
94-1285 - USDC for the Northern District of California.
94-2502 USDC for the District of Kansas, XERO-
GRAPHIC COPIES SERVICES, INC., a Texas corpora-

Case 1:05-cv-00485-JJF    Document 324-2    Filed 04/17/2007    Page 24 of 59

Page 2

162 F.R.D. 355, *; 1995 U.S. Dist. LEXIS 9806, **

tion. Case Number: 94-1285 - USDC for the Northern District of California. 94-2502 USDC for the District of Kansas, plaintiffs: James A Hennefer, San Francisco, CA. For CREATIVE COPIER SERVICES, INC, a Connecticut corporation. Case Number 94-1285 - USDC for the Northern District of California. 94-2502 USDC for the District of Kansas, plaintiff: Jack M Bernard, Philadelphia, PA.

For XEROX CORPORATION, Case Number: 94-2102-EEO - USDC for the District of Kansas and Case Number: 94-1285 USDC for the Northern District of California, defendant: Peter K Bleakley, Arnold & Porter, Washington, DC. Peter W Marshall, Xerox Corporation, Stamford, CT. Michael G. Norris, Norris, Keplinger & Logan, L.L.C., Overland Park, KS. C Larry O'Rourke, E Robert Yoches, Vincent P Kovalick, Leslie I Bookoff, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, DC.

For XEROX CORPORATION, counter-claimant: Peter K Bleakley, Arnold & Porter, Washington, DC. Peter W Marshall, Xerox Corporation, Stamford, CT. Michael G. Norris, Norris, Keplinger & Logan, L.L.C., Overland Park, KS. C Larry O'Rourke, E Robert Yoches, Vincent P Kovalick, Leslie I Bookoff, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, DC.

For CSU HOLDINGS INC, COPIER SERVICES UNLIMITED, INC., COPIER SERVICE UNLIMITED OF ST. LOUIS, INC., counter-defendant: Eric D. Braverman, Employers Reinsurance Corporation, Overland Park, KS. P. John Owen, Lori R. Schultz, Morrison & Hecker, Kansas City, MO. Michael C. Manning, Morrison & Hecker, Phoenix, AZ. For ACQUISITION SPECIALISTS, INC, TECSPEC, INC dba Atek, CONSOLIDATED PHOTO COPY, INC., COPIER REBUILD CENTER, INC., CPO LTD, GRADWELL COMPANY, INC., GRAPHIC CORPORATION OF ALABAMA, INTERNATIONAL BUSINESS EQUIPMENT, INC, LASER RESOURCES INC, LASER RESOURCES OF MINNESOTA, INC., LASER SOLUTIONS, INC, LASER SUPPORT AND ENGINEERING, INC., MARATHON COPIER SERVICE, INC., NATIONWIDE TECHNOLOGIES, INC., REPROGRAPHICS RESOURCES SYSTEMS, INC, RESOURCES SYSTEMS, INC, SUNTONE INDUSTRIES, INC, TECHNICIAL DUPLICATION SERVICES, INC, X-TECH SYSTEMS INC, XER-DOX INC., XEROGRAPHIC COPIES SERVICES, INC., counter-defendants: James A Hennefer, San Francisco, CA. For CREATIVE COPIER SERVICES, INC, counter-defendant: Jack M Bernard, Philadelphia, PA.

**JUDGES:** EARL E. O'CONNOR, United States District Judge

**OPINION BY:** EARL E. O'CONNOR

**OPINION:**

[*355] MEMORANDUM AND ORDER

This matter is before the court on the motion of the Copier Services Unlimited ("CSU") plaintiffs for a supplemental protective order (Doc. #42) and the related motion of defendant Xerox to compel discovery (Doc. [*356]  # 49). For the reasons set forth below, CSU's motion will be granted and Xerox' motion will be denied.

Central to CSU's antitrust claims in the instant action are CSU's allegations that Xerox illegally restricted access to replacement parts for Xerox equipment. Specifically, CSU claims Xerox implemented a parts policy that made it difficult for CSU and foreclosed CSU from access to the principal source of parts, i.e., Xerox. CSU claims that it was forced to rely on "limited and uncertain sources of captive parts" which were "inadequate, inefficient, and costly." Notwithstanding that availability of parts is a central issue in CSU's claims, CSU now seeks to withhold the identities of twelve of its parts suppliers ("the confidential suppliers").

A protective order is presently in force (Doc. #37). Prior to its entry, the Acquisition Specialist plaintiffs sought to modify the present [**2] protective order to exclude access by Xerox in-house counsel to *all* highly confidential information. Information about ISO parts sources is considered highly confidential information. Under the competitive decision-making test set forth in *United States Steel Corp. v. United States, 730 F.2d 1465, 1469 (Fed. Cir. 1984),* the court denied the request of the Acquisition Specialist plaintiffs for a blanket restriction on access by Xerox in-house counsel to all highly confidential information because the court held that the protective order provided adequate protection. *In re Independent Service Organizations Antitrust Litigation, 1995 U.S. Dist. LEXIS 4698, 1995 WL 151739,* at *1-2 (D. Kan. March 9, 1995). A key factor in the court's decision was Xerox' past history of compliance with the protective order in the R&D case. Id. In addition, the court's decision was driven by considerations about unfairly hampering Xerox' ability to properly defend itself by denying Xerox in-house counsel access to all highly confidential information in the case. Id. at *1.

In entering the present protective order, the court did not, however, reach the question of whether certain types of critical [**3] highly confidential information could be protected. CSU now seeks to protect, as trade secrets, the identities of twelve confidential suppliers. "There is no absolute privilege for trade secrets and similar confiden-

Case 1:05-cv-00485-JJF    Document 324-2    Filed 04/17/2007    Page 25 of 59

Page 3

162 F.R.D. 355, *; 1995 U.S. Dist. LEXIS 9806, **

tial information." *Centurion Indus., Inc. v. Warren Steurer & Assocs., 665 F.2d 323, 325 (10th Cir. 1981).* Rather, we must balance Xerox' need for the trade secrets against CSU's claim of injury which might result from disclosure. See id.

We analyze controversies involving the disclosure of trade secrets as follows:

> To resist discovery under Rule 26(c)(7), a person must first establish that the information sought is a trade secret . . . and then demonstrate that its disclosure might be harmful. . . . If these requirements are met, the burden shifts to the party seeking discovery to establish that the disclosure of trade secrets is relevant and necessary to the action.

Id. Absent a showing of relevancy and need, disclosure should not be required. Id. However, if relevancy and sufficient need are established, the trade secrets should generally be disclosed, unless "they are privileged, or the subpoenas are unreasonable, oppressive, annoying, [**4] or embarrassing." Id.

CSU asserts that it obtains its parts from legitimate sources, which fall into the following categories: 1) Xerox and Xerox affiliates, including overseas affiliates; 2) third party manufacturers; 3) end users; 4) independent agents, brokers, and distributors in foreign countries; and 5) stripping parts from machines which are no longer in service. The twelve confidential suppliers are in the fourth category, i.e., independent agents, brokers, and distributors.

CSU contends that it does not obtain parts by theft and it does not buy stolen parts from Xerox employees. Rather, according to CSU, foreign subsidiaries of Xerox rely on a network of independent agents, brokers, and dealers to distribute and service Xerox high volume copiers. Xerox willingly sells parts to this intermediary network of companies for resale to Xerox subsidiaries. Paul T. Lyons, CSU's Chief Executive Officer, affies that the intermediaries then legally sell, either directly or indirectly, to CSU. Mr. Lyons asserts that, as independent companies, [*357] these sources are not restricted by Xerox' internal parts policies. He states that he is not aware of any legal or contractual prohibition [**5] on these companies selling parts to ISOs.

Although CSU purchases less than 10% of their total parts from these sources, CSU contends that their savings from these purchases are substantial. CSU maintains that without the cost savings represented by these parts

sources, its profitability would be seriously impacted and it would have lost money every year since 1988.

CSU states that it seeks to withhold only the identities of the suppliers, but agrees to disclose all other non-identifying information relative to its purchases of parts from the confidential sources, including the part numbers, quantities, dates, prices and shipping costs of parts purchased. CSU has already produced actual parts invoices from which all identifying information of the source has been redacted.

CSU contends that no protective order can adequately protect against the substantial harm which could result from disclosure of the identities of the twelve confidential suppliers. CSU argues that the nature of CSU's relationship with these twelve suppliers is highly sensitive to detrimental action by Xerox if the identities of the suppliers are revealed. Under the present protective order, a large number of people, [**6] including Xerox in-house legal staff and expert witnesses, would have access to the information about CSU's confidential parts sources. CSU argues that even inadvertent disclosure in violation of the protective order could be lethal to CSU because Xerox would use it to cut off CSU's source of supply and put it out of business.

CSU submits a wealth of internal Xerox documents which further its point. The documents show a concerted effort by Xerox to discover ISO parts sources and reveal somewhat extreme efforts by Xerox employees to discover the identities of parts sources, including searching trash and hiring an outside security firm. Sources in the documents assess Xerox' expenditures on efforts to discover ISO parts sources at between $ 100,000 and $ 250,000. The documents are dated from 1988 through 1992. The documents indicate a desire by Xerox employees to eliminate CSU as a competitive threat by cutting its parts sources if discovered.

CSU maintains that if the identity of these twelve confidential suppliers is disclosed, Xerox will take actions to cut off CSU's access to parts from these sources. As an example, CSU points to Rank Xerox, an important parts source which was [**7] cut off when discovered by Xerox. From April 1988 through February 1990, Rank Xerox, a United Kingdom company (51% of which is owned by Xerox USA), supplied significant quantities of parts to CSU at prices approximately 50% less than the prices at which CSU could buy the parts in the United States. CSU asserts that Rank Xerox terminated its relationship with CSU due to pressure from Xerox USA. CSU does not claim that Xerox discovered CSU's relationship with Rank Xerox as a result of a violation of the protective order in the R&D case, but offers the Rank Xerox incident as an example of what Xerox will do with information about its parts sources.

Case 1:05-cv-00485-JJF    Document 324-2    Filed 04/17/2007    Page 26 of 59

Page 4

162 F.R.D. 355, *; 1995 U.S. Dist. LEXIS 9806, **

Xerox does not quarrel with CSU's claim that the identity of the confidential suppliers are trade secrets. n1 Rather, Xerox maintains that, under the present protective order, there is no risk of harm from disclosure. Xerox argues that CSU's allegations regarding actions taken by Xerox to discover ISO parts sources simply show efforts by Xerox to protect its proprietary parts. Xerox maintains that any such actions are irrelevant to the question of whether the present protective order is adequate. Xerox contends that CSU has not shown potential [**8] harm from disclosure under the present protective order. Xerox offers its adherence to the R&D protective order as evidence that no additional protections are appropriate or necessary. In addition, Xerox points to certain documents it claims were inadvertently disclosed [*358] by CSU which may reveal some of its confidential parts sources. As evidence of its good faith compliance with the present protective order, Xerox asserts that it has not taken any action to stop those sources from selling to CSU.

> n1 Under Kansas law, a trade secret has been described as, "any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *Southwestern Bell Tel. Co. v. State Corp. Comm'n, 6 Kan. App. 2d 444, 457, 629 P.2d 1174, 1184 (1981)* (quoting *Koch Engineering Co. v. Faulconer, 227 Kan. 813, 827, 610 P.2d 1094, 1104 (1980))*.

Xerox' past compliance with the R&D protective order does [**9] not convince the court that there is no potential risk of harm from disclosure of CSU's confidential parts sources in the instant litigation. Notably, the identities of CSU's confidential parts suppliers were never revealed under the R&D order -- CSU was specifically excepted from the obligation to disclose the identity of its parts sources. Order at 1 (R&D Business Systems, et. al. v. Xerox Corp., No. 2-92-CV-042 (E.D. Tx.)) (order entered after a hearing at which disclosure of CSU's confidential suppliers was given considerable attention). From the transcript of the hearing on the protective order in the R&D case, it appears that the court contemplated conducting an in camera inspection of CSU's parts source information to determine whether disclosure should be required. However, according to CSU, the case settled and the identities of its confidential parts sources were never revealed to Xerox in the R&D suit.

The court finds that CSU has established that the identities of its parts sources are trade secrets and that disclosure, even under the present protective order, might be harmful. See *Centurion, 665 F.2d at 325.* We acknowledge that CSU has not presented [**10] any evidence that Xerox has violated the protective order in this case or that it violated the protective order in the R&D case. Notwithstanding good faith efforts by Xerox to comply with the confidentiality mandates of the protective order, the court believes that CSU has demonstrated potential harm which could result from even inadvertent disclosure of its confidential suppliers.

Moreover, Xerox has not met its burden of showing sufficient need for disclosure of the identities of the confidential suppliers to counterbalance the potential harm from disclosure. See *id. at 325-26.* Xerox contends that the information is necessary for Xerox to properly defend against CSU's claims and to prosecute its counterclaims. Specifically, Xerox asserts that discovery of the identity of CSU's confidential parts suppliers is necessary for Xerox to rebut claims by CSU that: 1) sources for parts were "inadequate, inefficient, and costly"; 2) CSU's planned expansion was impeded by limited access to parts; 3) Xerox has market power in the parts market; 4) Xerox has erected barriers to entry and expansion in the parts market. Xerox contends that the identity of the confidential suppliers is also [**11] essential to its ability to prove its patent infringement counterclaims.

On the present record, it appears that disclosure of all information regarding the parts obtained from the confidential suppliers, except the identities of the confidential suppliers, will provide Xerox with the information necessary to rebut CSU's claims. Close examination of Xerox' arguments as to need reveal primarily supposition, rather than a particularized showing of substantial need. Especially in light of CSU's disclosure of all other information related to its parts sources, Xerox' present showing of need is inadequate. Xerox has not demonstrated that the *identities* of the twelve confidential parts sources will provide any necessary or essential additional component to Xerox' defense to plaintiffs' claims. Similarly, unless Xerox can make a particularized showing that the sale from a source likely infringes a patent, Xerox' need to prosecute its patent infringement counterclaims does not establish sufficient need to require CSU to disclose the identities of its confidential suppliers.

Xerox complains that CSU has refused to answer any questions related to parts sources on the pretense that they [**12] might be tangentially related to the identity of a confidential supplier. This approach is simply unacceptable. CSU will not be permitted to parlay its request for protection of the identities of its confidential suppliers into authorization for categorical refusals to answer relevant questions. One particularly relevant area appears to be the sources from which CSU did not purchase parts. CSU is forewarned that if it becomes apparent that protection of the identity of its confidential suppliers [*359] cannot, as a practical matter, be afforded without

162 F.R.D. 355, *; 1995 U.S. Dist. LEXIS 9806, **

thwarting Xerox' right to discovery, the court will direct CSU to reveal the identities of their confidential suppliers.

IT IS THEREFORE ORDERED that CSU's motion for a supplemental protective order (Doc. #42) is granted.

IT IS FURTHER ORDERED that Xerox' motion to compel (Doc. #49) is denied.

Dated this 30th day of June, 1995, at Kansas City, Kansas.

EARL E. O'CONNOR

United States District Judge

LEXSEE 206 F.R.D. 525

**MANNINGTON MILLS, INC. and MANNINGTON MILLS OF DELAWARE, INC., Plaintiffs, v. ARMSTRONG WORLD INDUSTRIES, INC., Defendant.**

**C. A. No. 00-876-RRM (SLR)(MPT)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*206 F.R.D. 525; 2002 U.S. Dist. LEXIS 7798; 63 U.S.P.Q.2D (BNA) 1203*

**April 25, 2002, Decided**

**DISPOSITION:** [**1] Non-party Congoleum's motion to quash was granted.

**COUNSEL:** For MANNINGTON MILLS, INC., MANNINGTON MILLS OF DELAWARE, INC., plaintiffs: Steven J. Balick, Ashby & Geddes, Wilmington, DE.

For ARMSTRONG WORLD INDUSTRIES, INC., defendant: Thomas A. Stevens, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For CONGOLEUM CORPORATION, movant: Philip A. Rovner, Potter Anderson & Corroon, LLP, Wilmington, DE.

For ARMSTRONG WORLD INDUSTRIES, INC., counter-claimant: Thomas A. Stevens, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For MANNINGTON MILLS, INC., MANNINGTON MILLS OF DELAWARE, INC., counter-defendants: Steven J. Balick, Ashby & Geddes, Wilmington, DE.

**JUDGES:** Mary Pat Thynge, United States Magistrate Judge.

**OPINION BY:** Mary Pat Thynge

**OPINION:**

[*526] **ORDER**

At Wilmington this 25th day of **April, 2002.**

Under consideration is nonparty Congoleum's, motion to quash the subpoena for documents issued by plaintiff, Mannington Mills (Mannington). Mannington served the extensive subpoena to obtain various documents from Congoleum relating to any and all contacts, discussions, understandings or agreements, whether written or oral, between Congoleum and defendant, Armstrong and Domco Tarkett (plaintiff [**2] in a declaratory judgment action against Mannington) and all of Congoleum's financial information relating to sales, market share, net profits/gross revenue, field and customer testing and information used in determining the success of products falling within the category of Dual Embossed Floor Covering, as well as resilient vinyl flooring from 1995 to the present. Further, the document requests are directed to both the '008 patent, which is the subject of this action and the '903 patent, a related patent which is presently not part of Mannington's claims in this matter. n1 *D.I. 111, Ex. 1.*

> n1 Mannington has moved in a separate motion to consolidate this action with the other Armstrong matter involving the '903 patent. The declaratory judgment action with Domco Tarkett involves both the '008 and '903 patents. In recent discussions with the court regarding scheduling in the Domco Tarkett matter, Mannington has agreed that it "makes sense" to have a consolidated Markman hearing in all three actions.

