IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br>INTEL CORP. MICROPROCESSOR<br>ANTITRUST LITIGATION | MDL Docket No. 05-1717-JJF |
| PHIL PAUL, on behalf of himself<br>and all others similarly situated,<br><br>              Plaintiffs,<br>v.<br><br>INTEL CORPORATION,<br><br>              Defendant. | Civil Action No. 05-485-JJF<br><br>CONSOLIDATED ACTION |

**DECLARATION OF JONATHAN M. ORSZAG**

Dated: April 23, 2007

I, Jonathan M. Orszag, declare:

1.  I am a Senior Managing Director and co-founder of Competition Policy Associates ("COMPASS"), an economic consulting firm. I have been retained by a variety of public-sector entities and private-sector firms ranging from small businesses to Fortune 500 companies. These engagements have involved a wide array of antitrust matters, including issues similar to those raised in this litigation. I have testified before various entities, including the United States Congress, the European Court of First Instance, and foreign regulatory bodies on a range of issues, including competition policy, industry structure, and fiscal policy. In 2004, I was named by the *Global Competition Review* as the youngest member of "the world's 40 brightest young antitrust lawyers and economists" in its "40 under 40" survey.

2.  Previously, I served as the Assistant to the U.S. Secretary of Commerce and Director of the Office of Policy and Strategic Planning, as an Economic Policy Advisor on the President's National Economic Council, and an economic aide to the Secretary of Labor. For my work at the White House, I was presented the Corporation for Enterprise Development's 1999 leadership award for "forging innovative public policies to expand economic opportunity in America."

3.  I also serve as a Fellow at the University of Southern California's Center for Communication Law & Policy. I received a M.Sc. from Oxford University, which I attended as a Marshall Scholar. I graduated *summa cum laude* in economics from Princeton University, was elected to Phi Beta Kappa, and was named a *USA Today* Academic All-American.

4.  In their First Amended Consolidated Complaint ("FACC," D.I. 108 in MD-05-1717), Class Plaintiffs allege that Intel has been able to charge supra-competitive prices for x86 microprocessors as a result of an unlawful monopolization of the worldwide x86 microprocessor market. These supra-competitive prices have been allegedly passed on to end-users of computers containing x86 microprocessors. These end-users form the putative class of indirect purchasers whose members the complaint alleges have been harmed as a consequence of Intel's actions.

5.  The data requested from Fry's Electronics, Inc. ("Fry's") are directly relevant to the analyses to be undertaken by Class Plaintiffs in pursuit of their claims. As part of the analysis associated with class certification, Class Plaintiffs must be able to describe a classwide formula that would show that any overcharge linked to Intel microprocessors has been passed through to end-users of computers containing those same microprocessors. Proving pass-through requires a demonstration that inflated costs paid by intermediaries in the supply chain result in higher prices paid by end-users. As such, Class Plaintiffs need data from large computer retailers, such as Fry's, that purchase computers containing Intel microprocessors and then resell them to end-users that make up the putative class.

6.  An important element of the class certification process is determining whether classwide evidence and analysis are available to prove common impact from Intel's allegedly anticompetitive actions. Fry's data are directly relevant to that inquiry. Such data constitute part of the common proof of whether consumers of Fry's computers were affected by Intel's actions in common with other consumers of computers with Intel microprocessors. Fry's data would also be relevant to assessing whether it was possible to develop a generalized model of damages.

7.  Furthermore, Fry's data are directly relevant in measuring damages to putative class members. Damages are determined by comparing the prices end-users actually paid for computers containing Intel's x86 microprocessors with the prices those same consumers would have paid but-for Intel's allegedly anticompetitive conduct. Actual prices paid by end-users are measured using data from third-parties, such as Fry's, that sell directly to end-users.

8.  Fry's states that it is "willing to provide summary reports showing aggregate information for a sample of computer models..." (Fry's letter to Class Plaintiffs, dated April 11, 2007 at 2) However, Fry's summary reports would not be particularly useful in assessing the class certification and damage issues at the heart of this case. First, the proposed sample is aggregated at the product level, and second, it appears to be devoid of necessary temporal information on sales and purchases. In other words, Fry's proposed sample includes merely one data point per computer product and appears to not even

include all the relevant products purchased and sold by Fry's. The lack of a time dimension, in particular, deems the proposed data sample irrelevant to Class Plaintiffs for a variety of reasons (*e.g.*, if costs and sales prices of computer products change over time).

9. Since the sample proposed by Fry's would be insufficient to analyze class certification and damage issues, what data are relevant? For the class certification and damages process, relevant data would include information on the price at which Fry's sold each computer, the quantity of such computers sold, and the date associated with each transaction. In addition, relevant data would allow Class Plaintiffs to obtain the acquisition cost of each computer sold to end-users. The full set of fields required by Class Plaintiffs would have to be determined based on the nature of the data available in Fry's databases. There are two ways of gaining a sufficient understanding of Fry's available databases to be able to determine the most relevant fields: (i) Fry's could produce data dictionaries of its transaction level sales and purchase databases, or (ii) Fry's could turn over a limited sample data production of its transaction level sales and purchase data. For example, this sample production could consist of sales and purchases of several computer models – PLUs as Fry's calls them – in a specified time period, say, a week. Using either data dictionaries or a limited sample production, Class Plaintiffs would then be able to specify adequately the full set of relevant fields associated with Fry's transaction level sales and purchase data production. Through this process, Fry's could then provide the Class Plaintiffs with the most relevant data at the most modest burden.

10. Based on the description provided in the Payne and Seth Declarations, the "Merchant Master" system is most likely not the information or database system where historical sales and purchases are stored. In our discussions with other subpoenaed resellers, it is clear that many of these resellers store their historical sales and purchase data on an individual transaction basis (*i.e.*, the data are not aggregated), and the sales and purchases data are stored in separate but centralized databases. Unless Fry's is representing that they do not maintain historical sales or purchase data for the relevant period (at a transaction level or in some aggregated format), it would appear as though

these data are stored in another data system, not "Merchant Master," and the data requests would not constitute an unduly burdensome production.

11.  It also appears that Fry's is under the misconception that we seek actual copies of customer invoices that Fry's prints for each of its x86 related sales (See Payne Declaration at ¶ 9). That is not the case. The Class Plaintiffs seek transaction level data that would allow the identification of the x86 products sold, when the products were sold, and for what price they were sold. Similarly, Class Plaintiffs seek purchases by Fry's of these same x86 products; specifically, the product purchased, when it was purchased, and at what cost. As mentioned above, these data are typically stored in centralized databases and should not be confused with databases that store images of invoices that are printed for customers. If Fry's were to provide the Class Plaintiffs with information regarding where and in what format these historical sales and purchases are stored, the Class Plaintiffs can very easily tailor the data request according to how Fry's keeps these relevant data.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed on April 23, 2007 in Los Angeles, California.

_____
Jonathan M. Orszag

Filed on this 23rd day of April, 2007 by:

                        PRICKETT, JONES & ELLIOTT, P.A.

By: _____
     James L. Holzman (#663)
     J. Clayton Athey (#4378)
     Laina M. Herbert (#4717)
     1310 King Street
     P.O. Box 1328
     Wilmington, DE 19899
     (302) 888-6500
     jlholzman@prickett.com
     jcathey@prickett.com
     lmherbert@prickett.com

     *Interim Liaison Counsel for Plaintiffs*