## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ADVANCED MICRO DEVICES, INC. and<br>AMD INTERNATIONAL SALES & SERVICE,<br>LTD., | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 05-441 (JJF) |
| v. | ) ) | |
| INTEL CORPORATION and<br>INTEL KABUSHIKI KAISHA, | ) ) ) | |
| Defendants. | ) ) | |

| | | |
|---|---|---|
| IN RE INTEL CORPORATION<br>MICROPROCESSOR ANTITRUST<br>LITIGATION | ) ) ) | C.A. No. 05-MD-1717 (JJF) |

| | | |
|---|---|---|
| PHIL PAUL, on behalf of himself and all others<br>similarly situated, | ) ) | |
| Plaintiffs, | ) ) ) | C.A. No. 05-485 (JJF) |
| v. | ) ) | CONSOLIDATED ACTION |
| INTEL CORPORATION | ) ) | |
| Defendant. | ) | |

**REPORT AND PROPOSED REMEDIATION PLAN OF INTEL CORPORATION AND
INTEL KABUSHIKI KAISHA TO SPECIAL MASTER PURSUANT TO
MARCH 16, 2007 ORDER RE INTEL'S EVIDENCE PRESERVATION ISSUES**

OF COUNSEL:

Robert E. Cooper
Daniel S. Floyd,
GIBSON, DUNN & CRUTCHER LLP

Peter E. Moll
Darren B. Bernhard
HOWREY LLP

Dated: April 23, 2007

Richard L. Horwitz (#2246)
W. Harding Drane, Jr. (#1023)
POTTER ANDERSON & CORROON LLP

*Attorneys for Defendants*
*Intel Corporation and Intel Kabushiki Kaisha*

## **TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................................................. 1

II.    INTEL'S PRESERVATION ACTIVITIES.......................................................... 6

     A.    Information Technology Emergency Response Team............................... 6

     B.    June 28, 2005 Preservation Activities..................................................... 7

     C.    June 29, 2005 Preservation Activities..................................................... 8

     D.    Issuance of June 29, 2005 Hold Notice To 4,000 Sales and Marketing Group Employees to Preserve Documents............................... 8

     E.    Due Diligence Performed To Identify Employees To Receive More Detailed Litigation Hold Notice........................................................... 9

     F.    Issuance of July 1, 2005 Litigation Hold Notice To 629 Employees ...... 9

     G.    Issuance Of Litigation Hold Notices To Additional Employees ............. 12

     H.    Harvesting of Custodial Documents ...................................................... 12

     I.    Intel's Effort to Preserve and Back-Up Emails on a Going Forward Basis.................................................................................................... 13

     J.    Departing Employees............................................................................ 15

III.    THE "CUSTODIAL APPROACH" TO DISCOVERY ...................................... 15

     A.    The Parties' Designation of Custodians................................................. 18

IV.    RETENTION ISSUES ....................................................................................... 19

     A.    Incomplete Retention On An Individual Level........................................ 19

     B.    Late Issuance of Litigation Hold Notice To Certain Custodians............. 21

     C.    Departed Employee Hard Drives .......................................................... 22

V.    AVAILABLE BACKUP TAPES....................................................................... 23

     A.    Complaint Freeze Tapes ....................................................................... 23

     B.    Weekly Back-Up Tapes ........................................................................ 26

i

**TABLE OF CONTENTS** (continued)

Page

1.    Custodians Not Migrated In The Fall of 2005 ............................................ 26

2.    Swindon, England Backup Tapes ................................................................ 27

3.    Tapes From The 2005 Migration In Other Locations Have
      Been Preserved........................................................................................... 29

VI.   INTEL'S PROPOSED REMEDIATION PLAN .................................................. 30

      A.    Ongoing Preservation Measures ............................................................. 30

            1.    Reissuance of Litigation Hold Notices ....................................... 30

            2.    Oral Follow-Up with Each Custodian.......................................... 31

            3.    Revised Process for Handling Hard Drives of Departing
                  Employees.................................................................................... 31

            4.    Continued Harvesting of Materials from Custodians ................. 31

            5.    Implementation of an E-Mail Archiving Solution ...................... 31

            6.    Remedial Measures...................................................................... 32

            7.    Sources of Remedial Material...................................................... 33

      B.    Remediation Approach ............................................................................ 35

      C.    Remedial Approach ................................................................................. 37

VII.  CONCLUSION ...................................................................................................... 39

# I.  INTRODUCTION

Intel took prompt, decisive and comprehensive action to address document retention upon learning that AMD filed a complaint against it on the afternoon of June 27, 2005.  On its face, the complaint addressed Intel's sales conduct and other business activities throughout the world.  Due to its breadth and geographic scope, Intel immediately formed a team to put into place a tiered process to identify and preserve potentially relevant paper and electronic records.  Unlike AMD, which undoubtedly had been planning this action and putting in place its own document retention strategies for some time,[1] Intel had no warning that the action was coming.  Thus, from the very beginning of this case, Intel was playing catch-up.  Yet it immediately undertook an effort of unprecedented proportions and expense to ensure the preservation of potentially relevant documents on a worldwide basis.  That effort to create a tiered process, with multiple layers of retention, included all of the following:

- The day after the complaint was filed, Intel began to preserve a company-wide snapshot of email and other electronic documents stored on Intel's servers as of the week the complaint was filed ("Complaint Freeze Tapes").

- Two days after the complaint was filed, Intel sent a hold notice bulletin to 4,000 Sales and Marketing Group employees with instructions to retain documents related to competition with AMD and competition concerning the sale of CPUs generally.

- Four days after the complaint was filed, Intel distributed a more detailed litigation hold notice to 629 employees, and has now provided such notices to approximately 1,500 employees.

---

1  AMD admits that it began preserving its own documents on March 11, 2005, and, thus, concedes that it was considering filing this lawsuit at least three months before it was filed.

- Within days of the filing of the complaint, Intel began collecting the electronic and hard copy documents from certain employees – and has now collected materials from hundreds of its employees.

- In the Fall of 2005, Intel began a process of preserving, on a weekly basis, the backup tapes containing emails of employees identified as having potential relevance to the lawsuit ("Weekly Backup Tapes"). These tapes were not the primary preservation method, but as a mechanism to fall back on in the event documents could not be obtained directly from the individual employees who originally generated or received the emails.

- More recently, as an additional layer of backup, Intel purchased and implemented a new email archive system designed to capture and preserve automatically all incoming and outgoing email messages of currently employed custodians who have been identified on Intel's Custodian List.

As a result of those efforts, Intel has preserved hundreds of millions of pages of e-mails and other electronic materials to be reviewed for production in this case.

From a process standpoint, Intel faced unprecedented challenges in its document preservation efforts for this massive case, which exceeded many times over anything Intel had previously faced. Some of these key challenges were:

- Intel not only had to save relevant historical information relating to AMD's allegations (which it did with the Complaint Freeze Tapes and the prompt hard drive harvesting), but it had to retain an enormous volume of electronic material generated by hundreds of Intel employees on a forward-going basis;

- The number of custodians required to retain documents on a going forward basis was enormous, the relevant document requests numbered in the hundreds, and it was clear from the outset that most of those custodians would never have to produce documents for the case;

- Intel had to keep documents for custodians spread across six different continents;

- Shortly after this litigation began, Intel, in an effort to cut costs as a result of the fierce competition in the semiconductor market, carried out a significant reduction in work force; many of its layoffs hit sales, marketing and information technology, and that made the job of document retention more complex;

- This was a case of unprecedented proportions, for which Intel had to develop practical solutions as it went along; and

- This effort had to be made in the context of rapidly evolving legal and technical standards and solutions.

