# EXHIBIT A

## EXHIBIT A

### DESCRIPTION OF MATTERS ON
### WHICH EXAMINATION IS REQUESTED

### I.

### DEFINITIONS

1. "AMD" shall mean and refer collectively to plaintiffs Advanced Micro Devices, Inc. and AMD International Sales & Service, Ltd., including their respective past and present officers, directors, agents, attorneys, employees, consultants, or other persons acting on either of their behalf.

2. "AMD Custodians" means and refers to the approximately 440 individuals identified by AMD on its Custodian List served on June 1, 2006, pursuant to the Stipulation and Order Regarding Document Production entered by the Court in this Litigation.

3. "Complaint Freeze Tapes" means the tapes preserved in or about March 2005 as described in David Herron's October 24, 2005 letter to John J. Rosenthal.

4. "Email Journaling System" means the system that AMD activated for document retention purposes as identified in David Herron's April 23, 2007 letter to Robert E. Cooper.

5. "Enterprise Vault" means the system that AMD obtained and implemented for document retention purposes as identified in David Herron's April 23, 2007 letter to Robert E. Cooper.

6. "Litigation" means and refers to the litigation in which this Notice of Taking Deposition has been served.

7. "Litigation Hold Notices" means and refers to the means by which AMD communicated its preservation obligations to its employees concerning the Litigation (regardless of the title or name given to such communications), including all oral, written or electronic

notices, reminders, or other communications by AMD to AMD Custodians or other AMD

employees.

8.  "Monthly Backup Tapes" means the tapes described in David Herron's October

24, 2005 letter to John J. Rosenthal.

## II.

### SUBJECT MATTER

1.  The information sought in Robert E. Cooper's April 11, 2007 letter to David L. Herron regarding AMD's document retention activities, attached hereto as Exhibit C.

2.  The information sought in Robert E. Cooper's August 1, 2007 letter to Charles P. Diamond regarding AMD's document retention activities, attached hereto as Exhibit D.

3.  The design, architecture, operation, functionality, capabilities and implementation of AMD's Enterprise Vault system, including its reporting, search and production capabilities.

4.  The design, architecture, operation, functionality, capabilities and implementation of AMD's Email Journaling System, including its reporting, search and production capabilities.

5.  The preparation, timing, contents, and distribution of all Litigation Hold Notices, including the identity (name, location, position) of anyone receiving such Litigation Hold Notice and the date(s) of receipt by each AMD Custodian of each Litigation Hold Notice.

6.  The details and circumstances concerning any known or suspected non-compliance with the Litigation Hold Notices, whether on a systemic or individual basis, the facts and timing of AMD's discovery of such non-compliance, the identity of those persons involved in such non-compliance, and the timing and nature of all steps taken following such discovery.

7.  The details and circumstances of any known or suspected failures, whether on a systemic or individual basis, in the preservation of potentially relevant Documents on the Complaint Freeze Tapes, Monthly Backup Tapes, Email Journaling System, Enterprise Vault or hard drive of any AMD Custodian.

8.  AMD's harvest of data from AMD Custodians, including the harvest instructions and protocols employed and the identity of those persons involved in developing and executing such instructions and protocols.

9.  The details of any steps, policies, practices or other measures undertaken by AMD to preserve the electronic data and other documents of departing AMD Custodians, including the details and timing of any AMD efforts to monitor or otherwise ensure compliance with such steps, policies, practices or measures.

10. For each individual AMD Custodian: (a) the date(s) on which the Custodian's documents were harvested for the Litigation; (b) the date on which the Custodian was put on the Email Journaling System; (c) the date on which the Enterprise Vault was first used to capture and preserve email for the Custodian; (d) whether the Custodian has deleted any potentially relevant Documents from the hard drive of the Custodian's laptop or desktop computer; (e) whether the Custodian has deleted any potentially relevant email from the Exchange server hosting that Custodian's email; (f) whether any of the Custodian's potentially relevant Documents have been lost from the Custodian's hard drive due to file corruption, lost laptop or other means of loss; (g) whether the data for the Custodian has been preserved on Monthly Backup Tapes, and if so, for which specific months; and (h) whether the data for the Custodian has been preserved on the Complaint Freeze Tapes.

