## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE INTEL CORPORATION MICROPROCESSOR ANTITRUST LITIGATION | ) ) ) ) | MDL No. 05-1717-JJF |
| ADVANCED MICRO DEVICES, INC. and AMD INTERNATIONAL SALES & SERVICE, LTD., | ) ) ) ) | C. A. No. 05-441-JJF<br><br>DM No. 4 |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **REDACTED - PUBLIC VERSION** |
| INTEL CORPORATION and INTEL KABUSHIKI KAISHA, | ) ) ) ) | |
| Defendants. | ) | |
| PHIL PAUL, on behalf of himself and all others similarly situated, | ) ) ) | C. A. No. 05-485-JJF |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| INTEL CORPORATION, | ) ) | |
| Defendant. | ) | |

## RESPONSE OF ADVANCED MICRO DEVICES, INC., AMD INTERNATIONAL SALES & SERVICE, LTD. AND CLASS PLAINTIFFS TO PAGES 30-39 OF INTEL'S PROPOSED REMEDIATION PLAN

OF COUNSEL:
Charles P. Diamond
Linda J. Smith
James M. Pearl
O'Melveny & Myers LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, CA 90067
(310) 553-6700

Mark A. Samuels
David L. Herron
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071
(213) 430-6000
Dated:  September 11, 2007

Jesse A. Finkelstein (#1090)
Frederick L. Cottrell, III (#2555)
Chad M. Shandler (#3796)
Steven J. Fineman (#4025)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
Finkelstein@rlf.com
Cottrell@rlf.com
Shandler@rlf.com
Fineman@rlf.com

*Attorneys for Plaintiffs Advanced Micro Devices, Inc. and AMD International Sales & Service, Ltd.*

James L. Holzman (#663)
J. Clayton Athey (#4378)
Prickett Jones & Elliott, P.A.
1310 King Street
P. O. Box 1328
Wilmington, DE  19899
(302) 888-6509
jlholzman@prickett.com
jcathey@prickett.com

*Interim Liaison Counsel and Attorneys for Phil Paul, on behalf of himself and all others similarly situated*

Pursuant to Paragraph 2 of the Stipulation and Order Bifurcating Discovery into Intel's Evidence Preservation Issues, entered on June 20, 2007 (D.I. 382 in Docket 05-441-JJF) (the "Bifurcation Order"), AMD and Class Plaintiffs (hereinafter collectively, "Plaintiffs") submit this response to pages 30-39 of Intel's April 24, 2007 Proposed Plan of Remediation (D.I. 321) ("Intel's Remediation Plan").

## I.    INTRODUCTION

On March 5, 2007, Intel came forward with the stunning public admission that it had discovered what it euphemistically termed "some document retention lapses." (Letter from R. Horwitz to Hon. Joseph J. Farnan, at 1 (Mar. 5, 2007) (D.I. 293) ("Intel's March 5 Letter").) Intel told the Court that these "lapses" occurred despite Intel's best efforts at document preservation:

> Intel acted promptly to set up a reasonable and thorough tiered process that exemplified best practices in such a massive case. Intel made good decisions about what procedures to implement. Intel's objective was to go beyond the standard of reasonableness . . . .

(Intel's March 5 Letter, at 3.)

At that time, Intel promised Plaintiffs and the Court that it would disclose, address and remediate its document preservation lapses in an open, transparent fashion:

> Intel is undertaking these remediation efforts at great expense. Intel has made it clear to counsel for AMD and the class that it is prepared to share information regarding Intel's efforts in that regard and to work with them going forward in addressing the issues and minimizing any potential losses, if any, of information.

(*Id.* at 7.)[1]

Notwithstanding Intel's professed contrition and pledges of transparency, AMD and Class have been largely stonewalled in their efforts to understand the full magnitude of Intel's

---

[1] *See also* Letter from Daniel Floyd to Mark Samuels and Daniel Small, at 3 (April 17, 2007) ("Intel is committed to providing a full factual record as to its retention efforts."), attached hereto as Exhibit A.

"lapses," and to assess the efficacy of Intel's Remediation Plan. Seemingly at every turn, Intel has delayed and obfuscated in providing critical information; and when that information was ultimately extracted from Intel, it was dribbled out slowly and nearly always shrouded from public view through questionable protective order designations.

Six months later, it is now abundantly clear why Intel has been so reticent to provide the transparency it promised Plaintiffs and the Court on March 5, 2007.

By any measure, Intel has allowed an immense loss of relevant evidence to occur during the course of this litigation, far exceeding anything even hinted at in its March 5, 2007 letter to the Court. These were not the common accidental and inconsequential losses of electronic evidence that often occur in litigation, despite reasonable preservation efforts, such as those that might result from an individual custodian's judgment as to what documents to retain and what to discard. As to the latter, one can always find the occasional mistake, made in good faith, in the hundreds of thousands (if not millions) of individual retention decisions that are at the core of most large document preservation plans. Intel's "lapses" are not of this kind. Rather, they are losses of a nature and scope as to call into question Intel's entire document preservation scheme. Indeed, one is forced to ask whether any responsible litigant seriously intent on retaining evidence would have adopted so flawed a system, and then so systematically fail to monitor and police it.[2] It was, in short, a preservation scheme destined to fail in a cataclysmic way. And it did.

