# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

**IN RE:**

**INTEL CORP. MICROPROCESSOR ANTITRUST LITIGATION**

**PHIL PAUL, on behalf of himself and all others similarly situated,**

Plaintiffs,

v.

**INTEL CORPORATION,**

Defendant.

**MDL Docket No. 05-1717 (JJF)**

**C.A. No. 05-485 (JJF) CONSOLIDATED**

**DECLARATION OF DAVID ROSENBERG**

**October 11, 2007**

David Rosenberg declares as follows:

## I. Introduction

### A. Summary of Opinion

1. This declaration presents my opinion and analysis of the respective and related qualifications and roles of the class representative and class counsel under the adequate representation requirements of Federal Rule 23(a) (4) and (g).[1] In particular, I address two central questions posed by a hypothesized conflict between the class representative and class counsel regarding the choice among different options that may be available on legal issues in a class action. The first question is whose judgment and decision governs in such a conflict and over such a choice: the class representative's or the class counsel's? The second question is whether the class representative must, as a condition of appointment by the Court, possess the financial wherewithal to fund a class action so as to be in a position to resist being "coerced into complying with an attorneys' advice . . . on legal issues . . . [by the lawyer's] potential threat of funding revocation."[2]

2. To summarize my conclusions:

a. The answer to the first question is that class counsel's judgment and decision governs (subject to challenge before the court). This must be so for class

---

[1] Unless otherwise specified, "class representative" refers to an individual person named as a party plaintiff in a plaintiff class action complaint and approved or seeking approval by the court to serve in a representative capacity, and "class counsel" refers to the attorney appointed or seeking appointment by the court to represent the plaintiff class. Rule 23 references are to the rule as amended in 2003. Rule 23(a)(4) provides in pertinent part: "(a) Prerequisites to a Class Action. One or more members of a class may sue … as representative parties on behalf of all only if … (4) the representative parties will fairly and adequately protect the interests of the class." Rule 23 (g) provides in pertinent part: "(g) Class Counsel. (1) Appointing Class Counsel. (A) Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. (B) An attorney appointed to serve as class counsel must fairly and adequately represent the interests of the class. (C) In appointing class counsel, the court (i) must consider … the resources counsel will commit to representing the class …. "

[2] *In re ML-Lee Acquisition Fund II, L.P. and ML-Lee Acquisition Fund (Retirement Accounts) II, L.P. Sec Litig.*, 149 F.R.D. 506, 509 (D. Del. 1993).

counsel to fulfill his or her Rule 23 obligations to serve as the exclusive legal representative of the entire class and to promote the class's litigation interests with undivided allegiance. Thus, in directing and controlling the course of class litigation, class counsel's judgment and decision on such litigation issues must not be subjected to a veto power or subordinated to any conflicting preferences asserted by the class representative or any other member or members of the class.

b. Regarding the second question, the answer is "no." The entire hypothesized scenario of conflict over litigation options and coercive threat of funding revocation lacks reality.

(1) As the amended version of Rule 23 makes clear, the wealth condition is entirely irrelevant to the qualifications and role of the class representative. The reason in short is that any conflict over litigation options is precluded by Rule 23's empowerment of class counsel as the exclusive, single-mindedly devoted legal representative of the class. Class counsel's judgment and decision on legal options is final, subject only to overruling by the Court on a finding of unfair or inadequate representation. Because no such conflict could arise, there is no conflict for class counsel to seek to resolve by threatening funding cutoff or otherwise.

(2) Moreover, even if such a conflict could arise, counsel would not attempt to compel the class representative's compliance by threatening to cutoff funding the class action. To carry out the threat would entail

violating his or her express and legally enforceable funding agreement with the court and the client, thereby inevitably incurring grave financial sanctions -- both formal and reputational.

(3) Furthermore, a funding-cutoff threat would be irrational and lack credibility. Both the class representative and class counsel would know that the threat was not credible, because to carry it out would harm class counsel much more than the class representative. Class counsel would lose the prospect of the class action fee-award in addition to suffering severe financial and other penalties for reneging on the funding agreement. In contrast, the representative would lose nothing at all, because he or she would report the threat to the court and the defalcating lawyer would be required to pay for any losses and costs incurred by the representative and would be replaced by proper class counsel. Even if the class representative did nothing, the most he or she could lose is the chance of winning a few dollars on a "small" claim.

(4) Requiring the representative to fund the class action when class counsel threatens to renege on the class funding agreement, not only yields perverse consequences, not the least of which would be making the threat overwhelmingly powerful, but also begs the question of the qualifications and role of the class representative under Rule 23.

c. To vest the class representative with a veto power over class counsel and make the ability to fund the class action a relevant factor for appointment as class

representative would undermine the core, law-enforcement purpose of the Rule 23 class action: to facilitate use of civil liability as a deterrent in cases where the losses suffered are individually small, but are collectively large. The veto power threatens the value of class counsel's expenditures of time and money, making the litigation more costly and less worthy of investment. To be clear, the concern is not the impact on class counsel's profits per se; rather, as with the private production of goods generally, and especially the production of such a vital good as law-enforcement, the investment needed to maximize the social value of the litigation will be made only if the investor, class counsel, expects a sufficiently high return, and encumbering that expectation can result in under-investment, and consequently under-deterrence and greater risk of harm for everyone. The wealth condition would also thwart the deterrence objective by restricting the availability of class action law-enforcement. Class representatives who are able and willing to volunteer to be personal financiers of the class action would be few and far between. Indeed, no rational individual however wealthy would make such a commitment given the chance of losing a fortune for the possibility of winning a few dollars on a small claim.

3. These conclusions and the analysis below rest on a set of basic premises that should be made explicit at the outset.

a. The foundational presumption is that civil actions usefully augment other government and market means of deterring violations of statutory and common law

protections of the economic interests of individuals.[3] Antitrust actions for damages epitomize the significant enforcement role played by private damage actions.[4]

b. Class action is essential to achieving the law-enforcement objective of optimal deterrence by means of civil liability. Obviously, if the expected expense of litigation exceeds the expected recovery from judgment (or settlement) on an individual's claim, then the chance of suit will be virtually nil. The failure to pose a realistic threat of liability for the sanctionable costs will leave a major gap in law enforcement and correspondingly heighten the risk of harm from anticompetitive conduct and other wrongdoing by business entities.[5] The very core of the class action mechanism is to render such "small" claims enforceable in court by aggregating "the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor."[6]

c. Class action is essential to achieving optimal deterrence for two more general reasons. First, only class action treatment of all similar claims provides the scale efficiencies that enable class counsel (the person who normally bears the enormous

---

[3] *See Newman v. Piggie Park Enterprises Inc.*, 390 U.S. 400, 401 (1968); *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 271 (1975).

[4] See e.g., *Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 275 (1972).

[5] I speak mainly of deterrence because class action optimally promotes this goal by maximizing class members' recovery for compensation purposes. Moreover, any conflict between these functions should be resolved in favor of deterrence generally because preventing rather than redressing harm from illegal conduct makes everyone better off.

