EXHIBIT 6

*Phil Paul   v.*
*Intel Corporation*

---

*Hearing*
*May 1, 2007*

---

*Hawkins Reporting Service*
*715 N King Street*
*Suite 3*
*Wilmington, DE  19801*
*(302) 658-6697*

*Original File 050107~1.TXT, 118 Pages*
*Min-U-Script® File ID: 2256850095*

**Word Index included with this Min-U-Script®**

**Phil Paul v.**
**Intel Corporation**

**Hearing**
**May 1, 2007**

---

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE: )
INTEL CORP. MICROPROCESSOR)MDL Docket No. 05-MD-
1717-JJF )
ANTITRUST LITIGATION, )
PHIL PAUL, on behalf of )
Himself and all others )
similarly situated, ) Civil Action No. 05485-JJF
    Plaintiffs, ) CONSOLIDATED ACTION
v. )
INTEL CORPORATION, )
    Defendant. )

Tuesday, May 1, 2007
10:00 a.m.
Courtroom 4B
844 King Street
Wilmington, Delaware
BEFORE: SPECIAL MASTER VINCENT J. POPPITI
APPEARANCES:
    RICHARDS, LAYTON & FINGER
    BY: FREDERICK L. COTTRELL, III, ESQ.
        -and-
    O'MELVENY & MYERS, LLP
    BY: JENNIFER LASER, ESQ.
        Counsel for AMD

Page 2

APPEARANCES CONTINUED:
    POTTER, ANDERSON & CORROON, LLP
    BY: RICHARD L. HORWITZ, ESQ.
        -and-
    BINGHAM McCUTCHEON, LLP
    BY: RICHARD A. RIPLEY, ESQ.
        Counsel for Intel
    PRICKETT, JONES & ELLIOTT
    BY: J. CLAYTON ATHEY, ESQ.
        -and-
    COHEN, MILSTEIN, HAUSFELD & TOLL
    BY: DANIEL A. SMALL, ESQ.
    BY: BRENT W. LANDAU, ESQ.
        -and-
    FINKELSTEIN THOMPSON, LLP
    BY: RICHARD M. VOLIN, ESQ.
    BY: KAREN J. MARCUS, ESQ.
        Counsel for Class Plaintiffs
    MORRIS, NICHOLS, ARSHT & TUNNELL
    BY: MARY B. GRAHAM, ESQ.
        -and-
    QUINN EMANUEL
    BY: ROBERT W. STONE, ESQ.
        -and-
    FRY'S ELECTRONICS
    BY: BRIAN D. HENRI, ESQ.
        Counsel for Fry's Electronics
Also Present:
    David Carickhoff, Esq.

Page 3

[1] **SPECIAL MASTER POPPITI:** Good morning, [2] all. This is a time we've set for a hearing on [3] class plaintiffs' application to compel Fry's [4] Electronics, Inc. to produce transactional data [5] in response to the subpoena issued on June 23rd [6] of 2006.

[7] Counsel, before we proceed, let's [8] make a record of all those that are present, [9] please.

[10] **MR. ATHEY:** Good morning, Your [11] Honor. Clayton Athey from Prickett, Jones & [12] Elliott.

[13] **SPECIAL MASTER POPPITI:** Thank you, [14] Mr. Athey.

[15] **MR. ATHEY:** I believe you know my [16] co-counsel, Daniel Small.

[17] **SPECIAL MASTER POPPITI:** I indeed do.

[19] **MR. ATHEY:** Brent Landau from Cohen [20] Milstein as well. And Richard Volin and his [21] associate, Karen Marcus, from Finklestein Thomas.

[22] **MR. SMALL:** Thank you [23] very much.

[24] **MR. COTTRELL:** Good morning, Your

Page 4

[1] Honor. Fred Cottrell for AMD.

[2] With me from the O'Melveny firm in [3] Los Angeles is Jennifer Laser. Jennifer has one [4] of the main roles at O'Melveny on third-party [5] discovery, so I'm sure everybody hopes this may [6] be the last third-party discovery issue.

[7] I think we all know it will not be. [8] So Jennifer is here today to listen and perhaps [9] even participate, if necessary.

[10] **SPECIAL MASTER POPPITI:** Thank you, [11] Mr. Cottrell.

[12] **MR. COTTRELL:** Thank you, Your [13] Honor.

[14] **MR. HORWITZ:** Rich Horwitz from [15] Potter Anderson on behalf of Intel. With me [16] today, Rick Ripley from Bingham McCutchen.

[17] **SPECIAL MASTER POPPITI:** Nice to see [18] you again, sir.

[19] **MS. GRAHAM:** Good morning, Your [20] Honor. Mary Graham from Morris Nichols on behalf [21] of Fry's Electronics.

[22] And with me are Robert Stone from [23] Quinn Emanuel. He will be arguing on behalf of [24] Fry's today.

Page 5

[1] And also with us are Brian Henri, [2] legal counsel in-house at Fry's. And he's here, [3] both because this is important to Fry's and also [4] in case there — if there's a desire on the part [5] of the Court to hear from him, he'd be happy to [6] address the Court.

[7] **SPECIAL MASTER POPPITI:** Thank you, [8] Ms. Graham. Welcome, counsel.

[9] **MR. STONE:** Good morning, Your [10] Honor.

[11] **MR. HENRI:** Good morning.

[12] **SPECIAL MASTER POPPITI:** Counsel, [13] before we proceed, I think it may be appropriate [14] for me to maybe cut through several of the — at [15] least one of the issues that was raised by virtue [16] of Fry's response to your application.

[17] Fry's contests the jurisdiction of [18] this Court to entertain, that is, consider and [19] rule on your motion. Let me do it this way: I [20] do intend, notwithstanding any other business [21] that we conduct today, to issue a finding, [22] proposed finding and recommendation to Judge [23] Farnan that the Court conclude that this Court [24] does have jurisdiction to entertain

Page 6

[1] application.

[2] And the reason why I intend to issue [3] a formal document to the Court, notwithstanding [4] anything else I may do today, is so that there [5] can be due consideration by the Court and a [6] ruling. That is, a ruling that gets made for [7] purposes of this district's jurisprudence.

[8] I would note for purposes of [9] creating a very brief record — counsel, you may [10] want to just take your seat for a moment, if you [11] don't mind.

[12] **MR. SMALL:** Sure, Your Honor.

[13] **SPECIAL MASTER POPPITI:** That [14] Fry's — and I will apologize at the front end of [15] this proceeding. There will be some reference to [16] the hearing in advance of the issuance of my [17] report to the Court on the protective order [18] that's in place in this case, and I apologize for [19] referring to the entity as Fry.

[20] I would anticipate that there would [21] hopefully be no need to go back and correct the [22] record, but if there is an application to do [23] that, if you'll make note of that, I will be [24] happy to do that.

Page 7

[1] Fry's cites the case of Visx — VI [2] S X, Inc. versus Nidek, N-I-D-E-K Co., 208 [3] F.R.D. [3] 615. That's 616 in that case. It's a [4] Northern [4] District of California case in the year 2002 — [5] for the proposition that the Chancery Court in [6] multidistrict litigation does not have the [7] authority to — the power to enforce a [8] documents-only subpoena.

[9] It is interesting, and I say this [10] gently, that both Fry's and the class ignored a [11] later decision issued by the same Court, which [12] decision declined to follow the Visx decision.

[13] That case is In Re: Welding Rod [14] Products Liability Litigation at 406 F. Supp 2d [15] 1064, a Northern District of California case in [16] the year 2005.

[17] In Welding Rod, the Court recognized [18] that the stated purpose of coordinating pretrial [19] proceedings in multi-district litigation is to [20] promote the just and efficient conduct of such [21] actions. And there is a reference in that case [22] at Page 1066.

[23] The Court also acknowledged that [24] most courts that have addressed that very issue,

Page 8

[1] most courts have concluded that 28 U.S.C. Section [2] 1407(b) empowers a multi-district litigation [3] transferee Court to exercise the power of any [4] other district, including the enforcement of [5] documents-only subpoenas. The reference is at [6] Page 1066.

---

[7] I have taken the opportunity, and [8] you'll see this in the written document that I [9] expect will issue in short order to review the [10] relevant case law regarding the authority of a [11] transferee Court in multi-district Court [12] litigation to adjudicate discovery disputes in [13] connection with non-parties.

[14] And I am satisfied that the majority [15] view is the better reasoned approach. And I also [16] would expect that the Third Circuit would adopt a [17] view that it expressed in dicta in the case of In [18] Re: Flat Glass, antitrust litigation at 288 F. [19] 3d 83 at note 90. That's the Third Circuit in [20] the year 2002.

[21] That footnote reads in part that [22] Section 1407 (b) "empowers the transferee judge [23] in multi-district cases to act not only on behalf [24] of the transferee district, but also with the

---

Page 9

[1] powers of a district judge in any district for [2] the purpose of conducting pretrial depositions in [3] such coordinated or consolidated proceedings. [4] I'm mindful that the focus was on the conduct of [5] depositions, but I conclude that the Third [6] Circuit, in examining its own dicta, would take [7] what I conclude to be the better reasoned [8] approach and the majority view."

[9] So I do conclude for purposes of [10] this proceeding that the Court has the authority [11] to entertain the application. Counsel, if you [12] believe there's any need for you to make further [13] record in this regard, I'm happy to permit you to [14] do that.

[15] MR. STONE: We don't believe so, [16] Your Honor.

[17] MR. SMALL: Nothing for the class [18] plaintiffs, Your Honor.

[19] SPECIAL MASTER POPPITI: Thank you. [20] The other thing that I'd like to [21] turn to — just give me one moment, please.

[22] I'd like to have some discussion [23] with you about the protective order that exists [24] in this case. And I'd like the discussion that

---

Page 10

[1] you all have with me to be framed against the [2] following backdrop, if you will.

[3] I think it's fair to say that the [4] process leading up to Judge Farnan's entry of the [5] protective order in this case was unique to [6] proceedings of this nature. I think it's fair to [7] say that the uniqueness is literally demonstrated [8] by the schedule of opportunities for all parties [9] to have input to the protective order. And all [10] non-parties, third parties to have

input into [11] that protective order.

[12] Without giving the actual deadlines [13] of the process, I don't think it's important to [14] do that in advance of a scheduled proceeding. [15] Fry's, as a third party, along with all other [16] third parties, have the opportunity to provide [17] written objections and comments with respect to [18] the proposed order.

[19] Fry's did that on May the 19th of [20] 2006, along with a host, if not all of the other [21] third parties providing their objections and [22] comments. Subsequent to receiving those [23] comments, and consistent with the scheduling [24] order relating to the protection order of

---

Page 11

[1] protection, a hearing was conducted on June the [2] 12th of 2006.

[3] I think it's fair to suggest that my [4] style in conducting hearings of this nature was [5] no different on June 12th than it was yesterday [6] or than it will be today. And that is, I believe [7] all of those that were present had a full and [8] fair opportunity to not only explore their [9] objections and comments with the Court, but also [10] had a full and fair opportunity out of the [11] presence of the Court to continue to negotiate [12] provisions of the parts of the protective order [13] that were stipulated.

[14] Fry's did not choose to appear at [15] that hearing, and there were no arguments, [16] therefore, advanced to support Fry's objections [17] and comments. Notwithstanding that, and I think [18] it was very clear before going into the [19] proceeding and it was certainly very clear during [20] the conduct of the proceeding, that all [21] objections and comments that were offered would [22] be considered.

[23] Counsel that was present [24] re-presenting the interest of some third parties

---

Page 12

[1] in the course of their respective presentations [2] suggested to the Court that notwithstanding the [3] comments in the courtroom, that they were not [4] waiving any of their objections that were made in [5] their written submittal.

[6] In reviewing the decision, not a [7] decision, the report and recommendations [8] regarding the proposed protective order, with [9] respect in particular to Fry's May 19, 2006 [10] filing, reference was made to that filing in a [11] multiple — in a number of places in the document [12] itself. And, in fact, — just give me a minute, [13] please.

[14] With respect to comments made to [15] Subparagraph 6c, and I think these [16] paragraphs and [16] subparagraphs are

all, to some extent, etched in [17] our minds. The Court received comments from Best [18] Buy, Dell, Fry's, Hewlett-Packard, and Microsoft.

[19] Fry's was the only third party that [20] argued for the two-tiered approach that they are [21] presently asking for today.

[22] Fry's also in its submittal of [23] May the 19th, 2006 suggested alternatives if the [24] Court were not to accept the two-tiered approach.

---

Page 13

[1] And I think it may be important for purposes of [2] this record to read my language with respect to [3] Fry's objections and comments with respect to [4] subparagraph 6c. And that's found at Page 39.

[5] This is a quote. It says, "Fry" — [6] it should read Fry's objects to allowing In-house [7] Litigation Counsel to view its highly [8] confidential sales documents such as [9] industry-wide purchase agreements and sales [10] information. Fry's argues that such information [11] could greatly harm Fry's and the other third [12] parties' ability to negotiate competitive [13] purchase orders and vendor agreements should it [14] be disclosed to the parties to the lawsuit.

[15] Fry's therefore requests that a [16] second "tier" be added to the protective order [17] that would shield "highly confidential" [18] information from disclosure to the parties and [19] their In-house Litigation Counsel.

[20] Fry's offered an alternative. In [21] the alternative, should the Court refuse the [22] request for a two-tiered protective order, Fry's [23] requests that in-house litigation counsel be [24] precluded from viewing confidential documents in

---

Page 14

[1] their normal place of business and that they only [2] be granted access to view the documents at their [3] outside counsel's office.

[4] I'm sure all remember that that [5] recommendation was one that was not adopted in [6] the ultimate report and in the order as signed by [7] Judge Farnan.

[8] Finally, to the extent that this [9] Court allows in-house litigation counsel to view [10] confidential documents produced by third parties, [11] Fry's requests that the in-house litigation [12] counsel's identity be disclosed to the [13] third-parties by revising Paragraph 6c to read [14] "To in-house counsel, identify to the opposing [15] party and any producing party".

[16] That language was, in fact, adopted [17] in the report and was ultimately signed by Judge [18] Farnan.

[19] I would also note that with respect [20] to other third parties' comments,

Phil Paul  v.
Intel Corporation

**Hearing**
May 1, 2007

focusing on [21] issues involving the ban, that there was [22] significant discussion on whether the one year [23] was sufficient. There was also significant [24] discussion with respect to what that ban would

Page 15

[1] include. And the Court, at my re-commendation, [2] substantially accepted a number of the [3] observations made by Microsoft.

[4] The report and recommendation was [5] entered on the 27th of June of 2006. Subsequent [6] to the entry of that finding and recommendation, [7] there was an opportunity for Fry's and all other [8] parties to file exceptions to the report. [9] Subsequent to that filing of my [10] report, AMD was the only party that filed [11] exceptions to the report. On September the 26th [12] of 2006, Judge Farnan, after discussing AMD's [13] objections, adopted the proposed protective [14] order, and here we are.

[15] So my question, for purposes of that [16] backdrop, is why should the Court permit Fry's or [17] any other party to ask that the protective order [18] be revisited with all that went into the [19] development of that order?

[20] **MR. SMALL:** Good morning, Your [21] Honor. Dan Small for the class plaintiffs.

[22] **SPECIAL MASTER POPPITI:** Sir, do you [23] have a problem?

[24] **MR. STONE:** Oh, was Your Honor's

Page 16

[1] question to Fry's or —

[2] **SPECIAL MASTER POPPITI:** No. At [3] this juncture, it is plaintiffs' application.

[4] **MR. STONE:** Okay. I'm sorry.

[5] **MR. SMALL:** Your Honor, I think you [6] put it as well as it could be. The nature of the [7] prior proceedings that this Court has already had [8] on the protective order issues, the very full [9] nature of the proceedings, the very careful [10] consideration that this Court gave to all the [11] objections made by third parties, including [12] certainly Fry's.

[13] And it's also the case, Your Honor, [14] that the specific concerns that Fry's is raising [15] now in connection with its opposition to [16] producing any data in this case are the very [17] concerns that Fry's and others raised the first [18] time around. So it's not a situation, Your [19] Honor, where there was some concern not addressed [20] to the Court that the Court was not aware of. [21] It's not a situation where the circumstances have [22] changed.

[23] In fact, the very data that we seek [24] production of today is the very data that was

Page 17

[1] sought by AMD when it served a subpoena on Fry's [2] back in November of 2005, or I think it was [3] October of 2005.

[4] So the circumstances have not [5] changed, Your Honor. And there simply is no [6] reason for the very explanation that Your Honor [7] gave that we should disturb and reopen weeks and [8] weeks of negotiations among the parties and the [9] third parties, as well as very full proceedings [10] that this Court generously gave to all the third [11] parties to participate in the formulation of a [12] protective order that the third parties knew, [13] because they had all been subpoenaed at that [14] point, that they would have to produce under.

[15] There's simply no reason to go back.

[16] **SPECIAL MASTER POPPITI:** Let me ask [17] this question, counsel, because you do this [18] day-to-day every day, and I expect that you have [19] appeared in a number of different courtroom [20] settings.

[21] Are you aware of a process in any [22] other proceeding that you've been involved with [23] where the opportunity to participate literally in [24] the crafting of the initial order was as it was

Page 18

[1] constructed in this case?

[2] **MR. SMALL:** Your Honor, in my [3] experience, I have never been involved where the [4] Court proactively invited the third parties to [5] look at a concrete proposal formulated by the [6] parties for a protective order, where they had [7] the opportunity to look at a concrete draft and [8] give written comments as well as to argue as to [9] the propriety of the language. That kind of [10] proceeding I've never seen.

[11] In all candor, I have seen it where [12] the parties have agreed to or the Court has [13] entered a protective order and then subsequently [14] a third party who has been asked to produce has [15] objected to a particular provision. But never [16] has the third party had the opportunity before [17] the order was entered to object.

[18] **SPECIAL MASTER POPPITI:** I'm aware [19] of that practice, if you will, and I'm aware of [20] the case law that was cited or discussed by [21] Fry's.

[22] **MR. SMALL:** Yes. Those are all the [23] comments I have at this point on the protective [24] order issue.

Page 19

[1] Your Honor, would you prefer to hear [2] from Fry's?

[3] **SPECIAL MASTER POPPITI:** I would [4] prefer to hear that issue first, please.

[5] **MR. STONE:** Thank you, Your Honor. [6] Respectfully, it's Fry's position that things [7] have changed actually since the time that Fry's [8] submitted some comments with respect to the [9] protective order that was ultimately entered in [10] this case.

[11] As you noted, Fry's comments and [12] objections to the proposed protective order were [13] submitted on May 19, 2006. That was more than a [14] month prior to the June 22, 2006 subpoena from [15] class plaintiffs.

[16] When class plaintiffs subpoenaed [17] Fry's, that changed the landscape with respect to [18] both the information being sought from Fry's and [19] the potential for harm that could come to Fry's [20] if its confidential and highly proprietary tr-ade [21] secret information is produced in this case. And [22] I think that the documents before Your Honor [23] demonstrate that it's undisputed that what we're [24] talking about here are highly proprietary trade

Page 20

[1] secret materials of Fry's, materials that provide [2] Fry's with its competitive advantage in the [3] marketplace.

[4] **SPECIAL MASTER POPPITI:** I don't [5] think there's any dispute with respect to that, [6] is there, Mr. Small?

[7] **MR. SMALL:** There's a partial [8] dispute, Your Honor.

[9] **SPECIAL MASTER POPPITI:** Okay. I'll [10] let you develop it at some point.

[11] **MR. STONE:** Also mentioned, Your [12] Honor, a June 12, 2006 hearing which Fry's did [13] not participate in. At that point in time, again [14] that was prior to the time that the subpoena that [15] is currently before the Court issued to Fry's. [16] And it wasn't until December of 2006 when class [17] plaintiffs began a meet and confer process with [18] Fry's that led to where we are today.

[19] And it was through those discussions [20] with counsel for class plaintiffs and the [21] recognition that AMD and Intel would not be [22] seeking this transactional data, at least as of [23] now, but are not participating in this motion to [24] compel, that it became apparent to Fry's that a

Page 21

[1] modification to the protective order was [2] something that they were interested in trying to [3] obtain, given the nature of the materials being [4] sought by class plaintiffs.

[5] **SPECIAL MASTER POPPITI:** So is [6] counsel suggesting that notwithstanding the [7] whereas clauses in the protective order, that I [8] would submit to you contemplates access to [9] transactional data, that notwithstanding that or [10]

access to highly confidential information as [11] sensitive and as important as the information [12] that you have described, notwithstanding that, [13] Fry's had no expectation as a third party in this [14] case that the transactional data would not be the [15] subject of third-party subpoena practice?

[16] **MR. STONE:** I think the question [17] that precisely what transactional data was going [18] to be sought. And I think as Your Honor can see [19] from the back and forth between the parties, that [20] that's been somewhat of a moving target.

[21] I think that at the time that Your [22] Honor previously considered Fry's objections, the [23] issue wasn't quite ripe. It hadn't been framed [24] as a result of the ongoing discussions that have

---

Page 22

[1] taken place between and among the parties.

[2] And so even though in the abstract [3] one could talk about what materials might [4] ultimately be sought, now Your Honor has a fuller [5] record, including declarations from Fry's [6] specifically identifying the trade secret and [7] confidential nature of the materials. And as a [8] result, the Court is in a better position to [9] consider Fry's request.

[10] **SPECIAL MASTER POPPITI:** Just give [11] me one moment.

[12] (Following a discussion held off the [13] record:)

[14] **SPECIAL MASTER POPPITI:** I think [15] what I'm hearing you say is that notwithstanding [16] the fact that AMD had already issued the [17] subpoena, and I can tell you I haven't studied [18] that, that that would not have put you on notice [19] that transactional data was expected to be an [20] object of discovery in this case and perhaps [21] ultimately be involved in ultimate proofs in this [22] case.

[23] **MR. STONE:** There was the potential [24] that they were going to seek such data. Given

---

Page 23

[1] their current posture, and Intel's current [2] posture not participating in this motion, and [3] those two parties dropping out, and the fact that [4] what they sought was slightly different from what [5] class plaintiffs seek, I don't think that Fry's [6] was on notice with respect to the precise [7] information that we're now discussing.

[8] In addition, it was a different [9] landscape when Your Honor was considering a [10] subpoena from AMD and/or Intel whereas now there [11] are tens and tens of law firms representing class [12] plaintiffs that want to have access to Fry's [13] data.

[14] **SPECIAL MASTER POPPITI:** Just give [15] me one moment, please, counsel, if you will.

[16] Mr. Small, do you have a copy of the [17] AMD —

[18] **MR. SMALL:** Yes, Your Honor.

[19] **SPECIAL MASTER POPPITI:** — subpoena?

[20] **MR. SMALL:** Would you like me to [21] bring it up?

[22] **SPECIAL MASTER POPPITI:** Please.
[23] Let's do this: I know it is [24] certainly part of the Court's record. Do you all

---

Page 24

[1] have your copy or a copy with you?
[2] You do not? [3] How many copies will we need? Do [4] you want three? Four?

[5] **MR. STONE:** I think three will be [6] helpful.

[7] **SPECIAL MASTER POPPITI:** Three?
[8] (Following a discussion held off the [9] record:)

[10] **MR. SMALL:** Your Honor.

[11] **SPECIAL MASTER POPPITI:** Yeah, [12] please.

[13] **MR. SMALL:** I would note for [14] everyone's convenience that the AMD subpoena was [15] attached to the Volin declaration, which was [16] submitted with our reply papers as Exhibit F.

[17] **SPECIAL MASTER POPPITI:** Thank you. [18] That's not in your — that's not [19] Exhibit F of your application; correct, counsel?

[20] **MR. SMALL:** Right. It was attached [21] to the Volin declaration, which was with the [22] reply.

[23] **SPECIAL MASTER POPPITI:** Right. [24] Right.

---

Page 25

[1] **MR. SMALL:** Your Honor.

[2] **SPECIAL MASTER POPPITI:** Yes.

[3] **MR. SMALL:** I apologize to the [4] Court. I was just advised that the subpoena that [5] I gave you was the Intel subpoena, not the AMD [6] subpoena.

[7] **SPECIAL MASTER POPPITI:** Yeah. I [8] didn't think I saw an AMD subpoena.

[9] **MR. SMALL:** Yeah.

[10] **SPECIAL MASTER POPPITI:** I'm kind of [11] happy that I didn't, because —

[12] **MR. VOLIN:** Your Honor, I apologize. [13] Richard Volin.

[14] The Exhibit F is the AMD subpoena, [15] but what was handed up was Exhibit D, which was [16] the Intel subpoena.

[17] **SPECIAL MASTER POPPITI:** I didn't [18] remember — just a second.

[19] I have it now. I have it. [20] Please. Mr. Small, you have — I'm [21] going to direct my attention to that document for [22] a

---

minute. You can do it from the table.

[23] **MR. STONE:** Thank you.

[24] **MR. SMALL:** Your Honor, the specific

---

Page 26

[1] part of the AMD subpoena that addresses the data [2] of Fry's is Request Number 11, all four subparts, [3] but of most interest are subparts c and which is [4] listed under the heading Purchase History.

[5] **SPECIAL MASTER POPPITI:** Does [6] counsel have that?

[7] **MR. STONE:** I do now, Your Honor.

[8] **SPECIAL MASTER POPPITI:** Please.

[9] **MR. STONE:** And the point I'd make, [10] Your Honor, is that the level of detail sought [11] there is vastly different than the level of [12] detail currently being sought by class [13] plaintiffs. Circumstances change in discovery [14] and —

[15] **SPECIAL MASTER POPPITI:** I [16] understand that.

[17] **MR. STONE:** — that's why we're here [18] on a more fuller — on a more full record [19] requesting modification of the protective order.

[20] **SPECIAL MASTER POPPITI:** And why [21] does the existing protective order not give you [22] protection and the expectation that if there is a [23] violation of the order, a Court standing behind [24] the order of protection?

---

Page 27

[1] **MR. STONE:** Well, what I'd say, Your [2] Honor, is that you can't unring the bell. Once [3] the information is out there, and with the vastly [4] greater number of lawyers, and law firms, and [5] parties involved now, the possibility of the [6] information being disclosed, even inadvertently, [7] is much greater.

[8] And so the safeguards that Fry's has [9] requested are common and have been issued on [10] numerous occasions by Judge Farnan.

[11] **SPECIAL MASTER POPPITI:** I'm aware [12] of this.

