# Exhibit A

**From:** Cooper, Robert E. [mailto:RCooper@gibsondunn.com]
**Sent:** Thursday, February 08, 2007 2:56 PM
**To:** Diamond, Chuck
**Subject:**

Chuck: Following up on our conversation today, this will provide you more background about the document preservation issue we have experienced at Intel and the steps Intel is taking to address it. As part of our normal follow-up process, we interviewed custodians and identified some retention issues. We will, of course, share full details with you about these retention issues, and this email is only a broad summary. We are still sorting out details, and as we discussed, it will probably take us until sometime late next week to be more precise about the extent of the problem, but this will give you an overview of the problem and what we know now.

The problem we are seeing is confined to emails that post-date the complaint. Perhaps the best way to start is to review the steps Intel has taken to ensure retention of emails, and explain the problem that has arisen in that context.

"COMPLAINT FREEZE TAPES". The AMD Complaint was filed June 27, 2005. On June 28, Intel implemented a complete freeze of its routine back-up recycling procedures for all potentially relevant worldwide systems. This resulted in the removal and retention of literally some 5000 or more back-up tapes, which contain a complete snapshot of all of Intel's relevant and active data as of the filing of the lawsuit. We believe we have all of these "complaint freeze tapes," but we haven't been able to specifically confirm that yet, and won't know for sure until we restore them, which will take a matter of weeks.

LITIGATION HOLD NOTICES. On July 1, 2005, Intel issued its first litigation hold notice to more

than 600 custodians. Among other things, the recipients were instructed to retain and not destroy all potentially relevant documents, including existing and future emails. Thereafter, Intel added additional custodians to the litigation hold with similar notices, and of course all have been instructed to retain documents. There also have been follow-up retention reminders to custodians.

"WEEKLY BACK-UP TAPES." As an additional measure to ensure that potentially relevant email was preserved, between mid October and early November 2005, Intel migrated employees subject to the litigation hold to dedicated servers, with instructions to to the IT Department to back up these servers on a weekly basis going forward and retain the back up tapes for purposes of this case.

PROBLEMS WITH SOME INDIVIDUALS' COMPLIANCE WITH HOLD INSTRUCTIONS. In October 2006, Intel first became aware that a couple of individuals subject to the hold notice had not fully complied with the instructions as to email retention. This problem prompted an additional follow-up program – to date of more than 200 custodians – to make sure Intel custodians were complying with the retention instructions. In the course of these reviews, we have discovered further inadequacies in preserving emails.

For example, a common mistake was a failure to retain all items from the custodians' sent email box, and as a result only received emails were fully retained. Presumably we will find almost all sent emails that relate to the case in the received emails of other Intel custodians as well as in responses to emails. Other mistakes occurred for various different reasons. For example, a few thought that their emails were being retained automatically by Intel's IT department, and for those encompassed by the "weekly back-up tapes," they were.

PROBLEMS WITH "WEEKLY BACK-UP TAPES." Of course, the 'weekly back-up tapes" are redundant for the large number of Intel people who followed the directions of the retention notice. But they do serve as a back-up for those who didn't fully comply with the hold instructions. That leads me to some issues with the weekly back-up tapes.

Since the "weekly back-up tapes" cover the time period of October 2005 forward, they leave a maximum possible gap of about four months, between the end of June and October. But of course an October back-up tape presumably would capture historical emails not yet automatically purged, and thus could cut the gap in half. And, in addition, a significant number of custodians in the first tranche were "harvested" during this gap period and their emails would have been collected and saved at that time.

Intel also has discovered some issues with the overall coverage of the back-up tapes. In late January 2007, Intel first learned that 151 (out of some 900 or so) custodians that were supposed to be migrated to the dedicated servers were not migrated. This appears to have been caused by an oversight by Intel's IT department. (The names were electronically transmitted to the IT department in attached Excel spreadsheets with tabs, and it looks like IT failed to open one tab.) Further, custodians added after the first 900 were not migrated to the servers. Finally, although these "weekly back-up tapes" were supposed to be preserved for the duration of the litigation, in Europe Intel's IT department mistakenly began recycling the weekly tapes after one year. We are still studying this issue to fully understand the extent of the "weekly back-up tapes" Intel has.

POTENTIAL SIGNIFICANCE OF RETENTION PROBLEMS. As to most of the custodians whose email retention was inadequate, Intel will be able to restore the "complaint freeze tapes" and the "weekly back-up tapes" and capture all of their emails. But as to some, there could be a short gap as described above. Presumably Intel will find many of those missing emails during that gap period in the retained emails of others.

As to the 151 custodians that were mistakenly not migrated to the dedicated servers, we believe that most of them do not have any retention problems. Some do, however, but many of their missing emails should be found in retained emails of other custodians. However, since there are no "weekly back-up tapes' for them, the gap periods for which we will have to rely on others' emails will be longer.

