# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| INTEL CORP. MICROPROCESSOR | ) | MDL Docket No. 05-1717-JJF |
| ANTITRUST LITIGATION | ) | (Re: D.I. 300) |
| | ) | |
| | ) | |
| PHIL PAUL, on behalf of himself and all | ) | |
| others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. N o. 05-485-JJF |
| | ) | |
| INTEL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**DM 5**

## SPECIAL MASTER'S REPORT AND RECOMMENDATIONS REGARDING ALLOCATION OF THE SPECIAL MASTER'S COMPENSATION AND COSTS AS A SANCTION AGAINST NONPARTY FRY'S ELECTRONICS, INC.

## BACKGROUND

These are antitrust actions brought against Intel Corporation ("Intel") as the manufacturer of microprocessors that run the Microsoft Windows and Linux families of operating systems (the "x86 Microprocessor Market"). Intel is alleged to hold worldwide market share measured as 80% of the market in units and 90% of the market in revenues.

The 05-485 action is brought on behalf of a class of consumers who allege economic injury resulting from Intel's alleged anticompetitive and monopolistic practices. The 05-485 action has been consolidated with over 70 other consumer-related actions (collectively, the "Class Litigation") by the Judicial Panel on Multidistrict Litigation, which has and assigned said action to this Court as MDL Docket No. 05-1717. As used herein, the term "Class Plaintiffs" refers to the plaintiffs in the Class Litigation.

## INTRODUCTION

The matter *sub judice* comes before me, as Special Master, out of a proposed allocation of Special Master compensation resulting from a discovery dispute ("DM 5") following litigation between the Class Plaintiffs (D.I. 422 in Case No. 05-1717) and Fry's Electronics, Inc. ("Fry's"). DM 5 ensued as a result of the Class Plaintiffs' motion to produce certain transactional data, pursuant to a documents-only subpoena issued on June 22, 2006. The proposed allocation was made in conjunction with Invoice No. 868401, sent to the parties on May 25, 2007. The Special Master's cover letter to the Class Plaintiffs and Fry's, dated May 25, 2007, stated that the total compensation due to the Special Master relating to DM 5 should be split equally between the Class Plaintiffs and Fry's.[1] Fry's objected to this proposed allocation by e-mail from its local

---

[1] Upon reviewing Fry's Electronics, Inc.'s October 19, 2007 Response to Class Plaintiffs' October 9, 2007 Supplemental Letter Brief Regarding Allocation of Special Master's Cost, it appears that Fry's misapprehends the outstanding balance of unpaid invoices as of August 31, 2007, referenced in the Special Master's letter to counsel of September 11, 2007. In its brief, Fry's characterizes the award sought by Class Plaintiffs as sanctions "in excess of

2

counsel, Mary Graham, dated June 13, 2007. (See D.I. 628, Declaration of Michael Powell in Support of Fry's Opposition Brief, at Exhs. 2, 5.) After a teleconference on this issue, Class Plaintiffs filed a Supplemental Letter Brief in support of this allocation. (D.I. 610.) Fry's submitted an opposition, and a response to same was submitted by Class Plaintiffs. (D.I. 628; 632.) Class Plaintiffs have argued that the Federal Rules of Civil Procedure permit the proposed allocation, or, alternatively, that the Special Master may impose a sanction upon Fry's for its conduct in conjunction with the litigation of DM 5.

For the reasons discussed herein, the Special Master concludes that Fry's conduct resulted in unnecessary delays to the Discovery Litigation, and while Fry's conduct suggest a finding of bad faith, the Special Master, under the Court's inherent power to sanction, need not make a finding of bad faith in order to impose sanctions on Fry's actions. The Special Master concludes, therefore, that Fry's should be sanctioned for its vexatious conduct, which caused the Class Plaintiffs to incur additional expenses in an amount equal to one-half of the Special Master's compensation for the litigation of DM 5, including the matter *sub judice*.

