

**Potter
Anderson
& Corroon LLP**

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

**Richard L. Horwitz**
Partner
Attorney at Law
rhorwitz@potteranderson.com
302 984-6027  Direct Phone
302 658-1192  Fax

January 11, 2008

**VIA ELECTRONIC FILING AND BY HAND**
The Honorable Vincent J. Poppiti
Blank Rome LLP
Chase Manhattan Centre, Suite 800
1201 North Market Street
Wilmington, DE  19801-4226

   Re: *Advanced Micro Devices, Inc., et al. v. Intel Corporation, et al., C.A.
     No. 05-441-JJF; In re Intel Corporation, C.A. No. 05-MD-1717-JJF;
     and Phil Paul, et al. v. Intel Corporation, C.A. 05-485-JJF  DM 4b.*

Dear Judge Poppiti:

   While on its face AMD's motion to compel seeks to obtain broad discovery concerning
Intel's document retention efforts in connection with *all* of its litigation, of every kind, over the
past ten years, its arguments are focused on a single issue:  Has Intel ever modified its email
management system to eliminate the auto-delete function in connection with any prior litigations
or government investigations?  Intel informed AMD upon receipt of its letter brief that Intel was,
and continues to be, prepared to answer that question under oath, through one of Intel's
Rule 30(b)(6) witnesses.  (The answer will be "no," an answer that Intel believes will moot
further inquiry into the issue, making this motion entirely unnecessary.)  Moreover, as AMD
itself states, "to be clear, Plaintiffs do not seek the deliberation regarding auto-delete in other
cases, simply the fact as to whether Intel has ever suspended the feature."  (Motion at 4.)

   AMD does not identify any other *specific* information it is seeking in connection with
Intel's prior document retention approaches in other litigation other than whether auto-delete has
been suspended, nor does it provide argument supporting the need to obtain any such specific
information.  At most, AMD argues that because Intel made statements in a letter to
Judge Farnan that its retention efforts constituted "best practices" and that its form of hold notice
had been used successfully in other cases (citing to the March 5, 2007 letter from Richard L.
Horwitz to Judge Farnan, Jr.  (Ex. 1, hereto.)), those statements opened the door to unspecified
free-ranging discovery about Intel's prior litigation document retention practices for the last
decade.  Whether Intel's retention plan constituted "best practices" involves an assessment of
what are accepted as best practices in litigation generally at the time, not Intel's practice in
litigation historically.

   AMD's relevance argument also ignores Intel's repeated point, set forth in both its letter
to Judge Farnan and its brief in support of its remediation plan, that the document retention
challenges in this litigation were of a unprecedented nature and magnitude, beyond those

The Honorable Vincent J. Poppiti
January 11, 2008
Page 2

presented in any prior litigation. For example, the March 5, 2007 letter (Ex. 1) noted (at 2) that "the enormous scope of potentially producible documents makes the document retention issues [in the AMD case] far more complex than in any ordinary case." And the letter further stated (at 1) that the process was "extraordinarily complex in light of the broad-ranging allegations at the AMD complaint which, as pled, reaches the worldwide activities of Intel – a company with approximately 100,000 employees at the time, most with individual computers – and with hundreds of computing systems that are geographically dispersed throughout the world." This was further explained in Intel's brief in support of its remediation plan, where Intel argued that "from a process standpoint, Intel faced unprecedented challenges in its document preservation efforts for this massive case, which exceeded many times over anything Intel had previously faced;" that the case was one "for which Intel had to develop practical solutions as it went along;" and finally, that Intel's document retention effort "had to be made in the context of rapidly evolving legal and technical standards and solutions." (Report and Proposed Remediation Plan of Intel at 2.)

Thus, far from arguing that its document retention was a mere copy of what it had done in prior litigation, Intel explained that there were many dissimilarities which meant it was not relying upon its past practices. As for the litigation hold notice issue, Intel has already provided a sample of the general form used by Intel. AMD's argument that Intel "opened the door" to broad discovery through its arguments is simply unsupported by the record.

Further, AMD's failure to address any specific facts that it needs other than those concerning auto-delete constitutes a failure to properly support its motion, both as a matter of procedure and in practical terms.[1] While AMD brushes aside Intel's work product and attorney-client privilege arguments by stating that it merely wants to discover "facts" about Intel's retention measures, AMD's failure to reference any retention measure (i.e., "facts") other than suspending "auto-delete" (which Intel has agreed to address), is telling. AMD is fully aware of all the steps Intel took to preserve and collect documents because Intel has willingly provided that information in writing – i.e., comprehensive complaint freeze tapes, detailed hold notices, weekly back-up tapes, aggressive hard drive harvesting. What AMD fails to identify (beyond suspending auto-delete) is what other steps it believes Intel could have taken that might support its need for discovery. And AMD does not identify even a theoretical measure Intel could have employed, for which it wants discovery, and thereby frame an inquiry that Intel can answer factually. AMD has specifically disclaimed seeking testimony and documents on the issues and

---

[1] It is extremely burdensome to seek to prepare a Rule 30(b)(6) witness about all the facts concerning Intel's retention practices in connection with 10 years of intellectual property, Human Resources, real property, and other forms of litigation, as opposed to addressing a specific question, such as one relating to auto-delete. The complexity of the retention efforts of this case alone presents enormous discovery burdens, and do not need to be compounded by yet another fishing expedition implicating privilege and work product.

