# EXHIBIT 5

**IMPORTANT LEGAL NOTICE** - The information on this site is subject to a <u>disclaimer and a copyright notice.</u>

JUDGMENT OF THE COURT OF FIRST INSTANCE (Fourth Chamber)

20 March 2002 <u>(1)</u>

(Competition - Cartel - District heating pipes - Article 85 of the EC Treaty (now Article 81 EC) - Continuous infringement – Boycott - Access to the file - Fine - Guidelines on the method of setting fines - Non-retroactivity - Legitimate expectations)

In Case T-23/99,

**LR af 1998 A/S** (formerly Løgstør Rør A/S), established in Løgstør (Denmark), represented by D. Waelbroeck and H. Peytz, lawyers, with an address for service in Luxembourg,

applicant,

v

**Commission of the European Communities,** represented by P. Oliver and E. Gippini Fournier, acting as Agents, with an address for service in Luxembourg,

defendant,

APPLICATION for, primarily, annulment of Commission Decision 1999/60/EC of 21 October 1998 relating to a proceeding under Article 85 of the EC Treaty (Case No IV/35.691/E-4: - Pre-Insulated Pipe Cartel) (OJ 1999 L 24, p. 1) or, in the alternative, reduction of the fine imposed on the applicant by that decision,

THE COURT OF FIRST INSTANCE

OF THE EUROPEAN COMMUNITIES (Fourth Chamber),

composed of: P. Mengozzi, President, V. Tiili and R.M. Moura Ramos, Judges,

Registrar: G. Herzig, Administrator,

having regard to the written procedure and further to the hearing on 25 October 2000,

gives the following

# Judgment

**Facts of the case**

1.    LR AF 1998 A/S, formerly Løgstør Rør A/S, is a Danish company which at the material time manufactured and sold pre-insulated pipes used, *inter alia*, for district heating.

2.    In district heating systems, water heated in a central site is taken by underground pipes to the premises to be heated. Since the temperature of the water (or steam) carried in the pipes is very high, the pipes must be insulated in order to ensure an economic, risk-free distribution. The pipes used are pre-insulated and, for that purpose, generally consist of a steel tube surrounded by a plastic tube with a layer of insulating foam between them.

3.  There is a substantial trade in district heating pipes between Member States. The largest national markets in the European Union are Germany, with 40% of Community consumption, and Denmark, with 20%. Denmark has 50% of the manufacturing capacity in the European Union and is the main production centre in the Union supplying all Member States in which district heating is used.

4.  By a complaint dated 18 January 1995, the Swedish undertaking Powerpipe AB informed the Commission that the other manufacturers and suppliers of district heating pipes had shared the European market in a cartel and that they had adopted concerted measures to harm its activities or to confine those activities to the Swedish market, or simply to force it out of the sector.

5.  On 28 June 1995, acting under a Commission decision of 12 June 1995, officials of the Commission and representatives of the competition authorities of the Member States concerned carried out simultaneous and unannounced investigations at 10 undertakings or associations of undertakings in the district heating sector, including the applicant (hereinafter the investigations).

6.  The Commission then sent requests for information under Article 11 of Council Regulation No 17 of 6 February 1962, First Regulation implementing Articles 85 and 86 of the Treaty (OJ, English Special Edition 1959-1962, p. 87), to the applicant and most of the undertakings concerned.

7.  On 20 March 1997, the Commission served a statement of objections on the applicant and the other undertakings concerned. A hearing of the undertakings concerned took place on 24 and 25 November 1997.

8.  On 21 October 1998, the Commission adopted Decision 1999/60/EC relating to a proceeding under Article 85 of the EC Treaty (Case No IV/35.691/E-4: - Pre-Insulated Pipe Cartel) (OJ 1999 L 24, p. 1), corrected before publication by a decision of 6 November 1998 (C(1998) 3415 final) (the decision or the contested decision) finding that various undertakings and, in particular, the applicant had participated in a series of agreements and concerted practices within the meaning of Article 85(1) of the EC Treaty (now Article 81(1) EC) (hereinafter the cartel).

9.  According to the decision, at the end of 1990 an agreement was reached between the four Danish producers of district heating pipes on the principle of general cooperation on their domestic market. The parties to the agreement were the applicant and ABB IC Møller A/S, the Danish subsidiary of the Swiss/Swedish group ABB Asea Brown Boveri Ltd (ABB), Dansk Rørindustri A/S, also known as Starpipe (Dansk Rørindustrie), and Tarco Energi A/S (Tarco) (the four together being hereinafter referred to as the Danish producers). One of the first measures was to coordinate a price increase both for the Danish market and for the export markets. For the purpose of sharing the Danish market, quotas were agreed upon and then implemented and monitored by a contact group consisting of the sales managers of the undertakings concerned. For each commercial project (project), the undertaking to which the contact group had assigned the project informed the other participants of the price it intended to quote and they then submitted tenders at a higher price in order to protect the supplier designated by the cartel.

10.  According to the decision, two German producers, the Henss/Isoplus group (Henss/Isoplus) and Pan-Isovit GmbH, joined in the regular meetings of the Danish producers from the autumn of 1991. In these meetings negotiations took place with a view to sharing the German market. In August 1993, these negotiations led to agreements fixing sales quotas for each undertaking.

11.  Still according to the decision, all the producers agreed in 1994 to fix quotas for the whole of the European market. This European cartel involved a two-tier structure. The directors' club, consisting of the chairmen or managing directors of the undertakings participating in the cartel, allocated quotas to each undertaking in the market as a whole and in each of the national markets, including Germany, Austria, Denmark, Finland, Italy, the Netherlands and Sweden. For certain national markets, contact groups consisting of local sales managers were set up and given the task of administering the agreements by assigning individual projects and coordinating tender bids.

12.  With regard to the German market, the decision states that following a meeting between the six main European producers (ABB, Dansk Rørindustri, Henss/Isoplus, Pan-Isovit, Tarco and the applicant) and Brugg Rohrsysteme GmbH (Brugg) on 18 August 1994, a first meeting of the contact group for Germany was held on 7 October 1994. Meetings of this group continued long after the Commission

carried out its investigations at the end of June 1995 although, from that time on, they were held outside the European Union, in Zurich. The Zurich meetings continued until 25 March 1996.

13.  As a characteristic feature of the cartel, the decision refers in particular to the adoption and implementation of concerted measures to eliminate Powerpipe, the only major undertaking which was not a member. The Commission states that certain members of the cartel recruited key employees of Powerpipe and gave Powerpipe to understand that it should withdraw from the German market. Following the award to Powerpipe of an important German project, a meeting took place in Düsseldorf in March 1995 which was attended by the six major producers and Brugg. According to the Commission, it was decided at that meeting to organise a collective boycott of Powerpipe's customers and suppliers. The boycott was subsequently implemented.

14.  In the decision, the Commission sets out the reasons why not only the express market-sharing arrangements concluded between the Danish producers at the end of 1990 but also the arrangements made after October 1991, taken as a whole, can be considered to constitute an agreement prohibited under Article 85(1) of the EC Treaty. Furthermore, the Commission stresses that the Danish and European cartels were merely the manifestation of a single cartel which originated in Denmark but which from the start had the long-term objective of extending the control of participants to the whole market. According to the Commission, the continuous agreement between the producers had an appreciable effect on trade between Member States.

15.  On those grounds, the operative part of the decision is as follows:

*Article 1*

ABB Asea Brown Boveri Ltd, Brugg Rohrsysteme GmbH, Dansk Rørindustri A/S, Henss/Isoplus Group, Ke Kelit Kunststoffwerk Ges mbH, Oy KWH Tech AB, Løgstør Rør A/S, Pan-Isovit GmbH, Sigma Tecnologie Di Rivestimento S. r. l. and Tarco Energie A/S have infringed Article 85(1) of the Treaty by participating, in the manner and to the extent set out in the reasoning, in a complex of agreements and concerted practices in the pre-insulated pipes sector which originated in about November/December 1990 among the four Danish producers, was subsequently extended to other national markets and brought in Pan-Isovit and Henss/Isoplus, and by late 1994 consisted of a comprehensive cartel covering the whole of the common market.

The duration of the infringements was as follows:

- in the case of ... Løgstør, ... from about November/December 1990 to at least March or April 1996,

...

The principal characteristics of the infringement consisted in:

- dividing national markets and eventually the whole European market amongst themselves on the basis of quotas,

- allocating national markets to particular producers and arranging the withdrawal of other producers,

- agreeing prices for the product and for individual projects,

- allocating individual projects to designated producers and manipulating the bidding procedure for those projects in order to ensure that the assigned producer was awarded the contract in question,

- in order to protect the cartel from competition from the only substantial non-member, Powerpipe AB, agreeing and taking concerted measures to hinder its commercial activity, damage its business or drive it out of the market altogether.

...

*Article 3*

The following fines are hereby imposed on the undertakings named in Article 1 in respect of the infringements found therein:

...

(g) [Løgstør], a fine of ECU 8 900 000;

...

16. The applicant was notified of the decision by letter of 12 November 1998, received by it the following day.

**Procedure and forms of order sought by the parties**

17. By application lodged at the Registry of the Court of First Instance on 21 January 1999, the applicant brought the present action.

18. Seven of the nine other undertakings held liable for the infringement also brought actions against the decision (Cases T-9/99, T-15/99, T-16/99, T-17/99, T-21/99, T-28/99 and T-31/99).

19. Upon hearing the report of the Judge Rapporteur, the Court of First Instance (Fourth Chamber) decided to open the oral procedure and, by way of measures of organisation of procedure, requested the parties to answer a number of written questions and to produce certain documents. The parties complied with those requests.

20. The parties presented oral argument and answered the questions put by the Court at the hearing held in open court on 25 October 2000.

21. The applicant claims that the Court should:

    - annul the decision in so far as it is addressed to the applicant;

    - alternatively, substantially reduce the amount of the fine;

    - order the defendant to pay the costs.

22. The defendant contends that the Court should:

    - dismiss the application;

    - order the applicant to pay the costs.

**Substance**

23. The applicant relies in essence on five pleas in law. The first plea alleges factual errors in applying Article 85(1) of the EC Treaty. The second alleges infringement of the right of defence. The third alleges infringement of general principles and factual errors in determining the fine. The fourth alleges that the obligation to state reasons was infringed in connection with the determination of the fine. The fifth plea alleges that the rate of interest applied if the fine is not paid immediately is excessive.

    I - *First plea in law, alleging factual errors in applying Article 85(1) of the Treaty*

    A - *The compensation scheme in the framework of the Danish cartel*

1. Arguments of the parties

24.    The applicant observes that the Commission erred in stating, in point 35 of the decision, that it participated in a compensation arrangement at the end of 1991. When Tarco demanded compensation for the market share which it had lost, the applicant merely suggested withdrawing, for Tarco's benefit, a tender submitted on the Icelandic market which it knew had already been rejected by the Icelandic customer. Although other compensation schemes were discussed, the applicant ultimately made no payment to Tarco. This shows that the applicant had no intention of participating in a compensation scheme and did not in fact do so.

