# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE<br>INTEL CORPORATION<br>MICROPROCESSOR ANTITRUST<br>LITIGATION | )<br>)<br>) MDL No. 05-1717-JJF<br>)<br>) |
| ADVANCED MICRO DEVICES, INC., a Delaware corporation, and AMD INTERNATIONAL SALES & SERVICE, LTD., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION, a Delaware corporation, and INTEL KABUSHIKI KAISHA, a Japanese corporation,<br><br>Defendants. | )<br>)<br>)<br>)<br>) C.A. No. 05-441-JJF<br>)<br>)<br>)<br>)<br>)<br>) |
| PHIL PAUL, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION,<br><br>Defendant. | )<br>)<br>)<br>) C.A. No. 05-485-JJF<br>)<br>) CONSOLIDATED ACTION<br>)<br>)<br>)<br>) |

## INTEL'S PRELIMINARY PRETRIAL STATEMENT

TABLE OF CONTENTS

Page

I.      INTRODUCTION ..................................................................................................1

        A.      AMD Is Seeking to Stop Intel's Above-Cost Price-Cutting Which Is *Per
                Se* Lawful and Encouraged by the Antitrust Laws.................................1

        B.      Intel's Success in the Microprocessor Industry Reflects the Relative
                Strengths of Intel's and AMD's Offerings...............................................4

        C.      The Microprocessor Market Is Intensely Competitive .............................6

        D.      OEMs That Have Chosen to Source Solely from Intel Have Done So
                Based on Intel's Competitive Merits .......................................................7

        E.      Deposition Discovery Should Be Staged and Kept Within Reasonable
                Limits ........................................................................................................9

II.     LEGAL STANDARDS .......................................................................................10

        A.      Elements of a Section 2 Claim ..............................................................10

                1.      Monopoly Power...........................................................................12

                2.      The Alleged Anticompetitive Conduct .........................................13

                3.      Business Justification....................................................................28

                4.      Causation and Antitrust Injury.....................................................30

        B.      California Business & Professions Code Section 17045 ........................31

        C.      Intentional Interference with Prospective Economic Advantage............32

        D.      AMD's Foreign Conduct Claims Have Been Dismissed Under the FTAIA
                and Such Foreign Conduct Cannot Be Used To Prove AMD's Claims ...............33

                1.      Foreign Commerce Claims ...........................................................33

                2.      AMD's Allegations of Loss of Export Commerce Are Meritless
                        and Cannot Support Foreign Conduct Discovery ........................35

III.    STATEMENT OF FACTUAL CONTENTIONS AND CATEGORIES OF
        EVIDENCE REQUIRED ....................................................................................37

        A.      Competition on the Merits Is Multi-Faceted..........................................37

        B.      Intel Lacks Monopoly Power..................................................................38

TABLE OF CONTENTS

Page

1.    Falling Prices and Large Consumer Gains..............................................38

2.    Large and Powerful Customers..................................................................39

3.    Rapid Innovation......................................................................................39

C.    AMD's Claim That It Is the "Victim" of Exclusionary Conduct Is Belied by the Evidence, Including AMD's Own Statements ...........................................40

      1.    AMD's Market Performance Reflected the Company's Business Execution ...........................................................................................41

      2.    AMD's Shortcomings Have Limited the Company's Growth .................50

D.    Alleged Anticompetitive Conduct .........................................................59

      1.    OEMs ....................................................................................................60

      2.    Distributors ..........................................................................................82

      3.    Retail ....................................................................................................84

      4.    Compilers..............................................................................................86

      5.    Standard Setting ...................................................................................87

E.    Damages/Injunction ...............................................................................88

      1.    Monetary Damages ..............................................................................89

      2.    Injunction ............................................................................................90

IV.   REQUIRED DISCOVERY AND SUBJECTS OF EXPERT TESTIMONY ...................91

A.    Staged Discovery Proposal .....................................................................91

B.    Discovery Intel Needs To Take from AMD .............................................92

      1.    Overall Proposal...................................................................................92

      2.    Individual Depositions .........................................................................94

      3.    Rule 30(b)(6) Topics ............................................................................96

C.    Third Parties............................................................................................96

      1.    Documents ...........................................................................................96

## TABLE OF CONTENTS

Page

    2.    Depositions ...............................................................................97

D.    Subjects of Expert Testimony...........................................................100

TABLE OF AUTHORITIES

Page(s)

CASES

*A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*,
　881 F.2d 1396 (7th Cir. 1989) .......... 22

*Abcor Corp. v. AM Int'l, Inc.*,
　916 F.2d 924 (4th Cir. 1990) .......... 25

*Addamax Corp. v. Open Software Found.*,
　152 F.3d 48 (1st Cir. 1998) .......... 30

*Advo, Inc. v. Philadelphia Newspapers, Inc.*,
　51 F.3d 1191 (3d Cir. 1995) .......... 22

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
　948 F.2d 536 (9th Cir. 1991) .......... 27

*Am. Motor Inns, Inc. v. Holiday Inns, Inc.*,
　521 F.2d 1230 (3d Cir. 1975) .......... 30

*A-Mark Coin Co. v. Gen. Mills, Inc.*,
　148 Cal. App. 3d 312 (1983) .......... 32

*Amerinet, Inc. v. Xerox Corp.*,
　972 F.2d 1483 (8th Cir. 1992) .......... 30

*Argus Inc. v. Eastman Kodak Co.*,
　801 F.2d 38 (2d Cir. 1986) .......... 30

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
　472 U.S. 585 (1985) .......... 21

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
　459 U.S. 519 (1983) .......... 36

*Atlantic Richfield Co. v. USA Petroleum Co.*,
　495 U.S. 328 (1990) .......... 15

*Augusta News Co. v. Hudson News Co.*,
　269 F.3d 41 (1st Cir. 2001) .......... 15

*Balaklaw v. Lovell*,
　14 F.3d 793 (2d Cir. 1994) .......... 24

TABLE OF AUTHORITIES

Page(s)

*Barry Wright Corp. v. ITT Grinnell Corp.,*
724 F.2d 227 (1st Cir. 1983) .......................................................... 3, 11, 22

*Blue Cross & Blue Shield United v. Marshfield Clinic,*
152 F.2d 588 (7th Cir. 1998) .......................................................... 89

*Broadcom Corp. v. Qualcomm Inc.,*
501 F.3d 297 (3d Cir. 2007) .......................................................... 13, 28, 38

*Brooke Group Ltd. v Brown Williamson Tobacco Corp.,*
509 U.S. 222 (1993) ....................................................................... passim

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977) ....................................................................... 10, 34, 90

*Cargill, Inc. v. Monfort of Colorado, Inc.,*
479 U.S. 104 (1986) ....................................................................... 15, 90

*Cascade Health Solutions v. PeaceHealth,*
515 F.3d 883 (9th Cir. 2008) .......................................................... 14, 20, 23

*CDC Techs., Inc. v. IDEXX Labs., Inc.,*
186 F.3d 74 (2d Cir. 1999) ............................................................. 24

*Coleman Motor Co. v. Chrysler Corp.,*
525 F.2d 1338 (3rd Cir. 1975) ........................................................ 89

*Concord Boat Corp. v. Brunswick Corp.,*
207 F.3d 1039 (8th Cir. 2000) ........................................................ 14, 20, 23, 29

*Conwood Co., L.P. v. U.S. Tobacco Co.,*
290 F.3d 768 (6th Cir. 2002) .......................................................... 25

*E&H Wholesale, Inc. v. Glaser Bros.,*
158 Cal. App. 3d 728 (1984) .......................................................... 31, 32

*E.I. Dupont De Nemours & Co. v. United States,*
508 F.3d 126 (3d Cir. 2007) .......................................................... 20

*F. Hoffmann-La Roche, Ltd. v. Empagran S.A.,*
542 U.S. 155 (2004) ....................................................................... 33, 34, 91

*Finch v. Hercules,*
865 F. Supp. 1104 (D. Del. 2004) .................................................. 20

TABLE OF AUTHORITIES

Page(s)

*Fineman v. Armstrong World Indus.*,
   980 F.2d 171 (3d Cir. 1992) .......... 27

*Forsyth v. Humana, Inc.*,
   114 F.3d 1467 (9th Cir. 1997) .......... 13

*Gemini Aluminum Corp. v. Cal. Custom Shapes, Inc.*,
   95 Cal. App. 4th 1249 (2002) .......... 32

*HDC Med., Inc. v. Minntech Corp.*,
   474 F.3d 543 (8th Cir. 2007) .......... 11

*Healy v. Beer Inst., Inc.*,
   491 U.S. 324 (1989) .......... 32

*In re Intel Corp. Microprocessor Antitrust Litig.*,
   452 F. Supp. 2d 555 (D. Del. 2006) .......... 33

*In re Intel Corp. Microprocessor Antitrust Litig.*,
   476 F. Supp. 2d 452 (D. Del. 2007) .......... 33, 35

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
   998 F.2d 1144 (3d Cir. 1993) .......... 89

*Invacare Corp. v. Respironics, Inc.*,
   No. 1:04 CV 1580, 2006 U.S. Dist. LEXIS 77312 (N.D. Ohio Oct. 23, 2006),
   *recons. denied*, 2007 U.S. Dist. LEXIS 52321 (N.D. Ohio July 18, 2007) .......... 18

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*,
   485 F.3d 880 (6th Cir. 2007) .......... 30

*Kentmaster Mfg. Co. v. Jarvis Products Corp.*,
   146 F.3d 691 (9th Cir. 1998), *amended by* 164 F.3d 1243 (9th Cir. 1998) .......... 31, 32

*LePage's Inc. v. 3M*,
   324 F.3d 141 (3d Cir. 2003) .......... passim

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) .......... 3, 15

*MCI Commc'ns Corp. v. AT&T Corp.*,
   708 F.2d 1081 (7th Cir. 1983) .......... 89

*Nat'l Assoc. of Review Appraisers & Mortgage Underwriters v. Appraisal Found.*,
   64 F.3d 1130 (8th Cir. 1995) .......... 30

TABLE OF AUTHORITIES

Page(s)

*NicSand, Inc. v. 3M Co.,*
   507 F.3d 442 (6th Cir. 2007) ......... passim

*NYNEX Corp. v. Discon, Inc.,*
   525 U.S. 128 (1998) ......... 11

*Omega Envtl., Inc. v. Gilbarco, Inc.,*
   127 F.3d 1157 (9th Cir. 1997) ......... 24

*Pappas v. City of Lebanon,*
   331 F. Supp. 2d 311 (M.D. Pa. 2004) ......... 20

*Pitchford v. PEPI, Inc.,*
   531 F.2d 92 (3d Cir. 1975) ......... 30

*Pool Water Prods. v. Olin Corp.,*
   258 F.3d 1024 (9th Cir. 2001) ......... 31

*Roland Mach. Co. v. Dresser Indus., Inc.,*
   749 F.2d 380 (7th Cir. 1984) ......... 26

*Santana Prods. v. Bobrick Washroom Equip., Inc.,*
   401 F.3d 123 (3d Cir. 2005) ......... 25

*Schor v. Abbott Labs.,*
   457 F.3d 608 (7th Cir. 2006) ......... 28

*SmithKline Corp. v. Eli Lilly & Co.,*
   575 F.2d 1056 (3d Cir. 1978) ......... 17

*Spectrum Sports, Inc. v. McQuillan,*
   506 U.S. 447 (1993) ......... 27, 30

*Stearns Airport Equip. Co. v. FMC Corp.,*
   170 F.3d 518 (5th Cir. 1999) ......... 11, 18, 25, 37

*U.S. Football League v. Nat'l Football League,*
   842 F.2d 1335 (2d Cir. 1988) ......... 89

*United States v. Dentsply Intl.,*
   399 F.3d 181 (3d Cir. 2005) ......... 24, 28

*United States v. Griffith,* 334 U.S. 100 (1948) ......... 27

*United States v. Grinnell Corp.,*
   384 U.S. 563 (1966) ......... 10

TABLE OF AUTHORITIES

Page(s)

*United States v. Microsoft Corp.,*
   253 F.3d 34 (D.C. Cir. 2001) .......................... 13

*Verizon Commuc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
   540 U.S. 398 (2004) .......................... passim

*Virgin Atl. Airways Ltd. v. British Airways PLC,*
   257 F.3d 256 (2d Cir. 2001) .......................... 18, 24, 29

*W. Parcel Express v. United Parcel Serv. of Am. Inc.,*
   190 F.3d 974 (9th Cir. 1999) .......................... 22

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.,*
   127 S. Ct. 1069 (2007) .......................... 3, 16, 20

**STATUTES**

15 U.S.C. § 6a .......................... 33, 35

Cal. Bus. & Prof. Code § 17045 .......................... 31

**OTHER AUTHORITIES**

ABA Section of Antitrust Law, Obtaining Discovery Abroad (2d ed. 2005) .......................... 35

American Bar Association, Antitrust Law Developments (Sixth) (2007) .......................... 27

Antitrust Modernization Commission, Report and Recommendations 100 (2007 .......................... 14

Areeda, Phillip E. & Herbert Hovenkamp, Antitrust Law (Supp. 2007) .......................... 12, 14, 17, 18, 19 22, 23

Areeda, Phillip E., *Essential Facilities: An Epithet in Need of Limiting Principles,*
   58 Antitrust L.J. 841 (1989) .......................... 91

Defendants Intel Corporation and Intel Kabushiki Kaisha ("Intel") respectfully submit this preliminary pretrial statement pursuant to the Special Master's Order entered March 28, 2008.

