PRIVILEGED AND CONFIDENTIAL
ATTORNEY-WORK PRODUCT

**Index of Exhibits to the Declaration of James S. Venit**

| Exhibit No. | Description of Exhibit |
|---|---|
| 1. | Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty, *Official Journal L 1, 04.01.2003*, p.1-25 |
| 2. | Commission Notice on the handling of complaints by the Commission under Articles 81 and 82 of the EC Treaty, *Official Journal C 101, 27.04.2004*, p. 65-77 |
| 3. | Case T-65/96, *Kish Glass & Co. Ltd. v Commission* [2000] E.C.R. II-1885 |
| 4. | Commission Regulation (EC) No 773/2004 of 7 April 2004 relating to the conduct of proceedings by the Commission pursuant to Articles 81 and 82 of the EC Treaty, *Official Journal L 123, 27.04.2004*, p. 18-24 |
| 5. | Commission Decision 2001/462 of 23 May 2001 on the terms of reference of hearing officers in certain competition proceedings, *Official Journal L 162, 19.06.2001*, pages 21-24 |
| 6. | Brief of the Commission of the European Communities in Opposition to Microsoft Corporation's Objections to Magistrate's Order, *In re Application of Microsoft Corp.*, Case No. 06-80038 JF (PVT) (Apr. 17, 2006) (N.D.Cal.) |
| 7. | Reply Brief of the Commission of the European Communities in Support of Novell, Inc.'s Motion to Quash at 3, In re Application of Microsoft Corp., C.A. 06-MBD-10061 (MLW)  (Apr. 12, 2006) (D. Mass) |
| 8. | - Intel, Retailers Hit By EU Raids, The Wall Street Journal, February 13, 2008<br>- EU regulators raid Intel offices," The Financial Times, February 12, 2008. |
| 9. | Brief for the Commission of the European Communities in Support of Novell, Inc.'s Motion to Quash, In re Application of Microsoft Corp., 2006 US Dist LEXIS 32577 (Apr. 17, 2006) |
| 10. | Brief for the Commission of the European Communities as *Amicus Curiae* Supporting Reversal, Intel Corp. v. Advanced Micro Devices, Inc., 542 US 241 (2004) |
| 11. | European Commission's press release, MEMO/07/314 "Competition: Commission confirms sending of Statement of Objections to Intel", July 27, 2007 |
| 12. | - CNet, "EU antitrust officials raid Intel", July 12, 2005<br>- The Register "EC officials raid Intel offices", July 12, 2005 |
| 13. | Letter from Philip Lowe, Director-General, European Commission, to Maurits Dolmans, Cleary Gottlieb Steen & Hamilton (Mar. 2006) |

# EXHIBIT 1

Case 1:05-cv-00485-JJF     Document 734-2     Filed 05/05/2008     Page 3 of 70

I

*(Acts whose publication is obligatory)*

### COUNCIL REGULATION (EC) No 1/2003
### of 16 December 2002
**on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty**

**(Text with EEA relevance)**

THE COUNCIL OF THE EUROPEAN UNION,

Having regard to the Treaty establishing the European Community, and in particular Article 83 thereof,

Having regard to the proposal from the Commission [1],

Having regard to the opinion of the European Parliament [2],

Having regard to the opinion of the European Economic and Social Committee [3],

Whereas:

(1)  In order to establish a system which ensures that competition in the common market is not distorted, Articles 81 and 82 of the Treaty must be applied effectively and uniformly in the Community. Council Regulation No 17 of 6 February 1962, First Regulation implementing Articles 81 and 82 [*] of the Treaty [4], has allowed a Community competition policy to develop that has helped to disseminate a competition culture within the Community. In the light of experience, however, that Regulation should now be replaced by legislation designed to meet the challenges of an integrated market and a future enlargement of the Community.

(2)  In particular, there is a need to rethink the arrangements for applying the exception from the prohibition on agreements, which restrict competition, laid down in Article 81(3) of the Treaty. Under Article 83(2)(b) of the Treaty, account must be taken in this regard of the need to ensure effective supervision, on the one hand, and to simplify administration to the greatest possible extent, on the other.

(3)  The centralised scheme set up by Regulation No 17 no longer secures a balance between those two objectives. It hampers application of the Community competition rules by the courts and competition authorities of the Member States, and the system of notification it involves prevents the Commission from concentrating its resources on curbing the most serious infringements. It also imposes considerable costs on undertakings.

(4)  The present system should therefore be replaced by a directly applicable exception system in which the competition authorities and courts of the Member States have the power to apply not only Article 81(1) and Article 82 of the Treaty, which have direct applicability by virtue of the case-law of the Court of Justice of the European Communities, but also Article 81(3) of the Treaty.

[1]  OJ C 365 E, 19.12.2000, p. 284.
[2]  OJ C 72 E, 21.3.2002, p. 305.
[3]  OJ C 155, 29.5.2001, p. 73.
[*]  The title of Regulation No 17 has been adjusted to take account of the renumbering of the Articles of the EC Treaty, in accordance with Article 12 of the Treaty of Amsterdam; the original reference was to Articles 85 and 86 of the Treaty.
[4]  OJ 13, 21.2.1962, p. 204/62. Regulation as last amended by Regulation (EC) No 1216/1999 (OJ L 148, 15.6.1999, p. 5).

(5)   In order to ensure an effective enforcement of the Community competition rules and at the same time the respect of fundamental rights of defence, this Regulation should regulate the burden of proof under Articles 81 and 82 of the Treaty. It should be for the party or the authority alleging an infringement of Article 81(1) and Article 82 of the Treaty to prove the existence thereof to the required legal standard. It should be for the undertaking or association of undertakings invoking the benefit of a defence against a finding of an infringement to demonstrate to the required legal standard that the conditions for applying such defence are satisfied. This Regulation affects neither national rules on the standard of proof nor obligations of competition authorities and courts of the Member States to ascertain the relevant facts of a case, provided that such rules and obligations are compatible with general principles of Community law.

(6)   In order to ensure that the Community competition rules are applied effectively, the competition authorities of the Member States should be associated more closely with their application. To this end, they should be empowered to apply Community law.

(7)   National courts have an essential part to play in applying the Community competition rules. When deciding disputes between private individuals, they protect the subjective rights under Community law, for example by awarding damages to the victims of infringements. The role of the national courts here complements that of the competition authorities of the Member States. They should therefore be allowed to apply Articles 81 and 82 of the Treaty in full.

(8)   In order to ensure the effective enforcement of the Community competition rules and the proper functioning of the cooperation mechanisms contained in this Regulation, it is necessary to oblige the competition authorities and courts of the Member States to also apply Articles 81 and 82 of the Treaty where they apply national competition law to agreements and practices which may affect trade between Member States. In order to create a level playing field for agreements, decisions by associations of undertakings and concerted practices within the internal market, it is also necessary to determine pursuant to Article 83(2)(e) of the Treaty the relationship between national laws and Community competition law. To that effect it is necessary to provide that the application of national competition laws to agreements, decisions or concerted practices within the meaning of Article 81(1) of the Treaty may not lead to the prohibition of such agreements, decisions and concerted practices if they are not also prohibited under Community competition law. The notions of agreements, decisions and concerted practices are autonomous concepts of Community competition law covering the coordination of behaviour of undertakings on the market as interpreted by the Community Courts. Member States should not under this Regulation be precluded from adopting and applying on their territory stricter national competition laws which prohibit or impose sanctions on unilateral conduct engaged in by undertakings. These stricter national laws may include provisions which prohibit or impose sanctions on abusive behaviour toward economically dependent undertakings. Furthermore, this Regulation does not apply to national laws which impose criminal sanctions on natural persons except to the extent that such sanctions are the means whereby competition rules applying to undertakings are enforced.

(9)   Articles 81 and 82 of the Treaty have as their objective the protection of competition on the market. This Regulation, which is adopted for the implementation of these Treaty provisions, does not preclude Member States from implementing on their territory national legislation, which protects other legitimate interests provided that such legislation is compatible with general principles and other provisions of Community law. In so far as such national legislation pursues predominantly an objective different from that of protecting competition on the market, the competition authorities and courts of the Member States may apply such legislation on their territory. Accordingly, Member States may under this Regulation implement on their territory national legislation that prohibits or imposes sanctions on acts of unfair trading practice, be they unilateral or contractual. Such legislation pursues a specific objective, irrespective of the actual or presumed effects of such acts on competition on the market. This is particularly the case of legislation which prohibits undertakings from imposing on their trading partners, obtaining or attempting to obtain from them terms and conditions that are unjustified, disproportionate or without consideration.

(10) Regulations such as 19/65/EEC ($^1$), (EEC) No 2821/71 ($^2$), (EEC) No 3976/87 ($^3$), (EEC) No 1534/91 ($^4$), or (EEC) No 479/92 ($^5$) empower the Commission to apply Article 81(3) of the Treaty by Regulation to certain categories of agreements, decisions by associations of undertakings and concerted practices. In the areas defined by such Regulations, the Commission has adopted and may continue to adopt so called 'block' exemption Regulations by which it declares Article 81(1) of the Treaty inapplicable to categories of agreements, decisions and concerted practices. Where agreements, decisions and concerted practices to which such Regulations apply nonetheless have effects that are incompatible with Article 81(3) of the Treaty, the Commission and the competition authorities of the Member States should have the power to withdraw in a particular case the benefit of the block exemption Regulation.

(11) For it to ensure that the provisions of the Treaty are applied, the Commission should be able to address decisions to undertakings or associations of undertakings for the purpose of bringing to an end infringements of Articles 81 and 82 of the Treaty. Provided there is a legitimate interest in doing so, the Commission should also be able to adopt decisions which find that an infringement has been committed in the past even if it does not impose a fine. This Regulation should also make explicit provision for the Commission's power to adopt decisions ordering interim measures, which has been acknowledged by the Court of Justice.

(12) This Regulation should make explicit provision for the Commission's power to impose any remedy, whether behavioural or structural, which is necessary to bring the infringement effectively to an end, having regard to the principle of proportionality. Structural remedies should only be imposed either where there is no equally effective behavioural remedy or where any equally effective behavioural remedy would be more burdensome for the undertaking concerned than the structural remedy. Changes to the structure of an undertaking as it existed before the infringement was committed would only be proportionate where there is a substantial risk of a lasting or repeated infringement that derives from the very structure of the undertaking.

(13) Where, in the course of proceedings which might lead to an agreement or practice being prohibited, undertakings offer the Commission commitments such as to meet its concerns, the Commission should be able to adopt decisions which make those commitments binding on the undertakings concerned. Commitment decisions should find that there are no longer grounds for action by the Commission without concluding whether or not there has been or still is an infringement. Commitment decisions are without prejudice to the powers of competition authorities and courts of the Member States to make such a finding and decide upon the case. Commitment decisions are not appropriate in cases where the Commission intends to impose a fine.

---

($^1$) Council Regulation No 19/65/EEC of 2 March 1965 on the application of Article 81(3) (The titles of the Regulations have been adjusted to take account of the renumbering of the Articles of the EC Treaty, in accordance with Article 12 of the Treaty of Amsterdam; the original reference was to Article 85(3) of the Treaty) of the Treaty to certain categories of agreements and concerted practices (OJ 36, 6.3.1965, p. 533). Regulation as last amended by Regulation (EC) No 1215/1999 (OJ L 148, 15.6.1999, p. 1).

($^2$) Council Regulation (EEC) No 2821/71 of 20 December 1971 on the application of Article 81(3) (The titles of the Regulations have been adjusted to take account of the renumbering of the Articles of the EC Treaty, in accordance with Article 12 of the Treaty of Amsterdam; the original reference was to Article 85(3) of the Treaty) of the Treaty to categories of agreements, decisions and concerted practices (OJ L 285, 29.12.1971, p. 46). Regulation as last amended by the Act of Accession of 1994.

($^3$) Council Regulation (EEC) No 3976/87 of 14 December 1987 on the application of Article 81(3) (The titles of the Regulations have been adjusted to take account of the renumbering of the Articles of the EC Treaty, in accordance with Article 12 of the Treaty of Amsterdam; the original reference was to Article 85(3) of the Treaty) of the Treaty to certain categories of agreements and concerted practices in the air transport sector (OJ L 374, 31.12.1987, p. 9). Regulation as last amended by the Act of Accession of 1994.

($^4$) Council Regulation (EEC) No 1534/91 of 31 May 1991 on the application of Article 81(3) (The titles of the Regulations have been adjusted to take account of the renumbering of the Articles of the EC Treaty, in accordance with Article 12 of the Treaty of Amsterdam; the original reference was to Article 85(3) of the Treaty) of the Treaty to certain categories of agreements, decisions and concerted practices in the insurance sector (OJ L 143, 7.6.1991, p. 1).

($^5$) Council Regulation (EEC) No 479/92 of 25 February 1992 on the application of Article 81(3) (The titles of the Regulations have been adjusted to take account of the renumbering of the Articles of the EC Treaty, in accordance with Article 12 of the Treaty of Amsterdam; the original reference was to Article 85(3) of the Treaty) of the Treaty to certain categories of agreements, decisions and concerted practices between liner shipping companies (Consortia) (OJ L 55, 29.2.1992, p. 3). Regulation amended by the Act of Accession of 1994.

(14) In exceptional cases where the public interest of the Community so requires, it may also be expedient for the Commission to adopt a decision of a declaratory nature finding that the prohibition in Article 81 or Article 82 of the Treaty does not apply, with a view to clarifying the law and ensuring its consistent application throughout the Community, in particular with regard to new types of agreements or practices that have not been settled in the existing case-law and administrative practice.

(15) The Commission and the competition authorities of the Member States should form together a network of public authorities applying the Community competition rules in close cooperation. For that purpose it is necessary to set up arrangements for information and consultation. Further modalities for the cooperation within the network will be laid down and revised by the Commission, in close cooperation with the Member States.

(16) Notwithstanding any national provision to the contrary, the exchange of information and the use of such information in evidence should be allowed between the members of the network even where the information is confidential. This information may be used for the application of Articles 81 and 82 of the Treaty as well as for the parallel application of national competition law, provided that the latter application relates to the same case and does not lead to a different outcome. When the information exchanged is used by the receiving authority to impose sanctions on undertakings, there should be no other limit to the use of the information than the obligation to use it for the purpose for which it was collected given the fact that the sanctions imposed on undertakings are of the same type in all systems. The rights of defence enjoyed by undertakings in the various systems can be considered as sufficiently equivalent. However, as regards natural persons, they may be subject to substantially different types of sanctions across the various systems. Where that is the case, it is necessary to ensure that information can only be used if it has been collected in a way which respects the same level of protection of the rights of defence of natural persons as provided for under the national rules of the receiving authority.

(17) If the competition rules are to be applied consistently and, at the same time, the network is to be managed in the best possible way, it is essential to retain the rule that the competition authorities of the Member States are automatically relieved of their competence if the Commission initiates its own proceedings. Where a competition authority of a Member State is already acting on a case and the Commission intends to initiate proceedings, it should endeavour to do so as soon as possible. Before initiating proceedings, the Commission should consult the national authority concerned.

(18) To ensure that cases are dealt with by the most appropriate authorities within the network, a general provision should be laid down allowing a competition authority to suspend or close a case on the ground that another authority is dealing with it or has already dealt with it, the objective being that each case should be handled by a single authority. This provision should not prevent the Commission from rejecting a complaint for lack of Community interest, as the case-law of the Court of Justice has acknowledged it may do, even if no other competition authority has indicated its intention of dealing with the case.

(19) The Advisory Committee on Restrictive Practices and Dominant Positions set up by Regulation No 17 has functioned in a very satisfactory manner. It will fit well into the new system of decentralised application. It is necessary, therefore, to build upon the rules laid down by Regulation No 17, while improving the effectiveness of the organisational arrangements. To this end, it would be expedient to allow opinions to be delivered by written procedure. The Advisory Committee should also be able to act as a forum for discussing cases that are being handled by the competition authorities of the Member States, so as to help safeguard the consistent application of the Community competition rules.

(20) The Advisory Committee should be composed of representatives of the competition authorities of the Member States. For meetings in which general issues are being discussed, Member States should be able to appoint an additional representative. This is without prejudice to members of the Committee being assisted by other experts from the Member States.

(21) Consistency in the application of the competition rules also requires that arrangements be established for cooperation between the courts of the Member States and the Commission. This is relevant for all courts of the Member States that apply Articles 81 and 82 of the Treaty, whether applying these rules in lawsuits between private parties, acting as public enforcers or as review courts. In particular, national courts should be able to ask the Commission for information or for its opinion on points concerning the application of Community competition law. The Commission and the competition authorities of the Member States should also be able to submit written or oral observations to courts called upon to apply Article 81 or Article 82 of the Treaty. These observations should be submitted within the framework of national procedural rules and practices including those safeguarding the rights of the parties. Steps should therefore be taken to ensure that the Commission and the competition authorities of the Member States are kept sufficiently well informed of proceedings before national courts.

(22) In order to ensure compliance with the principles of legal certainty and the uniform application of the Community competition rules in a system of parallel powers, conflicting decisions must be avoided. It is therefore necessary to clarify, in accordance with the case-law of the Court of Justice, the effects of Commission decisions and proceedings on courts and competition authorities of the Member States. Commitment decisions adopted by the Commission do not affect the power of the courts and the competition authorities of the Member States to apply Articles 81 and 82 of the Treaty.

(23) The Commission should be empowered throughout the Community to require such information to be supplied as is necessary to detect any agreement, decision or concerted practice prohibited by Article 81 of the Treaty or any abuse of a dominant position prohibited by Article 82 of the Treaty. When complying with a decision of the Commission, undertakings cannot be forced to admit that they have committed an infringement, but they are in any event obliged to answer factual questions and to provide documents, even if this information may be used to establish against them or against another undertaking the existence of an infringement.

(24) The Commission should also be empowered to undertake such inspections as are necessary to detect any agreement, decision or concerted practice prohibited by Article 81 of the Treaty or any abuse of a dominant position prohibited by Article 82 of the Treaty. The competition authorities of the Member States should cooperate actively in the exercise of these powers.

(25) The detection of infringements of the competition rules is growing ever more difficult, and, in order to protect competition effectively, the Commission's powers of investigation need to be supplemented. The Commission should in particular be empowered to interview any persons who may be in possession of useful information and to record the statements made. In the course of an inspection, officials authorised by the Commission should be empowered to affix seals for the period of time necessary for the inspection. Seals should normally not be affixed for more than 72 hours. Officials authorised by the Commission should also be empowered to ask for any information relevant to the subject matter and purpose of the inspection.

(26) Experience has shown that there are cases where business records are kept in the homes of directors or other people working for an undertaking. In order to safeguard the effectiveness of inspections, therefore, officials and other persons authorised by the Commission should be empowered to enter any premises where business records may be kept, including private homes. However, the exercise of this latter power should be subject to the authorisation of the judicial authority.

(27) Without prejudice to the case-law of the Court of Justice, it is useful to set out the scope of the control that the national judicial authority may carry out when it authorises, as foreseen by national law including as a precautionary measure, assistance from law enforcement authorities in order to overcome possible opposition on the part of the undertaking or the execution of the decision to carry out inspections in non-business premises. It results from the case-law that the national judicial authority may in particular ask the Commission for further information which it needs to carry out its control and in the absence of which it could refuse the authorisation. The case-law also confirms the competence of the national courts to control the application of national rules governing the implementation of coercive measures.

(28)  In order to help the competition authorities of the Member States to apply Articles 81 and 82 of the Treaty effectively, it is expedient to enable them to assist one another by carrying out inspections and other fact-finding measures.

(29)  Compliance with Articles 81 and 82 of the Treaty and the fulfilment of the obligations imposed on undertakings and associations of undertakings under this Regulation should be enforceable by means of fines and periodic penalty payments. To that end, appropriate levels of fine should also be laid down for infringements of the procedural rules.

(30)  In order to ensure effective recovery of fines imposed on associations of undertakings for infringements that they have committed, it is necessary to lay down the conditions on which the Commission may require payment of the fine from the members of the association where the association is not solvent. In doing so, the Commission should have regard to the relative size of the undertakings belonging to the association and in particular to the situation of small and medium-sized enterprises. Payment of the fine by one or several members of an association is without prejudice to rules of national law that provide for recovery of the amount paid from other members of the association.

(31)  The rules on periods of limitation for the imposition of fines and periodic penalty payments were laid down in Council Regulation (EEC) No 2988/74 (¹), which also concerns penalties in the field of transport. In a system of parallel powers, the acts, which may interrupt a limitation period, should include procedural steps taken independently by the competition authority of a Member State. To clarify the legal framework, Regulation (EEC) No 2988/74 should therefore be amended to prevent it applying to matters covered by this Regulation, and this Regulation should include provisions on periods of limitation.

(32)  The undertakings concerned should be accorded the right to be heard by the Commission, third parties whose interests may be affected by a decision should be given the opportunity of submitting their observations beforehand, and the decisions taken should be widely publicised. While ensuring the rights of defence of the undertakings concerned, in particular, the right of access to the file, it is essential that business secrets be protected. The confidentiality of information exchanged in the network should likewise be safeguarded.

(33)  Since all decisions taken by the Commission under this Regulation are subject to review by the Court of Justice in accordance with the Treaty, the Court of Justice should, in accordance with Article 229 thereof be given unlimited jurisdiction in respect of decisions by which the Commission imposes fines or periodic penalty payments.

(34)  The principles laid down in Articles 81 and 82 of the Treaty, as they have been applied by Regulation No 17, have given a central role to the Community bodies. This central role should be retained, whilst associating the Member States more closely with the application of the Community competition rules. In accordance with the principles of subsidiarity and proportionality as set out in Article 5 of the Treaty, this Regulation does not go beyond what is necessary in order to achieve its objective, which is to allow the Community competition rules to be applied effectively.

(35)  In order to attain a proper enforcement of Community competition law, Member States should designate and empower authorities to apply Articles 81 and 82 of the Treaty as public enforcers. They should be able to designate administrative as well as judicial authorities to carry out the various functions conferred upon competition authorities in this Regulation. This Regulation recognises the wide variation which exists in the public enforcement systems of Member States. The effects of Article 11(6) of this Regulation should apply to all competition authorities. As an exception to this general rule, where a prosecuting authority brings a case before a separate judicial

---

(¹) Council Regulation (EEC) No 2988/74 of 26 November 1974 concerning limitation periods in proceedings and the enforcement of sanctions under the rules of the European Economic Community relating to transport and competition (OJ L 319, 29.11.1974, p. 1).

authority, Article 11(6) should apply to the prosecuting authority subject to the conditions in Article 35(4) of this Regulation. Where these conditions are not fulfilled, the general rule should apply. In any case, Article 11(6) should not apply to courts insofar as they are acting as review courts.

(36) As the case-law has made it clear that the competition rules apply to transport, that sector should be made subject to the procedural provisions of this Regulation. Council Regulation No 141 of 26 November 1962 exempting transport from the application of Regulation No 17 (¹) should therefore be repealed and Regulations (EEC) No 1017/68 (²), (EEC) No 4056/86 (³) and (EEC) No 3975/87 (⁴) should be amended in order to delete the specific procedural provisions they contain.

(37) This Regulation respects the fundamental rights and observes the principles recognised in particular by the Charter of Fundamental Rights of the European Union. Accordingly, this Regulation should be interpreted and applied with respect to those rights and principles.

(38) Legal certainty for undertakings operating under the Community competition rules contributes to the promotion of innovation and investment. Where cases give rise to genuine uncertainty because they present novel or unresolved questions for the application of these rules, individual undertakings may wish to seek informal guidance from the Commission. This Regulation is without prejudice to the ability of the Commission to issue such informal guidance,

HAS ADOPTED THIS REGULATION:

CHAPTER I

PRINCIPLES

Article 1

**Application of Articles 81 and 82 of the Treaty**

1.    Agreements, decisions and concerted practices caught by Article 81(1) of the Treaty which do not satisfy the conditions of Article 81(3) of the Treaty shall be prohibited, no prior decision to that effect being required.

2.    Agreements, decisions and concerted practices caught by Article 81(1) of the Treaty which satisfy the conditions of Article 81(3) of the Treaty shall not be prohibited, no prior decision to that effect being required.

3.    The abuse of a dominant position referred to in Article 82 of the Treaty shall be prohibited, no prior decision to that effect being required.

