### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE<br>**INTEL CORPORATION**<br>**MICROPROCESSOR ANTITRUST**<br>**LITIGATION** | )<br>)<br>)<br>)<br>) | **MDL No. 05-1717-JJF** |

| | |
|---|---|
| **ADVANCED MICRO DEVICES, INC., a**<br>**Delaware Corporation, and AMD**<br>**INTERNATIONAL SALES & SERVICES,**<br>**LTD., a Delaware corporation,** | )<br>)<br>)<br>)<br>) |
| **Plaintiffs,** | ) |
| v. | ) **C.A. No. 05-441-JJF** |
| **INTEL CORPORATION, a Delaware**<br>**Corporation, and INTEL KABUSHIKI**<br>**KAISHA, a Japanese corporation,** | )<br>)<br>) |
| **Defendants.** | ) |

| | |
|---|---|
| **PHIL PAUL, on behalf of himself and**<br>**all others similarly situated,** | )<br>) |
| **Plaintiffs,** | ) |
| v. | ) **C.A. No. 05-485-JJF** |
| **INTEL CORPORATION,** | ) **CONSOLIDATED** |
| **Defendants.** | ) |

## SPECIAL MASTER'S REPORT AND RECOMMENDATION – (DM 4A)

The captioned cases are brought against the Intel Corporation ("Intel") as the

manufacturer of microprocessors that run the Microsoft Windows and Linux families of

operating systems (the "x86 Microprocessor Market"), a market in which Intel is alleged to hold

revenues. The 05-441 action is brought by Advanced Micro Devices, Inc. and AMD

International Sales & Service, Ltd. (collectively, "AMD"), an American-based manufacturer and competitor of Intel in the x86 Microprocessor Market.

The 05-485 action is brought on behalf of a class of consumers (the "Class Plaintiffs") who allege economic injury resulting from Intel's alleged anticompetitive and monopolistic practices. The 05-485 action has been consolidated with over 70 other consumer-related actions by the Judicial Panel on Multidistrict Litigation and assigned to this Court, where it is docketed as MDL Docket No. 05-1717 (collectively, the "Class Litigation"). As used herein, the term "Parties" refers to Intel, AMD and the Class Plaintiffs. Presently before the Special Master is the Motion of AMD and the Class Plaintiffs to compel Intel to produce the notes of Intel's counsel investigation interviews ("Weil Materials")[1] of designated employees ("custodians") conducted by Intel's counsel, Weil Gotshal & Manges, LLC ("Weil") concerning Intel's compliance with its evidence preservation obligations. (D.I. 467).[2]

Having read and considered the papers submitted by the parties, having heard and considered the parties respective oral arguments made before the Special Master in a hearing on December 27, 2007, and having conducted an exhaustive *in camera* review of all Weil Material, including notes, the Special Master recommends that the requested Weil Materials, as redacted by the Special Master, be produced.[3]

## BACKGROUND

On June 27, 2005, AMD filed its complaint (the "Complaint") against Intel.[4]  On the same date, upon learning of the filing of the Complaint, Intel assembled a team to put into place

---

[1] The Weil Materials included notes taken during and after the custodian interviews, meeting notices, emails between attorneys regarding the interviews, etc.

[2] For convenience, all Docket Identification numbers will only reference C.A. No. 05-441-JJF (except for the final recommendation).

[3] To understand the in camera process that took place, see Appendix.

[4] Since the triggering event for Intel's document preservation obligation is the first-filed AMD complaint, the Special Master does not reference the complaint filed on behalf of Class Plaintiffs.

- 2 -

a process to "identify and preserve relevant paper and electronic documents" across six different

continents. (D.I. 321 at 1-13). Intel describes its document retention plan (the "Plan") as being

tiered and having multiple layers of retention. The Plan included:

- The day after the Complaint was filed, Intel began to preserve a company-wide snapshot of e-mail and other electronic documents stored in Intel servers as of the week the Complaint was filed ("Complaint Freeze Tapes").

- Two days after the Complaint was filed, Intel sent a hold notice bulletin to 4,000 sales and marketing group employees with instructions to retain documents related to competition with AMD and competition concerning the sale of CPUs generally.

- Four days after the Complaint was filed, Intel distributed a more detailed litigation hold notice to 629 employees and now has provided such notices to approximately 1,500 employees.

- Within days of the filing of the Complaint, Intel began collecting the electronic and hard copy documents from certain employees.

- In the Fall of 2005, Intel began a process of preserving, on a weekly basis, the backup tapes containing e-mails of employees identified as having potential relevance to the lawsuit ("Weekly Backup Tapes"). These tapes were not the primary preservation method, but [rather] a mechanism to fall back on in the event documents could not be obtained directly from the individual employees who originally generated or received e-mails.

(D.I. 321 at 1-2).

Absent from Intel's preservation activities was its decision not to suspend, that is turn off,

the so-called "auto delete" function of its e-mail system, which automatically deletes e-mails

remaining in an employees mailbox after they have aged for 35 days.[5]   (D.I. 489 at Ex. 2 at 1).

---

[5] Intel described its auto delete function to Judge Joseph J. Farnan, Jr., in correspondence dated March 5, 2007, as follows:

> Like many companies, Intel's e-mail system routinely deletes e-mails remaining in the mailbox after they have aged a certain period of time. Aging does not apply to e-mails moved to a person's hard drive or personal folders. The system is common in many companies to maintain the efficient functioning of the complex, dynamic environment of e-mail servers. Intel employees are educated on the operation of the purge system and instructed on the methods of saving e-mails to prevent them rolling off the system once they reach the end of the aging period. Congress recently enacted Rule 37(f) of the Federal Rules of Civil Procedure in recognition of the unique document preservation challenges presented by the manner in which most large computer systems operate. The Committee Notes regarding the impetus of Rule 37(f) point out that: "[T]he

In this regard, Intel claims that the ongoing operation of auto delete would not interfere with its preservation obligations because: (1) it had instructed all custodians subject to the hold to preserve all relevant e-mails and (2) Intel would move all custodians to a group of isolated exchange servers that would backup on a regular weekly interval and would, in turn, preserve backup tapes through the litigation. (D.I 489 at 1-2).

AMD, the Class Plaintiffs and Intel recognize that this litigation could be the "largest electronic production in history" (Jan. 25, 2007 Tr. at 10-11) resulting in Intel's production of "somewhere in the neighborhood of a pile 137 miles high." (Apr. 20, 2006 Tr. at 43:22). Given this expectation the parties negotiated and ultimately agreed to the production of documents by Order dated May 17, 2006. (D.I. 124). The parties agreement is described as a three-step approach:

- Step 1 – AMD and Intel were required to exchange custodian lists accompanied by a representation that after reasonable investigation, the individuals on the list comprised all of their personnel in possession of an "appreciable quantity of non-duplicative documents and things responsive to [the party's document request]" ("Custodian List"). Intel guaranteed that its Custodian List would include no

---

> regular purging of e-mails or other electronic communications is necessary to
> prevent a build-up of data that can overwhelm the most robust electronic
> information system." *See* Report of the Judicial Conference Committee on
> Rules of Practice and Procedure (Sept. 2005) at 14.

