## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE<br>INTEL CORPORATION<br>MICROPROCESSOR ANTITRUST<br>LITIGATION | ) ) ) ) ) )  MDL No. 05-1717-JJF |
| | ) |
| ADVANCED MICRO DEVICES, INC., a Delaware<br>corporation, and AMD INTERNATIONAL SALES<br>& SERVICE, LTD., a Delaware corporation, | ) ) ) ) |
| Plaintiffs, | )  C.A. No. 05-441-JJF |
| v. | ) ) |
| INTEL CORPORATION, a Delaware corporation,<br>and INTEL KABUSHIKI KAISHA, a Japanese<br>corporation, | ) ) ) ) |
| Defendants. | ) ) |
| | ) ) ) |
| PHIL PAUL, on behalf of himself<br>and all others similarly situated, | ) ) ) |
| Plaintiffs, | )  C.A. No. 05-485-JJF |
| v. | ) )  CONSOLIDATED ACTION |
| INTEL CORPORATION, | ) ) |
| Defendant. | ) ) |

## INTEL'S RESPONSE TO PLAINTIFFS'
## JOINT PRELIMINARY CASE STATEMENT

## PUBLIC VERSION

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................1

II.   AMD'S VIEW OF THE LEGAL STANDARDS FOR ANTICOMPETITIVE
CONDUCT IS CONTRADICTED BY SUPREME COURT AUTHORITY....................5

    A.   AMD's Challenge to Intel's Pricing Practices Is Governed by *Brooke
Group* ...........................................................................................6

    B.   AMD Cannot Circumvent *Brooke Group* by Relying on Intel's
Expressions of Desire to Prevail over AMD.........................................10

    C.   AMD Proposes an Incorrect Standard for a Price-Cost Test .................11

    D.   AMD Cannot Rely on the "Synergistic" Effect of Various Forms of
Lawful Conduct to Support a Claim of Illegality ................................14

III.  INTEL'S RESPONSE TO AMD'S FACTUAL CONTENTIONS...................15

    A.   Overview..................................................................................15

    B.   AMD's False Claims Regarding Its "Superior" Product Offerings.......17

    C.   AMD's Claims of Anticompetitive Exclusion from OEMs Are Unfounded ........19

        1.   Dell.............................................................................19

        2.   HP ..............................................................................23

        3.   IBM.............................................................................25

        4.   Lenovo .........................................................................27

        5.   Gateway .......................................................................30

        6.   Acer.............................................................................31

        7.   Sony ............................................................................32

        8.   Toshiba........................................................................33

    D.   AMD's Claim of Exclusion from the Distributor Channel has No Basis.............33

E.   AMD's Demand for ▮ Depositions Regarding Intel's Alleged "Exclusionary Technical Conduct" Is Completely Unsupported and Excessive.................................................................................34

F.   Intel's Document Policies.................................................................37

IV.   INTEL'S RESPONSE TO PLAINTIFFS' REQUESTED RELIEF.................................39

# TABLE OF AUTHORITIES

Page(s)

## CASES

*2660 Woodley Road Joint Venture v. ITT Sheraton Corp.,*
    369 F.3d 732 (3d Cir. 2004) ........................................................................ 10

*Advo, Inc. v. Phila. Newspapers, Inc.,*
    51 F.3d 1191 (3d Cir. 1995) ........................................................... 4, 12, 13, 14

*Alaska Airlines, Inc. v. United Airlines, Inc.,*
    948 F.2d 536 (9th Cir. 1991) ...................................................................... 37

*Am. Academic Suppliers v. Beckley-Cardy, Inc.,*
    922 F.2d 1317 (7th Cir. 1991) .................................................................... 15

*Atl. Richfield Co. v. USA Petroleum Co.,*
    495 U.S. 328 (1990) ............................................................................... 8, 44

*Barry Wright Corp. v. ITT Grinnell Corp.,*
    724 F.2d 227 (1st Cir. 1983) .............................................................. 12, 13, 43

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993) ................................................................ 4, 5, 8, 9, 15, 17

*Cascade Health Solutions v. PeaceHealth,*
    515 F.3d 883 (9th Cir. 2008) ...................................................................... 9, 13

*City of Groton v. Conn. Light & Power Co.,*
    662 F.2d 921 (2d Cir. 1981) ........................................................................ 16

*Concord Boat Corp. v. Brunswick Corp.,*
    207 F.3d 1039 (8th Cir. 2000) ...................................................................... 9

*Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.,*
    411 F.3d 1030 (9th Cir. 2005) ...................................................................... 9

*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.,*
    846 F.2d 284 (5th Cir. 1988) ....................................................................... 39

*Directory Sales Mgmt. Corp. v. Ohio Bell Tel. Co.,*
    833 F.2d 606 (6th Cir. 1987) ....................................................................... 15

*Int'l Travel Arrangers v. NWA, Inc.,*
    991 F.2d 1389 (8th Cir. 1998) ..................................................................... 15

**Table of Authorities**
**(Continued)**

Page(s)

*Intergraph Corp. v. Intel Corp.,*
    195 F.3d 1346 (Fed. Cir. 1999) ................................................................. 16

*Invacare Corp. v. Respironics, Inc.,*
    2006 U.S. Dist. LEXIS 77312 (N.D. Ohio Oct. 23 2006) ............................. 16

*Kloth v. Microsoft Corp.,*
    444 F.3d 312 (4th Cir. 2006) ..................................................................... 43

*LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) ....................................... 3, 9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ................................................................................ 6, 44

*MCI Commc'ns Corp. v. AT&T Co.,*
    708 F.2d 1081 (7th Cir. 1983) ............................................................... 12, 13

*Meijer, Inc. v. Abbott Labs.,*
    2008 U.S. Dist. LEXIS 31816 (N.D. Cal. Apr. 11, 2008) ........................... 14

*Ne. Tel. Co. v. AT&T,*
    651 F.2d 76 (2d Cir. 1981) ........................................................................ 13

*NicSand, Inc. v. 3M Co.,*
    507 F.3d 442 (6th Cir. 2007) ...................................................................... 6

*Pool Water Prods. v. Olin Corp.,*
    258 F.3d 1024 (9th Cir. 2001) ................................................................... 11

*Rebel Oil Co. v. Atl. Richfield Co.,*
    146 F.3d 1088 (9th Cir. 1998) ................................................................... 12

*S. Pac. Commc'ns v. AT&T Co.,*
    556 F. Supp. 825 (D.D.C. 1983) ............................................................... 16

*SmithKline Corp. v. Eli Lilly & Co.,*
    575 F.2d 1056 (3d Cir. 1978) ...................................................................... 8

