# ANNEX F

**ANNEX F**

**Indirect Purchaser Litigated (Non-Settlement) Class Certification Decisions In Subclass States**

| State | Type of Claim | Case Authority | Product Involved | Ruling |
|---|---|---|---|---|
| **AR** | CP | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various drugs | Certification of co-payor class granted |
| **AZ** | CP | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various drugs | Certification of co-payor class granted |
| | AT, CP | *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 288 (D. Mass. 2004) | Drugs | Exemplar classes certified |
| | AT | "Order" in *Friedman v. Microsoft Corp.*, No. CV-2000-00722 (Az. Dist. Ct., Maricopa Cty., Nov. 15, 2000) (attached as Ex. 15 to the accompanying "Compendium of Exhibits" (exhibits to which will be cited herein as "Comp. Ex. ___")) | Computer software | Class certified |
| **CA** | AT, CP | *Microsoft I-V Cases*, 2000-2 Trade Cas. (CCH) ¶ 73,013 at 88,558-65 (Cal. Super. Ct., San Francisco Cty., Aug. 29, 2000), Comp. Ex. 8 | Computer Software | Granted class certification |
| | AT, CP | *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 288 (D. Mass. 2004) | Drugs | Exemplar classes certified |
| | CP | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various drugs | Certification of co-payor class granted |
| | CP, AT | *Robinson v. EMI Music Dist., Inc.*, Civ. No. L10462, 1996 WL 495551 at *5 (Tenn. Cir. Ct. July 8, 1996) | CDs | Multi-state classes certified |
| | CP | "Order" in *Kristensen v. Great Spring Waters of America*, No. 302774 (Cal. Super. Ct., San Francisco Cty., June 29, 2003), Comp. Ex. 17 | Spring water | Class certified |

1

| State | Type of Claim | Case Authority | Product Involved | Ruling |
|---|---|---|---|---|
| | AT | *B.W.I. Custom Kitchen, Inc. v. Owens-Illinois, Inc.*, 191 Cal. App. 3d 1341, 1355 (Cal. Ct. App. 1987) | Glass containers | Reversed decision denying certification |
| | AT | *Rosack v. Volvo of America Corp.*, 131 Cal. App. 3d 741, 763 (Cal. Ct. App. 1982), *cert. denied*, 460 U.S. 1012 (1983) | Autos | Reversed decision denying certification |
| | AT, CP | *In re Cipro Cases I and II*, 121 Cal. App. 4th 402, 418 (Cal. Ct. App. 2004) | Drugs | Affirmed certification order |
| | AT | *Lethbridge v. Johnson & Johnson*, No. B105754 (Cal. Ct. App., 2d App. Dist., Nov. 10, 1997) (unpublished), Comp. Ex. 18 | Disposable contact lenses | Reversed decision denying certification |
| | AT | *Aguilar v. Atlantic Richfield Corp.*, 1998-1 Trade Cas. (CCH) ¶72 ,080 at 81,496-97 (Cal. Super. Ct., San Diego Cty., May 1, 1997), Comp. Ex. 19 | Gasoline | Granted class certification |
| | AT, CP | *Smokeless Tobacco Cases I-V*, J.C.C.P. Nos. 4250, 4258, 4259 & 4262 (Cal. Super. Ct., San Francisco Cty., Jan. 29, 2004), Comp. Ex. 4 | Smokeless Tobacco | Granted certification |
| | AT, CP | "Order Granting Motion of Plaintiffs For Class Certification" in *In re Automotive Refinishing Paint Cases*, No. J.C.C.P. 4199 (Cal. Super. Ct., Alameda Cty., June 17, 2004), Comp. Ex. 6 | Automotive refinishing paint | Certified end-user, reseller classes |
| | CP, AT | "Orders" of June 23 & Aug. 16, 1995 in *Pharmaceutical Cases I, II, and III*, J.C.C.P. Nos. 2969, 2971 & 2972 (Cal. Super. Ct., San Francisco Cty.), Comp. Ex. 11 and 20 | Drugs | Granted certification |
| | AT | *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) | Drugs | Certification granted |

2

| State | Type of Claim | Case Authority | Product Involved | Ruling |
|---|---|---|---|---|
| DC | AT, CP | "Order Granting Plaintiffs' Motion for Class Certification" in *In re Reformulated Gasoline (RFG) Antitrust & Patent Litig.*, No. CV-05-01671 (VBKx) (C.D. Cal. March 27, 2007), Comp. Ex. 21 | Gasoline | Certification granted |
|  | AT | *Robinson v. EMI Music Dist., Inc.*, Civ. No. L10462, 1996 WL 495551 at *5 (Tenn. Cir. Ct. July 8, 1996) | CDs | Multi-state classes certified |
|  | AT | *Goda v. Abbott Labs.*, No. CIV A.01445-96, 1997 WL 156541 at *10 (D.C. Super. Feb. 3, 1997) | Prescription drugs | Certification granted |
| FL | CP | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various drugs | Certification of co-payor class granted |
|  | CP | *Execu-Tech Bus. Sys., Inc. v. Appleton Papers, Inc.*, 743 So. 2d 19, 22 (Fla. App. 1998) | Thermal fax paper | Affirmed class certification |
|  | AT | *Robinson v. EMI Music Dist., Inc.*, Civ. No. L10462, 1996 WL 495551 at *5 (Tenn. Cir. Ct. July 8, 1996) | CDs | Multi-state classes certified |
|  | AT | *In re Fla. Microsoft Antitrust Litig.*, No. 99-27340, 2002 WL 3142360 at *19 (Fla. Cir. Ct. Aug. 26, 2002) | Computer software | Granted class certification |
|  | AT | *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) | Drugs | Certification granted |
| IA | AT | *Comes v. Microsoft Corp.*, 696 N.W.2d 318, 327 (Ia. 2005) | Computer software | Certification granted |
|  | AT | *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253425 at *1 (E.D. Pa. Aug. 3, 2007) | Oriented Strand Board | Certification granted as to individuals and businesses |
|  | AT | "Ruling on Plaintiff's Motion for Class Certification" in *Anderson Contr., Inc. v. Bayer AG*, No. CL 95959 (Ia. Dist. Ct., Polk Cty., March 16, 2007), Comp. Ex. 22 | EPDM | Certification granted |
| ID | CP | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various drugs | Certification of co-payor |

| State | Type of Claim | Case Authority | Product Involved | Ruling |
|-------|---------------|----------------|------------------|--------|
| KS | AT | *Bellinder v. Microsoft Corp.*, No. 00-C-855, 2001 WL 1397995 at *8 (Kan. Dist. Ct. Sept. 7, 2001) | Computer software | Granted class certification |
| | AT | *Chance v. United States Tobacco Co.*, No. 02-C-12, Journal Entry (Kan. Dist. Ct. July 29, 2003), Comp. Ex. 5 | Smokeless Tobacco | Granted class certification |
| | AT | *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253425 at *1 (E.D. Pa. Aug. 3, 2007) | Oriented Strand Board | Certification granted as to individuals and businesses |
| | CP | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various drugs | Certification of co-payor glass granted |
| | AT | "Memorandum Decision" in *Premier Pork, Inc. v. Rhone Poulenc, S.A.*, No. 00 C 3 (Kan. Dist. Ct. May 1, 2004), Comp. Ex. 23 | Methionine | Certification granted |
| | AT | "Journal Entry" in *Todd v. F. Hoffman-La Roche, Ltd.*, No. 98-C-4574 (Kan. Dist. Ct. March 3, 2006), Comp. Ex. 24 | Choline chloride | Granted certification |
| | CP, AT | *Robinson v. EMI Music Dist., Inc.*, Civ. No. L10462, 1996 WL 495551 at *5 (Tenn. Cir. Ct. July 8, 1996) | CDs | Multi-state class certification |
| | AT | "Order" in *Smith v. Philip Morris Cos., Inc.*, No. 00-CV-26 (Kan. Dist. Ct. Nov. 15, 2001), Comp. Ex. 25 | Cigarettes | Certification granted |
| | AT | "Order" in *Donelan v. Abbott Labs., Inc.* No. 94-C-709 (Kan. Dist. Ct., Sedgwick Cty., Nov. 3, 1995), Comp. Ex. 26 | Infant formula | Granted class certification |
| | AT | *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) | Drugs | Certification granted |
| MA | CP | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various drugs | Certification of co-payor glass granted |
| | AT, CP | *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 288 (D. Mass. 2004) | Drugs | Exemplar classes certified |

4

| State | Type of Claim | Case Authority | Product Involved | Ruling |
|-------|---------------|----------------|------------------|--------|
| ME | CP | "Memorandum And Order" in *In re Massachusetts Smokeless Tobacco Litig.*, No. 03-3038 BLS (Mass. Super. Ct., Suffolk Cty., Dec. 7, 2004), Comp. Ex. 27 | Smokeless Tobacco | Class certified |
| | CP | *Aspinall v. Philip Morris Cos., Inc.*, 442 Mass. 381 (2004) | Light cigarettes | Affirmed class certification |
| | AT | *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253425 at *1 (E.D. Pa. Aug. 3, 2007) | Oriented Strand Board | Certification granted as to individuals and businesses |
| | AT, CP | *Robinson v. EMI Music Dist., Inc.*, Civ. No. L10462, 1996 WL 495551 at *5 (Tenn. Cir. Ct. July 8, 1996) | CDs | Multi-state classes certified |
| | AT | *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) | Drugs | Certification granted |
| MI | AT, CP | *Robinson v. EMI Music Dist., Inc.*, Civ. No. L10462, 1996 WL 495551 at *5 (Tenn. Cir. Ct. July 8, 1996) | CDs | Multi-state class certification |
| | AT | *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253425 at *1 (E.D. Pa. Aug. 3, 2007) | Oriented Strand Board | Certification granted as to individuals and businesses |
| | AT | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various drugs | Certification of co-payor glass granted |
| | AT | *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) | Drugs | Certification granted |
| MN | AT | *Robinson v. EMI Music Dist., Inc.*, Civ. No. L10462, 1996 WL 495551 at *5 (Tenn. Cir. Ct. July 8, 1996) | CDs | Multi-state classes certified |
| | AT | *Gordon v. Microsoft Corp.*, No. 00-594, 2001 WL 366432 at *13 (Minn. Dist. Ct. March 30, 2001), *interlocutory review denied*, 645 N.W. 2d 393 (Minn. 2002) and 2003 WL 23105552 at *10 (Minn. Dist. Ct. March 14, 2003) | Computer software | Certification granted |
| | AT | *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) | Drugs | Certification granted |

5

| State | Type of Claim | Case Authority | Product Involved | Ruling |
|---|---|---|---|---|
| MS | CP | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various drugs | Certification of co-payor glass granted |
| | AT | *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253425 at *1 (E.D. Pa. Aug. 3, 2007) | Oriented Strand Board | Certification granted as to individuals and businesses |
| | AT | *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) | Drugs | Certification granted |
| | AT, CP | *Robinson v. EMI Music Dist., Inc.*, Civ. No. L10462, 1996 WL 495551 at *5 (Tenn. Cir. Ct. July 8, 1996) | CDs | Multi-state classes certified |
| NC | AT | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various drugs | Certification of co-payor class granted |
| | AT | *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253425 at *1 (E.D. Pa. Aug. 3, 2007) | Oriented Strand Board | Certification granted as to individuals and businesses |
| | AT | *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) | Drugs | Certification granted |
| ND | AT | *Howe v. Microsoft Corp.*, 656 N.W. 2d 285, 298 (N.D. 2003), *aff' g* 2002 WL 199130 (N.D. Dist. Ct. Jan. 16, 2002) | Computer software | Affirmed grant of certification |
| | AT | *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) | Drugs | Certification granted |
| | AT | *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253425 at *1 (E.D. Pa. Aug. 3, 2007) | Oriented Strand Board | Certification granted as to individuals and businesses |
| | AT, CP | *Robinson v. EMI Music Dist., Inc.*, Civ. No. L10462, 1996 WL 495551 at *5 (Tenn. Cir. Ct. July 8, 1996) | CDs | Multi-state classes certified |
| NE | CP | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various drugs | Certification of co-payor class granted |
| | CP | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various drugs | Certification of co-payor class granted |

| State | Type of Claim | Case Authority | Product Involved | Ruling |
|---|---|---|---|---|
| NH | CP | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various drugs | Certification of co-payor class granted |
| | AT | *Robinson v. EMI Music Dist., Inc.*, Civ. No. L10462, 1996 WL 495551 at *5 (Tenn. Cir. Ct. July 8, 1996) | CDs | Multi-state classes certified |
| NM | AT | *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) | Drugs | Certification granted |
| | AT | "Decision And Order" in *In re New Mexico Indirect Purchasers Microsoft Antitrust Litig.*, No. D-0101-CV-2000 (N.M. Dist. Ct., 1st Judicial Dist.. Oct. 2, 2002), Comp. Ex. 9; *see In re New Mexico Indirect Purchasers Microsoft Corp. Antitrust Litig.*, 149 P.3d 976, 983-84 (N.M. App. 2006) | Computer software | Certification granted |
| | AT | *Romero v. Philip Morris Inc.*, 109 P.3d 768, 795 (N.M. App. 2005) | Cigarettes | Certification granted |
| NV | CP | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various Drugs | Certification of co-payor class granted |
| | AT | *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) | Drugs | Certification granted |
| NY | CP | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various drugs | Certification of co-payor class granted |
| | CP | *Cox v. Microsoft Corp.*, 10 Misc. 3d 1055 (A), 809 N.Y.S. 2d 480 (N.Y. Sup. 2005) | Computer software | Granted class certification |
| | AT | *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) | Drugs | Certification granted |
| RI | CP | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various drugs | Certification of co-payor class granted |
| SD | AT | *In re S.D. Microsoft Antitrust Litig.*, 657 N.W.2d 668, 672 (S.D. 2003) | Computer software | Affirmed grant of certification |

7

| State | Type of Claim | Case Authority | Product Involved | Ruling |
|---|---|---|---|---|
| | AT | *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) | Drugs | Certification granted |
| | CP | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various drugs | Certification of co-payor class granted |
| | AT, CP | *Robinson v. EMI Music Dist., Inc.*, Civ. No. L10462, 1996 WL 495551 at *5 (Tenn. Cir. Ct. July 8, 1996) | CDs | Multi-state classes certified |
| | AT | "Order Granting Class Certification" in *Hagemann v. Abbott Labs., Inc.*, No. 94-221 (S.D. Cir. Ct., Hughes Cty., Nov. 21, 1995), Comp. Ex. 28 | Infant formula | Certification granted |
| TN | AT | "Memorandum and Order" in *Sherwood v. Microsoft Corp.*, No. 99C-5362 (Tenn. Cir. Ct., Davidson Cty., Dec. 20, 2002), Comp. Ex. 10 | Computer software | Certification granted |
| | AT | *In re OSB Antitrust Litig.*, No. 06-826, 2007 WL 2253425 at *1 (E.D. Pa. Aug. 3, 2007) | Oriented Strand Board | Certification granted as to individuals and businesses |
| | CP, AT | *Robinson v. EMI Music Dist., Inc.*, Civ. No. L10462, 1996 WL 495551 at *5 (Tenn. Cir. Ct. July 8, 1996) | CDs | Certified multi-state classes |
| | CP | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various drugs | Certification of co-payor class granted |
| VT | AT, CP | *In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 288 (D. Mass. 2004) | Drugs | Exemplar classes certified |
| | CP | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various drugs | Certification of co-payor class granted |
| WI | AT | *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) | Drugs | Certification granted |
| | CP | *In re Pharmaceutical Indus. Average Wholesale Price Litig.*, 233 F.R.D. 229, 230-31 (D. Mass. 2006) | Various drugs | Certification of co-payor class granted |
| | AT | *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 164-66 (N.D. Cal. 2001) | Methionine | Granted decertification |

| State | Type of Claim | Case Authority | Product Involved | Ruling |
|---|---|---|---|---|
| | CP | *Robinson v. EMI Music Dist., Inc.*, Civ. No. L10462, 1996 WL 495551 at *5 (Tenn. Cir. Ct. July 8, 1996) | CDs | Multi-state classes certified |
| | AT | " Order Certifying Class Action" in *Capp v. Microsoft Corp.*, No. 00-CV-0637 (Wis. Cir. Ct., Dane Cty., July 25, 2001), Comp. Ex. 29 | Computer software | Certification granted |
| | AT | *Derzon v. Appleton Papers, Inc.*, No. 96-CV-3670, 1998 WL 1031504 at *10 (Wis. Cir. Ct. July 7, 1998) | Fax thermal paper | Denied certification |
| | AT | " Decision And Order" in *Feuerabend v. UST Corp.*, No. 2002CV07124 (Wis. Cir. Ct., Milwaukee Cty., May 10, 2004), Comp. Ex. 3 | Smokeless tobacco | Certification granted |
| | AT | " Order" in *Carlson v. Abbott Labs., Inc.*, No. 94 CV 002608 (Wis. Cir. Ct., Milwaukee Cty., March 23, 1995), Comp. Ex. 30 | Infant formula | Certification granted |
| WV | AT | *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) | Drugs | Certification granted |
| | AT, CP | *Robinson v. EMI Music Dist., Inc.*, Civ. No. L10462, 1996 WL 495551 at *5 (Tenn. Cir. Ct. July 8, 1996) | CDs | Multi-state classes certified |

