1

## PROOF OF SERVICE

2      I, John Webb, am over the age of 18 years and not a party to the above-entitled case.   I am

3   employed in the County of San Francisco; my business address is 111 Pine Street, Suite 1700, San

4   Francisco, California  94111-5630.

5      On January 30, 2004, I served a true and correct copy of the following document(s):

6      **NOTICE OF ENTRY OF ORDER GRANTING MOTION FOR CLASS
       CERTIFICATION**

7   by depositing a copy of the described document in the United States mail in San Francisco, California,

8   in a sealed envelope, with postage fully prepaid, addressed as follows:

9   **Plaintiffs**

10  Norman B. Blumenthal
    David Markham
11  **BLUMENTHAL AND MARKHAM**
    2255 Calle Clara
12  La Jolla, CA 92037

13  Barry A. Fisher
    **FLEISHMAN & FISHER**
14  1875 Century Park East, Ste. 2130
    Los Angeles, CA 90067

15  
    Stephen B. Morris
16  **MORRIS & ASSOCIATES**
    401 West A. Street, Ste 2200
17  San Diego, CA 92101

18  Gordon Ball
    Suite 750, Bank of America Center
19  550 Main Street
    Knoxville, TN 37902
20  
    Michael P. Lehmann
21  **THE FURTH FIRM**
    225 Bush Street, 15th Floor
22  San Francisco, CA 94104

23  Craig C. Corbitt
    Jeffrey Topor
24  **ZELLE HOFMANN VOELBEL MASON & GETTE**
    44 Montgomery Street, Suite 3400
25  San Francisco, CA 94104

26  Bruce Simon
    Peter Borkon
27  **Cotchett Pitre Simon & McCarthy**
    840 Malcolm Road, Suite 200
28  Burlingame, CA 94010

Randy Renick
**LAW OFFICES OF RANDY RENICK**
128 North Fair Oaks Avenue, Suite 204
Pasadena, CA 91103

Venus Soltan
**SOLTAN & ASSOCIATES**
555 Anton, Suite 1200
Costa Mesa, CA 92625

Daniel J. Mogin
Lisa Frisella
**THE MOGIN LAW FIRM, P.C.**
110 Juniper Street
San Diego, CA 92101-1502

Alexander M. Schack
**LAW OFFICES ALEXANDER M. SCHACK**
11440 W. Bernardo Court, Suite 300
San Diego, CA 92127

Kevin P. Roddy
**HAGENS BERMAN LLP**
700 Flower Street, Suite 2940
Los Angeles, CA 90017

Henry Rossbacher
**ROSSBACHER & ASSOCIATES**
811 Wilshire Boulevard, Suite 1650
Los Angeles, CA 90017-2666

Frederic L. Gordon
**GORDON & HOLMES**
1230 Columbia Street, Suite 700
San Diego, California 92101-3571

1

1  Terry Gross                                Steve W. Berman
   **GROSS & BELSKY LLP**                      **Hagens Berman LLP**
2  180 Montgomery Street, Suite 2200          1301 Fifth Avenue, Suite 2900
   San Francisco, California 94104            Seattle, WA 98101
3

4

5  **Defendants**

6  Charles H. Samel                           Margaret M. Zwisler
   **HOWRY SIMON ARNOLD & WHITE, LLP**         Marc G. Schildkraur
7  550 South Hope Street, Suite 1100          **HOWRY SIMON ARNOLD & WHITE, LLP**
   Los Angeles, CA 90071                      1299 Pennsylvania Avenue, N.W.
8                                             Washington, District of Columbia 20004-2402

9

10

      I declare under penalty of perjury that the foregoing is true and correct.  Executed this 30th day of
11
   January, 2004.
12

13

14 pos.wpd

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          2

Tab 5

FILED
CLERK OF DIST. COURT
SEWARD COUNTY

## IN THE DISTRICT COURT OF SEWARD COUNTY, KANSAS

2003 JUL 29 PM 2:34

*[signature]*

MARVIN D. CHANCE, JR. on behalf
of himself and all others similarly situated,

Plaintiffs

vs.                                                        Case No. 02-C-12

UNITED STATES TOBACCO COMPANY,
UNITED STATES TOBACCO SALES AND
MARKETING COMPANY, INC., UNITED
STATES TOBACCO MANUFACTURING
COMPANY, INC., and UST., INC.,

Defendants

### JOURNAL ENTRY

NOW ON THIS 29th day of July, 2003, the above captioned matter comes on for decision on the Motion of Plaintiffs to certify the above captioned matter as a class action. The Court heard oral arguments on the 28th day of April, 2003. The proposed Plaintiffs' class representative, Marvin D. Chance, Jr., appeared in person and with his attorneys, Rex Sharp of Gunderson, Sharp and Rhein, Prairie Village, Kansas; Isaac L. Diel of Diel and Seelman, P.C., Prairie Village, Kansas; and Kerry McQueen of Sharp, McQueen, McKinley, McQueen & Dodge, P.A., Liberal, Kansas. The Defendants appeared by and through their attorneys Margaret M. Zwisler of Howrey, Simon, Arnold, & White, LLP, Washington, DC.; and Daniel H. Diepenbrock of Miller & Diepenbrock, Liberal, Kansas. There are no other appearances.

Chance v. U.S. Tobacco
02-C-12
Page 2

Thereupon, the Court after hearing arguments and statements of counsel and a complete review of the briefs and file finds as follows.

1.    The Court has jurisdiction of the parties and subject matter herein.

2.    Plaintiffs have asked for this matter to be certified as a class action in compliance with K.S.A. 60-223.

3.    Plaintiffs alleged Defendants have violated the Kansas Antitrust law through conspiracy and monopolistic activities to control the "moist snuff" market, and are entitled to damages under K.S.A. 50-115 and K.S.A. 50-801.

4.    K.S.A. 60-223(a) states as follows:

*"Prerequisites to a class action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

5.    K.S.A. 60-223(b) states as follows:

*"Class action maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
(1)  The prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interest; or
(2)  the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the

Chance v. U.S. Tobacco
02-C-12
Page 3

class as a whole; or

(3)   the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  The matters pertinent to the findings include: (A) The interest of members of the class in prosecuting or defending separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against members of the class; (C) the appropriate place for maintaining, and the procedural measures which may be needed in conducting, a class action.

6.     The Court has read all the cases in Kansas involving class actions.

7.     The Court understands before certifying a class of indirect purchasers, the

       Plaintiffs must meet the four requirements of K.S.A. 60-223(a) and the

       additional requirements under K.S.A. 60-223(b), specifically (b)(3).

8.     This Court further understands the analysis undertaken pursuant to K.S.A.

       60-223(a) and K.S.A. 60-223(b)(3) along with Federal Civil Procedure

       Rule 23 when taken all together:

                "does not authorize, as part of the determination whether a
                suit may be maintained as a class action, a preliminary
                hearing on the merits of the case with a view to
                determining whether the named Plaintiff is more than likely
                to prevail on his claims;. . ." Eisen v. Carlisle & Jacquelin,
                et. al., 417 US 156, 40 L Ed 2d 732, 94 S Ct 2140 (1974),
                page 736. headnote 13.

9.     This Court further understands the level of discretion it has in deciding

       whether or not to maintain a class action. See Helmley v. Ashland Oil,

       Inc., 1 Kan.App. 2d 532, 535; 571 P.2d 345 (1977).

Chance v. U.S. Tobacco
02-C-12
Page 4

10.    Plaintiffs in this matter have argued certification of a class action is procedural, whereas the Defendants have argued they should be allowed to present evidence on their objection to class certification and their claims Plaintiffs' case is without merit. This Court will follow the statement in <u>Winter v. Kansas Hospital Services, Inc.,</u> 1 Kan. App. 2d. 65, pg. 67, 562 P.2d 98 (1977).

> "K.S.A. 60-223, like rule 23, Fed. R. Civ. P., is a
> procedural statute. It creates no substantive rights."

The real question to be answered is whether the conditions of K.S.A. 60-223 have been met by Plaintiffs.

11.    The Court will now analyze the issues that must be addressed under K.S.A. 60-223(a) as follows.

    A.    It is clear Plaintiffs' Petition, if taken as true, the potential plaintiffs (numbering in the thousands) in this action are so numerous that without joinder of all members, it would be impractical and impossible for the Court to preside over individual actions against the Defendants. Individual lawsuits would be an improper use of judicial resources. Defendants don't seem to dispute numerosity.

    B.    Next the Court will look to see if there is a common question of law or fact within the proposed class. The commonality requirement permits more than one issue to be addressed. "The

Chance v. U.S. Tobacco
02-C-12
Page 5

question of commonality is to be liberally construed." See Gray v.

Amoco, 1 Kan. App. 2d. 338, 564 P.2d 579 (1977), Syl. 9. The

commonality claim is based upon the argument all plaintiffs

through the purchase of "moist snuff" suffered an overcharge

through a "pass on" by the Defendants in a monopolistic setting in

the State of Kansas.

The Court recognizes the Defendant's claims class certification

cannot be granted because each of the proposed class members

bought "moist snuff" at varying prices from various retailers, but

that is an issue of class subdivisions to be considered, if necessary,

at a later time.  Plaintiffs have shown commonality.

C.    The next issue under K.S.A. 60-223(a) is whether or not the

representative party's claim is typical of the claims or defenses of

the class.  The record reflects the proposed Plaintiffs' class

representative, Marvin D. Chance, Jr., is a user of "moist snuff"

manufactured by Defendants and, therefore, meets the typicality

requirement.  His claim may not be the same as all class members,

but it is close enough to satisfy this requirement.  There was no

argument presented by Defendants the proposed Plaintiffs' class

representative's position would be antagonistic to other class

members.  Defendants have claimed there might be in essence a

sub-class on their discount brands, if a class at all, and that

Chance v. U.S. Tobacco
02-C-12
Page 6

allegation destroys Plaintiffs' ability to proceed in this litigation.

Defendants' position has no merit at this time.

"Defendant must show that a conflict exists that goes to the very

subject matter of the litigation before Lloyd's representative status

can be defeated." Helmley v. Ashland Oil, Inc., 1 Kan.App. 2d

532, 536; 571 P.2d 345 (1977).

The co-extensiveness requirement does not mandate that the

positions of the representative and the class be identical; rather,

only that the representative and class members "share common

objectives and legal or factual positions." Helmley v. Ashland Oil,

Inc., page 536 supra. There appears to be no conflict between the

proposed class representative and the other members of the

proposed class. Typicality has been satisfied.

D.     There has been no argument presented to the Court Plaintiffs' legal

counsel is not qualified. The Court is drawn to the discussion in

Shutts v. Philips Petroleum Company, 235 Kan. 195, 679 P.2d

1159 at page 207, where the court said:

"What constitutes adequate representation is a question of fact to
be determined by the trial court based upon the circumstances of
each case. The decision should not be disturbed on appeal absent a
showing of an abuse of discretion. 7 Wright & Miller, Federal
Practice & Procedure: Civil § 1765; 3B Moor's Federal Practice ¶
23.07[1], Helmley v. Ashland Oil, Inc., 1 Kan. App. 2d 532, 535,
571 P.2d 345, rev. denied 222 Kan. 749 (1977). Moreover, the law
does not require that a named plaintiff be the perfect class member
or even the best available. In determining the adequacy of the

Chance v. U.S. Tobacco
02-C-12
Page 7

representative the trial court should consider: (1) whether there is adequate competent counsel; (2) whether the litigants are involved in a collusive suit; (3) whether the interest of the named parties are conflicting with or are antagonistic in any way to the interest of the other members of the class; (4) whether the named representatives' interests are coextensive with the interests of the other members of the class; (5) the quality of the named representatives, not the quantity; and (6) the extent of the named representatives' interests in the suit's outcome. See 7 Wright & Miller, Federal Practice & Procedure: Civil §§ 1765-1769; 3B Moore's Federal Practice, ¶¶ 23.07[1]-23.07[4]; *Helmley v. Ashland Oil, Inc.*, 1 Kan. App. 2d at 535; *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562-63 (2d Cir. 1968); *Miner v. Gillette Co.*, 87 Ill. 2d at 14."

