**Tab 18**

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

TODD LETHBRIDGE,

    Plaintiff and Appellant,

    v.

JOHNSON & JOHNSON et al.,

    Defendants and Respondents.

B105754

(Super. Ct. No. BC113271)

COURT OF APPEAL - SECOND DIST.
FILED
NOV 1 0 1997

JOSEPh ⌐. ⌐ ⸳⸳⌐   Clerk

Deputy Clerk

    APPEAL from an order of the Superior Court of Los Angeles County, Bruce Mitchell, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Order reversed.

    Patrick F. Reynolds; Rabin & Peckel and I. Stephen Rabin, Mark W. Gaffney, Brian P. Murray; Jones, Day, Reavis & Pogue and Elwood Lui; Lynn, Stodghill, Melsheimer & Tillotson and Thomas Melscheimer, Jeffrey Tillotson, for Plaintiff and Appellant.

    Dykema & Gossett and D. Biard MacGuineas; Howrey & Simon and Thomas J. Nolan, Margaret M. Zwisler, Richard A. Ripley, Elizabeth B. McCallum; Jones Day Reavis & Pogue and Elwood Lui, for Defendants and Respondents.

# I.    INTRODUCTION

This appeal is from an order denying a motion for class certification.  The complaint alleges defendants, Johnson & Johnson Vision Products, Inc., doing business as Vistakon, Bausch & Lomb, Inc., and The American Optometric Association,[1] conspired to prevent certain retailers (e.g., mail order firms, retail pharmacies) other than eyecare professionals from selling disposable contact lenses; further, by foreclosing alternative channels of distribution, defendants restrained competition and caused consumers to pay artificially inflated prices for the products.[2]  Plaintiff, Todd Lethbridge, alleged violations of the Cartwright and the Unfair Competition Acts.  (Bus. & Prof. Code, §§ 16700 et seq., 17200 et seq.)  He sought to bring this action on behalf of California consumers of disposable contact lenses manufactured by Johnson & Johnson and Bausch & Lomb.  The trial court concluded questions of law or fact common to the class did not predominate over questions affecting the individual members.  Specifically, the court held both impact, fact of injury, and damages would require the litigation of complex, numerous, and substantial individual issues.  We reverse.  We find the trial court's ruling was based on improper criteria or erroneous legal assumptions.

---

[1]    The Contact Lens and Anterior Segment Society, another professional association, was also named as a defendant.  However, it sought protection in the bankruptcy courts and was never served.

[2]    The defendant manufacturers, Johnson & Johnson and Bausch & Lomb, do not sell contact lenses directly to the public.  They sell lenses to eyecare practitioners, chain optical stores, and authorized retail outlets with professionals on the premises.  They also sell to distributors who are contractually obligated to resell lenses only to eyecare professionals and authorized retail outlets.  However, some distributors and eyecare professionals divert lenses to unauthorized entities.  In other words, mail order companies and others obtain supplies of the manufacturers' disposable contact lenses on the "grey market."

## II.    DISCUSSION

### A.    Standard of Review

Our review of the order denying plaintiff's motion for class action certification is governed by the abuse of discretion standard. (*Richmond* v. *Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470; *Petherbridge* v. *Altadena Fed. Sav. & Loan Assn.* (1974) 37 Cal.App.3d 193, 199.) We must uphold the ruling on class certification if it is supported by substantial evidence, unless the trial court used improper criteria or made erroneous legal assumptions. (*Richmond* v. *Dart Industries, Inc., supra,* 29 Cal.3d at p. 470; *Petherbridge* v. *Altadena Fed. Sav. & Loan Assn., supra,* 37 Cal.App.3d at p. 199.) The Supreme Court has described the requisite standard of review as follows: "In reviewing the ruling of the trial court, we are guided by the principle that the showing required for certification of a class is within the trial court's discretion provided that correct criteria are employed. [Citation.]" (*Occidential Land, Inc.* v. *Superior Court* (1976) 18 Cal.3d 355, 361; *Petherbridge* v. *Altadena Fed. Sav. & Loan Assn., supra,* 37 Cal.App.3d at p. 199.) At another point the Supreme Court held: "For example, in the absence of other error, this court will not disturb a trial court ruling on class certification which is supported by substantial evidence unless (1) improper criteria were used (see *Occidental Land, Inc. v. Superior Court*[,*supra*] 18 Cal.3d [at p. 361]); or (2) erroneous legal assumptions were made (*Fletcher v. Security Pacific National Bank* (1979) 23 Cal.3d 442, 446 [])." (*Richmond v. Dart Industries, supra,* 29 Cal.3d at p. 470.)

B.    Class Certification Requirements

Class actions are authorized in California under Code of Civil Procedure section 382, which provides in relevant part: "[W]hen the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all." The Supreme Court has held: "The . . . statute is based upon the doctrine of virtual representation, which, as an exception to the general rule of compulsory joinder of all interested parties, 'rests upon considerations of necessity and paramount convenience, and was adopted to prevent a failure of justice.' [Citation.]" (*Weaver* v. *Pasadena Tournament of Roses* (1948) 32 Cal.2d 833, 837; *Daar* v. *Yellow Cab Co.*, (1967) 67 Cal.2d 695, 703.) The Supreme Court has held Code of Civil Procedure section 382 embodies two requirements: "(1) there must be an ascertainable class [citations]; and (2) there must be a well defined *community of interest* in the questions of law and fact involved affecting the parties to be represented [citations]." (*Id.* at p. 704, italics added; *Occidental Land, Inc.* v. *Superior Court, supra,* 18 Cal.3d at p. 360.) The Supreme Court has held: "The community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class. [Citation.]" (*Richmond* v. *Dart Industries, Inc., supra,* 29 Cal.3d at p. 470; *Silva* v. *Block* (1996) 49 Cal.App.4th 345, 351.) At issue in the present case is whether the trial court properly concluded that common questions of law or fact do not predominate over individual questions. In the absence of relevant California precedent,

we are required to follow the procedures proscribed by rule 23 of the Federal Rules of Civil Procedure (28 U.S.C.).[3]

---

[3]     Rule 23 of the Federal Rules of Civil Procedure (28 U.S.C.) states: "(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. [¶] (b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: [¶] (1) the prosecution of separate actions by or against individual members of the class would create a risk of [¶] (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or [¶] (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or [¶] (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or [¶] (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. [¶] (c) Determination by Order Whether Class Action to be Maintained; Notice; Judgment; Actions Conducted Partially as Class Actions. [¶] (1) As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits. [¶] (2) In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude the member from the class if the member so requests by a specified date; (B) the judgment, whether favorable or not, will include all

## C.    Showing Required in the Trial Court

The burden of establishing that the certification requirements are met falls on the party seeking to certify the class. (*Richmond* v. *Dart Industries, Inc., supra,* 29 Cal.3d at p. 470; *City of San Jose* v. *Superior Court* (1974) 12 Cal.3d 447, 460; *Vasquez* v. *Superior Court* (1971) 4 Cal.3d 800, 820.) A trial court must carefully weigh the benefits

---

members who do not request exclusion; and (C) any member who does not request exclusion may, if the member desires, enter an appearance through counsel. [¶] (3) The judgment in an action maintained as a class action under subdivision (b)(1) or (b)(2), whether or not favorable to the class, shall include and describe those whom the court finds to be members of the class. The judgment in an action maintained as a class action under subdivision (b)(3), whether or not favorable to the class, shall include and specify or describe those to whom the notice provided in subdivision (c)(2) was directed, and who have not requested exclusion, and whom the court finds to be members of the class. [¶] (4) When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly. [¶] (d) Orders in Conduct of Actions. In the conduct of actions to which this rule applies, the court may make appropriate orders: (1) determining the course of proceedings or prescribing measures to prevent undue repetition or complication in the presentation of evidence or argument; (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action; (3) imposing conditions on the representative parties or on intervenors; (4) requiring that the pleadings be amended to eliminate therefrom allegations as to representation of absent persons, and that the action proceed accordingly; (5) dealing with similar procedural matters. The orders may be combined with an order under Rule 16, and may be altered or amended as may be desirable from time to time. [¶] (e) Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."

6

and burdens and allow a class action to proceed only where there are substantial advantages both to the litigants and to the court. (*City of San Jose* v. *Superior Court, supra,* 12 Cal.3d at p. 459; *Vasquez* v. *Superior Court, supra,* 4 Cal.3d at p. 810.) However, the trial court, in ruling on a class certification request, is not to determine the merits of the case. (*Reyes* v. *Board of Supervisors* (1987) 196 Cal.App.3d 1263, 1271-1272; *Stephens* v. *Montgomery Ward* (1987) 193 Cal.App.3d 411, 418.) The court's inquiry is limited to whether the moving party has carried its burden of establishing the class certification requirements are met. (*Reyes* v. *Board of Supervisors, supra,* 196 Cal.App.3d at pp. 1271-1272.) The determination of the ultimate merits of the litigation is separate from the question of whether the class should be certified. (*Green* v. *Obledo* (1981) 29 Cal.3d 126, 145-146; *Danzig* v. *Jack Grynberg & Associates* (1984) 161 Cal.App.3d 1128, 1136.)

In the present case, plaintiff was not required to *prove* impact or damages in connection with his motion to certify the proposed class. (E.g. *Eisen* v. *Carlisle & Jacquelin* (1974) 417 U.S. 156, 177-178; *In re Catfish Antitrust Litigation* (N.D.Miss. 1993) 826 F.Supp. 1019, 1038-1039, & fn. 22; *In re Disposable Contact Lens Antitrust Litigation* (M.D.Fla. 1996) 170 F.R.D. 524, 528, 530; *In re Amerifirst Securities Litigation* (S.D.Fla. 1991) 139 F.R.D. 423, 427; *Shelter Realty Corp.* v. *Allied Maintenance Corp.* (S.D.N.Y. 1977) 75 F.R.D. 34, 37.) Rather, plaintiff's burden was to make a "threshold showing" that the conspiracy, if proven, would have had a common impact on members of the class. (*In re Catfish Antitrust Litigation, supra,* 826 F.Supp. at pp. 1041-1042; *In re Disposable Contact Lens Antitrust Litigation, supra,* 170 F.R.D. at p. 530.) Additionally, plaintiff had to propose a method for generalized proof of damages not "so insubstantial that it amounted to no method at all." (*In re Catfish Antitrust Litigation, supra,* 826 F.Supp. at p. 1042; *In re Potash Antitrust Litigation* (D.Minn. 1995) 159 F.R.D. 682, 697; *In re Industrial Gas Antitrust Litigation* (N.D.Ill. 1983) 100

7

F.R.D. 280, 306; see also *In re Domestic Air Transp.* (N.D.Ga. 1991) 137 F.R.D. 677, 692.)

### D.     Community of Interest

A community of interest exists for certification purposes when questions of law or fact common to the class are sufficiently important to permit their adjudication in a single action rather than multiple separate suits. (*Occidental Land, Inc.* v. *Superior Court, supra,* 18 Cal.3d at p. 360; *Daar* v. *Yellow Cab Co., supra,* 67 Cal.2d at p. 713.) Conversely, a class action cannot be maintained when questions requiring individual proof upon facts peculiar to each member's own case predominate. (*Id.* at pp. 706-708; *Weaver* v. *Pasadena Tournament of Roses, supra,* 32 Cal.2d at pp. 838-839.) The reason for this rule was identified and amplified upon by the Supreme Court in *City of San Jose* v. *Superior Court, supra,* 12 Cal.3d at pages 459-460 as follows: "Holding that a class action cannot be maintained where each member's right to recover depends on facts peculiar to his case, *Weaver* remains viable in this state. The rule exists because the community of interest requirement is not satisfied if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the 'class judgment' determining issues common to the purported class. ([*Weaver* v. *Pasadena Tournament of Roses, supra,*] 32 Cal.2d at pp. 838-840, 842-843.) [¶] This court has consistently recognized the continued validity of this rule. (See *Daar* v. *Yellow Cab Co., supra,* 67 Cal.2d 695, 704-705, 707-708; *Chance* v. *Superior Court* [(1962)] 58 Cal.2d 275, 285; *Vasquez* v. *Superior Court, supra,* 4 Cal.3d 800, 809, 811, 815-816; *Collins* v. *Rocha* [(1972)] 7 Cal.3d 232, 237-238.) Most significantly, in *Gerhard* v. *Stephens* (1968) 68 Cal.2d 864 [], this court, based on this rule, refused to certify a class suit, stating, "'Applicable precedents indicate that in observing the ascertainable class requirement they are at the same time giving recognition

8

to the principle that a group of individuals' rights to recover, each of which is based on a separate set of facts, cannot be determined by a judgment in a class action." [Citation.]' (68 Cal.2d at p. 912.)" It is this issue—whether damages issues were such that individual proof would be required—which is at the heart of this appeal.

The essential elements of plaintiff's claim, for certification purposes, are: (1) the existence of the conspiracy; (2) causing injury to the proposed class (impact); and (3) damages. There is no contention here that proof of the existence of the conspiracy was not a common question of law and fact. As noted above, the trial court concluded both impact and damages could be established only by litigating complex, numerous, and substantial fact questions peculiar to individual members of the class. We respectfully conclude the trial court's ruling was based on improper criteria or erroneous legal assumptions.

### 1.  Impact

#### a)  *Impact is separate and distinct from the issue of actual damages*

At the outset, it is important to note the distinction between impact (also called "fact of injury," "fact of damage," or "injury") and actual damages in the antitrust context. The Court of Appeal has held: "Court and commentators have taken great pains to point out that injury or 'fact of damage,' which must be proven on a class-wide basis, is separate and distinct from the issue of actual damages. As was pointed out in *Zenith Corp.* v. *Hazeltine* (1969) 395 U.S. 100, 114, fn. 9, . . . an antitrust plaintiff's 'burden of proving the fact of damage . . . is satisfied by its proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage.' [Citations.] 'Fact of damage pertains to the existence of injury, as a

9

predicate to liability; actual damages involve the quantum of injury, and relate to the appropriate measure of individual relief.' [Citation.] However, class treatment of fact of damage presumes the ability to prove the class as a whole was injured without becoming enmeshed in individual questions of actual damage. [Citation.]" (*B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* (1987) 191 Cal.App.3d 1341, 1350, fn. 7, original italics.)

> **b)    *Certification of a class is ordinarily appropriate so long as the existence of a conspiracy in violation of antitrust laws and impact can be established by common proof***

If the existence of a conspiracy in violation of antitrust laws and impact can be established by facts common to the class, certification is ordinarily justified; this is true regardless of whether the issue of actual damages presents an individualized inquiry. (*City of San Jose* v. *Superior Court, supra,* 12 Cal.3d at pp. 459-463.) The mere fact that class members engaged in separately consummated transactions for which each could seek independent relief does not preclude class certification. (*Daar* v. *Yellow Cab Co., supra,* 67 Cal.2d at p. 708, fn. 11.) As the Supreme Court explained in *Vasquez* v. *Superior Court, supra,* 4 Cal.3d at page 809: "The requirement of a community of interest does not depend upon an identical recovery, and the fact that each member of the class must prove [her or] his separate claim to a portion of any recovery by the class [i.e., individual damages] is only one factor to be considered in determining whether a class action is proper. The mere fact that separate transactions are involved does not of itself preclude a finding of the requisite community of interest so long as every member of the alleged class would not be required to litigate numerous and substantial questions to determine [her or] his individual right to recover [i.e., impact or fact of injury] subsequent to the rendering of any class judgment which determined in plaintiffs' favor whatever questions were common to the class."

