## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE INTEL CORPORATION MICROPROCESSOR ANTITRUST LITIGATION | ) ) ) | MDL No. 05-1717-JJF |
| ADVANCED MICRO DEVICES, INC. and AMD INTERNATIONAL SALES & SERVICE, LTD., | ) ) ) ) | C. A. No. 05-441-JJF |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| INTEL CORPORATION and INTEL KABUSHIKI KAISHA, | ) ) ) | |
| Defendants. | ) | |
| PHIL PAUL, on behalf of himself and all others similarly situated, | ) ) ) | C. A. No. 05-485-JJF |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| INTEL CORPORATION, | ) ) | |
| Defendant. | ) | |

### NOTICE OF TAKING DEPOSITION OF
### ADVANCED MICRO DEVICES, INC. and
### AMD INTERNATIONAL SALES & SERVICE, LTD.

**PLEASE TAKE NOTICE** that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil

Procedure, defendant Intel Corporation will take the deposition of Advanced Micro Devices, Inc.

and AMD International Sales & Service, Ltd. (collectively, "AMD") on July 9 and 10, 2008

beginning each day at 9:30 a.m., at the offices of Gibson, Dunn & Crutcher LLP, 333 South

Grand Avenue, 47th Floor, Los Angeles, California 90071, or at such other time and place as the

parties may agree.   The deposition will be recorded by stenographic and sound-and-visual

(videographic) means, will be taken before a Notary Public or other officer authorized to administer oaths, and will continue from day to day until completed, weekends and public holidays excepted.

Reference is made to the "Description of Matters on Which Examination is Requested" attached hereto as Exhibit A and incorporated herein by this reference. In accordance with Rule 30(b)(6) of the Federal Rules of Civil Procedure, AMD is hereby notified of its obligation to designate one or more officers, directors, or managing agents (or other persons who consent to do so) to testify on its behalf as to all matters embraced in the "Description of Matters on Which Examination is Requested" and known or reasonably available to AMD.

OF COUNSEL:

Robert E. Cooper
Daniel S. Floyd
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 900071
(213) 229-7000

Peter E. Moll
Darren B. Bernhard
Howrey LLP
1299 Pennsylvania Avenue
N.W. Washington, DC 20004
(202) 783-0800

Dated: May 30, 2008

**POTTER ANDERSON & CORROON LLP**

By:    */s/ W. Harding Drane, Jr.*
        Richard L. Horwitz (#2246)
        W. Harding Drane, Jr. (#1023)
        Hercules Plaza, 6th Floor
        1313 N. Market Street
        P.O. Box 951
        Wilmington, DE 19899-0951
        (302) 984-6000
        rhorwitz@potteranderson.com
        wdrane@potteranderson.com

Attorneys for Defendants
Intel Corporation and Intel Kabushiki Kaisha

# EXHIBIT A

## EXHIBIT A

## DESCRIPTION OF MATTERS ON
## WHICH EXAMINATION IS REQUESTED

### I.

### DEFINITIONS

1.    "AMD" shall mean and refer collectively to plaintiffs Advanced Micro Devices, Inc. and AMD International Sales & Service, Ltd., including their respective past and present officers, directors, agents, attorneys, employees, consultants, or other persons acting on either of their behalf.

2.    "AMD Custodians" means and refers to the approximately 440 individuals identified by AMD on its Custodian List served on June 1, 2006, pursuant to the Stipulation and Order Regarding Document Production entered by the Court in this Litigation.

3.    "Complaint Freeze Tapes" means the tapes preserved in or about March 2005 as described in David Herron's October 24, 2005 letter to John J. Rosenthal.

4.    "Email Journaling System" means the system that AMD activated for document retention purposes as identified in David Herron's April 23, 2007 letter to Robert E. Cooper.

5.    "Enterprise Vault" means the system that AMD obtained and implemented for document retention purposes as identified in David Herron's April 23, 2007 letter to Robert E. Cooper.

6.    "Litigation" means and refers to the litigation in which this Notice of Taking Deposition has been served.

7.    "Litigation Hold Notices" or "Hold Notices" means and refers to the means by which AMD communicated its preservation obligations to its employees concerning the Litigation (regardless of the title or name given to such communications), including all oral, written or electronic notices, reminders, or other communications by AMD to AMD Custodians or other AMD employees.

8.    "Monthly Backup Tapes" means the tapes described in David Herron's October 24, 2005 letter to John J. Rosenthal.

## II.

### SUBJECT MATTER

1.    The information sought in Robert E. Cooper's April 11, 2007 letter to David L. Herron regarding AMD's document retention activities, attached hereto as Exhibit B.

2.    The selection, design, architecture, operation, functionality, capabilities and implementation of AMD's Enterprise Vault system, including its reporting, search and production capabilities.

3.    The design, architecture, operation, functionality, capabilities and implementation of AMD's Email Journaling System, including its reporting, search and production capabilities, as well as any errors, malfunctions, or unexpected attributes of AMD's Email Journaling System.

4.    The preparation, timing, contents, and distribution of all Litigation Hold Notices, including the identity (name, location, position) of anyone receiving such Litigation Hold Notice and the date(s) of receipt by each AMD Custodian of each Litigation Hold Notice.

5.    The details and circumstances concerning any known or suspected non-compliance with the Litigation Hold Notices, whether on a systemic or individual basis, the facts and timing of AMD's discovery of such non-compliance, the identity of those persons involved in such non-compliance, and the timing and nature of all steps taken following such discovery including actions AMD has taken to investigate AMD's compliance with its document retention obligations in connection with this Litigation.

6.    The details and circumstances of any known or suspected failures, whether on a systemic or individual basis, in the preservation of potentially relevant Documents on the Complaint Freeze Tapes, Monthly Backup Tapes, Email Journaling System, Enterprise Vault or hard drive of any AMD Custodian including actions AMD has taken to investigate AMD's compliance with it document retention obligations in connection with this Litigation.

7.    AMD's harvest of data from AMD Custodians, including the harvest instructions and protocols employed and the identity of those persons involved in developing and executing such instructions and protocols, and the timing of the harvest of each AMD Custodian.

8.    The details of any steps, policies, practices or other measures undertaken by AMD to preserve the electronic data and other documents of departing AMD Custodians, including the details and timing of any AMD effort to monitor or otherwise ensure compliance with such steps, policies, practices or measures including actions AMD has taken to investigate AMD's compliance with it document retention obligations in connection with this Litigation.

