# EXHIBIT 1

## AMD's Backup Tape Retention Protocols

Advanced Micro Devices, Inc. ("AMD") provides the following summary of its backup tape retention protocols in response to the backup tape-related questions set forth in Intel counsel Richard P. Levy's November 7, 2007 and March 4, 2008 correspondence. This summary supplements the backup tape information that AMD already has provided Intel. (*See, e.g.,* October 25, 2005 letter from David Herron to John J. Rosenthal, attached hereto as Exhibit "A".)

AMD's backup tape retention protocols have involved three steps. *First*, on or around March 11, 2005, IT retained the oldest full backups of every Exchange or file server utilized by relevant employees involved in AMD's x86 general purpose microprocessor business ("Employees"). *Second*, on or around March 19, 2005, IT took a one-time snapshot of the same Exchange and file servers. *Third*, IT indefinitely suspended its backup tape recycling procedures and, since March 19, 2005, continues to retain 30 day backup tapes of all Exchange and/or file servers utilized by Employees. Each of these steps is discussed below.

### Step 1: Retaining the Oldest Full Backups

On March 11, 2005, AMD instructed IT managers to identify and retain the oldest full backup of every Exchange and file server utilized by Employees. IT personnel in the various offices then delivered the tapes to designated storage vaults.

This backup retention effort involved servers located in Austin, Sunnyvale, Boston, Longmont, Taipei, Hong Kong, Beijing, Tokyo, Seoul, Dresden, Frimley (UK), Munich, Paris, Milan, Stockholm, Helsinki, Moscow, Amsterdam, and Antwerp. The months covered by these

## AMD's Backup Tape Retention Protocols

tapes vary depending on backup cycles, but most are within the January to March 10, 2005 timeframe.

### Step 2: Taking the March 19, 2005 Snapshot

On or around March 19, 2005, IT personnel made a special one-time backup of each Exchange and file server in the locations above. IT personnel from the various offices then delivered the tapes to the same designated storage vaults that maintain the backup tapes collected pursuant to Step 1. These tapes would contain any data stored on the Exchange and file servers utilized by Employees as of the date that the one-time backup was made for the particular server, on or around March 19, 2005.

### Step 3: Retaining Monthly Backups Since March 2005

AMD IT has retained 30-day backup tapes for Exchange and file servers utilized by Employees since March 2005. AMD IT monitors and tracks the monthly backup procedures. Every month, IT personnel in each location are required to report regarding each 30-day backup. Tapes are maintained in designated storage vaults. This monthly backup tape protocol includes all Exchange servers utilized by Employees; therefore, the resulting backup tapes would include the Exchange mailboxes for all Employees employed at AMD from March 2005 to the present.

# EXHIBIT 2

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 3

O

## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

OUR FILE NUMBER
8,346-163

WRITER'S DIRECT DIAL
(213) 430-6340

WRITER'S E-MAIL ADDRESS
msamuels@omm.com

August 10, 2007

### VIA E-MAIL AND U.S. MAIL

Robert E. Cooper, Esq.
Gibson Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California 90071-3197

Re:     *AMD v. Intel*

Dear Bob:

This is to follow up on David Herron's letter to you of April 23, 2007. It also addresses the portion of your August 1, 2007 letter to Chuck Diamond in which you suggest that there may be lapses in AMD's own document preservation effort.

We have now completed a review of AMD's preservation program with respect to each of the 108 AMD party-designated production custodians. We are pleased to report that our preservation program appears to be operating as designed and intended; no lapses in that program have been identified.

During our review, we identified a small number of custodians (including Messrs. Ruiz and Colandro) whose initial productions did not include all available .pst files. In some cases, this was because the files were corrupted and required repair. In others, some .pst's were apparently not located during the initial harvest of the custodian's data. In any event, these files are now being processed and reviewed for production, and the supplemental productions should be in your hands shortly. There are also responsive materials that are still in privilege review, and to the extent ultimately determined to be nonprivileged, they will be released to you in due course. I understand that some such materials were released earlier this week together with the privilege log for Mr. Rivet, and that Mr. Ruiz's privilege log is not due until mid-September. Finally, let me say that while we cannot verify the so-called "discrepancies" you cite in your letter, and putting aside the fact that the supplemental productions are still in process, it is hardly surprising that different reviewers looking at multiple copies of the same email might reach different conclusions as to responsiveness. We are sure the same phenomenon pervades the Intel production. This does not in any respect suggest a breakdown in AMD's document preservation, and as noted above, we are currently aware of none.

O'MELVENY & MYERS LLP

Robert E. Cooper, Esq., August 10, 2007 - Page 2

Let me also add that we have found two instances in which party-designated custodians do not appear to have received formal written preservation instructions until September 2006; in both instances, it is clear that the custodians were nonetheless aware of their preservation obligations, and understood and complied with them.

We have previously agreed to provide you with exemplar preservation notices on a "no waiver" basis. We stand ready to do so once we have received Intel's, which were to have been provided to us long ago under the July 10 Remediation Discovery Order.

A review of the 71 adverse party designated production custodians is under way, and we will advise you when it has been completed, as well as any issues identified.

Should you have any questions, please do not hesitate to call.

Very truly yours,

Mark A. Samuels
of O'MELVENY & MYERS LLP

LA2:838030.3

# EXHIBIT 4

# GIBSON, DUNN & CRUTCHER LLP

### LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

333 South Grand Avenue  Los Angeles, California 90071-3197
(213) 229-7000
www.gibsondunn.com

RCooper@gibsondunn.com

August 1, 2007

| | |
|---|---|
| Direct Dial | Client No. |
| (213) 229-7179 | T42376-00764 |
| Fax No. | |
| (213) 229-6179 | |

### VIA E-MAIL/U.S. MAIL

Charles P. Diamond Esq.
O'Melveny & Myers, LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California  90067

      Re:    *AMD v. Intel*

Dear Chuck:

      Thank you for your letter of July 25, 2007. We too have been giving thought to ways to address the unprecedented burdens of the document discovery in this matter. I wanted to take this opportunity, in advance of a meeting, to give you some of our concerns and ideas about how we might proceed going forward.

      Of course, your suggested approach is a substantial departure from what was agreed to and embodied in a court order. When we initially discussed the document production, the issue was whether word searches or other techniques could be used to define the universe for production. With respect to third party productions, we have agreed to such an up-front word search screen to address their burden concerns. However, the parties' production has been more traditional. Your proposal would effectively require wholesale production of data, encompassing large volumes of entirely irrelevant material, with only a privilege screen done by word search. The proposal assumes that the savings accruing to each of us by avoiding up-front review of our own documents will far exceed the additional costs each of us will incur in reviewing a much larger production from the other. This may very well be true, but the result will certainly be production of a massive amount of irrelevant, sensitive or privileged material that otherwise would not have been produced. This raises significant issues that we will want to discuss.

