IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE<br>INTEL CORPORATION<br>MICROPROCESSOR ANTITRUST<br>LITIGATION | ) ) ) ) ) ) ) | MDL No. 05-1717-JJF<br><br>**(DM 12)** |
| ADVANCED MICRO DEVICES, INC. a Delaware corporation, and AMD INTERNATIONAL SALES & SERVICE, LTD., a Delaware corporation,<br><br>                     Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION, a Delaware corporation, and INTEL KABUSHIKI KAISHA, a Japanese corporation,<br><br>                     Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C. A. No. 05-441 (JJF) |
| PHIL PAUL, on behalf of himself and all others similarly situated,<br><br>                     Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION,<br><br>                     Defendant. | ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 05-485-JJF<br><br>CONSOLIDATED ACTION |

**DECLARATION OF CATHERINE KESSEDJIAN**

OF COUNSEL:

Robert E. Cooper
Daniel S. Floyd
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

Michael L. Denger
Joseph Kattan, PC
Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036-5306
(202) 955-8500

Darren B. Bernhard
Howrey LLP
1299 Pennsylvania Avenue
N.W. Washington, DC 20004
(202) 783-0800

Dated:  July 3, 2008

872671 / 29282

Richard L. Horwitz (#2246)
W. Harding Drane, Jr. (#1023)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19899-0951
(302) 984-6000

rhorwitz@potteranderson.com
wdrane@potteranderson.com

*Attorneys for Defendants*
*Intel Corporation and Intel Kabushiki Kaisha*

**Catherine Kessedjian**
Professor of Law (Professeur agrégé des Facultés de droit)
19 B Villa Seurat
75014 Paris – France
Tel +33 1 43 20 07 75
Fax +33 1 43 20 09 13
Email : kessedjian@hotmail.com

# Opinion

In the case of Advanced Micro Devices Inc et al
vs.
Intel Corporation

## 1) Introduction

1. I, the undersigned, Catherine Kessedjian, Professor of Law, have received a request for an opinion from the counsel to Intel Corporation, the defendant in an action brought by Advanced Micro Devices Inc et al, in the U.S. District Court in Delaware, in connection with Intel's response to (1) the Motion of the Union Fédérale des Consommateurs – Que Choisir (Que Choisir) to intervene for the limited purpose of seeking modification to protective orders; and (2) Que Choisir's Application pursuant to 28 U.S.C. §1782 for an order requiring Intel and Third Parties to provide access to Documents and Deposition Testimony for use in Foreign Proceedings, dated 9 April 2008.

### 1.1) *General description of professional experience*

2. I am a Professor of Law at the University of Panthéon-Assas, Paris II where I am the Deputy Director of the European College of Paris and head a Postgraduate Masters2/research program in European Law. I teach alternatively European business law, international litigation and international commercial arbitration. I hold a Doctorate in Law, with highest honors, from the University of Panthéon-Sorbonne Paris I (1986), a Master of Laws from the University of Pennsylvania Law School (1981), a Postgraduate degree in private international law and international business transactions, *cum laude*, and a postgraduate degree in public international law, also *cum laude*.

3. I gained my experience in international litigation over a period of 18 years during which I practised as a lawyer *(avocat)* at the Paris Bar (1981-1998). Since 1998 I have periodically advised businesses or individuals who are parties to international cases before the French courts or arbitral tribunals and I have written legal opinions

about the French legal or judicial systems to be produced before courts in the United States. Since 1990 I have periodically been nominated as an arbitrator in *ad hoc* proceedings or proceedings administered by institutions such as the International Chamber of Commerce, the International Centre for the Settlement of Investment Disputes (ICSID), the American Arbitration Association or the London Court of International Arbitration. I also act as a mediator or conciliator in international commercial disputes.

4. I have been a member of the American Law Institute for many years. In 1998 I was appointed adviser for the Institute's project on transnational rules of procedure, which was finally adopted in 2004. In 2002 I was appointed adviser for the project on principles governing jurisdiction, choice of laws and judgments in the area of intellectual property.

5. I am involved in research and publication in the areas of private international law and international litigation and I participate in many international conferences on these subjects. I am a member of the European Private International Law group and, in this capacity, participate in the development of European private international law. I teach in numerous foreign universities, notably New York University and The Hague Academy of International Law.

6. For the last three years, I chair a Committee under the auspices of the International Law Association whose mandate is to propose principles or rules for private litigation in the interest of the public. The Committee is presently finalising a report and resolution to be presented in the 73rd ILA Conference to be held in August 2008 in Rio de Janeiro. The report and the resolution deal with Transnational Group Actions.

