## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE<br>INTEL CORPORATION<br>MICROPROCESSOR ANTITRUST<br>LITIGATION | ) <br>)<br>) MDL No. 05-1717-JJF<br>)<br>)<br>) |
| | ) **(DM 12)** |
| ADVANCED MICRO DEVICES, INC. a<br>Delaware corporation, and AMD<br>INTERNATIONAL SALES & SERVICE, LTD.,<br>a Delaware corporation, | )<br>)<br>)<br>) |
| Plaintiffs, | ) C. A. No. 05-441 (JJF)<br>)<br>) |
| v. | )<br>) |
| INTEL CORPORATION, a Delaware corporation,<br>and INTEL KABUSHIKI KAISHA, a Japanese<br>corporation, | )<br>)<br>)<br>) |
| Defendants. | )<br>) |
| PHIL PAUL, on behalf of himself<br>and all others similarly situated, | )<br>)<br>)<br>) |
| Plaintiffs, | ) C.A. No. 05-485-JJF<br>) |
| v. | ) CONSOLIDATED ACTION<br>) |
| INTEL CORPORATION, | )<br>) |
| Defendant. | )<br>) |

## DECLARATION OF JEAN-PIERRE FARGES

OF COUNSEL:

Robert E. Cooper
Daniel S. Floyd
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

Michael L. Denger
Joseph Kattan, PC
Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036-5306
(202) 955-8500

Darren B. Bernhard
Howrey LLP
1299 Pennsylvania Avenue
N.W. Washington, DC 20004
(202) 783-0800

Dated: July 3, 2008

872671 / 29282

Richard L. Horwitz (#2246)
W. Harding Drane, Jr. (#1023)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19899-0951
(302) 984-6000

rhorwitz@potteranderson.com
wdrane@potteranderson.com

*Attorneys for Defendants*
*Intel Corporation and Intel Kabushiki Kaisha*

## <u>AFFIDAVIT OF JEAN-PIERRE FARGES</u>

I, Jean-Pierre Farges, make the following affidavit:

1.  I make this affidavit upon personal knowledge and I am competent to testify to the facts set forth herein. This declaration is based on my background in, and familiarity with, French law and procedures. The statements and opinions expressed herein are made in good faith on the basis of my understanding of the relevant facts and law.

2.  I am a partner and the head of the litigation and arbitration practice at Ashurst Paris. I specialize in arbitration and litigation in contractual issues, finance, industrial risk, construction, international trade, public and administrative law disputes and regulatory issues. I have been involved in a number of major disputes before State courts and arbitral tribunals, acting for listed industrial companies, banks and funds. I am an avocat at the Paris Bar.

3.  I earned my law degree, known as Doctorate in private international law on international arbitration from University of Paris I (Panthéon-Sorbonne), my Magistère (postgraduate degree) in private and public economic law from University of Paris I (Panthéon-Sorbonne), and my DESS (postgraduate degree) in business and tax law from University of Paris I (Panthéon-Sorbonne).

4.  In the course of my law practice, I regularly practice before courts in France. I am familiar with French competition law and the procedural rules in the courts listed above.

## I. UNION FEDERALE DES CONSOMMATEURS – QUE CHOISIR AND POTENTIAL ACTION FOR DAMAGES

### (a) <u>QC provides no information on the potential action for damages</u>

5.  I understand from Union Fédérale Des Consommateurs – Que Choisir ("QC") Brief that it envisages to start consumer damages litigation in Europe after the European Commission has adopted a final decision in its pending proceedings.

6.  Indeed, page 6 of its brief, QC indicates that the request to modify certain provisions of the Protective Order is made "*to allow it access to materials produced in this litigation by Intel and third parties, and deposition transcripts, as such access will assist it in efficiently participating in the EC proceedings as well as in consumer damages litigation in Europe that is <u>likely to follow the EC proceedings</u>*" (underlining added). In page 7, QC also indicates that it intervenes in the litigation before the Delaware Court to seek a modification of the Protective



Order so as it may *"seek, via subsequent and related judicial proceedings, compensation, for consumers"*.

