# Exhibit [21]

**Commission Notice on the co-operation between the Commission and the courts of the EU Member States in the Application of Articles 81 and 82 EC, Official Journal, C 101, 04/27/2004, p.54.**

**Commission Notice on the co-operation between the Commission and the courts of the EU Member States in the application of Articles 81 and 82 EC**

(2004/C 101/04)

(Text with EEA relevance)

## I. THE SCOPE OF THE NOTICE

1. The present notice addresses the co-operation between the Commission and the courts of the EU Member States, when the latter apply Articles 81 and 82 EC. For the purpose of this notice, the 'courts of the EU Member States' (hereinafter 'national courts') are those courts and tribunals within an EU Member State that can apply Articles 81 and 82 EC and that are authorised to ask a preliminary question to the Court of Justice of the European Communities pursuant to Article 234 EC ([1]).

2. The national courts may be called upon to apply Articles 81 or 82 EC in lawsuits between private parties, such as actions relating to contracts or actions for damages. They may also act as public enforcer or as review court. A national court may indeed be designated as a competition authority of a Member State (hereinafter 'the national competition authority') pursuant to Article 35(1) of Regulation (EC) No 1/2003 (hereinafter 'the regulation') ([2]). In that case, the co-operation between the national courts and the Commission is not only covered by the present notice, but also by the notice on the co-operation within the network of competition authorities ([3]).

## II. THE APPLICATION OF EC COMPETITION RULES BY NATIONAL COURTS

### A. THE COMPETENCE OF NATIONAL COURTS TO APPLY EC COMPETITION RULES

3. To the extent that national courts have jurisdiction to deal with a case ([4]), they have the power to apply Articles 81 and 82 EC ([5]). Moreover, it should be remembered that Articles 81 and 82 EC are a matter of public policy and are essential to the accomplishment of the tasks entrusted to the Community, and, in particular, for the functioning of the internal market ([6]). According to the Court of Justice, where, by virtue of domestic law, national courts must raise of their own motion points of law based on binding domestic rules which have not been raised by the parties, such an obligation also exists where binding Community rules, such as the EC competition rules, are concerned. The position is the same if domestic law confers on national courts a discretion to apply of their own motion binding rules of law: national courts must

apply the EC competition rules, even when the party with an interest in application of those provisions has not relied on them, where domestic law allows such application by the national court. However, Community law does not require national courts to raise of their own motion an issue concerning the breach of provisions of Community law where examination of that issue would oblige them to abandon the passive role assigned to them by going beyond the ambit of the dispute defined by the parties themselves and relying on facts and circumstances other than those on which the party with an interest in application of those provisions bases his claim ([7]).

4. Depending on the functions attributed to them under national law, national courts may be called upon to apply Articles 81 and 82 EC in administrative, civil or criminal proceedings ([8]). In particular, where a natural or legal person asks the national court to safeguard his individual rights, national courts play a specific role in the enforcement of Articles 81 and 82 EC, which is different from the enforcement in the public interest by the Commission or by national competition authorities ([9]). Indeed, national courts can give effect to Articles 81 and 82 EC by finding contracts to be void or by awards of damages.

5. National courts can apply Articles 81 and 82 EC, without it being necessary to apply national competition law in parallel. However, where a national court applies national competition law to agreements, decisions by associations of undertakings or concerted practices which may affect trade between Member States within the meaning of Article 81(1) EC ([10]) or to any abuse prohibited by Article 82 EC, they also have to apply EC competition rules to those agreements, decisions or practices ([11]).

6. The regulation does not only empower the national courts to apply EC competition law. The parallel application of national competition law to agreements, decisions of associations of undertakings and concerted practices which affect trade between Member States may not lead to a different outcome from that of EC competition law. Article 3(2) of the regulation provides that agreements, decisions or concerted practices which do not infringe

Article 81(1) EC or which fulfil the conditions of Article 81(3) EC cannot be prohibited either under national competition law [12]. On the other hand, the Court of Justice has ruled that agreements, decisions or concerted practices that violate Article 81(1) and do not fulfil the conditions of Article 81(3) EC cannot be upheld under national law [13]. As to the parallel application of national competition law and Article 82 EC in the case of unilateral conduct, Article 3 of the regulation does not provide for a similar convergence obligation. However, in case of conflicting provisions, the general principle of primacy of Community law requires national courts to disapply any provision of national law which contravenes a Community rule, regardless of whether that national law provision was adopted before or after the Community rule [14].

7. Apart from the application of Articles 81 and 82 EC, national courts are also competent to apply acts adopted by EU institutions in accordance with the EC Treaty or in accordance with the measures adopted to give the Treaty effect, to the extent that these acts have direct effect. National courts may thus have to enforce Commission decisions [15] or regulations applying Article 81(3) EC to certain categories of agreements, decisions or concerted practices. When applying these EC competition rules, national courts act within the framework of Community law and are consequently bound to observe the general principles of Community law [16].

8. The application of Articles 81 and 82 EC by national courts often depends on complex economic and legal assessments [17]. When applying EC competition rules, national courts are bound by the case law of the Community courts as well as by Commission regulations applying Article 81(3) EC to certain categories of agreements, decisions or concerted practices [18]. Furthermore, the application of Articles 81 and 82 EC by the Commission in a specific case binds the national courts when they apply EC competition rules in the same case in parallel with or subsequent to the Commission [19]. Finally, and without prejudice to the ultimate interpretation of the EC Treaty by the Court of Justice, national courts may find guidance in Commission regulations and decisions which present elements of analogy with the case they are dealing with, as well as in Commission notices and guidelines relating to the application of Articles 81 and 82 EC [20] and in the annual report on competition policy [21].

B. PROCEDURAL ASPECTS OF THE APPLICATION OF EC COMPETITION RULES BY NATIONAL COURTS

9. The procedural conditions for the enforcement of EC competition rules by national courts and the sanctions they can impose in case of an infringement of those rules, are largely covered by national law. However, to some extent, Community law also determines the conditions in which EC competition rules are enforced. Those Community law provisions may provide for the faculty of national courts to avail themselves of certain instruments, e.g. to ask for the Commission's opinion on questions concerning the application of EC competition rules [22] or they may create rules that have an obligatory impact on proceedings before them, e.g. allowing the Commission and national competition authorities to submit written observations [23]. These Community law provisions prevail over national rules. Therefore, national courts have to set aside national rules which, if applied, would conflict with these Community law provisions. Where such Community law provisions are directly applicable, they are a direct source of rights and duties for all those affected, and must be fully and uniformly applied in all the Member States from the date of their entry into force [24].

10. In the absence of Community law provisions on procedures and sanctions related to the enforcement of EC competition rules by national courts, the latter apply national procedural law and — to the extent that they are competent to do so — impose sanctions provided for under national law. However, the application of these national provisions must be compatible with the general principles of Community law. In this regard, it is useful to recall the case law of the Court of Justice, according to which:

(a) where there is an infringement of Community law, national law must provide for sanctions which are effective, proportionate and dissuasive [25];

(b) where the infringement of Community law causes harm to an individual, the latter should under certain conditions be able to ask the national court for damages [26];

(c) the rules on procedures and sanctions which national courts apply to enforce Community law

— must not make such enforcement excessively difficult or practically impossible (the principle of effectiveness) [27] and they

— must not be less favourable than the rules applicable to the enforcement of equivalent national law (the principle of equivalence) [28].

On the basis of the principle of primacy of Community law, a national court may not apply national rules that are incompatible with these principles.

C. PARALLEL OR CONSECUTIVE APPLICATION OF EC COMPETITION RULES BY THE COMMISSION AND BY NATIONAL COURTS

11. A national court may be applying EC competition law to an agreement, decision, concerted practice or unilateral behaviour affecting trade between Member States at the same time as the Commission or subsequent to the Commission [29]. The following points outline some of the obligations national courts have to respect in those circumstances.

12. Where a national court comes to a decision before the Commission does, it must avoid adopting a decision that would conflict with a decision contemplated by the Commission [30]. To that effect, the national court may ask the Commission whether it has initiated proceedings regarding the same agreements, decisions or practices [31] and if so, about the progress of proceedings and the likelihood of a decision in that case [32]. The national court may, for reasons of legal certainty, also consider staying its proceedings until the Commission has reached a decision [33]. The Commission, for its part, will endeavour to give priority to cases for which it has decided to initiate proceedings within the meaning of Article 2(1) of Commission Regulation (EC) No 773/2004 and that are the subject of national proceedings stayed in this way, in particular when the outcome of a civil dispute depends on them. However, where the national court cannot reasonably doubt the Commission's contemplated decision or where the Commission has already decided on a similar case, the national court may decide on the case pending before it in accordance with that contemplated or earlier decision without it being necessary to ask the Commission for the information mentioned above or to await the Commission's decision.

13. Where the Commission reaches a decision in a particular case before the national court, the latter cannot take a decision running counter to that of the Commission. The binding effect of the Commission's decision is of course without prejudice to the interpretation of Community law by the Court of Justice. Therefore, if the national court doubts the legality of the Commission's decision, it cannot avoid the binding effects of that decision without a ruling to the contrary by the Court of Justice [34]. Consequently, if a national court intends to take a decision that runs counter to that of the Commission, it must refer a question to the Court of Justice for a preliminary ruling (Article 234 EC). The latter will then decide on the compatibility of the Commission's decision with Community law. However, if the Commission's decision is challenged before the Community courts pursuant to Article 230 EC and the outcome of the dispute before the national court depends on the validity of the Commission's decision, the national court should stay its proceedings pending final judgment in the action for annulment by the Community courts unless it considers that, in the circumstances of the case, a reference to the Court of Justice for a preliminary ruling on the validity of the Commission decision is warranted [35].

