# Exhibit [30]

## Cour de cassation, chambre criminelle, 12 décembre 2007, n° 07-83228

# Exhibit [ ]

**Cour de cassation, chambre criminelle, 12 décembre 2007, n° 07-83228**



Et attendu que l'arrêt est régulier en la forme ;

REJETTE le pourvoi ;

Ainsi jugé et prononcé par la Cour de cassation, chambre criminelle, en son audience publique, les jour, mois et an que dessus ;

Etaient présents aux débats et au délibéré : M. Cotte président, Mme Nocquet conseiller rapporteur, M. Dulin, Mmes Thin, Desgrange, M. Rognon, Mme Ract-Madoux, M. Bayet conseillers de la chambre, M. Soulard, Mmes Slove, Degorce, Labrousse conseillers référendaires ;

Avocat général : M. Boccon-Gibod ;

Greffier de chambre : Mme Randouin ;

En foi de quoi le présent arrêt a été signé par le président, le rapporteur et le greffier de chambre ;

**Publication :**

**Décision attaquée :** Cour d'appel de Paris du 28 mars 2007

**Titrages et résumés :** DOCUMENTS ET RENSEIGNEMENTS D'ORDRE ECONOMIQUE OU TECHNIQUE - Communication à des personnes physiques ou morales étrangères - Communication tendant à la constitution de preuves pour une procédure étrangère - Autorisation - Mandat prévu par la Convention de La Haye du 18 mars 1970 - Défaut - Portée

Constituent, au sens de l'article 1 bis de la loi du 26 juillet 1968, modifiée, la recherche de renseignements d'ordre économique, commercial, industriel, financier ou technique tendant à la constitution de preuves en vue d'une procédure étrangère, les démarches effectuées par une personne, correspondante en France de l'avocat d'une des parties à ladite procédure, dans le but de connaître les circonstances dans lesquelles le conseil d'administration d'une société française a pris la décision d'acquérir une société étrangère. Dès lors, commet le délit réprimé par l'article 3 de la loi susvisée, la personne qui se livre à de telles démarches, sans disposer d'un mandat autorisé prévu par la Convention de La Haye du 18 mars 1970

**Précédents jurisprudentiels:**



# Exhibit [31]

**Cour de Cassation, Criminal Chamber, 12 December 2007, No 07-83228**

# Exhibit [   ]

## Cour de Cassation, Criminal Chamber, 12 December 2007, No. 07-83228



Within the meaning of Article 1 bis of the Act of 26 July 1968, as amended, the search for economic, commercial, industrial, financial or technical information aimed at the identification of evidence with a view to foreign proceedings consists in steps taken by any person, who is the correspondent in France of the attorney of any of the parties to the said proceedings, in order to know the circumstances in which the board of directors of a French company decided to acquire a foreign company. Therefore, the offence targeted by Article 3 of the above Act is committed by any person engaging in such search without having been appointed by an authorized agency agreement provided for by the Hague Convention of 18 March 1970.

Je, soussignée, Karen RENEL, Traductrice Expert près la Cour d'Appel d'Amiens certifie que la traduction qui précède est conforme à l'original libellé en langue ....française....
visé ne varietur sous le n° ..8783..
Fait à ........Kaus........, le ....22/26/08
(signature exempte de légalisation
Décret n° 53914 Art. 8 du 26.9.1953).



# Exhibit [32]

Luc Chatel, "Le temps est venu d'introduire l'action de groupe dans notre pays", Concurrences, Revue des droits de la concurrence, n° 2-2008, pp. 21-24

