**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE<br>INTEL CORPORATION<br>MICROPROCESSOR ANTITRUST<br>LITIGATION | ) ) ) ) | MDL No. 05-1717-JJF |
| ADVANCED MICRO DEVICES, INC., a<br>Delaware corporation, and AMD<br>INTERNATIONAL SALES & SERVICES, LTD.,<br>a Delaware corporation, | ) ) ) ) | **REDACTED VERSION 8/8/08** |
| Plaintiffs, | ) ) | C.A. No. 05-441-JJF |
| v. | ) ) | |
| INTEL CORPORATION, a Delaware corporation,<br>and INTEL KABUSHIKI KAISHA, a Japanese<br>corporation, | ) ) ) ) | |
| Defendants. | ) ) | |
| PHIL PAUL, on behalf of himself<br>and all others similarly situated, | ) ) ) | C.A. No. 05-485-JJF |
| Plaintiffs, | ) ) | CONSOLIDATED ACTION |
| v. | ) ) | |
| INTEL CORPORATION, | ) ) ) | |
| Defendants. | ) ) | |

**SECOND DECLARATION OF JOHN F. ASHLEY**
**WITH EXHIBITS 1-5**
**REDACTED VERSION AUGUST 8, 2008**

OF COUNSEL:

Robert E. Cooper
Daniel S. Floyd
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 900071
(213) 229-7000


Joseph Kattan, PC

GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave., N.W.
Washington, D.C. 20036-5306

Darren B. Bernhard
HOWREY LLP
1229 Pennsylvania Avenue
N.W. Washington, DC 20004
(202) 783-0800

James Hunt
Donn P. Pickett
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, CA 94111
(415) 393-2000

Joel W. Nomkin
Anthony L. Marks
PERKINS COIE BROWN & BAIN P.A.
2901 North Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
(602) 351-8000


Dated: August 8, 2008

877679/ 29282

cc: James L. Holzman, Esquire (By electronic mail)
    Frederick L. Cottrell, II, Esquire (By electronic mail)
    J. Clayton Athey, Esquire (By electronic mail)

Richard L. Horwitz (#2246)
W. Harding Drane, Jr. (#1023)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
wdrane@potteranderson.com

*Attorneys for Defendant*
*Intel Corporation and Intel Kabushiki Kaisha*

## SECOND DECLARATION OF JOHN F. ASHLEY

I, John F. Ashley, declare and state as follows:

1.      I have reviewed the Declaration of Jeffrey J. Fowler and its accompanying exhibits (the "Fowler Declaration"). The Fowler Declaration questions certain parts of my July 1, 2008 Declaration. It also reveals new information about AMD's document retention problems. I address Mr. Fowler's comments regarding my July 1, 2008 Declaration and assess the newly-revealed information in this Declaration. I have personal knowledge of the facts stated in this Declaration and am able to testify to everything contained within it under oath.

2.      Nothing in the Fowler Declaration changes my opinion that there are anomalies in AMD's document retention and production in this matter that fully merit further investigation, and that additional information in the form of source documents and sworn testimony from knowledgeable witnesses is necessary to fairly consider and analyze those anomalies.

3.      I note that Mr. Fowler describes himself as an attorney representing AMD and that he makes no reference to prior experience as either a computer forensics expert or electronic discovery expert. Nevertheless, he makes representations regarding forensic analysis and disputes certain of my technical assertions. Mr. Fowler states AMD has retained an e-discovery vendor, Forensic Consulting Solutions ("FCS") whose principal has previously submitted a declaration in this matter. It is unclear why AMD chose to use counsel rather than an experienced electronic discovery professional to respond to my July 1, 2008 declaration. Mr. Fowler's representations (1) suggest insufficient technical expertise and/or (2) fail to adequately disclose whether Mr. Fowler performed any analysis to support his assertions.

