## UNITED STATES DISTRICT COURT

### DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE INTEL CORP. MICROPROCESSOR ANTITRUST LITIGATION, | MDL No. 05-1717-JJF |
| PHIL PAUL, on behalf of himself and all others similarly situated, | C.A. No. 05-485-JJF |
| Plaintiffs, | CONSOLIDATED ACTION |
| | **PUBLIC VERSION** |
| v. | |
| INTEL CORPORATION, | |
| Defendants. | |

## DEFENDANT INTEL CORPORATION'S RESPONSE TO CLASS PLAINTIFFS' PRELIMINARY TRIAL PLAN

OF COUNSEL:

David M. Balabanian
James L. Hunt
Donn P. Pickett
Frank M. Hinman
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, CA  94111-4067
(415) 393-2000

Richard L. Horwitz (#2246)
W. Harding Drane, Jr. (#1023)
POTTER, ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000

rhorwitz@potteranderson.com
wdrane@potteranderson.com

DATED:  January 11, 2010
PUBLIC VERSION:
January 15, 2010

Attorneys for Defendant
Intel Corporation

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................ 1

II.   PLAINTIFFS' TRIAL PLAN IS IN IRRECONCILABLE CONFLICT WITH
      THEIR CLASS MOTION ............................................................................ 7

      A.    Class Plaintiffs' Trial Plan Confirms They Are Contending That Intel's
            Discounts Were Anticompetitive, Thus Disproving Their Theory Of Class
            Certification ............................................................................................ 9

            1.    Plaintiffs' Claim That OEMs Could Not And Did Not Pass On
                  Lump-Sum Payments Contradicts One Of Their Primary Liability
                  Allegations .................................................................................. 13

            2.    A Review Of OEM-Specific Evidence Confirms That Lump-Sum
                  Payments Were Actually Competitive Discounts That Were Often
                  Passed On.................................................................................... 13
                                                                                     ........ 14
                                                                                     ........ 17
                                                                                     ........ 19
                                                                                     ........ 20
                                                                                     ........ 21

            3.    AMD's Expert Agreed Some "Lump Sum Payments" Were Passed
                  On.............................................................................................. 23

III.  PLAINTIFFS' TRIAL PLAN IGNORES, AND CONTRADICTS, THE
      ACTUAL EVIDENCE THAT WOULD BE PRESENTED AT TRIAL....................... 25

      A.    Class Plaintiffs' Trial Plan Confirms That They Cannot Prove That Intel's
            Alleged Acts Excluded AMD "Substantially Before The Class Period" ............ 25

      B.    Plaintiffs' Trial Plan Ignores Important Evidence Regarding AMD's
            Capabilities And Intentions That Undermine Their Proof Of Impact On
            All Class Members.................................................................................... 29

            1.    There Is No Scenario Under Which AMD Could Have Achieved
                  The Competitive Position Plaintiffs Project In The "But For"
                  World ......................................................................................... 30

            2.    If AMD Was More Successful, It Admits It Would Have Raised Its
                  Prices........................................................................................... 33

            3.    Intel Would Prove That Plaintiffs' "Four Competitor" Hypothesis
                  Is Nonsense And Does Not Fix the Problem ........................................ 35

      C.    Intel Would Offer Defensive Evidence At Trial That Pass-On Of An
            Alleged Overcharge Did Not Occur For Each Class Member............................. 35

TABLE OF CONTENTS
(continued)

Page

1.    Intel Would Show That OEMs And Retailers Engage In Strategic
      Behavior And Do Not Systematically Pass On Cost Changes ................ 36

2.    Intel's Defensive Evidence Related To Corporate Purchasers
      Would Be Different Than For Household Consumers ........................... 37

3.    Plaintiffs Cannot Offer Common, Or Any, Proof That Choice And
      Innovation Have Been Reduced............................................................ 38

IV.   CLASS PLAINTIFFS' DECISION TO PRESS CLAIMS UNDER A COMPLEX
      WEB OF VARIED AND CONFLICTING STATE LAWS REQUIRES THEM
      TO PROFFER DISPARATE EVIDENCE TO MEET THEIR BURDEN OF
      PROOF UNDER EACH STATUTE ...................................................................... 40

      A.    Plaintiffs' Trial Plan Does Not Explain How A Trial For The Proposed 26-
            State Subclass Would be Manageable; It Would Not ......................... 41

            1.    Plaintiffs Would Have To Introduce State Specific And Individual
                  Evidence To Address The Differences In The Relevant State Laws....... 41

            2.    The Court Would Be Required To Attempt To Fully Instruct The
                  Jury On Each Of The Relevant State Laws ............................. 49

      B.    Plaintiffs' Trial Plan Does Not Explain How The Trials For The Proposed
            26 Separate Statewide Subclasses Would be Manageable; It Also Would
            Not................................................................................................... 51

V.    CONCLUSION............................................................................................. 52

TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Atlantic Richfield Co. v. USA Petroleum Co.,*
  495 U.S. 328 (1990)....................................................................................................................25

*BMW of N. Am. Inc. v. Gore,*
  517 U.S. 559 (1996)....................................................................................................................44

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
  509 U.S. 209 (1993)....................................................................................................................25

*Cargill, Inc. v. Monfort of Colo., Inc.,*
  479 U.S. 104 (1986)....................................................................................................................24

*Carpenter v. BMW of N. Am., Inc.,*
  1999 WL 415390 (E.D. Pa. June 21, 1999) .......................................................................49, 50

*Dimidowich v. Bell & Howell,*
  803 F.2d 1473 (9th Cir. 1986) ................................................................................................42, 43

*Doll v. Chi. Title Ins. Co.,*
  246 F.R.D. 683 (D. Kan. 2007)....................................................................................................51

*Emergency One Inc. v. Waterous Co.,*
  23 F. Supp. 2d 959 (E.D. Wis. 1998)..........................................................................................48

*Harding v. Tambrands, Inc.,*
  165 F.R.D. 623 (D. Kan. 1996)....................................................................................................51

*In re Automotive Refinishing Paint Antitrust Litig.,*
  515 F. Supp. 2d 544 (E.D. Pa. 2007) ......................................................................................43, 47

*In re Chocolate Confectionary Antitrust Litig.,*
  602 F. Supp. 2d 538 (M.D. Pa. 2009)..............................................................................42, 45, 47

*In re Flash Memory Antitrust Litig.,*
  643 F. Supp. 2d 1133 (N.D. Cal. 2009) .......................................................................................45

*In re Graphics Processing Units Antitrust Litig.,*
  253 F.R.D. 478 (N.D. Cal. 2008)...............................................................................................5, 7

*In re Graphics Processing Units Antitrust Litig.,*
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) ...................................................................................45, 46

TABLE OF AUTHORITIES
(continued)

Page

*In re Hydrogen Peroxide Antitrust Litig.,*
    552 F.3d 305 (3d Cir. 2008)...................................................................................................8

*In re LifeUSA Holding, Inc.,*
    242 F.3d 136 (3d. Cir. 2001)................................................................................................51

*In re Paxil Litig.,*
    212 F.R.D. 539 (C.D. Cal. 2003)..........................................................................................42

*In re Prempro Prods. Liab. Litig.,*
    230 F.R.D. 555 (E.D. Ark. 2005)..........................................................................................42

*In re Relafen Antitrust Litig.,*
    221 F.R.D. 260 (D. Mass. 2004)...........................................................................................43

*In re Stucco Litig.,*
    175 F.R.D. 210 (E.D.N.C. 1997) ..........................................................................................47

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
    586 F. Supp. 2d 1109 (N.D. Cal. 2008) ..........................................................................42-43

*In re Wellbutrin XL Antirust Litig.,*
    2009 WL 2356864 (E.D. Pa. July 30, 2009) ........................................................................48

*In re Zyprexa Prods. Liab. Litig.,*
    253 F.R.D. 69 (E.D.N.Y. 2008)............................................................................................44

*Jenkins v. Hyundai Motor Financing Co.,*
    2008 WL 781862 (S.D. Ohio Mar. 24, 2008) ......................................................................51

*Kloth v. Microsoft Corp.,*
    444 F.3d 312 (4th Cir. 2006) ................................................................................................38

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
    523 U.S. 26 (1998)................................................................................................................40

*Lyon v. Caterpillar, Inc.,*
    194 F.R.D. 206 (E.D. Pa. 2000)...........................................................................................50

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)..............................................................................................................24

*Matter of Rhone-Poulenc Rorer, Inc.,*
    51 F.3d 1293 (7th Cir. 1995) ................................................................................................49

TABLE OF AUTHORITIES
(continued)

Page

*Pac. Bell Tel. Co. v. linkLine Communications, Inc.,*
  __ U.S. __, 129 S. Ct. 1109 (2009)..................................................................................25

*Schoenbaum v. E.I. DuPont De Nemours and Co.,*
  2009 WL 4782082 (E.D. Mo. Dec. 8, 2009) ...........................................................8

*Story Parchment Co. v. Paterson Parchment Paper Co.,*
  282 U.S. 555 (1931)..................................................................................................8

*Thompson v. Jiffy Lube Int'l., Inc.,*
  250 F.R.D. 607 (D. Kan. 2008)......................................................................43, 44, 49

*Thorogood v. Sears, Roebuck and Co.,*
  547 F.3d 742 (7th Cir. 2008) ........................................................................44, 49, 50

*Tylka v. Gerber Prods., Co.,*
  178 F.R.D. 493 (N.D. Ill. 1998).............................................................................50

*United Phosphorus, Ltd. v. Angus Chemical Co.,*
  131 F. Supp. 2d 1003 (N.D. Ill. 2001), *aff'd* 322 F.3d 942 (7th Cir. 2003) ...........................22

*Utility Consumers' Action Network v. Sprint Solutions,*
  259 F.R.D. 484 (S.D. Cal. 2009) ........................................................................48, 49, 51

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.,*
  549 U.S. 312 (2007)................................................................................................25

**STATE CASES**

*ERI Max Entm't, Inc v. Streisand,*
  690 A.2d 1351 (R.I. 1997)....................................................................................45-46

