# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE INTEL CORPORATION MICROPROCESSOR ANTITRUST LITIGATION | ) ) ) ) ) | MDL No. 05-1717-JJF |
| PHIL PAUL, on behalf of himself and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 05-485-JJF |
| v. | ) ) | CONSOLIDATED ACTION |
| INTEL CORPORATION, | ) ) ) | **REDACTED** |
| Defendant. | ) | **PUBLIC INSPECTION VERSION** |

## REPLY TO INTEL'S OPPOSITION TO
## CLASS PLAINTIFFS' PRELIMINARY TRIAL PLAN

**PRICKETT JONES & ELLIOTT, P.A.**
James L. Holzman (#663)
J. Clayton Athey (#4378)
Laina M. Herbert (#4717)
Kevin H. Davenport (#5327)
1310 King Street
P.O. Box 1328
Wilmington, DE 19899
(302) 888-6500
jholzman@prickett.com
jcathey@prickett.com
lmherbert@prickett.com
khdavenport@prickett.com
*Interim Liaison Counsel and Attorneys for Phil Paul, on behalf of himself and all others similarly situated*

Dated: February 1, 2010

# Table of Contents

**Page**

TABLE OF AUTHORITIES .................................................................................... iii

I.  INTRODUCTION ..................................................................................... 1

II. ARGUMENT ............................................................................................ 8

    A.   The Evidence Presented in Class Plaintiffs' Trial Plan is Common to the Class. ............................................................................................ 8

    B.   Common Evidence Demonstrates That Intel Has Engaged In Anticompetitive Conduct Since Well Before The Beginning of the Class Period ............................................................................................. 8

    C.   AMD's Expert Reports Unequivocally Support Class Plaintiffs' Position that Intel's Anticompetitive Conduct Harms Consumers ..................... 12

         1.   ████████████████████████████ ........ 13

         2.   ████████████████████████ .............. 14

         3.   █████████████ is Irrelevant to Class Certification ............... 14

    D.   Common Evidence Demonstrates That Intel's Practice of Paying its Customers Not to Do Business With Its Rivals Is Not ████████ and Does Not Benefit Consumers. ................................................... 15

         1.   ████████████████████████ ............... 17

         2.   ████████████████████████ .............. 18

             a.   ██████████ ......................................... 19

             b.   ██████████ ......................................... 21

             c.   ██████████ ......................................... 24

             d.   ██████████ ......................................... 25

             e.   ██████████ ......................................... 26

         3.   Despite Intel's False Characterizations, Each of its Various ████████████████████████ ............. 27

             a.   Intel's System of Record for Rebates is Corrupt ........................... 29

             b.   ██████████████████ .......................... 30

c. ████████████████████ .............. 31

d. Examples of Intel Price Retaliation .............................................. 31

E. Common Evidence Demonstrates That Intel's Overcharges Are Passed
On to Consumers in the Form of Higher PC Prices ............................... 33

F. Common Evidence Demonstrates That in The But-For World AMD
Would Have Been a More Robust Competitor Across All Products
and Market Segments ........................................................................... 35

1. AMD's Capacity ...................................................................... 36

2. AMD's Prices .......................................................................... 37

G. Intel's Efforts to Suppress Competition in The Server Market Were
Designed to ████████████ ................................................................. 38

H. The Trial Would be Manageable ........................................................... 39

1. Class Plaintiffs' Proposed Bifurcated Trial Structure Ensures
That the Trial Will Be Manageable ....................................... 40

2. Differences in State Antitrust and Consumer Protection Laws Are
Irrelevant to Class Certification ............................................ 41

a. The Differences in State Laws Identified by Intel Pertain
Solely to Damage Remedies ...................................... 42

b. A Limited State-by-State Analysis Shows That There
Are No Substantive Differences Between the State Laws
at Issue in This Case .................................................. 43

c. Intel's Conduct Violated § 5 of the FTCA Which is a
Predicate Act That Automatically Violates the Consumer
Protection Laws of Several Included States ................... 52

i. A Violation of FTCA § 5 is a Predicate Act That
Constitutes a Violation of California's UCL. ......... 53

ii. A Violation of the FTCA § 5 Constitutes a Violation
of the Consumer Protection Statutes of the Included
States. .......................................................... 54

d. Despite Any Purported Issues Related to Manageability,
CAFA Mandates This Court to Follow The Substantive
Laws of The Various States ....................................... 56

CONCLUSION ............................................................................................ 57

# TABLE OF AUTHORITIES

**Cases**

*Adolph Coors Co. v. FTC,*
  497 F.2d 1178 (10th Cir. 1974) .................................................................................... 52

*Amarel v. Connell,*
  202 Cal.App.3d 137 (1988) .................................................................................... 52, 53

*Angelo v Armstrong World Industries,*
  11 F.3d 957 (10th Cir. 1993) ..................................................................................... 40

*Carter Carburetor Corp. v. FTC,*
  112 F.2d 722 (8th Cir. 1940) ..................................................................................... 52

*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone,*
  20 Cal. 4th 163 (1999) ......................................................................................... 53, 54

*Federal Trade Commission ("FTC") v. Brown Shoe Co.,*
  384 U.S. 316 (1966) .................................................................................................. 52

*Four B Corp. v. Daicel Chemical Industries, Ltd.,*
  253 F. Supp. 2d 1147 (D. Kan. 2003) ........................................................................ 47

*FTC v. Wallace,*
  75 F.2d 733 (8th Cir. 1935) ....................................................................................... 52

*Hastings Mfg. Co. v. FTC,*
  153 F.2d 253 (6th Cir. 1946) ..................................................................................... 52

*In re Graphics Processing Units Antitrust Litig.,*
  527 F.Supp. 1011 (N.D. Cal. 2007) ........................................................................... 49

*Kolling v. Dow Jones & Co., Inc.,*
  137 Cal.App.3d 709 (1982) ....................................................................................... 53

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerack,*
  523 U.S. 26 (1998) .................................................................................................... 56

*Lippa's, Inc. v. Lennox, Inc.,*
  305 F.Supp. 182 (D. Vt. 1969) ................................................................................... 55

*Manufacturers Life Insurance Co. v. Superior Court,*
  10 Cal.4th 257 (1995) ................................................................................................ 54

*MGA Entertainment, Inc. v. Mattel, Inc.,*
  2005 WL 5894689 (C.D.Cal. August 26, 2005) ......................................................... 52

*R.E. Spriggs Co., Inc. v. Adolph Coors Co.,*
  94 Cal.App.3d 419 (1979) .......................................................................................... 53

*Rambus v. Infineon Technologies AG,*
  304 F.Supp.2d 812 (E.D.Va. 2004) ............................................................................ 54

*Stevens v. Superior Court,*
   75 Cal.App.4th 594 (1999) ........................................................................ 54

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.,*
   17 Cal. 4th 553 (1998) ............................................................................ 54

*The In Porters, S.A. v. Hanes Printables, Inc.,*
   663 F.Supp. 494 (M.D.N.C. 1987)............................................................. 55

*Union Circulation Co. v. FTC,*
   241 F.2d 652 (2d Cir. 1957)..................................................................... 52

**Statutes**
15 U.S.C. § 45 .......................................................................................... 46

Arkansas Deceptive Trade Practices Act ..................................................... 43

Cal. Bus. & Prof. Code § 16720 ............................................................... 44

D.C. Code § 28-4503 ................................................................................ 51

Mass. Gen. Laws ch. 93A ......................................................................... 42

N.M. Stat. Ann. § 57-1-2 ......................................................................... 49

New Mexico's Unfair Practices Act ............................................................ 55

New York General Business Law § 349 ...................................................... 50

Sherman Act § 2......................................................................................... 55

**Other Authorities**
F.R.C.P. Rule 42 ....................................................................................... 40

Manual For Complex Litigation (4ht Ed.) ................................................... 40

Moores Federal Rules Pamphlet § 42.4 ...................................................... 40

*Newberg on Class Actions* (4th Ed.) ......................................................... 41

STATE ANTITRUST PRACTICE AND STATUTES (THIRD ED. 2004) .................... 55

## I.   INTRODUCTION

Class Plaintiffs' Preliminary Trial Plan, D.I. 1667[1] ("TP"), demonstrates that Class Plaintiffs' liability and consumer harm theories are capable of common proof at trial, and shows that a trial under the Sherman Act and the Antitrust and Consumer Protection Laws of the Included States would be manageable.  Intel's Response to Class Plaintiffs' Preliminary Trial Plan, D.I. 1875 ("TP Response"), is flawed, inadequate, and makes no attempt to discuss – much less rebut – the substantial amount of common, class-wide evidence put forward therein.

First, no matter how the class is ultimately defined — whether it is 26 separate statewide classes or a nationwide class under California law — Class Plaintiffs have proposed a single trial in the U.S. District Court for the District of Delaware.  Class Plaintiffs have also proposed that the trial be bifurcated into two phases.  *See* TP at 1.  In the initial phase ("Phase I"), Class Plaintiffs will try common issues of liability, impact to direct and indirect purchasers, and the measure and determination of the total amount of damages to the jury.  *Id.*  Assuming the jury reaches a verdict in favor of Class Plaintiffs on these issues, Class Plaintiffs will then present evidence as to the purchases made by individual class members during a second phase of the trial ("Phase II").  This routine method of trying class action cases overcomes Intel's overstated concerns regarding manageability.  *See* TP at n.3.

Second, Class Plaintiffs' trial evidence will be the same regardless of how the class or classes are ultimately defined, where the class member resides, or which laws are at issue.  Intel cannot articulate any reasonable scenario under which the evidence offered to support the claims of one particular member of a potential class would be any different than the evidence offered to support the claims of any other member of a potential class.

