## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | MDL Docket No. 05-1717 (JJF) |
| INTEL CORP. MICROPROCESSOR ANTITRUST LITIGATION | |
| PHIL PAUL, on behalf of himself and all others similarly situated, | C.A. No. 05-485-JJF |
| Plaintiffs, | CONSOLIDATED ACTION |
| v. | **PUBLIC VERSION** |
| INTEL CORPORATION, | |
| Defendants. | |

## INTEL CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS FOR INTEL'S FAILURE TO PRESERVE EVIDENCE (DM 44)

OF COUNSEL:

James L. Hunt, Esq.
Donn P. Pickett, Esq.
Frank M. Hinman, Esq.
Brian C. Rocca, Esq.
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, CA 94111
(415) 393-2000

Dated: March 5, 2010

Richard L. Horwitz, Esq. (#2246)
W. Harding Drane, Jr., Esq. (#1023)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
wdrane@potteranderson.com

*Attorneys for Defendant*
*Intel Corporation*

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................. 1

II.   NO ADVERSE INFERENCE MAY OR SHOULD BE DRAWN AT THE
      CLASS CERTIFICATION STAGE ................................................................... 6

      A.    Plaintiffs Missed Their Opportunity To Pursue A Motion For Sanctions
            Related To Class Certification ............................................................................ 7

      B.    Plaintiffs' Request For A Class Certification Inference Should, If
            Reached, Be Denied ............................................................................................ 9

III.  INTEL'S RETENTION AND REMEDIATION WERE EXTREMELY
      EFFECTIVE AND RESULTED IN MASSIVE PRODUCTIONS OF DATA .............. 11

      A.    Intel's Retention Efforts Met And Exceeded Legal Requirements ..................... 11

            1.    As Soon As AMD And Plaintiffs Sued, Intel Launched An
                  Instantaneous, Worldwide Response ....................................................... 12

            2.    Intel Sent Immediate And Proper Hold Notices To Hundreds Of
                  Appropriate Employees Worldwide ......................................................... 14

            3.    Intel Followed Up Its Hold Notices With Individual
                  Communications, Monitoring, and Reminders ......................................... 18

            4.    Intel Gathered Terabytes Of Data With An Aggressive Harvest
                  Plan ......................................................................................................... 19

            5.    In Addition To Its Primary Retention, Intel Took Extraordinary
                  And Valuable Failsafe Measures To Enhance Preservation .................... 20

                  a.    Worldwide "Complaint Freeze" Tapes ........................................ 20

                  b.    Migration And Preservation Of Backup Tapes ............................ 22

                  c.    Automatic Journaling Of Emails .................................................. 24

      B.    Intel's Remediation Efforts Were Extraordinary And Effective ......................... 25

            1.    Intel Conducted A Comprehensive Investigation Of Any Lapses ........... 25

                  a.    Custodian Interviews ................................................................... 25

                  b.    Immediate Steps Toward Remediation ........................................ 26

                  c.    Additional Retention Reminders .................................................. 27

            2.    Upon Completion Of Its Investigation, Intel Promptly Disclosed Its
                  Retention Issues And Proposed A Remediation Plan ............................... 27

            3.    Intel Undertook Massive And Unprecedented Steps To Remediate ....... 27

            4.    The Remediation Was Successful ............................................................ 28

IV.   THE APPLICABLE LEGAL STANDARDS ............................................................ 29

TABLE OF CONTENTS
(continued)

V.    PLAINTIFFS HAVE FAILED TO CARRY THEIR MULTIPLE BURDENS ON
      THIS MOTION.................................................................................................. 31

      A.    Intel Engaged In No Intentional Misconduct Or Willful Suppression Of
            Evidence................................................................................................. 32

            1.    Intel's Retention Plan Was Sound ............................................. 32

            2.    Intel's "Auto-Delete" Decision Was Made In Complete Good Faith...... 34

            3.    Intel Did Not Violate Any "Preservation Order".................... 40

            4.    Plaintiffs' Other Critiques Of Intel's Retention Plan Are
                  Unfounded................................................................................... 41

            5.    Without Dispute Some Individual Retention Issues Were
                  Inevitable And Understandable................................................. 45

            6.    The Other Deviations From the Retention Plan Were Also Isolated,
                  Honest Human Errors ............................................................. 47

                  a.    Recipients Of Hold Notices ........................................... 48

                  b.    Backup Systems................................................................ 48

      B.    Plaintiffs Have Failed To Establish Any Prejudice ............................. 50

            1.    Plaintiffs Rely On A Second-Hand, Improper And Ultimately Self-
                  Defeating Analysis For Which They Have No Expert ............. 51

                  a.    Simmons Overstates Intel's "Jump" ............................. 52

                  b.    Simmons Understates the "Discount"............................. 53

            2.    Plaintiffs' "Critical" And Supposedly "Missing" Evidence Is
                  Neither........................................................................................ 55

      C.    The Motion Should Be Denied .............................................................. 57

            1.    Plaintiffs' Request For An Adverse Inference Instruction At Trial
                  Should, If Reached, Be Denied................................................. 57

            2.    No Monetary Sanction Is Warranted ........................................ 60

VI.   CONCLUSION............................................................................................... 60

# TABLE OF AUTHORITIES

Page

**FEDERAL CASES**

*Barcelo v. Brown,*
   78 F.R.D. 531 (D.P.R. 1978) ...........................................................................8

*Brewer v. Quaker State Oil Refining Corp.,*
   72 F.3d 326 (3d Cir. 1995)................................................................29, 30, 31, 32

*Broccoli v. Echostar Commc'n Corp.,*
   229 F.R.D. 506 (D. Md. 2005)....................................................................39, 57, 58

*Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.,*
   244 F.R.D. 614 (D. Colo. 2007) ............................................................................58

*Chambers v. NASCO, Inc.,*
   501 U.S. 32 (1991)..............................................................................................29

*Chirdo v. Minerals Tech., Inc.,*
   2009 WL 2195135 (E.D. Pa. July 23, 2009).........................................................30

*Consol. Aluminum Corp. v. Alcoa, Inc.,*
   244 F.R.D. 335 (M.D. La. 2006) ..................................................................55, 57, 58

*DaimlerChrysler v. Bill Davis Racing,*
   2005 WL 3502172 (E.D. Mich. Dec. 22, 2005) ................................................58, 59

*Disability Rights Council of Greater Wash. v. Wash. Metro. Transit Auth.,*
   242 F.R.D. 139 (D.D.C. 2007)..............................................................................39

*Doe v. Norwalk Cmt. Coll.,*
   248 F.R.D. 372 (D. Conn. 2007)...........................................................................39

*Escobar v. City of Houston,*
   2007 WL 2900581 (S.D. Tex. Sept. 29, 2007) ......................................................57

*Estate of Spear v. Comm'r of IRS,*
   41 F.3d 103 (3d Cir. 1994)...........................................................................29, 50

*Gumbs v. Int'l Harvester, Inc.,*
   718 F.2d 88 (3d Cir. 1983)...........................................................................29, 31

*Harding v. Careerbuilder, LLC,*
   168 F. App'x 535 (3d Cir. 2006) ..........................................................................31

TABLE OF AUTHORITIES
(continued)

Page

*In re DaimlerChrysler AG,*
  2003 WL 22951696 (D. Del. Nov. 25, 2003) ................................................................. passim

*In re Hechinger Inv. Co.,*
  489 F.3d 568 (3d Cir. 2007) ....................................................................................29, 31, 50

*In re Hydrogen Peroxide Antitrust Litig.,*
  552 F.3d 305 (3d Cir. 2008) ....................................................................................10

*In re Nissan Motor Corp. Antitrust Litig.,*
  385 F. Supp. 1253 (JPML 1974) ..............................................................................8

*Jackson v. Univ. of Pittsburgh,*
  141 F.R.D. 253 (W.D. Pa. 1992) .............................................................................9

*Kounelis v. Sherrer,*
  529 F. Supp. 2d 503 (D.N.J. 2008) ..........................................................................58

*Marinechance Shipping, Ltd. v. Sebastian,*
  143 F.3d 216 (5th Cir. 1998) ...................................................................................8

*Morse Diesel Int'l, Inc. v. U.S.,*
  81 Fed. Cl. 220 (Fed. Cl. 2008) ...............................................................................8

*MOSAID Tech. Inc., v. Samsung Elec. Co.,*
  348 F. Supp. 2d 332 (D.N.J. 2004) ..........................................................................58

*N.Y. State Nat'l Org. for Women v. Cuomo,*
  1998 WL 395320 (S.D.N.Y. July 14, 1998) .............................................................55

*Paluch v. Dawson,*
  2009 WL 3287395 (M.D. Penn. Oct. 13, 2009) .......................................................59

*Pension Committee of the Univ. of Montreal Pension Plan v.
  Banc of America Securities, LLC,*
  2010 WL 184312 (S.D.N.Y. Jan. 15, 2010) .............................................................60

*Peskoff v. Faber,*
  244 F.R.D. 54 (D.D.C. 2007) ...................................................................................39

*Phillips v. Potter,*
  2009 WL 1362049 (W.D. Pa. May 14, 2009) ...........................................................40, 50, 57

*Republic of the Philippines v. Westinghouse Elec. Corp.,*
  43 F.3d 65 (3d Cir. 1994) .........................................................................................29

TABLE OF AUTHORITIES
(continued)

Page

*Residential Funding v. DeGeorge Fin. Corp.*,
    306 F.3d 99 (2d Cir. 2002)........................................................................31

*Schmid v. Milwaukee Elec. Tool Corp.*,
    13 F.3d 76 (3d Cir. 1994)................................................................... passim

*Scott v. IBM Corp.*,
    196 F.R.D. 233 (D.N.J. 2000)................................................................30, 58

*Smith v. Georgia Energy USA, LLC*,
    259 F.R.D. 684 (S.D. Ga. 2009) ..............................................................10

*Southeastern Mech. Servs., Inc. v. Brody*,
    2009 WL 2242395 (M.D. Fla. July 14, 2009) ........................................39

*Turner v. Hudson Transit Lines, Inc.*,
    142 F.R.D. 68 (S.D.N.Y. 1991) ................................................................60

*United States v. Atkinson*,
    316 F. App'x 93 (3d Cir. 2008) ................................................................31

*United States v. Philip Morris USA, Inc.*,
    327 F. Supp. 2d 21 (D.D.C. 2004)............................................................58

*Zubulake IV*,
    220 F.R.D. 212 (S.D.N.Y. 2003) ......................................................... passim

*Zubulake V*,
    229 F.R.D. 422, 435 (S.D.N.Y. 2004) ..........................................34, 44, 59

**RULES**

Fed. R. Civ. P. 23 .........................................................................................10

Fed. R. Civ. P. 37(e) ...............................................................................36, 38

Fed. R. Civ. P. 37(f)......................................................................................39

**OTHER AUTHORITIES**

ABA SECTION OF ANTITRUST LAW, ANTITRUST COMPLIANCE: PERSPECTIVES AND
RESOURCES FOR CORPORATE COUNSELORS (2005)................................................42

## I.    INTRODUCTION

On June 27, 2005, AMD filed one of the largest and most sweeping antitrust cases ever, effectively challenging the entirety of Intel's microprocessor business practices over a period of several years. The first of class plaintiffs' substantively identical complaints followed on June 29. In response, Intel undertook a document retention effort of historic proportions. Its actions were immediate, global and intensive. Bottom line, Intel's retention undertakings exceeded all applicable legal requirements – both those of 2005 and those of today.

Despite these efforts, and based on problems Intel disclosed in the implementation of its retention program, AMD, on October 14, 2009, filed a motion seeking sanctions against Intel for document retention lapses. Through discovery, Intel had uncovered similar lapses by AMD and, on the same date, filed its own sanctions motion. Both motions were filed on a schedule the Court directed. Plaintiffs did not join AMD's motion, nor express any interest in it, until now.

Plaintiffs have now filed their own sanctions motion – an eleventh-hour "Hail Mary" copied liberally from AMD and designed to distract from and paper over the fatal flaws in their bid for class certification – seeking to penalize Intel for a handful of unintentional and isolated errors of execution in Intel's massive preservation efforts. It is based on multiple misstatements of fact, erroneous analyses and misreadings of law. Its purported link to class certification is make believe, as most strikingly evidenced by plaintiffs' failure to raise any retention issue or purported lack of evidence during 20 months and hundreds of pages of class certification briefing, and indeed their recent (incorrect) claim to have located in the record a "▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬." The motion should be denied in every respect on multiple grounds.

Like virtually all litigants, Intel designed its document retention program by relying primarily on widespread litigation hold notices and individual custodian preservation. That primary retention plan was timely and comprehensive, and by itself completely satisfied all legal

obligations. Immediately upon learning that AMD and plaintiffs had brought suit, Intel analyzed which of its over 100,000 employees were most likely to have potentially relevant information. It gave notice and careful instructions to hundreds of identified employees to retain all relevant data, reminded them regularly of their retention obligations, followed up directly with key custodians, and within weeks began harvesting and preserving custodians' documents – ultimately collecting and producing documents from over *900 employees*. As a result of this process, it retained and produced hundreds of millions of pages of documents. Intel's primary retention efforts demonstrate the opposite of culpable conduct. John Jessen, a principal architect of the Sedona Principles – recognized as an "authoritative set of principles on electronic discovery" – and one of the world's leading e-discovery experts has evaluated Intel's primary retention and testified on this motion that Intel fully met its obligations.

But Intel did not stop there. It took extensive and costly additional steps – well beyond what the law required – to backstop its primary retention plan. Intel's additional retention efforts further refute plaintiffs' arguments. First, within days of the AMD Complaint, Intel created and set aside thousands of "Complaint Freeze" backup tapes containing terabytes of potentially relevant data, an enormous undertaking far beyond any legal requirement. On top of that, within a few months, Intel implemented weekly backup tape retention, also not required, to supplement its primary retention efforts. And later when it became technologically feasible, Intel introduced a system to automatically capture emails sent to or from custodians. Mr. Jessen has concluded that these efforts *exceeded* Intel's obligations. Tellingly, Intel's retention surpassed in both scope and timeliness AMD's retention, what plaintiffs embrace as the "gold standard."[1]

---

[1] Plaintiffs' motion liberally adopts the (erroneous) arguments and evidence from AMD's sanctions motion, including the opinion of AMD's lawyer Shaun Simmons that AMD's retention set the "gold standard." While Intel disputes that characterization, AMD's retention experience

Plaintiffs' accusation that Intel nevertheless acted "intentionally" to suppress evidence is belied by these undisputed supplemental retention efforts beyond any legal obligations.

Not surprisingly, Intel's execution of its retention plan (like AMD's) was not error free. The issues that arose resulted from a series of innocent human errors over several months by individuals in different locations around the world managing this unparalleled global effort. They do not undermine Intel's state-of-the-art retention plan, but represent unintentional deviations from the plan – an unfortunate but unconnected sequence of oversights, miscommunications and simple mistakes. Importantly, most relate to the *voluntary* backup measures Intel had no obligation to take in the first place.

The principal exception to plaintiffs' focus on human error is Intel's initial decision not to disable its email aging system, a complaint copied from AMD. Intel told AMD right up front that it was not disabling "auto-delete" (just as AMD did not disable its mailbox size quotas, similarly designed to maintain a manageable email system). Moreover, auto-delete played no role once a custodian preserved an email as instructed. The fact, discovered later, that some custodians did not perfectly comply does not allow plaintiffs to second-guess Intel's initial auto-delete decision now, much less turn it into sanctionable "intentional" misconduct, *ex post facto*.

