# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | ) | MDL Docket No. 05-1717 (JJF) |
| | ) | |
| INTEL CORP. MICROPROCESSOR | ) | |
| ANTITRUST LITIGATION | ) | |
| | ) | |
| | ) | |
| PHIL PAUL, on behalf of himself | ) | C.A. No. 05-485-JJF |
| and all others similarly situated, | ) | |
| | ) | CONSOLIDATED ACTION |
| Plaintiffs, | ) | |
| | ) | **PUBLIC VERSION** |
| v. | ) | |
| | ) | |
| INTEL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## INTEL'S MEMORANDUM IN SUPPORT OF ITS MOTION TO STRIKE THE DECLARATION OF SHAUN M. SIMMONS (DM 44)

OF COUNSEL:

James L. Hunt, Esq.
Donn P. Pickett, Esq.
Frank M. Hinman, Esq.
Brian C. Rocca, Esq.
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, CA 94111
(415) 393-2000

DATED: March 5, 2010

Richard L. Horwitz, Esq. (#2246)
W. Harding Drane, Jr., Esq. (#1023)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
(302) 984-6000
rhorwitz@potteranderson.com
wdrane@potteranderson.com

*Attorneys for Defendant*
*Intel Corporation*

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................... 1

II.    BACKGROUND ............................................................................................ 2

    A.     Simmons Is Admittedly Not An Expert................................................. 2

    B.     Simmons' "Discounted Intel Email Loss Model" ................................ 3

    C.     Plaintiffs Rely Extensively On Simmons ........................................... 8

III.   LEGAL STANDARD..................................................................................... 9

IV.    ARGUMENT ................................................................................................ 10

    A.     Simmons' Lay Opinion Violates Federal Rule Of Evidence 701 ....... 11

    B.     Simmons' Declaration Is Fraught With Errors .................................. 14

V.     REQUEST FOR RELIEF ............................................................................. 15

A/73191680.6

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Applera Corp. v. MJ Research Inc.,*
  389 F. Supp. 2d 344 (D. Conn. 2005)................................................................................10, 13

*Chase Manhattan Bank v. Iridium Africa Corp.,*
  No. 00-564-JJF, 2003 WL 22928042 (D. Del. Nov. 25, 2003) (Farnan, J.).............................9

*Cuyahoga Metropolitan Housing Authority v. U.S.,*
  60 Fed. Cl. 481 (Fed. Cl. 2004) ..............................................................................................13

*Donlin v. Philips Lighting N. Am. Corp.,*
  581 F.3d 73 (3rd Cir. 2009) ....................................................................1, 2, 9, 10, 11, 12, 14

*Eichorn v. AT&T Corp.,*
  484 F.3d 644 (3d Cir. 2007)..............................................................................1, 2, 10, 12

*Gov't of Virgin Islands v. Knight,*
  989 F.2d 619 (3d Cir. 1993).......................................................................................................9

*United States v. Garcia,*
  413 F.3d 201 (2d Cir. 2005)......................................................................................................9

**RULES**

Federal Rule of Civil Procedure 26 ..............................................................................................13

Federal Rule of Evidence 701 ............................................................1, 2, 9, 10, 11, 12, 13, 14, 15

Rule 702 ..........................................................................................................................9, 10, 13

A/73191680.6

## I.     INTRODUCTION

On October 14, 2009, in support of its sanctions motion, AMD submitted the Declaration of Shaun M. Simmons, an O'Melveny & Myers lawyer (D.I. 2193) ("the Declaration"). Although AMD's sanctions motion has since been dismissed with prejudice, putative class plaintiffs ("plaintiffs") nonetheless rely heavily on the Declaration in their own sanctions motion. Intel moves for an order striking the Declaration, and any references to it, because it is inadmissible lay opinion testimony under Federal Rule of Evidence 701.[1]

In the Declaration, Mr. Simmons describes – really, *invents* – what he refers to as his "Discounted Intel Email Loss Model" and, based upon that model, states his opinion that Intel purportedly lost between 642,970 and 868,925 emails related to this action.  The Declaration is admittedly not based on Simmons' personal knowledge or experience – he has none – but rather seeks to evaluate alleged email loss using flawed statistical techniques.  Simmons' model is based upon layers of statistical assumptions, inferences and judgment calls, and is riddled with design and calculation errors.  In short, it is the type of opinion testimony for which a qualified expert, and a properly constructed expert declaration, is required.  Yet Simmons admittedly has no expertise in statistics.  As a result, he is ill-equipped to design and introduce such a model and, indeed, cannot do so under the Federal Rules of Evidence.

