## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE INTEL CORPORATION MICROPROCESSOR ANTITRUST LITIGATION ) ) ) ) ) | MDL No. 05-1717-JJF |
| PHIL PAUL, on behalf of himself and all others similarly situated, ) ) ) ) |  |
| Plaintiffs, ) ) | Civil Action No. 05-485-JJF |
| v. ) ) | CONSOLIDATED ACTION |
| INTEL CORPORATION, ) ) ) | **REDACTED** |
| Defendant. ) ) | **PUBLIC INSPECTION VERSION** |

## CLASS PLAINTIFFS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR SANCTIONS FOR INTEL'S FAILURE TO PRESERVE EVIDENCE

Dated: May 3, 2010

OF COUNSEL:

Daniel A. Small
George F. Farah
Kalpana Kotagal
COHEN, MILSTEIN, SELLERS
   & TOLL, PLLC
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC 20005

PRICKETT JONES & ELLIOTT, P.A.
James L. Holzman (#663)
J. Clayton Athey (#4378)
Laina M. Herbert (#4717)
Kevin H. Davenport (#5237)
1310 King Street
P.O. Box 1328
Wilmington, DE 19899
(302) 888-6500
jholzman@prickett.com
jcathey@prickett.com
lmherbert@prickett.com
khdavenport@prickett.com
*Interim Liaison Counsel and Attorneys for Phil*
*Paul, on behalf of himself and all others*
*similarly situated*

Seth R. Gassman
COHEN, MILSTEIN, SELLERS
    & TOLL, PLLC
150 East 52nd Street
Thirtieth Floor
New York, NY 10022

Steve W. Berman
Anthony D. Shapiro
Erin K. Flory
Steve W. Fimmel
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101

Guido Saveri
R. Alexander Saveri
Lisa Saveri
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA  94111

Craig C. Corbitt
Judith A. Zahid
Demetrius X. Lambrinos
Eric W. Buetzow
ZELLE, HOFMANN, VOELBEL
    & MASON LLP
44 Montgomery St., Suite 3400
San Francisco, CA 94104

*Interim Co-Lead Counsel for the Class
Plaintiffs*

    -and-

Terry Gross
GROSS BELSKY ALONSO LLP
180 Montgomery Street
Suite 2200
San Francisco, CA  94104

Mark A. Griffin
Tana Lin
Raymond J. Farrow
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052

Jay S. Cohen
SPECTOR ROSEMAN KODROFF &
WILLIS
1818 Market Street, Suite 2500
Philadelphia, PA 19103

*Counsel for the Class Plaintiffs*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION....................................................................................................... 1

I.    GIVEN THE UNDISPUTED FACT THAT INTEL SPOLIATED EVIDENCE, THE
ONLY REMAINING ISSUE IS WHAT SANCTION TO IMPOSE ................................. 2

II.    THE FRAMEWORK FOR DETERMINING AN APPROPRIATE SANCTION ............... 2

    A.    Intel Acted With a Culpable State Of Mind ................................................... 3

        1.    Intel Cannot Claim Ignorance of, or Inability to Abide by, the Law ...................... 3

        2.    Intel Failed To Take The Necessary "Affirmative Steps" When Implementing
Its Preservation Plan.......................................................................................... 5

            a.    Intel Failed To Properly Design and Issue an Effective and Timely
Litigation Hold Notice................................................................................. 6

            b.    Intel Did Not Effectively Communicate With Key Players And Did Not
Adequately Monitor Their LEHN Compliance................................................. 7

            c.    Intel's ".pst" Instruction Was Inadequate ................................................ 9

            d.    Intel Failed To Implement An Effective Backup Tape System......................... 10

            e.    Intel's Decision To Not Pursue Journaling In 2005 Was Unreasonable and
Made In Bad Faith...................................................................................... 12

            f.    Intel Failed To Properly Harvest Data From Custodians ................................ 13

        3.    Given Intel's Flawed And Poorly Implemented Self-Archival System, Intel's
Refusal To Suspend Auto-Delete Constituted A Culpable Violation Of Its
Preservation Obligations ...................................................................................... 13

        4.    Intel's Lack Of Candor About The Functioning Of Its Auto-Delete Program
Was A Willful, Independently Sanctionable Violation Of Its Discovery
Obligations......................................................................................................... 15

        5.    Intel's Reliance On The Sedona Principles Is Misplaced ...................................... 16

    B.    Intel's Spoliation Prejudiced Class Plaintiffs .............................................. 17

        1.    Intel Destroyed a Massive Number Of Emails ....................................................... 18

3.    Documents Intel Destroyed Would Likely Have Supported Class Plaintiffs' Liability Case. ........................................................................................................ 20

4.    Intel's Remediation Did Not Cure The Prejudice To The Class And Cannot Be Used As A Shield Against Sanctions .................................................................... 21

C.    Lesser Sanctions Than Those Requested Are Inappropriate ......................................... 22

III.    AN ADVERSE INFERENCE SANCTION IS APPROPRIATE ....................................... 23

A.    Intel Engaged In The "Actual Suppression" Of Evidence ........................................... 24

B.    No Showing Of Bad Faith Is Required ....................................................................... 24

C.    This Court Should Impose An Adverse Inference At Class Certification .................... 25

1.    Case Law Supports Class Plaintiffs' Position......................................................... 26

2.    Class Plaintiffs Have Not Waived Their Right To Seek An Adverse Inference As To Class Certification ................................................................................... 26

IV.    CLASS PLAINTIFFS ARE ENTITLED TO MONETARY SANCTIONS ....................... 28

V.    AMD'S CLAIMED PRODUCTION DEFICIENCIES HAVE NO BEARING AS TO WHETHER INTEL SHOULD BE SANCTIONED FOR ITS CONDUCT....................... 29

CONCLUSION ........................................................................................................................ 30

**TABLE OF AUTHORITIES**

### Cases

*Brewer v Quaker State,*
  72 F.3d 326 (3d Cir. 1995)................................................................................................ 24

*Canton v. Kmart Corp.,*
  2009 U.S. Dist. LEXIS 59352 (D.V.I. July 10, 2009)......................................................... 24

*CentiMark Corp. v. Pegnato & Pegnato Roof Mgmt.,*
  2008 U.S. Dist. LEXIS 37057 (W.D. Pa. May 5, 2008)...................................................... 24

*Clark v. Alan Vester Auto Group, Inc.,*
  2009 WL 2181675 (N.C. Super. July 17, 2009) ................................................................. 26

*Crowley v. Chait,*
  2004 U.S. Dist. LEXIS 27235 (D.N.J. Dec. 27, 2004)..................................................... 3, 24

*Dowling v. United States Gov't,*
  2008 WL 5046853 (D.V.I. Nov. 20, 2008).......................................................................... 24

*Gumbs v. Int'l Harvester,*
  718 F.2d 88 (3d Cir. 1983).................................................................................................. 24

*In re Wechsler,*
  121 F.Supp.2d 404 (D. Del. 2000) ...................................................................................... 4

*In re: Daimler Chrysler AG,*
  2003 WL 22951696 (D. Del. Nov. 25, 2003) ...................................................................... 17

*Jackson v. Univ. of Pittsburgh,*
  141 F.R.D. 253 (W.D. Pa. 1992).......................................................................................... 28

*Morse Diesel Int'l, Inc. v. U.S.,*
  81 Fed.Cl. 220 (Fed. Cl. 2008)............................................................................................ 28

*MOSAID Tech. Inc. v Samsung Elecs. Co.,*
  348 F.Supp.2d 332 (D.N.J. 2004)................................................................................ passim

*Paris Bus. Prods. v. Genisis Techs., LLC,*
  2007 U.S. Dist. LEXIS 78870 (D.N.J. Oct. 24, 2007) ........................................................ 24

*Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Secs., LLC,*
  2010 U.S. Dist. LEXIS 4546 (S.D.N.Y. Jan. 15, 2010) ................................................ passim

*Rimkus Consulting Group, Inc. v. Cammarata,*
  2010 U.S. Dist. LEXIS 14573 (S.D. Tex. Feb. 19, 2010) .................................................... 22

*Schmidt v. Milwaukee Elec. Tool Corp.,*
  13 F.3d 76 (3d Cir. 1994)...................................................................................................... 2

*Smith v Georgia Energy USA, LLC,*
  259 F.R.D. 684 (S.D. Ga. 2009)........................................................................................... 26

*TeleQuest Int'l Corp. v. Dedicated Bus. Sys., Inc.*,
   2009 U.S. Dist. LEXIS 19546 (D.N.J. Mar. 11, 2009) ..................................................3, 23, 29

*U.S. v. Philip Morris U.S.A. Inc.*,
   449 F.Supp.2d 1 (D.D.C. 2006) ........................................................................................ 22

*United States v. Philip Morris USA, Inc.*,
   327 F.Supp.2d 21 (D.D.C. 2004) ............................................................................2, 4, 5, 22

*Wachtel v. Helath Net, Inc.*,
   239 F.R.D. 81 (D.N.J. 2006)............................................................................................. 15

*Zubulake v. UBS Warberg LLC*,
   229 F.R.D. 422 (S.D.N.Y. 2004)................................................................................. passim

*Zubulake v. UBS Warburg*,
   220 F.R.D. 212 (S.D.N.Y. 2003).......................................................................................... 3

## INTRODUCTION

Intel does not dispute that its conduct resulted in massive document losses or that the lost documents were relevant to this litigation. It argues only that it was not obliged to produce "each and every" email, and that Class Plaintiffs should be content to litigate with the "vast majority of hypothetically available documents" at their disposal. *See* Intel's Opposition to Class Plaintiffs' Motion for Sanctions, D.I. 1949[1] ("Mem. Opp.") at 6. Intel is wrong. When confronted with "one of the largest and most sweeping antitrust cases ever," Intel made a series of intentional and well-informed choices that, in effect, permitted the systematic destruction of relevant and likely damaging evidence. For example, Intel and its expert John Jessen assert that a self-archival process that depends heavily on company employees to comply strictly with their litigation hold notices is perfectly "reasonable," even when there is clear evidence that those employees habitually deleted emails, did not do as they were instructed, and, in some cases, openly flaunted their preservation obligations.[2]

Intel ardently defends its conscious decision not to suspend auto-delete and its refusal to use available preservation methods such as Exchange journaling, even though it failed to send litigation hold notices to nearly a third of its custodians, failed to back up any of its employees' email transmissions for the first four months of the litigation, and failed to follow up with its executives to make sure they understood that the IT department was <u>not</u> backing up their email. These are not the hallmarks of a "state-of-the-art retention plan," Mem. Opp. at 3, or even of a minimally adequate plan.

---

[1] References to "D.I. __" are to docket items in C.A. No. 05-485-JJF, unless otherwise noted.

[2] *See* Class Plaintiffs' Memorandum in Support of Their Motion for Sanctions for Intel's Failure to Preserve Evidence, D.I. 1898 ("Mot.") at 3 ▮▮▮▮▮▮▮▮▮▮▮▮▮

**I.    GIVEN THE UNDISPUTED FACT THAT INTEL SPOLIATED EVIDENCE, THE ONLY REMAINING ISSUE IS WHAT SANCTION TO IMPOSE**

Intel does not contest that it spoliated evidence in this case. Once it has been determined that a litigant has spoliated evidence, "[t]he only issue is what remedy is appropriate." *United States v. Philip Morris USA, Inc.*, 327 F.Supp.2d 21, 25 (D.D.C. 2004) (emphasis added); *see also Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of America Secs., LLC ("Pension Committee")*, 2010 U.S. Dist. LEXIS 4546, at *7 (S.D.N.Y. Jan. 15, 2010) ("Conduct is either acceptable or unacceptable. Once it is unacceptable the only question is how bad is the conduct."). "The case law makes crystal clear that the breach of the duty to preserve, and the resulting spoliation of evidence, may result in the imposition of sanctions by a court because the court has the obligation to ensure that the judicial process is not abused." *Id.* at *14; *see also MOSAID Tech. Inc. v Samsung Elecs. Co.*, 348 F.Supp.2d 332, 335 (D.N.J. 2004) (defining spoliation as the "destruction or significant alteration of evidence" and stating that sanctions are appropriate where "a party's spoliation of evidence threatens the integrity of [the] Court").

**II.    THE FRAMEWORK FOR DETERMINING AN APPROPRIATE SANCTION**

Courts evaluate three factors when determining appropriate sanctions: (1) the level of culpability; (2) the level of prejudice; and (3) whether a lesser sanction can achieve the desired result. *Schmidt v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994). Each of these factors supports the imposition of the sanctions requested here. Class Plaintiffs are seeking only an adverse inference sanction at class certification and trial, and monetary sanctions. These are relatively minor sanctions compared to the possible alternative, terminating sanctions. *See Pension Committee*, 2010 U.S. Dist. LEXIS 4546, at *28.[3]

---

[3] While Intel fails to acknowledge the distinction between the various forms of sanctions (and, indeed, only cites to cases concerning terminating sanctions), it is well-recognized that a spoliation inference and monetary sanctions are flexible in their application and thus constitute far lesser sanctions than dismissal of the case or the exclusion of

## A.      Intel Acted With a Culpable State Of Mind

*Pension Committee*, a leading case on e-discovery sanctions, describes a continuum of culpability, ranging from negligence through gross negligence, on to willfulness. *See id.* at *7. As discussed below, the actions Intel took, and those it <u>failed</u> to take regarding the design, implementation and audit of its preservation plan, ran the gamut from simple negligence, to gross negligence, to willful and intentional misconduct.[4]

### 1.      Intel Cannot Claim Ignorance of, or Inability to Abide by, the Law

Intel knew the laws relating to e-discovery when the AMD and Class complaints were filed, it just chose not to follow them.  As noted in *Pension Committee*, any party operating under a preservation obligation in 2005 had the benefit of knowledge of the e-discovery protocols established by *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422 (S.D.N.Y. 2004) (*Zubulake V*) in July 2004—almost a full year before Intel's duty to preserve was triggered.  2010 U.S. Dist. LEXIS 4546, at *48-49.  Yet, despite its familiarity with the relevant e-discovery protocols, and having ████████████████████████████████████████ ████ Mem. Opp. at 12, Intel failed to follow most of the steps set forth in *Zubulake V*.

As the *Pension Committee* court explained, as of 2005, when the current suit was filed, companies should have known that failing to take the following actions would constitute at least gross negligence:

---

evidence.  *See Pension Committee*, 2010 U.S. Dist LEXIS 4546, at *28-29 (discussing the differences between the "most harsh" and "least harsh" forms of the spoliation inference sanction"); *TeleQuest Int'l Corp. v. Dedicated Bus. Sys., Inc.*, 2009 U.S. Dist. LEXIS 19546, at *9 (D.N.J. Mar. 11, 2009); *Crowley v. Chait*, 2004 U.S. Dist. LEXIS 27235, at *32 (D.N.J. Dec. 27, 2004).

[4] *See Zubulake v. UBS Warburg*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003)("Zubulake IV") ("[o]nce the duty to preserve attaches, any destruction of documents is, at a minimum, negligent") (emphasis added); *Pension Committee*, 2010 U.S. Dist. Lexis 4546, at *7-9 (defining willfulness as "intentional or reckless conduct that is so unreasonable that harm is highly likely to occur," defining gross negligence as "a failure to exercise even that care which a careless person would use" and noting that "gross negligence is something more than negligence and differs from ordinary negligence only in degree, and not in kind.") (internal quotations omitted).

