# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| IN RE INTEL CORPORATION MICROPROCESSOR ANTITRUST LITIGATION | ) ) ) ) ) | MDL No. 05-1717-JJF |
| PHIL PAUL, on behalf of himself and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 05-485-JJF |
| v. | ) ) | CONSOLIDATED ACTION |
| INTEL CORPORATION, | ) ) ) | **REDACTED** |
| Defendant. | ) ) ) | **PUBLIC INSPECTION VERSION** |

## CLASS PLAINTIFFS' OPPOSITION TO INTEL'S
## MOTION TO STRIKE THE DECLARATION OF SHAUN M. SIMMONS

PRICKETT JONES & ELLIOTT, P.A.
James L. Holzman (#663)
J. Clayton Athey (#4378)
Laina M. Herbert (#4717)
Kevin H. Davenport (#5237)
1310 King Street
P.O. Box 1328
Wilmington, DE 19899
(302) 888-6500

Dated:  May 3, 2010

jholzman@prickett.com
jcathey@prickett.com
lmherbert@prickett.com
khdavenport@prickett.com

OF COUNSEL:

Interim Liaison Counsel and Attorneys for Phil Paul, on behalf of himself and all others similarly situated

Daniel A. Small
George F. Farah
Kalpana Kotagal
COHEN, MILSTEIN, SELLERS
& TOLL, PLLC
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC  20005

Seth R. Gassman
COHEN, MILSTEIN, SELLERS
    & TOLL, PLLC
150 East 52nd Street
Thirtieth Floor
New York, NY 10022

Steve W. Berman
Anthony D. Shapiro
Erin K. Flory
Steve W. Fimmel
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101

Guido Saveri
R. Alexander Saveri
Lisa Saveri
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA  94111

Craig C. Corbitt
Judith A. Zahid
Demetrius X. Lambrinos
Eric W. Buetzow
ZELLE, HOFMANN, VOELBEL
    & MASON LLP
44 Montgomery St., Suite 3400
San Francisco, CA 94104

Interim Co-Lead Counsel for the Class
Plaintiffs

    -and-

Terry Gross
GROSS BELSKY ALONSO LLP
180 Montgomery Street
Suite 2200
San Francisco, CA  94104

Mark A. Griffin
Tana Lin
Raymond J. Farrow
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101-3052

Jay S. Cohen
SPECTOR ROSEMAN KODROFF &
WILLIS
1818 Market Street, Suite 2500
Philadelphia, PA  19103

Counsel for the Class Plaintiffs

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION ........................................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................. 4

1.      The Simmons Declaration and Class Plaintiffs' Limited Use of It ...................................... 4

2.      Intel's Expert, Dr. Arnold Barnett ...................................................................................... 6

3.      Declaration of James Thompson, Statistics Professor ........................................................ 8

ARGUMENT ................................................................................................................................... 9

I.      THE CITED PORTIONS OF THE SIMMONS DECLARATION ARE ADMISSIBLE AS "SUMMARY OR CALCULATION" EVIDENCE UNDER FRE 1006, "PEDAGOGICAL DEVICES" UNDER FRE 611, OR PERMISSIBLE LAY OPINION UNDER FRE 701 ...................................................................................................... 9

     A.      The Federal Rules of Evidence Allow the Use of This Type of Evidence ........... 10

     B.      The Cited Portions of the Simmons Declaration Are Admissible Under Federal Rule of Evidence 1006, 611, or 701 ........................................................ 14

         1.      The data in Simmons' Exhibit 1 estimating about 600,000 lost emails for the 272 Intel custodians ..................................................................... 15

         2.      Simmons' calculations as to the 106 Intel custodians ............................... 25

         3.      Simmons' comparison of the email retention rates of Intel's custodians to AMD's custodians ............................................................................... 28

     C.      The Cases Cited by Intel Are Inapplicable, and Do Not Show That The Simmons Declaration Is An Exercise of Expert Opinion ..................................... 34

CONCLUSION .............................................................................................................................. 37

## TABLE OF AUTHORITIES

**Cases**

*Ameropan Oil Corp. v. Monarch Air Serv.*,
   1994 WL 86701 (N.D. Ill. Mar. 16, 1994) ................................................................................ 13

*Asplundh Mfg. Div. v. Benton Harbor Eng'g*,
   57 F.3d 1190 (3d Cir. 1995) ................................................................................................... 16

*Badgett v. Rent-Way, Inc.*,
   350 F. Supp. 2d 642 (W.D. Pa. 2004) ................................................................................... 12

*Bryant v. Farmers Ins. Exch.*,
   432 F.3d 1114 (10th Cir. 2005) .............................................................................................. 26

*Donlin v. Philips Lighting N. Am. Corp.*,
   581 F.3d 73 (3d Cir. 2009) ............................................................................... 37, 38, 39, 40

*Eichorn v. AT&T Corp.*,
   484 F.3d 644 (3d Cir. 2007) ............................................................................ 37, 38, 39, 40

*F.D.I.C. v. Key Fin. Serv., Inc.*,
   1999 WL 34866812 (D. Mass. Dec. 23, 1999) .................................................................... 14

*Feesers, Inc. v. Michael Foods, Inc.*,
   2008 WL 4890030 (M.D. Pa. Nov. 12, 2008) ................................................................ 12, 20

*Forest Laboratories, Inc. v. Ivax Pharm., Inc.*,
   237 F.R.D. 106 (D. Del. 2006) ......................................................................................... 16, 31

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*,
   772 F.2d 505 (9th Cir. 1985) ................................................................................................. 13

*Fraser v. Major League Soccer, LLC*,
   284 F.3d 47 (1st Cir. 2002) .................................................................................................... 11

*In re Merritt Logan, Inc.*,
   901 F.2d 349 (3d Cir. 1990) .................................................................................................. 15

*In re Unisys Sav. Plan Litig.*,
   173 F.3d 145 (3d Cir. 1999) .................................................................................................. 11

*Interstate Circuit, Inc. v. United States,*
   306 U.S. 208 (1939) ................................................................................................ 22, 25, 31, 35

*Joy Mfg. Co. v. Sola Basic Indus.,*
   697 F.2d 104 (3d Cir. 1982) ................................................................................................ 15, 16

Kannankeril v. Terminix Int'l., Inc.,
   128 F.3d 802 (3d Cir. 1997) ................................................................................................ 11

*Lightning Lube, Inc. v. Witco Corp.,*
   4 F.3d 1153 (3d Cir. 1993) ................................................................................................ 15

*McKenna v. City of Philadelphia,*
   2009 WL 2230771 3 (E.D. Pa. 2009) ................................................................................................ 39

*Riley v. Taylor,*
   277 F.3d 261 (3d Cir. 2001) ................................................................................................ 22, 25, 31, 36

*Schlier v. Rice,*
   2008 WL 4922435 (M.D.Pa. Nov. 14, 2008) ................................................................................................ 21

*Sea Star Line, LLC v. Emerald Equip. Leasing, Inc.,*
   648 F. Supp. 2d 626 (D. Del. 2009) ................................................................................................ 11

*Teen-Ed, Inc. v. Kimball Int'l, Inc.,*
   620 F.2d 399 (3d Cir.1980) ................................................................................................ 15

*United States v. Babajian,*
   2009 WL 412333 (C.D. Cal. Feb. 17, 2009) ................................................................................................ 12

*United States v. Caballero,*
   277 F.3d 1235 (10th Cir. 2002) ................................................................................................ 26

*United States v. Hamaker,*
   455 F.3d 1316 (11th Cir. 2006) ................................................................................................ 26

*United States v. Hemphill,*
   514 F.3d 1350 (D.C. Cir. 2008) ................................................................................................ 21, 31

*United States v. Hevener,*
   382 F. Supp. 2d 719 (E.D. Pa. 2005) ................................................................................................ 21

*United States v. Janati,*
   374 F.3d 263 (4th Cir.2004) ................................................................................................ 14

*United States v. Jennings,*
   724 F.2d 436 (5th Cir. 1984) ................................................................................................ 12, 20

*United States v. Leo,*
   941 F.2d 181 (3d Cir. 1991)............................................................................... 12, 15

*United States v. Nivica,*
   887 F.2d 1110 (1st Cir. 1989) ............................................................................ 31

*United States v. Sarraga-Solana,*
   2005 WL 3701472 (D. Del. Oct. 6, 2005) ........................................................ 13

*United States v. Sawyer,*
   85 F.3d 713 (1st Cir. 1996)............................................................................... 13

*United States v. Scales,*
   594 F.2d 558 (6th Cir. 1979)............................................................................. 26

*United States v. Swanson,*
   161 F.3d 1064 (7th Cir. 1998)........................................................................... 13

**Rules**

Fed. R. Evid. 611 ................................................................................................. passim

Fed. R. Evid. 701 ................................................................................................. passim

Fed. R. Evid. 702 ........................................................................................... 15, 25, 38

Fed. R. Evid. 1006 ............................................................................................... passim

**Treatises**

6 Margaret A. Berger, et al.,
   *Federal Evidence,* § 1006.04 [2] (Joseph McLauglin, ed.2000)................................. 13

## INTRODUCTION

It does not take a rocket scientist to notice, just by looking at Intel's own data, that the number of emails Intel custodians produced during the period of self-archival (the "pre-automation" period) was dramatically lower than for the period when automatic preservation was put in place for those custodians (the "post-automation" period) – this simple fact is obvious, even to the untrained observer. But Intel tries to assert that it *does* require a rocket scientist (or, rather, a trained statistician) to make this simple observation; and that, even though this disparity is obvious to an untrained observer examining Intel's email production data, only a trained statistician has the ability to say so. This assertion must be rejected.

Shaun Simmons, a lawyer for Intel's adversary Advanced Micro Devices, Inc. ("AMD"), worked on the electronic discovery aspects of the parallel AMD case for many years, and was very familiar with the facts surrounding Intel's document production and assertions about preservation of electronic documents. His declaration, prepared for AMD's sanctions motion, summarizes voluminous documents and data and performs solely arithmetical calculations from that data. Simmons engaged only in simple arithmetical computations, using computer spreadsheet software. While the increase in Intel custodian production rates post-automation is obvious from a cursory review of Intel's email production documents, quantifying that increase requires scrutinizing data scattered across literally hundreds of pages of spreadsheets produced by Intel in this litigation. The Simmons Declaration, D.I. 1810,[1] therefore presents a useful summary of the data contained in those voluminous pages of spreadsheets. Such a summary of voluminous data is routinely admitted under Federal Rules of Evidence 1006 and 611.

