## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE<br>INTEL CORPORATION<br>MICROPROCESSOR ANTITRUST LITIGATION | MDL Docket No. 05-1717 (JJF) |
| PHIL PAUL, on behalf of himself<br>and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION,<br><br>Defendant. | C.A. No. 05-485-JJF<br><br>CONSOLIDATED ACTION<br><br>DM 13, DM 13A, DM 44 |

### SPECIAL MASTER'S REPORT AND RECOMMENDATIONS GRANTING INTEL'S MOTION TO EXCLUDE TESTIMONY OF DR. KEITH LEFFLER AND DENYING CLASS PLAINTIFFS' MOTION TO CERTIFY CLASS

The matter is presently before the Special Master on the Motion to Certify Class (the "Motion for Class Certification") (D.I. 753) of Phil Paul, on behalf of himself and all others similarly situated ("Class Plaintiffs"), and on the Motion to Exclude Testimony of Dr. Keith Leffler ("Dr. Leffler") (the "Motion to Exclude") (D.I. 1062) of Defendant Intel Corporation ("Defendant" or "Intel"). Dr. Leffler is Class Plaintiffs' proffered expert on class certification issues.

Having read and considered the papers submitted by the parties, the expert witness testimony presented at the hearing on the Motion to Exclude and the Motion for Class Certification at the hearing held on April 15, 16, and 19, 2010 (the "Class Certification Hearing"), and the arguments of counsel, the Special Master recommends that Intel's Motion to Exclude be GRANTED because Dr. Leffler's analysis fails to meet the standard set forth in Fed. R. Evid. 702.

The Special Master further recommends that the Motion for Class Certification be DENIED for the following reasons:

1.  Class Plaintiffs cannot demonstrate that questions of law and fact common to class members predominate over individual inquiries because original equipment manufacturers ("OEMs") had discretion with respect to how to use Intel's monetary concessions and x86 microprocessors were subject to different distribution chains – factors Dr. Leffler ignores;

2.  Class Plaintiffs' proposed benchmark analysis (the "2006 Overcharge Regression") fails to prove common impact.

3.  There are no class representatives for so-called "enterprise purchasers," whose claims are atypical of other class members, and who the class representatives will not be able to adequately represent.

4.  With respect to Class Plaintiffs' request for injunctive relief, they have not demonstrated that impact is capable of common proof, and moreover Class Plaintiffs primarily seek monetary damages.

5.  Maintaining subclasses based on the law of 26 different states would be unmanageable.

## BACKGROUND

Intel was founded in 1968 in Santa Clara, California as Integrated Electronics Corporation and manufactures computer microprocessors. See Stipulated Facts Relating To Class Plaintiffs' Motion for Class Certification ("Stip. Facts") (D.I. 2295) at ¶ 1. A general-purpose computer microprocessor is an integrated circuit capable of executing programming instructions and performing computations at rapid speeds. It is the "brain" of every personal computer. See Stip. Facts (D.I. 2295) at ¶ 2.

2

Class Plaintiffs seek to certify a nationwide damages class which includes "all persons and entities residing in the United States who . . . purchased an x86 microprocessor in the United States, other than for resale, indirectly from the Defendant, as part of a desktop or mobile personal computer" from June 28, 2001 to March 31, 2006. See Class Plaintiffs' Proposed Conclusions of Law As To A Nationwide Class ("CPPCLNWC") (D.I. 2300) at ¶ 1. Class Plaintiffs also seek to certify an injunctive class which includes all persons and entities who purchased an Intel microprocessor in the United States from June 28, 2001 through the present. Id. Purchasers of servers that incorporate x86 microprocessors and purchasers of stand-alone microprocessors – microprocessors not incorporated into a computer – are excluded from both proposed classes. See Stip. Facts (D.I. 2295) at ¶ 7.

All members of the proposed class are "indirect purchasers" – they did not purchase microprocessors directly from Intel. Rather, they purchased a desktop or mobile computer (laptop) that incorporated an x86 microprocessor that passed through a multilevel distribution chain that ended with the indirect purchaser. The majority of x86 microprocessors are sold to the Tier 1 OEMs.[1] See First Amended Consolidated Complaint ("FACC") (D.I. 108) at ¶ 134. The balance of the x86 microprocessor production is sold to smaller OEMs, regional computer assemblers, value-added resellers ("VARs") and other smaller distributors. Id. at ¶ 136. OEMs have adopted a variety of business models, including sales of PCs directly to customers through web-based e-commerce, sales through company-employed sales staffs (who target IT professionals and Fortune 1000 companies) and sales through a network of independent

---

[1] The largest OEMs, or 'Tier Ones' as they are sometimes referred to in the industry, account for roughly 80% of worldwide server and workstation (special high-powered desktops) sales, some 40% of desktop sales and nearly 80% of notebook sales. See Plaintiffs' Joint Preliminary Case Statement ("PJCS") (D.I. 872) at 18. They include Hewlett-Packard ("HP"), which acquired Compaq Computer ("Compaq") in 2002, Dell, IBM, which sold its PC (but not server) business to Lenovo in May 2005, Fujitsu, and Fujitsu-Siemens. Id. Acer, which completed its purchase of Gateway/emachines in October 2007, NEC, Toshiba, and Sony are commonly considered Tier 1 OEMs, the last two principally in the notebook segment of the PC market. Id. Dell and HP are the dominant players, accounting for over 30% of the worldwide desktop and mobile sales, and almost 60% of worldwide server sales. Id.

distributors (who focus on smaller business customers). See Intel's Proposed Findings of Fact and Conclusions of Law ("IPFFCL") (D.I. 2296) at ¶ 19; FACC (D.I. 108) at ¶ 137. OEMs may sell PCs directly to end-users and/or retailers or VARs that resell them to end users. See IPFFCL (D.I. 2296) at ¶ 21; Stip. Facts. (D.I. 2295) at ¶ 16. Thus, the distribution chain that stands between an Intel microprocessor and the personal computers purchased by proposed class members can include a number of different entities and levels depending on the computer and manufacturer. See IPFFCL (D.I. 2296) at ¶ 21.

Moreover, pricing varies at each point in the distribution chain – an OEM may choose to sell to a retailer at a discount off of its list price; a retailer may place a computer on sale, or on clearance; a consumer may use a manufacturer's mail-in rebate to lower the price he pays for a mobile computer. See Deposition Transcript of Dr. Keith Leffler dated October 28, 2008 ("Leffler Dep. Tr. 1") (D.I. 2270, Exh. 1) at 159:21-160:3 (stating that many factors go into the decision of an OEM in determining the price to charge for a computer; similarly, many factors determine the prices distributors charge for computers); see Deposition Transcript of Elliot Becker ("Becker Dep. Tr.") (Circuit City) (D.I. 2273, Exh. 206) at 57:11-18 (retailers like Circuit City sometimes sell personal computers at a loss to bring in foot traffic for TV or other sales); Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 394:15-395:16 (mail-in rebates from retailers to indirect purchasers were a "popular way to price discriminate", was a "hot" idea and was "relatively common" during the class period).

The named class representatives include either individual consumers or small businesses with sixty or fewer employees ("SMB"), but do not include businesses and companies with more than 500 employees ("enterprise customers"). See IPFFCL (D.I. 2298) at ¶ 12; Class Plaintiffs'

4

Response to Intel Corporation's Proposed Findings of Fact and Conclusions of Law

("CPRIPFF") (D.I. 2325) at ¶ 12; IPFFCL (D.I. 2298) at ¶¶ 8-9.

Class Plaintiffs assert that Intel violated Section 2 of the Sherman Act, 15 U.S.C. § 2, and

similar provisions of state antitrust and unfair competition laws by abusing its alleged monopoly

power over the domestic market for x86 architecture computer microprocessors through a variety

of conduct, including, *inter alia*:

- Forcing major customers into exclusive or near-exclusive purchasing relationships, through bribes, conditioned rebates, and other payments.

- Conditioning rebates and allowances to severely limit OEMs from purchasing x86 microprocessors from Intel's competitors.

- Threatening retaliation against OEMs that introduced computers that utilize microprocessors manufactured by competitors.

- Forcing its technical standards on the industry to handicap competitors.

See Class Plaintiffs' Opening Brief in Support of Motion for Class Certification ("Class Cert.

Opening Br.") (D.I. 917) at 3.

Class Plaintiffs maintain that the "purposes and effect" of these actions was to exclude

Intel's most significant competitor, Advanced Micro Devices, Inc. ("AMD"), from the market.

Class Plaintiffs further contend that, as a result of AMD's exclusion, Intel was able to charge its

customers higher prices than would have existed in the "but for" world – the competitive

situation that would have existed absent, or "but for", Intel's wrongful conduct. The direct result

of this market foreclosure was that the prices consumers paid for computers containing Intel's

x86 microprocessors were higher than they otherwise would have been. See Plaintiffs' Reply in

Further Support of Class Plaintiffs' Motion for Class Certification ("Class Certification Reply

Brief") (D.I. 2017) at 1.

5

A.     **Intel's x86 Microprocessors**

Intel's microprocessors are characterized by different brand names  (e.g. Pentium 4 ,

Pentium D, Celeron, Core 2 Duo, etc.) and different performance characteristics.  See Stip. Facts

(D.I. 2295) at ¶11.  Throughout the class period, Intel sold more than 1,200 different

microprocessors for use in desktop personal computers, and more than 600 different

microprocessors for use in mobile computers. See IPFFCL (D.I. 2296) at ¶ 14.

B.     **AMD's x 86 Microprocessors**

**AMD**

AMD was founded in 1969 in Sunnyvale, California and has for the last two decades

been Intel's most significant competitor in the x86 microprocessor product market.  In 1981, as

part of IBM's development of its line of personal computers, it decided to use the line of

processors derived from Intel's 8086 chip.  See PJCS (D.I. 872) at 8.  Consequently, IBM

entered into a contract with Intel where Intel agreed to publish its technical standards openly,

facilitate second-source manufacturing of Intel-designed chips, and licensed AMD (and others)

to begin selling other versions of Intel's microprocessors to IBM.  Id. at 9.

Intel's x86 microprocessor architecture became the industry standard and other OEMs

began designing x86 microprocessors.  Id.  According to Class Plaintiffs, Intel refused to

acknowledge the applicability of AMD's license to Intel's newly released 386 chip or any future

generations of x86 microprocessors.  Id.  Years of protracted litigation between the parties

ensued, resulting in a settlement where: AMD agreed to cease offering pin-for-pin replicates of

Intel microprocessors in return for ridding itself of a second source for its designs; Intel granted

AMD a permanent, non-exclusive and royalty-free license to the x86 instruction set, but not

Intel's x86 architecture; and AMD agreed to remain a long-term supplier of x86

6

microprocessors, develop its own proprietary x86 architecture and become a full-fledged innovation rival to Intel. Id.

AMD understood that to successfully compete with Intel over the long-term, it would have to compete with Intel in all three major segments of the x86 computing market – desktop computers, laptops, and servers. Id. Because it had no experience with the server market, AMD would have to develop a product essentially from scratch. Id. at 10.

## AMD's Products

In April 1997, AMD designed and introduced its own x86 architecture in a desktop microprocessor – the K6 – that was assertedly smaller, faster and easier to use than Intel's competitive desktop offering (Pentium II). See PJCS (D.I. 872) at 10. In June 1999, AMD introduced a next-generation (K-7) microprocessor (Athlon) suitable for both desktop and mobile. Id. According to Class Plaintiffs, the Athlon beat its Intel counterpart (the Pentium III) in just about every benchmark, and maintained its lead through successive generations. This opened up the door to a handful of computer-makers who constitute the Tier 1 OEMs, such as Hewlett Packard ("HP"), IBM, Sony and Toshiba, and helped establish AMD as a significant innovator. Id. at 10-11. In September 2003, AMD introduced the Athlon64 family of microprocessors for the desktop and notebook markets. Id. at 11. Class Plaintiffs assert that, with these products, AMD became the first company to provide a simple transition for computer users from the standard 32-bit chip architecture to the dramatically faster 64-bit computing. Id. On the other hand, Class Plaintiffs assert that Intel pushed for an abandonment of the existing x86-instruction set, which would render existing software obsolete. Id. Many suppliers therefore turned to AMD's 64-bit computers and AMD developed a technological lead in the market until 2006. Id.

7

**AMD's Pricing Strategy**

AMD historically engaged in aggressive "penetration pricing," pricing microprocessors substantially lower than Intel in order to gain market share. See Declaration of David C. Beach ("Beach Decl.") (D.I. 2271, Exh. 28) at 4. AMD generally priced its x86 microprocessors $70 to $100 lower than comparable Intel microprocessors. See CPRIFFCL (D.I. 2325) at ¶ 139. In 2003, when AMD released its Athlon 64 products, AMD switched to a "neutral pricing" strategy, where AMD allowed Intel to set the market prices for microprocessors and then priced its comparable products at the same level. See IPFFCL (D.I. 2296) at ¶ 140-141. If AMD believed its product to be technologically superior, it would price its microprocessor above Intel's comparable product. Id. at ¶ 142.

**AMD's Market Share**

AMD's market share for the x86 worldwide market increased from 7.5% in 1997 to 20.2% in 2001, then dropped to 14.9% in 2002. See AMD Complaint (D.I. 1) at ¶ 25. Between 2002 and 2006, AMD's worldwide shares of the x86 microprocessor segment increased from 14.9% to 22.9%, according to Mercury Research Data. See Intel's Preliminary Pretrial Statement (D.I. 870) at 2, n.2.

**C.      Intel's Relationships With OEMs**

Intel sells its x86 microprocessors to OEMs and distributors. See Stip. Facts (D.I. 2295) ¶ 12. The prices OEMs and other direct purchasers paid Intel and AMD for microprocessors during the class period were the product of negotiations and depended on the market segment, time, the OEM's bargaining power, purchase volume, individual needs, and other factors. See IPFFCL (D.I. 2296) at ¶ 22. The direct purchasers "always negotiate[d]" with Intel, pitting

8

AMD and Intel against each other on the basis of price, performance and end-user demand, among other things. Id. at ¶ 23.

Intel provided monetary concessions in the form of rebates, discounts and allowances to OEMs who purchased Intel microprocessors over the class period, which varied at different times and were the product of individual negotiations between Intel and each OEM. Id. at ¶ 24-25. Intel describes these monetary concessions as follows:

1.      ECAPs: "ECAP" represented an "Exception From Corporate Authorized Price."

Id. at ¶ 26. These were discounts or rebates off the price of a specific microprocessor. Id. Stuart Pann, Intel's Vice President of the Business Management Group, testified that ECAP was a flexible notion that did not necessarily involve only price concessions:

A:      It is a lower price that we would authorize for a customer based on a meet-comp offer. . . . It's purpose is to win volumes that a customer based on an offer made from a customer.

Q:      Is there any additional form that ECAP takes other than the specific SKU and the total sort of dollar value paid for a quarter?

A:      We would look at ECAP's from time to time as giving exceptions for like marketing programs, things that we wanted to co-invest with customers. In certain efforts it could be sales training. It wouldn't be tied to a specific SKU. It would be more tied to a credit that says we will give you a discount and co-invest in our training your sales force or doing joint promotional activities.

. . .

Q:      But, I mean accounting-wise, these payments or these considerations take various forms, some reduced the customer's cost of goods sold?

A:      Correct. Yes.

See Reply Decl. of David P. Kaplan dated Jan. 11, 2010 ("Kaplan Dec. II") (D.I. 2273, Exh. 247) (Deposition Transcript of Stuart Pann) ("Pann Dep. Tr.") at 8:1-3, 66:1-16, 94:6-95:14.

2.       LCAPs: "LCAPs" are a type of lump-sum rebate based on total purchase volume, to enable an OEM to meet competitive offers from AMD-based systems across its Intel-based product line. See IPFFCL (D.I. 2296) at ¶ 27. LCAPs have been characterized by several Intel employees as "lump sum ECAPs," used to avoid having to process a multitude of ECAPs. See (Deposition Transcript of Jeffrey Hoogenboom) ("Hoogenboom Dep. Tr.") (D.I. 2273, Exh. 226) at 22:2-9; Pann Dep. Tr. (D.I. 2273, Exh. 247) at 132:11-134:23.

3.       Intel also offered certain OEMs so-called "meet competition" allowances ("MCP"), unrestricted lump sum funds that allowed OEMs to discount a computer containing an Intel microprocessor to compete against a rival OEM's computer containing an AMD microprocessor. Id. at ¶ 28.

4.       Marketing Development Funds: Intel sometimes offered OEMs marketing development funds ("MDF"), lump-sum funds that were designed for joint engineering or marketing activities. Id. at ¶ 29.

## PROCEDURAL HISTORY

### A.    General Background

This consolidated indirect purchaser action was initiated by way of putative class actions filed in different federal courts in the wake of AMD's section 2 action against Intel (the "AMD Action") in 2005.  On July 12, 2005, Class Plaintiffs filed a class action complaint bringing claims against Intel for violation of state antitrust statutes and state consumer protection statutes. See Complaint at ¶¶ 72-114 (not available on 05-1717 docket).  On November 3, 2005, the Judicial Panel on Multidistrict Litigation (the "Panel") ordered the centralization and coordination for pretrial proceedings of ten actions in the Northern District of California and four actions in the District of Delaware under 28 U.S.C. 1407 (the "MDL Transfer Order"), finding

that all actions contained common allegations and consolidation "will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation". See MDL Transfer Order (D.I. 1).

On December 6, 2005, the Panel ordered the transfer and consolidation of seventeen additional actions from the Northern District of California, one action from the Southern District of California, one action from the Southern District of Florida, one action from the District of Kansas, one action from the Eastern District of Tennessee and one action from the Western District of Tennessee. See Letter from U.S. Judicial Panel on Multidistrict Litigation Dated December 22, 2005 Enclosing Transfer Order (D.I. 16). On December 6, 2007, the MDL transferred one action from the District of Maine and one action from the District of New Mexico (D.I. 689) to the District of Delaware, and on January 24, 2010 the MDL transferred one action from the District of Nebraska to this Court. (D.I. 730). On March 3, 2008, the Panel transferred one action from the District of Idaho to this Court (D.I. 845).

On April 18, 2006, consistent with the Panel's MDL Transfer Order and pursuant to Fed. R. Civ. P. 42, the Court ordered all purchaser antitrust actions pending in this Court against Intel and all related actions later filed in or transferred to this Court consolidated for pretrial purposes. (D.I. 51) at 4-5. The Court also granted Cohen Milstein Hausfeld & Toll, the Furth Firm, Hagens Berman Sobol, and Saveri & Saveri's Motion For Appointment As Interim Class Counsel pursuant to Fed. R. Civ. P. 23(g)(2)(A). Id. at 6

On April 28, 2006, Class Plaintiffs filed their Consolidated Complaint. (D.I. 59). Class Plaintiffs brought claims against Intel for a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; a violation of the California Cartwright Act, Cal. Bus. & Prof. Code § 16720; California's tort law against monopolization; California's Unfair Competition Law, Cal. Bus. & Prof. Code

11

§§ 17200 *et seq.*; various state antitrust and restraint of trade laws; violations of state consumer protection and unfair competition laws and violation of California's unjust enrichment and disgorgement of profits laws. Id. at ¶¶236-320. On May 28, 2006, Class Plaintiffs filed their First Amended Consolidated Complaint. (D.I. 108).

The Special Master was appointed by Order of the Court dated May 11, 2006. (D.I. 73).

Class Plaintiffs originally moved under Fed. R. Civ. P. 23(b)(3) for certification of a nationwide class for monetary relief under California law. As a first alternative, Class Plaintiffs sought certification of a single, 26-state class for monetary relief under the antitrust and consumer protection laws of those states. As their second alternative, Class Plaintiffs sought certification of 26 separate statewide classes, with each such class asserting claims for monetary relief under the antitrust and consumer protection laws of the respective state. However, with respect to certification of a class under Fed. R. Civ. P. 23(b)(3) for monetary relief, Class Plaintiffs decided not to pursue their first alternative. See Class Plaintiffs' [Proposed] Pre-Hearing Order (D.I. 2324). Class Plaintiffs have also moved under Fed. R. Civ. P. 26(b)(2) for certification of a nationwide injunctive relief class under the federal antitrust laws.

On November 3, 2006, Intel filed a Motion To Dismiss Class Plaintiffs' Foreign Conduct Claims ("Motion to Dismiss") (D.I. 311). On March 7, 2007, the Court granted Intel's Motion to Dismiss, holding that "this speculative chain of events [that a microprocessor takes from Intel to the indirect purchaser] is insufficient to create the direct, substantial and foreseeable effects on commerce required by the FTAIA [the Foreign Trade Antitrust Improvements Act of 1982]". (D.I. 408) at 6.

Intel and AMD entered into a global settlement on November 11, 2009, and filed a
Stipulation of Dismissal with the Court on November 30, 2010, dismissing the AMD Action with
prejudice. (D.I. 2261).

On December 23, 2009, the Special Master entered an Order requiring the parties to file a
pre-hearing order identifying each of the legal and factual issues the Special Master would be
expected to resolve when determining if class certification is appropriate under In Re Hydrogen
Peroxide, 552 F.3d 305 (3d Cir. 2008) and establishing any pre-hearing procedures. (D.I. 2266);
see also Amended Order (D.I. 2266) (extending deadline to file Pre-Hearing Orders to Feb. 22,
2010). On February 22, 2010, the parties both filed proposed Pre-Hearing Orders. (D.I. 2323
and 2324). On March 26, 2010, the Special Master entered a Pre-Hearing Order incorporating
the parties submissions. (D.I. 2388) at ¶ 1.

The Class Certification Hearing took place on April 15, 16 and April 19, 2010. Class
Plaintiffs presented the expert testimony of Dr. Leffler and Intel presented the expert testimony
of Mr. David Kaplan ("Mr. Kaplan") in support of their respective cases.

After the Class Certification Hearing, Class Plaintiffs submitted subsequent additional
authority for consideration on Class Plaintiffs' Motion for Class Certification. See Intel's Letter
to The Honorable Vincent J. Poppiti Enclosing Subsequent Authority in Support of Intel's
Opposition to Class Plaintiffs' Motion for Class Certification dated June 11, 2010 (D.I. 2462);
Class Plaintiffs' Letter dated June 16, 2010 Responding to H. Drane's June 11, 2010 letter (D.I.
2463); Intel's Reply Letter dated June 21, 2010 (D.I. 2465); Intel's Letter to The Honorable
Vincent J. Poppiti dated July 16, 2010 regarding Third Circuit decision, No. 08-2784 (D.I. 2468);
Class Plaintiffs' Response dated July 21, 2010 to Intel's letter of July 16, 2010 Regarding Recent
Decision. (D.I. 2469).

**B.**     **Motion to Exclude**

On October 30, 2008, Intel filed its Motion to Exclude on the following grounds:

> (1) Dr. Leffler's class-wide impact opinions depend on the false premise that plaintiffs will prove exclusionary acts that "substantially precede" the class period; (2) Dr. Leffler improperly applied methods of "art", rather than science; (3) Dr. Leffler's class-wide impact methodology rejects and contradicts Class Plaintiffs' liability theory; (4) Dr. Leffler failed to consider the implications of the Court's FTAIA decision; and (5) Dr. Leffler's regressions are unreliable.

See Intel's Opening Brief In Support of Motion to Exclude (D.I. 1255) at 2-3.

Following the United States Court of Appeals' decision in In re Hydrogen Peroxide Antitrust Litigation, 552 F.3d 305, on December 30, 2008, the Special Master convened a teleconference on January 27, 2009 (the "January 2009 Hearing") regarding the briefing for, and ultimate hearing schedule on, Plaintiffs' Motion for Class Certification and Intel's Motion to Exclude. See Transcript of January 2009 Hearing (D.I. 1521) at 4. At the January 2009 Hearing, Plaintiffs' counsel explained that because of Hydrogen Peroxide, Class Plaintiffs "would be better off doing additional analysis" in support of class certification, which they would present in their Class Certification Reply Brief. Id. at 5.

In exchange for the opportunity to present additional evidence in their Class Certification Reply Brief, Class Plaintiffs agreed to Intel's request to re-depose Dr. Leffler and respond with a Sur-Reply In Further Opposition to Class Plaintiffs' Motion for Class Certification. Id. at 5-7. By stipulation of the parties, an Amended Stipulation and Order Regarding Class Certification and Motion to Exclude Briefing Schedule ("Amended Briefing Schedule") was entered by the Special Master and approved by the Court on February 19, 2009 (D.I. 1595 and D.I. 1598).[2]

---

[2] The Amended Briefing Schedule was further amended on four separate occasions. (On April 16, 2009 (D.I. 1707 and D.I. 1708); on June 30, 2009 (D.I. 1965); on November 9, 2009 (D.I. 2245); and on December 7, 2009 (D.I. 2263)).

On July 23, 2009, Class Plaintiffs filed their Memorandum In Opposition to Intel's

Motion to Exclude Testimony of Dr. Keith Dr. Leffler ("Motion to Exclude Opposition").  (D.I.

