IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE INTEL CORP. MICROPROCESSOR ANTITRUST LITIGATION | MDL No. 05-1717-LPS |
| PHIL PAUL, on behalf of himself and all others similarly situated,<br><br>                              Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION,<br><br>                              Defendant. | C. A. No. 05-485-LPS<br><br>CONSOLIDATED ACTION<br><br>**REDACTED PUBLIC VERSION** |

**RULE 53(f) OBJECTIONS TO SPECIAL MASTER'S REPORT AND
RECOMMENDATIONS GRANTING INTEL'S MOTION TO
EXCLUDE TESTIMONY OF DR. KEITH LEFFLER AND
DENYING CLASS PLAINTIFFS' MOTION TO CERTIFY CLASS**

PRICKETT, JONES & ELLIOTT, P.A.
James L. Holzman (#663)
J. Clayton Athey (#4378)
Laina M. Herbert (#4717)
Kevin H. Davenport (#5327)
1310 King Street
P.O. Box 1328
Wilmington, DE 19899
(302) 888-6500
jholzman@prickett.com
jcathey@prickett.com
lmherbert@prickett.com
khdavenport@prickett.com

*Interim Liaison Counsel and Attorneys for Phil
Paul, on behalf of himself and all others
similarly situated*

Dated: October 4, 2010

Of Counsel:

Daniel A. Small
David Young
COHEN, MILSTEIN, SELLERS
    & TOLL, P.L.L.C.
1100 New York Avenue, NW
Suite 500 West
Washington, DC 20005

Seth R. Gassman
COHEN, MILSTEIN, SELLERS
    & TOLL, P.L.L.C
88 Pine Street
14th Floor
New York, NY 10005

Steve W. Berman
Anthony D. Shapiro
Erin K. Flory
Steve W. Fimmel
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Ave., Suite 3300
Seattle, WA 98101

Guido Saveri
R. Alexander Saveri
Lisa Saveri
Geoff Rushing
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111

Craig C. Corbitt
Judith A. Zahid
Demetrius X. Lambrinos
Qianwei Fu
ZELLE, HOFMANN, VOELBEL
    & MASON LLP
44 Montgomery St., Suite 3400
San Francisco, CA 94104

*Interim Co-Lead Counsel for the Class Plaintiffs*

# TABLE OF CONTENTS

I.  Introduction ................................................................................................................1

II.  Nature and State of Proceedings .............................................................................1

   A.  Nature and Commencement of the Action ..........................................................1

   B.  Status of the Case ...............................................................................................2

      1.  Intel's Motion to Dismiss the Class's Claim ..............................................2

      2.  The Motion for Class Certification .............................................................3

      3.  The Motion to Exclude the Testimony of Dr. Leffler.................................5

      4.  The Motion to Exclude Dr. Leffler's Rebuttal Analyses ...........................6

      5.  Intel's Objections to Dr. Leffler's Rebuttal Testimony at the Class
         Certification Hearing ...................................................................................6

      6.  Class Plaintiffs' Sanctions Motion.............................................................6

III.  Summary of Argument ............................................................................................7

   A.  The Requested Classes Should Be Certified.......................................................7

   B.  Dr. Leffler's Testimony and Analysis Is Admissible Under Fed. R. Evid. 702 ...............11

   C.  Dr. Leffler's Rebuttal Analyses Are Proper Rebuttal Testimony, Timely,
      Not Unfairly Prejudicial, and Should Not Have Been Excluded.......................12

IV.  Statement of Facts.................................................................................................12

   A.  Intel's Conduct Violated the Antitrust Laws ...................................................14

   B.  Intel Made Billions of Dollars in Loyalty Payments to Secure Exclusivity
      With Tier One OEMs.........................................................................................16

   C.  Intel Took Affirmative Steps to Avoid Price Lowering Competition ...............17

   D.  Intel's Net Microprocessor Prices Would Have Been Lower in the But-For
      World of Greater Competition ..........................................................................19

   E.  Intel's Overcharges Were Passed On To Consumers as Higher PC Prices .......20

   F.  Intel's Loyalty Payments Did Not Benefit Consumers......................................20

   G.  Government Enforcement Actions Confirm That Intel Engaged in Anticompetitive
      Behavior and that Consumers Were Harmed as a Result ..................................21

V.  Standard of Review.................................................................................................22

VI.  Argument ...............................................................................................................23

   A.  The Special Master Erred in Denying Class Certification.................................23

      1.  Class Plaintiffs Meet the Threshold Requirements of FRCP 23(a) ...........23

         a.  Typicality ...........................................................................................23

         b.  Adequacy of Representation ...............................................................26

    c. The Proposed Classes Are Ascertainable ............................................................28

  2. Class Plaintiffs Meet the Requirements of FRCP 23(b)(3) For Certification
    of a Class or Classes For Monetary Relief Based on Violations of State Law............31

    a. Common Questions of Law and Fact Predominate ...............................................31

      1. Monopolization Is Susceptible to Proof with Evidence Common
        to the Class.........................................................................................................32

      2. Common Impact Is Susceptible to Proof with Evidence Common
        to the Class.........................................................................................................34

        i. Dr. Leffler's Methodology Can Show That Intel's Desktop and
          Mobile Microprocessor Prices Were Higher as a Result of Intel's
          Challenged Conduct...................................................................................35

        ii. Dr. Leffler's Methodology Can Show That Some Portion of the Intel
          Overcharge Was Passed on to Class Members .........................................41

      3. Damages Are Susceptible to Proof with Evidence Common to the Class.......46

        i. Dr. Leffler's Methodology Can Provide a Reasonable Estimate
          of the Size of Intel's Overcharge .............................................................46

        ii. Dr. Leffler's Methodology Can Provide a Reasonable Estimate of
          the Rate at Which the Intel Overcharge Was Passed on to Class
          Members and the Amount of Resulting Damages to Class Members .......48

    b. A Class Action Would Be Superior...................................................................49

  3. The Certification of a 23(b)(2) Nationwide Injunctive Relief Class Pursuant to
    Federal Law is Warranted.........................................................................................53

B. Dr. Leffler's Testimony and Analysis Are Admissible Under FRE 702............................58

C. Dr. Leffler's Rebuttal Analyses Are Proper Rebuttal Testimony, Timely,
  Not Unfairly Prejudicial to Intel, and Should Not Have Been Excluded ..........................63

  1. Rebuttal Evidence and Testimony Is Proper When It Is Consistent with
    Original Opinions and Addresses the Same Subject Matter as the Opposing
    Expert's Opinions.....................................................................................................64

  2. Dr. Leffler's Rebuttal Analyses Were Proper and It Was Error to
    Exclude Them ...........................................................................................................68

    a. Comparison of Prices, Discounts, and Sales in Intel and Dell Databases .............70

    b. Proper Application of Overcharge Regression Methodology by OEM
      and Brand............................................................................................................72

    c. Analysis of Initial to End Price for Microprocessors Older Than
      Three Years ........................................................................................................73

    d. Dell 2006 Pass-Through Regressions Without Averaging Prices and Costs.........73

CONCLUSION.........................................................................................................................74

# TABLE OF AUTHORITIES

## Cases

*Allen v. Holiday Universal,*
  249 F.R.D. 166 (E.D. Pa. 2008)........................................................... 29

*Amchem Prods. v. Windsor,*
  521 U.S. 591 (1997)........................................................................... 31

*Ardrey v. Federal Kemper Ins. Co.,*
  142 F.R.D. 105 (E.D. Pa. 1992)......................................................... 27

*Baby Neal for & by Kanter v. Casey,*
  43 F.3d 48 (3d Cir. 1994) ............................................................ 23, 56

*Barnes v. American Tobacco Co.,*
  161 F.3d 127 (3d Cir. 1998) .................................................. 55, 56, 57

*Bazemore v. Friday,*
  478 U.S. 385 (1986)........................................................................... 48

*Bigelow v. RKO Radio Pictures,*
  327 U.S. 251 (1946)........................................................................... 36

*Blackie v. Barrack,*
  524 F.2d 891 (9th Cir. 1975) ............................................................. 28

*Bradburn Parent/Teacher Stores, Inc. v. 3M,*
  2004 U.S. Dist. LEXIS 16193 (E.D. Pa. Aug. 17, 2004) ................... 26

*Carnegie v. Household Int'l, Inc.,*
  376 F.3d 656 (7th Cir. 2004) ....................................................... 29, 50

*Carpenter v. BMW of N. Am., Inc.,*
  1999 U.S. Dist. LEXIS 9272 (E.D. Pa. June 21, 1999) ..................... 53

*Chiang v. Veneman,*
  385 F.3d 256 (3d Cir. 2004) .............................................................. 31

*Christiana Mortgage Corp. v. Del. Mortgage Bankers Ass'n,*
  136 F.R.D. 372 (D. Del. 1991) .......................................................... 58

*City of Gary v. Shafer,*
  2009 WL 1370997 (N.D. Ind. May 13, 2009) .............................. 64, 67

*Cook v. Rockwell Int'l Corp.,*
  580 F. Supp. 2d 1071 (D. Colo. 2006)............................................... 67

*Cooper Tire & Rubber Co. v. Farese,*
  2008 WL 5104745 (N.D. Miss. Nov. 26, 2008) ................................ 65

*Crowley v. Chait,*
  332 F. Supp. 2d 530 (D. N.J. 2004)................................................... 66

*Daniels v. Baritz,*
  2004 U.S. Dist. LEXIS 14649 (E.D. Pa. 2004) ................................ 30

*Dieter v. Microsoft,*
   436 F.3d 461 (4th Cir. 2006) ............................................................................ 25

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
   504 U.S. 451 (1992) ......................................................................................... 33

*Gold Strike Stamp Co. v. Christensen,*
   436 F.2d 791 (10th Cir. 1970) .......................................................................... 32

*Gordon v. Microsoft Corp.,*
   2001 WL 366432 (D. Minn. Mar. 30, 2001) ..................................................... 58

*Hedges Enter., Inc. v. Cont'l Group, Inc.,*
   81 F.R.D. 461 (D.C. Pa. 1979) ......................................................................... 25

*In re Cardizem CD Antitrust Litig.,*
   200 F.R.D. 297 (E.D. Mich. 2001) .................................................................... 28

*In re DaimlerChrysler AG Sec. Litig.,*
   216 F.R.D. 291 (D. Del. 2003) .......................................................................... 23

*In re EPDM Antitrust Litig.,*
   256 F.R.D. 82 (D. Conn. 2009). ....................................................................... 68

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.,*
   256 F.R.D. 82 (D. Conn. 2009) ......................................................................... 48

*In re Flat Glass Antitrust Litig.,*
   191 F.R.D. 472 (W.D. Pa. 1999) ....................................................................... 25

*In re Graphics Processing Units Antitrust Litig.,*
   253 F.R.D. 478 (N.D. Cal. 2008) ....................................................................... 67

*In re Hydrogen Peroxide Antitrust Litig.,*
   552 F.3d 305 (3d Cir. 2008) ............................................................. 3, 31, 34, 57

*In re Linerboard Antitrust Litig.,*
   497 F. Supp. 2d 666 (E.D. Pa. 2007) ................................................................ 45

*In re Methyl Tertiary Butyl Ether (MBTE) Prods. Liab. Litig.,*
   241 F.R.D. 185 (S.D.N.Y. 2007) ....................................................................... 28

*In re NASDAQ Market-Makers Antitrust Litig.,*
   169 F.R.D. 493 (S.D.N.Y. 1996) ................................................... 29, 40, 54, 55

*In re New Motor Vehicles Canadian Export Antitrust Litig.,*
   2006 WL 623591 (D. Me. Mar. 10, 2006) ........................................................ 58

*In re OSB Antitrust Litig.,*
   2007 WL 2253425 (E.D. Pa. 2007) ............................................................ passim

*In re Paoli R.R. Yard PCB Litig.,*
   35 F.3d 717 (3d Cir. 1994) ............................................................................... 59

*In re Prempro Prods. Liab. Litig.,*
   230 F.R.D. 555 (E.D. Ark. 2005) ...................................................................... 53

*In re S. Cent. States Bakery Prods. Antitrust Litig.*,
86 F.R.D. 407 (M.D. La. 1980) ................................................................................ 26

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
264 F.R.D. 603 (N.D. Ca. 2008) ............................................... 24, 51, 52, 55

*In re Sugar Indus. Antitrust Litig.*,
73 F.R.D. 322 (E.D. Pa. 1976) ........................................................... 28, 40

*In re Terazosin Hydrochloride Antitrust Litig.*,
220 F.R.D. 672 (S.D. Fla. 2004) ........................................................... 33

*In re TFT-LCD (Flat Panel) Antitrust Litigation*,
267 F.R.D. 583 (N.D. Cal. 2010) ...................................................... 51, 52, 55

*In re Urethane Antitrust Litig.*,
237 F.R.D. 440 (D. Kan. 2006) ......................................................... 25, 40

*In re Visa Check/Mastermoney Antitrust Litig.*,
280 F.3d 124 (2d. Cir. 2001) .............................................................. 27

*In re Vitamins Antitrust Litig.*,
209 F.R.D. 251 (D.D.C. 2002) ........................................................... 25

*In re Warfarin Sodium Antitrust Litig.*,
391 F.3d 516 (3d Cir. 2004) ........................................................ 7, 31, 54

*In re: Intel Corp. Microprocessor Antitrust Litig.*,
526 F. Supp. 2d 461 (D. Del. 2007) ...................................................... 22

*In re: NASDAQ Market-Makers Antitrust Litig.*,
169 F.R.D. 493 (S.D.N.Y. 1996) ....................................................... 50

*J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*,
451 U.S. 557 (1981) .................................................................... 36, 41

*J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*,
225 F.R.D. 208 (S.D. Ohio 2003) ....................................................... 29

*Jefferson v. Ingersol Int'l Inc.*,
195 F.3d 894 (7th Cir. 1999) ............................................................ 54

*Jenkins v. Raymark Indus., Inc.*,
782 F.2d 468 (5th Cir. 1986) ............................................................ 31

*Kieffer v. Sears, Roebuck & Co.*,
873 F.2d 954 (6th Cir. 1989) ............................................................ 22

*Kirola v. City & County of San Francisco*,
2010 WL 373817 (N.D. Cal. Jan. 29, 2010) ........................................... 67

*Kohen v. Pac. Inv. Mgmt. Co. LLC*,
571 F.3d 672 (7th Cir. 2009) ...................................................... 28, 29, 40

*LePage's Inc. v. 3M*,
324 F.3d 141 (3d Cir. 2003) ............................................................ 33

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*,
    523 U.S. 26 (1988)...............................................................................................52

*McKesson Automation, Inc. v. Swisslog Holding AG*,
    2009 WL 3648455 (D. Del. Oct. 30, 2009) ......................................................59

*Meijer, Inc. v. Warner Chilcott Holdings Co. III, LTD.*,
    246 F.R.D. 293 (D.D.C. 2007)............................................................................28

*Microsoft I-V Cases*,
    2000-2 Trade Cas. ¶ 73,013 at 88,559 .............................................................32

*MMI Realty Servs., Inc. v. Westchester Surplus Lines Ins. Co.*,
    2009 WL 649894 (D. Haw. Mar. 10, 2009) ......................................................67

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001) ........................................................................23, 26

*Palmer v. Asarco Inc.*,
    2007 U.S. Dist. LEXIS 56969 (N.D. Okla. Aug. 3, 2007) ................................67

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc.*,
    998 F.2d 1224 (3d Cir. 1993) ....................................................................11, 59

*Pritchard v. Dow Agro Sciences*,
    263 F.R.D. 277 (W.D. Pa. 2009) .......................................................12, 64, 65

*Sanneman v. Chrysler Corporation*,
    191 F.R.D. 441 (E.D. Pa.)...................................................................................30

*Sci. Components Corp. v. Sirenza Microdevices, Inc.*,
    2008 WL 4911440 (E.D.N.Y. Nov. 13, 2008).................................................65

*Sodium Antitrust Litig.*,
    214 F.3d 395 (3d Cir. 2000) .............................................................................54

*Stephenson v. Bell Atl. Corp.*,
    177 F.R.D. 279 (D.N.J. 1997).............................................................................33

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931)...........................................................................................41

*TC Sys. Inc. v. Town of Colonie, N.Y.*,
    213 F. Supp. 2d 171 (N.D.N.Y. 2002)..............................................................66

*Teva Pharms. USA v. Abbot Labs.*,
    252 F.R.D. 213 (D. Del. 2008) .........................................................................25

*U.S. v. Chrzanowski*,
    502 F.2d 573 (3d Cir. 1974) .............................................................................64

*U.S. v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d Cir. 2005) .............................................................................33

*Willis v. Thorn Am. Inc.*,
    1996 U.S. Dist. LEXIS 3086 (E.D. Pa. Mar. 11, 1996)....................................53

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
   395 U.S. 100 (1969) ................................................................................. 55

**Rules**

Fed. R. Civ. P. 23 ..................................................................................... passim

Fed. R. Civ. P. 26 ..................................................................................... 12, 64

Fed. R. Civ. P. 53 ..................................................................................... 22

Fed. R. Evid. 702 ..................................................................................... 6, 11, 58, 59

**Treatises**

Albert Conte & Herbert Newberg,
   *Newberg on Class Actions* (4th ed. 2002) ....................................... 50, 53, 54, 55

# I.    INTRODUCTION

Intel's anticompetitive conduct has been condemned by regulatory and law enforcement agencies across the globe.  Intel was enjoined by the Japan Fair Trade Commission ("JFTC"), was fined $1.45 billion by the European Commission ("EC"), fined $25.4 million by the Korea Fair Trade Commission ("KFTC") both of which also found consumer harm, entered a consent decree with the United States Federal Trade Commission ("USFTC"), and settled with its competitor AMD for over $1.4 billion.  Notwithstanding this international effort to bring Intel to justice, U.S. consumers, by far the most vulnerable of Intel's victims, are the only group that has not received relief from the harm inflicted by Intel.  As the decisions of the EC, USFTC, and KFTC indicate, and as the common facts detailed below demonstrate, the impact of Intel's conduct on consumers is evident—higher prices and fewer choices for personal computers.  The only way the rights of consumers will be vindicated is if this Court rejects the Special Master's Report and Recommendations Granting Intel's Motion to Exclude Testimony of Dr. Keith Leffler and Denying Class Plaintiffs' Motion to Certify Class ("R&R", D.I. 2073).[1]  The Special Master's recommendations are incorrect as a matter of law and fact, and Class Plaintiffs respectfully submit that the recommendations be rejected and that the Court certify the requested classes.

## II.    NATURE AND STATE OF PROCEEDINGS

### A.    Nature and Commencement of the Action

This is a Multi-District Litigation ("MDL") proceeding in which plaintiff indirect purchaser consumers seek class-treatment of their injunctive and monetary relief claims based on allegations that Intel violated federal antitrust law (injunctive relief) and state antitrust and

---

[1] References to "D.I. ___" are to C.A. No. 05-485-LPS, unless otherwise noted.

consumer protection laws (monetary relief). In June, 2005, Advanced Micro Devices ("AMD") filed an action against its competitor Intel Corporation and Intel Kabushiki Kaisha (collectively "Intel" or "Defendant") (D.I. 1 in C.A. No. 05-441-LPS) alleging, *inter alia*, that Intel violated Section 2 of the Sherman Act by employing exclusionary strategies that stifled competition in, and prevented entry into, the relevant market for x86 computer microprocessors. Beginning in July 2005, Class Plaintiffs filed multiple class action lawsuits against Intel in various district courts around the country. These lawsuits were consolidated for pretrial purposes on April 18, 2006. D.I. 9.