**Background:** [**3]

Mannington instituted this patent action against Armstrong alleging infringement of its '008 patent, a patent covering products made using Mannington's Natureform process, which are products that generally fall within resilient sheet vinyl flooring and in particular, are included in Dual Embossed Floor Covering. The '008 patent issued on September 5, 2000. In a related case, 01-815-RRM(SLR), Mannington also has sued Armstrong under its '903 patent, which covers the Natureform process. That patent issued on October 5, 1999. In these cases, Armstrong has alleged invalidity defenses against the patents. In another matter, Domco Tarkett, a licensee

206 F.R.D. 525, *; 2002 U.S. Dist. LEXIS 7798, **;
63 U.S.P.Q.2D (BNA) 1203

of Mannington, instituted a declaratory judgment action against Mannington on the aforementioned patents. n2 *D.I. 197.* Congoleum is not a party [*527] to any of these actions.

n2 These are three cases of which the court is aware that have been filed in this jurisdiction. Invalidity, but not infringement, is in issue in the Domco Tarkett matter, as are damages.

Congoleum [**4] is a competitor of Mannington, Armstrong and Domco Tarkett and likewise, is in the business of manufacturing and selling resilient sheet vinyl flooring, which includes floor covering products known as Dual Embossed Floor Covering. n3 Prior to the issuance of the subpoena in question, Armstrong took the depositions of certain present and former employees of Congoleum, all of whom responded to subpoenas, including Merrill Smith, a Senior Vice-President of Technology. *D.I. 112 n. 2; D.I. 191 at 10-11.* n4 The documents produced by Congoleum to Armstrong pursuant to those subpoenas had been previously produced to Mannington. They included some work on trial flooring, prior art documents, evidence of sales of the 1420 flooring and samples of that flooring as well. *D.I. 191 at 13.* The sample flooring produced to Mannington and subsequently to Armstrong, was resilient sheet vinyl flooring which included Congoleum floor products known as Concept/Reunion, Landscape/Earthtone and Classic Elegance/Mosaic Manor. n5 These products were subsequently examined by Mannington through visual inspection, and then microscopically, after which photographs of the cross-sections of the three samples [**5] were taken to view and measure certain properties of the products. *D.I. 124 P 4-7.* Further, Mannington examined Congoleum's Futura sample as well via a similar process. *D.I. 124 P 9.* n6 No testing beyond some form of visual observation occurred.

n3 According to Mannington and Congoleum, these four companies are the major players in this market. *D.I. 191 at 24.*

n4 Armstrong's subpoena duces tecum was limited to correspondence from Mannington soliciting Congoleum to license these patents and representative documents *to be selected by Congoleum* relating to the existence of and product specifications of any sheet vinyl floor covering manufactured by it prior to February 20, 1997. *D.I. 111, Ex. 4* (emphasis added).

n5 Although during oral argument, Mannington suggested cooperation between Armstrong and Congoleum in support of its opposition to Congoleum's motion, any contact between Congoleum and Armstrong occurred after product samples, documents and prior art had been shared by Congoleum with Mannington, which, in turn, motivated Armstrong's subpoena to obtain like information from Congoleum. *D.I. 191 at 11-12.*

[**6]

n6 The examinations were performed by Dr. Hao A. Chen, Mannington's Director of R&D, who concluded that the Futura product was not prior art and therefore, did not invalidate the '008 patent and that the other three products read on this patent's claims. See *D.I. 124.*

Congoleum filed its motion to quash, opening brief and affidavits on January 11, 2002. *D.I. 111, 112.* Mannington responded with its opposition brief and declarations in support thereof on or about January 24, 2002. *D.I. 123-126.* Thereafter, Congoleum filed its reply brief and another supporting declaration from Smith. *D.I. 127, 128.* On March 8, 2002, a telephone conference was held to address the issues and arguments made by Mannington and Congoleum concerning this motion. *D.I. 191.* This is the Court's decision and order on Congoleum's motion to quash.

**Congoleum's Arguments:**

Congoleum based its motion to quash on the following reasons:

1. The subpoena demands trade secrets and highly confidential information without any showing of need and without any adequate protective order. Any protective order in [**7] existence cannot adequately protect Congoleum since it is not a party to this action.

2. The subpoena is overbroad, is unduly burdensome, is time consuming and to comply with it will be expensive.

3. The subpoena requests irrelevant information because it seeks documents pertaining to a patent not in issue in this case (specifically, '903 patent) and requests documents concerning alleged "secondary considerations" in relation to obviousness of the '008 patent when no allegations of infringement have been made by or against Congoleum.

4. The subpoena seeks information protected by attorney/client privilege or attorney work product immunity.

206 F.R.D. 525, *; 2002 U.S. Dist. LEXIS 7798, **;
63 U.S.P.Q.2D (BNA) 1203

5. The subpoena includes information presently in Mannington's possession, is obtainable from other sources, that are more [*528] convenient, less burdensome and less expensive.

In support of its motion, Congoleum filed two declarations from Merrill Smith, as well as one from its counsel. See *D.I. 111, 128.* In support of its legal position, Congoleum relies primarily upon *Fed.R.Civ.P. 45(c)(3)* and *American Standard, Inc. v. Pfizer, Inc., 828 F.2d 734 (Fed. Cir 1987)* and *Micro Motion, Inc. v. Kane Steel Co., Inc. 894 F.2d 1318 (Fed. Cir. 1990)* [**8] .

**Mannington's Arguments:**

Mannington opposes the quashing of its subpoena because:

1. The court may issue a protective order that will prevent disclosure of Congoleum's trade secrets or confidential information from competitors.

2. Mannington is seeking highly relevant and probative information relating to "secondary considerations" or nonobviousness of the '008 patent and its needs outweigh any burden imposed upon Congoleum.

3. The subpoena seeks relevant documents relating to discussions, agreements, arrangement or understandings between Congoleum and other parties regarding this litigation.

4. Mannington is not seeking any information subject to privilege and if so, such information can be identified in a privilege log.

Similarly, Mannington relies on affidavits -- Dr. Chen, Thomas Davis (President and CEO of Mannington) and its counsel -- as well as, *Fed.R.Civ.P. 45(c)(3)* and *Truswal Systems Corp. v. Hydro-Air Engineering, Inc., 813 F.2d 1207 (Fed. Cir. 1987).*

**Discussion:**

Applicable Standards:

The Federal Circuit has addressed the issue of a party obtaining sales and financial information, test data and other confidential materials from [**9] a nonparty to an infringement action. Interestingly, two of the three cases emphasized by the parties to this motion were decided within six months of one another and which, at first blush, seemingly came to opposite results. *See, Truswal Systems Corp v. Hydro-Air Engineering, Inc., 813 F.2d 1207 (Fed. Cir. 1987) and American Standard Inc. v. Pfizer Inc., 828 F.2d 734 (Fed. Cir. 1987).* n7

n7 In fact, Judge Newman similarly noted in her concurring opinion, commenting that she had hoped that the majority "might seize the opportu-

nity to shed light on the boundary between these decisions," in light of the "scant guidance" provided. *American Standard 828 F.2d at 747.*

Both cases involved the balancing of "the relevance of the discovery sought, the requesting party's need and the potential hardship to the party subject to the subpoena." *Truswal at 1210* (quoting *Heat & Control, Inc. v. Hester Indus., 785 F.2d 1017, 1024 (Fed. Cir. 1986).* In other [**10] words, the court applied a balancing test to determine whether the need of the party seeking disclosure outweighs the adverse affect disclosure would have on the policies underlying the claimed privilege. If the information sought is confidential and its disclosure might be harmful, then "the burden shifts to the party seeking discovery to establish that disclosure of trade secrets and confidential information is relevant and necessary to its case." *American Standard 828 F.2d at 741.* According to the *American Standard* court, remand occurred in *Truswal* because the court below granted the motion to quash solely on the ground that discovery was sought from a nonparty, without the appropriate aforementioned inquiry. Further, based on affidavits and documents submitted, which were absent in *Truswal*, the district court in *American Standard* issued a protective order. n8 In a later decision, *Micro Motion* [*529] *Inc v. Kane Steel Co., Inc., 894 F.2d 1318 (Fed. Cir. 1990),* the Federal Circuit again addressed the issue of obtaining discovery from a nonparty competitor in connection with a patent infringement suit. As in *Truswal* and *American* [**11] *Standard*, the information sought is, in large part, disclosure of the nonparty's confidential materials. Similarly, the nonparty in *Micro Motion*, moved to quash the subpoenas. The court in that case, however, initially focused on the issue of relevance in its analysis, noting that the purpose of a protective order "is to prevent harm by limiting the disclosure of *relevant* and *necessary* information." *Micro Motion, 894 F.2d at 1325* (emphasis in the original).

n8 In a strong dissenting opinion in *Truswal*, Judge Rich felt that the majority was being "unrealistic, impractical and its holding likely to encourage abuse of the discovery process," and was requiring a certain amount of "mumbo jumbo in the [district court's] order, on top of the 15 pages of reported hearing," to demonstrate that the appropriate balancing, consideration, application and determination of the facts to the law had occurred.

Judge Rich and Judge Newman had similar concerns with the majority, which consisted of the same two judges in both *Truswal* and *American Standard* (Chief Judge Markey and Judge

Case 1:05-cv-00485-JJF    Document 324-2    Filed 04/17/2007    Page 31 of 59

Page 4

206 F.R.D. 525, *; 2002 U.S. Dist. LEXIS 7798, **;
63 U.S.P.Q.2D (BNA) 1203

Smith). Moreover, Chief Judge Markey was also part of the majority in *Micro Motion*. He did not, however, author the opinion in *Micro Motion* as he had done in *Truswal* and *American Standard*.

[**12]

Between now and the time when *Truswal* and *American Standard* were decided, both *Fed. R. Civ. Prod. 26* and *45* underwent major overhauls in 1993 and 1991 respectively. n9 New Rule 45(c) was enacted which provides for the rights of witnesses. According to the Advisory Committee Notes, it was not "intended to diminish rights conferred by rules 26-37 or other authority." Moreover, the Advisory Committee Notes recognize the intimate relationship between Rules 26 and 45. They note that Rule 45(c)(1) "gives specific application to the principle stated in Rule 26(g)." The Notes recognize that 45(c)(3), which authorizes the quashing of a subpoena, tracks the provisions of Rule 26(c), which empowers the issuance of a protective order, and likewise, protects a nonparty from undue burden by identifying circumstances where a subpoena is not allowed absent a showing of substantial need. Rule 45(c)(3)(A) identifies the circumstances where a subpoena must be quashed or modified: Rule 45(c)(3)(B) is directed to situations where a subpoena should be quashed. *See, Advisory Committee Notes*. Specifically, 45(3)(A)(iii) protects from disclosure privileged or other protected matters, while Rule [**13] 45(c)(3)(B)(i) safeguards trade secrets or other confidential research, development, or commercial information. *See, Rule 26(c)(7)*.

> n9 For that matter, *Micro Motion Inc.* was also decided before the changes to Rules 26 and 45. Other minor changes occurred to Rule 26 in 2000 which do not appear applicable to this motion.

Thus, it appears that all cases cited by the parties are still applicable law. Although the burdens may differ depending upon which rule is invoked, the substantive bases for denying a party discovery are similar. *See, Rule 26(b), (c) and (g); Micro Motion Inc. v. Kane Steel Co., Inc., 894 F.2d 1318, 1323 (Fed. Cir. 1990)*, citing *Truswal Systems Corp. v. Hydro-Air Eng'g, Inc., 813 F.2d at 1210-11* and *American Standard Inc. v. Pfizer Inc., 828 F.2d at 739-42*. As a result, a nonparty may seek from the court protection from discovery via the overlapping and interrelated provisions of both Rules 26 and 45. A nonparty moving to quash a subpoena, [**14] in essence, is the same as moving for a protective order that such discovery not be allowed.

Therefore, this court is required to apply the balancing standards -- relevance, need, confidentiality and harm. And even if the information sought is relevant, discovery is not allowed where no need is shown, or where compliance is unduly burdensome, or where the potential harm caused by production outweighs the benefit. *Micro Motion, 894 F.2d at 1323*.

Analysis:

For the purpose of this motion only, there is no dispute that the information requested constitutes trade secrets and is confidential. *D.I. 123 at 5-6*.

As to the issue of potential harm, Congoleum, through the declaration of Merrill Smith, its Senior Vice-President of Technology, represents these facts:

> "3. Congoleum's primary domestic competitors in the resilient sheet vinyl flooring market are Mannington Mills, Inc. ("Mannington") and Armstrong World Industries, Inc. ("Armstrong"), the real parties in interest in the underlying lawsuit.
>
> * * * *
>
> 5. Document Request Nos 6-9, 11-22 and 24 all ask, in whole or in part for Congoleum [*530] trade secrets including highly confidential financial and sales [**15] information, marketing plans, marketing reports, advertising information and expenditures, as well as other types of internal memoranda and reports. Such information is kept confidential at Congoleum and Congoleum has taken great measures to ensure that all officers, employees and agents of Congoleum maintain confidentiality of this type of information. For example, Congoleum makes it a practice to have all persons who have access to such information sign employment agreements and/or confidentiality agreements to maintain the confidentiality of Congoleum's trade secrets and confidential information. In addition, access to all of Congoleum's corporate and manufacturing facilities is controlled, uniform security officers are employed and the company uses password protection on its computer systems to protect its electronically stored information.
>
> 6. Due to the highly competitive nature of the floor covering industry, it is imperative that Congoleum's competitors not

206 F.R.D. 525, *; 2002 U.S. Dist. LEXIS 7798, **;
63 U.S.P.Q.2D (BNA) 1203

have access to our trade secrets and confidential financial, sales and marketing information. To effectively compete, Congoleum is continually working on product innovations and new product designs and must engage in many [**16] types of sales and marketing practices, including competitive pricing. Thus, Congoleum will surely sustain irreparable economic harm if the trade secret and confidential information which is sought is disclosed to Congoleum's competitors, Mannington and Armstrong."

*D.I. 111.*

In response, Mannington argues that Congoleum cannot make a showing of any harm since a court-ordered protective order limits disclosure of confidential information to attorney's eyes only. Mannington relies primarily on paragraph 3 of that order which provides:

> Disclosure of Confidential Information. Unless otherwise agreed to in writing by the person or entity that produces or discloses Confidential Information or until the court orders otherwise, any party, person or entity receiving Confidential Information shall use it only for purposes of litigating this case and shall not disclose that information to anyone other than counsel of record and the members and employees of their firms.

However, the preceding paragraph states:

> Stipulation Providing for the Disclosure and Use of Confidential Information. The parties may file a stipulation setting out their agreement on the handling [**17] and use of Confidential Information, and may include in the stipulation, terms and conditions by which they propose to handle and use Confidential Information received in discovery from a person or entity that is not a party to this action. The parties may include in that stipulation a form for an agreement by which a person receiving information consents to be subject to the jurisdiction of this court for the purposes of enforcing this order.

Moreover, paragraph 6 of the protective order further provides that "counsel should address in the pretrial order how they propose to handle the use and disclosure

of Confidential Information at trial." *D.I. 125 at P 6.* Under the present protective order, confidential information includes nonpublic confidential, proprietary, commercially sensative or trade secret information. *Id.* The order, by its terms, does not solely address the confidential information of the parties to this litigation, but encompasses any such information deemed to be confidential by "any person or entity producing or disclosing information in response to discovery." *D.I. 125 at P 1.*

What happens with any information disclosed by Congoleum in response [**18] to Mannington's subpoena, particularly at trial, is anyone's guess. Although the protective order allows the designation by Congoleum that such information is confidential and limits initial disclosure to outside counsel, the parties to this litigation are left with the option of how disclosure of such confidential information is handled at trial. As a result, control is in the hands of Congoleum's undisputed competitors and the court. Despite Mannington's arguments to the contrary, "it would be divorced from reality to believe that either party here would serve as the champion [*531] of its competitor. . . to maintain the confidentiality designation or to limit public disclosure . . . during trial." *Micro Motion, 894 F.2d at 1325.* Moreover, courts have traditionally recognized that disclosure to a competitor is more harmful than disclosure to a non-competitor. *American Standard 828 F.2d at 741,relying on Coca-Cola Bottling Co. v. Coca Cola Co., 107 F.R.D. 288, 293, 299 (D. Del. 1985).* Therefore, potential harm exists for Congoleum resulting from disclosure of the information demanded by Mannington. n10

> n10 Moreover, the law firms representing the parties in this action also serve as counsel for their respective clients in the prosecution of patent applications and other proceedings before the Patent and Trademark Office, thus, elevating the concern of harm from such disclosure. *See, D.I. 70.*

[**19]

Further, "[a] protective order which limits to whom information may be disclosed does not eliminate the requirement of relevance and need. . . ." *Id.* In this regard, Mannington asserts that requests numbers 6-24 in its subpoena are highly relevant to the "secondary" considerations of nonobviousness and potentially critical to rebut Armstrong's charges of invalidity. n11 To further support its argument regarding relevance, Mannington relies on the declaration of Mr. Chen who visually, including microscopically, examined the flooring samples Congoleum had provided and concluded that these three samples of Congoleum's dual embossed products potentially infringe the '008 patent. n12 Mannington empha-

206 F.R.D. 525, *; 2002 U.S. Dist. LEXIS 7798, **;
63 U.S.P.Q.2D (BNA) 1203

sizes that it is not interested in charging Congoleum with infringement or being subject to another suit for declaratory judgment. *D.I. 123 at 9.* n13 However, in light of the declaration of Mr. Chen, Mannington argues that it has shown all that it needs to pursuant to both *American Standard* and *Truswal* -- that is, there is some relationship between the claimed invention and information sought. n14

n11 Mannington concedes that some of its document requests include the '903 patent which is not at issue in this matter, but is raised in the second Armstrong case. The subpoena at issue was only filed in the matter at bar. However, Mannington is only willing to limit Request # 6 to the '008 patent claiming that any communications, arrangements and the like that Congoleum made regarding the '903 patent are relevant to the '008 patent.