Despite its extensive preservation mechanisms, Intel has discovered a number of human errors in the post-complaint period in the execution of its plan. These human errors did not reflect a flawed plan – the plan was comprehensive. Rather, these human errors were misunderstandings or errors by individual employees, with ongoing day to day business responsibilities, working diligently to carry out the complex and unprecedented scope of preservation obligations in this case. Intel's investigation has revealed no instance of deliberate deletion to deny AMD access to any information responsive to the allegations in the complaint. Intel itself discovered the errors and voluntarily disclosed them to counsel for AMD and lead counsel for the class, and then brought them to the Court's attention.

Intel has undertaken remediation steps, at great expense, on its own volition. For example, Intel already has spent approximately $3.3 million just in outside vendor costs for the initial step of processing the Complaint Freeze Tapes and Weekly Backup Tapes, and expects to spend millions more to complete the remediation plan proposed in this Report.

Intel's experience with this effort to preserve hundreds of millions of e-mails, when named as a defendant in a massive antitrust lawsuit with allegations that sweep broadly across the global competitive activities of a company with almost 100,000 employees, highlights a festering problem with the burdens that the demands of document production in the computer era inflict on a defendant. Intel believes the action is meritless, but is forced to devote huge resources to defending itself. Intel marshaled a

3

large team of IT personnel in an emergency program to preserve virtually every e-mail in existence when the complaint was filed, and then devoted huge time and resources in an attempt to manage the preservation of a constantly growing daily load of emails generated by more than a thousand employees. The document preservation costs AMD has imposed on Intel by simply filing this lawsuit has quickly added up to many millions, and has required Intel to devise a program for retention that stretched its resources and required attention on a scale far beyond anything Intel had attempted in the past.

Intel's intentions and plans were ambitious and laudable. Its missteps were the result of human error in attempting a challenging task -- in retrospect a task of such magnitude that it probably never could have been accomplished without some lapses. Fortunately, because of the ambitious program Intel put in place at the outset, Intel has the ability to remediate potential losses in an individual's e-mails from a multitude of alternative sources, and has a sound basis to believe that ultimately nothing of any genuine significance will prove to have been lost.

Of course, this remediation program will also come at a great cost to Intel, again in the many millions of dollars. Nevertheless, Intel is committed to doing everything reasonably calculated to address the retention lapses that occurred. But as Intel goes forward with its remediation program, we hope everyone concerned will not lose sight of the fact that what Intel attempted to do here in preserving an endless stream of e-mails may push the boundaries of what can reasonably be expected of any defendant, no matter how large or sophisticated it may be.

Intel's ultimate remediation efforts should be evaluated in light of the following, which Intel believes will eliminate any risk of prejudice to AMD: First, the retention

4

lapses relate primarily to post-complaint e-mails, not documents that existed as of the filing of the complaint and which relate to the operative allegations in the case. Second, because Intel implemented multiple and largely duplicative layers of preservation, materials not retained at one level may be located in and produced from other layers of the preservation system. Third, by agreement, AMD is entitled to discovery from fewer than half of the custodians on Intel's Custodian List, so many custodian's retention efforts will ultimately be irrelevant.[2] Fourth, AMD will ultimately be receiving documents that will allow it to determine the terms of every transaction between Intel and its customers – thus addressing the key issues in the case. The production will provide AMD with an enormous source of documents from which it can attempt to present its case.

Indeed, Intel already has produced the equivalent of approximately 17 million pages of documents and expects to be producing the equivalent of 47 million pages of documents from the first set of 239 employees alone. In addition, Intel expects that it will produce tens of millions of additional pages from the remaining employees that AMD is entitled to designate for production (which does not include the huge volume of additional documents Intel is likely to produce in response to AMD's corporate requests). This production will encompass many hundreds of Intel employees company-wide – a massive level of document production almost certainly unmatched in any other case in the history of U.S. litigation.

---

2  Under the terms of the parties Custodian stipulation, AMD is entitled to select approximately 471 custodians for production (more than AMD has on retention in its entirety). AMD has already selected 291, so what remains is selection of an additional 180 from the remaining list of 732 custodians. The custodians not selected will then be relieved of retention obligations going forward.

Intel has provided detailed information in this report concerning its preservation efforts, the status of individual compliance issues, the back-up tapes, the harvesting of custodians' materials, Intel's remedial efforts and other information. In light of the fact that there is an extraordinary amount of information to collect, review and assess, this report may be supplemented based on further information that Intel may learn during the ongoing work.

## II.     INTEL'S PRESERVATION ACTIVITIES

### A.     Information Technology Emergency Response Team

Immediately upon learning of the filing of the complaint on the afternoon of June 27, 2005, Intel assembled a team to implement steps to preserve potentially relevant records. This team took steps to preserve existing back-up tapes in its system. In the ordinary course of Intel's routine business operations, safety backup tapes are created and periodically recycled, meaning they are reused and overwritten if no special preservation steps are taken. On June 28, 2005, Intel's Chief Information Officer ordered Intel's senior IT managers to implement the necessary steps to prevent backup tapes from being placed back into the normal rotation cycle. The senior IT managers, in turn, issued directives to the field that it was imperative that IT not inadvertently delete or overwrite data from back-up tapes then in rotation during this time.

Intel activated its Information Technology Emergency Response Team ("IT Emergency Response Team"), which is a team of IT specialists that are called upon in the event of an IT crisis or other event requiring immediate action. The IT Emergency Response Team is composed of managers from various IT groups across the world. The IT Emergency Response Team was faced with an enormous challenge due to Intel's vast

6

information technology infrastructure. To service the nearly 100,000 Intel employees, working in 124 Intel facilities located in 57 countries, Intel maintained approximately 79 IT sites located in 27 different countries. Within these sites there are approximately 139 data centers. Intel employed approximately 9,500 information technology professionals to operate and maintain its computing environment in 2005.

**B.    June 28, 2005 Preservation Activities**

On June 28, 2005, Perry Olson was the scheduled Incident Commander for the IT Emergency Response Team. Mr. Olson was assigned responsibility to coordinate and implement the directive to retain back-up tapes pending determination of a feasible plan for preserving documents going forward. Mr. Olson held the first meeting of the IT Emergency Response Team in the early afternoon of June 28, 2005. Members from across the globe attended both in person and by telephone. Mr. Olson instructed the various team members to develop plans to suspend back-up rotation cycles on all systems for the next 72 hours, and use only new tapes for back-up. This required the purchase of new tapes, at significant expense. The IT Emergency Response Team was further instructed to store tapes according to the then existing procedures. The IT Emergency Response Team continued to meet every few hours to address developments, including the acquisition of additional back-up tapes, whether to suspend certain back-up systems entirely, and how to create and ensure the preservation of back-up tapes for certain systems (*e.g.*, mainframe applications).

During the day of June 28, 2005, Intel worked to identify those systems with potential relevance to AMD's claims and decided to continue preservation of back-up

7

tapes for sales-related communications, Exchange services, Sharepoint Services, Connected Network Backup, Shared Drive Services and Office Shares.

As a result of this decision, Intel determined it would preserve the range of tapes for the duration of the litigation: (i) tapes then in existence from the weekend of June 24, 2005; (ii) tapes to be generated during the July 1, 2005 weekend; and (iii) daily tapes generated in between. As a result of the directives to preserve the Complaint Freeze Tapes, over 5,000 back-up tapes were generated, taken out of circulation, and preserved – a huge number compared to the 200 tapes AMD indicates it preserved in March 2005. This involved a major human effort – and, as a result of it, Intel still has and can use tapes created and preserved during this period.

**C.    June 29, 2005 Preservation Activities**

The IT Emergency Response Team continued its preservation activities on June 29, 2005, fielding questions from IT personnel across the world about how to implement the directive, such as what systems had been identified for retention, how to preserve tapes on specific systems, how to acquire tapes, and the process for storing tapes designated for preservation.