11. Whether AMD has discovered that any AMD Custodian manually deleted, or otherwise lost, any potentially relevant email or other electronic data *prior to the date on which the Custodian's data was harvested*, and if so, the date(s) and volume of such deletion or loss, and whether AMD has produced (or will produce) documents for that Custodian from the Complaint Freeze Tapes, Monthly Backup Tapes, Enterprise Vault or other source.

12. The existence, details and application of "AMD's corporate document retention and destruction policies" referenced in David Herron's October 24, 2005 letter to John J. Rosenthal, and the suspension or deviation from such policies and practices in connection with this Litigation.

# EXHIBIT B

## EXHIBIT B

### CATEGORIES OF
### DOCUMENTS AND TANGIBLE THINGS
### REQUESTED FOR PRODUCTION

1.    "AMD" shall mean and refer collectively to plaintiffs Advanced Micro Devices, Inc. and AMD International Sales & Service, Ltd., including their respective past and present officers, directors, agents, attorneys, employees, consultants, or other persons acting on either of their behalf.

2.    "AMD Custodians" means and refers to the approximately 440 individuals identified by AMD on its Custodian List served on June 1, 2006, pursuant to the Stipulation and Order Regarding Document Production entered by the Court in this Litigation.

3.    "Complaint Freeze Tapes" means the tapes preserved in or about March 2005 as described in David Herron's October 24, 2005 letter to John J. Rosenthal.

4.    "Documents" shall mean and include all "writings," "recordings" or "photographs" as those terms are defined in Rule 1001 of the Federal Rules of Evidence. Without limiting the generality of the foregoing, the term "documents" includes both hard copy documents as well as electronically stored data-files including email, instant messaging, shared network files, and databases.  With respect to electronically stored data, "documents" also includes, without limitation, any data on magnetic or optical storage media (e.g., servers, storage area networks, hard drives, back-up tapes, CDs, DVDs, thumb/flash drives, floppy disks, or any other type of portable storage device, etc.) stored as an "active" or back-up file, in its native format.

5.    "Email Journaling System" means the system that AMD activated for document retention purposes as identified in David Herron's April 23, 2007 letter to Robert E. Cooper.

6.      "Enterprise Vault" means the system that AMD obtained and implemented for document retention purposes as identified in David Herron's April 23, 2007 letter to Robert E. Cooper.

7.      "Litigation" means and refers to the litigation in which this Notice of Taking Deposition has been served.

8.      "Litigation Hold Notices" means and refers to the means by which AMD communicated its preservation obligations to its employees concerning the Litigation (regardless of the title or name given to such communications), including all oral, written or electronic notices, reminders, or other communications by AMD to AMD Custodians or other AMD employees.

9.      "Monthly Backup Tapes" means the tapes described in David Herron's October 24, 2005 letter to John J. Rosenthal.

## INSTRUCTIONS

1.      These requests call for the production of all responsive documents that are within the possession, custody or control of AMD, including its officers, directors, agents, attorneys, employees, and other persons acting on AMD's behalf.

2.      If any document covered by these requests is withheld by reason of a claim of attorney-client privilege, attorney work product protection, or any other privilege or protection, please furnish a log providing the following information with respect to each such withheld document:  date; author; recipients; general subject matter; and legal basis upon which the document has been withheld.

3.      Unless otherwise stated, the time period covered by these Requests is January 1, 2002 to the present.

## REQUESTS

1.  The Litigation Hold Notices issued by AMD in connection with this Litigation.

2.  Documents sufficient to show the design, architecture, operation, functionality, capabilities and implementation of AMD's Enterprise Vault system, including its reporting, search and production capabilities.

3.  Documents sufficient to show the design, architecture, operation, functionality, capabilities and implementation of AMD's Email Journaling System, including its reporting, search and production capabilities.

4.  Documents sufficient to show the harvest instructions and protocols employed for the harvesting of data from AMD Custodians.

5.  Documents sufficient to show the failure of preservation, if any, of potentially relevant Documents, whether on a systemic or individual basis, from the hard drive of any AMD Custodian.

6.  Documents sufficient to show the failure of preservation, if any, of potentially relevant Documents, whether on a systemic or individual basis, from the Complaint Freeze Tapes, Monthly Backup Tapes, Email Journaling System, Enterprise Vault or other preservation source.