It is now clear that Intel knew of at least some of its pervasive "lapses" by October 2006, if not earlier. Not only did Intel fail to disclose them to Plaintiffs or the Court until more than

---

[2] By virtue of the Bifurcation Order, Plaintiffs have not yet had the opportunity to conduct discovery into the causes of Intel's evidence preservation failings, or culpability for them. That discovery will commence on October 1. Bifurcation Order, at ¶ 9.

four months later,[3] but Intel also failed for months to take even the most obvious, basic interim step to avoid *further* evidence loss: the disabling of an auto-delete function (essentially an automatic paper shredder that operates on email) that was allowed to systematically obliterate electronic evidence for *twenty-one months* after this litigation commenced, and which should unquestionably have been shut off at the outset.[4]

Intel's decision to leave its auto-delete system running -- a decision that appears to have avoided no more than $55,000 of expense to Intel[5] -- injected grave risk that its preservation plan would fail. It required that Intel employees scattered all over the world regularly and faithfully take affirmative and timely steps to move their email out of the grim reaper's path and into a locally-stored personal folder or archive beyond the reach of the auto-delete system. For email an individual might *send*, an Intel employee had to "move or lose" a Sent Item within as few as 7 days or it would be auto-deleted; for *received* email, the period was 35-45 days. (Intel's Remediation Plan, at 14.)

With auto-delete systematically destroying all evidence that was not being affirmatively archived, one would have expected Intel to clearly and effectively instruct its employees to ensure that they were, in fact, moving their email out of harm's way, to thoroughly and consistently police compliance with those instructions, and to implement reasonable backup

---

[3] Intel first brought some of its document retention issues to the attention of AMD counsel on February 8, 2007.

[4] At the very least, Intel could have temporarily suspended its auto-delete system until it had determined which custodians' email accounts would be subject to long-term preservation. It then could have acquired one of several commercially-available "journaling" systems to preserve those individuals' sent or received email regardless of auto-deletion and regardless of what a given employee might do (or fail to do). Intel ultimately acquired this type of system only in March 2007, some six months *after* its massive losses were discovered. (Intel's Remediation Plan, at 31-32.)

[5] *See* Letter from Kay Kochenderfer to James Pearl, at 4 (Aug. 3, 2007), attached hereto as Exhibit B.

3

strategies to ensure that relevant evidence an employee might neglect to move would nonetheless be preserved on a backup tape. In all of these respects, as we demonstrate in the next section of this response, Intel failed miserably.

This submission is not intended to catalog Intel's preservation malfeasance -- that will follow Court-ordered discovery by AMD and Class Plaintiffs into exactly what Intel did wrong and who is to blame. This memorandum instead addresses the proposed Remediation Plan Intel has put forward. We will urge that the Special Master order certain enhancements to Intel's plan in order to provide the transparency Intel has promised, and in order to provide meaningful benchmarks and other data through which Intel's remediation can be assessed. Finally, in order to preserve the trial date in this case and to avoid further prejudice to AMD and Class Plaintiffs, we will request that the Special Master set an outside date by which Intel's remediation activities must be accomplished.

## II.    THE SCOPE OF INTEL'S DOCUMENT PRESERVATION LAPSES

To assess the reasonableness of Intel's proposed Remediation Plan, it is obviously essential that one have a full understanding of the "target" -- the data that has been lost and is sought to be remediated.

As the Special Master is aware, Intel and AMD agreed to a "custodian"-based approach to document production in which each side self-identified those of its employees "in possession of an appreciable quantity of non-privileged, material, non-duplicative documents and things responsive to" the other side's document requests.[6] Intel identified 1,023 such employees on its

---

[6] Stipulation and Proposed Order Regarding Document Production, filed May 15, 2006, at ¶1 (D.I. 122) ("Document Production Stipulation"), entered by the Court in Case Management Order No. 1 at ¶ 5(d) (May 16, 2006) (D.I. 123).

Custodian List served on June 1, 2006, and amended on April 23, 2007.[7]  The parties further agreed that they would specifically consider each of the individuals on their respective Custodian Lists and self-identify "the most important custodians with knowledge of the issues framed by the pleadings" and possessing "the most non-privileged, non-duplicative documents responsive to [the other's document requests]."[8]  Intel self-identified 219 key employees from its Custodian List as meeting these criteria.[9]  The parties' deal requires production from each of these 219 Intel Custodians, as well as from 254 additional Custodians to be selected by Plaintiffs.[10]

Especially when combined with the reckless decision to leave its auto-delete system running after this litigation began, one of Intel's most fundamental "lapses" was its failure to notify hundreds of its Custodians of their obligation to preserve evidence.  All told, 378 of Intel's Custodians, or 37% of the individuals on its Custodian List, received no evidence preservation instructions until late February or early March 2007 -- twenty-one months after AMD and the Class commenced suit -- or, in the case of employees who left Intel in the interim, not at all.[11]  Calculated to the date of Intel's belated evidence preservation instructions to these individuals (or the date of their separation from Intel, as the case may be),[12] the result of this failure was that Intel allowed a *conservative minimum*[13] of 11,471 aggregate working weeks to elapse without