[6] *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997); see also *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (contract) ("Class actions also may permit the plaintiffs to pool claims which would be uneconomical to litigate individually. For example, this lawsuit involves claims averaging about $100 per plaintiff; most of the plaintiffs would have no realistic day in court if a class action were not available."); *Deposit Guaranty Nat. Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 339 (1980) (Truth in Lending Act) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device."); *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156 (1974) (antitrust); *Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 378 (D. Del. 1990) (securities)("The class action device is especially appropriate in securities fraud cases, such as this one, wherein there are many individual plaintiffs who suffer damages too small to justify a suit against a large corporate defendant.").

financial risk of prosecuting the class action) to make the optimal investment that would maximize the class-wide aggregate recovery.[7] Second, class action corrects a bias in the civil liability system that undermines the deterrence benefits of civil actions. In an individual action challenging conduct that has injured multiple persons, the defendant naturally and automatically owns and reaps the aggregate, class-wide benefit from its defense effort. Essentially, defendants have the litigation advantages of a "de facto" class action because they can spread the costs of preparing and litigating common questions across all pending and prospective claims. The class action affords the plaintiffs the same incentives to invest in the litigation as defendants have, and thereby motivates class counsel to invest optimally in maximizing the aggregate recovery just as defendants invest optimally to defeat it. In short, the class action is essential to achieving optimal deterrence because it alone assures the opportunity for the court to make an informed decision based on an optimally developed case for as well as against liability.

d. Contingent, percentage fee agreements[8] in which the lawyer agrees to advance litigation costs provide the funding for most civil liability actions, class or by individual plaintiffs, and do so because they provide three indispensable and related benefits. First,

---

[7] This benefit of class actions is suggested in *Standard Oil*, 405 U.S. at 266 (noting that antitrust class actions "may enhance the efficacy of private actions by permitting citizens to combine their limited resources to achieve a more powerful litigation posture"). It should be noted that scale efficiencies enable class counsel not only to reduce litigation costs, but also to raise the quality of the case made on plaintiffs' behalf. The latter point is often overlooked, yet it is elemental that when the stakes in litigation are high, it will be worthwhile to invest in higher quality preparation, e.g., experts, discovery, and, of course, lawyers, for an increased probability of success at trial, compared to the lower-quality investment that would be worthwhile to make when the stakes are smaller. The "small" claim, worth nothing prosecuted separately, but a significant amount if prosecuted in a class action, is simply a polar example.

[8] References to contingent fee agreements are to those arrangements by which the attorney agrees to invest his or her time and money to prosecute the civil action competently and effectively with the proviso that counsel will seek payment covering the value of that investment only from a recovery by judgment or settlement. In the absence of such recovery, the attorney agrees to absorb the lost value of time and money as simply a failed business investment.

such agreements provide the means by which all but the affluent must finance the prosecution of their civil liability claims. Second, by giving the attorney a percentage stake in the outcome of the litigation, the agreement protects the vast majority of individuals – who lack not only the resources, but also the training, to monitor the competence and effectiveness of the lawyer's effort – against the lawyer slacking, churning, colluding with the defendant, or engaging in other self-serving behavior. Third, assuming realistically that individual plaintiffs are more risk-averse than are their attorneys to bearing the lost investment of time and money in the event of a no-recovery outcome, the agreement efficiently lowers the overall cost borne by plaintiffs to prosecute their claims.[9] To be clear, the plaintiff always pays for the costs of the no-recovery outcome (just as a consumer always pays the cost of producing any good). The price for this risk is reflected in the percentage of the recovery charged by the attorney – higher to the extent the lawyer bears all litigation expenses, and lower to the extent the plaintiff shares the burden.[10] Being risk-averse, the plaintiff gains from a contingent fee agreement that shifts the entire expense to the less risk-averse attorney and thereby reduces the risk,

---

[9] This assumption regarding the relatively greater risk aversion of plaintiffs is realistic for high-stakes litigation generally, and especially so for the representative and other members of a class action. Indeed, only those in the business of financing litigation, typically attorneys specializing in large-scale, complex cases, can efficiently hedge the risk as well as bear the costs of prosecuting a class action. See *Rand v. Monsanto Co.*, 926 F.2d 596,599 (7th Cir. 1991) ("Lawyers, who unlike the representative plaintiff receive compensation reflecting any benefits conferred on the class as a whole, also may be willing to underwrite the costs. Lawyers can spread risk not only across the partners of the firms but also across cases. One loss does not mean disaster if the firms have portfolios of actions, as they will. But the representative cannot diversify in this way and cannot collect a reward for bearing exceptional risk in a single case.").

[10] A simple example can illustrate the point. Assume that the plaintiff's claim for $100 has a 50% probability of recovery if the attorney invests $30 in financial outlays. Assume that if the plaintiff agreed to reimburse the attorney for the financial outlay in the event of non-recovery the attorney would charge 10% of the recovery to cover the time investment. Under this agreement, the expected net return for the plaintiff is $15 (50% ($100 recovery – $10 fee) – 100% x $30 repayment of financial outlay), while the attorneys expected net return is $5 (50% x $10 fee). Now assume that the plaintiff seeks an agreement whereby the attorney bears the $30 outlay in the event of non-recovery. To avoid a losing proposition, the lawyer confronted with this choice would rationally raise the percentage, in this case to 40% to secure the same expected net return of $5 (50% x $40 fee – 50% x $30 paid out-of-pocket in event of non-recovery).

and corresponding risk-bearing cost, of incurring a large loss of money in the event of non-recovery.[11]

e. The foregoing should not be taken as suggesting that class actions and contingent, percentage fee agreements are unproblematic. Class actions have become most controversial in recent years because of concern about their potential to promote nuisance-value claims[12] and to result in sweetheart settlements with the defendant.[13] It should be noted, however, that these problems pervade the entire domain of civil litigation and are not endemic to class actions. Indeed, they may be less of a problem for class than for individual actions due to the extraordinary upgrade in safeguards effected by the amendments to Rule 23 (and by related changes in federal constitutional law, statutes, and rules of civil procedure). The class representative's function in monitoring class counsel's representation is one of these safeguards and there is reason for concern that class counsel might seek to undermine that function.[14] But, it should also be

---

[11] Note that in the above example, the plaintiff's expected net return remains the same regardless of who bears the $30 outlay in the event of non-recovery. Thus under the agreement shifting the $30 burden to the lawyer, the plaintiff's net expected recovery is still $15 (50% ($100 recovery – $40 fee – $30 costs)). But although they have equivalent expected value, the two agreements differ markedly in the variability of outcomes for the plaintiff – in the event of non-recovery, the variance is between winning $30 and losing nothing if the attorney bears the $30 cost; and between winning $60 and losing $30 if the plaintiff bears the $30 cost. Being risk averse, the individual prefers less variability; with more variability, the welfare gain from winning more money is more than offset by the welfare loss from losing more money.

[12] The equally great potential for nuisance-value defenses should also be noted. See e.g., *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 802 (3d Cir. 1995)(noting that "the defendant can pressure the plaintiffs' attorney into early settlement by threatening to expend large sums on dilatory tactics that would run the expenses up beyond what plaintiffs' attorneys can expect to profit").

[13] Because the contingent, percentage fee promises only a fractional return on the plaintiff-attorney's investment, the system will still favor defendants, whose investment is geared to the full value of an effective defense, and thus jeopardize the deterrence objectives of civil liability.