[13] **MR. STONE:** And so we think that [14] would help prevent the possibility of any harm [15] befalling for us.

[16] **SPECIAL MASTER POPPITI:** Thank you, [17] sir.

[18] **MR. STONE:** Thank you.

[19] **SPECIAL MASTER POPPITI:** Mr. Small.

[20] **MS. GRAHAM:** Your Honor.

[21] **SPECIAL MASTER POPPITI:** Yes, [22] please.

[23] **MS. GRAHAM:** I assume you would [24] prefer to hear from just one counsel for each

---

Phil Paul    v.
Intel Corporation

**Hearing**
**May 1, 2007**

---

Page 28

[1] party, but if I might impose upon the Court. You [2] had asked a question if counsel was aware of an [3] instance where, under circumstances as here, a [4] protective order had been negotiated with third [5] parties, and then subsequently a third party came [6] in and wanted different provisions.

[7] And I'm not aware of something that [8] satisfies that, but I am aware of a case, an [9] antitrust case here that was being handled by [10] Judge Jordan, and we represent the defendant as [11] does Mr. Cottrell. It's the Tricor litigation [12] against Abbott and Fournier.

[13] And in that case, a protective order [14] had been negotiated at the outset. I don't [15] recall that the Court needed to rule on anything [16] in the case, but it was negotiated. And Abbott's [17] in-house counsel was covered under the protective [18] order to see all information.

[19] This I know, because Abbott is my [20] client. It's a very important provision to that [21] client.

[22] Subsequently, this past fall, the [23] defendants were seeking certain information from [24] Impax, one of the plaintiffs that's a generic

Page 29

[1] pharmaceutical company, and it protested that [2] this information was highly confidential. It was [3] related, I believe, to business-type planning [4] information and financial information, and they [5] took the position that, notwithstanding the [6] protective order, that in-house counsel should [7] not be allowed to see that information. And over [8] the objections of Abbott to modify the protective [9] order, in fact, Judge Jordan said that that [10] information would be produced and not given to [11] in-house counsel.

[12] So we at least have that precedent [13] that where specific information came along later, [14] and certainly this kind of information was in [15] general information that was fully expected to be [16] produced in the case. But notwithstanding that, [17] Judge Jordan took — he held that given the [18] special — how proprietary this information was [19] and it was one category of information, that he [20] would modify the protective order to the extent [21] that that information would not go to in-house [22] counsel.

[23] SPECIAL MASTER POPPITI: And did I [24] understand your comments to be that the third

Page 30

[1] parties participated in the negotiation of the [2] original order?

[3] MS. GRAHAM: That order didn't [4] involve third parties, so I was trying to

make [5] clear that third parties weren't involved there. [6] But that was — Impax is actually a party in that [7] case.

[8] So I would submit that if a party to [9] a case, who certainly is fully engaged in the [10] case or controversy, is negotiating a protective [11] order at the outset and submits it to the Court [12] for entry and later comes along to modify it, and [13] the Court would agree to do it, that the case [14] ought to be stronger in this instance.

[15] SPECIAL MASTER POPPITI: What [16] standard did the Court use?

[17] MS. GRAHAM: I'm not sure that he [18] articulated a standard, but we could certainly [19] get you the transcript, if that would be helpful.

[20] SPECIAL MASTER POPPITI: Yeah. [21] There was no written decision; it was in the [22] transcript?

[23] MS. GRAHAM: I believe it was just a [24] transcript decision, although there probably was

Page 31

[1] a written order that issued.

[2] SPECIAL MASTER POPPITI: I'd like to [3] be supplied with the transcript, please.

[4] MS. GRAHAM: Okay. We'll do that.

[5] SPECIAL MASTER POPPITI: Mr. Small.

[6] MR. SMALL: Thank you, Your Honor. [7] A few things. If the Court were to [8] compare the document request made by AMD in its [9] 2005 subpoena with the document request made in [10] class plaintiffs' subpoena with respect to data, [11] you would see that they're strikingly similar.

[12] Both ask for data on a monthly basis [13] broken down in certain ways. Both for Fry's [14] purchases of computer systems and for Fry's sales [15] of those same computer systems.

[16] So there really is no basis, Your [17] Honor, based on differences, very slight between [18] the AMD and the class plaintiffs subpoenas, for [19] Fry's to argue that it was not fully aware that [20] it would have to produce data exactly of the type [21] we're talking about today.

[22] The only evolution there is, Your [23] Honor, in the negotiations with respect to Fry's [24] data is that the parties have moved from

Page 32

[1] requesting data on a monthly basis to requesting [2] it on a transactional basis. And the reason for [3] that, Your Honor, is it's preferable for the [4] parties to get it transactionally. And we also [5] believe it's less burdensome for the producing [6] party to give it that way if it maintains it on a [7] transactional basis in the ordinary

course of [8] business.

[9] Now, Fry's has represented to us [10] that it does not keep its data on a monthly [11] basis. So when Fry's saw the request for [12] documents sufficient to show their sales and [13] their purchases on a monthly basis, it knew that [14] that would require it to produce it [15] transactionally or to aggregate it for us.

[16] And presumably, since it says it [17] doesn't want to undergo the burden of aggregating [18] by month, that it understood that that meant a [19] transactional production.

[20] SPECIAL MASTER POPPITI: Okay.

[21] MR. SMALL: A couple other points, [22] Your Honor.

[23] SPECIAL MASTER POPPITI: On this [24] issue?

Page 33

[1] MR. SMALL: Well, yes. [2] Let me say, too, that when Fry's [3] submitted its objection to the original proposed [4] protective order, that it understood exactly the [5] type of information that it would be asked to be [6] produced in this case. If you look at objection [7] number two, it says, in part, plaintiffs have [8] subpoenaed highly confidential sales documents [9] such as industry-wide purchase agreements and [10] sales information. If that doesn't encompass [11] sales data, I'm not sure what does.

[12] So clearly, Fry's anticipated this [13] kind of production of data. But Your Honor, it's [14] not just what Fry's anticipated, it's also what [15] the Court anticipated.

[16] And there's no doubt that Your Honor [17] and Judge Farnan in dealing with the [18] confidentiality order in this case understood and [19] anticipated that there would be production in [20] this case of highly confidential materials, [21] including the very types of materials that are at [22] issue here.

[23] In the protective order itself, it [24] lists the type of documents that can be

Page 34

[1] designated confidential. Those documents include: [2] "non-public pricing information, non-public data [3] concerning sales, revenues, profits, margins and [4] variants, non-public customer lists, non-public [5] data concerning costs."

[6] So the Court was very aware that the [7] data would be included in those categories of [8] documents and in determining that the protections [9] that the order provided were sufficient for [10] documents of that type.

[11] The other point, Your Honor, is that [12] the Court understood very well that there was [13] going to be production of

---

data or other types of [14] documents that were very sensitive competitively. [15] As Your Honor mentioned, I believe there is a [16] specific whereas clause in the order that says [17] "preparation for trial may require the discovery [18] and use of documents and other information which [19] constitute or contain commercial trade secrets".

[20] The very type of information that [21] Fry's is saying its data is and therefore needs [22] to be protected. So there was no doubt in the [23] Court's mind when it entered this order that [24] there would be trade secrets produced in this

### Page 35

[1] case. And there's no doubt that the Court [2] determined that the protections afforded by the [3] existing protective order were sufficient to [4] handle production of trade secrets.

[5] And the Court even goes on in the [6] protective order to say —

[7] **SPECIAL MASTER POPPITI:** What page?

[8] **MR. SMALL:** — that the disclosure of [9] trade secrets would be competitively harmful to [10] the producing party. So all the harm that Fry's [11] talks about, the Court was aware of and [12] considered and found that the protective order [13] was sufficient to handle it.

[14] Last point, Your Honor. There's [15] always going to be a third party out there that [16] would prefer more protection from the protective [17] order. In fact, Your Honor heard many of them [18] come forward already in connection with the [19] original proceedings on the protective order [20] asking for more than they got.

[21] If Fry's, who is producing data [22] really no different from data being produced by [23] many other third parties in this case, were to [24] get a change of the protective order, then I

### Page 36

[1] believe, Your Honor, that would open the flood [2] gates to other third parties producing exactly [3] the same kind of data asking for their [4] modifications to the protective order with really [5] no end in sight.

[6] And that was the whole purpose, Your [7] Honor, of the prior proceedings was to let [8] everyone come forward at once, put all their [9] objections out, argue them, and let the Court [10] make a decision about what the right protective [11] order was.

[12] Finally, you know, this notion that [13] Intel and AMD are dropping out is not the case, [14] Your Honor. Those parties can speak for [15] themselves. They're here today.

[16] But my understanding is that they [17]

have not withdrawn their subpoenas, and they [18] still seek production of Fry's data. And, in [19] fact, they seek the very data that we do, which [20] is transactional sales and purchase records of [21] Fry's.

[22] Thank you, Your Honor.

[23] **SPECIAL MASTER POPPITI:** Counsel, [24] please.

### Page 37

[1] **MR. STONE:** A few comments, Your [2] Honor.

[3] First, with respect to the AMD [4] subpoena, I would submit that there are actually [5] far more differences than there are similarities. [6] And in particular, it's the type of information [7] that's being sought by the subpoena where the [8] differences are found.

[9] The AMD subpoena in points 11c and [10] 11d doesn't seek the information which is [11] particularly at issue here today, which is the [12] revenue information, the pricing information, the [13] cost information that is at the heart of Fry's [14] business, and if disclosed would cause the most [15] harm to Fry's.

[16] Beyond that, Your Honor, the reason [17] why — one reason why we argue that we need [18] additional protections under the protective order [19] is that what class plaintiffs intends to do [20] apparently is to push the burden on monitoring [21] this case to a non-party, Fry's, to make sure [22] that every submission in the case doesn't include [23] Fry's confidential information.

[24] By having some additional

### Page 38

[1] protections, Fry's hopes that ultimately the [2] information would not be used either [3] inadvertently or intentionally in a harmful [4] manner.

[5] And I think that's all I have, Your [6] Honor, unless you have any further questions?

[7] **SPECIAL MASTER POPPITI:** No. Thank [8] you.

[9] Mr. Small, what I would like you to [10] do, if you're prepared to do it at this point, [11] with respect to documents that have been produced [12] by other third parties, what have you done to [13] protect the safeguards of those interests of [14] those third parties?

[15] **MR. SMALL:** Your Honor, this is Dan [16] Small for the class plaintiffs.

[17] We, of course, have read the [18] protective order that the Court has entered. We [19] are fully prepared and have fully abided by all [20] of the provisions of that protective order.

[21] The experts, whether they be [22] testifying or non-testifying experts that we [23] retain, have all been provided a

copy of the [24] protective order and have been asked to and have

### Page 39

[1] signed the acknowledgement that they have read, [2] understood and will abide by the protective [3] order.

[4] There are additional procedures that [5] have been set up with respect to the review of [6] electronic data that has been produced in this [7] case which provide additional protections [8] actually beyond what is provided by the [9] protective order. So really we've done [10] everything.

[11] **SPECIAL MASTER POPPITI:** Would you [12] describe some of those? Because there is some [13] language in the order that I certainly can [14] reference if it's important to do that. There is [15] an expectation that there would have been [16] procedures established if electronic data was [17] being reviewed by in-house counsel at their [18] office.

[19] **MR. SMALL:** Yes. I'll have to [20] confess, Your Honor, I'm not as familiar maybe as [21] some others here with the provisions of the [22] E-discovery stipulation and order.

[23] But essentially my understanding is [24] that when native productions are made of

### Page 40

[1] electronic documents, that the location of the [2] review has to be a secure facility. And that [3] there have to be other appropriate protections to [4] make sure that the native documents are not [5] improperly disseminated or are not reviewed [6] improperly by those who are not permitted access [7] to them.

[8] **SPECIAL MASTER POPPITI:** Thank you.

[9] **MR. SMALL:** Sure.

[10] **SPECIAL MASTER POPPITI:** Any other [11] comments?

[12] **MR. STONE:** If I could briefly be [13] heard, Your Honor?

[14] **SPECIAL MASTER POPPITI:** Please.

[15] **MR. STONE:** Counsel for class [16] plaintiffs makes note that there are experts in [17] this case. And now given the number of law firms [18] representing class plaintiffs, there are many, [19] many experts.

[20] And so one additional protection [21] that Fry's had requested is having some knowledge [22] concerning the nature of those experts. Fry's [23] does not want to have its highly confidential [24] information, its trade secret information to make

### Page 41

[1] its way into the hands of an expert who's working [2] for one of Fry's direct

Phil Paul v.
Intel Corporation

Hearing
May 1, 2007

competitors. And to [3] avoid such an occurrence, in many cases, courts [4] impose some notice requirement that would then [5] give Fry's an opportunity to object.

[6] And given the current state of the [7] protective order, that does not exist. When [8] Fry's was dealing with AMD and Intel, two [9] parties, the number of experts at issue and [10] potentially in play was fairly small.

[11] Now, that number has expanded [12] exponentially and so Fry's submits that that is [13] further grounds for a modification of the [14] protective order at this time.

[15] **SPECIAL MASTER POPPITI:** Thank you.

[16] **MR. STONE:** I'll also note that it [17] seems that some parties have been satisfied by [18] the protective order. Fry's is not.

[19] But to the extent that a number of [20] them are, then it's not likely that many parties [21] will be coming back to seek modifications.

[22] **SPECIAL MASTER POPPITI:** Thank you. [23] Just give me one moment, please.

[24] I just want to take ten minutes to

### Page 42

[1] look at something in the transcript to the [2] hearing and then we'll reconvene. Let's [3] reconvene by that clock at ten after four, please.

[4] **MR. STONE:** Okay.

[5] (A brief recess was taken.)

[6] **SPECIAL MASTER POPPITI:** I    just [7] need a few more minutes.

[8] (Following a discussion held off the [9] record:)

[10] **SPECIAL MASTER POPPITI:** Let me just [11] focus on one issue for the moment. I do want the [12] opportunity to review Judge Jordan's transcript, [13] and without sounding unreasonable, because I [14] don't want to sound unreasonable, if I can have [15] that — is close of business today doable?

[16] **MS. GRAHAM:** That's fine. We can do [17] that.

[18] **SPECIAL MASTER POPPITI:** Okay. [19] Great.

[20] There was some reference to a need, [21] if you will, to also look at the protective order [22] insofar as utilization of confidential material [23] by — highly confidential is the way you look at [24] it as far — insofar as experts are concerned.

### Page 43

[1] And I think it's fair to suggest [2] that if you look at Page 81 of my report dealing [3] with Paragraphs 6b and 11, you will

see the [4] result of the dispute as between a number of [5] third parties and what the parties wanted in the [6] case. And the dispute was framed in virtually [7] the same language that counsel framed it just a [8] short while ago.

[9] I'm looking at Page 88 of the June [10] 12th, 2006 transcript. This is Mr. Holston [11] speaking. It's H-O-L-S-T-O-N. Excuse me.

[12] This is a quote. "This relates to [13] the parties' experts and consultants." And by [14] "this relates", he's talking about Paragraph 6 —[15] 6b. "The third — the non-parties have requested [16] that they be given, in fact, who the parties are [17] intending to use as their experts and their [18] consultants in this litigation.

[19] And Your Honor, although it may not [20] be clear, let me make it clear. Obviously, [21] non-parties would be willing to be bound by [22] appropriate confidentiality around that [23] information. We don't have a dog in the fight, [24] Your Honor, but we do — it is a small world.

### Page 44

[1] The technology world is small and [2] getting smaller every day. And who the parties [3] are selecting, and my guess is there's going to [4] be quite a number of experts and consultants in [5] this case, and who they're using may very well be [6] relevant to the non-parties in the context of the [7] ordinary course of their business.

[8] And in the nature of the information [9] that's going to be provided to these individuals, [10] Your Honor, we don't think this is an [11] unreasonable protection. And to take a page out [12] of AMD's book, the only concern here would be if [13] the Court were to conclude that the counsel and [14] the non-parties could get access on this [15] information and would misuse it.

[16] And, otherwise, Your Honor, there is [17] clearly a legitimate business interest for the [18] non-parties to know who's getting access to their [19] incredibly sensitive information. AMD, in [20] essence, recognizes that they are going to tell [21] us who the in-house lawyers are. [22] We think we ought to be told who the [23] experts are as well."

[24] Now, what resulted from that

### Page 45

[1] discussion — let me just read the section of the [2] report. This is a quote from Page 81 into 82.

[3] The parties argued against the [4] change sought by the third parties " simply [5] because there's going to be a lot of experts, a [6] lot of consultants. Many of the mare [7] non-testimonial. And both Intel and AMD view [8] that as work product and that we wouldn't, in the [9]

ordinary course, be disclosing to anyone — [10] anybody, nor would we have any obligation to do [11] so."

[12] "The parties, however, went on to [13] offer that they would be willing to accommodate [14] the third parties' concerns in the spirit of [15] compromise and agreed to work with the third [16] parties to come up with mutually acceptable [17] language."

[18] "Following the hearing, by [19] submission dated June 15th, 2006, the parties [20] agreed to revise the concluding paragraph, [21] Paragraph 11 to add the following language." And [22] then it goes on to quote the language.

[23] With that, I will suggest for the [24] record that I am not inclined to propose a change

### Page 46

[1] to the protective order. At the same time, I [2] want to give counsel the opportunity to provide [3] me with the transcript from the case that you [4] referenced with Judge Jordan, so I can examine [5] that.

[6] If you think that the papers filed [7] in conjunction with that would be helpful, then [8] I'll leave it to your discretion as to whether or [9] not you want to file those papers with the [10] transcript.

[11] I don't know that there would be a [12] need, but if you want the need, you want to have [13] the opportunity to make comments on those, I'll [14] entertain that.

[15] And we should discuss that now, [16] because I realize that all time frames in going [17] forward are rather tight. So if I can have the [18] transcript and anything else that you'd like [19] to — I said tonight, but that may mean you want [20] to file something along with it.

[21] Why don't you propose a time frame, [22] please.

[23] **MR. STONE:** Could we do it by close [24] of business tomorrow, Your Honor?

### Page 47

[1] **SPECIAL MASTER POPPITI:** Yes.

[2] **MR. STONE:** That would give us [3] adequate time.

[4] **SPECIAL MASTER POPPITI:** Yes.

[5] **MR. SMALL:** My suggestion, Your [6] Honor, would be for Fry's to simply identify any [7] portions of the transcript that they believe are [8] relevant. If they would limit their comments to [9] that, we would not have anything that we would [10] need to respond to.

[11] **SPECIAL MASTER POPPITI:** Do you want [12] to limit yourself at this point or do you want to [13] make some judgment as to whether you want to file [14] something in addition to the transcript?

[15] MR. STONE: I think we'd like to [16] reserve our right to —

[17] SPECIAL MASTER POPPITI: Okay.

[18] MR. STONE: — file something along [19] with the transcript, Your Honor.

[20] SPECIAL MASTER POPPITI: And if that [21] is done by close of business tomorrow, how long [22] would you like to have to weigh in?

[23] MR. SMALL: Two days, Your Honor, [24] please.

---

Page 48

[1] SPECIAL MASTER POPPITI: Okay.

[2] MR. SMALL: Thank you.

[3] SPECIAL MASTER POPPITI: Would [4] someone suggest a page limit, please, so we don't [5] wind up having submittals in the submittals?

[6] MR. STONE: I think three pages [7] would be sufficient.

[8] MR. SMALL: That would do for us as [9] well.

[10] SPECIAL MASTER POPPITI: Three pages [11] is fine. Okay.

[12] Let me just clear some of this stuff [13] up, please. Well, I guess that concludes my [14] opening comments. Didn't expect it to take this [15] long, but I think it was productive for purposes [16] of the record.

[17] Counsel, please.

[18] MR. SMALL: Thank you, Your Honor. [19] Dan Small for the class plaintiffs.

[20] SPECIAL MASTER POPPITI: Please.

[21] MR. SMALL: I want to start actually [22] by clarifying something I told the Court before [23] relating to the E-discovery stipulation. Based [24] on my conversations with colleagues during the

---

Page 49

[1] break, it's not clear to me that the E-discovery [2] stipulation applies to data production. And it's [3] also not clear to me that it applies to [4] third-party production.

[5] So I don't want to represent to the [6] Court that that's necessarily an additional [7] protection that would apply to Fry's today.

[8] SPECIAL MASTER POPPITI: Okay. [9] Thank you.

[10] MR. SMALL: Your Honor, the class [11] plaintiffs and the class that they seek to [12] represent are end users of the x86 microprocessor [13] that Intel manufactures. The class or the [14] proposed class purchases primarily computer [15] systems that contain Intel's microprocessor [16] chips.

[17] And we are at the end of the line for [18] distribution. We are the ones who buy for our [19] own use and not for resale.

---

[20] What that means for this case, Your [21] Honor, is that to prove our damages claim, it's [22] not sufficient for us just to prove, of course, [23] that Intel unlawfully monopolized the x86 market, [24] nor is it even sufficient to show that as a

---

Page 50

[1] result of that unlawful monopolization, Intel [2] charged inflated prices to its customers.

[3] In addition, because we stand at the [4] end of the distribution chain, we need to prove [5] that any overcharge that Intel imposed on its [6] customers was passed on down the line of [7] distribution to the end users, our proposed class [8] members.

[9] Therefore, Your Honor, we need [10] transactional data in this case, including Fry's [11] transactional data, to be able to show that [12] inflated prices paid by intermediaries in the [13] distribution chain led to higher prices those [14] intermediaries charged to the end users.

[15] That's the pass-on analysis. It [16] requires data, both as to the prices paid by [17] intermediaries and the prices charged by [18] intermediaries. That's precisely the type of [19] data that we're looking for in this case.

[20] That data is also relevant to class [21] certification, because it's often the case that a [22] defendant will oppose class certification on the [23] argument that you cannot use a class-wide [24] generalized damages formula to show impact and

---

Page 51

[1] damages to all segments of the market, that you [2] need to individually look at different types of [3] end users, depending on which channel of [4] distribution they purchased in to see whether [5] they were injured.

[6] SPECIAL MASTER POPPITI: Okay. And [7] if I understand the law on that issue, it is [8] something that is not settled in this case yet, [9] and counsel has not chosen to take the [10] opportunity to ask me to look at what the law [11] would be on class certification; correct?

[12] MR. SMALL: That's correct, Your [13] Honor. And I think it fits sort of into the [14] category that Your Honor pointed out before when [15] we were seeking to compel Intel to produce the [16] foreign document discovery, raising, you know, [17] issues under the FTAIA about whether we were [18] entitled to that discovery, you know, based [19] really on issues that were raised by the motion [20] to dismiss that Intel file.

[21] And Your Honor correctly pointed out [22] that those are, you know, merit issues that the [23] Court will get to in connection with the motion [24] to dis-

---

miss. Here, you know, ultimately the Court

---

Page 52

[1] will have to decide on plaintiffs' class [2] certification motion, what the law is, what the [3] standard is, what showing we have to make.

[4] Our point for now is because that [5] has not been ruled on by the Court, we need to be [6] able to get discovery now that will allow us to [7] handle the arguments that Intel may well make in [8] this case. And we certainly would not be [9] surprised to see Intel argue you have to show [10] that there is a generalized damages formula that [11] shows that Fry's customers, no differently from [12] customers of other retailers, are impacted by the [13] unlawful conduct, and that you have a formula [14] that can show the damages for all segments of the [15] market through a single formula.

[16] So that may well be the proof that [17] Intel tries to put us to.

[18] SPECIAL MASTER POPPITI: And I [19] expect that Intel is not going to take the [20] opportunity today to announce what position it is [21] going to take.

[22] MR. SMALL: I believe that's [23] correct, Your Honor. And I want to hasten to add [24] that we don't necessarily agree with how Intel

---

Page 53

[1] may argue class certification, but it is still [2] incumbent upon us as representatives of a [3] proposed class to accumulate all of the evidence [4] that we think would be important to handling [5] arguments that may well be made by Intel.

[6] So Your Honor, those are the reasons [7] that we need this data. And in particular, Fry's [8] data.

[9] We very carefully, at the outset of [10] the case, sat down with our economist and said, [11] We know we have to prove pass on here. What is [12] the sample that we need from intermediaries in [13] the distribution chain to be able to prove pass [14] on to the class?

[15] We understood that we could not [16] subpoena every single reseller in the country who [17] sells a computer with an Intel chip in it. It's [18] just not possible or practical.

[19] So we had to make judgments about [20] what would be an appropriate representative [21] sample of resellers. Now, we picked Fry's [22] because Fry's is actually different from many [23] retailers.

[24] Certainly different from Best Buy

---

Page 54

[1] and Circuit City in the sense that Fry's [2] is a computer super store. They have

---

huge retail [3] outlets that carry a very complete line of [4] computers, many more models than typically would [5] be carried by a Circuit City or a Best Buy.

[6] In fact, in its papers, Fry's points [7] out that since 2000 it has sold over 2000 [8] different computer models. And unlike many other [9] computer retailers or electronic stores that [10] include computers in their line of products, [11] Fry's also sells computer components.

[12] It's a store that the proverbial [13] computer geeks like to go to because they can [14] pick out each of the different components of a [15] computer and actually assemble their own [16] computers. And so Fry's is it's own kind of [17] retailer that we would like to see data from to [18] be able to see how the prices and what the [19] pricing strategy is to assure ourselves that we [20] can show with the single formula that Fry's [21] customers are injured no less than other [22] customers in the market.

[23] The other thing, Fry's has a [24] reputation and a practice of being an aggressive

Page 55

[1] pricer in the market. It offers, you know, [2] especially it appears on a sort of lost leader [3] basis, very low prices for computer systems. So [4] we need to be able to see whether there is any [5] issues there that have implications for a class [6] certification or proof of pass on.

[7] And it's also a very large retailer. [8] By our count, it has 33 stores in nine different [9] states. So they sell a lot of computers, as they [10] made clear in the papers that they submitted on [11] this motion.

[12] I would also finally point out that [13] really none of this is challenged by Fry's. They [14] claim that we didn't explain relevance [15] sufficiently or we haven't shown, you know, [16] enough relevance in light of their reasons for [17] not wanting to produce.

[18] But the essence of our explanation [19] for why these data are relevant and needed by the [20] plaintiffs, they have really not challenged.

[21] **SPECIAL MASTER POPPITI:** I think [22] Fry's position is that you haven't stepped up to [23] what they see to be a more significant burden [24] when you're looking for this information from

Page 56

[1] third parties.