INITIAL STEPS INTEL HAS BEEN TAKING TO ADDRESS THESE PROBLEMS. As it became apparent that there were likely to be some gaps in email retention, Intel made the decision to retain a third party vendor to restore all of the "weekly back-up tapes" and the "complaint freeze tapes," so as to be in a position to produce responsive documents saved on those tapes. Intel will take every reasonable step to fill every gap, to find every email, and to make sure Intel's production is as complete as possible. This process will be very expensive -- several million dollars just to restore the back-up tapes to useable format -- and of course Intel will then be faced with the cost of reviewing the restored emails for production.

Intel is in the process now of shipping the tapes from the various locations where they were held, and expects to receive all of them by the end of this week, and to have the "weekly back-up tapes" restored by sometime next week. The "complaint freeze tapes" will take an additonal two weeks or so. The restoration will provide us with the names of each custodian whose emails are stored on the tapes, and will allow us to better pinpoint exactly what custodians' emails may not be found.

FURTHER STEPS INTEL IS TAKING. Before Intel became aware of these document retention issues, Intel was in the process of implementing a technological solution that will allow for the automatic retention of emails for any designated custodian. This program is still in the testing phase, but Intel expects it will be fully implemented shortly. In addition, Intel has done significant follow-up with its custodians to reinforce compliance.

As I explained, the purpose of our call today was so I could alert you to the problem, and suggest that we plan to meet sometime late next week to review all of this in more detail. We are prepared to undertake huge costs to do everything possible to recover missing emails, but thought we should discuss with you whether AMD might be experiencing any similar problems, and if so, whether we might be able to agree on the most efficient course of action. In any event, we certainly want to provide you with complete information and full cooperation.   Bob



"MMS <Gibsondunn.net>" made the following annotations.
------------------------------------------------------------------------

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.
==========================================================================

# Exhibit B



# O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
HONG KONG
LONDON
LOS ANGELES
NEWPORT BEACH

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

November 9, 2007

**VIA E-MAIL**

Robert E. Cooper, Esq.
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071

OUR FILE NUMBER
008,346-0163

WRITER'S DIRECT DIAL
(310) 246-8434

WRITER'S E-MAIL ADDRESS
jpearl@omm.com

Re:   *AMD v. Intel*

Dear Bob:

This responds to your November 7, 2007 letter to Mark Samuels regarding Intel's privilege non-waiver proposal for Causation/Culpability discovery.

In Mark's letter of November 5, 2007, we specifically identified the notes of interviews conducted to ascertain each custodian's compliance with Intel's document preservation instructions as materials we had expected to see in Intel's production. The interview notes are plainly called for by, *inter alia*, AMD's Request for Production Nos. 34 ("All documents evidencing, referring or relating to the failure or suspected failure of any Intel Custodian to comply with a Litigation Hold Notice or retention instruction, including the timing and means by which it was discovered.") and 41 ("All documents evidencing or relating to the nature, purpose and timing of the investigation reflected in the draft spreadsheet provided by Intel counsel to AMD counsel on February 22, 2007."). *See also* AMD's Request for Production Nos. 10, 12, 31-33, 39, 40, 42, and 43.

Intel has not produced the notes, apparently on the basis that doing so would potentially make "Intel's outside counsel witnesses in the very case they are responsible for defending." Even were that relevant to Intel's document production obligations, the fact is that we have now determined that the interviews were conducted not by Intel's trial counsel in this case, but instead by attorneys at Weil, Gotshal & Manges LLP. There is, therefore, no basis we can see for Intel's failure to produce these interview summaries. As you know, we have in place an agreement that requires Intel to produce non-core work product relevant to its document preservation lapses, as this seems clearly to be.

While Intel has in the past indicated that the information developed during the Custodian interviews conducted by counsel has been provided to AMD through its Paragraph 8 disclosures,

O'MELVENY & MYERS LLP
Robert E. Cooper, Esq., November 9, 2007 - Page 2

those disclosures are not the substantial equivalent of the interview notes themselves. AMD is entitled to get behind the Paragraph 8 assertions to precisely determine what the custodians stated with regard to their preservation practices. The only alternative to production of the summaries is for AMD to depose hundreds of Intel employees around the world specifically on their preservation habits and failures. Even were there no stipulation in place requiring production of non-core work product, this circumstance alone would justify production of the interview summaries.

    Please let us know whether Intel will reconsider its position. Failing that, we intend to take the matter up with the Special Master.