## DISCUSSION

### A.    Rule 53

A threshold issue to be addressed is whether Federal Rule of Civil Procedure 53 provides a mechanism by which a Special Master may allocate Special Master compensation and costs to a litigant in a situation where, as here, the litigant is involved in a discovery dispute but is a stranger – a non-party to the underlying litigation. Rule 53 instructs the Special Master to allocate fees among the "parties" or "from a fund or subject matter of the action within the

---

$50,000." (D.I. 627 at 2, n.2. See also D.I. 627 at 3 (referring to $100,000 in Special Master fees for this discovery dispute).) The total balance as of August 31, 2007 for the Discovery Litigation is $50,556.92. Were there to be an allocation of one-half of the August 31, 2007 balance to Fry's, the amount of the allocation would be $25,278.46.

3

court's control." Fed. R. Civ. P. 53(h)(2)(B).

Class Plaintiffs argue that the term "party" could be read to mean a party to the discovery matter, concluding therefore that it is not limited to a party to the underlying litigation. (See D.I. 520, Class Plaintiffs' Letter of June 25, 2007.)  Alternatively, Class Plaintiffs assert that Fry's assets are a "fund or subject matter of the action within the court's control."  (Id.)  Fry's disagrees, arguing that the Federal Rules expressly define the term "party" to be a party named in the lawsuit, which definition necessarily encompasses Rule 53's use of "party."  (D.I. 627 at 3 (citing Fed. R. Civ. P. 10).)  Fry's also argues that because Fed. R. Civ. P. 53(c)(2) references both "a party" and "a nonparty," the plain language of Rule 53 necessarily distinguishes between the two terms.  Therefore, when Fed. R. Civ. P. 53(h) expressly states that compensation must be paid by "a party or parties," it means just that and does not include nonparties.  Further, Fry's argues that there is no "fund or subject matter of the action within the court's control."  (Id.) Accordingly, Fry's argues that the Special Master's fees for DM 5 can only be allocated pursuant to Fed. R. Civ. P. 53(h) among "the parties -- Class Plaintiffs, AMD and Intel, " and not to itself, a nonparty.  (Id.)  While Fry's arguments on this issue are persuasive, for reasons discussed below, the Special Master need not reach this question.

**B.**    **Sanctions**

    1.    The Court's Inherent Power to Sanction[2]

There can be no dispute that Federal courts have inherent power to impose sanctions for a party's misconduct.  Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991).  Although many statues and rules provide for the imposition of sanctions, the court is not limited to imposing sanctions based on the rules. Id. at 43.  Rather, the court retains "certain implied powers," and "the power

---

[2]  Except to say that Class Plaintiffs request that the Special Master utilize the inherent authority of the Court to sanction comes too late, Fry's did not address the principle of the Court's inherent authority in its papers.

to punish for contempts is inherent in all courts." <u>Id.</u> at 44. This power "extends to a full range of litigation abuses" to "fill in the interstices." <u>Id.</u> at 46. Therefore, "if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." <u>Id.</u> at 50. <u>See also</u> <u>Republic of Philippines v. Westinghouse Elec. Corp.</u>, 43 F.3d 65, 73 (3d Cir. 1995).

There can also be no dispute that a court's inherent powers "are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." <u>Chambers</u>, 501 U.S. at 43. Federal courts may exercise their inherent power "to impose sanctions on both litigants and attorneys to regulate their docket, to promote judicial efficiency, and to deter abuse of judicial process." <u>Quiroga v. Hasbro, Inc.</u>, 934 F.2d 497, 505 (3d Cir. 1991). A court's inherent authority to sanction extends to the conduct of a nonparty. <u>Corder v. Howard Johnson & Co.</u>, 53 F.3d 225, 232 (9th Cir. 1994) ("[E]ven in the absence of statutory authority, a court may impose attorney's fees against a non-party as an exercise of the court's inherent power to impose sanctions to curb abusive litigation practices.") (citing <u>Roadway Express, Inc. v. Piper</u>, 447 U.S. 752, 764 (1980); <u>SECO Nevada v. McMordie (In re Holloway)</u>, 884 F.2d 476, 477 (9th Cir. 1989); <u>Moten v. Bricklayers, Masons and Plasterers International Union of America</u>, 543 F.2d 224 (D.C. Cir. 1976)).