The Honorable Vincent J. Poppiti
January 11, 2008
Page 3

thought process behind the selection and implementation of Intel's retention measures in other cases (Motion at 4), which in any event is core work product, not discoverable under Rule 26(b).

It appears that at least one purpose of AMD's letter brief is to preview its argument regarding Rule 37(f) of the Federal Rules of Civil Procedure, and to attack Intel's decision at the outset of the litigation to use the methods outlined above to preserve documents, as opposed to modifying its information system directly. As an example, AMD points (Motion at 2) to *Mosaid Technologies Inc. v. Samsung Electronics Co., Ltd.*, "as directly on point." AMD is mistaken. First, *Mosaid* is not "on point" as it does not address the issue of discoverability of document retention practices in other litigation. Nor does it support the view that a decision not to suspend an auto-delete function itself constitutes a document retention failure. The problem in *Mosaid* was that the defendant did not produce a single relevant technical email because it took no document preservation steps whatsoever. *Id.* at 333. The Court in *Mosaid* did not hold, suggest or even discuss any "obligation" to modify the information system itself, *i.e.*, "suspend auto-delete." Instead, the court noted that the defendant had an obligation to institute a litigation hold and take steps to preserve relevant emails, a principle not in dispute here. To compare what the court characterized as an utter failure to undertake any retention efforts in a narrow patent dispute to the extensive efforts undertaken by Intel - - which, even with its acknowledged lapses, will lead to almost certainly the largest document production in the history of litigation -- and to then assert that the case is "directly on point" to this narrow discovery issue - - is entirely unfounded.

Similarly, AMD's attempt to cast the advisory committee's note on the "safe harbor" of Rule 37(f) as establishing a rule that the only reasonable method of document preservation is to abandon an information management system, turns the law on its head. The language of Rule 37(f) states that "[a]bsent exceptional circumstances, a court may not impose sanctions under these rules on a party for failing to provide electronically stored information lost as a result of the routine, good faith operation an electronic information system." Rule 37(f) was enacted to protect a party from the imposition of sanctions for loss of information caused by the good faith operation of an information management system, not to provide a basis to award sanctions.

While Rule 37(f) will no doubt be addressed at length when AMD's anticipated sanctions motion is actually filed, the Rule was intended as a shield, not a sword. What does or does not constitute "good faith" operation of an information management system in the context of a particular lawsuit is a fact specific inquiry, not at issue for this motion. AMD's apparent argument that the "safe harbor" necessarily requires the technical alteration of the information management system itself, rather than simply good faith efforts to preserve relevant documents, would, in fact, render the "safe harbor" meaningless. Moreover, such arguments are contravened by the Committee Notes (on Rule 37(f)) that considered this very issue: "[T]he regular purging of e-mails or other electronic communications is necessary to prevent a build-up of data that can overwhelm the most robust electronic information systems." *See* Report of the Judicial Conference, Committee on Rules of Practice and Procedure (Sept. 2005) at 14. If the law required technical modification of the information management system itself in all instances it would have said so. Intel believes that its plan – document hold notices, backed up by a

The Honorable Vincent J. Poppiti
January 11, 2008
Page 4

comprehensive system of back-up tapes, in light of all the facts in this case, will easily satisfy the good faith standard.[2] AMD disagrees, but that issue is properly litigated later.

Finally, AMD's attempt to create the impression that it "warned" Intel about its decision not to suspend auto-delete cannot go unchallenged. In its preliminary statement, AMD contends that "[a]t the outset of this litigation, citing impracticality, Intel decided not to suspend its 'auto-deletion' of employee e-mail *notwithstanding plaintiff's expressed concerns.*" (italics added). (Motion at 1.) Not surprisingly, there is no citation to evidence of plaintiff's "expressed concerns." Nor can AMD say it was misled into believing Intel was suspending auto-delete. In his letter of October 14, 2005, John Rosenthal, a litigation partner with the Howrey law firm specializing in e-discovery issues, informed AMD counsel of Intel's document preservation efforts in light of the Complaint that was filed three and a half months earlier. In that October, 2005 letter, (Ex. 2 at 1) Mr. Rosenthal stated that

> "As I recently indicated on the telephone to you, Intel does have a 35 day auto delete policy relating to e-mail. Intel has expressly instructed all custodians subject to the hold to preserve all relevant e-mails. In addition, Intel has moved a large number of custodians (and is in the process of moving all custodians) subject to the hold notice to a group of isolated Exchange servers. These servers are backed up on a regular weekly interval, and in-turn, those back up tapes preserved through the litigation."