25.    The defendant observes that the applicant's explanations are inadequate, given that it admits having discussed compensation payments with Tarco and having made an offer to withdraw from a tendering procedure. The argument that no monetary compensation was paid does not contradict the analysis of the compensation scheme in the decision.

2. Findings of the Court

26.    The Commission maintains in point 35 of the decision that, as regards the cartel on the Danish market, there is no dispute that a compensation mechanism was operated at the end of 1991, but that the exact details of that compensation are unclear. The Commission refers, first, to Tarco's statement that cash was paid in return for invoices for non-existent deliveries of pipes and, second, to the applicant's reply of 2 October 1997 to the request for information of 26 August 1997, to the effect that Tarco's demand for compensation was settled by taking into account orders which the applicant had already placed with Tarco and by its relinquishment in favour of Tarco of its share in a joint project in Iceland (second paragraph of point 35 of the decision). The Commission concluded that, whatever the precise procedure for settling compensation had been in 1991, it was agreed that for 1992 a new system would apply, under which surplus market share would be rolled over and re-assigned to the producers who were below their allocated quota (third paragraph of point 35 of the decision).

27.    The applicant accepts that during discussions with Tarco following the latter's demand for compensation for the lost projects, it succeeded in satisfying that demand by stating that it was withdrawing its tender for an Icelandic project.

28.    Even though the applicant was aware that it was not going to obtain that project in any event and even though, following discussions with Tarco, no payment was made, it cannot be disputed that the applicant relinquished a project in favour of Tarco in order to meet a claim for compensation based on the mechanism set up within the cartel.

29.    The Commission was therefore correct to state that, even though the precise details of the compensation are unclear, it was established that the compensation mechanism was operated.

30.    The applicant's complaint must therefore be rejected.

B - *The existence of a continuous cartel from 1990 until 1996*

31.    The applicant denies having taken part in an infringement of Article 85 of the Treaty during a continuous period from about November-December 1990 to at least March or April 1996. According to the applicant, there were two separate cartels, one limited to the Danish market, from January 1991 to April 1993, and a second covering the European market from March 1995 to November or December 1995 and supplemented, as regards Denmark and Germany, by cooperation from late 1994 and sporadically until March 1996.

32.    The Court will first consider the arguments concerning the applicant's participation in the activities of the cartel, outside the Danish market, for the period 1990-1993, then the arguments concerning the suspension of its participation, in 1993, and the setting-up of a European cartel from 1994 and, last, the arguments concerning the duration and continuous nature of the cartel.

1. The applicant's participation in the cartel outside the Danish market during the period 1990-1993

- Arguments of the parties

33. The applicant observes that although a number of attempts were made by the undertakings concerned to secure cooperation in Germany between 1991 and 1993, these attempts were not successful and competition was not distorted during that period. The applicant did not want a market-sharing agreement because it felt that it was capable of increasing its market share. At the meetings which it attended it participated passively, without entering into any commitments.

34. First, the applicant did not participate in an agreement to increase prices for 1991, including prices on export markets. The Commission is wrong to rely in that regard on the note of the meeting of the sub-committee of the Danish council for Central Heating (an association with no connection to the cartel) on 22 November 1990, since the price increases announced by the producers on that occasion had been decided unilaterally. That is shown by the fact that the applicant's price increases which took effect on 12 November 1990 had already been published prior to that meeting. The producers could not have coordinated price increases which each of them had already decided. Tarco's statement to the contrary, on which the Commission also relies, is wrong. Furthermore, the person who signed that statement was not employed by Tarco at the time and was not present at the meeting.

35. In the period 1991-1993 the only infringements outside the Danish market were an agreement concerning Germany to increase gross price lists from 1 January 1992 and a cooperation agreement in Italy of 14 October 1991 concerning the Turin project. The agreement on gross price lists was not concluded until the meeting of 10 December 1991. At that meeting, however, no agreement was reached on common price lists or on a programme for monthly meetings. It is unlikely that the agreement on gross price lists had any direct effect on the German market, as the applicant was selling there through an independent distributor which fixed its own end prices and as the list price increases were offset by discounts granted by the applicant to its German distributor. The Turin project was an isolated instance of cooperation with no effect on the market.

36. Second, the applicant claims that it did not participate in an agreement on sharing the German market for 1994, as the Commission states in points 50 and 51 of the decision. It has no recollection of the meetings allegedly held in Copenhagen on 30 June 1993 and Zurich on 18 or 19 August 1993 as described in points 49 and 50 of the decision. Nor did it agree to the drafting of a uniform price list or to the preparation of a scheme of sanctions. The document which the Commission has presented as evidence of such an agreement, contained in annex 7 to the applicant's comments on the statement of objections, is merely a proposal by ABB which was submitted to the applicant at a later date (hereinafter the ABB proposal). The applicant's refusal to sign such an agreement was not inconsistent with its acceptance of an audit by Swiss auditors, commissioned by the members of the cartel, to obtain figures on the overall size of the German market or with the fact that Pan-Isovit had the impression that the applicant was seeking an agreement. The applicant pretended to be interested in an agreement on conditions which it knew were unacceptable to the German undertakings in the cartel. At a brief meeting which the applicant attended on 8 September 1993, it stated that it did not wish to conclude any agreement on the German market. At a meeting on 29 September 1993 it again refused to accept the ABB proposal. Not only did the applicant therefore refuse to accept an agreement to share the German market, but it actually caused the attempts to reach such an agreement to fail.

37. The applicant maintains that the mere fact that it participated in meetings with an anti-competitive object cannot result in its liability as a participant in the cartel, because on a number of occasions it explained to the other participants that it was not interested in pursuing the cooperation envisaged, thus distancing itself publicly from the matters discussed at the meetings. Furthermore, those discussions never achieved anything and had no effect on the market.

38. The defendant observes that, as regards cooperation outside Denmark between 1991 and 1993, an express agreement was concluded, first of all between Danish producers, on an export price increase at the beginning of 1991 and then on a price increase in Germany from January 1992, on price-fixing and project-sharing in Italy, and on the system of quotas in terms of market share for 1994. These agreements cannot be treated as isolated events. The applicant participated in numerous regular meetings in the context of a cartel which, from autumn 1991, extended the formal cooperation of Danish producers to the German market.

- Findings of the Court

39.    It is settled case-law that where an undertaking participates, even if not actively, in meetings between undertakings with an anti-competitive object and does not publicly distance itself from what occurred at them, thus giving the impression to the other participants that it subscribes to the results of the meetings and will act in conformity with them, it may be concluded that it is participating in the cartel resulting from those meetings (Case T-7/89 *Hercules Chemicals* v *Commission* [1991] ECR II-1711, paragraph 232, Case T-12/89 *Solvay* v *Commission* [1992] ECR II-907, paragraph 98, and Case T-141/89 *Tréfileurope* v *Commission* [1995] ECR II-791, paragraphs 85 and 86).

40.    It is against that background that the Court must evaluate, as regards the period October 1991 to October 1993, the evidence gathered by the Commission and the conclusions which it drew from that evidence in point 38 et seq. of the decision.

41.    First, it must be held that the Commission was correct to conclude in points 31, 38 and 135 of the decision that the applicant participated in the increases agreed upon by the Danish producers of their prices on export markets.

42.    The applicant does not deny that it participated in the meeting of 22 November 1990, the minutes of which (annex 19 to the statement of objections) contain a list of price increases, stating for each Danish producer one or two percentages with a date, both in a column headed Denmark and in a column headed Exports. The conclusion which the Commission drew from that document, that the participants in that meeting agreed to coordinate an increase in their prices on the export markets, is corroborated by Tarco's statement that the participants in that meeting reached agreement on concerted increases in their basic price lists both for domestic sales and for export sales (Tarco's reply of 26 April 1996 to the request for information of 13 March 1996, hereinafter Tarco's reply).

43.    The applicant cannot dispute the Commission's conclusion by claiming that the increase in export prices was not agreed at that meeting. The Commission merely found that the Danish producers coordinated their export price increases, which implies that the participants reached agreement at least on the way in which the envisaged price increases would be implemented, but it did not claim that the participants also agreed at the meeting in question on the principle or the precise percentage of the price increases. It follows from the minutes of the meeting of 22 November 1990 that the participants in any event announced the dates on which they were going to increase their prices and, where appropriate, the time-scale envisaged for that increase. The Commission was therefore entitled to find that there had been a concerted price increase.

44.    The applicant's argument that it had already published a list of increased prices before the committee meeting of 22 November 1990 is irrelevant. First, the applicant has not stated to what extent the price list published in Danish on 12 November 1990 also applied to export sales, given that at the meeting of 22 November 1990 it was considered necessary to deal with export prices separately from those for the Danish market. Second, the date on which that list became applicable (12 November 1990) corresponds to a date mentioned in the minutes of the meeting of 22 November 1990 for the increase of the applicant's prices on the Danish market, while all the price increases in the column headed Exports were to become applicable at a later date (1 December 1990 for Dansk Rørindustri and 1 January 1991 for Tarco and the applicant). The applicant cannot therefore claim that it increased its export prices without being aware that the other producers intended to do likewise.

45.    In that regard, it should be further pointed out that, contrary to what the applicant claims, the probative value of Tarco's reply is not affected by the fact that the person who signed it was not present at the meeting of 22 November 1990 or employed by Tarco at that time. As the reply was given on behalf of the undertaking as such, it carries more weight than that of an employee of the undertaking, whatever his individual experience or opinion. Furthermore, Tarco's representatives expressly stated in their reply that the reply represented the outcome of an internal investigation carried out by the undertaking.

46.    Second, the applicant recognises that it participated in an agreement to increase gross prices in Germany from 1 January 1992 and in a cooperation agreement in October 1991 relating to the Turin project.

47.    In that regard, the argument that the agreements in question had no effect on the market is irrelevant. Likewise, the argument that, following the agreement to increase gross prices, there was keen

competition on the market, leading to a reduction in prices, is of no effect. For the purposes of applying Article 85(1) of the Treaty, there is no need to take account of the concrete effects of an agreement once it appears that it has as its object the prevention, restriction or distortion of competition within the common market (Joined Cases 56/64 and 58/64 *Consten and Grundig* v *Commission* [1966] ECR 299, at p. 342, Case C-49/92 P *Commission* v *Anic Partecipazioni* [1999] ECR I-4125, paragraph 99, and Case C-199/92 P *Hüls* v *Commission* [1999] ECR I-4287, paragraph 178; and judgment of the Court of First Instance in Joined Cases T-39/92 and T-40/92 *CB and Europay* v *Commission* [1994] ECR II-49, paragraph 87). As regards the agreement to increase gross prices in Germany, the fact that an undertaking participating with others in meetings during which decisions on prices are taken does not comply with the agreed prices does not lessen the anti-competitive object of those meetings and therefore the undertaking's participation in the collusion, but tends at the most to show that it did not implement the agreements in question (Case T-148/89 *Tréfilunion* v *Commission* [1995] ECR II-1063, paragraph 79).