## I.    INTRODUCTION

In this introduction, Intel provides an overview of the basic elements of its defense and its basic suggested plan for deposition discovery. Subsequent sections set forth the applicable law and the facts that Intel plans to develop through pretrial discovery from both AMD and third parties. The submission also includes a proposal to stage deposition discovery.

### A.    AMD Is Seeking to Stop Intel's Above-Cost Price-Cutting Which Is *Per Se* Lawful and Encouraged by the Antitrust Laws

AMD brought its monopolization lawsuit in an intensely competitive industry, in which competition has unquestionably brought enormous benefits to consumers. Competition in the microprocessor industry has given consumers the benefits of lower prices and higher quality and performance – the exact opposite of a market plagued by a stagnant monopoly. These consumer benefits have been extraordinary even in a world in which prices for high-technology products often decline. According to U.S. Bureau of Labor Statistics reports, which take into account both nominal price changes and product improvements, microprocessor prices have fallen more rapidly than prices in each of the 1,200 product categories tracked by the Bureau.[1] Nothing about the microprocessor industry suggests that it is hobbled by a monopolist that is reaping monopoly profits and stalling the development of new and better products.

AMD filed this lawsuit in the midst of a run of more than three years during which it enjoyed unprecedented success in increasing its market share, its range of products, and its

---

[1]    For most categories prices went up rather than down. By contrast, microprocessor prices declined from the first quarter of 2000 through the fourth quarter of 2007 at a compounded annual rate of 42.4%. This rate of decline in prices has outpaced the decline in prices in all closely related product categories, such as personal computers (23.6%), storage devices (19.3%), and software (0.7%).

profits.[2] More recently, its fortunes have sagged as a result of poor business execution with new key products, like its Barcelona microprocessor for servers. AMD's lawsuit is part of a larger strategy to secure greater success by deterring Intel from aggressive competition. Stripped of hyperbole, AMD's Complaint accuses Intel of competing too aggressively, by offering customers attractive, discounted prices and marketing and technical support to win their business. But price discounts in any form, whether based on volume or market share, or given through rebates, payments, free services or other price reductions, lower the effective cost to customers immediately, and benefit consumers. The fundamental legal problem that AMD faces is that Intel's prices have always been comfortably above any appropriate measure of Intel's costs.

Intel invented the microprocessor and has enjoyed a leadership position for many years because of its innovation, risk-taking, manufacturing excellence, and investments in demand creation, among other things. Intel has a superior reputation for reliability and consistency, in sharp contrast to AMD, which has a long history of broken promises that left customers with doubts about its ability to deliver. Those doubts lingered even after AMD began to execute better a few years ago, and then proved to be well founded more recently as AMD stranded long-standing customers when it was caught short of product and later failed to fulfill promises to release competitive new microprocessors.

Intel has also held an advantage over AMD because, for many years, it has emphasized delivering solutions – platforms of microprocessors and other components optimized to work together – while AMD has delivered only "point products." AMD's Chairman and CEO

---

2    Between 2002 and 2006, AMD's worldwide share of the x86 microprocessor segment increased by more than 50%, from 14.9% to 22.9%, according to Mercury Research data. AMD's microprocessors revenues tripled over the same time frame. AMD's profitability increases were even more impressive. During 2005, the year when AMD sued Intel, AMD announced record-breaking profits each quarter. In early 2007, AMD's Chairman and CEO proclaimed that "if you look at the last 12 quarters, we grew faster than our competition by at least a factor of two each quarter as a percent of the market."

acknowledged in 2006 that customers have wanted AMD to "get stronger in the more total solution of the system" and have "been asking us for this for quite some time." But AMD failed to meet the competitive challenge of providing solutions and therefore lagged in the market segments in which customers had a preference for solutions and not just microprocessors.

Among Intel's many advantages is a substantial cost advantage attributable to Intel's leadership in adopting new manufacturing technologies that reduce manufacturing costs dramatically, which Intel has done consistently on a two-year cadence. Bank of America Securities estimates that Intel leads AMD by a year to a year and a half in manufacturing.[3] The cost advantage resulting from this leadership has enabled Intel to meet competition profitably when discounting deeply where necessary to win the sale. AMD's complaint about Intel's discounting boils down to a complaint that Intel is a more efficient competitor.

The U.S. antitrust laws encourage Intel's discounting conduct. "[C]utting prices in order to increase business often is the very essence of competition." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986). As the Supreme Court has explained, "we specifically declined to allow plaintiffs to recover for above-cost price cutting," because "'[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition.'" *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 127 S. Ct. 1069, 1074 (2007) (citation omitted).

The Supreme Court has repeatedly rejected the claim that above-cost price-cutting might in the longer run lead to a "less" competitive world for the reason that "mistaken inferences" of anticompetitive effects "are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Matsushita*, 475 U.S. at 594. Because of the benefits of above-cost discounting, the "antitrust laws very rarely reject such beneficial 'birds in hand' for the sake of more speculative (future low-price) 'birds in the bush.'" *Barry Wright Corp. v. ITT Grinnell*

---

[3]    Another leading industry analyst, Martin Reynolds of Gartner Research, has estimated that the advantage may be as much as two years.

*Corp.*, 724 F.2d 227, 234 (1st Cir. 1983) (Breyer, J.). Exposing a company to a violation of the antitrust laws and treble damages based on above-cost discounting would disadvantage consumers by compelling successful competitors to keep prices higher to avoid challenges under the antitrust laws from less successful rivals.

Not surprisingly, in an industry with large, powerful customers, whose purchases are often measured in the hundreds of millions, and in some cases billions, of dollars, competition is often bruising. Both Intel and AMD engage in vigorous persuasion and negotiation to convince customers to align their products with the suppliers' offerings. In the face of this intense competition, AMD is seeking a rule that would require a successful competitor like Intel to pull its punches and not compete aggressively on price. AMD's position runs headlong into a series of Supreme Court decisions spanning more than twenty years that treat above-cost price competition as *per se* lawful – the antitrust equivalent of free speech under First Amendment jurisprudence. These Supreme Court decisions recognize that winning on the basis of superior efficiency is encouraged by the antitrust laws and underscore that the antitrust laws do not seek to create a federal rule of "unfair competition," or punish aggressive competition on the merits. AMD's goals are clear.



That is what this lawsuit is all about.

### B.    Intel's Success in the Microprocessor Industry Reflects the Relative Strengths of Intel's and AMD's Offerings

AMD's case appears based on the logical fallacy that despite AMD's strong success in the market segments in which its products offered advantages, it should have been even more successful, and thus Intel must have competed unfairly. AMD bases this position in large

measure on claims that two microprocessors that it introduced in 2003, the Opteron microprocessor for servers and the Athlon 64 microprocessor for desktop PCs, offered superior performance.

Even if AMD had achieved an across-the-board performance lead with these products (which it most certainly did not[4]), its claim that it should have been more successful is based on a false premise that customers care only about one or two product attributes and not the range of attributes on which companies compete. These attributes include price, performance, reliability, consistency, strength of technological solutions (as opposed to merely individual "point products"), strength of "roadmaps" of future product offerings, supply capacity, technical and marketing support, reputation, and brand. AMD would like to overlook the many important dimensions of competition that explain its marketplace performance and focus simply on certain advantages that it believes it achieved. Competition is far more multidimensional than AMD would have the Court believe, and Intel has consistently out-competed AMD across the many dimensions of competition on the merits.

The Court need not take Intel's word for this.



---

4    For example, AMD will make much of the fact that its PC processors had "64-bit" capabilities a short while before Intel's, but Intel will show that those capabilities were of little value to customers, who were unwilling to pay a premium for the capabilities and placed a greater value on product attributes that Intel, but not AMD, offered. *See* Section III(C)(2), *infra.*



A supplier with a reputation for [ ] cannot expect to turn the market upside down overnight by delivering a leadership-quality product for the first time.

Intel has compiled an impressive record of continuing product innovation and a willingness to make risky multi-billion dollar investments, even in periods of business downturns, to develop more advanced manufacturing technology and build the manufacturing capacity to supply its customers' complete needs. AMD, in contrast, has often floundered, introducing products that often failed to live up to expectations, even after embarrassing delays. And while AMD seeks to portray itself as the innovator in the microprocessor industry, its brief period of a computing performance advantage with the Opteron microprocessor cannot mask AMD's historical and current position as a laggard in computing performance, its consistent record of failing to offer suitable solutions to corporate customers or competitive products for the notebook (or mobile) market segment, and finally its well deserved reputation for unreliability, among other deficiencies.

### C.  The Microprocessor Market Is Intensely Competitive

Another fallacy in AMD's case is that Intel has the power to prevent AMD from competing on the merits. AMD's success in the market segments for which it had suitable offerings refutes that notion. In the highly profitable server market segment, for example, AMD registered, according to a senior AMD executive, "phenomenal explosive growth." In the U.S. retail segment, AMD has been so successful that it has outsold Intel for much of the past few years. By contrast, in the corporate segment, which cares more about computing solutions and supplier reliability than the performance of "point products," AMD has not been successful.

6

AMD's discrepant performance in different parts of the market demonstrates that competition on the merits determines success. If Intel had the power to block AMD, why has it not blocked AMD's growth in retail sales or its "phenomenal explosive growth" in the server segment?

Intel has no ability to block AMD's growth because, among other things, agreements with the main consumers of microprocessors – computer manufacturers, also known as OEMs – have a very short duration, one calendar quarter in most instances, and no more than a year in virtually all others. Because of the never-ending cycle of product innovation in the microprocessor industry, OEMs update computers with newer microprocessors every few months. OEMs are always looking for the next deal, which leaves multiple opportunities for AMD to win business. The OEMs themselves are some of the world's largest companies – several of whom, including Dell, HP and IBM, have significantly larger revenues than Intel.

The OEMs also understand the economic forces that drive the market. In particular they understand that Intel (and AMD) face vast fixed costs in manufacturing microprocessors, which means that the incremental cost of producing microprocessors is substantially below the average cost level. They know that Intel has a strong incentive to discount its prices to maximize the utilization of its manufacturing facilities while increasing profits (because of the low cost of producing additional units). The economic forces driving Intel's pricing are transparent, and OEMs fully exploit this advantage in their negotiations with Intel. Moreover, OEMs, sophisticated buyers experienced at driving hard bargains, can – and do – shift substantial volumes of business to and from a supplier in a short period of time. When they threaten to shift business, their threats are credible. This adds to the substantial leverage that they exert.

### D.    OEMs That Have Chosen to Source Solely from Intel Have Done So Based on Intel's Competitive Merits

AMD claims that Intel's price competition has led to anticompetitive *de facto* exclusive or near exclusive dealing. (Compl. ¶¶ 38-55.) AMD is simply attacking lawful price competition using a different label. Exclusive dealing that raises competitive concerns typically entails a refusal by a supplier to sell to a customer unless the customer buys exclusively from the

7

supplier. Intel has not refused to sell, or threatened to refuse to sell, microprocessors to customers unless they agreed to buy only from Intel. So AMD has contrived an exclusive dealing claim based not on exclusivity commitments, but on providing greater discounts to OEMs who buy larger quantities from Intel. That is discounting to win business, not exclusive dealing.

Intel, of course, competes for the opportunity to supply as much of its customers' needs as possible, and it competes in many ways, including by offering discounted prices. Intel has not refused to provide competitive discounts to customers that also buy from AMD. It would be counterproductive for Intel to deny competitive prices to OEMs that buy from AMD – that would only increase the likelihood they would buy more from AMD. In AMD's view, Intel violates the law no matter what it does: if Intel discounts aggressively, even if above cost, it is engaged in exclusive dealing; but if Intel reduces discounts, it is engaged in "retaliation." This is not the law, which asks simply whether Intel is pricing above cost. If Intel is, its discount can be matched by an equally efficient competitor, and the conduct is immunized from antitrust attack.