(¹) OJ 124, 28.11.1962, p. 2751/62; Regulation as last amended by Regulation No 1002/67/EEC (OJ 306, 16.12.1967, p. 1).
(²) Council Regulation (EEC) No 1017/68 of 19 July 1968 applying rules of competition to transport by rail, road and inland waterway (OJ L 175, 23.7.1968, p. 1). Regulation as last amended by the Act of Accession of 1994.
(³) Council Regulation (EEC) No 4056/86 of 22 December 1986 laying down detailed rules for the application of Articles 81 and 82 (The title of the Regulation has been adjusted to take account of the renumbering of the Articles of the EC Treaty, in accordance with Article 12 of the Treaty of Amsterdam; the original reference was to Articles 85 and 86 of the Treaty) of the Treaty to maritime transport (OJ L 378, 31.12.1986, p. 4). Regulation as last amended by the Act of Accession of 1994.
(⁴) Council Regulation (EEC) No 3975/87 of 14 December 1987 laying down the procedure for the application of the rules on competition to undertakings in the air transport sector (OJ L 374, 31.12.1987, p. 1). Regulation as last amended by Regulation (EEC) No 2410/92 (OJ L 240, 24.8.1992, p. 18).

L 1/8    EN    Official Journal of the European Communities    4.1.2003

*Article 2*

**Burden of proof**

In any national or Community proceedings for the application of Articles 81 and 82 of the Treaty, the burden of proving an infringement of Article 81(1) or of Article 82 of the Treaty shall rest on the party or the authority alleging the infringement. The undertaking or association of undertakings claiming the benefit of Article 81(3) of the Treaty shall bear the burden of proving that the conditions of that paragraph are fulfilled.

*Article 3*

**Relationship between Articles 81 and 82 of the Treaty and national competition laws**

1.    Where the competition authorities of the Member States or national courts apply national competition law to agreements, decisions by associations of undertakings or concerted practices within the meaning of Article 81(1) of the Treaty which may affect trade between Member States within the meaning of that provision, they shall also apply Article 81 of the Treaty to such agreements, decisions or concerted practices. Where the competition authorities of the Member States or national courts apply national competition law to any abuse prohibited by Article 82 of the Treaty, they shall also apply Article 82 of the Treaty.

2.    The application of national competition law may not lead to the prohibition of agreements, decisions by associations of undertakings or concerted practices which may affect trade between Member States but which do not restrict competition within the meaning of Article 81(1) of the Treaty, or which fulfil the conditions of Article 81(3) of the Treaty or which are covered by a Regulation for the application of Article 81(3) of the Treaty. Member States shall not under this Regulation be precluded from adopting and applying on their territory stricter national laws which prohibit or sanction unilateral conduct engaged in by undertakings.

3.    Without prejudice to general principles and other provisions of Community law, paragraphs 1 and 2 do not apply when the competition authorities and the courts of the Member States apply national merger control laws nor do they preclude the application of provisions of national law that predominantly pursue an objective different from that pursued by Articles 81 and 82 of the Treaty.

CHAPTER II

**POWERS**

*Article 4*

**Powers of the Commission**

For the purpose of applying Articles 81 and 82 of the Treaty, the Commission shall have the powers provided for by this Regulation.

*Article 5*

**Powers of the competition authorities of the Member States**

The competition authorities of the Member States shall have the power to apply Articles 81 and 82 of the Treaty in individual cases. For this purpose, acting on their own initiative or on a complaint, they may take the following decisions:

— requiring that an infringement be brought to an end,

— ordering interim measures,

— accepting commitments,

— imposing fines, periodic penalty payments or any other penalty provided for in their national law.

Where on the basis of the information in their possession the conditions for prohibition are not met they may likewise decide that there are no grounds for action on their part.

*Article 6*

**Powers of the national courts**

National courts shall have the power to apply Articles 81 and 82 of the Treaty.

CHAPTER III

**COMMISSION DECISIONS**

*Article 7*

**Finding and termination of infringement**

1.     Where the Commission, acting on a complaint or on its own initiative, finds that there is an infringement of Article 81 or of Article 82 of the Treaty, it may by decision require the undertakings and associations of undertakings concerned to bring such infringement to an end. For this purpose, it may impose on them any behavioural or structural remedies which are proportionate to the infringement committed and necessary to bring the infringement effectively to an end. Structural remedies can only be imposed either where there is no equally effective behavioural remedy or where any equally effective behavioural remedy would be more burdensome for the undertaking concerned than the structural remedy. If the Commission has a legitimate interest in doing so, it may also find that an infringement has been committed in the past.

2.     Those entitled to lodge a complaint for the purposes of paragraph 1 are natural or legal persons who can show a legitimate interest and Member States.

*Article 8*

**Interim measures**

1.     In cases of urgency due to the risk of serious and irreparable damage to competition, the Commission, acting on its own initiative may by decision, on the basis of a *prima facie* finding of infringement, order interim measures.

2.     A decision under paragraph 1 shall apply for a specified period of time and may be renewed in so far this is necessary and appropriate.

*Article 9*

**Commitments**

1.     Where the Commission intends to adopt a decision requiring that an infringement be brought to an end and the undertakings concerned offer commitments to meet the concerns expressed to them by the Commission in its preliminary assessment, the Commission may by decision make those commitments binding on the undertakings. Such a decision may be adopted for a specified period and shall conclude that there are no longer grounds for action by the Commission.

2.   The Commission may, upon request or on its own initiative, reopen the proceedings:

(a) where there has been a material change in any of the facts on which the decision was based;

(b) where the undertakings concerned act contrary to their commitments; or

(c) where the decision was based on incomplete, incorrect or misleading information provided by the parties.

*Article 10*

**Finding of inapplicability**

Where the Community public interest relating to the application of Articles 81 and 82 of the Treaty so requires, the Commission, acting on its own initiative, may by decision find that Article 81 of the Treaty is not applicable to an agreement, a decision by an association of undertakings or a concerted practice, either because the conditions of Article 81(1) of the Treaty are not fulfilled, or because the conditions of Article 81(3) of the Treaty are satisfied.

The Commission may likewise make such a finding with reference to Article 82 of the Treaty.

CHAPTER IV

**COOPERATION**

*Article 11*

**Cooperation between the Commission and the competition authorities of the Member States**

1.   The Commission and the competition authorities of the Member States shall apply the Community competition rules in close cooperation.

2.   The Commission shall transmit to the competition authorities of the Member States copies of the most important documents it has collected with a view to applying Articles 7, 8, 9, 10 and Article 29(1). At the request of the competition authority of a Member State, the Commission shall provide it with a copy of other existing documents necessary for the assessment of the case.

3.   The competition authorities of the Member States shall, when acting under Article 81 or Article 82 of the Treaty, inform the Commission in writing before or without delay after commencing the first formal investigative measure. This information may also be made available to the competition authorities of the other Member States.

4.   No later than 30 days before the adoption of a decision requiring that an infringement be brought to an end, accepting commitments or withdrawing the benefit of a block exemption Regulation, the competition authorities of the Member States shall inform the Commission. To that effect, they shall provide the Commission with a summary of the case, the envisaged decision or, in the absence thereof, any other document indicating the proposed course of action. This information may also be made available to the competition authorities of the other Member States. At the request of the Commission, the acting competition authority shall make available to the Commission other documents it holds which are necessary for the assessment of the case. The information supplied to the Commission may be made available to the competition authorities of the other Member States. National competition authorities may also exchange between themselves information necessary for the assessment of a case that they are dealing with under Article 81 or Article 82 of the Treaty.

5.   The competition authorities of the Member States may consult the Commission on any case involving the application of Community law.

6.   The initiation by the Commission of proceedings for the adoption of a decision under Chapter III shall relieve the competition authorities of the Member States of their competence to apply Articles 81 and 82 of the Treaty. If a competition authority of a Member State is already acting on a case, the Commission shall only initiate proceedings after consulting with that national competition authority.

## Article 12

### Exchange of information

1.   For the purpose of applying Articles 81 and 82 of the Treaty the Commission and the competition authorities of the Member States shall have the power to provide one another with and use in evidence any matter of fact or of law, including confidential information.

2.   Information exchanged shall only be used in evidence for the purpose of applying Article 81 or Article 82 of the Treaty and in respect of the subject-matter for which it was collected by the transmitting authority. However, where national competition law is applied in the same case and in parallel to Community competition law and does not lead to a different outcome, information exchanged under this Article may also be used for the application of national competition law.

3.   Information exchanged pursuant to paragraph 1 can only be used in evidence to impose sanctions on natural persons where:

— the law of the transmitting authority foresees sanctions of a similar kind in relation to an infringement of Article 81 or Article 82 of the Treaty or, in the absence thereof,

— the information has been collected in a way which respects the same level of protection of the rights of defence of natural persons as provided for under the national rules of the receiving authority. However, in this case, the information exchanged cannot be used by the receiving authority to impose custodial sanctions.

## Article 13

### Suspension or termination of proceedings

1.   Where competition authorities of two or more Member States have received a complaint or are acting on their own initiative under Article 81 or Article 82 of the Treaty against the same agreement, decision of an association or practice, the fact that one authority is dealing with the case shall be sufficient grounds for the others to suspend the proceedings before them or to reject the complaint. The Commission may likewise reject a complaint on the ground that a competition authority of a Member State is dealing with the case.

2.   Where a competition authority of a Member State or the Commission has received a complaint against an agreement, decision of an association or practice which has already been dealt with by another competition authority, it may reject it.

## Article 14

### Advisory Committee

1.   The Commission shall consult an Advisory Committee on Restrictive Practices and Dominant Positions prior to the taking of any decision under Articles 7, 8, 9, 10, 23, Article 24(2) and Article 29(1).

2.   For the discussion of individual cases, the Advisory Committee shall be composed of representatives of the competition authorities of the Member States. For meetings in which issues other than individual cases are being discussed, an additional Member State representative competent in competition matters may be appointed. Representatives may, if unable to attend, be replaced by other representatives.

3.    The consultation may take place at a meeting convened and chaired by the Commission, held not earlier than 14 days after dispatch of the notice convening it, together with a summary of the case, an indication of the most important documents and a preliminary draft decision. In respect of decisions pursuant to Article 8, the meeting may be held seven days after the dispatch of the operative part of a draft decision. Where the Commission dispatches a notice convening the meeting which gives a shorter period of notice than those specified above, the meeting may take place on the proposed date in the absence of an objection by any Member State. The Advisory Committee shall deliver a written opinion on the Commission's preliminary draft decision. It may deliver an opinion even if some members are absent and are not represented. At the request of one or several members, the positions stated in the opinion shall be reasoned.

4.    Consultation may also take place by written procedure. However, if any Member State so requests, the Commission shall convene a meeting. In case of written procedure, the Commission shall determine a time-limit of not less than 14 days within which the Member States are to put forward their observations for circulation to all other Member States. In case of decisions to be taken pursuant to Article 8, the time-limit of 14 days is replaced by seven days. Where the Commission determines a time-limit for the written procedure which is shorter than those specified above, the proposed time-limit shall be applicable in the absence of an objection by any Member State.

5.    The Commission shall take the utmost account of the opinion delivered by the Advisory Committee. It shall inform the Committee of the manner in which its opinion has been taken into account.

6.    Where the Advisory Committee delivers a written opinion, this opinion shall be appended to the draft decision. If the Advisory Committee recommends publication of the opinion, the Commission shall carry out such publication taking into account the legitimate interest of undertakings in the protection of their business secrets.

7.    At the request of a competition authority of a Member State, the Commission shall include on the agenda of the Advisory Committee cases that are being dealt with by a competition authority of a Member State under Article 81 or Article 82 of the Treaty. The Commission may also do so on its own initiative. In either case, the Commission shall inform the competition authority concerned.

A request may in particular be made by a competition authority of a Member State in respect of a case where the Commission intends to initiate proceedings with the effect of Article 11(6).

The Advisory Committee shall not issue opinions on cases dealt with by competition authorities of the Member States. The Advisory Committee may also discuss general issues of Community competition law.

*Article 15*

**Cooperation with national courts**

1.    In proceedings for the application of Article 81 or Article 82 of the Treaty, courts of the Member States may ask the Commission to transmit to them information in its possession or its opinion on questions concerning the application of the Community competition rules.

2.    Member States shall forward to the Commission a copy of any written judgment of national courts deciding on the application of Article 81 or Article 82 of the Treaty. Such copy shall be forwarded without delay after the full written judgment is notified to the parties.

3.    Competition authorities of the Member States, acting on their own initiative, may submit written observations to the national courts of their Member State on issues relating to the application of Article 81 or Article 82 of the Treaty. With the permission of the court in question, they may also submit oral observations to the national courts of their Member State. Where the coherent application of Article 81 or Article 82 of the Treaty so requires, the Commission, acting on its own initiative, may submit written observations to courts of the Member States. With the permission of the court in question, it may also make oral observations.

For the purpose of the preparation of their observations only, the competition authorities of the Member States and the Commission may request the relevant court of the Member State to transmit or ensure the transmission to them of any documents necessary for the assessment of the case.

4.    This Article is without prejudice to wider powers to make observations before courts conferred on competition authorities of the Member States under the law of their Member State.


## Article 16

### Uniform application of Community competition law

1.    When national courts rule on agreements, decisions or practices under Article 81 or Article 82 of the Treaty which are already the subject of a Commission decision, they cannot take decisions running counter to the decision adopted by the Commission. They must also avoid giving decisions which would conflict with a decision contemplated by the Commission in proceedings it has initiated. To that effect, the national court may assess whether it is necessary to stay its proceedings. This obligation is without prejudice to the rights and obligations under Article 234 of the Treaty.

2.    When competition authorities of the Member States rule on agreements, decisions or practices under Article 81 or Article 82 of the Treaty which are already the subject of a Commission decision, they cannot take decisions which would run counter to the decision adopted by the Commission.


## CHAPTER V

### POWERS OF INVESTIGATION


## Article 17

### Investigations into sectors of the economy and into types of agreements

1.    Where the trend of trade between Member States, the rigidity of prices or other circumstances suggest that competition may be restricted or distorted within the common market, the Commission may conduct its inquiry into a particular sector of the economy or into a particular type of agreements across various sectors. In the course of that inquiry, the Commission may request the undertakings or associations of undertakings concerned to supply the information necessary for giving effect to Articles 81 and 82 of the Treaty and may carry out any inspections necessary for that purpose.

The Commission may in particular request the undertakings or associations of undertakings concerned to communicate to it all agreements, decisions and concerted practices.

The Commission may publish a report on the results of its inquiry into particular sectors of the economy or particular types of agreements across various sectors and invite comments from interested parties.

2.    Articles 14, 18, 19, 20, 22, 23 and 24 shall apply *mutatis mutandis*.


## Article 18

### Requests for information

1.    In order to carry out the duties assigned to it by this Regulation, the Commission may, by simple request or by decision, require undertakings and associations of undertakings to provide all necessary information.

2.    When sending a simple request for information to an undertaking or association of undertakings, the Commission shall state the legal basis and the purpose of the request, specify what information is required and fix the time-limit within which the information is to be provided, and the penalties provided for in Article 23 for supplying incorrect or misleading information.

L 1/14      EN      Official Journal of the European Communities      4.1.2003

3.    Where the Commission requires undertakings and associations of undertakings to supply information by decision, it shall state the legal basis and the purpose of the request, specify what information is required and fix the time-limit within which it is to be provided. It shall also indicate the penalties provided for in Article 23 and indicate or impose the penalties provided for in Article 24. It shall further indicate the right to have the decision reviewed by the Court of Justice.

4.    The owners of the undertakings or their representatives and, in the case of legal persons, companies or firms, or associations having no legal personality, the persons authorised to represent them by law or by their constitution shall supply the information requested on behalf of the undertaking or the association of undertakings concerned. Lawyers duly authorised to act may supply the information on behalf of their clients. The latter shall remain fully responsible if the information supplied is incomplete, incorrect or misleading.

5.    The Commission shall without delay forward a copy of the simple request or of the decision to the competition authority of the Member State in whose territory the seat of the undertaking or association of undertakings is situated and the competition authority of the Member State whose territory is affected.

6.    At the request of the Commission the governments and competition authorities of the Member States shall provide the Commission with all necessary information to carry out the duties assigned to it by this Regulation.

*Article 19*

**Power to take statements**

1.    In order to carry out the duties assigned to it by this Regulation, the Commission may interview any natural or legal person who consents to be interviewed for the purpose of collecting information relating to the subject-matter of an investigation.

2.    Where an interview pursuant to paragraph 1 is conducted in the premises of an undertaking, the Commission shall inform the competition authority of the Member State in whose territory the interview takes place. If so requested by the competition authority of that Member State, its officials may assist the officials and other accompanying persons authorised by the Commission to conduct the interview.

*Article 20*

**The Commission's powers of inspection**

1.    In order to carry out the duties assigned to it by this Regulation, the Commission may conduct all necessary inspections of undertakings and associations of undertakings.

2.    The officials and other accompanying persons authorised by the Commission to conduct an inspection are empowered:

(a) to enter any premises, land and means of transport of undertakings and associations of undertakings;

(b) to examine the books and other records related to the business, irrespective of the medium on which they are stored;

(c) to take or obtain in any form copies of or extracts from such books or records;

(d) to seal any business premises and books or records for the period and to the extent necessary for the inspection;

(e) to ask any representative or member of staff of the undertaking or association of undertakings for explanations on facts or documents relating to the subject-matter and purpose of the inspection and to record the answers.

3.     The officials and other accompanying persons authorised by the Commission to conduct an inspection shall exercise their powers upon production of a written authorisation specifying the subject matter and purpose of the inspection and the penalties provided for in Article 23 in case the production of the required books or other records related to the business is incomplete or where the answers to questions asked under paragraph 2 of the present Article are incorrect or misleading. In good time before the inspection, the Commission shall give notice of the inspection to the competition authority of the Member State in whose territory it is to be conducted.

4.     Undertakings and associations of undertakings are required to submit to inspections ordered by decision of the Commission. The decision shall specify the subject matter and purpose of the inspection, appoint the date on which it is to begin and indicate the penalties provided for in Articles 23 and 24 and the right to have the decision reviewed by the Court of Justice. The Commission shall take such decisions after consulting the competition authority of the Member State in whose territory the inspection is to be conducted.

5.     Officials of as well as those authorised or appointed by the competition authority of the Member State in whose territory the inspection is to be conducted shall, at the request of that authority or of the Commission, actively assist the officials and other accompanying persons authorised by the Commission. To this end, they shall enjoy the powers specified in paragraph 2.

6.     Where the officials and other accompanying persons authorised by the Commission find that an undertaking opposes an inspection ordered pursuant to this Article, the Member State concerned shall afford them the necessary assistance, requesting where appropriate the assistance of the police or of an equivalent enforcement authority, so as to enable them to conduct their inspection.

7.     If the assistance provided for in paragraph 6 requires authorisation from a judicial authority according to national rules, such authorisation shall be applied for. Such authorisation may also be applied for as a precautionary measure.

8.     Where authorisation as referred to in paragraph 7 is applied for, the national judicial authority shall control that the Commission decision is authentic and that the coercive measures envisaged are neither arbitrary nor excessive having regard to the subject matter of the inspection. In its control of the proportionality of the coercive measures, the national judicial authority may ask the Commission, directly or through the Member State competition authority, for detailed explanations in particular on the grounds the Commission has for suspecting infringement of Articles 81 and 82 of the Treaty, as well as on the seriousness of the suspected infringement and on the nature of the involvement of the undertaking concerned. However, the national judicial authority may not call into question the necessity for the inspection nor demand that it be provided with the information in the Commission's file. The lawfulness of the Commission decision shall be subject to review only by the Court of Justice.

*Article 21*

**Inspection of other premises**

1.     If a reasonable suspicion exists that books or other records related to the business and to the subject-matter of the inspection, which may be relevant to prove a serious violation of Article 81 or Article 82 of the Treaty, are being kept in any other premises, land and means of transport, including the homes of directors, managers and other members of staff of the undertakings and associations of undertakings concerned, the Commission can by decision order an inspection to be conducted in such other premises, land and means of transport.

2.     The decision shall specify the subject matter and purpose of the inspection, appoint the date on which it is to begin and indicate the right to have the decision reviewed by the Court of Justice. It shall in particular state the reasons that have led the Commission to conclude that a suspicion in the sense of paragraph 1 exists. The Commission shall take such decisions after consulting the competition authority of the Member State in whose territory the inspection is to be conducted.

3.   A decision adopted pursuant to paragraph 1 cannot be executed without prior authorisation from the national judicial authority of the Member State concerned. The national judicial authority shall control that the Commission decision is authentic and that the coercive measures envisaged are neither arbitrary nor excessive having regard in particular to the seriousness of the suspected infringement, to the importance of the evidence sought, to the involvement of the undertaking concerned and to the reasonable likelihood that business books and records relating to the subject matter of the inspection are kept in the premises for which the authorisation is requested. The national judicial authority may ask the Commission, directly or through the Member State competition authority, for detailed explanations on those elements which are necessary to allow its control of the proportionality of the coercive measures envisaged.

However, the national judicial authority may not call into question the necessity for the inspection nor demand that it be provided with information in the Commission's file. The lawfulness of the Commission decision shall be subject to review only by the Court of Justice.

4.   The officials and other accompanying persons authorised by the Commission to conduct an inspection ordered in accordance with paragraph 1 of this Article shall have the powers set out in Article 20(2)(a), (b) and (c). Article 20(5) and (6) shall apply *mutatis mutandis*.

### Article 22

### Investigations by competition authorities of Member States

1.   The competition authority of a Member State may in its own territory carry out any inspection or other fact-finding measure under its national law on behalf and for the account of the competition authority of another Member State in order to establish whether there has been an infringement of Article 81 or Article 82 of the Treaty. Any exchange and use of the information collected shall be carried out in accordance with Article 12.

2.   At the request of the Commission, the competition authorities of the Member States shall undertake the inspections which the Commission considers to be necessary under Article 20(1) or which it has ordered by decision pursuant to Article 20(4). The officials of the competition authorities of the Member States who are responsible for conducting these inspections as well as those authorised or appointed by them shall exercise their powers in accordance with their national law.

If so requested by the Commission or by the competition authority of the Member State in whose territory the inspection is to be conducted, officials and other accompanying persons authorised by the Commission may assist the officials of the authority concerned.

### CHAPTER VI

### PENALTIES

### Article 23

### Fines

1.   The Commission may by decision impose on undertakings and associations of undertakings fines not exceeding 1 % of the total turnover in the preceding business year where, intentionally or negligently:

(a) they supply incorrect or misleading information in response to a request made pursuant to Article 17 or Article 18(2);

(b) in response to a request made by decision adopted pursuant to Article 17 or Article 18(3), they supply incorrect, incomplete or misleading information or do not supply information within the required time-limit;

(c) they produce the required books or other records related to the business in incomplete form during inspections under Article 20 or refuse to submit to inspections ordered by a decision adopted pursuant to Article 20(4);

(d) in response to a question asked in accordance with Article 20(2)(e),

— they give an incorrect or misleading answer,

— they fail to rectify within a time-limit set by the Commission an incorrect, incomplete or misleading answer given by a member of staff, or

— they fail or refuse to provide a complete answer on facts relating to the subject-matter and purpose of an inspection ordered by a decision adopted pursuant to Article 20(4);

(e) seals affixed in accordance with Article 20(2)(d) by officials or other accompanying persons authorised by the Commission have been broken.

2.    The Commission may by decision impose fines on undertakings and associations of undertakings where, either intentionally or negligently:

(a) they infringe Article 81 or Article 82 of the Treaty; or

(b) they contravene a decision ordering interim measures under Article 8; or

(c) they fail to comply with a commitment made binding by a decision pursuant to Article 9.

For each undertaking and association of undertakings participating in the infringement, the fine shall not exceed 10 % of its total turnover in the preceding business year.

Where the infringement of an association relates to the activities of its members, the fine shall not exceed 10 % of the sum of the total turnover of each member active on the market affected by the infringement of the association.

3.    In fixing the amount of the fine, regard shall be had both to the gravity and to the duration of the infringement.

4.    When a fine is imposed on an association of undertakings taking account of the turnover of its members and the association is not solvent, the association is obliged to call for contributions from its members to cover the amount of the fine.

Where such contributions have not been made to the association within a time-limit fixed by the Commission, the Commission may require payment of the fine directly by any of the undertakings whose representatives were members of the decision-making bodies concerned of the association.

After the Commission has required payment under the second subparagraph, where necessary to ensure full payment of the fine, the Commission may require payment of the balance by any of the members of the association which were active on the market on which the infringement occurred.