(D.I. 489, Ex. 1 at 3 n.3).

Absent from Intel's description to Judge Farnan is the following language from the referenced Advisory Committee Note:

> Good faith in the routine operation of an information system may involve a
> party's intervention to modify or suspend certain features of that routine
> operation to prevent the loss of information, if that information is subject to a
> preservation obligation. . . . The good faith requirement of Rule 37(f) means that
> a party is not permitted to exploit the routine operation of an information system
> to thwart discovery obligations by allowing that operation to continue in order to
> destroy specific stored information that it is required to preserve.  When a party
> is under a duty to preserve information because of pending . . . litigation,
> intervention in the routine operation of an information system is one aspect of
> what is often called a "litigation hold."

Fed. R. Civ. P. 37(f) advisory committee's note.

> fewer than 1,000 custodians and AMD guaranteed that its Custodian List would include no fewer than 400 custodians.
>
> - Step 2 – Each party then agreed to designate no fewer than 20% of the custodians on its own Custodian List "whose paper and electronic files will be reviewed and produced in the first instance in response to the other parties' initial document requests" ("Party Designated Production Custodian List").
>
> - Step 3 – Following the exchange of the Party Designated Production Custodian Lists, the parties would cooperate in and complete an informal discovery process to allow each side to collect additional information so they could designate additional custodians for production from the other side's list. Each side was entitled to select not more than 15% of the persons identified in the other's Custodian List ("Adverse Party Designated Production Custodian List"). Intel could request production from up to 50 additional custodians in AMD's custodian list and AMD could request up to 100 additional custodians from Intel's custodian list.

(D.I. 321 at 17-18) (footnotes omitted).

Independent of its implementation of the document preservation plan, Intel, in the Fall of

2006, discovered some lapses in the plan. Intel subsequently hired attorneys at Weil, who began

the then undisclosed process of interviewing each of Intel's 1,023 custodians for the purpose of

determining their e-mail preservation habits and their level of compliance with Intel's litigation

hold notices/instructions.

Intel first advised AMD and the Class Plaintiffs of the lapses during a telephone

conversation that was followed up by e-mail correspondence in February 8, 2007. (D.I. 467 at

Ex. A). The referenced e-mail advised in part as follows:

> The problem we are seeing is confined to e-mails that post-date the complaint. . . .
>
> * * * * *
>
> PROBLEMS WITH SOME INDIVIDUALS' COMPLIANCE WITH HOLD INSTRUCTIONS. In October of 2006, Intel first became aware that a couple of individuals subject to the hold notice had not fully complied with the instructions as to e-mail retention. This problem prompted an additional follow-up program – to date of more than 200 custodians – to make sure Intel custodians were complying with the retention instructions. In the course of these reviews, we have discovered further inadequacies in preserving e-mails.

> For example, a common mistake was a failure to retain all items
> from the custodians' sent e-mail box, and as a result only received
> e-mails were fully retained. . . . Other mistakes occurred for
> various different reasons. For example, a few thought that their e-
> mails were being retained automatically by Intel's IT department....
>
> PROBLEMS WITH "WEEKLY BACK-UP TAPES". . . . [T]hey do serve as a
> back-up for those who didn't fully comply with the hold instructions. . . .
>
> Since the "weekly back-up tapes" cover the time period of October 2005 forward,
> they leave a maximum possible gap of about four months between the end of June
> and October. . . .
>
> Intel has also discovered some issues with the overall coverage of the back-up
> tapes. In late January 2007, Intel first learned that 151 (out of some 900 or so)
> custodians that were supposed to be migrated to the dedicated servers were not
> migrated. . . . Further, custodians added after the first 900 were not migrated to
> the servers. Finally, although these "weekly back-up tapes" were supposed to be
> preserved for the duration of the litigation, in Europe Intel's IT department
> mistakenly began recycling the weekly tapes after one year.

(D.I. 467 at Ex. A). In addition to describing what Intel had been doing to address issues

implicated by the disclosure lapses, Intel assured AMD that, "In any event, we certainly want to

provide you with complete information and full cooperation." (D.I. 467 at Exh. A).

By correspondence dated March 5, 2007, in anticipation of a March 7, 2007 status

conference, Intel advised Judge Farnan that it had:

> identified a number of inadvertent mistakes in the implementation
> of [its] described preservation process. These document retention
> issues are the result of human errors in implementation, and
> include the following: some employees' retention practices were
> incomplete on an individual level, some employees were not given
> timely notice to retain materials, some terminated employees'
> documents may not have been saved and the fail-safe plan to
> prepare back-up tapes missed some employees.

(D.I. 293 at 3).

In the referenced correspondence, Intel provided Judge Farnan with greater detail about

the lapses and its remediation efforts to that date. Intel also proposed that it continue its

remediation efforts, complete its review in a short period of time and report back to the Court.

Intel also advised the Court that it "made it clear to counsel for AMD and the [Class Plaintiffs]

that it is prepared to share information regarding Intel's efforts in that regard and to work with

them going forward in addressing the issues and minimizing any potential losses, if any, of

information." (D.I. 293 at 7).

AMD also filed a Status Conference Statement on March 5, 2007. (D.I. 294). For its

part, AMD described Intel's document retention issues as follows:

> Through what appears to be a combination of gross
> communication failures, an ill-conceived plan of document
> retention and lackluster oversight by outside counsel, Intel has
> apparently allowed evidence to be destroyed.
>
> * * *
>
> Intel chose to adopt and rely on a highly-risky system of document
> preservation . . . From [what] AMD can tell, Intel's preservation
> strategy:
>
> - Allowed the continued, automatic purge on a 35 day (or longer) schedule of
>   all e-mail communications to, from and within the company;
>
> - Relied exclusively on a move-it-or-lose-it "honor system" that required
>   individual custodians to correctly identify, segregate and proactively move
>   relevant evidence to media or their local computer before that data was
>   destroyed by a network purge;
>
> - Backstopped this "honor system" beginning in October 2005 with a weekly
>   back-up of e-mail that required Intel's IT personnel to identify and correctly
>   migrate custodian's data to dedicated servers subject to backup.
>
> [T]his "honor system" was defeated by a combination of apparently erroneous
> unclear or incomplete "litigation hold" instructions, lack of adequate monitoring
> to ensure those instructions were understood and followed and a wholesale failure
> [to] timely . . . deliver any preservation instructions to a third of the employee-
> custodians Intel itself identified.