*Stearns Airport Equip. Co. v. FMC Corp.,*
    170 F.3d 518 (5th Cir. 1999) ......................................................... 13, 15, 39

*Taylor Publ'g Co. v. Jostens Inc.,*
    216 F.3d 465 (5th Cir. 2000) ..................................................................... 16

**Table of Authorities**
**(Continued)**

Page(s)

*Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.,*
    998 F.2d 1073 (1st Cir. 1993) ........................................................................... 13

*United States v. AMR Corp.,*
    335 F.3d 1109 (10th Cir. 2003) ........................................................................ 13

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
    540 U.S. 398 (2004) ........................................................... 6, 8, 19, 29, 38, 43

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.,*
    127 S. Ct. 1069 (2007) .......................................................................... 4, 7, 8, 9

## STATUTES

15 U.S.C. § 2 .................................................................................................... 8

## RULES

Fed. R. Civ. P. 26 ........................................................................................ 2, 31

Fed. R. Civ. P. 37(f) .......................................................................................... 38

## TREATISES

3 Phillip Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶¶ 735a (2d ed. 2002) ........................ 3

3 Phillip Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶¶ 739-740a (2d ed. 2002) ............... 12

Phillip Areeda & Herbert Hovenkamp, ANTITRUST LAW ¶ 749b (Supp. 2007) ........................ 8, 9

American Bar Association, ANTITRUST LAW DEVELOPMENTS (SIXTH) (2007) ............................ 13

## I.    INTRODUCTION

AMD's Preliminary Case Statement resoundingly demonstrates the wisdom of the staged, proportionate discovery plan advanced by Intel.[1]  The Special Master recognized the merit of staging depositions and specifically asked the parties to address the extent to which discovery should be staged, and, if so, how:  "Because my thought is that, I am thinking in terms of staging discovery, if you will, not necessarily determining the number of stages, but staging discovery in a fashion that may begin to focus on the . . . more significant third parties." (March 27, 2008 Special Master Conference Tr. at 14.)

Intel proposed in its Preliminary Pretrial Statement that the first stage of deposition discovery in this action, through early 2009, focus on key U.S.-based third-party customers, in particular, the three key U.S.-based OEMs: Dell, Hewlett-Packard, and IBM/Lenovo.  By contrast, AMD ignored the request for a staging proposal, and proposed a no-holds-barred, worldwide discovery crusade – with no stages, no limits, no plan.  AMD proposes taking at least ▮ depositions throughout the world, including ▮ depositions of third parties that AMD either does not mention or references only in passing.

AMD's Statement in fact reinforces that Intel's proposal has the appropriate focus.  AMD states, for example, that the major domestic OEMs are Dell, HP, and IBM/Lenovo.  In particular, AMD characterizes HP and Dell as "the dominant players" that together control over 30% of the worldwide desktop and mobile PC sales and almost 60% of worldwide server sales.  (AMD's Preliminary Case Statement ("PCS") at 18.)  Their U.S. share in these product lines is even larger.  Moreover, AMD claims that HP, Dell, and IBM/Lenovo "control most of the higher value, enterprise business" (*id.*), which is a focus of AMD's allegations.  However, even as to those third parties, the number of depositions AMD seeks is excessive.  AMD seeks to depose no

---

[1]  For convenience, Intel will refer only to AMD in this Response, except in the Section addressing Class Plaintiffs' request for relief.

fewer than ▮ representatives of Dell, HP, and IBM/Lenovo, in contrast to the 14 depositions that Intel seeks from the same third parties. AMD also seeks to depose ▮ Intel witnesses on those three accounts alone, whereas Intel seeks 50 AMD depositions in total. While AMD's numbers are completely unreasonable, AMD's Statement confirms that the first stage of discovery should focus on those accounts.

The number of depositions that AMD requests, which does not even include depositions of witnesses that AMD says that it might add, is staggering, and understates the magnitude of the problems that AMD would create. The count of nearly ▮ depositions (almost half of which involve third-party witnesses) does not include the additional depositions that Intel would require, not only of AMD, but of third parties, to respond. AMD makes precious little showing of the need for ▮ depositions. For many third parties it provides no support for its requested depositions.[2] For others, it wants to take ▮ depositions, even though only a few individuals played a decision making role.

AMD does not explain how those depositions – including of many witnesses located abroad, outside the subpoena power of the Court – can be taken in any reasonable time frame. AMD also does not address Rule 26(b)(2)(C) of the Federal Rules of Civil Procedure, which requires that discovery be planned so that the burden and expense do not outweigh the likely benefit. And the only mention that AMD makes of the Court's FTAIA decision is to hint that it intends to have its experts attempt to circumvent the ruling. (PCS at 94-95.) As discussed in Intel's Statement, the FTAIA ruling should be accounted for in framing deposition discovery,

---

[2] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

and its scope properly should be evaluated after key depositions regarding transactions directly affecting U.S. commerce have been conducted.

AMD's contention that it needs almost ▮ depositions is premised on a profoundly misguided view of the law, which, contrary to AMD's view, confers a legally protected status on above-cost discounting.[3]  AMD's attempts to cast Intel's discounts to its OEM customers as "payments" and "bribes" cannot disguise that AMD is attacking price competition.  The "payments" and "bribes" turn out to be no more than discounts granted to win profitable sales, and are the type of discounts or payments that AMD itself routinely offers to customers.  Nor do AMD's limitations as a competitor – which according to AMD include "end-user demand that is microprocessor specific" (PCS at 78), an admission that end users prefer Intel – justify restricting Intel's ability to compete on price.  As the leading antitrust treatise explains, "[a]ntitrust begins with the premise that all firms, even dominant firms, are permitted to compete aggressively, and that hard competition is a desideratum rather than an evil."  3 Phillip Areeda and Herbert Hovenkamp, ANTITRUST LAW ¶ 735a at 365 (2d ed. 2002).