9

Comp. Ex. 1, *Hopkins v. De Beers Centenary AG*, No. CGC04-432954, Order Certifying Plaintiff Class (Cal. Super. Ct. Apr. 18, 2005)

Comp. Ex. 2, *In re Mass. Smokeless Tobacco Litig.*, No. 03-5038 BLS, Memorandum and Order (Suffolk Cty. Super. Ct. Dec. 7, 2004);

Comp. Ex. 3, *Feuerabend v. UST, Inc.*, No. 2002CV007124, Decision and Order Granting Plaintiff's Motion for Class Certification (Wis. Cir. Ct. May 10, 2004);

Comp. Ex. 4, *Smokeless Tobacco Cases I-IV*, J.C.C.P. Nos. 4250, 4258, 4259 & 4262, Order Granting Motion for Class Certification (Cal. Super. Ct. Jan. 29, 2004);

Comp. Ex. 5, *Chance v. United States Tobacco Co.,* No. 02-C-12, Journal Entry (Kan. Dist. Ct. July 29, 2003).

Comp. Ex. 6, *In re Automotive Refinishing Paint Cases*, J.C.C.P. No. 4199, Order Granting Motion of Plaintiffs for Class Certification (Cal. Super. Ct. Jun. 17, 2004);

Comp. Ex. 7, *See Charles I. Friedman, P.C. v. Microsoft Corp.*, No. CV2000-000722, Minute Entry (Ariz. Super. Ct. Nov. 14, 2000);

Comp. Ex. 8, *Microsoft I-V Cases*, J.C.C.P. No. 4106, 2000-2 Trade Cas. ¶ 73,013 (Cal. Super. Ct. Aug. 29, 2000);

Comp. Ex. 9, *In re N.M. Indirect Purchasers Microsoft Corp. Antitrust Litig.*, No. D-0101-CV-2000-1697, Decision and Order on Motion for Class Certification (N.M. Dist. Ct. Oct. 2, 2002);

Comp. Ex. 10, *Sherwood v. Microsoft Corp.*, No. 99C-3562, Memorandum and Order (Tenn. Cir. Ct. Dec. 20, 2002).

Comp. Ex. 11, *Pharmaceutical Cases I, II, and III*, J.C.C.P. Nos. 2969, 2971 & 2972, Order Certifying Consumer Class (Cal. Super. Ct. Aug. 16, 1995);.

*See, e.g.*, Comp. Ex. 12, Darrell Dunn, *The PC Replacement Decision*, InformationWeek (June 20, 2005) (reporting that "the average life span of a desktop PC is 43 months, and only 36 months for mobile PCs").

Comp. Ex. 13, *In re Wells Fargo Overtime Pay Litig.*, MDL No. 06-1770, Mem. & Order Re: Nationwide Plaintiffs' Motion to Certify a Class and Collective Action, slip op. at 12 (N.D. Cal. Oct. 18, 2007)

Comp. Ex. 14, Jury Instructions, *In re Lorazepam & Clorazepate Antitrust Litig.*, Misc. No. 99mc0276 (D.D.C.), at 35, 46, 52.

Comp. Ex. 15, "Order" in Friedman v. Microsoft Corp., No. CV-2000-00722 (Az. Dist. Ct., Maricopa Cty., Nov. 15, 2000)

Comp. Ex. 16  "Statement of Decision" in *Bruce v. Crompton Corp.*, No. BC284175 (Cal. Super. Ct., L.A. Cty., Jan. 4, 2005), Comp. Ex. 16

Comp. Ex. 17 "Order" in *Christensen v. Great Spring Waters of America,* No. 302774 (Cal. Super. Ct., San Francisco Cty., June 29, 2003), Comp. Ex. 17

*Lethbridge v. Johnson & Johnson,* No. B105754 (Cal. Ct. App., 2d App. Dist., Nov. 10, 1997) (unpublished), Comp. Ex. 18

*Aguilar v. Atlantic Richfield Corp.,* 1998-1 Trade Cas. (CCH) ¶72,080 at 81,496-97 (Cal. Super. Ct., San Diego Cty., May 1, 1997), Comp. Ex. 19

"Orders" of June 23 & Aug. 16, 1995 in *Pharmaceutical Cases I, II, and III,* J.C.C.P. Nos. 2969, 2971 & 2972 (Cal. Super. Ct., San Francisco Cty.), Comp. Ex. 11 and 20

"Order Granting Plaintiffs' Motion for Class Certification" in *In re Reformulated Gasoline (RFG) Antitrust & Patent Litig.,* No. CV-05-01671 (VBKx) (C.D. Cal. March 27, 2007), Comp. Ex. 21

"Ruling on Plaintiff's Motion for Class Certification" in *Anderson Contr., Inc. v. Bayer AG*, No. CL 95959 (Ia. Dist. Ct., Polk Cty., March 16, 2007), Comp. Ex. 22

"Memorandum Decision" in *Premier Pork, Inc. v. Rhone Poulenc, S.A.*, No. 00 C 3 (Kan. Dist. Ct. May 1, 2004), Comp. Ex. 23

"Journal Entry" in *Todd v. F. Hoffman- La Roche, Ltd.,* No. 98-C-4574 (Kan. Dist. Ct. March 3, 2006), Comp. Ex. 24

"Order" in *Smith v. Philip Morris Cos., Inc.,* No. 00-CV-26 (Kan. Dist. Ct. Nov. 15, 2001), Comp. Ex. 25

"Order" in *Donelan v. Abbott Labs., Inc.* No. 94-C-709 (Kan. Dist. Ct., Sedgwick Cty., Nov. 3, 1995), Comp. Ex. 26

"Memorandum And Order" in *In re Massachusetts Smokeless Tobacco Litig.*, No. 03-3038 BLS (Mass. Super. Ct., Suffolk Cty., Dec. 7, 2004), Comp. Ex. 27

"Order Granting Class Certification" in *Hagemann v. Abbott Labs., Inc.*, No. 94-221 (S.D. Cir. Ct., Hughes Cty., Nov. 21, 1995), Comp. Ex. 28

"Order Certifying Class Action" in *Capp v. Microsoft Corp.,* No. 00-CV-0637 (Wis. Cir. Ct., Dane Cty., July 25, 2001), Comp. Ex. 29

"Order" in *Carlson v. Abbott Labs., Inc.,* No. 94 CV 002608 (Wis. Cir. Ct., Milwaukee Cty., March 23, 1995), Comp. Ex. 30

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| *In Re* LORAZEPAM & CLORAZEPATE ANTITRUST LITIGATION | MDL Docket No. 1290<br>Misc. No. 99mc0276 |
| HEALTH CARE SERVICE CORP., | This document applies to: |
| Plaintiff, | |
| v. | Civ. No. 01-2646 (TFH) |
| MYLAN LABORATORIES, INC., et al., | |
| Defendants. | |
| BLUE CROSS BLUE SHIELD OF MINNESOTA, BLUE CROSS BLUE SHIELD OF MASSACHUSETTS, and FEDERATED MUTUAL INSURANCE COMPANY, | |
| Plaintiffs, | Civ. No. 02-1299 (TFH) |
| v. | |
| MYLAN LABORATORIES, INC., et al., | |
| Defendants. | |

## JURY INSTRUCTIONS

Date: _____          _____
                                  Thomas F. Hogan
                                  Chief Judge

## FUNCTION OF THE COURT

My function is to conduct this trial in an orderly, fair, and efficient manner; to rule on questions of law; and to instruct you on the law which applies in this case.

It is your duty to accept the law as I state it to you without questioning the wisdom of these instructions. In other words, even if you disagree or do not understand the reasons for any of the instructions, you are bound to follow them.

## SIGNIFICANCE OF PARTY DESIGNATIONS

During the course of the trial, you have heard references to the terms plaintiff and defendant. To put it as simply as possible, the plaintiff is the person who starts a lawsuit and the defendant is the person who is sued by the plaintiff.

During your deliberations, however, you must not attach any significance in weighing the evidence to the terms plaintiff and defendant. In other words, the fact that the plaintiff has filed a lawsuit against the defendant does not mean that the plaintiff is entitled to your verdict or that his evidence is entitled to greater weight than the defendant's evidence. A plaintiff must prove every element of his claim against a defendant by a preponderance of the evidence before he is entitled to prevail.

## JUROR'S DUTY TO DELIBERATE

It is your duty as jurors to consult with one another and to deliberate expecting to reach an agreement. You must decide the case for yourself but you should do so only after thoroughly discussing it with your fellow jurors. You should not hesitate to change an opinion when convinced that it is wrong. You should not be influenced to vote in any way on any question just because another juror favors a particular decision or holds an opinion different from your own. You should reach an agreement only if you can do so in good conscience. In other words, you should not surrender your honest beliefs about the effect or weight of evidence merely to return a verdict or solely because of other jurors' opinions.

5

## ATTITUDE AND CONDUCT OF JURORS

Remember that you are not advocates in this matter. You are neutral judges of the facts. The final test of the quality of your service will lie in the verdict which you return to this courtroom. You will make an important contribution to the cause of justice if you arrive at a just and proper verdict in this case. Therefore, during your deliberations in the jury room, your purpose should not be to support your own opinion but to determine the facts.

6

## COURT'S COMMENTING ON THE EVIDENCE

The law permits me to comment to you about the evidence in this case. My comments are only my opinions about the facts, and you are not bound by my opinions. If, during the course of this trial, or the giving of these instructions, I have made or make any comment on any evidence, you are free to disregard the comment. Remember, you are the sole and exclusive judges of all questions of fact in this case.

8

## COURT'S QUESTIONS TO WITNESSES

During the course of the trial, I may have asked questions of a witness, to obtain information or to bring out facts. You should not take my questions to witnesses as any indication of my opinion about how you should determine the facts.

9

## JURY NOT TO TAKE CUE FROM JUDGE

If I have said or done anything at any time during this case, including giving these instructions, which seemed to indicate my opinion on any of these matters, then I instruct you to disregard that indication. Nothing I have said or done should influence or suggest to you that I favor any party in this case.

I have not meant to express, or to suggest, any opinion about which witnesses should be believed, or which facts are established.

10

## RULINGS ON OBJECTIONS

There may have been times during the trial when a lawyer made an objection to a question asked by another lawyer or to an answer given by a witness. It is the duty of a lawyer to make objections if the lawyer believes something improper is being done. When I sustained an objection to a question, the witness was not allowed to answer it. Do not attempt to guess what the answer might have been had I allowed the question to be answered. Similarly, when I told you to disregard a particular answer—when I ordered it stricken—you should have put that statement out of your mind, and you may not refer to that stricken answer during your deliberations.

While it may have been natural for you to become impatient with the delay caused by objections or other portions of the proceedings, you must not let your feelings in any way affect your deliberations. Those interruptions concerned legal matters, while your job is to decide the facts. You should not be influenced by the any lawyer's objections, no matter how I ruled upon them.

11

## EQUALITY OF LITIGANTS – CORPORATIONS

Our system of justice requires that you decide the facts of this case in an impartial manner. You must not be influenced by bias, sympathy, prejudice or public opinion. It is a violation of your sworn duty to base your verdict upon anything other than the evidence in the case.

In reaching a just verdict, you must consider and decide this case as an action between persons of equal standing in the community and of equal worth. A corporation, whether large or small, has the same right to a fair trial as a private individual. All persons, including corporations, stand equal before the law and are to be treated as equals in this court. In other words, the fact that a plaintiff or defendant or both are corporations must not affect your decision.

12

## EVIDENCE IN THE CASE

You may consider only the evidence properly admitted in the case. Evidence includes the sworn testimony of witnesses, as well as exhibits admitted into evidence. Evidence also includes facts that have been stipulated, that is, agreed to, by counsel. You may consider any facts to which all counsel have agreed or stipulated to be undisputed evidence.

## INFERENCES

In arriving at your verdict, you are to consider only the evidence in the case. When you are considering the evidence, however, you are not limited solely to the statements of the witnesses. You are permitted to draw from the evidence any inferences or conclusions that reason and common sense lead you to make.

14

## STATEMENTS OF COUNSEL

Statements and arguments of the lawyers, such as their opening statements and closing arguments, are not evidence. They are only intended to help you understand and interpret the evidence from each party's perspective.

The questions that the lawyers ask are not evidence. A lawyer's question that contains an assertion of a fact does not provide evidence of that fact.

15

## JURY'S RECOLLECTION CONTROLS

During this case, I or the lawyers may have called your attention to certain evidence. If you remember that evidence differently from the way I or the lawyers stated it, then you should disregard our characterization of the evidence and rely upon your own memory.

## BURDEN OF PROOF

The party who makes a claim has the burden of proving it. This burden of proof means that the plaintiff must prove every element of her claim by a preponderance of the evidence. To establish a fact by a preponderance of the evidence is to prove that it is more likely so than not so. In other words, a preponderance of the evidence means that the evidence produces in your mind the belief that the thing in question is more likely true than not true.

If, after considering all of the evidence, the evidence favoring the plaintiff's side of an issue is more convincing to you, and causes you to believe that the probability of truth favors the plaintiff on that issue, then the plaintiff will have succeeded in carrying the burden of proof on that issue.

The term "preponderance of the evidence" does not mean that the proof must produce absolute or mathematical certainty. For example, it does not mean proof beyond a reasonable doubt as is required in criminal cases.

Whether there is a preponderance of the evidence depends on the quality, and not the quantity, of evidence. In other words, merely having a greater number of witnesses or documents bearing on a certain version of the facts does not necessarily constitute a preponderance of the evidence.

If you believe that the evidence is evenly balanced, on an issue the plaintiff had to prove, then the plaintiff has not carried the burden of proof and your finding on that issue must be for the defendant.

17

## EVIDENCE PRODUCED BY ADVERSARY

In determining whether any fact has been proved by a preponderance of the evidence, you should consider all the evidence bearing upon that fact, regardless of who produced it. A party is entitled to benefit from all evidence that favors him or her whether he or she produced it or his or her adversary produced it.

## DIRECT AND CIRCUMSTANTIAL EVIDENCE

There are two types of evidence: direct and circumstantial. Direct evidence is the direct proof of a fact, such as the testimony of an eyewitness. Circumstantial evidence is indirect evidence of a fact which is established or logically inferred from a chain of other facts or circumstances. For example, direct evidence of whether an animal was running in the snow might be the testimony of a person who actually saw the animal in the snow. Circumstantial evidence might be the testimony of a person who saw the tracks of the animal in the snow, rather than the animal itself.