This requirement is clearly established as to adequacy and the ability of the proposed Plaintiffs' class representative and Plaintiffs' counsel to represent the Plaintiffs' class.

THEREFORE, the Court finds all the requirements under K.S.A. 60-223(a)(1-4) have been satisfied by Plaintiff.

12.   The Court will now analyze K.S.A. 60-223(b)(3) to see if the (b)(3) requirements have been met.

13.   Defendants dispute Plaintiffs' claim of predominance in meeting the requirements of K.S.A. 60-223(b)(3).

14.   Defendants argue this is a very complex matter and the conditions for predominance under K.S.A. 60-223(b)(3) cannot be met because questions of fact or law with members of the class do not predominate over questions affecting only individual members. Defendants argue class certification as described by Plaintiffs covers a period of time when various prices have been paid for Defendants' products in the State of

Chance v. U.S. Tobacco
02-C-12
Page 8

Kansas and with those different prices being paid, the individual

member's claims versus the claims of the class members destroys

predominance. The Court has reviewed this argument by Defendants, the

argument by Plaintiffs, and finds when analyzing the arguments and

briefs, there is a common question of fact; has there been a "pass on" to

the Kansas indirect purchaser (consumer) of artificial price increases to

the retail purchaser of "moist snuff". The argument of pricing and its

impact by Defendants is a question of fact. At class certification plaintiffs

are not required to prove their case. This Court will not conduct a

preliminary hearing on the merits.

15.  A class action will predominate over individual actions and will be a

superior method for the fair and efficient adjudication of the controversy.

16.  The Court is aware of the instruction provided by Shutts v. Phillips

Petroleum Co., supra, page 529 and 530, as follows.

> "Before a class action is certified the trial judge should
> consider concepts of manageability in terms of our Kansas
> class action statute, the nature of the controversy and the
> relief sought, the interest of Kansas in having the matter
> determined, and the class size and complexity."

When considering this intuitive instruction from the Supreme Court of the

State of Kansas, the Court is left with the finding Plaintiffs have satisfied

the requirement of K.S.A. 60-223(a) and K.S.A. 60-223(b)(3) as set out

Chance v. U.S. Tobacco
02-C-12
Page 9

above and it is the finding and order of this Court the Motion for Class

Certification shall be and is hereby granted.

IT IS, THEREFORE, ORDERED, JUDGED, AND DECREED the Plaintiffs'

Motion for Class Certification Pursuant to K.S.A. 60-223(a) is granted and the class is defined

as follows.

> "All persons that are Kansas residents who have purchased "moist snuff"
> products manufactured or sold by the Defendants, or their subsidiary or
> affiliate, for consumption and not resale at any time from January 1, 1990, to
> the present."

It is further ordered Plaintiffs shall give notice of this Class Certification as

required by law and shall provide the Court by August 15, 2003, with a copy of its proposed

Notice and the method they will use to provide Notice to the class. Defendants shall have until

August 29, 2003, to file any objection it has to the proposed Notice and method of notice to be

given by Plaintiffs. If the parties cannot agree, a hearing shall be set before this Court to address

the issues of notice.

Plaintiffs' counsel shall contact the Court and set up a hearing (in person) to

establish a Scheduling Order for the future management of this case.

This shall be the final journal entry addressing this matter and there shall be no

need to circulate another journal entry among counsel.

IT IS SO ORDERED.

Kim R. Schroeder
District Court Judge

Chance v. U.S. Tobacco
02-C-12
Page 10

## CERTIFICATE OF SERVICE

I, Renata McCulloch, hereby certify that I mailed a true and correct copy of the above Journal Entry by United States mail, postage prepaid and properly addressed on the 29th day of July, 2003 to:

Rex A. Sharp
Attorney at Law
4121 W. 83rd St., Ste. 256
- Prairie Village, KS 66208

Daniel H. Diepenbrock
Attorney at Law
P.O. Box 2677
Liberal, KS 67905-2677

Kerry E. McQueen
Attorney at Law
P.O. Box 2619
Liberal, KS 67905-2619

Isaac L. Diel
Attorney at Law
4121 W. 83rd St., Ste. 254
Prairie Village, KS 66208

and the original to:

Rhonda Truhlar
Clerk of the District Court
415 N. Washington, Ste. 103
Liberal, KS 67901

Renata McCulloch

**Tab 6**

*3124909*

FILED
ALAMEDA COUNTY

JUN 1 7 2004

CLERK OF THE SUPERIOR COURT
By _Charlotte Manic_
Deputy

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF ALAMEDA

Coordinated Proceeding, C.R.C. 1550(b)

No. J.C.C.P 4199

IN RE AUTOMOTIVE REFINISHING PAINT
CASES

ORDER GRANTING MOTION OF
PLAINTIFFS FOR CLASS
CERTIFICATION.

Date:    June 7, 2004
Time:    2:00 p.m.
Dept.:   22

The motion of Plaintiffs for class certification came on for hearing on June 7, 2004, in

Department 22 of this Court, the Honorable Ronald M. Sabraw presiding. Counsel appeared on

behalf of Plaintiffs and Defendants. After consideration of the points and authorities and the

evidence, as well as the oral argument of counsel, the Court orders as follows:

The motion of Plaintiffs for class certification is GRANTED.

SUMMARY.

This is a purported class action alleging that Defendants have engaged in a horizontal

conspiracy not to compete in the sale of automobile refinishing paint. This case is brought by the

indirect purchasers of automobile refinishing paint. There is a separate federal action brought by

the direct purchasers of automobile refinishing paint. *In re Refinishing Paint Antitrust

Litigation*, MDL 1426.

The Second Consolidated Amended Class Action Complaint filed December 31, 2002, alleges two causes of action: (1) Restraint of trade in violation of the Cartwright Act, Business and Professions Code 16720, and (2) Unlawful and Unfair Business Practices under the Unfair Competition Law, Business and Professions Code 17200.

Plaintiffs are seeking class certification of both causes of action and suggest two subclasses: (1) a subclass of merchants who bought the paint and resold it to others (the "Refinisher Class") and (2) a class of end users (the "End User Class").

LEGAL FRAMEWORK.

The guiding principles for deciding a motion for class certification are well defined. "To obtain certification, a party must establish the existence of both an ascertainable class and a well-defined community of interest among the class-members." *Linder v. Thrifty Oil Co.* 23 Cal.4th 429, 435 (citing *Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462). The latter inquiry involves the following three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class. *Richmond, supra,* 29 Cal.3d at 470. Other relevant considerations include the probability that each class member will come forward ultimately to prove his or her separate claim to a portion of the total recovery and whether the class approach would actually serve to deter and redress alleged wrongdoing. *Linder,* 23 Cal.4th at 429. In addition, the trial court may assess the advantages of alternative procedures for handling the controversy. *Caro v. Procter & Gamble Co.* (1993) 18 Cal. App. 4th 644, 660-662.

It is plaintiffs' burden to support each of the above factors with a factual showing. *Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal. 4th 1096, 108. The determination of

whether a class should be certified is a procedural question and does *not* include a weighing of whether the action is legally or factually meritorious. *Linder*, 23 Cal.4[th] at 439-40.

### NUMEROSITY.

Defendants do not contest numerosity. The Court finds that the proposed subclasses are numerous and that it is impracticable to bring all members of the subclasses before the court.

### ASCERTAINABILITY.

A class must be defined in terms of objective characteristics and common transactional facts making the ultimate identification of class members possible. *Hicks v. Kaufman and Broad Home Corp.* (2001) 89 Cal.App.4th 908, 915; *Bartold v. Glendale Federal Bank* (2000) 81 Cal. App. 4th 816, 828. At this stage of the proceedings a plaintiff is not required to establish the existence and identity of class members. *Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1275.

Defendants argue that the subclasses are not ascertainable because not all members of the proposed subclass may have been affected by the alleged conspiracy. This argument concerns commonality, not ascertainability.

Plaintiffs' proposed class definitions are inadequate because they are in conflict with the class definitions proposed by Plaintiffs' expert, Dr. Greer, and because the Court needs to alter the proposed class structure to address commonality and competency concerns. The Court can, however, define classes that permit objective determinations of whether a person is in either the Refinisher Class or the End User Class.

3

COMMONALITY - BACKGROUND.

Class certification is determined with reference to each claim asserted, and must take into account whether a class is appropriate for each claim. *Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal. App. 4th 908, 916 fn 22.

Plaintiffs' Cartwright Act claim is asserted by the named plaintiffs individually and on behalf of the members of the putative class and alleges that Defendants engaged in a horizontal conspiracy in restraint of trade.

Plaintiffs' UCL claim is asserted by the named plaintiffs individually and on behalf of the members of the putative class and asserts that Defendants engaged in unlawful and unfair business practices. The UCL claim is not brought in the interest of the "general public." The alleged unlawful and unfair business practices are substantially similar to the alleged violations of the Cartwright Act.

There is no material distinction between the Cartwright Act claim and the UCL claim, so the Court considers them together. The essential elements of both claims are (1) the existence of a conspiracy, (2) an injury to the proposed class (impact), and (3) damages.

COMMONALITY – EXISTENCE OF A CONSPIRACY.

The existence of a conspiracy in restraint of trade is the central factual issue in this case. If there is a conspiracy, then Defendants are liable and the remaining issues are determining the amount of aggregate damages and discerning who is entitled to recover what amount of damages.

The Court finds that the existence of a conspiracy is a common issue. Defendants do not seriously contest this point. (As a practical matter, if the existence of a conspiracy is determined

1   in the federal antitrust action, then that decision might have issue preclusion (collateral estoppel)

2   effect in this case.)

3

4   COMMONALITY - PRESUMPTION OF IMPACT - HISTORICAL DIGRESSION.

5

6       An inquiry into the presumption of impact and the extent of any such presumption

7   requires a brief historical digression.

8       California's Cartwright Act is modeled after the federal Sherman Act, and before 1977

9   both the Cartwright and Sherman Acts permitted claims by direct and indirect purchasers. Most

10  of the pre-1977 case law concerns direct purchasers. There are, however, cases that address the

11  problems of determining whether indirect purchasers have standing, have suffered injury, the

12  amount of any injury, and related issues. Many of these cases arise in the context of whether

13  indirect purchasers have standing to assert antitrust claims. *In re Western Liquid Asphalt Cases*

14  (9th Cir. 1973) 487 F.2d 191 (liquid asphalt in road materials); *Philadelphia Housing Authority v.*

15  *American Radiator & Standard Sanitary Corp.* (E.D. Pa. 1970) 50 F.R.D. 13, aff'd sub nom

16  *Magano v. American Radiator & Standard Sanitary Corp.* (3rd Cir. 1971) 438 F.2d

17

18  1187(plumbing fixtures in houses); *In re Sugar Industry Antitrust Litigation* (E.D. Pa. 1976) 73

19  F.R.D. 322, 339 (sugar); *In re Antibiotic Antitrust Actions* (S.D.N.Y. 1971) 333 F. Supp. 310,

20  312 (antibiotics in animal feed); *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* (1987) 191 Cal.