### c)    *A presumption or inference of impact applies in this case*

Defendants argue: "[T]o establish impact [plaintiff] must show that the alleged conspiracy . . . caused the thousands of individual contact lens retailers in California, who were not part of the alleged conspiracy, to charge prices higher than they would have charged absent the conspiracy, and that the tens of thousands of individual contact lens consumers actually paid these supracompetitive prices." However, rules peculiar to antitrust litigation have developed in the decisional authority of this state as well as the federal courts. Significantly, for purposes of the present litigation, our courts have held that when a conspiracy to fix, raise, maintain, or stabilize prices at supracompetitive levels has been alleged and proven, a jury can presume or infer that the class members were damaged. (*B.W.I. Custom Kitchen* v. *Owens-Illinois, Inc., supra,* 191 Cal.App.3d at pp. 1350-1353; *Rosack* v. *Volvo of America Corp.* (1982) 131 Cal.App.3d 741, 753-754.) This inference eliminates the need for each class member to individually prove impact. (*Id.* at p. 753.)

In *Rosack* v. *Volvo of America Corp., supra,* 131 Cal.App.3d at page 745, the plaintiff bought an antitrust action against Volvo and moved to certify a class of purchasers of that brand of automobile. She alleged Volvo had "coerced its dealers into giving little or no discount from the 'Monroney' automobile sticker price, thus conspiring to artificially maintain the price of Volvo automobiles above free competitive levels" in violation of the Cartwright Act. (*Id.* at p. 746, fn. omitted.) The trial court denied the class certification motion on the ground, among others, that impact could not be shown on a common basis. (*Id.* at p. 747.) The Court of Appeal granted a writ of mandate directing the trial court to vacate its order denying class certification. (*Id.* at p. 763.) The court explained as follows: "Proof of fact of injury (impact) as a common issue has been far more troublesome to the courts than has proof of the violation. A dominant approach has

11

emerged as illustrated in the decision in *In re Master Key Antitrust Litigation* (D.Conn. 1975) 70 F.R.D. 23, appeal dismissed (2d Cir. 1975) 528 F.2d 5. The court addressed the requirements of section 4 of the Clayton Act and rule 23, Federal Rules of Civil Procedure, without unduly burdening parties seeking certification: '[i]f the plaintiffs introduce proof . . . *at the liability stage* that they bought master key systems and that the defendants engaged in a pervasive nationwide course of action that had the effect of stabilizing prices at supracompetitive levels, the jury may conclude that the defendants' conduct caused injury to each plaintiff.' [Citation.] [¶] 'Under this approach a jury can *infer* the fact of injury when a conspiracy to fix prices has been established and plaintiffs have established that they purchased the affected goods or services. This inference eliminates the need for each class member to prove individually the consequences of the defendants' actions to him or her. Accordingly, impact can be treated as a common question for certification purposes.' [Citation.] [¶] Other cases have used this approach, which we think is sound. [Citations.]" (*Id.* at p. 753, italics added and original.)

In *B.W.I. Custom Kitchen* v. *Owen-Illinois, Inc., supra,* 191 Cal.App.3d at pages 1345-1346 and footnote 1, an indirect purchaser of glass containers brought a class action alleging numerous corporate defendants had engaged in a conspiracy to set noncompetitive prices in violation of the Cartwright Act and the unfair competition statutes. The plaintiff, and the class he proposed to represent, had not purchased glass containers directly from the defendant manufacturers but from independent distributors. There was no allegation the independent distributors had conspired with the manufacturers. (*Ibid.*) The plaintiff sought to certify a class of California businesses which had purchased glass containers indirectly from the manufacturers at inflated prices due to the conspiracy. The trial court refused to certify the class. (*Id.* at p. 1345.) It found, inter alia, the plaintiff had failed to demonstrate that class-wide proof of impact was available to substantiate the claim class members had paid more for the glass containers than they would have paid in the absence of the conspiracy. (*Id.* at p. 1350.)

12

The Court of Appeal reversed. The court explained: "'[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.' [Citation.]" (*Id.* at p. 1348.) It held that "'once a plaintiff demonstrates the existence of an unlawful conspiracy that had the effect of stabilizing, maintaining or establishing product prices beyond competitive levels,'" impact would be presumed. (*Id.* at p. 1351.) The court's discussion was as follows: "Courts have shown no hesitancy in ruling that when a conspiracy to fix prices has been proven and plaintiffs have established they purchased the price-fixed goods or services, the jury can *infer* plaintiffs were damaged. As the court stated in *In re Sugar Industry Antitrust Litigation* [(E.D.Pa. 1976)] 73 F.R.D. [322,] 347: 'It has been held that impact will be presumed once a plaintiff demonstrates the existence of an unlawful conspiracy that had the effect of stabilizing, maintaining or establishing product prices beyond competitive levels. [Citations.]'" (*Id.* at pp. 1350-1351, original italics.)

Furthermore, to establish impact, plaintiff need not prove that *every* class member necessarily paid a supracompetitive price for disposable contact lenses. As the Court of Appeal explained in *Rosack* v. *Volvo of America Corp., supra,* 131 Cal.App.3d at pages 753-754: "The courts have rejected the notion that each member of the purported class must prove that he or she absorbed at least some portion of the overcharges in order to establish liability. [Citations.] '[C]lass certification does not require that common questions be completely dispositive . . . as to all potential members of the class. [Citation.]' [Citation.] The fact that certain members of the class may not have been injured at all does not defeat class certification. [Citations.]" Similarly, in *B.W.I. Custom Kitchen* v. *Owens-Illinois, Inc., supra,* 191 Cal.App.3d at pages 1352-1353, the court commented: "[C]ourts have assumed consumers were injured when they purchased products in an anticompetitive market, even though the price and terms of sale for the

13

price-fixed product are individually negotiated. [Citations.] Even if it were shown that certain class members escaped having to pay any of the overcharge . . . the fact remains that in the vast majority of cases at least a portion of the [manufacturers'] illegal overcharge was passed on by the independent distributors to class members in the form of higher prices. Consequently, we conclude that the issue of injury can be proven on a class-wide basis." (Fn. omitted.)

In the present case, plaintiff made a threshold showing of "'the existence of an unlawful conspiracy that had the effect of stabilizing, maintaining or establishing product prices beyond competitive levels[.]'" (*B.W.I. Custom Kitchen* v. *Owens-Illinois, Inc., supra,* 191 Cal.App.3d at p. 1351.) Plaintiff presented evidence the conspiracy arose in response to the growth of alternative channels of distribution of disposable contact lenses (particularly mail order houses and retail pharmacies) "that threatened to capture a large and growing share of the market for the distribution of replacement contact lenses . . . ." There is no contention here that proof of the existence of the conspiracy was not a common question of law and fact. With respect to its effect, there was evidence eyecare professionals had expressed serious concern about the sale of contact lenses by mail order suppliers and other retailers (e.g., Price Club) whose lower prices resulted in price shopping, profitability problems, and loss of patients. Eyecare professionals complained they were unable to remain profitable with respect to defendants' products if forced to compete with these lower price alternative suppliers. The purpose of the alleged conspiracy was to eliminate the competition between eyecare professionals and the excluded alternative sellers; this would allow eyecare professionals to continue to charge profitable prices for lenses free of competition from the alternative suppliers. In addition, defendants' efforts to prevent the diversion of disposable contact lenses to mail order companies and other unauthorized retailers caused alternative sellers to have problems obtaining inventory; the restricted supply caused them to increase their prices. The restricted supply also caused an increase in the price *charged to* the alternative sellers,

14

which elevated cost was passed on to consumers. Plaintiff presented the opinion testimony of an economist, Dr. Daniel J. Slottje. Dr. Slottje concluded restricting the level of supply to the alternative sources caused prices at the consumer level to rise overall. Dr. Slottje concluded that as a result of the conspiracy and as a matter of basic economic principle, "all of the members of the class . . . experienced increased prices in the relevant market due to the effects of reduced competition." This was a sufficient threshold showing, at the separate certification stage, that the alleged conspiracy had the effect of establishing, stabilizing, or maintaining supracompetitive prices.

Defendants contend the inference of impact allowed in price-fixing cases is inapplicable to this case. They assert the presumption of impact applies only in *some* price-fixing cases—where there is evidence of a fixed or base price from which all individual prices are derived. We disagree. Based on decisional authority, we discern no material distinction, for purposes of the presumption or inference of impact between the present lawsuit and pure price-fixing cases. Plaintiff claims defendants conspired to interfere with the competitive market for the sale of disposable contact lenses. The effect of the conspiracy was to establish, stabilize, or maintain prices above free market competitive levels. In other words, the alleged unlawful conspiracy caused the prices of disposable contact lenses to be higher than they would have been absent the conspiracy; consumers were forced to purchase disposable contact lenses in an anti-competitive market. The presumption of impact applies because plaintiff has made a threshold showing defendants conspired to artificially maintain the price of disposable contact lenses at supracompetitive levels. (*B.W.I. Custom Kitchen* v. *Owens-Illinois, Inc., supra,* 191 Cal.App.3d at p. 1351; *Rosack* v. *Volvo of America Corp., supra,* 131 Cal.App.3d at pp. 753-754.) Application of the presumption or inference is not dependent, as urged by defendants, on a showing a base or fixed price was set. That factor may tend to make the computation of actual damages easier, but is not an essential prerequisite to presumed or inferred impact. Further, that some consumers may not have in fact paid a higher cost

15

because they had insurance or were covered under a service agreement goes to the question of actual damages rather than impact. It is also of no moment that some eyecare professionals hide the true cost of the contact lenses by raising professional fees instead of the cost of the lenses. This too goes to the question of actual damage.

The defendants also assert "[t]he contact lens market is complex and highly competitive, with numerous variables affecting both the price charged by each retailer and each individual consumer's purchasing decision." They contend "a large and complicated array of variables affect[ed] whether contact lens retailers charged, and consumers paid, supracompetitive prices as a result of the conspiracy . . . ." In other words, according to defendants, certain market variations preclude any presumption or inference of impact. Defendants point to evidence of wide variations in prices charged by eyecare professionals for disposable contact lenses: some eyecare professionals charge different prices to different customers; factors affecting the price actually paid by consumers include varying profit margins, the availability of insurance, the existence of a service agreement, long-term customer discounts, and quantity discounts, as well as the practice of packaging of lenses with services (e.g., eye exams) or lens-related products (e.g., cleaning solutions) for a single fee. There was also evidence some practitioners created profit by charging higher professional fees while selling contact lenses at a lower than profitable cost. Defendants cite further to evidence of factors affecting consumers' purchasing decisions, including: convenience; price; proximity of eyecare professional or retail optical chain to home or work; and preference for seeing a medical doctor versus an optometrist or optician. Defendants relied on the testimony of an economist, Dr. Robert McLeod. Dr. McLeod concluded: "A detailed examination of the decision variables that affect each consumer's purchase of contact lenses and the economic variables that affect each [eyecare professional's] pricing decisions would be necessary to determine whether a consumer could have been affected by the . . . alleged conspiracy . . . ." Market complexity, however, is not a bar to class certification. Appellate courts have applied the

inference or presumption of impact to complex markets characterized by price variations, diverse marketing practices, differing supplier-customer relationships, varying profit margins, and intense competition. (E.g., *B.W.I. Custom Kitchen* v. *Owens-Illinois, Inc., supra,* 191 Cal.App.3d at p. 1351; *Rosack* v. *Volvo of America Corp., supra,* 131 Cal.App.3d at pp. 754-757; *In re Folding Carton Antitrust Litigation* (N.D.Ill. 1977) 75 F.R.D. 727, 734; *In re Sugar Industry Antitrust Litigation* (E.D.Pa. 1976) 73 F.R.D. 322, 344; *Philadelphia Electric Co.* v. *Anaconda American Brass Co.* (E.D.Pa. 1968) 43 F.R.D. 452, 457.) As explained in *Rosack* v. *Volvo of America Corp., supra,* 131 Cal.App.3d at page 757, quoting *Shelter Realty Corp.* v. *Allied Maintenance Corp., supra,* 75 F.R.D. at page 37: "'In certifying a plaintiff class, the courts have found it appropriate to look past surface distinctions among the products purchased by class members or the marketing mechanisms involved when allegations of anti-competitive behavior embracing all of the various products and distribution patterns have been credibly pleaded. [Citations.] Identical products, uniform prices, and unitary distribution patterns are not indispensable for class certification in this [antitrust] context.'" One court synthesized the relevant authority as follows: "Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that . . . the price range was affected generally." (*In re Nasdaq Market-Makers Antitrust Litigation* (S.D.N.Y. 1996) 169 F.R.D. 493, 523.) Further, the market variations to which defendants point relate primarily to the question of actual damages.

### 2.    Damages

With respect to damages, the central issue is whether plaintiff met his burden, on a class certification motion, of showing that actual damages could be established on a class-wide basis. We begin with that question for the following reason: at the hearing on the



class certification motion, plaintiff's counsel stated this action *would not proceed as a class action* unless the court found that, in addition to conspiracy and impact, *actual damages* could be shown by *classwide proof.* Plaintiff's counsel envisioned that classwide damages would be shown by generalized proof, after which individuals could come forward to prove their own claims.[4] Plaintiff relied on the testimony of an economist, Dr. Slottje, that regression analysis[5] could be used to determine damages classwide.[6] Dr. Slottje testified he had not performed such an analysis. He explained, however, the manner in which such an analysis would proceed and the data that would be necessary. Plaintiff argued the actual analysis should not be performed before the class was certified. Defendants presented the testimony of their own economist, Dr. McLeod. Dr. McLeod testified he had no background in performing the sort of regression analysis Dr. Slottje had proposed. Further, Dr. McLeod was not conversant with the particular technique Dr. Slottje had explained. Therefore, Dr. McLeod was unable to comment on its applicability in this case. Nevertheless, Dr. McLeod opined that a regression analysis would be "extremely difficult" in this case. The trial court was unconvinced the proposed methodology would work given the large number of variables affecting prices actually paid by consumers (e.g., insurance coverage, bundling of services and products by

---

4      Plaintiff apparently has no desire to proceed by requiring actual damages to be litigated separately by each class member. Plaintiff seeks a class judgment which encompasses damages. Individual class members could then file claims for part of the damages. We note that any remaining funds might be distributed by the method of fluid class recovery. (*State of California* v. *Levi-Strauss & Co.* (1986) 41 Cal.3d 460, 471-476; *Bruno* v. *Superior Court* (1981) 127 Cal.App.3d 120, 122-135.)

5      "Regression analysis is a statistical method that permits evaluation of a group of variables simultaneously. The method attempts to isolate the effects of various factors on a phenomenon, and analyze their relationships." (*Tim Torres Enterprises, Inc.* v. *Linscott* (Wis. App. 1987) 416 N.W.2d 670, 676, fn. 5.)

6      In a declaration filed in the trial court, Dr. Slottje proposed other methods for classwide damage determination. However, on appeal, plaintiff limits his argument to the proposed regression analysis.

eyecare providers, providers increasing professional fees to absorb, in part, the cost of lenses).

To the extent the parties' economists' opinions were conflicting, and given the trial court's conclusion a regression analysis would likely fail, we must consider whether plaintiff's ability to show classwide damages was properly resolved at this juncture. In other words, was it appropriate to resolve the so-called "battle of the experts" as to the feasibility of the regression analysis on a motion for class certification? Further, did plaintiff meet his burden by proposing an economic model for the determination of classwide damages without attempting to "plug in" relevant data (some of which was not yet available)?