9.    For each individual AMD Custodian: (a) the date(s) on which the Custodian's documents were harvested for the Litigation; (b) the date on which the Custodian was put on the

Email Journaling System; (c) the date on which the Enterprise Vault was first used to capture and preserve email for the Custodian; (d) whether the Custodian has deleted any potentially relevant Documents from the hard drive of the Custodian's laptop or desktop computer; (e) whether the Custodian has deleted any potentially relevant email from the Exchange server hosting that Custodian's email; (f) whether any of the Custodian's potentially relevant Documents have been lost from the Custodian's hard drive due to file corruption, lost laptop or other means of loss; (g) whether the data for the Custodian has been preserved on Monthly Backup Tapes, and if so, for which specific months; and (h) whether the data for the Custodian has been preserved on the Complaint Freeze Tapes.

10.     Whether AMD has discovered that any AMD Custodian manually deleted, or otherwise lost, any potentially relevant email or other electronic data prior to the date on which the Custodian's data was harvested, and if so, the date(s) and volume of such deletion or loss, and whether AMD has produced (or will produce) documents for that Custodian from the Complaint Freeze Tapes, Monthly Backup Tapes, Enterprise Vault or other source including actions AMD has taken to investigate AMD's compliance with it document retention obligations in connection with this Litigation.

11.     The existence, details and application of "AMD's document retention and destruction policies" referenced in David Herron's October 24, 2005 letter to John J. Rosenthal (attached as Exhibit C), and the suspension or deviation from such policies and practices in connection with this Litigation.

12.     Limitations on storage for individual AMD employees' email including the consequence of an AMD employee's email account reaching the storage limit and whether any AMD Custodians reached the storage limits imposed on their email account at any time after March 11, 2005.

13.     The operation, functionality and capabilities of AMD Custodians' email accounts before each custodian is or was placed on AMD's Email Journaling System and the changes to the characteristics and functionality that occur as a result of enabling AMD's Email Journaling System for a Custodian's email account.

14.     The information that is captured on each Monthly Backup Tape including what folders and types of items are included and excluded, and whether PST files are located on the Exchange servers.

15.     The "auto-delete features on email" referred to in the "Frequently Asked Questions and Answers" attached to AMD's Hold Notices, including whether and how AMD Custodians could enable or disable such features, which, if any AMD Custodians used the auto-delete feature at any time after March 11, 2005 and how AMD determined those facts, efforts made to inform AMD Custodians of the auto-delete system and whether and how to disable it, and whether auto-delete could have been disabled at a system level.

16.     The actual or potential data loss referred to in David L. Heron's March 19, 2008 and May 14, 2008 letters to Richard Levy (attached as Exhibit D), including: (a) the facts and circumstances surrounding the actual or potential loss of data from Messrs. Oji, Kepler, and

Soares; (b) the timing and details of the delay in AMD counsel learning of the data loss; (c) the extent to which AMD has investigated whether other AMD Custodians have experienced similar actual or potential data loss; (d) whether other AMD Custodians follow retention practices like those of Messrs. Oji, Kepler, and Soares described in the letters, and (e) whether such practices were known and authorized by AMD.

# EXHIBIT B

# GIBSON, DUNN & CRUTCHER LLP

## LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

333 South Grand Avenue  Los Angeles, California 90071-3197
(213) 229-7000
www.gibsondunn.com

RCooper@gibsondunn.com

April 11, 2007

Direct Dial
(213) 229-7179

Fax No.
(213) 229-6179

Client No.
T 42376-00764

David L. Herron
Jeffrey J. Fowler
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071-2899

Re:    *AMD v. Intel - eDiscovery Issues*

Gentlemen:

In the last several weeks, Intel has shared with AMD detailed information with regard to the steps it designed to retain all documents, including emails, relevant to this litigation, the implementation of those steps, and some lapses that Intel has discovered with regard to that implementation. We are now engaged in a Court supervised accounting of those lapses and the creation of a remediation plan to deal with them. It is thus reasonable and timely for Intel to ask AMD for certain updated information with regard to its document retention activities so that Intel will be in a position, as the parties go forward in discovery, to understand whether there might be any lapses in AMD's document retention. We assume the information Intel is seeking should not be burdensome since we are merely seeking to update and confirm representations that AMD has made to Intel about its retention practices.

We do not mean to suggest that AMD has not undertaken its preservation obligations. The spirit of the Amended Federal Rules, however, contemplate that the parties will continue to keep each other apprised on the status of preservation, especially in case of this complexity and length.

## A.    Document Retention In General.

Is AMD aware of the loss of any documents potentially relevant to this litigation, and/or any non-compliance with all hold instructions issued to AMD employees, either as a result of human conduct, the operation of a computing system, or otherwise? If so, please provide a full

# GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 2

description of the loss or non-compliance, including: (i) the custodian(s) involved; (ii) the nature of the loss or non-compliance; (iii) when AMD first discovered the loss or non-compliance; and (iv) all remedial steps undertaken by AMD to address the loss or non-compliance.

Whether or not AMD is aware of any loss or non-compliance, has AMD made any efforts to determine whether any loss or non-compliance has occurred? Please describe AMD's efforts in detail.

   **B.**     **Enterprise Level Preservation.**

   **"March 11, 2005, AMD sent preservation letters to its IT personnel in its various offices. The oldest full backup of the Exchange servers and Windows environment, network servers were located and preserved."**

Please describe, in detail, why AMD chose March 11, 2005, to send these letters. Please also confirm that the oldest full backup of the Exchange and Windows, network servers are being preserved. In this regard, we would appreciate a list of the location of the Exchange servers and the individual custodians subject to the legal hold that is on those servers. With respect to the windows environment and network shared files servers, we would appreciate a list of those servers, a general description of their content and the date upon which the backup was created.

   **"Beginning March 19, 2005, full backups were made and retained. Over the next several weeks the backup schedules were coordinated; going forward, full backups are taken and retained every month." (10/24/05 AMD Letter at 1)**

Please confirm, as represented, that full backups were being made and retained beginning on March 19, 2005, and on a monthly basis thereafter. In particular, confirm the location and storage of the backups, including whether the backups have or are being indexed. In this regard, are there any servers that were initially part of the March 19, 2005 backups that have been taken off the monthly backup process or added to the monthly backup process? In addition, is there a person or group of people responsible for this backup process at AMD? If so, please identify that individual(s).

   **"The monthly full backups are retained in secure locations. Most of these sites send their tapes to Austin, although a few offices retain their backups locally. Compliance is tracked and monitored on a weekly basis." (10/24/05 AMD Letter at 1)**

# GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 3

Have each of these backups been retained? With respect to these backup tapes, are any of these tapes lost or missing or not readable? In addition, has AMD attempted or restored any of these backup tapes and, if so, for what purpose?