      I also think it is time for both parties to acknowledge the obvious. The scope of the document discovery envisioned by our original agreement, and accompanying retention

LOS ANGELES  NEW YORK  WASHINGTON, D.C.  SAN FRANCISCO  PALO ALTO
LONDON  PARIS  MUNICH  BRUSSELS  ORANGE COUNTY  CENTURY CITY  DALLAS  DENVER

## GIBSON, DUNN & CRUTCHER LLP

Charles P. Diamond Esq.
August 1, 2007
Page 2

obligations, has proved to be staggering in scope and cost. As experienced trial lawyers, we both know that as a practical matter the relationship in this case between the documents subject to retention, inspection and production in native format for review by opposing counsel are extraordinarily disproportionate to what few will ultimately be used. Indeed, your proposal that AMD and the Class be limited to designating 236,600 documents to TIFF for potential use at trial, when there will be tens of millions, if not over a hundred million, pages of documents produced in this matter illustrates how huge the disparity is between volume and usefulness. The problem here is the availability of more information than can be rationally evaluated.

In your letter, you lament the pace of the parties document exchange despite the resources we both have devoted to it. We certainly agree that the document production has been a huge burden, but I do want to take this opportunity to stress that Intel has borne a much larger burden in that process, irrespective of our remediation program. Intel has produced more than twice as many pages of documents as AMD. By our count, using standard conversion rates, we have produced the electronic equivalent of approximately 35 million pages, whereas, in contrast, using the same conversion rates, AMD has produced approximately 15 million pages. Moreover, we have produced from more than twice as many custodians as AMD; specifically Intel has produced documents from more than 219 custodians, compared to AMD's 108 custodians. And presumably AMD has a lot of additional review to complete before it can finish its production, so any delays in getting document production completed cannot be laid entirely at Intel's door.

In that regard, you commented that, as a result of the unavoidable magnitude of Intel's remediation effort, AMD likely will "face a deluge of additional electronic documents dwarfing the initial production." I am unclear exactly what you meant, but our remediation effort is not designed to increase the overall production, but rather to ensure that the production from the agreed custodians is as complete as possible. Moreover, while it is true that it will take some time to complete the global data base envisioned by our remediation plan, our remediation plan is only meant to supplement the production we will be producing from our custodians. To move discovery along as quickly as possible, I called David Herron on July 19, shortly before you wrote your letter, to suggest that the plaintiffs should take steps now to designate a large number of the approximately 180 remaining custodians they have the right to designate but have not yet designated. For example, if plaintiffs were to designate an additional 130 custodians, this would permit us to continue production on a rolling basis for 423 custodians, not just 293, and to do so by supplementing each of the 423 custodian's production with documents found in any of the other designated custodians' emails. This will avoid slowing down on-going production, and should reduce the level of supplementation that will come later after loading of the remaining custodians in the global data base is completed. We believe that plaintiffs now have the information they need to make a very large and meaningful additional designation to facilitate this process.

I was a little unclear about your response to our proposal for rolling production. You said you were "willing to accept the production of remediation data on a rolling basis, that is, as

# GIBSON, DUNN & CRUTCHER LLP

Charles P. Diamond Esq.
August 1, 2007
Page 3

supplemental materials for a custodian are culled ... rather than waiting until the entire remediation database is assembled" but only "so long as we can control the order in which custodians supplemental material is produced." I think that is exactly what we asked you to do – by designating now most of the remaining custodians from whom you want documents produced. Plaintiffs still would retain a large number of "free-throws," but in the meantime we can make a substantially complete production on a rolling basis for the designated custodians.

Intel has proceeded to designate many of the AMD custodians it is entitled to designate, and we have done so, despite the fact that the production AMD has made thus far largely ends as of July 12, 2005. Although we have been assuming that AMD has not experienced any lapses in its document retention, we are still awaiting a response to our letter of April 11, 2007 asking for information about AMD's preservation program. On April 23, 2007 you assured us that you were "aware of no systemic failure in the execution of the preservation plan" and promised to undertake "a thorough review of AMD's preservation program." We have heard nothing since. We raise this now because we are seeing what appear to us to be problems with AMD's production.

Just by way of example, our review of the emails produced by Hector Ruiz, AMD's CEO, shows that he retained only a fraction of his sent emails, as evidenced by the number of his emails found in other mailboxes during the same time period. We understand that AMD decided to bring its lawsuit on March 11, 2005 and issued a document hold notice for selected custodians (which certainly would have included top executives) on April 1, 2005. For the time period from April 1 through June 30, 2005, Mr. Ruiz had 66 sent emails in his custodial production (which appear to have been recovered from back-up sources or an archive system incidentally). Yet our various searches uncovered what appears to be over 250 non-duplicative sent emails from Mr. Ruiz in the production of other custodians – sent emails that apparently were not retained by Mr. Ruiz after the litigation hold was imposed.

Documents produced from the files of other custodians for the same time period also seem to show lapses in retention. For example, the .pst file of Chris Calandro, AMD's Gateway Global Account Manager, contained only six (6) sent emails (and those were produced from his in-box). Yet our initial review shows more than 600 non-duplicative sent emails in the production of other AMD custodians. AMD's CFO, Bob Rivet, produced 99 custodial sent emails, but our initial review shows more than 75 of his non-duplicative sent emails in the production of other AMD custodians.

Our review of AMD's production is in the preliminary stages, and of course we don't know why these problems occurred. We certainly realize that these apparent inconsistencies may reflect how difficult it is to achieve perfect retention production. But we would like to know whether we should expect similar issues in the production of other AMD custodians, if it is going to be necessary for AMD to go to back-up measures to ensure a reasonably complete production, and, if so, how that might affect the timing of AMD's completion of production. Of

# GIBSON, DUNN & CRUTCHER LLP

Charles P. Diamond Esq.
August 1, 2007
Page 4

course we recognize that it takes considerable time to audit and interview large numbers of custodians to confirm the completeness of their retention practices, but at least AMD is dealing with far fewer custodians than Intel is. We would appreciate a reply as soon as reasonably possible to our letter of April 11, 2007.

I recognize that the above discussion doesn't directly address your proposal that the parties produce all documents in native form, whether or not relevant, with only a word search for privileged documents. Such a procedure presumably might accelerate the initial production, although it will put a much larger burden on the receiving party. While we are prepared to discuss the idea, we are concerned that, as the case is presently postured, it would prove counterproductive to Intel.

For Intel, a fundamental problem with your suggestion—in a world in which your client has publicly indicated that it will seek sanctions—is that it will require Intel to follow two different approaches to production, thereby increasing, not decreasing Intel's document handling and costs. An important part of our response to any sanctions motion will be to establish, by means of forensic analysis, that any claim of material document loss is unfounded. This will likely require comparison of different groups of documents produced at different times. For such a comparison to be meaningful, and not yield false results, the second group of documents cannot be saturated with irrelevant material that would never have been subject to a retention obligation. A "failure" to retain irrelevant material is meaningless (indeed, our custodians were not asked to retain irrelevant documents), but if Intel's later productions are simply data dumps, we will be vulnerable to attack based on a comparison of sheer numbers, unless the later emails are reasonably comparable to the earlier ones. As a result, any production protocol that takes a radically different approach to determining "relevant" data for production, as yours does, will potentially prejudice Intel's ability to defend its remediation, putting aside the other issues associated with unreviewed production of huge numbers of documents. Put otherwise, we will have to do the same relevancy analysis for forensic purposes that we would do in any event under the present production protocol. So your proposal achieves no cost savings for Intel in producing its documents, but obligates Intel to produce massive amounts of irrelevant material, which will likely include sensitive or privileged information, while imposing greater costs on Intel in analyzing what will be a data dump from AMD. Given AMD's public statements that it intends to seek sanctions, and the massive costs Intel is incurring to remediate, we cannot readily agree to such a fundamental change.