### 1.2) *The facts upon which the present opinion is based*

7. In order to prepare this consultation, I received a copy of the Brief in support of 1) The Motion of the Union Fédérale des consommateurs – Que Choisir (Que Choisir) to intervene for the limited purpose of seeking modification to protective orders; and 2) Application pursuant to 28 U.S.C. §1782 for an order requiring Intel and Third Parties to provide access to Documents and Deposition Testimony for use in Foreign Proceedings, dated 9 April 2008.

8. In addition, I was informed by Intel's Counsel that the Delaware Litigation involves allegations that Intel unlawfully monopolized the x86 microprocessor market. Complaints have been filed against Intel in this consolidated action by Advanced Micro Devices ("AMD"), a competitor of Intel, and by purported classes of purchasers of personal computers (PCs) containing microprocessors. Intel also has produced in discovery the electronic equivalent of over 150 million pages of documents and over 70 third parties (such as manufacturers of PCs) have received subpoenas to produce documents.

### 2) The reluctance of the French system towards US style discovery

9. Because Que Choisir is a French legal entity, whose mandate is to represent French consumers, this opinion will focus on the implications of Que Choisir's application under § 1782 with respect to the French judicial system.

10. The French judicial system is fundamentally different than the judicial system in the US. In particular, the judicial system in France is an inquisitorial system, in which the judge is active and has the power to act, at any stage of the proceedings, order measures, modify the ones already taken, add new measures at measures already taken and, generally, monitor the enforcement of the measures which have been ordered (See Articles 147 to 150, 155 and ff of the NCPC). This system is very different from common law systems, particularly in the US, which follow an accusatorial model in which the parties essentially frame the dispute themselves and the judge is primarily an arbiter.

11. In part because of the nature of the French judicial system, and in part because of a longstanding cultural repulsion toward massive litigation, discovery in French courts is far more limited and much more closely controlled by a judge than in US courts.

12. The reluctance of France, and more generally continental countries, towards American style discovery is already evidenced in the *travaux préparatoires* of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial matters[1] as they crystallised in Article 23 of the Convention by which a contracting Party may declare that it will not execute letters of Request for the purpose of obtaining pre-trial discovery of documents as known in Common law countries. France did make the reservation of Article 23 which was later amended to read as follows: "The declaration made by the French Republic in accordance with Article 23 relating to Letters of Request issued for the purpose of obtaining pre-trial discovery of documents does not apply when the requested documents are enumerated limitatively in the Letter of Request and have a direct and precise link with the object of the procedure"[2].

13. This question came up again during the negotiations of a world wide convention on jurisdiction and foreign judgments, at the Hague Conference on Private International Law, during the years 1992-2001. The strong political decision European countries had set for themselves to curtail what they considered to be a too expansive conception of jurisdictional grounds by the United States was due to several factors,

---

[1]  http://hcch.e-vision.nl/index_en.php?act=conventions.pdf&cid=82

[2]  Modification dated 19 January 1987, to be found on website of the Hague Conference at http://hcch.e-vision.nl/index_en.php?act=status.comment&csid=501&disp=resdn .

one of which was US style discovery. European countries feared that by allowing the United States to use their broad base jurisdiction against European companies would allow law suits which are extremely expensive and burdensome in substantial part because of discovery. This is one of the reasons for which the convention finally could not be adopted.

14. Furthermore, the recent discussions in Europe about creating private collective recourse, including for damages, either for violation of competition rules, or more generally for violation of consumers' rights, have shown that most European representatives do not want to take as a model the US class action particularly because they see it as a vehicle to import into the European system a US style discovery which is foreign to European fundamental conceptions of civil procedure. This is expressed, for example, by the EC Commission White Paper on Damages actions for breach of the EC antitrust rules[3] when dealing with access to evidence. After recognising that evidence is "often concealed and being held by the defendant or by third parties, is usually not known in sufficient detail to the claimant", the Commission expresses its policy choice as follows: *"Whilst it is essential to overcome this structural information asymmetry and to improve victim's access to relevant evidence, it is also important to **avoid the negative effects**[4] of overly broad and burdensome disclosure obligations, including the **risk of abuses**."*. What follows is a carefully crafted policy for a pan-European system of evidence disclosure almost identical to the French system, both in its philosophy and its concrete application, together with a well defined active role for judges in the Member States akin to the role already assumed by French judges.

15. The same policy is also clearly expressed in the report of the French working group on collective actions co-chaired by Guillaume Cerutti (former Director General of the French Directorate General for Competition Policy) and Marc Guillaume (former Director for Civil Affairs at the Ministry of Justice)[5]. It is also expressed in the report of the working group set up by the Ministry of Justice for the de-criminalisation of French business law, presided by one of the former President of the Paris Court of Appeals, Mr. Jean-Marie Coulon[6].