7.  First, I notice that QC provides the Court with no information about the *"consumer damages litigation"* mentioned in its Brief. QC does not indicate that an action has already been brought before any court in the European Union. This could be easily explained by the fact that, as QC has itself indicated in its Brief, the consumer damages litigation will follow the EC proceedings in which the EC has not yet adopted its final decision.

8.  In addition, I notice that QC does not even indicate before which potential courts a consumer damages litigation could be launched.

9.  It is therefore impossible to verify whether QC would fulfil the conditions to start civil actions in the Member States in which consumer damages litigation is *"likely to follow the EC proceedings"*.

(b)  <u>QC does not demonstrate that the conditions to start a civil action in France are fulfilled</u>

10. The possibility for an association such as QC to bring an action for damages when the interests of consumers are affected are strictly defined under French Law. Consumer associations can bring two types of actions: (i) an action for the protection of collective interest of consumers and (ii) an action in joint representation (joint action) by which they represent the interest of individual consumers.

(i)  *Action for the protection of collective interest of consumers*

11. Under French Law, there are two legal grounds for actions aimed at protecting the collective interest of consumers, depending on whether the offence is a civil one or a criminal one.

12. I understand from QC's brief, that its purpose is to participate in consumer damages litigation in Europe that is likely to follow the EC proceedings. Therefore, I can imagine that QC would base its action on Article L.421-7 of the Consumer Code, which is the specific ground for actions aimed at protecting the collective interest of consumers against a civil offence.

13. For civil offences, Article L.421-7 of the Consumer Code provides that *"The associations mentioned in Article L. 421-1 [i.e. duly authorized] may <u>intervene</u> before civil courts and, in particular, request the application of the measures provided for in Article L. 421-2, where the initial application is aimed at making whole any damage suffered by one or more consumers due to events not constituting a criminal offence."* (underlining added). A true and correct copy of

3



Article L.421-7 of the French Consumer Code is attached hereto as Exhibit [1]. Attached hereto as Exhibit [2], is an English translation of Exhibit [1], which was prepared by a sworn translator.

14. This provision means that consumer associations that have been duly authorized by the public authorities and that seek for the protection of collective interest of consumers against a civil offence can only intervene in proceedings that have already been initiated by one or more consumers.

15. I am not aware that QC has demonstrated that one or several consumers already have introduced a civil action before French courts. It can therefore not intervene in such a procedure.

16. Another action is conceivable under French Law on the basis of Article L.421-1 of the Consumer Code provided that Intel's managers/directors behaviour constitutes a criminal offence (on the basis of article L.420-6 of the Commercial Code). But since I understand from QC's brief that it will not base its action on that ground, I will not discuss it. I would just notice that, to my best knowledge, criminal sanctions have never been imposed following a Commission decision in France and that the application Article L.421-1 of the Consumer Code would raise serious issues in such a case. A true and correct copy of Article L.421-1 of the French Consumer Code and of Article L.420-6 of the Commercial Code are attached hereto as Exhibit [3]. Attached hereto as Exhibit [4], an English translation of Exhibit [3], which was prepared by a sworn translator.

(ii)    *Joint action (action for representation)*

17. Article L.422-1 Consumer Code states "*Where several consumers, who are natural persons, have suffered individual losses caused by the same merchant and having a common origin, any approved association recognised as a representative association at a national level pursuant to the provisions of Title I may, if duly appointed by no fewer than two of the consumers concerned, institute legal proceedings indemnification on behalf of these consumers*". A true and correct copy of Article L.422-1 of the French Consumer Code is attached hereto as Exhibit [5]. Attached hereto as Exhibit [6], is an English translation of Exhibit [5], which was prepared by a sworn translator.

18. Thus French law entrusts consumer associations to bring a representative action provided that they have received prior mandate from at least two consumers.