14. When a national court stays proceedings, e.g. awaiting the Commission's decision (situation described in point 12 of this notice) or pending final judgement by the Community courts in an action for annulment or in a preliminary ruling procedure (situation described in point 13), it is incumbent on it to examine whether it is necessary to order interim measures in order to safeguard the interests of the parties [36].

III. THE CO-OPERATION BETWEEN THE COMMISSION AND NATIONAL COURTS

15. Other than the co-operation mechanism between the national courts and the Court of Justice under Article 234 EC, the EC Treaty does not explicitly provide for co-operation between the national courts and the Commission. However, in its interpretation of Article 10 EC, which obliges the Member States to facilitate the achievement of the Community's tasks, the Community courts found that this Treaty provision imposes on the European institutions and the Member States mutual duties of loyal co-operation with a view to attaining the objectives of the EC Treaty. Article 10 EC thus implies that the Commission must assist national courts when they apply Community law [37]. Equally, national courts may be obliged to assist the Commission in the fulfilment of its tasks [38].

16. It is also appropriate to recall the co-operation between national courts and national authorities, in particular national competition authorities, for the application of Articles 81 and 82 EC. While the co-operation between these national authorities is primarily governed by national rules, Article 15(3) of the regulation provides for the possibility for national competition authorities to submit observations before the national courts of their Member State. Points 31 and 33 to 35 of this notice are *mutatis mutandis* applicable to those submissions.

### A. THE COMMISSION AS *AMICUS CURIAE*

17. In order to assist national courts in the application of EC competition rules, the Commission is committed to help national courts where the latter find such help necessary to be able to decide on a case. Article 15 of the regulation refers to the most frequent types of such assistance: the transmission of information (points 21 to 26) and the Commission's opinions (points 27 to 30), both at the request of a national court and the possibility for the Commission to submit observations (points 31 to 35). Since the regulation provides for these types of assistance, it cannot be limited by any Member States' rule. However, in the absence of Community procedural rules to this effect and to the extent that they are necessary to facilitate these forms of assistance, Member States must adopt the appropriate procedural rules to allow both the national courts and the Commission to make full use of the possibilities the regulation offers ([39]).

18. The national court may send its request for assistance in writing to

European Commission
Directorate General for Competition
B-1049 Brussels
Belgium

or send it electronically to comp-amicus@cec.eu.int

19. It should be recalled that whatever form the co-operation with national courts takes, the Commission will respect the independence of national courts. *As a consequence*, the assistance offered by the Commission does not bind the national court. The Commission has also to make sure that it respects its duty of professional secrecy and that it safeguards its own functioning and independence ([40]). In fulfilling its duty under Article 10 EC, of assisting national courts in the application of EC competition rules, the Commission is committed to remaining neutral and objective in its assistance. Indeed, the Commission's assistance to national courts is part of its duty to defend the public interest. It has therefore no intention to serve the private interests of the parties involved in the case pending before the national court. As a consequence, the Commission will not hear any of the parties about its assistance to the national court. In case the Commission has been contacted by any of the parties in the case pending before the court on issues which are raised before the national court, it will inform the national court thereof, independent of whether these contacts took place before or after the national court's request for co-operation.

20. The Commission will publish a summary concerning its co-operation with national courts pursuant to this notice in its annual Report on Competition Policy. It may also make its opinions and observations available on its website.

### 1. The Commission's duty to transmit information to national courts

21. The duty for the Commission to assist national courts in the application of EC competition law is mainly reflected in the obligation for the Commission to transmit information it holds to national courts. A national court may, e.g., ask the Commission for documents in its possession or for information of a procedural nature to enable it to discover whether a certain case is pending before the Commission, whether the Commission has initiated a procedure or whether it has already taken a position. A national court may also ask the Commission when a decision is likely to be taken, so as to be able to determine the conditions for any decision to stay proceedings or whether interim measures need to be adopted ([41]).

22. In order to ensure the efficiency of the co-operation with national courts, the Commission will endeavour to provide the national court with the requested information within one month from the date it receives the request. Where the Commission has to ask the national court for further clarification of its request or where the Commission has to consult those who are directly affected by the transmission of the information, that period starts to run from the moment that it receives the required information.

23. In transmitting information to national courts, the Commission has to uphold the guarantees given to natural and legal persons by Article 287 EC (42). Article 287 EC prevents members, officials and other servants of the Commission from disclosing information covered by the obligation of professional secrecy. The information covered by professional secrecy may be both confidential information and business secrets. Business secrets are information of which not only disclosure to the public but also mere transmission to a person other than the one that provided the information might seriously harm the latter's interests (43).

24. The combined reading of Articles 10 and 287 EC does not lead to an absolute prohibition for the Commission to transmit information which is covered by the obligation of professional secrecy to national courts. The case law of the Community courts confirms that the duty of loyal co-operation requires the Commission to provide the national court with whatever information the latter asks for, even information covered by professional secrecy. However, in offering its co-operation to the national courts, the Commission may not in any circumstances undermine the guarantees laid down in Article 287 EC.

25. Consequently, before transmitting information covered by professional secrecy to a national court, the Commission will remind the court of its obligation under Community law to uphold the rights which Article 287 EC confers on natural and legal persons and it will ask the court whether it can and will guarantee protection of confidential information and business secrets. If the national court cannot offer such guarantee, the Commission shall not transmit the information covered by professional secrecy to the national court (44). Only when the national court has offered a guarantee that it will protect the confidential information and business secrets, will the Commission transmit the information requested, indicating those parts which are covered by professional secrecy and which parts are not and can therefore be disclosed.

26. There are further exceptions to the disclosure of information by the Commission to national courts. Particularly, the Commission may refuse to transmit information to national courts for overriding reasons relating to the need to safeguard the interests of the Community or to avoid any interference with its functioning and independence, in particular by jeopardising the accomplishment of the tasks entrusted to it (45). Therefore, the Commission will not transmit to national courts information voluntarily submitted by a leniency applicant without the consent of that applicant.

## 2. Request for an opinion on questions concerning the application of EC competition rules

27. When called upon to apply EC competition rules to a case pending before it, a national court may first seek guidance in the case law of the Community courts or in Commission regulations, decisions, notices and guidelines applying Articles 81 and 82 EC (46). Where these tools do not offer sufficient guidance, the national court may ask the Commission for its opinion on questions concerning the application of EC competition rules. The national court may ask the Commission for its opinion on economic, factual and legal matters (47). The latter is of course without prejudice to the possibility or the obligation for the national court to ask the Court of Justice for a preliminary ruling regarding the interpretation or the validity of Community law in accordance with Article 234 EC.

28. In order to enable the Commission to provide the national court with a useful opinion, it may request the national court for further information (48). In order to ensure the efficiency of the co-operation with national courts, the Commission will endeavour to provide the national court with the requested opinion within four months from the date it receives the request. Where the Commission has requested the national court for further information in order to enable it to formulate its opinion, that period starts to run from the moment that it receives the additional information.

29. When giving its opinion, the Commission will limit itself to providing the national court with the factual information or the economic or legal clarification asked for, without considering the merits of the case pending before the national court. Moreover, unlike the authoritative interpretation of Community law by the Community courts, the opinion of the Commission does not legally bind the national court.

30. In line with what has been said in point 19 of this notice, the Commission will not hear the parties before formulating its opinion to the national court. The latter will have to deal with the Commission's opinion in accordance with the relevant national procedural rules, which have to respect the general principles of Community law.

## 3. The Commission's submission of observations to the national court

31. According to Article 15(3) of the regulation, the national competition authorities and the Commission may submit observations on issues relating to the application of Articles 81 or 82 EC to a national court which is called upon to apply those provisions. The regulation distinguishes between written observations, which the national competition authorities and the Commission may submit on their own initiative, and oral observations, which can only be submitted with the permission of the national court [49].

32. The regulation specifies that the Commission will only submit observations when the coherent application of Articles 81 or 82 EC so requires. That being the objective of its submission, the Commission will limit its observations to an economic and legal analysis of the facts underlying the case pending before the national court.

33. In order to enable the Commission to submit useful observations, national courts may be asked to transmit or ensure the transmission to the Commission of a copy of all documents that are necessary for the assessment of the case. In line with Article 15(3), second subparagraph, of the regulation, the Commission will only use those documents for the preparation of its observations [50].

34. Since the regulation does not provide for a procedural framework within which the observations are to be submitted, Member States' procedural rules and practices determine the relevant procedural framework. Where a Member State has not yet established the relevant procedural framework, the national court has to determine which procedural rules are appropriate for the submission of observations in the case pending before it.

35. The procedural framework should respect the principles set out in point 10 of this notice. That implies amongst others that the procedural framework for the submission of observations on issues relating to the application of Articles 81 or 82 EC

(a) has to be compatible with the general principles of Community law, in particular the fundamental rights of the parties involved in the case;

(b) cannot make the submission of such observations excessively difficult or practically impossible (the principle of effectiveness) [51]; and

(c) cannot make the submission of such observations more difficult than the submission of observations in court proceedings where equivalent national law is applied (the principle of equivalence).

## B. THE NATIONAL COURTS FACILITATING THE ROLE OF THE COMMISSION IN THE ENFORCEMENT OF EC COMPETITION RULES

36. Since the duty of loyal co-operation also implies that Member States' authorities assist the European institutions with a view to attaining the objectives of the EC Treaty [52], the regulation provides for three examples of such assistance: (1) the transmission of documents necessary for the assessment of a case in which the Commission would like to submit observations (see point 33), (2) the transmission of judgements applying Articles 81 or 82 EC; and (3) the role of national courts in the context of a Commission inspection.