Annexe 8-1

# Exhibit [ ]

**Luc Chatel, "Le temps est venu d'introduire l'action de groupe dans notre pays", Concurrences, Revue des droits de la concurrence, n° 2-2008, pp. 21-24**



illicites et en suppression de clauses illicites ou abusives (article L. 421-6), action en intervention volontaire (article L. 421-7) ou bien encore action en représentation conjointe (article L. 422-1). Les actions menées dans l'intérêt collectif des consommateurs ne permettent cependant pas la réparation des dommages individuels puisque les montants obtenus sont versés à l'association de consommateurs et non aux victimes. Quant à l'action en suppression de clauses abusives ou illicites, elle n'a pas pour vocation à réparer le dommage causé mais à en éliminer les causes, en ordonnant par exemple la suppression d'une clause illicite ou abusive dans un contrat. Pour ce qui concerne le droit d'intervention devant les juridictions civiles, les associations de consommateurs ne sont présentes que comme "partie jointe", en soutien d'une demande introduite par des consommateurs agissant à titre individuel.

9. L'action en représentation conjointe s'apparente sans doute le plus à la procédure d'action de groupe puisqu'elle permet aux associations d'agir au nom d'au moins deux consommateurs et en vue de la réparation de préjudices individuels. Toutefois, l'association de consommateurs ne peut agir de sa propre initiative. De surcroît, la procédure se révèle en pratique contraignante et coûteuse, les associations de consommateurs devant collecter et gérer les mandats de chaque victime.

10. L'introduction d'une véritable action de groupe s'impose donc. Elle présenterait plusieurs vertus :

→ Elle réduirait considérablement pour les victimes le coût d'une action en justice et faciliterait de ce fait l'accès de tous à la justice.

→ Elle diminuerait les coûts de fonctionnement du système judiciaire, en évitant la duplication des procédures et permettrait ainsi de réaliser des économies d'échelle.

→ Elle mettrait les quelques professionnels indélicats face à leurs responsabilités et écarterait ainsi la suspicion qu'ils font porter sur les autres.

→ Elle dissuaderait les entreprises de recourir à des pratiques illicites, nuisibles pour l'efficacité économique, et les inciterait à se montrer plus attentives aux attentes et réclamations de leurs clients.

→ Finalement, elle restaurerait la confiance des consommateurs dans le bon fonctionnement de l'économie, en leur donnant un rôle de régulateur à part entière.

11. L'action de groupe n'est plus aujourd'hui le combat isolé de quelques-uns : elle mobilise toutes les familles politiques, bien au-delà des clivages partisans traditionnels. Ainsi, en novembre 2007, lors de la discussion d'un amendement sur le sujet, une convergence de vue s'est fait jour entre les différents groupes parlementaires. Les Français plébiscitent également l'action de groupe : selon un sondage CSA, publié en mars 2007, 84 % des Français sont favorables à l'introduction en France d'une telle procédure, 57 % estimant même cette réforme prioritaire. En dernier lieu, les rapports Coulon et Attali se sont clairement exprimés en faveur d'une action de groupe.

12. La question centrale n'est donc plus tant de savoir s'il faut introduire une action de groupe mais bien plutôt de définir les contours d'un projet raisonné, qui redonne confiance aux consommateurs tout en protégeant les entreprises d'éventuels abus.

Car nous le savons tous, l'action de groupe est susceptible de sérieuses dérives, à l'image de ce que nous avons pu observer outre-Atlantique. L'action de groupe mal encadrée peut être dévoyée pour devenir l'instrument d'un enrichissement indu, voire d'un lynchage médiatique, avant même que la responsabilité réelle de l'entreprise ne soit établie. Le droit légitime à la réparation cède alors la place au chantage pour se transformer parfois en droit de vie et de mort sur les entreprises. Loin de bénéficier d'abord aux victimes – en l'espèce les consommateurs – les *class actions* américaines alimentent bien souvent une véritable "industrie du procès", qui profite d'abord aux intermédiaires et à certains concurrents mal intentionnés. Les *class actions* peuvent même se retourner contre leur propre objet, la défense des consommateurs : dans certains secteurs à risque tels que la pharmacie, la perspective de réparations élevées se traduit aux États-Unis par une hausse des primes d'assurances, que les entreprises reportent ensuite sur… les prix aux consommateurs. Tous ces risques, nous les connaissons et les Américains eux-mêmes s'en inquiètent et ont d'ailleurs engagé des réformes de leur procédure de *class action*.