4.      The Fowler Declaration does provide some information that enhances my understanding of AMD's retention practices, but, unfortunately, Mr. Fowler does not

satisfactorily address any of the issues in my July 1, 2008 Declaration.  Moreover, some of the facts AMD only now discloses relate to lapses that occurred years ago.  These new disclosures cast doubt on AMD's prior representation that it had conducted a "thorough", "custodian by custodian" review of any retention lapses.  [Ex. 1 at 1]  As discussed below, the Fowler Declaration raises the following new issues, among others:

- Although AMD decided to change dumpster settings and recover email from the dumpster for a small number of custodians, it did not take the same steps for all custodians;

- Not all of Mr. ██████ available email was restored from the dumpster;

- AMD decided to suppress production from the Lost Files folders for custodians whose machines were forensically imaged (even though relevant documents were produced from Lost Files folders for four custodians); and

- AMD custodians were able to delete items from the Enterprise Vault.

Because it raises important new questions, the Fowler Declaration confirms my opinion that documents and testimony from knowledgeable witnesses must be provided by AMD if Intel and the Court are to achieve a fair understanding of AMD's retention and production program.

### Backup Tape Retention (Fowler Declaration ¶¶ 5-6)

5.    Mr. Fowler states (at ¶ 5) that AMD indefinitely suspended its backup tape recycling procedures and has retained 30-day backups of relevant email and file servers.  It is unclear why AMD chose to only retain 30-day backups and how they determined which servers were relevant.  Notably, the Fowler Declaration fails to address the issue (raised at ¶ 31 of my July 1, 2008 Declaration) about the discrepancy between retaining 30-day backups but purging dumpster items on a seven-day schedule, and the resulting risk of data loss.

6.    Mr. Fowler refers (at ¶ 6) to the attorney-drafted summary "AMD's Backup Tape Retention Protocols." Beyond being attorney-drafted, that document, however, only relates to what was done in connection with the litigation hold and does not describe AMD's normal archive/backup routines. I cannot assess the appropriateness of AMD's backup tape retention without further information about the standard configurations of AMD's server and backup systems.

7.    Mr. Fowler (at ¶ 5) also misdescribes AMD's backup tape retention instructions, describing those instructions as requiring IT personnel "to retain the oldest full backup" of relevant servers, implying that IT personnel were to search for backups from prior years. In fact,

████████████████████████████████████████████████████████

████████████████████████████" [Ex. 2]

**Litigation Hold Notices (Fowler Declaration ¶¶ 7, 19, 34)**

8.    Mr. Fowler says (at ¶ 7) that the████████████████████████████ accompanying the AMD hold notices "further define[s] a hold recipient's obligations." He later says (at ¶ 34), however, that the instructions in the FAQ were "not mandatory" and (at ¶ 19) that non-compliance with those instructions "is not evidence of a failure to comply with preservation protocols." Sworn testimony from informed witnesses is necessary to determine whether these contradictions are merely an attempt at after-the-fact justification for non-compliance, or whether in fact AMD's custodians as a whole were not required or expected to comply with the specific instructions in their hold notices.

9.    Mr. Fowler does not address the apparently contradictory nature of instructions contained within AMD's hold notices (which I noted at ¶¶ 33-34 of my July 1, 2008 Declaration), in particular the instructions regarding ███████████████████████ ████████████ Moreover, he states (at ¶ 7) that AMD's hold notices "did not materially

- 5 -

change over time" although he later (at ¶ 34) concedes that the instruction ████████████ ██████████████████ was removed from later versions of the FAQ.

### Enterprise Vault/Journal Issues (Fowler Declaration ¶¶ 9-14, 38-42)

10.    Mr. Fowler discloses (at ¶ 11) that AMD custodians are able to delete email from the Enterprise Vault in some circumstances. I am unaware of any prior disclosure of this fact by AMD. Moreover, Mr. Fowler does not provide any information identifying the circumstances under which custodians are able to delete email from the Enterprise Vault. To assess whether this constitutes a risk of data loss, I would need additional information about AMD's practices with regard to the Enterprise Vault.