*Estate of Nunez-Polcano v. Boch Toyota, Inc.,*
  2006 WL 1709680 (Mass. Super. May 26, 2006)................................................................48

*State v. Daicel Chemical Indus.,*
  106 P.3d 428 (Idaho 2005).....................................................................................43

**FEDERAL STATUTES**

15 U.S.C. § 4.........................................................................................................8

28 U.S.C. 2072(b) .................................................................................................8

28 U.S.C. § 1404(a) ..............................................................................................40

TABLE OF AUTHORITIES
(continued)

Page

28 U.S.C. § 1407.................................................................................................................40

**STATE STATUTES**

Idaho Code § 48-603 (18) (2009) .....................................................................................46

Idaho Code § 48-603C(2)(c) (2009) .................................................................................46

Kan. Stat. Ann. § 50-642(b) (2009) ..............................................................................47-48

Massachusetts General Laws c. 93A, § 9 .........................................................................48

Me. Rev. Stat. Ann. titl 5, § 213(1) (2009) ......................................................................48

N.M. Stat. Ann. § 57-12-2 (E)(1)-(2) (2009) ...................................................................46

N.M. Stat. Ann. § 57-12-3 (2009)....................................................................................46

Nev. Rev. Stat. Ann. § 598.0977 (2009)...........................................................................48

R.I. Gen. Laws § 6-13.1-5.2(a) (2009) .............................................................................47

W. Va. Code §§ 46-A-6-102(2) (2009) ............................................................................48

**OTHER AUTHORITIES**

Barry Hawk & Laraine Laudati, *Antitrust Federalism in the United States and
    Decentralization of Competition Law Enforcement in The European Union: A
    Comparison*, 20 Fordham Int'l L.J. 18, 21 (Nov. 1996)...........................................43

Joel Cohen & Trisha Lawson, *Navigating Multistate Indirect Purchaser Lawsuits*, 15
    Antitrust 29, 31 (Summer 2001) ..............................................................................44

John C. Anderson, *Good "Brick" Walls Make Good Neighbors: Should A State Court
    Certify a Multistate or Nationwide Class of Indirect Purchasers?*, 70 Fordham L.
    Rev. 2019, 2047 (April 2002) ..................................................................................44

## I.    INTRODUCTION

The Court requested the parties' respective trial plans "[t]o assist the Court in its endeavor to ascertain whether the certification standards are met." February 18, 2009 Order Regarding Class Certification Briefing Schedule ("2/18/09 Order") (Docket Item ("D.I.") 1595), ¶ 1. Now that plaintiffs have laid their plan before the Court, it is clear, once and for all, that their class certification motion is inconsistent with both the evidence that would be presented at trial and their own liability theory. Plaintiffs' plan also vastly oversimplifies how an actual class trial would work. It ignores both the highly individualized proof, including Intel's defensive evidence, that plaintiffs' liability theory would necessarily entail, and the idiosyncratic proof and jury instructions required by their 35 state law causes of action.

As the Court knows, Intel has argued and, we submit, has shown in the class certification briefing, that the highly individualized nature of the proof required to resolve plaintiffs' claims, including impact on each class member, means that common issues do not predominate and no class-wide trial would be manageable or otherwise meet Rule 23's requirements. The discussion of that proof below as it relates to a potential trial illustrates Intel's point and is meant "[t]o assist the Court in its endeavor to ascertain whether the certification standards are met," 2/18/09 Order, ¶ 1; but, of course, it should not be read as a concession that such a trial would be appropriate, since none is required.[1]

The most critical, and indeed dispositive, flaw exposed by plaintiffs' Trial Plan is that the liability case they propose to prove would simultaneously disprove the theory of common impact

---

[1]    Intel does not (and at this time could not) attempt to list every piece of evidence it would offer at trial, but focuses on responding to plaintiffs' Trial Plan and the class certification issues it purports to address. See 2/18/09 Order, ¶ 1. In doing so, Intel focuses on the dispositive issue of the lack of common proof of impact. If there were a trial, Intel would, of course, demonstrate plaintiffs' failure of proof of any Intel liability under each of the statutes on which plaintiffs purport to base their claims.

upon which they must rely at the class certification stage. Plaintiffs cannot try this case as the class action they seek to certify, and cannot certify the case they propose to try.

The flaw derives from plaintiffs' theory of liability. Plaintiffs claim that some, but only some, of Intel's microprocessor discounts, rebates and allowances, unlawfully excluded AMD, thus causing class members to overpay for computers. Intel will, if necessary, prove at trial that its pricing practices were not only lawful, but the essence of competition and, thus, did not "exclude" AMD. As part of its customized negotiations with the OEMs – including some of the largest and most powerful buyers in the world – Intel offered targeted discounts to meet competition (and, yes, take business) from AMD and provided rebates or other funds to allow its OEM customers to compete with their competitors' AMD-based computers. Intel would prove, by factual evidence and expert opinion testimony, that its pricing conduct was, in each instance, procompetitive and fully compliant with all applicable laws, and, in particular, with Supreme Court precedent. Largely due to Intel's extraordinary efforts and R&D investments, the microprocessor industry has experienced more innovation, output expansion, and price declines over the past decade than any other, with consumers (i.e., class members) the clear beneficiaries.[2]

---

[2]    According to Bureau of Labor Statistics data, quality-adjusted microprocessor prices declined during the past decade faster than any of the 1,200 other products that the Bureau tracks, including any other high-technology product. Intel will also, if necessary, prove, among other things, that OEMs and consumers preferred its products because of their technological superiority, brand image and reputation, and other legitimate competitive advantages, which varied by segment and time; and that AMD's technological, strategic, and execution errors in various segments at various times caused any competitive disadvantages it experienced. Moreover, due to the competitive nature of the market, at times, AMD in fact experienced competitive success in some segments. Intel would also offer evidence to refute plaintiffs' allegations of monopoly power, exclusionary conduct, harm to competition or consumers, and collective or individual damages to the putative class.

Plaintiffs nevertheless claim Intel's efforts to meet competition through price concessions were sometimes anticompetitive, when they involved so-called "loyalty payments" rather than "discounts."[3] Plaintiffs and their expert theorize that "loyalty payments" unlawfully excluded AMD but were never passed on to class members, while "discounts" were lawful and were always passed on. This dichotomy is essential to plaintiffs' predominance argument. Under it, "loyalty payments" (being anticompetitive) go away in the "but for" world, while lawful "discounts" remain. Therefore, the theory goes, (a) because plaintiffs do not challenge "discounts," all class members would continue to benefit from them in the "but for" world, with the discounts being applied to lower starting prices. Conversely, (b) all class members were harmed by "loyalty payments" because they excluded AMD, and no class member benefited from them through lower computer prices because they were never passed through. Accordingly, under these assumptions, their absence in the "but for" world benefits all class members and harms none.

If (a) is false (plaintiffs *do* challenge some "discounts"), then class members who benefited from discounts plaintiffs challenge would, on plaintiffs' theory of pass through, lose that price reduction in the "but for" world, and thus potentially were not overcharged and have no claim. If (b) is false ("loyalty payments" *were* sometimes passed through), then class members who benefited from loyalty payments in the actual world would lose that price reduction in the "but for" world, and thus potentially were not overcharged and have no claim.

---

[3]     Plaintiffs and their expert, Professor Leffler, now divide Intel's microprocessor price concessions into legitimate "discounts" and anticompetitive "loyalty payments." By their hypothesis – and it is nothing more than that – the former would have existed in the "but for" world and the latter would not. Leffler opines that the former reduced the price of computers while the latter did not. *See* Intel's Sur-reply In Opposition To Plaintiffs' Motion For Class Certification ("Sur-reply") at part II.B. Intel disputes plaintiffs' characterization of any of its price concessions as anticompetitive "loyalty payments," but uses plaintiffs' terminology for argument's sake in this Response.

Plaintiffs and Leffler have proffered no model of common proof if either (a) or (b) is

false, because, in either case, there is no common method to identify which class members (if

any) were overcharged and which were not.[4] Instead, to answer that question, the parties would

be required to offer individualized proof with respect to each and every one of thousands of

Intel's price concessions, regardless of label.

Plaintiffs' Trial Plan, as well as Intel's evidence, proves *both* (a) and (b) false, and thus

exposes the unavoidable and fatal conflict between plaintiffs' theories of liability and class.  As

to (a), plaintiffs' Trial Plan confirms that they *are* challenging some Intel "discounts" as

anticompetitive.  As to (b), Intel will prove, if a trial proceeds, that many of plaintiffs' so-called

"loyalty" or lump-sum payments were actually passed on to class members in the form of lower

computer prices.  Indeed, the evidence cited in plaintiffs Trial Plan proves that very thing.

Plaintiffs' only response is that Leffler's "conceptual" approach to the issue, based on

supposed economic theory, can unerringly separate "discounts" from "loyalty payments."  But

even if plaintiffs' theory-based proof were somehow common to the class (and Leffler concedes

it is not), Intel's defensive proof would be highly individualized, at a customer and transaction

level.  This includes evidence – some of which plaintiffs cite in their own Trial Plan, while either

ignoring or misunderstanding its import – that OEMs had the discretion to, and often did, pass on

what plaintiffs characterize as "loyalty payments" in the form of lower computer prices.  *See*

Class Plaintiffs' Preliminary Trial Plan ("Tr. Pl.") (D.I. 2018) at 29-30, 33-34; Sur-reply at

---

[4]     For example, plaintiffs have proposed no model to identify with common proof (1) which
"loyalty payments" were passed on and to what extent; (2) whether OEMs' and retailers'
decisions to pass on some "loyalty payments" caused the prices of some computers in the actual
world to be lower than they would have been in the "but for" world; and (3) which class
members purchased computers whose prices were below the "but for" price due to the pass-on of
"loyalty payments."  There is no such model.  A similar problem arises if some "discounts" are
challenged and thus would not exist in the "but for" world.

part II.B.3.[5] Thus, whether the alleged activities impacted each and every class member can only

be demonstrated (if at all) through the consideration of a vast amount of individual, product-by-

product evidence concerning what each OEM did with every alleged loyalty payment over a long

period of time. Accordingly, class treatment is inappropriate on this basis alone. *See In re*

*Graphics Processing Units Antitrust Litig.* ("*GPU*"), 253 F.R.D. 478, 500 (N.D. Cal. 2008) (in

indirect purchaser cases, on class certification "the issue is impact").