---

[1] References to "D.I. ___" are to docket items in C.A. No. 05-485-JJF.

19684.1\421538v3

This bifurcated structure ensures that a trial in this case will be manageable. Any issues regarding the extent of an individual class member's damages, or slight differences in damage calculations necessitated by the various laws of the Included States, can be determined during Phase II. This is routine.

Third, Class Plaintiffs' Trial Plan puts forward common proof capable of demonstrating at trial that Intel is and has been engaged in a widespread, persistent, secretive and global pattern of illegal behavior specifically designed to avoid price competition. Common evidence is capable of showing that, as part of an overall scheme to ███████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████[2] Ultimately, Intel's customers ████████████████████████████████████████████████ ███████.[3] In this way, Intel foments fear and dependency in its customer base, thus corrupting what should be a competitive and well-functioning marketplace for microprocessors and PCs.

Common proof will show that through this strategy, ████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████ *See. e.g.* TP at

---

[2] Notwithstanding the voluminous evidence to the contrary, Intel has stated publicly that "We don't buy exclusivity." *Roger Parloff, Intel's Worst Nightmare,* Nov. 16, 2006, http://money.cnn.com/magazines/fortune/fortune_archive/2006/08/21/8383598/index.htm (viewed on Jan. 31, 2010).

[3] *See, e.g.,* Herbert Tab 169 at ██████████████████████████████████████
Herbert Tab 139 ██████████████████████████████████████████
██████████████████ Citations to "Herbert Tab ___" are to the Exhibits In Support Of Reply In Further Support Of Class Plaintiffs' Motion For Class Certification, Class Plaintiffs' Preliminary Trial Plan, And Memorandum In Opposition To Defendant Intel Corporation's Motion To Exclude Testimony Of Dr. Keith Leffler, filed July 29, 2009, D.I. 1672-1676.

n.17; Class Plaintiffs Proposed Findings of Fact, filed herewith ("Plaintiffs' FOF") ¶¶ 86-87.

Common proof will also show that ███████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████ *See*

Plaintiffs' FOF at Section IV.C.; Reply in Further Support of Class Plaintiffs' Motion for Class

Certification, D.I. 1666 ("Class Reply") at 6-15; TP at 13-47, n.21. ██████████████

██████████████████████████████ *See, e.g.,* TP at 26.  This is

precisely the <u>opposite</u> of competition on the merits.

The clear implication of Intel's abusive and exclusionary strategies is that ████████

███████████████████████████████████████████

████████████████████████████████ Rather, as

common evidence will demonstrate,██████████████████████████████

███████████████████████████████████████████

██████████████████████ Declaration of Kevin H. Davenport ("Davenport Decl.") Tab

86██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████ *See* Plaintiffs' FOF at Section

IV.D.3.b.

Substantial common evidence also demonstrates that ████████████████

██████████████████████████

The impact of Intel's conduct on consumers is obvious – <u>higher prices and fewer choices</u>

<u>for personal computers</u>.  Intel understood that █████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████  *See* Plaintiffs' FOF at Section

IV.C.2.; TP at 13-21; Class Reply at 2-4 and 8-11.  ███████████████████

█████████████████████████████████████████████

█████████████████████████████████████  *See* Plaintiffs' FOF at

Section IV.C.2.; TP at 13-21; Class Reply at 2-4 and 8-11.  Under this regime, Intel's customers

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████  *See* Plaintiffs'

FOF at Section IV.D.3.a, ; TP at 62-66; Class Reply at 41-49.

███████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████  *See*

Leffler's Revised Reply Declaration ("Leffler's Revised Reply"), D.I. 1705 at Exhibit E, Table

16.  ████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████  *Id.* at ¶15 (noting

█████████████████████████████████████████████

████████  and Exhibit B████████████████████████.

Fourth, Intel fails to address ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████   *See* Plaintiffs' FOF at Section IV.C.2.; TP at

13-21; Class Reply at 2-4, 7-8.  In so doing, Intel blithely ignores huge amounts of common

evidence capable of demonstrating ████████████████████████████████████

focuses only on narrow technical issues related to its ████████████████   *See* TP

Response at n.1.

Intel similarly ignores considerable amounts of common evidence detailed in Class

Plaintiffs' Trial Plan and Reply Brief that can be used at trial to demonstrate: ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ TP

at 71.  *See generally* TP at 48-76; Class Reply at 41-49; Plaintiffs FOF at Section IV.D.3.  The

common evidence supporting these points is capable of establishing at trial that Intel's conduct

████████████████████████████████████████   By ignoring this common evidence, Intel

effectively concedes the efficacy of a trial on common issues in this case.

Fifth, despite Intel's assertions to the contrary, the positions and evidence advanced in

Class Plaintiffs' Trial Plan are consistent with ████████████████████████████████



*See*

*id.* at pp. 268-311.

In any case, what <u>is</u> clear is that Intel's efforts to

*See* Plaintiffs' FOF at 8;

.[4] *Id.*

In short, Intel's Response to Class Plaintiffs' Trial Plan ignores the ███████████. Intel's objections

do not cast doubt on the fact that common evidence will, for example, demonstrate at trial that

Intel is an ███████████████████████

███████████████████████

## II.    ARGUMENT

### A.    The Evidence Presented in Class Plaintiffs' Trial Plan is Common to the Class.

Class Plaintiffs have presented considerable amounts of undisputed common evidence capable of demonstrating at trial that Intel █████████████████████████ ███████████████████████████████████ *See* TP at 9-76; Class Plaintiffs' Reply Memorandum in Support of Class Certification ("Class Reply Brief") at 6-15, 29-51; Plaintiffs' FOF at Sections IV.C and D.  Each piece of evidence presented is common to the Class, or to members of each Statewide Class, irrespective of where any individual class member resides. Intel has failed to explain how the evidence supporting the claims of one individual class member would be any different than the evidence supporting the claims of any other individual class member.

A class action trial under the Sherman Act and the Antitrust and Consumer Protection Laws of the Included States will focus squarely on Intel's conduct and the effect of that conduct on the marketplace.

### B.    Common Evidence Demonstrates That Intel Has Engaged In Anticompetitive Conduct Since Well Before The Beginning of the Class Period

Class Plaintiffs' Trial Plan contains substantial amounts of common evidence capable of proving that Intel ████████████████████████████████.[5]

Class Plaintiffs offer additional evidence on this point below.[6]

---

[5] ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████ *See* Davenport Decl. Tab 87 ██████████

---

[6] For illustrative purposes, Class Plaintiffs' provided samples of evidence to demonstrate how they would prove their claims against Intel before a jury, using common, class-wide evidence, while reserving the right to bring additional evidence supporting their claims at a later time. *See* TP at n.1.

Class Plaintiffs have submitted substantial common evidence detailing multiple instances of Intel's ████████████████████████████████████████████████

████████ *See* Class Reply at 46-48. *See* TP Response at 26. The record evidence shows, for example, ██████████████████████████████████ *See* TP at 36. ██████████

████████████████████████████████████████████████

████████████████████████████████████████████████ *Id.* █

████████████████████████████████████████████████

████████████████████████████████████████████ TP Response at 28. Intel again misses the point. ██████████████████████

████████████████████████████████████████████████

██████████████████████ *See* Herbert Tab 47 ██████████████

Intel's characterization of the agreement as relating to ██████████████████████

██████████████ is both irrelevant and false. TP Response at 28. ████████ made the following statement when asked about ████████████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Intel also attempts to distinguish an Intel document Class Plaintiffs discuss in the Trial Plan which shows ██████████████████████████████████████

██████████████████████████. TP Response at 27. Intel argues that the purpose ██████████████████████████████████████

██████████████████████████████████ *Id.* What the

document actually says, however, is ████████████████████████████

████████████████████████████████████████████████████

████ Herbert Tab 11 ████████████████. Intel plainly offered ████████

████████████████████████

An ████ document describing the same deal demonstrates that ████ accepted the deal

despite the fact that ████████████████████████████████████████

████████████████████████████:



Herbert Tab 104 ████████████████ (emphasis in original).

The following are additional examples of common, class-wide evidence demonstrating

that Intel's conduct substantially pre-dates the proposed class period and thwarted competition at

some of the largest OEMs, including ████████████████:

(1) ██████████████████████████████████

████████████████████████████████████



(2)   On June 1, 2009, ███ further testified that ███████████████

███████████████████████████████████

███████ Davenport Decl. Tab 876 ███████████████

███████████████████████████████████

██████████████████

(3)   ██████████████████████████████ testified that

███████████████████████████████████

███████████████████████████████████

██████████ Herbert Tab 205 ████████████████

████████████████ *see also* Davenport Decl. Tab 81 ███████

███████████████████████████████████

██████████████████████

(4)   ███████████████████████████████████

██████████████████████ testified that ███████ cancelled the

launch of an AMD-based commercial desktop ███████ in 2000 due to threats from

Intel.  Herbert Tab 208 ████████████████████

(5)   A June 21, 2001 email from ███████████████████████

███████████████████████████████████

to ███████████ described an agreement Intel secured from ███████████

---

[7] A more fulsome description of ██████████████████ is provided in Class Plaintiffs' Findings of Fact. Plaintiffs' FOF at Section IV.C.3.d.

2000 to cancel an AMD-based workstation, code-named ███████ in exchange for
██████████:



(6)    ██████████ testified that the exclusive ████████ relationship had been in place since
1987:

Herbert Tab 207 ███████████████████████

As the above examples illustrate, Class Plaintiffs are capable of demonstrating through
common evidence at trial that Intel engaged in anticompetitive conduct substantially before the
start of the class period.