In addition, as even AMD admitted while its action against Intel was pending, individual preservation issues "inevitably occur whenever human beings are required to make individual judgments" – what AMD in defending its own retention called "personal, on-the-fly decisions – in some cases, perhaps a thousand or more of them each month – about whether a given email is or is not within the scope of the preservation instructions given to him/her." Individual retention lapses are, AMD agreed, "not the result of a failure . . . to impose a proper litigation hold or to

---

(including its problems) indicates the effort required in a case of this scope and complexity, although, as a much smaller company, AMD's burden was significantly less than Intel's.

monitor it." Those that occurred here are well within the margin of error for an action of this size and complexity. Indeed, AMD, whose conclusion plaintiffs adopt, blessed its own failure to produce hundreds of thousands of emails, describing a 20% shortfall in its retention before automatic journaling as "benign."

When Intel discovered some retention issues, it reacted promptly to resolve them, was proactive and open with AMD, plaintiffs, and the Court, and spared no legitimate expense. Intel's voluntary backup systems provided a significant source for its remediation program. That massive, unprecedented effort was highly successful, and resulted in the production of millions of additional documents, including almost one million pre-Complaint emails plaintiffs, by stipulation and operation of law, would not otherwise have received. No one can seriously argue Intel's actions reflect anything but an extraordinary effort to remedy any potential retention deficiency – exactly the opposite of plaintiffs' thesis that Intel was deliberately trying to avoid producing evidence. Indeed, the remediation plan was Court-approved, and plaintiffs and AMD could find no fault with it whatsoever. A finding, required under settled Third Circuit law to justify any of the various "adverse inferences" plaintiffs seek, that Intel engaged in "intentional" evidence destruction with a "desire to suppress" the truth, cannot be supported on this record.[2]

---

[2] Plaintiffs' Introduction is littered with unsupportable sound bites. They adopt AMD's claim that "Intel maintained a pervasive culture of concealment, which required document destruction and the avoidance of paper trails" in violation of its "legal duty." Mot. 3. That is false. Indeed, the article AMD had principally cited purportedly to support this slander – but plaintiffs notably omit – says the opposite. As its title suggests ("Playing By The Rules"), Intel trained its employees, rigorously, to comply with the antitrust laws. Ex. 1 to Declaration of Duff Beach ("Beach") (unless otherwise identified, all exhibit references are to the Beach Declaration). Intel's ████████████████████, worked to develop "the world's best antitrust compliance program," including "compliance standards that were more conservative than the company's literal reading of the law," and he drove "respect for antitrust principles deep into the organization." *Id.* at 3. Plaintiffs also make much of a single email from Intel's ███████ to ████████████████████ (Mot. 3), but offer no support for the claim that ███████ was "under the same litigation hold instructions," much less that ███████ knew he was. In any case, ███

Some perspective is also in order in considering plaintiffs' motion and whether they have suffered prejudice. Plaintiffs have amassed a mind-boggling number of documents from which to build their case. This was, as AMD told the Court, "the largest electronic production in history" and it has generated many millions of documents – *including some 14 million Intel emails* – for plaintiffs to use.[3] That includes Intel's initial productions of many millions of documents, its remediation productions of millions more, and substantial productions from the key third parties whose purchasing decisions are at the heart of the case. Added to that factual record are tens of thousands of pages of deposition testimony from hundreds of Intel and third party deponents, and huge amounts of transactional and other data. The actual adverse effect on plaintiffs of any retention issues is nil. They have no evidence of any missing material emails and no evidence of prejudice. To the contrary, contemporaneously with this motion seeking sanctions, in which they claim harm from allegedly missing evidence, plaintiffs assert, in trying to win their class certification motion, that they have identified a '███████████████████
███████████████████████████████████████████████████████████████
██████████████████████████████████'[4]

Nor was it ever the parties' intention or expectation that all relevant emails would or could be produced. Indeed, they explicitly stipulated early on that their respective productions would be limited to a subset of potentially relevant custodians and would "not include each and every responsive document." Not surprisingly and to no one's harm, they did not.

---

████ did not suggest *he* would not retain the email. In fact, it was preserved and produced in his "organic" production. Declaration of Brandon Leatha ("Leatha") ¶ 14.

[3] Leatha ¶ 5.

[4] 2/1/10 Trial Plan Reply (D.I. 2297) at 7. Similarly, AMD found more than 2,500 Intel documents suitable to question deponents and designated more than 3,600 as trial exhibits. Its experts relied on more than 2,900 in generating some 3,000 pages of reports. Beach ¶ 2.

Plaintiffs have submitted no credible analysis to support their prejudice claims, but instead point to an unreliable, inadmissible declaration based on the "▮▮▮▮▮▮" and non-expert "statistical" analysis of an associate in one of AMD's law firms. Even taking those deeply flawed statistics at face value, which is not justified, plaintiffs ask the Court to infer prejudice because they claim Intel failed to produce approximately 4% of all possible emails.[5] There is no basis for plaintiffs to argue the presentation of their claims has been hampered because, in their view, they have only the vast majority of the hypothetically available documents, and not "each and every" one – which the parties agreed was not feasible to begin with. The chance of any missing hypothetical email adding materially to the oceans of documents, data and testimony at plaintiffs' disposal is effectively zero.

This significant antitrust case should be decided on its merits, not bogged down in a discovery sideshow. Plaintiffs have not come close to showing Intel's intentional misconduct or plaintiffs' prejudice. There is no basis for sanctions, and the motion should be denied.

## II.    NO ADVERSE INFERENCE MAY OR SHOULD BE DRAWN AT THE CLASS CERTIFICATION STAGE

Preliminarily, plaintiffs' request for one or more "adverse inferences" in the resolution of their class certification motion should be denied on the grounds that it is untimely and diversionary. Nothing in plaintiffs' afterthought sanctions motion implicates class certification, and it should not be permitted to derail, or distract from, resolution of that motion.

---

[5] Plaintiffs rely on AMD's calculations, which are statistically unsound and grossly exaggerated. *See* Motion to Strike the Declaration of Shaun Simmons. In any event, the purportedly missing material represents an even smaller percentage of the total universe of relevant documents which, in addition to email, includes almost two million user-created documents (*e.g.*, Word or PowerPoint) and calendar items produced by Intel, and more than two million third party documents. Leatha ¶ 8; 3/24/09 CMO 7 (D.I. 1650) at 2. Moreover, to conclude any absence of *material* emails is purely speculative. Intel has admittedly produced a "huge amount of . . . evidence" from which plaintiffs claim they can try to build a case and gain class certification.

A.   **Plaintiffs Missed Their Opportunity To Pursue A Motion For Sanctions Related To Class Certification**

In March 2007 – *three years ago* – Intel informed the Court and the parties of certain retention issues and outlined its planned response.[6]   Intel and AMD, with plaintiffs' full knowledge and opportunity to participate, engaged in a massive effort to discover the facts behind Intel's – and, as was learned later, AMD's -- document retention issues.  In the ensuing two-and-a-half years, plaintiffs, who shared a joint prosecution agreement with AMD, attended dozens of depositions and hearings relating to the retention issues.[7]

After participating in the retention litigation for more than a year, on May 16, 2008, plaintiffs filed their Motion For Class Certification (D.I. 916).[8]   More than two years after retention discovery began, on July 23, 2009, they filed their Reply In Support Of Class Certification (D.I. 2016) and Preliminary Trial Plan (D.I. 2018).  By then, Intel had already given four days of 30(b)(6) depositions and at least 45 hours of additional deposition testimony from seven Intel witnesses on remediation and causation/culpability topics.[9]   Finally, almost three years after Intel's disclosure of its retention issues, on February 1, 2010, plaintiffs filed their Trial Plan Reply (D.I. 2297).  In none of these filings did plaintiffs complain that their ability to prepare this case was inhibited in any way by Intel's retention lapses.  Plaintiffs had the knowledge and opportunity to raise any alleged connection between the document retention issues and class certification when they filed their papers, but chose not to, thereby waiving any claimed connection between the two and acknowledging by their inaction that there is none.

---

[6]  3/5/07 Intel ltr. to Ct. (D.I. 404).

[7]  *See, e.g.*, Ex. 2.

[8]  When plaintiffs moved for class certification, Intel had already produced over 750,000 pages of retention related documents. Ex. 3 (6/26/09 Intel ltr. to Ct.).

[9]  Ex. 4 at 4 (Intel's 5/23/09 Response to Notice of Taking of Deposition of Intel . . . Concerning Evidence Preservation and Completeness of Document Production . . . .).

And there is more.  Class counsel attended the August 24, 2009 hearing at which the Court directed the parties to meet and confer on "any expected motions that deal with issues focused on spoliation and remedy," including filing, briefing, and hearing dates and procedures.[10] They attended the September 4, 2009 hearing when the Court again directed the parties to meet and confer on when they might file their "evidence preservation motions."[11]  As late as November 2009, plaintiffs anticipated a class certification hearing on February 17-19, 2010.[12] While Intel and AMD followed the Court's direction and prepared sanctions motions, plaintiffs decided to do nothing.  Their decision not to file or even join a sanctions motion confirms they did not believe preservation issues affected the rapidly approaching class certification hearing.[13]

The purpose of coordinating proceedings "is to streamline the efforts of the parties and witnesses, their counsel and the judiciary."  *E.g., In re Nissan Motor Corp. Antitrust Litig.*, 385 F. Supp. 1253, 1255 (JPML 1974).  That purpose is thwarted if the parties may sit out motions only to re-litigate them later.  *See Barcelo v. Brown*, 78 F.R.D. 531, 536 (D.P.R. 1978) ("The rule seeks to *avoid overlapping duplication in motion practice ... by competing counsel representing different Plaintiffs*.") (emphasis added).  Plaintiffs made a conscious, informed decision not to participate in AMD's motion for sanctions, while embroiled in the class certification motion.  By waiting until this late hour to raise the retention issue, plaintiffs both waived it with regard to class certification and admitted it was not related to certification.[14]

---

[10] Ex. 5 (8/24/09 Hrg. Tr. (D.I. 2138) at 6:07-08, 14:16-16:01).

[11] *See* 11/9/09 Stipulation and Order (D.I. 2246) at 2.

[12] *See* 11/9/09 Order (D.I. 2245) at ¶ 4.

[13] Plaintiffs clearly knew they could join AMD's motion; they joined many others.  Just prior to filing this motion, they sought a decision on a pending joint motion.  1/26/10 Letter (D.I. 2284).

[14] *See Morse Diesel Int'l, Inc. v. U.S.*, 81 Fed. Cl. 220, 223 (Fed. Cl. 2008) (denying spoliation sanctions motion as untimely); *Marinechance Shipping, Ltd. v. Sebastian*, 143 F.3d 216, 218 (5th Cir. 1998) ("The district court possesses the inherent power to control its docket.  This power

**B.     Plaintiffs' Request For A Class Certification Inference Should, If Reached, Be Denied**

Even if not waived for certification purposes, plaintiffs' last minute suggestion that retention issues somehow relate to class certification, or could support an "adverse inference . . . at the class certification stage" (Mot. 41), is utterly without legal support.  In addition to their (lack of) action, plaintiffs' words also prove the disconnect between their sanctions and certification motions.  On the one hand, plaintiffs claim, without support or specificity, they "have been denied the opportunity to present [relevant class certification] evidence to the Court." *Id.*  On the other, in their contemporaneous Trial Plan Reply, plaintiffs claim they have a "█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ███████" that supports certification.  Tr. Pl. Rep. (D.I. 2297) at 7.  Both cannot be true.[15]

Plaintiffs' class-related argument is, in fact, a last-ditch invention designed to obfuscate the unavoidable problems with their class certification request.  As noted, plaintiffs' *400 pages* of briefing and supporting expert declarations does not include a single word – not even in a footnote – suggesting plaintiffs or their expert, Prof. Leffler, believed Intel's retention issues might impact their class certification showing, much less how.  To the contrary, they argue they have presented a "████████" of evidence.  Tr. Pl. Rep. at 7.

Not surprisingly given that record, plaintiffs' effort to tie the sanctions motion to class

---

includes the authority to decide the order in which to hear and decide pending issues."); *Jackson v. Univ. of Pittsburgh*, 141 F.R.D. 253, 254 (W.D. Pa. 1992) ("Trial courts have inherent power to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.").

[15] In fact, both are untrue.  In any event, plaintiffs' argument that they need more emails to dig deeper into the details of individual transactions to see how "customer arrangements are characterized" (*see, e.g.,* Mot. 29-31, 42) is self-defeating.  If plaintiffs, as they claim, have common proof of liability and antitrust impact on all class members throughout the class period, any "missing" emails are cumulative by definition and their sanctions motion fails.  If they don't, and need more emails to fill gaps during the class period, that demonstrates that plaintiffs' proof is individualized so that their certification motion fails.

certification fails. First, without *any* analysis, plaintiffs seek an adverse inference of liability and harm to consumers. Mot. 44-45. That is not only logically contrary to their claim that they have "huge amounts of common evidence capable of demonstrating ███████████████████ ███████████████" (Tr. Pl. Rep. at 5) (emphasis added), but a legal *non sequitur*. As plaintiffs themselves argue, liability is not before the court on class certification. *See, e.g.*, Reply in Support of Class Cert. (D.I. 2017) at 20 (class certification discovery "not to be used to address 'the probable outcome on the merits'") (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 319 n.20 (3d Cir. 2008)); *id.* at 24 ("Such challenges go to the merits of Plaintiffs' claim, which can be raised on summary judgment, not class certification.").[16] Also, the relevant question for class certification is not whether some, or average, consumers were harmed by paying higher prices, but whether plaintiffs can use a common method to show that *all* consumers in the class were. *See Hydrogen Peroxide*, 552 F.3d at 311-12. Finally, plaintiffs' additional request for an inference that allegedly missing emails would support late 2006 as a "competitive benchmark" (Mot. 44-45) is similarly beside any point. There is no logical basis for that inference, nor do plaintiffs even proffer one. In any event, Intel agrees that its sales in late 2006 (along with the rest of the class period) were made during a competitive period.[17]

Plaintiffs' contention that document retention "is an issue that is common to all proposed class members, and all class members have been prejudiced by Intel's" alleged spoliation (Mot.

---

[16] *Smith v. Georgia Energy USA, LLC*, 259 F.R.D. 684 (S.D. Ga. 2009) (Mot. 41 n.189), is obviously off point. It addressed "who is a proper class member, not questions of liability." *Id.* at 692. The court provided for an adverse inference regarding the identity of class members and their damages because the records of that information were destroyed. *Id.* at 696.

[17] Plaintiffs' requested class certification "inference" request is logically and legally infirm for another reason. The "common sense" basis for an adverse inference is that a spoliating party can be inferred to have believed that the spoliated evidence would have hurt its litigation position. *See* Mot. 36. Even assuming any connection between the allegedly missing emails and any class issue, and there is none, it strains the imagination to conceive that an Intel custodian would have understood, let alone intentionally set out to thwart, the required proof under Rule 23.

41-42) is also demonstrably wrong. Intel had no document retention obligation until June 27, 2005, four years into the class period (and only one year before plaintiffs and Leffler claim the x86 microprocessor market became "competitive"). Thus, by definition, any retention issues could have no bearing on the vast majority of the class members' claims, because they bought their computers before Intel's document retention obligation arose. Therefore, no inference could be applied to the claims of all class members.

Indeed, for the reasons discussed above and below, no inference may or should be applied at all. Moreover, because the question of an adverse inference at trial does not arise, if at all, for many months (as a practical matter only if and when the Court were to grant class certification, which Intel submits it should not), the merits of that request should be deferred.[18] If it is not, it should be denied in all respects, for the following reasons.

## III.   INTEL'S RETENTION AND REMEDIATION WERE EXTREMELY EFFECTIVE AND RESULTED IN MASSIVE PRODUCTIONS OF DATA

Intel understands the Court is generally familiar with the discovery facts in this case. However, plaintiffs' brief distorts them. It provides an inaccurate picture of the epic retention challenges Intel faced upon the surprise launch of the AMD and class litigation, Intel's extraordinary efforts to grapple with them, the overall success of those efforts, and the actual (minimal) consequences of the human errors that inevitably occurred. These are the facts.