During Simmons' deposition, the Special Master concluded he "has not been offered as an expert witness," but has "offered opinion testimony as a lay witness."  Ex. 1 (Simmons Tr. 27:04-08).[2]  Two recent Third Circuit decisions, *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73 (3rd Cir. 2009) and *Eichorn v. AT&T Corp.*, 484 F.3d 644 (3d Cir. 2007), set forth the

---

[1]   On February 26, 2010, the parties conferred by telephone regarding this motion and were unable to resolve the dispute.  Declaration of Brian C. Rocca ("Rocca") ¶ 1.

[2]   All cited exhibits are attached to the Declaration of Brian C. Rocca.

controlling standard for the admissibility of lay opinion testimony.  In both *Donlin* and *Eichorn*, the Third Circuit soundly rejected evidence proffered under Federal Rule of Evidence 701 because the testimony, similar to the Declaration here, went beyond the witnesses' personal knowledge and included calculations of sufficient complexity that the opinion of a lay person was inappropriate.  *Donlin*, 581 F.3d at 83 ("Because this testimony was of a specialized or technical nature and was not within Donlin's personal knowledge, the District Court abused its discretion in allowing her to offer it."); *Eichorn*, 484 F.3d at 650 ("The calculations went beyond the data they summarized and included several assumptions, inferences, and projections about future events, which represent [] opinion, rather than the underlying information.").

As with the testimony in *Donlin* and *Eichorn*, the Declaration should be stricken because it "crossed the line into subject areas that demand expert testimony."  *Donlin*, 581 F.3d at 83. The Court need not determine whether the opinion itself has merit or, as in this case, is without merit.  However, the pervasive problems with the model, its logic and assumptions only highlight why the work of experts should be left to *experts*, not lay persons.  As explained in the Declaration of Arnold Barnett ("Barnett"), a statistician and professor at MIT, Simmons' model "does not meet prevailing standards for statistical analysis," is often "illogical" and "offers no serious answer to the question that motivated it."  Barnett ¶¶ 3, 38.

## II.    BACKGROUND

### A.    Simmons Is Admittedly Not An Expert

Simmons, an attorney at O'Melveny & Myers, worked on the legal team representing AMD in its antitrust action against Intel.  Plaintiffs (and AMD) have not proffered Simmons as an expert in this case, nor does Simmons claim to be one in any subject relevant to his Declaration. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

2

███████████████████████████████████         *See, e.g.,* Ex. 1 (Simmons Tr. 6:21-7:15,

39:24-40:04).   Despite this lack of specialized knowledge and experience, Simmons has

nonetheless presented an opinion regarding the alleged "████████████████████████████

███████████████████████████████"   *Id.* at 127:03-08.   As such, the Special Master

properly concluded Simmons is not an expert, yet he has "████████████████████████████

████████"   *Id.* at 27:04-08.

### B.   Simmons' "Discounted Intel Email Loss Model"

The task that Simmons set out to accomplish – determining alleged email loss from

hundreds of Intel production custodians over time – involves neither direct observation of facts,

nor simple arithmetic.   Simmons did not observe any Intel custodian retain (or fail to retain) any

email.   Rather than relying on firsthand factual observation, he instead designed a complex

model to predict past behavior.   Simmons concedes these points by describing the

"████████" underlying his opinion as a "███████" involving "███████████" "█████████"

"███████" and "███████"   *See, e.g.,* Declaration ¶¶ 3, 18, 32-36; Ex. 1 (Simmons Tr. 9:23-

10:01, 109:07-16, 110:18-19, 112:21-113:20, 114:01-05).   In his declaration filed concurrently

with this motion, Dr. Barnett summarizes Simmons' methodology, acknowledges the need for

expertise to design such a methodology and identifies many of its flawed assumptions and

inferences.