> To issue a written litigation hold; to identify all of the key players and to ensure that their electronic and paper records are preserved; to cease the deletion of email or to preserve the records of former employees that are in a party's possession, custody, or control; and to preserve backup tapes when they are the sole source of relevant information or when they relate to key players.

*Pension Committee*, 2010 U.S. Dist. LEXIS 4546, at *32 (discussing *Zubulake V*).

Courts hold "sophisticated corporate litigant[s]" such as Intel to an exacting standard in spoliation cases.[5] *Philip Morris*, 327 F.Supp.2d at 25 (as part of its reasoning for imposing monetary sanctions, noting that "Philip Morris is a particularly sophisticated corporate litigant which has been involved in hundreds, and more likely thousands, of smoking-related lawsuits."); *see also In re Wechsler*, 121 F.Supp.2d 404, 418 (D. Del. 2000) (stating that courts "hold sophisticated parties with vast financial resources responsible for their failure to take seemingly reasonable steps to preserve evidence which they know or should know might be relevant to a future lawsuit").

Intel's conduct was <u>far worse</u> than that of Philip Morris. Both companies failed to suspend the auto-delete feature on their email mailboxes and severs, but Intel's conduct lasted <u>more than a year</u> before it was reported to this Court while Philip Morris reported its failure to disable auto-delete four months after discovering this fact. Lambrinos Decl., Ex. 3 (Sept. 9, 2008 Letter from F. Cottrell to Special Master Poppiti) at 1; *compare Philip Morris*, 327 F.Supp.2d at 23. Intel's longest "aging limitations" (*e.g.* 45 days for inbox) were much shorter that Philip Morris' standard 60-day retention period. *See* Vespremi Ex. 21 (Intel's Remediation

---

[5] Intel -- one of the largest and most sophisticated high technology companies in the world -- is no stranger to litigation involving e-discovery as it has been a party in ongoing massive antitrust, patent and other lawsuits for nearly two decades. Declaration of Demetrius Lambrinos in Further Support of Class Plaintiffs' Motion for Sanctions ("Lambrinos Decl.") at Ex. 4. http://www.pcworld.com/businesscenter/article/184882/a_history_of_intels_antitrust_woes.html (viewed on May 2, 2010); *see also* Lambrinos Decl., Ex. 5 (Oral Testimony of Bruce Sewell, Intel's Former General Counsel at 32:7-10, ("[Electronic Discovery] is a matter which is not only close to my heart, but also close to my professional life, because I spend an inordinate amount of time addressing these issues"); *id.* at 40:16-19 ("...routinely our productions today are in the multiple millions of dollars. So we routinely produce between three and seven or eight million documents for each litigation")).

Plan at 14, stating 7-35 days for sent items); *compare* 327 F.Supp.2d at 23. As opposed to the mere eleven spoliating executives at Philip Morris, Intel admits that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Intel knew better. Intel was obliged to implement a document retention system that was designed to work, not fail. As the *Philip Morris* court cautioned, "it is essential that such conduct be deterred, [and] that the corporate and legal community understand that <u>such conduct will not be tolerated</u>." 327 F.Supp.2d at 26 (emphasis added).

### 2. Intel Failed To Take The Necessary "Affirmative Steps" When Implementing Its Preservation Plan

The duty to preserve documents is not a "passive" one; rather, "[c]ounsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched." *Zubulake V*, 229 F.R.D. at 432. These affirmative steps include "communicating with the 'key players' in the litigation," *id.*, and Intel's failure to establish such communications created a widespread communication breakdown and massive non-compliance. This constitutes a willful violation of Intel's preservation obligations.

*Zubulake V* is directly on point. The *Zubulake V* court concluded that UBS "acted wilfully [sic] in destroying potentially relevant information" and granted an adverse inference sanction on this basis, because there had been a "<u>failure of communication</u>," and UBS employees "for unknown reasons – ignored many of the instructions that counsel gave," resulting in the

destruction of potentially relevant information. *Id.* at 436-37 (emphasis added).[6]  Like UBS, Intel failed to take the necessary "affirmative steps," which resulted in a massive self-imposed communication breakdown.  First, Intel failed to properly issue litigation holds.  Second, Intel did not effectively communicate with ███████████████████ about their preservation obligations, and did not adequately monitor compliance with litigation hold instructions.  This resulted ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████  Third, Intel failed to effectively ███████████████████████

████████████████████████████████████████████████████

Fourth, ██████████████████████████████████████████████

████████████████████████████

### a.   Intel Failed To Properly Design and Issue an Effective and Timely Litigation Hold Notice

Intel's system of issuing litigation event hold notices ("LEHNs")[7] was a massive failure. *See generally* Rebuttal Declaration of George J. Socha, Jr. filed herewith ("Socha Decl.") ¶¶ 57-69, 77-78; Mot at 15-20.  First, Intel did not even require acknowledgement of receipt of the LEHNs sent out in 2005 and 2006. Socha Decl. ¶¶ 54-56.  Second, of Intel's 1,025 Custodians, 66 never received a LEHN and 321 did not get a LEHN until February 7, 2007, more than a year and a half after Intel's preservation duty was triggered. *See* Lambrinos Decl., Ex. 8 (Summary Compilation re "Terminated Prior to Receiving LEHN"); Lambrinos Decl., Ex. 9 (Summary Compilation re "Late LEHNs");  Socha Decl. n.42.  Third, over 200 custodians admitted that

---

[6] The court explained that when a party is put on notice of its preservation obligations, it "acts at its own peril" when it fails to take the necessary "affirmative steps" to ensure custodial compliance.  229 F.R.D. at 436-37.

[7] ████████████████████████████████████████

they failed to preserve documents in accordance with the LEHN instructions. *See generally* Lambrinos Decl., Ex. 1 (Summary Compilation re: "Failures to Follow Instructions").[8]

The reason for this massive non-compliance and resulting preservation failure is obvious: Intel failed to act reasonably and in a manner consistent with the goal of preserving discoverable documents. Intel's employees were ███████████████████████ *See* Mot. at 6-8. Intel did nothing to counter these habits and, in fact, actively encouraged them.[9] Intel's employees were ███████████████████████████████████████████ ██████████████████████████████ Socha Decl. ¶¶ 61, 66. These failures had immediate and devastating effects, and countless emails were irretrievably lost as a result.

### b. Intel Did Not Effectively Communicate With Key Players And Did Not Adequately Monitor Their LEHN Compliance

Intel claims that it communicated regularly with its custodians concerning their preservation obligations, Mem. Opp. at 18-19, but, in fact, there was very little actual communication and even less custodial follow up. ████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ The result was massive non-compliance with the LEHNs across the organization.

---

[8] Among the reasons Intel gave for custodians' failures to follow the hold notice are:████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████





Other [REDACTED] were not saving their emails because they mistakenly thought the litigation hold did not apply to them.  These individuals include, among others:



At least 31 [REDACTED] not saving their email because they were under one of these two misimpressions—that IT was backing up their emails or that the litigation hold did not apply to them.[18]  Moreover, as discussed below, the only mechanism Intel provided for saving relevant email in this litigation was the creation of .pst folders.  Yet Intel failed to institute the systems necessary for a .pst foldering system to function properly, and did not effectively monitor custodial compliance with the .pst instruction it provided.

### c.    Intel's ".pst" Instruction Was Inadequate

Intel asserts that "[a]uto delete only came into play if a custodian failed to preserve a relevant email in a .pst folder, contrary to the hold notice and to many custodians' pre-litigation practices."  Mem. Opp. at 35.  However, auto-delete did come into play [REDACTED]

---

[16] *See* Mem. Opp. at 26.
[17] *See* Mot. at 17-18 [REDACTED]
[REDACTED]
[18] *See* Lambrinos Decl., Ex. 6 (Summary Compilation re Mistaken Belief).