Class Plaintiffs rely on only three basic points from the Simmons Declaration: (1) his comparison of Intel's email production rates for 272 Intel custodians for a period before Intel

instituted some form of automatic email preservation system to Intel's production rates after automatic preservation was instituted; (2) his comparison of the increases in production rates post-automation for these 272 Intel custodians to Intel's production rates for 106 Intel custodians who never were placed on automatic preservation (and thus for whom no pre and post-automation comparison could be done); and (3) his comparison of the average monthly increase in Intel's post-automation email production for the 272 Intel custodians to the average monthly increase in AMD's email production for 113 AMD custodians for whom similar pre-automation to post-automation data existed.

For the 272 Intel custodians, Simmons simply compares two time periods for the same custodians. He uses data culled from voluminous documents produced by Intel to collate and calculate the average monthly number of emails that Intel produced from the pre-automation period, and compares that to the average monthly number of emails Intel produced from the post-automation period. The resulting arithmetical summary shows that email retention shot up dramatically once the automated preservation methods were in place. For these 272 Intel document custodians, 600,000 fewer emails were produced during the pre-automation period than were produced during the same number of months under automated preservation. This is a straightforward arithmetical computation.

Intel distorts Simmons' summaries by asserting that Simmons 

or that Simmons                                                    Intel's Memorandum in Support of Its Motion to Strike the Declaration of Shaun M. Simmons, D.I. 1957 ("Intel Strike Mem.") at 3. Simmons' calculations were

---

[1] Citations to "D.I. ___" are to docket items in C.A. No. 05-485-JJF unless otherwise noted.

compared for each custodian the number of emails produced pre-automation with the number of emails produced post-automation for the same number of months.

The data Simmons used was supplied by Intel, and can also be independently evaluated by the Court to estimate the number of emails that Intel custodians failed to preserve. If the Court were to conclude that emails were generated at the same rate during both periods, then Intel failed to preserve more than 600,000 emails from the self-preservation period. Intel presents no evidence that emails were generated at different rates during both time periods. This omission is striking, as Intel, the custodians' employer, is the sole party that would have any such evidence. It is a perfectly reasonable conclusion that emails in fact were generated at similar rates during both periods, and one that this Court should make, especially given the fact that Intel makes no attempt to provide evidence that would show otherwise. As demonstrated below, the two other comparisons from the Simmons Declaration on which Class Plaintiffs rely involved similarly straightforward data summaries and arithmetical computations.

Intel's expert, Dr. Arnold Barnett, admits that Simmons' exhibits are spreadsheets that contain summaries of voluminous data produced by Intel and contain solely arithmetical calculations. While Dr. Barnett does assert that ███████ Simmons made in conducting his calculations required an expert in statistics, this is undercut by Class Plaintiffs' expert, Dr. James R. Thompson, whose declaration establishes that the types of comparisons and calculations performed by Simmons are of the type normally performed by lay persons in business.

As noted above, the Simmons Declaration is admissible as a summary of voluminous data produced by Intel of the type that courts routinely admit under Federal Rules of Evidence 1006 and 611. To the extent any cited portion could be viewed as opinion, it is admissible under Rule 701 as lay opinion because it is rationally based on Intel's own data, helpful to the Court,

and not based on any specialized knowledge.  Intel's arguments are not a basis to exclude Simmons' declaration.  They are meritless challenges to the weight to be given to the Simmons Declaration.

In fact, Intel and Dr. Barnett attack a number of statements contained in the Simmons Declaration that are never cited by plaintiffs in the Class Plaintiffs' Memorandum in Support of Their Motion for Sanctions For Intel's Failure to Preserve Evidence, D.I. 1898 ("Plaintiffs' Sanctions Mem."), and therefore these attacks are simply irrelevant.

<b>STATEMENT OF FACTS</b>

**1.      The Simmons Declaration and Class Plaintiffs' Limited Use of It**

Simmons' summaries are based on data that Intel produced.  Intel did not produce any documents that calculated the average number of emails that its document custodians saved each month while they were self-preserving emails, or the average number of emails its document custodians saved each month after automated document preservation mechanisms were put in place.  What Intel did produce were the following voluminous reports and documents that made it possible to derive that information: (1)



During the discovery phase of this litigation, Simmons, an attorney for AMD, worked closely with the documents produced by Intel and AMD concerning email retention and production. Thus, Simmons had first-hand knowledge of the documents produced by Intel and AMD concerning their productions of emails, and of the data contained in those documents relating to the production of emails by each Intel and AMD document custodian. Simmons Decl. ¶ 1.

Simmons summarized the data from these voluminous reports. First, from the reports produced by Intel, Simmons noted that there were 272 Intel document custodians who had received litigation hold notices that told them to self-preserve emails, and at a later time were placed on an automated preservation method. Second, Simmons noted that there were 106 Intel custodians who had never been placed on automated preservation prior to their termination from Intel or production cut-off. Simmons Decl. ¶ 18. Third, Simmons noted that there were 113 AMD document custodians with both pre- and post-automation data. Simmons Decl. ¶ 23.[2]

Class Plaintiffs cited the Simmons Declaration for the following three points:

(1) Simmons collated, from voluminous documents produced by Intel, the number of emails produced by each of the 272 Intel custodians during both the pre-automation period (he termed this the ███████████████ and the post-automation period, and he compared these amounts on a monthly basis. *See* Addendum A (which lists all the references in Plaintiffs' Sanctions Memorandum to the Simmons Declaration), point 1. Details of how Simmons collated and summarized this information are described in the Argument section, Point I.B.1.

(2) Simmons used the information obtained as to the 272 Intel custodians with both pre- and post-automation data and applied it to the 106 Intel custodians for whom there was never any

---

[2] These foundational facts are not disputed by Intel.

automated preservation period.   *See* Addendum A, point 2.   Details of how Simmons summarized and utilized this information for these 106 custodians are described in the Argument section, Point I.B.2.

(3) Simmons then performed the same summary calculations for 113 AMD custodians, and he then determined the average monthly percentage increase for Intel custodians and the average monthly percentage increase for AMD custodians. *See* Addendum A, point 3. Details of how Simmons summarized and compared the data for the Intel custodians and AMD custodians are described in the Argument section, Point I.B.3.[3]

**2.      Intel's Expert, Dr. Arnold Barnett**

Intel relies on the declaration of an alleged expert in statistics, Dr. Arnold Barnett, to challenge the Simmons Declaration.  Dr. Barnett admitted that he did not have a degree in statistics, and that he was not a professor of statistics.  Lambrinos Decl. Ex. 36 (Barnett Tr. at 9:2-7).

Dr. Barnett admitted that the figures contained in Exhibit 1 to the Simmons Declaration were summaries of the voluminous data produced by Intel concerning its production of emails during each month, and that the figures in each column showed only arithmetical calculations. *Id.* at 86:3-20, 76:12-79:8, 80:25-81:25, 82:7-20.  Dr. Barnett admitted that he had retained an economics firm to check the calculations in the exhibits to the Simmons Declaration, and that these numbers and calculations were essentially accurate and accurately reported data contained in Intel's reports.   *Id.* at 68:15-69:6, 70:13-71:1, 77:23-78:4 (Barnett was informed of

---

[3] There is one other category of citations to the Simmons Declaration in Plaintiffs' Sanctions Memorandum, for specific calculations concerning email production as to a few specific Intel employees. *See* Addendum A, point 4.  However, Intel does not challenge or mention any of these statements by Class Plaintiffs. The totality of the citations to the Simmons Declaration contained in Class Plaintiffs' Memorandum in Support of Motion for Sanctions are collected in Addendum A.

"approximately five arithmetic errors" and other than those five errors had no reason to doubt the accuracy of any particular calculation in the Simmons' exhibits, and did not conclude that any were significant enough to affect the bottom line on any arithmetical calculations); *id.* at 84:17-85:7, 133:11-21, 233:4-10.

Dr. Barnett barely addresses the first point for which Class Plaintiffs cite the Simmons Declaration, *i.e.,* that a comparison of the email productions for 272 Intel custodians for a pre-automated preservation period to a post-automated preservation period shows that during the pre-automation period Intel produced 611,295 fewer emails than during the same number of months in the post-automation period. His declaration has four section headings under his "Discussion of Simmons Analysis," and none of them refer directly this point.[4]   Dr. Barnett's only direct criticisms of Simmons' calculation for the 272 Intel custodians of 611,259 emails not retained during the self-preservation period are:   (a) Simmons did not analyze or explain all possible factors that might affect one period more than another (Barnett Decl. ¶ 18); (b) that some of the data Simmons used had inaccuracies (Barnett Decl. ¶  11); and (c) that Simmons "does not assign a margin-of-error to any of his estimates" (Barnett Decl. ¶ 37).   *See* Declaration of Prof. James R. Thompson ("Thompson Decl.") ¶ 7.   The issues Dr. Barnett comments on are focused on the comparison between the Intel and AMD increased rates of preservation post-automation.

Dr. Barnett never read Plaintiffs' Memorandum in Support of Motion for Sanctions (Lambrinos Decl., Ex. 36 (Barnett Tr. at 21:8-22:7)), and therefore did not know the limited purposes for which Class Plaintiffs submitted and relied on the Simmons Declaration.   Dr. Barnett therefore criticized a number of statements in the Simmons Declaration that Class

---

[4]   The headings are "The 87% Statistic," "The 20% Statistic," "The 106 Other Intel Custodians" and "Margin-of-Error." The headings concerning the 87% and the 20% statistics refer only to the comparison between the average monthly increases for all Intel custodians (127%) versus all AMD custodians (20%).

Plaintiffs did not rely on.  For example, Dr. Barnett focused a number of his arguments on a statement by Simmons that he believed the 20% increase at AMD in the average monthly email retention to be "benign" (Barnett Decl. ¶¶ 23-20).  However, Class Plaintiffs' Sanctions Memorandum does not cite or rely upon any such statements by Simmons.[5]  Dr. Barnett's specific criticisms of the Simmons Declaration will be discussed in the Argument section.

Dr. Barnett would not answer the question as to what he, as a trained statistician, would have done if he wanted to estimate the number of emails not saved during the self-preservation periods, stating that he had not been retained for that purpose.  He refused to provide any statements or analysis as to what he would have done differently than Simmons did.  Lambrinos Decl. Ex. 36 (Barnett Tr. at 136:16-24; 140:3-142:1).  More importantly, Dr. Barnett conceded that, since he had not performed any independent analysis, he was *"not saying there is no increase."*  *Id.* at 132:5-19.  In essence, Dr. Barnett leveled criticisms at Simmons' summary and calculations, but, since he did no independent analysis, he could not say whether any of his criticisms affected the ultimate calculations performed by Simmons.