2016).  At this time, Class Plaintiffs had an opportunity to offer – and did offer – a second

declaration by Dr. Leffler.  See Reply Declaration of Dr. Keith Leffler dated July 23, 2009

("Leffler Decl. II") (D.I. 2020).[3]  In their Motion To Exclude Opposition, Class Plaintiffs argued

that Dr. Leffler's multiple regression analysis comported with the law of antitrust damages and

satisfied the threshold of reliability required by Fed. R. Civ. P. 702.  See Motion to Exclude

Opposition (D.I. 2016) at 7.  Specifically, Plaintiffs asserted that:

> (1) Dr. Leffler's analysis properly uses available data; (2) Dr.
> Leffler's multiple regression analysis determines the rate of pass-
> on of Intel's overcharge to class members; (3) there is no conflict
> between Dr. Leffler's "embedded" overcharge theory and Class
> Plaintiffs' liability theory; (4) use of the term "art" does not
> warrant exclusion of Dr. Leffler's testimony; (5) Dr. Leffler's
> class-wide impact methodology is consistent with Class Plaintiffs'
> theory; and (6) the Court's FTAIA ruling does not undercut Dr.
> Leffler's methodology.

Id. at 7-16.

On January 11, 2010, Intel filed its Reply Memorandum In Further Support of Intel's

Motion to Exclude, reiterating many of the points raised in Intel's opening brief.  (D.I. 2268).

On January 12, 2010, the Special Master entered an Amended Order scheduling the Class

Certification Hearing for April 14-16, 2010 and April 19, 2010 (D.I. 2274).

On January 26, 2010, Plaintiffs requested "leave to file a final brief and ***supporting***

***expert report*** in response to Intel's January 11, 2010 sur-reply."  (D.I. 2285) (emphasis added).

By Order dated February 2, 2010, the Special Master denied Class Plaintiffs' request because

briefing had closed on Plaintiffs' Motion for Class Certification.  (D.I. 2302) at 3.  The Special

---

[3] At the Special Master's request Dr. Leffler provided a revised Reply Declaration on August 29, 2009.  (D.I. 2069).
The revised Reply Declaration was the same in substance but added certain missing citations.

15

Master concluded that "Class Plaintiffs stipulated to the briefing schedule on Class Plaintiffs' Motion for Class Certification and re-confirmed this schedule each time it amended the Stipulation and Order Regarding Class Certification Briefing Schedule." As a result, Plaintiffs had waived any asserted right to file a Reply to Sur-Reply. Id. at 3. Moreover, Plaintiffs' request was untimely. Id. Class Plaintiffs having failed to take a Fed. R. Civ. P. 53 objection to the Special Master's Order, it became the law of the case.

### C.   Identification Of Professor Roger Noll As A Rebuttal Witness

On February 22, 2010, Class Plaintiffs filed their Proposed Pre-Hearing Order and, for the first time, identified Professor Roger Noll ("Dr. Noll") as a rebuttal expert witness. (D.I. 2330) at ¶ 24(a)(i). On February 25, 2010, Intel objected to "plaintiffs' twelfth hour reservation of 'the right' to call Dr. Noll 'during their rebuttal presentation.'" (D.I. 2330) at 1. On March 22, 2010, the Special Master granted, in part, Intel's objections to Class Plaintiffs' Proposed Pre-Hearing Order, thereby barring Dr. Noll from testifying as a rebuttal witness at the Hearing (the "Noll Order") for the following reasons: (1) Class Plaintiffs' disclosure of Dr. Noll was untimely under Fed. R. Civ. P. 26(a)(2)(C)(ii); (2) Class Plaintiffs did not request the right to disclose additional expert testimony when the briefing schedule on Plaintiffs' Motion for Class Certification was amended on four occasions; (3) Plaintiffs did not meet the expert disclosure requirements under Fed. R. Civ. P. 26(a)(2); and (4) Third Circuit authority,[4] which takes into account the prejudice or surprise to the party against whom the excluded witness would testify and disruption of the orderly and efficient trial of the case, favors the exclusion of Dr. Noll's rebuttal testimony. (D.I. 2382) at 3-6. On March 24, 2010, the Court entered an Order reducing the time for Class Plaintiffs to object to the Noll Order to two days, rather than twenty days, due

---

[4] See Coalition to Save Our Children v. Bd. Of Educ. Of the State of Delaware, 90 F.3d 752, 789-90 (3d Cir. 1996).

to the impending Class Certification Hearing. (D.I. 2386).  Class Plaintiffs having failed to take a Fed. R. Civ. P. 53 objection to the Noll Order, it became the law of the case.

### D.    Dr. Leffler's New Analyses Offered Prior To The Hearing

On March 30, 2010, Intel filed a motion for an Order precluding Class Plaintiffs and Dr. Leffler from introducing or relying on recently disclosed analyses and opinions at the Class Certification Hearing ("Intel's Motion to Preclude New Analyses") (D.I. 2391).  Intel argued that Class Plaintiffs had twice unsuccessfully sought to offer new opinions and analyses "presumably aimed at correcting the flaws in Dr. Leffler's existing opinions.  Having failed in those attempts, plaintiffs now take a third tack."  Id. at 1.  On March 10, 2010, Intel questioned certain statements made in Class Plaintiffs' Response to Intel's Proposed Findings of Fact and Conclusions of Law. Id. at Exh. "A".  Class Plaintiffs responded that they had: "been working to respond at the upcoming class certification hearing to Intel's sur-reply papers, including Mr. Kaplan's reply report.  We intend to produce our backup by the end of next week for any analyses we will present at the hearing in response to those papers and that report." Id.

According to Intel, the backup files for Dr. Leffler's new analyses were produced on March 22, 2010 and March 27, 2010, three weeks before the Class Certification Hearing.  (D.I. 2391) at 2.  Intel claimed that the fifteen analyses sought to be introduced by Class Plaintiffs fell into two broad categories: "(1) completely new analyses without any precedent in Dr. Leffler's previous reports and (2) reworkings of analyses in Dr. Leffler's Reply Declaration that either materially change the specification of the analysis or use entirely different data sets to generate their results." Id.  On April 6, 2010, Class Plaintiffs responded that the analyses "directly respond[ed] to Dr. Kaplan's latest work" and that the "rebuttal analyses will defend – not change or replace – those opinions by showing that Dr. Kaplans' attacks on them are not well taken."

17

(D.I. 2397). Class Plaintiffs acknowledged that Dr. Leffler had performed "new empirical work", but stated that it was proper rebuttal testimony. Id. at 1, 2. The Special Master held a telephonic hearing on Intel's Motion to Preclude New Analyses on April 9, 2010 (the "April 9 Hearing").

At the April 9 Hearing, the Special Master noted the following:

> I am mindful that the parties entered into a stipulated briefing schedule subsequent to Hydrogen Peroxide, where I was asked to permit the Class Plaintiffs to file an additional report on the part of Dr. Leffler, and I am also satisfied that it was the parties' decision to permit Intel to have the last word . . . So . . . to the extent that Dr. Leffler offers appropriate rebuttal testimony, it may be the fact that the first time Intel gets to hear it is, if you will, at the hearing.

(D.I. 2457) at 7:17-23 and 8:5-7.

Before ruling upon each of the fifteen analyses Intel sought to exclude, the Special Master made the following overarching comments about the proper scope of rebuttal testimony:

> A supplemental expert report that states additional opinions or rationales or seeks to strengthen or deepen opinions expressed in the original expert report exceeds the bounds of permissible supplementation and is subject to exclusion[5] . . .
>
> I am satisfied that to rule . . . differently than the way Palmer[6] instructs, would, as the Court in Cook versus Rockwell[7] suggested, it would create a system where preliminary expert reports could be followed by supplementary reports. There would be no finality to those reports. Each side, in order to, and this is the language of the Court, buttress its case or position could supplement existing reports and modify opinions previously given. The Court made the observation that this result would be the antithesis of the full expert disclosure requirements . . . as stated in Rule 26(a).[8]
>
> Moreover, I am satisfied that experts are not permitted to include, in rebuttal reports, supplemental reports, or, in this context,

---

[5] The Special Master noted that although two of the cases cited by the parties dealt with the scope of supplemental expert reports, he was satisfied that there was "no distinction" between the scope of supplemental and rebuttal expert testimony in the ultimate analysis here. (D.I. 2457) at 6:9-6:17.

[6] See Palmer v. Asarco Inc., 2007 U.S. Dist. LEXIS 56969, at *15 (N.D. Okl. 2007).

[7] See also Cook v. Rockwell Int'l Corp., 2006 U.S. Dist. LEXIS 89121 (D. Colo. Dec. 7, 2006).

[8] Id.

18

> rebuttal testimony, information they could have included in their
> prior reports. And I am satisfied that the ruling in . . . In Re:
> Graphics Processing Units Litigation[9] is instructive in this case.

Id. at 6:4-7:13.

The Special Master heard oral argument from the parties on each of the analyses, and

ultimately excluded fourteen of the fifteen analyses offered by Class Plaintiffs, concluding that

they were new analyses that did not fall under the proper scope of rebuttal testimony. See

Appendix "A" hereto, Detailed Description of Dr. Leffler Analyses Offered and Special Master's

Rulings Thereon. The Special Master deferred his ruling on one analysis until the Class

Certification Hearing in order to hear testimony on the issue. Id.[10]

## E. Dr. Leffler's New Analyses/Opinions Offered During The Class Certification Hearing

On April 19, 2010, the last day of the Class Certification Hearing and during Dr. Leffler's

rebuttal presentation, Class Plaintiffs offered a new analysis that attempted to measure the

amount of total Intel loyalty payments based upon information in both the Intel and Dell

databases (the "April 19 Analysis").[11]

---

[9] See In Re Graphics Processing Units Antitrust Litigation, 253 F.R.D. 478, 501 (N.D. Cal. 2008) ("GPU II") (striking portions of expert where reply report raised new points that should have been raised in the opening report and was based on previously available information).

[10] By correspondence dated April 12, 2010, the Special Master advised counsel that the Report and Recommendations Regarding Intel's Corporation's Motion to Preclude New Analyses "was in the nature of a motion in limine . . . [and] any party choosing to file objections to the Special Master's Order . . . shall do so subsequent to the Hearing." (D.I. 2408). Counsel confirmed the Special Master's directive with a Stipulation and Order to the same effect. (D.I. 2466).

[11] **A. Intel Database:** Intel Lump Sum = Intel Total Payments – Intel Price Discounts

**B. OEM Allocations Not In Intel Database**
   **i. Dell Database:** Dell Price Discounts

   **ii. Others:** Estimate Percent Missing (% Missing) from comparison of Dell Database to Intel Database

    % Missing = (Dell Price Discount – Intel Dell Price Discount)/ Intel Dell Price Discount

Intel objected to the introduction of Class Hearing – Leffler Exhibits 58[12], 59, 60, 61, and 62-65. In sum, the April 19 Analysis attempted to calculate the total amount of purported Intel loyalty payments (those that were not treated by OEMs as "discounts") by looking at payments in the Intel database and the Dell database. When determining the amount of purported loyalty payments made to OEMs other than Dell, Dr. Leffler testified: "[f]or those we can't do that, because we don't have a database for the hundreds of purchasers of Intel microprocessors, so some estimation has to be done there." (D.I. 2439) at 722:1-4. Thus, Dr. Leffler "use[d] Dell as a means of estimating what happens to the others [OEMs]". Id. at 723:1-3. Dr. Leffler testified that he had not presented this analysis in any of his reports, had not testified about it before, had not performed the analysis, and had not reviewed it for accuracy. Id. at 755:8-755:19.

## F.   Class Plaintiffs' Motion For Sanctions For Failure to Preserve Evidence AMD's Motion For Sanctions/Settlement

On October 14, 2009, AMD filed its Motion for Sanctions for Intel's Failure to Preserve Evidence ("AMD's Sanctions Motion") (D.I. 1806). Class Plaintiffs chose not to file a motion at that time or take an active role in the depositions or other discovery undertaken by AMD with respect to AMD's Sanctions Motion.

---

C. **Total Loyalty Payments** = Intel Lump Sum – (Dell Price Discount – Intel Dell Price Discount) – (1 + %M) * Others Price Discount

(D.I. 2456, Class Hearing – Leffler Exh. 59).

[12] Intel objected to "Issue 1" listed on Class Hearing – Leffler Exhibit 58, objected in part to "Issue 2", and did not object to "Issue 3" on Exhibit 58. (D.I. 2439) at 703:13-18. The Special Master permitted Dr. Leffler to testify regarding Class Hearing – Leffler Exhibits 58-61, for Intel to make a record regarding these slides, and to treat Intel's objection as a motion to strike after Dr. Leffler's testimony. Id. at 704:12-24. After a brief recess, Class Plaintiffs withdrew Exhibits 59 and 60, offering slides 59A and 60A, and Intel cross-examined Dr. Leffler on original exhibits 59 and 60. (D.I. 2439) at 707:9-24.

As a result of Intel and AMD's global settlement on November 11, 2009, Intel and AMD

entered into a stipulation and order dismissing their respective sanctions motions ("Stipulation of

Dismissal"), which was approved by the Court on November 25, 2009. (D.I. 2258).

While negotiating settlement of AMD's Sanctions Motion, Intel and AMD included Class

Plaintiffs in the case caption of the Stipulation of Dismissal submitted to the Special Master. On

November 13, 2010, Class Plaintiffs objected to the "entry of the Sanctions Stipulation as an

Order to the extent it would preclude . . . [them] from independently challenging Intel's

document and data retention and production deficiencies." (D.I. 1857). Although Intel initially

opposed Class Plaintiffs' independent right to file a sanctions motion, after the issue was fully

briefed, the parties submitted a revised Stipulation of Dismissal omitting Class Plaintiffs from

the case caption. The revised Stipulation of Dismissal stated that the Intel and Class Plaintiffs

"reserve all rights and arguments" relating to the sanctions issue. (D.I. 2258) at 2.

## Class Plaintiffs' Sanctions Motion/The Adverse Inference Requested

On January 28, 2010, Class Plaintiffs filed their Motion for Sanctions for Intel's Failure

To Preserve Evidence ("Sanctions Motion") (D.I. 2291). Class Plaintiffs argued that the

documents destroyed by Intel "would certainly have been favorable . . . both in the context of

class certification and at trial." See Memorandum in Support of Motion for Sanctions (D.I.

2292) at 28. In their Sanctions Motion Class Plaintiffs sought the following relief:

> (i) "an adverse inference against Intel whereby the Court
> will presume that documents Intel destroyed would
> have supported Class Plaintiffs' theory of liability, their
> allegations that Intel's anti-competitive conduct
> adversely impacted consumers, and their proposed
> competitive benchmark;"

> (ii) A jury instruction that Intel violated its duty to preserve
> evidence by intentionally destroying hundreds of
> thousands of documents related to Intel's conduct in the
> x86 microprocessor market. The jury would be

21

instructed that: "you may presume these documents would have helped establish Class Plaintiffs' claims that Intel violated Section 2 of the Sherman Act and the laws of 26 states as set for in the First Amended Consolidated Complaint."

(iii)    Class Plaintiffs may present evidence of Intel's document destruction to the jury;

(iv)    Intel is ordered to pay Class Plaintiffs' attorneys' fees and costs related to the Motion for Sanctions and related to investigating and responding to Intel's misconduct.

See Order to Sanctions Motion (D.I. 2291).

Class Plaintiffs sought an adverse inference as set forth below:

**1. Liability**: Class Plaintiffs state that "to the extent this Court evaluates liability or merits issues in deciding class certification, it should adopt an adverse inference against Intel and presume that evidence Intel destroyed would have supported Class Plaintiffs' liability theory." Id. at 43.

    a. **Money-for-market share deals**: destroyed emails regarding "conditions of the money-for-market share deals with various original equipment manufacturers." Id. at 42-43.

    b. **Documents Regarding Anticompetitive Conduct**: additional documents that "Intel's anticompetitive conduct adversely impacted consumers." Id. at 44.

**2. Economic Theory Related to Impact on Class Members (Proposed Competitive Benchmark)**: "The documents Intel destroyed likely would have supported Class Plaintiffs' argument that Intel's decision to lower its list price for microprocessors in the second half of 2006 is an appropriate competitive benchmark. Intel's pricing behavior in the second half of 2006 is best understood as a reaction to increasing antitrust scrutiny in the U.S. and abroad and Dell's decision to break its monogamy with Intel and start purchasing microprocessors from AMD. To the extent Class Plaintiffs and Intel have different explanations for Intel's pricing

22

behavior during this time period, the Court should adopt inferences in favor of Class Plaintiffs' explanation." Id. at 44.

On February 21, 2010, the Court entered a Stipulation and Order Regarding Briefing Schedule on Class Plaintiffs' Sanctions Motion. (D.I. 2320). Intel's answering brief was due on March 5, 2010 and Class Plaintiffs' Reply Brief In Further Support of Motion for Sanctions ("Sanctions Reply") was due on April 1, 2010. Id.

On March 23, 2010, the Court entered a stipulated revised briefing schedule Regarding Class Plaintiffs' Sanctions Motion ("Stipulated Revised Briefing Schedule"), extending the due date for Class Plaintiffs' Sanctions Reply to May 3, 2010 – after the Class Certification Hearing. (D.I. 2385).

Class Plaintiffs never alerted the Special Master that they sought an adverse inference with respect to class certification in their Proposed Findings Of Fact, Proposed Conclusions Of Law With Respect To A Nationwide Class, Proposed Conclusions Of Law For Certification Of A Nationwide Injunctive Class And 26 Statewide Classes or in their pre-hearing order. Nor did counsel raise their Sanctions Motion at the Class Certification Hearing. In fact, when the Special Master *sua sponte* generically raised the issue of spoliation during Class Plaintiffs' closing, Class Plaintiffs declined the opportunity to link their Sanctions Motion to class certification:

> THE COURT: Let me focus you on the quote you bring to my attention. I understand the context and the reason for saying that a wrongdoer's conduct cannot be forgotten if that wrongdoer has rendered data unavailable.
>
> Help me with the record in this case. I have heard a lot of discussion about data that may or may not be available from third parties, OEMs on down. There is certainly no suggestion on your part that Intel has rendered certain of that data unavailable by virtue of actions that they have taken, is there, and is there anything in the record to support that?

23

. . . .

Is it fair for me to suggest that the record is ful[]some and complete, and if your position is that it's not, nobody has b[r]ought that to my attention.

MR. CORBITT: Well, I think, Your Honor, there is a limit, again as I think Dr. Leffler said to how much is knowable and how much is obtainable . . . we subpoenaed dozens of OEMS, third parties and so forth. You know, we had disputes with many of them about production. Some of them were compromised and worked out. I think in at least two or three instances, Verizon, that[] was a retailer, **we had this motion that was pending[,] that [was] the sanctions motion where we contend that there was Intel information that was lost.**

I am not going to stand here and say we have not had an opportunity before now, which I think is the thrust of your question for, you know, full discovery and whatever disputes vis-à-vis OEM data and so forth or document production there may have been[,] have not been brought to your attention.

**But you know, there is a <u>massive record</u> in this case . . . And we are confident that there is <u>sufficient information</u> out there under the standard we have been articulating that we have to demonstrate in order for a just and reasonable approximation in order for impact to be shown and for a just and reasonable approximation of damages.**

<u>See</u> Class Certification Hearing Transcript ("Class Cert. Hrng. Tr.") (D.I. 2440) at 827:16-828:4;

829:24-831:1; 832:13-19 (emphasis added).

### Intel's Motions To Strike Class Plaintiffs' Sanctions Experts

On March 5, 2010, Intel filed a Motion to Strike the Declaration of Shaun Simmons

("Simmons Motion"), an O'Melveny & Meyers lawyer, on the grounds that it was inadmissible

lay testimony under Fed. R. Evid. 701. (D.I. 2354). Class Plaintiffs relied exclusively on the

Simmons Declaration in their Sanctions Motion. <u>Id.</u> at 1.

Pursuant to the Stipulated Revised Briefing Schedule, Class Plaintiffs' submitted a

response in opposition to the Simmons Motion ("Simmons Answering Brief") on May 3, 2010

24

attaching the declarations of three new experts.  (D.I. 2428).  Intel's reply brief ("Simmons Reply") was due May 17, 2010 – two weeks after the record of the Class Certification Hearing was closed.  (D.I. 2385).

After the Class Certification Hearing, on May 19, 2010, Intel filed a Motion To Strike Class Plaintiffs' Rebuttal Expert Declarations of Barry J. Murphy, George J. Socha, Jr. and James R. Thompson as improper and untimely "rebuttal" expert reports.  (D.I. 2451).  On May 26, 2010, Class Plaintiffs filed an answering brief (D.I. 2455) and on June 1, 2010 Intel filed a reply.  (D.I. 2458).

## RECOMMENDATIONS

### I.    Intel's Motion To Exclude Should Be Granted.

While the Special Master recommends the denial of Class Plaintiffs' Motion for Class Certification and while the Special Master did not hear Intel's Motion to Exclude in advance of the Hearing, the Special Master concludes that it is important to make a recommendation to the Court with respect to Intel's Motion To Exclude.  In this regard the Special Master is mindful of the recently decided case of American Honda Motor Co., Inc. v. Richard Allen, 600 F.3d 813, 815-816 (7th Cir. 2010), where the court in a *per curium* decision ruled that the Daubert issue should be decided where the expert's opinion is critical to class certification.  The Court went on to criticize the lower court's ruling for passing on the Daubert issue.  The Court stated:

> [The expert's] testimony is necessary to show that Plaintiff's claims are capable of resolution on a class-wide basis and that the common defect in the [product] predominates over the class members' individual issues,

and concluded that:

> [B]y failing to clearly resolve the issue of its admissibility before certifying the class, the district court erred.

Id. at 817.

## **LEGAL STANDARD**

Fed. R. Civ. P. 104(a) provides:

> [p]reliminary questions concerning the qualifications of a person to
> be a witness . . . shall be determined by the court . . . In making
> this determination it is not bound by the rules of evidence except
> those with respect to privilege.

The Supreme Court in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 593 (1993)

held that Rule 104(a) shall be established by a "preponderance of proof." It follows then that the

proponent of expert testimony must "demonstrate by a preponderance of the evidence that [the]

opinions are reliable." See In re Paoli R.R. Yard Litig., 35 F.3d 717, 744 (3d Cir. 1994) ("Paoli

II"). Fed. R. Evid. 702 governs the use of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist
> the trier of fact to understand the evidence or to determine a fact in
> issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education may testify thereto in the form of
> an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable
> principles and methods, and (3) the witness has applied the
> principles and methods reliably to the facts of the case.

Rule 702 has three major requirements: (1) qualifications: the witness proffered to testify

to specialized knowledge must be an expert, a requirement that is interpreted liberally; (2)

reliability: whether the testimony has "a reliable basis in the knowledge and experience of [the

relevant] discipline;" and (3) fit: the work of the expert must be helpful to the trier of fact in that

particular case. See Daubert, 509 U.S. at 592; see also Paoli II, 35 F.3d at 744.

District courts are responsible for performing a vigorous screening function to ensure that

scientific evidence presented by expert witnesses is relevant, reliable and helpful to the trier of

fact. See Elcock v. Kmart Corp., 233 F.3d 734, 744 (3d Cir. 2000) (citing Daubert, 509 U.S.

579). The court's gate-keeping function applies to testimony based not only on scientific

26

knowledge, but also to testimony based on "technical" or "other specialized knowledge."

Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149 (1999).

In order to prove reliability by a preponderance of the evidence, one must prove that the

"expert's opinion . . . [is] based on the 'methods and procedures of science' rather than on

'subjective belief or unsupported speculation'", and that the expert has "'good grounds' for his

or her belief." See Paoli II, 35 F.3d at 742-744 (quoting Daubert, 509 U.S. at 589). In

evaluating whether evidence is reliable, the Third Circuit has suggested that district courts take

into account the factors set forth in Daubert and U.S. v. Downing, 753 F.2d 1224 (3d Cir. 1985),

namely –

> (1) whether a method consists of a testable hypothesis; (2) whether
> the method has been subject to peer review; (3) the known or
> potential rate of error; (4) the existence and maintenance of
> standards controlling the technique's operation; (5) whether the
> method is generally accepted; (6) the relationship of the technique
> to methods which have been established to be reliable; (7) the
> qualifications of the expert witness testifying based on the
> methodology; and (8) the non-judicial uses to which the method
> has been put.

Paoli II, 35 U.S. at 742.

The Daubert factors are non-exhaustive and the district court is not required to apply each

factor. See Kumho Tire, 526 U.S. at 152; see also Elcock, 233 F.3d at 746. Rather, the trial

judge has "considerable leeway in deciding whether particular expert testimony is reliable."