Class Plaintiffs filed their First Amended Consolidated Complaint on May 26, 2006 (the "Complaint," D.I. 49) alleging that Intel has violated section 2 of the federal Sherman Act, 15 U.S.C. § 2 (Count I); the California Cartwright Act, Cal. Bus & Prof. Code § 16720 (Count II); the California state tort law against monopolization (Count III); the California Unfair Competition Law, Cal. Bus & Prof. Code 17200 *et seq.* (Count IV); various state antitrust and restraint of trade laws (Count V); and various state consumer protection and unfair competition laws (Count VI). Class Plaintiffs also assert claims for unjust enrichment and seek disgorgement of profits under California common law, or alternatively, the laws of various states (Count VII).

## B.    Status of the Case

### 1.    Intel's Motion to Dismiss the Class's Claim

On November 3, 2006, Intel moved to dismiss Class Plaintiffs' foreign conduct claims for lack of subject matter jurisdiction under the Foreign Trade Antitrust Improvements Act ("FTAIA, D.I. 221), and to dismiss the complaint for failure to state a claim. D.I. 217. By Order dated March 7, 2007, the Court dismissed Class Plaintiffs' foreign conduct claims and struck paragraphs 145-149, 159-162, 169, 178-179, 185-187, 190, 193, 197-198, 204-205, and 210 from the Complaint. D.I. 300. By Order dated July 12, 2007, the Court granted Intel's motion to

dismiss Class Plaintiffs' antitrust claims under New York law, their class action consumer protection claims under the laws of the states of Alaska, Georgia, Louisiana and Montana, and their common law claims for monopoly and unjust enrichment.  D.I. 411.  The Court denied Intel's motion to dismiss in all other respects.  *Id.*

### 2.   The Motion for Class Certification

On May 16, 2008, Class Plaintiffs filed their motion for class certification, seeking (1) pursuant to Fed. R. Civ. P. 23(b)(2), certification of a nationwide class for injunctive relief under federal antitrust law (specifically Sherman Act § 2); and (2) pursuant to Fed. R. Civ. R. 23(b)(3), certification of a nationwide class for monetary relief under California law; as a first alternative, certification of a single, 26-state class for monetary relief under the antitrust and consumer protection laws of those states; and as a second alternative, certification of 26 separate, individual statewide classes for monetary relief under the laws of each of those states.[2]  May 16, 2008 Motion for Class Certification ("Class Mot.", D.I. 753).  Class Plaintiffs ultimately decided not to pursue the first alternative of a single 26-state class for monetary relief.  *See* Class Plaintiffs' [Proposed] Pre-Hearing Order, D.I. 1930.  On October 30, 2008, Intel submitted its Opposition to Class Plaintiffs' Motion for Class Certification ("Class Op.", D.I. 1053-1065).

After Intel filed its Opposition, but before Class Plaintiffs filed their Reply, the Third Circuit handed down its decision in *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008), which addressed standards governing class certification in this Circuit.  In light of this decision, Intel and Class Plaintiffs stipulated to, and the Court approved, a schedule whereby Class Plaintiffs were given additional time to file any new or revised expert reports and an

---

[2] The Included States are: Arkansas, Arizona, California, the District of Columbia, Florida, Idaho, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

opposition to Intel's Motion to Exclude the Testimony of Dr. Keith Leffler ("Motion to Exclude", D.I. 1062), and Intel was given an opportunity to respond to any new or revised arguments, analyses, or reports submitted by Class Plaintiffs, including the opportunity to depose the authors of any such reports. February 19, 2009 Order Regarding Class Certification (the "February 19 Order", D.I. 1365). The February 19 Order also required Class Plaintiffs to submit a Trial Plan, and required both Intel and Class Plaintiffs to submit separate Proposed Findings of Fact and Conclusions of Law and a joint Statement of Stipulated Facts. D.I. 1365 at 2-3.

Class Plaintiffs' Trial Plan proposed a single trial to be carried out in two phases. *See* Class Plaintiffs' Preliminary Trial Plan ("TP") at 1-2 (D.I. 1667). The first phase would cover common questions of liability, impact to direct and indirect purchasers, and measure and determination of the total amount of damages. *Id.* During the second phase, assuming the jury returned a verdict in favor of the class on the common issues, Class Plaintiffs would introduce evidence as to the purchases of individual class members. *Id.* Alternatively, Class Plaintiffs proposed that individual state subclasses be tried separately, if necessary. Reply in Further Support of Class Plaintiffs' Motion for Class Certification ("Class Reply") at 51-52. Class Plaintiffs stated their plan would be the same regardless of the scope of the class certified. *Id.* at 7, n.7. In addition, Class Plaintiffs submitted extensive evidence to support their proposed Findings of Fact and additional evidence in opposition to Intel's Proposed Findings of Fact.

The three-day hearing on Class Certification was held before the Special Master on April 15, 16, and 19, 2010.

On July 28, 2010, the Special Master filed his Report and Recommendations, recommending that class certification be denied for the following reasons:

1.    Class Plaintiffs cannot demonstrate that questions of law and fact common to class members predominate over individual inquiries because original

equipment manufacturers ("OEMs") had discretion with respect to how to use Intel's monetary concessions and x86 microprocessors were subject to different distribution chains—factors Dr. Leffler ignores[.]

2. Class Plaintiffs' proposed benchmark analysis (the "2006 Overcharge Regressions") fails to prove common impact.

3. There are no class representatives for so-called "enterprise purchasers," whose claims are atypical of other class members, and who the class representatives will not be able to adequately represent.

4. With respect to Class Plaintiffs' request for injunctive relief, they have not demonstrated that an antitrust violation and impact are capable of common proof, and moreover Class Plaintiffs primarily seek monetary damages.

5. Maintaining subclasses based on the law of 26 different states would be unmanageable.

R&R at 2.[3]

### 3.   The Motion to Exclude the Testimony of Dr. Leffler

On May 16, 2008, Class Plaintiffs submitted the Declaration of Keith B. Leffler ("Leffler Opening Report"), Class Plaintiffs' expert, with their Motion for Class Certification. D.I. 756-758. On October 30, 2008, Intel submitted the Declaration of David P. Kaplan ("Kaplan Opening Report"), and its Motion to Exclude the Testimony of Dr. Keith Leffler ("Motion to Exclude," D.I. 1062) with its opposition brief. D.I. 1053-1065. On August 26, 2009, Class Plaintiffs submitted the Revised Reply Declaration of Keith B. Leffler ("Leffler Revised Reply", D.I. 1705), responding to Mr. Kaplan. On January 11, 2010, Intel submitted the Reply Declaration of David P. Kaplan ("Kaplan Reply", D.I. 1876), which responded to Dr. Leffler's Revised Reply and raised additional arguments and criticisms. Both Dr. Leffler and Mr. Kaplan

---

[3] As to the required elements of Fed. R. Civ. P. 23, the Special Master found the numerosity requirement had been satisfied and the commonality requirement was subsumed by the predominance inquiry, but Class Plaintiffs had failed to satisfy the typicality, adequacy, ascertainability, and predominance requirements. *See generally* R&R at 52-90.

testified at the Hearing on Class Certification.   On July 28, 2010, the Special Master recommended that Intel's Motion to Exclude be granted under Fed. R. Evid. 702. R&R at 1.

### 4.   The Motion to Exclude Dr. Leffler's Rebuttal Analyses

On March 27, 2010, prior to the class certification hearing, Class Plaintiffs submitted a file containing fifteen analyses, which responded to the arguments raised in Mr. Kaplan's Reply. On March 30, 2010, Intel filed a motion seeking to preclude Class Plaintiffs and Dr. Leffler from introducing or relying on these analyses. D.I. 1993.   During a telephonic hearing on April 9, 2010, the Special Master excluded fourteen of the fifteen analyses based on his conclusion that they "did not fall under the proper scope of rebuttal testimony."   The Special Master subsequently issued a Report and Recommendation on June 2, 2010 ("June 2 R&R", D.I. 2061) excluding the fourteen analyses. *See also* R&R at 19 and Appendix A (Detailed Description of Dr. Leffler Analyses Offered and Special Master's Rulings Thereon).

### 5.   Intel's Objections to Dr. Leffler's Rebuttal Testimony at the Class Certification Hearing

On April 19, 2010, during the class certification hearing, Class Plaintiffs called Dr. Leffler to offer rebuttal testimony in response to Mr. Kaplan's presentation (*i.e.* the "April 19 Analysis"). *See* Class Cert. Tr. at 710:11-20; R&R at 48. Dr. Leffler testified as to how he could determine the total amount of Intel loyalty payments based on information in both the Intel and Dell databases. *See generally id.* at 720:6-745:15.   Intel objected to this testimony and the attendant exhibits. *Id.* at 703:13-16.   Without analyzing its reliability, the Special Master excluded the April 19 Analysis finding that it "is untimely and prejudicial to Intel." R&R at 48.

### 6.   Class Plaintiffs' Sanctions Motion

On January 28, 2010, Class Plaintiffs filed their Motion for Sanctions for Intel's Failure to Preserve Evidence ("Sanctions Motion") (D.I. 1897).   Class Plaintiffs argued the documents

Intel destroyed "would certainly have been favorable . . . both in the context of class certification and at trial." *See* Class Plaintiffs' Memorandum in Support of Their Motion for Sanctions For Intel's Failure to Preserve Evidence (D.I. 1898) at 28.  Class Plaintiffs sought relief in the form of monetary sanctions, an adverse jury instruction, and an adverse inference that the spoliated documents would have supported class certification. *See* Proposed Order to Sanctions Motion (D.I. 1897).  The Special Master, without deciding Class Plaintiffs' Sanctions Motion, found that even if he were to grant Class Plaintiffs the requested adverse inference, Class Plaintiffs still could not satisfy the predominance requirement.  R&R at 50.  On August 9, 2010, in an effort to expedite the Court's review of the Special Master's R&R, Class Plaintiffs withdrew their Sanctions Motion without prejudice.  D.I. 2075 at 2.

## III.    SUMMARY OF ARGUMENT

### A.    The Requested Classes Should Be Certified

1.      In order to certify the requested classes this Court must find that Class Plaintiffs have satisfied "the threshold requirements of Rule 23(a)" (numerosity, commonality, typicality, and adequacy) as well as one of the subdivisions of Rule 23(b) and that the class definition is readily ascertainable. *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 527 (3d Cir. 2004). Class Plaintiffs have satisfied the threshold requirements and the requirements under Rule 23(b)(2) for injunctive relief and 23(b)(3) for monetary relief.

2.      The Special Master found that numerosity was satisfied and that commonality was subsumed by Fed. R. Civ. P. 23(b)(3)'s predominance requirement.  The Special Master's discussion of the 23(a) requirements is therefore limited to typicality and adequacy. *See* R&R at 52-57.

3.      Class Plaintiffs have satisfied Rule 23(a)'s typicality requirement because the claims of all class members, both individuals and businesses, stem from Intel's alleged

anticompetitive conduct and took the form of higher prices for personal computers.  The focus of

the typicality inquiry centers on the defendant's conduct, not factual differences among putative

class members.  The differences between individuals and enterprise purchasers identified by the

Special Master, such as the existence of individualized negotiations (R&R at 54), are not

"meaningful" in the class certification context because they would continue to exist in the but-for

world of greater competition.  However, in the but for world, the price negotiations between

OEMs and their enterprise customers would have begun "from a revised lower cost basis."  *See*

*infra* at 24.  Moreover, Dr. Leffler's separate regressions for enterprise customers and individual

consumers confirmed that "there is a full or more than full pass-on of microprocessor cost

changes to all customer types, including large corporate purchasers."  *Id.* (emphasis added)

Class Plaintiffs therefore satisfy the typicality requirement.

      4.      Class Plaintiffs have satisfied Rule 23(a)'s adequacy requirement because the

class representatives' interests are aligned with all class members, including enterprise

customers.  Individual purchasers and enterprise customers suffered the same harm and have the

same interest in establishing Intel's liability and their right to monetary and injunctive relief.

Moreover, under Class Plaintiffs' proposed bifurcated trial structure, all class members,

including enterprise customers, will use the same proof of Intel's liability during Phase I.  To the

extent there are differences among class members as to the size of their purchases, these

differences relate only to damages and can be resolved in Phase II.  The Special Master assumed,

without citing to any evidence, that enterprise customers were "satisfied with the status quo" and

therefore had no interest in seeking monetary or injunctive relief from Intel.  R&R at 57.

Hypothetical conflicts cannot defeat class certification.  Rather, there must be an actual showing

that a real conflict exists. There has been no such showing here, and Class Plaintiffs therefore satisfy the adequacy requirement.

5.     The proposed classes are readily ascertainable whether or not they might potentially include members who were not injured by Intel's conduct. The fact that a proposed class may contain unharmed members does not preclude certification. Several courts have held that the mere possibility the class includes some class members who may not have been injured does not transform the common liability question into a multitude of individual ones, and that class treatment of the common issues, such as liability, is still appropriate. If differences exist among class members as to the extent of their injuries, they can be resolved in separate proceedings after liability is established, such as Phase II of the trial Class Plaintiffs propose.

6.     Class Plaintiffs have demonstrated that common questions of law and fact predominate and that a class action would be superior, satisfying Rule 23(b)(3) for certification of a class or classes for monetary relief based on violations of the state laws of the Included States. Neither Intel nor the Special Master seriously dispute that unlawful monopolization is susceptible to proof through evidence common to the class. They have demonstrated that common impact can be proven with evidence common to the class. Dr. Leffler explained why decreased competition resulting from Intel's anticompetitive conduct would lead to higher prices, and conducted empirical analysis of a period of greater competition to demonstrate that Intel would reduce its prices in the face of greater competition. He also demonstrated the economic expectation of full pass-on of that overcharge to consumers in a competitive market like that for computers containing x86 microprocessors, and performed empirical analysis showing that this bore out. Contemporaneous documents and testimony, consistent with Dr. Leffler's analysis, show class-wide impact. Dr. Leffler also demonstrated methodologies for estimating the amount

of the overcharge. Because all of this evidence of antitrust violation, impact, and damages is common to the class, the Special Master erred in concluding that common questions of law and fact do not predominate.

7.     Class proceedings are superior to the alternative if class certification is denied. *See* Fed. R. Civ. P. 23(b)(3); *In re OSB Antitrust Litig.*, 2007 WL 2253425, at *13-*14 (E.D. Pa. 2007). In this case, the alternative to class certification is millions of individual actions, or, more likely, the denial of meaningful redress to millions of class members. It is likely that all of Class Plaintiffs' claims could be tried in a single, bifurcated trial, where Class Plaintiffs will try common issues of liability, impact, and determination of the total amount of damages. TP at 1-2. Assuming the jury returns a verdict in favor of Class Plaintiffs on these issues, Class Plaintiffs will then put in evidence as to the purchases made by the individual class members during Phase II. Any differences between the claims of individual class members or differences in state laws as to the scope of available monetary relief can be resolved in Phase II, or in other well-established ways – e.g., bifurcation of issues, jury instructions, special verdicts. Additionally, a single trial is appropriate because Intel's conduct violated FTCA § 5, which is a predicate act that automatically violates the consumer protection laws of the Included States. Courts in multi-district antitrust cases have routinely rejected manageability arguments and certified multiple indirect purchaser classes under the laws of individual states. Finally, the Special Master's ruling is inconsistent with CAFA, under which most multi-state consumer class actions end up in federal court. An MDL court may not dismiss an otherwise proper class action on manageability grounds simply because of the existence of actions brought on behalf of different plaintiffs under the laws of different states.

8.     Class Plaintiffs have satisfied the requirements of Rule 23(b)(2) for certification

of a nationwide class for injunctive relief based on a violation of the federal antitrust law,

specifically, section 2 of the Sherman Act.   The class is cohesive; the record is replete with

common and unchallenged evidence of on Intel's unlawful monopolization of the x86

microprocessor market.    Class Plaintiffs have also set forth common evidence capable of

establishing that as a result of its anticompetitive conduct, Intel overcharged for its

microprocessors resulting in inflated PC prices to consumers, choice was limited and innovation

was stifled.  Without analysis under any discernable standard and failing to distinguish between

certification under Rule 23(b)(2) (injunctive relief for violation of federal antitrust law) and Rule

23(b)(3) (monetary relief for violation of state-law based claims), the Special Master erred in

concluding that Class Plaintiffs cannot demonstrate an antitrust violation through common proof

and that "demonstration that impact is susceptible of common proof is absent here."  The Special

Master also erred in concluding that Class Plaintiffs cannot seek both injunctive and monetary

relief.   Case law both before and after the passage of the Class Action Fairness Act of 2005

("CAFA") holds otherwise.

**B.      Dr. Leffler's Testimony and Analysis Is Admissible Under Fed. R. Evid. 702**

9.     Dr. Leffler's testimony is admissible under Fed. R. Evid. 702 because it is based

upon sufficient facts and is the product of reliable principles and methods, applied reliably.  *See*

Fed. R. Evid. 702.  Dr. Leffler's empirical work consists primarily of multiple regression

analysis, which multiple courts have found to be reliable.   *See, e.g., Petruzzi's IGA*

*Supermarkets, Inc. v. Darling-Delaware Co., Inc.*, 998 F.2d 1224, 1238 (3d Cir. 1993).  The

Special Master identifies no serious defect in this methodology.  Rather, his exclusion of the

testimony is based on his misunderstanding of Class Plaintiffs' claims in the case and his

complaints about the details of specific calculations.  This is not a proper basis to exclude expert testimony.

**C.   Dr. Leffler's Rebuttal Analyses Are Proper Rebuttal Testimony, Timely, Not Unfairly Prejudicial, and Should Not Have Been Excluded**

10.     The Special Master erred in excluding Dr. Leffler's rebuttal analyses and testimony.  Expert rebuttal evidence and testimony, including additional analysis, is proper as long as it:  (1) concerns the same subject matter as the opposing expert's opinions, and (2) is offered only to rebut the opposing expert's opinions and is consistent with the rebuttal expert's original opinions.  *See* Fed. R. Civ. P. 26(a)(2)(C)(ii); *Pritchard v. Dow Agro Sciences*, 263 F.R.D. 277, 285 (W.D. Pa. 2009).  Dr. Leffler's testimony and analyses constituted proper rebuttal because they concern the same subject matter as Mr. Kaplan's reply report, are directly responsive to that report, and are consistent with Dr. Leffler's earlier opinions.  Furthermore, there is no unfair prejudice to Intel; the Special Master ruled months before the hearing that Class Plaintiffs would be permitted to supply rebuttal testimony, and Class Plaintiffs made the rebuttal analyses and supporting material available to Intel well in advance of the hearing.

## IV.   STATEMENT OF FACTS

Since the emergence of AMD as a viable threat in the late 1990's, Intel has been engaged in an anticompetitive global campaign to protect its dominant position in the microprocessor market.  *See* Pltfs' Prelim. Stmt. at 10-11; Reply to Intel's Opposition to Class Plaintiffs' Preliminary Trial Plan ("TP Reply") at 8-12 (D.I. 1931); Class Reply at 8-10 (D.I. 1666); Class Plaintiffs' Proposed Findings of Fact ("Pltfs' FOF") Section IV.C (D.I. 1904).  Intel's tactics included multi-billion dollar loyalty payments that Intel used both to reward and punish key

OEMs and distributors.[4]  Class Reply at 8-13.  Notwithstanding Intel's attempt in opposition to

class certification to describe these loyalty payments as ███████ the record evidence shows

that these payments bore ██████ to the prices Intel's customers paid for microprocessors,

and that the OEMs kept these funds to improve their bottom lines instead of passing them along

to consumers.  Pltfs' FOF ¶ 102d; ████████████████████████████████

██████ Class Reply at 11-13; Pltfs' Resp.[7] ¶¶ 22-29; Pltfs' FOF Section IV.D.3.[8]  Class

---

[4] Dr. Leffler defines a loyalty payment as a payment from Intel to one of its customers that is (1) conditioned on that customer's loyalty (either implicitly or explicitly) and which is "non-price related" (*i.e.*, it does not affect the OEM's marginal microprocessor costs).  *See* Leffler Opening Report ¶ 31; Leffler Revised Reply ¶ 7 (2nd Bullet) and n.12.