[**20]

n12 Congoleum emphasizes that Mannington's document requests are not solely directed to the samples provided, but include all dual embossed floor coverings, as well as, resilient sheet vinyl floor coverings, which would involve hundreds of styles, patterns and colors and require searching several different facilities in different states and numerous locations within each facility to properly respond to the requests for the time period involved (from 1995 to the present). Congoleum asserts that a proper response would entail "more than a month and over a few hundred man hours to search for, collect and produce all the documents that Mannington seeks" and would necessitate contacting dozens of people in its accounting, marketing, sales, advertising and R&D departments. *D.I. 111 at P 7.*

n13 According to the affidavit of Mr. Davis, Mannington's President and CEO, Congoleum is accurate in that Mannington has neither accused Congoleum of infringing the '008 or '903 patents nor sued it for alleged infringement of either patent. In fact, Mannington clearly made a conscious decision to avoid such accusations against Congoleum since it presently is engaged in several other lawsuits involving both patents. However, that does not mean that Mannington does not believe that Congoleum's products read on the '008 claims. *D.I. 126 at P 10.*

[**21]

n14 Although suggesting that such examination was sufficient to determine that three of Congoleum's products read on the patent claims and thus, potentially infringe, Mannington has argued the contrary in other telephonic conferences with Court concerning discovery disputes between the parties. *See, D.I. 83 at 26, 29; D.I. 70 at 14, 28-30, 33-34.* During these conferences in its attempt to obtain process/manufacturing information from Armstrong regarding its products and to have a tour of Armstrong's manufacturing facilities, Mannington has argued that a myriad of factors (e.g., temperature, amount of inhibitors, pressure of embossing rolls, cooling stages and other parameters) are involved in determining whether the product infringes the '008 patent. Mannington has represented during the aforementioned conferences that visual inspection and review is inadequate and that the only way infringement by Armstrong's products can be determined is through information that illustrates or demonstrates how the product is manufactured since the process is highly relevant to the outcome of the product. *D.I. 83 at 29.* The court has denied access to such information from Armstrong. *D.I. 67 at 13.*

[**22]

Reviewing Mr. Chen's declaration, in summary, all he says is that, as a result of his visual/microscopic inspection, he concludes [*532] that the three Congoleum samples read on the '008 patent claims and that the Futura product does not meet all the claims of the '008 patent and therefore, it is not prior art. His affidavit does not address any other Congoleum products within resilient sheet vinyl flooring or the dual embossed floor covering. Nothing in Mr. Chen's declaration or in any of the other submissions by Mannington focus on the issue of commercial success/nonobviousness -- that is, whether Congoleum's products have been or are successful due to the merits of the claimed invention. *American Standard, 828 F.2d at 742.* In other words, Mannington has failed to carry its burden in showing some relationship between the invention claimed in the '008 patent and Congoleum's confidential financial, marketing and sales data. n15

n15 The Smith declaration suggests factors other than the claimed invention, noting that to "effectively compete, Congoleum is continually working on product innovations and new product designs and must engage in many types of sales and marketing practices, including competitive pricing." *D.I. 111 Smith Declaration at P 7.*

[**23]

Regarding the issue of need, Mannington argues that only through information from Congoleum can it develop the commercial success of Congoleum's products believed to be covered by the claims of the '008 patent, which would be relevant to rebut Armstrong's charges of invalidity. Mannington further asserts that the "uniqueness" of the information requested is obvious because it is confidential and therefore, only in the possession of Congoleum. Ignoring for the moment Mannington's somewhat circular argument, Mannington is required to establish that the discovery of confidential sales information is "reasonably necessary for a fair opportunity to develop and prepare its case for trial." n16 *American Standard, 828 F.2d at 743*. Presently, Mannington is involved in three actions in this jurisdiction alone involving two of its three primary competitors. In all of these actions, invalidity and obviousness are at issue. Although the financial, marketing and sales data of Congoleum is "unique" in the sense that it is information about Congoleum, financial, marketing and sales information is not uniquely available from Congoleum, the party from whom the information is sought.  [**24] Mannington presumably has access or will have access to similar information from its opponents during discovery on their defenses. *See, D.I. 191 at 14-15*.

n16 Moreover, evidence of sales of different infringing products substantiating commercial success of the claimed invention cannot be cumulative. *American Standard, 828 F.2d at 742-743*.

Addressing now the breadth of the subpoena, despite Mannington's arguments to the contrary, these document requests are substantial, essentially asking for every financial, marketing, testing, and sales document from Congoleum for all resilient sheet vinyl floor covering products and all dual embossed floor coverings from 1995 to the present, a seven year period. *D.I. 111 Bannon Declaration Ex. 1*. Although Mannington ignores Congoleum's representations regarding the time, effort, employee involvement and resulting cost to respond by arguing that the information sought is likely on computers and thus, readily available, the undisputed evidence shows otherwise.  [**25] *See, footnote 12*. Therefore, the potential hardship to Congoleum in responding to the subpoena clearly outweighs any tangential need by Mannington for this information.

"Where proof of either relevance *or* need is not established, discovery is properly denied." *American Standard, 828 F.2d at 743*. (emphasis in original). Therefore, consistent with the findings herein,

IT IS ORDERED that Congoleum's motion to quash is GRANTED.

Mary Pat Thynge

United States Magistrate Judge

LEXSEE 753 F.2D 1244

**SI HANDLING SYSTEMS, INC. v. MICHAEL E. HEISLEY, HEICO INC. PHILIP
L. BITELY, RICHARD O. DENTNER, EAGLE SHEET METAL MFG. CO., INC.
THOMAS H. HUGHES, SY-CON TECHNOLOGY INC., RUSSELL H. SCHEEL,
STANLEY K. GUTEKUNST, BARRY L. ZIEGENFUS, FRANK V. POSSINGER,**
Appellants

No. 84-1155

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*753 F.2d 1244; 1985 U.S. App. LEXIS 28032; 225 U.S.P.Q. (BNA) 441*

**September 10, 1984, Argued
February 4, 1985, Decided**

**PRIOR HISTORY:** [**1]

ON APPEAL FROM THE UNITED STATES DIS-
TRICT COURT FORT THE EASTERN DISTRICT OF
PENNSYLVANIA.

**COUNSEL:**

Harold Cramer, Anthony E. Creato, Sr., Steven R.
Williams, Mesirov, Gelman, Jaffe, Cramer & Jamieson,
Philadelphia, Pennsylvania, for Appellants.

Edward C. Gonda, Seidel, Gonda & Goldhammer,
P.C., Philadelphia, Pennsylvania, E. Jerome Brose, Tho-
mas R. Elliott, Jr., Charles W. Elliott, Brose and Poswis-
tilo, Easton, Pennsylvania, for Appellee.

**JUDGES:**

Adams, Higginbotham and Sloviter, Circuit Judges.
Adams, Circuit Judge, concurring.

**OPINION BY:**

HIGGINBOTHAM, JR.

**OPINION:**

[*1248] **OPINION OF THE COURT**

A. LEON HIGGINBOTHAM, JR., Circuit Judge.

INTRODUCTION

This is an appeal pursuant to *28 U.S.C. § 1292*(a)(1)
(1982) from an interlocutory order of the district court
preliminarily enjoining the use and disclosure of certain
trade secrets. Our scope of review is narrow. On a mo-
tion for a preliminary injunction, "unless the trial court

abuses [its] discretion, commits an obvious error in ap-
plying the law, or makes a serious mistake in considering
the proof, the appellate court must take the judgment of
the trial court as presumptively correct." *A.O. Smith
Corp. v. FTC, 530* [**2] *F.2d 515, 525 (3d Cir. 1976).*
Nonetheless, because we find that some of the district
court's conclusions are without support in the applicable
law of trade secrets, and that in some respects its order is
so overbroad and vague as to constitute an abuse of dis-
cretion, we will vacate the order and remand for refor-
mulation of the preliminary injunction.

I.

BACKGROUND

The unusually voluminous record upon which this
preliminary injunction was issued includes nineteen days
of testimony and well over 100 exhibits. Much of this
material is of a specialized, technical nature. We will
summarize the evidence in as much detail as is necessary
to properly frame the numerous issues raised in this ap-
peal, but with due regard for SI Handling Systems, Inc.'s
proprietary claims.

A. *SI Handling and CARTRAC*

Appellee SI Handling Systems, Inc. ("SI"), founded
in 1958 by its current Chairman and Chief Executive
Officer L. Jack Bradt, is a Pennsylvania corporation with
headquarters and principal manufacturing facilities lo-
cated in Easton, Pennsylvania. SI employs approxi-
mately 300 persons and had sales of 20 million dollars in
the fiscal year ended February 27, 1983. Through a
number [**3] of subsidiaries and licensees SI's products
are sold in much of the industrialized world.

753 F.2d 1244, *; 1985 U.S. App. LEXIS 28032, **;
225 U.S.P.Q. (BNA) 441

SI is in the business of designing, manufacturing, and installing "materials handling systems". "Materials handling" is a generic term describing the transportation [*1249] of materials, by any mechanized means, between locations in a factory or warehouse. Forklift trucks and conveyor belts are familiar examples of materials handling devices. A materials handling "system" connotes a combination of devices or components designed to integrate a number of warehouse or factory operations, in order to achieve greater automation and efficiency. SI, which at the outset made only manually-operated steel pushcarts, is today an industry leader with four sophisticated, highly automated product lines, each of which possesses the flexibility to be custom-designed for diverse systems applications.

This litigation involves only one of SI's product lines, known by the trade name "CARTRAC". CARTRAC was initially developed by a Swedish company which had limited success in marketing the product for light manufacturing applications during the 1960's. In 1971 SI purchased the worldwide rights to CARTRAC [**4] for 1.2 million dollars. SI's strategy with regard to acquisitions such as this is to identify products that can be further developed to meet market demands in a manner that secures SI a "unique proprietary advantage". Central to this strategy is the availability of patent or trade secret protection for SI's developments.

A somewhat detailed description of CARTRAC is helpful to understanding the issues raised in this appeal. CARTRAC is generically described as a "car-on-track" materials handling system. The track is a simple pair of steel rails, resembling railroad tracks. Materials are placed upon a carrier -- the "car" -- which transports them along the track. Propulsion for the car is provided by a cylindrical drive tube that is mounted in between the two rails and parallel to them. The car engages the tube via a urethane drive wheel mounted on the underside of the car in a pivoting, spring-loaded housing. When the tube is caused to spin by a drive belt connected to an electric motor, it imparts a force (or "thrust") to the drive wheel and causes it to turn. If the drive wheel's motion is perpendicular to the track the car cannot move and the energy expended is simply [**5] dissipated in spinning the drive wheel. If, however, the drive wheel is turned at an angle, a component of the thrust will be imparted in the direction parallel to the rails, thus enabling the car to move along the track. The car will accelerate as the angle of the drive wheel is increased, reaching a maximum velocity at 45 degrees. SI does not claim that these basic principles of CARTRAC propulsion are trade secrets.

SI's method of propelling the car along the track gives CARTRAC a number of capabilities not shared by other car-on-track systems. Among the advantages of the spinning tube approach are the capacity to operate different cars at different speeds at different points in the system ("asynchronous" operation), and to accelerate, decelerate, or stop an individual car at various points in the system with great precision and reliability.

Another feature, especially important in the context of this litigation, is the ability of the cars to automatically "accumulate": that is, to line up between work stations. Thus, where one work station in an integrated operation is shut down, the accumulated cars feeding materials to other stations will provide a ready bank of materials [**6] until the stalled station is again operational. Accumulation permits work stations "upstream" or "downstream" from the affected station to operate more or less continuously. Automatic "car-to-car" accumulation is accomplished in CARTRAC systems through the placement of devices at the front of each car that reduce the angle of the drive wheel as it approaches the rear of a stopped car. This method of accumulation utilizes the only significant patent that SI currently holds with regard to CARTRAC, the so-called "Jacoby" patent (No. 3,818,837).

In the years following SI's purchase of the rights to CARTRAC, SI further developed and refined the product for a variety of industrial applications. SI entered into a number of licensing agreements which provided [*1250] for, among other things, the exchange of technical information relating to any improvements in the design or manufacture of CARTRAC. The most important of these agreements, in the context of this litigation, was the one SI entered into with Ishihawajima-Harima Heavy Industries Co., Ltd. ("IHI") of Japan. IHI succeeded in selling CARTRAC to Nissan Motors for use in its highly roboticized automobile assembly plants. [**7] Substantial technical development was necessary to bring CARTRAC to the point where it could interact effectively with robots, interaction that requires the capability to move very heavy loads (such as car bodies) at very high speeds and to stop them at very precise locations. By 1976 SI had begun to study the market for "automotive CARTRAC" in the United States. In 1977 an extensive transfer of technology from IHI began, and in conjunction with Unimation, Inc., a leading robot manufacturer, SI sold several CARTRAC systems to Chrysler.

Beginning in 1978, "SI mounted a campaign to convince General Motors that CARTRAC could provide the automated system necessary for it to retool and meet the Japanese automotive challenge." *SI Handling Systems v. Heisley, 581 F. Supp. 1553, 1558 (E.D. Pa. 1984).* This campaign included intensive engineering and sales efforts. In January 1981, after several small purchases by GM, the companies consummated what has been referred to as "the big buy" -- an order for eight CARTRAC systems at a price of more than 17 million dollars. Since then SI has continued to sell CARTRAC systems to GM,

753 F.2d 1244, *; 1985 U.S. App. LEXIS 28032, **;
225 U.S.P.Q. (BNA) 441

and continues to view the GM market as its outstanding business [**8] opportunity.

Among the specific projects SI has undertaken to meet GM requirements is the development of inexpensive "two-way accumulation" cars. Such cars are desirable where a factory operation requires that cars be sent back and forth between two work stations to be loaded and unloaded cyclically. Two-way accumulation permits a bank of cars to " stack up" at both stations, without the necessity of turning the cars around so that they can accumulate in the "car-to-car" manner we have previously described. By mid-1981 GM had purchased three CAR-TRAC systems using two-way accumulation, but were dissatisfied with the price of $400,000. Though SI gave high priority to solving this problem, it was not until April 11, 1983, after this litigation was commenced, that SI was able to offer GM a two-way system at a price ($200,000) that was competitive with other methods of performing this particular materials handling task. Two other development projects that SI has undertaken at GM's behest figure in this litigation: "buffer" systems and "tugger" systems. Each of these systems would involve the use of a spinning tube car-on-track conveyor to solve a current GM materials handling problem. [**9]

SI does not place any restrictions on how purchasers of CARTRAC use it, and it has publicized the basic principles and capabilities of the product extensively in trade shows, articles, and advertisements. With regard to SI's confidentiality policies, the district court found:

> SI has taken the usual and reasonable precautions at its Easton facility to preserve and protect the confidential nature of its development of the CARTRAC product. Entry into the building is limited and visitors are restricted. All visitors must have passes and be escorted throughout the operation when they are inside the building. Alarm systems are utilized when the business is closed. Certain documents of a highly proprietary nature are marked accordingly. Files containing sensitive documents are locked. Drawings are prestamped with a proprietary legend. In addition, the majority of employees at SI are required to sign an Employee Agreement which purports to limit disclosure by employees of confidential information. Licensees of SI are duly proscribed from disclosure of the licensed designs and processes received via their respective license agreements.

> All Sales proposals for, and maintenance [**10] manuals provided with, CARTRAC [*1251] systems contain restrictive use language. SI's purchase orders to suppliers also contain a restrictive provision.

*581 F. Supp. at 1561-62* (footnotes omitted). The district court also found that "in supplying product to General Motors SI took precautions not to give GM any more technical detail than is necessary for successful operation and maintenance of the systems." *581 F. Supp. at 1558.*

SI's CARTRAC competes in the market with other sorts of materials handling systems that can do the same jobs. It appears that two Japanese companies, Murada and Daifuku, have marketed car-on-track systems that utilize spinning drive tubes, though they may differ from CARTRAC in other significant respects. There was no evidence that they have sold their systems in the United States. Thus, CARTRAC had no competition from other spinning tube car-on-track systems in the U.S. automobile manufacturing market until the advent of appellants' ROBOTRAC product.

### B. *The Appellants and ROBOTRAC*

Appellant Michael E. Heisley was an officer of SI from 1973 to mid-1978, serving as president for nearly all of that period. In that capacity he [**11] was involved in early discussions concerning SI's entry into the automotive manufacturing market, and he traveled to Japan to study IHI's technology. Heisley left SI at about the time of the early automotive CARTRAC sales to Chrysler. After leaving SI in 1978 Heisley formed appellant Heico, Inc. ("Heico"), an Illinois corporation. Appellant Philip L. Bitely, then SI's vice-president for finance, left the company and joined Heico shortly thereafter. Bitely had been with SI since 1971, and had also been involved in the early development of automotive CARTRAC. The record indicates that Heico is a diversified company employing over 300 persons with annual sales of approximately 25 million dollars. Heisley is the chairman of Heico and Bitely is its president. There is no evidence that, prior to 1982, Heico made any effort to develop a car-on-track system.