**D.    Issuance of June 29, 2005 Hold Notice To 4,000 Sales and Marketing Group Employees to Preserve Documents**

On June 29, 2005, two days after the complaint was filed, Intel distributed a litigation hold notice in the form of a Bulletin to 4,000 employees in its Sales and Marketing Group ("SMG"). The Bulletin instructed all SMG employees, pending further instructions, to retain all paper and electronic documents (including sent/received e-mails), which related to competition in the sale of CPUs, in general, and with AMD, in particular.

8

**E.    Due Diligence Performed To Identify Employees To Receive More Detailed Litigation Hold Notice**

From June 29, 2005 to July 1, 2005, Intel identified the individuals, who, based on the allegations in the AMD complaint, were likely to have discoverable information and should receive more detailed legal hold instructions.  These individuals included senior executives, as well as employees from sales, finance, manufacturing, business planning, benchmarking, legal, operations, platform groups, customer fulfillment and logistics, digital enterprise, the compiler lab, and a host of other internal organizations that spanned Intel's five worldwide regions:  Americas Marketing and Sales Organization ("ASMO"), Latin America Region ("LAR"), Asia Pacific ("APAC"), Europe, Middle East and Africa ("EMEA"), and Japan ("IJKK").

**F.    Issuance of July 1, 2005 Litigation Hold Notice To 629 Employees**

On July 1, 2005, four days after the Complaint was filed, Intel sent a detailed litigation hold notice to 629 employees selected based on the process described above. The notice (communicated by e-mail) informed employees that they were receiving the retention instructions because they might have materials related to the *AMD v. Intel* lawsuit.  It also instructed these employees that Intel policy required them to retain all relevant information relating to AMD's lawsuit (and the other related lawsuits) against Intel:

You are receiving this message because you may have materials related to a pending legal matter. This e-mail contains instructions that Intel policy requires you to follow in connection with this legal matter, until you receive further instructions from Intel Legal. The matter relates to the lawsuit filed by Advanced Micro Devices in the U.S. District Court for the District of Delaware whereby it alleges, among other things, violations of antitrust and competition laws against Intel Corporation, and other lawsuits that have been or may be filed relating to similar allegations.

**Do not destroy or delete relevant materials** *[emphasis in original]:* You must retain, and not destroy, alter, delete, or move to outside storage, all of the following documents or other materials.

The litigation hold notice defined "document" as "any kind of recorded information, including documents in electronic format," and "customer" as "any OEM, ODM, distributor or retailer." The Notice identified fourteen broad categories of information, instructing each employee to retain all documents that refer or relate to:

1.      Pricing, discounts, rebates, allowances, market developments funds, or other payments to customers made in connection with the sale of microprocessors.

2.      The business relationship for the sale of microprocessors as well as the retail sale of computer systems with any customer.

3.      Incentives or disincentives offered to customers to purchase Intel microprocessors for their entire offerings, or a percentage of their offerings, for any type of systems (such as desktop, mobile, or server), for any segment of their offerings (such as corporate, consumer, etc.), or for any combination of system and segment (such as business desktop, consumer mobile, etc.).

4.      Limiting or prohibiting a customer's (a) use of AMD microprocessors for any purpose; (b) sale of AMD-based systems; (c) participation in AMD product launches; (d) representation of AMD at trade shows; (e) participation in other promotional activities on behalf of AMD; or (f) other actions taken against a customer based on any aspect of its relationship with AMD.

5.      The importance of Tier 1 OEMs and of relationships with such OEMs.

6.      Below-cost pricing.

7.     Bundling or kitting of any microprocessors with any other product.

8.     AMD's manufacturing capacity, the creation of any impediments to AMD's expansion, or the scale that AMD needs to operate efficiently.

9.     Competition in the microprocessor industry, including, but not limited to, Intel's and AMD's market shares in microprocessors, competition among x86 processors and between x86 processors and processors based on other architectures, requirements for entry to compete in microprocessors, AMD's performance as a microprocessor competitor, and the merits of AMD processors or comparisons of Intel and AMD processors.

10.     The Intel Inside® Program; and the Centrino™ Mobile Technology program.

11.     Intel's collaboration with DRAM suppliers to develop next-generation DRAM technologies, including, but not limited to, its participation in the Advanced DRAM Technology (ADT) Consortium or any subsequent group, or its participation in JEDEC in connection with DDR3.

12.     The compatibility of Intel compilers with AMD processors, including the compatibility of optimized code.

13.     The impact of any of the foregoing alleged activities on AMD, microprocessors or system prices, or consumers.

14.     Any documents that refer or relate to the allegations in the attached AMD complaint.

The litigation hold notice further instructed employees to preserve the following types of documents:

> This includes documents or other materials that exist today or that you create in the future, and includes all types of documents, such as e-mail, calendars, meeting notes and status reports. This includes materials you maintain at Intel as well as Intel materials maintained at your home, on shared drives, Web sites, PDAs, or any other location. To help Intel comply with its obligations, Intel Legal will send you periodic reminders of this instruction.

Intel employees were also given instructions on how to prevent e-mails from being subject to automatic deletion after reaching a certain age: "For your convenience, you may find it helpful to create additional e-mail folders to store e-mails. Please reference your Outlook Help files on creation and maintenance of these new folders or contact an appropriate IT person to assist you. Below we have added a 'how to' create new data files guide." The instructions explained how to create and move e-mails to personal folders (.pst folders), which are stored locally on an employee's hard drive and are not subject to the deletion due to aging process.

## G.    Issuance Of Litigation Hold Notices To Additional Employees

After the litigation hold notices were sent to 629 individuals on July 1, 2005, additional employees received retention notices. Approximately 848 individuals at Intel had received retention notices by August 25, 2005. Intel continued to send retention notices on an ongoing basis to additional employees throughout the remainder of 2005, 2006 and 2007. The number of employees who have received such notices is now approximately 1,500 employees, more than three times the number that will be subject to production. ("Retention List").[3] In addition to these original retention notices, in March, July, October, November and December 2006, Intel reissued its litigation hold notice as a reminder to various custodians.

## H.    Harvesting of Custodial Documents

Another significant part of Intel's tiered preservation process was the collection of each custodian's paper and electronic files. Starting in July 2005, after preserving the

---

3  The Retention List is different than another list of employees, referred to later in this report as the June 1, 2006 Custodian List.

Complaint Freeze Tapes and issuing the litigation hold notice, Intel began the process of harvesting (i.e., copying and collecting) the electronic data and other materials from selected employees. To collect this data, Intel has sent approximately 50 paralegals to at least 16 countries around the world, including Japan, Brazil, Netherlands, China, Mexico, Taiwan, Spain, Italy, England, Ireland, Belgium, the United States, France, Canada, Germany, and India. Initial efforts focused on key employees, and later collection efforts were expanded to include a broad range of employees; this effort continues to this day.[4]

## I.    Intel's Effort to Preserve and Back-Up Emails on a Going Forward Basis

Intel also addressed the issue of creating redundant back-up systems for emails generated going forward while the litigation was pending, which was challenging on multiple levels, including the size and complexity of Intel's email system. In light of the enormous volume of e-mail generated on a regular basis – over 4.6 million e-mails per day – Intel's Exchange e-mail system is designed to limit the amount of data maintained in the system through a process of mailbox size limitations, aging and a limited rotation cycle on the back-up tapes. The purpose is to balance the critical need to have a well-functioning, efficient system with the ability of users to maintain that information needed by the corporation and individual users for ongoing business purposes.

---

[4] In July 2005, Intel harvested the materials of 49 employees, and within three months, Intel had collected the data and documents of more than 280 employees in multiple countries for purposes of this litigation. By the end of 2005, Intel had collected data and documents for over 500 employees, and by the end of 2006, had collected data and documents for over 780 employees, approximately 300 more than AMD could even request for production under the document Stipulation. Intel did not finalize its custodian list until June 1, 2006, so it has harvested (and still retains) information from employees who are not custodians based on the Stipulation.