7.  Documents sufficient to show the following for each AMD Custodian: (a) the date(s) on which the Custodian's documents were harvested for the Litigation; (b) the date on which the Custodian was put on the Email Journaling System; (c) the date on which the Enterprise Vault was first used to capture and preserve email for the Custodian; (d) whether the Custodian has deleted any potentially relevant Documents from the hard drive of the Custodian's laptop or desktop computer; (e) whether the Custodian has deleted any potentially relevant email from the Exchange server hosting that Custodian's email; (f) whether any of the Custodian's potentially relevant Documents have been lost from the Custodian's hard drive due to file corruption, lost laptop or other means of loss; (g) whether the data for the Custodian has been preserved on Monthly Backup Tapes, and if so, for which specific months; and (h) whether the data for the Custodian has been preserved on the Complaint Freeze Tapes.

8.  Documents sufficient to describe AMD's document retention and destruction policies, and steps taken, if any, to suspend such policies to prevent the destruction of Documents that may be relevant to the Litigation.

9.  Documents sufficient to identify and describe AMD's IT infrastructure relevant to the support, storage (including email storage conventions), maintenance and back-up of electronic data relevant to this Litigation, including data residing on hard drives or other off-network media.

100284739_1.DOC

# EXHIBIT C

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

333 South Grand Avenue  Los Angeles, California 90071-3197
(213) 229-7000
www.gibsondunn.com

RCooper@gibsondunn.com

April 11, 2007

Direct Dial
(213) 229-7179

Fax No.
(213) 229-6179

Client No.
T 42376-00764

David L. Herron
Jeffrey J. Fowler
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899

   Re:  *AMD v. Intel - eDiscovery Issues*

Gentlemen:

   In the last several weeks, Intel has shared with AMD detailed information with regard to the steps it designed to retain all documents, including emails, relevant to this litigation, the implementation of those steps, and some lapses that Intel has discovered with regard to that implementation. We are now engaged in a Court supervised accounting of those lapses and the creation of a remediation plan to deal with them. It is thus reasonable and timely for Intel to ask AMD for certain updated information with regard to its document retention activities so that Intel will be in a position, as the parties go forward in discovery, to understand whether there might be any lapses in AMD's document retention. We assume the information Intel is seeking should not be burdensome since we are merely seeking to update and confirm representations that AMD has made to Intel about its retention practices.

   We do not mean to suggest that AMD has not undertaken its preservation obligations. The spirit of the Amended Federal Rules, however, contemplate that the parties will continue to keep each other apprised on the status of preservation, especially in case of this complexity and length.

## A.  Document Retention In General.

   Is AMD aware of the loss of any documents potentially relevant to this litigation, and/or any non-compliance with all hold instructions issued to AMD employees, either as a result of human conduct, the operation of a computing system, or otherwise? If so, please provide a full

# GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 2

description of the loss or non-compliance, including: (i) the custodian(s) involved; (ii) the nature of the loss or non-compliance; (iii) when AMD first discovered the loss or non-compliance; and (iv) all remedial steps undertaken by AMD to address the loss or non-compliance.

Whether or not AMD is aware of any loss or non-compliance, has AMD made any efforts to determine whether any loss or non-compliance has occurred? Please describe AMD's efforts in detail.

**B.      Enterprise Level Preservation.**

**"March 11, 2005, AMD sent preservation letters to its IT
personnel in its various offices. The oldest full backup of the
Exchange servers and Windows environment, network servers
were located and preserved."**

Please describe, in detail, why AMD chose March 11, 2005, to send these letters. Please also confirm that the oldest full backup of the Exchange and Windows, network servers are being preserved. In this regard, we would appreciate a list of the location of the Exchange servers and the individual custodians subject to the legal hold that is on those servers. With respect to the windows environment and network shared files servers, we would appreciate a list of those servers, a general description of their content and the date upon which the backup was created.