---

[7] *See* Custodian Designations of Intel Corporation and Intel Kabushiki Kaisha Pursuant to the Stipulation and Order Regarding Document Discovery, served June 1, 2006, attached hereto as Exhibit C; Corrected Custodian Designations of Intel Corporation and Intel Kabushiki Kaisha Pursuant to the Stipulation and Order Regarding Document Discovery, served June 1, 2006, attached as Ex. B to Intel's Remediation Plan.
[8] Document Production Stipulation, at ¶ 2.
[9] Intel's Remediation Plan, at Ex. B.  (These 219 Custodians are identified in Intel's Custodian List with an asterisk beside their name.)
[10] Intel's Remediation Plan, at 17-19 and Ex. A ¶¶ 3-4.
[11] Intel's Remediation Plan, at Ex. D.
[12] These dates are set forth in Exhibit D to Intel's Remediation Plan.
[13] For this purpose, we indulge the assumption that none of these individuals should have been recognized by Intel as likely custodians prior to June 1, 2006.

RLF1-3199808-1

placing these individuals under evidence preservation instructions. *Because there is no reason to believe that any of these 378 individuals would have taken regular, affirmative steps to prevent their relevant electronic data from being auto-deleted without being instructed to do so -- nor has Intel come forward with any evidence to suggest otherwise -- this amounts to a conservative minimum of more than 220 YEARS worth of data that has been destroyed by Intel.* And that computation ignores all of the *other* Intel data preservation "lapses."

Intel Custodians who *did* receive timely preservation instructions were only slightly better off than those who received none at all. This is because Intel's actual preservation instructions to its Custodians were stunningly inadequate. Intel inexplicably failed to instruct its Custodians that they would have to *affirmatively move* their data into personal folders to prevent it from being eviscerated by the auto-delete system, or that they would need to do so on a prompt and regular basis in light of Intel's seven-day auto-delete cycle for Sent Items. *In fact, the preservation instructions do not even refer to the auto-delete system at all!* Rather than alerting Custodians that, unless moved, their email would fall victim to an auto-delete purge (the only instruction Intel could have given that would have been reasonable under the circumstances), Intel matter-of-factly told Custodians that they "may find it helpful" to move email into personal folders -- a clear message that doing so was merely "optional," rather than "essential."[14]

Even as insufficient as Intel's preservation notice was, the mere fact that an Intel Custodian received one was no guarantee that he or she complied in good faith with it. A stunning number of Intel Custodians who presumably[15] received timely evidence preservation instructions nevertheless failed to comply with them. Fully 570 of Intel's Custodians -- over

---

[14] Intel's Remediation Plan, at 12.

[15] Intel has not disclosed the date on which its Custodians were first instructed to preserve evidence, except for those identified at Exhibit D of Intel's Remediation Plan as having received notice for the first time after January 1, 2007.

6

55% of them -- have admitted to Intel's investigators that they had one or more compliance

issues, ranging from a total disregard of the evidence preservation notice they received, to a

failure to preserve their Sent Items (reported by a whopping 203 Custodians), to the ineffective

use of a macro intended to save e-mails.[16]  The non-compliant include many of Intel's most

important Custodians, including its three top executives -- Mr. Otellini, Mr. Barrett and Mr.

Maloney.[17]  And this may be the tip of the iceberg.  To this point, Plaintiffs have been forced to

take Intel's counsel's word for the extent of Intel Custodians' compliance, and the reasons for

any non-compliance.  Intel's disclosure of Custodian defalcations has dribbled out over nearly

six months and was not completed until this past week,[18] and Intel's hearsay explanations[19] for a

particular custodian's non-compliance, or its impacts, frequently strain credulity.[20]  *Of the most*

*important Intel Custodians -- the 219 employees represented by Intel as being "the most*

---

[16] *See* Intel's letters to the Special Master and attachments thereto dated Apr. 27, 2007, May 11, 2007, May 18, 2007, May 25, 2007, June 1, 2007, June 8, 2007, June 15, 2007, June 22, 2007, June 29, 2007, July 6, 2007, July 13, 2007, July 20, 2007, July 27, 2007, Aug. 3, 2007, Aug. 10, 2007, Aug. 17, 2007, Sept. 7, 2007. (D.I. 327, 339, 346, 352, 356, 375, 376 (revised submission of D.I. 352), 377, 379-80, 384-85, 388-89, 391, 392 (revised submission of D.I. 389), 393, 395-98, 401-02, 404-05, 409-10, 416-17, 422, 423 (revised submission of D.I. 417), and 424.
[17] *See* Intel's February 22, 2007 Disclosure to Plaintiffs, entitled *Information Regarding Intel's Initially Designated 217 Custodians and The Additional 22 Custodians Designated by AMD*, attached hereto as Exhibit D.
[18] Paragraph 8 of the Order Regarding Intel's Evidence Preservation Issues required Intel to disclose all "preservation issues" affecting any of its Custodians "in a reasonable time frame, on a rolling basis."  It has taken Intel nearly six months to make these rolling disclosures, and even as of August 31, 2007 (the deadline for completion of Remediation Discovery), several custodians remained unaccounted for.  Intel served its most recent rolling disclosure on September 7.  D.I. 422, 424.  With that submission, Intel appears to have accounted for all but one of the Custodians on its Custodian List.  *See* Email from Kay Kochenderfer to Robert Postawko (Sept. 5, 2007 9:42 AM), attached hereto as Exhibit E.
[19] Intel has thus far rebuffed all of Plaintiffs' efforts to get behind Intel's conclusory, unsworn explanations to ascertain the actual facts.  This will be the subject of upcoming discovery.
[20] For example, Messrs. Otellini, Barrett and Maloney are each said to have ignored the preservation instructions given to them by Intel's Legal Department because they were laboring under a misimpression that Intel's IT Department was automatically saving their emails.  *See* Ex. D.  Is it a believable coincidence that Intel's most senior executives would each indulge the identical catastrophic misimpression, especially in the absence of any explanation as to why?