[14] Of course, all class members will have monitoring opportunities based on various class-wide notices as well as the posting of the docket and public record documents. However, the class representative has special access to class counsel, who on some reasonable basis will meet and update the class representative, supply documents, and respond to questions, especially concerning the terms and conditions of a proposed

emphasized that giving the class representative a veto power over class counsel's litigation decisions and requiring the class representative to possess sufficient wealth to fund a class action will not solve or ameliorate these problems; most likely the veto power and wealth condition would exacerbate them. Moreover, these steps are unnecessary, as Rule 23 effectively protects the class representative not only by affording ongoing access to the court to report coercive and other misconduct by class counsel, and if the accusations prove true, by assuring swift and severe punishment of the lawyer, but also crucially by authorizing payment of the fees and costs of an attorney assisting the representative in making this report.[15]

**B. Basis for Opinion**

4. My opinion is based on certain record documents in this litigation and other materials provided by class counsel.

a. In particular, I have reviewed the following: Intel's July 31, 2007 letter brief and accompanying exhibits in support of its motion to compel the proposed class representatives to produce certain documents; the Class Plaintiff's August 7, 2007 letter brief and accompanying exhibits in opposition; Intel's August 9, 2007 reply letter brief and accompanying exhibit; the transcript of the August 28, 2007 hearing before the Special Master on the motion and accompanying exhibits; the Special Master's Report filed September 6, 2007; the discovery decision in *In re ML-Lee Acquisition Fund II, L.P.*, 149 F.R.D. 506 (D. Del. 1993), which the Special Master cited; the class

---

settlement. The promise of being compensated by the class in the form of an incentive award for the time and money expended in this monitoring effort gives the class representative greater motivation than has the average class member to perform this function.

[15] While reports of misconduct can be filed anytime in the course of the litigation, they will have their strongest impact when the court's attention is focused on evaluating class counsel's proffer of a proposed class settlement or request for a fee-award.

certification decision in *In re ML-Lee, Acquisition Fund II, L.P. and ML-Lee Acquisition Fund (Retirement Accounts) II, L.P. Securities Litigation,,* 848 F. Supp. 527 (D. Del. 1994); First Amended Consolidated Complaint in this case, Dated May 26, 2006; Memorandum of the EU Commission Expressing Preliminary View of Intel Infringement of Monopoly Position, dated July 27, 2007; Rule 1.8 of The Delaware Lawyers' Rules of Professional Conduct; Certification of Bree Hann in Support of Defendant Intel Corporation's Request to Compel, filed July 31, 2007; Oklahoma Bar Association Opinion Report, dated August 9, 2007.

b. I also draw upon my knowledge and experience regarding the relevant fields of law and legal theory, including civil procedure; civil liability, class actions, and complex litigation, and the basic and applied theories of deterrence, insurance, and law enforcement. In addition, I rely on my forty years of practice (as litigator and consultant), and more than thirty-five years of teaching and writing in relation to these areas of law and theory. For further elaboration, please see the following statement regarding my qualifications.

c. Because I may receive additional information and give further consideration to the questions class counsel have asked me to address, I reserve the right to modify and/or supplement the opinions set forth in this declaration.

**C. Qualifications**

5. I am the Lee S. Kreindler Professor of Law at Harvard Law School. From 1967 until I joined the Harvard faculty in 1979, I was engaged in the full time practice of law. I began practice as an associate in the New York City firm of Rabinowitz, Boudin, and Standard handling complex litigations and class actions mainly concerning questions of

constitutional law. Subsequently, I was a partner in a small Cambridge firm, Rosenberg, Baker, and Fine, handling major litigations, including the DES litigation, in the course of which I pioneered the collectivized adjudication of "mass torts," including development of the basic modes, designs, and law-enforcement related justifications for use of class actions to adjudicate mass torts and other cases of mass injury (e.g., risk-based "mass tort" and other types of class actions; rules of market share and probabilistically proportioned liability; insurance-fund judgments; medical monitoring programs, and structural reforms of FDA, prisons, parole, voting, and other institutions and systems of government and industry). I was the first to develop courses on mass torts, on the public law conception of civil liability, and on the risk management role of complex litigation, courses which I have taught continuously since the mid-1970s. My writing on these subjects has contributed to the relevant literatures. My qualifications are set forth more fully in the attached curriculum vitae.

## II. Whose Judgment and Decision Governs on Litigation Issues

6. The conflict hypothesized in *ML-Lee* is predicated on class counsel giving "advice" to the class representative regarding available legal options. The implication is that the relationship between class counsel and class representative is the same as the attorney-client relationship in standard, individual action litigation where the attorney advises and the client decides. This conception of the class counsel-class representative relationship may have had some traction in the past, as may be inferred from the perceived need by courts and Rule 23 drafters to disavow it explicitly. In any event, that conception does not hold today. It is now clear that Rule 23 makes class counsel the exclusive legal representative for the class with the authority and obligations to serve the

interests of the entire class with vigor and undivided fealty. Class counsel's client is not the class representative or any other class member. "In a class action, the client is the class."[16]

7. It is therefore antithetical to the role and responsibilities of class counsel under the federal rules to posit that his or her judgment and decision regarding how best to promote the legal interests of the class client should be subject to a veto power by the class representative. But that would be the rule if before making and executing a litigation decision class counsel were required to take an "advice and consent" step by which the class representative received "advice" of the planned action and had the power to block it by denying "consent." It follows that the only conception of class counsel's authority that coheres with the mandate of the federal rules to provide exclusive, vigorous, and un-conflicted legal representation to the entire class is that the attorney's judgment and decision must govern over differences of opinion and even disapproval by the class representative or any other member or members of the class regardless of their motivation.[17]

8. The principle that class counsel serves as the exclusive, un-conflicted legal representative of the class has been explicitly recognized by the Third Circuit since the mid-1990s. As the court stated, "[t]he ultimate focus falls on the appropriateness of the

---

[16] *Rand* , 926 F.2d at 600.

[17] Given the minimal level of interest and knowledge required for service as class representative, it is difficult to imagine the occasion when the plaintiff will have discovered on his or her own or invested to hire a lawyer who discovers legal options missed or discounted by class counsel. See e.g., *Greenfield v. Villager Industries*, 483 F.2d 824 (3d Cir. 1973) ("Experience teaches that it is counsel for the class representative and not the named parties, who direct and manage these actions. Every experienced federal judge knows that any statement to the contrary is sheer sophistry.") Moreover, the class representative, like class members generally, is usually a lay person, whose intuition on litigation matters may well be grounded in good common sense, but will not reflect the judgment of a trained and experienced lawyer. This difference between lay and expert judgment explains why F.R.Civ.P. 11 exempts represented parties from monetary sanctions for litigating frivolous claims.

class device to assert and vindicate ... the rights of the *entire* class ..." and class counsel thus "owe the entire class a fiduciary duty once the class complaint is filed."[18] That principle was subsequently made an express mandate of Rule 23. In directing class counsel to serve the "interests of the class" fairly and adequately, Rule 23(g)(1)(B), as its drafters acknowledge, establishes ". . . an obligation that may be different from the customary obligations of counsel to individual clients."[19] "Appointment as class counsel" means that, as the Rule 23 Commentary emphasizes, "the primary obligation of counsel is to the class rather than to any individual members of it."[20] Thus, in contrast to the customary attorney-client relationship, "the class representatives do not have an unfettered right to 'fire' class counsel."[21] By extension, the class representative has no power to veto or otherwise have a say over the class counsel's choice of which among the available legal options to pursue and how to pursue it. Indeed, regarding the central question in most class action litigation of whether, when, and for what to settle, the Commentary is emphatic about whose judgment and decision governs fully and finally (subject to judicial oversight): "the class representatives cannot command class counsel to accept or reject a settlement proposal. To the contrary, class counsel must determine whether seeking the court's approval of a settlement would be in the best interests of the class as a whole."[22]

---

[18] *General Motors,* 55 F.3d at 796, 801.