[2] Would you speak to that, please?

[3] **MR. SMALL:** Yes. First of all, for [4] all the reasons I just articulated, Your Honor, [5] this was not a casual request on the class [6] plaintiffs' part for this data. This was part of [7] a very carefully crafted sampling of resellers [8] that, with the

assistance of our economist, we [9] put in place to get the collection of data we [10] believe we need to show pass on in this case.

[11] And the notion that we need to prove [12] pass on is not disputed, nor could it be. And [13] the notion that the right way or the right [14] collection of evidence to prove pass on is [15] purchase information and resale information by [16] the intermediaries is not disputed, nor could it [17] be. So that's why we need this information.

[18] And I would submit, while certainly [19] Fry's can make arguments that that need is [20] outweighed by certain other factors, we think, [21] first of all, that the need is great. So it [22] would take very compelling other factors to [23] outweigh it.

[24] And second, when you look closely at

Page 57

[1] what the other factors are that Fry's points to, [2] they are not substantial.

[3] And if I may, Your Honor, I'd like [4] to go through those.

[5] **SPECIAL MASTER POPPITI:** Please.

[6] **MR. SMALL:** First, Fry's argues, [7] well, you might need the data at some point, but [8] you certainly don't need it now. And for the [9] reasons I just gave, Your Honor, we certainly do [10] need it now for class certification purposes.

[11] This is an issue that is going to [12] come up, we believe, on class certification, and [13] the data is directly relevant to the issue of [14] whether we can have a generalized damages [15] formula.

[16] Second —

[17] **SPECIAL MASTER POPPITI:** Let me just [18] ask a question. It really is more out of [19] curiosity then of substance, but when the [20] original scheduling order was discussed with [21] Judge Farnan, was there any discussion of phase [22] discovery? That is, discovery for class [23] certification purposes and then discovery for [24] merits?

Page 58

[1] **MR. SMALL:** Not to my knowledge, [2] Your Honor.

[3] And I believe the reason for that is [4] because, of course, the class plaintiffs are not [5] the only plaintiffs in this case.

[6] **SPECIAL MASTER POPPITI:** Right.

[7] **MR. SMALL:** There is also AMD, which [8] of course doesn't have to face any class [9] certification issues. So AMD, which had filed [10] the case first, had served subpoenas on third [11] parties I think way back in 2005.

[12] It was anxious, as it should be, to [13] proceed in discovery, and certainly

would not [14] want to have to be bifurcated where it dealt just [15] with class certification issues, which it didn't [16] have, and had to wait further to get to the [17] merits.

[18] So AMD sort of led the charge in [19] moving into merits, and we followed along.

[20] **SPECIAL MASTER POPPITI:** And [21] notwithstanding that, it's my under-standing, I [22] think, based on your submittals that you have [23] either agreed or you would agree that you will [24] accept, if you will, discovery that is more

Page 59

[1] focused for purposes of class cer-tification. And [2] then once that is accomplished, you expect full [3] discovery without explaining any time lines; is [4] that fair or am I —

[5] **MR. SMALL:** I would say it's correct [6] to this extent, Your Honor, that the class [7] plaintiffs have focused their efforts on getting [8] production of transactional data.

[9] **SPECIAL MASTER POPPITI:** Right.

[10] **MR. SMALL:** Because that is a key [11] portion of the evidence that we need for class [12] certification purposes. But it's certainly our [13] hope that the pro-duction we get now will be the [14] production for the case, that the same data that [15] we get now will be used also for merits.

[16] **SPECIAL MASTER POPPITI:** Okay.

[17] **MR. SMALL:** Now, I will mention that [18] we offered in our papers to accept a sample from [19] Fry's of its data for class certification [20] purposes as long as Fry's would agree for merits [21] to make a full production of its data later.

[22] We don't know what Fry's position is [23] on that, but that is something we're willing to [24] discuss with Fry's.

Page 60

[1] **SPECIAL MASTER POPPITI:** Yeah. Let [2] me just make sure of that, because if you would [3] turn your attention just briefly to Page 3 of [4] your reply.

[5] **MR. SMALL:** Mm-hmm.

[6] **SPECIAL MASTER POPPITI:** Do you have [7] that in front of you?

[8] **MR. SMALL:** Yes, Your Honor.

[9] **SPECIAL MASTER POPPITI:** You [10] indicate at five, class plaintiffs are amen-able [11] to receiving such a sample for class [12] certification purposes, but Fry's would then need [13] to produce the full data for merits.

[14] And at the same time in the [15] conclusion, you state that Fry's argume-nts of [16] class plaintiffs can wait until after class [17] certification. Note, only a

sample should be [18] rejected for the reasons expressed above.

[19] **MR. SMALL:** Yes.

[20] **SPECIAL MASTER POPPITI:** There is [21] some happy medium there somewhere, is there not?

[22] **MR. SMALL:** It's really separate [23] points. We certainly cannot wait until after [24] class certification for any production from

### Page 61

[1] Fry's.

[2] **SPECIAL MASTER POPPITI:** I [3] understand.

[4] **MR. SMALL:** And ultimately, in the [5] case, we want a full production from Fry's, not [6] just a sample. The only thing we're saying in [7] the nature of a compromise is that we would take, [8] for class certification purposes, a sample if [9] Fry's agree to give us the full production later.

[10] **SPECIAL MASTER POPPITI:** Okay.

[11] **MR. SMALL:** So, Your Honor, there [12] really is no reason, even if Fry's could show [13] that the data are not necessary for class [14] certification, which we strenuously dispute, to [15] delay production anyway, because AMD and Intel [16] seek the same data.

[17] And there's no reason to wait for [18] them. They don't face class certification [19] issues.

[20] Fry's also says that we haven't met [21] and conferred enough. It's probably the first [22] time I've heard that argument eight months after [23] we began meeting and conferring.

[24] We believe, based on the history of

### Page 62

[1] the negotiations, Your Honor, that we would not [2] reach agreement with Fry's even through extensive [3] additional attempts at meeting and conferring, [4] because, number one, Fry's has taken its position [5] that it would not produce data absent [6] modification of the protective order. Something [7] we could not agree to.

[8] Second, just the history of the [9] negotiations shows that despite many attempts, we [10] have not made progress, at least before the [11] filing of the motion to compel with Fry's in the [12] negotiations. There's no reason to think that [13] would suddenly change.

[14] In fact, in the seven months [15] prefiling of the motion that we negotiated, we [16] never once got an offer from Fry's to produce any [17] data. Certainly none was produced.

[18] Fry's would not even agree to [19] produce the tiny sample that we had asked for [20] that would allow the parties

to identify the [21] precise fields that Fry's maintains that we [22] needed production of. So we could not get [23] cooperation from Fry's to advance the [24] negotiations really at all.

### Page 63

[1] And third, since the filing of the [2] motion, we have had a discussion with Fry's about [3] what they would produce. And that proposal that [4] Fry's made to us, in our view, is wholly [5] inadequate. Really what it consists of is an [6] offer to produce one data point for each product [7] that Fry's sold during the relevant period.

[8] So for a particular computer [9] product, a particular model, or however they [10] define their different products, they would give [11] us one data point for the whole time period. Our [12] expert, who is handling the data work in the [13] case, submitted a declaration, a declaration of [14] Jonathan Orszag saying that that level of [15] aggregation, which by the way is compounded by [16] the fact that Fry's also wants to just give us a [17] sample of that data, which would necessarily [18] exclude some products, is simply not useful. We [19] can't use that for the purposes for which we need [20] to.

[21] So in our view, it's essentially an [22] offer that has no value to us. And we firmly [23] believe, Your Honor, all the meeting and [24] conferring would not get us where we need to be.

### Page 64

[1] We unfortunately have to put the [2] burden on the Court to give us some assistance in moving the [3] negotiations forward.

[4] Fry's also talks about burden, but I [5] think their burden arguments rest on a couple [6] misunderstandings of what we're looking for.

[7] First of all, we do not — we are [8] not asking Fry's to change the form of the data [9] that they keep these to produce it to us. We're [10] asking them to produce to us as they keep it in [11] the ordinary course of business.

[12] Basically our request to Fry's is [13] to — for the fields we select, for the data [14] fields we select, to simply download the data in [15] those fields onto some medium that they can then [16] hand over to us.

[17] That's what we're asking for. There [18] should not be an excessive burden at all to do [19] that.

[20] Second, Fry's talks about the burden [21] of having to print out invoices that they keep [22] in electronic file invoice by invoice and then [23] having to redact customer identification [24] information from the invoices. I want to be

### Page 65

[1] clear, Your Honor, we are not asking for [2] production of invoices that are going to be [3] printed out in hard copy.

[4] What we're looking for is data that [5] is input into a database that reflects the [6] transactions that Fry's has engaged in, both as a [7] buyer and a seller, that we can use to do the [8] kind of analysis we want. The invoices will not [9] do that in any way that's feasible.

[10] I mean, to try and input into a [11] data — create our own database basically from [12] invoices is a Herculean task that we're not [13] asking Fry's to produce to us or that we would [14] try to undertake in this case.

[15] Now, Fry's says why should we have [16] to produce data here when you're going to get [17] some of that data from other sources?

[18] And the short answer to that, Your [19] Honor, as we've said in our papers, is that most [20] of the data is not going to be available from [21] other sources. Certainly Fry's sales of its [22] computers to customers are really only, as a [23] practical matter, available from Fry's. We can't [24] go to each customer that walks in the door of a

### Page 66

[1] Fry's store and subpoena that customer to turn [2] over the receipt or whatever they may have.

[3] I mean, they're not going to [4] obviously keep data. So that's not a feasible [5] alternative.

[6] As to purchases, we probably will [7] get production of some data that overlaps at [8] least in theory with what Fry's has. But there's [9] a few things.

[10] We don't know exactly the extent of [11] the overlap. Even if there is some overlap, [12] there may be gaps in another producing party's [13] data. There may be technical difficulties with [14] another party's data.

[15] There may be other flaws in the data [16] or the data may just not be as good. It may not [17] be as granular, for instance, as Fry's data.

[18] So we can't give up on Fry's data [19] simply because of the possibility that there may [20] be data out there that overlaps. And in any [21] event, it's not a bad thing to have production of [22] data from two parties as sort of cross checks [23] against each other for issues of accuracy, and [24] quality, and things like that.

### Page 67

[1] On the sample issue, I think I've [2] basically addressed that.

[3] **SPECIAL MASTER POPPITI:** You have.

Phil Paul   v.
Intel Corporation

<div align="right">

**Hearing**
May 1, 2007

</div>

[4] MR. SMALL: Fry's is saying don't [5] put us to the burden of producing the full data, [6] allow us to produce a sample — that issue, by [7] the way, mainly arises in the context of Fry's [8] confidentiality concerns. They're essentially [9] saying the less data we have to produce, the less [10] confidentiality concern we have.

[11] But I would submit, Your Honor, for [12] all the reasons that we discussed this morning, [13] that the protective order deals adequately, very [14] adequately with Fry's confidentiality concerns, [15] and they should have to produce the full set of [16] data, because the protective order gives them [17] adequate protection.

[18] And I would also submit, too, the [19] burden of producing a full set of data compared [20] to a sample is virtually the same. That because [21] we're dealing with electronics in a database that [22] can download onto a medium, whether they download [23] some of the data or all the data really is not [24] much different in terms of burden.

### Page 68

[1] And, in fact, it may be easier just [2] to have it all downloaded rather than trying to [3] come up with a program that identifies some [4] subset of the data.

[5] And finally, to the extent Fry's is [6] complaining about the burden, we have offered [7] repeatedly to Fry to give us a tiny sample of [8] the data which will allow us to focus the best we [9] can on the relevant fields that we have to have [10] for our purposes, and we will limit our requests [11] for production to just those fields.

[12] So if we can get any assistance from [13] Fry's in that regard, we can actually help reduce [14] the burden that they face.

[15] The only other area that I briefly [16] want to cover, Your Honor, goes to the issue of [17] relief. As you know, when we filed our original [18] opening briefs with the Court, we said just [19] simply tell Fry's it has to produce the data and [20] give it a deadline for doing so, because we [21] thought that if it had a deadline and [22] understanding that it had to produce data, the [23] parties and Fry's could sit down and negotiate [24] the details of the production.

### Page 69

[1] We unfortunately have less [2] confidence in that process now, Your Honor, [3] because of the difficulty we've had post-filing [4] of our motion in getting a productive [5] conversation going to try and lead to an [6] appropriate production of data. And so we see as [7] key features of the relief that we now request [8] the following: First, make it clear to Fry's [9] that they must produce transactional

data in the [10] case.

[11] Second, Fry's should have a date [12] certain for completing the production. We [13] propose three weeks. I'm not going to say that [14] that's a date fixed in stone, but I think it [15] gives the Court a good idea of what we believe [16] the time frame is here for production.

[17] Third, Fry's should cooperate with [18] the parties to identify the fields that we [19] ultimately want production of. And that, of [20] course, involves production of a sample and [21] making available as needed Fry's IT people who [22] can explain and answer questions that we have [23] about the data sample. [24] And third, make it clear that to the

### Page 70

[1] extent the data are available — or fourth, I [2] should say, to the extent the data are available [3] in transactional form at a transactional level, [4] that they should be produced that way. If [5] they're not available at a transactional level, [6] then produce them at the level most disaggregated [7] as they exist.

[8] And one clarification in our papers, [9] Your Honor, we propose for the sample that it be [10] just for two SKUs for a two-day period. That's [11] probably sufficient, but with the clarification [12] that the SKUs have to be — they're among their [13] top selling SKUs, so we'll have enough data in [14] the sample that it will be meaningful.

[15] In other words, it's not going to be [16] sufficient if Fry's picks two SKUs that they had [17] virtually no sales of.

[18] So, Your Honor, unless —

[19] SPECIAL MASTER POPPITI: So I'm [20] looking at the reply with respect to the detail [21] of what you are requesting in terms of the [22] relief.

[23] MR. SMALL: Yes.

[24] SPECIAL MASTER POPPITI: You're

### Page 71

[1] suggesting that number one be modified; correct?

[2] MR. SMALL: Yes. Just to make it [3] clear that the two SKUs that they would produce [4] the sample of would be SKUs that have a lot of [5] sales.

[6] SPECIAL MASTER POPPITI: Well, that [7] phrase may not ring to a number, SKUs that have a [8] lot of sales.

[9] I mean, I certainly can — were I to [10] grant the relief, I could write that language, [11] but I'm not sure how it translates.

[12] MR. SMALL: I could probably do [13] better than that by suggesting Your Honor that it [14] be SKUs that are among the top ten selling SKUs [15] that Fry's has.

[16] SPECIAL MASTER POPPITI: I would

[17] just like to note — I don't know if you want to [18] make any comments, Mr. Small, for the record, and [19] I expect it goes, to some extent, to the issue of [20] meet and confer.

[21] I am mindful of the March 12, 2007 [22] correspondence from Mr. Volin to Mr. Henri which [23] it previews your application. And what I would [24] suggest is precise detail. And it seems to me

### Page 72

[1] that — well, it just does that.

[2] Do you have any comments about that [3] correspondence and what it does or does not [4] accomplish?

[5] Do you have that in front of you?

[6] MR. SMALL: I agree with the Court's [7] sentiment about that. I mean, throughout the [8] negotiations, it was our attempt to be clear and [9] be, you know, open and let Fry's know as best we [10] could exactly what we were looking for and what [11] our positions were on the different issues that [12] were raised in the course of the negotiations. [13] And this is a good example of the detail and the [14] effort that went into that process.

[15] SPECIAL MASTER POPPITI: Well, there [16] were some comments earlier in the morning in your [17] application that the subject of the subpoena was [18] somewhat of a moving target. I think that was [19] the phrase that was used.

[20] MR. SMALL: Yes.

[21] SPECIAL MASTER POPPITI: I'm [22] mindful of the fact that the focus was either [23] tightened or at least changed. Would you [24] characterize what you did as a moving target during the course of

### Page 73

[1] the meet and confers? And if you don't, how [2] would you characterize what you did?

[3] MR. SMALL: The basic concept of [4] what we were looking for, I don't think changed. [5] We were looking for transaction level data, both [6] with respect to Fry's purchases of computer [7] systems with x86 chips and Fry's sales of those [8] same computer systems. That never changed.

[9] What did evolve in the negotiations [10] was our attempt to articulate specifically what [11] that would require Fry's to produce. And the way [12] that we came at it was to list for Fry's as best [13] we could, the fields that we thought they [14] maintain in their database that would give us the [15] necessary information.

[16] And I think the best example of [17] that, Your Honor, is the February 23rd, 2007 [18] letter from Mr. Volin to Mr. Henri which attaches [19] to it a list of the fields broken down into neat [20] categories that we were looking for, as well as [21]

another attachment that gave a set of [22] look-up tables to try and minimize the volume of the data [23] that Fry's would have to —

[24] SPECIAL MASTER POPPITI: What was

### Page 74

[1] the reference again, please?

[2] MR. SMALL: February 23rd, 2007 [3] letter from Mr. Volin to Mr. Henri. I would say [4] that our inability to more precisely than we did, [5] and I think we did it pretty precisely, but our [6] inability to more precisely define the data that [7] we were looking for was due, I believe, to our [8] inability to get Fry's to produce the data sample [9] or to give us a data dictionary that would [10] explain exactly what the fields are.

[11] If they had taken either of those [12] steps, we could have come back with a very [13] specific type request for the fields that we [14] wanted produced. But unless they are willing to [15] share that kind of information, all we can do is [16] give them a list of the type of fields we're [17] looking for.

[18] But it's really in their corner to [19] share the data with us so we can see what the [20] fields are. They keep — or for them to figure [21] out which specific fields they have that fit [22] within the categories of fields that we set out [23] in that February 23rd letter.

[24] SPECIAL MASTER POPPITI: Do you have

### Page 75

[1] the reference to that in your exhibits, please?

[2] MR. SMALL: Yes. One second, [3] please.

[4] SPECIAL MASTER POPPITI: Sure. [5] Thank you.

[6] MR. SMALL: Your Honor, the Feb- [7] ruary 23rd letter is attached to the Volin [8] certification, which was filed with our initial [9] letter brief as Exhibit H.

[10] SPECIAL MASTER POPPITI: Just give [11] me one moment to relook at that.

[12] MR. SMALL: Sure. Thank you.

[13] SPECIAL MASTER POPPITI: Thank you.

[14] MR. SMALL: Sure. Thank you, Your [15] Honor.

[16] SPECIAL MASTER POPPITI: If counsel [17] would first turn your attention to the issue of [18] meet and confer, I'd appreciate it, please.

[19] MR. STONE: Your Honor, with re- spect [20] to the meet and confer and the fact that what [21] plaintiffs have been seeking is a moving target, [22] I think

further evidence for that is the fact [23] that plaintiffs' reply requests relief that [24] wasn't requested in plaintiffs' open- ing brief.

### Page 76

[1] Plaintiffs' reply requests additional relief that [2] plaintiffs did not initially seek.

[3] This has been an evolutionary [4] process. Fry's has certainly made a good faith [5] effort to explain to counsel for plaintiffs why [6] it was that they had problems with the subpoena [7] and what it was willing to do if agreement could [8] be reached with respect to things such as the [9] protective order.

[10] SPECIAL MASTER POPPITI: That's what [11] I want to ask you. I mean, is it fair to suggest [12] that absent an agreement on the protective order, [13] literally everything else was a non-start?

[14] I mean, it may have been interesting [15] to look at. It may have been in- teresting to [16] start to frame, but absent an agreement on the [17] protective order, you were not going to agree to [18] produce the first piece of transactional data.

[19] MR. STONE: I think it depends on [20] how transactional data ultimately was defined and [21] agreed to by the parties. But certainly with [22] respect to the information that class plaintiffs [23] were seeking, absent some modifications to the [24] protective order, Fry's was un- willing to produce

### Page 77

[1] information.

[2] SPECIAL MASTER POPPITI: And in [3] light of that, don't you expect that the dialogue [4] that you did have — and I'm aware of the [5] teleconferences. I'm aware of the Email strings. [6] I'm aware of the gaps in time between certain [7] pieces, if you will, of communication.

[8] Are you suggesting that there was [9] insufficient communication with re- spect to [10] detail? I understand it changed.

[11] MR. STONE: Well, I think at the end [12] of the day, Your Honor, counsel for plaintiffs [13] did not hear what Fry's was saying about the way [14] in which Fry's maintains its data, and I can get [15] to that in a little bit.

[16] SPECIAL MASTER POPPITI: Yeah. I [17] want you to do that.

[18] Are you suggesting that even today [19] counsel is mistaken as to how Fry's creates its [20] data, and how Fry's acces- ses its data and how [21] Fry's stores its data?

[22] MR. STONE: I believe they are, Your [23] Honor.

[24] SPECIAL MASTER POPPITI: Well,

with

### Page 78

[1] that said, I'm satisfied that where the premise [2] of any meet and confer was, there had to be an [3] agreement with respect to change in protective [4] order; that that premise, because it was a [5] non- starter for the class plaintiffs, that there [6] was a sufficient meet and confer before the [7] filing of the instant motion.

[8] Let's proceed to the merits then, [9] please.

[10] MR. STONE: Thank you, Your Honor.

[11] SPECIAL MASTER POPPITI: Thank you.

[12] MR. STONE: Counsel for the [13] plaintiffs noted during his argument that Fry's [14] is different from some of the other third parties [15] from which the plaintiffs have sought data. And [16] he's right.

[17] For instance, you were just talking [18] about SKUs. Fry's doesn't use SKUs.

[19] SPECIAL MASTER POPPITI: Right.

[20] MR. STONE: Counsel for Fry's, [21] Mr. Henri, has explained that to counsel for [22] plaintiffs on a number of occasions.

[23] In the meet and confer that began in [24] December, it didn't go back eight months like

### Page 79

[1] counsel for plaintiffs suggest, but there was [2] some discussion about that.

[3] Fry's is also different in that it [4] is a private company. It is not a public company [5] like a number of the other third parties from [6] which the plaintiffs seek information.

[7] As a result, Fry's does not have the [8] same disclosure requirements as the other third [9] parties, and that has been the stumbling block in [10] connection with the negotiations.

[11] It's undisputed that the information [12] that the plaintiffs seek from Fry's is trade [13] secret, and they're seeking trade secret [14] information concerning millions and millions of [15] transactions. As a result, the plaintiffs have a [16] burden of making a particularized showing that [17] the information that they seek is relevant and [18] necessary.

[19] But even if the information is [20] relevant, discovery from a nonparty should not be [21] allowed where no need is shown, or where [22] compliance is unduly burdensome, or where the [23] potential harm caused by the pro- duction [24] outweighs the benefit.

### Page 80

[1] And here Fry's submits plaintiffs [2] have not met their burden, not even in connection [3] with their reply brief. For the first time they [4] submitted their

Phil Paul    v.
Intel Corporation

<div style="text-align:right">

Hearing
May 1, 2007
</div>

expert declaration of Mr. Orszag.

[5] And I probably have butchered his [6] name. I apologize.

[7] They have not made a particularized [8] showing that the information they seek is [9] necessary, particularly at the class [10] certification stage. They have not cited case [11] authority that says they need to rely on [12] imperical data to certify a class.

[13] In fact, the cases that they've [14] relied upon suggest to the contrary as we've set [15] forth in our brief.

[16] **SPECIAL MASTER POPPITI:** Well, let's [17] just talk about that for a moment. I mean, just [18] give me one moment, please.

[19] If counsel would indulge me, I'm [20] looking at Romero versus Philip Morris.

[21] **MR. STONE:** Yes, Your Honor.

[22] **SPECIAL MASTER POPPITI:** And I'm [23] mindful of the ultimate conclusion in Romero [24] versus Philip Morris. But isn't it fair to say

### Page 81

[1] that what Romero versus Philip Morris did, what [2] the Court did in that case is it went through a [3] rather healthy exhaustive analysis of one [4] approach versus another?

[5] **MR. STONE:** That's correct, Your [6] Honor.

[7] **SPECIAL MASTER POPPITI:** And it came [8] up, if you will, with a decision that if I were [9] to turn to Intel right now, and I'm certainly not [10] going to do that, but if I asked Intel, do you [11] accept the Romero approach with respect to the [12] proof necessary at the stage of class [13] certification, do you think that Intel would be [14] happy with the Romero result?

[15] **MR. STONE:** I really can't speak for [16] Intel, Your Honor.

[17] **SPECIAL MASTER POPPITI:** I can't, [18] either. But it just seems to me what Romero did [19] was, certainly that Court made a decision, but [20] the decision in Romero and the decision in South [21] Dakota Microsoft antitrust litigation does not [22] bind this Court.

[23] Is that fair?

[24] **MR. STONE:** That's correct, Your

### Page 82

[1] Honor. But —

[2] **SPECIAL MASTER POPPITI:** It may be [3] the better approach. It may be that this Court [4] will adopt that approach.

[5] But in my role as a special master, [6] the discovery phase of these proceedings, unless [7] there is law articulated which is either the law [8] of the case or this Court has spoken — has [9] written about the applicable law in this

case in [10] another context, in another case, [11] looking at law [11] of the district where this action was instituted, [12] I'd have something to go by. But I don't know [13] that.

[14] At least if I do, I'm not aware of [15] it. And counsel for either side has not informed [16] me of that.

[17] Is that fair?

[18] **MR. STONE:** I believe so, Your [19] Honor. But what that highlights is that, at [20] most, what plaintiffs have shown is that they [21] might need this information.

[22] **SPECIAL MASTER POPPITI:** Well, they [23] need information. There's no question about [24] that.

### Page 83

[1] And is counsel suggesting that a [2] plaintiff, insofar as a discovery is from a third [3] party, should be limited by virtue of what the [4] third party says the proof in class certification [5] should be?

[6] **MR. STONE:** In the context of [7] seeking highly confidential trade secret [8] materials where the materials need to make a [9] particularized showing that they're entitled to [10] the information, I think it's — they need to say [11] something more than we might need this [12] information.

[13] Given the potential for harm to [14] Fry's that exists, if this information is used [15] improperly, it's not enough for them to say on [16] reply in a declaration that we didn't have a [17] chance to deal with in opposition that we might [18] need this information.

[19] **SPECIAL MASTER POPPITI:** How can [20] they do that?

[21] I mean, how can they be more [22] particular than what they have been, accepting [23] their position for the moment without some [24] articulation of what the standard is in this

### Page 84

[1] case, given the fact that this Court is sitting [2] in multi-district litigation?