Very truly yours,

James M. Pearl
for O'MELVENY & MYERS LLP

CC1:774068.3

# Exhibit C

# GIBSON, DUNN & CRUTCHER LLP

LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

333 South Grand Avenue  Los Angeles, California 90071-3197
(213) 229-7000
www.gibsondunn.com

RLevy@gibsondunn.com

November 16, 2007

*Via E-Mail and U.S. Mail*

Direct Dial
(213) 229-7556
Fax No.
(213) 229-6556

Client No.
C 42376-00830

James Bo Pearl
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035

Re:   AMD v. Intel

Dear Bo:

     This is intended to respond to your letter to Bob Cooper dated November 9, 2007 calling for Intel to produce notes prepared by Intel's outside attorneys in connection with this litigation. As you know, in other instances in which AMD has questioned Intel's privilege or work product determinations, Intel has willingly revisited the issue. Indeed, in the spirit of compromise, Intel has already re-reviewed thousands of pages of work product redactions to better comport with AMD's narrower construction of what constitutes core work product, resulting in the production of a substantial amount of material that had previously been withheld. In this instance, however, Intel is unable to accommodate AMD's request for production because, even if the attorney notes in question were within the scope of AMD's specific discovery requests (a point we do not concede, but are not going to argue), they are unquestionably protected from disclosure both by the attorney-client privilege and by the core work product doctrine.

     First, whether Weil, Gotshal & Manges ("Weil") is acting as Intel's trial counsel in this matter has no bearing on the validity of Intel's claim of attorney-client privilege. As you are well aware, the scope of the privilege is not limited to trial counsel. Rather, the attorney-client privilege protects all confidential communications between Intel and its attorneys for the purpose of receiving legal advice, including information provided by Intel's employees to its counsel. *See, e.g., Upjohn Co. v. United States*, 449 U.S. 383, 390 (U.S. 1981) (holding that the privilege "exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."); *id.* at 393 (protecting employees' communications with counsel that were "needed to supply a basis for

GIBSON, DUNN & CRUTCHER LLP

James Bo Pearl
November 16, 2007
Page 2

legal advice," holding "these communications must be protected against compelled disclosure."); *Better Gov't Bureau v. McGraw (In re Allen)*, 106 F.3d 582, 605 (4th Cir. 1997) (reversing trial court's order to produce attorneys' summaries of interviews with client employees, explaining that the client "retained Allen to conduct an investigation in her capacity as an attorney, for the purpose of providing legal services and advice. Therefore, the attorney-client privilege protects all communications between Allen and the [client] that occurred in connection with her investigation."). In this case, as in *Upjohn and In re Allen*, the employee communications at issue involved information that was specifically requested by counsel to supply the basis for legal advice. Thus, Weil's notes of those communications are unquestionably privileged.

Second, Weil's interview notes are also protected as core work product that reflects counsels' mental impressions. *See, e.g., Upjohn Co.*, 449 U.S. at 400 (U.S. ("Forcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney' mental processes, 329 U.S., at 513 ("what he saw fit to write down regarding witnesses' remarks"); *id.*, at 516-517 ("the statement would be his [the attorney's] language, with his inferences") (Jackson, J., concurring)); *Baker v. GMC (In re GMC)*, 209 F.3d 1051, 1054 (8th Cir. 2000) ("Notes and memoranda of an attorney, or an attorney's agent, from a witness interview are opinion work product entitled to almost absolute immunity.") The rule applies with equal force whether the notes were taken by an attorney or his paralegal assistant. *See, e.g., EEOC v. Pasta House Co.*, 1996 U.S. Dist. LEXIS 3812 at *8 (D. Mo. 1996) (finding work product doctrine applied to prevent production of questionnaires sent to class members and notes of interviews of class members conducted by plaintiff's attorney and its paralegal assistant).

If you wish to provide us with authority requiring production of attorney-client privileged and core work product materials under analogous circumstances, we urge you to do so. Until then, we believe that we have expressed the appropriate objections and positions.

Feel free to contact me again should you wish to discuss these matters further.

Very truly yours,

Richard P. Levy

RPL/BPB/jt
100339304_1.DOC

cc: Robert E. Cooper
Kay E. Kochenderfer

# Exhibit D

**From:** Floyd, Daniel S. [mailto:DFloyd@gibsondunn.com]
**Sent:** Friday, August 24, 2007 3:44 PM
**To:** Pearl, James
**Subject:** RE: Culpability/Causation Discovery

Just to confirm our conversation, we will be producing the non-privileged "Investigation Documents" next week in hard copy form. We will accept the agreement on privilege waiver for this production subject to the terms of Paragraph 7 of the Order re: AMD's and Class Plaintiffs' Initial Remediation Discovery. We discussed in general our expectation that any follow-up document discovery will be conducted in a focused manner, and that we were not contemplating a broad-based custodian production, but you also made it clear that you needed to review the materials we produce in the first instance before you can state definitively what follow-up you will need.