When exercising discretion under its inherent sanction powers, a court is guided by the considerations set forth in the Federal Rules of Civil Procedure. <u>Westinghouse</u>, 43 F.3d at 74. Factors to consider include:

1. The nature and quality of the conduct at issue;

2. Whether the attorney or the client is responsible for the culpable conduct;

3. Whether there was a pattern of wrongdoing requiring a stiffer sanction;

5

4.  The sanctioned party's ability to pay;

5.  Whether the wrongdoing actually prejudiced the wrongdoer's opponent or hindered the administration of justice; and,

6.  The existence of mitigating factors.

Id. The Supreme Court also stated that this inherent power "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." Chambers, 501 U.S. at 42.  Therefore, "a district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and must also ensure that the sanction is tailored to address the harm identified." Westinghouse, 43 F.3d at 74.

In the end, the Supreme Court in Chambers, stated that a court may exercise its authority to impose sanctions

> when a party has "acted in bad faith, vexatiously, wantonly or for oppressive reasons.". . .  The imposition of sanctions in [the proper] instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of "vindicating judicial authority without resort to more drastic sanctions available for contempt of court and making the prevailing pay whole for expenses caused by [the] opponent's obstinacy."

Id. at 46 (internal citations omitted).

2.    Fry's Conduct is Sanctionable Under the Court's Inherent Power

Class Plaintiffs have detailed a plethora of actions by Fry's that have assertedly precipitated, and then extended and expanded the discovery proceedings before the Special Master, resulting in unnecessary expense and delay of the Special Master's issuance of the September 27, 2007 Report and Recommendation.  (D.I. 610 at 2-4; D.I. 422, Class Plaintiffs' Letter Briefs of March 29, 2007; D.I 440 April 23, 2007 in Support of Motion to Compel.)

6

Fry's makes no attempt to respond to any specific allegation made by Class Plaintiffs except for the allegation that it did not, in so many words, participate in meaningful good faith dialogue. In this regard Fry's relies on examples of comments made by counsel for Class Plaintiffs during one phase of the process. The Special Master repeats Fry's examples here:

- At the May 17 Conference, Class Plaintiffs' counsel Dan Small commented: "We met … yesterday … [i]t was a very full conversation, a good faith conversation, and a productive one." Powell Decl., Ex. 8 at 4:1-7 [May 17, 2007 Transcript].

- At the May 24 Status Conference, Mr. Small reported: "Some real quick history, just to put in context recent progress made … We reported back to Your Honor … and we reported that we had made very substantial progress, both in terms of understanding the data and in trying to resolve the dispute … In any event, we had a brief call with Fry's today in which they made that counter-proposal … it does appear at first blush to be a good-faith counteroffer." Powell Decl., Ex. 9 at 3:4-5 [May 24, 2007 Transcript].

- At the June 6 Conference, Mr. Small remarked: "The proposal appears to represent very significant progress, and I actually say, with some caution, that we may be close to an agreement." Powell Decl., Ex. 10 at 6:13-16 [June 6, 2007 Transcript].

- And at the July 20 Conference, Mr. Small indicated: "we have continued to work hard … I believe that we are very close to an agreement." Powell Decl., Ex. 11 [July 20, 2007 Transcript].

While the Special Master must accept the plain meaning of Mr. Small's own statements, they are accepted for what they were, statements made during discrete phases of the process.

At the same time, in the Special Master's view, many of the Class Plaintiffs' allegations go without a meaningful answer. The Special Master adopts certain of the Class Plaintiffs' characterizations of "Fry's Pre-Motion Conduct," which in the Special Master's view, necessitated the filing of DM 5, and "Fry's Conduct in Conjunction with Proceedings Before the Special Master," which in the Special Master's view resulted in the unnecessary protraction of the process and the commensurate increase of Special Master compensation and costs.

### "Fry's Pre-Motion Conduct"

1.    Taking the position that its data is a trade secret and shall not be produced, while

7

maintaining that they are easily obtained from the sources." (Certification of Richard M. Volin in Support of Class Plaintiffs' Request to Compel Fry's Electronics, Inc. dated March 29, 2007 ("Volin Certification") Ex. G at 1, Ex. J at 2.)