At no time, up until February 2007, did AMD or its counsel communicate to Intel or its counsel that it believed Intel's continued use of auto-delete was improper. Indeed, AMD's counsel admitted in a February 15, 2007 letter that AMD was informed about Intel's 35 day auto-delete system, but was "mollified" by a description of the retention plan, in particular the weekly back-up tapes. (Ex. 3.) It was only after the fact that AMD's counsel said "frankly, we saw this coming." (Ex. 3.) It is easy in hindsight for AMD to disagree with Intel's comprehensive document retention plan because of Intel's lapses in implementation – but AMD's silence certainly supports the view that the plan itself was reasonable.

---

[2]  AMD further uses this discovery dispute to argue that Intel could have disabled its auto-delete mechanism and doing so "would have initially cost no more than $55,000." This argument is not relevant to the motion and misleading. As AMD itself admits, this is an "initial cost," and does not address any system or productivity issues. The cost of doing so for more than 1000 custodians for the years this case is pending would have been a multiple of that "initial cost." Nor did Intel ever say – as AMD claims (Motion p.2) – that Intel contended suspending auto-delete was "impossible."

The Honorable Vincent J. Poppiti
January 11, 2008
Page 5

Respectfully,

*/s/ Richard L. Horwitz*

Richard L. Horwitz

/msb
842091 / 29282

cc    The Honorable Vincent J. Poppiti (via electronic mail)
      Charles Diamond, Counsel for AMD (via electronic mail)
      Michael Hausfeld, Interim Class Counsel (via electronic mail)
      Frederick L. Cottrell, III (via electronic mail)
      James L. Holzman (via electronic mail)

# EXHIBIT 1



Potter
Anderson
&Corroon LLP

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984-6000

www.potteranderson.com

Richard L. Horwitz
Partner
Attorney at Law
rhorwitz@potteranderson.com
302 984-6027 Direct Phone
302 658-1192 Fax

March 5, 2007

**VIA ELECTRONIC FILING**

The Honorable Joseph J. Farnan, Jr.
United States District Court
District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street, Room 4124
Wilmington, DE 19801

Re:     *Advanced Micro Devices, Inc., et al. v. Intel Corporation, et al.,*
        *C. A. No. 05-441-JJF;*
        *In re Intel Corp., C.A. No. 05-1717-JJF; and*
        *Phil Paul v. Intel Corporation, C. A. No. 05-485-JJF (Consolidated)*

Dear Judge Farnan:

         In connection with the March 7, 2007 Status Conference, Intel Corporation and Intel
Kabushiki Kaisha (collectively "Intel") submit this letter to advise the Court of some document
retention lapses that have occurred, related primarily to emails generated *after* the filing of
complaint, and the extensive steps Intel is undertaking to address these issues. We will be
prepared to discuss these matters at the upcoming Status Conference.

         Intel advised counsel for AMD of the document retention issues it was addressing on
February 8, 2007, and alerted lead class counsel the next week. On February 22, 2007, Intel met
in person with counsel for AMD to provide more detailed information about the retention issues,
including a spreadsheet of some of the issues discovered by Intel. At the time of the meeting,
Intel's counsel cautioned AMD that the information being provided was preliminary and subject
to revision and supplementation. During the meeting Intel also obtained AMD's input on the
remedial plan to be undertaken. Although these discussions are still underway, Intel thought it
was appropriate at this time to provide the Court with an overview of the issue as we now
understand it.

         A.     **Intel's Tiered Preservation Process**

         Intel acted swiftly after learning of the filing of the complaint on June 27, 2005 to address
document retention, putting into place a tiered process to identify and preserve potentially
relevant paper and electronic records. The process was extraordinarily complex in light of the
broad-ranging allegations of the AMD complaint which, as pled, reached the worldwide
activities of Intel – a company with approximately 100,000 employees at the time, most with

The Honorable Joseph J. Farnan, Jr.
March 5, 2007
Page 2

individual computers – and with hundreds of computing systems that are geographically dispersed throughout the world. The tiered process is premised on preserving records utilizing, *inter alia*, the Information Technology ("IT") group, and includes harvesting hard drives and documents on Intel's systems, creating back-up tapes and requiring individual employees to save materials. The enormous scope of potentially producible documents makes the document retention issues far more complex than in an ordinary case. A summary of this tiered process is described below – which is necessary to understand the lapses that occurred.

- The day after the AMD complaint was filed, Intel instructed its IT group to preserve a one time company-wide snapshot of email and other electronic documents that were stored on Intel's servers, including Exchange servers that store emails. This was accomplished by taking a complete set of back-up tapes and preserving them, rather than recycling them to be written-over, as is the normal process. This generated thousands of back-up tapes ("Complaint Freeze Tapes").

- On July 1, 2005, Intel also sent litigation hold notices to hundreds of employees who it then believed, based on the complaint, were most likely to possess relevant documents – instructing them to retain all relevant documents, broadly defined, including email. The first notice went to more than 600 employees. The basic form of notice had been used successfully in previous Intel litigation. On a rolling basis, throughout 2005, 2006 and 2007, retention notices were sent out to additional employees who were later identified as also likely to have relevant information.