48.    Nor can the validity of the decision be affected, as regards the agreement to increase gross prices in Germany, by the applicant's assertion that that agreement did not include all the matters referred to by the Commission in the second paragraph of point 44 of the decision. The crucial elements of the agreement, which, according to ABB's reply of 4 June 1996 to the request for information of 13 March 1996 (hereinafter ABB's reply), were agreed in principle at a meeting on 9 or 10 October 1991, are to be found in the brief handwritten notes relating to the meeting of 10 December 1991, taken by the applicant (annex 36 to the statement of objections), which refer, in particular, to the List of minimum prices for customers, Ex-factory + 7%, Monthly meeting(s) and List 13.1.92. Even if agreement was reached solely on the increase of gross prices, that does not invalidate the decision, since it follows from the third paragraph of point 137 that the Commission identified as an agreement within the meaning of Article 85 of the Treaty, for that period, only the agreement to increase prices in Germany from 1 January 1992. Likewise, the fact that such an agreement was reached at the meeting of 10 December 1991 and not at the meeting of 9 or 10 October 1991 is not of such a kind as to invalidate the conclusion which the Commission drew from that series of meetings, namely that the Danish cartel, in which the applicant was then participating, was supplemented, at some time in the autumn of 1991, by an agreement to increase gross prices on the German market. Furthermore, it is not disputed that that agreement, which in any event was reached no later than December 1991, had already been discussed at the meeting of 9 or 10 October 1991.

49.    Third, it is apparent that the Commission properly established that at the end of 1993 the applicant was party to an agreement to share the German market.

50.    ABB has acknowledged that at the end of an audit establishing each producer's sales for 1992, the producers reached an agreement on 18 August 1993 to share the German market in accordance with the shares obtained in 1992, on the preparation of a new uniform price list and on the subsequent preparation of a system of sanctions (ABB's reply). According to ABB, negotiations on the allocation of market shares continued at meetings held in Copenhagen on 8 or 9 September 1993 and subsequently in Frankfurt (ABB's reply).

51.    As regards the audit establishing sales for 1992, ABB's account corresponds with the conclusions which must be drawn from a memorandum of ABB IC Møller of 19 August 1993 (annex 53 to the statement of objections) setting out a table which states, for the Danish producers and for Pan-Isovit and Henss/Isoplus, the turnover and market share for 1992 and a figure representing the market share envisaged for 1994. According to ABB, the data on the turnover and market share of the undertakings concerned were provided by a firm of Swiss auditors (ABB's reply of 4 June 1996). On page 36 of its comments on the statement of objections, the applicant acknowledged the existence of a sales audit carried out by a firm of Swiss auditors. As regards the purpose of that audit, the credibility of the explanation provided by ABB cannot be called into question by the applicant's assertion that it only requested an audit of the sales of its distributor in Germany in order to provide reliable data on the total size of the German market. It is difficult to envisage that an undertaking would collaborate with a firm of auditors to which it provides its sales figures with the sole purpose of then being able to determine its own share of the market compared with the overall market, when the other undertakings which accepted the same audit intend that all the information relating to market share be communicated to them.

52.    Next, as regards the conclusion of an agreement in principle to share the market, ABB's argument, in its reply, that the undertakings had agreed in August 1993 to share the German market, even though

the precise market share of each participant was still subject to negotiation which continued from one meeting to another, is confirmed not only by the information on market shares for 1994 in the ABB IC Møller memorandum referred to above but also in a memorandum of 18 August 1993 from Pan-Isovit (annex 52 to the statement of objections) and by the ABB proposal, which together show that in August and September 1993 negotiations on the allocation of market shares in Germany were continuing.

53.   First, the existence of such negotiations is confirmed by the abovementioned memorandum of 18 August 1993, drawn up by Pan-Isovit for its parent company concerning a visit to the applicant on 3 August 1993, from which it is apparent that Pan-Isovit was informed that the applicant was in principle interested in agreements on prices, but only if [its] market share ... [was] sufficient and that the applicant [was] endeavouring, in agreement with ABB, to place Tarco under control in Denmark and in Germany.

54.   Second, it is confirmed by the ABB proposal that, as regards market-sharing, all that remained to be discussed in September 1993 was the amount of individual quotas. In that regard, the ABB proposal, concerning an arrangement to share the German market based on the audit of sales, payments to be made where the allocated quotas were exceeded and a common price list, was received by the applicant, according to its comments on the statement of objections, in September 1993 and was supported by Pan-Isovit and Henss/Isoplus. As regards market shares, the percentages stated in that proposal correspond to the figures in the ABB IC Møller memorandum (26 for Pan-Isovit, 25 for ABB Isolrohr, 12 for the applicant and 4 for Dansk Rørindustri/Starpipe), except in the case of Tarco and Henss/Isoplus, which in the latter document are allocated 17 and 16 respectively, while the ABB proposal states 17.7% and 15.3%. As regards the increase in Tarco's share, ABB states in its reply that the figures for 1994 in the ABB IC Møller memorandum reflect the agreement reached at the meeting of 18 August [1993] to maintain those market shares for 1994, with slight adjustments following the discussions held at that meeting and that, at the meeting of 8 or 9 September 1993, the purpose of the meeting seems to have been to continue the negotiations on the allocation of market shares following the report of the [firm of Swiss auditors]: Tarco apparently insisted on being allocated 18% of the German market. Having regard to the consistency between ABB's statements and the increase in Tarco's share proposed by ABB, Pan-Isovit and Henss/Isoplus in September 1993, compared with the share mentioned in the ABB IC Møller memorandum in August 1993, it must be concluded that, following the meetings held in August and September 1993, an agreement to share the German market existed, even if discussions on quotas were continuing.

55.   The applicant's argument that it did not accept the arrangement in the terms set out in the ABB proposal is irrelevant. The series of meetings at which the undertakings met to discuss the allocation of market shares would not have been possible had there not been at the material time a common intention among those participating in the meetings to restrict sales on the German market by allocating market shares to each trader.

56.   It is settled law that in order for there to be an agreement within the meaning of Article 85(1) of the Treaty it is sufficient that the undertakings in question should have expressed their joint intention to conduct themselves on the market in a specific way (Case 41/69 *ACF Chemiefarma* v *Commission* [1970] ECR 661, paragraph 112, Joined Cases 209/78 to 215/78 and 218/78 *Van Landewyck and Others* v *Commission* [1980] ECR 3125, paragraph 86, *Commission* v *Anic Partecipazioni*, cited above, paragraph 130, and Case T-1/89 *Rhône-Poulenc* v *Commission* [1991] ECR II-867, paragraph 120).

57.   In those circumstances, the Commission correctly inferred from the fact that meetings on the allocation of market shares continued in August and September 1993 that there was an agreement between those participating in the meetings on, at least, the principle of sharing the German market.

58.   It is true that the Commission has not established that such an agreement in principle existed in regard to the system of payments to be made in the event that the allocated quotas were exceeded and as regards the common price list. However, that cannot invalidate the findings of the decision, since, according to the third paragraph of point 137 of the decision, the Commission identified as an agreement within the meaning of Article 85 of the Treaty, in August 1993, only the agreement on the system of quotas in terms of market shares.

59.   As to whether the applicant participated in such an agreement in principle to share the German market, its presence at the meetings of 30 June and 18 or 19 August 1993, of which it claims to have no

recollection, is attested by ABB in its reply, while the applicant itself has acknowledged having been present at the meeting of 8 or 9 September 1993.

60.    In that regard, even if the applicant was not present at the meetings of 30 June and 18 or 19 August 1993, it is apparent from the case-file that it was none the less involved in the negotiations forming the background to both those meetings. First, by giving its consent during the summer of 1993 to an audit of its sales on the German market, the applicant complied with the decision taken in that regard at the meeting of 30 June 1993. Second, the applicant has acknowledged that, at a meeting with ABB in June 1993, the sharing of the German market was discussed and the applicant stated that it did not wish to accept a division of that market between the German undertakings, on the one hand, and the Danish undertakings, on the other hand, in a ratio of less than 60:40 for that market (comments on the statement of objections). A division along those lines was at the same time envisaged by ABB, according to its memorandum of 2 July 1993, in preparation for the meeting with the applicant (annex 48 to the statement of objections), in which ABB states that the applicant wanted a larger share of the market. It follows from that document and also from the Pan-Isovit memorandum of 18 August 1993 that even if, before the meeting of 18 or 19 August 1993, there had not yet been any agreement to share the German market, the applicant was among the undertakings looking to find an agreement.

61.    In those circumstances, the applicant cannot avoid liability for the agreement in principle to share the German market by maintaining that it stated at the meeting of 8 or 9 September 1993 that it did not wish to conclude any agreement in Germany and that at a meeting of 29 September 1993 it refused to accept the ABB proposal.

62.    The applicant's position during the meetings of 8 or 9 and 29 September 1993 did not amount to publicly distancing itself from the agreement in principle to share the German market which formed the subject-matter of the negotiations in August and September 1993. It is true that although the agreement to share the German market ultimately did not culminate in a written agreement and then broke down completely, that is mainly due to the applicant's conduct, as ABB acknowledged in its reply. However, since, at some time, a consensus was reached on the principle of sharing the German market, the applicant has not sufficiently proved that at that time it adopted a position which clearly informed the other participants in the negotiations that it was distancing itself from the principle of sharing that market. It is apparent from all the documents described in paragraphs 52 to 54 above that during August and September 1993 other participants, like Pan-Isovit and ABB, did not take the position adopted by the applicant to mean that it was distancing itself from the principle of market-sharing.

63.    By participating in the negotiations that took place in August and September 1993, and in particular by attending the meeting of 8 September 1993, without publicly distancing itself from what occurred at that meeting, the applicant gave the impression to the other participants that it subscribed to the results of the meeting and that it would act in conformity with them, so that it may be concluded that it participated in the agreement resulting from that meeting (see the case-law cited in paragraph 39 above).

64.    As the Commission does not accuse the applicant of having subscribed to an agreement, within the meaning of Article 85 of the Treaty, on a system of compensatory payments and a common price list, and as it does not maintain that the agreement to share the German market was actually put into practice, it is of no avail to the applicant to rely on the fact that it objected to the conclusion of a written agreement on compensatory payments and the common price list or on the fact that the market-sharing agreement was not implemented.