While most OEMs also buy from AMD, a few OEMs at various times have chosen to buy solely from Intel. That does not mean that Intel and AMD did not compete to sell to those customers. Seeking to win 100% of a customer's business, and offering above-cost discounts to a customer that then chooses to buy most, or all, of its needs from Intel is not exclusive dealing, let alone anticompetitive exclusive dealing. And this is certainly the case when any such "exclusive" win is short lived and can be reversed in the next round of competitive bidding. It represents nothing more than a win for Intel on the merits.[5]

---

5 ████████████████████████████████████

### E.  Deposition Discovery Should Be Staged and Kept Within Reasonable Limits

The overall picture that emerges in this case is not one of a competitor hamstrung by anticompetitive conduct. It is a picture of a highly competitive marketplace, where opportunity is always present to the competitor, whether Intel or AMD, that takes risks, innovates, and delivers value across the broad range of factors that drive customer purchasing decisions. But the astounding costs and risks of this litigation itself threaten that positive dynamic. Intel has produced the electronic equivalent of more than 150 million pages of documents, including an extensive data production of the pricing of all of Intel's sales. It is now facing a proposed scorched earth deposition plan, seeking to examine in detail virtually every individual negotiation that led to the above-cost discounting encouraged by the antitrust laws. Intel respectfully believes that deposition discovery must not replicate the document production, but must make use of what has been learned from that document discovery and focus on a manageable selection of representative transactions.

To achieve this end, and in light of the Court's ruling striking Intel's alleged foreign conduct from the action, Intel believes that the first stage of deposition discovery should focus on the major U.S. OEMs, distributors and retailers, with a target date of completion of early 2009, with overall limits on numbers consistent with what Intel proposed previously, *i.e.*, 50 party depositions, 25 third-party witnesses and 10 Rule 30(b)(6) depositions. Witnesses whose testimony relates solely to foreign conduct, both party and third-party, would be part of a second phase to the extent necessary and appropriate. The foreign discovery presents serious logistical and procedural challenges, and the parties, the Special Master and the Court can reconvene when the first phase discovery is nearly complete to determine what substantive issues can then be addressed, and what foreign discovery is necessary.

## II.    LEGAL STANDARDS

### A.    Elements of a Section 2 Claim

The elements of a claim under Section 2 of the Sherman Act are well established: (1) possession of monopoly power in the relevant market; (2) the willful acquisition or maintenance of that power by anticompetitive or exclusionary means; and (3) resulting injury to the plaintiff.[6] *See United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). AMD has identified its Section 2 claim solely as "Willful Maintenance of a Monopoly" (Compl. at p. 43), and Intel is proceeding on the assumption that its alleged acquisition of monopoly power is not at issue.[7]

Intel believes that the evidence of the performance of the microprocessor market dispels the notion that it possesses monopoly power. A market controlled by a monopolist would not experience price reductions that outstrip those in any other market. Nor would such a market be expected to experience the rapid innovation and product improvements that the microprocessor market has produced. But even if Intel did possess monopoly power, contrary to what the evidence will show, the possession of such power is "not only not unlawful; it is an important element of the free-market system," as it is what "induces risk taking that produces innovation and economic growth." *Verizon Commuc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004). Thus, "[t]o safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Id.* (emphasis in original).

---

[6]    An antitrust plaintiff must also "show more than merely an 'injury casually linked' to a competitive practice; it 'must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.'" *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (emphasis in original)).

[7]    AMD has made allegations relating to conduct that it released from future claims under a January 1995 settlement agreement with Intel. Intel assumes that AMD will not be permitted to breach this agreement.

Assuming that AMD can overcome the absence of monopoly power, it will have to show that Intel has maintained such power unlawfully by "compet[ing] on some basis other than the merits." *LePage's Inc. v. 3M*, 324 F.3d 141, 147 (3d Cir. 2003) (en banc). Merits-based competition is lawful. AMD must show conduct that does not constitute competition on the merits. Generally, this "requires some sign that the monopolist engaged in behavior that – examined without reference to its effects on competitors – is economically irrational." *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 523 (5th Cir. 1999); *accord HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 549 (8th Cir. 2007) ("Anticompetitive conduct is conduct without legitimate business purpose that makes sense only because it eliminates competition." (internal quotations omitted)).[8]

"Applying the requirements of § 2 'can be difficult' because 'the means of illicit exclusion, like the means of legitimate competition, are myriad,'" so it is also essential to consider that "[m]istaken inferences and the resulting condemnations 'are especially costly, because they chill the very conduct the antitrust laws are designed to protect.'" *Trinko*, 540 U.S. at 414 (citations omitted). This risk is particularly acute when the challenged conduct involves pricing. As Justice Breyer observed, "the consequence of a mistake here is not simply to force a firm to forego legitimate business activity it wishes to pursue; rather, it is to penalize a pro-competitive price cut, perhaps the most desirable activity (from an antitrust perspective) that can take place in a concentrated industry where prices typically exceed costs." *Barry Wright*, 724 F.2d at 235.

---

8    And characterizing Intel's competition as unfair or difficult to match is no answer. The antitrust laws also "do not create a federal law of unfair competition." *Brooke Group Ltd. v Brown Williamson Tobacco Corp.*, 509 U.S. 222, 225 (1993). Indeed, while AMD alleges no tortious conduct on the part of Intel, "[e]ven an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws." *Id.*; *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137 (1998) (citing *Brooke Group*, 509 U.S. at 225).

Because of the great risk of falsely condemning procompetitive price cuts and the limited institutional capability of the courts to ferret out anticompetitive schemes involving above-cost pricing, the Supreme Court has concluded that certain types of conduct, particularly "above-cost predatory pricing schemes," are "'beyond the practical ability of a judicial tribunal to control.'" *Trinko*, 540 U.S. at 414.[9]  The Sherman Act "does not give judges *carte blanche* to insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition." *Id.* at 415-16.

These fundamental principles of Section 2 are of particular importance in this case because (1) most of the purported anticompetitive conduct in this case involves alleged unfair price discounting; and (2) the microprocessor industry is hugely complex, and has been indisputably marked by extraordinary innovation, expanding output, and lower prices.  AMD's theory is simply that Intel competes too hard, too strategically, and that a set of rules reining back that competition would, in the long run, yield greater competition from a more successful AMD.  This theory in turn drives AMD's apparent litigation and discovery strategy of seeking to examine in detail every sales transaction by Intel, to fuel a free-for-all where the issue is whether Intel's competition is unfair when viewed under amorphous standards.  But as set forth in detail below, a consistent body of Supreme Court case law exposes the fundamental legal flaws in AMD's approach, both on the merits and in discovery.

## 1.     Monopoly Power

The first element AMD must prove is that Intel possesses monopoly power.  AMD alleges that Intel possesses monopoly power by virtue of its market share over time, and the large costs associated with entry. (Compl. ¶¶ 25, 27.)  AMD ignores both the rapid expansion of the

---

9     As the leading antitrust treatise explains, "[t]he economic modeling showing that certain discounts can be anticompetitive tend to be highly complex, often making unrealistic assumptions.  The result can be proposed legal standards that make impossible informational demands on courts."  Philip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 749b at 244 (Supp. 2007).

market and declining prices over the relevant period, which rebut any inference of monopoly power from Intel's market share. *See Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1476 (9th Cir. 1997) (without proof of restricted output, there was no "direct evidence of market power").

"Monopoly power is the ability to control prices and exclude competition in a given market. If a firm can profitably raise prices without causing competing firms to expand output and drive down prices, that firm has monopoly power." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 (3d Cir. 2007) (citation omitted). The microprocessor industry is, and has historically been, characterized by a trend of ever-increasing output and simultaneously decreasing prices. As shown earlier, microprocessor prices have declined more rapidly than the prices of any other product. Intel has invested heavily in product innovation, manufacturing technology, manufacturing capacity, and marketing, to expand output and stimulate demand. If Intel were instead to restrict output and raise prices, it would create an opportunity for AMD to expand at Intel's expense. Indeed, the price discounting that AMD seeks to restrict has been granted to meet competition. *Cf. United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (treating setting of prices "without considering rivals' prices" as evidence of monopoly power). Because Intel lacks the ability to control prices and exclude competition, it does not possess monopoly power.

### 2.    The Alleged Anticompetitive Conduct

#### a.    Pricing and Rebate Practices

AMD's Complaint focuses principally on Intel's price discounting practices, alleging that Intel has (1) "conditioned rebates, allowances and market development funding on customers' agreement to severely limit or forego entirely purchases from AMD," and (2) "established a system of discriminatory, retroactive first-dollar rebates, triggered by purchases at such high levels as to have the practical and intended effect of denying customers the freedom to purchase any significant volume of processors from AMD." (Compl. ¶ 2; *see also id.* ¶¶ 59-71, 88-91, 96-98, 103-05.) AMD does not allege and will not be able to prove that Intel has priced below cost

13

or that an equally efficient competitor cannot compete against the alleged practices. *See Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 906-09 (9th Cir. 2008); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1061 (8th Cir. 2000); Antitrust Modernization Commission, REPORT AND RECOMMENDATIONS 100 (2007)[10]; Philip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 749a at 241, ¶ 1807 at 419 (Supp. 2007).[11]  Instead AMD merely alleges that Intel's discounts, combined with the various competitive advantages Intel has earned, make it "impossible" for AMD to win business.

AMD will not be able to show Intel has priced below cost, and accordingly it seeks to shift the focus away from a price-cost test.  To that end, AMD offers a hypothetical example that purports to explain how AMD may be forced to meet an Intel discount with even lower prices. (Compl. ¶¶ 61-62.)  AMD's example is notable in that it does not purport to claim that Intel is pricing below cost.  AMD attempts to explain why it believes that above-cost discounts are anticompetitive (Compl. ¶ 70), but the explanation amounts to the unremarkable claim that Intel only discounts when it has to meet competition to win a sale.[12]  Notably, AMD does not even attempt to explain how customers are injured from competition in which AMD must compete against above-cost discounting, and no explanation could pass economic muster.

While AMD consistently uses colorful language in describing Intel's alleged practices – claiming that Intel "bought off" customers, or that Intel's discounts amounted to coercion or were addictive like drugs – the reality is that rebates "are nothing more than 'price reductions,'" whatever volume or market share targets that might be involved, and "[r]ather than upsetting the

---

[10]  http://govinfo.library.unt.edu/amc/report_recommendation/amc_final_report.pdf.

[11]  All citations herein to Areeda & Hovenkamp's ANTITRUST LAW refer to the 2007 supplement.

[12]  The only allegation of "below-cost" pricing (on "incremental sales") is hypothetical and does not come close to satisfying the recognized elements of a predatory pricing claim. (Compl. ¶ 68.) This assertion is also inconsistent with AMD's assertion that Intel enjoys the "overwhelming portion of PC profits." (Compl. ¶ 33.)

competition-enhancing goals of the antitrust laws," those discounts "furthered them." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 452 (6th Cir. 2007) (en banc) (citing *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 45 (1st Cir. 2001)).

Under U.S. antitrust laws, above-cost price competition is sacrosanct, and only below-cost predatory pricing can pose an anticompetitive threat. Intel's prices, after taking into account all discounts and other price concessions, were consistently above any appropriate measure of Intel's costs, and in most instances, exceeded AMD's prices as well. This is true whether discounts are applied to the entire quantity sold, as is appropriate (and as AMD's hypothetical example in ¶¶ 61-62 of the Complaint endorses), or merely to the share for which AMD claims that it was competing. From a legal perspective AMD's antitrust claim, based as it is on Intel's above-cost price discounting, must fail, and in light of the data produced identifying Intel's pricing and discounts on a deal-by-deal basis, AMD's apparent intention to examine each pricing negotiation leading to those prices across multiple customers in detail will be a monumental waste of party resources unless it is scaled back to reasonable dimensions.

Intel's position is supported by a series of decisions spanning more than twenty years in which the Supreme Court has affirmed repeatedly the bright line principle that above-cost price-cutting is *per se* lawful. The Court first announced the basic principle in *Matsushita*, 475 U.S. at 594, where it declared that "cutting prices in order to increase business often is the very essence of competition," and cautioned that "[we] must be concerned lest a rule or precedent that authorizes a search for a particular type of undesirable pricing behavior end up by discouraging legitimate price competition." The Court reaffirmed this principle in *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990), where it held that nonpredatory prices do not threaten competition "*regardless of the type of antitrust claim involved.*" *Id.* at 340 (emphasis added).[13]

---

[13] *See also Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116 (1986) ("To hold that the antitrust laws protect competitors from loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market

In *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993), the Court emphasized once again that only below-cost pricing is subject to antitrust scrutiny: "The mechanism by which a firm engages in predatory pricing – lowering prices – is the same mechanism by which a firm stimulates competition; because cutting prices in order to increase business often is the very essence of competition . . . [;] mistaken inferences . . . are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Id.* at 226 (internal quotations omitted). It repeated this admonition in its 2004 decision in *Trinko*, 540 U.S. at 414.