However, the Commission shall not require payment under the second or the third subparagraph from undertakings which show that they have not implemented the infringing decision of the association and either were not aware of its existence or have actively distanced themselves from it before the Commission started investigating the case.

The financial liability of each undertaking in respect of the payment of the fine shall not exceed 10 % of its total turnover in the preceding business year.

5.    Decisions taken pursuant to paragraphs 1 and 2 shall not be of a criminal law nature.


### Article 24

### Periodic penalty payments

1.    The Commission may, by decision, impose on undertakings or associations of undertakings periodic penalty payments not exceeding 5 % of the average daily turnover in the preceding business year per day and calculated from the date appointed by the decision, in order to compel them:

(a) to put an end to an infringement of Article 81 or Article 82 of the Treaty, in accordance with a decision taken pursuant to Article 7;

(b) to comply with a decision ordering interim measures taken pursuant to Article 8;

(c) to comply with a commitment made binding by a decision pursuant to Article 9;

(d) to supply complete and correct information which it has requested by decision taken pursuant to Article 17 or Article 18(3);

(e) to submit to an inspection which it has ordered by decision taken pursuant to Article 20(4).

2.    Where the undertakings or associations of undertakings have satisfied the obligation which the periodic penalty payment was intended to enforce, the Commission may fix the definitive amount of the periodic penalty payment at a figure lower than that which would arise under the original decision. Article 23(4) shall apply correspondingly.

CHAPTER VII

**LIMITATION PERIODS**

*Article 25*

**Limitation periods for the imposition of penalties**

1.    The powers conferred on the Commission by Articles 23 and 24 shall be subject to the following limitation periods:

(a) three years in the case of infringements of provisions concerning requests for information or the conduct of inspections;

(b) five years in the case of all other infringements.

2.    Time shall begin to run on the day on which the infringement is committed. However, in the case of continuing or repeated infringements, time shall begin to run on the day on which the infringement ceases.

3.    Any action taken by the Commission or by the competition authority of a Member State for the purpose of the investigation or proceedings in respect of an infringement shall interrupt the limitation period for the imposition of fines or periodic penalty payments. The limitation period shall be interrupted with effect from the date on which the action is notified to at least one undertaking or association of undertakings which has participated in the infringement. Actions which interrupt the running of the period shall include in particular the following:

(a) written requests for information by the Commission or by the competition authority of a Member State;

(b) written authorisations to conduct inspections issued to its officials by the Commission or by the competition authority of a Member State;

(c) the initiation of proceedings by the Commission or by the competition authority of a Member State;

(d) notification of the statement of objections of the Commission or of the competition authority of a Member State.

4.    The interruption of the limitation period shall apply for all the undertakings or associations of undertakings which have participated in the infringement.

5.    Each interruption shall start time running afresh. However, the limitation period shall expire at the latest on the day on which a period equal to twice the limitation period has elapsed without the Commission having imposed a fine or a periodic penalty payment. That period shall be extended by the time during which limitation is suspended pursuant to paragraph 6.

6.    The limitation period for the imposition of fines or periodic penalty payments shall be suspended for as long as the decision of the Commission is the subject of proceedings pending before the Court of Justice.

*Article 26*

### Limitation period for the enforcement of penalties

1.   The power of the Commission to enforce decisions taken pursuant to Articles 23 and 24 shall be subject to a limitation period of five years.

2.   Time shall begin to run on the day on which the decision becomes final.

3.   The limitation period for the enforcement of penalties shall be interrupted:

(a) by notification of a decision varying the original amount of the fine or periodic penalty payment or refusing an application for variation;

(b) by any action of the Commission or of a Member State, acting at the request of the Commission, designed to enforce payment of the fine or periodic penalty payment.

4.   Each interruption shall start time running afresh.

5.   The limitation period for the enforcement of penalties shall be suspended for so long as:

(a) time to pay is allowed;

(b) enforcement of payment is suspended pursuant to a decision of the Court of Justice.

CHAPTER VIII

### HEARINGS AND PROFESSIONAL SECRECY

*Article 27*

### Hearing of the parties, complainants and others

1.   Before taking decisions as provided for in Articles 7, 8, 23 and Article 24(2), the Commission shall give the undertakings or associations of undertakings which are the subject of the proceedings conducted by the Commission the opportunity of being heard on the matters to which the Commission has taken objection. The Commission shall base its decisions only on objections on which the parties concerned have been able to comment. Complainants shall be associated closely with the proceedings.

2.   The rights of defence of the parties concerned shall be fully respected in the proceedings. They shall be entitled to have access to the Commission's file, subject to the legitimate interest of undertakings in the protection of their business secrets. The right of access to the file shall not extend to confidential information and internal documents of the Commission or the competition authorities of the Member States. In particular, the right of access shall not extend to correspondence between the Commission and the competition authorities of the Member States, or between the latter, including documents drawn up pursuant to Articles 11 and 14. Nothing in this paragraph shall prevent the Commission from disclosing and using information necessary to prove an infringement.

3.   If the Commission considers it necessary, it may also hear other natural or legal persons. Applications to be heard on the part of such persons shall, where they show a sufficient interest, be granted. The competition authorities of the Member States may also ask the Commission to hear other natural or legal persons.

4.   Where the Commission intends to adopt a decision pursuant to Article 9 or Article 10, it shall publish a concise summary of the case and the main content of the commitments or of the proposed course of action. Interested third parties may submit their observations within a time limit which is fixed by the Commission in its publication and which may not be less than one month. Publication shall have regard to the legitimate interest of undertakings in the protection of their business secrets.

*Article 28*

**Professional secrecy**

1.   Without prejudice to Articles 12 and 15, information collected pursuant to Articles 17 to 22 shall be used only for the purpose for which it was acquired.

2.   Without prejudice to the exchange and to the use of information foreseen in Articles 11, 12, 14, 15 and 27, the Commission and the competition authorities of the Member States, their officials, servants and other persons working under the supervision of these authorities as well as officials and civil servants of other authorities of the Member States shall not disclose information acquired or exchanged by them pursuant to this Regulation and of the kind covered by the obligation of professional secrecy. This obligation also applies to all representatives and experts of Member States attending meetings of the Advisory Committee pursuant to Article 14.

CHAPTER IX

**EXEMPTION REGULATIONS**

*Article 29*

**Withdrawal in individual cases**

1.   Where the Commission, empowered by a Council Regulation, such as Regulations 19/65/EEC, (EEC) No 2821/71, (EEC) No 3976/87, (EEC) No 1534/91 or (EEC) No 479/92, to apply Article 81(3) of the Treaty by regulation, has declared Article 81(1) of the Treaty inapplicable to certain categories of agreements, decisions by associations of undertakings or concerted practices, it may, acting on its own initiative or on a complaint, withdraw the benefit of such an exemption Regulation when it finds that in any particular case an agreement, decision or concerted practice to which the exemption Regulation applies has certain effects which are incompatible with Article 81(3) of the Treaty.

2.   Where, in any particular case, agreements, decisions by associations of undertakings or concerted practices to which a Commission Regulation referred to in paragraph 1 applies have effects which are incompatible with Article 81(3) of the Treaty in the territory of a Member State, or in a part thereof, which has all the characteristics of a distinct geographic market, the competition authority of that Member State may withdraw the benefit of the Regulation in question in respect of that territory.

CHAPTER X

**GENERAL PROVISIONS**

*Article 30*

**Publication of decisions**

1.   The Commission shall publish the decisions, which it takes pursuant to Articles 7 to 10, 23 and 24.

2.   The publication shall state the names of the parties and the main content of the decision, including any penalties imposed. It shall have regard to the legitimate interest of undertakings in the protection of their business secrets.

*Article 31*

**Review by the Court of Justice**

The Court of Justice shall have unlimited jurisdiction to review decisions whereby the Commission has fixed a fine or periodic penalty payment. It may cancel, reduce or increase the fine or periodic penalty payment imposed.

*Article 32*

**Exclusions**

This Regulation shall not apply to:

(a) international tramp vessel services as defined in Article 1(3)(a) of Regulation (EEC) No 4056/86;

(b) a maritime transport service that takes place exclusively between ports in one and the same Member State as foreseen in Article 1(2) of Regulation (EEC) No 4056/86;

(c) air transport between Community airports and third countries.

*Article 33*

**Implementing provisions**

1.    The Commission shall be authorised to take such measures as may be appropriate in order to apply this Regulation. The measures may concern, *inter alia*:

(a) the form, content and other details of complaints lodged pursuant to Article 7 and the procedure for rejecting complaints;

(b) the practical arrangements for the exchange of information and consultations provided for in Article 11;

(c) the practical arrangements for the hearings provided for in Article 27.

2.    Before the adoption of any measures pursuant to paragraph 1, the Commission shall publish a draft thereof and invite all interested parties to submit their comments within the time-limit it lays down, which may not be less than one month. Before publishing a draft measure and before adopting it, the Commission shall consult the Advisory Committee on Restrictive Practices and Dominant Positions.

CHAPTER XI

**TRANSITIONAL, AMENDING AND FINAL PROVISIONS**

*Article 34*

**Transitional provisions**

1.    Applications made to the Commission under Article 2 of Regulation No 17, notifications made under Articles 4 and 5 of that Regulation and the corresponding applications and notifications made under Regulations (EEC) No 1017/68, (EEC) No 4056/86 and (EEC) No 3975/87 shall lapse as from the date of application of this Regulation.

2.    Procedural steps taken under Regulation No 17 and Regulations (EEC) No 1017/68, (EEC) No 4056/86 and (EEC) No 3975/87 shall continue to have effect for the purposes of applying this Regulation.

*Article 35*

**Designation of competition authorities of Member States**

1.    The Member States shall designate the competition authority or authorities responsible for the application of Articles 81 and 82 of the Treaty in such a way that the provisions of this regulation are effectively complied with. The measures necessary to empower those authorities to apply those Articles shall be taken before 1 May 2004. The authorities designated may include courts.

2.    When enforcement of Community competition law is entrusted to national administrative and judicial authorities, the Member States may allocate different powers and functions to those different national authorities, whether administrative or judicial.

3.    The effects of Article 11(6) apply to the authorities designated by the Member States including courts that exercise functions regarding the preparation and the adoption of the types of decisions foreseen in Article 5. The effects of Article 11(6) do not extend to courts insofar as they act as review courts in respect of the types of decisions foreseen in Article 5.

4.    Notwithstanding paragraph 3, in the Member States where, for the adoption of certain types of decisions foreseen in Article 5, an authority brings an action before a judicial authority that is separate and different from the prosecuting authority and provided that the terms of this paragraph are complied with, the effects of Article 11(6) shall be limited to the authority prosecuting the case which shall withdraw its claim before the judicial authority when the Commission opens proceedings and this withdrawal shall bring the national proceedings effectively to an end.

*Article 36*

**Amendment of Regulation (EEC) No 1017/68**

Regulation (EEC) No 1017/68 is amended as follows:

1. Article 2 is repealed;

2. in Article 3(1), the words 'The prohibition laid down in Article 2' are replaced by the words 'The prohibition in Article 11(1) of the Treaty';

3. Article 4 is amended as follows:

   (a) In paragraph 1, the words 'The agreements, decisions and concerted practices referred to in Article 2' are replaced by the words 'Agreements, decisions and concerted practices pursuant to Article 81(1) of the Treaty';

   (b) Paragraph 2 is replaced by the following:

   '2.    If the implementation of any agreement, decision or concerted practice covered by paragraph 1 has, in a given case, effects which are incompatible with the requirements of Article 81(3) of the Treaty, undertakings or associations of undertakings may be required to make such effects cease.'

4. Articles 5 to 29 are repealed with the exception of Article 13(3) which continues to apply to decisions adopted pursuant to Article 5 of Regulation (EEC) No 1017/68 prior to the date of application of this Regulation until the date of expiration of those decisions;

5. in Article 30, paragraphs 2, 3 and 4 are deleted.

*Article 37*

**Amendment of Regulation (EEC) No 2988/74**

In Regulation (EEC) No 2988/74, the following Article is inserted:

'*Article 7a*

**Exclusion**

This Regulation shall not apply to measures taken under Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty (*).

_____
(*) OJ L 1, 4.1.2003, p. 1.'

*Article 38*

## Amendment of Regulation (EEC) No 4056/86

Regulation (EEC) No 4056/86 is amended as follows:

1. Article 7 is amended as follows:

   (a) Paragraph 1 is replaced by the following:

   '1. *Breach of an obligation*

   Where the persons concerned are in breach of an obligation which, pursuant to Article 5, attaches to the exemption provided for in Article 3, the Commission may, in order to put an end to such breach and under the conditions laid down in Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty (*) adopt a decision that either prohibits them from carrying out or requires them to perform certain specific acts, or withdraws the benefit of the block exemption which they enjoyed.

   _____
   (*) OJ L 1, 4.1.2003, p. 1.'

   (b) Paragraph 2 is amended as follows:

   (i) In point (a), the words 'under the conditions laid down in Section II' are replaced by the words 'under the conditions laid down in Regulation (EC) No 1/2003';

   (ii) The second sentence of the second subparagraph of point (c)(i) is replaced by the following:

   'At the same time it shall decide, in accordance with Article 9 of Regulation (EC) No 1/2003, whether to accept commitments offered by the undertakings concerned with a view, *inter alia*, to obtaining access to the market for non-conference lines.'

2. Article 8 is amended as follows:

   (a) Paragraph 1 is deleted.

   (b) In paragraph 2 the words 'pursuant to Article 10' are replaced by the words 'pursuant to Regulation (EC) No 1/2003'.

   (c) Paragraph 3 is deleted;

3. Article 9 is amended as follows:

   (a) In paragraph 1, the words 'Advisory Committee referred to in Article 15' are replaced by the words 'Advisory Committee referred to in Article 14 of Regulation (EC) No 1/2003';

   (b) In paragraph 2, the words 'Advisory Committee as referred to in Article 15' are replaced by the words 'Advisory Committee referred to in Article 14 of Regulation (EC) No 1/2003';

4. Articles 10 to 25 are repealed with the exception of Article 13(3) which continues to apply to decisions adopted pursuant to Article 81(3) of the Treaty prior to the date of application of this Regulation until the date of expiration of those decisions;

5. in Article 26, the words 'the form, content and other details of complaints pursuant to Article 10, applications pursuant to Article 12 and the hearings provided for in Article 23(1) and (2)' are deleted.

*Article 39*

## Amendment of Regulation (EEC) No 3975/87

Articles 3 to 19 of Regulation (EEC) No 3975/87 are repealed with the exception of Article 6(3) which continues to apply to decisions adopted pursuant to Article 81(3) of the Treaty prior to the date of application of this Regulation until the date of expiration of those decisions.

L 1/24     EN     Official Journal of the European Communities     4.1.2003

*Article 40*

**Amendment of Regulations No 19/65/EEC, (EEC) No 2821/71 and (EEC) No 1534/91**

Article 7 of Regulation No 19/65/EEC, Article 7 of Regulation (EEC) No 2821/71 and Article 7 of Regulation (EEC) No 1534/91 are repealed.

*Article 41*

**Amendment of Regulation (EEC) No 3976/87**

Regulation (EEC) No 3976/87 is amended as follows:

1. Article 6 is replaced by the following:

   '*Article 6*

   The Commission shall consult the Advisory Committee referred to in Article 14 of Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty (*) before publishing a draft Regulation and before adopting a Regulation.

   _____
   (*) OJ L 1, 4.1.2003, p. 1.'

2. Article 7 is repealed.

*Article 42*

**Amendment of Regulation (EEC) No 479/92**

Regulation (EEC) No 479/92 is amended as follows:

1. Article 5 is replaced by the following:

   '*Article 5*

   Before publishing the draft Regulation and before adopting the Regulation, the Commission shall consult the Advisory Committee referred to in Article 14 of Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty (*).

   _____
   (*) OJ L 1, 4.1.2003, p. 1.'

2. Article 6 is repealed.

*Article 43*

**Repeal of Regulations No 17 and No 141**

1.    Regulation No 17 is repealed with the exception of Article 8(3) which continues to apply to decisions adopted pursuant to Article 81(3) of the Treaty prior to the date of application of this Regulation until the date of expiration of those decisions.

2.    Regulation No 141 is repealed.

3.    References to the repealed Regulations shall be construed as references to this Regulation.

*Article 44*

**Report on the application of the present Regulation**

Five years from the date of application of this Regulation, the Commission shall report to the European Parliament and the Council on the functioning of this Regulation, in particular on the application of Article 11(6) and Article 17.

On the basis of this report, the Commission shall assess whether it is appropriate to propose to the Council a revision of this Regulation.

*Article 45*

**Entry into force**

This Regulation shall enter into force on the 20th day following that of its publication in the *Official Journal of the European Communities.*

It shall apply from 1 May 2004.


This Regulation shall be binding in its entirety and directly applicable in all Member States.


Done at Brussels, 16 December 2002.

*For the Council*
*The President*
M. FISCHER BOEL.

# EXHIBIT 2

27.4.2004    EN    Official Journal of the European Union    C 101/65

**Commission Notice on the handling of complaints by the Commission under Articles 81 and 82 of the EC Treaty**

(2004/C 101/05)

**(Text with EEA relevance)**

## I. INTRODUCTION AND SUBJECT-MATTER OF THE NOTICE

1. Regulation 1/2003 ([1]) establishes a system of parallel competence for the application of Articles 81 and 82 of the EC Treaty by the Commission and the Member States' competition authorities and courts. The Regulation recognises in particular the complementary functions of the Commission and Member States' competition authorities acting as public enforcers and the Member States' courts that rule on private lawsuits in order to safeguard the rights of individuals deriving from Articles 81 and 82 ([2]).

2. Under Regulation 1/2003, the public enforcers may focus their action on the investigation of serious infringements of Articles 81 and 82 which are often difficult to detect. For their enforcement activity, they benefit from information supplied by undertakings and by consumers in the market.

3. The Commission therefore wishes to encourage citizens and undertakings to address themselves to the public enforcers to inform them about suspected infringements of the competition rules. At the level of the Commission, there are two ways to do this, one is by lodging a complaint pursuant to Article 7(2) of Regulation 1/2003. Under Articles 5 to 9 of Regulation 773/2004 ([3]), such complaints must fulfil certain requirements.

4. The other way is the provision of market information that does not have to comply with the requirements for complaints pursuant to Article 7(2) of Regulation 1/2003. For this purpose, the Commission has created a special website to collect information from citizens and undertakings and their associations who wish to inform the Commission about suspected infringements of Articles 81 and 82. Such information can be the starting point for an investigation by the Commission ([4]). Information about suspected infringements can be supplied to the following address:

   http://europa.eu.int/dgcomp/info-on-anti-competitive-practices

   or to:

   Commission européenne/Europese Commissie
   Competition DG
   B-1049 Bruxelles/Brussel

5. Without prejudice to the interpretation of Regulation 1/2003 and of Commission Regulation 773/2004 by the Community Courts, the present Notice intends to provide guidance to citizens and undertakings that are seeking relief from suspected infringements of the competition rules. The Notice contains two main parts:

— Part II gives indications about the choice between complaining to the Commission or bringing a lawsuit before a national court. Moreover, it recalls the principles related to the work-sharing between the Commission and the national competition authorities in the enforcement system established by Regulation 1/2003 that are explained in the Notice on cooperation within the network of competition authorities ([5]).

— Part III explains the procedure for the treatment of complaints pursuant to Article 7(2) of Regulation 1/2003 by the Commission.

6. This Notice does not address the following situations:

— complaints lodged by Member States pursuant to Article 7(2) of Regulation 1/2003,

— complaints that ask the Commission to take action against a Member State pursuant to Article 86(3) in conjunction with Articles 81 or 82 of the Treaty,

— complaints relating to Article 87 of the Treaty on state aids,

— complaints relating to infringements by Member States that the Commission may pursue in the framework of Article 226 of the Treaty ([6]).

## II. DIFFERENT POSSIBILITIES FOR LODGING COMPLAINTS ABOUT SUSPECTED INFRINGEMENTS OF ARTICLES 81 OR 82

### A. COMPLAINTS IN THE NEW ENFORCEMENT SYSTEM ESTABLISHED BY REGULATION 1/2003

7. Depending on the nature of the complaint, a complainant may bring his complaint either to a national court or to a competition authority that acts as public enforcer. The present chapter of this Notice intends to help potential complainants to make an informed choice about whether to address themselves to the Commission, to one of the Member States' competition authorities or to a national court.

C 101/66    [EN]    Official Journal of the European Union    27.4.2004

8. While national courts are called upon to safeguard the rights of individuals and are thus bound to rule on cases brought before them, public enforcers cannot investigate all complaints, but must set priorities in their treatment of cases. The Court of Justice has held that the Commission, entrusted by Article 85(1) of the EC Treaty with the task of ensuring application of the principles laid down in Articles 81 and 82 of the Treaty, is responsible for defining and implementing the orientation of Community competition policy and that, in order to perform that task effectively, it is entitled to give differing degrees of priority to the complaints brought before it [7].

9. Regulation 1/2003 empowers Member States' courts and Member States' competition authorities to apply Articles 81 and 82 in their entirety alongside the Commission. Regulation 1/2003 pursues as one principal objective that Member States' courts and competition authorities should participate effectively in the enforcement of Articles 81 and 82 [8].

10. Moreover, Article 3 of Regulation 1/2003 provides that Member States' courts and competition authorities have to apply Articles 81 and 82 to all cases of agreements or conduct that are capable of affecting trade between Member States to which they apply their national competition laws. In addition, Articles 11 and 15 of the Regulation create a range of mechanisms by which Member States' courts and competition authorities cooperate with the Commission in the enforcement of Articles 81 and 82.

11. In this new legislative framework, the Commission intends to refocus its enforcement resources along the following lines:

— enforce the EC competition rules in cases for which it is well placed to act [9], concentrating its resources on the most serious infringements [10];

— handle cases in relation to which the Commission should act with a view to define Community competition policy and/or to ensure coherent application of Articles 81 or 82.

B. THE COMPLEMENTARY ROLES OF PRIVATE AND PUBLIC ENFORCEMENT

12. It has been consistently held by the Community Courts that national courts are called upon to safeguard the rights of individuals created by the direct effect of Articles 81(1) and 82 [11].

13. National courts can decide upon the nullity or validity of contracts and only national courts can grant damages to an individual in case of an infringement of Articles 81 and 82. Under the case law of the Court of Justice, any individual can claim damages for loss caused to him by a contract or by conduct which restricts or distorts competition, in order to ensure the full effectiveness of the Community competition rules. Such actions for damages before the national courts can make a significant contribution to the maintenance of effective competition in the Community as they discourage undertakings from concluding or applying restrictive agreements or practices [12].

14. Regulation 1/2003 takes express account of the fact that national courts have an essential part to play in applying the EC competition rules [13]. By extending the power to apply Article 81(3) to national courts it removes the possibility for undertakings to delay national court proceedings by a notification to the Commission and thus eliminates an obstacle for private litigation that existed under Regulation No 17 [14].

15. Without prejudice to the right or obligation of national courts to address a preliminary question to the Court of Justice in accordance with Article 234 EC, Article 15(1) of Regulation 1/2003 provides expressly that national courts may ask for opinions or information from the Commission. This provision aims at facilitating the application of Articles 81 and 82 by national courts [15].

16. Action before national courts has the following advantages for complainants:

— National courts may award damages for loss suffered as a result of an infringement of Article 81 or 82.

— National courts may rule on claims for payment or contractual obligations based on an agreement that they examine under Article 81.

— It is for the national courts to apply the civil sanction of nullity of Article 81(2) in contractual relationships between individuals [16]. They can in particular assess, in the light of the applicable national law, the scope and consequences of the nullity of certain contractual provisions under Article 81(2), with particular regard to all the other matters covered by the agreement [17].

— National courts are usually better placed than the Commission to adopt interim measures [18].

27.4.2004    EN    Official Journal of the European Union    C 101/67

— Before national courts, it is possible to combine a claim under Community competition law with other claims under national law.

— Courts normally have the power to award legal costs to the successful applicant. This is never possible in an administrative procedure before the Commission.

17. The fact that a complainant can secure the protection of his rights by an action before a national court, is an important element that the Commission may take into account in its examination of the Community interest for investigating a complaint ([19]).

18. The Commission holds the view that the new enforcement system established by Regulation 1/2003 strengthens the possibilities for complainants to seek and obtain effective relief before national courts.