(D.I. 294 at 1, 5-6) (footnote omitted).

AMD further advised the Court that, on February 15 and February 23, 2007, it had

requested that Intel supply, among other data, the following:

> A spreadsheet listing each of Intel's 1027 custodians with the following information for each: (1) the custodian's name; (2) whether that custodian has been designated by Intel on its "20% list" or, alternatively, adversely designated by AMD; (3) the "harvest" date, i.e., date that the custodian's data was collected (if applicable); (4) the date upon which the custodian's email was migrated to the dedicated server, if it was; (5) a useful description of the exact nature of any retention deficiency or data loss; (6) the date that Intel discovered the retention deficiency or data loss; and (7) the time period during which these problems persisted.

(D.I. 294 at 7).

AMD proposed that Intel provide to the Special Master and the parties "a complete accounting of its preservation problems, a custodian-by-custodian tally of issues, identification of data that appears to have been lost, and an inventory of back-up tapes that exist and can be successfully restored." (D.I. 294 at 8).

The parties ultimately stipulated to a disclosure order, on March 16, 2007, which provided:

> 6. On April 17, 2007 Intel shall submit in writing an updated and final report regarding 239 Intel Custodians for which Intel provided preliminary information to AMD on February 22, 2007, which will reflect Intel's best information gathered after reasonable investigation and which shall contain the following information for each such Intel custodian [footnote addressing the same information from former employees omitted]:
>
>     a. The Intel Custodian's name;
>
>     b. A detailed written description of the preservation issues affecting the Intel Custodian, including the nature, scope and duration of any preservation issue(s).
>
>                       * * *
>
> 7. On April 27, 2007, Intel shall provide the same information identified in paragraph 6 for those custodians identified in paragraph 2. ("Paragraph 7 Summaries").
>
> 8. With respect to the remainder of Intel's Custodians not on the list of 239 Intel custodians referred to in Paragraphs 6 and 7, commencing after April 27, 2007, Intel shall provide

> the same information called for by Paragraph 6 in a
> reasonable time frame, on a rolling basis and prioritizing
> those Intel custodians in senior positions. ("Paragraph 8
> Summaries").

(D.I. 301 at 4-5).

Absent from the March 16, 2007 Order were any references to the attorney-client

privilege or the work-product protection. The Order does speak to a reservation of rights, but

only refers to the rights of both AMD and the Class Plaintiffs to seek additional information from

Intel, by providing:

> This order is without prejudice to the rights of AMD or the Class
> Plaintiffs to request the disclosure of additional information from
> Intel with respect to its evidence preservation issues, including
> formal discovery, or to seek any other relief, remedy or order with
> respect thereto.

(D.I. 301 at 6).

As required by the disclosure order, from April 27, 2007 through March 24, 2008, Intel

has filed one Paragraph 7 Summary and over 1,000 Paragraph 8 Summaries. In this regard, Intel

claims that it "spent many hours preparing roughly 400 pages of custodian-specific retention

reports which drew upon thousands of pages of attorney notes, as well as other information."

(D.I. 469 at 2). The Paragraph 8 Summaries were produced in spread sheet fashion and

generally provided the following information:

| Custodian | Intel or AMD Designated | Description | Location | Complaint Freeze Tapes | Weekly Back-Up Tapes | Best Approximation of E-Harvest Dates |
|-----------|------------|-------------|----------|-----------|----------|----------|
| Name | I/A | Generally, e-mail archiving activity, whether IM (Instant Messaging) was used, whether reminded of retention obligation, confirmation that would archive relevant e-mail going forward, Intel's preservation of complaint freeze tapes, harvesting and preservation activity. Many contained specific information about any preservation issues info, e.g. whether the hard drive had failed or any other relevant custodian specific issues. | US, etc. | Yes | Yes (Date) | Dates |

On July 10, 2007, the Special Master issued a stipulated Order regarding AMD's and

Class Plaintiffs' Initial Remediation Discovery, directing Intel to promptly produce all

responsive documents from certain shared custodians and from additional custodians who "have

been  retaining the materials responsive to the Initial Remediation Discovery either in response

to specific litigation hold notices and/or as a matter of general practice." (D.I. 394 at ¶1).  The

parties agreed that:

> in producing documents pursuant to this Order Intel shall not withhold any attorney work product unless it contains the mental impressions, conclusions, opinions or legal theories of an attorney or party representative within the meaning of F.R.C.P. 26(b)(3), and Intel's production of such materials will not be deemed a waiver of any protection applicable to such "opinion work product" under F.R.C.P. 26(b)(3).  However, AMD and Class Plaintiffs' fully reserve any and all other rights or grounds to challenge any assertions of privilege or work product protection.

(D.I. 394 at ¶ 7).

The July 10, 2007 Order made no reference to the disclosure Order of May 11, 2007, which

required the preparation of the Paragraph 8 Summaries, discussed *supra.*

In support of the matter *sub judice,* AMD and the Class Plaintiffs contend that in order to

test Intel's assertions that the lapses in its document preservation efforts were

"misunderstandings or errors by individual employees" and that its "investigation has revealed

no instance of deliberate deletion to deny AMD access to any information responsive to the

allegations in the Complaint," (D.I. 321 at 3-4) AMD and the Class Plaintiffs must review the

"notes of investigation interviews conducted by Intel's counsel concerning Intel's [custodian]

employees' compliance with their evidence preservation obligations." (D.I. 467 at 1).

AMD and the Class Plaintiffs' Request for Production No. 34, which supports the instant

motion, requests:

> All documents evidencing, referring or relating to the failure or
> suspected failure of any Intel custodian to comply with a Litigation
> Hold Notice or retention instruction, including the timing and
> means by which it was discovered.

(D.I. 312, Ex. B at 6).

Intel responded to Request for Production No. 34 as follows:

> Intel incorporates its General Objections and General Response to
> Document Requests by reference. Intel will produce the relevant
> documents from the Collection as set forth in its General
> Response.

(D.I. 479, Ex. A at 46).

In its General Objections to AMD's Request for Production of Documents Intel stated:

> Intel objects to each Request herein to the extent that it seeks
> documents or information protected from disclosure by the
> attorney-client privilege or work product doctrine (other than the
> limited non-core work product information that Intel has agreed to
> produce pursuant to the non-waiver stipulation that the parties have
> entered into in this litigation [in the July 10, 2007 Order, Paragraph
> 7]), joint defense privilege, or any other applicable privilege.

(D.I. 479, Ex. A at 3).