In an attempt to circumvent the governing legal standards, which encourage price competition, AMD proclaims that Intel is "bundling" its microprocessors, even though the alleged "bundle" is of a single product that AMD also supplies.  AMD takes this position in a vain attempt to bring this case within the ambit of *LePage's Inc. v. 3M*, 324 F.3d 141 (3d Cir. 2003) (en banc), which involved the bundling of unrelated products that only the defendant supplied and the plaintiff could not match.  As Intel showed in its Statement, any attempt to extend *LePage's* to unilateral pricing practices and beyond the bundling of disparate, unrelated products addressed in that decision is unsupportable in light of subsequent Supreme Court authority.  (Intel's Preliminary Pretrial Statement ("PPS") at 13-22.)  Controlling Supreme Court

---

[3] AMD's Statement confirms that this case is an attack on Intel's price competition.  This can easily be gleaned from AMD's "bullet" points on pages 3-8 that summarize Intel's alleged anticompetitive acts, all but one of which, although phrased pejoratively, involve discounting.

authority, which AMD ignores, requires AMD to show that Intel sold its microprocessors below cost and that there existed a dangerous probability that Intel would thereafter recoup the losses it thereby sustained. *See Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 127 S. Ct. 1069, 1074 n.1 (2007); *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-27 (1993). The Third Circuit, in line with other circuits, has stated that any sale at prices above marginal cost "decreases losses or increases profits" and therefore is "presumably not predatory." *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1198 (3d Cir. 1995).

AMD's discovery approach reflects its untenable legal position. Having ignored any objective price/cost considerations in its proposed legal standard of conduct, AMD wants to depose hundreds of witnesses in a worldwide search for what it seeks to label as "bad acts" – aggressive language, hard negotiations, intense back and forth, and emotional outbursts. But the law marginalizes the relevance of such evidence, *see Advo*, 51 F.3d at 1199, which is no substitute for the essential showing of anticompetitive conduct and does not provide a basis for discovery untethered to such conduct. Here, the alleged wrongful conduct is price discounting, and the decisionmaking authority was concentrated in a few individuals and not in the hands of the hundreds of individuals that AMD seeks to depose.

Rather than propose a rational deposition plan, AMD resorts to selective and often misleading citations to documents and colorful rhetoric to suggest that the written record is incomprehensible and incomplete,[4] that sinister conduct lurks everywhere Intel negotiated a discounted sale, and that the only way to uncover it is to go on a worldwide fishing expedition involving the entire computer industry. Intel has responded and will respond here to as many of AMD's baseless allegations and mischaracterizations as space permits.[5] But disagreement on

---

[4] ███████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

[5] AMD also makes reckless and groundless allegations to support its deposition proposal. ████
██████████████████████████████████████████████

the interpretation of certain events has no bearing on the discovery needed, which is determined by the scope of material issues under the law.

Intel's discovery proposal will allow the parties to focus in the first instance on the major transactions with the major domestic OEMs, which account for a very large share of the U.S. sales of microprocessors and which, according to AMD, are central to its case. AMD has defaulted on its obligation to present a reasonable discovery plan, offering instead an overbroad and overreaching mess. Thus, there is only one real plan before the Court – Intel's.

## II. AMD'S VIEW OF THE LEGAL STANDARDS FOR ANTICOMPETITIVE CONDUCT IS CONTRADICTED BY SUPREME COURT AUTHORITY

As set forth in Intel's Statement, a long and consistent line of Supreme Court authority makes clear that any claim of antitrust injury resulting from a firm's pricing practices must be analyzed under *Brooke Group*'s predatory pricing test. The Supreme Court has held firmly to this bright-line rule, recognizing that "cutting prices in order to increase business often is the very essence of competition" and that "mistaken inferences" of anticompetitive effects are "especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986). The high and unacceptable "cost of false positives counsels against an undue expansion of § 2 liability." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 414 (2004). AMD disregards this bright-line rule and seeks extended discovery in a quest to show that Intel's above-cost pricing somehow could eventually have led to a "less" competitive world, or somehow was "unfair." This the law does not permit.

### A.    AMD's Challenge to Intel's Pricing Practices Is Governed by *Brooke Group*

As Intel showed in its Statement, this case is fundamentally about discounting, and AMD's characterizations of discounts provided by Intel to win profitable sales as "payments" to exclude AMD or even "bribes" cannot alter the discounts' lawful character. *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 453 (6th Cir. 2007) (en banc) ("payments" to customers are "nothing more than 'price reductions'"). Winning sales with above-cost pricing is not anticompetitive. It is, according to the large body of Supreme Court decisions that AMD studiously ignores, precisely what the antitrust laws encourage.

AMD's attempts to characterize discounts as forms of exclusive or near-exclusive dealing are far off the mark both factually and legally. Factually, AMD's exclusivity claims are based on





AMD's sweeping claims of broad, market-wide agreements in which discounts are conditioned on exclusivity simply have no factual grounding. For example, AMD claims that "Intel conditions its all-or-nothing rebate on the customer meeting an Intel-established purchase target that reflects all, or virtually all, of the OEM's requirements." (PCS at 78.) Inconvenient facts – such as AMD's "capture [of] nearly 60% of HP's U.S. retail sales," according to AMD's own Complaint (Compl. ¶ 64) – are swept aside to preserve the dramatic effect, as are the factors that contributed to AMD's gains in the segments in which it was successful and the shortcomings that had held AMD back in other market segments. Thus, while AMD harps repeatedly on its alleged exclusion from the commercial segment, and its Complaint alleges that there is "no reason, other than Intel's chokehold on the OEMs," for AMD's lack of success in this sector (*id.* ¶ 62), its own Chairman ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████ *See, e.g.*, Section III.B., *infra*.

Legally, AMD's attempts to avoid the unmistakable message of two decades of Supreme Court jurisprudence, by characterizing discounts as exclusivity payments, are equally unfounded. The Supreme Court has made clear that every firm is entitled to compete for business by offering lower prices. *See Weyerhaeuser*, 127 S. Ct. at 1076; *Trinko*, 540 U.S. at 407. It has affirmed repeatedly that "[l]ow prices benefit consumers *regardless of how those prices are set*, and so long as they are above predatory levels, they do not threaten competition." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990) (emphasis added), *quoted in Weyerhaeuser Co.*, 127 S. Ct. at 1074; *Brooke Group*, 509 U.S. at 224-25. The Court has "adhered to this principle regardless of the type of antitrust claim involved." *Id.*, *quoted in Brooke Group*, 509 U.S. at 223.