You may consider both types of evidence equally. The law makes no distinction between the weight to be given either direct or circumstantial evidence. The law does not require a greater degree of certainty for circumstantial evidence than of direct evidence. You should weigh all the evidence in the case, both direct and circumstantial, and find the facts in accordance with that evidence.

19

## JURY TO DETERMINE CREDIBILITY OF WITNESSES

In evaluating the evidence and deciding what the facts are, you must consider and weigh the testimony of all the witnesses who have appeared before you. You are the sole judges of the credibility of the witnesses. In other words, you alone are to determine whether to believe any witness and to what extent any witness should be believed. If there is any conflict in the testimony between a witness's testimony and other evidence, it is your function to resolve the conflict and to determine where the truth lies.

In deciding the credibility of any witness, you may consider any matter that may have a bearing on the subject. You may consider the appearance and the behavior of the witness on the witness stand; whether the witness impresses you as a truthful individual; whether the witness impresses you as having an accurate memory and recollection; whether the witness has any motive for not telling the truth; whether the witness had full opportunity to observe the matters about which he or she has testified; whether the witness has any interest in the outcome of this case; or whether the witness has any friendship or animosity toward other persons concerned in this case.

You may consider the reasonableness or unreasonableness, and the probability or improbability, of the testimony of a witness in determining whether to accept it as true and accurate. You may consider whether the witness has been contradicted or corroborated by other credible evidence.

If you believe that any witness has shown himself to be biased or prejudiced, either for or against either side in this trial, you may consider and decide whether that bias or prejudice has colored the testimony of the witness so as to affect the witness's desire and capability to tell the truth.

20

You should give the testimony of each witness as much weight as in your judgment it is fairly entitled to receive.

## NUMBER OF WITNESSES AND EXHIBITS

The relative weight of the evidence on a particular issue is not determined by the number of witnesses testifying for either side or the number of exhibits being offered. You should consider all the facts and circumstances in evidence to determine which of the witnesses are worthy of greater belief and which of the exhibits are worthy of greater belief. You may find that the testimony of a smaller number of witnesses or the presentation of a smaller number of exhibits on one side is more believable than the testimony of a greater number of witnesses or the presentation of a greater number of exhibits on the other side. Indeed, the testimony of a single witness or the presentation of a single piece of evidence, which you believe to be the truth, is enough to prove any fact.

If, after considering all the evidence in the case, you hold a greater belief in the accuracy and reliability of one or a few witnesses' testimony, or one or a few exhibits, then you may base your verdict on that testimony or on that one or several exhibits, even though a larger number of witnesses or exhibits may have testified to the contrary.

## EXPERT OPINION

You have heard testimony from persons identified as experts. These witnesses are considered experts because their training, skill, experience or education has given them scientific, technical or other specialized knowledge that might assist the jury in understanding the evidence or in determining a fact in issue. Expert witnesses may state an opinion about any matter within their expertise and provide the reasons for the opinion.

Expert testimony should be judged just as any other evidence. You may accept it or reject it, or give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, the expert's credibility and all the other evidence in the case.

In this case there has been a conflict in the testimony of expert witnesses. As reasonable and intelligent people using your own good judgment, you must resolve that conflict and determine which, if any, of the expert opinions you will accept as accurate. You should consider and weigh the credibility and qualifications of the experts who have testified, the logic of the reasons given in support of their opinions, and other evidence in the case that favors or opposes a given opinion.

23

## DEPOSITIONS AS EVIDENCE

During the trial of this case, certain testimony has been read to you or presented by videotape. You should give to this testimony the same consideration as to its weight and credibility, as you give to the testimony of witnesses who testified here in court. You must not discount any testimony merely because it was read to you or presented on videotape.

24

## IMPEACHMENT BY PRIOR INCONSISTENT STATEMENTS

The testimony of a witness may be discredited or impeached by showing that he or she has previously made statements which are inconsistent with his or her present courtroom testimony. It is for you to decide whether a witness made a statement on an earlier occasion and whether it was in fact inconsistent with the witness's testimony in court here.

If a witness at trial has been confronted with a prior statement which that witness made, and that prior statement is inconsistent with his or her testimony here in court, then you may consider the prior statement when you assess the truthfulness of the testimony he or she gave in court.

If the witness made the prior inconsistent statement under oath subject to the penalty of perjury, to include at a deposition, then you may also treat that prior statement as evidence in this case — that is, you may treat what the witness said in that prior statement as evidence like any other evidence in this case.

If the witness was not under oath subject to the penalty of perjury when he or she made the statement, then you may not treat the prior statement as evidence of the facts in the statement. You may consider the statement only to evaluate the witness's credibility, that is, you may use the prior statement only to determine whether to believe the witness's present testimony in court.

If you believe that any witness has been discredited or impeached, then you should give his or her testimony the weight, if any, that you judge it is fairly entitled to receive.

25

## ADOPTING PRIOR INCONSISTENT STATEMENTS

If a witness testifies that a prior inconsistent statement is the truth, then you may consider the prior statement both to evaluate the witness's credibility and as evidence of the truth of any fact contained in that statement.

## CHARTS AND SUMMARIES

The lawyers and witnesses have shown to you various charts and summaries to help explain the facts. The facts in these charts and summaries come from books, records, and other documents which are in evidence in the case. The charts or summaries themselves, however, are not evidence or proof of any facts. If any chart or summary does not correctly reflect facts or figures shown by the evidence in the case, then you should disregard that chart or summary.

In other words, the charts or summaries are used only as a convenience; you should disregard entirely any chart or summary that does not state the truth based on the evidence.

27

## MULTIPLE PLAINTIFFS

There are four plaintiffs in this trial. However, the case of each plaintiff is separate from, and independent of, that of the other. The law permits these plaintiffs to join their cases solely because their claims involve the same subject matter. Each plaintiff has separate individual rights. Thus, just because one plaintiff might be entitled to receive damages does not necessarily mean that the other should receive damages.

Unless I tell you otherwise, the instructions I give you apply equally to each plaintiff. You must decide each plaintiff's case independently and as a separate action as to each defendant.

The defendants are entitled to fair consideration of the defense as to each plaintiff, just as each plaintiff is entitled to a fair consideration of his or her claim against the defendants.

28

## MULTIPLE DEFENDANTS

There is more than one defendant in this lawsuit. Each defendant deserves fair consideration of his or her own separate defense. Accordingly, your finding one defendant liable or not liable should have no effect on your decision about the liability of any other defendant. The instructions I give you govern the case as to each defendant to the same effect as if that defendant were the only one in the lawsuit.

If you should find that no defendant is liable to the plaintiff, then your verdict should be in favor of all defendants against the plaintiff. If you should find that not all of the defendants are liable to the plaintiff, then your verdict should be in favor of the plaintiff and against only those defendants you found liable.

29

# CONSIDERATION OF THE EVIDENCE – CORPORATE PARTY'S AGENTS AND EMPLOYEES

The parties in this case are corporations. A corporation can act only through individuals as its agents or employees. In general, if any agent or employee of a corporation acts or makes statements while acting within the scope of his or her authority as an agent, or within the scope of his or her duties as an employee, then under the law those acts and statements are of the corporation.

## GENERAL INSTRUCTION – PARTIES

On one side of this case are the Plaintiffs, Blue Cross Blue Shield of Massachusetts, Blue Cross Blue Shield of Minnesota, Federated Mutual Insurance Company, and HCSC — health insurance companies, who pay patient drug benefits. I will use the term "Plaintiff" or "Plaintiffs" to refer to those companies.

On the other side of this case are the Defendants, Mylan Laboratories, Inc. and Mylan Pharmaceuticals, Inc., manufacturers of Lorazepam and Clorazepate, and Cambrex Corporation, the parent company of Profarmaco, and Gyma Laboratories of America, Inc., suppliers of active pharmaceutical ingredients used to manufacture Lorazepam and Clorazepate. I will use the term "Defendant" or "Defendants" to refer to those companies.

In this case, Plaintiffs and Defendants are corporations. The mere fact that the parties are corporations does not mean they are entitled to any lesser consideration by you. All litigants are equal before the law, and corporations, big or small, are entitled to the same fair consideration as you would give any other individual party.

Plaintiffs Blue Cross Blue Shield of Minnesota and Massachusetts, Federated Insurance Company, and HCSC claim that Defendants unlawfully and unreasonably restrained trade or commerce by monopolizing, attempting to monopolize, restraining trade or conspiring to restrain trade in violation of law. Plaintiffs contend that they paid more for Lorazepam and Clorazepate than they would have paid in a free and open competitive market.

All Plaintiffs claim that Defendants illegally profited by artificially inflating prices for Lorazepam and Clorazepate and the active pharmaceutical ingredients used to make those prescription drugs.

Defendants deny that the Agreements allowed them to unreasonably restrain trade or to monopolize the markets for Lorazepam and Clorazepate finished tablets or APIs, or that they attempted to monopolize these markets. Defendants contend that the Agreements did not foreclose

31

competitors from the market and did not foreclose the supply of the API to other makers of Lorazepam and Clorazepate tablets. Defendants also contend that the price increases were lawful, and that the Plaintiff insurance companies and their PBMs set the amount they would reimburse for Lorazepam and Clorazepate in negotiations with drug stores.

## TRANSITION TO CLAIMS

This completes my general review of the rules of evidence as they apply in this case. You will be reviewing all of the evidence, both direct and circumstantial, to determine whether the Defendants violated the law.

Plaintiffs Blue Cross Blue Shield of Minnesota, Blue Cross Blue Shield of Massachusetts, Federated Insurance Company and Health Care Services Corporation (HCSC) have all brought antitrust claims against Defendants. All four Plaintiffs have also brought unjust enrichment claims.

The antitrust claims brought by Plaintiffs are for:

1) Unlawful Restraint of Trade;

2) Conspiracy to Unreasonably Restrain Trade;

3) Monopolization; and

4) Attempted Monopolization.

If you find Defendants liable under any one of the above claims in favor of the Plaintiff who pursued such claim, then that Plaintiff(s) has established liability and you may award damages to that Plaintiff, based on the damage instructions that follow.

## PURPOSE OF ANTITRUST LAWS

The purpose of the antitrust laws is to preserve and advance our system of free enterprise by encouraging, to the fullest extent practicable, free and open competition in the marketplace, and by preventing unreasonable restraints or monopolization of any business or trade, so that the consuming public may receive better goods and services at lower cost.

# MINNESOTA ANTITRUST ACT OF 1971 – PROHIBITIONS

# MASSACHUSETTS ANTITRUST ACT – PROHIBITIONS

# ILLINOIS ANTITRUST ACT – PROHIBITIONS

Minnesota's, Massachusetts' and Illinois' antitrust laws prohibit contracts, combinations, and conspiracies that unreasonably restrain trade, and make it illegal for any person to enter into any such contract, combination or conspiracy. The term "person" includes individuals, corporations, firms, partnerships, and every other association or organization of every kind and character.

35

## RELEVANT MARKET

There are two aspects you must consider in defining a relevant market: the first is the geographic market and the second is the product market. In this case, the relevant geographic market is the United States.

The second aspect of determining the relevant market is the relevant product market. The basic idea of a relevant product market is that the products within it are reasonable substitutes from a buyer's point of view; that is, the products compete with each other. This does not mean that products must be identical to be in the same relevant product market. It means that, as a matter of practical fact and the actual behavior of buyers, the products are reasonable substitutes for the buyer's needs.

There are a number of factors you may consider in determining whether products are reasonable substitutes for each other. The basic test is whether changes in the price of one product cause a considerable number of customers to switch from one product to another. If so, the products are in the same market. You also may consider how people in the industry and the public at large view the products; whether the products have the same or similar characteristics or uses; whether the products have similar prices; whether changes in the price of one product are followed by changes in the price of the other product; whether the products are sold to similar customers; and whether they are distributed and sold by the same kinds of distributors or dealers.

In sum, to determine the relevant product market, you must decide which products compete with each other. This is a practical determination. Products do not have to be identical to be in the same relevant market, but they must compete meaningfully with each other.

36

In determining which products compete with each other, you may also consider whether certain products, although chemically equivalent, are operating in separate markets. The fact that two products are functionally interchangeable does not compel a finding that they belong in the same market. Within a general market there may exist separate economic markets for antitrust purposes.

In defining the relevant market, you may find that generic and branded drugs compete in the same relevant market. You should consider whether generic drugs, in this case Lorazepam and Clorazepate, compete in a market separate from the brand products. There are a number of factors that you may consider in determining whether Clorazepate and Lorazepam were operating in a separate market, apart from their brand counterparts. These are merely factors that you may consider, you do not need to find that each of these factors exists in order to define a relevant market:

a. whether the industry or the public recognizes these markets as separate economic entities;

b. whether the products have distinct prices or different pricing systems;

c. whether there are different sensitivities to price changes for the products;

d. whether there are distinct customers for the products;

e. whether there are specialized vendors or distributors for the products; and

f. whether the products have peculiar characteristics, uses, or unique production facilities.

If you conclude the Lorazepam and Clorazepate were operating in markets separate from their branded counterparts, then the relevant market for your antitrust analysis should be the markets for generic Lorazepam and Clorazepate. If you believe they operated in the same market as their branded counterparts, then the relevant market for your antitrust analysis should include their branded counterparts, Ativan and Tranxene.

37

## UNREASONABLE RESTRAINT OF TRADE – GENERAL

Plaintiffs have alleged that Defendants entered into unlawful agreements to unreasonably restrain trade in the relevant markets. To win on this claim, Plaintiffs must have proved the following elements by a preponderance of the evidence:

**First**, that the Defendants entered into an agreement;

**Second**, that the agreement unreasonably restrained trade in an appropriately defined relevant market;

**Third**, that the restraint of trade affected commerce in Minnesota as to Blue Cross Blue Shield of Minnesota and Federate Insurance Company, in Massachusetts as to Blue Cross Blue Shield of Massachusetts, and in Illinois as to HCSC; and

**Fourth**, that Plaintiffs were injured in their business or property because of Defendants' conduct.

38

## UNREASONABLE RESTRAINT OF TRADE – AGREEMENT

First, you must find that Defendants entered into an agreement. In this case, there is no dispute that Defendants Mylan, Profarmaco, and GYMA entered into Agreements.

## UNREASONABLE RESTRAINT OF TRADE – RESTRAINT/RULE OF REASON

Plaintiffs challenge Defendants' execution of exclusive agreements and subsequent price increases on Lorazepam and Clorazepate. To win on this claim, Plaintiffs must show that this practice was an unreasonable restraint of trade.

In determining whether the restraint was reasonable, you must decide whether the restraint helped competition or harmed competition. Your task is to balance any aspects of the restraint that were helpful to competition against any aspects that were harmful to it. In doing so, you should consider such factors as the particular business of Defendants; the condition of the market before and after the restraint was imposed; the nature of the restraint and its effect on competition; the history of the restraint; the reason for adopting the restraint; and Defendants' purpose or intent.

To show that the restraint was unreasonable, Plaintiffs must prove that Defendants' activities substantially harmed competition in a relevant market. To show this, Plaintiffs must prove by a preponderance of the evidence:

**First**, what the relevant market is;

**Second**, that Defendants' restraint or practice had a substantially harmful effect on competition in that relevant market; and

**Third**, that the harmful effect on competition outweighs any beneficial effect on competition.

You need to first consider whether Plaintiffs have proven that Defendants' restraint had a harmful effect on competition in the relevant market. Evidence that Defendants' restraint has harmed Plaintiffs' businesses is not enough by itself, although that is one relevant factor. Plaintiffs must show that the restraint harmed overall competition in the relevant market, for example, by raising prices or reducing output, not just that it harmed Plaintiffs.

40

In determining whether Defendants' restraint had a harmful effect on competition in the relevant market, you should consider the nature of the restraint, the history of the restraint, the structure of the market, and Defendants' positions in the market. You should look at such factors as the number of companies or firms in the market, the reasons and the way in which the restraint was imposed, and the nature of the market before and after the restraint was imposed. If you find that Plaintiffs have not proved a harmful effect on competition in the relevant market, then you must find in favor of Defendants.