21  App. 3d 1341, 1353 fn 9 (collecting cases).

22

23      In *Illinois Brick Co. v. Illinois* (1977) 431 U.S. 720, the Court held that the possibility of

24  claims by direct and indirect purchasers presented an unacceptable risk of duplicative recovery

25  and held an indirect purchaser may not claim damages from an antitrust violator measured by the

26  amount of overcharge passed through to the indirect purchaser. The Court reasoned that the

1  statute would be adequately enforced by the direct purchasers. The California Legislature

2  thought otherwise and amended Business and Professional Code 16750 to expressly permit

3  damage claims by indirect purchasers. The legislation states that the 1978 amendment to section

4  16750 "does not constitute a change in, but is declaratory of, the existing law." Stats 1978 ch

5  536, sec 2. This suggests that the Legislature intended to incorporate pre-*Illinois Brick* case law.

6
7  *Union Carbide Corp. v. Superior Court* (1984) 36 Cal. 3d 15, 19-20, suggests that the

8  Legislature intended to incorporate the dissenting opinion in *Illinois Brick*.

9      Assuming that the California Legislature adopted the reasoning of the dissent in *Illinois*

10  *Brick*, the Court must consider that reasoning in determining the extent of any presumption of

11  impact. The dissent in *Illinois Brick* suggests (1) permitting recovery by indirect purchasers will

12  further the statute's purpose, 431 U.S. at 754-755, (2) the need for "massive evidence and

13  complicated theories" in determining the existence and amount of injury should not deter the

14  court from resolving those issues at trial, 431 U.S. at 758-760, and (3) the possibility of double

15
16  recovery can be limited through prudent case management, 431 U.S. at 762-763, (4) but that

17  there is a point beyond which the wrongdoer should not be held liable, 431 U.S. at 760-761.

18

19  COMMONALITY - PRESUMPTION OF IMPACT – CALIFORNIA LAW.

20      Under California case law, if Plaintiffs prove a conspiracy regarding the sale of

21  manufactured goods, then the trier of fact can generally presume an injury to all direct or indirect

22  purchasers. *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* (1987) 191 Cal. App. 3d 1341, 1350

23  ("Courts have shown no hesitancy in ruling that when a conspiracy to fix prices has been proven

24  and plaintiffs have established they purchased the price-fixed goods or services, the jury can *infer*

25  plaintiffs were damaged."); *Rosack v. Volvo of America Corp.* (1982) 131 Cal. App. 3d 741, 760

26

6

1  ("Once a price-fixing conspiracy has been established, it follows that the class has been injured

2  to some extent.").

3      It is unclear how far this presumption extends. This Court can identify two distinct

4  approaches to determining limits on the presumption of impact on a motion for class

5  certification. First, the Court could presume that the impact of an unlawful conspiracy extends

6  indefinitely. Following class certification, the parties could then resolve whether all subclasses

7  have standing to assert antitrust claims. Second, the Court could presume that the impact of an

8  unlawful conspiracy extends only to persons or entities who have standing to assert claims. This

9  is a practical approach that might be appropriate if the parties agreed to address the standing issue

10  in the context of class certification. *Linder*, 23 Cal.4[th] at 439-40. The Court finds that the first

11  approach is most consistent with *Linder's* admonition not to merge the procedural class

12  certification determination with any substantive determination. *Linder*, 23 Cal.4[th] at 439-40.

13

14      The presumption of common impact can be rebutted. Evidence Code 601. In *Global*

15  *Minerals & Metals Corp. v. Superior Court* (2003) 113 Cal. App. 4th 836, 856-857, the Court

16  held that a class should not be certified because the plaintiffs had not demonstrated that the

17  alleged restraint of trade actually affected the prices that the class members had to pay. After

18  noting the presumption of impact, the Court in *Global Minerals* recited the facts presented by

19  Defendants and then held that the facts demonstrating a lack of common impact overcame the

20  presumption of common impact.

21

22      The presumption of common impact is a presumption affecting the burden of proof rather

23  than a presumption affecting the burden of producing evidence. Evidence Code 603-606.

24  Presumptions affecting the burden of proof further a public policy and do not just facilitate the

25  determination of the action. The California Legislature's amendment of Business and

26

7

1　Professions Code section 16750 in 1978 and its implicit incorporation of the *Illinois Brick*

2　dissent indicate that the Legislature determined that permitting recovery by indirect purchasers

3　furthers California public policy of enforcing the antitrust laws fully. *B.W.I Custom Kitchen*, 191

4　Cal.Appp.3d at 1355, then holds that indirect purchasers cannot meaningfully enforce the

5　antitrust laws unless there is a presumption of impact at the class certification stage. The

6　characterization of the presumption as one affecting the burden of proof is significant because it

7　shifts the burden to Defendants to disprove the existence of impact at the class certification stage.

8　

9　Evidence Code 606.

10　　　The Court does not address whether there is a presumption of impact affecting the burden

11　of proof at trial.

12

13

## COMMONALITY - IMPACT - APPLICATION TO THIS CASE.

14

15　　　Plaintiffs rely on the presumption of impact. Plaintiffs also present the testimony of Dr.

16　Greer, who opines that changes in manufacturer list prices correlated strongly with changes in the

17　prices charged to refinishers. Dr. Greer states that price increases were passed from

18　manufacturers to jobbers to refinishers. (Greer Dec 44-68.) Dr. Greer presents limited testimony

19　regarding the pass through of price increases to end users. (Greer Dec 92-93.)

20　　　Defendants present evidence that there is no common impact on the putative class

21　members. First, Defendants present evidence that there are numerous distribution chains.

22　Second, Defendants assert that prices did not always pass from jobbers to refinishers. Dr. Snyder

23　states that actual transactional records of jobbers and refinishers were scarce (Snyder, para 64),

24　that he examined the records of one jobber (among the hundreds in California) concerning one

25　type of automotive refinishing product (among the hundreds of products) (Snyder, para 67), and

26

1  that he concluded the data did not support the proposition that price increases passed from

2  manufacturers to jobbers to refinishers. Dr. Snyder expressly stated that his analysis was only a

3  starting point and that the data probably contained false positives and false negatives due to

4  individualized factors such as (1) volume and long term contracts, (2) rebates to refinishers, and

5  (3) offsets such as technical services, customers support, and free equipment. (Snyder para 74-

6  85.) Third, Defendants argue that prices did not always pass from refinishers to end users

7  because refinishers base their charges primarily on labor costs and because consumers may have

9  suffered no out of pocket injury if their costs were paid by insurance. (Snyder para 27-29, 56-58.)

10      Refinisher Class. The Court finds that common issues predominate concerning impact on

11  the Refinisher Class. There is a presumption of common impact. In addition, Dr. Greer

12  concludes that (assuming liability) there is a common adverse impact at the refinisher level.

13  (Greer Dec, para 69, 84.) The Court in particular notes that DuPont, BASF, PPG, and AKZO

14  NOBEL all had documents that referred to suggested prices for refinishers even though the

15  manufacturers did not sell directly to the refinishers. (Greer Dec., Exh 24, 25, 26, and 27.)

17  These documents and the documents concerning the maintenance of jobber margins suggest that

18  the defendants expected that increases in their prices to the jobbers would be passed on to the

19  refinishers. The variations among members of the Refinisher Class concerning specific

20  contracts, products and circumstances do not overcome the presumption of common impact.

21      End User Class. The Court finds that common issues predominate concerning impact on

22  the End User Class. There is very little evidence of any sort concerning the impact on the end

23  users. Dr. Greer's conclusions regarding impact are limited to the refinisher class (Greer Dec,

24  para 69, 84) and Dr. Snyder's testimony consists of general observations about the refinisher/end

25  user/insurer relationship (Snyder para 27-29, 56-58, 86-94). Neither Dr. Greer nor Dr. Snyder

9

present empirical data concerning whether refinishers pass their paint costs through to end users. Dr. Snyder's observation that end users are frequently reimbursed by insurance is not relevant because the effect of insurance is not considered under the collateral source rule. In the absence of evidence to rebut the presumption of impact, the Court finds that a common impact exists.

Consistent with *Linder's* admonition not to reach the merits the Court does not address whether the End User Class has standing.

COMMONALITY – DAMAGES.

The Court's determination whether there is any commonality in the actual damages incurred by the class members turns on the degree of certainty required at this stage of the proceeding. Plaintiffs argue that they need only to present a credible plan to allocate damages among the classmembers. Defendants argue that Plaintiffs should be required to present, and have not presented, a plan that can withstand scrutiny and will ensure that the rights of Defendant and the classmembers are protected.

The Court holds that the lower standard suggested by Plaintiffs is appropriate for two reasons. First, the amount of damages to be awarded can be determined in the aggregate. *Bruno v. Superior Court* (1981) 127 Cal. App. 3d 120, 135 n9. Therefore, the trier of fact can determine the aggregate amount of damages and the Court can later devise an equitable means to apportion those damages among the class members. Second, *B.W.I. Custom Kitchen* suggests that the presence of individual damage issues should not bar certification as long as the Plaintiffs can suggest a reasonable approach to allocating damages among the members of the putative class.

1    Allocation between the Refinisher Class and the End User Class. Dr. Greer asserts that
2  he can allocate any damages between the Refinisher Class and the End User Class through a
3  multiple regression analysis (Greer para 92-93, Greer Reply para 69-71) and Dr. Snyder states he
4  has no confidence that that approach will work (Snyder para 115). The allocation of damages
5  between the two plaintiff classes can be determined on a classwide basis and will not necessarily
6
7  require an inquiry into each transaction. The Court has confidence that the separate counsel
8  representing the two Plaintiff classes will ensure that any allocation between the two classes is
9  based on a thorough presentation of the evidence and an explanation of that evidence by
10  competent experts.

11    Allocation among the Refinisher Class. The Court finds that the allocation of damages
12  among members of the Refinisher Class does not present undue manageability concerns. *B.W.I.*
13  *Custom Kitchen*, 191 Cal.App.3d at 1354, holds that where the class consists of business entities
14  that presumably have records, that the Court should be able to devise remedial procedures to
15
16  channel the individual damage determinations.

17    Allocation among the End User Class. The Court finds that the allocation of damages
18  among members of the End User Class does not present undue manageability concerns. Unlike
19  the Refinisher Class, the members of the End User Class are not business entities and they
20  probably do not have records. The Court can, however, devise remedial mechanisms such as
21  notice by publication and the use of claim forms that will permit an allocation among End-Users.
22
23
24  TYPICALITY AND ADQUACY OF REPRESENTATION.

25    Plaintiffs propose two subclasses. Therefore, the Court addresses typicality and adequacy
26  issues separately for the representative in each subclass.

11

Typicality. Defendants do not contest the typicality of the named plaintiffs for the subclasses. Competition Collision Center, LLC and Harold's Autobody and Paint Shop are the named plaintiffs for the Refinisher Class. Shannon Nishida and Gabrielle Romero are the named plaintiffs for the End User Class.

Adequacy. "Adequacy of representation depends on whether the plaintiff's attorney is qualified to conduct the proposed litigation and the plaintiff's interests are not antagonistic to the interests of the class." *McGhee v. Bank of America* (1976) 60 Cal.App.3d 442, 450. See also *Lazar v. Hertz Corp.* (1983) 143 Cal.App.3d 128, 141-142. Plaintiffs have retained counsel that are qualified, experienced and generally able to conduct the proposed litigation. *Miller v. Woods* (1983) 148 Cal.App.3d 862, 874-875.

Defendants argue that there are conflicts between the Refinisher Class and the End User Class. *Global Minerals*, 113 Cal. App. 4th at 851-854. Defendants are correct, but the use of separate classes, each with their own counsel, should address the concerns raised by the conflicts. In future proceedings counsel for the separate classes may choose to collaborate or work separately as is appropriate in the interests of their clients.

SUPERIORITY/DETERRING AND REDRESSING THE ALLEGED WRONGDOING.