We have not found any decisional authority in this state discussing conflicting expert opinions in the context of a class certification request. There is authority from other jurisdictions, however, to the effect that a "battle of the experts" should *not* be resolved on a motion for class certification; the question, rather, is whether the moving party has made a "threshold showing" of predominant common questions of law or fact. (*In re Catfish Antitrust Litigation, supra,* 826 F.Supp. at pp. 1038, 1042 [whether expert was correct in assessment of common impact was for the trier of fact to decide at the proper time; plaintiffs made a threshold showing of common impact]; *In re Disposable Contact Lens Antitrust Litigation, supra,* 170 F.R.D. at pp. 531-532 [where parties' experts disagreed as to common impact, question was for jury to resolve; plaintiffs demonstrated "at least a 'colorable method' of proving impact at trial"]; *In re Indus. Diamonds Antitrust Litigation* (S.D.N.Y. 1996) 167 F.R.D. 374, 384 [it is for jury to resolve conflicting expert opinions]; *In re Potash Antitrust Litigation, supra,* 159 F.R.D. at p. 697 [certification stage not the proper forum in which to resolve "'battle of the experts'" concerning assessment of common impact; question is for trier of fact to decide; plaintiffs made a threshold showing impact could be established by generalized proof].) In the present case, the trial court was arguably presented with conflicting expert opinions

19

on whether regression analysis could be used to establish actual damages on a generalized basis. We conclude it was premature to resolve that debate at the certification stage.

The question remains, did plaintiff make a sufficient showing, for certification purposes, that actual damages could be determined on a classwide basis. Existing California decisional authority does not clearly set forth the level of showing required as to classwide proof on a motion for class certification. However, federal decisional authority holds, "The preliminary inquiry is whether or not the proposed methods [for measuring damages] are so insubstantial that they amount to no method at all. [Citation.]" (*In re Catfish Antitrust Litigation, supra,* 826 F.Supp. at p. 1042; *In re Potash Antitrust Litigation, supra,* 159 F.R.D. at p. 697; *In re Industrial Gas Antitrust Litigation, supra,* 100 F.R.D. at p. 306; *In re Domestic Air Transp., supra,* 137 F.R.D. at pp. 692-693 [plaintiffs' burden is to present "a likely method for determining class damages"; absence of a "formulaic measure" for calculation of damages not sufficient to deny class certification].) It need not be shown at the certification stage that the proposed method "will work with certainty." (*In re Domestic Air Transp., supra,* 137 F.R.D. at p. 693.) In addition, our courts have held that when the existence of an antitrust conspiracy, and impact, can be established by common proof, problems with regard to computation of damage are not fatal to class certification. (*B.W.I. Custom Kitchen* v. *Owens-Illinois, Inc., supra,* 191 Cal.App.3d at p. 1353; *Rosack* v. *Volvo of America Corp., supra,* 131 Cal.App.3d at pp. 762-763.) Questions as to the precise method of damage computation can be deferred to a later stage of the litigation. (*Ibid.; In re Nasdaq Market-Makers Antitrust Litigation, supra,* 169 F.R.D. at p. 522.)

We conclude plaintiff made a threshold showing of a likely method for determining actual damages on a classwide basis. Dr. Slottje's testimony exceeded a mere unexplained assurance he could compute classwide damages. (*In re Domestic Air Transp., supra,* 137 F.R.D. at pp. 692-693.) Defendants did not substantiate their criticism of the proposed method. (*Lumco Industries, Inc.* v. *Jeld-Wen, Inc.* (E.D.Pa.

1997) 171 F.R.D. 168, 174 [plaintiffs' witness proposed to calculate damages using a regressional analysis; defendants failed to substantiate their criticisms of plaintiffs' proposed methodology].)  That defendants disagree with Dr. Slottje's proposed methodology and conclusions is not reason to deny class certification.  (*In re Nasdaq Market-Makers Antitrust Litigation, supra,* 169 F.R.D. at p. 522.)  Further, regression analysis is an accepted methodology for the calculation of class-wide damages as evidenced by its acceptance in other antitrust class actions. (E.g., *Lumco Industries, Inc.* v. *Jeld-Wen, Inc., supra,* 171 F.R.D. at p. 174.)  Dr. Slottje's failure to have implemented the regression analysis at this stage of the proceedings was not fatal to plaintiff's certification motion.  (*In re Domestic Air Transp., supra,* 137 F.R.D. at pp. 692-693.)  Courts have recognized that the precise method or formula by which actual damages will be shown is better determined after liability has been established.  (*B.W.I. Custom Kitchen* v. *Owens-Illinois , Inc., supra,* 191 Cal.App.3d at p. 1353; *Rosack* v. *Volvo of America Corp., supra,* 131 Cal.App.3d at pp. 762-763; *In re Sugar Industry Antitrust Litigation, supra,* 73 F.R.D. at p. 355.)  This is not to say that the court cannot decide, at some later point, that actual damages are not susceptible to classwide proof.  Decertification remains a possibility.  (*Occidental Land, Inc.* v. *Superior Court, supra,* 18 Cal.3d at p. 360; *Vasquez* v. *Superior Court, supra,* 4 Cal.3d at p. 821.)  Moreover, the question of manageability of proof remains.

### E.    Superiority

Defendants have asked this court to find, in the first instance, certification in the present case would not be superior to other available methods for the fair and efficient adjudication of this controversy in that the state class action would duplicate an action brought by the Attorney General of the State of California in federal court. (State of California v. American Optometric Association (E.D.N.Y., Dec. 19, 1996, 96-CV-



6200).)[7]  The superiority criterion is found in Federal Rules of Civil Procedure, rule 23(b)(3) (28 U.S.C.) (rule 23(b)(3)).  Under rule 23(b)(3), a court considering certification of a class action must find the "class action is superior to other available methods for the fair and efficient adjudication of the controversy." Further, "[t]he matters pertinent to the findings include: . . . (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; . . . ." (*Ibid.*) The rule 23(b)(3) superiority criterion is applied in determining whether to certify a class action in this state's courts. (E.g., *Dean Witter Reynolds, Inc.* v. *Superior Court* (1989) 211 Cal.App.3d 758, 773; *Schneider* v. *Vennard* (1986) 183 Cal.App.3d 1340, 1345-1350; *Lazar* v. *Hertz Corp.* (1983) 143 Cal.App.3d 128, 144; *Rosack* v. *Volvo of America Corp., supra,* 131 Cal.App.3d at pp. 760-763.) The Court of Appeal has observed further: "The [rule 23(b)(3)] superiority criterion is manifest in the determination that a class action brought under Code of Civil Procedure section 382 would produce 'substantial benefits' to the litigants and the judicial system. [Citations.]" (*Schneider* v. *Vennard, supra,* 183 Cal.App.3d at p. 1347.)

We decline to consider the superiority issue in the first instance. The federal complaint had not yet been filed when the trial court ruled on plaintiff's certification request. The trial court has had no opportunity to exercise its discretion with respect to the superiority question as applied to this case. On remand, given the considerable flexibility available to the trial court in terms of class action determination, defendants may pursue this issue if they so choose. (*Occidental Land, Inc.* v. *Superior Court, supra,* 18 Cal.3d at p. 360; *Vasquez* v. *Superior Court, supra,* 4 Cal.3d at p. 821; *Clothesrigger, Inc.* v. *GTE Corp.* (1987) 191 Cal.App.3d 605, 618.)

---

7    Defendants' motion for judicial notice of the complaint filed in the federal action is granted. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)



We note, however, the existence of extensive, highly pertinent, and persuasive decisional authority to the effect that when a class is adequately represented in another action, including one filed by an attorney general, an action such as the present litigation is unwarranted. In *Schneider* v. *Vennard, supra,* 183 Cal.App.3d at pages 1345-1350, the Court of Appeal for the Sixth District affirmed an order denying class certification because two federal actions between the same parties and for the same cause were already pending. The court concluded the trial court's refusal to certify the class was not an abuse of discretion. (*Id.* at p. 1350.) In *Commonwealth of Pennsylvania* v. *Budget Fuel Co., Inc.* (E.D.Pa. 1988) 122 F.R.D. 184, 185-186, the district court held a parens patriae action brought by the Pennsylvania Attorney General under section 4c of the Clayton Act (15 U.S.C. § 15c) was superior to a private class action. Both suits alleged a price-fixing conspiracy in violation of section 1 of the Sherman Act (15 U.S.C. § 1). All of the defendants named in the private lawsuit were also named in the parens patriae action. The court concluded, as a practical matter, there was no reason to allow a class action brought by private parties when the aggrieved plaintiffs' interests were adequately represented by the attorney general. (*Id.* at p. 186.) The court emphasized: "By striking [the private party's] class action allegations, the court is not stating that *parens patriae* actions were intended to supplant the private class action in antitrust damage cases. All the court is stating is that in the situation where a state attorney general and a private class representative seek to represent the same class members, the *parens patriae* action is superior to that of a private class action." (*Id.* at p. 186.) (Accord, *Becker* v. *Schenley Industries, Inc.* (2d Cir. 1977) 557 F.2d 346, 347-348 [where plaintiffs declined to intervene in pending class action, allowing suit to proceed as class action would be duplicative and inconsistent with the objectives of Rule 23(b)(3)]; *Mitchell* v. *Texas Gulf Sulphur Company* (10th Cir. 1971) 446 F.2d 90, 107 [two class actions already pending]; *United States* v. *City of Chicago* (N.D.Ill. 1976) 411 F.Supp. 218, 243, rev. in part on other grounds (7th Cir. 1977) 549 F.2d 415, 442 [representation by government was

superior to private class action]; *Barcelo* v. *Brown* (D.P.R. 1978) 78 F.R.D. 531, 534 [in view of presence of Commonwealth plaintiffs in action, class action would not be superior]; *Barkal* v. *Chas, Pfizer & Co., Inc.* (S.D.N.Y. 1970) 51 F.R.D. 504, 504-505 [where state attorney general had settled antitrust action against same defendants, resident of state would not be permitted to bring class action]; cf. *Dean Witter Reynolds, Inc.* v. *Superior Court, supra,* 211 Cal.App.3d at p. 773 [class treatment not superior to individual action under unfair competition statutes].) Nonetheless, we leave the issue of whether to decertify the present class based on the new federal litigation in the good hands of the trial court in the first instance.

## III.    DISPOSITION

The order denying the motion of plaintiff, Todd Lethbridge, for class certification is reversed. Plaintiff is to recover his costs on appeal, jointly and severally, from defendants, Johnson & Johnson Vision Products, Inc., Bausch & Lomb, Inc., and The American Optometric Association.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P.J.

I concur:

ARANDA, J. *

---

* Assigned by the Chairperson of the Judicial Council.

Grignon, J., Dissenting.

In this case, the trial court concluded questions of law or fact common to the class did not predominate over questions affecting individual members. The trial court found that both the fact of injury and the amount of damages would require litigation of numerous and substantial individual issues. Because I conclude the trial court did not abuse its discretion, I would affirm the order denying the motion for class certification.

"Trial courts have great discretion with regard to class certification [citation] and we will not disturb an order denying certification where the plaintiff has failed to establish (1) the existence of an ascertainable class *and* (2) a well-defined community of interest among the class members. [Citations.] To establish the required 'community of interest,' the plaintiff must show (1) predominant common questions of law or fact; (2) class representatives with claims typical of the class; and (3) class representatives who can adequately represent the class. [Citations.] Stated differently, a trial court's determination that the plaintiff has failed to establish the requisite ascertainable class or the requisite community of interest terminates the inquiry against the plaintiff." (*Linder* v. *Thrifty Oil Co.* (September 24, 1997, B106507) ___ Cal.App.4th ___, ___ [97 Daily Journal D.A.R. 13093].) The burden of establishing the certification requirements is on the plaintiff. (*Richmond* v. *Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470.)

The plaintiff must show that both the fact of damage or injury (impact) as well as the amount of damages may be proven on a class-wide basis. (*B.W.I. Custom Kitchen* v. *Owens-Illinois, Inc.* (1987) 191 Cal.App.3d 1341, 1350.) The plaintiff must demonstrate the ability to prove that the class as a whole was injured. (*Id.* at fn. 7.) A presumption of class-wide impact arises where the defendants have engaged in a conspiracy to fix prices at a supracompetitive level. (*Id.* at pp. 1350-1353.) In order for a presumption to arise, the plaintiff must demonstrate the existence of a conspiracy which has the effect of fixing prices at a supracompetitive level. (*Id.* at pp. 1350-1351.) A price-fixing conspiracy giving rise to the presumption of impact may arise, for example, where an automobile



manufacturer coerces its dealers into giving to consumers little or no discount from the sticker price (*Rosack* v. *Volvo of America Corp.* (1982) 131 Cal.App.3d 741, 746, 753), or imposes illegal overcharges on its sales to distributors (*B.W.I. Custom Kitchen* v. *Owens-Illinois, Inc.*, *supra*, 191 Cal.App.3d at p. 1353). It is only price-fixing which gives rise to the presumption of impact. (*Rosack* v. *Volvo of America Corp.*, *supra*, 131 Cal.App.3d at p. 757.) Other types of anticompetitive behavior do not give rise to the presumption. (*Ibid.*; *Holland* v. *Goodyear Tire & Rubber Co.* (N.D.Ohio 1975) 75 F.R.D. 743, 749 [monopoly].)

In addition to demonstrating generalized impact, the plaintiff must propose a substantial method for generalized proof of damages. (*In re Catfish Antitrust Litigation* (N.D.Miss. 1993) 826 F.Supp. 1019, 1039.)

Although class actions are accorded general support in California, it is recognized that class actions are accompanied by the danger of injustice and serve beneficial purposes only in limited situations. (*Dean Witter Reynolds, Inc.* v. *Superior Court* (1989) 211 Cal.App.3d 758, 772.) Trial courts must "carefully weigh respective benefits and burdens and [] allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." (*City of San Jose* v. *Superior Court* (1974) 12 Cal.3d 447, 459.) Class actions should be prevented where they are not beneficial. (*Ibid.*) A class action confers substantial benefits only when it is "'superior to other available methods for the fair and efficient adjudication of the controversy.'" (*Dean Witter Reynolds, Inc.* v. *Superior Court*, *supra*, 211 Cal.App.3d at p. 773.) "To determine whether the class mechanism confers a substantial benefit and whether it is superior to other forms of adjudication, the [trial] court must necessarily consider the merits of the plaintiff's claim . . . ." (*Linder* v. *Thrifty Oil Co.*, *supra*, ___ Cal.App.4th at p. ___.) The trial court may not, however, engage in speculation or resolve disputed facts. (*Ibid.*)

In this case, the relevant facts are not in dispute. Defendants began the manufacture of soft disposable contact lenses in 1988. Defendants' lenses are distributed

to eyecare professionals (ophthalmologists, optometrists, and opticians), chain optical stores, mass merchandisers with eyecare professionals on premises and wholesalers. Defendants do not distribute their contact lenses to mass merchandisers without eyecare professionals on premises or to mail order retailers. Wholesalers are not permitted to distribute defendants' contact lenses to mass merchandisers without eyecare professionals on premises or to mail order retailers. Nevertheless, these excluded mass merchandisers and mail order retailers obtain defendants' soft contact lenses on the gray market.