> **"AMD's document retention and destruction policies were suspended to prevent inadvertent description of documents that may be relevant to this lawsuit." (10/24/05 AMD letter at 1-2)**

It is unclear what you mean by the policies were "suspended." Was this suspension limited to categories of potentially relevant records to this litigation or to all records. And was the suspension ever lifted for any custodian or corporate groups? Please confirm that each of the custodians subject to the legal hold has, in fact, complied with this suspension directive? Please state whether AMD's computer system has an auto-delete process

## C.    Custodian Level Presentation And Legal Holds.

> **"On April 1, 2005, AMD issued its first wave of document preservation notices to approximately 150 custodians likely to have relevant information. The custodians were instructed to preserve all documents and data relevant to the lawsuit. This includes, of course, e-mail." (10/24/05 AMD Letter at 2)**

> **"As additional custodians are identified, preservation notices are sent to them and they are put on the litigation hold. To date, the list of custodians includes approximately 440 people. Appropriate follow-up is conducted as needed to ensure custodian understanding and continued compliance with that hold." (10/24/05 AMD Letter at 2)**

> **"The current count of custodians to whom a litigation hold has been issued is roughly 440. AMD continues to assess the propriety of maintaining that hold with respect to all of these employees, some of whom AMD does not believe have any relevant information or involvement with any issue relevant to this lawsuit. Accordingly AMD currently is in the process of reviewing its hold list and is considering paring that list, as appropriate." (10/24/05 AMD Letter at 3)**

Please provide a list of the 440 custodians originally issued a legal hold, and the date they were issued the legal hold. To the extent any custodians were added, please identify them by

GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 4

name, job title and office location, and indicate the day they were issued legal hold notices. If AMD has identified and removed from hold custodians that "it does not believe has any relevant information or involvement with any issues relevant to this lawsuit," please identify those custodians, the date they were removed from hold and the rationale as to why they were removed?

For each witness identified on AMD's Rule 26 disclosure, provide the date on which they were provided a legal hold notice, the date on which they were placed on journaling, and whether their emails are preserved on any monthly backup tapes. Please also identify each witness on AMD's Rule 26 disclosure who, at the time of the disclosure, had not been provided a legal hold notice, and an explanation of why they had not been provided a notice.

AMD has previously suggested that the parties exchange the content of their legal hold orders, and that the production of these orders will not constitute a waiver of any privilege, including a subject matter waiver. We accept this proposal. Please provide a copy of the legal hold order sent to AMD custodians (and any differing versions) and Intel will do the same.

> **"When a custodian is terminated during the pendency of the litigation hold, AMD harvests that custodian's potentially relevant data and documents. AMD either retains or makes a forensic copy of that custodian's hard drive; segregates and preserves data and documents on Exchange and Windows-environment, shared network servers; and paper documents and other physical storage media are collected as appropriate."** (10/24/05 AMD Letter at 3).

Please identify any custodian that was originally subject to the legal hold notice, but was terminated. As to those employees, please confirm that AMD has undertaken the preservation obligations described above. With respect to AMD's efforts, what is meant by a forensic copy (e.g., bit-by-bit). Please identify any terminated employee, whose data has been lost.

D.     E-mail Preservation

> **"AMD also is in the process of moving its custodians subject to the hold notice to a new Exchange server on which e-mail can be more easily stored." (10/24/05 AMD Letter at 1).**

We remain confused regarding the steps that AMD has undertaken to preserve the potentially relevant e-mails in this action. In the course of our preservation discussions in the summer of 2005, AMD represented that it was relying upon the individual custodians to preserve the relevant e-mails by the issuance of the written legal hold notice. You further indicated, and

## GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 5

confirmed in writing, that "AMD was in the process of moving custodians to a new Exchange server on which e-mail could be more easily stored" and, presumably, backed up per the representations described in your October 2005 letter.

In the meeting in Los Angeles in February 2007, AMD indicated that it had implemented a "journaling system" to preserve potentially relevant e-mails. It is unclear what AMD means by a "journaling system." Are you merely describing using MS Exchange Journaling of all sent and received e-mails that are then written off to backup tapes or has AMD implemented an archive solution where the e-mail is written off to some type of a storage area network drive? We would appreciate a full description of what AMD has implemented, including its configuration, when it was implemented when specific custodians subject to the legal hold in this matter where added to the system and whether AMD has experienced an issues or problems with this system.

### E.    Harvesting of Drives

Please identify the dates upon which each custodian's drive was harvested or reharvested. With respect to those drives, please identify any drive that AMD has been unable to harvest for any reason.

### F.    One-Time Backup

**"AMD is extracting monthly full backups of its Exchange and Windows-environment, shared network servers. Roughly 200 tapes are collected in these backups." (10124/05 AMD Letter at 2).**

**"The oldest, full backup in existence as of March 11, 2005, was preserved and full backups were to be taken on and in the few weeks immediately after March 19, 2005. The exact date varied by a week or two depending on the sites' backup schedules. Since about May 2005, backup schedules were (and are now) coordinated worldwide." (10/24/05 AMD Letter at 2).**

We are concerned about the low number of tapes taken as part of this "one-time backup." Your letter suggests that for each server, there should be two tapes: (i) the oldest full backup in rotation at that time; and (ii) a new backup taken on or about March 19, 2005. Accordingly, this would mean that only 100 potential servers were backed-up.

It would also be helpful if AMD could identify the specific severs that were backed up and the general purpose of that server (e-g., Exchange, NT shared drive). With respect to these tapes, please confirm that they have been preserved as indicated in your October 2005 letter. In

# GIBSON, DUNN & CRUTCHER LLP

David L. Herron
Jeffrey J. Fowler
April 11, 2007
Page 6

addition, are any of these tapes lost or missing or not readable? In addition, has AMD attempted to restore or restored any of these backup tapes and, if so, for what purpose?

On a separate matter, your October 2005 letter indicates that the "oldest, full backup in existence as of March 11, 2005, was preserved. This would obviously mean that AMD was contemplating litigation as early as March 11, 2005. However, we are concerned that the first legal hold notices to custodians were not issued until April 1, 2005. (10/24/05 AMD Letter at 2). Accordingly, we would like to know when AMD first contemplated litigation, who was involved in the decision to file the instant action, when that decision was made, the specific dates of any communications or meetings in which the topic of potential litigation was discussed, when did the issue of preservation of potentially relevant records first arise, whether there was any discussion about the timing of the issuance of the legal hold records and who was involved in such discussions? To the extent you are asserting privilege around these communications, we would anticipate that you will provide us with log from which we can evaluate the claim of privilege.

Finally, to the extent AMD has information about any other issues relating to the preservation of its documents, please provide us with a full report. We look forward to hearing from you on the above issues. Of course, we will be happy to discuss our requests with you and respond to any questions you may have.

Very truly yours,

Robert E. Cooper

KEK:REC/lsj

100203202_1.DOC

# EXHIBIT C



## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
IRVINE SPECTRUM
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

October 24, 2005

OUR FILE NUMBER
008,346-163

**VIA E-MAIL AND U.S. MAIL**

WRITER'S DIRECT DIAL
(213) 430-6230

John J. Rosenthal, Esq.
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

WRITER'S E-MAIL ADDRESS
dherron@omm.com

Re:    *AMD v. Intel:* eDiscovery Issue Regarding Preservation

Dear Mr. Rosenthal:

As agreed, this letter provides AMD's responses to the questions posed to Intel in Jeff Fowler's September 23, 2005 letter regarding preservation efforts.