The only circumstance under which it would make sense for Intel to consider the implications of the drastic change in document production you are proposing would be if plaintiffs are prepared to forego pursuing any sanctions motion based on Intel's retention lapses. Otherwise, what you are proposing imposes double costs on Intel. Moreover, at a minimum it should be apparent by now that we have developed a comprehensive remediation plan, at enormous expense, and are pursuing it rigorously, and would expect to complete it and adjust it in any respect that the Special Master deems appropriate. We think plaintiffs are now in a

## GIBSON, DUNN & CRUTCHER LLP

Charles P. Diamond Esq.
August 1, 2007
Page 5

position to make a decision whether they want the parties to continue to devote huge resources to litigating issues relating to sanctions – an exercise which is unfounded and likely to contribute to delay of the trial date. However, that is plaintiffs' call. Our point is simply that, as long as Intel is faced with the threat of sanctions, your proposal to change the parties' production protocol in mid-stream does not make sense from Intel's viewpoint.

Let me also suggest another subject that we should discuss in our mutual effort to bring this case to trial in a timely fashion. Why not reduce the total number of custodians for whom each side is producing? We think the reality is that both sides were overly ambitious in terms of what could actually be accomplished, given such a large number of individuals who might have relevant documents, and that both sides will be awash in documents that fully describe the transactions that are at issue in the case. Does AMD really need production of another 180 or so custodians? Perhaps we both need to make some concessions to the shortness of life.

On a related front, we believe that both Intel and AMD should continue our on-going effort to find a way to reduce the volume of production of share drives and share points, including testing a number of protocols, such as designating a limited number of shared sources for production, horizontal de-duplication processes and targeted word searches, all aimed at reducing the burden on both parties.

Addressing other issues raised in your letter, we are in general agreement on the harvest cut-off dates, but believe that there should be parity, i.e., a June 1, 2006 production for party-designated custodians. Creating a time disparity in production to address a document retention issue is not appropriate in any event, and engaging in lengthy and subjective evaluations of each side's productions to determine production cut-offs does not seem reasonable. As for the adverse party-designated custodians, we believe that the date of Intel's recent comprehensive harvests should be used for AMD's adverse designations of Intel witnesses. This is more than reasonable, since AMD will be making most of its designations well after Intel and will receive a production with a significantly broader time frame.

We agree on the timing on the "Free Throw" custodians. We also believe that, absent good cause, all choices should be made by January 31, 2008. If we can reach agreement on these points, we will also agree to your proposal on Deposition Reharvests and self-TIFFing, so long as the required notice is given. However, we are not inclined to agree to arbitrary limits on TIFFing of documents. Finally, while any party will always have the ability to seek relief to reopen depositions for good cause, we will not agree to any proposal that gives Plaintiffs carte blanche the opportunity to reopen depositions.

We are prepared to discuss these issues this week. One final point: As Dan Floyd indicated on the call with the Special Master, we believe these discussions are in the nature of a meet and confer. All such discussions to date have been conducted certainly in the first instance among counsel. While the Special Master has been extremely helpful in assisting the parties in

## GIBSON, DUNN & CRUTCHER LLP

Charles P. Diamond Esq.
August 1, 2007
Page 6

resolving discovery issues, we think it will be more productive if our initial meeting were limited to counsel. We can bring in Mr. Friedberg or Judge Poppiti as necessary after we've had a chance to have a full and frank discussion of the many issues raised by your proposal. Otherwise, I am concerned that a frank discussion might be hindered, as both of us jockey to make points in front of Mr. Friedberg or Judge Poppiti.

Very truly yours,

Robert E. Cooper

REC/lsj

cc:    Eric M. Friedberg
       Daniel A. Small

100270792_1.DOC

# EXHIBIT 5



## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
NEWPORT BEACH

400 South Hope Street
Los Angeles, California 90071-2899

TELEPHONE (213) 430-6000
FACSIMILE (213) 430-6407
www.omm.com

NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO
WASHINGTON, D.C.

OUR FILE NUMBER
008,346-163

WRITER'S DIRECT DIAL
(213) 430-6230

WRITER'S E-MAIL ADDRESS
dherron@omm.com

May 14, 2008

**VIA E-MAIL AND U.S. MAIL**

Richard Levy, Esq.
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, California 90071

Re:     *AMD v. Intel*

Dear Rich:

This responds to your March 28, 2008 letter, and provides additional information about AMD's evidence preservation program and efforts.

We begin by recounting the status of AMD's disclosures and the parties' agreements about them. As you know, at AMD's request, the parties exchanged information about their respective evidence preservation plans early in the case. On April 11, 2007 -- which, not coincidentally, was right before Intel's disclosure and proposed plan to remediate its own acknowledged evidence preservation failures was due by Court order -- Intel launched a broad, intrusive and unwarranted inquiry into AMD's preservation efforts. Despite AMD's subsequent responsive disclosures to the extent appropriately called for, Intel then served a document request and deposition notice under Rule 30(b)(6). AMD responded by objecting, but also by agreeing to supply further information wholly sufficient for Intel's professed desire to assess AMD's preservation program.

Meet and confer efforts culminated in your letter of November 7, 2007, which professes Intel's intent to "narrow, or even eliminate, the issues that might be open for discovery." Your letter goes on to "outline the areas that we propose to now pursue," represents that Intel had "reduced considerably the number of topics for which we are requesting information," and states that your proposal, if accepted, would "result in what we view, as an appropriate exchange of information." In response, our November 27 letter then outlined the reciprocal disclosures which AMD agreed to make. That letter exchange constituted, in our view, agreement on the AMD disclosures that would fully satisfy Intel's Rule 30(b)(6) discovery, and agreement that the parties' exchanges of litigation hold notices and harvest dates would occur simultaneously.

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 2

        Your March 4, 2008 letter reconfirmed this agreement by defining the information Intel
was requesting in precisely the same order and using almost precisely the same language as set
forth in my November 27 letter to you.  On March 11, 2008, AMD produced more information,
including a summary of AMD's Backup Tape Retention Protocols, and AMD's custodian
journaling dates.  Our March 19 letter then disclosed in detail the now-remediated loss of data
related to Mr. Oji.

        We view your next letter of March 28, 2008, as Intel's attempt to seize upon the isolated
data loss of a single AMD custodian, Mr. Oji, to substantially broaden inquiry already properly
narrowed by agreement.  In particular, AMD does not agree that this loss means that "Intel and
AMD should be on equal footing," or somehow justifies your "request that [Intel] get additional
information and assurances from AMD similar or identical" to those the Court required of Intel
as a consequence of its wide-spread evidence preservation failures.

        In short, Intel's attempt to equate a single, isolated mishap of an AMD custodian with
Intel's institutional-level failure to implement and monitor a proper preservation program is
unjustified and inappropriate.  Despite our several requests, Intel has not cited any authority or
facts that would even begin to justify the vastly expanded, intrusive and burdensome discovery
Intel apparently contemplates and which goes well beyond what was agreed upon last year.
Instead, your March 28 and April 24, 2008 letters refer only to still-unexplained supposed
"irregularities" in AMD's preservation efforts, or attempt to leverage Mr. Oji's loss.  We must
assume that if Intel truly believed there were "irregularities in AMD's retention efforts" that
somehow justified this attempted broadening of preservation discovery, it surely would have said
something to us long ago.