16. The reluctance towards American style discovery is such that even the American Law Institute has made clear that, for transnational cases, the American style discovery is not the model to be followed. This is evidenced in the Principles of

---

[3]   2 April 2008, Com(2008) 165 final, p.5.

[4]   Emphasis in the original text.

[5]   Rapport sur les actions de groupe transmis au Ministre de l'Economie et au Ministre de la Justice, on 16 December 2005, http://www.ladocumentationfrancaise.fr/rapports-publics/054004458/index.shtml

[6]   Rapport du groupe de travail sur la dépénalisation du droit des affaires, January 2008, at p.94.

Transnational Civil Procedure, prepared initially under the sole auspices of the American Law Institute and later jointly published with the Unidroit[7]. In his preface to the work, Geoffrey Hazard, one of the Reporters, explains that "the idea that one disputant can ransack another's files through a 'fishing expedition', is abhorrent to some mentalities and at least troublesome to all"[8]. In explaining further how the balance has been found between the different interests at stake, Prof. Hazard explained that the drafters have avoided the ambiguities of the broad definitions included in the US Federal Rules of Civil procedure. Indeed, when one examines Section 16.2 of the Principles, it becomes clear that the drafters have come closer to a European style disclosure[9]. The explanation provided in the Reporters' study supports this conclusion. In Section R-22C, the Reporters explain: "The philosophy expressed in [these rules] is essentially that of the common-law countries **other than the United States** [emphasis added]. In those countries, the scope of discovery or disclosure is specified and limited [...]". In Section R-22E, they add: "Disclosure and exchange of evidence under civil-law systems are generally more restricted, or nonexistent".[10]

### 3) The clear policy of the French system for international cooperation

17. Ratifying the Hague Convention on taking of evidence abroad, already mentioned above, was for France a clear statement that international cooperation in these matters was the preferred means "to resolve international friction caused by one nation's application of its domestic discovery rules in another's territory"[11]. The Republic of France also considers that the Hague Convention is to provide "the sole [and exclusive] means by which discovery demands emanating from other signatory countries would be carried out on French soil"[12].

---

[7] ALI/Unidroit, *Principles of Transnational Civil Procedure*, Cambridge University Press, 2006.

[8] Ibidem, at p.1.

[9] Section 16.2 provides: "Upon timely request of a party, the court should order disclosure of relevant, nonpriviledged, and reasonably identified evidence in the possession or control of another party or, if necessary and on just terms, of a non party. It is not a basis of objection to such disclosure that the evidence may be adverse to the party or person making the disclosure".

[10] Ibidem, at pp.131 and 132.

[11] Brief of Amicus curiae the Republic of France in support of petitioners, before the Supreme Court of the United States, in the case Société nationale industrielle Aerospatiale, 22 August 1986, page 2.

[12] Ibidem, pages 3 to 11.

18. It is well known that an international Convention such as the Hague Evidence Convention is based on reciprocity. Consequently, France expects that other signatories to the Convention have the same respect for French evidence rules which France has for foreign rules, within the limits of public policy. France has extensively modified its New Code of Civil Procedure to accommodate requests emanating particularly from United States courts. In fact, in the almost twenty years I have practiced law in Paris, I participated in several instances where a court reporter, appointed by a court in the United States, came to Paris and registered verbatim the examination and cross examination (performed in the US style) of witnesses located in France. These processes were (and are still) completely unknown in French procedure, but because they were requested by a foreign court and they were legal under foreign procedural rules, they were performed on the French territory without difficulty with the help of the French Central Authority under the Hague Convention.

19. French courts, in return, will expect courts in the United States to stand ready to help secure evidence located in the United States. But instead of acting unilaterally, and without any control from a French court, as is attempted in the present case, France has clearly indicated that a bilateral cooperation is the only mechanism to achieve what Que Choisir is seeking here. Accepting such a unilateral attempt would deprive the French court of its inherent control over administration of evidence, as provided by French civil procedural rules.

## 4) Conclusion

20. Based on the differences in the judicial systems, and the clear distaste in the French judicial system for American-style discovery, it is highly unlikely that any French court would be receptive to unilateral judicial assistance from a US court that permits a French litigant to have access to massive US-style discovery for use in a French proceeding. To the contrary, the French court would likely view the action as an evasion of fundamental principles of French civil procedure and a breach of comity.

*
*   *

I declare that I have prepared the above opinion myself and that I am aware that it will be produced before the Delaware Court.

Executed at Paris, France, on 1st July 2008

*[signature]*

Catherine Kessedjian
Professor of Law