4



19.    Article R.422-2 of the Consumer Code[1] specifies that "*The agency agreement must be made in writing and expressly state its purpose and grant to the nationally approved association of consumers the power to complete, in the consumer's name, all procedural actions.*"[2] A true and correct copy of Article R.422-2 of the French Consumer Code is attached hereto as Exhibit [7]. Attached hereto as Exhibit [8], is an English translation of Exhibit [7], which was prepared a sworn translator.

20.    I am not aware that QC has demonstrated that it holds such mandates. In addition, it is doubtful since in its brief QC explicitly states that the consumer damages litigation will follow the European Commission proceedings in which no final decision has been rendered yet.

21.    I must also recall that French law contains strict conditions for QC to obtain mandates from consumers. In particular, the possibility for QC to solicit assignments from consumers to seek damages on their behalf is very limited. Indeed, article L.422-1 of the Consumer Code states that "*The appointment of the said association may not be sought by means of a public appeal on radio or television, or by poster placement, leaflets or customized letters. The relevant appointment must be made in writing by each consumer.*" A true and correct copy of Article L.422-1 of the French Consumer Code is attached hereto as Exhibit [5]. Attached hereto as Exhibit [6], is an English translation of Exhibit [5], which was prepared by a sworn translator.

22.    In its brief in support of its application pursuant to §1782, QC insists that it has brought an action against a mobile telephony operator (i.e. Bouygues Telecom) before the Paris Court on its own name (meaning an action for the protection of collective interests of consumers)[3]. Nevertheless it should be pointed out that, without adjudicating on the merits of the case, the Paris Court considered this

---

[1]    "R" means Regulatory part of the Consumer Code by contrast to "L" that means Legislative Part of the Consumer Code.

[2]    Article R. 422-2 follows by stating: "The agency agreement may also provide for:

An advance made by the nationally approved association of consumers in respect of all or part, of the expenses and costs related to the procedure;

The payment of advances by the consumer;

The possibility for the nationally approved association of consumers to waive the performance of the agency agreement, after sending a formal notice to the consumer by registered mail return receipt requested in the event that the consumer's inertia is likely to slow down the process of the procedure;

Representation of the consumer by the nationally approved association of consumers upon performance of any investigation procedures;

The possibility for the nationally approved association, of exercising, in the consumer's name, any remedies, except for an appeal before the Cour the Cassation, without execution of any further agency agreement"

[3]    QC's brief in support of application pursuant to 28 U.S.C. §1782, Apr. 9, 2008, at 5.

action as a representative (joint) action by QC and held that QC has violated article L. 422-1 of the Consumer Code that prohibited canvassing. It decided that the writ of summons and the voluntary interventions were not admissible, and that it was not necessary to adjudicate on the other claims. A true and correct copy of the judgment of the Paris Court of Commerce is attached hereto as Exhibit **[9]**. Attached hereto as Exhibit **[10]**, is an English translation of Exhibit **[9]**, which was prepared by a sworn translator. I note that QC claim that It have, with some consumers, lodged an appeal against this judgment.

2.     **DISCOVERY POTENTIALLY AVAILABLE TO QC UNDER FRENCH LAW**

23.     In its brief, QC does not explain for which reasons it considers that the documents and evidence it seeks before the Delaware Court are outside the French Courts jurisdictional reach.

24.     It should be reminded that French law already provides efficient mechanisms which allow a judge to order production of evidence either (a) in a pre trial litigation or (b) in a trial on the merits and (c) to obtain assistance from the US Courts when appropriate.

(a)     Pre-trial measures can be ordered by French courts

25.     Under Article 145 of the Code of Civil Procedure ("CPC"), legally permissible preparatory inquiries may be ordered at the request of any interested party, by way of a petition or by way of a summary procedure, if there is a legitimate reason to preserve or to establish, before any legal process, the evidence of the facts upon which the resolution of the dispute depends. A true and correct copy of Article 145 of the CPC is attached hereto as Exhibit **[11]**. Attached hereto as Exhibit **[12]**, is an English translation of Exhibit **[11]**, which was prepared by sworn translator.