## 1. The transmission of judgements of national courts applying Articles 81 or 82 EC

37. According to Article 15(2) of the regulation, Member States shall send to the Commission a copy of any written judgement of national courts applying Articles 81 or 82 EC without delay after the full written judgement is notified to the parties. The transmission of national judgements on the application of Articles 81 or 82 EC and the resulting information on proceedings before national courts primarily enable the Commission to become aware in a timely fashion of cases for which it might be appropriate to submit observations where one of the parties lodges an appeal against the judgement.

## 2. The role of national courts in the context of a Commission inspection

38. Finally, national courts may play a role in the context of a Commission inspection of undertakings and associations of undertakings. The role of the national courts depends on whether the inspections are conducted in business premises or in non-business premises.

39. With regard to the inspection of business premises, national legislation may require authorisation from a national court to allow a national enforcement authority to assist the Commission in case of opposition of the undertaking concerned. Such authorisation may also be sought as a precautionary measure. When dealing with the request, the national court has the power to control that the Commission's inspection decision is authentic and that the coercive measures envisaged are neither arbitrary nor excessive having regard to the subject matter of the inspection. In its control of the proportionality of the coercive measures, the national court may ask the Commission, directly or through the national competition authority, for detailed explanations in particular on the grounds the Commission has for suspecting infringement of Articles 81 and 82 EC, as well as on the seriousness of the suspected infringement and on the nature of the involvement of the undertaking concerned ([53]).

40. With regard to the inspection of non-business premises, the regulation requires the authorisation from a national court before a Commission decision ordering such an inspection can be executed. In that case, the national court may control that the Commission's inspection decision is authentic and that the coercive measures envisaged are neither arbitrary nor excessive having regard in particular to the seriousness of the suspected infringement, to the importance of the evidence sought, to the involvement of the undertaking concerned and to the reasonable likelihood that business books and records relating to the subject matter of the inspection are kept in the premises for which the authorisation is requested. The national court may ask the Commission, directly or through the national competition authority, for detailed explanations on those elements that are necessary to allow its control of the proportionality of the coercive measures envisaged ([54]).

41. In both cases referred to in points 39 and 40, the national court may not call into question the lawfulness of the Commission's decision or the necessity for the inspection nor can it demand that it be provided with information in the Commission's file ([55]). Furthermore, the duty of loyal co-operation requires the national court to take its decision within an appropriate timeframe that allows the Commission to effectively conduct its inspection ([56]).

### IV. FINAL PROVISIONS

42. This notice is issued in order to assist national courts in the application of Articles 81 and 82 EC. It does not bind the national courts, nor does it affect the rights and obligations of the EU Member States and natural or legal persons under Community law.

43. This notice replaces the 1993 notice on co-operation between national courts and the Commission in applying Articles 85 and 86 of the EEC Treaty ([57]).

---

([1]) For the criteria to determine which entities can be regarded as courts or tribunals within the meaning of Article 234 EC, see e.g. case C-516/99 Schmid [2002] ECR I-4573, 34: 'The Court takes account of a number of factors, such as whether the body is established by law, whether it is permanent, whether its jurisdiction is compulsory, whether its procedure is inter partes, whether it applies rules of law and whether it is independent'.

([2]) Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty (OJ L 1, 4.1.2003, p. 1).

([3]) Notice on the co-operation within the network of competition authorities (OJ C 101, 27.4.2004, p. 43). For the purpose of this notice, a 'national competition authority' is the authority designated by a Member State in accordance with Article 35(1) of the regulation.

([4]) The jurisdiction of a national court depends on national, European and international rules of jurisdiction. In this context, it may be recalled that Council Regulation (EC) No 44/2001 of 22 December 2000 on jurisdiction and the recognition and enforcement of judgements in civil and commercial matters (OJ L 12, 16.1.2001, p. 1) is applicable to all competition cases of a civil or commercial nature.

([5]) See Article 6 of the regulation.

([6]) See Articles 2 and 3 EC, case C-126/97 Eco Swiss [1999] ECR I-3055, 36; case T-34/92 Fiatagri UK and New Holland Ford [1994] ECR II-905, 39 and case T-128/98 Aéroports de Paris [2000] ECR II-3929, 241.

([7]) Joined cases C-430/93 and C-431/93 van Schijndel [1995] ECR I-4705, 13 to 15 and 22.

([8]) According to the last sentence of recital 8 of Regulation (EC) No 1/2003, the regulation does not apply to national laws which impose criminal sanctions on natural persons except to the extent that such sanctions are the means whereby competition rules applying to undertakings are enforced.

(⁹) Case T-24/90 Automec [1992] ECR II-2223, 85.

(¹⁰) For further clarification of the effect on trade concept, see the notice on this issue (OJ L 101, 27.4.2004, p. 81).

(¹¹) Article 3(1) of the regulation.

(¹²) See also the notice on the application of Article 81(3) EC (OJ L 101, 27.4.2004, p. 2).

(¹³) Case 14/68 Walt Wilhelm [1969] ECR 1 and joined cases 253/78 and 1 to 3/79 Giry and Guerlain [1980] ECR 2327, 15 to 17.

(¹⁴) Case 106/77 Simmenthal [1978] ECR 629, 21 and case C-198/01, Consorzio Industrie Fiammiferi (CIF) [2003] 49.

(¹⁵) E.g. a national court may be asked to enforce a Commission decision taken pursuant to Articles 7 to 10, 23 and 24 of the regulation.

(¹⁶) See e.g. case 5/88 Wachauf [1989] ECR 2609, 19.

(¹⁷) Joined cases C-215/96 and C-216/96 Bagnasco [1999] ECR I-135, 50.

(¹⁸) Case 63/75 Fonderies Roubaix [1976] ECR 111, 9 to 11 and case C-234/89 Delimitis [1991] ECR I-935, 46.

(¹⁹) On the parallel or consecutive application of EC competition rules by national courts and the Commission, see also points 11 to 14.

(²⁰) Case 66/86 Ahmed Saeed Flugreisen [1989] ECR 803, 27 and case C-234/89 Delimitis [1991] ECR I-935, 50. A list of Commission guidelines, notices and regulations in the field of competition policy, in particular the regulations applying Article 81(3) EC to certain categories of agreements, decisions or concerted practices, are annexed to this notice. For the decisions of the Commission applying Articles 81 and 82 EC (since 1964), see http://www.europa.eu.int/comm/competition/antitrust/cases/.

(²¹) Joined cases C-319/93, C-40/94 and C-224/94 Dijkstra [1995] ECR I-4471, 32.

(²²) On the possibility for national courts to ask the Commission for an opinion, see further in points 27 to 30.

(²³) On the submission of observations, see further in points 31 to 35.

(²⁴) Case 106/77 Simmenthal [1978] ECR 629, 14 and 15.

(²⁵) Case 68/88 Commission v Greece [1989] ECR 2965, 23 to 25.

(²⁶) On damages in case of an infringement by an undertaking, see case C-453/99 Courage and Crehan [2001] ECR 6297, 26 and 27. On damages in case of an infringement by a Member State or by an authority which is an emanation of the State and on the conditions of such state liability, see e.g. joined cases C-6/90 and C-9/90 Francovich [1991] ECR I-5357, 33 to 36; case C-271/91 Marshall v Southampton and South West Hampshire Area Health Authority [1993] ECR I-4367, 30 and 34 to 35; joined cases C-46/93 and C-48/93 Brasserie du Pêcheur and Factortame [1996] ECR I-1029; case C-392/93 British Telecommunications [1996] ECR I-1631, 39 to 46 and joined cases C-178/94, C-179/94 and C-188/94 to 190/94 Dillenkofer [1996] ECR I-4845, 22 to 26 and 72.

(²⁷) See e.g. case 33/76 Rewe [1976] ECR 1989, 5; case 45/76 Comet [1976] ECR 2043, 12 and case 79/83 Harz [1984] ECR 1921, 18 and 23.

(²⁸) See e.g. case 33/76 Rewe [1976] ECR 1989, 5; case 158/80 Rewe [1981] ECR 1805, 44; case 199/82 San Giorgio [1983] ECR 3595, 12 and case C-231/96 Edis [1998] ECR I-4951, 36 and 37.

(²⁹) Article 11(6), juncto Article 35(3) and (4) of the regulation prevents a parallel application of Articles 81 or 82 EC by the Commission and a national court only when the latter has been designated as a national competition authority.

(³⁰) Article 16(1) of the regulation.

(³¹) The Commission makes the initiation of its proceedings with a view to adopting a decision pursuant to Article 7 to 10 of the regulation public (see Article 2(2) of Commission Regulation (EC) No 773/2004 of 7 April relating to proceedings pursuant to Articles 81 and 82 of the EC Treaty (OJ C 101, 27.4.2004). According to the Court of Justice, the initiation of proceedings implies an authoritative act of the Commission, evidencing its intention of taking a decision (case 48/72 Brasserie de Haecht [1973] ECR 77, 16).

(³²) Case C-234/89 Delimitis [1991] ECR I-935, 53, and joined cases C-319/93, C-40/94 and C-224/94 Dijkstra [1995] ECR I-4471, 34. See further on this issue point 21 of this notice.

(³³) See Article 16(1) of the regulation and case C-234/89 Delimitis [1991] ECR I-935, 47 and case C-344/98 Masterfoods [2000] ECR I-11369, 51.

[34] Case 314/85 Foto-Frost [1987] ECR 4199, 12 to 20.

[35] See Article 16(1) of the regulation and case C-344/98 Masterfoods [2000] ECR I-11369, 52 to 59.

[36] Case C-344/98 Masterfoods [2000] ECR, I-11369, 58.

[37] Case C-2/88 Imm Zwartveld [1990] ECR I-3365, 16 to 22 and case C-234/89 Delimitis [1991] I-935, 53.