13. Mais, à l'inverse, n'agitons pas en permanence le chiffon rouge des *class actions* américaines pour prêcher l'immobilisme total. Prenons plutôt la mesure des excès et des errements Outre-Atlantique, pour construire un système juste et équilibré. Nous devons d'ailleurs nous méfier des parallèles, analogies et raccourcis trop rapides qui sont parfois faits entre le cas américain et ce qui pourrait advenir en France. Les dérives américaines résultent en grande partie de l'organisation même de leur système judiciaire, difficilement comparable et transposable au nôtre.

→ Ils ont des jurys populaires et des magistrats élus, nous avons des juridictions spécialisées, au travers des huit TGI spécialisés dans l'application du droit de la concurrence, et des magistrats professionnels.

→ Ils autorisent la rémunération des avocats sur le seul résultat du procès (pacte de *quota litis*) – rémunération qui peut atteindre dans certaines affaires jusqu'à 40 % du montant des réparations – cette solution n'est pas permise dans notre pays et n'est pas à l'ordre du jour.

→ Ils offrent aux avocats une grande liberté d'initiative en matière de publicité (radio, télévision) et ce à tous les stades de la procédure – notamment dans la constitution du groupe, avant même que la recevabilité et la responsabilité de l'entreprise ne soient établies – alors que notre droit l'encadre strictement.

→ Ils recourent à des dommages punitifs – les fameux "*triple dommages*" – alors que nous sommes dans une logique de réparation stricte du préjudice. Le principe de la réparation simple permet de centrer l'action de groupe sur son seul objectif légitime, le dédommagement du consommateur lésé et non l'enrichissement des intermédiaires qui sont souvent les seuls grands gagnants d'un système de dommages punitifs.

→ Ils privilégient un champ très large à l'action de groupe, incluant par exemple les sinistres collectifs médicaux (tabac), l'environnement, les discriminations au travail, les atteintes aux droits de l'homme. Le récent rapport Coulon propose de limiter l'action de groupe aux seuls préjudices matériels subis par les consommateurs.

→ Ils recourent, en matière de régime de la preuve, au mécanisme très intrusif de la "*discovery*"[4], notre droit ne dispose pas d'une procédure équivalente.

Bref, en matière d'action de groupe, il est peu réaliste de penser que la France de demain ressemblera aux États-Unis d'aujourd'hui.

**14.** Le débat doit donc se centrer sur les modalités d'une action de groupe et plusieurs questions de fond doivent être tranchées, parmi lesquelles :

→ La place de la médiation

Différentes options peuvent être envisagées : une médiation préalable et obligatoire à toute initiative devant le juge ou bien encore une médiation qui interviendrait à l'issue de la phase de recevabilité par le juge. Favoriser la médiation, c'est développer dans notre pays la culture de la négociation, c'est également éviter le risque d'une "juridicisation" excessive de notre économie, en faisant du juge le dernier recours. De plus, lorsqu'elle intervient en amont, la médiation, discrète par nature, peut éviter à l'entreprise l'exposition médiatique et la publicité inhérente à toute décision de justice ;

→ Le système d'inclusion des bénéficiaires

Si la majorité des pays (États-Unis mais aussi Québec, Portugal) privilégient l'*opt-out*, d'autres, comme la Suède, ont fait le choix de l'*opt-in* ou d'un système mixte, en fonction du montant du dommage individuel. Je note également que dans son récent Livre blanc sur les actions en réparation de pratiques anticoncurrentielles, la Commission a pris position en faveur de l'*opt-in*.

→ Le champ de l'action de groupe

Les rapports Cerruti-Guillaume et Coulon préconisent de le circonscrire aux préjudices matériels subis par les consommateurs. Ce champ pourrait recouvrir les obligations contractuelles et légales du vendeur en matière commerciale mais également celles en matière de concurrence. Permettez-moi de développer plus avant ce dernier point.