11.    Mr. Fowler's description of AMD's Enterprise Vault Migration process (at ¶ 38) is inconsistent with the ████████████████████████████████ ███████████████████████    Although Mr. Fowler says that IT personnel were primarily responsible for migrating custodian emails, the written instructions and custodian correspondence in reaction to them ███████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ [Ex. 3]

12.    Mr. Fowler's confirmation (at ¶ 39) (of my observation at ¶ 42 of my July 1, 2008 Declaration) that deleted items were not automatically migrated to the vault is even more troubling in light of his representation (at ¶ 19) that it was "routine" for certain AMD custodians to "preserve" relevant email in their Deleted Items folder, an explanation that, in my 19 years of experience, I have never previously encountered.

13.    AMD's process for migrating deleted items to the Enterprise Vault (described by Mr. Fowler at ¶ 39) appears to have relied on happenstance. He states that "if the AMD IT representative *noticed* a large Deleted Items folder" the IT representative would contact the

custodian and ask whether the folder should be migrated. (Emphasis added). Moreover, there is no indication that AMD ever defined for its IT personnel what constituted a "large" Deleted Items folder. Finally, Mr. Fowler does not provide a rationale for believing that relevant items could not reside in a small Deleted Items folder.

14.    Mr. Fowler's discussion (at ¶ 40) about how the Enterprise Vault creates "migration failure" folders does not respond to my inquiry (at ¶ 39 of my July 1, 2008 Declaration) about whether AMD had a process for confirming that PST migrations were successful. Mr. Fowler's admission (at ¶ 42) that AMD in fact instructed custodians to delete their PST files is worrisome if no audit process existed. Additional information from AMD is necessary to evaluate this aspect of AMD's retention process.

15.    Although AMD's vendor was unable to locate them (see Fowler Decl. ¶ 41), documents produced for AMD custodian ████████ do in fact contain a "Migration Failed Items" folder. However it appears that AMD mistakenly produced documents for another AMD custodian ████████ under Mr. ████████ name.

**Deleted Files (Fowler Declaration ¶¶ 19-26, 30-33)**

16.    Contrary to Mr. Fowler's suggestion (at ¶ 19), I am well aware of the distinction between items stored in a Deleted Items folder and items that have been subject to attempted permanent deletion. I made distinct criticisms based on the distinct types of "deleted" items.

**Custodians' Deletion of Email to the Deleted Items Folder**

17.    First, I noted (at ¶¶ 14-15, 18-21 of my July 1, 2008 Declaration) that (1) an unusually high percentage of items from the "Deleted Items" folder were produced from a small number of AMD custodians, (2) that the custodians involved were high-ranking AMD officials, and (3) that the majority of emails produced for those custodians came from their deleted items files. I did not indicate, as Mr. Fowler suggests (at ¶ 19), that these emails were "irretrievably

deleted." Rather, as I explained (at ¶ 20), I viewed this as an indication that "some of AMD's most senior executives failed to comply with the retention instructions they had received." Nothing in the Fowler Declaration changes my view on that point.

18.    Mr. Fowler states (at ¶ 19) that AMD custodians could delete relevant emails without violating their retention obligations under the AMD hold notice. He describes the process of deleting relevant items, after receipt of a hold notice instructing custodians to preserve such items in a defined manner, as "routine" among certain custodians and "not evidence of a failure to comply with preservation protocols." In my opinion, and based on my experience, it is questionable whether such behavior should be viewed as compliance with retention obligations. I find Mr. Fowler's attempt to define this behavior as "compliance" rather than admit that it constituted non-compliance by AMD's senior executives disingenuous.    At a minimum, testimony concerning the creation, implementation, and monitoring of the hold notices, as well as the understandings and practices of hold notice recipients, is necessary to confirm whether AMD and its custodians shared Mr. Fowler's understanding that deleting relevant emails was consistent with their retention obligations.

### AMD's Use of EnCase and the Creation of Lost Files Folders

19.    Second, I noted (at ¶¶ 22-24 of my July 1, 2008 Declaration) that for specific AMD officials (including high-ranking officials like ████████████████ there were PST files that appeared to have been deleted from the custodian's hard drive and recovered using the EnCase forensic software utility.