   Plaintiffs face another, related conflict between their class certification motion and Trial

Plan relating to alleged below-cost pricing. Plaintiffs' Trial Plan conspicuously avoids taking

any position on whether Intel priced any PC microprocessor below cost. There is a reason for

that omission. If plaintiffs show that Intel priced any PC microprocessors below cost – although

it clearly did not – Leffler concedes consumers who purchased computers containing those

products were not overcharged because those prices would not have been any lower in the "but

for" world. Therefore, plaintiffs would not be able to establish impact on those class members,

or even identify who they are. Plaintiffs, therefore, instructed Leffler to assume that any of the

Intel below-cost pricing alleged in their Complaint was limited to server microprocessors, which

they have excluded from the class. But the Supreme Court has established a bright-line principle

that above cost price cutting can never violate the antitrust laws, regardless of the form it takes.

So plaintiffs cannot prevail on liability without showing that the alleged exclusion of AMD from

the PC market was the product of below-cost pricing. Thus, again, plaintiffs' liability and class

theories are hopelessly at odds.

---

[5]     It is also true, however, that "discounts" were *not* always passed on to consumers. In
both situations, Intel's evidence shows the pass-on decision at each level of distribution
depended on a variety of individualized strategic factors. Part III.C below. Plaintiffs' and
Leffler's "always/never" model is over-simplified and contrary to that evidence. Sur-reply at
part II.B.1.

Plaintiffs' Trial Plan also highlights several additional areas where the assumptions underlying their class certification motion conflict with the evidence they would seek to present at trial. First, plaintiffs' Trial Plan confirms they cannot prove Intel's alleged activities achieved the competitive foreclosure of AMD "substantially before the class period," a necessary assumption for their class certification model. Plaintiffs concede there would be a significant lag between when Intel began the alleged anticompetitive conduct, and when that conduct could have impacted the computer purchasers that comprise the class. They propose no common proof by which to measure that lag period or to identify which class members bought computers before the alleged overcharge manifested. Instead, they rely solely on the existence of an "embedded" overcharge at the beginning of the class period. But if plaintiffs rely on acts that began after the class period, as they do in their Trial Plan, then they cannot prove the existence of this "embedded" overcharge, and their model to show impact on all class members will fail.[6]

Second, plaintiffs' Trial Plan does not account for AMD's independent strategic and capacity decisions that would have prevented it from achieving the competitive dynamic at the beginning of the class period that plaintiffs claim is necessary in the "but for" world for all of Intel's prices to come down. This evidence establishes that at least some class members were not impacted, depending on which computers they bought and when. Intel would present such proof at trial,

---

[6]     Plaintiffs also fail to address the Court's FTAIA ruling, which would require individualized proof to determine which class members' claims are barred by it, if that can be determined at all. *See* Sur-reply at 47-48.

if necessary, to disprove plaintiffs' theory that all prices to all class members would somehow have fallen absent Intel's price concessions.

Third, the trial would necessarily require consideration of extensive, individualized evidence to determine whether, if an alleged overcharge existed for some transactions at the OEM level, some portion of that overcharge was passed on through the distribution chain to the indirect purchasers who comprise the plaintiff class. Even if plaintiffs' expert could propose a viable statistical model purporting to show impact on all class members, and he cannot, Intel would be entitled to rebut plaintiffs' evidence of uniform pass-on with individualized, real world proof to the contrary. Intel's evidence would prove that the intermediaries in the distribution chain – OEMs, distributors, and retailers – do not uniformly pass on cost changes. Instead, their pricing decisions are the product of a host of idiosyncratic strategic decisions that cannot be lumped together into a single formula.

Finally, the presence of the multiple state laws at issue in plaintiffs' proposed damages subclasses necessitates the introduction of even more individual evidence. Because there are material differences in the state laws at issue in the subclasses, the proof needed to prove violations of each of the laws would also be materially different. Individual evidence from both sides would be required to address these differences and to adjudicate the alleged violations of every applicable state law.

We address these issues in order, below.

## II.     PLAINTIFFS' TRIAL PLAN IS IN IRRECONCILABLE CONFLICT WITH THEIR CLASS MOTION

Plaintiffs' Trial Plan largely ignores the elephant in the room – the evidence needed to prove antitrust impact under plaintiffs' liability theory is different for every class member. Antitrust class certification turns on common proof of impact. *See GPU*, 253 F.R.D. at 500.

Procedural rules, including Rule 23, "shall not abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2072(b). Thus, plaintiffs cannot use the class action mechanism to sidestep this essential element of each class member's claim. *See* 15 U.S.C. § 4; *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931); *Schoenbaum v. E.I. DuPont De Nemours and Co.*, 2009 WL 4782082, *9 (E.D. Mo.) ("predominance is not satisfied where proof of antitrust impact – a prerequisite for recovering treble damages under § 4 of the Clayton Act – calls for an individualized inquiry instead of proof common to the class") (citing *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008)); Sur-reply at part II.A.[7]

Plaintiffs go on at length about Intel pricing practices – and Intel will prove, if necessary, that they were the result of vigorous, legitimate competition – but do not come to grips with the actual evidence necessary to prove the essential element of antitrust impact on each class member. Even their eventual discussion of how, allegedly, "class plaintiffs were injured by Intel's conduct" (Tr. Pl. at 45-71), offers generalized argument and evidence that fails to address critical differences among class members in terms of their market segments, timing of purchases, and potential net pricing benefits from Intel's challenged conduct.[8] Unless the Court is satisfied those issues affecting antitrust impact can be fully litigated by both sides with common proof,

---

[7]    All unreported decisions are included in an Appendix of Unpublished and Non-Federal Authorities, filed contemporaneously herewith.

[8]    *See, e.g.*, Tr. Pl. at 48 ("Intel's conduct injured indirect purchasers of microprocessors"), 53, 59 (Leffler's regression shows on average Intel's prices "would have been 15% less"), 56 (Intel "was forced to drop its actual prices, and consumers ultimately benefited as a result"), 61 (indirect purchasers "paid higher prices for their PCs than they otherwise would have"), 63 (Leffler's pass-through regressions "empirically demonstrated that pass through occurs" on average). Plaintiffs' claimed harm through suppressed innovation (Tr. Pl. at 67-72) is both facially baseless and ███████████████

███████████████    Their recitations of foreign antitrust agency charges "[t]hat Intel's [c]onduct [c]aused [c]onsumer [h]arm" (Tr. Pl. at 72-74) are both generalized and legally irrelevant, including under the FTAIA. *See* Sur-reply at 47-48.

class certification is inappropriate and must be denied. *See* Sur-reply at parts II.B and C. As the

evidence that would be presented at trial, discussed below, demonstrates, they cannot.

### A.   Class Plaintiffs' Trial Plan Confirms They Are Contending That Intel's Discounts Were Anticompetitive, Thus Disproving Their Theory Of Class Certification

In their class certification reply papers, plaintiffs argue they are *not* challenging Intel's

discounts. *See, e.g.*, Reply In Further Support Of Class Plaintiffs' Motion For Class Certification

("Reply") (D.I. 2017) at 24 ("plaintiffs are <u>not</u> complaining about Intel <u>price reductions</u>, whether

these take the form of discounts, rebates or credits") (emphasis in original); Reply Declaration

Of Dr. Keith Leffler ("Leffler Decl. II") (D.I. 2020), ¶ 11 ("This case <u>does not</u> concern

(emphasis in original).



*see also* Reply at 26 ("These payments were

not price adjustments.").[2]

---

[2]

For convenience sake, when discussing whether or not a
rebate is a "loyalty payment" or "bribe" rather than a "legitimate price discount," this Response

Plaintiffs and Leffler implicitly concede that if they were to challenge Intel's discounts as anticompetitive, their model to show common impact for class certification would not be viable. This is because plaintiffs agree that when ███████████████████████████████████ ████████████████████████████████████████████████████ Reply at 28 (emphasis in original); ████████████████ If that were the case, OEMs who received the challenged discounts in the actual world might have paid more in the "but for" world (where the discounts would not exist). If a direct purchaser was not overcharged for a microprocessor (*i.e.*, would not have paid less in the "but for" world), by definition neither was the indirect purchaser who bought the computer containing it. Yet plaintiffs have no method by which they could identify those class members who suffered no antitrust impact because the processor in their computer was discounted below the "but for" level.

Plaintiffs' current effort to save their class certification motion by claiming they do not challenge any Intel discounts is also at odds with both their previous statements and Trial Plan. Plaintiffs have represented to the Court at least **14 times** that rebates and other concessions they are challenging were, in fact, "discounts" under Leffler's construct, because they impacted the effective price at which the OEM purchased processors.[10] In other words, plaintiffs' case from

---

is discussing whether or not the rebate affected the price of microprocessors, not the additional liability question of whether it was conditional and therefore foreclosed AMD from the market.

[10]     *See* First Amended Consolidated Complaint ("FACC") (D.I. 108), ¶¶ 171 ("If the customer chooses to purchase any significant quantity of microprocessors from an Intel competitor, it will not qualify for its Intel rebate, and **the price will be higher** on all the Intel processors it buys across the board."), 172 ("Intel's **use of retroactive rebates** leads, in some cases, to **below-cost pricing** on incremental sales."), 174 ("Even where Intel's prices are above cost on the incremental volumes and despite its retroactive rebate schemes, **these rebates enable Intel to lower prices selectively** in the contested market segment while maintaining higher prices in its captive market."); Plaintiffs' Joint Preliminary Case Statement ("JS") (D.I. 872) at 5 ("Intel accomplishes this by **offering to discount the price** of its non-contestable microprocessors on the condition that the customer also buy its contestable needs from Intel."), 59 ███████████████████████████████████████████

the beginning has been based on a direct challenge to Intel's price discounting, including rebates to loyal OEMs.