### C.    AMD's Expert Reports Unequivocally Support Class Plaintiffs' Position that Intel's Anticompetitive Conduct Harms Consumers

Notwithstanding Intel's incorrect assertions to the contrary, ██████████████



██████████████████████ that unequivocally supports Class Plaintiffs'
position that Intel's anticompetitive conduct harmed consumers. *See* ████████████ The
primary thrust of ████████████████████████████████



██████████████████████ (emphasis added).[8]

**1.** ████████████████████████████████

Intel's Response to Class Plaintiffs' Preliminary Trial Plan attacks ████████████

████ TP Response at 23 ████████████████████████████

████████████ But Intel has misconstrued and twisted ████████ and Class Plaintiffs

therefore submit ████████████████████████ *See* Davenport Decl Tab 103.

██████████████████████████████████████ Class Plaintiffs have similarly emphasized

these points. *See* Class Reply at 13-15, 41-49; TP at 48-76; Plaintiffs' FOF Section IV.D.

In analyzing how Intel's conduct resulted in increased computer prices, ████████

████████████████████████ These observations are consistent with, and in fact

nearly identical, to the positions Class Plaintiffs have taken in support of their motion for class

certification. *See* Class Reply at 1-15, 41-49; TP at 48-76; Plaintiffs' FOF Section IV.D.

2. ████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

3. ██████████████████████ **is Irrelevant to Class Certification**

Intel makes the tortured argument that, because ████████████████████████

████████████████████████████████████████████████████

████ TR-Response at 23. The argument is simply dead wrong.

First, ████████████ uses the ████████ test to evaluate ████████████

████████████████████████████████████████████████████

████████████████████████ lays out this distinction as follows:



Since Class Plaintiffs are not pursuing a ███████████████ theory, it is clear that ████████████████ is not even applicable to Class Plaintiffs' case.

Second, the primary inputs into ██████████████ are what ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████ Accordingly, this purely hypothetical price adjustment is completely irrelevant to Class Plaintiffs' theory of consumer harm. That theory is that Intel's actual ████████ would have been lower in the but for world of greater competition.

Third, the only episode of ██████████ identified by ███████████████ ████████████████████████████████ As Intel well knows, servers are not part of any class proposed in the present litigation. *See* ████████████

**D.     Common Evidence Demonstrates That Intel's Practice of** ███████████ ███████████████ **and Does Not Benefit Consumers.**

Class Plaintiffs have advanced compelling common evidence capable of demonstrating at trial that Intel ███████████████████████████████████

████ Class Reply at 7-11; TP at 13-21; Plaintiffs' FOF at Section IV.C.2. and ¶74.  In this way, Intel ████████████████████████████████ Fully cognizant of this fact, Intel repeatedly attempts to confuse ██████████████████████ ███████████████████████████████ While Intel is fully capable of giving its customers ███████████████████████ ████████████████████ See Plaintiffs' FOF Section IV.C.; Class Reply at 7-11, 38-40; Leffler's Revised Reply at 7-16 and n.11, n.17.  In any case, the weight of evidence shows clearly that, regardless of Intel's word games, ██████████ ████████████████████████████████████ ████████████

Class Plaintiffs' position that ████████████████████████ ████████ TP Response at 11.  This position was stated explicitly in Class Plaintiffs' Opening Brief and Professor Leffler's Opening Declarations.  Class Plaintiffs' Opening Brief in Support of Motion to Certify Class, D.I. 754 ("Opening Class Brief"), at 1; Opening Declaration of Keith B. Leffler, D.I. 756, ¶¶ 30-32.

Intel ignores evidence from ████████████████████████ ███████████████████████████ (sometimes referred to as ██████████) would result in a ██████████████ and that they feared microprocessor price ██████████ and a resulting ████████████ would ████████████████████ and ████████ ██████████████ Herbert Tab 11 ████████████████████.  In other words, common evidence is capable of showing that ██████████████████████ ███████████████████████████████ This evidence is also capable

of showing that ███████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████ Herbert

Tab 230 ████████████████████████████████

   While Intel has cobbled together a handful of documents that suggest ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████     More to the point, even if these documents supported Intel's position, Intel has

repeatedly failed to explain how they would create individualized issues.  Indeed, they would

not.

   **1.**   ████████████████████████████████████

   It is not necessary for Class Plaintiffs forensically to account for ████████████

███████████████████████████████████████ TP Response at n.5.  It is

simply not the case, as Intel states, that if the ██████████████████████████

████████████████████████████ *See id.* at 3.  Rather, Class

Plaintiffs' theory of consumer harm states that, ████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

that somehow ██████████ consumers.  However, the evidence detailed in Class Plaintiffs' Trial

Plan and in Intel's Response to the Trial Plan confirms that, with very limited exceptions, the

███████████████████████████████████████████████████████████

█████████████████████████ Plaintiffs' FOF at Section IV.D.3.b; TP at 22-47; Class Reply at 11-

13.

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ Leffler's Revised Reply ¶

15 and Exhibit B.  Given this fact, Intel's entire discussion about █████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████ *Id.* █████████████████████

████████████████████████████████████████████████ . *See*

26 State Conclusions of Law ¶ 53.

    **2.**   ████████████████████████████████████████████████████

Class Plaintiffs' Trial Plan and Reply Brief contain undisputed common evidence capable

of proving at trial that████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████ . Plaintiffs' FOF at Section IV.D.3.b.  That common evidence is also capable

of showing that in certain instances, ████████████████████████████████

███████████████████████████████████ . *Id.*

████████████████████████████████████████████████████

████████████████████████████████████████████████ TP Response

at 13.  In fact, the opposite is true.  As the following discussion illustrates, the few documents

that <u>appear</u> to support Intel's position are taken wholly out of context, as are the few passages of carefully excerpted deposition testimony.

        **a.** ███████

      Intel's recitation of the evidence relating to ███████████████ is wholly inconsistent with what the documents and witnesses actually say.  For the sake of clarity, Class Plaintiffs list the following examples:

      (1) ████████ - According to Intel, the deposition testimony of ████████████, the ████████████████████████████████████████████ ██████████. This is inaccurate. ████████ testified point blank at his deposition that the ██████████████████████████████████████████████ Herbert Tab 227 ██████████████████████████████.

      While ███████ did testify that Intel's ████████ were to ████████████████████ ██████████ he did not indicate that he was referring to ███████████. *Id.* at ████████ Moreover, <u>one minute later</u>, when answering a follow up question ████████ described the Intel ████████ as follows:



      Further clarifying what he meant as to ████████████ testified:

███ later testified that ████████████████████████ and
that what he meant by ███████ was ███████████████████ ███████
explained his motivation for ██████████████████:



    (2) ██████ - Intel quotes ████████ as having testified that ██████████████
████████████████████████████████████ TP Response at 18
(citing Herbert Tab 216 ████████████████████████████

    Here is what ██████ actually said:

Moreover, ████ proposed the following slide for a presentation he made to ████ board of
directors, stating that ███████████████████████████

Herbert Tab 49

When asked about the veracity of this statement at his deposition, ████ testified ████

Herbert Tab 216 ████████████

███████

(3)   ██████ - Intel quotes a document from ██████████ stating that out of a ████████████, ███████████████████████████ TP Response at 19. One cannot determine the context of this document on the basis of what Intel submitted, because Intel did not provide the document in its transmittal declaration. *See* Ex. 39 to ███ Declaration. Rather, Intel provided several pages from ████████████ wherein this document is summarized. *Id.* That said, the relevant page of ███████ report, and indeed what is obvious from the face of the document, states the following:



**b.**   ████████

Class Plaintiffs' common evidence shows that ███ did not treat the payments it received from Intel as adjustments to price.   Intel quotes ███ as saying that it ██████████ ███████████████████████████ but it provides no context for this quote. TP Response at 15.   Contrary to Intel's assertion, ███ in its statement to the European Union, noted that the payments it receives from Intel are ██████████ ████████ Herbert Tab 36 ███████████████████ noted that ████████ ██████████████████████████████████████ ██████████████████████ *Id.* As ████████ testified at his deposition ████████████████████ █████████████████████████████████████████ ████████████████████ Herbert Tab 207 ████████ ████████  In other words, the ████████████████████

████████████████████████████████████████████

Herbert Tab 36 ████████████████████████

    Intel now attempts to argue to this Court that the ████████████████████

████████████████████ that can be accounted for in some rational way.  The

opposite is true.  ████ own employees described the ██████████ as ██████████ that

████████████████████████ and  suggest  that ████████████████████g

████████████████████████████████████████████

████████ and ████████████ to be ████████████ Herbert Tab 91 ████████

████████████████████████████████████████

    ████ defines ████████ as follows, indicating that these are ████████████

by ████ to ████████████████ directly:

████████████████████████████████████

Herbert  Tab  31 ████████████████████

████████████████████████████████████

    Intel and ████ often disagreed about the structure of ████████████ It appears

that ████ would  actually  have  preferred ████████████████████████s.  For

example, ████████████████████████, stated that ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

9 ████████████████████████████ account, implicitly acknowledged that Intel had not kept

track of the way ████

████████████████████████████████████████████

Davenport Decl. Tab 123 ████████████████

██████████████████████████████ Herbert Tab 89 ██████████████████ In other words, ████████████████████████████████████████████, and it understood the difference between the two.