### A.   Intel's Retention Efforts Met And Exceeded Legal Requirements

Intel's retention plan was immediate, comprehensive and beyond its legal obligations. As Mr. Jessen concluded in his declaration included with this opposition, it reflected a clear intent to

---

[18] Plaintiffs themselves acknowledge that "[n]o trial date has been set in the Class case and the parties have scheduling flexibility to fully brief this motion as the Court deems appropriate." Mot. 49. No hearing date has been set. Significantly, plaintiffs did not mention this motion in their [Proposed] Pre-Hearing Order regarding the certification motion hearing nor at the February 26 Pre-Hearing teleconference.

preserve relevant information and "exceeded in both scope and speed the retention efforts one typically sees in major commercial litigation."[19]

### 1. As Soon As AMD And Plaintiffs Sued, Intel Launched An Instantaneous, Worldwide Response

The surprise AMD and class action lawsuits dwarfed in complexity and geographic scope any litigation in Intel's (really, most anyone's) history. Within hours, Intel formed a team of lawyers and IT personnel to devise and implement a preservation plan. Intel quickly deemed the retention issue an "███████████████████" and a "████████████" that resulted in an "████" retention imperative.[20]

AMD and plaintiffs' allegations attacked Intel's sales practices for several years, implicating hundreds of deals and dozens of companies at all levels of distribution around the world. In 2005, Intel had over 100,000 employees at 124 facilities in 57 countries, who generated and received an enormous, ever-growing volume of documents.[21] When this action was filed, Intel's servers and other storage devices contained over 9.8 *petabytes* of data.[22]

Given the breadth of the allegations, in theory many of those billions of pages of data were potentially relevant but retaining all of them would, of course, have been hopelessly unrealistic. Intel's challenge was to identify and preserve a reasonable universe of potentially

---

[19] Declaration of John Jessen ("Jessen") ¶ 43. Mr. Jessen is one of the world's leading electronic discovery experts. His credentials are described in paragraphs 5-12 of his declaration. Among other things, he is a main architect of the Sedona Principles, since 2004 an "authoritative set of principles on electronic discovery" widely recognized, cited, and followed by courts across the country. *Id.* ¶ 20 & Jessen Ex. 4 (citing cases). At the moment this case was filed, the Sedona Conference was formulating "best known practices" for coping with electronic discovery. The Sedona Conference, *Sedona Principles: Best Practices, Recommendations & Principles for Addressing Electronic Document Production* 26 (July 2005).

[20] Ex. 6.

[21] Ex. 7 at 4.

[22] *Id.* at 3. One petabyte is 1,000 terabytes or 1,000,000 gigabytes. One gigabyte is about 60,000 pages, so 9.8 petabytes would be about 60 billion pages. *See* Leatha ¶ 7.

relevant materials. From the outset, the parties recognized that this case would entail one of the, if not the, largest productions in litigation history, but that only a tiny subset of documents would ever be used in the case. The parties – including plaintiffs – agreed, after months of negotiation, to a stipulation restricting the preservation, collection and production of documents to a limited set of custodians. Importantly, the parties acknowledged their respective productions would "not include each and every responsive document."[23]

Instead, they agreed Intel and AMD would each create a custodian list, with Intel's containing at least 1,000 employees, and AMD's no fewer than 400, who had an "appreciable quantity of non-privileged, material, non-duplicative documents responsive to" the other's requests. Intel and AMD each agreed to designate at least 20% of its own custodians for production ("Production Custodians"). Each could also select up to 15% of the other's custodians and designate additional "Free Throw" custodians identified through ongoing discovery.[24] Intel submitted a list of 1,023 potential custodians in June 2006, of which it selected 217 for production.[25] With AMD's counter-designations and free throw picks, the total ultimately reached 381.[26]

---

[23] 5/15/06 Stip. re Doc. Prod. (D.I. 77) at 3. At the same time AMD and Intel entered that stipulation, the Court consolidated AMD and the class cases for discovery. 5/17/06 CMO 1 (D.I. 79) at ¶ 5(a), (d). Plaintiffs later ratified the Stipulation Regarding Document Production. 6/26/06 Amended Stip. re Elec. Disc. (D.I. 214) at 2; 9/25/06 Jt. Status Rep. (D.I. 274) at 2.

[24] 5/15/06 Stip. re Doc. Prod. (D.I. 77) at 1-2.

[25] Ex. 8 at 18-19 (4/23/07 Report and Proposed Remediation Plan) ("Remediation Plan").

[26] Ex. 9 (10/1/07 AMD ltr. to Intel); Ex. 10 (2/19/08, 4/16/08, 5/13/08, 7/16/08, & 10/14/08 AMD ltrs to Intel). For purposes of this brief, Intel excludes from the 381 Production Custodians 28 custodians who had no retention obligations, either because they were terminated before the complaint was filed, Ex. 11; or were not among the 1,023 potential custodians. Thus, 353 custodians are relevant to Intel's retention plan.

### 2.    Intel Sent Immediate And Proper Hold Notices To Hundreds Of Appropriate Employees Worldwide

"It is an exceedingly difficult task for any entity, let alone one as large and geographically dispersed as Intel, to develop a rational and effective data preservation model without knowing whose data needs to be preserved." Jessen ¶ 46.  Intel, however, did just that.



[27] It then worked to anticipate AMD and plaintiffs' discovery, and to identify more precisely which of Intel's 100,000 employees most likely had relevant documents.[28]  By July 2, based on its analysis, Intel sent hold notices to 629 key employees from SMG, finance, manufacturing, business planning, Legal and other areas.[29]

Employees were told that

---

[27]  Declaration of Mark F. Friedman ("Friedman") ¶ 2; Ex. 12 at 67871DOC0015295.

[28]  Ex. 13 ▮▮▮▮▮Tr. 331:06-332:02).

[29]  Ex. 14 at IIT-8001-0000446 (7/1/05 ▮▮ email to 629 custodians); *see also* Ex. 8 at 9 (Remediation Plan).

████████████████████████████████████████████████████ [30]

Intel's hold notice conformed with "recommended litigation hold notice content." Jessen ¶ 33.

████████████████████████████████████████████████████

████████████████████   Because Outlook Exchange servers have limited capacity, Intel (like most

businesses) limits how long emails may remain unmodified in a user's network mailbox.[31]  To

retain them longer, employees must print them, use an auto-archive feature, or, more commonly,

save them in folders corresponding to ".pst" files on their computer's hard drive.[32]  "It is

common practice to use the [hold notice] to task Custodians with saving appropriate

[electronically stored] information" (ESI) on their local hard drives. Jessen ¶ 41.

In Intel's case, saving emails this way is simple: users create a folder (or subfolder) in

Outlook, then move or copy emails to it by "dragging" them to the icon representing the folder.

This practice was (and is) widely followed at Intel (like many companies) already – "████████████

████████████████████"[33] and "████████████████████"[34] ██

████████████████████████████████████████████████████

---

[30] Ex. 14 at IIT-8001-0000446 (7/1/05 email from ██████ to 629 custodians).

[31] Jessen ¶¶ 68-69.  Most Intel employees had either a "Standard" (35 days for "Inbox items," 7 days for "Sent Items," and 1 day for "Deleted Items") or "Road Warrior" (35 days for "Inbox items, 35 days for "Sent Items," and 7 days for "Deleted Items") setting.  A smaller group, mainly senior managers, had either "ESM" (45 days for "Inbox items, 45 days for "Sent Items," and 45 days for "Deleted Items") or "Special" settings (60 days for "Inbox items, 60 days for "Sent Items" and 7 days for "Deleted Items").  Of the retention custodians, 638 were Standard users, 323 were Road Warriors, 27 were ESM and 12 were Special users as of November 2005.  For Production Custodians, the numbers were 187, 141, 17, and 8, respectively.  Ex. 15; Beach ¶ 3.

[32] In Microsoft Outlook, .pst files are used to "archive" email items off the server-based Exchange system so they will not be affected by mailbox manager-type functions.  Jessen ¶ 75.

[33] Ex. 16 (██████ Tr. 193:03).

[34] Ex. 13 (████████████ Tr. 356:04-358:14).



More litigation hold notices followed as Intel identified additional, potentially relevant employees with potentially relevant documents. By August 25, 2005, 848 Intel employees had received them and, by the end of 2005, 1,062 had.[39]  In June 2006, following months of negotiation, Intel and AMD exchanged lists of custodians from which the actual Production Custodians were to be selected. Intel's list had 1,023 names, 384 of which it turned out were not already on its previously created voluntary retention list of 1,040 employees who had already received hold notices (and roughly the same number on the earlier list did not make the final cut for the custodian list).[40]  However, the responsible Intel Legal attorney, ▮▮▮▮▮▮▮▮▮▮▮



[35] Ex. 17 (▮▮▮ Tr. 179:15-19); *see also* Ex. 16 (▮▮▮ Tr. 192:05-193:07) ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"); Ex. 13 (▮▮▮ Tr. 357:10-22) ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

[36] Ex. 16 (▮▮▮ Tr. 189:18-19); Ex. 17 (▮▮▮ Tr. 179:17-22) ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮").

[37] Ex. 18.

[38] Ex. 19 (▮▮▮ Tr. 49:07-19).

[39] Ex. 8 at 12 (Remediation Plan); Ex. 20.

[40] Ex. 13 (▮▮▮ Tr. 253:09-25).

confused the two lists and thus failed to send hold notices to the new 384 custodians.  She

explained that " ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████ "[41]  Her error was indisputably inadvertent.

Upon discovering it in early 2007, Intel promptly issued hold notices to the affected

custodians.[42]  It ultimately sent notices to more than 1,500 employees, throughout 2005, 2006

and 2007.[43]  However, the early Intel lists contained the vast majority of custodians who truly

matter: 318 of the 353 finally selected Production Custodians were sent hold notices in 2005.[44]

"By any objective measure, early in the lawsuit and without any guidance from AMD or

plaintiffs, Intel did an extraordinary job of identifying people who should receive the [notice]."[45]

AMD, by contrast, waited weeks after it reasonably anticipated litigation before sending

any hold notices.[46]  ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████[47] █

█████████████████████████████████████████████████████[48]

---

[41]  *Id.* at 253:09-25.

[42]  *Id.* at 254:12-255:08, 258:16-259:10.

[43]  *Id.* at 254:12-255:08.

[44]  Three others left Intel before the lawsuit, so could not have received notices.  Ex. 20.

[45]  Jessen ¶ 38.

[46]  Beach ¶ 4; Ex. 21; Ex. 22.

[47]  Ex. 23 at AMD-500-00000092-93; Ex. 22 (listing the date of ████████████ first hold notice as 5/5/05); Ex. 24.

[48]  ███████████████████████████████████████████████ did not receive hold notices until July 2005.  Ex. 22.

### 3.   Intel Followed Up Its Hold Notices With Individual Communications, Monitoring, and Reminders

Intel reminded custodians repeatedly, both orally and in writing, of their duty to retain records.[49]   Intel's ███████████ reinforced the hold notice in person at a ███████████ ██████ meeting in July 2005.[50]   On July 13, 2005, he advised the entire company on Intel's intranet that ████████████████████████████████████████████████ ████████████████████████" and to "███████████████████████████████ ████████████████████████████████████████████████"[51]

Additionally, Intel ████ reminded █████████████ – █ of the potentially most relevant custodians – of their retention obligation in person at their quarterly staff meetings, starting in July 2005.[52]   It gave periodic in-person reminders to █████████████████ starting in August 2005, and to ████████████████ in early 2006.[53]   Also, throughout the relevant period, "███████████████████████████████████████████"[54]

When document collections or "harvests" began in summer 2005, "█████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████"[55]   The collection team was trained to "███████

---

[49]   *See* Ex. 25 (████ Tr. 12:21-13:20, 57:06-20, 75:03-77:08, 85:24-86:15); Ex. 26 (████ Tr. 221:12-21); Ex. 27 (████ Tr. 346:18-09); Ex. 28 (████ Tr. 13:09-23).

[50]   Ex. 25 (████ Tr. 75:03-77:08).

[51]   Ex. 29 at 76 (68902DOC0000074).

[52]   Friedman ¶ 4.

[53]   *Id.* ¶¶ 5-6; Ex. 25 (████ Tr. 31:02-33:09).

[54]   Ex. 30 (11/18/09 ████ Depo. Corr. 86:23-25); Friedman ¶ 3.

[55]   Ex. 16 (████ Tr. 28:21-29:03); *see also*, *id.* at 35:20-23, 41:10-21); Ex. 13 (████ Tr. 365:14-366:11).

█████████████████████████████████████████[56] Intel ██████ also sent written

reminders to many employees who were on retention in March, October and November 2006.[57]

As Mr. Jessen explains, this follow-up is the hallmark of a sound retention plan.  Jessen ¶ 40.

### 4.    Intel Gathered Terabytes Of Data With An Aggressive Harvest Plan

After sending hold notices, Intel began harvesting those employees' electronic and paper

records.  Intel assembled and trained office search teams of experienced paralegals from Intel

and outside counsel and, starting less than two weeks after the lawsuit was filed, sent them

literally around the world to collect documents.[58]

By the end of September 2005, before AMD had even served document requests, Intel

had collected data and documents from 280 employees, by the end of 2005 over 500, and by the

end of 2006 over 780, *some 400 more than potentially required for production* under the parties'

ultimate agreement.[59]  Intel's early-harvest plan was, again, extraordinary.  While many litigants

"rely mainly on [hold notices] and choose a wait-and-see approach to data collection, Intel began

an expansive and onerous harvesting effort shortly after the Complaint was filed, and 10 months

*before* the first of the Production Custodians were finalized" in 2006.[60]  Jessen ¶ 42.

By contrast, AMD harvested no data until late October 2005, seven months after it

---

[56]  Ex. 16 (██████ Tr. 41:10-21, 84:04-85:11).

[57]  Ex. 31 (3/20/06 ██████ email to ██████ et al., 69412DOC0002215) ("██████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████"); Ex. 32 (10/6/06 ██████ email
to ██████ et al., 69412DOC0002895); Ex. 33 (11/28/06 ██████ email to ██████ et al.,
69412DOC0002874); Ex. 13 (██████ Tr. 389:17-391:03).

[58]  Ex. 13 (██████ Tr. 36:17-37:02); Ex. 16 (██████ Tr. 39:18-40:15, 84:04-24); Ex. 34
(██████ Dep. Ex. 25).

[59]  Ex. 8 at 13, n.4 (Remediation Plan).

[60]  Intel harvested documents from *all but one* of its witnesses identified in its initial disclosures
prior to the designation of any Production Custodians.  *See* Ex. 11 (Remediation Plan, Ex. F).

claimed it reasonably anticipated litigation;[61] 47 of its custodians were not harvested until 2006.[62]

**5.      In Addition To Its Primary Retention, Intel Took Extraordinary And
         Valuable Failsafe Measures To Enhance Preservation**

By themselves, Intel's hold notices, reminders and harvests fully satisfied its legal

retention obligations.  Intel nevertheless took several additional steps to ensure preservation.

**a.      Worldwide "Complaint Freeze" Tapes**

The   day   after   AMD   filed   suit,   before   plaintiffs   had   even   filed   suit,   Intel's ▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮▮   ordered Intel's ▮▮▮▮▮▮▮▮▮▮   throughout the world to stop recycling

server backup tapes for 72 hours.[63]  His request was ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[64]

Even that initial step required enormous effort and coordination.  Intel had 79 IT sites in

27 countries and over 9,500 IT employees who managed 139 data centers and thousands of

servers.[65]  Intel scrambled to find vendors to supply thousands of tapes on short notice, at an

estimated weekly cost of $700,000 for Europe alone.[66]  In the next few days, Intel ▮▮▮ worked

with the ▮▮▮▮▮▮▮▮▮▮▮▮▮   and others to identify the systems containing files most

likely to be relevant.[67]  Intel decided to retain all existing Outlook Exchange server tapes from

the June 24, 2005 weekend, all such tapes to be created during the July 1, 2005 weekend, and

---

[61] Beach ¶ 4; Ex. 21.