Simmons' most basic assumption is that he can, based on an invented model and his own

"████████████" predict the number of emails individual custodians should have, but allegedly

failed to, preserve in connection with this case.   His model has "████████████████████████

████████████████"   (Ex. 1 (Simmons Tr. 11:02-16)), and it is based upon various factual and

statistical assumptions.   The "██████████████████████" involves a comparison of certain

custodians' monthly email counts during their "self-preservation" periods with counts during

3

their "automated preservation" periods.  *Id*. at 11:02-09, 38:07-11, 42:20-25.  The three subparts include a series of calculations related to Intel's custodians' preservation, a comparison with some AMD custodians' preservation, and the application of a "discount," based upon a purported analysis of AMD's preservation, to Intel's alleged email loss.  *Id*. at 11:02-16.

At every step of the model, Simmons makes assumptions and draws inferences that impact his ultimate opinion.  Among other things, Simmons decided which Intel and AMD custodians to analyze and which to exclude, which data points from those custodians to include or throw out, the appropriateness and extent of comparing "self-preservation" with "automated" preservation, and the level of "discount," if any, to apply to Intel's preservation and how to apply it.  *See, e.g.*, *id*. at 86:18-87:05, 110:18-111:07, 113:07-114:05.  Simmons does not deny that his model is laden with judgment calls as to the inputs to, and implementation of, his model.  *See, e.g.*, *id.* at 110:18-21 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮"); *see also id.* at 113:07-114:05.

The following paragraphs describe some of the key assumptions and judgments that Simmons made in designing his model.  Again, the Court need not determine whether the following assumptions and judgments are valid – the very fact that Simmons is making them demonstrates that his Declaration consists of more than mere calculations.  Rather, he sought to design a complex, predictive statistical model.  This requires the work of an expert and takes his opinion out of the realm of permissible lay testimony.

▪ ***"Self-Preservation" and "Automated Preservation".***  Simmons assumes the proper manner of evaluating an individual custodian's retention is to compare "self-preservation" email counts with "automated preservation" email counts.  In order to fit the available data into those two categories, Simmons makes the additional assumption, without explanation or

4

justification, that an Intel custodian's placement on weekly backup tape preservation is the functional equivalent to email journaling, and thus email productions during that time frame fall within the "automatic" preservation category.  Declaration ¶ 3.  However, when considering AMD custodians, Simmons assumes *exactly the opposite*:  for the 35 AMD custodians for whom AMD produced backup tape data, Simmons assumes that the backup tape data falls within the "self-preservation" category.  *Id.* ¶¶ 23, 26.

▪      ***"Extrapolation" For 106 Intel Custodians.***  According to Simmons, there are over 106 Intel custodians "for whom a comparison could not be made between the self-preservation average and the automated average . . . ."  *Id.* ¶ 18.  In order to "estimate" allegedly lost emails for those 106 custodians, Simmons "extrapolated" from his analysis of the 272 other Intel custodians for whom he believed a comparison could be made.  *Id.*  In so doing, Simmons applies the (incorrectly) calculated average increase in emails among the 272 Intel custodians – 336 per month after "automation" – and assumes that it applies *exactly* to the other 106 custodians during their self-preservation months.  But Simmons gives no explanation why the 106 custodians who purportedly lack data are similar to the other 272, such that the calculations for one can be extrapolated to the other.  *See* Barnett¶¶ 34-36.

▪      ***Source Data For AMD Custodians***.  In analyzing AMD production counts, Simmons relies on the Declaration of Anthony Cardine (D.I. 2195) ("Cardine"), which purports to list the number of emails AMD produced (1) organically for each custodian and (2) from the files of other AMD custodians that relate to the subject custodians (which he calls "other custodians' files," or "OCFs").  Mr. Cardine's methodology for developing these email counts itself involved layers of assumptions and judgment calls.  ████████████████████

████████████████████████████████████████ *See, e.g.,* Ex. 3 (Cardine Tr. 194:06-22, 201:04-15, 151:22-152:16, 134:01-07, 187:06-22).[3]