9



Socha Decl. ¶ 59.

For the custodians who did receive a LEHN, the record shows that ████████████ ███████ did not provide clear instructions on how to comply with the .pst instruction. Intel did not tell personnel at the ██████████████████████████

Intel argues that the practice of creating .pst files is "common practice" and "simple" for employees to use. Mem. Opp. at 15. There is no indication anywhere in the record, however, that ████████████████████████████████ they understood the LEHN's .pst instructions or that they followed those instructions. There is considerable evidence that there was minimal custodial follow up and that ██████████████ often did not save their emails to .pst files. Instead, ████████████████████████ ████████████████████████████

### d.   Intel Failed To Implement An Effective Backup Tape System

Intel falsely asserts that Class Plaintiffs' complaints regarding the backup tapes are "overblown," and that "there was no reason at that time to believe anything more was required, and as a legal matter nothing was." Mot. Opp. 34, n.126. This is incorrect. Intel relied on backup tapes as the sole source from which to preserve documents that would have otherwise been purged by its default aging limitations.

Despite its knowledge that backup tape systems were limited in terms of their preservation capabilities, Intel elected to migrate custodians to five dedicated, consolidated Exchange servers, and then preserve a backup tape from each of those servers once a week. Intel also failed to take the necessary steps to correct for the tape system. Mot. Opp. at 22. When the complaints were filed, ███████████████████████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

████████████████████████ Less than a year before the filing of this case, General Counsel, Bruce Sewell testified before the committee responsible for revising the Federal Rules of Civil Procedure that "[b]ackup tapes will not capture data that had not yet been created or that had been deleted at the time of backup." Socha Decl. ¶¶ 27-29. Intel willfully ignored these known inadequacies.

Despite this knowledge, on ████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████ Socha Decl. ¶ 104.

First, ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████ Second, for those custodians that were put on designated servers, Intel ████████████████████████████████████████████████ Socha Decl. ¶¶107-108. This all but ensured deleted emails would not be captured. ████████
████████████████████████ Intel chose self-preservation and backup tapes even though there were viable alternatives.[19]

---

[19] Intel's email archiving system was <u>not operational until April 2007.</u> ████████████████████████████
████ There were viable alternatives. ███████████████████████████████ Lambrinos

  e. **Intel's Decision To Not Pursue Journaling In 2005 Was Unreasonable and Made In Bad Faith**

Intel argues that it was not legally obligated to implement Journaling in 2005. Mem. Opp. at 24-25. This misstates the issue. The question before this Court is not whether Journaling is "required," but whether the loss of ESI resulting from Intel's choice to not implement Journaling in 2005 was the product of negligence, gross negligence, recklessness or willful intent.

Intel could have done better. Intel implemented archiving in March 2007, Mem. Opp. at 25, yet the same system, EMC EmailExtender,[20] could have been implemented in 2005, just as Intel's IT department recommended at the time. *See* Rebuttal Declaration of Barry J. Murphy ("Murphy Decl.") ¶¶ 13-14. According to Class Plaintiffs' experts Barry J. Murphy[21] and George Socha, by 2005, journaling systems were commonly used by large organizations to meet compliance or preservation obligations.[22] Murphy has tested and shown that the product Intel used in 2007 had not materially changed from the journaling product available in 2005. Murphy Decl. ¶¶ 12-14. ████████████████████████████████████

█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████

Intel knew using weekly backup tapes would not capture custodian-deleted emails. Intel and Jessen claim journaling was not "reliable" in 2005. Mem. Opp. at n.38; Declaration of John

---

Decl., Ex. 23 ████████████████████  Lambrinos Decl., Ex. ████████████████

[20] Lambrinos Decl., Ex. 26 (March 17, 2007 Report and Proposed Remediation Plan ████████ at 31).
[21] Plaintiffs engaged Barry Murphy, an expert in the area of Enterprise Content Management, eDiscovery records management, and email archiving. As noted by Murphy, Legato was a product purchased by EMC that became EMailXtender. Murphy Decl. ¶ 13.
[22] Murphy Decl. ¶¶ 4, 6, 10, 17; Socha Decl. ¶ 117.

H. Jessen (Jessen Decl.")] ¶ 78.  However, the only reason ███████████████████

████████████████████████████████████████████  The truth is that

hosted email archiving service providers, which were standard at the time, could have had a

solution up and running for Intel in days, if not hours.[23]

### f.   Intel Failed To Properly Harvest Data From Custodians

Intel's document harvests were implemented poorly.  Socha Decl. ¶ 92-97.  Serious

problems also existed with the harvests' overall design.  *Id.* at ¶¶ 93-96.  As a result, Intel failed

to harvest material for over 350 custodians until after April 1, 2007, and as of October 8, 2008,

over 100 custodians had still not been harvested.  *Id.* at ¶¶ 97-102.  Intel's limited harvests also

failed to collect a broad range of potential sources of relevant ESI which may have been lost

forever.  *Id.* at ¶ 103.

### 3.   Given Intel's Flawed And Poorly Implemented Self-Archival System, Intel's Refusal To Suspend Auto-Delete Constituted A Culpable Violation Of Its Preservation Obligations

It is <u>undisputed</u> that Intel <u>chose</u> not to suspend the routine operation of the auto-delete

function for its email mailboxes and servers.  *See* Mem. Opp. at 34.  This constitutes gross

negligence in and of itself.  *See Pension Committee*, 2010 U.S. Dist. LEXIS 4546, at *32.  As

*MOSAID* explained, the "duty to preserve potentially relevant evidence is an <u>affirmative</u>

<u>obligation</u> that a party may not shirk."  348 F.Supp.2d at 339 (emphasis added).  Forgetting to

press the "off switch" on one's auto-delete program is not a defense to a spoliation claim.  *Id.*

Intel nevertheless goes to great lengths to defend its conscious refusal to suspend auto-delete,

---

[23] Murphy Decl. ¶¶ 9-11; Socha Decl. ¶ 118.  Indeed, while Jessen opines that Smith "reasonably believed that the technology was not sufficiently reliable," his own company, EED, announced in April 2005 the "release of a module integrating EED Discovery with EMC EmailXtender, one of the major email archiving solutions on the market today."  Lambrinos Decl., Ex. 17 (Jessen Dep. Ex. 11,300).  Jessen is quoted in this article stating: "We expect EmailXtender Data Access Module will further drive EED Discovery sales because companies archiving email typically also need the functionality of our system..." *Id;* ████████████████████████████████████
████

and even makes the incredible assertion that "there was no reason to think auto-delete was a major issue." Mem. Opp. at 35. This is incorrect. Intel knew or should have known that the failure of an Intel custodian to comply with the .pst instruction to affirmatively move relevant emails to a .pst file before the expiration of the retention period would result in relevant documents being systematically destroyed. Socha Decl. ¶¶ 57-58, 62.

Intel cites to the Federal Rules Committee's "Summary" Report, which was issued in 2006, and asserts that the "regular purging of e-mails" by parties subject to litigation holds is a practice endorsed by that Committee because it "prevent[s] [the] build-up of data." Mem. Opp. at 36. However, the next page of that report provides as follows:

> The proposed amendment does not provide a shield for a party that intentionally destroys specific information. . . or for a party that allows such information to be destroyed in order to make it unavailable in discovery by exploiting the routine operation of an information system. Depending on the circumstances, good faith may require that a party intervene to modify or suspend certain features of the routine operation of a computer system to prevent the loss of information, if that information is subject to a preservation obligation. [24]

The formal final committee notes echo this sentiment:

> The good faith requirement of Rule 37(f) means that a party is not permitted to exploit the routine operation of an information system to thwart discovery obligations by allowing that operation to continue in order to destroy specific stored information that it is required to preserve. When a party is under a duty to preserve information because of pending or reasonably anticipated litigation, intervention in the routine operation of an information system is one aspect of what is often called a "litigation hold."[25]

---

[24] Lambrinos Decl., Ex. 27 (Summary of the Rpt. of the Judicial Conf. Comm. on Rules of Prac. & Proc. (2005), available at www.uscourts.gov/rules/Reports/ST09-2005.pdf at 34).