**3.     Declaration of James Thompson, Statistics Professor**

Dr. James Thompson, Professor of Statistics at Rice University, reviewed Mr. Simmons' declaration, and also reviewed Dr. Barnett's declaration and deposition testimony.  Dr. Thompson concluded that "the type of comparison performed by Mr. Simmons (comparing two similar periods to obtain information as to the effect of an event) is one often utilized in business

---

[5]  Dr. Barnett states that Simmons "declared that [the 113 AMD custodians] provide ████████ ████ of custodians who made good-faith efforts to preserve their emails manually." Barnett Decl. ¶ 24.  No such statement by Simmons is contained in his declaration; rather, Dr. Barnett is citing only to a statement made by Simmons at his deposition.  This statement is irrelevant to Class Plaintiffs' Sanctions Motion for several reasons: (1) it is not contained in the Simmons Declaration, nor referred to by Class Plaintiffs; and (2) Class Plaintiffs cite to the AMD custodians in the Sanctions Memorandum not as a "gold standard," but rather as a reasonable comparison in email preservation, since the AMD custodians

and government throughout the United States without needing a statistician, and that Mr.
Simmons' analysis is of the type normally performed by lay persons." Thompson Decl. ¶¶ 3, 6.
Dr. Thompson also concluded that, from a statistician's perspective, Simmons' analysis is valid
and has a reasonable standard deviation. *Id.* ¶¶ 12-13, 30. Dr. Thompson's analysis of each
objection by Dr. Barnett is discussed in the Argument section.

## ARGUMENT

**I.     THE CITED PORTIONS OF THE SIMMONS DECLARATION ARE
       ADMISSIBLE AS "SUMMARY OR CALCULATION" EVIDENCE UNDER FRE
       1006, "PEDAGOGICAL DEVICES" UNDER FRE 611, OR PERMISSIBLE LAY
       OPINION UNDER FRE 701**

Intel objects to the Simmons Declaration solely on the ground that it is inadmissible lay
opinion under Federal Rule of Evidence 701, because "[t]he statistical model Simmons invented
specifically for this case entails complicated (and deeply flawed) statistics and inherently
involves a process 'which can be mastered only by specialists in the field.'" Intel Strike Mem. at
11. To the contrary, the Simmons Declaration is a simple comparison, of the type ordinarily
done by lay people, comparing data produced by Intel concerning its preservation of emails both
before and after Intel finally and belatedly instituted automated email preservation methods.
*See* Class Plaintiffs' Reply in Further Support of Their Motion for Sanctions for Intel's Failure to
Preserve Evidence ("Sanctions Reply") at 13 (Intel IT admitted that journaling was the "only
assured way for collecting absolutely everything"). Nothing in the portions of the Simmons
Declaration cited by Class Plaintiffs requires an expert statistician. It is simply basic and well-
explained summaries of voluminous data produced by Intel of the type that courts routinely
admit under Federal Rules of Evidence 1006 and 611. Moreover, to the extent any cited portion
could be viewed as opinion, it is admissible under Rule 701 as lay opinion because rationally

---

and the Intel custodians are very similarly situated and thus are comparable. *See* Thompson Decl. ¶ 19.

based on Intel's own data, helpful to the Court, and not based on any specialized knowledge. Finally, Intel's arguments are not a basis to exclude the Simmons' declaration, but rather simply are challenges to the weight to be given to the Simmons Declaration. Intel had a full and fair opportunity to cross-examine Simmons and present its own evidence in an attempt to counter his showing, and, as shown below, the Simmons Declaration is entitled to great weight.

Dr. Barnett conceded that he performed no independent analysis of the likely magnitude of Intel's preservation losses, and provides no alternative to the simple arithmetical calculations Simmons performed. Indeed, none is necessary. Dr. Barnett admitted that, since he had not performed any independent analysis, he could not conclude that Simmons' calculations were inaccurate. Lambrinos Decl., Ex. 36 (Barnett Tr. at 103:17-24 ("the point I was trying to make was I said it can lead to exaggerated results. *I didn't say it must lead to exaggerated results*") (emphasis added); 128:10-18 (Dr. Barnett could not rule out that the reason there were more upward fluctuations than downward fluctuations was because Intel custodians had not been preserving email as they should have been)).

### A.     The Federal Rules of Evidence Allow the Use of This Type of Evidence

Federal Rule of Evidence 1006 authorizes the use of summary evidence: "The contents of voluminous writings, recordings or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or *calculation*." Fed. R. Evid. 1006 (emphasis added). The Federal Rules of Evidence "embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact." Kannankeril v. Terminix Int'l., Inc., 128 F.3d 802, 806 (3d Cir. 1997). This is particularly the case when evidence is being presented to a judge rather than jury. *In re Unisys Sav. Plan Litig.*, 173 F.3d 145, 156 (3d Cir. 1999). "It is hard to imagine an issue on which a trial judge enjoys more

10

discretion than as to whether summary exhibits will be helpful." *Fraser v. Major League Soccer, LLC*, 284 F.3d 47, 67 (1st Cir. 2002).

This Court and numerous other courts have admitted evidence under Rule 1006 similar to the Simmons Declaration. For example, in *Sea Star Line, LLC v. Emerald Equip. Leasing, Inc.*, 648 F. Supp. 2d 626, 636 (D. Del. 2009) (Farnan, J.), the Court held that invoices, not kept in the ordinary course of business but created through compilation from many separate sources, and containing litigation calculations, were admissible under Rule 1006, concluding that "Federal Rules of Evidence 1006 permits the use of summaries of voluminous books, records or documents for the convenience of the Court." In *Feesers, Inc. v. Michael Foods, Inc.*, 2008 WL 4890030, at *3 (M.D. Pa. Nov. 12, 2008), the court denied a motion to exclude testimony by the defendant's chief financial officer concerning calculations he performed using data from a customer database, holding that his "testimony about his calculations qualifies as summary evidence under Fed. R. Evid. 1006." *Id.* In *United States v. Jennings*, 724 F.2d 436, 441 (5th Cir. 1984), the court approved the use of a summary under Rule 1006, in which the government's non-expert witness extrapolated defendant's reimbursement by assuming a value for average daily expenditure. *See also United States v. Leo*, 941 F.2d 181, 193 (3d Cir. 1991) ("[o]ur Court has specifically held that lay opinion testimony can be based upon a witness's review of business records"); *United States v. Babajian*, 2009 WL 412333, at *8 (C.D. Cal. Feb. 17, 2009) ("[a]s the government is presenting the persons responsible for supervising and compiling the summary reports as witnesses, no expert is required to present this evidence"); *Badgett v. Rent-Way, Inc.*, 350 F. Supp. 2d 642, 651 n.4 (W.D. Pa. 2004) ("[d]ocuments offered as summaries under Fed. R. Evid. 1006 are necessarily selective compilations of relevant

information created for litigation purposes; indeed, that is the very reason for their existence").[6]

Alternatively, relevant portions of the Simmons Declaration are admissible under Federal Rule of Evidence 611, which gives the trial court "control over the mode . . . [of] presenting evidence." Fed. R. Evid. 611 (a). Courts routinely allow the use of summary testimony under Rule 611 as "pedagogical-devices . . . to clarify and simplify complex testimony or other information and evidence or to assist counsel in the presentation of argument to the court or jury." *United States v. Bray*, 139 F.3d 1104, 1111 (6th Cir. 1998). "Often this type of summary takes the form of a witness or exhibit that condenses and organizes an extensive array of evidence into a form that is easier to understand and digest." *F.D.I.C. v. Key Fin. Serv., Inc.*, 1999 WL 34866812, at *9 (D. Mass. Dec. 23, 1999).

Pedagogical devices or demonstratives have long been recognized in the form of

---

[6] "Federal Rule of Evidence 1006 requires the proponent of a summary to establish that: (1) the documents are so voluminous that the trier of fact cannot conveniently examine them in court; (2) the documents have been made available to the opponent for examination or copying; (3) the original documents are admissible into evidence; (4) the summary is accurate and does not prejudice the other side; and (5) a proper foundation will be laid before admitting the summaries into evidence." *United States v. Sarraga-Solana*, 2005 WL 3701472, at *4 (D. Del. Oct. 6, 2005) (Farnan, J.). Here, the data on which the Simmons Declaration is based is Intel's own data, and is thus fully available to Intel. *See Ameropan Oil Corp. v. Monarch Air Serv.*, 1994 WL 86701, at *4 (N.D. Ill. Mar. 16, 1994) (admitting attorney's declaration providing summaries of the opposing party's invoices "since the underlying documents consist of [the opposing party's] business records which are therefore available to [it]"). The original documents, all produced by Intel, are voluminous, constituting thousands of pages of spreadsheets with thousands of rows and columns. These documents are admissible into evidence, and Intel does not challenge their admissibility. Intel's expert agrees that the calculations in Simmons' summaries are accurate. Moreover, Intel had a full and fair opportunity to cross-examine Simmons, deposing him for many hours solely on his declaration. *See, e.g., United States v. Swanson*, 161 F.3d 1064, 1073 (7th Cir. 1998) (upholding summary testimony under Rule 1006 because defendant "had ample opportunity during his cross-examination of Agent Sebo to elicit any facts that might have suggested that the government's charts incorrectly captured the nature of his Champion Bank loans"); *United States v. Sawyer*, 85 F.3d 713, 740 (1st Cir. 1996) (upholding admission of Rule 1006 summaries comparing expenditures for three representatives before and after they left office because defendant "had ample opportunity to explore them on cross-examination"); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 515 n. 9 (9th Cir. 1985) (as "plaintiffs had ample opportunity to cross-examine [the non-expert witness], under whose direction the summary was prepared," "[a]ny inaccuracies in the cost estimates could have been brought out on this cross-examination"). Thus, Intel has a full and fair opportunity to rebut the Simmons Declaration and cannot identify any prejudice to it from the Court's

summaries, charts and other aids used by parties "to organize or aid the jury's examination of testimony or documents which are themselves admitted into evidence." *See* 6 Margaret A. Berger, et al., *Federal Evidence,* § 1006.04 [2] (Joseph McLauglin, ed.2000). It is a common view that such pedagogical devices "are not evidence themselves, but are used merely to aid the [court or] jury in its understanding of the evidence that has already been admitted." *United States v. Janati,* 374 F.3d 263, 273 (4th Cir.2004) (citations omitted). Here, the underlying evidence is the voluminous reports produced by Intel, which clearly are admissible into evidence. Thus, the summary charts prepared as exhibits to the Simmons Declaration are admissible under Rule 611 as pedagogical devices.