Kumho Tire, 526 U.S. at 152. In applying these factors, the court must focus on the principles

and methodology, and not on the conclusions the expert reaches. Daubert, 509 U.S. at 595; see

also Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997) ("Admissibility

decisions focus on the expert's methods and reasoning; credibility decisions arise after

admissibility has been determined.").

The court then, at the class certification stage, has discretion to preclude expert evidence

if it is shown that it is the type of "junk science" that a Daubert inquiry is designed to screen. In

Re Linerboard Antitrust Litig., 203 F.R.D. 197, 217 n.13 (E.D. Pa. 2001) (internal citations

omitted).

The Special Master considers the foregoing factors[13] in light of the testimony of Dr.

Leffler and Mr. Kaplan, and concludes that the testimony of Dr. Leffler is inadmissible pursuant

to the Fed. R. Evid. 702 for the reasons set forth below.[14]

## A.   Dr. Leffler's Regression Analyses Do Not Meet The Reliability Requirement of Fed. R. Evid. 702.

Dr. Leffler performed a series of regression analyses to measure the rate of the alleged

Intel overcharge "passed-on" to members of the proposed class. See Declaration of Dr. Keith

Leffler ("Leffler Decl. I") dated May 16, 2008 (D.I. 920) at ¶¶ 99-107.  Dr. Leffler defines the

"overcharge" as the "difference between what the direct purchasers actually paid for Intel's x86

microprocessors and the price they would have paid absent (that is, "but for") Intel's alleged

unlawful conduct."  Id. at ¶ 67.

After defining the relevant inquiry, Dr. Leffler opined that "[t]his evidence strongly

supports the hypothesis that the entire distribution of Intel prices fell as a result of Intel's

recognition of a new competitive environment as its change to more price competition."  See

---

[13] Intel does not challenge the sufficiency of Dr. Leffler's qualifications. See Intel's Memorandum in Support of Motion to Exclude (D.I. 1255) at 1. Thus, factor seven weighs in favor of admission of Dr. Leffler's testimony, without the Special Master having to address the sufficiency of Dr. Leffler's qualifications.

[14] Class Plaintiffs cite two cases in support of their argument that Dr. Leffler's testimony should not be excluded by the Court, but should be assessed by the jury. See Motion to Exclude Opposition (D.I. 2016) at 8-9 (citing Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002), McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 801 (6th Cir. 2000)).  The Special Master concludes that these cases do not support Class Plaintiffs' arguments.  In Stecyk, the Court held that "[i]t is an abuse of discretion to admit expert testimony which is based on assumptions lacking any factual foundation in the record." 295 F.3d at 414.  The court admitted the expert testimony at issue because it "reflect[ed] a factual foundation sufficient to support . . . [the expert's] testimony." Id.  In the matter *sub judice*, the Special Master concludes that Dr. Leffler's opinions are inadmissible pursuant to Fed. R. Evid. 702 precisely because he has not demonstrated a factual foundation for his opinions. See also McLean, 224 F.3d at 801 (causation expert's conclusions must "have a basis in established fact and cannot be premised on mere suppositions" and must "find some support for those assumptions in the record.").

Leffler Decl. II (D.I. 2069) at ¶ 42. Using the second-half of 2006 as a benchmark "as to how Intel x86 desktop and mobile microprocessor prices would have been impacted by increased competition during the relevant damage period," Dr. Leffler estimated an overcharge of 15 percent. Id. at ¶ 83.[15] Dr. Leffler also opined that "[p]reliminary analysis suggests that a 100% or higher pass-on rate of any overcharge will likely exist for all groups." See Leffler Decl. I at ¶ 8(M).

Regression analysis is a generally accepted methodology and has been used at the class certification stage to assess impact. See In re Linerboard Antitrust Litig., 203 F.R.D. 197, 218 (E.D. Pa. 2001) (accepting econometric models advanced by plaintiffs to assess impact on class-wide basis through generalized proof). See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1238 (3d Cir. 1993) (method of multiple regression analysis used by economists is reliable); Tracinda Corp. v. Daimler Chrysler AG, 362 F. Supp. 2d 487 (D. Del. 1987).

Although regression analysis itself is a generally accepted methodology, the Special Master, for reasons to follow, concludes that Dr. Leffler's application of this methodology is fundamentally flawed. Class Plaintiffs are therefore unable to prove reliability by a preponderance of the evidence and Dr. Leffler's analyses should be excluded.

---

[15] Dr. Leffler later amended the overcharge to "at least 14% or so lower". See Deposition of Dr. Keith Leffler dated October 8, 2009 ("Leffler Dep. Tr. II") (D.I. 2270, Exh. 2) at 799:3-5.

**(1)      Dr. Leffler's Regressions Do Not Answer The Precise Issue Of The Amount Of The Alleged Intel Overcharge.**

**(i)      Dr. Leffler Does Not "Regress Out" The Myriad Variables That Could Affect Computer Price.**

In the Special Master's view, the question of interest is the amount of an alleged Intel overcharge with respect to a *particular microprocessor over the relevant time period.*[16]  In other words, the relevant issue is how microprocessor prices declined in the second half of 2006 with respect to a particular microprocessor.

Dr. Leffler admits that "[t]he prices of personal computers are influenced by many factors including product features . . . and bundled products and services."  See Leffler Decl. I (D.I. 920) at ¶ 8F.  Thus, in order to calculate the amount of the alleged Intel overcharge, Dr. Leffler must account for price/cost changes due to these product features, including items such as video cards, hard drives, speakers or software.  The Special Master concludes that Dr. Leffler failed to do so.

For example, in his internet, Dell[17] and Mercury Research[18] regressions, Dr. Leffler compares computers with the same product features (i.e. the same video cards, hard drive, speakers etc.) but with different processors in an effort to answer the question of interest.  Id. at ¶¶ 101, 111 ("The surveys collected the sales prices for personal computers for which the purchaser could choose alternative Intel x86 microprocessors.  All other characteristics of the computer were held constant.").  Through his regression analysis, Dr. Leffler purported to

---

[16] Dr. Leffler states that "[t]he statistical analysis need not be specific to microprocessors.  The question of interest is how retailers and OEMs react to cost changes, from whatever source, that approximates the size of an Intel microprocessor overcharge."  See Leffler Decl. I (D.I. 920) at ¶ 96, n.146.

[17] The reliability of the Dell data is addressed separately below.

[18] Intel points out that, in answering why the Mercury research data had been relegated to a footnote, Dr. Leffler responded that the Mercury Research data was "not to be given any particular weight at all."  See Leffler Dep. II (D.I. 2270, Exh. 2) at 400:14-401:1.  The Special Master concludes that, although stated inartfully, a full reading of Dr. Leffler's testimony reveals that Dr. Leffler did not literally mean that the Mercury Research data was to be given less weight than other data in his analysis.  Rather, the Special Master concludes that Dr. Leffler was merely explaining his use of a footnote in the text of his report.  Id. at 400:25-401:1.

calculate the increase in cost of a personal computer as a result of a particular increase in the cost of a microprocessor. Id.

The Special Master concludes that Dr. Leffler failed to answer the question of interest by comparing different processors that varied in quality, without accounting for this variance. Indeed, Dr. Leffler himself concedes a flaw in his methods, admitting that the analysis that would most closely reflect the question of interest is not the regression results that he presents, but rather, an analysis of the difference over time in the price of a particular microprocessor compared to the price of the computer into which that microprocessor is incorporated. See Leffler Dep. Tr. II (D.I. 2270, Exh. 2) at 411:4-20.

Seeming to disagree with Dr. Leffler, Class Plaintiffs argue that "this quality variance does not change between the actual and the but-for world, however, measuring such a variance does not inform the amount of pass-on." See Motion to Exclude Opposition (D.I. 2016) at 13.

Even without the divergence in Class Plaintiffs' view and the sworn testimony of their expert, the Special Master concludes that with respect to the internet, Dell and Mercury Research regressions, it is a fundamental flaw in Dr. Leffler's methodology to fail to control for quality differences that influence the purported Intel overcharge. It follows then that Class Plaintiffs' assertion that the circumstances of Dr. Leffler's regression analysis exist to the same extent in both the actual and "but-for" worlds is simply not supportable.

The Special Master concludes that Dr. Leffler's failure to address the question of interest and take into account a myriad of relevant factors that influence the price of personal computers renders his regression analysis unreliable. See In Re Methionine, 2003 U.S. Dist. LEXIS 14828, at *9-10 (N.D. Cal. August 22, 2003) (holding that failure to take into account variables that

31

could effect price of final product to the end user, even though expert stated these variables affected price, rendered analysis unreliable).

### (ii)    Dr. Leffler's Regressions Do Not Control For Differences In Microprocessor Quality.

Dr. Leffler admits that he did not control for variations in processor specifications. See Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 369:14-370:3. Class Plaintiffs argue that there is "no need to engage in an SKU-by-SKU analysis" because "Intel has offered no reason to believe that the relationship between cost changes and price changes varies by SKU, or even if it did, that any SKU would have less than full pass-on." See Motion to Exclude Opposition (D.I. 2016) at 12. The Special Master concludes that any suggestion that Intel failed to offer reasons/proof in this regard misplaces the burden of proof, as it is Class Plaintiffs' burden to demonstrate the admissibility of Dr. Leffler's testimony. See In re Paoli II, 35 F.3d at 744 (the proponent of expert testimony must "demonstrate by a preponderance of the evidence that [the] opinions are reliable").

The Special Master also concludes that, by stacking[19] all SKUs together, and thereby not controlling for different microprocessor types, Dr. Leffler failed to isolate the alleged Intel microprocessor overcharge. Once again Dr. Leffler himself admits what the Special Master sees as a flaw in his methodology – that his regression analysis gave the average effect across all SKUs and did not estimate a separate coefficient on cost per SKU basis. See Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 415:14-24.

In the Special Master's view, Dr. Leffler's failure to take this quality difference into account results in a regression analysis which likely includes "quality differences" due to the difference in microprocessor, thereby failing to isolate the purported microprocessor overcharge.

---

[19] "Stacking", "short for stacked generalization, is a term of art in the field of statistics referring to combining results of different models." See In re GPU, 253 F.R.D. at 494 (internal citations omitted).

For example, in his internet regression, Dr. Leffler combined many different quality chips that reflect cost differences of hundreds of dollars, i.e. a Celeron M microprocessor ($36.27) (a lower quality microprocessor) and a Pentium M microprocessor ($395.00) (a higher quality microprocessor), which have a cost difference of $358.73, were lumped together within the same regression. See Declaration of David Kaplan dated October 30, 2008 ("Kaplan Decl. I") (D.I. 1251) at ¶ 132 & Table 8. The problem of aggregating together many different quality chips into one regression analysis is demonstrated by the fact that the estimated Intel overcharge for a microprocessor would be much smaller than $358.73, and may only be $5.44 (i.e. 15 percent (the purported overcharge applied to $36.27)). Id.

Mr. Kaplan's observation in this regard is that by aggregating together many different chips that reflect cost differences of many hundreds of dollars, the method "likely do[es] not 'approximate the size' of any alleged Intel overcharge here." Id. at ¶ 131 & Table 8; Reply Declaration of David Kaplan dated January 11, 2010 ("Kaplan Decl. II") (D.I. 2273) at ¶ 102.[20]

In the Special Master's view, Class Plaintiffs do not provide a meaningful response to this criticism, but rather rely on a ruling in the price-fixing case of In Re High Pressure Laminates Antitrust Litig., 2006 U.S. Dist. LEXIS 21546, *5 (S.D.N.Y. Apr. 7, 2006) for the proposition that "the failure to disaggregate goes to the weight of the testimony." See Motion to Exclude Opposition (D.I. 2016) at 12-13. Relying on a price-fixing case is in the Special Master's view unavailing in the context of the present case. Moreover, the Special Master is

---

[20] Class Plaintiffs' response is that "Intel makes no showing whatsoever that larger cost changes are passed on at any different rate than smaller cost changes. Indeed, Intel can identify no bias, which is the only relevant economic question, in the pass-on estimation of the Internet regression." See Motion to Exclude Opposition (D.I. 2016) at 13. The Special Master concludes that Class Plaintiffs fail to address the fact that Dr. Leffler's regression analysis does not isolate the alleged Intel overcharge by comparing different processors of different qualities and failing to control for quality differences.

required to assess the viability of Dr. Leffler's theory to determine whether it meets the
requirements of Fed. R. Civ. P. 23.

Further, in the matter *sub judice* disaggregation is not the fatal flaw; rather in the Special
Master's view, Dr. Leffler failure to pinpoint the purported overcharge through his analysis by
failing to control for microprocessor quality is the fundamental flaw.

For the foregoing reasons, the Special Master concludes that Dr. Leffler's failure to
account for differences in microprocessor quality renders his results unreliable. See Freeland v.
AT&T Corp., 238 F.R.D. 130, 149 (S.D.N.Y. 2006) (holding that where two significant variables
were omitted from expert's regression analysis, and plaintiffs failed to provide appropriate
explanation for omission, plaintiffs failed to carry their burden of proof that the incomplete
analysis was sufficiently reliable and helpful to justify admission into evidence).

### (2) The Retailer Regressions Fail to Control For Quality Differences In Different Computer Models.

Dr. Leffler's retailer regressions (Costco, CompUSA, CDW and PCMall)[21] compile
several different SKUs in one regression that contain different quality microprocessors and non-
processor components. Intel criticizes the retailer regressions because Dr. Leffler has "no way of
knowing whether a computer price change is based on a change in the cost of the microprocessor
or the change in quality associated with variation in components across computer models he fails
to account for. Indeed, Leffler's retailer regression could compare two computers with different
microprocessors, monitors, memory, hard drive, and/or a host of other features, and predict a
pass-through of a microprocessor overcharge based on the difference in quality caused by the

---

[21] Intel claims that Dr. Leffler's retailer regressions do not address the relationship between Intel's microprocessor price and the downstream computer price because they relate solely to one link in the distribution chain – the retailer link. See Motion to Exclude (D.I. 1254) at 13. Class Plaintiffs counter that Dr. Leffler's regressions, when considered "as a group" demonstrates that "the probability of higher PC costs not being passed on is 'less than one hundredth of one percent.'" See Motion to Exclude Opposition (D.I. 2016) at 8. The Special Master does not address that specific argument here but instead focuses on the other analytical gaps in Dr. Leffler's retailer regressions.

34

different features of the computer." See Motion to Exclude (D.I. 1254) at 21. The Special Master agrees that Dr. Leffler fails to compare "apples to apples", and as a result, Dr. Leffler does not measure the alleged Intel overcharge, but instead measures what may be, in part, quality differences in non-processor components.

The Special Master also concludes that the retailer regressions stack together all SKUs sold by a retailer, which, like the internet regressions discussed *supra* at 30, makes it impossible to determine if the overcharge that is calculated comes from differences in quality (i.e. a better hard drive, memory etc.) or an alleged Intel overcharge with respect to a specific microprocessor. Yet again, Dr. Leffler admits that if different retailers passed on the alleged overcharge differently his model would have "difficulty in doing that" and "I don't know how one would do that." See Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 416:20-24.

The Special Master therefore concludes that the retailer regressions not only fail to answer the question of interest, namely the amount of an alleged Intel overcharge with respect to a *particular microprocessor over the relevant time period*, but also fail to take into account important individualized differences between retailers, and thus should be excluded as unreliable.[22] See General Electric v. Joiner, 522 U.S. 136, 146 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that

---

[22] Intel also makes the argument that Class Plaintiffs' impact opinions depend on the false premise that Class Plaintiffs will prove exclusionary acts that substantially predate the class period. See Motion to Exclude (D.I. 1254) at 6. The Special Master does not consider the embedded overcharge issue in connection with Intel's Motion to Exclude. However, the Special Master notes that Dr. Leffler testified in August, 2008 that an alleged Intel overcharge would need to be "imbedded" two years prior to the start of the class period. See Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 105:3-21. On July 23, 2009, in his Reply Declaration, Dr. Leffler states that "four to eight months, is required between any illegal acts that began or continued at some point and the beginning of the class period to assure that the impact of the monopolization has flowed through to PC prices." (D.I. 2020) at ¶ 47. Dr. Leffler assumed, as part of his analysis, that the alleged Intel overcharge was imbedded. See Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 105:5-8. The Special Master questions the reliability of this assumption where Dr. Leffler significantly changes his assumption without any articulated reason, and did not provide any empirical reasons for making this assumption in the first place.

is connected to existing data only by the *ipse dixit* of the expert. A court many conclude that there simply is too great an analytical gap between the data and the opinion proffered.").

### (3) Dr. Leffler's Dell Regression Analysis Should Be Excluded As Unreliable.

Dr. Leffler testified that a regression based on six days of data was "inadequate for finalizing any conclusions." See Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 400:6-13. However, Dr. Leffler's Dell regression[23] is based on two days of data, March 19, 2006 and July 14, 2006. See Kaplan Decl. II (D.I. 2273) at ¶ 58 & Exh. 42. As Mr. Kaplan points out, Dr. Leffler does not explain why data based on two days is adequate, nor does he explain why one day in March and July 2006 are representative of the other 180 days in the first and third quarters of 2006. Id. at ¶ 57. The Special Master concludes that Dr. Leffler's *ipse dixit* use of only two days of data affects the reliability of his results based upon Dr. Leffler's own standards of reliability – namely, six days of data is inadequate to finalize any conclusions.

More problematic, however, is that when generating his PC cost data for the two dates in question, Dr. Leffler averaged together the individual transactions reported by Dell for particular SKUs for those two days separately. Id. Dr. Leffler stated that the differences in the individual Dell transactions reflected a "small variation in costs for the same SKU." See Kaplan Decl. I (D.I. 2069) at ¶ 67, n.182. The Special Master notes, for example, that the same commercial SKU might sell for $562.47 and $8,472.38 on July 14, 2006, but when using such data in his regression analysis, Dr. Leffler used the average, or $1,419.91. See Kaplan Decl. II (D.I. 2273, Exh. 42) at 2.[24] The Special Master concludes that the cost difference is more than a "small variation in costs," and that averaging further compromises the reliability of the Dell data. See,

---

[23] See Declaration of Dr. Keith Leffler dated July 23, 2009 ("Leffler Decl. II") (D.I. 2020) at Table 7 and 7A-C.

[24] The Special Master notes that Dr. Leffler also used averages to calculate prices that Dell charged on those two days during 2006, creating the same problem of averaging with respect to *price* data caused by an averaging of cost data. See Kaplan Decl. II (D.I. 2273, Exh. 47).

e.g., GPU II, 253 F.R.D. at 493 ("If data points are lumped together and averaged before the analysis, the averaging compromises the ability to tease meaningful relationships out of the data.").

Significantly, once again, Dr. Leffler admits to a deficiency in his methodology, namely that "[i]deally he would compare the exact same PCs sold in March and then in July," but he asserts that this was impossible. (D.I. 2020) at ¶ 67, ¶ 181. When comparing the Dell SKUs, Dr. Leffler acknowledges that the SKU includes more than the processor. Id. Dr. Leffler's analysis of the Dell data does not therefore analyze the relationship between just the Intel microprocessor cost reduction and the PC prices to Dell. Instead, the data used by Dr. Leffler are based on total costs incurred by Dell in configuring a PC (the processor and other components). Dr. Leffler testified that he had no data on the cost of these "other components" used in the computers on March 19 and July 14, 2006. See Leffler Dep. Tr. II (D.I. 2270, Exh. 2) at 759:16-761:9.

The Special Master concludes that, by failing to deduct the cost of other components from the cost data, Dr. Leffler was unable to measure the asserted relationship between changes in microprocessor costs and prices of PCs sold by Dell. See Kaplan Decl. I (D.I. 2020) at ¶ 58.

For reasons stated herein, the Special Master concludes that Dr. Leffler's Dell regression is unreliable.

37

**(4)    Dr. Leffler Fails To Account For Rebates In His Regressions Analyses. [25]**

In conjunction with Class Plaintiffs' application to secure data from a third-party, they

argued that "pass on analysis must utilize actual acquisition costs, i.e. costs net of all rebates,

discounts, credits, etc." See Class Plaintiffs' Supplemental Letter Brief In Support of Motion to

Compel Fry's Electronics (D.I. 560) at 2 (citing Declaration of Jonathan Orszag, ¶ 4) ("Since a

reasonably accurate measurement of this net cost is essential for Class Plaintiffs to carry out a

reliable analysis of the extent to which [retailer] Fry's and other intermediaries pass through

changes in microprocessor or computer costs to their customers, the financial incentives data

requested by Class Plaintiffs to carry out a reliable analysis of the extent to which [retailer] Fry's

and other intermediaries pass through changes in microprocessor or computer costs to their

customers, the financial incentives data requested by Class Plaintiffs from Fry's and other third

parties are an important part of Class Plaintiffs' class certification and damages analysis").

Contrary to Class Plaintiffs' affirmative representation to the Special Master that net

acquisition cost are essential to calculate the amount of an Intel overcharge, Dr. Leffler testified

that even if Circuit City, CompUSA and Costco had rebates, the data he used did not take those

rebates into account. See Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 404:5-21. Moreover, he

concedes that his analysis "could be" biased due to his failure to include rebates in his regression

analysis. See Leffler Dep. Tr. II (D.I. 2270, Exh. 2) at 794:17-795:25. In their Opposition to

Motion to Exclude, Class Plaintiffs admit that they "do not dispute that retailers and VARs

---

[25] The retailer regressions include regressions for Costco, CompUSA, CDW and PCMall. Dr. Leffler also testified that he did not take into account rebates to the ultimate purchaser in his regression analysis because he asserts rebates would exist to the same extent in the real world as in the "but for" world. See Leffler Dep. Tr. I (D.I. 2270, Exh. I) at 393:15-394:15. The Special Master concludes that Dr. Leffler's explanation is insufficient because he fails to account for real world facts that create individualized issues among proposed class members, i.e. that some purchasers may have paid hundreds of dollars less than others because they took advantage of a rebates. Dr. Leffler testified that studies report that under fifty percent of people redeem such rebates. Id. at 395:11-16. Indeed Dr. Leffler makes the point that some indirect purchasers take advantage of rebates, other do not – real world facts that cannot be ignored.

38

receive rebates from OEMs." See Motion to Exclude Opposition (D.I. 2016) at 10, n.12. At the same time, Class Plaintiffs state that "[t]he fact that Prof. Leffler[] analyzes data without applying the rebates does not create bias that would impact the pass-on coefficient, however, and is therefore irrelevant." Id. Dr. Leffler joins Class Plaintiffs' chorus, stating that "[t]he important statistical issue is not whether the cost data is complete in all ways but rather whether there is any bias in the cost data that would impact the estimated pass-on coefficient", "[h]owever, there is no a priori reason to think that the regression is in any way biased." See Leffler Decl. II (D.I. 2020)at ¶ 57.

In the Special Master's view, Class Plaintiffs and Dr. Leffler cannot have it both ways. To say on July 23, 2009 with little or no explanation that Dr. Leffler's failure to apply rebate data "does not create bias" and to say on October 9, 2009 that there "could be" bias is simply not credible.

The Special Master concludes that for the reasons stated, Dr. Leffler's regression analysis is unreliable. See, e.g., GPU II, 253 F.R.D. at 496 (quoting ABA Section of Antitrust Law, ECONOMETRICS: LEGAL, PRACTICAL, AND TECHNICAL ISSUES 224 (ABA Publishing 2005)) ("Plaintiffs using regressions for class certification purposes will generally try to control for various customer attributes. But these attributes are not always captured in regressions because of data limitations or problems with the specification of the regression. For example, if individual customers qualify for volume discounts at some times but not others, the regression would need to take this into account.").

### (5) Dr. Leffler Relies On Economic Theory and Ignores Real World Facts, Effecting the Reliability of His Analysis.

Dr. Leffler testified that "right under 50 percent" of the total set of Intel payments to OEMs effected the specific price of microprocessors, i.e. fifty percent were discounts, which are

39

not anti-competitive. See Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 383:20-384:384:6. On the other hand, the other fifty percent of payments were made up of so-called loyalty payments, which according to Dr. Leffler, "do not change the marginal cost to the OEM of making and selling one more or less PC", and thus "do not alter the pricing and output decisions of the OEMs that receive such payments." See Kaplan Decl. I (D.I. 2069) at ¶ 12.

The record clearly and flatly contradicts Dr. Leffler's economic theory. Indeed, significant uncontradicted evidence demonstrates that OEMs had discretion to use Intel payments as they chose and often passed-on Intel payments to consumers. See, e.g., Class Plaintiffs' Preliminary Trial Plan (D.I. 2018) at 39 (citing Exh. 133) ("In October 2004, the relationship between Intel and Gateway faltered because of the way Gateway was using Intel's 'rebates.' Intel did not want Gateway to use the Intel funds it was receiving to lower its PC price points ("SPPs"), because "SPPs are too low and will expose 'something's up' to the other OEMs.").[26] Dr. Leffler's response is that "no complicated empirical analysis needs to be conducted" because a "discount either impacts the marginal cost of purchasing an Intel chip or it does not", and if it does not, then "economic theory implies it does not impact pricing." See Leffler Decl. II (D.I. 2069) at ¶ 11, n.37.