[5] References to "Dep. Annex Tab ___" are to the Annex of Class Plaintiffs' Previously Cited Deposition Testimony and Designated and Counter-Designated Deposition Testimony served on April 13, 2010.

[6] References to "Herbert Tab ___" are to the Exhibits in Support of Reply in Further Support of Class Plaintiffs' Motion for Class Certification, Class Plaintiffs' Preliminary Trial Plan, and Memorandum in Opposition to Defendant Intel Corporation's Motion to Exclude Testimony of Dr. Keith Leffler (D.I. 1672-1676).

[7] References to "Pltfs' Resp." refer to Class Plaintiffs' Response to Intel Corporation's Proposed Findings of Fact and Conclusions of Law (D.I. 1931).

[8] To facilitate its exclusionary conduct, █████████████████████████████████



13

Plaintiffs have put forward a massive record of common evidence capable of demonstrating at trial that through the combined use of loyalty payments and retaliatory actions, Intel successfully foreclosed AMD from key customer accounts and maintained high degrees of exclusivity even when AMD's products were clearly superior. *See, e.g.*, TP at n.21; Pltfs' FOF ¶¶ 106-109. Intel's misconduct prevented AMD from achieving the economies of scale necessary to remain competitive with Intel and is the opposite of competition on the merits. Leffler Opening Report ¶¶ 26-29.

The impact of Intel's misconduct on consumers is manifest. Left unchecked, Intel overcharged its customers in excess of $4 billion. Leffler Reply ¶ 6 and Exhibit E, Table 16; Pltfs' FOF Section IV.D.; TP Reply at 17-18; Class Reply at 13-14, 41-49. Intel's illegal conduct further harmed consumers by reducing the number of choices in the marketplace, forcing OEMs to produce underconfigured computers, and slowing technological innovation. *See* Pltfs' FOF at Section IV.D.3.c-e.

## A.     Intel's Conduct Violated the Antitrust Laws

Intel made the calculated decision to focus solely on the narrow question of impact and to ignore the common evidence of violation, the overwhelming common issue in this case. *See* Intel's Opposition to Class Plaintiffs' Preliminary Trial Plan ("Intel Opp.", D.I. 1875) at 1, n.1. The common violation evidence is capable of demonstrating at trial that Intel paid the "Tier One" OEMs not do business with AMD, and that it retaliated against them in various ways when

---

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ As Class Plaintiffs have consistently maintained, Dr. Leffler's analysis was conservative because he took Intel at its word and treated any and all adjustments to price identified by Intel's transactional data as price adjustments. Leffler Reply ¶ 15 and Exhibit B; *see also* TP Reply at 17-18; Pltfs' Resp. ¶¶ 26, 42, 49, 57, 83. Dr. Leffler then performed his empirical analyses of common impact and his estimation of Intel's overcharge based on these "net prices." Leffler Reply ¶ 15 and Exhibit B. Class Plaintiffs' theory of consumer harm correctly stated is: Net of all adjustment to price, Intel's microprocessor prices would have been lower in the but-for world of greater competition. TP Reply at 17; Leffler Revised Reply ¶¶ 14-15.

they disobeyed.[9]  *See* Class Reply at 8-11; Pltfs' FOF at Section IV.C; TP at 9-44; TP Reply at

331-33.  Intel's primary defense is that "some" portion of these loyalty payments may have been

passed on to consumers.  Intel Opp. at 3.  Not only has Intel failed to defend the legitimacy of its

loyalty payments, but its own expert, Mr. Kaplan, claimed to assume that these payments

violated the antitrust laws.  Class Cert. Tr. at 649:19-21.  Intel also does not contest that it

maintains a monopoly in the relevant market for x86 microprocessors for personal computers,

with a market share exceeding 80%.  Pltfs' FOF ¶¶ 25-26.  In short, Intel has ignored a massive

record of common violation evidence and effectively conceded the efficacy of a trial on common

issues in this case.

> Intel has similarly ignored considerable amounts of common evidence detailed in Class

Plaintiffs' Trial Plan and Reply brief that can be used at trial to demonstrate the following points:

(1) industry participants understood that, consistent with basic economics, increased competition

in the microprocessor market would have yielded lower microprocessor prices across the

industry; (2) industry participants expected a high rate of pass on; (3) to the extent OEMs

maintain stable price points for their PCs, they compensate for the Intel overcharges by creating

underconfigured PCs; (4) Intel's conduct deprived consumers of the choice of cheaper, higher

performing AMD-based PCs; and (5) Intel's conduct stifled technological innovation; and (6)

Intel knew its exclusionary conduct violated the antitrust laws and took affirmative steps to

---

[9] Tier One OEMs, are the largest OEMs, and account for approximately 40% of desktop sales and nearly 80% of notebook sales.  *See* Plaintiffs' Joint Preliminary Case Statement (Pltfs' Prelim. Stmt.) at 18, D.I. 714.  A handful of large OEMs dominate in both desktop and notebook: ███████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ *Id.* ████████████ are the dominant players, collectively accounting for over 30% of worldwide desktop and mobile sales.  In terms of microprocessor purchases, the Tier Ones are critical.  *Id.*  Not only do their purchases comprise an inordinate share of the market, but the leading ones ██████ ███████████ — control most of the higher value, enterprise business.  Not surprisingly, excluding AMD from these OEMs has been an Intel priority.  Leffler Revised Reply ¶¶ 9, 25.

conceal it. TP at 71. *See generally* TP at 48-76; Class Reply at 41-49; Pltfs' FOF at § IV.D.3.

There can be little doubt that this evidence is common to the class and capable of supporting a

jury verdict in Class Plaintiffs' favor at trial.

**B.     Intel Made Billions of Dollars in Loyalty Payments to Secure Exclusivity With Tier One OEMs**

Intel understood that to protect its dominant position in the microprocessor market and

maintain artificially elevated prices, it had to lock AMD out of the "bellwether" Tier One OEMs.

Leffler Reply ¶ 25.  The largest and most important OEM was ██████████████████████

Intel paid ███████████████ much of it to buy ███████ agreement not to do business with AMD.

Pltfs' FOF ¶ 35.  Intel also made massive loyalty payments to the other "Tier One" OEMs.  *See*

*generally* Pltfs' FOF at § IV.C.  Common evidence will show, for example, that Intel used

loyalty payments to lock AMD out of 95% of ███████ consumer desktops and 100% of ████████

laptops.  *See* Pltfs' FOF at §§ IV.C.3.b and f.  Intel also paid for exclusivity with ████████

██████████████████████████████████ *Id.* at §§ C.3.c-e and h-l.

Intel's loyalty payments were effective in procuring the OEMs' loyalty.  Intel used these

payments, regardless of label, to hold the OEMs hostage, rescinding them to punish OEMs that

attempted to do business with AMD.  *See* TP Reply at 27-28, 31-33.  This was a deadly

proposition for the OEMs, many of which had become dependant on Intel's loyalty payments to

remain profitable.  *See* Pltfs' FOF at Section IV.D.3.b; Pltfs' Ex. 180[10] ██████████████████

████████████████████████████████████████████████████████  As the EU

noted:

> Intel's ability to exert control . . . derives from its dominant position.  The fact
> that it is an unavoidable trading partner for a product which is a significant

---

[10] References to "Pltfs' Ex. ___" refer to exhibits on class Plaintiffs' List of Exhibits for the Class Certification Hearing (D.I. 2020).

element of OEMs' procurement costs, combined with the very low margins on which OEMs operate (*see* section 3) enables Intel to maintain tight control over the OEMs' dealings through targeted *ad hoc* exclusionary rebates. As a consequence, Intel has the ability and the incentive to punish OEMs for not remaining loyal. The fact that [...] dollar contract for x86 CPUs are not in fact formalized via written terms, but appear to be agreed via informal arrangement such as handshakes, further improves the ability of Intel to control the loyalty inducing effect of its rebates by leaving a maximum of discretion to Intel on when to cut its rebates.

Pltfs' Ex. 485 (Davenport Tab 97 (EU Report) at ¶ 1599);[11] *see also* Pltfs' FOF at ¶¶ 38b, 43, 52

███████████████████████████████████████████████

███████ and 37, 45-47, 62b, 76b, 78, 80c, 96g ████████████████████████

████████████████████████████

## C.  Intel Took Affirmative Steps to Avoid Price Lowering Competition

Making selective loyalty payments to its largest customers was profitable for Intel because it was cheaper than lowering its microprocessor prices industry-wide. Leffler Opening Report ¶ 32.



---

[11] References to "Davenport Tab" are to the Declaration of Kevin H. Davenport in Support of Class Plaintiffs' Proposed Findings of Fact and Reply to Intel's Opposition to Class Plaintiffs' Preliminary Trial Plan (D.I. 1907).



Events confirmed these expectations. In May 2006, Intel's scheme of securing market share through loyalty payments broke down, at least temporarily, and AMD was able to compete more effectively. The critical event was ▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

As predicted, within days after ▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬ Intel dropped its microprocessor list prices dramatically. ▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Public Mercury Research Data confirms aggregate average selling price ("ASP") declines for Intel's desktop microprocessors (16.3% for desktop chips) in the second and third quarters of 2006. Pltfs' Ex. 488. Davenport Tab 146 (Bernheim Report Ex. 68); Pltfs' Resp. at 18-19 & 18 n.7.

---

[12] References to "RRKL Tab ___" are to the Annex of Exhibits cited in the Revised Reply Declaration of Dr. Keith Leffler (D.I. 1706-1710).

**D.      Intel's Net Microprocessor Prices Would Have Been Lower in the But-For World of Greater Competition**

Common evidence will show that, consistent with basic economic theory, greater market penetration by AMD or other microprocessor manufactures would have forced Intel to lower its prices market-wide. Numerous industry participants shared this view. *See* Pltfs' FOF ¶ 97. Dr. Leffler observed that, consistent with the expectations of industry participants, Intel's desktop microprocessor prices dropped dramatically in the second half of 2006 when its chokehold on the market began to loosen. Leffler Reply ¶¶ 39-43. Dr. Leffler analyzed the change in these prices between the first quarter and second half of 2006 (his proposed "benchmark" period). Leffler Revised Reply ¶ 7 (8th Bullet), 39-43; Pltfs' FOF ¶ 89-90. Dr. Leffler concluded "that there were Intel overcharges on essentially <u>all</u> microprocessors used in PCs purchased by the proposed class during the time period examined." Leffler Reply ¶ 7 (8th Bullet) (emphasis in original).

The evidence supports Dr. Leffler's analysis.



### E.    Intel's Overcharges Were Passed On To Consumers as Higher PC Prices

If Intel's microprocessor prices had been lower, OEMs would have produced lower priced PCs. *See* Leffler Opening Report, ¶¶ 32, 58-65, 77, 91. This conclusion is based on the well-accepted economic principle that "overcharges at one level of the distribution chain are expected to flow through to end-users . . . ." *See* Leffler Opening Report, ¶¶ 7, 59. Empirical evidence confirms that when the overcharge is eliminated, the savings are passed through to computer purchasers. *See* Leffler Opening Report, ¶¶ 91-113. Intel also understood that OEMs would pass overcharges onto consumers in the form of higher PC prices.[14]

### F.    Intel's Loyalty Payments Did Not Benefit Consumers

Intel actively encouraged the OEMs to apply these funds to their bottom lines so that the payments would not be ▮▮▮▮▮ to the other OEMs. ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ In this way, Intel acquired an OEM's exclusivity without



this is purely an accounting convention unrelated to the underlying

economics of the transaction. Leffler Revised Reply ¶¶ 12 n.12, 37, 157; Pltfs' Resp. ¶ 44. A payment that does not lower the marginal cost of purchasing a microprocessor is, by definition, not a discount. Leffler Revised Reply n.12. Consistent with Class Plaintiffs' common proof that Intel loyalty payments were not discounts, the Securities and Exchange Commission ("SEC") filed a complaint against Dell alleging accounting irregularities pertaining to Dell's treatment of "exclusivity payments" from Intel during the period 2001 to 2006. Declaration of J. Clayton Athey ("Athey Decl.") Tab 1 (SEC Complaint) ¶ 2; Athey Decl. Tab 3 (SEC Consent Decree).[15]

### G. Government Enforcement Actions Confirm That Intel Engaged in Anticompetitive Behavior and that Consumers Were Harmed as a Result

Separate government enforcement actions against Intel in Japan, Korea, the European Union and the United States determined that Intel engaged in anticompetitive conduct by providing payments to OEMs conditioned on market share. *See* Pltfs' FOF at Section VI.C.4. The Korean Federal Trade Commission found that Intel's conduct resulted in higher PC prices and limited choice. Pltfs' Ex. 472 (Herbert Tab 233); Pltfs' Ex. 467 (Herbert Tab 240). The European Commission found Intel's conduct harmed consumers "both in the short and in the long term, in terms of price, choice and innovation." Pltfs' Ex. 485 (Davenport Tab 97 at ¶ 1612). Intel was fined a staggering $1.45 billion by the European Commission. The New York Attorney General ("NYAG") has an ongoing action against Intel that contains similar allegations to those advanced by Class Plaintiffs. Athey Decl. Tab 7 (NYAG Complaint). None of these

---

[15] According to the SEC, Dell used these exclusivity payments to "improv[e] profitability" in order to hit earnings forecasts, notwithstanding both companies' attempts to disguise these payments as "meet competition" allowances. SEC Complaint at ¶¶ 1, 27-33. The SEC also alleged that "the overall growth of the [lump-sum] MCP payments largely reflected Dell's desire to shore up its bottom line to meet its quarterly forecasts and Intel's desire to keep Dell from buying AMD products." *Id.* at 33; *see, e.g., id.* ¶¶ 43-50, 59, 65. Dell entered into a consent decree in which it agreed to pay $100 million and to improve its accounting practices. *See* Athey Decl. Tab 2 (Dell Form 8-K). The SEC, at least at the time it drafted its complaint, appears not to have known the contents of ██████████

actions were brought, or the fines levied, because Intel was a good corporate citizen whose practices in the marketplace lowered prices.

The FTC also filed a complaint against Intel.



see also Athey Decl. Tab 5 (FTC Complaint). According to the FTC, "[c]onsumers were harmed by Intel's conduct, which resulted in higher prices, less innovation and less consumer choice in the relevant markets." Athey Decl. Tab 6 (FTC "Analysis of Proposed Consent Order to Aid Public Comment" at 1).

## V.   STANDARD OF REVIEW

Pursuant to Federal Rules of Civil Procedure 53(f)(3) and (4), this Court reviews the Special Master's Findings of Fact and Conclusions of Law *de novo. See, e.g., In re: Intel Corp. Microprocessor Antitrust Litig.,* 526 F. Supp. 2d 461, 463 (D. Del. 2007) (rejecting the Special Master's recommendation that Intel be allowed to examine Class Representatives' tax returns and personal financial information). This Court "may adopt or affirm; modify; wholly or partly reject or reverse; or resubmit to the master with instructions." Fed. R. Civ. P. 53(f)(1). Once a party has filed objections under Rule 53 (f), district courts are advised to hold a hearing before adopting the Special Master's recommendations. *See Kieffer v. Sears, Roebuck & Co.,* 873 F.2d 954, 955 (6th Cir. 1989); *see also* Fed. R. Civ. Proc. 53(f)(1).

## VI.   ARGUMENT

A.   **The Special Master Erred in Denying Class Certification**

1.   **Class Plaintiffs Meet the Threshold Requirements of FRCP 23(a)**

Under Fed. R. Civ. P. 23(a), a class must satisfy four threshold requirements in order to be certified: numerosity, commonality, typicality, and adequacy.  The Special Master found that numerosity was satisfied and that commonality was subsumed by Fed. R. Civ. P. 23(b)(3)'s predominance requirement.   The Special Master's discussion of the 23(a) requirements is therefore limited to typicality and adequacy. *See* R&R at 52-57.

a.   **Typicality**

Class Plaintiffs have satisfied Rule 23(a)'s typicality requirement because the claims of all class members, both individuals and businesses, stem from Intel's alleged anticompetitive conduct and took the form of higher prices for personal computers.  The focus of the typicality inquiry centers on the defendant's conduct, <u>not</u> factual differences among putative class members.  Third Circuit law is clear on this point: "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001); *accord Baby Neal for & by Kanter v. Casey*, 43 F.3d 48, 57-58 (3d Cir. 1994) (same); *In re DaimlerChrysler AG Sec. Litig.*, 216 F.R.D. 291, 297 (D. Del. 2003) (same).  *Newton* held that notwithstanding any factual differences among class members, "[t]he alleged <u>cause</u> of their injuries, however, remains typical throughout the class," and that the district court therefore erred in "finding [that such] potential factual differences rendered plaintiffs' claims atypical." *Newton*, 259 F.3d at 185; *see also* Class Plaintiffs' Proposed Conclusions of Law For Certification of a Nationwide Injunctive Class and 26 Statewide Classes ("26 State COL", D.I. 1905) ¶ 24; and Pltfs' Resp. at 121.  Here, enterprise purchasers and

individual purchasers both paid inflated prices for PCs, and the Special Master acknowledged in both cases the alleged cause of this injury was Intel's anticompetitive conduct. *See* R&R at 54. The claims of all the proposed class members, individuals and business, are therefore typical because they suffered the same harm emanating from the same alleged conduct.

The Special Master made a factual error in concluding that there are "meaningful differences" between individuals and enterprise customers that preclude a finding of typicality. R&R at 54. As Class Plaintiffs have explained, the differences that the Special Master identified—(1) that enterprise purchasers engaged in "heavily individualized negotiations" with the OEMs, (2) that these negotiations often resulted in multiyear contracts, and (3) that enterprise purchasers bought computers in "bundles" that included other products and services (R&R at 54)—are not "meaningful" in the class certification context because they would continue to exist in the but-for world, except that the price negotiations between OEMs and their enterprise customers would have begun "from a revised lower cost basis." Leffler Revised Reply ¶¶ 61-62; Pltfs' Resp. at ¶¶ 178, 181. The OEMs will have a "revised lower cost basis" for their PCs in the but-for world regardless of who they sell to because the prices they pay Intel for microprocessor prices will be lower. Leffler Revised Reply ¶ 62. Dr. Leffler performed separate regressions for enterprise customers and individual consumers and confirmed that "there is a full or more than full pass-on of microprocessor cost changes to *all customer types*, including large corporate purchasers." Leffler Revised Reply at ¶ 71 (emphasis added), *id.* ¶ 68.

Courts routinely certify classes in antitrust cases despite factual differences among class members as to the products purchased, prices paid, methods of purchase, or the size of purchases. *See, e.g., In re Static Random Access Memory (SRAM) Antitrust Litig.,* 264 F.R.D. 603, 609 (N.D. Ca. 2008) (certifying class and stating "[t]he typicality requirement does not

mandate that products purchased, methods of purchase, or even damages of the named plaintiffs must be the same as those of the absent class members") (internal quotation omitted); *Teva Pharms. USA v. Abbot Labs.*, 252 F.R.D. 213, 225-26, 232 (D. Del. 2008); *In re Urethane Antitrust Litig.*, 237 F.R.D. 440, 447 (D. Kan. 2006); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260-61 (D.D.C. 2002); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 480 (W.D. Pa. 1999); *Hedges Enter., Inc. v. Cont'l Group, Inc.*, 81 F.R.D. 461, 465-66 (D.C. Pa. 1979).