Appellant Thomas H. Hughes joined SI in 1976 as manager of field sales. In March 1977 he was promoted to vice-president of marketing, and in January of 1979 he became vice-president in charge of the computer controls division. It appears that in the latter two positions he had significant responsibility for the development of [**12] automotive CARTRAC. In July of 1981 Hughes left SI, with a number of other controls division employees, to form appellant Sy-Con Technology, Inc. ("Sy-Con"), a

753 F.2d 1244, *; 1985 U.S. App. LEXIS 28032, **;
225 U.S.P.Q. (BNA) 441

subsidiary of Heico. Sy-Con is located in Easton, Pennsylvania and is in the business of providing controls software for materials handling systems.

The watershed event leading to this litigation took place on April 17, 1982. On that date chief executive officer Bradt fired SI's vice-president of operations, appellant Richard O. Dentner. Dentner, it is fair to say, was the "father" of SI's automotive CARTRAC, with responsibility for coordinating both the engineering and marketing of this product. According to Bradt, he fired Dentner reluctantly, only after efforts to resolve tensions between Dentner and other SI officers had failed.

Dentner remained as vice-president of operations until May 9, 1982, and continued to receive severance pay until September 30, 1982. During that period he also did some consulting for SI on a per diem basis. Despite this continuing relationship with SI, Dentner was already making plans, in association with Heico, to market a competing spinning tube car-on-track system, ROBOTRAC.

Dentner's [**13] efforts are well-documented by exhibits produced from Heico's files. A document dated May 1, 1982, in Dentner's handwriting, contained detailed charts projecting costs and revenues, with the legend: "The above numbers were calculated using 20% less than SI for sell, using SI cost for engineering and installation and using SI manufacturing cost + 15% for Conco profit." Also introduced was a document, parts of which are dated May 4, 1982 and bear the initials of Dentner and Bitely, that appears to be a prospectus designed to [*1252] attract venture capital. Under the heading "History" it reports: "In May 1982, Dick Dentner, Vice President of Operations, left SI Handling Systems to form ROBOTRAC Inc. He became concerned that CARTRAC was becoming overpriced because of an excessive overhead structure and absorption of large costs for three other non-profitable product lines."

The prospectus goes on to state that "almost all of the senior management personnel from SI Handling, who developed Cartrac, are part of the ROBOTRAC team." These individuals were identified as Dentner, Stanley K. Gutekunst (SI's Director of Engineering), Russell H. Scheel (SI's Director of Systems Engineering), [**14] and Barry Conklin (SI's Manager of Control Systems). Gutekunst and Scheel, key players in the development of automotive CARTRAC and appellants here, did not actually leave SI to join ROBOTRAC until February 1983, and Conklin remains an SI employee.

Under the heading "Strategy", the prospectus states that "General Motors, who bought 24 systems from SI Handling Systems, will be the prime prospect for the new company. This is because; . . . The team who sold, designed and installed the system at General Motors are

[sic] now with ROBOTRAC Inc." Under the heading "Patent Position" the prospectus states:

> In 1978, Mike Heisley, President of SI Handling Systems, had an in-depth study performed on the patent position of the CARTRAC system. This study was performed by the SI engineering organization and Ed Gonda the SI patent attorney. The result of that study clearly indicated that the Jacoby Patent No. 3,818,837 was the only significant patent. This patent covers car-to-car accumulation, which is an inexpensive but effective way to accumulate on a CARTRAC system.
> In April 1982, Stan Dalton, patent attorney with Wagner, McCord, Wood and Dalton, reviewed the patent position [**15] of CARTRAC and confirmed that the previous patent position had not been improved.
> The ROBOTRAC team reviewed several alternatives to the Jacoby patent and Mr. Dalton confirmed that they would not infringe. In addition, he indicated in an April 19, 1982 letter that possibly the Jacoby patent is invalid.
> The ROBOTRAC team, because of their familiarity with CARTRAC, can -- with minimum effort -- bypass the SI patent position.

On June 26, 1982 Dentner authored a letter to Midwest Conveyor -- a Kansas City materials handling company -- captioned "Proposed Plan of Action for Midwest Conveyors Robotrac Product". Dentner proposed that Midwest establish a temporary office in Easton with the following "charter":

> 1.) Basic Concepts & Designs of Robotrac Components.

> a.) Basic design of some critical long lead items such as drive wheel assemblies, drive tube components, & stop station components. These items require castings and will be needed for prototypes.

753 F.2d 1244, *; 1985 U.S. App. LEXIS 28032, **;
225 U.S.P.Q. (BNA) 441

b.) Basic design of most recent GM body shop system components. . . . I feel it is important to get the basic designs completed while they are still fresh in our minds.

c.) Basic design of a car to [**16] car accumulation method that does not infringe upon the existing SI (Jacoby) patent.

. . . .

e.) Basic concept & design of a Tugger system for use in GM Trim Line automation projects.

f.) Basic concept & design of Buffer Systems for use between various operating lines of automotive assembly plants.

. . . .

. . . .

3.) Sales Contact with GM and a few other customers that we have been working with while employees of SI Handling.

[*1253] The Midwest letter goes on to propose that the Easton office be staffed by Dentner, Gutekunst (who would start by mid-July of 1982 and relocate to Kansas City by July 1983), Scheel (who would start in mid-August of 1982 and relocate by July 1984), and Conklin (who would start in September of 1982 "if still interested"). The remainder of the letter details how the "charter" would be carried out.

Also introduced into evidence was a July 20, 1982 letter from Heisley to ACCO Industries, Inc. ("ACCO"), another materials handling company. In this letter Heisley proposed three ways in which "ACCO could have access to the ROBOTRAC product line at substantially less cost than starting with a development group of your own." [**17] The options were: (1) a joint venture (apparently between Heico and ACCO); (2) for Heico to start an engineering group, "located in Easton, Penna., and hire the personnel from SI Handling Systems necessary to provide ACCO with all of the engineering drawings to build ROBOTRAC"; or (3) for ACCO to hire "R. Dentner and 2 or 3 of his associates directly."

The record is largely silent as to events between July of 1982 and February of 1983. It appears that the overtures to Midwest Conveyor and ACCO proved fruitless. At some point, Dentner was installed as president of appellant Eagle Sheet Metal Manufacturing, Inc. ("Eagle"), an Illinois maker of computer room furniture that Heico had acquired, and this became his base for further ROBOTRAC activities.

On February 22, 1983, Scheel, Gutekunst, and appellant Barry L. Ziegenfus (an SI engineer who had significant responsibility for the development of automotive CARTRAC, and who was deeply involved in the exchange of technology with IHI) resigned from SI, and joined Heico. Appellant Frank V. Possinger, who had been fired as SI's manager of cost accounting in a staff cutback in June 1982, had by then also joined Heico. At about this time [**18] Ziegenfus persuaded George Bartha, an SI draftsman who is not a party to this litigation, to leave SI and work for ROBOTRAC. With this team in place, Heico finally announced the formation of its ROBOTRAC Division. In a February 25, 1983 letter to the Director of Purchasing at GM's Fisher Body Division, Heisley reported that "the purpose of the ROBOTRAC division is to market, design, engineer, manufacture, install and service a high quality, low cost product similar to SI's CARTRAC." The letter listed all the individual appellants as "a staff uniquely qualified to design, manufacture, install and service CAR-ON-TRACK systems."

The district court described ROBOTRAC's subsequent progress, through the time of the hearing on SI's motion for a preliminary injunction:

On April 11, 1983, HEICO, through ROBOTRAC, submitted to General Motors an "unsolicited bid" for three spinning tube systems. Although unsuccessful in obtaining the bid, it is significant to note that the bid was even considered by GM. Part of the development effort expended by SI in securing General Motors as a customer was the selling of itself as a company that could accomplish the systems engineering necessary [**19] to fully automate its manufacturing operations. HEICO, on the other hand, went through no such process. Rather, it attained instant stature with GM by the means of hiring away the key SI people who sold General Motors on the system in the first place and then performed as required to install the systems.

Since the formation of the new division HEICO has been successful in secur-

ing one contract with General Motors for an installation at its Livonia plant. It has also bid on several other systems. Of note is its bid on what was termed the Buick City job. The request for quotation on this job was answered by SI and HEICO and the contract awarded to SI. This entire process took place during the time of the hearing. Two matters concerning this bid are important.

First, General Motors' request was conditioned upon responder's undertaking to deliver detailed drawings of all [*1254] products supplied as well as title to all new developments created in the performance of the contract. SI took exception to these conditions; HEICO did not.

Second, General Motors referred to CARTRAC components in the request by specific CARTRAC terminology and by reference to MH drawing numbers. [**20] These MH numbers are General Motors' internal description for SI CARTRAC components.

*581 F. Supp. at 1560-61* (footnote omitted). Significantly, ROBOTRAC's April 11, 1983 bid was for two-way accumulation systems in the $200,000 price range that GM had sought since 1981. This was the same date that SI, after two years of development effort, first offered two-way systems in this price range.

### C. *Proceedings in the District Court*

On March 21, 1983 SI filed a complaint against the aforementioned corporate and individual appellants, alleging violations of the Sherman Act and the Racketeering Influenced and Corrupt Organizations Act, and stating a variety of common law claims sounding in contract and tort, including misappropriation of trade secrets. SI moved for a preliminary injunction against use and disclosure of its trade secrets on October 20, 1983, and a hearing on this motion commenced November 7. The hearing, prolonged by acrimonious disputes over discovery (which continued throughout the hearing), a motion for a temporary restraining order (made at the time of the bidding on the Buick City job), and fruitless settlement discussions, ended February 2, [**21] 1984 after 25 days of testimony and argument. A number of SI officers and employees testified on the company's behalf. Appellants presented only one witness -- an expert on the subject of reverse engineering.

In an opinion handed down on March 1, 1984, the district court found that SI had made the requisite showings for preliminary injunctive relief, and in particular had demonstrated a reasonable probability of success on the merits of its trade secrets claim.

The district court's order enjoining appellants from use and disclosure of SI's trade secrets reads, in pertinent part:

> 1. all defendants are enjoined from the use and disclosure of any mechanisms developed by them or any of them to design around the Jacoby patent;
>
> 2. all defendants are enjoined from the use and disclosure of any detailed drawings of car-on-track materials handling products not revealed by the CARTRAC hardware;
>
> 3. the defendants Dentner, Bitely and Possinger are enjoined from engaging in any costing/pricing of a car-on-track materials handling system;
>
> 4. the defendants Scheel, Gutekunst and Ziegenfus are enjoined from concepting, designing, manufacturing, marketing or installing of any car-on-track [**22] materials handling system except as may be necessary to complete the General Motors Livonia Plant installation;
>
> 5. this injunction being preliminary in nature is limited in time until final hearing and the issuance thereafter of an order pertaining to plaintiff's application for a final and permanent injunction; subject, however, to earlier termination, upon appropriate application, if the confidential information in question comes into the possession of defendant by legitimate means.

This appeal followed.

II.

### DISCUSSION

In considering a motion for preliminary injunctive relief, a court must carefully weigh four factors: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of such relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting

753 F.2d 1244, *; 1985 U.S. App. LEXIS 28032, **;
225 U.S.P.Q. (BNA) 441

preliminary relief will be in the public interest. *See Klitzman, Klitzman and Gallagher v. Krut, 744 F.2d 955, 958-59 (3d Cir. 1984); Continental Group v.* [*1255] *Amoco Chemicals Corp., 614 F.2d 351, 356-57 (3d Cir. 1980).*

Appellants concede nothing here. [**23] They challenge every one of the district court's specific trade secret findings as unsupported by the law or the evidence. They argue that none of the prerequisites for preliminary injunctive relief have been met. Finally, they argue that the district court's order is, on any view of the law and evidence, overbroad and vague. We will consider appellants' contentions at some length, but within the confines of the limited scope of our appellate review of the grant or denial of a preliminary injunction.

A.  *Probability of Success On The Merits*

In exercising pendent jurisdiction over trade secrets claims, federal courts must apply state law. *Rohm and Haas Co. v. Adco Chemical Co., 689 F.2d 424, 428-29 (3d Cir. 1982); Sims v. Mack Truck Corp., 608 F.2d 87, 95 (3d Cir. 1979), cert. denied, 445 U.S. 930, 63 L. Ed. 2d 764, 100 S. Ct. 1319, 205 U.S.P.Q. (BNA) 488 (1980).* In this case there is no dispute that under the choice of law principles of the forum state, Pennsylvania, it is the trade secrets law of Pennsylvania that we are to apply.

To be entitled to an injunction against use or disclosure of information, under Pennsylvania law, a plaintiff must show: [**24] (1) that the information constitutes a trade secret; (2) that it was of value to the employer and important in the conduct of his business; (3) that by reason of discovery or ownership the employer had the right to the use and enjoyment of the secret; and (4) that the secret was communicated to the defendant while employed in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer. *See Reinforced Molding Corp. v. General Electric Co., 592 F. Supp. 1083, 1087 (W.D. Pa. 1984); Felmlee v. Lockett, 466 Pa. 1, 8, 351 A.2d 273, 277 (1976); MacBeth-Evans Glass Co. v. Schnelbach, 239 Pa. 76, 87, 86 A. 688, 691 (1913).* In this case there is no serious dispute that the latter three elements were made out with respect to the trade secrets the district court found. Thus, our discussion will focus on the first element -- the existence of trade secrets.

The Pennsylvania courts have adopted the definition of a trade secret given in the Restatement of Torts § 757 comment b. (1939):

A trade secret may consist of any formula, pattern, device [**25] or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

*See Ecolaire Inc. v. Crissman, 542 F. Supp. 196, 205 (E.D.Pa. 1982); Felmlee v. Lockett, supra, 466 Pa. at 9, 351 A.2d at 277; Van Products Co. v. General Welding and Fabricating Co., 419 Pa. 248, 258-59, 213 A.2d 769, 775 (1965).* "Novelty is only required of a trade secret to the extent necessary to show that the alleged secret is not a matter of public knowledge. . . . A trade secret may be no more than a slight mechanical advance over common knowledge and practice in the art." *Anaconda Co. v. Metric Tool & Die Co., 485 F. Supp. 410, 422 (E.D. Pa. 1980).* Matters which are fully disclosed by a marketed product and are susceptible to "reverse engineering" -- *i.e.,* "starting with the known product and working backward to divine the process which aided in its manufacture," *Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470,* [**26] *476, 40 L. Ed. 2d 315, 94 S. Ct. 1879 (1974)* -- cannot be protected as trade secrets. *See Air Products and Chemicals v. Johnson, 296 Pa. Super. 405, 432, 442 A.2d 1114, 1128 (1982).* Moreover, the concept of a trade secret does not include "[a] man's aptitude, his skill, his dexterity, his manual and mental ability, and such other subjective knowledge as he obtains while in the course of his employment, . . . the right to use and expand these powers remains his property [*1256] . . . ." *Pittsburgh Cut Wire Co. v. Sufrin, 350 Pa. 31, 35, 38 A.2d 33, 34 (1944).*

Some factors to be considered in determining whether given information is a trade secret are: (1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. [**27] Restatement of Torts § 757 comment b (1939); *International Election Systems Corp. v. Shoup, 452 F. Supp. 684, 706 (E.D. Pa. 1978), aff'd, 595 F.2d 1212 (3d Cir. 1979).*

753 F.2d 1244, *; 1985 U.S. App. LEXIS 28032, **;
225 U.S.P.Q. (BNA) 441

With these general principles before us, we will consider the factual and legal basis for each of the district court's trade secret findings:

*SI's method of examining drive tubes for concentricity.* This testing procedure, developed over a period of years by SI, is intended to ensure that the rotating drive tube, when installed, will not exceed the maximum allowable deflection as the moving car presses down upon it. This would seem to fit comfortably within the rubric of "processes of manufacture," *MacBeth-Evans, supra, 239 Pa. at 85, 86 A. at 691,* and therefore be protectible subject matter under the trade secret law of Pennsylvania. *Cf. Sperry Rand Corp. v. Pentronix, Inc., 311 F. Supp. 910 (E.D. Pa. 1970)* (methods of testing magnetic memory cores).

Appellants attempt to trivialize this procedure, arguing that it is one that would be used by any competent engineer and therefore cannot be a protectible trade secret. *See Capital Bakers v. Townsend, 426 Pa. 188, 191-92, 231 A.2d 292,* [**28] *294 (1967)* ("'Trade secrets' which will be so protected must be *particular* secrets of the complaining employer and not general secrets of the trade in which he is engaged.") *See also Trilog Associates v. Famularo, 455 Pa. 243, 252, 314 A.2d 287, 292 (1974).* If so, we must wonder why the competent engineers of SI only began using this procedure after a number of years of experience manufacturing the product. A trade secret may be no more than "merely a mechanical improvement that a good mechanic can make." *Schmidinger v. Welsh, 383 F.2d 455, 466 & n.14 (3d Cir. 1967)* (quoting Restatement of Torts § 757 comment b (1939)), *cert. denied, 390 U.S. 946, 88 S. Ct. 1031, 19 L. Ed. 2d 1134 (1968).* We cannot say that the district court's finding that this was a secret process of manufacture is clearly erroneous.