The aging process operates by requiring the users to take some action before a set period, (usually 35 to 45 days for inbox items, and 7 to 35 days for sent items), without which emails beyond a specific date will automatically be deleted from the user's mailbox. Users have the ability to create "personal folders" or ".pst" to store or archive information. These .pst files are stored locally on the user's hard drive, and aging does not apply to these folders. Intel employees are educated on the operation of the aging or "auto-delete" system and instructed on the methods of saving e-mails to prevent them from rolling off the system once they reach the end of the aging period.

Intel concluded that the aging limitations on all Exchange mailboxes could not, as a practical matter, be turned off as part of the preservation effort. As of July 1, 2005, the 629 employees who had received litigation hold notices were spread out across the world in different locations and distributed across 137 different Exchange servers located in various countries. To turn off auto delete would pose an unacceptable risk to the performance and integrity of these 137 Exchange servers over time.

Therefore, Intel adopted a plan to create and preserve Weekly Backup Tapes for emails for those employees subject to the litigation hold notice. To establish this system, however, the mailboxes of employees on the then existing Retention List needed to be moved – or "migrated" – from the 137 different Exchange servers where they were located to a set of consolidated Exchange servers ("Storage Group 3" or "SG3" servers) that could then be backed-up. Based on the distribution of employees, Intel decided that consolidated Exchange servers would be located in the following five locations: (1) California; (2) Arizona; (3) England; (4) Malaysia; and (5) Japan.

14

Intel's Legal and IT Departments worked on implementing the decision to migrate the electronic mailboxes of designated employees to this set of five Exchange servers. A list of employees to be migrated was prepared and IT determined the locations and configurations of the servers to be used, prepared the servers, provided notices to the employees of the move and performed the actual migration of data from certain employees' home servers to the consolidated Exchange servers. Intel began this migration process in October 2005.

**J.    Departing Employees**

During the course of the litigation, Intel also undertook efforts to identify departing employees who were on retention so their hard drives could be harvested. In the litigation hold notices, for example, employees were instructed to notify Legal when they left their employment at Intel: "If you leave Intel: Notify the Intel Legal contacts below prior to your departure." This provided Legal with the ability to contact the departing employees and have their hard drives harvested before they were overwritten and re-circulated for use by another Intel employee.

### III.    THE "CUSTODIAL APPROACH" TO DISCOVERY

In recognition of the extraordinarily broad scope of AMD's allegations regarding Intel's worldwide operations and competition between Intel and AMD over the four-year period before the complaint was filed, the parties jointly acknowledged that the terabytes of data potentially "relevant" to the complaint could not realistically be produced or maintained. The parties agreed that this would be one of the largest, if not the largest, document productions in litigation history, with ultimately only a very small sub-set ultimately used in the litigation.

15

Indeed, AMD's stated to this Court that this case could be "the largest electronic

production in history or maybe this will be the case that proves you can't do it."

(Transcript of teleconference at 10 to 11, January 25, 2007).   Similarly, in commenting

on the magnitude of the document production task, AMD stated:

> We have been trying to work toward a process which identifies the Intel
> employees with relevant information and the AMD employees with
> relevant information…. We expect that when that list is finalized, there
> will be somewhere between a thousand and 1,100 Intel employees on it.
> We are expecting AMD's list to be between four and 500 individuals. And
> our discussion with the, roughly, 30 non-parties, the computer OEMs,
> retailers, distributors have identified about 475 people who are likely to be
> involved in transactions that we will want to find out about.  So we're
> looking at in excess of 2,000 individuals with potentially relevant
> information and relevant documents.
>
> We have been told to estimate that each of these individuals is likely to
> have between three and five hundred gigabytes of data. If you put all of
> that together and you try to make some estimates to avoid duplication, we
> are both braced for an onslaught of discovery that is likely to be in the
> neighborhood of five plus terabytes of information. To put that in
> perspective, if we assume it's all word-type documents, Outlook E-mail
> material, and if it were printed out on eight-and-a-half-by-eleven paper,
> we are expecting to receive in exchange somewhere in the neighborhood
> of a pile 137 miles high.  (Transcript of Hearing at 49-50, April 20, 2006,
> D. I. 100.)

As a result of these practical limitations, the parties at the outset of this case

decided to negotiate a "custodian-based" approach to the production of documents.

These negotiations resulted in a May 2006 Stipulation and Proposed Order Regarding

Document Production ("Stipulation") that restricts the preservation, collection and

production of documents to a limited set of custodians on both sides.[5]  (A copy of the

---

5  Stipulation and Proposed Order Regarding Document Production at ¶ 1, AMD v. Intel, No. 05-441-JJF
(D.Del. May 15, 2006) (entered by the court in Case Management Order 1, at  ¶ 5(d), AMD v. Intel,
No. 05-441-JJF (D.Del. May 15, 2006)).

Stipulation is attached hereto as Exhibit A). Fundamental to this Stipulation was the premise that the parties "each acknowledged that the production will not include each and every responsive document," but each party agreed "that it will in good faith have attempted to identify custodians based on the criteria set forth above to cover all of the other's Initial Document Requests. . . ." (*Id.* ¶ 2)

The Stipulation is broken down into several steps:

- **Step 1.** AMD and Intel were required to exchange custodian lists accompanied by a representation that, after reasonable investigation, the individuals on the list comprised all of their personnel in possession of an "appreciable quantity of non-privileged material non-duplicative documents and things responsive to [the parties' document requests]" ("Custodian List").[6] Intel guaranteed that its Custodian List would include no fewer than 1,000 custodians, and AMD guaranteed that its Custodian List would include no fewer than 400 custodians.

- **Step 2.** Each party then agreed to designate no fewer than 20% of the custodians on its own Custodian List "whose paper and electronic files will be reviewed and produced in the first instance in response to the other parties' initial document requests" ("Party Designated Production Custodian List").[7] In other words, this initial group was expected to be sufficient to allow the parties to reasonably litigate this matter.

- **Step 3.** Following the exchange of the Party Designated Production Custodian Lists, the parties would cooperate in and complete an informal discovery process to allow each side to collect additional information so

---

6  This representation applied to documents in the files of relevant custodians. Certain other document requests sought information in the files of the corporation or organizational-level requests, shared files or databases.

7  This "Party Designated Production Custodian List" was to be prepared in good faith after the exercise of reasonable diligence in ascertaining the likely scope of documents in the custody of those individuals on the list. The Party Designated Production Custodian List constituted a representation that the individual custodians were believed in good faith to include: (i) the most important custodians with knowledge of the issues framed by the pleadings; (ii) the custodians believed likely to have the most non-privileged, non-duplicative documents responsive to the other party's initial document requests; (iii) the custodians whose files, taken together, constituted a comprehensive response to the other party's initial document requests; and (iv) all persons whom the party then reasonably believed were likely to be called by that party as a witness at trial. Id. at ¶ 2.

they each could designate additional custodians for production from the other side's custodian lists. Each side was entitled to select not more than 15% of the persons identified on the other's Custodian List (called the "Adverse Party Designated Production Custodian List"). Together, the Party Designated Production Custodian List and Adverse Party Designated Production Custodian List were to be used to limit the number of custodians whose files were to be produced.[8]

The Stipulation set out that for any person who was not designated as a custodian on the Party Designated Production Custodian List or Adverse Party Designated Production Custodian List, the parties would be relieved of ongoing retention obligations for such individuals.[9]

A.    **The Parties' Designation of Custodians**

On June 1, 2006, after the Court's entry of the Stipulation and Order Regarding Document Production, Intel designated 1,023 custodians and AMD designated 470 custodians pursuant to Step 1 of the Stipulation (the "June 1, 2006 Custodian List" or the "Custodian List").[10] This Custodian List was drawn from, but did not include all of, the employees on Intel's Retention List; in addition, some employees were placed on the Custodian List who were not on the broader Retention List.