**"Beginning March 19, 2005, full backups were made and
retained. Over the next several weeks the backup schedules
were coordinated; going forward, full backups are taken and
retained every month." (10/24/05 AMD Letter at 1)**

Please confirm, as represented, that full backups were being made and retained beginning on March 19, 2005, and on a monthly basis thereafter. In particular, confirm the location and storage of the backups, including whether the backups have or are being indexed. In this regard, are there any servers that were initially part of the March 19, 2005 backups that have been taken off the monthly backup process or added to the monthly backup process? In addition, is there a person or group of people responsible for this backup process at AMD? If so, please identify that individual(s).

**"The monthly full backups are retained in secure locations.
Most of these sites send their tapes to Austin, although a few
offices retain their backups locally. Compliance is tracked and
monitored on a weekly basis." (10/24/05 AMD Letter at 1)**

# GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 3

Have each of these backups been retained?  With respect to these backup tapes, are any of these tapes lost or missing or not readable?  In addition, has AMD attempted or restored any of these backup tapes, and, if so, for what purpose?

> **"AMD's document retention and destruction policies were suspended to prevent inadvertent description of documents that may be relevant to this lawsuit." (10/24/05 AMD letter at 1-2)**

It is unclear what you mean by the policies were "suspended."  Was this suspension limited to categories of potentially relevant records to this litigation or to all records. And was the suspension ever lifted for any custodian or corporate groups?  Please confirm that each of the custodians subject to the legal hold has, in fact, complied with this suspension directive?  Please state whether AMD's computer system has an auto-delete process

### C.    Custodian Level Presentation And Legal Holds.

> **"On April 1, 2005, AMD issued its first wave of document preservation notices to approximately 150 custodians likely to have relevant information.  The custodians were instructed to preserve all documents and data relevant to the lawsuit.  This includes, of course, e-mail." (10/24/05 AMD Letter at 2)**

> **"As additional custodians are identified, preservation notices are sent to them and they are put on the litigation hold.  To date, the list of custodians includes approximately 440 people.  Appropriate follow-up is conducted as needed to ensure custodian understanding and continued compliance with that hold." (10/24/05 AMD Letter at 2)**

> **"The current count of custodians to whom a litigation hold has been issued is roughly 440.  AMD continues to assess the propriety of maintaining that hold with respect to all of these employees, some of whom AMD does not believe have any relevant information or involvement with any issue relevant to this lawsuit.  Accordingly AMD currently is in the process of reviewing its hold list and is considering paring that list, as appropriate." (10/24/05 AMD Letter at 3)**

Please provide a list of the 440 custodians originally issued a legal hold, and the date they were issued the legal hold.  To the extent any custodians were added, please identify them by

# GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 4

name, job title and office location, and indicate the day they were issued legal hold notices. If AMD has identified and removed from hold custodians that "it does not believe has any relevant information or involvement with any issues relevant to this lawsuit," please identify those custodians, the date they were removed from hold and the rationale as to why they were removed?

For each witness identified on AMD's Rule 26 disclosure, provide the date on which they were provided a legal hold notice, the date on which they were placed on journaling, and whether their emails are preserved on any monthly backup tapes. Please also identify each witness on AMD's Rule 26 disclosure who, at the time of the disclosure, had not been provided a legal hold notice, and an explanation of why they had not been provided a notice.

AMD has previously suggested that the parties exchange the content of their legal hold orders, and that the production of these orders will not constitute a waiver of any privilege, including a subject matter waiver. We accept this proposal. Please provide a copy of the legal hold order sent to AMD custodians (and any differing versions) and Intel will do the same.

> **"When a custodian is terminated during the pendency of the litigation hold, AMD harvests that custodian's potentially relevant data and documents. AMD either retains or makes a forensic copy of that custodian's hard drive; segregates and preserves data and documents on Exchange and Windows-environment, shared network servers; and paper documents and other physical storage media are collected as appropriate." (10/24/05 AMD Letter at 3).**

Please identify any custodian that was originally subject to the legal hold notice, but was terminated. As to those employees, please confirm that AMD has undertaken the preservation obligations described above. With respect to AMD's efforts, what is meant by a forensic copy (e.g., bit-by-bit). Please identify any terminated employee, whose data has been lost.