7

*important custodians with knowledge of the issues framed by the pleadings" and as possessing "the most non-privileged, non-duplicative documents responsive to [Plaintiffs' document requests]"[21] -- a surprising 148 of them, or 67.5% of that group -- have already admitted to having one or more compliance issues.*

Finally, a significant number of Custodians had *both* a systemic preservation problem -- in that Intel either did not preserve their Complaint Freeze Tape, failed to send a timely preservation instruction (or sent none at all), or did not begin making and preserving backup tapes until late 2006/2007, or some combination thereof -- *and* a compliance problem. No fewer than 328 Intel Custodians – 32% of the total – are "dual failures" under this definition. Intel's self-selected 219 most important Custodians did not fare much better. Over one-fourth of them are reported by Intel to have *both* preservation and compliance problems.

While it is impossible to measure exactly how much data has been lost or destroyed under Intel's self-proclaimed "comprehensive" and "multi-tiered" document preservation plan, Intel's disclosures regarding the employees on its Custodian List, including the 219 key employees identified by Intel itself as being the most important, suggest that the scope of the loss is both unprecedented and irreparable. It is clear that Intel's preservation plan began falling apart from its inception. In fact, 618 Intel custodians – *over 60% of the employees on its Custodian List* – suffered a breakdown in one or more of the three fundamental building blocks of this so-called tiered preservation plan, either (i) because a Complaint Freeze Tape, which should have provided a snapshot of the custodian's electronic files as of the week that AMD filed its Complaint, was overwritten[22]; (ii) because the Custodian received a severely belated Litigation

---

[21] Intel's Remediation Plan, at Ex. A, ¶ 2 and Ex. B.
[22] Intel did not preserve "Complaint Freeze Tapes" for 96 custodians on its Custodian List. (Intel's Remediation Plan, at 23 and Ex. F (col. 5).)

Hold Notice (or none at all)[23]; and/or (iii) because Intel did not start preserving the Custodian's data on weekly backup tapes until late 2006 or, more commonly, some time in 2007.[24]  And of the 219 individuals Intel self-identified as its most important Custodians, Intel either did not preserve a Complaint Freeze Tape or did not make and preserve Weekly Backup Tapes prior to 2007 (or both) for 87 of them -- nearly 40% of this group.[25]

In light of the massive scope and nature of Intel's evidence preservation failures, one is immediately struck by the following assertion in Intel's Remediation Plan:

> [Intel] has a sound basis to believe that ultimately nothing of any genuine significance will prove to have been lost.

(Intel's Remediation Plan, at 4.)

For there to be any "sound basis" that nothing "will prove to have been lost," one has to indulge a tenuous set of assumptions that is at the core of Intel's Remediation Plan:  That each Custodian with a preservation problem (and there are over 600 of them) sent a copy of every significant email relating to Intel's microprocessor business (including emails directed outside the company) to someone else within Intel (i) who was also a Custodian, (ii) who actually received timely preservation instructions, (iii) who actually complied with those instructions, and (iv) who had the presence of mind (despite the impression created by the preservation notice that it was merely an option) to create an archive, transfer every applicable email into that archive, and preserve it.  Of course, Intel has not conducted any testing or offered even a scintilla of evidence to support *any* of these assumptions, let alone all four.

---

[23] 378 of Intel's 1,023 Custodians, or 37 % of the total, received evidence preservation instructions <u>a minimum</u> of 8 months too late, or (in the case of employees who left Intel prior to February 2007) not at all.  (Intel's Remediation Plan, at Ex. D.)

[24] Intel did not begin making weekly backup tapes for 495 custodians on its Custodian List until late 2006 or 2007.  (Intel's Remediation Plan, at Ex. F (col. 7).)

[25] ████████████████████████████████████████████████

As we will show, AMD's discovery into Intel's Remediation Plan has revealed that there is absolutely no scientific or other analytical basis for Intel's assurance that "nothing of any genuine significance will prove to have been lost." In the absence of any evidence to support the fantastic assumptions above, one must assume there has been an irremediable loss of data. Intel's statement instead represents nothing more than the extreme, unfounded optimism of a desperate litigant facing grave discovery problems, as the evidence to date certainly belies Intel's suggestions to the Court that its problems are routine and eventually curable. In the end, it is probably the case that Intel can do little more than it is doing to remediate. But that hardly establishes that "nothing of any genuine significance" has been lost. Simple logic establishes as a virtual certainty that the opposite is true.