[19] Advisory Committee Notes, Rule 23(g) (2003).

[20] *Id.*

[21] *Id.*

[22] *Id.* The wealth of the class representative does not alter the attorney-client relationship in class actions. Thus, under the Private Securities Litigation Reform Act, the class remains the singular client and counsel remains its exclusive, final, and single-minded legal representative even though the class representative

9. The 2003 amendments to Rule 23 remove any lingering ambiguity regarding the exclusivity and indivisibility of class counsel's role in representing class interests. The amendments, however, do not effect any radical transformation of the basis for class counsel's authority. Class counsel is placed in charge of the legal representation of class interests in a Rule 23 (b) (3) class action, now as before, only if the court finds that the interests of class members in proceeding collectively outweigh their respective interests in individually controlling the prosecution of separate actions,[23] in which of course they would possess the customary prerogatives of having final say over the choices of legal options. Similarly, while denying the class representative any veto power in the legal representation of class interest, Rule 23 continues to afford all class members "the opportunity ... to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action," subject to conditions imposed by the court.[24] The amendments also require the court to provide class members detailed notice of the terms and conditions of the class settlement, including notice of the requested award of class counsel's fee and expenses, and expressly adopt and encourage the long-standing judicial practice of affording class members the opportunity to opt-out of the settlement.[25] In addition, Rule 23 now expressly allows class members to file objections and otherwise make known their

---

may be a giant state pension fund, which could feasibly if not efficiently fund the class action should the need arise. It should be noted that while the Private Securities Litigation Reform Act contemplates the class representative, presumptively the "most adequate plaintiff" with "the largest financial interest," selecting and retaining lead counsel, that decision is subject to court approval applying Rule 23 criteria. Consequently, and unsurprisingly, the lead (class) counsel serves the interests of the class, not those of the class representative. See *In re Cendant Corp. Litigation*, 264 F.3d 201, 264-65 (3rd Cir. 2001).

[23] Fed. R. Civ. P. 23 (b)(3) (A).

[24] *Id.* at 23(d)(2).

[25] Fed. R. Civ. P. 23(e).

critical views regarding settlement and attorney-fee applications.[26] However, given that class members with "small" individual claims lack the economic incentive to invest the necessary time and money for effective monitoring of class counsel's litigation decisions, settlement demands, and fee requests, these various opportunities for members to initiate a judicial check on the fairness and adequacy of class counsel's representation would be virtually meaningless but for one further crucial provision of Rule 23. By virtue of the 2003 amendments, Rule 23 endorses the judicial practice of awarding attorneys' fees and costs to class-member intervenors, objectors, or other relators – and possibly to further reward their attorneys by appointing them to replace the incumbent class counsel – whose petitions and intercessions supply information to the court that results in significant benefits for the class.[27]

10. Rule 23 wisely vests the court rather than the class representative with the power to overrule class counsel. Indeed, were the class representative given that power in any degree it would only increase the potential for class action abuse and cost. A veto power would open the door to the class representative leveraging this authority over class counsel to promote interests of the representative and any similarly situated segment of the class at the expense of other members of the class.[28] Conversely, a veto power, which when unexercised would be taken as a sign that class counsel's decision benefited the class, might result in the attorney bribing the class representative to approve some decision that promoted class counsel's fee prospects at the expense of the class. There is also the danger of the class representative holding up the class counsel, that is, refusing to

---

[26] Fed. R. Civ. P. 23 (d) (2), (e) (4)(A), and (h)(2).

[27] Advisory Committee Notes, Rule 23(h) (2003).

[28] *See e.g.*, *General Motors,* 55 F.3d 768.

approve some legal decision that will make the class better off unless class counsel makes a side payment to the representative. Significantly, Rule 23 contains procedures designed to thwart the filing of nuisance-value objections aimed at extorting such side-payoffs from class counsel: notably, filed objections may not be withdrawn without court approval, and class counsel must disclose any other agreement made in connection with the proposed settlement agreement.[29] This "blackmail" problem would be many orders of magnitude greater if beyond having the opportunity afforded to all class members of publicly filing objections or joining the action through separate counsel, the class representative could also wield a veto power, which, however limited, might well be effective in extracting a substantial side payoff in a class action that involves large aggregate stakes for the class and class counsel.

## III. Relevance of the Class Representative's Wealth

### A. Does Rule 23 Sanction a Wealth Investigation?

11. Discovery of a prospective class representative's financial ability to fund the class action may well now be precluded by Rule 23 in cases such as the present litigation where class counsel's possession of the resources and abilities needed to prosecute the class action effectively is not questioned and class counsel has agreed to fund the class action with reimbursement contingent on recovery by judgment or settlement. Notably, the only express authority under Rule 23 to assess the financial resources of anyone representing the class is the direction to the court that in determining whom to appoint as class counsel consideration must be given to the "the resources counsel will commit to

[29] Fed. R. Civ. P. 23(e), (2) and (4) (B).

representing the class."[30] This directive recognizes the reality that the "selection and activity of class counsel are often critically important to the successful handling of a class action."[31] Indeed, the 2003 amendments to Rule 23 create a new set of guidelines for assessing class counsel's adequacy. As the Commentary notes, "[u]til now, courts have scrutinized proposed class counsel as well as the class representative under Rule 23(a)(4)," but while that provision continues to call for scrutiny of the proposed class representative, the new Rule 23 (g) guidelines "recognize the importance of class counsel, states the obligation to represent the interest of the class, and provides a framework for select[ing]" from among competing candidates "the best able to represent the interest of the class."[32]

12. Logically as well as realistically, the Ruler 23(g) requirement to consider class counsel's resources renders irrelevant a similar inquiry under Rule 23(a) (4) of the class representative's financial ability to fund the class action. An inquiry into class counsel's resources is dispositive of adequate funding since the rule does not limit the source of funding to counsel's own bank account. Adequate funding can be supplied from other sources, including lawyers or other professional litigation investors, banks and other lenders – and the class representative. Class counsel's failure to demonstrate adequate resources would therefore necessarily rule out any reason to scrutinize the class representative's resources; if class counsel cannot fund the case from any source including backing from the class representative, then the class representative obviously

---

[30] Fed. R.Civ. P. 23 (g).

[31] Advisory Committee Notes, Rule 23(e) (2003).

[32] *Id.*

cannot do it alone. Moreover, as explained below, it would be a rare and very questionable case if the primary source of funding were a class representative.