[3] **MR. STONE:** Perhaps they can't be, [4] Your Honor, but we submit that given the record [5] that we've put in front of the Court, that [6] balancing the need for protection that Fry's [7] must have with respect to the information and [8] the need for the information that the plaintiffs have [9] demonstrated when comparing those two, and [10] weighing the respective burdens and looking at [11] whether or not plaintiffs have met their burden, [12] that in this case, you can say they don't need [13] Fry's information, particularly at the class [14] certification stage.

[15] **SPECIAL MASTER POPPITI:** Okay. [16] You've made your point. Please.

[17] **MR. STONE:** They certainly haven't [18] articulated why it is they need data concerning [19] millions and millions of transactions at the [20] class certification stage. Fry's also is [21] different from the other third parties in this [22] case because it apparently does not maintain its [23] data in the same way that other third parties do.

[24] As we understand it, plaintiffs seek

### Page 85

[1] individual transaction data for the sales of [2] computer systems. And plaintiffs' reply makes [3] clear that all they want is Fry's data as it [4] exists in the ordinary course of business.

[5] They've made that representation to [6] Fry's in connection with meet and confer [7] discussions. They've made that representation to [8] the Court in their papers. They've made that [9] representation today to the Court in open Court.

[10] Fry's has been telling plaintiffs [11] for months that it does not maintain data in the [12] format sought by plaintiffs. It does not [13] maintain data relating to individual [14] transactions.

[15] As the declarations that Fry's has [16] submitted make clear, Fry's database system [17] merchant master contains the categories of [18] information that are generally related to the [19] information plaintiffs seek. But as those [20] declarations also make clear, that information is [21] maintained in an aggregated form.

[22] So you can't extract the data from [23] that database where you can follow a purchase by [24] Fry's of a computer system and then the sale of

### Page 86

[1] that computer system to an end user.

[2] Instead, as I understand it, the [3] merchant master database aggregates purchase and [4] sale information by blue. So in the reply in the [5] declaration of Jonathan Orszag, plaintiffs' [6] expert suggests that the aggregate data that [7] Fry's has offered to produce and that Fry's [8] maintains, as we represented to counsel for [9] plaintiffs, is of no use to plaintiffs.

[10] And contrary to plaintiffs' expert [11] declaration suggesting that there are other [12] databases based on his knowledge of other third [13] parties, it is our understanding — my [14] understanding based on the investigation we've [15] conducted as part of our work here that there is [16] no other database that contains this information.

[17] **SPECIAL MASTER POPPITI:** You said [18] what again, please? There is no other?

[19] **MR. STONE:** That there is no other [20] database.

[21] SPECIAL MASTER POPPITI: Thank you.

[22] MR. STONE: So because Fry's is [23] different in that regard and class plaintiffs [24] have suggested that the aggregate information

**Page 87**

[1] that Fry's maintains is not of use to them, as [2] Mr. Volin I believe said in his declaration would [3] not be meaningful, Fry's submits that it should [4] not be required to produce the information [5] requested.

[6] SPECIAL MASTER POPPITI: Let's have [7] a little bit of a dialogue, if you will, with [8] respect to that issue, Mr. Small.

[9] MR. SMALL: It's a little [10] frustrating, Your Honor, that we're at the point [11] where there's a lack of understanding apparently [12] about what data Fry's has and how it maintains [13] it. That's the very reason we've been asking for [14] production of a sample or something that would [15] explain what the data are that Fry's has.

[16] In all the correspondence I've [17] reviewed in connection with the meet and confers, [18] the only thing I've ever heard is that Fry's does [19] not keep the data on a monthly basis. And [20] because we had said produce your data sufficient [21] to show your monthly sales or your monthly [22] purchases, they said they didn't keep it in that [23] form.

[24] SPECIAL MASTER POPPITI: This

**Page 88**

[1] information, then, is it fair to say is new to [2] you —

[3] MR. SMALL: Well, —

[4] SPECIAL MASTER POPPITI: — as it's [5] been described today?

[6] MR. SMALL: I had an off the record [7] discussion with Fry's recently which we agreed to [8] keep off the record.

[9] SPECIAL MASTER POPPITI: Sure.

[10] MR. SMALL: But I did learn [11] information relevant to this topic for the first [12] time recently, very recently. But let me just [13] try and explain, if I can, Your Honor when [14] Fry's talks about the merchant master database and says [15] that it aggregates data into some more aggregated [16] form, the question immediately that I have is [17] where's the data coming from that it aggregates?

[18] My understanding of the merchant [19] master database is that it's an interface that [20] puts together data in certain forms for purposes [21] of reports that are generated using that [22] interface. And that it is drawing the [23] information, the data from some source to [24] aggregate it and to put it together into these

**Page 89**

[1] reports.

[2] So the question remains is: Where's [3] he getting the data from that it aggregates? And [4] we've never gotten an answer to that question, [5] Your Honor, and I don't know the answer.

[6] SPECIAL MASTER POPPITI: Have you [7] asked it?

[8] MR. SMALL: Yeah. We've asked them. [9] In fact, in the letter that we sent to the Court [10] in which we agreed to extend their time to oppose [11] our motion to compel to April 13th, they agreed [12] to describe the data that they keep and their [13] plan for producing it.

[14] Well, they only gave their plan for [15] producing it. We got virtually no description of [16] how they keep their data, what data they have.

[17] SPECIAL MASTER POPPITI: I'm [18] surprised you haven't mentioned that agreement [19] earlier in this proceeding. You want to focus on [20] that for a moment?

[21] I mean, there was an agreement to do [22] what you just suggested. Are you suggesting that [23] up to this point there has been, from your [24] vantage point, no description that is sufficient

**Page 90**

[1] for you to understand how the data is kept?

[2] MR. SMALL: I can certainly answer [3] for myself that I do not understand sufficiently [4] how Fry's keeps its data. I would encourage the [5] Court to, if the Court would like to hear from [6] Mr. Volin, who participated in all the [7] discussions, I believe, with Fry's, to see if [8] he [8] has anything to add about that.

[9] SPECIAL MASTER POPPITI: Well, let [10] me ask this question, and just take your chair [11] there for a minute, Mr. Small.

[12] From my perspective, how can I make [13] some judgment with respect to this application if [14] I'm being told by Fry's that this is the way we [15] understand our data system from the class [16] plaintiffs? We're not sure we understand.

[17] How can I make some judgment with [18] respect to that if I have no record on which to [19] make my own judgment with respect to data, how [20] it's kept and the fields that you're asking for?

[21] I mean, I don't think that's an [22] unfair observation to make, is it?

[23] MR. SMALL: I have two suggestions, [24] Your Honor. Would you like me to come up to the

**Page 91**

[1] podium?

[2] SPECIAL MASTER POPPITI: No. You [3] can stay at counsel table.

[4] MR. SMALL: First of all, the Court [5] could certainly direct Fry's to produce the [6] responsive data in its most disaggregated form. [7] It has it.

[8] We're not, again, asking it to [9] change the form in which it keeps its data. I [10] said that earlier.

[11] But just give it to us as [12] disaggregated as you have it. That they can [13] certainly do.

[14] You know, second, I think as an [15] alternative that we don't prefer, but if the [16] Court would like us to do, we certainly would. I [17] mean, I think we made a lot of headway today.

[18] The Court has, you know, addressed [19] some important issues that have interfered with [20] our ability, I believe, to make progress with [21] Fry's, that if we can get enough clarity from the [22] Court on the other issues besides the particular [23] scope of the production or the particular nature [24] of the data to be produced, that with

**Page 92**

[1] encouragement from the Court to sit down, you [2] know, earnestly and in good faith to complete the [3] negotiation about the particular data to be [4] produced, that we could do that fruitfully.

[5] SPECIAL MASTER POPPITI: Please.

[6] MR. STONE: Your Honor, to go over [7] the point about whether or not this is the first [8] time class plaintiffs are hearing about how this [9] is, how Fry's maintains its data, and Mr. Henri [10] can address this further because he actually [11] participated in discussions, but my understanding [12] is that this has been a problem from the [13] beginning.

[14] Because Fry's information is not [15] maintained in such a way that you can track [16] individual transactions. And I believe that [17] counsel for Fry's, Mr. Henri, explained that I [18] believe, to Mr. Volin.

[19] So this is not something that's [20] brand new here at the hearing. In addition, in [21] an effort to explain that and provide the Court [22] with a record which supports that, we did submit [23] two declarations. One from a Fry's IT person who [24] described ways in which the data is maintained in

**Page 93**

[1] merchant master, which happens to be a [2] proprietary system as described in [3] declarations —

[4] SPECIAL MASTER POPPITI: Right.

[5] MR. STONE: — developed by Fry's. [6] So there is a record before the [7] Court on this point.

Phil Paul  v.
Intel Corporation

<div align="right">
Hearing
May 1, 2007
</div>

[8] **SPECIAL MASTER POPPITI:** And are you [9] satisfied that the record is complete on this [10] point?

[11] **MR. STONE:** I believe that the [12] record before the Court demonstrates that the [13] information that the plaintiffs were seeking that [14] Fry's has in its database is aggregated. And [15] given the declaration of plaintiffs' expert, the [16] plaintiffs' expert says that that information, if [17] it's aggregated, is of no use to them.

[18] **MR. SMALL:** Your Honor, I'm not even [19] sure we have clarity as to exactly how the data [20] at merchant master database is kept. But we [21] still don't have an answer to the question, and I [22] think it's very fundamental.

[23] Where does the merchant master [24] database get its data from that it puts into

Page 94

[1] these aggregate categories? Where is that data [2] coming from?

[3] **SPECIAL MASTER POPPITI:** Well, the [4] dilemma that I have is I'm not convinced at this [5] juncture, having read everything you've [6] submitted, that I can make a judgment on paper on [7] these papers. I mean, it seems to me that the [8] only way that I can have some degree of comfort [9] with any judgment that I would make is for there [10] to be some opportunity to have someone describe [11] under oath the data system and react to that by [12] testimony under oath. Because I'm not convinced [13] I can do it on these cold papers.

[14] Now, I understand that it is the [15] applicant's burden, but that doesn't make this [16] application go away if I'm not convinced that I [17] understand the nature of what we're looking for [18] here, and if I don't see it rising out of the [19] meet and confers. And I'm not sure that I do.

[20] So that I think I have two [21] alternatives here, a little bit different from [22] the way Mr. Small describes it.

[23] And that one of the alternatives is [24] to say you all go back to your respective places

Page 95

[1] and drill down on precisely what we're talking [2] about here and forge at least an understanding, [3] if you will, almost by stipulation that we [4] understand that this is what this system is. [5] This is what this system does. And as a result [6] of that, this is what we're asking for.

[7] And if that can't be accomplished, I [8] don't see any way I can deal with this short of [9] some hearing. Not argument, if you will.

[10] Now, you may have your witnesses [11] sitting right here. I don't know

whether you do [12] or don't.

[13] If you do, we may want to talk about [14] whether that can be done or whether you want it [15] to be done or suggest that it be done today. Even [16] if you do, you may want to be doing it in [17] short order on another day.

[18] And if you don't have your folks [19] here, then clearly we have to do it in short [20] order on another day.

[21] **MR. SMALL:** Your Honor, it seems to [22] me —

[23] **SPECIAL MASTER POPPITI:** You want to [24] discuss anything among yourselves off the record

Page 96

[1] at this point, because I'm happy to suggest that [2] you do that if you want to.

[3] **MR. STONE:** I'd certainly like to [4] have a discussion with my client, at a minimum.

[5] **SPECIAL MASTER POPPITI:** Certainly. [6] What time?

[7] **MR. STONE:** Could we say 15 minutes, [8] Your Honor?

[9] **SPECIAL MASTER POPPITI:** Is that the [10] right time? Sure.

[11] So we'll do ten minutes to 1:00 by [12] that clock or thereabouts. I think the clocks in [13] the courthouse are all the same.

[14] Okay. Thank you.

[15] **MR. STONE:** Thank you, Your Honor.

[16] (A recess was taken.)

[17] **MS. GRAHAM:** Thank you for waiting.

[18] **SPECIAL MASTER POPPITI:** Oh, not a [19] problem.

[20] **MR. STONE:** Much appreciated, Your [21] Honor.

[22] **SPECIAL MASTER POPPITI:** Thank you. [23] Please.

[24] **MR. SMALL:** Your Honor, we have

Page 97

[1] conferred with Fry's and talked among ourselves, [2] and I think there are elements of a procedure [3] that we agree with and elements that the parties [4] will present separately to Your Honor for your [5] consideration.

[6] **SPECIAL MASTER POPPITI:** I'm missing [7] some of what you're saying.

[8] **MR. SMALL:** I'm sorry.

[9] **SPECIAL MASTER POPPITI:** No, that's [10] okay. It's really dry in this room. I think [11] it's probably affecting all of us.

[12] **MR. SMALL:** We had a conversation [13] with Fry's —

[14] **SPECIAL MASTER POPPITI:** Yes.

[15] **MR. SMALL:** — in which we discussed [16] procedures going forward

with the goal of class [17] plans and presumably the other parties to the [18] litigation trying to understand exactly what the [19] data are that Fry's keeps that would be [20] responsive to our subpoenas.

[21] And the first part of the proposal [22] would be for class plaintiffs through two of [23] their — up to two of their experts and up to two [24] of their lawyers to meet informally with Fry's

Page 98

[1] who would make available to us their IT [2] personnel who have knowledge of their data to [3] answer all our relevant questions about the data [4] that Fry's keeps with the goal of hopefully [5] permitting us to fully understand what Fry's has [6] and doesn't have that's responsive to the [7] subpoena. We propose that that meeting occur [8] within one week from today.

[9] We further propose that if we do not [10] feel that we adequately understand what data [11] Fry's has based on the informal meeting, that we [12] then take, within one week after that, the [13] 30(b)6 deposition of Fry's.

[14] So, in essence, that's what our [15] proposal is. And if —

[16] **SPECIAL MASTER POPPITI:** And by [17] proposal, does that mean that that has, in [18] substance, been agreed to?

[19] **MR. SMALL:** Only the first part, [20] Your Honor, about having the informal meeting has [21] been agreed to, but not the 30(b)6 deposition.

[22] **SPECIAL MASTER POPPITI:** Well, you [23] were — I'm happy to hear, counsel. It sounds [24] like you were reading my notes.

Page 99

[1] **MR. SMALL:** And actually, Your [2] Honor, I did forget one part. I apologize.

[3] It would be important to us before [4] the informal meeting with Fry's to receive a [5] sample of the data so that we can have a better [6] understanding of what's there to inform our [7] questions for the informal meeting.

[8] **SPECIAL MASTER POPPITI:** And you [9] discussed that as well?

[10] **MR. SMALL:** That part I'm not — I [11] think was with certain restrictions to protect [12] the confidentiality of that data sample. I think [13] Fry's, in concept, is agreeable to that.

[14] **MR. STONE:** Yeah, in concept. The [15] additional point was that whoever attends this [16] meeting on behalf of plaintiffs would sign an [17] undertaking that would have a heightened level of [18] confidentiality beyond the scope of the current [19] protective order, so that information would [20] not be disclosed

at all to anyone outside of that [21] meeting.

[22] That's what Fry's would propose.

[23] MR. SMALL: And it's acceptable to [24] us.

Page 100

[1] SPECIAL MASTER POPPITI: Okay.

[2] MR. SMALL: The concept would be [3] only the lawyers and the experts at the meeting [4] would have access to the information.

[5] SPECIAL MASTER POPPITI: Okay.

[6] MR. STONE: And what we would like, [7] Your Honor, is that information not be used in [8] any subsequent proceedings before the Court, so [9] that there's not a declaration from someone from [10] class plaintiffs saying Fry's told us this and [11] then that information is disseminated here in the [12] Court, given our concerns with the protective [13] order that's currently in place.

[14] SPECIAL MASTER POPPITI: Well, let [15] me make an observation before I ask you to kind [16] of — please be comfortable.

[17] MR. STONE: Thank you.

[18] SPECIAL MASTER POPPITI: Before [19] getting into the detail of what you were [20] discussing, what I want to make sure that I do [21] from my desk is to generate the proposed findings [22] and conclusions for Judge Farnan on the issue of [23] jurisdiction and on the issue of the protective [24] order.

Page 101

[1] I'm going to suggest just on those [2] two issues, in light of what I think is going on [3] here, not later than Tuesday or Wednesday of next [4] week. I mean, I'm going to be getting what you [5] are providing to me by close of business on [6] Friday, if I remember the count as you proposed [7] the number of days that you need.

[8] I'm also going to suggest to Judge [9] Farnan, in light of the importance of the issue [10] to keep things moving forward, that he shorten [11] the time within which you would have the [12] opportunity to take exceptions to that. You, [13] by virtue of the rule, are afforded 20 days.

[14] In light of the record that you've [15] made here today, and in light of the record I [16] expect you're going to be making by Friday, I'm [17] going to propose that Judge Farnan shorten the [18] time to three days within which you would take [19] exception to whatever I order.

[20] You can expect that the [21] jurisdictional piece is essentially what I did [22] in the courtroom today with some flesh on the bones [23] in terms of case

citations so that that record is [24] before Judge Farnan. And with respect to the

Page 102

[1] protective order, if I don't accept the [2] approach [2] Judge Jordan took, not suggesting I'm not going [3] to look at it and not give it serious [4] consideration and perhaps may even accept it. [5] But if I don't, you can expect that the order and [6] the rationale for it is going to be substantially [7] what I did in the court-room today.

[8] So I believe that the suggestion to [9] Judge Farnan to shorten the time to three days [10] gives you more than adequate time. I would do [11] that from my desk, but I don't believe I have [12] that authority under the rule.

[13] It seems to me that the rule which [14] enables the Court to appoint a special master [15] lays out some of the responsibilities of the [16] special master in that rule, and then calls out [17] the 20 days and says unless it is otherwise [18] shortened by the Court or words to that effect.

[19] I don't believe that I have that [20] authority, even though I know I have the [21] authority to issue orders. I know I have the [22] authority to issue findings, recommendations, et [23] cetera. But I don't believe I have the authority [24] to impact on that rule.

Page 103

[1] I will have some ex parte [2] communication as contemplated by the order that [3] appointed me with Judge Farnan only on the issue [4] of shortening the time within which to take [5] exceptions. And I anticipate I'll have that in [6] due course.

[7] If he believes or if he concludes [8] that I have the authority to shorten that time, [9] then you can expect that the time will be [10] shortened to three days. And the reason why I'm [11] doing that is because it seems to me it's [12] critically important to keep this issue on track [13] for ultimate decision, one way or the other.

[14] Now, let's get back to what I think [15] I heard part of, and I'm happy to listen to the [16] rest of it. I understand that there will be a [17] meet and confer informal. I understand that that [18] will involve some of your technical folks.

[19] And I understand that it will [20] involve some of your technical folks and [21] attorneys. I don't know whether those [22] individuals are going to be pre-identified prior [23] to the meeting. I expect that that would make [24] sense to do that in a document, if you will,

Page 104

[1] memorializing what you've done here.

[2] I also understand that what is —[3] what is — if this is agreeable, what is learned [4] during. the course of that meeting is not going to [5] form the basis for any information ultimately [6] provided to the Court. I'm not sure I understand [7] that, because it seems to me if things fall [8] apart, at some point I'm going to have to be back [9] involved. And ultimately, I'm going to want to [10] know what this data is, and how it's kept, and et [11] cetera.

[12] MR. SMALL: Your Honor, I think [13] there are two situations where we would need to [14] be able to communicate to the Court what it is [15] that we learned during this informal meeting with [16] Fry's. One, is if we determine that the informal [17] meeting is not successful, that it doesn't give [18] us an adequate understanding of Fry's data, and [19] we come to the Court, unless the Court is [20] prepared now to put this in place and say we want [21] to take a deposition, I think we need to be able [22] to tell the Court why. You know, what it was [23] about, what we learned and didn't learn that [24] requires a deposition.

Page 105

[1] And then, second, you know if we get [2] to the point where we take a deposition, and [3] we're coming back to the Court, or even if we [4] don't take a deposition, but we are coming back [5] to the Court for further proceedings on our [6] motion to compel, we may — it will be, I think, [7] critical for us to be able to explain to the [8] Court what the data are that we're trying to [9] compel.

[10] SPECIAL MASTER POPPITI: Well, let [11] me make an observation before I hear what your [12] understanding or what agreement you may choose to [13] forge.

[14] I, in fact, contemplated setting up [15] a process, not unsimilar to what you have just [16] described, to include the opportunity for a [17] deposition. Now, whether or not it makes sense [18] to schedule that, if you will, in terms of time [19] frame, or whether it makes sense to go through [20] the meet and confer within the time frame you [21] describe, if it doesn't work to get back to me, [22] and have some discussion about whether a [23] 30(b)(6) [23] goes forward. I just don't want to be wasting [24] your resources, and by virtue of you using my

Page 106

[1] resources, spending your resources.

[2] So, if it's — if it is a matter of [3] a two-step, so long as the two-step proposes a [4] very short time frame, then I'll do a two-step. [5] I like to dance.

[6] MR. STONE: On the two-step point —

[7] SPECIAL MASTER POPPITI: Just    [8]

Phil Paul   v.
Intel Corporation

Hearing
May 1, 2007

kidding. I said I like to dance. I'm sorry.

[9] MR. STONE: I would propose that we [10] do it that way. And that within 24 hours of the [11] meeting out in California, we report back to you [12] with either this issue is now resolved —

[13] SPECIAL MASTER POPPITI: Or isn't.

[14] MR. STONE: — or isn't. And then we [15] see what the step is, because it could well be [16] that we have a fruitful discussion.

[17] SPECIAL MASTER POPPITI: Right.

[18] MR. STONE: And it makes sense to [19] have another discussion —

[20] SPECIAL MASTER POPPITI: Right.

[21] MR. STONE: — rather than going to [22] something like a deposition.

[23] SPECIAL MASTER POPPITI: I'm [24] amenable to doing it in that fashion. What I'd

Page 107

[1] like you all to do if you wouldn't mind is lay [2] this out with dates certain and dates certain to [3] include me at the end of that meet and confer, if [4] you wouldn't mind making the call to my office [5] sometime this afternoon and checking with Mary [6] Levan to see what my availability could be [7] consistent with what I know I would like to see. [8] And that is expedited.

[9] MR. STONE: And if I may, Your [10] Honor —

[11] SPECIAL MASTER POPPITI: And also [12] weave into that document, if you will, the [13] discussion about confidentiality, heightened [14] confidentiality that you will be making in this [15] for purposes of doing this business.

[16] MR. STONE: Given that some of us [17] are traveling back to the West Coast today, would [18] it be okay if we were to get back to you by close [19] of business tomorrow?

[20] SPECIAL MASTER POPPITI: Absolutely.

[21] MR. STONE: Thank you, Your Honor.

[22] SPECIAL MASTER POPPITI: Yes.

[23] MR. SMALL: And I just want to be [24] clear, Your Honor, that this schedule we're going

Page 108

[1] to put in place will include production of the [2] sample data by Fry's.

[3] MR. STONE: I mean, conceptually, [4] although, Mr. Henri needs to speak to some people [5] at Fry's before we can actually agree to that in [6] advance.

[7] SPECIAL MASTER POPPITI: Well, let [8] me ask this question, because I expect I have the [9] authority to order it, and you've got the right [10] to take exception to it, which puts us all in a [11] balloon of stall, if you will. And I don't mean [12] to suggest that's not appropriate.

[13] That's what the rules contemplate.

[14] That's the authority that I have.

[15] I'm inclined to expect that making a [16] sample makes sense particularly in the context of [17] your having forged an agreement with respect to [18] the utilization of that information. And the [19] expectation that your agreement, even though it [20] is different from the protective order, I will [21] sign it as an order and expect full compliance [22] with that order.

[23] And if there isn't, I understand the [24] work that — the very important work this Court

Page 109

[1] does, all the time dealing with highly [2] confidential information. And I know from [3] conversations I've had with Judge Farnan and with [4] other judges of the Court that they take it very [5] seriously. And I can assure you that if there's [6] a violation of any confidence, that I will deal [7] with it as severely as I think I should.

[8] MR. STONE: I appreciate your [9] comments, Your Honor. Given that there's some [10] additional people at Fry's who would have to make [11] this decision, I'm not in a position to do that.

[12] SPECIAL MASTER POPPITI: I [13] respect that.

[14] MR. STONE: But it's something we [15] can address in our correspondence with you [16] tomorrow.

[17] SPECIAL MASTER POPPITI: Okay. And [18] your colleagues, your clients can expect that if [19] there is no agreement with respect to a sample, [20] that I am inclined to order one.

[21] So to the extent it should be [22] described, then you should describe it in the [23] context of serving up to me your agreement, which [24] I will order. And in the context of saying we

Page 110

[1] have not been able to agree to this, this is what [2] we'd like to see. This is what we'd like not to [3] see.

[4] Please.

[5] MS. GRAHAM: Your Honor, I just [6] wanted to address the issue of the parameters on [7] this meeting. And I got the sense that Your [8] Honor was not clear about why we might be asking [9] to have the meeting off the record, if you will.

[10] And I wanted to just make the point, [11] and it relates a little bit to this two-step —[12] one step, as Your Honor pointed out, if we get to [13] a point where there's a step that's an [14] affirmative order, and if it implicates our [15] concerns with respect to confidentiality and also [16] relevance, then we're faced with having to make a [17] choice of whether to appeal that. And as you [18] said, there's the stall concern.

[19] SPECIAL MASTER POPPITI: It's built [20] in. Sure.

[21] MS. GRAHAM: Yeah. It's just built [22] in.

[23] So the point of having this meeting [24] was really in our interest — and I think both

Page 111

[1] sides maybe proposed it, but we certainly did —[2] was two-fold. One relates to having something [3] productive and the other relates to protecting [4] our concerns.

[5] So, I mean, we all know if we give a [6] deposition, that will be subject to the rules of [7] a deposition. And often it's just harder to have [8] the kind of give and take and really get down to [9] really what you can understand.

[10] When we were talking while Your [11] Honor was waiting for us, I mean, we each had [12] questions of the other of, you know, what is it [13] you're looking for, because we don't get that. [14] And, you know, you can ask those questions.

[15] In a deposition, you're not going to [16] have that. So they would get their shot at [17] making whatever record they could. And, [18] obviously, we're not going to be interested in [19] helping them make a record.