**From:** Pearl, James [mailto:JPearl@OMM.com]
**Sent:** Wednesday, August 22, 2007 4:52 PM
**To:** Floyd, Daniel S.
**Subject:** RE: Culpability/Causation Discovery

Dan -- You were on my list to call today. In terms of culpability discovery, we believe Intel should produce the eight boxes of "Investigation Documents" in the first instance. Once we get those in hand, we will have a better lay of the land in terms of whether a custodial production makes sense for culpability discovery. We will also be able to make more informed judgments regarding custodians if we decide to go down that path. That said, with a September 28, 2007 deadline for Intel to complete its response to AMD's outstanding discovery and given Intel's representations to the Court about its ability to quickly produce these documents, we believe the production should be done over the next couple days as all that is required presumably is a privilege review. Reviewing privilege for eight boxes should not take long.

With respect to privilege waiver, we will agree that the production of the Investigation Documents will proceed under the same core / non-core non-waiver agreement laid out in Paragraph 7 of the Order Re: AMD's and Class Plaintiffs' Initial Remediation Discovery. After our review of the Investigation Documents, we will discuss with you whether and to what extent this same agreement should apply to the remainder of Intel's culpability discovery.

We believe this is the most efficient way to proceed and agree with you that a lengthy meet & confer process is not in either side's interests.

Thanks.

Bo

---

**From:** Floyd, Daniel S. [mailto:DFloyd@gibsondunn.com]
**Sent:** Wednesday, August 22, 2007 4:07 PM
**To:** Pearl, James
**Subject:** Culpability/Causation Discovery

Any response from our phone call last week on what we discussed re the above? It impacts how we proceed and there are time deadlines, so if you can get back to me, I'd appreciate it. Thanks.

====================================================================

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.
====================================================================

"MMS <Gibsondunn.net>" made the following annotations.
------------------------------------------------------------

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.
====================================================================

# Exhibit E

# GIBSON, DUNN & CRUTCHER LLP

LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

333 South Grand Avenue  Los Angeles, California 90071-3197
(213) 229-7000
www.gibsondunn.com

RCooper@gibsondunn.com

November 7, 2007

Direct Dial
(213) 229-7179

Fax No.
(213) 229-6179

Client No.
C 42376-00830

**VIA E-MAIL/U.S. MAIL**

Mark A. Samuels
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, California 90071-2899

Re:   *AMD v. Intel: Broader Non-Waiver Proposal*

Dear Mark:

I received your letter of November 5, 2007. We are sorry we were unable to work something out to facilitate production of inside counsels' attorney client privileged and core work product protected communications. Consequently, we have reluctantly concluded that we are at an impasse because Intel is not prepared to waive these protections as to outside counsel. To do so potentially would make Intel's outside counsel witnesses in the very case they are responsible for defending – not only with respect to the merits of plaintiffs' allegations, but also with respect to plaintiffs' potential motion for sanctions.

Let me add one further thought. By reason of our earlier non-waiver stipulation covering non-core work product, Intel basically is providing plaintiffs with the same underlying facts concerning its retention practices that counsel discovered and addressed, so we don't see our willingness to broaden the scope of the waiver as allowing "only part of the truth to come out." The facts of what happened are available to you. Absent the broader non-waiver stipulation we proposed, what is not available to you is the benefit of the mental impressions, opinions or legal theories of Intel's inside counsel in their role as lawyers addressing retention issues. You are free to make your own assessment and reach your own conclusions about Intel's retention practices based on the underlying facts. The attorney client privilege and work product protection is meant to protect that work product, and that work product may not properly be considered to be any part of the "truth" in the case. Nevertheless, we tried to draw a line that would not open

# GIBSON, DUNN & CRUTCHER LLP

Mark A. Samuels
November 7, 2007
Page 2

outside counsel to discovery, while opening to discovery the work of inside counsel, who will not be serving as trial counsel in the trial.

So we will complete our production of documents relating to causation/culpability, subject to the earlier non-waiver stipulation, but will not expand our production to encompass internal documents that would have been picked up by the broader non-waiver stipulation we proposed. In that regard, if we have a question about where the line should be drawn as to a particular document, we plan to submit it to the Special Master for a determination whether it contains only non-core work product (and therefore may be produced in accordance with our non-waiver stipulation), or whether it contains attorney client privileged or work product protected communications (and therefore should not be produced). We think that it may be necessary to submit an occasional document for such a ruling, to ensure that Intel will not later be faced with a challenge that it waived attorney client privileged or core work product communications.

I also wanted to respond to your inquiry about whether outside counsel conducted the interviews of Intel personnel about their compliance practices, and the answer is yes.

Yours very truly,

Bob

Robert E. Cooper

REC/lsj

cc:   Charles P. Diamond
      David L. Herron
      Daniel A. Small

100333783_1.DOC