The Special Master concludes that Fry's positions are not consistent, resulting in a waste of time.

2.    Refusing to comply with the subpoena until it was narrowed, while at the same time refusing to provide either a data sample or a description of the data fields in question. (Volin Certification Ex. G at 2, Ex. H at 1, Ex. J at 2 and Declaration of Richard M. Volin dated April 23, 2007 ("Volin Declaration") at ¶6.)

The Special Master concludes that Fry's positions are neither consistent nor reasonable, resulting in a waste of time.

3.    Taking the position that the Class Plaintiffs had to "verify" whether any of them had purchased a Intel based computer from Fry's. (Volin Certification Ex. G at 1, Ex. J at 1 and Volin Declaration at ¶3, Ex. A.)

The Special Master concludes that Fry's position has no legal basis in law and, therefore, did not otherwise obviate its obligation to produce, which resulted in a waste of time.

4.    Participating in the process that led to the entry of the Protective Order that was entered in this case (Special Master Report and Recommendation of May 18, 2006 at 15; Volin Declaration at ¶18), invoking the protection of the Protective Order for its meet and confer correspondence (Volin Certification at ¶9, Ex. G at 1, 3) and then taking the position that the Protective Order did not apply to the production of Fry's data (Volin Certification at ¶12, Ex. J at 2; Volin Declaration at ¶19).

The Special Master concludes that Fry's positions are inconsistent, resulting in a

8

waste of time.

5.      Taking the position that it did not have to produce the data because the Class

Plaintiffs were seeking the same data from other nonparties.  (Volin Certification Ex. J, Ex. K at

4.)

The Special Master concludes that Fry's position has no basis in law and did not obviate

its obligation to produce, which resulted in a waste of time.

Regarding Fry's Pre-Motion Intransigence, the Special Master adopts the Class Plaintiffs'

view of the world.

6.      The Special Master is also mindful that Fry's claim of burden has never been

demonstrated.  In this regard, the Special Master is aware of the claims of Class Plaintiffs and

AMD, as outlined in correspondence from the Class Plaintiffs' counsel to Fry's in-house counsel

dated March 12, 2007, that:

- [The parties] offered to discuss costs with an eye toward a reasonable cost-sharing of reasonable out-of-pocket expenses incurred by Fry's;

- The parties have explained that cost estimates are not necessary for the initial sample database, which will likely result in only nominal costs, and will inform all involved of potential future costs of the production;

- The parties have nevertheless offered to review and discuss a cost estimate on the initial sample database – an estimate that would need to come from Fry's;

- The parties have suggested that additional costs discussions take place after the initial sample database is produced and reviewed.  The initial sample database will be used to narrow the parties' requests and lower the cost of the full production; and,

- The [parties] assert that a request for cost estimates was made during the December 13th conference with Fry's.  However, regardless of whether such a request was communicated by the parties or heard by Fry's, [Fry's] now claim that [it is] unable to offer a cost estimate.  Ironically, the logic that Fry's now offers as to why it cannot provide cost estimates is the same logic offered by the parties as to why the initial production of a sample database would help inform the cost issue.  (See March 8, 2007 letter from Brian Henri to Richard Volin (questioning, "how could Fry's provide such an estimate without knowing how the parties will limit the requests?").)

9

(Volin Certification Ex. K at 2.)

The Special Master concludes that Fry's failed to do much, if anything, resulting in a waste of time. The Special Master is also mindful that Fry's claim of burden of production was never demonstrated.

In sum, the Special Master concludes that the record prior to the filing of DM 5 supports the finding that the goal of Fry's was to avoid the timely production of relevant data, which production was not unduly burdensome and which was adequately safeguarded by the provisions of the Protective Order. The Special Master further concludes that Fry's intransigence prior to the filing of the instant motion represents its vexatious efforts to avoid compliance with the subpoena resulting in the Class Plaintiffs' filing of DM 5 with the Special Master. The Special Master adopts the Class Plaintiffs' language which properly characterizes Fry's conduct:

> Before the motion to compel was filed, Fry's had shown no willingness to produce data and thwarted efforts to make progress on negotiating the scope of production. After seven months of negotiation, the parties have gotten nowhere with Fry's. No production has been made; no production has been offered; and no data sample has been provided or offered. . . .