- Starting July 8, 2005, Intel sent a team out to numerous Intel facilities to begin harvesting, i.e., collecting, documents of key employees most likely to possess relevant material. The "harvesting" included copying all information on the employee's computer hard drive, including any emails or documents maintained by that employee on Intel's servers as of the date of harvest. To date, Intel has harvested documents from over eight hundred employees.

- As a secondary measure, in the middle of October 2005, Intel began implementing a program of creating weekly back-up tapes on a going-forward basis for several hundred employees from whom documents might be requested. Given the number of Intel employees, and the number of servers at Intel, for practical reasons this required the affirmative step of moving the relevant individuals from their existing servers to separate, dedicated servers that were then backed-up weekly.[1]

---

[1] As will be explained in greater detail in any final report on this issue, Intel does not have weekly back-up tapes for every custodian on the final Custodian List. Some were inadvertently not migrated to the server in 2005 and some, who were later identified, were

[Footnote continued on next page]

The Honorable Joseph J. Farnan, Jr.
March 5, 2007
Page 3

In summary, Intel put in place comprehensive processes to preserve a very broad universe of documents for possible production. It generated tapes representing an electronic snap-shot of electronic data stored on the company's servers immediately after the filing of the complaint. It sent hundreds of employees likely to have relevant documents and emails specific instructions to retain that material and began promptly harvesting documents for production. And then it added a program of creating back-up tapes as a fail-safe, to be used as a last resort if there were any lapses in individual employees' retention efforts.

From a process standpoint, Intel acted promptly to set up a reasonable and thorough tiered process that exemplified best practices in such a massive case. Intel made good decisions about what procedures to implement. Intel's objective was to go beyond the standard of reasonableness, even though it recognized that the actual production, while enormous, would necessarily be a small sub-set of that being preserved. Intel communicated its retention program to AMD by letter in October 2005, and received no objections. AMD sent Intel a similar letter, which described a parallel effort.

**B.    Document Retention Issues**

Despite these measures, Intel has identified a number of inadvertent mistakes in the implementation of the above described preservation process. These document retention issues are the result of human errors in implementation, and include the following: some employees' retention practices were incomplete on an individual level, some employees had not been given timely notice to retain materials, some terminated employees' documents may not have been saved, and the fail-safe plan to prepare back-up tapes missed some employees.

The human errors in executing the preservation plan were independent of the plan itself, and to some extent, in retrospect, were the consequence of the huge undertaking that document retention and production entailed in this case, involving employees scattered throughout the world, an evolving retention list, which, as of today, includes approximately 1,400 individual employees,[2] and a major redeployment and layoff of approximately 9,000 employees in 2006 necessitated by business conditions.

With respect to email, the retention issues primarily include:

- Certain employees complied with the retention notice by moving emails from their inbox to their hard drive, but failed to move emails from their sent box to

---

[Footnote continued from previous page]

not migrated upon such identification. In addition, some weekly back-up tapes appear to have been recycled.

[2]  This includes employees who were sent litigation hold notices, but who no longer are employed by Intel.

The Honorable Joseph J. Farnan, Jr.
March 5, 2007
Page 4

> their hard drive, and those sent items were purged by Intel's system of
> automatically deleting emails after they have aged for a certain period of time;[3]
>
> • A few employees thought Intel's IT group was automatically saving their emails;
>   and
>
> • Some employees may not have moved all the emails called for by the sweeping
>   requests to their hard drives.

Another lapse occurred during the on-going effort to refine the custodian list, when Intel
identified employees to add in lieu of employees previously designated on the list. Because
everyone recognized from the start of the litigation that not all of the potentially relevant
information in such a massive case realistically could be produced or maintained, the parties
cooperatively negotiated a series of agreements to narrow and focus discovery. An agreement
was reached to use a "custodian based" approach to the preservation, collection, review and
production of documents. In May 2006, AMD and Intel entered into a Stipulation and Proposed
Order Regarding Document Production, pursuant to which the parties agreed that Intel and AMD
would each designate "custodians" (employees) with "an appreciable quantity of non-privileged,
material, non-duplicative documents and things" responsive to the document requests.

In negotiating the Stipulation, there were discussions about the number of employees
each party would be obligated to put on its respective list. Intel agreed to put in excess of 1000
employees on its list. AMD committed to place at least 400 employees on its list. On June 1,
2006, Intel designated more than 1000 such custodians and AMD designated approximately 440.