65.    It follows from the foregoing that, as regards the period November 1990 to September 1993, the Commission has established to the requisite legal standard that the applicant participated in the agreements to increase prices outside Denmark in 1990, to increase prices in Germany from 1 January 1992, to fix prices and share projects in Italy and in the agreement on the system of quotas in terms of market share in August 1993.

66.    The applicant's arguments concerning its participation in anti-competitive activities outside the Danish market during the period 1990-1993 must therefore be rejected.

2. The suspension of participation in the cartel in 1993 and participation in the cartel from 1994

- Arguments of the parties

67. The applicant claims that it left the cartel in April 1993. The Commission is therefore wrong to state that at that time the price fall in Denmark was the result of a trial of strength inside the cartel, not of its abandonment. The applicant's withdrawal from the cartel is corroborated by a number of ABB internal memoranda, which refer to its conduct as against the agreement and aggressive, and also the significant change in the sharing of the Danish market owing to the applicant's demand for a greater market share.

68. As regards Germany before 1994 and Denmark from April 1993 until 1994, the importance of frictions within the cartel should not be played down because they resulted in the applicant leaving the cartel in 1993. As regards the period 1993-1994, the Commission has not established any parallel conduct on the relevant market, a market which, on the contrary, was experiencing a price war.

69. The applicant does not deny that it participated in occasional meetings in 1993 and 1994. Thus, it participated in a meeting with ABB on 5 and 6 July 1993 during which it rejected ABB's proposals that it should rejoin the cartel. However, such participation cannot constitute proof of uninterrupted parallel conduct throughout the period in question. The participation of some undertakings in occasional meetings in relation to the German market alone is of no relevance, since all the undertakings concerned, and the applicant in particular, had decided independently on their approach to the relevant market. Therefore, the existence of contacts, following which the parties did not agree on sharing the market, is not sufficient to establish a concerted practice. The situation on the relevant market prior to 1995 shows clearly that there was no parallel behaviour.

70. As regards the European cartel, the applicant admits that it was present at the meeting of 3 May 1994 during which prices on the German market were discussed, but it denies having used any price list at that time. It does not recall having participated in the meeting of 18 August 1994 in Copenhagen and states that the first occasion on which it participated in a multilateral meeting was on 30 September 1994. None the less, the decision wrongly states that there was a global agreement on sharing the European market already in Autumn 1994. It was only from 20 March 1995 that a final arrangement of that market was agreed upon and it was only around that date that there were any attempts to implement such an agreement. As regards the German market, the first meeting of the contact group, on 7 October 1994, did not result in an agreement. The first meeting at which individual projects were allocated to the participants was held in January 1995. As regards the Danish market, no formal market-sharing agreement had yet entered into force in March 1995.

71. The defendant contends that the applicant did not leave the cartel in April 1993. Throughout the whole period of the infringement the applicant continued to attend the regular meetings. All the threats it made were intended to secure a larger quota from ABB. Furthermore, it attended the meetings in August and September 1993, and during autumn 1993 or early in 1994 it agreed to contribute to the salary of the person recruited from Powerpipe, after ABB asked it to do so.

72. It is pointless for the applicant to attempt to show that the cartel had been suspended in 1993-1994, since the Commission recognised in the actual decision that, although bilateral contacts continued between the various parties to the cartel, the various arrangements had been suspended between the end of 1993 and the beginning of 1994.

- Findings of the Court

73. The applicant's arguments must be taken to mean that, after it allegedly withdrew from the cartel, in April 1993, it was only from March 1995, after a final agreement had been reached on sharing the European market, that it participated in an agreement or a concerted practice within the meaning of Article 85 of the Treaty.

74. First, it must be observed that, contrary to what the applicant claims, it cannot be concluded from the change in the Danish cartel, around April 1993, that the applicant ceased at that time to participate in anti-competitive activities in the district heating sector.

75. It is sufficient to point out, in that regard, that even though, from March or April 1993, prices on the

Danish market began to fall and the arrangements for the allocation of projects were no longer complied with, the Danish producers and Pan-Isovit and Henss/Isoplus entered into negotiations on sharing the German market at meetings held in Copenhagen on 30 June 1993, in Zurich on 18 or 19 August 1993 and in Copenhagen and Frankfurt on 8 or 9 September 1993, which led to an agreement in principle, in August 1993, that was subsequently developed at meetings held in September 1993. As stated in paragraphs 59 to 63 above, the Commission has established to the requisite legal standard that the applicant participated in those negotiations, in particular by being present at the meeting of 8 or 9 September 1993.

76.    In that context, the Commission therefore correctly stated in point 37 of the decision that the price fall in Denmark at that time was the result of a trial of strength inside the cartel, not of its abandonment.

77.    Second, as regards the period following the change in the agreement on the sharing of the German market, in September or October 1993, the Commission itself recognised in its decision that during a certain period the anti-competitive activities on the market were not significant and could not in any event be proved.

78.    The Commission stated in point 52 of its decision that at that time prices fell by 20% in a few months on the major national markets. The Commission observed that the producers none the less continued to meet, even if for some time the multilateral meetings were replaced by bilateral and trilateral contacts. It was most probable, according to the Commission, that such contacts involved efforts by ABB to broker a new arrangement to restore order in those markets (fifth paragraph of point 52 of the decision). According to the decision, meetings took place between the applicant and ABB on 28 January, 23 February and 11 March 1994 and between the applicant and Tarco on 8 January and 19 March 1994 (sixth and seventh paragraphs of point 52 of the decision). However, no information is available about that series of meetings, apart from the applicant's claim that Tarco had unsuccessfully demanded compensation from the applicant as the precondition for peace talks (seventh paragraph of point 52 of the decision).

79.    The Commission further stated, in point 53 of the decision, that meetings between the six producers were resumed on 7 March, 15 April and 3 May 1994. The March and April meetings involved discussions on price increases but seem to have been inconclusive. However, following the meeting on 3 May 1994 between the applicant, ABB, Henss and Pan-Isovit, a price list was drawn up which was to be used as the basis for all supplies to the German market (first paragraph of point 54 of the decision). The Commission contends that it is likely that it was agreed at a meeting between the six major undertakings and Brugg on 18 August 1994 to prepare a new common price list and to limit discounts to an agreed level (third paragraph of point 56 of the decision).

80.    It follows that, as regards the period beginning after September or October 1993, the Commission recognised that even though contacts between the undertakings continued, there is no proof of an agreement or concerted practice within the meaning of Article 85 of the Treaty until a price increase for the German market was negotiated, and it is recognised in the decision that the negotiation did not lead to an agreement until after the meeting of 3 May 1994.

81.    The Commission likewise considered, in the part of the decision headed Legal assessment, that the cartel arrangements were for a time in abeyance. First, when assessing the nature of the infringement in this case, the Commission recognised that, even though the Danish and European cartels continued in such a way that they constituted a single continuing violation, there was a short period when the arrangements were in abeyance (third paragraph of point 145 of the decision). More specifically, the Commission states in the third paragraph of point 141 of the decision that, for the period September 1993 to March 1994, [a]ny hiatus could be considered to be a suspension of the normal arrangements and relationships: the producers soon recognised that a prolonged power struggle was self-defeating and returned to the conference table. Also, when assessing the duration of the infringement, the Commission stated that [f]or the six-month period between October 1993 and March 1994 the arrangements can be considered to have been in abeyance, although (as ABB says) bilateral and trilateral meetings continued and that [b]y May 1994 the collusion had been re-established in Germany with the implementation of the Euro price list (first paragraph of point 152 of the decision).

82.    In that context, the applicant cannot claim that the Commission accused it in the decision of having participated in anti-competitive conduct during the period following its refusal to sign the agreement to

share the German market, namely between September/October 1993 and March 1994.

83. Then, as regards the resumption of the cartel, the Commission rightly stated that the applicant participated in an agreement on a price list for the German market following the meeting held on 3 May 1994 and then, from autumn 1994, in an agreement on a quota system for the European market.

84. First, as regards the price list for the German market, ABB's reply states that there was a price list which, following a meeting held in Hanover on 3 May 1994, was to be used for all deliveries to German suppliers. That is confirmed by the letter of 10 June 1994, in which Mr Henss and the directors of the applicant, ABB, Dansk Rørindustri, Pan-Isovit and Tarco were invited by the co-ordinator of the cartel to a meeting to be held on 18 August 1994 (annex 56 to the statement of objections), which states:

The meeting on the situation of the market in the FRG is now fixed for the following date:

Thursday 18 August 1994 at 11 a.m. ...

Since the list of 9 May 1994 is incomplete as regards certain heads and since comparisons of bids have therefore led to confrontations and significant differences of interpretation, I shall supplement the missing heads by the enclosed list.

85. It is apparent from that letter that there was a price list which was to be applied when tenders were submitted and which had already taken effect, albeit with some problems. The existence of such a list is confirmed by Tarco in its second reply, dated 31 May 1996, to the request for information of 13 March 1996, which refers to a price list sent to the directors by the co-ordinator of the cartel probably in May 1994. According to ABB's reply, measures designed to improve the price level in Germany were then discussed at the meeting held in Copenhagen on 18 August 1994.

86. As regards the applicant's participation in that agreement on a common price list, the applicant admits that it attended the meeting of 3 May 1994 at which the price situation on the German market was discussed and that a price list was actually sent to it afterwards. Furthermore, it must be regarded as established that the applicant participated in the meeting of 18 August 1994, even though it claims, before the Court, that its sales director had intended to attend the meeting but in the end did not do so. The presence of a representative of the applicant at that meeting is confirmed not only by the applicant itself, in the table of business trips made by its sales director annexed to its reply of 25 April 1996 to the request for information of 13 March 1996, but also by ABB's reply and by Brugg (table in annex 2 to Brugg's reply of 9 August 1996 to the request for information). In view of the letter inviting the applicant to the meeting of 18 August 1994 and referring to the price list already sent to the applicant, the Commission correctly inferred that the applicant participated in the agreement on the price list and that it was present at the meetings of 3 May and 18 August 1994.

87. The applicant cannot rely on the fact that it never applied such an agreement, since the mere fact that an undertaking participating with others in meetings at which decisions on prices are taken does not observe the prices fixed is not of such a kind as to lessen the anti-competitive object of those meetings and therefore the participation of the undertaking concerned in the cartel, but tends at the most to show that it did not implement the agreements in question (see the case-law cited in paragraph 47 above).

88. Next, as regards the agreement to share the European market, the applicant recognises that the meeting of 30 September and then other meetings on 12 October and 16 November 1994 involved discussions on sharing the European market, but it maintains that an agreement was not reached until March 1995.

89. In that regard, the Commission has established to the requisite legal standard its assertion that, at the meeting of 30 September 1994, an agreement was reached in principle that an overall quota system be set up for the European market, with detailed figures for each national market to be agreed and passed to the lower level contact group meetings for implementation (fourth paragraph of point 59 of the decision).