Last year, in *Weyerhaeuser v. Ross-Simmons*, 127 S. Ct. 1069 (2007), the Court affirmed the broad applicability of the *Brooke Group* standard to Section 2 claims, overturning a Court of Appeals decision that had declined to apply *Brooke Group* in a Section 2 case involving allegedly anticompetitive buying. *Id.* at 1074. The Court made it clear that the *Brooke Group* standard applies to all claims involving the "deliberate use of unilateral pricing measures for [alleged] anticompetitive purpose." *Id.* at 1076. The Court explained that although *Brooke Group* had been decided under the Robinson-Patman Act, the legal standard of that case applied to claims "under § 2 of the Sherman Act." *Id.* at 1074 n.1. *Brooke Group* itself had reaffirmed *Atlantic Richfield*'s holding that nonpredatory pricing are lawful regardless of how they are set, and *Weyerhaeuser* reaffirmed that principle in the specific context of a Section 2 claim, leaving no doubt that any claim involving pricing conduct must rest on pricing below cost.[14]

---

share. The antitrust laws require no such perverse result, for '[it] is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition.'").

[14] Below-cost pricing is just one component of "predatory pricing"; the plaintiff must also show that there is a "dangerous probability" that the defendant could recoup its losses by driving out competitors from the market and then charging supracompetitive prices. *See Brooke Group*, 509 U.S. at 224-25. Both aspects are critical: price reductions benefit consumers and when they are above cost, the reductions can be matched by an equally efficient competitor. And it is only when an equally efficient competitor is driven out of business and prices are raised sufficiently to recoup the losses the predator incurred that discounting injures consumers. AMD's failure to properly allege the elements of predatory pricing does not mean its Section 2 claim is not subject to those standards; it means that the claim, insofar as it is based on Intel's pricing practices, fails

This clear and consistent Supreme Court rejection of challenges to above-cost price discounting as anticompetitive cannot be circumvented by attempts to cast price discounting in the language of exclusive dealing. As the leading antitrust treatise explains, "when a discount is offered on a single product (whether a quantity or market share discount), the discount should be lawful if the price after all discounts are taken into account exceeds the defendant's marginal cost or average variable cost." Areeda & Hovenkamp, ANTITRUST LAW ¶ 749b at 245.

Intel expects AMD will argue that *LePage's* creates an exception to this unequivocal Supreme Court authority under which "bundling" can be challenged as anticompetitive even though the bundled products are sold at prices above cost. AMD appears to claim Intel "bundles" microprocessors with other microprocessors, using its discounts to achieve *de facto* exclusivity or near-exclusivity. (*See* Compl. ¶¶ 63, 70, 85.)

AMD's legal theories fail for multiple reasons. First, *LePage's* involved a competitive practice not at issue here, *i.e.*, the broad and systematic bundling of a series of distinct, unrelated products mainly through all-or-nothing rebates, which the Third Circuit viewed as not furthering competition on the merits. 324 F.3d at 155 ("The principal anticompetitive effect of bundled rebates as offered by 3M is that when offered by a monopolist they may foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer.").[15] 3M's rebate programs "offered discounts to certain customers conditioned on purchases spanning six of 3M's diverse product

---

as a matter of law. *See NicSand*, 507 F.3d at 450-52 (affirming dismissal of Section 2 claim for lack of antitrust standing, where the plaintiff asserted that the defendant's up-front payments to retailers constituted unlawful exclusive dealing, but conceded that the defendant "did not sell automotive sandpaper below cost with the goal of recouping its losses by charging monopolistic prices later").

[15] This is reinforced by *LePage's* citation to *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir. 1978) as involving "substantially identical" conduct. 324 F.3d at 155. *SmithKline* involved a pharmaceutical manufacturer's bundled rebates of *patented* drugs with other non-patented drugs, such that its competitors could not compete.

lines," including health care, home care, home improvement, stationery, retail auto, and leisure time. *Id.* at 154. In that limited context the rebates were found to be distinguishable from "volume discounts" that are "concededly legal and often reflect cost savings." *Id.*

Unlike *LePage's*, AMD's claims based on Intel's microprocessor pricing and discounts do not involve bundling; AMD alleges a single relevant product market – x86 microprocessors. (Compl. ¶ 23.) While both Intel and AMD offer a wide range of x86 microprocessors with differing performance characteristics, microprocessors are, as AMD concedes, a single product. And unlike *LePage's*, where the plaintiff could not offer most of the products in the defendant's bundle, AMD could match Intel's microprocessor offerings even if they are improperly characterized as "bundles." When both competitors are capable of offering the "bundle," the asymmetry on which *LePage's* depended is absent. *See, e.g., Invacare Corp. v. Respironics, Inc.*, No. 1:04 CV 1580, 2006 U.S. Dist. LEXIS 77312, at *33-37 (N.D. Ohio Oct. 23, 2006), *recons. denied*, 2007 U.S. Dist. LEXIS 52321 (N.D. Ohio July 18, 2007); Areeda & Hovenkamp, ANTITRUST LAW ¶ 749b at 250.

In addition, any supply, product, reliability, marketing, or brand advantages that Intel uses to compete constitute competition on the merits. *See Stearns*, 170 F.3d at 525 ("Competition grounded in nonprice considerations such as reliability, maintenance support, and general quality is competition on the merits."). For example, Intel's supply advantages result directly from a series of multi-billion dollar investments in manufacturing technology and capacity. "[E]ven with monopoly power, a business entity is not guilty of predatory conduct through excluding its competitors from the market when it is simply exploiting competitive advantages legitimately available to it." *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 266 (2d Cir. 2001).[16] To the extent that Intel benefits from its lower manufacturing

---

16  As the leading antitrust treatise explains: "In any industry subject to significant economies of scale in production or distribution a firm with a high volume of sales may be able to undersell firms that have a lower volume of sales. But no firm, not even a monopolist, is a trustee for another firm's economies of scale. To force such a firm to hold a price umbrella over

costs or superior reputation, that is competition on the merits. Any such advantage here is based on superior efficiency and not on the ability to bundle unrelated products that a competitor cannot supply.

As to the limited "bundling" of microprocessors and chipsets or motherboards alleged in the Complaint. (Compl. ¶ 85), Intel's ability to offer directly complementary products, like chipsets, which directly improve the functionality of a computer system, and which customers prefer to buy as part of a platform, is competition on the merits and is not within the ambit of *LePage's*. Intel and AMD compete not simply by offering microprocessors, but by providing platform solutions, which include both microprocessors and chipsets. ████████████████ ████████████████████████████████████████████████████████ Satisfying customers' preferences to buy platform solutions is not anticompetitive.

AMD publicly acknowledged in 2006 that "[o]ur limitation in the commercial space has been the fact that we did not offer one-stop shopping like the competition does when it comes to the total platform, meaning the motherboard, chipset and the processor." AMD was capable of addressing this limitation, however, by teaming with a chipset vendor to supply a platform. This capability provides a further reason why this case is outside the limited ambit of *LePage's* where the bundling of many disparate products presented difficult coordination problems for 3M's rival. *See* Areeda & Hovenkamp, ANTITRUST LAW ¶ 749b at 258-59 ("[T]he court must be satisfied that the defendant's discounted package is not likely to be matched, whether by a rival manufacturer who produces the same bundle or by some union of two or more firms, each of whom makes one component of the bundle.") Any bundled pricing of microprocessors and chipsets or motherboards is thus not anticompetitive unless it is below cost.

---

its rivals, selling at above-cost prices in order to protect the rivals' inefficiently small production, would be a blatant example of protecting competitors at the expense of consumers." Areeda & Hovenkamp, ANTITRUST LAW ¶ 749b at 249.

Finally, in light of the Supreme Court's clear affirmation in *Weyerhaeuser* that the *Brooke Group* test generally applies to Section 2 pricing claims, *LePage's* conclusion that the *Brooke Group* predatory pricing standards do not apply to a Section 2 claim where the defendant has market power (*see* 324 F.3d at 151-52) no longer holds any force.[17] *Weyerhaeuser*, 127 S. Ct. at 1074 n.1. *LePage's* narrow view of the scope of predatory pricing claims was subsequently contradicted by the Supreme Court in *Weyerhaeuser*, which made clear that all Section 2 claims involving the "deliberate use of unilateral pricing measures for anticompetitive purposes" are governed by predatory pricing standards. *Id.* at 1076; *see also Concord Boat*, 207 F.3d at 1061-62 (market share discounts governed by predatory pricing standards). *LePage's* conclusion – that *Brooke Group* "was primarily concerned with the Robinson-Patman Act, *not § 2 of the Sherman Act*" (324 F.3d at 151 (emphasis added)) – has since been refuted by the Supreme Court twice, most recently in *Weyerhaeuser's* application of *Brooke Group* in the Section 2 context and before that by the Court's reliance on *Brooke Group* in *Trinko*, another Section 2 case. This fact, at a minimum, prevents the extension of *LePages* beyond the context of bundling of unrelated products, and makes clear that the decision cannot be extended to a claim based on unilateral pricing conduct.[18]

---

[17] In evaluating the applicability of *Brooke Group* predatory pricing standards, *LePage's* stated that "nothing in the decision suggests that its discussion of the issue is applicable to a monopolist with its unconstrained market power." 324 F.3d at 151. In other words, *LePage's* concluded that *Brooke Group* did not apply to claims based on alleged maintenance of a monopoly – a proposition no longer tenable after *Weyerhaeuser*, which involved a maintenance claim. Where, as here, a Court of Appeals decision has been "obviously undermined by more recent opinions of the Supreme Court, the district court has an obligation to recognize the former as overruled." *Pappas v. City of Lebanon*, 331 F. Supp. 2d 311, 319 (M.D. Pa. 2004); *accord Finch v. Hercules*, 865 F. Supp. 1104, 1120-21 (D. Del. 2004); *see also E.I. Dupont De Nemours & Co. v. United States*, 508 F.3d 126, 132 (3d Cir. 2007) ("Notwithstanding this court's strict adherence to our precedents, we have made clear that those precedents may be reevaluated when there has been intervening authority.").

[18] The Ninth Circuit recently considered *LePage's* in light of the Supreme Court authorities cited above, including the most recent authorities of *Weyerhaeuser* and *Trinko*, and declined to follow it. *PeaceHealth*, 515 F.3d at 903C ("Given the endemic nature of bundled discounts in many spheres of normal economic activity, we decline to endorse the Third Circuit's definition

*LePage's* also relied heavily on *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), as suggesting that a monopolist violates Section 2 whenever it "'ma[kes] a deliberate effort to discourage its customers from doing business with a smaller rival.'" 324 F.3d at 150 (quoting *Aspen Skiing*, 472 U.S. at 610). Since *LePage's*, the Supreme Court has specifically precluded reliance on *Aspen* as establishing general standards for Section 2 liability, declaring that *Aspen* is "at or near the outer boundary of § 2 liability" and explaining the holding in *Aspen* as the result of the extreme circumstances presented in that case, in particular, "[t]he unilateral termination of a voluntary (*and thus presumably profitable*) course of dealing suggest[ing] a willingness to forsake short-term profits to achieve an anticompetitive end." *Trinko*, 540 U.S. at 409 (emphasis in original). The Supreme Court's severe limitation of *Aspen* as precedent further undermines *LePage's*. Indeed, *Trinko's* reasoning parallels that of the Supreme Court's predatory pricing cases in its focus on the willingness of a monopolist to effectively take *losses* up front, so as to lay the foundation for charging supracompetitive prices later. There is nothing about Intel's conduct here that fits into that paradigm or that supports the view that profitable above-cost price discounting can be condemned as anticompetitive simply because it is successful.

Nor will AMD be able to fall back on evidence of Intel's purported exclusionary intent — to win sales and maintain or expand its market share — to transform procompetitive conduct into anticompetitive conduct. For monopolization cases, "evidence of intent is merely relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive' . . . ." *Aspen*, 472 U.S. at 602.[19] In particular, here Intel's conduct has led to

---

of when bundled discounts constitute the exclusionary conduct proscribed by § 2 of the Sherman Act."). *PeaceHealth* reinforces that *LePage's* at a minimum should not be viewed expansively beyond the unique circumstances present in that case.