### C. WORK-SHARING BETWEEN THE PUBLIC ENFORCERS IN THE EUROPEAN COMMUNITY

19. Regulation 1/2003 creates a system of parallel competence for the application of Articles 81 and 82 by empowering Member States' competition authorities to apply Articles 81 and 82 in their entirety (Article 5). Decentralised enforcement by Member States' competition authorities is further encouraged by the possibility to exchange information (Article 12) and to provide each other assistance with investigations (Article 22).

20. The Regulation does not regulate the work-sharing between the Commission and the Member States' competition authorities but leaves the division of case work to the cooperation of the Commission and the Member States' competition authorities inside the European Competition Network (ECN). The Regulation pursues the objective of ensuring effective enforcement of Articles 81 and 82 through a flexible division of case work between the public enforcers in the Community.

21. Orientations for the work sharing between the Commission and the Member States' competition authorities are laid down in a separate Notice ([20]). The guidance contained in that Notice, which concerns the relations between the public enforcers, will be of interest to complainants as it permits them to address a complaint to the authority most likely to be well placed to deal with their case.

22. The Notice on cooperation within the Network of Competition Authorities states in particular ([21]):

'An authority can be considered to be well placed to deal with a case if the following three cumulative conditions are met:

— the agreement or practice has substantial direct actual or foreseeable effects on competition within its territory, is implemented within or originates from its territory;

— the authority is able effectively to bring to an end the entire infringement, i.e. it can adopt a cease-and desist order, the effect of which will be sufficient to bring an end to the infringement and it can, where appropriate, sanction the infringement adequately;

— it can gather, possibly with the assistance of other authorities, the evidence required to prove the infringement.

The above criteria indicate that a material link between the infringement and the territory of a Member State must exist in order for that Member State's competition authority to be considered well placed. It can be expected that in most cases the authorities of those Member States where competition is substantially affected by an infringement will be well placed provided they are capable of effectively bringing the infringement to an end through either single or parallel action unless the Commission is better placed to act (see below [. . .]).

It follows that a single NCA is usually well placed to deal with agreements or practices that substantially affect competition mainly within its territory [. . .].

Furthermore single action of an NCA might also be appropriate where, although more than one NCA can be regarded as well placed, the action of a single NCA is sufficient to bring the entire infringement to an end [. . .].

Parallel action by two or three NCAs may be appropriate where an agreement or practice has substantial effects on competition mainly in their respective territories and the action of only one NCA would not be sufficient to bring the entire infringement to an end and/or to sanction it adequately [. . .].

The authorities dealing with a case in parallel action will endeavour to coordinate their action to the extent possible. To that effect, they may find it useful to designate one of them as a lead authority and to delegate tasks to the lead authority such as for example the coordination of investigative measures, while each authority remains responsible for conducting its own proceedings.

The Commission is particularly well placed if one or several agreement(s) or practice(s), including networks of similar agreements or practices, have effects on competition in more than three Member States (cross-border markets covering more than three Member States or several national markets) [. . .].

Moreover, the Commission is particularly well placed to deal with a case if it is closely linked to other Community provisions which may be exclusively or more effectively applied by the Commission, if the Community interest requires the adoption of a Commission decision to develop Community competition policy when a new competition issue arises or to ensure effective enforcement.'.

23. Within the European Competition Network, information on cases that are being investigated following a complaint will be made available to the other members of the network before or without delay after commencing the first formal investigative measure (²²). Where the same complaint has been lodged with several authorities or where a case has not been lodged with an authority that is well placed, the members of the network will endeavour to determine within an indicative time-limit of two months which authority or authorities should be in charge of the case.

24. Complainants themselves have an important role to play in further reducing the potential need for reallocation of a case originating from their complaint by referring to the orientations on work sharing in the network set out in the present chapter when deciding on where to lodge their complaint. If nonetheless a case is reallocated within the network, the undertakings concerned and the complainant(s) are informed as soon as possible by the competition authorities involved (²³).

25. The Commission may reject a complaint in accordance with Article 13 of Regulation 1/2003, on the grounds that a Member State competition authority is dealing or has dealt with the case. When doing so, the Commission must, in accordance with Article 9 of Regulation

773/2004, inform the complainant without delay of the national competition authority which is dealing or has already dealt with the case.

### III. THE COMMISSION'S HANDLING OF COMPLAINTS PURSUANT TO ARTICLE 7(2) OF REGULATION 1/2003

#### A. GENERAL

26. According to Article 7(2) of Regulation 1/2003 natural or legal persons that can show a legitimate interest (²⁴) are entitled to lodge a complaint to ask the Commission to find an infringement of Articles 81 and 82 EC and to require that the infringement be brought to an end in accordance with Article 7(1) of Regulation 1/2003. The present part of this Notice explains the requirements applicable to complaints based on Article 7(2) of Regulation 1/2003, their assessment and the procedure followed by the Commission.

27. The Commission, unlike civil courts, whose task is to safeguard the individual rights of private persons, is an administrative authority that must act in the public interest. It is an inherent feature of the Commission's task as public enforcer that it has a margin of discretion to set priorities in its enforcement activity (²⁵).

28. The Commission is entitled to give different degrees of priority to complaints made to it and may refer to the Community interest presented by a case as a criterion of priority (²⁶). The Commission may reject a complaint when it considers that the case does not display a sufficient Community interest to justify further investigation. Where the Commission rejects a complaint, the complainant is entitled to a decision of the Commission (²⁷) without prejudice to Article 7(3) of Regulation 773/2004.

#### B. MAKING A COMPLAINT PURSUANT TO ARTICLE 7(2) OF REGULATION 1/2003

##### (a) Complaint form

29. A complaint pursuant to Article 7(2) of Regulation 1/2003 can only be made about an alleged infringement of Articles 81 or 82 with a view to the Commission taking action under Article 7(1) of Regulation 1/2003. A complaint under Article 7(2) of Regulation 1/2003 has to comply with Form C mentioned in Article 5(1) of Regulation 773/2004 and annexed to that Regulation.

30. Form C is available at http://europa.eu.int/dgcomp/complaints-form and is also annexed to this Notice. The complaint must be submitted in three paper copies as well as, if possible, an electronic copy. In addition, the complainant must provide a non-confidential version of the complaint (Article 5(2) of Regulation 773/2004). Electronic transmission to the Commission is possible via the website indicated, the paper copies should be sent to the following address:

Commission européenne/Europese Commissie
Competition DG
B-1049 Bruxelles/Brussel

31. Form C requires complainants to submit comprehensive information in relation to their complaint. They should also provide copies of relevant supporting documentation reasonably available to them and, to the extent possible, provide indications as to where relevant information and documents that are unavailable to them could be obtained by the Commission. In particular cases, the Commission may dispense with the obligation to provide information in relation to part of the information required by Form C (Article 5(1) of Regulation 773/2004). The Commission holds the view that this possibility can in particular play a role to facilitate complaints by consumer associations where they, in the context of an otherwise substantiated complaint, do not have access to specific pieces of information from the sphere of the undertakings complained of.

32. Correspondence to the Commission that does not comply with the requirements of Article 5 of Regulation 773/2004 and therefore does not constitute a complaint within the meaning of Article 7(2) of Regulation 1/2003 will be considered by the Commission as general information that, where it is useful, may lead to an own-initiative investigation (cf. point 4 above).

(b) **Legitimate interest**

33. The status of formal complainant under Article 7(2) of Regulation 1/2003 is reserved to legal and natural persons who can show a legitimate interest [28]. Member States are deemed to have a legitimate interest for all complaints they choose to lodge.

34. In the past practice of the Commission, the condition of legitimate interest was not often a matter of doubt as most complainants were in a position of being directly and adversely affected by the alleged infringement. However, there are situations where the condition of a 'legitimate interest' in Article 7(2) requires further analysis to conclude that it is fulfilled. Useful guidance can best be provided by a non-exhaustive set of examples.

35. The Court of First Instance has held that an association of undertakings may claim a legitimate interest in lodging a complaint regarding conduct concerning its members, even if it is not directly concerned, as an undertaking operating in the relevant market, by the conduct complained of, provided that, first, it is entitled to represent the interests of its members and secondly, the conduct complained of is liable to adversely affect the interests of its members [29]. Conversely, the Commission has been found to be entitled not to pursue the complaint of an association of undertakings whose members were not involved in the type of business transactions complained of [30].

36. From this case law, it can be inferred that undertakings (themselves or through associations that are entitled to represent their interests) can claim a legitimate interest where they are operating in the relevant market or where the conduct complained of is liable to directly and adversely affect their interests. This confirms the established practice of the Commission which has accepted that a legitimate interest can, for instance, be claimed by the parties to the agreement or practice which is the subject of the complaint, by competitors whose interests have allegedly been damaged by the behaviour complained of or by undertakings excluded from a distribution system.

37. Consumer associations can equally lodge complaints with the Commission [31]. The Commission moreover holds the view that individual consumers whose economic interests are directly and adversely affected insofar as they are the buyers of goods or services that are the object of an infringement can be in a position to show a legitimate interest [32].

38. However, the Commission does not consider as a legitimate interest within the meaning of Article 7(2) the interest of persons or organisations that wish to come forward on general interest considerations without showing that they or their members are liable to be directly and adversely affected by the infringement (pro bono publico).

39. Local or regional public authorities may be able to show a legitimate interest in their capacity as buyers or users of goods or services affected by the conduct complained of. Conversely, they cannot be considered as showing a legitimate interest within the meaning of Article 7(2) of Regulation 1/2003 to the extent that they bring to the attention of the Commission alleged infringements pro bono publico.

40. Complainants have to demonstrate their legitimate interest. Where a natural or legal person lodging a complaint is unable to demonstrate a legitimate interest, the Commission is entitled, without prejudice to its right to initiate proceedings of its own initiative, not to pursue the complaint. The Commission may ascertain whether this condition is met at any stage of the investigation [33].

C 101/70        EN        Official Journal of the European Union                27.4.2004

C. ASSESSMENT OF COMPLAINTS

(a) **Community interest**

41. Under the settled case law of the Community Courts, the Commission is not required to conduct an investigation in each case [34] or, *a fortiori*, to take a decision within the meaning of Article 249 EC on the existence or non-existence of an infringement of Articles 81 or 82 [35], but is entitled to give differing degrees of priority to the complaints brought before it and refer to the Community interest in order to determine the degree of priority to be applied to the various complaints it receives [36]. The position is different only if the complaint falls within the exclusive competence of the Commission [37].

42. The Commission must however examine carefully the factual and legal elements brought to its attention by the complainant in order to assess the Community interest in further investigation of a case [38].

43. The assessment of the Community interest raised by a complaint depends on the circumstances of each individual case. Accordingly, the number of criteria of assessment to which the Commission may refer is not limited, nor is the Commission required to have recourse exclusively to certain criteria. As the factual and legal circumstances may differ considerably from case to case, it is permissible to apply new criteria which had not before been considered [39]. Where appropriate, the Commission may give priority to a single criterion for assessing the Community interest [40].

44. Among the criteria which have been held relevant in the case law for the assessment of the Community interest in the (further) investigation of a case are the following:

— The Commission can reject a complaint on the ground that the complainant can bring an action to assert its rights before national courts [41].

— The Commission may not regard certain situations as excluded in principle from its purview under the task entrusted to it by the Treaty but is required to assess in each case how serious the alleged infringements are and how persistent their consequences are. This means in particular that it must take into account the duration and the extent of the infringements complained of and their effect on the competition situation in the Community [42].

— The Commission may have to balance the significance of the alleged infringement as regards the functioning of the common market, the probability of establishing the existence of the infringement and the scope of the investigation required in order to fulfil its task of ensuring that Articles 81 and 82 of the Treaty are complied with [43].

— While the Commission's discretion does not depend on how advanced the investigation of a case is, the stage of the investigation forms part of the circumstances of the case which the Commission may have to take into consideration [44].

— The Commission may decide that it is not appropriate to investigate a complaint where the practices in question have ceased. However, for this purpose, the Commission will have to ascertain whether anti-competitive effects persist and if the seriousness of the infringements or the persistence of their effects does not give the complaint a Community interest [45].

— The Commission may also decide that it is not appropriate to investigate a complaint where the undertakings concerned agree to change their conduct in such a way that it can consider that there is no longer a sufficient Community interest to intervene [46].

45. Where it forms the view that a case does not display sufficient Community interest to justify (further) investigation, the Commission may reject the complaint on that ground. Such a decision can be taken either before commencing an investigation or after taking investigative measures [47]. However, the Commission is not obliged to set aside a complaint for lack of Community interest [48].

(b) **Assessment under Articles 81 and 82**

46. The examination of a complaint under Articles 81 and 82 involves two aspects, one relating to the facts to be established to prove an infringement of Articles 81 or 82 and the other relating to the legal assessment of the conduct complained of.

47. Where the complaint, while complying with the requirements of Article 5 of Regulation 773/2004 and Form C, does not sufficiently substantiate the allegations put forward, it may be rejected on that ground [49]. In order to reject a complaint on the ground that the conduct complained of does not infringe the EC competition rules or does not fall within their scope of application, the Commission is not obliged to take into account circumstances that have not been brought to its attention by the complainant and that it could only have uncovered by the investigation of the case [50].

27.4.2004     EN     Official Journal of the European Union     C 101/71

48. The criteria for the legal assessment of agreements or practices under Articles 81 and 82 cannot be dealt with exhaustively in the present Notice. However, potential complainants should refer to the extensive guidance available from the Commission [51], in addition to other sources and in particular the case law of the Community Courts and the case practice of the Commission. Four specific issues are mentioned in the following points with indications on where to find further guidance.

49. Agreements and practices fall within the scope of application of Articles 81 and 82 where they are capable of affecting trade between Member States. Where an agreement or practice does not fulfil this condition, national competition law may apply, but not EC competition law. Extensive guidance on this subject can be found in the Notice on the effect on trade concept [52].

50. Agreements falling within the scope of Article 81 may be agreements of minor importance which are deemed not to restrict competition appreciably. Guidance on this issue can be found in the Commission's *de minimis* Notice [53].

51. Agreements that fulfil the conditions of a block exemption regulation are deemed to satisfy the conditions of Article 81(3) [54]. For the Commission to withdraw the benefit of the block exemption pursuant to Article 29 of Regulation 1/2003, it must find that upon individual assessment an agreement to which the exemption regulation applies has certain effects which are incompatible with Article 81(3).

52. Agreements that restrict competition within the meaning of Article 81(1) EC may fulfil the conditions of Article 81(3) EC. Pursuant to Article 1(2) of Regulation 1/2003 and without a prior administrative decision being required, such agreements are not prohibited. Guidance on the conditions to be fulfilled by an agreement pursuant to Article 81(3) can be found in the Notice on Article 81(3) [55].

### D. THE COMMISSION'S PROCEDURES WHEN DEALING WITH COMPLAINTS

#### (a) Overview

53. As recalled above, the Commission is not obliged to carry out an investigation on the basis of every complaint submitted with a view to establishing whether an infringement has been committed. However, the Commission is under a duty to consider carefully the factual and legal issues brought to its attention by the complainant, in order to assess whether those issues indicate conduct which is liable to infringe Articles 81 and 82 [56].

54. In the Commission's procedure for dealing with complaints, different stages can be distinguished [57].

55. During the first stage, following the submission of the complaint, the Commission examines the complaint and may collect further information in order to decide what action it will take on the complaint. That stage may include an informal exchange of views between the Commission and the complainant with a view to clarifying the factual and legal issues with which the complaint is concerned. In this stage, the Commission may give an initial reaction to the complainant allowing the complainant an opportunity to expand on his allegations in the light of that initial reaction.

56. In the second stage, the Commission may investigate the case further with a view to initiating proceedings pursuant to Article 7(1) of Regulation 1/2003 against the undertakings complained of. Where the Commission considers that there are insufficient grounds for acting on the complaint, it will inform the complainant of its reasons and offer the complainant the opportunity to submit any further comments within a time-limit which it fixes (Article 7(1) of Regulation 773/2004).

57. If the complainant fails to make known its views within the time-limit set by the Commission, the complaint is deemed to have been withdrawn (Article 7(3) of Regulation 773/2004). In all other cases, in the third stage of the procedure, the Commission takes cognisance of the observations submitted by the complainant and either initiates a procedure against the subject of the complaint or adopts a decision rejecting the complaint [58].

58. Where the Commission rejects a complaint pursuant to Article 13 of Regulation 1/2003 on the grounds that another authority is dealing or has dealt with the case, the Commission proceeds in accordance with Article 9 of Regulation 773/2004.

59. Throughout the procedure, complainants benefit from a range of rights as provided in particular in Articles 6 to 8 of Regulation 773/2004. However, proceedings of the Commission in competition cases do not constitute adversarial proceedings between the complainant on the one hand and the companies which are the subject of the investigation on the other hand. Accordingly, the procedural rights of complainants are less far-reaching than the right to a fair hearing of the companies which are the subject of an infringement procedure [59].

C 101/72    EN    Official Journal of the European Union    27.4.2004

(b) **Indicative time limit for informing the complainant of the Commission's proposed action**

60. The Commission is under an obligation to decide on complaints within a reasonable time [60]. What is a reasonable duration depends on the circumstances of each case and in particular, its context, the various procedural steps followed by the Commission, the conduct of the parties in the course of the procedure, the complexity of the case and its importance for the various parties involved [61].

61. The Commission will in principle endeavour to inform complainants of the action that it proposes to take on a complaint within an indicative time frame of four months from the reception of the complaint. Thus, subject to the circumstances of the individual case and in particular the possible need to request complementary information from the complainant or third parties, the Commission will in principle inform the complainant within four months whether or not it intends to investigate its case further. This time-limit does not constitute a binding statutory term.

62. Accordingly, within this four month period, the Commission may communicate its proposed course of action to the complainant as an initial reaction within the first phase of the procedure (see point 55 above). The Commission may also, where the examination of the complaint has progressed to the second stage (see point 56 above), directly proceed to informing the complainant about its provisional assessment by a letter pursuant to Article 7(1) of Regulation 773/2004.

63. To ensure the most expeditious treatment of their complaint, it is desirable that complainants cooperate diligently in the procedures [62], for example by informing the Commission of new developments.

(c) **Procedural rights of the complainant**

64. Where the Commission addresses a statement of objections to the companies complained of pursuant to Article 10(1) of Regulation 773/2004, the complainant is entitled to receive a copy of this document from which business secrets and other confidential information of the companies concerned have been removed (non-confidential version of the statement of objections; cf. Article 6(1) of Regulation 773/2004). The complainant is invited to comment in writing on the statement of objections. A time-limit will be set for such written comments.

65. Furthermore, the Commission may, where appropriate, afford complainants the opportunity of expressing their views at the oral hearing of the parties to which a statement of objections has been addressed, if the complainants so request in their written comments [63].

66. Complainants may submit, of their own initiative or following a request by the Commission, documents that contain business secrets or other confidential information. Confidential information will be protected by the Commission [64]. Under Article 16 of Regulation 773/2004, complainants are obliged to identify confidential information, give reasons why the information is considered confidential and submit a separate non-confidential version when they make their views known pursuant to Article 6(1) and 7(1) of Regulation 773/2004, as well as when they subsequently submit further information in the course of the same procedure. Moreover, the Commission may, in all other cases, request complainants which produce documents or statements to identify the documents or parts of the documents or statements which they consider to be confidential. It may in particular set a deadline for the complainant to specify why it considers a piece of information to be confidential and to provide a non-confidential version, including a concise description or non-confidential version of each piece of information deleted.

67. The qualification of information as confidential does not prevent the Commission from disclosing and using information where that is necessary to prove an infringement of Articles 81 or 82 [65]. Where business secrets and confidential information are necessary to prove an infringement, the Commission must assess for each individual document whether the need to disclose is greater than the harm which might result from disclosure.

68. Where the Commission takes the view that a complaint should not be further examined, because there is no sufficient Community interest in pursuing the case further or on other grounds, it will inform the complainant in the form of a letter which indicates its legal basis (Article 7(1) of Regulation 773/2004), sets out the reasons that have led the Commission to provisionally conclude in the sense indicated and provides the complainant with the opportunity to submit supplementary information or observations within a time-limit set by the Commission. The Commission will also indicate the consequences of not replying pursuant to Article 7(3) of Regulation 773/2004, as explained below.

69. Pursuant to Article 8(1) of Regulation 773/2004, the complainant has the right to access the information on which the Commission bases its preliminary view. Such access is normally provided by annexing to the letter a copy of the relevant documents.

70. The time-limit for observations by the complainant on the letter pursuant to Article 7(1) of Regulation 773/2004 will be set in accordance with the circumstances of the case. It will not be shorter than four weeks (Article 17(2) of Regulation 773/2004). If the complainant does not respond within the time-limit set, the complaint is deemed to have been withdrawn pursuant to Article 7(3) of Regulation 773/2004. Complainants are also entitled to withdraw their complaint at any time if they so wish.

71. The complainant may request an extension of the time-limit for the provision of comments. Depending on the circumstances of the case, the Commission may grant such an extension.

72. In that case, where the complainant submits supplementary observations, the Commission takes cognisance of those observations. Where they are of such a nature as to make the Commission change its previous course of action, it may initiate a procedure against the companies complained of. In this procedure, the complainant has the procedural rights explained above.

73. Where the observations of the complainant do not alter the Commission's proposed course of action, it rejects the complaint by decision ([66]).

(d) **The Commission decision rejecting a complaint**

74. Where the Commission rejects a complaint by decision pursuant to Article 7(2) of Regulation 773/2004, it must state the reasons in accordance with Article 253 EC, i.e. in a way that is appropriate to the act at issue and takes into account the circumstances of each case.

75. The statement of reasons must disclose in a clear and unequivocal fashion the reasoning followed by the Commission in such a way as to enable the complainant to ascertain the reasons for the decision and to enable the competent Community Court to exercise its power of review. However, the Commission is not obliged to adopt a position on all the arguments relied on by the complainant in support of its complaint. It only needs to set out the facts and legal considerations which are of decisive importance in the context of the decision ([67]).

76. Where the Commission rejects a complaint in a case that also gives rise to a decision pursuant to Article 10 of Regulation 1/2003 (Finding of inapplicability of Articles 81 or 82) or Article 9 of Regulation 1/2003 (Commitments), the decision rejecting a complaint may

refer to that other decision adopted on the basis of the provisions mentioned.

77. A decision to reject a complaint is subject to appeal before the Community Courts ([68]).

78. A decision rejecting a complaint prevents complainants from requiring the reopening of the investigation unless they put forward significant new evidence. Accordingly, further correspondence on the same alleged infringement by former complainants cannot be regarded as a new complaint unless significant new evidence is brought to the attention of the Commission. However, the Commission may re-open a file under appropriate circumstances.

79. A decision to reject a complaint does not definitively rule on the question of whether or not there is an infringement of Articles 81 or 82, even where the Commission has assessed the facts on the basis of Articles 81 and 82. The assessments made by the Commission in a decision rejecting a complaint therefore do not prevent a Member State court or competition authority from applying Articles 81 and 82 to agreements and practices brought before it. The assessments made by the Commission in a decision rejecting a complaint constitute facts which Member States' courts or competition authorities may take into account in examining whether the agreements or conduct in question are in conformity with Articles 81 and 82 ([69]).

(e) **Specific situations**

80. According to Article 8 of Regulation 1/2003 the Commission may on its own initiative order interim measures where there is the risk of serious and irreparable damage to competition. Article 8 of Regulation 1/2003 makes it clear that interim measures cannot be applied for by complainants under Article 7(2) of Regulation 1/2003. Requests for interim measures by undertakings can be brought before Member States' courts which are well placed to decide on such measures ([70]).

81. Some persons may wish to inform the Commission about suspected infringements of Articles 81 or 82 without having their identity revealed to the undertakings concerned by the allegations. These persons are welcome to contact the Commission. The Commission is bound to respect an informant's request for anonymity ([71]), unless the request to remain anonymous is manifestly unjustified.

C 101/74    EN    Official Journal of the European Union    27.4.2004

---

(¹) Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty (OJ L 1, 4.1.2003, pages 1-25).

(²) Cf. in particular Recitals 3-7 and 35 of Regulation 1/2003.

(³) Commission Regulation (EC) No 773/2004 of 7 April 2004 relating to the conduct of proceedings by the Commission pursuant to Articles 81 and 82 of the EC Treaty (OJ 123, 27.4.2004).