AMD and the Class Plaintiffs further contend that, in response to Intel's concerns about

the potentially privileged nature of some of the requested documents, the parties entered into an

agreement which brought additional documents under Paragraph 7 of the May 11, 2007

disclosure Order. (D.I. 467). Intel claims that the asserted agreement is contained in an e-mail

exchange between James Pearl on behalf of AMD and Daniel Floyd on behalf of Intel. In this

exchange, on August 22, 2007, Mr. Pearl stated:

> In terms of culpability discovery, we believe that Intel should
> produce the eight boxes of "Investigative Documents" in the first
> instance. Once we get those in hand, we will have a better lay of
> the land in terms of whether a custodial production makes sense
> for culpability discovery.
>
> With respect to privilege waiver, we will agree that the production
> of the Investigation Documents will proceed under the same-
> core/non-core non-waiver agreement laid out in Paragraph 7 of the
> Order Re: AMD's and Class Plaintiffs' Initial Remediation
> Discovery. After our review of the Investigation Documents, we
> will discuss with you whether and to what extent this same
> agreement should apply to the remainder of Intel's culpability
> discovery.

(D.I. 467, Ex. D).

On August 24, 2007, Mr. Floyd responded that:

> we will be producing the non-privileged "Investigation
> Documents" next week in hard copy form. We will accept the
> agreement on privilege waiver for this production subject to the
> terms of paragraph 7 of the Order re: AMD's and Class Plaintiffs'
> Initial Remediation Discovery.

(D.I. 467, Ex. D).

Intel maintains for reasons discussed hereinafter that no agreement was reached.

The Special Master will address *seriatim* the issues of whether there was a privilege

waiver agreement as to the Weil Materials, and if there was no agreement, whether the attorney-

client privilege and/or the work-product protection applies.

## DISCUSSION AND CONCLUSIONS WITH RESPECT
## TO THE WEIL MATERIALS

**A.    DID THE PARTIES AGREE TO EXTEND THE PRIVILEGE WAIVER AGREEMENT CONTAINED IN PARAGRAPH 7 OF THE JULY 10, 2007 ORDER (D.I. 394) TO THE WEIL MATERIALS?**

The Special Master concludes that the answer is no.  In the Special Master's view, the answer to the question is found by examining the transcript of the hearing conducted on May 3, 2007 and the e-mail chain of August 22 and 24, 2007, referenced *supra* at page 12.

On Thursday, May 3, 2007, the Special Master held a regularly scheduled teleconference. (D.I. 368).  No agenda had been established for the teleconference.  One issue discussed related to the production of 8 boxes of documents by 17 Intel employees that were sent to outside counsel to assist in conducting the investigation into Intel's document retention problems.  (May 3, 2007 Tr. at 14:11-24-17:16).  The Special Master was also advised that, with respect to the production of these documents, there were privilege issues that had yet to be addressed.  (May 3, 2007 Tr. at 22:23, 26:4).  At no time during the May 3, 2007 teleconference was there any discussion of the Weil Materials.

The teleconference concluded with the expectation that the parties would meet and confer and present a proposed form of order on the document production issues addressed during the hearing.  In the resulting July 10, 2007 Order, Intel agreed to produce documents retained by certain custodians either in response to specific litigation hold notices and/or as a matter of the custodian's general practice.  (D.I. 394, ¶1).  Over the objection of AMD and the Class Plaintiffs, the referenced order provided that "Intel has excluded from its list of Intel Remediation Discovery Custodians in Paragraph 1 its attorneys and legal staff, inside and outside, on the basis that the non-duplicative documents held by those individuals are almost entirely protected from discovery by the attorney client privilege or the work product doctrine."  (D.I. 394, ¶3).

Notwithstanding this limitation, the parties agreed that "in producing documents pursuant to this Order, Intel shall not withhold any attorney work-product unless it contains the mental impressions, conclusions, opinions or legal theories of an attorney or party representative within the meaning of F.R.C.P.26(b)(3) . . . ." (D.I. 394, ¶7).

The Special Master is also mindful that prior to the entry of the July 10, 2007 Order the Special Master had not been provided with any documentation of the history of any meet and confer process regarding the Weil Materials. Further, there was no discussion of the Weil Materials with the Special Master prior to the filing of the instant motion – even in the nature of a status "heads-up" similar to the discussion that took place during the May 3, 2003 teleconference.

As for the e-mail chain of August 22 and 24, 2007, it is clear from the plain language of the e-mails that the subject was limited to Intel's production of 8 boxes of documents from 17 employees. Mr. Floyd could not have been more clear, "we will discuss . . . whether and to what extent this same agreement should apply to the remainder of Intel's culpability discovery." (D.I. 467, Ex. D). Intel's response was equally clear: Intel "will accept the agreement on privilege waiver for this production subject to the terms of paragraph 7 of the Order." (*Id.*) (Emphasis added).

**CONCLUSION**:

Nothing on the record before the Special Master would permit the Special Master to conclude that the parties agreed to extend the privilege waiver agreement contained in Paragraph 7 of the July 10, 2007 Order to the Weil Materials.

**B.    ACCEPTING AS A CONCESSION AMD AND THE CLASS PLAINTIFFS'
STATEMENT THAT THE "WEIL [MATERIALS] MAY HAVE
ONCE CONSTITUTED PRIVILEGED ATTORNEY-CLIENT
COMMUNICATIONS," HAS THE PRIVILEGE BEEN WAIVED?**

The Special Master concludes that the answer is yes.  However, waiver exists only as to

those portions of the Weil summaries that reveal the substance of the custodian statements

already voluntarily disclosed in the Paragraph 8 Summaries.

AMD and the Class Plaintiffs maintain that Intel waived the attorney-client privilege with

respect to the interviews themselves.  AMD argues that Intel provided the Court and the

Plaintiffs with "self-serving summaries" of the Weil interviews and, in turn, "asked the Court to

rely on them to conclude that its preservation failures were the result of 'human error.'"  (D.I.

467 at 2-3).

The Third Circuit in the case of *Westinghouse Electric Corp. v. Republic of the*

*Philippines*, addressed the question of:

> whether a party that discloses information protected by the
> attorney-client privilege and the work-product doctrine in order to
> cooperate with a government agency that is investigating it waives
> the privilege and the doctrine only as against the government, or
> waives them completely, thereby exposing the documents to civil
> discovery in litigation between the discloser and a third party.