Whereas the Supreme Court has stressed that above-cost pricing is per se *lawful*, AMD articulates purported rules of per se *illegality*. For example, AMD claims that "leveraging of rebates on sales on which Intel faces no competition to secure sales where it confronts competition constitutes 'an act of willful acquisition and maintenance of monopoly power' and is

prohibited by Section 2." (PCS at 79-80.) But no such legal rule exists. The case cited by AMD in support, *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir. 1978), involved the bundling of patented pharmaceuticals with unpatented ones in competition with a plaintiff that could not offer the bundle. This case, by contrast, involves a single product, microprocessors, and AMD is perfectly capable of competing, and does compete with Intel, with its own complement of microprocessors.[8]

AMD also claims that "[p]ayments for exclusion violate Section 2 if they are structured to preclude new entrants from competing on the merits." (PCS at 76.) But calling a discount to win profitable sales a "payment for exclusion" does not change a discount into something else, and AMD, a 25-year veteran of the microprocessor business, is hardly a new entrant. AMD misplaces its reliance on *LePage's* for the proposition that discounts that incentivize customers to buy more from a supplier can be condemned as exclusive dealing. Insofar as *LePage's* permitted the imposition of liability for above-cost pricing, it did so based on the understanding that "nothing in [*Brooke Group*] suggests that its discussion of the [price-cost] issue is applicable to a monopolist with its unconstrained market power." 324 F.3d at 151. Last year's Supreme Court decision in *Weyerhaeuser*, a monopoly maintenance case, leaves no doubt, however, that *Brooke Group*'s price-cost test does apply to claims of "deliberate use of unilateral pricing measures for anticompetitive purposes" under Section 2 of the Sherman Act. 127 S. Ct. at 1076. The Court stated expressly that "[i]n *Brooke Group*, we considered what a plaintiff must show in

---

[8] "In a single product case, we may simply ask whether the defendant has priced its product below its incremental cost of producing that product because a rival that produces the same product as efficiently as the defendant should be able to match any price at or above the defendant's cost." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 903-04 (9th Cir. 2008); *see Brooke Group*, 509 U.S. at 223 ("As a general rule, the exclusionary effect of prices above a relevant measure of cost either reflects the lower cost structure of the alleged predator and so represents competition on the merits, or is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate price cutting."); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1061 (8th Cir. 2000). *See also* Areeda & Hovenkamp, ANTITRUST LAW ¶ 749b at 245 (Supp. 2007).

order to succeed on a claim of predatory pricing *under § 2 of the Sherman Act*." *Id.* at 1074 (emphasis added).[9]

AMD's attempts to cast Intel's discounts as "bribes" (PCS at 83) are wrong factually and legally. The "critical element" of a bribe is "the breach of the duty of fidelity" to a third party. *2660 Woodley Road Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 737 n.4 (3d Cir. 2004). OEMs solicited and accepted Intel's discounts in their own self interest, without breach of any duty, because the discounts lowered the cost of buying Intel microprocessors. AMD's invective of corruption against Intel – a company that ranked first in Corporate Responsibility Officer's 100 Best Corporate Citizens in 2008 and is one of only three companies to make the list of best corporate citizens in each of the nine years in which rankings have been compiled – is paradigmatic of AMD's proclivity to make reckless accusations without regard to the facts. False allegations of bribery, now picked up by the media, have absolutely no place in this case.

Finally, AMD's suggestion that Intel owes it a duty to refrain from competing so that AMD can attain a market share of 30-35% (PCS at 10) is without legal foundation. Intel is entitled to compete hard for every sale and, so long as its prices are above cost, to win every sale that it can get. As the leading antitrust treatise states, "no firm, not even a monopolist, is a trustee for another firm's economies of scale." Areeda & Hovenkamp, ANTITRUST LAW ¶ 749b at 249 (Supp. 2007). Moreover, AMD's successful run between 2003 and 2006, during which time it earned $1.5 billion in microprocessor profits, puts the lie to AMD's claim that it must achieve those shares to be viable or to achieve a minimum efficient scale.[10]

---

[9] The Ninth Circuit, in the decision reversed by the Supreme Court in *Weyerhaeuser*, had concluded that the record contained "direct evidence of Weyerhaeuser's injurious exercise of market power." *Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*, 411 F.3d 1030, 1043 (9th Cir. 2005).

[10] AMD also claims that "[b]y leveraging its monopoly power over that uncontestable demand, Intel forecloses AMD from any meaningful opportunity to compete for the OEM's far lesser contestable demand." (PCS at 78.) AMD makes no attempt to reconcile this claim of near total foreclosure with its Chairman's description of AMD's growth in the years 2004-2006: "[I]f you look at the last 12 quarters, we grew faster than our competition by at least a factor of two each

**B.     AMD Cannot Circumvent *Brooke Group* by Relying on Intel's Expressions of Desire to Prevail over AMD**

AMD attempts to avoid the clear implications of the case law by quoting fragments from email messages and documents – often in misleading ways[11] – to claim that Intel intended to exclude AMD. The overall thrust of the quotations is that Intel wanted to win the competitive battles with AMD, something that is neither surprising nor legally significant.

Expressions of a desire to prevail over the competition, no matter how stated, are normal, even expected, in a competitive industry.

The point is not that AMD did something wrong; it is that competition is tough and that businesspersons often express the desire to win in strong, or even harsh, terms.

Expressions of intent to prevail over a competitor are not relevant to the antitrust analysis. As Justice Breyer explained, "most courts now find their standard, not in intent, but in the relation of the suspect price to the firm's costs." *Barry Wright Corp. v. ITT Grinnell Corp.*,

---

quarter as a percent of the market." AMD brushes aside the fact that it "gained some share and revenue" as "immaterial" (PCS at 86), and it entirely disregards the substantial profits it earned while it was supposedly being excluded. But the law is not as forgiving of a plaintiff that continued to be profitable and is seeking compensation for price competition. *See, e.g., Pool Water Products v. Olin Corp.*, 258 F.3d 1024, 1035 (9th Cir. 2001).

[11]


724 F.2d 227, 232 (1st Cir. 1983). As Justice Breyer explained, "'intent to harm' without more offers too vague a standard in a world where executives may think no further than 'Let's get more business' . . . ." *Id.* The Third Circuit similarly has made it clear that "there is nothing to gain by using the law to mandate 'commercially correct' speech within corporate memoranda and business plans. Isolated and unrelated snippets of such language 'provide no help in deciding whether a defendant has crossed the elusive line separating aggressive competition from unfair competition.'" *Advo*, 51 F.3d at 1199; *accord MCI Commc'ns Corp. v. AT&T Co.*, 708 F.2d 1081, 1112-13 (7th Cir. 1983). In a case involving discounts, the dispositive issue remains whether the defendant has priced below cost. *See Rebel Oil Co. v. Atl. Richfield Co.*, 146 F.3d 1088, 1097 (9th Cir. 1998) ("If intent cannot substitute for the required element of recoupment, it likewise cannot establish an antitrust violation in the absence of . . . below-cost pricing.")