If you find that Plaintiffs have proven the relevant market for Defendants' product, you should then consider whether Plaintiffs have shown that Defendants' exclusive dealing arrangements substantially lessened competition in the relevant markets. In considering the effect of the exclusive dealing arrangements in the relevant markets, you should consider its effect in the past, now and in the future. Only if you find that Plaintiffs have proven a substantial lessening of competition in the relevant market due to Defendants' exclusive dealing arrangements can you find in favor of Plaintiffs.

If you find that the restraint did harm competition in the relevant market, you must then consider the extent to which competition was harmed. A restraint is unreasonable only if it substantially harms competition. A restraint that has only a slight or insubstantial impact on competition is not unreasonable or unlawful.

In deciding this issue, you should consider the structure of the market Defendants are in and the percentage of the relevant market closed off by or tied up because of the exclusive dealing arrangement. In this regard, you may consider how many companies are in the market and whether the exclusive agreements significantly limited the opportunities for competing drug manufacturers to enter or remain in the market. If competing drug manufacturers were kept out of the market or left the market, this may tend to show the exclusive dealing arrangement may have affected competition in the market. On the other hand, if competing drug manufacturers are coming into the

41

market or staying in the market, this may tend to show that the exclusive dealing arrangement did not affect competition in the market.

It is not enough to look solely at the percentage of the market that is now closed to competing sellers. However, to find that Defendants have unreasonably restrained trade, it is not necessary that all competition be removed from the market. The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit. For example, a planned exclusive dealing contract may slow a rival's expansion by requiring it to develop alternative outlets for its products or rely at least temporarily on inferior or more expensive outlets. Injury results to consumers, such as Plaintiffs, from the delay that the dominant firm imposes on the smaller rival's growth. An exclusive agreement is only an unreasonable restraint of trade when a significant fraction of buyers or sellers are foreclosed from the market for a non-transitory period of time.

If you find that the Agreements did harm competition in a relevant market, such as by substantially lessening competition in a relevant market, then you must then consider the extent to which competition was harmed (or, in other words, whether the Agreements were nonetheless reasonable). Only unreasonable restraints are unlawful. To be considered unreasonable, a restraint must substantially harm competition. A restraint that has only an insubstantial impact on competition is not unreasonable or unlawful.

In determining if the restraint here substantially harmed competition, you should consider Defendants' market power and how much of the relevant market was affected by Defendants' restraint. In determining if the restraint substantially harmed competition, you should consider Defendants' market power and how much of the relevant market was affected by Defendants' restraint. Market power is defined as the ability to raise or lower prices or exclude competition. If Defendants have little market power or the restraint affects only a small part of the market, then it is less likely that it had a substantial effect on competition in the market. In considering Defendants'

42

market power, you may consider Defendants' market share, but market share may not always, by itself, show Defendants' market power.

You should also consider whether the restraint influenced or affected price, output, or product quality in the relevant market. Where a restraint does not affect price, output, or product quality or exclude a competitor from the market, it is unlikely to harm competition. If Plaintiffs have not proved that the restraint substantially harmed competition in the market, then you must find in favor of Defendants.

If you find that Plaintiffs have proved a relevant market and that Defendants' restraint had a substantially harmful effect on competition in that market, you must also weigh any effects of the restraint that are helpful to competition against any harmful effects. For instance, you should consider whether the agreements lowered consumer prices, increased output of existing API manufacturers, or made entry easier and/or increase entry by competitors. All of these may be aspects of the restraint that benefit competition. If the beneficial effects outweigh the harmful effects, or if the net effects on competition are harmful but insubstantial, the restraint is not unreasonable or unlawful.

The fact that a restraint does not provide any benefit to competition does not necessarily mean that it is unreasonable, however. If the restraint has only a slight or insubstantial adverse impact on competition, it is not unreasonable or unlawful even if it does not benefit competition.

In determining whether the restraint was unreasonable, you also may consider Defendants' purpose in imposing the restraint. A purpose or intent to harm competition, by itself, is not sufficient to establish that a restraint of trade was unreasonable. Effect, not intent, is the ultimate test. However, consideration of the purpose of the restraint may help you determine if it likely would have had a harmful effect upon competition. You may consider, for example, whether Defendants imposed the restraint to achieve a legitimate business purpose, and, if so, whether the restraint was tailored to achieve that legitimate business purpose or, rather, was broader than necessary.

43

## ELEMENTS OF CONSPIRACY IN RESTRAINT OF TRADE

Plaintiffs also have alleged that Defendants participated in a conspiracy to unreasonably restrain trade in the relevant markets.

A conspiracy is an agreement by two or more persons to accomplish some unlawful purpose or to accomplish a lawful purpose by unlawful means. In order to prevail on this claim, with respect to each relevant product market you determine Plaintiffs have proved, if any, Plaintiffs must prove each of the following elements by a preponderance of the evidence.

1.  That the conspiracy described in the complaint was knowingly formed and was in existence at or about the time alleged;

2.  That each Defendant knowingly became a member of the conspiracy;

3.  That the conspiracy unreasonably restrained trade in an appropriately defined relevant market;

4.  That the Defendants' activities occurred in or affected trade or commerce in Minnesota as to Plaintiffs Blue Cross Blue Shield of Minnesota and Federated Insurance Company, in the State of Massachusetts as to Plaintiff Blue Cross Blue Shield of Massachusetts, and in the State of Illinois as to Plaintiff HCSC; and

5.  That each of these Plaintiffs was injured in its business or property as a direct, proximate result of the conspiracy to unreasonably restrain trade.

44

## CONSPIRACY IN RESTRAINT OF TRADE EXPLAINED

The allegation in this claim is similar to the allegation that Defendants entered an agreement in restraint of trade in those markets.

If you conclude that Plaintiffs have proven the formation of such a conspiracy in one or more of the relevant markets, then you must determine if they have proven by the preponderance of the evidence that each Defendant knowingly joined the conspiracy. In this regard, you must consider the evidence with respect to each Defendant separately to determine if that Defendant by its own acts and statements knowingly joined such a conspiracy. If Plaintiffs fail to prove that a Defendant knowingly joined such a conspiracy, then you must find for that Defendant on this charge.

If you conclude that such a conspiracy was formed and that one or more of Defendants knowingly joined the conspiracy, you must determine whether the conspiracy in fact unreasonably restrained trade in the alleged relevant market. In making that determination, you must decide whether the conspiracy was intended to and did result in foreclosing a significant fraction of buyers or sellers of Lorazepam or Clorazepate API and whether competition in the relevant API supply or tablet market was substantially lessened for a non-transitory period of time. In making that determination, you should consider the same issues you addressed in deciding whether the Defendants' agreements had such an effect. If they did not, you must find for Defendants on this allegation. If they did, you must determine if any Plaintiff suffered any damage to its business or property as a direct proximate result of the lessening of competition in the relevant market under examination.

45

## MONOPOLIZATION – ELEMENTS

Pursuant to the Minnesota Statute § 325D.51 and .52, Massachusetts law Chapter 93A § 2, and 740 Illinois Law 10/3 and 10/4, Plaintiffs Blue Cross Blue Shield of Minnesota, Federated Mutual Insurance Company, Blue Cross Blue Shield of Massachusetts, and HCSC, respectively, allege that they were injured by Defendants' unlawful monopolization of a relevant market. To win on their claim of monopolization against a Defendant, Plaintiffs must have proved each of the following elements by a preponderance of the evidence:

**First**, that the Defendants possessed monopoly power in a relevant market;

**Second**, that the Defendants willfully acquired or maintained that power through restrictive or exclusionary conduct;

**Third**, that the Defendants' activities occurred in or affected trade or commerce in the State of Minnesota as to Plaintiffs Blue Cross Blue Shield of Minnesota and Federated Insurance Company, in the State of Massachusetts as to Plaintiff Blue Cross Blue Shield of Massachusetts, and in the State of Illinois as to Plaintiff HCSC; and

**Fourth**, that Plaintiffs were injured in their business or property because of Defendants' restrictive or exclusionary conduct.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find against Plaintiffs on their monopolization claim.

46

## MONOPOLIZATION – MONOPOLY POWER DEFINED

Monopoly power is the power to control prices and exclude competition in the relevant antitrust market. More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level for a non-transitory period of time. To prove its monopolization claim, one of the elements Plaintiffs must prove is that Defendants had monopoly power in a relevant antitrust market. However, monopoly power, in and of itself, is not unlawful.

Plaintiffs need not establish that a Defendant had a pure monopoly – that is, where they are the only competitor left in the market - however, they do need to establish monopoly power.

There are a number of factors you should consider, none of which is necessarily controlling.

For example, you have heard evidence about market share. You may infer whether or not monopoly power exists from a Defendant's share of the relevant market. Market share is a firm's share of total industry sales, shipments, production, capacity, or reserves, expressed as a percentage of the whole. There are a variety of ways to measure market share, but whatever measure you use must be reasonable and consistently applied.

If you determine that a Defendant's share of the relevant market is less than 50 percent, that market share by itself does not permit you to infer that the Defendant has monopoly power. However, a market share of less than 50 percent does not preclude a finding of monopoly power if there is other evidence indicating that the Defendant has monopoly power. If you determine that a Defendant's share of the relevant market is 80 percent or higher, that is strong evidence of the existence of monopoly power. If you determine that a Defendant's market share is somewhere between 50 percent and 80 percent, you may infer the existence of monopoly power from that share, and the inference is stronger the higher the Defendant's market share is within that range.

47

You also may consider the trend in the market share. A declining market share may indicate the absence of monopoly power, though it does not foreclose such a finding, while an increasing market share may indicate the opposite.

Another factor is the number and size of Defendant's competitors. If the competitors are few, weak, or have small or decreasing market shares, so that they do not offer substantial competition to a Defendant in the relevant market, this may tend to indicate that a Defendant has monopoly power. If, on the other hand, they are numerous, vigorous, or have large or increasing shares in that market, this may be evidence that a Defendant does not have monopoly power.

You also may consider the history of entry into and exit from the market by other companies. Entry of companies into the market may indicate a lack of monopoly power. On the other hand, departure of companies from the market, or the failure of companies to enter the market, may indicate that monopoly power exists.

Plaintiffs must also prove that Defendants had the power to maintain prices above a competitive level for a non-transitory period of time. If Defendants attempted to maintain prices above competitive levels, but would have lost so much business to other competitors that the price increase would have become unprofitable and would had to have been withdrawn, then Defendants did not have monopoly power.

Similarly, Plaintiffs must prove that Defendants had the ability to exclude competition. For example, if Defendants attempted to maintain prices above competitive levels, but new competitors could have entered the relevant market or existing competitors could have expanded their sales and taken so much business that the price increase would have become unprofitable and would had to have been withdrawn, then Defendants did not have monopoly power.

The ability to earn high profit margins or a high rate of return does not necessarily mean that Defendants had monopoly power. Other factors may enable a company without monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as the ability to offer

48

superior products or services, the ability to maintain efficient business operation, or superior advertising or marketing. However, an ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. By contrast, evidence that Defendants would have lost a substantial amount of sales if it had raised prices substantially, or that the Defendants' profit margins were low compared to its competitors, erratic, and/or decreasing, might be evidence that the Defendants did not have monopoly power.

There are several other factors to consider when determining whether the Defendants exercised monopoly power such as relative size and strength of the Defendants; fluctuations in the Defendants' market share; development of the industry; ease of entry, which is assessed by examining any market condition that makes entry more costly or time consuming; excess capacity; monopoly profits; and the impact of regulations.

Further, to conclude that Defendants had monopoly power, you need not find that a Defendant could sell at any price it desired or that it had no competition whatsoever. A company may face some competition in the relevant market and still have monopoly power.

If you find that a Defendant had monopoly power, then you must find that Plaintiffs have established this requirement and you must consider the remaining elements of their monopolization claim. If you find that a Defendant did not have monopoly power, then you must find for Defendants and against Plaintiffs on this claim.

49

## MONOPOLIZATION GENERAL – WILLFUL ACQUISITION OR
## MAINTENANCE OF MONOPOLY POWER

If you decide that Defendants possessed monopoly power in a relevant product market, you must decide whether Defendants willfully acquired or maintained monopoly power through exclusionary acts or practices, rather than by supplying better products or services, or by exercising superior business judgment, or just by chance.

Exclusionary conduct refers to practices that unreasonably or unnecessarily impede fair competition; that is, conduct that impairs efforts of others to compete for customers in an unnecessarily restrictive way. Exclusionary conduct does not refer to ordinary means of competition, like offering better prices, products or services, exercising superior skill or business judgment, utilizing more efficient technology, or exercising natural competitive advantages. It is conduct that has the effect of preventing or excluding competition or frustrating or impairing the efforts of other firms to compete for customers within the relevant market. It is not necessary that such conduct be unlawful in and of itself, apart from its effect in securing or maintaining monopoly power.

To prove that Defendants acted willfully, Plaintiffs must prove either that Defendants engaged in exclusionary acts or practices with the conscious object of furthering the dominance of a Defendant in the relevant market or that this was the necessary direct consequence of Defendant's conduct or business arrangements.

You may not find that a company willfully acquired or maintained monopoly power if it has acquired or maintained that power solely through the exercise of superior foresight and skill. Conduct is not exclusionary simply because it harms individual competitors. That is because all business activities, whether desirable or undesirable, seek to advance a company's fortunes at the expense of its competitors. Rather, exclusionary conduct is conduct that harms the competitive process in general and thereby harms the basic goals of competition, which are lower prices, higher quality and a wider variety of goods and services.

50

If you find that a Defendant willfully acquired or maintained monopoly power, then you must find that Plaintiffs have established this element and you must consider the remaining elements of Plaintiffs' monopolization claim. If you find that a Defendant did not willfully acquire or maintain monopoly power, then you must find against Plaintiffs on this claim.

## ATTEMPT TO MONOPOLIZE – ELEMENTS

Plaintiffs Blue Cross Blue Shield of Minnesota, Blue Cross Blue Shield of Massachusetts, HCSC, and Federated Insurance Company also allege that they were injured by Defendants' unlawful attempt to monopolize, pursuant to the Minnesota Statue § 325D.51 and .52, Massachusetts law Chapter 93A § 2, and 740 Illinois Law 10/3 and 10/4. Plaintiffs also have alleged that Defendants unlawfully attempted to monopolize the relevant markets. To win on their claim of attempted monopolization against a Defendant, as to that Defendant, Plaintiffs must prove each of the following elements by a preponderance of the evidence:

> **First**, that a Defendant engaged in exclusionary conduct.
>
> **Second**, that a Defendant had a specific intent to achieve monopoly power in a relevant market;
>
> **Third**, that there was a dangerous probability that a Defendant would achieve the goal of monopoly power in the relevant market;
>
> **Fourth**, that a Defendant's conduct occurred in or affected trade or commerce in the State of Minnesota, and/or Massachusetts, and/or Illinois; and
>
> **Fifth**, that Plaintiffs were injured in their business or property by the Defendants' exclusionary conduct.

If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for Defendants and against Plaintiffs on Plaintiffs' attempt to monopolize claims.

52

## ATTEMPT TO MONOPOLIZE – EXCLUSIONARY CONDUCT

Exclusionary conduct is conduct that has the effect of preventing or excluding competition or frustrating or impairing the efforts of other firms to compete for customers within the relevant market. The conduct requirement for the attempted monopolization claim is the same as that required for the monopolization claim, which I described for you in more detail in the instruction entitled Monopolization General – Willful Acquisition or Maintenance of Monopoly Power.

## ATTEMPT TO MONOPOLIZE – SPECIFIC INTENT

The second element that Plaintiffs must prove is that defendant had a specific intent to monopolize a relevant market. To do so, Plaintiffs must first prove the market it is talking about is a relevant market for antitrust purposes. Plaintiffs must then prove that Defendants had a specific intent to monopolize that market. The Court already has instructed you on the relevant market; I will now discuss specific intent.