The Court has considered the suitability of alternative procedures for handling the controversy. *Linder*, 23 Cal.4th at 435.

Defendants suggest that even if a class is certified the Court will still need to make thousands of individual damage determinations, which will eliminate any benefits of class certification. *J. P. Morgan & Co., Inc. v. Superior Court* (2003) 113 Cal. App. 4th 195, 215-216.

12

1   This overlooks that the trier of fact can determine damages in the aggregate and the Court can

2   devise a means of allocating any damages among the class members.

3       There is no suitable alternative procedure to address the alleged wrong. As noted in

4   *B.W.I. Custom Kitchen*, a class action is often the only means to provide compensation to persons

5   harmed by anticompetitive business practices. *B.W.I. Custom Kitchen* states, "courts should

6

7   avoid interpreting procedural requirements in such a way as "would thwart the legislative intent .

8   . . to retain the availability of indirect-purchaser suits as a viable and effective means of enforcing

9   California's antitrust laws."" 191 Cal.App.3d at 1355.

10

11  EVIDENCE

12      The Court has considered all the declarations submitted, as well as the exhibits attached

13  thereto. The Court notes that its consideration of the evidence is be limited to the motion for

14  class certification only and shall not be construed as an indication of admissibility in future

15

16  motions or at trial.

17      Regarding the Reply Declaration of Greer, the Court finds that it is focused primarily, if

18  not entirely, on rebutting the testimony of Dr. Snyder. The Motion of Defendants to strike the

19  Reply Declaration of Greer is DENIED. The Motion of Defendants for leave to present oral

20  testimony under C.R.C. 323(b) is DENIED.

21      By separate order, the Motion of Defendants to seal certain portions of the record is

22  GRANTED.

23

24

25  ///

26  ///

12

1  CLASS DEFINITION

2      The Court certifies two classes, a Refinisher Class and an End User Class. Based on Dr.

3  Greer's definitions of the two classes, the distinction between the two classes is whether the paint

4  is purchased in liquid form or as applied to a vehicle. (Greer Dec, para 19-26.) Specifically, Dr.

5  Greer states that most of the End-User Class are persons "who have had their vehicles repaired

6  and/or repainted," (Greer Dec. para 26.) This suggests that it is inappropriate to distinguish

7  between the classes based on whether the paint was purchased "for resale or incorporation into

8  

9  another product for resale." This redefinition will affect the Fleet Refinisher and Fleet OE class

10  members, which would have been End Users under Plaintiffs' proposed class definition, but will

11  be Refinishers under the Court's definition.

12      The class definitions are:

13  

14      Refinishing class: All persons or entities located in California that
       purchased liquid automotive refinishing products manufactured by
15      defendants from persons other than defendants from January 1,
       1993, through December 31, 2002. Excluded from the class are
16      governmental entities and the defendants and their parents,
       subsidiaries, and affiliates.

17  

18      End User class: All persons or entities located in California that
       purchased applied automotive refinishing products manufactured
19      by defendants from persons other than defendants from January 1,
       1993, through December 31, 2002. Excluded from the class are
20      governmental entities and the defendants and their parents,
       subsidiaries, and affiliates.

21      At the hearing on June 7, 2004, counsel for Plaintiffs informed the Court which counsel

22  would be representing which class. The Refinisher Class will be represented by (1) Berman

23  DeValerio Pease Tabacco Burt & Pucillo, (2) Cotchett, Pitre, Simon & McCarthy; (3) Saveri &

24  Saveri; (4) Glancy Binkow & Goldberg; and (5) the Terrell Law Group. The End-User Class will

25  

26

be represented by (1) Zelle, Hoffman, Voelbel, Mason & Gette; (2) Gross & Belsky; (3) Wassserman, Comden & Casselman; and (4) the Mogin Law Firm.

## CLASS NOTICE.

Class notice is appropriate under C.R.C. 1856. Absent class members must be provided adequate notice and an opportunity to opt out. The parties are to meet and confer regarding the timing, content, and means of distributing the class notice as well as the allocation of the costs related to class notice.

## FURTHER PROCEEDINGS.

The next CMC is set for June 24, 2004, at 2:00 pm. Counsel should be prepared to discuss the following:

Organization of Plaintiffs' Counsel. The structure ordered in Pre-trial Order No. 1, filed December 12, 2001, is inappropriate given the creation of two classes. Prior to the CMC, counsel for Plaintiffs are to meet and confer regarding the reorganization of Plaintiffs' counsel.

Class Definition. Counsel may suggest any modifications to the class definitions.

Class Notice. Counsel should meet and confer regarding class notice issues. If the parties cannot reach agreement regarding class notice, then the Counsel should be prepared to discuss a schedule for Plaintiffs to file a motion for approval of class notice and allocation of costs.

Discovery on merits issues.

Substantive motions.

Mediation/Settlement prospects.

15

1      The status of *In re Refinishing Paint Antitrust Litigation*, MDL 1426. It is unclear what

2    effect, if any, the settlements in that action may have on this case. The Court will also inquire

3    whether there are indirect purchaser cases pending in other state courts.

4      Setting a trial date.

5

6    Dated: June 17, 2004

7                    Judge Ronald M. Sabraw

**Tab 7**

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

11/14/2000

CLERK OF THE COURT
FORM V000

HON. MICHAEL J. O'MELIA

A. Beery
Deputy

CV2000-000722

FILED: _____

CHARLES I. FRIEDMAN, P.C., ET AL.    ANDREW S. FRIEDMAN

v.

MICROSOFT CORPORATION

LEONARD B SIMON
MILBERG WEISS BERSHAD
HYNES & LERACH LLP
600 W BROADWAY
STE 1800
SAN DIEGO  CA  92101


DAVID J BERSHAD
ONE PENNSYLVANIA PLAZA
NEW YORK NY  10119-0165


KENNETH J VIANALE
MILBERG WEISS BERSHAD HYNES &
LERACH LLP
THE PLAZA  STE 900
5355 TOWN CENTER RD
BOCA RATON FL  33486


MARK D BOGEN
1761 W HILLSBORO BLVD
STE 328
DEERFIELD BEACH FL  33442


BRIAN MICHAEL GOODWIN

Docket Code 019

Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

11/14/2000                                    CLERK OF THE COURT
                                              FORM V000

HON. MICHAEL J. O'MELIA                            A. Beery
                                                   Deputy

CV2000-000722


                                    JOHN J. BOUMA

                                    CHRISTOPHER A. O'HARA



                                    STEVE W BERMAN
                                    HAGENS BERMAN
                                    1301 FIFTH AVE
                                    STE 2900
                                    SEATTLE WA  98101




                            MINUTE ENTRY

        The Court has considered all of the memoranda and cases
submitted by both parties.  The Court will not give an
appellate-type ruling, as I would only be repeating what is set
forth in the moving papers.  The Court therefore makes the
following rulings:

        1.   Microsoft's Motion to Dismiss is denied.  The Court
             finds that Arizona residents can bring this action,
             and *Illinois Brick* does not apply.

        2.   The Plaintiff's Motion to Certify the Class is
             granted.

        3.   Microsoft's Motion to Stay is denied.

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

11/14/2000                                    CLERK OF THE COURT
                                                  FORM V000

HON. MICHAEL J. O'MELIA                          A. Beery
                                                 Deputy

CV2000-000722

    The Court will rule on Microsoft's Motion to Consolidate
and Lucero's Motion to Intervene when the pleadings are
complete.

**Tab 8**

supported by the trial testimony of plaintiffs' expert, as well as economic theory and factors regarding the efficient administration of the settlement fund. Any attempt to further refine the method of allocation would unduly diminish and delay the payments to individual class members with no material improvement in the fairness of the plan. Accordingly, the Court approves the revised plan of allocation.

**IT IS THEREFORE ORDERED** that settlement counsel's *Motion For Approval Of Revised Plan Of Allocation* (Doc. #1040) filed May 26, 2000 be and hereby is **SUSTAINED**.

**IT IS FURTHER ORDERED** that the *Motion For Attorney's Fees* (Doc. #1027) filed by Gerald H. Abrams on April 25, 2000 be and hereby is **OVERRULED**.

---

**[¶ 73,013]    Microsoft I-V Cases, Coordination Proceedings Special Title (Rule 1550(b)).**

California Superior Court, City and County of San Francisco. No. J.C.C.P. No. 4106. Filed August 29, 2000.

### California Cartwright Act

**Class Actions—State Laws—Class Certification—Standard—Computers, Computer Software.**—Two purported classes of California indirect purchasers of software products produced by a computer software company (purchasers of the company's operating system software and purchasers of the company's word processing or spreadsheet software) were certified to proceed with California state law claims against the company. The plaintiffs alleged that the company harmed consumers by establishing and maintaining a monopoly of the Intel-compatible personal computer markets for operating systems software and for word processing and spreadsheet applications software. The matter was suitable for resolution on a classwide basis. The proposed classes were ascertainable; the classes were sufficiently numerous; the named representatives' claims were typical of those of the classes and the interests of the classes would be fairly and adequately represented. In addition, common questions of fact or law predominated, and a class action was the superior method for adjudicating the matter.

See ¶ 9410.05.

**Class Actions—State Laws—Class Certification—Monopolization—Computers, Computer Software.**—For purposes of class certification in a state antitrust law class action by California indirect purchasers against a computer software company for engaging in monopolization, plaintiffs made a sufficient threshold showing that issues of law and fact regarding the company's antitrust violations were subject to common proof by pointing to findings of fact and conclusions of law against the company in a federal/state enforcement action. Issues as to whether the company violated the Cartwright Act were not differentiated among individual consumers.

See ¶ 9410.05.

**Class Actions—State Laws—Class Certification—Fact of Injury—Computers, Computer Software.**—For purposes of class certification in a state antitrust law class action by California indirect purchasers against a computer software company for engaging in monopolization, the plaintiffs established that the harm suffered by consumers as a result of the company's anticompetitive practices—or fact of injury—was capable of proof on a classwide basis. While the task was formidable, it was not impossible. The plaintiffs proposed several methodologies shown to be widely accepted within the profession and submitted published empirical analyses to demonstrate general harm to consumers as a result of the company's conduct. The plaintiffs did not have to prove that each and every plaintiff paid a supracompetitive price for the relevant software products.

See ¶ 9410.05.

**Class Actions—State Laws—Class Certification—Damages Calculation—Computers, Computer Software.**—For purposes of class certification in a state antitrust law class action by California indirect purchasers against a computer software company for engaging in monopolization, the plaintiffs demonstrated that the amount of damages resulting from the company's alleged overcharges was susceptible to classwide proof. Damages could be calculated in the aggregate for the class. Summing of all individual claims was not required.

See ¶ 9410.05.

**Class Actions—State Laws—Class Certification—Superiority of Class Action Methodology—Computers, Computer Software.**—A class action was the superior method for adjudicating a state law monopolization action by California indirect purchasers of software products produced by a computer software company against that company. The case involved a very large number of claimants with relatively small amounts at stake. Most consumers had little incentive to

litigate independently, since the costs of litigation would have overwhelmed their potential recovery. Moreover, the potential recovery was not so insignificant to warrant the assumption that individual consumers would not be motivated to claim any recovery to which they were entitled or that a favorable outcome would only benefit attorneys. The denial of class treatment could result in repetitious litigation and inconsistent judgments to the extent that purchasers of large quantities of the company's software elected to pursue individual claims.

See ¶ 9410.05.