Plaintiff alleges that, beginning in 1989, defendants conspired with eyecare professionals through their professional associations to prevent mass merchandisers without eyecare professionals on premises and mail order retailers from obtaining defendants' contact lenses. The purpose of this conspiracy was to restrict the supply of defendants' contact lenses available to these non-eyecare professional retailers. Plaintiff alleges that this restriction of supply artificially inflated the price of defendants' contact lenses to all consumers.

Unfortunately, in support of his motion for class certification, plaintiff presented no evidence that the price of defendants' contact lenses had been artificially inflated by this alleged marketing conspiracy: No evidence was presented that the market price after the conspiracy was higher than before the conspiracy. No evidence was presented that the excluded retailers' supply was less than their available market. No evidence was presented that the excluded retailers paid more on the gray market than they would if permitted to purchase directly from the manufacturers. No evidence was presented that the excluded retailers would sell at a lower price than the other retailers. In fact, the evidence demonstrated a wide variance in the price of a six-pack of disposable contact lenses, e.g., eyecare professionals $13 to $150; retail optical chains $19 to $35; mail order retailers $20 to $39.37.

Plaintiff asserts he is entitled to a presumption of impact or fact of damage because he has established a conspiracy to exclude non-eyecare professionals from the chain of

3



distribution. Plaintiff concedes that he has not established a price-fixing scheme, but rather the anticompetitive behavior commonly referred to as a group boycott.[1] Plaintiff is not entitled to a presumption of impact under these circumstances. When a manufacturer acts to fix prices at a supracompetitive level, it may legitimately be presumed that this price fixing will impact generally all consumers of the manufacturer's product. The same presumption does not flow from other anticompetitive behavior. Even a monopolist may not charge excess prices to the consumer. Here, there are over 10,000 eyecare professionals in the state and thus ample competition. It cannot be presumed that the exclusion of two types of distributors from the chain of distribution leads to the inference that all retail prices must therefore be higher. This conclusion must be established by evidence. To accept the applicability of a presumption of impact in this case would in effect require the certification of a class in every case in which a conspiracy to restrain trade was charged.

As noted previously, plaintiff presented no substantial evidence of generalized impact. In essence, plaintiff asked the trial court to presume that the excluded retailers would sell at a cheaper price and, if they were included in the direct chain of distribution, would sell more disposable contact lenses to consumers. Plaintiff also asked the trial court to presume that the increased competition from the excluded retailers would cause all retailers to lower their prices. The trial court was certainly not required to engage in this speculation.

Plaintiff contends that he presented substantial evidence via the expert opinion of Dr. Slottje. I am not persuaded by this contention. Dr. Slottje merely clothed

---

[1]    Defendants agree that the alleged conspiracy is not one to fix prices, but disagree that the conspiracy can be characterized as a group boycott. Rather, defendants characterize the alleged conspiracy as a nonprice vertical restraint, which may not be unlawful. Indeed, a manufacturer of a medical device might legitimately conclude that it is in the best interest of the consumer to distribute the medical device only through health care professionals.



impermissible presumption, inference and speculation in the guise of an expert opinion. His opinion is based on no empirical evidence. He merely states that if a low cost distributor such as a mail order retailer is excluded from the chain of distribution, it is self-evident that such an exclusion will impact the price of the product to all consumers. He then opines that the amount of the impact may be determined by the use of regression analysis. This formula to calculate the amount of damages does not cure the failure to establish a general impact in the first instance.

Moreover, even if the trial court were to conclude that the excluded retailers might sell at a cheaper price if they were included in the direct chain of distribution, plaintiff was still required to establish that the effect of the conspiracy would have a common impact on all or most consumers. This plaintiff wholly failed to do. The trial court concluded that the variables involved were so complex that no common impact could be determined. This conclusion is supported by substantial evidence.

There are 10,000 eyecare professionals in the state. The pricing of disposable contact lenses by these eyecare professionals is dependent on numerous factors including: competition with other eyecare professionals, the nature of the professional's practice, service to the customer, customer loyalty, insurance, service plans and discounts. Moreover, the sale of disposable contact lenses is frequently packaged or bundled with other products or services. Thus, the lowest ($13) and highest ($150) prices for six-packs of disposable contact lenses were found at eyecare professional practices. In addition, there are a multitude of factors affecting a customer's decision to purchase disposable contact lenses from a particular retailer. Those factors include: a desire to purchase from an eyecare professional, the bundling of examination with the purchase, convenience, loyalty, price and the availability of insurance and service plans.

It is apparent from the foregoing that plaintiff has not established a community of interest among the purchasers of disposable contact lenses within the state. Thus, the trial court did not err in denying the motion for class certification. Nor did the trial court base

5

its decision on any improper criteria or erroneous legal assumptions. A presumption of impact did not arise in this non-price-fixing conspiracy. No substantial evidence was presented by plaintiff to establish impact. Dr. Slottje's opinion does not constitute substantial evidence. Theoretical discussions concerning the applicability of regression analysis in determining the amount of damages does not constitute substantial evidence of impact.

I would affirm.

NOT TO BE PUBLISHED.


GRIGNON, J.

**Tab 19**

Cited 1998-1 Trade Cases
*Aguilar v. Atlantic Richfield Corp.*

[¶ 72,080]   Theresa Aguilar, Tamara Keller, Adam Raps and Fred H. Chavez, individuals, on behalf of themselves and all others similarly situated v. Atlantic Richfield Corp., Chevron Corp., Exxon Corp., Mobil Oil Corp., Shell Oil Co., Texaco, Inc., Tosco Corp., Ultramar Corp., Unocal Corp., and Does 1 through 40, inclusive.

California Superior Court, San Diego County. Case No. 700810. Dated May 1, 1997.

### California Cartwright Act

Class Actions—Certification—Gasoline.—A class consisting of all California motorists who purchased California Air Resources Board (CARB) phase 2 gasoline in connection with a price fixing case against nine gasoline refineries was well suited for class action certification. The class was ascertainable, common issues of fact and law on the question of conspiracy predominated, and the interests and claims of the named plaintiffs were similar to those of class members. There existed economic disincentives for California motorists to bring individual actions for themselves.

See ¶ 9410.05.

For parties: Timothy D. Cohelan and Isam C. Khoury of Cohelan & Khoury, Daniel J. Mogin and Angela Milea Mogin of The Mogin Law Firm, Patrick J. Sullivan of Sullivan, Hill, Lewin, Rez, Engel & LaBazzo, and Peter H. Benzian, John J. Lyons and James W. Baker of Latham & Watkins, San Diego, Cal., Robert A. Mittelstaedt and Caroline Mitchell of Pillsbury, Madison & Sutro, San Francisco, Cal., Barbara A. Reeves, Don A. Hernandez and David R. Boyko of Fried, Frank, Harris, Shriver & Jacobson, Ronald L. Olson, Bradley S. Phillips and William D. Temko of Munger, Tolles & Olson, Charles H. Samel and John S. Schuster of Howrey & Simon, Los Angeles, Cal., Alan M. Grimaldi, Paul N. Zolfagari and Daniel E. Brannen, Jr., of Howrey & Simon, Washington, D.C., Maxwell M. Blecher, Harold R. Collins, Jr., and William C. Hsu of Blecher & Collins, Los Angeles, Cal., Ernest I. Reveal III and Holly A.H. Williams of Robins, Kaplan, Miller & Ciresi, Costa Mesa, Cal., Ronald C. Fedcay, John J. Kralik, Susan C. Wright and Richard C. Morse, Los Angeles, Cal., Paul R. Truebenbach, San Francisco, Cal., Kelly H. Scoffield and Robert Harrison, Houston, Tex., Raymond V. McCord, Los Angeles, Cal., Robert E. Fuller, Universal City, Cal., Timothy R. Thomas and W. Thomas Skok, Costa Mesa, Cal.

### ORDER GRANTING MOTION FOR MOTION FOR CLASS CERTIFICATION

MILLER, J.: On March 25, 1997, the motion of plaintiffs for class certification was heard in Department 49 of this court, The Honorable Jeffrey T. Miller presiding. After carefully considering the file in this action, all pleadings concerning the motion, and the oral argument of counsel, the Court rules as follows:

Initially, the Court advises it has neither read nor considered the declarations of Noll, Seffler, and Bloom, originally submitted with plaintiffs' rebuttal papers, pursuant to the voluntary withdrawal of these declarations by plaintiffs' counsel. (Tr. of Oral Argument, pp. 6-8.)

This is an action brought by plaintiffs Theresa Aguilar, etc.. Plaintiffs purport to be representatives of a class consisting of all California motorists who purchased any grade or type of reformulated or California Air Resources Board ("CARB") Phase 2 gasoline (hereafter "Carb Gas") from March 1, 1996. Defendants are nine major refiners, distributors and retailers of Carb Gas.

Plaintiffs' First Amended Complaint sets forth causes of action for violations of the California Cartwright Act (Bus. & Prof. Code § 16720, *et seq.*) and the California Unfair Competition Act (Bus. & Prof. Code § 17200, *et seq.*). Plaintiffs, in this motion, submit this is a case well suited for class treatment as "[t]his class is ascertainable, a well-defined community of interest exists and common issues of fact and law predominate." Defendants, on the other hand, contend common questions of law and fact do not predominate over individual issues. Specifically, defendants assert neither impact nor damages can be proven on a classwide basis as each class member would have to prove individual damage. Further, defendants contend, the inherent pricing complexities of the gasoline industry from the refinery to the retail station, create a maze of conditions which renders individual retail purchaser impact impossible.

Defendants also assert in their pleadings and at oral argument (Tr. of Oral Argument, pp. 18-22) plaintiffs must bear a threshold evidentiary burden of establishing a realistic chance of ultimate success on the merits. In that regard, defendants cite to the existence of three federal governmental agency studies into the price spike of 1996 which have been concluded without civil or criminal prosecution. (Tr. Oral Argument, pp. 22-23.) Defendants suggest this Court should not "take on [the] burden ..." of this purported class action in light of the extensive governmental analysis into the issue. (Tr. Oral Argument, pp. 25-26.)

For the reasons stated below, the Court finds this case is appropriate for class treatment and grants the motion for class certification.

### DISCUSSION

The beginning of the inquiry into class certification in this case must focus on the nature of the claims brought by plaintiffs. Basically,

**¶ 72,080**

**81,496**

plaintiffs claim defendant oil companies got to-gether and unlawfully conspired to artificially raise prices of Carb Gas to be sold in California. This is precisely the type of claim to be litigated within the context of class treatment. The class, although huge, is ascertainable. Common issues of fact and law on the question of conspiracy or unfair business practices will predominate. The interests and claims of the named plaintiffs are similar to those of class members. There exist economic disincentives for California motorists to bring individual actions for themselves. Fur-ther, the prospect of a myriad of subclaims being filed would do violence to judicial econ-omy. Moreover, any practical subgroup of mo-torists, whether defined by region, county, municipality, individual oil company, or mini-mum purchase level, would result in a massive class action. Judicial economy and uniformity would dictate these similar claims be litigated in one massive class action rather than many.

Defendants argue there is some threshold evi-dentiary standard the law imposes on plaintiffs by which a reasonable chance of prevailing on the merits must be established before a class certification motion may be granted. They cite *Vasquez v. Superior Court,* (1971) 4 Cal.3d 800; *Carabini v. Superior Court,* (1994) 26 Cal.App.4th 239; and *Caro v. Procter & Gamble Co.,* (1993) 18 Cal.App.4th 644. The state of the law, however, is to the contrary. Indeed, the Court *may* consider the merits of a claim to determine whether there is a realistic chance for recovery. *Carabini,* at 245. However, a motion for class certification is not a trial on the merits or tantamount to a motion for summary judg-ment. *Id.* Indeed, allegations of a conspiracy to fix prices in a context similar to this case has been observed to establish common questions of law and fact which predominate over individual issues. *B.W.I. Custom Kitchens v. Owens-Illi-nois, Inc.* [1988-1 TRADE CASES ¶ 68,053], (1987) 191 Cal.App.3d 1341, 1347-9. Given the allega-tions of the First Amended Complaint, the proof necessary to establish the alleged conspiracy will require a "common thread of evidence" applica-ble to all class members. *Id.* Further, doubts as to the suitability of a class treatment should be resolved in favor of certification, consistent with California's public policy encouraging use of the class action. *Richmond v. Dart Industries Inc.,* (1981) 29 Cal.3d 462, 473.

Defendants, while recognizing this Court may not consider the contents of these governmental studies into the Carb Gas price hike, urge the Court to take notice of the existence of the studies. Defendants, however, do not cite any authority for the proposition such studies should preempt the right of consumers to press private claims of the type brought here. These studies should not deprive California consumers of their day in court.

**¶ 72,080**

Defendants forcefully argue that pricing com-plexities at the various levels from the oil refin-ery to the retail pump pose mammoth practical impediments to certifying this matter as a class action. They argue the reasoning of *Illinois Brick Co. v. Illinois* [1977-1 TRADE CASES ¶ 61,460], (1977) 431 U.S. 720, while conceding the case is not controlling precedent here. (Tr. Oral Argument pp. 32-35.) *Illinois Brick* held that generally indirect purchasers of an alleged price-fixed product may not sue under federal antitrust law on the theory the price-fixers' overcharge has been passed on to the indirect purchaser. It cannot be disputed the majority opinion of Justice White in *Illinois Brick* recog-nized the uncertainties and difficulties in ana-lyzing whether a price overcharge to the direct purchaser of an alleged price-fixed product has been passed on to the indirect purchaser who brings a federal antitrust action. The true hold-ing, however, of *Illinois Brick* is that fundamen-tal fairness and reciprocity principles bar such an action based upon an offensive use of a pass-on theory where the Court has already deter-mined a pass-on theory may not be used defen-sively by an antitrust violator against a direct purchaser plaintiff.

In 1978, the California legislature rejected the reasoning of *Illinois Brick* when it amended the Cartwright Act [Bus. & Prof. Code § 16750, subdivision (a)] to allow any person to bring an action under the act, "*regardless of whether such injured person dealt directly or indirectly with the defendant*". (Italics added.) See *B.W.I., supra,* at 1346. Of course, this Court is bound by the controlling California precedent. Although defendants greatly argue their position on im-pact and damage complexities, at this juncture these arguments simply point out the potential need for fashioning creative remedial devices in the event liability is established on either of the theories advanced by plaintiffs.

The case of *Devidian v. Automotive Service Dealers Assn.* [1973-2 TRADE CASES ¶ 74,852], (1973) 35 Cal.App.3d 978, provides neither aid nor comfort to defendants. The purported class in *Devidian* consisted of all retail purchasers of gasoline in Fresno County, and the defendants were identified as over one thousand price fixing gasoline distributors supplying gasoline to retail-ers with a two-cent per gallon overcharge. The Court recognized that where it is alleged a myr-iad of defendants have allegedly conspired to impose a de minimis price increase in an indus-try with great marketing complexities, the case is not appropriate for class treatment. The *Devidian* case, of course, was decided prior to the 1978 amendment to the Cartwright Act. More importantly, however, this action can eas-ily be distinguished from *Devidian.* Here, there are only nine defendants who, it is alleged, en-tered into a straightforward conspiracy to artifi-

©1998, CCH INCORPORATED

cially hike the price of Carb Gas a significant sum. This action is directed at an initial and fundamental price level. Liability, if any, of this limited group of defendants is not greatly impacted by the retail pricing complexities which existed at the retail pump in the *Devidian* case.