**Overview of AMD's Preservation Efforts**

Enterprise Level Preservation

- On March 11, 2005, AMD sent preservation notices to the appropriate IT personnel in its various offices. The oldest full backup of the Exchange servers and Windows-environment, network shared file servers were located and preserved.

- Beginning March 19, 2005, full backups were made and retained. Over the next several weeks the backup schedules were coordinated; going forward, full backups are taken and retained every month.

- The monthly full backups are retained in secure locations. Most of the sites send their tapes to Austin, although a few offices retain their backups locally. Compliance is tracked and monitored on a weekly basis.

- AMD's document retention and destruction policies were suspended to prevent the inadvertent destruction of documents that may be relevant to this lawsuit.

O'MELVENY & MYERS LLP
John J. Rosenthal, Esq., October 24, 2005 - Page 2

<u>Custodian Level Preservation</u>

- On April 1, 2005, AMD issued its first wave of document preservation notices to approximately 150 custodians likely to have relevant information. The custodians were instructed to preserve all documents and data relevant to the lawsuit. This includes, of course, e-mail. Like Intel, AMD also is in the process of moving its custodians subject to the hold notice to a new Exchange server on which e-mail can be more easily stored.

- As additional custodians are identified, preservation notices are sent to them and they are put on the litigation hold. To date, the list of custodians includes approximately 440 people. Appropriate follow-up is conducted as needed to ensure custodian understanding and continued compliance with the hold.

**<u>Responses to Follow-up Questions</u>**

<u>One-Time Backup</u>

*How many total tapes were gathered during the snapshot?*
AMD is extracting monthly full backups of its Exchange and Windows-environment, shared network servers. Roughly 200 tapes are collected in these backups.

*How are they organized/indexed?*
These backup tapes are organized by backup type (*i.e.*, Exchange or file server), by site, and by date.

*How were instructions for the one-time backup communicated?*
The instructions for AMD's monthly backup protocol were communicated in writing. Follow-up phone calls were made to the appropriate IT personnel to confirm understanding and compliance.

*Were all snapshots taken on June 20?*
The oldest, full backup in existence as of March 11, 2005, was preserved and full backups were to be taken on and in the few weeks immediately after March 19, 2005. The exact date varied by a week or two depending on the sites' backup schedules. Since about May 2005, backup schedules were (and are now) coordinated worldwide.

*Have any backup tapes covering periods prior to June 20 been recycled?*
Prior to the initiation of the enterprise level hold on March 11, 2005, backup tapes were recycled and rewritten in the ordinary course of business.

*Have any backup tapes covering periods after June 20 been recycled?*
Monthly backup tapes for the Exchange and Window-environment, shared network servers have not been recycled since March 2005.

O'MELVENY & MYERS LLP
John J. Rosenthal, Esq., October 24, 2005 - Page 3

*Is there a legal hold on any existing backup tapes other than those constituting the one-time backup?*
Legal holds on monthly backup tapes are described above.

*Has there been any subsequent effort to target certain systems or segments of the IT structure and conduct more regular backup snapshots of those targets?*
As noted, AMD is conducting monthly backups on its Exchange and Windows-based, shared file environment. This has resulted in a large collection of tapes storing the data collected over the time period specified.

Shared Sources

*Has [AMD] engaged in any preservation efforts for shared sources other than hold notices to custodians?*
As part of the Enterprise Level Preservation, AMD is retaining monthly full backups of its Exchange and Windows-environment, shared network servers – which includes data and documents from employees company-wide.

Custodian Legal Holds

*Exactly how many hold notices have been issued?*
The current count of custodians to whom a litigation hold has been issued is roughly 440. AMD continues to assess the propriety of maintaining that hold with respect to all of these employees, some of whom AMD does not believe have any relevant information or involvement with any issue relevant to this lawsuit. Accordingly, AMD currently is in the process of reviewing its hold list and is considering paring that list, as appropriate.

*How was the hold notice communicated?*
The preservation notice was communicated in writing. Follow-up phone calls were made and emails sent on an as-needed basis.

*Please describe in specific terms the instructions given to custodians for how to preserve their electronic documents.*
At the present time, AMD will adopt Intel's approach to responding to this question.

*Is there a procedure to monitor compliance with the legal hold? What is it?*
Yes. Compliance is monitored in part by requesting acknowledgement of the custodians' receipt and understanding of the hold notice. Periodic email communications are sent to custodians reminding them of their preservation obligations and providing an opportunity to raise any questions or concerns. Follow-up communications occur on an as-needed basis.

*Is there a procedure for preserving the documents of terminated employees?*
Yes. When a custodian is terminated during the pendency of the litigation hold, AMD harvests that custodian's potentially relevant data and documents. AMD either retains or makes a forensic copy of that custodian's hard drive; segregates and preserves data and documents on Exchange and Windows-environment, shared network servers; and paper documents and other physical storage media are collected as appropriate.

O'MELVENY & MYERS LLP
John J. Rosenthal, Esq., October 24, 2005 - Page 4

*Are there different hold instructions for the custodian once his or her computer has been imaged for collection?*
Not at this time.

Miscellaneous Sources

*Does [AMD] archive Instant Messages?*
No. AMD's current instant messaging ("IM") system cannot be configured to save or log IMs. Accordingly, AMD does not have an instant message archiving system.

*What efforts are being made to prevent relevant data from being deleted in Instant Messaging systems?*
Custodians have been specifically instructed not to use IMs for business-related, substantive communication. Such business information is to be conveyed via email, memorandum, or other means that can be saved and retrieved. The litigation hold applies to require preservation of any communications by this or other means that is relevant to the lawsuit.

Please feel free to contact me if you have any questions.

Sincerely,

David L. Herron
of O'MELVENY & MYERS LLP

cc:    Rod Stone, Esq.

CC1:720688.8

# EXHIBIT D

O

## O'MELVENY & MYERS LLP

BEIJING

BRUSSELS

CENTURY CITY

HONG KONG

LONDON

NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK

SAN FRANCISCO

SHANGHAI

SILICON VALLEY

TOKYO

WASHINGTON, D.C.

OUR FILE NUMBER
008,346-163

WRITER'S DIRECT DIAL
(213) 430-6230

WRITER'S E-MAIL ADDRESS
dherron@omm.com

March 19, 2008

**VIA E-MAIL AND U.S. MAIL**

Richard Levy, Esq.
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, California 90071

Re:    *AMD v. Intel*

Dear Rich:

As promised in my letter of March 11, this will respond to your March 4 inquiry regarding "known losses of relevant data from an AMD custodian's hard drive due to file corruption, lost laptop or other, similar means of loss." Based on our investigation to date, and consistent with our agreement of December 7, 2007, we describe below the apparent loss of relevant data by one of AMD's custodians during the preservation period.