        As you know, AMD has committed itself to producing the information reasonably
necessary to Intel's ability to assess AMD's preservation program and efforts, and we have also
repeatedly acknowledged AMD's commitment to inform Intel of data loss.  To that end, this
letter and the attached materials provide the information AMD has previously agreed to supply.
And in an effort to reach a compromise on the remaining items requested in your March 28
letter, we also supply additional information which we think should be more than sufficient.

        These disclosures are made by AMD in keeping with our agreements on these topics, and
on the understanding that they are made in full and complete satisfaction of Intel's Rule 30(b)(6)
deposition notice and document request.  After these disclosures and other limited disclosures (as
outlined below) that the parties may agree to are completed, we expect Intel to formally
withdraw that discovery and bring this costly, burdensome and largely unnecessary exercise to a
close.  In addition, AMD's disclosures in this and all prior letters, as well as the attachments
thereto and any other disclosures AMD has made to Intel regarding preservation issues, are made
without waiver of the attorney-client privilege or work product protection.

        We now respond to the specific issues raised in your March 28 letter.

        1.    Harvest Dates:  We appreciate Intel's March 28, 2008 disclosure of harvest dates
for its custodians over the time period between August 2007 to December 31, 2007, which AMD

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 3

has been requesting for some time. (*See* our letters to you dated November 27, 2007, and March 11, 2008.) Attached at Tab 1 are all of the harvest dates for designated AMD production custodians that have not previously been provided. We also provide a list of "deposition reharvest" dates for all AMD custodians for whom Intel has thus far requested such reharvests. We do not believe that Intel has produced deposition reharvest dates for its custodians. Please do so now.

You will see that the list at Tab 1 does not include the party-designated custodian "reharvest" dates, i.e., the dates on which additional harvesting was conducted of party-designated custodians in order to bring their production forward to the June 1, 2006 production date as called for by Case Management Order No. 3. We are willing to discuss whether that information should be provided, but do not believe that it is important or necessary to any assessment of AMD's preservation or production.

Here's why. Judge Farnan signed Case Management Order. No. 3 on September 19, 2007. That order, of course, required each side to supplement party-designated custodians' productions through June 1, 2006. At that time, AMD began conducting any reharvests that were necessary to fill any data "gaps" between the prior production and the June 1, 2006 cut-off date. AMD's harvesting protocols -- including those followed in regard to party-designated custodian reharvesting through June 1, 2006 -- are described in the six-page disclosure titled "Summary of AMD's Document Collection Protocols" that AMD produced to you on November 16, 2007. To reiterate, in connection with that reharvesting, AMD obtained custodial data for each custodian from all appropriate sources to assemble a full and complete collection for review and production. This included re-imaging of computer hard drives and harvesting from AMD's journal and vault, in addition to harvesting from other data sources. That harvesting occurred after September 19, 2006, and obviously before all relevant documents were produced to Intel on February 15, 2008. Given AMD's prior disclosures and the information supplied here, we do not believe that a request for each subsequent harvest date serves a legitimate purpose. If you believe this information nevertheless should be provided, please explain.

Finally with respect to harvesting dates, your March 28, 2008 letter requests such dates for all custodians on AMD's "master custodian list," rather than merely those custodians who are "in-play" by reason of having been designated as a production custodian by AMD or Intel, or a free throw custodian. AMD declines to produce that information. Whether and to what extent AMD has harvested data from non-production custodians is irrelevant to any issue in the case, and also constitutes our work product. In any event, AMD declines to undertake this unnecessary and undue burden and expense.

2.    <u>Journaling Dates</u>:  AMD has provided its journaling dates to Intel. Intel has not reciprocated. We have requested this information repeatedly. Your March 28 letter promises it, but we still do not have it. Please tell us the date by which Intel will provide this information.

3.    <u>Mr. Oji's Data Loss Issues</u>:  Your March 28 letter poses seriatim a long list of questions concerning issues purportedly relevant to Mr. Oji's loss of data. Other than to try to equate Mr. Oji's loss to Intel's own catastrophic preservation failings, we are at a loss to

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 4

understand why Intel would attempt to seize on this isolated loss of a defined, limited and now-remediated set of data with such stridency. Nor do we believe most of the additional inquiries you have made are reasonable.

AMD has already disclosed the details concerning Mr. Oji's inadvertent loss of data, including: When the loss occurred; detailed facts about how the loss occurred; the probable volume of data that was lost; when AMD's IT department learned of the loss; the precise sources of replacement data AMD identified and why those sources seemed likely to yield the most responsive data; who Mr. Oji regularly sent emails to; and the backup tapes containing the files that AMD obtained, restored and extracted. We urge you to identify *any* disclosure made by Intel with respect to *any* of its custodians that contains even remotely this range of information or level of detail, or *any* indication of the estimated volume of lost data. We are aware of none.

The vast majority of the questions posed in your March 28 letter also are best answered by Mr. Oji himself. On April 11, 2008, we offered in writing to bring Mr. Oji to the United States for deposition so that you could ask him whatever you like about his accidental loss. Intel has declined that offer. We renew that offer now.

In addition, we note that Intel is asking for information that Intel has itself refused to provide under claims of privilege and work product. You are directed, for example, to pages 186-87, 193, 315 and 420 from Ms. Almirantearena's deposition. There, Intel instructed the witness not to answer questions concerning the timing and circumstances of Intel's counsel's discovery of Intel document preservation lapses.

We assume you agree that AMD cannot reasonably be asked to provide information Intel simultaneously asserts to be privileged and work product. Again in the spirit of compromise, however, in addition to our offering Mr. Oji for deposition, AMD will supply you with the following, which should adequately resolve any bona fide issues concerning Mr. Oji. First, you have asked for documents showing what AMD did in order to recover Mr. Oji's files. Attached at Tab 2 are three emails between Mr. Oji and AMD Japan's IT personnel that are dated as of the first several business days after Mr. Oji experienced the accidental loss. These are written in Japanese. For your convenience, we have attached a non-certified translation. These emails demonstrate that Mr. Oji reported the loss immediately, and that AMD Japan IT personnel tried every conceivable means to recover the lost data immediately after the loss occurred.

Second, you have asked that AMD restore the backup tapes for each of Mr. Oji's "frequent correspondents" as identified in our March 19, 2008 letter to you. AMD agrees to this, and is in the process of restoring the tapes now. All relevant, non-duplicative material that is recovered, if any, will be produced by AMD as soon as reasonably possible. We will keep you apprised of our progress.

4.    Intel Inquiries Regarding Back-Up Tapes and AMD's IT Infrastructure: Your March 28 letter raises four issues on these topics. First, you now ask that AMD provide a narrative "describing the relevant AMD IT infrastructure." AMD agrees to do so.

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 5

Second, you state that you have a number of questions with respect to AMD's written disclosure about its backup tape protocols, but do not identify those questions. Please send us a list of your questions so that we can answer them if appropriate.

Third, you ask AMD to confirm that it has conducted a physical inspection of each and every backup tape generated for each and every server for each and every month since March 2005, and to confirm that AMD has all information for every AMD custodian on such backup tapes. AMD declines to do this. Our prior written disclosure clearly and adequately explained that AMD has retained monthly backups for all relevant Exchange and file servers since March 2005 in 19 separate AMD locations across the United States and around the world. This regimen has worked and is working well, and AMD has no indication of any problems with it.