26.     In addition, according to the French Supreme Court anything which amounts to a general investigation is not a legally permissible measure under article 145 CPC[4]. This means that, in practice, for such measure to be granted, the claimant must identify precisely the types or the nature or the subject of the documents requested.

(b)     French law also provides mechanisms allowing judges to order the production of documents during legal proceedings

27.     Under Article 10 of the CPC judges have the authority to order ex officio any legally appropriate investigation measures. In addition, Article 11 of the CPC (i)

---

4     Cour de cassation, second civil chamber, 7 January 1999, No 97-10381, Bulletin No 3. A true and correct copy of the judgment of the Cour de cassation is attached hereto as Exhibit **[13]**. Attached hereto as Exhibit **[14]**, is an English translation of Exhibit **[13]**, which was prepared by sworn translator.

requires the parties to cooperate for the implementation of the investigation measures and (ii) provides that the judge may draw any consequence of abstention or refusal to do so. It also allows the judge, where a party holds material evidence, and upon the request of the party, to order him to produce it, where necessary under a penalty payment. The judge may also, upon the petition by one party, request or order, where necessary, under the same penalty, the production of all documents held by third parties where there is no legitimate impediment to doing so.

28.     A true and correct copy of Articles 10 and 11 of the CPC is attached hereto as Exhibit [15]. Attached hereto as Exhibit [16], is an English translation of Exhibit [15], which was prepared by sworn translator.

29.     If the service of documents is not been carried out (spontaneously), the judge may, without any formality, be requested to order such service (Article 133 of the CPC).

30.     The judge sets, if necessary, under a periodic penalty payment, the time-limit and, where applicable, the terms and conditions of the service (Article 134 of the CPC).

31.     If, during the proceeding, a party wishes to rely on a notarial deed or a deed under private signature to which he was not a party or a document held by a third party, he may request the judge, to whom the matter is referred to, to order the delivery of a certified copy or the lodging in court of the deed or the document (Article 138).

32.     The judge must limit the choice of the order as to what is sufficient for the resolution of the dispute by endeavouring to select the simplest and least onerous ones (Article 147 of the CPC).

33.     The judge may combine several inquiries. He may at any time, even while they are being carried out, decide to add any other necessary inquiry to those that have been ordered (Article 148 of the CPC).

34.     The judge may at any time extend or restrict the scope of the prescribed inquiries (Article 149 of the CPC).

35.     The judge may travel outside his jurisdiction to implement the preparatory inquiry or to supervise its implementation (Article 156 of the CPC).

36.     The judge entrusted to carry out a preparatory inquiry or to supervise its implementation may order such other inquiry that the implementation of the one already ordered deems necessary (Article 166 of the CPC).

37.     The difficulties to which the implementation of the preparatory inquiry would be confronted will be resolved, at the request of the parties, on the initiative of the mandated expert, or ex officio, either by the judge who carries it out or by the



judge entrusted with the supervision of its implementation (Article 167 of the CPC).

38.   A true and correct copy of Articles 133, 134, 138, 147, 148, 149, 156, 166 and 167 of the CPC is attached hereto as Exhibit [17]. Attached hereto as Exhibit [18], is an English translation of Exhibit [17], which was prepared by sworn translator.

39.   The parties are held to cooperate for the implementation of the investigation measures: the judge is therefore allowed to take into consideration in its final ruling abstention or refusal to do so (Article 11 of the CPC) against the party who refused.

(c)   Possibility for French Courts to obtain assistance from US Courts

40.   Finally, it should also be mentioned that French courts can use the mechanisms provided by The Hague Evidence Convention when needing US court assistance.

41.   Indeed, the Hague Evidence Convention[5] provides legal basis for the collection of evidence abroad on civil or commercial matters for use in judicial proceedings. The French Republic and the United States of America are both contracting parties to this Convention since the early 1970's. According to this text, the evidence can be collected by letter of request, diplomatic or consular officer or appointed commission. Letter of request appears a priori to be the appropriate tool to get compulsory production of evidence abroad.