[38] C-94/00 Roquette Frères [2002] ECR 9011, 31.

[39] On the compatibility of such national procedural rules with the general principles of Community law, see points 9 and 10 of this notice.

[40] On these duties, see e.g. points 23 to 26 of this notice.

[41] Case C-234/89 Delimitis [1991] ECR I-935, 53, and joined cases C-319/93, C-40/94 and C-224/94 Dijkstra [1995] ECR I-4471, 34.

[42] Case C-234/89 Delimitis [1991] I-935, 53.

[43] Case T-353/94 Postbank [1996] ECR II-921, 86 and 87 and case 145/83 Adams [1985] ECR 3539, 34.

[44] Case C-2/88 Zwartveld [1990] ECR I-4405, 10 and 11 and case T-353/94 Postbank [1996] ECR II-921, 93.

[45] Case C-2/88 Zwartveld [1990] ECR I-4405, 10 and 11; case C-275/00 First and Franex [2002] ECR I-10943, 49 and case T-353/94 Postbank [1996] ECR II-921, 93.

[46] See point 8 of this notice.

[47] Case C-234/89 Delimitis [1991] ECR I-935, 53, and joined cases C-319/93, C-40/94 and C-224/94 Dijkstra [1995] ECR I-4471, 34.

[48] Compare with case 96/81 Commission v the Netherlands [1982] ECR 1791, 7 and case 272/86 Commission v Greece [1988] ECR 4875, 30.

[49] According to Article 15(4) of the regulation, this is without prejudice to wider powers to make observations before courts conferred on national competition authorities under national law.

[50] See also Article 28(2) of the regulation, which prevents the Commission from disclosing the information it has acquired and which is covered by the obligation of professional secrecy.

[51] Joined cases 46/87 and 227/88 Hoechst [1989] ECR, 2859, 33. See also Article 15(3) of the regulation.

[52] Case C-69/90 Commission v Italy [1991] ECR 6011, 15.

[53] Article 20(6) to (8) of the regulation and case C-94/00 Roquette Frères [2002] ECR 9011.

[54] Article 21(3) of the regulation.

[55] Case C-94/00 Roquette Frères [2002] ECR 9011, 39 and 62 to 66.

[56] See also ibidem, 91 and 92.

[57] OJ C 39, 13.2.93, p. 6.

27.4.2004    EN    Official Journal of the European Union    C 101/63

*ANNEX*

## COMMISSION BLOCK EXEMPTION REGULATIONS, NOTICES AND GUIDELINES

This list is also available and updated on the website of the Directorate General for Competition of the European Commission:

http://europa.eu.int/comm/competition/antitrust/legislation/

### A. Non-sector specific rules

1. *Notices of a general nature*

— Notice on the definition of the relevant market for the purposes of Community competition law (OJ C 372, 9.12.1997, p. 5)

— Notice on agreements of minor importance which do not appreciably restrict competition under Article 81(1) of the Treaty establishing the European Community (de minimis) (OJ C 368, 22.12.2001, p. 13)

— Notice on the effect on trade concept contained in Articles 81 and 82 of the Treaty (OJ C 101, 27.4.2004, p. 81)

— Guidelines on the application of Article 81(3) of the Treaty (OJ C 101, 27.4.2004, p. 2)

2. *Vertical agreements*

— Regulation (EC) No 2790/1999 of 22 December 1999 on the application of Article 81(3) of the Treaty to categories of vertical agreements and concerted practices (OJ L 336, 29.12.1999, p. 21)

— Guidelines on Vertical Restraints (OJ C 291, 13.10.2000, p. 1)

3. *Horizontal co-operation agreements*

— Regulation (EC) No 2658/2000 of 29 November 2000 on the application of Article 81(3) of the Treaty to categories of specialisation agreements (OJ L 304, 5.12.2000, p. 3)

— Regulation (EC) No 2659/2000 of 29 November 2000 on the application of Article 81(3) of the Treaty to categories of research and development agreements (OJ L 304, 5.12.2000, p. 7)

— Guidelines on the applicability of Article 81 to horizontal co-operation agreements (OJ C 3, 6.1.2001, p. 2)

4. *Licensing agreements for the transfer of technology*

— Regulation (EC) No 773/2004 of 27 April 2004 on the application of Article 81(3) of the Treaty to categories of technology transfer agreements (OJ L 123, 27.4.2004)

— Guidelines on the application of Article 81 of the EC Treaty to technology transfer agreements (OJ C 101, 27.4.2004, p. 2)

### B. Sector specific rules

1. *Insurance*

— Regulation (EC) No 358/2003 of 27 February 2003 on the application of Article 81(3) of the Treaty to certain categories of agreements, decisions and concerted practices in the insurance sector (OJ L 53, 28.2.2003, p. 8)

2. *Motor vehicles*

— Regulation (EC) No 1400/2002 of 31 July 2002 on the application of Article 81(3) of the Treaty to categories of vertical agreements and concerted practices in the motor vehicle sector (OJ L 203, 1.8.2002, p. 30)

3. *Telecommunications and postal services*

— Guidelines on the application of EEC competition rules in the telecommunications sector (OJ C 233, 6.9.1991, p. 2)

— Notice on the application of the competition rules to the postal sector and on the assessment of certain State measures relating to postal services (OJ C 39, 6.2.1998, p. 2)

— Notice on the application of the competition rules to access agreements in the telecommunications sector — Framework, relevant markets and principles (OJ C 265, 22.8.1998, p. 2)

— Guidelines on market analysis and the assessment of significant market power under the Community regulatory framework for electronic communications networks and services (OJ C 165, 11.7.2002, p. 6)

4. *Transport*

— Regulation (EEC) No 1617/93 on the application of Article 81(3) of the Treaty to certain categories of agreements and concerted practices concerning joint planning and co-ordination of schedules, joint operations, consultations on passenger and cargo tariffs on scheduled air services and slot allocation at airports (OJ L 155, 26.6.1993, p. 18)

— Communication on clarification of the Commission recommendations on the application of the competition rules to new transport infrastructure projects (OJ C 298, 30.9.1997, p. 5)

— Regulation (EC) No 823/2000 of 19 April 2000 on the application of Article 81(3) of the Treaty to certain categories of agreements, decisions and concerted practices between liner shipping companies (consortia) (OJ L 100, 20.4.2000, p. 24)

———————

# Exhibit [22]

> ## Treaty Establishing the European Community (Nice consolidated version) - Article 287

# 12002E287

**Treaty establishing the European Community (Nice consolidated version) - Part Six: General and Final Provisions - Article 287 - Article 214 - EC Treaty (Maastricht consolidated version) - Article 214 - EEC Treaty**

*Official Journal C 325 , 24/12/2002 P. 0147 - 0147*
*Official Journal C 340 , 10/11/1997 P. 0294 - Consolidated version*
*Official Journal C 224 , 31/08/1992 P. 0075 - Consolidated version*
*(EEC Treaty - no official publication available)*

Treaty establishing the European Community (Nice consolidated version)

Part Six: General and Final Provisions

Article 287

Article 214 - EC Treaty (Maastricht consolidated version)

Article 214 - EEC Treaty

Article 287

The members of the institutions of the Community, the members of committees, and the officials and other servants of the Community shall be required, even after their duties have ceased, not to disclose information of the kind covered by the obligation of professional secrecy, in particular information about undertakings, their business relations or their cost components.

**Managed by the Publications Office**

# Exhibit [23]

**Le droit de la preuve devant le juge civil et l'attractivité économique du droit français (France, Angleterre et Pays de Galles, Etats-Unis), Ministère de la Justice, Service des Affaires européennes et internationales, 19 octobre 2005**



*Liberté • Égalité • Fraternité*
**RÉPUBLIQUE FRANÇAISE**

19 octobre 2005

## *Ministère de la Justice*

SERVICE

DES AFFAIRES EUROPEENNES ET INTERNATIONALES

Bureau du droit comparé

DOSSIER SUIVI PAR ML NADAUD-CASTANIE
L'attractivité économique du droit/Note droit de la preuve 191005.doc

---

### LE DROIT DE LA PREUVE DEVANT LE JUGE CIVIL
### ET L'ATTRACTIVITE ECONOMIQUE DU DROIT FRANÇAIS

#### *(France, Angleterre et Pays de Galles, Etats-Unis)*

---

Les différences culturelles entre les droits de tradition romano-germanique et les droits de *common law* sont évidentes en ce qui concerne le droit de la preuve. Ainsi en droit français, le juge établit la vérité dans son jugement, alors qu'aux Etats-Unis le tribunal confronte les versions de chaque partie, afin de faire triompher la plus vraisemblable à l'audience.

L'analyse des modes de recherche des éléments de preuve en France, en Angleterre et aux Etats-Unis (I), du rôle de l'écrit dans les pays de tradition romano-germanique et de *common law* (II) et de la complexité du droit de la preuve et des aléas liés au *jury* aux Etats-Unis (III) pourrait présenter un intérêt, à l'effet de démontrer l'attractivité économique du droit français. La question de l'expertise dans les pays de tradition civiliste et du recours aux témoins-experts *(expert witnesses)* dans les pays de *Common law* (IV) est une question-clé. Bien que la pratique des *expert witnesses* soit critiquée, l'analyse paraît plus risquée au regard de l'attractivité économique du droit français.

## I – LA RECHERCHE DES ELEMENTS DE PREUVE

**La production des éléments de preuve repose avant tout sur l'initiative des parties. Mais l'ampleur de cette production peut varier sensiblement selon que celle-ci s'effectue selon les principes d'un droit de *Common law*** (production très complète de tous éléments de preuve, favorables ou défavorables, dont peut disposer une partie : la *discovery* ou divulgation) (A) **ou du droit d'un pays continental** (production des éléments de preuve aptes à soutenir les prétentions des parties) (B).