**15.** L'inclusion des pratiques anticoncurrentielles dans le champ de l'action de groupe mérite d'être discutée. La Commission européenne vient d'ailleurs de prendre position clairement sur ce sujet, à l'occasion de la publication du Livre blanc : elle a estimé que la pleine effectivité des règles de concurrence implique non seulement une action forte des autorités de concurrence mais également la possibilité d'actions en réparation. La Commissaire chargée de la protection des consommateurs, Madame Kuneva, m'a réaffirmé à plusieurs reprises sa volonté d'avancer sur cette question, tout comme la Commissaire en charge de la concurrence, Madame Kroes.

**16.** L'espace de la libre concurrence s'est considérablement élargi dans notre pays, notamment à la suite du mouvement de déréglementation qui a touché les industries de réseau : téléphonie fixe hier, gaz et électricité aujourd'hui, chemins de fer demain. Cette liberté entrepreneuriale a pour contrepartie une responsabilité plus grande vis-à-vis des clients : la concurrence ne profite véritablement aux consommateurs que pour autant que les firmes respectent les règles du jeu concurrentiel et ne s'engagent pas dans des pratiques telles que des ententes sur les prix.

**17.** Si nous considérons le cas particulier des ententes sur les prix, elles causent bien souvent un dommage global important à l'économie et aux consommateurs en particulier. Les économistes estiment que cette pratique augmente les prix de l'ordre de 20 %, ce qui est tout à fait considérable. Cette hausse de prix est complètement artificielle. Elle ne s'accompagne d'aucune contrepartie réelle en termes de progrès économique et d'efficacité. Les consommateurs sont tout simplement spoliés : ils paient plus cher pour le même produit ou sont même parfois contraints de renoncer à l'acheter. Mais la perte individuelle que supporte chaque consommateur est généralement trop faible pour qu'il engage seul une action en réparation. Si l'on prend le cas de l'entente dans la téléphonie mobile entre 2000 et 2002, le dommage global a été estimé à plus d'un milliard d'euros, mais la perte pour chaque abonné se chiffre à quelques dizaines d'euros. Qui ira individuellement en justice pour si peu ? Je constate d'ailleurs que seulement 12 000 plaintes ont été déposées dans le cadre de l'action conjointe engagée par une association de consommateurs… sur un parc d'abonnés qui avoisinait les 30 millions de clients à l'époque des faits. Ce décalage entre l'ampleur des dommages causés par l'entente et les obstacles à une juste réparation vient alimenter chez les consommateurs un sentiment d'impuissance et de défiance, qui nuit au bon fonctionnement de notre économie.

**18.** De plus, l'action privée peut venir renforcer l'effet dissuasif de l'action publique. En effet, bien que les réparations soient d'une nature juridique différente des sanctions pécuniaires infligées par les autorités de concurrence, elles contribuent tout autant à accroître le risque financier pour une entreprise d'une violation des règles de concurrence. Cet effet ne doit pas être sous-estimé, nombre d'économistes estimant que le niveau des amendes reste encore insuffisant au regard du gain illicite et de la faible probabilité de détection.

**19.** L'action privée n'est pas redondante avec l'action publique et ne conduit pas à punir deux fois l'entreprise pour les mêmes faits. En effet, lorsqu'un prix augmente, certains consommateurs renoncent à consommer, tandis que d'autres

---

[4] Cette procédure est une phase d'investigation de la cause préalable au procès. Elle fait obligation à chaque partie de divulguer à l'autre partie tous les éléments de preuve pertinents au litige dont elle dispose (faits, actes, documents…), y compris ceux qui lui sont défavorables.

# Exhibit [33]

Luc Chatel "The time has come to introduce group actions in our country", Concurrences (a Competition Law Journal), No 2-2008, pp.21-24

Exhibit [   ]

Luc Chatel "The time has come to introduce group actions in our country" Competition Law Journal, No. 2-2008, pp. 21-24

(...)