20.    Mr. Fowler (at ¶¶ 30-33) has provided information about the processing of the PST files from these custodians' hard drives and he attempts to explain the presence of Lost Files in the path notation among their email. Although testimony from a knowledgeable witness is necessary to reach any final conclusions, Mr. Fowler's explanation fails to address basic issues.

- 8 -

21.    Mr. Fowler states (at ¶ 32) that AMD imaged "certain custodians' hard drives" using EnCase. He does not identify the custodians. He states that the presence of Lost Files folders resulted from the restoration of encrypted EnCase hard drive images to new hard drives, decryption of those hard drives, imaging of the new decrypted drives, and opening of the new image using a different version of EnCase. This description is inconsistent with my understanding of how EnCase works and with the information about the creation of Lost Files found on the website of Guidance Software (maker of EnCase):

> "What is the Lost Files folder?
> EnCase has a different method for recovering deleted files
> and folders with NTFS evidence files. When you add an
> NTFS Evidence file to EnCase, you will notice a folder
> added automatically to the evidence file in the case view
> called "Lost Files". In the MFT (Master File Table) in
> NTFS, all files and folders are marked as a folder or file,
> and they are marked as belonging to a "parent". So say you
> have a folder with bunch of files within [sic] it. Those files
> are its "children". For those files to become "lost", let us
> pretend the users [sic] deletes those files and then deletes
> the folder itself. The user then creates a new folder. The
> entry in the MFT for the 'old' folder is overwritten. So it,
> the original "parent" folder, and its entry in the MFT, are
> gone. But it's "Children", while deleted, have not been
> overwritten and their entries are still in the MFT. EnCase
> can then tell what those files are, but there is no longer any
> record of what folder those files were in. So all those files
> (without parent folders anymore) are lumped into the "Lost
> Files" folder that EnCase creates and puts in the case view
> so that you, the forensic investigator, can see those files.
> There is no way the user of a machine can see those deleted
> files without using EnCase."

[Ex. 4]

22.    Further, Mr. Fowler's inability (at ¶ 32) to determine why EnCase generated Lost Files notations demonstrates a failure of the purported "forensically sound" process and has been

added to the growing list of items that suggests systemic issues with the process AMD has employed.

23.     Moreover, according to Mr. Fowler (at ¶ 33), AMD attempted to suppress Lost Files and exclude them from production.   Nevertheless, relevant files existed in and were inadvertently produced from Lost Files folders for two custodians due to AMD's failure to follow its own processing specifications.  This fact (1) rebuts Mr. Fowler's assumption that the relevant files from any Lost Files folder were neither user-generated nor user-deleted, and (2) calls into question AMD's decision to suppress Lost Files for the overwhelming majority of its custodians.   Moreover, Mr. Fowler's inability to explain how Lost Files originated in the encrypted EnCase files (at ¶ 32) demonstrates Intel's need to ask questions of a more knowledgeable witness.

### Dumpster Modification and Recovery

24.     Mr. Fowler now discloses (for the first time) (at ¶¶ 22-26) that AMD changed its retention procedures and attempted to recover dumpster items for only a select few custodians. As Mr. Fowler acknowledges (in response to my July 1, 2008 Declaration), email items remain in AMD's dumpster for only seven days before being automatically and permanently deleted. Mr. Fowler (at ¶ 24) states that (apparently based on the known risk of automatic deletion of relevant materials) ▮▮▮▮▮▮▮ "decided to change certain custodians' dumpster settings so that the Exchange server would preserve any emails in the dumpster for approximately one year." According to Mr. Fowler, "Mr. ▮▮▮▮ recalls changing the settings for ▮▮▮▮▮▮ and ▮▮▮ ▮▮▮▮"

25.     This new disclosure raises a number of important questions.  First, it will be important to learn *when* Mr. ▮▮▮▮ changed the dumpster settings.  Obviously, any emails in the dumpster more than seven days before the settings were changed have been permanently and

irretrievably deleted. If, for example, the dumpster settings for Mr. █████s email were not changed until May 2005, significant relevant data may have been lost after AMD was aware of its retention obligations (no later than March 11, 2005). Second, it is important to know *whose* dumpster settings Mr. █████changed. It is not clear to me whether Mr. Fowler is stating that Mr. █████only changed the settings for Messrs. █████and█████ or whether there are others. The fact that Mr. █████changed the settings for *any* custodian indicates that he recognized a risk of data loss. Sworn testimony would be needed to understand why he limited application of this preventative measure (perhaps to only two custodians).