In fact, plaintiffs' Trial Plan confirms that, notwithstanding their new class certification position, and their expert's opinion in his second report, there has been no departure, and plaintiffs are, in fact, challenging Intel price concessions that even Leffler has labeled "discounts" and "legitimate price competition."  Although, for purposes of class certification,

, neither plaintiffs nor Leffler applied this division to the evidence plaintiffs plan to present at trial to prove liability.  Indeed, some of the



8 n.4 (alleging "first-dollar rebate system **makes each unit purchased up to the target amount relatively expensive** unless the target it achieved"), 15

37 ("Plaintiffs allege that **Intel's prices, even after accounting for discounts and rebates**, are currently supracompetitive.");

(all emphases added).

documentary evidence and testimony plaintiffs put forth in their Trial Plan as evidence of Intel's anticompetitive conduct unambiguously refers to discounts on specific microprocessors, conduct that Leffler has identified as "legitimate price competition."[11]

Moreover, the evidence cited in plaintiffs' Trial Plan, as well as myriad evidence that Intel would offer in its defense, confirms that plaintiffs are wrong in assuming that so-called "loyalty payments" are never price reductions that resulted in lower computer prices. Significant amounts of the payments plaintiffs challenge were in fact passed on to consumers in the form of lower prices. Plaintiffs' class certification model treats this as impossible, as a matter of economic theory, and, on that basis alone, ignores this evidence.

and the "actual facts," which Intel will, if necessary, prove at trial, are completely inconsistent with plaintiffs' class certification theory. Those actual facts clearly show that what Professor Leffler thinks is rational, and what the largest, most successful OEMs in this industry think is rational, are two different things.

---

[11]     The bulk of class plaintiffs' Trial Plan consists of an OEM-by-OEM discussion of the "evidence" that class plaintiffs plan to offer at trial to prove that Intel violated the antitrust laws. These facts are, of course, hotly disputed. Intel will demonstrate at trial that it engaged in customized, procompetitive negotiations with OEMs, distributors, and other direct purchasers. Consistent with a competitive market, the nature and outcomes of those negotiations varied by customer, time, segment and the actual or perceived competitive threat posed by AMD. Intel's response here discusses some of the factual issues presented by the Trial Plan that are most relevant to the pending class certification issues, but does not attempt to address every allegation made by plaintiffs.

1.  **Plaintiffs' Claim That OEMs Could Not And Did Not Pass On Lump-Sum Payments Contradicts One Of Their Primary Liability Allegations**

Before considering the OEM-specific evidence that so-called "loyalty payments" were, in fact, frequently passed on in the form of lower PC prices, it is important to consider that plaintiffs' assumption is disproved by one of plaintiffs' repeated liability claims: that Intel threatened to "punish" a "disloyal" OEM by making lump-sum payments to one of its competitors.

Intel would prove at trial that AMD also understood that clear logic.

Beach Decl., Ex. 7                                                                    Plaintiffs' new idea that lump-sum "loyalty discounts" were never treated as discounts and passed on fundamentally conflicts with that undisputed evidence from AMD – whose complaint plaintiffs parrot – and their own expert.

2.  **A Review Of OEM-Specific Evidence Confirms That Lump-Sum Payments Were Actually Competitive Discounts That Were Often Passed On**

Intel's evidence proves this "concept" false.



Therefore, if

"loyalty payments" are allocated to the cost of specific microprocessors (i.e., per unit COGS),

those payments, under Leffler's own theory of pass through, lower computer prices to class

members.

The following discussion highlights the "evidence" that plaintiffs claim they will offer at

trial for several OEMs as well as the responsive evidence that Intel would offer.  In each case, it

is indisputable that OEMs had the discretion to, and in fact often did, use Intel lump-sum

payments to reduce the cost of specific microprocessors (per unit COGS) and thus the

downstream prices of their computers, for a variety of strategic reasons.  This undermines a

critical assumption of plaintiffs' class certification model, and demonstrates that plaintiffs' plan

to demonstrate impact with common proof is not viable.  Instead, individual proof would be

required to determine when and to what extent lump-sum or "loyalty payments" were passed on.



Plaintiffs claim they will prove at trial that Intel

Tr. Pl. at 22.  Plaintiffs assert

*Id.* at

Plaintiffs'

own evidence does not even support their claims that these payments were not discounts and

---

12    Plaintiffs apparently claim, with unintentional irony, that "Meet Competition" funds were
not actually used for that purpose.

were never passed on to class members.  Moreover, Intel's evidence at any trial would show that

its discounts were highly competitive and led to lower consumer prices.



Plaintiffs make much of the fact that the

(Beach Decl., Ex. 9)).

(emphasis added).

Plaintiffs neglect to mention that the

same document they cite states that

13

Intel would offer even more evidence on this point.

These are the "loyalty payments" that
plaintiffs are challenging,

---

Plaintiffs' Trial Plan includes a

Tr. Pl. at 23 n.26.  Plaintiffs make no effort to reconcile this evidence with the fact that plaintiffs'
own expert relies exclusively on the accounting treatment in Intel's database to determine
whether a payment was treated by an OEM as a cost reduction.



Thus, the "actual facts" to be presented at trial confirm that passed on in the form of lower computer prices substantial amounts of the MCP funds that plaintiffs claim were anticompetitive.  Accordingly, determining which class members did or did not benefit as a result would require a fact-intensive, individualized analysis (if it is possible to determine at all). Plaintiffs' class certification theory ignores and contradicts this evidence.

Plaintiffs' proposed evidence with respect to

Tr. Pl. at 25.  Plaintiffs say that

Tr. Pl. at 29 (emphasis omitted).  The primary document plaintiffs cite as evidence of this claim says that



15

16



Also contrary to Leffler's expectation,



Again, these "actual facts" Intel would present at trial trump Leffler's predictions.

Plaintiffs' proposed evidence concerning ████████ cited to establish so-called "loyalty payments" also rebuts the main premise of plaintiffs' class certification motion.

Tr. Pl. at 33. ████ which on plaintiffs' theory would have been passed on to consumers in the form of lower prices, but which plaintiffs are now contending was illegal (and, therefore, unavailable in the "but for" world).



In other words, the sales team wanted to use that money to lower computer prices.

means, in Leffler's terms, reducing marginal cost of processors – *i.e.*, a discount that would be passed through. Intel would present these facts at trial to rebut Leffler's economic theory.

Tr. Pl. at 39. Plaintiffs' evidence, taken at face value, is subject to only one interpretation:



Again, the "actual facts" Intel would present at trial show that

was doing exactly what Leffler's model treats as an economic impossibility.

     **e.**    **Foreign OEMs and**

     Plaintiffs' Trial Plan purports to cite evidence regarding Intel conduct directed to several

foreign OEMs,

     *See* Tr. Pl. at 35-38, 40-47.  These allegations reflect plaintiffs' continued disregard

for the Court's March 7, 2007 Memorandum Opinion ("FTAIA Opinion") (D.I. 408), dismissing

their claims based on Intel's alleged foreign conduct.  Indeed, in at least two instances –

– plaintiffs appear to include in the Trial Plan the *exact same allegations* that were

stricken from their Complaint by the Court's Order.

---

<sup>17</sup>    *Compare* FACC, ¶ 147 (stricken from Complaint by FTAIA Opinion) ("In May 2002, Intel agreed to pay NEC more than 300 million yen per quarter in exchange for caps on NEC's purchases from AMD.") *with* Tr. Pl. at 36

<sup>18</sup>    *Compare* FACC, ¶ 145 (stricken from Complaint by FTAIA Opinion) ("To reverse the erosion of its business, in 2003 Intel paid Sony multimillion dollar sums, disguised as discounts and promotional support, in exchange for absolute microprocessor exclusivity.") *with* Tr. Pl. at 44

Plaintiffs cannot base a claim on conduct directed at foreign OEMs even if they claim it allowed Intel to achieve a worldwide monopoly that led to higher computer prices in the United States. *See* FTAIA Opinion at 6-7 (dismissing claim that "weakened condition of rivals like AMD ultimately led Intel to charge higher prices for its microprocessors" leading to "higher retail prices for PCs" because "this speculative chain of events is insufficient to create the direct, substantial, and foreseeable effects on commerce required by the FTAIA.") (citing *United Phosphorus, Ltd. v. Angus Chemical Co.*, 131 F. Supp. 2d 1003 (N.D. Ill. 2001), *aff'd* 322 F.3d 942 (7th Cir. 2003) ("The FTAIA explicitly bars antitrust actions alleging restraints in foreign markets for inputs . . . that are used abroad to manufacture downstream products . . . that may later be imported into the United States.")).[19]

Nor can plaintiffs claim this evidence of foreign conduct is somehow relevant to proving Intel's domestic conduct. The Court rejected the contention "that Intel's foreign conduct is relevant to proving the unlawfulness of Intel's domestic conduct, and therefore, Class Plaintiffs can base their claims on foreign misconduct, even if Intel cannot ultimately be held liable for that foreign misconduct." *Id.* at 5. Thus, there is no basis on which any of these allegations would even be admissible at trial.

But even considered on its merits, the evidence relating to these foreign OEMs is consistent with that for the domestic OEMs; it proves they often passed on lump-sum payments received from Intel in the form of lower computer prices.

---

[19]     For the same reason, plaintiffs' repeated citations to decisions by foreign antitrust regulators (who, of course, apply different procedures and substantive law than those controlling this case) are irrelevant.

 Given the way

████████ allocated its Intel rebates, the Court would have to consider highly individualized,

transaction-level details for every microprocessor ████████ purchased.