The following February 1, 2006 e-mail chain is an example of the issue ███ faced when considering whether to ████████████████████████████████████████████

████

Email from ████████████████████████████████ and Others:

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

Email from ████████ in response to ████████:
████████████████████████████████████████████████████
████████████████████████████████████████████████████

Email from ████████ in response to ████████:
████████████████████████████████████████████████████
████████████████████████████████ Davenport
Decl. Tab 106 ████████████████████████

On May 27, 2006, in anticipation of the Intel ████████ (which ████████████████ ████████████████████). ████ noted the following:

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████ Davenport  Decl.  Tab  108 ████████████████
████████████████████████████████████

Intel attempts to dismiss these ambiguities by asserting that ██████████████████
████████████████████████████████████████████████████████████████████████
████. However, as the discussion above illustrates, these labels are wholly artificial and do not

reflect the economic reality of the transactions. ██████████████████████ bt
█████████████████████████████████████████████████. In other
words, ██████████ to ██████████. Herbert Tab 207 ████████████████
This is the polar opposite of legitimate price competition.

Finally, Intel argues that ██████ use of Intel ████████ shows ████████████
████████████████████. Intel cites <u>no evidence</u> of such activity in ████████████
The one document Intel does cite on this point states only that the terms ██████ and
██████ refer to ████████████████████████████████████████
██████ and does not explain ██████████████ *See* Declaration of ████████████
██████ at Tab 11 ████████████████████████

        **c.**  ██████

With ██████ Intel again plays games with the truth.

Intel quotes the following deposition testimony from ████████████: ██████████
█████████████████████████████████████████ TP Response at 20.
Intel characterizes this testimony states ████████████████████████████████
██████████████████ *Id.* There is nothing in ██████████ surrounding deposition
testimony suggesting that his team was seeking to ████████████████ *See generally*
Herbert Tab 212 ████████████████████████████ In fact, the actual
document ██████████ was being questioned on (Exhibit ██), reads as follows: ██████████



        Herbert Tab 105 ████████████████████████ Nothing in the
document suggests <u>how</u> the author intends to ██████████ and there is no reference in the
document to lower prices.

Moreover, a June 10, 2004 email exchange between ███████ and his colleague ████████████████████████████████ showing ████ explicit understanding that ████████████ the Intel ██████████ ██████████████ Herbert Tab 48 ████████████████████████████████████████████ ██████████████████████ *see also* Herbert Tab 212 ██████████████ (confirming this email exchange).

Again, Intel ignores this evidence, and twists the facts to suit its needs.

**d.**   ████████████

Intel does not present a single document detailing what ██████████████ ████████ *See* TP Response at 20-21. The one document Intel does discuss, which was presented in Class Plaintiffs' Trial Plan, states explicitly that ████████████ ████████ are ██████████████████████████████ Herbert Tab 133 █ ██████████ Intel asserts that because this document was written in 2004, it must refer to a new concern of Intel, and that the only ██████████████████████████ ████████████████████████ TP Response at 20.

There is at least one other interpretation. During 2002 and 2003, when ███████ ████████████████████████████████████████████ When ████████████████████████ starting in 2004, Intel became concerned that this would tip off the other OEMs that ██████████ with ██████ Intel attempts to make much of the fact that ██████████ said that ██████ ██████████████ TP Response at 21. This is not what ████ testified to at his deposition. First, the document at issue was written by an ████ employee, ████████ y, not a ██████ employee. Davenport Decl. Tab 125 ████████████ Second, when asked what the term ██████████ meant, ████ testified ██████████



*Id.* at ███ ███ also testified that Intel's use of the term ████████████████████████████████

*Id.* at ██████ Moreover, as ███ and Intel readily admit, ████████████████

████████. In ███ own words, ████████████████████████

████████████████████████████████ *Id.* at ███

████ This is precisely the level of ambiguity Intel expected and encouraged. ██████

████████████████████████████████████████

happening. *See, e.g.,* Herbert Tab 230 █████████████(confirming that Intel

████████████████████████████████████████

███████████████████████).

e.   ██████████████████████

Intel lumps its discussion of ██████████████ together in its TP

Response, but only discusses████████[10] Intel's discussion of ██████ consists of one convoluted

paragraph, which suggests that ██████████████████████

██████. TP Response at 23. An internal document written by ████████████

helps explain why ██████ did not have a ████████████████████

████████████████████████, █████████ ██████

██████████████

---

[10] Intel also gratuitously inserts a reference to FTAIA in its discussion of these entities. First, this discussion is misplaced. *See* 26 State Conclusions of Law for full discussion. Second, the Court's FTAIA ruling dismissed only foreign injuries, and Intel has not established that consumers who purchased products from these manufacturers fall into that category. Third, Class Plaintiffs went to great lengths to provide evidentiary support for their claim that Intel's conduct affected the domestic U.S. subsidiaries of these entities█████████████ respectively. *See* TP 35-38 and 42-47. Finally, ████████████████████ *See* Herbert Tab 203 ██████
███████████████



Davenport Decl. Tab 6

3.    **Despite Intel's False Characterizations, Each of its Various**

. Davenport Decl. Tab 86

As one Intel employee put it,

Herbert

Tab 130          *see also* Herbert Tab 227

While Intel claims to have

, the one thing all

these programs have in common is that Intel could

[11]   For example,                                                    ,

described his understanding,                  , that Intel's use of the terms

and          in describing its pricing policies is really a          because these

:

---

[11] In a document dated November 20, 2002, which attempts to clarify the various labels attached to Intel's

Davenport Decl. Tab 109                          In that same

document that he states that

*Id.*          also notes that

*Id.* As          note in February 2003, however, there is a

Davenport Decl. Tab 119



Davenport Decl. Tab 86

Intel's ██████████████████████████████████████████

████████████████. *See* Davenport Decl. Tab 102 ██████████████████

███████████████████████████████████████ Davenport Decl. Tab 110

██████████████████████████████████████████████████████████████

██████████████████████████████████████ Given their uncertainty as to

whether Intel would █████████████████████████████████████████████

████████████████████. *See, e.g.,* Davenport Decl. Tab 111 ████████████

(Intel employee notes that ████████████████████████████████████████

███████████████████); Davenport Decl. Tab 112 █████████████ (Intel

document stating that ████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████); Davenport Decl. Tab 113 ███████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████. *See generally* Plaintiffs' FOF at

Section IV.D.3.2.

### a.    Intel's System of Record for Rebates is Corrupt

███████████████████████████████████████████

███████████████████████████████████. Leffler's Revised

Reply ¶ 15. There is, however, considerable common evidence that Intel's ████████

████████████████████████████████████████

██████████████████████████. The following document dated February 5,

2003, written by █████████████████████, illustrates this point:



Davenport Decl. Tab 119 █████████████

As this admission shows, ██████████████████████████████

███████████████████████████████████████

██████, including Intel's own ███████████ has been hopelessly corrupted. Intel cannot

now argue that Class Plaintiffs must prove, with forensic accuracy, which of Intel's ████████

---

[12] In March of 2003, ████████████ wrote a self-professed ████████ email to ████ and others
explaining, that ████
████ Davenport Decl. Tab 114 ████████████ notes that the ████
that there are ████████████ and
that ███████████████. *Id.*

███████████████████████████████████████████████

████████████████████████████████ *Id.*

**b.** ███████████████████████████████████

Intel incorrectly assumes that, because Class Plaintiffs' Trial Plan has described how

███████████ system is *supposed* to work,[14] that Class Plaintiffs are not ███████████████

█████████████ *See* TP Response at 9;  and TP at 59-61 █████████████████████████.

This is not the case.  While some █████████████████████████████████████o

███████████████████████████████████████████████h

was often simply subterfuge for Intel's policy of ████████████ and not ████████████

████████████ Davenport Decl. Tab 86 ██████████████████; Class Reply at 11-

13 and 38-40.

█████████████, one of ████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████.



Davenport
Decl. Tab 102 ███████████████████████.

---

[13] Intel's own documents demonstrate that ████████████████████████████████. *See*
Davenport Decl. Tab 116 ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

[14] *I.e.,* ██████████████████████████████████
████████████████████ *See* TP at 59-61.

██████████ testified that, ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████



Davenport Decl. Tab 95

In other words, the ████████████████████████ were not price adjustments.

**c.** ████████████████████████████████████

According to Intel's own documents, ████████████████████. For example, an██ PowerPoint dated October 7, 2002 titled ██████████ defines ██████ as follows:

Davenport Decl. Tab 126 ████████████████ *see also* Davenport Decl. Tab 95

████████████████████████████████████████████████████████

████████████████████████████████████████████

**d.      Examples of Intel Price Retaliation**

Regardless of how Intel labeled its ████████████████████████

████████████████████, or any other moniker – common evidence is capable of

demonstrating  at  trial  that ████████████████████████████████

████████████████████████████████.

(1)     An Internal █████ email dated September 3, 2004 from ████████████████

████████████████ to ██████████████████████████████████ described

his fear of ██████████████



Davenport Decl. Tab 116

(2)     An internal █████ document dated June 16, 2001 described ████████ fear that Intel

██████████████████ if ████████████████████████████████

████

Davenport Decl.

(3)     An internal Intel email described Intel's plan to curb ████████████ unless ████

████████████

Davenport Decl. Tab 14

(4)     An internal █████ email dated November 3, 2003 discussed Intel's decision to

reduce ████████████████████████████:

███████ Davenport Decl. Tab 26 ███████████████████

There are many other such examples.

**E.   Common Evidence Demonstrates That Intel's Overcharges Are Passed On to Consumers in the Form of Higher PC Prices**

Class Plaintiffs have presented common evidence capable of demonstrating at trial that



. Leffler Reply Report ¶¶ 50-82.  Similarly, ██████████████████████████████████████ ███████████████████████████████████████████████████. *Id.* ████████████ ████████████████████████████████████████ ████████████████████████████. *See* TP at 62-66; Plaintiffs' FOF ¶77-79; and Class Reply at 40-49.

Intel has not even attempted to address this evidence.  Instead, Intel relies on four declarations submitted by third parties and a handful of snippets from depositions of retailers.  Intel's reliance on these sources is misplaced.