[62] Ex. 35.

[63] Ex. 8 at 7 (Remediation Plan).  Intel IT created daily backup tapes of the contents of Intel's
137 Outlook exchange servers in case of a server "crash" or other cataclysmic event.  Because
tapes are expensive and no business reason exists to retain them after another has been created,
Intel routinely recycled them.  Ex. 36 (▮▮▮ Tr. 39:24-40:15, 40:21-41:04).

[64] Ex. 37 at 69412DOC0000869; Ex. 6 at 69412DOC0004474.

[65] Ex. 7 at 4.

[66] Ex. 38 at 69412DOC0004431.  Some ▮▮▮▮▮   were sent to retail stores to buy backup
tapes using their personal credit cards.  Ex. 13 (▮▮▮▮▮▮   Tr. 325:01-326:03).

[67] Ex. 13 (▮▮▮▮▮   Tr. 322:09-21).

daily tapes created in between (collectively the "Complaint Freeze" tapes).[68] ███ worked furiously, coordinating scores of global ██ personnel to carry out the retention directives.[69]

This massive effort, beyond Intel's legal obligations, was marred by a single, small glitch in Germany.  One week after Intel ██ in Munich removed and separately stored all backup tapes, European antitrust investigators arrived unannounced to retrieve documents related to AMD's complaints to the EC.[70]  The investigators demanded the backup tapes from the vault.[71]  Days later, the EC completed its search and '████████████████████'[72]  Munich ██ did not realize the tapes had been pulled for this case and returned them to the "pool" in the tape vault, where they were eventually overwritten.[73]  Intel ███ discovered the loss in early 2007, when it ordered all Complaint Freeze tapes shipped to the U.S.[74]  Again, this was an inadvertent, and ultimately immaterial, mistake in implementing a wholly voluntary procedure.

Intel nevertheless preserved more than 5,000 Complaint Freeze tapes, and thereby preserved pre-complaint documents (the dates most important to the class) for 93% of the 353 eventual Production Custodians.[75]  Intel's tape retention "went beyond what is called for under

---

[68] Ex. 13 (████████ Tr. 47:21-48:11); Ex. 8 at 8 (Remediation Plan).

[69] Ex. 8 at 6-9 (Remediation Plan); see also Ex. 39 at 69412DOC0004435-36 (6/28/05 ███ email to ██ et al.).

[70] Ex. 8 at 24 (Remediation Plan); Ex. 40 (6/29/05 ███ email to ██████, 68902-000021).

[71] Ex. 8 at 24-25 (Remediation Plan); Ex. 41 (7/13/05 ███ email to ██ et al., 69412DOC0006667).

[72] Ex. 8 at 25 (Remediation Plan); Ex. 42 (7/13/05 ███ ltr. to ██, 68902DOC0000033).

[73] Ex. 8 at 25 (Remediation Plan); Ex. 43 (7/14/05 ███ email to ██ et al., 68902DOC0000028).

[74] Ex. 44 at 2 (2/8/07 Intel email to AMD); Ex. 13 (████ Tr. 430:05-13).

[75] Ex. 8 at 8, 33 (Remediation Plan); Ex. 11.  The Munich tapes covered 25 Production Custodians.  *Id.*  By comparison, AMD chose to preserve only 200 tapes in March 2005 when it claims it decided to sue – 4% of Intel's number.  Ex. 45 at 2 (10/24/05 AMD ltr. to Intel).

the Sedona Principles and . . . common practice" and "exceeded in both scope and speed the retention efforts one typically sees in major commercial litigation." Jessen ¶¶ 43, 50.

### b.   Migration And Preservation Of Backup Tapes

Although it had taken comprehensive steps to preserve potentially relevant documents, in July 2005, Intel ▮▮▮▮ charged ▮▮ with devising an additional safeguard against possible retention lapses by individual employees.[76] ▮▮▮▮ direction was "▮▮▮▮▮▮▮



Intel decided the best approach was to move, or "migrate," email accounts for those on retention to dedicated server groups and preserve a backup tape from each server once a week.[79] A weekly backup would capture emails in the custodians' Inbox and Sent Items folders, as well as some emails recently moved to the Deleted Items folder. "Intel's voluntary implementation of a plan to utilize targeted Weekly Backup Tapes to provide an additional preservation layer extended above and beyond what was and is recommended under Sedona Principles and . . . was further evidence of Intel's commitment to the preservation of potentially responsive documents." Jessen ¶ 55. Also: "It should be noted that a more common method would be to make and preserve monthly backup tapes, such as the plan that AMD implemented. The making and

---

[76] Ex. 13 (▮▮▮▮▮▮ Tr. 32:23-33:11, 50:14-51:4).

[77] Ex. 46 (9/6/05 ▮▮▮ email to ▮▮▮▮, 69412DOC0000192).

[78] *Id.*

[79] Ex. 36 (▮▮▮ Tr. 74:21-75:07, 76:08-18, 146:13-18); Ex. 13 (▮▮▮▮ Tr. 31:22-32:06) ("▮▮▮▮▮▮▮▮"); *id.* at 56:12-23 ("▮▮▮▮▮▮▮▮▮▮▮▮"); *id.* at 50:20-51:04); Ex. 47 (9/8/05 ▮▮▮ email to ▮▮▮, 69412DOC0004380). Among other things, ▮ was assigned to recommend a "▮▮▮▮▮▮▮▮▮" Ex. 48 at 2 (10/4/05 ▮▮▮ email to ▮▮▮). To minimize the performance impact, ▮▮▮ recommended placing the migrated accounts on five server groups located around the world, rather than one. Ex. 17 (▮▮▮ Tr. 269:07-270:06); Ex. 36 (▮▮▮ Tr. 113:01-15).

retaining of weekly backup tapes is a more comprehensive (and more costly and laborious) model . . . ." *Id.* ¶ 54.

The migration began in October 2005 but it was not perfect due to two unintended human errors.[80] First, ███████, from Intel IT, performed the required steps.[81] At that point, Intel ██ and ███ believed all email accounts on Intel's initial retention list had been successfully migrated.[82] However, an unknown error caused certain accounts either not to be migrated or to be moved off the designated servers shortly after migration.[83] To this day, ███ does not know what went wrong with this part of the additional – and beyond Intel's legal obligation – effort.[84]

Then, in January 2006, ███ emailed his supervisor that an audit had revealed, among other things, that some accounts were in the wrong server groups.[85] ██████████ ████████████████████████████████████████████████. He asked for confirmation that the listed employees had left Intel or clarification about the spellings.[86] His email was eventually forwarded to ██████████ to confirm whether employees on the list remained at Intel. She commented on the list, but did not focus on the rest of the email.[87] ███ took no action because he received no express direction.[88] Thus, these

---

[80] Ex. 8 at 15 (Remediation Plan).

[81] Ex. 49 (10/13/05 ███ email to ███, 69412DOC0000624-25); Ex. 50 (9/9/05 ██ email to ███, 67865-000088-001_00001-002_00013).

[82] Ex. 51 (███ Tr. 32:23-35:01); Ex. 13 (██████ Tr. 415:13-23).

[83] Ex. 51 (███ Tr. 47:17-48:10).

[84] *Id.*

[85] Ex. 52 (1/10/06 ███ email to ███, 67871-000713.001_00001); Ex. 51 (███ Tr. 35:02-36:17) ("██████████████████████████"); *id.* at 112:23-113:25 ("███████████████████████████████").

[86] Ex. 52 (1/10/06 ███ email to ███, 67871-000713.001_00001).

[87] *Id.*

particular migration errors were not discovered and resolved until early 2007, when Intel ███

started restoring backup tapes and could not locate certain custodians' data.[89]

      Finally, preserving weekly backup tapes required modifying server expiration dates to

extend the tapes' retention periods. ███ directed another █ employee, ████, to assign

them a seven-year retention period.[90] ███ modified the dates for four server groups, but had

technical problems with the fifth, in Swindon, England.[91] He asked ███ to investigate.[92] ███

was unable to access the server and told ███ he would try again later.[93] Unfortunately, each

assumed the other had taken care of the problem, but neither did.[94] As a result, the Swindon

backup tapes were recycled weekly from November 2005 until July 2006, when the server was

replaced and the problem corrected.[95] Intel ███ was not aware of the loss from the extra

failsafe effort until early 2007, when it ordered all tapes shipped to the U.S. for remediation.[96]

### c.    Automatic Journaling Of Emails

      Even AMD acknowledged "the law and the facts in no way require the institution of

---

[88] Ex. 51 (███ Tr. 38:09-22) ("██████████████████████" from ████████).

[89] Ex. 17 (███ Tr. 338:13-339:14).

[90] Ex. 51 (███ Tr. 77:07-22, 103:11-19, 116:01-117:08); Ex. 53 (10/31/05 ███ email to ███, IIT-8005-0000030-32).

[91] Ex. 51 (███ Tr. 77:23-79:01, 117:21-118:03).

[92] Ex. 53 (10/31/05 ███ email to ███, IIT-8005-0000030-32); Ex. 54 (11/4/05 ███ email to ███ et al., 67865DOC0000576-77); Ex. 51 (███ Tr. 77:23-79:01, 106:9-15).

[93] Ex. 54 (11/4/05 ███ email to ███ et al., 67865DOC0000576-77); Ex. 51 (███ Tr. 77:23-79:01, 118:05-13).

[94] Ex. 51 (███ Tr. 78:24-79:03, 106:09-15).

[95] Ex. 8 at 28-29 (Remediation Plan).

[96] Ex. 44 at 2 (2/8/07 Intel email to AMD). Isolated problems occurred at other locations worldwide. Backups occasionally failed, and stored tapes were occasionally lost or physically damaged. None of these unconnected and accidental problems resulted in a gap of more than four consecutive weeks for a given server. Thus, even with these problems, Intel effectively retained monthly backup tapes for the affected custodians. Ex. 8 at 29 (Remediation Plan).

automated archiving in the fall of 2005, or even today, for that matter."[97]  Nevertheless, in March and April 2007, after several months' trial run, Intel implemented a state-of-the-art journaling system designed to retain on a separate server all "relevant emails sent to or from all custodians."[98]  In June 2008, the parties (including plaintiffs) agreed that the "respective [journaling] systems are successfully capturing emails as intended," and the Court ordered that they "are relieved of any further retention obligations beyond the continued good faith operation and maintenance of their respective" systems.[99]

**B.      Intel's Remediation Efforts Were Extraordinary And Effective**

Despite its efforts to notify and remind custodians of their preservation obligations under the primary retention plan, Intel discovered in October 2006 that some had not been saving all categories of emails that the hold notices specified.[100]

**1.      Intel Conducted A Comprehensive Investigation Of Any Lapses**

Intel took immediate action to determine the scope of the problem.  It retained Weil Gotshal to interview certain custodians.[101]  Retaining an independent firm with no prior involvement in the case was itself extraordinary and showed the seriousness with which Intel approached the issue. Jessen ¶ 59.

**a.      Custodian Interviews**

Early in its interviews, Weil found additional individual custodian issues.  Some employees were saving potentially relevant emails they had received, but not those they had

---

[97] *See* Ex. 55 (12/12/08 Hearing Tr. 18:08-11); Jessen ¶ 78.

[98] 5/30/08 Stip and Proposed Case Management Order No. 4 (D.I. 947) at 3.

[99] *Id.*

[100] Ex. 13 ▮           Tr. 420:17-421:03).

[101] *Id.* at 290:23-291:24.

sent.[102]  Some did not retain emails for the entire relevant time period.[103]  Some were archiving

important business-related emails, but not ones they considered duplicative or unimportant.[104]

Some, including ▮▮▮▮▮▮▮▮▮▮, were under the mistaken belief that their emails were

being automatically retained, relieving them of the need to archive emails on their hard drives.[105]

Based on these discoveries, Intel instructed Weil to expand its work to interview all 1,023

custodians around the world – an extraordinary effort that went far beyond the 353 who

ultimately were actual Production Custodians.  *See* Jessen ¶ 59.

### b.   Immediate Steps Toward Remediation

Weil's comprehensive investigation took three months to complete.  In the meantime,

Intel took prompt action toward mitigating the problem by collecting backup tapes from around

the world and forwarding them to an outside vendor for data restoration.[106]

In late 2006 and early 2007, Intel staged a major additional effort to harvest from all

remaining custodians and to re-harvest from those previously searched and, for some senior

executives, others who worked closely with them (e.g., assistants or technical advisors).[107]  By

the end of 2006, Intel had harvested data and documents from over 780 employees.[108]  Beginning

---

[102] Ex. 56 (*see, e.g.*, ▮▮▮▮▮▮▮ Weil Interview Notes at WEIL 002236, ▮▮▮▮▮▮ Weil
Interview Notes at WEIL 002598, ▮▮▮▮▮▮ Weil Interview Notes at WEIL 002676, and ▮
▮▮▮▮ Weil Interview Notes at WEIL 003734-35).

[103] Ex. 57 (*see, e.g.*, ▮▮▮▮▮▮ Weil Interview Notes at WEIL 003086, ▮▮▮▮▮▮ Weil
Interview Notes at 006504, ▮▮▮▮▮▮ Weil Interview Notes at WEIL 003397).

[104] Ex. 58 (*see, e.g.*, ▮▮▮▮▮▮ Weil Interview Notes at WEIL 003577-78, ▮▮▮▮▮
Weil Interview Notes at WEIL 003807, ▮▮▮▮▮▮ Weil Interveiw Notes at WEIL 006405).

[105] Ex. 59 (*see, e.g.*, ▮▮▮▮▮▮ Weil Interview Notes at WEIL 006225, ▮▮▮▮▮▮ Weil
Interview Notes at WEIL 002269, ▮▮▮▮▮▮ Weil Interview Notes at WEIL 004534).

[106] Ex. 13 ▮▮▮▮▮▮▮▮ Tr. 419:21-421:03).

[107] Ex. 17 ▮▮▮ Tr. 16:5-17, 29:23-30:16, 78:18-21); Ex. 16 ▮▮▮ Tr. 133:09-134:11);
Ex. 8 at 31 (Remediation Plan).

[108] Ex. 8 at 13 n.4 (Remediation Plan).

in March 2007, Intel conducted some 880 additional harvests in 43 countries on six continents (and 22 states within the U.S.) with a team of 55 lawyers, paralegals and IT personnel.[109]

### c.     Additional Retention Reminders

In February and March 2007, Intel issued or re-issued litigation hold notices to all current Intel employees (around 850) among the 1,023 potential custodians.[110] The Weil attorneys also gave retention reminders during their interviews.[111]

### 2.     Upon Completion Of Its Investigation, Intel Promptly Disclosed Its Retention Issues And Proposed A Remediation Plan

After assessing the scope of the issues and possible remediation options, Intel advised plaintiffs and AMD in February 2007 what it had discovered so far and what it was doing about it.[112] Intel disclosed the problems to the Court on March 5,[113] and in April submitted an extensive report summarizing the issues and proposing a remediation plan with aggressive measures to eliminate further problems and capture, from other sources in the company, emails individual custodians may not have retained.[114] The Special Master approved those steps, and plaintiffs and AMD never suggested others were needed, even after six months of extensive discovery.[115]

### 3.     Intel Undertook Massive And Unprecedented Steps To Remediate

Intel's plan required it to create a massive "global" database of emails for all 1,023 custodians from all of its harvests, over 7,000 Complaint Freeze and over 400 weekly backup

---

[109] Ex. 17 (Harkins Tr. 29:23-32:10).