Cardine's declaration relied, in part, on inaccurate information.  Cardine utilized data provided by Intel to AMD in March 2009 – however, soon after Intel produced that data, Intel withdrew it, advised AMD not to rely on it, and replaced it with corrected information.  *See* Cardine ¶ 8; Ex. 2 (3/16/09 Intel email to AMD). ██████████████████████ ██████████████████ Ex. 3 (Cardine Tr. 188:24-191:16).  Simmons' model is based in part on all these faulty assumptions and incorrect data imbedded within Cardine's declaration.[4]

- ■   ***Sample of 113 AMD Custodians***.  Simmons considered data for only 113 of AMD's 178 production custodians to calculate the "mean percentage change" in the "average monthly produced email counts."  Declaration ¶ 31.  Simmons assumes, with no analysis or explanation, that these 113 AMD production custodians are representative of *all* AMD custodians.

- ■   ***AMD's "Benign" Retention Increase***.  Simmons further assumes that increases in post-automation email retention for those 113 AMD custodians was "benign" – that is, not reflecting custodians' failure to comply with preservation obligations.  *Id.* ¶ 32; *see also* Barnett ¶¶ 26-30.  Thus, in another example of inconsistent logic, Simmons found that numerous AMD

---

[3]   This is not surprising, in light of Cardine's admission █████████████████████████████ ██████████████████████████████████████ Ex. 3 (Cardine Tr. 110:02-24; 111:17-19).  It should also be noted that Cardine, ████████████████ ████████████████████████████████████ *Id.* at 118:20-119:03.

[4]    It should be noted that Simmons and his co-counsel attempted to discredit the very data on which Cardine and Simmons now rely in rendering their opinions.  Ex. 4 (8/11/09 AMD ltr. to Intel) (describing the histogram and OCF analysis as "inherently flawed analytic methods" which paint a "fictional preservation portrait").

custodians apparently failed to retain relevant documents but, without explanation or justification, and contrary to his assumption for Intel custodians, excused it as "benign."

- ***AMD As So-Called "Gold Standard" of Retention Plans***.  Simmons assumes without support – and contrary to the evidence – that AMD's preservation plan is the proper benchmark for a "litigant attempting to comply with his preservation obligations in good faith." Declaration ¶ 32.  Simmons claims that AMD's retention and production reflect the "████████ ████████" to measure Intel's alleged email loss in this case.  Ex. 1 (Simmons Tr. 51:01-21).

*   *   *

Based on these assumptions and many others, Simmons ultimately concludes that Intel lost between 642,970 and 868,925 emails during the course of discovery in this matter (which Intel strongly disputes).   After conceding repeatedly that ████████████████████ ████████████████████████████████████████████████████ ████████████:



*Id.* at 129:25-130:08.[5]

---

[5]   *See also id.* 40:05-09, 41:08-10, 49:06-11, 49:12-19, 66:12-15, 68:14-17, 77:17-21, 91:01-15, 103:10-104:15, 111:23-112:08, 129:25-130:08 ████████████████████████████ ████.

7

## C.        Plaintiffs Rely Extensively On Simmons

Having declined to conduct any analysis or proffer any expert testimony, plaintiffs now base their sanctions motion on  Simmons' "███████."  Citing only to Simmons' model and opinion, plaintiffs claim the following:

- ■        "According to the Declaration of Shaun M. Simmons . . . a conservative estimate is that over 600,000 potentially responsive documents were lost."  Plaintiffs' Memorandum in Support of Their Motion For Sanctions For Intel's Failure to Preserve Evidence (D.I. 2292) ("Mot.") at 2 n.4.

- ■        "In AMD's Sanctions Brief, the Special Master was presented with a full record of Intel's preservation efforts, including the 'file count' analysis performed by Simmons that points to the loss of hundreds of thousands of e-mails under a flawed manual, custodian-dependent preservation system."  *Id.* at 6.

- ■        "[A] simple and sensible comparison of how many e-mails certain custodians produced before and after they were properly placed on an automated litigation hold (whether by backup or duplicate journaling) can provide circumstantial evidence of these [email] losses.  Such an analysis suggests that this number maybe well over 600,000.  *Id.* at 12-13 (citing the Declaration).

- ■        "Extrapolating from the conduct of the 272 for whom data exists suggests that this group of 106 would have produced well over 200,000 e-mails more than they did if they had been converted to automatic preservation system.  This results in a total loss of well over 800,000.  *Id.* at 13 n.52 (citing to the Declaration).