[25] Lambrinos Decl., Ex. 28 (FRCP 2006 E-Discovery Amendments with Committee Notes Formal Notes at 42 (Discussing Rule 37f, which was later changed to Rule 37e). It is not common practice to refuse to suspend an auto-delete system on key witnesses in a litigation matter of this scope and magnitude. In fact, law firms are advising clients to suspend auto-delete as early as February 2005. *See, e.g.,* Lambrinos Decl., Ex. 29 (The Evolving Law Concerning Document Preservation Obligations, Heller Ehrman LLP (February 2005) ("Even if a company has a policy requiring that all emails must be printed and filed in accordance with analogous procedures for hard copy documents, such auto-delete programs **must be turned off** at least for the entire potentially relevant population.")).

4.    **Intel's Lack Of Candor About The Functioning Of Its Auto-Delete Program Was A Willful, Independently Sanctionable Violation Of Its Discovery Obligations**

In its Opposition, Intel misleadingly describes its refusal to suspend auto-delete as an ███████████████ Mem. Opp. at 34.  The evidence is clear, however, that Intel was less than candid about the functioning and application of its auto-delete program throughout the course of the parties' investigation into Intel's spoliation and discovery abuses.  Intel consistently failed to disclose to this Court or Class Plaintiffs that it ██████████████ it set up the backup tape system for the migrated custodian mailboxes.  Specifically, Intel maintained a retention period of "one-day" for deleted items, which meant that deleted items would <u>not</u> be captured by the "weekly" backup tape system Intel established for the migrated custodian mailboxes.  Socha Decl. ¶¶ 117-118.  Intel did not even realize it had ██████████████ until December 2006, and it has never been straightforward with the Court about having done so.

Such willful misrepresentations are independently sanctionable.  *See generally Wachtel v. Helath Net, Inc.*, 239 F.R.D. 81 (D.N.J. 2006).  In *Wachtel*, the district court was confronted with a very similar situation:

> On February 28, 2006 [after the close of discovery], this Court learned for the first time that Health Net used an email retention policy that automatically removed e-mails from employees' active files and sent them to back-up disks every 90 days. . . . Further adding to spoliation, any e-mails that an employee deleted within 30 days of receipt were lost permanently upon transfer to storage at 90 days.

*Id.* at 95.  The *Wachtel* court found that "[i]t was not candid of Health Net to keep this information about the 90 day backup system from Plaintiffs . . . and this Court throughout the entire discovery period."  *Id.* at 96.  The *Wachtel* court held that multiple sanctions were appropriate "in order to protect the integrity of the judicial process, remedy the prejudice suffered by Plaintiffs, and punish the wrongdoer."  *Id.* at 85, 102, 104, 110 (deeming facts admitted, precluding evidence, and awarding monetary sanctions).

Intel cites 

Intel <u>never</u> informed the Court ▮▮▮▮▮ in any formal filing.  Rather, this fact

had to be extracted out of several witnesses by the Plaintiffs and the Court's e-discovery expert,

Eric Friedberg, at several depositions.[28]

It is telling that in his February 8, 2007 email to Chuck Diamond, over a year after Intel

▮▮▮▮▮▮▮ Intel's attorney, Robert Cooper, did not discuss Intel's auto-

delete policy at all.[29]  Instead, Cooper wrote that ▮▮▮▮▮▮▮

▮▮▮▮▮ *Id.*  In other words, a full nineteen months after the trigger date, Intel finally

considered complying with its preservation obligations.  Cooper also failed to mention that the

▮▮▮▮▮[30]

### 5. Intel's Reliance On The Sedona Principles Is Misplaced

Intel's reliance on The Sedona Conference Working Group 1 ("WG1") papers is

misplaced.  Intel's own expert acknowledges that The Sedona Principles do not constitute

---

[26] Mem. Opp. at 34; Lambrinos Decl., Ex. 30.

[27] *Id.* at 1-2.

[28] Lambrinos Decl., Ex. 21 ▮▮▮▮▮▮▮

[29] *See* Lambrinos Decl., Ex. 33.  There are other examples of Intel's lack of candor in this case.  *See* Mot. at 21-22; Lambrinos Decl., Ex. 3 (Sept. 9, 2008 Letter from Cottrell to Special Master Poppiti regarding discrepancies between Paragraph 8 Summaries and Weil Notes).

[30] *See* Murphy Decl. ¶ 13. ▮▮▮▮▮▮▮

established legal authority.[31]   Moreover, Intel conveniently ignores the more authoritative Sedona Guidelines, which were first published in September 2005.   Guideline 5 states, for example, that litigants "<u>must</u> mandate the suspension of ordinary destruction practices and procedures as necessary to comply with [their] preservation obligations."[32]

## B.      Intel's Spoliation Prejudiced Class Plaintiffs

Given Intel's willful and grossly negligent conduct, Class Plaintiffs need not establish prejudice to obtain an adverse inference or monetary sanction.   However, there is considerable evidence that Class Plaintiffs were prejudiced by Intel's spoliation.[33]

Intel relies on *In re: Daimler Chrysler AG*, 2003 WL 22951696 (D. Del. Nov. 25, 2003), to disparage Class Plaintiffs' claims of prejudice as the result of their "fertile imagination." Mem. Opp. at 31, 50, 55 and n.197.   Yet *Daimler* involved a mere "18 pieces of paper," hand-written notes discarded after being typed, that were *unintentionally* destroyed.   *Daimler*, 2003 WL 22951696, at *3.   On the opposite spectrum, Intel's flawed preservation plan, its deliberate choice to permit the destruction of masses of electronically stored evidence, and its failure to adequately monitor custodial compliance resulted in the permanent loss of a massive number of documents.   Moreover, *Daimler* was written in 2003, one year prior to *Zubulake V* and *MOSAID*, and did not deal with the spoliation of electronically stored information.

---

[31] Jessen Decl. ¶ 24.   It should be noted that Jessen conducted very little independent research before reaching his opinions. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[32] Lambrinos Decl., Ex. 34 (2005 Sedona Guidelines).

[33] Generally, to establish prejudice, "the [innocent party] must present extrinsic evidence tending to show that the destroyed emails would have been favorable to [its] case." *Pension Committee*, 2010 U.S. Dist. LEXIS 4546, at *20.   The "prejudice" requirement is, however, commonly subsumed by the culpability inquiry where there is a finding of gross negligence or willfulness.   The reason for this is "[r]elevance and prejudice may be <u>presumed</u> when the spoliating party acted in bad faith or in a grossly negligent manner." *Id.* at *19 (emphasis added), *59 (the prejudiced party should not be held to "'too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence,' because doing so would . . . allow parties who have . . . destroyed evidence to profit from that destruction") (citation omitted). *See also* Mot. at 28.

The facts here are closer to those discussed at the end of the *Daimler* case, where sanctions were imposed against parties that destroyed "key pieces of evidence" and where the contents of those documents was not otherwise discoverable. *Id.* at *3. The evidence lost in this case was not "merely cumulative" of what was ultimately produced. Mem. Opp. at 31. Rather, the evidence Intel destroyed would have provided the Court additional context from which to determine the true nature of Intel's anticompetitive conduct.