Were the Court to determine that the Simmons Declaration was not admissible under Rules 1006 and 611, it would still be admissible under Federal Rule of Evidence 701. Rule 701 allows a non-expert witness to testify "to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. "The modern trend favors the admission of opinion testimony, provided that it is well founded on personal knowledge and susceptible to specific cross-examination." *In re Merritt Logan, Inc.,* 901 F.2d 349, 360 (3d Cir. 1990) (upholding the admission of non-expert opinion testimony concerning calculation of lost profits); *see also Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1175 (3d Cir. 1993) (same); *United States v. Leo,* 941 F.2d 181, 193 (3d Cir. 1991) (approving admission of lay opinion testimony because "helpful in allowing the jury to synthesize and understand the many documents contained in the thirty subcontract files that [the witness] had examined"); *Teen-Ed, Inc. v. Kimball Int'l, Inc.,* 620 F.2d 399, 402-04 (3d Cir.1980) (accountant's personal

---

consideration of relevant portions of his declaration.

knowledge of plaintiff's balance sheets was sufficient to qualify him as a lay witness eligible under Rule 701 to testify as to how lost profits could be calculated); *Joy Mfg. Co. v. Sola Basic Indus.*, 697 F.2d 104, 111-12 (3d Cir. 1982) (district court abused its discretion in striking non-expert opinion testimony rationally based on witness's personal knowledge).

As this Court has explained, "a lay witness' opinion on technical matters may be admissible if it 'derive[s] from a sufficiently qualified source as to be reliable and hence helpful to the [finder of fact].'" *Forest Laboratories, Inc. v. Ivax Pharm., Inc.*, 237 F.R.D. 106, 115 (D. Del. 2006) (Farnan, J.) (quoting *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1201 (3d Cir. 1995)). In *Forest Laboratories*, defendants objected to testimony by a non-expert witness concerning research he had performed as improper lay opinion. The Court overruled the objection, concluding:

> Dr. Bogeso, though not an expert in pharmacology, possesses sufficient knowledge and expertise to testify as to the results of research work that he himself performed. Dr. Bogeso was not asked to give general expert opinions on topics of pharmacology; rather, he was asked about research in which he participated and about his surprise at its results. Thus, the Court concludes that Dr. Bogeso's testimony is sufficiently grounded in the witness' first-hand knowledge and sufficiently reliable to be admissible under FRE 701.

237 F.R.D. at 115. As demonstrated below, the relevant portions of the Simmons Declaration meet this test.

### B.    The Cited Portions of the Simmons Declaration Are Admissible Under Federal Rule of Evidence 1006, 611, or 701

The Simmons Declaration fits squarely within the definition of summary evidence admissible under Rules 1006 and 611. Even were any of the Simmons Declaration cited by Class Plaintiffs to be considered opinion, it is at most lay opinion admissible under Rule 701.

14

As noted above, Intel challenges only the following three points for which Class Plaintiffs cited to the Simmons Declaration: (1) that a comparison of the pre- and post-automation period email production by Intel "suggests that this number [of emails lost because not properly placed on an automated litigation hold] may well be over 600,000" (Sanctions Mem. at 12-13); (2) that "extrapolating from the conduct of the 272 for whom data exists suggests that this group of 106 [who had never been placed on an automatic preservation system] would have produced well over 200,000 emails more than they did if they had been converted to automatic preservation system" (Sanctions Mem. at 13 n.32); and (3) that doing a similar pre- and post-automation comparison for AMD document custodians shows that there was a substantially smaller increase post-automation for AMD custodians (20%) than for Intel custodians (127%). *See* Addendum A, points 1-3.

1. **The data in Simmons' Exhibit 1 estimating about 600,000 lost emails for the 272 Intel custodians**

Simmons' Exhibit 1 has 272 lines of data, one line for each of 272 Intel custodians. The following demonstrates the steps that Simmons took to summarize Intel's data for one document custodian, ██████████████████████, in order to obtain the one line in Exhibit 1 for ██████ at page 5:

Simmons looked at Exhibit 37 to the Vespremi Declaration, an Intel spreadsheet listing the dates that all Intel custodians received hold notices (73 pages), and learned that ██████████ received his initial hold notice on July 1, 2005; and he looked at Exhibit 8 to the Simmons Declaration, an Intel list of the dates Intel custodians were placed on tape backup (32 page spreadsheet, with 8 columns and approximately 30 rows each page), and learned that ██████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

███████████████████████████████████████████████

████ Simmons reviewed Exhibit 38 to the Vespremi Declaration, a 988-page Intel spreadsheet with 9 columns and approximately 34 rows each page, showing the emails Intel produced for each Intel custodian with a line for each month, and learned that for July 2005, Intel produced 608 emails for ██████████ for August 590 emails, for September 614 emails, and for October 928 emails (this document has 99 rows of data for ██████████ The same exhibit shows that once automated preservation began, Intel produced 1053 emails for ██████████ for December 2005, and then for the following months produced 1151 (January 2006), 913 (February 2006), 1306 (March 2006), 1643 (April 2006), 1583 (May 2006), 971 (June 2006), 882 (July 2006), 1143 (August 2006), 1239 (September 2006), 1020 (October 2006), and 1135 (November 2006). Simmons then added up the number of monthly emails in both periods and had his Exhibit 1 spreadsheet calculate an average for each period; the resulting calculation showed that, during the four months when ██████████ was deleting emails without any process in place to capture destroyed documents, Intel preserved on average 685 emails a month; and during the period ███ ██████ was on automated weekly back-up, Intel preserved on average 1,170 emails a month. (Simmons placed these two figures in columns 2 and 3 of Simmons Exhibit 1 ███████████████ ███████████████████████████ Thus, during the automated period, ████████████ preserved on average each month 485 *more* emails (1,170 minus 685) than during the self-preservation period (this subtraction of columns 2 and 3 is contained in the seventh column, "Estimated Monthly Loss") for a total of 1,940 emails (485 emails times the four months of the self-preservation period) more than preserved during the self-preservation period. (The last column titled "Total Estimated Lost Email" multiplies the figure in the "Estimated Monthly Loss" column times the figure in the "Self-Preservation Months column). Thus, all this

16

voluminous data concerning Mr. ████████ email production is summarized in the one line for ████████ in Simmons Decl. Ex. 1, at p. 5, which contains simply sums of numbers obtained from Intel's File Report spreadsheet that is Vespremi Exhibit 38, or arithmetical calculations using those numbers, and shows that ████████ produced 1,940 more emails during four months of the post-automation period than he did during the four months he was self-preserving emails. Dr. Barnett agreed that the numbers in the Simmons Ex. 1 were derived from data contained in Intel documents, that Simmons through the spreadsheet performed only arithmetical calculations (addition, subtraction, multiplication or division), and that the calculations were essentially accurate. Lambrinos Decl. Ex. 36 (Barnett Tr. at 86:3-20, 76:12-79:8, 80:25-81:25, 82:7-20; 70:13-71:1, 84:17-85:7, 132:11-21, 233:4-10).

Simmons did the same for all 272 custodians. Lambrinos Decl. Ex. 36 (Barnett Tr. at 80:25-81:25). In essence, for each of the 272 Intel custodians, the columns in Simmons Exhibit 1 show a simple comparison of email production during two different periods of time. For each Intel custodian, each line in Exhibit 1 is a calculation, obtained by comparing the emails preserved pre-automation and post-automation. The number in the last column, titled "Total Estimated Lost Email," states the number of emails that the custodian preserved during the automated period in *excess* of the number he preserved on his own during self-preservation pro-rated for the number of months of self-preservation. This number is a simple calculation of the *excess* emails retained comparing the post-automated period to the pro-rated pre-automated period. This resulting figure is of use to the Court because, if the Court concludes that the email usage of the Intel custodians was relatively the same during the pre-automation period and the post-automation period, then this figure provides a calculation of the number of emails that Intel failed to preserve during the pre-automation period.

Simmons then had the spreadsheet calculate the sum of the "Estimated Monthly Loss" figure for each of the 272 custodians in the last column, which yielded the sum of 611,285.[7]

Dr. Barnett admitted that each of these entries in Simmons Exhibit 1 were simple arithmetical calculations, and were essentially accurate. Lambrinos Decl. Ex. 36 (Barnett Tr. at 68:15-69:6, 70:13-71:1). As described, and as conceded by Dr. Barnett, these calculations are just arithmetical calculations that summarize voluminous data produced by Intel, taking the numbers of emails produced by Intel relating to the self-preservation period, comparing them to the number of emails produced by Intel for the post-automation period, and calculating how many more emails were produced during post-automation for the same number of months that each custodian was self-preserving emails. It is a straightforward comparison between email preservation in two different time periods, of the type regularly admissible under Rules 1006 or 611. *See, e.g., Feesers*, 2008 WL 4890030, at *3 ("Westphal's mastery of basic spreadsheet software and his ability to perform simple calculations does not constitute specialized knowledge sufficient to transform his calculations into the work of an expert"); *Jennings*, 724 F.2d at 443 (when a summary submitted under Rule 1006 "does not contain complicated calculations requiring the need of an expert for accuracy, no special expertise is required in presenting [it]"); *United States v. Hemphill*, 514 F.3d 1350, 1359 (D.C. Cir. 2008) (approving summary testimony by non-expert government auditor under Rule 1006 because it is not problematic for a witness "to perform some calculations"); *Schlier v. Rice*, 2008 WL 4922435, at *10 (M.D.Pa. Nov. 14, 2008) (non-expert's calculations admissible under Rule 1006 because they "involved

---

[7] As Dr. Barnett concedes, the column "Percentage Jump" in Simmons Ex. 1 has nothing to do with Simmons' calculation of the column "Total Estimated Email Loss" nor with the total figure on page 11 of Simmons Ex. 1 of 611,285 captioned "Total Loss." Lambrinos Decl. Ex. 36 (Barnett Tr. at 79:11-80:14). The Percentage Jump column is discussed in the section concerning the comparison between Intel custodians and AMD custodians. *See* Point I.B.3, *infra*.

rudimentary multiplication, addition and subtraction" from figures provided on invoices, and the non-expert "testified in great detail about the methodology employed to arrive at the numbers offered"); *United States v. Hevener*, 382 F. Supp. 2d 719, 728-31 (E.D. Pa. 2005) (approving summary testimony by non-expert witness under Rule 1006 because the testimony was "based on Defendant's financial statements and records," and "did not presume or predict information," concluding that "many courts have found that 'the nature of a summary witness's testimony requires that he [or she] draw conclusions based upon the evidence presented'") (citation omitted).