When asked how he would account for Intel payments that were in fact passed on by OEMs to purchasers, in whole or in part, Dr. Leffler replied this question was "intrinsically one that is handled at the conceptual level." See Leffler Dep. Tr. II (D.I. 2270, Exh. 2) at 524:1-2

---

[26] See also Deposition Transcript of Daniel Allen ("Allen Dep. Tr.") (D.I. 2018, Tab 202) at 353:9-22, 618:10-619:12 (Dell could use meet competition funds as they chose to, and even though Intel felt too many dollars were going to bottom line, rather than to the cost of goods sold (COGS), Dell chose to apply the funds as they chose); Deposition Transcript of Duane Zitner (D.I. 2270, Exh. 14) at 164:21-165:5 (HP witness explained that credits in 2002 agreement were "dollar payments to HP on a quarter that we could use to offset the cost of the processors that we were buying"); AMD's 30(b)(6) Dep. Written Responses, Topic 12 (D.I. 2270, Exh. 8) ("We know enough anecdotal information to know there is no consistent pattern. Some OEMs account for anticipated rebates at the product line level and take them into account for pricing, some at the corporate P&L level and do not take them into account for pricing, and they vary in making the choices and make different choices at different times for reasons known to them and not us.").

40

(i.e. that discounts by definition reduce the cost of purchasing a microprocessor and lump sum payments do not). Dr. Leffler testified further that if OEMs acted contrary to his "conceptual" theory, and in fact did pass on Intel payments, "I certainly can't preclude that possibility but I can't do analysis based on the assumption that profit making businesses acted irrationally – I'd – we'd have to have some other expert here, I guess." Id. at 524:9-17. However, even Dr. Leffler had to admit an obvious truism, namely, that actual facts trump economic predictions. Id. at 513:3-16 ("of course actual facts would certainly trump economic predictions but more often than not facts are a little murky and economic theory is how one sorts them out."). And yet again Dr. Leffler conceded a potential flaw in his methods that if "[m]ost[,] all or a substantial amount of the non what I'd call variable impact discounts, were in fact, passed on and affected the price that the ultimate consumers paid, yes, my analysis would have to change and change significantly." See Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 85:6-10.

The Special Master concludes that Class Plaintiffs cannot meet their burden with an expert's general statements about economic theory, and simply throw up their hands when record real-world facts fail to conform to economic theory. An expert such as Dr. Leffler is required to take real-world facts into account in conducting his analysis, including the undisputed fact that OEMs had discretion to use loyalty payments[27] as they chose, and indeed often chose to pass those payments along to the computer purchasers – members of the proposed class. See GPU II, 253 F.R.D. at 496 (holding that economic expert does not meet his burden by stating that economic theory dictates that prices for retail and wholesale purchases go up. Rather, "plaintiffs must demonstrate through 'properly-analyzed, reliable evidence' that a common method of proof exists to prove impact on a class-wide basis.").

---

[27] Dr. Leffler testified that OEMS had "some discretion to use loyalty or lump sum payments to lower microprocessor prices." See Class Cert. Hrng. Tr. (D.I. 2439) at 448:14-19.

41

By failing to so do, the Special Master's concludes that Dr. Leffler's method is unreliable as it impermissibly includes within the proposed class purchasers who benefited from Intel's payments to OEMs – individuals who were not harmed at all.

### (6) Dr. Leffler's Opinion Regarding Mobile Chips Is Based On An Analysis of Desktop Chips.

Dr. Leffler opined that " I have reached the opinion that all Intel x86 desktop and mobile microprocessors sold during the period July 2001 through March 2006 were sold at higher prices than would have been present with increased competition as exemplified by the competition during mid to late-2006." See Leffler Decl. II (D.I. 2069) at ¶ 43. Dr. Leffler's overcharge regression in fact contains no mobile chips, and he therefore provides no empirical support for his conclusion that Intel lowered its prices with respect to mobile chips in the second half of 2006. See Kaplan Decl. II (D.I. 2273) at ¶ 33. Significantly, Dr. Leffler testified that "in general there was little change in the price of mobile[] chips" during that period. See Leffler Dep. Tr. I at 651:13-16.

In response to Mr. Kaplan's criticism that Dr. Leffler did not include mobile chips in his regression, Dr. Leffler simply states that "Intel's mobile parts were relatively unchallenged in the mid to high end," so Intel would not be forced to lower its prices, and "there is no economic reasons that in the but-for world competitors other than Intel would not be equally effective in all market segments including mobile." See Leffler Decl. II (D.I. 2069) at ¶ 39, n.107. Again, the real-world facts contradict Dr. Leffler's speculation. Indeed, Dr. Leffler's own Reply Declaration cites to evidence that in 2006, "AMD's share of the market for *laptop [mobile]*, desktop and server chips rose to 23.3% in the third quarter, from 17.7% a year earlier," demonstrating that in fact Intel's mobile parts were challenged by AMD in 2006. Id. at ¶ 37, n.95 (emphasis added) (internal citations omitted); see also Deposition Transcript of Marty

42

Seyer, Senior V.P., AMD (D.I. 2273, Tab 258) at 288:20-24 (AMD began to ship

microprocessors to Dell in mid-September 2006 and by the end of 2006, AMD achieved a share

of "somewhere in the mid 30s" of Dell's notebook microprocessor business.").

Significantly, Dr. Leffler stated at the Class Certification Hearing that "AMD was not

focusing on the mobil[e] market . . . and so my hypothesis was that [sic] was an area where it

would not be a good test of the increased competition that occurred in the 2006 era." See Class

Cert. Hrng. Tr. (D.I. 2439) at 347:8-16. Based on Dr. Leffler's statements at the Class

Certification Hearing, the Special Master concludes that mobile chips should not have been

included in Dr. Leffler's analysis where it was not a "good test of increased competition", i.e. a

good benchmark.

The Special Master concludes that Dr. Leffler, even in the face of his own declaration,

did not have data or present an analysis with respect to mobile chips, and thus has no empirical

support for his conclusion that all markets (i.e. mobile, server, and desktop) operate the same.

The Special Master therefore concludes the Dr. Leffler's opinion with respect to mobile chips is

unreliable.

**(7)      Dr. Leffler Does Not Apply A Reliable Methodology To Determine Who
           Should Be Excluded From The Class And Fails To Exclude Those
           Individuals.**

**(i)      Special Competitive Situations**

Dr. Leffler stated that certain "special competitive situations" exist that "result[] in a

competitive or below competitive price." See Leffler Decl. I (D.I. 920) at n.2, n.87, n.90[28], n.93,

¶8C, ¶81, ¶83. In his first declaration, Dr. Leffler stated that these situations were "uncommon",

that "it will be necessary to identify and analyze such 'competitive situations' to determine

---

[28] "In February 2006, IBM paid a price of $119.29 for 209 units. This *may have been* another special competitive
situation." See Leffler Decl. I (D.I. 920) at n.90 (emphasis added).

whether the resulting Intel prices were above or below the appropriate but-for prices". Id. at ¶ 55) and that "overcharges for these purchases would not be sought." Id. at n.126. Dr. Leffler also testified that "one would need to identify who those purchasers are because overcharges would not be calculated on those purchases." See Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 299:18-20.

Notwithstanding Dr. Leffler's observations, he did not perform further analysis to identify and analyze these special competitive situations. Indeed he did not set forth any criteria necessary to identify a special competitive situation. Id. at 300:13-17 ("This is not a benchmark that I – perhaps I was thinking of it then, I don't know, but I haven't mentally pursued it since then. But at the same time, I strongly believe that in these situations Intel will have the information.") Rather, when asked how he identified a special competitive situation, Dr. Leffler replied that he would have to determine whether a particular sale looked "unusual" according to "a statistical analysis of prices." See Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 298:25-299:6. When asked what statistical criteria he applied to determine unusualness, Dr. Leffler replied, "It's an art."[29] Id. at 299:7-9.

Applying the standard set forth in Daubert/Kumho, the Special Master concludes that Dr. Leffler has not proposed an analytical methodology to identify with common proof the microprocessors that were subject to special competitive situations, and thus were not subject to an overcharge.

The Special Master also concludes that this is precisely the type of "analysis" that should be excluded because this method has not been subject to peer review, the potential rate of error is

---

[29] While the Special Master understands that "an art" may refer to a method that is based in science, nonetheless the method has to be more than just a thin-air assertion.

44

unknown, no standards exist to control the technique's operation, and there is no indication that the method is generally accepted.

The Special Master also notes that Dr. Leffler simply failed to exclude members of the class subject to special competitive situations from his overcharge regression, although he testified that this was a necessary step in his analysis. See Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 299:18-20. In their Opposition to Motion to Exclude, Class Plaintiffs respond that this problem no longer exists because Dr. Leffler has performed an extensive empirical analysis. See Motion to Exclude Opposition (D.I. 2016) at 19-20. Class Plaintiffs have however not provided any support for this proposition.

The Special Master concludes that Dr. Leffler's failure to exclude members from the proposed class that were not subject to the alleged Intel overcharge would necessarily affect the reliability of Dr. Leffler's regression analysis.[30]

### (ii)    Members Of The Proposed Class Subject To The Court's FTAIA Decision

On March 7, 2007, the Court issued a Memorandum Opinion granting Intel's Motion to Dismiss Class Plaintiffs' claims based on foreign conduct under the Foreign Trade Antitrust Improvements Act of 1982 (the "FTAIA") (the "FTAIA Decision"). (D.I. 408) at 10. The Court held that "[t]he FTAIA explicitly bars antitrust actions alleging restraints in foreign markets for inputs . . . that are used abroad to manufacture downstream products . . . that may later be imported into the United States." Id. at 7 (quoting United Phosphorus, Ltd. v. Angus Chem. Co., 131 F. Supp. 2d 1003 (N.D. Ill. 2001)). Therefore, the Court held that it lacked subject matter

---

[30] Intel argues that Dr. Leffler's methodology contradicts Class Plaintiffs' theory of a contestable/non-contestable market. See Motion to Exclude (D.I. 1254) at 13. The Special Master does not consider this argument in deciding Intel's Motion to Exclude, except to note that Dr. Leffler's precise definition of a non-contestable portion of the market (one that "is more difficult for an entrant to break in[to]") differs from Class Plaintiffs' definition of a non-contestable market. See Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 146:3-4.

Case 1:05-cv-00485-JJF   Document 2073   Filed 07/28/10   Page 46 of 112

jurisdiction under the FTAIA over Class Plaintiffs' Sherman Act claims "to the extent those claims are based on the alleged foreign conduct of Intel." Id. at 8.

When asked whether he had excluded the transactions subject to the Court's FTAIA Decision from those considered in his regression analysis, Dr. Leffler replied: "I've proposed how one would not include any sales to non-U.S. final end users." See Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 342:19-343:12. Thus, Dr. Leffler's method was simply to exclude purchasers not residing in the United States.

The Special Master concludes that Dr. Leffler again failed to take into account real-world facts by failing to propose a reliable methodology to exclude members of the proposed class subject to the Court's FTAIA Decision. The Special Master concludes that U.S. purchasers who purchased Intel microprocessors from foreign OEMs subject to the purported Intel overcharge would still be included in the proposed class in violation of the FTAIA Decision.[31]

The Daubert/Kumho factors weighs against the admission of Dr. Leffler's regression analysis where he does not set forth any method to exclude from the proposed class individuals subject to the Court's FTAIA Decision.

## B.     The Analysis Raised At The Class Certification Hearing Is Untimely And Prejudicial To Intel.

On April 19, 2010, the last day of the Class Certification Hearing and during Dr. Leffler's rebuttal presentation, Class Plaintiffs offered a new analysis that attempted to measure the amount of total Intel lump sum payments (the anticompetitive payments Class Plaintiffs seek to recover for) based upon information in both the Intel and Dell databases (the "April 19 Analysis").[32] See Class Cert. Hrng. Tr. (D.I. 2440) at 721:3-21.

---

[31] Class Plaintiffs simply state that there is "no need for Prof. Leffler to exclude such foreign conduct from his analysis." See Motion to Exclude Opposition (D.I. 2016) at 22.

[32] **A. Intel Database:** Intel Lump Sum = Intel Total Payments – Intel Price Discounts

Intel objected to the introduction of Class Hearing – Leffler Exhibits 58[33], 59, 60, 61, and 62-65 as a new analysis, noting that the Court had already excluded such an analysis. Id. at 703:13-704:1, 705:9-10. The Special Master permitted Intel to voire dire Dr. Leffler on the April 19 Analysis. Id. at 706:16-23.

During voir dire, Dr. Leffler testified that: when determining the amount of purported loyalty payments made to OEMs other than Dell, he would use Dell as guideline to perform an estimation. Id. at 722:1-4, 723:1-3. ("[f]or those we can't do that, because we don't have a database for the hundreds of purchasers of Intel microprocessors, so some estimation has to be done there"; thus, Dr. Leffler "use[d] Dell as a means of estimating what happens to the others [OEMs]"). Dr. Leffler testified that he had not presented this analysis in any of his reports, had not testified about it before, had not performed the analysis, and had not reviewed it for accuracy. Id. at 755:8-755:19.

The Special Master notes that this analysis does not comport with Dr. Leffler's prior statements. On October 8, 2009, Dr. Leffler testified that how an OEM treats a purported Intel

---

**B. OEM Allocations Not In Intel Database**
    **i. Dell Database:** Dell Price Discounts

      **ii. Others:** Estimate Percent Missing (% Missing) from comparison of Dell Database to Intel Database

      % Missing = (Dell Price Discount – Intel Dell Price Discount) / Intel Dell Price Discount

**C. Total Loyalty Payments** = Intel Lump Sum – (Dell Price Discount – Intel Dell Price Discount) – (1 + %M) * Others Price Discount

(D.I. 2456, Class Hearing – Leffler Exh. 59).

[33] Intel objected to "Issue 1" listed on Class Hearing – Leffler Exhibit 58, objected in part to "Issue 2", and did not object to "Issue 3" on Exhibit 58. See Class Cert. Hrng. Tr. (D.I. 2439) at 703:13-18. The Special Master permitted Dr. Leffler to testify regarding Class Hearing – Leffler Exhibits 58-61, for Intel to make a record regarding these demonstrative exhibits, and to treat Intel's objection as a motion to strike after Dr. Leffler's testimony. Id. at 704:12-24. After a brief recess, Class Plaintiffs withdrew Exhibits 59 and 60, offering slides 59A and 60A, and Intel cross-examined Dr. Leffler on original exhibits 59 and 60. Id. at 707: 9-24.

loyalty payment (versus the way Intel treats that payment) is "totally irrelevant economically." See Leffler Dep. Tr. II (D.I. 2270, Exh. 2) at 519:10-11. Then, at the Class Certification Hearing, Dr. Leffler attempted to introduce an analysis that relies upon both the Intel database and the Dell databases to "estimat[e] what happens to the other OEMs." See Class Cert. Hrng. Tr. (D.I. 2439) at 723:1-3. Dr. Leffler's changed testimony in the Special Master's view directly impacts his credibility.

While not analyzing the reliability of the April 19 Analysis, the Special Master concludes that it is untimely and prejudicial to Intel, and should therefore be excluded. See Coalition to Save Our Children, 90 F.3d at 789-90 (quotations omitted) (holding that court should consider the following factors in determining whether testimony should be excluded: (1) the prejudice or surprise in fact of the party against whom the testimony is offered, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the court's order).

## CONCLUSION

For each of the reasons set forth herein, the Special Mater concludes that Dr. Leffler's testimony should be excluded under the Daubert/Kumho standard because it is not based on "methods and procedures of science," but rather upon unreliable analyses that fail to measure the alleged Intel overcharge and fails to "regress out" important factors. See Daubert, 509 U.S. at 589.[34]

After weighing the foregoing factors, and considering the testimony of Dr. Leffler and Mr. Kaplan, the Special Master concludes that Dr. Leffler's testimony should be excluded

---

[34] The qualifications of Dr. Leffler weigh in Class Plaintiffs' favor and are not challenged by Intel.

pursuant to Fed. R. Evid. 702 because his analysis is unreliable and fails to isolate the alleged
Intel overcharge, the very item he purports to measure.

In the Special Master's view, the court's admonition in Clark v. Takata Corp., 192 F.3d
750, 759 n.5 (7th Cir. 1999) is applicable here, namely while paying due respect to Dr. Leffler's
credentials, even the most "supremely qualified expert cannot waltz into the courtroom and
render opinions unless their opinions are based on some recognized . . . method and are reliable .
. . under the test set forth by the Supreme Court in Daubert." Id.

## II.    Class Plaintiffs' Receipt of The Adverse Inference Is Unavailing.

The Special Master, without deciding Class Plaintiffs' Motion for Sanctions, concludes
that Class Plaintiffs failed to establish a link between their request for an adverse inference and
their Motion for Class Certification by failing to raise the Sanctions Motion in a timely fashion –
namely before commencement of the Class Certification Hearing or during the hearing itself. In
the Special Master's view it is telling that Class Plaintiffs' Sanctions Reply was due after the
Class Certification Hearing and that counsel for Class Plaintiffs stated that they had a fulsome
and complete record for class certification purposes. Class Plaintiffs' actions necessarily
prevented the adversarial process from accomplishing its goal of fully informing the Special
Master on how the adverse inference ultimately affected issues of class certification and denied
Intel an opportunity to address these implications. The Special Master believes that this record
strongly favors denial of Class Plaintiffs' request for failing to fully and fairly prosecute the
issue.

At the same time, the Special Master believes that it is important to explore the
implications of permitting Class Plaintiffs the benefit of the adverse inference. With the grant to
the Class Plaintiffs of every adverse inference requested, the Special Master could conclude that

49

there is anticompetitive conduct sufficient enough and at a time consistent with Dr. Leffler's

theory that it occurred two years before the beginning of the class period. Even with the adverse

inference with respect to money-for-market share deals, documents regarding anticompetitive

conduct, and the 2006 benchmark, the Special Master concludes that Class Plaintiffs still fail to

meet the predominance requirement of Fed. R. Civ. P. 23(b)(3). In the Special Master's view,

the adverse inference does not change the fact that, when disaggregated, Dr. Leffler's 2006

Overcharge Regression demonstrates that the prices of some microprocessors went up in the

second half of 2006 and Class Plaintiffs cannot demonstrate that antitrust impact is capable of

proof through evidence common to the class. (Discussed *infra* at 58-91).

## III.    Class Plaintiffs' Motion for Class Certification Pursuant To Fed. R. Civ. P. 23(a) Should Be Denied.

### STANDARD

In deciding whether to certify a class, the district court has discretion to grant or deny

class certification. See American Seed Co., Inc. v. Monsanto Co., 238 F.R.D 394, 396 (D. Del.

2006). The class action device conserves the resources of the court and the parties by allowing

issues that potentially affect every class member to be litigated together economically. See, e.g.,

Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 155 (1982) (citing Califano v. Yamasaki, 442

U.S. 682, 701 (1979)).

To be certified, a class must satisfy the four threshold requirements of Fed. R. Civ. P.

23(a): numerosity (a "class [so large] that joinder of all members is impracticable"); (2)

commonality ("questions of law or fact common to the class"); (3) typicality (named parties'

claims or defenses "are typical ... of the class"); and (4) adequacy of representation

(representatives "will fairly and adequately protect the interests of the class"). See In re

50

Warfarin Sodium Antitrust Litig., 391 F.3d 516, 527 (3d Cir. 2004) (quoting Fed. R. Civ. P. 23(a)).

In addition to the threshold requirements of Rule 23(a), parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3). Id. To obtain certification of a damages class under Rule 23(b)(3), two additional requirements must be met in order for a class to be certified: (1) common questions must "predominate over any questions affecting only individual members" (the "predominance requirement"), and (2) class resolution must be "superior to other available methods for the fair and efficient adjudication of the controversy" (the "superiority requirement"). Id.

The rigorous analysis for class certification "requires a thorough examination of the factual and legal allegations." See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 166 (3d Cir. 2001). The court may look beyond the pleadings in making class certification determinations. See Hydrogen Peroxide, 552 F.3d at 316. "Because the determination of a certification request invariably involves some examination of factual and legal issues underlying the plaintiffs' cause of action, a court may consider the substantive elements of plaintiffs' case in order to envision the form that a trial on those issues would take." Id. (quoting 5 MOORE'S FEDERAL PRACTICE § 23.46[4]). The court may be required to resolve disputes and make findings, but only to the extent necessary to determine whether the class certification requirements are met. See Hydrogen Peroxide, 552 F.3d at 316. Moreover, a party's assurance that they will meet the requirements of class certification in the future is not sufficient. Id. at 318. Any "[f]actual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence." Id. at 320. Accordingly, all factual determinations herein are made by a preponderance of the evidence.

### A.    **Numerosity**

Fed. R. Civ. P. 23(a)(1) requires that the class be "so numerous that joinder of its members is impracticable." "No magic number exists satisfying the numerosity requirement. . ." See Moskowski v. Lopp, 128 F.R.D. 624, 628 (E.D. Pa. 1989). "[G]enerally, if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." See Marsden v. Select Med. Group, 246 F.R.D. 480, 483-484 (E.D. Pa. 2007) (citing Stewart v. Abraham, 275 F.3d 200, 226-227 (3d Cir. 2001)).

The proposed class potentially consists of millions of members, therefore making joinder impossible. See Behrend v. Comcast Corp., 2007 U.S. Dist. LEXIS 75186, at *16-17 (E.D. Pa. Oct. 10, 2007).

The Special Master therefore concludes that Class Plaintiffs have satisfied this requirement of Fed. R. Civ. P. 23(a)(1).

### B.    **Commonality**

Fed. R. Rule 23(a)(2) provides that "there are questions of law or fact common to the class." "However, where an action is to proceed under Fed. R.  23(b)(3), 'the commonality requirement is subsumed by the predominance requirement.' See Danvers Motor Co., Inc. v. Ford Motor Co., 543 F.3d 141, 148 (3d Cir. 2008) (quoting Georgine v. Amchem. Prod., Inc., 83 F.3d 610, 626 (3d Cir. 1996)). The predominance requirement "tests whether the class is sufficiently cohesive to warrant adjudication by representation, and mandate that it is far more demanding than the Rule 23(a)(2) commonality requirement." See In re Life USA Holding Co., 242 F.3d 136, 144 (3d Cir. 2001).

The commonality requirement will be discussed in the predominance section *infra* at 58-91.

## C. Typicality

Fed. R. 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The typicality inquiry asks "whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." See Beck v. Maximus, Inc., 457 F.3d 291, 295-96 (3d Cir. 2006) (quoting Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir. 1994)). "The typicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees." See Amchem Prods., 83 F.3d at 631. "The inquiry assesses whether the named plaintiffs have incentives that align with those of absent class members so that the absentees' interests will be fairly represented." Id.

As described *supra* at 4, the named class representatives include either individuals consumers or SMB, but do not include enterprise customers.

Members of the proposed class purchased computers either from a direct-selling OEM, a VAR, a retailer at a brick-and-mortar store, online, or over the phone. See Intel's Opposition to Motion for Class Certification (D.I. 1245) at 46 n.37; Kaplan Decl. I (D.I. 1251) at ¶ 48. Certain small businesses also purchased computers in a similar fashion. Id. Their purchases involved a small number of computers and may or may not include a limited number of hardware accessories. See Deposition Transcript of Chad Ohlorogge (D.I. 1252, Exh. 33) at 30:20-22, 31:11-32:12, Deposition Transcript of Jason Hoenshell (D.I. 1252, Exh. 34) at 29:19-22, 35:17-36:1; Deposition Transcript of Dwight Dickerson (D.I. 1252, Exh. 35) at 29:19-22, 35:17-36:1. Individual consumers generally purchased computers based on need. See Deposition Transcript of Bergerson and Associates, Inc. (D.I. 1252, Exh. 24) at 38:1-4, 58:7-11.

Dr. Leffler testified that enterprise customers, on the other hand, "typically buy . . . from major OEMs" and VARs, buy larger volumes of computers than individuals, buy different types of computers, and have different needs. See Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 271:1-272:23. In addition, enterprise customers often buy computers as part of a "package" of information management services, in which case Dr. Leffler admitted the cost of the computers themselves cannot be identified in "any non-arbitrary way." Id. at 270:13-273:15. Prices paid in enterprise and commercial SMB sales are often based on heavily individualized negotiations that change over time and there is a diversity of skill set with respect to the negotiation. See Decl. of Keith LeFebvre (HP) (D.I. 1248) at ¶ 9. They often negotiate multiyear contracts that require them to purchase products and services from the OEM for the duration of the contract. Id. Moreover, enterprise sales often involve bundles of computers and other products and services, such as a commercial notebook that has an accidental damage protection contract. Id. On the other hand, individuals do not negotiate individualized contracts.