The Special Master's reliance on *Dieter v. Microsoft*, 436 F.3d 461 (4th Cir. 2006) ("*Dieter*") is misplaced. *See* R&R at 54-55, Class Reply at 15. While *Dieter* does discuss the fact that enterprise purchasers engage in individualized negotiations with OEMs, the focus of the court's ruling on typicality was the fact that plaintiffs' theory and proof of liability and damages did not extend to corporate purchasers. *Dieter*, 436 F.3d at 467-68. In *Dieter*, the plaintiffs alleged separate markets for: (1) operating system software and (2) applications software. *Id.* at 468. The plaintiffs purchased only operating system software, while enterprise customers purchased in both markets. *Id.* Importantly, *Dieter* was a direct purchaser case, and the court was concerned that the enterprise customers would have to offer <u>different proof</u> of Microsoft's overcharge than individual consumers. *Id.* Here, in contrast, the interests of the individual purchasers and enterprise customers are aligned because they rely on <u>common proof</u> that: (1) Intel engaged in anticompetitive conduct; (2) this conduct enabled Intel to overcharge OEMs for microprocessors; and (3) the OEMs passed-on these overcharges in the form of higher PC prices.[16]

---

[16] The Special Master asserts that individuals and enterprise customers purchased PCs in separate relevant markets, but provides no legal or economic justification for this assertion. *See* R&R at 55. Intel has not challenged Class Plaintiffs' argument that the relevant market in this case is the market for x86 microprocessors for use in PCs. *See* TP at 11-13. The OEMs purchased their microprocessors from Intel in this market, and the enterprise customers and individual purchasers bought their PCs from these OEMs.

###### b.     Adequacy of Representation

Class Plaintiffs satisfy Rule 23(a)'s adequacy requirement.  When evaluating whether the class representatives can "fairly and adequately protect the interests of the class," under F.R.C.P. 23(a)(4), courts look at two factors:  "(1) whether the representatives' interests conflict with those of the class and (2) whether the class attorney is capable of representing the class." *Newton*, 259 F.3d at 185.  The Special Master correctly concluded that the second factor was satisfied, but erred in finding that the class representatives' interests conflicted with those of some absent class members, namely enterprise customers.  *See* R&R at 56-57.

An inter-class conflict is not created nor are the class representatives inadequate just because no enterprise customers are among the class representatives.  R&R at 57.  A conflict between class members "must be more than merely speculative or hypothetical before a named representative can be deemed inadequate." *Bradburn Parent/Teacher Stores, Inc. v. 3M*, 2004 U.S. Dist. LEXIS 16193, at *14 (E.D. Pa. Aug. 17, 2004) (internal quotation omitted).  The Special Master erroneously assumed that enterprise customers were "satisfied with the status quo" simply because they had not filed their individual claims against Intel.  R&R at 57. However, the inaction of the enterprise customers is equally consistent with their desire to have their claims adjudicated in this class action or to avoid the burdens and distraction of complex litigation.  "[N]aked allegation[s] of antagonism cannot defeat class certification; there must be an *actual showing* of a real probability of a potential conflict which goes to the subject matter of the suit." *In re S. Cent. States Bakery Prods. Antitrust Litig.*, 86 F.R.D. 407, 418 (M.D. La. 1980) (emphasis added).  There has been no such showing here, and the mere hypothetical possibility of a conflict is not sufficient to defeat class certification on adequacy grounds.  *See, e.g., OSB*, 2007 WL 2253425, at *4-5 (finding no conflict between purchasers in an end-user class even though some of those purchasers were also resellers); *In re Visa Check/Mastermoney*

*Antitrust Litig.*, 280 F.3d 124, 145 (2d. Cir. 2001) (finding that there was no conflict between class members even though the class included merchants whose debit card sales predominated over their credit card sales).

A conflict is not created between enterprise customers and the class representatives simply because enterprise customers engaged in individualized negotiations with OEMs. Dr. Leffler's pass-on analysis assumes, for example, that these negotiations will continue to exist in the but-for world of greater competition, but the starting point of the negotiations will be lower. Leffler Revised Report at ¶¶ 68, 71. Dr. Leffler's analysis is capable of demonstrating that all indirect purchasers, including enterprise customers, paid inflated prices for Intel-based PCs. *Id.* at ¶ 43. No conflict exists because individual purchasers and enterprise customers suffered the same harm and have the same interest in establishing Intel's liability and their right to monetary and injunctive relief. *Ardrey v. Federal Kemper Ins. Co.*, 142 F.R.D. 105, 111 (E.D. Pa. 1992) (holding that the interests of the class representatives and the absent class members were not antagonist where plaintiffs alleged that each member of the proposed class was injured by the defendant's conduct); *see also* 26 State COL at ¶¶ 26-30.

A conflict is not created with the class representatives even though enterprise customers purchased computers through different channels or in higher volumes. Dr. Leffler's analysis is capable of demonstrating that all class members, including enterprise customers, paid inflated prices for Intel-based PCs. Leffler Revised Reply ¶ 55. Moreover, all class members will use the same proof of Intel's liability during the first phase of the bifurcated trial Class Plaintiffs propose regardless of the volume of their purchases. *See* TP at 1-2. Differences among class members as to the size of their purchases will be resolved in the second phase. *Id.*

The Special Master's recommendations as to adequacy should be rejected.

c.    **The Proposed Classes Are Ascertainable**

The proposed classes are readily ascertainable even though they might potentially include members who were not injured by Intel's conduct. Membership in the proposed class is determined by the following objective criteria: The person or entity (1) resides in the United States, and (2) purchased a desktop or mobile personal computer (3) during the Class Period (4) in the United States (5) other than for resale (6) powered by an Intel x86 microprocessor. *See* Class Plaintiffs' Proposed Conclusions of Law for Nationwide Class ("Nationwide COL") (D.I. 1906) at ¶ 5; 26 State COL at ¶ 11 (same). This is all that Rule 23 requires. *See In re Methyl Tertiary Butyl Ether (MBTE) Prods. Liab. Litig.*, 241 F.R.D. 185, 195-96 (S.D.N.Y. 2007) ("[I]t is the class, not each member, that must be ascertained").

The fact that some proposed class members "may" not have been harmed by Intel's anticompetitive conduct, as the Special Master suggests (R&R at 74) does not preclude certification. As Judge Posner recently explained:

> What is true is that a class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable because at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown. Such a possibility or indeed inevitability does not preclude class certification . . .

*Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009).

Consistent with *Kohen*, many courts have held that the mere possibility the class includes some class members who may not have been injured does not "transform the common [liability] question in a multitude of individual ones," and that class treatment of the common issues, such as liability, is still appropriate. *See Blackie v. Barrack*, 524 F.2d 891, 907 n.22 (9th Cir. 1975); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 321 (E.D. Mich. 2001); *Meijer, Inc. v. Warner Chilcott Holdings Co. III, LTD.*, 246 F.R.D. 293, 310 (D.D.C. 2007); *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 347 (E.D. Pa. 1976); and *J.B.D.L. Corp. v. Wyeth-Ayerst Labs.,*

*Inc.*, 225 F.R.D. 208, 218 (S.D. Ohio 2003).   Moreover, if there are differences among class members as to the extent of their injuries, they can be resolved in "separate proceedings" after liability is established, such as Phase II of the trial proposed by Class Plaintiffs. *See* TP at 2, 9, and n.3; Class Reply Br. at 17-18; *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 524 (S.D.N.Y. 1996).

The Special Master reasoned that under *Kohen* a class is overly broad if it "sweeps within it persons who could not have been injured by defendant's conduct." R&R at 58, n.35.  The Special Master ignored that the *Kohen* court put the burden on Pimco, the defendant, to show that the class definition included "a great many" class members who suffered no injury.  *Kohen*, 571 F.3d at 677.  The *Kohen* court concluded "this has not yet been shown" and affirmed the district court's certification order.  *Id.* at 678.  Intel has failed to make such a showing here.

None of the authorities cited by the Special Master hold that class certification should be precluded merely because of the hypothetical possibility that some class members may not have been injured.  *See* R&R at 57.  *Allen v. Holiday Universal*, 249 F.R.D. 166 (E.D. Pa. 2008), supports Class Plaintiffs' position that such questions relate only to damages and do not implicate the common question of liability.  The plaintiffs in *Allen* alleged that the defendant health clubs violated Pennsylvania's consumer protection statute by charging unlawful initiation fees. *Id.*  The defendants argued that the class was overbroad because it included persons who had not suffered an injury.  *Id.* at 172.  According to the defendants, certain class members accepted the benefits of their membership contracts (*i.e.*, they "ratified" them) and were therefore not injured. *Id.*  The court held "the Health Clubs' ratification argument *does not preclude class certification* because ratification is relevant to *damages*, not liability."  *See id.* at 172, 174 (emphasis added).

The other two cases cited by the Special Master, *Daniels v. Baritz*, 2004 U.S. Dist. LEXIS 14649 (E.D. Pa. 2004) and *Sanneman v. Chrysler Corporation*, 191 F.R.D. 441 (E.D. Pa.), are distinguishable because the class definitions proposed by the plaintiffs in those cases included subjective elements that required the district courts to predetermine liability and damages in order to ascertain who was in each class. The class definition in *Daniels*, for example, included all persons who "sustained damages as a result of renting" from the defendants. *Daniels*, 2004 U.S. Dist. LEXIS 14649, at *4-5. Similarly, the class definition in *Sanneman* included all persons who bought Chrysler motor vehicles "with serious paint defects that Defendants refused to repair." *Sanneman*, 191 F.R.D. at 444. In contrast to *Daniels* and *Sanneman*, the class definitions here contain no subjective elements as they include all purchasers of PCs containing x86 Intel microprocessors during the class period. Thus, the Special Master erred in ruling that the proposed classes are overbroad and unascertainable.

The Special Master erred in finding that the proposed classes failed to take into account the Court's FTAIA decision. That decision, which dismissed "those claims [that were] based on the alleged foreign conduct of Intel" and struck several paragraphs from Class Plaintiffs' complaint, had nothing to do with class certification. March 7, 2007 Mem. Op. at 8 (D.I. 299). As Class Plaintiffs explained in their Proposed Conclusions of Law, this ruling does not affect the ascertainability of the proposed classes because membership in those classes is limited to persons and entities that indirectly purchased an x86 microprocessor in the United States, as part of a personal computer. 26 State COL ¶ 6. The Special Master, again uncritically accepted Intel's assertions without citing to any legal authority or providing any explanation, and summarily dismissed this explanation as "insufficient." R&R at 58. The Court's FTAIA

decision does not, on its face, require that any person or entity be excluded from the classes as defined. It follows that the decision cannot, and does not, create any ascertainability issue.

> **2.     Class Plaintiffs Meet the Requirements of FRCP 23(b)(3) For Certification of a Class or Classes For Monetary Relief Based on Violations of State Law**
>
> **a.     Common Questions of Law and Fact Predominate**

Federal Rule of Civil Procedure 23(b)(3) requires that, in order for an action to be maintained under that provision, "questions of law or fact common to class members predominate over any questions affecting only individual members." The predominance inquiry asks "whether Plaintiffs can establish the three elements of their case through common proof: (1) existence of the alleged [antitrust violation]; (2) injury or impact; and (3) damages." *In re OSB Antitrust Litig.*, 2007 WL 2253425, at *6 (citations omitted). At the class certification stage, Class Plaintiffs "need not actually prove these elements; rather, they must offer a valid and detailed method by which they will do so at trial." *Id.; see also In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311-12 (3d Cir. 2008) (plaintiffs' class certification burden "is to demonstrate that the element of antitrust impact is *capable* of proof at trial through evidence that is common to the class rather than to its individual members") (emphasis added). As the Third Circuit instructs, "[i]n order to predominate, the common issues must constitute a 'significant part' of the individual cases." *Chiang v. Veneman*, 385 F.3d 256, 273 (3d Cir. 2004) (quoting *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986)). Moreover, "[a]s the Supreme Court noted in *Amchem*, '[p]redominance is a test readily met in certain cases alleging ... violations of the antitrust laws." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 (3d Cir. 2004) (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 625 (1997)).

Because Class Plaintiffs demonstrated reliable, feasible, class-wide methods for proving violation, impact, and damages, the Special Master erred in concluding that Class Plaintiffs

failed to meet the requirements of Rule 23(b)(3) and recommending that class certification be denied. Despite Intel's failure to challenge predominance as to an antitrust violation, the Special Master—without analysis—concludes that Class Plaintiffs "have not established that they will be able to demonstrate an antitrust violation through common proof." R&R at 110. The Special Master also erred in concluding that "Class Plaintiffs have not demonstrated that antitrust impact is capable of proof at trial though evidence common to the class," R&R at 59, and in failing to address predominance as to monetary relief (damages and restitution).

1. **Monopolization Is Susceptible to Proof with Evidence Common to the Class**

Intel does not seriously dispute predominance as to monopolization; the focus of its challenge is impact. As Class Plaintiffs have shown, the evidence of an antitrust violation concerns Intel's own conduct and is thus common to the class. *See, e.g., Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791, 795 (10th Cir. 1970) (monopolization claims are "superbly suited for class action"); *Microsoft I-V Cases*, 2000-2 Trade Cas. ¶ 73,013 at 88,559 ("Microsoft's actions in this regard are not differentiated with respect to individual consumers; the focus is squarely on Microsoft's conduct, not the conduct of individual class members.") (attached as Exhibit A hereto). Since before the late-1990's, Intel has had a monopoly share of the x86 microprocessor market. Beginning no later than the late-1990's, Intel offered major OEMs special treatment, not better prices, for their agreement to restrict their dealings with competitors. Intel paid these OEMs to buy all or most of their microprocessors from Intel, rather than from AMD. Intel's conduct foreclosed AMD and others from a substantial portion of the market. If AMD had been able to sell more microprocessors, it would have achieved greater scale, lower costs, earlier and greater innovation, and lower prices. This in turn would have forced Intel to compete with AMD by offering better microprocessors and by selling its microprocessors at

lower prices. Instead, Intel had greater market power and was able to charge higher prices, to the ultimate detriment of consumers. *See* Memorandum of Law in Support of Class Plaintiffs' Motion for Class Certification ("Class Cert. Br.") at 32-34; Leffler Opening Report ¶¶ 25-41; Leffler Reply ¶¶ 8-15. Many courts have found harm to consumers in the form of higher prices caused by a monopolist's exclusionary conduct. *See, e.g., LePage's Inc. v. 3M*, 324 F.3d 141, 159, 162-63 (3d Cir. 2003) (exclusion of competitors by monopolist led to competitive injury including higher consumer prices); *U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 190-91 (3d. Cir. 2005) (same).

Intel's monopolization of the market for x86 microprocessors is a common issue that concerns Intel's conduct, and is thus entirely subject to common evidence. Monopolization is generally proven by demonstrating: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) (quotations and citations omitted). As numerous courts have held, the market definition, the existence of market power, and the anticompetitive acquisition or maintenance of monopoly power do not vary by class member and thus are determined on a class-wide basis. *See, e.g., In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 696 (S.D. Fla. 2004) (issues regarding market power "are capable of determination using common proof, as they focus on [the defendant's] power and are not impacted by any individual determinations relating to specific classes or class members"); *Stephenson v. Bell Atl. Corp.*, 177 F.R.D. 279, 288 (D.N.J. 1997) ("Because each member must make the same showing of anticompetitive conduct and monopolistic pricing in

order to prevail on her antitrust claims, the manner of proof will not vary, and individual issues of fact and law do not predominate.").[17]

### 2.    Common Impact Is Susceptible to Proof with Evidence Common to the Class

Class Plaintiffs' burden "is to demonstrate that the element of antitrust impact is capable of proof at trial through evidence that is common to the class rather than individual to its members." *Hydrogen Peroxide*, 552 F.3d at 311-12.  Plaintiffs do not need to fully implement the method or actually prove impact, instead, Plaintiffs must show that the proposed methodology and evidence are available at trial.  *See* Class Reply Br. at 20-22.  Dr. Leffler did precisely this.  The R&R does not challenge the core of these methodologies.  Instead, the R&R reflects the Special Master's lack of understanding of Dr. Leffler's analyses and conclusions.  It accordingly must be rejected.

To prove that the class members were injured by Intel's anticompetitive conduct, Class Plaintiffs must (1) prove that Intel overcharged for its microprocessors and (2) show that the overcharge was passed on to the class members.  Dr. Leffler offered reliable, feasible, class-wide methodologies that can be used at trial to establish both steps.[18]

---

[17] The Special Master is incorrect that Class Plaintiffs' theory of contestable and noncontestable markets presents a problem for Dr. Leffler's analysis by requiring him to exclude certain members from the class. *See* R&R at 90-91.  This theory is based on Intel's ability to leverage control over "non-contestable" business—sales for which Intel rivals would have significant difficulty competing—in order to capture all or nearly all of a customer's business, including all or most of its "contestable" business. Class Reply Br. at 40-41.  It simply explains how Intel's loyalty payments excluded AMD and other competitors from otherwise "contestable" sales.  As further discussed below, these payments lowered the OEM's total cost, but not its marginal cost (*i.e.*, price), of purchasing Intel microprocessors.  Thus, Intel was able to use the loyalty payments to foreclose AMD without lowering its microprocessor prices.  Because they did not affect the price of purchasing Intel chips, the loyalty payments were not passed on in the form of lower computer prices.  Thus, no class member benefited from the loyalty payments and therefore, no class member should be excluded from the class.

[18] Furthermore, as explained in the Statement of Facts, contemporaneous documents, consistent with Dr. Leffler's analysis, show class-wide impact.  The Special Master's rejection of this evidence (and Dr. Leffler's conclusions) essentially amounts to a finding on the merits against Class Plaintiffs.  This is

i.   **Dr. Leffler's Methodology Can Show
That Intel's Desktop and Mobile
Microprocessor Prices Were Higher as
a Result of Intel's Challenged Conduct**

Dr. Leffler demonstrated a class-wide methodology for showing Intel's desktop and mobile microprocessor prices were higher because of its monopolization.  First, basic, uncontested economic propositions demonstrate that greater competition will lead to lower prices.  *See* Class Cert. Tr. 308:8-21 ("I'm unaware of any model of anybody's work or any imperical (sic) implementation of those models that doesn't get the result that you increase competition, you lower prices, absent collusion.")  Second, for different products in the same market, it "has been established many times" that once you lower the price of some of those products, it will lead to lower prices for other products in the same market.  *Id.* 308:24-309:23. The parties do not dispute the relevant market is the market for x86 microprocessors. Accordingly, basic economic principles predict increased competition in the x86 microprocessor market will lead to lower prices for the microprocessors sold in that market.[19]

_____

improper on a motion for class certification.  *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311-12; *United Steel, Paper & Forestry, Rubber, Manufacturing Energy, Allied Industrial & Service Workers International Union, AFL-CIO v. ConocoPhilips Co.*, 593 F.3d 802, 808-09 (9th Cir. 2010).

[19] The Special Master concluded AMD changed to a "neutral pricing strategy" in August 2003 and Dr. Leffler failed to account for how this might challenge the theoretical expectation that greater competition would lead to lower prices.  *See* R&R at 85-87.  This conclusion is incorrect for four reasons.  *See generally* Pltfs' Resp. ¶¶ 138-148. ███████████████████████████████████████████████ In a competitive market, if AMD priced a technologically-superior product at the same price as Intel's comparable, but inferior product, Intel would be forced to lower the price on its product in order to compete.  Third, as explained below, ████████████████████████████████ Fourth, Intel's claims relating to AMD's pricing strategy are based on documents prepared by a third party consultant that no AMD witness will corroborate.  *See* Pltfs' Resp. ¶ 141.