*The dimensions, tolerances, and method of fit between drive tubes and drive plugs.* Drive plugs are attached to each end of the drive tube and connect it to the ball bearings that support the tube while permitting it to rotate. The district court found that the diameter of these plugs, their tolerances (*i.e.,* the amount by which they may actually deviate [**29] from the stated diameter), and the manner in which they are fitted into the drive tube prior to welding are SI's trade secrets.

Appellants do not seem to dispute the district court's finding that this information could not be obtained by disassembling the product. Indeed, tolerances have previously been recognized as trade secrets par excellence, because they cannot be obtained by even the most precise measurements. *See Williams v. Curtiss-Wright Corp., 681 F.2d 161, 164 (3d Cir. 1982); Ecolaire Inc. v. Crissman, supra, 542 F. Supp. at 203; Anaconda Co. v. Metric Tool & Die Co., supra, 485 F. Supp. at 418;* Business Organizations, *Milgrim on Trade Secrets § 9.03*[3][d][i] (1984) [hereinafter cited as "Milgrim"]. Rather, appellants argue that the tolerances, at least, can be ascertained by reference to a steel bar manufacturer's catalog. The district court rejected this contention, and because we see no necessary connection between the variations in the size of steel bars a manufacturer sells and the variations a particular user can allow for a particular application -- to say nothing of the method of fit, which the [*1257] district court found would be [**30] "obliterated" in any attempt to discover it, *581 F. Supp. at 1564* -- we are not able to say that the district court's finding of fact was clearly erroneous.

*Use of a nonstandard maximum angular misalignment in conjunction with certain grease pack specifications in bearings.* SI's ball bearings are designed to allow for greater-than-usual angular misalignment of the shaft, resulting from the slight deflection of the drive tube as the weight of the car presses down upon it. SI also has special bearing lubrication requirements. These specifications required special negotiations with bearing manufacturers, and under the terms of SI's purchase orders the specifications were to be treated as confidential. The district court found that the precise numbers used are SI's trade secrets.

Again, we do not understand appellants to be contending that this is not the sort of information that is protectible under Pennsylvania trade secret law as "formulae" or "patterns", *cf. Henry Hope X-Ray Products v. Marron Carrel, 674 F.2d 1336, 1341 (9th Cir. 1982)* (applying Pennsylvania law); rather they ask us to overturn the district court's factual finding that this information is, indeed, [**31] secret. They point out that the bearing manufacturer used the prefix "J" in the part number, meaning, according to their catalog, "extra loose internal fit", and that this prefix could be found by inspecting the part. This does not adequately answer SI's evidence indicating that the exact specifications were the result of confidential negotiations and that the part was manufactured exclusively for SI -- one who ordered by this catalog number simply would not obtain the same part. The district court's finding is not clearly erroneous.

*Knowledge of the existence of alternate suppliers of parts at lower prices.* The "parts" the district court referred to here appear to be the bearings discussed in the preceding paragraph. Out of 200 bearing manufacturers in the United States, SI found only two that would make bearings that meet its specifications. After purchasing bearings from one of these suppliers for six years, SI learned in 1982 that the other company could offer a lower price, and therefore switched suppliers. The district court deemed this comparative price information to be SI's trade secret.

To the extent that knowledge of alternate suppliers of these bearings, [**32] and their respective prices, was dependent on knowing the secret specifications, this information would seem to be secret as well. Milgrim § 2.09[8][c]. We do not, however, recognize this as an independent trade secret. Here the information SI wishes to enjoin appellants from using (the identity of the vendors and the price of their merchandise) is already in the hands of third parties -- i.e., the bearing suppliers -- who have every incentive, and every right, to disclose it to their customers. To prevent appellants from using this information would put an undue burden on the innocent vendors, as well as place an artificial constraint on the free market. As the Pennsylvania Supreme Court recognized in *Van Products, supra,* "material sources and costs" are "something that would be learned in any productive industry, . . ." *419 Pa. at 261, 213 A.2d at 776. See also Jewish Employment and Vocational Service v. Pleasantville Educational Supply Corp., 220 U.S.P.Q. 613, 626-27 (E.D.Pa. 1982).* The district court erred as a matter of law in holding that knowledge of alternate suppliers of parts, and their prices, is protectible as a trade secret. (Language to the contrary [**33] in *Sims v. Mack Truck Corp., 488 F. Supp. 592, 601 (E.D. Pa. 1980)* is not supported by the cases cited therein and we reject that language.)

*Efficiency factors gained from component experience.* Design of a CARTRAC system requires knowledge of the efficiency of the various components of the drive tube system (a speed reducer gear box connected to the motor, the belt system, and the drive tube/drive wheel interface). The district court apparently accepted SI's contention that the efficiency of [*1258] the drive tube/drive wheel interface is nonstandard and not readily measurable.

This is clearly the sort of technical data that, if secret, may be protected under Pennsylvania law. Appellants contend, however, that these efficiency factors may be obtained by reference to standard engineering principles, and that their expert engineering witness demonstrated this on the stand. The expert did indeed, when prompted, come up with the exact figure SI claims as its secret, but it appears he did so without factoring in the drive tube/drive wheel interface. Therefore we cannot say the district court's finding was clearly erroneous.

*The nonstandard coefficient of friction* [**34] *used by SI in making calculations for system design.* The co-efficient of friction between the drive tube and drive wheel is one factor determining the car's acceleration and deceleration distances and times. In designing its systems SI uses an artificial figure incorporating a margin for safety. Because this design number will not be revealed by measurements of actual systems in operation, the district court found that it was SI's trade secret.

Again, appellants challenge this as a finding of fact rather than as a conclusion of law. Appellants' brief points to the admissions of an SI engineer that the downward force and forward thrust of the car can be measured, and argues that, with those two measurements, "another producer would not need to know Cartrac's design driving coefficient; it is simply a function of those two measurements plus a design safety factor." Appellants miss the point -- it is the "design safety factor" that the district court found to be a trade secret. This finding is not clearly erroneous.

*Knowledge of long lead times in component supply.* In order to meet its tight delivery schedules, SI must begin work on certain parts well in advance of the [**35] planned delivery date for a system. The district court found that knowledge of these "critical, long lead items" was SI's trade secret.

We believe that this information stands in much the same position as supplier price information -- except to the extent that the component itself is secret (and there is no indication that the district court was referring here to components that are not disclosed by the marketed product), knowledge of long lead times in component supply is "something that would be learned in any productive industry," *Van Products, supra,* and therefore is not protectible as a trade secret.

*SI's knowledge of the key decisionmakers within General Motors.* SI asserts that GM has over 100,000 white collar workers. According to the district court, "it was only after peeling through layer and layer of personnel and following many false leads that SI was finally able to reach the real decisionmakers as to its product. The development of these contacts was a secret to SI and was of value to it." *581 F. Supp. at 1565.*

SI seeks to bring this information within the category of "customer lists", subject matter that has long been protectible as trade secrets under [**36] Pennsylvania law. *See, e.g., American Ice Co. v. Royal Petroleum Corp., 261 F.2d 365 (3d Cir. 1958); Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (1957).* It is apparent to us, however, that this information -- which involves only one customer that is well-known in the industry and that, the record shows, actively seeks to disseminate the information -- is something quite different. Appellants use of this information is more akin to the exploitation of SI's "goodwill" than to the misappropriation of secret customer lists. Though this goodwill is obviously of great value to SI, we do not believe it is protectible as a trade secret. Rather, SI could have prevented this exploitation through reasonable covenants not to compete, which are enforceable under Pennsylvania law. *See Bettinger v. Carl Berke Associates, 455 Pa. 100, 314 A.2d 296 (1974); Morgan's Home*

*Equipment v. Martucci, supra, 390 Pa. at 628, 136 A.2d at 844.* SI did not require such covenants from its [*1259] employees, and cannot now through the medium of trade secrets law prevent them from exploiting their GM contacts. *See Trilog Associates v. Famularo, supra.* The words [**37] of the Pennsylvania Supreme Court in *Spring Steels v. Molloy, 400 Pa. 354, 363, 162 A.2d 370, 375 (1960)* are pertinent here:

> It is not a phenomenal thing in American business life to see an employee, after a long period of service, leave his employment and start a business of his own or in association with others. And it is inevitable in such a situation, where the former employee has dealt with customers on a personal basis that some of those customers will want to continue to deal with him in his new association. This is so natural, logical and part of human fellowship, that an employer who fears this kind of future competition must protect himself by a preventive contract with his employee, . . .

*SI's identification of GM needs for "two-way accumulation", "tugger", and "buffer" systems.* The district court found that knowledge of each of these potential markets was peculiar to SI, and was its trade secret.

Whether or not market research may qualify as the sort of "compilation of information" that is protectible under trade secret law, *see Sims v. Mack Truck Corp., supra, 488 F. Supp. at 600* (holding that under *Van Products* market study for [**38] front-discharging concrete mixers could not be a trade secret), this knowledge "of GM needs" clearly stands on a different footing. Where market research explores the needs of numerous, diverse buyers, the resulting profile is information that can only be obtained by others who undertake the same study. *See Air Products and Chemicals v. Johnson, supra, 296 Pa. Super. at 419-420, 442 A.2d at 1121-22.* Here the information relates to a single prominent buyer that is presumably well aware of its own needs, and which naturally would like to choose from among competing sellers. Where the claimed trade secret is information that is in the hands of a third party by whom it is not treated as secret, we think giving trade secret protection would seriously skew the workings of the marketplace. Indeed, it appears from the district court's findings that GM, at least with regard to its two-way accumulation needs, was soliciting bids and buying from a number of SI competitors offering non-"car-on-track" systems.

*The two-way accumulation system developed by appellants for ROBOTRAC while they were still in SI's employ.* Within six weeks of the formation of RO-BOTRAC, appellants offered [**39] GM a two-way accumulation system at approximately the $200,000 price GM had sought. The district court found it "inconceivable" that the same personnel who were unable to report any progress on this front in 19 months with SI could make this offer unless "they did so by misappropriating the unmatured development effort paid for by SI. . . . For these reasons the two-way accumulation concept developed by defendants for ROBOTRAC is deemed to be the property of SI and is presumably a trade secret as well." *581 F. Supp. at 1565.*

We do not question the district court's factual finding that appellants misappropriated information that was developed with SI's resources and, under the terms of their employment contracts, was SI's property. We cannot, however, agree with the district court's unsupported legal conclusion that this property "is presumably a trade secret as well". It is difficult to understand how information that was never revealed to SI can be its "trade secret" in the sense of information that is important in the conduct of one's business. *Cf. Rohm and Haas Co. v. Adco Chemical Co., supra, 689 F.2d at 430.* Moreover, there is no finding that if this development were [**40] to be marketed, it would be entitled to proprietary protection. *See Milgrim § 2.02[1], at 2-14.* In the event that appellants could patent this development, or are entitled to trade secret or some other type of proprietary protection, then under Pennsylvania law SI may be entitled to "shop rights" -- *i.e.*, a free license to use this technology. [*1260] *See Toner v. Sobelman, 86 F. Supp. 369 (E.D. Pa. 1949); Quaker State Oil Refining Co. v. Talbot, 315 Pa. 517, 174 A. 99 (1934).* SI is not without remedies for breach of the employment contract and may have other causes of action as well; the trade secret injunction, however, is simply *not* the remedy for *all* employee breaches of faith. We believe that these remedies would be preferable to issuing an injunction that may result in appellants' system never reaching the market at all.

*The contents of three pending SI patent applications.* SI has applied for patents on several devices invented as part of the development effort leading to the GM "big buy". Scheel, Gutekunst, and Ziegenfus are named as inventors of one or more of these devices. The district court found that the information contained [**41] in these applications, which are treated as confidential by the patent office, and which would enable appellants to design around the prospective patents, is SI's trade secret. We see no defect in the district court's conclusion. *See Milgrim § 2.06[2].*

*Methods developed by appellants, while they were still in SI's employ, for achieving car-to-car accumula-*

753 F.2d 1244, *; 1985 U.S. App. LEXIS 28032, **;
225 U.S.P.Q. (BNA) 441

*tion without infringing on the Jacoby patent.* Documentary evidence showed that as early as April 1982 "the ROBOTRAC team" (then including three SI engineers) had reviewed with patent counsel accumulation devices that would not infringe on SI's patent. The district court determined that the accumulation configuration used on ROBOTRAC prototypes was SI's property and trade secret.

Appellants argue that, unlike the developments reflected in the pending patent applications, the Jacoby patent has been issued and the mechanism fully disclosed, and SI may not extend its legal monopoly to the point of preventing others from designing noninfringing devices that do the same job. We agree, *see also Sims v. Mack Truck Corp., supra, 488 F. Supp. at 599,* but note that the district court's theory with regard to this trade [**42] secret was actually somewhat different. The district court was concerned that the design of the noninfringing devices had occurred while appellants were under contract to turn their developments over to SI. Thus, these developments stand on the same legal footing as the two-way accumulation system discussed previously. For the same reasons given there, we do not think *appellants'* method of achieving car-to-car accumulation without infringing the Jacoby patent can be protected as *SI's* trade secret, though SI may well have other remedies for this breach of duty.

*SI's CARTRAC costing and pricing information.* Apparently the district court rejected SI's contention that the formulae it uses in pricing its systems are trade secrets, but agreed that the numbers SI actually uses are trade secrets that appellants have misappropriated.

As we understand the district court's finding, subsumed under "costing" and "pricing" information is a whole range of data relating to materials, labor, overhead, and profit margin, among other things. Thus, unlike the price of bearings, this is not information that is readily obtainable by anyone in the industry. We believe such information [**43] qualifies for trade secret protection. *See also Ecolaire Inc. v. Crissman, supra, 542 F. Supp. at 206; cf. C. Albert Sauter Co. v. Richard S. Sauter Co., 368 F. Supp. 501, 506 (E.D. Pa. 1973)* (Sherman Act case). Appellants contend, based on SI's admissions that these figures change over time, and the fact that prior to issuance of the preliminary injunction appellants had not won any contracts it competed for against SI, that the district court's finding of fact was clearly erroneous. In the face of ROBOTRAC documents making financial projections on the basis of SI figures, we are not prepared to reverse the district court's factual finding.

*Nonstandard formulae for systems design developed by an IHI engineer (the "Tokunago formula book").* This book, entitled "CARTRAC Engineering Data, Theoreti-

cal and Practical Analysis", was supplied to SI under its technology exchange agreement with IHI. Though some [*1261] of the formulae reflect common engineering knowledge, the district court found, based on expert testimony, that others were based on experimental data and assumptions not in the public domain.

Empirical formulae used in systems design are clearly at the [**44] very core of trade secret law protection. Appellants ask us to reject the district court's factual finding on the ground that there was no evidence that the appellants are *using* these trade secrets. We cannot agree. There was ample evidence that the Tokunago formulae were crucial to the design of CARTRAC systems, and that appellants, who were among the few who had access to this information, were building an identical system, from which the district court could surmise that these trade secrets were being used. *Cf. Mixing Equipment Co. v. Philadelphia Gear, 436 F.2d 1308, 1314 (3d Cir. 1971)* (applying New York law). In trade secret cases

> misappropriation and misuse can rarely be proved by convincing direct evidence. In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place. Against this often delicate construct of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything.

*Greenberg v. Croydon* [**45] *Plastics Co., 378 F. Supp. 806, 814 (E.D. Pa. 1974).* On this issue, more than any other, the failure of the appellants to testify in answer to SI's strong showing justifies the inference that their testimony would be unfavorable to their cause. *See Stowe Township v. Standard Life Insurance Co., 507 F.2d 1332, 1337-38 (3d Cir. 1975); United States v. Cherkasky Meat Co., 259 F.2d 89, 93 (3d Cir. 1958).*

*SI's "know-how" in systems engineering.* As the district court described it, this "know-how" is "the cumulative knowledge and experience necessary to design a materials handling system which answers a particular customer's needs in a unique way. As such it goes far beyond the general knowledge and skill which any employee might gain by working at SI. . . . SI's system engineering know-how -- the knowledge of how to make a

753 F.2d 1244, *; 1985 U.S. App. LEXIS 28032, **;
225 U.S.P.Q. (BNA) 441

system work -- on the other hand is grounded in the trial and error, experimentation and expenditures of investment dollars over the period of product development. This know-how belongs to SI, is a valuable secret to it and has unlawfully been appropriated by defendants." *581 F. Supp. at 1564.*

In *Van Products* plaintiff sought trade secret protection [**46] for "know-how" in manufacturing deliquescent desiccant air driers "which it only achieved after years of success and failure, mistakes and corrections, testing and retesting, field testing, experimentation, study and analysis of problems in actual operation." *419 Pa. at 256, 213 A.2d at 774.* The Pennsylvania Supreme Court wrote:

> The concept of "know-how" is . . . a very fuzzily defined area, used primarily as a short-hand device for stating the conclusion that a process is protectible. It covers a multitude of matters, however, which in the broad sense are not protectible, e.g., an employee's general knowledge and skill.

*419 Pa. at 263-64, 213 A.2d at 777. See also Somat Corp. v. Combs, 40 Pa. D. & C.2d 107 (Chester County 1966).* In verbally formulating its findings the district court was careful to observe the distinction between protectible "know-how" and "general knowledge and skill", but we believe that, in substance, the matter the district court sought to include under this slippery heading was not protectible as a trade secret.