---

[8]  *Id.* at ¶ 3. The stipulation also allowed Intel to request production from up to 50 additional custodians on AMD's custodian list and AMD to request up to 100 additional custodians from Intel's custodian list. Stipulation ¶ 4.

[9]  *Id.* at ¶ 6. This provision did not apply to any individuals who participated directly in the negotiation of the commercial terms of the sale of microprocessors or chipsets or who had approval responsibility for such sales.

[10]  The June 1, 2006 Custodian List contains some duplicative entries. A corrected Custodian List is attached as Exhibit B to this Report and contains the names of 1,023 custodians. This corrected Custodian List deletes the duplicate entries, corrects some misspelled names, provides information regarding changed names (due to marriage) and deletes one individual who was mistakenly identified and is not an Intel employee. The job titles listed in the correct Custodian List are the tiles the custodians held as of June 1, 2006.

On that same date, and as required by Step 2, Intel identified a Party Designated Production Custodian List comprised of 217 initial custodians that it believed would provide a reasonably complete production responsive to AMD's document requests.[11] Under Step 3 of the process, AMD has the right to select approximately 254 more Intel custodians for document production purposes. At present, AMD has identified 74 such additional Intel production custodians, leaving it with 180 additional custodians to designate. Intel's total production is limited to these 471 custodians; documents will not be produced from any of the remaining 552 custodians on the Custodian List (absent a showing of good cause).

## IV.    RETENTION ISSUES

In the Fall of 2006, Intel discovered some lapses in the implementation of the document retention program it developed after this action was filed. These errors were independent of the plan itself, and were the result of misunderstandings or errors by Intel personnel who were working conscientiously to carry out their preservation obligations in Intel's complex and dynamic business environment. The following is a summary of Intel's findings to date with regard to those human errors.

### A.    Incomplete Retention On An Individual Level

In the Fall of 2006, Intel discovered that the email retention practices of certain individuals who had been designated as custodians on the Custodians List were not fully in accord with the Intel retention notice. Some custodians, many of whom were diligently saving all potentially relevant emails they received, did not manually keep – or

---

[11] These custodians are indicated with an asterisk in Intel's June 1, 2006 Custodian List.

"archive" – a copy of emails they sent. Unarchived "sent" emails would be retained automatically in the "Sent Mail" folder for a period of time, usually either 7 days or 35 days, and would then be deleted pursuant to Intel's aging system. Some of these custodians, however, copied themselves on "sent" email and then archived the copy by moving it into a personal folder on their hard drive. Other custodians archived the response to their sent e-mail when it was responded to (which would include a copy of the sent e-mail.)

In addition to this "sent" items issue, some custodians did not retain emails for the entire relevant time period. Some custodians were archiving potentially relevant e-mails, but were not certain whether they kept every single e-mail arguably within the scope of the litigation hold notice. Other custodians were archiving important, business related e-mails, but not necessarily every single document that might come within the retention notice. A few custodians had gaps in their preservation due to technical problems, such as a computer crash or a corrupt .pst file. A handful of custodians believed that their emails were being automatically backed-up or retained from the time the complaint was filed, and that this relieved them of the need to keep copies of emails on their hard drives. A description of the retention practices of the currently employed 239 custodians from the Custodian List initially designated by the parties is set forth in Exhibit C.[12] The remediation plan that Intel proposes in this Report deals with each of these lapses.

---

[12] For each of the 239 custodians initially designated by the parties, this Exhibit includes the following information: (1) the custodian's name; (2) whether the custodian was designated by Intel or AMD; (3) a description of the retention issues for each custodian; (4) whether Intel has located Complaint Freeze Tapes for the custodian; (5) whether Intel has created and preserved Weekly Backup Tapes for the

[Footnote continued on next page]

**B.    Late Issuance of Litigation Hold Notice To Certain Custodians**

Intel was early and aggressive in its efforts to timely notify employees with potentially relevant documents that they had a preservation obligation. Beginning days after the complaint was filed, and continuing throughout 2005, 2006 and into 2007 Intel provided litigation hold notices to approximately 1,500 employees believed to have potentially relevant documents. Intel acted in good faith to implement the hold notice portion of its preservation plan.

Intel has discovered, however, that approximately 378 employees who were selected in mid-2006 to be placed on Intel's June 1, 2006 Custodian List did not receive litigation hold notices until February or March of 2007.[13] This error of late notice, which was an unintentional oversight, arose in the context of a fast moving, constantly changing litigation landscape that involved ongoing efforts to identify appropriate employees to put on Intel's Custodian List.

During the time Intel was determining which employees should be put on the Custodian List, Intel had already distributed litigation hold notices to approximately 1,090 employees. Many of the employees who already had received notices were selected during the process described above for inclusion on the Custodian List. In

---

[Footnote continued from previous page]
custodian, and if so, the first date of such tapes; and (6) the date the custodian's materials were harvested.

[13] Some of the 378 custodians were no longer employed by Intel in February or March of 2007 and therefore did not receive a notice. Attached hereto as Exhibit D is an updated list of these 378 custodians, which supersedes the list provided in Mr. Cooper's March 16, 2007 letter to plaintiffs' counsel.

addition, another smaller set of employees who had *not* already received a litigation hold notice were also ultimately selected for inclusion on the Custodian List.

Intel's inside counsel responsible for document retention, Eva Almirantearena, lost track of the issue internally in the press of multiple litigation tasks proceeding at the same time and inadvertently did not send litigation hold notices to the newly selected custodians. This was a single, unintentional human error -- a failure to complete the last step of a lengthy process by comparing the final Custodian List to the then existing Retention List, and adding the newly selected custodians to the Retention List and providing them with litigation hold notices. The remediation plan that Intel proposes in this Report deals with this lapse as well.

## C.    Departed Employee Hard Drives

Intel's general process for retaining the materials of departed employees who received litigation hold notices was successful for a number of those employees. As noted earlier, the litigation hold notices instructed employees to advise the Legal Department of their departure so their materials could be harvested. Seventy-three departing employees received litigation hold notices prior to their departure, and Intel harvested materials from 60 of these custodians.[14] Intel appears to have missed capturing the hard drives of 13 custodians who had received retention notices. Seven of those occurred at the time of Intel's significant work force reduction in 2006, and many

---

[14] Intel harvested the hard drives of 25 custodians within a month prior to their departure, 5 within three months prior to their departure and 30 at some other point prior to their departure. Of the 30, Intel has Weekly Backup Tapes for 24 of them.

were based in remote locations, such as Kuala Lumpur, Bangalore, Singapore, Moscow, Mexico, Buenes Aires and Penang.

The single mistake discussed earlier – the failure to send litigation hold notices to a number of employees until 2007 – also had an impact on harvests of departing employees' computers because the triggering mechanism to ensure the harvesting of those departing employees' hard drives, the delivery of a retention notice, was missing.[15]

## V.     AVAILABLE BACKUP TAPES

Set forth below is a description of the Complaint Freeze Tapes and Weekly Backup Tapes that are available to fill whatever gaps may exist as a result of the lapses described above.

## A.     Complaint Freeze Tapes

As noted above, Intel's first action upon learning of the filing of the complaint was to preserve Complaint Freeze Tapes. Intel has now confirmed that it has Complaint Freeze Tapes that contain the data of all custodians on Intel's June 1, 2006 Custodian List, who were employed at the time the complaint was filed, with the exception of 96 custodians whose data was stored on servers in Munich, Germany.[16] Intel thus has Complaint Freeze Tapes for approximately 90% of the then-employed custodians on the Custodian List.