## D.    E-mail Preservation

> **"AMD also is in the process of moving its custodians subject to the hold notice to a new Exchange server on which e-mail can be more easily stored." (10/24/05 AMD Letter at 1).**

We remain confused regarding the steps that AMD has undertaken to preserve the potentially relevant e-mails in this action. In the course of our preservation discussions in the summer of 2005, AMD represented that it was relying upon the individual custodians to preserve the relevant e-mails by the issuance of the written legal hold notice. You further indicated, and

GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 5

confirmed in writing, that "AMD was in the process of moving custodians to a new Exchange server on which e-mail could be more easily stored" and, presumably, backed up per the representations described in your October 2005 letter.

In the meeting in Los Angeles in February 2007, AMD indicated that it had implemented a "journaling system" to preserve potentially relevant e-mails. It is unclear what AMD means by a "journaling system." Are you merely describing using MS Exchange Journaling of all sent and received e-mails that are then written off to backup tapes or has AMD implemented an archive solution where the e-mail is written off to some type of a storage area network drive? We would appreciate a full description of what AMD has implemented, including its configuration, when it was implemented when specific custodians subject to the legal hold in this matter where added to the system and whether AMD has experienced an issues or problems with this system.

      **E.**      **Harvesting of Drives**

Please identify the dates upon which each custodian's drive was harvested or reharvested. With respect to those drives, please identify any drive that AMD has been unable to harvest for any reason.

      **F.**      **One-Time Backup**

> **"AMD is extracting monthly full backups of its Exchange and Windows-environment, shared network servers. Roughly 200 tapes are collected in these backups." (10124/05 AMD Letter at 2).**

> **"The oldest, full backup in existence as of March 11, 2005, was preserved and full backups were to be taken on and in the few weeks immediately after March 19, 2005. The exact date varied by a week or two depending on the sites' backup schedules. Since about May 2005, backup schedules were (and arc now) coordinated worldwide." (10/24/05 AMD Letter at 2).**

We are concerned about the low number of tapes taken as part of this "one-time backup." Your letter suggests that for each server, there should be two tapes: (i) the oldest full backup in rotation at that time; and (ii) a new backup taken on or about March 19, 2005. Accordingly, this would mean that only 100 potential servers were backed-up.

It would also be helpful if AMD could identify the specific severs that were backed up and the general purpose of that server (e-g., Exchange, NT shared drive). With respect to these tapes, please confirm that they have been preserved as indicated in your October 2005 letter. In

# GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 6

addition, are any of these tapes lost or missing or not readable?  In addition, has AMD attempted to restore or restored any of these backup tapes and, if so, for what purpose?

On a separate matter, your October 2005 letter indicates that the "oldest, full backup in existence as of March 11, 2005, was preserved.  This would obviously mean that AMD was contemplating litigation as early as March 11, 2005.  However, we are concerned that the first legal hold notices to custodians were not issued until April 1, 2005. (10/24/05 AMD Letter at 2). Accordingly, we would like to know when AMD first contemplated litigation, who was involved in the decision to file the instant action, when that decision was made, the specific dates of any communications or meetings in which the topic of potential litigation was discussed, when did the issue of preservation of potentially relevant records first arise, whether there was any discussion about the timing of the issuance of the legal hold records and who was involved in such discussions?  To the extent you are asserting privilege around these communications, we would anticipate that you will provide us with log from which we can evaluate the claim of privilege.

Finally, to the extent AMD has information about any other issues relating to the preservation of its documents, please provide us with a full report.  We look forward to hearing from you on the above issues.  Of course, we will be happy to discuss our requests with you and respond to any questions you may have.

Very truly yours,

Robert E. Cooper

KEK:REC/lsj

100203202_1.DOC

# EXHIBIT D

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

333 South Grand Avenue  Los Angeles, California 90071-3197
(213) 229-7000
www.gibsondunn.com

RCooper@gibsondunn.com

August 1, 2007

Direct Dial
(213) 229-7179

Fax No.
(213) 229-6179

Client No.
T42376-00764

### VIA E-MAIL/U.S. MAIL

Charles P. Diamond Esq.
O'Melveny & Myers, LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067

  Re: *AMD v. Intel*

Dear Chuck:

  Thank you for your letter of July 25, 2007.  We too have been giving thought to ways to address the unprecedented burdens of the document discovery in this matter.  I wanted to take this opportunity, in advance of a meeting, to give you some of our concerns and ideas about how we might proceed going forward.