III.    PLAINTIFFS' ASSESSMENT OF INTEL'S REMEDIATION PLAN

Intel's Remediation Plan leaves a first-blush impression that Intel has devised a reasonable fix for its preservation failures. For their part, Plaintiffs do not doubt that Intel's attempt to remediate evidence destruction of this magnitude is a major and expensive undertaking. Restoring thousands of backup tapes, searching custodial email repositories, issuing newly-worded litigation hold orders to previously-ignored custodians, and harvesting new data from all of its currently-employed Custodians naturally entails significant cost, time and effort. AMD also expects that at the end of the day Intel will be able to gather great volumes of lost and new data -- even though Intel has failed so far to analyze what it has found or disclose those results to Plaintiffs.

However, the mere expenditure of money (even lots of it) and the restoration of volumes of data (even huge ones) are neither reliable nor conclusive indicators of remediation success, much less evidence that all data "of any genuine significance" has been restored. Instead,

gauging the effectiveness of Intel's proposed Remediation Plan requires assessing: (1) the extent of Intel's data loss; (2) what data has been preserved -- in backup tapes or other custodial email collections -- and can, therefore, be retrieved and produced; and (3) whether Intel will be able to timely produce remedial data to avoid even further delay and the prejudice that Intel's delay is causing. Only Intel possesses the data necessary and sufficient to answer each of these critical inquiries. Accordingly, unless and until Intel provides -- or is compelled to provide -- a complete accounting on these issues, AMD and Class Plaintiffs are left largely to guess at the answers. Unfortunately, that is the current situation.

### A. INTEL HAS NO ANALYTIC OR QUANTITATIVE BASIS TO ASSERT THAT ITS PLAN WILL SUCCESSFULLY REMEDIATE ITS MASSIVE EVIDENCE DESTRUCTION

Intel has produced some pertinent information about data loss. For example, Intel's disclosures about non-existent and unreadable backup tapes, individual custodian preservation lapses, failures to migrate Intel custodians to dedicated servers, failures to harvest departing employees' hard drives, and disclosures about Intel Custodians who did not begin preserving any evidence until March 2007 all demonstrate the *fact* of loss. But Intel has produced nothing to show -- and has not attempted to determine -- the magnitude and precise *extent* of loss.

Any honest assessment of this fiasco requires Intel to acknowledge that it cannot remediate the irremediable. As discussed above, Intel indisputably destroyed a massive amount of relevant data that will never be recovered. Intel thus misleads when it pretends that it has a "*sound basis* to believe that *ultimately nothing of any genuine significance* will prove to have been lost."[26] Having made this bold representation to the Court, Plaintiffs and the media, Intel presumably should have thorough testing and analytics to establish this "sound basis." In fact,

---

[26] Intel's Remediation Plan, at 4.

11

however, this is simply an *ipse dixit* assertion about the ultimate value of evidence Intel destroyed, and for which Intel has no credible or reliable support.

AMD has conducted discovery into the important issues of how much and precisely what data Intel lost -- and what underlies Intel's assertion that nothing of "genuine significance" has been. ███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████ Intel thus confuses gigabyte totals with adequacy to advance a legal and factual conclusion that Intel has done nothing to verify.

Detailed auditing, data analysis and reporting by Intel are essential elements to assessing the extent of Intel's data loss and the extent to which loss can be remediated. For example, assessing individual Custodian data loss requires comparing counts of email retained during a period of preservation failure (*e g*, when Intel's "auto-delete" was operating on a Custodian's data, with no backup in place) with email counts during a time period when, as now, Intel has disabled its "auto delete" function and is capturing all email in an "archive." (Intel's Remediation Plan, at 31-32.) Auditing and reporting functions, however, are entirely missing from Intel's proposals -- and Intel appears to have conducted *no thorough analyses*. Indeed, at deposition, ████████████████████████████████████████████:

---

27 ██████████████████████████████████████████████████████████████
██████████████████████████
28 █████████████████████████

12



In sum, Intel has conducted no methodical analyses to determine whether its Remediation Plan is likely to succeed, is succeeding, or could be improved to increase chances of success. As set forth below, AMD asks the Court to order Intel to supply proper auditing data at its expense.

**B.     INTEL'S REMEDIATION PLAN HAS REASONABLE ELEMENTS THAT, NEVERTHELESS, WILL NOT AND CAN NOT RESULT IN RECOVERY OF ALL RELEVANT DATA**

Despite Intel's failure to conduct or disclose any analysis of data loss, Plaintiffs do not contend that Intel's proposed Remediation Plan is patently unreasonable.   Given the evidence preservation scheme it implemented, Intel does appear to be searching for email in the two principal remedial data repositories available to it:  (1) Weekly Backup and "Complaint Freeze" tapes; and (2) the files of other Intel Custodians.[29]  As described above, however, Intel lost some relevant data that is necessarily gone forever.   The Court should be under no illusion that backup tapes and custodial collections captured or contain all, or the vast majority, of the lost data relevant to this case.   Each has real limitations and gaps through which relevant data doubtless slipped.