13. The Rule 23 (a) (4) assessment could have been, but was not, amended to direct the court to investigate the class representative's resources. To be sure, prior practice of such inquiries under that provision was not expressly overruled. However, that result seems implicit from the evident reason the amendments focus attention on the class counsel and not on the class representative. The reason is that only the class counsel will generally have the economic incentive to invest efficiently in prosecuting the class action. This is not simply a question of relative wealth. Funding a class action is no more economically rational for a wealthy "small" claim class representative than it is for a poor one. Indeed, for any class representative the monetary investment is not rational; while bearing the total cost, the class representative (in contrast to the class counsel) receives only a chance of winning the money back plus the tiny fraction – measured by the chance of recovering a few dollars on a small claim – of the aggregate benefit that his or her investment would confer on the class. As such, "[t]he representative plaintiff gains nothing from the collective proceeding. ... The very feature that makes class treatment appropriate – small individual stakes and large aggregate ones – ensures that the representative will be unwilling to vouch for the entire costs. Only a lunatic would do so. A madman is not a good representative of the class!"[33]

[33] *Rand*, 926 F.2d at 599. The truth of this observation redeems its colloquial phrasing. See also *In re Molson Coors Brewing Co. Securities Litig.*, 233 F.R.D 147, 149 n.4 (D. Del. 2005) ("It is the lead counsel who stands to gain, not the lead plaintiff [under the PSLRA], as both the tone of the arguments and the logic of the incentives suggest here. The "pick me" urgency seems far more likely to come from the lawyers than the parties because, in the real world, people are not so eager to undertake work that someone else will do for them. ... The incentives giving rise to the classic "free rider" phenomenon, i.e., the inclination of people to take advantage of a benefit bearing a commensurate portion of the associated burden, do not evaporate simply because securities are involved. They get overridden because securities lawyers are involved, lawyers who are vying for the chance to take the laboring oar in litigation and the

**B. Can the Wealth Condition Really Solve Real Problems?**

14. The investigation and verification of whether the class representative possesses sufficient wealth to fund out-of-pocket a class action and thus would be able to resist a coercive threat of funding cutoff by class counsel would serve no useful purpose. First and foremost, the effort has no relevance to the proper governance of the class action because the intrusive and costly evaluation of plaintiffs' financial conditions is designed to address a problem that has no basis in reality. The reason quite simply is that class counsel is not required or motivated by Rule 23 to give the class representative "advice" about available legal options for the purpose of securing the representative's approval. Under Rule 23, as discussed above, the class representative has no power of veto or of prior consent over the legal representation provided by class counsel and consequently the hypothesized conflict over legal strategy, the motive for class counsel to threaten funding cutoff, and the consequent need for a class representative with the wealth to fund the class action will never arise.

15. Moreover, even assuming for the sake of argument some degree of veto power, it would be irrational for class counsel to think a threat of funding cutoff would compel compliance from the class representative in a dispute over legal tactics. First, Rule 23 precludes class counsel from ceasing to fund the class action, and presumably ceasing to function as class counsel – actions tantamount to voluntary dismissal of the class action – without approval of the court. In addition, it would constitute a blatant violation of the representation class counsel made to the court in applying for

---

monetary rewards that go with it. * * * After going over the parties' submissions and counter-submissions, which, including appendices, run to hundreds of pages in length, it strikes me that this exercise is simply a business investment for the lawyers. They invest their time and consume judicial resources in the hope of scoring a significant financial return.").

appointment, in particular, the affirmation that the lawyer possessed the needed resources to fund the class action and the unqualified resolve to apply them on behalf the class. Doubtless a court would not only swiftly dismiss such defaulting class counsel, but also readily find a replacement to quest for the fee award. But, it is also likely that the court would tax the departing attorney for any costs of transition and lost opportunities. In view of these penalties, it is doubtful that many cases will arise in which the class counsel – even if the class representative had veto power -- would choose to threaten funding revocation.

16. Second, class actions often proceed as in this case on the basis of a contingent, percentage fee agreement by which class counsel pledges to invest time and money in prosecuting the class action and to seek remuneration for the value of the expended resources from and only from a recovery by settlement or judgment. This agreement is generally enforceable not only under standard rules of contract and equity, but also by regulatory authorities overseeing professional conduct. Reneging on the contract could result in the award of reliance and expectation damages as well as the imposition of professional sanctions. Furthermore under Rule 23 as amended in 2003 the court may, and if concerned about the conflict hypothesized in *ML-Lee*, probably would require the potential class counsel to specify the terms of his or her contingent fee agreement and affirm to the court that the terms will be performed fully unless and until the court formally relieves counsel from the agreed obligation.[34] Violation of that pledge could also prove disastrous for class counsel, because it may result in speedy and severe contempt sanctions, recession of the appointment to serve as class counsel, and forfeiture of the prospect of a court-awarded fee. But, the most potent sanction for any violation of

[34] Fed. R. Civ. P.23 (g) (B).

class counsel's fee agreement with the class, class representative, and court is the devastating harm to the attorney's reputation that may end any hope of future appointment as class counsel, and indeed, of retention and referrals in the individual action marketplace.

17. Third, the threat would be transparently incredible to both parties. Class counsel would be saying "If you don't comply, I'll cut off funding, which means you'll lose the chance of recovering $50 (before payout of attorneys' fees and costs); of course I'd be giving up the chance of getting millions in court-awarded fees, but don't think that'll stop me." Such a threat is hollow; it's a classic "cut-off-nose-to-spite-face" proposition. Whatever traits one might attribute to plaintiffs' attorneys, a predilection for such self-destructive behavior is not among them. It would also be attributing irrational behavior to class counsel in a further respect. If the class representative is sufficiently adamant to confront class counsel over a legal option, it is doubtful that the representative will be moved to drop it merely by being threatened with loss of the chance to recover a few dollars on a small claim. Rather, faced with a threat of funding cutoff, the class representative would notify the court of the dispute and also of class counsel's threat. The fact that courts award attorneys fees and costs for class-benefiting critiques of the fairness and adequacy of class counsel's representation should provide no dearth of lawyers to aid the class representative (on a contingent fee, no-reimbursement arrangement).

18. Unreality characterizes not only the coercive threat of funding cutoff, but also the proposed solution: appointment of a class representative with sufficient wealth to fund a class action so that class counsel will recognize the futility of such a threat. To

begin with, the class representative cannot "fire" class counsel; only the court can. Therefore, having the money to fund a class action is meaningless unless the court allows the class representative to take over the class action. Here again, the course of action for the class representative to pursue is the one that is not only most sensible but also prescribed by the rules: notify the court of the reasons for believing that class counsel is not fairly and adequately representing the class, and seek the remedy of replacing class counsel as well as compensation for the representative's attorney.

19. Fourth, the threat of funding cutoff has no reality in cases where class counsel has made a legally enforceable agreement with the class representative and court, and thereby with all members of the class, to fund the class action without reimbursement from class members for the money as well as time invested, contingent on recovery from judgment or settlement. The class representative is held harmless by virtue of the damage remedies for class counsel's reneging on this agreement; hence class counsel's threat to harm the class representative is meaningless. Because a new attorney would undoubtedly be appointed to take over as class counsel and the defalcating attorney would be required to pay for all accrued and transitional costs as well as for any irrevocable harm to the class claim, the class representative would suffer no loss in the event class counsel reneges on the funding agreement.