[20] SPECIAL MASTER POPPITI: I [21] understand that.

[22] MS. GRAHAM: And so that — so my [23] experience, if you have something that's, you [24] know, more like a real meeting between real

Page 112

[1] people, it can be productive. And I would hope [2] this is productive.

[3] And then, of course, the other [4] reason is simply that if we have an order now [5] that as I mentioned implicates our concerns, then [6] you know, we have to decide whether or not to [7] appeal that. So if it were subject either to [8] confidentiality issues that are — you know, that [9] don't have the protections that Fry's thinks it [10] should have, and also ordering us to give [11] information that we think is not relevant, you [12] know, we have to decide, for example, whether [13] under, you know, trade secret law we really want [14] to pursue that.

[15] So that was the reasoning for our [16] wanting to have this meeting.

[17] SPECIAL MASTER POPPITI: Informal.

[18] MS. GRAHAM: Off the record meet-

ing.

[19] **SPECIAL MASTER POPPITI:**Well, and I [20] understand the concerns. And it seems to me, [21] correct me if I'm mistaken, please, I would [22] prefer that the opportunity is full, fair and [23] open. And if there's an expectation that [24] something coming out of that meeting literally

---
Page 113

[1] comes back to help in the same form and that [2] chills the opportunity to, in good faith, meet [3] and confer that, I'm not wanting to do that.

[4] At the same time, if it falls apart, [5] then it seems to me what is likely to occur is [6] the record then gets made through a 30(b)6 [7] deposition. So you have it, but you have it [8] later in a different context.

[9] **SPECIAL MASTER POPPITI:**And I [10] realize that may not be the most efficient, but [11] what I'm not wanting to do is have to — I don't [12] want to have to measure the good faith in terms [13] of what goes on during that meeting or meeting to [14] follow by virtue of having to literally eavesdrop [15] later on in that meeting process.

[16] And if stepping back from that, [17] saying you can't use anything in that meeting to [18] come back to me, other than the fact that it [19] failed and you've got to come back and gather [20] that same information, if you will, on the record [21] with a 30(b)6, I'll stand aside.

[22] **MR. SMALL:**Your Honor, we can [23] handle it that way. Remember, the purpose of the [24] meeting is for us to understand what data Fry's

---
Page 114

[1] has.

[2] And so I think there's one or two [3] outcomes of that meeting. One, we understand [4] Fry's data, in which case most likely we're going [5] to ask for whatever they have available to be [6] produced.

[7] You know, unless they convince — I [8] suppose it's possible that it's totally [9] valueless —

[10] **SPECIAL MASTER POPPITI:**Right.

[11] **MR. SMALL:**— or we don't understand [12] it, in which case we'll need to take a [13] deposition.

[14] **SPECIAL MASTER POPPITI:**I [15] understand.

[16] **MR. SMALL:**Now, if it's the former, [17] then how do we get back to the Court and say, [18] okay, we now understand this is what Fry's data [19] is? We want the following to be produced.

[20] And so really what I think it means [21] is — it's okay, but I think what it means is [22] that we would have to do a 30(b)6 deposition [23] after this meeting which

---
Page 115

we can do. I would just [24] suggest if we're going to have to do it, let's

[1] set up a time right now for that to happen.

[2] **SPECIAL MASTER POPPITI:**Well, I [3] think that what I'm hearing is that that's what [4] Fry's is proposing, and I don't want in any [5] fashion to chill that meet and confer. So it [6] will have to be a two step, if you will.

[7] At the same time, and even though [8] you may not need the date, I will require that [9] you set at least parameters, outside dates for [10] deposition.

[11] Okay.

[12] **MR. SMALL:**Thank you.

[13] **SPECIAL MASTER POPPITI:**So   I'll be [14] looking for a form of order when? Close of [15] business tomorrow?

[16] **MR. STONE:**Yes, Your Honor.

[17] **MR. SMALL:**Yes.

[18] **SPECIAL MASTER POPPITI:**Okay. [19] Good.

[20] Any other matters then for today [21] please?

[22] **MR. SMALL:**Not for the class, Your [23] Honor.

[24] **MS. GRAHAM:**Your Honor, there is

---
Page 116

[1] one matter. When Mr. Small initially spoke this [2] morning, he revealed certain data from one of the [3] declarations that we had put under seal, data [4] about Fry's sales.

[5] And so would ask to — we'd like [6] to have that information redacted from the [7] transcript, at least the public version of the [8] transcript.

[9] **SPECIAL MASTER POPPITI:**Mr. Small.

[10] **MR. SMALL:**No objection, Your [11] Honor, as long as there is a version that's [12] complete that the parties can use.

[13] **MS. GRAHAM:**I think it was only two [14] sentences or so.

[15] **SPECIAL MASTER POPPITI:**I will [16] leave it to you to talk about what several [17] sentences are involved, and therefore, leave it [18] to you to propose the redacted version of the [19] transcript before lodging the transcript.

[20] **MS. GRAHAM:**Sure.

[21] **MR. SMALL:**Thank you.

[22] **SPECIAL MASTER POPPITI:**And the [23] transcript would be available when, please?

[24] **THE REPORTER:**Tomorrow.

---
Page 117

[1] **SPECIAL MASTER POPPITI:** Tomorrow. [2] Thank you. Thank you, all.

[3] (Hearing was concluded at 1:50 p.m.)

---
Page 118

State of Delaware        )
                         )
New Castle County        )

CERTIFICATE OF REPORTER

I, Heather M. Triozzi, Registered Professional Reporter, Certified Shorthand Reporter, and Notary Public, do hereby certify that the foregoing record, Pages 1 to 118 inclusive, is a true and accurate transcript of my stenographic notes taken on May 1, 2007, in the above-captioned matter.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 2nd day of May, 2007, at Wilmington.

Heather M. Triozzi, RPR, CSR
Cert. No. 184-PS

**Lawyer's Notes**

Phil Paul   v.
Intel Corporation

Hearing
May 1, 2007

**1**

**1064** 7:15
**1066** 7:22; 8:6
**11** 26:2; 43:3; 45:21
**11c** 37:9
**11d** 37:10
**12** 20:12; 71:21
**12th** 11:2, 5; 43:10
**13th** 89:11
**1407** 8:22
**1407(b** 8:2
**15** 96:7
**15th** 45:19
**19** 12:9; 19:13
**19th** 10:19; 12:23
**1:00** 96:11
**1:50** 117:3

**2**

**20** 101:13; 102:17
**2000** 54:7, 7
**2002** 7:4; 8:20
**2005** 7:16; 17:2, 3; 31:9; 58:11
**2006** 3:6; 10:20; 11:2; 12:9, 23; 15:5, 12; 19:13, 14; 20:12, 16; 43:10; 45:19
**2007** 71:21; 73:17; 74:2
**208** 7:2
**22** 19:14
**23rd** 3:5; 73:17; 74:2, 23; 75:7
**24** 106:10
**26th** 15:11
**27th** 15:5
**28** 8:1
**288** 8:18
**2d** 7:14

**3**

**3** 60:3
**30(b)6** 98:12, 21; 105:22; 113:6, 21; 114:22
**33** 55:8
**39** 13:4
**3d** 8:19

**4**

**406** 7:14

**6**

**6** 43:14
**615** 7:3
**616** 7:3

**6b** 43:3, 15
**6c** 12:15; 13:4; 14:13

**8**

**81** 43:2; 45:2
**82** 45:2
**83** 8:19
**88** 43:9

**9**

**90** 8:19

**A**

**Abbott** 28:12, 19; 29:8
**Abbott's** 28:16
**abide** 39:2
**abided** 38:19
**ability** 13:12; 91:20
**able** 50:11; 52:6; 53:13; 54:18; 55:4; 104:14, 21; 105:7; 110:1
**above** 60:18
**absent** 62:5; 76:12, 16, 23
**Absolutely** 107:20
**abstract** 22:2
**accept** 12:24; 58:24; 59:18; 81:11; 102:1, 4
**acceptable** 45:16; 99:23
**accepted** 15:2
**accepting** 83:22
**access** 14:2; 21:8, 10; 23:12; 40:6; 44:14, 18; 100:4
**accesses** 77:20
**accommodate** 45:13
**accomplish** 72:4
**accomplished** 59:2; 95:7
**accumulate** 53:3
**accuracy** 66:23
**acknowledged** 7:23
**acknowledgement** 39:1
**act** 8:23
**action** 82:11
**actions** 7:21
**actual** 10:12
**actually** 19:7; 30:6; 37:4; 39:8; 48:21; 53:22; 54:15; 68:13; 92:10; 99:1; 108:5
**add** 45:21; 52:23; 90:8
**added** 13:16
**addition** 23:8; 47:14; 50:3; 92:20
**additional** 37:18, 24; 39:4, 7; 40:20; 49:6; 62:3; 76:1; 99:15; 109:10
**address** 5:6; 92:10;

109:15; 110:6
**addressed** 7:24; 16:19; 67:2; 91:18
**addresses** 26:1
**adequate** 47:3; 67:17; 102:10; 104:18
**adequately** 67:13, 14; 98:10
**adjudicate** 8:12
**adopt** 8:16; 82:4
**adopted** 14:5, 16; 15:13
**advance** 6:16; 10:14; 62:23; 108:6
**advanced** 11:16
**advantage** 20:2
**advised** 25:4
**affecting** 97:11
**affirmative** 110:14
**afforded** 35:2; 101:13
**afternoon** 107:5
**again** 4:18; 20:13; 74:1; 86:18; 91:8
**against** 10:1; 28:12; 45:3; 66:23
**aggregate** 32:15; 86:6, 24; 88:24; 94:1
**aggregated** 85:21; 88:15; 93:14, 17
**aggregates** 86:3; 88:15, 17; 89:3
**aggregating** 32:17
**aggregation** 63:15
**aggressive** 54:24
**ago** 43:8
**agree** 30:13; 52:24; 58:23; 59:20; 61:9; 62:7, 18; 72:6; 76:17; 97:3; 108:5; 110:1
**agreeable** 99:13; 104:3
**agreed** 18:12; 45:15, 20; 58:23; 76:21; 88:7; 89:10, 11; 98:18, 21
**agreement** 62:2; 76:7, 12, 16; 78:3; 89:18, 21; 105:12; 108:17, 19; 109:19, 23
**agreements** 13:9, 13; 33:9
**allow** 52:6; 62:20; 67:6; 68:8
**allowed** 29:7; 79:21
**allowing** 13:6
**allows** 14:9
**almost** 95:3
**along** 10:15, 20; 29:13; 30:12; 46:20; 47:18; 58:19
**alternative** 13:20, 21; 66:5; 91:15
**alternatives** 12:23; 94:21, 23
**although** 30:24; 43:19; 108:4
**always** 35:15
**AMD** 4:1; 15:10; 17:1;

20:21; 22:16; 23:10, 17; 24:14; 25:5, 8, 14; 26:1; 31:8, 18; 36:13; 37:3, 9; 41:8; 44:19; 45:7; 58:7, 9, 18; 61:15
**AMD's** 15:12; 44:12
**amenable** 60:10; 106:24
**among** 17:8; 22:1; 70:12; 71:14; 95:24; 97:1
**analysis** 50:15; 65:8; 81:3
**and/or** 23:10
**Anderson** 4:15
**Angeles** 4:3
**announce** 52:20
**anticipate** 6:20; 103:5
**anticipated** 33:12, 14, 15, 19
**antitrust** 8:18; 28:9; 81:21
**anxious** 58:12
**apart** 104:8; 113:4
**apologize** 6:14, 18; 25:3, 12; 80:6; 99:2
**apparent** 20:24
**apparently** 37:20; 84:22; 87:11
**appeal** 110:17; 112:7
**appear** 11:14
**appeared** 17:19
**appears** 55:2
**applicable** 82:9
**applicant's** 94:15
**application** 3:3; 5:16; 6:1, 22; 9:11; 16:3; 24:19; 71:23; 72:17; 90:13; 94:16
**applies** 49:2, 3
**apply** 49:7
**appoint** 102:14
**appointed** 103:3
**appreciate** 75:18; 109:8
**appreciated** 96:20
**approach** 8:15; 9:8; 12:20, 24; 81:4, 11; 82:3, 4; 102:1
**appropriate** 5:13; 40:3; 43:22; 53:20; 69:6; 108:12
**April** 89:11
**area** 68:15
**argue** 18:8; 31:19; 36:9; 37:17; 52:9; 53:1
**argued** 12:20; 45:3
**argues** 13:10; 57:6
**arguing** 4:23
**argument** 50:23; 61:22; 78:13; 95:9
**arguments** 11:15; 52:7; 53:5; 56:19; 60:15; 64:5
**arises** 67:7
**around** 16:18; 43:22
**articulate** 73:10
**articulated** 30:18; 56:4; 82:7; 84:18

**articulation** 83:24
**aside** 113:21
**assemble** 54:15
**assistance** 56:8; 64:2; 68:12
**associate** 3:21
**assume** 27:23
**assure** 54:19; 109:5
**ATHEY** 3:10, 11, 14, 15, 19
**attached** 24:15, 20; 75:7
**attaches** 73:18
**attachment** 73:21
**attempt** 72:8; 73:10
**attempts** 62:3, 9
**attends** 99:15
**attention** 25:21; 60:3; 75:17
**attorneys** 103:21
**authority** 7:7; 8:10; 9:10; 80:11; 102:12, 20, 21, 22, 23; 103:8; 108:9, 14
**availability** 107:6
**available** 65:20, 23; 69:21; 70:1, 2, 5; 98:1; 114:5; 116:23
**avoid** 41:3
**aware** 16:20; 17:21; 18:18, 19; 27:11; 28:2, 7, 8; 31:19; 34:6; 35:11; 77:4, 5, 6; 82:14
**away** 94:16

**B**

**b** 8:22
**back** 6:21; 17:2, 15; 21:19; 41:21; 58:11; 74:12; 78:24; 94:24; 103:14; 104:8; 105:3, 4, 21; 106:11; 107:17, 18; 113:1, 16, 18, 19; 114:17
**backdrop** 10:2; 15:16
**bad** 66:21
**balancing** 84:6
**balloon** 108:11
**ban** 14:21, 24
**based** 31:17; 48:23; 51:18; 58:22; 61:24; 86:12, 14; 98:11
**basic** 73:3
**Basically** 64:12; 65:11; 67:2
**basis** 31:12, 16; 32:1, 2, 7, 11, 13; 55:3; 87:19; 104:5
**became** 20:24
**befalling** 27:15
**began** 20:17; 61:23; 78:23
**beginning** 92:13
**behalf** 4:15, 20, 23; 8:23; 99:16

behind 26:23
believes 103:7
bell 27:2
benefit 79:24
besides 91:22
Best 12:17; 53:24; 54:5;
68:8; 72:9; 73:12, 16
better 8:15; 9:7; 22:8;
71:13; 82:3; 99:5
Beyond 37:16; 39:8;
99:18
bifurcated 58:14
bind 81:22
Bingham 4:16
bit 77:15; 87:7; 94:21;
110:11
block 79:9
blue 86:4
bones 101:22
book 44:12
both 5:3; 7:10; 19:18;
31:12, 13; 45:7; 50:16;
65:6; 73:5; 110:24
bound 43:21
brand 92:20
break 49:1
Brent 3:19
Brian 5:1
brief 6:9; 42:5; 75:9, 24;
80:3, 15
briefly 40:12; 60:3; 68:15
briefs 68:18
bring 23:21
broken 31:13; 73:19
built 110:19, 21
burden 32:17; 37:20;
55:23; 64:1, 4, 5, 18, 20;
67:5, 19, 24; 68:6, 14;
79:16; 80:2; 84:11; 94:15
burdens 84:10
burdensome 32:5; 79:22
business 5:20; 14:1;
32:8; 37:14; 42:15; 44:7,
17; 46:24; 47:21; 64:11;
85:4; 101:5; 107:15, 19;
115:15
business-type 29:3
butchered 80:5
Buy 12:18; 49:18; 53:24;
54:5
buyer 65:7

C

c 26:3
California 7:4, 15; 106:11
call 107:4
calls 102:16
came 28:5; 29:13; 73:12;
81:7
can 6:5; 21:18; 22:17;
25:22; 33:24; 36:14;
39:13; 42:14, 16; 46:4, 17;

52:14; 54:13, 20; 56:19;
57:14; 60:16; 64:15; 65:7;
67:22; 68:9, 12, 13; 69:22;
71:9; 74:15, 19; 77:14;
83:19, 21; 84:12; 85:23;
88:13; 90:2, 12, 17; 91:3,
12, 21; 92:10, 15; 94:6, 8,
13; 95:8, 14; 99:5; 101:20;
102:5; 103:9; 108:5;
109:5, 15, 18; 111:9, 14;
112:1; 113:22; 114:23;
116:12
candor 18:11
careful 16:9
carefully 53:9; 56:7
carried 54:5
carry 54:3
case 5:4; 6:18; 7:1, 3, 4,
13, 15, 21; 8:10, 17; 9:24;
10:5; 16:13, 16; 18:1, 20;
19:10, 21; 21:14; 22:20,
22; 28:8, 9, 13, 16; 29:16;
30:7, 9, 10, 13; 33:6, 18,
20; 35:1, 23; 36:13; 37:21,
22; 39:7; 40:17; 43:6; 44:5;
46:3; 49:20; 50:10, 19, 21;
51:8; 52:8; 53:10; 56:10;
58:5, 10; 59:14; 61:5;
63:13; 65:14; 69:10;
80:10; 81:2; 82:8, 9, 10;
84:1, 12, 22; 101:23;
114:4, 12
cases 8:23; 41:3; 80:13
casual 56:5
categories 34:7; 73:20;
74:22; 85:17; 94:1
category 29:19; 51:14
cause 37:14
caused 79:23
certain 28:23; 31:13;
56:20; 69:12; 77:6; 88:20;
99:11; 107:2, 2; 116:2
certainly 11:19; 16:12;
23:24; 29:14; 30:9, 18;
39:13; 52:8; 53:24; 56:18;
57:8, 9; 58:13; 59:12;
60:23; 62:17; 65:21; 71:9;
76:4, 21; 81:9, 19; 84:17;
90:2; 91:5, 13, 16; 96:3, 5;
111:1
certification 50:21, 22;
51:11; 52:2; 53:1; 55:6;
57:10, 12, 23; 58:9, 15;
59:1, 12, 19; 60:12, 17, 24;
61:8, 14, 18; 75:8; 80:10;
81:13; 83:4; 84:14, 20
certify 80:12
cetera 102:23; 104:11
chain 50:4, 13; 53:13
chair 90:10
challenged 55:13, 20
chance 83:17
Chancery 7:5
change 26:13; 35:24;
45:4, 24; 62:13; 64:8; 78:3;
91:9
changed 16:22; 17:5;

19:7, 17; 72:23; 73:4, 8;
77:10
channel 51:3
characterize 72:23; 73:2
charge 58:18
charged 50:2, 14, 17
checking 107:5
checks 66:22
chill 115:5
chills 113:2
chip 53:17
chips 49:16; 73:7
choice 110:17
choose 11:14; 105:12
chosen 51:9
Circuit 8:16, 19; 9:6;
54:1, 5
circumstances 16:21;
17:4; 26:13; 28:3
citations 101:23
cited 18:20; 80:10
cites 7:1
City 54:1, 5
claim 49:21; 55:14
clarification 70:8, 11
clarifying 48:22
clarity 91:21; 93:19
class 3:3; 7:10; 9:17;
15:21; 19:15, 16; 20:16,
20; 21:4; 23:5, 11; 26:12;
31:10, 18; 37:19; 38:16;
40:15, 18; 48:19; 49:10,
11, 13, 14; 50:7, 20, 22;
51:11; 52:1; 53:1, 3, 14;
55:5; 56:5; 57:10, 12, 22;
58:4, 8, 15; 59:1, 6, 11, 19;
60:10, 11, 16, 16, 24; 61:8,
13, 18; 76:22; 78:5; 80:9,
12; 81:12; 83:4; 84:13, 20;
86:23; 90:15; 92:8; 97:16,
22; 100:10; 115:22
class-wide 50:23
clause 34:16
clauses 21:7
Clayton 3:11
clear 11:18, 19; 30:5;
43:20, 20; 48:12; 49:1, 3;
55:10; 65:1; 69:8, 24; 71:3;
72:8; 85:3, 16, 20; 107:24;
110:8
clearly 33:12; 44:17;
95:19
client 28:20, 21; 96:4
clients 109:18
clock 42:3; 96:12
clocks 96:12
close 42:15; 46:23;
47:21; 101:5; 107:18;
115:14
closely 56:24
Co 7:2
co-counsel 3:16
Coast 107:17
Cohen 3:19

cold 94:13
colleagues 48:24;
109:18
collection 56:9, 14
comfort 94:8
comfortable 100:16
coming 41:21; 88:17;
94:2; 105:3, 4; 112:24
comments 10:17, 22, 23;
11:9, 17, 21; 12:3, 14, 17;
13:3; 14:20; 18:8, 23; 19:8,
11; 29:24; 37:1; 40:11;
46:13; 47:8; 48:14; 71:18;
72:2, 16; 109:9
commercial 34:19
common 27:9
communicate 104:14
communication 77:7, 9;
103:2
company 29:1; 79:4, 4
compare 31:8
compared 67:19
comparing 84:9
compel 3:3; 20:24; 51:15;
62:11; 89:11; 105:6, 9
compelling 56:22
competitive 13:12; 20:2
competitively 34:14;
35:9
competitors 41:2
complaining 68:6
complete 54:3; 92:2;
93:9; 116:12
completing 69:12
compliance 79:22;
108:21
components 54:11, 14
compounded 63:15
compromise 45:15; 61:7
computer 31:14, 15;
49:14; 53:17; 54:2, 8, 9,
11, 13, 15; 55:3; 63:8;
73:6, 8; 85:2, 24; 86:1
computers 54:4, 10, 16;
55:9; 65:22
concept 73:3; 99:13, 14;
100:2
conceptually 108:3
concern 16:19; 44:12;
67:10; 110:18
concerned 42:24
concerning 34:3, 5;
40:22; 79:14; 84:18
concerns 16:14, 17;
45:14; 67:8, 14; 100:12;
110:15; 111:4; 112:5, 20
conclude 5:23; 9:5, 7, 9;
44:13
concluded 8:1; 117:3
concludes 48:13; 103:7
concluding 45:20
conclusion 60:15; 80:23
conclusions 100:22
concrete 18:5, 7

conduct 5:21; 7:20; 9:4;
11:20; 52:13
conducted 11:1; 86:15
conducting 9:2; 11:4
confer 20:17; 71:20;
75:18, 20; 78:2, 6, 23;
85:6; 103:17; 105:20;
107:3; 113:3; 115:5
conferred 61:21; 97:1
conferring 61:23; 62:3;
63:24
confers 73:1; 87:17;
94:19
confess 39:20
confidence 69:2; 109:6
confidential 13:8, 17, 24;
14:10; 19:20; 21:10; 22:7;
29:2; 33:8, 20; 34:1; 37:23;
40:23; 42:22, 23; 83:7;
109:2
confidentiality 33:18;
43:22; 67:8, 10, 14; 99:12,
18; 107:13, 14; 110:15;
112:8
conjunction 46:7
connection 8:13; 16:15;
35:18; 51:23; 79:10; 80:2;
85:6; 87:17
consider 5:18; 22:9
consideration 6:5;
16:10; 97:5; 102:4
considered 11:22;
21:22; 35:12
considering 23:9
consistent 10:23; 107:7
consists 63:5
consolidated 9:3
constitute 34:19
constructed 18:1
consultants 43:13, 18;
44:4; 45:6
contain 34:19; 49:15
contains 85:17; 86:16
contemplate 108:13
contemplated 103:2;
105:14
contemplates 21:8
contests 5:17
context 44:6; 67:7; 82:10;
83:6; 108:16; 109:23, 24;
113:8
continue 11:11
contrary 80:14; 86:10
controversy 30:10
convenience 24:14
conversation 69:5;
97:12
conversations 48:24;
109:3
convince 114:7
convinced 94:4, 12, 16
cooperate 69:17
cooperation 62:23
coordinated 9:3

Phil Paul   v.
Intel Corporation

Hearing
May 1, 2007

coordinating 7:18
copies 24:3
copy 23:16; 24:1, 1;
38:23; 65:3
corner 74:18
correctly 51:21
correspondence 71:22;
72:3; 87:16; 109:15
cost 87:13
costs 34:5
COTTRELL 3:24; 4:1, 11,
12; 28:11
Counsel 3:7; 5:2, 8, 12;
6:9; 9:11; 11:23; 13:7, 19,
23; 14:9, 14; 17:17; 20:20;
21:6; 23:15; 24:19; 26:6;
27:24; 28:2, 17; 29:6, 11,
22; 36:23; 39:17; 40:15;
43:7; 44:13; 46:2; 48:17;
51:9; 75:16; 76:5; 77:12,
19; 78:12, 20, 21; 79:1;
80:19; 82:15; 83:1; 86:8;
91:3; 92:17; 98:23
counsel's 14:3, 12
count 55:8; 101:6
country 53:16
couple 32:21; 64:5
course 12:1; 32:7; 38:17;
44:7; 45:9; 49:22; 58:4, 8;
64:11; 69:20; 72:12, 24;
85:4; 103:6; 104:4; 112:3
Court 5:5, 6, 18, 23, 23;
6:3, 5, 17; 7:5, 11, 17, 23;
8:3, 11, 11; 9:10; 11:9, 11;
12:2, 17, 24; 13:21; 14:9;
15:1, 16; 16:7; 10, 20, 20;
17:10; 18:4, 12; 20:15;
22:8; 25:4; 26:23; 28:1, 15;
30:11, 13, 16; 31:7; 33:15;
34:6, 12; 35:1, 5, 11; 36:9;
38:18; 44:13; 48:22; 49:6;
51:23, 24; 52:5; 64:2;
68:18; 69:15; 81:2, 19, 22;
82:3, 8; 84:1, 5; 85:8, 9, 9;
89:9; 90:5, 5; 91:4, 16, 18,
22; 92:1, 21; 93:7, 12;
100:8, 12; 102:14, 18;
104:6, 14, 19, 19, 22;
105:3, 5, 8; 108:24; 109:4;
114:17
Court's 23:24; 34:23;
72:6
courthouse 96:13
courtroom 12:3; 17:19;
101:22; 102:7
courts 72:4; 8:1; 41:3
cover 68:16
covered 28:17
crafted 56:7
crafting 17:24
create 65:11
creates 77:19
creating 6:9
critical 105:7
critically 103:12
cross 66:22

curiosity 57:19
current 23:1, 1; 41:6;
99:18
currently 20:15; 26:12;
100:13
customer 34:4; 64:23;
65:24; 66:1
customers 50:2, 6;
52:11, 12; 54:21, 22; 65:22
cut 5:14