(Volin Certification Ex. J.)

### "Fry's Post Motion Positions and Conduct"

The Special Master adopts certain of the Class Plaintiffs' characterizations of Fry's Post Motion Positions and Conduct which resulted in the further protraction of the process and the commensurate increase of Special Master compensation and costs.

1.     Fry's again insisted that the Protective Order did not sufficiently protect their claimed trade secrets and therefore argued the Protective Order be modified as a prerequisite to any production.

The Special Master, and ultimately the Court in adopting the Special Master's Report and

10

Recommendations by Order dated June 14, 2007, rejected Fry's position, concluding in part that, "Fry's present concerns with respect to the existing Protective Order were previously raised in the context of third party objections. Its concerns were specifically considered in the Protective Order Report and Recommendations and addressed either through revisions or rejected." (See D.I. 221 pp. 39-40, 44, 48-49, 81-82, 90, 96-97, Special Master's Report and Recommendations Regarding Threshold Issue Raised By Class Plaintiffs' Motion to Compel and Other Issues – DM 5, May 18, 2007 at 15 and see pp. 9-23.)

The Special Master concludes that Fry's conduct in this regard completely lacked merit, resulting in a waste of time.

2.     Fry's took the position in its April 17, 2007 letter brief in opposition to the Motion to Compel that Class Plaintiffs had failed to adequately meet and confer as required by Federal Rule of Civil Procedure 37(a)(1).

The Special Master is mindful that it was Fry's in-house counsel, in correspondence dated March 8, 2007 to Class Plaintiffs', who stated, "Accordingly I cannot see there is anything left to discuss." (Volin Certification Ex. J at 3.) In any event, the Special Master ruled during the hearing on DM 5 that: "I'm satisfied that were the premise of any meet and confer, was there had to be an agreement with respect to [changes] in [the] protective order; that premise, because it was a non-starter for the Class Plaintiffs, that here was a sufficient meet and confer before the filing of the instant motion." (May 1, 2007, Transcript at 78, 1-7.)

The Special Master concludes that Fry's claim on the inadequacy of the meet and confer was in no way attributable to the Class Plaintiffs, but instead was a result of its own position regarding the protective order. The Special Master further concludes that this compounded the resulting waste of time.

062038.00615/40172516v.1

3.    Fry's took the position that Class Plaintiffs had not adequately identified the data that it sought to compel. The position was taken against the backdrop of Fry's having also asserted that it did not have data in the form that Class Plaintiffs sought, representing it "does not maintain data relating to individual transactions." (May 1, 2007, Transcript 85:12-14.) The Special Master is satisfied that Fry's refused to comply with the Class Plaintiffs' request for a sample of its data or a description of its data fields which in turn would have permitted Class Plaintiffs "[to further target the] requests with regard to a complete transactional data production." (Volin Certification H at 1.) Fry's position in this regard resulted in the Special Master deferring a ruling on DM 5 and the ordering of a further meet and confer for the purpose of Fry's describing its data to the Class Plaintiffs – something that Fry's should have accomplished before DM 5 was filed.

In the Special Master's view, the position that Class Plaintiffs found themselves in after the pre-Motion meet and confer was untenable, leaving the Special Master unable to make a decision at that point. During the hearing on the Motion, the Special Master stated:

> Well, the dilemma that I have is I'm not convinced at this juncture, have read everything you've submitted, that I can make a judgment on paper on these papers. I mean, it seems to me that the only way that I can have some degree of comfort with any judgment that I would make is for there to be some opportunity to have someone describe under oath the data system and react to that by testimony under oath. Because I'm not convinced I can do it on these cold papers.
>
> Now, I understand that it is the applicant's burden, but that doesn't make this application go away if I'm not convinced that I understand the nature of what we're looking for here, and if I don't see it rising out of the meet and confers. And I'm not sure that I do.
>
> So . . . I think I have two alternatives here, a little bit different from the way Mr. Small describes it.
>
> And that one of the alternatives is to say you all go back to your

12

respective places and drill down on precisely what we're talking about here and forge at least an understanding, if you will, almost by stipulation that we understand that this is what this system is. This is what this system does. And as a result of that, this is what we're asking for.