The Stipulation provided that each party was required to identify a sub-set of its list of
employees (at least 20%) for initial document production purposes, to provide a "comprehensive
response" to the requests. Intel designated 217 employees to comply with that agreement, and
Intel is currently reviewing and producing documents from these 217 employees. Under the
Stipulation, the next step is for AMD to select another sub-set of employees on Intel's list for

---

[3] Like many companies, Intel's email system routinely deletes emails remaining in the mailbox
after they have aged a certain period of time. Aging does not apply to emails moved to a
person's hard drive or personal folders. The system is common in many companies to
maintain the efficient functioning of the complex, dynamic environment of email servers.
Intel employees are educated on the operation of the purge system and instructed on the
methods of saving emails to prevent them rolling off the system once they reach the end of
the aging period. Congress recently enacted Rule 37(f) of the Federal Rules of Civil
Procedure in recognition of the unique document preservation challenges presented by the
manner in which most large computer systems operate. The Committee Notes regarding the
impetus for Rule 37(f) point out that: "[T]he regular purging of e-mails or other electronic
communications is necessary to prevent a build-up of data that can overwhelm the most
robust electronic information systems." *See* Report of the Judicial Conference, Committee
on Rules of Practice and Procedure (Sept. 2005) at 14.

The Honorable Joseph J. Farnan, Jr.
March 5, 2007
Page 5

production. AMD has the right to select approximately 254 more Intel employees for document production (and has identified 74 such additional employees to date). Thus, the maximum number of Intel employees from whom Intel may be required to produce documents will not exceed 471, absent good cause.[4]

During the process of selecting employees for its final version of the Custodian List, in mid-2006 Intel identified an additional 400 or so employees to add to the list, supplanting other employees already on Intel's retention list. These new designees had not previously been provided with a retention notice. Although the additional employees were slated to be put on retention in mid-2006, Intel recently realized that, notwithstanding its intention to do so, it had failed to send retention notices to most of these additional designees. This was essentially a single mistake, as it was a failure to circle back after the creation of the final list of additional custodians. This error was corrected promptly upon discovery.

Before Intel caught its error in failing to send these additional retention notices, it had already instructed more than 1000 employees to retain documents, including hundreds of employees that ultimately were not included on Intel's final custodian list. Although there is a process set forth in the Stipulation to remove persons from retention once the final custodians have been selected, none of these people who were on the initial retention list, but not included on the final list, were taken off retention and they continue to be a potential source of documents if necessary.

Intel also is currently investigating the completeness of its efforts to collect documents from terminated employees, and there may be some lapses in that regard. Intel had significant redeployments and lay-offs in 2006, which in hindsight made it more difficult to adhere to Intel's policies requiring collection of electronic information from departing employees subject to litigation holds.

### C.    Intel's Ongoing Review and Remediation Efforts

While Intel is continuing its review of these various document retention issues, Intel has developed and it is in the process of implementing a plan to address each of these issues. These remedial actions include the following steps:

First, another round of litigation hold notices has been sent to all employees who are currently employed by Intel and appear on Intel's Custodian List, including those who were missed earlier.

Second, the overall scope of the emails and documents Intel will be producing is sweeping in breadth and magnitude – and will encompass the equivalent of tens of millions of pages of material from many hundreds of employees with overlapping involvement in communications, both internal and external. These materials should span the full breadth and

---

[4] AMD and Intel also have the right to supplementation from a specific number of custodians after the main production.

The Honorable Joseph J. Farnan, Jr.
March 5, 2007
Page 6

provide a comprehensive picture of Intel's business activities that might be relevant in the lawsuit, which involves an evaluation of the competition between Intel and AMD and the terms and conditions of the parties' sales, which is evidenced in multiple ways, from multiple sources.

Third, Intel expects the Complaint Freeze Tapes that were retained immediately after the complaint will be substantially complete, but is in the process of confirming this fact. Intel is specifically aware of only one likely exception at this point involving a small number of back-up tapes from its Munich facility. Intel has a huge project underway to collect and (using multiple vendors) to restore and index all the back-up tapes made at the time the complaint was filed. Only then will Intel be in a position to confirm definitively the status of those back-up tapes. Those tapes will be used as a basis for additional production as may be necessary of emails in existence when the complaint was filed.

Fourth, Intel is producing massive volumes of emails and other materials gathered by its ongoing harvesting of materials of employees maintained on their computer hard drives and servers, and that process to capture and preserve materials is continuing unabated.

Fifth, the weekly back-up tapes (initiated in October/November 2005) will supplement the email production for many of the employees who might be missing some emails generated after the complaint was filed. As is the case with the Complaint Freeze Tapes, Intel is in the process of restoring and indexing all such back-up tapes, and, when that work is completed, Intel will be in position to confirm the emails captured on those tapes.

Sixth, emails that may be missing from the production of some employees are likely to be picked up in the retained emails of other employees who were addressees or received copies.

Seventh, Intel is implementing a new email archiving system to replace the reliance on the individual custodians and the secondary weekly back up tapes for preservation. The system will use software developed by EMC, Inc. Once fully implemented, the archive will preserve all sent and received emails of all of the employees subject to the legal hold notice. Intel has been beta testing the system over the last two months and it is moving quickly to implement the system.

In light of the multiple layers of retention, it is necessary to restore and compare these various sources of information to evaluate Intel's document retention. It is not a matter of simply adding up the number of persons who have some form of retention issue at one level of the retention process. Many of the issues are limited in scope or time, or are addressed by specific back-up materials, and must be evaluated in the context of the multiple sources of retained materials and the actual email and retention practices of the various individuals.