90. First of all, ABB has accepted in its reply that the principle of an overall division of the European market

was already decided on at the meeting in September 1994, while the individual shares were determined later, at the meeting of 16 November 1994. Then, as regards the meeting of 30 September 1994, although the applicant maintains that no agreement was concluded at that meeting and that such an agreement required the participation of Brugg and another European producer, KWH, it has accepted that there was a consensus to continue with the procedure, that it was agreed that the applicant should consider ABB's proposal, that ABB would visit all the undertakings, including KWH and Brugg, in order to arrive at a definitive solution and that the market shares would be determined if and when ABB succeeded in bringing KWH into the agreement. That assertion on the applicant's part cannot serve to refute the conclusion which the Commission inferred from ABB's reply, namely that the participants in the meeting of 30 September 1994 had agreed on the principle of sharing the European market. By conferring on ABB the task of drawing up an agreement with all the undertakings involved, the participants in that meeting demonstrated their common intention to co-ordinate their conduct on the market by allocating market shares to each trader, even though the actual share depended on any shares allocated to Brugg and to KWH.

91.     The Commission therefore rightly stated that the agreement on the sharing of the European market was reached in principle at the meeting of 30 September 1994, although fixing of the individual shares was not to be decided until later. It should also be observed in that regard, that 20 March 1995 cannot in any event be taken as the date on which the allocation of shares of the European market was first the subject of a common agreement, since, according to the consistent statements of ABB, in its reply, and Pan-Isovit (in its reply of 17 June 1996 to the request for information), such an agreement was reached at the meeting of 16 November 1994.

92.     Last, since the applicant's participation in the overall agreement to share the European market is established by its presence at the meetings of 30 September, 12 October and 16 November 1994, it is pointless to claim that that agreement was not implemented on the various national markets until later, after agreements had been concluded within the national contact groups.

93.     It follows from the foregoing that the applicant's arguments must be rejected in so far as they challenge the finding made in the decision concerning the suspension of the applicant's participation in the cartel at the end of 1993 and the resumption of its participation in the cartel from the beginning of 1994.

94.     However, it is still necessary to consider the applicant's position in so far as it also disputes the assessment of the duration and continuous nature of the infringement.

3. The duration and continuous nature of the infringement of which the applicant is accused

- Arguments of the parties

95.     The applicant observes that, since there were two separate cartels, it did not take part in an infringement of Article 85 of the Treaty during a continuous period from about November-December 1990 to at least March or April 1996, or for 5 years and 5 months in all. The period must be taken to be 2 years and 3 months in the case of the initial Danish cartel and, as regards the later European cartel, depending on the countries, between 4 months and 16, or 18 months at the most in Germany's case.

96.     In so far as the defendant states that it took account of the fact that in the early period the arrangements were incomplete and of limited effect outside the Danish market, the applicant submits that a less extensive infringement should result in a finding of lesser gravity rather than shorter duration.

97.     The defendant observes that the cartel was a single comprehensive infringement rather than a series of multiple but discrete arrangements and that it lasted until the spring of 1996 rather than the autumn of 1995 and towards the end became even more egregious than before.

- Findings of the Court

98.     According to the second paragraph of Article 1 of the decision, the duration of the infringement was, in the applicant's case, from about November/December 1990 to at least March or April 1996.

99.  Furthermore, in the fourth paragraph of point 153 of the decision, the Commission states that the participation of various undertakings in the infringement lasted as follows: (a) ABB, [the applicant], Tarco and [Dansk Rørindustri] from about November 1990 in Denmark, progressively extending to the whole of the Community and lasting until at least March or April 1996, subject to the arrangements being in abeyance for a period of up to six months from October 1993 to about March 1994.

100.  The Commission must therefore be considered to have correctly calculated the duration of the infringement of which the applicant is accused.

101.  First of all, it cannot be disputed that the applicant's participation began in November/December 1990 on the Danish market and that the applicant did not cease its participation in the European cartel until March or April 1996. It has been established in paragraphs 42 to 45 above that the applicant participated in November 1990 in concerted price increases at a meeting held on 22 November 1990. As regards the end of its participation in the cartel, it is sufficient to state that the applicant concedes that it also participated in a meeting of the directors' club on 4 March 1996 and in the meetings of the German contact group until 25 March 1996.

102.  Second, the applicant is incorrect to maintain that the Commission should have found the existence of two separate cartels and should have taken account of the fact that its participation in the Danish cartel ceased in April 1993 and that its participation in the European cartel did not commence until March 1995. It has been found in paragraphs 50 to 65 and 84 to 88 above that the applicant still took part in an agreement in principle to share the German market in August or September 1993 and subsequently participated, from May 1994, in the agreement on the common price list in Germany. It is apparent from point 153 of the decision that in assessing the duration of the infringement of which the applicant is accused the Commission specifically took into account the fact that the cartel arrangements were in abeyance between October 1993 and about March 1994.

103.  Furthermore, the fact that the Commission took into account a period during which the cartel was in abeyance is confirmed in the context of the calculation of the fine imposed on the applicant. According to the third paragraph of point 175 of the decision, the duration used in determining the fine is the same as that used for ABB. As regards ABB, it is stated in point 170 of the decision that the fact that the arrangements were in abeyance from late 1993 to early 1994, together with the fact that the arrangements were initially incomplete and of limited effect outside the Danish market and the fact that the arrangements reached their most developed form only with the Europe-wide cartel set up in 1994 to 1995, are among the factors which the Commission took into account in deciding to apply a weighting of 1.4 to the fine for an infringement which lasted more than five years.

104.  In that regard, it should be observed that the fact that the applicant resumed its participation in the cartel in May 1994, whereas the decision took into account the fact that the arrangements were in abeyance only until about March 1994, is not of such a kind as to invalidate the Commission's assessment of the duration of the infringement, since it follows from point 170 of the decision that the fact that the cartel was in abeyance for a number of months was in any event only one of a number of factors taken into account in determining the consequences of the duration of the infringement to be used in calculating the fine, so that those consequences did not depend on the precise number of months during which the cartel arrangements were in abeyance.

105.  Nor, since the fact that the cartel activities were in abeyance was taken into account in assessing the duration of the cartel, can the applicant find support in the fact that the Commission classified the cartel as a single, continuous infringement.

106.  In so far as the Commission classified the cartel as a single, continuous infringement, it rejected the argument put forward during the administrative procedure, in particular by the applicant, that the Danish and European cartels were two entirely discrete and unrelated infringements. In that context, the Commission emphasised that from the time the cartel began in Denmark the longer-term objective was to extend control to the whole market (third paragraph of point 140 of the decision), that for the period September 1993 to March 1994 any hiatus could be considered to be a suspension of the normal arrangements and relationships (third paragraph of point 141 of the decision) and that there was a clear continuity of method and practice between the new agreement concluded in late 1994 for the whole European market and the earlier arrangements (first paragraph of point 142 of the decision).

107. It follows that the Commission, in considering in the decision that the European cartel set up at the end of 1994 was merely a continuation of the earlier cartel between producers on the district heating market, did not find that the applicant had participated continuously in a cartel during the whole period of November 1990 to March 1996. That conclusion is all the more necessary because the Commission expressly recognised that, while the infringement constituted a single continuing violation, its intensity and effectiveness varied over the duration of the time period covered: it progressively developed (subject to a short period when the arrangements were in abeyance) from arrangements affecting primarily Denmark in 1991 to other markets and by 1994 constituted a pan-European cartel covering almost all trade in the product (third paragraph of point 145 of the decision).

108. The applicant's arguments in relation to the duration and continuous nature of the infringement must therefore be rejected.

109. Accordingly, the complaint concerning the existence of a continuous cartel from 1990 to 1996 must be rejected in its entirety.

   C - *Participation in the European cartel as regards the Italian market*

   1. Arguments of the parties

110. The applicant criticises the Commission for having incorrectly taken the Italian market into consideration in its case, when it was not present on that market. It cannot be held liable for infringements on that market by its local distributor, Socologstor, since it held only 49% of the shares in that undertaking.

111. There is no reason, it alleges, why the situation regarding Socologstor should be treated differently from that regarding Ke Kelit Kunststoffwerk GmbH (Ke Kelit), which also distributed the applicant's products but on which a separate fine was imposed. Even if the applicant's presence at meetings concerning the Italian market could constitute an infringement of the competition rules, the Commission has not demonstrated that the applicant was able to impose its will on Socologstor in order to achieve any restriction of competition.

112. The Commission refers to evidence of allocation of quotas for Italy to each producer, including the applicant, and to the applicant's presence at a meeting of the contact group for Italy and at another meeting concerning Italy held on 9 June 1995. The applicant would not have taken the trouble to attend those meetings had it had no real interest in Italy. Furthermore, the fact that the Commission could have brought proceedings against Socologstor does not exonerate the applicant from the acts committed by the cartel in Italy.

   2. Findings of the Court

113. The applicant does not deny having participated in the first meeting of the contact group for Italy held in Milan on 21 March 1995 and in another meeting concerning Italy held in Zurich on 9 June 1995.

114. Furthermore, it is apparent from certain memoranda which the Commission obtained from the undertakings in question that, as regards the Italian market, the applicant was involved in the allocation of quotas and projects (annexes 64, 111 and 188 to the statement of objections), which is further confirmed by Pan-Isovit (in its reply of 17 June 1996 to the request for information).

115. Consequently, it must be held that the Commission had sufficient evidence to find that the applicant's participation in the European cartel also extended to the Italian market, and there is no need to ascertain to what extent the applicant was able to control the conduct of its distributor on that market.

116. The complaint raised by the applicant must therefore be rejected.

   D - *Cooperation on quality norms*

   1. Arguments of the parties

117. The applicant claims that it did not participate in the infringement of which the pipe producers are accused consisting in using quality norms to maintain prices at a certain level and delay the introduction of new cost-saving technologies. On the contrary, it was the victim of such conduct, which was primarily directed against the technology developed by it.

118. In that regard, the defendant wrongly maintains that such an infringement does not form part of the conduct sanctioned by the decision. Although such an infringement was not included in the principal characteristics of the infringement, the decision states in point 2 that the conduct in question constitutes a separate infringement, attributed *inter alia* to the applicant. When defining the infringement, Article 1 of the decision explicitly refers to the reasoning set out elsewhere in the decision.

119. The defendant observes that the decision does not refer in Article 1 of the operative part to the use of quality norms as a principal characteristic of the infringement. The issue as to whether the applicant, having more efficient technology, was a victim of the cooperation as concerns the quality norms should be examined in the assessment of the mitigating circumstances taken into account in determining the amount of the fine.