[19]  When it comes to pricing, not only is evidence of intent unhelpful in separating procompetitive from anticompetitive conduct, reliance on such evidence is detrimental to robust price competition. As Justice Breyer has explained, "the antitrust courts' major task is to set rules and precedents that can segregate the economically harmful price-cutting goats from the

significantly improved products, lower prices and expanded output, and no evidence of intent or aggressive language can change those facts. *See Brooke Group*, 509 U.S. at 241; *see also Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1199 (3d Cir. 1995) ("[T]here is nothing to gain by using the law to mandate 'commercially correct' speech within corporate memoranda and business plans. Isolated and unrelated snippets of such language 'provide no help in deciding whether a defendant has crossed the elusive line separating aggressive competition from unfair competition.'").

### b.  Alleged Exclusive or Near-Exclusive Dealing

AMD alleges that Intel engaged in anticompetitive exclusive or near-exclusive dealing arrangements with individual OEMs (Compl. ¶¶ 38-46), or across particular geographic or product lines. (*Id.* ¶¶ 47-58.) AMD does not allege traditional exclusive dealing arrangements, whereby a "buyer can purchase the good subject to the exclusive agreement only by breaching its contract or by else giving up something in which it has made a significant investment." Areeda & Hovenkamp, ANTITRUST LAW ¶ 749 at 241, ¶ 1807 at 418-19. Instead, AMD alleges *de facto* exclusive dealing, based on Intel's high market shares with major OEMs, obtained by discounts, including "rebates," "outright payments" and "favorable discriminatory pricing and service." (*See, e.g.*, Compl. ¶ 39.) But "virtually *every* contract to buy 'forecloses' or 'excludes' alternative sellers from some portion of the market, namely the portion consisting of what was bought." *Barry Wright*, 724 F.2d at 236 (emphasis in original); *see also W. Parcel Express v. United Parcel Serv. of Am. Inc.*, 190 F.3d 974, 976 (9th Cir. 1999) ("contracts [that] do not preclude consumers from using other [suppliers] . . . are not exclusive dealings contracts that

---

more ordinary price-cutting sheep, in a manner precise enough to avoid discouraging desirable price-cutting activity. . . . Some courts have written as if one might look to a firm's 'intent to harm' to separate 'good' from 'bad.' But 'intent to harm' without more offers too vague a standard in a world where executives may think no further than 'Let's get more business' . . . ." *Barry Wright*, 724 F.2d at 231-32 (citations omitted); *accord A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1401-02 (7th Cir. 1989).

preclude competition in violation of the Sherman Antitrust Act"). Without proof of the anticompetitive nature of the pricing used to obtain the sale, *i.e.*, below-cost pricing, condemning Intel for having high shares of the purchases of OEMs would be akin to finding liability based on market share alone. *See Trinko*, 540 U.S. at 407; *see also Concord Boat*, 207 F.3d at 1059 ("The boat builders failed to produce sufficient evidence to demonstrate that Brunswick had foreclosed a substantial share of the stern drive engine market through anticompetitive conduct.").

Any claims that an alleged monopolist has attained a high share of a customer's purchases through pricing practices must be analyzed under *Brooke Group*. Any above-cost price that can be matched by an equally efficient competitor is not anticompetitive, as any success that it brings is based on superior efficiency, the basis on which the antitrust laws encourage firms to compete. *See PeaceHealth*, 515 F.3d at 903-04 ("In a single product case, we may simply ask whether the defendant has priced its product below its incremental cost of producing that product because a rival that produces the same product as efficiently as the defendant should be able to match any price at or above the defendant's cost."); *Concord Boat*, 207 F.3d at 1061 ("[A] firm's ability to offer above cost discounts is attributable to 'the lower cost structure of the alleged predator, and so represents competition on the merits.'" (quoting *Brooke Group*, 509 U.S. at 223)).

As all of Intel's discounted prices were above cost, "an equally efficient rival could steal the sale," and any customer's decision to give all or almost all of its business to Intel was a result of competition on the merits. Areeda & Hovenkamp, ANTITRUST LAW ¶ 1807 at 419; *see Concord Boat*, 207 F.3d at 1061. This procompetitive pricing conduct does not become anticompetitive "exclusive dealing" because Intel is successful in winning the business.

Moreover, even if Intel's agreements could be characterized as exclusive dealing contracts, their short duration would preclude any liability. Every OEM could freely switch more of its business to AMD in any quarter and still obtain considerable discounts from Intel. The regular shifting of purchases from Intel to AMD and vice versa shows that OEMs were not locked into one supplier or the other. *See Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157,

1163-64 (9th Cir. 1997) ("the short duration and easy terminability of [ ] agreements negate substantially their potential to foreclose competition"); *accord CDC Techs., Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74, 81 (2d Cir. 1999) (same); *see also Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994) (exclusive dealing arrangements with reasonable termination provisions "may actually encourage, rather than discourage competition"). Therefore, even if Intel's pricing practices could be construed as exclusive dealing, they were not unreasonable.

This case is easily distinguishable from *United States v. Dentsply International.*, 399 F.3d 181 (3d Cir. 2005). Unlike in *Dentsply,* where the defendant strictly enforced exclusive distributorships where the competing artificial teeth product could not support a separate distributorship, Intel did not enter into contracts with customers that forced them to choose between purchasing all of their requirements from Intel, *or* purchasing some of their requirements from AMD *and* losing their ability to do business with Intel. Nor did Intel's discounts "force manufacturers to make an all-or-nothing choice." *LePage's*, 324 F.3d at 158 (internal quotations omitted). Most OEMs did business with both Intel and AMD, and Intel did not deny discounts to OEMs that purchased from AMD. Intel engaged in regular ongoing negotiations with its customers, based on customer requests for discounted pricing in response to AMD's offers. These regular opportunities for competition, and Intel's above-cost pricing, render AMD's claims of unlawful exclusive dealing meritless. *See Virgin Atl. Airways*, 257 F.3d at 266.

### c.    Product Launches

AMD also alleges that Intel unfairly "interfered" with the launches of its new Opteron and Athlon 64 products in 2003. The Complaint is vague and unspecific in describing the actual conduct Intel supposedly engaged in. AMD claims that Intel "intimidated" third parties and engaged in "coercion" to convince its customers not to publicly support AMD's promotion of directly competing products, by suggesting that certain Intel market development support might be withheld or not be forthcoming if the customer publicly aligned itself with AMD. (Compl.

¶ 81, 83.) While Intel denies AMD's allegations, the claims are also insufficient as a matter of law.

AMD does not in fact allege *any* recognized tortious conduct on the part of Intel in connection with AMD's product launches. Even if it did, it is well established that the antitrust laws "do not create a federal law of unfair competition." *Brooke Group*, 509 U.S. at 225; *see also Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 931 (4th Cir. 1990) ("[C]ourts should be circumspect in converting ordinary business torts into violations of antitrust laws. To do so would be to create a federal common law of unfair competition which was not the intent of the antitrust laws." (internal quotations omitted)). Those limited instances where the courts have recognized antitrust claims based on allegations of tortious unfair competition involved conduct that was both destructive and much more pervasive than attempting to persuade customers to remain publicly aligned with Intel in ways AMD characterizes as heavy-handed. *See, e.g., Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 783 (6th Cir. 2002) (anticompetitive conduct included discarding the competitor's sales racks, training operatives to engage in "ruses" in an effort to destroy the competitor's racks, providing misleading information, and entering into express exclusive dealing agreements).

Shorn of colorful language, AMD's allegation is that Intel sought to persuade its customers to buy and support its products, not those of its competitor. But that is ordinary competition. *See Stearns Airport*, 170 F.3d at 524-25 ("Inferring an attempt to circumvent competition on the merits is extraordinarily difficult when the alleged violator takes the facially rational and unproblematic step of attempting to sell its product, couches its arguments to the customer in favor of a sale on the merits of the product and procedures it recommends, and the consumer agrees."), *cited with approval in Santana Prods. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 132-33 (3d Cir. 2005).

Competition is often tough, but tough competition is not a basis for a monopolization claim. A supplier can rightly perceive that the public endorsement of a directly competing product by a customer that is prominently associated with the supplier's product can undermine

25

the customer's promotional efforts on behalf of the supplier's product. It is therefore reasonable that a supplier would want customers to endorse its products and not those of a competitor and make efforts to persuade a customer to limit support to the supplier's own products. And reacting to changes in the perceived benefits of future collaboration with a customer is not improper – the antitrust laws recognize the importance of preserving the right of a party to decide whether, and on what terms, it will deal with a customer. *See Trinko*, 540 U.S. at 408.[20] Even if AMD's vague allegations of Intel's alleged use of "pressure points" with its customers (Compl. ¶ 72) could be proved (and they cannot), they would not show that Intel engaged in any conduct that can be punished as anticompetitive under the antitrust laws.

### d.    Compilers

AMD alleges that Intel has engaged in anticompetitive conduct in connection with the development and sale of compilers.[21] Intel invested in developing compilers to take advantage of the full range of capabilities of its new microprocessors. Intel markets and sells its compilers to independent software vendors, who use Intel's compilers to compile software on systems utilizing both Intel and AMD microprocessors. AMD has not alleged that Intel possesses monopoly power with respect to compilers. Indeed, Intel's market share in compilers is small, which is fatal to AMD's compiler claims.

---

20  *Cf. Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 395 (7th Cir. 1984) (noting that sole-sourcing relationships can be economically rational and procompetitive, as they may "enable a manufacturer to prevent dealers from taking a free ride on his efforts (for example, efforts in the form of national advertising) to promote his brand. The dealer who carried competing brands as well might switch customers to a lower-priced substitute on which he got a higher margin, thus defeating the manufacturer's effort to recover the costs of his promotional expenditures by charging the dealer a higher price.") (citation omitted)).

21  Put simply, a compiler takes programming instructions written in languages that are understandable by computer programmers and turns them into code that can be executed by computers. Popular programming languages include C, C++, and Java. The compiler's role is to turn human readable "source code" into computer readable "machine code."

AMD claims Intel has "leverag[ed]" its other product lines to "unfairly disadvantage AMD in the marketplace," and suggests that such "leveraging" violates the Sherman Act. (Compl. at p. 40.) AMD, however, fails to allege two essential elements of monopoly leveraging. First, leveraging requires the use of monopoly power in one market to foreclose competition in another. *See United States v. Griffith*, 334 U.S. 100, 107 (1948) ("the use of monopoly power . . . to foreclose competition, to gain a competitive advantage, or to destroy a competitor" may violate Section 2); *see also Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 545 n.12 (9th Cir. 1991) ("Monopoly control of the upstream market is a necessary element of . . . monopoly leveraging claims."). Second, the monopoly power must be used to obtain or dangerously threaten to obtain a monopoly in a second market, and not merely to gain an advantage. *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 206 (3d Cir. 1992); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993). AMD alleges neither the existence of a monopoly in compilers nor the use of that monopoly to obtain a second monopoly. For that reason, its claim fails as a matter of law. *See* American Bar Association, ANTITRUST LAW DEVELOPMENTS (SIXTH) at 304-05 (2007) (summarizing case law).

Even if Intel were a monopolist in the compiler market (despite its overall single digit share) it would not have a duty to assist a rival in the microprocessor market. *See Trinko*, 540 U.S. at 408-09. As the Supreme Court emphasized in *Trinko*, compelling firms that acquire market strength "by establishing an infrastructure that renders them uniquely suited to serve their customers" to "share the source of their advantage is in some tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities." *Id.* at 407-08. Like the regulation of above-cost pricing, "[e]nforced sharing also requires antitrust courts to act as central planners, identifying the proper price, quantity, and other terms of dealing – a role for which they are ill-suited." *Id.* at 408. Indeed, by "compelling negotiation between competitors," judicially enforced sharing "may facilitate the supreme evil of antitrust: collusion." *Id.*; *see also Schor v.*

*Abbott Labs.*, 457 F.3d 608, 610 (7th Cir. 2006) ("Cooperation is a *problem* in antitrust, not one of its obligations." (citing *Trinko*, 540 U.S. 398) (emphasis in original)).

### e.     Standard Setting Organizations

AMD alleges that "Intel has employed, and continues to employ, a variety of tactics that have the purpose and effect of excluding and/or hampering AMD's full and active participation in the development of important industry standards. It has also worked to deny AMD timely access to such standards. Its efforts have hampered AMD's ability to vigorously compete in the market." (Compl. ¶ 108.) AMD further alleges that the practical effect of Intel's conduct is that Intel has an "undeserved head-start and unfair competitive advantage" in bringing products to market that incorporate any new standards. (*Id.* ¶ 115.) The evidence will show that these allegations are groundless.