(⁴) The Commission handles correspondence from informants in accordance with its principles of good administrative practice.

(⁵) Notice on cooperation within the Network of competition authorities (p. 43).

(⁶) For the handling of such complaints, cf. Commission communication of 10 October 2002, COM(2002) 141.

(⁷) Case C-344/98, Masterfoods v HB Ice Cream, [2000] ECR I-11369, para 46; Case C-119/97 P, Union française de l'express (Ufex) and Others v Commission of the European Communities, [1999] ECR I-1341, para 88; Case T-24/90, Automec v Commission of the European Communities, [1992] ECR II-2223, paras 73-77.

(⁸) Cf. in particular Articles 5, 6, 11, 12, 15, 22, 29, 35 and Recitals 2 to 4 and 6 to 8 of Regulation 1/2003.

(⁹) Cf. Notice on cooperation within the network of competition authorities ..., points 5 ss.

(¹⁰) Cf. Recital 3 of Regulation 1/2003.

(¹¹) Settled case law, cf. Case 127/73, Belgische Radio en Televisie (BRT) v SABAM and Fonior, [1974] ECR 51, para 16; Case C-282/95 P, Guérin automobiles v Commission of the European Communities, [1997] ECR I-1503, para 39; Case C-453/99, Courage v Bernhard Crehan, [2001] ECR I-6297, para 23.

(¹²) Case C-453/99, Courage v Bernhard Crehan, [2001] ECR I-6297, paras 26 and 27; the power of national courts to grant damages is also underlined in Recital 7 of Regulation 1/2003.

(¹³) Cf. Articles 1, 6 and 15 as well as Recital 7 of Regulation 1/2003.

(¹⁴) Regulation No 17: First Regulation implementing Articles 85 and 86 of the Treaty; OJ P 13 of 21 February 1962, p. 204-211; English special edition: Series I Chapter 1959-1962 p. 87. Regulation No 17 is repealed by Article 43 of Regulation 1/2003 with effect from 1 May 2004.

(¹⁵) For more detailed explanations of this mechanism, cf. Notice on the co-operation between the Commission and the courts of the EU Member States in the application of Articles 81 and 82 EC ...

(¹⁶) Case T-24/90, Automec v Commission of the European Communities, [1992] ECR II-2223, para 93.

(¹⁷) Case C-230/96, Cabour and Nord Distribution Automobile v Arnor 'SOCO', [1998] ECR I-2055, para 51; Joined Cases T-185/96, T-189/96 and T-190/96, Dalmasso and Others v Commission of the European Communities, [1999] ECR II-93, para 50.

(¹⁸) Cf. Article 8 of Regulation 1/2003 and para 80 below. Depending on the case, Member States' competition authorities may equally be well placed to adopt interim measures.

(¹⁹) Cf. points 41 ss. below.

(²⁰) Notice on cooperation within the Network of competition authorities (p. 43).

(²¹) Notice on cooperation within the Network of competition authorities ..., points 8-15.

(²²) Article 11(2) and (3) of Regulation 1/2003; Notice on cooperation within the Network of Competition Authorities ..., points 16/17.

(²³) Notice on cooperation within the Network of Competition Authorities, ..., point 34.

(²⁴) For more extensive explanations on this notion in particular, cf. points 33 ss. below.

(²⁵) Case C-119/97 P, Union française de l'express (Ufex) and Others v Commission of the European Communities, [1999] ECR I-1341, para 88; Case T-24/90, Automec v Commission of the European Communities, [1992] ECR II-2223, paras 73-77 and 85.

(²⁶) Settled case law since Case T-24/90, Automec v Commission of the European Communities, [1992] ECR II-2223, para 85.

(²⁷) Case C-282/95 P, Guérin automobiles v Commission of the European Communities, [1997] ECR I-1503, para 36.

(²⁸) Cf. Article 5(1) of Regulation 773/2004.

(²⁹) Case T-114/92, Bureau Européen des Médias et de l'Industrie Musicale (BEMIM) v Commission of the European Communities, [1995] ECR II-147, para 28. Associations of undertakings were also the complainants in the cases underlying the judgments in Case 298/83, Comité des industries cinématographiques des Communautés européennes (CICCE) v Commission of the European Communities, [1985] ECR 1105 and Case T-319/99, Federacion Nacional de Empresas (FENIN) v Commission of the European Communities, not yet published in [2003] ECR.

(³⁰) Joined Cases T-133/95 and T-204/95, International Express Carriers Conference (IECC) v Commission of the European Communities, [1998] ECR II-3645, paras 79-83.

(³¹) Case T-37/92, Bureau Européen des Unions des Consommateurs (BEUC) v Commission of the European Communities, [1994] ECR II-285, para 36.

(³²) This question is currently raised in a pending procedure before the Court of First Instance (Joined cases T-213 and 214/01). The Commission has also accepted as complainant an individual consumer in its Decision of 9 December 1998 in Case IV/D-2/34.466, Greek Ferries, OJ L 109/24 of 27 April 1999, para 1.

(³³) Joined Cases T-133/95 and T-204/95, International Express Carriers Conference (IECC) v Commission of the European Communities, [1998] ECR II-3645, para 79.

(³⁴) Case T-24/90, Automec v Commission of the European Communities, [1992] ECR II-2223, para 76; Case C-91/95 P, Roger Tremblay and Others v Commission of the European Communities, [1996] ECR I-5547, para 30.

(³⁵) Case 125/78, GEMA v Commission of the European Communities, [1979] ECR 3173, para 17; Case C-119/97/P, Union française de l'express (Ufex) and Others v Commission of the European Communities, [1999] ECR I-1341, para 87.

(³⁶) Settled case law since the Case T-24/90, Automec v Commission of the European Communities, [1992] ECR II-2223, paras 77 and 85; Recital 18 of Regulation 1/2003 expressly confirms this possibility.

(³⁷) Settled case law since Case T-24/90, Automec v Commission of the European Communities, [1992] ECR II-2223, para 75. Under Regulation 1/2003, this principle may only be relevant in the context of Article 29 of that Regulation.

(³⁸) Case 210/81, Oswald Schmidt, trading as Demo-Studio Schmidt v Commission of the European Communities, [1983] ECR 3045, para 19; Case C-119/97 P, Union française de l'express (Ufex) and Others v Commission of the European Communities, [1999] ECR I-1341, para 86.

(³⁹) Case C-119/97 P, Union française de l'express (Ufex) and Others v Commission of the European Communities, [1999] ECR I-1341, paras 79-80.

(⁴⁰) Case C-450/98 P, International Express Carriers Conference (IECC) v Commission of the European Communities, [2001] ECR I-3947, paras 57-59.

(⁴¹) Case T-24/90, Automec v Commission of the European Communities, [1992] ECR II-2223, paras 88ss.; Case T-5/93, Roger Tremblay and Others v Commission of the European Communities, [1995] ECR II-185, paras 65ss.; Case T-575/93, Casper Koelman v Commission of the European Communities, [1996] ECR II-1, paras 75-80; see also part II above where more detailed explanations concerning this situation are given.

(⁴²) Case C-119/97 P, Union française de l'express (Ufex) and Others v Commission of the European Communities, [1999] ECR I-1341, paras 92/93.

(⁴³) Settled case law since Case T-24/90, Automec v Commission of the European Communities, [1992] ECR II-2223, para 86.

(⁴⁴) Case C-449/98 P, International Express Carriers Conference (IECC) v Commission of the European Communities [2001] ECR I-3875, para 37.

(⁴⁵) Case T-77/95, Syndicat français de l'Express International and Others v Commission of the European Communities [1997] ECR II-1, para 57; Case C-119/97 P, Union française de l'express (Ufex) and Others v Commission of the European Communities, [1999] ECR I-1341, para 95. Cf. also Case T-37/92, Bureau Européen des Unions des Consommateurs (BEUC) v Commission of the European Communities, [1994] ECR II-285, para 113, where an unwritten commitment between a Member State and a third county outside the common commercial policy was held not to suffice to establish that the conduct complained of had ceased.

(⁴⁶) Case T-110/95, International Express Carriers (IECC) v Commission of the European Communities and Others, [1998] ECR II-3605, para 57, upheld by Case 449/98 P, International Express Carriers (IECC) v Commission of the European Communities and Others, [2001] ECR I-3875, paras 44-47.

(⁴⁷) Case C-449/98 P, International Express Carriers (IECC) v Commission of the European Communities e.a. [2001] ECR I-3875, para 37.

(⁴⁸) Cf. Case T-77/92, Parker Pen v Commission of the European Communities, [1994] ECR II-549, paras 64/65.

(⁴⁹) Case 298/83, Comité des industries cinématographiques des Communautés européennes (CICCE) v Commission of the European Communities, [1985] ECR 1105, paras 21-24; Case T-198/98, Micro Leader Business v Commission of the European Communities, [1999] ECR II-3989, paras 32-39.

(⁵⁰) Case T-319/99, Federación Nacional de Empresas (FENIN) v Commission of the European Communities, not yet published in [2003] ECR, para 43.

(⁵¹) Extensive guidance can be found on the Commission's website at http://europa.eu.int/comm/competition/index_en.html

(⁵²) Notice on the effect on trade concept contained in Articles 81 and 82 of the Treaty (p. 81).

(⁵³) Commission Notice on agreements of minor importance which do not appreciably restrict competition under Article 81(1) of the Treaty establishing the European Community (de minimis), OJ C 368 of 22 December 2002, p. 13.

(⁵⁴) The texts of all block exemption regulations are available on the Commission's website at http://europa.eu.int/comm/competition/index_en.html

(⁵⁵) Commission Notice — Guidelines on the application of Article 81(3) of the Treaty (p. 97).

(⁵⁶) Case 210/81, Oswald Schmidt, trading as Demo-Studio Schmidt v Commission of the European Communities, [1983] ECR 3045, para 19; Case T-24/90, Automec v Commission of the European Communities, [1992] ECR II-2223, para 79.

(⁵⁷) Cf. Case T-64/89, Automec v Commission of the European Communities, [1990] ECR II-367, paras 45-47; Case T-37/92, Bureau Européen des Unions des Consommateurs (BEUC) v Commission of the European Communities, [1994] ECR II-285, para 29.

(⁵⁸) Case C-282/95 P, Guérin automobiles v Commission of the European Communities, [1997] ECR I-1503, para 36.

(⁵⁹) Joined Cases 142 and 156/84, British American Tobacco Company and R. J. Reynolds Industries v Commission of the European Communities [1987] ECR 249, paras 19/20.

(⁶⁰) Case C-282/95 P, Guérin automobiles v Commission of the European Communities, [1997] ECR I-1503, para 37.

(⁶¹) Joined Cases T-213/95 and T-18/96, Stichting Certificatie Kraanverhuurbedrijf (SCK) and Federatie van Nederlandse Kraanbedrijven (FNK) v Commission of the European Communities, [1997] ECR 1739, para 57.

(⁶²) The notion of 'diligence' on the part of the complainant is used by the Court of First Instance in Case T-77/94, Vereniging van Groothandelaren in Bloemkwekerijprodukten and Others v Commission of the European Communities, [1997] ECR II-759, para 75.

(⁶³) Article 6(2) of Commission Regulation 773/2004.

(⁶⁴) Article 287 EC, Article 28 of Regulation 1/2003 and Articles 15 and 16 of Regulation 773/2004.

(⁶⁵) Article 27(2) of Regulation 1/2003.

(⁶⁶) Article 7(2) of Regulation 773/2004; Case C-282/95 P, Guérin automobiles v Commission of the European Communities, [1997] ECR I-1503, para 36.

(⁶⁷) Settled case law, cf. i.a. Case T-114/92, Bureau Européen des Médias et de l'Industrie Musicale (BEMIM) v Commission of the European Communities, [1995] ECR II-147, para 41.

(⁶⁸) Settled case law since Case 210/81, Oswald Schmidt, trading as Demo-Studio Schmidt v Commission of the European Communities, [1983] ECR 3045.

(⁶⁹) Case T-575/93, Casper Koelman v Commission of the European Communities, [1996] ECR II-1, paras 41-43.

(⁷⁰) Depending on the case, Member States' competition authorities may equally be well placed to adopt interim measures.

(⁷¹) Case 145/83, Stanley George Adams v Commission of the European Communities, [1985] ECR 3539.

27.4.2004    [ EN ]    Official Journal of the European Union    C 101/77

ANNEX

---

FORM C

**Complaint pursuant to Article 7 of Regulation (EC) No 1/2003**

**I. Information regarding the complainant and the undertaking(s) or association of undertakings giving rise to the complaint**

1. Give full details on the identity of the legal or natural person submitting the complaint. Where the complainant is an undertaking, identify the corporate group to which it belongs and provide a concise overview of the nature and scope of its business activities. Provide a contact person (with telephone number, postal and e-mail-address) from which supplementary explanations can be obtained.

2. Identify the undertaking(s) or association of undertakings whose conduct the complaint relates to, including, where applicable, all available information on the corporate group to which the undertaking(s) complained of belong and the nature and scope of the business activities pursued by them. Indicate the position of the complainant vis-à-vis the undertaking(s) or association of undertakings complained of (e.g. customer, competitor).

**II. Details of the alleged infringement and evidence**

3. Set out in detail the facts from which, in your opinion, it appears that there exists an infringement of Article 81 or 82 of the Treaty and/or Article 53 or 54 of the EEA agreement. Indicate in particular the nature of the products (goods or services) affected by the alleged infringements and explain, where necessary, the commercial relationships concerning these products. Provide all available details on the agreements or practices of the undertakings or associations of undertakings to which this complaint relates. Indicate, to the extent possible, the relative market positions of the undertakings concerned by the complaint.

4. Submit all documentation in your possession relating to or directly connected with the facts set out in the complaint (for example, texts of agreements, minutes of negotiations or meetings, terms of transactions, business documents, circulars, correspondence, notes of telephone conversations . . .). State the names and address of the persons able to testify to the facts set out in the complaint, and in particular of persons affected by the alleged infringement. Submit statistics or other data in your possession which relate to the facts set out, in particular where they show developments in the marketplace (for example information relating to prices and price trends, barriers to entry to the market for new suppliers etc.).

5. Set out your view about the geographical scope of the alleged infringement and explain, where that is not obvious, to what extent trade between Member States or between the Community and one or more EFTA States that are contracting parties of the EEA Agreement may be affected by the conduct complained of.

**III. Finding sought from the Commission and legitimate interest**

6. Explain what finding or action you are seeking as a result of proceedings brought by the Commission.

7. Set out the grounds on which you claim a legitimate interest as complainant pursuant to Article 7 of Regulation (EC) No 1/2003. State in particular how the conduct complained of affects you and explain how, in your view, intervention by the Commission would be liable to remedy the alleged grievance.

**IV. Proceedings before national competition authorities or national courts**

8. Provide full information about whether you have approached, concerning the same or closely related subject-matters, any other competition authority and/or whether a lawsuit has been brought before a national court. If so, provide full details about the administrative or judicial authority contacted and your submissions to such authority.

Declaration that the information given in this form and in the Annexes thereto is given entirely in good faith.

..........................................................................................................
Date and signature

# EXHIBIT 3

**IMPORTANT LEGAL NOTICE** - The information on this site is subject to a <u>disclaimer and a
copyright notice.</u>

JUDGMENT OF THE COURT OF FIRST INSTANCE (Fourth Chamber)

30 March 2000 (1)

(Competition - Float glass - Rights of defence and procedural rights of the complainant - Product market
and geographical market - Article 86 of the EC Treaty (now Article 82 EC))

In Case T-65/96,

**Kish Glass & Co. Ltd,** established in Dublin (Ireland), represented by M. Byrne, Solicitor, with an address
for service in Luxembourg at the Chambers of Arendt and Medernach, 8-10 Rue Mathias Hardt,

applicant,

v

**Commission of the European Communities,** represented initially by R. Lyal, of its Legal Service, and R.
Caudwell, national civil servant on secondment to the Commission, and subsequently, in the oral
procedure, by B. Doherty, of its Legal Service, acting as Agents, with an address for service in
Luxembourg at the Chambers of Carlos Gómez de la Cruz, of its Legal Service, Wagner Centre, Kirchberg,

defendant,

supported by

**Pilkington United Kingdom Ltd,** established in Saint Helens, Merseyside (United Kingdom), represented
by J. Kallaugher, Solicitor, A. Weitbrecht, Berlin and M.Hansen, Brussels, with an address for service in
Luxembourg at the Chambers of Loesch & Wolter, 11 Rue Goethe,

intervener,

APPLICATION for annulment of the Commission Decision of 21 February 1996 (IV/34.193 - Kish Glass)
rejecting the complaint made by the applicant on 17 January 1992 pursuant to Article 3(2) of Council
Regulation No 17 of 6 February 1962, First Regulation implementing Articles 85 and 85 of the Treaty (OJ,
English Special Edition 1959-1962, p. 87) alleging an infringement of Article 86 of the EC Treaty (now
Article 82 EC),

THE COURT OF FIRST INSTANCE

OF THE EUROPEAN COMMUNITIES (Fourth Chamber),

composed of: R.M. Moura Ramos, President, V. Tiili and P. Mengozzi, Judges,

Registrar: J. Palacio González, Administrator,

having regard to the written procedure and further to the hearing on 28 April 1999,

gives the following

# Judgment

**Background to the dispute**

1.    On 17 January 1992 Kish Glass & Co Ltd (hereinafter 'Kish Glass or the 'applicant), a company
      incorporated under Irish law which supplies glass, lodged a complaint with the Commission

pursuant to Article 3(2) of Council Regulation No 17 of 6 February 1962, First Regulation implementing Articles 85 and 86 of the Treaty (OJ, English Special Edition 1959-1962, p. 87, hereinafter 'Regulation No 17), alleging that Pilkington United Kingdom Ltd (hereinafter 'Pilkington) and its German subsidiary, Flabeg GmbH, abused their dominant position on the Irish market in 4 mm float glass, in applying different conditions from those offered to other purchasers for equivalent transactions and in refusing to supply it with this type of glass beyond a certain limit, thereby placing the applicant at a competitive disadvantage.

2.    On 14 February 1992 the Commission sent a request for information, pursuant to Article 11 of Regulation No 17, to the applicant, to which the applicant replied on 10 March 1992.

3.    When requested to comment on that complaint by the Commission, Pilkington stated that it did not hold a dominant position on the market in float glass and that it applied a system of discounts based on the size of the customer, the time allowed for payment and the quantity purchased.

4.    The applicant submitted its comments on Pilkington's observations to the Commission on 1 July 1992. It maintained that the system of customer classification used by Pilkington was discriminatory, and that that company, with a market share of more than 80%, was the major supplier of 4 mm float glass in Ireland, which was the relevant geographical market for assessing whether it held a dominant position.

5.    The Commission replied to the applicant on 9 July 1992, stating that a system of discounts based on a classification of customers by category and on quantity was not discriminatory. The applicant submitted its observations on that statement on 10 August 1992.

6.    On 18 November 1992 the Commission sent a letter to the applicant pursuant to Article 6 of Commission Regulation No 99/63/EEC of 25 July 1963 on the hearings provided for in Article 19(1) and (2) of Council Regulation No 17 (OJ, English Special Edition 1963-1964, p. 47, hereinafter 'Regulation No 99/63), informing it that it considered that there were not sufficient grounds for upholding its complaint and requesting it to submit any further observations it might have so that it could formulate its definitive position. Kish Glass complied with that request.

7.    Following an informal meeting of 27 April 1993, the Commission informed the applicant, by letter of 24 June 1993, that its observations disclosed no matters of fact or of law liable to affect the conclusions in the letter of 18 November 1992. However, the Commission stated that it intended to send to Pilkington a request for information under Article 11 of Regulation No 17 and that the applicant would be kept informed of the procedure.

8.    On 3 December 1993 the Commission sent to the applicant a non-confidential version of Pilkington's response to that request for information.

9.    By letters to the Commission of 16 February 1994 and 1 March 1994 Pilkington clarified its position with regard to the definition of the relevant geographical market and its alleged dominant position on that market.

10.   In two letters to the Commission dated 8 March 1994, Kish Glass reaffirmed its position regarding the definition of the relevant geographical market, which it argued to be the Irish market, and Pilkington's alleged abuse of its dominant position on the specific market for 4 mm float glass. It also provided the Commission with information on the prices charged by Pilkington on the Irish market.

11.   On 24 and 27 May 1994, the applicant submitted to the Commission further evidence to show that the transport costs from continental Europe to Ireland were far higher than those from the United Kingdom to Ireland and that there was a local geographical market.

12.   By letter of 10 June 1994 Pilkington informed the Commission that it disputed the transport-cost data provided by the applicant.

13.   Having obtained information from other manufacturers of glass in the Community, on 19 July 1995 the Commission sent a second letter to the applicant pursuant to Article 6 of Regulation No 99/63 confirming that the relevant product market was the sale of float glass of all thicknesses to dealers, that the geographical market was the whole of the Community and that Pilkington did not hold a dominant position on that market.

14.    On 31 August 1995 the applicant submitted its observations regarding that second letter pursuant to Article 6 of Regulation No 99/63, again disputing both the definition of the geographical and product market adopted by the Commission and its appraisal of the dominant position held by Pilkington.

15.    Between 31 October and 3 November 1995, the Commission obtained information by telephone and by fax from eight importers of glass established in Ireland on methods of purchasing 4 mm float glass.

16.    On 14 November 1995 the Commission sent a request for information pursuant to Article 11 of Regulation No 17 to certain companies operating on the Irish market, including the applicant and Pilkington, to obtain data on the quantity of 4 mm float glass sold in Ireland, on the dimensions of the glass sold and on the transport costs to the Dublin area.

17.    On 18 December 1995 the Commission sent to the applicant five replies from glass companies, which were received on 22 December 1995. On 7 February 1996 the Commission sent to the applicant five further replies from glass companies, which reached it on 12 February 1996.

18.    By decision of 21 February 1996, received by the applicant on 1 March 1996, the Commission definitively rejected the complaint lodged by Kish Glass (Case IV/34.193 - Kish Glass, hereinafter 'the contested decision). The Commission maintained its previous position that the relevant product market was the sale of float glass of all thicknesses to dealers, that the relevant geographical market was the Community as a whole, or at least the northern part of the Community, and that Pilkington did not hold a dominant position on that market.

### Procedure

19.    By application lodged at the Registry of the Court of First Instance on 11 May 1996, Kish Glass brought this action.

20.    By application lodged at the Registry of the Court of First Instance on 30 September 1996, Pilkington United Kingdom Limited applied for leave to intervene in support of the form of order sought by the defendant. By order of 30 June 1997 the President of the Third Chamber of the Court of First Instance granted it leave to intervene.

21.    Upon hearing the report of the Judge-Rapporteur, the Court of First Instance (Fourth Chamber) decided to open the oral procedure without any preparatory inquiry. It requested the Commission, however, to answer a number of written questions, to which the Commission replied on 22 March 1999.

22.    The parties presented oral argument and answered the questions put by the Court at the hearing on 28 April 1999.

### Forms of order sought

23.    The applicant claims that the Court should:

- annul the Decision adopted by the Commission on 21 February 1996 in Case IV/34.193 - Kish Glass;

- order the Commission to pay the costs.

24.    The defendant, supported by the intervener, contends that the Court should:

- dismiss the application;

- order the applicant to pay the costs.

### Law

25.    The applicant raises five pleas in law in support of its application. In the first plea, which is in two

parts, it alleges both that the Commission infringed its right to be heard and that it breached the principle of legal certainty and misused its powers. In its second plea it claims that the defendant disregarded procedural rules. Its third plea alleges breach of essential procedural requirements and of the principleof legal certainty. In its fourth and fifth pleas it alleges that the Commission committed a manifest error of assessment in its definition, on the one hand, of the relevant product market and, on the other, the geographical market.

*The first plea, alleging infringement of the applicant's right to be heard and of the principle of legal certainty and misuse of powers*

Arguments of the parties

26.     The applicant argues, first, that the Commission did not allow it enough time to put its point of view, thus infringing its right to be heard. It submits, second, that the Commission misused its powers and infringed the principle of legal certainty in obtaining information by methods not provided for by Regulation No 17.

        - Infringement of the applicant's right to be heard

27.     The applicant points out, first, that the Commission asked the Irish companies by letter of 14 November 1995 to provide information on the quantity, dimensions and thicknesses of float glass sold on the Irish market and the markets of continental Europe. The applicant received a copy of the responses from the Irish companies on 22 December 1995 and 12 February 1996, on which the contested decision adopted on 21 February 1996 was based. The tenor of the responses was such as to provide valuable support for its arguments but the Commission allowed it too little time (nine days) to comment on all the responses of the Irish companies, thus preventing it from exercising its right to be heard.