951 F. 2d 1414, 1417 (3d Cir. 1991).

The facts in the *Westinghouse* can be succinctly stated:

> [T]he SEC commenced an investigation into whether
> Westinghouse had violated United States securities laws by
> making illegal payments to obtain the contract [for the first
> Philippine nuclear power plant]. . . . Westinghouse retained the law
> firm Kirkland & Ellis to conduct an internal investigation into
> whether company officials had made improper payments. In the
> course of the internal investigation . . . Kirkland & Ellis produced
> two letters reporting its findings.
>
> The law firm, at the behest of Westinghouse, showed the SEC
> investigators one of the letter reports and, in addition, orally
> presented its findings to the agency. Kirkland & Ellis did not

> supply the SEC with any of the documents underlying the
> presentation and the report, and the SEC agreed not to retain the
> report.

*Id.* at 1418.

During the course of discovery, the Republic of the Philippines requested that

Westinghouse produce the documents that it had provided to the SEC. Westinghouse objected to

the request on the grounds of attorney-client privilege and the work-product doctrine – asserting

in part that it had relied on SEC confidentiality regulations as well as the Eighth Circuit's

decision in *Diversified Industries, Inc. v. Meredith*, 572 F. 2d 596 (8th Cir. 1997) (supporting a

reasonable expectation of continuing confidentiality for documents shown to the SEC).

*Westinghouse*, 951 F. 2d. at 1418.

*Westinghouse* articulated the difference between selective waiver, "which permits the

client who has disclosed privileged communications to one party to continue asserting the

privilege against other parties," and a partial waiver, which "permit[s] a client who has disclosed

a portion of a privileged communication to continue asserting the privilege as to the remaining

portions of the same communication." *Id.* at 1423, n.7. After acknowledging that the often

stated purpose of the attorney-client privilege "is to encourage full and frank communications

between attorneys and their clients,"[6] and that, "[b]ecause the attorney-client privilege obstructs

the truth-finding process, it is construed narrowly," *Westinghouse* rejected the so called

"selective waiver" theory of *Diversified* by observing that:

> The court [in *Permain Corp. v. United States*, 665 F. 2d 1214
> (D.C. Cir. 1981)] reasoned that selective waiver "has little to do
> with" the privilege's purpose-protecting the confidentiality of
> attorney-client communications in order to encourage clients to
> obtain informed legal assistance. The court explained that while
> voluntary cooperation with government investigations "may be a

---

[6] *See, e.g., Upjohn v. United States*, 449 U.S. 383, 389 (1981).

> laudable activity, ... it is hard to understand how such conduct
> improves the attorney-client relationship."

*Id.* at 1425-1426. (internal citations omitted).

Although *Westinghouse* recognized a partial waiver, the court also stated that the

"fairness doctrine" may be invoked in cases of partial disclosure cases. *Westinghouse* held:

> When a party discloses a portion of otherwise privileged materials
> while withholding the rest, the privilege is waived only as to those
> communications actually disclosed, unless a partial waiver would
> be unfair to the party's adversary.

*Id.* at 1426, n.12 (citations omitted).

Stated differently:

> The client cannot be permitted to pick and chose among his
> opponents, waiving the privilege for some and resurrecting the
> claim of confidentiality for others, or to invoke the privilege as to
> communications whose confidentiality he has already
> compromised for his own benefit . . . the attorney-client privilege
> is not designed for such tactical employment.

*Permain*, 665 F. 2d at 1221.

The fairness doctrine "aims to prevent prejudice to a party and distortion of the judicial

process that may be caused by the privilege holder's selective disclosure during litigation of

otherwise privileged information." *In re Kidder Peabody Sec. Litig.*, 168 F. R. D. 459, 469

(S.D.N.Y. 1996) (citing *In re von Bulow*, 828 F. 2d 94 (2d Cir. 1987)). And, the "extent of the

waiver by implication turns on the circumstances of the disclosure." *Kidder*, 168 F. R. D. at 468.

The court in *Kidder*, finding that the final report of findings which was released to the

public contained "not only a factual summary based on the interview documents, but explicit

paraphrases from the interviews" and that defendant "has made repeated and extensive use of the

. . . report . . . in this litigation,"[7] ordered the production of attorney notes and memoranda

reflecting employee interviews conducted by defendant's trial counsel during an internal fraud

investigation. *Id.* at 468. Disclosure in a "judicial setting" may then trigger an implied waiver

for related and otherwise privileged or protected materials. *Id.* *Kidder* explained:

> The Second Circuit in *von Bulow* acknowledged that one
> traditionally recognized form of waiver is found when a privilege
> holder makes assertions in a litigation context that, in fairness, call
> for the revelation of privileged communications. (Citation
> omitted). The quintessential example is the defendant who asserts
> an advice-of-counsel defense and is thereby deemed to have
> waived his privilege with respect to the advice that he received.
> (Citation omitted).  Nonetheless, this principle is somewhat
> broader in scope, and has been generally recognized as requiring
> disclosure "when defendant asserts a claim that in fairness requires
> examination of protected communications."
>
> The waiver may be found even if the privilege holder does
> not attempt to make use of a privileged communication; he may
> waive the privilege if he makes factual assertions the truth of
> which can only be assessed by examination of the privileged
> communication. The governing principle was summarized in
> *Hearn v. Rhay*, in a passage cited with approval by the Second
> Circuit:
>
>> All of these established exceptions to the
>> rules of privilege have a common denominator; in
>> each instance, the party asserting the privilege
>> placed information protected by it in issue through
>> some affirmative act for his own benefit, and to
>> allow the privilege to protect against disclosure of
>> such information would have been manifestly unfair
>> to the opposing party. The factors common to each
>> exception may be summarized as follows: (1)
>> assertion of the privilege was a result of some
>> affirmative act, such as filing suit, by the asserting
>> party; (2) through this affirmative act, the asserting
>> party put the protected information at issue by
>> making it relevant to the case; and (3) application of
>> the privilege would have denied the opposing party
>> access to information vital to his defense. Thus,
>> where these three conditions exist, a court should
>> find that the party asserting a privilege has
>> impliedly waived it through his own affirmative
>> conduct.

---

[7] The Special Master need not discuss the implications of a public disclosure, as none is present here.

*Id.* at 470 (citations omitted). The waiver may be even broader to include "the entirety of the communications that a party has disclosed only in part and all other communications insofar as they touch upon subjects voluntarily disclosed by the privilege holder." *Id.* at 469. *See also Granite Partners, L.P. v. Bear Stearns & Co., Inc.*, 184 F. R. D. 49, 56 (S.D.N.Y. 1999) (finding that plaintiff's use of selective quotes of interview notes waives the unquoted portions of the interview notes where plaintiff placed the accuracy of the data and analysis at issue).

Intel makes much of the fact that *Westinghouse* and *Kidder* involved the disclosure of the entire report, arguing that, by contrast, here Intel only provided factual information, in summary form, "derived in part from attorney's notes, pursuant to Court Order,[8] but did not disclose or even paraphrase the attorney-client communications themselves." (D.I. 469 at 3).