### C. AMD Proposes an Incorrect Standard for a Price-Cost Test

Insofar as AMD acknowledges that a price-cost test is relevant at all, it advocates (in a footnote) one that is clearly at odds with the case law (and with the test AMD set out in paragraph 69 of AMD's Complaint, which it apparently realizes that it cannot satisfy). AMD claims that the microprocessor industry should be governed by a special standard that "should include fixed and sunk capital costs," because "[w]hile a monopolist's prices could be above the marginal short-term cost of producing an additional unit, they may be below an equally efficient competitor's long-term costs of staying in business." (PCS at 83 n.88.) Thus, according to AMD, Intel should forego profitable sales of additional units because Intel's prices are allegedly below AMD's long run costs.[12]

---

[12] Although the appropriate measure of cost is purely a legal question, *see MCI Commc'ns*, 708 F.3d at 1112, it is worth noting that the factual predicate for this claim is wrong. The claim is contradicted by the great profitability of AMD's microprocessor business while the "exclusion" of AMD from the market was allegedly in full swing, before AMD's business turned unprofitable more recently due to publicly acknowledged poor business execution.

AMD's position has no basis in law.  The Third Circuit has stated that "[a]s long as a firm's prices exceeds its marginal cost, each additional sale decreases losses or increases profits. Such pricing is presumably not predatory."  *Advo*, 51 F.3d at 1198.[13]  Most circuits that have decided this issue have agreed, with most adopting average variable cost as the proxy.  *See, e.g., Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 998 F.2d 1073, 1080 (1st Cir. 1993); *Northeastern Tel. Co. v. AT&T*, 651 F.2d 76, 87-88 (2d Cir. 1981); *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 532 (5th Cir. 1999); *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 909-910 & n.20 (9th Cir. 2008); *United States v. AMR Corp.*, 335 F.3d 1109, 1115-16 (10th Cir. 2003).[14]  As Justice Breyer explained, "[w]hen prices exceed incremental costs, one cannot argue that they must rise for the firm to stay in business.  Nor will such prices have a tendency to exclude or eliminate equally efficient competitors."  *Barry Wright*, 724 F.2d at 232; *see also* 3 Areeda & Hovenkamp, ANTITRUST LAW ¶¶ 739-740a at 412-26 (2d ed. 2002).[15]

AMD's claim that "there is clear evidence that ███████████████████████████ ██████████████████████████████ (PCS at 83) is groundless.  AMD makes only one specific claim of below-cost pricing. ████████████████████████████████████

---

[13]  It is notable that the Third Circuit reached this decision in a case involving newspaper advertising, a business characterized by high fixed costs.

[14]  The Third Circuit has cited without expressly adopting the use of average variable cost as a proxy for marginal (or incremental) cost.

[15]  In *Meijer, Inc. v. Abbott Labs.*, 2008 U.S. Dist. LEXIS 31816 (N.D. Cal. Apr. 11, 2008), the court declined to apply an average variable cost standard in ruling on a motion to dismiss because it believed that, in the specific context of the pharmaceutical industry, such a standard would not allow an entrant to recover the costs of research and development.  The application of a cost standard that is not based on a proxy for marginal cost is precluded both by the Third Circuit's *Advo* decision and by the strong weight of out-of-circuit authority.  Moreover, even if this legal issue were suitable to a case-by-case factual determination, the notion that discounting at prices above marginal cost would make it impossible for an entrant to compete is irrelevant to AMD, which, according to its filings with the Securities and Exchange Commission, earned very large profits while allegedly being the victim of exclusion.



AMD's claim of foreclosure in the server segment is also belied by AMD's claim of having achieved "phenomenal, explosive growth" in the segment while the predatory conduct was supposedly occurring.

Moreover, "[c]ourts generally have held that the price-cost comparison should be made across entire product lines, rather than on a product-by-product basis."  American Bar Ass'n, ANTITRUST LAW DEVELOPMENTS (SIXTH) at 274 (2007); *see Stearns*, 170 F.3d at 533 n.15; *Int'l Travel Arrangers v. NWA, Inc.*, 991 F.2d 1389, 1396 (8th Cir. 1998); *Am. Academic Suppliers v. Beckley-Cardy, Inc.*, 922 F.2d 1317, 1320-21 (7th Cir. 1991); *Directory Sales Mgmt. Corp. v. Ohio Bell Tel. Co.*, 833 F.2d 606, 613-14 (6th Cir. 1987).  AMD's sole example goes beneath even the product-by-product level to a claim involving an individual bid involving one particular product.  Even if the claim had a scintilla of factual support – and it emphatically does not – it would not amount to evidence of exclusion.[17]

---

16



---

[17] AMD speculates that "Intel can readily recoup the costs associated with its targeted predatory pricing scheme through the lessening in innovation rivalry that its suppression of AMD will engender." (PCS at 83.)  But AMD acknowledges in its Statement that "Intel included among its containment tactics legitimately competitive components, such as redoubling investments in R&D and competing more aggressively on price." (*Id.* at 13.)  So, according to AMD, Intel simultaneously suppressed innovation rivalry and redoubled its investment in innovation.  In any event, AMD's theory is contrary to the teachings of *Brooke Group*, which emphasized that "[f]or recoupment to occur, below-cost pricing must be capable, as a threshold matter, of producing the intended effects on the firm's rivals, whether driving them from the market, or . . . causing them

**D.    AMD Cannot Rely on the "Synergistic" Effect of Various Forms of Lawful Conduct to Support a Claim of Illegality**

In another attempt to avoid the necessity of a price-cost test, AMD claims that it is the "cumulative and synergistic effect" of Intel's conduct that matters in this case. But AMD is not saying that the Court should consider the synergistic effect of *unlawful* conduct. Rather, AMD seeks to combine the effects of merits competition to establish an unlawful foreclosure claim. This has no basis in law. *See Taylor Publ'g Co. v. Jostens Inc.*, 216 F.3d 465, 484 (5th Cir. 2000) (conduct found not be exclusionary cannot be combined with other conduct that was "more consistent with individual competitive decisions than with an overall plan to compete on grounds other than the merits").

Courts "reject the notion that if there is a fraction of validity to each of the basic claims and the sum of the fraction is one or more, the plaintiffs have proved a violation of . . . section 2 of the Sherman Act." *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 928-29 (2d Cir. 1981). Even where the challenged acts are interrelated, the court must "analyze the various issues individually." *Id.* at 928; *see also Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1367 (Fed. Cir. 1999) ("Each legal theory must be examined for its sufficiency and applicability, on the entirety of the relevant facts."); *Invacare Corp. v. Respironics, Inc.*, 2006 U.S. Dist. LEXIS 77312 at *23-25 (N.D. Ohio Oct. 23 2006); *S. Pac. Commnc'ns v. AT&T Co.*, 556 F. Supp. 825, 888-89 (D.D.C. 1983). Above-cost price competition unassailable under the antitrust laws cannot morph into market-wide illegal exclusion through claimed "synergies."