If you find that Plaintiffs have proven a relevant market, you must then decide whether defendant had the specific intent to monopolize that market. In other words, you must decide if the evidence shows that defendant acted with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the relevant market.

There are several ways in which Plaintiffs may prove that Defendants had the specific intent to monopolize. There may be evidence of direct statements of Defendants' intent to obtain a monopoly in the relevant market. Such proof of specific intent may be established by documents prepared by responsible officers or employees of Defendants at or about the time of the conduct in question or by testimony concerning statements made by responsible officers or employees of Defendants. You must be careful, however, to distinguish between a defendant's intent to compete aggressively (which is lawful), which may be accompanied by aggressive language, and a true intent to acquire monopoly power by using anticompetitive means.

Even if you decide that the evidence does not prove directly that Defendants actually intended to obtain a monopoly, specific intent may be inferred from what Defendants did. For example, if the evidence shows that the natural and probable consequence of Defendants' conduct in the relevant

54

market was to give Defendants control over prices and to exclude or destroy competition, and that this was plainly foreseeable by Defendants, then you may (but are not required to) infer that Defendants specifically intended to acquire monopoly power.

## ATTEMPT TO MONOPOLIZE – DANGEROUS PROBABILITY OF SUCCESS

If you find that Defendants had the specific intent to achieve a monopoly and engaged in significant exclusionary or restrictive conduct, you also must determine if the evidence shows the next element of attempt to monopolize: namely, that there was a dangerous probability that the Defendants would sooner or later succeed in achieving monopoly power if it continued to engage in the same or similar conduct. In determining whether there was a dangerous probability of success, you should consider the following factors:

(1) the market share and power of Defendants as compared to their competitors;

(2) whether the Defendants' share of the relevant market was increasing or decreasing;

(3) the actual or probable impact on competition of Defendants' restrictive or exclusionary acts or practices; and

(4) whether the barriers to entry into the market made it difficult for competitors to enter the market.

A dangerous probability of success need not mean that success was nearly certain. It means that the chance of success was substantial and real: that is, there was a reasonable likelihood that Defendants would ultimately achieve their goal of monopoly power.

56

## PLAINTIFFS' MISREPRESENTATION ALLEGATIONS

In this case, Plaintiffs also have alleged that Defendants made misrepresentations and false statements in an attempt to sustain Mylan's price increase. While false statements and misrepresentations can in some circumstances have anticompetitive effects, false statements and misrepresentation standing alone do not constitute violations of the antitrust laws when the consumer can readily discover the Defendants' falsity.

## TRANSITIONAL INSTRUCTION – CAUSATION AND DAMAGES

I will now instruct you on the issues of injury, causation, and damages, which are common issues for Plaintiffs' restraint of trade, conspiracy to restrain trade, monopolization, and attempt to monopolize claims. You should consider these instructions only if you have found that Plaintiffs have established all of the elements of at least one claim. You should not draw any inference one way or the other from the fact that I am providing instructions on these issues.

### RESTRAINT OF TRADE, CONSPIRACY TO RESTRAIN TRADE, MONOPOLIZATION, ATTEMPTED MONOPOLIZATION –

#### INJURY AND CAUSATION

If you find that Defendants have violated the antitrust laws as alleged by Plaintiffs, then you must decide if Plaintiffs are entitled to recover damages from Defendants.

Plaintiffs are entitled to recover damages for an injury to its business or property if they can establish three elements of injury and causation:

> **First**, that Plaintiffs were in fact injured as a result of Defendants' alleged violation of the antitrust laws;
>
> **Second**, that Defendants' alleged illegal conduct was a material cause of Plaintiffs' injury; and
>
> **Third**, that Plaintiffs' injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damages." For a Plaintiff to establish that it is entitled to recover damages, it must prove that it was injured as a result of Defendants' alleged violation of the antitrust laws. The measure of damages in this case is the amount by which the prices Plaintiffs actually paid exceeded the price they would have paid if there had been no antitrust violation, and if there had been free and open competition in the pricing of Lorazepam and Clorazepate.

Proving the fact of damage does not require Plaintiffs to prove the dollar value of their injury. It requires only that Plaintiffs prove that they were in fact injured by Defendants' alleged antitrust violation. If you find that Plaintiffs have established that they were in fact injured, you may then consider the amount of Plaintiffs' damages. It is important to understand, however, that injury

and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that Plaintiffs have established that it was in fact injured.

Plaintiffs must also offer evidence that establishes as a matter of fact and with a fair degree of certainty that Defendants' alleged illegal conduct was a material cause of a Plaintiff's injury. This means that Plaintiffs must have proved that some damage occurred to them as a result of Defendants' alleged antitrust violation, and not some other cause. Plaintiffs are not required to prove that Defendants' alleged antitrust violation was the sole cause of its injury; nor need Plaintiffs eliminate all other possible causes of injury. It is enough if Plaintiffs have proved that the alleged antitrust violation was a material cause of their injury. However, if you find that Plaintiffs' injury was caused primarily by something other than the alleged antitrust violation, then you must find that Plaintiffs have failed to prove that they are entitled to recover damages from Defendants.

Finally, Plaintiffs must establish that their injury is the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If Plaintiffs' injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm consumers, then Plaintiffs' injuries are antitrust injuries. On the other hand, if Plaintiffs' injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then Plaintiffs' injuries are not antitrust injuries and Plaintiffs may not recover damages for those injuries under the antitrust laws.

However, if Plaintiffs can establish that they were in fact injured by Defendants' conduct, that Defendants' conduct was a material cause of Plaintiffs' injury, and that Plaintiffs' injury was the type that the antitrust laws were intended to prevent, then Plaintiffs are entitled to recover damages for the injury to their business or property.

60

## CAUSATION AND DISAGGREGATION

If you find that Defendants violated the antitrust laws and that Plaintiffs were injured by that violation, Plaintiffs are entitled to recover for such injury that was the direct and proximate result of the unlawful acts of Defendants. Plaintiffs are not entitled to recover for injury that resulted from other causes.

Plaintiffs claim that they suffered injury because they paid increased prices for Lorazepam and Clorazepate tablets as a result of Defendants' alleged antitrust violations. In the normal course of business activity, prices might rise for a variety of factors that have nothing to do with the antitrust laws. For example, prices may rise because producers' costs rose, the sellers engaged in lawful follow-the-leader pricing behavior, or the marketplace otherwise changed to allow producers to raise prices independent of any antitrust violation.

Plaintiffs bear the burden of showing that their injuries were caused by Defendants' alleged antitrust violation -- as opposed to any other factors, such as those that I just described to you. If you find that Plaintiffs' alleged injuries were caused by factors other than Defendants' alleged antitrust violation, then you must return a verdict for Defendants. If you find that a Plaintiff's alleged injuries were caused in part by Defendants alleged antitrust violation and in part by other factors, then you may award damages only for that portion of the Plaintiff's alleged injuries that were caused by Defendants' alleged antitrust violation. Plaintiffs bear the burden of proving damages with reasonable certainty, including apportioning damages between lawful and unlawful causes. If you find that there is no reasonable basis to apportion Plaintiffs' alleged injury between lawful and unlawful causes, or that apportionment can only be accomplished through speculation or guesswork, then you may not award any damages at all. If you find that Plaintiffs have proven with reasonable certainty the amount of damage caused by Defendants' alleged antitrust violation, then you must return a verdict for Plaintiffs.

61

## SPECULATION NOT PERMITTED

Damages may not be based on guesswork or speculation. If you find that a damages calculation cannot be based on evidence and reasonable inferences, and instead can only be reached through guesswork or speculation, then you may not award damages. If the amount of damages attributable to an antitrust violation cannot be separated from the amount caused by factors other than the antitrust violation except through guesswork or speculation, then you may not award damages.

You are permitted to make reasonable estimates in calculating damages. It may be difficult for you to determine the precise amount of damages suffered by Plaintiff. If Plaintiffs establish with reasonable probability the existence of an injury proximately caused by the Defendants' antitrust violation, you are permitted to make a just and reasonable estimate of the damages. So long as there is a reasonable basis in the evidence for a damages award, Plaintiffs should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty. The amount of damages must, however, be based on reasonable, non-speculative assumptions and estimates. Plaintiffs must prove the reasonableness of each of the assumptions upon which the damages calculation is based. If you find that Plaintiffs have failed to carry their burden of providing a reasonable basis for determining damages, then your verdict must be for Defendants. If you find that Plaintiffs have provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.

## NOMINAL DAMAGES

If you find that you are not able to calculate monetary damages without resorting to pure speculation or guesswork, you may award a nominal amount, say, $1.00.

## DAMAGES – MULTIPLE PLAINTIFFS

In awarding damages, if any, you will be asked what sum of money would fairly and reasonably compensate each Plaintiff for any injury sustained by that Plaintiff. Once a particular Plaintiff establishes that it is entitled to recover damages, the law permits that Plaintiff to recover only for those damages it has sustained. Therefore, if you find that two or more of the Plaintiffs are entitled to recover damages, caution should be exercised to be sure that each Plaintiff is awarded only the damages to which it is entitled.

64

## WILLFULNESS

If you find that any Plaintiff is entitled to recover damages under the Illinois Antitrust Act, the Minnesota Antitrust Law or the Massachusetts Antitrust Act, you will need to let me know if you find that Defendants' violation of the antitrust law(s) was (were) willful. A violation is "willful" if a corporation, by and through agents, officers, or employees acting on its behalf, intends to commit actions that would result in monopolization, attempt to monopolize, restraint of trade or conspiracy to restrain trade.

## TRANSITIONAL INSTRUCTION – UNJUST ENRICHMENT

I will now instruct you on Plaintiffs unjust enrichment claims. All four Plaintiffs brought unjust enrichment claims. These are alternative claims for relief only. You should consider these instructions only for a Plaintiff, if any, for which you found an antitrust violation, but were unable to find damages other than nominal damages. In other words, you will not return a verdict on this claim unless you have found for a Plaintiff but have not awarded any damages.

## UNJUST ENRICHMENT – ELEMENTS

Plaintiffs also have alleged that they are entitled to recover damages because Defendants were unjustly enriched by the alleged antitrust violations. In order to prevail on this claim, Plaintiffs must prove by a preponderance of the evidence the following elements:

1.      Plaintiffs conferred a legally recognizable benefit upon Defendants;

2.      Defendants possessed an appreciation or knowledge of the benefit; and

3.      Defendants accepted or retained the benefit under inequitable circumstances.

Plaintiffs make this claim as an alternative to, not in addition to, their claim for damages under the antitrust laws. However, if you find Defendants did not violate the antitrust laws then you must also find for Defendants on this claim. If Plaintiffs prove that they conferred a benefit on Defendants and that Defendants knew of the benefit, unless they prove that Defendants violated the antitrust law they will have failed to prove that Defendants accepted or retained a benefit under inequitable circumstances, in which case you would have to find for the Defendants on this claim.

67

## MEASURE OF DAMAGES – UNJUST ENRICHMENT

If you find that Plaintiffs have proved each of the elements of their unjust enrichment claims, then you may award Plaintiffs damages in an amount that is equal to the unfair gains conferred directly or indirectly to the Defendants by Plaintiffs, and which were derived from Defendants' unfair or illegal acts, agreements, practices or conduct. That is, the measure of damages for a proven unjust enrichment claim is the amount the Defendants unjustly received from the Plaintiff. Here the measure of damages, if any, would be the amount of profit the Defendants would not have earned from the Plaintiffs but for the inequitable conduct. The measure of these damages, if any, must be based upon the evidence in the case provided to you by the Plaintiffs and cannot be based upon speculation or guesswork.

68

## ELECTION OF FOREPERSON

When you return to the jury room, you should first select one of your members to be the foreperson. The foreperson should preside over your deliberations and will be your spokesperson here in court.

## UNANIMITY

The verdict must represent the considered judgment of each juror. In order to return a verdict, each juror must agree to the verdict. Your verdict must be unanimous.

## EXHIBITS DURING DELIBERATIONS

I am sending the exhibits that have been admitted into evidence with you as you start your

deliberations.

## NOTETAKING

During the trial, I have permitted those jurors who wanted to do so to take notes. You may take your notes with you to the jury room and use them during your deliberations if you wish. As I told you at the beginning of the trial, your notes are only to be an aid to your memory and they should not replace your memory. Those jurors who have not taken notes should rely on their own memory of the evidence and should not be influenced by another juror's notes if the notes do not c-oincide with their memory. The notes are intended to be for the notetaker's own personal use.

At the end of your deliberations, please tear out from your notebooks any notes you have made and give them to your foreperson. The clerk will collect your notebooks and pencils when you return to the courtroom, and I will ask the foreperson to give the clerk your notes when your verdict is announced. The clerk will destroy your notes immediately after the trial. No one, including myself, will look at them.

72

## COMMUNICATIONS BETWEEN COURT AND JURY
### DURING JURY'S DELIBERATIONS

If it becomes necessary during your deliberations to communicate with me, you may send a note by the clerk or marshal, signed by your foreperson or by one or more members of the jury. No member of the jury should try to communicate with me by any means other than a signed note and I will never communicate with any member of the jury on any matter touching the merits of this case, except in writing or orally here in open court.

Bear in mind also that you are never, under any circumstances, to reveal to any person — not the clerk, the marshal or me — how the jury stands on the questions until after you have reached a unanimous verdict. This means, for example, that you never should state to the court that the jury is divided 6 to 6, 7 to 5, 11 to 1, or in any other fashion, whether for the Plaintiffs or the Defendants.

## FURNISHING THE JURY WITH A COPY OF THE INSTRUCTIONS

I will provide you with a copy of my instructions. During your deliberations, you may, if you want, refer to these instructions. While you may refer to any particular portion of the instructions, you are to consider the instructions as a whole and you may not follow some and ignore others. The fact that you have been provided a copy of my instructions should not discourage you from making an inquiry regarding the meaning of these instructions if necessary. Please return the instructions to me when your verdict is rendered.

## USE OF A VERDICT FORM

A verdict form has been prepared for your convenience. You will take this form to the jury room and, when you have reached unanimous agreement as to your verdicts, you will have your foreperson fill in, date and sign the form to state the verdicts upon which you unanimously agree.





# InformationWeek
BUSINESS INNOVATION POWERED BY TECHNOLOGY

## The PC Replacement Decision

More companies are replacing all their PCs at once, rather than in staggered cycles; benefits include reduced maintenance costs

By Darrell Dunn,  InformationWeek
June 20, 2005
URL: http://www.informationweek.com/story/showArticle.jhtml?articleID=164900387

It's inevitable. Those sparkling, high-performance PCs you purchased to help run your business more efficiently a few years ago have become less productive and must be replaced with new systems providing the latest in technology advancements. The question for CIOs and system administrators is how much of their aging PC inventories should be replaced in any given cycle.

According to a recent survey that research firm Gartner conducted with 177 large businesses, the average life span of a desktop PC is 43 months, and only 36 months for mobile PCs. More than a third of respondents said the main reason for replacement of PCs is to improve user productivity, while more than a quarter cited escalating support costs with older machines. More than 20% said new software requirements led to the need for new computing systems.

Traditionally, many businesses have employed a strategy of replacing their PC inventories in staggered, one-third-per-year increments over a three-year cycle. In fact, the Gartner survey found that businesses often redeploy, or "cascade," about a third of all used PCs to other employees. More recently, large companies have moved to a policy of replacing their entire PC inventories once every two to three years, but some small and midsize business still regard that practice as cost-prohibitive.

"The reason many companies have used the one-third replacement model has been to spread the cost out over the lifetime of the computers," says Doug Hafford, VP of consulting services and co-founder of technology integrator Afinety Inc. "Unfortunately, what they're doing is robbing Peter to pay Paul. They're focusing on the cost of the hardware and software, which is really focusing on the wrong thing."