For plaintiffs: Eugene Crew, Daniele J. Gurniss, Richard L. Grossman, and Theodore T. Herhold of Townsend & Townsend & Crew, San Francisco, Cal., R. Stephen Berry, J. Daniel Leftwich, Michael J. Quinn, and Gregory Baruch of Berry & Leftwich, Washington, D.C., Michael K. Kellogg, Mark C. Hansen, and Steven F. Benz of Kellogg, Huber, Hansen, Todd & Evans, Washington, D.C., Craig C. Corbitt of Zelle, Hofmann, Voelbel & Gette, San Francisco, Cal., William Bernstein, Joseph R. Saveri, and Steven M. Tindall of Lieff, Cabraser, Heimann & Bernstein, San Francisco, Cal., Leonard B. Simon of Milberg, Weiss, Bershad, Hynes & Lerach, New York, Daniel J. Mogin, San Diego, Cal., Guido Saveri and R. Alexander Saveri of Saveri & Saveri, Inc., San Francisco, Cal., Josef D. Cooper and Tracy R. Kirkham of Cooper & Kirkham, San Francisco, Cal., Lingel H. Winters, San Francisco, Cal., Jeffreyi J. Parish, Oakland, Cal., and Francis O. Scarpulla, San Francisco, Cal. For defendant: Robert A. Rosenfeld and Stephen V. Bomse of Heller, Ehrman, White & McAuliffe, San Francisco, Cal., David Tulchin and Michael Lacovara of Sullivan & Cromwell, New York, N.Y., Steve W. Berman of Hagens & Berman, Seattle, Wash., Thomas W. Burt, Richard J. Wallis, and Steven J. Aeschbacher, Redmond, Wash.

## ORDER RE CLASS CERTIFICATION

POLLAK, J.: This is a coordinated proceeding brought by plaintiffs as representatives of two purported classes of California indirect purchasers of software products produced by defendant Microsoft Corporation.

The operative complaint for all of the coordinated actions[1] alleges causes of action under the Cartwright Act (Bus. & Prof. Code, § 16720 et seq.) and the Unfair Competition Act (Bus. & Prof. Code, § 17200 et seq.). Plaintiffs allege that defendant engaged in numerous violations of these Acts in establishing and maintaining an illegal monopoly in the Intel-compatible personal computer markets for operating systems software and for word processing and spreadsheet applications software. Plaintiffs allege that Microsoft harmed California consumers by overcharging for its software as a result of the abuse of its monopoly power and by depriving consumers of other benefits that would have been derived from competition in those markets.

Plaintiffs seek to bring this action on behalf of California individuals and entities that purchased software programs indirectly from Microsoft. Specifically, plaintiffs request that two classes be certified:

(1) The "*Windows and MS-DOS Operating System Software Class*:" All persons or entities within the State of California who, on or after May 18, 1994, indirectly purchased "Microsoft Windows operating system software or MS-DOS operating system software" and who did not purchase it for the purpose of resale.

(2) The "*Word and Excel Software Class*:" All persons or entities within the State of California who, on or after May 18, 1994, indirectly purchased Microsoft "Word" word processing software and/or "Excel" spreadsheet software compatible with "Microsoft Windows operating system software or MS-DOS operating system software" and who did not purchase it for the purpose of resale.

Excluded from the class[es] are government entities, Microsoft officers and directors, subsidiaries in which Microsoft has greater than a 50 percent ownership interest and any judges or justices assigned to hear any aspect of this litigation. Also excluded are persons or entities who make their purchases after the date of notice to the class.[2]

Microsoft contends that the complexities of this case preclude common proof of the key issue of whether any illegal practices adversely impacted California consumers, and that certification is therefore inappropriate. "[S]hort of making an individual inquiry as to each proposed class member, [there is] no way of proving the key 'fact of injury' or 'impact' element in an antitrust class action: that the alleged monopolistic 'overcharge' actually worked a discernible,

---

[1] The Amended Complaint for Violations of California Business and Professions Code § § 16720 and 17200 Seeking Damages, Restitution and Injunctive Relief; Class Action, filed March 19, 1999 in *Lingo v. Microsoft Corporation*, San Francisco Superior Court No. 301357 (hereafter "Complaint").

[2] Microsoft notes that because it does not actually "sell" its software to anyone (rather, it "licenses" its products), it

is technically incorrect to refer to putative class members as indirect "purchasers." However, for the sake of simplicity, the court will also adopt plaintiffs' use of the widely recognized terminology. However, the term "licensed" should be inserted in the definition of the classes to be certified.

**¶ 73,013**

©2000, CCH INCORPORATED

tangible impact on the vast majority of end-users in the proposed class. Nor could the amount of the alleged overcharge, if any, passed on to an end-user be estimated without individual investigation." (Microsoft Corporation's Memorandum of Points and Authorities in Support of Its Opposition to Plaintiffs' Renewed Motion for Class Certification ("Opp.") at p. 3.)

While plaintiffs urge that "[t]here is nothing extraordinary about [this] motion" (Memorandum of Points and Authorities in Support of Plaintiffs' Renewed Motion for Class Certification ("Motion") at p. 1), the application for certification of a class in this case is hardly run of the mill. Unlike virtually all reported decisions in antitrust cases in which classes of indirect purchasers have been certified, plaintiffs do not base their claim for recovery on allegations that defendant committed a per se violation—a critical factor that would permit a classwide presumption of injury. Moreover, there undoubtedly is a basis for Microsoft's emphasis on the number of software programs it has marketed over the purported class period, the pricing differences that have existed over this period of more than six years, the rapid pace of change in the computer industry over this period, the varied channels through which its software has been distributed, and the critical fact that its software was frequently incorporated into personal computers and represented only a small fraction of the consumers' purchase price. These factors require the court to consider with utmost care the particular issues raised by the allegations and the way in which plaintiffs intend to meet their burden of proof. The question at this point, however, is not whether plaintiffs will be able to prove their case, but only whether their contentions can be evaluated in a manner that does not require consideration of so many individualized circumstances as to be completely impracticable.

**A. Standard for Class Certification.**

Class suits are authorized in California when "the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." (Code Civ. Proc., § 382.) A class should be certified when the party seeking certification has demonstrated the existence of an ascertainable class and a well-defined community of interest among the class members. (*Richmond v. Dart Indus., Inc.* (1981) 29 Cal.3d 462, 470; see also *Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 704.) The community

of interest requirement embodies three factors: "(1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 (citing *Richmond v. Dart Indus., Inc., supra,* 29 Cal.3d at p. 470.) In addition, the party seeking certification must establish that the class action is a superior method of adjudicating the matter. (*Reyes v. Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1279-1280.) In the absence of controlling state authority, California courts look to Rule 23 of the Federal Rules of Civil Procedure and to the federal case law interpreting this rule. (*Richmond v. Dart Indus., Inc., supra,* 29 Cal.3d at pp. 469470.)[3]

The party seeking certification of the class carries the burden of establishing that the requirements for certification are met. (*Richmond v. Dart Indus., Inc., supra,* 29 Cal.3d at p. 470.) Courts encourage the use of the class action to "prevent a failure of justice in our judicial system." (*Linder v. Thrifty Oil Co., supra,* 23 Cal.4th at p. 434.) Consumers' individual damages frequently are insufficient to justify the costs of litigation, so that in the absence of class treatment, violations of law inflicting substantial damages in the aggregate would go unremedied. But to ensure that no party suffers a failure of justice, it is necessary to "carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." (*Linder v. Thrifty Oil Co., supra,* 23 Cal.4th at p. 435.)

In considering a class certification motion, the court accepts the facts alleged in the complaint as true. (See *Linder v. Thrifty Oil Co., supra,* 23 Cal.4th at p. 443; *Blackie v. Barrack* (9th Cir. 1975) 524 F.2d 891, 901, fn. 17.) The Supreme Court has recently emphasized that certification of a class is a procedural question that should not be conditioned upon a showing that the class claims are likely to succeed on the merits. (*Linder v. Thrifty Oil Co., supra,* 23 Cal.4th at pp. 439-440, 443.) The Supreme Court also has repeated that courts should resolve any doubt as to whether to certify a class in favor of certification. (See, e.g., *Richmond v. Dart Indus., Inc., supra,* 29 Cal.3d at pp. 473-475; *La Sala v. American Savings & Loan Ass'n* (1971) 5 Cal.3d 864, 883; *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 807.)

---

[3] Rule 23 of the Federal Rules of Civil Procedure requires that plaintiff show common questions of fact or law, numerosity of the class, typicality of the named plaintiff's claim and adequacy of representation. In addition, plaintiff must show that the common questions of law or fact predominate over questions affecting only individual class members and that the class action is superior to other methods for fairly and efficiently resolving the dispute. (Fed. Rules Civ. Proc., Rule 23(a), (b)(3), 28 U.S.C.; *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* (1988-1 TRADE CASES ¶ 68,053], (1987) 191 Cal.App.3d 1341, 1347, fn. 5.)

¶ 73,013

While issues affecting the merits may be enmeshed with class action requirements, the issue at this stage of the proceedings is only whether the matter is suitable for resolution on a classwide basis. (*Linder v. Thrifty Oil Co., supra,* 23 Cal.4th at p. 443.) Plaintiffs are not now required to prove their case. (*See id.,* at p. 438-39, 443; *Eisen v. Carlisle & Jacquelin* [1974-1 TRADE CASES ¶75,082] (1974) 417 U.S. 156, 177; *In re Catfish Antitrust Litigation* [1993-2 TRADE CASES ¶70,395] (N.D. Miss. 1993) 826 F.Supp. 1019, 1038-1039.) Rather, they are required to make a "threshold showing" that the antitrust violations, if proven, have had a common impact on the class. (*In re Catfish Antitrust, supra,* at pp. 1041-1042.) Plaintiffs are also required to advance a method for proving generalized damages on a classwide basis "not so insubstantial that it amount[s] to no method at all." (*Id.,* at p. 1042.) In response to plaintiffs' showing that all of the requirements for class certification have been met, Microsoft disputes only whether common questions of law or fact predominate.[4]

### B. Indirect Purchaser Suits for Damages in California.

California is one of a minority of states that permits indirect purchasers to maintain antitrust suits for damages. Rejecting *Illinois Brick Co. v. Illinois* [1977-1 TRADE CASES ¶61,460] (1977) 431 U.S. 720, in which the United States Supreme Court held that such suits could not be maintained under the federal Sherman Act, the California Legislature amended the Cartwright Act specifically to permit indirect purchaser actions under California law. (Bus. & Prof. Code, §16750(a).) The California Supreme Court noted that this legislative action constituted an endorsement of Justice Brennan's dissenting opinion in *Illinois Brick* and "a mandate to avoid unnecessary procedural barriers to indirect purchasers' prosecution of California antitrust suits." (*Union Carbide v. Superior Court* (1984) 36 Cal.3d 15, 21-22.)

### C. Common Questions of Law or Fact Predominate over Individual Questions.

Plaintiffs' burden is to establish that common questions of law or fact predominate over individual issues. This inquiry "turns on an interpretation of substantive issues of antitrust law." (*Rosack v. Volvo of America Corp.* [1982-83 TRADE CASES ¶65,145] (1982) 131 Cal.App.3d 741, 751 (*Rosack*).) Federal case law interpreting the Sherman and Clayton Acts is applicable to interpretation of California's antitrust law. (*Ibid.*) To establish liability, plaintiffs must prove an antitrust violation and demonstrate that the class suffered injury or impact as a result of the violation. (*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* [1988-1 TRADE CASES ¶68,053] (1987) 191 Cal.App.3d 1341, 1350 (*B.W.I. Custom Kitchen*).) For class certification purposes, plaintiffs may satisfy this requirement by making a "threshold showing that the antitrust violation, if proven, had a common impact on the class members." (*In re Catfish Antitrust Litigation, supra,* 826 F.Supp. at pp. 1038-1039.) "If plaintiffs have stated claims of illegality and impact which can be proved predominantly with facts applicable to the class as a whole, rather than by a series of facts relevant to only individual or small groups of plaintiffs, then prosecution of this case as a class action is appropriate and desirable." (*Rosack, supra,* 131 Cal.App.3d at p. 752.) Plaintiffs' proposed method for generalized proof of dam-

---

[4] Microsoft does not seem to contest that the proposed classes are ascertainable. Whether a class is ascertainable depends on the clarity of the class definition, the numerosity of the putative class and the means available to identify potential class members. (*Reyes v. Board of Supervisors, supra,* 196 Cal.App.3d at p. 1974.) The class definitions make clear that any California consumer of the software at issue who purchased the product(s) for his, her or its own use and not for resale within the class period is a member of the class. The definitions also make clear who is excluded from the classes. Moreover, according to declarations submitted with the moving papers, the named plaintiffs who seek to represent one or both classes are themselves members of one or both of the classes.