In summary, this Court finds this case involves an ascertainable class and a well-defined community of interest as shown by typicality, adequacy, and the predominance of common issues of law and fact. This is the type of consumer *state* antitrust case the courts and legislature have mandated is suitable for class action treatment. The motion of plaintiffs for class certification is granted.

---

[¶ 72,081]   Theresa Aguilar, et al., on behalf of themselves and all others similarly situated v. Atlantic Richfield Corp., Chevron Corp., Exxon Corp., Mobil Oil Corp., Shell Oil Corp., Texaco, Inc., Tosco Corp., Ultramar Corp., Unocal Corp., and Does 1 through 40, inclusive.

California Superior Court, San Diego County. Case No. 700810. Dated January 29, 1998.

### California Cartwright Act

Price Fixing—Agreements—Summary Judgment—Sufficiency of Declarations—Gasoline.—The declarations of nine gasoline refinery employees that stated that there was no conspiracy to fix the price of gasoline sold in the State of California were insufficient to shift the burden of proof to the consumer plaintiffs to raise a triable issue of material fact on a motion for summary judgment. The consumers alleged a wide variety of purported activities in connection with their conspiracy theory, including that the refineries exchanged, communicated, and signaled to each other confidential information regarding production plans, supplies, and prices, and agreed to wrongfully restrict supplies of gasoline, sustain an artificially high level of refiner margin, and thereby fix, raise, and maintain prices at supracompetitive levels. In order for the refineries to shift the burden of proof to the consumers, an unbroken chain of officers whose principal responsibility was to determine production plans and set inventory, price, and supply levels and who alone were responsible for price, inventory and supply decisions would have to detail the manner in which prices and supply levels were set and would have to say they had not agreed with other refineries to fix prices.

See ¶ 4840.05, ¶ 9416.

For plaintiffs: Daniel J. Mogin and Angela Milea Mogin of The Mogin Law Firm, and Timothy D. Cohelan, Isam C. Khoury and Margaret Coates of Cohelan & Khoury, San Diego, Cal. For defendants: David J. Noonan and Sandra L. Lackey of Post Kirby Noonan & Sweat LLP, San Diego, Cal., Ronald Redcay and John J. Kralik, Los Angeles, Cal., for Atlantic Richfield Corp.; Robert A. Mittelstaedt of Pillsbury, Madison & Sutro, San Francisco, Cal., for Chevron Corp.; Patrick J. Sullivan of Sullivan, Hill, Lewin, Rez, Engel & LaBazzo, San Diego, Cal., for Exxon Corp.; Andrew Kilcarr of Hogan & Hartson, Washington, D.C., and Don A. Hernandez of Fried Frank Harris Shriver & Jacobson, Los Angeles, Cal., for Mobil Oil Corp.; Ronald Olson, Bradley S. Phillips and William D. Tempko of Munger Tolles & Olson, Los Angeles, Cal., for Shell Oil Corp.; Alan M. Grimaldi of Howrey & Simon, Washington, D.C., for Texaco, Inc.; John J. Lyons of Latham & Watkins, San Diego, Cal., for Tosco Corp.; Maxwell M. Blecher and Harold R. Collins, Jr., of Blecher & Collins, Los Angeles, Cal., for Ultramar Corp.; and Ernest I. Reveal III, of Robins, Kaplan, Miller & Ciresi LLP, Costa Mesa, Cal., for Unocal/76 Products Corp.

### MINUTE ORDER

*CCP § 657 SPECIFICATION OF REASONS FOR GRANTING PLAINTIFFS' MOTION FOR NEW TRIAL*

DANIELSON, J.: On January 23, 1998, the COURT granted plaintiff's motion for a new trial on the ground of error in law pursuant to CCP § 657(7). A court has discretion to grant a new trial if its original ruling was erroneous as a matter of law. *See, e.g., Ramirez v. USAA Casualty Ins. Co.,* 234 Cal.App.3d 391, 397.

In granting summary judgment to defendants, the court relied on the declaration of various of defendants' employees, who denied the existence of any agreement to fix prices and/or supply. *See* Order granting summary judgment at 4:1-20 [1997-2 TRADE CASES ¶ 71,995]. The court relied on *Biljac Associates v. First Interstate Bank* [1990-1 TRADE CASES ¶ 69,009], (1990) 218 Cal.App.3d 1410, 1424 For the proposition that these declarations were sufficient under CCP 437c(o)(2) to shift the burden of proof to plaintiffs to raise a triable issue of material fact. In *Biljac,* however,

¶ 72,081

**Tab 20**

1  FREDERICK P. FURTH (No. 038438)
   CRAIG C. CORBITT (No. 083251)
2  EMILY PLATT RICH (No. 168735)
   FURTH, FAHRNER & MASON
3  201 Sansome Street, Suite 1000
   San Francisco, CA 94104
4  Telephone: (415) 433-2070
   Facsimile: (415) 982-2076

5

6  Plaintiffs' Co-Lead and Co-Liaison Counsel
   [Additional Counsel Listed on Signature Page]

7

8           SUPERIOR COURT OF THE STATE OF CALIFORNIA

9              IN AND FOR THE COUNTY OF SAN FRANCISCO

10 _____
                                     )  JUDICIAL COUNCIL
11 Coordination Proceeding           )  COORDINATION PROCEEDING NOS.
   Special Title (Rule 1550(b))      )  2969, 2971 & 2972
12                                    )
   PHARMACEUTICAL CASES I, II, AND    )  Hon. Alfred G. Chiantelli
13 III                               )  Coordination Trial Judge
   _____ )
14                                    )
   This Document Relates To          )  ORDER CERTIFYING RETAIL
15                                    )  PHARMACY AND PHARMACIST CLASS
   Jerome Y. Feitelberg, et al.      )
16                                    )  Date:  June 2, 1995
                   v.                )  Time:  1:30 p.m.
17                                    )  Dept:  9, Room 438
   Abbott Laboratories, et al.       )
18 _____ )

19

20         The motion of plaintiffs for certification of the

21 Retail Pharmacy and Pharmacist Class came on regularly for

22 hearing before this Court on June 2, 1995.  Craig C. Corbitt and

23 Joseph L. Alioto argued on behalf of the plaintiffs, and Maurice

24 A. Leiter argued on behalf of the defendants.  The Court has

25 considered the memoranda of counsel, reviewed the evidence

26 submitted, and heard oral argument.  Good cause appearing, the

27 motion for class certification is GRANTED.  The Court finds that:

28

3467.064                        -1-

ENDORSED
FILED
San Francisco County Superior Court

JUN 26 1995

ALAN CARLSON, Clerk
BY: _____ VERA MU _____
                    Deputy Clerk

1    1.    The class sought by plaintiffs in this coordinated
2  action satisfies the numerosity requirement in that there are
3  thousands of class members who purchased brand name prescription
4  drugs manufactured and/or sold by the defendants.

5    2.    The class is ascertainable and possesses a
6  commonality of interest in determining defendants' liability, if
7  any, for the course of conduct alleged in the First and Seventh
8  Causes of Action in the Third Consolidated and Amended Class
9  Action Complaint ("CACAC").

10    3.    There are common questions of law and fact
11  including the claimed existence, nature, scope and extent of the
12  alleged conspiracy, as well as the fact of injury, which exist
13  and predominate over any individual questions that may arise.

14    4.    The plaintiffs' claims are typical of the claims
15  of the absent class members, as all such claims arise out of
16  their purchase of drugs from the defendants.

17    5.    Plaintiffs will fairly and adequately represent
18  the class, and plaintiffs' counsel are skilled in prosecuting
19  class actions.

20    6.    The following shall serve as class
21  representatives:  Jerome Y. Feitelberg d/b/a Alameda Drug
22  Company, Inc.; Michael Goldstein d/b/a San Bruno Professional
23  Plaza Pharmacy, Inc.; Timothy Tong Chang/Oriental Twin Dragons,
24  Ltd., d/b/a Estudillo Pharmacies Nos. 1 and 2; Roland Kong/WM
25  Pharmacy Inc. d/b/a Washington Pharmacy; Donald J. Bartolo d/b/a
26  Wapples Prunedale Pharmacy; and Pharmaceutical Investments d/b/a
27  Grantline Drug.

28

-2-

7. The following law firms shall serve as Class Counsel: Furth, Fahrner & Mason; Law Offices of Joseph L. Alioto; The Alexander Law Firm; and Freeman, Brown, Hartmann, Sperry & D'Aiuto.

8. This action is manageable as a class action.

Therefore, IT IS HEREBY ORDERED that, pursuant to Rules 23(a)(1)-(4) and 23(b)(3) of the Federal Rules of Civil Procedure, adopted for use by California courts, California Code of Civil Procedure Section 382, California Civil Code Section 1781, and the San Francisco Superior Court Manual for the Conduct of Pretrial Proceedings in Class Actions, the following class is certified:

> All California community retail pharmacists/pharmacies (including pharmacy chains with ten locations or less) who have purchased any Brand Name Prescription Drugs from the defendants from August 4, 1989 to date.
>
> Excluded from the Class are the defendants, other drug manufacturers, other wholesalers, their co-conspirators, and their respective subsidiaries and affiliates; all governmental entities; chain pharmacies with more than ten locations; mail order pharmacies; health maintenance organizations; hospitals; clinics and nursing homes, and any entity in which any of them have a controlling interest.

Counsel for the parties shall meet and confer on the form of notice to the class. If no agreement is reached, a hearing for approval of the form of notice shall be held on July 28th, 1995 at 1:30 p.m. in Department 9. On or before July 19th, ABC

-3-

1  1995, counsel shall submit either an agreed-upon form of notice

2  or their respective proposals.

3          IT IS SO ORDERED.

4  DATED:     June 23rd, 1995

5                                              Alfred G. Chiantelli

6                                    Hon. Alfred G. Chiantelli
                                     Judge of the Superior Court

7

8  Approved as to form:

9

10  Leonard R. Stein
    Steefel, Levitt & Weiss
    One Embarcadero Center, 29th Floor
11  San Francisco, CA 94111
    Telephone:  (415) 788-0900
12  Facsimile:  (415) 788-2019

13

14  Terrence A. Callan
    Pillsbury, Madison & Sutro
15  225 Bush Street
    San Francisco, CA 94104
16  Telephone:  (415) 983-1000
    Facsimile:  (415) 983-1200

17

18  Defendants' Co-Liaison Counsel

19  Additional Counsel for Plaintiffs:

20  Joseph L. Alioto
    Law Offices of Joseph L. Alioto
21  650 California Street, 25th Floor
    San Francisco, CA 94104
22  Telephone:  (415) 434-2100
    Facsimile:  (415) 434-3277

23

24  Richard Alexander
    Jeffrey Rickard
    The Alexander Law Firm
25  555 South Market Street, Suite 1080
    San Jose, CA 95109
26  Telephone:  (408) 289-1776
    Facsimile:  (408) 287-1776

27

28

1 | James Belford Brown
Curtis Sawyer
2 | Freeman, Brown, Hartmann, Sperry & D'Aiuto
1818 Grand Canal Boulevard
3 | Stockton, CA 95207
Telephone:  (209) 474-1818
4 | Facsimile:  (209) 474-1245

5 | Plaintiffs Class Executive Committee Members

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3467.064

**Tab 21**

FILED
CLERK, U.S. DISTRICT COURT

MAR 2 7 2007

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

__X__ Priority
__X__ Send
_____ Clsd
_____ Enter
_____ JS-5/JS-6
_____ JS-2/JS-3

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

MDL

|  |  |
|---|---|
| IN RE REFORMULATED GASOLINE (RFG) ANTITRUST & PATENT LITIGATION | Case No. CV-05-01671 CAS (VBKx) **ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |

## I.    BACKGROUND

Class plaintiffs[1] allege that defendants Union Oil Co. of California and Unocal Corporation (collectively, "Unocal") unlawfully obtained market power by manipulating the California Air Resources Board ("CARB") rulemaking proceedings regarding emission standards and regulations for "reformulated" gasoline ("RFG"). Consolidated Class Action Complaint ("Complaint"), filed September 12, 2005, ¶¶ 1, 3,

---

[1] Plaintiffs Caleb Klepper, Corrine Sealey, Christopher Sheppard, Stephen Buckser, Asher Rubin, Jeffrey Rubin, Corey Rosen, Gail Harper, and Michael Shames, bring suit on behalf of themselves and all others similarly situated.

DOCKETED ON CM
MAR 28 2007

1    160.[2] Specifically, plaintiffs allege that Unocal made materially false and misleading

2    _____

3        [2]    The following consolidated cases were originally filed in state court as set
forth below:

4    Case No. CV 04-09600, <u>Acosta v. Union Oil Company of California</u> was filed in the Los

5    Angeles County Superior Court on November 1, 2004, removed to the Central District of

6    California on November 23, 2004, and dismissed without prejudice pursuant to stipulation
on November 30, 2006;

7    Case No. CV 05-03441, <u>Harper v. Union Oil Company of California</u> was filed in the

8    Alameda County Superior Court, and removed to the Northern District of California on
December 3, 2004;

9    Case No. CV 05-03443, <u>Haro v. Union Oil Company of California</u> was filed in the San

10   Francisco County Superior Court on November 10, 2004, was removed to the Northern
District of California on December 10, 2004, and was remanded to the San Francisco

11   County Superior Court on September 13, 2005;

12   Case No. CV 05-03445, <u>Rosen v. Union Oil Company of California</u> was filed in the San
Francisco County Superior Court on November 15, 2004, and removed to the Northern

13   District of California on December 10, 2004;

14   Case No. CV 05-03446, <u>Sullivan v. Union Oil Company of California</u> was filed in the San
Francisco County Superior Court on November 4, 2004, and removed to the Northern

15   District of California on December 10, 2004;

16   Case No. CV 05-03577, <u>Shames v. Union Oil Company of California</u>, was filed in the San

17   Diego County Superior Court on November 9, 2004, and removed to the Southern District
of California on May 25, 2005.

18

19       The following consolidated cases were originally filed in federal district court as set
forth below:

20   Case No. CV 04-08795, <u>Kleppner v. Union Oil Company of California</u> was filed in the

21   United States District Court for the Central District of California on October 22, 2004;
Case No. CV 05-00309, <u>Sealey v. Union Oil Company of California</u> was filed in the United

22   States District Court for the Central District of California on January 12, 2005;

23   Case No. CV 05-01264, <u>Sheppard v. Union Oil Company of California</u> was filed in the
United States District Court for the Central District of California on February 18, 2005;

24   Case No. CV 05-03438, <u>Buckser v. Union Oil Company of California</u> was filed in the

25   United States District Court for the Northern District of California on November 9, 2004;
Case No. CV 05-03439, <u>Rubin v. Union Oil Company of California</u> was filed in the United

26   States District Court for the Northern District of California on November 12, 2004.

27
                                                    (continued...)
28

S:\CAS\Orders\CIVIL\2005\05-1671.class.cert.numbered.wpd

1  statements, resulting in the development of RFG regulations that substantially

2  overlapped with Unocal's then-undisclosed patent claims. Id. ¶¶ 4, 160-161. Plaintiffs

3  allege that Unocal exercised the market power obtained through this manipulation by

4  enforcing its patents, which have now been terminally disclaimed, through litigation

5  and licensing activities. Id. ¶ 171.