Kazuyuki Oji experienced an inadvertent loss of email dated during the period October 1, 2005 through March 2007. As described more fully below, AMD has attempted to recover this lost data by obtaining all of Mr. Oji's email from all sources identified by AMD as reasonably likely to contain it. AMD currently is in the process of reviewing that data for production.

AMD hired Mr. Oji as a Regional Sales Manager on October 1, 2005. Mr. Oji has worked on the Toshiba account since joining AMD. From October 1 through December 1, 2005, Mr. Oji reported directly to Akihiro Nakamura, Director of Sales, who in turn reported to David Uze, then-President of AMD Japan. On December 1, 2005, Mr. Oji began reporting directly to Keisuke Matsumoto (who reported to Mr. Uze). Masatoshi Morishita began his tenure as President of AMD Japan on November 22, 2006, at which time Mr. Matsumoto -- Mr. Oji's then and current supervisor -- began reporting to Mr. Morishita. During the course of his employment, Mr. Oji's regular practice was to copy his supervisors on important emails related to Toshiba business, and he believes that he did so with respect to a predominant majority of such emails. Mr. Oji also copied Shunsuke Yoshizawa, AMD Japan Director of Marketing, on certain of his emails.

Mr. Oji preserved email principally on his laptop computer hard drive. He also periodically backed up files to his personal external hard drive. The loss of email occurred while

Richard Levy, Esq., March 19, 2008 - Page 2

he was attempting such a back up procedure. Specifically, during the weekend of March 24-25, 2007, Mr. Oji attempted to back-up .pst files containing his email covering the time period of October 2005 to March 2007 to an external hard drive in order to preserve them. Mr. Oji estimated that the total size of these .pst files was approximately three gigabytes. In attempting this back up procedure, it appears that Mr. Oji was working with two separate folders, one of which was empty and another of which contained the subject .pst files. It appears that Mr. Oji mistakenly transferred the empty file to the external hard drive and then deleted the folder containing his email .psts. When Mr. Oji realized what had occurred, he attempted to recover the deleted files but was unsuccessful.

Mr. Oji reported this data loss to AMD Japan IT on the next business day, Monday, March 26, 2007. AMD Japan IT personnel attempted to recover Mr. Oji's data in several ways.

First, IT personnel tried to locate a copy of that data that had been created when exchanging Mr. Oji's old laptop computer for a new laptop computer in November 2006. Pursuant to AMD Japan IT's standard procedures, the process for creating such a copy is to transfer the data from the old computer to an alternate storage location, transfer the data from that location to the new computer's hard drive and, after confirming successful transfer, to delete the image from the temporary storage location. This process was followed in Mr. Oji's case, such that IT's copy of Mr. Oji's data no longer existed. Second, IT personnel located and checked Mr. Oji's pre-November 2006 computer, but found that the data had been removed from the hard drive after it had been transferred to the new computer. Third, AMD Japan IT personnel purchased what they believed to be the best commercially-available data recovery software for the specific purpose of recovering Mr. Oji's lost files and ran it on Mr. Oji's laptop hard drive. Although some data was recovered (approximately 335 megabytes), the subject .psts were not. Finally, AMD Japan IT checked the file server but found no .pst files from the end of December 2006 (which would have been the date that such files possibly could have been temporarily copied to a file server when switching out Mr. Oji's old computer). In sum, despite these many efforts, IT personnel were unable to recover the inadvertently-deleted email files.

Intel adversely designated Mr. Oji on September 2007. AMD's counsel learned about Mr. Oji's inadvertent loss of data in November 2007. Given the fact and nature of the loss, AMD then immediately collected Mr. Oji's data from all of the sources on which he stored data as well as all back up or subsidiary sources that AMD identified as containing Mr. Oji's data.

First, consistent with its harvesting protocols, AMD obtained an image of Mr. Oji's laptop computer. AMD also obtained and extracted files from his personal external hard drive; obtained files from the personal network space assigned to Mr. Oji; and obtained files from Mr. Oji's home computer that were work-related.

Second, AMD obtained the 18 monthly back up tapes applicable to Mr. Oji covering the time period from October 2005 through March 2007. These back up tapes were made pursuant to AMD's back up tape protocols for this litigation. The applicable back up tapes were restored by an outside vendor, and the Exchange mailbox items related to Mr. Oji were extracted.

Richard Levy, Esq., March 19, 2008 - Page 3

Third, AMD conducted a search across its journaling system and vault repository for emails sent or received by Mr. Oji. This search captured emails sent or received by Mr. Oji for the AMD employees, some of whom were on those systems as early as November 2005.

Finally, AMD created a data repository of hard drive images of the laptop computers and, as applicable, the personal network space of the five supervisors whom Mr. Oji regularly copied on work-related email, Messrs. Nakamura, Uze, Matsumoto, Morishita and Yoshizawa. This material was searched for Mr. Oji's emails, which were exported for review.

On February 15, 2008, AMD produced 21,345 of Mr. Oji's files to Intel. Both the data collected from Mr. Oji's own computer and storage devices as well as the additional data referenced above contain a significant amount of Japanese language text. That material is currently under review for anticipated production by March 31, the date by which each side is to supplement productions with foreign language documents. AMD will make its best efforts to produce all of Mr. Oji's responsive data by that date, but it is possible that review and production of some portion of the recovered data will not be concluded by that time. Should that be the case, we will keep you apprised of our progress.

Given the significant document production on February 15, AMD continues to assess and monitor document preservation and possible data losses, and we assume Intel is doing so as well. AMD will make additional disclosures promptly, if any become necessary.

If you have questions, please feel free to contact me.

Sincerely,

David L. Herron
of O'MELVENY & MYERS LLP

LA3:1145562.1



# O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

OUR FILE NUMBER
008,346-163

May 14, 2008

WRITER'S DIRECT DIAL
(213) 430-6230

**VIA E-MAIL AND U.S. MAIL**

WRITER'S E-MAIL ADDRESS
dherron@omm.com

Richard Levy, Esq.
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, California 90071

    Re:    *AMD v. Intel*

Dear Rich:

    This responds to your March 28, 2008 letter, and provides additional information about AMD's evidence preservation program and efforts.

    We begin by recounting the status of AMD's disclosures and the parties' agreements about them. As you know, at AMD's request, the parties exchanged information about their respective evidence preservation plans early in the case. On April 11, 2007 -- which, not coincidentally, was right before Intel's disclosure and proposed plan to remediate its own acknowledged evidence preservation failures was due by Court order -- Intel launched a broad, intrusive and unwarranted inquiry into AMD's preservation efforts. Despite AMD's subsequent responsive disclosures to the extent appropriately called for, Intel then served a document request and deposition notice under Rule 30(b)(6). AMD responded by objecting, but also by agreeing to supply further information wholly sufficient for Intel's professed desire to assess AMD's preservation program.