Compliance with your proposal would impose undue burden and expense on AMD and serve no legitimate purpose. This proposed audit would entail a world-wide adventure at huge expense. It also would entail restoring all those tapes simply in order to be able to represent with absolute specificity and certainty that each custodian's data was captured by backup tapes at each location and at all times. There is no good reason we can think of for you to ask this of us. If you disagree, please explain to us why you think this is justified,

Finally, you ask 10 separate questions about what data is captured on backup tapes. Our question to you is: Why does Intel need this information? We are prepared to discuss this. But many of the questions posed are of such a technical nature that Intel's own IT professionals or consultants ought to be able to answer them, and the balance of them strike us as requesting information that would be expensive and time-consuming to develop, for no apparent legitimate purpose. Please explain, and we will take the issue from there.

5.    Intel's and AMD's Litigation Hold Notices: We raise two issues about Intel's production of its hold notices and how that impacts the agreed-upon reciprocal exchange.

First, we are perplexed why it took Intel so long to produce its hold notices. We first asked Intel to produce them in March 2007. They were also the subject of AMD's first set of document requests regarding Intel's preservation failures. On May 15, 2007, AMD served its remediation discovery, Document Request No. 2 of which again requested production of "Intel's Litigation Hold Notices." On June 20, 2007, Special Master Poppiti ordered Intel to complete its production of these documents by *September 28, 2007.* On November 27, 2007, and again on March 11, 2008, we requested by letter that Intel complete its production of litigation hold notices, and you told us that AMD was prepared to provide a reciprocal exchange at that time.

On March 28, 2008, Intel finally produced what it now represents is the last of its custodian litigation hold notices. The hold notice produced is, quite incredibly, dated September 27, 2007 -- that is, one day before the Court-ordered production cut-off date and six months before the date it was produced. The second litigation hold-related item is a list from April 2007 of recipients of a litigation hold notice you previously delivered. We cannot fathom why it took Intel so long to produce this oft-requested information, or why Intel believes that it is free to

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 6

disregard not only our repeated requests but also the Court's order. What we do know is that Intel's conduct has unnecessarily delayed the reciprocal exchange that AMD proposed long ago.

Second, Intel has still refused to respond to AMD's very specific questions about, or to produce, the litigation hold notices delivered by Intel to its IT personnel. As stated in both our November 27, 2007, and March 11, 2008 letters to you, here again is the issue:

> "[T]horough searches through the documents Intel has produced in remediation and culpability discovery have not uncovered any litigation hold notices delivered by Intel to its IT personnel (as referenced by Intel in its various filings with the Court concerning its evidence preservation issues). For instance, while we have found emails sent among Intel IT personnel, we have not located any litigation hold notice directed by Intel (or its in-house counsel) to IT personnel with respect to Intel's "complaint freeze" effort that Intel said it undertook in June and July 2005, or any litigation hold notice issued by Intel to its IT personnel at the time of the discovery of Intel's evidence preservation issues in October 2006. (*See* my November 27, 2007 letter at page 2.)

> One of following three things must be true: (1) Intel has, in fact, already produced the litigation hold notices it directed to its IT personnel, but we have not located them; (2) Intel has not yet produced these IT-directed litigation hold notices; or (3) Intel did not issue litigation hold notices to its IT personnel at the times and for the purposes indicated in the foregoing paragraph. If (1), please direct us to the documents; if (2), let's please set a date for a mutual exchange; and if (3), please so state in writing so that we can have a written record of this fact."

If Intel issued a litigation hold notice to its IT personnel to take the so-called "complaint freeze," AMD surely is entitled to its production. If Intel did not do so, we expect Intel to so state in writing.

More important, however, is the issue of whether Intel issued instructions or hold notices of some kind to its IT personnel when Intel discovered its preservation failures -- which occurred as early as January 2006 and certainly no later than October 2006. At that time, Intel indisputably had only a limited number of its custodians on dedicated email servers backed up on a weekly basis; hundreds more had not been migrated to any such server; many custodians were already known not to be complying with Intel's litigation hold notices; and hundreds of other custodians had never been provided with litigation hold notices at all. Again, if Intel issued any such litigation hold notice(s) to its IT personnel at that time, AMD is entitled to their production; if not, Intel should so state in writing.

AMD has promised to produce the litigation hold notice issued to its IT personnel in March 2005 in exchange for Intel's production of the same material. We stand by that offer and agreement, and will comply as soon as Intel does. At this time, AMD produces at Tab 3 the remaining litigation hold notices, not already produced, that AMD issued to its document production custodians during the course of this litigation. AMD's now-completed productions, taken together, constitute a complete set of such litigation hold notices.

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 7

6.    <u>Litigation Hold Notice Dates</u>:  You have asked that AMD prepare a chart showing when each of its custodians received litigation hold notices.  AMD agrees to do so with respect to its designated production custodians in exchange for Intel's production of the same chart for its designated production custodians.  We are prepared to exchange these charts whenever you would like.

7.    <u>Litigation Hold Dates for Particular AMD Custodians</u>:  On August 10, 2007, we advised you that two party-designated custodians did not receive written litigation hold notices until September 2006.  Anticipating that Intel will agree to our proposal to exchange charts of litigation hold notice dates for production custodians, we inform you that those individuals are Fanny Chan (who received a written litigation hold notice on September 19, 2006), and Stan Lublin (who received a written litigation hold notice on September 18, 2006).

As to adversely-designated custodians, Kazuyuki Oji received a written litigation hold notice on November 10, 2006.  During Mr. Oji's new-hire orientation conducted on or immediately after October 1, 2005, however, Mr. Oji was advised by Shunsuke Yoshizawa, AMD Japan Director of Marketing, about the existence of this lawsuit, and was instructed to preserve all information related to it.

Finally, Makoto Kato, located in AMD's Tokyo, Japan, office, received a written litigation hold notice on November 10, 2006.  Mr. Kato began his employment on April 1, 2006.  Like Mr. Oji, Mr. Kato was advised by Mr. Yoshizawa immediately after his hire date about the existence of this lawsuit, and was instructed to preserve all information related to it.

8.    <u>Auto-Delete</u>:  You have asked about auto-delete functions applicable within AMD.  As stated previously, AMD has not implemented or used an auto-delete function within its Exchange environment.  Individual employees are able to set up an auto-delete function on their own Outlook account, which would operate only as to their own email account.  As you know from prior productions, the first and subsequent litigation hold notices delivered by AMD contained a "FAQ" section.  With regard to electronic documents, the FAQ section instructs, in relevant part, that: "Also, please be sure to disable any auto-delete features on email (e.g., auto-delete of 'sent' email messages)."

AMD has identified a designated custodian who used an auto-delete setting on his Outlook account: Nick Kepler.  AMD delivered a litigation hold notice to Mr. Kepler which included the foregoing instruction to disable "auto-delete" on July 5, 2005, and followed that with numerous reminders.  On November 21, 2005, AMD IT migrated Mr. Kepler's email box into AMD's journal and vault archiving systems.  During the time period between the July 5 and November 21, 2005, Mr. Kepler's Outlook account was set to not save "sent" items.  Mr. Kepler, however, copied himself on relevant "sent" items and preserved those emails.