(d)   Evidence can be obtained directly from the Commission

42.   Since QC indicates in its brief that the consumer damages litigation will follow the EC proceedings, QC will also have the possibility to request access to the Commission's file for further private actions before the national courts on the basis of Regulation No 1049/2001 of the European Parliament and of the Council of 30 May 2001 regarding public access to European Parliament, Council and Commission documents[6]. This regulation states the principles, conditions and limits governing the right of access to documents of those institutions, provided for in Article 255 EC. A true and correct copy of Regulation 1049/2001 is attached hereto as Exhibit [19].

43.   Even if Regulation No 1049/2001 has not been adopted for that specific purpose, the CFI made clear in a recent case that it fully applies in antitrust cases. A true and correct copy of the CFI judgment is attached hereto as Exhibit [20].

---

5    Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil and Commercial Matters.
6    OJ 2001 L 145, p. 43.



44. As a result, the CFI annulled a Commission decision that refused to grant access to documents that were in the Commission's file relating to a cartel decision and that were requested[7] by a consumer organization constituted under Austrian in order to secure damages for the consumers.

(e) Evidence can also be obtained indirectly via French Courts

45. Evidence can also be obtained indirectly via the Courts before which QC envisages to introduce a consumer private action. Indeed, Courts can request access to information held by the European Commission.

46. The Commission has a duty to transmit information to national courts provided it respects the guarantees given to natural and legal persons by Article 287 EC[8]. A true and correct copy of Article 287 EC is attached hereto as Exhibit [22].

3. RECEPTIVITY OF FRENCH COURTS AND AUTHORITIES

47. To my best knowledge, the French authorities and Courts are quite reluctant to import the US "litigation culture" and discovery system.

(a) The French authorities are reluctant to import the US "Litigation Culture" and disclosure system

48. In various circumstances, the French government and administrative bodies indicated that they were reluctant to import US "litigation culture" and disclosure system.

(i) *French officials do not seem receptive to the US disclosure procedure*

---

7    Judgment of the Court of first instance of the European Communities, 13 April 2005, Verein für Konsumenteninformation (VKI) v. Commission of the European Communities, case T-2/03. Regulation 1049/2001 defines the principle of the right of access to documents of the European institutions and provides a number of exceptions to this right of access. These exceptions are in particular the protection of the purpose of inspections (think about leniency), the protection of commercial interests, the protection of court proceedings and the protection of privacy and the integrity of the individual. In its ruling the CFI recalled the case law according to which the mere fact that a document concerns an interest protected by an exception cannot justify application of that exception. In order to apply an exception the European Commission must conduct a concrete examination of the content of each document except when a category of document is manifestly covered by an exception. In this case, the CFI stated that the Commission could not refuse access on a general analysis by reference to categories of documents of the file (to the whole file). The CFI ruled that the EC Commission should carry out a concrete, individual examination of the documents referred to in the request for access in order to determine whether any exceptions applies or whether partial access is possible.

8    See Commission Notice on the co-operation between the Commission and the courts of the EU Member States in the Application of Articles 81 and 82 EC, Official Journal, C 101, 04/27/2004, p.54. A true and correct copy of this notice is attached hereto as Exhibit [21].



49.     Discovery hurts the French law principle of "access to justice" as this procedure is costly, time consuming and therefore generates unequal treatment.

50.     Expressing either their personal view or the view of the institution they belong to, French officials have explained their hostility to the importation of the US disclosure procedure "as is" on many occasions. These findings were based on conceptual issues but also on the practical adverse effects of the disclosure procedure on the French system.

51.     Some officials have recalled that the French and American legal systems have different approaches to such issues. When considering the practicalities of the disclosure procedure in France, a majority has pointed to the delays and the cost it generates and the risks it raises for business secrets.

52.     The Ministry of Justice itself published a comparative study relating to "*Rules of evidence before civil courts and economic attractiveness of French law (France, England and Wales, United-States)*" in 2005[9]. The conclusion of that study indicates that, even if the divergence between the two systems decreases compared to the past, discrepancies remain. In particular, the study underlined the huge cost of "uncontrolled disclosure" in the US system. It concludes that "*The opposition between the two legal traditions no longer is as clear-cut as in the past. However, uncontrolled discovery seems to be one of the major factors inducing useless costs in common law countries.*". A true and correct copy of the report is attached hereto as Exhibit [23]. Attached hereto as Exhibit [24], is an English translation of the paragraphs of the report concerning discovery issues, which was prepared by a sworn translator.