### A) Dans les pays de *common law*

**La procédure de *discovery* (ou *pre-trial discovery*) est une phase d'investigation de la cause préalable au procès. Elle fait obligation à chaque partie de divulguer à l'autre partie tous les éléments de preuve pertinents au litige dont elle dispose** (faits, actes, documents …), y compris ceux qui lui sont défavorables, et ce, par différents moyens (déposition sous serment, question écrite, mise en demeure de communiquer des documents, demande de reconnaissance ou de démenti d'un fait ou d'une allégation …). **L'objectif est de garantir davantage d'égalité et de justice entre les parties, et d'abréger un procès en permettant l'élimination de certains points qui ne sont pas véritablement contestés.**

### 1) Angleterre et Pays de Galles

**Conçue dans le but de réduire les coûts et d'accélérer la résolution des litiges, la *discovery* générait en pratique des frais importants et inutiles et allongeait la procédure. Des réformes récentes ont tenté d'y pallier.**

**Au Royaume Uni**, le rapport Heilbron/Hodge de juin 1993, qui a reçu l'appui de l'ordre des avocats et des notaires, **a souligné les difficultés liées à la procédure de *discovery*** et a recommandé un contrôle plus strict par les parties et le tribunal ainsi que l'application des règles permettant de minimiser le recours à la *discovery*. Le rapport souligne que de très nombreux documents doivent être photocopiés puis analysés par les avocats des parties, alors que tous ne sont pas réellement nécessaires à la solution du litige, certains ne servant qu'à donner des indications sur le contexte. Par ailleurs, la procédure de *discovery* complique et allonge la procédure, en raison de la tendance fréquente à élargir le champ du litige. **La *City of London Law Society* s'est ainsi interrogée sur le bilan coûts/avantages de la *discovery*, au regard de l'efficacité du système. Sans remettre totalement en cause le système, elle a constaté que l'un des principaux facteurs générateurs de coûts et de délais dans le système procédural était dû à la procédure de *discovery*.** Une simple recherche de preuve était très onéreuse pour le justiciable, sans donner nécessairement les résultats escomptés.

Les *Civil Procedural Rules 1998*, entrées en vigueur le 26 avril 1999 à la suite du rapport de Lord Woolf de juillet 1996 sur la procédure civile, n'utilisent plus le terme « *discovery* », mais ceux de « *disclosure* » et « *inspection of documents* ». **Pour la filière rapide *(fast track)*, une communication standardisée entre les parties *(disclosure)* après l'échange des *pleadings* remplace la *discovery*, très lourde et très chronophage.** Pour la filière à

2

géométrie variable *(multi track)*, le principe est la communication standardisée des pièces entre les parties, sous réserve d'une autorisation du juge pour des demandes complémentaires (*extra disclosure*). Le *master* peut, à la requête d'une partie, ordonner à l'autre de produire sous la forme d'un *affidavit* (déclaration écrite sous serment) la liste des documents qu'elle a en sa possession, même ceux qu'elle estime défavorables à sa défense, à l'exclusion peut-être de certains documents privilégiés, tels que les supports écrits des témoignages qui seront recueillis à l'audience. Une réponse incomplète relèverait du faux serment.

2) Etats-Unis

**Aux Etats-Unis, les avocats instruisent la cause, définissent les éléments de fait et de droit à soumettre au juge, rassemblent les éléments de preuve et conduisent les auditions des témoins au cours du débat. Le juge a un rôle d' « arbitre » neutre et passif, chargé de veiller au respect des règles visant à assurer l'équilibre entre les parties.**

Les *Federal Rules of Evidence 2004* régissent l'administration de la preuve devant les tribunaux fédéraux. Si de nombreux Etats se sont inspirés des règles fédérales pour leur propre législation, **les règles varient d'un Etat à l'autre en matière de** *discovery*. Les principes de base sont cependant relativement similaires : **la procédure tend à rechercher les preuves, circonscrire l'objet du litige** (en éliminant les motivations types sur lesquelles la partie adverse n'entend pas se fonder lors du procès), **préserver les témoignages et les preuves, et obtenir des témoignages dans un autre Etat.**

**La procédure est lourde et peut s'avérer très onéreuse :**
- préparation (questionnaires, demandes de documents)
- dépositions des témoins (orales ou par déclarations écrites)
- enregistrement des dépositions (demandes de documents ou d'interrogatoires complémentaires)
- *discovery* par des *expert witnesses*, qui fait l'objet de dispositions spécifiques.

**Les avocats pratiquent fréquemment la « boilerplate discovery »** (demande de *discovery* dont le champ est très large dans la mesure où l'avocat procède par documents-types) **qui augmente les frais sans produire de résultats intéressants. La pratique recourt parfois à un arbitrage privé pour la** *discovery* **dans les litiges commerciaux, afin de réduire les coûts.**

**Souvent utilisée comme une arme par les parties, la** *discovery* **présente également un risque au regard de la sécurité des affaires.** Une demande de *discovery* très large formée par un concurrent dans le cadre d'une procédure peut amener une partie à devoir ouvrir ses archives et produire des documents, dont la communication pourrait être de nature à lui nuire.

**Selon Walter K. Olson, les dérapages des coûts aux Etats-Unis tiennent en partie à l'ampleur de la** *discovery* **en droit américain. Dans son livre référence (*The litigation explosion, 1996*), sur l'explosion des litiges aux Etats-Unis, il fait une analyse critique de cette «industrie du procès» qui est préjudiciable au système judiciaire américain, notamment par la longueur et le coût des procédures. En utilisant des exemples de la vie courante (garde d'enfant, diffamation, préjudice corporel), il montre que le litige est devenu un mode de vie aux Etats-Unis. Il insiste sur les effets pervers de la** *discovery* **dans l'administration de la preuve, par exemple lorsque des avocats n'hésitent pas à louer les services d'«** *expert witnesses* **» peu scrupuleux. Après la publication** et la parution de

3

l'ouvrage de M. Olson, l'administration Bush a repris les thèmes qu'il a développés et a appelé à une réforme du système procédural.

### B) Dans les pays civilistes

La plupart des pays de tradition romano-germanique ne connaissent pas de procédure tendant à la recherche de preuves, similaire à la *discovery* du *common law,* et n'obligent pas les parties à produire des preuves.

En France, l'administration de la preuve devant le juge civil repose sur la communication spontanée des pièces par les parties. L'effort repose en principe sur chaque partie (l'article 9 du nouveau Code de procédure civile énonce qu'il incombe à chaque partie de prouver conformément à la loi les faits nécessaires au succès de sa prétention). Une partie peut toutefois compléter, le cas échéant, les preuves dont elle dispose, en sollicitant du juge la production forcée des pièces que l'adversaire n'accepterait pas de verser spontanément ou de celles détenues par un tiers, le prononcé d'une mesure d'instruction (à condition qu'il ne s'agisse pas d'un remède tendant à pallier la sous-production de pièces, comme le prévoit l'article 146 du NCPC) et les mesures tendant à la conservation ou à l'établissement de la preuve, en amont du procès au fond (article 145 du NCPC).

En droit français, jusqu'en 1972, les principes de la recherche de la preuve en matière civile voulaient que le procès en reste aux armes préparées par les parties pour le duel judiciaire. Il était impossible à une partie de contraindre l'autre partie à produire les pièces qu'elle détenait. L'adage de l'ancien droit *nemo tenetur edere contra se* signifiant qu'une partie n'était jamais tenue de produire une pièce susceptible de lui nuire, une partie était exposée à perdre son procès au seul motif que l'élément de preuve indispensable était détenu par l'autre partie.

L'article 10 du Code civil dispose désormais que chacun est tenu d'apporter son concours à la justice en vue de la manifestation de la vérité et que celui qui, sans motif légitime, se soustrait à cette obligation lorsqu'il en a été légalement requis, peut être contraint d'y satisfaire. L'article 133 du nouveau Code de procédure civile permet à une partie de demander au juge d'enjoindre une communication de pièces, au besoin à peine d'astreinte, à condition que cette demande soit motivée et détermine les pièces recherchées. La pratique française  de l'injonction de produire invite à la production utile, par opposition à la procédure de *discovery.*

### C) *Discovery* et arbitrage

L'expérience de l'arbitrage international semble démontrer l'attractivité de la tradition romano-germanique en matière de recherche des éléments de preuve. Bien que certains règlements d'arbitrage internationaux (*American Arbitration Association, London Court of International Arbitration,* Chambre de Commerce Internationale, CNUDCI) fassent place à la *discovery,* une ordonnance de procédure de la Chambre de Commerce Internationale de 1993 a refusé une demande de *discovery* trop imprécise, comme étant contraire à l'interdiction de recherche d'informations « qui fait partie des principes fondamentaux du droit procédural en droit de procédure civile dans les pays du continent européen ».

## II – LE ROLE DE L'ECRIT

Les pays de tradition romano-germanique mettent l'accent sur la preuve écrite et sur les règles relatives à l'admissibilité de la preuve, alors que les pays de *common law* se focalisent sur le principe de l'oralité. Le *common law* se fixe sur les règles de procédure, afin d'établir la bonne méthode pour trouver « la vérité » lors de l'audience. Les règles de preuve sont donc en *common law* nombreuses et détaillées, afin que les parties puissent se confronter par des interrogatoires (*examinations*) et des contre-interrogatoires (*cross-examinations*).