12. The central issue no longer primarily hinges on whether it is necessary to introduce a group action but rather focuses on the definition of the outlines of a reasoned project that would restore consumers' trust while protecting enterprises against possible abuses.

Indeed, as we all know, group actions may lead to serious excesses, as observed in the United States. Improperly regulated group actions may be misused in order to become an unfair enrichment tool, or to allow for "lynching" by the media, even well before it is proved that the enterprise concerned is actually liable. The legitimate right to a remedy is then replaced by blackmail, and sometimes amounts to a right of life and death over enterprises. Far from being beneficial most of all to the victims (in the instant case, consumers), US class actions very often feed a genuine "litigation industry," that is primarily profitable for intermediaries or certain malicious competitors. Class actions may even be contrary to their own purpose, i.e. the defense of consumers: in certain high-risk areas, such as pharmaceuticals, the prospect of huge damages induces in the United States a rise in insurance premiums that enterprises then pass on to consumers. We are well aware of all of these risks, and Americans themselves have voiced concerns in this respect and have launched reforms of their class action procedures.

13. However, conversely, let us not constantly wave the red flag of US class actions in order to recommend total inertia. Let us rather take stock of excesses and aberrations observed in the United States, so that we can build a fair and balanced system. Also, we must avoid too quickly coming up with any comparisons, analogies or snap judgments that are sometimes made when analyzing the US situation and what might be done in France. US excesses largely result from the very organization of the country's judicial system, which is difficult to compare with our institutions or to transpose in France.

The United States has a jury system and elected judges, while France has specialized courts, with eight First Instance courts specialized in competition matters, and also has professional judges.

The United States allows for the remuneration of attorneys on the sole basis of the trial's outcome (contingency fee arrangements, with a remuneration that may reach 40% of the amount of the damages), while such a system is not allowed in our country, and its introduction is not on the agenda.

The US gives attorneys considerable freedom as regards canvassing (radio, television), at all stages of the procedure, and in particular in order to constitute the group, even before the action is found admissible and the enterprise is found liable, while French law strictly regulates such canvassing.

US courts may order punitive damages (the notorious "treble damages"), while French law only allows the strict indemnification of the loss. The principle of mere indemnification makes it possible to focus the group action on its sole legitimate objective, i.e. the indemnification of the aggrieved consumer and not the enrichment of the intermediaries, which are often the only winners in a punitive damages system.

The US allows for a broad scope of class actions, by including in particular collective medical losses (tobacco), environmental matters, labor discrimination and human rights violations. Its

France recently, the Coulon report proposed limiting group actions to the sole tangible damages sustained by consumers.

As regards evidence rules, the US largely relies on the highly intrusive discovery[1] system, while French law does not provide for any equivalent procedure.

In brief, as regards group actions, it is quite unrealistic to consider that, in the near future, the French system will resemble the system currently observed in the United States.

---

This refers to a procedure called the pre-trial investigation phase. Under this system, each party is required to submit all evidence relevant to the dispute and available to it (facts, deeds, documents, etc.) including any evidence detrimental to the submitting party.

Je, soussignée, Karen RENEL, Traductrice Expert près la Cour d'Appel d'Amiens certifie que la traduction qui précède, subtilisée de la langue anglaise, libellé en langue détrimentale, visé ne varietur sous le n° 18989
Fait à Paris, le 27/06/08
(signature exempte de légalisation Décret n° 53914 Art. 8 du 26.9.1953).