26.     In addition to changing dumpster settings, Mr. Fowler also explains (at ¶¶ 25-26) that Mr. █████took steps to recover dumpster items for six custodians, but not for any others. Again, this new disclosure raises important questions that should be answered by someone who has independent knowledge of the facts:

27.     First, were any relevant email found in these custodians' dumpsters, and if so, what volume and which custodian(s)?

28.     Second, if relevant email were found in the dumpster, how does AMD explain that fact consistent with its custodians' retention obligations?

29.     Third, why did Mr. █████only recover items for six custodians, and how did he select these particular custodians? Mr. Fowler suggests that completing the recovery process would have delayed implementation of the Journal and Vault. In my opinion, recovering and preserving relevant email should have taken priority. I know of no technical reason that recovery of dumpster items would have implementation of the journaling system, and Mr. Fowler does not identify one. Also, Mr. Fowler does not explain why Mr. █████s dumpster-recovery efforts ended November 1, 2005 even though many custodians were not journaled for many months after that date. Nor does Mr. Fowler (who at ¶ 2) describes his principal responsibilities

- 11 -

in this case to be AMD's preservation and collection protocols) explain whether Mr. ████s

actions were known to or approved by him or by others who bore responsibility for AMD's

retention obligations.

30.     Fourth, did the discrepancy between the seven-day auto-delete period for

dumpster items and AMD's thirty-day backup tape protocol result in loss of relevant email? Mr.

Fowler ignores this significant issue raised in my initial Declaration (at ¶ 31). It has implications

for other representations he does make, however. For example, the only email in the dumpster

for Messrs. ████ ████, ████ and ████(whose dumpsters Mr. Fowler says (at ¶

26) Mr. ████recovered over the weekend of October 29-30) would be email that had been in

the dumpster seven days or less. No dumpster items from the period prior to October 22, 2005

would be recoverable through the process Mr. ████undertook. Again, if relevant items were

recovered for these custodians from the seven day period prior to October 29 or 30, 2005, it

seems likely that relevant items were also in their dumpsters at various times during much-longer

period between March 11, 2005 and October 22, 2005 but Mr. ████s dumpster-recovery

process would not capture any such email. In all reasonable probability, dumpster items for

AMD custodians still reside on 30 day backup tapes (i.e., those from the seven-day period prior

to the creation of each tape), but AMD has not as yet attempted to recover or produce them.

Such recovery however would fail to capture dumpster emails outside of that seven-day window

each month.

31.     Moreover, Mr. Fowler acknowledges (at ¶ 25) the previously-undisclosed fact that

Mr. ████'s dumpster-recovery process failed to capture Mr. ████s dumpster items for the

period between October 9, 2005 and November 2, 2005. AMD also acknowledges (at footnote 2

of its brief) that it will be necessary for AMD to attempt to recover data for this period from

backup tapes. AMD does not offer to take the same step for any other custodians. It will be

necessary to follow up on AMD's remedial efforts to recover data from the backup tapes for Mr. ████ and Ms. ████████.

32.    In addition, the pattern of production of Mr. ████ s sent email depicted in Exhibit 6 to my July 1, 2008 Declaration rebuts Mr. Fowler's statement (at ¶ 24) that Mr. ████████ successfully "guard[ed] against the possibility that [Mr. ████ s] email would be lost." Specifically, for the months May through October 2005, the number of email produced for Mr. ████ is small and decreases to nearly zero, despite the fact that Mr. ████ sent hundreds of relevant emails during this period. Comparing that pattern to the post-journaling period and to the email sent by Mr. ████ and produced from other custodians reveals an inconsistency that is not explained by the Fowler Declaration. [Ex. 5]

33.    Finally, given Mr. Fowler's criticisms of my July 1, 2008 Declaration and apparent questioning of my knowledge or methodology, I believe it is appropriate to note that AMD only discovered these issues and made these new disclosures as a result of my initial inquiries. That fact confirms my conclusion that additional information in the form of sworn testimony from informed and knowledgeable witnesses and receipt of source documents will be necessary to fairly assess AMD's retention processes. It also calls into question the adequacy of AMD's investigation of its retention efforts to date despite its repeated previous statements that it has thoroughly investigated its efforts.