### 3. AMD's Expert Agreed Some "Lump Sum Payments" Were Passed On



████████ which class plaintiffs have repeatedly endorsed. *See, e.g.*, JS at 5 ("Intel leverages its

uncontestable control over the dominant share of the customer's business to capture its

contestable business."); *see also* JRS at 7-11; Opp. to MTD at 14-18; FACC, ¶¶ 163-175.[20]

████████████████████

---

[20]      Intel disagrees with plaintiffs' theory of "non-contestable business." ████████
████████ But plaintiffs, having repeatedly offered it to the
Court for liability purposes, cannot deny its consequences for the proof that would be required at
trial.



Bernheim's opinions clearly illustrate the unavoidable problem with plaintiffs' class certification model. Plaintiffs' claim is entirely derived from AMD's, but its proof would necessarily establish that some processors that class members eventually purchased would not have been priced lower in the "but for" world. On the other hand, if plaintiffs stick with what they told Leffler – that no PC transactions resulted in pricing below cost – there will be no trial; plaintiffs' antitrust case will fail as a matter of law. In an unbroken, 20-year series of decisions, the Supreme Court has rejected any antitrust challenge to above-cost price cutting, regardless of the form that it takes.[21]

---

[21]    *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986) (holding that "cutting prices in order to increase business often is the very essence of competition" and that "mistaken inferences" of anticompetitive effects "are especially costly" in cases involving discounting "because they chill the very conduct the antitrust laws are designed to protect"); *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 114-16 (1986) (rejecting

Overwhelming evidence from Intel, AMD, the OEMs, and Leffler himself plainly

demonstrates the scores of individualized issues that must be resolved at trial, and the failure of

plaintiffs' arguments that impact on all class members may be resolved with common proof.

Plaintiffs' class certification motion seeks to sweep those issues under the rug, for good reason:

their liability theory, as reflected in the Trial Plan, and class certification motion are

irreconcilable.

## III.  PLAINTIFFS' TRIAL PLAN IGNORES, AND CONTRADICTS, THE ACTUAL EVIDENCE THAT WOULD BE PRESENTED AT TRIAL

### A.  Class Plaintiffs' Trial Plan Confirms That They Cannot Prove That Intel's Alleged Acts Excluded AMD "Substantially Before The Class Period"

The Trial Plan confirms that plaintiffs cannot, and apparently will not even attempt to,

prove that Intel's anticompetitive conduct caused the competitive foreclosure of AMD

---

antitrust claim that merged company would drive competitor out of business with low prices, and that it would be a "perverse result" to hold illegal a "decision by a firm to cut prices in order to increase market share" when the firm's prices are above cost); *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990) (holding that "[l]ow prices benefit consumers *regardless of how those prices are set*, and so long as they are above predatory levels, they do not threaten competition" and that "[w]e have adhered to this principle *regardless of the type of antitrust claim involved*") (emphasis added); *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 226 (1993) ("[T]he mechanism by which a firm engages in predatory pricing – lowering prices – is the same mechanism by which a firm stimulates competition; because cutting prices in order to increase business often is the very essence of competition . . . mistaken inferences . . . are especially costly, because they chill the very conduct the antitrust laws are designed to protect.") (quotation marks and citation omitted); *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 549 U.S. 312, 319-22 (2007) (holding that low, above-cost prices "benefit consumers regardless of how those prices are set," and that the price-cost standard governs *all* claims of the "deliberate use of unilateral pricing measures for anticompetitive purposes") (internal citation and quotation omitted); *Pac. Bell Tel. Co. v. linkLine Communications, Inc.*, ___ U.S. ___, 129 S. Ct. 1109, 1120 (2009) ("To avoid chilling aggressive price competition, we have carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging that prices are too low.  Specifically, to prevail on a predatory pricing claim, a plaintiff must demonstrate that: (1) 'the prices complained of are below an appropriate measure of its rival's [the defendant's] costs;' and (2) there is a 'dangerous probability' that the defendant will be able to recoup its 'investment' in below-cost prices.") (citation omitted).

"substantially before the class period," even though this is a necessary assumption for their class certification model. Plaintiffs concede that there would be a substantial lag period between when Intel began its alleged anticompetitive conduct, when that conduct would have had an exclusionary effect on AMD, and when that effect would have created an overcharge to class members. Plaintiffs do not propose any way to identify or measure this lag period.

To support that necessary premise, Intel's alleged exclusionary acts had to take place "substantially before" the class period. Declaration Of Keith B. Leffler (D.I. 920), ¶ 8.D. If that critical assumption fails, so does Leffler's theory of class-wide impact.

Plaintiffs' Trial Plan confirms that they did not find what they told Leffler they would; they have no evidence to support this critical allegation. For 7 out of 10 customers discussed in the Trial Plan ██████████████████████████████ – class plaintiffs

---

[22]    Tr. Pl. at 22

[23]    Tr. Pl. at 25

do not even claim that the alleged anticompetitive conduct began even a day before the class

period.[29]

The only customers for which plaintiffs have cited anything predating the class period are

███████████████████  None of these claims would come even close to showing that AMD

had been competitively foreclosed prior to the class period.



---

[24]   Tr. Pl. at 39 ███████████████████████████

[25]   Tr. Pl. at 42 █████████████████████████████

[26]   Tr. Pl. at 40 ████████████████████

[27]   Tr. Pl. at 46 ██████████████████████████

[28]   Tr. Pl. at 47 ██████████████████████████
██████

[29]   While plaintiffs' citation to the findings of foreign antitrust regulators are irrelevant in light of the Court's decision dismissing plaintiffs' claims concerning foreign conduct, it is noteworthy that both of the findings cited in plaintiffs' Trial Plan reject the plaintiffs' argument that the challenged conduct began "substantially before the class period;" both allege conduct beginning in 2002.  Tr. Pl. at 73-74.

[30]   As discussed above, ███████████████████████████████████
Court's dismissal of all of plaintiffs' claims concerning Intel's alleged foreign conduct. Plaintiffs cite additional evidence in opposition to Intel's Motion to Exclude Leffler's testimony, supposedly showing anticompetitive conduct prior to the class period.  That evidence also does not support plaintiffs' argument.  *See* Daubert Reply at 8-15.

There is no evidence that this funding was conditioned on excluding AMD.

Tr. Pl. at 35-36.  Plaintiffs' description of this document is highly misleading.

and therefore not relevant, given the Court's dismissal of plaintiffs' claims based on alleged foreign conduct.



Plaintiffs' Trial Plan confirms that they cannot prove that AMD was impacted by any alleged Intel anticompetitive conduct "substantially before the class period." Because that is a fundamental assumption of their class certification model, a trial cannot proceed on a class basis.

**B.    Plaintiffs' Trial Plan Ignores Important Evidence Regarding AMD's Capabilities And Intentions That Undermine Their Proof Of Impact On All Class Members**

Plaintiffs' Trial Plan says nothing about what plaintiffs intend to prove at trial regarding the so-called "but for" world, especially as it relates to AMD's capacity and competitive intentions. This is surprising, given that their Complaint is a copy of, and entirely derived from, AMD's. The facts are clear, however, that AMD – which obviously was in the best position to know – does not share plaintiffs' view as to how it would have responded if it became more competitive. Contrary to plaintiffs' assumptions, Intel will, if necessary, prove at trial that (1) AMD made strategic and capacity decisions that were unrelated to Intel's alleged anticompetitive conduct that would have independently prevented AMD from achieving the competitive position that plaintiffs assume, and (2) as it became more competitive in certain segments, AMD intended to raise its own prices, rather than trying to force Intel to lower its prices.

### 1. There Is No Scenario Under Which AMD Could Have Achieved The Competitive Position Plaintiffs Project In The "But For" World



Even under its most optimistic scenarios, however, AMD would not have been capable of doing so in the time period that class plaintiffs allege.



---

[31] Fab 25 employed two key technologies that were approaching obsolescence: (1) aluminum interconnect technology, as opposed to the state-of-the-art copper interconnect (the materials that connect the transistors on the microprocessors) and (2) 200 mm wafers, as opposed to the state-of-the-art 300 mm wafers.

[32]



 thus these same capacity constraints would have prevented AMD from competing for all customers in all segments even in the "but for" world.

Given these facts, there is no scenario under which AMD would have been capable of competing with Intel for all potential sales as of the beginning of the class period. This is a point on which Intel and AMD agree.

While Professor Lys's opinion was helpful to AMD, it is devastating to plaintiffs.

Leffler's analysis (and plaintiffs' Trial Plan) do not account for any such lag. AMD's presence as a full-line competitor in the "but for" world is a necessary assumption of the plaintiffs' class certification model because if AMD competed only in certain segments, Intel

would not have lowered its prices in segments where AMD did not (or could not) compete, and OEMs that bought in those segments would have paid the same in the "but for" world. Therefore, class members who bought those computers would have been unaffected.[33]  But Intel's evidence proves that even under AMD's most optimistic scenario, it would not have been a full-line competitor until after the class period ended.

### 2. If AMD Was More Successful, It Admits It Would Have Raised Its Prices

A fundamental assumption behind plaintiffs' claim is that if AMD became more competitive with Intel in all segments and at all times, increased competition would have caused Intel to decrease its microprocessor prices across the board to match AMD's prices.  Intel would prove at trial, however, that as AMD became more competitive with Intel it planned to and did raise its own prices to Intel's levels, indeed above Intel's levels, rather than Intel reducing its prices to AMD's levels.[34]  If, in the "but for" world, AMD raised its prices to reach parity with Intel in some or all segments, Intel would have no incentive to reduce its prices in those segments, and the prices that OEMs paid for those Intel processors would not have changed.

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

---

[33]     When faced with capacity constraints, AMD strategically responded by prioritizing high-end server and mobile products at the expense of lower-end desktop products that form the bulk of plaintiffs' class. ███████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████ This suggests that the segments in which AMD would have to choose not to contest sales, and for which there would be no impact, would be the very ones that comprise the plaintiff class.

[34] ███████████████████████████████████████████████████████
███████████████████████████████



Intel would prove that, contrary to the assumption underlying plaintiffs' case, when AMD

became more competitive, it did not stand pat and wait for Intel to drop its prices to AMD's

level.



Intel would have no reason to reduce its own prices, certainly not "across-the-board" on all processors.