First, the third party declarations cited by Intel appear to have been drafted by attorneys and not industry participants.  *See, e.g.,* Tab 122 ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████ Second, these individuals made statements that undermined Intel's claims at their depositions.

█████████████████ provides an excellent example. ████████████████

██████████████████████████████████████████, testified that the

computer industry is ██████████████ and a ██████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████ Herbert

Tab 209 ████████████████████████████████████████████ ████

█████████████ also testified that ███ engaged in ████████████████ and that when ████████

████████████████████████████████████████ Id. ████████████

████████████ then confirmed that ███ employs a ██████████████████) policy with

its retailers, which retailers generally follow and that ███ does not ████████████████████

████████████████[15] *See Id.* █████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████

After reviewing a document that stated ████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████ testified ███████████████████████

████████████████████████████████████████████████████████████████

████████████████ Herbert Tab 103 ███████████████████████████ *see also*

Herbert Tab 209 ████████████████████████████████████

Finally, ██████████ testified that ████████████████████████████████

███████████████████████████████████████████████████ because ████

███████████████████ *Id.* █████████████ The point of ██████████ testimony is

_____

[15] █████████████████████████████████████████████████████████. *See* TP at n.53.

that ▮ could ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ▮▮▮▮

The logical extension of this argument is that Intel's ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

Given these statements, it is not surprising that Intel cites only to the nearly identical declaration of these affiants, and, with the exception of ▮▮▮▮▮ does not even mention the fact that they were deposed.[16]

Intel's deposition snippets from retailers are no more helpful to its position. *See* TP Response at 37. While these individuals did make occasional statements that their firms did not engage in ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Leffler's Revised Reply ¶ 52. At best, what these statements show is that the individuals being deposed did not know whether ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮

**F.     Common Evidence Demonstrates That in The But-For World AMD Would Have Been a More Robust Competitor Across All Products and Market Segments**

Contrary to Intel's assertion, it is not Class Plaintiffs burden to demonstrate precisely what ▮▮▮▮▮ AMD would have achieved in the but-for world of competition. TP Response at 30. All that matters for class certification in this case is that common proof is

---

16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

Davenport Decl. Tab 122

capable of demonstrating that but-for Intel's conduct, AMD would have been a more robust competitor, and that with increased competition prices come down.

### 1.    AMD's Capacity

Intel's argument concerning ███████████████████████████████████ ████████ has no bearing on what would have happened in the but-for world of greater competition.  TP Response at 30.  The reason for this is that, absent Intel's anticompetitive conduct, AMD's entire strategic posture would have been different. ████████████



Davenport Decl. Tab 86

*Id.* ████████ Therefore, AMD's strategy would have been different, because, by virtue of Intel's anticompetitive conduct ███

*Id.* ███████ also testified that ████████████████████ because in 2001 it already ████████

*Id.* ████

Moreover, █████████████████████████████████████████,

▮ ████████████████████████████████, testified at his 30(b)(6)

deposition, for example, ████████████████████████████████████

████████████████████████████████████████████████████.

Davenport Decl. Tab 87 ████████████████████████

     While ████████ assumed for the sake of his calculations █████████████

██████████████████████████████████████████████████████s

████ *Id.* ████████████ ████ testified that absent that instruction it would have been

reasonable for him to assume that in the but for world, █████████████████████

██████████████████████, *Id.* ████████ █████ also testified that ███

████████████████████████████████████████████, in

the but for world than it did in the actual world. *Id.* ████████

### 2.  AMD's Prices

     Intel claims that in the but for world ████████████████. TP Response

at 33.  The documents Intel uses to support this position are ████████████████

████████████████. *Id.* (████████████████████████

████████████████).  In support of its position, Intel cites to a document, which

purportedly states AMD's position that █████████████████ TP Response at 34.

While this is almost certainly an accurate description of Intel's worldview, it is not a view shared

by AMD.  When ████████████ was shown this ████████ document at his deposition

he stated, ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████ Davenport Decl. Tab 86 ███████████

████████████████ Upon further questioning on this same document ████ said

████████████████████████████████████████████ *Id.* ██████████

████████████[17]

When asked directly about whether AMD's prices would have gone up in the but for

world, ████████████████████████████████████████████

████████████████████████████████████████████. *Id.* at

██████ When ██████ performed his calculations of what AMD's market share gains would

have looked like in the but for world he assumed AMD's prices ████████████████████

Davenport Decl. Tab 87 ████████████████████████ At the instruction of counsel,

████████████████████████████████████████████████

However, ██████ clarified at his deposition that this assumption was based on ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ Davenport Decl. Tab 87 ████████████████████████

████████████████████████████████████████████to

### G.     Intel's Efforts to Suppress Competition in The Server Market Were Designed to ████████

Intel has failed to address several items of common evidence capable of showing that

Intel's anticompetitive activities in the server market were designed to prevent AMD from

entering the lucrative market for corporate PCs.  Class Plaintiffs cited several uncontroverted

documents demonstrating that ████████████████████████████████

████████████████████████████████████████████

---

[17] At an earlier deposition, when discussing ████████████████████████████████

████████████████████████████████████

██████████. *See* Leffler's Opening Declaration at n.52; and Class Plaintiffs' Proposed Findings of Fact at ¶8.

████████████ made the following statement as to this dynamic:

████████████████████████████████████

Decl. Tab 86 ████████████                              Davenport

Intel has misinterpreted the argument and wrongly assumes that because it relates to the server market, Class Plaintiffs allege ██████████ pricing in this case.  TP Response at 5.  They do not.  All of the examples Intel provides on this point relate to ███████████████. *See* TP Response at n.10.  Moreover, Intel's examples relate exclusively to the server market, which is not part of any proposed class. *See id.* ████████████████████

████████████████████████████████

██████████████████████ The citations to Plaintiffs' Preliminary Joint Statement are particularly misleading, because, as AMD and Class Plaintiffs explicitly stated in that Statement, ████████████████ ██████████████████████

████████████████████████████████

██████████ Plaintiffs' Joint Preliminary Case Statement, D.I. 714, at 81.

Intel is well aware that AMD's and Class Plaintiffs' cases are not one in the same, nor are they bound by one another's statements.

**H.      The Trial Would be Manageable**

Intel is misguided in its feeble attempt to cast doubt on the manageability of a trial based on the laws of the 26 states under which Class Plaintiffs assert claims.  Proof establishing Class Plaintiffs' claims does not differ depending on state of residence.  Moreover, whatever minor

differences may exist between the various state laws relate solely to damages, and can thus be resolved by bifurcating the trial into separate proceedings for liability and damages.

### 1.   Class Plaintiffs' Proposed Bifurcated Trial Structure Ensures That the Trial Will Be Manageable

As stated in the Trial Plan, during Phase I, the Court will consider common issues relating to liability, impact, and total measure of damages to the class. *See* TP 7-9.  During Phase II, the Court will address any individualized issues relating to amount of damages. This bifurcated trial structure solves all of the manageability concerns raised in Intel's Response. Thus it is not surprising that Intel's Response conspicuously avoids any substantive discussion of Class Plaintiffs' proposed structure.

Bifurcated trials are routinely used in class actions, and are explicitly permitted by the Federal Rules of Civil Procedure ("F.R.C.P."). *See* F.R.C.P. Rule 42(b) ("[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, cross claims, counterclaims, or third party claims") F.R.C.P. 42(b); Moores Federal Rules Pamphlet § 42.4[2] at 549 ("[o]ne common application of Rule 42(b) is the conduct of separate trials on the issues of liability and damages, thus bifurcating the trial into a liability phase and a damages phase"); Manual For Complex Litigation (4ht Ed.)(stating "[i]n jury cases, the court may consider trying common issues first, preserving individual issues for later determination); *Angelo v Armstrong World Industries*, 11 F.3d 957, 964-65 (10th Cir. 1993)(holding that district court did not abuse its discretion by bifurcating trial into damages and liability phases, and that it was not improper to try damages first, then liability). Intel has not offered a single piece of legal authority countering the efficacy of this codified and routinely used trial structure.

As explained fully in the following section, the differences in state laws asserted by Intel are either so trivial that they could not possibly generate predominating individualized issues, or they relate exclusively to damages. This fact is fatal to Intel's argument because damages for individual class members will be calculated during the damages phase of the trial. *See Newberg on Class Actions* (4th Ed.) § 18:52 (stating "the question [of] whether there has been a violation of the antitrust laws will, in a proper class action, be common to the entire class and amenable to proof by the class representative with individual participation"); § 18:53 ("[i]n many cases, the class representative in an antitrust suit may prove the amount of damages for the entire class, as well as the issue of liability and the fact of damages, thus eliminating the need for individual damage proofs at trial. This will not be burdensome or unmanageable because courts presiding over class actions can, and routinely do, assign special masters to receive evidence during the damages phase, in order to make individual damages determinations based on the calculations. *See* Newberg On Class Actions (4th Ed.) § 18:54 at 185.

### 2. Differences in State Antitrust and Consumer Protection Laws Are Irrelevant to Class Certification

Intel's Response to Class Plaintiffs' Trial Plan fails to identify any meaningful distinction among state laws that would necessitate individualized proof during Phase I of the trial Class Plaintiffs have proposed. Any differences in state law are obviously irrelevant to the manageability of a nationwide class certified under California law. Similarly, should 26 separate statewide classes be certified, any manageability issues are irrelevant to class certification because each statewide class must be assessed individually. *See* Class Plaintiffs' Proposed Conclusions of Law for Certification of a Nationwide Injunctive Class and 26 Statewide Classes, Exhibit A, filed herewith ("26 State Conclusions of Law"), at 22-23. For the sake of clarity, however, Class Plaintiffs will address each of the various state laws Intel's Response attempts to

put at issue. *See also* Class Reply at 52-58; 26 State Conclusions of Law, Exhibit A (detailing the laws of each statewide class and amenability of each to class certification).[18] *See generally* 26 State Conclusions of Law.