[110] Ex. 8 at 30 (Remediation Plan).

[111] *Id.* at 31.

[112] Ex. 44 (2/8/07 Intel email to AMD).

[113] 3/5/07 Intel ltr. to Ct. (D.I. 404).

[114] Ex. 8 (Remediation Plan).

[115] 10/22/07 Order (D.I. 629) at 2-3 (AMD "concede[d], for a lot of good reasons, that we are not going to ask Your Honor to order Intel to do more than it proposes to do in its effort to remediate.").

tapes, and the email journaling archive.[116]   Intel searched that database for responsive emails from or to any of the 353 Production Custodians and produced all non-duplicative emails.[117]

That project was unprecedented – complex, laborious and costly, almost beyond description.   The Global Database's vast size and the number of disparate inputs required enormous effort, cost, and resources to process and load the data, eliminate duplicates, and identify for each Production Custodian whether each email was found in his files or through "repopulation" of his files from other sources in the database.

Intel invested a staggering amount of financial, technical and human resources in this remediation effort, surely the largest in litigation history.   Jessen believes "Intel's voluntary offer and resulting effort were most unusual," noting the company took on "an extremely complex and costly effort to locate missing documents, without regard to expense or technical challenge." Jessen ¶ 84.

### 4.    The Remediation Was Successful

Intel's plan worked.   Through its extraordinary efforts, plaintiffs received millions of emails, including some 4.8 million emails from repopulation sources.[118]   Moreover, because Intel harvested and processed hundreds of non-production custodians' emails, plaintiffs received nearly one million "bonus" emails from before the Complaint was filed – the time period by far most relevant to their claims – that Intel had no obligation to retain, and that plaintiffs would not otherwise have received.[119]   This massive bonus production was a direct result of Intel's initial

---

[116] Leatha ¶ 3; Ex. 17 ( ████ Tr. 76:24-77:23, 98:5-10); Ex. 60 (Leatha Tr. 128:13-129:11).

[117] Ex. 60 (Leatha Tr. 128:13-130:05).

[118] Leatha ¶ 5.

[119] *See id.* ¶ 9.   If any email had been deleted prior to the filing of the action, Intel had no obligation to retrieve it.   But due to remediation, Intel produced nearly one million such emails through repopulation from non-production custodians who had not deleted them.

retention efforts and its voluntary, comprehensive and well-executed remediation plan. Jessen ¶¶ 86-87.[120]

On this record of Intel's extraordinary retention efforts and obvious good faith, plaintiffs' sanction request does not and cannot meet the applicable legal standards.

## IV.    THE APPLICABLE LEGAL STANDARDS

The Third Circuit requires weighing three factors to decide whether sanctions are appropriate for an alleged loss of documents: culpability of the actor, prejudice to the other party, and (if those two are met) the adequacy of lesser sanctions. *In re Hechinger Inv. Co.*, 489 F.3d 568, 579 (3d Cir. 2007). The Court's inherent authority to impose sanctions must be exercised with restraint and only in narrow circumstances, such as when "a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991); *accord Republic of the Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 74 (3d Cir. 1994) ("[A] district court must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and also ensure that the sanction is tailored to address the harm identified."). The Court should impose the least onerous of any appropriate sanctions. *See Estate of Spear v. Comm'r of IRS*, 41 F.3d 103, 116 (3d Cir. 1994) (reversing award because "lesser sanctions than were employed here . . . could have 'sent the message'").

To obtain an adverse inference instruction under Third Circuit law, plaintiffs must prove "an actual suppression or withholding of the evidence," meaning the "destruction of evidence [must be] intentional, and indicate[] fraud and a desire to suppress the truth." *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 334 (3d Cir. 1995) (citation omitted); *accord Gumbs v.*

---

[120]  The stipulated, Court-approved dismissal of AMD's case expressly recognized "the massive and unprecedented scope and size of the document retention and production the parties undertook . . . , the difficulties inherent in that undertaking, and each party's good faith effort to remediate any losses that might have ensued." 11/25/09 Stip. and Order (D.I. 2257) at 2.

*Int'l Harvester, Inc.*, 718 F.2d 88, 96 (3d Cir. 1983) (affirming denial of sanctions because movant "failed to demonstrate" that "plaintiff intentionally or fraudulently lost or destroyed" evidence; "[n]o unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed"); *see also Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 80 (3d Cir. 1994) (reversing order granting defendant judgment and precluding plaintiff's expert testimony in part because the record did not support a finding that plaintiff's expert "intended to impair the ability of the potential defendant to defend itself").

This Court has similarly recognized an adverse inference instruction is inappropriate absent proof of "bad faith," a "deliberate choice" to destroy evidence, or that the alleged spoliator "acted intentionally to impair [the other party's] ability to" make its case. *See In re DaimlerChrysler AG*, 2003 WL 22951696, at *3 (D. Del. Nov. 25, 2003) (Farnan, J.) (*citing Brewer* for intent standard); Ex. 61 (3/7/07 Hrg. Tr 13:07-14, 14:02-12) (directing parties to consider *DaimlerChrysler* standard when evaluating Intel retention issues and distinguishing between "intentional" destruction and inadvertent "human error" that is common in complex cases.); *see also Chirdo v. Minerals Tech., Inc.*, 2009 WL 2195135, at *1 (E.D. Pa. July 23, 2009) (no adverse inference where plaintiff "produced no evidence that defendants 'intended to impair [his] ability to uncover evidence' as he is required to show"). Even *Scott v. IBM Corp.*, which plaintiffs cite frequently, held that "actual suppression" occurs only when evidence "was destroyed intentionally and not as a matter of routine disposal." 196 F.R.D. 233, 248 (D.N.J. 2000).[121]

Following that standard, the Third Circuit has routinely affirmed the denial of sanctions where the moving party failed to demonstrate that its opponent intended to destroy evidence that

---

[121] *Scott denied* a motion for an adverse inference. Moreover, in that employment case *all* documents relating to the key issue – why plaintiff was fired – had been lost. 196 F.R.D. at 250.

it knew would be important or useful to the moving party in its claims or defenses. *See United States v. Atkinson*, 316 F. App'x 93, 94-95 (3d Cir. 2008) (affirming denial of adverse inference instruction in bank robbery trial where no evidence showed prosecution "suppressed or withheld" missing surveillance tape; "no unfavorable inference arises" where evidence is "lost or accidentally destroyed") (quoting *Gumbs*); *Hechinger*, 489 F.3d at 579 (affirming denial of sanctions because "[t]here is no evidence that Hechinger intentionally destroyed documents that it knew would be important or useful to UFP in defending" itself); *see also Harding v. Careerbuilder, LLC*, 168 F. App'x 535, 540 (3d Cir. 2006) (affirming summary judgment; no adverse inference could be drawn "from the mere fact of [party's] inability to produce the records, absent evidence that they were intentionally concealed or destroyed").[122]

In addition to intentional spoliation, which plaintiffs cannot prove, they must also prove prejudice under controlling law, which requires "a reasonable possibility, based on concrete evidence rather than a fertile imagination that access to the [lost material] would have produced evidence favorable to his cause." *DaimlerChrysler*, 2003 WL 22951696, at *2 (quotations omitted).  "This standard is not satisfied where the evidence lost is merely cumulative, insignificant or of marginal relevance." *Id.* (quotations omitted); *accord Schmid*, 13 F.3d at 80.

Plaintiffs have not come close to proving either necessary legal element for an adverse inference instruction.

## V.   PLAINTIFFS HAVE FAILED TO CARRY THEIR MULTIPLE BURDENS ON THIS MOTION

We address below plaintiffs' failures to prove the critical elements of intent and prejudice

---

[122]  Plaintiffs claim a presumption of prejudice might even arise "in some circumstances" from "gross negligence." Mot. 29, n.130, quoting *Residential Funding v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir. 2002). *Zubulake V* cited *Residential Funding* for just the opposite proposition. 229 F.R.D. at 431. In any event, that is not the law in this Circuit. No adverse inference sanction may arise from gross negligence. *See, e.g., Brewer*, 72 F.3d at 334.

(Parts A and B); then the reasons the request for adverse inference instructions (and monetary sanctions) should be denied (Part C).

### A.    Intel Engaged In No Intentional Misconduct Or Willful Suppression Of Evidence

Plaintiffs' own authority recognized "there are many ways to manage electronic data, [so] litigants are free to choose how this task is accomplished." *Zubulake IV*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003). "Responding parties are best situated to evaluate the procedures, methodologies and technologies appropriate for preserving and producing their own electronic data and documents." *Sedona Principles* 6.

Intel's retention plan exemplified a deliberate, good faith effort to preserve evidence, and more than satisfied the applicable law in 2005 (and even today).[123] Innocent errors along the way, particularly in implementing voluntary steps, do not undermine the propriety of the plan itself. Perfection is not the standard, and mistakes are not sanctionable. *See Brewer*, 72 F.3d at 334. Plaintiffs' unsupported accusations of "bad faith" (Mot. 37-39) are contrary to the facts.

### 1.    Intel's Retention Plan Was Sound



[124]

Mot. 12. Plaintiffs' repeated "                    " criticism of Intel's plan is, in effect, that Intel asked its custodians to comply with a litigation hold. That complaint fails for two reasons.

---

[123] *See also Sedona Principles* Comment 5g ("Civil litigation should not create the aura of a crime scene with forensic investigation employed at every opportunity. . . . [T]he preservation obligation should be limited to those steps reasonably necessary to secure evidence for the fair and just resolution of the matter in dispute.").

[124] Ex. 14 at 1 (7/1/05 ▮▮▮ email to 629 custodians).

First, delivering litigation holds to the relevant custodians is an accepted, common and indeed uncontroversial method of retaining documents. Jessen ¶ 29; *see Zubulake V*, 229 F.R.D. 422, 435 (S.D.N.Y. 2004) ("reasonable" to circulate hold notice to "many of the key players in [the] litigation" when litigation was anticipated, re-circulate it when the complaint was filed, and again seven months later"); *Sedona Principles* Comment 5d (custodians should be "notified via email of the dispute and . . . asked to take steps to retain documents (including electronic communications, data and records) that may be relevant to the litigation"). Second, as set out above, Intel's document preservation system was multi-layered, comprehensive and effective. In fact, for a relevant email to slip through it, all of the following must have occurred:

- A Production Custodian failed to preserve an email pursuant to the hold notice and did not independently retain it or any later emails in the same thread for business or other reasons;

- The email was not captured on the Complaint Freeze Tapes containing the Production Custodian's emails;

- The email was not captured by the weekly backup tapes containing the Production Custodian's emails;

- Every other recipient, or the sender, of the email who are among the 1,023 retention custodians failed to retain the email pursuant to the hold notice, or independently for business or other reasons;

- The item was not captured on the Complaint Freeze or weekly backup tapes containing the emails of any other recipients, or the sender, of the email who are among the 1,023 retention custodians;

- If the email was sent by or to a third party (solely and not to others at Intel – an extremely unlikely occurrence) subject to discovery in this case, that third party also failed to retain the email.[125]

---

[125] Jessen ¶ 85. Even if a custodian with a Standard email setting deleted a responsive email several days before their weekly backup tape was run:

"█████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████"

Even if some number of emails did elude the multiple filters Intel designed to catch them, it would still not mean Intel's retention plan was insufficient. Perfection was, and is, not the standard, and the parties never imagined it was. Plaintiffs' hindsight criticisms of the plan's details, or individuals' execution of it, are unavailing.

### 2.   Intel's "Auto-Delete" Decision Was Made In Complete Good Faith

Intel disclosed in an October 2005 letter that it did not intend to disable auto-delete, and AMD said nothing.[126]   Plaintiffs' argument now that Intel's unchallenged, out-in-the-open decision was somehow made in bad faith is baseless.

There is, of course, nothing improper about an email aging policy. This so-called "auto-delete" function "is routinely used by businesses worldwide." Jessen ¶ 69. Even AMD maintained an email size quota system throughout the litigation, explaining it was meant '███ ████████████████████████████████████████████████████' system.[127]   In addition, AMD claimed that its email quota system was used to:



Ex. 62 (████ Tr. 112:25-114:13).

[126] Ex. 63 at 1-2 (10/14/05 Intel ltr. to AMD). Plaintiffs' claim that Intel's weekly backup tape plan, disclosed contemporaneously, was '████████████████████████' because it did not necessarily capture every email in a custodian's deleted items folder (Mot. 33) is overblown. The argument ignores the fact that some custodians had a seven-day (or longer) setting for their deleted items, and that Intel's hold notices instructed all custodians not to delete relevant emails in the first place. There was no reason at that time to believe anything more was required, and as a legal matter nothing was.

[127] Ex. 64 (████ Tr. 51:08-12).

████████████████████████████████████████████████[128]

Besides, given Intel's prompt litigation holds, harvests, and migration and backup plan, there was no reason to think auto-delete was a major issue, and it was not. Auto-delete only came into play if a custodian failed to preserve a relevant email in a .pst folder, contrary to the hold notice and to many custodians' pre-litigation practices.[129]  Also, once weekly tapes were preserved, the issue affected only users with "Standard" retention settings (about 60%); and only for emails they deleted within the same work week they were received.[130]  Auto-delete would thus not affect emails that Standard users sent, emails they received but left in their inbox, or even emails they deleted after the weekly backup tape had been captured.

Plaintiffs misstate the law as it applies to the auto-delete function.  *See* Mot. 24-26.  No authority in 2005 (or even today) categorically required a party to suspend "the operation of an auto-delete system," as plaintiffs suggest.  In fact, "the preservation obligation, except in extreme circumstances, should not require the complete suspension of normal document management policies, including the routine destruction and deletion of records."  *Sedona Principles* Comment

---

[128]  *Id.* at 52:11-23.

[129]  Ex. 36 (█████ Tr. 29:24-30:07); *see also*, Ex. 13 (█████████ Tr. 56:12-23); Jessen ¶¶ 71-75.

[130]  Ex. 15 (10/3/05 ████ email to ████, 69412DOC0000055); Ex. 65 at 68902-000011. Plaintiffs complain that Intel "███████████████████" the ██████████████████████████ ████████████ Mot. 33. ████████████████████████████████████████████████ *Id.* 3-4.  When IT's Smith migrated the accounts, he did not change the "Standard" retention setting for "Deleted Items" from one to seven days because he knew that users were only supposed to delete emails that were not subject to a litigation hold.  Ex. 51 (████ Tr. 88:21-90:02). ████ might also have been confused about the number of days that Deleted Items were retained. *Id.* at 58:02-15.  Smith had never been asked to restore a deleted item in the past, and his focus was on retaining backup tapes in case the auto-delete feature purged items that users had not intended to delete.  *Id.* at 99:02-100:10.  He did not realize his oversight until December 2006. *Id.* at 92:20-93:23; *see also id.* at 94:05-07 ("██████████████████████████████████ ████████████████████").

5d.  Rather, the obligation:

> must be balanced against the right of a party to continue to manage its electronic information in the best interest of the enterprise, even though some electronic information is necessarily overwritten on a routine basis by various computer systems. . . . At a minimum, organizations need not preserve every shred of paper, every email or electronic document, and every backup tape.  To declare otherwise would 'cripple large corporations' who are almost always involved in litigation.  A reasonable balance must be struck between (1) an organization's duty to preserve relevant data, and (2) an organization's need, in good faith, to continue operations.

*Sedona Principles* Comment 5a.  Indeed, the Federal Rules Committee that recommended Rule 37(e) expressly recognized in 2006 that: "the regular purging of e-mails or other electronic communications is necessary to prevent a build-up of data that can overwhelm the most robust electronic information systems."[131]

Plaintiffs claim 

. Mot. 9, n.32.  Not true.  The evidence shows a good faith concern within Intel █ that suspending auto-delete threatened the email system's performance.[132]  █ believed suspending auto-delete was

"

"[133]

---

[131] Summary of the Rpt. of the Judicial Conf. Comm. on Rules of Prac. & Proc. (2005), available at www.uscourts.gov/rules/Reports/ST09-2005.pdf at p.33.  The advisory committee note refers to the rule as 37(f).  It was later changed to 37(e).