- ■        "In contrast, only seven of the thirty-seven AMD custodians who Intel has claimed did not preserve evidence had file counts that grew by 50% when they were moved to some form of automatic preservation system."  *Id.* at 13 n.57 (citing to the Declaration).

- ■        "Conducting the same before-and-after comparison for 113 AMD custodians who were put on automated preservation prior to their production cut-off, the mean jump in produced e-mail counts after automation is just 20%.  In comparison, for the 272 Intel custodians, the mean post-automation jump is 127% – and that after a massive remediation effort directed to the pre-automation period."  *Id.* at 14 (citing to the Declaration).

- ■        "Evaluating the disparity between self-preservation counts and automatic preservation counts demonstrates that Intel's custodians saved almost 650,000 fewer e-mails than would have been expected with a proper preservation effort."  *Id.* at 15 n.61 (citing to the Declaration).

8

Plaintiffs do not hide the scope and depth of their reliance on Simmons' opinion – indeed, it is a lynchpin of their motion.  Plaintiffs' reliance is misplaced and in violation of the Federal Rules of Evidence.  Simmons' Declaration must be stricken.

## III.   LEGAL STANDARD

Federal Rule of Evidence 701 governs the admissibility of opinion testimony by lay witnesses.  *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 80 (3rd Cir. 2009).  The rule states as follows:

> ### Rule 701. Opinion Testimony by Lay Witnesses
>
> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

"The Third Circuit has interpreted 'rationally based on the perception of the witness' to require 'firsthand knowledge of the factual predicates that form the basis for the opinion.'" *Chase Manhattan Bank v. Iridium Africa Corp.*, No. 00-564-JJF, 2003 WL 22928042, at *3 (D. Del. Nov. 25, 2003) (Farnan, J.) (quoting *Gov't of Virgin Islands v. Knight,* 989 F.2d 619, 629 (3d Cir. 1993)).  The witness must therefore possess the "requisite *personal knowledge* to qualify as a lay witness under Rule 701." *Id*. (emphasis added).

In 2000, subsection (c) was added to Rule 701 to "eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." *Donlin*, 581 F.3d at 80 (quoting Fed. R. Evid. 701 advisory committee's notes); *see also United States v. Garcia,* 413 F.3d 201, 215 (2d Cir. 2005) ("The

9

purpose of [subsection (c)] is to prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702.").

Lay testimony, therefore, must result from a "process of reasoning familiar in everyday life," as opposed to a process "which can be mastered only by specialists in the field." *Donlin*, 581 F.3d at 81 (quoting Fed. R. Evid. 701 advisory committee's notes).  Only when a lay witness has particularized knowledge by virtue of his experience may he testify about specialized or technical subjects – that is because the testimony in such situations is based upon the layperson's *personal knowledge*, rather than on specialized knowledge within the scope of Fed. R. Evid. 702 (the rule governing admissibility of expert opinions).  *Id.* at 80-81.

## IV.   ARGUMENT

Third Circuit law counsels courts to "rigorously examine the reliability of a layperson's opinion by ensuring that the witness possesses sufficient specialized knowledge or experience which is germane to the opinion offered." *Donlin*, 581 F.3d at 83.  Here, without question, the Simmons Declaration "crossed the line into subject areas that demand expert testimony." *Id.* Simmons' testimony is based neither on experience nor personal knowledge relating to the statistical analysis he purports to perform, and the model is "sufficiently complex" that it should be excluded as improper under Federal Rule of Evidence 701.  *Id.* at 82-83; *Eichorn v. AT&T Corp.*, 484 F.3d 644, 649-50 (3d Cir. 2007); *see also Applera Corp. v. MJ Research Inc.,* 389 F. Supp. 2d 344, 353 (D. Conn. 2005).

Before filing their motion, plaintiffs reviewed the transcript from Simmons' deposition,

Ex. 1 (Simmons Tr. 27:04-08).  Plaintiffs nonetheless decided to rely extensively on

10

Simmons' opinion, claiming – incorrectly – that it reflects a "straightforward methodology" that "does not require expert opinion."  Mot. 12.  Controlling Third Circuit case law holds otherwise.