### 1.      Intel Destroyed a Massive Number Of Emails

As previously explained, AMD's counsel, Shaun Simmons, used Intel's data to compare the number of emails Intel had produced for 272 custodians during the self-preservation period and during the post-automated preservation period. *See generally* Class Plaintiffs' Opposition to Intel's Motion to Strike the Declaration of Shaun M. Simmons ("Simmons Opp."), filed herewith.   This data shows that email retention increased dramatically once Intel finally instituted automated preservation methods:   for these 272 Intel document custodians, Intel produced 600,000 more emails for a comparable post-automation period than Intel produced for the pre-automation period.   Dr. James Thompson, Professor of Statistics at Rice University, states that it is reasonable to assume that the two time periods were similar in terms of expected email production.   Declaration of James Thompson ("Thompson Dec. ") ¶¶ 9-10.   Since it must be assumed that emails were generated at the same rate during both periods, Intel failed to preserve more than 600,000 emails from the self-preservation period.[34]

If the 106 Intel custodians who had never been placed on automatic preservation had the same average monthly increase in email production as the 272 Intel custodians, their production

---

[34] Significantly, Intel, the sole party that would have such evidence, presents no evidence that emails were generated at different rates during both time periods.

18

would be expected to have increased by approximately 200,000 emails.[35]  Intel's custodians had a mean percentage increase in average monthly produced email of 127% when automated preservation methods were put in place, while a group of similar AMD custodians had only a 20% increase.  The large disparity between these two numbers is both striking and meaningful. It is quite reasonable to compare these two groups, due to the similarities between them – both are high-technology companies in the same business of manufacturing microprocessors, and both were subject to the same litigation preservation requirements.  This comparison shows that Intel's email preservation and production for the period before automated preservation procedures were put in place were woefully lacking.

As Class Plaintiffs explain in their Simmons Opposition, Intel's assertion that only a trained statistician can summarize and compare basic data is unfounded and incorrect.[36]



---

[35] Again, Intel failed to present any evidence that these 106 custodians' receipt of email would be any different than for the 272 custodians.

[36] As Dr. Thompson states: "the type of comparison performed by Mr. Simmons (comparing two similar periods to obtain information as to the effect of an event) is one often utilized in business and government throughout the United States without needing a statistician . . . . Mr. Simmons' analysis is of the type normally performed by lay persons;" and "Simmons' conclusions are accurate, and . . . confirmed by application of sophisticated statistical techniques." Thompson Decl. ¶¶ 3, 30.



### 3.    Documents Intel Destroyed Would Likely Have Supported Class Plaintiffs' Liability Case.

Intel's ███████████ destroyed documents that were undoubtedly favorable to Class Plaintiffs' case on liability. *See* Mot. at 3 and 30-32.[39] There is considerable evidence that Intel made loyalty payments to its largest customers in exchange for their agreements not to do business with AMD.[40] However the true nature of those payments, and the underlying economic reality relating to them, is best understood in the full light of all the relevant evidence. It is important to have a complete record when considering whether to certify the class. The documents, in particular, are important to Class Plaintiffs' experts when analyzing the effects of Intel's anticompetitive conduct. *See* Lambrinos Decl., Ex. 38 (Class Certification Hearing Trans.

---

[39] As explained in Class Plaintiffs' Opening Brief, the existence of relevant and favorable documents in Intel's so-called "repopulation" or "repop" production suggests that the documents Intel destroyed were also favorable and relevant. Intel attempts to dismiss the nine documents designated as "repop" in Class Plaintiffs opening brief. *See* Mot. at 30-32; ████████████████████

[40] *See* Class Plaintiffs' Proposed Findings of Fact (D.I. 1904), Section IV.C.

at 236:8-24; 301:12-302:1).  Class Plaintiffs have been denied the full scope of evidence that would have been available had Intel behaved as the responsible litigant and corporate citizen that it constantly claims it is.

### 4.   Intel's Remediation Did Not Cure The Prejudice To The Class And Cannot Be Used As A Shield Against Sanctions

Intel's opposition implies that Intel should be rewarded for its remediation efforts.  Mem. Opp. at 25.  This is nonsense.  Intel does not cite a single legal authority exonerating a known spoliator just because it has made an attempt to "remediate."  To the contrary, as many courts have observed, "you cannot recreate what has been destroyed."  *Philip Morris*, 327 F.Supp.2d at 25; *see also MOSAID*, 348 F.Supp.2d at 338 ("the Court is neither impressed nor moved by Samsung's belated efforts to retrieve emails that were allegedly retained by a 'litigation hold' imposed for a different lawsuit").

Moreover, where a litigant has destroyed relevant material and then retrieved it from other sources, it is often produced too late.  This is precisely the situation here.  ████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████████████  When confronted with an analogous situation, the *Zubulake V* court stated that "[e]ven those e-mails that were deleted but ultimately salvaged from other sources . . . were produced 22 months after they were initially requested.  The effect of losing potentially relevant e-mails is obvious, but the effect of late productions cannot be underestimated either."  *Zubulake V*, 229 F.R.D. at 436.  As was the case in *Zubulake V*, "[some] of those [deleted] e-mails were recovered . . . but some – and no one can say how many – were not.  And even those e-mails that were recovered were produced to Zubulake well after she originally asked for them."  *Id.* at 429;

*see also Rimkus Consulting Group, Inc. v. Cammarata*, 2010 U.S. Dist. LEXIS 14573, at *117-20 (S.D. Tex. Feb. 19, 2010) (imposing adverse inference after finding that the prejudice inflicted on the moving party was not "irreparable").

### C.   Lesser Sanctions Than Those Requested Are Inappropriate

Spoliation sanctions serve three functions: a remedial function by leveling the playing field or restoring the prejudiced party to the position it would have been without spoliation; a punitive function, by punishing the spoliator for its actions; and a deterrent function, by sending a clear message to other potential litigants that this type of behavior will not be tolerated and will be dealt with appropriately if need be. *MOSAID*, 348 F.Supp.2d at 335.

The sanctions Class Plaintiffs seek are appropriate to serve the three purposes of the spoliation sanction device. Not only are adverse inference sanctions and monetary sanctions considered relatively minor compared to terminating sanctions, but they can be applied flexibly and tailored to suit each case. *See Pension Committee*, 2010 U.S. Dist. LEXIS 4546, at *28.

Intel suggests that the magnitude of the discovery in this case should excuse its actions. But this rationale would give every litigant in a large, complex case a free pass to spoliate with impunity. That simply cannot be so. Indeed, there cannot be many larger suits than the massive tobacco litigation brought by the United States against nine cigarette manufacturers in *Philip Morris* where the parties engaged in intensive discovery for more than two years, exchanged over 4,000 requests for production of documents, and defendant alone made available over 26 million pages of documents. *U.S. v. Philip Morris U.S.A. Inc.*, 449 F.Supp.2d 1, 33 (D.D.C. 2006). Yet the size of the discovery in *Philip Morris* did not stop the court from imposing spoliation sanctions. *Philip Morris*, 327 F.Supp.2d at 25-26.

## III.    AN ADVERSE INFERENCE SANCTION IS APPROPRIATE

Even though traces of liability and consumer harm evidence remained in the record despite Intel's massive document purge (and Intel has conceded the weight of that evidence), the fact remains that Class Plaintiffs were deprived of *additional* evidence that would have further supported class certification, and were prejudiced as a result.

It is black-letter law that "[e]vidence of spoliation may give rise to sanctions" including, but not limited to, "an adverse inference, referred to as the spoliation inference." *MOSAID*, 348 F.Supp.2d at 335. The spoliation inference is "predicated upon the common sense observation that when a party destroys evidence that is relevant to a claim or defense in a case, the party did so out of the well-founded fear that the contents would harm him." *Id.* at 336. A spoliation inference is considered a "far lesser" sanction than terminating sanctions such as dismissal or suppression of evidence, which are available in only the most extreme cases. *Id.* Intel fails to even acknowledge this distinction between the various forms that sanctions may take, and cites only to cases concerning terminating sanctions which Class Plaintiffs have not asked for here.