Nevertheless, Intel argues that Simmons' calculations concerning the 272 custodians constitute inadmissible expert opinion, because Intel asserts that only an expert statistician can compare one time period to another, and such attempts by a lay person are inadequate. For example, Intel argues, through Dr. Barnett's declaration, that "a fundamental concept in Statistics is that a 'before/after' comparison is not meaningful unless the analyst has identified and corrected for any extraneous factors that affect one period more than the other" and then asserts that Simmons "took no consideration of any sick leaves, leaves of absence, or sabbaticals" or holidays or seasonal patterns. Barnett Decl. ¶ 19. This argument is pure sophistry. Dr. Barnett admitted that he had no information that any of these factors was any different in the pre-automation period than in the post-automation period for Intel employees. Clearly, if any of these factors (sick leave, leaves of absence, holidays) affected the pre-automatic period more heavily than during the post automation period for the relevant Intel employees, Intel, as the employer, is the sole entity with control over that information; that Intel did not provide its expert, or the Court, with any such information provides a strong inference that no such differences exist. *See, e.g., Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 226 (1939)

("[t]he production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse"); *Riley v. Taylor,* 277 F.3d 261, 283 (3d Cir. 2001) ("'where relevant information . . . is in the possession of one party and not provided, then an adverse inference may be drawn that such information would be harmful to the party who fails to provide it'") (citation omitted).[8]

Of course, Intel could have attacked the Simmons' summaries and calculations by providing evidence that some extrinsic factors *in fact* affected the pre-automation period differently than the post-automation period (such as greater sick leave or employee absence, or that email receipt by Intel's custodians was much greater overall during the post-automation period), and demonstrated that the two periods compared by Simmons cannot be easily compared. However, Intel makes no attempt to show any *actual* factors that in fact affected one period more than the other. Rather, Intel attempts to attack simply by *suggesting* that there *might* be differences between the two periods and that only a trained statistician can perform an analysis comparing two time periods that addresses this issue. Significantly, Dr. Barnett did not opine that Simmons' summary and calculations *were* inaccurate because Simmons had not "identified and corrected for any extraneous factors," but rather only that they *might* be; Dr. Barnett could not offer any opinion that Simmons' calculations were in fact affected by external factors because Dr. Barnett had not investigated if any extraneous factors affected one period more than the other. Lambrinos Decl. Ex. 36 (Barnett Tr. at 147:20-149:11). Moreover,

---

[8] Though Dr. Barnett points out that one Intel employee was on maternity leave during the "before" period (Barnett Decl. ¶ 19), he did not know if any Intel employees had been on maternity leave or sick leave during the "after" period, which would have balanced out this one maternity leave issue, or if there were any factors that would have affected the pre-automation period differently than the post-automation period. Lambrinos Decl. Ex. 36 (Barnett Tr. at 147:20-149:11). Since Intel clearly has such information about its employees, Intel's failure to provide any such showing demonstrates that there are no such factors that would have depressed email production during the pre-automation period.

contrary to Intel's assertion, Dr. Thompson states that it is quite normal in business for untrained individuals to perform simple comparisons of data between two time periods; that Dr. Barnett's blanket statement – that a before/after comparison is not meaningful unless the analyst has corrected for any extraneous factors – is simply not correct; and that even in statistical analyses performed by experts it is standard to not correct for all possible covariants, as the basic assumption is that such covariants will probably affect both time periods equally. Thompson Decl. ¶¶ 9-10.

Intel's only other criticism of Simmons' calculation of 611,285 estimated lost emails for the 272 Intel custodians is that Simmons "does not assign a margin-of-error to any of his estimates" and that Simmons "offers no insight into how much uncertainty attends his estimate." Barnett Decl. ¶ 37. However, as Dr. Thompson demonstrates, a simple lay comparison of two time periods does not require sophisticated margin of error analysis in order to provide meaningful information, and here the raw data showed such a great difference between the two periods that most statistical experts would not feel any need to consider or calculate the margin of error. Thompson Decl. ¶¶ 12-14. Dr. Thompson, even though he pointed out such a calculation was unnecessary, did calculate the margin of error solely to address Dr. Barnett's criticism, and his margin of error calculation supported the conclusions reached by Simmons' calculation. *Id.* ¶¶ 12-13. Further, Dr. Barnett stated that he had not calculated the margin of error in Simmons' analysis, asserting that he could not do so because Simmons did not provide a basis for such calculations. Lambrinos Decl. Ex. 36 (Barnett Tr. at 191:11- 21). Dr. Thompson points out that there are fairly simple statistical methods Dr. Barnett could have applied to calculate the margin-of-error associated with Simmons' calculations, and that basic Excel spreadsheet software has a simple operation that lay people can use to calculate the margin of

error in any calculation (Thompson Decl. ¶ 12), thus suggesting that the reason Dr. Barnett failed to provide any calculations for margin of error was because any such calculation would have supported Simmons' calculation that many emails were lost. Dr. Thompson calculated the margin of error using the Excel spreadsheet function, and concluded that the standard estimate for the margin of error for Simmons' calculation of the total number of lost emails of 611,285 is reasonable, and that this margin of error analysis provides support that Simmons' calculation is valid. *Id.*

It is true that Simmons' calculations comparing the two time periods are based on an assumption that the amounts of email received were, on average for all relevant Intel custodians, the same during the pre-automation period and post-automation period. This is simply the basis for the comparison of the two time periods. Intel has presented no evidence to challenge this assumption. Intel, of course, could have argued that this assumption was inaccurate (and thus the comparison not valid) by demonstrating that there were explicit factors that affected one period more than another; in fact, Intel, as the custodians' employer, would be in possession of any evidence that might demonstrate this. The fact that Intel made no such showing is strong evidence that the number of emails received on average over all the Intel custodians during the two time periods was the same. *Interstate Circuit,* 306 U.S. at 226; *Riley,* 277 F.3d at 283. As with Dr. Barnett's contention that Simmons erred in not accounting for all possible covariates concerning employee work attendance, Dr. Thompson's statement that the basic assumption is that any covariates will affect both time periods equally applies here as well. Thompson Decl. ¶¶ 9-10.

Even were the Court to determine that this portion of the Simmons Declaration involved an exercise of opinion due to certain selections or assumptions by Simmons, any such opinion

would be lay opinion admissible pursuant to Rule 701, rather than *expert* opinion. As set forth above, Rule 701 permits lay witnesses to render opinions, so long as they are "(a) rationally based on the perception of the witness; (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue; and (c) not based on scientific, technical or other specialized knowledge within the scope of Rule 702." Simmons' methods of choosing certain data are all fully explained, and none of his choices are based on any assertion of expert knowledge. Simmons' testimony has value to the Court merely because he explains that he witnessed and reviewed the document production spreadsheets produced by Intel, and that these spreadsheets show there was a tremendous amount more email captured after automation than before, pursuant to a summary of Intel's own data. *See, e.g., United States v. Hamaker*, 455 F.3d 1316, 1331-32 (11th Cir. 2006) (holding that government was not required to qualify witness as an expert because he "simply added and subtracted numbers from a long catalogue of MCC records, and then compared those numbers in a straightforward fashion"); *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005) ("[a] mathematical calculation well within the ability of anyone with a grade-school education is, in our opinion, more aptly characterized as a lay opinion under Fed. R. Evid. 701 "); *United States v. Caballero*, 277 F.3d 1235, 1247 (10th Cir. 2002) (holding that an FBI financial analyst properly testified as a lay witness even where his testimony "summarized business records and client lists and presented them in condensed form"); *United States v. Scales*, 594 F.2d 558, 563 (6th Cir. 1979) ("[t]he chart did not contain complicated calculations that would require an expert for accuracy"). Intel's claim that "Simmons is far afield from the recognized subjects of lay opinion testimony" (Intel Strike Mem. at 11) is rebutted by the numerous cases that permit exactly this type of lay opinion testimony.[9]

---

[9] Intel may argue that Simmons assumed that the number of emails generated and received on average by the 272 Intel document custodians during the two time periods was the same, and that such an

In any event, Dr. Thompson did perform some standard statistical analyses of the underlying data that Simmons used, to confirm whether Simmons' lay analysis was supportable, though specifically noting that he did not feel such analyses were necessary since Simmons' comparison of two periods was of the type regularly utilized by lay persons in business. Dr. Thompson concluded that a comparison of the pre- and post-automation period for Intel custodians demonstrates that a significant number of emails were not preserved by Intel during the self-preservation period, and that Simmons' lay analysis was reasonable and well within a normal margin of error. Thompson Decl. ¶¶ 12-14.    Dr. Thompson concludes Simmons' "methodology . . . is a natural method of comparing email retention during two different periods, and of the type of comparison and calculation that a lay person would apply . . . [and] is one that I, a trained statistician, might have applied myself." *Id.* ¶¶ 11, 30.

Dr. Barnett also objected to some of the *labels* that Simmons had used on the columns in Simmons Exhibit 1, which referred to "Estimated Monthly Loss" and "Total Estimated Lost Email," asserting that the use of the word "loss" was inaccurate.   Lambrinos Decl. Ex. 36 (Barnett Tr. at 180:13-181:13).   However, the comparison of the pre- and post-automation periods performed by Simmons demonstrated that the figure for each Intel custodian in the "Estimated Monthly Loss" column was the average monthly *increase* in retained emails once

---

assumption requires expert opinion.  However, Simmons' declaration does not make that assumption. Rather, Simmons essentially is comparing the production of emails for these Intel custodians during two different time periods, and calculates the amount by which the email production *increased* post-automation.  It is the Court that can analyze this data, and make a determination whether or not there has been any showing that email generation during the two periods was relatively the same, or higher or lower.  Were the Court to conclude that email generation was about the same, then Simmons' calculation shows the number of emails that Intel failed to preserve.  Even were the Court to determine that Simmons did make such an assumption, this would not transform Simmons' opinion into expert opinion, since the assumption is rationally based on Simmons' understanding of parameters of the two different time periods, and the selection is helpful to the determination of a fact in issue, *i.e.,* a comparison of the number of emails produced by Intel in the pre-automation period compared to the post-automation period.

automated preservation methods were put in place. Whether this column is headed "Average Monthly Increase After Automation" or "Estimated Monthly Loss Before Automation," the result is the same: Simmons' comparison shows that for the 272 custodians, there was a dramatic increase in saved emails once automated email preservation began.

### 2.    Simmons' calculations as to the 106 Intel custodians

Simmons noted that there were 106 Intel custodians who had never been placed on automated preservation. Thus, it was impossible to do the type of comparison of two time periods, as he had done for the 272 custodians. Simmons Decl. ¶ 18. Instead, Simmons did a different type of comparison, by taking the results for the group of 272 Intel custodians and applying those results to the group of 106 Intel custodians.