Although Intel's alleged anticompetitive conduct may have been the same with respect to individuals, SMB and enterprise customers, this fails to take into account the meaningful differences between individuals on the one hand, and SMB and enterprise customers on the other hand. Deiter v. Microsoft Corp., 436 F.3d 461, 467-468 (4th Cir. 2006) is instructive. In Dieter, the court affirmed exclusion from the class enterprise customers where the named plaintiffs did not include a representative from that group. The Microsoft plaintiffs asserted that all class members were similarly injured because the price they paid was artificially inflated as a result of Microsoft's monopolization of the relevant markets under Section 2 of the Sherman Act. Id. at *14-15. The court held that:

> [T]his argument was made at an unacceptably general level.
> Examining typicality at a more directly relevant level, the district

> court found meaningful differences between plaintiffs' claims and
> those of the Enterprise customers. The plaintiffs purchased
> operating system software in 1999 and 2000 from Microsoft either
> on-line or by telephone, paying the fixed prices that Microsoft
> posted as part of its offer to sell. They claimed that they purchased
> individual copies of Windows at Microsoft's "estimated retail
> price," which they contended was as much as twenty percent
> higher than the prices charged by retail stores and other on-line
> retailers . . .
>
> In proving their case, however, the plaintiffs would hardly prove a
> case on behalf of Microsoft's Enterprise customers. These
> customers, who purchased at least 250 licenses, did not purchase
> on-line or by telephone, nor did they pay prices established in
> advance by Microsoft. The prices that Enterprise customers paid
> were negotiated and, as a consequence, were both discounted and
> unique to each transaction. In addition, Enterprise customers
> purchased different products: their agreements were three-year
> deals that included upgrades for the software covered by their
> agreements and sometimes included applications software in
> addition to operating system software. Thus, plaintiffs' proof that
> Microsoft overcharged them would hardly prove that Microsoft
> overcharged the Enterprise customers.

Id. at 467-468.

Similarly, in the matter *sub judice*, where the proposed class representatives do not

include any enterprise customers, and the enterprise customers had different needs, methods of

purchase, and pricing, the Special Master concludes that the interests of the proposed class

representatives are not aligned with enterprise customers. The Special Master also notes that to

prove that Intel overcharged the enterprise customers would require different proof because they

were able to negotiate deals in a different competitive landscape. As such, with respect to the

enterprise customers, plaintiffs "would have to define and prove a relevant market and injury to

competition in *that* market." Id. at 468. Thus, the Special Master concludes that, due to the

dissimilarities in the market, injury to competition and causation, the representative parties'

claims are not typical of the claims of the enterprise purchasers, and thus the enterprise

customers should be excluded from the proposed class.

55

**D.    Adequacy of Representation**

The court in Warfarin acknowledged that the district court, consistent with Fed. R. Civ. P. 23(a)(4), shared the same goal of establishing the liability of the defendant, suffered the same injury, and sought essentially the same damages.  391 F.3d at 532.  Fed. R. Civ. P. 23(a)(4) requires that the representative class members "fairly and adequately protect the interests of the class."  The court must determine: (i) "whether the representatives' interests conflict with those of the class"; and (ii) "whether the class attorney is capable of representing the class."  See Newton, 259 F.3d at 185 (internal citations omitted).

**i.  Whether the representatives' interests conflict with those of the class**

"In analyzing this criteria, the court must determine whether the representatives' interests conflict with those of the class", or in other words, whether any foreseeable conflicts between the named representatives and the proposed class members exist.  See Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178, 185 (3d Cir. 2001).  Any speculative conflicts, though, should be disregarded at this stage in class certification.  In re OSB Antitrust Litig., 2007 U.S. Dist. LEXIS 56617, at *9 (E.D. Pa. August 3, 2007) (citing In re VisaCheck/MasterMoney Antitrust Litig., 280 F.3d 124. 145 (2d Cir. 2001)).  This requirement serves as a "catch-all requirement" that "tends to merge with the commonality and typicality criteria of Rule 23(a)."  See Newton, 259 F.3d at 185 (citing Amchem, 521 U.S. at 626 n.20).  Ultimately, the burden rests with the defendant to prove that the named representatives will not adequately represent the class.  See Behrend v. Comcast Corp., 2007 U.S. Dist. LEXIS 75186, at *27 (E.D. Pa. October 9, 2007).

Enterprise customers typically purchase computers through different channels, in higher volumes, and enter into individualized negotiations with OEMs, whereas individuals do not.  See *supra* at 53-55.  Having chosen not to join in this class action with any representative from the

enterprise customers is in the Special Master's view the strongest indication of being satisfied with the status quo. Satisfaction with the status quo is certainly not consistent with an action for damages against Intel or an action for injunctive relief against Intel. The Special Master therefore concludes that the individual and SMB representatives' interests necessarily conflict with enterprise customers.

### ii. Whether the class attorney is capable of representing the class

Rule 23(a)(4) requires the Special Master to determine whether class counsel is capable of representing the class. Intel concedes that counsel for Class Plaintiffs are capable of representing the class. See Stip. Facts (D.I. 2295) at ¶ 9.

With Intel's concession, the Special Master concludes that the attorneys' for Class Plaintiffs are capable of representing them.

### E.    Ascertainability

A class is overly broad if it includes members who have not suffered injury. See Allen v. Holiday Universal, 249 F.R.D. 166, 171 (E.D. Pa. 2008). Moreover, a class definition must be "precise, objective . . . [and] presently ascertainable." See Daniels v. Baritz, 2004 U.S. Dist. LEXIS 14649, *5 (E.D. Pa. July 29, 2004). If "[d]etermining membership in the class would essentially require a mini-hearing on the merits of each class member's case . . . a class action [is] inappropriate for addressing the claims at issue." See Sanneman v. Chrysler Corp., 191 F.R.D. 441, 446 (E.D. Pa. 2000).

As discussed *infra* at 66-74, the proposed classes include members that suffered no injury or actually benefited from Intel's alleged anticompetitive acts.

In addition, the proposed class fails to take into account the Court's FTAIA Decision, namely purchasers of foreign market downstream products are not excluded from the class. See

57

FTAIA Decision (D.I. 408) at 7. The only method that Class Plaintiffs have proposed to comply with the Court's FTAIA decision is to restrict the class to purchasers located in the United States, which the Special Master concludes is insufficient. See Class Cert. Reply (D.I. 2017) at 17.

The Special Master concludes that having failed to exclude individuals who were not harmed and those who should have been excluded consistent with the Court's FTAIA Decision, Class Plaintiffs have not satisfied the ascertainability requirement.[35]

## IV.    Certification Of A Damages Class Pursuant To Fed. R. Civ. P. 23(b)(3)

### A.    Predominance

"Predominance 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation,' a standard 'far more demanding' than the commonality requirement of Rule 23(a)." See Hydrogen Peroxide, 552 F.2d at 311 (quoting Amchem Prods., 83 F.3d at 623-624). In order for certification to be appropriate, "'[i]ssues common to the class must predominate over individual issues.'" Id. (quoting In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 313-14 (3d Cir. 1998)).

"The predominance inquiry is especially dependent upon the merits of a plaintiff's claim, since 'the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual.'" See In re Constar Int'l Sec. Litig., 585 F.3d 774, 780 (3d Cir. 2009) (quoting Hydrogen Peroxide, 552 F.3d at 311). "'If proof of the essential elements of

---

[35] Class Plaintiffs rely on Kohen v. Pac. Invest. Mgmt., 2009 U.S. App. LEXIS 14943, at *12 (7th Cir. 2009) for the proposition that the class will often include individuals who have not been injured by the defendant's conduct. See Class Cert. Reply (D.I. 2017) at 17. At the same time, the Kohen court recognized that "if the definition is so broad that it sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad" and "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant", which is precisely the case here. Class Plaintiffs' reliance on Kohen is, in the Special Master's view, therefore misplaced. Similarly, the Special Master concludes that Class Plaintiffs' reliance on GPU II, 253 F.R.D. at 503 (internal citations omitted) is also misplaced. The GPU II Court noted that "courts have allowed indirect-purchaser plaintiffs to proceed as a class where they are unable to establish injury as to a few class members but can show 'widespread injury to the class'", but plaintiffs "must first demonstrate that there is way to prove injury to direct purchasers on a common formulaic basis" before demonstrating widespread injury. Class Plaintiffs have not made such a showing.

the cause of action requires individual treatment,' then predominance is defeated and a class should not be certified." Id. (quoting Hydrogen Peroxide, 585 F.3d at 311).

To be successful on a Section 2 claim, class plaintiffs must prove at the merits stage: (i) defendants engaged in predatory or anticompetitive conduct; (ii) a specific intent to monopolize; and (iii) a dangerous probability of achieving monopoly power. See Boyd v. Wilmington Trust Co., 630 F.Supp. 379, 386 n.24 (D. Del. 2009); 15 U.S.C. § 15. As the Third Circuit cautioned in Hydrogen Peroxide, "[i]n antitrust cases, impact often is critically important for the purpose of evaluating Rule 23(b)(3)'s predominance requirement because it is an element of the claim that may call for individual, as opposed to common proof." See Hydrogen Peroxide, 552 F.3d at 311. Although Class Plaintiffs need not prove common impact at the class certification stage, they must:

> demonstrate that the element of antitrust impact is capable of proof
> at trial through evidence that is common to the class rather than
> individual to its members. Deciding this issue calls for the district
> court's rigorous assessment of the available evidence and the
> method or methods by which plaintiffs propose to use the evidence
> to prove impact at trial.

Id. at 311-312.

The Special Master concludes, for the reasons set forth below, that Class Plaintiffs have not demonstrated that antitrust impact is capable of proof at trial through evidence common to the class.

**B.      Class Plaintiffs Fail To Demonstrate A Consistent Theory That Demonstrates Common Impact On All Class Members.**

**(1)      Class Plaintiffs' Evolving Theory**

**May 26, 2006 – First Amended Consolidated Complaint — Rebates and Discounts Are Anti-Competitive**

In Class Plaintiffs' First Amended Consolidated Complaint filed on May 26, 2006,

largely adopted from AMD, Class Plaintiffs asserted that "Intel has maintained its x86

microprocessor monopoly by deploying a host of financial and other exclusionary business

practices that in effect limits its customers' ability and/or incentive to deal with AMD or other

competitors." See FACC (D.I. 108) at ¶ 106. Class Plaintiffs described these exclusionary

practices as follows:

> the Intel arsenal includes: direct payments in return for exclusivity
> or near-exclusivity; **discriminatory rebates, discounts and
> subsidies** conditioned on customer loyalty that have the practical
> and intended affect of creating exclusive or near-exclusive dealing
> arrangements; threats of economic retaliation . . .

Id. (emphasis added); see also Id. at ¶ 165 ("Intel's retroactive rebates can operate to price

microprocessors so low that Intel's rivals are put at a competitive disadvantage they cannot

overcome."); Id. at 174 ("these rebates enable Intel to lower prices selectively in the contested

market segment while maintaining higher prices in the captive market.").

According to Class Plaintiffs, "all of Intel's rebate schemes are discriminatory and

market-foreclosing." Id. at ¶ 171 (emphasis added).

Dr. Leffler describing Class Plaintiffs' theory as "problematic" testified as follows:

"I suspected that the Plaintiffs were not interested in pushing the boundaries of antitrust law into

new areas and I thought I don't think I understand what they're claiming here. See Class Cert.

Hrng. Tr. (D.I. 2439) at 455:23-456:8.

60

Thus, as of May 2006, Class Plaintiffs alleged that all of Intel's monetary concessions were anticompetitive.

## May 1, 2008 – Motion For Class Certification — All Intel Monetary Concessions Are Anticompetitive

Two years later, on May 1, 2008, in Class Plaintiffs' Motion for Class Certification, Class Plaintiffs again referred to "bribes", "rebates", discounts, MCP, and ECAPs – essentially all Intel monetary concessions – as anticompetitive. See Motion for Class Certification (D.I. 917) at 1, 3, 4, and 7.

Dr. Leffler testified that he would "certainly disagree with that". See Class Cert. Hrng. Tr. (D.I. 2439) at 455:23-456:8.

## August 28, 2008 – Dr. Leffler's Deposition — Some Rebates Are Discounts; Most ECAPs are Discounts

In contrast to Class Plaintiffs twice-stated position, at Dr. Leffler's first deposition on August 28, 2008, Dr. Leffler described some monetary concessions as "price reductions" or "discounts":[36]

> Some of the payments are effectively and actually price reductions on specific microprocessor purchases by an OEM. That I call a price reduction. So they can call it whatever they want. They can call it a fund, a payment, a rebate at the end, a credit on an invoice. I don't care. If, in fact, what it does is effectively lower the price of purchasing additional microprocessors, not past ones, but additional processors, I call that a price discount, and I think economically those types of things are very, very different and should be treated very, very differently than payments that are not like that.

See Leffler Dep. I (D.I. 2270, Exh. 1) at 43:18–44:4.

---

[36] "Economically a 'discount' is a price reduction if the cost to an OEM of additional (marginal) microprocessors is lower because of the discount. A payment, the amount of which does not vary with marginal purchases, is not a price reduction." See Leffler Decl. II (D.I. 2020) at ¶ 7, n.12.

Dr. Leffler also testified that certain "rebates on-invoice payments" made by Intel were

discounts:

> Q:  By on-invoice payments, do you mean an allowance rebate
> which is actually recorded on the invoice? . . .
>
> A:  I mean a price discount.  It may not be on the original invoice,
> but it was a discounted price.  It may show up in the form of a
> rebate at the end of the month, but its known to be a form of rebate
> payment or discount by Intel that's associated with the purchase of
> particular microprocessors that effectively reduce your cost of
> those microprocessors.

See Leffler Decl. I (D.I. 920) at ¶ 42 n.77; Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 210:11-22.

Finally, Dr. Leffler testified that ECAPs "mostly" took the form of lower prices –

meaning discounts.  See Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 51:16-52:4.

## July 23, 2009 – Class Plaintiffs' Reply Brief In Further Support Of Class Certification — Class Plaintiffs Only Challenge Loyalty Payments,[37] Not Discounts

Almost a full year later, on July 23, 2009, in Class Plaintiffs Reply Brief, Class Plaintiffs

for the first time fell in line with Dr. Leffler's testimony, by placing Intel's monetary concessions

into two categories – (1) "price reductions" or discounts – which Class Plaintiffs do not

challenge; and (2) anticompetitive loyalty payments:

> Intel's arguments are based on a misunderstanding of plaintiffs'
> theory.  Contrary to Intel's assumption, plaintiffs are not
> complaining about Intel price reductions, whether these take the
> form of discounts, rebates or credits.  Rather, critically, Intel's
> anticompetitive conduct consists primarily of payments or threats
> to certain key OEMs, unrelated to the prices they were paying to
> Intel, to buy or coerce their agreement not to do business with
> AMD or to significantly limit their business relationship with
> AMD . . . The illegal acts (among others) are the loyalty payments,
> not the price adjustments.

See Class Certification Reply Brief (D.I. 2017) at 24-25.[38]

---

[37] The Special Master notes that Class Plaintiffs seem to use the terms loyalty payments, bribes, and rebates interchangeably.  According to Class Plaintiffs, "Intel's loyalty payments lowered the overall cost to the OEM recipients of doing business with Intel."  Class Certification Reply Brief (D.I. 2017) at 25.

Similarly, and in the Special Master's view by no coincidence, in Dr. Leffler's Reply

Declaration filed on the same date, Dr. Leffler more precisely drew the same distinction between

discounts and loyalty payments:

> [d]iscounts on microprocessors can reduce the price from Intel and
> the cost to an OEM for purchase of additional microprocessors.
> Discounts on microprocessors can consequently (absent
> "predatory" pricing) be pro-competitive. In contrast, payments for
> loyalty, which are the focus of my analysis of alleged
> anticompetitive acts, do not reduce the price from Intel and are not
> pro-competitive.

See Leffler Decl. II (D.I. 2020) at ¶ 7.

In sum, as of July 23, 2009, Class Plaintiffs and Dr. Leffler were for the moment on the

same page.

## February 2, 2010 – Class Plaintiffs Reply To Intel's Opposition To Class Plaintiffs' Preliminary Trial Plan

In their final pre-Class Certification Hearing filing, on February 2, 2010, in the Special

Master's view Class Plaintiffs appeared to revert to their primordial view that each and all of

Intel's monetary concessions were anticompetitive, namely – "[w]hile Intel claims to have a

number of rebate programs that ostensibly function in different ways and serve different

purposes (MCP, LCAPs, ECAPs, MDF, etc.), the one thing all these programs have in common

is that Intel could refuse to pay them if the OEMs did business with AMD." See Class Plaintiffs'

Reply Brief In Further Support of Trial Plan ("Trial Plan Reply") (D.I. 2297) at 27. Thus, as

Class Plaintiffs put it, "[e]ach of its [Intel's] various 'back end' rebate programs . . . are

anticompetitive penalties used to punish disloyal OEMs," and include rebates, ECAPs, LCAPs,

meet-comp and MDF. Id. at 27, 31. Class Plaintiffs were "not attacking these payments

---

[38] Notwithstanding Class Plaintiffs' assertion that Intel misunderstood Class Plaintiffs' theory, it may be helpful to understand that the Special Master shared Intel's view of Class Plaintiffs' stated theory – namely that "all of Intel's rebate schemes are discriminatory and market-foreclosing." See FACC (D.I. 108) at ¶ 171 (emphasis added).

[ECAPs] as anticompetitive", but "[w]hile some Intel ECAP payments may possibly have been applied to particular processors, common evidence is capable of demonstrating that Intel's ECAP program was often simply subterfuge for Intel's policy of 'price retaliation.'" Id. at 30.

Yet, even within Class Plaintiffs' Trial Plan Reply, Class Plaintiffs vacillated between various positions on ECAPs. While at one point Class Plaintiffs challenge ECAPs as anti-competitive and stated that they "were not price adjustments," Dr. Leffler concluded that "ECAPs "mostly" took the form of lower prices, and thus the indirect purchaser received the benefit of the payment. Id. at 30-31; Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 51:16-52:4.

## April 15, April 16, and April 19, 2010 – Class Certification Hearing

On April 15, 2010, during Class Plaintiffs' opening statement, Class Plaintiffs challenged "loyalty payments", where "they [Intel] bought loyalty and made it a condition of these payments that OEMs would not deal with AMD, would not buy from AMD, or if they did, would do so only on a very minor scale . . . from our perspective, these were not actual discounts. They were, in essence, bribes to prevent competition from AMD and . . . other potential competitors." See Class Certification Hrng. Tr. (D.I. 2438) at 20:10-20:14, 21:2-6.

At the same time, on the first day of the Class Certification Hearing, on direct examination, Dr. Leffler made clear that he did not challenge discounts:

> Q: . . . And do the economics as you analyzed them support the . . . [theory] that its discounts that plaintiffs are contending that led to overcharges?
>
> A: I will speak to the economic analysis I have done in this case, and that economic analysis . . . there is nothing I have attempted to do that talks about discounts being turned into overcharges. Discounts as far as I'm concerned, I think it's been clear in various snippets of my deposition testimony and my reports that have been cited, I am not analyzing discounts, I am analyzing things that are not discounts.

See Class Certification Hrng. Tr. (D.I. 2438) at 223:6-20.

In fact, Dr. Leffler confirmed that his analysis focused on loyalty payments:

> Q: And is it your understanding based on the economics of this
> case that its discounts or loyalty payments that led to overcharges
> to the class?
>
> A: My analysis is focuses solely on nonprice payments [loyalty
> payments].

Id. at 224:8-13.

On the first day of the Class Certification Hearing then, in the Special Master's view,
Class Plaintiffs reverted back to the theory set forth in their Class Certification Reply Brief,
namely that Class Plaintiffs were only challenging loyalty payments and were not challenging
discounts.

Notwithstanding the long, winding road of contradictory positions taken by Class
Plaintiffs from May 2006 to April 2010 the Special Master concludes that the fundamental
theory espoused by Class Plaintiffs was that advocated at the Class Certification Hearing, and
also relied upon in the Class Certification Reply Brief– i.e. that Class Plaintiffs challenge loyalty
payments/rebates as anti-competitive and do not challenge discounts. As such, the question
becomes whether Class Plaintiffs have demonstrated that antitrust impact is capable of proof at
trial through evidence common to the class. For the reasons set forth below, the Special Master
concludes that the answer is no.

### (2)     The Facts Contradict Class Plaintiffs' Economic Theory.

### A.     Some Loyalty Payments Resulted in Lower Microprocessor Costs For OEMs and Lower Prices For Some Class Members.[39]

### Dell

"Class Plaintiffs are challenging Intel's loyalty payments to Dell, which includes payments made under the auspices of its MCP program, as anticompetitive." See CPRIPFF at ¶ 58; see also Class Plaintiffs' Preliminary Trial Plan (D.I. 2018) at 22 ("Intel maintained this exclusive relationship through the use of anticompetitive bribes paid through various mechanisms, including the so-called 'Meet-Competition Program' ('MCP'), and . . . from 2002 to 2006, Intel made Dell over $6 billion in undifferentiated lump sum quarterly payments in exchange for Dell's commitment to purchase CPUs exclusively from Intel."). One of the programs Class Plaintiffs challenge as anti-competitive is Dell's MCP program. See Leffler Decl. II (D.I. 2020) at ¶ 8 ("Intel's loyalty payment strategy was designed to constrain AMD's competitive strength in the marketplace. For example, Dell noted that '[the] intent of the MCP program is to provide funding to Dell to combat the AMD threat in the marketplace since Dell is an Intel-only OEM for CPUs).

Notwithstanding Class Plaintiffs' theory regarding MCP and even in the face of his own Reply Declaration, Dr. Leffler testified that Intel payments to Dell under the MCP program constituted discounts:

> Q:  …..you're familiar with [the] MCP program?
>
> A:  Generally, yes.
>
> Q:  Do you have an opinion as to what category those payments are in, discounts or bribes.

---

[39] Attached as Appendix "B" hereto is a list of instances wherein Class Plaintiffs themselves assert that "some", not "all", of Intel's monetary concessions led to higher microprocessor prices.

> A:  Generally those payments are things that affect the marginal
> cost of buying microprocessors and therefore what I call discounts.

See Leffler Dep. Tr. II (D.I. 2270, Exh. 2) at 535:17-536:6.

Dr. Leffler reiterated that the MCP program constituted discounts:

> Q:  So clearly the MCP program, if this is a correct description of
> it, is a program that reduced the price of computers.
>
> A:  At least that was its intent?
>
> A:  That would be, yes.
>
> Q:  And effect.
>
> A:  I'm assuming that Dell is a rational OEM and therefore reacts
> to lower microprocessor prices resulting from assuming MCP or
> means of the type of payment that lowers their price by, yes,
> selling more Intel-based Dell computers.

Id. at 537:7-22.

Aside from the fact that Class Plaintiffs and Dr. Leffler disagreed about whether Dell's

MCP program amounted to discounts or loyalty payments, in the Special Master's view the facts

flatly contradict Class Plaintiffs' theory that all of Intel's payments to Dell were anticompetitive

loyalty payments.

For example, Class Plaintiffs challenge all Intel payments to Dell asserting that

"[p]ursuant to a money for market share scheme, Intel paid Dell $6.08 billion over five years

(2002 to 2007)." See CPPFF at ¶ 35 (totaling all MCP and non-MCP payments).  However, Dell

executives testified that the MCP program referred to discounts:

> Q:  Did Dell seek discounts from Intel to help it compete against
> the OEMs against which Dell was competing in the marketplace?
>
> A:  Absolutely.
>
> . . .
>
> Q:  During the course of your deposition, Mr. Allen, there's been a
> lot of words in documents related to the Intel MOAP program,

> funding, rebates, discounts, dollars, money.  When those terms are
> used to refer to the MCP program . . . are they referring to
> discounts, in your experience?
>
> A:  Yeah, effectively, yes.

(D.I. 2018, Tab 202) (Allen Dep. Tr.) at 686:21-25; 687:12-688:7; see also Dep. Tr. of

Christopher Goelkel (Dell) (D.I. 2273, Exh. 219) at 100:19-101:12 (Dell's R. 30(b)(6) witness

testified that Dell loaded Intel payments into Merlin, Dell's "cost forecasting system", which

lowered the cost of goods sold); Beach Decl. (D.I. 2270, Exh. 10) at DELL-0019-0169086-88

(showing specific allocation of rebates by Dell to certain processors).

Moreover, in Dell's submission to the European Commission dated November 11, 2005,

Dell described its MCP program as follows:

> Dell negotiated a new discount programme referred to as MCP or
> "meet competition program" (it was initially referred to,
> colloquially, as the "mother of all programmes" or "MOAP").
> Under MCP, Dell receives a discount not on a per microprocessor
> basis, but rather as a percentage of Dell's total purchases of all
> Intel products (not just microprocessors) . . .
>
> *Because Dell applies a portion of these discounts to reduce
> specified microprocessor costs*, there are internal references that
> occasionally and confusingly refer to this as a "ECAP".  The
> reason this terminology has lingered is that, like the historical
> ECAP programme, *the cost of specific microprocessors is marked
> down.*

See Response of Dell, Inc. to European Commission Competition DG Request for Information

Dated 11 November 2005 (D.I. 2270, Exh. 11) at DELL-0001-0249302 (emphasis added).