Third, in a monopolization case like this one, the details of the but-for world cannot be known with as much certainty as in, for example, price-fixing cases. Intel's anti-competitive conduct began over a decade ago and fundamentally changed the market by, among other things, constraining AMD's size, deterring others from entering or attempting to enter the market, and slowing the pace and changing the direction of innovation—harm experienced by all purchasers in the x86 microprocessor market. *See* Leffler Reply ¶¶ 26, 28, 30. Because it is not possible to determine what precise innovation, product offerings, and competitors would have existed in the but-for world, the impact of Intel's conduct is demonstrated by "hold[ing] these factors constant and focus[ing] only on how Intel prices would have been impacted from the greater competition of the existing competitor AMD." *Id.* ¶ 30. This market-wide approach of estimating the impact of the overall effect of the conduct on the market is necessary because there is no way to determine the effect on individual products in the real world when those products likely never would have existed in the but-for world. This approach requires no individualized analysis; it involves the same issues as if a single OEM or purchaser had brought this case. *Id.* ¶¶ 31, 43 n.118.[20]

Fourth, Dr. Leffler conducted empirical tests which demonstrated the economic and commonsense expectation that increased competition will lead to lower prices in this market— that is, that Intel drops all prices of microprocessors facing increased competition (and that,

---

[20]     Because it is Intel's anticompetitive conduct that altered the market and made it necessary to estimate the but-for world, Intel is not entitled to demand undue precision in that calculation. *See, e.g., J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981) ("Our willingness to accept a degree of uncertainty in these cases rests in part on the difficulty of ascertaining business damages as compared, for example, to damages resulting from a personal injury or from condemnation of a parcel of land. The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation. But our willingness also rests on the principle articulated in cases such a *Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946) [cited at Class Cert. Reply Br. at 31], that it does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted.") (citation omitted).

accordingly, all microprocessors had inflated prices due to Intel's conduct). *See* Class Reply at 33-35. Dr. Leffler focused on a period of increased competition in the desktop segment of the x86 microprocessor market in mid-2006, when Intel faced increased government scrutiny and increased OEM dissatisfaction, culminating in Dell's announcement in May that it would begin selling AMD chips in desktop computers. *See* Leffler Reply ¶¶ 37-38; Class Reply at 33. Dr. Leffler used this period as a benchmark to evaluate how Intel priced its processors in the face of such competition. Dr. Leffler concluded that, on average, Intel's net prices for desktop microprocessors fell significantly between the first and third quarters of 2006 ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ Leffler Reply ¶ 39.

Focusing on this benchmark period, Dr. Leffler conducted two empirical tests. First, he performed the Mann-Whitney Two Sample Statistic test and confirmed that the *entire* distribution of prices for *each* Intel microprocessor brand was significantly lower in the third quarter of 2006 than it was in the first quarter of 2006. Leffler Reply ¶ 42 n.116.[21] Second, he examined the extent of discounting before and after the ▮▮▮▮▮ and found that "the frequency of discounting and the average percentage discount from 'list' were essentially unchanged ▮▮▮▮▮ *Id.* ¶ 42 (the "Table 4 analysis").[22] Additionally, while

---

[21] Mr. Kaplan criticized Dr. Leffler's Mann-Whitney analysis because it was not limited to microprocessors present in both the first and third quarters of 2006. When Mr. Kaplan ran the test for only those microprocessors, he found the distribution of prices for Pentium 4 microprocessors did not experience a statistically significant change. Kaplan Reply ¶ 55. ▮▮▮▮▮ *See* Leffler Reply ¶ 41 n.113. ▮▮▮▮▮ *See* Apr. 6, 2010 Letter Br. (D.I. 1999), Ex. 1, at 6.

[22] Mr. Kaplan criticized this analysis by noting that when it is disaggregated by brand, the results varied meaningfully. Kaplan Reply ¶¶ 51-52. This is expected, however, because the increased competition in the third quarter of 2006 was restricted to the specific segments where AMD threatened Intel; it was not the across-the-board greater competition that would have existed in the but-for world.

the mobile segment was not subject to the same competitive pressures in the second half of 2006 as the desktop segment, Dr. Leffler concluded the mobile segment should respond in similar fashion to increased competition because it was simply another segment of the but-for x86 microprocessor market. *Id.* ¶ 39 n.107.[23]

The Special Master's "fundamental and seminal" complaint with Dr. Leffler's analysis, and primary basis for rejecting it, is that because OEMs had some discretion regarding how they used Intel's monetary concessions, there are "countless issues of individualized fact not possibly capable of common proof." R&R at 69. The Special Master believed Class Plaintiffs would have to "analyze and exclude" any individuals who "benefited" from Intel's monetary concessions. His conclusion reflects a fundamental misunderstanding of Plaintiffs' claims and their burden at this stage and is incorrect for five reasons.

First, Class Plaintiffs only challenge the Intel payments that were used to secure OEMs' loyalty. They do not challenge discounts or Intel payments from Intel that affected an OEM's marginal cost of acquiring an additional microprocessor. *See* Class Reply at 2, 38. Accordingly, none of the payments that Plaintiffs challenge were passed through to customers, and none of the payments would exist in the but-for world. Consumers would not lose any "benefit" from the challenged payments in the but-for world.

---

*See, e.g.,* Leffler Reply ¶ 25 ███████████████████████████████████████
███████ *id.* ¶ 39 n.107 ███████████████████████████████████████ Accordingly, Intel's response in the second half of 2006 would be expected to—and did—vary depending on the AMD threat particular to the segment. Moreover, for both discounted and non-discounted transactions of each microprocessor brand, the average net price decreased from the first to the third quarter of 2006. *See* Leffler Reply ¶ 42; Apr. 6, 2010 Letter Br. Ex. 1, at 6 (showing that for customers that bought the same microprocessors in both the first and third quarters of 2006, the average prices dropped for all desktop brands under consideration).

[23]   Dr. Leffler's conclusions regarding the mobile segment are discussed more full in Section VI.A.2.b, below.

Second, Plaintiffs have already accounted for Intel's discounts. Dr. Leffler conducted his analysis based on *net* prices—that is, prices less any discounts recorded in Intel's database. *See* Leffler Opening Report ¶¶ 25, 45 n.86. Accordingly, his conclusion that Intel's conduct impacted the entire class takes discounts into account.[24] For example, as described above, Dr. Leffler's Mann-Whitney test and his Table 4 analysis are based on net prices and show that net prices fell as a result of increased competition in the second half of 2006.

Third, the task of identifying which portion, if any, of an Intel payment was a discount was done by Intel in its sales database. The Intel database links an Intel payment, to the extent it is a discount, to the discounted transaction. To the extent the payment is not a discount, it is not linked to any transaction. *See* Class Cert. Tr. at 463:22-466:4. The Intel database is common evidence that readily identifies discounts, net prices and loyalty payments.

Fourth, the Special Master appears to believe, incorrectly, that an individual who purchases a computer, the cost of which is lower due to an Intel discount, has not been harmed if the discount is big enough. But discounts are not the result of Intel's anticompetitive conduct, and thus would still exist in the but-for world. Rather, "with increased competition from AMD in the but-for world, the array or matrix of ... microprocessor prices would be at a lower level..." Leffler Opening Report ¶ 54. All Intel prices, even the most discounted ones, would be lower in the but-for world. *See* Class Reply Br. at 38-40; Class Cert. Tr. 238:2-239:4.

---

[24]     The Special Master's suggestion that Dr. Leffler and Class Plaintiffs disagree about the nature of the Intel payments at issue, *see* R&R at 66-68, is contradicted by the record. Intel and the Special Master seize on one piece of testimony in Dr. Leffler's deposition regarding Intel's ▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆ testimony that Dr. Leffler later explained was based on his understanding at the time that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *See* Dep. Annex Tab 32 (Davenport Response Tab 152 (Leffler Dep.) at 535:17-537:22); Class Cert. Tr. 536:10-23. Regardless, Dr. Leffler repeatedly stated during his deposition that loyalty payments are not discounts. *See* Dep. Annex Tab 32 (Davenport Response Tab 152 (Leffler Dep.) at 459:23-460:2, 460:13-16, 500:22-501:1, 501:14-25, 505:11-17, 560:15-23, 570:15-21, 617:16-18, 649:24-650:4). References to "Davenport Response Tab" refer to the Declaration of Kevin H. Davenport in Support of Class Plaintiffs' Response to Intel Corporation's Proposed Findings of Fact and Conclusions of Law (D.I. 1932).

Purchasers who "benefited" from discounts are not better off than they would have been in the but-for world, because discounted prices would have been lower in the but-for world.  Dr. Leffler demonstrated this point with the Mann-Whitney and Table 4 analyses, which showed that the entire distribution of prices, including the most discounted prices, dropped after Intel's "giant price move" in the second half of 2006.  *See* Leffler Reply ¶ 42 & n.116.[25]

Fifth, the notion that Intel's lump-sum payments were primarily for discounting or that OEMs had significant discretion to discount (*see* R&R at 67 (regarding Dell's purported discretion to discount), is plainly refuted by the record.  These payments were not tied to specific products and were often made well after the OEMs sold Intel's products.  *See* Class Reply at 11-12.

---

[25] In any event, Plaintiffs are not required to show that *every single* class member was harmed by Intel's conduct.  It is "almost inevitable" that "a class will often include persons who have not been injured by the defendant's conduct."  *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009).  "Such a possibility or indeed inevitability does not preclude class certification" unless "the class definition clearly were overbroad."  *Id.* at 677-78.  Rather, it presents an issue of allocation only.  *See* Class Cert. Reply at 17-18; *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 632 (D. Kan. 2008) (holding that where plaintiffs are capable of demonstrating violation and impact with common proof "[t]he fact that the damage element may involve more predominantly individualized issues does not defeat the fact that common issues will predominate the claim as a whole"); *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 524 (S.D.N.Y. 1996); *In re Sugar Indus. Antitrust Litig.*, 73 F.R.D. 322, 353 (E.D. Pa. 1976).

[26] For purposes of proving antitrust injury, courts can infer that reductions in list price mean lower negotiated prices.  *See In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 486 (W.D. Pa. 1999) ("even though some plaintiffs negotiated prices, if plaintiffs can establish that the base price form which these negotiations occurred was inflated, this would establish at least the fact of damage, even if the extent of damage by



> ii.    **Dr. Leffler's Methodology Can Show That Some Portion of the Intel Overcharge Was Passed on to Class Members**

Class Plaintiffs' second step in the class-wide impact analysis Plaintiffs must show at least *some* portion of Intel's overcharge was passed on to class members when they purchased Intel's microprocessors as part of a desktop or mobile computer. Dr. Leffler's analysis showed standard economic theory predicts 100% pass-on in a competitive market like the one for computers running x86 microprocessors, and provided substantial empirical evidence demonstrating, based on class-wide evidence, full pass-on of increased costs, including increased

---

each plaintiff varied"); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 297, 318-19 (E.D. Mich. 2001) (granting class certification and stating that "variations in net prices class members based for their purchases . . . are relevant to proof of individual damage amounts, not the fact of injury").



Moreover, whatever difficulty exists in determining the exact price of the goods, it is a direct result of Intel's illegal scheme. Intel's challenge to the accuracy of its own data amounts to a request, based on its unlawful pricing system, to avoid accountability for the harm caused by its conduct. The Special Master erred in failing to reject that request. *See, e.g., J. Truett Payne Co., Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 566-67 (1981) ("Our willingness to accept a degree of uncertainty in these cases . . . also rests on the principle . . . that it does not 'come with very good grace' for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted.") (citation omitted); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) ("Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, . . . it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.").

microprocessors costs.   Intel countered this forceful analysis with nothing but unsupported attacks on the sufficiency of the data Dr. Leffler used to show pass-on, and accordingly the Special Master erred in rejecting Dr. Leffler's testimony.

First, Dr. Leffler examined academic research regarding pass-on issues.  This material shows that "overcharges at one level of the distribution chain are expected to flow through to end-users such that a class of end-users will normally be impacted by an overcharge to the direct purchasers." (Leffler Opening Report ¶¶ 59-60).  It also shows that in a competitive market, the expected pass-on is close to 100 percent. *Id.*  Second, market-wide cost changes in a competitive market "will rapidly and quickly affect prices to be passed on." Class Cert. Tr. 382:7-12.  Since the cost change is market-wide, all manufacturers will use the lower cost to lower prices and sell more units, maintaining their pricing at marginal cost levels. *See id.* 381:24-384:9.

Third, Dr. Leffler examined evidence regarding the characteristics of the x86-based computer market to confirm that it should perform in accordance with these expectations.  The x86-based computer market is highly competitive, suggesting full pass-on, and industry participants expected changes in microprocessor prices to be passed on. *See* Leffler Opening Report ¶¶ 60-61; Class Cert. Tr. 379:22-381:23.  The microprocessor is essentially unchanged as it passes through distribution (as opposed to substantially transformed in production), increasing the likelihood of complete pass-on. Leffler Opening Report ¶ 65.  Additionally, it should take only a matter of months for the cost change to be translated to different prices for end purchasers, so the cost change only needs to be in place a matter of months before the start of the class period in order to impact all class members. *See* Leffler Reply ¶ 47; Class Cert. Tr. 385:7-386:9.

Finally, Dr. Leffler conducted multiple regression analyses to examine the relationship between changes in reseller costs and changes in its prices.  These analyses identified how

computer prices to end-users were impacted by differences in manufacturers' costs. Using these analyses, Dr. Leffler created a reasonable and reliable inference as to how the prices paid by end-purchasers were impacted by Intel's overcharges. *See* Leffler Opening Report ¶ 96. This examination of "how OEMs and retailers generally change prices when faced with lower or higher cost inputs used in PCs" is "the closest analogous situation" to a but-for world in which Intel charges lower prices for all of its microprocessors. *See* Leffler Reply ¶ 54.[28] Dr. Leffler performed 17 different regressions, using data from OEMs, retailers, value-added resellers, and distributors. *Every single regression* showed not only that *some* amount of the cost changes were passed through, but that—as expected—approximately 100 percent or more of the cost changes were passed through. *See* Leffler Opening Report ¶¶ 101-11; Leffler Reply ¶¶ 57-81. Dr. Leffler's data included sales of nearly 7.8 million computers covering the entire overcharge period. Leffler Reply ¶ 82. As Dr. Leffler stated, "[a]ll the empirical analyses strongly support[] the widely accepted and empirically documented prediction from standard economic analysis— an industry wide, long standing cost reduction for a significant and important component of PCs,

---

[28] While "the closest analogous situation" to the but-for world, the pass-on regressions are also conservative. The data on which they are based includes not only market-wide cost changes like Intel's overcharge, but also cost changes specific to individual OEMs. While market-wide changes are expected to be passed on rapidly in full, manufacturers do not have the same incentive to pass on the full cost change if other manufacturers are not also benefiting from that change. *See* Class Cert. Tr. 382:18-383:15. Since the data include OEM-specific cost changes, with their associated lower pass-on rate, the regressions should show a lower pass-on rate than if they only included market-wide changes (like the Intel overcharge), and are thus conservative.

Accordingly, the Special Master's citation to documents and testimony regarding the factors an individual OEM or retailer considers as a short-run reaction to cost changes specific to that re-seller is irrelevant. *See* R&R at 75-78. The pass-on analysis concerns a market-wide overcharge that has been embedded in Intel's prices since well before the beginning of the damages period in the case, and applies to all microprocessor purchasers in the industry. Short run responses by retailers or OEMs to retailer- or OEM-specific cost changes simply are not relevant. *See* Leffler Reply ¶¶ 60-65; Class Cert. Reply at 44-45; Class Cert. Tr. 381:24-386:9.

the microprocessor, will result in an equal or more than equal reduction in prices to the purchasers of PCs." *Id.*

Neither Intel nor the Special Master challenges Dr. Leffler's first three points—that in the x86 microprocessor market one would expect near-complete pass-on. They likewise do not significantly challenge use of a statistical regression to determine the extent of pass-on, and Intel presented no analysis suggesting that costs were *not* passed on. Instead, they quibble with the data Dr. Leffler used and the specific regressions he ran. The Special Master's misplaced objections fall into two categories.[29]

First, the Special Master rejected pass-on regressions for their "failure" to account for variances—such as differences in product features, business strategy, and microprocessor quality—that are irrelevant to the question of pass-on. *See* R&R at 30-36, 75-78. The Special Master appeared to believe that Class Plaintiffs must isolate every factor that affects microprocessor prices. However, as Dr. Leffler explained, this is not necessary:

> The objective of the pass-on analysis in this overcharge context is not to identify all the economic factors that may lead to particular retailers or OEMs charging higher or lower prices than others. That is, there are numerous reasons particular OEMs, VARS or retailers charge different prices over time for the same goods. ... However, whatever the factors are that cause some sellers to charge high prices and others low prices, those same factors would have existed in the but-for world such that the same distribution of prices, but-for the Intel overcharge, would have prevailed.

Leffler Opening Report ¶ 94 (footnotes omitted). The Special Master also believed cost changes not associated with microprocessors were irrelevant. This belief is incorrect. Because "there is no reason that an OEM would treat differently a cost change resulting from an Intel price reduction from a cost change resulting from, for example, using a more or less expensive Intel

---

[29] The Special Master's recommendation regarding the exclusion of Dr. Leffler's testimony was largely premised on these pass-on regressions. Accordingly, the errors in the Special Master's conclusions regarding specific regressions are also discussed in Section VI.A.2.b, below.

microprocessor model [or] a more or less expensive hard drive," Dr. Leffler's regressions properly examined the effect on price of any changes in cost. *Id.* ¶ 96; *see also* Leffler Reply ¶¶ 54, 60; Class Cert. Reply at 45-46.[30]

Second, the Special Master rejected Dr. Leffler's pass-on regressions because most of the data they were based on did not contain rebate data. *See* R&R at 38-39. However, this is only problematic if that lack of rebate information introduces bias. Intel offers nothing to suggest that the data is biased, and there is no economic reason to think it would be biased. *See also* Daniel Rubinfeld, "Reference Guide to Multiple Regression," in Federal Judicial Center, Reference Manual on Scientific Evidence at 188-89 (2d ed. 2000) (explaining that data errors and omitted variables are not of concern to the reliability of regression analysis unless there is evidence they create bias); *In re Linerboard Antitrust Litig.*, 497 F. Supp. 2d 666, 678 (E.D. Pa. 2007) ("several other courts have recognized that '[m]erely pointing to economic conditions that *may* affect the dependent variable is not enough to call into question the reliability of an econometric model'") (citation omitted, emphasis added). Moreover, this is corroborated by ▓▓▓▓▓▓▓ which did contain rebate information and likewise showed a pass-through rate of nearly 100 percent. *See* Apr. 6, 2010 Letter Br., Ex. 1, at 4.

Furthermore, the Special Master failed to take account of the sheer weight of the regression analyses. Dr. Leffler performed 17 different regressions using data covering sales of nearly 7.8 million computers. Leffler Reply ¶ 82. Most of these measured differences in computer prices due to differences in computer costs, without holding the computers' configuration constant, while some held computer configuration constant while measuring price

---

[30] Accordingly, Dr. Leffler did not "simply stat[e]—*ipse dixit*—that an industry-wide cost decrease would [be passed on] in the 'but-for' world." R&R at 75. He provided a theoretical basis for expecting such a decrease and empirical evidence that the x86 microprocessor market would respond to component price changes—including changes in the cost of microprocessors—in the expected manner.

changes due changes in the cost of computer processors. *See* Leffler Opening Report ¶¶ 101-11; Leffler Reply ¶¶ 57-81. Additionally, when just the seven regressions Dr. Leffler included in his initial expert report are considered together, the chance that there is not pass-on of a cost change is one out of 10 million. Leffler Reply ¶ 55. The Special Master's Report and Recommendations is incorrect in its rejection of the pass-on methodology in the face of such consistent results, particularly where Class Plaintiffs' only burden was to demonstrate a methodology capable of showing that *some* amount of the overcharge was passed on.