*Mixing Equipment Co. v. Philadelphia Gear, supra,* where we applied New York law, is instructive. There the plaintiff [**47] claimed as its trade secret "know-how" which was described as

> proficiency at analyzing the various problems presented by its customers and designing equipment capable of producing [*1262] the desired results. This ability, while dependent in part upon certain scientific and mechanical relationships known throughout the industry, in the main is based upon experience in the field. That experience, which has been acquired by Mixco during its 50 years of operation, is recorded in the form of graphs, charts, drawings, and other data sheets. . . .

*436 F.2d at 1314.* Interestingly, it was not the "ability" or "experience" that we recognized as qualifying for trade secret protection, but rather the compiled products of that ability and experience that had been recorded for repetitive use. (Milgrim, similarly, equates protectible "know-how" with "methods and techniques". Milgrim § 2.09[3].) Here we have accorded trade secret status to such compiled "know-how" as the method of testing for drive tube concentricity, efficiency factors, and the Tokunaga formulae. But the employee ability and experience that led to these developments, and presumably will lead to still [**48] further developments, does not belong to SI. "If this were not so an apprentice who has worked up through the stages of journeyman and master workman could never become an entrepreneur on his own behalf. Any such system of quasi-serfdom has long since passed away." *Midland-Ross Corp. v. Yokana, 293 F.2d 411, 412 (3d Cir. 1961)* (applying New Jersey law). *See also Sims v. Mack Truck Corp., supra, 488 F. Supp. at 600* (rejecting attempt to protect as "know-how" the "entire working knowledge of the Plaintiff in the field of manufacturing, servicing, and selling front-discharge mixers.").

As we understand the district court, the "know-how" it enjoined appellants from using is comprised of two things: (1) the ability to solve novel problems arising in CARTRAC applications; and (2) the experience necessary to avoid past mistakes and failures ("negative know-how"). Though we do not depreciate the value such "know-how" has to SI (indeed, the technology exchange agreements introduced at the hearing all provide that SI will make its employees and their "know-how" available to licensees), or the price at which it was obtained, we do not think that, after employees leave, SI can assert [**49] proprietary rights over their problem-solving ability or knowledge of mistakes to be avoided. Under Pennsylvania law, "the employee, upon terminating his employment relationship with his employer, is entitled to take with him 'the experience, knowledge, memory, and skill, which he gained while there employed.' " *Van Products, supra, 419 Pa. at 260, 213 A.2d at 776.* It is also doubtful that under Pennsylvania law an employer can keep his employees' knowledge of past mistakes and failures as a trade secret. *See Pressed Steel Car Co. v. Standard Steel Car Co., 210 Pa. 464, 470, 60 A. 4, 7 (1904); see also* M. Jager, 1984 Trade Secrets Law Handbook § 5.05[5], at 133. We believe that the line *Van Products* draws is a salutary one that comports with common sense and human nature. We, too, would be loath to "act as a judicial eraser to blot out . . . knowledge and skill." *419 Pa. at 261, 213 A.2d at 776.* Thus, we conclude that the

753 F.2d 1244, *; 1985 U.S. App. LEXIS 28032, **;
225 U.S.P.Q. (BNA) 441

district court erred in finding that the appellants' "know-how" was SI's trade secret.

*Reverse Engineering.* It is clear that under Pennsylvania law CARTRAC is not entitled to trade secret protection if it is susceptible to reverse engineering, [**50] regardless of whether appellants in fact went through such an exercise or, as would be more likely, relied on their memory. *See Henry Hope X-Ray Products v. Marron Carrel, supra, 674 F.2d at 1341-42; Van Products, supra, 419 Pa. at 267-68, 214 A.2d at 779-80.* Thus, we must review one more finding of the district court -- its finding that CARTRAC could not be reverse engineered.

Appellants argue that this finding was clearly erroneous in that it ignored the detailed testimony of their expert engineering witness, Dr. Terrance Willis. Dr. Willis opined that a small team of engineers and draftsmen could take complete measurements of a CARTRAC system and reverse engineer it in ten to twelve weeks. In addition, "he offered that without the benefit [*1263] of any measurements, but by visually inspecting the system and knowing its function, four engineers without CARTRAC experience, could reverse engineer the entire system in 16 to 18 weeks." *581 F. Supp. at 1568.*

We do not believe the district court ignored Dr. Willis's testimony. Rather, it considered the testimony closely and concluded that "Dr. Willis did not have the expertise as to the scope of the field of his alleged [**51] endeavor . . . . The inconsistencies, lack of foundation and illogical result cause the testimony of this witness to be of no moment." *Id.* We have reviewed this testimony and we, too, detect the smell of the lamp about it. Even if our impression was to the contrary, we would be unlikely to reverse what was basically a credibility determination of the district court. Even if credited, Dr. Willis's testimony pales beside the substantial evidence that, prior to ROBOTRAC, nobody had marketed a comparable product in the United States, and the fact that ROBOTRAC -- rather than hiring, or even contemplating hiring, engineers without CARTRAC experience and independently developing a product "in 16 to 18 weeks" -- worked for nearly a year in putting together a team of former SI engineers. *Cf. Rohm and Haas Co. v. Adco Chemical Co., supra, 689 F.2d at 431-32.* Though we assume, without deciding, that SI had the burden of proving that CARTRAC could *not* be reverse engineered, *contra Henry Hope X-Ray Products v. Marron Carrel, supra, 674 F.2d at 1341,* we cannot say the district court's finding was clearly erroneous.

In summary, we affirm the district court's factual and legal [**52] findings that SI has shown a reasonable probability of success on the merits as to the following claimed trade secrets:

(1) SI's method of examining drive tubes for concentricity;
(2) the dimensions, tolerances, and method of fit between drive tubes and drive plugs;
(3) use of a nonstandard maximum angular misalignment in conjunction with certain grease pack specifications in bearings;
(4) efficiency factors gained from component experience;
(5) the nonstandard coefficient of friction used by SI in making calculations for system design;
(6) the contents of three pending SI patent applications;
(7) SI's CARTRAC costing and pricing information; and
(8) nonstandard formulae for systems design developed by an IHI engineer (the "Tokunago formula book").

We reverse the district court's findings that the following were SI's trade secrets: knowledge of the existence of alternate suppliers of parts at lower prices; knowledge of long lead times in component supply; knowledge of key decisionmakers within General Motors, SI's identification of GM needs for "two-way accumulation", "tugger", and "buffer" systems; the two-way accumulation system developed by appellants [**53] for ROBOTRAC while they were still in SI's employ; methods developed by appellants, while they were still in SI's employ, for achieving car-to-car accumulation without infringing on the Jacoby patent; and SI's "know-how" in systems engineering.

B. *Equitable Considerations*

In exercising its discretion in the issuance of a preliminary injunction, a district court must weigh, in addition to the movant's probability of success on the merits: (1) the threat of irreparable harm to the movant if relief is denied; (2) the balance of harms; and (3) the public interest. *Continental Group v. Amoco Chemicals Corp., supra, 614 F.2d at 356-57.* Appellants contend that the district court abused its equitable discretion because none of these factors militate in favor of a preliminary injunction here. We disagree. Though our holdings with regard to the individual trade secret findings require that the preliminary injunction be vacated, we [*1264] see no barrier to issuance of a modified injunction on remand.

753 F.2d 1244, *; 1985 U.S. App. LEXIS 28032, **;
225 U.S.P.Q. (BNA) 441

Appellants contend that there has been no showing that SI will suffer irreparable harm in the absence of a preliminary injunction. They rely on the fact that SI did not [**54] move for a preliminary injunction until seven months after filing their complaint. (SI attributes this delay to appellants' failure to comply with discovery.) We do not understand appellants to be asserting the defense of laches, but rather to be suggesting an estoppel -- *i.e.*, SI's conduct is inconsistent with a claim of immediate and irreparable harm. We do not, however, think it is important whether the movant considered a preliminary injunction necessary at the time of filing the complaint. The relevant inquiry is whether the movant is in danger of suffering irreparable harm at the time the preliminary injunction is to be issued. Here SI made an ample showing that appellants intended to use its trade secrets, and did not intend to take reasonable measures to preserve their secret status. *See Union Carbide Corp. v. UGI Corp., 731 F.2d 1186, 1191-92 (5th Cir. 1984)* (applying Pennsylvania law); *Ecolaire Inc. v. Crissman, supra, 542 F. Supp. at 205; cf. Continental Group v. Amoco Chemicals Corp., supra, 614 F.2d at 358-59.*

Appellants further contend that had the district court properly balanced the harm they would suffer if an injunction was granted against the [**55] harm to SI if an injunction was denied, it could not have issued a preliminary injunction. They claim that the harm appellants suffer is "catastrophic" and that for Scheel, Gutekunst and Ziegenfus it is "the equivalent of economic capital punishment". We do not find any evidence in the record that would support these claims. Heico, the parent of Sy-Con and Eagle, appears to be a corporation of roughly equal size to SI, with the advantage of greater diversity. Though it is clear that individual appellants Scheel, Gutekunst and Ziegenfus are prevented by the injunction from exploiting valuable expertise, we cannot find by judicial notice that they have been subjected to economic capital punishment. It appears that they continue to be employed by Heico, and we surmise that their considerable talents have found a productive outlet.

Finally, appellants ask us to hold that the district court failed to properly weigh the public interest when it stated that "the preservation of commercial morality far outweighs any negative impact on free competition which might result from any order emanating for this litigation." *581 F. Supp. at 1562.* Appellants point to the numerous statutes and cases [**56] embodying the strong public policies favoring competition and economic mobility, apparently implying that these are overriding interests. Appellants do not, however, explain why this case is different from numerous other trade secret cases, all implicating similar "commercial morality" issues and thus these same public policy concerns, where injunctions have issued. *See, e.g., United Insurance Co.*

*v. Dienno, 248 F. Supp. 553, 557 (E.D. Pa. 1965).* Appellants here are not concerned about raising the morality of capitalism; rather their sole concern is raising the profitability of their ventures predicated on utilizing a competitor's trade secrets. A classic statement of the competing policies appears in *Wexler v. Greenberg, 399 Pa. 569, 160 A.2d 430 (1960)* where the court found that trade secrets cases bring

to the fore a problem of accommodating competing policies in our law: the right of a businessman to be protected against unfair competition stemming from the usurpation of his trade secrets and the right of an individual to the unhampered pursuit of the occupations and livelihoods for which he is best suited. There are cogent socio-economic arguments in favor [**57] of either position. Society as a whole greatly benefits from technological improvements. Without some means of post-employment protection to assure that valuable developments or improvements are exclusively those of the employer, the businessman could not afford to subsidize research or improve current [*1265] methods. In addition, it must be recognized that modern economic growth and development has pushed the business venture beyond the size of the one-man firm, forcing the businessman to a much greater degree to entrust confidential business information relating to technological development to appropriate employees. While recognizing the utility in the dispersion of responsibilities in larger firms, the optimum amount of "entrusting" will not occur unless the risk of loss to the businessman through a breach of trust can be held to a minimum.

On the other hand, any form of post-employment restraint reduces the economic mobility of employees and limits their personal freedom to pursue a preferred course of livelihood. The employee's bargaining position is weakened because he is potentially shackled by the acquisition of alleged trade secrets; and thus, paradoxically, he [**58] is restrained, because of his increased expertise, from advancing further in the industry in which he is most productive. Moreover, as previously mentioned, society suffers because competition is dimin-

ished by slackening the dissemination of ideas, processes and methods.

*399 Pa. at 578-79, 160 A.2d at 434-35* (footnote omitted). *See also Kewanee Oil Co. v. Bicron Corp., supra, 416 U.S. at 481-82, 485-87;* M. Jager, 1984 Trade Secrets Law Handbook §§ 1.03-1.04. It was not necessary for the district court to engage in extended analysis of the public interest -- extensive precedent supports an injunctive remedy where the elements of a trade secret claim are established. *See, e.g., Belmont Laboratories v. Heist, 300 Pa. 542, 151 A. 15 (1930); Fralich v. Despar, 165 Pa. 24, 30 A. 521 (1894).*

C. *The Scope of the Injunction*

The district court found:

It will be virtually impossible for the various individual defendants not to use their CARTRAC systems engineering knowledge if they continue to work in car-on-track materials handling systems. Further, continued use of it by them would inevitably result in disclosure to fellow employees and potential [**59] customers. For these reasons a limited injunction against disclosure and use of the information is not sufficient.

*581 F. Supp. at 1569.* It is clear that under Pennsylvania law a court of equity may fashion a trade secret injunction that is broad enough to ensure that the information is protected. *See Air Products and Chemicals v. Johnson, supra, 296 Pa. Super. at 420-21, 442 A.2d at 1122-23;* Milgrim § 7.08[1][b]. Because we have rejected several of the district court's most significant trade secret findings, it is necessary that this preliminary injunction be vacated. Because the terms of an injunction are normally committed to the discretion of the district court, rather than issue a modified order ourselves, we deem it advisable to remand to the district court for reformulation. In view of our holding, it will be necessary for the district court to reconsider its conclusion that it will be "virtually impossible" for appellants to work on car-on-track systems without compromising SI's proprietary information. In particular, the district court should consider whether, with regard to the eight trade secret findings that we have affirmed, *all* appellants [**60] are equally situated, or that work by appellants on *any* car-on-track system -- as opposed to merely *spinning tube* car-on-track systems --

is threatening to SI's proprietary interests. The district court is in the best position to tailor an appropriate order.

For the guidance of the district court on remand, we set out here two additional concerns relating to the breadth and specificity of the original order.

Paragraph four of the preliminary injunction enjoins appellants Scheel, Gutekunst, and Ziegenfus from, among other things, "concepting" any car-on-track materials handling system. The term 'concepting', though it was used by a number of witnesses and appears to be part of the jargon of the trade, is probably one that ought to be eschewed in judicial orders. Our concern is in part linguistic. As Theodore [*1266] Bernstein has written, the tendency "to make the lesser seem the greater and to enfold the commonplace in the mantle of science or philosophy has had a debasing effect on the work *concept*." The Careful Writer 113 (1977). The coinage of the nonstandard verb "concepting" only makes matters worse. Moreover we doubt, whatever exactly is meant by "concepting", [**61] that it is something that can be enjoined by judicial fiat. A court of equity should not issue an order that it cannot enforce.

The fifth paragraph of the preliminary injunction provides that it will terminate upon disposition of the application for a final injunction, "subject, however to earlier termination, upon appropriate application, if the confidential information in question comes into the possession of defendant by legitimate means." To the extent this means that, should SI's trade secrets be publicly disclosed, the injunction would terminate, we think this is a salutary and necessary provision. *Cf. Kewanee Oil Co. v. Bicron Corp., supra, 416 U.S. at 473-74.* To the extent it means, as SI suggests, that appellants should have to retrace every step SI has taken in developing CARTRAC before they can market a similar product, we believe it would be a wasteful and unduly punitive requirement. A court of equity should not require one who knows that Los Angeles is west of Chicago to look at a map before going to Los Angeles. We endorse the current trend toward so-called "lead time" injunctions, whereby the trade secret injunction lasts only so long as is necessary to negate [**62] the advantage the misappropriator would otherwise obtain by foregoing independent development. *See Anaconda Co. v. Metric Tool & Die Co., supra, 485 F. Supp. at 431; Morgan's Home Equipment v. Martucci, supra, 390 Pa. at 636, 136 A.2d at 848;* Uniform Trade Secrets Act § 2 Commissioners' Comment (1980); Milgrim § 7.08[1]. *See generally* Comment, *Trade Secrets: How Long Should an Injunction Last?, 26 UCLA L. Rev. 203 (1978).*

We recognize that with the advantage of hindsight it is much easier for appellate judges to find a deficiency in a decree than it would be to write a specific decree that

does not offend the law when dealing with the somewhat nebulous field of trade secrets. We are aware of the difficult tasks that confronted the trial judge and of the conscientious efforts he made to take the appropriate path through this litigation jungle. In framing a decree a trial judge is not dealing with mathematical niceties, and thus he must have substantial discretion in defining the relief. Here, however, because the preliminary injunction is predicated on erroneous legal conclusions we must remand for a recasting of the decree and the redrawing of the line between [**63] permissible and impermissible conduct. Some of the conduct of the appellants was very near the line or within the zone of permissible conduct, while other conduct had no redeeming value and simply reflected appellants' pursuit of profit without regard to the harm caused to SI. As Justice Holmes observed in a somewhat different context, "the inevitable result of drawing a line" is "distinctions [that] are distinctions of degree; and the constant business of the law is to draw such lines." *Dominion Hotel v. Arizona, 249 U.S. 265, 269, 63 L. Ed. 597, 39 S. Ct. 273 (1919).*

CONCLUSION

For the reasons set forth above, the order of the district court will be vacated and the case remanded for proceedings consistent with this opinion.

**CONCUR BY:**

ADAMS

**CONCUR:**

ADAMS, Circuit Judge, concurring.

Although I concur with the result reached by the majority, I believe that a number of the contentions raised in this appeal are sufficiently important to warrant additional comment.

When deciding the equitable issues surrounding the request for a trade secret injunction, it would seem that a court cannot act as a pure engineer or scientist, assessing the technical import of the information in [**64] question. Rather, the court must [*1267] also consider economic factors, since the very definition of "trade secret" requires an assessment of the competitive advantage a particular item of information affords to a business. Similarly, among the elements to be weighed in determining trade secret status are the value of the information to its owner and to competitors, and the ease or difficulty with which the information may be properly acquired or duplicated. *International Election Systems Corp. v. Shoup, 452 F. Supp. 684, 706 (E.D. Pa. 1978), aff'd, 595 F.2d 1212 (3d Cir. 1979)* (applying Pennsylvania law of trade secrets).