---

[15] Despite the missing mechanism, Intel harvested the materials of 7 custodians who departed without receiving a notice. Some of these harvests were in connection with other litigation.

[16] For five custodians whose data was stored on servers in Israel, Intel has tapes dated May 23, 2005, approximately one month before the complaint was filed.

The tapes containing the data for the 96 custodians whose data was stored on the Munich Server were lost as a result of a single incident. At the time Intel generated the Complaint Freeze Tapes, 96 of the 1,023 custodians had their Exchange data hosted on servers located at Intel's facility in Feldkirchen (Munich), Germany. In late June 2005, two of the Intel IT personnel in Munich were directed by Intel IT personnel in Swindon, England (a site at which Intel's master servers controlling this region of the world were located) to locate and physically remove all backup tapes (about 20 of them) from the Munich Exchange server and store those backup tapes in a secure area at the Intel Munich campus. The Munich IT personnel were not told that the backup tapes they pulled were related specifically to the AMD lawsuit in the United States; rather, their IT colleague in England told them that the tapes might be needed by Intel's Legal Department. They did exactly as instructed: one of the Munich IT employees placed the pulled Complaint Freeze tapes in a safe in a building on the Intel Munich campus on July 5, 2005.

One week later, on July 12, 2005, investigators from the European Commission ("EC") and the German antitrust enforcement agency, Bundeskartellamt, arrived unannounced at Intel's Munich location to perform document searches related to AMD's complaints to the EC about Intel's sales conduct in Europe. As the investigators began their searches, one of the investigators demanded that Munich IT personnel immediately provide him with all the backup tapes from the Munich server that covered the last complete three-month period and the incremental period to that day. One of the Munich IT employees went to the vault and removed the system backup tapes he had placed there only a week earlier (which he knew covered the last complete three-month period), and

added to those the additional backup tapes that had been created in Munich during the preceding week up through the previous night, which he pulled out of the current tape machine. He then placed all of these tapes into a metal carrying case and gave the case to the investigators, who sealed it with security tape. After two days, the investigators completed their searches and were preparing to depart. They offered no instruction on what Intel was to do with the carrying case full of tapes.

The investigators had warned Intel that employees would face serious sanctions for tampering with or destroying the tapes that Intel had given to the investigators, and therefore Intel wanted no misunderstanding about what was to be done with the tapes. Intel's in-house counsel in Munich, Georg Fisch, asked the lead EC investigator, Dr. Thomas Kauffman about the tapes, and Dr. Kaufmann said the investigators no longer had any use for the tapes, which Dr. Kaufmann's confirmed by signing a letter that the tapes "are released for unlimited use by Intel and that no further restrictions of use apply."

The next day, the Munich IT employee, who was unaware that the reason the backup tapes had originally been pulled the week before was to preserve them for possible use in the AMD litigation, rather than in connection with the EC investigation, returned the tapes to the backup tape pool in the Munich tape vault, where they became available for future re-use.

Some months later, the servers in Munich began using a new type of backup media that was different from the type of tape that was used for the complaint freeze back-up in July 2005. The Munich backup tapes that had the older style tape format (which included all the Munich Complaint Freeze Tapes that remained in the tape pool)

25

were no longer usable in Munich and were shipped, in bulk (*i.e.,* without any log of

tracking information), to Intel's regional facility in England for reuse.  Under standard IT

procedures, information that would allow the tapes to be identified later was removed

before they were re-used or sent out to other locations.

     As a result of this misunderstanding, the Complaint Freeze Tapes that were

originally pulled and set aside in July 2005 for the 96 custodians whose data was stored

on the Munich server are unavailable today, but that should have no impact on this

matter.  The Complaint Freeze Tapes, of course, were created for backup purposes.  Of

these 96 Munich custodians, only a small number will be chosen for production – only 18

have been designated as the first set of Intel custodians for production,[17] and only five of

these individuals have incomplete retention practices – and two are departed employees,

both of whom had their materials harvested.  In addition, at least 46 of the 96 Munich

custodians had their hard drive harvested and 35 have Weekly Backup Tapes,

commencing in July 2006.

**B.**    **Weekly Back-Up Tapes**

    **1.**    **Custodians Not Migrated In The Fall of 2005**

     As noted above, in the Fall of 2005, Intel established a detailed plan for

preserving, on a weekly basis, backup tapes containing the Exchange data of the Intel

employees who had been placed on retention.  These tapes, like the Complaint Freeze

Tapes, were not intended to be the primary preservation method, but a back-up

mechanism in the event documents could not be obtained directly from the individual

---

[17] These are the 217 custodians designated for production by Intel and the 22 custodians initially adversely designated for production by AMD.

employees who originally generated or received the documents. As stated above, to preserve the Weekly Backup Tapes, the mailboxes of employees on the retention list needed to be moved – or "migrated" – from 137 servers located around the world to a set of five Exchange servers that could then be backed-up.

Intel migrated one set of custodians in October 2005, and a second set of custodians in November 2005. During that process, Intel intended to migrate all employees then on its Retention List, and believed that it had done so. However, it appears that, through human error, 121 of the employees whose names appear on Intel's Custodian List were either not successfully migrated at that time, or were inadvertently moved off the consolidated Exchange servers shortly thereafter.[18]

### 2.    Swindon, England Backup Tapes

A miscommunication prevented Weekly Backup Tapes for approximately 79 custodians from being preserved for the period November 2005 to June 2006, approximately eight months. The affected employees are those whose data was stored on Intel's server in Swindon, England.

When the five servers for creating weekly back up tapes were configured, a temporary backup policy with a standard six-day retention period was set. As part of Intel's typical practice, Curtis Smith requested that the temporary backup policies be modified by a member of Intel's Enterprise Backup and Recovery ("EBaR") group, which generally had responsibility for tape backup policies, so that the retention period would comport with the retention time period Intel's Legal department had directed for

---

18  Attached hereto as Exhibit E is a list of the 121 custodians, along with an accounting of the first eight
weeks of weekly backup tapes for each of the 121 custodians.

the AMD case, seven years. Shortly thereafter, a member of Intel's EBaR group, Jamie
Triest, did modify the retention period on the backup polices associated with four of the
five servers that had been set up for the Weekly Backup Tapes, by changing those backup
policies to a seven-year retention period. However, Mr. Triest was unable to modify the
backup policy for the fifth new storage group, the Swindon group, on the Swindon server
because of some technical problems. Mr. Triest asked Mr. Smith to investigate the
problems. Mr. Smith e-mailed back to Mr. Triest that he tried to investigate the problems
but could not access the master server at that time because it was being accessed by
another user, and that he would try again later.

　　　Neither participant recalls any further communication with respect to the backup
policy for the new storage group on the Swindon server. Mr. Triest took no further action
because he was not contacted again with confirmation that the SG2 backup policy existed
and was ready for him to configure, so he assumed that the backup policy had been
configured by Mr. Smith or by someone else. Mr. Smith assumed that Mr. Triest or some
other member of the EBaR team had completed the backup policy for the new Swindon
server, just as he had done with the new storage groups on each of the other four regional
servers. As a result, the seven-year retention period the Legal Department had requested
on the storage group on the Swindon server was improperly configured, and the tapes
being used to capture the data from this Swindon storage group were overwritten on
Intel's standard Exchange data schedule (six days) starting when the weekly backups
began in November 2005.

　　　In early 2006, Intel began a project to replace the Exchange mailbox server that
housed the Swindon Weekly Backup Tape storage group with a new, upgraded server.