  Of course, your suggested approach is a substantial departure from what was agreed to and embodied in a court order.  When we initially discussed the document production, the issue was whether word searches or other techniques could be used to define the universe for production.  With respect to third party productions, we have agreed to such an up-front word search screen to address their burden concerns.  However, the parties' production has been more traditional.  Your proposal would effectively require wholesale production of data, encompassing large volumes of entirely irrelevant material, with only a privilege screen done by word search.  The proposal assumes that the savings accruing to each of us by avoiding up-front review of our own documents will far exceed the additional costs each of us will incur in reviewing a much larger production from the other.  This may very well be true, but the result will certainly be production of a massive amount of irrelevant, sensitive or privileged material that otherwise would not have been produced.  This raises significant issues that we will want to discuss.

  I also think it is time for both parties to acknowledge the obvious.  The scope of the document discovery envisioned by our original agreement, and accompanying retention

LOS ANGELES   NEW YORK   WASHINGTON, D.C.   SAN FRANCISCO   PALO ALTO
LONDON   PARIS   MUNICH   BRUSSELS   ORANGE COUNTY   CENTURY CITY   DALLAS   DENVER

# GIBSON, DUNN & CRUTCHER LLP

Charles P. Diamond Esq.
August 1, 2007
Page 2

obligations, has proved to be staggering in scope and cost. As experienced trial lawyers, we both
know that as a practical matter the relationship in this case between the documents subject to
retention, inspection and production in native format for review by opposing counsel are
extraordinarily disproportionate to what few will ultimately be used. Indeed, your proposal that
AMD and the Class be limited to designating 236,600 documents to TIFF for potential use at
trial, when there will be tens of millions, if not over a hundred million, pages of documents
produced in this matter illustrates how huge the disparity is between volume and usefulness. The
problem here is the availability of more information than can be rationally evaluated.

In your letter, you lament the pace of the parties document exchange despite the
resources we both have devoted to it. We certainly agree that the document production has been
a huge burden, but I do want to take this opportunity to stress that Intel has borne a much larger
burden in that process, irrespective of our remediation program. Intel has produced more than
twice as many pages of documents as AMD. By our count, using standard conversion rates, we
have produced the electronic equivalent of approximately 35 million pages, whereas, in contrast,
using the same conversion rates, AMD has produced approximately 15 million pages. Moreover,
we have produced from more than twice as many custodians as AMD; specifically Intel has
produced documents from more than 219 custodians, compared to AMD's 108 custodians. And
presumably AMD has a lot of additional review to complete before it can finish its production,
so any delays in getting document production completed cannot be laid entirely at Intel's door.

In that regard, you commented that, as a result of the unavoidable magnitude of Intel's
remediation effort, AMD likely will "face a deluge of additional electronic documents dwarfing
the initial production." I am unclear exactly what you meant, but our remediation effort is not
designed to increase the overall production, but rather to ensure that the production from the
agreed custodians is as complete as possible. Moreover, while it is true that it will take some
time to complete the global data base envisioned by our remediation plan, our remediation plan
is only meant to supplement the production we will be producing from our custodians. To move
discovery along as quickly as possible, I called David Herron on July 19, shortly before you
wrote your letter, to suggest that the plaintiffs should take steps now to designate a large number
of the approximately 180 remaining custodians they have the right to designate but have not yet
designated. For example, if plaintiffs were to designate an additional 130 custodians, this would
permit us to continue production on a rolling basis for 423 custodians, not just 293, and to do so
by supplementing each of the 423 custodian's production with documents found in any of the
other designated custodians' emails. This will avoid slowing down on-going production, and
should reduce the level of supplementation that will come later after loading of the remaining
custodians in the global data base is completed. We believe that plaintiffs now have the
information they need to make a very large and meaningful additional designation to facilitate
this process.

I was a little unclear about your response to our proposal for rolling production. You said
you were "willing to accept the production of remediation data on a rolling basis, that is, as

# GIBSON, DUNN & CRUTCHER LLP

Charles P. Diamond Esq.
August 1, 2007
Page 3

supplemental materials for a custodian are culled … rather than waiting until the entire remediation database is assembled" but only "so long as we can control the order in which custodians supplemental material is produced." I think that is exactly what we asked you to do – by designating now most of the remaining custodians from whom you want documents produced. Plaintiffs still would retain a large number of "free-throws," but in the meantime we can make a substantially complete production on a rolling basis for the designated custodians.