For example, Intel has conceded that it failed to make *any* weekly backup tapes for hundreds of its custodians.   And unlike Intel's new "archive," weekly backup tapes are not designed to, nor do they capture, all email.   █████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

---

[29] These are the only two elements of Intel's proposed Remediation Plan that are exclusively directed to locating and restoring evidence lost through evidence preservation failures.   In contrast, Intel's other proposals focus on capturing data that was principally generated *after* Intel discovered its evidence destruction.   For example, implementing new policies to capture departing Intel Custodian data does nothing to replace data already lost.   Intel's data harvests conducted in May 2007 may capture some email files created before 2007, but very likely will not capture much given Intel's failure until March 2007 to disable "auto-delete" and instruct 378 of its Custodians to retain *any* relevant documents.   Similarly, Intel's March 2007 implementation of a new email "archive" and issuance of new document hold instructions may prevent future evidence destruction, but neither can nor will remediate any past data losses.

████████████████████████████████████████████████████████████████████

████████████████████████

    Searching for email in a "mush pot" collection of Intel Custodian files has its own limitations. ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ And the fact that Intel failed until late February 2007 or later to instruct fully one-third of its Custodians to preserve *any* evidence belies the assumption that those individuals' hard drives today will contain substantial volumes of email from a time before they were instructed to save any. ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

    Nor does Intel's Remediation Plan comprehensively pursue other available data sources or data retrieval means. ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

30 ██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███

**IV.    INTEL HAS LIMITED AMD'S ABILITY TO RESPOND TO THE REMEDIATION PLAN**

Intel's promised transparency has proved largely a fiction.  To Plaintiffs' surprise and disappointment, they endured months-long negotiations with Intel that resulted in only selective and belated rolling productions of Intel documents relating principally to the technical aspects of its Remediation Plan implementation.  Despite promising the Special Master that it would complete its remediation production by August 10,[31] Intel instead dragged out its production and even as of August 28, 2007, was unable to certify that its production was complete.[32]  Prolonging inquiry into what Intel intends to do about its evidence destruction problems benefits no one.  Plaintiffs have elected to simply respond to Intel's Remediation Plan rather than expend further resources trying in vain to extract meaningful information from Intel.[33]  After all, Intel began

---

███████████████████████  This does not, however, represent a methodical effort or a statistically-significant sampling of backup tapes for missing files.

[31] *See* Special Master Teleconference Tr. 30:3-14, 31:22-32:12, July 31, 2007, excerpts of which are attached hereto as Exhibit I.

[32] *See* Email from Kay Kochenderfer to James Pearl (Aug. 28, 2007 9:35 AM), attached hereto as Exhibit J.  For example, AMD had been requesting Intel's litigation hold memoranda since February 15, 2007, and agreed that their production would not waive privilege.  (*See* Letter from Charles Diamond to Robert Cooper, at 3 (Feb. 15, 2007), attached hereto as Exhibit K; *see also* Letter from Richard Horwitz to Judge Poppiti (Apr. 23, 2007) (D.I. 320).)  AMD renewed that request repeatedly, both orally and in writing.  These documents, which Intel had readily in hand but simply refused to produce, were not fully produced until the discovery cutoff date of August 31 -- *6 months* after AMD requested them and at a point where additional discovery about them could not be conducted.

[33] Plaintiffs' ability fully to understand and assess Intel's Remediation Plan and efforts, however, has been adversely impacted by discovery tactics.  A prime example is Intel's walling off

16

unilaterally to execute its Remediation Plan months ago, without any input from Plaintiffs or approval from the Special Master. Intel has thus assumed responsibility for any deficiencies or failures in the Remediation Plan it is now implementing by unilateral fiat.

While, for purposes of actually moving the case forward, AMD has forsaken fights on many categories of information withheld by Intel, AMD (and the Court, for that matter) will need access to critical data relating to Intel's remediation that Intel has thus far been unwilling to provide. AMD requested and was denied data on what the Remediation Plan was actually recovering in terms of email counts for affected custodians. Specifically, on July 2, 2007, AMD requested reports from First Advantage, OnSite, and Electronic Evidence Discovery providing data on the emails restored from Complaint Freeze and weekly backup tapes.[34] ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████. But when AMD requested those reports,

---

production of critical documents by wide-ranging privilege assertions, and thus refusing to produce *any* documents relating to the design and deliberations that went into the creation of the Remediation Plan. Presumably, Intel should have written remediation protocols and other documents that describe how it chose the remediation course it did -- but Plaintiffs have been deprived access to them. Without that information, Plaintiffs have been unable to assess what steps Intel could and should have taken, but declined to take -- or forcefully rebut Intel's assertions of thoroughness. Intel rejected AMD's attempt to break the log-jam by offering to stipulate that a production of privileged documents relating to Intel's remediation plan would not constitute a broader waiver of the attorney-client privilege or work-product protection. Intel, however, maintains its position that, because its legal counsel designed its Remediation Plan, inquiry into how that plan came about is off limits. Although the parties now have a non-waiver agreement in place, Intel nevertheless refused to produce the documents of *any* attorney custodian, privileged or not, as part of its remediation production, and refused even to produce a privilege log. The promised transparency sufficient to allow Plaintiffs, the Special Master and the Court to fairly evaluate Intel's Remediation Plan proposals has thus been obscured by overbroad invocation of privilege.