20. The Special Master in this case seems to have concluded that the class counsel's funding agreement would not cover all costs; in particular, in the event of judgment against the class, the suggestion is that class members could be subject to court-taxed defense costs under Rule 54. No reason is given why such costs are not, let alone should not, be covered by class counsel's funding agreement. The defendant's distinction

between "indemnifying" and "advancing" costs has no functional significance. In the course of prosecuting the class claim, the litigation-related debt owed to defendant as well as to vendors and other third parties is owed by the class and paid by class counsel on behalf of the class, regardless of whether the class, class representative, or class counsel is the first to receive the bill.[35] The benefits of the contingent fee agreement shifting the burden of litigation costs to class counsel in the event the class claim fails hold fully for court-taxed costs as it does for all other costs. Class counsel payment of court-taxed costs under the contingent fee agreement poses no realistic danger of a coercive threat to cutoff funding, not only because of the reasons discussed above, but also because the class members' pro rata share of court-taxed costs will be negligible and there is no evidence defendants have ever collected them directly.[36] Indeed, the only way defendants could ever receive payment of these costs is that class counsel would pay them as the attorney would any litigation cost.[37]

21. Although it is not needed or effective to assure that class counsel fairly and adequately represents the legal interests of the class, conditioning appointment of the class representative on possession of sufficient wealth to fund a class action would undermine the usefulness of class actions as means of law enforcement. Obviously, very few individuals possess such wealth, and undoubtedly fewer still are likely to be

---

[35] It should be noted that defendants appear not to be subject to the burden of bearing court-taxed costs that the Special Master's ruling would have class members bear in this action. Observation suggests that standard liability and defense insurance covers such court-taxed costs, even when the insurer provides the defense attorney. Similarly, corporations often agree to pay all litigation-related costs, presumably including court-taxed costs, in suits against their directors and officers.

[36] *Phillips Petroleum* , 472 U.S. at 810, n.2 (observing that class members are rarely subject to the burdens of discovery, counterclaims, cross-claims, or court costs).

[37] The further benefit of class counsel bearing these costs under the contingent funding-agreement is that it helps align the attorney's "private" incentives with the "public" purposes for prosecuting a class action. Compelling litigants to internalize some of the costs borne by the opposing party, tends to dampen the incentive for excessive litigation.

victimized by the type of "nickel and dime" rip-offs that usually call for convening class actions. Quite likely too even fewer of such individuals would be interested in becoming a class representative at the cost of having their tax and other financial background rummaged through by their legal adversaries. But, as noted above, even if a wealthy person stepped forward to serve as class representative, he or she would have no economically rational reason to volunteer financing for the class action. To force this or any financially responsible class representative to bear the risk of funding the class action in any significant degree beyond his or her respective pro rata share of the cost not only would discourage applicants for this position and correspondingly diminish resort to class actions in meritorious cases, but also would have other perverse consequences. Subjecting the class representative to high litigation costs in the event class counsel defaults on the obligation to provide fair and adequate representation would transform class counsel's threat of funding cutoff from hollow to frightfully potent. The combination of vesting the class representative with some degree of veto power and conditioning appointment on ability to fund the class action would also exacerbate plaintiffs' general willingness to accept a lower settlement offer from the defendant than would unfettered class counsel, and thus undermine the deterrence objective of class action.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on October 11, 2007 in Cambridge, Massachusetts.

David Rosenberg

Michael David Rosenberg
Lee S. Kreindler Professor of Law
1575 Massachusetts Ave. (Hauser Hall 500)
Cambridge MA 02138
Tel. 617-495-4558
Fax 617-496-6166
Email MDR@law.harvard.edu

**Bar Membership**: Massachusetts and New York, federal and state; Supreme Court of the United States

**Practice and Teaching Specialties**: tort law, labor law, constitutional law, federal jurisdiction, legal profession, civil procedure, and complex federal litigation

**Education**: New York University School of Law, N.Y.C., NY (J.D. 1967); American University, Washington D.C. (B.A. 1964)

**Professional Experience**:

*Employment*: Associate, Rabinowitz, Boudin & Standard, N.Y.C., NY (1967-1971); Teaching Fellow, Harvard Law School (1971-1974); Single legal practice, Boston, MA (1971-1974); Lecturer, Harvard Law School (1974-1979); Partner, Rosenberg, Baker & Fine, Cambridge, MA (1974-1979); Assistant Professor, Harvard Law School (1979-1983); Professor, Harvard Law School (1983- )

*Practice in major cases*:

As or with counsel of record—Bond v. Floyd, 385 U.S. 116 (1967);[1] O'Callahan v. Parker, 395 U.S. 258 (1969); United States v. Spock, 416 F.2d 165 (1st Cir. 1969); United States v. Ellsberg (1971); In re Stolar, 401 U.S. 23 (1971); Law Students Civil Rights Research Council v. Wadmond, 401 U.S. 154 (1971); Mandel v. Mitchell, 408 U.S. 753 (1972); Robison v. Johnson, 415 U.S. 361 (1974); Commonwealth v. Edelin, 359 N.E.2d 4 (Mass. 1976); Payton v. Abbott Laboratories, 83 F.R.D. 382 (D.Mass. 1979); National Coordinating Counsel for Plaintiffs in the DES litigation; Sindell v. Abbott Laboratories, 607 P.2d 924 (Cal. 1980); Richmond Newspapers v. Virginia, 448 U.S. 555 (1980); Grendel's Den v. Larkin, 459 U.S. 116 (1982); Hawaii Housing Authority v. Midkiff, 463 U.S. 1323 (1982); Cipollone v. Liggett Group, 112 S.Ct. 2608 (1992); Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S.Ct. 2786 (1992)

As expert consultant or witness—Walker v. Liggett Group, Inc. Civ. Act. No. 2:97-0102 (S.D. W. Va. (1997); Cox v. Shell Oil Company (Chan. Ct., Tenn. 1995); Price v. Ciba-Geigy Corporation (S.D. Ala. 1994); In the Matter of the Exxon Valdez (FERC 1994); Georgine v. Amchem Products, Inc., 157 F.R.D. 246 (E.D. Pa. 1994), and in

[1] Pre-bar admission.

Amchem Products, Inc. v. Windsor, 117 S.Ct. 2231 (1997); Bowling v. Pfizer, Inc., 143 F.R.D. 141 (S.D. Ohio 1992); Manville Trust Reorganization (E.D.N.Y., AFL-CIO panel); Dairyland Ins. Co. v. Pfizer, Inc., Case No. 718166 (Super. Ct. Cal. 1993)

*Books, journal articles, and other scholarly publications:*

On Torts, Civil Liability Generally, Civil Process, and Related Topics—

30. (with Kenneth S. Reinker) Improving Medical Malpractice Liability by Allowing Insurers in Charge, available at: http://ssrn.com/abstract=923424 (forthcoming J. Legal Studies 2008)

29. (with Robert J. Jackson, Jr.) A New Model of Administrative Enforcement (forthcoming Va. L. Rev. 2007) currently available at: http://ssrn.com/abstract=943038; The Judicial Posner on Negligence Versus Strict Liability (120 Harv. L. Rev. 1210 (2007)

28. The Judicial Posner on Negligence Versus Strict Liability: Indiana Harbor Belt Railroad Co. v. American Cyanamid Co., 120 Harv. L. Rev. 1210 (2007)