# D

D 25:15
Dakota 81:21
damages 49:21; 50:24;
51:1; 52:10, 14; 57:14
Dan 15:21; 38:15; 48:19
dance 106:5, 8
Daniel 3:16
data 3:4; 16:16, 23, 24;
20:22; 21:9, 14, 17; 22:19,
24; 23:13; 26:1; 31:10, 12,
20, 24; 32:1, 10; 33:11, 13;
34:2, 5, 7, 13, 21; 35:21,
22; 36:3, 18, 19; 39:6, 16;
49:2; 50:10, 11, 16, 19, 20;
53:7, 8; 54:17; 55:19; 56:6,
9; 57:7, 13; 59:8, 14, 19,
21; 60:13; 61:13, 16; 62:5,
17; 63:6, 11, 12, 17; 64:8,
13, 14; 65:4, 11, 16, 17,
17, 18, 20, 22; 67:5, 9, 16,
19, 23, 23; 68:4, 8, 19, 22;
69:6, 9, 23; 70:1, 2, 13;
73:5, 22; 74:6, 8, 9, 19;
76:18, 20; 77:14, 20, 20,
21; 78:15; 80:12; 84:18,
23; 85:1, 3, 11, 13, 22;
86:6; 87:12, 15, 19, 20;
88:15, 17, 20, 23; 89:3, 12,
16, 16; 90:1, 4, 15, 19;
91:6, 9, 24; 92:3, 9, 24;
93:19, 24; 94:1, 11; 97:19;
98:2, 3, 10; 99:5, 12;
104:10, 18; 105:8; 108:2;
113:24; 114:4, 18; 116:2, 3
database 65:5, 11; 67:21;
73:14; 85:16, 23; 86:3, 16,
20; 88:14, 19; 93:14, 20,
24
databases 86:12
date 69:11, 14; 115:8
dated 45:19
dates 107:2, 2; 115:9
day 17:18; 44:2; 77:12;
95:17, 20
day-to-day 17:18
days 47:23; 101:7, 13, 18;
102:9, 17; 103:10
deadline 68:20, 21
deadlines 10:12
deal 83:17; 95:8; 109:6
dealing 33:17; 41:8; 43:2;
67:21; 109:1

deals 67:13
dealt 58:14
December 20:16; 78:24
decide 52:1; 112:6, 12
decision 7:11, 12, 12;
12:6, 7; 30:21, 24; 34:10;
81:8, 19, 20, 20; 103:13;
109:11
declaration 24:15, 21;
63:13, 13; 80:4; 83:16;
86:5, 11; 87:2; 93:15;
100:9
declarations 22:5;
85:15, 20; 92:23; 93:3;
116:3
declined 7:12
defendant 28:10; 50:22
defendants 28:23
define 63:10; 74:6
defined 76:20
degree 94:8
delay 61:15
Dell 12:18
demonstrate 19:23
demonstrated 10:7; 84:9
demonstrates 93:12
depending 51:3
depends 76:19
deposition 98:13, 21;
104:21, 24; 105:2, 4, 17;
106:22; 111:6, 7, 15;
113:7; 114:13, 22; 115:10
depositions 9:2, 5
describe 39:12; 89:12;
94:10; 105:21; 109:22
described 21:12; 88:5;
92:24; 93:2; 105:16;
109:22
describes 94:22
description 89:15, 24
designated 34:1
desire 5:4
desk 100:21; 102:11
despite 62:9
detail 26:10, 12; 70:20;
71:24; 72:13; 77:10;
100:19
details 68:24
determine 104:16
determined 35:2
determining 34:8
develop 20:10
developed 93:5
development 15:19
dialogue 77:3; 87:7
dicta 8:17; 9:6
dictionary 74:9
differences 31:17; 37:5,
8
different 11:5; 17:19;
23:4, 8; 26:11; 28:6; 35:22;
51:2; 53:22, 24; 54:8, 14;
55:8; 63:10; 67:24; 72:11;
78:14; 79:3; 84:21; 86:23;

94:21; 108:20; 113:8
differently 52:11
difficulties 66:13
difficulty 69:3
dilemma 94:4
direct 25:21; 41:2; 91:5
directly 57:13
disaggregated 70:6;
91:6, 12
disclosed 13:14; 14:12;
27:6; 37:14; 99:20
disclosing 45:9
disclosure 13:18; 35:8;
79:8
discovery 4:5, 6; 8:12;
22:20; 26:13; 34:17;
51:16, 18; 52:6; 57:22, 22,
23; 58:13, 24; 59:3; 79:20;
82:6; 83:2
discretion 46:8
discuss 46:15; 59:24;
95:24
discussed 18:20; 57:20;
67:12; 97:15; 99:9
discussing 15:12; 23:7;
100:20
discussion 9:22, 24;
14:22, 24; 22:12; 24:8;
42:8; 45:1; 57:21; 63:2;
79:2; 88:7; 96:4; 105:22;
106:16, 19; 107:13
discussions 20:19;
21:24; 85:7; 90:7; 92:11
dismiss 51:20, 24
dispute 20:5, 8; 43:4, 6;
61:14
disputed 56:12, 16
disputes 8:12
disseminated 40:5;
100:11
distribution 49:18; 50:4,
7, 13; 51:4; 53:13
District 7:4, 15; 8:4, 24;
9:1, 1; 82:11
district's 6:7
disturb 17:7
doable 42:15
document 6:3; 8:8;
12:11; 25:21; 31:8, 9;
51:16; 103:24; 107:12
documents 13:8, 24;
14:2, 10; 19:22; 32:12;
33:8, 24; 34:1, 8, 10, 14,
18; 38:11; 40:1, 4
documents-only 7:8; 8:5
dog 43:23
done 38:12; 39:9; 47:21;
95:14, 15, 15; 104:1
door 65:24
doubt 33:16; 34:22; 35:1
down 31:13; 50:6; 53:10;
68:23; 73:19; 92:1; 95:1;
111:8
download 64:14; 67:22,
22

94:21; 108:20; 113:8
downloaded 68:2
draft 18:7
drawing 88:22
drill 95:1
dropping 23:3; 36:13
dry 97:10
due 6:5; 74:7; 103:6
during 11:19; 48:24;
63:7; 72:24; 78:13; 104:4,
15; 113:13

# E

E-discovery 39:22;
48:23; 49:1
earlier 72:16; 89:19;
91:10
earnestly 92:2
easier 68:1
eavesdrop 113:14
economist 53:10; 56:8
effect 102:18
efficient 7:20; 113:10
effort 72:14; 76:5; 92:21
efforts 59:7
eight 61:22; 78:24
either 38:2; 58:23; 72:22;
74:11; 81:18; 82:7, 15;
106:12; 112:7
electronic 39:6, 16; 40:1;
54:9; 64:22
Electronics 3:4; 4:21;
67:21
elements 97:2, 3
Elliott 3:12
else 6:4; 46:18; 76:13
Email 77:5
Emanuel 4:23
empowers 8:2, 22
enables 102:14
encompass 33:10
encourage 90:4
encouragement 92:1
end 6:14; 36:5; 49:12, 17;
50:4, 7, 14; 51:3; 77:11;
86:1; 107:3
enforce 7:7
enforcement 8:4
engaged 30:9; 65:6
enough 55:16; 61:21;
70:13; 83:15; 91:21
entered 15:5; 18:13, 17;
19:9; 34:23; 38:18
entertain 5:18, 24; 9:11;
46:14
entitled 51:18; 83:9
entity 6:19
entry 10:4; 15:6; 30:12
especially 55:2
essence 44:20; 55:18;
98:14
essentially 39:23; 63:21;

Hearing
May 1, 2007

Phil Paul    v.
Intel Corporation

67:8; 101:21
**established** 39:16
**et** 102:22; 104:10
**etched** 12:16
**even** 4:9; 22:2; 27:6; 35:5;
49:24; 61:12; 62:2, 18;
66:11; 77:18; 79:19; 80:2;
93:18; 95:16; 102:4, 20;
105:3; 108:19; 115:7
**event** 66:21
**everybody** 4:5
**everyone** 36:8
**everyone's** 24:14
**evidence** 53:3; 56:14;
59:11; 75:22
**evolution** 31:22
**evolutionary** 76:3
**evolve** 73:9
**ex** 103:1
**exactly** 31:20; 33:4; 36:2;
66:10; 72:10; 74:10;
93:19; 97:18
**examine** 46:4
**examining** 9:6
**example** 72:13; 73:16;
112:12
**exception** 101:19;
108:10
**exceptions** 15:8, 11;
101:12; 103:5
**excessive** 64:18
**exclude** 63:18
**Excuse** 43:11
**exercise** 8:3
**exhaustive** 81:3
**Exhibit** 24:16, 19; 25:14,
15; 75:9
**exhibits** 75:1
**exist** 41:7; 70:7
**existing** 26:21; 35:3
**exists** 9:23; 83:14; 85:4
**expanded** 41:11
**expect** 8:9, 16; 17:18;
48:14; 52:19; 59:2; 71:19;
77:3; 101:16, 20; 102:5;
103:9, 23; 108:8, 15, 21;
109:18
**expectation** 21:13;
26:22; 39:15; 108:19;
112:23
**expected** 22:19; 29:15
**expedited** 107:8
**experience** 18:3; 111:23
**expert** 41:1; 63:12; 80:4;
86:6, 10; 93:15, 16
**experts** 38:21, 22; 40:16,
19, 22; 41:9; 42:24; 43:13,
17; 44:4, 23; 45:5; 97:23;
100:3
**explain** 55:14; 69:22;
74:10; 76:5; 87:15; 88:13;
92:21; 105:7
**explained** 78:21; 92:17
**explaining** 59:3

**explanation** 17:6; 55:18
**explore** 11:8
**exponentially** 41:12
**expressed** 8:17; 60:18
**extend** 89:10
**extensive** 62:2
**extent** 12:16; 14:8; 29:20;
41:19; 59:6; 66:10; 68:5;
70:1, 2; 71:19; 109:21
**extract** 85:22

# F

**F** 7:14; 8:18; 24:16, 19;
25:14
**F.R.D** 7:2
**face** 58:8; 61:18; 68:14
**faced** 110:16
**facility** 40:2
**fact** 12:12; 14:16; 16:23;
22:16; 23:3; 29:9; 35:17;
36:19; 43:16; 54:6; 62:14;
63:16; 68:1; 72:22; 75:20,
22; 80:13; 84:1; 89:9;
105:14; 113:18
**factors** 56:20, 22; 57:1
**failed** 113:19
**fair** 10:3, 6; 11:3, 8, 10;
43:1; 59:4; 76:11; 80:24;
81:23; 82:17; 88:1; 112:22
**fairly** 41:10
**faith** 76:4; 92:2; 113:2, 12
**fall** 28:22; 104:7
**falls** 113:4
**familiar** 39:20
**far** 37:5; 42:24
**Farnan** 5:23; 14:7, 18;
15:12; 27:10; 33:17;
57:21; 100:22; 101:9, 17,
24; 102:9; 103:3; 109:3
**Farnan's** 10:4
**fashion** 106:24; 115:5
**feasible** 65:9; 66:4
**features** 69:7
**February** 73:17; 74:2, 23;
75:6
**feel** 98:10
**few** 31:7; 37:1; 42:7; 66:9
**fields** 62:21; 64:13, 14,
15; 68:9, 11; 69:18; 73:13,
19; 74:10, 13, 16, 20, 21,
22; 90:20
**fight** 43:23
**figure** 74:20
**file** 15:8; 46:9, 20; 47:13,
18; 51:20; 64:12
**filed** 15:10; 46:6; 58:9;
68:17; 75:8
**filing** 12:10, 10; 15:9;
62:11; 63:1; 78:7
**financial** 29:4

**finding** 5:21, 22; 15:6
**findings** 100:21; 102:22
**Fine** 42:16; 48:11
**Finklestein** 3:21
**firm** 4:2
**firmly** 63:22
**firms** 23:11; 27:4; 40:17
**first** 16:17; 19:4; 37:3;
56:3, 21; 57:6; 58:10;
61:21; 64:7; 69:8; 75:17;
76:18; 80:3; 88:11; 91:4;
92:7; 97:21; 98:19
**fit** 74:21
**fits** 51:13
**five** 60:10
**fixed** 69:14
**Flat** 8:18
**flaws** 66:15
**flesh** 101:22
**flood** 36:1
**focus** 9:4; 42:11; 68:8;
72:22; 89:19
**focused** 59:1, 7
**focusing** 14:20
**folks** 95:18; 103:18, 20
**follow** 7:12; 85:23;
113:14
**followed** 58:19
**following** 10:2; 22:12;
24:8; 42:8; 45:18, 21; 69:8;
114:19
**footnote** 8:21
**foreign** 51:16
**forge** 95:2; 105:13
**forged** 108:17
**forget** 99:2
**form** 64:8; 70:3; 85:21;
87:23; 88:16; 91:6, 9;
104:5; 113:1; 115:14
**formal** 6:3
**format** 85:12
**former** 114:16
**forms** 88:20
**formula** 50:24; 52:10, 13,
15; 54:20; 57:15
**formulated** 18:5
**formulation** 17:11
**forth** 21:19; 80:15
**forward** 35:18; 36:8;
46:17; 64:3; 97:16;
101:10; 105:23
**found** 13:4; 35:12; 37:8
**Four** 24:4; 26:2
**Fournier** 28:12
**fourth** 70:1
**frame** 46:21; 69:16;
76:16; 105:19, 20; 106:4
**framed** 10:1; 21:23; 43:6,
7
**frames** 46:16
**Fred** 4:1
**Friday** 101:6, 16
**front** 6:14; 60:7; 72:5;

84:5
**fruitful** 106:16
**fruitfully** 92:4
**frustrating** 87:10
**Fry** 6:19; 13:5
**Fry's** 3:3; 4:21, 24; 5:2, 3,
16, 17; 6:14; 7:1, 10;
10:15, 19; 11:14, 16; 12:9,
18, 19, 22; 13:3, 6, 10, 11,
15, 20, 22; 14:11; 15:7, 16;
16:1, 12, 14, 17; 17:1;
18:21; 19:2, 6, 7, 11, 17,
18, 19; 20:1, 2, 12, 15, 18,
24; 21:13, 22; 22:5, 9;
23:5, 12; 26:2; 27:8; 31:13,
14, 19, 23; 32:9, 11; 33:2,
12, 14; 34:21; 35:10, 21;
36:18, 21; 37:13, 15, 21,
23; 38:1; 40:21, 22; 41:2,
5, 8, 12, 18; 47:6; 49:7;
50:10; 52:11; 53:7, 21, 22;
54:1, 6, 11, 16, 20, 23;
55:13, 22; 56:19; 57:1, 6;
59:19, 20, 22, 24; 60:12,
15; 61:1, 5, 9, 12, 20; 62:2,
4, 11, 16, 18, 21, 23; 63:2,
4, 7, 16; 64:4, 8, 18; 65:2,
20; 65:6, 13, 15, 21, 23; 66:1,
8, 17, 18; 67:4, 7, 14; 68:5,
7, 13, 19, 23; 69:8, 11, 17,
21; 70:16; 71:15; 72:9;
73:6, 7, 11, 12, 23; 74:8;
76:4, 24; 77:13, 14, 19, 20,
21; 78:13, 18, 20; 79:3, 7,
12; 80:1; 83:14; 84:6, 13,
20; 85:3, 6, 10, 15, 16, 24;
86:7, 7, 22; 87:1, 3, 12, 15,
18; 88:7, 13; 90:4, 7, 14;
91:5, 21; 92:9, 14, 17, 23;
93:5, 14; 97:1, 13, 19, 24;
98:3, 5, 11, 13; 99:4, 13,
22; 100:10; 104:16, 18;
108:2, 5; 109:10; 112:9;
113:24; 114:4, 18; 115:4;
116:4
**FTAIA** 51:17
**full** 11:7, 10; 16:8; 17:9;
26:18; 59:2, 21; 60:13;
61:5, 9; 67:5, 15, 19;
108:21; 112:22
**fuller** 22:4; 26:18
**fully** 29:15; 30:9; 31:19;
38:19, 19; 98:5
**fundamental** 93:22
**further** 9:12; 38:6; 41:13;
58:16; 75:22; 92:10; 98:9;
105:5

# G

**gaps** 66:12; 77:6
**gates** 36:2
**gather** 113:19
**gave** 16:10; 17:7, 10;
25:5; 57:9; 73:21; 89:14
**geeks** 54:13
**general** 29:15

**generalized** 50:24;
52:10; 57:14
**generally** 85:18
**generate** 100:21
**generated** 88:21
**generic** 28:24
**generously** 17:10
**gently** 7:10
**gets** 6:6; 113:6
**given** 21:3; 22:24; 29:10,
17; 40:17; 41:6; 43:16;
83:13; 84:1, 4; 93:15;
100:12; 107:16; 109:9
**gives** 67:16; 69:15;
102:10
**giving** 10:12
**Glass** 8:18
**goal** 97:16; 98:4
**goes** 35:5; 45:22; 68:16;
71:19; 105:23; 113:13
**Good** 3:1, 10, 24; 4:19;
5:9, 11; 15:20; 66:16;
69:15; 72:13; 76:4; 92:2;
113:2, 12; 115:19
**GRAHAM** 4:19, 20; 5:8;
27:20, 23; 30:3, 17, 23;
31:4; 42:16; 96:17; 110:5,
21; 111:22; 112:18;
115:24; 116:13, 20
**grant** 71:10
**granted** 14:2
**granular** 66:17
**Great** 42:19; 56:21
**greater** 27:4, 7
**greatly** 13:11
**grounds** 41:13
**guess** 44:3; 48:13

# H

**H** 75:9
**H-O-L-S-T-O-N** 43:11
**hand** 64:16
**handed** 25:15
**handle** 35:4, 13; 52:7;
113:23
**handled** 28:9
**handling** 53:4; 63:12
**hands** 41:1
**happen** 115:1
**happens** 93:1
**happy** 5:5; 6:24; 9:13;
25:11; 60:21; 81:14; 96:1;
98:23; 103:15
**hard** 65:3
**harder** 111:7
**harm** 13:11; 19:19; 27:14;
35:10; 37:15; 79:23; 83:13
**harmful** 35:9; 38:3
**hasten** 52:23
**heading** 26:4
**headway** 91:17
**healthy** 81:3

Min-U-Script®

Phil Paul  v.
Intel Corporation

Hearing
May 1, 2007

hear 5:5; 19:1, 4; 27:24; 77:13; 90:5; 98:23; 105:11
heard 35:17; 40:13; 61:22; 87:18; 103:15
hearing 3:2; 6:16; 11:1, 15; 20:12; 22:15; 42:2; 45:18; 92:8, 20; 95:9; 115:3; 117:3
hearings 11:4
heart 37:13
heightened 99:17; 107:13
held 22:12; 24:8; 29:17; 42:8
help 27:14; 68:13; 113:1
helpful 24:6; 30:19; 46:7
helping 111:19
Henri 5:1, 11; 71:22; 73:18; 74:3; 78:21; 92:9, 17; 108:4
Herculean 65:12
Hewlett-Packard 12:18
higher 50:13
highlights 82:19
highly 13:7, 17; 19:20, 24; 21:10; 29:2; 33:8, 20; 40:23; 42:23; 83:7; 109:1
History 26:4; 61:24; 62:8
Holston 43:10
Honor 3:11; 4:1, 13, 20; 5:10; 6:12; 9:16, 18; 15:21; 16:5, 13, 19; 17:5, 6; 18:2; 19:1, 5, 22; 20:8, 12; 21:18, 22; 22:4; 23:9, 18; 24:10; 25:1, 12, 24; 26:7, 10; 27:2, 20; 31:6, 17, 23; 32:3, 22; 33:13, 16; 34:11, 15; 35:14, 17; 36:1, 7, 14, 22; 37:2, 16; 38:6, 15; 39:20; 40:13; 43:19, 24; 44:10, 16; 46:24; 47:6, 19, 23; 48:18; 49:10, 21; 50:9; 51:13, 14, 21; 52:23; 53:6; 56:4; 57:3, 9; 58:2; 59:6; 60:8; 61:11; 62:1; 63:23; 65:1, 19; 67:11; 68:16; 69:2; 70:9, 18; 71:13; 73:17; 75:6, 15, 19; 77:12, 23; 78:10; 80:21; 81:6, 16; 82:1, 19; 84:4; 87:10; 88:13; 89:5; 90:24; 92:6; 93:18; 95:21; 96:8, 15, 21, 24; 97:4; 98:20; 99:2; 100:7; 104:12; 107:10, 21, 24; 109:9; 110:5, 8, 12; 111:11; 113:22; 115:16, 23, 24; 116:11
Honor's 15:24
hope 59:13; 112:1
hopefully 6:21; 98:4
hopes 4:5; 38:1
HORWITZ 4:14, 14
host 10:20
hours 106:10
huge 54:2

I

idea 69:15
identification 64:23
identifies 68:3
identify 14:14; 47:6; 62:20; 69:18
identifying 22:6
identity 14:12
ignored 7:10
immediately 88:16
impact 50:24; 102:24
impacted 52:12
Impax 28:24; 30:6
imperical 80:12
implicates 110:14; 112:5
implications 55:5
importance 101:9
important 5:3; 10:13; 13:1; 21:11; 28:20; 39:14; 53:4; 91:19; 99:3; 103:12; 108:24
impose 28:1; 41:4
imposed 50:5
improperly 40:5, 6; 83:15
in-house 5:2; 13:6, 19, 23; 14:9, 11, 14; 28:17; 29:6, 11, 21; 39:17; 44:21
inability 74:4, 6, 8
inadequate 63:5
inadvertently 27:6; 38:3
Inc 3:4; 7:2
inclined 45:24; 108:15; 109:20
include 15:1; 34:1; 37:22; 54:10; 105:16; 107:3; 108:1
included 34:7
including 8:4; 16:11; 22:5; 33:21; 50:10
incredibly 44:19
incumbent 53:2
indeed 3:17
indicate 60:10
individual 85:1, 13; 92:16
individually 51:2
individuals 44:9; 103:22
indulge 80:19
industry-wide 13:9; 33:9
inflated 50:2, 12
inform 99:6
informal 98:11, 20; 99:4, 7; 103:17; 104:15, 16; 112:17
informally 97:24
information 13:10, 10, 18; 19:18, 21; 21:10, 11; 23:7; 27:3, 6; 28:18, 23; 29:2, 4, 4, 7, 10, 13, 14, 15, 18, 19, 21; 33:5, 10; 34:2,

18, 20; 37:6, 10, 12, 12, 13, 23; 38:2; 40:24, 24; 43:23; 44:8, 15, 19; 55:24; 56:15, 15, 17; 64:24; 73:15; 74:15; 76:22; 77:1; 79:6, 11, 14, 17, 19; 80:8; 82:21, 23; 83:10, 12, 14, 18; 84:7, 8, 13; 85:18, 19, 20; 86:4, 16, 24; 87:4; 88:1, 11, 23; 92:14; 93:13, 16; 99:19; 100:4, 7, 11; 104:5; 108:18; 109:2; 112:11; 113:20; 116:6
informed 82:15
initial 17:24; 75:8
initially 76:2; 116:1
injured 51:5; 54:21
input 10:9, 10; 65:5, 10
insofar 42:22, 24; 83:2
instance 28:3; 30:14; 66:17; 78:17
instant 78:7
instead 86:2
instituted 82:11
insufficient 77:9
Intel 4:15; 20:21; 23:10; 25:5, 16; 36:13; 41:8; 45:7; 49:13, 23; 50:1, 5; 51:15, 20; 52:7, 9, 17, 19, 24; 53:5, 17; 61:15; 81:9, 10, 13, 16
Intel's 23:1; 49:15
intend 5:20; 6:2
intending 43:17
intends 37:19
intentionally 38:3
interest 11:24; 26:3; 44:17; 110:24
interested 21:2; 111:18
interesting 7:9; 76:14, 15
interests 38:13
interface 88:19, 22
interfered 91:19
intermediaries 50:12, 14, 17, 18; 53:12; 56:16
into 10:10; 11:18; 15:18; 41:1; 45:2; 51:13; 58:19; 65:5, 10; 72:14; 73:19; 88:15, 24; 93:24; 100:19; 107:12
investigation 86:14
invited 18:4
invoice 64:22, 22
invoices 64:21, 24; 65:2, 8, 12
involve 30:4; 103:18, 20
involved 17:22; 18:3; 22:21; 27:5; 30:5; 104:9; 116:17
involves 69:20
involving 14:21
issuance 6:16
issue 4:6; 5:21; 6:2; 7:24; 8:9; 18:24; 19:4; 21:23; 32:24; 33:22; 37:11; 41:9;

42:11; 51:7; 57:11, 13; 67:1, 6; 68:16; 71:19; 75:17; 87:8; 100:22, 23; 101:9; 102:21, 22; 103:3, 12; 106:12; 110:6
issued 3:5; 7:11; 20:15; 22:16; 27:9; 31:1
issues 5:15; 14:21; 16:8; 51:17, 19, 22; 55:5; 58:9, 15; 61:19; 66:23; 72:11; 91:19, 22; 101:2; 112:8

J

Jennifer 4:3, 3, 8
Jonathan 63:14; 86:5
Jones 3:11
Jordan 28:10; 29:9, 17; 46:4; 102:2
Jordan's 42:12
Judge 5:22; 8:22; 9:1; 10:4; 14:7, 17; 15:12; 27:10; 28:10; 29:9, 17; 33:17; 42:12; 46:4; 57:21; 100:22; 101:8, 17, 24; 102:2, 9; 103:3; 109:3
judges 109:4
judgment 47:13; 90:13, 17, 19; 94:6, 9
judgments 53:19
juncture 16:3; 94:5
June 3:5; 11:1, 5; 15:5; 19:14; 20:12; 43:9; 45:19
jurisdiction 5:17, 24; 100:23
jurisdictional 101:21
jurisprudence 6:7