And if that can't be accomplished, I don't see any way I can deal with this sort of hearing. Not argument, if you will.

(May 1, 2007, Transcript 94:3-24; 95:1-9.)

Pursuant to the Special Master's May 4, 2007 Stipulation and Order, Class Plaintiffs and Fry's conducted a telephonic meet and confer on May 14, 2007. (D.I. 459.) Also pursuant to the referenced Order, Fry's made one of its IT personnel available, "who was most knowledgeable about [Fry's] database and datasets who shall use their best efforts to assist Class Plaintiffs in understanding the data in such databases and/or datasets." (Id. at 1.) As a result of the information provided by Fry's IT personnel, the Class Plaintiffs learned that:

Fry's maintains at least two databases in addition to the Merchant Master database. At least one for purchases and at least one for sales. These are centralized databases that form daily uploads of data from Fry's individual stores and it appears from the information Fry's was willing and able to provide ... that both databases are maintained at a transactional level.

(D.I. 560, Smalls Declaration at ¶5.)

The Special Master concludes that the Fry's positions regarding its data base/bases was inconsistent, resulting in a waste of time.

In sum, the Special Master concludes it is clear from the record that Fry's vexatious positions and conduct hindered the administration of justice in delaying this aspect of the litigation, resulting in increased costs to the Class Plaintiffs in the form of increased Special Master compensation and costs. The Special Master is of the view that Fry's should not be able to precipitate such delays and then receive a "free ride" in the allocation of costs. In this regard, the Special Master concludes that the use of the Court's inherent power to sanction in this case:

13

transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of 'vindicat[ing] judicial authority without resort[ing] to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy.'

Chambers, 501 U.S. at 46 (quoting Hutto v. Finney, 437 U.S. 678, 689 n. 14 (1978)). The imposition of costs upon Fry's also comports with the idea that "the cost of a master should be borne by the party or parties whose conduct necessitated the reference to the master." Pennsylvania v. Local Union 542, Int'l Union of Operating Eng'r, 507 F. Supp. 1146, 1163 (E.D. Pa 1980), aff'd without opinion, 648 F.2d 923 (3d Cir. 1981), rev'd on other grounds, 458 U.S. 375 (1982).

## SANCTION

a.    Under the Inherent Power of the Court the Special Master Need Not Make a Finding of Contempt to Sanction Fry's

Fry's argues that it cannot be subject to sanctions without a finding of contempt. (D.I. 627 at 5.) The Special Master concludes otherwise. Rule 53(c)(2) of the Federal Rules states:

*Sanctions.* The master may by order impose on a party any noncontempt sanction provided by Rule 37 or 45, and may recommend a contempt sanction against a party and *sanctions against a nonparty.* (Emphasis added).

The Special Master is satisfied that a plain reading of this section shows that a finding of contempt is not necessary, as the Rule provides for sanctions against a nonparty without an express mention of "contempt sanctions." Thus, sanctions by a Special Master may fall under the heading of contempt sanctions, or may be sanctions for improper conduct. The case relied upon by Fry's for the proposition that contempt is required for sanctions, Pennwalt Corp. v. Durand-Wayland, Inc., 708 F.2d 492 (9th Cir. 1983), is unpersuasive. Pennwalt deals chiefly

14

with sanctions for attorney's fees for a nonparty, and Fry's cites it for its discussion of Rule 45, which governs the imposition of sanctions against a nonparty for failure to comply with a *subpoena duces tecum*. (See D.I. 627 at 5 (citing Pennwalt, 708 F.2d at 494).) Pennwalt discussed the Court's inherent power to sanction as independent of its power to issue contempt sanctions. Id.; see also Chambers, 501 U.S. at 46 (differentiating between contempt sanctions and sanctions pursuant to court's inherent authority).