As one example of how the multiple layers of retention may minimize what would otherwise appear to be a loss of emails, set forth below is an explanation of the means by which Intel can and will search for the emails from the "sent" items folders of employees who failed to affirmatively save emails from their "sent" items, which is the most common lapse on an individual employee basis.

The Honorable Joseph J. Farnan, Jr.
March 5, 2007
Page 7

First, some of these employees copy themselves on "sent" emails, which then would be archived from their inboxes. Second, a meaningful percentage of emails are responded to, and therefore the underlying "sent" email is preserved. Third, Intel believes that it has the Complaint Freeze Tapes for almost all of the employees on the Custodian List. Fourth, for many of these individuals, Intel has harvested their electronic data, including email. Fifth, for many of the individuals, Intel has their weekly back-up tapes. Sixth, for many of the individuals, Intel has both their harvested materials and their weekly back-up tapes. Seventh, for those custodians for whom Intel does not have the weekly back-up tapes, Intel will identify other employees with whom the non-complying individual regularly corresponded and search the emails of those additional employees. Finally, for a particular customer, where the key communications will be in the files of several individuals, the fact that one employee may not have perfectly retained documents will not mean that all key communications about a customer will not be produced. To the contrary, there will be massive duplication in what is produced because of the practice of Intel employees to copy multiple recipients on important communications.

In closing, Intel is taking this matter very seriously. It very much regrets this happened. At every step of the way, Intel had the best intentions regarding developing and implementing reasonable and comprehensive tiered preservation processes. It should be noted that the non-compliance issue is largely limited to post-complaint e-mail and that literally millions of email and other documents have been appropriately preserved and produced or in the process of being produced. Intel voluntarily disclosed this matter in good faith to AMD and the Class after it had completed its preliminary review. Intel is undertaking these remediation efforts at great expense. In addition, Intel has made it clear to counsel for AMD and the class that it is prepared to share information regarding Intel's efforts in that regard and to work with them going forward in addressing the issues and minimizing any potential losses, if any, of information.

In terms of moving forward, Intel respectfully requests that it be given a short period of time to complete our review, continue the above described remediation efforts and, thereafter, make a more detailed report to the Court. And we would welcome this Court's or Special Master Poppiti's oversight. We look forward to discussing these matters with the Court on March 7, 2006.

Respectfully,

/s/ Richard L. Horwitz

Richard L. Horwitz

/msb
781165 / 29282

cc    The Honorable Vincent J. Poppiti (via electronic mail)
      Charles Diamond, Counsel for AMD (via electronic mail)
      Michael Hausfeld, Interim Class Counsel (via electronic mail)
      Frederick L. Cottrell, III (via electronic mail)
      James L. Holzman (via electronic mail)

# EXHIBIT 2

# HOWREY LLP

1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
www.howrey.com

**John J. Rosenthal**
Partner
T 202.383.7234
F 202.383.6610
rosenthalj@howrey.com

File 03656.0038

October 14, 2005

VIA E-MAIL

David L. Herron
Jeffrey J. Fowler
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA  90071-2899

  Re: AMD v. Intel - <u>eDiscovery Issues Regarding Preservation</u>

Dear Mr. Herron:

   I am writing in response to your letter regarding our ongoing discussions concerning the preservation of documents potentially related to the litigation.  As an initial matter, I want to reconfirm that these communications (including this letter) are part of the agreement between the parties that the E-Discovery Committee's discussions are "off the record" and, accordingly, neither party will quote, restate, or otherwise reference the contents of our oral or written communications outside the confines of the meet and confer process, including in any submission to the Court.

   In terms of your specific inquiries, I have outlined Intel's responses below.

**Intel's Preservation of Documents**

  1. Your statement is correct with the exception that Intel's initial steps regarding preservation were undertaken commencing on June 28, 2005.  In addition, the back up was taken of those IT systems that Intel identified as potentially relevant to this action and not of all Intel's systems.  As I previously stated, Intel did not back up, for example, all engineering data systems.

  2. Intel issued its first instruction to hold documents on July 1, 2005.  The initial hold instructions were issued to approximately 600 custodians and approximately 500 additional custodians have received hold instructions so that the total number of custodians under the hold instructions is approximately 1,100.

  3. As I recently indicated on the telephone to you, Intel does have a 35-day auto delete policy relating to e-mail.  Intel has expressly instructed all custodians

**HOWREY.**

David L. Herron
October 14, 2005
Page 2

subject to the hold to preserve all relevant e-mails.  In addition, Intel has moved a
large number of custodians (and is in the process of moving all custodians)
subject to the hold notice to a group of isolated Exchange servers.  These servers
are backed-up on a regular weekly interval and, in turn, those back-up tapes
preserved through the litigation.

4.       For each of the custodians issued a hold notice, Intel is in the process of collecting
potentially relevant data from their hard drives.  At present, Intel has completed
this process for approximately 300 custodians.  In doing so, Intel is doing a
complete folder capture, including copying the "my documents" folder.  By doing
a complete folder capture, the relevant documents and associated metadata should
be captured without any modification.  Those folders will then be processed and
reviewed.