2. Findings of the Court

120. The use of quality norms to keep up prices and delay the introduction of new cost-saving technology is mentioned as one of the characteristics of the infringement in question as set out in point 2 of the decision. Later in the decision, the Commission refers, in points 113 to 115, where it examines the role of the trade association European District Heating Pipe Manufacturers Association (EuHP) in the cartel, to ABB's intention to use quality norms as a means of preventing the applicant from exploiting a continuous production process with savings in production costs and hence lower selling prices. Furthermore, according to the final indent of point 147 of the decision, the restrictions on competition in which the cartel engaged included using norms and standards in order to prevent or delay the introduction of new technology which would result in price reductions (the members of EuHP).

121. However, cooperation in relation to quality norms is not among the principal characteristics of the cartel mentioned in the third paragraph of Article 1 of the operative part of the contested decision, as amended. The Danish version of the decision served on the applicant on 21 October 1998 did actually contain, in its operative part, a passage referring to cooperation in relation to quality norms among the principal characteristics of the cartel. By specifically deleting that passage from the operative part, by an amending decision of 6 November 1998, the Commission clearly indicated its intention not to find that such cooperation formed part of the infringement of which the applicant was accused.

122. Even though a certain inconsistency still exists, since cooperation in relation to quality norms is not listed in the operative part of the decision among the characteristics of the infringement in question but is still described on a number of occasions in the grounds of the decision, there can be no doubt, following the clarification made by the abovementioned corrigendum, that the Commission does not accuse the applicant of having infringed Article 85 of the Treaty by participating in cooperation in relation to quality norms.

123. Consequently, the applicant cannot challenge the validity of the decision by maintaining that it did not participate in such cooperation.

124. This complaint must therefore be rejected.

E - *Concerted action against Powerpipe*

1. Arguments of the parties

125. The applicant disputes each of the assertions in the decision concerning its participation in concerted action against Powerpipe. Although it was present at a number of meetings in which actions against Powerpipe were discussed, it did not implement any concerted action against that undertaking.

126.  First, the applicant states that the Billund meeting in July 1992 and the recruitment of the managing director of Powerpipe, a Swedish undertaking, took place before Sweden acceded to the European Union on 1 January 1995. Consequently, those events are relevant only to the extent to which they affected competition within the European Union. Such effect, if any, was minimal.

127.  The applicant was indeed present at the Billund meeting between ABB, Powerpipe and itself, at which ABB gave a warning to Powerpipe. None the less, the purpose of that meeting was to discuss the possible sale of Powerpipe to ABB and/or the applicant, and the applicant withdrew from the negotiations with ABB when the latter's intention to close and split up Powerpipe became clear.

128.  As regards the recruitment of the managing director of Powerpipe, there had for some time been a plan to open a lobbying office in Brussels, and ABB's proposal to hire that person jointly for the post seemed to be a good choice. That question was not raised again until later, probably in the autumn of 1993 or early in 1994. The applicant was not aware that the person concerned had been hired until ABB presented it with the invoice for the related costs. The applicant understood that the person concerned wished to leave Powerpipe and had himself contacted ABB. It was in those circumstances that the applicant agreed to pay part of the costs associated with hiring him. It was not aware of and did not take part in any ABB campaign to entice other employees away from Powerpipe.

129.  The applicant does not deny having contacted Powerpipe in 1994, under strong pressure from Henss, in order to persuade Powerpipe to withdraw from the Neubrandenburg project, and having suggested that Powerpipe find an amicable solution with Henss/Isoplus. However, it claims that it did not threaten Powerpipe in any way during that conversation or during a second telephone conversation.

130.  As regards the Leipzig-Lippendorf project, the applicant states that, in spite of the fact that it was agreed within the cartel that this project should be allocated to the three German producers, it decided to seek to obtain the order. It states, however, that it had to order its German subsidiary to withdraw the tender submitted in connection with that project for 20-metre pipes and replace it by a tender for 18-metre pipes. The initial tender would have required substantial investment in its new production facilities, which would not have been profitable. Owing to an error, the new tender was never submitted. As the awarding body was unhappy at the withdrawal of the initial tender, negotiations between it and the applicant subsequently ceased.

131.  As regards the meeting of 24 March 1995, the applicant observes that at that time, to its knowledge, the awarding body for the Leipzig-Lippendorf project had not yet decided to award the contract to Powerpipe. The applicant was not present during the first part of the meeting, when collective action against Powerpipe may have been discussed. During the part of the meeting which it did attend, Henss pressed the issue of collective actions. However, the applicant requested the consortium of the three German producers to try to match Powerpipe's prices and even offered to supply pipes as a sub-contractor. The discussion also focused on Powerpipe's technical inability to honour the tender, particularly by the deadline. During the meeting, the applicant suggested that ABB should explain to the awarding body the damage already done to the image of district heating in general by the choice of an insufficiently qualified supplier for the Turin project. ABB's approach to the awarding body was unsuccessful, since the consortium did not want to match Powerpipe's price. It was not until April 1995 that the applicant learned that Powerpipe had been awarded the contract.

132.  The applicant did not implement any agreement against Powerpipe; neither, to its knowledge, did any other producers, apart from ABB and Isoplus. At a meeting of the EuHP on 5 May 1995 ABB and Isoplus urged that concerted action be taken against Powerpipe to make it difficult for it to obtain supplies. As the applicant did not manufacture the products required by the sub-contractor on the Leipzig-Lippendorf project, it would have been unable to supply them anyway. There was no confirmation of any agreement directed against Powerpipe at a meeting held on 13 June 1995.

133.  As regards Lymatex, the applicant's sub-contractor, the applicant did not in any way instruct it to harm Powerpipe. At the time Lymatex was significantly behind in its deliveries of joints to the applicant, while the latter was under a contractual obligation to obtain supplies from Lymatex for all its joints requirements in 1995. Contrary to what the decision states in point 102, the applicant merely urged Lymatex to comply with its contractual obligations to the applicant. A draft letter to Powerpipe was sent to the applicant on Lymatex's own initiative, apparently in order to show the applicant that Lymatex was endeavouring to solve its delivery problems, and was never commented on by the applicant.

134. Furthermore, the problem which Powerpipe was experiencing in meeting its contractual obligations was of its own making. As regards the Århus Kommunale Væerker (ÅKV) project, Powerpipe entered into an unrealistic contract, under which it was required to supply, at short notice, joints of the same type as the applicant's, which was impossible. It was because of Powerpipe's failure to deliver these supplies that the awarding body for that project eventually cancelled the contract. The decision to cancel the contract was therefore taken independently of Lymatex's decision not to make further supplies to Powerpipe. That is confirmed by the fact that the decision to cancel supplies to Powerpipe was taken on 10 May 1995, thus on the same day that Lymatex informed Powerpipe that it was experiencing temporary delivery problems and could not accept new orders before September 1995. The customer's reasons for cancelling the contract therefore had nothing to do with the applicant's conduct.

135. The applicant therefore played no part in the attempts to force Powerpipe out of the market. The fact that it insisted on obtaining supplies from Lymatex was perfectly legitimate and the alleged effects of that approach on Powerpipe were not the result of any illegal behaviour.

136. The defendant observes that the applicant admits having attended a long series of meetings where measures against Powerpipe were discussed, in particular the meeting of July 1992 with ABB and Powerpipe at which the latter was warned. That admission suffices to implicate the applicant in the concerted actions against Powerpipe. Furthermore, the applicant has adduced no evidence to cast doubt on the findings in points 143 and 144 of the decision that it took part, by its presence at the meeting of 24 March 1995, in an agreement designed to harm Powerpipe.

   2. Findings of the Court

137. It must be observed, first of all, that the applicant has not succeeded in invalidating the Commission's findings in respect of its collaboration in the plan to eliminate Powerpipe and, in particular, in respect of the recruitment of key employees of Powerpipe.

138. The applicant does not deny having attended the meeting held in Billund in July 1992 described in point 91 of the decision. Nor is it disputed that the applicant entered into and implemented the agreement with ABB to entice away Powerpipe's managing director and to share the associated costs.

139. The applicant's submission that the aim of the agreement to contribute to those costs was not to harm Powerpipe cannot be accepted. Having regard to the warning already given to Powerpipe by ABB at the meeting with Powerpipe in July 1992, in the applicant's presence, the applicant could not fail to be aware that ABB's intention to hire Powerpipe employees formed part of a strategy designed to harm Powerpipe. It is apparent from ABB's memorandum of 2 July 1993 in preparation for a meeting with the applicant that the hiring of the managing director was regarded as common action as regards Powerpipe (annex 48 to the statement of objections). The applicant acknowledged during the administrative procedure that it was aware that the appointment of the person in question might be regarded as a negative action against Powerpipe (statement of Mr Bech annexed to the applicant's reply of 25 April to the request for information of 13 March 1996).

140. In any event, even if the applicant can claim to have agreed initially to share in the costs of hiring the managing director solely in order to be able to open a lobbying office, that explanation does not justify the fact that it agreed to pay the contribution envisaged at a time when it was clear that the person in question was being hired by ABB to perform duties other than those proposed.

141. Neither is it disputed, second, that at the time when Powerpipe was tendering for the Neubrandenburg project the applicant agreed with ABB and Henss to put pressure on Powerpipe to withdraw its tender. Even though the applicant did not itself threaten Powerpipe during the meetings with it, it is common ground that it acted along the lines agreed with other participants in the cartel. The applicant admits that its sales director told Powerpipe at the time that a certain cartel existed between traders in the sector.

142. As regards the pressure of which the applicant was a victim, an undertaking which participates with others in anti-competitive behaviour cannot rely on the fact that it did so under pressure from the other participants. It could have complained to the competent authorities about the pressure brought to bear on it and have lodged a complaint with the Commission under Article 3 of Regulation No 17 rather than

participating in the activities in question (see the judgment of the Court of First Instance in Case T-9/89 *Hüls* v *Commission* [1992] ECR II-499, paragraph 128, and *Tréfileurope* v *Commission*, cited above, paragraph 58).

143.  Third, as regards the award of the Leipzig-Lippendorf project, the Commission's findings are based on the outcome of the meeting held in Düsseldorf on 24 March 1995.

144.  In that regard, it should be stated, first, that the applicant does not deny that there was an agreement within the cartel that the Leipzig-Lippendorf project was intended for ABB, Henss/Isoplus and Pan-Isovit.

145.  In that context, the Commission was entitled to conclude, in point 99 of the decision, that the withdrawal of the bid submitted by the applicant for that project was at least in part the result of pressure from the other producers. Even if the applicant had considered that the investments required by its initial bid could not be profitable, the assertion that its failure to submit a fresh bid was explained exclusively by an error is not credible, since the applicant must have known, in view of the way in which the project had been allocated within the cartel, that such behaviour corresponded to what the other participants in the cartel expected of it.