The case law is clear that the conduct alleged by AMD – entering into private standard setting development efforts with other companies, the nature of which is kept confidential – is procompetitive, except in limited circumstances not present here. *See Broadcom*, 501 F.3d at 308 ("Private standard setting advances th[e] goal [of promoting competition among firms] on several levels. In the end-consumer market, standards that ensure the interoperability of products facilitate the sharing of information among purchasers of products from competing manufacturers, thereby enhancing the utility of all products and enlarging the overall consumer market."). Notably, AMD does not even allege that any standard that disadvantages it was ever adopted, so its claims amount to much ado about nothing.

### 3.     Business Justification

Even where monopoly power, anticompetitive conduct, and foreclosure are shown, "the monopolist still retains a defense of business justification." *Dentsply*, 399 F.3d at 187 (citation omitted). Unlike the artificial tooth manufacturing industry at issue in *Dentsply*, *see id.* at 184, the microprocessor industry is marked by rapid technological obsolescence, high-growth potential, a large number of direct and indirect customers with significant bargaining power, and

dynamic competitive conditions. In such a market, constant innovation of new and better technology is imperative. There is a strong business need to develop strategic relationships with major players in order to cooperate in developing, introducing, and promoting new technology.

Intel's price discounting is focused on meeting AMD competition by lowering the cost of Intel's products to its customers and thereby profitably increasing Intel's sales. This is a legitimate business justification. *Concord Boat*, 207 F.3d at 1062 ("Brunswick's business justification in this case is that it was trying to sell its product. Cutting prices is the 'very essence of competition.'" (citations omitted)). Increasing sales volume in the microprocessor industry has clear efficiency benefits. Intel's manufacturing is characterized by significant economies of scale; the average manufacturing cost decreases with every additional microprocessor made. At the same time, in order to manufacture efficiently, Intel benefits from precise information regarding the expected purchases of its products to establish manufacturing plans to meet the expected mix of demand.

The structure and amounts of Intel's other financial support are fundamentally directed toward the goal of expanding the market and promoting new and better technology. Intel provides a variety of co-marketing funds to its OEM partners for these purposes. Although these funds grow the market as a whole, which benefits AMD, Intel legitimately seeks to make sure that its investments are used in a way that most effectively promotes Intel products.

AMD's attempt to cast aspersions on Intel's discounts by characterizing some of them as "loyalty rebates" or "first dollar" discounts is unavailing. As the Second Circuit has held, "[r]ewarding customer loyalty promotes competition on the merits." *Virgin Atl. Airways*, 257 F.3d at 265. In particular, market share-based discounts give OEMs the ability to secure a certain level of discounts and plan ahead accordingly, by obtaining some insulation from the volatility and uncertainty of the PC market. Discounts that begin at a negotiated level of

29

purchases (which AMD characterizes as "first dollar") are merely one form of volume discounts.[22]

### 4.    Causation and Antitrust Injury

As a viable competitor, AMD cannot show causation and antitrust injury from Intel's discounting practices. The fact of injury from an alleged antitrust violation must be shown with reasonable certainty. *Pitchford v. PEPI, Inc.*, 531 F.2d 92, 104 (3d Cir. 1975); *accord J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 485 F.3d 880, 887 (6th Cir. 2007). Furthermore, it must be shown that the alleged violation was a "material cause" of the injury, i.e., "a substantial factor" in the occurrence of damages. *J.B.D.L. Corp.*, 485 F.3d at 887. Evidence that a plaintiff's alleged injury was caused by other factors, such as its own competitive missteps, may also rebut any inference of causation. *See, e.g., Addamax Corp. v. Open Software Found.*, 152 F.3d 48, 53-55 (1st Cir. 1998); *Nat'l Assoc. of Review Appraisers & Mortgage Underwriters v. Appraisal Found.*, 64 F.3d 1130, 1135-36 (8th Cir. 1995); *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1495-96 (8th Cir. 1992); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 42-46 (2d Cir. 1986). Intel is developing evidence of AMD's "competitive missteps" to rebut causation.

The purpose of the Sherman Act "is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports*, 506 U.S. at 458. "At a minimum," this means that "one competitor may not use the antitrust laws to sue a rival merely for vigorous or intensified competition"; antitrust claims should be permitted to

---

22    In evaluating the reasonableness and justifications for a particular type of business arrangement, courts should not draw categorical distinctions, or require that the "least restrictive means" be employed to attain the same business purpose. *Cf. Am. Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1249 (3d Cir. 1975) ("In its descriptions of the rule of reason inquiry, the Supreme Court has never indicated that, regardless of the other circumstances present, the availability of an alternative means of achieving the asserted business purpose renders the existing arrangement unlawful if that alternative would be less restrictive of competition no matter to how small a degree." (footnote omitted)). Rather, "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Trinko*, 540 U.S. at 411.

proceed "only when one of the rivals has engaged in some form of predatory pricing or illegal tying – when the rival has engaged in something more than vigorous price, product or service competition." *NicSand*, 507 F.3d at 450, 451 (citation omitted).

The record will show that both prior to filing this lawsuit, and for more than a year afterward, AMD enjoyed record success. While AMD speculates that it would have done even better had Intel not engaged in intense price competition, "[t]he Supreme Court has made clear . . . that a decrease in profits from a reduction in a competitor's prices, so long as the prices are not predatory, is not an antitrust injury." *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1035 (9th Cir. 2001); *see also Brooke Group*, 509 U.S. at 223-24; *NicSand*, 507 F.3d at 457. The fierce competition between Intel and AMD has greatly benefited OEMs, distributors, and end users in the form of low prices. *See Kentmaster Mfg. Co. v. Jarvis Products Corp.*, 146 F.3d 691, 695 (9th Cir. 1998) ("To beat a competitor's prices is not an offense against the antitrust laws. To beat a competitor's prices is a boon to customers choosing between the competitors. To beat a competitor's prices is good business and normal business."), *amended by* 164 F.3d 1243 (9th Cir. 1998). AMD has not alleged, and cannot prove, either that Intel has sold below cost to exclude AMD from the market or that Intel is charging supracompetitive prices to recoup the losses from below-cost pricing.

**B.     California Business & Professions Code Section 17045**

AMD also brings a so-called "secret rebate" claim under Cal. Bus. & Prof. Code § 17045. That section provides: "[t]he secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful." A violation of Section 17045 consists of three elements: (1) a secret payment of a rebate; (2) injury to a competitor; and (3) tendency of such rebate to destroy competition. *E&H Wholesale, Inc. v. Glaser Bros.*, 158 Cal. App. 3d 728, 738 (1984).

Consistent with *Brooke Group*, AMD cannot show a tendency to destroy competition in a primary-line discrimination case without establishing below-cost pricing, which it cannot do. *See Kentmaster Mfg. Co.*, 146 F.3d at 695 (concluding that to the extent that the Cal. Bus. & Prof. Code § 17045 claim "depend[ed] on allegations of predatory pricing," it "fail[ed]" for the same reasons that the federal claims fail[ed]," i.e., no allegation of below-cost pricing and therefore no injury to competition). The evidence will also show that Intel offered the rebates to "meet competition," which further shows that the rebates had no tendency to destroy competition. *See E&H Wholesale*, 158 Cal. App. 3d at 739.[23]

## C.    Intentional Interference with Prospective Economic Advantage

AMD also relies upon all the conduct alleged to bring a tort claim under California law for intentional interference with prospective economic advantage. The elements of the claim are: (1) the existence of a valid economic relationship with a probability of future economic benefit to plaintiff; (2) that the defendant had knowledge of the economic relationship; (3) that the defendant engaged in intentional conduct to interfere with the relationship that was wrongful by some legal measure other than the fact of interference itself; (4) actual disruption of the relationship; and (5) resulting damage. *Gemini Aluminum Corp. v. Cal. Custom Shapes, Inc.*, 95 Cal. App. 4th 1249, 1256 (2002).

This claim fails for multiple reasons:  (1) Intel's above-cost discounts, co-marketing efforts, and other competitive acts did not violate either the Sherman Act or Cal. Bus. & Prof. Code § 17045, *see A-Mark Coin Co. v. Gen. Mills, Inc.*, 148 Cal. App. 3d 312, 323-24 (1983) (describing competition privilege); (2) AMD's relationship with OEMs did not have a

---

23   The extraterritorial application of Cal. Bus. & Prof. Code § 17045 to rebates paid to customers outside of California also raises Commerce Clause, due process, and conflict of law concerns. *See, e.g., Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336, 339 (1989) ("legislation that has the practical effect of establishing 'a scale of prices for use in other states'" or "depriv[ing] businesses and consumers in other States of 'whatever competitive advantages they may possess' based on the conditions of the local market" violates the Commerce Clause).

*probability* of future economic benefit with respect to any particular sale; and (3) Intel's conduct is protected by the recognized competition privilege. In any event, given that the antitrust and tort claims are entirely congruous, the claim is not a basis to expand discovery.

> **D.    AMD's Foreign Conduct Claims Have Been Dismissed Under the FTAIA and Such Foreign Conduct Cannot Be Used To Prove AMD's Claims**

> **1.    Foreign Commerce Claims**

In September 2006, the District Court dismissed "AMD's claims that are based on lost sales of AMD's German-made microprocessors to foreign customers" for lack of jurisdiction pursuant to the Foreign Trade Antitrust Improvements Act ("FTAIA"), finding that AMD had failed to demonstrate that "the alleged foreign conduct of Intel has direct, substantial and foreseeable effects in the United States." *In re Intel Corp. Microprocessor Antitrust Litig.*, 452 F. Supp. 2d 555, 559, 563 (D. Del. 2006). The Court's ruling encompassed all claims, including state law claims. *Id.* at 563-64; *see also* 476 F. Supp. 2d 452, 457-58 (D. Del. 2007).

Intel believes that the Court's ruling means that Intel's foreign conduct will be inadmissible at trial under Rules 401 and 403 of the Federal Rules of Evidence to establish the anticompetitive conduct required to prove a Section 2 claim. The FTAIA plainly states that *"the [Sherman Act] shall not apply"* to foreign conduct without the requisite direct, substantial, and foreseeable domestic effects. 15 U.S.C. § 6a. As the Supreme Court explained in *F. Hoffmann-La Roche, Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004), the FTAIA "initially lays down a general rule placing *all* (non-import) activity involving foreign commerce outside the Sherman Act's reach." *Id.* at 162 (emphasis in original). Such conduct only comes back "within the Sherman Act's reach *provided that* the conduct *both* (1) . . . has a 'direct, substantial and reasonably foreseeable effect' on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, i.e., the 'effect' must 'giv[e] rise to a [Sherman Act] claim.'" *Id.* (emphasis in original).

33

Thus, this Court's ruling dismissing AMD's foreign conduct claims under the FTAIA means that the conduct is "outside the Sherman Act's reach." *Id.* Indeed, the Court specifically struck all allegations relating to foreign conduct because they "[did not] give rise to an antitrust claim within the jurisdictional reach of the Sherman Act." 452 F. Supp. 2d at 563. To allow evidence of foreign conduct to be admitted to establish a Sherman Act violation would be inconsistent with the Court's ruling, and would contradict the plain language of the FTAIA as well as *Empagran.*

Further, under *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977), a plaintiff must prove antitrust injury, which the Supreme Court described as "injury of the type the antitrust laws were intended to prevent and that *flows from that which makes the defendant's acts unlawful.*" *Id.* at 489 (emphasis added). Under the FTAIA, this Court has ruled that AMD's sales abroad from its German plant did not have the necessary direct, substantial, and foreseeable effect required to confer jurisdiction under the Sherman Act on those claims. *Brunswick* and the FTAIA mandate the same result — under the FTAIA plaintiffs cannot use Intel's foreign conduct to prove antitrust injury, and under *Brunswick*, by definition, Intel's foreign conduct that does not violate the U.S. antitrust laws cannot constitute "antitrust injury." Thus, a critical element of AMD's case is that it suffered injury caused by anticompetitive conduct engaged in by Intel in U.S. domestic commerce.

For discovery purposes, however, AMD took the position that, despite the Court's ruling, it is entitled to conduct discovery of Intel's foreign conduct for two reasons: (1) that while AMD agreed that the Court's decision precludes antitrust damage claims based on its sales made to foreign customers from its German plant, evidence of foreign conduct was relevant to show that Intel possessed monopoly power in the worldwide market and that Intel maintained that power through anticompetitive, exclusionary conduct in that same worldwide market; and (2) that the evidence was relevant to AMD's export commerce claim.

Based on the Court's FTAIA ruling, Intel opposed AMD's motion to compel foreign discovery. The Special Master overruled Intel's objections, but expressly did not make any

determinations as to the ultimate admissibility or use of the discovery. *See* 476 F. Supp. 2d at 457. Intel elected not to appeal the Special Master's discovery ruling to the Court and is not seeking to reargue the ruling here. However, the costs and the serious procedural obstacles associated with obtaining foreign discovery[24] are powerful reasons why AMD's quest for such discovery should be staged and potentially narrowed. Intel sets forth its proposal for such staging in Section IV(A), *infra*.