28.     The applicant points out, second, that the Court of Justice has established, in its case-law, that respect for the right to be heard in all proceedings which are liable to culminate in a measure adversely affecting a person is a fundamental principle of Community law which must be guaranteed, even in the absence of specific rules. Moreover, the Commission, in implementing the principle that the rights of the defence must be guaranteed, established rules for access to files both for the defending party and for the complainant. Furthermore, the case-law of the Court of First Instance both in the area of competition and of dumping has established that the right to comment on documents on the file is implicit in the right of access to it.

29.     The Commission contends that documents annexed to the application show that, during the investigation of its complaint, the applicant had numerous opportunities to put its point of view; in particular between the lodging of the complaint and the letter sent to it on 19 July 1995 the applicant made use of nine opportunities to submit its comments. In that connection the Commission points out that non-confidential copies of the responses of Pilkington and of four Irish importers of glass were sent on 18 December 1995 to the applicant, that is to say two months before the adoption of the contested decision; two of the four undertakings wereamongst the three main importers and the two others were amongst the smallest glass importers. What is more, non-confidential copies of five other responses were sent to the applicant on 7 February 1996: those responses corroborated the information which the Commission had obtained at the time of its telephone inquiries between 31 October and 3 November 1995, information of which the applicant had been informed. The applicant had two further weeks to submit its observations on those responses. The applicant was fully informed of its right to make known its views on the documents placed on the file to which it had access and it was therefore not necessary for the Commission to issue a formal invitation to that effect.

        - Misuse of powers and breach of the principle of legal certainty

30.     The applicant points out that, during the written procedure, the Commission explained that the requests for information sent on 14 November 1995 to the Irish companies sought only to obtain documentary evidence of the responses which those companies had already given by fax and by telephone. It argues that the method chosen by the Commission to obtain the information it needed, that is to say, by telephone and subsequently in writing, is not provided for by Article 11(2) to 11(6) of Regulation No 17 and is, therefore, incompatible with those provisions. The Commission has thus misused its powers and undermined the principle of legal certainty.

31.     The Commission contends that Article 11 of Regulation No 17 does not rule out the possibility of

obtaining information orally and subsequently making official requests for information.

Findings of the Court

- Infringement of the applicant's right to be heard

32. According to settled case-law, respect for the right to be heard is, in all proceedings initiated against a person which are liable to culminate in a measure adversely affecting that person, a fundamental principle of Community law which must be guaranteed even in the absence of specific rules. That principle requires that the undertaking concerned be afforded the opportunity during the administrative procedure to make known its views on the truth and relevance of the facts, charges and circumstances relied on by the Commission (see, in particular, Case C-301/87 *France* v *Commission* [1990] ECR I-307, paragraph 29, Joined Cases C-48/90 and C-66/90 *Netherlands and Others* v *Commission* [1992] ECR I-565, paragraph 37, Case C-135/92 *Fiskano* v *Commission* [1994] ECR I-2885, paragraphs 39 and 40, and Case C-48/96 P *Windpark Groothusen* v *Commission* [1998] ECR I-2873, paragraph 47).

33. However, it must be observed that this principle concerns the rights to be heard of those in respect of whom the Commission carries out its investigation. As the Court of Justice has already observed, such an investigation does not constitute an adversary procedure as between the undertakings concerned but a procedure commenced by the Commission, upon its own initiative or upon application, in fulfilment of its duty to ensure that the rules on competition are observed. It follows that the companies which are the object of the investigation and those which have submitted an application under Article 3 of Regulation No 17, having shown that they have a legitimate interest in seeking an end to the alleged infringement, are not in the same procedural situation and that the latter cannot invoke the right to be heard as defined in the cases relied on (see, to that effect, judgment of the Court of Justice in Joined Cases 142/84 and 156/84 *BAT and Reynolds* v *Commission* [1987] ECR 4487, paragraph 19, and judgment of the Court of First Instance in Case T-17/93 *Matra Hachette* v *Commission* [1994] ECR II-595, paragraph 34).

34. Since the right of access to the file is also one of the procedural guarantees intended to safeguard the right to be heard, the Court of First Instance has held, similarly, that the principle that there must be full disclosure in the administrative procedure before the Commission in matters concerning the competition rules applicable to undertakings applies only to undertakings which may be penalised by a Commission decision finding an infringement of Articles 85 or 86 of the EC Treaty (now Articles 81 EC and 82 EC), since the rights of third parties, as laid down by Article 19 of Regulation No 17, are limited to the right to participate in the administrative procedure. In particular, third parties cannot claim to have a right of access to the file held by the Commission on the same basis as the undertakings under investigation (judgment in *Matra Hachette* v *Commission*, cited above, paragraph 34).

35. As regards the rights of the applicant as a complainant, the Court of First Instance points out that, in the present case, the investigation of the complaint lasted more than four years and that the applicant had the opportunity to put its point of view on several occasions. In particular, the last five replies of the Irish companies of which the applicant was notified did not alter the essential points with which the procedure was concerned so that the fact that the Commission only allowed the applicant nine days to comment on the replies before adopting the contested decision did not prevent it from making its views known.

36. In the circumstances the applicant's rights cannot be said to have been infringed.

- Misuse of powers and breach of the principle of legal certainty

37. As regards the argument that the Commission misused its powers in seeking information from Irish glass companies by telephone or fax even though Article 11 of Regulation No 17 provides that such requests must be made in writing, it mustbe borne in mind to begin with that, according to consistent case-law, the adoption by a Community institution of a measure with the exclusive or main purpose of achieving an end other than that stated constitutes a misuse of powers (see Case C-84/94 *United Kingdom* v *Council* [1996] ECR I-5755, paragraph 69, and Case T-77/95 *SFEI and Others* v *Commission* [1997] ECR II-1, paragraph 116).

38. In the present case, it must be observed both that Article 11 of Regulation No 17 does not prevent the Commission from obtaining information by means of oral requests followed by requests in the proper form and that the applicant has not furnished evidence that the collection of information

orally had any purpose other than that envisaged by that article.

39.     It follows that the first plea must be rejected as unfounded in its entirety.

        *The second plea, alleging breach of procedural rules*

        Arguments of the parties

40.     The applicant submits that the Commission breached the procedural guarantees provided for by Community law in sending Pilkington a request for information which was not drawn up objectively.

41.     In support of its submission the applicant points out that the Commission sent Pilkington a request for information on 14 November 1995, the same day as it sent requests for information to the Irish companies. In its request for information, the Commission wrote: 'In its response Kish maintains that 4 mm clear float glass forms a distinct market in Ireland ... Kish further maintains that Pilkington alone is able to supply the dimensions demanded by the Irish market. The Commission has investigated this point and it appears to be poorly founded. Nevertheless, in order to have on the file all the evidence necessary to reject the complaint, it has proved necessary to make a further request for information. Thus the Commission had informed Pilkington that the complaint was poorly founded even though the issue in question had not been considered, given that it had not yet received the responses to the questions put by letter of 14 November 1995. It follows that the Commission could have had no idea of the evidence which might be revealed pursuant to its requests for information but it none the less indicated to the party against which the complaint was directed that it proposed to reject the complaint and asked it to provide the evidence that would make this possible.

42.     The Commission observes that Article 11(3) of Regulation No 17 requires it to indicate the purpose of the request for information. At the time when the Commission wrote its letters it knew that the claims by Kish Glass were probably not founded since it had already received, by telephone and by fax, the responses of the undertakings to which it was writing. It had therefore considered thearguments of Kish Glass with the requisite seriousness and diligence but had found that they were erroneous.

43.     According to the intervener, to prevent a breach of the duty of impartiality, it is essential that, in pursuing its inquiries, the Commission should not prejudge the action to be taken on a complaint; but that does not mean that the officials of the Commission cannot form an initial opinion on the issues raised by a complaint. The duty of impartiality requires, at the very least, that until the complainant has exercised his right to present observations pursuant to Article 6 of Regulation No 99/63, the Commission should remain open to any discussion liable to make it change its mind. However, there is no legal obstacle, once the Commission officials have formed an initial opinion, to their informing the undertaking subject to the investigation of that opinion. In the present case, the Commission had already informed Kish Glass in its letter pursuant to Article 6 of Regulation No 99/63 of its view that no action should be taken on its complaint. Moreover, Kish Glass had already had an opportunity to comment on the Commission's position. When it sent the request for information at issue the Commission had already formed an initial opinion and its communication to Pilkington does not constitute a breach of the principle of objectivity and impartiality.

        Findings of the Court

44.     First, it must be borne in mind that, under Article 11(3) of Regulation No 17, when the Commission sends a request for information to an undertaking or an association of undertakings, it is to state the legal bases and the purpose of the request and also the penalties laid down for supplying incorrect information. Consequently, the Commission was required to inform Pilkington, in its letter of 14 November 1995, of the reasons which led it to request further information.

45.     Second, according to settled case-law, once the Commission decides to proceed with an investigation, it must, in the absence of a duly substantiated statement of reasons, conduct it with the requisite care, seriousness and diligence so as to be able to assess with full knowledge of the case the factual and legal particulars submitted for its appraisal by the complainants (Case T-7/92 *Asia Motor France and Others* v *Commission* [1993] ECR II-669, paragraph 36).

46.     In the present case, it is clear from the documents before the Court that the Commission's investigation was carried out over a period of more than four years, during which the Commission

collected comments from a significant number of undertakings in the sector, analysed them and gave the complainant an opportunity to put forward, on several occasions, all such information as could be taken into account. In so doing, the Commission carried out all its activities with the requisite care, seriousness and diligence. In confining itself to observing that, in its letter of 14 November 1995, the Commission had expressed the view that its complaint was'poorly founded and asked for further information from Pilkington in order to 'reject it, the applicant has not proved the contrary.

47.    Accordingly, the second plea must be rejected as unfounded.

*The third plea, alleging breach of essential procedural requirements and of the principle of legal certainty*

Arguments of the parties

48.    The applicant submits that the decision of the Commission is vitiated by formal defects and breaches the principle of legal certainty.

49.    In that regard, it states that decisions rejecting complaints usually take the form of a reasoned letter signed by the Commissioner responsible for competition matters. In the present case that Commissioner merely signed a covering letter which, after summarising the procedure, rejected the complaint, referring to a separate document for the reasoning. That document contains no indication (such as a signature or even an initial) that the Commissioner responsible had seen it. Given this unusual manner of proceeding, the applicant has no way of knowing whether the Commissioner responsible saw or approved the arguments for the rejection of the complaint. What is at issue in this case is therefore a matter of form rather than a matter of inadequate reasoning.

50.    The Commission observes, first, that the contested decision is not in an unusual form and, second, refers expressly to the annex containing the reasons for which it decided to reject the complaint.

Findings of the Court

51.    It should be borne in mind that, according to case-law, a reference in a document to a separate document must be considered in the light of Article 190 of the EC Treaty (now Article 253 EC) and does not breach the obligation to state reasons incumbent on the Community institutions. Thus, in its judgment in Case T-504/93 *Tiercé Ladbroke* v *Commission* [1997] ECR II-923, paragraph 55, the Court of First Instance held that a Commission decision sent to the author of a complaint that gave rise to an investigation, which referred to a letter sent pursuant to Article 6 of Regulation No 99/63, disclosed with sufficient clarity the reasons for which the complaint was rejected, and thus fulfilled the obligation to state reasons under Article 190 of the Treaty. Regardless of whether such a reference is described as a matter of reasoning or of form, that finding applies *a fortiori* where reference is made to a document annexed to a decision and, therefore, contained in it.Moreover, the applicant has in no way substantiated its suspicions that the Commissioner responsible was unaware of the reasoning for the contested measure.

52.    The reference in question is sufficient to meet the requirements of legal certainty under Community law.

53.    It follows that the third plea must also be rejected as unfounded.

*The fourth plea, alleging a manifest error of assessment in the definition of the relevant product market*

Arguments of the parties

54.    The applicant submits that the Commission committed a manifest error of assessment in defining, in point 19 of the contested decision, the relevant product market not as that for 4 mm float glass but as that for the sale of raw or primary float glass of all thicknesses to dealers in view of the fact that the persons active in the market, both on the supply side and the demand side, are the same for all thicknesses of glass. Where products of different types and dimensions are not interchangeable from the point of view of the user, it is insufficient merely to examine whether the persons active in the market are the same, but it is also necessary to take into consideration, as the Court of Justice did in its judgment in Case 322/81 *Michelin* [1983] ECR 3461, the competitive

conditions and the structure of supply and demand on the market.

55.    The applicant submits, as regards the conditions of competition, that given that a significant percentage of the market is effectively reserved for one manufacturer, producers who do not sell imperial sheet sizes (2 440 mm x 1 220 mm) are unlikely to be competitive in the remainder of the market and may choose not to operate at or attempt to maintain competition on it. This has a significant knock-on effect on the conditions of competition in the remainder of the market, as is borne out by the fact that a very large share (84%) of the Irish glass market is held by Pilkington. In that connection, it points out that so far as it is aware, Pilkington is the only manufacturer of 4 mm float glass to use trays of certain dimensions on which the glass is cooled ('lehr-ends') which permit the glass to be cut into imperial sizes without wastage. It believes that other producers, producing metric glass, use lehr-ends which enable them to manufacture only metric-sized sheets (3 210 mm x 2 250 mm). Finally, it is likely that there are only two dealers on the Irish market which have the equipment required to cut metric sizes down to imperial sizes, and moreover, one of those customers still continues to import 30% of its requirement in imperial sizes from Pilkington.

56.    It submits, moreover, as regards the structure of supply, that, as was confirmed by the replies of the Irish companies, more than 27% of 4 mm float glass sold inIreland is in imperial sizes. Pilkington has a near monopoly in respect of the size in question (95% of sales) and, moreover, holds 84% of the Irish market in 4 mm float glass. Supply on the float glass market is affected as a result: because of the structure of the market, customers buying sheets in imperial sizes are obliged to deal, for all sizes, with that manufacturer, who is well placed to meet their other requirements for 4 mm float glass.

57.    It states, further, that the market in 4 mm float glass must be considered to be the relevant product market as that product cannot be substituted by float glass of other thicknesses: the cross-elasticity of demand between 4 mm float glass and float glass of other thicknesses is zero; increases in the price of 4 mm float glass are unlikely to have any effect on demand for other float glass products. In that regard, although there is significant fluctuation in the price charged for 4 mm float glass in Ireland, demand for other float glass products has remained constant. According to both the case-law of the Court of Justice and Court of First Instance and the decisions of the Commission (Commission Decision 88/138/EEC of 22 December 1987 relating to a proceeding under Article 86 of the EEC Treaty (IV/30.787 and 31.488 - Eurofix - Bauco/Hilti) (OJ 1988 L 65, p. 19); Commission Decision 92/163/EEC of 24 July 1991 relating to a proceeding pursuant to Article 86 of the EEC Treaty (IV/31.043 - Tetra Pak II) (OJ 1992 L 72, p. 1); judgment in Case C-53/92 P *Hilti* v *Commission* [1994] ECR I-667; judgment in Case T-30/89 *Hilti* v *Commission* [1991] ECR II-1439; judgment in Case T-83/91 *Tetra Pak* v *Commission* [1994] ECR II-755), there is a relevant product market when cross-elasticity with other products, which may be considered interchangeable, is low: it follows that a product market is *a fortiori* distinct from another where the cross-elasticity between them is zero.

58.    Finally, it adds that the fact that one of Pilkington's four manufacturing sites specialises in the production of 4 mm float glass implies that it is not possible to convert rapidly to production of other thicknesses.

59.    The Commission contends that in the *Michelin* case, the Court of Justice found that products of different types and dimensions, that are not interchangeable from the point of view of the user, may nevertheless be considered as forming part of a single product market where they are technically similar or complementary and are supplied through dealers who must meet demand for the whole range of products. This clearly holds true for the raw float market, where at the first stage of distribution the persons active in the market on the supply side and on the demand side are identical for all thicknesses of glass. It points out that the applicant does not produce any evidence to support its statement that conditions of competition are affected when, first, a significant percentage of the market is effectively reserved for one producer and, second, producers who do not sell imperial sheet size 4 mm float glass are unlikely to be competitive on the remainder of the market and may choose not to compete in that part of the market.

60.    In response to the assertion by Kish Glass that a near monopoly position on the part of the float glass market sold in imperial sizes gives Pilkington an insurmountable advantage on the market as a whole, the Commission maintains that glass of one thickness sold in one set of dimensions may be substituted by glass of the same thickness sold in different dimensions, given that all wholesalers are in a position to cut down larger sizes to obtain the size required by processors and end users. Float glass in imperial dimensions is used for exactly the same economic purposes as float glass in metric dimensions.

61.   Finally, it observes that the applicant has adduced no evidence in support of its assertion that the
      operation of the 4 mm float glass market in Ireland is independent, because of its alleged specific
      character, from that of the market for other thicknesses of glass. In fact, 4 mm float glass is
      technically almost identical with float glass of other sizes and a producer's float line can be rapidly
      adapted without excessive cost to change from one thickness to another.

      Findings of the Court

62.   According to settled case-law, for the purposes of investigating the possibly dominant position of an
      undertaking on a given market, the possibilities of competition must be judged in the context of the
      market comprising the totality of the products which, with respect to their characteristics, are
      particularly suitable for satisfying constant needs and are only to a limited extent interchangeable
      with other products (see, in particular, the judgment in Case 31/80 *L'Oréal* [1980] ECR 3775,
      paragraph 25, and in *Michelin* v *Commission*, cited above, paragraph 37). Moreover, according to
      the same case-law (*Michelin* v *Commission*, cited above, paragraph 44), the absence of
      interchangeability between different types and dimensions of a product from the point of view of the
      specific needs of the user does not imply that, for each of those types and dimensions, there is a
      distinct market for the purposes of determining whether there is a dominant position. Furthermore,
      since the determination of the relevant market is useful in assessing whether the undertaking
      concerned is in a position to prevent effective competition from being maintained and behave to an
      appreciable extent independently of its competitors and customers and consumers, an examination
      to that end cannot be limited to the objective characteristics only of the relevant products but the
      competitive conditions and the structure of supply and demand on the market must also be taken
      into consideration (*Michelin* v *Commission*, cited above, paragraph 37).

63.   In the present case, the Court of First Instance must consider whether the conditions of competition
      and the structure of supply on the market in float glass precluded the Commission from finding, on
      the basis of *Michelin* v *Commission*, cited above, that even if glass of different thicknesses is not
      interchangeable for final users, the relevant product market must be considered to be that for raw
      floatglass of all thicknesses, as distributors must meet demand for the whole range of products.

64.   As a preliminary point, the Court of First Instance observes that, according to consistent case-law,
      although as a general rule the Community judicature undertakes a comprehensive review of the
      question whether or not the conditions for the application of the competition rules are met, its
      review of complex economic appraisals made by the Commission is necessarily limited to verifying
      whether the relevant rules on procedure and on stating reasons have been complied with, whether
      the facts have been accurately stated and whether there has been any manifest error of assessment
      or a misuse of powers.

65.   The applicant contends that the fact that continental producers do not produce glass in imperial
      dimensions prevents them from competing effectively with Pilkington. On that point, it must be
      observed that, at point 15 of the contested decision, the Commission considered that question and
      arrived at the opposite conclusion to that reached by the applicant. On the basis of information
      provided by nine Irish importers it found that wholesalers did not have a clear preference for
      imperial sizes in so far as they were able to cut - without too much wastage - glass in metric sizes
      down to imperial sizes. During the proceedings before the Court of First Instance, the applicant
      confined itself, with regard to that point, to stating that, so far as it was aware, Pilkington was the
      only manufacturer of 4 mm float glass able to adapt the glass to imperial sizes without wastage,
      that it believed that the other manufacturers used 'lehr ends allowing them to manufacture only
      sheets of different sizes and that it was unlikely that wholesalers would be able to cut metric sizes
      without wastage. Not only does the applicant furnish no evidence in support of its argument, but it
      puts forward nothing to invalidate the Commission's assessment of the matter, which was based on
      information obtained directly from operators on the market.

66.   The applicant also maintains, essentially, that, in view of the near monopoly enjoyed by Pilkington
      in the market for 4 mm glass in imperial sizes, that company enjoys a privileged position in
      commercial relations with glass importers. Moreover, it submits that 4 mm glass cannot be replaced
      by float glass of other thicknesses.

67.   In that regard, it must be observed that the applicant has not established that any preference
      importers have for Pilkington's products is not the result of their pursuing their own economic
      interest or exercising their freedom of contract. Accordingly such preferences cannot be interpreted
      as being indicative of a deterioration in the structure of supply on the market. It must be observed,
      next, that it is clear from the data given in the replies of the Irish companies, which are not

contested by the applicant, that sales in Ireland of 4 mm float glass in imperial sizes account for 27% of the market. Even if it is accepted that Pilkington holds a near monopoly in the sector of 4 mm glass in imperial sizes, that percentage is clearly not in itself a sufficient ground for claiming, as the applicant has done, that the majority of purchases of 4 mm float glass in Ireland are processed by Pilkington. About 73% of demand for the product is made up of purchases of glass in metric sizes which cannot be affected by Pilkington.

68.   Finally, in point 18 of the contested decision, the Commission explained that production of 4 mm glass is technically almost identical to production of glass of other thicknesses and that glass manufacturers can convert production rapidly without excessive cost. In that connection, it must be observed that the fact that one of Pilkington's four production sites specialises in the manufacture of a certain type of glass does not mean that the technical processes for manufacture of the glass are different and does not demonstrate that an economic operator with only one production site cannot convert his production rapidly, so that the applicant's argument on the basis of the lack of cross-elasticity between supply of 4 mm glass and glass of other thicknesses cannot be upheld either.

69.   The Court of First Instance finds, therefore, that the applicant has not established that the position of the Commission, set out in point 19 of the contested decision, that the relevant product market is the sale of glass of all thicknesses, was vitiated by a manifest error of assessment. It follows that that argument cannot be upheld by the Court.

70.   The fourth plea must, therefore, be rejected as unfounded.

*The fifth plea, alleging a manifest error of assessment of the geographical market*

Arguments of the applicant

71.   The applicant points out that the Commission, in point 23 of the contested decision, while conceding that certain features of the float glass market in Ireland do distinguish it from that in continental Europe (that is to say the absence of production facilities and the fact that all float glass has to be transported there by sea), took the view that the analysis of transport costs and the level of prices of glass in the different parts of the Community point to the conclusion that the relevant geographical market is the Community or the northern part of the Community. It submits that the Commission has committed a manifest error of assessment and should have taken the view that the relevant geographical market was Ireland or Ireland and the United Kingdom.

72.   It sets out, essentially, three objections to the definition of the geographical market in the contested decision.

      - The first objection

73.   The test which the Commission applied to define the relevant geographical market is not in conformity with that defined by the Court of Justice in its judgment in Case 27/76 *United Brands* v *Commission* [1978] ECR 207. Rather than defining the glass market on the basis of transport costs to Ireland only, it should have determined the zone in which other objective conditions of competition for the product in question are similar for all economic operators. Application of that test would have led it to conclude that the relevant geographical market was Ireland (or Ireland and the United Kingdom). The determination of Ireland as the relevant geographical market finds support in the fact that, in that country, continental exporters have no competitive weight as regards sales of 4 mm float glass as their combined market share is approximately 16% compared with Pilkington's market share which is 84%.

      - The second objection

74.   The Commission committed a manifest error of assessment in finding that two northern European producers had higher transport costs to Ireland than those of Pilkington, to the extent of 7 to 8%, and that only one producer from that part of Europe had lower transport costs to Ireland than Pilkington's. On that point, an analysis contained in the letter to the Commission of 24 May 1994 shows that the costs of sea and land transport to Ireland for continental producers are in fact far higher than they are for Pilkington: glass manufactured by a continental producer has a greater distance to travel by road and by sea and does not enjoy the significant discounts on road and sea transport from which Pilkington can benefit.