The Special Master is satisfied that the principles of waiver articulated in both *Westinghouse* and *Kidder* apply with equal force to the voluntary disclosure of the verbatim privileged communication itself, a full report containing references to same, or to a memorandum or summary of the privileged communication. As in *Westinghouse*, it appears to the Special Master that the disclosure of the privileged information to AMD, the Class Plaintiffs and to the Court were not "disclosures necessary to encourage clients to seek informed legal advice," but rather were for the purpose of supporting Intel's litigation position. *Westinghouse*, 951 F. 2d at 1426

Further, Intel's suggestion that it was somehow hood-winked into the position of now having to argue for protection for what it agreed to divulge is simply without merit. Intel maintains that:

> attorney-prepared summaries – and the detail required, were specifically agreed upon in advance and then ordered by the Court. Plaintiffs received the full benefits of that agreement. And the

---

[8] Intel neglects to admit that the Order was by Stipulation.

> parties contemplated that Intel would have its attorneys conduct an investigation to obtain the information, which touched on numerous legal issues, but there was no order or agreement that the investigative materials themselves be produced. To now rewrite the order under these circumstances would be manifestly unfair.

(D.I. 469 at 3).

As to this argument, first, there is nothing in the meet-and-confer process that has been brought to the Special Master's attention where the parties had agreed to permit Intel to preserve a claim of attorney-client privilege or the work-product protection with respect to the Paragraph 8 Summaries.

Second, the Special Master is mindful that counsel for all parties are highly qualified and experienced trial attorneys and that counsel for Intel could have at least proposed such protection if not forged an agreement with respect to same.

Finally, the language of the March 16, 2007 Order regarding Intel's Evidence Preservation Issues itself belies Intel's position. Indeed, the only preservation of rights language in the March 16, 2007 Order is on behalf of the Plaintiffs. *See* March 16, 2007 Order language referenced *supra* at 8-9.

Rather than being hood-winked, Intel decided to include in its production to the parties and in its filings with the Court the Paragraph 8 Summaries. In the Special Master's view, by so doing, Intel placed the accuracy and validity of the information contained in these summaries at issue, thus waving the attorney-client privilege on the underlying documents. *Granite Partners,* 184 F.R.D. at 54 (finding privilege waiver where bankruptcy trustee used partial quotes of privileged communications in a publicly distributed document). To conclude otherwise would place Intel in the position of being able to use its sword to assert facts while at the same time shield AMD, the Class Plaintiffs and the Court from the accuracy of Intel's assertion that:

> Despite its extensive preservation mechanisms, Intel has
> discovered a number of human errors in the post-complaint period
> in the execution of its [preservation] plan. . . . [T]hese human
> errors were misunderstandings or errors by individual employees,
> with ongoing day to day business responsibilities, working
> diligently to carry out the complex and unprecedented scope of
> preservation obligations in this case. Intel's investigation has
> revealed no instance of deliberate deletion to deny AMD access to
> any information responsive to the allegations in the complaint.

(D.I. 321 at 3).

AMD and the Class Plaintiffs cannot in fairness be expected to blindly rely on Intel's

assertions in performing their critically important role of fully informing the Court on the issue.

Indeed, although in the context of a Fed. R. Civ. P. 26(b)(4)(B) so called safe harbor analysis,

this Court in *CP Kelco U.S. Inc. v. Pharmacia Corp.*, 213 F. R. D. 176, 179 (D. Del. 2003)

observed:

> Waiver is the deliberate relinquishment of a right which might
> otherwise be claimed.
>
> In the context of an assertion of privilege, the inviability of that
> rule is of fundamental importance. It would be manifestly unfair to
> allow a party to use a privilege to shield information which if
> deliberately chose to use offensively . . .. Hence the truism that a
> privilege cannot be used as both a shield and a sword. (Internal
> citation omitted). The non-legal equivalent of that truism is
> equally to the point. "You can't have it both ways."

Intel also makes the point that the Paragraph 8 Summaries are akin to answers to

interrogatories. While the Special Master understands that they were prepared by a Weil

attorney, and while the Special Master knows that they were prepared based on underlying

privileged communications, the Paragraph 8 Summaries are different from interrogatory

responses in several critically important respects:

1. The information contained in each Paragraph 8 Summary was agreed to by all parties.

2. The Paragraph 8 Summaries were unlike interrogatory responses because they were
   filed with the Court. F. R. Civ. P. 5(a)(1).

3.  The Paragraph 8 Summaries were, unlike interrogatory responses, not signed by Pat Doe,[9] the person who prepared them.  F. R. Civ. P. 33(b)(5).

4.  The clear purpose of the Paragraph 8 Summaries is to provide facts to the Court regarding Intel's preservation issues and permit Intel to build and prove its assertion that permit AMD and the Class Plaintiffs to test Intel's position and assist in informing the Court in this regard.

Intel also argues that were the Paragraph 8 Summaries treated like interrogatory

responses, some how information divulged cannot be the subject of a waiver of attorney-client

privilege, the work-product protection or by extension could not be the subject of a F. R. Civ. P.

26(b)(3) application.  In this regard the Special Master concludes that the analysis of either

waiver or F. R. Civ. P. 26(b)(3) in the context of the cited cases would be no different in the

context of interrogatory responses.  See generally *Wright, Miller & Marcus Federal Practice and*

*Procedure*:  Civil 2d § 2016.1, 2016.2, 2025.

## CONCLUSION:

The Special Master concludes:

- The waiver of the privilege was a result of Intel's claim to the Plaintiffs and to the Court that its retention lapses are the result of human error and not the result of deliberate deletion.  Further, Intel took the affirmative step of providing to AMD, the Class Plaintiff and to the Court the Paragraph 8 Summaries – which in no small measure forms the leitmotif of Intel's position.

- There is no question that the protected information, namely the custodian's information given to Intel through Weil attorneys describing in "detail . . . the preservation issues affecting [each] Intel custodian including the nature, scope and duration of any preservation issue(s)," (D.I. 301 at 4) is at issue.  Indeed, the parties and the Special Master have spent and will continue to spend a significant amount of time and resources focused on the question of spoliation and, if appropriate, sanctions.

- An application of the privilege would effectively deny AMD and the Class Plaintiffs the opportunity to fully test Intel's positions and would ultimately deprive the Court from having the benefit of having been informed by the adversarial process prior to making any judgment on the issue of spoliation.

---

[9] As this review and all information submitted pursuant to it was submitted as confidential material, the Special Master will not reveal the attorney's name that submitted the declaration.  Rather, any reference to this attorney will to "Pat Doe."  For more information on this process, please reference the Appendix.