---

to raise their prices to supracompetitive levels . . . ." 509 U.S. at 224. AMD's market share and revenue gains, which AMD now dismisses as "immaterial" (PCS at 86), and $1.5 billion in profits from the third quarter of 2003 through the fourth quarter of 2006, make a mockery of any claim that Intel's conduct was capable of driving AMD out of the market.

## III.    INTEL'S RESPONSE TO AMD'S FACTUAL CONTENTIONS

### A.    Overview

AMD's basic theory of anticompetitive conduct is that "Intel leverages its uncontestable control over the dominant share of the customer's business to capture its contestable business." (PCS at 5.)  This is accomplished, according to AMD, by Intel "offering to discount the price of its non-contestable microprocessors on the condition that the customer also buy its contestable needs from Intel." (*Id.*)  The alleged vice is that such an approach "imposes a disproportionate, and often unaffordable, cost on AMD," which must provide larger discounts to make up for the lower prices on the so-called "non-contestable units." (*Id.*)  The relevant question under the law, however, is not what it costs AMD to meet an Intel discount, but whether Intel's price is above its own costs. *See Brooke Group*, 509 U.S. at 223 ("[W]e have rejected elsewhere the notion that above-cost prices that are below . . . the costs of a firm's competitors inflict injury to competition cognizable under the antitrust law.")  Thus, AMD is asking the wrong questions, and as result, much of what it seeks through deposition discovery is irrelevant.

AMD attempts to break down the sale of a single product, microprocessors, into "contestable" and "non-contestable" portions to support its contrived claim of "bundling" of a single product.  This is wrong, not only because there is no legally cognizable "bundling" of a single product, but because the demarcation line that AMD attempts to draw between the two is artificial.  AMD assumes that competition exists only when AMD and Intel compete to sell the same units to an OEM.  It ignores the fact that competition between Intel and AMD also takes place downstream, at the system level.  For Intel to succeed, Intel-based systems must be competitively priced against AMD-based systems, and Intel must provide an overall value proposition, often including discounts, to achieve that goal.  Even when AMD is not selling to an OEM, the microprocessors that Intel sells to that OEM are contestable because the sales can be lost in downstream competition.

There are other reasons why AMD's theory – that all of Intel's discounts must be applied only to "contestable units" rather than to all units Intel sells to an OEM – must fail here.  First,

the competitive environment in the microprocessor industry is such that there is no way for Intel to contemporaneously gauge what the "contestable share" might be. OEMs, as part of negotiations, often exaggerate their interest in shifting their business to AMD. Intel cannot reliably discount such claims. Because large shifts of business to or from AMD have occurred in the past, Intel must take these negotiation positions seriously. Given the Supreme Court's insistence upon a bright-line, objective standard for evaluating whether price cutting is anticompetitive, lest the aggressive pricing cutting that the antitrust laws encourage be chilled, Intel cannot be held responsible in hindsight, under threat of treble damages, for offering discounts on "too many units."

AMD's claims that Intel's pricing conduct was unfair or otherwise anticompetitive under subjective, amorphous standards are also meritless. The only standard by which pricing conduct is judged is a price-cost standard. Moreover, the argument that Intel's discounts are provided on an "all or nothing" basis, or that OEMs are subject to punishment or retaliation, is wrong. All of the major OEMs doing business with Intel received significant discounts, whether or not they bought from AMD, and AMD does not contend otherwise. The discounts were provided in similar ways. For customers with a mix of AMD and Intel-based systems, Intel typically gave individual line-item discounts to meet direct competition from AMD microprocessors. At times for customers that chose to sole-source from Intel, such as Dell, Intel negotiated overall discount plans to meet direct competitive offers from AMD to Dell, and, equally as important, to meet downstream competition from AMD-based systems against Dell's Intel-based systems. All prices were above cost and under those circumstances Intel cannot be held liable for giving discounts that in hindsight were more than "necessary."

The market demand for Intel's microprocessors exists because Intel has earned it – by its history of producing innovative and reliable products. AMD wants to control Intel's use of these legitimate advantages on the theory that holding Intel back now would allow AMD to achieve what it considers to be a more desirable share of the market. But competing with above cost prices can never be anticompetitive, and the Sherman Act "does not give judges *carte blanche* to

16

insist that a monopolist alter its way of doing business whenever some other approach might yield greater competition." *Trinko*, 540 U.S. at 415-16.  And dampening competition to cede share to AMD would decrease, not enhance, competition.

### B.     AMD's False Claims Regarding Its "Superior" Product Offerings

AMD's claims are anchored in the contention that AMD's microprocessors were superior to Intel's, and that AMD did not achieve success commensurate with its alleged "superiority." Intel addressed these issues in some detail in its Statement (PPS at 40-58) and will only respond briefly to AMD's articulation of this claim.  It is nothing short of astonishing, however, to see a company ███████████████████████████████████████████ claim that Intel faced a "long climb toward regaining technical parity."[18]  (PCS at 2.)  AMD's claim that it ███████████████████████████████████████████ (PCS at 14) is similarly grounded in a disregard for the evidence in AMD's own files.  As noted earlier, ███████

---

[18] AMD's Statement is replete with significant misstatements of the facts regarding technological performance.  For example, while AMD claims Intel did not earn its position as market leader when IBM chose Intel to supply it (PCS at 8), AMD ignores that Intel, which invented the microprocessor, won that competition on the merits.  AMD also claims that its K6 processor was "smaller, faster, and easier to use than Intel's competitive desktop offering." (PCS at 10.)  But ███████████████████████████████████████████████████████████████████████████████████████████████████████████ AMD's extravagant statement that its original Athlon processor "beat its Intel counterpart" on "just about every benchmark" and "maintained its performance lead through successive generations" (PCS at 10) is equally divorced from reality.  For example, in October 2002, BusinessWeek reported that "with Intel Corp. (INTC) preparing to roll out a souped-up 3 gigahertz Pentium 4 processor in November, AMD is still struggling to make chips that pass the 2-gighertz mark."  And while AMD claims that it was first to release dual core microprocessors, the truth is that Intel was first, as systems with Intel's dual-core microprocessors went on sale on 18 April 2005 – more than a month before systems with AMD's dual-core microprocessors.

 Below is a small representative sample addressing the leading U.S. OEMs.