The cost of PCs and associated software remains relatively stable from one year to the next, allowing businesses to build a consistent understanding of their infrastructure costs. Leasing programs also let businesses extend the cost of a replacement cycle over the lifetime of the equipment. While the cost of equipment and software remains constant whether a company uses a staggered replacement cycle or a



**Reasons For Replacements**
What's the main reason your
company has replaced its PCs?

1% OTHER
3% MOBILITY REQUIREMENTS
36% IMPROVE USER PRODUCTIVITY

http://www.informationweek.com/shared/printableArticle.jhtml?articleID=164900387                                    5/13/08 7:33 PM

single enterprisewide deployment, the maintenance costs associated with a staggered cycle can be 30% to 45% greater than a single-cycle approach, Hafford says.

When companies upgrade only portions of their PC inventories over a multiyear schedule, they often end up with workforces that are using multiple and inconsistent computing platforms, operating systems, and applications, Hafford says. Maintenance costs begin to skyrocket as technology staffs attempt to work with a variety of systems and software. When a company wants to deploy a new software application, technicians often will be forced to install it individually across the varying platforms, rather than completing a single systemwide deployment that's much more achievable if all systems are consistent.



Data: Gartner Large U.S. Business PC Market survey of 177 PC decision makers

By more consistently managing its total PC network, a company doesn't run into as many surprises and can avoid spikes in IT budgets, says Christina Garcia, technical training manager and computer application specialist at law firm Brown, Winfield & Canzoneri Inc. A staggered replacement cycle "makes about as much sense as replacing the tires on your car one at a time," Garcia says. "The different tires aren't going to perform the same. The tread wear is going to be different, and they're each going to handle differently. You need to buy all four tires at the same time."

Garcia learned the hard way how difficult it can be to manage a PC inventory and associated applications that are built up over a period of years. Her law firm provides legal input on real-estate transactions and has about 80 lawyers on staff. The lawyers used desktop computers that had been purchased and installed over a five-year period. "What we ended up with was a patch-quilt inventory, which brought no end to problems as far as support," she says.

These problems were compounded as the company combined old and new servers. "It was nothing short of a nightmare," Garcia says. "We were having increasing problems with document saving, software freezing, and it was affecting the productivity of the firm."

Last summer Brown, Winfield & Canzoneri decided to upgrade its server infrastructure and, after much debate, brought in Afinety to perform a companywide upgrade of its PC inventory. By October, the integrator had completed the installation of 80 Hewlett-Packard desktop PCs and four laptop systems.

Time dedicated to scheduled maintenance is now around 15 minutes a day, Garcia says, affording her the flexibility to create training sessions for the firm's attorneys. "That's really the other half of the equation that's improving our overall performance," she says. "You can have all the best and latest equipment and software, but if users don't understand how to use it, they'd be just as well off with an Etch A Sketch." ParadigmHealth Inc., a provider of health-care-management services, eventually may move to a single-cycle PC upgrade schedule, says Tom Hagan, executive VP and CIO. But he doesn't believe the advantages of that approach warrant significant changes to his operations in the short term.

ParadigmHealth has grown quickly over the past few years with two acquisitions that have divided the company into three divisions that are rotated yearly for PC replacement. The company, which originally specialized in providing on-site nursing support to acutely ill patients, three years ago acquired Padios Health Management Services Inc., a provider of similar services to premature and other newborns that need intensive treatment, and last year acquired PersonalPath Systems Inc., a provider of disease-management

services. ParadigmHealth employs about 250 nurses, most of whom work out of home offices and perform their actual services in either patients' homes or hospitals. In all, the company has a workforce of about 450 employees.



Because of the acquisitions, ParadigmHealth has yet to synchronize on a single replacement cycle. Last year, it took what Hagan says may be the first step when it decided to standardize on IBM PCs. IBM has since sold its PC business to Lenovo Group Ltd., although the new company continues to use the IBM brand name.

"Because we have three separate divisions that have slightly different business requirements, there's a logical segmentation," Hagan says. "They do have slightly different footprints from an application perspective, but we have standardized on the hardware and operating system."

ParadigmHealth isn't rushing to one replacement cycle, Tom Hagan, executive VP and CIO, says.

Hagan says he can see advantages to getting the entire company on a single replacement cycle, and he's evaluating how it might be best accomplished by either accelerating or delaying a divisional cycle. "I really don't see where we sit today to be a major problem," he says. "There can also be an advantage to not having to time all your expenditures in one year. [The staggered cycle] can smooth things out."

And other factors are just as important as the PC replacement cycle. Says Hagan, "It's more important to have a single manufacturer for our desktops, operating system, and service packs, and to keep the platforms on the same release levels."





Copyright © 2007 CMP Media LLC

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0182p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————

In re: SCRAP METAL ANTITRUST LITIGATION

No. 06-4511

————————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 02-00844—Kathleen McDonald O'Malley, District Judge.

Argued: October 30, 2007

Decided and Filed: May 15, 2008

Before: BATCHELDER, COLE, and SUTTON, Circuit Judges.

————————

### COUNSEL

**ARGUED:** Leslie W. Jacobs, THOMPSON HINE, Cleveland, Ohio, for Appellant. William A. Isaacson, BOIES, SCHILLER & FLEXNER, Washington, D.C., for Appellees. **ON BRIEF:** Leslie W. Jacobs, THOMPSON HINE, Cleveland, Ohio, for Appellant. William A. Isaacson, Tanya S. Chutkan, Jennifer Milici, BOIES, SCHILLER & FLEXNER, Washington, D.C., Edmund W. Searby, McDONALD HOPKINS, Cleveland, Ohio, for Appellees.

————————

### OPINION

————————

R. GUY COLE, JR., Circuit Judge. Defendant-Appellant Columbia Iron and Metal Company ("Columbia") appeals a jury verdict finding Columbia liable for antitrust violations and awarding the Plaintiffs-Appellees damages exceeding $20 million. The most critical question on appeal relates to the damages testimony of Plaintiffs-Appellees' expert, Dr. Jeffrey Leitzinger. Columbia asserts that Leitzinger's damages calculations are unreliable, and that the district court therefore erred in admitting his testimony. Columbia also raises three additional arguments on appeal: (1) the damages award is not supported by sufficient evidence and represents an impermissible "fluid recovery"; (2) the district court improperly allowed the case to proceed as a class action; and (3) the district court improperly instructed the jury on the tolling of the statute of limitations. Finding no reversible error by the district court, we **AFFIRM** the verdict and damages award.

# I. BACKGROUND

Plaintiffs-Appellees Lincoln Electric Company and Profile Grinding, Inc. filed suit in 2002 on behalf of themselves and a class of industrial scrap-generating companies in Northeastern Ohio (collectively, "Plaintiffs") against, inter alia, Defendant-Appellant Columbia; Columbia National Group (Columbia's parent company); Harry Rock & Associates; M. Weingold & Co., Inc.; DeMilta Iron and Metal; Bay Metal, Inc.; Bluestar Metal Recycling, Inc.; and Parkwood Iron and Metal, Inc. (collectively, "Defendants"). Plaintiffs generate scrap metal, both ferrous (iron-based) and non-ferrous, as a byproduct of their manufacturing. Plaintiffs sell the unprocessed scrap metal to brokers and dealers, such as Defendants, who then haul, clean, sort, and process the scrap before selling it to end users, such as steel mills. The movement of unprocessed scrap from generators to dealers generally works as follows: The dealers submit bids to the generators for the purchase of unprocessed scrap during a specified time period at a set price. In setting their bid price, dealers consult various trade publications, which report the prevailing prices that dealers can expect to charge users for the scrap after they have processed it. To ensure that they turn a profit, dealers set their bid price for the unprocessed scrap below the amount they will ultimately charge the users for the processed scrap. If the bid is accepted by the scrap generator, the generator and the dealer enter into a contract at the bid price for the bid period.

In this case, Plaintiffs allege that Defendants violated § 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to restrain and eliminate competition in the purchase of unprocessed industrial scrap metal in Northeastern Ohio. Specifically, Plaintiffs claim that Defendants engaged in a variety of unlawful acts including allocating scrap metal generators among dealers, agreeing not to compete with one another, submitting rigged bids, setting prices for the purchase of unprocessed scrap metal, and imposing financial penalties on co-conspirators for disobeying allocation agreements.

On May 30, 2003, Plaintiffs moved to certify a class consisting of all generators who sold scrap metal to Defendants and/or their co-conspirators between December 1992 and March 2000. The district court certified the class in March 2004.

Prior to trial, Plaintiffs settled with or dismissed all but three Defendants. In 2005, the remaining Defendants, including Columbia, filed a motion to preclude damages testimony from Plaintiffs' expert economist, Dr. Jeffrey Leitzinger. The district court denied the motion, finding that Defendants' arguments relating to Leitzinger's damages analysis went to the weight, not the admissibility, of his testimony. Defendants then moved for summary judgment, which the district court also denied. Three days before trial, Columbia moved to decertify the class, claiming that it had just discovered that the class notice was inadequate. The district court denied Columbia's motion, and the three remaining Defendants, including Columbia, proceeded to trial.

At the conclusion of the trial, the court directed a verdict against Plaintiffs for all claims relating to non-ferrous scrap-metal sales on the ground that Plaintiffs failed to establish any proof of injury or damages relating to such transactions. As for the remaining claims, those relating to ferrous scrap-metal sales, the jury returned a verdict against Columbia only and awarded Plaintiffs $11.5 million in damages. The district court, pursuant to 15 U.S.C. § 15(a), tripled the jury's award to $34.5 million, subtracted the amount received from the settling Defendants, and thereupon entered a judgment against Columbia in the amount of $23,036,000.

Columbia moved for judgment as a matter of law and, alternatively, for a new trial or a reduction of the damages. The district court denied both motions, and Columbia timely appealed.

# II. ANALYSIS

Columbia presents four issues on appeal. First, Columbia claims that the district court erred in denying its motion to exclude Leitzinger's testimony. Second, Columbia asserts that the evidence

was insufficient to support the damages award and that the award represents an impermissible "fluid recovery." Third, Columbia argues that the district court did not comply with Federal Rule of Civil Procedure 23 in certifying a class and allowing the case to proceed as a class action. Finally, Columbia challenges the district court's instructions to the jury on the tolling of the statute of limitations. We address each of these arguments in turn.

## A. Admissibility of Leitzinger's Testimony

### 1. Leitzinger's Calculations

We begin by summarizing Leitzinger's testimony, which Plaintiffs offered to prove the amount of damages the class incurred as a result of Defendants' anticompetitive conduct. Leitzinger employed what is referred to interchangeably as the "during and after" or "before and after" method to determine the amount Defendants underpaid Plaintiffs for unprocessed scrap metal. Employing this method, the profits made by antitrust defendants *during* the alleged conspiracy are compared with the profits made by the defendants in the period *after* the alleged conspiracy. In simple terms, by analyzing this difference, an expert can determine the amount of profit during the conspiracy period had the antitrust violation not occurred. Presumably, the data would show that, but for the anticompetitive conduct, the defendants' profit margin would have been lower and the plaintiffs' profit margin would have been higher.

Here, Leitzinger calculated the difference, both during and after the alleged conspiracy, between (1) the generator-dealer transactions, i.e., the amount the dealers paid to the generators for unprocessed scrap metal, and (2) the dealer-user transactions, i.e., the amount for which the dealers sold processed scrap metal to users. Leitzinger used actual transaction data from a sample of generators and dealers for the generator-dealer transactions. However, in order to control for factors other than the conspiracy that might have affected prices, Leitzinger used index prices for the dealer-user transactions, which were published on a weekly basis in American Metal Market ("AMM") and *Iron Age* magazine's Scrap Price Bulletin ("SPB"). These index prices represented the prevailing prices users paid dealers for processed scrap. Leitzinger testified that Defendants also used these published prices to determine the amount they would bid on the generators' unprocessed scrap. The "price spread"—the difference between (1) the price a dealer paid to a generator for unprocessed scrap, and (2) the comparative figure from a price index, representing the amount the dealer earned from selling the processed scrap to a user—was the dealer's profit. By comparing the price spread during the conspiracy period with the price spread after the conspiracy period, Leitzinger concluded that the results were consistent with anticompetitive conduct: Defendants' profits declined after the conspiracy, while the generators' profits rose.

Leitzinger used the SPB index to analyze only the ferrous scrap-metal market. He concluded that, on average, there had been a 16.4 percent undercharge on the purchase of unprocessed ferrous scrap metal during the conspiracy period. Put another way, Leitzinger concluded that Defendants would have paid Plaintiffs 16.4 percent more for unprocessed ferrous scrap metal in the absence of an antitrust conspiracy. Because Defendants' total purchases of ferrous scrap metal from the class members during the class period amounted to $127.6 million, Leitzinger calculated damages at $20.9 million ($127.6 million times 16.4 percent).

As to the non-ferrous scrap-metal market, Leitzinger used the AMM index to make his calculations, rather than the SPB index, because market participants regularly used the AMM index to price non-ferrous scrap. Leitzinger was unable to identify any undercharge affecting dealers' purchase of non-ferrous scrap, which he attributed to his inability to assemble "enough data of the right quality to be able to really and truly see what had happened on the nonferrous side."

## 2. Scrap Price Bulletin

Columbia objects to Leitzinger's use of the SPB index to ascertain the pricing of dealer-user ferrous scrap-metal sales. Although evidence at trial showed that the SPB index was commonly used by dealers as a benchmark for pricing processed ferrous scrap, Columbia argues that this index is not a reliable source for damages calculations because on December 7, 1998 and October 4, 1999, *Iron Age* issued a correction to the SPB, stating that thirteen of the eighteen categories of processed ferrous scrap had been reported incorrectly for an unknown period of time. At his deposition, Leitzinger explained that this adjustment was merely a result of the magazine's "change in [its] method of reporting prices." Leitzinger said that *Iron Age* decided to switch from reporting prices "FOB dealer to FOB user," thereby adding additional costs like transportation and broker fees to the reported prices.[1] To "account for the *Iron Age* reporting method change" and "to measure the value that generators received relative to a consistent processed scrap price," Leitzinger "backed out" the December 1998 and October 1999 "corrections" by subtracting them from the SPB index prices.

Following Leitzinger's deposition, Columbia submitted the affidavit of John Ambrosia, an *Iron Age* reporter, who explained that the magazine adjusted the SPB prices because, for some unexplained reason, they failed to reflect actual transaction prices for the Northeastern Ohio area. The corrections were therefore necessary to ensure that the SPB index accurately reported market prices. Ambrosia stated that the adjustments had nothing to do with a change in pricing measuring points, e.g., "FOB dealer to FOB user," as Leitzinger believed. Moreover, Ambrosia said that he did not know when the ferrous scrap prices had begun to depart from actual market prices.

Columbia asserts that because Leitzinger assumed that the increases in the SPB index simply reflected a change in the price measuring point, he mistakenly concluded that he could create a "consistent processed-ferrous-scrap-price data set" by "backing out" the amount of the SPB increases. Plaintiffs concede that Leitzinger's assumption that *Iron Age* simply changed reporting methods was incorrect and that the SPB corrections were necessary to accurately report market prices for processed ferrous scrap. Columbia thus argues that Leitzinger's analysis is fatally flawed for two reasons: First, as the argument goes, Leitzinger did not have a reliable data set to work with prior to December 7, 1998, when the SPB index was brought back into alignment with actual market prices. Second, by "backing out" the corrections, Leitzinger made the SPB data with which he was working inaccurate.

Columbia compares Leitzinger's conclusion that there was a 16.4 percent undercharge during the conspiracy with his inability to identify any measurable damages in connection with non-ferrous scrap sales. Columbia argues that this inconsistency makes no sense because the same scrap dealers were purchasing both ferrous and non-ferrous scrap during the conspiracy, usually from the same generators. It is therefore reasonable to expect that if there was an undercharge for the sale of ferrous scrap, there similarly would have been an undercharge for the sale of non-ferrous scrap. Columbia argues that there is an obvious culprit behind this discrepancy: Whereas Leitzinger used the inaccurate SPB price index in calculating the ferrous-scrap undercharge (and then made that data even more inaccurate by subtracting out the 1998 and 1999 adjustments), he used the AMM price index in analyzing the non-ferrous scrap market. Columbia points out that, unlike the SPB index, the AMM required no "corrections" to ensure that it accurately reflected actual market prices. Further, at trial, Columbia's expert testified that when he substituted the AMM data into Leitzinger's ferrous analysis, "most of the apparent damages disappeared."