The numerosity requirement also is not disputed and is satisfied because the class members are so numerous that it is "impracticable to bring them all before the court." (Code Civ. Proc., §382.) There is no predetermined number of class members necessary as a matter of law for the maintenance of a class action. (*Hebbard v. Colgrove* (1972) 28 Cal.App.3d 1017 (not inappropriate to certify class involving a minimum of 28 members); *Clothesrigger, Inc. v. GTE Corp.* (1987) 191 Cal.App.3d 605 (mere size of class numbering over one million members did not make proposed class action unmanageable).) Here plaintiffs allege there are "clearly millions of class members." (Motion at p. 19.)

The typicality requirement is satisfied if the representative plaintiff's claim "has the essential characteristics common to the claims of the class." (*In re Flat Glass Antitrust Litigation* [1999-2 TRADE CASES ¶72,713] (1999) 191 F.R.D. 472, 479.) The named plaintiffs' claims here, that they paid illegal overcharges due to defendant's antitrust violations, are identical to those of the class and are, therefore, typical of those of the class.

Again, the parties do not take issue with the adequacy of representation requirement, which is met by (1) retaining class counsel competent to handle the litigation; and (2) ensuring that the class representatives' interests are not antagonistic to those of the class. In approving plaintiffs' proposed organization of counsel, this court found plaintiffs' counsel to be well qualified to conduct this litigation. (*See* Pretrial Order No.1, filed Mar. 9, 2000, and supporting documentation filed by plaintiffs in support thereof.) The named plaintiffs' claims arise through the same set of facts as do those of the class and their claimed injuries are the same. Through declarations, the named plaintiffs attest to their ability and willingness to prosecute the litigation and protect the interests of the class.

**¶73,013**

©2000, CCH INCORPORATED

ages must not be "so insubstantial that it amount[s] to no method at all." (In re Catfish Antitrust Litigation, supra, 826 F.Supp. at p. 1042.)

Plaintiffs frame the common questions presented by this action as follows:

(1) whether Microsoft possesses monopoly power in the relevant computer software markets; (2) whether Microsoft has acquired, maintained and increased its market power through violations of the Cartwright Act and the Unfair Competition Act (Bus. & Prof. Code §§ 16720, 16727 and 17200); (3) whether Microsoft exploited its illegal monopoly to cause substantial harm to competition in the relevant markets; (4) whether Microsoft exploited its illegal monopoly to cause substantial harm to consumers by overcharging them for inferior products, suppressing innovation and denying consumers their freedom of choice in a competitive market; (5) whether Microsoft should be required to make full restitution for the harm it unlawfully inflicted upon consumers and the profit it unlawfully reaped from consumers; and (6) whether Microsoft should be enjoined from continuing its violations of law.

(Plaintiffs' Reply in Support of Renewed Motion for Class Certification ("Reply") at pp. 10-11.) The issues presented fall into three categories: (1) whether Microsoft violated California's antitrust law; (2) whether any such violation caused harm to the classes; and (3) what relief is appropriate.

**1. Violation.**

Plaintiffs allege numerous antitrust violations by Microsoft that had the purpose and effect of establishing and maintaining an illegal monopoly of the personal computer operating systems, word processing and spreadsheet software markets. (Compl. at ¶¶ 37, 38, 104-107.) Plaintiffs allege that Microsoft exploited its monopoly power[5] to cause substantial harm to competition and to the ultimate consumers of Microsoft's products in California, including overcharges for the software programs at issue. (Compl. at ¶¶ 104, 105, 107.) Such conduct, if proven, violates the Cartwright Act, which prohibits combinations or conspiracies in restraint of trade. (Bus. and Prof. Code, § 16720 et seq.)

As evidence of the substantiality of their claims and the susceptibility of these claims to classwide analysis, plaintiffs point to the Find-

ings of Fact in the antitrust action brought by the United States against Microsoft. (United States v. Microsoft Corp. [2000-1 TRADE CASES ¶ 72,839] (D.D.C. 1999) 65 F.Supp.2d 1 [hereafter "Findings of Fact"]; see also United States v. Microsoft Corp. [2000-1 TRADE CASES ¶ 72,839] (D.D.C. 2000) 87 F.Supp.2d 30 [hereafter "Conclusions of Law"].) There, the District Court made detailed findings of various forms of anticompetitive conduct by Microsoft. Judge Jackson found that Microsoft engaged in anticompetitive conduct to protect Windows, its core asset, from competition (e.g. Findings of Fact ¶¶ 132, 194, 409-412; see also Conclusions of Law § I.2), including restrictions on personal computer manufacturers, internet access providers and internet content providers. (E.g. Findings of Fact ¶¶ 155, 203, 215, 221, 234, 235, 237, 242-336.) Judge Jackson found that Microsoft charged higher prices than it would have in a competitive environment, consistent with monopoly power (Findings of Fact ¶¶ 62, 63),[6] and concluded that Microsoft's conduct had "harmed consumers in ways that are immediate and discernible." (Findings of Fact ¶ 409.)

Such Sherman Act violations also constitute violations of the Cartwright Act and violations of the Unfair Competition Act (Quelimane Co. v. Stewart Title Guaranty Co. [1998-2 TRADE CASES ¶ 72,285] (1998) 19 Cal.4th 26, 42-43), and will entail proof of the same conduct by Microsoft as to each class member. (Rosack, supra, 131 Cal.App.3d at p. 752; In re Catfish Antitrust Litigation, supra, 826 F.Supp. at p. 1039.) Microsoft's actions in this regard are not differentiated with respect to individual consumers; the focus is squarely on Microsoft's conduct, not the conduct of individual class members. Thus, the proof required to demonstrate the "existence, implementation and effect" of the alleged unlawful conduct will require "a common thread of evidence" which will "correspond to evidence which otherwise would be introduced by absentee class members." (B.W.I. Custom Kitchen, supra, 191 Cal.App.3d at p. 1349 [quoting In re Sugar Indus. Antitrust Litigation [1976-2 TRADE CASES ¶ 61,215] (E.D. Pa. 1976) 73 F.R.D. 322, 345]; In re Flat Glass Antitrust Litigation [1999-2 TRADE CASES ¶ 72,713] (W.D. Pa. 1999) 191 F.R.D. 472, 484.) Plaintiffs have made a sufficient "threshold showing" that the issues of fact and law regarding Microsoft's alleged violations of the Cartwright Act and the Unfair Competition Act are subject to common proof.

---

[5] Plaintiffs allege that Microsoft controls approximately 90% of the operating systems, word processing and spreadsheet software markets. (Compl. ¶¶ 31, 34, 36.)

[6] In further support of their motion, plaintiffs submitted the opinion of Professor David J. Farber describing the nature of the competition that would have existed absent

Microsoft's alleged anticompetitive conduct (the "but for" world) and opining that pricing for operating systems and applications software would have been lower had Microsoft not engaged in such conduct. (Declaration of David J. Farber in Support of Plaintiffs' Renewed Motion for Class Certification ("Farber Decl.") ¶¶ 34, 57.)

### 2. Fact of Injury.

Plaintiffs must also demonstrate that whether consumers suffered harm as a result of Microsoft's anticompetitive conduct is also capable of proof on a classwide basis. (*B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at p. 1350.)[7] "[A]n antitrust plaintiff's 'burden of proving the fact of damage . . . is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage.' " (*Ibid.* [citing *Zenith Corp. v. Hazeltine* (1969) 395 U.S. 100, 114, fn. 9].) Plaintiffs contend that Microsoft harmed the class by charging supracompetitive prices for its software. Plaintiffs must, therefore, make a "threshold showing" that proof of the overcharge is common to the class.

There is considerable authority for the proposition that in a case alleging price fixing the fact of injury may be determined on a classwide basis. (*See,* e.g., *B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d 1341; *Rosack, supra,* 131 Cal.App.3d 741; *In re Catfish Antitrust Litigation, supra,* 826 F.Supp. 1019; *In re Sugar Antitrust Litigation, supra,* 73 F.R.D. 322.) Because price fixing is a *per se* violation of antitrust law, a presumption of harm arises from proof of such a violation. (*B.W.I. Custom Kitchen, supra,* at pp. 1350-1353; *Rosack, supra,* at pp. 753-754.) "It has been held that impact will be presumed once a plaintiff demonstrates the existence of an unlawful conspiracy that had the effect of stabilizing, maintaining or establishing product prices beyond competitive levels." (*In re Sugar Indus. Antitrust Litigation, supra,* at p. 347.) A *per se* violation raises a presumption of harm because conduct such as a conspiracy to fix prices has the sole purpose of artificially raising the price of the item. It follows that consumers of the product pay more than they would in a competitive market even if the prices charged to direct purchasers vary. (*B.W.I. Custom Kitchen, supra,* at pp. 1350-1351.) Thus, a plaintiff need not provide evidence of harm to direct purchasers above and beyond establishing "the existence of an unlawful conspiracy that had the effect of stabilizing, maintaining, or establishing product prices beyond competitive levels." (*In re Sugar Indus. Antitrust Litigation, supra,* at p. 347.)

Holding monopoly power, however, is not itself a violation of any antitrust provision. Whether particular practices engaged in to acquire, maintain or extend such power constitute violations must be evaluated under the rule of reason. (*Bert G. Gianelli Distrib. Co. v. Beck &*

*Co.* [1985-2 TRADE CASES ¶ 66,851] (1985) 172 Cal.App.3d 1020, 1047-1048; *Standard Oil Co. v. United States* (1910) 221 U.S. 1, 61-62.) Some practices that flow from the existence of monopoly power may benefit rather than harm consumers, so that injury may not be presumed simply from proof that the defendant engaged in the conduct in question. (*Standard Oil Co. v. United States, supra,* 221 U.S. at pp. 61-62.) Here, Microsoft makes exactly that contention: that the various practices that are challenged—such as preventing other products from being used with its operating systems and bundling its internet browser with its operating system—have been of great benefit to the public by enhancing product standardization and increasing the ease of computer use and internet access.

But while the presence of these additional issues in a monopolization case such as this may preclude any presumption of harm, as in a price-fixing case, the existence of these issues does not necessarily mean that common issues do not predominate. Without regard to the possibility that some of the relevant issues in this case may be conclusively determined by the final outcome in the Government's action against Microsoft, remaining issues concerning the legality of defendant's practices are issues common to all members of the classes plaintiffs seek to certify. As discussed in section C.1 above, the fundamental and predicate issues as to whether defendant violated the Cartwright Act are not differentiated among individual consumers. In this respect, the situation is no different from a case involving an alleged conspiracy that would constitute a *per se* violation of the statute.