6        Plaintiffs allege that Unocal's anti-competitive conduct has materially caused

7  and threatened to cause substantial harm to consumers by artificially raising the retail

8  price of RFG in California resulting from refiners' actual and potential liability for

9  patent infringement, substantial costs incurred by refiners to "blend around" the

10  patents, royalties paid by refiners, harm to supply in the market due to reluctance of

11  importers to import RFG into California, and disincentives to refiners to make capital

12  investments necessary to increase production of RFG. Id. ¶ 174.

13        Plaintiffs seek to certify a class comprised of:

14        All consumers who purchased CARB-compliant summertime reformulated

15        gasoline in the State of California at any time during the period from

16        January 1995 to and including August 11, 2005. Excluded from the class

17        are governmental entities, defendants, their co-conspirators, along with all

18        of their respective parents, subsidiaries, and/or affiliates, and any and all

19        judges and justices assigned to hear any aspect of this litigation.

20  Mot. at 24.

21        The Complaint alleges claims against Unocal[3] for: (1) equitable and injunctive

22  relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26; (2) common law

23

24        [2](...continued)

25        On May 4, 2005, the Judicial Panel on Multidistrict Litigation transferred the above
cases to the United States District Court for the Central District of California, pursuant to

26  28 U.S.C. § 1407, and assigned them to the Honorable Christina A. Snyder.

27        [3]The Complaint also named Chevron Corporation ("Chevron") as a defendant.

28  Pursuant to a stipulation filed December 2, 2005, the parties dismissed without prejudice
all claims against Chevron.

1    monopolization; (3) violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16720;

2    (4) violation of the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200;

3    and (5) unjust enrichment.

4         Unocal filed a motion to dismiss the Complaint on September 26, 2005. On July

5    21, 2006, the Court granted Unocal's motion to dismiss plaintiff's Clayton Act claim,

6    and denied Unocal's motion in all other respects.

7         On September 15, 2006, plaintiffs filed the instant motion for class certification.

8    Unocal filed its opposition on January 16, 2007. On February 15, 2007, plaintiffs filed

9    a reply. After carefully considering the parties' arguments, the Court hereby finds and

10   concludes as follows.

11   **II.    LEGAL STANDARD**

12        "Class actions have two primary purposes: (1) to accomplish judicial economy

13   by avoiding multiple suits, and (2) to protect rights of persons who might not be able to

14   present claims on an individual basis." Haley v. Medtronic, Inc., 169 F.R.D. 643, 647

15   (C.D. Cal. 1996) (citing Crown, Cork & Seal Co. v. Parker, 462 U.S. 345 (1983)).

16   Federal Rule of Civil Procedure 23 governs class actions. A class action "may be

17   certified if the trial court is satisfied after a rigorous analysis, that the prerequisites of

18   Rule 23(a) have been satisfied." General Tel. Co. of the Southwest v. Falcon, 457 U.S.

19   147, 161 (1982).

20        To certify a class action, plaintiffs must set forth prima facie facts that support

21   the four requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality;

22   and (4) adequacy of representation. Dunleavy v. Nadler (In re Mego Fir. Corp. Sec.

23   Litig.), 213 F.3d 454, 462 (9th Cir. 2000) (internal quotations omitted). These

24   requirements effectively "limit the class claims to those fairly encompassed by the

25   named plaintiff's claims." Falcon, 457 U.S. at 155 (quoting Califano v. Yamasaki, 442,

26   U.S. 682, 701 (1979)).

27        If the district court finds that the action meets the prerequisites of Rule 23(a), the

28   court must then consider whether the class is maintainable under one or more of the

1  three alternatives set forth in Rule 23(b). Plaintiffs seek certification under Rule
2  23(b)(3) which governs in a case where money damages is the predominant form of
3  relief sought, which is the case here. A class is maintainable under Rule 23(b)(3)
4  where "questions of law or fact common to the members of the class *predominate* over
5  any questions affecting only individual members," and where "a class action is
6  *superior* to other available methods for fair and efficient adjudication of the
7  controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added). "The Rule 23(b)(3)
8  predominance inquiry tests whether the proposed classes are sufficiently cohesive to
9  warrant adjudication by representation." Hanlon v. Chrysler Corp., 150 F.3d 1011,
10  1022 (9th Cir. 1998) *(citing* Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997)).
11  The predominance inquiry measures the relative weight of the common to
12  individualized claims. Id. "Implicit in the satisfaction of the predominance test is the
13  notion that the adjudication of common issues will help achieve judicial economy."
14  Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1189 (9th Cir. 2001) *(*citing
15  Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996)). In determining
16  superiority, the court must consider the four factors of Rule 23(b)(3): (1) the interests
17  members in the class have in individually controlling the prosecution or defense of the
18  separate actions; (2) the extent and nature of any litigations concerning the controversy
19  already commenced by or against members of the class; (3) the desirability or
20  undesirability of concentrating the litigation of the claims in the particular forum; and
21  (4) the difficulties likely encountered in the management of a class action. Id. at 1190-
22  1993. "If the main issues in a case require the separate adjudication of each class
23  member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate."
24  Id. (citing 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal
25  Practice and Procedure § 1778 at 535-39 (2d. ed. 1986) (hereinafter "Wright, Miller &
26  Kane")).
27
28

1  **III.   DISCUSSION**

2      **A. Rule 23(a) Requirements**

3          Unocal does not appear to dispute that the requirements of Rule 23(a) are met in

4  this case.

5      **1. Numerosity**

6          Rule 23(a)(1) requires the members of a proposed class to be so numerous that

7  joinder of all of the class members would be impracticable.  Fed. R. Civ. P. 23(a).

8  However, "[i]mpracticability does not mean 'impossibility,' but only the difficulty or

9  inconvenience in joining all members of the class."  Harris v. Palm Springs Alpine

10  Estates, Inc., 329 F.2d 909, 913-14 (9th Cir. 1964) (quoting Advertising Specialty Nat.

11  Ass'n v. FTC, 238 F.2d 108, 119 (1st Cir. 1956)).

12          Plaintiffs argue that, because "RFG is the exclusive gas sold in California during

13  the summertime months and has been for many years, the class easily is in the

14  millions."  Mot. at 6.  The Court concludes that plaintiffs have satisfied the numerosity

15  requirement.

16      **2. Commonality**

17          Commonality requires "questions of law or fact common to the class."  Rule

18  23(a)(2).  The commonality requirement is generally construed liberally; the existence

19  of only a few common legal and factual issues may satisfy the requirement.  Jordan v.

20  County of Los Angeles, 669 F.2d 1311, 1320 (9th Cir. 1982).

21          Plaintiffs argue that the instant litigation involves the common questions of

22  whether (1) Unocal attempted to, or did, maintain a monopoly through anticompetitive

23  activity; (2) Unocal's conduct violated the Cartwright Act, Cal. Bus. & Prof. Code §

24  17200 et seq., and California common law; (3) Unocal was unjustly enriched; (4)

25  Unocal's conduct caused damage to the class and the amount of such damage; and (5)

26  Unocal is liable for punitive and/or treble damages.  The Court concludes that the

27  instant action addresses common questions of law and fact, sufficient to satisfy the

28  commonality requirement of Rule 23(a)(2).

### 3. Typicality

Typicality requires a determination of whether the named plaintiff's claims are typical of those of the proposed class they seek to represent. Rule 23(a)(3). "[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." Hanlon, 150 F.3d at 1020; Schwartz v. Harp, 108 F.R.D. 279, 282 (C.D. Cal. 1985) ("A plaintiff's claim meets this requirement if it arises from the same event or course of conduct that gives rise to claims of other class members and the claims are based on the same legal theory.").

Plaintiffs argue that the "class representatives and the class members all must prove the same things: anticompetitive conduct by Unocal that resulted in all class members being forced to pay artificially inflated prices for RFG in California." Mot. at 7. The Court concludes that plaintiffs' claims arise from the "same event or course of conduct" as those of the various class members, as required under Rule 23(a)(3), and are typical of the claims of the proposed class. Schwartz, 108 F.R.D. at 282; Rosario v. Livaditis, 963 F.2d 1013, 1018 (7th Cir. 1992).[4]

### 4. Adequacy of Representation

The adequacy of representation requirement of Rule 23(a)(4) involves a two-part inquiry: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute

---

[4]The Court further notes that variations in the degree of injury allegedly suffered by each class member do not defeat typicality. "It is *not* necessary that all class members suffer the same injury as the class representatives." Judge William W. Schwarzer, Judge A. Wallace Tashima, & James M. Wagstaffe, Federal Civil Procedure Before Trial, § 10:292 (The Rutter Group, 2006) (emphasis in original). Rather, a "plaintiff's claim may be 'typical' although other members of the class suffered less (or more) injury." Id. § 10:293 (citing Rosario, 963 F.2d at 1017 ("The fact that there is some factual variation among the class grievances will not defeat a class action.")).

1  the action vigorously on behalf of the class?" Hanlon, 150 F.3d at 1020. It appears to

2  the Court that the named plaintiffs and their counsel will adequately represent the class.

3       Accordingly, the requirements of Rule 23(a) are satisfied. The Court next turns

4  to the requirements of Rule 23(b)(3).

5       **B. Rule 23(b)(3) Requirements**

6       Certification under Rule 23(b)(3) is proper "whenever the actual interests of the

7  parties can be served best by settling their differences in a single action." Hanlon, 150

8  F.3d at 1022 (internal quotations omitted). As noted above, Rule 23(b)(3) calls for two

9  separate inquiries: (1) do issues common to the class "predominate" over issues unique

10 to individual class members, and (2) is the proposed class action "superior" to other

11 methods available for adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). The latter

12 requirement requires consideration of the difficulties likely to be encountered in the

13 management of this litigation as a class action, including, especially, whether and how

14 the case may be tried. In making these determinations, the Court does not decide the

15 merits of any claims or defenses, or whether the plaintiffs are likely to prevail on their

16 claims. Rather, the Court must determine whether plaintiffs have shown that there are

17 plausible class-wide methods of proof available to prove their claims.

18       **1. Plaintiffs' Antitrust Claims**

19       Plaintiffs allege claims for common law monopolization and violation of the

20 Cartwright Act.[5] The Cartwright Act, codified at Cal. Bus. & Prof. Code § 16700, et

21

22       [5]As discussed in the Court's June 21, 2006 order, California authority suggests that

23 a business tort of monopolization may be recognized under California law separate and

   apart from statutory claims arising under the Cartwright Act. See Burdell v. Grandi, 152

24 Cal. 376, 383 (1907)("The court finds that [the defendant] imposed [conditions in a deed,

25 which prohibited the sale of intoxicating liquors on the premises,] to create a monopoly

   in his own behalf in the sale of intoxicating liquors upon other property in the town owned

26 and leased by him . . . Conditions imposed to attain that end are, as we have seen, against

27 public policy and void."); Exxon Corp. v. Superior Court, 51 Cal. App. 4th 1672, 1687

28 (1997)(separately analyzing the propriety of summary adjudication as to causes of action

                                        (continued...)

1   seq., requires a plaintiff to prove the existence of a "trust," defined in part as "a

2   combination of capital, skill or act by two or more persons," for the prohibited

3   purposes enumerated by Cal. Bus. & Prof. Code § 16720.  Under the Cartwright Act,

4   plaintiffs are required to show that they have suffered antitrust injury, i.e,. "injury of

5   the type the antitrust laws were intended to prevent and that flows from that which

6   makes defendants' acts unlawful."  Atlantic Richfield Co. v. USA Petroleum Co., 495

7   U.S. 328, 334 (1990).  To prevail on their monopolization claim, plaintiffs must

8   establish (1) possession of monopoly power in the relevant market, (2) willful

9   acquisition or maintenance of that power, and (3) antitrust injury.  See Austin v.

10  McNamara, 979 F.2d 728, 739 (9th Cir. 1992).

11          Parsing the Supreme Court's definition, the Ninth Circuit has explained that

12  there are four requirements for antitrust injury: "(1) unlawful conduct, (2) causing an

13  injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and

14  (4) that is of the type the antitrust laws were intended to prevent."  Knevelbaard Dairies

15  v. Kraft Foods, Inc., 232 F.3d 979, 987 (9th Cir. 2000) (quoting Am. Ad Mgmt., Inc. v.

16  General Tel. Co., 190 F.3d 1051, 1055 (9th Cir. 1999)).

17                          **a) Predominance and Commonality**

18          "Implicit in the satisfaction of the predominance test is the notion that the

19  adjudication of common issues will help achieve judicial economy."  See Valentino, 97

20  F.3d at 1234.  Thus, the Court must determine whether common issues constitute such

21  a significant aspect of the action that "there is a clear justification for handling the

22  dispute on a representative rather than on an individual basis."  7A Wright, Miller, &

23  Kane § 1778 (3d ed. 2005).  For the proponent to satisfy the predominance inquiry, it is

24  not enough to establish that common questions of law or fact exist, as it is under Rule

25

26

27          [5](...continued)
        for violation of the Cartwright Act and for the business tort of monopolization).

28

1   23(a)(2)'s commonality requirement -- the predominance inquiry under Rule 23(b) is

2   more rigorous. <u>Amchem Prods., Inc.</u>, 521 U.S. at 624. The predominance question

3   "tests whether proposed classes are sufficiently cohesive to warrant adjudication by

4   representation." <u>Id.</u> at 623. The Court, therefore, must balance concerns regarding the

5   litigation of issues common to the class as a whole with questions affecting individual

6   class members. <u>Abed v. A. H. Robins Co.</u> (In re Northern District of California,

7   Dalkon Shield IUD Products Liability Litigation), 693 F.2d 847, 856 (9th Cir. 1982).

8                    **(i) Classwide Proof of Violation and Impact**

9           With regard to violation, plaintiffs argue that "[w]hether Unocal violated the

10  Cartwright Act and monopolized the technology market for RFG in California is a

11  question that depends solely upon an analysis of Unocal's behavior and the behavior of

12  entities with whom Unocal dealt. . . . Since this conduct did not vary among class

13  members, proof relevant to any one purchaser must of necessity apply equally to all

14  class members." Mot. at 10.

15          With regard to impact, plaintiffs contend that where an antitrust action is brought

16  under the Cartwright Act, there is an "inference of classwide impact of injury" upon

17  showing of an antitrust conspiracy by the defendant. <u>Id.</u> at 11 (quoting <u>In re Cipro</u>

18  <u>Cases I and II</u>, 2003 WL 23005275 at *5 (Cal. Superior Ct. Nov. 25, 2003), affirmed in

19  part by 121 Cal. App. 4th 402 (2004)). Plaintiffs assert that they need not show that

20  Unocal's conduct was the sole cause of the injury, or prove that each class member was

21  injured. <u>Id.</u> Rather, plaintiffs argue that they need only submit a plausible economic

22  methodology to demonstrate that proof of impact is possible on a classwide basis. <u>Id.</u>

23  at 12.

24          For that purpose, plaintiffs submit the declaration of Dr. Janet Netz ("Dr. Netz"),

25  who has opined that Unocal's alleged anticompetitive behavior reduced the supply of

26  RFG, increased the cost of producing RFG, and therefore caused RFG retail prices to

27  inflate a measurable amount above what the prices would have been absent Unocal's

28

1    alleged illegal conduct. Id.; Netz Decl. ¶¶ 47-64. Dr. Netz testifies that Unocal's

2    alleged illegal conduct decreased the RFG supply by causing the reduction of (1) the

3    capacity of refineries that were updated to conform to CARB Phase 2 standards; (2)

4    other production of CARB-compliant summertime gasoline in California; and (3)

5    imports of CARB-compliant summertime gasoline into California. Mot. at 13; Netz

6    Decl. ¶ 50. Dr. Netz testifies that Unocal's conduct increased the cost of producing

7    RFG because gasoline producers incurred (1) costs of blending around Unocal's

8    patents; (2) royalty costs paid by refiners who licensed Unocal's patents; (3) capital and

9    operating expenditures that were higher than would be expected absent the stricter

10   CARB regulations influenced by Unocal's conduct; and (4) patent litigation costs and

11   uncertainty. Mot. at 13; Netz Decl. ¶¶ 53-60.