    Meet and confer efforts culminated in your letter of November 7, 2007, which professes Intel's intent to "narrow, or even eliminate, the issues that might be open for discovery." Your letter goes on to "outline the areas that we propose to now pursue," represents that Intel had "reduced considerably the number of topics for which we are requesting information," and states that your proposal, if accepted, would "result in what we view, as an appropriate exchange of information." In response, our November 27 letter then outlined the reciprocal disclosures which AMD agreed to make. That letter exchange constituted, in our view, agreement on the AMD disclosures that would fully satisfy Intel's Rule 30(b)(6) discovery, and agreement that the parties' exchanges of litigation hold notices and harvest dates would occur simultaneously.

Your March 4, 2008 letter reconfirmed this agreement by defining the information Intel was requesting in precisely the same order and using almost precisely the same language as set forth in my November 27 letter to you. On March 11, 2008, AMD produced more information, including a summary of AMD's Backup Tape Retention Protocols, and AMD's custodian journaling dates. Our March 19 letter then disclosed in detail the now-remediated loss of data related to Mr. Oji.

We view your next letter of March 28, 2008, as Intel's attempt to seize upon the isolated data loss of a single AMD custodian, Mr. Oji, to substantially broaden inquiry already properly narrowed by agreement. In particular, AMD does not agree that this loss means that "Intel and AMD should be on equal footing," or somehow justifies your "request that [Intel] get additional information and assurances from AMD similar or identical" to those the Court required of Intel as a consequence of its wide-spread evidence preservation failures.

In short, Intel's attempt to equate a single, isolated mishap of an AMD custodian with Intel's institutional-level failure to implement and monitor a proper preservation program is unjustified and inappropriate. Despite our several requests, Intel has not cited any authority or facts that would even begin to justify the vastly expanded, intrusive and burdensome discovery Intel apparently contemplates and which goes well beyond what was agreed upon last year. Instead, your March 28 and April 24, 2008 letters refer only to still-unexplained supposed "irregularities" in AMD's preservation efforts, or attempt to leverage Mr. Oji's loss. We must assume that if Intel truly believed there were "irregularities in AMD's retention efforts" that somehow justified this attempted broadening of preservation discovery, it surely would have said something to us long ago.

As you know, AMD has committed itself to producing the information reasonably necessary to Intel's ability to assess AMD's preservation program and efforts, and we have also repeatedly acknowledged AMD's commitment to inform Intel of data loss. To that end, this letter and the attached materials provide the information AMD has previously agreed to supply. And in an effort to reach a compromise on the remaining items requested in your March 28 letter, we also supply additional information which we think should be more than sufficient.

These disclosures are made by AMD in keeping with our agreements on these topics, and on the understanding that they are made in full and complete satisfaction of Intel's Rule 30(b)(6) deposition notice and document request. After these disclosures and other limited disclosures (as outlined below) that the parties may agree to are completed, we expect Intel to formally withdraw that discovery and bring this costly, burdensome and largely unnecessary exercise to a close. In addition, AMD's disclosures in this and all prior letters, as well as the attachments thereto and any other disclosures AMD has made to Intel regarding preservation issues, are made without waiver of the attorney-client privilege or work product protection.

We now respond to the specific issues raised in your March 28 letter.

1.    Harvest Dates: We appreciate Intel's March 28, 2008 disclosure of harvest dates for its custodians over the time period between August 2007 to December 31, 2007, which AMD

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 3

has been requesting for some time. (*See* our letters to you dated November 27, 2007, and March 11, 2008.) Attached at Tab 1 are all of the harvest dates for designated AMD production custodians that have not previously been provided. We also provide a list of "deposition reharvest" dates for all AMD custodians for whom Intel has thus far requested such reharvests. We do not believe that Intel has produced deposition reharvest dates for its custodians. Please do so now.

You will see that the list at Tab 1 does not include the party-designated custodian "reharvest" dates, i.e., the dates on which additional harvesting was conducted of party-designated custodians in order to bring their production forward to the June 1, 2006 production date as called for by Case Management Order No. 3. We are willing to discuss whether that information should be provided, but do not believe that it is important or necessary to any assessment of AMD's preservation or production.

Here's why. Judge Farnan signed Case Management Order. No. 3 on September 19, 2007. That order, of course, required each side to supplement party-designated custodians' productions through June 1, 2006. At that time, AMD began conducting any reharvests that were necessary to fill any data "gaps" between the prior production and the June 1, 2006 cut-off date. AMD's harvesting protocols -- including those followed in regard to party-designated custodian reharvesting through June 1, 2006 -- are described in the six-page disclosure titled "Summary of AMD's Document Collection Protocols" that AMD produced to you on November 16, 2007. To reiterate, in connection with that reharvesting, AMD obtained custodial data for each custodian from all appropriate sources to assemble a full and complete collection for review and production. This included re-imaging of computer hard drives and harvesting from AMD's journal and vault, in addition to harvesting from other data sources. That harvesting occurred after September 19, 2006, and obviously before all relevant documents were produced to Intel on February 15, 2008. Given AMD's prior disclosures and the information supplied here, we do not believe that a request for each subsequent harvest date serves a legitimate purpose. If you believe this information nevertheless should be provided, please explain.

Finally with respect to harvesting dates, your March 28, 2008 letter requests such dates for all custodians on AMD's "master custodian list," rather than merely those custodians who are "in-play" by reason of having been designated as a production custodian by AMD or Intel, or a free throw custodian. AMD declines to produce that information. Whether and to what extent AMD has harvested data from non-production custodians is irrelevant to any issue in the case, and also constitutes our work product. In any event, AMD declines to undertake this unnecessary and undue burden and expense.

2.    Journaling Dates: AMD has provided its journaling dates to Intel. Intel has not reciprocated. We have requested this information repeatedly. Your March 28 letter promises it, but we still do not have it. Please tell us the date by which Intel will provide this information.

3.    Mr. Oji's Data Loss Issues: Your March 28 letter poses seriatim a long list of questions concerning issues purportedly relevant to Mr. Oji's loss of data. Other than to try to equate Mr. Oji's loss to Intel's own catastrophic preservation failings, we are at a loss to

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 4

understand why Intel would attempt to seize on this isolated loss of a defined, limited and now-remediated set of data with such stridency. Nor do we believe most of the additional inquiries you have made are reasonable.