9.    <u>Possible Custodian Data Loss</u>:  AMD discloses a possible data loss with respect to Michael Soares, a document custodian adversely designated by Intel.  AMD provided Mr. Soares with a litigation hold notice on February 21, 2006.  AMD IT migrated Mr. Soares' email account to its journal and vault archiving systems on March 30, 2006.  It appears that after Mr. Soares'

O'MELVENY & MYERS LLP

Richard Levy, Esq., May 14, 2008 - Page 8

email account was placed into AMD's email archiving system, he experienced a problem with his laptop computer, shipped it to AMD for repair, but the computer was lost or stolen during transit. In May 2007, AMD imaged for purposes of this litigation the computer Mr. Soares was then using. The hard drive used to make that acquisition failed. AMD sent that hard drive to an outside vendor, NDCI, to attempt to recover the data. NDCI was unable to recover any data from that failed hard drive.

Mr. Soares was on leave from AMD from June 2007 to January 2008, at which he separated from his AMD employment. He did not perform work for AMD during that time period. AMD obtained Mr. Soares' laptop computer upon his separation, but it does not seem to be the same computer of which an image was taken in May 2007. It thus appears that AMD was not able to obtain images of two separate laptop computers that Mr. Soares used during the same time period his email account was maintained on AMD's journal and vault archiving systems.

We have now advised you about all of the data losses of which AMD is aware with respect to its production custodians. We again acknowledge our professional obligation to make such disclosures in the future if and as we learn of them.

If you have questions about the foregoing, please feel free to call me.

Sincerely,

David L. Herron
of O'MELVENY & MYERS LLP

LA3:1146399.1

# EXHIBIT 6



# EXHIBIT 7

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 8

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 9

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 10

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 11

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 12

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 13

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 14

O

_____
## O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | 400 South Hope Street | NEW YORK |
| BRUSSELS | Los Angeles, California 90071-2899 | SAN FRANCISCO |
| CENTURY CITY | TELEPHONE (213) 430-6000 | SHANGHAI |
| HONG KONG | FACSIMILE (213) 430-6407 | SILICON VALLEY |
| LONDON | www.omm.com | TOKYO |
| NEWPORT BEACH | | WASHINGTON, D.C. |

OUR FILE NUMBER
008,346-163

WRITER'S DIRECT DIAL
(213) 430-6230

WRITER'S E-MAIL ADDRESS
dherron@omm.com

November 27, 2007

## VIA E-MAIL AND U.S. MAIL

Richard Levy, Esq.
Gibson Dunn & Crutcher
333 South Grand Avenue
Los Angeles, California 90071

Re:    *AMD v. Intel*

Dear Rich:

On November 16, 2007, we delivered to you a written summary of AMD's document collection protocols. This letter responds to the remainder of the issues raised in your November 7 letter concerning AMD document preservation.

Your letter raises seven items, which we address mostly in the order that you did. First, you raise AMD's email journaling system, stating that Intel is interested "simply in learning how the system worked both from an AMD user's perspective and from AMD's IT perspective." As you know, on September 28, 2007, we did make AMD's Jerry Meeker available to you for an informal interview on the subject of AMD's email journaling system. We did not artificially limit the length of that interview, and it appears that the general topics you now raise were discussed then and could have been discussed even more fully, had you desired to do so.

We are nevertheless amenable to providing further relevant information if you need it. We cannot tell from your letter whether Mr. Meeker ought to be produced a second time, whether someone else would be better able to answer your questions, whether a written summary would suffice or, indeed, precisely what information you seek beyond that already disclosed. Let's please discuss this in person or, if you prefer, please detail your further inquiries in writing. We can then agree on the means and scope of a further exchange, as necessary. We believe that a written summary would be sufficient.

The second issue you raise is the written summary of AMD's document collection protocols, which has since been provided.

Third, you raise AMD's litigation hold notices and at least three questions related to them. You also ask for our suggestion on how best to proceed to answer these questions, which

Richard Levy, Esq., November 27, 2007 - Page 2

include: (1) whether AMD delivered to its custodians more litigation hold notices than the three AMD already has produced to Intel; (2) which of the notices we've provided was delivered to AMD's IT personnel (i.e., the hold notice dated March 11, 2005); and (3) the approximate distribution dates of the various litigation hold notices that AMD has produced to Intel.

Let me answer your questions in part now and suggest a further, mutual production of litigation hold notices. The litigation hold notices that AMD produced are exemplars of the principal notices delivered by AMD to its custodians in this case, and all of the material terms set forth in these notices are replicated in other versions sent by AMD from time-to-time. Any differences between the notices produced and others sent at various times are slight and non-material (e.g., changing the renamed CPG group to MSS, and changing "[i]n light of the scope of information it appears Intel may seek in discovery, we are expanding our ongoing efforts to preserve documents . . . ." to "[a] critical part of the discovery process requires that we take all reasonable steps to preserve documents . . . ."). These custodian-directed exemplars of litigation hold notices are what we believe the parties agreed to exchange, and are similar to what we appear to have received from Intel as attachments to a letter from Kay Kochenderfer. AMD has not yet produced the litigation hold notice dated March 11, 2005, that was directed to AMD IT personnel, as we did not understand this to be part of the agreed-upon exchange.

Nor, apparently, have we received IT-related litigation notices from Intel. Indeed, other than those notices attached to Kay's letter, thorough searches through the documents Intel has produced in remediation and culpability discovery have not uncovered any litigation hold notices delivered by Intel to its IT personnel (as referenced by Intel in its various filings with the Court concerning its evidence preservation issues). For instance, while we have found emails sent among Intel IT personnel, we have not located any litigation hold notice directed by Intel (or its in-house counsel) to IT personnel with respect to Intel's "complaint freeze" effort that Intel said it undertook in June and July 2005, or any litigation hold notice issued by Intel to its IT personnel at the time of the discovery of Intel's evidence preservation issues in October 2006.

While AMD is not opposed to producing its March 11, 2005 notice, subject again to an agreement that by doing so no privilege will be deemed waived, we would like the exchange to be mutual. If Intel already has produced the litigation hold notices it delivered to its IT personnel, we would appreciate your identifying those documents by bates number. If Intel has not produced those documents, let's please set a date for mutual exchange.

Finally on litigation hold notices, AMD is prepared to reproduce the litigation hold notices already produced, this time with their dates evident. This ought to answer many or all of the questions your letter poses. If there are additional questions about litigation hold notices that need to be answered after this production, they can be answered promptly.

Fourth, your letter (items 4, 5 and 7) inquires about document retention failures by AMD custodians, including non-compliance with litigation hold notices. As we have previously advised, AMD has already conducted a review of AMD's preservation program with respect to its 108 AMD party-designated production custodians. While your letter mentions use of the word "systemic" in prior correspondence, Mark Samuels' August 10, 2007 letter reporting on the

Richard Levy, Esq., November 27, 2007 - Page 3

results of that review did not use that term but, instead, provided Intel with AMD's "report that our preservation program appears to be operating as designed and intended; no lapses in that program have been identified." That same letter discussed the further production of .psts for certain custodians, and identified two instances in which litigation notices were sent out in September 2006. If AMD learns information with respect to these (or any other) AMD production custodians or as to AMD's preservation program more generally that require modification of these representations, please be assured that AMD will so notify Intel.