53.     In its report on Class Actions, the French Working Group co-chaired by Mr. Guillaume Cerutti (Former Directorate General For Competition Policy) and Mr. Marc Guillaume (former director of the Civil Affairs and of the Seal) indicates clearly that it is opposed to importing the US disclosure system[10]. Indeed, the report indicates that "*while the discovery procedure is a fundamental instrument of the US judicial system, the procedure may not be transposed in other legal systems. Indeed, this procedure tends to challenge the guiding principles of any civil-law judicial process*" and adds that "*It is not advisable to cause our legal system to evolve in that direction, and no request has been made to that end*". A

---

9     "Le droit de la preuve devant le juge civil et l'attractivité économique du droit français (France, Angleterre et Pays de Galles, Etats-Unis), Ministère de la Justice, SAEI, October 19, 2005. [Rules of evidence before civil courts and economic attractiveness of French law (France, England and Wales, United-States)]

10    See Rapport sur l'action de groupe, Groupe de travail présidé par Guillaume Cerutti et Marc Guillaume, delivered to the French Ministry of Economic and to the French Ministry of Justice on December 16th, 2005. [Report on group actions, Working Group chaired by Guillaume Cerutti and Marc Guillaume]



true and correct copy of the report is attached hereto as Exhibit [25]. Attached hereto as Exhibit [26], is an English translation of the paragraphs of the report concerning discovery issues, which was prepared by a sworn translator.

54.    In a similar approach, the recent report of the working group, set up by the Ministry of Justice for the de-criminalisation of French business law[11] presided over by the former president of the Court of Appeal of Paris, Mr. Jean-Marie Coulon, recommends the introduction of class actions in France but in a way that departs from the American system by avoiding the treble damages and the disclosure procedure. The report indicates "*In order to avoid such excesses, not only must the action be limited, but also, it is advisable not to import into our country the institutions that have generated such abuses: on the one hand, [...] and on the other hand, the discovery procedure, which has sometimes been used unfairly in order to destabilize, or spy on, an enterprise*". A true and correct copy of the report is attached hereto as Exhibit [27]. Attached hereto as Exhibit [28], is an English translation of relevant paragraphs of the report concerning discovery issues, which was prepared by a sworn translator.

(ii)    *The French Republic and the French Courts would not be receptive*

55.    In some instances, the French Republic has recalled that the Hague Evidence Convention (18 March 1970) was the appropriate tool to obtain evidence abroad in the context of international litigation and that importing US discovery proceedings into a French litigation would infringe France's judicial sovereignty[12]. Attached hereto as Exhibit [29] is the brief amicus curiae of the Republic of France in support of the petitioners in Société Nationale Industrielle Aerospatiale v. United States Dist. Court, 482 U.S. 522 (1987), in which the French government expresses this view.

56.    More recently, the French Supreme Court, the Cour de cassation, has confirmed the decision to sanction a French lawyer for having violated the French Blocking Statute (adopted in 1980). A true and correct copy of the judgment of the Cour de cassation is attached hereto as Exhibit [30]. Attached hereto as Exhibit [31], is an English translation of Exhibit [30], which was prepared by a sworn translator.

57.    The criminal behaviour consisted in transferring or attempting to transfer sensitive information located in France to a US lawyer in the context of a litigation opposing the State of California to a French Mutual insurer (MAAF) in order to be produced

---

[11]    Rapport du groupe de travail sur la dépénalisation du droit des affaires, January 2008, see p. 94. [Removing criminal law rules from business law, Working Group chaired by Jean-Marie Coulon, First Honorary Presiding Judge of the Court of Appeals of Paris]

[12]    See the amicus curiae of the French Republic before the US Supreme Court, *Aerospatiale*, 482 US 522 (1987).



before a US Court (Executive-Life case)[13]. This demonstrates, contrary to what QC is trying to argue before the US Court, that French Courts, and in particular the Supreme Court, are attached to the use of existing tools when trying to transfer information outside the French territory. Therefore, even if the present situation is different, there is no reason to consider that the position of the French Courts would differ when a party, like QC in the present case, tries to circumvent existing French procedural rules by making forum shopping in order to gather evidence from the US.