### A) Primauté de l'écrit en France

En France, la primauté de l'écrit est affirmée par l'article 1341 du Code civil : il n'est reçu aucune preuve contre et outre le contenu d'un écrit. Cette règle s'applique aux actes authentiques, aux actes sous seing privé et aux écrits qui leur sont assimilés. Le système français prend en compte les imperfections et les risques du témoignage (risques de mensonge, d'erreur …).

Le système français met l'accent sur l'admissibilité de la preuve testimoniale dans l'espèce considérée : le fait à prouver doit être pertinent, c'est-à-dire utile à la solution du litige. Par préférence à l'enquête. qui peut être ordonnée par le juge et se dérouler devant lui, la pratique recourt aux attestations écrites des témoins, pour lesquelles le nouveau Code de procédure civile fixe des règles très précises.

En matière commerciale, la preuve est libre, les actes de commerce pouvant se prouver par tous moyens à moins qu'il n'en soit autrement disposé par la loi (article 109 du Code de commerce). La preuve des actes de commerce peut résulter des livres de commerce (article 1330 du Code civil). Certaines règles spéciales viennent contrecarrer la liberté de la preuve commerciale, par leur rigueur.

### B) Principe de l'oralité en *common law*

#### 1) Angleterre et Pays de Galles

En Angleterre et au Pays de Galles, le principe de l'oralité domine la preuve des faits et encourage l'établissement des faits de façon directe et immédiate (« *principle of immediacy* »). Il a pour inconvénient de prolonger les audiences, contribuant ainsi aux retards et aux frais de justice, d'où la tendance actuelle à augmenter le rôle des procédures écrites notamment en matière de procédure civile.

Avant la réforme introduite en 1999 suite au rapport Woolf, l'administration des preuves incombait aux parties et n'entrait pas dans les prérogatives du tribunal. Chaque partie produisait ses preuves, la preuve testimoniale étant privilégiée (c'est encore le cas aujourd'hui). Lorsqu'un expert-témoin (*expert witness*) était appelé à la barre, il arrivait cependant que son témoignage soit délivré par écrit sur autorisation expresse du juge.

La durée de l'expertise est prise en compte dans l'évaluation de la durée du procès. **Les retards enregistrés dans la solution des litiges sont souvent imputés à l'expertise judiciaire. Pourtant l'expert n'a aucun intérêt à dépasser les délais impartis,** dans la mesure où l'article 284 du nouveau Code de procédure civile permet au juge de fixer la rémunération de l'expert en fonction de divers éléments, dont le respect des délais impartis.

**Le coût d'une expertise « continentale » est inférieur à celui d'une expertise dans un pays de *Common law*.** La qualité d'expert judiciaire attire à l'expert une clientèle privée, l'activité d'expertise judiciaire étant menée en parallèle. **Le tribunal taxe la rémunération de l'expert, ce qui garantit un niveau de rémunération raisonnable.**

En 1973, la multiplication par les experts des diligences non techniques en vue de tenter de concilier les parties, a conduit à recentrer l'expert sur la seule investigation technique. **L'article 240 du nouveau Code de procédure civile impose aux experts une interdiction stricte de concilier les parties. La voie contentieuse classique est ainsi privilégiée.** La pratique s'est attachée à aménager la rigidité du principe : l'expert judiciaire fournit fréquemment aux parties un pré rapport qui leur indique les bases techniques d'un rapprochement.

**Le rapport Magendie de juin 2004 marque cependant une évolution vers les modes amiables de règlement des litiges, très développés dans les pays de *common law*. Il suggère que l'expert puisse recueillir l'accord des parties qui se concilient en cours d'expertise.** L'expert deviendrait un témoin rendant compte des éléments de la transaction.

### B) Les *expert witnesses* en *common law*

**Les systèmes de *Common law* reposent sur une procédure accusatoire : chaque partie apporte ses preuves en désignant son propre expert. L'expert fait corps avec la partie qu'il assiste.** Le tribunal examine les preuves apportées par chaque partie, avant de trancher sur les questions techniques débattues. Il n'y a pas de liste d'experts, la compétence de l'expert étant déterminée par le tribunal.

**Les missions des témoins experts (« *expert witnesses* ») sont beaucoup plus larges que celles des experts en droit français :**

- Ils sont missionnés par les parties, afin de les aider dans leur recherche des faits et dans l'estimation des chances de succès d'une action en justice. Lors des discussions préliminaires avec un expert potentiel, l'avocat cherchera à cerner si l'expert soutiendra les moyens qu'il entend développer ;

- Ils peuvent également produire en justice leur avis (*expert opinion*), qui sera retenu comme preuve, notamment lorsqu'en raison de leur expertise, la preuve par *expert witness* a une force probante supérieure à celle qui serait fournie par un témoin non qualifié (certificats de coutume sur le droit étranger, métrés faits par les contrôleurs de chantier …). Au Royaume-Uni, en vertu de l'article 3-1 de la loi sur les preuves en matière civile de 1972, un expert peut donner son avis sur « *tout sujet pertinent sur lequel il est qualifié pour apporter des preuves* » ;

9

Le juge était lié par la présentation des faits par les parties : il ne pouvait interroger les témoins que dans le but de préciser ou de clarifier une réponse déjà donnée.

**La réforme de la procédure civile de 1999 a fait une place plus importante à l'écrit. Pour la filière rapide (*fast track*), il n'y a plus de déposition orale des experts à l'audience. La preuve doit désormais être délivrée par écrit, à moins que la Cour n'en décide autrement.**

   2) Etats-Unis

**Aux Etats-Unis, les rapports entre les parties lors de l'audience, les questions des avocats et les réponses des témoins doivent impérativement être oraux.**

Le demandeur débute l'introduction de ses preuves par la présentation des témoins. Un témoin peut attester un fait, expliquer ce qu'il a vu ou entendu. Il ne peut ni donner son opinion ou son impression, ni tirer de conclusions, sauf s'il s'agit d'un expert. Un avocat ne peut poser à son propre témoin des questions orientées, bien qu'il utilise souvent ce moyen pour éclaircir des faits non contestés. L'avocat de la partie adverse devra alors soulever une objection que le juge retiendra (*sustained*) ou, au contraire, qu'il ne jugera pas valable (*overruled*). Lorsque l'avocat du demandeur a terminé l'audition d'un témoin (*examination*), l'avocat de la partie adverse peut à son tour interroger le témoin (*cross examination*). Le contre-interrogatoire devra également être mené sans orienter les questions.

**Dans le domaine civil, les parties font appel à des experts dans des affaires complexes (par exemple dans les procès liés à l'amiante). C'est sur la foi de leur témoignage que le juge ou le *jury* se fondera pour prendre sa décision.**

**La preuve écrite (*documentary evidence*) est admise si l'authenticité du document est établie par un témoignage décrivant les conditions dans lesquelles l'écrit a été produit ou les circonstances dans lesquelles l'écrit a été conservé.**

---

**III – LA COMPLEXITE DU DROIT DE LA PREUVE AUX ETATS-UNIS ET LES ALEAS LIES A L'INSTITUTION DU JURY**

---

**Le jury en matière civile est inconnu dans les systèmes de tradition romano-germanique. D'origine anglaise, le droit à être jugé par un *jury* dans un procès pénal ou civil est aux Etats-Unis un droit politique, inscrit dans la Constitution. En matière civile, ce droit est reconnu par le VIIe amendement à la Constitution, si l'on demande des dommages et intérêts (il s'agit d'une séquelle de l'*Equity*). Le *jury* fait participer le justiciable au fonctionnement de la justice, les jurés tranchant l'affaire au vu des valeurs de la société.**

Aux Etats Unis, les procès sont et resteront sans doute, longs et coûteux en raison du caractère contradictoire de la procédure et de la tradition du *jury*. Par rapport à un procès devant un juge, le procès devant un *jury* entraîne un coût direct additionnel. Selon une étude de 1983 du *Rand Institute for Civil Justice*, le coût direct additionnel d'un procès devant un *jury* par rapport à un procès devant un juge unique est de l'ordre de 13.300 $ en moyenne. Selon cette même étude, la durée moyenne d'un procès fédéral devant un jury est de 5,19 jours, contre 2,34 jours devant un juge. Le juge fédéral Richard Posner a repris ces données dans son livre de 1999 (*The Federal Courts : Challenge and Reform*).

Le *common law* a toujours eu des règles de preuve très strictes. Toutefois, le droit de la preuve est marqué aux Etats-Unis par l'institution du *jury*, qui introduit un aléa important.

### A) La complexité des règles de preuve

L'élaboration de règles extrêmement détaillées pour la production des preuves s'explique en grande partie par le souhait de limiter les pouvoirs du *jury*. Le *jury*, composé de personnes ordinaires, juge à partir du fonds d'expérience et selon la raison pratique de l'« homme moyen ». Dans une affaire civile, le *jury* doit être convaincu de la supériorité des preuves du demandeur. Le standard de preuve en matière civile est celui de la prépondérance de la preuve (*preponderance of the evidence*), qui exige qu'aucune preuve ne soit admise si sa probabilité ne dépasse pas 50%. Les thèses des deux parties sont mises en concurrence dans une procédure accusatoire, le demandeur et le défendeur partageant les risques de la décision à 50-50 (l'unanimité des jurés est parfois requise dans certaines juridictions, sauf si les parties y renoncent). La règle du « ouï dire » (« *hearsay rule* ») : *Uniform Rule of Evidence 63*) interdit généralement d'invoquer des déclarations faites en dehors du tribunal en vue de prouver un point donné, car les jurés n'ont pu observer l'attitude du témoin pendant sa déposition (*examination*) et lors de son contre-interrogatoire par la partie adverse (*cross-examination*).