# Exhibit [34]

EC Commission, Staff Working Document, Accompanying document to the White Paper on Damages actions for breach of the EC antitrust rules, 2.4.2008, SEC(2008) 404 (extract)

instance, one could envisage a partial shift of the burden so that the claimant would "only" have to show that there was an infringement of competition rules that may have caused damage to him whilst the defendant would have to demonstrate that his breach of the law did not cause a harm to the claimant. However, such shift would not address the difficulties victims have in obtaining information or evidence necessary to (even roughly) describe and prove the infringement. Even where victims can rely on the finding of an infringement in the decision of a competition authority, the reversal of the burden is of no real help with respect to the quantification of damages, because without access to the relevant information on how e.g. a price-fixing agreement was implemented in the specific case of the claimants, they and courts will often be unable to even roughly estimate a quantum of damage that then has to be rebutted by the defendant. Moreover, generally shifting the burden of proof would produce undesirable results because it would encourage unmeritorious claims as much as meritorious claims. This sets the wrong incentives and would entail the risks of incorrect judgments and procedural abuses referred to above.

3. *The proposed solution: a minimum level of disclosure based on fact pleading, combined with judicial control of relevance and proportionality*

93. Whilst it is essential to improve in antitrust damages cases access to evidence held by the opponent or third persons, the negative effects of certain systems of disclosure must be avoided. In some (non-European) jurisdictions, opponents or third persons are obliged to cooperate in potentially very wide-ranging, time-consuming and expensive disclosure procedures on the basis of rather low thresholds. In such systems, parties can be required to spend large amounts of time and resources on screening, compiling and disclosing the requested documents, even where there is only a low probability that the case is meritorious. This creates risks of abuses, e.g. through what is called "discovery blackmail" where the threat of potentially immense costs of disclosure procedures may be used to drive defendants to agree on an early settlement even where the claimant has a rather weak or even fully unmeritorious case. The same can occur in reverse, namely the situation where defendants with "deep pockets" use the threat of costly disclosure measures to cause the claimant to settle at a very low amount or even to abandon the case.

94. The Commission therefore proposes, to ensure across the EU a minimum level of disclosure *inter partes* in antitrust damages cases that avoids excesses in both directions, i.e. on the one hand, overly broad and costly disclosure obligations that are prone to abuses and, on the other hand, high obstacles to revealing the truth just because the relevant evidence happens to be under the control of the defendant or a third person. Claimants suing for antitrust damages should, plausibility of their claim provided, have the realistic possibility to obtain evidence that is indispensable for proving the case.

95. To this end, the Commission suggests to build on the approach adopted in the IP Directive and to follow the legal tradition of the majority of Member States. The accordingly proposed minimum standard for disclosure in antitrust damages cases is described in more detail below. It relies on the central function of the court seised with the damages claim. Disclosure measures could only be ordered by judges and

---

drawing of adverse inferences as a sanction for obstructive behaviour of a party as discussed in paragraph 130 below.

would be subject to strict and active judicial control as to their necessity, scope and proportionality. The Commission thus clearly does not propose a system of overly broad pre-trial disclosure, which may not fit easily with the legal tradition and principles of civil procedure of Member States and which may conflict with public policy principles of some Member States.

96. Member States which currently apply very strict requirements in terms of specification of facts and means of evidence would have to allow for an initial alleviation of these strict requirements in antitrust damages cases. The general standard of proof for ultimately winning a case would, however, remain unaffected. Moreover, any disclosure order would presuppose that the claimant has presented reasonably available facts and evidence that are sufficient to make his claim a plausible one. The Commission considers that such a fact-pleading requirement can have useful functions in safeguarding against unmeritorious claims and in structuring and streamlining civil procedures.

97. For reasons of equality of arms, this minimum level of disclosure in antitrust damages cases should be available not only to support claims of claimants but also defences by defendants (where in the following sections reference is made to "the claimant", the same shall apply *mutatis mutandis* to defendants).

4. *Conditions for obtaining a disclosure order by the court and its scope*

98. The civil procedure systems of Member States should allow, as a minimum level of disclosure in antitrust damages cases, targeted disclosure measures under the condition that (a) the claimant has asserted all the facts and offered all those means of evidence that are reasonably available to him, provided that these are sufficient to make his claim a plausible one; (b) he has shown to the satisfaction of the court that he is unable, applying all efforts that can reasonably be expected, to assert the specific facts or to produce the means of evidence for which disclosure is envisaged; (c) he has specified sufficiently precise categories of information or means of evidence to be disclosed, and (d) the court is satisfied that the envisaged disclosure measure is relevant to the case as well as necessary and proportional in scope.