**AMD Custodians** ████████ **and** ████████ **(Fowler Declaration ¶¶ 28-29)**

34.    Although AMD previously represented (in their initial brief at 3) that ████████ "saved relevant items," in his Declaration Mr. Fowler does not represent that Mr. ████ saved all relevant items. Moreover, his statement (at ¶ 28) that Mr. ████ placed his name "in the 'cc' field of the email" he sent is not consistent with my analysis. I note that AMD has not yet produced any email harvested from Mr. ████ and a complete analysis is thus not yet possible.

But my research to date shows that, of the emails produced from other custodians that were sent by Mr. ▮ less than half include Mr. ▮ on the "cc" line.

35.    Mr. Fowler also asserts (at ¶ 28) that Mr. ▮ is the only "known" AMD employee "of the 164 designated AMD custodians" who configured their mailbox to use auto-delete "this way." The value of this representation depends on the adequacy of the investigation (if any) AMD has undertaken to discover whether other custodians similarly configured their mailboxes. I also note that despite the fact that AMD's reply quotes a number of statistics about Intel's non-production custodians, Mr. Fowler limits his representation to AMD's production custodians, excluding all information about non-production custodians, and also limits his representation to use of auto-delete on "sent" items. Conspicuously, Mr. Fowler does not represent that no other AMD custodians used auto-delete. These limitations indicate a need to obtain additional information from AMD to determine whether Mr. ▮ is the only AMD custodian who enabled auto-delete. In particular, the fact that many AMD custodians had zero items produced from their Deleted Items folder—especially given Mr. Fowler's representation that storing relevant items in a Deleted Items folder was permissible under AMD's retention protocols—may indicate that they had configured Outlook to automatically purge their Deleted Items folder periodically.

36.    Mr. Fowler (at ¶ 29) confirms that no preservation steps were taken for Mr. ▮ for nearly a year after AMD was aware of its retention obligations. Moreover, the fact that AMD does not know the date (apparently even an estimated date) that Mr. ▮s laptop was stolen suggests that its investigation of the extent of his data loss may be incomplete.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 7, 2008

Date: August 7, 2008

John F. Ashley

# EXHIBIT 1

O

## O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | 400 South Hope Street | NEW YORK |
| BRUSSELS | Los Angeles, California 90071-2899 | SAN FRANCISCO |
| CENTURY CITY | | SHANGHAI |
| HONG KONG | TELEPHONE (213) 430-6000 | SILICON VALLEY |
| LONDON | FACSIMILE (213) 430-6407 | TOKYO |
| NEWPORT BEACH | www.omm.com | WASHINGTON, D.C. |

April 23, 2007

OUR FILE NUMBER
008346-163

**VIA E-MAIL & U.S. MAIL**

WRITER'S DIRECT DIAL
(213) 430-6230

Robert E. Cooper
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, California 90071

WRITER'S E-MAIL ADDRESS
dherron@omm.com

Re:     *AMD v. Intel: eDiscovery Issues*

Dear Bob:

This will respond to your April 11 letter.

Your letter begins by noting that, as a result of "some lapses that Intel has discovered" with respect to its document preservation efforts, Intel recently shared with AMD certain information about "the steps it designed to retain" documents relevant to this litigation. As your letter itself states, however, Intel has provided that information about its preservation program solely as part of the "court supervised accounting" of its document retention lapses. While acknowledging that you "do not mean to suggest" that AMD has experienced any similar lapses, your letter nevertheless proceeds to ask AMD to provide very detailed information similar to -- and in many instances far exceeding -- what Intel is providing as part of its Court-ordered accounting.