### 3. Intel Would Prove That Plaintiffs' "Four Competitor" Hypothesis Is Nonsense And Does Not Fix the Problem

Perhaps recognizing the frailty of relying on the assumption that increased competition from AMD would cause Intel to lower its microprocessor prices across-the-board in the "but for" world, ███████████████████████████████████████████████████████████████ But this is inconsistent with plaintiffs' claim that there are substantial barriers to entry in the market. *See* Tr. Pl. at 13, n.15.[35] Indeed, it has been 3.5 years since the 2006 time period that Dr. Leffler claims is an "ideal benchmark" for the "but for" world, and there has been no additional entry, nor have Via or Transmeta experienced increased market success.

### C. Intel Would Offer Defensive Evidence At Trial That Pass-On Of An Alleged Overcharge Did Not Occur For Each Class Member

Plaintiffs face insurmountable obstacles to prove that there was an overcharge on all microprocessors sold by Intel at all times during the extensive class period. But even if they could overcome those obstacles, that is not enough to prove their case. Plaintiffs must also prove that any overcharges to direct purchasers were passed on to indirect purchasers. Their Trial Plan confirms that they will not be able to meet this burden. Individual evidence is needed

---

[35]



for an examination of the pass-on practices of each OEM, distributor, and retailer, and is the only

way to determine when pass-on may have occurred and when it may not have.

### 1.   Intel Would Show That OEMs And Retailers Engage In Strategic Behavior And Do Not Systematically Pass On Cost Changes

The evidence is overwhelming that OEMs and retailers do not always pass on cost

changes, and certainly not in any formulaic way. *This is true for every major OEM and retailer.*





This evidence, which Intel would present in its defense, is completely inconsistent with

the assumption of a 100%, formulaic pass-on of microprocessor cost changes on which plaintiffs

rely for class certification.

### 2. Intel's Defensive Evidence Related To Corporate Purchasers Would Be Different Than For Household Consumers

Plaintiffs' Trial Plan offers no suggestion as to any common proof they would use to

show pass through for large corporate customers, also known as "enterprise" customers. There is

none. As explained in Intel's Opposition, large corporations individually negotiate contracts for

millions of different combinations of hardware, software, and services directly with OEMs or

---

36    The documents cited in plaintiffs' Trial Plan are also consistent with incomplete and
varied pass-through of cost changes. ████████████████████████████

resellers.  Memorandum In Support Of Intel Corporation's Opposition To Plaintiff's Motion For

Class Certification ("Opp.") at 44-47.  Each contract, therefore, is uniquely priced, and there is

no method to prove overcharges were passed on using common proof.  *Id.*  Rather, the jury

would need to evaluate different evidence for each transaction.

Plaintiffs cannot plausibly dispute the need for highly individualized proof.  Their only

attempt hangs on a single piece of mischaracterized deposition testimony.  They claim that a

(emphasis added).  Indeed, the evidence that enterprise

customers had a different procurement process than consumers is overwhelming and not

genuinely disputed.  *See* Reply at 48-49.

### 3.    Plaintiffs Cannot Offer Common, Or Any, Proof That Choice And Innovation Have Been Reduced

In their Trial Plan, plaintiffs also claim that class members were harmed by reduced

choice and "stalled innovation" in the microprocessor market.  Tr. Pl. at 8, 67-72.

Indeed,

the case law is clear that abstract claims such as reduced choice or innovation are insufficient to

demonstrate impact on class members.  *See Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir.

2006) (affirming dismissal of claims that defendant's anticompetitive conduct reduced customer

choice, explaining "the harms that the plaintiffs have alleged with respect to the loss of competitive technologies are so diffuse that they could not possibly be adequately measured").

As a factual matter, the claim that innovation has been retarded in the PC market is nonsense. Intel would prove that no market has seen greater increases in choice and innovation, and decreasing prices, than the PC market. While AMD and Intel certainly disagree over who has been more innovative and when, no one seriously disputes that this market has seen massive innovation from the onset. Between them, Intel and AMD have spent tens of billions of dollars on research and development in the last decade. Those in the industry agree.



In an industry that witnessed "startling" increases in innovation, plaintiffs' unsupported hypothesis that there may have been even more is meaningless.

Plaintiffs also suggest that everyone in the class was impacted by lack of choice or inferior PC configurations, irrespective of price, because they would have preferred allegedly-superior AMD products to Intel products. Tr. Pl. at 67.

█████████████████████████████████████████████████████ And,

more importantly, this argument is based on the flawed suggestion that AMD based products

were superior to Intel products at all times during the class period, █████████████████

█████████████████████████████████████████████████████

█████████████████████████ Intel would, if necessary, present this defensive evidence at trial.

IV.   **CLASS PLAINTIFFS' DECISION TO PRESS CLAIMS UNDER A COMPLEX
      WEB OF VARIED AND CONFLICTING STATE LAWS REQUIRES THEM TO
      PROFFER DISPARATE EVIDENCE TO MEET THEIR BURDEN OF PROOF
      UNDER EACH STATUTE**

As alternatives to certifying a nationwide damages class under California's antitrust and

consumer protection laws – a constitutional and choice-of-law non-starter, *see* Sur-reply at

part II.J.1.a – plaintiffs propose that the Court certify and hold a trial for a 26-state subclass or

certify 26 separate statewide subclasses and hold a separate trial for each of them.[37] Plaintiffs

fail to address in their Trial Plan how prospective trials under either of these proposals would

proceed. However, contrary to plaintiffs' unstated assumption, the trials would be massive

undertakings presenting complex, indeed insurmountable, problems for the plaintiffs in proving

---

[37]    Plaintiffs appear to assume that the various transferee cases would remain with this Court
for trial. However, because most of the cases consolidated in this action were filed in other
district courts and transferred to this Court pursuant to 28 U.S.C. § 1407(a), absent an agreement
among all parties, the trial of each matter must occur in its transferor district. 28 U.S.C.
§ 1407(a) (case transferred to MDL court "shall be remanded by the [MDL Panel] at or before
the conclusion of such pretrial proceedings to the district from which it was transferred unless it
shall have been previously terminated"); *Lexecon Inc. v. Milberg Weiss Bershad Hynes &
Lerach*, 523 U.S. 26, 40-41 (1998) (district court conducting pretrial proceedings pursuant to
§ 1407(a) has no authority to invoke § 1404(a) to assign a transferred case to itself for trial).  If
so, district courts throughout the nation would be forced to manage trials for particular
subclasses for a case with which they have no familiarity. Plaintiffs do not address how the
transfer of the original cases back to their transferor courts would be handled or how it would
affect their Trial Plan.

violations of the laws, for the court in managing the trials and instructing the jury, and for the

jury in applying the laws.

**A.    Plaintiffs' Trial Plan Does Not Explain How A Trial For The Proposed 26-State Subclass Would be Manageable; It Would Not**

If the Court finds that it cannot apply California's antitrust and consumer protection laws

to a nationwide class, the plaintiffs have proposed that the Court instead certify a 26-state

subclass under the antitrust and consumer protection laws of those 26 states.[38]  Plaintiffs propose

that one trial be held to determine whether all of these laws have been violated by Intel's alleged

acts.  Mot. at 42; Reply at 52-55.  However, plaintiffs' Trial Plan contains almost no discussion

of how such a trial would proceed and what evidence would be necessary to prove violations of

each of the various state antitrust and consumer protection laws included in the proposed 26-state

subclass.  This is likely because when the specifics of the state laws are examined, it is apparent

that common, class-wide proof cannot be used to prove violations of each of them.  Rather, the

parties would have to introduce evidence that is specific to the differing elements of the state

laws and, in certain instances, that is individual to the class members that are covered by them.

As a result, the case would quickly bog down in the evidence required to address the intricacies

of each state's statutes and would lead to sizable problems in instructing the jury.

**1.    Plaintiffs Would Have To Introduce State Specific And Individual Evidence To Address The Differences In The Relevant State Laws**

The Court's February 18, 2009 Order required plaintiffs to specify whether each issue is

susceptible to class-wide proof and to "identif[y] the evidence that will prove each element of the

claims in issue."  2/18/09 Order, ¶ 1.  Plaintiffs have not even identified or discussed the

---

[38]    The "26-state subclass" actually includes the antitrust laws of 18 states and the consumer protection laws of 17 states.  The total number of states included in the subclass is 26.  *See* Opp. at 66, n.54-55.

elements of any of the state law claims in their Trial Plan. Instead, plaintiffs make broad, unsupported statements that the elements of each of the state laws under which they have brought claims are identical, and that the evidence they will use to prove a Sherman Act Section 2 violation will also prove violations of all of the state laws. Tr. Pl. at 11 ("As to the various state law monopolizations and consumer protection claims, the evidence to prove the violations of these various laws is common to the class and will not differ from state to state."); *see also id.* at 9 ("Common class-wide evidence establishes that Intel violated Section 2 of the Sherman Act, California's Cartwright Act, and various state monopolization and consumer protection laws. The proof of Intel's liability is the same under each of these laws."). This "'description does not even begin to lay out the specific elements required to prove [the] causes of action[]."" *In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555, 568 (E.D. Ark. 2005) (quoting *In re Paxil Litig.*, 212 F.R.D. 539, 546 (C.D. Cal. 2003) (finding that plaintiffs' trial plan was inadequate and refusing to certify multi-state class)). "'The completed picture will no doubt be too vast and too complicated for even the most diligent jury to grasp."" *Id.*

First, the proof of Intel's liability is not the same under Sherman Act Section 2 and the various state laws. Most fundamentally, the California Cartwright Act, which plaintiffs propose to apply nationwide, does not reach unilateral conduct, which is all Section 2 governs. *See, e.g., Dimidowich v. Bell & Howell*, 803 F.2d 1473 (9th Cir. 1986). Contrary to plaintiffs' suggestion, the federal and primary state law they seek to apply are mutually exclusive.