### a. The Differences in State Laws Identified by Intel Pertain Solely to Damage Remedies

First, Intel asserts that ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ TP Response

at 47-48. Intel is incorrect. Common evidence exists to determine the volume of purchases made in each state for such purposes. *See* Leffler's Revised Reply at ¶ 115-18. Intel raises similar arguments as to <u>Nevada</u> (proof that the class member is elderly or disabled) and <u>Wisconsin</u> (proof that the Wisconsin Department of Agriculture issued an order relating to Intel's conduct). These differences are irrelevant at the class certification stage, however, because they relate exclusively to remedies (*i.e.*, the amount of damages to which an individual class member may be entitled), and will be dealt with during Phase II. Even if the Court had to make a determination about these issues during Phase I, they do not rise to the level of predominant individualized issues.

---

[18] Class Plaintiffs note here that they are no longer pursuing a single 26-state class of indirect purchasers, and are only seeking to certify (1) 26 separate state classes under the laws of the Included states and (2) a nationwide class under California law. Class Plaintiffs propose a single trial, in bifurcated format, at which evidence common to the class will be used to demonstrate Intel's liability, the corresponding impact on consumers, and the total measure of damages.

[19] The Massachusetts consumer protection statute does not have this provision, as Intel contends. Rather, a statutory provision exists to award damages to consumers, while another exists to award damages to businesses. *See* Mass. Gen. Laws ch. 93A §§ 9, 11.

b.     **A Limited State-by-State Analysis Shows That There Are No Substantive Differences Between the State Laws at Issue in This Case**

As Class Plaintiffs have stated repeatedly, and as the state-by-state analysis below demonstrates, the common evidence that will be presented at trial is capable of demonstrating

█████████████████████████████████████████████

███████████. Class Plaintiffs have limited the state-by-state analysis below to focus only on the eleven states put at issue by Intel. *See* TP Response at 40-51. Intel has not and cannot identify any meaningful distinction between these two formulations of the same general principle that American antitrust law does not permit monopolists to purchase market share from their customers, to retaliate against those customers when they attempt to do business with the monopolists' rivals, or take any other actions that foreclose markets to competition and injure consumers. *See also* Class Reply at 51-58.

(1)     Arkansas Deceptive Trade Practices Act ("DTPA").

Intel makes two arguments as to the Arkansas Deceptive Trade Practices Act ("DTPA"). First, Intel argues that this statute does not prohibit antitrust violations.  TP Response at 42. Second, Intel asserts that Arkansas's prohibition on the exercise of ██████████████████ ██████████ somehow elevates the proof required to demonstrate a violation of the DTPA beyond what would be required under the Sherman Act or the laws of the other Included States.  TP Response at 46.  Both arguments are incorrect.

First, the elements of the applicable provisions of the Arkansas consumer protection statutes are the same as the elements of the applicable provisions of the consumer protection statutes of several other states. *See* Annex C to Plaintiffs' Motion for Class Certification, D.I. 757.  Moreover, Arkansas's DPTA prohibits "unfair trade practices," and courts have certified

indirect purchaser class action cases under Arkansas law.  *See* 26 State Conclusions of Law at 1;
Annex F to Motion for Class Certification, D.I. 757.

Second, even if Intel correctly interprets Arkansas law, which it does not, common
evidence is capable of demonstrating at trial that Intel's conduct was unconscionable in that it
████████████████████████████████████████████████████ the Arkansas consumer
protection laws were designed to prevent.  *See* 26 State Conclusions of Law, Exhibit A.  This
evidence will demonstrate that ████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████████████████████  *See* Class Reply at
6-15, 49-51;  Plaintiffs' FOF at Section IV.C-E; TP at 13-21, 75-76.

(2)    California's Cartwright Act.

Intel argues that California's Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq.*, is
███████████████████████████████████████████████████████  TP
Response at 42.  This argument is makeweight.  There is no exclusive language in either act.
Moreover, the elements of the Sherman and Cartwright Acts are nearly identical, except that the
Cartwright Act requires the additional showing that Intel acted in "combination" with other
entities when restraining trade in the relevant market for x86 microprocessors.  *See* 26 State
Conclusions of Law at 3-4.

The Cartwright Act's "combination" requirement will be satisfied easily by the common
evidence Class Plaintiffs will present at trial, no matter what claim is at issue.

First, as Class Plaintiffs explained in their Trial Plan, the mere existence of
███████████████████████████████████████████ satisfies this element.  Common
evidence is capable of showing at trial that Intel ████████████████████████████



. Herbert Tab 90

; Herbert Tab 227

*See* TP at 10 (citing cases).

Second, the common evidence that Intel

*See* TP at n.13.

Third, when the legislature enacted the Cartwright Act, it delivered

and

*See* 26 State Conclusions of Law at 3-4.  Finally, courts regularly certify classes of indirect purchasers on Cartwright Act claims.

    (3)    <u>Idaho Consumer Protection Act.</u>

Intel makes two arguments regarding Idaho's Consumer Protection Act.  First, Intel asserts that

TP Response at 46.

Not only are these assertions based on incorrect interpretations of Idaho law, they are completely irrelevant to Class Plaintiffs' claims, and their motion for certification, for at least three reasons.

First, the common evidence Class Plaintiffs will rely on to prove their case at trial will affirmatively demonstrate that

████████████████████████████████ This evidence will show that ██████

███████████████████████████████████████████████

███████████████████████████████████████ *See* TP

at n.21.  Class Plaintiffs will present this common evidence no matter what law is at issue, and

no matter what class is ultimately certified.

Second, Class Plaintiffs have put forward considerable common evidence capable of

demonstrating that ████████████████████████ as defined by Idaho law.

*See* 26 State Conclusions of Law at 8-9.

Third, Idaho's consumer protection law, like the laws of several other states, gives "due

consideration and great weight . . . to the interpretation of the federal trade commission and the

federal courts relating to section 59(a)(1) of the federal trade commission act (15 U.S.C. §

45(a)(1))."  As explained above, common evidence is capable of demonstrating that ██████

███████████████████████████████████████████████

██████████████████████

(4)    Kansas Antitrust Statute.

Intel makes two arguments about Kansas's antitrust statute.  First, Intel asserts that Class

Plaintiffs must introduce individual evidence to prove whether the proposed class members

purchased computers for home use.  TP Response at 47.  As discussed above, this distinction is

irrelevant to class certification.

Second, Intel argues that Kansas's prohibition on the exercise of ████████████

██████████████ somehow elevates the proof required to demonstrate a violation of this act

beyond what would be required under the Sherman Act or the laws of the other Included States.

TP Response at 46.  This argument makes no sense.

Under Kansas law, anticompetitive agreements, such as those alleged by Class Plaintiffs in this case, are explicitly prohibited. 26 State Conclusions of Law at 10-11; *see also Four B Corp. v. Daicel Chemical Industries, Ltd.*, 253 F. Supp. 2d 1147, 1150, 1152 (D. Kan. 2003) (indirect purchasers have standing under this statute to sue for antitrust misconduct).

Moreover, even if Intel's interpretation of Kansas law were correct, which it is not, common evidence is capable of demonstrating that █████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████. *See* Class Reply at 6-15, 49-51; Plaintiffs' FOF at Section IV.C-E; TP at 13-21, 75-76. Such acts are an obvious illegal exercise of "grossly unequal bargaining power" under Kansas law. 26 State Conclusions of Law at 10-11; Annex F to Motion for Class Certification.

(5)     Maine Antitrust and Unfair Trade Practices Acts.

As to Maine's statutes, Intel asserts only that individual evidence must be introduced to prove whether the proposed class members purchased computers for home use. TP Response at 47. As discussed above, this distinction is irrelevant to class certification as it relates solely to individual damage remedies. Moreover, several courts have certified Maine classes of indirect purchasers under the Maine antitrust and consumer protections statutes. *See* Annex F to Motion for Class Certification.

(6)     Massachusetts Consumer Protection Act.

Regarding the Massachusetts Consumer Protection Act, Intel asserts only that individual evidence must be introduced to prove whether the proposed class members purchased computers for home use. TP Response at 47. First, as discussed above, this distinction is irrelevant to class

certification as it relates solely to individual damage remedies.   Second, Massachusetts's consumer protection statute prohibits "unfair methods of competition," which includes conduct by Intel that is at issue in this case.   *See* 26 State Conclusions of Law at 13.

Third, to the extent common evidence is capable of demonstrating that Intel's conduct violated FTCA § 5, such evidence is equally capable of demonstrating, without material distinction, that Intel's conduct also violated Maine's consumer protection act because the two acts have been interpreted as analogous.   *Id.*

(7)     Nevada Unfair Trade Practices Act and Consumer Protection Statute.

Intel argues that only elderly or disabled plaintiffs can assert claims under Nevada's Deceptive Trade Practices Act, and makes no mention of Nevada's Consumer Protection Statute. TP Response at 48.   Defendant's assertions are incorrect and Intel fails to cite any Nevada law from any Nevada authority to support its arguments.   Intel fails even to identify what provision in the Nevada statute its argument relies on.   Instead, Intel cites to a case from the Eastern District of Pennsylvania in support of this tenuous proposition.

To the contrary, the language of Nevada's UTPA explicitly allows private antitrust plaintiffs to sue for damages and injunctive relief.   *See* 26 State Conclusions of Law at 17-18. Nevada's UTPA specifically prohibits monopolization, and provides that indirect purchasers may sue for such violations.   *Id.*   Finally, the Nevada UTPA "shall be construed in harmony with prevailing judicial interpretations of the federal antitrust statutes."   *Id.*

(8)     New Mexico Antitrust and Unfair Practices Acts.