[132] Ex. 66 at 67864DOC0003847-3848.  Plaintiffs' claim that Intel '█ " by doing so in March 2007 (Mot. 9, n.29) is misleading at best.  That March 2007 decision was made '█ " the journal system, Ex. 17 (█ Tr. 219:02-10), and in the midst of Intel's pull-out-all-the-stops remediation planning.  It is hardly a measure of what was feasible, much less reasonable or required, in the ordinary course.

[133] Ex. 36 (█ Tr. 59:02-59:12).  In 2005, Intel employees sent a monthly average of 113 million emails and its Outlook Exchange servers contained 3.2 petabytes (3.2 million gigabytes)



[REDACTED] [134] Mr. Jessen agrees.[135]  Even after migration to the five dedicated server groups, Intel ▊ continued to advise against disabling auto-delete because of ['[REDACTED]

[REDACTED]"[136]

Plaintiffs also understate the problem Intel faced.  '[REDACTED]

[REDACTED]

[REDACTED]"[137]  That concern mirrored the one behind AMD's mailbox size quota, which as noted above, it likewise did not disable.  '[REDACTED]

[REDACTED]

[REDACTED]"[138]

Plaintiffs also misstate the facts.  The email they claim shows '[REDACTED]

[REDACTED]" in July 2005 (Mot. 8) actually says just the opposite.[139]  In fact, Intel ▊

---

of data. Ex. 7 at 5 (Intel 2005 IT Annual Performance Report, 68902-000012). *See also* Jessen ¶ 69 ("In my opinion, shutting down Mailbox Manager . . . would not have been in keeping with common practice at the time and could well have impaired Intel's operations.").

[134] Ex. 51 (▊▊▊ Tr. 45:03-14); *see also*, Ex. 36 (▊▊▊ Tr. 29:24-30:20) (it was important '▊[REDACTED]
"; '[REDACTED]
").

[135] Jessen ¶¶ 65, 69.

[136] Ex. 13 (▊▊▊▊ Tr. 411:12-412:01).

[137] *Id.* at 33:14-18.

[138] *Id.* at 33:19-24.

[139] Ex. 67 at 67871DOC0010649.  Plaintiffs also claim that '[REDACTED]
" Mot. 9. Plaintiffs gloss over the fact that the same Intel employee whom they claim raised the possibility of journaling in 2005 unequivocally stated the [REDACTED] concluded that the '[REDACTED]

A/73286074.9                                        37

believed that suspending auto-delete would harm server performance, and that the █████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████[140]  Thus, Intel ██ had a good faith belief that to

suspend auto-delete, "███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████[141]  Mr. Jessen agrees.[142]

Accordingly, Intel decided to protect the integrity of its systems while attempting to moot auto-delete with weekly backup tapes as a backstop to individual retention efforts. That "balanced" approach, adopted after "good faith" consideration, was undeniably consistent with best practices. *See Sedona Principles* Comment 5a ("If such overwriting is incidental to the operation of the systems as opposed to a deliberate attempt to destroy evidence in anticipation of or in connection with an investigation or litigation it should be permitted to continue after the commencement of litigation.").

The December 2006 Rule 37(e) advisory committee note, which plaintiffs' rely on but quote only in part (Mot. 25) does not help them.[143]  First, Rule 37(e) and the note did not exist in 2005.  Second, Rule 37(e) is a "safe harbor," the opposite end of the spectrum from the

---

██████████████████████████████████████████████████████████" Ex. 51 (██████
Tr. 115:19-24). Apart from the technical issues, journaling was not legally required or recommended then, or even today. Part III.A.5.c, above; Jessen ¶ 78.

[140]  Ex. 17 (███████ Tr. 405:06-21).

[141]  Ex. 66 at 67864DOC0003847-3848.

[142]  Jessen ¶¶ 65, 78.

[143]  Rule 37(e) today was adopted in 2006 as 37(f). The advisory committee note refers to (f).

intentional conduct required to award sanctions. Third, plaintiffs ignore the following statement: "Good faith in the routine operation of an information system *may* involve a party's intervention to modify or suspend certain features of that routine operation to prevent the loss of information. . . . Among the factors that bear on a party's good faith in the routine operation of an information system are the steps the party took to comply" with a preservation obligation.[144] Thus, under the safe harbor, good faith "may," *but need not*, involve suspension of a routine operation, depending on other "steps" taken "to comply." *See also Southeastern Mech. Servs., Inc. v. Brody*, 2009 WL 2242395 at *3 (M.D. Fla.) (finding spoliation sanctions inappropriate for lack of evidence of bad faith, where backup tapes were overwritten as part of "routine document management policy"). Certainly there is no evidence – none whatsoever – that Intel sought to "exploit" auto-delete "in order to" destroy relevant information. In any event, plaintiffs' (non-binding) cases relating to auto-delete are, again, at the other end of the spectrum. In each, a party, unlike Intel, did *absolutely nothing* "to comply" with its retention obligation.[145]

Intel took multiple other "steps . . . to comply" with its preservation obligations and "interven[e] in the routine operation" of auto-delete. It immediately and repeatedly instructed custodians to preserve and not to delete potentially relevant materials, almost immediately began harvesting custodians' documents, and within months implemented a plan to preserve weekly

---

[144] Fed. R. Civ. P. 37(f), Advisory Committee Note (Dec. 2006) (emphasis added).

[145] *See* Mot. 25-26, n. 119 *citing Broccoli* v. *Echostar Commc'n Corp.*, 229 F.R.D. 506 (D. Md. 2005) ("bad faith" failure to issue litigation hold or take any steps to preserve relevant emails after receiving notice of potential litigation); *Peskoff v. Faber*, 244 F.R.D. 54, 60-62 (D.D.C. 2007) (not involving sanctions; ordering forensic search where "no explanation whatsoever for the phenomenon of the missing two years of emails"); *Disability Rights Council of Greater Wash. v. Wash. Metro. Transit Auth.*, 242 F.R.D. 139, 145-46 (D.D.C. 2007) (not involving sanctions; defendant failed to instruct employees to preserve relevant evidence or take any steps to bypass automatic deletion); *Doe v. Norwalk Cmt. Coll.*, 248 F.R.D. 372, 376-380 (D. Conn. 2007) (failure to take any steps to preserve relevant documents, and evidence of "selective destruction [of the most relevant documents], evidencing intentional behavior").

backup tapes (in addition to thousands of Complaint Freeze tapes) for them. Each of those steps was designed to take relevant emails outside the reach of auto-delete, and most were beyond legal requirements. Even if all of them somehow failed on occasion, the email in question would likely appear in the files of the sender or other recipients, or on one or more of *their* backup tapes. Thus, the odds of any significant email having disappeared altogether due to this small hole in one of Intel's many layers of protection are remote. Jessen ¶¶ 71, 85. Based on what Intel knew, no further steps were required. *See Phillips v. Potter*, 2009 WL 1362049 at *5 (W.D. Pa.) (refusing to impose adverse inference even where defendant failed to issue a litigation hold and emails "were destroyed as a result of the automatic deletion system," absent evidence of "bad or malicious intent" or prejudice).

There is no authority, and plaintiffs cite none, that Intel's good faith decision relating to auto-delete, in the context of its multi-layered retention plan and disclosed right up front, was even remotely sanctionable.

### 3.   Intel Did Not Violate Any "Preservation Order"

Plaintiffs claim "Intel has consistently failed to comply with the Special Master's Orders regarding the preservation of evidence." Mot. 21-22. That is untrue. Plaintiffs identify exactly one such order, which was not a "Preservation Order" (*id.* at 1), but an order to disclose Intel custodians' retention practices.[146]  Besides, when the Court held certain of Intel's custodian interview summaries should have contained more information, it ordered a remedy that resolved any compliance issues – the production of updated disclosures detailing the nature, scope and duration of all known retention issues absent from the interview notes.[147]  Contrary to plaintiffs'

---

[146] 3/16/07 Order (D.I. 417). The actual title of the Order was Stipulated Order re Intel's Evidence Preservation Issues.

[147] Ex. 68 (1/23/09 Hrg. Tr. 11:15-13:22); 3/10/09 Order (D.I. 1628) at 2-4.

claim that "Intel has never provided complete information" (Mot. 22), in fact Intel complied fully with the Court's Order, and neither AMD nor plaintiffs ever challenged Intel's remedial disclosures.[148]  Thus, plaintiffs identify no "Preservation Order" that was violated, any issue relating to the Order they do identify has long since been remedied, and it would be unfair and impermissible to sanction Intel for an issue previously resolved to everyone's satisfaction.

### 4.    Plaintiffs' Other Critiques Of Intel's Retention Plan Are Unfounded

Plaintiffs' remaining kitchen sink arguments include a variety of other unfounded complaints about Intel's retention.  First, plaintiffs level baseless and irrelevant charges that Intel employees ' ████████████ "  Mot. 7.  However, with one exception, all of the examples plaintiffs cite were sent *before the Complaint was filed where there was no retention obligation.*[149]  *Id.* at 3, 6-7.  Plaintiffs' examples add up to nothing more than isolated, unauthorized comments on the part of a few employees.  Moreover, the supposedly damning emails plaintiffs cite are no different than one might expect from a few isolated employees in any business setting.  For example, several emails establish that even *AMD's* '█ ████ " mantra continued after it anticipated litigation and even after it filed its case.[150]

Plaintiffs also try to transform Intel's rigorous antitrust compliance program into '█

---

[148]  4/17/09 Intel ltr. to Ct.(D.I. 1712).

[149]  As to the only post-Complaint email, there is no evidence ████ knew that ████ of ███ was under a retention obligation as of his June 18, 2006 email, and in any event the email was preserved and produced in ████ organic production. *See* note 2, above.

[150] ████████████████████████

■■■

■■■

Case 1:05-cv-00485-JJF   Document 1962   Filed 03/05/10   Page 48 of 67





██████████████████████████████████ " and training on the "██████████████

██████████████████ "[151] Mot. 6. The effort is baseless. Plaintiffs mischaracterize ██████

████████ testimony about "████████████████" or as plaintiffs call them "████████████" ignoring

that he explained their actual purpose was to bring compliance "████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████████████████ "[152]  Even taking their perversions of the record at

face value, this is a complete sideshow. Plaintiffs cannot credibly deny that Intel took immediate

steps upon notice of litigation to preserve relevant documents. Instead, plaintiffs nit-pick.

  Intel's hold notice fully complied with applicable standards: ██████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████[153]  Plaintiffs nevertheless argue now that the hold notice "████████

███████████████████████ ," suggested "████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████████ " Mot. 15, n.62.

  Plaintiffs' charges are wrong. First, the vast majority of Intel employees already knew

about auto-delete, and they routinely kept emails in .pst folders to preserve them for business

---

[151] The American Bar Association recommends what plaintiffs malign, that companies audit
their employees for antitrust compliance by reviewing their documents and conducting personal
interviews. ABA SECTION OF ANTITRUST LAW, ANTITRUST COMPLIANCE: PERSPECTIVES
AND RESOURCES FOR CORPORATE COUNSELORS (2005) ch. 11, at 122-23.

[152] Ex. 76 (██████ Tr. 20:01-21:13).

[153] Compare Ex. 18 at 69412DOC0004178-81 with Sedona Principles Comment 5d.

A/73286074.9                                    42

purposes, thus mooting any effect of auto-delete. Jessen ¶¶ 75, 77; Part III.a.2, above.  The hold

notice said ███████████████████████████████████████████

██████████████████[154]  In the unlikely event that an employee did *not* know how to

create and move emails to .pst files, ███████████████[155]  Second, █

████████████████████████████████████.  Finally, the hold

notice instructed ███████████████████████████████████████

███████████████[156]

      Plaintiffs also claim, incorrectly, that Intel "failed to monitor" or "follow up" on the hold

notice.  Mot. 15-17, 23.  In fact, Intel delivered multiple retention notices and reminders

throughout the litigation.  Intel paid particular attention to ███████████████████

██████ the "'key players' in the litigation."  *See id.* at 16.  It immediately reinforced the

written hold notices they had received with in-person retention instructions from top in-house

counsel.  Intel ██████ specifically inserted retention reminders for this litigation into the quarterly

███████████████ meetings, and reached out to the next levels of ██████ with in-person

retention reminders in both summer 2005 and early 2006.[157]

      Though plaintiffs cite *Zubulake* for the proposition that a litigant and its counsel have an

absolute obligation to "communicate directly with . . . the people identified in a party's initial

disclosure" (Mot. 23, quoting *Zubulake V,* 229 F.R.D. at 433), they fail to note that the goal is

---

[154] Ex. 14 at IIT-8001-0000445 (emphasis added).

[155] *Id.*

[156] *Id.*  The initial hold notice told employees to retain '████████████████████

████████ " *See* Mot. 15.  However, "the notice need not be a detailed catalog of information
types to be retained." *Sedona Principles* Comment 5d.  This point is ultimately makeweight.
Plaintiffs do not even argue hypothetical missing IMs prejudiced them.

[157] Part III.A.3, above.  Freidman ¶¶ 4-6; Ex. 30 (11/18/09 ██████ Depo. Corr. 31:14-32:21).

"to understand how they stored information" so that potential information sources are not lost. 229 F.R.D. at 432. Intel met and exceeded that goal. Though plaintiffs ignore the other components of Intel's retention plan, Intel not only identified but began harvesting, and thus preserving, custodians' documents almost immediately. By November 2005, Intel had harvested documents from 500 custodians, including 55% of the eventually selected Production Custodians (with retention reminders often given contemporaneously).[158]

Indeed, Intel went further. "A party's preservation obligation does not require freezing of all electronic documents and data, including email," *Sedona Principles* Comment 5g, yet Intel did that with its immediate and comprehensive Complaint Freeze tapes. It also implemented, even though not required, a backup tape plan to guard against individual compliance problems. *See id.* at Comment 5h ("[E]mploying proper preservation procedures with respect to the active system should render preservation of backup tapes on a going-forward basis redundant."). Thus, plaintiffs' contention that there was "either inadequate or no backup mechanism in place at all" from July 2005 through March 2006 (Mot. 17) is invented.

So is plaintiffs' assertion that " ███████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████ " Mot. 16. By the time, in early 2007, that Intel had discovered problems with the hold notice and some individual retention lapses, it either took or had already conducted an extensive investigation, including interviewing hundreds of (and ultimately some 1,000) custodians; migrated custodians to their own servers and preserved weekly backup tapes, harvested hundreds of custodians' documents and thus preserved them,

---

[158] Ex. 8 at 13, n.4 (Remediation Plan); Ex. 77. *Zubulake* explicitly recognized "it may not be feasible for counsel to speak with every key player, given the size of a company or the scope of the lawsuit." *Zubulake V,* 229 F.R.D. at 432.

issued and re-issued an effective and appropriate hold notice and reminded key custodians repeatedly of their retention obligations, and rolled out its automated journaling system. Intel's remedial steps were thorough, appropriate, and indeed "extraordinary." Jessen ¶ 80.

Plaintiffs claim Intel failed to take steps to ensure compliance with its preservation program. Mot. 17-18. That too is unfounded. Intel sent an ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████[159] Besides, the "best known practices" at the time were that custodians should be "notified via email of the dispute and . . . asked to take steps to retain documents (including electronic communications, data and records) that may be relevant to the litigation." *Sedona Principles* Comment 5d.