### A.    Simmons' Lay Opinion Violates Federal Rule Of Evidence 701

Simmons' model does not employ a "process of reasoning familiar in everyday life" and therefore must be stricken pursuant to Rule 701.  *Donlin*, 581 F.3d at 81 (quoting Fed. R. Evid. 701 Notes to 2000 Amendments).  Simmons is far afield from the recognized subjects of lay opinion testimony.  *See, e.g.,* Fed. Rule Evid. 701 (2000 commentary) (listing common forms of permissible lay opinion testimony, such as estimating distance, size, weight, degrees of light or darkness, etc.).  The statistical model Simmons invented specifically for this case entails complicated (and deeply flawed) statistics and inherently involves a process "which can be mastered only by specialists in the field."  *Donlin*, 581 F.3d at 81.

In *Donlin*, an employment case, the trial court permitted the plaintiff, a lay person, to testify about her own alleged compensatory damages, including back pay, estimated lost earnings and pension benefits.  As part of this analysis, the plaintiff estimated her future pension value, performed a probability of death calculation, and reduced her front pay award to its present value.  On appeal, the Third Circuit found reversible error because the trial court failed to properly examine the reliability of the testimony under Rule 701.  The plaintiffs' testimony went beyond "easily verifiable facts within her personal knowledge" and instead required "forward-looking speculation for which she lacked the necessary training."  *Id.* at 83.  In particular,

> . . . Donlin's lay testimony was inappropriate with regard to her estimate of the annual pay raises at Philips, her estimated pension value, and the discounts she made for the probability of death to find the present value of the award.  Because this testimony was of a specialized or technical nature and was not within Donlin's personal knowledge, the District Court abused its discretion in allowing her to offer it.

*Id.*

As part of its analysis, the Third Circuit in *Donlin* discussed its prior decision in *Eichorn*, which also rejected lay opinion testimony under Rule 701. The plaintiffs in *Eichorn* similarly did not produce an expert on damages and instead relied on a report and testimony from plaintiffs' counsel's son. "The witness made various assumptions – much like those made by Donlin – including: when plaintiffs would have retired; how their salaries would have increased in the merged company; what choices the plaintiffs would have made with respect to pension benefits; and the life expectancy of each plaintiff." *Id.* at 82 (citing *Eichorn v. AT&T Corp.*, 484 F.3d 644, 648 (3d Cir. 2007)). In *Eichorn*, the Third Circuit concluded "that Rule 701 requires a lay witness to have a 'reasonable basis grounded in either experience or specialized knowledge for arriving at the opinion that he or she expresses.'" *Id.* (citing *Eichorn*, 484 F.3d at 649). Because the witness in that case had no such personal knowledge, relevant experience, or specialized knowledge, he could not render an opinion under Rule 701. *Id.* (citing *Eichorn*, 484 F.3d at 649).

> The calculations went beyond the data they summarized and included several assumptions, inferences, and projections about future events, which represent Mr. Crowley's opinion, rather than the underlying information. The proposed evidence is thus subject to the rules governing opinion testimony and was properly held inadmissible.

*Eichorn*, 484 F.3d at 650.

Here, as in *Donlin*, "much of [Simmons'] testimony went beyond those easily verifiable facts within [his] personal knowledge and instead required [backward]-looking speculation for which [he] lacked the necessary training." *Donlin*, 581 F.3d at 83. And, as in *Eichorn*, Simmons' model "went beyond the data [it] summarized and included several assumptions, inferences, and projections about [past] events, which represent [Simmons'] opinion, rather than the underlying information." *Eichorn*, 484 F.3d at 650.

12

The following line of questioning from Simmons' deposition underscores that his model



Ex. 1 (Simmons Tr. 113:07-:114:05).