An adverse inference is appropriate if (1) the evidence destroyed was in the party's control; (2) there was actual suppression of evidence; (3) the evidence was relevant to claims or defenses[41] (this requirement is often combined with the concept of "prejudice"); and (4) it was "reasonably foreseeable" that the evidence would later be discoverable. *MOSAID*, 348

---

[41] Intel cannot reasonably contest that the evidence it destroyed was relevant to this litigation. "In any case dealing with the issue of spoliation, there will necessarily be some doubt as to the relevance of the missing evidence due to the mere fact that it is missing." *TeleQuest Int'l Corp.*, 2009 U.S. Dist. LEXIS 19546, at *12. However, "[i]t cannot reasonably be imagined that *no* relevant information was deleted as the result of these purges," where it "is beyond argument that Defendants were aware that a lawsuit had been brought against them and that the subject matter of this lawsuit focused directly on Defendants' business activities and customer interactions" and defendant "[did] not deny that he routinely permanently deleted emails, including emails communicating with customers, in addition to invoices and other business documents during the course of this litigation." *Id.* at *11-13. As in *TeleQuest*, we can infer that they were relevant based on traces that remain in the record.

F.Supp.2d at 336.   Intel's opposition states very clearly that it only contests the "actual suppression" and the relevance/prejudice requirements.[42]

### A.      Intel Engaged In The "Actual Suppression" Of Evidence

To merit an adverse inference from spoliated evidence, the moving party must show that there has been an "actual suppression" or withholding of the evidence. *Id.* at 336.  Negligence is sufficient to satisfy this element and to warrant an adverse inference.[43] *Id.*

### B.      No Showing Of Bad Faith Is Required

Intel incorrectly states in its Opposition that an adverse inference sanction requires a showing of bad faith. Mem. Opp. at 30.  This is not the case. *MOSAID* notes "this Court did not find any case law in this circuit that requires a finding of bad faith before allowing a spoliation inference." *MOSAID*, 348 F.Supp.2d at 337 (emphasis added).

Finally, as a lesser sanction, the threshold for an adverse spoliation inference is less stringent. *See Crowley v. Chait*, 2004 U.S. Dist. LEXIS 27235, at *33.  As an inference is a less severe sanction than suppression of evidence, requiring "an express showing of scienter for the former while permitting some lesser showing for the latter would perversely burden the less severe sanction with a higher threshold." *Id.* at *32.

---

[42] Intel cannot reasonably dispute that the documents it destroyed were in its control, or that it was "reasonably foreseeable" that they would later be discoverable. *See MOSAID*, 348 F.Supp.2d at 336 (stating that "Samsung's deleted or inaccessible e-mails easily satisfy factors one, three, and four").

[43] Intel relies heavily on two third Circuit cases in support of its assertion that an adverse inference sanction requires a showing of intent. *See* Mem. Opp at 29-32 (citing *Brewer v. Quaker State*, 72 F.3d 326 (3d Cir. 1995) *and Gumbs v. Int'l Harvester*, 718 F.2d 88 (3d Cir. 1983).  Neither case is on point as both of them pre-date the now-widely accepted e-discovery protocols in *Zubulake V*, and neither deals with the loss of documents in the e-discovery context.  Moreover, while district courts in this Circuit have adopted conflicting interpretations of *Brewer*, numerous courts follow *MOSAID* and hold that a spoliation inference is permitted where the conduct in question is "at the very least negligent." *Crowley*, 2004 U.S. Dist. LEXIS 27235, at *31-32 (distinguishing *Brewer*). *See also Canton v. Kmart Corp.*, 2009 U.S. Dist. LEXIS 59352, at *9 (D.V.I. July 10, 2009); *Dowling v. United States Gov't*, 2008 WL 5046853, at *1 (D.V.I. Nov. 20, 2008); *CentiMark Corp. v. Pegnato & Pegnato Roof Mgmt.*, 2008 U.S. Dist. LEXIS 37057, at *30-31 (W.D. Pa. May 5, 2008); *Paris Bus. Prods. v. Genisis Techs., LLC*, 2007 U.S. Dist. LEXIS 78870, at *8 (D.N.J. Oct. 24, 2007).  Regardless, under either standard, an adverse inference is warranted in this case.

**C.     This Court Should Impose An Adverse Inference At Class Certification**

In this case, an adverse inference sanction at the class certification stage is appropriate because Class Plaintiffs have been denied important evidence that would likely have supported their case on class certification. As this court knows, the denial of the class certification motion will effectively end this litigation, and Intel will have achieved its goal.[44]

Intel has misconstrued Class Plaintiffs' argument. The Class position is as follows: To the extent *Hydrogen Peroxide* requires this Court to evaluate the evidence as to liability and impact, Plaintiffs are entitled to an adverse inference that the evidence Intel destroyed would have supported their claims. Class Plaintiffs have stated throughout this litigation that, regardless of who is right and who is wrong about a specific piece of evidence, all of the evidence is common to the class. *See* Plaintiffs' Response to Intel's Proposed Findings of Fact at 1. Thus an item-by-item determination of whether a given piece of evidence supports the class "theory" is not needed because the evidence will be the same for every class member. *Id.* Intel, in apparent agreement, states that "class certification discovery [is] 'not to be used to address' the probable outcome on the merits." Mem. Opp. at 10.

To the extent this Court is satisfied that liability and impact are susceptible to common proof, it need not resolve any merits issues at this phase. To the extent the Court must evaluate evidence and make factual determinations to decide class certification, however, Class Plaintiffs are entitled to an adverse inference that the documents Intel destroyed would have been favorable to their positions.

---

[44] Class Plaintiffs have also requested an adverse inference instruction at trial. *See* Mot. at 36-41. In responding to this sanction, Intel merely repeats the arguments it made against the adverse inference sanction at class certification, and basically argues that a showing of "intent" is required. Mem. Opp. at 57-60. This is incorrect and irrelevant. None of the cases cited by Intel counter the fact that in this Circuit, as discussed above, an adverse inference is considered a "lesser sanction" and is permitted based on a showing of negligence. In any case, this sanction is warranted regardless of the standard as Intel's conduct in this case was egregious.

1.      **Case Law Supports Class Plaintiffs' Position**

Intel incorrectly claims, without citing a single piece of legal authority, that Class Plaintiffs' request for an adverse inference sanction at class certification is "utterly without legal support." Mem. Opp. at 9.  Courts have wide discretion when determining sanctions for discovery abuses, and can impose such sanctions an any phase of the litigation.  In *Smith v Georgia Energy USA, LLC*, 259 F.R.D. 684, 696 (S.D. Ga. 2009), the district court imposed an adverse inference in the class certification context.  Intel's argument that the issue involved numerosity rather than predominance misses the point -- the Court can impose an adverse inference sanction when determining class certification issues, regardless of what those issues are.  In *Clark v. Alan Vester Auto Group, Inc.*, 2009 WL 2181675 (N.C. Super. July 17, 2009), for example, a state court imposed an adverse inference sanction at the class certification stage. That sanction had the effect of "discount[ing] any arguments" raised by the defendants which suggested the class certification should be denied for lack of evidence that the defendants themselves destroyed.  *Id.* at \*9.