For the 272 Intel custodians for whom there was data both pre- and post-automation, Simmons calculated the average monthly change in email retention for *all* the 272 custodians, by a simple arithmetical calculation: he took the figure for Total Lost Emails, 611,285 (the sum of all 272 entries in the eighth column in Exhibit 1), and divided this by the total number of months all 272 custodians were on self-preservation, 1,802 (the sum of all 272 entries in the third column), resulting in a quotient of 339. Simmons Decl. ¶ 19. Dr. Barnett conceded that the numbers in Simmons Exhibit 1, which included this calculation, were essentially arithmetical calculations and generally accurate. Lambrinos Decl. Ex. 36 (Barnett Tr. at 80:25-85:11). This quotient of 339 reflected the average monthly increase in emails per custodian once automated preservation methods were put in place.

Simmons then, for the 106 Intel custodians who had never been placed on automated preservation, summarized Intel's data by calculating the total number of months these 106

Moreover, Simmons makes no claim that his time period selection is based on any specialized knowledge,

custodians were self-preserving email. He did this utilizing the same method that he had used for the 272 custodians to calculate the number of self-preservation months, and listed the resulting figures for each of the 106 custodians in the second column in Simmons Exhibit 2, and then had the spreadsheet sum all 106 entries in the second column, yielding a total of 760 months that all 106 custodians had been self-preserving emails. Simmons then multiplied the average monthly increase in emails for the 272 Intel custodians (339) by the 760 months of self-preservation for the 106 custodians, which yielded 257,640. This number is simply the difference in total emails, if the 106 Intel custodians had the same increase in email retention as the 272 custodians did if Intel had utilized automated preservation methods. Simmons Decl. ¶¶ 20-22.

As Dr. Barnett conceded, this figure is derived from a summary of the self-preservation months for the 106 custodians, and as with all the figures in Simmons Exhibit 1, involves purely arithmetical calculations that are accurate. Lambrinos Decl. Ex. 36 (Barnett Tr. at 80:25-85:11). Accordingly, this testimony is admissible under Rule 1006 as a summary of voluminous data.

Intel, nevertheless, asserts that Simmons' calculations as to the email retention of the 106 Intel custodians constitute expert testimony, because Simmons "assumes that it [the calculated average increase in emails among the 272 Intel custodians] applies *exactly* to the other 106 custodians during their self-preservation months . . . [without] giv[ing any] explanation why the 106 custodians who purportedly lack data are similar to the other 272." Intel Strike Mem. at 5 (emphasis in original). This mischaracterizes Simmons' declaration. Simmons nowhere says that the average increase in emails among the 272 applies exactly to the 106 custodians. Rather, all that Simmons does is provide summaries of Intel's own data, and then posits a method for

but only on his "common-sense." Lambrinos Decl. Ex. 37 (Simmons Tr. at 47:18-49:11).

comparing the two groups. The data shows that the average monthly email loss rate for the 272 custodians was 339, and *if* for the 106 custodians there similarly was "an average loss rate of 339 emails per self-preservation month [for the 106 custodians], the total estimated loss is 257,640 emails." Simmons Decl. ¶ 9. Simmons nowhere states that this figure *is* the specific number of emails that these 106 custodians failed to preserve, nor that the 106 custodians did have the same average monthly loss rate as the 272 custodians. Rather, all that Simmons does is provide a summary of data from Intel documents, and compares these two groups. Such testimony clearly is admissible under Rule 1006, as Simmons makes no statement purportedly based on special expertise that the 106 Intel custodians would have the same average monthly email losses as the 272 custodians. Nothing about these summary calculations rises above the level of testimony admissible under Rule 1006 to the level of opinion testimony, much less expert opinion testimony.

But even if extrapolating data from one group to another similar group is considered by the Court to be an exercise of opinion, rather than a summary admissible under Rule 1006, then such opinion is an exercise of lay opinion. Simmons does not claim any expertise in making the comparison between the group of 272 custodians and the group of 106 custodians. Significantly, neither Intel nor its expert points to any specific difference between the two groups that would require an expert's analysis, or that the two groups are *not* similar, Barnett Decl. ¶ 19; Lambrinos Decl. Ex. 36 (Barnett Tr. at 147:20-149:11, 188:25-189:5, 190:18-23 (Dr. Barnett did no investigation as to similarities to dissimilarities between the two groups)). Again, Intel is the employer of all of these custodians, and Intel clearly has sufficient data concerning them that it could present to the Court if in fact there was some difference between the two groups that would make a comparison between them inappropriate.

Dr. Thompson states that little weight should be given to Dr. Barnett's attempt to throw stones, as even without expert analysis it is statistically reasonable to extrapolate from the group of 272 Intel custodians to the group of 106 Intel custodians, due to the significant similarities between the two groups: all are employees of the same company working in the same area, all had similar document preservation obligations in the same period, and all were subject to the same general employment conditions. Moreover Intel – clearly the sole entity that would possess any evidence that would show these two groups are dissimilar if such evidence existed – does not provide any evidence of dissimilarity. Thompson Decl. ¶¶ 15-17. *See, e.g., Interstate Circuit*, 306 U.S. at 226; *Riley*, 277 F.3d at 283.

Intel's argument goes, at most, to the weight the Court should accord to this summary by Simmons. *See, e.g., United States v. Hemphill*, 514 F.3d 1350, 1359 (D.C. Cir. 2008) ("[e]ven if the calculations are mistaken, the chart is itself admissible, since admissible evidence may be unpersuasive and a defendant has the opportunity to rebut it"); *United States v. Nivica*, 887 F.2d 1110, 1125 (1st Cir. 1989) (argument that summaries failed to reflect "total financial activity" "affect[s] the weight rather than the admissibility"); *cf. Forest Laboratories, Inc. v. Ivax Pharm., Inc.*, 237 F.R.D. 106, 112 (D. Del. 2006) (Farnan, J.) (because plaintiffs had the opportunity to cross-examine the expert, plaintiffs' objection goes to the weight to be afforded his testimony and not its admissibility). Dr. Thompson concludes that "Simmons' extrapolation from the group of 272 Intel custodians to the group of 106 Intel custodians . . . is a sound and reasonable comparison, that can be performed by a lay person such as Simmons," and that "Simmons' conclusions are accurate." Thompson Decl. ¶¶ 17, 30.

### 3. Simmons' comparison of the email retention rates of Intel's custodians to AMD's custodians

Simmons also did a simple comparison of email retention rates of Intel custodians to AMD custodians. For the 272 Intel custodians in Simmons Exhibit 1, in addition to summarizing the average monthly numbers of emails produced for the custodians during the pre- and post-automation periods (columns three and four of Exhibit 1), Simmons also utilized those numbers to calculate the average percentage increase in email production for each custodian, through basic arithmetic. For example, ███████████ production rate, as stated above, increased from 685 emails during the pre-automation period to 1,170 during the post-automation period, and so he therefore produced on average 71% more emails a month when his email was subject to automated preservation than when Intel relied on his manual process for preserving documents (the calculation is (1,170 minus 685) divided by 685). Simmons had the Exhibit 1 spreadsheet perform the same calculation for each of Intel's 272 document custodians (utilizing solely the figures in the Self-Preservation Average and the Automated Average columns), and placed the resultant percentage increase in the sixth column, "Percentage Jump." Dr. Barnett agreed that the figures in this column were simply arithmetical calculations, that the AMD calculations were performed the same way as for Intel custodians, and that these figures are accurately calculated. Lambrinos Decl. Ex. 36 (Barnett Tr. at 96:21-98:13, 80:25-85:11; 204:20-207:19).

Simmons performed the same procedure for the 113 AMD custodians, and placed the resultant percentages in the Percentage Jump column of Exhibit 3. Again, Dr. Barnett agreed that the figures in this column were simply arithmetical calculations derived from the data in AMD's reports, and that these figures are accurately calculated. Lambrinos Decl. Ex. 36 (Barnett Tr. at 206:24-207:19, 80:25-85:11, 201:2-9).

Then Simmons did a simple comparison of these percentages for Intel and AMD. For both Intel and AMD, Simmons took the mean of the figures in the Average Percentage Jump

columns, simply by adding up the figures in "Percentage Jump" column in Exhibits 1 and 3, and dividing each by the number of custodians. The resultant figures were 127% as the mean of the percentage increase for the 272 Intel custodians, and 20% as the mean of the percentage increase for AMD custodians. Simmons Decl. ¶ 16, 31.[10] Again, Dr. Barnett concedes that these figures are simply arithmetical calculations based on a summary of Intel's and AMD's data. Lambrinos Decl. Ex. 36 (Barnett Tr. at 207:12-19, 80:25-85:11). Thus, Simmons' testimony as to these means is admissible pursuant to Rule 1006. And this is a striking result, apparent to the naked eye: the average rate of increase in email retention after automation shown for Intel document custodians is more than six times the rate for AMD custodians.

Dr. Thompson concurs this "is an appropriate comparison of the type regularly performed by lay people" (Thompson Decl. ¶ 20) and that "[i]t is quite reasonable to compare these two groups, due to the similarities between them – both are high-technology companies in the same business of manufacturing semiconductors, who compete with each other; and both were subject to the same litigation preservation requirements imposed by law." *Id.* ¶ 19.

Despite the fact that this dramatic difference is so obvious to the naked eye (or, more likely, because it is so obvious), Intel attacks these calculations and comparisons as requiring expert testimony. Intel challenges Simmons' calculation of the means for Intel and AMD, by asserting a number of issues. First, Dr. Barnett asserts that "[t]o provide a typical outcome in a population of results, statisticians routinely calculate and report the median of the outcomes in

---

[10] Simmons noted that in obtaining the mean percentage increase, he treated custodians with a Percentage Jump of less than zero as if the Percentage Jump was zero, explaining that "a negative percentage change occurring after automation is not indicative of any greater evidence preservation during the Self-Preservation Months than a zero jump would be." Simmons Decl. ¶¶ 16, 31. He also noted that if he had included all the negative percentages, the Intel mean percentage jump would be 123%, and the AMD mean percentage jump would be 10%. *Id.* Thus, the exclusion of the negative percentages favored Intel in the comparison between Intel and AMD.

addition to the mean." Barnett Decl. ¶ 20. However, as Dr. Barnett's language indicates, even if the median is often reported, that is *in addition* to the mean, and the mean (the average) still remains an important indicator and is a valid method of interpreting a large data set. In any event, Dr. Barnett at his deposition conceded that the median average percentage increase for Intel document custodians after automation is 56% (Lambrinos Decl. Ex. 36 (Barnett Tr. at 156:20-157:16)) – itself a substantial figure, especially since the median for the AMD custodians is 3%. Simmons Exhibit 3. Strikingly, Dr. Barnett admitted that he did know if Simmons' method of utilizing the mean (the average) was inaccurate. (Lambrinos Decl. Ex. 36 (Barnett Tr. at 103:17-24 ("the point I was trying to make was I said it can lead to exaggerated results. *I didn't say it must lead to exaggerated results*) (emphasis added); 128:10-18 (Dr. Barnett could not rule out that the reason there were more upward fluctuations than downward fluctuations was because Intel custodians had not been preserving email as they should have been). Dr. Thompson confirms that the most important indicator is the mean, that the 56% median demonstrates a dramatic increase in email retention post-automation, and that the difference between the mean and median "does not negate the fact that, on average (or even just by looking at the median), there was a significant average increase in the monthly emails retained by Intel custodians once an automated protocol was put in place." Thompson Decl. ¶¶ 24-25.