Similarly, an internal Dell document describes the "typical split" of the $6.08 billion Intel

provided to Dell – 47.5% in ECAP,[40] 5% in bid bucket funds, and 47.5% in MDF funds. See

Declaration of Sujal Shah ("Shah Decl.") (D.I. 2322, Exh. 16) at DELL-0019-0005595.

---

[40] The document notes that this money is an offset to COGS, "cost of goods sold" and is therefore a discount. See
Shah Decl. (D.I. 2322, Exh. 16) at DELL-0019-0005595.

Accordingly, 52.5%, or $3.192 billion of the funds Dell received, lowered the cost of

microprocessors.

Indeed, at the Class Certification Hearing, when referring to this chart, Dr. Leffler

admitted that Dell used MCP funds to discount microprocessors:

> Q: And do you agree, Professor Leffler, with the heading of this
> exhibit, that Dell used MCP funds to discount microprocessors?
>
> A: Well, yes, they certainly did.
>
> . . .
>
> At the same time Dell was given payments that had nothing to do
> with lowering the price, and in a gross overview, the MDF part of
> this, the forty-seven-and-a-half percent is like that has a general
> statement that 52-and-a-half percent on the left side are things that
> generally would affect price, would be discounts.

See Class Cert. Hrng. Tr. (D.I. 2438) at 227:19-228:9.

Dr. Leffler was essentially forced to concede that because OEMs had discretion with

respect to how they used Intel funds, "it makes life harder" with respect to Class Plaintiffs'

ability to prove impact on a class-wide basis:

> So would it have been easier if there were no discretion on the
> parts of the OEMs for the plaintiffs' case, yes, it certainly would
> have been because the detailed analysis wouldn't have been
> required. It's a class-wide analysis, *but it is a detailed analysis.*

Id. at 233:6-11; 234:2-7 (emphasis added).

In the Special Master's view Dr. Leffler highlights the fundamental and seminal problem

with Class Plaintiffs' case – the fact that OEMs had discretion to use Intel's monetary

concessions as they chose – thereby creating countless issues of individualized fact not possibly

capable of common proof. For example, for Dell alone, Dr. Leffler would have to analyze and

exclude from the proposed class individuals who benefited from the $3.192 billion in Intel

payments, which he admitted were discounts that lowered the price of microprocessors. Dr.

Leffler performed no such analysis. Rather, Dr. Leffler merely stated that Class Plaintiffs would establish "at the merit stage . . . that there were sufficient payments that were not price discounts, and that those payments were sufficient to limit AMD's competitive presence in the marketplace . . . such that it allowed Intel to set higher prices than otherwise." See Class Cert. Hrng. Tr. (D.I. 2438) at 233:13-233:20. Dr. Leffler further stated that he had "not completed the process of the detailed analysis that[] involves." Id. Without more, Dr. Leffler's mere assurance that he will do the work and develop the analysis later for the trial on the merits rings hollow and does not comport with the standard in Hydrogen Peroxide. See 552 F.3d at 318.

The Special Master concludes that Dr. Leffler's response rather than obviating the need for an individualized analysis to be performed to determine which class members received the benefit of Intel's monetary concessions actually demonstrates that an individualized analysis is necessary. For example, for Dell alone, more than half of the proposed class members that purchased computers from Dell received a microprocessor discount.

The Special Master concludes that individualized inquiry is necessary to determine how much of Intel's monetary concessions were passed on to indirect purchasers during the class period, an analysis Dr. Leffler failed to perform.

### Hewlett Packard

Documents and testimony demonstrate that HP had discretion with respect to how it used Intel's monetary concessions – i.e. whether they used those dollars to reduce microprocessors prices (passed along the payments to the indirect purchaser) or applied the monetary concessions to their bottom line. For example, an internal Intel document dated July 18, 2001 states that "HP is restructuring the way they handle ECAP dollars, and are working to apply the money to the bottom line as we requested, without starting a new price war, or fueling the current price war."

See Beach Decl. (D.I. 2271, Exh. 38) at 66507DOC0000251. When questioned about the

document, HP's Joe Lee testified that some of Intel's monetary concessions were indeed passed

on to the indirect purchaser:

> Q: And Mr. Lee, there a - the next bullet point, a sub-bullet point,
> that says 'Some rebate dollars are passed along to customers, most
> drop to HP's bottom line.' Do you see that?
>
> A: Yes.
>
> Q: Is that an accurate statement?
>
> A: Yeah, at the time I wrote this, I believed that yes.
>
> A: And when you say 'most drop to HP's bottom line' what did
> you mean by that Mr. Lee?
>
> A: Many of Intel rebates we were able to use to enhance HP's
> profitability.
>
> A: And in what sense did they enhance HP's profitability? ...
>
> A: Some of the discounts that we receive from Intel; the rebates . .
> . were passed along to customers, but we were able to retain much
> of it and enhance HP's profitability.

See Class Plaintiffs' Preliminary Trial Plan (D.I. 2027, Tab 216) (Deposition Transcript of Joe

Lee) at 232:12-233:19; 305:21-306:10 ("Some rebate dollars were kept and some rebate dollars

were passed along.").

The Special Master concludes that individualized inquiry is necessary to determine how

much of Intel's monetary concessions were passed on to indirect purchasers during the class

period, an analysis Dr. Leffler failed to perform.

### Gateway

Class Plaintiffs state that the following with respect to Gateway:

> In October 2004, the relationship between Intel and Gateway
> faltered because of the way Gateway was using Intel's 'rebates.'
> Intel did not want Gateway to use the Intel funds it was receiving

71

> to lower its PC price points ('SPPs'), because "SPPs are too low
> and will expose 'something's up' to the other OEMs.

See Class Plaintiffs' Preliminary Trial Plan (D.I. 2027) at 39 (citing Tab 133 at

67657DOC0001946) (emphasis in original) ("SEE ANSWER BELOW, BUT PART OF THE

VALUE TO GW [Gateway] OF PARTICIPATING IS HAVING THE FLEXIBILITY TO USE

THE FUNDS WITHOUT RESTRICTION.").

The Special Master concludes that Gateway, at least until 2004, used Intel's monetary

concessions to lower the price of microprocessors, thereby benefiting some indirect purchasers

during the class period.

The Special Master concludes that individualized inquiry is necessary to determine how

much of Intel's monetary concessions were passed on to indirect purchasers during the class

period, an analysis Dr. Leffler failed to perform.

### IBM

Class Plaintiffs challenge IBM's ECAP payments as anticompetitive.  See Class

Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("CPPFFCL") at ¶ 57(b) ("An

internal Intel email chain from December 1999 detailed Intel's attempt to prevent IBM from

using AMD in the commercial segment").  However, IBM's internal documents demonstrate that

IBM used Intel ECAPs to "enable low cost bids" and for "aggressive" pricing.  See Class Cert.

Reply (D.I. 2024, Tab 8) at 66667DOC5000001-2.

The Special Master concludes that IBM used at least some ECAP payments to lower the

price of microprocessors, thereby benefiting some indirect purchasers during the class period.

The Special Master therefore concludes that individualized inquiry is necessary to

determine how much of Intel's monetary concessions were passed on to indirect purchasers

during the class period, an analysis Dr. Leffler failed to perform.

72

### NEC and Toshiba

With respect to NEC, Class Plaintiffs assert that "[e]xplicit money-for-market schemes continued in 2003." See Class Plaintiffs' Preliminary Trial Plan (D.I. 2018) at 38. However, an internal NEC document demonstrates that ECAPs from Intel to NEC in 2003 lowered the cost of microprocessors. See Class Cert. Reply (D.I. 2024, Tab 1) at 66039DOC0001364. The same is true for Toshiba. See CPPFFCL at ¶ 75; Declaration of Kevin H. Davenport (D.I. 2301, Tab 70) at TOSH-0036822.

The Special Master concludes that NEC and Toshiba used some ECAPs to lower the cost of Intel microprocessors during the class period.

The Special Master therefore concludes that individualized inquiry is necessary to determine how much of Intel's monetary concessions were passed on to indirect purchasers during the class period, an analysis Dr. Leffler failed to perform.[41]

Class Plaintiffs' response to the overwhelming evidence of record in this regard is that "[w]hether a particular OEM decided to treat some or all of a payment from Intel as a reduction in cost is irrelevant to class certification." See CPRIPFF at ¶52; see also id. at ¶¶25, 26, 44-46, 50, 51, 53, 61, 63-66, 69, 70-76, 78, 87 and 95. However, at the Class Certification Hearing, Dr. Leffler flatly, and in the Special Master's view, properly disagreed:

---

[41] Even AMD observed in principle that individual analysis is necessary to determine how much of Intel's monetary concessions were passed on to indirect purchasers because OEMs had discretion with respect to how to use these funds:

> We know enough anecdotal information to know that there is no consistent pattern. Some OEMs account for anticipated rebates at the product line level and take them into account for pricing, some at the corporate P&L level and do not take them into account for pricing, and they vary in making the choices and make different choices at different times for reasons known to them and not us.

See Beach Decl. (D.I. 2270, Exh. 8) (AMD 30(b)(6) Written Responses, Topic 12).

> Q: Now, reading from this slide, it's the response, plaintiff's
> response to Intel's proposed findings of fact. And I'm reading
> whether a particular OEM passed on some Intel payment dollars in
> the form of lower prices is irrelevant to class certification. You,
> Professor Leffler, would you disagree that the passing on in the
> form lower prices is irrelevant. True?
>
> A: I wouldn't write that sentence . . . I would never write this.
>
> . . .
>
> A: I would certainly agree that this could lead to the interpretation
> that it matters for nothing and I would not agree with that.
>
> Q: It's key to you?
>
> A: In order to establish anticompetitive impact, you['ve] got to be
> able to quantify, establish that the loyalty payment were sufficient
> to ca[use] anticompetitive impact, yes.

See Class Certification Hrng. Tr. (D.I. 2439) at 451:4-452:10.

Mr. Kaplan agreed that individual analysis is necessary:

> I believe that . . . a very careful examination is required as to which direct buyers
> received the payments, when they received them, how much they were, and very
> importantly what did they do with the money that they were provided as part of this
> allegation, i.e., did they pass any of it on in the form of lower computer prices that
> were ultimately purchased by proposed class members . . . [A]s I understand
> plaintiffs' allegation, these claimed loyalty payments are going to disappear in the
> but for world, they're no longer going to exist. . . . And we have to ask ourselves
> the question, for that particular proposed Class member, are they necessarily better
> of in a but for world when they no longer have the advantage of that benefit.

Id. at 590:14-591:19.

In the face of a clear and strong record that OEMs had discretion to use Intel's monetary

concessions as they chose, the Special Master concludes that common issues do not predominate

and that individualized inquiry is necessary to determine which proposed class members were

negatively impacted by Intel's challenged conduct, which proposed class members were not

impacted at all and which proposed class members may have actually benefited.

74

### (3)    The Extent Of Pass-Through Depends On A Number Of Factors Which Dr. Leffler Did Not Take Into Account.

Dr. Leffler opined that "there will be a full or more than full pass-on of a cost change" of

the cost of a microprocessor to the ultimate purchaser. See Leffler Decl. II (D.I. 2020) at ¶ 7. At

the same time he admitted that "[t]he prices of personal computers are influenced by many

factors including product features, reputation, marketing strategy, competition particular to

segments of the market, and bundled products and services." See Leffler Decl. I (D.I. 920) at ¶

8(F). Yet Dr. Leffler chose not to account for these factors because he reasoned that:

> these factors are independent of the overall price level of the Intel
> x86 microprocessors and the alleged Intel activity. If the prices of
> a major component of personal computers, the Intel x86
> microprocessor, are lower to all computer makers for a substantial
> period of time (as they would have been in the but-for world), and
> other factors explaining relative prices are unchanged, basic
> economic principles of competition imply that the entire price
> matrix of personal computers power by Intel x86 microprocessors
> would be at a lower level.

Id.

In other words, Dr. Leffler chose not to take into account the individual factors that effect

OEMs' pricing decisions because in his theoretical "but for" world he concludes that the entire

matrix of microprocessor prices would be lower.

The Special Master concludes that Dr. Leffler cannot simply ignore the evidence of

record by simply stating – *ipse dixit* – that an industry-wide cost decrease would occur in the

"but-for" world.  For example, in discussing the factors that OEMs took into account in setting

prices for products containing x86 microprocessors, and "whether those factors varied as

between different devices, different OEMs, different competitive conditions, different parts of

the country or different times of the year", AMD's response was as follows:

> we generally understand the factors to be: component costs,
> channel costs, time of year (for example, Black Friday), inventory

> levels, shipping costs, traffic building inducement costs,
> competition from other OEMs, retailer target price points, demand,
> cost of after sale service, software loads, supply chain costs, and
> currency fluctuations.

See Beach Decl. (D.I. 2270, Exh. 8) (AMD Fed. R. Civ. P. 30(b)(6) Written Responses, Topic

14).

With respect to retailers, AMD described that retailers took the following factors into

account in setting their prices:

> generally we understand the factors to be: their costs, how the
> market segments into demand at various price points, prices being
> offered by OEMs and their differentiated value propositions,
> seasonality, their own competition in various geographies or
> segments of the retail industry, and third party rebates, spiffs and
> other funding.

Id. at Topic 15.

The Special Master concludes that Dr. Leffler's assumption of full or more than full pass-

on is contradicted by the uncontroverted testimony of the OEMs and retailers, who took a variety

of factors into account in determining whether to pass on to the indirect purchaser Intel's

monetary concessions (through lower microprocessor prices). See Becker Dep. Tr. (Circuit City)

(D.I. 2273, Exh. 206) at 81:8-25 (Circuit City "strives to negotiate cost savings", but may or may

not "strive to pass on those cost savings" to its customers "depending on what you're trying to

achieve for that quarter and what your budget is"); Id. at 17:19-22 (Circuit City will sell a

particular model of computer at different prices based on "how much you purchased", what the

"brand is", where you are in the "life cycle", and what "similar brands" are being sold for by

competitors"); Declaration of Bruce Greenwood (HP) (D.I. 1247) at ¶ 6 (it "is not simply a 'cost-

plus' calculation", "HP determines the price for the notebooks and desktops it sells not according

to a percentage mark-up on the cost of goods sold", but by taking into consideration factors such

as "the current competitive landscape" that "may vary region by region, platform and end user

segment", in addition to factors such as the "lifecycle or age of the computer product, brand value, time to market, delivery, timing, saleability and costs of goods sold.") and ¶ 11(a) ("HP does not necessarily alter its prices for its computer products when Intel changes the price of a microprocessor" because of "many variables," including, among many others, if "HP wishes to affect its market share or whether it wants to affect its margins" and noting that "[t]o determine whether HP changed the price of a computer product when there was a change in the cost of a microprocessor would be an extremely difficult, individualized inquiry and would require an examination of the circumstances that existed at that time"); Declaration of Robert J. Herman (Lenovo) (D.I. 1249) at ¶¶ 5-6 ("list price that Lenovo sets for its laptops and desktops is the product of a number of considerations; the price decision is not simply a 'cost plus' calculation" and that "[w]ith respect to microprocessors during the past eight years, following a change in Intel's CAP to Lenovo for a microprocessor or receipt of an Intel discount or rebate on an Intel microprocessor, Lenovo sometimes has, and sometimes has not, changed the price [that] Lenovo charges for the Lenovo PC containing that microprocessor."); Goelkel Dep. Tr. (Dell) (D.I. 2273, Exh. 219) at 171:3-4 (Dell "[c]ould potentially, depending on all the factors, margin and going through the revenue" lower the cost of a computer if there was an industry wide cost decrease in microprocessors"). Dr. Leffler cannot through economic theory simply ignore the facts. The facts of record in this regard are anything but murky, contrary to Dr. Leffler's view that "more often than not facts are a little murky and economic theory is how one sorts them out." See Leffler Dep. Tr. II (D.I. 2270, Exh. 2) at 513:14-16.

•

Based on the variety of factors that OEMs and retailers take into account in setting their prices, the Special Master concludes that individualized analysis is needed to determine to what extent a purported Intel overcharge was passed on to indirect purchasers who were subject to

77

different chains of distribution and pricings decisions at each point in the chain, an analysis Dr. Leffler failed to perform.

### (4)   Dr. Leffler's 2006 Overcharge Regression Fails To Demonstrate That Common Issues Predominate.

Dr. Leffler performed a regression analysis that compared the change in prices from the first to third quarters in 2006 (the "2006 Overcharge Regression"),[42] "when Intel lowered the prices of its desktop microprocessors to combat increasing competitive pressure" as "an ideal benchmark that demonstrates the feasibility of a classwide approach to the quantification of the overcharge to the direct purchasers of Intel x86 microprocessors." See Leffler Decl. I (D.I. 920) at ¶ 37; Leffler Decl. II (D.I. 2020) at ¶ 4. Dr. Leffler testified that he did not include the Core II Duo Intel microprocessor in the 2006 Overcharge Regression because it was not sold in the first quarter of 2006, nor did he include mobile microprocessors because "AMD was not focusing on the mobile market, [and] it was not a strong competitor in the marketplace, and so my hypothesis was that that was an area where it would not be a good test of the increased competition that occurred in the 2006 era." See Class Certification Hrng. Tr. (D.I. 2439) at 346:7-13; 347:5-16.

According to Dr. Leffler, "Intel's prices of its desktop microprocessors did fall significantly from the first quarter to the third quarter of 2006" for the following reasons:

(i) pressure from the Japanese Fair Trade Commission and European Commission that "Intel had engaged in unfair business practices";

(ii) increased competition from AMD's Athlon 64 microprocessor in September 2003, which heightened "Intel fear[s] that AMD inroads, first into the corporate server market and then into the corporate desktop market, might offer AMD the credibility to generally

---

[42] See Class Certification Hrng. Tr. (D.I. 2439) at 345:19-23 (Dr. Leffler testified that: "I looked at all the desktop processors, I compared their pricing in the first quarter of 2006, and then I looked at their pricing . . . both in the third quarter and in the second half of 2006.").

attack the lucrative commercial/enterprise market segment, and to add to its success in consumer sales";

(iii) "the introduction of desktop dual-core Pentium Extreme microprocessors, and AMD's Athlon 64x2 microprocessors in April and May 2005, respectively, with AMD's new microprocessor consistently receiving more favorable reviews"; and

(iv) HP's increasing involvement with AMD in 2005, with Dell and other OEMs to follow. See Leffler Decl. I (D.I. 920) at ¶¶ 37, 39.

As a result of his 2006 Overcharge Regression, Dr. Leffler concluded that the "evidence strongly supports the hypothesis that all desktop microprocessors had price reductions as a consequence of the increased competition in the second half of 2006." Id. at ¶ 42. At the same time, Dr. Leffler had to concede that Pentium 4 chips that were most competitive with the Core 2 Duo chips (those Pentium 4s with speeds equal to or above 3.0 Ghz) did not exhibit a price reduction in the second half of 2006. See Leffler Decl. II (D.I. 2020) at ¶ 41, n.112 ("the prices of Pentium 4 chips that were most competitive with the Core 2 Duo chips (those Pentium 4s with speeds equal to or above 3.0 Ghz) did not have significant price changes" for a "strategic reason", i.e. "for Intel to encourage the market toward rapid adoption of the dual core microprocessors"). Dr. Leffler's explanation is in the Special Master's view unavailing. The fact remains that the Pentium 4 chips (with speeds equal to or above 3.0 Ghz) did not exhibit a decrease in price in the second half of 2006. In sum Dr. Leffler's "all" is in real world facts not "all", rendering his opinion in this regard imprecise at best.

After considering the evidence of record, the Special Master concludes that the 2006 Overcharge Regression fails to demonstrate that the element of antitrust impact is capable of proof at trial through common proof for the reasons set forth below.

**(A)     When the 2006 Overcharge Regression Is Disaggregated By Brand Or By OEM, Some Prices Rose and Some Prices Fell In The Second Half Of 2006.**

Dr. Leffler aggregated all brands and all OEMs into one single regression. When disaggregated by brand using Dr. Leffler's data, Mr. Kaplan demonstrated that 4 out of the 6 brands showed an increase, rather than a decrease in prices in the second half of 2006 – just the opposite of Dr. Leffler's hypothesis:

|  | Leffler | Celeron D | Celeron | Pentium III | Pentium 4 All | Pentium 4 GHz Or Above | Pentium D | Pentium Extreme |
|---|---|---|---|---|---|---|---|---|
| **% Change** | -13.6% | -29.4% | 21.3% | 22.9% | -3.0% | 32.8% | -38.0% | 29.7% |
| **Increase Or Decrease** | ↓ | ↓ | ↑ | ↑ | All Pentium 4 | ↑ | ↓ | ↑ |

See Intel Demonstrative Exhibit (D.I. 2425) at **86** (4 out of 6 brands experienced an increase in prices in the second half of 2006).

Similarly, when disaggregated by OEM using Dr. Leffler's data, Mr. Kaplan demonstrated that 6 out of 10 OEMs showed an increase, rather than a decrease in prices in the second half of 2006 – just the opposite of Dr. Leffler's hypothesis:

*[Remainder of page intentionally left blank]*

**(A)**   **When the 2006 Overcharge Regression Is Disaggregated By Brand Or By OEM, Some Prices Rose and Some Prices Fell In The Second Half Of 2006.**

Dr. Leffler aggregated all brands and all OEMs into one single regression.  When disaggregated by brand using Dr. Leffler's data, Mr. Kaplan demonstrated that 4 out of the 6 brands showed an increase, rather than a decrease in prices in the second half of 2006 – just the opposite of Dr. Leffler's hypothesis:

|  | Leffler | Celeron D | Celeron | Pentium III | Pentium 4 All | Pentium 4 GHz Or Above | Pentium D | Pentium Extreme |
|---|---|---|---|---|---|---|---|---|
| **% Change** | -13.6% | -29.4% | 21.3% | 22.9% | -3.0% | 32.8% | -38.0% | 29.7% |
| **Increase Or Decrease** | ↓ | ↓ | ↑ | ↑ | All Pentium 4 | ↑ | ↓ | ↑ |

See Intel Demonstrative Exhibit (D.I. 2425) at 86 (4 out of 6 brands experienced an increase in prices in the second half of 2006).

Similarly, when disaggregated by OEM using Dr. Leffler's data, Mr. Kaplan demonstrated that 6 out of 10 OEMs showed an increase, rather than a decrease in prices in the second half of 2006 – just the opposite of Dr. Leffler's hypothesis:

| | Leffler | Dell | HP | IBM | Tosh. | Fujit. | Acer | Len. | Sony | NEC | GW |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **% Change** | -13.6% | 22.7% | .2% | -8.7% | -15.1% | 9.7% | 21.2% | 8.6% | -10.0% | 2.7% | 7.0% |
| **Increase Or Decrease** | ↓ | ↑ | ↑ | ↓ | ↓ | ↑ | ↑ | ↑ | ↓ | ↑ | ↑ |

Id. at Slide 87.

In the Special Master's view, Dr. Leffler unsuccessfully attempted to explain away these

striking inconsistencies:

> Q: Do those [the Table 4 Analysis] provide a final answer as to whether the price of Intel microprocessors would be lower in the but for world?
>
> A: No, because, again, as we've discussed, it's . . . including all the Pentium 4's. It's including all the Celerons that have not yet gone into the data and attempted to do those fine divisions into which of those microprocessors, where I don't expect increased competition.

See Class Certification Hrng. Tr. (D.I. 2439) at 375:10-19.

> Q: Why did you include all desktop microprocessors in your benchmark analysis other than the Core II Duo?
>
> A: I thought it was a this point, my purpose was to discuss, to establish a feasible methodology, to see in general that it would work, that it was supporting my hypothesis.
>
> While I was aware that there were certainly segments in the entire desktop market where there was not or I would not expect to see effects of increase Intel competition given the broad set of

> processors I was including, I did not feel that it was appropriate at
> this time for me to be making fine cuts in the data that would
> exclude particular segments and include particular segments, so I
> just included it all thinking that's the most conservative approach
> and if it works for that approach, it's showing this methodology is
> certainly going to work in its final implementation.

Id. at 347:23-348-18.[43]

In sum, Dr. Leffler's concluded that "all desktop microprocessors had price reductions as

a consequence of the increased competition in the second half of 2006." Leffler Decl. II (D.I.

2020) at ¶ 42 (emphasis added). However, when confronted with the fact that the data did not

support his hypothesis, Dr. Leffler responded that he had not made "fine cuts" of the data – i.e.

excluded data where he didn't "expect increased competition". See Class Certification Hrng. Tr.

(D.I. 2439) at 348:12; 375:18-19.