### 3.   Damages Are Susceptible to Proof with Evidence Common to the Class

Dr. Leffler's damages model involves methodologies to: (1) estimate the amount of the Intel overcharge and (2) determine the rate at which the overcharge was passed on to the class members. *See* Leffler Reply ¶¶ 83-86. Because Dr. Leffler demonstrated feasible and reliable class-wide methodologies for doing so, the Special Master erred in rejecting his damages methodologies.

#### i.   Dr. Leffler's Methodology Can Provide a Reasonable Estimate of the Size of Intel's Overcharge

Dr. Leffler used a benchmark period of greater competition in the x86 desktop microprocessor market in order to conservatively estimate of the size of Intel's overcharge. Dr. Leffler determined Intel lowered its prices for desktop microprocessors significantly in the second half of 2006 due to increased competitive pressure from AMD, and as a result desktop microprocessor prices fell by approximately 14 percent. *See* Leffler Reply ¶¶ 36-42; Dep. Annex Tab 32 (Leffler Dep. 832:11-833:20); Class Cert. Reply at 32-35. As Dr. Leffler noted, the analysis is "quite conservative" because it does not reflect the loss of innovation due to Intel's conduct and allows only a short time for the market to adjust to the increased competition.

Leffler Reply ¶ 44.  Dr. Leffler thus demonstrated a methodology that can calculate a reasonable (and conservative) estimate of Intel's overcharge.[31]

The Special Master's primary complaint with Dr. Leffler's 2006 overcharge regression is that it is aggregated—averaged—across all desktop microprocessor brands.  The Special Master contends that Dr. Leffler's analysis is unreliable because Mr. Kaplan's analysis showed that, when disaggregated by brand or OEM, some prices rose and some prices fell in the second half of 2006.  *See* R&R at 85.  This reflects both a fundamental misunderstanding of the overcharge analysis methodology and why Dr. Leffler properly chose to aggregate.

The Special Master did not understand that aggregation to "get[] rid of the 'idiosyncratic details,'" (R&R at 83) is not a flaw, but a virtue under the circumstances of this case.  In cases like this one, where the anticompetitive activity fundamentally changed the market over several years, an estimate of a brand-specific or OEM-specific overcharge is less accurate than an estimate of a market-wide overcharge.  As Dr. Leffler stated during the class certification hearing, "[y]ou want an abstract from all of those idiosyncratic details that take away from the big picture of the change in competition."  Class Cert. Tr. 407:12-408:15; *see also id.* 253:20-254:4 (disaggregation "remov[es] the overall market effects from the data," and you therefore "can't interpret [the data] anymore as telling you about overall market effects").  Thus, aggregation is the preferred method of estimating the Intel overcharge, and is class-wide, feasible and reliable.

---

[31] As discussed above, *see* Section VI.A.2.a.2.i, the fact that OEMs may have had some "discretion" regarding the use of Intel's monetary concessions does not result in "countless issues of individualized fact" that would preclude class certification.  *See* R&R at 69.  In any event, the "fact that Intel offered some OEMs relatively lower prices through discounts impacts only the calculation of the actual prices paid by those OEMs and the magnitude of their overcharges."  Leffler Reply ¶ 33.  Courts have repeatedly held individual issues regarding proof of damages do not defeat class certification.  *See* Class Cert. Br. at 38 n.29.

If one were, nonetheless, to estimate disaggregated overcharges, one would need to understand the idiosyncrasies and the marketplace in order to properly perform the regression. *See id.* 249:1-8, 252:1-254:4. Mr. Kaplan's disaggregated regressions, rather than discrediting Dr. Leffler's aggregated approach, only reveal the problems of disaggregating without properly understanding the marketplace or appreciating the idiosyncrasies. Dr. Leffler properly implemented some disaggregated regressions in his rebuttal analyses, which are directly responsive to Mr. Kaplan's criticisms and generate results consistent with Dr. Leffler's original and superior aggregated approach. *See* Section VI.C.2.b, below.[32] For example, Dr. Leffler ran the overcharge regression on the Pentium 4 brand that Mr. Kaplan ran in his Reply Report, but because of specific idiosyncratic factors relevant only to the Pentium 4 at that particular time— factors that confound the measurement of the competitive constraint placed on Intel by AMD in that period—Dr. Leffler excluded the high end Pentium 4 600 series from the regression. Once those specific microprocessors were excluded from the regression Mr. Kaplan ran, the results showed a significant decrease in the price of Pentium 4 microprocessors in the second half of 2006. *See* Apr. 6, 2010 Letter Br., Ex. 1, at 2.

        ii.    **Dr. Leffler's Methodology Can Provide a Reasonable Estimate of the Rate at Which the Intel Overcharge Was Passed on to Class Members and the Amount of Resulting Damages to Class Members**

As explained above, *see* Section VI.A.2.a.2.ii, Dr. Leffler's pass-on analysis is a reliable and feasible class-wide method of estimating the portion of Intel's overcharge that was passed on to class members. Dr. Leffler demonstrated that 100 percent pass-on was expected in a highly

---

[32] Additionally, even if Mr. Kaplan had performed his analyses properly and some prices had increased, it would be a challenge to the result, not to the methodology, and therefore an improper basis for denying class certification. *See, e.g., Bazemore v. Friday*, 478 U.S. 385, 400 (1986); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 98 (D. Conn. 2009).

competitive market such as the market for computers containing x86 microprocessors, and then

conducted 17 separate regressions, each of which showed that OEMs, retailers, and resellers pass

on about 100 percent or more of cost increases.  The purpose of these regressions "was not to

estimate the final pass-on coefficients but rather to demonstrate the feasibility of the classwide

approach to such estimation." Leffler Reply ¶ 59.  Accordingly,

> [a]ll the empirical analyses strongly supported the widely accepted and
> empirically documented prediction from standard economic analysis – an industry
> wide, long standing cost reduction for a significant and important component of
> PCs, the microprocessor, will result in an equal or more than equal reduction in
> prices to the purchasers of PCs. Therefore, my conservative damage estimation in
> this case is based on a full pass-on of the Intel overcharges from the direct
> purchasers of the Intel microprocessors to the class members.

Leffler Reply ¶ 82.  As explained above, the Special Master erred in rejecting Dr. Leffler's pass-

on analysis.

### b.    A Class Action Would Be Superior

The Special Master's conclusion that class certification would not be "superior" in this

case under Fed. R. Civ. P. 23(b)(3) because of "serious and significant manageability concerns"

is also incorrect.  R&R at 105-08.  The Special Master ignores and misapplies applicable law,

misapprehends the nature of this proceeding, and essentially recommends that the Court abdicate

its responsibility to adjudicate class members' claims on the merits.

First, as Class Plaintiffs explained in detail in their Reply Brief and Trial Plan, it is likely

that all of Class Plaintiffs' claims could be tried in a single, bifurcated trial.  TP at 1-2.  Under

this proposed trial structure, Class Plaintiffs will try common issues of liability, impact to direct

and indirect purchasers, and determination of the total amount of damages Phase I.  TP at 1-2.

Assuming the jury returns a verdict in favor of Class Plaintiffs, Class Plaintiffs will then put in evidence as to the purchases made by the individual class members during Phase II.[33]

Under this proposed structure, any differences between the claims of individual class members or differences in state laws as to the scope of available monetary relief can be resolved in Phase II, or in other well-established ways—*e.g.,* bifurcation of issues, jury instructions, special verdicts. Class Reply at 52-55, TP at 76 n.58; TP Reply at 39-57.[34]  The Special Master ignored these arguments as well as Class Plaintiffs' argument that a single trial is appropriate because Intel's conduct violated § 5 of the FTCA, which is a predicate act that automatically violates the consumer protection laws of the Included States.[35]

Second, the Special Master ignores contrary authority.  Courts in multi-district antitrust cases have routinely rejected manageability arguments and have certified multiple indirect purchaser classes under the laws of individual states. *See, e.g., OSB,* 2007 WL 2253425, at *14,

---

[33] The determination as to each individual class member's damages will be conducted during a separate proceeding (i.e., "Phase 11"). During that proceeding, which can be conducted by the Special Master, class members will bring proof of their individual damage claims (*i.e.,* receipts of the PCs they purchased). A. Conte & H. Newberg, *Newberg on Class Actions* § 18:54 (4th ed. 2002). The Special Master will then review and process the class members' individual damage claims, and make individual damage determinations "by application of [the] mechanical [formula]" offered by Class Plaintiffs. *See also Lynne Carnegie v. Household International, Inc.,* 376 F.3d 656, 661 (7th Cir. 2004); *In re: NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 524 (S.D.N.Y. 1996).

[34] Even if a single joint trial is not possible, it is extremely unlikely that resolution of each of the state class actions would require a separate trial. Again, application of well-established techniques – e.g., trial of test cases, application of principles of *res judicata* and collateral estoppel, mediation, etc. – will enable the Court to effectively and efficiently resolve these cases.

[35] Plaintiffs also submit that the Special Master erroneously rejected their argument that—because, *inter alia,* Intel is headquartered in California, and its wrongful conduct originated there and was directed at another California company—California law should apply to a single national class. Class Reply at 58-71. If the Court accepts Plaintiffs' argument—and Plaintiffs urge the Court to do so—then, of course, all of Plaintiffs' claims can be tried in a single trial under the law of a single state, and no manageability issues related to differences in state law will arise. Class Plaintiffs rely on their prior briefing in support of their argument that certification of a single nationwide damages class under California law is appropriate. Class Cert. Br. at 21-43; Class Reply at 58-71; Pltfs' FOF Section III.A.; Pltfs' Resp. at 209-212.

*20 (certifying eight statewide subclasses for separate trials in indirect purchaser case); *SRAM,*
264 F.R.D. at 615 (certification of 27 separate state classes "superior" in indirect purchaser
MDL); *In re TFT-LCD (Flat Panel) Antitrust Litigation,* 267 F.R.D. 583, 609-613 (N.D. Cal.
2010) ("LCD") (certification of 23 separate state classes "superior" in indirect purchaser MDL).
The Special Master fails to even address these cases. *See also* Class Cert. Br. at 50-53; Class
Reply at 54.

Third, the Special Master misunderstands the "superiority" inquiry. "Superiority" refers
to the benefits of class proceedings as compared to the alternative if class certification is denied.
*See OSB,* 2007 WL 2253425, at *13-*14. In this case, as in most other class actions, the
alternative to class certification is millions of individual actions, or, more likely, the denial of
meaningful redress to millions of class members. As Judge Posner noted in *Carnegie,* 376 F.3d
at 661, in which, as here, the value of class members' claims would not justify individual
litigations:

> The *realistic* alternative to a class action is not 17 million individual suits, but
> zero individual suits, as only a lunatic or a fanatic sues for $30. But a class action
> has to be unwieldy indeed before it can be pronounced an inferior alternative – no
> matter how massive the fraud or other wrongdoing that will go unpunished if
> class treatment is denied – to no litigation at all. (emphasis in original).

In this context, the Special Master's comparison of the difficulties of multiple trials to a
single proceeding is plainly erroneous. R&R at 106. His conclusion that holding multiple trials
"eliminates any efficiencies . . . of the class action mechanism and creates insurmountable
manageability concerns" is nonsensical. *Id.; see also id.* at 108 ("The Special Master therefore
concludes that there is **no benefit** to the utilization of the national class action device to allow the
26 classes to be tried jointly or separately in this one action.") (emphasis added). There is no
question that class certification, regardless of whether this matter can be resolved in a single or

several trials, is far superior to the alternative. *See, e.g., OSB,* 2007 WL 2253425, at *13; *SRAM,* 264 F.R.D. at 615; *LCD,* 267 F.R.D. at 609.

Fourth, the Special Master did not find—indeed, it was uncontested below—that any single state class had any manageability problems. Rather, he recommends denial of class certification on manageability grounds solely on the basis that the individual state classes may have to be tried separately. Such a ruling is inconsistent with MDL procedures and spectacularly inequitable. Although Class Plaintiffs' claims (except for their injunctive relief claim) are primarily based on state law, because of the passage of CAFA in 2005, all but a very few of these actions must now be brought in federal court.[36] The MDL procedure assures that each such case will end up as part of an MDL proceeding in a single court consolidated with other cases filed on behalf of indirect purchasers from other states. MDL consolidation, however, is limited to pretrial proceedings; indeed, the MDL court is required, in most cases, to remand the actions to the courts in which they originated for trial. *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,* 523 U.S. 26, 39-41 (1988). Plainly, it does not follow that an MDL court may dismiss an otherwise proper class action on manageability grounds simply because of the existence of actions brought on behalf of different plaintiffs under the laws of different states. To the contrary, as the court acknowledged in *OSB,* such a ruling would also run afoul of CAFA. *See OSB,* 2007 WL 2253425, at *13 ("As I have noted, the law grants district courts original jurisdiction over claims of this nature. . . [citing CAFA] . . . Congress thus envisioned that such

---

[36] Other than actions involving small sums (in the aggregate), class actions on behalf of members of one state against a defendant from the same state are the only actions not subject to removal to federal court. 28 U.S.C. § 1332(d)(2). In this case, only California class members had the option under CAFA of seeking class relief against Intel in state court; a parallel class action is currently pending there.

claims—involving thousands of plaintiffs from many states—would be litigated in one forum"). None of the cases upon which the Special Master relies hold otherwise.[37]

For all of these reasons, Plaintiffs respectfully submit that the Court should reject the Special Master's recommendation that class certification be denied on the ground that these actions are not superior and are unmanageable.

### 3.   The Certification of a 23(b)(2) Nationwide Injunctive Relief Class Pursuant to Federal Law is Warranted

The Special Master's conclusion that Class Plaintiffs, who seek certification of a nationwide class for injunctive relief based on a violation of federal antitrust law (specifically Sherman Act, § 2), have failed to satisfy Rule 23(b)(2) is not supported by law or fact.

First, the Special Master's erroneous conclusion is driven by generalized statements from a class action treatise that "[a]ntitrust class actions are rare under Fed. R. Civ. 23(b)(2) [sic.]; to the extent they are upheld, they are upheld almost exclusively under subsection (b)(3)."  R&R at 108 (citing Albert Conte & Herbert Newberg, *Newberg on Class Actions ("Newberg")* § 18.23-24 at 78 (4th ed. 2002)). Given this authority, the Special Master states, "Nevertheless, Plaintiffs have here requested certification of . . . [a] nationwide class for injunctive relief . . ." R&R at 108. He suggests that Class Plaintiffs are seeking something unusual. They are not. In fact, the same treatise immediately compares the foregoing statement with *In re Catfish Antitrust Litig.* (*see Newberg*, § 18:24 at 79), where the court certified a class under Rule 23(b)(3) and Rule 23(b)(2) noting "more recent trends in Rule 23(b)(2) utilization appear to favor a broader

---

[37] *Carpenter v. BMW of N. Am., Inc.*, 1999 U.S. Dist. LEXIS 9272, at *38 (E.D. Pa. June 21, 1999) and *Willis v. Thorn Am. Inc.*, 1996 U.S. Dist. LEXIS 3086, at *2-3 (E.D. Pa. Mar. 11, 1996) are both distinguishable on several grounds. Among other things, neither case was an MDL proceeding and both predate CAFA. Both cases, moreover, turn on facts other than a multiplicity of otherwise viable state sub-classes. In *In re Prempro Prods. Liab. Litig.*, 230 F.R.D. 555, 566-67 (E.D. Ark. 2005), the Court held no class could be certified regardless of state law differences. The complaint in the case also predated CAFA.

application of equitable relief certification; and, 23(b)(2) certification has been ordered where the primary relief sought was clearly money damages pursuant to 23(b)(3)." *In re Catfish Antitrust Litig.*, 826 F. Supp. 1019, 1046 (N. D. Miss. 1993) (certifying direct purchaser class for damages under Rule 23(b)(3) and injunctive or declaratory relief under rule 23(b)(2)). *See, e.g., In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 515-517 (S.D.N.Y. 1996) (certifying injunctive class under Rule 23(b) and damages class under Rule 23(b)(3) in same action); *see also*, Newberg, § 4:11 at 62-63 (increasing frequency of filing Rule 23(b)(2) class actions alleging antitrust violations). *See generally Jefferson v. Ingersol Int'l Inc.*, 195 F.3d 894, 898 (7th Cir. 1999) ("It is possible to certify the injunctive aspects of the suit under Rule 23(b)(2) and the damages aspects under Rule 23(b)(3), achieving both consistent treatment of class-wide equitable relief and an opportunity for each affected person to exercise control over the damages aspects.").

The Special Master also ignores the implications of CAFA pursuant to which indirect purchasers, who previously filed state antitrust and consumer protection law-based damage claims in state court, now file those state-law based damage claims in federal court. Although indirect purchasers are precluded under *Illinois Brick* from seeking damages for a violation of federal antitrust laws, they are not precluded from seeking injunctive relief based on a violation of those laws. *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 400 (3d Cir. 2000); *see also OSB*, 2007 WL 2253425, at *18. Thus, in the post-CAFA world of multidistrict litigation, it is not unusual for indirect purchaser plaintiffs to seek, and for federal district courts to certify, state-law based damage classes under Rule 23(b)(3) and a nationwide injunctive relief class alleging a violation of the federal antitrust laws under Rule 23(b)(2). *See, e.g., OBS*, 2007 WL 2253425, at *18-19 (where plaintiffs alleged violations of Sherman Act and numerous state

antitrust provisions, court certified nationwide class pursuant to Rule 23(b)(2) for injunctive relief and a multistate class with eight state subclasses under Rule 23(b)(3)); *LCD*, 267 F.R.D. at 595-598, 608-614 (where plaintiffs alleged violations of Sherman Act and antitrust and consumer protection laws of twenty three states, court certified nationwide injunctive and declaratory relief class under Rule 23(b)(2) and twenty-three state classes for damages pursuant to Rule 23(b)(3)); *SRAM*, 264 F.R.D. at 617-621 (certifying nationwide injunctive relief class under Rule 23(b)(2) and twenty-seven state classes under Rule 23(b)(3)).

Second, though acknowledging the right of indirect purchasers to seek injunctive relief under section 16 of the Clayton Act, the precise certification standard the Special Master relied on in denying certification of plaintiffs' federal antitrust claim is unclear. R&R at 109-110. Although he cites *OSB*, the Special Master disregards its concise pronouncement of what Class Plaintiffs must show for certification under Rule 23(b)(2) of a class alleging an antitrust violation.[38] *See OSB*, 2007 WL 2253425, at *18-*19. To the extent the Special Master relies on generalized treatise statements delineating "express" and "implicit" requirements (*see* R&R at 109-100 (citing *Newberg* § 4:11 at 56, § 4:14 at 83)) and interjects an "'implicit 'cohesiveness' 'requirement, which precludes certification when individual issues abound'" (R&R at 109 (quoting *Newberg* § 4:11 at 61)), the denial of certification is error. This implicit "requirement" is merely a repetition of a district court's interpretation of cohesiveness in a medical monitoring

---

[38] "Plaintiffs must show that 'the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief . . . with respect to the class as a whole.' Fed. R. Civ. P. 23(b)(2). Thus, Plaintiffs must show: (1) actual or threatened injury 'from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur'; (2) causation; and (3) likelihood that the equitable relief will redress the injury. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 [citation omitted] (1969); *Warfarin*, 214 F. 3d [395,] *399* [(3d Cir. 2000)]; *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 520 (S.D.N.Y. 1996). Because (b)(2) classes must be cohesive, Plaintiffs must show that these elements are susceptible of common proof. *See Barnes v. American Tobacco Co.*, 161 F.3d 127, 143, (3d Cir. 1998) [citations omitted]." *OSB*, 2007 WL 2253425, at *17-18.

case as described by the Third Circuit in *Barns v. American Tobacco*, relied on in *OSB* (*see Thompson v. Am. Tobacco Co.*, 189 F.R.D. 544, 557 (D. Minn. 1999)) and the Special Master's apparent reliance on it suggests the erroneous view that an injunctive relief class cannot be certified if a single class member was not harmed by Intel's conduct. To the contrary, according to the Third Circuit's standard for cohesiveness under b(2), "Injuries remedied through (b)(2) actions are really group, as opposed to individual injuries." *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 n.18 (3d Cir. 1998). Thus, certification of (b)(2) class actions is appropriate to remedy systemic violations of rights of large (and often amorphous) classes even though "not all of the orders issued will immediately benefit every plaintiff." *Baby Neal*, 43 F.3d at 64; *see also id.* at 64-65 ("Because this suit challenges conduct generally applicable to the class and because the court can enter appropriate declaratory and injunctive relief, this action patently satisfies the b(2) standard.").