While the majority may be correct in suggesting that the trial court need not always "engage in extended analysis of the public interest," the court on occasion must apply the elements of sociology. This is so since trade secret cases frequently implicate the important countervailing policies served on one hand by protecting a business person from unfair competition stemming from the usurpation of trade secrets, and on the other by permitting an individual to pursue unhampered the occupation for which he or she is best suited. *See Wexler v. [**65] Greenberg, 399 Pa. 569, 160 A.2d 430 (1960).* "Trade secrets are not . . . so important to society that the interests of employees, competitors and competition should automatically be relegated to a lower position whenever trade secrets are proved to exist." Robison, *The Confidence Game: An Approach to the Law About Trade Secrets, 25 Ariz. L. Rev. 347, 382 (1983).*

These observations take on more force, I believe, when a case such as the present one involves the concept of "know-how." Under Pennsylvania law an employee's general knowledge, skill, and experience are not trade secrets. *E.g., Van Products Co. v. General Welding & Fabricating Co., 419 Pa. 248, 260-61, 213 A.2d 769, 777 (1965).* Thus in theory an employer generally may not inhibit the manner in which an employee uses his or her knowledge, skill, and experience -- even if these were acquired during employment. *See id.; Pittsburgh Cut Wire Co. v. Sufrin, 350 Pa. 31, 38 A.2d 33 (1944).* When these attributes of the employee are inextricably related to the information or process that constitutes an employer's competitive advantage -- as increasingly seems to be the case in newer, high-technology industries, [**66] *see generally* Note, *Trade Secrets and the Skilled Employee in the Computer Industry, 61 Wash. U.L.Q. 823 (1983)* -- the legal questions confronting the court necessarily become bound up with competing public policies.

It is noteworthy that in such cases the balance struck by the Pennsylvania courts apparently has favored greater freedom for employees to pursue a chosen profession. *See* Comment, *The Trade Secret Quagmire in Pennsylvania: A Mandate for Statutory Clarification, 86 Dick. L. Rev. 137 (1981).* The courts have recognized that someone who has worked in a particular field cannot be expected to forego the accumulated skills, knowledge, and experience gained before the employee changes jobs. Such qualifications are obviously very valuable to an employee seeking to sell his services in the marketplace. A person leaving one employer and going into the marketplace will seek to compete in the area of his or her greatest aptitude. In light of the highly mobile nature of our society, and as the economy becomes increasingly comprised of highly skilled or high-tech jobs, the individual's economic interests will more and more be buf-

feted by by employers' perceived needs [**67] to maintain their competitive advantage. Courts must be cautious not to strike a balance that unduly disadvantages the individual worker.

In achieving a proper balance, courts should be guarded in their use of older precedents. Perhaps the most "influential Pennsylvania holdings in the field of trade secrets" were decided in the early 1960's. *See* Comment, supra, 86 Dick. L. Rev. at 148. Yet, quite significantly, those cases pre-date the rapid growth of several high-tech [*1268] industries and the innovations which those fields have spawned. n1

> n1 For example, before 1969 computer manufacturers apparently gave away "software" programs as part of their packaged product. Since then the estimated value of computer programs in use has surpassed $100 billion, and there is now an acute shortage of personnel capable of creating and improving computer programs. *See* Note, *supra, 61 Wash. U.L.Q. at 836.* The status of a particular program in trade secret law is often extremely difficult to assess, partly because the programs do not blend easily into a framework that utilizes such concepts as know-how and reverse engineering. *Compare, e.g., Structural Dynamics Research Corp. v. Engineering Mechanics Research Corp., 401 F. Supp. 1102 (E.D. Mich. 1975)* (software a trade secret) *with, e.g., Electronic Data Systems Corp. v. Kinder, 360 F. Supp. 1044, 1049 (N.D. Tex. 1973), aff'd, 497 F.2d 222 (5th Cir. 1974)* (not a trade secret). In Pennsylvania, the idea of putting together computer programs to achieve a specific result and the expertise necessary to develop the programs are not subject to trade secret protection, but the specific programs developed to accomplish the purpose may be protected. *See Computer Print Systems, Inc. v. Lewis, 281 Pa. Super. 240, 250 n.3, 422 A.2d 148, 153 n.3 (1980).*

[**68]

Furthermore, society has a fundamental interest in allowing an individual reasonable freedom to change his or her job and to make full use of acquired skills and experience for new employment. Reasonable movement promotes competition and the dissemination of ideas, which in turn benefit the consumer. *Accord ILG Industries, Inc. v. Scott, 49 Ill. 2d 88, 273 N.E.2d 393 (1971).* Important values are served when the resources of skill and information are allocated in such a manner that they are utilized most efficiently to produce goods and services. *See* Robison, *supra,* 25 Ariz. L. Rev. at 362.

Another point, mentioned by the majority but worth emphasizing, is that when an injunction is to issue in cases involving the "extraordinarily difficult" concept of trade secrets, *Greenberg v. Croydon Plastics Co., 378 F. Supp. 806, 812 (E.D. Pa. 1974),* and the "fuzzy" notion of know-how, *Van Products, 419 Pa. at 263, 213 A.2d at 777,* it is incumbent upon a court to frame its injunction in terms as specific as possible. Fairness to the parties requires that a court do more than permit in general terms the use of employee know-how, and forbid the use of various trade secrets, [**69] without defining with some precision the boundaries of those areas as determined by the facts of the case. An employee may be aware of an obligation to respect a former employer's trade secrets but may have no satisfactory way to distinguish the information he or she must not disclose from that which may be employed. Robison, *supra,* 25 Ariz. L. Rev. at 348. In this respect I specifically endorse the majority's admonition against the use of a term such as "concepting," which is inherently vague and difficult to enforce when incorporated into an injunction.

Finally, I would highlight the concern that an important consideration for the district court on remand should be the effective life-span of any injunction that may issue. Appellants Scheel, Gutekunst, and Ziegenfus left SI in February 1983, an event followed closely by the institution of this lawsuit in March 1983. When the district court issued its injunction in March 1984, over one year had passed since the departure of those three employees. In addition, six years had passed since the departure of appellant Heisley, almost three years since the departure of appellant Hughes, and almost two years since the departure [**70] of appellant Dentner. It might be questioned whether, had the appellee sought to restrain these employees for such lengthy periods of time, pursuant to explicit non-competition agreements, such agreements would be upheld as reasonable. *See generally Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 632, 136 A.2d 838, 846 (1957);* Blake, *Employee Agreements Not to Compete,* 73 Harv. L. Rev. 625 (1960).

In my view a proper injunction necessarily would impose the minimum restraint upon the free utilization of employee skill consistent with denying unfaithful employees an advantage from misappropriation of information. *See Trade Secrets: How Long Should an Injunction Last?, 26 UCLA L. Rev. 203 (1978).* Thus, as I see it, the district court, on remand, should fashion [*1269] an injunction that extends only so long as is essential to negate any unfair advantage that may have been gained by the appellants.

LEXSEE 63 F. SUPP. 2D 475

**UNITED STATES OF AMERICA, Plaintiff, v. FEDERATION OF PHYSICIANS AND DENTISTS, INC., Defendant.**

**CA No. 98-475 JJF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*63 F. Supp. 2d 475; 1999 U.S. Dist. LEXIS 12844; 45 Fed. R. Serv. 3d (Callaghan) 668*

**July 29, 1999, Decided**

**DISPOSITION:** [**1] Government's motion to compel the Federation to comply with the Government's First Request for Documents and its motion to compel Dr. Connair to comply with the Government's subpoena granted. Government's motion to compel directed to the individual surgeons and surgeon group practices denied.

**COUNSEL:** Carl Schnee, United States Attorney and Virginia Gibson-Mason, Assistant United States Attorney, U.S. DEPARTMENT OF JUSTICE, Wilmington, DE, for United States of America.

Of Counsel: Melvin A. Schwarz, Special Enforcement Counsel, Assistant Attorney General and Steven Kramer, Richard S. Martin, Denise E. Biehn, Michael D. Farber, Heather H. Howard, and Jean Lin, Assistant Attorneys General, U.S. DEPARTMENT OF JUSTICE, ANTITRUST DIVISION, Washington, D.C., for United States of America.

Perry F. Goldlust, Esquire, HEIMAN, ABER, GOLDLUST & BAKER, Wilmington, DE, for Federation of Physicians and Dentists, Inc., Defendant.

Hal K. Litchford, Donald E. Christopher, and Mary E. Fitzgibbons, Esquires, Of Counsel, LITCHFORD & CHRISTOPHER P.A., Orlando, FL., for Federation of Physicians and Dentists, Inc., Defendant.

P. Clarkson Collins Jr. and Lewis H. Lazarus, Esquires, MORRIS, JAMES, [**2] HITCHENS & WILLIAMS, Wilmington, DE, for Third Party First State Orthopaedics, P.A.

**JUDGES:** Joseph J. Farnan, Jr., Chief Judge.

**OPINION BY:** Joseph J. Farnan, Jr.

**OPINION:**

[*476] **OPINION**

July 29, 1999
Wilmington, Delaware

Joseph J. Farnan, Jr.
**Chief Judge**

Presently before the Court is the Plaintiff's Letter Motion to Compel the Defendant, the Federation of Physicians and Dentists, Inc., to comply with the Government's First Request for Documents and to compel non-party orthopedic surgeons, orthopedic surgeon group practices and Dr. Connair to comply with certain requests made in subpoenas duces tecum served on them. (D.I. 65). For the reasons stated below, the Court will grant the Government's motion as it applies to the Defendant and Dr. Connair and deny it as it applies to the non-party surgeons and surgeon practices.

**I. BACKGROUND**

In this action, the Government seeks to enjoin 44 of Delaware's 47 orthopedic surgeons from joining the Federation of Physicians and Dentists, Inc. (the "Federation") and bargaining as a unit concerning what they will charge for their services. In 1996, orthopedic surgeons practicing in Delaware sought to enhance their negotiating [**3] position with insurance companies by joining the Federation, a labor organization headquartered in Tallahassee, Florida. The Federation is a public-sector labor negotiator that is attempting to move into the private sector by acting as a "third party messenger," or agent, for surgeons and private practice groups.

In 1997, Blue Cross/Blue Shield of Delaware ("Blue Cross"), one of the four major health care insurance companies in Delaware, announced to physicians practicing as orthopedic surgeons in Delaware that it [*477]

63 F. Supp. 2d 475, *; 1999 U.S. Dist. LEXIS 12844, **;
45 Fed. R. Serv. 3d (Callaghan) 668

intended to cut the fees it would pay for the surgeons' services by 20%. Through the Federation, the surgeons refused to accept the proposed lower fees. Subsequently, the Federation tried to negotiate with Blue Cross on behalf of the orthopedic surgeons. Blue Cross refused to negotiate, called the surgeons' action a violation of federal antitrust laws and complained to the United States Department of Justice (the "Government"). The Federation surgeons maintained a united bargaining stance, called Blue Cross' refusal to negotiate a lockout, and notified Blue Cross of their intent to terminate their contracts, a threat they eventually carried out.

The Government investigated [**4] Blue Cross' complaint, gathering information through civil investigation demands ("CID") and deposition subpoenas served on healthcare payers, the Federation and the Federation's Delaware members. During the Government's investigation, the surgeons negotiated new contracts with Blue Cross. In August 1998, the Government sued for injunctive relief and a declaratory judgment requesting that the court declare that the alliance of Delaware orthopedic surgeons in the Federation is an illegal conspiracy in violation of the Sherman Act, *15 U.S.C. §§ 1 & 2*. The instant dispute arose shortly after the Defendants answered the Complaint.

The disputed discovery requests are directed towards three distinct entities: first, the Defendant Federation; second, the Delaware orthopedic surgeons and group practices who joined the Federation in 1996 and 1997, who are not named as parties in this lawsuit but are alleged to be parties to the conspiracy and have been served with subpoenas duces tecum by the Government; and third, Dr. Michael Connair, a Connecticut physician and Federation member who was active in the Federation's recruitment drive in Delaware. All of the entities [**5] and individuals served with the Government's discovery requests have filed objections to the requests and subpoenas.

The Government seeks production of the following: Federation documents pertaining to Federation activity in Delaware and other states; phone records documenting contacts among the Federation, Dr. Connair, Delaware orthopedic surgeons and orthopedic group practices during the negotiation impasse period with Blue Cross; recruitment contacts among the Federation, Dr. Connair and Delaware surgeons n1 and notes of comments or comments about recruitment efforts in Delaware made in public gatherings across the country; notes of meetings and recruitment contacts made on behalf of the Federation by Dr. Connair; and information about Federation activities in Delaware after this lawsuit was filed. (D.I. 65) The Government also wants to compel each Delaware surgeon or group practice to turn over financial records including revenue and cost statements for 1997

and a list of the top 10 insurance companies they received reimbursements from in 1997, ranked by the amount received. (D.I. 21, Requests 7 & 9)

> n1 The Government has offered to search the phone records of the Delaware orthopedic surgeons and their practices to alleviate any burden claimed by the objecting entities.

[**6]

The Federation objects to the Government's requests as overly broad, duplicative of the information obtained by the CID and burdensome. The Federation requests that the Court limit the Government to events that occurred in Delaware up to the time this lawsuit was filed. First State Orthopaedics P.A., one of the group practices that joined the Federation and received a subpoena duces tecum from the Government, objects to the Government's requests for phone records as overly burdensome and a violation of the doctor/patient privilege. First State also objects to the Government's motion to compel production of financial records as overly burdensome and in violation of their privacy. The Federation, on behalf of several surgeons and group practices, joins in First State's objections. Finally, the Federation [*478] objects to the requests for information from Dr. Connair as overly broad and burdensome and duplicative of the information obtained by the CID.

## II. DISCUSSION

In general, the Federal Rules of Civil Procedure provide for a broad scope of discovery, allowing parties to obtain unprivileged material relevant to the subject of a lawsuit and not limited to evidence that would [**7] be admitted at trial, but "reasonably calculated to lead to the discovery of admissible evidence." *Fed. R. Civ. P.26(b)(1)*. The Court can limit discovery if the parties seek duplicative or cumulative information, had ample time to get the information, or the burden outweighs the benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issue and the importance of the discovery in resolving the issue. See generally id., at (b)(2). The Court has the discretion to issue a protective order to modify the request or prevent the discovery, if necessary to protect the person served with the request from "annoyance, embarrassment or oppression, or undue burden or expense." Id. at 26(c).

A. Discovery Requests Directed to the Federation and Dr. Connair

Proving a conspiracy in the context of an antitrust case by circumstantial evidence requires more than evidence of parallel business decisions. The plaintiff must

63 F. Supp. 475, *; 1999 U.S. Dist. LEXIS 12844, **;
45 Fed. R. Serv. 3d (Callaghan) 668

show an agreement among the participants to fix prices. See *Alvord-Polk v. Schumacher & Co.*, 37 F.3d 996, 1013 (3d Cir. 1994). Absent an explicit agreement, the plaintiff can prove an agreement [**8] through an inference drawn from circumstantial evidence. Proof of the inference requires a showing that the defendants acted contrary to their own economic interests and had a motivation to enter into an agreement. See id.

In this case, the Government is attempting to prove the alleged conspiracy to fix the prices of certain health care services through circumstantial evidence. It alleges that the Federation is the hub of an antitrust conspiracy. The Government has shown and the Federation has admitted that the surgeons made parallel business decisions. (D.I. 1 at P 46 and D.I. 11 at P 46) The Government is now seeking to discover evidence that will ultimately enable the Court to draw the inference of an agreement to fix prices.

By its discovery requests, the Government seeks information concerning how the Federation characterized and continues to characterize its recruitment and bargaining efforts in Delaware. Additionally, the Government seeks information concerning the activities of Dr. Connair, who held himself out as a representative of the Federation, came to Delaware to recruit members for the Federation, and contacted Delaware orthopedic surgeons on behalf of the Federation [**9] during the showdown with Blue Cross. The Government also wants to know how much money Dr. Connair was paid by the Federation for his efforts.

The Federation "wants to limit its production of relevant documents to pre-complaint information related to the Federation's activities on behalf of orthopedic surgeons in Delaware, concerning Blue Cross, or 'third party messenger' activities in Delaware with respect to Blue Cross." (D.I. 96 at 3) In raising its objections, the Federation has made no showing of the burden or expense it will bear to meet the Government's requests. Likewise, the Federation does not demonstrate how the information previously supplied to the Government through compliance with the CID renders the Government's present discovery requests duplicative or cumulative.

In reviewing the Government's various requests for discovery directed to the Federation and Dr. Connair, the Court is persuaded that more emphasis or weight should be given to the nature of the Government's [*479] claims against the Defendants and the Government's right to probe the activities of the Federation and Dr. Connair to legitimately develop evidence of any conspiracy in which the Defendants may have engaged. [**10] In this regard, it does not seem unreasonable for the Government to obtain certain records related to the Defendants' efforts to organize orthopedic surgeons in Delaware within a reasonable time frame of the surgeons' and Federation's negotiations with Blue Cross. What the Government is not permitted to do is harass or oppress the Federation and Dr. Connair through the use of discovery tools designed to obtain evidence for this lawsuit. At present, the Court is satisfied that what the Government seeks from the Federation and Dr. Connair is not burdensome nor duplicative to the extent that the Defendant's should be shielded by the Court, and therefore, the Court will grant the Government's motion to compel the requested discovery from the Federation and Dr. Connair. However, it is understood that should the Defendants become convinced that the Government is seeking to harass or unduly burden them they may call the Court for a teleconference and be heard on short notice.