As part of that process, an Intel IT employee in Malaysia moved all the data from the old Swindon server over to the new replacement server. This IT employee set up the storage group for the AMD custodians on the new Swindon server and then, as part of his standard practice, asked the EBaR team to set up the appropriate backup policy. On or about July 1, 2006, a backup policy with a longer retention period for the special storage group on the new Swindon server was set. As a result, with the exception of a single week,[19] Intel has the Weekly Backup Tapes created for the custodians on the Swindon server for the entire period from July 2, 2006 to the present.

### 3. Tapes From The 2005 Migration In Other Locations Have Been Preserved

With a few exceptions, Intel believes it has retrieved all of the existing Weekly Backup Tapes for the four other locations.[20] Specifically, Intel has readable tapes or archiving data from those locations for 94% of the weeks from November 6, 2005 (when the backup process was initiated), through April 1, 2007 (the last date through which Intel has complete information from its data and tape restoration vendor). As for the remaining weeks, Intel has determined that failed backups or physical damage to the tapes accounts for the loss of some data. Even in those cases, however, none of the gaps covers a period of more than four consecutive weeks.

---

[19]  The loss for data for the week of September 10, 2006 was caused by a failure to re-run the backup tape after a power outage.

[20]  To date, Intel has not been able to locate the tapes covering one week in Japan, one week in Penang, and three weeks in Folsom.

## VI.    INTEL'S PROPOSED REMEDIATION PLAN

Intel has undertaken a comprehensive investigation into its own lapses in carrying out the unprecedented retention plan it implemented as a result of the broad, forward-looking allegations of AMD's complaint. It has subjected its conduct to the most searching inquiry, expended extraordinary resources and, on its own volition, reported its lapses to the parties and the Court. It regrets that the full implementation of its carefully designed retention plan was not executed as it should have been.

Intel herein proposes a remediation plan that is comprehensive in an effort to address the issues created by the lapses. Intel's remediation plan has two parts. First, comprehensive steps have been taken to address problems that arose during the litigation to ensure that going forward all potentially significant documents will be retained from all custodians still employed at Intel. Second, Intel has set out a plan to produce documents from all available data sources to address any production gaps. The first step is directed at all custodians, while the second will be focused on the custodians actually relevant for discovery, *i.e.*, the approximately 471 persons from whom AMD (and class counsel) is entitled to seek production under the Document Production Stipulation.

### A.    Ongoing Preservation Measures

#### 1.    Reissuance of Litigation Hold Notices

In February and March 2007, Intel re-issued litigation hold notices to all current Intel employees who are on Intel's Custodian List, including those who were missed earlier. The notice requires that each employee acknowledge having received and read the notice. If a timely acknowledgement is not made, Intel Legal calls the custodian.

Intel will send out reminders of the litigation hold notice every six months during the litigation and require confirmation of receipt from each custodian.

### 2.    Oral Follow-Up with Each Custodian

Intel is directly contacting by phone all 1,023 currently employed custodians who appear on Intel's June 1, 2006 Custodian List. During the call, the custodians are reminded of their preservation obligations.

### 3.    Revised Process for Handling Hard Drives of Departing Employees

Intel has recently instituted additional procedures to implement its requirement that hard drives and files of all departing employees be captured on retention. Intel's IT Department has been directed that no laptops are to be scrubbed until IT receives affirmative clearance from Legal.

### 4.    Continued Harvesting of Materials from Custodians

Intel is in the process of harvesting and reharvesting the electronic documents of all currently employed custodians on Intel's Custodian List. This includes re-harvests from those custodians who were previously harvested, and harvests from all remaining custodians not previously harvested. These re-harvests and harvests began in April 2007 and should be completed by the end of May 2007. All of this data will be retained.

### 5.    Implementation of an E-Mail Archiving Solution

Intel has implemented an industry leading e-mail archive system by EMC. The system is composed of several inter-related components of EMC's e-mail archiving solution including EmailXtender, DiskXtender and Centera (collectively the "Archive"). The Archive is designed to capture all of the currently employed 1,023 custodians'

31

Exchange e-mail transmissions to and from any custodian-owned mailbox as of the date such mailbox was put on the Exchange journaling system.[21]

The archive is designed with redundancy built in at several levels. In particular, the Exchange Servers that contain accounts for all of the currently employed custodians feed into a primary and back-up journaling server. The journaling server, in turn, writes off all sent and received e-mails of the designated custodians to the EMC Extender Server, which is replicated on a second EMC Extender Server as a backup. The EMC Extender Server then writes the e-mail to an EMC Centera Server, which is set up as a write once-read only storage device. A second EMC Sever has been set up and replicates all of the first EMC Centera Sever as back up to the system.

No rules or settings have been or will be enabled in the Archive that will allow for the alteration or deletion of stored e-mail. The operation of the Archive prevents individual custodians from deleting or altering e-mails located within the Archive. Custodians' Exchange e-mails that enter the Archive will be preserved for the duration of the litigation

### 6.    Remedial Measures

At bottom, the remediation plan is simple in concept, although it will take considerable time, expense and the devotion of enormous resources to execute. Intel proposes to remediate focusing its efforts on the custodians selected by it and AMD (or to be selected by AMD in the future) pursuant to the document Stipulation and using all

---

[21]    The Archive is not configured to capture system generated e-mail, e.g., an internal notice that an e-mail delivery was delayed.

available sources of data it has assembled to complete its production. This may include, in limited circumstances, additional or substitute designation of custodians.

### 7.    Sources of Remedial Material

There are multiple layers of preservation with overlapping sources of information. Set forth below is a description of the multiple sources of custodian data:

- **Complaint Freeze Tapes:** Intel preserved over five thousand Complaint Freeze Tapes created on or about the date of the filing of the complaint that contain an electronic snapshot of Intel's systems, including, but not limited to, the Exchange mailbox (which contains Inbox, Sent and Deleted folders). Attached to this Report as Exhibit F is a spreadsheet which identifies the custodians for whom Intel has Complaint Freeze Tapes, and shows that Intel has Complaint Freeze Tapes for the vast majority of such custodians.[22]

- **Weekly Backup Tapes:** Beginning in October, 2005, Intel commenced migrating custodians to a weekly backup system. These tapes were not intended to be the primary preservation method, but as a mechanism to fall back on in the event documents could not be obtained directly from the individual employees who originally generated or received the documents. These backup tapes contain Exchange mailboxes for the custodians, including Inbox, Sent and Deleted folders.

---

[22] The exceptions are the 96 custodians whose email was stored on the server in Munich, Germany at the time the complaint was filed, and five custodians for whom Intel, nevertheless, has tapes dated May 23, 2005 – approximately a month before the complaint was filed.

- **Harvested Information:** Beginning days after the complaint was filed, Intel began the process of harvesting documents from employees with potentially relevant materials. To date, Intel has harvested materials from over 800 employees, over 600 of whom are custodians on the June 1, 2006 Custodian List. Exhibit F, which is attached to this Report, contains information regarding the approximate dates on which the materials for each custodian were harvested. By May of 2007, Intel expects to complete the harvest of all 1,023 custodians who remain in Intel's employ.

- **E-mails Sent To or Received By Other Custodians.** To the extent there is a retention issue with a specific custodian, another source of e-mails and related attachments that can be used to augment that Custodian's production are the records of other custodians that either sent or received such e-mails and their attachments. The documents sent, but not retained, by a particular custodian may likely be present in the Inbox of another custodian. For example, for one custodian who was not saving all sent emails, Intel has already produced 13,887 emails from his custodial data, 965 of which were from his Sent email box. Thus far, Intel has also produced 2,004 emails sent by this same custodian in the custodial data of other produced custodians, and, there are over 4,000 responsive sent emails from this custodian identified to date within the data of Custodians not yet produced.