Intel has proceeded to designate many of the AMD custodians it is entitled to designate, and we have done so, despite the fact that the production AMD has made thus far largely ends as of July 12, 2005. Although we have been assuming that AMD has not experienced any lapses in its document retention, we are still awaiting a response to our letter of April 11, 2007 asking for information about AMD's preservation program. On April 23, 2007 you assured us that you were "aware of no systemic failure in the execution of the preservation plan" and promised to undertake "a thorough review of AMD's preservation program." We have heard nothing since. We raise this now because we are seeing what appear to us to be problems with AMD's production.

Just by way of example, our review of the emails produced by Hector Ruiz, AMD's CEO, shows that he retained only a fraction of his sent emails, as evidenced by the number of his emails found in other mailboxes during the same time period. We understand that AMD decided to bring its lawsuit on March 11, 2005 and issued a document hold notice for selected custodians (which certainly would have included top executives) on April 1, 2005. For the time period from April 1 through June 30, 2005, Mr. Ruiz had 66 sent emails in his custodial production (which appear to have been recovered from back-up sources or an archive system incidentally). Yet our various searches uncovered what appears to be over 250 non-duplicative sent emails from Mr. Ruiz in the production of other custodians – sent emails that apparently were not retained by Mr. Ruiz after the litigation hold was imposed.

Documents produced from the files of other custodians for the same time period also seem to show lapses in retention. For example, the .pst file of Chris Calandro, AMD's Gateway Global Account Manager, contained only six (6) sent emails (and those were produced from his in-box). Yet our initial review shows more than 600 non-duplicative sent emails in the production of other AMD custodians. AMD's CFO, Bob Rivet, produced 99 custodial sent emails, but our initial review shows more than 75 of his non-duplicative sent emails in the production of other AMD custodians.

Our review of AMD's production is in the preliminary stages, and of course we don't know why these problems occurred. We certainly realize that these apparent inconsistencies may reflect how difficult it is to achieve perfect retention production. But we would like to know whether we should expect similar issues in the production of other AMD custodians, if it is going to be necessary for AMD to go to back-up measures to ensure a reasonably complete production, and, if so, how that might affect the timing of AMD's completion of production. Of

# GIBSON, DUNN & CRUTCHER LLP

Charles P. Diamond Esq.
August 1, 2007
Page 4

course we recognize that it takes considerable time to audit and interview large numbers of custodians to confirm the completeness of their retention practices, but at least AMD is dealing with far fewer custodians than Intel is. We would appreciate a reply as soon as reasonably possible to our letter of April 11, 2007.

I recognize that the above discussion doesn't directly address your proposal that the parties produce all documents in native form, whether or not relevant, with only a word search for privileged documents. Such a procedure presumably might accelerate the initial production, although it will put a much larger burden on the receiving party. While we are prepared to discuss the idea, we are concerned that, as the case is presently postured, it would prove counterproductive to Intel.

For Intel, a fundamental problem with your suggestion—in a world in which your client has publicly indicated that it will seek sanctions—is that it will require Intel to follow two different approaches to production, thereby increasing, not decreasing Intel's document handling and costs. An important part of our response to any sanctions motion will be to establish, by means of forensic analysis, that any claim of material document loss is unfounded. This will likely require comparison of different groups of documents produced at different times. For such a comparison to be meaningful, and not yield false results, the second group of documents cannot be saturated with irrelevant material that would never have been subject to a retention obligation. A "failure" to retain irrelevant material is meaningless (indeed, our custodians were not asked to retain irrelevant documents), but if Intel's later productions are simply data dumps, we will be vulnerable to attack based on a comparison of sheer numbers, unless the later emails are reasonably comparable to the earlier ones. As a result, any production protocol that takes a radically different approach to determining "relevant" data for production, as yours does, will potentially prejudice Intel's ability to defend its remediation, putting aside the other issues associated with unreviewed production of huge numbers of documents. Put otherwise, we will have to do the same relevancy analysis for forensic purposes that we would do in any event under the present production protocol. So your proposal achieves no cost savings for Intel in producing its documents, but obligates Intel to produce massive amounts of irrelevant material, which will likely include sensitive or privileged information, while imposing greater costs on Intel in analyzing what will be a data dump from AMD. Given AMD's public statements that it intends to seek sanctions, and the massive costs Intel is incurring to remediate, we cannot readily agree to such a fundamental change.