[34] *See* Email from James Pearl to Kay Kochenderfer, Robert Cooper, and Daniel Floyd (June 26, 2007 2:23 PM PST), attached hereto as Exhibit L; Letter from James Pearl to Kay Kochenderfer (July 2, 2007), attached hereto as Exhibit M.

17

Intel stated that they would take four weeks and $50,000 to generate, and that it would provide them only if AMD paid the cost.[35] Intel provided no legal support for its assertion that AMD should bear the financial brunt of assessing the effectiveness of Intel's efforts to cure its own preservation failings, and it is grossly unfair to inflict this cost on AMD (as Intel has sought to do) when it is directly the result of Intel's admitted dereliction. It is also inconsistent with the Bifurcation Order, wherein Intel expressly acknowledged its prior representation to the Special Master that it would not resist enhancements or modifications to its Remediation Plan on the basis that the cost or burden was unjustified by its level of culpability. (*See* Bifurcation Order, at 2.)

No party, including Intel, can know whether Intel's Remediation Plan is effective if Intel persists in refusing to supply the data necessary to make that assessment. To determine whether Intel's plan is working, Plaintiffs need detailed data on how many emails existed for each Custodian from each remedial source both before and after Intel's preservation failings. Without this information, Plaintiffs cannot make meaningful comparisons of what would likely have existed in Intel Custodian files in the absence of Intel's preservation dereliction. These "apples to apples" comparisons are the only meaningful metrics to judge the efficacy of Intel's remedial effort.

Intel's claims about how much it has spent remediating and how much data it is generating are meaningless figures that establish nothing about the Remediation Plan's merit or likely success. And Intel's repeated complaints about the costs it has incurred evoke little sympathy given that it is now clear Intel could easily have avoided them by spending a fraction

---

[35] *See* Letter from Kay Kochenderfer to James Pearl, at 2-3 (July 6, 2007), attached hereto as Exhibit N.

of those costs up front to suspend auto-delete for its Custodians and to provide clear and complete preservation instructions -- as any responsible litigant would have.

## V.    CONCLUSION AND REQUEST FOR RELIEF

By its own account, Intel discovered its evidence destruction problems in Fall 2006, nearly a year ago. Intel waited at least four months before disclosing these problems to Plaintiffs. Since then, Plaintiffs have devoted enormous resources to discovering the extent of Intel's evidence destruction and its plans to attempt to resolve it. The consequence to the case has been delay -- and increased costs. To date, Intel has not produced a single document located through its remedial efforts. Moreover, even the limited evidence extracted from Intel to date establishes that we are well beyond any ordinary, unintentional loss of some data. The questions now are (i) what can be done to try to retrieve in a reasonable period of time what has been lost to the extent it still exists elsewhere; and (ii) once causation and culpability discovery has been completed, whether and to what extent Intel should be sanctioned.

Intel could probably do more to remediate its evidence preservation failures. But an essential element of any legitimate remediation plan is that it be carried out in a reasonable amount of time, that it minimize prejudice to the innocent, and that it not delay the administration of justice. It is striking that Intel's Remediation Plan contains no proposed timeline or other schedule. During the six months since that plan was filed, Plaintiffs have repeatedly tried in vain to extract a real commitment from Intel as to when it will be completed.

Enough is enough; this case needs to move forward.

Remediation that results in trial delay, or in documents being produced after its authors and recipients have been deposed, is not remediation at all. After Intel has had a year to fix its problems, Plaintiffs see no reason for further delay. Nor do they perceive any benefit from

19

insisting that Intel consume more time by remediating its Remediation Plan. Instead, Intel should be ordered to execute its proposed Remediation Plan, to promptly produce all remedial documents on a rolling basis, and to complete its remediation production no later than December 31, 2007.[36]

In addition, as noted above, Intel has refused to produce data necessary to assess the effectiveness of its Remediation Plan and the extent of data loss. Accordingly, we respectfully urge that the Special Master order Intel to conduct proper audits and analyses of the results of remediation on an ongoing basis, and to supply those results to Plaintiffs and to the Special Master's technical consultant on an expedited schedule. Plaintiffs specifically request that the Court order Intel's production of the following data that is critical to their ability to analyze the effectiveness of Intel's remediation:

1. Total email count for each custodian whose data has been restored from all backup tapes, by month, post de-duplication against backup tapes and the "First Harvest",[37] broken down by Archived Items, Sent Items, Inbox, and Deleted Items.

---

[36] Plaintiffs and AMD have recently reached a comprehensive agreement in principle concerning completion of electronic discovery, which agreement includes establishing certain deadlines and protocols, limiting the number of documents to be TIFFed, reducing the number of custodians from whom production is to be made, and providing for supplemental production in connection with depositions. That agreement also includes a provision requiring Intel to complete its remediation production by February 15, 2008 (rather than December 31, 2007 as proposed herein) in consideration for the agreement as a whole. That agreement is being documented and, when finalized, will supersede Plaintiffs' request for a remediation production deadline of December 31, 2007.