27. (with James Sullivan) Coordinating Private Class Action and Public Agency Enforcement of Antitrust Law, 2 J. Competition L. & Econ. 159 (2006) (also published in Canadian Class Action Review (2006); and Litigating Conspiracy: An Analysis of Competition Class Actions (Steven Pitel & Tom Telfer eds. 2006))

26. (with Steven Shavell), A Solution to the Problem of Nuisance Suits: The Option to Have the Court Bar Settlement, 26 Internat. Rev. L. & Econ. 42 (2006)

25. (with Steven Shavell) A Simple Proposal to Halve Litigation Costs in the United States, 91 VA. L. REV. 1721 (2005)

24. (with John Scanlon), Class Actions in Mississippi: To Be or Not to B(3), 26 Miss. College L. Rev. 153 (2005)

23. (with Randy Kozel), Solving the Nuisance-Value Settlement Problem: Mandatory Summary Judgment, 90 Va. L. Rev. 1849 (2004)

22. (with Charles Fried) MAKING TORT LAW: WHAT SHOULD BE DONE AND WHO SHOULD DO IT (2003)

21. Adding a Second Opt-Out to Rule 23(b)(3) Class Action: Cost Without Benefit, (2003 U. Chi. Legal Forum 19)

20. (published remarks) Symposium: Judge Jack B. Weinstein, Tort Litigation, and the Public Good, 12 J. Law & Pub. Policy 149 (2003)

19. Decoupling Deterrence and Compensation Functions in Mass Tort Class Actions for Future Loss, 88 Va. L. Rev. 1871 (2002)

18. Mandatory-Litigation Class Action: The Only Option for Mass Tort Cases, 115 Harv. L. Rev. 831 (2002);

17. The Regulatory Advantage of Mass Tort Class Action, in REGULATION BY LITIGATION (W. Kip Viscusi ed., 2002);

16. Mass Tort Class Action: A Social Welfare Perspective (Boston Bar Association, CLE 2001)

15. (published remarks) Symposium: Tort Liability, the Structural Constitution, and the States, 31 Seton Hall L. Rev. 563 (2001)

14. Mass Tort Class Actions: What Defendants Have and Plaintiffs Don't, 37 Harv. J. Legis. 393 (2000)

13. (with Bruce Hay), Sweetheart and Blackmail Settlements in Class Actions: Reality and Remedy, 75 Notre Dame L. Rev. 1377 (2000)

12. Individual Justice and Risk-Based Claims in Mass Exposure Cases, 71 N.Y.U. L.Rev. 210 (1996)

11. THE HIDDEN HOLMES: HIS THEORY OF TORTS IN HISTORY (Harvard University Press, 1995)

10. Mass Torts and Collective Judicial Procedure, in ALI Reporters' Study, ENTERPRISE RESPONSIBILITY FOR PERSONAL INJURY: APPROACHES TO LEGAL AND INSTITUTIONAL CHANGE (1991)

9. Damage Scheduling in Mass Exposure Cases, 1 Courts, Health Science, and the Law 335 (1991)

8. Of End Games and Openings in Mass Tort Cases: lessons from a Special Master, 69 B.U. L. Rev. 695 (1989)

7. Class Actions for Mass Torts: Doing Individual Justice by Collective Means, 62 Ind.L.J.561 (1987)

6. Toxic Tort Crisis, 24 Houston L. Rev. 183 (1987)

5. Joint and Several Liability for Toxic Torts, 15 J. Hazardous Mat. 219 (1987)

4. The Uncertainties of Assigned Shares Tort Compensation: What We Don't Know Can Hurt Us, 6 Risk Analysis 363 (1986)

3. Book Review, The Dusting of America: A Story of Asbestos -- Carnage, Cover-up and Litigation, 99 Harv. L. Rev. 1693 (1986)

2. (with Steven Shavell), A Model in Which Suits are Brought for their Nuisance Value, 5 Int. Rev. L. & Eco. 3 (1985)

1. The Causal Connection in Mass Exposure Cases: A "Public Law" Vision of the Tort System, 97 Harv. L. Rev. 849 (1984)

On other subjects—

5. "The Path Not Taken," in *The Path of the Law* After One Hundred Years, 110 Harv. L.Rev. 1044 (1997)

4. "Litigating Civil Rights and Liberties in the United States: A Vital but Flawed Enterprise," in LITIGATING THE VALUES OF A NATION: THE CANADIAN CHARTER OF RIGHTS AND FREEDOMS, 357 (J. Weiler & R. Elliot eds., 1986)

3. (with C. Nesson & J. Travaline), DISTRICT COURT TRIAL MANUAL, MASSACHUSETTS DEFENDERS COMMITTEE (1975)

2. A Form Book for Enjoining Undeclared Wars, (Book Review), 8 Harv. Civ. Rts.-Civ. Lib. L. Rev. 223 (1973)

1. Constitutional Limitations on the Process of Admission to the Bar, 23 N.Y.U. Intramural L. Rev. 135 (1968)

*Work in progress:*

18. Overcoming the Choice of Law Barrier to Multi-state Class Actions: A New Method of Sampling

17. Book Project: Doing Individual Justice by Collective Means: A General Theory and Model for Collectivized Adjudication of Mass Tort (and other Civil Liability Claims against Business and Government)

16. The Advantage of Random Adjudication of Defendant Liability on Multiple Claims

15. (with Jack Goldberg) A Heuristic View Point on the Making and Choice of Law in Mass Tort Cases

14. A New Method of Sampling to Eliminate Non-Common Question Barriers to Class Action Certification

13. Ex ante versus Ex Post Compensation in Civil Liability Cases

12. (with Matthew Macdonald) Why Courts Should Charge a User Fee for Adjudicating Business Disputes

11. (with Charlene Choi and Jonathan Krop) A Revamped System for Enforcing Securities Law

10. Optimizing Inter-generational Welfare-transfers Through the Market in Bond Financing

9. Real Contract Cases in Tort: How Courts Should Recognize and Resolve Them

8. Private and Public Financing of Election Campaigns By Means of Anonymous Individual Contributions

7. "Search Me": Selective Waiver of Fourth Amendment Restraints on National Security Investigations

6. On Mandatory Unionization

5. (with Andrew Oldham) The Scalar Dimension of Law Enforcement

4. Mass Production Goods, Torts, and Justice; The Problem of Opt-Out (http://papers.ssrn.com/sol3/papers.cfm?abstract_id=354120, posted 2003)

3. Avoiding Duplicative Litigation of Similar Claims: The Superiority of Class Action vs. Collateral Estoppel vs. Standard Claims Market (http://papers.ssrn.com/sol3/papers.cfm?abstract_id=354100, posted 2002)

2. Deregulating Insurance Subrogation: Towards an Ex Ante Market in Tort Claims (http://papers.ssrn.com/sol3/papers.cfm?abstract_id=350940, posted 2002); (with Bruce Hay), THE INDIVIDUAL JUSTICE OF AVERAGING (Harvard John M. Olin Discussion Paper Series No. 285, 2000) available at: http://ssrn.com/abstract=11336;

1. What Distributional Difference Can Rule Changes Make? (1989).

# Exhibit C

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>INTEL CORP. MICROPROCESSOR ANTITRUST LITIGATION, | MDL Docket No. 05-MD-1717-JJF |
| PHIL PAUL, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION,<br><br>Defendant. | Civil Action No. 05-485-JJF<br><br>CONSOLIDATED ACTION |

**DECLARATION OF STEVE BERMAN IN SUPPORT OF OBJECTIONS TO SPECIAL MASTER'S REPORT AND RECOMMENDATIONS COMPELLING PRODUCTION OF CLASS PLAINTIFF'S FINANCIAL DOCUMENTS**

1. My name is Steve Berman. I am managing partner at Hagens, Berman, Sobol & Shapiro, LLP, a national firm specializing in complex plaintiff class action cases, including consumer antitrust litigation. I submit this declaration in support of Plaintiffs' Objections to Special Master's Report and Recommendations Compelling Production of Class Plaintiffs' Financial Documents.