K

Karen 3:21
keep 32:10; 64:9, 10, 21; 66:4; 74:20; 87:19, 22; 88:8; 89:12, 16; 101:10; 103:12
keeps 90:4; 91:9; 97:19; 98:4
kept 90:1, 20; 93:20; 104:10
key 59:10; 69:7
kidding 106:8
kind 18:9; 25:10; 29:14; 33:13; 36:3; 54:16; 65:8; 74:15; 100:15; 111:8
knew 17:12; 32:13
knowledge 40:21; 58:1; 86:12; 98:2

L

lack 87:11
Landau 3:19
landscape 19:17; 23:9

language 13:2; 14:16; 18:9; 39:13; 43:7; 45:17, 21, 22; 71:10
large 55:7
Laser 4:3
last 4:6; 35:14
later 7:11; 29:13; 30:12; 59:21; 61:9; 101:3; 113:8, 15
law 8:10; 18:20; 23:11; 27:4; 40:17; 51:7, 10; 52:2; 82:7, 7, 9, 10; 112:13
lawsuit 13:14
lawyers 27:4; 44:21; 97:24; 100:3
lay 107:1
lays 102:15
lead 69:5
leader 55:2
leading 10:4
learn 88:10; 104:23
learned 104:3, 15, 23
least 5:15; 20:22; 29:12; 62:10; 66:8; 72:23; 82:14; 95:2; 115:9; 116:7
leave 46:8; 116:16, 17
led 20:18; 50:13; 58:18
legal 5:2
legitimate 44:17
less 32:5; 54:21; 67:9, 9; 69:1
letter 73:18; 74:3, 23; 75:7, 9; 89:9
Levan 107:6
level 26:10, 11; 63:14; 70:3, 5, 6; 73:5; 99:17
Liability 7:14
light 55:16; 77:3; 101:2, 9, 14, 15
likely 41:20; 113:5; 114:4
limit 47:8, 12; 48:4; 68:10
limited 83:3
line 49:17; 50:6; 54:3, 10
lines 59:3
list 73:12, 19; 74:16
listed 26:4
listen 4:8; 103:15
lists 33:24; 34:4
literally 17:7; 17:23; 76:13; 112:24; 113:14
litigation 7:6, 14, 19; 8:2, 12, 18; 13:7, 19, 23; 14:9, 11; 28:11; 43:18; 81:21; 84:2; 97:18
little 77:15; 87:7, 9; 94:21; 110:11
location 40:1
lodging 116:19
long 47:21; 48:15; 59:20; 106:3; 116:11
look 18:5, 7; 33:6; 42:1, 21, 23; 43:2; 52:1, 10; 56:24; 76:15; 102:3
look-up 73:21

looking 43:9; 50:19;
55:24; 64:6; 65:4; 70:20;
72:10; 73:4, 5, 20; 74:7,
17; 80:20; 82:10; 84:10;
94:17; 111:13; 115:14
**Los** 4:3
**lost** 55:2
**lot** 45:5, 6; 55:9; 71:4, 8;
91:17
**low** 55:3

# M

**main** 4:4
**mainly** 67:7
**maintain** 73:14; 84:22;
85:11, 13
**maintained** 85:21; 92:15,
24
**maintains** 32:6; 62:21;
77:14; 86:8; 87:1, 12; 92:9
**majority** 8:14; 9:8
**makes** 40:16; 85:2;
105:17, 19; 106:18;
108:16
**making** 69:21; 79:16;
101:16; 107:4, 14; 108:15;
111:17
**manner** 38:4
**manufactures** 49:13
**many** 24:3; 35:17, 23;
40:18, 19; 41:3, 20; 45:6;
53:22; 54:4, 8; 62:9
**March** 71:21
**Marcus** 3:21
**margins** 34:3
**market** 49:23; 51:1;
52:15; 54:22; 55:1
**marketplace** 20:3
**Mary** 4:20; 107:5
**MASTER** 3:1, 13, 17, 22;
4:10, 17; 5:7, 12; 6:13;
9:19; 15:22; 16:2; 17:16;
18:18; 19:3; 20:4, 9; 21:5;
22:10, 14; 23:14, 19, 22;
24:7, 11, 17, 23; 25:2, 7,
10, 17; 26:5, 8, 15, 20;
27:11, 16, 19, 21; 29:23;
30:15, 20; 31:2, 5; 32:20,
23; 35:7; 36:23; 38:7;
39:11; 40:8, 10, 14; 41:15,
22; 42:6, 10, 18; 47:1, 4,
11, 17, 20; 48:1, 3, 10, 20;
49:8; 51:6; 52:18; 55:21;
57:5, 17; 58:6, 20; 59:9,
16; 60:1, 6, 9, 20; 61:2, 10;
67:3; 70:19, 24; 71:6, 16;
72:15, 21; 73:24; 74:24;
75:4, 10, 13, 16; 76:10;
77:2, 16, 24; 78:11, 19;
80:16, 22; 81:7, 17; 82:2,
5, 22; 83:19; 84:15; 85:17;
86:3, 17, 21; 87:6, 24;
88:4, 9, 14, 19; 89:6, 17;
90:9; 91:2; 92:5; 93:1, 4, 8,
20, 23; 94:3; 95:23; 96:5,

9, 18, 22; 97:6, 9, 14;
98:16, 22; 99:8; 100:1, 5,
14, 18; 102:14, 16; 105:10;
106:7, 13, 17, 20, 23;
107:1, 20, 22; 108:7;
109:12, 17; 110:19;
111:20; 112:17, 19; 113:9;
114:10, 14; 115:2, 13, 18;
116:9, 15, 22; 117:1
**material** 42:22
**materials** 20:1, 1; 21:3;
22:3, 7; 33:20, 21; 83:8, 8
**matter** 65:23; 106:2;
116:1
**matters** 115:20
**may** 4:5; 5:13; 6:4, 9;
10:19; 12:9, 23; 13:1;
19:13; 34:17; 43:19; 44:5;
46:19; 52:7, 16; 53:1, 5;
57:3; 66:2, 12, 13, 15, 16,
16, 19; 68:1; 71:7; 76:14,
15; 82:2, 3; 95:10, 13, 16;
102:4; 105:6, 12; 107:9;
113:10; 115:8
**maybe** 5:14; 39:20; 111:1
**McCutcheon** 4:16
**mean** 46:19; 65:10; 66:3;
71:9; 72:7; 76:11, 14;
80:17; 83:21; 89:21;
90:21; 91:17; 94:7; 98:17;
101:4; 108:3, 11; 111:5, 11
**meaningful** 70:14; 87:3
**means** 49:20; 114:20, 21
**meant** 32:18
**measure** 113:12
**medium** 60:21; 64:15;
67:22
**meet** 20:17; 71:20; 73:1;
75:18, 20; 78:2, 6, 23;
85:6; 87:17; 94:19; 97:24;
103:17; 105:20; 107:3;
113:2; 115:5
**meeting** 61:23; 62:3;
63:23; 98:7, 11, 20; 99:4,
7, 16, 21; 100:3; 103:23;
104:4, 15, 17; 106:11;
110:7, 9, 23; 111:24;
112:16, 18, 24; 113:13, 13,
15, 17, 24; 114:3, 23
**members** 50:8
**memorializing** 104:1
**mention** 59:17
**mentioned** 20:11; 34:15;
89:18; 112:5
**merchant** 85:17; 86:3;
88:14, 18; 93:1, 20, 23
**merit** 51:22
**merits** 57:24; 58:17, 19;
59:15, 20; 60:13; 78:8
**met** 61:20; 80:2; 84:11
**microprocessor** 49:12,
15
**Microsoft** 12:18; 15:3;
81:21
**might** 22:3; 28:1; 57:7;
82:21; 83:11, 17; 110:8

**millions** 79:14, 14; 84:19,
19
**Milstein** 3:20
**mind** 6:11; 34:23; 107:1,
4
**mindful** 9:4; 71:21;
72:21; 80:23
**minds** 12:17
**minimize** 73:22
**minimum** 96:4
**minute** 12:12; 25:22;
90:11
**minutes** 41:24; 42:7;
96:7, 11
**missing** 97:6
**mistaken** 77:19; 112:21
**misunderstandings**
64:6
**misuse** 44:15
**Mm-hmm** 60:5
**model** 63:9
**models** 54:4, 8
**modification** 21:1;
26:19; 41:13; 62:6
**modifications** 36:4;
41:21; 76:23
**modified** 71:1
**modify** 29:8, 20; 30:12
**moment** 6:10; 9:21;
22:11; 23:15; 41:23;
42:11; 75:11; 80:17, 18;
83:23; 89:20
**monitoring** 37:20
**monopolization** 50:1
**monopolized** 49:23
**month** 19:14; 32:18
**monthly** 31:12; 32:1, 10,
13; 87:19, 21, 21
**months** 61:22; 62:14;
78:24; 85:11
**more** 19:13; 26:18, 18;
35:16, 20; 37:5; 42:7; 54:4;
55:23; 57:18; 58:24; 74:4,
6; 83:11, 21; 88:15;
102:10; 111:24
**morning** 3:1, 10, 24;
4:19; 5:9, 11; 15:20; 67:12;
72:16; 116:2
**Morris** 4:20; 80:20, 24;
81:1
**most** 7:24; 8:1; 26:3;
37:14; 65:19; 70:6; 82:20;
91:6; 113:10; 114:4
**motion** 5:19; 20:23; 23:2;
51:19, 23; 52:1; 55:11;
62:11, 15; 63:2; 69:4; 78:7;
89:11; 105:6
**moved** 51:24
**moving** 21:20; 58:19;
64:2; 72:18, 24; 75:21;
101:10
**much** 3:23; 27:7; 67:24;
96:20
**multi-district** 7:6, 19;
8:2, 11, 23; 84:2

**multiple** 12:11
**must** 69:9; 84:6
**mutually** 45:16
**myself** 90:3

# N

**N-I-D-E-K** 7:2
**name** 80:6
**native** 39:24; 40:4
**nature** 10:6; 11:4; 16:6, 9;
21:3; 22:7; 40:22; 44:8;
61:7; 91:23; 94:17
**neat** 51:9
**necessarily** 49:6; 52:24;
63:17
**necessary** 4:9; 61:13;
73:15; 79:18; 80:9; 81:12
**need** 6:21; 9:12; 24:3;
37:17; 42:6, 20; 46:12, 12;
47:10; 50:4, 9; 51:2; 52:5;
53:7, 12; 55:4; 56:10, 11,
17, 19, 21; 57:7, 8, 10;
59:11; 60:12; 63:19, 24;
79:21; 80:11; 82:21, 23;
83:8, 10, 11, 18; 84:6, 7,
12, 18; 101:7; 104:13, 21;
114:12; 115:8
**needed** 28:15; 55:19;
62:22; 69:21
**needs** 34:21; 108:4
**negotiate** 11:11; 13:12;
68:23
**negotiated** 28:4, 14, 16;
62:15
**negotiating** 30:10
**negotiation** 30:1; 92:3
**negotiations** 17:8;
31:23; 62:1, 9, 12, 24;
64:3; 72:8, 12; 73:9; 79:10
**new** 88:1; 92:20
**next** 101:3
**Nice** 4:17
**Nichols** 4:20
**Nidek** 7:2
**nine** 55:8
**non-parties** 8:13; 10:10;
43:15, 21; 44:6, 14, 18
**non-party** 37:21
**non-public** 34:2, 2, 4, 4
**non-start** 76:13
**non-starter** 78:5
**non-testifying** 38:22
**non-testimonial** 45:7
**none** 55:13; 62:17
**nonparty** 79:20
**nor** 45:10; 49:24; 56:12,
16
**normal** 14:1
**Northern** 7:3, 15
**note** 6:8, 23; 8:19; 14:19;
24:13; 40:16; 41:16;
60:17; 71:17

**noted** 19:11; 78:13
**notes** 98:24
**notice** 22:18; 23:6; 41:4
**notion** 36:12; 56:11, 13
**notwithstanding** 5:20;
6:3; 11:17; 12:2; 21:6, 9,
12; 22:15; 29:5, 16; 58:21
**November** 17:2
**number** 12:11; 15:2;
17:19; 26:2; 27:4; 33:7;
40:17; 41:9, 11, 19; 43:4;
44:4; 62:4; 71:1, 7; 78:22;
79:5; 101:7
**numerous** 27:10

# O

**O'Melveny** 4:2, 4
**oath** 94:11, 12
**object** 18:17; 22:20; 41:5
**objected** 18:15
**objection** 33:3, 6; 116:10
**objections** 10:17, 21;
11:9, 16, 21; 12:4; 13:3;
15:13; 16:11; 19:12;
21:22; 29:8; 36:9
**objects** 13:6
**obligation** 45:10
**observation** 90:22;
100:15; 105:11
**observations** 15:3
**obtain** 21:3
**Obviously** 43:20; 66:4;
111:18
**occasions** 27:10; 78:22
**occur** 98:7; 113:5
**occurrence** 41:3
**October** 17:3
**off** 22:12; 24:8; 42:8; 88:6,
8; 95:24; 110:9; 112:18
**offer** 45:13; 62:16; 63:6,
22
**offered** 11:21; 13:20;
59:18; 68:6; 86:7
**offers** 55:1
**office** 14:3; 39:18; 107:4
**often** 50:21; 111:7
**Once** 27:2; 36:8; 59:2;
62:16
**one** 4:3; 5:15; 9:21; 14:5,
22; 22:3, 11; 23:15; 27:24;
28:24; 29:19; 37:17;
40:20; 41:2, 23; 42:11;
62:4; 63:6, 11; 70:8; 71:1;
75:2, 11; 80:18; 81:3;
92:23; 94:23; 98:7, 12;
99:2; 103:13; 104:16;
109:20; 110:12; 111:2;
114:2, 3; 116:1, 2
**ones** 49:18
**ongoing** 21:24
**only** 8:23; 11:18; 12:19;
14:1; 15:10; 31:22; 44:12;
58:5; 60:17; 61:6; 65:22;

Phil Paul   v.
Intel Corporation

Hearing
May 1, 2007

68:15; 87:18; 89:14; 94:8;
98:19; 100:3; 103:3;
116:13
onto 64:15; 67:22
open 36:1; 72:9; 85:9;
112:23
opening 48:14; 68:18;
75:24
opportunities 10:8
opportunity 8:7; 10:16;
11:8, 10; 15:7; 17:23; 18:7,
16; 41:5; 42:12; 46:2, 13;
51:10; 52:20; 94:10;
101:12; 105:16; 112:22;
113:2
oppose 50:22; 89:10
opposing 14:14
opposition 16:15; 83:17
order 6:17; 8:9; 9:23;
10:5, 9, 11, 18, 24, 24;
11:12; 12:8; 13:16, 22;
14:6; 15:14, 17, 19; 16:8;
17:12, 24; 18:6, 13, 17, 24;
19:9, 12; 21:1, 7; 26:19,
21, 23, 24; 28:4, 13, 18;
29:6, 9, 20; 30:2, 3, 11;
31:1; 33:4, 18, 23; 34:9,
16, 23; 35:3, 6, 12, 17, 19,
24; 36:4, 11; 37:18; 38:18,
20, 24; 39:3, 9, 13, 22;
41:7, 14, 18; 42:21; 46:1;
57:20; 62:6; 67:13, 16;
76:9, 12, 17, 24; 78:4;
95:17, 20; 99:19; 100:13,
24; 101:19; 102:1, 5;
103:2; 108:9, 20, 21, 22;
109:20, 24; 110:14; 112:4;
115:14
ordering 112:10
orders 13:13; 102:21
ordinary 32:7; 44:7; 45:9;
64:11; 85:4
original 30:2; 33:3;
35:19; 57:20; 68:17
Orszag 63:14; 80:4; 86:5
others 16:17; 39:21
otherwise 44:16; 102:17
ought 30:14; 44:22
ourselves 54:19; 97:1
out 11:10; 23:3; 27:3;
35:15; 36:9, 13; 44:11;
51:14, 21; 54:7, 14; 55:12;
57:18; 64:21; 65:3; 66:20;
74:21, 22; 94:18; 102:15,
16; 106:11; 107:2; 110:12;
112:24
outcomes 114:3
outlets 54:3
outset 28:14; 30:11; 53:9
outside 14:3; 99:20;
115:9
outweigh 56:23
outweighed 56:20
outweighs 79:23
over 29:7; 54:7; 64:16;
66:2; 92:6

overcharge 50:5
overlap 66:11, 11
overlaps 66:7, 20
own 9:6; 49:19; 54:15, 16;
65:11; 90:19

P

p.m 117:3
Page 7:22; 8:6; 13:4;
35:7; 43:2, 9; 44:11; 45:2;
48:4; 60:3
pages 48:6, 10
paid 50:12, 16
paper 94:6
papers 24:16; 46:6, 9;
54:6; 55:10; 59:18; 65:19;
70:8; 85:8; 94:7, 13
Paragraph 14:13; 43:14;
45:20, 21
paragraphs 12:15; 43:3
parameters 110:6; 115:9
part 5:4; 8:21; 23:24;
26:1; 33:7; 56:6, 6; 86:15;
97:21; 98:19; 99:2, 10;
103:15
parte 103:1
partial 20:7
participate 4:9; 17:11,
23; 20:13
participated 30:1; 90:6;
92:11
participating 20:23; 23:2
particular 12:9; 18:15;
37:6; 53:7; 63:8, 9; 83:22;
91:22, 23; 92:3
particularized 79:16;
80:7; 83:9
particularly 37:11; 80:9;
84:13; 108:16
parties 10:8, 10, 16, 21;
11:24; 13:12, 14, 18;
14:10, 20; 15:8; 16:11;
17:8, 9, 11, 12; 18:4, 6, 12;
21:19; 22:1; 23:3; 27:5;
28:5; 30:1, 4, 5; 31:24;
32:4; 35:23; 36:2, 14;
38:12, 14; 41:9, 17, 20;
43:5, 5, 13, 16; 44:2; 45:3,
4, 12, 14, 16, 19; 56:1;
58:11; 62:20; 66:22;
68:23; 69:18; 76:21;
78:14; 79:5, 9; 84:21, 23;
86:13; 97:3, 17; 116:12
parts 11:12
party 10:15; 12:19; 14:15,
15; 15:10, 17; 18:14, 16;
21:13; 28:1, 5; 30:6, 8;
32:6; 35:10, 15; 83:3, 4
party's 66:12, 14
pass 53:11, 13; 55:6;
56:10, 12, 14
pass-on 50:15
passed 50:6
past 28:22

people 69:21; 108:4;
109:10; 112:1
perhaps 4:8; 22:20; 84:3;
102:4
period 63:7, 11; 70:10
permit 9:13; 15:16
permitted 40:6
permitting 98:4
person 92:23
personnel 98:1
perspective 90:12
pharmaceutical 29:1
phase 57:21; 82:6
Philip 80:20, 24; 81:1
phrase 71:7; 72:19
pick 54:14
picked 53:21
picks 70:16
piece 76:18; 101:21
pieces 77:7
place 6:18; 14:1; 22:1;
56:9; 100:13; 104:20;
108:1
places 12:11; 94:24
plaintiff 83:2
plaintiffs 3:3; 9:18;
15:21; 16:3; 19:15, 16;
20:17, 20; 21:4; 23:5, 12;
26:13; 28:24; 31:10, 18;
33:7; 37:19; 38:16; 40:16,
18; 48:19; 49:11; 52:1;
55:20; 56:6; 58:4, 5; 59:7;
60:10, 16; 75:21, 23, 24;
76:1, 2, 5, 22; 77:12; 78:5,
13, 15, 22; 79:1, 6, 12, 15;
80:1; 82:20; 84:8, 11, 24;
85:2, 10, 12, 19; 86:5, 9, 9,
10, 23; 90:16; 92:8; 93:13,
15, 16; 97:22; 99:16;
100:10
plan 89:13, 14
planning 29:3
plans 97:17
play 41:10
please 3:9; 9:21; 12:13;
19:4; 23:15, 22; 24:12;
25:20; 26:8; 27:22; 31:3;
36:24; 40:14; 41:23; 42:3;
46:22; 47:24; 48:4, 13, 17,
20; 56:2; 57:5; 74:1; 75:1,
3, 18; 78:9; 80:18; 84:16;
86:18; 92:5; 96:23;
100:16; 110:4; 112:21;
115:21; 116:23
podium 91:1
point 17:14; 18:23; 20:10,
13; 26:9; 34:11; 35:14;
38:10; 47:12; 52:4; 55:12;
57:7; 63:6, 11; 84:16;
87:10; 89:23, 24; 92:7;
93:7, 10; 96:1; 99:15;
104:8; 105:2; 106:6;
110:10, 13, 23
pointed 51:14, 21;
110:12
points 32:21; 37:9; 54:6;

57:1; 60:23
POPPITI 3:1, 13, 17, 22;
4:10, 17; 5:7, 12; 6:13;
9:19; 15:22; 16:2; 17:16;
18:18; 19:3; 20:4, 9; 21:5;
22:10, 14; 23:14, 19, 22;
24:7, 11, 17, 23; 25:2, 7,
10, 17; 26:5, 8, 15, 20;
27:11, 16, 19, 21; 29:23;
30:15, 20; 31:2, 5; 32:20,
23; 35:7; 36:23; 38:7;
39:11; 40:8, 10, 14; 41:15,
22; 42:6, 10, 18; 47:1, 4,
11, 17, 20; 48:1, 3, 10, 20;
49:8; 51:6; 52:18; 55:21;
57:5, 17; 58:6, 20; 59:9,
16; 60:1, 6, 9, 20; 61:2, 10;
67:3; 70:19, 24; 71:6, 16;
72:15, 21; 73:24; 74:24;
75:4, 10, 13, 16; 76:10;
77:2, 16, 24; 78:11, 19;
80:16, 22; 81:7, 17; 82:2,
22; 83:19; 84:15; 86:17,
21; 87:6, 24; 88:4, 9; 89:6,
17; 90:9; 91:2; 92:5; 93:4,
8; 94:3; 95:23; 96:5, 9, 18,
22; 97:6, 9, 14; 98:16, 22;
99:8; 100:1, 5, 14, 18;
105:10; 106:7, 13, 17, 20,
23; 107:11, 20, 22; 108:7;
109:12, 17; 110:19;
111:20; 112:17, 19; 113:9;
114:10, 14; 115:2, 13, 18;
116:9, 15, 22; 117:1
portion 59:11
portions 47:7
position 19:6; 22:8; 29:5;
52:20; 55:22; 59:22; 62:4;
83:23; 109:11
positions 72:11
possibility 27:5, 14;
66:19
possible 53:18; 114:8
post-filing 69:3
posture 23:1, 2
potential 19:19; 22:23;
79:23; 83:13
potentially 41:10
Potter 4:15
power 7:7; 8:3
powers 9:1
practical 53:18; 65:23
practice 18:19; 21:15;
54:24
pre-identified 103:22
precedent 29:12
precise 23:6; 62:21;
71:24
precisely 21:17; 50:18;
74:4, 5, 6; 95:1
precluded 13:24
prefer 19:1, 4; 27:24;
35:16; 91:15; 112:22
preferable 32:3
prefiling 62:15
premise 78:1, 4
preparation 34:17

prepared 38:10, 19;
104:20
presence 11:11
present 3:8; 11:7, 23;
97:4
presentations 12:1
presently 12:21
presumably 32:16;
97:17
pretrial 7:18; 9:2
pretty 74:5
prevent 27:14
previews 71:23
previously 21:22
pricer 55:1
prices 50:2, 12, 13, 16,
17; 54:18; 55:3
pricing 34:2; 37:12;
54:19
Prickett 3:11
primarily 49:14
print 64:21
printed 65:3
prior 16:7; 19:14; 20:14;
36:7; 103:22
private 79:4
proactively 18:4
probably 30:24; 61:21;
66:6; 70:11; 71:12; 80:5;
97:11
problem 15:23; 92:12;
96:19
problems 76:6
procedure 97:2
procedures 39:4, 16;
97:16
proceed 3:7; 5:13; 58:13;
78:8
proceeding 6:15; 9:10;
10:14; 11:19, 20; 17:22;
18:10; 89:19
proceedings 7:19; 9:3;
10:6; 16:7, 9; 17:9; 35:19;
36:7; 82:6; 100:8; 105:5
process 10:4, 13; 17:21;
20:17; 69:2; 72:14; 76:4;
105:15; 113:15
produce 3:4; 17:14;
18:14; 31:20; 32:14;
51:15; 55:17; 60:13; 62:5,
16, 19; 63:3, 6; 64:9, 10;
65:13, 16; 67:6, 9, 15;
68:19, 22; 69:9; 70:6; 71:3;
73:11; 74:8; 76:18, 24;
86:7; 87:4, 20; 91:5
produced 14:10; 19:21;
29:10, 16; 33:6; 34:24;
35:22; 38:11; 39:6; 62:17;
70:4; 74:14; 91:24; 92:4;
114:6, 19
producing 14:15; 16:16;
32:5; 35:10, 21; 36:2;
66:12; 67:5, 19; 89:13, 15
product 45:8; 63:6, 9
production 16:24; 32:19;