The Third Circuit has ruled that federal courts retain the inherent power "to sanction errant attorneys financially both for contempt and for conduct not rising to the level of contempt." Eash v. Riggins Trucking, Inc., 757 F.2d 557, 566 (3d Cir. 1985) (citing Roadway Express, Inc. v. Piper, 447 U.S. 752, 765 (1980)). The Eash court elaborated:

> [T]he Supreme Court [has] stat[ed] that the "inherent power" to sanction an attorney was "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." If a court's inherent powers include the ability to do whatever is reasonably necessary to deter abuse of the judicial process, courts must be able to impose reasonable sanctions for conduct by lawyers that falls short of contempt of court.

Id. at 567 (citations omitted).

      b.    While Fry's Actions Support a Finding of Bad Faith, the Special Master Need Not Make a Finding of Bad Faith to Sanction Fry's Under Its Inherent Power

The Pennwalt court concluded that it could not use such inherent sanctioning power absent a finding of bad faith conduct. Pennwalt, 708 F.2d at 494. A finding of bad faith means that a party or counsel acted "vexatiously, wantonly or for oppressive reasons." Chambers, 501 U.S. at 45-46. Bad faith "does not require that the legal and factual basis for the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy, or *mala fides*, the assertion of a colorable claim will not bar assessment of attorneys' fees." Mark Indus.,

15

Chambers, 501 U.S. at 45-46, 111 S.Ct. at 2133. As Justice Scalia pointed out in his dissent, however, the fact that fee-shifting as a sanction requires a finding of bad faith "in no way means that all sanctions imposed under the courts' inherent authority require a finding of bad faith." Id. at 59, 111 S.Ct. at 2140. Thus, a court need not always find bad faith before sanctioning under its inherent powers: "[s]ince necessity does not depend upon a litigant's state of mind, the inherent sanctioning power must extend to situations involving less than bad faith." Id.

c.     Class Plaintiffs Have Not Waived Their Argument for Sanctions

Fry's assertion that Class Plaintiffs implicitly waived an argument for sanctions in the September 27, 2007 hearing is unpersuasive. (See D.I. 627 at 2.) Class Plaintiffs did state that their support of an allocation of costs to Fry's was not in the nature of a Rule 37 request for sanctions, as Rule 37 only applies to parties and deponents, not to third parties. (See D.I. 632 at 3, n.4 (citing Fed. R. Civ. P. 37(a)(2)).) Class Plaintiffs, though, properly rest their arguments on the authority of the Special Master under Fed. R. Civ. P. 53 read in conjunction with the Court's inherent power.

d.     The Special Master's Ability to Sanction Fry's is Not Precluded by Fry's Lack of Ability to Oppose the Special Master's Appointment

Fry's also argues that an allocation of fees cannot be made to a nonparty to the underlying litigation, where the nonparty has not had an opportunity to object to the appointment of a Special Master. (D.I. 627 at 3-4, n.6.) Fry's argument unsupported by any authority simply misses the mark. Under the court's inherent powers, a sanction consisting of the allocation of the Special Master's compensation and costs is in the Special Master's view an appropriate way to tailor the sanction to address the harm identified. Westinghouse, 43 F.3d at 74.

17

<u>Ltd. v. Sea Captain's Choice, Inc.</u>, 50 F.3d 730, 732 (9th Cir. 1995) (internal quotation marks and citations omitted). To find bad faith, a court must find "some indication of an intentional advancement of a baseless contention that is made for an ulterior purpose, e.g., harassment or delay." <u>Ford v. Temple Hosp.</u>, 790 F.2d 342, 347 (3d Cir. 1986). The Special Master concludes that Fry's actions demonstrate it intentionally undertook dilatory conduct resulting in a waste of time and increased financial costs associated with discovery of its information.