**Follow-Up Questions**

o   Approximately 5,500 tapes were generated during the week of June 27 and the
weekend immediately following July 1st and those tapes are being maintained.

o   Tapes are labeled with a bar code and indexed with basic information reflecting the
time of the back up and the system that was backed up.  Tapes are held at various
locations worldwide with a strict chain of custody maintained.

o   Instructions regarding the "snapshot" back up were verbally communicated and then
confirmed in writing to the relevant IT staff located within particular facilities.

o   The "snapshots" of the relevant systems were taken each day from June 28 to July 1
and the weekend of July 1, 2005.

o   None of the back-up tapes taken during the period described above have been
recycled.

o   As we previously advised you, the back-up systems were returned to normal rotation
after the "snapshot" was taken and the legal hold notice was issued.  The back-up
rotation schedule varies according to the individual system.  Accordingly, certain
tapes have run through the back-up cycle, while other tapes are yet to complete the
recycle process.  Obviously, with the number of systems and tapes involved, it would
be extremely burdensome to identify where each of the tapes stand within their
individual rotation cycle.

o   There is no current legal hold on any existing back-up tapes other than those
constituting the first back up.  As we previously told you, Intel has issued a legal hold
notice and is undertaking to collect the relevant documents.  We have no reason to
believe that potentially relevant documents on active systems have been deleted and
believe that the custodians are preserving the relevant records on the active systems.

**HOWREY**LLP

David L. Herron
October 14, 2005
Page 3

o   As we previously discussed, Intel is moving all of the custodians to an isolated set of
    Exchange servers in order that those servers can be backed up on a regular basis and
    those tapes preserved during the litigation. Again, we are open to discussing with you
    additional preservation steps with respect to certain database systems.

**Shared Sources**

o   Intel took the initial "snapshot" of shared spaces where potentially relevant
    documents are located. In addition, Intel has advised custodians of the need to
    preserve records located in shared spaces.

**Custodian Legal Holds**

o   Approximately 1,100 hold notices have been issued.

o   The hold notices were communicated by e-mail.

o   Intel is not inclined to disclose the specific instructions contained in the legal hold
    notice on the grounds of privilege. As we previously discussed, we may be willing to
    exchange copies of the legal hold notice provided we mutually agree that such
    disclosure does not constitute a broader waiver of the attorney-client privilege and/or
    Intel's work product. In addition, we would need assurance from the class lawyers
    that they are agreeable to such an arrangement.

o   In terms of follow-up to the hold notice, Intel is in the process of collecting the
    documents from individual custodians. At the time of that collection, the custodians
    are reminded of their ongoing obligation to preserve potentially relevant records.

o   Intel has requested that it's Legal Department and IT staff be advised of any
    employees subject to the hold notice that are leaving the employment of Intel. The IT
    department has been instructed that the hard drives of any such employees that are
    likely to have discoverable information are appropriately preserved.

o   There are no new or different hold instructions once documents are collected from a
    custodian's computer. Again, the custodian is reminded of his/her continuing
    obligations to preserve potentially relevant records.

**Miscellaneous Sources**

o   Intel does not archive instant messages and does not have an instant message
    archiving system.

o   Custodians have been instructed that if they have or generate instant messages that
    are potentially relevant to this litigation they are to print the instant messages or to
    save them electronically for future collection.

# HOWREY.

David L. Herron
October 14, 2005
Page 4

**Preservation Timing**

o   The JFTC seized certain documents from Intel's offices located in Japan. Copies of all such documents have been preserved. Following the instigation of the JFTC's investigation, Intel collected relevant documents from custodians in Japan and a limited number of custodians in the United States. These documents have also been preserved. Subsequently, Intel issued a legal hold notice to certain custodians located in Japan with direction to preserve potentially relevant documents. That legal hold notice remains in place today.

   As we discussed, while you have previously indicated that AMD is generally comfortable with the preservation steps undertaken by Intel, we are agreeable to discussing additional steps that you may feel are prudent and reasonable. We look forward to receiving AMD's responses to these same questions in order that we can further discuss the steps that AMD has taken regarding preservation.

Sincerely,

John J. Rosenthal

cc: Rod Stone

# EXHIBIT 3



## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
HONG KONG
LONDON
LOS ANGELES
NEWPORT BEACH

1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067-6035

TELEPHONE (310) 553-6700
FACSIMILE (310) 246-6779
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

February 15, 2007

OUR FILE NUMBER
0008346-163

**VIA E-MAIL AND U.S. MAIL**

WRITER'S DIRECT DIAL
(310) 246-6789

Robert E. Cooper, Esq.
Gibson, Dunn & Crutcher
333 South Grand Avenue
Los Angeles, California 90071-3197

WRITER'S E-MAIL ADDRESS
cdiamond@omm.com

Re:    *AMD v. Intel — Document Retention Issues*

Dear Bob:

I have your Thursday email concerning the apparent lapse in Intel's document retention program and your efforts to identify and mitigate the loss of data. I worry that you understate the gravity of the situation. The retention problems and irretrievable loss of important data you describe appear to be broad in scope affecting as many as 20% to 30% of Intel's custodians.