146.  Furthermore, it follows from the notes of the meeting of 24 March 1995 taken by Tarco (annex 143 to the statement of objections) that the fact that Powerpipe was awarded the Leipzig-Lippendorf project gave rise to the discussion of a series of measures. According to those notes:

[Powerpipe] has been awarded the Leipzig-Lippendorf [project].

- No producer to supply at all to L-L, IKR, Mannesmann-Seiffert, VEAG.

- All requests for information concerning the project must be communicated to [X].

- None of our sub-contractors may work for [Powerpipe]; if they do, further cooperation will be stopped.

- We shall try to prevent [Powerpipe] from obtaining supplies of (for example) plastic.

- EuHP shall check whether we can complain about the contract going to an unqualified undertaking.

147.  It should be recalled that where an undertaking participates in a meeting having a clearly anti-competitive object, it gives the other participants the impression, unless it publicly distances itself from what occurs at the meeting, that it subscribes to the results of the meeting and will act in conformity with them (see the case-law cited in paragraph 39 above). In such circumstances, the fact that an unlawful collusion was referred to at the meeting in which the undertaking in question participated is sufficient to establish that it participated in the collusion in question.

148.  Since anti-competitive measures were referred to at the meeting of 24 March 1995, all the undertakings that participated in that meeting without publicly distancing themselves from what occurred must be regarded as having participated in the agreement, or in the concerted practice, constituted by such measures.

149.  In that regard, it is irrelevant whether the Leipzig-Lippendorf project had already been awarded to Powerpipe when the meeting of 24 March 1995 took place. The measures discussed at the meeting of 24 March 1995 were in any event aimed at a situation in which Powerpipe would obtain the contract. In any event, even though the contract between VEAG, the company that launched the call for tenders in question, and Powerpipe may not have been signed until after the date of that meeting, it is clear from VEAG's letter of 21 March 1995 to the general contractor of the project (annex 142 to the statement of objections) and also from VEAG's reply of 29 September 1995 to the request for information that the awarding body's decision in favour of Powerpipe was taken on 21 March 1995, before the date of that meeting.

150. Nor can the applicant avoid liability by claiming that it was not present at the part of the meeting during which a collective action against Powerpipe may have been discussed, since it admits that during the part which it did attend Henss pressed the issue of collective actions.

151. Furthermore, the applicant's conduct at the meeting of 24 March 1995 cannot be taken to mean that it publicly distanced itself from the decision not to make deliveries to Powerpipe, since, having regard to the context, in particular Powerpipe's situation *vis-à-vis* the ÅKV project and the delivery problems experienced by Lymatex, it showed by its attitude that it supported that decision.

152. First, the applicant does not deny having expressed its dissatisfaction on discovering that Powerpipe, after obtaining the ÅKV project which the cartel intended should be awarded to ABB and the applicant, succeeded in obtaining the necessary supplies to carry out that contract from the applicant's Swedish subsidiary. Such an attitude shows that the applicant intended to ensure that Powerpipe would encounter problems in obtaining supplies to carry out its projects.

153. Second, it must be regarded as proved that the applicant instructed Lymatex to delay its deliveries to Powerpipe. Powerpipe's assertion that a Lymatex employee assured it that the decision not to make deliveries before September 1995 had nothing to do with the production problems to which Lymatex had referred in its letter to Powerpipe of 10 May 1995 (annex 153 to the statement of objections) is confirmed by the fact that a draft of that letter (annex 155 to the statement of objections) was found in the office of the director of the applicant during the investigations carried out by the Commission on 28 June 1995. The fact that Lymatex found it necessary to inform the applicant of its reply to Powerpipe's order even before it had been sent to Powerpipe shows that Lymatex intended to give the applicant at least the opportunity to comment on the proposed reply to that order. Having regard to the decision taken at the meeting of 24 March 1995 not to supply Powerpipe, the fact that the draft version of Lymatex's reply was present at the applicant's premises cannot be seen as anything other than confirmation of the fact that the applicant had contacts with Lymatex on or before 10 May 1995 during which it expressed its wish that deliveries to Powerpipe should be delayed. That conclusion is not contradicted by the finding that Lymatex did not cancel other Powerpipe orders. Furthermore, Lymatex did not provide the Commission with a truthful explanation of why it sent the applicant a draft of its reply, but maintained that the document in question was not a draft but a copy of the letter to Powerpipe and that it merely wished to show that it was making some attempt to comply with its contractual obligations towards the applicant (annex 157 to the statement of objections), whereas it is clear from the version of the letter in the applicant's possession that it was a draft version sent some hours before the final version was sent to Powerpipe.

154. Since it has been sufficiently proved that the applicant did not distance itself from the decision to boycott Powerpipe taken at the meeting of 24 March 1995, there is no need to determine to what extent the applicant's conduct was the direct cause of the losses which Powerpipe claims to have made, in particular on the ÅKV project.

155. It follows that the Commission has correctly established that the applicant participated in an agreement designed to harm Powerpipe, since the applicant has failed to show that it distanced itself from the outcome of the meeting in question.

156. That conclusion is not called in question by the applicant's argument that it was not in any event capable of implementing a boycott of Powerpipe, since it did not manufacture the equipment required by the sub-contractor for the project in question.

157. A boycott may be attributed to an undertaking without there being any need for it actually to participate, or even be capable of participating, in its implementation. Were that not so, an undertaking which approved a boycott but did not have the opportunity to adopt a measure to implement it would avoid any form of liability for its participation in the agreement.

158. In that regard, it should be observed that an undertaking which has participated in a multiform infringement of the competition rules by its own conduct, which met the definition of an agreement or concerted practice having an anti-competitive object within the meaning of Article 85(1) of the Treaty and was intended to help bring about the infringement as a whole, may also be responsible for the conduct of other undertakings followed in the context of the same infringement throughout the period of its participation in the infringement, where it is proved that the undertaking in question was aware of

the unlawful conduct of the other participants, or could reasonably foresee such conduct, and was prepared to accept the risk (see, in that regard, *Commission* v *Anic Partecipazione*, cited above, paragraph 203).

159. By virtue of its presence at the meeting of 24 March 1995, the applicant was aware of the measures envisaged to damage Powerpipe's business. Because it did not distance itself from such measures, it at least gave the impression to the other participants at the meeting that it subscribed to the results of the meeting, that it would act in conformity with them and that it was prepared to accept the risk.

160. Last, in so far as the Commission relied on activities which took place in Sweden before it acceded to the European Union on 1 January 1995, it is sufficient to observe that the measures designed to harm Powerpipe's activities for which the applicant must be held responsible were precipitated by Powerpipe's entry into the German market and were therefore designed from the outset to prevent Powerpipe from expanding its activities in the European Union. Furthermore, by agreeing to contribute to hiring Powerpipe's managing director, the applicant actually implemented, even before 1 January 1995 and in the common market, an agreement designed to harm Powerpipe's activities. It follows that the Commission took the anti-competitive activities originating in Sweden into account in so far as they actually affected competition within the European Union.

161. In that regard, point 148 of the decision clearly states:

the Commission will for the purposes of this procedure take account of joint actions against Powerpipe prior to the accession of Sweden to the European Union (1 January 1995) only in so far as (i) it affected competition inside the Community (Powerpipe's entry to the German market) and (ii) it is circumstantial evidence of a continuing plan to damage or eliminate Powerpipe after that date.

162. It follows from all the foregoing that the complaint relating to the concerted actions against Powerpipe must also be rejected.

F - *The pressure brought to bear by ABB*

1. Arguments of the parties

163. The applicant claims that the Commission underestimated the pressure brought to bear on it by ABB; the Commission disputes that claim.

2. Findings of the Court

164. As the applicant observes, the Commission refers on a number of occasions in its decision to the fact that ABB brought considerable pressure to bear on the other undertakings in the sector in order to persuade them to subscribe to the anticompetitive arrangements in question. Furthermore, in determining the amount of the fine imposed on ABB, the Commission recognised that it systematically used its economic power and resources as a major multinational company to reinforce the effectiveness of the cartel and to ensure that other undertakings complied with its wishes (point 169 of the decision).

165. As regards the infringement of which the applicant is accused, it is sufficient to recall that, according to settled case-law, an undertaking which participates in anti-competitive activities under pressure from other participants cannot rely on that presure, since it could have reported it rather than participating in the activities in question (see the case-law cited in paragraph 142 above).

166. As this complaint cannot be upheld, the plea in law alleging factual errors in the application of Article 85 (1) of the Treaty must be rejected in its entirety.

II - *Second plea in law, alleging infringement of the rights of defence*

A - *Access to the file*

1. Arguments of the parties

167. The applicant maintains that the Commission discouraged it from insisting on having access to the file. Thus, Pan/Isovit, which apparently did insist on exercising its right of access, was penalised by receiving a smaller reduction for cooperation than others did. The applicant agreed under pressure to waive some of its rights, in the hope that it would receive the documents relating to the cartel directly from ABB. However, ABB provided it with only a selection of those documents, which were also incomplete. In that context, the applicant claims that the approach chosen by the Commission, namely to leave it to the undertakings concerned to ensure an adequate exchange of the documents in the file, was not a satisfactory solution.

168. The defendant denies having prevented the undertakings from having access to the file and states that the applicant agreed with the organisation of an exchange of documents between the undertakings concerned. The reduction of Pan-Isovit's fine had no connection with its attitude to access to the file. As for ABB, it is not true to say that it did not provide complete documentation.

2. Findings of the Court

169. Access to the file in competition cases is intended in particular to enable the addressees of statements of objections to acquaint themselves with the evidence in the Commission's file so that on the basis of that evidence they can express their views effectively on the conclusions reached by the Commission in its statement of objections (Case C-185/95 P *Baustahlgewebe* v *Commission* [1998] ECR I-8417, paragraph 89, Case C-51/92 P *Hercules Chemicals* v *Commission* [1999] ECR I-4235, paragraph 75, Case T-30/91 *Solvay* v *Commission* [1995] ECR II-1775, paragraph 59, and Case T-36/91 *ICI* v *Commission* [1995] ECR II-1847, paragraph 69). Access to the file is thus one of the procedural safeguards intended to protect the rights of the defence and to ensure, in particular, that the right to be heard provided for in Article 19(1) and (2) of Regulation No 17 and Article 2 of Commission Regulation No 99/63/EEC of 25 July 1963 on the hearings provided for in Article 19(1) and (2) of Regulation No 17 (OJ, English Special Edition 1963-1964, p. 47) can be exercised effectively (Case T-65/89 *BPB Industries and British Gypsum* v *Commission* [1993] ECR II-389, paragraph 30).

170. According to settled case-law, in order to allow the undertakings and associations of undertakings in question to defend themselves effectively against the objections raised against them in the statement of objections, the Commission has an obligation to make available to them the entire investigation file, except for documents containing business secrets of other undertakings, other confidential information and internal documents of the Commission (*Hercules Chemicals* v *Commission*, cited above, paragraph 54, and Case T-175/95 *BASF Coatings* v *Commission* [1999] ECR II-1581).