### 2.  AMD's Allegations of Loss of Export Commerce Are Meritless and Cannot Support Foreign Conduct Discovery

AMD's export claim under the FTAIA requires a showing that Intel's foreign conduct had a direct and substantial effect on export commerce, violated the Sherman Act and proximately injured AMD's "export commerce" business. 15 U.S.C. § 6a(1)(B). AMD argued before the Special Master that, but for Intel's foreign conduct, it would not have converted its only U.S. microprocessor fabrication facility (Fab 25 in Austin, Texas) from producing microprocessors to producing flash memory, and instead would have invested in major improvements to Fab 25 to make it competitive and continue in the "export" business. AMD further asserts that Intel's foreign conduct negatively affected the value of AMD's sales of its dwindling microprocessor output from Fab 25 and unsold inventory generated during the conversion process.

AMD's "export commerce" claim is flawed as a matter of law for the following reasons: (1) the alleged "but for" connection between Intel's foreign conduct and AMD's decision to

---

24  Foreign discovery also presents unique challenges that, in light of the limited use for which the foreign conduct could possibly be used, militate in favor of strict limits. For example, many of the countries potentially implicated by the foreign discovery, including Japan, China, France and Germany, have highly restrictive limitations on the ability of U.S. litigants to require foreign nationals, both party affiliated and third parties, to submit to depositions. *See generally* ABA SECTION OF ANTITRUST LAW, OBTAINING DISCOVERY ABROAD 118-22, 142-47, 173-75 (2d ed. 2005). The parties have taken no steps to even begin the process of invoking the Hague Convention procedures to take depositions. The inevitable result will be that any deposition discovery will be incomplete and sporadic.

convert Fab 25 to manufacturing flash memory and move its microprocessor business to Germany is insufficient to establish the requisite direct and proximate effects under the FTAIA; (2) any such claim is time-barred because AMD made the decision to convert Fab 25 before the statute of limitations cut-off of June 28, 2001[25]; (3) AMD cannot tie any alleged specific foreign conduct to lost sales from Fab 25; and (4) any speculation that, but for Intel's foreign conduct, it could have sold its inventory from Fab 25 at higher prices would not constitute antitrust injury, *see NicSand*, 507 F.3d at 449 (stating that "the tenuous and speculative character of the relationship between the alleged antitrust violation and the [claimant's] alleged injury . . . weigh[s] heavily against judicial enforcement" (quoting *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 545 (1983)) (alterations in original)).

AMD's foreign discovery in support of its export commerce claim under the FTAIA is also appropriate for staging. Intel proposes that during the first phase of discovery, it will depose AMD witnesses regarding the circumstances behind AMD's decision to convert its Fab 25 to flash memory production and AMD's claims regarding the sale of inventory during the Fab 25 conversion period.[26] Intel is convinced that such discovery will establish that AMD's export

---

25 William Siegle, then Senior Vice President of Technology and Manufacturing, stated to this Court that AMD "would have continued to manufacture microprocessors in [Fab 25] during 2003 and for at least several years thereafter" but for "Intel's misconduct" that resulted in "artificially limited customer demand for AMD microprocessors." (Declaration of William T. Siegle in Support of AMD's Motion to Compel ¶ 4.)

█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████

26 AMD should identify which specific sales it believes were thwarted by specific Intel anticompetitive foreign conduct. Simply claiming unlimited foreign conduct discovery for the period AMD alleges it had Fab 25 inventory available to sell fails to satisfy the proximate cause requirement under the FTAIA. AMD has had ample document discovery to enable it to identify

commerce claim is not viable and that no foreign discovery to support it is justified. Intel is prepared to conduct its discovery of AMD relating to Fab 25 at the earliest opportunity and to present the facts to the Special Master and the Court immediately thereafter.

### III. STATEMENT OF FACTUAL CONTENTIONS AND CATEGORIES OF EVIDENCE REQUIRED

Intel sets forth its basic contentions regarding AMD's claims, to help shape the scope of the deposition discovery that Intel foresees to prepare the case for trial.

#### A. Competition on the Merits Is Multi-Faceted

A critical issue in this litigation is the scope of competition on the merits and the causes of Intel's and AMD's marketplace performance. If Intel succeeded (or AMD failed) on the merits of competition, then AMD has no claim. AMD takes a narrow view of competition on the merits. For example, it attacks, among other things, Intel's above-cost price discounting, Intel's marketing and branding efforts, and Intel's manufacturing capacity investments and corresponding advantages – all plainly competition on the merits – as being anticompetitive. But competition in the microprocessor business is multi-faceted, and Intel's ability to execute well on the merits and convince customers to purchase its products has earned it success. *See Stearns*, 170 F.3d at 524. AMD's market performance reflects the company's competitive strengths and weaknesses, not anticompetitive conduct by Intel.

Much of Intel's discovery of AMD and third parties will be thus focused on establishing the reasons for the relative performance of Intel and AMD in the marketplace.

---

the circumstances, if any exist, in which it had sought to sell that inventory abroad and was thwarted by alleged anticompetitive conduct. Intel believes that AMD's unsold inventory was what the industry calls "brown bananas" – that is, outdated microprocessors that had been supplanted by new, better performing products. At a minimum, any foreign discovery should be strictly limited to those lost sales, and should proceed in the second stage, only after AMD has made an appropriate offer of proof to justify such discovery.

## B.    Intel Lacks Monopoly Power

"Monopoly power is the ability to control prices and exclude competition in a given market." *Broadcom*, 501 F.3d at 307.  AMD contends that Intel possesses monopoly power in the worldwide market for x86 microprocessors. (Compl. ¶¶ 131-35.)  The microprocessor industry, however, is characterized by fierce price competition, rapid innovation, powerful customers and falling prices, all of which belie AMD's claim and provide strong evidence of an intensely competitive and unconstrained market.  While this area will be primarily addressed by expert testimony, one focus of third-party discovery will be to support the contentions below.

### 1.    Falling Prices and Large Consumer Gains

AMD claims that Intel has the power to "control prices" and extract "monopoly" rents in the market for microprocessors, and that this power has caused injury to consumers in the form of artificially high prices. (Compl. ¶¶ 5, 6, 135.)  AMD's claim, however, rings hollow against the backdrop of rapidly falling microprocessor prices.  Microprocessor prices have declined on a quality-adjusted basis at an average rate of more than 40% *per year* since 2000.  These price declines were considerably more rapid than the price declines for any other product category among the 1,200 categories tracked by the United States Bureau of Labor Statistics, including any other computer-related products.  The table below depicts the annual price declines from 2000 through the fourth quarter of 2007:

| Product Category | Price Decline Q1'00-Q4'07 |
|---|---|
| Microprocessors | 42.4% |
| Portables and Laptop PCs | 25.8% |
| Personal Computers | 23.6% |
| Storage Devices | 19.3% |
| Software | 0.7% |

This evidence is incompatible with the existence of monopoly power.  AMD's own Chairman and CEO, Hector Ruiz, stated publicly just a few months ago that "[t]he good news is

that for consumers, prices keep going down . . . . The bad news is, we always have to figure out how to still do that and hopefully make money. It's a very competitive industry and I don't see pricing being anything but competitive in any segment in this industry." This is a powerful testament to a market that is functioning competitively to the benefit of consumers. The market dynamics and competitive pressures that have caused prices to decline are discussed below.

### 2.    Large and Powerful Customers

Intel's OEM customers purchase large amounts of products from Intel and consequently wield substantial negotiating leverage. The OEMs have the power to shift large volumes of microprocessor purchases between Intel and AMD, and they routinely use this power to play Intel and AMD off against each other, to extract large discounts and to drive prices down. The threats from these customers are real and highly credible. Because of the high fixed cost structure of microprocessor manufacturing, which results in incremental costs that are lower than average cost, reducing the price to hold on to business is typically a profitable strategy. The OEMs are aware of this dynamic and take advantage of it. Competition with AMD led Intel to cut prices, accelerate price reductions, and speed up product introduction schedules.

### 3.    Rapid Innovation

The microprocessor industry also is characterized by a history of rapid innovation. Intel's market position is a consequence of its success as an innovator, developer, and promoter of microprocessor technology. Without innovation, Intel cannot sustain a competitive advantage, even in the relatively short run. Intel's prospects for continued success are dependent on its ability to innovate at a sufficiently rapid pace to maintain a technology lead over its competitors. Because of the pace of technological change, if Intel failed to out-innovate its competitors, its share of the market would decline rapidly as rival products would inevitably overtake Intel's offerings in functionality and performance.

Direct evidence of Intel's behavior supports the conclusion that competitive forces compel Intel to innovate, and that growing the market is critical to its profitability. Intel's SEC

39

filings show that Intel spent approximately $30 billion dollars on R&D from 2002 through 2007. Intel has also publicly reported that it invested another approximately $29 billion in property, plants, and equipment during the same period, most of which went to new and upgraded manufacturing facilities to support the production of more advanced microprocessors. Those investments have directly led to a major expansion of output. In the first year of the limitations period, 2001, according to Mercury Research, a total of 151.7 million x86 microprocessors were sold. In 2007, by contrast, the number sold, according to Mercury Research, was 286.4 million, representing growth of 89% over six years. Thus, the microprocessor market has produced both sharply lower prices and sharply higher output – the opposite of what would be expected in a monopolized market.

### C.    AMD's Claim That It Is the "Victim" of Exclusionary Conduct Is Belied by the Evidence, Including AMD's Own Statements

During the period relevant to this lawsuit, AMD increased its microprocessor sales and grew its market segment share. From 1999 through 2006, AMD tripled its microprocessor sales. Particularly between 2003 and 2006, AMD experienced a remarkable growth spurt in which its market segment share increased by 50% at Intel's expense, and sales and profits repeatedly hit record levels. As AMD's Chairman and CEO Hector Ruiz explained at an analyst conference in 2007, "from 2003 to 2006, we had [four] years of nearly flawless execution, and we had a growth rate every one of those quarters that was larger than the competition by quite a bit." A few months before bringing this lawsuit Dr. Ruiz publicly declared that "[t]his company is in the strongest position we've ever been in," and a few months after filing the lawsuit he declared again that "[w]e are doing better than we ever have in the history of the company."

These are not the statements of a company that has been victimized by anticompetitive conduct. AMD in fact was so successful that, for much of the period at issue, AMD's growth was capped by capacity constraints, even though AMD more than doubled its manufacturing capacity between 2002 and 2006.

40



, which
makes its claim of exclusion by Intel's pricing practices all the more disingenuous.

This is a far cry from the normal monopolization case in which a victim has been forced to exit the market or marginalized. This "victim" enjoyed unprecedented success during the period of alleged anticompetitive conduct.

### 1.  AMD's Market Performance Reflected the Company's Business Execution

AMD claims that it should have performed even better than it did. AMD, however, is entitled only to the success that it earns, and no more. AMD performed well in market segments for which it developed and offered competitive products and it predictably performed less well in segments for which it did not. By late 2003, AMD began offering competitive products for servers and for desktop PCs sold to consumers, but it never measured up to market requirements in other segments, particularly notebook PCs and PCs (both desktop and notebook) for corporate customers. In short, the market performed normally, and each company's market position reflects the competitiveness of its offerings.

### a.  AMD Was Highly Successful in the Consumer Segment

Personal computers are sold both to consumers and to commercial customers. Although the PCs sold to consumers and commercial customers incorporate the same microprocessors, the two types of customers have different requirements. In the consumer segment of the market, price is a predominant consideration in purchasing decisions. But as will be explained later, corporate customers care more about the total cost of ownership, and specifically about the reliability and reputation of suppliers and the strength of the solution or "platform" offered by suppliers.

41

For most of its history, AMD focused its efforts almost entirely on consumer desktop PCs. According to AMD Board member Mort Topfer, and former AMD Chairman Jerry Sanders, who left AMD in 2004, AMD "tended to drive the strategy toward fighting Intel in the consumer space and the desktop space." AMD's President Dirk Meyer similarly explained: "If you look at our history . . . we focused on a smaller number of categories – desktop, desktop, desktop."