75.  In that regard, the approach which resulted in that analysis is in keeping with that followed by the
     Commission in certain decisions: Commission Decision 94/359/EC of 21 December 1993, declaring
     a concentration to be compatible with the common market (Case No IV/M/358 – Pilkington
     Techint/SIV, OJ 1994 L 158, p. 24, hereinafter 'Pilkington-Techint/SIV Decision), in which the
     Commission considered that raw float glass is a bulky heavy product, which is therefore expensive
     to transport over great distances; Commission Decision 89/93/EEC of 7 December 1988 relating to
     a proceeding under Articles 85 and 86 of the EEC Treaty, (Case IV/31.906 - 'Flat glass, OJ 1989 L
     33, p. 44, hereinafter 'Flat Glass Decision), in which the geographical location of production facilities
     was considered to be a vital factor in the transport of flat glass; Commission Decision 89/22/EEC of
     5 December 1988 relating to a proceeding under Articles 85 and 86 of the EEC Treaty (Case
     IV/31.900 - BPB Industries, OJ 1989 L 10, p. 50, hereinafter 'BPB Decision), in which, in view of the
     costs of transport and advantages of placing production facilities close to markets, it was considered
     that it was not economically possible to supply the market in Britain or Ireland on a large scale and
     for prolonged periods from abroad.

76.  Moreover, the significance of transport costs in determining the geographical market is confirmed
     by the replies of the Irish companies, which reveal that the glass companies established in the
     Dublin area (near the Pilkington factory) or in places easily accessible by road from Dublin (Galway)
     are supplied almost entirelyby Pilkington (98%), whilst companies which are further away (in the
     towns of Tipperary, Limerick and Wexford) buy lower quantities of glass from Pilkington (77%, 62%
     and 66% respectively).

     - The third objection

77.  An analysis of FOB (free on board) and CIF (cost, insurance, freight) prices for 4 mm float glass
     between 1990 and 1992 from the United Kingdom to other Member States shows that the Irish
     market does not have characteristics in common with the other European markets and that it is an
     independent market; according to that analysis, in the period under consideration, the average CIF
     price to Ireland was ECU 470 per tonne; it varied between ECU 500 and 540 per tonne to the
     Northern European countries (Germany, Netherlands, Belgium and Luxembourg), and varied
     between ECU 330 and 430 per tonne to the countries of Southern Europe (France, Italy, Portugal,
     Spain and Greece); in contrast, in the period under consideration, the average FOB price to Ireland
     was ECU 370 per tonne, the price to the countries of Northern Europe varied between ECU 300 and
     330 per tonne and the price to the countries of Southern Europe varied between ECU 300 and 370
     per tonne.

     Arguments of the Commission

     - The first objection

78.  The Commission denies not having applied the test established by the Court of Justice in *United
     Brands*, cited above. It points out that, in point 24 of the contested decision, it maintained that the
     area in which dominance should be assessed must be an area where 'the objective conditions of
     competition applying to the product in question must be the same for all traders; on the basis of
     that test it found that transport costs did not isolate Ireland from the continental market.

     - The second objection

79.  It maintains that the conclusions it drew from its analysis of transport costs are correct. On the
     basis of information supplied in response to its letters pursuant to Article 11 of Regulation No 17 by
     the producers concerned, it found that one Northern European producer's costs were marginally
     lower than Pilkington's and that two other producers had to bear costs, as a proportion of the value
     of the load, no more than 7 to 8% higher than Pilkington's. It even found that the Southern
     European producers had to bear costs which were significantly higher as a proportion of the value of
     the load. Taking account of the fact that the additional cost tolerated by a manufacturer for
     transport towards the edge of its domestic market was a maximum of 10% of the value of the
     product, it concluded that the transport costs to Ireland of Northern European producers fell within
     the range they tolerated on their domestic markets. Moreover, as it finds that the applicant has not
     produced any evidence to show that the information obtained in responseto the letter sent to a
     number of impartial undertakings pursuant to Article 11 of Regulation No 17 was erroneous, it
     states that it is not convinced of the unreliability of the information supplied to it.

     - The third objection

80.  The Commission states that the information on prices on the basis of which it adopted the contested decision was obtained directly from producers, whilst the figures given by the applicant were unreliable; in the course of its investigation it obtained a detailed breakdown of Pilkington's prices and they bore no relation to the prices submitted by the applicant. In the period 1990-1992 the average price charged by Pilkington in Ireland was very close to that charged in every country in Northern Europe. It added that the FOB and CIF prices used by the applicant are not a reliable indicator. The term FOB refers to the price of the product as it is loaded onto a ship and does not include any of the subsequent costs of transport, while float glass is sold on a 'delivered basis whereby the cost of transport is borne by the producer. CIF prices do not indicate the real market price as they do not take into account any discounts given.

Findings of the Court

- The first objection

81.  In its judgment in *United Brands* v *Commission*, cited above, the Court of Justice stated that the opportunities for competition must be considered, in regard to Article 86 of the Treaty, having regard to the particular features of the product in question and with reference to a clearly defined geographic area in which it is marketed and where the conditions of competition are sufficiently homogeneous for the effect of the economic power of the undertaking concerned to be able to be evaluated (paragraph 11). Furthermore, in the same judgment, in order to ascertain whether the conditions of competition were sufficiently homogeneous in that case the Court of Justice referred primarily to transport costs, taking the view that, where such costs do not in fact stand in the way of the distribution of the products, they are factors which go to make the relevant market a single market (*United Brands* v *Commission*, paragraphs 55 and 56).

82.  It follows that, in the present case, the definition of the relevant geographical market, in the light, in particular, of the costs of transporting glass borne by continental producers, is justified. It must be observed, moreover, that in order to determine the conditions of competition on European markets, the Commission did not, in the contested decision, only consider the costs mentioned above but also verified that the volume exported to Ireland between 1988 and 1994 by continental producers was about one-third of the volume of the demand for float glass in that country, that the differences between prices charged in Ireland and in five otherEuropean countries by the five main continental producers did not indicate the existence of separate markets and that the existence of obstacles of a technical or regulatory nature to entry to the Irish market could be ruled out. Finally, it must be observed that, although the applicant disputes that the criteria laid down by the judgment in *United Brands* v *Commission*, cited above, were applied correctly, it does not indicate how they should be applied in order to define the geographical market in the light of the impact of transport costs on the conditions of competition.

83.  It follows from the foregoing that the first objection must be dismissed.

- The second objection

84.  As regards the objection concerning the accuracy of the analysis of transport costs carried out by the Commission, it must be observed that that analysis takes account of the information supplied by the operators in the sector at the time of the investigation of the Pilkington-Techint/SIV merger and of the decision made following that investigation. In that decision the Commission observed that: (1) 80-90% of a plant's production is sold within a radius of 500 km; that distance is sometimes exceeded and can reach 1 000 km, beyond which the cost of transport becomes prohibitive, that is to say uncompetitive; (2) in its natural supply area with a 500 km radius a glass-producing undertaking is in competition with other undertakings whose supply areas overlap with its own; (3) since each of those undertakings has its own radius of supply, competition by an undertaking with those within its radius tends to extend to their natural supply area; (4) consequently, it is appropriate to consider the Community as a whole to be the geographical reference market.

85.  It must first be determined whether the argument set out by the Commission in the contested decision for the purpose of defining the geographical market is contradictory. In the course of the hearing it became apparent that at several points in the contested decision the Commission was making reference to its decision in Pilkington-Techint/SIV, point 16 of which appears to be inconsistent with point 33 of the contested decision. In that connection, it should be borne in mind that a contradiction in the statement of the reasons on which a decision is based constitutes a breach of the obligation laid down in Article 190 of the Treaty such as to affect the validity of the measure in question if it is established that, as a result of that contradiction, the addressee of the

measure is not in a position to ascertain, wholly or in part, the real reasons for the decision and, as a result, the operative part of the decision is, wholly or in part, devoid of any legal justification (see in particular the judgment of the Court of Justice in Case T-5/93 *Tremblay and Others* v *Commission* [1995] ECR II-185, paragraph 42).

86.    In point 16 of the preamble to the decision in Pilkington-Techint/SIV, the Commission states that raw float glass is a bulky, heavy product, 'expensive to transport over great distances, for example, the cost of transportation by lorryamounts to between 7.5 and 10% of the selling price at a distance of 500 km. In point 33 of the contested decision the Commission states that transport costs towards the edge of a plant's natural supply area ('domestic market) exceed those within its near vicinity by up to 10% of the value of the product.

87.    Following careful examination of those two decisions, the Court must observe, first, that the contested decision refers to the Pilkington-Techint/SIV decision without referring specifically to the percentages given in brackets in point 16 of the preamble to that decision, second, that the percentages given in point 16 are given by way of illustration and their significance is weakened by the conclusions the Commission reaches in that decision, which are the same as those it reached in the contested decision, in finding that it seems appropriate to consider the Community as a whole to be the geographical reference market and, third, that the true reason for the definition of the geographical reference market contained in the Pilkington-Techint/SIV decision is to be found in the second paragraph of point 16 of its preamble where it is stated that 'given the dispersion of the individual float plants and the varying degrees of overlap for the natural supply areas, so that effects can be transmitted from one circle to another, it seems appropriate to consider that the geographical reference market is the Community as a whole.

88.    It must be observed that the Commission in no way contradicts itself in that, first, in its decision in Pilkington-Techint/SIV it defined the geographical reference market essentially on the basis of the concept of the natural geographical area of supply from a given float-glass production plant, represented by concentric circles with a radius determined by the relative transport cost and, second, it arrived at the same definition in the contested decision, having found that the transport costs which are tolerated by a producer in the natural supply area of its plant exceed those within the near vicinity of that plant by up to 10% of the value of the product. The concepts of natural supply area and near vicinity of the plant, on the basis of which the Commission concluded that transport costs did not exceed 10%, are compatible. Both concepts enable the relevant geographical market to be determined for an undertaking on the basis of the cost of transport by measuring that market not from the factory but from a number of points on the edge of a circle or series of circles surrounding it which constitute its natural supply area or the area in its near vicinity.

89.    It follows that, contrary to what appeared to emerge from the hearing, the contested decision is not vitiated by contradiction in referring in point 33 to the Pilkington-Techint/SIV decision.

90.    The applicant, for its part, does not contest, in themselves, the criteria which were used by the Commission to define the natural supply area ('domestic market) and on which the contested decision was based. In claiming that the Commission made a manifest error of assessment in its determination of the relevant geographicalmarket, it is merely disputing the reliability of the replies of the glass producers on which that determination was based.

91.    The Court observes, in that regard, that the third-party undertakings requested to supply information pursuant to Article 11 of Regulation No 17 may have penalties imposed on them if they supply incorrect information, with the result that they cannot as a general rule be considered not to have supplied accurate and reliable information in the absence of evidence to the contrary. The applicant cannot purport to deny that the data supplied in those replies are of any value simply by referring to the analysis of transport costs which it put forward during the administrative procedure in its letter of 24 May 1994 and which was not accepted by the Commission in the contested decision.

92.    In its letter of 24 May 1994, the applicant refers to the report commissioned by the Dublin Port and Docks Board from Dublin City University Business School (hereinafter 'the Dublin Port Report') on transport costs in the port of Dublin. On the question of the advantages said to be enjoyed by Pilkington in terms of transport costs, the applicant bases its argument on data which do not specifically refer to Pilkington but are merely inferred from its presumed commercial activity. For example, on page 4 of its letter, it states: '[Pilkington] is not constrained by any particular sailing and will therefore ship by the most cost effective sailing. The Dublin Port Report (pages 172-173)

indicates that discounts of 15% to 18% are available for volume or guaranteed units. As Pilkington imports considerable amounts of glass to the Irish market (and maintains an office in Dublin), it would be guaranteed the highest discount. In addition, the 18% discount is granted for transport by day, whereas 15% is the maximum discount for night transport. Due to the proximity of Liverpool, Pilkington can benefit from the higher 18% discount. Finally, Kish estimates that Pilkington may have as many as 40 units per week and would benefit from favoured customer status and be at the low end of the price range, particularly if each shipment is block-booked. Moreover, in that letter the applicant does not give precise figures for continental transport costs and, again on page 4 of the letter, states: 'The Dublin Port Report does not indicate the percentage of the available 20 containers which are open-top, but it is certainly very small as only two shipping lines provide such specialised form of transport.

93.     The applicant's argument based on the significance of transport costs as it emerges from the replies of the Irish glass companies is not sufficient to establish that the relevant geographical market is Ireland alone. The fact that the glass companies established in the Dublin and Galway areas obtain almost all their supplies from Pilkington merely indicates that, in view of the cost of transport, the latter has a competitive advantage in the geographical area close to its factory, but an advantage of that kind must be considered to be normal on most markets. Moreover, as the applicant itself points out, many other Irish companies buy significant quantities of glass from continental producers. In that regard, it must be observed that the company based in Limerick, which is as far away from Dublin as that based in Galway is, purchases only 62% of its supplies from Pilkington. It is thus clear that the data concerning glass imports derived from the replies of the Irish companies do not support the inference drawn by the applicant that the Irish market is separate from the Northern European market.

94.     Finally, the Court observes that the applicant's argument finds no support in the decisions it cites. For instance, whilst it is clear from point 77 in the preamble to the Flat Glass Decision that the cost of transport is a very significant factor in marketing flat glass beyond national frontiers and that the proportion of production intended for export is limited compared with the quantities sold on the home market, that does not mean that the analysis of costs that is made in the contested decision is erroneous. Second, the situation on the plasterboard market in the case which gave rise to the BPB decision was quite different from that on the float glass market. In that decision, unlike the situation in the present case, BPB Industries, which was charged with an abuse of a dominant position, had a factory in Ireland which supplied the national market and a factory in Great Britain which did not export to Ireland. In that connection, the Commission made the point that the prices of the factory located in Great Britain were not competitive with those in Ireland (see point 21 of the preamble to the BPB decision). The Commission concluded that Great Britain and Ireland were the relevant geographical market since those countries were 'the only areas in the Community where BPB is both the sole producer and has a near monopoly position in the supply of plasterboard (point 24 of the preamble to the BPB decision). It therefore determined the geographical market on the basis of factors quite different from those relied on by the applicant in the present case.

95.     It follows from the foregoing that the second objection must be dismissed.

        - The third objection

96.     The Court finds that the analysis of the differences in the FOB and CIF prices for 4 mm float glass from the United Kingdom sold in other countries of the Community is not such as to invalidate the conclusions which the Commission drew from it in the contested decision.

97.     As regards the FOB prices, it must be observed that, as the Commission pointed out, they refer to the price of the product as loaded on board and do not include the costs of subsequent transport, which on this type of market are normally borne by the producers. Consequently, such prices cannot be considered to give appropriate information on the real market prices.

98.     On the other hand, the CIF price, which includes production and insurance costs, and every type of transport costs, can be taken into account for determining the real market prices. However, it must be observed that the data furnished by the applicant do not support its submission that the relevant geographical market is Ireland. Those data show that the discrepancy between the average prices charged in Ireland and the average prices charged in the Netherlands (470/500; ECU 30 per tonne) is less than that between the average prices charged in the Netherlands and the average prices charged in Germany, Belgium or Luxembourg (500/540; ECU 40 per tonne). On the basis of that consideration alone, it should be concluded that Ireland forms part of the same geographical market as the Netherlands and not, as the applicant argues, that Ireland constitutes a separate market

from the rest of Northern Europe.

99.   It follows from the foregoing that the third objection must be dismissed.

100.  It also follows that the fifth plea must be dismissed as unfounded.

101.  The application must, therefore be dismissed in its entirety.

**Costs**

102.  Under Article 87(2) of the Rules of Procedure of the Court of First Instance, the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings. Since the applicant has been unsuccessful and the Commission has applied for costs, the applicant must be ordered to pay the costs.

On those grounds,

THE COURT OF FIRST INSTANCE (Fourth Chamber)

hereby:

**1. Dismisses the application;**

**2. Orders the applicant to pay the costs.**

Moura Ramos
   Tiili
     Mengozzi

Delivered in open court in Luxembourg on 30 March 2000.

H. Jung

V. Tiili

Registrar

President

---

1: Language of the case: English. </HTML

# EXHIBIT 4

L 123/18          EN          Official Journal of the European Union          27.4.2004

COMMISSION REGULATION (EC) No 773/2004

of 7 April 2004

relating to the conduct of proceedings by the Commission pursuant to Articles 81 and 82 of the EC Treaty

(Text with EEA relevance)

THE COMMISSION OF THE EUROPEAN COMMUNITIES,

Having regard to the Treaty establishing the European Community,

Having regard to the Agreement on the European Economic Area,

Having regard to Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty (¹), and in particular Article 33 thereof,

After consulting the Advisory Committee on Restrictive Practices and Dominant Positions,

Whereas:

(1)    Regulation (EC) No 1/2003 empowers the Commission to regulate certain aspects of proceedings for the application of Articles 81 and 82 of the Treaty. It is necessary to lay down rules concerning the initiation of proceedings by the Commission as well as the handling of complaints and the hearing of the parties concerned.

(2)    According to Regulation (EC) No 1/2003, national courts are under an obligation to avoid taking decisions which could run counter to decisions envisaged by the Commission in the same case. According to Article 11(6) of that Regulation, national competition authorities are relieved from their competence once the Commission has initiated proceedings for the adoption of a decision under Chapter III of Regulation (EC) No 1/2003. In this context, it is important that courts and competition authorities of the Member States are aware of the initiation of proceedings by the Commission. The Commission should therefore be able to make public its decisions to initiate proceedings.

(3)    Before taking oral statements from natural or legal persons who consent to be interviewed, the Commission should inform those persons of the legal basis of the interview and its voluntary nature. The persons interviewed should also be informed of the purpose of the interview and of any record which may be made. In order to enhance the accuracy of the statements, the persons interviewed should also be given an opportunity to correct the statements recorded. Where information gathered from oral statements is exchanged pursuant to Article 12 of Regulation (EC) No 1/2003, that information should only be used in evidence to impose sanctions on natural persons where the conditions set out in that Article are fulfilled.

(4)    Pursuant to Article 23(1)(d) of Regulation (EC) No 1/2003 fines may be imposed on undertakings and associations of undertakings where they fail to rectify within the time limit fixed by the Commission an incorrect, incomplete or misleading answer given by a member of their staff to questions in the course of inspections. It is therefore necessary to provide the undertaking concerned with a record of any explanations given and to establish a procedure enabling it to add any rectification, amendment or supplement to the explanations given by the member of staff who is not or was not authorised to provide explanations on behalf of the undertaking. The explanations given by a member of staff should remain in the Commission file as recorded during the inspection.

(5)    Complaints are an essential source of information for detecting infringements of competition rules. It is important to define clear and efficient procedures for handling complaints lodged with the Commission.

(6)    In order to be admissible for the purposes of Article 7 of Regulation (EC) No 1/2003, a complaint must contain certain specified information.

(7)    In order to assist complainants in submitting the necessary facts to the Commission, a form should be drawn up. The submission of the information listed in that form should be a condition for a complaint to be treated as a complaint as referred to in Article 7 of Regulation (EC) No 1/2003.

(8)    Natural or legal persons having chosen to lodge a complaint should be given the possibility to be associated closely with the proceedings initiated by the Commission with a view to finding an infringement. However, they should not have access to business secrets or other confidential information belonging to other parties involved in the proceedings.

(9)    Complainants should be granted the opportunity of expressing their views if the Commission considers that there are insufficient grounds for acting on the complaint. Where the Commission rejects a complaint on the grounds that a competition authority of a Member State is dealing with it or has already done so, it should inform the complainant of the identity of that authority.

---

(¹) OJ L 1, 4.1.2003, p. 1. Regulation as amended by Regulation (EC) No 411/2004 (OJ L 68, 6.3.2004, p. 1).

(10) In order to respect the rights of defence of undertakings, the Commission should give the parties concerned the right to be heard before it takes a decision.

(11) Provision should also be made for the hearing of persons who have not submitted a complaint as referred to in Article 7 of Regulation (EC) No 1/2003 and who are not parties to whom a statement of objections has been addressed but who can nevertheless show a sufficient interest. Consumer associations that apply to be heard should generally be regarded as having a sufficient interest, where the proceedings concern products or services used by the end-consumer or products or services that constitute a direct input into such products or services. Where it considers this to be useful for the proceedings, the Commission should also be able to invite other persons to express their views in writing and to attend the oral hearing of the parties to whom a statement of objections has been addressed. Where appropriate, it should also be able to invite such persons to express their views at that oral hearing.

(12) To improve the effectiveness of oral hearings, the Hearing Officer should have the power to allow the parties concerned, complainants, other persons invited to the hearing, the Commission services and the authorities of the Member States to ask questions during the hearing.

(13) When granting access to the file, the Commission should ensure the protection of business secrets and other confidential information. The category of 'other confidential information' includes information other than business secrets, which may be considered as confidential, insofar as its disclosure would significantly harm an undertaking or person. The Commission should be able to request undertakings or associations of undertakings that submit or have submitted documents or statements to identify confidential information.

(14) Where business secrets or other confidential information are necessary to prove an infringement, the Commission should assess for each individual document whether the need to disclose is greater than the harm which might result from disclosure.

(15) In the interest of legal certainty, a minimum time-limit for the various submissions provided for in this Regulation should be laid down.

(16) This Regulation replaces Commission Regulation (EC) No 2842/98 of 22 December 1998 on the hearing of parties in certain proceedings under Articles 85 and 86 of the EC Treaty (¹), which should therefore be repealed.

(¹) OJ L 354, 30.12.1998, p. 18.

(17) This Regulation aligns the procedural rules in the transport sector with the general rules of procedure in all sectors. Commission Regulation (EC) No 2843/98 of 22 December 1998 on the form, content and other details of applications and notifications provided for in Council Regulations (EEC) No 1017/68, (EEC) No 4056/86 and (EEC) No 3975/87 applying the rules on competition to the transport sector (²) should therefore be repealed.

(18) Regulation (EC) No 1/2003 abolishes the notification and authorisation system. Commission Regulation (EC) No 3385/94 of 21 December 1994 on the form, content and other details of applications and notifications provided for in Council Regulation No 17 (³) should therefore be repealed,

HAS ADOPTED THIS REGULATION:

CHAPTER I

SCOPE

*Article 1*

**Subject-matter and scope**

This regulation applies to proceedings conducted by the Commission for the application of Articles 81 and 82 of the Treaty.

CHAPTER II

INITIATION OF PROCEEDINGS

*Article 2*

**Initiation of proceedings**

1. The Commission may decide to initiate proceedings with a view to adopting a decision pursuant to Chapter III of Regulation (EC) No 1/2003 at any point in time, but no later than the date on which it issues a preliminary assessment as referred to in Article 9(1) of that Regulation or a statement of objections or the date on which a notice pursuant to Article 27(4) of that Regulation is published, whichever is the earlier.

2. The Commission may make public the initiation of proceedings, in any appropriate way. Before doing so, it shall inform the parties concerned.

(²) OJ L 354, 30.12.1998, p. 22.
(³) OJ L 377, 31.12.1994, p. 28.

3.   The Commission may exercise its powers of investigation pursuant to Chapter V of Regulation (EC) No 1/2003 before initiating proceedings.

4.   The Commission may reject a complaint pursuant to Article 7 of Regulation (EC) No 1/2003 without initiating proceedings.

## CHAPTER III

### INVESTIGATIONS BY THE COMMISSION

### Article 3

#### Power to take statements

1.   Where the Commission interviews a person with his consent in accordance with Article 19 of Regulation (EC) No 1/2003, it shall, at the beginning of the interview, state the legal basis and the purpose of the interview, and recall its voluntary nature. It shall also inform the person interviewed of its intention to make a record of the interview.

2.   The interview may be conducted by any means including by telephone or electronic means.

3.   The Commission may record the statements made by the persons interviewed in any form. A copy of any recording shall be made available to the person interviewed for approval. Where necessary, the Commission shall set a time-limit within which the person interviewed may communicate to it any correction to be made to the statement.

### Article 4

#### Oral questions during inspections

1.   When, pursuant to Article 20(2)(e) of Regulation (EC) No 1/2003, officials or other accompanying persons authorised by the Commission ask representatives or members of staff of an undertaking or of an association of undertakings for explanations, the explanations given may be recorded in any form.

2.   A copy of any recording made pursuant to paragraph 1 shall be made available to the undertaking or association of undertakings concerned after the inspection.

3.   In cases where a member of staff of an undertaking or of an association of undertakings who is not or was not authorised by the undertaking or by the association of undertakings to provide explanations on behalf of the undertaking or association of undertakings has been asked for explanations, the Commission shall set a time-limit within which the undertaking or the association of undertakings may communicate to the Commission any rectification, amendment or supplement to the explanations given by such member of staff. The rectification, amendment or supplement shall be added to the explanations as recorded pursuant to paragraph 1.