- The Paragraph 8 Summaries are fundamentally different from interrogatory responses, and in any event, the waiver analysis would be the same.

## C.    AS IT IS NOT DISPUTED THAT THE WEIL MATERIALS ARE OTHERWISE PROTECTED BY THE WORK-PRODUCT DOCTRINE, HAS INTEL WAIVED THE PROTECTION OF THE DOCTRINE?

The Special Master concludes that with respect to core work-product the answer is no,

and with respect to non-core work-product, the answer is yes.[10]

Intel argues that the work-product doctrine shields the Weil Materials. The doctrine set

forth in Fed. R. Civ. P. 26(b)(3), "shelters the mental processes of the attorney, providing a

privileged area within which [the attorney] can analyze and prepare [the] client's case." *In re*

*Cendant Corp. Sec. Litig.*, 343 F. 3d 658, 661-662 (3d Cir. 2003) (internal citation omitted). The

Court in *Cendant* reminds us that the essential nature of the doctrine was articulated by the

Supreme Court in *Hickman v. Taylor*, 329 U.S. 495, 510-511 (1947):

> In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impressions, personal beliefs, and countless other tangible and intangible ways-aptly though roughly termed … as the 'Work product of the lawyer.' Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial.

---

[10] AMD and Class Plaintiffs concede that they are not seeking the production of core work-product, rather they are seeking fact work-product only. (D.I. 467).

In contrast then to the attorney-client privilege, the work-product doctrine "promotes the advocacy system directly." *Westinghouse*, 951 F. 2d at 1428.

There can be no question that in the matter *sub judice*, the interviews conducted by Weil and Weil Materials thereof were prepared for Intel in preparation for matters that are being litigated. *Cendant*, 343 F. 3d at 663. Indeed the Special Master adopts the view of AMD and the Class Plaintiffs that the Paragraph 8 Summaries are at the heart of Intel's defense [on issues related to spoliation] and remediation plan and work-product. (Jan. 3, 2008 Tr. at 27).

## 1. Are the Weil interview notes core or non-core work-product?

Core or opinion work-product encompasses the "mental impressions, conclusions, opinion or legal theories of an attorney or other representative of a party concerning the litigation," and is "generally afford near absolute protection from discovery." Fed. R. Civ. P. 26 (b)(3), *Cendant*, 343 F. 3d at 664 (citing *In re Ford Motor Co.*, 110 F. 3d 954, 962 n.7 (3d Cir. 1997)). Non-core work-product or fact work-product contains raw factual information. *Baker v. General Motors Corp.*, 209 F. 2d 1051, 1054 (8th Cir. 2000). *See also Director, Office of Thrift Supervision v. Vinson v. Elkins, LLP*, 124 F. 3d 1304, 1307-08 (D.C. Cir. 1997) (stating that a lawyer's interview notes are not always core work-product, and "purely factual material embedded in attorney notes may not deserve the super-protection afforded to a lawyers' mental impressions"); *Lopez v. City of New York*, 2007 WL 869590, at *2 (E.D.N.Y. 2007) (according documents that are simply verbatim statements of witnesses' recollection of events a lower degree of protection then mental impressions of attorneys).

The Special Master is also mindful that where a document contains both fact and opinion work-product the analysis and consideration becomes more difficult. Such is the case in the matter *sub judice* where notes of witnesses' oral statements may be so intertwined with an

attorney's mental impressions that it is not possible to sort between the fact work-product and the

core work-product. *In re Vitamins Antitrust Litig.*, 211 F. R. D. 1, 4 (D.D.C. 2002). In *Vitamins*,

defendants' counsel took handwritten notes from Fed. R. Civ. P. 30(b)(6) witness interviews, and

defendants' counsel later developed these interview notes into written statements and served the

written statements as the "sum total of defendants corporate knowledge respecting certain Rule

30(b)(6) deposition topics and to substitute for live testimony on these deposition topics." *Id.* at

4.

In adopting the report and recommendation of the Special Master pending an *in camera*

review of the materials, the Court tentatively concluded the materials to be discoverable. The

Court's observations are instructive:

> The [Special Master's Report] notes [the] difficulty, as well as the
> admonition of the Supreme Court that disclosure of "notes and
> memoranda of witnesses' oral statements is particularly disfavored
> because it tends to reveal the attorney's mental processes."
> [Master's Report] (quoting *Upjohn v. United States*, 449 U.S. 383,
> 399, 101 S. Ct. 677, 66 L. Ed. 2d 584 (1981)). However, as the
> Special Master further points out, a distinction may be made
> between attorney notes of the type obtained in a wide ranging
> inquiry such as that done in an initial interview, and those obtained
> in a litigation-related investigation where "facts elicited necessarily
> reflect [ ] a focus chosen by the lawyer." *Id.* at 33 (quoting *In re
> Sealed Case*, 124 F. 3d 230, 236-37 (D.C. Cir. 1997)).
>
> * * *
>
> The Special Master reached the conclusion that the Source
> Materials were largely, if not wholly, fact work product based on
> the parties' own description of the materials as counsel's attempts
> to record questions and responses as accurately and completely as
> possible. (Citation omitted). As the Special Master notes, such a
> determination cannot be definitively made until the Source
> Materials are produced *for in camera* review. . . .On such review,
> should the Special Master find that the attorney's mental
> impressions are so thoroughly intertwined with factual information
> that the entire memoranda should be treated as opinion work
> product, the Source Materials cannot be produced. Fed. R. Civ. P.
> 26(b)(3).

*Id.* at 4-5.

The Special Master having had the benefit of conducting an exhaustive *in camera* review

(as described in the Appendix) concludes that the Weil Materials contain both core and non-core

work-product. The core work-product, however, is not so intertwined with fact information that

the entirety of the Weil Materials from each interview should be treated as core. Rather, the

facts can be easily separated from any core work-product.

### 2. Are AMD and the Class Plaintiffs entitled to the fact work-product contained in the Weil Materials because Intel waived the work-product protection otherwise afforded by the Rule?

The Special Master concludes that the answer is yes.

As explained in the Special Master's Report and Recommendation (DM 8), entered on

March 6, 2008, adopted by the Court without objections taken, on March 20, 2007, the Advisory

Committee Notes to rejected Fed. R. Evid. 511 is instructive:

> The central purpose of most privileges is the promotion of some
> interest or relationship by endowing it with a supporting secrecy or
> confidentiality. It is evident that the privilege should terminate
> when the holder by his own act destroys the confidentiality.
> (Internal citation omitted). The rule is designed to be read with a
> view to what it is that the particular privilege protects.

Special Master Report and Recommendation at 22 (D.I. 562) (quoting 26A Wright & Graham,

*Federal Practice and Procedure* § 5721 (1992)).