**Dell.**



**IBM.**



**HP.**

C.    **AMD's Claims of Anticompetitive Exclusion from OEMs Are Unfounded**

     1.    **Dell**









---

19 



In attempting to justify the huge numbers of depositions that it seeks, AMD states that, "[t]he numbers are great because over time, different people occupied seats at the negotiating table, and we are dealing with a seven-year time horizon."  (PCS at 89.)



**2.    HP**





20





### 3.     IBM

---

22  Intel discusses allegations regarding IBM's former PC business, which is now owned by Lenovo, in a separate Lenovo section below.





**4.    Lenovo**







27 █████████████████████████████████████████████████████████████████

28 ███████████████████████ even though in its Statement AMD attributes its post-complaint success through the end of 2006 to the moderating effects of this lawsuit.  (PCS at 14).  ████

█████████████████████



5.    Gateway





### 6.    Acer

(PCS at 44.)  But publicly available data shows that AMD's share of Acer's business has grown dramatically during the period in which AMD claims it was excluded.  The following table shows AMD's unit share at Acer from the third quarter of 2004, ███████ ████████████████████████████████ through the end of 2006:

|     | 2004 Q3 | 2004 Q4 | 2005 Q1 | 2005 Q2 | 2005 Q3 | 2005 Q4 | 2006 Q1 | 2006 Q2 | 2006 Q3 | 2006 Q4 |
|-----|---------|---------|---------|---------|---------|---------|---------|---------|---------|---------|
| AMD | 10%     | 12%     | 16%     | 25%     | 25%     | 30%     | 31%     | 25%     | 27%     | 30%     |

As can be readily seen from this chart, any claim that AMD has been "excluded" from selling to Acer is false.

AMD's Statement also repeats allegations that Intel coerced Acer into delaying its launch of PCs using AMD's new Athlon 64 microprocessor in September 2003.[29]

---

[29]

7.    **Sony**



 For it to
demand foreign depositions , which could not possibly
affect U.S. commerce at all, much less directly and substantially, demonstrates AMD's disregard
both for the Court's FTAIA ruling and for the requirements of Rule 26.

30

**8.     Toshiba**



**D.     AMD's Claim of Exclusion from the Distributor Channel has No Basis**



---

[31] Contrary to AMD's implication, while Intel chose to settle the charges of the Japan Fair Trade Commission ("JFTC"), it expressly denied, and continues to deny, the JFTC's allegations and did not acquiesce in the JFTC consent agreement charges in accepting its Recommendation Decision. The Recommendation Decision, which is based on Japanese law, is irrelevant to these proceedings.



E.   **AMD's Demand for ▮ Depositions Regarding Intel's Alleged "Exclusionary Technical Conduct" Is Completely Unsupported and Excessive**

In another striking example of its indiscriminate discovery agenda, AMD demands ▮

depositions regarding a list of trivial grievances, which AMD lumps under the heading "Intel's

Exclusionary Technical Conduct," but none of which describes actionable conduct. (PCS at 64-72.)[32] This demand is patently unreasonable.

The first category of conduct attacked by AMD involves compilers. As Intel pointed out in its Statement, Intel has a small market share in compilers, which completely disposes of AMD's claim that Intel leverages its compiler position to disadvantage AMD. (PPS at 26-27.) AMD cannot and does not claim that Intel has a monopoly position in compilers, and that itself is fatal to AMD's claim. *See Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 545 n.12 (9th Cir. 1991).

AMD claim is factually flawed as well. AMD claims that Intel designed its compilers to "artificially degrade the performance of AMD microprocessors." (PCS at 65.) Lacking supporting evidence, AMD claims that ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ (PCS at 66.) This is a far cry from evidence of artificial degradation. Even if this assertion were true, it amounts to nothing more than a claim that Intel invested in designing compilers that maximized the performance of software on its microprocessors and did not design its products to help AMD. But the law does not require Intel to design its products for the benefit of its rivals. Even a compiler monopolist – and Intel is far from one – would not be required to design its products to help its rivals. *Trinko*, 540 U.S. at 408-11. Competition is fostered when a competitor does *not* aid a rival. Indeed, according to press accounts, AMD is now working closely with third-party compiler suppliers to focus the optimization of their compilers on AMD-based systems.

---

[32]  As set forth in Intel's Statement, the controlling legal authority holds that, except in narrow circumstances not implicated here: (1) a firm's vigorous advocacy in standard-setting efforts is procompetitive; and (2) a firm has no duty to design its products in a way that equally benefits its competitors. (*See* PPS at 27-28.) By contrast, AMD's Statement wholly lacks any legal discussion of what type of "technical" conduct violates the antitrust laws.

AMD also does not come close to showing the possibility of anticompetitive conduct in the standard-setting area. Even if AMD's claims regarding Intel's alleged standard-setting conduct were true, they would be of no consequence because AMD admits in its Complaint that the standards it is complaining about were never adopted. (*See* Compl. ¶¶ 113, 121.) AMD cannot show how it could have been damaged or disadvantaged by standards that were never adopted, and it does not attempt to do so. But it still seeks to depose ▮ Intel employees on this topic.[33]

In its Statement, AMD identifies three new areas of alleged Intel technical misconduct not mentioned in its Complaint, none of which is actionable and all of which are trivial and untrue. First, AMD complains that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In any event, BAPCo merely makes information available to interested persons and does not coerce them to buy any products. In these circumstances, the dissemination of information by BAPCo cannot serve as the basis for an antitrust violation. *See Consolidated Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 296 (5th Cir. 1988). Further, AMD's reckless assertion that Intel improperly disseminated AMD confidential data actually describes AMD's own behavior.[34]

---

[33]   AMD's additional contention that it is an antitrust violation for Intel and third parties to protect the technical trade secrets involved in their joint development efforts through confidentiality agreements has no support in the law. (*See* PCS at 70).

[34]   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Second, AMD's allegations about Intel's collaboration with Skype contain a number of material omissions.  AMD complains that



It is both common and procompetitive for a company to recoup its investment in a collaboration through some reasonable degree of preferred functionality in the resulting technology.

Third, AMD makes the muddled accusation that

(PCS at 71-72.) Persuading a supplier of a complementary product of the capabilities of one's products has never been held to be an antitrust violation.  *See Stearns*, 170 F.3d at 522-23, 527.

Given that AMD's allegations regarding Intel's "technical exclusionary conduct" do not amount even to a molehill, AMD's demand for a mountain of depositions in this area should not be countenanced.  Intel suggests a much more limited and sensible approach to technical conduct and, in fact, indicated in its Statement that these allegations are best pursued and disposed of through a few Rule 30(b)(6) depositions.  (*See* PPS at 96.)