---

[1] "FOB," meaning "free on board" is a delivery term which indicates what transportation costs and risks the dealer must assume. "FOB dealer" means that the dealer is responsible for getting the goods to a common carrier; "FOB user" means that the dealer is responsible for getting the goods to the user. 18 Richard A. Lord, Williston on Contracts § 52:11 (4th ed. 2007).

Plaintiffs counter Columbia's argument in several ways. First, Plaintiffs claim that Leitzinger's decision to rely on the SPB index for ferrous transactions and on the AMM index for non-ferrous transactions was proper because that is exactly what the relevant industry actors did. Testimony at trial established that industry participants used the SPB to price ferrous scrap and the AMM to price non-ferrous scrap. Second, and relatedly, Plaintiffs argue that regardless of whether the SPB numbers were accurate, because the industry participants referred to those numbers for their pricing decisions, it was entirely appropriate for Leitzinger to rely on them to calculate Plaintiffs' damages in connection with their ferrous scrap sales. Third, Plaintiffs argue that Leitzinger made the right call when he "backed out" the SPB adjustments because the dealers themselves did the same thing. In other words, the dealers did not increase their bid price to the generators based on the new SPB numbers, but instead held firm to the old numbers. Thus, according to Plaintiffs, even though Leitzinger got the reason for the SPB adjustments wrong, all that matters is that he treated the adjustments just as the industry participants did—by backing them out of the SPB prices. Stated otherwise, Plaintiffs claim that Leitzinger relied on the SPB index to account for market changes, and when the SPB index adjusted, he, *just like Defendants*, backed out the adjustments. Finally, Plaintiffs assert that Columbia's argument founders on the testimony of its own expert, who stated at trial that as long as the SPB index moved "roughly parallel" to actual prices of processed ferrous scrap, inaccuracies in the index were not material. Indeed, Plaintiffs displayed a graph at trial showing "roughly parallel" lines representing actual sales prices for processed ferrous scrap and the SPB indices.

### 3. The District Court's Ruling

The district court denied Columbia's motion to preclude Leitzinger's testimony. The court explained that it had

> spent a substantial amount of time and effort reviewing the parties' voluminous filings relative to the admissibility—or inadmissibility—of Dr. Leitzinger's testimony pursuant to the applicable standards set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Despite [Columbia's] many well-supported attacks on the underlying data employed and assumptions made by Dr. Leitzinger in reaching his assumed damage calculation, the Court finds that those attacks are best reserved for cross-examination and do not, in this case, rise to the level warranting exclusion under *Daubert*.

(JA 799-800.) The court went on to state that there was "substantial room for debate" about Leitzinger's data set and "substantial bases upon which to criticize" certain of his assumptions. Nonetheless, the court concluded that

> Dr. Leitzinger has provided reasoned explanations for the assumptions that he made and has, at least at [this] stage, presented viable arguments to support his data set choices. Whether those explanations will withstand rigorous cross-examination, or challenges based on alternative assumptions or data choices, is not the issue now before the Court. The Court concludes that Dr. Leitzinger's opinions satisfy the *Daubert* standard and that [Columbia's] criticisms of those opinions simply are appropriate fodder for cross-examination.

(*Id.*)

In response to the two post-trial motions filed by Columbia, a motion for judgment as a matter of law and a motion for a new trial, the district court made

> one final observation regarding the nature and strength of Leitzinger's testimony. As noted, the Court spent a substantial period of time analyzing, and re-analyzing,

the Defendants' *Daubert* motions seeking to exclude Leitzinger's testimony in its entirety. The Court felt that Defendants' challenges were substantial and written attacks on his testimony articulately stated. It was only after several passes through the motion papers that the Court was able to understand that those challenges, though pointed, went to the weight and not the admissibility of Leitzinger's opinions- i.e., did not justify the wholesale exclusion of testimony Defendants sought.

The Court finds it notable that, after hearing Leitzinger's testimony in open court, hearing his responses to counsel's pointed attacks on cross-examination, and hearing what ultimately proved to be only limited critiques of Leitzinger's analysis by [Defendants'] expert], the Court was more convinced than it had been when it made its initial *Daubert* ruling that its ruling was correct. . . . Ultimately, the debate over Leitzinger's testimony was left where it should have remained-with the jury.

*In re Scrap Metal Antitrust Litigation*, No. 1:02CV0844, 2006 WL 2850453, at *18 (N.D. Ohio Sept. 30, 2006).

### 4. Standard of Review

We review for abuse of discretion the district court's determination to admit or exclude expert testimony, "recognizing, of course, that such review calls for deference to the district court's decision." *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 781 (6th Cir. 2002) (citing *Clay v. Ford Motor Co.*, 215 F.3d 663, 666 (6th Cir. 2000)). Such deference applies to the way in which the court assesses admissibility as well as the court's ultimate decision of admissibility. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152-53 (1999). Thus, we will not substitute our own judgment for that of the district court and will reverse an evidentiary decision "only where we are left with a definite and firm conviction that [the district court] committed a clear error of judgment." *Conwood*, 290 F.3d at 781 (citing *Singleton v. United States*, 277 F.3d 864, 870 (6th Cir. 2002); *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 716 (6th Cir.1999)).

### 5. Discussion

The starting point in our analysis is Federal Rule of Evidence 702, which governs the use of expert testimony. Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This rule, as amended in 2000, reflects the Supreme Court's decisions in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and *Kumho.* Fed. R. Evid. 702 advisory committee's notes, 2000 amend. ("In *Daubert* the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in *Kumho* clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science.").

Parsing the language of the Rule, it is evident that a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Third, the testimony must be reliable. *Id.* Rule 702

guides the trial court by providing general standards to assess reliability: whether the testimony is based upon "sufficient facts or data," whether the testimony is the "product of reliable principles and methods," and whether the expert "has applied the principles and methods reliably to the facts of the case." *Id.* In addition, *Daubert* provided a non-exclusive checklist for trial courts to consult in evaluating the reliability of expert testimony. These factors include: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *United States v. Langan,* 263 F.3d 613, 621 (6th Cir. 2001) (citing *Daubert,* 509 U.S. at 593-94). The test of reliability is "flexible," and the *Daubert* factors do not constitute a "definitive checklist or test," but may be tailored to the facts of a particular case. *Kumho,* 526 U.S. at 150 (citing *Daubert,* 509 U.S. at 593). Indeed, we have recognized that the *Daubert* factors "are not dispositive in every case" and should be applied only "where they are reasonable measures of the reliability of expert testimony." *Gross v. Comm'r,* 272 F.3d 333, 339 (6th Cir. 2001).

On appeal, Columbia does not argue that Leitzinger was unqualified as an expert or that his testimony was irrelevant. Nor does Columbia challenge generally the reliability of the "during and after" method to determine damages; indeed, this method is broadly accepted for proving antitrust damages. *See Conwood,* 290 F.3d at 793 n.8 (explaining that "[t]he before and after theory compares the plaintiff's profit record prior to the violation with that subsequent to it" and finding such method accepted in antitrust cases) (internal quotation and citation omitted). Columbia's argument, rather, is limited to challenging the reliability of Leitzinger's testimony specifically because of his use of the inaccurate SPB price index and his alterations to the SPB's prices. Columbia contends that Leitzinger used erroneous data and necessarily produced an erroneous conclusion; in sum, "garbage in, garbage out." Columbia argues that the district court should have, therefore, excluded Leitzinger's proposed testimony as insufficiently reliable under Rule 702.

Columbia's argument is unpersuasive because it fundamentally confuses the *credibility and accuracy* of Leitzinger's opinion with its *reliability.* Contrary to Columbia's assertions, a determination that proffered expert testimony is reliable does not indicate, in any way, the correctness or truthfulness of such an opinion. Indeed, although "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert," *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997), a court must be sure not "to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other." Fed. R. Evid. 702 advisory committee's note, 2000 amend. Instead, the requirement that an expert's testimony be reliable means that it must be "supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert,* 509 U.S. at 590. The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation. *See* Fed. R. Evid. 702 (explaining that expert testimony must be based on "sufficient facts or data" and the "product of reliable principles and methods"); *Conwood,* 290 F.3d at 792 (stating that the district court must determine whether proffered expert testimony "rests on a reliable foundation") (internal quotation and citation omitted).

An analogous case is illustrative. In *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.,* 326 F.3d 1333, 1343-44 (11th Cir. 2003), the appellant challenged the admission of the appellee's expert testimony relating to computational fluid dynamics ("CFD"). The appellant focused on the specific application of the CFD method, not on the reliability of the CFD method in general. Specifically, the appellant argued that the expert used incorrect data or was missing data to run the CFD study and used the wrong equations to run the analysis. *Id.* at 1344. If the data used was incorrect, the appellant argued, the conclusions necessarily were flawed as well and should be excluded from the jury. *Id.* at 1344-45. The Eleventh Circuit, however, held that such an attack goes to the weight of the evidence, rather than to its admissibility:

> [The appellant] does not argue that it is improper to conduct a CFD study using the sorts of aerodynamic data that [the appellee] employed, but rather that the specific numbers that [the appellee] used were wrong. Thus, the alleged flaws in [the appellee's] analysis are of a character that impugn the *accuracy* of his results, not the general scientific *validity* of his methods.
>
>          The identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination.

*Id*. at 1345 (emphasis added).

That is not to say that a significant error in application will never go to the admissibility, as opposed to the weight, of the evidence. Indeed, the 2000 amendments to Rule 702 explain that an expert witness must "appl[y] the principles and methods reliably to the facts of the case." Fed. R. Evid. 702(3); *see also* Fed. R. Evid. 702 advisory committee's note, 2000 amend. ("[*A*]*ny* step that renders the analysis unreliable . . . renders the expert's testimony inadmissible.") (internal quotation marks omitted). But "rejection of expert testimony is the exception, rather than the rule," *id*., and we will generally permit testimony based on allegedly erroneous facts when there is some support for those facts in the record.

For example, in *Jahn v. Equine Services*, 233 F.3d 382 (6th Cir. 2000), this Court reversed a district judge's decision holding inadmissible proposed expert testimony, and remanded for a hearing. The Court explained that although the opinions of the proffered testimony "may very well be 'shaky,'" because the opinions were based upon facts in the record, and were not "assumptions" or "guesses," challenges merely went to the accuracy of the conclusions, not to the reliability of the testimony. *Id*. at 390-93. *See also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000) ("An expert's opinion, where based on assumed facts, must find some support for those assumptions in the record. However, mere 'weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.' (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir.1993)) (internal citations omitted)); *Cooke*, 991 F.2d at 342 ("Where an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony, but where the opinion has a reasonable factual basis, it should not be excluded. Rather, it is up to opposing counsel to inquire into the expert's factual basis.")

Here, Columbia takes issue with the factual basis of Leitzinger's testimony, specifically his use of the SPB data, his understanding of what the December 1998 and October 1999 adjustments meant, and his reasons for backing out those adjustments. But Columbia does not argue that Leitzinger's opinion is entirely unsupported, that he merely pulled the numbers comprising his calculations out of thin air. Insofar as Columbia claims that Leitzinger should not have used the SPB index at all, that argument fails in light of the uncontroverted testimony at trial establishing that the industry participants used the SPB index to fix prices for ferrous scrap.

Next, we agree with the district court that Leitzinger's "backing out" of the SPB adjustments did not render his expert opinion fatally unreliable and subject to exclusion. Leitzinger offered a foundation for how and why he analyzed the data as he did. He testified at trial that subtracting the SPB corrections mirrored exactly what dealers had done in the marketplace at the time the corrections were announced. In support, he referred to three letters that dealers sent in December 1998 to three generators with unexpired contracts that contained price formulas tied to the SPB. The letters requested a modification to the contracts in light of the substantial increase in the SPB index. As Leitzinger explained at trial:

> [T]he major dealers . . . promptly sent letters to customers [i.e., generators] saying here's the change in index. We want to adjust the differential to back it out.

> Just because the magazine changed the index doesn't mean we are now going to pay you more money. If our contract used to be index less 20, and they just raised the index by $20, . . . we want it to be index less 40. So they immediately sent letters out saying we want to, in effect, unwind the increase by Scrap Price Bulletin.

(JA 1195.)

In addition, Leitzinger referenced a graph at trial that showed "roughly parallel" lines, one representing actual sale prices for processed ferrous scrap and the other representing the corresponding SPB index prices. Even Defendants' expert agreed that for the purposes of Leitzinger's analysis, it did not matter whether the SPB index accurately reflected price for processed scrap and that all that mattered was that the SPB index moved "roughly parallel" to actual prices for processed scrap. Thus, the graph provided evidence that indeed the market followed the SPB index even after December 1998 and October 1999 corrections were made and that any inaccuracies in the SPB were irrelevant so long as the index moved up and down over time parallel to actual market prices.

In sum, the jury was free to give Leitzinger's opinion little or no weight, and to credit instead Defendants' attacks on his decision to back out the adjustments. We cannot say that the district court abused its discretion in admitting Leitzinger's testimony when the record shows that he performed his analysis according to a reliable method (the "during and after" method) and reliably applied that method to the facts of this case. Moreover, Leitzinger's calculations were tested on cross-examination and subjected to further scrutiny and criticism by Defendants' own expert. *Daubert*, 509 U.S. at 593 (explaining that in analyzing the reliability of an expert's testimony, the "key question" is "whether it can be (and has been) tested"). The question of whether Leitzinger's opinion is accurate in light of his use of the SPB data goes to the weight of the evidence, not to its admissibility, and the district court appropriately passed the torch to the jury to make this determination. *See id.* at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *see also Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 415 n.3 (3d Cir. 2002) ("While the Federal Rules of Evidence call upon the courts to serve as gatekeepers who independently evaluate the admissibility of expert opinion testimony, they rely upon the discretion of the trial courts—not the discretion of the courts of appeals. Because the record contains *some* factual basis—albeit shaky—for [the expert's] testimony, the District Court did not abuse its discretion in performing this gatekeeping function." (internal citations omitted)).

Finally we note that the district court did not abuse its discretion by failing to hold a *Daubert* hearing, because the record on the expert testimony was extensive, and the *Daubert* issue was fully briefed by the parties. *Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000) (stating that a district court is not required to conduct a *Daubert* evidentiary hearing to qualify an expert witness). Columbia claims that the district court's opinion in response to Columbia's motion to preclude Leitzinger's testimony was cursory. We conclude that the court accurately considered the key issues, found the testimony to be sufficiently reliable by stating that Leitzinger "provided reasoned explanations" and "presented viable arguments" for his calculations, and concluded that Columbia's attacks were most appropriate for cross-examination. We, therefore, cannot say that the district court abused its discretion.

## B. Damages Award

Columbia argues that even crediting Leitzinger's testimony, there is insufficient evidence to support the damages verdict and, in any event, the verdict is an impermissible "fluid recovery."

Columbia raised this issue in its Rule 50(a) and (b) motions for judgment as a matter of law. We review a district court's refusal to grant a party's motion for judgment as a matter of law de novo. *Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 788 (6th Cir. 2005). We have explained that the standard of review is identical to that used by the district court:

> The evidence should not be weighed, and the credibility of the witnesses should not be questioned. The judgment of this court should not be substituted for that of the jury; instead, the evidence should be viewed in the light most favorable to the party against whom the motion is made, and that party given the benefit of all reasonable inferences. The motion should be granted, and the district court reversed, only if reasonable minds could not come to a conclusion other than one favoring the movant.

*Tisdale v. Fed. Exp. Corp.*, 415 F.3d 516, 531 (6th Cir. 2005) (quoting *Williams v. Nashville Network*, 132 F.3d 1123, 1130-31 (6th Cir. 1997)).