If it should be determined that defendant's practices unlawfully elevated prices to direct purchasers of Microsoft's software, the complexities of the marketplace to which defendant refers will affect the ability to analyze whether, and the extent to which, these higher prices were passed on to consumers. However, once the existence of unlawfully inflated prices at the direct purchaser level has been established, the difficulties of determining whether the price increase was absorbed by those direct purchasers or passed on to successive purchasers in the chain of distribution are no greater in a monopolization case than in a *per se* price-fixing case. There is no ascertainable difference between the analysis of the impact of the abuse of a monopoly and of price fixing once the overcharge to direct purchasers has been established, and in response to the court's inquiry at oral argument Microsoft offered none. The starting point in both situations is artificially high prices set in an anticompetitive market. The same economic

---

[7] The parties acknowledge the distinction between the fact of harm or impact, on the one hand, and actual damages, on the other. "Fact of damage pertains to the existence of injury, as a predicate to liability; actual damages involve the quantum of injury, and relate to the appropriate measure of individual relief." (*B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at p. 1350, fn. 7 [citation omitted].)

models and analyses that have been accepted for purposes of tracing a supracompetitive price that results from a price fixing conspiracy are relevant and applicable to trace the pass-through resulting from monopoly abuse.

Unlike the conclusion reached by the Supreme Court in *Illinois Brick* and by the courts of some other states, the California courts have made clear that the difficulties in tracing the pass-through of artificially inflated prices do not nec-essarily create insuperable obstacles to classwide analysis and to class certification. "In certifying a plaintiff class, the courts have found it appro-priate to look past surface distinctions among the products purchased by class members or the marketing mechanisms involved when allega-tions of anticompetitive behavior embracing all of the various products and distribution pat-terns have been credibly pleaded. [Citation omitted.] Identical products, uniform prices, and unitary distribution patterns are not indis-pensable for class certification in this context." (*B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at p. 1350 [quoting *Shelter Realty Corp. v. Allied Maintenance Corp.* [1977-2 TRADE CASES ¶ 61,691] (S.D.N.Y. 1977) 75 F.R.D. 34, 37]; *Rosack, supra,* 131 Cal.App.3d at p. 757 [same].) "[C]ontentions of infinite diversity of product, marketing practices, and pricing have been made in numerous cases and rejected." (*Rosack, supra,* 131 Cal.App.3d at p. 755 [quot-ing *In re Folding Carton Antitrust Litigation* [1977-2 TRADE CASES ¶ 61,596] (N.D. Ill. 1977) 75 F.R.D. 727, 734].) "It should also be empha-sized that courts have applied these principles to markets, such as this one, characterized by individually negotiated prices, varying profit margins, and intense competition." (*B.W.I. Cus-tom Kitchen, supra,* at p. 1351.)

Nonetheless, defendant argues that the com-plexity and changing nature of the software markets over the past six years have been so great as to render classwide analysis "impossi-ble" in this case. (Opp. at p. 1.) Focusing almost exclusively on the market for operating systems software, defendant emphasizes that over the class period it marketed a progression of product "families"—from MS DOS to the most current Windows NT Workstation system. The variety of illegal practices in which defendant allegedly engaged necessarily affected the price defendant was able to and did charge at different times and for different products. If defendant engaged in predatory pricing, the price to some purchas-ers presumably would have been less than a competitively determined price, so that some class members may have benefited from the practice, rather than having been damaged by it. Because of the high level of competition among computer manufacturers ("original equipment manufacturers" or "OEMs"), each OEM that purchased software directly from

Microsoft made its own pricing decisions and therefore each may have absorbed rather than passed on a different portion of any excess in the price paid to Microsoft. Because the software represents only a small percentage of the cost of the computer, and because there are many other factors which may inhibit passing on price changes (such as "focal point" pricing and "menu costs"), whether, and the extent to which, any given OEM absorbed the excess will differ from case to case. The amount passed through by distributors or retailers purchasing from the OEMs, or purchasing directly from Microsoft, may also vary, so that the fact, much less the amount, of any overcharge reaching a consumer will be a function of so many vari-ables, defendant argues, that the impact of any violation cannot possibly be considered collec-tively. In the words of Microsoft's economist, Professor Jerry A. Hausman, "any analysis of whether an overcharge may have been passed on to an eventual final purchaser would require an evaluation of a large number of individual-spe-cific facts that essentially will amount to an individualized inquiry for each final purchaser." (Declaration of Jerry A. Hausman ("Hausman Decl.") ¶ 32.)

Such a broad statement proves too much. If true, it would invalidate the entire study of microeconomics. In his Findings of Fact, Judge Jackson concluded that Microsoft's conduct had "harmed consumers in ways that are immediate and discernible." (Findings of Fact ¶ 409.) To demonstrate that impact on consumers can be proven on a non-individualized and classwide basis, plaintiffs rely heavily on the expert opin-ion of Professor Jeffrey K. MacKie-Mason, an economist. Accepting the allegations in the Complaint and the Findings of Fact, and based upon his knowledge of the industry, Professor MacKie-Mason opined that plaintiffs could demonstrate common impact on the classes "by showing that, as a result of Microsoft's monop-oly power (derived from or maintained by the anticompetitive conduct alleged) consumers (1) were charged supra-competitive prices for [the relevant software] and (2) experienced less choice and innovation in [the relevant software markets] than they would have enjoyed in a competitive market." (Declaration of Jeffrey K. MacKie-Mason in Support of Plaintiffs' Re-newed Motion for Class Certification ("MacKie-Mason Decl.") ¶ 6(a), (c).) "When a monopolist sets prices above competitive levels to its dis-tributors, it generally results that all customers suffer harm." (Declaration of Jeffrey K. MacKie-Mason in Support of Plaintiffs' Reply re Renewed Motion for Class Certification ("MacKie-Mason Reply Decl.") ¶ 5.) Summariz-ing his conclusions, Professor MacKie-Mason stated:

**¶ 73,013**

As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly all of the overcharge will be passed through to ultimate consumers. . . . Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust law and economics as well."

(MacKie-Mason Reply Decl. ¶ 6.)

Professor MacKie-Mason described several recognized methods to estimate what Microsoft's prices to its direct purchasers would have been in a hypothetical "but for" world in which Microsoft had not engaged in the allegedly anticompetitive conduct. These include the use of "yardstick" prices based on the prices of products when the markets were more competitive or the prices of similar goods sold in more competitive markets; the comparative margin method (calculating the price at which Microsoft's margin on a product would equal the average margin of other software manufacturers); and constructing models of equilibrium in the relevant markets. (MacKie-Mason Decl. ¶¶ 28-36.) He further described two methods to measure the extent to which particular increased costs were passed on to final purchasers, both based on equilibrium models of distribution channels. (Mackie-Mason Decl. ¶¶ 38-40.)

Professor MacKie-Mason did not commit himself to the use of any one or more of these approaches, nor did he make the necessary calculations or attempt to prove that any of these methods ultimately will be able to support plaintiffs' burden of proof at trial. Nonetheless, his declarations contain a good bit more than a plea to "trust me," as the defendant would characterize his testimony. (Opp. at p. 3.)

In addition to proposing several methodologies shown to be widely accepted within the profession, plaintiffs submitted several published works by prominent economists and consumer groups that have conducted empirical analyses to demonstrate general harm to consumers as a result of Microsoft's conduct. (Hall, *Toward A Quantification of the Effects of Microsoft's Conduct* (2000) American Economic Review 90; Fisher & Rubinfeld, *United States v. Microsoft: An Economic Analysis* in Did Microsoft Harm Consumers? Two Opposing Views (AEI-Brookings Joint Center for Regulatory Studies 2000); Fisher & Rubinfeld, *Misconceptions, Misdirection, and Mistakes* in Did

Microsoft Harm Consumers? Two Opposing Views (AEI-Brookings Joint Center for Regulatory Studies 2000); Consumer Federation of America, Media Access Project, U.S. Public Interest Research Group, The Consumer Cost of the Microsoft Monopoly: $10 Billion of Overcharges and Counting (Jan. 1999).) Moreover, the opposing experts agree that equilibrium economic models can be used to calculate damages in antitrust cases. According to the defense expert, Professor Hausman:

> Economists have developed various theoretical models of competition in markets with limited numbers of sellers. These models are based on a series of strong simplifying assumptions. They can provide useful bases for suggestive theoretical analyses, but they do not provide reliable bases for calculating damages *unless carefully designed and calibrated to fit the actual conditions of the market in question.*

(Hausman Decl. ¶ 125 (emphasis added).)

Professor Hausman asserts that none of the methods proposed by Professor MacKie-Mason will work because none of them "accounts for the real world complexities of the products and the distribution chains at issue.", (Hausman Decl. ¶ 113.) However, the experts agree on the importance of product differentiation in reaching dependable conclusions (Hausman Decl. ¶ 126; MacKie-Mason Decl. ¶ 108.), but, not surprisingly, disagree over the extent to which Professor MacKie-Mason's anticipated models will reflect reality. (See, e.g., Hausman Decl. at pp. 43-52; MacKie-Mason Decl. at pp. 38-52.) The question at this stage is not whether plaintiffs will be able to carry their burden of proving that their experts' analyses are reliable, but whether it appears that the differences between the experts can be intelligently presented and evaluated within the framework of a class action. On a motion for class certification, it is inappropriate to resolve a "battle of the experts." (*In re Catfish Antitrust Litigation, supra,* 826 F.Supp. at p. 1042.) "Whether or not [plaintiff's expert] is correct in his assessment of common impact/injury is for the trier of fact to decide at the proper time. [Citations omitted.] For now, the court is persuaded that for the purposes of a class certification motion, plaintiffs have made [the required] threshold showing . . . ," (*Ibid.*) The court is similarly persuaded here.

It may be, as defendant has argued, that closer examination of the facts will disclose that not all class members were harmed by Microsoft's practices.[8] However, plaintiffs need not prove that each and every class member

---

[8] Some skepticism is warranted as to the extent to which defendant will be able to prove its assertion in this regard. Microsoft contends, for example, that its conduct benefited rather than harmed consumers because consumers received

Microsoft's Web browser, Internet Explorer, at "no charge." Judge Jackson found that Microsoft's practice of bundling its Web browser with Windows was designed to harm the ability of Netscape's Navigator Web browser to compete

**¶ 73,013**    ©2000, CCH INCORPORATED

Cited 2000-2 Trade Cases
*Microsoft I-V Cases*

paid a supracompetitive price for the relevant software products. As explained in *Rosack*, "[t]he courts have rejected the notion that each member of the purported class must prove that he or she absorbed at least some portion of the overcharges in order to establish liability. [Citations omitted] '[C]lass certification does not require that common questions be completely dispositive . . . as to all potential members of the class. [Citations omitted.] The fact that certain members of the class may not have been injured at all does not defeat class certification. [Citations omitted.]" (*Rosack, supra*, 131 Cal.App.3d at pp. 753-754.) Similarly, the *B.W.I. Custom Kitchen* court pointed out that "[e]ven if it were shown that certain class members escaped having to pay any of the overcharge . . . , the fact remains that in the vast majority of cases at least a portion of the illegal overcharge was passed on by the independent distributors to class members in the form of higher prices." (*B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1353.) Whether that is true in this case will depend upon an evaluation of the evidence at trial.