12        Dr. Netz testifies that these changes affected the entire RFG market because

13   RFG is a fungible commodity, supply of RFG is constrained geographically and by

14   refiner capacity, and therefore pricing of the RFG wholesale market is impacted

15   primarily by the highest marginal cost refiner; i.e, the refiner with the highest marginal

16   costs. Netz Decl. ¶¶ 21-22, 61.[6] Plaintiffs argue that Unocal's conduct would have

17   necessarily affected the entire price structure for RFG by increasing the costs of the

18

19   _____

20        [6]Dr. Netz testifies:

21        Competition tends to drive price down as firms attempt to attract additional
         customers. If the lower price attracts a sufficiently large increase in
22       customers, profits from the new customers will more than make up for the
23       reduction in profit per unit. However, if the firm has a capacity constraint,
         there is a limit to how many new customers a firm can actually serve. If a
24       firm is already producing as much as it can, there is no point to reducing
25       price (and hence profit), because the firm will not be able to sell anymore.
         Thus, the price charged in the marketplace for RFG is the price that is
26       charged by the refiner with the highest production costs.
27

28   Netz Decl. ¶ 21.

1    highest marginal cost refiner because the rest of the wholesale market will key off of

2    that refiner's pricing.  Mot. at 13; Netz Decl. ¶¶ 21-22, 61.  According to Dr. Netz, if

3    the highest marginal cost refiner's costs rise, that refiner "will raise the price it charges

4    in order to recoup the increased costs. . . .  Competing firms will likewise raise their

5    prices.  There is no incentive for competing firms to charge a lower price; they cannot

6    hope to gain market share from the relatively lower price in the presence of the capacity

7    constraint.  In other words, when the marginal producer's costs rise, the entire price

8    structure shifts upwards.  Individual consumers may pay different prices, but all

9    consumers will pay higher prices."  Netz Decl. ¶ 22.  Dr. Netz testifies that in these

10   circumstances there will be a "pass-through" of changes in upstream costs to

11   downstream consumers in the form of increased downstream prices.  Id. ¶ 62.  Dr. Netz

12   opines that, regardless of variations in individual sales of RFG by geographic location,

13   level of resale or grade, the aggregate result of higher costs for the highest marginal

14   cost refiner will give rise to an identifiable pattern of price pass-through, which is

15   described by the "pass-through rate."  Id. ¶¶ 63, 65-73.  Dr. Netz asserts that numerous

16   peer-reviewed economic studies have shown that costs at the wholesale level for

17   California RFG are passed on to the end consumer at a pass-through rate that is near or

18   equal to 100%.  Id. ¶ 64.  According to Dr. Netz, Unocal's alleged anticompetitive

19   conduct shifted the entire price structure of RFG upwards, such that all class members

20   pay supra-competitive prices, although individual class members may have suffered

21   varying degrees of harm.  Id. ¶¶ 65-66.

22          Unocal argues that the alleged increased costs of refiners varied significantly by

23   refiner and over time, making common proof of impact impossible.  Opp'n at 11.  First,

24   Unocal contends that royalty costs and patent infringement and litigation costs were

25   only incurred by a portion of refiners during limited periods of time.  Next, as to blend

26   around costs, Unocal asserts that refiners believed the Unocal patents were invalid, and

27   therefore made little or no effort to blend around them.  Id. at 12; Enson Decl., Exs. 10-

28   14.  Unocal also argues that wholesale and retail prices varied significantly among

1    different distribution channels, and therefore individual proof will be required to show

2    harm to each consumer. Opp'n at 13. Unocal asserts that, in the California gasoline

3    distribution system, gasoline goes from refiners to consumers by several different types

4    of gas stations which are supplied by different distribution channels and are charged

5    different wholesale prices. Id. Unocal further contends that prices vary by geographic

6    location, as well as within the same geographic area in response to local competition.

7    Id. at 14. Unocal argues that, as a result of these variations in the RFG market,

8    common issues do not predominate.

9        Unocal challenges Dr. Netz's opinion that the highest marginal cost refiner

10    determines the wholesale RFG price. Unocal contends that Dr. Netz admitted at

11    deposition that she does not know whether this is, in fact, true, and that Dr. Netz

12    admitted that she had not done the requisite analysis to know whether her hypothetical

13    model reflects the California RFG market. Opp'n at 15 (citing Netz Depo. at 241:18-

14    244:12, etc.). Unocal also challenges Dr. Netz's opinion that Unocal's alleged conduct

15    reduced the supply of RFG, and asserts that Dr. Netz admitted at her deposition that she

16    has not analyzed whether supply was actually reduced during the class period, or

17    whether any such decrease was caused by Unocal's patents. Unocal argues that Dr.

18    Netz's testimony "does not eliminate the significant issues that must be resolved on an

19    individual basis to determine at the threshold whether particular purchasers suffered

20    any injury at all." Opp'n at 17.

21        Plaintiffs respond, in their reply, that much of Unocal's opposition consists of

22    improper arguments regarding the factual merits of the case. Plaintiffs assert that Dr.

23    Netz proposes to account for changes in the market over time by utilizing regression

24    analysis. Reply at 11. Plaintiffs also contend that Unocal's expert economic witness in

25

26

27

28

1  prior patent and FTC litigation, Dr. David Teece, made similar conclusions about the

2  RFG market as Dr. Netz, which conclusions Unocal now challenges.[7]

3     The Court concludes that, in light of Dr. Netz's testimony, plaintiffs have

4  satisfied their burden of showing an available method of providing impact by evidence

5  applicable on a classwide basis. The economic model for the RFG market proposed by

6  Dr. Netz depends upon classwide proof, rather than individual issues. Such economic

7  models have been accepted by other courts as evidence of common proof of impact for

8  purposes of class certification in antitrust cases involving allegations of overcharges.

9  See, e.g., In re Terazosin Hydrochloride Antitrust Litig., 220 F.R.D. 672, 697 (S.D. Fla.

10  2004); In re Cardizem CD Antitrust Litig., 200 F.R.D. 326, 340-41, 348 (E.D. Mich.

11  2001).[8] Dr. Netz purports to account for variations in price by time and geographic

12  location in her regression analyses. Further, Dr. Netz contends that, although factors

13  like geographic location, channel of distribution, or grade of RFG have an effect upon

14

15  [7]Plaintiffs submitted the expert reports of Dr. David Teece under seal. See Tse
   Decl., Exs. 1, 4. Dr. Teece testified on behalf of Unocal as an expert in economics in prior
16  patent litigation, Atlantic Richfield Co., et al., v. Unocal Corp. and Union Oil Co. of Cal.,
17  Case No. CV 95-2379 KMW (JRx), as well in the FTC's case against Unocal, FTC Docket
   No. 9305. Plaintiffs also submit the expert report of Dr. Carl Shapiro, the FTC's expert
18  economist in the litigation with Unocal. Tse Decl., Ex. 3, at 32.

19

20  [8]Unocal attempts to distinguish these and other cases, upon which plaintiffs rely,
   as dealing with price-fixing conspiracies, as to which injury is more easily proved on a
21  classwide basis. See Opp'n at 9-10. Unocal may be correct that it is easier to prove
   classwide harm in a price-fixing case. See In re Playmobil Antitrust Litig., 35 F. Supp. 2d
22  231 (E.D.N.Y. 1998) ("It is well established that class actions are particularly appropriate
23  for antitrust litigation concerning price-fixing schemes because price-fixing presumably
   subjects purchasers in the market to common harm."). However, although Unocal
24  contends that consumers paid different prices depending upon the refiner, distribution
25  channel, location, and grade of RFG, plaintiffs have presented a method for proving the
   existence of antitrust injury on a classwide basis that would take into account such
26  variations, and would apply despite such variations. Indeed, 'in actions charging
27  conspiracy to monopolize, the same approach has been taken as in price-fixing cases" as
   to whether the requirements of Rule 23 are satisfied. 6 Herbert B. Newberg and Alba
28  Conte on Class Actions § 18:29 (4th ed. 2006) (hereinafter "Newberg").

1   the price paid by individual consumers, Unocal's alleged antitrust conduct would have

2   increased costs, and therefore prices, across the board.  See Netz Decl. ¶¶ 65-73.

3       Unocal's challenges to the evidence supporting Dr. Netz's conclusions go to the

4   merits, and not to the issue of whether plaintiffs' antitrust claim is susceptible to

5   classwide proof of impact.  See In re Lorazepam & Clorazepate Antitrust Litig., 202

6   F.R.D. 12, 29 (D.D.C. 2001) ("The plaintiffs intend to prove that through the

7   defendants' monopolization, they were able to hike and sustain prices of lorazepam and

8   clorazepate at artificially high levels causing antitrust injury. Needless to say, the

9   plaintiffs do not have to actually prove the injury at this stage; rather, they must

10  demonstrate that their attempt to evidence impact will involve common issues that

11  predominate"); In re Polypropylene Carpet Antitrust Litig., 178 F.R.D. 603, 618 (N.D.

12  Ga. 1997) (observing that "at the class certification stage, Plaintiffs must show that

13  antitrust impact can be proven with common evidence on a classwide basis; Plaintiffs

14  need not show antitrust impact in fact occurred on a classwide basis.").  In any event,

15  although Unocal asserts that Dr. Netz has little or no evidence that supply of RFG was

16  reduced during the class period, footnotes 75-78 to Dr. Netz's declaration cite

17  numerous articles, studies, and testing documenting a reduction in supply of RFG, and

18  opining that such reduction was caused by Unocal's conduct at issue in this case.

19  Further, the fact that Unocal's prior expert, Dr. Teece, came to similar conclusions

20  about the RFG market as Dr. Netz also lends support to Dr. Netz's opinion that impact

21  can be proven on a classwide basis.

22      Unocal's arguments regarding the complexity of the RFG market are also

23  unpersuasive.  Other courts have rejected similar arguments by defendants in antitrust

24  cases. For example, in In re Commercial Tissue Products Antitrust Litig., 183 F.R.D.

25  589, 595 (N.D. Fla. 1998), the court rejected defendants' argument that "the individual

26  questions of fact and law predominate over the general questions of law and fact

27  because the price paid by each [class member] was determined through an elaborate

28  system of individualized negotiations, contracts and rebates. . . .  Because pricing in the

1   industry is allegedly so individualized, the plaintiffs will be unable to show any

2   consistent classwide relationship between the acts of the defendants and the prices paid

3   by class members. Or at the very least, argue the defendants, proving such impact will

4   require infinite mini-trials concerning the price actually paid by each class member."

5   As discussed by the court in In re Cardizem, "courts have routinely rejected similar

6   arguments, despite differences in prices paid by class members, where the plaintiffs

7   show that the minimum baseline for beginning negotiations, or the range of prices

8   which resulted from negotiations, was artificially raised (or slowed in its descent) by

9   the collusive actions of the defendants. 200 F.R.D. at 345 (internal quotations and

10  citation omitted). Similarly, in In re NASDAQ Market-Makers Antitrust Litig., the

11  court observed that "[n]either a variety of prices nor negotiated prices is an impediment

12  to class certification if it appears that plaintiffs may be able to prove at trial that ... the

13  price range was affected generally." 169 F.R.D. 493, 523 (S.D.N.Y. 1996). Here,

14  plaintiffs assert that, although there were variations in prices paid by class members,

15  the overall price for RFG increased as a result of Unocal's alleged illegal conduct.

16  Thus, plaintiffs have established that antitrust impact may be proven on a classwide

17  basis. To the extent that Unocal argues that complexities of the RFG market will

18  necessarily result in individualized inquiries, such individualized examinations "will

19  relate to the quantum of damages, not the fact of injury." In re Terazosin, 220 F.R.D. at

20  697 (quoting In re Cardizem, 200 F.R.D. at 307).

21                         **(ii) Classwide Proof of Damages**

22          Plaintiffs argue that Dr. Netz has proposed several methods to measure damages,

23  which consist of the overcharge caused by Unocal's alleged illegal conduct, on a

24  common basis. According to Dr. Netz, the resulting overcharge is calculated by first

25  determining the price that would have been charged absent Unocal's alleged conduct

26  (the "but for" or "counterfactual price"), and subtracting the counterfactual price from

27  the actual price paid by class members. Netz Decl. ¶ 74. The overcharge can also be

28  represented by a percentage of the actual price. Id. To calculate the counterfactual

1    price, Dr. Netz proposes various regression models that would measure the impact of

2    Unocal's alleged conduct on prices, and control for the part of price that is determined

3    by other variables. Id. ¶ 85. For example, Dr. Netz testifies that one could use

4    regression analysis to (1) isolate, controlling for other variables, that portion of the

5    price increase that is attributable to Unocal's alleged anticompetitive conduct; (2)

6    estimate the total change in price after March 1996 and reduce it by estimates of price

7    increases not due to Unocal's conduct; or (3) measure the impact of Unocal's conduct

8    using comparison markets as control groups in a "differences-in-differences"

9    regression. Id. ¶¶ 86-88, 92-96. Dr. Netz also proposes various "disaggregated

10   methods" that may be used to calculate the magnitude of price increases arising from

11   specific sources, and may be used in conjunction with a regression analysis to isolate

12   the portion of price increase due to Unocal's alleged illegal conduct. Id. ¶ 103.

13   Plaintiffs contend that Dr. Netz may use these methods to determine damages on a per

14   gallon basis at the wholesale level, and then employ standard regression techniques to

15   measure the amount of damages passed through to retail customers. Mot. at 18; Netz

16   Decl. ¶ 76. Dr. Netz also proposes an alternative method of calculating harm to the

17   retail market on a per gallon basis, without examining pass-through, by directly

18   determining the effect of Unocal's alleged conduct on retail prices. Netz Decl. ¶¶ 77,

19   140. Plaintiffs contend that these methods may be used to calculate aggregate

20   damages, as well as damages to individual class members.

21       Unocal argues that plaintiffs fail to identify a common formulaic method by

22   which damages may be calculated. Unocal again contends that the alleged reduction in

23   supply "did not occur at any one time or have effects that persisted over the entire class

24   period" and therefore "[s]eparate calculations will be required for each of these various

25   time periods, as well as for all the permutations in between." Opp'n at 18. Unocal

26   similarly asserts that the alleged increased costs depend on the particular date on which

27   a consumer purchased RFG because any increased costs were not constant. Unocal

28   further argues that other individual issues exist depending on the location and identity

1    of the refiner from whom the consumer purchased RFG. Unocal asserts that Dr. Netz's

2    testimony regarding available damages calculation methods "amounts to a request that

3    the court have faith [that] some solution will be found," rather than proposing a

4    particular appropriate formula for the instant case. Id. at 21.

5         "The individuation of damages in consumer class actions is rarely determinative

6    under Rule 23(b)(3). Where [] common questions predominate regarding liability, then

7    courts generally find the predominance requirement to be satisfied even if individual

8    damages issues remain." Smilow v. Southwestern Bell Mobile Sys., Inc., 323 F.3d 32,

9    40 (1st Cir. 2003) (citing Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3d Cir.