AMD has already disclosed the details concerning Mr. Oji's inadvertent loss of data, including: When the loss occurred; detailed facts about how the loss occurred; the probable volume of data that was lost; when AMD's IT department learned of the loss; the precise sources of replacement data AMD identified and why those sources seemed likely to yield the most responsive data; who Mr. Oji regularly sent emails to; and the backup tapes containing the files that AMD obtained, restored and extracted. We urge you to identify *any* disclosure made by Intel with respect to *any* of its custodians that contains even remotely this range of information or level of detail, or *any* indication of the estimated volume of lost data. We are aware of none.

The vast majority of the questions posed in your March 28 letter also are best answered by Mr. Oji himself. On April 11, 2008, we offered in writing to bring Mr. Oji to the United States for deposition so that you could ask him whatever you like about his accidental loss. Intel has declined that offer. We renew that offer now.

In addition, we note that Intel is asking for information that Intel has itself refused to provide under claims of privilege and work product. You are directed, for example, to pages 186-87, 193, 315 and 420 from Ms. Almirantearena's deposition. There, Intel instructed the witness not to answer questions concerning the timing and circumstances of Intel's counsel's discovery of Intel document preservation lapses.

We assume you agree that AMD cannot reasonably be asked to provide information Intel simultaneously asserts to be privileged and work product. Again in the spirit of compromise, however, in addition to our offering Mr. Oji for deposition, AMD will supply you with the following, which should adequately resolve any bona fide issues concerning Mr. Oji. First, you have asked for documents showing what AMD did in order to recover Mr. Oji's files. Attached at Tab 2 are three emails between Mr. Oji and AMD Japan's IT personnel that are dated as of the first several business days after Mr. Oji experienced the accidental loss. These are written in Japanese. For your convenience, we have attached a non-certified translation. These emails demonstrate that Mr. Oji reported the loss immediately, and that AMD Japan IT personnel tried every conceivable means to recover the lost data immediately after the loss occurred.

Second, you have asked that AMD restore the backup tapes for each of Mr. Oji's "frequent correspondents" as identified in our March 19, 2008 letter to you. AMD agrees to this, and is in the process of restoring the tapes now. All relevant, non-duplicative material that is recovered, if any, will be produced by AMD as soon as reasonably possible. We will keep you apprised of our progress.

4.    Intel Inquiries Regarding Back-Up Tapes and AMD's IT Infrastructure: Your March 28 letter raises four issues on these topics. First, you now ask that AMD provide a narrative "describing the relevant AMD IT infrastructure." AMD agrees to do so.

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 5

Second, you state that you have a number of questions with respect to AMD's written disclosure about its backup tape protocols, but do not identify those questions. Please send us a list of your questions so that we can answer them if appropriate.

Third, you ask AMD to confirm that it has conducted a physical inspection of each and every backup tape generated for each and every server for each and every month since March 2005, and to confirm that AMD has all information for every AMD custodian on such backup tapes. AMD declines to do this. Our prior written disclosure clearly and adequately explained that AMD has retained monthly backups for all relevant Exchange and file servers since March 2005 in 19 separate AMD locations across the United States and around the world. This regimen has worked and is working well, and AMD has no indication of any problems with it.

Compliance with your proposal would impose undue burden and expense on AMD and serve no legitimate purpose. This proposed audit would entail a world-wide adventure at huge expense. It also would entail restoring all those tapes simply in order to be able to represent with absolute specificity and certainty that each custodian's data was captured by backup tapes at each location and at all times. There is no good reason we can think of for you to ask this of us. If you disagree, please explain to us why you think this is justified,

Finally, you ask 10 separate questions about what data is captured on backup tapes. Our question to you is: Why does Intel need this information? We are prepared to discuss this. But many of the questions posed are of such a technical nature that Intel's own IT professionals or consultants ought to be able to answer them, and the balance of them strike us as requesting information that would be expensive and time-consuming to develop, for no apparent legitimate purpose. Please explain, and we will take the issue from there.

5.     Intel's and AMD's Litigation Hold Notices: We raise two issues about Intel's production of its hold notices and how that impacts the agreed-upon reciprocal exchange.

First, we are perplexed why it took Intel so long to produce its hold notices. We first asked Intel to produce them in March 2007. They were also the subject of AMD's first set of document requests regarding Intel's preservation failures. On May 15, 2007, AMD served its remediation discovery, Document Request No. 2 of which again requested production of "Intel's Litigation Hold Notices." On June 20, 2007, Special Master Poppiti ordered Intel to complete its production of these documents by *September 28, 2007*. On November 27, 2007, and again on March 11, 2008, we requested by letter that Intel complete its production of litigation hold notices, and we told you that AMD was prepared to provide a reciprocal exchange at that time.

On March 28, 2008, Intel finally produced what it now represents is the last of its custodian litigation hold notices. The hold notice produced is, quite incredibly, dated September 27, 2007 -- that is, one day before the Court-ordered production cut-off date and six months before the date it was produced. The second litigation hold-related item is a list from April 2007 of recipients of a litigation hold notice you previously delivered. We cannot fathom why it took Intel so long to produce this oft-requested information, or why Intel believes that it is free to

disregard not only our repeated requests but also the Court's order. What we do know is that Intel's conduct has unnecessarily delayed the reciprocal exchange that AMD proposed long ago.

Second, Intel has still refused to respond to AMD's very specific questions about, or to produce, the litigation hold notices delivered by Intel to its IT personnel. As stated in both our November 27, 2007, and March 11, 2008 letters to you, here again is the issue:

> "[T]horough searches through the documents Intel has produced in remediation and culpability discovery have not uncovered any litigation hold notices delivered by Intel to its IT personnel (as referenced by Intel in its various filings with the Court concerning its evidence preservation issues). For instance, while we have found emails sent among Intel IT personnel, we have not located any litigation hold notice directed by Intel (or its in-house counsel) to IT personnel with respect to Intel's "complaint freeze" effort that Intel said it undertook in June and July 2005, or any litigation hold notice issued by Intel to its IT personnel at the time of the discovery of Intel's evidence preservation issues in October 2006. (*See* my November 27, 2007 letter at page 2.)
>
> One of following three things must be true: (1) Intel has, in fact, already produced the litigation hold notices it directed to its IT personnel, but we have not located them; (2) Intel has not yet produced these IT-directed litigation hold notices; or (3) Intel did not issue litigation hold notices to its IT personnel at the times and for the purposes indicated in the foregoing paragraph. If (1), please direct us to the documents; if (2), let's please set a date for a mutual exchange; and if (3), please so state in writing so that we can have a written record of this fact."

If Intel issued a litigation hold notice to its IT personnel to take the so-called "complaint freeze," AMD surely is entitled to its production. If Intel did not do so, we expect Intel to so state in writing.