At present, however, AMD reiterates the representations regarding its preservation program made in Mr. Samuels' prior letter. AMD also acknowledges its duties to monitor compliance with litigation hold notices and to report instances where AMD has identified losses of relevant data that require disclosure. We also believe that disclosures in response to item 6 in your letter (as discussed below) will provide Intel with responsive information. In addition, and as you know, AMD (like Intel) is in the process of harvesting, reviewing and producing documents from adversely-designated custodians. In that process, AMD remains mindful of the disclosure obligations imposed as outlined above and will adhere to them.

Finally, your letter's item 6 asks for a large variety of information, some of which AMD already has produced in part. We agree with your suggestion that information responsive to the topics raised in item 6 are best supplied in written summaries, and are prepared to assemble and produce to Intel the following:

*    The date on which AMD's custodian's documents were harvested in the litigation. As you know, AMD already has produced these dates for the AMD party-designated production custodians. AMD is in the midst of "reharvesting" these custodians' data through the June 1, 2006 cutoff date agreed to by the parties, and is in the process of harvesting, reviewing and producing data of the AMD custodians recently designated adversely by Intel. We can supply an interim update to the prior harvest date list supplied already, but think that it may be more efficient to pick a later date for exchange of this information -- with both Intel and AMD updating and producing this harvesting information -- after all such harvesting has been completed. Late December or early January seem like appropriate times for this exchange.

*    The date on which AMD's custodians were put on the email journaling system.

*    Identification of known losses of relevant data from an AMD custodian's harddrive due to file corruption, lost laptop or other, similar means of loss.

*    The months for which AMD custodian data has been preserved on monthly backup tapes and "complaint freeze tapes." This is best described, we believe, by way of written summary, perhaps to be accompanied with a spreadsheet of relevant data.

AMD already is in the process of preparing this information for disclosure. We suggest disclosing this information to Intel on a rolling basis as it is assembled. We should be able to begin production in the next few weeks.

Richard Levy, Esq., November 27, 2007 - Page 4

    We trust that this is responsive to your requests. There is, obviously, some detail we
ought to discuss, so please call me for that purpose.

                                    Sincerely,

                                    David L. Herron
                                    of O'MELVENY & MYERS LLP

LA3:1141891.1

# EXHIBIT 15

**From:** Herron, David [mailto:DHerron@OMM.com]
**Sent:** Mon 10/15/2007 3:04 PM
**To:** Levy, Richard P.; Dillickrath, Thomas
**Cc:** Simmons, Shaun M.; Herron, David
**Subject:** NEAR DEDUPLICATION

Rich and Tom: Per Rich's request and Tom's email below, attached is information about the functioning of near-deduping within Attenex Patterns. I am forwarding to you three pieces of information. The first is a general "layperson's" explanation of near-deduping, below. Second, the .pdf attached above is the Attenex description of near-deduping, which is confidential and which we have marked as such under the Protective Order. Finally, I have attached some links to the Attenex patent descriptions.

## General Description:

At a high-level, near-deduplication suppresses the early emails of an email thread. So, if we were to send emails back and forth 10 times, it would suppress the previous 9 instances of that thread, and just keep the last, 10th message for review. This comparison is very conservative, if the e-mail's text is changed, or a new recipient is added, or a new attachment is added, that message will not be considered a near-duplicate of the original. Running near-deduplication is very effective for the "chatting" often seen in email correspondence.

There are three critical pieces to Attenex's near-duplicate process and they occur in the following order:

1.  Conversation thread

a.    All near-duplicate comparisons are constrained within each conversation thread.  Since, in any group of email, there are potentially a large number of comparisons, Attenex uses the conversation thread to limit the scope of the near-duplicate comparisons.  So basically what this means is all emails within each thread group are compared.

2.  Message text

a.    The next step is to compare the actual message text within the emails of a given conversation.  The text comparison does assume some structure, namely new text is added before the previous message body.  Attenex compares the bodies of two messages to their end, character-by-character, until they differ.  If Attenex reaches the end of the shorter body, it's identified as a near-duplicate candidate.  It then is near-duped if, and only if, it has no attachment.  If there are attachments, a comparison of attachments, as described below in step 3, is executed.

Note

Since different email editors are used to format the email messages, Attenex does some clean-up before comparison (before messages are saved to the Attenex Patterns database).  All consecutive white spaces, such as spaces, carriage returns, new lines, or tabs, are replaced with a single space.  Also angle brackets < and > are replaced by single spaces as they are often used for indentation, or as markers for embedded URL links.

3.  Attachments

a.    If a near-duplicate candidate email has any attachments, those attachments are now compared. Attachments are compared by their hash-codes, i.e. binary equivalence.  After identifying a pair of near-duplicate message bodies, any attachments are then evaluated.  If an email message body is appended, in its entirety, within the other body, and its attachments are subset of the other, it is marked as a near-duplicate.

## Links To Patent Descriptions:

7035876  System and method for evaluating a structured message store for message redundancy

http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO1&Sect2=HITOFF&d=PALL&p=1&u=%2Fnetahtml%
2FPTO%2Fsrchnum.htm&r=1&f=G&l=50&s1=7035876.PN.&OS=PN/7035876&RS=PN/7035876


6820081 System and method for evaluating a structured message store for message redundancy

http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO1&Sect2=HITOFF&d=PALL&p=1&u=%2Fnetahtml%
2FPTO%2Fsrchnum.htm&r=1&f=G&l=50&s1=6820081.PN.&OS=PN/6820081&RS=PN/6820081


Lastly, please also note, as I believe we have described previously, that near-deduping is conducted on a per-custodian basis, not across the corpus of data of any two or more custodians.

If after you have reviewed this material you have additional questions, please let us know. Based on Chuck Diamond's and my discussion with Rich last week, I understood that Tom's question would be about "file pathing," which we will also be pleased to discuss if that is a different issue than the inquiry Tom raised in his email from this morning.  David

---

**From:** Dillickrath, Thomas [mailto:DillickrathT@howrey.com]
**Sent:** Monday, October 15, 2007 9:14 AM
**To:** Simmons, Shaun M.
**Subject:** De-Dupes

Shaun,

I've been told that you are the resident expert on the de-duplication protocols AMD is employing (you can thank David Herron for that). We would like to get a better understanding of the protocols you guys are employing--can we speak tomorrow morning your time?  Thanks.

Thomas J. Dillickrath
Senior Associate
Howrey LLP
1299 Pennsylvania Ave NW
Washington DC 20004
202.383.6745
dillickratht@howrey.com


---
This email and any attachments contain information from the law firm of Howrey LLP, which may be co
The information is intended to be for the use of the individual or entity named on this email.
If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the con
If you receive this email in error, please notify us by reply email immediately so that we can arrange for

We take steps to remove metadata in attachments sent by email.  Any remaining metadata should be pres
If you receive an attachment containing metadata, please notify the sender immediately and a replaceme
---

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE INTEL CORPORATION MICROPROCESSOR ANTITRUST LITIGATION | ) ) ) ) ) )   MDL No. 05-1717-JJF |
| ADVANCED MICRO DEVICES, INC. and AMD INTERNATIONAL SALES & SERVICE, LTD., <br><br> Plaintiffs, <br><br> vs. <br><br> INTEL CORPORATION and INTEL KABUSHIKI KAISHA, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) )   C. A. No. 05-441-JJF |
| PHIL PAUL, on behalf of himself and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> INTEL CORPORATION, <br> Defendant. | ) ) ) ) ) ) ) ) ) )   C. A. No. 05-485-JJF <br><br> CONSOLIDATED ACTION |