58.     Last but not least, in a recent article, published in May 2008, Mr. Luc Chatel, Secretary of State in charge of industry and consumption, and government spokesman, pleads in favour of the introduction of class action in France but also warns against the "serious excesses" observed in US[14]. In particular, he states *"group actions may lead to serious excesses, as observed in the United States"* and *"US excesses largely result from the very organization of the country's judicial system* [...]. *As regards evidence rules, the US largely relies on the highly intrusive discovery system, while French Law does not provide for any equivalent procedure"*. A true and correct copy of this article is attached hereto as Exhibit [32]. Attached hereto as Exhibit [33], is an English translation of relevant paragraphs of this article, which was prepared by a sworn translator.

(b)     <u>The French position is consistent with the European Commission's position which also opposes to the importation of the US litigation culture</u>

59.     The Commission has recently published a White Paper on Damages actions for breach of the EC antitrust rules. In a staff working paper accompanying it, the EC Commission has expressed a more general view about proof gathering methods (§ 93)[15].

60.     This document states that "the negative effects of certain systems of disclosure must be avoided". Then it continues: "In some (non-European) jurisdictions, opponents or third persons are obliged to cooperate in potentially very wide-ranging, time-consuming and expensive disclosure procedures on the basis of rather low thresholds. In such systems, parties can be required to spend large amounts of time and resources on screening, compiling and disclosing the

---

13    Cour de Cassation, Criminal Chamber, 12 December 2007, No 07-83228. The French Court confirmed that this behaviour was in breach of the French Blocking Statutes that provide the implementation of the procedure laid down in the Hague Evidence Convention.

14    Luc Chatel, "Le temps est venu d'introduire l'action de groupe dans notre pays", *Concurrences*, n° 2-2008, pp. 21-24. [Luc Chatel "The time has come to introduce group actions in our country"]

15    EC Commission, Staff Working Document, Accompanying document to the White Paper on Damages actions for breach of the EC antitrust rules, 2.4.2008, SEC(2008) 404. A true and correct copy of this Staff Working Document is attached hereto as Exhibit [34].

requested documents, even where there is only a low probability that the case is meritorious. This creates a risk of abuse, e.g. through what is called "discovery blackmail" where the threat of potentially immense costs of disclosure procedures may be used to drive defendants to agree on an early settlement even where the claimant has a rather weak or even fully unmeritorious case. The same can occur in reverse, namely the situation where defendants with "deep pockets" use the threat of costly disclosure measures to cause the claimant to settle at a very low amount or even to abandon the case."

61.    The Commission therefore proposes to ensure across the EU a minimum disclosure inter partes in antitrust damages that avoids these excesses. To this end, the Commission suggests to follow the legal tradition of Member States and build a system which relies on the central function of the court submitted with the damages claim. Disclosure measures could only be ordered by judges and would be subject to strict and active judicial control as to their necessity, scope and proportionality. The Commission clearly states that it "does not propose a system of overly broad pre-trial disclosure, which may not fit easily with the legal tradition and principles of civil procedure of Member States and which may conflict with public policy principles of some Member States"[16].

I declare, in application of Article 202 of the CPC, that I am aware that this affidavit is made to be produced before the Delaware Court and that I shall face penalties for any false statement on my behalf.

Executed on July 1st, 2008 at Paris, France.

Jean-Pierre FARGES

---

[16]    EC Commission, Staff Working Document, Accompanying document to the White Paper on Damages actions for breach of the EC antitrust rules, 2.4.2008, SEC(2008) 404, see §95 *in fine*.