### B) L'aléa du *jury*

#### 1) La capacité du *jury* à statuer dans des affaires complexes

En droit américain, le juge ne participe pas aux délibérations des jurés. Il facilite le travail du *jury* en le préparant et en l'orientant. Il élimine les preuves non pertinentes pour la solution du litige ainsi que les preuves valables mais susceptibles d'influencer excessivement les jurés.

Des voix de plus en plus nombreuses s'interrogent sur la capacité des jurés à statuer dans des affaires très complexes. Dans une affaire d'ententes illicites extrêmement compliquée (*Japanese Electronic Products Antitrust Litigation 3rd circuit 1980*), une cour d'appel fédérale, en raison de la durée prévisible du procès, de la masse de preuves, du nombre des réclamations, des difficultés techniques de l'affaire, de la quantité d'expertises et de l'impossibilité de compartimenter les divers aspects du litige a reconnu pour la première fois une « exception de complexité » et s'en est remise à un collège de trois juges fédéraux. D'autres voies ont également été explorées, telles que la scission du procès ou la *bifurcation* du procès. Par ailleurs, le juge peut, avec ou sans le consentement des parties, désigner un

7

*special master* (professeur de droit ou juge à la retraite) pour l'assister lorsque les questions sont complexes. Les *special masters* présentent leurs preuves et leurs conclusions au *jury*.

2) L'explosion des dommages punitifs

**Le monde des affaires peut se sentir menacé par l'imprévisibilité des jurés et se plaint de l'explosion des dommages punitifs (*punitive damages*).** Les grandes entreprises risquant de voir leur responsabilité engagée, notamment dans des affaires d'atteinte à l'environnement ou de contamination collective, essaieront de les retirer du *jury* ou à tout le moins d'obtenir une composition du *jury* qui leur soit favorable. La simple sélection des jurés, qui est essentielle quant à l'issue du procès, peut prendre à elle seule plusieurs semaines.

**Le système des *class actions* (action collective) et des *contingency fees* (honoraires de résultat) contribue à faire exploser les frais de justice. La majorité des affaires contentieuses seront résolues par la voie d'un accord à l'amiable.**

**A cause des dommages et intérêts accordés, les primes d'assurance ont grimpé dans les années 80 et certaines entreprises n'ont eu comme choix que de répercuter la hausse des primes d'assurances sur leurs clients ou de bannir toute innovation** susceptible de s'avérer dangereuse. C'est la thèse soutenue notamment par Peter W. Huber, juriste et écrivain américain, dans ses ouvrages. Certaines entreprises françaises ont, semble t'il, tendance à renoncer à exercer des activités aux Etats-Unis en raison du montant dissuasif des primes d'assurance.

---

**IV – L'EXPERTISE DANS LES PAYS DE TRADITION CIVILISTE ET LE RECOURS AUX *EXPERT WITNESSES* DU *COMMON LAW***

---

A) L'expertise dans les pays civilistes

**Dans les systèmes de tradition romano-germanique qui reposent sur des notions inquisitoires, l'expert est désigné par le tribunal. L'expert judiciaire convoque les parties contradictoirement pour mener sa propre enquête. Il est nécessairement impartial et son rapport est destiné à éclairer le tribunal. Le corps des experts est un corps exclusif, les experts étant inscrits sur une liste d'experts agréés.**

Le doyen Cornu a défini l'expertise comme une « *mesure d'instruction consistant, pour le technicien désigné par le juge, à examiner une question de fait qui requiert ses lumières et sur laquelle des constatations ou une simple consultation ne suffiraient pas à éclairer le juge et à donner un avis purement technique sans porter d'appréciation purement juridique* ».

**L'expert commis doit accomplir sa mission avec conscience, objectivité et impartialité** (article 237 du nouveau Code de procédure civile).

- Ils exécutent également les missions d'expertise ordonnées par un tribunal et peuvent siéger en tant qu'assesseurs afin d'aider le tribunal lors de l'examen de preuves à caractère technique.

1) Angleterre et Pays de Galles

**L'évolution du modèle anglais de l'expertise s'est inspirée du principe accusatoire du système français. Les nouvelles règles de procédure prévoient que le juge dispose d'un pouvoir d'appréciation pour autoriser la preuve par expert. Il doit la restreindre à ce qui est raisonnablement nécessaire à la résolution du litige. Les nouveaux principes directeurs tendent à limiter les coûts et affirment fortement le devoir du tribunal de conduire la procédure.**

a) Vers le système de l'expert unique

**Au Royaume Uni, le rapport Heilbron/Hodge de 1993 a évoqué les difficultés liées aux** *expert witnesses***, notamment les frais et retards excessifs, qu'un contrôle accru par les tribunaux ne peut suffire à pallier.** En effet, les règles de procédure ne permettent pas à un tribunal d'exclure totalement la preuve par expert si les parties désirent y recourir. Par ailleurs, l'impartialité des experts est également en cause : le rôle de *l'expert witness*, à l'origine indépendant, a évolué vers celui de conseil « supplémentaire » de la partie qui l'a missionné, recherchant l'aval du conseil de la partie qui les a missionnés.

De plus en plus, lorsque les sommes en jeu sont faibles ou dans des affaires sans grande complexité, les parties ont été encouragées par le système anglais à ne nommer qu'un seul expert. Bien que la possibilité de désigner un seul et unique expert existe depuis 1904, la nomination d'experts uniques communs n'a été sérieusement envisagée qu'en 1998, lors des réformes de Lord Woolf sur la procédure civile. **Les réformateurs du système de procédure civile en Angleterre ont reconnu que le système d'un expert unique présentait des avantages, si les conditions s'y prêtaient. Tout en rappelant les inconvénients du système** civiliste pour un *Common lawyer* (faible taux de satisfaction, affaire en pratique décidée sur la base du rapport d'expertise et non par le juge, frais d'expertise s'ajoutant aux frais des experts de chaque partie …), **le Barreau et la** *Law Society* **ont estimé que le recours à un expert désigné par le tribunal pourrait parfois s'avérer la meilleure solution et réduirait, voire supprimerait, beaucoup des problèmes liés aux** *expert witnesses.*

Toute nomination d'expert par une partie doit être autorisée par le tribunal. Lors de la conférence de mise en état, le tribunal déterminera le nombre d'experts et le nombre de disciplines dans lesquelles l'avis d'un expert est requis en fonction de la nature des points en litige, du montant des demandes et de la complexité de l'affaire. Lorsque les sommes en litige sont faibles, le tribunal encouragera les parties à nommer un seul expert, voire le leur imposera. S'il reste inhabituel que les parties suggèrent au tribunal de désigner un seul expert, le tribunal peut désigner d'office un seul expert s'il considère que le recours à un expert unique peut permettre de résoudre les faits en litige. Si le tribunal décide de nommer un seul expert, les parties devront convenir de sa désignation. A défaut, le tribunal choisira l'expert sur une liste préparée par les parties ou ordonnera que l'expert soit désigné selon toute autre procédure, au choix du tribunal. La voie rapide (*fast track*) est obligatoirement limitée à une seul expertise. **En 2002, le Département des affaires constitutionnelles a déclaré que le recours à un expert unique semblait avoir contribué à un système de justice civile moins accusatoire et avoir encouragé des transactions.**

10

b) La désignation de l'expert

A la différence de la France, il n'y a pas de procédure séparée pour nommer des experts : le témoignage de l'expert fait partie de la procédure au fond. La définition de la mission de l'expert incombe aux parties. Toutefois le nouveau système permet à la Cour d'intervenir .

c) L'impartialité de l'expert

En Angleterre, l'article 35 des règles de procédure civile précise que les experts ne sont pas les représentants des parties. Si le juge ou l'avocat de la partie adverse soumet à l'expert des questions spécifiques dont la réponse est défavorable à la partie qui l'a nommé, l'expert doit répondre à ces questions. **Le premier des devoirs des experts est d'apporter au tribunal une assistance indépendante par une évaluation objective et impartiale. Le devoir de l'expert envers le tribunal prévaut sur toute obligation vis-à-vis de la partie qui l'a missionné.**

Les communications d'une partie avec un expert ne sont pas protégées : selon les règles de procédure anglaise, chaque partie peut exiger la communication des conseils et des lettres d'instruction adressées à la partie adverse. **La partie ayant missionné un expert ne peut donc se fonder sur les seuls aspects de l'avis de l'expert qui lui seraient favorables.**

d) Les opérations d'expertise

Chaque expert prépare son rapport qui est produit avant l'audience. Après communication des rapports, les experts se réunissent, hors la présence des parties et du juge, afin d'identifier les points sur lesquels ils sont d'accord et ceux sur lesquels leurs opinions divergent. Les experts rédigent un compte rendu de leur réunion, qui aidera les parties à définir et à limiter les points qui seront évoqués par les experts lors de l'audience de plaidoiries. A l'audience, chaque expert sera interrogé puis contre-interrogé par les parties. Les contre-interrogatoires peuvent être longs et intensifs et la crédibilité de l'expert sera mise en question.

Les tribunaux anglais n'accordent pas d'importance au principe français du contradictoire lors du déroulement des opérations d'expertise. **Les preuves sont communiquées à toutes les parties à la procédure afin qu'elles soient contradictoires, mais les opérations des experts ne sont pas nécessairement contradictoires.**

e) Les frais

La règle habituelle est que la partie ayant gagné un procès recouvre à l'encontre de l'autre partie la plupart des frais de procédure (honoraires des avocats et rémunérations des experts).

2) Etats-Unis

**Aux Etats-Unis, chaque partie désigne son ou ses *expert witnesses*.** Les experts-témoins missionnés par chaque partie préparent une opinion écrite, restent disponibles pour les dépositions (les réunions pendant lesquelles l'avocat adverse peut interroger le témoin pour clarifier des points litigieux) et se présenteront devant le tribunal pour être interrogés par la partie les ayant cités (*examination*) et contre-interrogés par la partie adverse (*cross examination*).