99. Disclosure would be ordered upon application by a party, or upon the court's own motion where necessary, and would be tailored by the court to fit the facts pleaded by the parties and the particular circumstances of the case.

a. **Fact pleading: presentation of reasonably available facts and evidence sufficient to make out a plausible claim**

100. The first condition for any disclosure measure under the system of access to evidence proposed in the White Paper would be reasonable fact pleading by the claimant to the extent possible in the individual case. The facts presented must be sufficient to make out a plausible claim. As regards more specifically the last aspect, a claimant for antitrust damages would have to assert, as a condition for any disclosure, sufficient facts to show that there are plausible grounds to suspect that he suffered some harm through the infringement of competition rules by the defendant.

101. The purpose of requiring from the claimant a minimum level of fact pleading, and be it through rather general factual allegations (and where required reference to less precisely identified evidence), is to provide the court with a basis (i) to filter out

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**CERTIFICATE OF SERVICE**

I, W. Harding Drane, Jr., hereby certify that on July 3, 2008 the attached document was hand delivered to the following persons and was electronically filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following and the document is available for viewing and downloading from CM/ECF:

| | |
|---|---|
| Jesse A. Finkelstein | James L. Holzman |
| Frederick L. Cottrell, III | J. Clayton Athey |
| Chad M. Shandler | Prickett, Jones & Elliott, P.A. |
| Steven J. Fineman | 1310 King Street |
| Richards, Layton & Finger | P.O. Box 1328 |
| One Rodney Square | Wilmington, DE 19899 |
| 920 North King Street | |
| Wilmington, DE 19801 | |

I hereby certify that on July 3, 2008, I have Electronically Mailed the documents to the following non-registered participants:

| | |
|---|---|
| Charles P. Diamond | Mark A. Samuels |
| Linda J. Smith | O'Melveny & Myers LLP |
| O'Melveny & Myers LLP | 400 South Hope Street |
| 1999 Avenue of the Stars, 7th Floor | Los Angeles, CA 90071 |
| Los Angeles, CA 90067 | msamuels@omm.com |
| cdiamond@omm.com | |
| lsmith@omm.com | |
| | |
| Salem M. Katsh | Michael D. Hausfeld |
| Laurin B. Grollman | Daniel A. Small |
| Kasowitz, Benson, Torres & Friedman LLP | Brent W. Landau |
| 1633 Broadway, 22nd Floor | Cohen, Milstein, Hausfeld & Toll, P.L.L.C. |
| New York, New York 10019 | 1100 New York Avenue, N.W. |
| skatsh@kasowitz.com | Suite 500, West Tower |
| lgrollman@kasowitz.com | Washington, D.C. 20005 |
| | mhausfeld@cmht.com |
| | dsmall@cmht.com |
| | blandau@cmht.com |

Thomas P. Dove
Alex C. Turan
The Furth Firm LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
tdove@furth.com
aturan@furth.com

Guido Saveri
R. Alexander Saveri
Saveri & Saveri, Inc.
111 Pine Street, Suite 1700
San Francisco, CA 94111
guido@saveri.com
rick@saveri.com

Steve W. Berman
Anthony D. Shapiro
Hagens Berman Sobol Shapiro, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
steve@hbsslaw.com
tony@hbsslaw.com

Michael P. Lehman
Cohen, Milstein, Hausfeld & Toll , P.L.L.C.
One Embarcadero Center, Suite 526
San Francisco, CA 94111
mlehmann@cmht.com

By:   */s/ W. Harding Drane, Jr*
Richard L. Horwitz (#2246)
W. Harding Drane, Jr. (#1023)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
wdrane@potteranderson.com
*Attorneys for Defendants*
*Intel Corporation and Intel Kabushiki Kasiha*

Dated: July 3, 2008

738395 / 29282