We question whether, in the absence of any evidence whatsoever of any systematic failure to preserve documents on AMD's part, Intel is entitled to conduct the searching inquiry your letter seems to contemplate. Indeed, the timing and scope of your letter might lead a cynic to conclude that Intel is trying to distract attention from its own evidence preservation lapses by attempting to "gin up" problems on AMD's side, while at the same time diverting AMD from the real task at hand -- analyzing and preparing a response to Intel's imminent disclosures and remediation plans. Nevertheless, because we agree that the "spirit" of the Amended Federal Rules supports transparency and disclosure, we will provide appropriate information concerning AMD's document preservation activities.

Your letter poses a series of detailed questions about numerous aspects of AMD's retention program. In order to respond appropriately, we have commenced a thorough follow-up review of AMD's preservation program to date, on a custodian by custodian basis, to ensure that

O'MELVENY & MYERS LLP
Robert E. Cooper, April 23, 2007 - Page 2

its preservation processes are working as previously described to you, and as intended. When our review is complete, we will provide an appropriate report to Intel, and we believe that that report will address many of the areas about which your letter inquires. For now, as we work to gather the type of detailed information necessary to our analysis, we wanted to respond to three of the questions (or, more accurately, series of questions) posed in your letter.

First, you asked whether AMD is aware of any loss of documents relevant to this litigation or any non-compliance with any instructions to retain documents. We can represent that AMD's overall preservation program appears to be working as intended and that, at this time, we are aware of no systemic failure in the execution of that preservation plan, much less a systemic destruction of evidence in any sense comparable to what Intel has disclosed to date. We are able to make this representation mainly because AMD's multi-layered preservation plan was designed to ensure that evidence would be preserved even if one aspect of the plan failed. Because of that multi-layered preservation plan, we do not expect to find any systemic data loss issues. However, should we learn of any such issues in the course of our review, we will so advise you in our follow-up letter.

Second, your letter poses a series of questions about AMD's "enterprise level" retention efforts, focusing on email retention and backup tapes. Because AMD, unlike Intel, did not employ a routine program of automatic email deletion, AMD does not face the same move-it-or-lose-it data loss issues currently facing Intel. In short, AMD's email communications were being systematically preserved at the same time Intel's were being systematically destroyed. AMD continues to make monthly backups of all Exchange Servers and to preserve those backup tapes as a fail-safe measure. Even those backup tapes are not the only fail-safe for deleted emails, however, because, beginning in November 2005, AMD activated an email journaling system that is used to ensure that even email deleted by a journaled custodian nevertheless would be preserved. AMD also obtained and implemented the use of the Enterprise Vault.

Third, your letter asks about AMD's document preservation or "hold" notices. As we have previously advised, beginning in April 2005, AMD began distributing preservation notices to employees it believed might possess documents relevant to contemplated litigation. In an abundance of caution, AMD instructed over 800 employees to preserve documents that relate to the x86 microprocessor business. AMD also directed suspension of its ordinary document retention and destruction policies to ensure that relevant evidence was not being systematically destroyed pursuant to a pre-existing policy.

As noted, we currently are undertaking a thorough review of AMD's preservation program. We will appreciate Intel's patience while we conduct this review. Although it took Intel nearly six months to investigate, analyze, disclose, and propose a fix for its massive data loss, we will endeavor to complete our review with significantly greater dispatch.

O'MELVENY & MYERS LLP
Robert E. Cooper, April 23, 2007 - Page 3

Please feel free to call if you have any questions.

Sincerely,

David L. Herron
of O'MELVENY & MYERS LLP

DLH:ad

LA2:829501.3

**EXHIBIT 2**
**(Redacted in its Entirety 8/8/08)**

**EXHIBIT 3**
**(Redacted in its Entirety 8/8/08)**

**EXHIBIT 4**

Corporate Security with EnCase Enterprise                    http://www.guidancesoftware.com/support/esolutions.aspx



> products and services ▶  > company ▶  > resources ▶  > contact support ▶  > support portal

| Technical Support | Download Center | eSolutions | Support Articles | Support Videos | Customer Service |

Home > **Support Home** > eSolutions

## eSolutions

What is the Lost Files folder?