Also, the states' consumer protection laws "do not subsume conduct violative of the Sherman Act." *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 582 n.56 (M.D. Pa. 2009). Antitrust violations do not fall within the statutory language of a number of the consumer protection laws included in the 26-state subclass. *Id.* at 584-86; *In re TFT-LCD (Flat*

42

*Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1125, 1131 (N.D. Cal. 2008) (noting that Arkansas and West Virginia consumer protection statutes do not reach antitrust violations); *see also, e.g., In re Automotive Refinishing Paint Antitrust Litig.*, 515 F. Supp. 2d 544, 554-55 (E.D. Pa. 2007) (New York consumer protection statute does not cover antitrust violations without proof of additional deception or misrepresentation); *State v. Daicel Chemical Indus.*, 106 P.3d 428 (Idaho 2005) (pricing harms are not actionable under the Idaho Consumer Protection Act). Further, the state antitrust laws "vary from state-to-state and do not always coincide with federal antitrust law." Barry Hawk & Laraine Laudati, *Antitrust Federalism in the United States and Decentralization of Competition Law Enforcement in The European Union: A Comparison*, 20 Fordham Int'l L.J. 18, 21 (1996); *see also In re Relafen Antitrust Litig.*, 221 F.R.D. 260, 282-83 (D. Mass. 2004) (a number of the state antitrust statutes differ from Section 2 in that they require cooperative conduct and do not reach monopolization claims). Indeed, *the Cartwright Act itself does not reach unilateral conduct. See Dimodowich*, 803 F.2d at 1478. Thus, plaintiffs cannot rely on the evidence they intend to introduce to prove a Section 2 violation to prove violations of all state laws.[39]

Second, differing proof is also necessary to prove violations of the various state laws. Intel has already provided the court with a detailed analysis of the different state consumer protection and antitrust statutes at issue. Opp. at 68-71, Appendix C. Plaintiffs' "oversimplification [of the variances in those laws] ignores the actual elements of the various . . . statutes and the effect they could have on individual claims." *Thompson v. Jiffy Lube Int'l., Inc.*, 250 F.R.D. 607, 625 (D. Kan. 2008).

---

[39] Even if plaintiffs were to rely on such evidence to prove violations of the state laws, as demonstrated above, that evidence is not sufficient to show impact on all class members with class-wide proof.

The relevant state antitrust laws "vary from state to state" on a number of important

issues. Joel Cohen & Trisha Lawson, *Navigating Multistate Indirect Purchaser Lawsuits*, 15

Antitrust 29, 31 (2001); John C. Anderson, *Good "Brick" Walls Make Good Neighbors: Should

A State Court Certify a Multistate or Nationwide Class of Indirect Purchasers?*, 70 Fordham L.

Rev. 2019, 2047-48 (2002). For example, they vary as to the elements of the claim, who has

standing, the procedural devices available to plaintiff, the amount of damages that are

recoverable, the requisite proof of damages, available defenses, and whether the statutes apply

only to conduct that is predominately intrastate, as opposed to interstate. Cohen & Lawson,

*supra*, at 31.

In addition, there are "*significant* differences among the States' consumer protection

laws." *Thompson*, 250 F.R.D. at 625 (emphasis in original); *see also id.* ("Many courts

addressing this sort of issue in the past have rejected the argument that state consumer protection

laws are essentially the same."); *In re Zyprexa Prods. Liab. Litig.*, 253 F.R.D. 69, 201 (E.D.N.Y.

2008) ("State consumer protection laws vary on a range of fundamental substantive and

procedural issues."); *Thorogood v. Sears, Roebuck and Co.*, 547 F.3d 742, 746 (7th Cir. 2008)

(consumer protection laws of 29 states are too varied to be grouped together in jury instructions);

*BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568-69 (1996) ("[s]tates need not, and in fact do not,

provide . . . protection [from deceptive trade practices] in a uniform manner"); Opp. at 70-71,

Appendix C. Plaintiffs have failed to identify what evidence they will use to address the

numerous differences in the laws.

Examining the actual language from some of the state consumer protection laws

highlights the differences in proof that would require the introduction of evidence that is specific

to certain laws and/or individuals and that would unduly complicate a trial of the proposed 26-

state subclass. It also demonstrates that the evidence plaintiffs plan to rely on at trial cannot prove violations of certain statutes.

As one example, the Maine Unfair Trade Practices Act forbids "unfair methods of competition" as well as "unfair or deceptive . . . conduct of any trade." *Chocolate Confectionary*, 602 F. Supp. 2d at 584. A business practice is "unfair" if the injury it produces is (1) substantial, (2) not outweighed by any countervailing benefits to consumers or competition that the practice produces, and (3) not reasonably avoidable by consumers. *Id.* Further, in a pricing case such as this, plaintiffs must prove that the price has the effect of "induc[ing] the consumer to acquire something that he or she would not otherwise have purchased." *Id.*; *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1159 (N.D. Cal. 2009). "Here, the *higher* prices plaintiffs allegedly paid for [computers] because of the [alleged monopolization] could not have induced plaintiffs to purchase them." *In re Graphics Processing Units Antitrust Litig.* ("*GPU II*"), 527 F. Supp. 2d 1011, 1031 (N.D. Cal. 2007). "Arguing that higher prices induced consumers to make purchases simply does not make sense." *Id.*

The Rhode Island Unfair Trade Practices and Consumer Protection Act also prohibits unfair methods of competition and unfair or deceptive acts in the conduct of any trade. However, the Rhode Island law defines "unfair methods of competition and unfair or deceptive acts or practices to consist of 19 separately enumerated practices," none of which includes antitrust violations. *Flash Memory*, 643 F. Supp. 2d at 1161 (quoting R.I. Gen. Laws §§ 6-13.1-1(6)(i)-(xix)). A violation of the Rhode Island law "'must be predicated upon conduct on the part of the [defendant] that reasonably tended to confuse and mislead the general public into purchasing his product when the actual intent of the purchaser was to buy the product of the complainant.'" *Id.* at *91 (quoting *ERI Max Entm't, Inc v. Streisand*, 690 A.2d 1351, 1354 (R.I.

1997)); *GPU II*, 527 F. Supp. 2d at 1030. Plaintiffs have failed to demonstrate what evidence they would use to show that class members from Rhode Island were misled into purchasing a product containing an Intel CPU when they intended to buy a computer with another manufacturer's CPU.

Idaho's and New Mexico's consumer protection laws prohibit "unconscionable" trade practices. Idaho Code § 48-603 (18) (2009); N.M. Stat. Ann. § 57-12-3 (2009). However, the definition of "unconscionable" is different under each of the statutes. New Mexico defines an unconscionable trade practice as one that "(1) takes advantage of the lack of knowledge, ability, experience or capacity of a person to a grossly unfair degree; or (2) results in a gross disparity between the value received by a person and the price paid." N.M. Stat. Ann. § 57-12-2 (E)(1)-(2) (2009). Idaho, however, directs the fact-finder to consider four factors when determining whether a practice is unconscionable, including whether the defendant "knowingly or with reason to know, induced the consumer to enter into a transaction that was excessively one-sided in favor of the alleged violator." Idaho Code § 48-603C(2)(c) (2009). In addition, plaintiffs' allegation of a 13.6% overcharge on their computer purchases as a result of Intel's alleged monopolization of the CPU market does not constitute the "kind of grossly unequal bargaining power prohibited by" the ban on unconscionable conduct in consumer transactions by the New Mexico, Arkansas, District of Columbia, and Kansas consumer protection statutes. *See GPU II*, 527 F. Supp. 2d at 1029-30 (stating that "unconscionability requires something more than merely alleging that the price of a product was unfairly high" and holding that antitrust allegations "are not the kind of conduct prohibited under these statutes").

The New York consumer protection law only applies to "an individual consumer who falls victim to misrepresentations made by a seller of consumer goods through false or

misleading advertising." *Automotive Refinishing Paint*, 515 F. Supp. 2d at 552. "[W]hen the alleged deceptive act occurs in a transaction between two companies, even when the result of the deception impacts on a consumer, it is not actionable under § 349." *Id.* Plaintiffs allegations concern "prices charged to [OEMs and] distributors and then passed along to [consumers] like Plaintiff[s]." *Id.* at 553. These are "transactions between corporations and not consumers" and are "not the type of conduct intended to come within the scope of § 349." *Id.* Plaintiffs fail to discuss how they would address these details of New York's consumer protection law at trial.

A look at just these five statutes demonstrates the differing proof required under the consumer protection laws. As shown, different evidence would be required to prove that Intel's alleged acts were unfair, deceptive or unconscionable under each of the laws. *See In re Stucco Litig.*, 175 F.R.D. 210, 217 (E.D.N.C. 1997) ("Some states prohibit unfair and deceptive trade practices generally . . . . Other states' statutes provide a list of prohibited practices."). Further, examining the statutes shows that plaintiffs' proposed evidence is not sufficient to prove violations of each of the laws.

In addition to these examples of the differences in proof required by the state laws, other idiosyncrasies among the laws necessitate the introduction of evidence that is individual to each of the class members that reside within a certain state. For example, with respect to the Maine consumer protection statute, individual evidence would be required to determine whether Intel's alleged acts induced each class member from Maine to acquire a computer when he, she, or it otherwise would not have purchased one. *See Chocolate Confectionary*, 602 F. Supp. 2d at 584. Individual evidence must be introduced to prove which class members from Rhode Island, Kansas, Maine, West Virginia and Massachusetts purchased computers for personal, family or household, as opposed to business, purposes. R.I. Gen. Laws § 6-13.1-5.2(a) (2009); Kan. Stat.