Intel asserts that New Mexico's definition of the term "unconscionable" and its prohibition on the exercise of "grossly unequal bargaining power" somehow elevate the proof

required to demonstrate a violation of this act beyond what would be required under the Sherman Act or the laws of the other Included States. This is wrong for several reasons.

First, Intel's interpretation of New Mexico law is hopelessly convoluted. Under the New Mexico Antitrust Act, it is "unlawful for any person to monopolize or attempt to monopolize, or combine or conspire with any person or persons to monopolize, trade or commerce, any part of which trade or commerce is within the state." N.M. Stat. Ann. § 57-1-2. The statute expressly provides that indirect purchasers who are "threatened with injury or injured" have standing to assert such a claim, and "may bring an action for appropriate injunctive relief, up to threefold the damages sustained and costs and reasonable attorneys' fees." *See* 26 State Conclusions of Law at 19-20. Claims under the New Mexico Antitrust Act have been certified for class treatment in cases brought by indirect purchasers in both state and federal courts.

Second, *In re Graphics Processing Units Antitrust Litig.*, 527 F.Supp. 1011 (N.D. Cal. 2007) ("GPU II"), the only case cited by Intel on this point, did not even deal with monopolistic conduct.

Third, even if Intel's interpretation of New Mexico law were correct, which it is not, common evidence is capable of demonstrating that ██████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████ *See* Class Reply at 6-15, 49-51; Plaintiffs' FOF at Section IV.C-E; TP at 13-21, 75-76. Such acts are ███████████████ ██████████████████████ under New Mexico law. *See* 26 State Conclusions of Law at 19-20.

(9)     New York General Business Law (GBL) § 349(h).

Intel asserts that New York consumer protection law applies only to false advertising claims. TP Response at 46. This is incorrect.

The elements of a New York General Business Law § 349 claim are much broader than Intel asserts: (1) a showing that defendant is engaging in an act or practice that is deceptive or misleading in a material way, and (2) that plaintiff has been injured as a result. *See* 26 State Conclusions of Law at 20-21. Moreover, courts have certified classes in cases alleging "monopolistic business practices." *Id.* at 21.

(10)    Rhode Island Deceptive Trade Practices Act ("DPTA").

Intel claims that none of the enumerated practices outlined in Rhode Island's unfair trade practices and consumer protection acts prohibit antitrust violations. Like its other tortured interpretations of state law, this too is incorrect.

Rhode Island's DPTA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices." *See* 26 State Conclusions of Law at 23-24. The common proof that Class Plaintiffs will present at trial is capable of demonstrating that Intel engaged in unfair methods of competition under Rhode Island law.

(11)    West Virginia Antitrust Act.

As to the West Virginia Antitrust Act, Intel asserts only that individual evidence must be introduced to prove whether the proposed class members purchased computers for home use. TP Response at 47. As discussed above, this distinction is irrelevant to class certification as it relates solely to individual damage remedies.

For the sake of clarity, Class Plaintiffs note here that the West Virginia Antitrust Act declares unlawful "[t]he establishment, maintenance or use of a monopoly or an attempt to

establish a monopoly of trade or commerce, any part of which is within this State, by any persons for the purpose of excluding competition or controlling, fixing or maintaining prices . . . ." *See* 26 State Conclusions of Law at 27-28.

State and federal courts have certified West Virginia indirect purchaser under West Virginia's Antitrust Act.

> (12)   <u>District of Columbia Consumer Protection Procedures and Antitrust Acts</u>.

Intel asserts that the District of Columbia's consumer protection law prohibits "grossly unequal bargaining power," and that this prohibition somehow elevates the proof required to demonstrate a violation of this act beyond what would be required under the Sherman Act or the laws of the other Included States. This is wrong for several reasons.

First, the DCAA makes it "unlawful for any person to monopolize, attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of trade or commerce" (D.C. Code § 28-4503), and expressly provides a cause of action for indirect purchasers. *See* 26 State Conclusions of Law at 5-6.

Second, common evidence is capable of demonstrating at trial that Intel's conduct was unconscionable in that it exercised precisely the "kind of the grossly unequal bargaining power" the CPPA was designed to prevent. This evidence demonstrates that Intel coerced its customers into anticompetitive money-for-market-share agreements that they would not otherwise have entered into. *See* Plaintiffs' FOF at IV.C.

> (13) <u>Wisconsin Antitrust Act</u>.

Without analyzing any part of the actual statute, Intel asserts that there is no private right of action under this law unless there has been an order issued by the Wisconsin Department of Agriculture. A plaintiff may bring suit under the Wisconsin antitrust act when, as here, "the

conduct complained of 'substantially affects' the people of Wisconsin and has impacts in this state, even if the illegal activity resulting in those impacts occurred predominantly or exclusively outside of the state." *See* 26 State Conclusions of Law at 28-29. Claims under the Wisconsin antitrust and consumer protection statutes have been certified for class treatment in numerous cases in state and federal courts. *See* Annex F to Motion for Class Certification.

As noted above, even if Intel's interpretation of Wisconsin law were correct, which it is not, this distinction would only apply to the remedy available to a given class member (*i.e.*, the amount of his or her damages), and would not preclude a trial on common issues. This argument is therefore irrelevant to class certification.

<b>c.    Intel's Conduct Violated § 5 of the FTCA Which is a Predicate Act That Automatically Violates the Consumer Protection Laws of Several Included States</b>

Common evidence is capable of demonstrating at trial that Intel's conduct violated § 5 of the FTCA. FTCA § 5, like the Sherman Act § 2, prohibits dominant firms from entering and maintaining exclusive dealing arrangements with their customers and thereby foreclosing key distribution outlets in order to injure rivals, or taking other similar actions that foreclose their rivals from participating in the relevant market.[20] This is particularly significant in light of the

---

[20] *See MGA Entertainment, Inc. v. Mattel, Inc.*, 2005 WL 5894689 (C.D.Cal. August 26, 2005), which chronicles the following FTC cases on this issue: *Federal Trade Commission ("FTC") v. Brown Shoe Co.*, 384 U.S. 316, 321 (1966) ("basic policies" of antitrust laws violated when second largest shoe manufacturer employed extremely attractive program that required retailers "substantially to limit their trade with [manufacturer's] competitors"); *Adolph Coors Co. v. FTC*, 497 F.2d 1178 (10th Cir. 1974) (affirming FTC finding that powerful supplier violated FTCA by coercing distributors and retailers into participating in a variety of anticompetitive conduct, including excluding products of supplier's competitor); *Union Circulation Co. v. FTC*, 241 F.2d 652, 655-56 (2d Cir. 1957) (affirming FTC finding that defendants violated FTCA by "coercing" others into not doing business with defendants' competitor); *Hastings Mfg. Co. v. FTC*, 153 F.2d 253 (6th Cir. 1946) (affirming FTC finding that defendant violated FTCA by using various means to induce distributors into refusing to handle competitors' products); *Carter Carburetor Corp. v. FTC*, 112 F.2d 722, 734-36 (8th Cir. 1940) (affirming FTC finding that powerful supplier violated FTCA by "inducing, coercing and compelling many independent [retailers] to cancel existing sales contracts with ... competitor and to cease and refuse to deal in the products of such competitor"); *FTC v. Wallace*, 75 F.2d 733 (8th Cir. 1935) (affirming FTC finding that defendant coal dealers violated FTCA by intimidating and threatening to boycott suppliers that dealt with competitors); *Amarel v. Connell*, 202 Cal.App.3d 137, 142, 145 (1988) (plaintiff rice growers stated antitrust claim against powerful vertically-integrated competitors, in part,

fact that the FTC has initiated an administrative proceeding against Intel alleging that Intel has violated FTCA § 5.[21]

### i.   A Violation of FTCA § 5 is a Predicate Act That Constitutes a Violation of California's UCL.

To state a claim under California Business and Professions Code § 17200, California's Unfair Competition Law or "UCL," Class Plaintiffs need only establish that Intel engaged in business practices that were "unlawful, or unfair, or fraudulent." *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone,* 20 Cal. 4th 163, 180 (1999) *("Cel-Tech").* "Because it is written in the disjunctive," each of these prongs represents an independent basis for a cause of action under the UCL. *Id.* "In other words, a practice is prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa." *Id.* The evidence in this case establishes that Intel's conduct was both unlawful and unfair.

The "unlawful" prong of the UCL "governs 'anti-competitive' business practices as well as injuries to consumers, and has as a major purpose "the preservation of fair business competition." *Id.* This prong "proscribes any unlawful business practice, [and] borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Id.* The California Supreme Court has squarely stated that

because competitors refused to do business with those who dealt with plaintiffs' customers); *Kolling v. Dow Jones & Co., Inc.,* 137 Cal.App.3d 709 (1982) (violation of antitrust laws for supplier to threaten, intimidate, and coerce distributor into participating in anticompetitive conduct); *R.E. Spriggs Co., Inc. v. Adolph Coors Co.,* 94 Cal.App.3d 419, 425 (1979) (violation of antitrust laws for supplier to force distributors into anticompetitive behavior "through suggestions which the distributors could not refuse"). *Compare* Compl. ¶ 78 (alleging Mattel bought up supply of doll hair from two largest suppliers to lock MGA out of market), *with Amarel,* 202 Cal.App.3d at 142, 145 (plaintiff rice growers stated antitrust claim against integrated competitors, in part, because competitors locked plaintiffs' customers out of ports necessary for business).