## 5. Without Dispute Some Individual Retention Issues Were Inevitable And Understandable

Despite Intel's comprehensive retention plan and diligent efforts to implement and monitor compliance with it, some custodians did not comply with it in all respects at all times.[160] "Perfect compliance with a litigation hold notice is an unrealistic goal." Jessen ¶ 58. There is no evidence of any improper intent by anyone at Intel. Rather, these limited non-compliance situations resulted from a variety of individual circumstances, including a failure to focus on Sent Items, a narrow interpretation of relevance, or a mistaken belief that Intel IT was automatically saving all emails.[161]

Even AMD conceded individual retention failures "will inevitably occur whenever human beings are required to make individual judgments. . . . In a production of this magnitude,

---

[159] Ex. 14 at IIT-8001-0000445); Part III.A.2, above.

[160] Ex. 8 at 19-20 (Remediation Plan); Ex. 44 at 1 (2/8/07 Intel email to AMD).

[161] Ex. 8 at 19-20 (Remediation Plan); Ex. 44 at 1 (2/8/07 Intel email to AMD).

it is to be expected that one custodian may judge the responsiveness of a given email differently than another custodian looking at the same item."[162]  In fact, quite tellingly, AMD experienced the very same types of individual custodian non-compliance as Intel, demonstrating that perfect retention is not a reasonable (or required) goal for a party involved in litigation of this scope and size.  Indeed, AMD was forced to restore backup tapes for 57 – nearly one-third -- of its custodians, including its ███████████████, because they failed to preserve relevant emails.[163] AMD asserted such individual retention issues are "not, however, the consequence of some failure by AMD to exercise reasonable efforts to secure compliance . . . with AMD's preservation instructions."[164]  For another custodian with obvious retention problems, AMD said:

> ███████████████ retention of a relatively small number of files compared to [his files found in other custodians' productions] is not the result of a failure by AMD to impose a proper litigation hold or to monitor it.  Instead, as detailed in ███████████ written summary, AMD issued a comprehensive litigation hold to him within a week after this lawsuit began.  AMD thereafter provided ████████ with numerous written reminders about preservation. ██████ ████████ selectivity in deciding which files were relevant and which were not does not reflect what AMD would have preferred.[165]

Plaintiffs have no basis to apply a higher standard to Intel custodians' retention lapses.

Yet they try to, and in so doing, focus special attention on five Intel executives (████ ████████████████████████████████████████████████).  See Mot. 17-18.  Here are

---

[162]  Ex. 78 at 3 (12/9/08 AMD ltr. to Ct.) (Mistakes are expected in such a large production because "[e]very custodian must necessarily make personal, on-the-fly decisions -- in some cases, perhaps a thousand or more of them each month -- about whether a given email is or is not within the scope of the preservation instructions given to him/her."); Jessen ¶ 58 ("Even though the reliance on [hold notices] is a reasonable and common method of insuring the preservation of potentially discoverable documents, because retention decisions are made by individuals whose primary focus is their day-to-day jobs, mistakes are inevitable.").

[163]  See Ex. 79 at 33-37 (Intel Mot. for Sanctions).  Even this grudging concession by AMD no doubt understates the problems it experienced.  Id. at 36-37.

[164]  Ex. 78 at 9 (12/9/08 AMD ltr. to Ct.).

[165]  Id.

the facts.  Intel issued an immediate, comprehensive hold notice and written and oral reminders

in addition to harvesting their documents promptly, creating and maintaining a Complaint Freeze

tape for them, and placing them on weekly backup tapes.[166]  Plaintiffs complain Intel did not

discover their preservation issues sooner, but ignore the multiple steps Intel had taken in the

meantime to ensure their documents were preserved.  Furthermore, plaintiffs have overstated

facts and disregarded others relating to the circumstances of these individual custodians'

retention practices.[167]  Plaintiffs also ignore the bottom line fact that Intel produced over 182,000

emails to or from ▮▮▮▮▮▮▮ it singles out, including more than 139,000 post-lawsuit.[168]

**6.  The Other Deviations From the Retention Plan Were Also Isolated, Honest Human Errors**

All of the other mistakes in the implementation of Intel's document retention plan were

independent of the plan itself and resulted from honest misunderstandings or lapses by Intel▮ or

▮▮▮▮▮ conscientiously trying to preserve evidence for this litigation.  Some involved

Intel's backup tapes or other fail-safes, which were voluntary, not required, and matter only if

there was an individual retention lapse to begin with.  Plaintiffs mischaracterize what happened

and overstate the problem.

---

[166] Parts III.A.2, 3 and 5, above.  Plaintiffs question their "misimpression" that Intel IT was saving their emails automatically (Mot. 17-18) but ignore that AMD's ▮▮▮▮▮ was under the very same misimpression. Ex. 24 (▮▮. Tr. 572:06-20, 574:19-577:18, 582:11-583:15); Ex. 79 at 25-27 (Intel Mot. for Sanctions).

[167] For example, before the complaint was filed, ▮▮▮▮ had moved to the ▮▮▮▮▮, and thus was not sending or receiving many emails relevant to the lawsuit. Ex. 27 (▮ Tr. 13:04-14:02).  Similarly, ▮▮▮▮ had transitioned out of day-to-day responsibilities, and was often on vacation during 2005. Ex. 80 (▮▮Tr. 14:02-23); Ex. 81 (▮▮▮▮ Weil Interview Notes at WEIL 002044).  As a result, he also was sending and receiving few emails related to the litigation. *Id.*

[168] Leatha ¶ 10.

### a. Recipients Of Hold Notices

"By any objective measure, early in the lawsuit and without any guidance from AMD, Intel did an extraordinary job of identifying the people who should receive the [hold notice]." Jessen ¶ 38. Of the 353 Production Custodians ultimately identified, 250 (71%) received a litigation hold notice within 30 days of the AMD complaint, and 318 (90%) were among the 1,040 employees who received a litigation hold notice in 2005.[169] Another seven received a notice before Intel and AMD negotiated the final custodian list in June 2006.[170]

Plaintiffs nevertheless point out that ███████████████████████████ ███████████████████████████████████ Mot. 19. Plaintiffs neglect to mention that *only 28* of those were chosen as Production Custodians, and that they and AMD deemed *only one* of them important enough to depose.[171] In any case, plaintiffs do not and cannot dispute that this omission was a simple human error based on a confusion about custodian lists, nor can they argue it warrants any sanction whatever, much less suggests bad faith or ill intent.

### b. Backup Systems

Plaintiffs try to turn four, unconnected implementation errors related to Intel's voluntary backup systems into "empty promises" by Intel. Mot. 10-12. Again, plaintiffs overreach. The migration and backup tape issues were obviously mere oversights and miscommunications. Intel employee ████ might have made errors in the migration process (it is still unknown); he and ████ failed to close the loop on the Swindon tapes; he and ████████ did likewise with respect to the migration discrepancies; and Intel ██ in Munich misunderstood the relationship

---

[169] Ex. 20.

[170] *Id.*

[171] Beach ¶ 5.

between the EC investigation and AMD litigation.[172] That's all the evidence shows.

Moreover, each and every one of these issues related to Intel's voluntary, above-and-beyond its legal obligations retention efforts. Intel cannot be sanctioned for innocent errors relating to retention efforts it had no obligation to undertake in the first place.

Plaintiffs also overstate the problem. It is both legally irrelevant and factually incorrect that "███████████████████████████" there was "███████████████████████████" Mot. 11. Legally, no "███████" was required; Intel's hold notice, reminders, and harvests more than met its legal obligations.[173] The Complaint Freeze tapes and migration and backup plan were additional, voluntary measures. Moreover, many of Intel's custodians are missing only a few weekly tapes, so plaintiffs' assertion that there is no "██████ █" is wrong.[174] Plaintiffs' statistics are also misleading. They claim "██████████████ ███████████████████████████████████████████████ ███████████████████████████" Mot. 10. Plaintiffs neglect to mention, however, that hundreds of those custodians were not yet identified, so Intel had no obligation whatsoever to preserve their documents, let alone take voluntary backup measures, for the first twelve months of the case.[175] In any event, relatively few Production Custodians were affected: only 69 by the migration failures, 45 by the Swindon tapes, and 24 by the Munich tapes.[176] AMD and plaintiffs believed only 15, 4 and 2 of them, respectively, important enough to depose.[177] Finally, Intel's repopulation included data from more than a thousand weekly backup

---

[172] Parts III.A.5.a and b, above.

[173] *See* Part V.A.1, above; Jessen ¶¶ 27-55.

[174] *See, e.g.,* Leatha ¶¶ 3, 6.

[175] Ex. 82 (6/1/06 Intel ltr. to AMD).

[176] Ex. 77; Beach ¶ 6.

and Complaint Freeze tapes.[177]  Plaintiffs' claim that Intel had "███████████████

███" from which to remediate (Mot. 11) is simply untrue.

### B.    Plaintiffs Have Failed To Establish Any Prejudice

"[T]he basic thrust of the Supreme Court jurisprudence is that sanctions that [a]ffect the

outcome of the trial should only be imposed in order to compensate for violations that may

plausibly be thought likely to affect the outcome of the trial." *Estate of Spear*, 41 F.3d at 115.

Contrary to plaintiffs' suggestion (Mot. 29), "relevance" is not the standard. *Plaintiffs must*

*prove* that the "missing emails" would have been "favorable" to them, and not "cumulative,

insignificant or of marginal relevance." *DaimlerChrysler*, 2003 WL 22951696 at *2; *accord*

*Zubulake IV*, 220 F.R.D. at 221 ("to receive an adverse inference instruction, Zubulake must

demonstrate not only that UBS destroyed relevant evidence as that term is ordinarily understood,

but also that the destroyed evidence would have been favorable to her"). That requires "concrete

evidence," not the product of "a fertile imagination." *DaimlerChrysler*, 2003 WL 22951696 at

*2; *accord Hechinger*, 489 F.3d at 579 (affirming denial of sanctions where movant "did not

identify any evidence that was destroyed . . . that would have aided" it). "Speculation" does not

suffice. *Phillips*, 2009 WL 1362049 at *5.

Plaintiffs have amassed probably the largest discovery record in the history of American

litigation. They cannot seriously argue the presentation of their case has been handicapped in

any way. Plaintiffs boldly assert, without any substantive analysis, that the "loss of evidence in

this case has severely prejudiced" them because the allegedly missing documents "likely would

have been favorable to Class Plaintiffs' liability and consumer harm theories" (Mot. 2), yet

contemporaneously proclaim that they have "*huge amounts of common evidence* capable of

---

[177]  *Id.* ¶ 7.

[178]  *See* Leatha ¶ 3.

demonstrating ████████████████████████████████ " Tr. Pl. Rep. (D.I. 2297) at 5

(emphasis added).  In other words, they try to have it both ways.

   Notwithstanding their position that they have plenty of evidence available to them,

plaintiffs try to meet their burden of proving prejudice with a quantitative and qualitative

analysis, borrowed wholesale from AMD.  Each fails, and ends up disproving itself.

### 1.   Plaintiffs Rely On A Second-Hand, Improper And Ultimately Self-Defeating Analysis For Which They Have No Expert

   Plaintiffs did not bother trying to conduct their own analysis, or find their own witness,

choosing instead to rely on an inherently flawed "model" created by Shaun Simmons, one of

AMD's attorneys. ███████████████████████████████ His "model"

misapplies statistical techniques.[179]  It contains "████████" opinions he has no basis to offer and

relies on a long list of "████████" he has no "████████████████"[180]

████████████████████████████████████[181] ████████████████████

████████████████████████████[182] ████████████████████████

████████████████████████████[183]  It is, in the end, circular. ████

████████████████████████████████████████████████[184]

---

[179]  Ex. 83 (████████ Tr. 6:21-7:01, 66:01-15 ("████████████████████████████████

████████████); *id.* at

117:19-118:17 (████████████████████████████████████████).

[180]  *Id.* at 28:04-29:14, 113:18-114:05.

[181]  *Id.* at 81:02-85:14 (████████████████████████████████████

████████████████████████████████████████████).

[182]  *Id.* at 115:18-118:17.

[183]  *Id.* at 26:25-27:08, 41:11-42:05, 47:04-48:05.

[184]  *Id.* at 22:07-24:03.

Simmons' testimony cannot substitute for real expert opinion.[185]

In general terms, Simmons' email loss "model" purports to compare Intel's retention to AMD's by analyzing Intel and AMD's document productions during both "self-preservation" and "automated" retention periods.[186] It purports to calculate an average "jump" for Intel of 87% (after excluding four "outlier" custodians) from one period to the other, which it compares to AMD's supposedly "benign increase" of 20% on average.[187] It then calculates Intel's "missing" emails, applies a 20% "discount," based on AMD's so-called "gold standard" document preservation conduct, and concludes that Intel "lost" over 600,000 emails. Mot. 12-13.

Simmons' quantitative analysis of supposedly "missing" emails is so littered with conceptual, statistical and simple mathematical errors that it is literally useless. But even on its face, it establishes that perfection is not the standard, and Intel's production is well within Simmons' self-declared "benign" margin of error (according to Simmons, the number of documents AMD could have, but admittedly failed to, retain[188]).

a.    <strong>Simmons Overstates Intel's "Jump"</strong>

Simmons proclaims Intel's average monthly email production "jumped" by 87% in the "automated" preservation period, compared to AMD's "benign increase" of 20%. Mot. 14-15. That comparison relies on one conceptual error, one mathematical error and one factual misrepresentation. Conceptually, Simmons ignores Intel's multi-tiered retention scheme. Backup tapes were part of it (albeit a voluntary part beyond legal requirements). By comparing

---

[185] Simmons' mistakes are more fully described in the Declaration of Dr. Arnold Barnett in support of Intel's Motion to Strike the Simmons Declaration on the ground that his email loss "model" constitutes improper (and utterly unreliable) lay opinion testimony.

[186] Ex. 83 (Simmons Tr. 9:18-11:16, 21:3-15).

[187] Ex. 84 ¶¶ 16, 32-33.

[188] Ex. 84 ¶¶ 31-32.

Intel's self-preservation period to its backup tape period (as opposed to journaling, as he did for AMD), Simmons dramatically increases the supposed "jump" and, perversely, punishes Intel for implementing that voluntary backup measure. *See* Jessen ¶ 55. Also, mathematically, Simmons makes a basic, but very large, mistake, by calculating a simple rather than weighted average. The chart below shows the problem. On Simmons' analysis, the average "jump" for Custodians A and B would be 125% ([200% + 50%]/2 = 125%). However, the actual jump is only 80% ([1,800 − 1,000]/1000 = 80%).

|  | Self-Preservation | Automated Preservation | Actual "Jump" | Simmons' "Jump" |
|---|---|---|---|---|
| Custodian A | 200 | 600 | 200% | 200% |
| Custodian B | 800 | 1,200 | 50% | 50% |
| Total | 1,000 | 1,800 | **80%** | **125%** |

Factually, plaintiffs and Simmons single out four Intel custodians with supposedly "massive preservation failures."[189] That accusation is misleading, at best. Simmons starts these custodians' "self-preservation" period in July 2005, but they were not on the preservation list, *and thus had no obligation at all*, until June 2006. Thus, their "jumps" are wildly overstated.

### b.   Simmons Understates the "Discount"

Simmons decreed AMD's preservation the "gold standard," so saw fit to "discount" Intel's "missing" emails by 20% – supposedly AMD's "jump" from self-preservation to journal.[190] That gesture is fundamentally flawed. First, Simmons has no "scientific basis in coming to the conclusion that 20% was an acceptable benign increase."[191] Under Simmons' arbitrary analysis, a custodian with a 21% jump would have "missing" emails and one with a

---

[189]  Mot. 19-20 & n.98; Ex. 84 ¶ 17.

[190]  Ex. 83 (Simmons Tr. 49:12-51:21); Ex. 84 ¶¶ 32-37.

[191]  Ex. 83 (Simmons Tr. 68:18-24).