The amendments to Rule 701 in 2000 were designed to prevent exactly what plaintiffs now attempt to do:  smuggle in expert opinions through layperson testimony that is not based on "reasoning familiar in everyday life."  *See Donlin*, 581 F.3d at 81 (quoting Fed. R. Evid. 701 advisory committee's notes).  Courts in this Circuit and elsewhere routinely enforce Rule 701 to prevent an end-run around the expert requirements set forth in Evidence Rule 702 and Federal Rule of Civil Procedure 26.  *See, e.g., Applera Corp.*, 389 F. Supp. 2d at 353 ("By channeling testimony that is actually expert testimony to Rule 702, the amendment also ensures that a party will not evade the expert witness disclosure requirements set forth in [FRCP 26] . . . by simply calling an expert witness in the guise of a layperson.") (quoting commentary to Rule 701); *Cuyahoga Metropolitan Housing Authority v. U.S.*, 60 Fed. Cl. 481, 483 (Fed. Cl. 2004)

13

(selection of comparable real estate properties and calculations about them does not result from reasoning "familiar in everyday life" and instead requires "mastery of a specialized field").

    For that reason alone, the Court should strike the Declaration.

### B.    Simmons' Declaration Is Fraught With Errors

    The Court need not consider or decide whether Simmons' opinion is reliable.  Reliable or not, the opinion violates Rule 701, and it should be stricken.

    However, Simmons invented a statistical model despite no specialized training or experience and, unsurprisingly, he made several mistakes.  Those mistakes only serve to underscore that plaintiffs should have retained an expert, rather than rely on an unqualified lay witness.  *See Donlin*, 581 F.3d at 83 (describing how lay witness significantly overstated expected annual pay raise, misinterpreted definition of "pensionable earnings," and "misapplied the life expectancy charts," which further undermined the testimony's admissibility).  Dr. Barnett – a well-qualified statistician and MIT Professor – identifies several methodological flaws in Simmons' declaration and concludes that it is entirely unreliable.  According to Dr. Barnett:

> It is inconceivable to me that Mr. Simmons' analysis would meet the standard for publication in any journal of Applied Statistics. But I also believe that it does not meet the standard of "horse sense" that Mr. Simmons invoked in his deposition.  His analysis rests of a series of assumptions – many of them unstated – that often seem implausible and always go undefended.  I believe that his work offers no serious answer to the question that motivated it.

Barnett ¶ 38.[6]

    Simmons attempted to apply certain mathematical or statistical concepts that he was plainly not qualified to apply, ███████████████████████████████████████

██████    Ex. 1 (Simmons Tr. 123:08-124:04, 77:22-78:06, 86:06-17).  Despite the application

---

[6]  Rather than restate all of the methodological flaws here, Intel respectfully refers the Court to paragraphs 14-37 of the Barnett Declaration.

of these concepts, and the complexity of the model, ███████████████████████████

███████████████████████ (*id.* at 16:01-10), ████████████████████████████████

███████████████████████ (*id.* at 64:11-17, 114:06-09, 117:19-21), ████████████

███████████████████████ (*id.* at 116:24-118:17, 116:04-16), ████████████████

████████████████████████████   *Id.* at 90:12-17.   These errors, among others,

demonstrate and underscore the reason for Rule 701's prohibition on offering expert opinion in

the guise of lay testimony.

## V.      REQUEST FOR RELIEF

Based on the foregoing, Intel respectfully requests an Order striking from the record the

Simmons Declaration in its entirety, and any reference or citation to it contained in plaintiffs'

Memorandum In Support Of Their Motion For Sanctions For Intel's Failure To Preserve

Evidence (D.I. 2292).   For the Court's convenience, Intel has submitted with this Motion a

proposed order and a redline version of plaintiffs' Memorandum identifying each reference or

citation to the Simmons Declaration that should be stricken from the record.

OF COUNSEL:

James L. Hunt, Esq.
Donn P. Pickett, Esq.
Frank M. Hinman, Esq.
Brian C. Rocca, Esq.
BINGHAM McCUTCHEN LLP
Three Embarcadero Center
San Francisco, CA 94111
(415) 393-2000

DATED: March 5, 2010

POTTER ANDERSON & CORROON LLP

By:   */s/ W. Harding Drane, Jr.*
       Richard L. Horwitz, Esq. (#2246)
       W. Harding Drane, Jr., Esq. (#1023)
       Hercules Plaza, 6th Floor
       1313 N. Market Street
       P.O. Box 951
       Wilmington, DE 19899-0951
       (302) 984-6000
       rhorwitz@potteranderson.com
       wdrane@potteranderson.com

       *Attorneys for Defendant*
       *Intel Corporation*

15