2.      **Class Plaintiffs Have Not Waived Their Right To Seek An Adverse Inference As To Class Certification**

Because it cannot defend its massive preservation failures, Intel has asserted that Class Plaintiffs' sanctions motion was an "afterthought." Mem. Opp. at 7. In its haste, Intel failed to respond to Class Plaintiffs' several arguments as to why it was appropriate to bring this motion at the time they did. First, Class Plaintiffs' motion for sanctions is a "pre-trial motion" and not a discovery motion. Mot. at 48. Therefore, the filing of that motion did not thwart the purpose of Case Management Order No. 1 in promoting efficiency and avoiding duplication. Indeed, Class Plaintiffs have coordinated with AMD and have not issued or conducted any duplicative discovery. The only additional discovery Class Plaintiffs took were a very limited number of

depositions of individuals who submitted declarations in support of Intel's opposition to the sanctions motion, and the deposition topics were limited to the issues raised in those declarations. Second, this Court recognized very early on in the evidentiary remediation process that Class Plaintiffs had an independent right to seek sanctions. *Id.* This is spelled out explicitly in the [Proposed] Order Regarding Intel's Evidence Preservation Issues entered in both the Class and AMD matters on March 16, 2007 (D.I. 307), and in the Stipulation and [Proposed] Order Bifurcating Discovery into Intel's Evidence Preservation Issues (D.I. 396). Mot. at 49.

Moreover, as Intel itself noted in Exhibit 2 to its Opposition, there were numerous examples of Class Plaintiffs' participation in retention related hearings and depositions. This participation shows Class Plaintiffs' acute interest in getting to the bottom of Intel's document retention issues. As Class Plaintiffs noted in their class certification papers, Intel's spoliation should be taken into account as the documents it destroyed likely would have added further support to their arguments regarding liability, impact, and Professor Leffler's competitive benchmark. *See* Class Plaintiffs' Response to Intel's Proposed Findings of Fact (D.I. 1931) at n.3.

Regarding the August 24, 2009 and September 4, 2009 conferences referenced by Intel, Mem. Opp. at 8, the Special Master's instructions to meet and confer were given in the context of the respective proposed sanctions motions AMD and Intel discussed at those hearings. *See* Lambrinos Decl., Ex. 43 (Aug. 24, 2009 Hrg. Tr. (D.I. 2138) at 15:1-15:4) ("[P]resent to me your proposed ultimate date for the filing of your respective motions, and also, in conjunction with that, should be a proposed briefing schedule.") The timing of AMD's and Intel's motions were of particular importance to the Court given the limited time available for considering the respective pre-trial motions in light of the scheduled December 17, 2009 Pre-Trial Conference in

the AMD litigation, and the March 2010 trial date in that matter. However, those timing issues became irrelevant when Intel agreed to settle the AMD litigation in November 2009. No trial date had been set in the Class litigation at the time of the August 24 and September 4 conferences, and even today, a trial in this matter has not been scheduled. Nor, contrary to Intel's suggestion, did the scheduled class certification hearing present the same time pressure as the impending AMD litigation trial date. Although the sanctions motion bears on issues relevant to class certification, the sanctions motion did not need to be resolved prior to the class certification hearing. Indeed, Intel has stipulated to a schedule for completing briefing on the sanctions motion after the class certification hearing. As trial courts have the inherent power to manage their own affairs, *Jackson v. Univ. of Pittsburgh*, 141 F.R.D. 253, 254 (W.D. Pa. 1992), the Special Master has the discretion to address this motion as he sees fit.

The only case of any substance Intel cites on this topic is *Morse Diesel Int'l, Inc. v. U.S.*, 81 Fed.Cl. 220 (Fed. Cl. 2008). However, that case is completely inapposite. First, plaintiffs in that case asked the court to impose an adverse inference sanction for failing to preserve evidence that the court did not consider as it was irrelevant. *Id.* at 222. Second, plaintiffs in that case waited until after the court had ruled on a partial motion for summary judgment to ask the court to impose an adverse inference and reverse the summary judgment ruling, and the court held that the plaintiffs' motion was untimely under those circumstances. *Id.* Here, Class Plaintiffs have raised the issue in advance of any ruling on class certification and well in advance of the trial date.

## IV.    CLASS PLAINTIFFS ARE ENTITLED TO MONETARY SANCTIONS

For the same reasons supporting the imposition of an adverse inference, the court should also impose a monetary sanction on Intel for its actions. In spoliation cases, monetary sanctions are used to compensate a party for "the time and effort it was forced to expend in an effort to

obtain discovery" to which it was otherwise entitled.  *TeleQuest Int'l Corp.*, 2009 U.S. Dist. LEXIS 19546, at \*16 (*citing MOSAID*, 348 F.Supp.2d at 339).  Monetary sanctions are "an appropriate, additional sanction that is necessary to compensate [Class Plaintiffs] for the time and effort [they have been] forced to expend in an effort to obtain discovery [they were] entitled to."  *MOSAID*, 348 F.Supp.2d at 339.

Monetary sanctions are appropriate here because Class Plaintiffs have, like AMD, spent significant sums of money attempting to obtain the evidence to which they are entitled, but which has been destroyed.  To the extent this Court finds that Intel acted willfully, it should follow *MOSAID* and send Intel a "clear message" that willful and grossly negligent conduct "will not be tolerated."  *Id.* at 335.

## V.    AMD'S CLAIMED PRODUCTION DEFICIENCIES HAVE NO BEARING AS TO WHETHER INTEL SHOULD BE SANCTIONED FOR ITS CONDUCT.

Throughout its response, Intel scatters various allegations regarding supposed production deficiencies suffered by AMD.  Intel can identify no such deficiencies as to Class Plaintiffs and therefore, irrespective of whether Intel might have had any "unclean hands" defense against AMD, this material is irrelevant as to Class Plaintiffs.  But further, every one of Intel's allegations against AMD is false.[45]

---

[45] Intel's attacks on AMD are baseless.  *See generally* Lambrinos Decl., Ex. 44 (August 11, 2009 letter from David Herron to Donn Pickett); Lambrinos Decl., Ex. 45  (July 24, 2008 Fowler Decl.).

## CONCLUSION

For these reasons, Class Plaintiffs' Motion for Sanctions should be granted.


Dated: May 3, 2010                              PRICKETT JONES & ELLIOTT, P.A.


                                   By:  _____*J. Clayton Athey*_____
                                        James L. Holzman (#663)
                                        J. Clayton Athey (#4378)
                                        Laina M. Herbert (#4717)
                                        Kevin H. Davenport (#5327)
                                        1310 King Street
                                        P.O. Box 1328
                                        Wilmington, DE 19899
                                        (302) 888-6500
                                        jlholzman@prickett.com
OF COUNSEL:                             jcathey@prickett.com
                                        lmherbert@prickett.com
Daniel A. Small                         khdavenporti@prickett.com
George F. Farah                         *Interim Liaison Counsel and Attorneys for Phil*
Kalpana Kotagal                         *Paul, on behalf of himself and all others similarly*
COHEN, MILSTEIN, SELLERS                *situated*
    & TOLL, PLLC
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC 20005

Seth R. Gassman
COHEN, MILSTEIN, SELLERS
    & TOLL, PLLC
150 East 52nd Street
Thirtieth Floor
New York, NY 10022

Steve W. Berman
Anthony D. Shapiro
Erin K. Flory
Steve W. Fimmel
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

Guido Saveri
R. Alexander Saveri
Lisa Saveri
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111

Craig C. Corbitt
Judith A. Zahid
Demetrius X. Lambrinos
Eric W. Buetzow
ZELLE, HOFMANN, VOELBEL
   & MASON LLP
44 Montgomery St., Suite 3400
San Francisco, CA 94104

*Interim Co-Lead Counsel for the Class
Plaintiffs*

   -and-

Terry Gross
GROSS BELSKY ALONSO LLP
180 Montgomery Street
Suite 2200
San Francisco, CA 94104

Mark A. Griffin
Tana Lin
Raymond J. Farrow
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052

Jay S. Cohen
SPECTOR ROSEMAN KODROFF & WILLIS
1818 Market Street, Suite 2500
Philadelphia, PA 19103

*Counsel for the Class Plaintiffs*

31