Second, Dr. Barnett challenges Simmons' calculation of an average monthly percentage increase for each custodian pre- and post-automation, stating this "approach is vulnerable to upward distortions" and "can lead to exaggerated results based on a few extreme measurements of little practical importance," providing one example which does show a high average percentage increase when the actual number of emails has a lower percentage increase. Barnett Decl. ¶ 15. However, Dr. Barnett concedes that other situations could lead to similar, but

*downward,* distortions. Lambrinos Decl. Ex. 36 (Barnett Tr. at 102:11-104:2). Dr. Thompson concurs that downward distortions will occur, as well as upward distortions. Thompson Decl. ¶ 21.

Dr. Barnett also claims that the difference between the mean of the average monthly increases in email retentions (127%, or 87% if Simmons' ▮▮▮▮▮▮▮▮ is used), and the percentage of the calculated lost emails to the total emails preserved during the self-preservation period (48.4%), suggests that the mean is not an accurate indicator. Barnett Decl. ¶ 21. This comparison is, by itself, misleading. As Dr. Thompson states, Barnett here is comparing apples to oranges; the two types of percentages are measuring completely different comparisons, and thus one would not expect correlation between the two percentages. Thompson Decl. ¶ 26.

Intel claims that Simmons erred in his comparison of the Intel average percentage increase to the AMD average percentage increase, because he allegedly considered "weekly backup tapes for Intel custodians . . . as post-automation, while [he considered] certain backups for AMD custodians [as] pre-automation." Barnett Decl. ¶ 32; Intel Strike Mem. at 4-5 (conceding this issue applies to only 35 AMD custodians). Similarly, Intel asserts that some of the data relied on by Simmons was erroneous, referring to one exhibit utilized by Anthony Cardine. Intel Strike Mem. at 5-6; Barnett Decl. ¶ 11. These claims should be rejected. Intel has made no showing that these issues, if in fact it is correct, had any material affect on the percentage calculated by Simmons for AMD custodians, and Intel clearly had all the relevant data and a full opportunity to perform any necessary calculations. *Interstate Circuit,* 306 U.S. at 226; *Riley,* 277 F.3d at 283. In fact, Dr. Barnett stated that he had no knowledge whether there was any material difference due to the allegedly erroneous data used by Mr. Cardine or the way Simmons considered back-up tapes for AMD custodians. Lambrinos Decl. Ex. 36 (Barnett Tr. at

94:18-95:4, 203:6-25); Thompson Decl. ¶ 8.[11]  Intel also argues that Simmons' use of 113 AMD

custodians, rather than all 178 AMD custodians, in his calculation of AMD's mean percentage

increase in average monthly produced emails is inappropriate, because of the underlying

assumption that these 113 are representative of all AMD custodians. Intel Strike Mem. at 6.

Again, Intel fails to provide any calculations showing that these 113 are not representative,

despite having sufficient data, and, as Dr. Thompson states, it is statistically reasonable to make

this type of comparison from 113 out of 178 custodians. Thompson Decl. ¶ 28.

---

[11]  Dr. Barnett and Intel devote substantial space to discussing the ▮▮▮▮▮▮▮▮ figure that
Simmons mentioned in his declaration. Barnett Decl. ¶¶ 16-17; Intel's Strike Mem. at 14. However,
Class Plaintiffs' Sanction Memorandum never mentions nor cites to the ▮▮▮▮▮▮▮▮ so this
discussion is irrelevant to Class Plaintiffs' use of the Simmons Declaration. Even were the Court to
consider this issue, as Dr. Thompson states, Simmons' decision to ▮▮▮▮▮▮▮▮ and remove a few of
the higher percentage increases is an appropriate action, and it also results in a calculation that is more
favorable to Intel. Thompson Decl. ¶ 22.  Dr. Thompson concludes that it is appropriate to utilize the full
mean figure of 127%, rather than any ▮▮▮▮▮▮▮▮ in this comparison with AMD. *Id.*
     Intel and Dr. Barnett similarly devote a large part of their argument to the assertion that Simmons
accepted AMD's mean percentage increase in email retention in the automated period as "benign" and
that Simmons at his deposition agreed that AMD was the ▮▮▮▮▮▮▮▮ of good-faith retention, then
arguing that any of Intel custodians who had percentage increase in retention that was the same as any of
the AMD custodians must be treated as benign. Barnett Decl. ¶¶ 18, 23-24, 26-31; Intel Strike Mem. at 6-
7. This argument is irrelevant to Class Plaintiffs' Motion for Sanctions, since Class Plaintiffs' Sanctions
Memorandum does not cite to the Simmons Declaration for any assertions that AMD's increases were
"benign", nor for any assertion that AMD was the ▮▮▮▮▮▮▮▮ (such a statement in fact is not
contained anywhere in the Simmons Declaration). *See* Addendum A. While Simmons may called
AMD's increases benign because he represented AMD in their action against Intel, Class Plaintiffs in this
action do not advocate any such position. Rather, Class Plaintiffs simply submit and contrast the plain
summarized figures for the mean of the Intel custodians' percentage monthly increase in retention (127%)
and AMD's mean (20%), and do not bless AMD's procedures, nor assert that AMD increases are benign.
Yet it is glaringly obvious that the increase in the mean for Intel custodians' automated retention increase
is much greater than for AMD custodians, which is quite dramatic given that these two companies are in a
very similar situation – both in the same high-technology industry and same market, both in the same
litigation, both subject to the same legal requirements for litigation holds. As Dr. Thompson states, given
the obvious similarities between the two companies and their requirement to preserve emails, it would be
reasonable to expect that the mean monthly email retention rates of the two companies should be
comparable, yet Intel's is dramatically higher. Further, Intel's and Barnett's arguments based
on assertions of "benign" increases and that AMD is the ▮▮▮▮▮▮▮▮ as well as being irrelevant to this
motion, are also fallacious. As Dr. Thompson demonstrates, Intel's arguments attempting to challenge
the dramatic difference between its custodians' mean percentage increase and AMD's custodians, are
pure sophistry. *See* Thompson Decl. ¶¶ 22-29.
     Intel also challenges Simmons' application of a "discount" to Intel's alleged email loss, based on
a comparison with AMD preservation. Intel Strike Mem. at 4. Class Plaintiffs, however, do not cite any

None of the ▮▮▮▮▮▮▮ or ▮▮▮▮▮▮▮▮ cited by Intel transform Simmons'

Declaration into expert opinion. Rather, all Simmons' calculations, including any "assumptions"

or ▮▮▮▮▮▮▮▮ are at most simply lay opinion. As Dr. Thompson states, Simmons' method

of comparing the average monthly email retention rates for Intel and AMD is of the type

typically used in business by lay personnel, and does not require an expert statistician.

Thompson Decl. ¶¶ 3, 18, 30.

### C.   The Cases Cited by Intel Are Inapplicable, and Do Not Show That The Simmons Declaration Is An Exercise of Expert Opinion

Intel principally relies on two Third Circuit cases, *Eichorn v. AT&T Corp.*, 484 F.3d 644

(3d Cir. 2007) and *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73 (3d Cir. 2009), arguing

that, "[a]s with the testimony in *Donlin* and *Eichorn*, the Declaration should be stricken because

it 'crossed the line into subject areas that demand expert testimony.'" Intel Strike Mem. at 2; *see*

*also id.* at 10-13. These two cases, however, have no application here. Both involved the

prediction and valuation of *future* events by lay witnesses, not a comparison of two different time

periods in the past, and are completely distinguishable on their facts.

In *Eichorn*, an ERISA case, the sole support the plaintiffs advanced for their damages

calculations was spreadsheets prepared by the plaintiffs' counsel's son, "who was not offered as

an expert and has no training or experience with the economics of employment benefits." 484

F.3d at 648. The calculations "purported to quantify what each plaintiff would have earned in

pension benefits, had he or she remained employed at an AT&T company after the sale of

Paradyne." *Id.* In preparing the spreadsheets, the non-expert "made various assumptions about

such *future* events as when the plaintiffs would have retired, how their salaries would have

increased had Paradyne remained part of Lucent, what choices the plaintiffs would have made

---

portion of Simmons' Declaration that refers to such a discount; thus, this challenge is irrelevant.

with respect to their pension benefits, and what each plaintiff's life expectancy was." *Id.* (emphasis added). The court held that, in excluding this evidence, "the District Court was within the broad discretion afforded it under Federal Rules of Evidence 701 and 702 to act as a gatekeeper charged with preventing unreliable opinion testimony." *Id.* at 649.

*Donlin*, a case involving front pay claims by a temporary employee who alleged that she was not hired full time because of sex discrimination, is similarly off point. The court held that, because of her brief tenure, the plaintiff lacked the kind of personal knowledge of the business for her to provide competent lay testimony about her estimated *future* lost earnings and pension benefits, stating: "we have consistently required that lay testimony requiring *future projections of a business or operation* come from someone who has intimate and thorough knowledge of the business gathered from either a lengthy tenure or a position of authority." 581 F.3d at 81 (emphasis added). The court contrasted the plaintiff, who in her temporary position "did not develop in-depth knowledge of the company's salary structure, advancement opportunities, pay raises, or employment patterns," with cases in which the court had allowed lay testimony as to projected future earnings because the plaintiff had worked for the company for nearly 40 years, or as to future lost profits based on the witnesses' extensive knowledge of the businesses at issue. *Id.* at 81-82. Moreover, the projections that the plaintiff was attempting to make involved "complicated tasks such as calculating life-expectancy, assessing amortization rates, estimating pay raises, discounting to present value, [and] calculating earnings potential in a pension portfolio." *Id.* at 82. The court found that these calculations "required *forward-looking* speculation for which [plaintiff] lacked the necessary training." *Id.* at 83.