The Special Master concludes that these facts are not murky and Dr. Leffler's response is

unavailing – Dr. Leffler cannot simply ignore data that does not support his hypothesis.

Moreover, the Special Master notes that Dr. Leffler had approximately four years to complete the

2006 Overcharge Regression, and cannot now claim that he has not completed a final analysis at

such a late stage in the proceedings.

Put simply, the 2006 Overcharge Regression in the Special Master's view proves that

there was not, as Dr. Leffler posited, an across-the-board reduction in Intel microprocessors in

the second half of 2006. Rather, the evidence supports the conclusion that Intel raised or

lowered prices depending upon the OEM and depending upon the brand and/or other factors. As

---

[43] Dr. Leffler testified at his deposition and at the Class Certification Hearing that the "Celeron" processor was a so-called legacy product, a product at "the end of its life", an "old processor" that had "very few sales" and thus an increase in price in the second-half of 2006 for these processors was not something he "paid attention to". See Leffler Dep. Tr. II (D.I. 2270, Exh. 2) at 694:5-16; Class Cert. Hrng. Tr. (D.I. 2439) at 349:19-353:20 (stating that legacy chips are sold in "very small quantities" but "there's no competition . . . with respect to a chip that old", and pricing plays "little role in any sales"; Pentium 3 chips were legacy chips). According to Dr. Leffler, the price of legacy products are a "function of its past price not its current price" and he "included it to be conservative". See Leffler Dep. Tr. II (D.I. 2270, Exh. 2) at 694:24-695:7.

such, the Special Master concludes that individualized inquiry is necessary to determine whether

proposed class members were negatively impacted, positively impacted or not impacted at all by

Intel's monetary concessions, an analysis Dr. Leffler failed to perform.

### (B)     Averaging Is Not Appropriate.

When asked whether he ran separate overcharge regressions for different OEMs, Dr.

Leffler responded:

> A: No.
>
> Q: Why not?
>
> A: I talked earlier about the demonstrative that Mr. Pickett put
> there where he had the results of separate OEM regressions.
>
> . . .
>
> I haven't run those and done the analysis to understand them. I
> expect there to be very different results. I certainly – when I
> looked at them, I certainly know why some of those look different,
> but I'd have to delve into the detail of each relationship, each set of
> chips they bought . . .
>
> By running all the data, you've taken care of all those problems.
> That's the power of a regression. That's the power of an average,
> if you will. It's exactly what you want to know in these situations.
> You want an abstract from all of these idiosyncratic details that
> take away from the big picture of the change in competition.

See Class Certification Hrng. Tr. (D.I. 2439) at 406:19-407:2, 407:20-408:15.

To Dr. Leffler then the "power" of his regression analysis is that, through averaging, it

gets rid of the "idiosyncratic details" – that Intel prices with respect to some brands and some

OEMs actually increased during the second half of 2006 – contrary to his hypothesis and the

very detail that characterizes the x86 microprocessor market. Mr. Kaplan criticized Dr. Leffler's

2006 Overcharge Regression as follows:

> Dr. Leffler admits that his model 'stacks all SKUs' together and
> 'force[s] the estimated coefficient on cost,' a coefficient designed

> by Dr. Leffler to 'test' the relationship between cost and prices, to
> be the 'same for each SKU' and agreed that his model generates an
> 'average effect across all SKUs' as opposed to analyzing the
> relationship between cost and price for individual chips or personal
> computer models. In other words, rather than testing if, for a
> particular personal computer model, a statistically meaningful
> relationship existed between cost and price, Dr. Leffler's analysis
> generates a claimed 'test' across the different personal computer
> models on 'average'. As a result Dr. Leffler's decision to
> aggregate costs and prices together, if one particular personal
> computer model evidenced no statistically meaningful estimated
> relationship between cost and price, a result inconsistent with Dr.
> Leffler's 'expectations', that result could be lost when his
> computer model is aggregated together with other computer
> models in Dr. Leffler's regressions. In fact, by aggregating SKUs
> together, Dr. Leffler does not investigate the possibility that the
> relationship between cost and price for individual SKUs may differ
> meaningfully with respect to the issues relevant here.

See Declaration of David P. Kaplan dated Oct. 29, 2008 ("Kaplan Decl. I") (D.I. 1251) at ¶ 130

(internal citations omitted).

The Special Master agrees with Mr. Kaplan that by aggregating all microprocessors

(Pentium, Celeron D, Celeron etc.) in the 2006 Overcharge Regression, Dr. Leffler necessarily

and inappropriately misses important individual trends in the data, i.e. the price of some

microprocessors went up and the price of some went down during the second half of 2006. A

common-sense example illustrates that averaging often skews data – "[i]f Microsoft-founder Bill

Gates and nine monks are together in a room, it is accurate to say that on average the people in

the room are *extremely* well-to-do, but this kind of aggregate analysis obscures the fact that 90%

of the people in the room have taken a vow of poverty." See Abram v. UPS of Am., 200 F.R.D.

424, 431 (E.D. Wisc. 2001) (holding that focusing on aggregate numbers with respect to

supervisor pay in class action alleging discriminatory pay differences from district to district and

from supervisor to supervisor precludes finding of commonality).

The Special Master concludes that Dr. Leffler's 2006 Overcharge Regression masks the fact that some proposed class members may have been better off in the "but-for" world or may have suffered no harm at all, and therefore Dr. Leffler's use of averaging to establish common impact is in the Special Master's view simply inappropriate. See, e.g., Blades v. Monsanto Co., 400 F.3d 562, 573-574 (8th Cir. 2005) (rejecting use of averaging to prove common impact where wide price variation present in seeds); GPU II, 253 F.R.D. at 493 (averaging allowed expert to "evad[e] the very burden that he was supposed to shoulder," and rejecting averaging to establish class-wide injury with common proof).

## (5)   Class Plaintiffs Fail To Account For AMD's Pricing Strategies.

AMD engaged a consultant to institute a "pricing improvement process", the first phase of which was completed on September 17, 2003. See Beach Decl. (D.I. 2271, Exh. 29) at AMD-F060-00078497.

On August 22, 2003, AMD internally distributed an "Internal Training for New CPG Pricing and Value Strategy" which indicated that "AMD's historical pricing model is one of aggressive penetration pricing", but that going forward, "AMD will now be following a neutral pricing strategy with respect to our competition." See Beach Decl. (D.I. 2271, Exh. 28) at AMD-F125-5104451-52. Under a neutral pricing strategy:

-Market leaders set the market price, i.e. a pricing umbrella

> AMD will price at or slightly under market leader's pricing umbrella
>
> No deep discounts compared to the competition.
>
> . . .
>
> For our premium products, the AMD Athlon 64 FX processor . . .

-Charge a premium price for superior products.

85

Id. at Exh. 28 at AMD-F125-5104452; see also Beach Decl. (D.I. 2271, Exh. 30) (Dep. Tr. of Kurt Hoover) (AMD) at 69:20-21 (stating that "if you have a similar product, you price it at a similar price").

AMD's internal documents regarding their pricing strategy similarly describe it as one of neutral pricing after 2003. See Beach Decl. (D.I. 2272, Exh. 50) at AMD-F042-00027565 (AMD's Pricing Strategy dated Aug. 27, 2004) (AMD's pricing matrix – "AMD's current pricing strategy calls for parity between Athlon 64 and Pentium and parity between Sempron and Celeron . . . Because AMD is pursuing a parity pricing strategy, determining the 1K prices is simply a matter of determining Intel's expected 1K prices.") and AMD-F00027564 ("Pricing in a Duopoly: In a mature duopoly, the most profitable pricing strategy for a second player in a strong duopoly is neutral pricing. Under neutral pricing, the second player does not attempt to compete for market share on the basis of price, but instead offers comparable prices for comparable products. Neutral pricing is consistent with AMD's desire to compete on customer-centric innovation and customer satisfaction, not price."); Beach Decl. (D.I. 2272, Exh. 50) (AMD Pricing Strategy dated Aug. 27, 2004) ("price competition is a fool's game, you want to not compete on price").

Class Plaintiffs assert that "AMD did not have a strategy termed 'neutral pricing'" and that the term "penetration pricing" was incorrect. See CPRIPFFCL (D.I. 2325) at ¶ 139. The only evidence Class Plaintiffs present is the testimony of AMD's R. 30(b)(6) witness in the AMD Action, Thomas M. McCoy ("Mr. McCoy"), who testified that "he d[id]n't know what . . .[the] words [neutral pricing strategy] mean" and that he had never seen an internal AMD training document regarding AMD's neutral pricing strategy. See Davenport Decl. (D.I. 2301,

86

Exh. 86) at 43:2-20. Moreover, deposition counsel for AMD, David M. Balbanian, stated that Mr. McCoy was not designated as a witness with respect to AMD's pricing policies.

On these facts, the Special Master concludes that AMD changed its pricing strategy from penetration pricing to a neutral pricing strategy on or about August 22, 2003.

According to Dr. Leffler, "basic economic principles imply that the prices of the relevant Intel x86 microprocessors would have been lower in the absence of Intel's anticompetitive acts." See Leffler Decl. I (D.I. 920) at ¶ 8(C). In contrast to Dr. Leffler's basic economic theory, the facts of record demonstrate that AMD's prices in the "but for" world would have been the same if not higher. See CPRIPFFCL (D.I. 2325) at ¶146 (In AMD's Fed. R. Civ. P. 30(b)(6) deposition, AMD's corporate designee on pricing issues, Dirk Meyer, testified that in the "but for" world – even if Intel did not engage in the actions about which Plaintiffs complain – AMD's prices at best would have stayed "roughly the same," if they were not even higher.).

The Special Master concludes that Dr. Leffler's failure to take into account AMD's pricing strategy is yet another reason to conclude that Dr. Leffler's 2006 Overcharge Regression should not be given any weight.

**(6)    With The Adverse Inference Class Plaintiffs' Can Demonstrate That The Purported Intel Overcharge Was "Embedded" At The Beginning Of The Class Period, But Still Cannot Demonstrate Impact On Every Class Member.**

Dr. Leffler testified that Class Plaintiffs would have to demonstrate the existence of an embedded overcharge at the beginning of the class period:

> Q: Do you make any assumptions as to how much time would elapse between the time when, in fact you believe the anti-competitive acts began and the time when AMD would have been able to start exerting downward pressure on price if those acts had not occurred?

> A: No. Only that the plaintiffs will need to demonstrate that the
> effect occurs sufficiently before the beginning of the class period
> to allow an overcharge to be embedded.

See Leffler Dep. Tr. (D.I. 2270, Exh. 1) at 121:19-122:3.

According to Dr. Leffler, "[b]ecause the alleged Intel anticompetitive activities began substantially before the start of the class damages period, any Intel overcharges would have been embedded in PC prices at all levels of distribution by the beginning of the class period." See Leffler Decl. I (D.I. 920) at ¶ 8(D).

Addressing the issue of when Intel's anticompetitive activities had to commence before the beginning of the class period, Dr. Leffler's testimony is in the Special Master's view less than precise, and therefore not credible.

In August, 2008, Dr. Leffler testified that "given the way this industry works, it takes a while for these things [the alleged Intel overcharge] to roll through" and that he "was very comfortable" that an alleged Intel overcharge would need to be "embedded" two years prior to the start of the class period. See Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 105:13-25. Subsequently, on July 23, 2009, in his Reply Declaration, Dr. Leffler stated that "four to eight months, was required between any illegal acts that began or continued at some point and the beginning of the class period to assure that the impact of the monopolization has flowed through to PC prices." See Leffler Decl. II (D.I. 2020) at ¶ 47.[44] At the Class Certification Hearing, when asked how long it would take, with respect to a microprocessor, for a "seller's cost to translate into a change in their resale pricing", Dr. Leffler responded that it would be "quite rapid," but longer than three months, and that he had not reached a "final opinion" on this issue.

---

[44] Intel cites to the expert report of Dr. Thomas Z. Lys, Ph.D. ("Dr. Lys"), AMD's expert, but Dr. Lys considered a different issue – how long it would take AMD to become "an effective competitor to Intel" if "a but for world that is free of all of Intel's exclusionary conduct begins in Q3 2001." See Beach. Decl. (D.I. 2270) at Exh. 27 at ¶ 27. The Special Master concludes that Dr. Lys' analysis is different than Dr. Leffler's analysis that it would take four to eight months to two years for an alleged Intel overcharge to affect an indirect purchaser. See also Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 121:9-18.

See Class Cert. Hrng. Tr. (D.I. 2439) at 385:1-386:9 ("its not a topic on which I have reached a final opinion other than to say it appears to be quite rapid, but quite rapid is obviously not a quantitative statement").

This statement materially differs from Dr. Leffler's prior testimony and statements in Dr. Leffler's Reply Declaration, where he seemed to express a final opinion. The Special Master questions the accuracy of Dr. Leffler's estimate when he changed it from two years to four to eight months within less than a year's time without any articulated reason, and then at the Class Certification Hearing testified that he has not reached a final opinion on the issue.

Dr. Leffler testified that an overcharge was embedded and that even if some of Intel's monetary concessions were passed on to class members, it was less than the amount of the overcharge that was already embedded in Intel's microprocessor prices. See Leffler Dep. Tr. I (D.I. 2270, Exh. 1) at 78:17-79:1. Even in light of the adverse inference Class Plaintiffs received with respect to spoliated evidence of anticompetitive acts that pre-date the class period, Dr. Leffler's embedded overcharge theory fails to take into account individualized issues of fact. Specifically, some class members may have received the benefit of discounts that were greater than the amount of any embedded overcharge, while others may have received discounts that were equal to or less than the amount of an embedded overcharge.

Moreover, the Special Master agrees with Mr. Kaplan's observation that certain circumstances are not subject to Dr. Leffler's embedded overcharge theory – "special competitive situations", which result in a competitive or below competitive price, and Celeron chips, which Dr. Leffler concedes did not experience a decline in price in the second half of 2006.

The Special Master concludes that Dr. Leffler cannot simply *ipse dixit* conclude, without evidence or analysis, that the amount of an embedded overcharge will always exceed the benefit

89

of any discounts proposed class members received. Rather, the Special Master concludes that an individualized analysis is necessary to determine the impact on class members, an analysis Dr. Leffler failed to perform.

(7)     **The End Result Of Class Plaintiffs' Contestable/Non-Contestable Theory Is That Members Who Were Not Harmed In The "But For" World Are Included Within The Proposed Class.[45]**

Class Plaintiffs claim that "Intel leverages its uncontestable control over the dominant share of the customer's business to capture its contestable business." See PJCS (D.I. 872) at 5. "Intel accomplishes this by offering to discount the price of its non-contestable microprocessors on the condition that the customer also buy its contestable needs from Intel." Id.; FACC (D.I. 108) at ¶¶ 163-175. This scheme "make[s] it uneconomic[al] for AMD to compete for a customer's available business." See PJCS (D.I. 872) at 4. Class Plaintiffs allege that "some of Intel's discriminatory, retroactive rebates amount to unlawful, predatory, below-cost pricing". See FACC (D.I. 108 at ¶ 173); see also PJCS (D.I. 872 at 83) ("Intel was subsidizing OEMs with free or even negatively priced microprocessors") and 93-94 (Plaintiffs' expert would show that "Intel used conditional financial incentives that effectively priced units that would otherwise have been purchased from AMD below an appropriate measure of cost.").

In other words, under Class Plaintiffs' theory, a large portion of the market was already locked up by Intel (non-contestable), and Intel uses their dominance over the non-contestable portion of the market to gain control over the contestable portion of the market by offering certain discounts on microprocessors tied to volume targets. See FACC (D.I. 108) at ¶¶ 169-174. The problem with Class Plaintiffs' theory is that, if the entire discount is applied to the

---

[45] Dr. Leffler denied the existence of a "non-contestable" portion of the market in the literal sense. See Leffler Dep. Tr. 1 (D.I. 2270), Exh. 1 at 143:21-144:13 ("they don't literally mean its non-contested. They just mean its harder, that's all"). The Special Master notes that this yet another example of a divergence in views between Class Plaintiffs and their expert.

"contestable" microprocessors – those microprocessors subject to competition – then the ultimate purchaser was likely not overcharged. Dr. Leffler admitted that if Intel did sell microprocessors below-cost, the price would be no lower in the "but-for" world. See Leffler Dep. Tr. II (D.I. 2270, Exh. 2) at 340:6-340:10. In such a circumstance, those indirect purchases would have to have been excluded from the proposed class. Dr. Leffler failed to perform such an analysis.

If, on the other hand, the Intel discounts applied evenly to both contestable and non-contestable microprocessors, Intel would be offering discounts on non-contestable chips that it otherwise did not offer. For example, Class Plaintiffs present an example where Intel "discounts $100 non-contestable chips to $80 on the condition that the OEM also purchase contestable chips from Intel." See PJCS (D.I. 872) at 5 n.5. However, in the "but-for" world, where Intel would not offer such a discount, Intel would charge $100 for the non-contestable chips. In this scenario, the price of contestable chips would have risen in the "but-for" world (from $80 to $100 for example), demonstrating that certain members of the proposed class would not be harmed by Intel's alleged conduct.

In the Special Master's view, under Class Plaintiffs' contestable/non-contestable theory Class Plaintiffs should have excluded members of the class who benefited from Intel's alleged conduct. Failing so to do, and/or failing to offer a method to accomplish same, the Special Master concludes that Class Plaintiffs failed to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members.

C.    **Were There To Be Certification Of A Nationwide Damages Class, The Application of California Law to the Damages Claims of Each Member Of The Proposed Nationwide Class Is Unconstitutional.**

Class Plaintiffs request certification of the following nationwide damages class:

All persons and entities residing in the United States who, from June 28, 2001 through the present, purchased an x86 microprocessor in the United States, other than for resale, indirectly from the Defendant or any controlled subsidiary or affiliate of the Defendant, as part of a desktop or mobile personal computer. The Class excludes the Defendant; the officers, directors or employees of the Defendant; and any subsidiary, affiliate or other entity in which the Defendant has a controlling interest. The Class also excludes all federal, state or local governmental entities and all judicial officers presiding over this action (the "Nationwide Class"). Plaintiffs are seeking monetary relief on behalf of the Nationwide Class from June 28, 2001 through March 31, 2006.

See CPPCLNWC (D.I. 2300) at ¶ 1.

Class Plaintiffs contend California's substantive law applies to the damages claims of this proposed class. More specifically, Plaintiffs assert that California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700 et seq., and its Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200 et seq., govern the claims for monetary relief of each member of this proposed nationwide class. Intel opposes Class Plaintiffs' request for certification of a nationwide damages class; it also asserts that the application of California law to the claims of such a class is inappropriate.

Intel contends it is unconstitutional to apply California's antitrust and consumer protection laws to the damages claims of each member of the proposed nationwide class. The Due Process Clause and the Full Faith and Credit Clause impose certain restrictions on the application of a State's substantive law to the claims of each member of a plaintiff class; as a result, the selection of the law governing the claims of the members of a proposed nationwide class must be done in a constitutionally permissible manner. See Phillips Petroleum v. Shutts, 472 U.S. 797, 818 (1985). "[C]onstitutional limitations [on choice of law] . . . must be respected even in a nationwide class action." Id. at 823.

In Phillips Petroleum, the Supreme Court observed that a State "must have a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of [a State's]

92

law is not arbitrary or unfair." Id. at 821-822. When there is a lack of State interest in claims unrelated to that State, and when there are substantive conflicts between the laws of that State and the laws of other interested jurisdictions, the application of that State's law to every claim of the members of a nationwide class "is sufficiently arbitrary and unfair as to exceed constitutional limits." Id. at 822; see also In Re Graphics Processing Units Antitrust Litigation ("GPU I"), 527 F. Supp. 2d 1011, 1027 (N.D. Cal. 2007) ("For a nationwide class to invoke the law of a particular state, the chosen state's law must both (1) not conflict with the law of another jurisdiction that has an interest in the case, and (2) have a significant contact or significant aggregation of contacts to claims asserted by each member of the plaintiff class to insure that the choice of the forum state's law is not arbitrary or unfair.").

The Special Master concludes that California does not have a "'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests.'" See Phillips Petroleum, 472 U.S. at 821. The location of Intel's corporate headquarters in California and Plaintiffs' allegations that Intel engaged in misconduct in that state do not establish that California has a significant contact with the claims of non-resident class members in this action. See In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. 61, 83 (D. Mass. 2005).

Additionally, California's antitrust and consumer protection laws are not in harmony with those of each of the 49 other states and the District of Columbia. Indeed, as an initial matter, it bears mention that many states have not enacted statutes repealing Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), which prohibits private indirect purchaser suits against antitrust violators for damages under federal law. A number of states, including California, have since enacted statutes permitting such private indirect purchaser actions under state antitrust law (so-called

93

"repealer states"); however, many of the other interested states have not done so. Therefore, applying California law to a nationwide class of indirect purchasers would permit "residents of some states who abide by Illinois Brick to have claims where their respective state governments have declined to allow them." See GPU I, 527 F. Supp. 2d at 1027. Further, there are significant differences among the antitrust laws of those states that have enacted "repealer" statutes.[46] Additionally, there is wide variation among the consumer protection laws of the interested states.[47]

Based on the foregoing, the Special Master concludes that because neither of the required elements of the test set forth in Phillips Petroleum is met here, the Due Process Clause and the Full Faith and Credit Clause preclude the application of California's substantive law to the claims of each member of the proposed nationwide damages class.[48]

The rejection of Class Plaintiffs' request to apply the law of one state to the damages claims of a proposed nationwide class in this private indirect purchaser suit is in conformity with the conclusions reached by other courts that have recently considered similar requests. Indeed, in 2005, the In re Pharm. Indus. Average Wholesale Price Litig. court surveyed case law addressing consumer protection and antitrust class actions, and aptly observed as follows:

> [S]tate consumer protection statutes are designed to protect consumers rather than to regulate corporate conduct. See Relafen, 221 F.R.D. at 277 ("The primary aim

---

[46] See Appendix "C" hereto.

[47] See Appendix "D", Parts 1 and 2, hereto.

[48] On July 16, 2010, Intel submitted Sullivan v. DB Investments, Inc., No. 08-2784, slip. op. at 44-45 (July 13, 2010) (holding, in the context of a nationwide settlement class, that district court abuses its discretion when it certifies a nationwide class of litigants whose claims implicate the laws of multiple jurisdictions, despite the fact that only some of those jurisdictions recognize the claims for which recovery is sought). (D.I. 2468). The Special Master concludes that Sullivan is not applicable because that case concerned a nationwide class whose claims implicate the laws of multiple jurisdictions. Id. at 45. On the other hand, in the matter *sub judice*, Class Plaintiffs seek to certify a nationwide damages class applying California law. At the same time, Class Plaintiffs' reliance on Sullivan is misplaced. Unlike Sullivan, where the Court distinguished In re Warfarin Sodium Antitrust Litig., 391 F.3d at 528, a case where all members of the class shared a common state claim, the members of this proposed class do not share a state claim in common. See Sullivan, No. 08-2784, slip. op. at 42, n.15. Sullivan has no impact on the Special Master's analysis of Class Plaintiffs' request for certification of a class for injunctive relief pursuant to Fed. R. Civ. P. 23(b)(2).

of . . . consumer protection laws generally . . . is compensating consumers, not policing corporate conduct."); Lyon v. Caterpillar, Inc., 194 F.R.D. 206, 216 (E.D. Pa. 2000) ("State consumer protection acts are designed to protect the residents of the states in which the statutes are promulgated.").
Courts have generally rejected application of the law of a defendant's principal place of business to a nationwide class. See In re Bridgestone/Firestone, Inc., 288 F.3d 1012, 1018 (7th Cir. 2002) (applying Indiana lex loci delicti rule and stating that "state consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules"); Relafen, 221 F.R.D. at 277-78 (holding in antitrust case that Massachusetts and Pennsylvania choice of law rules would require that court apply law of state where consumers' purchases were made, rather than law of defendant's principal place of business); Lyon, 194 F.R.D. at 211-21 (applying Pennsylvania choice of law rules and Restatement to reject plaintiffs' argument that one state's law applied to nationwide claims). Thus, while it is tempting to apply the consumer protection laws of the states where defendants have their principal places of business to promote uniform results and the ease of managing a class, under the Restatement, the laws of the home states of the consumers govern.

230 F.R.D. at 83.

Additionally, in 2007, the GPU I court noted:

Even where substantial contacts to the forum state have been pled, courts have declined to apply a single state's laws to a nationwide antitrust class. See In re Relafen Antitrust Litig., 221 F.R.D. 260, 276-77 (D. Mass. 2004) (Young, J.). In In re Relafen Antitrust Litig., the plaintiffs attempted to apply Pennsylvania law to a nationwide class because the company producing the drug was headquartered in Pennsylvania and the product was sold and distributed from that state. Relafen noted that because "the primary aim of antitrust and consumer protection laws generally -- and those of indirect purchaser states particularly -- is compensating consumers, not policing corporate conduct," the court determined that the more significant factor was the location of the injury, or where the plaintiff was located when the injury occurred from purchasing the products. Most of the sales happened outside Pennsylvania, so the court declined to apply Pennsylvania law to out-of-state sales. Id. at 277.