Class Plaintiffs have met the requirements of Rule 23(b)(2); The class is cohesive; the record is replete with common evidence of Intel's conduct which monopolized a market and was not specific to individual end-users. The issue of liability is unquestionably common to the class; it focuses on Intel's exclusionary and anticompetitive conduct—which included loyalty payments and threats of retaliation in order secure exclusivity from OEMs and to ensure their compliance—acts that are on grounds generally applicable to the class. As a result, Intel was able to overcharge for its microprocessors, resulting in inflated PC prices. Furthermore, Intel's anticompetitive conduct is ongoing as demonstrated by the ever growing number of foreign and domestic regulatory agencies that have found that Intel's conduct was exclusionary and harmed consumers in the form of higher prices and limited choice.

Choosing to focus on impact, Intel makes no attempt to address the substantial amount of common evidence demonstrating Intel's liability. Nevertheless, even in the absence of any significant opposition, the Special Master concludes, without any analysis, that Class Plaintiffs "have not established that they will be able to demonstrate an antitrust violation through common proof[.]" R&R at 110. This suggests that the Special Master has made not only an unsupportable finding but also an impermissible determination on the merits of Plaintiffs' liability claim. *Cf. OSB*, 2007 WL 2253425, at *17-18 ((b)(2) requires that elements are susceptible of common proof); *Hydrogen Peroxide*, 553 F.3d at 309 & n.5, 310, 311-12 (certification proper only if prerequisites of Rule 23 are met and under (b)(3) analysis plaintiffs' burden is not to prove element of antitrust impact). The Special Master also concludes, without separate analysis: "In short, as discussed at length above, a demonstration that impact is susceptible of common proof is absent here." R&R at 110. Here, too, the Special Master errs. The impact analysis referred to by the Special Master applies Rule 23(b)(3) certification requirements (*see* R&R at 58-91) not those of Rule 23(b)(2), which are different. *See Barnes*, 161 F.3d at 143 (Rule 23(b)(2) class actions have no predominance or superiority requirements).

Third, the Special Master's conclusion that certification is precluded because the relief sought by the proposed nationwide injunctive class is monetary damages under California law is incorrect. Plaintiffs' claims for injunctive relief and damages are entirely separate—they arise under different statutes (the federal Clayton Act versus the laws of the repealer states). In addition, to the extent Plaintiffs seek, in the alternative, certification of a class or classes under the laws of the repealer states, Plaintiffs' claims are brought on behalf of different classes. The nationwide injunctive relief class includes many members from states that do not permit damage actions, thus their only relief is injunctive relief. In these circumstances, it is appropriate to

certify two separate classes under Rules 23(b)(2) and 23(b)(3). *OSB*, 2007 WL 2253425, at *18-19 (citing cases); *see In re New Motor Vehicles Canadian Export Antitrust Litig.*, 2006 WL 623591, at *7 & n.40 (D. Me. Mar. 10, 2006), *rev'd on other grounds*, 522 F.3d 6 (1st Cir. 2008) (distinguishing *Christiana Mortgage Corp. v. Del. Mortgage Bankers Ass'n,* 136 F.R.D. 372, 381 (D. Del. 1991)).

## B.     Dr. Leffler's Testimony and Analysis Are Admissible Under FRE 702

The Special Master erred in recommending that the Court grant Intel's motion to exclude Dr. Leffler's testimony.  Dr. Leffler is a widely respected economist who has repeatedly been certified as an expert in antitrust cases.  *See* Mot. to Exclude at 4-5 (discussing Dr. Leffler's qualifications); *see also Gordon v. Microsoft Corp.*, 2001 WL 366432, at *8 (D. Minn. Mar. 30, 2001) (describing Dr. Leffler as "an authority in the field of antitrust economics").  The methodologies he demonstrated were based on regression analysis, which even the Special Master acknowledged "is a generally accepted methodology and has been used at the class certification stage to assess impact." R&R at 29 (citing cases).  Because Dr. Leffler's application of regression analysis was scientifically sound and methodologically reliable, it should not have been excluded.

Expert testimony is admissible under Federal Rule of Evidence 702 when it will assist the trier of fact, the witness is qualified by knowledge, skill, experience, training or education, and "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.  The "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 Advisory Committee Notes to 2000 Amendments.  In response to a *Daubert* motion, the court's role is not to assess the correctness of the proffered opinion, but rather to ensure that the party offering it has "demonstrate[d] by a

preponderance of evidence that their opinions are reliable." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994); *see also McKesson Automation, Inc. v. Swisslog Holding AG*, 2009 WL 3648455, at *40 (D. Del. Oct. 30, 2009), *adopted in relevant part*, 2010 WL 1979370 (D. Del. May 18, 2010) ("In conducting the required analysis under Rule 702 and *Daubert*, it is not proper to attempt to assess the correctness of the expert's opinion."). Multiple regression analysis "is reliable" and should not be excluded so long as it is "done properly." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., Inc.*, 998 F.2d 1224, 1238 (3d Cir. 1993).

The Special Master's criticisms of Dr. Leffler—which essentially parrot those raised by Intel[39]—fail to demonstrate a material defect in Dr. Leffler's methodologies. For example, the Special Master excluded Dr. Leffler's testimony because he failed to understand the methodologies used in Dr. Leffler's analysis and how they can work together to meet Plaintiffs' burden. Dr. Leffler applied two methodologies as part of his demonstration that damages can be estimated reasonably at trial. The first is a method to estimate the size of the *overcharge* (*i.e.*, the amount Intel's prices were inflated) due to Intel's conduct, across all microprocessors. As Dr. Leffler explained, a processor-by-processor determination is not a feasible or accurate approach because of the fundamental ways in which Intel's conduct changed the market for x86 microprocessors. *See* Leffler Reply ¶¶ 26, 28, 30. The second methodology estimates the portion of that overcharge that was *passed-on* to class members as higher prices for the computers they purchased. The Special Master's exclusion ruling, however, is largely premised on finding Dr. Leffler's *pass-on* methodologies unreliable because they failed to demonstrate the amount of the *overcharge*—an entirely different calculation that the pass-on methodologies were

---

[39] Plaintiffs fully addressed Intel's criticisms of Dr. Leffler in their response to Intel's motion to exclude. *See* Memorandum in Opposition to Defendant Intel Corporation's Motion to Exclude Testimony of Dr. Keith Leffler ("Pltfs' Opp. to Mot. to Exclude") at 7-22.

never intended to supply. The Special Master rejects the regressions for failing to account for variables that may be relevant to the size or origin of the *cost change*, but are irrelevant to the rate of *pass-on*. *See also* Pltfs' Opp. Mot. to Exclude at 12-16 (explaining why Intel's arguments, which the Special Master adopted wholesale, lack merit). As explained previously, Dr. Leffler demonstrated a feasible and reliable class-wide methodology for showing both that *some* amount of the Intel overcharge was passed on (impact), *see* Section VI.A.2.a.2.ii, and that a reasonable estimate is that the complete overcharge was passed on (damages), *see* Section VI.A.2.a.3.ii.

For example, the Special Master concluded that the *pass-on* regressions were unreliable because they did not determine the "precise issue of the amount of the alleged Intel *overcharge*." R&R at 30 (emphasis added). Accordingly, he rejected a *pass-on* regression that considered differences in computer costs due to differences in their microprocessors, because "Dr. Leffler's methodology fail[ed] to control for quality differences that influence the purported Intel *overcharge*." R&R at 31 (emphasis added); *see also id.* at 32 (rejecting another *pass-on* regression because it "fail[ed] to isolate the purported microprocessor *overcharge*" (emphasis added)).[40] The Special Master fundamentally failed to understand that the purpose of the pass-on regressions was to show the effect on price of *any* change in cost, and the Report and Recommendations offers no reason why Dr. Leffler's methodology must "analyze the relationship between *just* the Intel microprocessor cost reduction *and* the PC prices." R&R at 37 (emphasis in original). To the contrary, that methodology—which generated exceptionally consistent results—reliably estimates the pass-on rate for changes in the costs of microprocessors. Accordingly, the pass-on analyses should not have been excluded.

---

[40] These criticisms are also addressed in Section VI.A.2.a.2.ii, above.

The Special Master's rejection of other pass-on regressions is similarly in error.  As discussed above, the lack of rebate information in much of the data Dr. Leffler used for his pass-on regressions does not undermine his conclusion because there is no economic or empirical reason to think the data is biased.  *See* R&R at 38-39; Section VI.A.2.a.2.ii.  The Special Master also rejected a regression based on Dell data because it was "based on two days of data" in March and July of 2006.  He concluded this was unreliable because Dr. Leffler previously stated, regarding a different regression, that six days of data was "inadequate for finalizing any conclusions."  R&R at 36 (quoting Leffler Dep. at 400:6-13).  But this conclusion ignores the relevant portions of the record and incorrectly assumes the relevant considerations are the same for every single regression.  The earlier regression was based on sales information for one day for each year from 2001 to 2006.  *See* Leffler Opening Brief. ¶ 101 n.149.  Dr. Leffler testified that additional data would be useful because all the data were for "the same day [of the year] so that the information doesn't allow us to analyze at all whether or not, or demonstrate, that there is or is not a cyclical variation in the pass-on."  Dep. Annex Tab 32 (Herbert Tab 218 (Leffler Dep.) at 226:21-227:13); *see also id.* Davenport Tab 85 (Leffler Dep.) at 742:24-743:20 (discussing the effect of seasonality).  Dr. Leffler also stated that if additional data were obtained that "covered a long time period," it would be sufficient to address the seasonality issue even without more Dell data.  *Id.* (Herbert Tab 218 (Leffler Dep.) at 227:9-13).[41]  The purpose of the March and July 2006 Dell regression, on the other hand, was to examine pass-on specifically during the benchmark period.  *See* Leffler Reply ¶ 66 ("[B]y utilizing data on prices charged for PCs sold during the higher microprocessor price period and during the lower price benchmark period, I can examine a situation much like that that would arise in the but-for world.").  The

---

[41] Dr. Leffler in fact did obtain additional Dell data covering, in total, 74 days, and the regressions he ran using it confirmed his initial analysis.  *See* Leffler Reply ¶ 70.

March and July dates Dr. Leffler chose did not raise the same concerns with "cyclical variation" previously identified by Dr. Leffler—concerns allayed by subsequent analysis—and thus the two days of data provide a reliable analysis that reflects at least some of the effect of Intel's "giant price move" in the second half of 2006.[42]

The Special Master's other critiques are similarly without merit:

- Dr. Leffler did not "ignore[] real world facts," *see* R&R at 39-42; to the contrary, his analysis accounts for Intel's discounts and still shows class-wide harm. *See* Section VI.A.2.a.2.i, above, including note 27 (discussing why it is reliable to use the Intel database to understand the extent of OEM discounts); Class Reply at 35-40.

- Dr. Leffler properly concluded that mobile microprocessors were sold at higher prices due to Intel's conduct. *See* Leffler Reply ¶ 43. The Special Master criticizes Dr. Leffler because his 2006 overcharge regression "in fact contains no mobile chips, and he therefore provides no empirical support for his conclusion that Intel lowered its prices with respect to mobile chips in the second half of 2006." R&R at 42. Yet Dr. Leffler concluded no such thing. Rather, he calculated how much Intel lowered its prices for *desktop* microprocessors when it faced increased competition in the *desktop* segment in the second half of 2006. *See* Leffler Reply ¶ 41. Dr. Leffler concluded that this calculation was a reasonable estimate of the overcharge during the entire class period, and applied this conclusion to both desktop and mobile microprocessors because he found "no economic reason that in the but-for world, competitors other than Intel would not be equally effective in all market segments including mobile." *Id.* ¶¶ 39 n.107, 44. Accordingly, Dr. Leffler did not use mobile microprocessors as a "good test of the increased competition," R&R at 43 (quoting Class Cert. Tr. 347:8-16); he applied the conclusions from the benchmark analysis (conducted in the desktop segment) to the mobile segment.[43]

---

[42] Additionally, the Special Master also criticizes this regression because Dr. Leffler averaged together transactions for particular SKUs on each day and some SKUs sold for more than one price on a particular day. *See* R&R at 36-37 (noting that one SKU sold on July 14 for both $562.47 and $8,472.38). First, the Special Master gave no consideration to the distribution of the transactions; he picked the example with the greatest variance from low to high (over 1,400%) out of 150 observations, where the rest range from 0% to 257.5% and 32 did not vary at all. Kaplan Reply at Ex. 42. Second, Dr. Leffler demonstrated in his rebuttal analysis that the results of the regression are qualitatively the same whether or not prices and costs for SKUs are averaged. *See* Apr. 6, 2010 Letter Br., Ex. 1, at 4.

The Special Master also unfairly characterizes Dr. Leffler's methodology as "flawed" for not comparing the exact same PCs sold in March and then July, *see* R&R at 37, where Dr. Leffler stated that this was not possible because of how quickly Dell changed the components in its PCs. *See* Leffler Reply ¶ 67 n.181.

[43] The Special Master incorrectly concluded that Dr. Leffler "has no empirical support for his conclusion that all markets (*i.e.*, mobile, server, and desktop) operate the same." R&R at 43. First, the Special Master confuses segments and markets; the parties do not dispute that both mobile and desktop

- Dr. Leffler performed extensive theoretical and empirical analyses in order to conclude that *none* of Intel's discounted prices for its desktop and mobile microprocessors were at or below a competitive level. *See* Leffler Reply ¶¶ 36-45; *see also* Apr. 6, 2010 Letter Br., Ex. 1, at 6 (showing that for customers that bought the same microprocessors in both the first and third quarters of 2006, the average prices dropped for all desktop brands under consideration). It was this methodology that determined there were no "special competitive situations," *see* R&R at 43-45, resulting in competitive or below competitive prices. *See* Section VI.A.2.a.2.i, above.[44]

- Dr. Leffler did not make inconsistent statements regarding the amount of time necessary for Intel's overcharge to become embedded in PC prices. *See* R&R at 87-90. During his first deposition, Dr. Leffler provided a preliminary outer bound for prices to become embedded. He testified that he was "completely comfortable" that an overcharge would be embedded within two years, but also that two years was not a "minimum period" and that he didn't know yet whether the period might be less. Dep. Annex Tab 32 (Herbert Tab 218 (Leffler Dep.) at 105:9-25 ("And I don't know that that's a year, six months, but I'm very comfortable with two years.")). Dr. Leffler's later estimation of four to eight months for the overcharge to be embedded was entirely consistent with the range that Dr. Leffler initially proposed. *See* Leffler Reply ¶ 47.[45]

In sum, the Special Master identified no material flaws in Dr. Leffler's methodologies. To the contrary, the Special Master's conclusions highlight his failure to understand the economic analyses in the case and why the Report and Recommendations must be rejected.

## C.   Dr. Leffler's Rebuttal Analyses Are Proper Rebuttal Testimony, Timely, Not Unfairly Prejudicial to Intel, and Should Not Have Been Excluded

The Special Master should not have excluded Dr. Leffler's rebuttal testimony. In January 2010, the Special Master held Class Plaintiffs "will have adequate opportunity to present any

---

microprocessors are part of the x86 microprocessor market at issue in this case. Second, Dr. Leffler not only opined that there was no economic reason that the mobile segment would not respond to increased competition in the same manner as the desktop segment, but also noted several manufacturers as evidence that competitors can effectively compete in the mobile segment. *See* Leffler Reply ¶ 39 n.107. Intel offers nothing to challenge this conclusion.

[44] Accordingly, Dr. Leffler did not "simply *ipse dixit* conclude, without evidence or analysis, that the amount of an embedded overcharge will always exceed the benefit of any discounts proposed class members received." R&R at 89-90. Dr. Leffler's common impact analysis determined that even the most discounted prices were above a competitive level.

[45] The Special Master also incorrectly concluded Dr. Leffler provided no "articulated reason" for this four to eight month estimate. In fact, he testified that this was based on the time it takes OEMs to design and begin manufacturing computers using new microprocessors. *See* Leffler Reply ¶ 47.

rebuttal evidence/arguments at the Hearing for Class Certification." *See* Order Regarding Class Plaintiffs' Request for Leave to File Additional Brief and Supporting Expert Report Regarding Class Certification, at 3, (Feb. 2, 2010) (D.I. 1908); *see also* Special Master's Report and Recommendations Granting, in Part, Intel Corporation's Objections to Class Plaintiffs' [Proposed] Pre-Hearing Order, at 9 (Mar. 22, 2010) (D.I. 1984) (recommending that "Dr. Leffler be permitted to testify as a rebuttal expert witness on Class Plaintiffs' behalf at the [class certification] Hearing"). The Special Master should not have excluded Dr. Leffler's testimony that Class Plaintiffs disclosed prior to the class certification hearing and that Dr. Leffler attempted to supply at the class certification hearing because it was proper rebuttal testimony.

### 1.    Rebuttal Evidence and Testimony Is Proper When It Is Consistent with Original Opinions and Addresses the Same Subject Matter as the Opposing Expert's Opinions

Rebuttal evidence and testimony offered by experts is proper when it: (1) concerns the same subject matter as the opinions of the expert the party seeks to rebut and (2) is consistent with the expert's prior opinions, being offered only to contradict or challenge the other expert's opinions. *See* Fed. R. Civ. P. 26(a)(2)(C)(ii) (expert rebuttal evidence and testimony is "intended solely to contradict or rebut evidence on the same subject matter identified by another party"); *see also U.S. v. Chrzanowski*, 502 F.2d 573, 576 (3d Cir. 1974) ("The proper function and purpose of rebuttal testimony is to explain, repel, counteract or disprove the evidence of the adverse party."); *Pritchard v. Dow Agro Scis.*, 263 F.R.D. 277, 287 (W.D. Pa. 2009) (expert declaration was permissible because it was "consistent with the opinions set forth in his expert report" and "presented for the purpose of rebutting the defense experts' opinions"); *City of Gary v. Shafer*, 2009 WL 1370997, at *3-*5 (N.D. Ind. May 13, 2009) (finding four opinions offered in rebuttal expert report were proper because they addressed same subject matter as opposing expert's opinions).