B. Discovery Requests Directed to the Non-Party Surgeons and Practice Groups

1. Financial Records

The Government is seeking individual financial information from orthopedic surgeons and surgeons in group practices [**11] in Delaware who joined the Federation. The Government contends this financial information will enable it to demonstrate that the surgeons' assertion they refused Blue Cross' fee reduction on the basis of quality of patient care was merely a pretext; and, that the surgeons and the Federation were really conspiring to fix prices in violation of the antitrust laws.

Non-parties served with a subpoena can file a timely objection and ask the court to quash or modify the subpoena to protect them from disclosing privileged or protected matter, trade secrets or confidential commercial information. See *Fed. R. Civ. P. 45(3)*. Financial information of non-parties in a lawsuit has been held by courts to be private and not routinely available for discovery. "The right of privacy and the right to keep confidential one's financial affairs is well-recognized" when the information involves non-parties, even though they may be allied to the parties. See *Hecht v. Pro Football Inc.*, 46 F.R.D. 605, 607 (D. D.C.. 1969); see also *Zenith Radio Corp. v. Matsushita Elec. indus. Co.*, 529 F. Supp. 866, 890 (3d Cir. 1981). Courts have shown even more reluctance to force disclosure [**12] of financial information when it may be revealed to business rivals, especially when the information would be collateral and not direct proof of the plaintiff's claims. See *Berrie v. Berrie*, 188 N.J. Super. 274, 457 A.2d 76, 81-82 (N.J. Super. Ct. Ch. Div. 1983) n2

n2 Though the decision by the New Jersey court is not binding on this Court, New Jersey has adopted rules of procedure similar to the federal rules. Some facts of the case cited are analogous

Case 1:05-cv-00485-JJF    Document 324-2    Filed 04/17/2007    Page 55 of 59

Page 4

63 F. Supp. 2d 475, *; 1999 U.S. Dist. LEXIS 12844, **;
45 Fed. R. Serv. 3d (Callaghan) 668

to the present case and the reasoning is persuasive.

Although the non-party surgeons from whom the Government seeks discovery all have a stake in the outcome of the case, the Court is inclined to weigh their privacy concerns strongly against the Government's requests. The information sought is private and confidential and discovery would entail the disclosure of sensitive, private information of the non-party surgeons and practices. Finally, the Court finds that the information sought by the Government from the surgeons and practices is only [**13] remotely connected to the Government's claims against the Defendants and the counterclaims asserted by the Defendants against the Government. In the Court's view, the Government's pretext argument is speculative and it ignores the reality of malpractice litigation and increased insurance premiums when quality patient care declines. As the Hecht [*480] court noted, "even if the information is not privileged, and it is not, it still may be oppressive or unreasonable to require disclosure." *Hecht, 46 F.R.D. at 607.* For these reasons, the Court concludes that the Government's requests for non-party surgeons' financial information is oppressive and would impose an undue burden on the surgeons and surgeon practices to compile and/or provide it. Therefore, the objections of First State Orthopedics, P.A. and the surgeons and practices represented by the Federation will be sustained and the Government's motion to compel with regard to such information will be denied.

2. Telephone Records

The Government is also seeking the telephone records of the orthopedic surgeons and the group practices of orthopedic surgeons purportedly to document contacts among themselves, with the [**14] Federation and with Dr. Connair during the Federation's recruitment effort, the impasse with Blue Cross and during the Government's CID investigation. The surgeons and surgeon practices object to such discovery on the grounds that it would put an undue burden and expense on the practices, which would have to search through hundreds of pages of phone records dating back 15 months and cull out unresponsive information. (D.I. 77 at P 6). Even when a responsive phone number is found, the surgeons claim the files would have to be researched to ensure that the conversation was not a consultation with another doctor about a patient and that the information is not otherwise protected by the doctor/patient privilege. Delaware recognizes a privilege of confidentiality in the doctor/patient relationship, and such a privilege is not preempted by federal law. See Del. R. Evid. Ann 503(b), 510 (Michie, vol. 1, 1999).

The Court agrees that the requested discovery would be overly burdensome and finds that the Government's offer to cull through the records is not a viable alternative because the disclosure of a patient's identity could violate the doctor/patient privilege as recognized under Delaware [**15] law. Therefore, the objections to Request # 11 by First State Orthopaedics, P.A. and the Federation will be sustained, and the Government's motion to compel will be denied.

**III. CONCLUSION**

For the reasons discussed, the Court will grant the Government's motion to compel the Federation to comply with the Government's First Request for Documents and its motion to compel Dr. Connair to comply with the Government's subpoena. However, the Government's motion to compel directed to the individual surgeons and surgeon group practices will be denied.

An appropriate Order will be entered.

1 of 1 DOCUMENT

**VISX, INC., Plaintiff(s), v. NIDEK CO., et al., Defendant(s). and CONSOLIDATED CASES**

**No. C98-4842 CRB (BZ), No. C00-0870 CRB (BZ), No. C00-0869 CRB (BZ), No. C00-0871 CRB (BZ), MDL NO. 1319**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

*208 F.R.D. 615; 2002 U.S. Dist. LEXIS 11892*

**June 27, 2002, Decided**

**DISPOSITION:** [**1] VISX's motion to enforce document subpoenas denied.

**COUNSEL:** For VISX INC., Plaintiff: Robert P. Feldman, Susan Creighton, Mark D. Flanagan, Ron E. Shulman, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA.

For NIDEK COMPANY, LTD., NIDEK INTERNA-TIONAL DIVISION, defendants: Alexander L. Brainerd, James R. Knox, Heller Ehrman White & McAuliffe, Menlo Park, CA. Henry Gutman, Simpson Thacher & Bartlett, New York, NY. Neil B. Siegel, Robert M. Masters, Abraham Rosner, Sughrue Mion Zinn MacPeak & Seas, Washington, DC.

For NIDEK INCORPORATED, NIDEK TECHNOLO-GIES INC., defendants: Alexander L. Brainerd, James R. Knox, Heller Ehrman White & McAuliffe, Menlo Park, CA. Henry Gutman, Simpson Thacher & Bartlett, New York, NY. Neil B. Siegel, Robert M. Masters, Abraham Rosner, Sughrue Mion Zinn MacPeak & Seas, Washington, DC. Frank L. Bernstein, Anirma Rakshpal Gupta, Sughrue Mion Zinn Macpeak & Seas, PLLC, Menlo Park, CA.

For NIDEK INCORPORATED, NIDEK TECHNOLO-GIES INC., Counter-claimants: Henry Gutman, Simpson Thacher & Bartlett, New York, NY. Neil B. Siegel, Robert M. Masters, Abraham Rosner, Sughrue Mion Zinn MacPeak & Seas, Washington, DC. Frank L. Bernstein, Anirma Rakshpal Gupta, Sughrue [**2] Mion Zinn Macpeak & Seas, PLLC, Menlo Park, CA.

For VISX INC., Counter-defendant: Mark D. Flanagan, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA.

For NIDEK COMPANY, LTD., NIDEK INTERNA-TIONAL DIVISION, Counter-claimants: Alexander L. Brainerd, James R. Knox, Heller Ehrman White & McAuliffe, Menlo Park, CA. Henry Gutman, Simpson Thacher & Bartlett, New York, NY. Neil B. Siegel, Robert M. Masters, Abraham Rosner, Sughrue Mion Zinn MacPeak & Seas, Washington, DC.

For NIDEK INCORPORATED, NIDEK TECHNOLO-GIES INC., Counter-claimant: Alexander L. Brainerd, James R. Knox, Heller Ehrman White & McAuliffe, Menlo Park, CA. Henry Gutman, Simpson Thacher & Bartlett, New York, NY. Neil B. Siegel, Robert M. Masters, Abraham Rosner, Sughrue Mion Zinn MacPeak & Seas, Washington, DC. Frank L. Bernstein, Anirma Rakshpal Gupta, Sughrue Mion Zinn Macpeak & Seas, PLLC, Menlo Park, CA.

For VISX INC., Counter-defendant: Robert P. Feldman, Susan Creighton, Mark D. Shulman, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA.

For VISX, INC., Plaintiff: Susan A. Callender, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA.

For FARMING LASER EYE CENTER, P.L.L.C., DONALD [**3] C. FIANDER, Dr., defendants: Alex-ander L. Brainerd, Heller Ehrman White & McAuliffe, Menlo Park, CA. Joseph F. Tringali, Simpson Thacher & Bartlett, New York, NY. Robert M. Masters, Sughrue Mion Zinn MacPeak & Seas, Washington, DC. Steven H. Bergman, Simpson Thacher & Bartlett, Universal City, CA. George M. Newcombe, Simpson Thacher & Bartlett, Palo Alto, CA.

For FARMING LASER EYE CENTER, P.L.L.C., Counter-claimant: Steven H. Bergman, Simpson Thacher & Bartlett, Universal City, CA.

For SOUTHWEST EYE CARE CENTER INC, defendant: Alexander L. Brainerd, Heller Ehrman White & McAuliffe, Menlo Park, CA. Joseph F. Tringali, Simpson Thacher & Bartlett, New York, NY. Robert M. Masters, Sughrue Mion Zinn MacPeak & Seas, Washington, DC. Steven H. Bergman, Simpson Thacher & Bartlett, Universal City, CA. George M. Newcombe, Simpson Thacher & Bartlett, Palo Alto, CA.

For GLENN A. KAWESCH, M.D., defendant: Alexander L. Brainerd, Heller Ehrman White & McAuliffe, Menlo Park, CA. Joseph F. Tringali, Simpson Thacher & Bartlett, New York, NY. Robert M. Masters, Sughrue Mion Zinn MacPeak & Seas, Washington, DC. Steven H. Bergman, Simpson Thacher & Bartlett, Universal City, CA. George M. [**4] Newcombe, Simpson Thacher & Bartlett, Palo Alto, CA. Steven H. Bergman, Simpson Thacher & Bartlett, Universal City, CA.

For SOUTHWEST EYE CARE CENTER INC, GLENN A. KAWESCH, M.D., Counter-claimants: Steven H. Bergman, Simpson Thacher & Bartlett, Universal City, CA. George M. Newcombe, Simpson Thacher & Bartlett, Palo Alto, CA.

For SOUTHWEST EYE CARE CENTER INC, GLENN A. KAWESCH, M.D., Counter-claimants: Alexander L. Brainerd, Heller Ehrman White & McAuliffe, Menlo Park, CA. Joseph F. Tringali, Simpson Thacher & Bartlett, New York, NY. Robert M. Masters, Sughrue Mion Zinn MacPeak & Seas, Washington, DC. Steven H. Bergman, Simpson Thacher & Bartlett, Universal City, CA. George M. Newcombe, Simpson Thacher & Bartlett, Palo Alto, CA.

For VISX, INC., Plaintiff: Susan A. Callender, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA. Michael J. Garvin, Hahn Loeser & Parks, Cleveland, OH. Joseph F. Tringali, Simpson Thacher & Bartlett, New York, NY.

For REFRACTIVE SUPPORT INC., ROBERT G. WILEY, M.D., defendants: Alexander L. Brainerd, Heller Ehrman White & McAuliffe, Menlo Park, CA. Joseph F. Tringali, Simpson Thacher & Bartlett, New York, NY. Robert M. Masters, Sughrue Mion [**5] Zinn MacPeak & Seas, Washington, DC. Michael J. Garvin, Hahn Loeser & Parks, Cleveland, OH. George M. Newcombe, Simpson Thacher & Bartlett, Palo Alto, CA.

For REFRACTIVE SUPPORT INC., ROBERT G. WILEY, M.D., REFRACTIVE SUPPORT INC., Counter-claimants: Alexander L. Brainerd, Heller Ehrman White & McAuliffe, Menlo Park, CA. Joseph F.

Tringali, Simpson Thacher & Bartlett, New York, NY. Robert M. Masters, Sughrue Mion Zinn MacPeak & Seas, Washington, DC. Michael J. Jordan, Walter & Haverfield, Cleveland, OH. George M. Newcombe, Simpson Thacher & Bartlett, Palo Alto, CA.

For VISX, INC., ROBERT G. WILEY, M.D., Counter-defendants: Michael J. Garvin, Hahn Loeser & Parks, Cleveland, OH.

**JUDGES:** Bernard Zimmerman, United States Magistrate Judge.

**OPINION BY:** Bernard Zimmerman

**OPINION:**

[*616]  **ORDER DENYING MOTION TO ENFORCE DOCUMENT SUBPOENAS**

Before the court is VISX's motion to enforce document subpoenas issued to at least 16 third parties. Relying on *Fed. R. Civ. P. 45*, Nidek asserts that this court lacks jurisdiction to rule on the subpoenas, because they were issued by courts outside the Northern District of California.

Under Rule 45, the only procedure for enforcing a subpoena duces tecum is to [**6] institute contempt proceedings before the district court that issued the subpoena. See *Fed. R. Civ. P. 45(e)*; Schwarzer, Tashima & Wagstaffe, Rutter Group Prac. Guide: Fed. Civ. Pro. Before Trial §§ 11:409, 11:949 (2001). n1

> n1 Likewise, only "the court by which the subpoena was issued shall quash or modify the subpoena . . . ." *Fed. R. Civ. P. 45(c)(3)(A)*. See also *In re Armstrong v. Red River Entertainment of Shreveport, 1997 U.S. Dist. LEXIS 1863, 1997 WL 739616* at *1 (Bankr. E.D. Ark. Nov. 12, 1997); *Aguinaga v. United Food and Commercial Workers Int'l Union, 1993 U.S. Dist. LEXIS 14353, 1993 WL 405964* at *2 (D. Kan. Sept. 27, 1993); 9A Wright & Miller, Federal Practice & Procedure § 2459 (1995).

Despite the clear language of Rule 45, VISX argues that this court has jurisdiction to enforce the document subpoenas because it is the transferee court in multidistrict litigation. VISX bases its argument on *28 U.S.C. § 1407*(b), which states:

> the judge or judges to whom such [multi-district] actions [**7] are assigned . . . may exercise the powers of a district

Case 1:05-cv-00485-JJF    Document 324-2    Filed 04/17/2007    Page 58 of 59

Page 3

208 F.R.D. 615, *; 2002 U.S. Dist. LEXIS 11892, **

judge in any district for the purpose of conducting **pretrial depositions** in such coordinated or consolidated pretrial proceedings.

*28 U.S.C. § 1407*(b) (emphasis added).

The flaw in VISX's argument is that § 1407(b) expands a transferee court's discovery powers only to pretrial depositions. n2 Had Congress wanted to expand these powers to document subpoenas, it would have said so. VISX has not produced, and the court has not found, any legislative history or commentary to suggest Congress meant something other than what it said.

> n2 Under *Fed. R. Civ. P. 30(d)(4)*, even in non-multidistrict litigation, the court in which the action is pending has jurisdiction to issue orders with respect to depositions taken in other districts.

VISX relies on two cases construing § 1407(b) which hold that a transferee court may enforce a subpoena for the production of documents at a deposition, issued by the district court in which [**8] the witness is located. See *In re Factor VIII or IX Concentrate Blood Prods. Litig., 174 F.R.D. 412, 415 (N.D. Ill. 1997);* n3 *In re Sunrise Sec. Litig., 130 F.R.D. 560, 585-86 (E.D. Penn. 1989).* Neither of these cases consider whether §

1407(b) extends a transferee court's authority to enforce a documents only subpoena.

> n3 While it is not altogether clear whether the subpoena in Factor VIII was for documents only or was for documents to be produced at a deposition, compare *174 F.R.D. 415* with 413, 415-16, the court in its analysis treats the subpoena as if it were connected to a deposition and offers no justification for extending § 1407(b) to a subpoena requiring only document production. See *id. at 415-16.*

VISX further asserts that the interests of judicial economy and of uniformity require this court as transferee court to rule on all the subpoenas. However strong those interests may be, they exist in any case in which subpoenas [**9] duces tecum issue from courts other than the district in which a case is pending. Yet Rule 45 is clear that such subpoenas can only be enforced in the district in which they were issued.

For the foregoing reasons, it is hereby **ORDERED** that VISX's motion to enforce document subpoenas is **DENIED**.

Dated: June 27, 2002

Bernard Zimmerman

United States Magistrate Judge

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 17, 2007, the foregoing was caused to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered participants.

In addition, the undersigned hereby certifies that on April 17, 2007 true and correct copies of the foregoing were caused to be served upon the following parties in the manner indicated:

### VIA HAND DELIVERY (in triplicate):

Vincent J. Poppiti
BLANK ROME LLP
1201 North Market Street, Suite 800
Wilmington, DE  19801-4226

### VIA E-MAIL:

Vincent J. Poppiti
BLANK ROME LLP
**poppiti@blankrome.com**

WITH A COPY TO:

David R. Dube
BLANK ROME LLP
**dube@blankrome.com**

Mary Levan
BLANK ROME LLP
**levan@blankrome.com**

Carrie David
BLANK ROME LLP
**david-c@blankrome.com**

### VIA E-MAIL:

J. Clayton Athey
PRICKETT, JONES & ELLIOTT, P.A.
**jcathey@prickett.com**

*/s/ Mary B. Graham*

_____
Mary B. Graham (#2256)

802096