- **Functionally Equivalent Custodian "Substitutes."** To the extent AMD selects a custodian for production who has indicated incomplete

34

compliance or did not receive a litigation hold notice until 2007, the potential gaps in that custodian's materials may be filled by materials from other custodians who are functional or partial substitutes for the non-complying custodian. For example, if AMD selected one of two or even several individuals relevant to a particular customer or a particular issue, then another individual or individuals can be used to augment the production where there are potential gaps.

**B.     Remediation Approach**

Remedial measures must focus on the custodians from whom plaintiffs have a right to seek production under the terms of the Custodian Stipulation (*see* Section III supra). This would include the 217 Party-Designated Custodians and the approximately 254 Adverse-Party Designated Custodians. A custodial approach to remediation is the only method that makes sense, given the structure of the existing Custodian Stipulation.

Throughout this case, the parties have understood that there needed to be a date cutoff for discovery. The Stipulation states that "once a scheduling order is in place, [the parties] will negotiate in good faith a date certain to cut-off any additional or supplemental production absent a compelling show of need." (Stipulation ¶ 4.) The parties have identified the need to reach closure on a cutoff date, but have not negotiated the date parameters. Establishing such a date now is important because it directly impacts the remediation plan and the case schedule. The further out the date, the larger the production for all sides, and the longer it will take to move this case to the deposition phase and beyond.

Given the magnitude of the document production, Intel began harvesting documents from potential custodians and reviewing those documents soon after the complaint was filed. AMD did the same, although its harvesting began in October 2005, a few months after Intel's. This has led to a potential dispute over the appropriate cutoff date for the production of documents. To date, Intel has produced documents for 126 custodians. Harvest dates for those custodians have ranged from July 8, 2005 to July 27, 2006, with the majority falling in the period July-November 2005. AMD has produced from 65 custodians. Although these custodians had a harvest date range of Oct. 31, 2005 to August 25, 2006,[23] and the majority of harvesting occurred about October-November 2005, AMD limited its production cutoff to July 12, 2005. AMD limited the date range of its production to documents existing as this date on the ground that Intel harvested its CEO's documents on that date, even though for many other custodians Intel produced documents through a later harvest date. AMD has indicated it intends to expand its production beyond July 12, 2005, but has not yet set forth the specifics of its plans.

Intel is proposing two production cutoff dates. The Party-Designated Custodian Lists were exchanged on June 1, 2006. For such custodians, a June 1, 2006 cutoff makes sense, since the selection by a Party on that date triggered an obligation to produce documents from those custodians. Because the parties harvested documents from many Party-Designated Custodians prior to June 1, 2006, it would require re-harvests and supplemental productions from all parties.

---

[23] One produced AMD custodian had not yet been harvested at the time its harvest list was supplied to Intel.

36

For the Adverse-Party Designated Custodians, Intel proposes a cutoff of March 1, 2007. This would provide information to near the present time, while also setting a limit so that the production (including remediation) can progress and also so that there is an end to this process. To the extent a Party has good cause to request additional supplementation, it can still do so under the Stipulation.

**C.     Remedial Approach**

Intel proposes to take the following additional steps to remediate the retention issues:

- For the 217 custodians on Intel's Party Designated Production Custodian list, Intel will produce responsive, non-privileged and non-duplicative documents through June 1, 2006, from all available data sources for that Custodian (Complaint Freeze Tapes, Weekly Backup Tapes, and harvests). For custodians whose files have already been produced, this would require supplementation.

- For all custodians that plaintiffs identify on the Adverse Party-Designated Production Lists, Intel will produce documents through March 1, 2007, from all available data sources for that custodian (Complaint Freeze Tapes, Weekly BackUp Tapes and harvests).

- Intel will create a global database from the above data sources. The database will include for all 1,023 custodians, all Complaint Freeze tapes, Weekly Backup Tapes and harvesting to be completed by May 2007 for the currently employed 1,023 custodians.

37

- From this global data set, Intel will search for any document sent from, or to (including cc and bcc), any Party Designated Custodian or Adverse Party Designated Custodian. Intel will produce any responsive, non-privileged and non-duplicative material for these custodians located by the searches. The date cutoff for any such supplementation would be June 1, 2006, for Party Designated Custodians, and March 1, 2007, for Adverse Party Designated custodians.

- AMD has raised the possibility that it might not want production from a specific custodian if, for example, that custodian was not placed on retention at the appropriate time and therefore that custodian might not have an appreciable quantity of responsive documents. Intel is willing to consider, under appropriate reasonable circumstances, permitting AMD to change a limited number of selections previously made.

- Intel will supplement its Custodian List to identify, where necessary, custodians that can substitute or augment because they played a similar functional role in the organization for other custodians or within the reporting chain. In this regard, Intel had on retention at the beginning of the case a large number of individuals that were not included on Intel's Custodian List, but who nonetheless might substitute for another custodian.

Intel is willing to discuss aspects of this plan with plaintiffs' counsel, to answer any questions or consider any suggested modifications.

Undertaking this plan will involve the processing and review of a huge, and as yet indeterminate volume of data. It will represent a tremendous cost to Intel, and a substantial (perhaps unprecedented) expenditure of resources. In order to effectuate this plan, Intel is cataloging, indexing and, to the extent appropriate, restoring thousands of backup tapes. Intel is willing to undertake this massive effort because it regrets the lapse in its retention practices, wants to set them right, and wishes to get the case back on the path to being resolved on the merits. Intel is prepared to discuss all aspects of this Report with the Special Master and the Court, and to supplement it, as directed.

## VII.    CONCLUSION

Intel respectfully requests that the Special Master approve the proposed Remediation Plan set forth in this Report.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Robert E. Cooper
Daniel S. Floyd
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

Peter E. Moll
Darren B. Bernhard
HOWREY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 2004

Dated: April 23, 2007
790982 / 29282

By:  /s/ Richard L. Horwitz
      Richard L. Horwitz (#2246)
      W. Harding Drane, Jr. (#1023)
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      Wilmington, DE 19899-0951
      (302) 984-6000
      rhorwitz@pottteranderson.com
      wdrane@potteranderson.com

*Attorneys for Defendants*
*Intel Corporation and Intel Kabushiki*
*Kaisha*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Richard L. Horwitz, hereby certify that on April 23, 2007 the attached

document was hand delivered to the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

Jesse A. Finkelstein
Frederick L. Cottrell, III
Chad M. Shandler
Steven J. Fineman
Richards, Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE 19801

James L. Holzman
J. Clayton Athey
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899

I hereby certify that on April 23, 2007 I have Electronically Mailed the documents

to the following non-registered participants:

Charles P. Diamond
Linda J. Smith
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
cdiamond@omm.com
lsmith@omm.com

Mark A. Samuels
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071
msamuels@omm.com

Guido Saveri
R. Alexander Saveri
Saveri & Saveri, Inc.
111 Pine Street, Suite 1700
San Francisco, CA 94111
guido@saveri.com
rick@saveri.com

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Allyson B. Baker
Cohen, Milstein, Hausfeld & Toll , P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
mhausfeld@cmht.com
dsmall@cmht.com
blandau@cmht.com
abaker@cmht.com

Michael P. Lehman
Thomas P. Dove
Alex C. Turan
The Furth Firm LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
mplehmann@furth.com
tdove@furth.com
aturan@furth.com

Steve W. Berman
Anthony D. Shapiro
Hagens Berman Sobol Shapiro, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
steve@hbsslaw.com
tony@hbsslaw.com

By:     */s/ Richard L. Horwitz*
        Richard L. Horwitz (#2246)
        W. Harding Drane, Jr. (#1023)
        POTTER ANDERSON & CORROON LLP
        Hercules Plaza, 6th Floor
        1313 N. Market Street
        P.O. Box 951
        Wilmington, DE 19899-0951
        (302) 984-6000
        rhorwitz@potteranderson.com
        wdrane@potteranderson.com

738395 / 29282

2