The only circumstance under which it would make sense for Intel to consider the implications of the drastic change in document production you are proposing would be if plaintiffs are prepared to forego pursuing any sanctions motion based on Intel's retention lapses. Otherwise, what you are proposing imposes double costs on Intel. Moreover, at a minimum it should be apparent by now that we have developed a comprehensive remediation plan, at enormous expense, and are pursuing it rigorously, and would expect to complete it and adjust it in any respect that the Special Master deems appropriate. We think plaintiffs are now in a

# GIBSON, DUNN & CRUTCHER LLP

Charles P. Diamond Esq.
August 1, 2007
Page 5

position to make a decision whether they want the parties to continue to devote huge resources to litigating issues relating to sanctions – an exercise which is unfounded and likely to contribute to delay of the trial date. However, that is plaintiffs' call. Our point is simply that, as long as Intel is faced with the threat of sanctions, your proposal to change the parties' production protocol in mid-stream does not make sense from Intel's viewpoint.

Let me also suggest another subject that we should discuss in our mutual effort to bring this case to trial in a timely fashion. Why not reduce the total number of custodians for whom each side is producing? We think the reality is that both sides were overly ambitious in terms of what could actually be accomplished, given such a large number of individuals who might have relevant documents, and that both sides will be awash in documents that fully describe the transactions that are at issue in the case. Does AMD really need production of another 180 or so custodians? Perhaps we both need to make some concessions to the shortness of life.

On a related front, we believe that both Intel and AMD should continue our on-going effort to find a way to reduce the volume of production of share drives and share points, including testing a number of protocols, such as designating a limited number of shared sources for production, horizontal de-duplication processes and targeted word searches, all aimed at reducing the burden on both parties.

Addressing other issues raised in your letter, we are in general agreement on the harvest cut-off dates, but believe that there should be parity, i.e., a June 1, 2006 production for party-designated custodians. Creating a time disparity in production to address a document retention issue is not appropriate in any event, and engaging in lengthy and subjective evaluations of each side's productions to determine production cut-offs does not seem reasonable. As for the adverse party-designated custodians, we believe that the date of Intel's recent comprehensive harvests should be used for AMD's adverse designations of Intel witnesses. This is more than reasonable, since AMD will be making most of its designations well after Intel and will receive a production with a significantly broader time frame.

We agree on the timing on the "Free Throw" custodians. We also believe that, absent good cause, all choices should be made by January 31, 2008. If we can reach agreement on these points, we will also agree to your proposal on Deposition Reharvests and self-TIFFing, so long as the required notice is given. However, we are not inclined to agree to arbitrary limits on TIFFing of documents. Finally, while any party will always have the ability to seek relief to reopen depositions for good cause, we will not agree to any proposal that gives Plaintiffs carte blanche the opportunity to reopen depositions.

We are prepared to discuss these issues this week. One final point: As Dan Floyd indicated on the call with the Special Master, we believe these discussions are in the nature of a meet and confer. All such discussions to date have been conducted certainly in the first instance among counsel. While the Special Master has been extremely helpful in assisting the parties in

**GIBSON, DUNN & CRUTCHER LLP**

Charles P. Diamond Esq.
August 1, 2007
Page 6


resolving discovery issues, we think it will be more productive if our initial meeting were limited to counsel.  We can bring in Mr. Friedberg or Judge Poppiti as necessary after we've had a chance to have a full and frank discussion of the many issues raised by your proposal. Otherwise, I am concerned that a frank discussion might be hindered, as both of us jockey to make points in front of Mr. Friedberg or Judge Poppiti.

Very truly yours,

Robert E. Cooper

REC/lsj

cc:    Eric M. Friedberg
       Daniel A. Small

100270792_1.DOC