[37] As Intel explained at its informal technical exchanges, Intel is searching across all of its available backup tapes for "Exchange Databases" associated with any of its 1,027 Custodians. For instance, a backup tape may contain an Exchange Database for Craig Barrett. This Exchange Database is simply a snapshot of Mr. Barrett's email files as they existed when the backup tape was made. Once Intel locates one of these databases, that Exchange Database is then restored. For an individual custodian, there are likely to be Exchange Databases existing on

20

2. Total email count for each custodian whose data has been restored from the files of other Intel Custodians, by month, post de-duplication against backup tapes and the First Harvest, broken down by Archived Items, Sent Items, Inbox, and Deleted Items.

3. Total non-duplicative email count for each custodian whose data was obtained in the First Harvest, by month, broken down by Archived Items, Sent Items, Inbox, and Deleted Items.

4. Total non-duplicative email count for each custodian whose data was obtained in the "Remedial Reharvest",[38] by month, broken down by Archived Items, Sent Items, Inbox, and Deleted Items.

5. Total non-duplicative email count for each custodian stored in the EMC Archive, by month, broken down by Archived Items, Sent Items, Inbox and Deleted Items through September 2007.

6. Total non-duplicative email count post-deduplication against all sources for each custodian, broken down by Archived Items, Sent Items, Inbox and Deleted Items through September 2007.

7. List and description of all corrupted .pst files.

---

multiple backup tapes. These databases may contain data that is largely duplicative of data that exists on other Exchange Databases. Intel explained that it would run a deduplication process against all of the backup tape data and its vendors indicated that they kept detailed records of how much data existed prior to deduplication and after the process was completed. As such, Plaintiffs request a count of the non-duplicative email pulled from all backup tapes. Plaintiffs then need to know how much of the non-duplicative data from the backup tapes is non-duplicative of what Intel originally harvested from its Custodians in 2005 and 2006 (the "First Harvest"). This will indicate to Plaintiffs and the Court whether backup tapes, a central component of Intel's preservation scheme, were in fact an effective preservation tool.

[38] As part of its Remediation Plan, Intel, in 2007, went to each of its 1,027 Custodians and copied what it considered to be the relevant file types from that Custodian's hard drive. We refer to this as the "Remedial Reharvest"

21

For all of the foregoing reasons, AMD and Class Plaintiffs respectfully urge that Intel be ordered to complete its remediation as proposed in its Remediation Plan, that it produce all remedial documents promptly and on a rolling basis, that it certify to its completion by December 31, 2007, that the efficacy of its remediation be evaluated with reference to the remedial documents it has produced to Plaintiffs as of that date,[39] and that it promptly comply with the data reporting obligations enumerated above and any further data requests reasonably sought by Plaintiffs or the Special Master's technical consultant.

---

[39] This is not to suggest that Intel would be relieved of its obligation to promptly produce responsive remedial documents it discovers after December 31, 2007.

OF COUNSEL:
Charles P. Diamond
Linda J. Smith
James M. Pearl
O'Melveny & Myers LLP
1999 Avenue of the Stars, Suite 700
Los Angeles, CA 90067
(310) 553-6700

Mark A. Samuels
David L. Herron
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071
(213) 430-6000


Dated: September 11, 2007

/s/ Chad M. Shandler
Jesse A. Finkelstein (#1090)
Frederick L. Cottrell, III (#2555)
Chad M. Shandler (#3796)
Steven J. Fineman (#4025)
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
(302) 651-7700
Finkelstein@rlf.com
Cottrell@rlf.com
Shandler@rlf.com
Fineman@rlf.com

*Attorneys for Plaintiffs Advanced Micro
Devices, Inc. and AMD International Sales &
Service, Ltd.*


/s/ J. Clayton Athey
James L. Holzman (#663)
J. Clayton Athey (#4378)
Prickett Jones & Elliott, P.A.
1310 King Street
P. O. Box 1328
Wilmington, DE 19899
(302) 888-6509
jlholzman@prickett.com
jcathey@prickett.com

*Interim Liaison Counsel and Attorneys for Phil
Paul, on behalf of himself and all others
similarly situated*

23

RLF1-3199808-1

## CERTIFICATE OF SERVICE

I hereby certify that on September 11, 2007, I electronically filed the foregoing document

with the Clerk of Court using CM/ECF and have sent by Hand Delivery to the following:

Richard L. Horwitz, Esquire
Potter Anderson & Corroon, LLP
1313 North Market Street
P. O. Box 951
Wilmington, DE 19899

I hereby certify that on September 11, 2007, I have sent by Federal Express the foregoing

document to the following non-registered participants

Darren B. Bernhard, Esquire
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, DC 20004-2402

Robert E. Cooper, Esquire
Daniel S. Floyd, Esquire
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California 90071-3197

*/s/ Steven J. Fineman*
Steven J. Fineman (#4025)
fineman@rlf.com