2. Ours is one of four firms appointed by the Court under Fed. R. Civ. P. 23(g) to serve as Interim Class Counsel in this litigation.

3. My firm employs 43 attorneys in six offices around the country. Collectively, my three named partners and I alone have well over 75 years of experience in litigating class actions.

4. As previously represented to the Court during the Fed. R. Civ. P. 23(g) proceedings to appoint interim class counsel, my firm is willing and able to fully fund this case, along with its co-counsel.

5. To the best of my knowledge, my firm has never revoked funding for a class action and has never threatened to do so.

6. In addition, I view my firm's representation under Fed. R. Civ. P. 23(g)(1)(C) to commit adequate resources to litigate this case zealously as a commitment to do so and my firm will not renege on that commitment. I believe that forsaking that commitment not only is highly improper but also would not be effective.

Date: October 10, 2007

Steve W. Berman
Managing Partner
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
(206) 623-7292
Fax: (206) 623-0594

# Exhibit D

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>INTEL CORP. MICROPROCESSOR ANTITRUST LITIGATION, | MDL Docket No. 05-MD-1717-JJF |
| PHIL PAUL, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION,<br><br>Defendant. | Civil Action No. 05-485-JJF<br><br>CONSOLIDATED ACTION |

**DECLARATION OF THOMAS P. DOVE IN SUPPORT OF OBJECTIONS TO SPECIAL MASTER'S REPORT AND RECOMMENDATIONS COMPELLING PRODUCTION OF CLASS PLAINTIFFS' FINANCIAL DOCUMENTS**

1. My name is Thomas P. Dove. I am Of Counsel at The Furth Firm LLP, a national practice firm specializing in complex plaintiff class action cases, including consumer antitrust litigation. I submit this declaration in support of Plaintiffs' Objections to Special Master's Report and Recommendations Compelling Production of Class Plaintiffs' Financial Documents.

2. The Furth Firm LLP is one of four firms appointed by the Court under FRCP 23(g) to serve as Interim Class Counsel in this litigation.

3. Attorneys at my firm collectively have well over 100 years of experience in litigating class actions. I, myself, currently am Lead or Co-Lead Counsel in several other consumer class action antitrust actions in addition to the current case, and I have over 35 years of class action litigation experience.

4. As previously represented to the Court during the FRCP 23(g) proceedings to appoint interim class counsel, my firm is willing and able to fully fund this case, along with its co-counsel.

5. To the best of my knowledge, my firm has never revoked funding for a class action and has never threatened to do so.

6. In addition, I view my firm's representation under Federal Rule of Civil Procedure 23(g)(1)(C) to commit adequate resources to litigate this case zealously as a commitment to do so and my firm will not renege on that commitment. I believe that forsaking that commitment not only is highly improper but also would not be effective.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 10th day of October, 2007, in San Francisco, California.

By: ______________________

Thomas P. Dove



88544.1

# Exhibit E

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>INTEL CORP. MICROPROCESSOR ANTITRUST LITIGATION, | MDL Docket No. 05-MD-1717-JJF |
| PHIL PAUL, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION,<br><br>Defendant. | Civil Action No. 05-485-JJF<br><br>CONSOLIDATED ACTION |

**DECLARATION OF R. ALEXANDER SAVERI IN SUPPORT OF OBJECTIONS TO SPECIAL MASTER'S REPORT AND RECOMMENDATIONS COMPELLING PRODUCTION OF CLASS PLAINTIFF'S FINANCIAL DOCUMENTS**

I, R. Alexander Saveri, declare:

1. I am the managing partner of Saveri & Saveri, Inc., a national firm specializing in complex plaintiff class action cases, including consumer antitrust litigation. I submit this declaration in support of Plaintiffs' Objections to Special Master's Report and Recommendations Compelling Production of Class Plaintiffs' Financial Documents.

2. Saveri & Saveri, Inc. is one of four firms appointed by the Court under FRCP 23(g) to serve as Interim Class Counsel in this litigation.

3. Attorneys in my firm collectively have over 100 years of experience in litigating class actions.

4. As previously represented to the Court during the FRCP 23(g) proceedings to appoint interim class counsel, my firm is willing and able to fully fund this case, along with its co-counsel.

5. To the best of my knowledge, my firm has never revoked funding for a class action and has never threatened to do so.

6. In addition, I view my firm's representation under Federal Rule of Civil Procedure 23(g)(1)(C) to commit adequate resources to litigate this case zealously as a commitment to do so and my firm will not renege on that commitment. I believe that forsaking that commitment not only is highly improper but also would not be effective.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 10 day of October, 2007 at San Francisco, California.

R. Alexander Saveri

R. Alexander Saveri

Intel.025

# Exhibit F

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br><br>INTEL CORP. MICROPROCESSOR ANTITRUST LITIGATION, | MDL Docket No. 05-MD-1717-JJF |
| PHIL PAUL, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION,<br><br>Defendant. | Civil Action No. 05-485-JJF<br><br>CONSOLIDATED ACTION |

**DECLARATION OF DANIEL A. SMALL IN SUPPORT OF OBJECTIONS TO SPECIAL MASTER'S REPORT AND RECOMMENDATIONS COMPELLING PRODUCTION OF CLASS PLAINTIFFS' FINANCIAL DOCUMENTS**

1. I am a member of Cohen, Milstein, Hausfeld & Toll, P.L.L.C. ("CMHT") and have worked at the firm for over 18 years. CMHT has offices in Washington, D.C., New York, San Francisco, Philadelphia, Chicago and London and employs approximately 65 attorneys. For more than 36 years, the firm and its predecessors have represented plaintiff classes in antitrust, securities and other practice areas. I submit this declaration in support of Plaintiffs' Objections

to Special Master's Report and Recommendations Compelling Production of Class Plaintiffs' Financial Documents.

2. Ours is one of four firms appointed by the Court under Fed. R. Civ. P. 23(g) to serve as Interim Class Counsel in this litigation.

3. As previously represented to the Court during the Fed. R. Civ. P. 23(g) proceedings to appoint interim class counsel, my firm is willing and able to fully fund this case, along with its co-counsel.

4. To the best of my knowledge, my firm has never revoked funding for a class action and has never threatened to do so.

5. In addition, I view my firm's representation under Fed. R. Civ. P. 23(g)(1)(C) to commit adequate resources to litigate this case zealously as a commitment to do so and my firm will not renege on that commitment. I believe that forsaking that commitment not only is highly improper but also would not be effective.

Dated: October 11, 2007

Daniel A. Small