33:13, 19; 34:13; 35:4; 36:18; 49:2, 4; 59:8, 13, 14, 21; 60:24; 61:5, 9, 15; 62:22; 65:2; 66:7, 21; 68:11, 24; 69:6, 12, 16, 19, 20; 79:23; 87:14; 91:23; 108:1
**productions** 39:24
**productive** 48:15; 69:4; 111:3; 112:1, 2
**Products** 7:14; 54:10; 63:10, 18
**profits** 34:3
**program** 68:3
**progress** 62:10; 91:20
**promote** 7:20
**proof** 52:16; 55:6; 81:12; 83:4
**proofs** 22:21
**proposal** 18:5; 63:3; 97:21; 98:15, 17
**propose** 45:24; 46:21; 69:13; 70:9; 98:6, 9; 99:22; 101:17; 106:9; 116:18
**proposed** 5:22; 10:18; 12:8; 15:13; 19:12; 33:3; 49:14; 50:7; 53:3; 100:21; 101:6; 111:1
**proposes** 106:3
**proposing** 115:4
**proposition** 7:5
**proprietary** 19:20, 24; 29:18; 93:2
**propriety** 18:9
**protect** 38:13; 99:11
**protected** 34:22
**protecting** 111:3
**protection** 10:24; 11:1; 26:22, 24; 35:16; 40:20; 44:11; 49:7; 67:17; 84:6
**protections** 34:8; 35:2; 37:18; 38:1; 39:7; 40:3; 112:9
**protective** 6:17; 9:23; 10:5, 9, 11; 11:12; 12:8; 13:16, 22; 15:13, 17; 16:8; 17:12; 18:6, 13, 23; 19:9, 12; 21:1, 7; 26:19, 21; 28:4, 13, 17; 29:6, 8, 20; 30:10; 33:4, 23; 35:3, 6, 12, 16, 19, 24; 36:4, 10; 37:18; 38:18, 20, 24; 39:2, 9; 41:7, 14, 18; 42:21; 46:1; 62:6; 67:13, 16; 76:9, 12, 17, 24; 78:3; 99:19; 100:12, 23; 102:1; 108:20
**protested** 29:1
**prove** 49:21, 22; 50:4; 53:11, 13; 56:11, 14
**proverbial** 54:12
**provide** 10:16; 20:1; 39:7; 46:2; 92:21
**provided** 34:9; 38:23; 39:8; 44:9; 104:6
**providing** 10:21; 101:5
**provision** 18:15; 28:20
**provisions** 11:12; 28:6; 38:20; 39:21
**public** 79:4; 116:7
**purchase** 13:9, 13; 26:4; 33:9; 36:20; 56:15; 85:23; 86:3
**purchased** 51:4
**purchases** 31:14; 32:13; 49:14; 66:6; 73:6; 87:22
**purpose** 7:18; 9:2; 36:6; 113:23
**purposes** 6:7, 8; 9:9; 13:1; 15:15; 48:15; 57:10, 23; 59:1, 12, 20; 60:12; 61:8; 63:19; 68:10; 88:20; 107:15
**pursue** 112:14
**push** 37:20
**put** 16:6; 22:18; 36:8; 52:17; 56:9; 64:1; 67:5; 84:5; 88:24; 104:20; 108:1; 116:3
**puts** 88:20; 93:24; 108:10

Q

**quality** 66:24
**Quinn** 4:23
**quite** 21:23; 44:4
**quote** 13:5; 43:12; 45:2, 22

R

**raised** 5:15; 16:17; 51:19; 72:12
**raising** 16:14; 51:16
**rather** 46:17; 68:2; 81:3; 106:21
**rationale** 102:6
**Re** 7:13; 8:18
**reach** 62:2
**reached** 76:8
**react** 94:11
**read** 13:2, 6; 14:13; 38:17; 39:1; 45:1; 94:5
**reading** 98:24
**reads** 8:21
**real** 111:24, 24
**realize** 46:16; 113:10
**really** 31:16; 35:22; 36:4; 39:9; 51:19; 55:13, 20; 57:18; 60:22; 61:12; 62:24; 63:5; 65:22; 67:23; 74:18; 81:15; 97:10; 110:24; 111:8, 9; 112:13; 114:20
**reason** 6:2; 17:6, 15; 32:2; 37:16, 17; 58:3; 61:12, 17; 62:12; 87:13; 103:10; 112:4
**reasoned** 8:15; 9:7
**reasoning** 112:15
**reasons** 53:6; 55:16; 56:4; 57:9; 60:18; 67:12
**recall** 28:15
**receipt** 66:2
**receive** 99:4
**received** 12:17
**receiving** 10:22; 60:11
**recently** 88:7, 12, 12
**recess** 42:5; 96:16
**recognition** 20:21
**recognized** 7:17
**recognizes** 44:20
**recommendation** 5:22; 14:5; 15:1, 4, 6
**recommendations** 12:7; 102:22
**reconvene** 42:2, 3
**record** 3:8; 6:9, 22; 9:13; 13:2; 22:5, 13; 23:24; 24:9; 26:18; 42:9; 45:24; 48:16; 71:18; 84:4; 88:6, 8; 90:18; 92:22; 93:6, 9, 12; 95:24; 101:14, 15, 23; 110:9; 111:17, 19; 112:18; 113:6, 20
**records** 36:20
**redact** 64:23
**redacted** 116:6, 18
**reduce** 68:13
**reference** 6:15; 7:21; 8:5; 12:10; 39:14; 42:20; 74:1; 75:1
**referenced** 46:4
**referring** 6:19
**reflects** 65:5
**refuse** 13:21
**regard** 9:13; 68:13; 86:23
**regarding** 8:10; 12:8
**rejected** 60:18
**related** 29:3; 85:18
**relates** 43:12, 14; 110:11; 111:2, 3
**relating** 10:24; 48:23; 85:13
**relevance** 55:14, 16; 110:16
**relevant** 8:10; 44:6; 47:8; 50:20; 55:19; 57:13; 63:7; 68:9; 79:17, 20; 88:11; 98:3; 112:11
**relied** 80:14
**relief** 68:17; 69:7; 70:22; 71:10; 75:23; 76:1
**relook** 75:11
**rely** 80:11
**remains** 89:2
**remember** 14:4; 25:18; 101:6; 113:23
**reopen** 17:7
**repeatedly** 68:7
**reply** 24:16, 22; 60:4; 70:20; 75:23; 76:1; 80:3; 83:16; 85:2; 86:4
**report** 6:17; 12:7; 14:6, 17; 15:4, 8, 10, 11; 43:2; 45:2; 106:11
**REPORTER** 116:24
**reports** 88:21; 89:1
**represent** 28:10; 49:5, 12
**representation** 85:5, 7, 9
**representative** 53:20
**representatives** 53:2
**represented** 32:9; 86:8
**representing** 11:24; 23:11; 40:18
**reputation** 54:24
**request** 13:22; 22:9; 26:2; 31:8, 9; 32:11; 56:5; 64:12; 69:7; 74:13
**requested** 27:9; 40:21; 43:15; 75:24; 87:5
**requesting** 26:19; 32:1, 1; 70:21
**requests** 13:15, 23; 14:11; 68:10; 75:23; 76:1
**require** 32:14; 34:17; 73:11; 115:8
**required** 87:4
**requirement** 41:4
**requirements** 79:8
**requires** 50:16; 104:24
**resale** 49:19; 56:15
**reseller** 53:16
**resellers** 53:21; 56:7
**reserve** 47:16
**resolved** 106:12
**resources** 105:24; 106:1, 1
**respect** 10:17; 12:9, 14; 13:2, 3; 14:19, 24; 19:8, 17; 20:5; 23:6; 31:10, 23; 37:3; 38:11; 39:5; 70:20; 73:6; 75:19; 76:8, 22; 77:9; 78:3; 81:11; 84:7; 87:8; 90:13, 18, 19; 101:24; 108:17; 109:12, 19; 110:15
**Respectfully** 19:6
**respective** 12:1; 84:10; 94:24
**respond** 47:10
**response** 3:5; 5:16
**responsibilities** 102:15
**responsive** 91:6; 97:20; 98:6
**rest** 64:5; 103:16
**restrictions** 99:11
**result** 21:24; 22:8; 43:4; 50:1; 79:7, 15; 81:14; 95:5
**resulted** 44:24
**retail** 54:2
**retailer** 54:17; 55:7
**retailers** 52:12; 53:23; 54:9
**retain** 38:23
**revealed** 116:2
**revenue** 37:12
**revenues** 34:3
**review** 8:9; 39:5; 40:2; 42:12
**reviewed** 39:17; 40:5; 87:17
**reviewing** 12:6
**revise** 45:20
**revising** 14:13
**revisited** 15:18
**Rich** 4:14
**Richard** 3:20; 25:13
**Rick** 4:16
**Right** 24:20, 23, 24; 36:10; 47:16; 56:13, 13; 58:6; 59:9; 78:16, 19; 81:9; 93:4; 95:11; 96:10; 106:17, 20; 108:9; 114:10; 115:1
**ring** 71:7
**ripe** 21:23
**Ripley** 4:16
**rising** 94:18
**Robert** 4:22
**Rod** 7:13, 17
**role** 82:5
**roles** 4:4
**Romero** 80:20, 23; 81:1, 11, 14, 18, 20
**room** 97:10
**rule** 5:19; 28:15; 101:13; 102:12, 13, 16, 24
**ruled** 52:5
**rules** 108:13; 111:6
**ruling** 6:6, 6

S

**S** 7:2
**safeguards** 27:8; 38:13
**sale** 85:24; 86:4
**sales** 13:8, 9; 31:14; 32:12; 33:8, 10, 11; 34:3; 36:20; 65:21; 70:17; 71:5, 8; 73:7; 85:1; 87:21; 116:4
**same** 7:11; 31:15; 36:3; 43:7; 46:1; 59:14; 60:14; 61:16; 67:20; 73:8; 79:8; 84:23; 96:13; 113:1, 4, 20; 115:7
**sample** 53:12, 21; 59:18; 60:11, 17; 61:6, 8; 62:19; 63:17; 67:1, 6, 20; 68:7; 69:20, 23; 70:9, 14; 71:4; 74:8; 87:14; 99:5, 12; 108:2, 16; 109:19
**sampling** 56:7
**sat** 53:10
**satisfied** 8:14; 41:17; 78:1; 93:9
**satisfies** 28:8
**saw** 25:8; 32:11
**saying** 34:21; 61:6; 63:14; 67:4, 9; 77:13; 97:7; 100:10; 109:24; 113:17
**schedule** 10:8; 105:18;

107:24
scheduled 10:14
scheduling 10:23; 57:20
scope 91:23; 99:18
seal 116:3
seat 6:10
second 13:16; 25:18;
56:24; 57:16; 62:8; 64:20;
69:11; 75:2; 91:14; 105:1
secret 19:21; 20:1; 22:6;
40:24; 79:13, 13; 83:7;
112:13
secrets 34:19, 24; 35:4, 9
Section 8:1, 22; 45:1
secure 40:2
seek 16:23; 22:24; 23:5;
36:18, 19; 37:10; 41:21;
49:11; 61:16; 76:2; 79:6,
12, 17; 80:8; 84:24; 85:19
seeking 20:22; 28:23;
51:15; 75:21; 76:23;
79:13; 83:7; 93:13
seems 41:17; 71:24;
81:18; 94:7; 95:21;
102:13; 103:11; 104:7;
112:20; 113:5
segments 51:1; 52:14
select 64:13, 14
selecting 44:3
sell 55:9
seller 65:7
selling 70:13; 71:14
sells 53:17; 54:11
sense 54:1; 103:24;
105:17, 19; 106:18;
108:16; 110:7
sensitive 21:11; 34:14;
44:19
sent 89:9
sentences 116:14, 17
sentiment 72:7
separate 60:22
separately 97:4
September 15:11
serious 102:3
seriously 109:5
served 17:1; 58:10
serving 109:23
set 3:2; 39:5; 67:15, 19;
73:21; 74:22; 80:14;
115:1, 9
setting 105:14
settings 17:20
settled 51:8
seven 62:14
several 5:14; 116:16
severely 109:7
share 74:15, 19
shield 13:17
short 8:9; 43:8; 65:18;
95:8, 17, 19; 106:4
shorten 101:10, 17;
102:9; 103:8

shortened 102:18;
103:10
shortening 103:4
shot 111:16
show 32:12; 49:24;
50:11, 24; 52:9, 14; 54:20;
56:10; 61:12; 87:21
showing 52:3; 79:16;
80:8; 83:9
shown 55:15; 79:21;
82:20
shows 52:11; 62:9
side 82:15
sides 111:1
sight 36:5
sign 99:16; 108:21
signed 14:6, 17; 39:1
significant 14:22, 23;
55:23
similar 31:11
similarities 37:5
simply 17:5, 15; 45:4;
47:6; 63:18; 64:14; 66:19;
68:19; 112:4
single 52:15; 53:16;
54:20
sit 68:23; 92:1
sitting 84:1; 95:11
situation 16:18, 21
situations 104:13
SKUs 70:10, 12, 13, 16;
71:3, 4, 7, 14, 14; 78:18,
18
slight 31:17
slightly 23:4
Small 3:16; 6:12; 9:17;
15:20, 21; 16:5; 18:2, 22;
20:6, 7; 23:16, 18, 20;
24:10, 13, 20; 25:1, 3, 9,
20, 24; 27:19; 31:5, 6;
32:21; 33:1; 35:8; 38:9, 15,
16; 39:19; 40:9; 41:10;
43:24; 44:1; 47:5, 23; 48:2,
8, 18, 19, 21; 49:10; 51:12;
52:22; 56:3; 57:6; 58:1, 7;
59:5, 10, 17; 60:5, 8, 19,
22; 61:4, 11; 67:4; 70:23;
71:2, 12, 18; 72:6, 20;
73:3; 74:2; 75:2, 6, 12, 14;
87:8, 9; 88:3, 6, 10; 89:8;
90:2, 11, 23; 91:4; 93:18;
94:22; 95:21; 96:24; 97:8,
12, 15; 98:19; 99:1, 10, 23;
100:2; 104:12; 107:23;
113:22; 114:11, 16;
115:12, 17, 22; 116:1, 9,
10, 21
smaller 44:2
sold 54:7; 63:7
someone 48:4; 94:10;
100:9
sometime 107:5
somewhat 21:20; 72:18
somewhere 60:21
sorry 16:4; 97:8; 106:8

sort 51:13; 55:2; 58:18;
66:22
sought 17:1; 19:18; 21:4,
18; 22:4; 23:4; 26:10, 12;
37:7; 45:4; 78:15; 85:12
sound 42:14
sounding 42:13
sounds 98:23
source 88:23
sources 65:17, 21
South 81:20
speak 36:14; 56:2; 81:15;
108:4
speaking 43:11
SPECIAL 3:1, 13, 17, 22;
4:10, 17; 5:7, 12; 6:13;
9:19; 15:22; 16:2; 17:16;
18:18; 19:3; 20:4, 9; 21:5;
22:10, 14; 23:14, 19, 22;
24:7, 11, 17, 23; 25:2, 7,
10, 17; 26:5, 8, 15, 20;
27:11, 16, 19, 21; 29:18,
23; 30:15, 20; 31:2, 5;
32:20, 23; 35:7; 36:23;
38:7; 39:11; 40:8, 10, 14;
41:15, 22; 42:6, 10, 18;
47:1, 4, 11, 17, 20; 48:1, 3,
10, 20; 49:8; 51:6; 52:18;
55:21; 57:5, 17; 58:6, 20;
59:9, 16; 60:1, 6, 9, 20;
61:2, 10; 67:3; 70:19, 24;
71:6, 16; 72:15, 21; 73:24;
74:24; 75:4, 10, 13, 16;
76:10; 77:2, 16, 24; 78:11,
19; 80:16, 22; 81:7, 17;
82:2, 5, 22; 83:19; 84:15;
86:17, 21; 87:6, 24; 88:4,
9; 89:6, 17; 90:9; 91:2;
92:5; 93:4, 8; 94:3; 95:23;
96:5, 9, 18, 22; 97:6, 9, 14;
98:16, 22; 99:8; 100:1, 5,
14, 18; 102:14, 16; 105:10;
106:7, 13, 17, 20, 23;
107:11, 20, 22; 108:7;
109:12, 17; 110:19;
111:20; 112:17, 19; 113:9;
114:10, 14; 115:2, 13, 18;
116:9, 15, 22; 117:1
specific 16:14; 25:24;
29:13; 34:16; 74:13, 21
specifically 22:6; 73:10
spending 106:1
spirit 45:4
spoke 116:1
spoken 82:8
stage 80:10; 81:12;
84:14, 20
stall 108:11; 110:18
stand 50:3; 113:21
standard 30:16, 18; 52:3;
83:24
standing 26:23
start 48:21; 76:16
state 41:6; 60:15
stated 7:18
states 55:9
stay 91:3

step 106:15; 110:12, 13;
115:6
stepped 55:22
stepping 113:16
steps 74:12
still 36:18; 53:1; 93:21
stipulated 11:13
stipulation 39:22; 48:23;
49:2; 95:3
Stone 4:22; 5:9; 9:15;
15:24; 16:4; 19:5; 20:11;
21:16; 22:23; 24:5; 25:23;
26:7, 9, 17; 27:1, 13, 18;
37:1; 40:12, 15; 41:16;
42:4; 46:23; 47:2, 15, 18;
48:6; 69:14; 75:19; 76:19;
77:11, 22; 78:10, 12, 20;
80:21; 81:5, 15, 24; 82:18;
83:6; 84:3, 17; 86:19, 22;
92:6; 93:5, 11; 96:3, 7, 15,
20; 99:14; 100:6, 17;
106:6, 9, 14, 18, 21; 107:9,
16, 21; 108:3; 109:8, 14;
115:16
store 54:2, 12; 66:1
stores 54:9; 55:8; 77:21
strategy 54:19
strenuously 61:14
strikingly 31:11
strings 77:5
stronger 30:14
studied 22:17
stuff 48:12
stumbling 79:9
style 11:4
subject 21:15; 72:17;
111:6; 112:7
submission 37:22; 45:19
submit 21:8; 30:8; 37:4;
56:18; 67:11, 18; 84:4;
92:22
submits 30:11; 41:12;
80:1; 87:3
submittal 12:5, 22
submittals 48:5, 5; 58:22
submitted 19:8, 13;
24:16; 33:3; 55:10; 63:13;
80:4; 85:16; 94:6
Subparagraph 12:15;
13:4
subparagraphs 12:16
subparts 26:2, 3
subpoena 3:5; 7:8; 17:1;
19:14; 20:14; 21:15;
22:17; 23:10, 19; 24:14;
25:4, 5, 6, 8, 14, 16; 26:1;
31:9, 10; 37:4, 7, 9; 53:16;
66:1; 72:17; 76:6; 98:6
subpoenaed 17:13;
19:16; 33:8
subpoenas 8:5; 31:18;
36:17; 58:10; 97:20
Subsequent 10:22; 15:5,
9; 100:8
subsequently 18:13;

28:5, 22
subset 68:4
substance 57:19; 98:18
substantial 57:2
substantially 15:2; 102:6
successful 104:17
suddenly 62:13
sufficient 14:23; 32:12;
34:9; 35:3, 13; 48:7; 49:22,
24; 70:11, 16; 78:6; 87:20;
89:24
sufficiently 55:15; 90:3
suggest 11:3; 43:1;
45:23; 48:4; 71:24; 76:11;
79:1; 80:14; 95:15; 96:1;
101:1, 8; 108:12; 114:24
suggested 12:2, 23;
86:24; 89:22
suggesting 21:6; 71:1,
13; 77:8, 18; 83:1; 86:11;
89:22; 102:2
suggestion 47:5; 102:8
suggestions 90:23
suggests 86:6
super 54:2
Supp 7:14
supplied 31:3
support 11:16
supports 92:22
suppose 114:8
sure 4:5; 6:12; 14:4;
30:17; 33:11; 37:21; 40:4,
9; 60:2; 71:11; 75:4, 12,
14; 88:9; 90:16; 93:19;
94:19; 96:10; 100:20;
104:6; 110:20; 116:20
surprised 52:9; 89:18
system 85:16, 24; 86:1;
90:15; 93:2; 94:11; 95:4, 5
systems 31:14, 15;
49:15; 55:3; 73:7, 8; 85:2

# T

table 25:22; 91:3
tables 73:22
talk 22:3; 80:17; 95:13;
116:16
talked 97:1
talking 19:24; 31:21;
43:14; 78:17; 95:1; 111:10
talks 35:11; 64:4, 20;
88:14
target 21:20; 72:18, 24;
75:21
task 65:12
technical 66:13; 103:18,
20
technology 44:1
teleconferences 77:5
telling 85:10
ten 41:24; 42:3; 71:14;
96:11

Hearing
May 1, 2007

Phil Paul   v.
Intel Corporation

tens 23:11, 11
terms 67:24; 70:21;
101:23; 105:18; 113:12
testifying 38:22
testimony 94:12
theory 66:8
thereabouts 96:12
therefore 11:16; 13:15;
34:21; 50:9; 116:17
Third 8:16, 19; 9:5; 10:10,
15, 16, 21; 11:24; 12:19;
13:11; 14:10, 20; 16:11;
17:9, 10, 12; 18:4, 14, 16;
21:13; 28:4, 5; 29:24; 30:4,
5; 35:15, 23; 36:2; 38:12,
14; 43:5, 15; 45:4, 14, 15;
56:1; 58:10; 63:1; 69:17,
24; 78:14; 79:5, 8; 83:2, 4;
84:21, 23; 86:12
third-parties 14:13
third-party 4:4, 6; 21:15;
49:4
Thomas 3:21
though 22:2; 102:20;
108:19; 115:7
thought 68:21; 73:13
three 24:4, 5, 7; 48:6, 10;
69:13; 101:18; 102:9;
103:10
throughout 72:7
tier 13:16
tight 46:17
tightened 72:22
tiny 62:19; 68:7
today 4:8, 16, 24; 5:21;
6:4; 11:6; 12:21; 16:24;
20:18; 31:21; 36:15;
37:11; 42:15; 49:7; 52:20;
77:18; 85:9; 88:5; 91:17;
95:15; 98:8; 101:15, 22;
102:7; 107:17; 115:20
together 88:20, 24
told 44:22; 48:22; 90:14;
100:10
tomorrow 46:24; 47:21;
107:19; 109:16; 115:15;
116:24; 117:1
tonight 46:19
took 29:5, 17; 102:2
top 70:13; 71:14
topic 88:11
totally 114:8
track 92:15; 103:12
trade 19:20, 24; 22:6;
34:19, 24; 35:4, 9; 40:24;
79:12, 13; 83:7; 112:13
transaction 73:5; 85:1
transactional 3:4; 20:22;
21:9, 14, 17; 22:19; 32:2,
7, 19; 36:20; 50:10, 11;
59:8; 69:9; 70:3, 3, 5;
76:18, 20
transactionally 32:4, 15
transactions 65:6;
79:15; 84:19; 85:14; 92:16

transcript 30:19, 22, 24;
31:3; 42:1, 12; 43:10; 46:3,
10, 18; 47:7, 14, 19; 116:7,
8, 19, 19, 23
transferee 8:3, 11, 22, 24
translates 71:11
traveling 107:17
trial 34:17
Tricor 28:11
tries 52:17
try 65:10, 14; 69:5; 73:22;
88:13
trying 21:2; 30:4; 68:2;
97:18; 105:8
Tuesday 101:3
turn 9:21; 60:3; 66:1;
75:17; 81:9
two 23:3; 33:7; 41:8;
47:23; 66:22; 70:10, 16;
71:3; 84:9; 90:23; 92:23;
94:20; 97:22, 23, 23;
101:2; 104:13; 114:2;
115:6; 116:13
two-day 70:10
two-fold 111:2
two-step 106:3, 3, 4, 6;
110:11
two-tiered 12:20, 24;
13:22
type 31:20; 33:5, 24;
34:10, 20; 37:6; 50:18;
74:13, 16
types 33:21; 34:13; 51:2
typically 54:4

# U

U.S.C 8:1
ultimate 14:6; 22:21;
80:23; 103:13
ultimately 14:17; 19:9;
22:4, 21; 38:1; 51:24; 61:4;
69:19; 76:20; 104:5, 9
under 17:14; 26:4; 28:3,
17; 37:18; 51:17; 94:11,
12; 102:12; 112:13; 116:3
undergo 32:17
understood 32:18; 33:4,
18; 34:12; 39:2; 53:15
undertake 65:14
undertaking 99:17
undisputed 19:23; 79:11
unduly 79:22
unfair 90:22
unfortunately 64:1; 69:1
unique 10:5
uniqueness 10:7
unlawful 50:1; 52:13
unlawfully 49:23
unless 38:6; 70:18;
74:14; 82:6; 102:17;
104:19; 114:7
unlike 54:8
unreasonable 42:13, 14;

44:11
unring 27:2
unsimilar 105:15
unwilling 76:24
up 10:4; 23:21; 25:15;
39:5; 45:16; 48:5, 13;
55:22; 57:12; 66:18; 68:3;
81:8; 89:23; 90:24; 97:23,
23; 105:14; 109:23; 115:1
upon 28:1; 53:2; 80:14
use 30:16; 34:18; 43:17;
49:19; 50:23; 63:19; 65:7;
78:18; 86:9; 87:1; 93:17;
113:17; 116:12
used 38:2; 59:15; 72:19;
83:14; 100:7
useful 63:18
user 86:1
users 49:12; 50:7, 14;
51:3
using 44:5; 88:21; 105:24
utilization 42:22; 108:18

# V

V 7:1
value 63:22
valueless 114:9
vantage 89:24
variants 34:4
vastly 26:11; 27:3
vendor 13:13
version 116:7, 11, 18
versus 7:2; 80:20, 24;
81:1, 4
view 8:15, 17; 9:8; 13:7;
14:2, 9; 45:7; 63:4, 21
viewing 13:24
violation 26:23; 109:6
virtually 43:6; 67:20;
70:17; 89:15
virtue 5:15; 83:3; 101:13;
105:24; 113:14
Visx 7:1, 12
Volin 3:20; 24:15, 21;
25:12, 13; 71:22; 73:18;
74:3; 75:7; 87:2; 90:6;
92:18
volume 73:22

# W

wait 58:16; 60:16, 23;
61:17
waiting 96:17; 111:11
waiving 12:4
walks 65:24
wants 63:16
wasting 105:23
way 5:19; 32:6; 41:1;
42:23; 56:13; 58:11;
61:15; 63:15; 65:9; 67:7;
70:4; 73:11; 77:13; 84:23;

90:14; 92:15; 94:8, 22;
95:8; 103:13; 106:10;
113:23
ways 31:13; 92:24
weave 107:12
Wednesday 101:3
week 98:7, 12; 101:4
weeks 17:7, 8; 69:13
weigh 47:22
weighing 84:10
Welcome 5:8
Welding 7:13, 17
weren't 30:5
West 107:17
what's 99:6
where's 88:17; 89:2
whereas 21:7; 23:10;
34:16
who's 41:1; 44:18
whole 36:6; 63:11
wholly 63:4
willing 43:21; 45:13;
59:23; 74:14; 76:7
wind 48:5
withdrawn 36:17
within 74:22; 98:7, 12;
101:11, 18; 103:4; 105:20;
106:10
Without 10:12; 42:13;
59:3; 83:23
witnesses 95:10
words 70:15; 102:18
work 45:8, 15; 63:12;
86:15; 105:21; 108:24, 24
working 41:1
world 43:24; 44:1
write 71:10
written 8:8; 10:17; 12:5;
18:8; 30:21; 31:1; 82:9

# X

X 7:2
x86 49:12, 23; 73:7

# Y

year 7:4, 16; 8:20; 14:22
yesterday 11:5

Min-U-Script®