At the same time, the Special Master is satisfied that a finding of bad faith by Fry's is unnecessary in order to impose sanctions pursuant to the Court's inherent power. (D.I. 610 at 4 (citing <u>Westinghouse</u>, 43 F.3d at 74); <u>see also</u> <u>Unigard Sec. Ins. Co. v. Lakewood Eng'g Mfg. Corp.</u>, 982 F.2d 363, 368 n.2 (9th Cir. 1992) ("This court has . . . confirmed the power of the district court to sanction under its inherent powers not only for bad faith, but also for willfulness or fault by the offending party."); <u>Fink v. Gomez</u>, 239 F.3d 989, 993-94 (9th Cir. 2001) (sanctions under court's inherent authority require bad faith or "a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose"). In <u>Westinghouse</u>, the Third Circuit expressly retreated from requiring a finding of bad faith for the imposition of sanctions in cases not involving fee shifting. <u>Westinghouse</u>, 43 F.3d 74 at n.11. The Court in <u>Westinghouse</u> held that:

> Although we stated in <u>Landon v. Hunt</u>, 938 F.2d 450 (3d Cir. 1991), that "a prerequisite for the exercise of the district court's inherent power to sanction is a finding of bad faith conduct" ( <u>id.</u> at 454), that statement should not be read to require a finding of bad faith in every case, regardless of the sanction contemplated. <u>Landon</u> addressed the propriety of assessing <u>attorneys' fees</u> against a litigant; thus, we followed the Supreme Court's decision in <u>Chambers</u>, which also involved assessment of attorneys' fees. <u>Landon</u>, 938 F.2d at 454. Under the American Rule, attorneys' fees ordinarily may not be shifted to a losing party. However, the Court in <u>Chambers</u> had relied on an exception to that rule allowing fees to be shifted when the losing party exhibited "bad faith."

16

e.    A Consideration of the Factors in Westinghouse Warrants
      the Recommended Sanctions

1.    The Nature and Quality of the Conduct at Issue.

Fry's conduct described herein is in the Special Master's view nothing short of unreasonable, if not vexatious designed to delay the production of relevant data, which production was not demonstrated to be burdensome and which production is adequately protected by the Protective Order in this case.

2.    Whether the Attorney or the Client is Responsible for the Culpable Conduct.

The position taken by Fry's counsel after the filing of DM 5 were mirror images of the positions taken by Fry's through its in-house counsel prior to its filing. The Special Master is satisfied that Fry's is responsible for the culpable conduct.

3.    Whether There is a Pattern of Wrongdoing Requiring a Stiffer Sanction.

While not applicable here, the Special Master is satisfied that Fry's conduct would warrant an allocation of an ever greater share of the Special Master's compensation and costs.

4.    The Sanctioned Party's Inability to Pay.

Fry's has raised no issue in this regard.

5.    Whether the Wrongdoing Actually Prejudiced the Wrongdoers' Opponent or Hindered the Administration of Justice

The Special Master is satisfied that Fry's conduct did both.

6.    The Existence of Mitigating Factors.

The Special Master is mindful that the process leading up to the filing of DM 5 and the resulting order are a result of some good faith dialogue as suggested by counsel for Class Plaintiffs which ultimately resulted in impasse. See herein at p. 7.

In sum, the Special Master concludes that the proposed sanction is tailored to address the

18

harm to the Class Plaintiffs resulting from Fry's conduct.  The Special Master further concludes it would be unfair in light of Fry's conduct to expect that the Class Plaintiffs should shoulder the entire added burden of the Special Master's compensation and costs.

## CONCLUSION

For the reasons set forth above, the Special Master RECOMMENDS that:

1.     Fry's should be sanctioned, by requiring it to pay one-half of the Special Master compensation and costs associated with DM 5 as well as one-half of the Special Master compensation and costs associated with the instant dispute.  The total costs associated with the dispute is $79,236.42.  Half of the Special Master's fees and costs, to be allocated to Fry's, is $39,618.21.

2.     Fry's shall be required to pay the share so allocated not later than 10 days from the date this Report and Recommendation is entered.

**In accordance with the Court's Order dated May 7, 2007 (D.I. 465), a party may file objections to, or a motion to adopt or modify, the Special Master's Order, Report or Recommendation on any issues related to the Motion to Compel no later than 5 days from the time the Special Master's Order, Report or Recommendation is served.**

ENTERED this
13th day of December, 2007

Vincent L. Poppiti  (DSBA No. 100614)
Special Master

19