Frankly, we saw this coming. In Fall of 2005, John Rosenthal generally described Intel's reliance on custodians to identify and retain relevant materials, but stated that Intel did not automatically delete email. He later corrected himself and informed us that Intel had not disabled an automatic delete system that purged custodian email after 35 days. But he mollified us with assurances that Intel intended to back-up all custodial email weekly. We shouldn't have been reassured. The Intel custodian-based "honor system" was defeated by a combination of custodian error and Intel's faulty retention instructions. And the back-ups that were supposed to backstop the "honor system" failed to capture and preserve email for what appears to be well in excess of 200 of your 1027 custodians.

At a time when the profession is so focused on doing e-discovery and document retention right, we find these breakdowns, and the consequent irrevocable loss of critical evidence, very troubling. Nor are we comforted that the loss may be mainly of "Sent" email. While some outgoing email might be captured in the in-boxes of other custodians (assuming the recipient took the steps necessary to save it), critical communications with Intel customers and others outside the Intel organization would not be.[1] But the loss is not confined to sent email: in the

---

[1] The parties also acknowledged the practical problem of matching a "received" item in one custodian's production with a missing "sent item" in another's production when we agreed to de-duplicate data on a custodian-by-custodian basis. Thus, even if the email is not irretrievably lost, finding and using it will be made much harder, at least.

absence of backups for 20-30% of Intel custodians, we have no faith that the Intel "honor system" will work to provide us a complete, unabridged collection of even their out-going emails. Anecdotally, our review of Intel custodian data so far reveals worrisomely low volumes of email.

We consider Intel's decision to rely on these risky preservation techniques in a case of this magnitude and scope to be improvident. And we also feel that we were not being told the whole story when Intel pressed us for agreement on what we consider premature collection dates for key custodians and unreasonably limited "re-harvest" protocols, which would have masked the document retention issues you surfaced last week.

Notwithstanding this, as we discussed yesterday, we are prepared to meet with you and your colleagues early next week to assess the problem and to discuss appropriate next steps. In advance of the meeting, could you please undertake to determine and communicate to us the following:

1. Since you will obviously need to restore pre-litigation email back-ups (e.g., the "Complaint Freeze Tapes") in order to recapture all relevant email, could you please confirm that such usable tapes exist for all 1,027 individuals listed on Intel's preservation list? Please be prepared to advise us of any deficiencies.

2. AMD needs to understand the exact nature and scope of the retention problems you have identified on both the macro and custodian-specific levels. We would appreciate your supplying the following information, preferably in a spreadsheet or similar format: (a) the custodian's name; (2) whether that custodian has been designated by Intel on its "20% list" or, alternately, adversely designated by AMD; (3) the "harvest" date, i.e., date that the custodian's data was collected (if applicable); (4) the date upon which the custodian's email was migrated to the dedicated server, if it was; (5) a useful description of the exact nature of any retention deficiency or data loss; (6) the date that Intel discovered the retention deficiency or data loss; and (7) the time period during which these problems persisted.

   We expect that AMD will be able to discern from this information the identity of the custodians who failed to comply with Intel's litigation "hold notice" and, for each, the precise nature of the failure and its duration. This will also reveal the 151 "original" custodians and the "subsequently added" custodians whose emails the Intel IT Department did not migrate to dedicated servers and thus did not back up weekly. Of course, this will permit identification of custodians for whom there are no presently-identified retention issues.

3. Please also identify (either in the spreadsheet or similar format referenced above or separately) the European custodians whose backed-up email was lost when Intel's IT Department began recycling tapes and, for each, provide us with the dates of back-ups that do exist.

O'MELVENY & MYERS LLP

Robert E. Cooper, Esq., February 15, 2007 - Page 3

4. We believe that these failures calls into question Intel's overall preservation effort. We therefore renew our request, first made in September 2005, for detailed information about the preservation instructions Intel gave to custodians. We will do the same and stipulate that any disclosure will not otherwise waive any applicable privilege.

5. Finally, please confirm that for those custodians produced thus far, Intel has worked from a restored email collection, not simply the custodian's "honor system" archive.

Since harvesting of some custodians is on-going and since the parties contemplate updating the harvesting for at least selected witnesses, we urge that you immediately suspend the automatic deletion of any custodian email, and inform us when that has happened. In view of the failure of the current system to capture and retain all relevant material and your need to restore backups, Intel also should cease relying on custodians' selections (if it has) and instead go back and review the entirety of its custodians' email collections, as AMD has done from the very beginning.

Finally, we grow increasingly uncomfortable in keeping these problems from class counsel. We understand your desire to surface the issue with class counsel only when you have the complete facts. But we think it would be better to notify them of the problems discovered thus far and invite them to the table next week.

Let us know what days and times are convenient.

Sincerely,

Charles P. Diamond
of O'MELVENY & MYERS LLP

CC1:757969.2