171. In the defended proceedings for which Regulation No 17 provides it cannot be for the Commission alone to decide which documents are of use for the defence (*Solvay* v *Commission*, cited above, paragraph 81, and *ICI* v *Commission*, cited above, paragraph 91). Having regard to the general principle of equality of arms, it is not acceptable for the Commission to be able to decide on its own whether or not to use documents against the undertakings, when the undertakings had no access to them and were therefore unable to decide whether or not to use them in their defence (*Solvay* v *Commission*, cited above, paragraph 83, and *ICI* v *Commission*, cited above, paragraph 93).

172. In the light of those principles, it is necessary to determine whether in the present case the Commission complied with its obligation to give access to the entire investigation file.

173. First, it must be observed that the Commission stated in its letter of 20 March 1997, annexed to the statement of objections served on the applicant:

In order to help the undertakings prepare their comments on the complaints addressed to them, the Commission may allow them to consult the file concerning them. In this case, the Commission has enclosed with the statement of objections all the relevant documentation, consisting of all the relevant correspondence exchanged pursuant to Article 11 of ... Regulation [No 17]. References to facts wholly unconnected with the subject-matter of the case have been struck out of the documents enclosed with the statement of objections.

In the event that you wish to examine the documents available for consultation and relating to your undertakings at the Commission's premises, or if you have any questions concerning the present proceedings, please contact ... within three weeks of receipt of this letter.

174.   The applicant confirmed, in answer to a written question put by the Court, that it contacted the Commission on 23 April 1997 in order to receive authorisation to have access to the entire file. Although it is common ground that such a telephone conversation took place, the parties disagree as to precisely what was said, in particular as regards, first, whether the Commission refused a request for access to the file by stating, as the applicant maintains, that so little do [the undertakings] actually show evidence of cooperation, [they] should rather agree to ensure themselves the exchange of copies and, second, whether the applicant ultimately requested access to the entire file. The parties are agreed, however, that an exchange of documents between the undertakings concerned was discussed during that conversation.

175.   It is common ground that in April and May 1997 the Commission suggested that the undertakings to which the statement of objections was addressed should arrange to exchange all the documents seized at their premises during the investigations. It is not disputed that all the undertakings concerned, apart from Dansk Rørindustri, agreed to exchange the documents as suggested by the Commission. Subsequently, each of the undertakings participating in the exchange of documents, including the applicant, received from each of the other undertakings the documents seized at its premises, together with a list drawn up either by the undertaking concerned or, in the case of ABB and Pan-Isovit, and at their request, by the Commission. Some of the documents seized from Dansk Rørindustri were sent to the undertakings on 18 June 1997, at the Commission's request, while others were sent by the Commission on 24 September 1997.

176.   It is also common ground that following the telephone conversation of 23 April 1997 the applicant did not contact the Commission's officers again about access to the file.

177.   In its answer to the written question put by the Court, the applicant claims that it inferred from that telephone conversation that it was in its interest not to request access to the Commission's entire file, otherwise it would be accused, because of that attitude, with not cooperating during the administrative procedure.

178.   However, the applicant provides no evidence of any conduct on the Commission's part from which it might reasonably have inferred, at the material time, that the exercise of its right of access to the investigation file would have had any effect on the subsequent assessment, when the fine was being calculated, of the extent to which it had cooperated. It is true that ABB, in a letter of 6 June 1997 to the Commission, linked its proposal to exchange documents with its wish to cooperate with the Commission and that Tarco stated in a letter of 19 June 1997 to the Commission that by participating in the exchange of documents [it] continue[d] to manifest [its] wish to cooperate and [its] actual cooperation with the Commission even though [it] risk[ed] not having access to the entire file. None the less, those assertions, although they refer to the willingness of the undertakings concerned to cooperate, make no reference to any conduct on the part of the Commission which might have given the impression that a request for access to the file would have led to an increase in the fine. Nor has the applicant proved the assertion in its application that it agreed under pressure not to insist on having access to the file. The same applies, moreover, to its assertion that Pan-Isovit's request for access to the file had an effect on the assessment of its cooperation when the amount of the fine was being calculated.

179.   It must therefore be concluded that the applicant has not proved that the Commission had brought pressure on it not to avail itself of the opportunity to have access to the entire investigation file. Consequently, it must be presumed that the applicant had no intention of making use of that opportunity.

180.   In any event, it must be considered that the Commission, in making provision and arrangements for access to the file at its premises as stated in the letter enclosed with the statement of objections, fulfilled its obligation to grant the undertakings access to the investigation file, on its own initiative and without waiting for any approach on their part.

181.   Nor, in those circumstances, can the Commission be accused of having wished to facilitate access to the investigation file by requesting the undertakings concerned to exchange between themselves, through

their legal advisers, the documents obtained from each of them during the investigations.

182.  It should be observed, in that regard, that the applicant cannot rely on lack of access to the file on the ground that, in the course of that exchange of documents, ABB sent documents from which certain passages had been deleted.

183.  It follows from the letter of 4 June 1997 from ABB's counsel to the applicant's legal advisers that ABB had redacted some documents because they were internal documents containing confidential information. It is settled case-law that access to the file cannot extend to the business secrets of other undertakings and to other confidential information (see paragraph 170 above). If the applicant had had any misgivings about the version of certain documents prepared by ABB or by other competitors, in particular about the information deleted by ABB from certain documents, or if it had suspected that the lists of documents drawn up by its competitors were not exhaustive, there was nothing to prevent it from contacting the Commission and if necessary making use of its right of access to the entire investigation file at the Commission's premises.

184.  It follows from all the foregoing that by suggesting that the undertakings concerned facilitate access to the documents by exchanging documents among themselves, and at the same time itself ensuring the right of access to the entire investigation file, the Commission had due regard to the requirements laid down in the case-law of the Court of First Instance, namely that an exchange of documents between the undertakings cannot in any event eliminate the Commission's own duty to ensure that during the investigation of an infringement of competition law the rights of defence of the undertakings concerned are respected. The defence of one undertaking cannot depend upon the goodwill of another undertaking which is supposed to be its competitor and against which the Commission has made similar allegations, since their economic and procedural interests often conflict (Case T-30/91 *Solvay* v *Commission*, cited above, paragraphs 85 and 86, and *ICI* v *Commission*, cited above, paragraphs 95 and 96).

185.  It follows that the complaint alleging lack of access to the file must be rejected.

      B - *Infringement of the right to be heard in relation to the production of fresh evidence*

      1. Arguments of the parties

186.  The applicant claims that the Commission infringed its rights of defence by twice introducing, by letters of 22 May and 9 October 1997, further documents in support of its case after it had sent the statement of objections. The Commission is not entitled to rely on those documents, since it did not indicate clearly in the statement of objections that it would do so.

187.  The defendant observes that there is no procedural rule precluding it from adducing further evidence after it has sent the statement of objections. In the letters in question, the Commission explained that the enclosed documents referred to the arguments raised in the statement of objections or in the observations thereon. As the letters were sent well before the hearing, the applicant had ample opportunity to reply and indeed did so.

      2. Findings of the Court

188.  It follows from a reading of Article 19(1) of Regulation No 17, in conjunction with Articles 2 and 4 of Regulation No 99/63, that the Commission must communicate the objections which it raises against the undertakings and associations concerned and may adopt in its decisions only those objections on which those undertakings and associations have had the opportunity to make known their views (*CB and Europay* v *Commission*, cited above, paragraph 47).

189.  Similarly, due observance of the rights of the defence, which constitutes a fundamental principle of Community law and which must be respected in all circumstances, in particular in any procedure which may give rise to penalties, even if it is an administrative procedure, requires that the undertakings and associations of undertakings concerned be afforded the opportunity, from the stage of the administrative procedure, to make known their views on the truth and relevance of the facts, objections and circumstances put forward by the Commission (Case 85/76 *Hoffman-La Roche* v *Commission* [1979] ECR 461, paragraph 11, and Case T-11/89 *Shell* v *Commission* [1992] ECR II-757, paragraph

39).

190. However, there is no provision which prevents the Commission from sending to the parties after the statement of objections fresh documents which it considers support its argument, subject to giving the undertakings the necessary time to submit their views on the subject (Case 107/82 *AEG* v *Commission* [1983] ECR 3151, paragraph 29).

191. In the letter of 22 May 1997, the Commission indicated the relevance to the statement of objections of 20 March 1997 of the documents enclosed as annexes X1 to X9 and indicated the section of the statement of objections to which each of the documents related. It follows that the applicant was sufficiently informed of the relevance of the documents to the objections already communicated.

192. The documents enclosed with the letter of 9 October 1997 consisted in a series of supplementary documents to the statement of objections, numbered 1 to 18, and a series of answers provided by some of the undertakings following requests for information, together with tables indicating, for each document, the subject concerned and a reference to the relevant passage of the statement of objections and, where appropriate, to the passages in certain undertakings' observations on the statement of objections.

193. It follows that the Commission's letters of 22 May and 9 October 1997 did not introduce fresh objections but that they cite certain documents constituting further evidence in support of the objections set out in the statement of objections.

194. Since the Commission sufficiently specified the extent to which each of the documents sent after the statement of objections related to that statement and since, moreover, the applicant does not maintain that it did not have the necessary time to submit its observations on the documents, it must be held that the applicant had an opportunity to make known its views on the truth and relevance of the facts, objections and circumstances alleged in those documents.

195. For those reasons, the complaint must be rejected in so far as it concerns the production of fresh evidence.

C - *Infringement of the right to be heard as concerns the application of the guidelines for calculating fines*

1. Arguments of the parties

196. The applicant maintains that the Commission infringed its rights of defence by relying on its new guidelines on the method of setting fines imposed pursuant to Article 15(2) of Regulation No 17 and Article 65(5) of the ECSC Treaty (OJ 1998 C 9, p. 3) (the new guidelines or the guidelines). Although these guidelines fundamentally altered the rules applicable until then, the Commission gave no indication in its statement of objections that it would apply a new policy in setting the fines. It is generally considered desirable that the Commission should indicate in its statement of objections which criteria it intends to apply in arriving at the fine.

197. The defendant points out, as regards its failure to mention the level of the fine in the statement of objections, that it is under no obligation to do so.

2. Findings of the Court

198. It should be observed, *in limine*, that it is common ground that the Commission determined the fine imposed on the applicant in accordance with the general method for setting fines described in the guidelines.

199. It is settled case-law that where the Commission expressly states in its statement of objections that it will consider whether it is appropriate to impose fines on the undertakings and it indicates the main factual and legal criteria capable of giving rise to a fine, such as the gravity and the duration of the alleged infringement and whether that infringement was committed intentionally or negligently, it fulfils