AMD has been particularly successful in the consumer desktop segment and more broadly in PCs intended for individual consumers (as opposed to businesses). AMD has historically focused on the consumer segment where price is a primary purchasing consideration, offered price-competitive microprocessors, and as a result prospered in that segment. In 2006, AMD Chairman Hector Ruiz estimated that AMD commanded a 40-50% share in the retail segment (including both desktop and notebook PCs) on a worldwide basis. Dr. Ruiz said that "we are reasonably pleased with our position in consumer" and "don't feel like we need to make huge strides in consumer in the near future." In the United States, AMD did even better. In early 2006, AMD's share of desktop PCs sold through U.S. retailers reached 80%. Its share of the broader U.S. retail segment (including both desktop and notebook PCs) has see-sawed in recent years, often exceeding 50%. ·

AMD's Complaint alleges that Intel foreclosed AMD's access to retailers' shelves. AMD's performance in the retail segment, where it has often outsold Intel in the United States and has achieved a very substantial worldwide share, and its Chairman's declaration that AMD was not even seeking to make strides in that segment, belie that allegation.

### b.  AMD Achieved What It Has Called "Phenomenal Explosive Growth" in Servers

Servers are used for technically demanding and high-volume business operations. Microprocessors that are designed for use in servers typically command higher prices and historically carry higher margins than microprocessors sold into other market segments.

The server segment was historically dominated by high-priced proprietary systems. Intel played a pioneering role in dramatically reducing the cost of servers and growing the server market segment by being the first company to supply low-priced microprocessors that enabled the manufacture of servers based on the same widely available low-cost building blocks as PCs. Until 2003, AMD had no meaningful presence in the server segment.

In mid-2003, AMD entered the server segment with its Opteron microprocessor. AMD's introduction of Opteron was part of a long-term strategy of shifting the company's focus from the consumer desktop segment to higher-margin, higher revenue products by focusing on servers first, mobile PCs second, and desktop PCs last. AMD considered this a necessary first step for establishing credibility with corporate customers, with whom AMD's reputation, ████████████

As AMD's Chief Financial Officer publicly explained the strategy, "[a]s hard as we tried in the past to win the hearts and minds of CIOs, with the desktop as our focus we were going to fail. They made their decisions from the server on down."

Although AMD raised concerns about its reliability by delivering Opteron more than a year late, Opteron proved to be a highly capable product that offered advantages to many server customers. AMD achieved rapid success with Opteron even though AMD had not meaningfully participated in the server segment before.

In 2004, AMD's current President, Dirk Meyer, publicly acknowledged that Opteron's success exceeded the company's expectations: "Given how quickly the product is being adopted, with perfect hindsight, I would have chosen [to] invest a little more aggressively than we have, relative to our server product line." As AMD executed well, it gained the confidence of some major OEMs, and enjoyed unprecedented success as a result. In 2006, AMD's top sales executive, Henri Richard, boasted that AMD had expanded its "footprint" in the server segment "in a very short, by enterprise standards, two and a half years of presence." That same year, an AMD Corporate Vice President characterized Opteron's trajectory as "phenomenal explosive growth." Citing research data for the second quarter of 2006, which marked only the third

anniversary of Opteron's release, he said that "the unit share for Opteron . . . is 26% and the revenue share is 33% of the x86 server market." For his part, AMD Chairman Ruiz described AMD's position in the server segment as "very strong."[27]

AMD's success with Opteron is particularly striking for at least two reasons. First, AMD enjoyed its "explosive growth" in a segment in which shares tend to change slowly due to the conservative purchasing criteria of IT managers, as acknowledged by Mr. Richard's reference to the short adoption time "by enterprise standards." IT managers generally prefer to stay with their incumbent suppliers because of, among other things, (a) the risk of turning over the mission critical tasks performed by servers to a supplier without a strong reputation, and (b) the desirability of maintaining common system configurations, which reduces complexity and increases reliability, which in turn reduce the "total cost of ownership."

Second, the server segment has traditionally offered higher margins than other market segments. Had Intel engaged in the anticompetitive conduct of which AMD accuses it, AMD's entry into that segment should have stalled. Instead, AMD enjoyed "explosive growth," capturing a quarter of all unit sales and a third of all revenues in the x86 server segment merely three years after entering the server segment. Although now AMD claims it was entitled to greater success, the evidence shows that AMD was deficient in many critical dimensions that were important to customers, making the success that it attained exceptional.

AMD lost share in the server segment more recently, after Intel introduced a new line of microprocessors that offered significant advantages over AMD's and AMD stumbled in its

---

27 Although AMD claims that its Opteron design shows that AMD was the technology leader, AMD greatly exaggerates the advantages of Opteron. ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████ Since then, improvements in Intel's Xeon processors for servers have left AMD significantly behind in the competitive race in the server segment.

attempts to introduce a newer microprocessor line. Referring to AMD's stumble at an analyst conference, AMD Chairman Ruiz said that AMD "blew it, and we're very humbled by it." In short, AMD did well in the server segment when it offered competitive products and fell behind when its products lagged. That is competition at work.

### c.    AMD Failed to Offer Competitive Mobile Microprocessors

While AMD did well in the server segment, it lagged badly in the mobile market segment. Mobile PC customers, and particularly commercial customers, focus on unique characteristics that distinguish a mobile PC from a desktop computer, including lower power consumption (which prolongs battery life), light weight, and, since 2003, Internet connectivity. While Intel has focused on these attributes for many years, and designed a microprocessor and chipset specifically for use in mobile computers, AMD neglected mobile computing, and did not design a mobile microprocessor. The result has been that AMD's mobile microprocessors have largely been relegated for use in so-called "desktop replacement" notebook PCs, which are heavier consumer notebook PCs that are seldom transported outside the home, and for which these attributes are therefore less relevant. AMD lagged badly in the more profitable "mobility" segment, which consists of lighter weight PCs with longer battery life.

Intel has long led in the mobile segment, and its March 2003 introduction of the Pentium® M processor and Centrino® mobile technology left AMD even further behind. Centrino mobile technology delivered for the first time a mobile platform with desktop-like performance, extended battery life, and easy-to-use wireless Internet connectivity. It was an instant hit. Its introduction led to a rapid market shift from desktop PCs toward mobile PCs, to the point where mobile PCs are expected to outsell desktop systems worldwide later this year (as they already do in North America). By contrast, when Intel introduced Centrino mobile

technology, desktop PCs outsold notebooks by more than 4 to 1. Intel's mobile products also led to the rapid proliferation of wireless hotspots, boosted by Intel's investments to create them.[28]

At the time of the release of the mobile products, a leading online technology journal predicted that "[i]n the end, the Pentium-M and the Centrino platform in general will do more for mobile computing than any single technology we've seen in the past." That prediction became a reality. As Bank of America Securities reported, "a lot of the credit for fueling growth in the notebook segment in fact goes to Intel."

Where was AMD while this mobile computing revolution was taking place? It was busy focusing on servers, knowing that "we were going to not be as competitive in the mobile space, even though we knew that mobile space was going to be critical." As Chairman Ruiz publicly acknowledged, AMD was "late with a competitive product in the mobile space." AMD has yet to catch up.



AMD's problems in the mobile segment were deep and broad.

---

28   As Information Week reported, "[t]o spur Centrino's adoption, Intel invested in the wireless-hot-spot technology and certified hot-spots offered by service providers to make it easier for users to get online."

█████████████████████████████████████████████████

█████████████████████████████████ It had neither.

AMD's failings in the mobile segment were not solely the result of the company's focus on the server segment. They also reflected AMD's failure to appreciate the extent to which Intel's mobile platforms would create demand for mobility solutions. AMD Chairman Ruiz publicly admitted in 2006 that "[t]he shift to mobile computers was much faster than we thought."

It was not until 2005 that AMD introduced Turion 64, the first AMD microprocessor that was directed at the mobile segment, but even this processor, as AMD's President Meyer admitted, was "highly leveraged from a desktop product." Unlike Intel's mobile microprocessors, it was not ████████████████████████████████████

█████████████████████████████████████ AMD also continues to lag at the platform level. Just a few months ago, the Chief Technology Officer of HP's PC division stated that "[i]f you look at the product line today and you stack up Intel against AMD on a chipset basis, the AMD chipsets are still at a negative power impact. In the enterprise market, that's the number-one criterion for selection – it's battery life."

Thus, it should hardly be surprising that AMD's performance in the mobile market segment was poorer than its performance in the desktop or server segments.

### d.    AMD Failed to Offer Competitive Products for Corporate Customers

As noted above, although the same or similar microprocessors are used in desktop and mobile products for retail and corporate client systems, the requirements of retail consumers and corporate customers differ. Corporate customers' primary focus is on the manageability, reliability, and stability of the entire *platform*. ████████████████████████

████████████████████████████████████████████

[BLACK REDACTION BOX]

Despite recording strong gains in the consumer segment, AMD has continued to trail Intel in corporate client systems because it has failed to offer the platforms that are critical to corporate customers. Moreover, AMD's Chairman publicly acknowledged AMD's poor reputation among IT professionals, observing that AMD must first "win the confidence of the enterprises" to penetrate the corporate segment and that this requires nothing less than to "change the attitude of the enterprises."

[BLACK REDACTION BOX] By contrast, Intel has offered platforms that are tailored to the requirements of commercial systems[30] and marketed extensively to IT managers with a marketing team fully qualified to present IT managers with details of the company's plans or "roadmaps" for corporate systems.

Intel's reputation as a reliable supplier of high-performance products to the corporate segment is well-established. In contrast, an AMD Corporate Vice President has publicly admitted that "[w]e haven't had the stability and longevity that enterprise customers are looking for compared with the strong legacy our competitor has in that market."

[BLACK REDACTION BOX]

One reflection of AMD's deficiencies in addressing the needs of corporate customers was the company's failure to offer a "stable platform" program to reduce the total cost of ownership

---

[29]  In spite of these statements, and its recent creation of a stable image platform program, AMD alleges that while platform stability is "perceived to increase reliability," "technically this is not the case." (Compl. ¶ 63.)

[30]  For example, Intel's platforms include remote diagnostic capabilities to enable IT departments to address many PC problems remotely. Its most recent corporate platform, called vPro, enables IT departments to diagnose problems remotely even on PCs that are turned off.

for corporate customers. Because of the high costs of IT staff, maintenance, training, and the like, the acquisition costs of PCs represent only a fraction of the total cost of PC ownership for corporate buyers (and microprocessor costs even a smaller fraction). Intel has focused for years on reducing the corporate total cost of ownership. For example, its Stable Image Platform Program has guaranteed corporate customers the ability to buy the identical system configuration for at least 12 months to provide companies with an extended window to complete a company-wide conversion. As industry analyst Rob Enderle explained, corporate customers "want to minimize the variances in the machines they are installing, and they clearly would like it if those machines didn't change for as long a period as possible." AMD has acknowledged this requirement in a published white paper. █████████████

Although AMD introduced a copycat stable platform program in late 2005, the program was inadequate, ████████████████████████████████████████████████████ Whereas Intel was able to fulfill the stability promise by manufacturing the critical components necessary to provide a stable platform, AMD relied on third parties to provide those components, "to the ire of many system builders," according to an industry journal. As Gartner Research noted, "the broad range of AMD's partners allows for wide variety of possible system configurations," and AMD's "platforms will lack . . . consistency" as a result. Even after AMD launched its program, an industry journal reported that "concerns about stability, quality and support for third-party AMD products have been a stumbling block."

AMD's Complaint alleges that "[t]here is no reason, other than Intel's chokehold on the OEMs, for AMD's inability to exploit its products in important sectors, particularly commercial desktops." (Compl. ¶ 58.) AMD should have looked no further than to ████████████████

49



AMD's senior executives have stated that AMD's $5.4 billion acquisition of chipset maker ATI Technologies in 2006 was intended to address these deficiencies. AMD Chairman Ruiz said that its customers wanted AMD to "get stronger in the more total solution of the system," and that they "have been asking us for this for quite some time." ATI (and later AMD) executive Chris Evenden explained in reference to the mobile and corporate segments that AMD "can't offer a complete platform that those customers really want," which he predicted the acquisition would finally enable it to do. Just *this week,* AMD took another crack at a stable image platform. An AMD marketing manager told eWeek that "AMD has offered stable platforms for servers" and "we are *now* doing that with the desktop side." (emphasis added). This program does not include mobile platforms or platforms for large corporate customers.

Different market segments impose different competitive requirements on microprocessor suppliers. AMD has succeeded in the segments for which it offered competitive products and lagged in the segments for which it was unable to offer what "customers really want." This is the hallmark of a competitive market.

### 2.    AMD's Shortcomings Have Limited the Company's Growth

In AMD's simplistic view of competition, the company's release of Opteron and its introduction of 64-bit microprocessors entitled it to instant success. But competition is multidimensional, and AMD's attempts to reduce competition to one or two attributes while ignoring the numerous qualities that customers care about cannot be squared with reality.

AMD's Complaint portrays AMD as the superior innovator for its 64-bit microprocessors. For a relatively short period, some of AMD's PC microprocessors had 64-bit capabilities while Intel stayed with 32-bit processors. AMD makes the simplistic claim that it is

50