## CHAPTER IV

### HANDLING OF COMPLAINTS

### Article 5

#### Admissibility of complaints

1.   Natural and legal persons shall show a legitimate interest in order to be entitled to lodge a complaint for the purposes of Article 7 of Regulation (EC) No 1/2003.

Such complaints shall contain the information required by Form C, as set out in the Annex. The Commission may dispense with this obligation as regards part of the information, including documents, required by Form C.

2.   Three paper copies as well as, if possible, an electronic copy of the complaint shall be submitted to the Commission. The complainant shall also submit a non-confidential version of the complaint, if confidentiality is claimed for any part of the complaint.

3.   Complaints shall be submitted in one of the official languages of the Community.

### Article 6

#### Participation of complainants in proceedings

1.   Where the Commission issues a statement of objections relating to a matter in respect of which it has received a complaint, it shall provide the complainant with a copy of the non-confidential version of the statement of objections and set a time-limit within which the complainant may make known its views in writing.

2.   The Commission may, where appropriate, afford complainants the opportunity of expressing their views at the oral hearing of the parties to which a statement of objections has been issued, if complainants so request in their written comments.

### Article 7

#### Rejection of complaints

1.   Where the Commission considers that on the basis of the information in its possession there are insufficient grounds for acting on a complaint, it shall inform the complainant of its reasons and set a time-limit within which the complainant may make known its views in writing. The Commission shall not be obliged to take into account any further written submission received after the expiry of that time-limit.

2.   If the complainant makes known its views within the time-limit set by the Commission and the written submissions made by the complainant do not lead to a different assessment of the complaint, the Commission shall reject the complaint by decision.

3.   If the complainant fails to make known its views within the time-limit set by the Commission, the complaint shall be deemed to have been withdrawn.

## Article 8

### Access to information

1.  Where the Commission has informed the complainant of its intention to reject a complaint pursuant to Article 7(1) the complainant may request access to the documents on which the Commission bases its provisional assessment. For this purpose, the complainant may however not have access to business secrets and other confidential information belonging to other parties involved in the proceedings.

2.  The documents to which the complainant has had access in the context of proceedings conducted by the Commission under Articles 81 and 82 of the Treaty may only be used by the complainant for the purposes of judicial or administrative proceedings for the application of those Treaty provisions.

## Article 9

### Rejections of complaints pursuant to Article 13 of Regulation (EC) No 1/2003

Where the Commission rejects a complaint pursuant to Article 13 of Regulation (EC) No 1/2003, it shall inform the complainant without delay of the national competition authority which is dealing or has already dealt with the case.

## CHAPTER V

### EXERCISE OF THE RIGHT TO BE HEARD

## Article 10

### Statement of objections and reply

1.  The Commission shall inform the parties concerned in writing of the objections raised against them. The statement of objections shall be notified to each of them.

2.  The Commission shall, when notifying the statement of objections to the parties concerned, set a time-limit within which these parties may inform it in writing of their views. The Commission shall not be obliged to take into account written submissions received after the expiry of that time-limit.

3.  The parties may, in their written submissions, set out all facts known to them which are relevant to their defence against the objections raised by the Commission. They shall attach any relevant documents as proof of the facts set out. They shall provide a paper original as well as an electronic copy or, where they do not provide an electronic copy, 28 paper copies of their submission and of the documents attached to it. They may propose that the Commission hear persons who may corroborate the facts set out in their submission.

## Article 11

### Right to be heard

1.  The Commission shall give the parties to whom it has addressed a statement of objections the opportunity to be heard before consulting the Advisory Committee referred to in Article 14(1) of Regulation (EC) No 1/2003.

2.  The Commission shall, in its decisions, deal only with objections in respect of which the parties referred to in paragraph 1 have been able to comment.

## Article 12

### Right to an oral hearing

The Commission shall give the parties to whom it has addressed a statement of objections the opportunity to develop their arguments at an oral hearing, if they so request in their written submissions.

## Article 13

### Hearing of other persons

1.  If natural or legal persons other than those referred to in Articles 5 and 11 apply to be heard and show a sufficient interest, the Commission shall inform them in writing of the nature and subject matter of the procedure and shall set a time-limit within which they may make known their views in writing.

2.  The Commission may, where appropriate, invite persons referred to in paragraph 1 to develop their arguments at the oral hearing of the parties to whom a statement of objections has been addressed, if the persons referred to in paragraph 1 so request in their written comments.

3.  The Commission may invite any other person to express its views in writing and to attend the oral hearing of the parties to whom a statement of objections has been addressed. The Commission may also invite such persons to express their views at that oral hearing.

## Article 14

### Conduct of oral hearings

1.  Hearings shall be conducted by a Hearing Officer in full independence.

2.  The Commission shall invite the persons to be heard to attend the oral hearing on such date as it shall determine.

3.  The Commission shall invite the competition authorities of the Member States to take part in the oral hearing. It may likewise invite officials and civil servants of other authorities of the Member States.

4.    Persons invited to attend shall either appear in person or be represented by legal representatives or by representatives authorised by their constitution as appropriate. Undertakings and associations of undertakings may also be represented by a duly authorised agent appointed from among their permanent staff.

5.    Persons heard by the Commission may be assisted by their lawyers or other qualified persons admitted by the Hearing Officer.

6.    Oral hearings shall not be public. Each person may be heard separately or in the presence of other persons invited to attend, having regard to the legitimate interest of the undertakings in the protection of their business secrets and other confidential information.

7.    The Hearing Officer may allow the parties to whom a statement of objections has been addressed, the complainants, other persons invited to the hearing, the Commission services and the authorities of the Member States to ask questions during the hearing.

8.    The statements made by each person heard shall be recorded. Upon request, the recording of the hearing shall be made available to the persons who attended the hearing. Regard shall be had to the legitimate interest of the parties in the protection of their business secrets and other confidential information.

CHAPTER VI

**ACCESS TO THE FILE AND TREATMENT OF CONFIDENTIAL INFORMATION**

*Article 15*

**Access to the file and use of documents**

1.    If so requested, the Commission shall grant access to the file to the parties to whom it has addressed a statement of objections. Access shall be granted after the notification of the statement of objections.

2.    The right of access to the file shall not extend to business secrets, other confidential information and internal documents of the Commission or of the competition authorities of the Member States. The right of access to the file shall also not extend to correspondence between the Commission and the competition authorities of the Member States or between the latter where such correspondence is contained in the file of the Commission.

3.    Nothing in this Regulation prevents the Commission from disclosing and using information necessary to prove an infringement of Articles 81 or 82 of the Treaty.

4.    Documents obtained through access to the file pursuant to this Article shall only be used for the purposes of judicial or administrative proceedings for the application of Articles 81 and 82 of the Treaty.

*Article 16*

**Identification and protection of confidential information**

1.    Information, including documents, shall not be communicated or made accessible by the Commission in so far as it contains business secrets or other confidential information of any person.

2.    Any person which makes known its views pursuant to Article 6(1), Article 7(1), Article 10(2) and Article 13(1) and (3) or subsequently submits further information to the Commission in the course of the same procedure, shall clearly identify any material which it considers to be confidential, giving reasons, and provide a separate non-confidential version by the date set by the Commission for making its views known.

3.    Without prejudice to paragraph 2 of this Article, the Commission may require undertakings and associations of undertakings which produce documents or statements pursuant to Regulation (EC) No 1/2003 to identify the documents or parts of documents which they consider to contain business secrets or other confidential information belonging to them and to identify the undertakings with regard to which such documents are to be considered confidential. The Commission may likewise require undertakings or associations of undertakings to identify any part of a statement of objections, a case summary drawn up pursuant to Article 27(4) of Regulation (EC) No 1/2003 or a decision adopted by the Commission which in their view contains business secrets.

The Commission may set a time-limit within which the undertakings and associations of undertakings are to:

(a)    substantiate their claim for confidentiality with regard to each individual document or part of document, statement or part of statement;

(b)    provide the Commission with a non-confidential version of the documents or statements, in which the confidential passages are deleted;

(c)    provide a concise description of each piece of deleted information.

4.    If undertakings or associations of undertakings fail to comply with paragraphs 2 and 3, the Commission may assume that the documents or statements concerned do not contain confidential information.

CHAPTER VII

**GENERAL AND FINAL PROVISIONS**

*Article 17*

**Time-limits**

1.    In setting the time-limits provided for in Article 3(3), Article 4(3), Article 6(1), Article 7(1), Article 10(2) and Article 16(3), the Commission shall have regard both to the time required for preparation of the submission and to the urgency of the case.

27.4.2004      EN      Official Journal of the European Union      L 123/23

2. The time-limits referred to in Article 6(1), Article 7(1) and Article 10(2) shall be at least four weeks. However, for proceedings initiated with a view to adopting interim measures pursuant to Article 8 of Regulation (EC) No 1/2003, the time-limit may be shortened to one week.

3. The time-limits referred to in Article 3(3), Article 4(3) and Article 16(3) shall be at least two weeks.

4. Where appropriate and upon reasoned request made before the expiry of the original time-limit, time-limits may be extended.

### Article 18

### Repeals

Regulations (EC) No 2842/98, (EC) No 2843/98 and (EC) No 3385/94 are repealed.

References to the repealed regulations shall be construed as references to this regulation.

### Article 19

### Transitional provisions

Procedural steps taken under Regulations (EC) No 2842/98 and (EC) No 2843/98 shall continue to have effect for the purpose of applying this Regulation.

### Article 20

### Entry into force

This Regulation shall enter into force on 1 May 2004.

This Regulation shall be binding in its entirety and directly applicable in all Member States.

Done at Brussels, 7 April 2004.

*For the Commission*
Mario MONTI
*Member of the Commission*

L 123/24    EN    Official Journal of the European Union    27.4.2004

*ANNEX*

---

**FORM C**

COMPLAINT PURSUANT TO ARTICLE 7 OF REGULATION (EC) No 1/2003

**I. Information regarding the complainant and the undertaking(s) or association of undertakings giving rise to the complaint**

1. Give full details on the identity of the legal or natural person submitting the complaint. Where the complainant is an undertaking, identify the corporate group to which it belongs and provide a concise overview of the nature and scope of its business activities. Provide a contact person (with telephone number, postal and e-mail-address) from which supplementary explanations can be obtained.

2. Identify the undertaking(s) or association of undertakings whose conduct the complaint relates to, including, where applicable, all available information on the corporate group to which the undertaking(s) complained of belong and the nature and scope of the business activities pursued by them. Indicate the position of the complainant vis-à-vis the undertaking(s) or association of undertakings complained of (e.g. customer, competitor).

**II. Details of the alleged infringement and evidence**

3. Set out in detail the facts from which, in your opinion, it appears that there exists an infringement of Article 81 or 82 of the Treaty and/or Article 53 or 54 of the EEA agreement. Indicate in particular the nature of the products (goods or services) affected by the alleged infringements and explain, where necessary, the commercial relationships concerning these products. Provide all available details on the agreements or practices of the undertakings or associations of undertakings to which this complaint relates. Indicate, to the extent possible, the relative market positions of the undertakings concerned by the complaint.

4. Submit all documentation in your possession relating to or directly connected with the facts set out in the complaint (for example, texts of agreements, minutes of negotiations or meetings, terms of transactions, business documents, circulars, correspondence, notes of telephone conversations...). State the names and address of the persons able to testify to the facts set out in the complaint, and in particular of persons affected by the alleged infringement. Submit statistics or other data in your possession which relate to the facts set out, in particular where they show developments in the marketplace (for example information relating to prices and price trends, barriers to entry to the market for new suppliers etc.).

5. Set out your view about the geographical scope of the alleged infringement and explain, where that is not obvious, to what extent trade between Member States or between the Community and one or more EFTA States that are contracting parties of the EEA Agreement may be affected by the conduct complained of.

**III. Finding sought from the Commission and legitimate interest**

6. Explain what finding or action you are seeking as a result of proceedings brought by the Commission.

7. Set out the grounds on which you claim a legitimate interest as complainant pursuant to Article 7 of Regulation (EC) No 1/2003. State in particular how the conduct complained of affects you and explain how, in your view, intervention by the Commission would be liable to remedy the alleged grievance.

**IV. Proceedings before national competition authorities or national courts**

8. Provide full information about whether you have approached, concerning the same or closely related subject-matters, any other competition authority and/or whether a lawsuit has been brought before a national court. If so, provide full details about the administrative or judicial authority contacted and your submissions to such authority.

Declaration that the information given in this form and in the Annexes thereto is given entirely in good faith.

Date and signature.

---

# EXHIBIT 5

19.6.2001    EN    Official Journal of the European Communities    L 162/21

## COMMISSION DECISION

### of 23 May 2001

### on the terms of reference of hearing officers in certain competition proceedings

*(notified under document number C(2001) 1461)*

**(Text with EEA relevance)**

(2001/462/EC, ECSC)

THE COMMISSION OF THE EUROPEAN COMMUNITIES,

Having regard to the Treaty establishing the European Community,

Having regard to the Treaty establishing the European Coal and Steel Community,

Having regard to the Agreement on the European Economic Area,

Having regard to the Rules of Procedure of the Commission ([1]), and in particular Article 20 thereof,

Whereas:

(1)   The right of the parties concerned and of third parties to be heard before a final decision affecting their interests is taken is a fundamental principle of Community law. That right is also set out in Council Regulation (EEC) No 4064/89 of 21 December 1989 on the control of concentrations between undertakings ([2]), as last amended by Regulation (EC) No 1310/97 ([3]), Commission Regulation (EC) No 2842/98 of 22 December 1998 on the hearing of parties in certain proceedings under Articles 85 and 86 of the EC Treaty ([4]) and Commission Regulation (EC) No 447/98 of 1 March 1998 on the notifications, time limits and hearings provided for in Council Regulation (EEC) No 4064/89 on the control of concentrations between undertakings ([5]).

(2)   The Commission must ensure that that right is guaranteed in its competition proceedings, having regard in particular to the Charter of Fundamental Rights of the European Union ([6]).

(3)   The conduct of administrative proceedings should therefore be entrusted to an independent person experienced in competition matters who has the integrity necessary to contribute to the objectivity, transparency and efficiency of those proceedings.

(4)   The Commission created the post of hearing officer for these purposes in 1982 and last laid down the terms of reference for that post in Commission Decision 94/810/ ECSC, EC of 12 December 1994 on the terms of reference of hearing officers in competition procedures before the Commission ([7]).

(5)   It is necessary to further strengthen the role of the hearing officer and to adapt and consolidate those terms of reference in the light of developments in competition law.

(6)   In order to ensure the independence of the hearing officer, he should be attached, for administrative purposes, to the member of the Commission with special responsibility for competition. Transparency as regards the appointment, termination of appointment and transfer of hearing officers should be increased.

(7)   The hearing officer should be appointed in accordance with the rules laid down in the Staff Regulations of Officials and the Conditions of Employment of Other Servants of the European Communities. In accordance with those rules, consideration may be given to candidates who are not officials of the Commission.

(8)   The terms of reference of the hearing officer in competition proceedings should be framed in such a way as to safeguard the right to be heard throughout the whole procedure.

(9)   When disclosing information on natural persons, particular attention should be paid to Regulation (EC) No 45/2001 of the European Parliament and of the Council of 18 December 2000 on the protection of individuals with regard to the processing of personal data by the Community institutions and bodies and on the free movement of such data ([8]).

---

([1]) OJ L 308, 8.12.2000, p. 26.
([2]) OJ L 395, 30.12.1989, p. 1 (corrected version in OJ L 257, 21.9.1990, p. 13).
([3]) OJ L 180, 9.7.1997, p. 1.
([4]) OJ L 354, 30.12.1998, p. 18.
([5]) OJ L 61, 2.3.1998, p. 1.
([6]) OJ C 364, 18.12.2000, p. 1.

([7]) OJ L 330, 21.12.1994, p. 67.
([8]) OJ L 8, 12.1.2001, p. 1.

L 162/22    [EN]    Official Journal of the European Communities    19.6.2001

(10)    This Decision should be without prejudice to the general rules granting or excluding access to Commission documents.

(11)    Decision 94/810/ECSC, EC should be repealed,

HAS DECIDED AS FOLLOWS:

### Article 1

The Commission shall appoint one or more hearing officers (hereinafter 'the hearing officer'), who shall ensure that the effective exercise of the right to be heard is respected in competition proceedings before the Commission under Articles 81 and 82 of the EC Treaty, Articles 65 and 66 of the ECSC Treaty, and Regulation (EEC) No 4064/89.

### Article 2

1.    The appointment of the hearing officer shall be published in the *Official Journal of the European Communities*. Any interruption, termination of appointment or transfer by whatever procedure, shall be the subject of a reasoned decision of the Commission. That decision shall be published in the *Official Journal of the European Communities*.

2.    The hearing officer shall be attached, for administrative purposes, to the member of the Commission with special responsibility for competition (hereinafter 'the competent member of the Commission').

3.    Where the hearing officer is unable to act, the competent member of the Commission, where appropriate after consultation of the hearing officer, shall designate another official, who is not involved in the case in question, to carry out the hearing officer's duties.

### Article 3

1.    In performing his duties, the hearing officer shall take account of the need for effective application of the competition rules in accordance with the Community legislation in force and the principles laid down by the Court of Justice and the Court of First Instance of the European Communities.

2.    The hearing officer shall be kept informed by the director responsible for investigating the case (hereinafter 'the director responsible') about the development of the procedure up to the stage of the draft decision to be submitted to the competent member of the Commission.

3.    The hearing officer may present observations on any matter arising out of any Commission competition proceeding to the competent member of the Commission.

### Article 4

1.    The hearing officer shall organise and conduct the hearings provided for in the provisions implementing Articles 81 and 82 of the EC Treaty, Articles 65 and 66 of the ECSC Treaty and Regulation (EEC) No 4064/89, in accordance with Articles 5 to 13 of this Decision.

2.    The provisions referred to in paragraph 1 are:

(a)    the first paragraph of Article 36 of the ECSC Treaty;

(b)    Regulation (EC) No 2842/98;

(c)    Regulation (EC) No 447/98.

### Article 5

The hearing officer shall ensure that the hearing is properly conducted and contributes to the objectivity of the hearing itself and of any decision taken subsequently. The hearing officer shall seek to ensure in writing, together with, in the preparation of draft Commission decisions, due account is taken of all the relevant facts, whether favourable or unfavourable to the parties concerned, including the factual elements related to the gravity of any infringement.

### Article 6

1.    Applications to be heard from third parties, be they persons, undertakings or associations of persons or undertakings, shall be submitted in writing, together with a written statement explaining the applicant's interest in the outcome of the procedure.

2.    Decisions as to whether third parties are to be heard shall be taken after consulting the director responsible.

3.    Where it is found that an application has not shown a sufficient interest to be heard, he shall be informed in writing of the reasons for such finding. A time limit shall be fixed within which he may submit any further written comments.

### Article 7

1.    Applications to be heard orally shall be made in the applicant's written comments on letters which the Commission has addressed to him.

2.    The letters referred to in paragraph 1 are those:

(a)    communicating a statement of objections;

(b)    inviting the written comments of a third party having shown sufficient interest to be heard;

(c)    informing a complainant that in the Commission's view there are insufficient grounds for finding an infringement and inviting him to submit any further written comments.

3.    Decisions as to whether applicants are to be heard orally shall be taken after consulting the director responsible.

### Article 8

1.    Where a person, an undertaking or an association of persons or undertakings has received one or more of the letters listed in Article 7(2) and has reason to believe that the Commission has in its possession documents which have not been disclosed to it and that those documents are necessary for the proper exercise of the right to be heard, access to those documents may be sought by means of a reasoned request.

2.   The reasoned decision on any such request shall be communicated to the person, undertaking or association that made the request and to any other person, undertaking or association concerned by the procedure.

### Article 9

Where it is intended to disclose information which may constitute a business secret of an undertaking, it shall be informed in writing of this intention and the reasons for it. A time limit shall be fixed within which the undertaking concerned may submit any written comments.

Where the undertaking concerned objects to the disclosure of the information but it is found that the information is not protected and may therefore be disclosed, that finding shall be stated in a reasoned decision which shall be notified to the undertaking concerned. The decision shall specify the date after which the information will be disclosed. This date shall not be less than one week from the date of notification.

The first and second paragraphs shall apply *mutatis mutandis* to the disclosure of information by publication in the *Official Journal of the European Communities*.

### Article 10

Where a person, undertaking or association of persons or undertakings considers that the time limit imposed for its reply to a letter referred to in Article 7(2) is too short, it may, within the original time limit, seek an extension of that time limit by means of a reasoned request. The applicant shall be informed in writing whether the request has been granted.

### Article 11

Where appropriate, in view of the need to ensure that the hearing is properly prepared and particularly that questions of fact are clarified as far as possible, the hearing officer may, after consulting the director responsible, supply in advance to the parties invited to the hearing a list of the questions on which he wishes them to make known their views.

For this purpose, after consulting the director responsible, the hearing officer may hold a meeting with the parties invited to the hearing and, where appropriate, the Commission staff, in order to prepare for the hearing itself.

The hearing officer may also ask for prior written notification of the essential contents of the intended statement of persons whom the parties invited to the hearing have proposed for hearing.

### Article 12

1.   After consulting the director responsible, the hearing officer shall determine the date, the duration and the place of the hearing. Where a postponement is requested, the hearing officer shall decide whether or not to allow it.

2.   The hearing officer shall be fully responsible for the conduct of the hearing.

3.   The hearing officer shall decide whether fresh documents should be admitted during the hearing, what persons should be heard on behalf of a party and whether the persons concerned should be heard separately or in the presence of other persons attending the hearing.

4.   Where appropriate, in view of the need to ensure the right to be heard, the hearing officer may, after consulting the Director responsible, afford persons, undertakings, and associations of persons or undertakings the opportunity of submitting further written comments after the oral hearing. The hearing officer shall fix a date by which such submissions may be made. The Commission shall not be obliged to take into account written comments received after that date.

### Article 13

1.   The hearing officer shall report to the competent member of the Commission on the hearing and the conclusions he draws from it, with regard to the respect of the right to be heard. The observations in this report shall concern procedural issues, including disclosure of documents and access to the file, time limits for replying to the statement of objections and the proper conduct of the oral hearing.

A copy of the report shall be given to the Director-General for Competition and to the director responsible.

2.   In addition to the report referred to in paragraph 1, the hearing officer may make observations on the further progress of the proceedings. Such observations may relate among other things to the need for further information, the withdrawal of certain objections, or the formulation of further objections.

### Article 14

Where appropriate, the hearing officer may report on the objectivity of any enquiry conducted in order to assess the competition impact of commitments proposed in relation to any proceeding initiated by the Commission in application of the provisions referred to in Article 1. This shall cover in particular the selection of respondents and the methodology used.

### Article 15

The hearing officer shall, on the basis of the draft decision to be submitted to the Advisory Committee in the case in question, prepare a final report in writing on the respect of the right to be heard, as referred to in Article 13(1). This report will also consider whether the draft decision deals only with objections in respect of which the parties have been afforded the opportunity of making known their views, and, where appropriate, the objectivity of any enquiry within the meaning of Article 14.

L 162/24 ⬛ EN ⬛     Official Journal of the European Communities     19.6.2001

The final report shall be submitted to the competent member of the Commission, the Director-General for Competition and the director responsible. It shall be communicated to the competent authorities of the Member States and, in accordance with the provisions on cooperation laid down in Protocol 23 and Protocol 24 of the EEA Agreement, to the EFTA Surveillance Authority.

### Article 16

1.   The hearing officer's final report shall be attached to the draft decision submitted to the Commission, in order to ensure that, when it reaches a decision on an individual case, the Commission is fully apprised of all relevant information as regards the course of the procedure and respect of the right to be heard.

2.   The final report may be modified by the hearing officer in the light of any amendments to the draft decision up to the time the decision is adopted by the Commission.

3.   The Commission shall communicate the hearing officer's final report, together with the decision, to the addressees of the decision. It shall publish the hearing officer's final report in the *Official Journal of the European Communities*, together with the decision, having regard to the legitimate interest of undertakings in the protection of their business secrets.

### Article 17

Decision 94/810/ECSC, EC is repealed.

Procedural steps already taken under that Decision shall continue to have effect.

Done at Brussels, 23 May 2001.

*For the Commission*
Mario MONTI
*Member of the Commission*