The stated purpose of the work-product protection is to promote the adversary system,

*Westinghouse*, 951 F.2d at 1428. The Court in *Westinghouse*, accepting the majority view, held

that:

> [T]he purpose of the work-product doctrine requires us to
> distinguish between disclosures to adversaries and disclosures to
> non-adversaries.

*Id.* And the Court went on to acknowledged that, "courts generally agree that disclosure to an adversary waives the work-product doctrine." *Id. See also* 8 Wright Miller & Marcus, *Federal Practice & Procedure* § 2016.2 (2d ed. 1994).

In the context of the discovery phase of Intel's preservation issues, Intel, by and through its attorneys, agreed to this form of discovery. Intel agreed to produce, "detailed written description[s] of the preservation issues affecting [every] Intel Custodian, including the nature, scope and duration of any preservation issue(s)." (D.I. 301 at ¶ 9). Intel could have left AMD and the Class Plaintiffs to their own devices, forcing them down the path of protracted world-wide preservation depositions. It did not. Rather it trumpeted its willingness to have AMD, the Class Plaintiffs and the Court informed as to fact work-product gathered and provided "a detailed written description of the information provided by each custodian [to Weil] during the interviews." (D.I. 434 at 4-5, n.6).

## CONCLUSION:

The Special Master concludes, therefore, that Intel cannot now mask its agreed to discovery of custodian information by asserting the work-product privilege with respect to fact work-product which, in the Special Master's view, lies at the heart of Intel's position on its preservation issues.

### D. WERE THE INSTANT APPLICATION TO HAVE BEEN PURSUANT TO F.R.C.P. 26(b)(3)(A)(ii), ARGUING SUBSTANTIAL NEED AND UNDUE HARDSHIP, WOULD THE APPLICATION HAVE BEEN GRANTED?

The Special Master concludes that the answer is yes as to fact work-product.

The Special Master is mindful that were the instant application to have been pursuant to Fed. R. Civ. P. 26(b)(3)(A)(ii), the Special Master would be required, as discussed above, to "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of any

attorney or other representative of a party." Fed. R. Civ. P. 26(b)(3)(B). *See Cendant,* 343 F.3d at 661-62.

The facts in the matter *sub judice* are in no way similar to the facts in *Cendant.* In *Cendant* what was left of a federal securities class action involving Cendant's alleged accounting fraud were claims asserted by Cendant and Ernst & Young – against each other. In the course depositions of former Ernst & Young senior manager and auditor who prepared the Cendant financial statements at issue, Cendant inquired into communications that occurred between the deponent, Ernst & Young's counsel who also represented the deponent and a consulting expert who had been retained as a non-testifying trial expert by Ernst & Young. The Court concluded that the experts discussions with Ernst & Young's counsel and notes of these discussions were protected by the work-product doctrine. The Court stated:

> The discussions were at all times understood and intended to be
> confidential by all participants. Furthermore, in connection with
> these discussions, [the expert] was provided with documents
> prepared by Ernst & Young's counsel reflecting counsel's mental
> impressions, opinions, conclusions and legal theories. In addition,
> [the expert's] notes may reflect the mental theories of Ernst &
> Young's counsel. Discovery of this information goes to the core of
> the work product doctrine and therefore in discoverable only upon
> a showing of extraordinary circumstances.

*Cendant*, 343 F.3d at 667.

Here, the Special Master has already concluded after an *in camera* review that the core work-product is not so intertwined with fact information that the entirety of the Weil Materials should be treated as core and, therefore, subject to the higher *Cendant* standard.

Moreover, the Special Master believes it is important to note that to the extent the primary focus of the interviews reflect the mental impressions of Intel counsel, it cannot be said that the focus was chosen by Intel counsel alone. Rather, the focus was developed collaboratively with all of the parties with the ultimate *imprimatur* of the Court. While the

Special Master is mindful that some interviews were conducted as early as December 2006, the ultimate focus of the interviews framed by Paragraph 8 of the March 17, 2007 Order were conducted after that date.

Turning to the issue of substantial need the Special Master concludes:

- First, there can be no question that AMD and the Class Plaintiffs are entitled to test Intel's version of what went wrong.
- Second, AMD and the Class Plaintiffs cannot be forced to rely on Intel's description of what the custodians reported.
- Third, AMD and the Class Plaintiffs, as they play their critically important role of informing the Court through the adversary process can not be restricted to Intel's assertions of what was the custodians' report.

In sum, the Special Master concludes that AMD and the Class Plaintiffs have demonstrated substantial need for non-core work-product in the Weil Materials to meet Intel's case on preservation issues.

Finally, addressing the issue of undue hardship, simply stated, the Special Master agrees with AMD and the Class Plaintiffs that "Plaintiffs merely seek an efficient mechanism to get the whole story out without embarking on a world tour of costly . . . preservation depositions." (D.I. 467 at 4).

In this regard, the Special Master concludes AMD and the Class Plaintiffs should not be saddled with the prospect of deposing over 1,000 custodians, nor can it be forced to settle for something less in the form of a sampling of the custodian pool. *See Javis Inc. v. American Tel. & Tel. Co.*, 84 F.R.D. 286, 293 (D. Col. 1979) (finding undue hardship warranting production of work-product where the movant would otherwise be forced to depose 1500).

During the argument on the motion, counsel for AMD and the Class Plaintiffs argued in substance that the Special Master should not have to consider whether Intel waived the attorney-client privilege and/or the work-product protection because Intel never intended that the

materials in question be covered by either. The Special Master is not satisfied, however, that this record – submitted in papers only – permits me to make any findings and recommendations in this regard. The Special Master therefore declines to do so.

## CONCLUSION

For the reasons set forth above, the Special Master concludes that Intel must produce the Weil Materials as redacted by the Special Master.

IT IS THEREFORE, HEREBY RECOMMENDED THAT:

(a)    AMD and the Class Plaintiffs' Motion to Compel be Granted (D.I. 467 [in 05-441, D.I. 533 [in 05-485, D.I. 667 [in 05-1717]).

(b)    Production shall occur not later than five (5) business days after either the Special Master's Report and Recommendations become final order of the Court, or five (5) business days after any order of the Court subsequent to a Fed. R. Civ. P. 53 (f) objection, unless otherwise ordered by the Court.

**The Special Master's Report and Recommendations will become a final order of the Court unless objections are taken within five (5) business days as provided by the Court's Order of June 28, 2006. (D.I. 178 [in 05-441], D.I. 353 [in 05-485], D.I. 465 [in 05-1717])**

ENTERED THIS _9th_ DAY OF May, 2008

Vincent J. Poppiti (Del Bar. ID No. 100614)
Special Master