**F.    Intel's Document Policies**

AMD's attacks on Intel's document retention, its contracting practices, and its corporate culture are disingenuous, reckless, and out of place in a discussion about the reasonable contours of discovery.  On the one hand, AMD complains of the "blizzard of documents" that Intel has produced pursuant to its requests that AMD is forced to deal with (PCS at 15), but at the same time complains that                                              (*id.* at 16 n.9).  These meritless attacks certainly cannot support AMD's scorched earth deposition plan.

37



AMD fails to

properly acknowledge to the Court that Intel is producing enormous amounts of data, in the form

negotiated by the parties, that identify all of Intel's sales transactions and their pricing (including

discounts) for the relevant time period.

Intel's transactions are documented. The documentation seldom takes the form of

detailed contracts, but that is not the same as being undocumented. No law or business practice

requires that deals be memorialized in formal contracts, particularly in fast-moving, competitive

industries where speed and flexibility are paramount. AMD notably provides no evidence that

any of Intel's customers do not understand the prices or terms of dealing with Intel.[35]

AMD's attack on Intel's document retention is long on hyperbole but very short on facts.

When this case was filed – with no advance warning – Intel took immediate and unprecedented

steps to preserve all documents potentially relevant to this lawsuit, including preserving

thousands of back-up tapes from its servers, including email servers.

To date, far from catastrophically failing

---

[35]  AMD's claim that Intel document management policies were "designed to keep its anti-competitive activities under wraps" (PCS at 16) is also false. As Rule 37(f) of the Federal Rules of Civil Procedure recognizes, such systems are both a routine and critical part of computer system management. Intel's reason for implementing an aging/auto-delete system – years before the lawsuit was filed – was to keep server space manageable and maintain the integrity of Intel's computing infrastructure.

as AMD suggests (while at the same time claiming to be drowning under a blizzard of documents), Intel's preservation efforts have led to the production of the electronic equivalent of well over 100 million pages of documents.

Finally, AMD's accusation of "lawlessness at the highest levels" (PCS at 16) is both factually wrong and reckless.



## IV.    INTEL'S RESPONSE TO PLAINTIFFS' REQUESTED RELIEF

AMD's proposed injunctive scheme would turn the Court into a regulatory agency tasked with constantly determining whether Intel prices were either "too low" or "too high," and effectively chill Intel's ability to compete. AMD's demand for "transparency" in pricing (PCS at 95) would effectively mean that Intel would not be able to conduct individual negotiations with

customers (as those would be nontransparent) and that AMD would therefore be granted a price umbrella, as Intel would not be able to respond to AMD's discount offers with its own offers. AMD's proposed ban on "express and implied exclusive dealing arrangements," and "payments for dropping, delaying or limiting the manufacture, sale or promotion of rival-based products" (*id.* at 95) would similarly only serve anticompetitive aims.

AMD does not define what would constitute an "implied" exclusive dealing arrangement or how a ban on such an arrangement could be enforced. As shown above, AMD has argued that the mere existence of a sole-source relationship (even in a case where AMD refused to supply the customer) is evidence of an exclusive dealing agreement. And barring Intel from offering above-cost discounts to win more of a customer's business would contravene the Supreme Court's repeated admonitions that above-cost pricing cannot violate the law. The proposed ban on "payments for dropping, delaying or limiting" the sale of rival products is similarly anticompetitive. Whenever one supplier wins an order, the other supplier's sales are limited; and when one wins a design competition, the other's product is "dropped or delayed." In other words, AMD is seeking to ban competition itself. *See Barry Wright*, 724 F.2d at 236.

Intel also explained in its Statement how injunctive relief of the sort that AMD seeks would place the Court in the impossible position as a regulator of Intel's pricing, contrary to the mandate of the Supreme Court's *Trinko* decision. 540 U.S. at 414-15 ("[a]n antitrust court is unlikely to be an effective day-to-day enforcer" of the Sherman Act because, *inter alia*, regulation of above-cost pricing is "beyond the practical ability of a judicial tribunal to control").

AMD has never set out a damage theory in any detail. Class Plaintiffs' damage theory is based on an alleged "overcharge" on computers purchased by them, but they have not set out in any detail how they would calculate damages or whether they could do so on a class-wide basis.[36] Until Class Plaintiffs file their motion for certification on May 16, it is premature for

---

[36]  To the extent that Class Plaintiffs seek damages for an alleged "innovation loss" to consumers generally, such purported consumer injury is too speculative to support a monetary damage claim. *See Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006) ("At bottom, the

Intel to comment on their methodology to calculate damages.  It does bear noting, however, that

Class Plaintiffs' "overcharge" allegation is irreconcilable with their allegations that Intel is

deeply discounting ███████████ (PCS at 6.)  If Intel in fact is doing so, how could the

beneficiaries of these deep ███████████ discounts have been overcharged?  This type of

overcharge theory lacks the minimum level of plausibility required under antitrust jurisprudence.

*See, e.g., Atl. Richfield*, 495 U.S. at 340-41 ("Low prices benefit consumers regardless of how

those prices are set, and so long as they are above predatory levels, they do not threaten

competition.  Hence, they cannot give rise to antitrust injury."); *Matsushita*, 475 U.S. at 593-

97 (rejecting implausible theories of recovery that make no economic sense).

---

harms that the plaintiffs have alleged with respect to the loss of competitive technologies are so
diffuse that they could not possibly be adequately measured.  The problem is not one of
discovery and specific evidence, but of the nature of the injury claimed.  Where the purported
injuries amount to generalized or abstract societal harms, the plaintiffs cannot claim that they, as
distinct from others in society, were specifically injured in their business or property or by the
alleged antitrust violation . . . .").  Nor is their any basis for a claim that innovation has been
stifled in the microprocessor industry, which has seen astounding advances and huge investments
in research and development.

OF COUNSEL:

Robert E. Cooper
Daniel S. Floyd
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 900071
(213) 229-7000

Joseph Kattan, PC
Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036-5306
(202) 955-8500

Darren B. Bernhard
Howrey LLP
1299 Pennsylvania Avenue
N.W. Washington, DC 20004
(202) 783-0800

Dated:  May 12, 2008
PUBLIC VERSION FILED:  May 15, 2008

POTTER ANDERSON & CORROON LLP

By:  /s/ W. Harding Drane, Jr.____
    Richard L. Horwitz (#2246)
    W. Harding Drane, Jr. (#1023)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    P.O. Box 951
    Wilmington, DE 19899-0951
    (302) 984-6000
    rhorwitz@potteranderson.com
    wdrane@potteranderson.com

Attorneys for Defendants
Intel Corporation and Intel Kabushiki Kaisha