### 1. Sufficiency of the Evidence

"An antitrust plaintiff seeking treble damages under section 4 of the Clayton Act must prove an antitrust violation, fact of damage or injury, and measurable damages." *Danny Kresky Enter. Corp. v. Magid*, 716 F.2d 206, 209 (3d Cir. 1983).

Columbia argues that Plaintiffs failed to provide the jury with sufficient evidence to support the jury's finding of individual and market-wide damages. Columbia recognizes that Leitzinger opined that every class member who sold ferrous scrap incurred a 16.4 percent undercharge for every sale during the class period, resulting in aggregate damages of $20.9 million. But because the jury reached a verdict of $11.5 million in damages, Columbia argues, the jury must have resorted to speculation and conjecture to arrive at such a figure, illustrating the insufficiency of the damages evidence on damages.

Columbia's challenge to the jury's verdict on damages is therefore directed at the accuracy of the amount of damages and not the fact of damages. Columbia's argument, in essence, is that Leitzinger's testimony alone was insufficient for the jury to have accurately fixed Plaintiffs' damages.

The district court, rejecting Columbia's argument, explained:

> In sum, Leitzinger testified that, if a conspiracy to depress prices via customer allocation existed during the alleged period, it would have uniformly impacted the relevant scrap metal market, and that impact would have been one that was shared in common by *all* of the ferrous generators. He went on to testify that the uniform injury experienced by *all* of the ferrous class members was a 16.4% undercharge during the conspiracy period. Further, Leitzinger testified that the undercharge experienced by the named Plaintiffs specifically was 16.4% as well.
>
> . . . .
>
> *If credited,* therefore, Leitzinger's testimony clearly established evidence of injury to the named Plaintiffs and the class as a whole, and measurable damages to the named Plaintiffs and the class as a whole. . . . If the jury credited Leitzinger's conclusions—in whole or in part—it reasonably could have reached the conclusions that it did.

*In re Scrap Metal*, 2006 WL 2850453, at *17-18.

We agree. First, a jury is entitled to award damages in an antitrust case based on expert testimony. *See Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 572 (1990) (holding that "expert testimony . . . provided a sufficient basis for an acceptable estimate of the amount of damages"). Second, "[t]he antitrust cases are legion which reiterate the proposition that, if the fact of damages is proven, the actual computation of damages may suffer from minor imperfections." *South-East Coal Co. v. Consol. Coal Co.*, 434 F.2d 767, 794 (6th Cir. 1970). Once liability is established, therefore, a plaintiff's proof of damages is evaluated under a more lenient standard. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 567 (1981). As the Supreme Court has stated in explaining its "traditional rule excusing antitrust plaintiffs from an unduly rigorous standard of proving antitrust injury," *id.* at 565, "it does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." *Id.* at 566-67 (quoting *Hetzel v. Baltimore & Ohio R.R.*, 169 U.S. 26, 39 (1898)). "Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim." *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946). Further, "the fact that the jury chose to assess damages in an amount substantially below that recommended by plaintiff's expert does not mean that the evidence offered in support of lost profits was inadequate as a matter of law." *Falls Steel Tube & Mfg. Co. v. Trumark, Inc.*, No. 94-3981, 1995 WL 750541, at *3 (6th Cir. 1995) (per curiam) (explaining that even though defendant identified weaknesses in the evidence of damages, "we do not find it to be so 'speculative or remote' that the matter should have been taken from the jury"). *See also Rodney v. Nw. Airlines, Inc.*, 146 F. App'x 783, 791 (6th Cir. 2005) ("A plaintiff need not calculate a specific damage figure so long as he proposes an acceptable method for calculating damages.").

We conclude that Leitzinger's testimony is sufficient to support the jury's damage award.

### 2. Fluid Recovery

Columbia further argues that the jury's verdict represents an "impermissible fluid recovery" because the jury was only permitted to return a lump-sum verdict for ferrous generators as a group without determining the damages incurred by individual class members. Columbia's argument again is premised on its disagreement with Leitzinger's finding that every ferrous scrap sale in the class period had been depressed at the same rate (16.4 percent). Because the jury returned a verdict in an amount less than Leitzinger's estimated damages, Columbia argues that there is no basis for concluding that the jury accepted Leitzinger's premise that the alleged conspiracy had a uniform impact. In other words, Columbia states that it is impossible to figure out how the jury reached its verdict or to which class members the verdict applies and in what amounts. Columbia therefore asserts that the verdict is an impermissible fluid recovery.

Columbia, however, confuses the concept of fluid recovery with aggregate damages. "Fluid recovery refers to the distribution of unclaimed or unclaimable funds to persons not found to be injured but who have interests similar to those of the class." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 525 (S.D.N.Y. 1996). *See also Schwab v. Philip Morris USA, Inc.*, No. CV 04-1945, 2005 WL 3032556, at *1 (E.D.N.Y. 2005) ("Recoveries described as 'fluid' include distribution of damages through price reductions rather than by cash to individual plaintiffs; distribution of settlement or damage funds left unclaimed by individuals to nonprofit organizations or to states for uses intended to benefit class members; and distribution of damages calculated on a classwide basis to individual plaintiffs or through various indirect means." (internal citations omitted)). Indeed, the cases on which Columbia relies involved scenarios where damages could not be returned to any meaningful number of class members, and the plaintiffs accordingly proposed a fluid recovery.

Here, Plaintiffs did not propose a fluid recovery; instead they provided evidence of a class-wide *aggregate* injury. "Damages in an antitrust class action may be determined on a classwide, or aggregate, basis, without resorting to fluid recovery where the [evidence] . . . provide[s] a means to

distribute damages to injured class members in the amount of their respective damages." *In re NASDAQ*, 169 F.R.D. at 526. Leitzinger produced evidence supporting an aggregate recovery because *each* Plaintiff suffered a 16.4 percent undercharge. Leitzinger testified that the scrap metal market was well-functioning so as to distribute the effect of an antitrust violation equally across class members. The jury accepted Leitzinger's uniform-impact theory and awarded aggregate damages based on the injury to each class member. That the jury awarded a lower amount than Leitzinger suggested does not mean that it rejected Leitzinger's uniform-impact theory; instead, the jury may have simply rejected the undercharge amount of 16.4 percent.

## C. Class Certification

Columbia argues that the district court erred in certifying a class and allowing the trial to proceed as a class action because (1) the "predominance of common questions" requirement of Rule 23(b)(3) was not met, and (2) Plaintiffs did not satisfy the notice requirement of Federal Rule of Civil Procedure 23(c)(2)(B). "The district court's decision *certifying* the class is subject to a 'very limited' review and will be reversed 'only upon a strong showing that the district court's decision was a clear abuse of discretion.'" *Olden v. LaFarge Corp.*, 383 F.3d 495, 507 (6th Cir. 2004) (quoting *Armstrong v. Davis*, 275 F.3d 849, 867 (9th Cir. 2001)).

### 1. Predominance of Common Questions

Columbia contends that Plaintiffs did not meet the "predominance of common questions" requirement of Rule 23(b)(3) because damages could not be calculated on a class-wide basis.

In addition to the prerequisites of Rule 23(a)—numerosity, commonality, typicality, and fair representation—Rule 23(b) requires that (1) questions common to the class predominate over questions affecting only individual members, and (2) class resolution is superior to alternative methods for adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). Put differently, the proposed class must be "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

Columbia erroneously assumes that the issue of damages must predominate. To the contrary, "[p]redominance is a test readily met in certain cases alleging . . . violations of the antitrust laws," *Amchem*, 521 U.S. at 625, because proof of the *conspiracy* is a common question that is thought to predominate over the other issues of the case. 7AA Wright & Miller § 1781. Indeed, we have never required a precise mathematical calculation of damages before deeming a class worthy of certification. *See Olden*, 383 F.3d at 508 (affirming class certification where liability could be determined for the class as a whole, despite individual issues of damages). Thus, even where there are individual variations in damages, the requirements of Rule 23(b)(3) are satisfied if the plaintiffs can establish that the defendants conspired to interfere with the free-market pricing structure. *See Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988) ("[T]he mere fact that questions peculiar to each individual member of the class action remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.").

Here, the district court found that the "*allegations* of price-fixing and market allocation . . . will not vary among class members." (JA 263 (emphasis added).) Accordingly, the court found that the "fact of damages" was a question common to the class even if the amount of damages sustained by each individual class member varied. *See Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007) ("[c]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues") (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2d Cir. 2001)); *see also Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 456 (3d Cir. 1977) (explaining that although damages calculation in antitrust

action may involve some individualized issues, "it has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate"). We, therefore, find no error in the district court's analysis.

### 2. Notice

Columbia next argues that Plaintiffs failed to inform sufficiently absent class members of "the binding effect of a class judgment." Fed. R. Civ. P. 23(c)(2)(B). In April 2004, the district court issued a Notice of Class Determination and Proposed Partial Settlements (hereinafter, "Notice"). Columbia did not object to this Notice until January 2006, three days before the scheduled trial. Without commenting on Columbia's dilatory decertification motion, we conclude that the district court did not abuse its discretion in determining that the Notice was adequate.

In three distinct places, the Notice informed class members of the effects of remaining a member of the class. First, contrary to Columbia's contention that the Notice focused exclusively on the agreements with the settling defendants, it concisely and clearly informed class members that "[w]hether or not the settlements . . . are approved, the litigation will continue against the non-settling defendants." (JA 283.) Second, the Notice specified the binding effect of both the proposed settlement and any future lawsuit by advising class members of the need to opt out in order to "pursue any claims against any defendants." (JA 283.) Third, the Notice informed the class members that by opting out of the class and the proposed settlements, they would not be bound by a judgment: "You will be excluded from the Class Plaintiffs' prosecution of the claims against all defendants . . .[and] you may present any claim you may have against . . . any other defendant by filing your own lawsuit." (JA 291-92.) Thus, the Notice was adequate in form and content to satisfy the requirements of the Federal Rules and due process. *See Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (class notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").

## D. Jury Instructions

Columbia contends that the trial court erred when it instructed the jury on tolling and the applicable statute of limitations. We review a district court's jury instructions for abuse of discretion. *United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007). "A judgment may be reversed based upon an improper jury instruction only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Id.* (internal quotations and citations omitted).

Antitrust actions are subject to a four-year statute of limitations, meaning of course, that suit must be brought within four years after the cause of action accrued. 15 U.S.C. § 15(b). A cause of action, however, does not necessarily "accrue" when the defendant commits the act causing the plaintiff's injury, but may be tolled until the plaintiff discovers or should have discovered the injury. *See Zenith Radio Corp. v. Hazeltine Research Inc.*, 401 U.S. 321, 338 (1971). For instance, acts of fraudulent concealment by the defendant toll the limitations period for as long as the concealment continues. *Norton-Children's Hosp., Inc. v. James E. Smith & Sons, Inc.*, 658 F.2d 440, 443 (6th Cir. 1981). In addition, pursuant to 15 U.S.C. § 16(i), the limitations period is tolled during the pendency of related criminal or civil proceedings by the government, plus an additional one-year period thereafter.

Plaintiffs filed suit on August 15, 2002. Columbia asserts, therefore, that August 15, 1998 is the date on or after which Plaintiffs must establish Columbia's participation in the alleged conspiracy. The district court, however, suspended the limitations period pursuant to 15 U.S.C. § 16(i) and instructed the jury that it could consider Defendants' acts four years prior to March 2000,

based on ongoing, related government proceedings beginning at that time. The district court's ruling meant that the jury could consider Defendants' conduct as of March of 1996. The district court also gave a fraudulent concealment instruction allowing the jury to alter further the dates in consideration, if it found the requisite elements. Columbia claims that both of these instructions were erroneous. Because we conclude that the jury could have reached the verdict based on the fraudulent concealment theory, we do not reach Columbia's objection to the statutory tolling instruction.

The district court gave the following fraudulent concealment instruction:

> To establish fraudulent concealment as to a specific defendant in this case, plaintiffs must prove each of the following elements by a preponderance of the evidence:

> (1)   First, that the members of the conspiracy actively concealed the alleged conduct that caused plaintiff's antitrust injuries. It is not enough for plaintiffs to show that the members of the conspiracy failed to disclose the alleged conduct; rather plaintiffs must prove that they took active and affirmative steps to prevent plaintiffs from learning about the alleged conduct, such as by keeping their meetings or agreements secret from their accounts or taking steps to conceal the fact of their non-competition; and

> (2)   Second, that plaintiffs failed to discover the fact of the unlawful conspiracy; and

> (3)   Third, that plaintiffs exercised reasonable diligence in the circumstances and still did not discover the alleged conduct.

> In deciding whether plaintiffs have proved fraudulent concealment by the alleged conspirators, you may consider a number of factors. First, the law recognizes that a conspiracy is, by nature, self-concealing. Thus, you may consider the very acts giving rise to the conspiracy when deciding whether it was concealed from the plaintiffs; there is no requirement that the affirmative acts of concealment be independent of the conspiracy itself. You may also consider other activities which operate to conceal anti-competitive conduct such as prearranged or phone bids, confining knowledge of any anti-competitive activity to a limited core group of individuals, engaging in clandestine meetings or using false identities . . . .

> [A]s with other acts in a conspiracy, any affirmative acts of concealment by one conspirator are chargeable to all you find to have been members of the conspiracy. Similarly, plaintiffs need not establish concealment on a victim-by-victim basis; affirmative acts of concealment generally are considered to have an industry-wide effect.

> If you find that plaintiffs have proven each of the elements of fraudulent concealment, then you may find that the doctrine of fraudulent concealment applies to plaintiffs' claims. In that event, plaintiffs may then seek to recover damages from the date of the earliest injury that you find they suffered, if any. If you find that plaintiffs have *failed to prove any one of these elements*, then you are *limited to the post-March 1996 time period* outlined in the previous "affirmative defense" instruction.

(JA 1033-34.) Columbia argues that the court erred by instructing the jury, in the foregoing emphasized language, that it could find fraudulent concealment or apply statutory tolling (with the

earliest date of consideration in March 1996), instead of stating that the jury could find fraudulent concealment, statutory tolling, *or* find that *neither* applied (meaning the earliest date of consideration would be August 1998). Because the jury heard evidence based upon which it could have found fraudulent concealment even *before* 1996 and lasting through 1998, we conclude that any error in the jury instructions is harmless. *See United States v. Rayborn*, 491 F.3d 513, 520 (6th Cir. 2007) ("Even assuming *arguendo* that the instruction was given in error, 'a legally-erroneous jury charge will not justify reversal of a conviction if its probable effect on the verdict was inconsequential.'") (quoting *United States v. Carney*, 387 F.3d 436, 449 (6th Cir. 2004)).

Columbia argues that some of the evidence of fraudulent concealment should not apply to it because it was based on acts taken by other Defendants. Fraudulent concealment, however, may be established through the acts of co-conspirators. *See Riddell v. Riddell Washington Corp.*, 866 F.2d 1480, 1493 (D.C. Cir. 1989) ("affirmative acts of concealment by one or more of the conspirators can be imputed to their co-conspirators for purposes of tolling the statute of limitations"); *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1084-85 (2d Cir. 1988) (same). Columbia cites no authority to support its argument that fraudulent concealment must be shown in relation to each plaintiff in a class action.

Finally, Columbia argues that the district court erred by instructing that "the law recognizes that a conspiracy is, by nature, self-concealing." Indeed, in the law of this Circuit, a plaintiff seeking to invoke the doctrine of fraudulent concealment in order to toll the statute of limitations in an antitrust case must prove "affirmative acts" of concealment; "concealment by mere silence is not enough." *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1467 (6th Cir. 1988) (citation omitted). The district court's instruction, however, stated accurately this standard in its instruction: "It is not enough for plaintiffs to show that the members of the conspiracy failed to disclose the alleged conduct; rather plaintiffs must prove that they took active and affirmative steps to prevent plaintiffs from learning about the alleged conduct . . . ." (JA 1033.)

Therefore, we find no abuse of discretion.

### III. CONCLUSION

For these reasons, we **AFFIRM**.