Defendant is correct that the multiple products embraced within each of the two proposed classes, the multiple distribution channels, and the extraordinary rate at which changes have occurred in the relevant markets over the six-year class period will complicate the analysis of the impact of any illegal practices in which Microsoft is found to have engaged. The trier of fact undoubtedly will be required to do more than make a single determination of whether any damages were incurred by the respective classes over the six-year period. However, plaintiffs advise that their evidence and expert studies will be presented in a manner that will permit, at a minimum, annual comparisons of prices paid by consumers for particular software products with the prices that would have prevailed in the hypothetical "but for" world in the absence of the unlawful practices. Moreover, since the relevant comparison is not between actual prices and prices in a perfectly competitive market, or even between actual prices and prices lawfully obtained in a monopoly market, plaintiffs' evidence will need to establish "the price increment caused by the anticompetitive conduct that originated or augmented the monopolist's control over the market." (*Berkey Photo, Inc. v. Eastman Kodak Co.* [1979-1 TRADE CASES ¶ 62,718] (2d Cir. 1979) 603 F.2d 263, 297.) The task is formidable, but not impossible. As the case proceeds towards trial, careful consideration will have to be given to the possibility of creating subclasses, bifurcating issues,

making special findings, or using other techniques that may facilitate the presentation and consideration of the relevant evidence. At this point, the court is not persuaded that a comprehensible analysis of these issues cannot be made within the context of properly managed trial proceedings.

**3. Calculation of Damages.**

Plaintiffs must also meet their burden of demonstrating that the amount of damages is susceptible to classwide proof. With respect to calculating damages once liability has been established, individual issues will not bar certification of a class. (*B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d at p. 1354; *Rosack, supra*, 131 Cal.App.3d at p. 761.) "[I]t has been recognized consistently that differences among potential class members concerning damages do not preclude class treatment so long as common questions regarding conspiracy and impact allegations predominate." (*Rosack, supra*, at p. 761.) Courts recognize a somewhat relaxed standard of proof once the antitrust violation and resulting injury have been proven. (*In re Catfish Antitrust Litigation, supra*, 826 F.Supp. at p. 1042.) This is the logical result of an inability to ascertain exactly what "plaintiff's position would have been in the absence of defendant's antitrust violation." (*Ibid.*) "Hence, the willingness to accept some uncertainty stems from a simple, equitable notion that the wrongdoer should not be allowed to profit by an insistence upon an unattainable standard of proof." (*Id.*, at pp. 1042-1043; *see also Bigelow v. RKO Radio Pictures, Inc.* [1946-1947 TRADE CASES ¶ 57,445] (1946) 327 U.S. 251, 264.)

The basic measure of damages for overcharges resulting from Microsoft's alleged anticompetitive conduct is the difference between the price paid by a class member for a particular product and the price that would have been paid absent the alleged anticompetitive conduct. (See *In re Catfish Antitrust Litigation, supra*, 826 F.Supp. at p. 1043; MacKie-Mason Decl. ¶ ¶ 25, 40.) To determine this amount, as discussed in section C.2 above, it is of course necessary to determine both the amount of the overcharge by Microsoft and the amount of such overcharge passed through to the consumer. Total classwide damages are the sum of the overcharges on all software programs sold to class members during the class period. (MacKie-Mason Decl. ¶ 40.)

Plaintiffs need not present a method to calculate each class member's damage individually. California courts permit calculation of damages in the aggregate for a class and do not require

_____

(Footnote Continued)

and caused harm to consumers. (Findings of Fact ¶ ¶ 143, 155-160, 166-168, 171-177; Conclusions of Law at pp. 38-40, 42-43.) Moreover, as Professor Mackie-Mason explained, the

effect of an overcharge is not cured by the marketing strategy: "buy three tires; get the fourth tire free." (MacKie-Mason Reply Decl. ¶ 23.)

summing all individual claims. (*Daar v. Yellow Cab Co., supra,* 67 Cal.2d at pp. 706, 714, 716; *Bruno v. Superior Court* (1981) 127 Cal.App.3d 120, 128-129 & fn. 4.) A reasonable basis for computing damages is permissible, even if it involves approximation or estimation. (*Suburban Mobile Homes, Inc. v. AMFAC Communities, Inc.* [1980-1 TRADE CASES ¶ 63,040] (1980) 101 Cal.App.3d 532, 545; *Bigelow, supra,* 327 U.S. at pp. 264-265.) Other courts in antitrust proceedings have found similar approaches to be sufficiently viable for purposes of class certification. (See, e.g., *In re Catfish Antitrust Litigation, supra,* 826 F.Supp. at p. 1043; *In re Domestic Air Transportation Antitrust Litigation* [1991-2 TRADE CASES ¶ 69,518] (N.D. Ga. 1991) 137 F.R.D. 677, 692; *In re Corrugated Container Antitrust Litigation* [1978-2 TRADE CASES ¶ 62,220] (S.D. Tex. 1978) 80 F.R.D. 244, 251.) Moreover, it is not necessary that plaintiffs demonstrate to a certainty that their proposed methods will succeed, and it would be improper for the court to make a determination as to the likely success of plaintiffs' proposed methods. (*In re Domestic Air Transportation Antitrust Litigation, supra,* at p. 693; *In re Flat Glass Antitrust Litigation, supra,* 191 F.R.D. at p. 487.)

The method of calculating the amount of any recovery that will be received by each class member and the method of distributing damages to class members are different questions altogether that need not be addressed at this point, and which the parties have not argued. Suffice it to say that there is no reason to presume that conventional techniques for notifying class members of their right to submit claims and for submitting and processing claims will not be feasible in this litigation. Nor is there any reason to assume that the amounts to which individual class members may be entitled will be insufficient to justify the effort and expense of a claim procedure. Moreover, as noted by plaintiffs, fluid class recovery is also a possibility. (*Bruno, supra,* 127 Cal.App.3d at p. 135; *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 119-120.) Should problems in calculating damages appear to outweigh the benefits of class treatment, the court may reconsider its certification order and vacate or amend the certification. (*B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at p. 1348 [citations omitted].)

**D. A Class Action Is a Superior Method of Adjudicating the Matter.**

Finally, plaintiffs must demonstrate that a class action would be of substantial benefit to the litigants and the court. (See *Blue Chip Stamps v. Superior Court* (1976) 18 Cal.3d 381, 385.) This requirement incorporates the superiority standard of Rule 23 of the Federal Rules of Civil Procedure. (*Schneider v. Vennard* (1986)

183 Cal.App.3d 1340, 1347.) The matters pertinent to this determination include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

(Fed. Rules Civ. Proc., Rule 23(b)(3); 28 U.S.C.) The various indirect purchaser claims filed in California against Microsoft already have been consolidated in this court, which is specifically called upon to utilize innovative methods to manage complex cases as part of the Judicial Council's Complex Civil Litigation pilot program. (See also *B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at p. 1355 [calling upon courts to adopt innovative methods for handling indirect purchaser class actions].)

This case involves a very large number of claimants with relatively small amounts at stake. Most consumers have little incentive to litigate independently since the costs of litigation undoubtedly would overwhelm their potential recovery. "The problems which arise in the management of a class action involving numerous small claims do not justify a judicial policy that would permit the defendant to retain the benefits of its wrongful conduct and to continue that conduct with impunity." (*Linder v. Thrifty Oil Co., supra,* 23 Cal.4th at p. 446.) Moreover, the potential recovery here is not so insignificant to warrant the assumption that individual consumers will not be motivated to claim any recovery to which they may be entitled, or that a favorable outcome would benefit only the attorneys involved. And, to the extent that purchasers of large quantities of Microsoft software should elect to pursue their individual claims, denying class treatment could result in repetitious litigation and inconsistent adjudication of similar issues and claims. (*Richmond v. Dart Indus., Inc., supra,* 29 Cal.3d at p. 469.) Under the circumstances, the superiority of a class action is apparent.

**CONCLUSION**

In keeping with the Supreme Court's mandate, this court must "avoid interpreting procedural requirements in such a way as 'would thwart the legislative intent . . . to retain the availability of indirect-purchaser suits as a viable and effective means of enforcing California's antitrust laws.'" (*B.W.I. Custom Kitchen, supra,* 191 Cal.App.3d at p. 1355 [quoting *Union Carbide Corp. v. Superior Court, supra,* 36 Cal.3d at p. 21].) The court finds that the proposed classes are ascertainable, that the classes are suffi-

**¶ 73,013**

©2000, CCH INCORPORATED

ciently numerous, that the named representatives' claims are typical of those of the classes and that the interests of the classes will be fairly and adequately represented. In addition, common questions of fact or law predominate and a class action is the superior method for adjudicating the matter. Accordingly, the two proposed classes will be certified, and the litigation will proceed as a class action. Counsel should confer concerning the method of giving notice to the classes and the content of the notice, and be prepared to discuss these issues at the status conference scheduled for October 4, 2000.

---

**[¶ 73,014]** Donald W. Nutting, an individual d/b/a Foothills Distributing Co. v. RAM Southwest, Inc., d/b/a Violets, and Ron Sheppeard.

U.S. District Court, District of Colorado. Civil Action No. 98-B-2360. Filed July 10, 2000. 2000 U.S. Dist. LEXIS 10081.

### Colorado Law

**Agreements Not to Compete—State Laws—Manufacturers and Distributors—Costumes.**—An agreement not to compete between a costume manufacturer and distributor was void as a matter of law since it was a naked restraint on competition that failed to protect a legally cognizable interest and, as such, was void against public policy under Colorado law. A costume manufacturer created certain vampire fangs and entered into an agreement not to compete with the distributor. The distributor subsequently created its own, similar product. The agreement did not fall under an exception to the Colorado law against agreements not to compete, since it was not a sale of a business or a trade secret.

See ¶ 1835.

**Agreements Not to Compete—State Laws—Reasonableness—Manufacturers and Distributors—Costumes.**—An agreement not to compete between a costume manufacturer and distributor was void as a matter of law since the scope of the restraint went beyond any protectable interest. A costume manufacturer created certain vampire fangs and entered into an agreement not to compete with the distributor. The distributor subsequently created its own, similar product. The restriction on the agreement not to compete was perpetual and no evidence was presented that such a restriction was necessary to protect the manufacturer or the product. The agreement was also vague in that it did not make clear what elements the distributor was prevented from using in the creation of his own product. Similarly, the geographic restriction was unduly broad, since it was a world-wide restriction.

See ¶ 1835.

For plaintiff: Brian D. Smith, Denver, Colo. For defendants: C. Michael Montgomery and Sharra L. Ikari of Montgomery, Kolodny, Amatuzio, Dusbabek & Parker, Denver, Colo., Kurt S. Lewis of Webb & Lewis, Denver, Colo., Paul Adams, Jeffrey D. Myers, and Rod D. Baker of Peacock, Myers & Adams, Albuquerque, N.M.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Ch. J.: Plaintiff, Donald Nutting ("Nutting"), asserts claims for direct infringement of United States Patent No. 5,547,381 (" '381 patent"), inducing infringement of the '381 patent, deceptive trade practices, and breach of a non-competition contract against Defendants, RAM Southwest, Inc. ("RAM") and Ron Sheppeard ("Sheppeard") (collectively "Defendants"). Defendants assert counterclaims for "interference with business and contractual relations" and "deceptive trade practices. Defendants move for summary judgment on Mr. Nutting's claim of breach of the noncompetition agreement. Mr. Nutting cross-moves for summary judgment on the Defendants' counterclaims. Oral argument would not aid my resolution of these matters. Having the benefit of the briefs to construe properly the claims in question, and for the following reasons,

I grant Defendants' motion for summary judgment as to the non-competition agreement, and grant Mr. Nutting's motion for summary judgement as to Defendants' counterclaims. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1338.

### I. Background

The following facts are undisputed. Mr. Nutting and Mr. Sheppeard sell and manufacture artificial vampire fangs. In 1994, the two met at a Halloween trade show where Mr. Nutting was demonstrating a new, longer fang product called "Custom Dracula Fangs." The Sheppeards (Mr. Sheppeard and his wife, co-owners and officers of RAM, doing business as Violet's Costumes) have manufactured and sold fangs since 1988. They developed an earlier product called "Original Fangtastics." Mr. Sheppeard and Mr. Nutting entered into a relationship whereby the Sheppeards would distribute Mr. Nutting's Cus-

**¶ 73,014**