10   1977); Gold Strike Stamp Co. v. Christensen, 436 F.2d 791, 798 (10th Cir.1970); 5

11   James Wm. Moore, Moore's Federal Practice § 23.46[2][a], at 23-208 & n. 11 (3d ed.

12   1997 & Supp. 2006) (collecting additional cases); Blackie v. Barrack, 524 F.2d 891,

13   905 (9th Cir.1975) ( "The amount of damages is invariably an individual question and

14   does not defeat class action treatment.")). In Klay v. Humana, Inc., the Eleventh

15   Circuit observed that, "[p]articularly where damages can be computed according to

16   some formula, statistical analysis, or other easy or essentially mechanical methods, the

17   fact that damages must be calculated on an individual basis is no impediment to class

18   certification." 382 F.3d 1241, 1259 -1260 (11th Cir. 2004); see also Smilow, 323 F.3d

19   at 40 (same); 5 Moore, supra, § 23.46[3], at 23-210 & n.18 (collecting cases holding

20   that class certification is appropriate where damages are calculable by mathematical

21   formula); In re Rubber Chems. Antitrust Litig., 232 F.R.D., at 354.

22        The Court concludes that plaintiffs have come forward with plausible economic

23   methodologies to calculate damages on a classwide basis. Courts routinely accept

24   regression and statistical analyses as providing a means for proving a classwide

25   measure of damages. See, e.g., In re Cardizem, 200 F.R.D. at 348. Plaintiffs need not

26   specify the particular method that will be used. See In re NASDAQ, 169 F.R.D. at 522

27   ("It is sufficient to note at this stage that there are methodologies available, and that

28   Rule 23(c)(1) and (d) allow ample flexibility" to deal with the individual damages

1   issues that may develop. . . . The Court need not decide at this juncture what approach

2   is best suited to the particularities of this case."); In re Cardizem at 349-50

3   ("Defendants' complaints that Plaintiffs' methodology and its damage calculations are

4   too imprecise for class certification are to no avail. At the class certification stage, it is

5   not necessary to identify specific benchmarks or methodology to ascertain the amount

6   of damages."); In re Lorazepam & Clorazepate, 202 F.R.D. at 30 ("The plaintiffs'

7   expert here has provided several reasonable approaches to calculating damages. . . .

8   For example, the plaintiffs propose that damages can be calculated in the aggregate for

9   the class as a whole, with allocation to particular class member to be accomplished

10  after trial through an administrative claims procedure."); In re Domestic Air Transp.

11  Antitrust Litig., 137 F.R.D. 677, 693 (N.D. Ga. 1991) ("It is not necessary that

12  plaintiffs show that [their expert]'s methods will work with certainty at this time.

13  Rather, plaintiffs' burden is to present the Court with a likely method for determining

14  class damages."). Indeed, "if individual damage questions were a barrier to class

15  certification, there would be little if any place for the class action device in the

16  adjudication of antitrust claims." In re NASDAQ, 169 F.R.D. at 524.

17          The Court concludes that plaintiffs have satisfied their burden of showing that

18  classwide methods for proving damages exist.

19                          **b) Superiority**

20          In addition to a predominance of common questions, a class proponent must also

21  demonstrate that the class action is superior to other methods of adjudicating the

22  controversy. See Valentino, 97 F.3d at 1235 (explaining that the party seeking

23  certification needs to make a "showing [as to] why the class mechanism is superior to

24  alternative methods of adjudication"). A class action may be superior where "class-

25  wide litigation of common issues will reduce litigation costs and promote greater

26  efficiency." Valentino, 97 F.3d at 1234. Rule 23(b)(3) provides the following non-

27  exhaustive list of four factors to consider in this assessment:

28

1     (A) the interest of members of the class in individually controlling the

2     prosecution or defense of separate actions;

3     (B) the extent and nature of any litigation concerning the controversy

4     already commenced by or against members of the class;

5     (C) the desirability or undesirability of concentrating the litigation of

6     the claims in the particular forum;

7     (D) the difficulties likely to be encountered in the management of a

8     class action.

9   Fed. R. Civ. P. 23(b)(3).

10       The greater the number of individual issues to be litigated, the more difficult it

11  will be for the court to manage the class action. See, e.g., Dalkon Shield, 693 F.2d at

12  856. Thus, a class action is improper where an individual class member would be

13  compelled to try "numerous and substantial issues to establish his or her right to

14  recover individually, after liability to the class is established." Schwarzer et al., supra,

15  at § 10:361. On the other hand, the fact that individual members seek separate

16  damages is not fatal to class treatment. Id.

17       Plaintiffs argue that each class member's individual claim is likely so small that

18  class members have little interest in a costly individual action and that, because class

19  members' claims are virtually identical, no one member of the class would have an

20  interesting in controlling the litigation. Mot. at 21. Plaintiffs contend that they are

21  aware of no other litigation concerning the instant controversy. Plaintiffs further argue

22  that it is desirable to concentrate litigation of these claims in this forum, selected by the

23  Judicial Panel on Multidistrict Litigation, in order to maximize efficiency. Id. at 22

24  (citing In re Compact Disc Minimum Advertised Price Antitrust Litig., 216 F.R.D. 197,

25  206 (D. Me. 2003)). Finally, plaintiffs contend that management difficulties are likely

26  to be lessened in this case because common issues predominate, and that, in any event,

27  courts generally should not deny class certification over manageability concerns. Id.

28  (citing In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 140 (2d Cir.

1    2001) ("[F]ailure to certify an action under Rule 23(b)(3) on the sole ground that it

2    would be unmanageable is disfavored and should be the exception rather than the

3    rule.") (internal quotation marks and citation omitted)).[9]

4         Unocal argues that plaintiffs' proposed class is inherently unmanageable because

5    the case involves potentially thousands of transactions for each class member, and class

6    members likely do not have adequate records of their purchases. Unocal contends that

7    the named plaintiffs have only partial records of their own purchases for the most

8    recent years of the class period, and these records do not show the number of gallons

9    purchased or the price per gallon.[10] Opp'n at 22 (citing In re Phenylpropanolamine

10   (PPA) Products Liab. Litig., 214 F.R.D. 614, 619-20 (W.D. Wash. 2003) ("Because the

11   vast majority of putative class members are unlikely to possess proof of purchase, and

12   given the purportedly immense size of this class, the individualized inquiries

13   surrounding class identification would be prodigious and would defy the court's ability

14   to effectively and efficiently manage the litigation."). In their reply, plaintiffs respond

15

16

17   _____

         [9]The Court notes that in In re Initial Public Offering Securities Litig., 471 F.3d 24
18   (2d Cir. 2006), the Second Circuit disapproved of the standard of proof for class
     certification employed in In re Visa Check/MasterMoney Antitrust Litig.
19

20        [10]Unocal further argues that these problems will not be resolved by the use of
     aggregate damages or fluid recovery. Regarding common proof of damages, plaintiffs
21   contend in their motion that the Cartwright Act "specifically allows the utilization of
     aggregate, statistical, or sampling methods with a pro rata allocation of illegal overcharges
22   or excess profits." Mot. at 15 (citing Cal. Bus. & Prof. Code § 16760(d); Bruno v.
23   Superior Court, 127 Cal. App. 3d 120, 135 n.9 (1981)). Unocal contests this point, and
     argues that, with the exception of price-fixing cases, under California law each class
24   member must come forward and prove the amount of damages before recovery, and that
25   fluid recovery is not a substitute for resolving individual claims. Opp'n at 24. In their
     reply, plaintiffs explain that they do not propose that aggregate damages or fluid recovery
26   will replace individual claims of class members; rather, plaintiffs suggest the use of fluid
27   recovery to distribute any funds that remain unclaimed after individual class members
     make claims. Reply at 23. In light of the Court's conclusion that the action is
28   manageable, the Court need not consider the permissibility of fluid recovery at this time.

1  that proofs of purchase are not required for certification, and that a well-designed
2  claims process will identify RFG purchases. Reply at 21-22.[11]
3      The Court concludes that the action appears, at this time, to be sufficiently
4  manageable. Failure to certify an action under Rule 23(b)(3) on the sole ground that it
5  would be unmanageable is disfavored and " 'should be the exception rather than the
6  rule.' " In re S. Cent. States Bakery Prods. Antitrust Litig., 86 F.R.D. 407, 423 (M.D.
7  La. 1980) (quoting Manual for Complex Litigation, § 1.43 n. 72 (1977)); see also
8  Mitchell-Tracey v. United General Title Ins. Co., 237 F.R.D. 551, 560 (D. Md. 2006);
9  In re Workers' Compensation Ins. Antitrust Litig., 130 F.R.D. 99, 110 (D. Minn. 1990)
10  (stating that "dismissal for management reasons is never favored"). In re
11  Phenylpropanolamine (PPA) Products, upon which Unocal relies, does not counsel a
12  different result. In that case, the court found the plaintiffs' proposed class action
13  unmanageable. The court noted that members of the class were not identifiable
14  because individuals would be required to show "purchase and possession of a
15  non-expired PPA-containing product as of November 6, 2000," in order to qualify for
16  membership in the proposed class, but "only a quarter of the class, at most, would
17  likely possess any physical proof of purchase" and a "determination as to the remainder
18  of the class would rely on the memories of those individuals as to the types, amounts,
19  and expiration dates of medication they possessed over two years ago." 214 F.R.D. at
20  617. Further, "[p]utative class members would be asked to distinguish, now over two
21  years after the fact, between defendants' various products and the various formulations
22  of those products, many of which differed only slightly in name and packaging." Id. at
23  618. However, unlike the product at issue in that case, RFG was the only gasoline
24  available in the summertime in California during the class period. As such,
25
26      [11]Plaintiffs submit the expert declaration of Tiffany A. Allen, a principal consultant
27  at Rust Consulting, who testifies that a well-designed claim form can assist in identifying
28  RFG purchases, in addition to those purchases identified through class members' existing
    purchase records.

1    identification of the class will be considerably easier.  Further, at this stage, it is

2    speculative to assert that only a minority of class members will possess proof of

3    purchase or other evidence sufficient to establish individual proof of damages.  Indeed,

4    plaintiffs contend that many class members are likely to have proof of RFG purchases,

5    and that Unocal may have records of such purchases made by use of purchase credit

6    cards.  Reply at 20.

7         Further, the Court has at its disposal various methods to deal with case

8    management issues.  As the Seventh Circuit in <u>Carnegie v. Houshold Intern., Inc.</u>, 376

9    F.3d 656 (7th Cir. 2004), noted,

10            Rule 23 allows district courts to devise imaginative solutions to problems

11            created by the presence in a class action litigation of individual damages

12            issues.  These solutions include "(1) bifurcating liability and damage trials

13            with the same or different juries; (2) appointing a magistrate judge or

14            special master to preside over individual damages proceedings; (3)

15            decertifying the class after the liability trial and providing notice to class

16            members concerning how they may proceed to prove damages; (4)

17            creating subclasses; or (5) altering or amending the class."

18    <u>Id.</u> at 661 (quoting <u>In re Visa Check/MasterMoney</u>, 280 F.3d at 141); <u>see also</u> Newberg

19    on Class Actions § 10:12 ("When classwide damages are amenable to proof by the

20    class representative, a lump sum damage award is possible on behalf of the class. . . .  If

21    the plaintiff prevails, individual damages may be distributed to class members on the

22    basis of the defendant's records or according to an apportionment plan based on public

23    data, thus eliminating the need for proof of claims by class members.  Where such

24    distribution is not possible, per capita or average damage distribution may be made or

25    individual proof of claims may be necessary.  Such individual claims may be processed

26    by a special master or by a committee of counsel appointed by the court.").  Further,

27    should complications in calculating damages for individual class members appear

28

1    evident, this Court has the option, under Rule 23(c)(1), to alter or amend its class

2    certification order before a decision is rendered on the merits.

### 2. Plaintiffs' Unfair Competition Claim

4        Plaintiffs assert that common impact and damages for their unfair competition

5    claim, pursuant to Cal. Bus. & Prof. Code § 17200 (the "UCL"), can be demonstrated

6    using virtually the same evidence that will be used regarding plaintiffs' antitrust

7    claims.  Unocal responds that plaintiffs' UCL claims fail to meet the requirements of

8    Rule 23(b)(3) for the reasons already discussed regarding plaintiffs' antitrust claims.

9        The Court concludes that plaintiffs' unfair competition claim is based upon the

10   same alleged conduct giving rise to plaintiffs' antitrust claims and involves the same or

11   similar issues.  As discussed above, these issues are susceptible to classwide proof.  As

12   such, plaintiffs have satisfied their burden under Rule 23 as to their unfair competition

13   claim.

### 3. Plaintiffs' Unjust Enrichment Claim

15       To prove unjust enrichment, plaintiffs must prove the "receipt of a benefit and

16   unjust retention of the benefit at the expense of another."  Hirsch v. Bank of America

17   N.A., 107 Cal. App. 4th 708, 717 (2003).  Plaintiffs argue that Unocal's unjust

18   enrichment will be proved on a classwide basis, and that restitution will be measured

19   by the profits or overcharges received by Unocal.  Mot. at 20 (citing In re Cardizem CD

20   Antitrust Litig., 200 F.R.D. at 352).

21       Unocal responds that the alleged benefit conferred upon Unocal, like plaintiffs'

22   other claims, turns upon "individual proof about whether and the degree to which

23   particular class members in fact incurred any such overcharge."  Opp'n at 25 n.15.

24       The Court concludes that plaintiffs' unjust enrichment claim is based upon the

25   same or similar issues presented by plaintiffs' antitrust claim.  As discussed above,

26   these issues are susceptible to classwide proof.  As such, plaintiffs have satisfied their

27   burden under Rule 23 as to their unjust enrichment claim.

28

1
2
3
4
5
6
7
8
9

### C. Appointment of Class Representatives and Lead Class Counsel

Plaintiffs request the appointment of Caleb Kleppner, Corrine Sealey, Christopher Sheppard, Stephen Buckser, Asher Rubin, Jeffrey Rubin, Corey Rosen, Gail Harper, and Michael Shames as class representatives. Plaintiffs also seek the appointment of their counsel of record as class counsel. Plaintiffs assert that proposed lead counsel "have extensive experience and expertise with the antitrust laws, as well as other complex civil litigation, including class actions, and have litigated such cases in courts throughout the country." Mot. at 23. Plaintiffs also assert that counsel have devoted considerable resources to the prosecution of this case.

10
11
12
13
14
15

Unocal apparently does not object to the appointment of class representatives and co-lead class counsel. Accordingly, plaintiffs' request is GRANTED. The Court appoints the following law firms as co-lead class counsel: Berman DeValerio Pease Tabacco Burt & Pucillo; Finkelstein Thompson LLP; Kirby McInerney & Squire LLP; and Pomerantz Haudek Block Grossman & Gross LLP. Milberg Weiss & Bershad LLP is appointed as Liaison Counsel.

16
### IV.    CONCLUSION

17
18
19

In accordance with the foregoing, plaintiffs' motion for class certification is hereby GRANTED. Plaintiffs' request to appoint class representatives and class counsel is GRANTED.

20
21    IT IS SO ORDERED.
22
23
24    Dated:        March 27, 2007
25
26
27
28

_Christina A. Snyder_
CHRISTINA A. SNYDER
United States District Judge