More important, however, is the issue of whether Intel issued instructions or hold notices of some kind to its IT personnel when Intel discovered its preservation failures -- which occurred as early as January 2006 and certainly no later than October 2006. At that time, Intel indisputably had only a limited number of its custodians on dedicated email servers backed up on a weekly basis; hundreds more had not been migrated to any such server; many custodians were already known not to be complying with Intel's litigation hold notices; and hundreds of other custodians had never been provided with litigation hold notices at all. Again, if Intel issued any such litigation hold notice(s) to its IT personnel at that time, AMD is entitled to their production; if not, Intel should so state in writing.

AMD has promised to produce the litigation hold notice issued to its IT personnel in March 2005 in exchange for Intel's production of the same material. We stand by that offer and agreement, and will comply as soon as Intel does. At this time, AMD produces at Tab 3 the remaining litigation hold notices, not already produced, that AMD issued to its document production custodians during the course of this litigation. AMD's now-completed productions, taken together, constitute a complete set of such litigation hold notices.

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 7

6.    Litigation Hold Notice Dates:  You have asked that AMD prepare a chart showing when each of its custodians received litigation hold notices.  AMD agrees to do so with respect to its designated production custodians in exchange for Intel's production of the same chart for its designated production custodians.  We are prepared to exchange these charts whenever you would like.

7.    Litigation Hold Dates for Particular AMD Custodians:  On August 10, 2007, we advised you that two party-designated custodians did not receive written litigation hold notices until September 2006.  Anticipating that Intel will agree to our proposal to exchange charts of litigation hold notice dates for production custodians, we inform you that those individuals are Fanny Chan (who received a written litigation hold notice on September 19, 2006), and Stan Lublin (who received a written litigation hold notice on September 18, 2006).

As to adversely-designated custodians, Kazuyuki Oji received a written litigation hold notice on November 10, 2006.  During Mr. Oji's new-hire orientation conducted on or immediately after October 1, 2005, however, Mr. Oji was advised by Shunsuke Yoshizawa, AMD Japan Director of Marketing, about the existence of this lawsuit, and was instructed to preserve all information related to it.

Finally, Makoto Kato, located in AMD's Tokyo, Japan, office, received a written litigation hold notice on November 10, 2006.  Mr. Kato began his employment on April 1, 2006.  Like Mr. Oji, Mr. Kato was advised by Mr. Yoshizawa immediately after his hire date about the existence of this lawsuit, and was instructed to preserve all information related to it.

8.    Auto-Delete:  You have asked about auto-delete functions applicable within AMD.  As stated previously, AMD has not implemented or used an auto-delete function within its Exchange environment.  Individual employees are able to set up an auto-delete function on their own Outlook account, which would operate only as to their own email account.  As you know from prior productions, the first and subsequent litigation hold notices delivered by AMD contained a "FAQ" section.  With regard to electronic documents, the FAQ section instructs, in relevant part, that: "Also, please be sure to disable any auto-delete features on email (e.g., auto-delete of 'sent' email messages)."

AMD has identified a designated custodian who used an auto-delete setting on his Outlook account: Nick Kepler.  AMD delivered a litigation hold notice to Mr. Kepler which included the foregoing instruction to disable "auto-delete" on July 5, 2005, and followed that with numerous reminders.  On November 21, 2005, AMD IT migrated Mr. Kepler's email box into AMD's journal and vault archiving systems.  During the time period between the July 5 and November 21, 2005, Mr. Kepler's Outlook account was set to not save "sent" items.  Mr. Kepler, however, copied himself on relevant "sent" items and preserved those emails.

9.    Possible Custodian Data Loss:  AMD discloses a possible data loss with respect to Michael Soares, a document custodian adversely designated by Intel.  AMD provided Mr. Soares with a litigation hold notice on February 21, 2006.  AMD IT migrated Mr. Soares' email account to its journal and vault archiving systems on March 30, 2006.  It appears that after Mr. Soares'

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 8

email account was placed into AMD's email archiving system, he experienced a problem with his laptop computer, shipped it to AMD for repair, but the computer was lost or stolen during transit. In May 2007, AMD imaged for purposes of this litigation the computer Mr. Soares was then using. The hard drive used to make that acquisition failed. AMD sent that hard drive to an outside vendor, NDCI, to attempt to recover the data. NDCI was unable to recover any data from that failed hard drive.

Mr. Soares was on leave from AMD from June 2007 to January 2008, at which he separated from his AMD employment. He did not perform work for AMD during that time period. AMD obtained Mr. Soares' laptop computer upon his separation, but it does not seem to be the same computer of which an image was taken in May 2007. It thus appears that AMD was not able to obtain images of two separate laptop computers that Mr. Soares used during the same time period his email account was maintained on AMD's journal and vault archiving systems.

We have now advised you about all of the data losses of which AMD is aware with respect to its production custodians. We again acknowledge our professional obligation to make such disclosures in the future if and as we learn of them.

If you have questions about the foregoing, please feel free to call me.

Sincerely,

David L. Herron
of O'MELVENY & MYERS LLP

LA3:1146399.1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, W. Harding Drane, Jr., hereby certify that on June 2, 2008 the attached

document was hand delivered to the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

Jesse A. Finkelstein
Frederick L. Cottrell, III
Chad M. Shandler
Steven J. Fineman
Richards, Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE 19801

James L. Holzman
J. Clayton Athey
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899

I hereby certify that on June 2, 2008, I have Electronically Mailed the documents

to the following non-registered participants:

Charles P. Diamond
Linda J. Smith
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067
cdiamond@omm.com
lsmith@omm.com

Mark A. Samuels
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA 90071
msamuels@omm.com

Salem M. Katsh
Laurin B. Grollman
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway, 22nd Floor
New York, New York 10019
skatsh@kasowitz.com
lgrollman@kasowitz.com

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Cohen, Milstein, Hausfeld & Toll , P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
mhausfeld@cmht.com
dsmall@cmht.com
blandau@cmht.com

Thomas P. Dove
Alex C. Turan
The Furth Firm LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
tdove@furth.com
aturan@furth.com

Guido Saveri
R. Alexander Saveri
Saveri & Saveri, Inc.
111 Pine Street, Suite 1700
San Francisco, CA 94111
guido@saveri.com
rick@saveri.com

Steve W. Berman
Anthony D. Shapiro
Hagens Berman Sobol Shapiro, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
steve@hbsslaw.com
tony@hbsslaw.com

Michael P. Lehman
Cohen, Milstein, Hausfeld & Toll , P.L.L.C.
One Embarcadero Center, Suite 526
San Francisco, CA  94111
mlehmann@cmht.com

By:  /s/ W. Harding Drane, Jr.
      Richard L. Horwitz (#2246)
      W. Harding Drane, Jr. (#1023)
      POTTER ANDERSON & CORROON LLP
      Hercules Plaza, 6th Floor
      1313 N. Market Street
      P.O. Box 951
      Wilmington, DE 19899-0951
      (302) 984-6000
      rhorwitz@potteranderson.com
      wdrane@potteranderson.com

738395 / 29282

2