## SECOND AMENDED STIPULATION REGARDING ELECTRONIC DISCOVERY AND FORMAT OF DOCUMENT PRODUCTION

WHEREAS, this action was commenced on June 27, 2005 by plaintiffs Advanced Micro Devices, Inc. and AMD International Sales & Service, Ltd. (hereafter jointly, "AMD") against defendants Intel Corporation and Intel Kabushiki Kaisha (hereafter jointly, "Intel");

WHEREAS, the Delaware District Court Default Standards for Discovery of Electronic Documents recommend that parties cooperatively reach agreement on electronic discovery issues prior to the Federal Rule of Civil Procedure 16 scheduling conference;

WHEREAS, AMD, Intel, Class Plaintiffs, and California Class Plaintiffs have reached a compromise under the specific circumstances of this case pursuant to which the number of custodians subject to discovery will be limited (pursuant to a separate stipulation), and have reached agreement on the terms of an appropriate Protective Order; AMD, Intel, Class Plaintiffs, and California Class Plaintiffs have also agreed to a protocol to govern electronic discovery and the format of documents to be produced in this case;

WHEREAS, coordinated class actions filed by purchasers ("Class Plaintiffs") are also pending in this District against Intel pursuant to a November 3, 2005 order of the Judicial Panel on Multidistrict Litigation;

WHEREAS, the Court appointed Interim Class Counsel to represent Class Plaintiffs by order dated April 28, 2006;

WHEREAS, class actions filed by California purchasers ("California Class Plaintiffs"), are also pending in the Superior Court of the State of California for the County of Santa Clara;

WHEREAS, the California Court has appointed Lead Class Counsel ("California Class Counsel") to represent California Class Plaintiffs;

WHEREAS, the parties do not intend for this stipulation to establish a procedure for future cases;

WHEREAS, AMD and Intel filed a "Stipulation Between AMD and Intel Regarding Electronic Discovery and Format of Document Production" on May 15, 2006, which was entered by the Court on May 17, 2006, and which is intended by the parties to be superseded by this Amended Stipulation;

NOW, THEREFORE, IT IS HEREBY STIPULATED BY AND AMONG AMD INTEL, CLASS PLAINTIFFS, AND CALIFORNIA CLASS PLAINTIFFS, THROUGH THEIR RESPECTIVE COUNSEL AND SUBJECT TO THE APPROVAL OF THE COURTS, AS FOLLOWS:

2

RLF1-3117650-1

1. For all files produced
    a. Document Control Number
    b. Custodian Name
    c. Media Control Number
    d. Path
    e. Confidentiality Designation
    f. Filename
2. For e-mails produced in .pst format
    a. Document Control Number
    b. Parent Id - Document Control Number of the produced .pst
    c. Mail Archive Member ID - pr_entry id property from the produced .pst file
3. For e-mails produced in .msg format
    a. Folder Name
    b. MD5 Hash Value
4. For non-e-mail electronic files
    a. MD5 Hash Value

The producing party shall provide, to the extent technically feasible, additional reference file fields to the extent that additional fields are needed for the requesting party to control and identify the documents produced.

### C.    De-duplication Protocols

4.    Prior to the production, the respective parties may de-duplicate the documents designated for production, as follows

- E-mail – de-duplicated by custodian.

- Non-database electronic documents – de-duplicated by custodian.

### D.    Production of Certain Documents in Non-Native Static Image

5.    Notwithstanding Section A hereto, the parties have agreed that the following categories of documents may be produced in static image format:

a.    Information designated as "red", "orange" or "yellow" under Intel's pre-existing color-coding system for highly confidential trade secret information, subject to the limitation that this group will constitute no more than 1.5% of Intel's total production;

b.    Documents redacted on the basis of privilege, as well as documents that are part of the same attachment group as redacted or withheld documents, even if not privileged;

4

Dated:____February 20, 2007_____          **POTTER ANDERSON & CORROON LLP**

                                      By:        /s/ Richard L. Horwitz #2246
                                            Richard L. Horwitz (#2246)
                                            rhorwitz@potteranderson.com
                                            W. Harding Drane, Jr. (#1023)
    wdrane@potteranderson.com
    1313 North Market Street
    P.O. Box 951
    Wilmington, DE  198999-0951
    (302) 984-6027

Dated: _____February 20, 2007_____          **GIBSON, DUNN & CRUTCHER LLP**

    By:        /s/ Daniel S. Floyd
    Daniel S. Floyd
    DFloyd@gibsondunn.com
    333 South Grand Avenue
    Los Angeles, CA 90071-3197
    (213) 229-7000

Dated: _____February 20, 2007_____          **HOWREY LLP**

    By:        /s/ Darren B. Bernhard
    Darren B. Bernhard
    BernhardD@howrey.com
    1299 Pennsylvania Avenue, N.W.
    Washington, DC 20004-2402
    (202) 383-6774

Dated: _____February 20, 2007_____          **BINGHAM McCUTCHEN LLP**

    By:        /s/ Richard A. Ripley
    Richard A. Ripley
    richard.ripley@bingham.com
    2020 K Street, N.W.
    Washington, DC 20006
    (202) 373-6000

    Attorneys for Intel Corporation and Intel
    Kabushiki Kaisha

17

Dated:   February 20, 2007

**RICHARDS, LAYTON & FINGER, P.A.**

By:   /s/ Frederick L. Cottrell, III #2555
      Frederick L. Cottrell, III (#2555)
      cottrell@rlf.com
      Richards, Layton & Finger
      One Rodney Square
      920 North King Street
      P.O. Box 551
      Wilmington, DE  19899
      (302) 651-7700

      Attorneys For Advanced Micro Devices,
      Inc. And AMD International Sales &
      Service, Ltd.

Dated:   February 20, 2007

**O'MELVENY & MYERS LLP**

By:   /s/ Charles B. Diamond
      Charles B. Diamond
      cdiamond@omm.com
      1999 Avenue of the Stars
      7th Floor
      Los Angeles, CA 90067-6035
      (310) 553-6700

      Attorneys for Advanced Micro Devices, Inc.
      And AMD International Sales & Service,
      Ltd.

Dated:   February 20, 2007

**PRICKETT JONES & ELLIOTT, P.A.**

By:   /s/ James L. Holzman #663
      James L. Holzman (#663)
      jlholzman@prickett.com
      J. Clayton Athey (#4378)
      jcathey@prickett.com
      1310 King Street, P.O. Box 1328
      Wilmington, DE 19899
      (302) 888-6509

      Interim Liaison Class Counsel, MDL 1717

Dated: ___February 20, 2007___          **COHEN MILSTEIN HAUSFELD & TOLL**

                                         By: _____/s/ Daniel A. Small_____
                                                Michael D. Hausfeld
                                                mhausfeld@cmht.com
                                                Daniel A. Small
                                                dsmall@cmht.com
                                                1100 New York Avenue, N.W.
                                                Suite 500, West Tower
                                                Washington, D.C.  20005
                                                (202) 408-4600

                                                Interim Class Counsel, MDL No. 05-1717

**SO ORDERED**:


Dated: _____          _____
                                         Joseph J. Farnan, Jr.
                                         United States District Judge
                                         District of Delaware

19