11

Les procès donnent souvent lieu à des batailles d'experts, les intérêts de chaque partie étant défendus par un groupe d'expert rémunérés par elle.

    a) Le juge ne peut ordonner la désignation d'un expert unique

Au cours de l'audience préliminaire, le juge peut limiter le nombre d'experts en fonction de l'importance et de la complexité du litige. Toutefois, **le juge ne peut pas d'office ordonner aux parties de désigner un expert unique, les règles de procédure civile n'envisageant pas cette possibilité.** Les *Federal Rules of Civil Procedure* et les codes de certains Etats permettent au tribunal de désigner des experts neutres qui s'ajoutent à ceux auxquels les parties ont fait appel (*Rule* 706 des FRCP). **Bien que les parties aient la possibilité de nommer un expert unique, cela reste très inhabituel dans un système aussi accusatoire.**

    b) Les experts ne sont pas tenus d'un devoir supérieur envers le tribunal

**Les experts ne sont pas tenus d'un devoir supérieur envers le tribunal comme au Royaume-Uni.** S'ils sont à l'évidence tenus de ne pas se rendre coupables de parjure, leur loyauté va pour le reste à la partie qui les a missionnés.

    c) Les opérations d'expertise

Comme dans le système anglais, il n'y a pas de procédure séparée pour nommer des experts. Ils sont nommés et interviennent dans le cadre de la procédure au fond.


**Conclusion**


**L'opposition entre les deux traditions juridiques n'est plus aussi tranchée qu'elle l'était par le passé mais la *discovery* incontrôlée (*uncontrolled discovery*) semble être un des facteurs majeurs générant des coûts inutiles en droit des pays de *common law*.** Elle oblige les avocats de chaque partie à des « parties de pêche », qui sont les heures passées à lire et à analyser le nombre, parfois impressionnant, de pièces communiquées, afin de dégager celles qu'ils utiliseront.

**Les inconvénients d'une telle *discovery* ont notamment été soulignés par Lord Woolf,** dans son rapport « *Access to justice* », qui a conduit à réformer la procédure civile en 1999 en Angleterre et au Pays de Galles. Ces nouvelles règles visent à créer de nouveaux équilibres entre les parties et le tribunal, à assurer une meilleure proportionnalité entre la nature de la cause et la procédure utilisée, à atténuer les effets du système contradictoire, entre autres en donnant aux tribunaux les moyens de gérer les procédures, de contrôler les expertises et de resserrer la preuve, à responsabiliser les parties et leurs avocats dans la conduite de l'instance et à instaurer des délais cibles pour encadrer l'action. Elles semblent également mettre l'accent sur les modes amiables de règlement des litiges, les favoriser et les insérer dans le contexte procédural. L'opposition n'est donc plus aussi radicale avec le système civiliste d'un pays comme la France.

**Le principe de l'oralité tend également à prolonger les audiences en *common law*.**

12

Enfin, si l'expertise « continentale » est critiquée en *common law*, le système des *expert witnesses* génère des coûts importants.

On constate que les systèmes français et anglais ont évolué au cours des dernières décennies dans le sens d'un rapprochement, chaque pays ayant, semble t'il, pris en considération les inconvénients pratiques découlant de son propre système. Le rapprochement et l'harmonisation des législations dans le cadre de l'Union européenne favorise cette convergence de vues dans des systèmes se heurtant à des difficultés comparables.

Les différences restent en revanche marquées entre le droit français et le droit américain, qui reste empreint d'une véritable culture du procès et l'explosion des litiges (*the litigation explosion*). Aux Etats-Unis, il existe une véritable industrie du procès, même si près de 90% des affaires font l'objet d'une transaction entre les parties. L'aléa du *jury* américain reporte en amont la pression sur le système judiciaire. Le droit de la preuve devient toujours plus compliqué, son administration de plus en plus lente et coûteuse tant lors de la phase de *discovery* que du procès lui-même. Les avocats doivent compenser l'aléa de la décision du *jury* en construisant un dossier très solide.

La question de la preuve rejoint celle du coût des procédures, élevé dans les pays de *common law*. Le coût des procédures en *common law* conduit les parties vers les modes alternatifs de règlement des litiges (*alternative dispute resolution*) et vers des transactions. Toutefois, les parties transigent souvent au dernier moment, alors qu'un temps précieux s'est déjà écoulé et que des sommes importantes ont été dépensées pendant la procédure de recherche des preuves préalable au procès.

**Bibliographie**

Introduction au système juridique des Etats-Unis, E. Allan Farnsworth, LGDJ 1986
Pratique professionnelle de l'avocat, Jean-Claude Woog, Litec 1991
*The litigation explosion : what happened when America unleashed the lawsuit*, Walter K. Olson, Penguin Books 1991
*Access to justice*, rapport de Lord Woolf, juillet 1996
*Heilbron/Hodge report*, juin 1993
La justice aux Etats-Unis, Anne Deysine, Que sais-je ? PUF 1998
L'expertise judiciaire en Europe, François Pinchon, Editions d'Organisation 2002
Juger en Amérique et en France, Antoine Garapon et Ioannis Papadopoulos, Ed. Odile Jacob, 2003
Rapport Magendie sur la célérité et la qualité de la justice, 15 juin 2004
Les spécificités du système anglo-saxon, Paul Taylor, Revue Expertises n° 68 septembre 2005
Expertise judiciaire et conciliation des parties, Christophe Ponce, Gazette du Palais 5 et 6 octobre 2005

13

# Exhibit [24]

**Rules of evidence before civil courts and economic attractiveness of French law (France, England and Wales, United-States), Justice Ministry, European and International Affairs Department, 19 October 2005**

**Exhibit [    ]**

---

**Rules of evidence before civil courts and economic
attractiveness of French law (France, England and Wales,
United States), Justice Ministry, European and
International Affairs Department, 19 October 2005**

---



(...)
2) United States

**In the United States, attorneys instruct the case, define the questions of fact and the questions of law to be submitted to the court, gather the evidence and conduct the hearings of witnesses during the debate. The judge plays the role of an "arbitrator," who is neutral and passive, and ensures compliance with the rules protecting balance between the parties.**

The *Federal Rules of Evidence 2004* govern the administration of evidence before federal courts. While numerous States have drawn on federal rules in order to prepare their own legislation, **discovery rules vary from one State to the next.** However, basic principles are relatively similar: **the procedure aims at seeking the evidence, delineating the subject matter of the dispute** (by eliminating standard grounds upon which the adversary party does not intend to rely during the trial), **protecting testimonies and evidence, and obtaining witness evidence in another State.**

**The procedure is cumbersome and may prove highly expensive:**
- preparation (questionnaires, requests for documents)
- depositions by the witnesses (whether orally or through written declarations)
- recording of the depositions (requests for documents or additional interrogations)
- discovery by expert witnesses, governed by specific provisions.

**Attorneys frequently engage in a boilerplate discovery process** (request for a discovery process having a very broad scope, as the attorney is using standard documents) **which increases expenses without producing any interesting results. In practice, in order to reduce costs, the parties sometimes rely on private arbitration for the purposes of the discovery process in commercial disputes.**

**While discovery is often used as a weapon by the parties, it also creates a business security risk.** A very broad discovery request made by a competitor in connection with a procedure may compel a party to open up its archives and produce documents, whose disclosure might harm the said party.

**According to Walter K. Olson, the excessive costs incurred in the United States in connection with legal proceedings are partly attributable to the broad range of the discovery process in US law. In his landmark work (*The Litigation Explosion*, 1996), Olson critically analyzes this "litigation industry," which is detrimental to the US judicial system, in particular because of the length and cost of the procedures.** By taking examples from daily life (child custody, slander, bodily injury), Olson shows that litigation has become a way of life in the United States. **He emphasizes the perverse effects of discovery in the administration of evidence,** for instance when attorneys do not hesitate to hire unscrupulous "expert witnesses." **After the publication and success of Mr. Olson's work, the Bush administration re-used the themes that he had discussed and asked for a reform of the procedural system.**



**Conclusion**

**The opposition between the two legal traditions no longer is as clear-cut as in the past. However, uncontrolled discovery seems to be one of the major factors inducing useless costs in common law countries.** This obliges each party's attorneys to hunt for evidence by spending endless time reading and analyzing the large, and sometimes impressive, number of communicated exhibits, in order to determine which ones they shall use.

The drawbacks of such a discovery process were in particular emphasized by Lord Woolf in his report entitled "Access to Justice" which led in 1999 to a civil procedure reform in England and Wales. These new rules are aimed at striking a new balance between the parties and the court, ensuring greater proportionality between the nature of the case and the procedure used, attenuating the effects of the adversary procedure, *inter alia* by giving courts the means of managing procedures, controlling the expert assessment process, tightening evidence, increasing the responsibility of the parties and their attorneys as regards the conduct of the proceedings, and determining target lead times in order to regulate the suit. These new rules also seem to focus on, and favor, amicable dispute settlement methods, and insert them into a procedural context. Therefore, the contrast with the civil-law system of a country such as France is no longer as radical as it had been.



Karen RENEL-KING
Expert - Traducteur
ASSERMENTÉ
près les tribunaux
TÉL. 03 22 89 04 72 - FAX 03 22 89 45 16

Je soussignée, Karen RENEL Traductrice Expert près la Cour d'Appel d'Amiens certifie que la traduction qui précède est conforme à l'original libellé en langue française visé ne varietur sous le n° 4018 Fait à Paris, le 01/07/08 (signature exempte de légalisation Décret n° 53914 Art. 8 du 26.9.1953).