EnCase has a different method for recovering deleted files and folders with NTFS evidence files. When you add an NTFS Evidence file to EnCase, you will notice a folder added automatically to the evidence file in the case view called "Lost Files". In the MFT (Master File Table) in NTFS, all files and folders are marked as a folder or file, and they are marked as belonging to a "parent". So say you have a folder with bunch of files within it. Those files are its "children". For those files to become "lost", let us pretend the users deletes those files and then deletes the folder itself. The user then creates a new folder. The entry in the MFT for the 'old' folder is overwritten. So it, the original "parent" folder, and its entry in the MFT, are gone. But it's "Children", while deleted, have not been overwritten and their entries are still in the MFT. EnCase can then tell what those files are, but there is no longer any record of what folder those files were in. So all those files (without parent folders anymore) are lumped into the "Lost Files" folder that EnCase creates and puts in the case view so that you, the forensic investigator, can see those files. There is no way the user of a machine can see those deleted files without using EnCase.

© 2002-2007 Guidance Software, Inc. All Rights Reserved.
**Privacy Statement** | **Historical Information** | **Contact Us** | **Careers** | **Mailing List** | **Resellers**

**EXHIBIT 5**
**(Redacted 8/8/08)**



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, W. Harding Drane, Jr., hereby certify that on August 8, 2008 the attached

document was hand delivered to the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

Jesse A. Finkelstein
Frederick L. Cottrell, III
Chad M. Shandler
Steven J. Fineman
Richards, Layton & Finger
One Rodney Square
920 North King Street
Wilmington, DE  19801

James L. Holzman
J. Clayton Athey
Prickett, Jones & Elliott, P.A.
1310 King Street
P.O. Box 1328
Wilmington, DE 19899

I hereby certify that on August 8, 2008, I have Electronically Mailed the

documents to the following non-registered participants:

Charles P. Diamond
Linda J. Smith
O'Melveny & Myers LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA  90067
cdiamond@omm.com
lsmith@omm.com

Mark A. Samuels
O'Melveny & Myers LLP
400 South Hope Street
Los Angeles, CA  90071
msamuels@omm.com

Salem M. Katsh
Laurin B. Grollman
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway, 22nd Floor
New York, New York 10019
skatsh@kasowitz.com
lgrollman@kasowitz.com

Michael D. Hausfeld
Daniel A. Small
Brent W. Landau
Cohen, Milstein, Hausfeld & Toll , P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C.  20005
mhausfeld@cmht.com
dsmall@cmht.com
blandau@cmht.com

Thomas P. Dove
Alex C. Turan
The Furth Firm LLP
225 Bush Street, 15th Floor
San Francisco, CA 94104
tdove@furth.com
aturan@furth.com

Guido Saveri
R. Alexander Saveri
Saveri & Saveri, Inc.
111 Pine Street, Suite 1700
San Francisco, CA 94111
guido@saveri.com
rick@saveri.com

Steve W. Berman
Anthony D. Shapiro
Hagens Berman Sobol Shapiro, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
steve@hbsslaw.com
tony@hbsslaw.com

Michael P. Lehman
Cohen, Milstein, Hausfeld & Toll , P.L.L.C.
One Embarcadero Center, Suite 526
San Francisco, CA  94111
mlehmann@cmht.com

By:    /s/ W. Harding Drane, Jr
       Richard L. Horwitz (#2246)
       W. Harding Drane, Jr. (#1023)
       POTTER ANDERSON & CORROON LLP
       Hercules Plaza, 6th Floor
       1313 N. Market Street
       P.O. Box 951
       Wilmington, DE 19899-0951
       (302) 984-6000
       rhorwitz@potteranderson.com
       wdrane@potteranderson.com
       *Attorneys for Defendants*
       *Intel Corporation and Intel Kabushiki Kasiha*

Dated: August 8, 2008

738395v2 / 29282

2