Ann. § 50-642(b) (2009); Me. Rev. Stat. Ann. titl 5, § 213(1) (2009); W. Va. Code §§ 46-A-6-102(2) (2009); *see Estate of Nunez-Polcano v. Boch Toyota, Inc.*, 2006 WL 1709680, *7 (Mass. Super.) (Massachusetts General Laws c. 93A, § 9 only affords a private remedy to individual consumers, other statute not alleged here provides remedy to businesses). Individual evidence would be required to determine which of the class members from Nevada are elderly or disabled. *In re Wellbutrin XL Antirust Litig.*, 2009 WL 2356864, *19 (E.D. Pa.) (only provision of Nevada Deceptive Trade Practice Act providing for a private civil action is limited to suits by elderly or disabled); Nev. Rev. Stat. Ann. § 598.0977 (2009) (only elderly or disabled people have a private right of action). Individual evidence would also be required to determine whether an order relating to Intel's alleged acts has been issued by the Wisconsin Department of Agriculture, Trade and Consumer Protection. *See Emergency One, Inc. v. Waterous Co.*, 23 F. Supp. 2d 959, 972 (E.D. Wis. 1998) (there is no private right of action under the Wisconsin consumer protection statute except to remedy a violation of an order issued by the Wisconsin Department of Agriculture, Trade and Consumer Protection). And so on.

Plaintiffs have failed to identify the evidence they would use to address these and the other differences in the state laws discussed above. However, it is clear that the evidence would not be class-wide, but often state- or class member-specific. Addressing similar differences in the other state laws (*see* Opp. at 68-71 & Annex C), as well as the other myriad differences among the statutes (*see id.*), also would require the introduction of different proof, "mak[ing] the trial exceedingly complex." *Utility Consumers' Action Network v. Sprint Solutions*, 259 F.R.D. 484, 487 (S.D. Cal. 2009).

**2.     The Court Would Be Required To Attempt To Fully Instruct The
Jury On Each Of The Relevant State Laws**

Envisioning how the court would attempt to instruct the jury on each of the relevant state

laws and how the jury would attempt to determine whether those laws have been violated further

demonstrates how impossibly complex a trial for the proposed 26-state subclass would be.

Although plaintiffs do not address the issue in their Trial Plan, they have argued that the laws can

be presented to the jury through specially crafted jury instructions and special verdict forms.

Reply at 55; Mot., Annex D & E. These instructions and verdict forms attempt to broadly

combine the multiple varying elements and definitions of the state laws into one set of

instructions. *Id.* As an example, plaintiffs instructions regarding whether the consumer

protection laws of the 26 states have been violated are barely one page long. Mot., Annex D

at 5-6.

However, "[i]nstructing a jury on varying standards and legal theories is not as simple as

plaintiffs suggest." *Utility Consumers' Action Network*, 259 F.R.D. at 488. "[A] federal court

cannot give 'a kind of Esperanto instruction' merging the requirements of . . . different State

laws into one standard." *Thompson*, 250 F.R.D. at 626 (citing *Matter of Rhone-Poulenc Rorer,

Inc.*, 51 F.3d 1293, 1299 (7th Cir. 1995)); *Thorogood*, 547 F.3d at 746 (denying certification of

29-state class of consumers in part because "[t]he instructions to the jury on the law it is to apply

will be an amalgam of the consumer protection laws of the 29 jurisdictions, and procedural rules

by which particular jurisdictions expand or contract relief will be ignored"). Plaintiffs' jury

instructions and verdict forms do just that while "merely scratch[ing] the surface of a mountain

of difficult issues that a class action trial of this magnitude would present." *Carpenter v. BMW

of N. Am., Inc.*, 1999 WL 415390, *6 (E.D. Pa.).

For example, plaintiffs' proposed jury instructions fail to account for each of the differences in the laws described above. They do not account for the different definitions of "unconscionable" under the Idaho and New Mexico consumer protection statutes, let alone the definitions other relevant statutes gives to the word. Mot., Annex D at 5. They fail to account for the different definitions of "unfair" under the various statutes and the requirement under Maine's law that the class members prove that they were induced into buying something they otherwise would not have purchased. *Id.* at 5-6. They fail to account for the requirement that class members from certain states must prove they used their computers for family or household purposes to recover damages or that class members from Nevada must prove they are elderly or disabled.[40] The list goes on and on.

Instead of using plaintiffs' proposed instructions that are an amalgam of state laws, the Court would be required to fully instruct the jury on the individual elements of each of the relevant state laws. *Thorogood*, 547 F.3d at 746; *Carpenter*, 1999 WL 415390, *3 (rejecting as "overly simplistic" plaintiff's argument that the states' consumer protection laws could be grouped into three categories and accurately charged to the jury); *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 218-221 (E.D. Pa. 2000) (rejecting plaintiffs suggestion that variations in state consumer protection laws could be handled by jury instruction that divide laws into four categories); *Tylka v. Gerber Prods., Co.*, 178 F.R.D. 493, 498 (N.D. Ill. 1998) (rejecting plaintiff's attempt to group consumer protection acts into four subclasses as "overly simplistic in light of the nuances and differences presented"). Due to the differences in the laws noted above,

---

[40]    While plaintiffs' jury instructions mention the requirement that class members from certain states must have used their computers for individual, family or household purposes, their verdict form does not ask the jury to decide whether those class members did in fact use the computers for one of those purposes. The jury could only do so by considering individualized evidence.

this would lead to "herculean" problems in "instructing the jury in a manner that is both legally sound and understandable." *Harding v. Tambrands, Inc.*, 165 F.R.D. 623, 632 (D. Kan. 1996); *Jenkins v. Hyundai Motor Financing Co.*, 2008 WL 781862, \*7 (S.D. Ohio) (finding that "legal variations . . . would render jury instructions nearly impossible and obviously voluminous."). Further, "the burden of analyzing and applying the nuances in multiple states' laws at issue would, simply stated, overwhelm a jury." *Jenkins*, 2008 WL 781862, \*7; *Doll v. Chi. Title Ins. Co.*, 246 F.R.D. 683, 693 (D. Kan. 2007) (finding that a jury could not "be lawfully and clearly instructed regarding, and properly apply, so many different standards for punitive damages").

Thus, "the individual adjudications of . . . differing state laws would make trying the plaintiffs' claims in a class action a thoroughly unwieldy endeavor." *In re LifeUSA Holding, Inc.*, 242 F.3d 136, 148 n.13 (3d. Cir. 2001); *Utility Consumers' Action Network*, 259 F.R.D. at 487 ("The application of several state laws to one action would make the trial exceedingly complex.").

**B.    Plaintiffs' Trial Plan Does Not Explain How The Trials For The Proposed 26 Separate Statewide Subclasses Would be Manageable; It Also Would Not**

Plaintiffs finally propose the alternative that the Court certify 26 separate state damages subclasses and hold a separate trial for each.[41] Mot. at 42; Reply at 52-55. As with the 26-state subclass, plaintiffs' Trial Plan contains no discussion of how the court would manage the 26 separate trials or what evidence would prove each element of the state law claims at issue. Instead, they simply assert: "Class plaintiffs' plan is the same regardless of the scope of the class certified." *See* Tr. Pl. at 7 n.7.

---

[41]    Some of the subclasses would be asserting only antitrust claims, others only consumer protection claims, and, yet others, both. Opp. at 73 n.66.

However, as demonstrated above, because of the differences in the relevant state laws the same evidence cannot be used at each of the 26 trials to prove violations of each of the laws. In fact, during trial for many of the subclasses individual evidence would have to be introduced to prove that each class member was injured and/or entitled to damages. *See* pp. 47-48 above (noting the individual evidence required under certain state statutes).

Further, plaintiffs' Trial Plan does not "set forth how they envision [the 26 separate] trial[s] should proceed." 2/18/09 Order, ¶ 1. Plaintiffs have proposed a broad plan, but have provided no information on the specifics. For example, a few of the unaddressed issues include: (1) would the same jury be used for each of the trials or would there be a separate jury for each trial?; (2) what order would the subclasses be tried in?; and (3) how would the Court handle potentially conflicting or inconsistent decisions? With so many issues to deal with, 26 separate trials would be just as, if not more, unmanageable than a trial for the proposed 26-state subclass.

Plaintiffs' failure even to propose a meaningful plan for managing a trial of their far-flung state law claims acknowledges the impossibility of doing so.

## V.    CONCLUSION

Plaintiffs' Trial Plan exposes the fundamental flaws in their proposal to try this case as a class action. No such trial would be manageable or, we submit, even possible. The class certification standards are not met and the motion should be denied.

52

OF COUNSEL:

David M. Balabanian
James L. Hunt
Donn P. Pickett
Frank M. Hinman
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, CA 94111-4067
(415) 393-2000

POTTER ANDERSON & CORROON LLP

By: /s/ W. Harding Drane Jr.
    Richard L. Horwitz (#2246)
    W. Harding Drane, Jr. (#1023)
    Hercules Plaza, 6th Floor
    1313 North Market Street
    P.O. Box 951
    Wilmington, DE 19899
    (302) 984-6000
    rhorwitz@potteranderson.com
    wdrane@potteranderson.com
    *Attorneys for Defendant*
*Intel Corporation*

Dated: January 11, 2010

949091v.1/29282
PUBLIC VERSION:
January 15, 2010

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, W. Harding Drane, Jr. hereby certify that on January 11, 2010, the attached

document was hand delivered to the following persons and was electronically filed with

the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the

following and the document is available for viewing and downloading from CM/ECF:

> James L. Holzman
> J. Clayton Athey
> Prickett, Jones & Elliott, P.A.
> 1310 King Street
> P.O. Box 1328
> Wilmington, DE 19899

I hereby certify that on January 11, 2010, I have Electronically Mailed the

documents to the following non-registered participants:

> Daniel A. Small
> Cohen, Milstein, Hausfeld & Toll , P.L.L.C.
> 1100 New York Avenue, NW
> Suite 500, West Tower
> Washington, DC 20005
> dsmall@cmht.com

> By:   */s/ W. Harding Drane, Jr.*
> Richard L. Horwitz (#2246)
> W. Harding Drane, Jr. (#1023)
> POTTER ANDERSON & CORROON LLP
> Hercules Plaza, 6th Floor
> 1313 N. Market Street
> P.O. Box 951
> Wilmington, DE 19899-0951
> (302) 984-6000
> rhorwitz@potteranderson.com
> wdrane@potteranderson.com
> *Attorneys for Defendants*
> *Intel Corporation and Intel Kabushiki Kasiha*