[21] The FTC alleges that "[t]his antitrust case challenges Intel's unfair methods of competition and unfair acts or practices beginning in 1999 and continuing through today, and seeks to restore lost competition, remedy harm to consumers, and ensure freedom of choice for consumers in this critical segment of the nation's economy. Intel's conduct during this period was and is designed to maintain Intel's monopoly in the markets for Central Processing Units ("CPUs") ...." Davenport Tab 101, In the Matter of Intel Corporation, Dkt. No. 9341, Complaint, ¶2 (Dec. 16, 2009 F.T.C) ("FTC Compl.").

"[t]he Legislature intended this 'sweeping language' to include 'anything that can properly be called a business practice and that at the same time is forbidden by law.'" *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 560 (1998). Given this standard, "[v]irtually any law – federal, state or local – can serve as a predicate for a section 17200 action." *Stevens v. Superior Court*, 75 Cal.App.4th 594 (1999).

It is therefore straight-forward that the evidence in this case establishes that Intel violated the UCL through its predicate violations of California's Cartwright Act, the consumer protection and antitrust statutes of the Included States, and Section 2 of the Sherman Act. *See, e.g., Manufacturers Life Insurance Co. v. Superior Court*, 10 Cal.4th 257, 266 (1995) (holding that a defendant's violation of the Cartwright Act gives rise to a private right of action under the UCL); *Rambus v. Infineon Technologies AG*, 304 F.Supp.2d 812, 820 (E.D.Va. 2004) (applying California law and finding that plaintiffs could properly plead a UCL claim based on defendant's alleged violation of Section 2 of the Sherman Act); *see also Cel Tech*, 20 Cal.4th at 179 (stating that one of the purposes of the UCL is to "safe-guard the public against the creation or perpetuation of monopolies and to foster and encourage competition").

ii. **A Violation of the FTCA § 5 Constitutes a Violation of the Consumer Protection Statutes of the Included States.**

Violations of Federal Law, including violations of the FTCA's prohibition of anticompetitive conduct, which can clearly be demonstrated by common evidence in this case, constitute violations of the consumer protection statutes of the Included States; the so-called "little FTC Acts."[22] Under these little FTC Acts, "unfair competition" is defined as, *inter alia*, "

---

[22] The "Consumer Protection" statutes of the following states parallel FTCA § 5 and are referred to as the "little FTC Acts": Arizona, California's UCL, Florida, Idaho, Maine, Massachusetts, Nebraska, Nevada, North Carolina, New Hampshire, New Mexico, South Dakota, Vermont, West Virginia, and Wisconsin. These "little FTC Acts," generally "parallel the proscription of 'unfair methods of competition' and/or 'unfair or deceptive acts or practices'

any method of competition that violates Federal Law." *See* Annex C: Part 1, submitted in conjunction with Plaintiffs' Class Brief.

Not only is common proof capable of independently demonstrating that Intel's conduct violated FTCA § 5, but proof of Intel's Sherman Act violations is sufficient as a matter of law to trigger liability under FTCA § 5 and "little FTC Acts" of the Included states. The reason for this is that "[i]t is clear that any activity that violates the Sherman Act also violates § 5(a)(1) of the FTCA, [which] is much broader, [and which is] also designed to 'stop in their incipiency acts and practices which, when full blown, would violate those acts.'" *Lippa's, Inc. v. Lennox, Inc.*, 305 F.Supp. 182, 186-87 (D. Vt. 1969).

Therefore, to the extent Class Plaintiffs prove that Intel violated the Sherman Act § 2 or FTCA § 5, they have also necessarily shown that Intel violated the Unfair Competition laws of the Included States Consumer Protection Statues.[23]

---

contained in Section 5 of the Federal Trade Commission Act (FTC Act)." STATE ANTITRUST PRACTICE AND STATUTES (THIRD ED. 2004), V.1 at 1 (generally), 4-36 (Arizona), 6-3 (California), 11-3 (Florida), 15-1 (Idaho), 22-2 (Maine), 24-1 and 2 (Massachusetts), 26-1 (Minnesota), 28-1 (Missouri), 30-1 (Nebraska), 31-1 (Nevada's Unfair Trade Practices Act is "construed in harmony with prevailing judicial interpretations of the federal antitrust statutes"), 32-1 (New Hampshire), 34-1 note 9 (interpretations of New Mexico's Unfair Practices Act "should be guided by the rulings of the Fair Trade Commission and the federal courts"), 36-2 (North Carolina), 45-1 (South Dakota), 49-1 (Vermont), 53-2 (West Virginia), 54-1 note 7 (Wisconsin); *see also, e.g.,* FLA STAT § 501.204(2) (stating that Florida's consumer protection statute is to be construed consistently with § 5 of the FTCA); *The In Porters, S.A. v. Hanes Printables, Inc.,* 663 F.Supp. 494, 502 n.7 (M.D.N.C. 1987) (stating "[a] violation of FTCA § 5 amounts to a violation of the Sherman Act; consequently, a violation of the Sherman Act violates North Carolina's unfair trade practices act")(emphasis added); Opening Class Brief at Annex C, D.I. 757.

[23] If Class Plaintiffs demonstrate that Intel violated § 2 of the Sherman Act, they have also demonstrated that Intel violated the monopolization laws of the Included States. Intel has consistently failed to address the fact that the monopolization statutes of the following states and the District of Columbia have been construed as analogous or otherwise "harmonized" with Section 2 of the Sherman Act by their various courts and state legislatures: Arkansas, Arizona, California, Kansas, Iowa, Maine, Michigan, Minnesota, Mississippi, Nevada, Nebraska, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Dakota, Tennessee, West Virginia, and Wisconsin. *See* Class Plaintiffs' Opening Class Brief at Annex B, D.I. 757; and STATE ANTITRUST PRACTICE AND STATUTES (THIRD ED. 2004), at 5-1 (Arkansas), 18-11 (Iowa), 19-2 (Kansas), 37-1, 25-1 (Michigan), (North Dakota), 43-1, 35-1 (New York analogous to Sherman Section 2, but like California's Cartwright Act requires additional showing of concerted action, which is present here), (Rhode Island), 46-2 (Tennessee).

**d.    Despite Any Purported Issues Related to Manageability, CAFA Mandates This Court to Follow The Substantive Laws of The Various States**

Even if the Court were to find merit in Intel's concerns of case manageability, these concerns are not a reason to deny certification. Courts have concluded that denying certification on the grounds Intel relies on runs afoul of the Class Action Fairness Act ("CAFA"). *See* Class Reply at 54. By enacting CAFA, "Congress thus envisioned that such claims – involving thousands of plaintiffs from many states – would be litigated in one forum." *Id.* The express purpose of CAFA was to provide a Federal forum for adjudicating the merits of most class actions, and was not intended to provide defendants with a procedural means for avoiding involvement with cases that might be difficult or inconvenient. *See id.*

Moreover, regardless of manageability concerns, courts presiding over class actions are bound to follow the underlying substantive antitrust and consumer protection laws of each relevant state. *See* 26 State Conclusions of Law at 2. Given this core principle, the Court should not deny class certification for any statewide class merely because there are 25 other statewide classes seeking to be certified. *Id.* Rather, the certification decision should be made separately and independently for each statewide class as if that were the only class presented to the Court for certification. Class Plaintiffs therefore are not prejudiced by the fact that CAFA and the multi-district litigation statute together enable adjudication of all 26 state-law class actions in one federal court instead of separate adjudication of each class action in 26 different courts. *Id.*[24]

---

[24] Intel asserts that under *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerack*, 523 U.S. 26 (1998), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ TP Response at 40. This argument is nonsense. *Lexecon* has nothing to do with class certification and does not say that classes should not be certified because cases may eventually be tried in non-MDL proceedings. Moreover, most of the complaints in this case were filed in the U.S. District Court for the District of Delaware, and Class Plaintiffs have since filed a consolidated amended complaint that supersedes the original complaints. D.I. 49.

**CONCLUSION**

As Class Plaintiffs' Preliminary Trial Plan makes clear, and as further explained herein, a manageable trial based on classwide, common evidence is feasible, irrespective of whether the Court certifies a nationwide class or several statewide classes. Intel has presented no evidence to the contrary. Class Plaintiffs' bifurcated trial plan should therefore be accepted as sufficient for class certification.

PRICKETT JONES & ELLIOTT, P.A.

By: _____

James L. Holzman (#663)
J. Clayton Athey (#4378)
Laina M. Herbert (#4717)
Kevin H. Davenport (#5327)
1310 King Street
P.O. Box 1328
Wilmington, DE 19899
(302) 888-6500
jlholzman@prickett.com
jcathey@prickett.com
lmherbert@prickett.com
khdavenport@prickett.com
*Interim Liaison Counsel and Attorneys for Phil Paul, on behalf of himself and all others similarly situated*

OF COUNSEL:

Daniel A. Small
George F. Farah
Kalpana Kotagal
COHEN, MILSTEIN, SELLERS
  & TOLL, PLLC
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC 20005

Seth R. Gassman
COHEN, MILSTEIN, SELLERS
  & TOLL, PLLC
150 East 52nd Street
Thirtieth Floor
New York, NY 10022

Steve W. Berman
Anthony D. Shapiro
Erin K. Flory
Steve W. Fimmel
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, WA 98101

Guido Saveri
R. Alexander Saveri
Lisa Saveri
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA  94111

Craig C. Corbitt
Judith A. Zahid
Demetrius X. Lambrinos
Qianwei Fu
ZELLE, HOFMANN, VOELBEL
   & MASON LLP
44 Montgomery St., Suite 3400
San Francisco, CA 94104

Interim Co-Lead Counsel for the Class
Plaintiffs

DATED:  February 1, 2010