19% jump would not.[192]   Second, in arriving at the "gold standard," Simmons omits ████

████, AMD's poster child for failed retention, *and 65 other custodians*.[193]   Third, the

model relies on inputs AMD previously called "patently false assertions" and "flagrantly flawed

methodologies" when Intel sought to use them to prove AMD's missing email.[194]

Put in perspective, Simmons' "████" "model" is quite the opposite.  The parties

stipulated that not all documents would be produced, consistent with the law and common sense,

as applied to a case of this magnitude and complexity.  Even Simmons' analysis claims that Intel

is "missing" only approximately 4% (642,970 ÷ (13,924,497 + 642,970)) of all possible emails

and, factoring in the millions of non-email documents, an even smaller percentage of the overall

production in this matter.[195]   The percentage of emails plaintiffs claims is missing (4%) is less

than one-fourth as large as the 20% Simmons considers the "gold standard" for "good faith"

document loss (*i.e.*, AMD's probable document loss).[196]   It is also less numerically than the 1

million email pre-Complaint "bonus" production that, as noted above, plaintiffs received *only*

through Intel's remediation efforts.  Thus, looked at either way, there was, and could be, no

prejudice.

---

[192]  *Id.* at 132:24-134:23.

[193]  *Id.* at 51:22-52:21.  Mr. Simmons does not know whether the AMD sample size is statistically meaningful either.  *Id.* at 116:24-117:1.

[194]  *Id.* at 43:18-45:24; *see also* Ex. 85 at 3 (8/11/09 AMD ltr to Intel).

[195]  *See* Jessen ¶ 92.  Aside from email, Intel produced almost two million additional documents (*e.g.*, Word, PowerPoint and Calendar items) and third parties produced over two million more. Leatha ¶ 8; 3/24/09 CMO 7 (D.I. 1650) at 2. ████████  *See* Tr. Pl. Rep. (D.I. 2297) at 7.

[196]  Simmons' model, which plaintiffs adopt, considers the automated retention period effectively perfect, and proclaims AMD's self-preservation of 20% fewer emails than that to be a good faith loss.  Plaintiffs also claim Intel could have produced only 4% more emails than it actually did.

2.    **Plaintiffs' "Critical" And Supposedly "Missing" Evidence Is Neither**

Plaintiffs claim their access to "only" about 96% of all possible emails from the ultimately selected custodians has caused "severe prejudice." Mot. 28. Plaintiffs' "fertile imagination" is getting the better of them. *See DaimlerChrysler*, 2003 WL 22951696 at *2.[197] Plaintiffs (and AMD) and their experts have had no trouble developing their case (factually and legally insufficient as it is). Indeed, neither plaintiffs nor Leffler claimed one iota of prejudice to their efforts, until now. To the contrary, and to repeat, plaintiffs admit in virtually the same breath that they have a "vast amount" of documents, testimony, and data with which to present their case.[198] *See Consol. Aluminum Corp. v. Alcoa, Inc.*, 244 F.R.D. 335, 347 (M.D. La. 2006) (finding no evidence of prejudice, "considering the overwhelming amount of documentary evidence and emails already produced by [defendant] in this matter"); *DaimlerChrysler*, 2003 WL 22951696 at *2 (no prejudice where party took deposition testimony on the subject of the missing evidence).

Plaintiffs' case falls apart even more when they try to get specific. They argue they have

---

[197] Similarly, plaintiffs' "presum[ption]" that during that time Intel custodians were "chatting about the merits of the suits and the danger they posed to Intel's business practices" (Mot. 33) is exactly the product of "fertile imagination" that does not suffice. *See id.* Plaintiffs offer no proof of that imagined chatter. "In essence, [plaintiffs] argue that [Intel's] conduct deprived [them] of a pond in which [they] would like to have gone on a fishing expedition. That is not a showing of prejudice." *N.Y. State Nat'l Org. for Women v. Cuomo*, 1998 WL 395320 at *3 (S.D.N.Y.) (denying sanctions for loss of records because plaintiffs "fail[ed] to identify with any specificity what information they would have been reasonably likely to find").

[198] 2/1/10 Trial Plan Reply (D.I. 2297) at 7; *id.* at 5 ("huge amounts of common evidence . . . of . . . ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆"). By way of comparison, for the post-Complaint time period on which plaintiffs focus here, AMD's liability expert, Dr. Bernheim, analyzed Intel's sales conduct relating to seven major OEMs in each of seven market segments. Beach ¶ 8, Ex. 86 (Output for Watson, Acer, Apple, Dell, Emachines/Gateway, IBM, Lenovo, and NEC). He prepared quarter-by-quarter conduct indices for OEMs from Q1 2000 to as late as Q1 2008. *Id.* In all, Bernheim seemingly found the data to painstakingly analyze over 25,000 OEM transactions over the course of seven years based on vast amounts of evidence, including documents from Intel and its contracting partners, thousands of hours of deposition testimony, and comprehensive Intel transactional data. Beach ¶ 9; Ex. 87.

been "prejudiced" on several fronts based on emails they *received*, of which, the theory goes, there would likely have been even more. Mot. 29-32. The argument's centerpiece is a collection of *nine documents*, whose "highly incriminating nature" supposedly proves "Intel Custodians intentionally deleted" them. Mot. 29. Plaintiffs claim Intel produced seven of them only through remediation but "failed originally to produce" them, and that two "were produced only by third parties," so plaintiffs have "proof" that Intel's remediation "failed in crucial respects." *Id.* at 30.

But here is the problem: *with a lone exception, Intel produced every single one of the documents, originally in its organic form,* and often produced multiple copies of substantively identical ones, also organically.[199]   In some, but not all, cases an *additional* Intel custodian produced the document only through repop, but that just proves the point that even if one custodian failed to preserve an email it would likely have been produced organically by another who sent or received it. Thus, the truth is plaintiffs have had these documents, or substantively identical ones, all along. That they do not realize they have had them, from the beginning, suggests maybe they aren't so critical after all. *See DaimlerChrysler*, 2003 WL 22951696 at *2.

Ultimately the "analysis" upon which plaintiffs rely is an exercise in pure speculation. It essentially assumes that some material email must be missing and must be proof of liability and consumer harm without proving either. Also, while plaintiffs purport to rely on AMD's counsel's analysis, they fail to distinguish AMD's own production issues. Simmons admits a 20% shortfall in AMD's emails prior to journaling, but assumes that is "benign," at the same

---

[199] Leatha ¶¶ 11-13. Intel did not produce a second document of the nine organically, nor should it have, because it did not come from a Production Custodian. The document was mistakenly listed as repop at first, because of confusion about custodian names, but later removed from the repop list. *Id.* ¶ 12. The one document plaintiffs correctly identify that was not produced organically was sent from a third party to ███████████. Neither plaintiffs nor AMD have pointed to evidence suggesting that ███████ failed to take reasonable, good faith steps to retain documents. There is none. In fact, Intel produced over 75,000 of his emails, which demonstrates the opposite is true. Beach ¶ 10.

time simply guessing that Intel's shortfall, whatever it is, contains significant evidence favorable to AMD (and plaintiffs). *See id.* Neither plaintiffs' speculation nor unreliable lay statistics carries their burden to provide "concrete" evidence of actual prejudice. *See Schmid*, 13 F.3d at 80; *Phillips*, 2009 WL 1362049 at *5.

    **C.**    **The Motion Should Be Denied**

        **1.**    **Plaintiffs' Request For An Adverse Inference Instruction At Trial Should, If Reached, Be Denied**

    The primary trial sanction plaintiffs seek is unwarranted under controlling Third Circuit law (and even the non-controlling cases plaintiffs cite), contravenes Supreme Court and Third Circuit admonitions to exercise restraint, and would be highly prejudicial. An adverse inference instruction at trial would be a game-changer.

> In practice, an adverse inference instruction often ends litigation – it is too difficult a hurdle for the spoliator to overcome. The *in terrorem* effect of an adverse inference is obvious. When a jury is instructed that it may "infer that the party who destroyed potentially relevant evidence did so 'out of a realization that the [evidence was] unfavorable,'" the party suffering this instruction will be hard-pressed to prevail on the merits. Accordingly, the adverse inference instruction is an extreme sanction and should not be given lightly.

*Zubulake IV*, 220 F.R.D. at 219-20; *accord Consol. Aluminum*, 244 F.R.D. at 340 & n.5 (adverse inference instruction is "drastic" because "it basically 'brands one party as a bad actor, guilty of destroying evidence that it should have retained for use by the jury'") (citation omitted); *Escobar v. City of Houston*, 2007 WL 2900581 at *18-19 (S.D. Tex.) (no "basis for such a severe sanction as an adverse inference instruction" absent proof of bad faith and prejudice).

    Plaintiffs' own cases do not remotely support its "drastic" request; they are neither binding nor persuasive. First, the spoliating party's conduct was much more egregious than anything plaintiffs can prove, or even allege, here. In *Broccoli*, the defendant acted in "bad faith" by failing to preserve *any* personnel documents or emails between the plaintiff, his

supervisors, or the company's upper management after receiving notice of potential litigation. 229 F.R.D. at 512; *see Kounelis v. Sherrer,* 529 F. Supp. 2d 503, 519 (D.N.J. 2008) (prisoner requested a specific videotape of incident and prison made "no effort" to preserve it, contrary to "commonplace" practice); *DaimlerChrysler* v. *Bill Davis Racing,* 2005 WL 3502172 at *2 (E.D. Mich. 2005) ("no efforts" made to preserve relevant email from various sources); *MOSAID Tech. Inc., v. Samsung Elec. Co.,* 348 F. Supp. 2d 332, 338 (D.N.J. 2004) ("knowing and intentional conduct"); *see also Scott,* 196 F.R.D. at 250 (denying adverse inference sanction).[200]

Second, plaintiffs' cases involved an exponentially smaller universe of documents, not a massive quantity of cumulative emails. *Broccoli, Scott,* and *Zubulake* were employment disputes, so the evidence at issue went to the discrete question of why a defendant terminated a single employee, and consisted of the documents of at most a handful of individuals involved in that decision at or around the time it was made. *Broccoli,* 229 F.R.D. at 511-12 (evidence was personnel file, investigative reports and emails between plaintiff and his supervisors and upper management); *Scott,* 196 F.R.D. at 239-40 (evidence was a flip chart and other contemporaneous documents reflecting how termination decision was made); *Zubulake V,* 229 F.R.D. at 424 n.3, 425 n.16 (document request at issue sought "all documents concerning any communications by or between UBS employees concerning Plaintiff" and dispute involved about 12 employees'

---

[200] Courts have rejected adverse inference instructions where parties did far less than Intel to preserve electronic data. *See, e.g., United States v. Philip Morris USA, Inc.,* 327 F. Supp. 2d 21, 23-24 (D.D.C. 2004) (many emails "highly relevant" to plaintiff's claims were lost when the company continued systemwide monthly deletion of *all* emails over 60 days old for two years after court-ordered preservation, and high-ranking, relevant employees did not preserve documents); *Consol. Aluminum,* 244 F.R.D. at 342-43 (11 of 15 key custodians were not advised for 2 1/2 years to preserve emails, weekly auto-deletion of all emails 45-days old not removed from a cleanup folder continued, and automatic destruction of backup tapes six months after creation continued); *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.,* 244 F.R.D. 614, 629-30, 635-36 (D. Colo. 2007) (defendants made no attempt to preserve or place a litigation hold on departing employees' hard drives, failed to ensure that all sources of discoverable information were identified and searched, and relied entirely on employees to provide relevant documents").

emails). *Kounelis* was about who started a prison shoving match, and the evidence was a single, dispositive videotape of the incident.  529 F. Supp. 2d at 505, 512; *but see Paluch v. Dawson*, 2009 WL 3287395 at *3 (M.D. Penn.) (no adverse inference for intentional destruction of prison videotape where "Plaintiff has a number of other resources" to prove his case, including his own testimony and declarations and depositions of other inmates).  *Bill Davis Racing* was a simple contract dispute, and the spoliated evidence was a few individuals' emails about the contract and its alleged breach.  2005 WL 3502172 at *1-2.

In addition, the wholesale failure to preserve that small universe of critical evidence meant the central dispute in these one-issue cases was lacking essential proof.  That was, and logically must be, the only justification for the "extreme sanction" awarded.  *See DaimlerChrysler*, 2003 WL 22951696 at *3 (distinguishing adverse inference cases because they "involve the destruction of key pieces of evidence, without which the defendants could not establish a defense or refute the plaintiff's allegations").

This case could hardly have less in common with those.  It involves activities by hundreds of Intel employees relating to virtually all aspects of its worldwide business operations for years on end, and has generated productions of many *millions* of documents.[201]  Accordingly, there is no proof, or any logical reason to infer, that the "missing" emails – scattered across scores of custodians, subject matters, and time – were somehow at the core of the case; nor any basis to infer that their absence could affect plaintiffs' proof at all, much less make or break it. Therefore, no adverse inference instruction should or may be given at trial.

---

[201]  Leatha ¶¶ 5, 6.  To begin to make plaintiffs' cases analogous, the plaintiffs there would have had to seek documents about ███████ worldwide, multi-year sales practices, not their treatment of a single employee.

### 2.    No Monetary Sanction Is Warranted

Plaintiffs' request for monetary sanctions for "fees and costs associated with this sanctions motion" (Mot. 46) should also be denied.   Under the *Schmid* factors, both Intel's "degree of fault" and plaintiffs' "degree of prejudice suffered" are, at very best, at the low end of the scale, but probably, as established herein, not on the scale at all. *See Schmid*, 13 F.3d at 79.

Monetary sanctions may be awarded to compensate the moving party for expenses incurred bringing the issue to a court's attention or identifying alternative sources of information. *See, e.g., Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 78 (S.D.N.Y. 1991).   That rationale, however, is inapplicable here.   Intel brought its discovery issues to the Court's (and plaintiffs') attention on its own, and voluntarily proposed and executed – at enormous expense – a remediation plan to which AMD and plaintiffs' conceded they had no objection or addition.   In any event, plaintiffs' expenses for largely copying AMD's prior motion would be minimal, and in fact entirely avoidable had they joined AMD's motion to begin with.[202]

## VI.    CONCLUSION

From beginning to end, Intel's document preservation efforts in this extraordinary case exceeded legal requirements and evidenced nothing but good faith.   Its mistakes were just that.   Plaintiffs were not harmed.   Their motion should be denied.

---

[202] Plaintiffs, in arguing for monetary sanctions, cite Judge Scheindlin's recent opinion in *Pension Committee of the Univ. of Montreal Pension Plan v. Banc of America Securities, LLC*, 2010 WL 184312 (S.D.N.Y.) (Mot. 46 n.205)   It does not help them.   Legally, its central holding is that an adverse inference should not apply unless the movant proves prejudice.   Factually, the court held prejudice would be presumed against those parties that did nothing (or close to it) to retain documents (for example, did not distribute litigation holds or collect electronic documents until years after litigation began), where they failed to voluntarily disclose their preservation issues and in fact filed false declarations asserting there were none. *Id.* at *12-18. *Pension Committee* is nothing like this case, which explains plaintiffs' passing reference to it.

Respectfully submitted,

OF COUNSEL:                                    POTTER ANDERSON & CORROON LLP

James L. Hunt                                  By: */s/ W. Harding Drane, Jr.*
Donn P. Pickett                                    Richard L. Horwitz (#2246)
Frank M. Hinman                                    W. Harding Drane, Jr. (#1023)
Brian C. Rocca                                     Hercules Plaza, 6th Floor
BINGHAM McCUTCHEN LLP                              1313 North Market Street
Three Embarcadero Center                           P.O. Box 951
San Francisco, CA 94111-4067                       Wilmington, DE 19899
(415) 393-2000                                     (302) 984-6000
                                                   rhorwitz@potteranderson.com
                                                   wdrane@potteranderson.com

                                                   *Attorneys for Defendant Intel Corporation*