Unlike the testimony in *Eichorn* and *Donlin*, the portions of the Simmons Declaration on which Class Plaintiffs rely here do not involve any such types of judgments that require an

expert.  None of the calculations by Simmons involved predictions of future events – rather, Simmons simply compared email retentions during two different periods, and calculated the *actual* average amount by which email retentions increased in the automated period, using only arithmetical operations.  Indeed, a court recently distinguished *Donlin* on this ground, stating: "*Donlin* involved the prediction and valuation of future events" while the back-pay testimony here "requires only arithmetic, not economic forecasting, and does not require expert testimony." *McKenna v. City of Philadelphia*, 2009 WL 2230771, at 3 (E.D. Pa. 2009).  This distinction is dramatically demonstrated by the bracketed changes that Intel makes to the passages it quotes from *Eichorn* and *Donlin*.  In *Eichorn*, plaintiffs had argued that the challenged spreadsheets were admissible under Rule 1006 because based in part on a life expectancy chart and various statistical tables.  *Eichorn*, 484 F.3d at 648.  In rejecting this argument, the court found that "[t]he calculations went beyond the data they summarized and included several assumptions, inferences, and projections about *future* events, which represent Mr. Crowley's opinion, rather than the underlying information."  *Id.* at 650.  In quoting this passage, Intel changes "future" to "[*past*]".  Intel Strike Mem. at 12.  Similarly, in quoting *Donlin*'s finding that the plaintiff's testimony concerning future lost earnings was inadmissible because it "required *forward-looking* speculation," Intel changes "forward-looking" to "[*backward*]-looking".  Intel Strike Mem. at 12.[12]

---

[12]   Intel, in its discussion of *Donlin* and *Eichorn,* cites to only the following "judgments" made by Simmons, none of which involved judgments as to possible future events, but simply methods of selecting data concerning past events: that Simmons excluded "negative jumps," that in calculating the ███████████ he excluded the "four [highest] of the Intel custodians" but no others, and that he "treat[ed] monthly back-up tapes and journaling the same."  Intel Strike Mem. at 13.  It is significant that virtually none of these judgments are utilized in the portions of the Simmons Declaration cited by Class Plaintiffs, or that Simmons' choices ensured that the resulting calculations benefitted Intel.  As described in notes 4 and 10, *supra,* Class Plaintiffs did not cite the Simmons Declaration for Simmons use of a ███████████ of 87%, but rather cited it simply for his basic mean calculation of 127%.  Further, as

discussed in note 9, *supra*, Simmons treatment of negative jumps as zero benefitted Intel.   Similarly, Simmons treatment of monthly back-up tapes and journaling as the same for the Intel custodians likewise favored Intel, as back-up tapes preserved much less email than journaling.

## CONCLUSION

For the reasons stated, Class Plaintiffs respectfully request that Intel's motion to strike the Simmons Declaration be denied.[13]

PRICKETT JONES & ELLIOTT, P.A.

By: ___/s/ J. Clayton Athey_____
    James L. Holzman (#663)
    J. Clayton Athey (#4378)
Dated: May 3, 2010    Laina M. Herbert (#4717)
    Kevin H. Davenport (#5327)
    1310 King Street
    P.O. Box 1328
    Wilmington, DE 19899
OF COUNSEL:    (302) 888-6500
    jlholzman@prickett.com
Daniel A. Small    jcathey@prickett.com
George F. Farah    lmherbert@prickett.com
Kalpana Kotagal    khdavenport@prickett.com
COHEN, MILSTEIN, SELLERS    *Interim Liaison Counsel and Attorneys for*
    & TOLL, PLLC    *Phil Paul, on behalf of himself and all*
1100 New York Avenue, NW    *others similarly situated*
Suite 500, West Tower
Washington, DC 20005

Seth R. Gassman
COHEN, MILSTEIN, SELLERS
    & TOLL, PLLC
150 East 52nd Street
Thirtieth Floor
New York, NY 10022

Steve W. Berman
Anthony D. Shapiro
Erin K. Flory
Steve W. Fimmel
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101

---

[13] Even if the Court were to grant Intel's motion and strike the Simmons Declaration, this means only that the number of emails lost due to Intel's failure to properly preserve emails is unknowable, and does not undercut the fact that Class Plaintiffs have been severely prejudiced due to Intel's spoliation.

Guido Saveri
R. Alexander Saveri
Lisa Saveri
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111

Craig C. Corbitt
Judith A. Zahid
Demetrius X. Lambrinos
Eric W. Buetzow
ZELLE, HOFMANN, VOELBEL
   & MASON LLP
44 Montgomery St., Suite 3400
San Francisco, CA 94104

*Interim Co-Lead Counsel for the Class
Plaintiffs*

   -and-

Terry Gross
GROSS BELSKY ALONSO LLP
180 Montgomery Street
Suite 2200
San Francisco, CA 94104

Mark A. Griffin
Tana Lin
Raymond J. Farrow
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052

Jay S. Cohen
SPECTOR ROSEMAN KODROFF &
WILLIS
1818 Market Street, Suite 2500
Philadelphia, PA 19103

*Counsel for the Class Plaintiffs*

## ADDENDUM A

### CITATIONS TO THE SIMMONS DECLARATION IN
### CLASS PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SANCTIONS

Below are all the citations to the Simmons Declaration contained in Class Plaintiffs' Memorandum in Support of Motion for Sanctions. These citations fall into the following four categories:

**1.    Estimate of over 600,000 potentially responsive documents lost**

Page 2 n.4:
According to the Declaration of Shaun M. Simmons ("Simmons Decl.") (D.I. 1810), at 11 36-37, a conservative estimate is that over 600,000 potentially responsive documents were lost.

Page 6:
In AMD's Sanctions Brief, the Special Master was presented with a full record of Intel's preservation efforts, including the 'file count' analysis performed by Mr. Simmons that points to the loss of hundreds of thousands of emails under a flawed, manual custodian-dependent preservation system. [Simmons Decl., Ex. 6].

Pages 12-13
[A] simple and sensible comparison of how many e-mails certain custodians produced before and after they were properly placed on an automated litigation hold (whether by backup or duplicate journaling) can provide circumstantial evidence of these losses. Such an analysis suggests that this number may be well over 600,000. [Simmons Decl. ¶¶ 36-37].

Page 15 n. 61:
Evaluating the disparity between self-preservation counts and automatic preservation counts demonstrates that Intel's custodians saved almost 650,000 fewer e-mails than would have been expected with a proper preservation effort. Simmons Decl. 32-37

**2.    Intel's 106 document custodians could have lost 200,000 emails**

Page 13 n.52:
The comparison can only be undertaken for the 272 Intel custodians who were migrated to some type of automatic preservation regime. 106 others were never placed on an automatic preservation regime. Simmons Decl. ¶¶ 18-22. Extrapolating from the conduct of the 272 for whom data exists suggests that this group of 106 would have produced well over 200,000 e-mails more than they did if they had been converted to automatic preservation system. *Id.* This results in a total loss of well over 800,000.

**3.    Comparison to AMD custodians**

Page 13 n.57:
In contrast, only seven of the thirty-seven AMD custodians who Intel has claimed did not

preserve evidence had file counts that grew by 50% when they were moved to some form of automatic preservation system. Simmons Decl., Ex. 3.

Page 14:
Conducting the same before-and-after comparison for 113 AMD custodians who were put on automated preservation prior to their production cut-off, the mean jump in produced e-mail counts after automation is just 20%. [Simmons Decl., ¶ 33]. In comparison, for the 272 Intel custodians, the mean post-automation jump is 127% – and that after a massive remediation effort directed to the pre-automation period. [Simmons Decl., Ex. 1, ¶¶ 16-17].

Page 14 n. 59:
Because AMD's data counts are being compared to Intel's counts after remediation, all sources of AMD data are included to ensure for an "apples-to-apples" comparison. Thus, AMD' s mean jump includes all files produced to Intel: (1) organic files preserved by the custodians; (2) files identified by Intel or AMD in other custodian's files and (3) files AMD culled from backup tapes to address "anomalies" for a handful of AMD productions. Simmons Decl., Ex. 3, ¶¶ 23-31.

## 4.    Specific examples of figures for Intel custodians (not disputed by Intel)

Page 10:
Of Intel's 1,023 custodians, nearly 500 custodians' mailboxes were not migrated to the dedicated servers or backed up for eighteen months or more after AMD and the class plaintiffs' filed their complaints. An additional seventy-nine custodians' mailboxes were never migrated to the dedicated servers because these employees left Intel's employ before Intel got around to migrating them. [Simmons Decl., Ex. 8 (Updated Exhibit F) [summarizing Intel document]].
Page 11:
"Complete" backup tapes exist for barely one-third of the individuals on Intel's custodian List (357 of the 1023). [Simmons Decl., Ex. 8]. [also cites to Intel's Proposed Remediation Plan at 23-29]

Page 13:

████████████████████████████████████████████████████████████he produced less than 685 e-mails a month. After he was prevented from destroying documents, his production jumped to 1170 per month. [Simmons Decl., Ex. 1, at 5]

Using the post-hold production as an estimate of ████████████ a critical witness, should have produced from this key time period, thousands of e-mails from ████████ files have been lost forever.

Half of Intel's custodians produced three times as many e-mails once they were placed on an automatic preservation system as they did when they were left to their own preservation devices. [Simmons Decl., Ex. 1]

Pages 13-14:
Such "before and after" comparisons for the 272 Intel custodians who were converted to

some form of automatic preservation system are striking. [Simmons Decl., Ex. 1]. An astounding 148 (54%) of the custodians experienced a jump of 50% or more in their produced e-mail count. *Id.* For 86 of these custodians (31%), the number of relevant e-mails preserved when Intel moved to some form of automated preservation doubled. [Simmons Decl., Ex. 1]

Page 12:

The Simmons Declaration lays out a straightforward methodology to evaluate the effects of this policy, relying in large part on Intel's own data. The evidence detailed in the Simmons Declaration does not require expert opinion. The underlying data consists primarily of a "file count report" produced by Intel ("Intel's File Count Report"). [Simmons Decl. ¶ 1]. Based on this data, Mr. Simmons compared the volume of custodian e-mail that was produced based on a self-archival methodology, to the volumes produced when Intel belatedly deployed an automatic preservation system in March 2007 using weekly backup tapes or duplication by journaling.