The Relafen decision seems persuasive. It is hard to see why the laws of other states should be tossed overboard and their residents remitted to California law for transactions that, for individual consumers, are local in nature.

527 F. Supp. 2d at 1029.

**D.      Were There To Be Certification Of A Nationwide Damages Class, Under Applicable Choice of Law Principles, California Law Does Not Govern the Claims of Each Member of the Proposed Nationwide Damages Class.**

For the reasons set forth below, the Special Master concludes that even were the application of California law to be constitutional, that state's law would not govern the claims of each member of the proposed nationwide damages class under applicable choice of law analyses.

Multidistrict litigation ("MDL") under 28 U.S.C. § 1407 consolidates in one federal court the pretrial proceedings of related cases. 28 U.S.C. § 1407. This is an MDL matter wherein the Panel implemented transfers of related cases to this Court under Section 1407. (D.I. 1). In transferred diversity-of-citizenship cases, the transferee federal district court is required to apply the substantive state law of the transferor court, including its choice-of-law rules. See Van Dusen v. Barrack, 376 U.S. 612 (1964); Ferens v. John Deere, 494 U.S. 516 (1990). Specifically, in this MDL proceeding, there are seven transferor courts: Delaware, California, Idaho, Kansas, Maine, Nebraska, and New Mexico.

Five of the transferor courts, Delaware, Idaho, Maine, Nebraska and New Mexico, have adopted Section 145 of the Restatement (Second) of Conflicts and apply the "most significant relationship test" to determine the governing law. See Clinton v. Enterprise Rent-a-Car Co., 977 A.2d 892 (Del. 2009); Grover v. Isom, 53 P.3d 821, 823-24 (Idaho 2002); Flaherty v. Allstate Ins. Co., 822 A.2d 1159, 1165-66 (Me. 2003); Heinze v. Heinze, 274 Neb. 595, 600-01 (Neb. 2007); Woodward v. Fidelity Nat'l Title Ins. Co., 2008 U.S. Dist. LEXIS 108411, *13 (D.N.M. Dec. 8, 2008). California applies a three-step "governmental interest analysis" when resolving choice of law issues. See Offshore Rental Co. v. Continental Oil Co., 22 Cal. 3d 157, 161 (Cal. 1978); Kearney v. Salomon Smith Barney, Inc., 39 Cal. 4th 95, 107-08 (Cal. 2006). Finally,

Kansas applies the "place of the wrong" rule to class actions. See Thompson v. Jiffy Lube Int'l, Inc., 250 F.R.D. 607, 627-28 (D. Kan. 2008).

The Special Master concludes that, for the reasons stated below, under each of the three relevant tests for determining the applicable law, California law cannot apply to the claims of each member of the proposed nationwide damages class. Instead, these choice-of-law rules require the application of the laws of each class member's state of purchase.

### 1.  Under the Most Significant Relationship Test, California Law Does Not Govern the Claims of Those Members of the Proposed Nationwide Class Who Purchased Outside That State.

As noted above, in the determination of the appropriate governing law, Delaware, Idaho, Maine, Nebraska and New Mexico apply the "most significant relationship test," which is stated in Section 145 of the Restatement. That Section provides:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 145 (1971).

Additionally, Section 6 of the Restatement lists the following considerations:

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,

97

(c) the relevant policies of other interested states and the relative interests of
    those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Id. at § 6(2).

Under paragraph 2 of Restatement Section 145, for each plaintiff the place where the
injury occurred is the state in which the computer was purchased by members of the proposed
class. See, e.g., Spence v. Glock, Ges. m.b.H., 227 F.3d 308, 312-314 (5th Cir. 2002) (under
Restatement test, economic injury occurred where plaintiffs purchased defendant's products).
Second, the conduct causing the injury is a neutral factor; Intel's challenged conduct (i.e.,
negotiating, agreeing to provide, and providing monetary concessions to OEMs) is not limited to
California and occurred in various jurisdictions. Third, Intel is incorporated in Delaware and has
its principal place of business in California; Class Plaintiffs reside in each of the 51 interested
jurisdictions. Fourth, to the extent there is arguably a relationship between Intel and each
plaintiff, that relationship is centered in the state in which the only indirect interaction occurred –
the state in which each proposed class member purchased a computer.

Under the most significant relationship test, each of the relevant contacts (the place where
the injury occurred, the place where the conduct causing the injury occurred, the domicile,
residence, nationality, place of the parties, and the place where the relationship, if any, between
the parties is centered) is not necessarily afforded equal weight. As noted above, the
Restatement provides that "[t]hese contacts are to be evaluated according to their relative

98

importance with respect to the particular issue." See RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 145 (1971). In this matter, the contact entitled to the greatest weight in the Special Master's view is the state in which the relevant transaction allegedly causing injury occurred, i.e., where each proposed class member made his, her or its PC purchase.

Additionally, Section 6 of the Restatement test compels consideration of the relevant policies of the interested states, the relative interests of those jurisdictions in the determination of the particular issue, and the basic policies underlying the particular field of law. See Restatement § 6(b), (c) & (e). The basic policies underlying the particular fields of law at issue here are the compensation and protection of consumers. See In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. at 83 ("[S]tate consumer protection statutes are designed to protect consumers rather than to regulate corporate conduct."); see also Relafen, 221 F.R.D. at 277 ("The primary aim of . . . consumer protection laws generally . . . is compensating consumers, not policing corporate conduct.").

Further, each state has a strong interest in determining, and enforcing, the protection to which those who make purchases within that state are entitled. As the court in In re Grand Theft Auto Video Game Consumer Litig. (No. II) noted: "Given the strong state interest in policing consumer purchases within the state's borders, and the weak state interest in regulating consumer purchases outside those borders[] there is no other state that has a closer relationship to the subject matter of the suit" than the state of purchase. 251 F.R.D 139, 151 (S.D.N.Y. 2008); see also In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. 61, 82-83 (D. Mass. 2005) (in light of the fact that state consumer protection statutes are designed to protect consumers, and not to regulate corporate conduct, law of consumers' residence and place of purchase, not defendants' principal places of business, applied); Berry v. Budget Rent a Car Sys., Inc., 497 F.

Supp. 2d 1361, 1365-67 (S.D. Fla. 2007) (the law of each state where transaction occurred

governed, not state where defendant was headquartered); Lyon v. Caterpillar, Inc., 194 F.R.D.

206, 214-15 (E.D. Pa. 2000) (law of consumers' homes states, not that of the state of defendant's

principal place of business and in which misrepresentations allegedly originated, governed);

Nicholson v. Marine Corps W. Fed. Credit Union, 953 F. Supp. 1012, 1015-16 (N.D. Ill. 1997)

(court dismissed claim under California's UCL, Cal. Bus. & Prof. Code § 17200, and noted law

of state of plaintiff's injury and residence applied, not law of California, where defendant's

headquarters was located); Baker v. Family Credit Counseling Corp., 440 F. Supp. 2d 392, 414

(E.D. Pa. 2006) ("[W]hen district courts have faced the problem of nationwide classes which

seek to apply state consumer protection laws, those courts have refused to certify a class, in part

because choice of law would require applying the consumer protection law of each class

member's home state.").

The Special Master therefore concludes that, under the Restatement's "most significant

relationship" analysis, California law does not control the claims of the class members who are

not residents of that state.[49]  Instead, for the proposed class members' claims, the law of the state

in which that proposed class member made the relevant computer purchase should apply to that

individual's claims.

### 2. Under the Governmental Interest Test, California Law Does Not Govern the Claims of Members of the Proposed Nationwide Class Who Purchased Outside That State.

In analyzing choice of law questions, California applies a three-step "governmental

interest analysis." See Offshore Rental Co., 22 Cal. 3d at 161; Kearney, 39 Cal. 4th at 107-08.

---

[49] Class Plaintiffs' reliance on the recent decision of the California Supreme Court in the case of Clayworth v. Pfizer, Inc., No. S166435, slip op. at 31 (Cal. July 12, 2010) for the proposition that the "primary concern" of California's antitrust laws "is . . . the elimination of restraints of trade and impairments of the free markets" perpetrated by businesses located in California directed *inter alia* at other California companies, see generally id. at 30-32, in the Special Master's view lends nothing to this analysis.

First, the court examines whether the foreign law differs from that of the forum; second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law to determine whether a "true conflict" exists; and third, if each jurisdiction has a legitimate interest in the application of its rule of decision, the court analyzes "the 'comparative impairment' of the interested jurisdictions." See Tucci v. Club Mediterranee, S.A., 89 Cal. App. 4th 180, 188 (2001) (citation omitted). Under the "comparative impairment" step, the court applies "the law of the state whose interest would be more impaired if its law were *not applied*." See Offshore Rental, 22 Cal. 3d at 161.

### 2(a).  Does The Foreign Law Differ From That Of The Forum

The Special Master notes that in comparing the antitrust and consumer protection laws of California on the one hand, and the antitrust and consumer protection laws applicable in the 50 other interested jurisdictions on the other, differences abound. One clear example, discussed above, is that the non-repealer states do not permit indirect purchaser actions. When confronting this issue in a proposed nationwide class of indirect purchasers in an antitrust and unfair competition action, the GPU I court correctly observed:

> California's choice-of-law test . . . consider[s] whether there is a conflict between the law of California and the laws of other states. Here, the conflict looms large. Again, some states allow their citizens to sue for antitrust injuries as indirect purchasers (like California) and some do not. Each state had the ability to repeal *Illinois Brick* as to its local law. Some chose yes. Some chose no. Plaintiffs have not shown that California has a greater interest in applying its law than other states.

527 F. Supp. 2d at 1027.

In the matter *sub judice*, substantial differences exist between the laws of California and the laws of the states that do not permit indirect purchaser actions, but there are also substantial differences between the laws of California and the antitrust and/or consumer protection laws of

101

the repealer states. The relevant state antitrust laws vary from state to state on a number of important issues. For example, they differ as to the elements of the claim, who has standing, the procedural devices available to plaintiffs, the amount of damages recoverable, the requisite proof of damages, available defenses and whether the statutes apply only to conduct that is predominantly intrastate as opposed to interstate.[50] The relevant state consumer protection laws also vary on a number of key issues. For example, they differ on issues such as the type of acts and practices that are forbidden, the statutes of limitations, the standards for punitive and enhanced damages, reliance, scienter, remedies and prefiling requirements.[51]

### 2(b). Examination Of Each Jurisdiction's Interest In The Application Of Its Own Law To Determine Whether A "True Conflict" Exists

The second step in the governmental interest test involves an examination of each interested jurisdiction's legitimate interest in the application of its law to determine whether true conflict exists. The GPU I court's conclusions are instructive and compelling, namely that considering the substantial differences between the laws of California and the laws of the non-repealer states, California has no greater interest in applying its antitrust laws in a proposed nationwide indirect purchaser class action than any other state. 527 F. Supp. 2d at 1027; see also Rosenthal v. Fonda, 862 F.2d 1398 (9th Cir. 1988) (noting California's weak interest in applying its policies to protect a non-resident plaintiff when the law of plaintiff's state would offer no protection).

The Special Master concludes that California has no legitimate interest in the application of its rule of decision to the members of a nationwide class who made no computer purchase in that state. See Liew v. Official Receiver & Liquidator, 685 F.2d 1192, 1198 (9th Cir. 1982) (noting that foreign jurisdiction has interest in regulating business transactions within its borders,

---

[50] See Appendix "C".
[51] See Appendix "D", Parts 1 and 2.

102

and that California's interest in deterring conduct of resident businesses extends only to cases where the purchaser resides in California).

Indeed, California's determination to allow indirect purchaser actions and to permit other consumer remedies is intended to protect its own citizens. See, e.g., Cal. Prop. 64, § 1(a) (2004) (consumer protection statute is "intended to protect California businesses and consumers from unlawful, unfair, and fraudulent business practices."); see also Pfizer, Inc., No. S166435, slip op. at 30-32. In the Special Master's view, California's interest is only a local one, and it is one that is vindicated through the claims of the California plaintiffs.

Moreover, the non-repealer states, having chosen not to allow suit for antitrust recovery by their citizens who are indirect purchasers, have no interest in permitting those citizens that very recovery by suing under the laws of another state, i.e., California. See, e.g., Kearney, 39 Cal. 4th at 123 (identifying a state's general interest in not having liability imposed on businesses acting within that state in reasonable reliance on that state's laws).

It follows then that only the states of purchase have a legitimate interest in the application of their laws to the claims of Class Plaintiffs. The states of purchase then have the primary interest in protecting their citizens in the manner they deem appropriate, in policing the stream of commerce in their states, and in delineating the proper scope of relief for torts that occur within their borders. See Lyon v. Caterpillar, Inc., 194 F.R.D. 206, 216 (E.D. Pa. 2000) ("State consumer protection acts are designed to protect the residents of the states in which the statutes are promulgated."); see also Grand Theft, 251 F.R.D. at 149-50 (court applied California's choice-of-law test and observed "states have a strong interest in protecting consumers with respect to sales within their borders, but they have a relatively weak interest, if any, in applying their policies to consumers or sales in neighboring states."); In re Ford Motor Co. Ignition

Switch Prods. Liab. Litig., 174 F.R.D. 332, 348 (D.N.J. 1997) ("Each plaintiff's home state has an interest in protecting its consumers from in-state injuries caused by foreign corporations and in delineating the scope of recovery for its citizens under its own laws.").

Were the Special Master to assume that California had a legitimate interest such that a true conflict exists, then an analysis of the "comparative impairment" step is required.

### 2(c).   "Comparative Impairment" Of The Interested Jurisdictions

The third step in the government interest analysis involves determining which state would be more impaired if its law were not applied.  See Tucci, 89 Cal. App. 4th at 188.  The application of California antitrust and consumer protection laws to consumer transactions occurring throughout the country would improperly frustrate the policies underlying the antitrust and consumer protection laws of the other 50 interested jurisdictions.  This is especially true when the policies of the non-repealer states are considered, as those states have specifically disallowed indirect purchaser antitrust claims.  Were California law to govern the claims of each member of the proposed nationwide damages class, the other interested jurisdictions' interests would be substantially impaired.  Conversely, the application of the laws of the states of purchase would not impair or frustrate any of California's interests or policies.  See Grand Theft, 251 F.R.D. at 150 (finding that the "interests of the state of purchase would be most impaired if its . . . laws were not applied.").

The Special Master concludes that the governmental interest analysis results in a determination that the appropriate law to govern each of the claims of the class members is not the law of California, but it is instead the law of the state of purchase.

104

### 3. Under the Place of the Wrong Test, California Law Does Not Govern the Claims of Those Members Who Made Purchases Outside that State.

Kansas applies the place of the wrong test. See Jiffy Lube Int'l, Inc., 250 F.R.D. at 627-28. Under that test, the location of the last act necessary to complete the injury is the place of the wrong. See Raskin v. Allison, 57 P.3d 30, 32 (Kan. App. 2002). Here, the last act is the purchase of a computer by a plaintiff, which act occurs within the borders of one of the 51 interested jurisdictions.

The Special Master concludes that the laws of the state of purchase, not those of California, apply to the claims of Class Plaintiffs under this test.

### E. Significant Manageability Concerns Preclude Certification of 26 Statewide Classes.

Among other requirements, Fed. R. Civ. P. 23(b)(3) mandates that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." In determining whether all of Fed. R. 23(b)(3)'s requirements have been satisfied, pertinent considerations "include . . . the likely difficulties in managing a class action." Id. "The difficulties likely to be encountered in the management of a class action are strongly considered when analyzing superiority." In re Prempro Prods. Liab. Litig., 230 F.R.D. 555, 568 (E.D. Ark. 2005).

Class Plaintiffs assert that the laws of 26 states authorize indirect purchaser actions seeking monetary damages. Specifically, Class Plaintiffs contend that the antitrust laws of 18 states,[52] and the consumer protection laws of 17 states[53] (including some that also have antitrust

---

[52] Those 18 states are: Arizona, California, the District of Columbia, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, West Virginia and Wisconsin.

105

laws so allowing), provide for such actions. See Class Cert. Reply (D.I. 2017) at 51. As a result, as an alternative to a nationwide damages class, Class Plaintiffs propose the certification of 26 separate classes, one for each of the "repealer" states.

Wide disparities exist among the required elements of the various antitrust and consumer protection laws of these 26 states.[54] See, e.g., Jiffy Lube Int'l, Inc., 250 F.R.D. at 625 (court identified "significant differences among the states' consumer protection laws."); see also In re Relafen Antitrust Litig., 221 F.R.D. at 282-284 (unlike the antitrust laws of other states, California's antitrust statute extends "only to concerted conduct, not to unilateral conduct"). The Special Master concludes that the variations among the antitrust and consumer protection laws of these "repealer" states present insurmountable manageability problems.

To avoid the problems the numerous differences in the substantive provisions of the governing state laws would present if there were to be a single class of the indirect purchasers residing in the repealer states, Class Plaintiffs offer this 26-class alternative. In particular, they propose a joint trial of 26 separate statewide classes or, in the alternative, 26 separate trials, one for each class. While this proposal attempts to conquer certain of the issues arising from the disparities among the relevant states' laws, the Special Master concludes that obstacles to certification nevertheless remain.

Indeed, this alternative eliminates any efficiencies that might have been gained by the use of the class action mechanism and creates insurmountable manageability concerns. See in re Prempro Prods. Liab. Litig., 230 F.R.D. at 565 ("While a multitude of subgroups might solve the variation of laws problem, it would lead to monumental case management problems."); see also

---

[53] Those 17 states are: Arkansas, California, the District of Columbia, Florida, Idaho, Kansas, Maine, Massachusetts, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, Rhode Island, Vermont and West Virginia.

[54] See Appendices "C" and "D," Parts 1 and 2.

Carpenter v. BMW of N. Am., Inc., 1999 U.S. Dist. LEXIS 9272, * 38 (E.D. Pa. June 21,1999) (rejecting certification of individual state subclasses because there was no plan as to how the jury could meaningfully be instructed on the laws of each jurisdiction); Willis v. Thorn Americas, Inc., 1996 U.S. Dist. LEXIS 3086, *2-3 (E.D. Pa. March 11, 1996 ) (refusing to certify 43 separate statewide subclasses to avoid variations in state law).

As noted above, this is not a circumstance where the "substantive state laws are virtually identical in their required elements." Cf. In re Terazosin Hydrochloride Antitrust Litig., 220 F.R.D. 672, 700 n.45 (S.D. Fla. 2004). Here, Class Plaintiffs have asserted claims under the antitrust laws of 18 states and under the consumer protection laws of 17 states. By virtue of the divergence among these statutes, different issues of law and fact will be present for each of these 26 classes. The relevant state antitrust laws vary from state to state on a number of important issues. For example, they differ as to the elements of the claim, who has standing, the procedural devices available to plaintiffs, the amount of damages recoverable, the requisite proof of damages, available defenses and whether the statutes apply only to conduct that is predominantly intrastate as opposed to interstate.[55] The relevant state consumer protection laws also vary on a number of key issues. For example, they differ on issues such as the type of acts and practices that are forbidden, the statutes of limitations, the standards for punitive and enhanced damages, reliance, scienter, remedies and pre-filing requirements.[56]

Additionally, because of the various legal elements that must be satisfied, different issues of fact will have to be resolved for each of these 26 classes. For each statewide class, Class Plaintiffs will have to introduce evidence specific to that state's antitrust and/or consumer protection statutes.

---

[55] See Appendix "C".
[56] See Appendix "D", Parts 1 and 2.

The consequence is that each of the 26 statewide classes presents its own, unique, individualized issues of law and fact. The Special Master therefore concludes that there is no benefit to the utilization of the national class action device to allow the 26 classes to be tried jointly or separately in this one action. The Special Master further concludes that the Class Plaintiffs' proposal presents serious and significant manageability concerns precluding a finding that the national class action device is superior to alternative means of adjudication.

## III.   Certification of a Class Pursuant To Fed. R. Civ. P. 23(b)(2).

Antitrust class actions are rare under Fed. R. P. Civ. 23(b)(2); to the extent they are upheld, they are upheld almost exclusively under subsection (b)(3). Albert Conte & Herbert Newberg, Newberg on Class Actions § 18:23-24 (p. 78) (4th ed. 2002). Nevertheless, Plaintiffs have here requested certification of the following nationwide class for injunctive relief:

> All persons and entities residing in the United States who, from June 28, 2001 through the present, purchased an x86 microprocessor in the United States, other than for resale, indirectly from the Defendant or any controlled subsidiary or affiliate of the Defendant, as part of a desktop or mobile personal computer. The Class excludes the Defendant; the officers, directors or employees of the Defendant; and any subsidiary, affiliate or other entity in which the Defendant has a controlling interest. The Class also excludes all federal, state or local governmental entities and all judicial officers presiding over this action.

See CPPCLNWC (D.I. 2300) at ¶ 1.

Unlike their request for monetary relief, Class Plaintiffs seek injunctive relief under federal law, namely, Section 16 of the Clayton Act, 15 U.S.C. § 26. That Section states in part:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity . . .

15 U.S.C. § 26.

108

The Court of Appeals for the Third Circuit has concluded that indirect purchasers may obtain injunctive relief under Section 16 of the Clayton Act by demonstrating that they meet the usual requirements for equitable relief:  injury, causation, and redressability.  Warfarin, 214 F.3d at 400; In re OSB Antitrust Litig., 2007 U.S. Dist. LEXIS 56617, *43; see also Mid-West Paper Prods. Co. v. Cont'l Group, Inc., 596 F.2d 573, 594 (3d Cir. 1979).

There are a number of hurdles Class Plaintiffs must overcome in order to obtain certification of a nationwide injunctive class.  First, the requirements of Fed. R. Civ. P. 23(a) must be met; second, the requirements of Fed. R. Civ. P. 23(b)(2) must be met.  See Fed. R. Civ. P. 23(b) ("A class action may be maintained if Fed. R. Civ. P. 23(a) is satisfied and if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.").  Each of the Fed. R. Civ. P. 23(a) requirements is discussed at *infra* at 52-91.

Further, Fed. R. Civ. P. 23(b)(2) has two express requirements.  First, the party opposing the class must have acted or refused to act, or failed to perform a legal duty, on grounds generally applicable to all class members.  Second, "final relief of an injunctive nature or a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, [must be] appropriate."  Newberg, *supra* 108, at § 4:11 (p. 56).

Fed. R. Civ. P. 23(b)(2) also contains implicit requirements.  The first is "an implicit 'cohesiveness' requirement, which precludes certification when individual issues abound."  Id.; see also id. § 4:14 (p. 83) ("[C]lass cohesiveness . . . distinguishes (b)(2) from (b)(3) actions.");  In re OSB Antitrust Litig., 2007 U.S. Dist. LEXIS 56617, *47 ("[Rule] (b)(2) classes must be cohesive").

Here, to meet Fed. R. Civ. P. 23(b)(2)'s express requirements and its implicit cohesiveness requirement, Class Plaintiffs must demonstrate that the following three elements are susceptible of common proof: "(1) actual or threatened injury 'from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur'; (2) causation; and (3) likelihood that the equitable relief will redress the injury." See In re OSB Antitrust Litig., 2007 U.S. Dist. LEXIS 56617, *46.

The Special Master concludes that Class Plaintiffs have not met Fed. R. Civ. P. 23(b)(2)'s express requirements or its cohesiveness requirement. They have not established that they will be able to demonstrate an antitrust violation through common proof, or a contemporary violation likely to recur will result in injury or a threatened injury to the members of their proposed nationwide injunctive class. In short, as discussed at length above, a demonstration that impact is susceptible of common proof is absent here.

Finally, "[c]lass certification under Fed. R. Civ. P. 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive, and when monetary damages are merely incidental." Id. § 4:11 (p. 58); see also id. (p. 61) ("Subsection (b)(2) class actions, unlike those of other Rule 23(b) categories, are limited to those class actions seeking primarily injunctive or corresponding declaratory relief."); see also Barnes v. The Am. Tobacco Co., 161 F.3d 127, 142 (3d Cir. 1998). In this litigation, the primary relief sought by the members of the proposed nationwide injunctive class is monetary damages under California law.

For all of these reasons, the Special Master concludes that the requirements of Fed. R. Civ. P. 23(b)(2) are not satisfied.

## CONCLUSION

NOW, THEREFORE, IT IS THEREFORE HEREBY RECOMMENDED that:

    1.  Intel's Motion To Exclude be GRANTED;

    2.  Class Plaintiffs' Motion For Class Certification be DENIED.

The Special Master's Report and Recommendation will become a final order of the Court

unless a party files an objection or a motion to modify same in accordance with Fed. R. Civ. P.

53(f).

       **ENTERED** this 28th day of July, 2010.

                              Vincent J. Poppiti (DSBA No. 100614)
                              Special Master

111