Accordingly, an expert may offer additional analyses in rebuttal, so long as those analyses are consistent with the expert's original opinion and address the same subject matter as the opposing expert's opinion. In *Pritchard*, for example, the plaintiff's expert initially opined that the plaintiff's non-Hodgkin's lymphoma was caused by the defendants' chemicals, but did not provide analysis regarding other potential causes. *Pritchard*, 263 F.R.D. at 287. After defendants' experts suggested the plaintiff's obesity and diabetes caused the disease, plaintiff's expert submitted a declaration rebutting that opinion by providing new analysis specific to those facts. The Court permitted the new statements because they "are consistent with the opinions set forth in his expert report and . . . are also presented for the purpose of rebutting the defense experts' opinions." *Id.*; *see also Sci. Components Corp. v. Sirenza Microdevices, Inc.*, 2008 WL 4911440, at *2 (E.D.N.Y. Nov. 13, 2008) ("technical information . . . that was not previously the subject of expert testimony in this litigation, and without which a non-scientist would be unable to evaluate Mr. Gladstone's criticism of Mr. Podell's report, is not out of place in a rebuttal report").[46]

Similarly, in *TC Systems Inc.*, plaintiffs' expert, an accountant, opined that the town was capable of tracking and accounting for the actual costs incurred from public rights-of-way. Plaintiffs then moved to strike the defendant's expert's rebuttal opinion, which stated that, from an engineering perspective, such an accounting was not possible. The court rejected plaintiffs' attempt to strike, concluding that the "same subject matter" requirement did not restrict the rebuttal expert to the same methodology used by the expert being rebutted and that the

---

[46] By contrast, new analyses that reject the rebuttal expert's original opinion are not proper rebuttal evidence. *See Cooper Tire & Rubber Co. v. Farese*, 2008 WL 5104745, at *2-3 (N.D. Miss. Nov. 26, 2008) (rejecting rebuttal expert report that "adopted this assertion [made by defendants' experts] and came up with a calculation to address it" because such a report "interjects a new basis for the calculation of damages Cooper Tire seeks to use in its case-in-chief").

defendant's expert could "interject[] concepts meant to support his rebuttal." *TC Sys. Inc. v. Town of Colonie, N.Y.*, 213 F. Supp. 2d 171, 180 (N.D.N.Y. 2002). More importantly, defendant's expert's rebuttal analyses would not have been part of the original report, because "whether Colonie could easily track and account for the costs incurred by use of public rights-of-way only becomes relevant through the testimony of [plaintiffs' expert]." *Id.*

Additionally, the rebuttal expert is not limited to the evidence cited by the opposing expert or the evidence that has only become available since the expert's initial report. In *Crowley v. Chait*, 332 F. Supp. 2d 530, 551 (D. N.J. 2004), defendants' expert criticized the standards the plaintiff's expert used to assess loss reserve methodology, arguing that those standards were not in effect at the time the loss reserve calculations at issue were performed. When plaintiff's expert attached a transcript to her rebuttal report showing that the standards she applied indeed were in use during the relevant time frame, defendants sought to exclude the evidence because she "had the transcript in her possession at the time she filed her [initial] report and could have included it." *Id.* The court disagreed:

> The Third Circuit's rule does not automatically exclude anything an expert could
> have included in his or her original report. Such a rule would lead to the inclusion
> of vast amounts of arguably irrelevant material in an expert's report on the off
> chance that failing to include any information in anticipation of a particular
> criticism would forever bar the expert from later introducing the relevant material.
> All that is required is for the information to repel other expert testimony, as
> [plaintiff's expert's] inclusion of the attachment does. The Court will not exclude
> the attached transcript.

*Id.*

Similarly, in *MMI Realty Services, Inc.*, defendant's experts opined that the plaintiff incurred excessive costs in cleaning up flood damage. Plaintiff's rebuttal expert countered that defendant's experts incorrectly categorized the flood as category 1, and that since the water was contaminated the more costly cleanup procedures of category 3 floods applied. The defendant

then attempted to exclude plaintiff's rebuttal expert, arguing that since plaintiff's experts did not raise the category 3 topic, discussion of that issue could not be considered rebuttal evidence. The court rejected this, noting that the plaintiff "is free to support his opinions with evidence not cited in [defendant's] reports so long as he rebuts the 'same subject matter' identified in those reports." *MMI Realty Servs., Inc. v. Westchester Surplus Lines Ins. Co.*, 2009 WL 649894, at *2 (D. Haw. Mar. 10, 2009). *See also The City of Gary v. Shafer*, 2009 WL 1370997, at *5 (N.D. Ind. May 13, 2009), (quoting *MMI Realty Servs.*); *Kirola v. City & County of San Francisco*, 2010 WL 373817, at *2 (N.D. Cal. Jan. 29, 2010) ("As a general matter, courts have permitted additional data to be used in a rebuttal report so long as it is of the same subject matter." (citing *Shafer* and *MMI Realty Servs.*).

Because permissible rebuttal expert testimony *can* contain new analyses that rebut the opposing expert's opinion, and *can* rely on evidence the expert had access to at the time of his or her first report, the Special Master applied an incorrect standard to determine the proper scope of rebuttal testimony. *See* June 2 R&R at 3. While the permissible scope of *supplemental* expert reports may bar "new analyses" and may prevent the use of data available at the time of the initial report, there *is* a "distinction between the scope of supplemental and rebuttal expert testimony." *See id.* at 3 n.3. Indeed, the authorities on which the Special Master relied are not to the contrary. *See In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 500-01 (N.D. Cal. 2008) (excluding new analyses where the judge's rules restricted rebuttal and there was no indication they were put forward to rebut the other side's report); *Palmer v. Asarco Inc.*, 2007 U.S. Dist. LEXIS 56969 (N.D. Okla. Aug. 3, 2007) (rejecting attempt to use supplemental report to replace work of another expert, since discredited, on whom the expert had relied in his first report); *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1167-72 (D. Colo. 2006)

(concerning the proper scope of supplemental reports). The effect of the Special Master's ruling was to place upon Class Plaintiffs and their expert the burden of unreasonable anticipation.

### 2.    Dr. Leffler's Rebuttal Analyses Were Proper and It Was Error to Exclude Them

Dr. Leffler's rebuttal analyses are consistent with his original opinions and address the same subject matter as Mr. Kaplan's report, and thus the Special Master erred in excluding them. The additional analyses are *not* revisions to his prior work, but rather are *direct responses* to Mr. Kaplan's criticisms of that prior work. *See* April 6, 2010 Letter Brief ("Apr. 6 Letter Br., D.I. 1999) at 1. Mr. Kaplan's latest opinions contain a significant amount of new empirical work and analyses. Not surprisingly, Dr. Leffler prepared to counter those opinions with additional empirical work and analyses of his own. This kind of pointed, direct response falls squarely within the scope of a proper rebuttal, and should not have been precluded by the Special Master.

Dr. Leffler's rebuttal analyses are directly responsive to Mr. Kaplan's critiques. The "back and forth" between Dr. Leffler and Mr. Kaplan that preceded the preparation of Dr. Leffler's rebuttal analyses demonstrates the point. Dr. Leffler's two expert reports demonstrated a feasible and plausibly reliable methodology for determining Intel's overcharge, and its pass-on to class members, on a class-wide basis. Dr. Leffler could meet this evidentiary burden—which did not require him to actually prove impact and damages—by implementing his methodology on an illustrative basis. This did not require him to "fine tune" the implementation as he would for trial, but simply to show that he had a workable methodology. *See In re EPDM Antitrust Litig.*, 256 F.R.D. 82, 100, 102 n.11 (D. Conn. 2009). Thus, Dr. Leffler implemented his overcharge methodology using a "rough cut" of Intel's sales data, including all Intel sales in the desktop segment (with the exception of the Core II Duo) where AMD was generally a significant competitor during the benchmark period, and excluding all Intel sales in the mobile segment

where AMD generally was not a significant competitor during the benchmark period. Moreover, Dr. Leffler estimated an overall overcharge, reflecting the overall price effect of Intel's success in unlawfully constraining AMD's competitive vigor. Dr. Leffler explained why the overall effect of Intel's monopolization is the best estimate of its effect on the price of any particular microprocessor. *See, e.g.*, Class Cert. Tr. 259:11-261:2 ("the nature of the but for world in a long-standing monopolization case is effectively one in which you are forced to and can only estimate the general effect of increased competition . . . . We're trying to make the best prediction in an uncertain world of generally what would have happened when the details are inherently unknown."); *see also id* 249:1-8 ("averaging is compelling . . . because it gets rid of all those [idiosyncrasies] and says, in general, here's what competition does").

Mr. Kaplan challenged Dr. Leffler's analysis largely by pulling out small chunks of data, purporting to apply Dr. Leffler's methodology to them, and then contending that the results undermined the validity of the methodology. Mr. Kaplan's approach is conceptually inferior to Dr. Leffler's aggregated approach, as Dr. Leffler explained at the class certification hearing. *See, e.g., id.* 253:11-254:4. More significantly, Mr. Kaplan also erred in his implementation. *See id.* 249:1-8, 252:1-254:4. When implemented correctly, Mr. Kaplan's approach generates results consistent with those of Dr. Leffler. Since Dr. Leffler's rebuttal analyses show just that, they are directly responsive to Mr. Kaplan's opinions.

A full list of the rebuttal analyses that Intel challenges is included as Exhibit 1 to plaintiffs' April 6 Letter Brief. It shows that each analysis responds directly to criticisms leveled by Mr. Kaplan. A closer examination of a few of the analyses demonstrates how the Special Master applied the wrong standard for rebuttal evidence to improperly exclude Dr. Leffler's appropriate rebuttal analyses.

### a.   Comparison of Prices, Discounts, and Sales in Intel and Dell Databases

Paragraph 24 of Mr. Kaplan's reply declaration challenged Dr. Leffler's reliance on Intel's own database to ascertain Intel's microprocessor prices by showing that for 20 sales (a miniscule fraction of Intel's total sales at issue), Dell recorded an acquisition cost that was substantially different from Intel's recorded sales price. To rebut Mr. Kaplan's conclusion, Dr. Leffler matched as many transactions in the Intel and Dell databases as the data would allow (about 18,000) to examine the extent to which such discrepancies existed. His analysis showed that for the relatively few transactions that could be matched, the overall difference in the prices between the two databases was less than one percent. That overall difference demonstrated that Mr. Kaplan's criticism was in fact a "cherry-picking" of a few highly substantial price/cost discrepancies and not an indication that the Intel database was unreliable. *See* Apr. 6, 2010 Letter Br., Ex. 1, at 1.

Intel points to Dr. Leffler's rejection of both the practicality and the usefulness of matching transactions in the two databases during his deposition, and suggests that to analyze such matching now constitutes an abandonment of his initial opinion. To the contrary, Dr. Leffler expressly adhered to his original opinion, and his additional analysis is quintessential rebuttal testimony. Dr. Leffler took a technique that Mr. Kaplan used to criticize his methodology, applied it in a more robust and systematic way than Mr. Kaplan did, and demonstrated that, when applied properly, Mr. Kaplan's technique failed to impugn Dr. Leffler's original opinion. This analysis did not constitute a change in Dr. Leffler's opinion; to the

contrary, the minor difference reinforces Dr. Leffler's original opinion that Intel's database can be reliably used to determine Intel's prices. As such, it is proper rebuttal evidence.[47]

The Special Master also recommended exclusion of this analysis at the class certification hearing because it was "untimely and prejudicial to Intel." R&R at 48. Yet, Intel suffered no surprise. After Class Plaintiffs were denied the opportunity to explain fully Dr. Leffler's rebuttal analyses in a written report, they voluntarily produced the results and backup materials for those analyses to Intel, and did so more than three weeks before the class certification hearing. *See* April 6 Letter Brief at 1. Intel replicated almost all of Dr. Leffler's analyses within approximately a week, and Class Plaintiffs worked diligently to respond quickly to Intel's questions once they learned Intel was having difficulty with a few of the analyses. *See* Letter from W. Drane to Special Master dated Mar. 30, 2010 ("Mar. 30 Letter Brief") at 2 n.2 (D.I. 1993). Moreover, as the Court noted when it denied Plaintiffs' request to submit the rebuttal analyses in writing before the class certification hearing, "what follows from [the briefing schedule] is, to the extent that Dr. Leffler offers appropriate rebuttal testimony, it may be the fact that the first time Intel gets to hear it is, if you will, at the hearing." Apr. 9, 2010 Hr'g Tr. 8:4-7; *see also* Ex. A to June 2 R&R). The Special Master cannot instruct Class Plaintiffs to wait until the class certification hearing to supply the rebuttal analyses, and then also find that providing the rebuttal analysis at the hearing was untimely and unfairly prejudicial.[48]

---

[47] Dr. Leffler's earlier testimony that such a matching cannot be systematically performed is supported, not undermined, by this analysis. Mr. Kaplan's reply report offered no wholesale matching of transactions in the Dell and Intel databases, and Dr. Leffler's rebuttal demonstrated that such a matching could only be performed on a transaction-by-transaction basis, and that even then 85% of the transactions could not be matched.

[48] The Special Master also incorrectly concluded that Dr. Leffler's introduction of this analysis "does not comport with Dr. Leffler's prior statements." R&R at 47-48. Dr. Leffler has not changed his view that "the [relevant] economic question" for determining anticompetitive impact is not specifically how OEMs accounted for a payment from Intel, but rather "did [OEMs] set [a] low price because of" the payment, and there is "no logical link" between lowering prices and the payment unless the payment "is affecting

**b.    Proper Application of Overcharge Regression Methodology by OEM and Brand**

In paragraph 36 of his reply declaration, Mr. Kaplan applied Dr. Leffler's overcharge regression model to data sets for individual Intel customers and individual Intel microprocessor brands and concluded that "separating the regression analysis by brand and by customer generates results inconsistent with [Dr. Leffler's] conclusion." Dr. Leffler's rebuttal directly confronts this criticism by properly applying the overcharge regression model to individual OEMs and brands. Mr. Kaplan's disaggregation analyses failed to consider idiosyncrasies in the narrowed data sets, idiosyncrasies that did not significantly distort the main results in Dr. Leffler's original analyses because they were not a significant part of the data in the aggregated analysis. Dr. Leffler's rebuttal analysis examined those idiosyncrasies, which required excluding particular microprocessors that were not subject to the increased competition from AMD during the benchmark period (the second half of 2006)[49] or where confounding factors negated the price effect of greater competition.[50] While the presence of these particular microprocessors was

---

their marginal cost of purchasing microprocessors." Dep. Annex Tab 32 (Davenport Response 152 (Leffler Dep.) 519:7-16). Dr. Leffler acknowledged that while adjusting price based on a payment that did not affect marginal cost would be economically irrational, he "can't preclude that possibility." *Id.* at 524:12-17. As Dr. Leffler's work in the case continued, he became aware that some OEMs accounted for a portion of Intel's payments as discounts. This accounting may have been done for internal management reasons simply to make favored computer sales appear more profitable and thus did not affect the OEM's computer prices. Nonetheless, Dr. Leffler, conservatively, analyzed these as true discounts. This is not "changed testimony," R&R at 48, but rather an appropriate response to learning of the OEM's unexpected behavior. Further, as Dr. Leffler concluded from his comparison of the Intel and Dell datasets, whatever limited instances of OEM discounting may have occurred resulted in a negligible change in the prices ultimately paid for Intel's microprocessors. This analysis confirms the reliability of the Intel sales data for use in Dr. Leffler's analyses. *See* note 27, above.

[49] For example, obsolete or "legacy" chips were sold in very small quantities, mostly as replacement chips. As replacement parts, they faced no real competition, and Intel priced them without regard to the price or quality of AMD's microprocessors.

[50] For example, in May 2006 after Dell announced it was introducing an AMD-based computer, Intel punished it by promptly eliminating much of its rebates, thereby depriving Dell of the advantages of additional AMD competition. *See* Apr. 6, 2010 Letter Br., Ex. 1, at 3; Class Cert. Tr. at 257:23-258:3.

insignificant for Dr. Leffler's earlier opinion—because their influence was minimized by the vast quantity of other data in his analysis and because Plaintiffs' class certification burden was only to show that Dr. Leffler's methodology was workable—Mr. Kaplan's failure to exclude them when analyzing individual customers and brands so skewed his results that it rendered them meaningless. *See* Apr. 6, 2010 Letter Br., Ex. 1, at 3.

      **c.**      **Analysis of Initial to End Price for Microprocessors Older Than Three Years**

In paragraphs 38 and 41 of Mr. Kaplan's reply declaration, he applied Dr. Leffler's overcharge regression analysis to Pentium III and Celeron microprocessors. Mr. Kaplan determined that prices for those processors increased in the second half of 2006, which he contended was inconsistent with Dr. Leffler's conclusion that where Intel faced increased competition in the second half of 2006, it lowered prices. In direct response, Dr. Leffler prepared an analysis showing that when microprocessors are sold for three or more years, the pricing at the end of the product's life—when more advanced chips are available and the chips are primarily being purchased as replacement parts—is related to the pricing at its launch. Because the Pentium III and Celeron microprocessors were near the end of their lifecycles in the second half of 2006, they were not directly competing with AMD and thus Intel did not lower their prices during this period. However, the conclusions from Dr. Leffler's overcharge model are still applicable to these products because increased competition from AMD throughout the class period in the but-for world would have reduced the microprocessors' launch prices and also, therefore, their end-of-life prices. *See* Apr. 6, 2010 Letter Br., Ex. 1, at 1.

      **d.**      **Dell 2006 Pass-Through Regressions Without Averaging Prices and Costs**

Paragraphs 59 and 63 of Mr. Kaplan's reply declaration criticized Dr. Leffler's averaging of price and cost information when performing the Dell 2006 pass-through regressions. Dr.

Leffler originally opined that such averaging was acceptable because there was little variation in cost for the same SKU. Mr. Kaplan disagreed about the extent of the variation and thus concluded averaging was not appropriate. Dr. Leffler rebutted this criticism by performing the same pass-through methodology with the Dell 2006 data but without averaging prices and costs. The pass-through calculated without averaging was not materially different from the original pass-through Dr. Leffler calculated (with averaging), directly contradicting Mr. Kaplan's contention that it was improper to average and that doing so would impact the result of the regression. *See* Apr. 6, 2010 Letter Br., Ex. 1, at 4.

As these examples show, Dr. Leffler's analyses directly respond to—and refute—Mr. Kaplan's criticisms, and in no way abandon any of Dr. Leffler's original opinions. As such, they are proper rebuttal evidence and the Special Master erred by excluding them.

## CONCLUSION

For the foregoing reasons, the Special Master's recommendations should be rejected, and this Court should enter an order certifying the proposed classes.

Dated: October 4, 2010                      PRICKETT, JONES & ELLIOTT, P.A.

                                            */s/ J. Clayton Athey*
                                            James L. Holzman (#663)
                                            J. Clayton Athey (#4378)
                                            Laina M. Herbert (#4717)
                                            Kevin H. Davenport (#5327)
                                            1310 King Street
                                            P.O. Box 1328
                                            Wilmington, DE 19899
                                            (302) 888-6500
                                            jlholzman@prickett.com
                                            jcathey@prickett.com
                                            lmherbet@prickett.com
                                            khdavenport@prickett.com
                                            *Interim Co-Lead Counsel for the Class Plaintiffs*
                                            *and Attorneys for Phil Paul, on behalf of himself*
                                            *and all others similarly situated*

Of Counsel:

Daniel A. Small
David Young
COHEN, MILSTEIN, SELLERS
    & TOLL, P.L.L.C.
1100 New York Avenue, NW
Suite 500 West
Washington, DC 20005

Seth R. Gassman
COHEN, MILSTEIN, SELLERS
    & TOLL, P.L.L.C
88 Pine Street
14th Floor
New York, NY 10005

Steve W. Berman
Anthony D. Shapiro
Erin K. Flory
Steve W. Fimmel
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Ave., Suite 3300
Seattle, WA 98101

Guido Saveri
R. Alexander Saveri
Lisa Saveri
Geoff Rushing
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111

Craig C. Corbitt
Judith A. Zahid
Demetrius X. Lambrinos
Qianwei Fu
ZELLE, HOFMANN, VOELBEL
    & MASON LLP
44 Montgomery St., Suite 3400
San Francisco, CA 94104

*Interim Co-Lead Counsel for the Class Plaintiffs*